# EXHIBIT 34 part 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

**EDUARDO AND CARMEN AMORIN,** *et al.*, **individually, and on behalf of all others similarly situated,**

    **Plaintiffs,**

        **v.**

**TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD., et al.,**

    **Plaintiffs.**

**Case No. 1:11-CV-22408-MGC**

## PRIORITY CLAIMANTS' NOTICE OF FILING EXPERT DEPOSITION TRANSCRIPTS IN RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE, AND COUNTERSTATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON NON-FORMULA DAMAGES

Priority Claimants, by and through undersigned counsel, hereby file the following expert depositions transcripts in support of their Response to Defendants' Motion and Memorandum for Summary Judgment (Dkt. No. 245) and Defendants' Statement of Material Facts Not In Dispute (Dkt. No. 250). The exhibits below will be cited in Priority Claimants' Reponses to docket numbers 245 and 250.

| Exhibit | Expert Deposition Transcript |
|---------|------------------------------|
| G1 | Deposition of Michael P. Elkin, Volume I & II |
| G2 | Deposition Transcript of Anthony M. Graziano, Volume I & II |

Dated: May 13, 2019.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400

Facsimile:  (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing motion was served by via CM/ECF on all parties authorized to receive service via CM/ECF, this 13th day of May 2019.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

# EXHIBIT G1

Case 2:09-md-02047-EEF-MBN Document 22363-54 Filed 11/19/19 Page 6 of 221
Case 1:11-cv-22408-MGC Document 279-1 Entered on FLSD Docket 05/15/2019 Page 2 of 388

CERTIFIED COPY

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
        -------------------------------:
 3     IN RE:  CHINESE-MANUFACTURED   : MDL NO. 2047
       DRYWALL PRODUCTS LIABILITY      :
 4     LITIGATION                      : SECTION:  L
                                       :
 5     THIS DOCUMENT APPLIES TO ALL    : JUDGE FALLON
       CASES                           :
 6                                     : MAG. JUDGE WILKINSON
                                       :
 7      -------------------------------:

 8                         - - -

 9
                   Monday, March 11, 2019
10
                         - - -
11

12              ** CONFIDENTIAL **

13      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

14                       - - -

15          Videotaped deposition of MICHAEL P. ELKIN,
        CPA, CFF, ABV, CFE, Volume 1, held at Colson
16      Hicks Eidson, 255 Alhambra Circle, Penthouse,
        Coral Gables, Florida, commencing at 10:05 a.m.,
17      on the above date, before Susan D. Wasilewski,
        Registered Professional Reporter, Certified
18      Realtime Reporter, Certified Realtime Captioner

19                       - - -

20              GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
21                 deps@golkow.com

22

23

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
                                                              Page 2
 1    APPEARANCES:

 2        BREIT DRESCHER IMPREVENTO
          BY:  JEFFREY BREIT, ESQUIRE
 3        600 22nd Street, Suite 402
          Virginia Beach, Virginia 23451
 4        Phone:  (757) 670-3888
          jeffrey@breitcantor.com
 5        Representing Plaintiffs

 6

 7        COLSON HICKS EIDSON
          BY:  NATALIE M. RICO, ESQUIRE
 8        255 Alhambra Circle, Penthouse
          Coral Gables, Florida 33134
 9        Phone:  (305) 476-7400
          natalie@colson.com
10        Representing Plaintiffs

11

12        MRACHEK FITZGERALD ROSE KONOPKA THOMAS & WEISS, P.A.
          BY:  GREGORY S. WEISS, ESQUIRE
13        505 South Flagler Drive, Suite 600
          West Palm Beach, Florida 33401
14        Phone:  (561) 655-2250
          gweiss@mrachek-law.com
15        Representing Plaintiffs

16

17        ABALLI MILNE KALIL
          BY:  CRAIG P. KALIL, ESQUIRE
18            MICHEL AYUB, ESQUIRE
          1 Southeast 3rd Avenue, Suite 2250
19        Miami, Florida 33131
          Phone:  (305) 373-6600
20        ckalil@aballi.com
          mayub@aballi.com
21        Representing Defendant Beijing New Building
          Materials PLC
22

23

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 3

```
 1    APPEARANCES:

 2         ORRICK, HERRINGTON & SUTCLIFFE, LLP
           BY:  DIANA SZEGO FASSBENDER, ESQUIRE
 3         1152 15th Street, NW
           Washington, D.C. 20005-1706
 4         Phone:  (202) 339-8533
           dszego@orrick.com
 5         Representing Defendant Beijing New Building
           Materials PLC
 6

 7
           ALSTON & BIRD LLP
 8         BY:  SARAH O'DONOHUE, ESQUIRE
           1201 West Peachtree Street
 9         Atlanta, Georgia 30309-3424
           Phone:  (404) 881-7000
10         sarah.odonohue@alston.com
           Representing Defendant Taishan Gypsum Company
11

12    ALSO PRESENT:

13

14         AURELIO ROMAN, Videographer

15         MARCIE D. BOUR, Yip Associates

16         ELAN STERNBERG, Kaufman Rossin

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 4

```
 1                        - - -

 2                      I N D E X

 3                      Volume 1

 4                 Monday, March 11, 2019

 5                        - - -

 6

     Testimony of:  MICHAEL P. ELKIN, CPA, CFF, ABV, CFE  Page
 7
          DIRECT EXAMINATION BY MR. KALIL................   7
 8

 9

                       E X H I B I T S
10
                  (Attached to transcript)
11
```

| MICHAEL ELKIN DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Videotaped Deposition of Michael Elkin, CPA, CFF, ABV, CFE | 10 |
| Exhibit 2 | Curriculum Vitae Michael P. Elkin, CPA/CFF/ABV, CFE | 32 |
| Exhibit 3 | Record of Expert Testimony for Michael P. Elkin | 40 |
| Exhibit 4 | Attachment A - Documents and Other Information Considered - All Claimants | 48 |
| Exhibit 5 | General Binder | 13 |
| Exhibit 6 | Lost Equity Calculations for Priority Claimants | 30 |
| Exhibit 7 | Binder - Elkin Expert Report - Chinese Drywall Matter February 19, 2019 | 62 |
| Exhibit 8 | Exhibit 4 (Updated) Calculations of Damages for Priority Claimants Steven & Cathy Etter | 65 |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 5

1                    E X H I B I T S

2                 (Attached to transcript)

3    MICHAEL ELKIN DEPOSITION EXHIBITS                    PAGE

4    Exhibit 9     Binder - CPK Email, Documents and      158
                   Other Information Considered -
5                  Updated(12), Report Exhibits -
                   Updated(12), Support Master
6                  Database - Updated(12)

7    Exhibit 10    Letter and September 18, 2012          175
                   Settlement Agreement and Release
8                  between Steven and Cathy Etter and
                   USAA
9
     Exhibit 11    November 26, 2004 Agreement between    180
10                 Owner and Contractor

11   Exhibit 12    Special Warranty Deed                  181

12   Exhibit 13    December 8, 2005 Mortgage - Etter      182

13   Exhibit 14    June 5, 2006 Modification and          184
                   Extension of Mortgage
14
     Exhibit 15    November 22, 2006 Mortgage             186
15                 Modification and Consolidation
                   Agreement
16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1                        - - -

2          THE VIDEOGRAPHER:  Good morning.  We're now

3     on the video record.  My name is Aurelio Roman.

4     I'm the videographer for Golkow Litigation

5     Services.  Today's date is Monday, the 11th day

6     of March, 2019.  The time is 5 minutes after

7     10:00 a.m.

8          The video deposition is being held at Colson

9     Hicks & Eidson, 255 Alhambra Circle, Penthouse

10    Suite, Coral Gables, Florida 33134, in the matter

11    of Chinese Drywall, for the courts filed in the

12    US District Court, Eastern District of Louisiana.

13         The deponent is Michael Elkin.

14         Will all counsels please state your

15    appearance for the record.

16         MR. KALIL:  Craig Kalil on behalf of Beijing

17    New Building Materials, Public Limited Company.

18    With me is Michel Ayub from my office.  Also

19    present is Diana Fassbender of Orrick, Herrington

20    & Sutcliffe, and also present is Marcie Bour.

21         MR. BREIT:  Jeffrey Breit representing the

22    Plaintiffs in the Chinese drywall litigation,

23    together with a list of -- we'll let them -- oh,

24    am I the only one with a mic?

25         MR. WEISS:  There's mics all the way down.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1          MR. BREIT:  All right.

 2          MR. WEISS:  Yeah.

 3          MS. RICO:  Natalie Rico, also representing

 4     the Plaintiffs.

 5          MR. WEISS:  Greg Weiss on behalf of the

 6     Plaintiffs.

 7          MR. STERNBERG:  Elan Sternberg, assistant to

 8     Mike Elkin.

 9          MS. O'DONOHUE:  Sarah O'Donohue from Alston

10     & Bird on behalf of Taishan Gypsum Company.

11          THE VIDEOGRAPHER:  Madam Court Reporter,

12     swear in the witness.

13          THE COURT REPORTER:  Would you raise your

14     right hand?

15          Do you solemnly swear or affirm the

16     testimony you're about to give will be the truth,

17     the whole truth, and nothing but the truth?

18          THE WITNESS:  Yes, I do.

19          THE COURT REPORTER:  Thank you.

20          MICHAEL P. ELKIN, CPA, CFF, ABV, CFE, called as

21     a witness by Defendant Beijing New Building

22     Materials, having been duly sworn, testified as

23     follows:

24                    DIRECT EXAMINATION

25     BY MR. KALIL:
```

Case 2:09-md-02047-EEF-MBN Document 22363-54 Filed 11/18/19 Page 13 of 221
Case 1:11-cv-22408-MGC Document 279-1 Entered on FLSD Docket 05/13/2013 Page 9 of
388

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 8

1    Q.   Will you state your full name, please?

2    A.   Michael Paul Elkin.

3    Q.   Mr. Elkin, you've been deposed before?

4    A.   Yes, I have.

5    Q.   On how many occasions?

6    A.   Roughly, 100.

7    Q.   So you are very familiar with the process?

8    A.   I believe so.

9    Q.   I'm going the ask you a number of questions

10   today.  If any of them are not clear, if you will

11   let me know, I will try to make them clear.

12   A.   Certainly.

13   Q.   And if you don't understand where I am going

14   with something, please tell me and I will try to

15   break it up into anything we need to.

16   A.   Thank you.  I appreciate that.

17   Q.   If you need a break at any time, will you

18   let me know?

19   A.   Of course.

20   Q.   Have you ever been deposed before in any

21   case that involves Chinese drywall or defective

22   drywall?

23   A.   No.

24   Q.   Have you ever testified in any case that

25   involves allegedly defective drywall or Chinese

Page 9

1   drywall?

2      A.   No.

3      Q.   Have you ever rendered any expert reports or

4   opinions involving Chinese drywall or defective

5   drywall?

6      A.   No.

7      Q.   What did you do to prepare for the

8   deposition?

9      A.   You mean specific to the deposition or

10  leading up from the beginning of the engagement?

11     Q.   Lets focus specific to the deposition?

12     A.   I reviewed my files.  I did a little bit of

13  extra jumping around into some documents so that my

14  memory would be a little fresher on some of the

15  issues and some of the plaintiffs.

16     Q.   Any particular plaintiffs?

17     A.   No.  I think I went through them all, at

18  least at some level.  Some of them are a little more

19  complicated than others, so I might have spent a

20  little bit more time on one or the other but I

21  believe I touched on all of them.

22     Q.   Did you speak with anybody other than the

23  plaintiff's attorneys in preparing for today?

24     A.   Again, with regard to preparing for the

25  deposition --

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1     Q.   -- yes.

 2     A.   No, I did not.

 3     Q.   I'm going to show you Exhibit 1 --

 4     A.   Excuse me, other than other people in my

 5   office.

 6     Q.   That's a very good point.  Who in your

 7   office have you talked to to prepare for today's

 8   deposition?

 9     A.   Probably Elan Sternberg.

10     Q.   Who is Elan Sternberg?

11     A.   Elan is a senior in my Forensic Advisory &

12   Valuation Services Group.

13     Q.   Anyone else?

14     A.   I don't believe so, specific to preparing

15   for this.

16     Q.   Okay.  All right.

17          (Elkin Exhibit 1 was marked for

18   identification.)

19   BY MR. KALIL:

20     Q.   I'm going to show you what we've marked as

21   Exhibit 1 to your deposition and it's a notice of

22   taking deposition.  I'll ask if you've seen that

23   before?

24     A.   Yes, I have.

25     Q.   Okay.  And did you review the request -- the
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 11

1    requested documents in that notice on page 6?

2       A.    Yes, I did.

3       Q.    Okay.  And is there anything that you

4    brought with you today in response to that that has

5    not previously been produced?

6       A.    Yes.

7       Q.    What specifically have you brought today?

8       A.    For the most part, it's stuff that has been

9    produced but might not have had some of my notations

10   on it.  So I have a binder here that's got --

11   actually, I think this sticky one wasn't produced,

12   it's got a sticky, and it's got some of the

13   documents that were identified in my documents

14   considered, but I noted that they had some

15   highlighting and some tabs, which I considered for

16   this purpose to be sort of my notes, so I included

17   that.

18          I also brought with me the Exhibit .2, so

19   whatever Plaintiff .2, for each plaintiff that had a

20   lost equity segment, because I have a yellow sticky

21   within my notepad that had some notes on it, and it

22   also had a little bit of highlighting -- I mean

23   referencing on it, so I thought that you would want

24   that as well.

25      Q.    Okay.  I would like to take a look at those

Page 12

1    probably on a break rather than now, if we can.

2        A.    Okay.  Certainly.

3        Q.    If you can put those aside.   Anything else?

4             MR. KALIL:  Are those copies?

5             MS. RICO:  Uh-huh.

6             THE WITNESS:  And I'll keep one of these,

7    but these are copies of the other.

8    BY MR. KALIL:

9        Q.    I'm sorry.  These are?

10       A.    These are copies of the exhibits that I told

11   you that I also brought.

12            MR. BREIT:  We come prepared.

13            MR. KALIL:  You do.

14            MR. BREIT:  To save life and save time.

15            MR. KALIL:  Since we've got these in nice

16   little binders, why don't we mark them so we know

17   what they are and then we can go through them at

18   some point after I have had a chance to view them

19   on a break.

20            MR. BREIT:  Yeah, I figured we've got time

21   to do that but someone may want to look at it

22   while we're waiting.

23            MR. KALIL:  All right.

24   BY MR. KALIL:

25       Q.    Mr. Elkin, I'm going to mark what's labeled

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1    the General Binder as Exhibit Number 5.

 2        A.   I'm sorry, what number, 5?

 3        Q.   5.

 4             (Elkin Exhibit 5 was marked for

 5    identification.)

 6    BY MR. KALIL:

 7        Q.   And can you tell me what's in that document,

 8    just generally?

 9        A.   It's a variety of information that I

10    received either from counsel or that I read online

11    or other sources to get with regards to a variety of

12    topics in there.  I think there is prejudgment

13    interest rates, and other information from online.

14    There is some information from the IRS.  I believe

15    that Judge Cooke's order is in there.  I believe

16    that some other relevant orders are in there as

17    well, or findings of fact.

18        Q.   Let me just take you through it generically

19    unless you have a list.

20        A.   Oh, wait.  I do have a copy -- I don't have

21    a copy.

22        Q.   Sure, under Tab Number 1, I see an order

23    from Judge Cooke, Docket Entry Number 112 of

24    November 16, 2018.

25        A.   That's correct.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 14

1    Q.   Tab Number 2 is an MDL Order Docket Entry
2  2741 from April 21st, 2017?
3    A.   That's correct.
4    Q.   What is Tab Number 3?
5    A.   Tab 3 is Findings of Fact and Conclusion of
6  Law, the document that relates to the Germano
7  matter.
8    Q.   Okay.  Where did you get that?
9    A.   I believe I downloaded that.
10   Q.   Okay.  When did you download that?
11   A.   Probably in the first or second week of
12 February, I would guess.
13   Q.   What is under Tab Number 4?
14   A.   Tab 4 was a table that was provided to me.
15 I had seen a table that looked a lot like this in
16 the discovery at some point and I asked about it and
17 it was sent to me.  I think it was given to me via
18 Dropbox by counsel.
19   Q.   Do you remember who?
20   A.   I believe it might have been -- I believe it
21 might have been Pete --
22   Q.   Pete Albanis?
23   A.   Thank you, of course, Pete Albanis, or his
24 office.
25   Q.   Okay.  All right.  Is that something you

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 15

1   relied upon in forming your opinions?

2       A.   I don't know if I'd say I relied upon it.

3   It made it -- it just clarified some things and put

4   it in a tabular form.  I also had looked at the

5   Germano Findings of Fact and Conclusions of Law in

6   conjunction with this, and essentially with them it

7   gave me a better understanding of the types of

8   things that were included in various categories.

9       Q.   And what categories were you looking for

10  there?

11      A.   Well, I was trying to understand what was

12  considered to be remediation and perhaps the timing

13  of remediation versus personal property damage, and,

14  you know, I'm sure it educated me to other factors

15  in it, but I think that was the primary reason I was

16  looking at it.

17      Q.   Was that for purposes of segregating items

18  into categories of remediation or personal property

19  damage or otherwise?

20      A.   Probably primarily that and then also, just,

21  having a better understanding of all of this.

22      Q.   Did you set up any written protocols in your

23  office for segregating information into different

24  categories?

25      A.   I don't recall any written protocols.  I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    recall having discussions with my staff to

2    understand that.

3            MR. BREIT:  Hold on one second.  Technical

4    problem.

5            MR. KALIL:  Am I speaking too softly?

6            THE COURT REPORTER:  No-- a little bit.

7    That will help.

8            MR. BREIT:  It was all you.  I heard her

9    going.

10           MR. KALIL:  It's always me.  Absolutely.

11           MR. BREIT:  Ready?

12           THE COURT REPORTER:  Yeah.

13   BY MR. KALIL:

14       Q.    Who in your -- while we're on the staff for

15   a second, who on your staff has assisted you in this

16   engagement?

17       A.    Primarily Elan Sternberg, who I mentioned

18   before, Michelle Reinhold, goes by Shelley, Austin

19   Paris, and then there may have been a variety of

20   other people that would have chipped in on a project

21   here or a project there.  I remember Rita Trabanco

22   handled one particular data entry project, Max

23   Halasz.

24       Q.    Can you spell that?

25       A.    H-a-l-a-s-z, and I'm sure if I went through

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 17

1    them, I'd find one or two other people, but I think

2    that's probably 90 percent or more of the work, and,

3    of course, myself.

4        Q.    Okay.  You told us a minute ago who -- well,

5    at least you started saying who these people are.

6    Can you tell me what each of these people was doing

7    involved with this engagement.  Let's start with

8    Elan Sternberg, if I'm saying the name right.

9        A.    Elan had a role pretty much in every aspect

10   of the matter from the standpoint of being with me

11   in most of the planning for it.  Elan was heavily

12   involved in the beginning and evaluating the

13   documentation that might be available to us as we

14   read through things.  He read early on some of the

15   depositions.  He was really leading the other group

16   that I discussed.  Sometimes they were directly with

17   me, often they were directly with him and often all

18   of them were together with me.

19         So he had roles in reviewing the information

20   organizing the information, directing the other

21   seniors or staff in their roles, and helping me to

22   bring all of it up to a final product.

23       Q.    And what is Elan's title?  I'm sorry if you

24   told me before, within the firm?

25       A.    I believe he's a senior, senior two

Case 2:09-md-02047-EEF-MBN Document 22363-54 Filed 11/19/19 Page 19 of
388
Case 2:12-cv-22408-WGC Document 279-1 Entered on FLSD Docket 09/15/2013 Page 19 of
221

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 18

```
 1   probably.

 2       Q.   How does that rank within the firm?  Can you

 3   give me the titles within your organization?

 4       A.   We have accounting clerks, we have

 5   administrative people, then we have accounting

 6   clerks, we have staff one, staff two, senior one,

 7   senior two, supervisor, manager, senior manager,

 8   associate principal, director, and principals, which

 9   are the equivalent of partners.

10       Q.   Okay.  And what -- your title is director?

11       A.   I'm a principal.

12       Q.   Principal.  Excuse me.  So Mr. Sternberg is

13   he the most senior person below you in this

14   engagement?

15       A.   In this particular engagement, yes.

16       Q.   Okay.  And then taking them in order from

17   senior to less senior, who is next?

18       A.   I believe Shelley, Michelle Reinhold is also

19   a senior; Austin Paris, I don't recall if he's a

20   staff two or a senior, maybe a staff two.

21            Rita Trabanco is a accounting clerk.

22            And Max Halasz is a senior.

23       Q.   And while we're on the staff, let's talk

24   billing rates for a second.  What are the billing

25   rates associated with these people, as best you
```

Case 2:09-md-02047-EEF-MBN Document 22363-54 Filed 11/19/19 Page 20 of
388
Case 1:11-cv-22408-MGC Document 279-1 Entered on FLSD Docket 09/18/2013 Page 20 of
221

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    recall?  What is your billing rate on this

2    assignment?

3        A.    My billing rate is $575 per hour.  I don't

4    recall the billing rates of the other people, so I

5    would be guessing.

6        Q.    I don't want you to guess.  Are they all

7    within the rates set forth in your report, the range

8    that you've given us in your report?

9        A.    Yes.

10       Q.    Would they be proportional from most senior

11   to less senior, do the numbers follow?

12       A.    I believe so.

13       Q.    Good enough.  Now, what tasks did Michelle

14   Reinhold have in this engagement?

15       A.    Michelle had tasks, she would be

16   specifically assigned at one point to one or more of

17   the plaintiffs.  She and Austin and Elan each sort

18   of broke up the plaintiffs among that group so that

19   they would have similar roles in them.

20            I believe at the beginning, before I --

21   before I broke it up, Michelle and/or Austin were

22   gathering different types of information, so I think

23   right at the beginning Michelle was gathering more

24   of the -- I might have this backwards, but I think

25   she was gathering more of the information with

Page 20

1   regard to the backup of damage claims, expenses,

2   receipts, and that type of stuff.

3           While I believe Austin was focused on

4   helping to gather information about the real estate,

5   the property itself.  Information was coming from a

6   number of different sources and Elan was involved

7   with both of those aspects.

8           And then once they were broken out into

9   different plaintiffs, they all -- each got involved

10  in both of those issues with regard to their

11  respective plaintiffs.  So it was lot of document

12  gathering at the beginning and organizing and then

13  in the analysis stage, it was broken up between, you

14  know, different plaintiffs.  I mean, I know that I

15  worked on every plaintiff, I know that Elan worked

16  on every plaintiff.  I don't think that Michelle or

17  Austin worked on every plaintiff.

18      Q.   When you say you worked on every plaintiff,

19  did you gather information on any of these

20  plaintiffs?

21      A.   I was involved in the gathering process.

22      Q.   And where was the information being gathered

23  from?

24      A.   We had a process where, initially, we had --

25  we were getting information as we requested it being

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 21

1    put on a Dropbox and we'd get a notice, there was

2    information for you on Dropbox and we would grab it

3    and pull it into our files.

4         At some point the information wasn't coming

5    in quite as fast as we needed it to and we were made

6    aware that there was a portal, BrownGreer I believe

7    is who administers that portal, and so we were given

8    access to that portal and when possible we pulled

9    information from there.

10        Some information was e-mailed to us from

11   time to time.  Probably more at the beginning than

12   towards the end, whether it was SPPFs, maybe some

13   interrogatories and those types of things at the

14   beginning, but the majority of the information we

15   got came from the Dropbox or from the portal itself

16   directly.

17       Q.   And who was putting information in the

18   Dropbox, as you understand it?

19       A.   I believe the attorneys and/or their

20   paralegals.

21       Q.   Okay.  Were you tracking, in any way, the

22   sources of this information, in terms of who

23   provided it to you?

24       A.   We were tracking it in terms of when we

25   received it.  We were tracking it in terms of how it

Page 22

1   came in, whether through an e-mail or Dropbox.  I

2   don't believe we were tracking who had loaded it

3   into the Dropbox and I don't know that we would have

4   any way of knowing who had loaded it into portal.

5      **Q.   And when you say you were tracking it in**

6   **terms of when you received it, where is that**

7   **reflected in any of your work papers or otherwise?**

8      A.   It should be in the documents that you

9   received.  I don't recall if it included the

10  tracking document, but the main way that that was

11  tracked is there is a folder called raw discovery,

12  and inside that folder there are a bunch of other

13  folders so that every day that we downloaded

14  something, if it was from the portal on that day,

15  then it would say that day's portal and a date.

16       There was -- and I don't believe -- in fact,

17  I'm certain that I had not provided to you the raw

18  discovery.

19     **Q.   I was just going to say I don't believe I've**

20  **seen it.**

21     A.   Because you've seen all of those same

22  documents in the organized fashion that we gave them

23  to you through the HTML in the basket of documents.

24     **Q.   Is that something that is electronic, the**

25  **raw discovery?**

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 23

1    A.   Yes.

2    Q.   I would like a copy, if you could provide

3    that to us.

4         Are there any other documents or database,

5    document sources or databases that have not been

6    provided to us?

7    A.   I don't believe so and it's possible that

8    you were provided the tracking that I was talking

9    about.

10   Q.   What type of a document would it be?

11   A.   Excel.

12   Q.   I don't believe I've seen it, Mr. Elkin, I

13   stand to be corrected but we can check on a break.

14   We were going through -- I'm sorry, we got a little

15   sideways.  We were going through Exhibit 5.  We

16   haven't quite finished.

17        We talked about most of the people who

18   assisted you.  Did we leave anything out in terms of

19   Rita -- I'm sorry, Trabanco?

20   A.   Uh-huh.

21   Q.   You said Rita Trabanco had one data entry

22   project, what was that data entry project?

23   A.   She had a data entry project which, I

24   believe, related to Claimant 17.

25   Q.   Okay.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 24

1      A.    She, under my direction, keypunched or

2   entered the data from a number of documents from the

3   company that did their design and update work.  I'm

4   trying to remember the name of the company.  It's

5   not coming to me.

6      Q.    This is Michael and Robyn --

7      A.    That's correct.

8      Q.    Michael and Robyn Rosen?

9      A.    That's correct.  And she helped to put the

10  data in from those various documents that were

11  probably maybe about 100 or less pages, and then

12  each of those pages had multiple -- some of them had

13  one item and some of them had multiple items and I

14  had instructed her on the information that I wanted

15  her to take from those documents and put onto an

16  Excel schedule.  The primary focus was breaking them

17  down between capital improvements and personal

18  property.

19     Q.    Okay.

20     A.    I explained to her my criteria for doing

21  that.  She did a very good job of doing that.  I

22  went back and reviewed it and tweaked a couple of

23  things on it.  She also put in some numbers from the

24  proposals and the invoices that -- so that she could

25  calculate the tax, because the items were on the

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1    list pre sales tax, but I wanted to include the

 2    sales tax into the numbers.

 3              So I instructed her on how to do that and

 4    then I thoroughly reviewed that information.

 5        Q.    Were these instructions in writing?

 6        A.    No.

 7        Q.    Were they electronic?

 8        A.    No.

 9        Q.    Just verbal?

10        A.    She came into my office, I brought it onto a

11    screen and I showed her exactly what I wanted, I

12    believe Elan was with me at the time and instructed

13    her and if she had any questions, told her to go to

14    Elan or to me.

15        Q.    And Max, I'm going to get --

16        A.    Halasz.

17        Q.    Halasz, what did Max do?

18        A.    I don't recall specifically.  He may have

19    done some work on one of the plaintiffs or he may

20    have just been asked to review some things.  He

21    wasn't a primary player on the team but he had some

22    availability and we had some work that we needed

23    somebody to help us with it.

24        Q.    Okay.  When were you first consulted on this

25    matter?
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 26

```
 1      A.   By consulted, you mean the first time I
 2  heard about it.
 3      Q.   First you heard about it?
 4      A.   It would have been sometime in the middle or
 5  end of December 2018.
 6      Q.   And how did you hear about it?
 7      A.   I believe I received a phone call.
 8      Q.   And who was that from?
 9      A.   I believe it was from Natalie Rico.
10  Actually, I'm not sure if it was Natalie or Patrick
11  Montoya.  It was somebody from the Colson Hicks
12  office and I don't recall who it was, the initial
13  call, might have even been a phone message or an
14  e-mail.
15      Q.   Did you make any notes from that call?
16      A.   I made notes from the first call in which I
17  actually had a conversation with Natalie and that's
18  why I was thinking of that one.  I don't remember if
19  prior to that I had a call or not.  If I did, I
20  don't have notes from it.
21      Q.   Did you learn anything in that call that
22  helped you in coming up with your report?
23      A.   I don't think so. I mean, I think I would
24  have learned a couple of dates that things were
25  happening and I would have been given names so that
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 27

1    I could run a conflict check and, I think, we

2    probably wouldn't have talked about much because I

3    hadn't run a conflict check.

4        Q.   Let me shift back for a second, Mr. Elkin,

5    just to Exhibit 5.  I apologize for going back and

6    forth.

7        A.   Sure.

8        Q.   What is under Tab Number 6?

9        A.   Tab Number 6 is a schedule that was provided

10   to me, I believe in Excel via Dropbox.  It was

11   identification by counsel of which claimants they

12   were alleging had partial or no remediation, versus

13   those claimants that they were claiming had complete

14   remediation.

15       Q.   And were you asked to make any determination

16   as to whether anyone had had -- had actually had

17   partial or full remediation?

18       A.   No, I was not.

19       Q.   And you didn't do anything in that effect in

20   the course of your engagement?

21       A.   That's correct.

22       Q.   Did it matter for purposes of your

23   engagement, whether somebody had had partial

24   remediation, full remediation or no remediation?

25       A.   I don't think so.  I mean I calculated the

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 28

1    amounts based on the documentation and things that I

2    had, so I don't recall it having a role.

3        Q.    Okay.   What is under Tab 7 of Exhibit 5?

4        A.    Tab 7 is a download from the Florida --

5    MyFloridaCFO.com, which is the State's website and

6    the information that they provide with regard to

7    judgment interest and prejudgment interest.  It's

8    got two different sections in it.  It's got the most

9    current rates in the first section and it's got the

10   historical judgment interest rates in the second

11   section.  They are from slightly different parts of

12   the website.

13       Q.    Is that the source for the interest rates

14   applied in your calculation of prejudgment interest?

15       A.    Yes.

16       Q.    What is Tab Number 8, please, Mr. Elkin?

17       A.    Tab Number 8 is a variety of information

18   relating to casualty loss deductions and the

19   recovery and taxes on the amounts received after, if

20   somebody does take a casualty loss deduction.  It's

21   from a variety of IRS revenue procedures, rulings,

22   bulletins, publications, and I also, I don't know

23   why, but I stuck a tax form in there for the

24   casualty loss.

25       Q.    Do you have an understanding, sitting here

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 29

1    today, as to whether there were tax relief provided

2    to the Priority Claimants in connection with

3    defective drywall or Chinese drywall?

4        A.    I understand that some of the claimants may

5    have received -- taken a deduction for casualty loss

6    and, therefore, gotten a deduction which would have

7    given them a reduction of tax in the year in which

8    they had remediation expenses, also understanding,

9    of course, that anything that they received to

10   recover on that will then be taxable too.

11       Q.    But you didn't work up any spreadsheets in

12   your analysis that describes these Priority

13   Claimants?

14       A.    No.

15       Q.    Why not?

16       A.    I don't believe it's relevant.

17       Q.    You didn't calculate anywhere in your

18   reports which of the Priority Claimants received tax

19   relief?

20       A.    No, I did not.

21       Q.    Did you calculate in your report which of

22   the Priority Claimants might have paid any money as

23   a result of receiving payments?

24       A.    No, I did not.

25       Q.    Okay.  What is under Tab Number 9?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 30

1    A.    I think this is -- at the beginning, when we

2  got access to the docket -- excuse me, the portal.

3    Q.    **This is the BrownGreer?**

4    A.    Yeah, the BrownGreer.  I think Elan might

5  have printed this up to show it to me, or maybe I

6  printed it up at the time, I don't recall, but this

7  is just an example.  I guess this is for claimant

8  Foster, and it's just an example.  I don't know, did

9  the word example come out on your copy?

10   Q.    **It does appear to be written in yellow on**

11  **the front page.**

12   A.    It does, right?  Okay.  Yeah.

13   Q.    **Did you consider this page in any way in**

14  **preparing your report?**

15   A.    Not this page itself.

16   Q.    **Information of this nature?**

17   A.    Information of this nature from this portal.

18  I'm frankly not sure exactly why I have this in here

19  but I do.

20   Q.    **Okay.  All right.**

21        **Mr. Elkin, just so we can get these**

22  **documents identified, I'm going to mark as**

23  **Exhibit 6, one of the additional documents you**

24  **provided to me.**

25        (Elkin Exhibit 6 was marked for

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 31

1    identification.)

2    BY MR. KALIL:

3         Q.    I'm not going to go through that in detail

4    now, I'm going to look at it on a break and ask you

5    a question, but if you could just tell me generally

6    what that is.

7         A.    This is a printout of each of the exhibits

8    for claimants that have a total lost equity

9    calculation.   In my binder that I brought with me

10   today, in the course of my review I was making notes

11   on a yellow sticky, and I was also making in some

12   cases either notations or references to the

13   documents to make them easier to find for me, and

14   recognizing that I was in -- putting notes on some

15   things that were in this binder, that was really

16   just primarily my report, I printed them up.   I

17   scanned them and printed them up so that you would

18   have copies of these notes rather than having to dig

19   through my binder for them.

20        Q.    You used the term total lost equity

21   calculation.   What do you mean by total lost equity?

22        A.    It's lost equity and it's just from a couple

23   of different components, so the word total is

24   getting on it, but lost equity, itself, is a term I

25   described in my report.   Would you mind if I go to

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    my report to see --

2        Q.    I don't mind if you go to your report but I

3    just want to know if that was specific to -- was

4    there any difference between the lost equity

5    calculations you did for any of the claimants and

6    the ones that are here, or is this every claimant

7    where you did a lost equity calculation?

8        A.    I apologize, I don't --

9        Q.    I was trying to understand if you were

10   referring to the word "total lost equity" as

11   something different.   Your title of this, on Exhibit

12   1, on the first page says:   1.2 lost equity Janet

13   Avery.

14           I didn't know if the word "total" meant

15   something segregated some of these from others.

16   That was all I was trying to get at.

17       A.    It does not mean anything separate.

18       Q.    That's all I was trying to --

19           Let me see if there is anything else.

20       A.    Here is your exhibit back.

21       Q.    Thank you.  We'll go back to where I wanted

22   to start.

23           (Elkin Exhibit 2 was marked for

24   identification.)

25   BY MR. KALIL:

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 33

1    Q.    Mr. Elkin, I'm going to give you a copy of

2    what's been marked as Exhibit 2 and ask if you

3    recognize that.

4    A.    I do.

5    Q.    What is that, sir?

6    A.    This is my curriculum vitae.

7    Q.    Is that current as of today?

8    A.    It is.  I know that in the last couple of

9    days they've -- the marketing department is trying

10   to change the format of it.  They don't like the way

11   it looks but I believe all the same information is

12   there.

13   Q.    All right.  Is anything new that's not on

14   here?

15   A.    No.

16   Q.    All right.  You're a certified public

17   accountant, correct?

18   A.    That's correct.

19   Q.    Okay.  Are you expressing any opinions in

20   this case as a certified public accountant?

21         MR. BREIT:  Before you answer that question,

22   all of his opinions, obviously, relate to his

23   background and CV as a certified public

24   accountant.  I'm not sure I understand what

25   you're asking when you say are you giving

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 34

1      certified public accountant opinions.  They all

2      include his background and knowledge in order to

3      make those opinions and I'm not sure that it's

4      possible to delineate which ones are and which

5      ones aren't.

6           MR. KALIL:  I note your objection.

7    BY MR. KALIL:

8      Q.   Did you understand my question?

9      A.   I'm not certain.  Maybe you could read it

10   back.

11     Q.   Let me see if I can ask it differently.

12          Did you do any work in connection with your

13   engagement, that required you to apply your specific

14   skills as a certified public accountant and governed

15   by the standards appropriate for certified public

16   accountants?

17     A.   Yes.

18     Q.   What specifically did you do that required

19   that set of skills?

20     A.   Well, more importantly, you had multiple

21   things in that question and you talked to me about

22   standards and when I perform my work as a CPA, I

23   will always apply the, and be, within the standards.

24          With regard to whether or not I used my

25   skills or my training or my certification, there are

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 35

1    a number of issues, for instance, the tax issues,

2    that call on perhaps some specific training, but

3    moreover, the skills that I've developed over some

4    30 years, it's difficult to distinguish whether

5    those are skills that fall under the CPA bracket,

6    the CFF bracket, the AVB bracket, the CFE bracket or

7    anything that doesn't have a certification but are

8    part of the basket of skills that I bring to the

9    table.

10          I do believe that as a CPA and my experience

11   as a CPA, having performed public accounting

12   services over the course of my career, that there

13   are certain -- certainly skill sets and levels of

14   knowledge that I accumulated that were helpful here.

15       Q.    Okay.  Did you set forth any written

16   guidelines for your staff in terms of what they were

17   to do or based on your skills as a CPA, did you say

18   we must follow this standard?

19       A.    Nothing written.

20       Q.    Okay.  You mentioned the tax issues in your

21   response.  Am I correct that you said you did not do

22   any analysis of the tax impacts on the Priority

23   Claimants here?

24       A.    I didn't do any specific analysis or

25   calculations.  I was cognizant of the issue and I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 36

1    determined that it was not relevant to my

2    calculations.

3        **Q.   So you didn't use that skill set here?**

4        A.   Well, I used the skill set of understanding

5    the tax law and the requirements and the impact on

6    individual taxpayers, but I didn't use that skill

7    set to make tax calculations.

8        **Q.   Fair enough.  Okay.  Financial forensics,**

9    **what do you understand that to be in context of what**

10   **you've done here today?**

11       A.   Most of it.  Financial forensics is a rather

12   broad category.  Technically, I suppose it means

13   anything that we do in our arena that relates to

14   matters that involve litigation or the court system.

15   It has, over the years, also taken on a broader -- a

16   broader spectrum so that a lot of the work that we

17   do that we call forensic accounting sometimes has

18   nothing to do with the court system, or at least not

19   yet.  It involves investigative accounting, fraud

20   tracing, and even some cases -- different types of

21   fraud prevention, which do not necessarily include

22   the court systems.

23       **Q.   Did you do any fraud analysis here?  Are you**

24   **looking for any fraudulent materials?**

25       A.   That wasn't the scope of what I was looking

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    for.

2        Q.   So that's beyond the scope of what you did?

3    You didn't do any fraud analysis here?

4        A.   No.

5        Q.   I take it you are not -- it's not listed

6    here.  You are not a real estate appraiser?

7        A.   No, I'm not.

8        Q.   You wouldn't hold yourself out as giving any

9    opinions on values of real estate?

10       A.   I would not.

11       Q.   You're not a personal property appraiser?

12       A.   I am not.

13       Q.   You wouldn't hold yourself out as giving

14   opinions on personal property?

15       A.   I would not.

16       Q.   What portion of your work, the last two or

17   three years, has been associated with litigation-

18   related assignments?

19       A.   It's really hard to determine.  More than

20   half of my time has nothing to do with any of that.

21   I run a department of 40 forensic accountants and

22   staff, and also I'm a liaison with the firm

23   management with regard to that, including a business

24   valuation department that very little of their

25   specific work is litigation-related.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 38

1          Then some of the, what I call, client fixing

2    work, which is actually working with cases or

3    individuals, some of it involves other than

4    litigation, so if I were to ballpark it, I would say

5    something less than 50 percent.

6        Q.   Less than?  I'm sorry?

7        A.   Less than 50 percent and I would be

8    comfortable saying probably more than 25 percent,

9    and then depending on the day, the week, the month,

10   and the year, some weeks that's all I do and some

11   weeks I don't do any of it.

12       Q.   If we left out management issues, running

13   the firm and simply into work that you are doing

14   either client work or litigation work, how would you

15   break out the distinction?

16       A.   More than half my time is on those other

17   things, so a little less than double, the 25 to 50.

18   It certainly wouldn't be 100 percent, so probably

19   the 50 wasn't a good estimate either.

20       Q.   Would you agree that a greater proportion of

21   your nonmanagement time is spent on matters relating

22   to litigation than otherwise?

23       A.   Yes.

24       Q.   Has that been consistent for the last

25   several years?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 39

1    A.    Yes, if you include in there receiverships,

2   because I have had very demanding, time demanding,

3   receiverships where it may have taken 100 percent of

4   my time for half a year, but I think, typically,

5   receivership is related to some type of litigation

6   and it was in these circumstances I'm thinking of.

7    Q.    What type of receiverships have you been

8   involved with?

9    A.    The most recent was a receivership where I

10  took over the management and operations and sale and

11  winding down of maybe 30 to 40 -- 25 to 35 shopping

12  centers across the -- mostly the southeast, but

13  across the United States as far out as Arizona.

14   Q.    Okay.

15   A.    Other roles have been more as assistant to

16  receivers, but the most current one would have been

17  that.  I've been a special magistrate, which isn't

18  quite being a receiver, in a matter that involved a

19  dispute between partners in a construction

20  contracting business.  So receiver in a very small

21  check cashing/money order/cafe business, very

22  briefly for a bar.  I actually don't remember if I

23  was the named receiver or working for counsel.

24        A lot of different types of small

25  businesses, nothing major lately.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 40

 1      Q.   Did the receivership of the shopping centers

 2   in any way involve any aspects of defective drywall

 3   or Chinese drywall?

 4      A.   No, at least not that I'm aware of.

 5      Q.   Okay.  The construction business, did

 6   anything come up in that matter that involved

 7   defective drywall or Chinese drywall?

 8      A.   No.

 9      Q.   In any receivership issues have you had any

10   dealings with defective drywall or Chinese drywall?

11      A.   Not that I'm aware of.

12      Q.   You're not a general contractor?

13      A.   No, I'm not.

14      Q.   Okay.  You wouldn't hold yourself out as an

15   expert on construction, I take it?

16      A.   On the technical sides of construction, no,

17   definitely not.

18      Q.   All right.  You've also provided us a copy

19   of your expert testimony.  Let me give you that.

20           (Elkin Exhibit 3 was marked for

21   identification.)

22   BY MR. KALIL:

23      Q.   Mr. Elkin, this is Exhibit 3.  I'll ask you

24   if you recognize Exhibit 3?

25      A.   I do.

1    Q.    Is that an accurate list of your expert

2    testimony between February 2014 and February 2019,

3    as listed on top?

4    A.    I believe it is.  It's certainly intended to

5    be.

6    Q.    Okay.  Let me start with the first question.

7    Do any of these matters involve any allegations of

8    defective drywall or Chinese drywall?

9    A.    No.

10    Q.    Okay.  Do any of these involve valuations or

11    issues involving lost personal property?

12    A.    Possibly.

13    Q.    Let's go through them.  The first one --

14    A.    I can take you to the possibly and zero in

15    on the one that made me say possibly.

16    Q.    Why don't we do that?

17    A.    That may be more efficient.

18    Q.    Which one is that?

19    A.    This is the very last entry.

20    Q.    The Epic Hotels matter?

21    A.    Yes, I simply don't remember if any of the

22    damages in there involved personal property, I

23    believe they may have.

24    Q.    What was the essence of that case, Epic

25    Hotels versus DP Properties?  So is lost profits and

Page 42

1    other damages due to business interruption, what was

2    going on?

3        A.    That was in connection with a impact to the

4    hotel in connection with Legionnaires' disease and

5    there were a variety of types of damages that were

6    categorized and calculated and I don't remember

7    certainly, but I'm pretty sure there would have been

8    some elements of personal property in that claim.

9        Q.    Did you do a calculation of personal

10   property, to your understanding?

11       A.    I don't recall.

12       Q.    Do you have your deposition from that case?

13       A.    Probably not.

14       Q.    Okay.  Would you check and if you do, would

15   you provide a copy to us?

16       A.    I will have to consult with counsel on that

17   case because if I remember correctly, this matter

18   settled and as often happens when a matter settles

19   or even when it doesn't settle, there is various

20   confidential elements of it, so I don't know that I

21   would be at liberty to do that.

22       Q.    I'm sorry, I didn't mean to speak over you.

23       A.    So if I am to do that, I will check with

24   counsel and then we'll go from there.

25       Q.    Did you prepare a report in that case?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 43

```
 1      A.   Probably.

 2      Q.   And same request, if you would provide a

 3   copy to us if you can, okay?

 4      A.   Okay.

 5           MR. BREIT:  With the same proviso that

 6      whether counsel thinks it's confidential to

 7      whether or not he has it in the first place.

 8   BY MR. Kalil:

 9      Q.   I assume you keep your reports in the

10   computer system?

11      A.   Not always.  In fact, very often when there

12   has been a confidentiality order they also request

13   us to get rid of documents or those requests comes

14   at the end so it is possible that we do not.

15      Q.   You will check and let us know either way?

16      A.   I will check with counsel and follow their

17   directions.

18      Q.   You're confident, Mr. Elkin, that none of

19   the other matters listed on this sheet of testimony

20   have anything to do with claims for drywall or

21   damage to property as a result of allegedly

22   defective drywall?

23      A.   Yes.

24      Q.   Okay.  Just to touch on a few, the very

25   first one, Florida Beach Investments, what was the
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 44

1   nature of the claims for damages in that case?

2       A.   There were investors -- well, an investor

3   and some junior lenders that were making claims to

4   be repaid or paid amounts that they believed were

5   owed to them.

6       Q.   So it was a pure economic claim for

7   investments?

8       A.   Pure economic claim for investments?  There

9   was nothing pure about it, so no.  It was a

10  complicated claim for a variety of things that

11  included not just the amounts but the activities of

12  the company and the accountings of the company.

13      Q.   And did you prepare a report in that case?

14      A.   Yes.

15      Q.   Okay.  Do you still have that report?

16      A.   Probably.

17      Q.   I'd like to ask you for a copy of that, too,

18  just to see if it has anything, maybe, bearing on

19  this?

20      A.   Once again, I will need to check with

21  counsel to see if I will be able to do that.

22      Q.   Understood.

23           MR. BREIT:  As well as reviewed by us with

24      regard to relevance and the appropriateness in

25      this case.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 45

```
 1          MR. KALIL:  Understood.  Understood.
 2    BY MR. KALIL:
 3      Q.    Okay.  The Williams Island case, what was
 4    the nature of the dispute there, as you recall?
 5      A.    This particular element involved the
 6    developers of Prive, which is a two-tower
 7    development in the Aventura area and the developers
 8    and their related parties were making claims against
 9    Williams Island Property Owners Association, where
10    they believed that the actions of Williams Island
11    Property Owners Association caused them damages in
12    the development and sale of their property.
13      Q.    Was this an access issue, access to the
14    properties?
15      A.    There were issues of access in this case.  I
16    don't think that the specific claims relating to
17    Williams Island Property Owners Association, were
18    primarily centered around access.
19      Q.    Okay.  Did any of these claims or any of
20    these -- excuse me, matters involve damage to
21    personal property and valuations of that property?
22      A.    Only the Epic Hotel matter that we
23    discussed.
24      Q.    Okay.  Mr. Elkin, you were first engaged in
25    this matter on what date?
```

Page 46

```
 1      A.    I don't recall the exact date.  It would

 2   have been at the beginning of sometime in January.

 3      Q.    Okay.

 4      A.    Or sometime at the beginning of January.

 5      Q.    Early January?

 6      A.    Yes.

 7      Q.    Okay.

 8      A.    First or second week.

 9      Q.    And were you given a time frame in which

10   your work had to be performed?

11      A.    We had discussed a time frame.  I don't

12   recall what it was but yes.

13      Q.    Did you understand that there were deadlines

14   being met under Judge Cooke's order?

15      A.    Yes.

16      Q.    And what process did you undertake,

17   initially, in terms of getting information?  I think

18   you told me a little bit about it but what was

19   brought to you and what did you actually go looking

20   for?

21      A.    Well, initially very little was brought to

22   us.  We became aware through conversation that there

23   were three or four relevant documents that had been

24   filed related to each plaintiff, and so the first

25   step was us trying to gather for each claimant their
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 47

1    answers to interrogatories, their answers to second

2    interrogatories, and any amended answers there might

3    be, and their -- I remember the initials but the

4    property profile -- I don't remember the first P,

5    but the SPPF.

6        Q.    Supplemental plaintiff profile form?

7        A.    Plaintiff was the word I was looking so

8    there was a plaintiff profile form and then there

9    was a supplemental plaintiff profile form, and I

10   believe we got many of them at the beginning and

11   then continued to seek out -- seek those out, and

12   then reviewed them to understand the nature of the

13   claims and to start asking for information that

14   might be available that had been produced in the

15   case or was available.  Ultimately, we learned that

16   a lot of it was available on the portal, but the

17   counsels for respective claimants were operative in

18   putting things into a Dropbox, some of which may

19   have come from the portal or may have originated

20   from the portal.  They may have been subsequently

21   marked as an exhibit to a deposition or an affidavit

22   or produced as a Bates-stamped document, and we

23   found a lot of them that were -- or some of them

24   that were probably all three of the above, and then

25   in addition to that, we sought out the deposition

CONFIDENTIAL – MICHAEL P. ELKIN, CPA

1    transcripts and deposition exhibits from the

2    depositions of each of the claimants.

3            It remained a rather fluid process of

4    getting documents as we could and recognizing when

5    we needed, there were certain documents, we sought

6    counsel's assistance whenever possible, if they were

7    aware of particular documents that were related to a

8    particular issue and they were cooperative in

9    helping us to identify that.

10           (Elkin Exhibit 4 was marked for

11   identification.)

12   BY MR. KALIL:

13       Q.   I'm going to show you what we've marked as

14   Exhibit 4 to your deposition and ask if you

15   recognize that document?

16           MR. BREIT:  What number is this?

17           MR. KALIL:  Exhibit 4.

18           THE WITNESS:  I do.

19   BY MR. KALIL:

20       Q.   And what is that, sir?

21       A.   This is Attachment A to my report.  It's a

22   listing of the documents and other information

23   considered for all of the different claimants.

24       Q.   Okay.  And it's in sections, starting with

25   Section A titled Pleadings and Other Legal

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Documents; is that correct?

2       A.   That's the first section, that's correct.

3       Q.   Are those all documents you would have

4    either received from counsel or from the portal?

5       A.   And when you say from counsel that is could

6    be either through an e-mail from counsel or them

7    making it available in the Dropbox?

8       Q.   Yes.

9       A.   I don't recall if the very first item, which

10   is Judge Cooke's order, if I received that from

11   counsel or if possibly we pulled that down from the

12   docket.

13      Q.   Okay.

14      A.   Which we sometimes do; so I'm just not

15   certain, but I think everything else on that list

16   would have come from counsel.

17      Q.   And did you personally review each of those

18   documents thoroughly in Section A?

19      A.   By the time this was over, I would say I've

20   reviewed at least parts of every document on that

21   list.  If something was an amendment to something, I

22   might not have read the original one.  I might have

23   only read the amendment, but for the most part, I

24   think that I looked at all of these.

25      Q.   Did you make notes on all of these?

Page 50

1    A.    No.

2    Q.    Did you make notes on any of them?

3    A.    No.

4    Q.    Okay.

5    A.    Not that I recall.  It's possible that I

6    might have put a check on something as I was going

7    through, maybe done -- put a little yellow sticky to

8    ask somebody a question.  I do a lot of yellow

9    stickies, but no real material notes that I can

10   think of.

11   Q.    Okay.  I neglected to ask you so let me go

12   back for a second.  Has anyone -- have you consulted

13   with anyone in your firm that who has had any prior

14   experience with defective drywall or Chinese drywall

15   that assisted you in preparing your report?

16   A.    What do you mean by experience with it?

17   Q.    Did you consult with anyone in your firm who

18   has previously dealt with issues involving Chinese

19   drywall or defective drywall that aided you in

20   preparing your report?

21   A.    I think I talked with somebody in my tax

22   department specific to treatment that they had

23   because they had a client that had made a -- had a

24   casualty loss deduction at some point in the past.

25   Q.    Okay.  And who would that have been, do you

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1    remember?

 2        A.    It would have been one of three people.

 3    Actually, the first one I talked to directed me to

 4    either Evan Morgan or most likely -- no, it was not

 5    Evan, it would have been -- I believe his name was

 6    Eric Christianson.

 7        Q.    Okay.  Anybody else in the firm that you

 8    talked to, that gave you any information that you

 9    used in formulating your opinions in your report?

10        A.    No.

11              MR. BREIT:  Before you -- you've already

12        answered it but for purposes of the question, the

13        question that preceded this question, I object to

14        the form.  The question that preceded it had to

15        deal with consulting.  This new question is a

16        different question in a different subject and I

17        want to make sure that you intended that and the

18        witness understood that.  Consulting and talking

19        and conducing for purposes of this formulation

20        are all different and I wanted to make sure that

21        the form of that was understood by you

22        particularly, and Counsel when that was his

23        intent.

24    BY MR. KALIL:

25        Q.    Well, let me ask it in a slightly different
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 52

```
 1   way.  Has anyone in your firm provided you any

 2   information that was used in formulating your

 3   opinions here, other than the people you've

 4   talked -- you've described the system and the

 5   project?

 6       A.   Yes, and I just realized I left out a

 7   significant player when I was listing people before.

 8       Q.   Who was that?

 9       A.   Cara Sharp.

10       Q.   Who is Cara Sharp?

11       A.   Cara Sharp is one of my partners in our

12   forensic group, our FABS group.

13       Q.   What did Cara -- what information did Cara

14   provide you that assisted you?

15       A.   Cara assisted me with the lost equity

16   calculations.

17       Q.   Okay.  To your knowledge had Cara had any

18   prior experience dealing with Chinese drywall or

19   defective drywall?

20       A.   I don't think so.  In fact, I know she did

21   not.

22       Q.   Has your firm represented any of the

23   priority plaintiffs in this case?

24       A.   Not that I'm aware of.

25       Q.   Have you had any clients, other than the one
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 53

1    you mentioned the person in the tax department was

2    dealing with, that had any interaction with Chinese

3    drywall?

4        A.   I don't know.

5        Q.   You're not aware of any others?

6        A.   Just that one.

7        Q.   The second set of documents in Exhibit 4 is

8    depositions and corresponding exhibits.  Where did

9    you get these from, sir?

10       A.   These would have come from counsel either

11   through e-mail or Dropbox.

12       Q.   And have you personally reviewed each and

13   every one of those?

14       A.   I'm sorry, have I personally reviewed each

15   of --

16       Q.   Each and every one of those depositions and

17   exhibits?

18       A.   Those being the transcripts and exhibits?

19       Q.   Yes.

20       A.   I have personally viewed parts of, if not

21   all of, the deposition transcripts.  I've reviewed

22   notes from review of them, and I have reviewed many

23   of the exhibits but, certain of the exhibits that I

24   didn't think were relevant, I just did not, so, for

25   instance, on the first page of that it says, floor

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 54

1   plan.  Maybe I clicked it and opened it, but not --

2   probably not intentionally.  So there are certain of

3   these that I would not have looked at because I

4   didn't believe they were relevant.

5       Q.    You said you reviewed parts of the

6   deposition transcripts.  Who prepared the excerpts

7   from the deposition transcripts for you?

8       A.    The excerpts were prepared by Elan

9   Sternberg.  There may have been one or two that

10  actually were prepared by me.  I don't recall.

11      Q.    Okay.  Would there be any way to tell?

12      A.    Actually, I can tell you I didn't because

13  then I would remember printing them, so those would

14  have been all Elan, I think.

15      Q.    Did you rely on Elan's selection in -- just

16  in helping you to decide what to review in the

17  deposition transcripts?

18      A.    We had a lot of discussion.  I didn't rely

19  entirely on it, but one of the good things that --

20  what he did help me with was to identify where in a

21  deposition a topic might be so if I was interested

22  in that topic I could read it more myself.  I mean,

23  I did open each of the depositions for one reason or

24  another.  I didn't rely solely on the deposition

25  summaries.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 55

1    Q.   Okay.  You stated, for instance, the floor

2    plan was not something you looked at?

3    A.   I don't think so.

4    Q.   For purposes of your report, you therefore

5    didn't consider it relevant to the layout of the

6    houses at issue?

7    A.   No.

8    Q.   I note that some of these have got Bates

9    stamps and some of them don't.  Is there any reason

10   for that that you're aware of?

11   A.   Some of the --

12   Q.   Some of the documents on this list,

13   Exhibit B, Bates stamps.  Did you make any effort to

14   understand why some were so numbered and some

15   weren't?

16   A.   The reason I have that is because some of

17   the documents did have Bates stamps and others did

18   not.

19   Q.   Okay.

20   A.   My understanding is documents, for instance,

21   that we pulled off of the portal, many of them did

22   not have Bates stamps.  They had a document ID

23   number and, therefore, it doesn't have a Bates

24   stamp.

25   Q.   Okay.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 56

1    A.    Some of these also are transcripts and

2   things that typically would not have.  Some of them

3   are pleadings or filings.  In some cases they did

4   have -- they might have been marked as an exhibit

5   and maybe one or two of them actually had Bates

6   stamps for some reason, so when we found a document

7   and it had that, we tried as much as we could to

8   also include the Bates number.

9    Q.    Section C, of this Exhibit 4, lists

10   supporting documentation.  Is that a complete list

11   of all other documentation you've looked at in

12   preparing your report?

13   A.    When coupled with Section D and the items

14   before it, yes.

15   Q.    I'm sorry.  I may have skipped Section D?

16   A.    You didn't skip it.  It just didn't come

17   yet.

18   Q.    What is Section D then?

19   A.    Section D is our research and other sources

20   that were not provided directly to me, but that I

21   received either through online search or from public

22   records.

23   Q.    So am I correct in understanding that

24   Section D is materials that your firm went out and

25   gathered independently?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 57

```
 1      A.    That's correct, or in a couple cases maybe

 2   conversations we had.

 3      Q.    Okay.

 4      A.    But things that were not included in Section

 5   C.

 6      Q.    Did you list all conversations you had with

 7   any of the priority plaintiffs on Section D?

 8      A.    Yes.

 9      Q.    I only see two.  I see Vickie and William

10   Foster and Kevin Rosen.  Is that consistent with

11   your understanding?

12      A.    Yes.

13      Q.    Were you on both of those conversations?

14      A.    Yes.

15      Q.    Okay.  Do you have any notes from those?

16      A.    No.

17      Q.    Okay.  Do you recall when you spoke to

18   Vickie and William Foster?

19      A.    Sometime within the week before the issuance

20   of my report, I believe.

21      Q.    Do you recall the reason that you spoke with

22   Vickie and William Foster?

23      A.    Trying to -- there were some documents that

24   were hard to read.  I was trying to get a better

25   understanding if there were better copies of them
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 58

1    somewhere, whether it was in the Doc IDs and what

2    have you, and I was trying to get an understanding

3    of one of the components of damage claims that they

4    had.

5        Q.    Which component?

6        A.    It was a component that related to

7    Mr. Foster needing to continue to work because he

8    was not comfortable without having cash flow while

9    there was questions with regard to his house and the

10   issues he was having with his house, and so he had a

11   variety of expenses that were associated with him

12   having to return to work.

13       Q.    Did you do any analysis or request any

14   information about his savings?

15       A.    No.

16       Q.    Do you have any documents that would

17   establish what assets Mr. Foster had at that time?

18       A.    No.

19       Q.    Was there any other topic that was discussed

20   in that call that you can remember?

21       A.    Not that comes to mind.

22       Q.    Okay.  You have a telephone conference --

23   conversation with counsel and Kevin Rosen.  Do you

24   recall the substance of that conversation?

25       A.    Yes.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.    Were there any notes made from that?

2    A.    No.

3    Q.    How long was the conversation?

4    A.    Five minutes, maybe.

5    Q.    And when was that?

6    A.    Would have been sometime in that few days or

7    week before the issuance of our report.

8    Q.    What was the substance of that conversation?

9    A.    I was trying to get an understanding of some

10   of his construction, his capital improvements and

11   getting -- understanding where the documentation of

12   that was within the -- within the documents.

13   Q.    What specific items were you trying to

14   understand?

15   A.    Well, he had a significant amount of

16   spending in constructing, and there is a very

17   detailed list of it in my report and I was trying to

18   find out where that detail was, and making sure that

19   I had properly addressed it.

20   Q.    How much time has been spent since your

21   engagement, your firm's engagement, in early January

22   through today, in connection with this engagement in

23   your report?

24   A.    Are you talking, like, total hours?

25   Q.    Yes.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 60

```
 1    A.   Hundreds.

 2    Q.   Do you have an accurate number or --

 3    A.   I probably have 150 hours myself.

 4    Q.   Okay.

 5    A.   And I suspect Elan has at least that, so

 6  that's 300.  Probably more than 500.  I mean, I

 7  can't guarantee that amount but I've got to believe

 8  it was at least that.

 9    Q.   All right.

10         Are there things that you were looking for

11  that you have not been able to obtain in connection

12  with this engagement?

13    A.   Yes.

14    Q.   What have you not been able to obtain?

15    A.   Well, to the extent that there were property

16  transactions, there were some instances where I

17  would have liked to have had the HUD from -- some of

18  them date back quite some period of time.  When I

19  didn't have the HUD, I used other information that

20  was available to reconstruct the most relevant

21  issues, but I would have liked to have had the HUD.

22         And, you know, as any forensic accountant

23  would like, although it's typically not expected, I

24  would have loved to have had every little receipt

25  and every little, you know, payment for every
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    transaction that's on here, but -- so that's

2    something I would have liked but I did find there to

3    be sufficient information to provide reliability for

4    the vast majority of the information I've included

5    and when I didn't find something, I believe I made

6    it clear through my documentation.

7        Q.    So you've tracked in your -- is it the

8    master Excel spreadsheet?

9        A.    I don't remember what we call it.  It's

10   the -- I mean, that's what it essentially is.  There

11   is one Excel spreadsheet that has, I think, what we

12   call it the support --

13       Q.    Is it the support and master database?

14       A.    Thank you.

15       Q.    Is that the one that tracks when you did and

16   did not have supporting materials?

17       A.    It tracks what we looked at.  It didn't

18   track everything that we looked at.  Sometimes we

19   would look at -- a lot of these things are

20   documented in a lot of different ways in a lot of

21   different places, so it would have been tracking

22   sometimes more than one and sometimes, you know, the

23   last place it was seen or the first place it was

24   seen, so it doesn't document every level of

25   tracking.  Some of them do.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 62

1    Q.   Was the intent to document everything in the

2  support master database?

3    A.   Not to document everything.  To document,

4  you know, to give me a good way to get back to

5  information that I could reach in order to see what

6  we had that supported it.  It wasn't intended to

7  identify every piece of paper that did or did not

8  identify it.

9    Q.   Okay.  Mr. Elkin, do you have a copy of your

10  report handy?

11    A.   I do.

12       MR. KALIL:  Could you give me a copy?

13       MR. BREIT:  He has one.

14       MR. KALIL:  We'll mark one.

15       THE WITNESS:  Would you like me to review it

16    for completion?

17       MR. KALIL:  Yes, please.  Let me hand you

18    what I'm going to mark as Exhibit 7.

19       (Elkin Exhibit 7 was marked for

20  identification.)

21       MR. BREIT:  Did we already mark 4?

22       MR. KALIL:  Did we mark 4?

23       MR. BREIT:  Yes.

24       MR. KALIL:  Yes, we did.

25       MR. BREIT:  This was 4.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 63

```
 1            THE WITNESS:  Thank you.

 2  BY MR. KALIL:

 3      Q.    4 was the Attachment A.

 4      A.    Thank you.

 5      Q.    Let me show you Exhibit 7 and ask you if you

 6  recognize that, and when you have it in front of

 7  you, I will give you one caveat?

 8            MR. BREIT:  Take your time.  Make sure it's

 9      complete and accurate.

10            THE WITNESS:  Do you need me to go through

11      each of the 1 through 20 to make sure every

12      schedule is there?

13  BY MR. KALIL

14      Q.    We'll work through them in the course of

15  what we're doing, but generally do you understand --

16  let's start with the first part of that, the section

17  that's titled Expert Report of Michael Elkin, dated

18  February 19, 2019 and it's nine pages.

19      A.    That's correct.

20      Q.    Is that your expert report or some portion

21  of it?

22      A.    Yes.

23      Q.    What would you call that piece, sir?

24      A.    The body of the report without the exhibits

25  and attachments.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.   And behind it there should be the

2  attachments, including the schedules we've talked

3  about, the attachments A, B and C that we've already

4  marked separately.

5    A.   That's correct.

6    Q.   And then the exhibits for each of the 20

7  Priority Claimants; is that correct?

8    A.   That is correct.  Those were the exhibits

9  that were submitted in connection with the February

10  19th report.

11    Q.   Okay.  And I believe in that binder, this is

12  the caveat, you will see an update for Exhibit 12?

13    A.   Yes, I see that.

14    Q.   And that was provided by you on February 26,

15  2019?  That's what it's dated.

16    A.   I don't recall -- yes.

17    Q.   And there is also an update for Exhibit 17

18  dated March 8th, 2019?

19    A.   That's correct.

20    Q.   Okay.  As of yesterday, were those all the

21  updates to your report?

22    A.   No.  As of yesterday I had -- there was

23  another update which I gave you at the beginning of

24  the deposition today that I had finished on

25  Saturday.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1      Q.    That would be Exhibit 4 updated?

 2      A.    That's correct.

 3      Q.    Which actually is dated March 9th.  So

 4   you're correct.

 5            If we add that -- let me make that Exhibit

 6   Number 8 since it was not in the binder.

 7            (Elkin Exhibit 8 was marked for

 8   identification.)

 9   BY MR. KALIL:

10      Q.    Mr. Elkin, I'm going to --

11            MR. KALIL:  The Exhibit 4, did we -- can we

12        go off for one second?  I am just a little

13        confused.

14            Did we mark this already, Counsel?  This is

15        Exhibit 4 for Steven and Cathy Etter.  I don't

16        think so.

17            MS. RICO:  I don't believe we did, no.

18      A.    No, we did not.

19            MR. KALIL:  You gave me this copy that I've

20        got.  I'm going to check with the other copies,

21        make sure we get those marked.  There it is.

22            Let's go back on.

23   BY MR. KALIL:

24      Q.    I'm going to show you what I've marked

25   Exhibit 9 -- so Exhibit 8, and ask you what that is.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 66

```
 1      A.   This is an update to Exhibit 4 from my

 2   initial report for Steven and Cathy Etter.

 3      Q.   So if we add Exhibit 7 and Exhibit 8

 4   together, do we have your complete report?

 5      A.   Yes.

 6      Q.   Okay.

 7           MR. KALIL:  Do you need a break?

 8           THE COURT REPORTER:  No.

 9           MR. KALIL:  Okay.

10   BY MR. KALIL:

11      Q.   All right.  Mr. Elkin, in your report, the

12   first section titled Background, you state:  "Is not

13   intended to represent any expert opinion."

14           So you're not offering any opinion on the

15   status of the litigation or how that came into

16   being, are you?

17      A.   No, I'm not.

18      Q.   Okay.

19           MR. BREIT:  Do you want him to?  We could

20      add it on there.

21           MR. KALIL:  You know, if --

22           MR. BREIT:  I'd like someone to explain it

23      to me.

24           MR. KALIL:  Well, I could ask the question,

25      I probably should ask the question.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    BY MR. KALIL:

2        Q.    Mr. Elkin, do you have an understanding

3    sitting here today of what the pleading -- the

4    operative pleading is in the Florida litigation that

5    we're traveling under and what comprises that

6    pleading?

7        A.    I'm not certain.

8        Q.    I think we might get agreement around the

9    table.

10            You've got some references to some orders.

11   In Paragraph 2 you talk about Judge Cooke's -- you

12   talk about the case in front of Judge Cooke but

13   you're not expressing any statement on what the

14   status of that case is, are you?

15       A.    No, I'm not.

16       Q.    This is just background?

17       A.    That's correct.

18       Q.    Similarly, Paragraph 3 is just background

19   regarding the proceedings in front of the multi

20   district judge, you're not expressing any opinions

21   on the status of that case?

22       A.    I am not.

23       Q.    The references to the trial plan in

24   Paragraph 4 is talking about a timeline and the

25   methodology.  Are you expressing any opinions with

Page 68

```
 1    regard to either of those?

 2        A.   No.

 3        Q.   The -- Paragraph 5 just talks about a

 4    timeline for the 20 Priority Claimants and certain

 5    types of damages.  Now, you are going to be

 6    expressing opinions as to some damages in this case?

 7        A.   That's correct.

 8        Q.   Are you limiting your opinions to the 20

 9    Priority Claimants?

10             MR. BREIT:  When are we talking about?  As

11    of now?

12             MR. KALIL:  As of today.

13        A.   As of today, that's correct.

14        Q.   Have you been asked to do anything more than

15    look at the 20 Priority Claimants as of today?

16        A.   No.

17        Q.   Do you have any expectation, sitting here

18    today, that you will be asked to do analyses for

19    more than the 20 Priority Claimants?

20        A.   I haven't been asked at this time.

21             THE WITNESS:  When you have a good time, if

22    we could just take a quick break, I want to get a

23    little bit of water.

24             MR. KALIL:  This is as good a time as any.

25             THE VIDEOGRAPHER:  The time is 11:23.  We
```

Page 69

1    are going off the record.  Please stand by.

2         (Recess from 11:23 a.m. until 11:31 a.m.)

3         THE VIDEOGRAPHER:  The time is 11:31 and

4    we're back on the video record.

5  BY MR. KALIL:

6    Q.  Mr. Elkin, in your scope of assignment --

7  but let's first go through what you are not

8  rendering your opinions on, if I may.  I think you

9  address it in Paragraph 7.  You say you're not

10 rendering any opinions regarding any legal theories

11 or conclusions; correct?

12   A.  That's correct.

13   Q.  You're not rendering any opinions regarding

14 liability or issues of liability; is that correct?

15   A.  That's correct.

16   Q.  Are you also not making any effort to

17 allocate any damages as between the various

18 defendants in the litigation?

19   A.  I am not.

20   Q.  If you were asked to do that, do you think

21 you could do that?

22        MR. BREIT:  Before you answer that question,

23   are you talking about delineation of the damages

24   in each item, whether it was caused by a

25   particular defendant, or whether part of it was

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 70

```
 1       damaged and the other part was damaged by someone

 2       else?

 3            MR. KALIL:  First talking about --

 4            MR. BREIT:  Asking for clarification.

 5  BY MR. KALIL:

 6       Q.  First part is, could you allocate damages as

 7  to who caused the damages if asked to do so?

 8       A.  Probably not.

 9       Q.  Have you been asked to determine if any of

10  the damages in your report have previously been

11  compensated from any sources?

12       A.  No.

13       Q.  And you've not made any such allocations?

14       A.  That's correct.

15       Q.  Were you specifically instructed not to look

16  at that?

17       A.  It was a conversation we had.  I would say I

18  wasn't specifically instructed not to, unless me

19  asking "Will I be?" and me being told no is an

20  instruction.

21       Q.  So you asked if you should look at other

22  sources?

23       A.  I just asked what my role was expected to be

24  with regard to them, and they said that those would

25  be separate issues for the court, were not for me.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 71

1    Q.   You are aware that many of the Priority

2  Claimants have received compensation from other

3  sources?

4    A.   I don't know if it would be termed

5  compensation or how to characterize it.  I know that

6  many of these Priority Claimants have received money

7  from something.

8    Q.   You've got a schedule, actually a work

9  paper, that lists payments made to the Priority

10  Claimants?

11    A.   Yes.

12    Q.   And do you have that available or do you --

13    A.   The -- I don't have it in the body of the

14  report.  It would be in the work papers that I

15  provided to you.

16    Q.   Okay.  Well, let me -- well, if we go

17  through the work papers, we'll do that in a minute,

18  you do have an actual listing of all of the payments

19  that you're aware of that were received by the

20  Priority Claimants?

21    A.   I believe that's correct.

22    Q.   And from what sources were those payments

23  received?

24    A.   I'd have to look at them to recall.  I

25  believe some of them were some types of settlements

Page 72

1 and others may have been other things. I might look

2 at them and not know specifically what they were.

3     Q. But you didn't do any analysis of whether

4 those were related to the same damages, or did you?

5     A. I did not.

6     Q. Did you have any discussions with any of the

7 counsel as to whether the damages you were

8 calculating had been compensated in whole or in part

9 from any sources?

10     A. No.

11     Q. You state that you're not looking at -- or

12 not rendering opinions on any remediation for any of

13 the damages, this is in Paragraph 7 of your scope of

14 assignment.

15     A. That's correct.

16     Q. Why are you not looking at that issue?

17     A. I wasn't asked to or ultimately was not

18 asked to.

19     Q. You were also not rendering any opinions on

20 any personal injury claims?

21     A. That's correct.

22     Q. Not rendering any opinions of any loss of

23 use or enjoyment; is that correct?

24     A. That is correct.

25     Q. And you're not rendering any opinions on

1    diminished value/stigma; is that correct?

2        A.    That is correct.

3        Q.    Now, let me just be clear.  Diminished value

4    and stigma, what do you understand that to be in

5    that context?

6        A.    I have a limited understanding about it,

7    just that it has to do with the impact that these

8    circumstances has had or may continue to have on

9    these properties.

10       Q.    You're also not going to be rendering any

11   opinions on any punitive damages?

12       A.    That's correct.

13       Q.    Now, let me direct you for a second to

14   Exhibit 1 for Janet Avery in your report, and

15   there's a document titled Data and Damage Summary.

16   Do you see that?  It's the first page under

17   Exhibit -- first page behind the title page for

18   Janet Avery.

19       A.    Yes.

20       Q.    Who prepared that document, sir?

21       A.    That was prepared in a combined effort by me

22   and by Elan Sternberg.

23       Q.    Okay.  And who determined what items to put

24   on that page?

25       A.    At the end of the day, I did, but it was in

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 74

1    conjunction with discussions with Elan, but I did.

2        Q.    Did you have any discussions with counsel in

3    determining what to be put on that page?

4        A.    No.

5        Q.    Did you provide any drafts of this format to

6    counsel?

7        A.    Counsel would have received a draft that

8    included this format.

9        Q.    Were there any drafts that were different in

10   terms of the types of information they were showing?

11       A.    No.

12       Q.    I note that there is a comment -- there is a

13   line on the very bottom that says punitive damages

14   and then the letters TBD?

15       A.    Yes.

16       Q.    TBD means to be determined?

17       A.    Yes.

18       Q.    By whom, sir?

19       A.    Not me.

20       Q.    Why did you include a line for that if

21   you're not doing that as part of your report?

22       A.    For clarity.

23       Q.    Clarity for what?

24       A.    Clarity to see that these are not items --

25   when I did this, I hadn't written the report yet or

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 75

1    I was in conjunction with it. So I had a list that

2    I had identified in the order and other places as to

3    what various claims were. So I just listed

4    everything there, and I thought it would be good to

5    make very clear what I do have an opinion on and

6    what I do not.

7        Q.    Did you ever consider taking those lines out

8    entirely if they're not part of your report?

9        A.    I don't think so. It wasn't, you know, a

10   significant determination one way or another.

11       Q.    Do you have any expectation that at any

12   point in time you will be asked to add in a number

13   for punitive damage as part of your work in this

14   engagement?

15       A.    I don't know.

16       Q.    Have you been asked to be ready to do that?

17       A.    No.

18       Q.    In any of your spreadsheets or work papers

19   have you included any place where you can bring in a

20   punitive damage figure to these documents, these

21   summaries?

22       A.    No, no.

23       Q.    Does this document, the data and damage

24   summary, import data from other places in your work

25   papers?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 76

```
 1    A.   Yes.

 2    Q.   Where is this created?  Is it a spreadsheet?

 3    A.   It's in the Excel that I provided to you.

 4    Q.   Okay.  And there is no place that would feed

 5  into the punitive damage amount in your work papers?

 6    A.   No, there's not.

 7    Q.   What about a loss of use and enjoyment, is

 8  there anything in your work papers where you're

 9  tracking any numbers of that nature?

10    A.   No.

11    Q.   Have you been asked to track that?

12    A.   No.

13    Q.   Do you expect at any point that someone else

14  will provide you any information about loss of use

15  and enjoyment and that you will be asked to testify

16  to that?

17    A.   No.

18    Q.   Diminution in value, you've listed it here

19  as another item that says "TBD."  Do you have any

20  place in your work papers where there is any

21  tracking of diminution of value?

22    A.   No.

23    Q.   Do you have any expectation that you will be

24  bringing any numbers into your damage summaries at

25  any point for diminution in value?
```

| | | |
|---|---|---|
| 1 | A. | If I'm asked to. |
| 2 | Q. | **Has anybody asked you to do that yet?** |
| 3 | A. | They talked that at some point that I might |
| 4 | | be asked to add that on. |
| 5 | Q. | **Who talked about that?** |
| 6 | A. | I believe that was Natalie Rico. |
| 7 | Q. | **And when was that?** |
| 8 | A. | Before the issuance of the report, probably |
| 9 | | -- probably after I sent them a draft or somewhere |
| 10 | | in that time period. |
| 11 | Q. | **When did you prepare your first draft of the** |
| 12 | | **report?** |
| 13 | A. | When did I prepare -- I mean, I started |
| 14 | | preparing the report almost as soon as we got the |
| 15 | | engagement. I mean, this was a very short period. |
| 16 | | So when you say when did I start preparing the |
| 17 | | draft, I mean, everything was just leading up to a |
| 18 | | final portion. The only thing that I would actually |
| 19 | | consider a draft is when I actually send something |
| 20 | | to somebody and it's marked up as draft. |
| 21 | Q. | **How many drafts have you shared with counsel** |
| 22 | | **of your report?** |
| 23 | A. | One or two. |
| 24 | Q. | **Okay. When did you share the first draft?** |
| 25 | A. | Roughly a week before it was due, I believe. |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    I'd have to take a look and --

2        Q.    So your report --

3        A.    -- try to figure that out.

4        Q.    So your report is dated February 19th, so

5    somewhere in early February?

6        A.    Yes.

7        Q.    Okay.  And when did you share the second

8    draft?

9        A.    I'm trying to remember if I did do a second

10   draft.  I don't recall, but if I did, it would have

11   been sometime in that time period shortly before.

12       Q.    Okay.  And did you get any substantive

13   comments back on your first draft?

14       A.    Nothing particularly substantive.  I did get

15   one comment that I noticed just now, actually, that

16   I didn't correct, which is, I had West Palm Beach

17   division listed on all of my exhibits, but I also

18   have it on the cover page.  I took it off all the

19   exhibits, but left it on the cover page.  So, oops.

20   But, no, I don't recall anything -- anything

21   substantive.

22       Q.    Given that you had inquired of one of your

23   partners about the tax consequences of Chinese

24   drywall -- and let me be more specific.

25             I believe you said you inquired of one of

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 79

1    your partners about whether there were tax

2    deductions that could be taken or casualty losses

3    that could be taken; is that correct?

4        A.   I was aware that there were.  I had asked

5    the partner that heads up that department if he had

6    or anybody in his group sort of could -- had

7    specialized in that or had done a lot of those.  And

8    he was aware of one of our managers -- I think he's

9    a manager, or a director -- in the group that had a

10   client that had that, so he just directed me to him.

11       Q.   So you were aware of that as a -- as an

12   issue that comes up in this context?

13       A.   Well, I read some of the questions in the

14   depositions, and I knew it was a question that was

15   being asked.  And so it's very often, when we're

16   doing damage calculations of any kind, that we talk

17   about taxes and whether they have an impact and

18   whether they should be done -- the damages should be

19   done pre or post-tax.

20            And so I was exploring the taxability not

21   only of -- as a deduction, but also the taxability

22   of money that would be received as compensation.  So

23   that was discussions that I wanted to have.

24       Q.   Why did you not put anything in your damage

25   summary that refers to whether you were or were not

Page 80

1   considering the tax impact of the losses or
2   payments?
3       A.   I just don't think it's relevant, period.
4       Q.   Well, you're -- it's not something you're
5   calculating?  It's not something you were asked to
6   calculate?
7       A.   It's not a question of being asked to
8   calculate or not asked to calculate.  It's my
9   opinion that it's not needed to be calculated
10  because it wouldn't be an appropriate component in
11  order to offset the damage.
12      Q.   Let me ask you this, Mr. Elkin.  If somebody
13  receives a deduction on their tax return, does that
14  give them an increase in cash?
15      A.   Potentially.
16      Q.   Would that not be relevant if a deduct -- a
17  deduction is directly related to a Chinese drywall
18  or defective drywall event?
19      A.   It could be potentially relevant, except
20  that any recovery of those amounts would also be
21  taxable to the extent -- at a minimum, to the extent
22  to which it would offset any benefit they had
23  received.
24           And typically, when we do damage
25  calculations and there's uncertainty with regard to

Page 81

1  the taxes that will be paid ultimately, we don't do

2  it.  We don't make tax calculations, and we don't

3  calculate tax benefits.

4      Q.   Were any of the Priority Claimants able to

5  obtain a tax deduction on their federal income tax

6  returns in relation to the Chinese drywall?

7      A.   I believe so.

8      Q.   Who?

9      A.   I don't recall as we sit here.

10      Q.   Okay.  This was an historical deduction?

11  When you say you believe so, somebody did this

12  historically?

13      A.   This happened in the past.

14      Q.   So it's not -- it's not an uncertain event?

15      A.   Well, that part might not be, but then the

16  recovery and the tax that they would have to pay on

17  it or may have already paid on some of the recovery

18  would be.

19      Q.   Now, if somebody had obtained -- if one of

20  the Priority Claimants had taken a tax deduction on

21  their federal income tax returns as a result of the

22  Chinese drywall -- defective drywall loss, and that

23  was a past year in their tax returns, you could

24  calculate the impact, couldn't you?

25      A.   Most likely.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 82

1      Q.   Did you make any effort to -- you didn't

2    make any effort to do that here?

3      A.   No.

4      Q.   To the extent somebody has an historical tax

5    deduction for defective drywall, and they pay less

6    income tax, doesn't that impact their cash flow such

7    that it should be taken into account in your

8    prejudgment interest calculations at a minimum?

9      A.   I think that would depend on a lot of

10   different circumstances.

11     Q.   What would it depend on?

12     A.   Well, it depends on what the --

13          MR. BREIT:  Before you answer this question,

14     let me just state an objection for purposes of

15     this deposition and what this expert has been

16     asked to do and not do.

17          You're now trying to inquire of this witness

18     in an area that he has not been asked to look

19     into, has not been asked to testify to, has not

20     given any information on any report to.  And

21     you're just throwing out questions to an

22     accountant because you want to know.

23          MR. KALIL:  Counsel, first of all, I object

24     to the speaking objection.  Typically, we say

25     simply "object to form" in this district, and

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 83

1    that's all we need.  If I need more, I can ask

2    you.

3         But I'm asking a question to understand his

4    methodology and his procedures.

5         MR. BREIT:  Well, with regard to his

6    methodology and procedures, this was not a part

7    of his expert report and/or testimony.

8         And so now I will state again on the

9    objection, whether you think it's speaking or

10   not, this is not part of his expertise that was

11   asked for in this case.

12        Now you're asking an expert to give you an

13   opinion broadly on tax information, which is not

14   a part of what he's supposed to do or asked to

15   do.  And I object to you trying to get him to

16   help you out on tax consequences of tax

17   returns --

18        MR. KALIL:  Counsel --

19        MR. BREIT:  -- which is not a part of this

20   subject area.

21        MR. KALIL:  Counsel, same thing.  "Objection

22   to form" is sufficient.  Speaking objections are

23   not allowed in the Southern District of Florida,

24   and I'd ask you not to make them.

25        MR. BREIT:  Well, then I'm going to ask you

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 84

1    not to go outside the expertise of this witness

2    and keep on asking him.

3         MR. KALIL:  It's --

4         MR. BREIT:  Otherwise, he may just say "It's

5    not part of my expertise.  I'm not going to

6    answer."

7         MR. KALIL:  Well, I think there's documents

8    that this witness has already provided where he

9    looked at the specific issue.  He's already given

10   me papers in his binder, and it is this binder

11   marked as Exhibit 5 where he has specifically

12   retrieved documents dealing with tax impacts of

13   Chinese drywall.  So he has looked at it.

14        MR. BREIT:  And what he said -- and so it's

15   clear on the record for purposes of your

16   questioning, he said, "I brought down from the

17   IRS documents with regard to this, but I am not

18   offering or stating or researched or reviewed

19   anything with regard to any of the Priority

20   Claimants for purpose of their testimony."

21        So you're way beyond this expert's testimony

22   for purposes of this case.

23        MR. KALIL:  I disagree with you, Counsel,

24   but I'm asking if this could be something that is

25   relevant to how he formulated his opinions.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
1   BY MR. KALIL:

2       Q.   So let me go back to my question.

3   Mr. Elkin, you did a schedule of prejudgment

4   interest based on expenditures of some of the

5   priority -- of all of the Priority Claimants who

6   spent money, did you not?

7       A.   Yes.

8       Q.   Okay.  And what did you consider in the

9   prejudgment interest calculations, just outflows?

10      A.   I just considered alternate living expenses

11  and personal property damage and remediation

12  expenses.

13      Q.   Okay.  So these are all expenses, outflows

14  of cash by those Priority Claimants, correct?

15      A.   That's correct.

16      Q.   Did you consider any inflows of cash?

17      A.   No.

18      Q.   You didn't factor in, in that part of your

19  report or anywhere else, any receipts by the

20  Priority Claimants of any funds from any sources,

21  did you?

22      A.   No.

23      Q.   Would you agree with me that if you are

24  calculating prejudgment interest on outflows, that

25  if you have an inflow, you should offset it?
```

Page 86

```
 1          MR. BREIT:  Again, I'm going to object to
 2     the form of the question.
 3     A.   Not necessarily.
 4     Q.   Would you agree with me that if a Priority
 5     Claimant spends money and is -- then receives an
 6     equivalent or greater amount, you would not be
 7     calculating prejudgment interest on the expenditure?
 8     A.   I don't think that can be determined at this
 9     point.
10     Q.   Did you make -- you made no effort to
11     determine that?
12     A.   I didn't think it would be appropriate.
13     Q.   But you made no effort to determine that; is
14     that correct?
15     A.   I didn't include it.
16     Q.   Did you make any effort to determine it?
17     A.   Well, to the extent that I didn't include
18     it, that's the effort that I made.
19     Q.   You didn't include it in your processes at
20     all?
21     A.   I was aware of it, and it was -- the receipt
22     of those funds was included in a schedule in my work
23     papers.  But whether or not those amounts should or
24     shouldn't go to offset the amounts that were
25     included in my prejudgment calculation is not a
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 87

1  determination to be made by me.

2      Q.   **Did you present any summary of those**

3  **receipts in your report proper?**

4      A.   In the report?  No.  Very clearly in the

5  tabs and the detail of the Excel schedule that was

6  provided to you, yes.

7      Q.   **The Excel schedule was provided to us, but**

8  **is not part of your report; is that correct?**

9      A.   It's not part of the -- it's not part of the

10  report.  Several of the tabs -- it forms several of

11  the tabs and calculations in the report.

12      Q.   **You agree with me that no part of your**

13  **report references the schedules that show the**

14  **receipts of funds by the Priority Claimants; is that**

15  **correct?**

16      A.   I don't recall, so I would have to go

17  through and look, but probably not.

18      Q.   **If you're at all uncertain, please take a**

19  **look.**

20      A.   I did not make reference to the specific

21  schedules, but I did have a paragraph that discussed

22  that I was not asked by counsel to address potential

23  reductions in damages in connection with potential

24  setoffs, settlement payments received by claimants,

25  or other collateral sources.  I understand that the

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 88

1    applicability of these items is matter for the

2    court.

3        Q.    Okay.  Where is that you're referring to

4    specifically?

5        A.    Paragraph 29 on Page 9 of 9.

6        Q.    There is no reference in there that would

7    advice a recipient of your report to the fact that

8    you had calculated a schedule of these receipts, is

9    there?

10       A.    Probably not.  No.  Other than it being

11   clearly delineated in the Excel schedule that I

12   provided to you, I don't -- I don't think it's

13   referenced in my report, so --

14       Q.    You make a reference in Paragraph 25 of your

15   report to prejudgment interest.  I'd direct you to

16   that, and let me read it to you.

17           It says:  "I was asked by counsel to

18   calculate prejudgment interest amounts as an aid for

19   the court or trier of fact should it be determined

20   that prejudgment interest is awardable for any or

21   all components of damage."

22           You go on to say:  "I'm not providing an

23   opinion regarding whether such interest is a legal

24   remedy in this matter.  I understand such a

25   conclusion is a matter for the court."

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 89

1              So you've given the recipient of your report

2     notice that you've done a calculation of prejudgment

3     interest; is that correct?

4     A.    That's correct.

5     Q.    You have not given a similar advice to the

6     recipients of your report that you have information

7     regarding payments that you are not factoring into

8     that; is that correct?

9     A.    That is correct.   I don't believe that it's

10    relevant to make that -- such a disclosure, but I

11    would agree with you that it's not here.

12    Q.    Let me direct you to Paragraph 27 of your

13    report -- actually, Paragraph 26, excuse me.

14          "I have evaluated the nature and timing of

15    the various damage components, and I have calculated

16    potential prejudgment interest for each Priority

17    Claimant as reflected in the corresponding

18    Exhibits 1 through 20.  I calculated prejudgment

19    interest using the Florida statutory interest rates,

20    following the simple interest method, not

21    compounded, to calculate statutory interest for each

22    element of damage on a claim-by-claim basis.

23          So again, you're describing that you have

24    calculated prejudgment interest, but you have not

25    given any disclosure that there are other items that

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 90

1    have been received by the Priority Claimants that

2    are not factored into that; is that correct?

3        A.    That is correct.

4        Q.    Paragraph 27, another paragraph dealing with

5    prejudgment interest:  "The period of prejudgment

6    interest has been calculated to begin at a date

7    corresponding with the date costs or damages were

8    incurred and to end on July 22, 2019, the

9    anticipated date of trial."

10            What do you mean by the date corresponding

11    with the date costs or damages were incurred?

12        A.    Based on the records that I reviewed, some

13    items were very clear, when something was paid for,

14    where the cost was incurred.

15            Other items required some level of

16    assumptions with regard to when it would have --

17    most likely have been paid.  Some items, the damage

18    may have taken place as of an assumed date even

19    though it might be something that had been paid for

20    in the past.

21        Q.    Okay.  So let's separate those out, then.

22    You've talked about costs and damages.  Are they two

23    separate components?

24        A.    I don't think so.  I mean, something can

25    cost something, but it might not be a damage in the

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 91

1    case, so I think it's a combined --

2        Q.    When you try to calculate -- or when you've

3    calculated a date that a cost was incurred, what did

4    you use?

5        A.    I used the best available information.  So

6    by example, if somebody had a lease to rent a

7    piece -- to rent an alternative living facility, but

8    they were not available to provide data going back

9    to a certain period of time as to when they actually

10   wrote the check, I looked at the lease, and so I

11   assumed that it had been paid based on the terms of

12   the lease.  So that would be an example of where I

13   don't have the actual payments.

14            In some cases, I had the actual payments, so

15   I would have used those dates.

16       Q.    So the dates were the dates of expenditures?

17       A.    Yes.

18       Q.    Whether proven or assumed?

19       A.    Correct.

20       Q.    Did you determine -- did you make any --

21   excuse me.  You didn't make any effort to determine

22   the source of funds used to pay those costs, did

23   you?

24       A.    No.

25       Q.    How did you calculate the dates of damages

Page 92

1    incurred?  What did you use as your benchmark?

2       A.   Again, I think it's the -- it's the same

3    explanation.

4       Q.   Well, what is a damage as opposed to a cost?

5    You've used the two different words.

6       A.   Well, a cost can be something that costs

7    something, but not a damage.  So perhaps I could

8    have worded that a little bit such that it was just

9    costs/damages.  But I wasn't really using those as

10   separate -- as separate and distinct items requiring

11   definition.

12      Q.   You didn't include any costs in your report

13   that you are not also claiming as damages, or did

14   you?

15      A.   I may have excluded some, but they wouldn't

16   be on here.  There might be one or two that have

17   a -- have a zero next to them, but for the most

18   part, I observed things that cost money, but that

19   weren't included as damages.

20      Q.   Let me talk to you about dates of damage.

21   To the extent somebody has personal property that

22   you've included as a damage, what did you use as the

23   date of damage?

24      A.   That was a difficult component.  And again,

25   I've used them, to be clear, for purposes of these

Page 93

1  calculations, with what I hope was a clear caveat

2  that ultimately those dates might be determined

3  based on the law, or what have you, to be different

4  dates.

5          Sometimes I would have used -- if it was a

6  cost that was incurred to replace something, I

7  believe I would have used the cost on the date that

8  they actually expended it, although there could be

9  argument that it was damaged earlier than that.

10         In some cases where I didn't have something

11 that was replaced, I used my judgment on a line item

12 basis to determine at what point that damage may

13 have taken place.

14         There were some things where I couldn't make

15 a determination as to when they were put in place,

16 so I used alternative dates, and I would have to go

17 line item by line item.

18         There was not a bright line, here's how

19 you're going to do it for each one, because the

20 facts and circumstances for each case were

21 different.

22         But when I had evidence of an actual date or

23 what I believed would be the date, particularly in

24 the alternate living expenses, I used a date then.

25         What I ultimately did was I used a -- I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 94

1   used -- I'm going to just call it a buffer period,

2   but I added an additional 30 days to the

3   calculation -- or I subtracted -- there is less days

4   of interest because I used a later date to try to

5   account for what might be differences as to whether

6   something hit a credit card expense or then got paid

7   a month later, or what have you, although there's

8   argument in other cases that I've been in where, if

9   it hit your credit card, that was the date of the

10  expense.

11       But I was trying to be as conservative as

12  possible, recognizing there is a variety of

13  different circumstances for these different dates.

14  **Q.  Mr. Elkin, would it be conservative to**

15  **include reimbursements in calculating prejudgment**

16  **interest?**

17       A.   I believe I was pretty clear that I haven't

18  considered what you're calling reimbursements and

19  I'm just calling other collateral sources or other

20  funds or other setoffs.  I don't believe it would

21  have been appropriate to do that because I haven't

22  made any conclusion whatsoever as to whether those

23  should apply, shouldn't apply, or are even relevant.

24       Some of those -- what you're calling

25  reimbursements may have been reimbursements for

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 95

 1    things that aren't built into the damage

 2    calculations.

 3          So since I was not addressing that, and I am

 4    not addressing that, I don't believe it would have

 5    been proper to offset these things because I don't

 6    render an opinion as to the relevance of these

 7    setoffs or other amounts received.

 8    Q.    Would you agree with me that if the court

 9    determined that the items you've tracked as

10    reimbursements or payments, but that you haven't

11    worked into your report, were relevant, that they

12    would impact your damage calculations, and they

13    would reduce them?

14    A.    They could.

15    Q.    And would you agree with me that if the

16    court determined they were relevant, they would also

17    impact your prejudgment interest?

18    A.    They could.

19    Q.    Assuming the timing was such that they came

20    before an expenditure, they would reduce prejudgment

21    interest; is that correct?

22    A.    Or even if they came after an expenditure,

23    it might reduce the period interest.

24    Q.    Okay.  What about claimants -- Priority

25    Claimants who testified they were reimbursed for

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 96

1    alternative living expenses, why didn't you include

2    that?

3        A.    I haven't been asked to determine the

4    relevance and the appropriateness of offsetting any

5    of the amounts that they received.

6        Q.    So notwithstanding the fact that some of the

7    Priority Claimants said they were reimbursed for the

8    expenses that you were tracking as a damage

9    component, you didn't back out those reimbursements?

10       A.    That's correct.

11       Q.    Let me go back for a minute to the personal

12   property expenses, items that were calculated as

13   being damaged.  Did you use the dates of acquisition

14   for those items, original acquisition, or the dates

15   of replacement as your basis?

16       A.    It depended on the type of item and the

17   timing.

18       Q.    Okay.  Is that reflected in your report or

19   your work papers anywhere?

20       A.    As to -- the date that I used is reflected.

21   As to whether or not it relates to the date that it

22   was originally purchased or the date it was replaced

23   would have to be determined on a line-by-line

24   item --

25       Q.    Is there a --

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    A.   -- a line-by-line basis.

2    Q.   Is there somewhere in your work papers where

3    that is readily shown?  We can readily sort your

4    work papers or Excel spreadsheet by that

5    differentiation?

6    A.   I don't think so.

7    Q.   When you were dealing with personal property

8    and putting it into your spreadsheets, did you

9    obtain evidence and inventories of what was in each

10   property before the Chinese drywall or defective

11   drywall came into the property?

12   A.   No.

13   Q.   Okay.  Did you obtain full documentation of

14   what was in the --

15   A.   I'm sorry.  Could you read back the last

16   question?

17   Q.   Sure.  Let me do it -- let me do it a little

18   differently.  I think I'll make it clearer.

19   A.   I think the question that you asked is not

20   the question that I answered.

21   Q.   I think that's correct.

22   A.   Because there's something about that

23   question that doesn't work.

24   Q.   And I see the problem.  Let me see if I can

25   fix it.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 98

1    When you were calculating personal property

2    damages and putting that into your work papers and

3    spreadsheets, did you obtain evidence and

4    inventories of what was in each property prior to

5    the time it was damaged?

6    A.    That's still not really making sense to me,

7    because my understanding is the dry -- the -- I

8    don't know what would be considered the date of

9    damage.

10    But if the date of damage is when the

11    drywall went in, then these people, or at least the

12    majority of them, would not have moved into the

13    house yet.  So it doesn't make sense that the

14    furniture would have been in there before the

15    drywall is installed.  If it's determined that it's

16    some other date that does correlate, but I did not

17    do that.

18    Q.    I take your point.  Let me make it a better

19    question.

20    Were you able to verify, through an

21    inventory or otherwise, that each item of personal

22    property that is claimed as a damage was, in fact,

23    in the Priority Claimant's house or other dwelling?

24    A.    No.

25    Q.    Okay.  Did you get an inventory by Priority

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 99

1    Claimant of the personal property that was damaged,

2    the date it was purchased, and the original cost?

3        A.    Some claimants had better information than

4    others.  Some of them had a lot of that information.

5    Some of them had very little.  And so to answer that

6    question, I would have to go on a -- pretty much a

7    case-by-case basis.

8             In one particular case, I received what I

9    believed to be a very detailed itemization that was

10   made actually by a third party.  In other cases,

11   there was more information -- I mean, we're talking

12   about information that would not typically be kept

13   by an individual.  So I really didn't expect to get

14   a lot of the information you're talking about.

15            Individuals don't always keep the receipts

16   and the proof of payment for things that they bought

17   many years ago, anticipating that they would need it

18   for any reason.  So some of them had better

19   information than others.  And I used a variety of

20   the information that they gave me.

21       Q.    Did you ask in all instances for either

22   proof or estimates of original costs?

23       A.    I asked about all of those things, and was

24   explained to me that everything that was either in

25   the items that had been provided to me that were

Page 100

```
 1   Bates stamped or that were already on the portal
 2   included everything that their clients had been
 3   able -- and I say that -- I'm generalizing.
 4        There might have been -- we're talking about
 5   20 different plaintiffs, but overriding that
 6   everything that was there was what they had with
 7   regard to what they spent, what they had, if they
 8   replaced it, what it cost them to replace, and if
 9   they hadn't replaced it yet, what they used to
10   determine the case.  In some cases, that was an
11   estimate.
12        Q.  And that was information provided by
13   counsel?
14        A.  It was information provided through counsel.
15   I believe most, if not all, of it was information
16   they got from their clients.
17        Q.  Did you speak to each of the clients to ask
18   for estimates?
19        A.  I did not.
20        Q.  Did you speak to each of the clients to ask
21   what additional information they might have that
22   could help you improve the accuracy of your report?
23        A.  Not directly.
24        Q.  Did you, through anybody in your firm, speak
25   to each of the clients to ask for that information?
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 101

1     A.    No.  By not directly, I meant nobody in my

2 firm directly spoke to the clients.  We would have

3 spoken to counsel, made clear to counsel what we

4 were looking for, and they would have inquired of

5 their clients.

6     **Q.   With the two exceptions we talked about**

7 **earlier?**

8     A.   With those two exceptions, and those were

9 just relevant to specific line items, not the

10 entirety.

11     **Q.   But you had access to the clients if you**

12 **wished to speak with them?**

13     A.   I had asked, for those particular clients,

14 for the specific things I was looking for from these

15 clients, not for everything that they had provided.

16     **Q.   Isn't it a fact you were provided with a**

17 **contact list for all of the clients, and that's in**

18 **your work papers?**

19     A.   I do have that contacts list.  That wasn't

20 why I was provided the contact list.  I believe I

21 was provided that list either in the -- in the scope

22 of running a conflict check, identifying whose

23 lawyers are whose, or knowing which depositions were

24 taken.  But it was not for purposes of me expecting

25 to contact those people.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.   Did anybody tell you not to contact the

2    clients?

3    A.   No.

4    Q.   So it was your decision?

5    A.   That's correct.

6    Q.   Sitting here today, can you say with any

7    certainty whether any of those clients might have

8    had greater information if you had reached out to

9    them?

10   A.   It's possible they could.

11   Q.   Okay.  You made no efforts to do that?

12        MR. BREIT:  Asked and answered.

13   A.   I believe I did make the effort.  I -- but I

14   can't tell you for sure what they might -- might or

15   might not have in some place.

16   Q.   To be clear, other than communications

17   through counsel, what other efforts, if any, did you

18   make to speak with the Priority Claimants and ask

19   for additional information?

20   A.   I felt comfortable that my inquiries of

21   counsel were sufficient.

22   Q.   Mr. Elkin, in regard to the values that you

23   put in your report for personal property that you

24   are claiming are damages, did you make any effort to

25   adjust them for the passage of time?  And by that, I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1   don't mean prejudgment interest.  I mean from the

2   date an item was purchased until the date it was

3   determined to be damaged.

4       A.   No.

5       Q.   Did you make any effort to adjust to fair

6   market value for any of the personal property

7   items on the date -- fair market value on the date

8   of damage?

9       A.   No.

10      Q.   Did you make any effort to compare the

11  personal property items that are listed in your

12  damage schedules for each of the Priority Claimants

13  to see that a lost item and a replacement item were

14  of like kind and quality?

15      A.   No.

16      Q.   Did you make any effort to determine, for

17  any of the Priority Claimants, if any of the

18  personal property items that are listed in your

19  damage schedule were betterment or improvements over

20  the items that had been lost?

21      A.   Not specifically.

22      Q.   How about not specifically, what --

23      A.   I may have seen one or -- one or two places

24  where the replacement was of similar nature, but I

25  wasn't specifically looking at them for that

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 104

1  purpose.

2      Q.   So you didn't make any judgment as to

3  whether a replacement item that might have been

4  better than the original should be included or not

5  included?

6      A.   That's correct.

7      Q.   Okay.  Did you see any instances that there

8  were replacement items that were of greater quality

9  than the original items?

10     A.   Not that I recall.

11     Q.   When you were given receipts for the

12  personal property items, were you able to verify,

13  for each of the receipts, specifically what quality

14  or type of item it was purchasing?

15     A.   No.

16     Q.   Did you put any procedures in place to

17  disallow any claimed personal property items if you

18  could not verify what was being purchased?

19     A.   No.  I mean, the procedure would have been

20  to identify whatever we believed was, in fact,

21  purchased, and when we could not, to make sure that

22  the description just accurately reflected that we

23  were unable to, either it was ineligible or it would

24  say miscellaneous.  But when we could identify what

25  it was, the description was included.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.   Did you use the word "ineligible."  Did you

2    mean ineligible or illegible?

3    A.   I totally meant illegible.

4    Q.   That's what I thought.

5    A.   Thank you for helping with that.

6    Q.   That's fine.  You did not make any --

7    establish any procedures for determining

8    ineligibility of any of the items -- let me finish

9    the question.

10        Am I correct that you did not establish any

11   forensic procedures for determining ineligibility of

12   any personal property items claimed as damages by

13   the Priority Claimants?

14   A.   That's correct.

15   Q.   Did you -- and you also did not establish

16   any forensic procedures for determining if any of

17   the replacement personal property items were of

18   greater value than the ones that were damaged?

19   A.   That's correct.

20   Q.   Let me shift you back to your report for a

21   second.  The -- Paragraph 6, you state that:

22   Kaufman Rossin & Company was retained in January of

23   2019 by Colson Hicks Eidson to provide expert

24   witness and consulting services regarding Priority

25   Claimants' damages...

Page 106

1    And then you go on to say:  "Specifically,

2    Counsel requested that KR determine out-of-pocket

3    expenses for those who fully or partially

4    remediated..."

5    What did you understand the out-of-pocket

6    expenses to be here?

7    A.   It wasn't intended to be a technical term,

8    but it was intended to be a delineation as to these

9    are expenses that were for moneys spent, not

10   something that would -- was -- corresponded to any

11   formulas or damages that had been proposed through

12   any other prescribed formulas.

13   Q.   Let me see if I understand that.  Are you

14   saying that you were taking expenditures and putting

15   them into an Excel spreadsheet so they could be

16   added together, but you weren't doing any formulaic

17   analysis of those?  Is that what you're saying.

18   A.   No.

19   Q.   I misunderstood you.

20   A.   What I'm saying is I was aware, and am

21   aware, that there is a remediation formula with

22   regard to claimants that have not fully

23   remediated --

24   Q.   Okay.

25   A.   -- or completely remediated.  And I was

Case 1:09-md-02047-EEF-MBN Document 22363-54 Filed 11/19/19 Page 112 of 221
Case 2:09-md-02047-EEF-MBN Document 22363-54 Filed 11/19/19 Page 112 of 221
388

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 107

1    trying to make it clear that that's not what this

2    is.  This is related to expenditures.

3        Q.    Now, when you got information about

4    out-of-pocket expenditures, how did you put them

5    into the Excel spreadsheet?  Was there any vetting

6    that was done, or did everything that was brought to

7    your attention get put into the spreadsheets?

8        A.    Everything would have been put into the

9    spreadsheets that we could identify, and then if

10   there were things that we couldn't find backup for

11   or we didn't find relevant support for or we didn't

12   find -- or we found contradictions of, would have

13   either been removed or in some cases, or in some

14   cases, just a zero would have been put next to them.

15   But in most cases, I think they would have been

16   removed.

17        If we found an extraneous receipt somewhere

18   or we found something listed somewhere -- if it was

19   listed by the claimant, we would have included it

20   there and identified it as claimant.

21        Are you talking about specifically for

22   remediation or for everything in general?

23        Q.    Well, I'm talking about -- you've used the

24   term "out-of-pocket expenses," and I'm not sure how

25   broadly you were using that term in Paragraph 6.

Page 108

```
 1      A.   I was primarily using those in conjunction
 2   with the fully or partially remediated.
 3      Q.   Okay.
 4      A.   Although I suppose it would be relevant to
 5   the other ones, as well.
 6      Q.   So if we go through your worksheets and your
 7   spreadsheets, will there be entries showing which of
 8   those expenses were excluded from your calculations?
 9      A.   There might be a handful.  Very few things
10   were actually excluded.  Well, actually, there
11   were -- there were large classes of things that
12   weren't entered in the first place.
13      Q.   Okay.
14      A.   So those wouldn't -- I don't know if those
15   ever even would have made it to the spreadsheet, or
16   if they did put them on the spreadsheet originally,
17   I think I would have just said, no, those don't
18   belong in here.
19           I don't remember if they stayed on the
20   schedule, because the schedule has the ability to --
21   I think there's a column in there where you can --
22   you can filter by damage, not damage, and a couple
23   of other categories.  It's likely I had them exclude
24   them in total just so we wouldn't spend a lot of
25   time on them.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 109

1    Q.    What type of categories would you excluded

2    in total?

3    A.    So, for example, if they had -- one

4    component that sticks out in my mind is they were

5    claiming as alternate damage -- alternate living

6    expenses amounts that they were paying for the

7    property owner association at the affected property,

8    and I did not include those as a damage for the

9    alternate living expenses.

10   Q.    That would have been an original living

11   expense, correct?

12   A.    If you want to call it that.  I just -- it's

13   expenses in connection with the affected property.

14   Q.    Any others that come to mind?

15   A.    Nothing that's jumping out at me at the

16   moment.  I mean, I'm sure there were other things.

17   It might have been things like real estate taxes or

18   other things like that that were also paid at the

19   affected property that might be relevant to one

20   area, but not to the areas that I dealt with.

21   Q.    Okay.  Now, with regard to the information

22   that you put into your spreadsheets, you would take

23   an expenditure which you saw some evidence of and

24   include it and then just add them all up by

25   claimant?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 110

1    A.    No.  Then we would look for backup for them.

2    Q.    **Okay.**

3    A.    In some cases, adjust them if we thought the

4  number was wrong.

5    Q.    **Okay.**

6    A.    Some of these documents go back a very long

7  time, and I don't know how many times they have been

8  copied over and over.  Some of them were very

9  difficult to read, so we would blow them up on a

10  screen.  In a couple of cases, we asked for better

11  copies.  You know, maybe someone was aware of an

12  earlier production, either on the -- on the portal

13  that hadn't been copied then for an exhibit, because

14  the exhibits had a tendency to be a little harder to

15  read than some of the more original documents down

16  the road.  But we would verify that.  We would look

17  for the timing of those to make sure we had the

18  dates proper.

19       In some cases, there were things that I

20  would move from one category to another when I

21  observed the nature of the expenditure.  There were

22  some things that were being put in remediation, for

23  instance, an air-conditioner repair that was done

24  back in 2011 when they hadn't even started

25  remediation process.  And so that really is damage

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 111

1   to the air-conditioning system before it was being

2   replaced or anything like that.  So that's really a

3   personal property damage, not a remediation effort.

4          So I went, I'd say, almost line item by line

5   item at one point or another, as did Elan, just

6   making sure that we felt we had things in the proper

7   categories.  In some cases, to the totality of this,

8   it might not have mattered which category it was in,

9   but we did try.

10         And there's a lot of really small

11   expenditures, too, in here.  You know, sometimes

12   there is a $12 item or $60 item.  So I can't say I

13   necessarily focused on every single item, but

14   probably most of them.

15      **Q.    When -- in part of your answer, you said you**

16   **adjusted some of the items.  And when you say**

17   **"adjusted," did you mean to make sure they matched**

18   **the receipts or the information provided?**

19      A.    There were some cases where it just looked

20   like either somebody had made a transposition error

21   on the information that we had been provided or -- I

22   remember one where we had a line item in there, but

23   when I looked at the receipt, I noticed that it

24   looked like it was -- it was Bed, Bath & Beyond.

25   And I don't know if you've ever been to Bed, Bath &

Page 112

1   Beyond, but they take anything back on an exchange.

2           And it was clear that something had actually

3   been returned and replaced, so I eliminated that

4   from the expenditure, because it looked like maybe

5   they took back whatever that damaged property was.

6           So I can't say I looked at every one of them

7   in that level of detail, but we did look at them

8   with as much detail as we could.  So that would have

9   been an adjustment.

10          And there might have been things where one

11  or two places we saw that maybe they had -- I mean,

12  remember, the people that did this, the homeowners,

13  the claimants, are not forensic accountants or

14  accountants, and they are dealing with older stuff.

15          So sometimes -- I would remember noticing

16  one or two where the number might have been actually

17  the change that was given on the receipt, as opposed

18  to the amount.  They were pretty close, but -- so

19  that's the type of adjustments that we tried to

20  make.

21      Q.    So you were -- you were making sure the data

22  you were putting into your spreadsheet matched the

23  invoices or receipts that you had been given?

24      A.    To the extent we could, yes.

25      Q.    Okay.  Did you do any calculations to say

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 113

1    not all of these should be included or some portion

2    of them should be included only?

3        A.    I think there were items from time to time

4    that we identified and didn't include --

5        Q.    Okay.  So --

6        A.    -- or --

7        Q.    I'm sorry.  I didn't mean to cut you off.

8        A.    And didn't include.  I don't remember at the

9    time, whether we -- we didn't have a process to

10   identify things and then say exclude.  So most of

11   those times, I think we just took them off the

12   schedule.

13       Q.    Was there any written process for your staff

14   to use in determining what should be included and

15   what should not be included?

16       A.    My staff was told to include everything that

17   they could, so that I would have an opportunity to

18   make that judgment and not leave that judgment to

19   them.

20       Q.    Did you review every single item on this for

21   that purpose?

22       A.    Pretty close.  Well, with what purpose?  To

23   determine whether it should be included or not?

24       Q.    Yes.

25       A.    Not every single line item, but the nature

Page 114

1    of the expenditures and the timing of the

2    expenditures and many of the larger expenditures,

3    but not all of them.

4        Q.    You mentioned returns.  That's an

5    interesting topic.  Did you set up any procedures to

6    see if any of the items being claimed had, in fact,

7    been returned?

8        A.    The staff was aware of it.  I mean, when you

9    say set up procedures, we're -- you know, we sat

10   together almost every day.  I reviewed the work that

11   had been in process, talked to them, sent them off

12   to do more work.  I did not -- we didn't have

13   written procedures as to -- as to what to do.

14       Q.    Am I correct that you did not make efforts

15   to verify that if you had a receipt, that the

16   claimant had not returned it on a separate document

17   that hadn't been provided to you?

18       A.    No, I did not.

19       Q.    Am I -- am I correct you didn't ask for

20   evidence of credit card statements to verify

21   receipts, if you had a receipt?

22       A.    In some cases, we had credit card

23   statements, and we did verify with credit card

24   statements if they were available.

25       Q.    If you didn't have them, did you ask for

Page 115

```
 1   them?

 2      A.   If we didn't have them, it was part of the

 3   conversation where we were told we have what they

 4   have.

 5      Q.   Conversation with counsel?

 6      A.   Counsel, yes.

 7      Q.   But you never made any efforts to reach out

 8   to the Priority Claimants directly to say, "Do you

 9   have credit card statements," if you didn't have

10   them in the original set?

11      A.   That's correct.

12      Q.   Okay.  Once the information got into your

13   spreadsheets for -- let's just use out-of-pocket

14   expenses -- what did you do with it?  Did you just

15   tally it by claimant and add it up?  In other words,

16   did you -- did you perform any calculations on the

17   data after it was input?

18      A.   I mean, I did a lot of different types of

19   filtering in order to see the timing of things and

20   see them sequentially and to see -- in some cases, I

21   filtered by -- by vendor.

22           We did some extensive work just to try to

23   eliminate any duplicates, which we did also find.

24   So we would sort by dollar amount, and if we found a

25   number of -- we found a number of different times
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 116

1    where there might have been two documents, maybe an

2    invoice and a receipt, that related to the same

3    thing.  So if there was a duplicate, we removed it.

4         So we did a lot of hands-on analytics, not

5    just general analytics, but really digging into,

6    whether it was by vendor or whether it was by date,

7    in each case on a claimant-by-claimant basis.

8    Q.   So you were deduplicating the records?

9    A.   Yes.

10   Q.   Okay.  And --

11   A.   And not only just deduplicating, but if we

12   found that -- if I remember correctly, in one or two

13   cases, there were payments that were made as a

14   deposit on something, and then later the full

15   payment was made, but the full payment didn't

16   include it.  But they might have put the amount that

17   was on the invoice.  So that's another form of

18   deduplicating or making sure that only the total

19   amount being paid was included.

20   Q.   Did you have any procedures to exclude items

21   based on date ranges?

22   A.   We looked at date ranges.  Again, it wasn't

23   a procedure.  It was a hands-on, take a look, does

24   it make sense.

25        We excluded alternative -- alternate living

Page 117

1    expenses.  And again, I don't remember if they're in

2    the -- still in the database or if they were moved

3    to not damage.  But in some cases, in a lot of

4    cases, for folk that did not move back into the

5    house and might have still been living in the

6    alternate living -- alternative living facility, we

7    cut off the -- all those expenditures as of the date

8    of the foreclosure or the short sale or the sale in

9    mitigation.

10       Q.    I think you used the term "moved to not

11   damages."  Is that the other spreadsheet you were

12   talking about earlier, or is there somewhere else

13   that you moved it?

14       A.    On the same spreadsheet, if you sort --

15   there is -- there's -- one of the category -- one of

16   the columns that I believe says "category" or

17   something of the like.  And I believe one of the

18   categories is settlement, one of the categories is

19   damage, one of the categories is not damage, and I

20   don't remember if there was another category in

21   there.  But some of them may have been moved to not

22   damage or they may have been taken out completely.

23       Q.    Okay.  So --

24       A.    And just eliminated from the schedule.

25       Q.    This is under the categories that you use in

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

 1    your Support Master Database.  I'm pulling it up

 2    here, and I don't know if you have it available,

 3    Mr. Elkin.

 4        A.    It would take me a little bit to log on, if

 5    you want me to do that, but if you want me to --

 6        Q.    But you've got, as I see it, three

 7    categories, damage, not damage, and settlement.

 8        A.    Okay.

 9        Q.    What did you deem to be settlement?

10        A.    Just -- that was the generic term for any

11    moneys that we saw that were collected.  I don't --

12    I wasn't intending to characterize it.  I think one

13    of them had used that, because it says settlement on

14    some of the checks.  And so we just said anything

15    that's incoming money that's going to go on this

16    worksheet, just call it settlement so we can sort it

17    that way.

18        Q.    And what did you use as criteria for

19    something to be determined not damage?

20        A.    If they had picked up some detail from

21    somewhere and put it into the spreadsheet and either

22    it was clear on the surface that it wasn't damage or

23    if it was ultimately determined -- for instance, if

24    it was a property owner association payment made in

25    conjunction with the affected property, when we made

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1   the determination, and I communicated to them that

2   those would not be included in alternate damage --

3   alternate living expenses, there may have been some

4   cases where they had already keyed in the data for

5   that particular claimant.  I don't recall if, in all

6   cases, they just simply removed it from the schedule

7   or if they called it not damage.

8          In some cases, where they hadn't already put

9   it in, they would not have keyed it into the

10  information, because that's how it would have been

11  identified to us.  That might include, you know,

12  lawn maintenance or any of the things that were

13  taking place on the facility that they were no

14  longer able to live in, the affected property.

15          MR. KALIL:  All right.  Can we take two

16     minutes, if that's okay with everybody?

17          MR. BREIT:  Yeah.

18          THE VIDEOGRAPHER:  The time is 12:31.  We're

19     going off the video record.  Please stand by.

20       (Recess from 12:31 p.m. until 12:35 p.m.)

21          THE VIDEOGRAPHER:  Stand by, please.  The

22     time is 12:35.  We're going off the video --

23     going on the video record.

24  BY MR. KALIL:

25     Q.    Mr. Elkin, in terms of the numbers that you

1  put into your spreadsheets, once they were input and

2  once you've checked them off to make sure that the

3  numbers matched the appropriate receipts, what

4  calculations, if any, did you do on those numbers?

5      A.   Totaled them up.

6      Q.   Okay.

7      A.   Carried them to the prejudgment interest

8  spreadsheet in order to make those calculations,

9  carried them forward to summary schedules, which

10  isn't the calculations, just a function.  I don't

11  know if there's any other calculations.

12          There were some calculations that were made

13  before they got onto the spreadsheet, so that items

14  that were being delineated separate of their sales

15  tax would have the sales tax included into them, and

16  then brought on.  So that's -- and that's on a --

17  was done separately, so those were on -- they

18  ultimately end up here, but those were on separate

19  calculations.

20      Q.   Let me pause you, if I may.

21      A.   Yes.

22      Q.   Have those been provided?

23      A.   It's all in here.  I mean, it just rolled up

24  into it.  I think -- I think at one point, we were

25  putting the number in with a formula, just, you

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1    know, put the number in that's showing up here.  I

 2    think it's -- six-and-a-half percent was the sales

 3    tax at that time.  And so -- and then we would have

 4    replaced the item.

 5          And then when I went back and reviewed it, I

 6    just was reviewing with a little spreadsheet so I

 7    can check the number, and it would fall off.  But I

 8    don't believe it was a separate schedule.  I think

 9    it was an Excel schedule that was in this data and

10    then pulled into the summary data.

11       Q.    Okay.  Did you or any of your staff visit

12    any of the properties at issue?

13       A.    No.

14       Q.    Is it fair to say that the report we have,

15    with the three updated exhibits, represents your

16    full opinion in this case as of today?

17       A.    Yes.

18       Q.    Okay.  Are you expecting to give any

19    additional opinions between now and trial?

20       A.    I haven't been asked to.

21       Q.    Okay.  Is there any other -- have you --

22    have you noticed any other errors in your report

23    besides Exhibit 12 that you've updated, Exhibit 17

24    that you've updated, and Exhibit 4?

25       A.    No.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.   Okay.  What brought to your attention the

2  need to update Exhibit 12?

3    A.   Exhibit 12, I believe, is the Martinez

4  family, and we had been aware that there was a

5  higher -- that they believed that there had been a

6  higher number than the number we were using.

7       And I believe in looking at our report and

8  looking at the documents we considered, they

9  recognized that we did not have a package that was

10  on the portal that included receipts that we had not

11  gotten, and so they asked us to look at that

12  particular document on the portal.

13       We went to the portal and got that document

14  and, in fact, recognized that there were -- I mean,

15  the biggest item that I recall was a reverse osmosis

16  equipment, and I believe there is a -- maybe an

17  air-conditioning repair, but there were -- and some

18  other smaller items, and so we added that to the

19  report.

20    Q.  Let me ask you, then, if you would look at

21  Exhibit 12 updated, which should be in your binder.

22    A.   Uh-huh.

23    Q.  And I see that on Page -- it's

24  Exhibit 12.1 updated.

25    A.   Yes.

1    Q.   It's three pages.  And you've been kind

2    enough to highlight the changes.  The first one is

3    the Bed, Bath & Beyond receipt.  Is that the one you

4    said you found there was a return on the same

5    receipt?

6    A.   I think it is.

7    Q.   Okay.  So you took that off?

8    A.   Yes.

9    Q.   The third page has a number of items, and I

10   was going to ask you about these.  What do you

11   understand the music equipment on here to be?

12   A.   I don't remember specifically.

13   Q.   Okay.

14   A.   I think that's a general characterization of

15   what was on the invoice.

16   Q.   What about the second entry, Pozo 100 foot

17   water well, what do you understand that to be?

18   A.   The plaintiff would have to describe that

19   specifically.  I believe it was either part of the

20   well or -- I'd have to go back to that specific

21   receipt to see what it is.  I don't recall as we're

22   sitting here right now.

23   Q.   Is that something you can access?  Because

24   this is -- this is one of the ones you've updated

25   since the time of your report, I want to find out.

Page 124

1    It should be fresh in your mind.

2        A.    I wouldn't say it should be fresh in my mind

3    when there's 20 different plaintiffs, but I could

4    possibly refer to that document.

5        Q.    Would you be kind enough to -- I mean, can

6    you tell me, sitting here today, what a water

7    well --

8        A.    Well, I do remember that they were on well

9    water there.

10       Q.    Okay.

11       A.    And I do remember I saw some expenditure for

12   replacement of the pump.  I don't think that's the

13   replacement of the pump, or it might be, but since

14   it's talking about depth, I'm wondering if that had

15   to do with some of the piping or anything that was

16   in connection with that.

17            So -- but to actually know specifically, I'd

18   have to get in and look at the actual -- it's -- I

19   mean, it's from PDF Page 48 of Document 329779.  But

20   I don't think that you -- and you were provided that

21   document.  Actually, you weren't provided that

22   document, I don't think.

23       Q.    Okay.

24       A.    I think you were just told the number

25   because it's -- it was on the portal.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1      Q.   Okay.  Do you have that in your work papers?

2      A.   I can find it.  I think it may have reverted

3   back to --

4      Q.   I'm looking through what I've been provided,

5   Mr. Elkin, and I do not see that in the list of

6   documents that I have.

7      A.   It's not.

8      Q.   So am I correct, then, that there are

9   documents that you have relied on in doing this

10   update to the Martinez schedule that were not

11   provided to us yet?

12      A.   That one document.

13      Q.   Okay.

14      A.   And we've made reference to it.  It's

15   available to you on the portal, but -- I brought up

16   on the screen.  I think I said Page 48, but it's

17   actually PDF Page 49, which is properly reflected

18   there, and it's -- it says "well" on the top.

19      Q.   Okay.

20      A.   And I think pozo -- there were many

21   circumstances here where I had to rely on Google

22   Translate to get a general understanding.  Most of

23   the words, I had to -- I don't recall what that is.

24      Q.   Did you make any determination, when you

25   were updating Exhibit 12, that that was an

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 126

1  appropriate expense to include here?

2      A.   My analysis was not to determine the

3  eligibility of particular expenses, but rather to

4  quantify the items that were being claimed and to do

5  everything I could to find the backup.  As to

6  whether or not the replacement or the repair that

7  relates to that well receipt, I did not.

8      Q.   And is that -- would that be true for all of

9  the items that are in your report, you were not --

10     A.   Yes.

11     Q.   I'm sorry.  Let me just finish the question.

12         Would you agree with me that you were not

13  making a determination as to whether -- whether any

14  of these items were appropriately included in the

15  report; you were simply including them for purposes

16  of the numbers and tallying them up?

17     A.   For the numbers and to do a diligent job to

18  make sure that we applied relatively simple, but

19  forensic procedures to be able to correlate the

20  expenses with the claimed backup.

21     Q.   And those forensic procedures extended to

22  matching invoices with numbers in your spreadsheets,

23  but they did not include any determination of

24  whether those invoices were, in fact, related to the

25  claims in the case; is that fair?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 127

1    A.    To the extent that if something obvious

2  jumped out, we might have had some discussion

3  with -- about it.  There are things that I excluded

4  based on my observation and subsequent discussions.

5        In fact, particular to this -- this -- the

6  Martinez claim, I had excluded a relatively large

7  item, but that was not -- it wasn't my intended

8  scope to be able to go through every receipt and

9  determine its eligibility.

10   Q.    And recognizing that you've already said

11 you're not an expert on Chinese drywall or defective

12 drywall, is it your general understanding that wells

13 are usually found outside of the homes?

14   A.    The well itself?  Again, I'm not an expert

15 in wells, but I've had three or four of them, and

16 all of mine were outside of the house.  The motor

17 was inside of the house, and much of the piping was

18 inside the house -- inside the garage.

19   Q.    Inside the garage.  Do you have any

20 understanding of where the well referenced here for

21 Mr. Martinez was located?

22   A.    I do not.

23   Q.    There's another entry also on that same

24 page, Home Depot miscellaneous.  Are you able to

25 find that for us?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 128

1    A.    Yes.

2        Q.    And what is -- what is it that's being

3    identified, or why is it listed as miscellaneous?

4        A.    It's being listed as miscellaneous because

5    it contains a number of different things, and I am

6    not certain what all of them are.  You can see the

7    descriptions there, drain pan.  The most expensive

8    thing on there is a -- was a 4500-watt 50-gallon,

9    but I'm not sure what it actually is.

10            I think I started to look at the -- I don't

11   recall what I did to look at this, but it was

12   described as miscellaneous because I couldn't

13   specifically identify what it is.  And I expect that

14   the claimant would be able to do that.

15       Q.    So you're not offering any opinion as to

16   whether this is an appropriate item or any of the

17   items are an appropriate item to be claimed by the

18   Priority Claimants; is that correct?  That's not

19   part of your --

20       A.    That's correct.  That's correct.

21       Q.    Okay.  While we're doing the updates, can I

22   ask you to turn to Exhibit 17, the second correction

23   to your report that you provided us?  Do you have

24   that in front of you?

25       A.    I do.

Page 129

1    Q.   Okay.  Can you tell me what is different

2    between the original Exhibit 17 and the updated

3    Exhibit 17?

4    A.   Yes.  The Exhibit 17.2, in the original

5    calculation, incorrectly treated the second mortgage

6    reflecting that that second mortgage had been taken

7    out in conjunction with the acquisition.  And upon a

8    deeper dive and review, it was determined that that

9    actually was taken out later.

10          And you've heard the expression pulling

11   equity out of your home, and so this was an equity

12   loan, as I understand it.  And the beginning

13   balance, for purposes of my calculation, should have

14   been zero, not 298,115.  And that one change flows

15   through to reduce the lost equity by that same

16   amount, 298,115.

17   Q.   Okay.  Were there any other changes on

18   Exhibit 17?

19   A.   I think it looks like I corrected -- in the

20   footnote, it's -- in the original, it said 98,114.

21   It was missing the 2, so I put that 2 in there.

22   Q.   Okay.

23   A.   And now, actually, as I'm looking at it

24   right now, it says "as if this time," and I should

25   have corrected that to say "as of this time," but I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 130

1    didn't.

2         I don't see anything else that changed.  It

3    looks like the documents that are referenced are the

4    same.

5    **Q.   So I take it in the original Exhibit 17, you**

6    **had assumed or presumed that all of the mortgages**

7    **were used to acquire or improve the house?**

8    A.   I wouldn't say I assumed it.  I was just

9    wrong about it.  I think I -- I had read it

10   somewhere.  I thought I had read it somewhere.  I

11   think I must have confused two claimants.

12        And when I was going through a

13   reconciliation process at a more detailed level,

14   sort of taking this in a different direction, it

15   wasn't matching, and it wasn't matching by 298,115.

16   I went -- if I remember correctly, I went back to

17   the deposition, the Rosen deposition, I think I had

18   read pretty early.  And it became clear to me, and

19   so I had made a mistake.

20   **Q.   When was the reconciliation process?  When**

21   **did you engage in that?**

22   A.   Well, when I reviewed this before submitting

23   it, I was really looking at the calculations as they

24   are in the backup.

25        In preparation for the deposition, I did

Page 131

1    it -- I'll just say going at it at a different

2    direction.  And so that took place last week and

3    then even through this weekend.

4        This particular item, I probably identified

5    on maybe Wednesday.  I don't remember the exact

6    time, but sometime last week.

7    **Q.    When you say in a different direction, what**

8    **do you mean by that?**

9    A.    Well, in order to determine the equity, the

10   money that they had in the deal, there's a lot of

11   different ways you can calculate it.  So we did it

12   one particular way, looking at the balances and

13   looking at the transactions one by one.

14       And then I did what I'll call a more

15   simplified method, and that's -- in the exhibits

16   that we marked at the beginning, that little yellow

17   sticky that's in the bottom left hand, was doing it

18   in a different direction.

19       So in other words, I was first measuring

20   what did they put into it -- not that binder.

21   It's --

22   **Q.    Thank you.**

23   A.    It's there.  And -- and so if you went to

24   17 -- it should be in that binder.  It probably says

25   17U.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 132

```
 1    Q.   Okay.

 2    A.   It just says 17.

 3    Q.   Okay.

 4    A.   So in this -- you know, it's a lot of the

 5  same numbers because they are coming from the same

 6  place, but I made a simple calculation of, here's

 7  the money that they put into it via paying for it,

 8  the 1,825,000.  Here, I just broke it out between

 9  the million six --

10    Q.   Bear with me one second.  I'm trying to

11  follow you.

12    A.   Sorry.  I'm down on the yellow sticky on the

13  bottom left.  Are we talking about --

14    Q.   Are we on 17?

15    A.   17.2 updated.

16    Q.   I'm looking for a 1,825,000.

17    A.   You won't see it.

18    Q.   Oh.

19    A.   That's my point.  It's a 1,600,000 plus

20  225,000.

21    Q.   Got it.

22    A.   So the testimony would have been that

23  they 1,825,000.  It was a combination of the

24  1,600,000 purchase price and then there were some

25  work orders in place at that time, and then capital
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 133

1   improvements that were made subsequent to the home,

2   to bring up a total of 1,975,000 that he had

3   actually physically put in money for.

4        I took out the balances of the loans that

5   were due at the time of the sale and mitigation, and

6   then I adjusted that for the closing costs and

7   related credits to come to a net of 1,192,583, which

8   is basically the money he had in the deal, you know,

9   not including the money that he had spent to carry

10  the property, the interest expense, the real estate

11  taxes, the hazard insurance, all those things.

12       This is just the money that he had so that

13  at the end -- sometimes someone says, How much

14  equity do you have in your house?  Well, the equity

15  I have is -- is, you know, what -- what I put into

16  it or what it's worth less the mortgages that I

17  have.

18  Q.   So I'm just going to ask you a question:

19  Isn't the general definition of equity in regards to

20  real estate the difference between the market value

21  and the outstanding incumbrances or loans?

22  A.   It can be, and -- and as you'll see in my

23  report, I defined what I'm calling equity in this

24  particular case.  And -- and it's including

25  settlement costs and other -- other capital -- other

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 134

1  outlays, either during the acquisition or held back

2  from them at the sale.

3      And one of those reasons is they weren't

4  given an opportunity to get that money out of this

5  because of either sale through foreclosure or sale

6  on a short sale or the fact that they sold it

7  prematurely.

8      Q.   You're not expressing an opinion on whether

9  they were not able to sell it otherwise, are you?

10     A.   No, I'm not.

11     Q.   You're taking that as that's what they

12  stated to you?

13     A.   Well, in part, I think it's -- I don't want

14  to call it obvious, but I think it's a fair

15  assumption on my part just for purposes of being

16  able to make a calculation, not to render an

17  opinion.

18     Q.   The assumption being that the Priority

19  Claimants' reduction in their cash flows -- this is

20  really a cash flow analysis, isn't it?

21     A.   More or less, yeah.  In fact, I think

22  what -- the best way to describe it --

23     Q.   In Paragraph 22 of your report?

24     A.   Yeah.  That it's really like almost net

25  investment capital.  It's the amount that they've

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 135

1    paid for the affected property.  So it's what was

2    paid directly by claimant through deposits, funds at

3    closing, payments of principal on mortgages, or

4    capital improvements, less the funds that they may

5    have received when they either sold it through --

6    whether -- when it was foreclosed, although I don't

7    think anybody got money back when it was foreclosed,

8    through a short sale or through -- or through sale

9    in mitigation.  And to the extent that they had to

10   come out-of-pocket for anything at one of those

11   events, that was included as well.

12      Q.   Am I correct in doing your analysis of lost

13   equity, you did not make any effort to take into

14   account general market forces in the real estate --

15   in the real estate world?

16      A.   That's absolutely correct.

17      Q.   Did you not attempt to take into account

18   whether any of the Priority Claimants has bought at

19   a high point in the real estate market and sold at a

20   low point?

21      A.   That's correct.

22      Q.   And you did not take -- attempt to take into

23   account any other issues that might have affected

24   the values of the property to determine whether the

25   equity was reduced for reasons wholly unrelated to

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 136

1    the presence of defective drywall or Chinese

2    drywall?

3        A.    That's correct.  This was simply a financial

4    calculation without those considerations.

5        Q.    Okay.  Am I correct that you did not take

6    into account in your calculation of lost equity, as

7    you've defined it, whether or not any of the

8    claimants, Priority Claimants, received a reduction

9    in property taxes as a result of the presence of

10   defective drywall or Chinese drywall?

11       A.    That's correct.

12       Q.    Okay.  Am I correct that you didn't take

13   into account in your calculation of lost equity, as

14   you've defined it, whether or not any of the

15   Priority Claimants overdeveloped their properties

16   for the neigh- -- neighborhood?

17       A.    I did not.

18       Q.    Am I correct that you did not take into

19   account for your determination of lost equity for

20   any of the Priority Claimants whether they made

21   improvements that were not the type of improvements

22   that are dollar-for-dollar increase in the value of

23   a home?

24       A.    I think that's sort of the same question as

25   the one before, but that's correct.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 137

1    Q.    Okay.  Am I correct that you didn't take

2    into account in your report whether or not any of

3    the Priority Claimants had the financial capacity to

4    maintain their homes rather than lose them through

5    foreclosures or short sales?

6    A.    That's correct.

7    Q.    Am I correct that you did not investigate

8    the circumstances of any of the short sales and what

9    negotiations were had with the lenders in regard to

10   the Priority Claimants who had short sales?

11   A.    That's correct.  Those things -- all those

12   things that you just said were not within my scope.

13   Q.    Am I correct that you did not investigate

14   any of the foreclosure processes in connection with

15   any of the Priority Claimants who were facing a

16   foreclosure?

17   A.    I mean, investigate the process, that's

18   correct.  I reviewed the documentation to see the

19   financial impact.

20   Q.    Am I correct that you did not attempt to

21   evaluate in any manner whether a piece of real

22   estate sold at a foreclosure sale has a lower sale

23   price than the same property sold privately?

24   A.    That's correct.

25   Q.    Am I correct that you did not attempt to

Page 138

1  evaluate in any manner in your report whether a

2  property sold by a short sale has a lower selling

3  price than a property sold outside of that process?

4      A.  That's correct.

5          MR. KALIL:  Good point for lunch?  It's

6      1:00 o'clock.

7          MR. BREIT:  It's up to you.  It's good with

8      me.

9          THE VIDEOGRAPHER:  The time is 1:00 o'clock.

10     We're going off the video record.  Stand by.

11         (Recess from 1:00?p.m. until 1:53?p.m.)

12         THE VIDEOGRAPHER:  The time is 1:53, and

13     we're back on the video record.

14 BY MR. KALIL:

15     Q.  Good afternoon, Mr. Elkin.  Just a couple of

16 cleanup things.

17         We mentioned -- or we talked about earlier

18 some items that you were retrieving from the portal.

19         Did you have full -- do you have full access

20 to the -- the portal that gives you full access to

21 all the documents on it?

22     A.  I don't know if my access is restricted or

23 not.

24     Q.  Okay.

25     A.  I know that I can get the things I see.  I

Page 139

1    don't know if there are more things on it or not.

2       Q.   Have you ever inquired as to whether your

3    access is full or limited?

4       A.   No.

5       Q.   Has anybody guided you in what items to look

6    at or suggested to you you should look at certain

7    items in the portal?

8       A.   Yes.  When we were seeking backup in

9    different information, we specifically got guidance

10   from probably each counsel as to things that they

11   knew were there that we relied on -- or that -- that

12   related to the different expenses.

13      Q.   Did they give you any proactive suggestions

14   on things you should look at as well?

15      A.   Yeah.  Yeah, they linked them to, you know,

16   particular items, or they would give us a list of

17   things and say, these came from -- these items or

18   this item.

19      Q.   Okay.

20      A.   That was -- that was the whole purpose.  We

21   really didn't go to the portal for the purpose of

22   looking through the portal for everything.  We went

23   to the portal to get better copies of something, and

24   really, once we got it, just to -- to know that

25   there was some information there, but we were still

Page 140

```
 1   relying on representations of what documents were

 2   available.

 3        Q.   And -- and representations from counsel as

 4   to what documents might be helpful in your analysis?

 5        A.   Yes.

 6        Q.   Is everything you've relied upon with the

 7   exception of one document we talked about earlier,

 8   on the Dropbox?  Did you -- everything you

 9   generated.  Excuse me.

10             There was one document --

11        A.   On the Dropbox?

12        Q.   I'm sorry.  That's been --

13        A.   Oh, the drop -- the second drop, yes.

14        Q.   Second Dropbox.

15        A.   The Dropbox that was provided for you?

16        Q.   Exactly.

17        A.   Yes.  It's possible that you got the Dropbox

18   that was connected to the HTML?

19        Q.   I have the HTML link.

20        A.   Yeah, okay.  Then you have the basket that

21   was -- the one file of documents that has everything

22   in it, so yes.

23        Q.   Okay.  Would I find in there the list of

24   documents that counsel suggested you review on the

25   portal?
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 141

1       A.    What you'll find in every section is a Word

2    or PDF document that -- they called it "damage

3    summaries," and it's not that at all.  But it links

4    different expenses and different things, and it

5    links them to either things on the portal or it

6    links it to wherever they were aware that those

7    documents were.  And you'll find that in every

8    section.

9       Q.    Well, I -- when I look --

10      A.    It's a Word document.

11      Q.    I am looking at what I have a link to right

12   now, and I've got -- let me see if I can find it

13   here.  Bear with me one second.

14            I see under "Supporting Documents,"

15   Section C, something EXT923 Martinez Out-of-Pocket

16   Damages Summary Provided by Counsel.

17            So I think that may be one of the documents

18   you relied on.

19      A.    I think -- well, I know I included it.

20            Are you looking at the -- what are you

21   looking at?

22      Q.    I am looking at -- whatever this is.

23      A.    Okay.  So that's the -- the --

24      Q.    The HTML link?

25      A.    The HTML -- yeah, sorry.  Let me log onto

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 142

```
 1   this real quick.

 2       Q.   I want to make sure we have the same

 3   materials.

 4       A.   Absolutely.

 5            So which one were you looking at?

 6       Q.   Well, I saw the one that says -- if you go

 7   up or -- excuse me, if you -- if I go to "Supporting

 8   Documentation" --

 9       A.   Yeah, which --

10       Q.   EXT9774, Florida Claimants Remediation, that

11   appears, at least what I'm seeing --

12       A.   Well, that's something different.

13       Q.   Okay.  That looks like I'm in the wrong one.

14   Let me go back.

15       A.   If you pick a particular claimant --

16       Q.   Yeah.

17       A.   -- I can show you what I'm talking about in

18   any claimant you'd like to ask about.

19       Q.   Why don't we just take the first one, Avery?

20       A.   Okay.  All right.  For some reason --

21       Q.   Your link is not working?

22       A.   Yeah.  So let me go to the same thing, if

23   you don't mind, but I'm going to go to the live

24   version of it --

25       Q.   Okay.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1   A.   -- which is the same basic thing, except

2   it's using the software that it was designed for,

3   and you will see it looks just like yours.

4   Q.   Uh-huh.

5   A.   And so at the bottom of Avery, you will see

6   "Janet Avery Out-of-Pocket Damage Summary."

7   Q.   Okay.  We'll go to that.

8   A.   And you can see there that this was counsel

9   sending me some things and basically telling me what

10  doc ID this lease was at.

11  Q.   All right.  And is -- is that the listing

12  which you were referring to of what counsel directed

13  you to on the portal, or was there anything else?

14  A.   It's possible, like on a phone conversation,

15  they could have also said something, but I don't

16  think so.  I think for the most part -- if they did

17  that, maybe we were on the phone and we were on the

18  portal while we talked to them, but I don't recall

19  that ever happening.  So I think -- I think it was

20  always this.

21       And then for Martinez, I don't remember, I

22  think they actually e-mailed me the actual document,

23  the one that we just looked at before.

24  Q.   Yeah.

25  A.   I think they e-mailed it to me, and I

Page 144

1 probably double-checked it, because I typically do

2 that on the docket but --

3    Q.    Is this -- is this a single time event per

4 priority plaintiff, or were these updated over time?

5    A.    I don't think they were updated.  I think

6 basically it was -- we were asking them where did

7 some of this stuff come from.  They were trying to

8 get stuff onto the portal as fast as they could, and

9 it really wasn't happening fast enough for us.  So

10 they said they could put this together for us.

11        I don't know if they already had this or

12 they put it together, but, no, it wasn't the

13 continual update thing.

14    Q.    All right.  Just a definitional thing.

15 There is a phrase, "sale in mitigation," that's in

16 your report.  Is that a phrase you came up with or

17 somebody else generated that?

18    A.    I think it evolved out of a conversation.

19 It's not a technical term I came out of.  I think it

20 was just, in their mind, a more descriptive -- more

21 descriptive of what -- what took place.

22    Q.    Not your choice of words?

23    A.    I don't know how it evolved, whether I said

24 "sale in mitigation" and they said, oh, let's use

25 that, or if they said, we want to call this "sale in

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1  mitigation," but it's not a term that I've used

2  outside of this case.

3       And I think I define it somewhere in my

4  report to be clear as to what I mean by that.

5     **Q.  Can you tell me where that's found in your**

6  **report?**

7     A.  Sure.  It's on Page 7 of 9, and it does say:

8  "Counsel refers to homes that were sold outside

9  of foreclosure or short sale as sales in mitigations

10  as claimants contend that such sales were made at

11  amounts below what they should have sold for but for

12  the Chinese drywall circumstance."

13       So that does make it sound a little bit more

14  to me like that was a terminology that they had been

15  using.

16     **Q.  So does that refresh your recollection that**

17  **was counsel's terminology, not yours?**

18     A.  I don't actually remember it that way, but

19  if I wrote that, which I did -- I wrote the

20  footnote -- then probably so.

21     **Q.  And when you say that -- in here that**

22  **claimants contend such sales were made at amounts**

23  **below what they should have sold for but for this,**

24  **that's based upon representations from counsel, the**

25  **claimants' statements, and/or things you read in**

Page 146

1  their depositions?

2    A.   Things I read in their depositions, things

3  that they put into their interrogatories or in their

4  SPPF or -- or anything like that.

5    Q.   But you didn't do any analysis of whether

6  that was an accurate statement or inaccurate?

7    A.   That's absolutely correct.

8    Q.   In your report, you say that you were asked

9  to determine out-of-pocket expenses.  And we've

10  touched on this, but I just want to make sure I

11  understand the use of that word "determine."

12       Was there anything else that you were trying

13  to do in terms of measuring the amounts put in

14  besides tying it into receipts or other evidences of

15  expenditures?

16    A.   Well, we were trying to determine the

17  accuracy of them.  So for instance, one of the

18  remediation expenses, the documentation was there,

19  everything was there, but it was missing a

20  50,000-dollar expenditure that was made to a

21  subcontractor as opposed to directly to the

22  contractor.

23       So there was an amount of, you know, going

24  through the documents, you know, as an accountant, a

25  forensic accountant, you know, tying things out and

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    making sure that things were included or not, as we

2    said before, duplicated or not duplicated.  But as

3    far as making determinations outside of the

4    financial and accounting accuracy, no.

5        Q.    And -- and again, you didn't verify each

6    expense independently as to whether it was

7    reasonable or in any other measure, just it had been

8    incurred?

9        A.    For the most part, that's correct.

10        Q.    Well, where would there be exceptions on

11    that?

12        A.    There -- there was -- I mean, the one thing

13    I can think of related to a motorcycle.

14        Q.    Okay.

15        A.    And I don't know that I made any

16    determination, but there was conversation as to

17    whether or not to include that motorcycle in the

18    personal damages -- personal property damages.  And

19    we talked about a number of different things, and

20    I'm pretty sure that that's not included.

21        Q.    When you say it's "not included," meaning

22    you didn't put it into your damage report?

23        A.    That's correct.

24        Q.    And why did you determine not to put the

25    motorcycle in?

Page 148

```
 1      A.   There were a combination of things and I --
 2   it was older, but then also I had read somewhere
 3   that they had sold it, but they couldn't tell me how
 4   much they sold it for.  And I just -- I don't
 5   remember what it was at that point, but the
 6   combination of all those things, we just felt that
 7   -- now, I was trying to be conservative for the most
 8   part with measurements, but in that particular case,
 9   I said -- you know, I don't remember my exact words,
10   but I said I'd prefer not to include it.
11      Q.   It was a Kawasaki motorcycle, if I recall
12   correctly.
13      A.   That's good, yes.  On a yellow receipt.
14      Q.   Did it have anything to do with the fact
15   that it might have been parked outside as opposed to
16   inside?
17      A.   No.
18      Q.   Any others that come to mind?
19      A.   Other than things that we've already spoken
20   about, I don't think so.
21      Q.   Did you ask --
22      A.   Actually, I take that back.  I'm sure there
23   are some other ones that aren't coming to my mind,
24   but the majority of them are the ones we've spoken
25   about.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1      Q.   Is there any way that we can find those from

 2   your -- your work papers to see which ones you

 3   exercised that additional level of inquiry?

 4      A.   I think it would just be things that might

 5   be listed somewhere that aren't on my listing, so I

 6   don't think so.

 7      Q.   Okay.  But I'm correct in saying there was

 8   no comparison on items in your damage reports and

 9   market values or things of that ilk?

10           That's not part of what you were doing?

11      A.   That's correct.

12      Q.   And I think I used the term "market values."

13           You didn't -- just to be clear, you didn't

14   make any effort to compare the prices in your report

15   for any personal property items with any other

16   measure of value except what the receipts were

17   showing?

18      A.   With one exception where, actually, I was

19   provided with an inventory that included a column

20   that had -- I believe they referred to it as

21   "replacement cost."

22      Q.   And which one was that?

23      A.   I believe that is for Claimant 3.

24      Q.   Let's see.  Is that David Deeg and Deborah

25   Hooker?
```

Page 150

1    A.   Yes.

2    Q.   Okay.  And where can we find in your

3  reports, if it's there -- it wasn't in your work

4  papers -- that other inventory?

5    A.   Well, if you look at Exhibit 3.1 --

6    Q.   Right.

7    A.   -- you will see that there is a -- five

8  pages of detail.  And when you look at "Supporting

9  Document" for that detail, it says "Duraclean

10  Inspection Report."  And it provides the -- the

11  Bates number from which each line item came and it

12  identifies that it was Exhibit 8 to a deposition,

13  and it identifies the PDF page that it came from.

14    Q.   Okay.  So that --

15    A.   The document itself is, of course, not with

16  my report, but it's specifically referenced.

17    Q.   And in that instance, you're not expressing

18  any opinion on whether those values are correct,

19  that's somebody else's work directly?

20    A.   That's correct.

21    Q.   Is that the only instance where you have

22  something of that nature?

23    A.   That's the only thing I can recall right

24  now.

25    Q.   All right.  While we're on that, why don't

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1  we just work through the column just to understand

2  what these are, if you don't mind. We're on 3.1.

3       The first column -- these are all

4  extractions from your Excel spreadsheets?

5    A.   These are -- that's fair enough. This is an

6  extraction from the support database.

7    Q.   Okay.

8    A.   And it -- less information was brought over

9  to here so that it could give you the relevant

10  columns for this. There may be one or two instances

11  where I might have made an update on the exhibit and

12  didn't make it on the original support database, but

13  they'd be very few.

14    Q.   All right. So the first column is just

15  "Type." Is that just the category into which you've

16  allocated that expense?

17    A.   That's correct. If you recall on the --

18  when we were looking earlier at the Support Master

19  Database or Master Support Database, there was a

20  column before that that had Damage, Not Damage,

21  Settlement. And so that wasn't necessary to make

22  this schedule so big since everything that's on here

23  is damage, so I didn't include that column.

24    Q.   Okay. Now, if I look at the Support Master

25  Database -- let's see if I can find this. Are you

Page 152

```
 1    saying that the -- the type is just a selection from

 2    the options in there?

 3       A.   Yes.

 4       Q.   Okay.  And in there, I'm seeing a number of

 5    different types of categories, if you will.  I don't

 6    know if you can pull that up.

 7       A.   What I'm going to do is pull up the one that

 8    was sent to you that was the most recent updated

 9    one, that was sent when we sent you the corrections

10    to 12.

11       Q.   "Support Master Database Updated (12)"?

12       A.   And it's got a little parenthesis in it that

13    says 12?

14       Q.   That's the one I'm looking at.

15       A.   Perfect.  Yeah.  Make sure we're on the

16    same --

17       Q.   And I see under the "Type," there is a

18    number of possible selections, if you look at the

19    dropdown.

20       A.   That's right.

21       Q.   Okay.  Let's run through those for a second.

22            What were "Additional Damages"?

23       A.   Additional damages were the things that fell

24    into a category consistent with Judge Cooke's order.

25    I would have to go into the specifics of that, but
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1   those are things that were not some of the things

2   that she specifically made reference to.  So it was

3   not alternate living expenses, it was not personal

4   property damage, it was not remediation.

5        You see in some cases, I -- I would have put

6   a -- I would have put a description of it, so one of

7   them says "Additional Damages, Lost rent."

8   Q.   Right.

9   A.   The particular one that's only called

10  "Additional Damages" actually just relates to a

11  small group of expenses, and those were attorneys'

12  fees and that was primarily for Claimant Miranda and

13  that related to costs in connection with their

14  foreclosure and possibly bankruptcy.  I don't

15  remember if they -- which they had.  I'd have to

16  look at that.  And then 96 dollars' worth of FedEx

17  expenses in connection with, I guess, this -- this

18  matter.

19  Q.   Are those included in your damages for

20  Miranda or excluded?

21  A.   Included.

22  Q.   Okay.  And why would you put the foreclosure

23  costs in your damages?

24  A.   One of the specific things in Judge Cooke's

25  order said "costs in connection with foreclosure,"

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 154

1    so they have been itemized there.

2        Q.   Now, it says on there, if I'm looking at it,

3    "Supporting Document Engagement Agreement"?

4        A.   That's correct.

5        Q.   Okay.  And then "proof of payment, no"?

6        A.   That's correct.

7        Q.   What does that mean?  You couldn't --

8        A.   I didn't have copies of the actual checks of

9    the payments, but I had copies of the agreement that

10   called for the payments.

11       Q.   And it called for payments at different

12   times?

13       A.   Yes.

14       Q.   Okay.  All right.  Did you make any attempt

15   to verify if those payments were actually made?

16       A.   Other than knowing that I didn't have the

17   checks and they weren't available to me.  We -- we

18   would ask, Do you have the checks?  And they would

19   say no.

20       Q.   So you would have asked the plaintiff's

21   counsel?

22       A.   That's correct.

23       Q.   But you didn't go to the lawyer -- the law

24   firm that was referring to, the third --

25       A.   No.  No.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.   Is it fair to say that in your work, you

2  have not reached out to third parties to verify data

3  that was not available through counsel?

4    A.   Other than going onto research property

5  information, that's correct.

6    Q.   Public records?

7    A.   Public records, that's correct.

8    Q.   Question:  When you were preparing your

9  report, actually before you issued your report, did

10  you provide the report and the schedules to each of

11  the plaintiffs to have them review it before you

12  finalized your report?

13    A.   I provided it to each of their counsel.

14    Q.   Each of their counsel.

15      And did you get any comments back before you

16  issued your report from the plaintiffs?

17    A.   Yes.

18    Q.   Okay.  Which ones?

19    A.   One was Kevin and Stacy Rosen with regard to

20  not having included all of the capital improvements.

21    Q.   That's the one we talked about earlier?

22    A.   That's correct.

23    Q.   Anyone else?

24    A.   I think I may have fielded a question or two

25  with regard to -- I remember there was one question

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 156

1    in connection with the duration of somebody's

2    remediation period.  It was more of a question, and

3    I don't remember if anything changed as a result of

4    that.

5        Q.   Okay.

6        A.   Take West Palm Beach off of the header.

7             I don't remember anything else coming up.

8        Q.   Okay.

9        A.   I think, you know, there were a couple -- a

10   couple of questions and then -- I apologize.  Then

11   subsequent to actually issuing the report, I heard

12   back with regard to the one that we talked about for

13   Martinez about there being some additional -- I

14   guess they went to look into why their number was

15   lower, and aside from the motorcycle, they realized

16   that these other things that had been on one of the

17   things that they had submitted for -- for

18   reimbursement for hadn't been picked up, and that's

19   that reverse osmosis, and I think some

20   air-conditioning repair.

21       Q.   Okay.  And that's -- that's how you got

22   those additional receipts?

23       A.   That's correct.

24       Q.   But no further discussions with them at that

25   point?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 157

1    A.    Not with the parties.  I -- I don't think

2    I -- I never talked to the Martinez claimant but

3    conversations with Mr. Albanis specific to that.

4    **Q.    Do you recall anything more about those**

5    **receipts than what we talked about earlier?**

6    A.    No.  It was in a package that had a lot of

7    the same receipts.  We had to actually go through

8    there to make sure that we weren't duplicating any

9    of them, and these was toward the back of that

10   package.  So I don't know if it got cut off from a

11   package or what happened, but it was -- it was clear

12   that -- clear that they had intended those to be

13   included as part of their personal property damage.

14   **Q.    Okay.  Let me take you back, since we were**

15   **there, to the Support Master Database updated -- and**

16   **in fact, to be fair to you, I think we have that as**

17   **an exhibit.**

18         **I'm going to turn to my colleague who is**

19   **better at managing these things than I am and ask if**

20   **we have that as an exhibit.**

21         MR. KALIL:  While he's doing that, let me

22         digress for one moment and just tell everybody I

23         realized on the break that I had marked as

24         Exhibit 8, the Steve and Cathy Etter report, I

25         had marked a copy that I had actually written on.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 158

```
 1        With your permission, I will substitute a clean
 2     copy.
 3            MR. BREIT:  With permission.
 4   BY MR. KALIL:
 5      Q.    And I'll just ask Mr. Elkin to verify that,
 6   just to make it clear.
 7      A.    That looks to be a complete copy.
 8      Q.    All right.
 9            (Elkin Exhibit 9 was marked for
10   identification.)
11   BY MR. KALIL:
12      Q.    Mr. Elkin, let me hand you, just so we can
13   do it for the record, what we've had put together as
14   Exhibit Number 9, and I believe that is everything
15   that was sent to us when you updated Exhibit 12,
16   including the Excel spreadsheets we've been talking
17   about, but if you'd take a minute and just verify
18   that for me.  My apologies, but --
19      A.    I'll try.
20      Q.    Start --
21            MR. BREIT:  Take your time.
22   BY MR. KALIL:
23      Q.    Take your time.
24      A.    Yeah.
25            MR. BREIT:  I'll be back tomorrow.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 159

```
 1              Have you looked at it?  That's what I want
 2     to know.
 3              MR. KALIL:  Have I looked at it?  Yes.
 4              Do you want to go off the -- for a second?
 5     Let's not burn the tape.
 6              THE VIDEOGRAPHER:  The time is 2:16.  We're
 7     going off the video record.  Stand by.
 8              (Recess from 2:16?p.m. until 2:22?p.m.)
 9              THE VIDEOGRAPHER:  The time is 2:22.  We're
10     back on the video record.
11                  (Discussion off the record.)
12     BY MR. KALIL:
13       Q.    Mr. Elkin, you have in front of you what's
14     been marked as Exhibit 9, and I will ask you if you
15     recognize that as the updates you provided to
16     Exhibit 12, to the Documents and Other Information
17     Considered Updated, the Report Exhibits Updated, the
18     Support Master Database Updated?
19       A.    I believe that's correct.
20       Q.    Okay.
21       A.    The Support Master Database Updated (12) is
22     a little bit difficult because it's multi pages.
23     What I did verify is that the first and last group
24     of them are the same, and then I know specifically
25     that there were Martinez items that were changed,
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 160

```
 1   and so I did find them on the spreadsheet, but I
 2   couldn't possibly go through line item by line item,
 3   but it seems correct.
 4        The only other thing is at the back of this
 5   binder, there is a blue sheet and then another copy
 6   of a Support Master Database, and I don't know if
 7   that is the original one or what it's intended to
 8   be.
 9        Q.   That's a fair question, and I suppose the
10   only way we can find out the answer is if we look
11   for the change.
12        A.   Yeah, and I don't see the changes on it.
13   That's why I suspect that it's not what was -- what
14   accompanied it.
15        Q.   Okay.
16        A.   So --
17        Q.   We may well have put that into the -- so we
18   can --
19        A.   It makes perfect sense.  I just didn't want
20   to say that was everything because I don't think I
21   sent you that one with it as well.
22        Q.   Oh, well.
23        A.   Let's look again.
24        This was -- yeah, I only sent you the
25   updated.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 161

```
 1     Q.   Now, whether we work from the paper or work

 2   from the electronic, I was going to ask you if you

 3   would go back to the support master database so we

 4   can run through some of the categories --

 5     A.   Okay.

 6     Q.   -- that you have in there and see what they

 7   relate to.

 8     A.   Okay.

 9     Q.   Okay.  If we look under the Types, I

10   think we -- excuse me, I said "categories," I meant

11   "Type."  I just wonder if you can tell us what, for

12   instance, "betterment" is.  It's one of the types

13   you have selected there.

14          I believe it's under D for --

15     A.   Yeah, I'm just -- I'm -- I'm going to --

16     Q.   -- select all --

17     A.   Yeah, I don't want anything else filtered

18   through this.

19          Okay.  I'm sorry.  Your question was?

20     Q.   What did you intend the word "betterment" to

21   be in that part of your report?

22     A.   "Betterment" was intended to identify things

23   that might have been considered to be beyond the

24   scope of remediation --

25     Q.   Okay.
```

Page 162

1  A.  -- and, therefore, potentially not part of

2  remediation expense.

3  Q.  Did you also intend to include any

4  improvements beyond what had existed before?  And by

5  that, I mean if one of the Priority Claimants had

6  had an item that they said was damaged and they had

7  replaced it with a better item, were you factoring

8  that in in any way?

9  A.  No.

10  Q.  If we look at what comes up in "Betterment,"

11  it's only one of the priority plaintiffs?

12  A.  I believe that's correct.  I believe it's

13  Chapman, but we'll see.  Yes.

14  Q.  Okay.  And why did you include these under

15  "Betterment"?

16  A.  At one point I was reviewing Chapman's

17  deposition as well as the proposal that she had for

18  the remediation.  I think it was back in December of

19  2018.  And specifically in connection with questions

20  that she was asked, she identified a group of

21  expenditures as improvements.

22  Q.  Okay.

23  A.  I think she had made a -- I don't think they

24  had been done yet.  I don't even know if they have

25  been done yet today.  But she had identified, I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 163

1    think, that she had put a deposit down on them or

2    was about to put a deposit down on them, but they

3    had been specifically identified by her as beyond

4    the scope of remediation.

5        Q.    So you were relying on her statement this

6    was beyond, you weren't making an independent

7    determination on that?

8        A.    That's correct.

9        Q.    If we look down to "Capital Improvements,"

10   what does that refer to?

11       A.    So Capital Improvements would have been for

12   a couple of claimants that had specifically

13   identified work that they had done in addition to

14   purchasing the house to make capital improvements

15   or -- or improvements to the home that were not

16   personal property damage, things that were attached

17   to the home or part of the construction.

18       Q.    Okay.  And these -- these would be the

19   Rosens, both group of Rosen claimants?

20       A.    As it turns out.  Let's see if there is

21   anybody else in that category.

22             That's correct, it's just those two.

23       Q.    If I direct you to Line 2244, for example.

24       A.    Yes.

25       Q.    Wallpaper in the powder room, is that

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 164

1    something that they determined to be a capital

2    improvement or you determined it to be a capital

3    improvement?

4        A.   I determined it to be a capital improvement.

5        Q.   And why would you consider that capital

6    improvement?

7        A.   Because it's not something that can be taken

8    out of the home.  The delineation that I made,

9    because these came from -- from specific things that

10   they got from their design group, was if it was

11   something that you could pick up and take out of the

12   house, it was personal property, and if it wasn't,

13   then -- sort of also thought of that along the lines

14   of if I was selling the house to somebody, the

15   things that they would reasonably expect would stay

16   there or the things that you would expect you would

17   be able to take away, or if you weren't going to

18   take them away, they typically would go on a

19   separate schedule identifying those things in the

20   purchase of a residence.

21          So, for instance, televisions.  If I were --

22   typically that's considered personal property, but

23   if you are selling your home and they are getting

24   the televisions, sometimes you list those out on a

25   personal property rider or addendum.

Page 165

1     Q.    Okay.  Was there a listing that you gave to

2     your staff to help allocate these?

3     A.    I spoke to you earlier.  That's the work

4     that I had Rita Trabanco do.

5     Q.    Okay.

6     A.    So I gave her very specific instructions

7     with basically the description that I just gave you

8     and I think I changed three things on the entire

9     list that she did, but I went item by item.

10    Q.    So we found her work product?

11    A.    The result of her work product, that's

12    correct.

13    Q.    Is there anything else that she was doing

14    other than this one?

15    A.    She did other things in the case.  She

16    helped us -- I don't know if you've noticed, but on

17    all the things that are -- they are document ID'd,

18    at least at the point that I had her do it.  So if

19    there is a document ID in the title, because there

20    is no Bate number on it or anything else, I had her

21    put a footer in the bottom right of all those

22    documents so that if somebody printed that up, you

23    could see document ID and so it wouldn't just be

24    some loose paper and you would know that it was a

25    document ID that would have come from the portal.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.    So it was effectively making sure the

2    documents could be tracked?

3    A.    Yes.

4    Q.    All right.

5    A.    And she may have done some other schedules

6    for us here and there.  She's, you know, incredibly

7    fast with entering data into these things.  So I

8    don't know, Elan may have asked her to do one or two

9    projects along the way, but all of it got reviewed

10   at multiple levels.

11   Q.    Okay.  Now, the Rosen -- Michael Rosen,

12   Capital Improvements, were they based on a proposal

13   or were they based on actual expenses?

14        Can you tell?

15   A.    They were based on proposals that the

16   testimony was that these proposals were pulled

17   because that's the work they actually had done at

18   those costs.

19   Q.    And did you go beyond the proposals to

20   verify that in any way?

21   A.    I was unable to do that.  No.

22   Q.    Okay.  Let me ask you to turn to Type -- and

23   let me see if I can get the right one here, excuse

24   me -- "Settlement Check From Contractor."

25        I think we see just one.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 167

```
 1     A.   Yes.

 2     Q.   This is for Etter?

 3     A.   Yes.

 4     Q.   Okay.  And what did you understand that to

 5  be?

 6     A.   I understood it to be a check from J. Helm

 7  Construction.

 8     Q.   Was that the -- was that the company that

 9  built her home?

10     A.   I don't know.

11     Q.   Did you make any inquiries?

12     A.   No.

13     Q.   Did anybody suggest that that is something

14  you should follow up?

15     A.   No.

16     Q.   Can I ask you to look at -- do you have any

17  doubt that that is the contractor who built the home

18  for Ms. -- for the Etters?

19     A.   I don't know one way or the other.

20     Q.   Okay.  If we go to the "Type Settlement

21  Program Check," can you select that, please?

22     A.   Okay.

23     Q.   Okay.  And what do you understand these to

24  be?

25     A.   These were checks that I understood came
```

Page 168

1    through the vendors that are listed here.  It says

2    "Vendor" here, but that would have been probably the

3    payer; and the description there would have been a

4    description of the source.  This information would

5    have come from either the SPPF or the interrogatory

6    specifically related to this or copies of the checks

7    themselves.

8            Beyond that, I don't -- other than what it

9    says on them, I don't have a deep understanding of

10   what they were for.

11      Q.   Do you understand from the plaintiffs that

12   these were actually funds they received?

13      A.   Yes.

14      Q.   And these relate to a number of the

15   different plaintiffs?

16      A.   That's correct.

17      Q.   Okay.  And have you not included any of

18   these payments in any of your work for any of the

19   priority plaintiffs; is that correct?

20      A.   I have included these payments in a schedule

21   in my work papers.  I have not -- they are -- they

22   are part of what I make reference to in a paragraph

23   we reviewed earlier where I have not incorporated

24   them in any way into the calculations that I've

25   made.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1      Q.    Okay.  So these -- none of these payments

 2   find their way into the calculations you've made in

 3   your -- in your report?

 4      A.    That's correct.

 5      Q.    What is the total number of those payments

 6   that you're showing on this sort?

 7      A.    47.

 8      Q.    And what is the total value?

 9      A.    $628,221.

10      Q.    Okay.  And for it looks like all but five,

11   you actually have proofs of payment?

12      A.    It looks that way, although my notes tell me

13   it's possible that it -- that I have proof of

14   payment for two of those five.

15      Q.    Okay.  Now, help me --

16      A.    Now, it's probably not actually.

17      Q.    When you say the "notes," what notes would

18   you be looking for?

19      A.    I'm looking in the column that says

20   "Supporting Doc."

21      Q.    Okay.

22      A.    And since two of those said "check," I

23   thought perhaps we had a copy of the check, but I'm

24   looking at it.  It does appear to only go to the

25   SPPF.  I'm guessing in the SPPF, maybe it made
```

Page 170

1    reference to a check number or something.  So that

2    told me that it was a check but that I didn't

3    actually see the check, so I probably kept "no" in

4    there.  I would have to go back to the specific

5    document to be sure.

6        Q.   And if you wanted to do that, how would you

7    do that?

8        A.   I would go to the SPPF for this claimant,

9    which is Wites --

10       Q.   Okay.

11       A.   -- and I would take a look at what it said

12   there.

13       Q.   All right.  And it -- and the total amount

14   that you have identified as not having proof of

15   payment is what dollar amount?

16       A.   $72,784.

17       Q.   And for the balance, you do have proofs of

18   payment?

19       A.   Pardon?

20       Q.   For the balance of the settlement of -- I

21   think it's for the settlement -- let me get the

22   terminology.

23       A.   "Settlement program check"?

24       Q.   Yeah, settlement program check, you do have

25   proofs of payment?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 171

```
 1     A.   It does appear so.

 2     Q.   Okay.  Now, if you -- if you include in your

 3   selection "Settlement Program Check" and "Settlement

 4   Check From Contractor," what number do you get up to

 5   there?

 6     A.   $680,437, 43 different line items.

 7     Q.   Let me ask you to include whether or not you

 8   have proof of payment.

 9     A.   Do you want to know the whether or the not?

10     Q.   Well, let's include all of them.

11     A.   The "yes" or the "no"?

12     Q.   Let's include both.  Let's do all under

13   "Proof of Payment."

14     A.   Oh, actually, I realize -- I'm sorry.

15     Q.   That's okay.

16     A.   I still had that filter on --

17     Q.   That's what I thought.

18     A.   -- if that's what you meant.

19          $753,221.

20     Q.   And now, that -- you're looking currently at

21   the support database updated.  Would that

22   information be the same in the support database

23   original?  Would you also show $753,000 in either

24   settlement program checks or settlement checks from

25   contractors?
```

Page 172

1     A.    I -- I would think so because that was not

2   anything that changed based on the changes to

3   Exhibit 12 updated.

4     Q.    Okay.  Now, do you have a different type

5   that would include insurance payments or some other

6   denomination under "Type"?

7     A.    I don't see one, no.

8     Q.    Do you recall any of the priority plaintiffs

9   receiving a payment from an insurance company?

10    A.    Yes.

11    Q.    Do you know --

12    A.    I think so.

13    Q.    Do you know who that was?

14    A.    I don't.  I recall that the insurance

15  company was USAA I think.

16    Q.    That's consistent with my recollection.

17    A.    But I don't remember who it was.

18    Q.    Is there --

19    A.    Let me look and see if it -- if it's in

20  here.  It might not be in here.  I don't know if we

21  have the payment.  I remember reading that in a

22  deposition.  I don't actually remember -- I'm

23  guessing it's not in there.  Let's open up the whole

24  database and see if USAA is in there in case we

25  called it something else.

Page 173

1      Anything else sorted over here?  No.  So

2  that should be -- well, something sorted.  Yeah.

3  Damage.  Okay.

4      No, now that thing is sorted.  And we'll put

5  in periods just in case.

6      I don't believe it's in the database.

7  Q.  Okay.  Is there another place that you could

8  identify -- I think it might be Etter.  Is there any

9  way you can tell if Etter received that payment?  If

10  not, I can take a look.

11  A.  Well, if it's not in this database --

12  Q.  Right.

13  A.  -- then I hadn't identified it directly.

14  Q.  Okay.

15  A.  It's possible there was somewhere else and

16  not entered here because we were -- that was not the

17  primary focus of what we were doing.  But I think

18  other than seeing it in the deposition, that might

19  be the only place.

20      And that does make sense that it was Etter

21  because I was looking at Etter's deposition just

22  recently because of the revision that we did.

23  Q.  So it's --

24  A.  But I'm not aware of any documents

25  specifically related to it.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1      Q.   All right.  The reason I asked the question

2  is you had some that didn't have a proof of payment,

3  and I didn't know if there was distinction made

4  between those and the USAA?

5      A.   I don't think so.

6      Q.   Okay.  Do you recall the order of magnitude

7  of the USAA payment?

8      A.   I don't.

9      Q.   We'll find them and then come back to it.

10         All right.  Mr. Elkin, you had given us an

11  update this morning, Exhibit 4 updated for Steven

12  and Cathy Etter which we've marked as Exhibit 8.

13  Can I give that to you, please?

14      A.   Sure.

15      Q.   All right.  Mr. Elkin, let's take a look at

16  the update which you did.  This is Exhibit 8 for

17  Steven and Cathy Etter.  And while you've got --

18  actually, you've got a deposition exhibit.  Why

19  don't -- why don't we do that first, if you want?

20      A.   I was just looking, because you were making

21  reference to the USAA, and I noted on here that

22  there is an -- Exhibit 9 is a letter regarding a

23  settlement agreement between the Etters and USAA,

24  and you had asked me if I had any documents so --

25      Q.   Yes.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 175

```
 1      A.   -- I was looking to see what that document
 2   is.
 3      Q.   Let me mark a copy of that as Exhibit 10 to
 4   your deposition and hand that to you.
 5           (Elkin Exhibit 10 was marked for
 6   identification.)
 7   BY MR. KALIL:
 8      Q.   And ask you if that's what you're referring
 9   to?
10      A.   Okay.  Yes.
11      Q.   And do you see on Page 4 a reference to a
12   payment and settlement funds?
13      A.   Yes.
14      Q.   And what is the amount that's referenced
15   there?
16      A.   It's $368,203.69.
17      Q.   Okay.  And this was a document you had
18   available to you when you were preparing your
19   report?
20      A.   Yes.
21      Q.   Is there any reason -- well, but you didn't
22   put that number into your spreadsheet or your work
23   papers?
24      A.   That's correct.
25      Q.   Okay.  If you added that in to the prior
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 176

```
 1   number that you had calculated from all of the

 2   settlement payments and settlement program checks

 3   that had not been factored into your damage

 4   calculations, what would the total amount left out

 5   be?

 6       A.   Can you ask your question again, please?

 7       Q.   Sure.   If you include the $368,203.69

 8   described as a payment to -- payable to Steven and

 9   Cathy Etter in Exhibit 10 to your deposition or

10   Exhibit 9 to the Etters' deposition, and you add

11   that to the total of the settlement program checks,

12   settlement checks from the contractors that you had

13   previously described as not being included in your

14   damage calculations, what is the total that you have

15   not included in your damage calculations of these

16   numbers?

17       A.   $1,121,425 is the total of those checks or

18   those amounts.

19       Q.   And just to be clear, those are not anywhere

20   in your damage calculations in your expert report?

21       A.   Those are the items that are referred to in

22   the paragraph that we reviewed earlier, and they are

23   not part of the calculations in the exhibits.

24       Q.   Let me ask it a little bit differently.   Is

25   it fair to say that the $1,121,422 is how it rounds
```

Page 177

```
 1    up on mine is not included in the damage
 2    calculations in your expert report?
 3        A.   That weren't included there?
 4        Q.   Let me do it differently.
 5        A.   All right.
 6        Q.   I -- I said it -- if my questions are
 7    difficult, I'll make them better.
 8             You would agree with me, Mr. Elkin, that the
 9    sum we've just determined, $1,121,422 in payments
10    from the various sources we've discussed are not
11    deducted in any way from the damage calculations in
12    your expert report?
13        A.   That's correct.
14        Q.   Please take me through what you did with
15    respect to the Etters' calculation of lost equity in
16    the update you gave us this morning, and that's
17    Exhibit 8 to your deposition today.
18        A.   So referring to Exhibit 4.2 Updated that is
19    inside of attachment -- excuse me, Exhibit 8 of the
20    deposition.
21        Q.   So I can follow along with you, I'm going to
22    get 4.2 Original and 4.2 Updated so I can do them
23    both.  Okay.  All right.  I have 4.2 Updated in
24    front of me.
25        A.   I apologize.  Did you say to walk you
```

Page 178

```
 1    through the calculation?

 2       Q.   Well, let's first start with:  How did this

 3    come to your attention that this number was -- that

 4    the number reflected in Exhibit 4.2 of your original

 5    report was incorrect?

 6       A.   I had initially -- it came to my attention

 7    because I was doing a more detailed, different

 8    direction I think I described earlier of the

 9    amounts, and I was -- I was not coming up with the

10    same answer.

11            And when I was referring back to I believe

12    Mr. Etter's deposition, at that point I recognized

13    that we had treated the land as a separate

14    transaction, as though the land had been bought

15    separately, and then that the mortgage that was

16    taken out was strictly to cover the construction,

17    and that didn't seem right.

18            So I went back to look at the detail, along

19    with the deposition, along with my new

20    reconciliation methodology and realized that was in

21    fact wrong, and that the mortgage was taken out at

22    the time of the -- I think the land was recorded at

23    one point, but it was all very close to the same

24    point in time.

25            So it was clear that the mortgage included
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    the land; and, therefore, it was wrong to assume or

2    to build in a calculation that had the land in it,

3    600,000, and the construction at the million one,

4    whatever the amount of the loan was at that point.

5          So I went back and took the documentation --

6    we didn't have the HUD unfortunately from the

7    beginning, the settlement statement.  So I went back

8    and took the construction contract and identified

9    that the construction contract was for $1,465,716,

10   and I recognized that the estimate, according to the

11   Etters' answers to interrogatories, was that the

12   cost of the project was $1,524,843.

13         I was unable to determine why there was a

14   difference between the million 465 and the million

15   524, but it made sense that that amount would

16   include closing costs or other such costs.  So I

17   accepted that as an estimate for the settlement

18   costs.

19         I then took out the loan balance for the

20   actual loan of $1,253,000 reflecting that the amount

21   due from the claimant at close would have

22   approximated $271,843.  Then I took the mortgage at

23   the beginning of a million 253 and I understood that

24   the Etters had paid off their mortgage, and so I

25   gave them credit for paying down the entire

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 180

```
 1    1,253,000.

 2            And then to determine the cash paid to

 3    claim -- and then backed out from that the cash that

 4    they received upon the close of the sale in

 5    mediation -- in mitigation of 1,458,559, giving them

 6    a total lost equity as we've described as $66,284.

 7            (Elkin Exhibit 11 was marked for

 8    identification.)

 9    BY MR. KALIL:

10        Q.   Okay.  Let me show you what I've marked as

11    Exhibit 11 to your deposition, Mr. Elkin, and ask

12    you if you recognize that document.  It was

13    previously marked as Exhibit 2 to Mr. Etter's

14    deposition.

15        A.   Yes.

16        Q.   Is that the -- the contractor's agreement

17    that you were talking about?

18        A.   Yes, that's the very first line item that we

19    discussed.

20        Q.   Okay.  That is dated November 26, 2004?

21        A.   That's correct.

22        Q.   Okay.  And that's something that you had at

23    the time you did your first report, Exhibit 4.2?

24        A.   I did.

25        Q.   Okay.  And on the last page of that
```

Page 181

1    document, there is an amendment to contract.  Do you

2    see that?

3        A.   Yes.

4        Q.   And it talks about the purchase price of the

5    lot as $600,000?

6        A.   Yes.

7        Q.   Okay.  And if we go back to the page before

8    that, it also shows a $600,000 purchase price,

9    discounted lot price?

10       A.   That's correct.

11       Q.   And the total of 1,465,000 is the estimate?

12       A.   That's correct.

13       Q.   So you had that information.  Now, I note in

14   the original 4.2, for purchase price you had a

15   reference to Martin County property search.  Is that

16   something where you or someone on your staff had to

17   go out to search the public records of Martin County

18   to find out the acquisition price for the Etters'

19   property?

20       A.   Yes.

21            (Elkin Exhibit 12 was marked for

22   identification.)

23   BY MR. KALIL:

24       Q.   Okay.  Let me show you Exhibit 12, if I may,

25   to your deposition and ask if you recognize that

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 182

```
 1   document?

 2       A.   Yes.

 3       Q.   Is that the deed for the acquisition of the

 4   Etters' property?

 5       A.   Yes, it is.

 6       Q.   Okay.  And did you determine from the doc

 7   stamps on the deed that the purchase price was

 8   $600,000?

 9       A.   Yes.  I divided the 4,200,000 by seven cents

10   per thousand to determine that the $600,000 was the

11   purchase price.

12       Q.   And the date of the deed is what?

13       A.   December 8, 2004.

14            (Elkin Exhibit 13 was marked for

15   identification.)

16   BY MR. KALIL:

17       Q.   Okay.  Let me show you what I'm going to

18   mark as Exhibit 13 to your deposition.  I'm sorry to

19   slide it this way.

20            Do you recognize that document as something

21   you've seen before?

22       A.   Yes.

23       Q.   And is that the mortgage that's referenced

24   on your original Exhibit 4.2?

25       A.   Yes.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 183

1    Q.   And that is a construction mortgage?

2    A.   I believe so.

3    Q.   And that's for $1,172,000?

4    A.   That's correct.

5    Q.   Did you ever get a draw schedule for the

6    construction of the Etters' property?

7    A.   I did not.

8    Q.   Okay.  Did you ever ask for one?

9    A.   No.

10    Q.   When you or your staff were looking for the

11    documents -- sorry.

12         That document, the mortgage we've just

13    marked as Exhibit 13, is also referenced as a source

14    document in your original Exhibit 4.2 as a KR

15    document public records?

16    A.   Yes.

17    Q.   Does that mean it was retrieved by somebody

18    in your staff?

19    A.   Yes.

20    Q.   Okay.  Did they find anything else at the

21    time from the public records with regard to the

22    Etters' property?

23    A.   I don't believe they found anything else

24    that would have -- that they thought would be

25    useful.

```
 1      Q.    Did they find anything else that they

 2   brought to your attention that you determined was

 3   not useful?

 4      A.    No.

 5            (Elkin Exhibit 14 was marked for

 6   identification.)

 7   BY MR. KALIL:

 8      Q.    I'm going to show you what's marked as

 9   Exhibit 14 -- what I'm marking as Exhibit 14, if I

10   may, and ask if you recognize that document.  And

11   it's titled "Modification and Extension of

12   Mortgage."

13      A.    I have not seen this document.

14      Q.    Okay.  That appears to be from the public

15   records of Martin County, Florida.  Is that where

16   your staff retrieved the original mortgage?

17      A.    I believe so.

18      Q.    Does this appear or does it state on its

19   face that is a modification of the original

20   mortgage, and can you tell that by the book and page

21   number referenced?

22      A.    It does appear so.

23      Q.    They just missed that?

24      A.    I don't know if they missed it or they just

25   didn't feel it was relevant when they were looking.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 185

1    Q.   Okay.  Did you have any discussions with

2    anyone about what was relevant or not relevant in

3    giving the lost equity timely for the Etters at the

4    time you prepared Exhibit 4.2?

5    A.   The discussion was that we would try to

6    determine the history of the purchases, sales, and

7    financing.

8    Q.   And Exhibit 4.2 was attributing a $1,172,000

9    mortgage in addition to a $600,000 purchase price as

10   the equity, as you described it, that was put in by

11   the Etters when you did that first calculation?

12   A.   Yes, and that was incorrect.

13   Q.   Okay.  And would it have been important to

14   know if the mortgage had been modified in any way?

15   A.   It, along with -- even without having this,

16   had I seen the documentation and put two and two

17   together in a better form, I would not have needed

18   this to make that correction.

19   Q.   Okay.

20   A.   I had the information originally, and that

21   was a mistake.

22   Q.   And the information you're talking about is

23   the deposition testimony of the Etters; is that

24   correct?

25   A.   Well, it's the deposition testimony and the

 1    other records we just looked at, the purchase

 2    contract that does make it clear that the $600,000

 3    was embedded in that, the mortgage that took place

 4    at the same time.

 5        Q.    All right.

 6        A.    So I would not have needed this Exhibit 14

 7    to -- I should have identified that correction at

 8    the time I was reviewing it initially.

 9        Q.    All right.  So what you -- you've done,

10    though, is you've then gone further and -- excuse

11    me, let me show you another document, and I

12    apologize for skipping around here.

13            (Elkin Exhibit 15 was marked for

14    identification.)

15    BY MR. KALIL:

16        Q.    I'm going to show you what's been marked as

17    Exhibit 15 to your deposition and ask you if you've

18    seen that document before?

19        A.    I've not seen this specific document.

20        Q.    Does that appear to be a mortgage

21    modification and consolidation agreements of

22    November 22nd, 2006?

23        A.    Yes.

24        Q.    Does it appear to relate to the Etters'

25    loan?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 187

1    A.    Yes.   In fact it's the balance that was used

2    in my updated calculation of 1,253,000 which I

3    didn't take from this document, but I took instead

4    from the information from the actual loan

5    statements.

6        Q.    When you say the "loan statements," what

7    specifically were you referring to?  It says in your

8    updated 4.2 loan statement as Etter Deposition

9    Exhibit 3.

10       A.    I've brought up on the screen Exhibit 3,

11   which was referred to in my schedule.  This is a

12   loan statement as it says up in the top right corner

13   for Seacoast National Bank dated November 19th,

14   2010, stating that the current balance is 1,253,000,

15   which is the same number on the document that you

16   just gave me from the public records.

17       Q.    Right.  Now, that loan statement is

18   December 1st, 2010.  What date did the Etters sell

19   their property, according to your updated

20   Exhibit 4.2?

21       A.    I believe it was 2016.

22       Q.    So some four-and-a-half years later?

23       A.    Give or take.

24       Q.    Okay.  Did you -- did you obtain any further

25   documentation about the loan balance on the date of

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 188

1  sale?

2      A.    My understanding is the loan had been paid

3  off by the date of sale.

4      Q.    What was that based on?

5      A.    The fact that the HUD did not show any

6  mortgage being paid off at that date and Mr. Etter's

7  testimony that had he paid off the loan when he sold

8  his business.

9      Q.    If I'm not mistaken, you are attributing the

10  full mortgage balance as a -- an investment by the

11  Etters; is that correct?  Let -- let me -- let me do

12  that differently.

13          In your calculations of lost equity on

14  Exhibit 4.2 Updated, what are you treating as the

15  equity?

16      A.    The amount that would be calculated as due

17  from the claimant at close, the amount of the

18  mortgage that they paid off, less cash paid to

19  claimants on the sale of the home.

20      Q.    Okay.  Now, if I take you back to

21  Exhibit 4.2, before you updated it, there's an

22  item -- an entry "Mortgage Beginning Balance."

23          Do you see that?

24      A.    In the -- in the original?

25      Q.    Yes, in the original.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1     A.   Yes.

 2     Q.   And that's $1,172,000?

 3     A.   That's correct.

 4     Q.   And then on the "Mortgage Beginning Balance"

 5  on Exhibit 4.2 Updated, it's moved to $1,253,000?

 6     A.   That's correct.

 7     Q.   How did you verify what was done with the

 8  additional amounts borrowed, if at all?

 9     A.   I did not.

10     Q.   Okay.  Fair enough.  Would you agree with me

11  that if the additional borrowings were not put into

12  the house, your amended calculation of lost equity

13  would not be accurate for what it is intended to

14  show?

15     A.   That depends on if it was closing costs or

16  other things that were intended to modify the

17  mortgage.  If it was cash that had been purely taken

18  out, then I would agree with that.

19     Q.   And you didn't make any effort to determine

20  what those amounts were used for?

21     A.   That's correct.

22     Q.   Okay.  Did you find any other -- well, let

23  me say it differently.

24          In your calculations of lost equity for any

25  of the other Priority Claimants, have you found any
```

Page 190

```
1    errors?

2        A.   We talked earlier about Rosen.

3        Q.   Yes.

4        A.   No, I haven't.

5        Q.   Okay.  Have you found all of the source

6    documents that you wish to look at for each of the

7    Priority Claimants to do the calculations you are

8    doing on lost --

9        A.   On many of them I would prefer to have the

10   HUDs, so I don't have the HUDs for everything.

11       Q.   Fair to say that you don't have supporting

12   documents to show the precise details on some of

13   those?

14       A.   That's correct.

15       Q.   Is there a possibility that any of the

16   Priority Claimants might have -- other than we've

17   talked about so far, might have taken out equity

18   from their homes by way of borrowings and used it

19   for purposes other than improvements to their house?

20       A.   I don't believe, based on my review of

21   these, that such circumstances exist; and I believe

22   I would have identified -- one in particular I did

23   identify and I don't recall any others -- where the

24   circumstances or the sequence of borrowing would

25   have lent to that opportunity.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    Q.   Fair enough.  And just to be clear,

2  Mr. Etter -- Mr. Elkin, my apology.

3        To be clear, Mr. Elkin, in your calculations

4  for lost equity for Steven and Cathy Etter, you do

5  not include in the calculations the USAA payment in

6  any fashion?

7    A.   That's correct.

8        MR. KALIL:  Can we take a two-minute break?

9        THE VIDEOGRAPHER:  The time is 5 minutes

10   after 3:00, and we're off the video record.

11       Stand by.

12       (Recess from 3:05 p.m. until 3:12?p.m.)

13       THE VIDEOGRAPHER:  The time is 12 after

14   3:00, and we're back on the video record.

15  BY MR. KALIL:

16   Q.   Mr. Elkin, you mentioned before we went off

17  that you had one other circumstance where you

18  identified a Priority Claimant may have taken money

19  out.  Do you -- I think that's what you said.  Do

20  you recall who that might be?

21   A.   I believe it was Kevin and Stacy Rosen.

22   Q.   Okay.  Okay.  Let me take you back to one

23  last point on the Etters, and I'm going to direct

24  you to Exhibit 6 which you provided me this morning,

25  which is the yellow stickies.  Do you have that

Case 1:09-md-02047-EEF-MBN Document 22363-54 Filed 11/19/19 Page 197 of 221
388
Case 2:09-md-02047-MCE-EF Document 279 entered on FLSD Docket 08/15/2013 Page 193 of

Page 192

1    handy?

2        A.    Yes.

3        Q.    Okay.  You've got -- first of all, you've

4    said $59,127 is an estimate for closing costs.  But,

5    again, just to be clear, there -- there is no

6    documentation that supported that?

7        A.    Yeah.  I don't know if it was closing costs

8    or potentially overruns for the construction or

9    potentially an error in Mr. Etter's calculation.

10       Q.    Okay.  And do you know if the original loan

11   for the Etters was $1,172,000, the original

12   mortgage, but they show a purchase price of

13   $1,465,716 on your updated schedule, do you know

14   where the balance came from?

15       A.    My understanding is it came from the

16   claimants.

17       Q.    And do you know how they paid that?

18       A.    I do not.

19       Q.    Okay.  You don't have any supporting

20   documents to establish that they did in fact pay

21   that?

22       A.    Other than testimony, I don't believe so.

23       Q.    And what would the difference be on that

24   between those two numbers, if you just did the math?

25       A.    Well, it -- if it's on the million 172?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 193

1      Q.    Yes.  The million 172 being the original

2   loan amount --

3           MR. BREIT:  Do you need a calculator?

4           THE WITNESS:  Yeah, I've got one.

5   BY MR. KALIL:

6      Q.    -- and 1,465,416 being the amount that they

7   had put on their -- I believe their claimants'

8   profile form -- or their answers to interrogatories,

9   excuse me.  What is the amount that you do not have

10  support for beyond that?

11     A.    And I apologize again.  Your question?

12     Q.    Sure.  If I understand it correctly, in your

13  updated schedule for Steven and Cathy Etter, you've

14  calculated a purchase price for the land and

15  construction of $1,465,716 based upon the

16  construction contract and the deposition testimony;

17  is that correct?

18     A.    Yes.

19     Q.    And the original mortgage that was taken

20  out -- and we can get the date of it -- which was in

21  December of 2004 was for $1,172,000.

22          What is the amount that had to be provided

23  from some other source?

24     A.    $293,716.

25     Q.    And am I correct that you have never seen

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 194

1    any proof that that additional 293,716 was in fact

2    paid?

3       A.    That's correct.

4       Q.    Do you know if the Etters received any

5    deduction on their income taxes relating to Chinese

6    drywall?

7       A.    I don't recall.

8       Q.    Okay.

9       A.    I imagine they did.

10      Q.    Okay.

11      A.    I think that might be from testimony.

12      Q.    I could direct you to Page 80 of I believe

13   it is Steven Etter's deposition of January 11, 2019

14   where the topic came up.  I'm going to ask you if

15   you have seen that before?

16      A.    Yes.

17      Q.    Okay.  So there is a reference to that.  Did

18   you --

19      A.    As I indicated, I thought I had seen it in

20   the deposition --

21      Q.    Yeah.

22      A.    -- and that's what I saw.

23      Q.    But you don't have any information as to

24   what amount they might have received on their taxes?

25      A.    That's correct.

Page 195

1  Q. Did you make any efforts to find that out?

2  A. No.

3  Q. Can I direct -- well, let me first ask you:

4 Do you recall if the Etters received any reduction

5 in their property taxes for their home as a result

6 of Chinese drywall?

7  A. I don't know.

8  Q. Can I direct you to Page 33 of Mr. Etter's

9 deposition, and particularly Lines 5 through 9?  Did

10 you read that before?

11  A. Yes.

12  Q. Okay.  Mr. Etter appears to be saying that

13 there was a program in Martin County to give you a

14 lower tax value; is that correct?

15  A. Yes.

16  Q. Okay.  Did you make any efforts to verify if

17 that had in fact occurred?

18  A. No.

19  Q. And on Page 34, Lines 2 through 4, Mr. Etter

20 confirms that reduced his tax payments; is that

21 correct?

22  A. That's what it says.

23  Q. Okay.  Do you have any reason to doubt that?

24  A. No.

25  Q. Mr. Elkin, can I direct to you Exhibit 4.1

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1    with regard to the Etters?

 2        A.    Yes.

 3        Q.    And what -- again, that is a calculation of

 4    damages that you have done for the Etters?

 5        A.    That's correct.

 6        Q.    Okay.  Do you see -- let me find it here.

 7              Do you see any charges for Florida Power &

 8    Light for the Etters under "Alternate Living

 9    Expenses"?

10        A.    Yes.

11        Q.    And what's the earliest date that you see a

12    charge for that?

13        A.    December of 2012.

14        Q.    Okay.  And what is the latest date you see

15    for that?

16        A.    September of 2013.

17        Q.    Okay.  Now, when were that -- when did they

18    return to the property?

19        A.    August of 2013.

20        Q.    Okay.  You didn't exclude the September

21    statement?

22        A.    Well, it's September 6th.

23        Q.    Okay.

24        A.    So it would include power through the month

25    of August.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 197

1    Q.   Okay.

2    A.   And to the extent that they were making

3  payments at an alternate -- at an alternate

4  location, it seemed to be appropriate to include

5  that.

6    Q.   All right.  When you included for

7  calculations of alternate living expenses, did you

8  attempt to make any adjustments for reduced expenses

9  at the primary residence?

10   A.   No.

11   Q.   In any instance?

12   A.   No.

13   Q.   Okay.  Is it correct that you did not

14  attempt to adjust for duplicative alternative living

15  expenses in your analysis?

16        MR. BREIT:  Could you define what you mean

17   by "duplicative expenses," please?

18        MR. KALIL:  Certainly.  Certainly.

19  BY MR. KALIL:

20   Q.   Am I correct that if you were including a

21  utility expense in an alternate living location, you

22  did not adjust for any reduction in the living

23  expense in the primary location?

24   A.   That's correct.  My calculation is the

25  expenses they incurred in an alternate living

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1    facility.

2        Q.    Okay.  And -- and you don't do any offset

3    for reductions elsewhere?

4        A.    I did not.

5        Q.    Okay.  Were you -- were you asked not to do

6    that, or was that your choice?

7        A.    My choice.

8        Q.    Hold on one second.  I think we may be done.

9            Mr. Elkin, did you read all of Mr. Steven

10   Etter's deposition of January 11, 2019?

11       A.    I don't recall if I read the whole thing or

12   if I read through parts.

13       Q.    Okay.

14       A.    I feel like I read the whole thing, but I'm

15   not sure.

16       Q.    Do you recall Mr. Etter stating that they

17   stopped paying for utility services at their primary

18   home while it was being remediated?

19       A.    I don't recall one way or another, but it

20   wouldn't surprise me.

21       Q.    Let me direct you, if I may, to Page 145 of

22   Mr. Etter's deposition, and Page [sic] 18, if I may,

23   or you can start before that if you wish.

24       A.    I see that.

25       Q.    Do you agree with me that Mr. Etter saying

1  he ceased paying for utilities at his primary

2  residence when he moved to the alternate residence?

3      A.    Yes.

4      Q.    And why would you consider the expenses at

5  the alternate residence an additional cost?

6      A.    They were expenses that they had for their

7  alternate living facility.  As to whether or not

8  other expenses changed, I think that that has more

9  to do with the loss of enjoyment or other elements

10 of damage than as a direct offset against these

11 components.

12     Q.    So if somebody moves out of one residence

13 and ceases having any expenses associated with it

14 and moves into another residence and has the same

15 expenses they would have had in the primary, you

16 could count those expenses as alternate living

17 expense just because they are in a different

18 location?

19     A.    Well, I'm identifying the costs at the

20 alternate facility.  There are a lot of other

21 factors that go into play as to expenditures that

22 did or didn't continue in a house they were no

23 longer able to live in, and so I considered those to

24 be factors that should be considered separately.

25     Q.    And where are those considered in your

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 200

1    report for the Etters?

2        A.   I'm not addressing loss of use and

3    enjoyment.

4        Q.   So am I correct in saying that your

5    definition of "alternate living expenses" does not

6    require an increase in expenses, just a different

7    location?

8        A.   It's the expenses that they incurred at an

9    alternate living residence.

10       Q.   Are we saying the same thing or something

11   different?

12       A.   Pardon?

13       Q.   Are we saying the same thing or something

14   different?  And did -- is --

15       A.   If you want to read back.

16       Q.   Sure.

17       A.   I heard it as a little bit different.

18       Q.   And let me -- let me see if I can do that.

19            For purposes of your expert reports, have

20   you defined "alternative living expenses" in your

21   report anywhere?  I believe it's in Paragraph 17.

22       A.   Paragraph 17, Page 5 of 9 in my report and

23   Paragraph 18, but I don't believe I specifically

24   defined it.

25       Q.   Okay.  So --

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1   A.   I believe the expenditure is defined -- or

2   there are very different circumstances between

3   different claimants as to what they did for purposes

4   of living outside of the house that they couldn't

5   live in anymore, and so each one was considered

6   differently.  If somebody had a reduction in their

7   FPL bill because they moved into a smaller house or

8   a small condo or whatever it was, versus whatever

9   they were paying or stopped paying in the other

10  home, I considered those be two separate issues for

11  purposes of my calculation of alternate living

12  expenses.

13  Q.   Okay.  And when you say you consider those

14  to be two separate issues, one of which you are

15  going to tally up and one of which you are not going

16  to tally up; is that correct?

17  A.   That is correct.

18  Q.   So is it fair to say that in no instances

19  where you calculated alternative living expenses for

20  any of the Priority Claimants did you attempt to

21  limit those to additional expenses, these were just

22  any expenses?

23  A.   That's correct.

24  Q.   Does it say that anywhere in your report?

25  A.   No, I don't think it specifically says it,

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

1   but I think that it's what I did.  It's what I

2   believe my evidence and my -- my schedules reflect.

3   And to the extent sometimes things need a little

4   additional clarification, that's why we're here

5   today.

6       Q.   Well, I'm just trying to see where in the

7   schedules attached to your report we can determine

8   that there is -- is or may be a reduction in

9   expenses at the primary residence.  Is that

10  reflected anywhere in the schedules?

11      A.   The -- it's reflected by the fact there are

12  no reductions on the schedule.  That would be the

13  first -- the first thing.  And it's reflected in the

14  fact that all the things that are on there are the

15  full amount that they paid.

16           So that's simply looking at the schedule, as

17  you have already deduced.  The amounts that they did

18  pay are on there, and there is no deduction for

19  anything else.

20      Q.   Is there anything in the schedules attached

21  to your report to show the court or any finder of

22  fact that might see your report that there were or

23  were not continued expenses in other locations?

24      A.   No.

25      Q.   And I take it that leaving aside your

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 203

1    report, there is no work sheet or schedule from

2    which we could make that analysis in any of your

3    work papers?

4        A.    That's correct.

5            MR. KALIL:  Can we take a longer than

6        two-minute break for a different reason?

7            THE VIDEOGRAPHER:  The time is 3:31.  We're

8        going off the video record.  Stand by.

9            (Recess from 3:31?p.m. until 3:47?p.m.)

10           THE VIDEOGRAPHER:  The time `is 3:47.  We're

11       back on the video record.

12   BY MR. KALIL:

13       Q.    Mr. Elkin, just to follow up on one of the

14   questions I asked you before, is it correct that you

15   didn't make any efforts for any of the Priority

16   Claimants to gather information that would allow you

17   to do a comparison of their expenses in their

18   primary residence before they moved out and after?

19       A.    That's right.

20       Q.    Okay.

21       A.    And I'm aware of them, but I didn't do any

22   analysis.

23       Q.    All right.  I think we're done with Foster.

24           One topic we didn't go to and correct

25   earlier was you have in your report the damage

Page 204

```
 1   summaries, and I don't see a place for diminution in

 2   value and stigma.  I see a place for diminution in

 3   value.

 4          Do I understand correctly that you are

 5   expecting to receive additional numbers or

 6   information from other experts that will be put in

 7   that report or you're not planning on putting

 8   anything in?

 9   A.    I -- it was mentioned to me at one point

10   that maybe I would.  If I did, it would just be a

11   question of sticking something on and adding it.  I

12   wouldn't be doing anything above that.

13          When you say you don't see it, are you

14   saying because this line item just says "Diminution

15   of Value" on Exhibit 4?

16   Q.    Yes.

17   A.    Yeah.  I didn't -- when I -- when I put that

18   in there, I didn't have in mind the word "stigma."

19   Q.    Okay.

20   A.    And I just never made the change.

21   Q.    All right.  And -- and -- but I'm also

22   referencing this Page 7 of your report,

23   Paragraph 23, the narrative on "Diminution in Value

24   and Stigma."  I just want to be sure I'm

25   understanding you correctly.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 205

1          You're not going to be doing any analysis or

2     providing any opinions on that irrespective of what

3     you might learn from other experts; is that correct?

4          A.    That's right.

5          Q.    Okay.  What is the reason for including

6     counsel as represented to me that the amounts will

7     be provided to me by that expert at a later date,

8     what are you expected to do with those?

9          A.    I think if they wanted to have a summary up

10    there that had the numbers together, that I might

11    have just put it on my schedule and I just wanted to

12    make sure I gave a warning, "Hey, this number might

13    be" -- it says "TBD" right now, to be determined.

14    That didn't mean to be determined by me, and so

15    maybe they were going to ask me to put it on the

16    schedule.

17         Q.    But you wouldn't be expressing any opinions,

18    regardless?

19         A.    No.

20         Q.    Has there been any expansion of the scope of

21    your engagement since you signed your expert report

22    on February 19th, 2019?

23         A.    No, I don't think -- when I signed the

24    engagement, I don't know that we knew the full scope

25    of what it would be.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
 1     Q.   Okay.

 2     A.   But there was nothing beyond what I

 3   anticipated it would be like.

 4     Q.   Have you talked to any of the experts that

 5   might be generating reports on diminution in value

 6   or stigma since you were engaged in this case?

 7     A.   I had conversation with Mr. Graziano --

 8     Q.   Okay.

 9     A.   -- very much toward the beginning of the

10   engagement and have not spoken with him since, that

11   I can think of.

12     Q.   Do you recall what those conversations

13   centered on?

14     A.   I don't know how specific they were to any

15   particular issue, but I know that I spoke to him.  I

16   don't think that I spoke to him about methodologies

17   or anything like that.

18          I'm trying to think if -- I don't know that

19   there was anything very specific.  That was -- it

20   was sort of trying to gain an understanding with --

21   with others as to the scope of who was doing what,

22   so it was probably more about just in general who

23   was doing what.

24     Q.   Did you call him, or did he call you?

25     A.   It wasn't a phone call.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 207

```
 1        Q.   Did you meet with him in person?

 2        A.   I was at a meeting that he was in attendance

 3   at.

 4        Q.   Who else was there?

 5        A.   A lot of people.

 6        Q.   The best as you recall?

 7        A.   Elan, Natalie, Patrick Montoya, Greg Weiss,

 8   Holly Werkema, Allison -- I don't remember her last

 9   name --

10        Q.   Okay.

11        A.   -- but she's co-counsel with Holly on some

12   cases.  And some other people that I don't remember

13   their names, but I believe essentially the other --

14   there was a -- hopefully they won't read this

15   transcript and realize I didn't remember their

16   name -- Dugan or -- or --

17        Q.   Okay.

18             MR. BREIT:  We know who she is.

19        A.   And then there were some people that were,

20   like, down to the right, and I don't remember who

21   they were.

22             But they were -- there was a Pete was

23   there --

24   BY MR. KALIL:

25        Q.   Okay.
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 208

1      A.   -- if I didn't say him.

2           So there was -- there was everybody from all

3   four of these, and those are the ones I'm most

4   familiar with; and then, for instance, I don't

5   believe you were there --

6           MR. BREIT:  (Shaking head.)

7      A.   -- and Mr. Graziano.

8   BY MR. KALIL:

9      Q.   Do you recall when that meeting took place?

10     A.   I think it was like the first week of

11  February, maybe the end of January.  It was -- it

12  was very much toward the beginning of digging in.

13  We had -- we had dug in some but --

14     Q.   Did you make any notes from that meeting?

15     A.   I didn't.  At one point I drew a picture

16  with the names on it.  I should have kept that.  But

17  I looked at it and realized I had done a bad job.

18  At some -- like in a room like this, I will do that

19  so that I can remember.  So clearly I should have

20  kept it, but I think I got rid of it that day.

21     Q.   Anything else?

22     A.   But as far as notes themselves, no.

23     Q.   Did you gather any information at that

24  meeting that has made its way into your report?

25     A.   Not details.  I mean, I -- I talked a bit

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 209

1    about trying to understand what the -- how I was

2    going to be able to communicate with people and ask

3    questions and -- and get -- get information and

4    tried to understand what my scope would be with

5    regard to, you know, understanding there were other

6    experts and there is things that are not within my

7    scope.  So a lot of it was also making sure they

8    understood, you know, what was within my expertise

9    and what was not.

10       Q.  Have you had any subsequent meetings or

11   discussions with any of the other experts retained

12   by the plaintiffs?

13       A.   No.

14       Q.   All right.

15           MR. KALIL:  With your consent and counsel's

16       consent, this is probably a good place to break

17       for the day and pick it up at 9:00 o'clock

18       tomorrow, if that works.

19           MR. BREIT:  It's okay with me.

20           MR. KALIL:  Didn't think you'd complain.

21           MR. BREIT:  You're making me go to the gym,

22       which I didn't want to do.

23               (Discussion off the record.)

24           MR. KALIL:  If -- if I may, one thing

25       that -- just to give you a heads-up for

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 210

1    tomorrow -- if you don't mind going back on for

2    one second.

3         One of the things I want to do tomorrow, and

4    I want to give you advance warning so we can do

5    it quicker, I'd asked you earlier about how you

6    had determined prices for items that had been

7    damaged, personal property items, and you said it

8    would be a case-by-case basis.  I want to give

9    you the heads-up that I'd like to go through that

10   in some detail tomorrow so you can think about

11   that.  Maybe we can do it a little quicker rather

12   than just springing it on you.

13        MR. BREIT:  Can you give me an example, give

14   him an example --

15        MR. KALIL:  Sure.

16        MR. BREIT:  -- just to -- just so it will

17   help speed us up.

18        MR. KALIL:  I could pick any one of the 20

19   Priority Claimants and I'll select some of the

20   items in there and say, "Was this a cost when

21   they bought it originally?  Was this a

22   replacement cost?  Was this some other valuation

23   method, and how do you determine it?"

24        MR. BREIT:  Right.  So how do you have the

25   number to get you to that number that's on your

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 211

1      sheet?

2          MR. KALIL:  Exactly.  And -- and to get

3      variations on the theme and see what -- what the

4      variations are and how you determine them.  So I

5      can give you that ahead of time rather than

6      springing it on you.

7          THE WITNESS:  Okay.  I don't know that I

8      will be able to do anything in advance other than

9      go through detail, but I will think of -- I'll

10     give it some thought.

11         MR. KALIL:  If -- if -- I appreciate that.

12     I just didn't want it to come out of the blue.

13         THE WITNESS:  I appreciate it.

14         (Discussion off the record.)

15         THE VIDEOGRAPHER:  The time is 3:55.

16       (The deposition was recessed at 3:55 p.m.)

17         (Whereupon, the deposition recessed at

18     3:55 p.m.)

19

20

21

22

23

24

25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 212

```
 1              C E R T I F I C A T E

 2         I, SUSAN D. WASILEWSKI, Registered

 3   Professional Reporter, Certified Realtime Reporter

 4   and Certified Realtime Captioner, do hereby certify

 5   that, pursuant to notice, the deposition of MICHAEL

 6   ELKIN was duly taken on Monday, March 11, 2019, at

 7   10:05 a.m. before me.

 8         The said MICHAEL P. ELKIN, CPA was duly sworn

 9   by me according to law to tell the truth, the whole truth

10   and nothing but the truth and thereupon did testify

11   as set forth in the above transcript of testimony.

12   The testimony was taken down stenographically by me.

13   I do further certify that the above deposition is

14   full, complete, and a true record of all the

15   testimony given by the said witness, and that a

16   review of the transcript was requested.

17

18

19   Susan D. Wasilewski, RPR, CRR, CCP

20   (The foregoing certification of this transcript does

21   not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying reporter.)

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
                                                          Page 213
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully

 5    and make any necessary corrections.  You should

 6    state the reason in the appropriate space on the

 7    errata sheet for any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10    and date it.  It will be attached to your

11    deposition.

12

13           It is imperative that you return the

14    original errata sheet to the deposing attorney

15    within thirty (30) days of receipt of the deposition

16    transcript by you.  If you fail to do so, the

17    deposition transcript may be deemed to be accurate

18    and may be used in court.

19

20

21

22

23

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

```
                                                              Page 214
 1                          - - - - - -

 2                       E R R A T A

 3                          - - - - - -

 4    PAGE   LINE   CHANGE

 5    ____   ____   _____

 6       REASON: _____

 7    ____   ____   _____

 8       REASON: _____

 9    ____   ____   _____

10       REASON: _____

11    ____   ____   _____

12       REASON: _____

13    ____   ____   _____

14       REASON: _____

15    ____   ____   _____

16       REASON: _____

17    ____   ____   _____

18       REASON: _____

19    ____   ____   _____

20       REASON: _____

21    ____   ____   _____

22       REASON: _____

23    ____   ____   _____

24       REASON: _____

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 215

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4     acknowledge that I have read the foregoing pages, 1

 5     through 214, and that the same is a correct

 6     transcription of the answers given by me to the

 7     questions therein propounded, except for the

 8     corrections or changes in form or substance, if any,

 9     noted in the attached Errata Sheet.

10

11

12     _____      _____

13     MICHAEL P. ELKIN, CPA, CFF, ABV, CFE          DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20___.

20     My Commission expires: _____

21

22     _____

       Notary Public
23

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Page 216

```
 1                    LAWYER'S NOTES

 2    PAGE   LINE

 3    _____  _____   _____

 4    _____  _____   _____

 5    _____  _____   _____

 6    _____  _____   _____

 7    _____  _____   _____

 8    _____  _____   _____

 9    _____  _____   _____

10    _____  _____   _____

11    _____  _____   _____

12    _____  _____   _____

13    _____  _____   _____

14    _____  _____   _____

15    _____  _____   _____

16    _____  _____   _____

17    _____  _____   _____

18    _____  _____   _____

19    _____  _____   _____

20    _____  _____   _____

21    _____  _____   _____

22    _____  _____   _____

23    _____  _____   _____

24    _____  _____   _____

25
```