# EXHIBIT 34 part 2

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: $1,121,422..20

**Exhibits**

**Elkin 01** 4:12
10:3,17,21
32:11,12 73:14

**Elkin 02** 4:14
32:23 33:2
180:13

**Elkin 03** 4:15
40:20,23,24
187:9,10

**Elkin 04** 4:17,
23 48:10,14,17
53:7 56:9 65:1,
11,15 66:1
121:24 174:11
204:15

**Elkin 05** 4:19
13:1,4 23:15
27:5 28:3
84:11

**Elkin 06** 4:20
30:23,25
191:24

**Elkin 07** 4:21
62:18,19 63:5
66:3

**Elkin 08** 4:23
65:5,6,7,25
66:3 150:12
157:24 174:12,
16 177:17,19

**Elkin 09** 5:4
65:25 158:9,14
159:14 174:22
176:10

**Elkin 10** 5:7
175:3,5 176:9

**Elkin 11** 5:9
180:7,11

**Elkin 12** 5:11
64:12 121:23
122:2,3,21
125:25 158:15
159:16 172:3
181:21,24

**Elkin 13** 5:12
182:14,18
183:13

**Elkin 14** 5:13
184:5,9 186:6

**Elkin 15** 5:14
186:13,17

---

**$**

---

**$1,121,422**
176:25 177:9

**$1,121,425**
176:17

**$1,172,000**
183:3 185:8
189:2 192:11
193:21

**$1,253,000**
179:20 189:5

**$1,465,716**
179:9 192:13
193:15

**$1,524,843**
179:12

**$12** 111:12

**$271,843**
179:22

**$293,716**
193:24

**$368,203.69**
175:16 176:7

**$575** 19:3

**$59,127** 192:4

**$60** 111:12

**$600,000**
181:5,8 182:8,
10 185:9 186:2

**$628,221** 169:9

**$66,284** 180:6

**$680,437** 171:6

**$72,784** 170:16

**$753,000**
171:23

**$753,221**
171:19

---

**(**

---

**(12)** 152:11
159:21

---

**1**

---

**1** 10:3,17,21
13:22 32:12
63:11 73:14
89:18

**1,192,583**
133:7

**1,253,000**
180:1 187:2,14

**1,458,559**
180:5

**1,465,000**
181:11

**1,465,416**
193:6

**1,600,000**
132:19,24

**1,825,000**
132:8,16,23

**1,975,000**
133:2

**1.2** 32:12

**10** 175:3,5
176:9

**100** 8:6 24:11
38:18 39:3
123:16

**10:00** 6:7

**11** 180:7,11
194:13 198:10

**112** 13:23

**11:23** 68:25
69:2

**11:31** 69:2,3

**11th** 6:5

**12** 64:12
121:23 122:2,
3,21 125:25
152:10,13
158:15 159:16
172:3 181:21,
24 191:13

**12.1** 122:24

**12:31** 119:18,
20

**12:35** 119:20,
22

**13** 182:14,18
183:13

**14** 184:5,9
186:6

**145** 198:21

**15** 186:13,17

**150** 60:3

**16** 13:24

**17** 23:24 64:17
121:23 128:22
129:2,3,18
130:5 131:24
132:2,14
200:21,22

**17.2** 129:4
132:15

**172** 192:25
193:1

**17U** 131:25

**18** 198:22
200:23

**19** 63:18

**19th** 64:10 78:4
187:13 205:22

**1:00** 138:6,9

**1:00?p.m**
138:11

**1:53** 138:12

**1:53?p.m**
138:11

**1st** 187:18

---

**2**

---

**2** 11:18,19 14:1
32:23 33:2
67:11 129:21
180:13 195:19

**20** 63:11 64:6
68:4,8,15,19
89:18 100:5
124:3 210:18

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: 2004..access

**2004** 180:20
182:13 193:21

**2006** 186:22

**2010** 187:14,18

**2011** 110:24

**2012** 196:13

**2013** 196:16,19

**2014** 41:2

**2016** 187:21

**2017** 14:2

**2018** 13:24
26:5 162:19

**2019** 6:6 41:2
63:18 64:15,18
90:8 105:23
194:13 198:10
205:22

**21st** 14:2

**22** 90:8 134:23

**2244** 163:23

**225,000** 132:20

**22nd** 186:22

**23** 204:23

**25** 38:8,17
39:11 88:14

**253** 179:23

**255** 6:9

**26** 64:14 89:13
180:20

**27** 89:12 90:4

**2741** 14:2

**29** 88:5

**293,716** 194:1

**298,115**
129:14,16
130:15

**2:16** 159:6

**2:16?p.m**
159:8

**2:22** 159:9

**2:22?p.m**
159:8

**3**

**3** 14:4,5 40:20,
23,24 67:18
149:23 187:9,
10

**3.1** 150:5 151:2

**30** 35:4 39:11
94:2

**300** 60:6

**329779** 124:19

**33** 195:8

**33134** 6:10

**34** 195:19

**35** 39:11

**3:00** 191:10,14

**3:05** 191:12

**3:12?p.m**
191:12

**3:31** 203:7

**3:31?p.m**
203:9

**3:47** 203:10

**3:47?p.m**
203:9

**3:55** 211:15,16,
18

**4**

**4** 14:13,14
48:10,14,17
53:7 56:9
62:21,22,25
63:3 65:1,11,
15 66:1 67:24
121:24 174:11
175:11 195:19
204:15

**4,200,000**
182:9

**4.1** 195:25

**4.2** 177:18,22,
23 178:4
180:23 181:14
182:24 183:14
185:4,8 187:8,
20 188:14,21
189:5

**40** 37:21 39:11

**43** 171:6

**4500-watt**
128:8

**465** 179:14

**47** 169:7

**48** 124:19
125:16

**49** 125:17

**5**

**5** 6:6 13:1,2,3,4
23:15 27:5
28:3 68:3

**84:11** 191:9
195:9 200:22

**50** 38:5,7,17,19

**50,000-dollar**
146:20

**50-gallon**
128:8

**500** 60:6

**524** 179:15

**6**

**6** 11:1 27:8,9
30:23,25
105:21 107:25
191:24

**600,000** 179:3

**6th** 196:22

**7**

**7** 28:3,4 62:18,
19 63:5 66:3
69:9 72:13
145:7 204:22

**8**

**8** 28:16,17
65:6,7,25 66:3
150:12 157:24
174:12,16
177:17,19
182:13

**80** 194:12

**8th** 64:18

**9**

**9** 29:25 65:25
88:5 145:7
158:9,14
159:14 174:22
176:10 195:9
200:22

**90** 17:2

**96** 153:16

**98,114** 129:20

**9:00** 209:17

**9th** 65:3

**A**

**a.m.** 6:7 69:2

**ability** 108:20

**able** 44:21
60:11,14 81:4
98:20 100:3
104:12 119:14
126:19 127:8,
24 128:14
134:9,16
164:17 199:23
209:2 211:8

**above** 47:24
204:12

**absolutely**
16:10 135:16
142:4 146:7

**ABV** 7:20

**accepted**
179:17

**access** 21:8
30:2 45:13,15,
18 101:11

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

123:23 138:19,
20,22 139:3

**accompanied**
160:14

**according**
179:10 187:19

**account** 82:7
94:5 135:14,
17,23 136:6,
13,19 137:2

**accountant**
33:17,20,24
34:1,14 60:22
82:22 146:24,
25

**accountants**
34:16 37:21
112:13,14

**accounting**
18:4,5,21
35:11 36:17,19
147:4

**accountings**
44:12

**accumulated**
35:14

**accuracy**
100:22 146:17
147:4

**accurate** 41:1
60:2 63:9
146:6 189:13

**accurately**
104:22

**acquire** 130:7

**acquisition**
96:13,14 129:7
134:1 181:18
182:3

**across** 39:12,
13

**actions** 45:10

**activities** 44:11

**actual** 71:18
91:13,14 93:22
124:18 143:22
154:8 166:13
179:20 187:4

**actually** 11:11
26:10,17 27:16
38:2 39:22
46:19 51:3
54:10,12 56:5
65:3 71:8
77:18,19 78:15
89:13 91:9
93:8 99:10
108:10 112:2,
16 124:17,21
125:17 128:9
129:9,23 133:3
143:22 145:18
148:22 149:18
153:10 154:15
155:9 156:11
157:7,25
166:17 168:12
169:11,16
170:3 171:14
172:22 174:18

**add** 65:5 66:3,
20 75:12 77:4
109:24 115:15
176:10

**added** 94:2
106:16 122:18
175:25

**addendum**
164:25

**adding** 204:11

**addition** 47:25
163:13 185:9

**additional**
30:23 94:2
100:21 102:19
121:19 149:3
152:22,23
153:7,10
156:13,22
189:8,11 194:1
199:5 201:21
202:4 204:5

**address** 69:9
87:22

**addressed**
59:19

**addressing**
95:3,4 200:2

**adjust** 102:25
103:5 110:3
197:14,22

**adjusted**
111:16,17
133:6

**adjustment**
112:9

**adjustments**
112:19 197:8

**administers**
21:7

**administrative**
18:5

**advance** 210:4
211:8

**advice** 88:7
89:5

**Advisory** 10:11

**affected** 109:7,
13,19 118:25

119:14 135:1,
23

**affidavit** 47:21

**affirm** 7:15

**after** 6:6 12:18
28:19 77:9
95:22 115:17
191:10,13
203:18

**afternoon**
138:15

**again** 9:24
44:20 83:8
86:1 89:23
92:2,24 116:22
117:1 127:14
147:5 160:23
176:6 192:5
193:11 196:3

**against** 45:8
199:10

**ago** 17:4 99:17

**agree** 38:20
85:23 86:4
87:12 89:11
95:8,15 126:12
177:8 189:10,
18 198:25

**agreement**
67:8 154:3,9
174:23 180:16

**agreements**
186:21

**ahead** 211:5

**aid** 88:18

**aided** 50:19

**air-conditioner**
110:23

**air-conditioning**
111:1 122:17
156:20

**Albanis** 14:22,
23 157:3

**Alhambra** 6:9

**all** 6:14,25 7:1
9:17,21 10:16
12:23 14:25
15:21 16:8
17:17,22 19:6
20:9 22:21
30:20 32:16,18
33:11,13,16,22
34:1 38:10
40:18 47:24
48:23 49:3,24,
25 51:20 53:21
54:14 56:11
57:6 60:9
64:20 66:11
71:18 78:17,18
82:23 83:1
85:5,13 86:20
87:18 88:21
99:21,23
100:15 101:17
109:24 113:1
114:3 117:7
119:5,15
120:23 126:8
127:16 128:6
130:6 133:11
137:11 138:21
141:3 142:20
143:11 144:14
148:6 150:25
151:3,14
154:14 155:20
158:8 161:16
165:17,21
166:4,9 169:10
170:13 171:10,
12 174:1,10,15

CONFIDENTIAL - MICHAEL P. ELKIN, CPA
Index: allegations..approximated

176:1 177:5,23
178:23 186:5,9
189:8 190:5
192:3 197:6
198:9 202:14
203:23 204:21
208:2 209:14

**allegations**
41:7

**allegedly** 8:25
43:21

**alleging** 27:12

**Allison** 207:8

**allocate** 69:17
70:6 165:2

**allocated**
151:16

**allocations**
70:13

**allow** 203:16

**allowed** 83:23

**almost** 77:14
111:4 114:10
134:24

**along** 164:13
166:9 177:21
178:18,19
185:15

**already** 51:11
62:21 64:3
65:14 81:17
84:8,9 100:1
119:4,8 127:10
144:11 148:19
202:17

**also** 6:18,20
7:3 11:18,22
12:11 15:4,20
18:18 24:23
28:22 29:8

31:11 36:15
37:22 40:18
43:12 56:1,8
64:17 69:16
72:19 73:10
78:17 79:21
80:20 92:13
95:16 105:15
109:18 115:23
127:23 143:15
148:2 162:3
164:13 171:23
181:8 183:13
204:21 209:7

**Alston** 7:9

**alternate** 85:10
93:24 109:5,9
116:25 117:6
119:2,3 153:3
196:8 197:3,7,
21,25 199:2,5,
7,16,20 200:5,
9 201:11

**alternative**
91:7 93:16
96:1 116:25
117:6 197:14
200:20 201:19

**although** 60:23
93:8 94:7
108:4 135:6
169:12

**always** 16:10
34:23 43:11
99:15 143:20

**amended** 47:2
189:12

**amendment**
49:21,23 181:1

**among** 19:18

**amount** 59:15
60:7 76:5 86:6

112:18 115:24
116:16,19
129:16 134:25
146:23 170:13,
15 175:14
176:4 179:4,
15,20 188:16,
17 193:2,6,9,
22 194:24
202:15

**amounts** 28:1,
19 44:4,11
80:20 86:23,24
88:18 95:7
96:5 109:6
145:11,22
146:13 176:18
178:9 189:8,20
202:17 205:6

**analyses** 68:18

**analysis** 20:13
29:12 35:22,24
36:23 37:3
58:13 72:3
106:17 126:2
134:20 135:12
140:4 146:5
197:15 203:2,
22 205:1

**analytics**
116:4,5

**and/or** 19:21
21:19 83:7
145:25

**another** 54:24
64:23 75:10
76:19 90:4
110:20 111:5
116:17 117:20
127:23 160:5
173:7 186:11
198:19 199:14

**answers** 47:1,2

179:11 193:8

**anticipated**
90:9 206:3

**anticipating**
99:17

**anybody** 9:22
51:7 77:2 79:6
100:24 102:1
135:7 139:5
163:21 167:13

**anymore** 201:5

**anyone** 10:13
27:16 50:12,
13,17 52:1
155:23 185:2

**anything** 8:15
11:3 12:3
23:18 26:21
27:19 29:9
32:17,19 33:13
35:7 36:13
40:6 43:20
44:18 68:14
76:8 78:20
79:24 84:19
111:2 112:1
118:14 124:15
130:2 135:10
143:13 146:4,
12 148:14
156:3,7 157:4
161:17 165:13,
20 172:2 173:1
183:20,23
184:1 202:19,
20 204:8,12
206:17,19
208:21 211:8

**anywhere**
29:17 85:19
96:19 176:19
200:21 201:24
202:10

**apologies**
158:18

**apologize** 27:5
32:8 156:10
177:25 186:12
193:11

**apology** 191:2

**appear** 30:10
169:24 171:1
184:18,22
186:20,24

**appearance**
6:15

**appears**
142:11 184:14
195:12

**applicability**
88:1

**applied** 28:14
126:18

**apply** 34:13,23
94:23

**appraiser** 37:6,
11

**appreciate**
8:16 211:11,13

**appropriate**
34:15 80:10
86:12 94:21
120:3 126:1
128:16,17
197:4

**appropriately**
126:14

**appropriatenes
s** 44:24 96:4

**approximated**
179:22

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: April..Bed

**April** 14:2

**area** 45:7 82:18
83:20 109:20

**areas** 109:20

**arena** 36:13

**argument** 93:9
94:8

**Arizona** 39:13

**around** 9:13
45:18 67:8
186:12

**aside** 12:3
156:15 202:25

**aspect** 17:9

**aspects** 20:7
40:2

**assets** 58:17

**assigned**
19:16

**assignment**
19:2 69:6
72:14

**assignments**
37:18

**assistance**
48:6

**assistant** 7:7
39:15

**assisted** 16:15
23:18 50:15
52:14,15

**associate** 18:8

**associated**
18:25 37:17
58:11 199:13

**association**

45:9,11,17
109:7 118:24

**assume** 43:9
179:1

**assumed**
90:18 91:11,18
130:6,8

**Assuming**
95:19

**assumption**
134:15,18

**assumptions**
90:16

**attached**
163:16 202:7,
20

**attachment**
48:21 63:3
177:19

**attachments**
63:25 64:2,3

**attempt**
135:17,22
137:20,25
154:14 197:8,
14 201:20

**attendance**
207:2

**attention** 107:7
122:1 178:3,6
184:2

**attorneys** 9:23
21:19

**attorneys'**
153:11

**attributing**
185:8 188:9

**August** 196:19,
25

**Aurelio** 6:3

**Austin** 16:18
18:19 19:17,21
20:3,17

**availability**
25:22

**available** 17:13
47:14,15,16
49:7 60:20
71:12 91:5,8
114:24 118:2
125:15 140:2
154:17 155:3
175:18

**AVB** 35:6

**Aventura** 45:7

**Avery** 32:13
73:14,18
142:19 143:5,6

**awardable**
88:20

**aware** 21:6
40:4,11 46:22
48:7 52:24
53:5 55:10
71:1,19 79:4,8,
11 86:21
106:20,21
110:11 114:8
122:4 141:6
173:24 203:21

**away** 164:17,
18

**Ayub** 6:18

___

**B**

___

**back** 24:22
27:4,5 32:20,
21 34:10 50:12

60:18 62:4
65:22 69:4
78:13 85:2
91:8 96:9,11
97:15 105:20
110:6,24
112:1,5 117:4
121:5 123:20
125:3 130:16
134:1 135:7
138:13 142:14
148:22 155:15
156:12 157:9,
14 158:25
159:10 160:4
161:3 162:18
170:4 174:9
178:11,18
179:5,7 181:7
188:20 191:14,
22 200:15
203:11 210:1

**backed** 180:3

**background**
33:23 34:2
66:12 67:16,18

**backup** 20:1
107:10 110:1
126:5,20
130:24 139:8

**backwards**
19:24

**bad** 208:17

**balance** 129:13
170:17,20
179:19 187:1,
14,25 188:10,
22 189:4
192:14

**balances**
131:12 133:4

**ballpark** 38:4

**Bank** 187:13

**bankruptcy**
153:14

**bar** 39:22

**based** 28:1
35:17 85:4
90:12 91:11
93:3 116:21
127:4 145:24
166:12,13,15
172:2 188:4
190:20 193:15

**basic** 143:1

**basically** 133:8
143:9 144:6
165:7

**basis** 89:22
93:12 96:15
97:1 99:7
116:7 210:8

**basket** 22:23
35:8 140:20

**Bate** 165:20

**Bates** 55:8,13,
17,22,23 56:5,
8 100:1 150:11

**Bates-stamped**
47:22

**Bath** 111:24,25
123:3

**Beach** 43:25
78:16 156:6

**Bear** 132:10
141:13

**bearing** 44:18

**became** 46:22
130:18

**Bed** 111:24,25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

123:3

**before** 8:3,20
10:23 16:18
17:24 19:20,21
33:21 51:11
52:7 56:14
57:19 59:7
69:22 77:8,25
78:11 82:13
95:20 97:10
98:14 111:1
120:13 130:22
136:25 143:23
147:2 151:20
155:9,11,15
162:4 181:7
182:21 186:18
188:21 191:16
194:15 195:10
198:23 203:14,
18

**begin** 90:6

**beginning** 9:10
17:12 19:20,23
20:12 21:11,14
30:1 46:2,4
47:10 64:23
129:12 131:16
179:7,23
188:22 189:4
206:9 208:12

**behalf** 6:16
7:5,10

**behind** 64:1
73:17

**Beijing** 6:16
7:21

**being** 6:8
17:10 20:22,25
39:18 46:14
53:18 66:16
70:19 79:15
80:7 88:10

96:13 104:18
110:22 111:1
114:6 116:19
120:14 126:4
128:2,4
134:15,18
156:13 176:13
188:6 193:1,6
198:18

**believe** 8:8
9:21 10:14
13:14,15 14:9,
20 17:25 18:18
19:12,20 20:3
21:6,19 22:2,
16,19 23:7,12,
24 25:12 26:7,
9 27:10 29:16
33:11 35:10
41:4,23 47:10
51:5 54:4
57:20 60:7
61:5 64:11
65:17 71:21,25
77:6,25 78:25
81:7,11 89:9
93:7 94:17,20
95:4 100:15
101:20 102:13
117:16,17
121:8 122:3,7,
16 123:19
149:20,23
158:14 159:19
161:14 162:12
173:6 178:11
183:2,23
184:17 187:21
190:20,21
191:21 192:22
193:7 194:12
200:21,23
201:1 202:2
207:13 208:5

**believed** 44:4
45:10 93:23

99:9 104:20
122:5

**belong** 108:18

**below** 18:13
145:11,23

**benchmark**
92:1

**benefit** 80:22

**benefits** 81:3

**besides** 121:23
146:14

**best** 18:25 91:5
134:22 207:6

**better** 15:7,21
57:24,25 98:18
99:3,18 104:4
110:10 139:23
157:19 162:7
177:7 185:17

**betterment**
103:19 161:12,
20,22 162:10,
15

**between** 20:13
24:17 32:4
39:19 41:2
69:17 121:19
129:2 132:8
133:20 174:4,
23 179:14
192:24 201:2

**beyond** 37:2
84:21 111:24
112:1 123:3
161:23 162:4
163:3,6 166:19
168:8 193:10
206:2

**big** 151:22

**biggest** 122:15

**bill** 201:7

**billing** 18:24
19:1,3,4

**binder** 11:10
13:1 31:9,15,
19 64:11 65:6
84:10 122:21
131:20,24
160:5

**binders** 12:16

**Bird** 7:10

**bit** 9:12,20
11:22 16:6
46:18 68:23
92:8 118:4
145:13 159:22
176:24 200:17
208:25

**blow** 110:9

**blue** 160:5
211:12

**body** 63:24
71:13

**book** 184:20

**borrowed**
189:8

**borrowing**
190:24

**borrowings**
189:11 190:18

**both** 20:7,10
57:13 163:19
171:12 177:23

**bottom** 74:13
131:17 132:13
143:5 165:21

**bought** 99:16

135:18 178:14
210:21

**Bour** 6:20

**bracket** 35:5,6

**break** 8:15,17
12:1,19 23:13
31:4 38:15
66:7 68:22
157:23 191:8
203:6 209:16

**breaking** 24:16

**Breit** 6:21 7:1
12:12,14,20
16:3,8,11
33:21 43:5
44:23 48:16
51:11 62:13,
21,23,25 63:8
66:19,22 68:10
69:22 70:4
82:13 83:5,19,
25 84:4,14
86:1 102:12
119:17 138:7
158:3,21,25
193:3 197:16
207:18 208:6
209:19,21
210:13,16,24

**briefly** 39:22

**bright** 93:18

**bring** 17:22
35:8 75:19
133:2

**bringing** 76:24

**broad** 36:12

**broader** 36:15,
16

**broadly** 83:13
107:25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

**broke** 19:18,21
132:8

**broken** 20:8,13

**brought** 11:4,
7,18 12:11
25:10 31:9
46:19,21 84:16
107:6 120:16
122:1 125:15
151:8 184:2
187:10

**Browngreer**
21:6 30:3,4

**buffer** 94:1

**build** 179:2

**Building** 6:17
7:21

**built** 95:1
167:9,17

**bulletins** 28:22

**bunch** 22:12

**burn** 159:5

**business**
37:23 39:20,21
40:5 42:1
188:8

**businesses**
39:25

_____

**C**
_____

**calculate** 24:25
29:17,21 80:6,
8 81:3,24
88:18 89:21
91:2,25 131:11

**calculated**
27:25 42:6
80:9 88:8

89:15,18,24
90:6 91:3
96:12 176:1
188:16 193:14
201:19

**calculating**
72:8 80:5
85:24 86:7
94:15 98:1

**calculation**
28:14 31:9,21
32:7 42:9
86:25 89:2
94:3 129:5,13
132:6 134:16
136:4,6,13
177:15 178:1
179:2 185:11
187:2 189:12
192:9 196:3
197:24 201:11

**calculations**
32:5 35:25
36:2,7 52:16
79:16 80:25
81:2 82:8 85:9
87:11 93:1
95:2,12 108:8
112:25 115:16
120:4,8,10,11,
12,19 130:23
168:24 169:2
176:4,14,15,
20,23 177:2,11
188:13 189:24
190:7 191:3,5
197:7

**calculator**
193:3

**call** 26:7,13,15,
16,19,21 35:2
36:17 38:1
58:20 61:9,12
63:23 94:1

**called** 7:20
22:11 119:7
141:2 153:9
154:10,11
172:25

**calling** 94:18,
19,24 133:23

**came** 21:15
22:1 25:10
66:15 95:19,22
97:11 139:17
144:16,19
150:11,13
164:9 167:25
178:6 192:14,
15 194:14

**can't** 60:7
102:14 111:12
112:6

**capacity** 137:3

**capital** 24:17
59:10 132:25
133:25 134:25
135:4 155:20
163:9,11,14
164:1,2,4,5
166:12

**Cara** 52:9,10,
11,13,15,17

**card** 94:6,9
114:20,22,23
115:9

**career** 35:12

**carried** 120:7,9

**carry** 133:9

**case** 8:21,24

33:20 41:24
42:12,17,25
44:1,13,25
45:3,15 47:15
52:23 67:12,
14,21 68:6
83:11 84:22
91:1 93:20
99:8 100:10
116:7 121:16
126:25 133:24
145:2 148:8
165:15 172:24
173:5 206:6

**case-by-case**
99:7 210:8

**cases** 31:12
36:20 38:2
56:3 57:1
91:14 93:10
94:8 99:10
100:10 107:13,
14,15 110:3,
10,19 111:7,19
114:22 115:20
116:13 117:3,4
119:4,6,8
153:5 207:12

**cash** 58:8
80:14 82:6
85:14,16
134:19,20
180:2,3 188:18
189:17

**cashing/money**
39:21

**casualty** 28:18,
20,24 29:5
50:24 79:2

**categories**
15:8,9,18,24
108:23 109:1
111:7 117:18,

19,25 118:7
152:5 161:4,10

**categorized**
42:6

**category** 36:12
110:20 111:8
117:15,16,20
151:15 152:24
163:21

**Cathy** 65:15
66:2 157:24
174:12,17
176:9 191:4
193:13

**caused** 45:11
69:24 70:7

**caveat** 63:7
64:12 93:1

**ceased** 199:1

**ceases** 199:13

**centered** 45:18
206:13

**centers** 39:12
40:1

**cents** 182:9

**certain** 22:17
34:9 35:13
48:5 49:15
53:23 54:2
67:7 68:4 91:9
128:6 139:6

**certainly** 8:12
12:2 35:13
38:18 41:4
42:7 197:18

**certainty** 102:7

**certification**
34:25 35:7

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: certified..come

**certified** 33:16, 20,23 34:1,14, 15

**CFE** 7:20 35:6

**CFF** 7:20 35:6

**chance** 12:18

**change** 33:10 112:17 129:14 160:11 204:20

**changed** 130:2 156:3 159:25 165:8 172:2 199:8

**changes** 123:2 129:17 160:12 172:2

**Chapman** 162:13

**Chapman's** 162:16

**characterizatio n** 123:14

**characterize** 71:5 118:12

**charge** 196:12

**charges** 196:7

**check** 23:13 27:1,3 39:21 42:14,23 43:15,16 44:20 50:6 65:20 91:10 101:22 121:7 166:24 167:6,21 169:22,23 170:1,2,3,23, 24 171:3,4

**checked** 120:2

**checks** 118:14 154:8,17,18 167:25 168:6 171:24 176:2, 11,12,17

**Chinese** 6:11, 22 8:21,25 9:4 29:3 40:3,7,10 41:8 50:14,18 52:18 53:2 78:23 80:17 81:6,22 84:13 97:10 127:11 136:1,10 145:12 194:5 195:6

**chipped** 16:20

**choice** 144:22 198:6,7

**Christianson** 51:6

**Circle** 6:9

**circumstance** 145:12 191:17

**circumstances** 39:6 73:8 82:10 93:20 94:13 125:21 137:8 190:21, 24 201:2

**claim** 42:8 44:6,8,10 127:6 180:3

**claim-by-claim** 89:22

**claimant** 23:24 30:7 32:6 46:25 86:5 89:17 99:1 107:19,20 109:25 114:16

115:15 119:5 128:14 135:2 142:15,18 149:23 153:12 157:2 170:8 179:21 188:17 191:18

**Claimant's** 98:23

**claimant-by-claimant** 116:7

**claimants** 27:11,13 29:2, 4,13,18,22 31:8 32:5 35:23 47:17 48:2,23 64:7 68:4,9,15,19 71:2,6,10,20 81:4,20 84:20 85:5,14,20 87:14,24 90:1 95:24,25 96:7 99:3 102:18 103:12,17 105:13 106:22 112:13 115:8 128:18 130:11 135:18 136:8, 15,20 137:3, 10,15 142:10 145:10,22 162:5 163:12, 19 188:19 189:25 190:7, 16 192:16 201:3,20 203:16 210:19

**claimants'** 105:25 134:19 145:25 193:7

**claimed** 98:22 104:17 105:12 114:6 126:4,20

128:17

**claiming** 27:13 92:13 102:24 109:5

**claims** 20:1 43:20 44:1,3 45:8,16,19 47:13 58:3 72:20 75:3 126:25

**clarification** 70:4 202:4

**clarified** 15:3

**clarity** 74:22, 23,24

**classes** 108:11

**clean** 158:1

**cleanup** 138:16

**clear** 8:10,11 61:6 73:3 75:5 84:15 90:13 92:25 93:1 94:17 101:3 102:16 107:1 112:2 118:22 130:18 145:4 149:13 157:11, 12 158:6 176:19 178:25 186:2 191:1,3 192:5

**clearer** 97:18

**clearly** 87:4 88:11 208:19

**clerk** 18:21

**clerks** 18:4,6

**clicked** 54:1

**client** 38:1,14 50:23 79:10

**clients** 52:25 100:2,16,17, 20,25 101:2,5, 11,13,15,17 102:2,7

**close** 112:18 113:22 178:23 179:21 180:4 188:17

**closing** 133:6 135:3 179:16 189:15 192:4,7

**co-counsel** 207:11

**cognizant** 35:25

**collateral** 87:25 94:19

**colleague** 157:18

**collected** 118:11

**Colson** 6:8 26:11 105:23

**column** 108:21 149:19 151:1, 3,14,20,23 169:19

**columns** 117:16 151:10

**combination** 132:23 148:1,6

**combined** 73:21 91:1

**come** 12:12 30:9 40:6 47:19 49:16

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: comes..cooperative

**comes** 43:13
53:10 56:16
109:14 133:7
135:10 144:7
148:18 165:25
168:5 174:9
178:3 211:12

**comes** 43:13
58:21 79:12
162:10

**comfortable**
38:8 58:8
102:20

**coming** 20:5
21:4 24:5
26:22 132:5
148:23 156:7
178:9

**comment**
74:12 78:15

**comments**
78:13 155:15

**communicate**
209:2

**communicated**
119:1

**communicatio
ns** 102:16

**company** 6:17
7:10 24:3,4
44:12 105:22
167:8 172:9,15

**compare**
103:10 149:14

**comparison**
149:8 203:17

**compensated**
70:11 72:8

**compensation**
71:2,5 79:22

**complain**
209:20

**complete**
27:13 56:10
63:9 66:4
158:7

**completely**
106:25 117:22

**completion**
62:16

**complicated**
9:19 44:10

**component**
58:5,6 80:10
92:24 96:9
109:4

**components**
31:23 58:3
88:21 89:15
90:23 199:11

**compounded**
89:21

**comprises**
67:5

**computer**
43:10

**conclusion**
14:5 88:25
94:22

**conclusions**
15:5 69:11

**condo** 201:8

**conducing**
51:19

**conference**
58:22

**confident**
43:18

**confidential**
42:20 43:6

**confidentiality**
43:12

**confirms**
195:20

**conflict** 27:1,3
101:22

**confused**
65:13 130:11

**conjunction**
15:6 74:1 75:1
108:1 118:25
129:7

**connected**
140:18

**connection**
29:2 34:12
42:3,4 59:22
60:11 64:9
87:23 109:13
124:16 137:14
153:13,17,25
156:1 162:19

**consent**
209:15,16

**consequences**
78:23 83:16

**conservative**
94:11,14 148:7

**consider** 30:13
55:5 75:7
77:19 85:8,16
164:5 199:4
201:13

**considerations**
136:4

**considered**
11:14,15 15:12
48:23 85:10

**considering**
94:18 98:8
122:8 159:17
161:23 164:22
199:23,24,25
201:5,10

**considering**
80:1

**consistent**
38:24 57:10
152:24 172:16

**consolidation**
186:21

**constructing**
59:16

**construction**
39:19 40:5,15,
16 59:10
163:17 167:7
178:16 179:3,
8,9 183:1,6
192:8 193:15,
16

**consult** 42:16
50:17

**consulted**
25:24 26:1
50:12

**consulting**
51:15,18
105:24

**contact**
101:17,20,25
102:1

**contacts**
101:19

**contains** 128:5

**contend**
145:10,22

**context** 36:9
73:5 79:12

**continual**
144:13

**continue** 58:7
73:8 199:22

**continued**
47:11 202:23

**contract** 179:8,
9 181:1 186:2
193:16

**contracting**
39:20

**contractor**
40:12 146:22
166:24 167:17
171:4

**contractor's**
180:16

**contractors**
171:25 176:12

**contradictions**
107:12

**conversation**
26:17 46:22
58:23,24 59:3,
8 70:17 115:3,
5 143:14
144:18 147:16
206:7

**conversations**
57:2,6,13
157:3 206:12

**Cooke** 13:23
67:12

**Cooke's** 13:15
46:14 49:10
67:11 152:24
153:24

**cooperative**
48:8

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

**copied** 110:8, 13

**copies** 12:4,7, 10 31:18 57:25 65:20 110:11 139:23 154:8,9 168:6

**copy** 13:20,21 23:2 30:9 33:1 40:18 42:15 43:3 44:17 62:9,12 65:19 157:25 158:2,7 160:5 169:23 175:3

**Coral** 6:10

**corner** 187:12

**correct** 13:25 14:3 24:7,9 27:21 33:17,18 35:21 49:1,2 56:23 57:1 63:19 64:5,7,8, 19 65:2,4 67:17 68:7,13 69:11,12,14,15 70:14 71:21 72:15,21,23,24 73:1,2,12 78:16 79:3 85:14,15 86:14 87:8,15 89:3,4, 8,9 90:2,3 91:19 95:21 96:10 97:21 102:5 104:6 105:10,14,19 109:11 114:14, 19 115:11 125:8 128:18, 20 135:12,16, 21 136:3,5,11, 12,18,25 137:1,6,7,11,

13,18,20,24,25 138:4 146:7 147:9,23 149:7,11 150:18,20 151:17 154:4, 6,22 155:5,7, 22 156:23 159:19 160:3 162:12 163:8, 22 165:12 168:16,19 169:4 175:24 177:13 180:21 181:10,12 183:4 185:24 188:11 189:3, 6,21 190:14 191:7 193:17, 25 194:3,25 195:14,21 196:5 197:13, 20,24 200:4 201:16,17,23 203:4,14,24 205:3

**corrected** 23:13 129:19, 25

**correction** 128:22 185:18 186:7

**corrections** 152:9

**correctly** 42:17 116:12 130:16 148:12 193:12 204:4,25

**correlate** 98:16 126:19

**corresponded** 106:10

**corresponding**

53:8 89:17 90:7,10

**cost** 90:14,25 91:3 92:4,6,18 93:6,7 99:2 100:8 149:21 179:12 199:5 210:20,22

**costs** 90:7,11, 22 91:22 92:6, 12 99:22 133:6,25 153:13,23,25 166:18 179:16, 18 189:15 192:4,7 199:19

**costs/damages** 92:9

**counsel** 13:10 14:18 27:11 39:23 42:16,24 43:6,16 44:21 49:4,5,6,11,16 51:22 53:10 58:23 65:14 72:7 74:2,6,7 77:21 82:23 83:18,21 84:23 87:22 88:17 100:13,14 101:3 102:17, 21 106:2 115:5,6 139:10 140:3,24 141:16 143:8, 12 145:8,24 154:21 155:3, 13,14 205:6

**counsel's** 48:6 145:17 209:15

**counsels** 6:14 47:17

**count** 199:16

**County** 181:15, 17 184:15 195:13

**couple** 24:22 26:24 31:22 33:8 57:1 108:22 110:10 138:15 156:9, 10 163:12

**coupled** 56:13

**course** 8:19 14:23 17:3 27:20 29:9 31:10 35:12 63:14 150:15

**court** 6:12 7:11,13,19 16:6,12 36:14, 18,22 66:8 70:25 88:2,19, 25 95:8,16 202:21

**courts** 6:11

**cover** 78:18,19 178:16

**CPA** 7:20 34:22 35:5,10, 11,17

**Craig** 6:16

**created** 76:2

**credit** 94:6,9 114:20,22,23 115:9 179:25

**credits** 133:7

**criteria** 24:20 118:18

**current** 28:9 33:7 39:16 187:14

**currently** 171:20

**curriculum** 33:6

**cut** 113:7 117:7 157:10

**CV** 33:23

**D**

**damage** 15:13, 19 20:1 43:21 45:20 58:3 73:15 75:13, 20,23 76:5,24 79:16,24 80:11,24 85:11 88:21 89:15,22 90:17,25 92:4, 7,20,22,23 93:12 95:1,12 96:8 98:9,10, 22 103:8,12,19 108:22 109:5,8 110:25 111:3 117:3,19,22 118:7,19,22 119:2,7 141:2 143:6 147:22 149:8 151:20, 23 153:4 157:13 163:16 173:3 176:3, 14,15,20 177:1,11 199:10 203:25

**damaged** 70:1 93:9 96:13 98:5 99:1 103:3 105:18 112:5 162:6 210:7

**damages**

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: data..describing

| | | | | |
|---|---|---|---|---|
| 41:22 42:1,5 44:1 45:11 68:5,6 69:17, 23 70:6,7,10 72:4,7,13 73:11 74:13 79:18 87:23 90:7,11,22 91:25 92:13,19 98:2 102:24 105:12,25 106:11 117:11 141:16 147:18 152:22,23 153:7,10,19,23 196:4 | 116:6,21,22 117:7 182:12 187:18,25 188:3,6 193:20 196:11,14 205:7 | 196:13 | defined 133:23 136:7,14 200:20,24 201:1 | deposition 6:8 9:8,9,11,25 10:8,21,22 42:12 47:21,25 48:1,14 53:21 54:6,7,17,21, 24 64:24 82:15 130:17,25 150:12 162:17 172:22 173:18, 21 174:18 175:4 176:9,10 177:17,20 178:12,19 180:11,14 181:25 182:18 185:23,25 186:17 187:8 193:16 194:13, 20 195:9 198:10,22 211:16,17 |
| | **dated** 63:17 64:15,18 65:3 78:4 180:20 187:13 | **decide** 54:16 | **definitely** 40:17 | |
| | | **decision** 102:4 | **definition** 92:11 133:19 200:5 | |
| | | **deduced** 202:17 | | |
| **data** 16:22 23:21,22,23 24:2,10 73:15 75:23,24 91:8 112:21 115:17 119:4 121:9,10 155:2 166:7 | **dates** 26:24 91:15,16,25 92:20 93:2,4, 16 94:13 96:13,14 110:18 | **deduct** 80:16 | **definitional** 144:14 | |
| | | **deducted** 177:11 | **delineate** 34:4 | |
| | | **deduction** 28:20 29:5,6 50:24 79:21 80:13,17 81:5, 10,20 82:5 194:5 202:18 | **delineated** 88:11 120:14 | |
| | **David** 149:24 | | **delineation** 69:23 106:8 164:8 | |
| | **day** 6:5 22:13, 14 38:9 73:25 114:10 208:20 209:17 | **deductions** 28:18 79:2 | **demanding** 39:2 | **depositions** 17:15 48:2 53:8,16 54:23 79:14 101:23 146:1,2 |
| **database** 23:4 61:13 62:2 117:2 118:1 151:6,12,19,25 152:11 157:15 159:18,21 160:6 161:3 171:21,22 172:24 173:6, 11 | | **deduplicating** 116:8,11,18 | | |
| | **day's** 22:15 | **deed** 182:3,7, 12 | **denomination** 172:6 | |
| | **days** 33:9 59:6 94:2,3 | **Deeg** 149:24 | **department** 33:9 37:21,24 50:22 53:1 79:5 | **deposits** 135:2 |
| | **deadlines** 46:13 | **deem** 118:9 | | **Depot** 127:24 |
| | | **deep** 168:9 | | **depth** 124:14 |
| | **deal** 51:15 131:10 133:8 | **deeper** 129:8 | **depend** 82:9, 11 | **describe** 123:18 134:22 |
| **databases** 23:5 | **dealing** 52:18 53:2 84:12 90:4 97:7 112:14 | **defective** 8:21, 25 9:4 29:3 40:2,7,10 41:8 43:22 50:14,19 52:19 80:18 81:22 82:5 97:10 127:11 136:1,10 | **depended** 96:16 | **described** 31:25 52:4 128:12 176:8, 13 178:8 180:6 185:10 |
| **date** 6:5 22:15 45:25 46:1 60:18 90:6,7,9, 10,11,18 91:3 92:23 93:7,22, 23,24 94:4,9 96:20,21,22 98:8,10,16 99:2 103:2,7 | **dealings** 40:10 | | **depending** 38:9 | |
| | **dealt** 50:18 109:20 | | **depends** 82:12 189:15 | |
| | **Deborah** 149:24 | **defendant** 7:21 69:25 | **deponent** 6:13 | **describes** 29:12 |
| | **December** 26:5 162:18 182:13 187:18 193:21 | **defendants** 69:18 | **deposed** 8:3, 20 | **describing** 89:23 |
| | | **define** 145:3 197:16 | **deposit** 116:14 163:1,2 | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA
Index: description..document

**description**
104:22,25
153:6 165:7
168:3,4

**descriptions**
128:7

**descriptive**
144:20,21

**design** 24:3
164:10

**designed**
143:2

**detail** 31:3
59:18 87:5
112:7,8 118:20
150:8,9 178:18
210:10 211:9

**detailed** 59:17
99:9 130:13
178:7

**details** 190:12
208:25

**determination**
27:15 75:10
87:1 93:15
119:1 125:24
126:13,23
136:19 147:16
163:7

**determinations**
147:3

**determine**
37:19 70:9
86:11,13,16
91:20,21 93:12
96:3 100:10
103:16 106:2
113:23 126:2
127:9 131:9
135:24 146:9,
11,16 147:24

**179:13 180:2**
182:6,10 185:6
189:19 202:7
210:23 211:4

**determined**
36:1 73:23
74:16 86:8
88:19 93:2
95:9,16 96:23
98:15 103:3
118:19,23
129:8 164:1,2,
4 177:9 184:2
205:13,14
210:6

**determining**
74:3 105:7,11,
16 113:14

**developed**
35:3

**developers**
45:6,7

**development**
45:7,12

**Diana** 6:19

**difference** 32:4
133:20 179:14
192:23

**differences**
94:5

**different** 15:23
19:22 20:6,9,
14 28:8,11
31:23 32:11
36:20 39:24
48:23 51:16,
20,25 61:20,21
74:9 82:10
92:5 93:3,21
94:13 100:5
115:18,25
124:3 128:5

**129:1 130:14**
131:1,7,11,18
139:9,12 141:4
142:12 147:19
152:5 154:11
168:15 171:6
172:4 178:7
199:17 200:6,
11,14,17
201:2,3 203:6

**differentiation**
97:5

**differently**
34:11 97:18
176:24 177:4
188:12 189:23
201:6

**difficult** 35:4
92:24 110:9
159:22 177:7

**dig** 31:18

**digging** 116:5
208:12

**digress** 157:22

**diligent** 126:17

**diminished**
73:1,3

**diminution**
76:18,21,25
204:1,2,14,23
206:5

**direct** 7:24
73:13 88:15
89:12 163:23
191:23 194:12
195:3,8,25
198:21 199:10

**directed** 51:3
79:10 143:12

**directing** 17:20

**direction** 24:1
130:14 131:2,
7,18 178:8

**directions**
43:17

**directly** 17:16,
17 21:16 56:20
80:17 100:23
101:1,2 115:8
135:2 146:21
150:19 173:13

**director** 18:8,
10 79:9

**disagree** 84:23

**disallow**
104:17

**disclosure**
89:10,25

**discounted**
181:9

**discovery**
14:16 22:11,
18,25

**discussed**
17:16 45:23
46:11 58:19
87:21 177:10
180:19

**discussion**
54:18 127:2
159:11 185:5
209:23 211:14

**discussions**
16:1 72:6 74:1,
2 79:23 127:4
156:24 185:1
209:11

**disease** 42:4

**dispute** 39:19
45:4

**distinct** 92:10

**distinction**
38:15 174:3

**distinguish**
35:4

**district** 6:12
67:20 82:25
83:23

**dive** 129:8

**divided** 182:9

**division** 78:17

**doc** 58:1
143:10 169:20
182:6

**docket** 13:23
14:1 30:2
49:12 144:2

**document** 13:7
14:6 20:11
22:10 23:5,10
47:22 48:15
49:20 55:22
56:6 61:24
62:1,3 73:15,
20 75:23
114:16 122:12,
13 124:4,19,
21,22 125:12
140:7,10
141:2,10
143:22 150:9,
15 154:3
165:17,19,23,
25 170:5
175:1,17
180:12 181:1
182:1,20
183:12,14,15
184:10,13
186:11,18,19
187:3,15

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: documentation..Elan

| | | | | |
|---|---|---|---|---|
| **documentation** 17:13 28:1 56:10,11 59:11 61:6 97:13 137:18 142:8 146:18 179:5 185:16 187:25 192:6 | 163:13 166:5, 17 186:9 189:7 196:4 198:8 203:23 208:17 **double** 38:17 **double-checked** 144:1 | **drywall** 6:11,22 8:21,22,25 9:1, 4,5 29:3 40:2, 3,7,10 41:8 43:20,22 50:14,19 52:18,19 53:3 78:24 80:17,18 81:6,22 82:5 | **E** **e-mail** 22:1 26:14 49:6 53:11 | **educated** 15:14 **effect** 27:19 **effectively** 166:1 **efficient** 41:17 |
| **documented** 61:20 | **doubt** 167:17 195:23 | 84:13 97:10,11 98:11,15 127:11,12 | **e-mailed** 21:10 143:22,25 | **effort** 55:13 69:16 73:21 82:1,2 86:10, |
| **documents** 9:13 11:1,13 22:8,22,23 23:4 24:2,10, 15 30:22,23 31:13 43:13 46:23 48:4,5,7, 22 49:1,3,18 53:7 55:12,17, 20 57:23 58:16 59:12 75:20 84:7,12,17 110:6,15 116:1 122:8 125:6,9 130:3 138:21 140:1,4,21,24 141:7,14,17 146:24 159:16 165:22 166:2 173:24 174:24 183:11 190:6, 12 192:20 | **down** 6:25 24:17 39:11 49:11 84:16 110:15 132:12 163:1,2,9 179:25 207:20 **download** 14:10 28:4 **downloaded** 14:9 22:13 **DP** 41:25 **draft** 74:7 77:9, 11,17,19,20,24 78:8,10,13 **drafts** 74:5,9 77:21 **drain** 128:7 | 136:1,2,10 145:12 194:6 195:6 **due** 42:1 77:25 133:5 179:21 188:16 **dug** 208:13 **Dugan** 207:16 **duly** 7:22 **duplicate** 116:3 **duplicated** 147:2 **duplicates** 115:23 **duplicating** 157:8 | **each** 11:19 17:6 19:17 20:9 24:12 31:7 46:24,25 48:2 49:17 53:12,14,16 54:23 63:11 64:6 69:24 89:16,21 93:19,20 97:9 98:4,21 100:17,20,25 103:12 104:13 116:7 139:10 147:5 150:11 155:10,13,14 190:6 201:5 **earlier** 93:9 101:7 110:12 117:12 138:17 140:7 151:18 155:21 157:5 165:3 168:23 176:22 178:8 190:2 203:25 210:5 | 13,16,18 91:21 102:13,24 103:5,10,16 111:3 135:13 149:14 189:19 **efforts** 102:11, 17 114:14 115:7 195:1,16 203:15 **Eidson** 6:9 105:23 **either** 13:10 31:12 38:14,19 43:15 49:4,6 51:4 53:10 56:21 68:1 99:21,24 101:21 104:23 107:13 110:12 111:20 118:21 123:19 134:1,5 135:5 141:5 168:5 171:23 |
| **dollar** 115:24 170:15 | **draw** 183:5 **drew** 208:15 | **duplicative** 197:14,17 | **earliest** 196:11 | **Elan** 7:7 10:9, 10,11 16:17 |
| **dollar-for-dollar** 136:22 | **drop** 140:13 **Dropbox** 14:18 | **Duraclean** 150:9 | **early** 17:14 46:5 59:21 | 17:8,9,11 19:17 20:6,15 |
| **dollars'** 153:16 | 21:1,2,15,18 22:1,3 27:10 | **duration** 156:1 | 78:5 130:18 | 25:12,14 30:4 54:8,14 60:5 |
| **done** 25:19 36:10 50:7 79:7,18,19 89:2 107:6 110:23 120:17 162:24,25 | 47:18 49:7 53:11 140:8, 11,14,15,17 **dropdown** 152:19 **dry** 98:7 | **during** 134:1 **dwelling** 98:23 | **easier** 31:13 **Eastern** 6:12 **economic** 44:6,8 | 73:22 74:1 111:5 166:8 207:7 |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA
Index: Elan's..EXAMINATION

**Elan's** 17:23
54:15

**electronic**
22:24 25:7
161:2

**element** 45:5
89:22

**elements** 42:8,
20 199:9

**eligibility**
126:3 127:9

**eliminate**
115:23

**eliminated**
112:3 117:24

**elkin** 6:13 7:8,
20 8:2,3 10:17
12:25 13:4
23:12 27:4
28:16 30:21,25
32:23 33:1
40:20,23 43:18
45:24 48:10
62:9,19 63:17
65:7,10 66:11
67:2 69:6
80:12 85:3
94:14 102:22
118:3 119:25
125:5 138:15
158:5,9,12
159:13 174:10,
15 175:5 177:8
180:7,11
181:21 182:14
184:5 186:13
191:2,3,16
195:25 198:9
203:13

**else's** 150:19

**elsewhere**
198:3

**embedded**
186:3

**end** 21:12 26:5
43:14 73:25
90:8 120:18
133:13 208:11

**engage** 130:21

**engaged** 45:24
206:6

**engagement**
9:10 16:16
17:7 18:14,15
19:14 27:20,23
34:13 59:21,22
60:12 75:14
77:15 154:3
205:21,24
206:10

**enjoyment**
72:23 76:7,15
199:9 200:3

**enough** 19:13
36:8 123:2
124:5 144:9
151:5 189:10
191:1

**entered** 24:2
108:12 173:16

**entering** 166:7

**entire** 165:8
179:25

**entirely** 54:19
75:8

**entirety** 101:10

**entries** 108:7

**entry** 13:23
14:1 16:22
23:21,22,23
41:19 123:16
127:23 188:22

**Epic** 41:20,24
45:22

**equipment**
122:16 123:11

**equity** 11:20
31:8,20,21,22,
24 32:4,7,10,
12 52:15
129:11,15
131:9 133:14,
19,23 135:13,
25 136:6,13,19
177:15 180:6
185:3,10
188:13,15
189:12,24
190:17 191:4

**equivalent**
18:9 86:6

**Eric** 51:6

**error** 111:20
192:9

**errors** 121:22
190:1

**essence** 41:24

**essentially**
15:6 61:10
207:13

**establish**
58:17 105:7,
10,15 192:20

**estate** 20:4
37:6,9 109:17
133:10,20
135:14,15,19
137:22

**estimate** 38:19
100:11 179:10,
17 181:11
192:4

**estimates**
99:22 100:18

**Etter** 65:15
66:2 157:24
167:2 173:8,9,
20 174:12,17
176:9 187:8
191:2,4 193:13
195:12,19
198:16,25

**Etter's** 173:21
178:12 180:13
188:6 192:9
194:13 195:8
198:10,22

**Etters** 167:18
174:23 179:24
185:3,11,23
187:18 188:11
191:23 192:11
194:4 195:4
196:1,4,8
200:1

**Etters'** 176:10
177:15 179:11
181:18 182:4
183:6,22
186:24

**evaluate**
137:21 138:1

**evaluated**
89:14

**evaluating**
17:12

**Evan** 51:4,5

**even** 26:13
36:20 42:19
90:18 94:23
95:22 108:15
110:24 131:3
162:24 185:15

**event** 80:18
81:14 144:3

**events** 135:11

**every** 17:9
20:15,16,17,18
22:13 32:6
49:20 53:13,16
60:24,25 61:24
62:7 63:11
111:13 112:6
113:20,25
114:10 127:8
141:1,7

**everybody**
119:16 157:22
208:2

**everything**
49:15 61:18
62:1,3 75:4
77:17 99:24
100:2,6 101:15
107:6,8,22
113:16 126:5
139:22 140:6,
8,21 146:19
151:22 158:14
160:20 190:10

**evidence** 93:22
97:9 98:3
109:23 114:20
202:2

**evidences**
146:14

**evolved**
144:18,23

**exact** 46:1
131:5 148:9

**exactly** 25:11
30:18 140:16
211:2

**EXAMINATION**

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

7:24

**example** 30:7, 8,9 91:6,12 109:3 163:23 210:13,14

**Excel** 23:11 24:16 27:10 61:8,11 76:3 87:5,7 88:11 97:4 106:15 107:5 121:9 151:4 158:16

**except** 80:19 143:1 149:16

**exception** 140:7 149:18

**exceptions** 101:6,8 147:10

**excerpts** 54:6, 8

**exchange** 112:1

**exclude** 108:23 113:10 116:20 196:20

**excluded** 92:15 108:8,10 109:1 116:25 127:3,6 153:20

**excuse** 10:4 18:12 30:2 45:20 89:13 91:21 140:9 142:7 161:10 166:23 177:19 186:10 193:9

**exercised** 149:3

**exhibit** 10:3, 17,21 11:18

13:1,4 23:15 27:5 28:3 30:23,25 32:11,20,23 33:2 40:20,23, 24 47:21 48:10,14,17 53:7 55:13 56:4,9 62:18, 19 63:5 64:12, 17 65:1,5,7,11, 15,25 66:1,3 73:14,17 84:11 110:13 121:23, 24 122:2,3,21, 24 125:25 128:22 129:2, 3,4,18 130:5 150:5,12 151:11 157:17, 20,24 158:9, 14,15 159:14, 16 172:3 174:11,12,16, 18,22 175:3,5 176:9,10 177:17,18,19 178:4 180:7, 11,13,23 181:21,24 182:14,18,24 183:13,14 184:5,9 185:4, 8 186:6,13,17 187:9,10,20 188:14,21 189:5 191:24 195:25 204:15

**exhibits** 12:10 31:7 48:1 53:8, 17,18,23 63:24 64:6,8 78:17, 19 89:18 110:14 121:15 131:15 159:17 176:23

**exist** 190:21

**existed** 162:4

**expansion** 205:20

**expect** 76:13 99:13 128:13 164:15,16

**expectation** 68:17 75:11 76:23

**expected** 60:23 70:23 205:8

**expecting** 101:24 121:18 204:5

**expended** 93:8

**expenditure** 86:7 95:20,22 109:23 110:21 112:4 124:11 146:20 201:1

**expenditures** 85:4 91:16 106:14 107:2,4 111:11 114:1,2 117:7 146:15 162:21 199:21

**expense** 94:6, 10 109:11 126:1 133:10 147:6 151:16 162:2 197:21, 23 199:17

**expenses** 20:1 29:8 58:11 85:10,12,13 93:24 96:1,8, 12 106:3,6,9 107:24 108:8 109:6,9,13

115:14 117:1 119:3 126:3,20 139:12 141:4 146:9,18 153:3,11,17 166:13 196:9 197:7,8,15,17, 25 199:4,6,8, 13,15,16 200:5,6,8,20 201:12,19,21, 22 202:9,23 203:17

**expensive** 128:7

**experience** 35:10 50:14,16 52:18

**expert** 9:3 40:15,19 41:1 63:17,20 66:13 82:15 83:7,12 105:23 127:11, 14 176:20 177:2,12 200:19 205:7, 21

**expert's** 84:21

**expertise** 83:10 84:1,5 209:8

**experts** 204:6 205:3 206:4 209:6,11

**explain** 66:22

**explained** 24:20 99:24

**explanation** 92:3

**exploring** 79:20

**expressing** 33:19 67:13, 20,25 68:6 134:8 150:17 205:17

**expression** 129:10

**EXT923** 141:15

**EXT9774** 142:10

**extended** 126:21

**Extension** 184:11

**extensive** 115:22

**extent** 60:15 80:21 82:4 86:17 92:21 112:24 127:1 135:9 197:2 202:3

**extra** 9:13

**extraction** 151:6

**extractions** 151:4

**extraneous** 107:17

---

**F**

**FABS** 52:12

**face** 184:19

**facility** 91:7 117:6 119:13 198:1 199:7,20

**facing** 137:15

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 17 of 556
Case 1:11-cv-22408-MGC Document 279 Entered on FLSD Docket 05/13/2015 Page 233 of
388

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: fact..formulaic

| | | | | |
|---|---|---|---|---|
| **fact** 13:17 14:5 15:5 22:16 43:11 52:20 88:7,19 96:6 98:22 101:16 104:20 114:6 122:14 126:24 127:5 134:6,21 148:14 157:16 178:21 187:1 188:5 192:20 194:1 195:17 202:11,14,22 | **fast** 21:5 144:8, 9 166:7 | 11 136:3 137:3,19 147:4 | 70:3,6 73:16, 17 77:11,24 78:13 82:23 108:12 123:2 131:19 142:19 151:3,14 159:23 174:19 178:2 180:18, 23 185:11 192:3 195:3 202:13 208:10 | **following** 89:20 |
| | **February** 14:12 41:2 63:18 64:9,14 78:4,5 205:22 208:11 | **financing** 185:7 | | **follows** 7:23 |
| | | **find** 17:1 31:13 59:18 61:2,5 107:10,11,12 115:23 123:25 125:2 126:5 127:25 140:23 141:1,7,12 149:1 150:2 151:25 160:1, 10 169:2 174:9 181:18 183:20 184:1 189:22 195:1 196:6 | | **foot** 123:16 |
| | **federal** 81:5,21 | | | **footer** 165:21 |
| | **Fedex** 153:16 | | | **footnote** 129:20 145:20 |
| | **feed** 76:4 | | | **forces** 135:14 |
| | **feel** 184:25 198:14 | | **five** 59:4 150:7 169:10,14 | **foreclosed** 135:6,7 |
| **factor** 85:18 | **fees** 153:12 | | **fix** 97:25 | **foreclosure** 117:8 134:5 137:14,16,22 145:9 153:14, 22,25 |
| **factored** 90:2 176:3 | **fell** 152:23 | **finder** 202:21 | **fixing** 38:1 | |
| | **felt** 102:20 111:6 148:6 | | **floor** 53:25 55:1 | |
| **factoring** 89:7 162:7 | | **findings** 13:17 14:5 15:5 | | |
| **factors** 15:14 199:21,24 | **few** 43:24 59:6 108:9 151:13 | **fine** 105:6 | **Florida** 6:10 28:4 43:25 67:4 83:23 89:19 142:10 184:15 196:7 | **foreclosures** 137:5 |
| **facts** 93:20 | **fielded** 155:24 | | | **forensic** 10:11 36:17 37:21 52:12 60:22 105:11,16 112:13 126:19, 21 146:25 |
| **fair** 36:8 103:5, 7 121:14 126:25 134:14 151:5 155:1 157:16 160:9 176:25 189:10 190:11 191:1 201:18 | **figure** 75:20 78:3 | **finish** 105:8 126:11 | **flow** 58:8 82:6 134:20 | |
| | **figured** 12:20 | **finished** 23:16 64:24 | **flows** 129:14 134:19 | |
| | **file** 140:21 | **firm** 17:24 18:2 37:22 38:13 50:13,17 51:7 52:1,22 56:24 100:24 101:2 154:24 | **fluid** 48:3 | **forensics** 36:8, 11 |
| | **filed** 6:11 46:24 | | **focus** 9:11 24:16 173:17 | **form** 15:4 28:23 47:6,8,9 51:14,21 82:25 83:22 86:2 116:17 185:17 193:8 |
| **fall** 35:5 121:7 | **files** 9:12 21:3 | | | |
| **familiar** 8:7 208:4 | **filings** 56:3 | | **focused** 20:3 111:13 | |
| | **filter** 108:22 171:16 | **firm's** 59:21 | | |
| **family** 122:4 | **filtered** 115:21 161:17 | **first** 14:11 25:24 26:1,3, 16 28:9 32:12 41:6,13 43:7, 25 45:24 46:8, 24 47:4 49:2,9 51:3 53:25 61:23 63:16 66:12 69:7 | **folder** 22:11,12 | **format** 33:10 74:5,8 |
| **far** 39:13 147:3 190:17 208:22 | | | **folders** 22:13 | **forming** 15:1 |
| | **filtering** 115:19 | | **folk** 117:4 | **forms** 87:10 |
| **fashion** 22:22 191:6 | **final** 17:22 77:18 | | **follow** 19:11 35:18 43:16 132:11 167:14 177:21 203:13 | **formula** 106:21 120:25 |
| **Fassbender** 6:19 | **finalized** 155:12 | | | **formulaic** |
| | **financial** 36:8, | | | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: formulas..harder

| | | | | |
|---|---|---|---|---|
| 106:16 | full 8:1 27:17, 24 97:13 116:14,15 121:16 138:19, 20 139:3 188:10 202:15 205:24 | 205:12 | 23 134:4 174:10 | guessing 19:5 169:25 172:23 |
| formulas 106:11,12 | | general 13:1 40:12 107:22 116:5 123:14 125:22 127:12 133:19 135:14 206:22 | gives 138:20 | guidance 139:9 |
| formulated 84:25 | | | giving 33:25 37:8,13 180:5 185:3 | guided 139:5 |
| formulating 51:9 52:2 | | | goes 16:18 | guidelines 35:16 |
| formulation 51:19 | fully 106:3,22 108:2 | generalizing 100:3 | Golkow 6:4 | gym 209:21 |
| forward 120:9 | function 120:10 | generally 13:8 31:5 63:15 | gone 186:10 | Gypsum 7:10 |
| Foster 30:8 57:10,18,22 58:7,17 203:23 | funds 85:20 86:22 87:14 91:22 94:20 135:2,4 168:12 175:12 | generated 140:9 144:17 | good 6:2 10:6 19:13 24:21 38:19 54:19 62:4 68:21,24 75:4 138:5,7, 15 148:13 209:16 | **H** |
| found 47:23 56:6 107:12, 17,18 115:24, 25 116:12 123:4 127:13 145:5 165:10 183:23 189:25 190:5 | | generating 206:5 | | H-A-L-A-S-Z 16:25 |
| | furniture 98:14 | generic 118:10 | | Halasz 16:23 18:22 25:16,17 |
| | further 156:24 186:10 187:24 | generically 13:18 | Google 125:21 | half 37:20 38:16 39:4 |
| | | Germano 14:6 15:5 | gotten 29:6 122:11 | hand 7:14 62:17 131:17 158:12 175:4 |
| four 46:23 127:15 208:3 | **G** | getting 20:25 31:24 46:17 48:4 59:11 164:23 | governed 34:14 | |
| four-and-a-half 187:22 | Gables 6:10 | | grab 21:2 | handful 108:9 |
| FPL 201:7 | gain 206:20 | give 7:16 18:3 33:1 40:19 62:4,12 63:7 80:14 83:12 121:18 139:13, 16 151:9 174:13 187:23 195:13 209:25 210:4,8,13 211:5,10 | Graziano 206:7 208:7 | handled 16:22 |
| frame 46:9,11 | garage 127:18, 19 | | greater 38:20 86:6 102:8 104:8 105:18 | hands-on 116:4,23 |
| frankly 30:18 | gather 20:4,19 46:25 203:16 208:23 | | | handy 62:10 192:1 |
| fraud 36:19,21, 23 37:3 | gathered 20:22 56:25 | | Greg 7:5 207:7 | happened 81:13 157:11 |
| fraudulent 36:24 | gathering 19:22,23,25 20:12,21 | | group 10:12 17:15 19:18 52:12 79:6,9 153:11 159:23 162:20 163:19 164:10 | happening 26:25 143:19 144:9 |
| fresh 124:1,2 | gave 15:7 22:22 51:8 64:23 65:19 99:20 165:1,6, 7 177:16 179:25 187:16 | given 14:17 19:8 21:7 26:25 29:7 46:9 78:22 82:20 84:9 89:1,5,25 104:11 112:17, | | happens 42:18 |
| fresher 9:14 | | | guarantee 60:7 | hard 37:19 57:24 |
| front 30:11 63:6 67:12,19 128:24 159:13 177:24 | | | guess 14:12 19:6 30:7 153:17 156:14 | harder 110:14 |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: having..include

| having 7:22 15:21 16:1 28:2 31:18 35:11 58:8,10, 12 155:20 170:14 185:15 199:13 | 81:9 82:2 89:11 92:16 102:6 106:6 108:18 111:11 118:2 120:18, 23 121:1 123:11,22 | home 127:24 129:11 133:1 136:23 163:15, 17 164:8,23 167:9,17 188:19 195:5 198:18 201:10 | Hundreds 60:1 | illegible 105:2, 3 |
|---|---|---|---|---|
| hazard 133:11 | 124:6 125:21 126:1 127:20 | homeowners 112:12 | I | imagine 194:9 |
| head 208:6 | 132:8 141:13 145:21 151:9, | homes 127:13 | ID 55:22 143:10 165:19, 23,25 | impact 36:5 42:3 73:7 79:17 80:1 81:24 82:6 95:12,17 137:19 |
| header 156:6 | 22 166:6,23 168:1,2 172:20 | 137:4 145:8 190:18 | | impacts 35:22 84:12 |
| heads 79:5 | 173:1,16 174:21 186:12 | Hooker 149:25 | ID'D 165:17 | import 75:24 |
| heads-up 209:25 210:9 | 196:6 202:4 | hope 93:1 | identification 10:18 13:5 27:11 31:1 | important 185:13 |
| hear 26:6 | here's 93:18 132:6 | hopefully 207:14 | 32:24 40:21 48:11 62:20 65:8 158:10 175:6 180:8 181:22 182:15 184:6 186:14 | importantly 34:20 |
| heard 16:8 26:2,3 129:10 156:11 200:17 | Herrington 6:19 | hotel 42:4 45:22 | | improve 100:22 130:7 |
| heavily 17:11 | Hey 205:12 | Hotels 41:20, 25 | identified 11:13 30:22 75:2 107:20 113:4 119:11 128:3 131:4 162:20,25 163:3,13 170:14 173:13 179:8 186:7 190:22 191:18 | improvement 164:2,3,4,6 |
| held 6:8 134:1 | Hicks 6:9 26:11 105:23 | hour 19:3 | | improvements 24:17 59:10 103:19 133:1 135:4 136:21 155:20 162:4, 21 163:9,11, 14,15 166:12 190:19 |
| Helm 167:6 | high 135:19 | hours 59:24 60:3 | | |
| help 16:7 25:23 54:20 83:16 100:22 165:2 169:15 210:17 | higher 122:5,6 | house 58:9,10 98:13,23 117:5 127:16,17,18 130:7 133:14 163:14 164:12, 14 189:12 190:19 199:22 201:4,7 | | |
| | highlight 123:2 | | identifies 150:12,13 | inaccurate 146:6 |
| helped 24:9 26:22 165:16 | highlighting 11:15,22 | | identify 48:9 54:20 62:7,8 104:20,24 107:9 113:10 128:13 161:22 173:8 190:23 | include 25:1 34:2 36:21 39:1 56:8 74:20 86:15, 17,19 92:12 94:15 96:1 109:8,24 113:4,8,16 116:16 119:11 126:1,23 147:17 148:10 |
| helpful 35:14 140:4 | historical 28:10 81:10 82:4 | | | |
| helping 17:21 20:4 48:9 54:16 105:5 | historically 81:12 | houses 55:6 | | |
| here 11:10 16:21 28:25 30:18 32:6,20 33:14 35:14,23 36:3,10,23 37:3,6 52:3 61:1 67:3 68:17 76:18 | history 185:6 | HTML 22:23 140:18,19 141:24,25 | identifying 101:22 164:19 199:19 | |
| | hit 94:6,9 | | | |
| | hold 16:3 37:8, 13 40:14 198:8 | HUD 60:17,19, 21 179:6 188:5 | IDS 58:1 | |
| | Holly 207:8,11 | HUDS 190:10 | ilk 149:9 | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: included..into

151:23 162:3, 14 171:2,7,10, 12 172:5 176:7 179:16 191:5 196:24 197:4

**included** 11:16 15:8 22:9 44:11 57:4 61:4 74:8 75:19 86:22,25 92:19,22 100:2 104:4,5,25 107:19 113:1, 2,14,15,23 116:19 119:2 120:15 122:10 126:14 135:11 141:19 147:1, 20,21 149:19 153:19,21 155:20 157:13 168:17,20 176:13,15 177:1,3 178:25 197:6

**including** 37:23 64:2 126:15 133:9, 24 158:16 197:20 205:5

**income** 81:5, 21 82:6 194:5

**incoming** 118:15

**incorporated** 168:23

**incorrect** 178:5 185:12

**incorrectly** 129:5

**increase** 80:14 136:22 200:6

**incredibly** 166:6

**incumbrances** 133:21

**incurred** 90:8, 11,14 91:3 92:1 93:6 147:8 197:25 200:8

**independent** 163:6

**independently** 56:25 147:6

**indicated** 194:19

**individual** 36:6 99:13

**individuals** 38:3 99:15

**ineligibility** 105:8,11

**ineligible** 104:23 105:1,2

**inflow** 85:25

**inflows** 85:16

**information** 13:9,13,14 15:23 17:19,20 19:22,25 20:4, 5,19,22,25 21:2,4,9,10,14, 17,22 24:14 25:4 28:6,17 30:16,17 33:11 46:17 47:13 48:22 51:8 52:2,13 58:14 60:19 61:3,4 62:5 74:10 76:14 82:20

83:13 89:6 91:5 99:3,4,11, 12,14,19,20 100:12,14,15, 21,25 102:8,19 107:3 109:21 111:18,21 115:12 119:10 139:9,25 151:8 155:5 159:16 168:4 171:22 181:13 185:20, 22 187:4 194:23 203:16 204:6 208:23 209:3

**initial** 26:12 66:2

**initially** 20:24 46:17,21 178:6 186:8

**initials** 47:3

**injury** 72:20

**input** 115:17 120:1

**inquire** 82:17

**inquired** 78:22, 25 101:4 139:2

**inquiries** 102:20 167:11

**inquiry** 149:3

**inside** 22:12 127:17,18,19 148:16 177:19

**Inspection** 150:10

**installed** 98:15

**instance** 35:1 53:25 55:1,20 110:23 118:23

146:17 150:17, 21 161:12 164:21 197:11 208:4

**instances** 60:16 99:21 104:7 151:10 201:18

**instead** 187:3

**instructed** 24:14 25:3,12 70:15,18

**instruction** 70:20

**instructions** 25:5 165:6

**insurance** 133:11 172:5, 9,14

**intend** 161:20 162:3

**intended** 41:4 51:17 62:6 66:13 106:7,8 127:7 157:12 160:7 161:22 189:13,16

**intending** 118:12

**intent** 51:23 62:1

**intentionally** 54:2

**interaction** 53:2

**interest** 13:13 28:7,10,13,14 82:8 85:4,9,24 86:7 88:15,18, 20,23 89:3,16,

19,20,21,24 90:5,6 94:4,16 95:17,21,23 103:1 120:7 133:10

**interested** 54:21

**interesting** 114:5

**interrogatories** 21:13 47:1,2 146:3 179:11 193:8

**interrogatory** 168:5

**interruption** 42:1

**into** 8:15 9:13 15:18,23 20:8 21:3 22:3,4 25:2,10 38:13 47:18 66:15 76:5,24 82:7, 19 89:7 90:2 95:1,11 97:8, 11 98:2,12 106:15 107:5, 7,8 109:22 112:22 115:12 116:5 117:4 118:21 119:9 120:1,15,24 121:10 131:20 132:7 133:15 135:13,17,22 136:6,13,18 137:2 146:3,14 147:22 151:15 152:24,25 156:14 160:17 166:7 168:24 169:2 175:22 176:3 189:11

CONFIDENTIAL - MICHAEL P. ELKIN, CPA
Index: inventories..later

| | | | | |
|---|---|---|---|---|
| 199:14,21 201:7 208:24 | **Island** 45:3,9, 10,17 | 89:25 90:13, 15,17 92:10 95:9 96:12,14 99:25 101:9 103:7,11,18,20 104:8,9,12,17 105:8,12,17 111:16 113:3 114:6 116:20 120:13 122:18 123:9 126:4,9, 14 128:17 138:18 139:5, 7,16,17 149:8, 15 159:25 171:6 176:21 210:6,7,20 | **junior** 44:3 | 20 |
| **inventories** 97:9 98:4 | **issuance** 57:19 59:7 77:8 | | **K** | **Kevin** 57:10 58:23 155:19 191:21 |
| **inventory** 98:21,25 149:19 150:4 | **issue** 35:25 45:13 48:8 55:6 72:16 79:12 84:9 121:12 206:15 | | **Kalil** 6:16 7:25 10:19 12:4,8, 13,15,23,24 13:6 16:5,10, 13 31:2 32:25 34:6,7 40:22 43:8 45:1,2 48:12,17,19 51:24 62:12, 14,17,22,24 63:2,13 65:9, 11,19,23 66:7, 9,10,21,24 67:1 68:12,24 69:5 70:3,5 82:23 83:18,21 84:3,7,23 85:1 119:15,24 138:5,14 157:21 158:4, 11,22 159:3,12 175:7 180:9 181:23 182:16 184:7 186:15 191:8,15 193:5 197:18,19 203:5,12 207:24 208:8 209:15,20,24 210:15,18 211:2,11 | **keyed** 119:4,9 |
| **investigate** 137:7,13,17 | | | | **keypunched** 24:1 |
| **investigative** 36:19 | **issued** 155:9, 16 | | | **kind** 79:16 103:14 123:1 124:5 |
| **investment** 134:25 188:10 | **issues** 9:15 20:10 35:1,20 38:12 40:9 41:11 45:15 50:18 58:10 60:21 69:14 70:25 135:23 201:10,14 | | | **knew** 79:14 139:11 205:24 |
| **investments** 43:25 44:7,8 | | | | **knowing** 22:4 101:23 154:16 |
| **investor** 44:2 | | **J** | | **knowledge** 34:2 35:14 52:17 |
| **investors** 44:2 | | **Janet** 32:12 73:14,18 143:6 | | **KR** 106:2 183:14 |
| **invoice** 116:2, 17 123:15 | **issuing** 156:11 | **January** 46:2, 4,5 59:21 105:22 194:13 198:10 208:11 | | **L** |
| **invoices** 24:24 112:23 126:22, 24 | **item** 24:13 49:9 69:24 76:19 93:11,17 96:16,24 98:21 103:2,13 104:3,14 111:4,5,12,13, 22 113:20,25 121:4 122:15 127:7 128:16, 17 131:4 139:18 150:11 160:2 162:6,7 165:9 180:18 188:22 204:14 | | | **labeled** 12:25 |
| **involve** 36:14 40:2 41:7,10 45:20 | | **Jeffrey** 6:21 | | **land** 178:13,14, 22 179:1,2 193:14 |
| | | **job** 24:21 126:17 208:17 | | |
| **involved** 17:7, 12 20:6,9,21 39:8,18 40:6 41:22 45:5 | | **judge** 13:15,23 46:14 49:10 67:11,12,20 152:24 153:24 | | **large** 108:11 127:6 |
| | | | | **larger** 114:2 |
| **involves** 8:21, 25 36:19 38:3 | | **judgment** 28:7, 10 93:11 104:2 113:18 | **Kaufman** 105:22 | **last** 33:8 37:16 38:24 41:19 61:23 97:15 131:2,6 159:23 180:25 191:23 207:8 |
| **involving** 9:4 41:11 50:18 | **itemization** 99:9 | **July** 90:8 | **Kawasaki** 148:11 | |
| **irrespective** 205:2 | **itemized** 154:1 | **jumped** 127:2 | **keep** 12:6 43:9 84:2 99:15 | **lately** 39:25 |
| **IRS** 13:14 28:21 84:17 | **items** 15:17 24:13,25 56:13 59:13 73:23 74:24 88:1 | **jumping** 9:13 109:15 | **kept** 99:12 170:3 208:16, | **later** 94:4,7 116:14 129:9 |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

187:22 205:7

**latest** 196:14

**law** 14:6 15:5 36:5 93:3 154:23

**lawn** 119:12

**lawyer** 154:23

**lawyers** 101:23

**layout** 55:5

**leading** 9:10 17:15 77:17

**learn** 26:21 205:3

**learned** 26:24 47:15

**lease** 91:6,10, 12 143:10

**least** 9:18 17:5 36:18 40:4 49:20 60:5,8 98:11 142:11 165:18

**leave** 23:18 113:18

**leaving** 202:25

**left** 38:12 52:6 78:19 131:17 132:13 176:4

**legal** 48:25 69:10 88:23

**Legionnaires'** 42:4

**lenders** 44:3 137:9

**lent** 190:25

**less** 18:17

**19:11** 24:11 38:5,6,7,17 82:5 94:3 133:16 134:21 135:4 151:8 188:18

**let** 6:23 8:11,18 13:18 27:4 32:19 34:11 40:19 41:6 43:15 50:11 51:25 62:17 63:5 65:5 71:16 73:3,13 78:24 80:12 82:14 85:2 88:16 89:12 92:20 96:11 97:17,24 98:18 105:8,20 106:13 120:20 122:20 126:11 141:12,25 142:14,22 157:14,21 158:12 166:22, 23 170:21 171:7 172:19 175:3 176:24 177:4 180:10 181:24 182:17 186:11 188:11 189:22 191:22 195:3 196:6 198:21 200:18

**Lets** 9:11

**letter** 174:22

**letters** 74:14

**level** 9:18 61:24 90:15 112:7 130:13 149:3

**levels** 35:13

166:10

**liability** 69:14

**liaison** 37:22

**liberty** 42:21

**life** 12:14

**Light** 196:8

**like** 11:25 14:15 23:2 33:10 44:17 59:24 60:23 62:15 66:22 103:14 109:17, 18 111:2,20,24 112:4 117:17 129:19 130:3 134:24 142:13, 18 143:3,14 145:14 146:4 169:10 198:14 206:3,17 207:20 208:10, 18 210:9

**liked** 60:17,21 61:2

**likely** 51:4 81:25 90:17 108:23

**limit** 201:21

**limited** 6:17 73:6 139:3

**limiting** 68:8

**line** 74:13,20 93:11,17,18 101:9 111:4,22 113:25 150:11 160:2 163:23 171:6 180:18 204:14

**line-by-line** 96:23 97:1

**lines** 75:7 164:13 195:9, 19

**link** 140:19 141:11,24 142:21

**linked** 139:15

**links** 141:3,5,6

**list** 6:23 13:19 25:1 41:1 49:15,21 55:12 56:10 57:6 59:17 75:1 101:17,19,20, 21 125:5 139:16 140:23 164:24 165:9

**listed** 37:5 41:3 43:19 75:3 76:18 78:17 103:11,18 107:18,19 128:3,4 149:5 168:1

**listing** 48:22 52:7 71:18 143:11 149:5 165:1

**lists** 56:9 71:9

**litigation** 6:4, 22 36:14 38:4, 14,22 39:5 66:15 67:4 69:18

**litigation-** 37:17

**litigation- related** 37:25

**little** 9:12,14, 18,20 11:22 12:16 16:6

23:14 37:24 38:17 46:18,21 50:7 60:24,25 65:12 68:23 92:8 97:17 99:5 110:14 118:4 121:6 131:16 145:13 152:12 159:22 176:24 200:17 202:3 210:11

**live** 119:14 142:23 199:23 201:5

**living** 85:10 91:7 93:24 96:1 109:5,9, 10 116:25 117:5,6 119:3 153:3 196:8 197:7,14,21, 22,25 199:7,16 200:5,9,20 201:4,11,19

**loaded** 22:2,4

**loan** 129:12 179:4,19,20 186:25 187:4, 6,8,12,17,25 188:2,7 192:10 193:2

**loans** 133:4,21

**located** 127:21

**location** 197:4, 21,23 199:18 200:7

**locations** 202:23

**log** 118:4 141:25

**long** 59:3

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: longer..master

110:6

**longer** 119:14
199:23 203:5

**looked** 14:15
15:4 49:24
54:3 55:2
56:11 61:17,18
84:9,13 91:10
111:19,23,24
112:4,6 116:22
143:23 159:1,3
186:1 208:17

**looking** 15:9,
16 36:24,25
46:19 47:7
60:10 72:11,16
101:4,14
103:25 122:7,8
125:4 129:23
130:23 131:12,
13 132:16
139:22 141:11,
20,21,22 142:5
151:18 152:14
154:2 169:18,
19,24 171:20
173:21 174:20
175:1 183:10
184:25 202:16

**looks** 33:11
129:19 130:3
142:13 143:3
158:7 169:10,
12

**loose** 165:24

**lose** 137:4

**loss** 28:18,20,
24 29:5 50:24
72:22 76:7,14
81:22 199:9
200:2

**losses** 79:2

80:1

**lost** 11:20 31:8,
20,21,22,24
32:4,7,10,12
41:11,25 52:15
103:13,20
129:15 135:12
136:6,13,19
153:7 177:15
180:6 185:3
188:13 189:12,
24 190:8 191:4

**lot** 14:15 20:11
36:16 39:24
47:16,23 50:8
54:18 61:19,20
79:7 82:9 99:4,
14 108:24
111:10 115:18
116:4 117:3
131:10 132:4
157:6 181:5,9
199:20 207:5
209:7

**Louisiana** 6:12

**loved** 60:24

**low** 135:20

**lower** 137:22
138:2 156:15
195:14

**lunch** 138:5

—————

**M**

**Madam** 7:11

**made** 15:3 21:5
26:16 41:15
50:23 59:1
61:5 70:13
71:9 86:10,13,
18 87:1 94:22

99:10 101:3
102:11 108:15
111:20 115:7
116:13,15
118:24,25
120:12 125:14
130:19 132:6
133:1 136:20
145:10,22
146:20 147:15
151:11 153:2
154:15 162:23
164:8 168:25
169:2,25 174:3
179:15 204:20
208:24

**magistrate**
39:17

**magnitude**
174:6

**main** 22:10

**maintain** 137:4

**maintenance**
119:12

**major** 39:25

**majority** 21:14
61:4 98:12
148:24

**make** 8:11
26:15 27:15
31:13 34:3
36:7 49:25
50:2 51:17,20
55:13 63:8,11
65:5,21 75:5
81:2 82:1,2
83:24 86:10,16
87:20 88:14
89:10 91:20,21
93:14 97:18
98:13,18
102:13,18,24

103:5,10,16
104:2,21 105:6
107:1 110:17
111:17 112:20
113:18 114:14
116:24 120:2,8
125:24 126:18
134:16 135:13
142:2 145:13
146:10 149:14
151:12,21
152:15 154:14
157:8 158:6
163:14 167:11
168:22 173:20
177:7 185:18
186:2 189:19
195:1,16 197:8
203:2,15
205:12 208:14

**makes** 160:19

**making** 31:10,
11 44:3 45:8
49:7 59:18
69:16 98:6
111:6 112:21
116:18 126:13
147:1,3 163:6
166:1 174:20
197:2 209:7,21

**management**
37:23 38:12
39:10

**manager** 18:7
79:9

**managers** 79:8

**managing**
157:19

**manner** 137:21
138:1

**many** 8:5 47:10
53:22 55:21

71:1,6 77:21
99:17 110:7
114:2 125:20
190:9

**March** 6:6
64:18 65:3

**Marcie** 6:20

**mark** 12:16,25
30:22 62:14,
18,21,22 65:14
175:3 182:18

**marked** 10:17,
20 13:4 30:25
32:23 33:2
40:20 47:21
48:10,13 56:4
62:19 64:4
65:7,21,24
77:20 84:11
131:16 157:23,
25 158:9
159:14 174:12
175:5 180:7,
10,13 181:21
182:14 183:13
184:5,8
186:13,16

**market** 103:6,7
133:20 135:14,
19 149:9,12

**marketing** 33:9

**marking** 184:9

**Martin** 181:15,
17 184:15
195:13

**Martinez** 122:3
125:10 127:6,
21 141:15
143:21 156:13
157:2 159:25

**master** 61:8,13

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 24 of 556
Case 4:11-cv-22408-KMC-EDocument 279 Entered on FLSD Docket 05/13/2019 Page 240 of
388

CONFIDENTIAL - MICHAEL P. ELKIN, CPA
Index: matched..modify

| | | | | |
|---|---|---|---|---|
| 62:2 118:1 151:18,19,24 152:11 157:15 159:18,21 160:6 161:3 | 120:20 125:2 135:4 141:17 151:10 155:24 160:17 166:5,8 181:24 184:10 191:18 198:8, 21,22 202:8 209:24 | 74:16 **meant** 32:14 101:1 105:3 161:10 171:18 **measure** 147:7 149:16 | **Michelle** 16:18 18:18 19:13, 15,21,23 20:16 **mics** 6:25 **middle** 26:4 | 204:18 210:1 **mine** 127:16 177:1 **minimum** 80:21 82:8 |
| **matched** 111:17 112:22 120:3 | **maybe** 18:20 21:12 24:11 30:5 34:9 | **measurements** 148:8 **measuring** | **might** 9:19 11:9 14:20,21 17:13 19:24 26:13 29:22 | **minute** 17:4 71:17 96:11 158:17 |
| **matching** 126:22 130:15 **material** 50:9 | 39:11 44:18 50:7 54:1 56:5 57:1 59:4 | 131:19 146:13 **mediation** 180:5 | 30:4 47:2,14 49:22 50:6 54:21 56:4 | **minutes** 6:6 59:4 119:16 191:9 |
| **materials** 6:17 7:22 36:24 56:24 61:16 142:3 | 110:11 112:4, 11 116:1 122:16 131:5 143:17 169:25 204:10 205:15 | **meet** 207:1 **meeting** 207:2 208:9,14,24 | 67:8 72:1 77:3 81:15 90:19,25 92:16 93:2 94:5 95:23 100:4,21 | **Miranda** 153:12,20 **miscellaneous** 104:24 127:24 128:3,4,12 |
| **math** 192:24 **matter** 6:10 14:7 17:10 25:25 27:22 | 208:11 210:11 **MDL** 14:1 **mean** 9:9 11:22 | **meetings** 209:10 **memory** 9:14 | 102:7,14,15 104:3 108:9 109:17,19 111:8 112:10, | **missed** 184:23, 24 **missing** 129:21 146:19 |
| 39:18 40:6 41:20 42:17,18 45:22,25 88:1, 24,25 153:18 | 20:14 26:1,23 27:25 31:21 32:17 42:22 50:16 54:22 | **mentioned** 16:17 35:20 53:1 114:4 138:17 191:16 | 16 116:1,16 117:5 119:11 124:13 127:2 135:23 140:4 | **mistake** 130:19 185:21 **mistaken** |
| **mattered** 111:8 **matters** 36:14 | 60:6 61:10 77:13,15,17 90:10,24 99:11 | 204:9 **message** 26:13 | 148:15 149:4 151:11 161:23 172:20 173:8, | 188:9 **misunderstood** 106:19 |
| 38:21 41:7 43:19 45:20 **Max** 16:22 | 103:1 104:19 105:2 109:16 111:17 112:11 113:7 114:8 | **met** 46:14 **method** 89:20 131:15 210:23 | 18 190:16,17 191:20 194:11, 24 202:22 205:3,10,12 | **mitigation** 117:9 133:5 135:9 144:15, |
| 18:22 25:15,17 **may** 12:21 16:19 25:18,19 | 115:18 120:23 122:14 124:5, 19 131:8 | **methodologies** 206:16 **methodology** | 206:5 **Mike** 7:8 **million** 132:9 | 24 145:1 180:5 **mitigations** 145:9 |
| 29:4 39:3 41:17,23 47:18,19,20 54:9 56:15 | 137:17 145:4 147:12 154:7 162:5 183:17 197:16 205:14 | 67:25 83:4,6 178:20 **mic** 6:24 | 179:3,14,23 192:25 193:1 **mind** 31:25 | **modification** 184:11,19 186:21 |
| 69:8 72:1 73:8 81:17 84:4 90:18 92:15 93:12 94:25 | 208:25 **meaning** 147:21 | **Michael** 6:13 7:20 8:2 24:6,8 63:17 166:11 | 32:2 58:21 109:4,14 124:1,2 142:23 144:20 148:18, | **modified** 185:14 |
| 103:23 117:21, 22 119:3 | **means** 36:12 | **Michel** 6:18 | 23 151:2 | **modify** 189:16 |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: moment..number

**moment**
109:16 157:22

**Monday** 6:5

**money** 29:22
71:6 79:22
85:6 86:5
92:18 118:15
131:10 132:7
133:3,8,9,12
134:4 135:7
191:18

**moneys** 106:9
118:11

**month** 38:9
94:7 196:24

**Montoya** 26:11
207:7

**more** 9:18,20
17:2 19:16,23,
25 21:11 34:20
37:19 38:8,16
39:15 41:17
54:22 60:6
61:22 68:14,19
78:24 83:1
99:11 110:15
114:12 130:13
131:14 134:21
139:1 144:20
145:13 156:2
157:4 178:7
199:8 206:22

**moreover** 35:3

**Morgan** 51:4

**morning** 6:2
174:11 177:16
191:24

**mortgage**
129:5,6
178:15,21,25
179:22,24

182:23 183:1,
12 184:12,16,
20 185:9,14
186:3,20
188:6,10,18,22
189:4,17
192:12 193:19

**mortgages**
130:6 133:16
135:3

**most** 11:8
17:11 18:13
19:10 23:17
28:8 36:11
39:9,16 49:23
51:4 60:20
81:25 90:17
92:17 100:15
107:15 111:14
113:10 125:22
128:7 143:16
147:9 148:7
152:8 208:3

**mostly** 39:12

**motor** 127:16

**motorcycle**
147:13,17,25
148:11 156:15

**move** 110:20
117:4

**moved** 98:12
117:2,10,13,21
189:5 199:2
201:7 203:18

**moves** 199:12,
14

**much** 17:9
27:2 56:7
59:20 99:6
112:8 127:17
133:13 148:4
206:9 208:12

**multi** 67:19
159:22

**multiple** 24:12,
13 34:20
166:10

**music** 123:11

**must** 35:18
130:11

**Myfloridacfo.
com** 28:5

_____

**N**

**name** 6:3 8:1
17:8 24:4 51:5
207:9,16

**named** 39:23

**names** 26:25
207:13 208:16

**narrative**
204:23

**Natalie** 7:3
26:9,10,17
77:6 207:7

**National**
187:13

**nature** 30:16,
17 44:1 45:4
47:12 76:9
89:14 103:24
110:21 113:25
150:22

**necessarily**
36:21 86:3
111:13

**necessary**
151:21

**need** 8:15,17
44:20 63:10

66:7 83:1
99:17 122:2
193:3 202:3

**needed** 21:5
25:22 48:5
80:9 185:17
186:6

**needing** 58:7

**neglected**
50:11

**negotiations**
137:9

**neigh-** 136:16

**neighborhood**
136:16

**net** 133:7
134:24

**never** 115:7
157:2 193:25
204:20

**new** 6:17 7:21
33:13 51:15
178:19

**next** 18:17
92:17 107:14

**nice** 12:15

**nine** 63:18

**No--** 16:6

**nobody** 101:1

**none** 43:18
169:1

**nonmanageme
nt** 38:21

**notations** 11:9
31:12

**note** 34:6 55:8
74:12 181:13

**noted** 11:14
174:21

**notepad** 11:21

**notes** 11:16,21
26:15,16,20
31:10,14,18
49:25 50:2,9
53:22 57:15
59:1 169:12,17
208:14,22

**nothing** 7:17
35:19 36:18
37:20 39:25
44:9 78:14
109:15 206:2

**notice** 10:21
11:1 21:1 89:2

**noticed** 78:15
111:23 121:22
165:16

**noticing**
112:15

**notwithstandin
g** 96:6

**November**
13:24 180:20
186:22 187:13

**number** 8:9
13:1,2,22,23
14:1,4,13 20:6
24:2 27:8,9
28:16,17 29:25
35:1 48:16
55:23 56:8
60:2 65:6
75:12 110:4
112:16 115:25
120:25 121:1,7
122:6 123:9
124:24 128:5
147:19 150:11
152:4,18

Case 4:11-cv-22408-KMW Document 22363-55 Filed 11/19/19 Page 26 of 556
Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 26 of 556
Case 2:09-md-02047-EEF-MBN Document 22363-55 Entered on FLSD Docket 05/13/2019 Page 242 of 388

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: numbered..original

| | | | | |
|---|---|---|---|---|
| 156:14 158:14 165:20 168:14 169:5 170:1 171:4 175:22 176:1 178:3,4 184:21 187:15 205:12 210:25 | obviously 33:22 | 23:21 24:13 25:19 26:18 30:23 39:16 41:13,15,18 43:25 49:22 51:2,3 52:11, | 198:8,19 199:12 201:5, 14,15 203:13, 24 204:9 208:15 209:24 210:2,3,18 | 72:12,19,22,25 73:11 84:25 121:19 205:2, 17 |
| | occasions 8:5 | | | opportunity 113:17 134:4 190:25 |
| | occurred 195:17 | 25 53:6,13,16 54:9,19,23 | ones 32:6 34:4, 5 105:18 108:5 | opposed 92:4 |
| numbered 55:14 | off 55:21 65:12 69:1 78:18 | 56:5 58:3 61:11,15,22 62:13,14 63:7 | 123:24 148:23, 24 149:2 155:18 208:3 | 112:17 146:21 148:15 |
| numbers 19:11 24:23 25:2 76:9,24 119:25 120:3,4 126:16,17,22 132:5 176:16 192:24 204:5 205:10 | 113:7,11 114:11 117:7 119:19,22 120:2 121:7 123:7 138:10 156:6 157:10 159:4,7,11 179:24 188:3, 6,7,18 191:10, 16 203:8 209:23 211:14 | 65:12 75:10 77:23 78:15, 22,25 79:8 81:19 92:16 93:19 99:8 103:23 109:3, 19 110:20 111:5,22 112:6,10,16 116:12 117:15, 17,18,19 118:12 120:24 | online 13:10, 13 56:21 only 6:24 45:22 49:23 57:9 77:18 79:21 113:2 116:11, 18 150:21,23 153:9 160:4, 10,24 162:11 169:24 173:19 | options 152:2 order 13:15,22 14:1 18:16 34:2 43:12 46:14 49:10 62:5 75:2 80:11 115:19 120:8 131:9 152:24 153:25 174:6 |
| **O** | | 123:2,3,24 125:12 129:14 | oops 78:19 | order/cafe 39:21 |
| O'DONOHUE 7:9 | offering 66:14 84:18 128:15 | 131:12,13 132:10 134:3 | open 54:23 172:23 | orders 13:16 67:10 132:25 |
| object 51:13 82:23,25 83:15 86:1 | office 6:18 10:5,7 14:24 15:23 25:10 26:12 | 135:10 136:25 140:7,10,21 141:13,17 142:5,6,13,19 | opened 54:1 operations 39:10 | organization 18:3 |
| objection 34:6 82:14,24 83:9, 21 | offset 80:11,22 85:25 86:24 95:5 198:2 199:10 | 143:23 146:17 147:12 149:18, 22 151:10 152:7,9,14 | operative 47:17 67:4 | organized 22:22 organizing 17:20 20:12 |
| objections 83:22 | offsetting 96:4 | 153:6,9,24 155:19,21,25 156:12,16 | opinion 66:13, 14 75:5 80:9 83:13 88:23 | original 49:22 96:14 99:2,22 |
| observation 127:4 | often 17:17 42:18 43:11 79:15 | 157:22 160:7, 21 161:12 162:5,11,16 | 95:6 121:16 128:15 134:8, 17 150:18 | 104:4,9 109:10 110:15 115:10 129:2,4,20 |
| observed 92:18 110:21 | older 112:14 148:2 | 165:14 166:8, 23,25 167:19 | opinions 9:4 15:1 33:19,22 | 130:5 151:12 160:7 171:23 |
| obtain 60:11, 14 81:5 97:9, 13 98:3 187:24 | once 20:8 44:20 115:12 120:1,2 139:24 | 172:7 178:23 179:3 183:8 190:22 191:17, 22 193:4 | 34:1,3 37:9,14 51:9 52:3 67:20,25 68:6, 8 69:8,10,13 | 177:22 178:4 181:14 182:24 183:14 184:16, 19 188:24,25 |
| obtained 81:19 | one 6:24 9:20 11:11 12:6 | | | |
| obvious 127:1 134:14 | 16:3,22 17:1 18:6 19:16 | | | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

192:10,11
193:1,19

**originally**
96:22 108:16
185:20 210:21

**originated**
47:19

**Orrick** 6:19

**osmosis**
122:15 156:19

**others** 9:19
32:15 53:5
55:17 72:1
99:4,19 109:14
148:18 190:23
206:21

**otherwise**
15:19 22:7
38:22 84:4
98:21 134:9

**out-of-pocket**
106:2,5 107:4,
24 115:13
135:10 141:15
143:6 146:9

**outflows** 85:9,
13,24

**outlays** 134:1

**outside** 84:1
127:13,16
138:3 145:2,8
147:3 148:15
201:4

**outstanding**
133:21

**over** 35:3,12
36:15 39:10
42:22 49:19
103:19 110:8
144:4 151:8

173:1

**overdeveloped**
136:15

**overriding**
100:5

**overruns** 192:8

**owed** 44:5

**owner** 109:7
118:24

**Owners** 45:9,
11,17

---

**P**

**p.m.** 119:20
191:12 211:16,
18

**package** 122:9
157:6,10,11

**pages** 24:11,12
63:18 123:1
150:8 159:22

**paid** 29:22 44:4
81:1,17 90:13,
17,19 91:11
94:6 109:18
116:19 135:1,2
179:24 180:2
188:2,6,7,18
192:17 194:2
202:15

**Palm** 78:16
156:6

**pan** 128:7

**paper** 62:7
71:9 161:1
165:24

**papers** 22:7
71:14,17

75:18,25 76:5,
8,20 84:10
86:23 96:19
97:2,4 98:2
101:18 125:1
149:2 150:4
168:21 175:23
203:3

**paragraph**
67:11,18,24
68:3 69:9
72:13 87:21
88:5,14 89:12,
13 90:4 105:21
107:25 134:23
168:22 176:22
200:21,22,23
204:23

**paralegals**
21:20

**Pardon** 170:19
200:12

**parenthesis**
152:12

**Paris** 16:19
18:19

**parked** 148:15

**part** 11:8 35:8
49:23 63:16
69:25 70:1,6
72:8 74:21
75:8,13 81:15
83:6,10,14,19
84:5 85:18
87:8,9,12
92:18 111:15
115:2 123:19
128:19 134:13,
15 143:16
147:9 148:8
149:10 157:13
161:21 162:1
163:17 168:22

176:23

**partial** 27:12,
17,23

**partially** 106:3
108:2

**particular** 9:16
16:22 18:15
45:5 48:7,8
69:25 99:8
101:13 119:5
122:12 126:3
127:5 131:4,12
133:24 139:16
142:15 148:8
153:9 190:22
206:15

**particularly**
51:22 78:14
93:23 195:9

**parties** 45:8
155:2 157:1

**partner** 79:5

**partners** 18:9
39:19 52:11
78:23 79:1

**parts** 28:11
49:20 53:20
54:5 198:12

**party** 99:10

**passage**
102:25

**past** 50:24
81:13,23 90:20

**Patrick** 26:10
207:7

**Paul** 8:2

**pause** 120:20

**pay** 81:16 82:5
91:22 192:20

202:18

**payable** 176:8

**payer** 168:3

**paying** 109:6
132:7 179:25
198:17 199:1
201:9

**payment** 60:25
99:16 116:15
118:24 154:5
169:11,14
170:15,18,25
171:8,13
172:9,21 173:9
174:2,7 175:12
176:8 191:5

**payments**
29:23 71:9,18,
22 80:2 87:24
89:7 91:13,14
95:10 116:13
135:3 154:9,
10,11,15
168:18,20
169:1,5 172:5
176:2 177:9
195:20 197:3

**PDF** 124:19
125:17 141:2
150:13

**Penthouse** 6:9

**people** 10:4
16:20 17:1,5,6
18:5,25 19:4
23:17 51:2
52:3,7 98:11
101:25 112:12
207:5,12,19
209:2

**percent** 17:2
38:5,7,8,18
39:3 121:2

| | | | | |
|---|---|---|---|---|
| **perfect** 152:15 160:19 | **phone** 26:7,13 143:14,17 206:25 | 19:17,18 20:9, 11,14,20 25:19 52:23 57:7 100:5 124:3 155:11,16 162:11 168:11, 15,19 172:8 209:12 | 125:15 138:18, 20 139:7,21, 22,23 140:25 141:5 143:13, 18 144:8 165:25 | **prejudgment** 13:12 28:7,14 82:8 85:3,9,24 86:7,25 88:15, 18,20 89:2,16, 18,24 90:5 94:15 95:17,20 103:1 120:7 |
| **perform** 34:22 115:16 | **phrase** 144:15, 16 | | **portion** 37:16 63:20 77:18 113:1 | **prematurely** 134:7 |
| **performed** 35:11 46:10 | **physically** 133:3 | **plan** 54:1 55:2 67:23 | | **preparation** 130:25 |
| **perhaps** 15:12 35:2 92:7 169:23 | **pick** 142:15 164:11 209:17 210:18 | **planning** 17:11 204:7 | **possibility** 190:15 | **prepare** 9:7 10:7 42:25 44:13 77:11,13 |
| **period** 60:18 77:10,15 78:11 80:3 90:5 91:9 94:1 95:23 156:2 | **picked** 118:20 156:18 | **play** 199:21 | **possible** 21:8 23:7 34:4 43:14 48:6 50:5 94:12 102:10 140:17 143:14 152:18 169:13 173:15 | **prepared** 12:12 54:6,8,10 73:20,21 185:4 |
| | **picture** 208:15 | **player** 25:21 52:7 | | |
| **periods** 173:5 | **piece** 62:7 63:23 91:7 137:21 | **pleading** 67:3, 4,6 | | **preparing** 9:23,24 10:14 30:14 50:15,20 56:12 77:14,16 155:8 175:18 |
| **permission** 158:1,3 | | **pleadings** 48:25 56:3 | **possibly** 41:12,14,15 49:11 124:4 153:14 160:2 | |
| **person** 18:13 53:1 207:1 | **piping** 124:15 127:17 | **plus** 132:19 | | **prescribed** 106:12 |
| **personal** 15:13,18 24:17 37:11,14 41:11,22 42:8, 9 45:21 72:20 85:11 92:21 96:11 97:7 98:1,21 99:1 102:23 103:6, 11,18 104:12, 17 105:12,17 111:3 147:18 149:15 153:3 157:13 163:16 164:12,22,25 210:7 | **place** 43:7 61:23 75:19 76:4,20 90:18 93:13,15 102:15 104:16 108:12 119:13 131:2 132:6,25 144:21 173:7, 19 186:3 204:1,2 208:9 209:16 | **point** 10:6 12:18 14:16 19:16 21:4 50:24 75:12 76:13,25 77:3 86:9 93:12 98:18 111:5 120:24 132:19 135:19,20 138:5 148:5 156:25 162:16 165:18 178:12, 23,24 179:4 191:23 204:9 208:15 | **post-tax** 79:19 | **presence** 136:1,9 |
| | | | **potential** 87:22,23 89:16 | **present** 6:19, 20 87:2 |
| | **places** 61:21 75:2,24 103:23 112:11 | | **potentially** 80:15,19 162:1 192:8,9 | **presumed** 130:6 |
| | **plaintiff** 11:19 20:15,16,17,18 46:24 47:6,7,8, 9 123:18 144:4 | | **powder** 163:25 | **pretty** 17:9 42:7 94:17 99:6 112:18 113:22 130:18 147:20 |
| | | | **power** 196:7, 24 | |
| **personally** 49:17 53:12, 14,20 | | **portal** 21:6,7,8, 15 22:4,14,15 30:2,17 47:16, 19,20 49:4 55:21 100:1 110:12 122:10, 12,13 124:25 | **pozo** 123:16 125:20 | **prevention** 36:21 |
| **Pete** 14:21,22, 23 207:22 | **plaintiff's** 9:23 154:20 | | **pre** 25:1 79:19 | |
| | | | **preceded** 51:13,14 | |
| | **plaintiffs** 6:22 7:4,6 9:15,16 | | **precise** 190:12 | **previously** 11:5 50:18 |
| | | | **prefer** 148:10 190:9 | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: price..public

70:10 176:13 180:13

**price** 132:24 137:23 138:3 181:4,8,9,14, 18 182:7,11 185:9 192:12 193:14

**prices** 149:14 210:6

**primarily** 15:20 16:17 31:16 45:18 108:1 153:12

**primary** 15:15 24:16 25:21 173:17 197:9, 23 198:17 199:1,15 202:9 203:18

**principal** 18:8, 11,12 135:3

**principals** 18:8

**printed** 30:5,6 31:16,17 165:22

**printing** 54:13

**printout** 31:7

**prior** 26:19 50:13 52:18 98:4 175:25

**priority** 29:2, 12,18,22 35:22 52:23 57:7 64:7 68:4,9,15, 19 71:1,6,9,20 81:4,20 84:19 85:5,14,20 86:4 87:14 89:16 90:1 95:24 96:7

98:23,25 102:18 103:12, 17 105:13,24 115:8 128:18 134:18 135:18 136:8,15,20 137:3,10,15 144:4 162:5,11 168:19 172:8 189:25 190:7, 16 191:18 201:20 203:15 210:19

**privately** 137:23

**Prive** 45:6

**proactive** 139:13

**probably** 10:9 12:1 14:11 15:20 17:2 18:1 21:11 24:11 27:2 38:8,18 42:13 43:1 44:16 47:24 54:2 60:3,6 66:25 70:8 77:8,9 87:17 88:10 111:14 131:4, 24 139:10 144:1 145:20 168:2 169:16 170:3 206:22 209:16

**problem** 16:4 97:24

**procedure** 104:19 116:23

**procedures** 28:21 83:4,6 104:16 105:7, 11,16 114:5,9,

13 116:20 126:19,21

**proceedings** 67:19

**process** 8:7 20:21,24 46:16 48:3 110:25 113:9,13 114:11 130:13, 20 137:17 138:3

**processes** 86:19 137:14

**produced** 11:5, 9,11 47:14,22

**product** 17:22 165:10,11

**production** 110:12

**profile** 47:4,6, 8,9 193:8

**profits** 41:25

**program** 167:21 170:23, 24 171:3,24 176:2,11 195:13

**project** 16:20, 21,22 23:22,23 52:5 179:12

**projects** 166:9

**proof** 99:16,22 154:5 169:13 170:14 171:8, 13 174:2 194:1

**proofs** 169:11 170:17,25

**proper** 87:3 95:5 110:18

111:6

**properly** 59:19 125:17

**properties** 41:25 45:14 73:9 121:12 136:15

**property** 15:13,18 20:5 24:18 37:11,14 41:11,22 42:8, 10 43:21 45:9, 11,12,17,21 47:4 60:15 85:11 92:21 96:12 97:7,10, 11 98:1,4,22 99:1 102:23 103:6,11,18 104:12,17 105:12,17 109:7,13,19 111:3 112:5 118:24,25 119:14 133:10 135:1,24 136:9 137:23 138:2,3 147:18 149:15 153:4 155:4 157:13 163:16 164:12,22,25 181:15,19 182:4 183:6,22 187:19 195:5 196:18 210:7

**proportion** 38:20

**proportional** 19:10

**proposal** 162:17 166:12

**proposals** 24:24 166:15,

16,19

**proposed** 106:11

**protocols** 15:22,25

**proven** 91:18

**provide** 23:2 28:6 42:15 43:2 52:14 61:3 74:5 76:14 91:8 105:23 155:10

**provided** 14:14 21:23 22:17 23:6,8 27:9 29:1 30:24 40:18 52:1 56:20 64:14 71:15 76:3 84:8 87:6,7 88:12 99:25 100:12,14 101:15,16,20, 21 111:18,21 114:17 120:22 124:20,21 125:4,11 128:23 140:15 141:16 149:19 155:13 159:15 191:24 193:22 205:7

**provides** 150:10

**providing** 88:22 205:2

**proviso** 43:5

**public** 6:17 33:16,20,23 34:1,14,15 35:11 56:21 155:6,7 181:17

Case 4:11-cv-02408-MSC-EEC-MRN Document 229-1 Filed 11/19/19 Page 30 of 556
Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed on FLSD Docket 05/13/2015 Page 246 of
388

CONFIDENTIAL - MICHAEL P. ELKIN, CPA
Index: publications..recall

| | | | | |
|---|---|---|---|---|
| 183:15,21 184:14 187:16 | 82:14 84:15,22 92:25 101:24 126:15 129:13 134:15 190:19 200:19 201:3, 11 | 41:6 50:8 51:12,13,14, 15,16 66:24,25 69:22 79:14 80:7 82:13 | 18:24,25 19:4, 7 28:9,10,13 89:19 | 31:15 37:19 92:9 98:6 99:13 110:25 111:2,10 116:5 |
| **publications** 28:22 | | | **rather** 12:1 31:18 36:11 48:3 126:3 137:4 210:11 211:5 | 130:23 134:20, 24 139:21,24 144:9 |
| **pull** 21:3 152:6, 7 | | 83:3 85:2 86:2 97:16,19,20,23 98:19 99:6 | | **reason** 15:15 54:23 55:9,16 |
| **pulled** 21:8 49:11 55:21 121:10 166:16 | **put** 12:3 15:3 21:1 24:9,15, 23 50:6,7 73:23 74:3 79:24 93:15 102:23 104:16 107:4,7,8,14 108:16 109:22 110:22 116:16 118:21 119:8 120:1 121:1 129:21 131:20 132:7 133:3,15 144:10,12 146:3,13 147:22,24 153:5,6,22 158:13 160:17 163:1,2 165:21 173:4 175:22 185:10,16 189:11 193:7 204:6,17 205:11,15 | 105:9 126:11 133:18 136:24 155:8,24,25 156:2 160:9 161:19 174:1 176:6 193:11 204:11 | **raw** 22:11,17, 25 | 56:6 57:21 99:18 142:20 174:1 175:21 195:23 203:6 205:5 |
| **pulling** 118:1 129:10 | | | **reach** 62:5 115:7 | |
| **pump** 124:12, 13 | | **questioning** 84:16 | **reached** 102:8 155:2 | **reasonable** 147:7 |
| **punitive** 73:11 74:13 75:13,20 76:5 | | **questions** 8:9 25:13 58:9 79:13 82:21 156:10 162:19 177:6 203:14 209:3 | **read** 13:10 17:14 34:9 49:22,23 54:22 57:24 79:13 88:16 97:15 110:9,15 130:9,10,18 145:25 146:2 148:2 195:10 198:9,11,12,14 200:15 207:14 | **reasonably** 164:15 |
| **purchase** 132:24 164:20 181:4,8,14 182:7,11 185:9 186:1 192:12 193:14 | | | | **reasons** 134:3 135:25 |
| | | | | **recall** 15:25 16:1 18:19 19:1,4 22:9 25:18 26:12 28:2 30:6 42:11 45:4 46:1,12 49:9 50:5 54:10 57:17,21 58:24 64:16 71:24 78:10,20 81:9 87:16 104:10 119:5 122:15 123:21 125:23 128:11 143:18 148:11 150:23 151:17 157:4 172:8,14 174:6 190:23 191:20 194:7 195:4 198:11,16,19 206:12 207:6 208:9 |
| **purchased** 96:22 99:2 103:2 104:18, 21 | | **quick** 68:22 142:1 | | |
| | | **quicker** 210:5, 11 | **readily** 97:3 | |
| **purchases** 185:6 | | **quite** 21:5 23:16 39:18 60:18 | **reading** 172:21 | |
| **purchasing** 104:14 163:14 | | | **ready** 16:11 75:16 | |
| **pure** 44:6,8,9 | **putting** 21:17 31:14 47:18 97:8 98:2 106:14 112:22 120:25 204:7 | | **real** 20:4 37:6,9 50:9 109:17 133:10,20 135:14,15,19 137:21 142:1 | |
| **purely** 189:17 | | ___ | | |
| **purpose** 11:16 84:20 104:1 113:21,22 139:20,21 | | **R** | | |
| | | ___ | | |
| | **Q** | **raise** 7:13 | **realize** 171:14 207:15 | |
| | | **range** 19:7 | | |
| **purposes** 15:17 27:22 51:12,19 55:4 | **quality** 103:14 104:8,13 | **ranges** 116:21, 22 | **realized** 52:6 156:15 157:23 178:20 208:17 | |
| | **quantify** 126:4 | **rank** 18:2 | | |
| | **question** 31:5 33:21 34:8,21 | **rate** 19:1,3 | **really** 17:15 | |
| | | **rates** 13:13 | | |

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 31 of 556
Case 1:11-cv-22408-MGC Document 279-1 Entered on FLSD Docket 05/13/2013 Page 247 of
388

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: receipt..relevant

| | | | | |
|---|---|---|---|---|
| **receipt** 60:24 86:21 107:17 111:23 112:17 114:15,21 116:2 123:3,5, 21 126:7 127:8 148:13 | **recent** 39:9 152:8 | **recorded** 178:22 | 11:23 204:22 | **reimbursed** 95:25 96:7 |
| | **recently** 173:22 | **records** 56:22 90:12 116:8 155:6,7 181:17 183:15,21 184:15 186:1 187:16 | **referred** 149:20 176:21 187:11 | **reimbursement** 156:18 |
| **receipts** 20:2 85:19 87:3,14 88:8 99:15 104:11,13 111:18 112:23 114:21 120:3 122:10 146:14 149:16 156:22 157:5,7 | **recess** 69:2 119:20 138:11 159:8 191:12 203:9 | | **referring** 32:10 88:3 143:12 154:24 175:8 177:18 178:11 187:7 | **reimbursements** 94:15,18,25 95:10 96:9 |
| | **recessed** 211:16,17 | **recover** 29:10 | | **Reinhold** 16:18 18:18 19:14 |
| | **recipient** 88:7 89:1 | **recovery** 28:19 80:20 81:16,17 | **refers** 79:25 145:8 | **relate** 33:22 161:7 168:14 186:24 |
| | **recipients** 89:6 | **reduce** 95:13, 20,23 129:15 | **reflect** 202:2 | **related** 23:24 37:18 39:5 45:8 46:24 48:7 58:6 72:4 80:17 107:2 116:2 126:24 133:7 139:12 147:13 153:13 168:6 173:25 |
| **receive** 204:5 | **recognize** 33:3 40:24 48:15 63:6 159:15 180:12 181:25 182:20 184:10 | **reduced** 135:25 195:20 197:8 | **reflected** 22:7 89:17 96:18,20 104:22 125:17 178:4 202:10, 11,13 | |
| **received** 13:10 21:25 22:6,9 26:7 28:19 29:5,9,18 49:4, 10 56:21 71:2, 6,19,23 74:7 79:22 80:23 87:24 90:1 95:7 96:5 99:8 135:5 136:8 168:12 173:9 180:4 194:4,24 195:4 | | **reduction** 29:7 134:19 136:8 195:4 197:22 201:6 202:8 | | |
| | **recognized** 122:9,14 178:12 179:10 | **reductions** 87:23 198:3 202:12 | **reflecting** 129:6 179:20 | **relates** 14:6 36:13 96:21 126:7 153:10 |
| | **recognizing** 31:14 48:4 94:12 127:10 | **refer** 124:4 163:10 | **refresh** 145:16 | **relating** 28:18 38:21 45:16 194:5 |
| | | | **regard** 9:24 20:1,10 28:6 34:24 37:23 44:24 58:9 68:1 70:24 80:25 83:5 84:17,19 90:16 100:7 102:22 106:22 109:21 137:9 155:19, 25 156:12 183:21 196:1 209:5 | |
| **receiver** 39:18, 20,23 | **recollection** 145:16 172:16 | **reference** 87:20 88:6,14 125:14 153:2 168:22 170:1 174:21 175:11 181:15 194:17 | | **relation** 81:6 |
| **receivers** 39:16 | **reconciliation** 130:13,20 178:20 | | | **relatively** 126:18 127:6 |
| **receivership** 39:5,9 40:1,9 | **reconstruct** 60:20 | **referenced** 88:13 127:20 130:3 150:16 175:14 182:23 183:13 184:21 | | **relevance** 44:24 95:6 96:4 |
| **receiverships** 39:1,3,7 | **record** 6:3,15 69:1,4 84:15 119:19,23 138:10,13 158:13 159:7, 10,11 191:10, 14 203:8,11 209:23 211:14 | | **regarding** 67:19 69:10,13 88:23 89:7 105:24 174:22 | **relevant** 13:16 29:16 36:1 46:23 53:24 54:4 55:5 60:20 80:3,16, 19 84:25 89:10 94:23 95:11,16 101:9 107:11 |
| **receives** 80:13 86:5 | | **references** 31:12 67:10,23 87:13 | **regardless** 205:18 | |
| **receiving** 29:23 172:9 | | **referencing** | **regards** 13:11 133:19 | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

108:4 109:19
151:9 184:25
185:2

**reliability** 61:3

**relied** 15:1,2
125:9 139:11
140:6 141:18

**relief** 29:1,19

**rely** 54:15,18,
24 125:21

**relying** 140:1
163:5

**remained** 48:3

**remediated**
106:4,23,25
108:2 198:18

**remediation**
15:12,13,18
27:12,14,17,24
29:8 72:12
85:11 106:21
107:22 110:22,
25 111:3
142:10 146:18
153:4 156:2
161:24 162:2,
18 163:4

**remedy** 88:24

**remember**
14:19 16:21
24:4 26:18
39:22 41:21
42:6,17 47:3,4
51:1 54:13
58:20 61:9
78:9 108:19
111:22 112:12,
15 113:8
116:12 117:1,
20 123:12
124:8,11

130:16 131:5
143:21 145:18
148:5,9 153:15
155:25 156:3,7
172:17,21,22
207:8,12,15,20
208:19

**removed**
107:13,16
116:3 119:6

**render** 95:6
134:16

**rendered** 9:3

**rendering**
69:8,10,13
72:12,19,22,25
73:10

**rent** 91:6,7
153:7

**repaid** 44:4

**repair** 110:23
122:17 126:6
156:20

**replace** 93:6
100:8

**replaced** 93:11
96:22 100:8,9
111:2 112:3
121:4 162:7

**replacement**
96:15 103:13,
24 104:3,8
105:17 124:12,
13 126:6
149:21 210:22

**report** 19:7,8
26:22 29:21
30:14 31:16,25
32:1,2 42:25
44:13,15 48:21
50:15,20 51:9

55:4 56:12
57:20 59:7,17,
23 62:10
63:17,20,24
64:10,21 66:2,
4,11 70:10
71:14 73:14
74:21,25 75:8
77:8,12,14,22
78:2,4 82:20
83:7 85:19
87:3,4,8,10,11,
13 88:7,13,15
89:1,6,13
92:12 95:11
96:18 100:22
102:23 105:20
121:14,22
122:7,19
123:25 126:9,
15 128:23
133:23 134:23
137:2 138:1
144:16 145:4,6
146:8 147:22
149:14 150:10,
16 155:9,10,
12,16 156:11
157:24 159:17
161:21 169:3
175:19 176:20
177:2,12 178:5
180:23 200:1,
21,22 201:24
202:7,21,22
203:1,25
204:7,22
205:21 208:24

**Reporter** 7:11,
13,19 16:6,12
66:8

**reports** 9:3
29:18 43:9
149:8 150:3
200:19 206:5

**represent**
66:13

**representation
s** 140:1,3
145:24

**represented**
52:22 205:6

**representing**
6:21 7:3

**represents**
121:15

**request** 10:25
43:2,12 58:13

**requested** 11:1
20:25 106:2

**requests** 43:13

**require** 200:6

**required** 34:13,
18 90:15

**requirements**
36:5

**requiring**
92:10

**research** 56:19
155:4

**researched**
84:18

**residence**
164:20 197:9
199:2,5,12,14
200:9 202:9
203:18

**respect** 177:15

**respective**
20:11 47:17

**response** 11:4
35:21

**restricted**
138:22

**result** 29:23
43:21 81:21
136:9 156:3
165:11 195:5

**retained**
105:22 209:11

**retrieved** 84:12
183:17 184:16

**retrieving**
138:18

**return** 58:12
80:13 123:4
196:18

**returned** 112:3
114:7,16

**returns** 81:6,
21,23 83:17
114:4

**revenue** 28:21

**reverse** 122:15
156:19

**reverted** 125:2

**review** 10:25
25:20 31:10
49:17 53:22
54:16 62:15
113:20 129:8
140:24 155:11
190:20

**reviewed** 9:12
24:22 25:4
44:23 47:12
49:20 53:12,
14,21,22 54:5
84:18 90:12
114:10 121:5
130:22 137:18
166:9 168:23

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: reviewing..seen

| | | | | |
|---|---|---|---|---|
| 176:22 | run 27:1,3 | 130:4 132:5 | 210:20 | 72:13 101:21 |
| **reviewing** | 37:21 152:21 | 136:24 137:23 | **saying** 17:5,8 | 127:8 137:12 |
| 17:19 121:6 | 161:4 | 142:2,22 143:1 | 38:8 106:14, | 161:24 163:4 |
| 162:16 186:8 | **running** 38:12 | 152:16 157:7 | 17,20 149:7 | 205:20,24 |
| | 101:22 | 159:24 171:22 | 152:1 195:12 | 206:21 209:4,7 |
| **revision** | | 178:10,23 | 198:25 200:4, | **screen** 25:11 |
| 173:22 | | 186:4 187:15 | 10,13 204:14 | 110:10 125:16 |
| **Rico** 7:3 12:5 | **S** | 199:14 200:10, | **says** 32:12 | 187:10 |
| 26:9 65:17 | | 13 | 53:25 74:13 | **Seacoast** |
| 77:6 | **said** 23:21 | **Sarah** 7:9 | 76:19 88:17 | 187:13 |
| **rid** 43:13 | 35:21 54:5 | **sat** 114:9 | 117:16 118:13 | **search** 56:21 |
| 208:20 | 70:24 78:25 | | 125:18 129:24 | 181:15,17 |
| **rider** 164:25 | 84:14,16 96:7 | **Saturday** 64:25 | 131:24 132:2 | **second** 14:11 |
| | 108:17 111:15 | **save** 12:14 | 133:13 142:6 | 16:3,15 18:24 |
| **Rita** 16:21 | 118:14 123:4 | **savings** 58:14 | 150:9 152:13 | 27:4 28:10 |
| 18:21 23:19,21 | 125:16 127:10 | **saw** 109:23 | 153:7 154:2 | 46:8 47:1 |
| 165:4 | 129:20 137:12 | 112:11 118:11 | 168:1,9 169:19 | 50:12 53:7 |
| **road** 110:16 | 143:15 144:10, | 124:11 142:6 | 187:7,12 | 65:12 73:13 |
| **Robyn** 24:6,8 | 23,24,25 147:2 | 194:22 | 195:22 201:25 | 78:7,9 105:21 |
| **role** 17:9 28:2 | 148:9,10 | | 204:14 205:13 | 123:16 128:22 |
| 70:23 | 153:25 161:10 | **say** 15:2 20:18 | **scanned** 31:17 | 129:5,6 132:10 |
| | 162:6 169:22 | 22:5,15,19 | | 140:13,14 |
| **roles** 17:19,21 | 170:11 177:6 | 33:25 35:17 | **schedule** | 141:13 152:21 |
| 19:19 39:15 | 191:19 192:4 | 38:4 41:15 | 24:16 27:9 | 159:4 198:8 |
| **rolled** 120:23 | 210:7 | 49:5,19 69:9 | 63:12 71:8 | 210:2 |
| **Roman** 6:3 | **sale** 39:10 | 70:17 77:16 | 85:3 86:22 | **section** 28:9, |
| | 45:12 117:8 | 81:11 82:24 | 87:5,7 88:8,11 | 11 48:25 49:2, |
| **room** 163:25 | 133:5 134:2,5, | 84:4 88:22 | 103:19 108:20 | 18 56:9,13,15, |
| 208:18 | 6 135:8 137:22 | 100:3 102:6 | 113:12 117:24 | 18,19,24 57:4, |
| **Rosen** 24:8 | 138:2 144:15, | 104:24 106:1 | 119:6 121:8,9 | 7 63:16 66:12 |
| 57:10 58:23 | 24,25 145:9 | 111:4,12,16 | 125:10 151:22 | 141:1,8,15 |
| 130:17 155:19 | 180:4 188:1,3, | 112:6,25 | 164:19 168:20 | **sections** 28:8 |
| 163:19 166:11 | 19 | 113:10 114:9 | 183:5 187:11 | 48:24 |
| 190:2 191:21 | **sales** 25:1,2 | 115:8 121:14 | 192:13 193:13 | |
| **Rosens** 163:19 | 120:14,15 | 124:2 129:25 | 202:12,16 | **seek** 47:11 |
| | 121:2 137:5,8, | 130:8 131:1,7 | 203:1 205:11, | **seeking** 139:8 |
| **Rossin** 105:22 | 10 145:9,10,22 | 139:17 145:7, | 16 | **seem** 178:17 |
| **Roughly** 8:6 | 185:6 | 21 146:8 | **schedules** | **seemed** 197:4 |
| 77:25 | **same** 22:21 | 147:21 154:19 | 64:2 87:13,21 | **seems** 160:3 |
| | 33:11 43:2,5 | 155:1 160:20 | 103:12 120:9 | |
| **rounds** 176:25 | 72:4 83:21 | 169:17 176:25 | 155:10 166:5 | **seen** 10:22 |
| **rulings** 28:21 | 92:2 116:2 | 177:25 187:6 | 202:2,7,10,20 | 14:15 22:20,21 |
| | 117:14 123:4 | 189:23 190:11 | **scope** 36:25 | |
| | 127:23 129:15 | 201:13,18,24 | 37:2 69:6 | |
| | | 204:13 208:1 | | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

| | | | | |
|---|---|---|---|---|
| 23:12 61:23,24 103:23 182:21 184:13 185:16 186:18,19 193:25 194:15,19 | separate 32:17 70:25 90:21,23 92:10 114:16 120:14,18 121:8 164:19 178:13 201:10,14 | settles 42:18<br><br>seven 182:9<br><br>several 38:25 87:10<br><br>shaking 208:6 | shouldn't 86:24 94:23<br><br>show 10:3,20 30:5 48:13 63:5 65:24 87:13 142:17 171:23 180:10 181:24 182:17 184:8 186:11,16 188:5 189:14 190:12 192:12 202:21 | since 12:15 59:20 65:6 95:3 123:25 124:13 151:22 157:14 169:22 205:21 206:6,10 |
| segment 11:20<br><br>segregated 32:15<br><br>segregating 15:17,23 | separately 64:4 120:17 178:15 199:24<br><br>September 196:16,20,22 | share 77:24 78:7<br><br>shared 77:21<br><br>Sharp 52:9,10,11 | | single 111:13 113:20,25 144:3<br><br>sir 33:5 48:20 53:9 63:23 73:20 74:18 |
| select 161:16 167:21 210:19<br><br>selected 161:13 | sequence 190:24<br><br>sequentially 115:20 | sheet 43:19 160:5 203:1 211:1<br><br>Shelley 16:18 18:18 | showed 25:11<br><br>showing 74:10 108:7 121:1 149:17 169:6 | sit 81:9<br><br>sitting 28:25 67:3 68:17 102:6 123:22 124:6 |
| selection 54:15 152:1 171:3<br><br>selections 152:18 | services 6:5 10:12 35:12 105:24 198:17<br><br>set 15:22 19:7 34:19 35:15 | shift 27:4 105:20<br><br>shopping 39:11 40:1 | shown 97:3<br><br>shows 181:8<br><br>sic 198:22 | six 132:9<br><br>six-and-a-half 121:2 |
| sell 134:9 187:18 | 36:3,4,7 53:7 114:5,9 115:10 | short 77:15 117:8 134:6 135:8 137:5,8,10 138:2 145:9 | sides 40:16<br><br>sideways 23:15 | skill 35:13 36:3,4,6 |
| selling 138:2 164:14,23 | setoffs 87:24 94:20 95:7<br><br>sets 35:13 | shortly 78:11 | signed 205:21,23 | skills 34:14,19,25 35:3,5,8,17 |
| send 77:19<br><br>sending 143:9 | settle 42:19<br><br>settled 42:18 | should 22:8 64:1 66:25 70:21 79:18 82:7 85:25 | significant 52:7 59:15 75:10<br><br>similar 19:19 | skip 56:16<br><br>skipped 56:15 |
| senior 10:11 17:25 18:6,7,13,17,19,20,22 19:10,11 | settlement 87:24 117:18 118:7,9,13,16 133:25 151:21 | 86:23 88:19 94:23 104:4 113:1,2,14,15,23 122:21 124:1,2 | 89:5 103:24<br><br>Similarly 67:18<br><br>simple 89:20 | skipping 186:12<br><br>slide 182:19 |
| seniors 17:21<br><br>sense 98:6,13 116:24 160:19 173:20 179:15 | 166:24 167:20 170:20,21,23,24 171:3,24 174:23 175:12 176:2,11,12 179:7,17 | 129:13,24 131:24 139:6,14 145:11,23 167:14 173:2 186:7 199:24 | 126:18 132:6<br><br>simplified 131:15<br><br>simply 38:13 | slightly 28:11 51:25<br><br>small 39:20,24 111:10 153:11 201:8 |
| sent 14:17 77:9 114:11 152:8,9 158:15 160:21,24 | settlements 71:25 | 208:16,19 | 41:21 82:25 119:6 126:15 136:3 202:16 | smaller 122:18 201:7<br><br>softly 16:5 |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: software..standards

**software** 143:2

**sold** 134:6
135:5,19
137:22,23
138:2,3 145:8,
11,23 148:3,4
188:7

**solely** 54:24

**solemnly** 7:15

**somebody**
25:23 26:11
27:23 28:20
50:8,21 77:20
80:12 81:11,19
82:4 91:6
92:21 111:20
144:17 150:19
164:14 165:22
183:17 199:12
201:6

**somebody's**
156:1

**someone**
12:21 66:22
70:1 76:13
110:11 133:13
181:16

**something**
8:14 14:25
22:14,24
32:11,15 38:5
49:21 50:6
55:2 61:2,5
71:7 77:19
80:4,5 84:24
90:13,19,24,25
92:6,7 93:6,10
94:6 97:22
106:10 107:18
112:2 116:14
117:17 118:19
123:23 127:1
139:23 141:15

142:12 143:15
150:22 164:1,
7,11 167:13
170:1 172:25
173:2 180:22
181:16 182:20
200:10,13
204:11

**sometime** 26:4
46:2,4 57:19
59:6 78:11
131:6

**sometimes**
17:16 36:17
49:14 61:18,22
93:5 111:11
112:15 133:13
164:24 202:3

**somewhere**
58:1 77:9 78:5
97:2 107:17,18
117:12 118:21
130:10 145:3
148:2 149:5
173:15

**soon** 77:14

**sorry** 12:9 13:2
17:23 23:14,19
38:6 42:22
53:14 56:15
97:15 113:7
126:11 132:12
140:12 141:25
161:19 171:14
182:18 183:11

**sort** 11:16
19:17 79:6
97:3 115:24
117:14 118:16
130:14 136:24
164:13 169:6
206:20

**sorted** 173:1,2,

**4**

**sought** 47:25
48:5

**sound** 145:13

**source** 28:13
91:22 168:4
183:13 190:5
193:23

**sources** 13:11
20:6 21:22
23:5 56:19
70:11,22 71:3,
22 72:9 85:20
87:25 94:19
177:10

**southeast**
39:12

**Southern**
83:23

**speak** 9:22
42:22 100:17,
20,24 101:12
102:18

**speaking** 16:5
82:24 83:9,22

**special** 39:17

**specialized**
79:7

**specific** 9:9,11
10:14 32:3
34:13 35:2,24
37:25 45:16
50:22 59:13
78:24 84:9
87:20 101:9,14
123:20 153:24
157:3 164:9
165:6 170:4
186:19 206:14,
19

**specifically**
11:7 19:16
25:18 34:18
70:15,18 72:2
84:11 88:4
103:21,22,25
104:13 106:1
107:21 123:12,
19 124:17
128:13 139:9
150:16 153:2
159:24 162:19
163:3,12 168:6
173:25 187:7
200:23 201:25

**specifics**
152:25

**spectrum**
36:16

**speed** 210:17

**spell** 16:24

**spend** 108:24

**spending**
59:16

**spends** 86:5

**spent** 9:19
38:21 59:20
85:6 100:7
106:9 133:9

**spoke** 57:17,21
101:2 165:3
206:15,16

**spoken** 101:3
148:19,24
206:10

**SPPF** 47:5
146:4 168:5
169:25 170:8

**SPPFS** 21:12

**spreadsheet**
61:8,11 76:2
97:4 106:15
107:5 108:15,
16 112:22
117:11,14
118:21 120:8,
13 121:6 160:1
175:22

**spreadsheets**
29:11 75:18
97:8 98:3
107:7,9 108:7
109:22 115:13
120:1 126:22
151:4 158:16

**springing**
210:12 211:6

**Stacy** 155:19
191:21

**staff** 16:1,14,
15 17:21 18:6,
20,23 35:16
37:22 113:13,
16 114:8
121:11 165:2
181:16 183:10,
18 184:16

**stage** 20:13

**stamp** 55:24

**stamped** 100:1

**stamps** 55:9,
13,17,22 56:6
182:7

**stand** 23:13
69:1 119:19,21
138:10 159:7
191:11 203:8

**standard** 35:18

**standards**
34:15,22,23

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: standpoint..taken

**standpoint**
17:10

**start** 17:7
32:22 41:6
47:13 63:16
77:16 158:20
178:2 198:23

**started** 17:5
77:13 110:24
128:10

**starting** 48:24

**state** 6:14 8:1
66:12 72:11
82:14 83:8
105:21 184:18

**State's** 28:5

**stated** 55:1
134:12

**statement**
67:13 146:6
163:5 179:7
187:8,12,17
196:21

**statements**
114:20,23,24
115:9 145:25
187:5,6

**States** 39:13

**stating** 84:18
187:14 198:16

**status** 66:15
67:14,21

**statutory**
89:19,21

**stay** 164:15

**stayed** 108:19

**step** 46:25

**Sternberg** 7:7

10:9,10 16:17
17:8 18:12
54:9 73:22

**Steve** 157:24

**Steven** 65:15
66:2 174:11,17
176:8 191:4
193:13 194:13
198:9

**stickies** 50:9
191:25

**sticking**
204:11

**sticks** 109:4

**sticky** 11:11,
12,20 31:11
50:7 131:17
132:12

**stigma** 73:4
204:2,18,24
206:6

**still** 44:15 98:6
117:2,5 139:25
171:16

**stopped**
198:17 201:9

**strictly** 178:16

**stuck** 28:23

**stuff** 11:8 20:2
112:14 144:7,8

**subcontractor**
146:21

**subject** 51:16
83:20

**submitted** 64:9
156:17

**submitting**
130:22

**subsequent**
127:4 133:1
156:11 209:10

**subsequently**
47:20

**substance**
58:24 59:8

**substantive**
78:12,14,21

**substitute**
158:1

**subtracted**
94:3

**such** 70:13
82:6 88:23,24
89:10 92:8
95:19 145:10,
22 179:16
190:21

**sufficient** 61:3
83:22 102:21

**suggest**
167:13

**suggested**
139:6 140:24

**suggestions**
139:13

**Suite** 6:10

**sum** 177:9

**summaries**
54:25 75:21
76:24 141:3
204:1

**summary**
73:15 75:24
79:25 87:2
120:9 121:10
141:16 143:6
205:9

**supervisor**
18:7

**supplemental**
47:6,9

**support** 61:12,
13 62:2 107:11
118:1 151:6,
12,18,19,24
152:11 157:15
159:18,21
160:6 161:3
171:21,22
193:10

**supported**
62:6 192:6

**supporting**
56:10 61:16
141:14 142:7
150:8 154:3
169:20 190:11
192:19

**suppose** 36:12
108:4 160:9

**supposed**
83:14

**surface** 118:22

**surprise**
198:20

**suspect** 60:5
160:13

**Sutcliffe** 6:20

**swear** 7:12,15

**sworn** 7:22

**system** 36:14,
18 43:10 52:4
111:1

**systems** 36:22

---

**T**

**Tab** 13:22 14:1,
4,5,13,14 27:8,
9 28:3,4,16,17
29:25

**table** 14:14,15
35:9 67:9

**tabs** 11:15
87:5,10,11

**tabular** 15:4

**Taishan** 7:10

**take** 11:25
13:18 24:15
28:20 37:5
40:15 41:14
63:8 68:22
78:1 87:18
98:18 109:22
112:1 116:23
118:4 119:15
130:5 135:13,
17,22 136:5,
12,18 137:1
142:19 148:22
156:6 157:14
158:17,21,23
164:11,17,18
170:11 173:10
174:15 177:14
187:3,23
188:20 191:8,
22 202:25
203:5

**taken** 29:5
36:15 39:3
79:2,3 81:20
82:7 90:18
93:13 101:24
117:22 129:6,9
164:7 178:16,
21 189:17

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: taking..thought

| | | | | |
|---|---|---|---|---|
| 190:17 191:18 193:19 | 36:5,7 50:21 53:1 78:23 79:1 80:1,13 81:2,3,5,16,20, 21,23 82:4,6 83:13,16 84:12 120:15 121:3 195:14,20 | **terminology** 145:14,17 170:22 | 43:16 45:8,12 46:25 47:1,3 80:13 81:5,21, 23 82:6 84:20 100:2,16 101:5 120:14 134:19 136:15 137:4 144:20 146:1, 2,3 153:13 155:13,14 156:14 157:13 164:10 169:2 179:24 187:19 190:18,19 193:7,8 194:5, 24 195:5 198:17 199:6 201:6 203:17 207:13,15 | 60:10 61:19 72:1 92:18 93:14 95:1,5 99:16,23 101:14 107:10 108:9,11 109:16,17,18 110:19,22 111:6 112:10 113:10 115:19 119:12 127:3 128:5 133:11 137:11,12 138:16,25 139:1,10,14,17 141:4,5 143:9 145:25 146:2, 25 147:1,19 148:1,6,19 149:4,9 152:23 153:1,24 156:16,17 157:19 161:22 163:16 164:9, 15,16,19 165:8,15,17 166:7 189:16 202:3,14 209:6 210:3 |
| **taking** 10:22 18:16 75:7 106:14 119:13 130:14 134:11 | | **terms** 21:22, 24,25 22:6 23:18 35:16 46:17 74:10 91:11 119:25 146:13 | | |
| **talk** 18:23 67:11,12 79:16 92:20 | **taxability** 79:20,21 | **testified** 7:22 8:24 95:25 | | |
| | **taxable** 29:10 80:21 | | | |
| **talked** 10:7 23:17 27:2 34:21 50:21 51:3,8 52:4 64:2 77:3,5 90:22 101:6 114:11 138:17 140:7 143:18 147:19 155:21 156:12 157:2,5 190:2,17 206:4 208:25 | **taxes** 28:19 79:17 81:1 109:17 133:11 136:9 194:5,24 195:5 | **testify** 76:15 82:19 | | |
| | | **testimony** 7:16 40:19 41:2 43:19 83:7 84:20,21 132:22 166:16 185:23,25 188:7 192:22 193:16 194:11 | | |
| | **taxpayers** 36:6 | | **theme** 211:3 | |
| | **TBD** 74:14,16 76:19 205:13 | | **themselves** 168:7 208:22 | |
| | **team** 25:21 | **than** 9:19,22 10:4 12:1 21:11 31:18 37:19 38:3,5,6, 7,8,16,17,22 52:3,25 60:6 61:22 68:14,19 88:10 93:9 99:3,19 102:16 104:4,9 105:18 110:15 122:6 137:4,23 138:3 148:19 154:16 155:4 157:5,19 165:14 168:8 173:18 190:16, 19 192:22 199:10 203:5 210:12 211:5,8 | **theories** 69:10 | |
| **talking** 23:8 51:18 59:24 67:24 68:10 69:23 70:3 99:11,14 100:4 107:21,23 117:12 124:14 132:13 142:17 158:16 180:17 185:22 | **technical** 16:3 40:16 106:7 144:19 | | **therefore** 29:6 55:4,23 162:1 179:1 | |
| | **Technically** 36:12 | | **thing** 77:18 83:21 116:3 128:8 142:22 143:1 144:13, 14 147:12 150:23 160:4 173:4 198:11, 14 200:10,13 202:13 209:24 | |
| | **telephone** 58:22 | | | |
| | **televisions** 164:21,24 | | | |
| **talks** 68:3 181:4 | **telling** 143:9 | | | |
| **tally** 115:15 201:15,16 | **tendency** 110:14 | | **things** 15:3,8 17:14 21:13 24:23 25:20 26:24 28:1 31:15 34:21 38:17 44:10 47:18 54:19 56:2 57:4 | **thoroughly** 25:4 49:18 |
| **tallying** 126:16 | **term** 31:20,24 106:7 107:24, 25 117:10 118:10 144:19 145:1 149:12 | | | **thought** 11:23 75:4 105:4 110:3 130:10 164:13 169:23 171:17 183:24 194:19 211:10 |
| **tape** 159:5 | | | | |
| **tasks** 19:13,15 | | **their** 17:21 20:10 21:19 24:3 37:24 | | |
| **tax** 24:25 25:1, 2 28:23 29:1,7, 18 35:1,20,22 | **termed** 71:4 | | | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

| | | | | |
|---|---|---|---|---|
| **thousand** 182:10 | 63:8 68:20,21, 24,25 69:3 75:12 77:10 78:11 91:9 98:5 102:25 108:25 110:7 113:3,9 119:18,22 121:3 123:25 129:24,25 131:6 132:25 133:5 138:9,12 144:3,4 158:21,23 159:6,9 178:22,24 180:23 183:21 185:4 186:4,8 191:9,13 203:7,10 211:5,15 | 59:22 64:24 67:3 68:12,13, 15,18 102:6 121:16 124:6 162:25 177:10 202:5 | 181:11 | **Translate** 125:22 |
| **three** 37:17 46:23 47:24 51:2 118:6 121:15 123:1 127:15 165:8 | | | **Totaled** 120:5 | **transposition** 111:20 |
| | | **today's** 6:5 10:7 | **totality** 111:7 | **traveling** 67:5 |
| | | | **totally** 105:3 | **treated** 129:5 178:13 |
| **through** 9:17 12:17 13:18 16:25 17:14 22:1,23 23:14, 15 31:3,19 41:13 46:22 49:6 50:7 53:11 56:21 59:22 61:6 63:10,11,14 69:7 71:17 87:17 89:18 98:20 100:14, 24 102:17 106:11 108:6 125:4 127:8 129:15 130:12 131:3 134:5 135:2,5,8 137:4 139:22 146:24 151:1 152:21 155:3 157:7 160:2 161:4,18 168:1 177:14 178:1 195:9,19 196:24 198:12 210:9 211:9 | | **together** 6:23 17:18 66:4 106:16 114:10 144:10,12 158:13 185:17 205:10 | **touch** 43:24 | **treating** 188:14 |
| | | | **touched** 9:21 146:10 | **treatment** 50:22 |
| | | **told** 12:10 17:4,24 25:13 46:18 70:19 113:16 115:3 124:24 170:2 | **toward** 157:9 206:9 208:12 | **trial** 67:23 90:9 121:19 |
| | | | **towards** 21:12 | **tried** 56:7 112:19 209:4 |
| | | | **Trabanco** 16:21 18:21 23:19,21 165:4 | **trier** 88:19 |
| | **timeline** 67:24 68:4 | **tomorrow** 158:25 209:18 210:1,3,10 | **tracing** 36:20 | **true** 126:8 |
| | **timely** 185:3 | | **track** 61:18 76:11 | **truth** 7:16,17 |
| | **times** 110:7 113:11 115:25 154:12 | **took** 39:10 78:18 112:5 113:11 123:7 131:2 133:4 144:21 179:5, 8,19,22 186:3 187:3 208:9 | **tracked** 22:11 61:7 95:9 166:2 | **try** 8:11,14 78:3 91:2 94:4 111:9 115:22 158:19 185:5 |
| | **timing** 15:12 89:14 95:19 96:17 110:17 114:1 115:19 | | **tracking** 21:21, 24,25 22:2,5, 10 23:8 61:21, 25 76:9,21 96:8 | **trying** 15:11 24:4 32:9,16, 18 33:9 46:25 57:23,24 58:2 59:9,13,17 78:9 82:17 83:15 94:11 107:1 132:10 144:7 146:12, 16 148:7 202:6 206:18,20 209:1 |
| **throwing** 82:21 | | **top** 41:3 125:18 187:12 | **tracks** 61:15, 17 | |
| **time** 6:6 8:17 9:20 12:14,20 21:11 25:12 26:1 30:6 37:20 38:16,21 39:2,4 46:9,11 49:19 58:17 59:20 60:18 | **title** 17:23 18:10 32:11 73:17 165:19 | **topic** 54:21,22 58:19 114:5 194:14 203:24 | **training** 34:25 35:2 | |
| | **titled** 48:25 63:17 66:12 73:15 184:11 | **topics** 13:12 | **transaction** 61:1 178:14 | **turn** 128:22 157:18 166:22 |
| | **titles** 18:3 | **total** 31:8,20, 21,23 32:10,14 59:24 108:24 109:2 116:18 133:2 169:5,8 170:13 176:4, 11,14,17 180:6 | **transactions** 60:16 131:13 | **turns** 163:20 |
| | **today** 8:10 9:23 11:4,7 29:1 31:10 33:7 36:10 | | **transcript** 207:15 | **tweaked** 24:22 |
| | | | **transcripts** 48:1 53:18,21 54:6,7,17 56:1 | **two** 17:1,25 |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: two-minute..verify

18:6,7,20 28:8
37:16 54:9
56:5 57:9
77:23 90:22
92:5,16 101:6,
8 103:23
112:11,16
116:1,12
119:15 130:11
151:10 155:24
163:22 166:8
169:14,22
185:16 192:24
201:10,14

**two-minute**
191:8 203:6

**two-tower** 45:6

**tying** 146:14,
25

**type** 20:2 23:10
39:5,7 96:16
104:14 109:1
112:19 136:21
151:15 152:1,
17 161:11
166:22 167:20
172:4,6

**types** 15:7
19:22 21:13
36:20 39:24
42:5 68:5
71:25 74:10
115:18 152:5
161:9,12

**typically** 39:4
56:2 60:23
80:24 82:24
99:12 144:1
164:18,22

---

**U**

---

**Uh-huh** 12:5

23:20 122:22
143:4

**ultimately**
47:15 72:17
81:1 93:2,25
118:23 120:18

**unable** 104:23
166:21 179:13

**uncertain**
81:14 87:18

**uncertainty**
80:25

**under** 13:22
14:13 24:1
27:8 28:3
29:25 35:5
46:14 67:5
73:16 117:25
141:14 152:17
161:9,14
162:14 171:12
172:6 196:8

**understand**
8:13 15:11
16:2 21:18
29:4 32:9
33:24 34:8
36:9 46:13
47:12 55:14
59:14 63:15
73:4 83:3
87:25 88:24
106:5,13
123:11,17
129:12 146:11
151:1 167:4,23
168:11 193:12
204:4 209:1,4

**understanding**
15:7,21 28:25
29:8 36:4
42:10 55:20
56:23 57:11,25

58:2 59:9,11
67:2 73:6 98:7
125:22 127:12,
20 168:9 188:2
192:15 204:25
206:20 209:5

**understood**
44:22 45:1
51:18,21
167:6,25
179:23 209:8

**undertake**
46:16

**unfortunately**
179:6

**United** 39:13

**unless** 13:19
70:18

**unrelated**
135:25

**until** 69:2
103:2 119:20
138:11 159:8
191:12 203:9

**update** 24:3
64:12,17,23
66:1 122:2
125:10 144:13
151:11 174:11,
16 177:16

**updated** 65:1
121:15,23,24
122:21,24
123:24 129:2
132:15 144:4,5
152:8,11
157:15 158:15
159:17,18,21
160:25 171:21
172:3 174:11
177:18,22,23
187:2,8,19

188:14,21
189:5 192:13
193:13

**updates** 64:21
128:21 159:15

**updating**
125:25

**USAA** 172:15,
24 174:4,7,21,
23 191:5

**use** 36:3,6
72:23 76:7,14
91:4 92:1,22
96:13 105:1
113:14 115:13
117:25 118:18
144:24 146:11
200:2

**used** 31:20
34:24 36:4
51:9 52:2
60:19 91:5,15,
22 92:5,25
93:5,7,11,16,
24,25 94:1,4
96:20 99:19
100:9 107:23
117:10 118:13
130:7 145:1
149:12 187:1
189:20 190:18

**useful** 183:25
184:3

**using** 89:19
92:9 107:25
108:1 122:6
143:2 145:15

**usually** 127:13

**utilities** 199:1

**utility** 197:21
198:17

---

**V**

---

**valuation**
10:12 37:24
210:22

**valuations**
41:10 45:21

**value** 73:3
76:18,21,25
103:6,7 105:18
133:20 136:22
149:16 169:8
195:14 204:2,
3,15,23 206:5

**value/stigma**
73:1

**values** 37:9
102:22 135:24
149:9,12
150:18

**variations**
211:3,4

**variety** 13:9,11
16:19 28:17,21
42:5 44:10
58:11 94:12
99:19

**various** 15:8
24:10 42:19
69:17 75:3
89:15 177:10

**vast** 61:4

**vendor** 115:21
116:6 168:2

**vendors** 168:1

**verbal** 25:9

**verify** 98:20
104:12,18
110:16 114:15,

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

Index: version..work

| | | | | |
|---|---|---|---|---|
| 20,23 147:5 154:15 155:2 158:5,17 159:23 166:20 189:7 195:16 | 134:13 142:2 144:25 146:10 159:1,4 160:19 161:17 171:9 174:19 200:15 204:24 209:22 210:3,4,8 211:12 | weekend 131:3 weeks 38:10, 11 Weiss 6:25 7:2, 5 207:7 wells 127:12, 15 | 96:21 102:7 104:3 113:9,23 116:6 126:6, 13,24 128:16 134:8 135:6, 18,24 136:7, 14,20 137:2,21 138:1 139:2 144:23 146:5 147:6,17 150:18 161:1 171:7,9 199:7 | 9,10,17 winding 39:11 wish 190:6 198:23 wished 101:12 Wites 170:9 within 11:21 17:24 18:2,3 19:7 34:23 57:19 59:12 137:12 209:6,8 |
| version 142:24 versus 15:13 27:12 41:25 201:8 vetting 107:5 via 14:17 27:10 132:7 | wanted 24:14 25:1,11 32:21 51:20 79:23 170:6 205:9,11 warning 205:12 210:4 | went 9:17 16:25 24:22 56:24 98:11 111:4 121:5 122:13 130:16 131:23 139:22 156:14 165:9 178:18 179:5,7 191:16 | while 12:22 16:14 18:23 20:3 58:8 128:21 143:18 150:25 157:21 174:17 198:18 | without 58:8 63:24 136:4 185:15 witness 7:12, 18,21 12:6 48:18 51:18 62:15 63:1,10 68:21 82:17 84:1,8 105:24 193:4 211:7,13 |
| Vickie 57:9,18, 22 video 6:3,8 69:4 119:19, 22,23 138:10, 13 159:7,10 191:10,14 203:8,11 | water 68:23 123:17 124:6,9 way 6:25 21:21 22:4,10 30:13 33:10 40:2 43:15 52:1 54:11 62:4 75:10 84:21 118:17 131:12 134:22 145:18 149:1 160:10 162:8 166:9,20 167:19 168:24 169:2,12 173:9 177:11 182:19 185:14 190:18 198:19 208:24 | Werkema 207:8 West 78:16 156:6 whatever 11:19 104:20 112:5 141:22 179:4 201:8 | whole 7:17 72:8 139:20 172:23 198:11, 14 wholly 135:25 whom 74:18 will 6:14 7:16 8:1,10,11,14, 17 16:7 29:10 34:23 42:16,23 43:15,16 44:20,21 63:7 64:12 68:18 70:19 75:12 76:14,15,23 81:1 83:8 108:7 143:3,5 150:7 152:5 158:1 159:14 204:6 205:6 208:18 210:16 211:8,9 | wonder 161:11 wondering 124:14 word 30:9 31:23 32:10,14 47:7 105:1 141:1,10 146:11 161:20 204:18 worded 92:8 words 92:5 115:15 125:23 131:19 144:22 148:9 |
| view 12:18 viewed 53:20 visit 121:11 vitae 33:6 | | whatsoever 94:22 whenever 48:6 whereupon 211:17 | | |
| **W** | | wherever 141:6 | | |
| wait 13:20 waiting 12:22 walk 177:25 Wallpaper 163:25 want 11:23 12:21 19:6 32:3 51:17 66:19 68:22 82:22 109:12 118:5 123:25 | ways 61:20 131:11 website 28:5, 12 Wednesday 131:5 week 14:11 38:9 46:8 57:19 59:7 77:25 131:2,6 208:10 | whether 21:12 22:1 27:16,23 29:1 34:24 35:4 43:6,7 58:1 69:24,25 72:3,7 79:1,17, 18,25 83:9 86:23 88:23 91:18 94:5,22 | William 57:9, 18,22 Williams 45:3, | work 17:2 22:7 24:3 25:19,22 29:11 34:12,22 36:16 37:16,25 38:2,13,14 |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA

46:10 58:7,12
63:14 71:8,14,
17 75:13,18,24
76:5,8,20
86:22 96:19
97:2,4,23 98:2
101:18 114:10,
12 115:22
125:1 132:25
149:2 150:3,19
151:1 155:1
161:1 163:13
165:3,10,11
166:17 168:18,
21 175:22
203:1,3

**worked** 20:15,
17,18 95:11

**working** 38:2
39:23 142:21

**works** 209:18

**worksheet**
118:16

**worksheets**
108:6

**world** 135:15

**worth** 133:16
153:16

**writing** 25:5

**written** 15:22,
25 30:10
35:15,19 74:25
113:13 114:13
157:25

**wrong** 110:4
130:9 142:13
178:21 179:1

**wrote** 91:10
145:19

## Y

**year** 29:7 38:10
39:4 81:23

**years** 35:4
36:15 37:17
38:25 99:17
187:22

**yellow** 11:20
30:10 31:11
50:7,8 131:16
132:12 148:13
191:25

**yesterday**
64:20,22

**yet** 36:19 56:17
74:25 77:2
98:13 100:9
125:11 162:24,
25

**yours** 143:3
145:17

**yourself** 37:8,
13 40:14

## Z

**zero** 41:14
92:17 107:14
129:14

**CERTIFIED COPY**

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
 2
      ------------------------------:
 3    IN RE:  CHINESE-MANUFACTURED  : MDL NO. 2047
      DRYWALL PRODUCTS LIABILITY     :
 4    LITIGATION                     : SECTION:  L
                                     :
 5    THIS DOCUMENT APPLIES TO ALL  : JUDGE FALLON
      CASES                          :
 6                                   : MAG. JUDGE WILKINSON
                                     :
 7    ------------------------------:

 8                          -  -  -

 9                 Tuesday, March 12, 2019
10                          -  -  -

11

12                   ** CONFIDENTIAL **

13        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

14                          -  -  -

15          Videotaped deposition of MICHAEL P. ELKIN,
      CPA, CFF, ABV, CFE, Volume 2, held at Colson
16    Hicks Eidson, 255 Alhambra Circle, Penthouse,
      Coral Gables, Florida, commencing at 9:00 a.m.,
17    on the above date, before Susan D. Wasilewski,
      Registered Professional Reporter, Certified
18    Realtime Reporter, Certified Realtime Captioner

19                          -  -  -

20               GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
21                    deps@golkow.com

22

23

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 218

1    APPEARANCES:

2       BREIT DRESCHER IMPREVENTO
        BY:  JEFFREY BREIT, ESQUIRE
3       600 22nd Street, Suite 402
        Virginia Beach, Virginia 23451
4       Phone:  (757) 670-3888
        jeffrey@breitcantor.com
5       Representing Plaintiffs

6

7       COLSON HICKS EIDSON
        BY:  NATALIE M. RICO, ESQUIRE
8       255 Alhambra Circle, Penthouse
        Coral Gables, Florida 33134
9       Phone:  (305) 476-7400
        natalie@colson.com
10      Representing Plaintiffs

11

12      ABALLI MILNE KALIL
        BY:  CRAIG P. KALIL, ESQUIRE
13           MICHEL AYUB, ESQUIRE
        1 Southeast 3rd Avenue, Suite 2250
14      Miami, Florida 33131
        Phone:  (305) 373-6600
15      ckalil@aballi.com
        mayub@aballi.com
16      Representing Defendant Beijing New Building
        Materials PLC
17

18
        ORRICK, HERRINGTON & SUTCLIFFE, LLP
19      BY:  DIANA SZEGO FASSBENDER, ESQUIRE
        1152 15th Street, NW
20      Washington, D.C. 20005-1706
        Phone:  (202) 339-8533
21      dszego@orrick.com
        Representing Defendant Beijing New Building
22      Materials PLC

23

24

25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 219

1    APPEARANCES:

2        ALSTON & BIRD LLP
         BY:   SARAH O'DONOHUE, ESQUIRE
3        1201 West Peachtree Street
         Atlanta, Georgia 30309-3424
4        Phone:  (404) 881-7000
         sarah.odonohue@alston.com
5        Representing Defendant Taishan Gypsum Company

6

7    ALSO PRESENT:

8
         AURELIO ROMAN, Videographer
9
         MARCIE D. BOUR, Yip Associates
10
         ELAN STERNBERG, Kaufman Rossin
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 220

```
 1                        - - -

 2                    I N D E X

 3                    Volume 2

 4              Tuesday, March 12, 2019

 5                        - - -

 6
    Testimony of:  MICHAEL P. ELKIN, CPA, CFF, ABV, CFE  Page
 7
        DIRECT EXAMINATION BY MR. KALIL............... 221
 8

 9                  E X H I B I T S

10          (Attached to transcript)

11  ELKIN DEPOSITION EXHIBITS                        PAGE

12  Exhibit 16   US Tax Return - 2009               286
                 Kevin and Stacey Rosen
13               KROSEN - 000500 through 555

14  Exhibit 17   Turkell & Gervis Design Documents  307
                 ROSEN, M (OLF) - 000085 through 191
15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

```
                                                     Page 221
 1                        -  -  -
 2           THE VIDEOGRAPHER:  Good morning.  Here
 3      begins Media Number 1 of Day 2 of the deposition
 4      of Mr. Michael Elkin.  We're back on the video
 5      record.  The time is 9 -- seven minutes after
 6      9:00 a.m.
 7           THE COURT REPORTER:  Let me remind you you
 8      are still under oath.
 9           THE WITNESS:  Thank you.  I understand that.
10           MICHAEL P. ELKIN, CPA, CFF, ABV, CFE, called as
11      a witness by the Beijing New Building Materials Defendants,
12      having been previously duly sworn, continued to testify as
13      follows:
14                      DIRECT EXAMINATION
15      BY MR. KALIL:
16      Q.   Good morning, Mr. Elkin.
17      A.   Good morning.
18      Q.   I want to pick up with some of the things we
19      were discussing yesterday.
20           First, let me ask you, have you brought
21      anything additional today or made any additional --
22      found any additional changes to your report?
23      A.   I did find a few things that might require
24      adjustment.
25      Q.   Okay.  What --
```

Case 2:11-cv-02408-MSG-EEF Document 279-1 Entered on FLSD Docket 05/13/2019 Page 263 of
388

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 222

1    A.   I brought with me some notes that I made as

2    I looked through some of the property damage

3    analysis.

4    **Q.   Okay.  And as to which properties?**

5    A.   With regard to Martinez --

6    **Q.   Okay.**

7    A.   -- I noted that somewhere in my formulas,

8    the start date for prejudgment interest for number

9    of transactions, I think I hard-coded something and

10   then I recopied a formula back over it, so it

11   actually has dates starting before they even moved

12   into the property which related to the date that

13   they acquired some of the property that they were

14   claiming damage for, and naturally, that should not

15   be predating the date that they moved, so that would

16   require some adjustment.

17   **Q.   Let me hold you for one second.  So**

18   **Martin -- can I just get the names first, then we'll**

19   **go through them one by one, if that's okay.**

20        **So Martinez is one?**

21   A.   I believe Martinez and Etter.

22   **Q.   Etter.  Okay.**

23        **Just those two?**

24   A.   And I'm trying to remember specifically if

25   Etter -- I believe Etter was a change in

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

```
 1   quantification.  It was just a change in

 2   classification.

 3           I don't recall any others.

 4      Q.   Let's go to Martinez for a second.  You

 5   would agree, wouldn't you, that prejudgment interest

 6   should not be calculated on anything prior to the

 7   time any of the Priority Claimants moved into their

 8   properties?

 9      A.   I'm not rendering opinions as to when the

10   timing should be, but I think I could be pretty

11   comfortable to say that.

12      Q.   So you're not rendering any opinions on

13   prejudgment interest as to when it should start

14   running, if at all?

15      A.   That's correct.  My goal was to establish

16   the format and the methodology, recognizing that

17   it's, as I understand it, up to the court's

18   jurisdiction or court's authority to determine

19   whether those things are even subject to prejudgment

20   interest and then to provide guidelines on when

21   prejudgment interest might or might not start, which

22   is why I tried to just lay out a very general --

23   pick the date something was acquired or the date

24   something was deemed damaged, add 30 days to it

25   for -- to catch some of the differences that might
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 224

1    happen, and it was not my intention.

2          And I did not go through item by item to

3    make that determination because, as I believe I

4    stated in the report, the timing and the dates and

5    even the things that are included would be subject

6    for the court.

7    Q.   Okay.  So let me -- let me see if I can just

8    break those down into bits.

9          Do you have a schedule where you found the

10   Martinez prejudgment interest that you have now said

11   needs to be adjusted?

12   A.   I haven't made the adjustment, but I

13   could -- but I could point on the schedule which --

14   Q.   Could you direct us to the one in the -- in

15   the report as it currently exists or your schedules

16   as they currently exist or your work papers, just to

17   make sure we're in the same place?

18   A.   I think the -- I think the best place to see

19   it would be to -- you want it in the actual report

20   or in the -- in the Excel?

21   Q.   So why won't we go to the report first?

22   A.   Okay.  So in the updated Martinez 12 --

23   Q.   This is the document you gave us as of the

24   26th?

25   A.   That's correct.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 225

```
 1     Q.   Okay.

 2     A.   If you go to Page 1 of 3 of Exhibit 12.1

 3  Updated.

 4     Q.   That is the damage claims detail?

 5     A.   Yes.

 6     Q.   Okay.  And by the way, just to be clear,

 7  that is part of your report proper that we put in

 8  evidence?

 9     A.   That's correct.

10     Q.   That we've -- that we've marked, excuse me?

11     A.   That's correct.

12     Q.   Okay.

13     A.   And if you look under where it begins with

14  "Property, Personal Property Damage Expense" --

15     Q.   Right.

16     A.   -- and if you look into the "Date" column.

17     Q.   For the first item, the frig?

18     A.   The first item, the frig, you can see that

19  that was purchased in April 2007.

20     Q.   All right.

21     A.   The Martinez's have claimed that to have

22  been damaged and --

23     Q.   And they didn't acquire their property until

24  September of 2008?

25     A.   They -- they had -- that's correct.
```

Page 226

```
 1          So if you look, there are -- beginning with

 2    the frig on April 1st, 2007, and ending with the

 3    miscellaneous from Lowe's of $115 on July 17th, all

 4    of those predated the date that they moved in, and

 5    so certainly prejudgment interest should not start

 6    then.

 7          I believe at one point I had changed those

 8    dates manually --

 9    Q.   Okay.

10    A.   -- not in the "Date" column, but in the

11    measure column --

12    Q.   I'm sorry.  In the which --

13    A.   -- so it wouldn't show up on here.  So if

14    you -- if you --

15    Q.   It would show up on the next schedule --

16    A.   Yeah.  If you would --

17    Q.   -- the one showing prejudgment interest?

18    A.   -- go to Exhibit --

19    Q.   12.3?

20    A.   It's actually 12.3A.

21    Q.   Okay.

22    A.   Well, actually, no.  You can see it on

23    preponderance 12.3 as well.  That's -- in fact,

24    it's -- 12.3A is sort of tiny.  So if you look

25    there, you will see that that is only using the
```

Page 227

1    30-day formula in the second column called

2    "Measurement Date."

3        Q.    Okay.

4        A.    I had -- I thought that I had recalled

5    changing that at one point to the move-in date.

6        Q.    Okay.

7        A.    But it's possible that I recopied the

8    formula back over it and didn't notice it.  I

9    suspect that's what happened.

10       Q.    So let me just see if I follow that.

11             On 12.3 Updated, the first column that's

12    labeled "Damage Date" is a date at which some

13    document indicates either an item was acquired or an

14    item was replaced; is that correct?

15       A.    Item was acquired, replaced, or determined

16    to be damaged.

17       Q.    Okay.  And when it was determined to be

18    damaged, that wasn't done by you or your office; is

19    that correct?

20       A.    There were assumptions that were made in

21    part by my office.

22       Q.    And what --

23       A.    So --

24       Q.    What assumptions?  I'm sorry.

25       A.    Such as -- so for these particular items --

Page 228

1    and, again, this is -- you know, the "Damage Date"

2    is not my opinion with regard to how it impacts the

3    prejudgment interest -- but for the items that were

4    moved into the house, assuming that the house at

5    that point already had the Chinese drywall, even

6    though they weren't aware of it, I took -- for

7    quantification, I would have changed that to be the

8    date that they moved in and that the items were

9    subject to the Chinese drywall.

10       Q.   So if I follow, you're saying that just

11   logically and not as part of your opinion, an item

12   could not be damaged by being put in the property

13   that might have defective drywall until it entered

14   that property.  That's the -- that's why you're

15   saying that?

16       A.   Yes.

17       Q.   Okay.  But you're not saying that as a --

18   you've made any determination as part of your

19   opinion that any of these properties in fact had

20   defective drywall, did you?

21       A.   No.

22       Q.   And you're not saying that you made any

23   determination as part of your opinion that any of

24   the items of personal property that are listed on

25   any of these schedules were in fact damaged by

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 229

1    defective drywall.  That's not part of your opinion?

2       A.    That's correct.

3       Q.    Okay.  So this is just simply saying if

4    someone else were to make a determination that a

5    particular item was in fact damaged and was in fact

6    damaged by defective drywall, this would be the

7    earliest date of which it could have been damaged?

8       A.    It would be the earliest.  And I would also

9    say if we were doing this calculation for, you know,

10   the purposes of rendering an opinion, it would also

11   be important to recognize it probably wasn't damaged

12   the day that it moved in.

13           And so I recognize, you know, as with all of

14   these dates, you know, it's going to be subject to

15   some other information before this calculation

16   becomes an actual calculation -- an actual opinion

17   of some type.

18      Q.    Are you planning on doing an actual opinion

19   on that issue?

20      A.    No.

21      Q.    Okay.  So when you say before it becomes,

22   not -- not by your hand?

23      A.    Not by my hand for purposes of rendering an

24   opinion at this time.  As you may know, sometimes

25   the court will end up rendering prejudgment interest

Page 230

1  is due; and then it comes back to somebody, and

2  often it's me, and the court would actually request

3  me to make a prejudgment interest calculation and

4  then they might lay out the parameters of how they

5  want that calculation done.  I've done that a number

6  of times.

7      Q.  Right.  But to under -- to get your last

8  statement clear, as best I understand it, you're not

9  rendering an opinion as to whether defective drywall

10  destroys items instantaneously.  In fact, I think

11  you're saying it would not be your view, just as a

12  general matter, that it does.  This is not a

13  catastrophic event?

14      A.  I just don't know the answer to it.

15      Q.  You have no opinion on this?

16      A.  I have no opinion on it.

17      Q.  So that's not any part of your report?

18      A.  That's correct.

19      Q.  Okay.  And all you're saying, though, is

20  logically, for no other reason than if the damage

21  would occur by being in the presence of Chinese

22  drywall, it couldn't start being damaged, even if

23  it's a slow process, until it's in close proximity?

24          MR. BREIT:  I'm going to object to the form

25      of the question based on his earlier answer.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 231

```
1           MR. KALIL:  Okay.

2           MR. BREIT:  He has no opinion.

3      A.   I don't have an actual opinion, but --

4   BY MR. KALIL:

5      Q.   But that's --

6      A.   But that's --

7      Q.   -- what you were trying to establish by

8   putting an -- an earliest date was to say,

9   logically, you wouldn't see a way that the property

10  could be damaged before it came into proximity, if

11  that -- if that was the cause?

12     A.   That would seem logical.

13     Q.   Okay.  Now, while we're on that, to be

14  clear, you never looked to make any determine -- you

15  were never asked to make any determination or render

16  a professional opinion as to whether there was any

17  defective drywall in any of the Priority Claimants'

18  properties; is that correct?

19     A.   Certainly not.  That's correct.

20     Q.   And you were never asked to render any

21  professional opinion as to whether any of the items

22  of personal property were in fact damaged by

23  defective drywall; is that correct?

24     A.   That is correct.

25     Q.   And you were not asked to render any
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 232

1    professional opinion as to whether any of the other

2    damages at issue in this case were caused by

3    defective drywall directly?

4        A.    That's correct.

5        Q.    Okay.  And in fact, while we're just getting

6    into what is not at issue, would you agree with me

7    that it was not within the scope of your engagement

8    to try to make any determination whether there was

9    or was not any defective drywall in any of the

10   Priority Claimants' properties?

11       A.    Yes, I would agree.

12       Q.    Would you --

13       A.    Sorry.  It just sounded like the other

14   question, so --

15       Q.    No.  I'm just -- I just want to get them

16   clean because I think past the objection --

17       A.    There -- the other questions --

18       Q.    -- to form.

19       A.    -- the answers were "no" and this one was

20   "yes," so I was trying to make sure there wasn't a

21   double negative that I missed.

22       Q.    I'll try to put them in a way that I hope

23   you will say "yes."

24       A.    I'll -- I'll be fine.

25       Q.    Okay.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 233

1    A.    You hope I say "yes."  Okay.

2        Q.    Am I correct that you are not offering any

3    professional opinion whether there was or was not

4    any defective drywall in any of the Priority

5    Claimants' properties?

6        A.    That's correct.

7        Q.    Am I correct that it is -- was not within

8    the scope of your engagement to try to make any

9    determination whether any personal property being

10   claimed by any Priority Claimant was in fact damaged

11   by being in close enough proximity to be defective

12   drywall?

13       A.    That's correct.

14       Q.    Am I correct that you are not offering any

15   professional opinion whether any personal property

16   being claimed by any Priority Claimant was in fact

17   damaged by being in close enough proximity to any

18   defective drywall?

19       A.    That's correct.

20       Q.    Am I correct that you're not offering any

21   professional opinion whether any personal property

22   being claimed by any Priority Claimant that was

23   located outside of the property was in fact damaged

24   by any defective drywall?

25       A.    That's correct.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 234

1    Q.   And it was not within the scope of your

2    engagement to try to be a gatekeeper as to whether

3    any of the Priority Claimants' claims for damage

4    were in fact caused by the presence of defective

5    drywall?

6         MR. BREIT:  I'm going to object to the form

7    of the question because of the way it's phrased

8    based on what he said yesterday, that there were

9    certain determinations made.  That's --

10   Q.   Let me see what --

11   A.   Can you -- can you --

12   Q.   I'll read it back.

13   A.   -- read it back for me, please?

14   Q.   Do you agree with me that it was not within

15   the scope of your engagement to try to be a

16   gatekeeper as to whether any of the Priority

17   Claimants' claims for damages were in fact caused by

18   the presence of defective drywall?

19   A.   I believe that's correct.

20   Q.   Would you agree with me that you were not

21   offering any professional opinion whether any of the

22   Priority Claimants' claims for damage were in fact

23   caused by the presence of defective drywall?

24   A.   Yes.

25   Q.   Would you agree with me that you are not

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 235

1  offering any professional opinion whether any of the

2  claims advanced by the Priority Claimants through

3  their counsel are or are not meritorious?

4      A.   I need you to read that one back.

5      Q.   Sure.

6           Do you agree with me that you are not

7  offering any professional opinion whether any of the

8  claims advanced by the Priority Claimants through

9  their counsel in this case are or are not

10 meritorious?

11     A.   I don't think I understand what you mean by

12 "meritorious."  Perhaps you can help me understand

13 that.

14     Q.   You are not expressing any opinion, any

15 professional opinion on the bona fides of any of

16 those claims, are you?

17     A.   I still don't understand the question.

18     Q.   Sure.

19     A.   I mean, there -- there are things that I'm

20 verifying the accuracy of, so that might in some --

21 in some way be whether something is bona fide or

22 not.

23     Q.   Well, let's -- let's see if we can do that

24 differently.

25          As I understand your role, you were looking

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 236

1    at data provided to you by way of invoices,

2    receipts, interrogatories, depositions, other data

3    that came from the Priority Claimants and their

4    counsel, but you weren't testing that data to see

5    whether the underlying premises were true or not

6    true?

7        A.    The underlying premises of the liability,

8    the causation, and what have you?

9        Q.    Yes, exactly.

10       A.    That's correct.

11       Q.    Okay.  So you were not validating the claims

12   as such as a gatekeeper?

13       A.    Not with regard to liability and not with

14   regard to causation, that's correct.

15       Q.    And it wasn't part of your engagement to

16   read out claims that you thought in your

17   professional opinion should not be included on the

18   basis of causation or liability?

19       A.    That's correct.

20       Q.    What you were doing was validating the

21   amounts listed on the claims to the best of your

22   ability?

23       A.    That is one of the things I did, yes.

24       Q.    And then you were putting those amounts into

25   various Excel spreadsheets or databases so that you

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 237

1    could sort them by date and add them to combine them

2    in various ways?

3        A.   That's one of the things I did, yes.

4        Q.   And then you did prejudgment interest

5    calculations on some of those to show examples of

6    what might be if the court asked for that type of

7    work?

8        A.   That's correct.

9        Q.   Did you do any other financial analysis of

10   that data?

11       A.   In some cases, it required financial

12   analysis of contracts or tracing back to bank

13   statements to determine if numbers were correct;

14   then also the linking of the actual expense with one

15   of the tens of thousands of documents or pages as --

16   as a forensic exercise; and looking for filtering,

17   whether it's duplicates or -- or certain payments

18   that might be in two places because one might have

19   been paid at a later time and a total might have

20   been picked up at another time.

21           So there was a -- an amount of screening of

22   the information in order to reach the totals as --

23   as you described.

24       Q.   Okay.

25       A.   And then there was some level of -- of

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 238

```
 1    putting things in buckets so that they were
 2    identifiable in that way.
 3        Q.   So to that extent, you were categorizing
 4    these numbers as personal property expenses or
 5    damage or lost equity or the other components that
 6    you've put them into?
 7        A.   That's correct.
 8        Q.   And that's what you mean by that, the
 9    "buckets"?
10        A.   Yes.  Yes.
11        Q.   Okay.
12        A.   Or excluding them from any bucket.
13        Q.   Exactly.  But excluding them on the basis
14    that you either didn't have a sufficient support for
15    the item or you couldn't validate the number, not on
16    the basis of whether it was meritorious to include
17    it?
18        A.   Yes, plus to the extent that I didn't feel
19    that the expenditure fit into any of those buckets.
20        Q.   When --
21        A.   We talked about some of those yesterday.
22        Q.   Okay.  So some things that might be a
23    betterment?  We had one of the claimants who
24    self-described this as betterment, and you accepted
25    that?
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 239

1    A.    That's correct.

2    Q.    But you didn't put any other items into

3   betterment based on your review?

4    A.    That's correct.

5    Q.    I noted -- while we're on the documents, I

6   noted in your report there was a reference -- and

7   let me get to the page.  I apologize for not having

8   it queued up.

9        On Page 4, Footnote 7 of your report, you

10  talk about some of the source information that you

11  were looking to, invoices, check copies, contracts,

12  et cetera; but there -- there is a reference that in

13  some instances either due to the passage of time or

14  other limitations, e.g., hurricane damage, specific

15  items may be supported by representation by

16  plaintiffs, through sworn testimony, or otherwise.

17       Did you find any instances where information

18  was said to be missing due to hurricanes?

19   A.    I recall in a conversation, I don't remember

20  if it was -- I don't remember if I read it in a

21  deposition or if it was a conversation possibly with

22  the Fosters.

23   Q.    Okay.

24   A.    But I do recall someone indicating that

25  somewhere along the line documentation that they

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 240

1   had -- and I don't even know if they were

2   specifically referencing this information, but that

3   they had had some damage and might not have the

4   documentation because of that.  I don't recall who

5   that was.

6       Q.   Okay.  But at least one of the Priority

7   Claimants you believe may have indicated they could

8   have lost documentation due to a hurricane or a

9   storm?  I'm asking because you used the word --

10      A.   No.  Well, no.  I remember putting it in

11  there.  I definitely used it, and I definitely -- at

12  the time I wrote this, which was a little while ago,

13  it was probably fresher in my mind as to who it was

14  and why, but that is my recollection.

15      Q.   Did you make any inquiry as to whether the

16  hurricane that had caused the loss of the data had

17  also caused damage to property?

18      A.   No.

19      Q.   Okay.  So you're not expressing any opinion

20  as to whether any of the property that's being

21  claimed to be damaged by the Priority Claimants

22  might have been damaged by other events such as

23  hurricanes?

24      A.   No.  I almost remember that perhaps the

25  hurricane or whatever they were talking about wasn't

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 241

1    in the affected property.  Maybe it's where the

2    records were or something like that.  I really don't

3    recall 100 percent.

4        Q.   Okay.

5        A.   It wasn't intended to be, you know, a word

6    that I put in there to say that it has implications.

7    I was just trying to give an example because this

8    has been going on for, you know, well over

9    ten years, and I don't recall specifically, but I

10   think it had to do with the Fosters, but I'm not

11   even certain.

12       Q.   But it's fair to say that although the case

13   has been going on for some time, the Priority

14   Claimants have been represented by counsel for that

15   time?

16       A.   I don't know when they were first

17   represented by counsel.

18       Q.   Did you ever make any inquiries to that

19   effect?

20       A.   As to when the -- each of the claimants was

21   first represented by counsel?

22       Q.   Yes.

23       A.   No.

24       Q.   Is it fair to say that you're not expressing

25   any opinions on whether there may or may not be

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 242

1    alternate causes of damage to any of the personal

2    property at issue in this report?

3        A.    I am not.

4        Q.    Is it fair to say that you're not expressing

5    any opinions as to whether there may or may not be

6    any alternate causes of a loss of equity as

7    expressed in your report?

8        A.    I am not.

9        Q.    Is it fair to say that you did not engage in

10   any forensic analysis to try to determine the causes

11   of any of the losses to the Priority Claimants,

12   whether it was related to defective drywall or other

13   causes?

14       A.    That's correct.

15       Q.    So you had told me about Martinez and I

16   think we touched on that; and while we're at it, let

17   me take one second here.  Let's see.

18             Do you recall Mr. Martinez or Mr. and

19   Mrs. Martinez, if I'm not mistaken, buying an RV?

20       A.    And that would be related to the second

21   thing on Martinez.

22       Q.    Okay.  And -- and did you originally include

23   the RV in your damage spreadsheet?

24       A.    Originally, and it is still in my damage

25   spreadsheet.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 243

1    Q.    And --

2    A.    But -- but what's missing from it is I had

3    intended to net out -- they testified that they had

4    sold the RV for $2,000 at a later time, and I noted

5    that although my intention was to submit that

6    amount, now I did not.

7         I think part of that was I was -- had been

8    looking for the timing of when to do that because,

9    in theory, at whatever time that would happen, aside

10   from it reducing the damage amount, it would also

11   reduce the prejudgment interest.  And ultimately I

12   had intended to just adjust it at the purchase

13   amount since I really wasn't doing the entire

14   prejudgment interest, and I saw -- I noted last

15   night that I neglected to do that.

16        So the RV, at a minimum, should be net of

17   the $2,000 that they estimated that they sold it

18   for.

19   Q.    And there should be, in addition, some

20   credit, if prejudgment interest is calculated,

21   allowing for the recovery when that was made?

22   A.    Positively.

23   Q.    Okay.  Are there any other items that you've

24   noted there were residual value on items that were

25   not accounted for?

Page 244

1    A.    Not that I was aware of.

2    Q.    Was it within the scope of your engagement

3    to determine if any of the personal property items

4    that the Priority Claimants say were damaged had any

5    residual value?

6    A.    No.

7    Q.    Okay.  Is it fair to say that for purposes

8    of the calculations you've done, adding up these

9    numbers, you've treated every one of the personal

10   property items as a total loss?

11   A.    Well, to the extent that there was a

12   replacement, I just treated it as a replacement.  So

13   sort of like the question before, I did not seek to

14   determine whether or not there was a residual value

15   to that damaged item.  That's correct.

16   Q.    So if there was a replacement for an item

17   that one of the Priority Claimants said was damaged,

18   did you attempt to use or did you use the original

19   cost for valuation, or the replacement cost, or

20   something else?

21   A.    If there was something that had not been

22   replaced, we used either the original cost, if there

23   was -- if there was evidence of that, or in some

24   cases estimates by the -- by the claimant with

25   regard to what they believed the original cost or

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 70 of 556
Case 1:11-cv-22408-MGC Document 279-1 Entered on FLSD Docket 05/13/2013 Page 286 of
388

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 245

1    the value was.

2            With regard to items that were actually

3    replaced, we used the replacement cost as of the

4    date that they replaced it, evidenced by the cost

5    for them to replace it.

6        **Q.   And was that consistent throughout all of**

7    **the Priority Claimants?**

8        A.   I believe to the extent that they replaced

9    something, yes.  With regard to some things that

10   might not have been replaced, I know that in at

11   least -- I'm trying to remember which one it is.  I

12   believe it's in Deeg/Hooker, we used an inventory

13   that was prepared as of a particular date of all the

14   items in the house as of that date that that company

15   deemed to have been damaged and their estimate of

16   replacement costs at that point in time.

17       **Q.   That was Duraclean's estimate --**

18       A.   That's correct.  I think we talked about

19   that yesterday, yeah.

20       **Q.   And, again, you weren't expressing any**

21   **opinion on the validity of those estimates, that was**

22   **Duraclean's?**

23       A.   That's correct.

24       **Q.   With the exception of Duraclean, was there**

25   **any other instance where you had a third party**

1  giving you estimates of the value of the damaged

2  property?

3      A.   I think there were some instances where the

4  claimants had sought information from third parties

5  as to estimates for some of their items; and to the

6  extent they provided those, I believe I may have

7  used those in one or two instances, but I did not go

8  out to seek independently any -- any values from

9  third parties.

10      Q.   That wasn't part of your engagement?

11      A.   No.

12      Q.   And you're not expressing any opinion on

13  whether those third-party values were in fact

14  correct or incorrect?

15      A.   That's correct.

16      Q.   And you didn't test those third-party values

17  in any way?

18      A.   That's correct.

19      Q.   If I can turn you to Page 4 of your report,

20  where we were before, at Paragraph 13, and we may

21  have touched on some of this, I just wanted to make

22  sure we've covered this.  You say: "In formulating

23  my opinions, I considered qualitative and

24  quantitative information relative to damages

25  suffered for each Priority Claimant following

Page 247

```
 1    prescribed or commonly applied methodology using the

 2    best available evidence."

 3            What qualitative information are you

 4    referring to there?

 5      A.    That would have to do with anything that I

 6    read or anything that described the nature of things

 7    that, in and of itself, didn't necessarily provide

 8    me an absolute number but either gave me a timeline

 9    or gave me a description of what took place as

10    opposed to just a document that had quantitative

11    numbers on it.

12      Q.    Can you give me an example?

13      A.    An example would be with Martinez, their

14    explanation as to why an RV expense would in fact be

15    an alternate living expense.

16            As to the timing of when they may have

17    started or when they may have moved out of a place,

18    the explanations in some cases where some claimants

19    took all of their -- their -- what they considered

20    to be damaged personal property and just brought it

21    to the curb.

22            So I guess that would come in -- in some you

23    asked, I guess, if I considered residual value.

24    While I didn't consider it, that would tell me that

25    those particular things didn't have a residual
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 248

1    value; or at a minimum, you know, just things that I

2    learned and understood.  I couldn't say other than

3    the things that I might mention as we go which

4    particular qualitative things, but not everything I

5    did was strictly based on quantitative measures.

6        Q.    And -- and when you say "taking things to

7    the curb" would indicate there was no residual

8    value, it would indicate at least to the person who

9    took it to the curb.  You weren't -- you weren't

10   validating that?

11       A.    That's absolutely correct.

12       Q.    Okay.  What standard did you hold yourself

13   to in finding best available evidence in order to

14   comply with any imposition of CPA guidelines; in

15   other words, having a reasonable basis for rendering

16   the opinions that you are intending to render?

17            MR. BREIT:  I'm going to object to the form

18       of the question.

19            Go ahead.

20       A.    I don't believe that there are specific

21   standards for litigation consulting work that

22   prescribe what is or is not best available evidence.

23       Q.    Okay.

24       A.    I believe that within our standards, there

25   is a certain amount of judgment, but there is also a

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 249

1  certain amount of transparency.  And when I talk

2  about best available evidence, I sought to find

3  exactly that, including in it testimony or -- or

4  representations by claimants that in and of itself

5  is some level of evidence, and that's evidence that

6  can be considered by others, and to include that

7  into the schedule so that a trier of fact or

8  somebody could have reached their own conclusion as

9  to the quality of that evidence.

10     Q.  Okay.  And --

11     A.  But I don't believe that there is

12  necessarily a standard within the CPA profession as

13  to what is or is not the best evidence or sufficient

14  relevant information, and a lot of it depends on the

15  nature of the case and the nature of the

16  documentation that could be expected under given

17  circumstances.

18     Q.  And so you're not -- you're not stating that

19  you had complete or perfect information as to any of

20  the Priority Claimants, are you?

21     A.  I believe that there was very strong

22  evidence for some line items; and I believe some

23  line items, although as few as possible, were

24  limited to the testimony and/or written

25  interrogatories or what have you of the claimants.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

1    Q.    But there is nowhere in your report that

2    I've seen where you rank the evidence or the quality

3    of the evidence as such.  You're not expressing

4    varied opinions on the quality of the individual

5    items you were looking at?

6    A.    I'm just presenting what was -- where it was

7    traced to.  I'm not doing any rankings, and I'm not

8    doing statistical analysis of that.

9    Q.    Okay.  Let me just direct you to Page 6 of

10   your report for a moment, the topic "Additional

11   Damages."  I think we've touched on it in some

12   sense, but I just want to make sure we've covered

13   it.

14        When you are looking at topics of additional

15   damages:  "I have evaluated documentation and

16   information in order to identify and quantify

17   additional damages incurred by some Priority

18   Claimants.  These damages include lost rental income

19   from affected properties, legal fees and costs in

20   connection with foreclosures, short sales or

21   bankruptcy, and in one case additional living

22   expenses and travel costs incurred by a claimant

23   because he needed to return to work."

24        Am I correct, though, that you are not

25   expressing any opinion on whether any of those

Page 251

1    additional damages are in fact caused by defective

2    or Chinese drywall?

3        A.    That's correct.

4        Q.    Okay.  Now, when you were doing your damages

5    assessment, did you eliminate some expenses?  I

6    think you said homeowners association fees, real

7    estate taxes, and betterment were things you

8    eliminated from your -- your calculation of damages?

9    I believe you said that yesterday?

10       A.    Yes.

11       Q.    Okay.  Were there any other expenses that

12   you eliminated?

13       A.    When you say "eliminated," there were a lot

14   of documents that were provided, and so it was not

15   as much of a question at all times of eliminating,

16   but whether or not they would be included.  And in

17   some cases, I noted where -- whether it was through

18   an interrogatory or some other representation, where

19   they did have things listed, and so I didn't include

20   them and so I was calling that "eliminated."

21           I don't know that they were, in those

22   instances, stating whether they were a damage or

23   just stating, "This is what I had to pay for X, Y or

24   Z."

25           I don't know if that answered your question.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 252

1  I started talking and I don't remember the whole

2  question.

3      Q.   That's all right.  Let me see if I can do

4  this slightly differently.  Let me take one of these

5  examples.  You say traveling -- "travel costs

6  incurred by a claimant because he needed to return

7  to work."

8      A.   Yes.

9      Q.   Who does that refer to?

10     A.   Mr. Foster.

11     Q.   Okay.  Now, Mr. Foster was work -- was

12  living in Florida but working in Kentucky, if I

13  recall correctly?

14     A.   At one point, that's correct.

15     Q.   And then he also worked in Michigan?

16     A.   I believe that's correct.

17     Q.   Why did you include travel expenses for

18  Mr. Foster?

19     A.   I -- initially, those expenses were included

20  as alternate living expenses.

21     Q.   Okay.

22     A.   In evaluating the claim and having

23  discussions with counsel, there was question as to

24  whether those were actually alternate living

25  expenses or expenses related to his claim with

Page 253

1  regard to having to return to work because of the --

2  in his -- in his words, maybe not exact

3  paraphrasing, because of the added expenses they

4  were going to have and because of the issues related

5  to not being able to retire into that home.

6          If that's the case and if that's deemed to

7  be the cause of that, then he did represent and did

8  present much information relative to the costs of

9  that taking place.

10          Based on how I was dealing with alternate

11  living expenses, it didn't seem to fit into that

12  bucket, so I put it into the other expenses, because

13  other expenses isn't limited to these components.

14  And so if it's deemed that is an appropriate damage,

15  then they've been quantified.

16     Q.    Now, I think we talked a bit about Foster

17  yesterday, and if I recall correctly, I think you

18  said you didn't make any inquiries into the Fosters'

19  general financial condition, and you didn't express

20  any opinion on whether you could -- or did you make

21  any inquiries into the Fosters' general financial

22  condition?

23     A.    No.

24     Q.    Okay.  And I take it you're not expressing

25  any opinion on whether his statement that he needed

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 254

1    to return to work was in fact true or not true?

2        A.    That's correct.

3        Q.    And did he provide you with any statement of

4    his net worth or his financial position?

5        A.    No.

6        Q.    And if I recall correctly, Mr. Foster --

7    let's see if I've got --

8              MR. KALIL:  Do we have the clip on Foster?

9    BY MR. KALIL:

10       Q.    While he's looking for that, you said you

11   put it in "Other Damages."  Is that include -- can

12   you show me where in your report or schedules the

13   "Other Damages" for Mr. Foster are found?  And

14   that's Exhibit 6, I believe, Mr. Foster.

15       A.    It is.  And if you look at Exhibit 6 under

16   "Other Damages," there are three categories:  One

17   for "Alternate Living Expenses," one for "Personal

18   Property Damages," and another called "Additional

19   Damages," and that "Additional Damages" makes

20   reference to Exhibit 6.1.

21             And if you go to Exhibit 6.1, beginning on

22   page -- beginning on Page 8 of 11 of 6.1 --

23       Q.    Give me one second to catch up with you.

24   I'm on Page 8.

25       A.    Are you there?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 255

1    Q.   Yes.

2    A.   And you will see that after the totals for

3    "Personal Property Damage" begins a section that

4    goes on for the next four pages.

5    Q.   I'm -- I may be missing something.  On 6.1?

6    A.   On Exhibit 6.1, Page 8 of 11.

7    Q.   Okay.  Page 8 of 11, I don't see a total.

8    Maybe I've got something --

9    A.   Well, you will see in the middle of the

10   page --

11   Q.   Okay.

12   A.   Higher.  Are you on Exhibit 6.1?

13   Q.   I believe I have -- Mr. Elkin, I'll show you

14   my page and you can tell me if I've got the same

15   page as you.

16        If there is a disconnect, I'll just go to

17   the one that's here.  Let me see.  Let me go to

18   exhibit -- I'll grab it here.

19        You know what?  I think, Mr. Elkin, I was

20   looking at a version that doesn't show that total.

21   A.   I believe what you're looking at may be a

22   printout from the Excel itself as opposed to the PDF

23   version, so maybe the pages are different.

24   Q.   Okay.

25   A.   I think if you look at the -- I'm guessing,

Page 256

1    because these are different.

2        Q.   That's -- that's fine.

3        A.   But it looks like it's the same schedule.

4        Q.   I tell you what I'll do is I'll work with

5    the exhibits that we've marked because it has it in

6    the middle.  So go ahead.

7        A.   You do see that on there?

8        Q.   I do see that.

9        A.   Okay.  So that's what I'm guessing happened,

10   which --

11       Q.   That's fine.

12       A.   -- which is not uncommon at all.

13            So if you look at that page from the

14   Exhibit 6.1, I'm trying to focus you on the section

15   below that total that starts --

16       Q.   Sally's Beauty Salon?

17       A.   It starts with "Comcast - Louisville,

18   Cable."

19       Q.   Hold on one second.  Let me get there.

20       A.   Page 8 of 11.

21       Q.   Again, this one, for some reason, is

22   formatted slightly different.  Okay.  This is on 7

23   of 11.  It's just, for some reason, the pages are

24   confusing and that's why this.

25            It's not a difference in the print other

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 257

1    than the way it printed because of the Excel or PDF.

2        A.    Okay.

3        Q.    On here it's at Page 7, but I can follow

4    you.

5        A.    Okay.  So if you can see the first line item

6    where it says:  "Additional Damages - W Foster

7    Living."

8        Q.    Okay.

9        A.    And so that entire category relates to

10   Mr. Foster's expenses for living and traveling in

11   order for him to be able to work.  It includes a

12   variety of expenses during that time period

13   totalling $94,728, and that is the amount that is

14   reflected on that initial schedule that I showed you

15   at Exhibit 6 for "Additional Damages."

16       Q.    Understood.

17           Now, if I understand it, did Mr. Foster --

18   when did Mr. Foster first become aware of the

19   defective drywall?

20       A.    I believe he indicated or it was indicated

21   that it was in February of 2009.

22       Q.    And the expenses we've just been talking

23   about seem to commence in February of 2008; is that

24   correct?

25       A.    Yes.

Page 258

1    Q.    Why would you categorize expenses associated

2    with returning to work prior to the date that

3    Mr. Foster became aware of the Chinese drywall or

4    the defective drywall, if that's what he had in his

5    home?

6    A.    I'd have to go back to make sure that I'm

7    addressing the proper plaintiff in this response.

8        But if I recall, they had recognized that

9    there were problems in the house and they were

10   having issues; but I don't know that they had

11   directly associated them with Chinese drywall until

12   2009, if I'm recalling the correct one, and I'm not

13   certain that I am.

14   Q.    Well, let me -- let me direct you if I can

15   to -- I can mark them.  Perhaps we can pull it up.

16   It's got that Bates number on the bottom that I

17   think might have been put on by your office,

18   F000783 -- or W Exhibit 01.  It's Mr. Foster's

19   Deposition Exhibit Number 1.

20       There we go.  Okay.  Now, this appears to be

21   a statement by the Fosters.  Is that what you

22   understand it to be?

23   A.    Yes.

24   Q.    If I'm reading the first entry correctly,

25   for 2008, is Mr. Foster staying at a house he owns

Page 259

1   in Louisville?

2     A.   Yes.

3     Q.   Okay.  And it appears that house has been

4   for sale since 2007?

5     A.   That's correct.

6     Q.   So wouldn't he be incurring utilities and

7   expenses of maintaining that house while it's for

8   sale in any event?

9     A.   If it's determined that he wouldn't have

10   been able to sell it, that's correct.  My -- my

11   understanding was that he had slowed down on his

12   efforts to sell it in order that he could continue

13   to work and live from there.

14     Q.   And what do you base that upon?

15     A.   I believe that was his testimony or that

16   might have been part of our discussions when I had

17   him on the phone.

18     Q.   Because I see him saying in the second

19   sentence under 2008:  "It had been for sale since

20   late 2007."

21     A.   It does say that.

22     Q.   And then it continues in 2009:  "Stayed at

23   our house until 3/20/2009 when we sold the house."

24     So it appears that he was still marketing

25   the house?

Page 260

```
 1     A.    Yes.

 2     Q.    And he ultimately did sell it?

 3     A.    Yes, he did.

 4     Q.    But in the meantime, he's putting in as rent

 5   and utilities what I am assuming you would be able

 6   to determine were the carrying costs for that house?

 7     A.    That's correct.

 8     Q.    So you weren't making any judgments as to

 9   whether that was an appropriate item to include here

10   or not; you were just taking it as, "This is

11   something he provided, let me include it in the

12   schedules and try to categorize it where I can"?

13     A.    For further testimony by him to represent

14   what he told me, that's correct.

15     Q.    Okay.  Now, did Mr. Foster also make a claim

16   for loss of rental income for the house in Florida?

17           Well, I'll reorient you in a minute.  Let me

18   -- let me give you one other thing before we go

19   there, Mr. Elkin, to make it a little simpler.

20           Did Mr. Foster make a claim for mileage

21   while he was working out of town?

22     A.    I believe he did.

23     Q.    Was he reimbursed any of that mileage by his

24   employer?

25     A.    I don't believe so.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/10/19 Page 86 of 556
Case 1:11-cv-22408-MGC Document 279-1 Entered on FLSD Docket 05/13/2013 Page 302 of 388

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

1    Q.    Can I ask you to turn to -- I think it's got

2    a Bates number F -- on that same document.  In that

3    same document you're on, a few pages in, there is a

4    bottom number F000785.  I think you have that.

5    Okay.

6         And where it starts "consulting job

7    Louisville," right where you've got the cursor,

8    okay, I think it says:  "Mileage for trips back and

9    forth from Fort Myers, Florida, to Louisville,

10   Kentucky, as well as food expenses were paid, all

11   paid by Ford during this time."

12        Do you see that?

13   A.    Yes.

14   Q.    Did you include or exclude those expenses in

15   the schedule?

16   A.    My understanding is that those expenses

17   weren't included on the schedule.  If I'm incorrect,

18   then they would need to come off.  I believe that

19   the other travel that wasn't reimbursed was all that

20   he put on his schedule.

21   Q.    So the -- that would be the travel to and

22   from work while in Louisville?

23   A.    To and from work, that's correct.

24   Q.    Now, did you make a determination of whether

25   people can normally expense travel to and from work?

Page 262

```
1      A.   Whether they normally --

2      Q.   Can expense -- is that considered a

3   deductible business expense?

4      A.   It's not a question of whether it's a

5   deductible business expense.  It's a question of

6   whether it's an expense that he should or should not

7   have had to incur based on the circumstances.

8      Q.   Okay.

9      A.   So it's -- typically your travel to and from

10  work is not a deductible expense.  There are some --

11  there are some differences in that, but this isn't a

12  question of whether something is tax deductible or

13  not.  It's a question of whether it was incurred or

14  reimbursed.

15     Q.   All right.  And did -- and so you didn't

16  make any analysis as to whether or not this should

17  or shouldn't be on the expenses.  You just simply

18  took it if he hadn't been reimbursed, it was going

19  to be included?

20     A.   That's correct.

21     Q.   Okay.  Let me ask you to look at -- well,

22  the first question is:  Did we -- did we determine

23  if the Fosters also included lost rent in their

24  claim?

25     A.   They didn't include lost rent of the -- of
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 263

```
 1    the affected property, if that's what you mean.
 2        Q.    But did they include any lost rent?
 3        A.    What they included as rent -- as part of
 4    their alternate living expense was foregone rent; in
 5    other words, rent that they were not able to receive
 6    because they moved into the home that they would
 7    have otherwise received rental income from.
 8        Q.    Okay.  And do you know which home that was?
 9        A.    I believe it was a Colonial Condo that
10    they --
11        Q.    Colonial Country Club perhaps?
12        A.    Well, I have it listed as "Colonial Condo."
13        Q.    Okay.
14        A.    Maybe it was in the Colonial Country Club.
15        Q.    All right.  And for what time period did
16    they claim that they were entitled to foregone
17    rental income?
18        A.    Beginning October 1, 2009.
19        Q.    Okay.  And ending in what time period?
20    Approximately nine months later?
21        A.    I believe July 2011.
22        Q.    About nine months later?
23        A.    That's, I believe, more than nine months.
24        Q.    Okay.  All right.  Now, did you see any --
25        A.    Looks like June 2011 was their last included
```

Page 264

1    foregone rent.

2        Q.    Okay.  Did you find evidence that they had

3    leased the Colonial Club property prior to the time

4    they were saying they were foregoing rent?

5        A.    Yes.

6        Q.    Okay.  And that lease ended, I believe, on

7    September 26th, 2009?  Is that consistent with what

8    you found?

9        A.    I'd have to look at the lease.  I don't

10   recall.

11       Q.    I believe the document ID is 125033.  I'm

12   not sure that's what you have, but I have 125033.

13       A.    I got it.  I just was trying to find it for

14   you.

15       Q.    Okay.  And somewhere there, I believe there

16   is a -- maybe the second page I believe you will see

17   a lease, if you keep going.  There we go.  Okay.

18   And at the bottom, it seems to have that number.

19            Okay.  Mr. Elkin, if I can direct you to

20   that first lease agreement, the one that is titled

21   "Dwelling Lease."  I think it's Page 2 of the 12.

22       A.    I just was looking at the whole document so

23   that I could be -- if you don't mind.

24       Q.    You take your time if you want.  Take your

25   time.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 265

1    A.    It's a 12-page document.  I'd like to see

2  everything in context, if I could.

3    Q.    Take your time and when you're ready, let me

4  know.  Do you want to go off for a second?

5    A.    No, it will be quick.

6          Okay.

7    Q.    All right.  Would you agree with me that the

8  Page 2 titled "Dwelling Lease" is a lease from Vicki

9  Foster to a Robert -- I'm going to do this badly --

10  Rosebeck maybe?

11    A.    I'm going to go with Rorebeck.

12    Q.    Rorebeck?  Okay.

13    A.    But if it's Rosebeck, I'll go with that,

14  too.

15    Q.    I'm not suggesting I've got it better than

16  you do.

17          And that is a lease that begins on

18  September 27, 2009, and ends on September 26, 2009,

19  a one-year lease.

20    A.    It's --

21    Q.    I'm sorry, September 27, 2008 --

22  September 27, 2008, through September 26, 2009.

23    A.    That's correct.

24    Q.    So that lease ended by its own terms on

25  September 26, 2009, correct?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 266

1     A.   That's correct.

2     Q.   Did you see any evidence that Mr. Rorebeck

3   asked to renew that lease?

4     A.   I don't know.

5     Q.   You didn't see any evidence?

6     A.   I didn't -- I didn't see any evidence.

7     Q.   Okay.  And if we go to the page that

8   immediately follows that lease, I think it's just

9   titled "Lease Agreement," that one, that appears to

10  be a June 4th, 2011 lease with the Fosters leasing

11  from -- or leasing to Ted Koch and Michelle

12  Maciejewski, if I'm saying it right?

13    A.   Yes.

14    Q.   And that is a lease that's dated June 4,

15  2011; is that correct?

16    A.   That's correct.

17    Q.   But when does the lease commence?

18    A.   It's -- actually it's dated -- yeah,

19  June 4th, 2011.

20    Q.   And when does the lease commence?

21    A.   July 14th, 2011.

22    Q.   So they had about a month and ten days'

23  notice before that lease commenced; is that correct?

24    A.   That's right.

25    Q.   If we go to the next document, the lease --

Page 267

1    there we go.  This appears to be a lease where the

2    Fosters went and leased another property.  Would you

3    agree with that?

4        A.    Yes.

5        Q.    And when did that commence?

6        A.    July 13th, 2011.

7        Q.    Okay.  So would you agree with me that it

8    appears that they stayed in their Colonial Club

9    property until they had a new tenant and then they

10   moved out?

11       A.    That's not how I understand it.

12       Q.    Okay.  Why would you see it any differently?

13       A.    Because I understand that this opportunity

14   became available to them, to move into this home,

15   which is, as I recall, closer to the neighborhood

16   that they had been living.

17            And so with that opportunity, they were able

18   to put the other apartment or condominium, excuse

19   me, back on the market to lease, and that's what

20   they did.

21       Q.    Well, they also lowered their -- excuse me.

22   They also were leasing this property for less than

23   they were renting the other one out for; is that

24   correct?  Because they were making money on the

25   transaction?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 268

```
 1    A.   No.

 2    Q.   Well, let's look at the two leases.  Let's

 3  take a --

 4    A.   Oh, you're talking about for the one coming

 5  in?

 6    Q.   Yes.

 7    A.   Yeah.  I thought you meant more than the 850

 8  that I -- because I used 850 throughout from the

 9  prior lease.

10    Q.   Okay.

11    A.   Also, it was my understanding that they may

12  have had an opportunity --

13    Q.   Okay.

14    A.   -- to continue leasing to the original

15  tenant; but needing -- needing a place to live, they

16  did -- they decided not to do that.

17    Q.   And do we have a document that shows that?

18    A.   No.  You -- you had asked me before if there

19  was a document, but I was just telling you what my

20  understanding was.

21    Q.   And what did you base that on?

22    A.   Discussion with Mr. Foster.

23    Q.   Did you make any notes from that discussion?

24    A.   I don't think so.  In fact, I know I did

25  not.
```

Page 269

1    Q.   All right.  Did you include in your

2  schedules the differential between the lease to the

3  Kochs and what they were paying on the lease from

4  the Walshes?

5    A.   No.

6    Q.   Okay.  Let me -- in fact, if we look at

7  those two, the lease agreement of the dwelling

8  lease, they are making a slight profit; is that

9  correct?

10   A.   I wouldn't call it a "profit."  I would say

11  that they have increased by $55 a month the amount

12  that were incurring.  I don't know that I would call

13  it a "profit" since we know that the lease that they

14  were able to get when they moved out was actually

15  for more.  So it was for $950 a month, so I think it

16  was a prudent move.

17   Q.   But they -- they were net positive on the

18  cash flow between those two events, the two leases?

19   A.   No, they were still negative cash flow.  In

20  one case, they would be paying zero -- $850, were

21  not getting $850, so that would put them at a

22  negative $850.

23        And they would still be in a negative.  They

24  are not positive cash flow.  They are just having to

25  spend less, but I've used only the $850 amount up

Page 270

```
 1   until that point.

 2       Q.   Okay.  And then you stopped?

 3       A.   What's that?

 4       Q.   That was only until that point?

 5       A.   Well, for a while they were in the Colonial

 6   as opposed to increasing it for what was -- any

 7   potential increase after the 850.

 8       Q.   Okay.  Did the Fosters cease claiming

 9   alternative living expenses -- when did they cease

10   claiming alternative living expenses?

11       A.   I believe when they moved back into the

12   home.

13       Q.   And when was that?

14       A.   November 2012.

15       Q.   Okay.  All right.  And you're not including

16   any alternative living expenses beyond that date?

17       A.   I think there were maybe some follow-on

18   electric bills that needed to be paid at that point,

19   but that's correct.

20       Q.   Okay.  One other thing I noted on the

21   Fosters, if I may, since we're on those, they had a

22   charge for storm shutters.  Did you see that?

23       A.   I think I recall that.

24       Q.   I believe it's a company called StormTech

25   Shutters?
```

Page 271

1    A.    Do you have the date handy to help me look

2    through this?

3    Q.    Yeah.  It looks like it's April 24th, 2008,

4    is what the estimate or contract appears to be.

5          It's in your database as a personal property

6    damage expense, and it has a vendor of StormTech

7    Shutters, Inc., if that helps, personal property

8    damage expense, and then the vendor is StormTech

9    Shutters.

10   A.    What did you say the date was?

11   Q.    Well, according to what I've got here, let

12   me see.  I have it included as 10/1/2009 based --

13   I'm sorry, but based on an estimate from 2008.

14   A.    Okay.  So that's why I didn't find it.  So

15   10/1/2009.

16   Q.    This is where I was -- we talked yesterday

17   about what dates were used.  This is one example I

18   was trying to understand.

19   A.    Yes.

20   Q.    Doc ID, I think, is 367443 for the document,

21   if you want to see that, at Page 8, I believe of

22   that document.

23         Okay.  You have the same document I have.

24         Did you make any determination, Mr. Elkin,

25   as to the propriety of the Fosters including this

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 272

1  item in their listing of damages?

2      A.  I did not.

3      Q.  Okay.  Would you agree with me that this

4  appears to be storm shutters, exterior storm

5  shutters?

6      A.  Yes.

7      Q.  And they appear to have been purchased, if I

8  have the date right, in April of 2008?

9      A.  That's correct.

10     Q.  Okay.  And you've included that on your

11 report or your database as one of the items that

12 comes into personal property damage expenses?

13     A.  That's correct.

14     Q.  Did they tell you anything more than what

15 you have in these documents as to why they were

16 claiming that?

17     A.  They told me that they were damaged.

18     Q.  Okay.  Did they say how they were damaged?

19     A.  I believe that they -- my assumption was

20 that they were making the assertion that it was from

21 the Chinese drywall.

22     Q.  So they were asserting that exterior storm

23 shutters were damaged by drywall in the house?

24     A.  They were asserting that these items on this

25 invoice were damaged.

Page 273

1    Q.   But they were asserting it was damaged by

2    drywall?

3    A.   That's correct.

4    Q.   And you didn't attempt to make any effort to

5    validate or invalidate that assertion?

6    A.   That's not within the scope of my analysis.

7    Q.   Understood.  You did put in the dates -- I'm

8    sorry, if I can go back to your master spreadsheet.

9    A.   Yeah.  Actually, you were going to ask me

10   about the October 1, 2009 date?

11   Q.   Which I assume is the move-out date?

12   A.   Since I couldn't be certain as to when those

13   were actually installed, because that was the --

14   when they made their deposit, that and a number of

15   items below it which they were claiming damage on,

16   but I didn't know when they were purchased, but I

17   did know that they were there when they moved out,

18   so I used the date a couple of days before their

19   move-out.

20   Q.   And you didn't make any effort to adjust the

21   purchase price from whenever they were installed in

22   April of 2008 to what they might be worth in 2009;

23   you just took the original purchase price?

24   A.   That's correct.

25   Q.   Full price?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 274

```
 1     A.    That's correct.

 2     Q.    All right.  Also in the documents for

 3  Mr. Foster, they had -- it may be in the same pages.

 4  They had some furniture that they were claiming, and

 5  let me -- I think you're in the right pages.

 6  There's a -- there's an invoice in there from a

 7  company called Haverty's -- let me see if I can --

 8  Exhibit 5 to Vicki Foster might be the easiest place

 9  to find that, I'm told.  And on Page 8, I believe

10  you will find what I'm looking at.  Okay.

11          It looks like -- there's an invoice 277145.

12  It might be a little higher or lower -- I'm sorry.

13  It was back where we had the -- your summary.

14  There's a -- do you know which page?

15               (Discussion off the record.)

16     Q.    The prior document we're on, my apologies,

17  Mr. Elkin.

18     A.    No worries.

19     Q.    There's a lot of documents.

20     A.    I'm trying to remember which document we

21  were -- 033.

22               (Discussion off the record.)

23     Q.    4443?  Okay.  Now, in there, there is an

24  invoice from a company called Haverty's that has an

25  invoice -- a sales invoice number 271745 -- let's
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 275

 1    see, maybe a few more pages in -- okay.  That's

 2    fine.  That will work.  There you are.  Okay.

 3           Did you understand these to be items that

 4    the Fosters were claiming were damaged?

 5      A.   Yes.

 6      Q.   And where were those items delivered when

 7    they were purchased?

 8      A.   To some other home.  This was back in 2004.

 9      Q.   Delivered to Kentucky?

10      A.   Yes.

11      Q.   At the home that they still had when he went

12    back to work?

13      A.   Yes.

14      Q.   Did they show you any evidence of these

15    items being brought to Florida?

16      A.   Just told me that they were.

17      Q.   And if --

18      A.   I think there may have been pictures of

19    these in other places.  These particular cherry

20    chests, I think there are pictures of them, as well.

21      Q.   Okay.  But did the pictures show a location

22    that you could identify where they were?

23      A.   No.

24      Q.   And if you look at Invoice 2751750, it's

25    also delivered to Kentucky?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 276

```
 1    A.   Yes.

 2    Q.   But again, you weren't acting as a

 3  gatekeeper to say whether these items had actually

 4  made it into the Fosters' house in Florida?

 5    A.   Not to inspect it, but they told me that

 6  they were there, so --

 7    Q.   And you just accepted that?

 8    A.   Yes.

 9    Q.   Did the Fosters also put in a claim for a

10  television set, a Samsung television set?

11    A.   I believe so.

12    Q.   Okay.  And if it helps, I think it's a

13  $2,000 item or thereabouts.  It's listed as personal

14  property damage expense and Samsung 55-inch

15  television.

16    A.   Do you have the date?

17    Q.   The date on this is shown as 9/30/2016,

18  September 30, 2016.

19    A.   It would help if I was in the proper

20  plaintiff.

21    Q.   Ah, that would help indeed.  Okay.  So

22  September 30, 2016, and it's listed as personal

23  property damage expense, Samsung television.  There

24  you are.  Okay.

25         And, Mr. Elkin, did you accept at face value
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 277

1   that that was an item that had been damaged, or was

2   that an item that was being replaced?

3       A.   This was an item, I believe, that was

4   replaced.

5       Q.   This was -- this was replacement of a

6   prior -- previously damaged item?

7       A.   That's my understanding.

8       Q.   Did they tell you what was actually the

9   original item that they were replacing?

10      A.   A similar TV.

11      Q.   Did you --

12      A.   Actually, when you say did they tell me, no,

13  they didn't tell me.

14      Q.   Did you find any indication of what was

15  being replaced?

16      A.   It was my understanding that this was a

17  replacement of some other TV.  I did not ask if it

18  was a Samsung 50 -- 55-inch television.

19      Q.   Okay.  Have you seen the invoice for that?

20      A.   The invoice for this television?

21      Q.   Yes.

22      A.   I believe I have.

23      Q.   And is there any way you can pull that up,

24  doc ID 365749?

25      A.   Yeah, Page 71.  I believe that that's going

Page 278

```
 1    to be on a credit card and maybe not the invoice,
 2    but let's find out.
 3         Q.   I think it's an under confirmation, I
 4    believe is what I see it as being.  That's Page 71
 5    of that document ID, I believe.
 6         A.   I don't know why I'm not seeing 365749.
 7         Q.   Do you have that number again?
 8         A.   I'm sure that's the right number.  There it
 9    is.
10         Q.   All right.  Page Number 71, I believe.
11    Okay.  You have the document.  And what did you
12    understand that to be, if you had an understanding?
13         A.   Replacement television.
14         Q.   Okay.  And when did they tell you the
15    original television was damaged, if they told you?
16         A.   I don't recall.  I mean, they didn't tell
17    me.  They just said that this was a -- or the
18    documentation reflected that this was a replacement
19    television.
20         Q.   And this was a 55-inch 9 Series curved
21    4K SUHD TV from Samsung?
22         A.   I'm trying to see where it says Samsung.
23         Q.   If you scroll up a little bit --
24         A.   Here it is, Samsung.  Yes.
25         Q.   Did they even make Samsung curved
```

Page 279

1    televisions back at the date that they were leaving

2    the property?

3        A.    I don't recall when the curved option became

4    available, but it's possibly not.

5        Q.    I would suggest to you that the Internet

6    suggests somewhere in 2014.  I don't know if that's

7    accurate.

8        A.    That's probably about right, based on my own

9    purchases.

10       Q.    Okay.  So would you --

11       A.    I didn't buy one, but I remember seeing

12   them.

13       Q.    Did you make any determination whether this

14   was an improvement over what they had claimed to

15   have lost?

16       A.    I did not.

17       Q.    So you included it regardless, without any

18   adjustment?

19       A.    That's correct.

20       Q.    And was that consistent with all of the

21   personal property items; you weren't trying to

22   adjust for like kind and quality?

23       A.    That's correct.

24           MR. KALIL:  I think we're done with

25   Mr. Foster, so let's --

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

```
 1          MR. BREIT:  Do you want a break?

 2          THE WITNESS:  I could use a break if you

 3     don't mind.

 4          MR. KALIL:  Why don't we take a break.  This

 5     is a good time.

 6          THE VIDEOGRAPHER:  The time is 19 after

 7     10:00 a.m.  We're going off the video record.

 8     Please stand by.

 9       (Recess from 10:19?a.m. until 10:34?a.m.)

10          THE VIDEOGRAPHER:  The time is 10:34 a.m.,

11     and we're back on the video record.

12  BY MR. KALIL:

13     Q.   Mr. Elkin, a few more questions just of a

14  general nature, if I may.  Am I correct that you are

15  not offering any professional opinion with respect

16  to any of the Priority Claimants that their lost

17  equity was not based on market declines in the

18  overall prices of real estate?

19     A.   I'm not basing an opinion on what caused the

20  lost equity.

21     Q.   Okay.  And then it's fair to say that you're

22  not offering any professional opinion that defective

23  drywall had any impact on the lost equity

24  calculations?  That's not within the scope of your

25  report?
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

1    A.    That's correct.

2    Q.    Let me ask it as a clean question, then.

3          You're not offering any professional opinion

4    with respect to any of the Priority Claimants that

5    defective drywall is the cause of their lost equity

6    to the exclusion of any other causes?

7    A.    That's correct.

8    Q.    And you're not opining in any way on the

9    cause of any damages claimed by any of the Priority

10   Claimants?

11   A.    That's correct.

12   Q.    Okay.  Let me take you to Mr. Martin --

13   Mr. and Mrs. Martinez, excuse me.  Under the

14   alternative living expenses for the Martinez

15   Priority Claimants --

16   A.    Yes.

17   Q.    -- how many items were included that were

18   labeled miscellaneous?  I'm sorry.  I think it's

19   alternative living.  I'm sorry.  It's personal

20   property damage expense I meant to ask you about.

21   Excuse me.

22   A.    No worries.

23   Q.    Thank you.  Can we do a sort just for

24   miscellaneous?

25         Now, I see you've got two categories.  You

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 107 of 556
Case 1:11-cv-22408-MGC Document 270 Entered on FLSD Docket 09/15/2013 Page 323 of 388

1    have miscellaneous, and then you have miscellaneous

2    removed from revised because you did the revised

3    spreadsheet for the Martinezes?

4        A.    That's correct.

5        Q.    How many were removed from miscellaneous?

6    Was it just the one entry?

7        A.    Just that one.

8        Q.    Okay.  Leaving that aside, how many are

9    still in for miscellaneous?

10       A.    59.

11       Q.    59.  And what is the total dollar value of

12   those?

13       A.    $26,167.

14       Q.    Okay.  And is it possible to sort those by

15   dollar amount so we can see what's in there?

16       A.    You want it largest to smallest?

17       Q.    Largest to smallest is probably easy.  Okay.

18   All right.  If I can direct you to the Lowe's entry

19   that is for $1,272, do you know what that is for?

20   If it helps, I believe it's a June 9th, 2013 entry.

21       A.    I'll find it.  It's just --

22       Q.    Sure.

23       A.    It's in the revised.

24       Q.    Okay.  I think that's it.

25       A.    I believe it's for a refrigerator.

Page 283

1    Q.   Okay.  And so that was a refrigerator in

2   2013.  Was that a replacement of a prior

3   refrigerator, as you understood it?

4    A.   I believe so.  I believe they -- I believe

5   they testified that they had to replace a

6   refrigerator on a number of occasions.

7    Q.   On a number of occasions.  Okay.  How many

8   refrigerators did they include in their damages?

9    A.   I'm not certain.

10    Q.   Well, we've got the one in -- June 9th,

11   2013?

12    A.   I have the -- that's the one we just looked

13   at; that's correct.

14    Q.   Okay.  If we go back to their personal

15   property damage expenses and we search for "fridge,"

16   will we see any other entries?

17    A.   I believe we'll see the one they brought

18   into the home, but let me look.  We see two other

19   entries.

20    Q.   And what are the dates of those?

21    A.   One of them is April 1st, 2007, and the

22   other is August 20th, 2007.

23    Q.   Okay.  And what date did they move into

24   their property?  I have it in -- on your Exhibit 12.

25    A.   They moved into the property in September of

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

1    2008.

2        Q.   So they're claiming they had two separate

3    refrigerators?

4        A.   I believe they brought two refrigerators

5    into the home.

6        Q.   Okay.  And then they replaced one in 2013,

7    we saw before.  Do we also have another entry on

8    August 22nd, 2007 under their personal property

9    expenses?  If the amount helps, I have it as $1,544.

10       A.   What was the date you said?

11       Q.   August 22, 2007.  I think -- it's just three

12   lines above what's highlighted.  It's labeled as

13   miscellaneous, the fifth -- there we go.  Do we know

14   what that is?  From the note, it appears to be

15   another refrigerator?

16       A.   That's what the note says; that's correct.

17       Q.   So am I correct that they have a

18   refrigerator they bought on April 1st, 2007, before

19   they moved into the property, another one they

20   purchased on August 20, 2007, also before they moved

21   into the property, a third one on August 22, 2007,

22   also before they moved into the property, and then

23   one that they purchased on June 9, 2013, and they're

24   claiming all four?

25       A.   It appears that way.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 285

 1    Q.   Okay.  And there was no process set up to

 2   look for that type of duplication?  Let me ask you a

 3   different question.

 4    A.   The process was set up to identify

 5   duplications, but not necessarily of the same item.

 6    Q.   Fair enough.

 7    A.   Or more to make sure that we weren't

 8   including the same item.

 9    Q.   But you weren't looking to find multiple

10   instances of similar items, even in close proximity

11   in time?

12    A.   That's correct.

13    Q.   Okay.  You had mentioned with Etter that

14   there was one other change that you had made this

15   morning, and I don't think we followed that up

16   because we went into Martinez.  Maybe just get that

17   while we're here.  I think you said a change in

18   private property --

19    A.   I think it was when I was reviewing the

20   Etter personal property --

21    Q.   Uh-huh.

22    A.   -- it appeared that there were a number of

23   things that would probably fall better into the

24   remediation category, rather than the personal

25   property category.  And I believe there were also

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 286

1    some expenses there that related to screening -- and

2    I don't mean like patio screening; I mean like

3    testing, probably --

4        Q.   Okay.

5        A.   -- that were in personal property damages,

6    and if they belonged, they probably should be in

7    other damages.

8        Q.   So you put them in a different bucket, so to

9    speak?

10       A.   I would put them in a different bucket.

11       Q.   Fair enough.  All right.  Let me go to

12   Mr. Kevin Rosen, and I'm going to mark this document

13   as Exhibit 16 to your deposition.

14           MR. KALIL:  Counsel.

15           (Elkin Exhibit 16 was marked for

16   identification.)

17   BY MR. KALIL:

18       Q.   And I'd ask you if that's part of your work

19   papers or what was provided to you.

20       A.   I believe it was, but I'll confirm that for

21   you.

22       Q.   Thank you.

23       A.   Yes.

24       Q.   Okay.  Now, if you'll go to two pages from

25   the end, almost where you were, do you see a Form

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 287

1    4868 Application for Automatic Extension of Time to

2    File US Individual Tax Return for tax year 2009?

3        A.    I do.

4        Q.    And you're familiar with those?

5        A.    Yes.

6        Q.    And in those applications, you're required

7    to estimate your taxes for the year?

8        A.    Yes.

9        Q.    And what was the estimate of taxes for 2009

10   that the Rosens did when they requested their

11   extension?

12       A.    $110,321.

13       Q.    Okay.  And those have to be filed by the due

14   date for your tax return, so by April of the year

15   following, so by April 20 -- 2010?

16       A.    With some flexibility depending on the

17   circumstances, but that's approximately correct.

18       Q.    So it's fair to say from that, we can

19   ascertain at least of -- no earlier -- somewhere in

20   2010, that they had estimated their 2009 tax

21   liability as $110,000 for purposes of requesting an

22   extension?

23       A.    If -- that's what this form shows; that's

24   correct.

25       Q.    Can I take you to the first page of the

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 288

1    document, and that appears to be their Form 1040

2    2009 tax return?

3        A.   That's correct.

4        Q.   And on the second page, is that dated?

5        A.   Yes.

6        Q.   And that's September 21, 2010.

7        A.   That's what it says, yes.

8        Q.   So that would be some months later, right?

9        A.   Yes.

10       Q.   And what do they show as their tax liability

11   for 2009 as of September?  I believe it's on Line

12   60.

13       A.   Zero.

14       Q.   Okay.  And do you see a casualty loss

15   deduction on this form?

16       A.   Yes.

17       Q.   And what is the amount of that?

18       A.   The amount of the deduction is $553,400.

19       Q.   Okay.  And if we go to -- see how many pages

20   this is.  KROSEN - 000509 is the Bates number on the

21   bottom.  You have a Form 4684?

22       A.   Yes.

23       Q.   And that is casualties and thefts; is that

24   correct?

25       A.   Yes.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

```
 1      Q.    And is that the Rosens taking losses

 2   associated with Chinese drywall?

 3      A.    Yes.

 4      Q.    And is that where the $553,400 comes from?

 5      A.    Yes.

 6      Q.    Is it fair to say that without having to do

 7   any more work from these documents alone, we can

 8   tell that the Rosens saved $110,000 on their 2009

 9   taxes by the casualty loss?

10      A.    I don't think it's fair to say that we know

11   that.  I don't know what other adjustments may have

12   come up or when they filled out -- since they filled

13   out the extension.  If -- there may have been other

14   items that might have also reduced it, but I would

15   say it's -- a significant portion of that would have

16   been this --

17      Q.    Okay.

18      A.    -- not knowing exactly what they had built

19   in to determine the 110,000.

20      Q.    If we go to Page 525 of that same exhibit,

21   Bates Number 525 --

22      A.    Yes.

23      Q.    -- is there a statement from the taxpayers

24   that they're claiming the casualty loss on that form

25   of 553,000 for that -- for losses associated with
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 290

1  Chinese drywall?

2     A.    Absolutely.

3     Q.    Okay.  So when we talked about it yesterday,

4  I believe we had left it that it might take some

5  work to determine whether or not a particular

6  Priority Claimant received a tax benefit, federal

7  income tax benefit, as a result of Chinese drywall

8  casualty deduction, but here we have an actual

9  example.

10    A.    Yeah.  And I don't know if that's

11 characterizing my testimony exactly right from

12 yesterday, because I think we were talking both

13 about the benefit they may have gotten and the taxes

14 they may have to pay upon recovery of those amounts,

15 which are certain and that they would, and whether

16 or not one could even be larger than the other.  So

17 I don't recall specifically stating that.

18          But even in this case, we can see that they

19 took a deduction.  We might not be able to

20 determine, without a little bit of work at least,

21 what their taxes would be otherwise; although I

22 think if I were going to undertake that exercise

23 with this particular tax return in front of me, I

24 could probably do that.

25    Q.    I was going to say, it's within the scope of

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

1    the work that your firm does?

2       A.   I could do that.

3       Q.   But that savings, whatever amount they might

4    have achieved, is not reflected in your schedules

5    for the Rosens' damage; is that correct?

6       A.   Because I don't think it's a -- it's an

7    element that can be considered without taking into

8    account the taxes that they would have to pay if

9    they get recovery on these amounts.

10      Q.   My question is:  It's not included, though?

11   Is that a "yes," it's not included?

12      A.   It's not deducted.

13      Q.   Well --

14      A.   We -- yesterday we had this same thing.

15   It's -- a deduction for their tax benefit in two

16   thousand -- for tax year 2009 has not been made in

17   my calculations.

18      Q.   That's what I was looking at.  Thank you.

19           I'll try to move through some of the little

20   buckets.  Janet Avery, if I can direct you to that,

21   did you include in her schedule -- sorry.  Did you

22   include in the schedule of expenses for Janet Avery

23   any moving expenses?  I believe it's under --

24      A.   Yes.

25      Q.   -- 1.3A.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

```
                                              Page 292
 1      A.    Yes.

 2      Q.    And how much was that?

 3      A.    $3,500.

 4      Q.    Did you see Ms. Avery's deposition testimony

 5   December 7th, 2018?

 6      A.    I believe I did.

 7      Q.    Did you see in there that she said the

 8   moving expenses, she couldn't remember what they

 9   were for?

10      A.    I don't know if she said she couldn't

11   remember what they were for or how much they were.

12      Q.    Couldn't remember how much they were.  Okay.

13      A.    I believe.  If --

14      Q.    Okay.

15      A.    -- I refer to the deposition, I might be

16   able to --

17      Q.    I believe it's -- it's Page 93 to 94 of her

18   deposition.  And you're absolutely correct.  She

19   couldn't recall what it was for.

20            If I could direct you to the top of Page

21   94 --

22      A.    I'm starting on Page 90 -- or 91, which is

23   where she begins speaking about it.

24      Q.    That's fine.

25      A.    She indicated that she has no receipts for
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 293

1    the moving expenses.

2        Q.    Okay.

3        A.    And then it looks like she gets a little

4    confused, saying "yes" when she meant "no" and "no"

5    when she meant "yes."

6        Q.    And then she's asked:  What did the 3,500

7    moving expenses --

8        A.    She -- so she -- at that time, she said

9    she --

10       Q.    Said she --

11       A.    -- could not remember at that point.

12       Q.    Right.  And then on the next page, she's

13    asked: Do you recall what you left behind in the

14    home as you vacated it?

15           And her answer is:  Everything I had in the

16    house, all my furniture, everything that was there.

17    Pots, pans, dishes, you name it, it was there.  The

18    only thing I took out was my clothes.  Actually, I

19    took some dishes out, too, because they were

20    washable.

21           Is that correct?

22       A.    I see that.

23       Q.    Did that -- that testimony didn't cause you

24    to question whether a $3,500 moving expense was

25    appropriate?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 294

1    A.    I didn't have any more information.  So I

2  believe I've marked that very clear, that it's just

3  coming from the SPPF, and I have no other backup for

4  that.  And I'm not weighing one way or another the

5  credibility of the witness's testimony for the

6  $3,500.

7    Q.    Okay.  When you say you marked -- you marked

8  that, in which section of the report?

9    A.    On the -- in the supporting document column,

10  it says SPPF, which means -- it could have also, I

11  guess, made reference to the deposition, but she had

12  listed the $3,500 on her testimony through the SPPF,

13  so it's just making reference to that, no receipts

14  or anything else.

15    Q.    But it doesn't say no receipts in the

16  summary, at least in your damage summary, does it?

17    A.    No, it doesn't.

18    Q.    Did Ms. Avery also say that she had stopped

19  paying her mortgage?  Do you recall that?

20    A.    I believe she may have, but I don't want to

21  confuse her with anybody else, so --

22    Q.    I think it's Page 95 she talks about that.

23    A.    I believe that's correct.

24    Q.    Okay.  The fact that she stopped paying her

25  mortgage is not something that factored into your

Page 295

1    lost equity calculations, is it?

2       A.   No.

3       Q.   And that would be true for any of the

4    Priority Claimants who stopped paying their

5    mortgage; that would not be something taken into

6    account in your lost equity calculations?

7       A.   It would be taken into account in that they

8    would not have continued to build equity through

9    those payments, which would have happened if they

10   made them.  And that's the only way it would impact

11   that calculation, except to the extent that it might

12   have caused them to be out-of-pocket any amount at

13   closing, through foreclosure, short sale, or

14   anything else, because then that amount would be --

15   if they got money back or if they had to lay out

16   money, that would have gone into that calculation,

17   as well.

18      Q.   But it wasn't something that would have

19   impacted whether or not to do a lost equity

20   calculation?  It wasn't a causal event?  You didn't

21   consider whether somebody had voluntarily stopped

22   paying a mortgage as having any impact on whether

23   that calculation should be done?

24      A.   Well, to the extent you say voluntarily,

25   it's sort of a characterization that may or may not

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

```
 1   be, but the fact that they did or didn't, whether

 2   they did it voluntarily or not --

 3       Q.   Let me make a clean question.

 4       A.   -- I believe was more appropriately dealt

 5   with not through the equity calculation, because

 6   that wasn't the intention of the equity calculation.

 7       Q.   So fair to say that where there's -- for

 8   whatever reason, if a Priority Claimant stopped

 9   paying their mortgage, that did not impact whether

10   you did an equity calculation, lost equity

11   calculation?

12       A.   I think it was directly related, because I

13   believe for everybody that stopped making a payment,

14   there was either a foreclosure or short sale.  And

15   for those Priority Claimants, I did an equity

16   calculation for anybody that sold either through

17   sale in mitigation, short sale, or foreclosure.  So

18   it might not be a direct reason, but I think it all

19   fits together in the same package.

20       Q.   Is it fair to say that the reasons for them

21   stopping making their payments was not something you

22   considered, just the fact that they stopped making

23   the payments?

24       A.   Yes.

25       Q.   Do you recall anyone else who stopped making
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 297

1    payments?  Does Miranda ring a bell?  Do you

2    recall -- for Mr. Miranda, you have a lost equity

3    calculation.  And do you remember when he stopped

4    making his payments on his mortgage?

5        A.    I don't remember the date.

6        Q.    Okay.  I believe it's on Page 53 of his

7    deposition at Line 11, and I can wait for you to get

8    there, on Page 53.

9        A.    January of 2009.

10       Q.    Okay.  And when did he first become aware of

11   the Chinese drywall?  On your -- on your damage

12   summary, I think I have it as January '10.

13       A.    That's correct.

14       Q.    So this was a year before he became aware of

15   the Chinese drywall?

16       A.    Yes.

17       Q.    Okay.  And that didn't factor into whether

18   you -- that did not change your analysis in any way?

19       A.    No.

20       Q.    Give me one second, Mr. Elkin.  I'm sorry.

21       A.    No worries.

22       Q.    Did any of the Priority Claimants state that

23   they were not seeking damages for repair or

24   replacement of personal property?  Does that ring

25   any bells?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

1      A.    Did any of them state that they were not?

2      Q.    Yes.

3      A.    I believe so.

4      Q.    Okay.  Does anyone come to mind?

5      A.    I believe it was in the deposition of

6    Deborah Hooker.

7      Q.    Okay.  At Page 35.  You have a very good

8    memory, Mr. Elkin.

9      A.    Wrong depo.  I have Mr. Deeg's depo by

10   accident.

11     Q.    We can probably go to her --

12     A.    I've got it.  It will take two seconds.

13   Maybe it was three.  Okay.  I'm there.

14     Q.    Do you see on Page 35, she's asked -- here

15   it is -- on Line 10:  Are you seeking any damage for

16   the repair of that personal property appliance?

17            And she says:  No.

18            Are you seeking any damage for the

19   replacement of that personal property or appliance?

20            And she says:  No.

21            Did you factor into your analysis any

22   statements by a Priority Claimant that they were not

23   seeking reimbursement for replacement of personal

24   property when they said so in their depositions?

25     A.    This is the only time I recall it happening,

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 299

1 and I did specifically discuss this with her

2 counsel.

3     Q.    Okay.

4     A.    And I was advised by her counsel that

5 whether or not she could was a legal -- a legal

6 question.  It's clear what she says here in her

7 deposition.  As to whether she understood that or

8 not is not -- is not my purview, but I was explained

9 by counsel that the inclusion or exclusion of that

10 would be a legal matter.

11     Q.    So what did you do?

12     A.    It's in there.

13     Q.    Okay.  So the Priority Claimant said she

14 wasn't seeking it, counsel said she was, and you put

15 it in your report?

16     A.    That's correct.

17     Q.    Okay.  Is it noted in your details in your

18 report proper that there was a disclaimer by the

19 Priority Claimant of seeking that reimbursement or

20 expense?

21     A.    Probably not.

22     Q.    Okay.  Fair enough.  Minor one.

23     Can I direct you to Mr. -- the Feldkamps?

24 They have some rental payments they've included, and

25 I believe it's on your Schedule 5.1.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 300

1    A.    Yes.

2    Q.    Am I correct that you've included the $375

3  application fee and deposit that they made on April

4  13th, 2012 in your -- in your damage calculation?

5    A.    That's correct.

6    Q.    And the $1,500 check in April 26, 2012 for

7  first and last month's rent?

8    A.    That's correct.

9    Q.    And also the $900 check made -- paid on

10  August 29th is included?

11    A.    August 27th?

12    Q.    I have it as August 29th.  I can show you

13  the document.  I don't know if you can find it that

14  way.  I'll have to hand that to you.

15    A.    I'm wondering if perhaps I just have it

16  miscoded.

17    Q.    Okay.

18    A.    Let's see if it's the same one.  No.  I'm

19  sorry.  It's 2016.  I thought we were --

20    Q.    Ah.

21    A.    -- at the beginning.  No, this is not

22  included.

23    Q.    It's not included?

24    A.    No.

25    Q.    Okay.  Fair enough.  Is there a different

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

```
 1   check that's on your schedule for August 27?  I'm

 2   sorry.  This is 2016.  You're right.  It's not.

 3   We'll leave that.

 4           Give me one second, Mr. Elkin.  Let me get

 5   organized here.

 6           Did you include a rental payment from August

 7   of 2015 for the Feldkamps in your schedule?

 8      A.   Yes.

 9      Q.   Do you know when they vacated the rental

10   property?

11      A.   September 24th, 2015.

12      Q.   Okay.  So it would appear, then, if they did

13   a first and last month's deposit and they paid a

14   payment at the end of August 2015, that they

15   double-paid for the last month?

16      A.   Well, if they didn't move in until September

17   24th, and there's no payment here for September

18   24th, so they would not have double-paid the rent.

19   And the question is the deposit.  And I don't

20   remember if it's this claimant or not, but I do

21   recall a claimant that did not get back all of their

22   deposit.  I don't remember if it was this one or

23   not.

24      Q.   Is there any reference to that in your

25   report?
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

1      A.   No.

2         Q.   Okay.  A general question about lost equity

3    and HUDs.  Did you include -- let me see if I can

4    frame this the right way.

5            If a Priority Claimant sells a property, and

6    you're doing a lost equity calculation, would you

7    include charges for real estate taxes as a return of

8    money to them or not?  I'm not sure if I'm making

9    that clear.  Let me see if I can do a little better.

10           Let me direct you, if I may, to Mr. Marin --

11   or the Marins.  When you calculated the cash paid to

12   the claimants upon the sale of their home from the

13   HUD, did you take into account any charges for real

14   property prorations?

15     A.   No.

16        Q.   So you just looked at the cash that was paid

17   to them?

18     A.   That is correct.

19        Q.   So if there was a charge for real property

20   prorations, even though they may have been

21   responsible for it because -- from having occupied

22   the house, you didn't treat that as something that

23   they got a benefit for?

24     A.   No.

25        Q.   Would you agree --

Page 303

1     A.   Or can you -- can you repeat that?

2     Q.   Sure.  Let me -- let me see if I can do it.

3          Do you agree that to the extent one of the

4     Priority Claimants sells real estate, and there's a

5     prorated charge on a HUD for real estate taxes or

6     insurance up until the date of closing, that those

7     charges should have been considered expenses

8     associated with living in the property and shouldn't

9     be deducted from the amount they received back in

10    calculating lost equity?

11    A.   I think it would depend on which way the

12    allocation goes.  If you are --

13    Q.   If they're sellers.

14    A.   If they're sellers and the charge is at the

15    end and if it relates to taxes during a time period

16    that they lived in the house, as opposed to the

17    allocation that relates to taxes that were already

18    paid that related to a period that they didn't live

19    in the house, I would agree.

20    Q.   Okay.  And did you check each of your lost

21    equity calculations to see whether you properly

22    allocated the tax prorations?  And I'll direct you

23    to -- on this one, it's Lines 1303 -- Line 1303 for

24    the Marins.  And as I read it, it looks like they

25    are being charged for 2011 real estate taxes even

Page 304

1    though this closing is in February 2012.

2         And my question, sir --

3    A.   Yeah.  I was going to ask you to repeat the

4    question.

5    Q.   My question is:  Would you agree that with

6    regard to the Marins, a charge for 2011 real estate

7    taxes, when they lived in the property for all of

8    2011, should not have been considered lost equity?

9    In other words, your figure for lost equity should

10   have been reduced by that amount?

11   A.   Yes.

12   Q.   And the same would be true for any charges

13   for prorations within the year of sale for the time

14   that the sellers had occupied the property, like

15   water bills --

16   A.   I'd want to look at it on a case-by-case

17   basis, but probably.

18   Q.   For instance, in that one, in the Marins, if

19   we go to Line 1304, there's also a charge for a

20   water bill.

21   A.   $232.14.  It's not clear what period that

22   relates to, but I suspect that would have been a

23   water bill that should have been the responsibility

24   of the Marins, and that's why it's being deducted.

25   Q.   And so should --

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 305

```
1      A.   And I would agree that that's not -- that

2    $232 should not be a -- an addition to the equity

3    calculation.

4      Q.   So their lost equity calculation, all other

5    things being equal, should be reduced by that

6    amount?

7      A.   By $232.

8      Q.   And similarly, on Line 511 on the first

9    page, the proration for county taxes in 2012 up

10   through the date of sale, should also be a reduction

11   to your calculation of lost equity?  And I'll orient

12   you to the top of the page, the settlement date

13   being February 17th, 2012.

14     A.   I'm just wondering why those two numbers are

15   so close.  I suppose it could be a coincidence, the

16   $232 and the $232, but assuming that they are

17   separate things, I think I would agree with that.

18     Q.   Okay.  Am I correct that that is not

19   properly calculated, then; that the Marins' lost

20   equity calculation is incorrect at least incorrect

21   to that extent?

22     A.   It does reflect that.  It still corrects --

23   it still reflects the same cash flow, but that cash

24   flow should likely recognize that certain amounts

25   that were -- that were deducted from their amount --
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

1   the $72,000 should be more of a carrying cost than

2   an equity calculation.

3       Q.   It would be no different than if somebody

4   had cashed out a mortgage, other than orders of

5   magnitude?  In other words --

6       A.   It's a different thing, but --

7       Q.   In terms of how it would impact actual cash

8   flow or what they are responsible for, leaving --

9       A.   Well, the answer is -- I mean, the simple

10  part of it is, if they had paid this in advance of

11  this, not that you can, then it wouldn't have been

12  reduced from cash, and they would have gotten a

13  little bit more, and then the little bit more would

14  have reduced their equity.

15      Q.   Right.  But you could have paid the 2011

16  taxes?

17      A.   That's -- they could have done that.

18      Q.   And in which case, all they did by not

19  paying it is they effectively borrowed from the

20  county, if you want to call it that?  They paid the

21  county like -- they weren't late.

22      A.   It's not due -- it wouldn't --

23      Q.   It's not due until --

24      A.   -- it's not due until 2012, so I'd not call

25  it borrowing from the county.  I would just say that

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 307

1    that allocation for 2011 has an -- has that impact.

2      Q.   And nonetheless, the proceeds they received

3    satisfied an obligation that was theirs?

4      A.   Yes.

5      Q.   So it's the same as having cash come into

6    their pocket for that purpose?

7      A.   Similar.

8         MR. KALIL:  Okay.  Give me one second.

9      Q.   Can I direct you to Exhibit 17, Michael and

10   Robyne Rosen?

11     A.   Yes.

12     Q.   And in the section personal property damage

13   expense on 17.1, there is an extensive list of items

14   for -- I'm not going to say this right -- Turkell &

15   Gervis Design.

16     A.   Yes.

17     Q.   Do you know what the total amount for

18   Turkell & Gervis Design is?

19     A.   I believe that amount is $96,637.

20        (Elkin Exhibit 17 was marked for

21   identification.)

22   BY MR. KALIL:

23     Q.   I'm going to show you what I've marked

24   Exhibit 17.

25     A.   I've included in that number something that

Page 308

1    was just for Gervis Design, a small amount.

2        Q.    You have in front of you Exhibit 17 which I

3    believe is a printout of the proposals of the items

4    referenced there?

5        A.    Without going line by line, I recognize this

6    as what I believe to be that.

7        Q.    Okay.  And so that $96,637, with the --

8    there is one at the end, Gervis, G-e-r-v-i-s, which

9    appears to be different.

10       A.    Would you like me to exclude that one from

11   this?

12       Q.    If you won't mind, just so we can get an

13   idea about it.

14       A.    Sure.

15       Q.    So if we -- if we limit it to Turkell &

16   Gervis Designs, not --

17       A.    $96,437.  Sorry.  I cut you off.

18       Q.    I've done it to you several times.

19             For supporting documents you state for that,

20   is it consistent with the proposal?

21       A.    Yes.

22       Q.    And you also state proof of payment, no?

23       A.    That's correct.

24       Q.    Did you not ask for proof of payment on

25   that?

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 309

1   A.   All -- this was all that was available to

2   me.

3   Q.   **Did you not have any protocol in place to**

4   **say, for significant expenditures, before they put**

5   **in the listing, they should have a proof of payment**

6   **or some further identification?**

7   A.   I would like, in the ideal world, to have

8   proof of payment.  They weren't able to give me any,

9   or none had been produced.  And so their testimony

10  was that they had pulled out from a big book of

11  proposals only the things they had ordered, followed

12  through, and paid for.  Their testimony was that

13  they did, in fact, pay for this, and I didn't have

14  any other evidence of that.

15       MR. KALIL:  We're getting close.  Can I

16    suggest we take five minutes to see what I have

17    left?

18       THE VIDEOGRAPHER:  The time is 11:21.

19    Please stand by.

20       (Recess from 11:21?a.m. until 11:37 a.m.)

21       THE VIDEOGRAPHER:  The time is 11:37.  We're

22    back on the video record.

23  BY MR. KALIL:

24    Q.   **Mr. Elkin, just to follow up your**

25  **communications regarding the proposal for the**

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 310

1    Rosens, did you actually call the Rosens and inquire

2    if they had any proofs of payment?

3        A.    No.

4        Q.    But you had the ability to call them?  You

5    had their phone number?

6        A.    I had their phone number.

7        Q.    In instances -- did you call the vendor,

8    Turkell & Gervis, if I'm saying it right?

9        A.    No.

10       Q.    Did you try and reach out to anybody else to

11   see if you could find verification for that 90,000

12   plus dollars?

13       A.    I discussed it with counsel, and I don't

14   know what counsel did in order to seek that

15   information, but they weren't able to provide it.

16       Q.    But you relied entirely on counsel to see if

17   there was anything else to be found?

18       A.    That's correct.

19       Q.    Is that consistent with any other instances

20   when you didn't have proofs of payment?  Did you

21   rely on counsel to find the proofs of payment, if

22   they existed?

23       A.    Well, I mean, I relied on them to

24   communicate with their client.  I would give them

25   ideas of the types of things that I was looking for.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 311

1    I'm just trying to think if there is any example.

2          It would be uncommon, under these

3    circumstances, to try to connect with third parties

4    directly.  So I don't -- I don't -- can't think of

5    an instance where I did anything differently, other

6    than the two phone calls that we've already spoken

7    about.

8       Q.   So two of the 20 Priority Claimants you or

9    your office spoke with directly, and 18 you didn't?

10      A.   I didn't.

11      Q.   Okay.  So you didn't personally?

12      A.   No.

13      Q.   And to your understanding, nobody else in

14   your office spoke to any of the others?

15      A.   That's correct.

16      Q.   All right.  When you were requesting

17   information in regards to the proofs of payment for

18   the Turkell & Gervis Design proposal, was that

19   request in writing?

20      A.   No.

21      Q.   Would it be by e-mail?

22      A.   It would have been telephonic.

23      Q.   Did you make any notes of those telephone

24   calls?

25      A.   Not that I can recall.  If I did --

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 312

```
1    typically what I do is, while I'm on the work paper
2    that I'm dealing with, I'm updating things on there,
3    so I'm not necessarily taking notes, but if I did,
4    maybe it was on a yellow sticky, just to remind me
5    of something or just remind me of the call, but not
6    notes specific to the call, no.
7        Q.   Were any requests for supporting
8    documentation to counsel put in writing?
9        A.   I don't -- I'll tell you what we did.  I
10   don't know if it falls in the category exactly, but
11   at one point very early, we were tracking whether or
12   not we had what I'll call the core -- the initial
13   core documents, which was the interrogatories, the
14   SPPFs, maybe even the depositions at that point.  So
15   we were trying to get all that preliminary stuff.
16           I think we had made a matrix, a schedule
17   that had Xs, here's what we have, here's what we
18   don't.  And I do think we may have sent that to
19   probably Natalie, and I don't recall what happened
20   with it.
21           But that's the only thing that I recall
22   where there was a communication, an actual written
23   communication, about what we have or didn't have.
24       Q.   And by written, you're including electronic?
25       A.   Yes, yes.
```

Page 313

1      Q.    Do you have a copy of that still?

2      A.    I'm sure I have it somewhere.  I don't -- I

3   don't have it with me today, I don't think.

4            MR. KALIL:  Can we request it to be provided

5      in due course?

6            MR. BREIT:  It can be requested.  Whether we

7      comply will be a decision we make at a point

8      after you request it.

9            MR. KALIL:  That's fine.

10           MR. BREIT:  We'll decide later.

11   BY MR. KALIL:

12     Q.    Mr. Elkin, with regard to the 20 Priority

13   Claimants, did you single any out for special or

14   different treatment, greater inquiries, or anything

15   of that nature?

16     A.    When you say single them out, I mean, I

17   think they singled themselves out by having either

18   more complications or more information or a lot of

19   documents.

20           So I didn't, you know, go into any

21   particular one saying I'm going to focus on this one

22   because of this, but by the nature of the

23   transactions or the claims or the information

24   available, some required a lot more attention than

25   others.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 314

1    Q.   And I take it that -- yeah, so if there is a

2    greater volume, you would spend more time on certain

3    ones, but what I'm really getting at is did you have

4    any different procedures that you applied to certain

5    of the Priority Claimants versus others, or were the

6    procedures uniform?

7    A.   I think the procedures were pretty uniform.

8    I think they were different in that, once something

9    had more complications, we probably did something

10   that we didn't need to do on other ones, but there

11   wasn't a prescribed "let's do this on these and

12   let's do this on those."

13        I mean, one of the differences would be we

14   only did equity calculations on affected homes that

15   were sold.

16   Q.   Okay.

17   A.   So that would be maybe an example.  I'm not

18   sure what you have in mind, but other than that.

19   Q.   Let's take that as an example.  With the

20   homes that were sold, did you make any inquiries

21   specifically targeting whether there were any other

22   factors unrelated to defective drywall that were the

23   cause of those foreclosures or short sales?

24   A.   No.

25   Q.   I didn't mean to cut you off.  You had

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 315

1    another piece.  I just wanted to get that question.

2            Anything else that was different?

3    A.   Not really.

4    Q.   When we started this morning, you told me

5    you'd found some additional information on Martinez.

6    Are you planning on doing any further amendment to

7    the Martinez section of your report?

8    A.   I'll have to ask counsel what they intend

9    for me to do.

10   Q.   And as you sit here today, do you believe

11   you've been asked to do anything further, or not?

12   A.   Not yet.

13   Q.   How about with regard to Etter?

14   A.   Same answer.

15   Q.   Okay.  As you sit here today, are you

16   planning on going back and doing any further work on

17   your report based on any of the questions we've had

18   in the last two days?

19   A.   That will be a discussion I'll have with

20   counsel.

21   Q.   Well, let me just ask you:  What is your

22   understanding today is the scope of your work --

23   does it include any further work based on these

24   discussions?

25   A.   I don't know yet.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 316

1    Q.   Okay.  Is it fair to say that as we're

2    sitting here today, we have the full and complete

3    opinions that you've expressed to date?

4    A.   Yes.

5    Q.   And there's nothing that we haven't asked

6    about or talked about that's not reflected in your

7    report as way -- by way of an opinion that you have

8    as of this date?

9    A.   By way of an opinion, although every opinion

10   is made up of perhaps many opinions, so to the

11   extent I have things documented about how I've

12   treated them, ever so small as some of them might

13   be, we may not have talked about them today, but

14   they are incorporated into the schedules that I

15   have.

16   Q.   And they're incorporated into the documents

17   we've been provided?

18   A.   Yes.

19   Q.   Do you -- as you sit here today, do you

20   believe any changes need to be made to your report

21   to more accurately reflect your opinion?

22   A.   I think there are a few things that could be

23   changed.

24   Q.   What needs to be changed?

25   A.   On the prejudgment interest calculations, I

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 317

1    don't know that I would change them, because I

2    really never intended them to be a full calculation,

3    but for those things that we've noted that obviously

4    don't make sense, I would probably make some type of

5    an adjustment for that.

6        Q.   What would you include in that category,

7    things that don't make sense?

8        A.   Some of the things that I marked as the

9    damage date before they moved into the home, that's

10   the primary thing that I'm thinking about right now.

11   I would reduce the Martinez's RV by the --

12       Q.   Residual value by the sale value?

13       A.   -- by the sale of -- I think it was $2,000,

14   even though they didn't know exactly when.  I'm not

15   sure when I would do the timing of that.

16            And I think there are just a number of

17   things that came up.  I think you brought up a good

18   point about the real estate taxes on the closing

19   statement.  So I would want to think about that a

20   little bit more, but that's a potential adjustment.

21       Q.   If there were any similar treatment, you

22   would want to adjust it?

23       A.   I might.  I need to look at the

24   circumstances, because there could be corresponding

25   differences the other way.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 318

1    I would want to -- I'd probably -- there's a

2  couple of categories that we talked about before

3  that I think -- that are better suited in a

4  different category, but it wouldn't change the

5  calculation, I don't believe.

6    That's what's coming to mind right now.

7    Q.  **What about the treatment of the payments,**

8  **whether they're from Chinese drywall settlements,**

9  **insurance proceeds, or otherwise, the million-plus**

10 **dollars we added up yesterday, do you think that**

11 **needs to be factored differently?**

12   A.   I think my report still says exactly how I

13 feel about those, that they are not for my purposes.

14 And then if somebody makes a decision about them,

15 and if there is a decision how they impact it, then

16 I might build that into my report one way or the

17 another, but as it stands right now is exactly how I

18 would expect it to be, which is collateral sources

19 or, you know, whatever you want to call them are not

20 under my scope.

21   Q.  **And you don't believe those need to be**

22 **factored into even the prejudgment interest**

23 **calculations?**

24   A.   No.  Depends on whether -- it depends on

25 whether they're expected to be or not.

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 319

1    Q.   Anything else --

2    A.   I think if they're expected to be a

3    reduction of some type, then I think that they would

4    affect the prejudgment interest, as well.

5    Q.   **Anything else you think needs to be changed**

6    **or adjusted?**

7    A.   We've been through a lot of the details

8    during the days, also some other things that we

9    looked at that might impact others that, you know,

10   might have similar circumstances, but I can't think

11   of anything as I sit here.

12        MR. KALIL:  Okay.  Mr. Elkin, I thank you

13   very much for your time you spent with us the

14   last two days.

15        And I pass the witness.

16        MR. BREIT:  I'll pass him back.

17        THE WITNESS:  I feel like a tennis ball.

18        MS. O'DONOHUE:  No questions from Taishan.

19        THE VIDEOGRAPHER:  Read or waive?

20        THE WITNESS:  Read, please.

21        THE VIDEOGRAPHER:  The time is 11:48 and

22   this concludes the deposition of Mr. Michael

23   Elkin.  Stand by, please.  We're off.

24        (Whereupon, the deposition concluded at

25   11:48 a.m.)

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

```
 1              C E R T I F I C A T E

 2          I, SUSAN D. WASILEWSKI, Registered

 3   Professional Reporter, Certified Realtime Reporter

 4   and Certified Realtime Captioner, do hereby certify

 5   that, pursuant to notice, the deposition of MICHAEL

 6   P. ELKIN was duly taken on Tuesday, March 12, 2019 at

 7   9:00 a.m. before me.

 8          The said MICHAEL ELKIN was duly sworn by me

 9   according to law to tell the truth, the whole truth

10   and nothing but the truth and thereupon did testify

11   as set forth in the above transcript of testimony.

12   The testimony was taken down stenographically by me.

13   I do further certify that the above deposition is

14   full, complete, and a true record of all the

15   testimony given by the said witness, and that a

16   review of the transcript was requested.

17

18   _____

19   Susan D. Wasilewski, RPR, CRR, CCP

20   (The foregoing certification of this transcript does

21   not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying reporter.)

24

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 321

1              INSTRUCTIONS TO WITNESS

2

3

4        Please read your deposition over carefully

5   and make any necessary corrections.  You should

6   state the reason in the appropriate space on the

7   errata sheet for any corrections that are made.

8

9        After doing so, please sign the errata sheet

10  and date it.  It will be attached to your

11  deposition.

12

13       It is imperative that you return the

14  original errata sheet to the deposing attorney

15  within thirty (30) days of receipt of the deposition

16  transcript by you.  If you fail to do so, the

17  deposition transcript may be deemed to be accurate

18  and may be used in court.

19

20

21

22

23

24

25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

```
                                              Page 322
 1                    - - - - - -

 2               E R R A T A

 3                    - - - - - -

 4   PAGE   LINE   CHANGE

 5   ____   ____   _____

 6     REASON: _____

 7   ____   ____   _____

 8     REASON: _____

 9   ____   ____   _____

10     REASON: _____

11   ____   ____   _____

12     REASON: _____

13   ____   ____   _____

14     REASON: _____

15   ____   ____   _____

16     REASON: _____

17   ____   ____   _____

18     REASON: _____

19   ____   ____   _____

20     REASON: _____

21   ____   ____   _____

22     REASON: _____

23   ____   ____   _____

24     REASON: _____

25
```

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 323

1         ACKNOWLEDGMENT OF DEPONENT

2

3          I, _____, do hereby

4     acknowledge that I have read the foregoing pages,

5     217 through 322, and that the same is a correct

6     transcription of the answers given by me to the

7     questions therein propounded, except for the

8     corrections or changes in form or substance, if any,

9     noted in the attached Errata Sheet.

10

11

12    _____      _____

13    MICHAEL P. ELKIN, CPA, CFF, ABV, CFE              DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20___.

20    My Commission expires: _____

21

22    _____
      Notary Public
23

24

25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Page 324

1                          LAWYER'S NOTES

2      PAGE    LINE

3      _____   _____   _____

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Index: $1,272..30

| | | | | |
|---|---|---|---|---|
| **Exhibits** | **$900** 300:9 | **110,000** 289:19 | **2** | 284:6,23 |
| | **$94,728** 257:13 | **11:21** 309:18 | | **2014** 279:6 |
| **Elkin 16** 220:12 286:13, 15 | **$950** 269:15 | **11:21?a.m** 309:20 | **2** 221:3 264:21 265:8 | **2015** 301:7,11, 14 |
| **Elkin 17** 220:14 307:9, 20,24 308:2 | **$96,437** 308:17 | **11:37** 309:20, 21 | **20** 284:20 287:15 311:8 313:12 | **2016** 276:18,22 300:19 301:2 |
| | **$96,637** 307:19 308:7 | **11:48** 319:21, 25 | **2004** 275:8 | **2018** 292:5 |
| **$** | **0** | **12** 224:22 264:21 283:24 | **2007** 225:19 226:2 259:4,20 283:21,22 284:8,11,18, 20,21 | **20th** 283:22 |
| **$1,272** 282:19 | **000509** 288:20 | **12-page** 265:1 | | **21** 288:6 |
| **$1,500** 300:6 | **01** 258:18 | **12.1** 225:2 | | **22** 284:11,21 |
| **$1,544** 284:9 | **033** 274:21 | **12.3** 226:19,23 227:11 | **2008** 225:24 257:23 258:25 259:19 265:21, 22 271:3,13 272:8 273:22 284:1 | **22nd** 284:8 |
| **$110,000** 287:21 289:8 | **1** | **12.3A** 226:20, 24 | | **24th** 271:3 301:11,17,18 |
| **$110,321** 287:12 | **1** 221:3 225:2 258:19 263:18 273:10 | **125033** 264:11, 12 | | **26** 265:18,22, 25 300:6 |
| **$115** 226:3 | **1.3A** 291:25 | **13** 246:20 | **2009** 257:21 258:12 259:22 263:18 264:7 265:18,22,25 273:10,22 287:2,9,20 288:2,11 289:8 291:16 297:9 | **26th** 224:24 264:7 |
| **$2,000** 243:4, 17 276:13 317:13 | **10** 297:12 298:15 | **1303** 303:23 | | **27** 265:18,21, 22 301:1 |
| | **10/1/2009** 271:12,15 | **1304** 304:19 | | **271745** 274:25 |
| **$232** 305:2,7, 16 | **100** 241:3 | **13th** 267:6 300:4 | **2010** 287:15,20 288:6 | **2751750** 275:24 |
| **$232.14** 304:21 | **1040** 288:1 | **14th** 266:21 | | **277145** 274:11 |
| **$26,167** 282:13 | **10:00** 280:7 | **16** 286:13,15 | **2011** 263:21,25 266:10,15,19, 21 267:6 303:25 304:6,8 306:15 307:1 | **27th** 300:11 |
| **$3,500** 292:3 293:24 294:6, 12 | **10:19?a.m** 280:9 | **17** 307:9,20,24 308:2 | | **29th** 300:10,12 |
| | **10:34** 280:10 | **17.1** 307:13 | | **3** |
| **$375** 300:2 | **10:34?a.m** 280:9 | **17th** 226:3 305:13 | **2012** 270:14 300:4,6 304:1 305:9,13 306:24 | **3** 225:2 |
| **$55** 269:11 | **11** 254:22 255:6,7 | **18** 311:9 | | **3,500** 293:6 |
| **$553,400** 288:18 289:4 | **11** 254:22 255:6,7 256:20,23 297:7 | **19** 280:6 | | **3/20/2009** 259:23 |
| **$72,000** 306:1 | 256:20,23 297:7 | **1st** 226:2 283:21 284:18 | **2013** 282:20 283:2,11 | **30** 223:24 276:18,22 |
| **$850** 269:20, 21,22,25 | | | | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Index: 30-day..all

| | | | | |
|---|---|---|---|---|
| **30-day** 227:1 | 256:14 | | **acquire** 225:23 | 224:12 279:18 317:5,20 |
| **35** 298:7,14 | **60** 288:12 | **A** | **acquired** 222:13 223:23 227:13,15 | **adjustments** 289:11 |
| **365749** 277:24 278:6 | | **a.m.** 221:6 280:7,10 309:20 319:25 | **acting** 276:2 | **advance** 306:10 |
| **367443** 271:20 | **7** | **ability** 236:22 310:4 | **actual** 224:19 229:16,18 231:3 237:14 290:8 306:7 312:22 | **advanced** 235:2,8 |
| **4** | **7** 239:9 256:22 257:3 | **able** 253:5 257:11 259:10 260:5 263:5 267:17 269:14 290:19 292:16 309:8 310:15 | **actually** 222:11 226:20,22 230:2 245:2 252:24 266:18 269:14 273:9, 13 276:3 277:8,12 293:18 310:1 | **advised** 299:4 |
| **4** 239:9 246:19 266:14 | **71** 277:25 278:4,10 | | | **affect** 319:4 |
| **4443** 274:23 | **7th** 292:5 | | | **affected** 241:1 250:19 263:1 314:14 |
| **4684** 288:21 | **8** | **above** 284:12 | | **after** 221:5 255:2 270:7 280:6 313:8 |
| **4868** 287:1 | **8** 254:22,24 255:6,7 256:20 271:21 274:9 | **absolute** 247:8 | **add** 223:24 237:1 | |
| **4K** 278:21 | | **absolutely** 248:11 290:2 292:18 | | **again** 228:1 245:20 256:21 276:2 278:7 |
| **4th** 266:10,19 | **850** 268:7,8 270:7 | **ABV** 221:10 | **added** 253:3 318:10 | **ago** 240:12 |
| **5** | **9** | **accept** 276:25 | **adding** 244:8 | **agree** 223:5 232:6,11 234:14,20,25 235:6 265:7 267:3,7 272:3 302:25 303:3, 19 304:5 305:1,17 |
| **5** 274:8 | | **accepted** 238:24 276:7 | **addition** 243:19 305:2 | |
| **5.1** 299:25 | **9** 221:5 278:20 284:23 | **accident** 298:10 | **additional** 221:21,22 250:10,14,17, 21 251:1 254:18,19 257:6,15 315:5 | |
| **50** 277:18 | **9/30/2016** 276:17 | **according** 271:11 | | **agreement** 264:20 266:9 269:7 |
| **511** 305:8 | **90** 292:22 | **account** 291:8 295:6,7 302:13 | | |
| **525** 289:20,21 | **90,000** 310:11 | **accounted** 243:25 | | **ahead** 248:19 256:6 |
| **53** 297:6,8 | **91** 292:22 | | **addressing** 258:7 | |
| **55-inch** 276:14 277:18 278:20 | **93** 292:17 | **accuracy** 235:20 | **adjust** 243:12 273:20 279:22 317:22 | **all** 223:14 225:20 226:3 229:13 230:19 245:6,13 247:19 251:15 252:3 256:12 261:10,19 |
| **553,000** 289:25 | **94** 292:17,21 | **accurate** 279:7 | | |
| **59** 282:10,11 | **95** 294:22 | **accurately** 316:21 | **adjusted** 224:11 319:6 | |
| **6** | **9:00** 221:6 | | | |
| **6** 250:9 254:14, 15 257:15 | **9th** 282:20 283:10 | **achieved** 291:4 | **adjustment** 221:24 222:16 | |
| **6.1** 254:20,21, 22 255:5,6,12 | | | | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)
Index: allocated..base

| | | | | |
|---|---|---|---|---|
| 262:15 263:15, 24 265:7 269:1 270:15 274:2 278:10 279:20 282:18 284:24 286:11 293:16 296:18 301:21 304:7 305:4 306:18 309:1 311:16 | **alternative** 270:9,10,16 281:14,19 **although** 241:12 243:5 249:23 290:21 316:9 **amendment** 315:6 | **anyone** 296:25 298:4 **anything** 221:21 223:6 247:5,6 272:14 294:14 295:14 310:17 311:5 313:14 315:2, 11 319:1,5,11 | 263:20 287:17 **April** 225:19 226:2 271:3 272:8 273:22 283:21 284:18 287:14,15 300:3,6 **ascertain** 287:19 | **authority** 223:18 **Automatic** 287:1 **available** 247:2 248:13,22 249:2 267:14 279:4 309:1 313:24 |
| **allocated** 303:22 | **amount** 237:21 243:6,10,13 | **apartment** 267:18 | **aside** 243:9 282:8 | **Avery** 291:20, 22 294:18 |
| **allocation** 303:12,17 307:1 | 248:25 249:1 257:13 269:11, 25 282:15 | **apologies** 274:16 | **asserting** 272:22,24 273:1 | **Avery's** 292:4 |
| **allowing** 243:21 | 284:9 288:17, 18 291:3 295:12,14 | **apologize** 239:7 | **assertion** 272:20 273:5 | **aware** 228:6 244:1 257:18 258:3 297:10, 14 |
| **almost** 240:24 286:25 | 303:9 304:10 305:6,25 307:17,19 | **appear** 272:7 301:12 | **assessment** 251:5 | |
| **alone** 289:7 | 308:1 | **appeared** 285:22 | **associated** | **B** |
| **along** 239:25 | **amounts** 236:21,24 | **appears** 258:20 259:3, | 258:1,11 289:2,25 303:8 | **back** 221:4 222:10 227:8 |
| **already** 228:5 303:17 311:6 | 290:14 291:9 305:24 | 24 266:9 267:1,8 271:4 | **association** 251:6 | 230:1 234:12, 13 235:4 237:12 258:6 |
| **also** 229:8,10 237:14 240:17 | **analysis** 222:3 237:9,12 | 272:4 284:14, 25 288:1 308:9 | **assume** 273:11 | 261:8 267:19 270:11 273:8 |
| 243:10 248:25 252:15 260:15 262:23 267:21, 22 268:11 274:2 275:25 276:9 284:7, 20,22 285:25 289:14 294:10, 18 300:9 304:19 305:10 308:22 319:8 | 242:10 250:8 262:16 273:6 297:18 298:21 **and/or** 249:24 **another** 237:20 254:18 267:2 284:7,15,19 294:4 315:1 318:17 | **appliance** 298:16,19 **application** 287:1 300:3 **applications** 287:6 **applied** 247:1 314:4 | **assuming** 228:4 260:5 305:16 **assumption** 272:19 **assumptions** 227:20,24 **attempt** 244:18 273:4 | 274:13 275:8, 12 279:1 280:11 283:14 295:15 301:21 303:9 309:22 315:16 319:16 **backup** 294:3 **badly** 265:9 **ball** 319:17 |
| **alternate** 242:1,6 247:15 252:20,24 253:10 254:17 263:4 | **answers** 232:19 **anybody** 294:21 296:16 310:10 | **appropriate** 253:14 260:9 293:25 **appropriately** 296:4 **approximately** | **attention** 313:24 **August** 283:22 284:8,11,20,21 300:10,11,12 301:1,6,14 | **bank** 237:12 **bankruptcy** 250:21 **base** 259:14 268:21 |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)
Index: based..cases

**based** 230:25
234:8 239:3
248:5 253:10
262:7 271:12,
13 279:8
280:17 315:17,
23

**basing** 280:19

**basis** 236:18
238:13,16
248:15 304:17

**Bates** 258:16
261:2 288:20
289:21

**Beauty** 256:16

**became** 258:3
267:14 279:3
297:14

**become**
257:18 297:10

**becomes**
229:16,21

**before** 222:11
229:15,21
231:10 244:13
246:20 260:18
266:23 268:18
273:18 284:7,
18,20,22
297:14 309:4
317:9 318:2

**beginning**
226:1 254:21,
22 263:18
300:21

**begins** 221:3
225:13 255:3
265:17 292:23

**behind** 293:13

**Beijing** 221:11

**being** 228:12
230:21,22
233:9,11,16,
17,22 240:20
253:5 275:15
277:2,15 278:4
303:25 304:24
305:5,13

**believe** 222:21,
25 224:3 226:7
234:19 240:7
245:8,12 246:6
248:20,24
249:11,21,22
251:9 252:16
254:14 255:13,
21 257:20
259:15 260:22,
25 261:18
263:9,21,23
264:6,11,15,16
270:11,24
271:21 272:19
274:9 276:11
277:3,22,25
278:4,5,10
282:20,25
283:4,17 284:4
285:25 286:20
288:11 290:4
291:23 292:6,
13,17 294:2,
20,23 296:4,13
297:6 298:3,5
299:25 307:19
308:3,6 315:10
316:20 318:5,
21

**believed**
244:25

**bell** 297:1

**bells** 297:25

**belonged**
286:6

**below** 256:15
273:15

**benefit** 290:6,
7,13 291:15
302:23

**best** 224:18
230:8 236:21
247:2 248:13,
22 249:2,13

**better** 265:15
285:23 302:9
318:3

**betterment**
238:23,24
239:3 251:7

**between** 269:2,
18

**beyond** 270:16

**big** 309:10

**bill** 304:20,23

**bills** 270:18
304:15

**bit** 253:16
278:23 290:20
306:13 317:20

**bits** 224:8

**bona** 235:15,
21

**book** 309:10

**borrowed**
306:19

**borrowing**
306:25

**both** 290:12

**bottom** 258:16
261:4 264:18
288:21

**bought** 284:18

**break** 224:8
280:1,2,4

**BREIT** 230:24
231:2 234:6
248:17 280:1
313:6,10
319:16

**brought**
221:20 222:1
247:20 275:15
283:17 284:4
317:17

**bucket** 238:12
253:12 286:8,
10

**buckets** 238:1,
9,19 291:20

**build** 295:8
318:16

**Building**
221:11

**built** 289:18

**business**
262:3,5

**buy** 279:11

**buying** 242:19

_____

**C**

**Cable** 256:18

**calculated**
223:6 243:20
302:11 305:19

**calculating**
303:10

**calculation**
229:9,15,16

230:3,5 251:8
295:11,16,20,
23 296:5,6,10,
11,16 297:3
300:4 302:6
305:3,4,11,20
306:2 317:2
318:5

**calculations**
237:5 244:8
280:24 291:17
295:1,6 303:21
314:14 316:25
318:23

**call** 269:10,12
306:20,24
310:1,4,7
312:5,6,12
318:19

**called** 221:10
227:1 254:18
270:24 274:7,
24

**calling** 251:20

**calls** 311:6,24

**came** 231:10
236:3 317:17

**can't** 311:4
319:10

**card** 278:1

**carrying** 260:6
306:1

**case** 232:2
235:9 241:12
249:15 250:21
253:6 269:20
290:18 306:18

**case-by-case**
304:16

**cases** 237:11

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

244:24 247:18 251:17

**cash** 269:18, 19,24 302:11, 16 305:23 306:7,12 307:5

**cashed** 306:4

**casualties** 288:23

**casualty** 288:14 289:9, 24 290:8

**catastrophic** 230:13

**catch** 223:25 254:23

**categories** 254:16 281:25 318:2

**categorize** 258:1 260:12

**categorizing** 238:3

**category** 257:9 285:24,25 312:10 317:6 318:4

**causal** 295:20

**causation** 236:8,14,18

**cause** 231:11 253:7 281:5,9 293:23 314:23

**caused** 232:2 234:4,17,23 240:16,17 251:1 280:19 295:12

**causes** 242:1, 6,10,13 281:6

**cease** 270:8,9

**certain** 234:9 237:17 241:11 248:25 249:1 258:13 273:12 283:9 290:15 305:24 314:2,4

**certainly** 226:5 231:19

**cetera** 239:12

**CFE** 221:10

**CFF** 221:10

**change** 222:25 223:1 285:14, 17 297:18 317:1 318:4

**changed** 226:7 228:7 316:23, 24 319:5

**changes** 221:22 316:20

**changing** 227:5

**characterizatio n** 295:25

**characterizing** 290:11

**charge** 270:22 302:19 303:5, 14 304:6,19

**charged** 303:25

**charges** 302:7, 13 303:7 304:12

**check** 239:11

**300**:6,9 301:1 303:20

**cherry** 275:19

**chests** 275:20

**Chinese** 228:5, 9 230:21 251:2 258:3,11 272:21 289:2 290:1,7 297:11,15 318:8

**circumstances** 249:17 262:7 287:17 311:3 317:24 319:10

**claim** 252:22, 25 260:15,20 262:24 263:16 276:9

**claimant** 233:10,16,22 244:24 246:25 250:22 252:6 290:6 296:8 298:22 299:13, 19 301:20,21 302:5

**claimants** 223:7 235:2,8 236:3 238:23 240:7,21 241:14,20 242:11 244:4, 17 245:7 246:4 247:18 249:4, 20,25 250:18 280:16 281:4, 10,15 295:4 296:15 297:22 302:12 303:4 311:8 313:13 314:5

**Claimants'** 231:17 232:10 233:5 234:3, 17,22

**claimed** 225:21 233:10,16,22 240:21 279:14 281:9

**claiming** 222:14 270:8, 10 272:16 273:15 274:4 275:4 284:2,24 289:24

**claims** 225:4 234:3,17,22 235:2,8,16 236:11,16,21 313:23

**classification** 223:2

**clean** 232:16 281:2 296:3

**clear** 225:6 230:8 231:14 294:2 299:6 302:9 304:21

**client** 310:24

**clip** 254:8

**close** 230:23 233:11,17 285:10 305:15 309:15

**closer** 267:15

**closing** 295:13 303:6 304:1 317:18

**clothes** 293:18

**Club** 263:11,14 264:3 267:8

**coincidence** 305:15

**collateral** 318:18

**Colonial** 263:9, 11,12,14 264:3 267:8 270:5

**column** 225:16 226:10,11 227:1,11 294:9

**combine** 237:1

**Comcast** 256:17

**come** 247:22 261:18 289:12 298:4 307:5

**comes** 230:1 272:12 289:4

**comfortable** 223:11

**coming** 268:4 294:3 318:6

**commence** 257:23 266:17, 20 267:5

**commenced** 266:23

**commonly** 247:1

**communicate** 310:24

**communicatio n** 312:22,23

**communicatio ns** 309:25

**company** 245:14 270:24 274:7,24

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 155 of 388
Case 1:11-cv-22408-MGC Document 270 Entered on FLSD Docket 08/15/2013 Page 371 of 388

**complete**
249:19 316:2

**complications**
313:18 314:9

**comply** 248:14
313:7

**components**
238:5 253:13

**concluded**
319:24

**concludes**
319:22

**conclusion**
249:8

**condition**
253:19,22

**Condo** 263:9,
12

**condominium**
267:18

**confirm** 286:20

**confirmation**
278:3

**confuse**
294:21

**confused**
293:4

**confusing**
256:24

**connect** 311:3

**connection**
250:20

**consider**
247:24 295:21

**considered**
246:23 247:19,
23 249:6 262:2

291:7 296:22
303:7 304:8

**consistent**
245:6 264:7
279:20 308:20
310:19

**consulting**
248:21 261:6

**context** 265:2

**continue**
259:12 268:14

**continued**
221:12 295:8

**continues**
259:22

**contract** 271:4

**contracts**
237:12 239:11

**conversation**
239:19,21

**copies** 239:11

**copy** 313:1

**core** 312:12,13

**correct** 223:15
224:25 225:9,
11,25 227:14,
19 229:2
230:18 231:18,
19,23,24 232:4
233:2,6,7,13,
14,19,20,25
234:19 236:10,
14,19 237:8,13
238:7 239:1,4
242:14 244:15
245:18,23
246:14,15,18
248:11 250:24
251:3 252:14,
16 254:2

257:24 258:12
259:5,10
260:7,14
261:23 262:20
265:23,25
266:1,15,16,23
267:24 269:9
270:19 272:9,
13 273:3,24
274:1 279:19,
23 280:14
281:1,7,11
282:4 283:13
284:16,17
285:12 287:17,
24 288:3,24
291:5 292:18
293:21 294:23
297:13 299:16
300:2,5,8
302:18 305:18
308:23 310:18
311:15

**correctly**
252:13 253:17
254:6 258:24

**corrects**
305:22

**corresponding**
317:24

**cost** 244:19,22,
25 245:3,4
306:1

**costs** 245:16
250:19,22
252:5 253:8
260:6

**counsel** 235:3,
9 236:4
241:14,17,21
252:23 286:14
299:2,4,9,14
310:13,14,16,

21 312:8
315:8,20

**Country**
263:11,14

**county** 305:9
306:20,21,25

**couple** 273:18
318:2

**course** 313:5

**court** 221:7
224:6 229:25
230:2 237:6

**court's** 223:17,
18

**covered**
246:22 250:12

**CPA** 221:10
248:14 249:12

**credibility**
294:5

**credit** 243:20
278:1

**curb** 247:21
248:7,9

**currently**
224:15,16

**cursor** 261:7

**curved** 278:20,
25 279:3

**cut** 308:17
314:25

**D**

**damage** 222:2,
14 225:4,14
227:12 228:1
230:20 234:3,

22 238:5
239:14 240:3,
17 242:1,23,24
243:10 251:22
253:14 255:3
271:6,8 272:12
273:15 276:14,
23 281:20
283:15 291:5
294:16 297:11
298:15,18
300:4 307:12
317:9

**damaged**
223:24 225:22
227:16,18
228:12,25
229:5,6,7,11
230:22 231:10,
22 233:10,17,
23 240:21,22
244:4,15,17
245:15 246:1
247:20 272:17,
18,23,25 273:1
275:4 277:1,6
278:15

**damages**
232:2 234:17
246:24 250:11,
15,17,18
251:1,4,8
254:11,13,16,
18,19 257:6,15
272:1 281:9
283:8 286:5,7
297:23

**data** 236:1,2,4
237:10 240:16

**database**
271:5 272:11

**databases**
236:25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

**date** 222:8,12, 15 223:23 225:16 226:4, 10 227:2,5,12 228:1,8 229:7 231:8 237:1 245:4,13,14 258:2 270:16 271:1,10 272:8 273:10,11,18 276:16,17 279:1 283:23 284:10 287:14 297:5 303:6 305:10,12 316:3,8 317:9

**dated** 266:14, 18 288:4

**dates** 222:11 224:4 226:8 229:14 271:17 273:7 283:20

**day** 221:3 229:12

**days** 223:24 273:18 315:18 319:8,14

**days'** 266:22

**dealing** 253:10 312:2

**dealt** 296:4

**Deborah** 298:6

**December** 292:5

**decide** 313:10

**decided** 268:16

**decision** 313:7 318:14,15

**declines** 280:17

**deducted** 291:12 303:9 304:24 305:25

**deductible** 262:3,5,10,12

**deduction** 288:15,18 290:8,19 291:15

**Deeg's** 298:9

**Deeg/hooker** 245:12

**deemed** 223:24 245:15 253:6,14

**defective** 228:13,20 229:1,6 230:9 231:17,23 232:3,9 233:4, 11,18,24 234:4,18,23 242:12 251:1 257:19 258:4 280:22 281:5 314:22

**Defendants** 221:11

**definitely** 240:11

**delivered** 275:6,9,25

**depend** 303:11

**depending** 287:16

**depends** 249:14 318:24

**depo** 298:9

**deposit** 273:14 300:3 301:13, 19,22

**deposition** 221:3 239:21 258:19 286:13 292:4,15,18 294:11 297:7 298:5 299:7 319:22,24

**depositions** 236:2 298:24 312:14

**described** 237:23 247:6

**description** 247:9

**Design** 307:15, 18 308:1 311:18

**Designs** 308:16

**destroys** 230:10

**detail** 225:4

**details** 299:17 319:7

**determination** 224:3 228:18, 23 229:4 231:15 232:8 233:9 261:24 271:24 279:13

**determinations** 234:9

**determine** 223:18 231:14 237:13 242:10 244:3,14 260:6

262:22 289:19 290:5,20

**determined** 227:15,17 259:9

**difference** 256:25

**differences** 223:25 262:11 314:13 317:25

**different** 255:23 256:1, 22 285:3 286:8,10 300:25 306:3,6 308:9 313:14 314:4,8 315:2 318:4

**differential** 269:2

**differently** 235:24 252:4 267:12 311:5 318:11

**direct** 221:14 224:14 250:9 258:14 264:19 282:18 291:20 292:20 296:18 299:23 302:10 303:22 307:9

**directly** 232:3 258:11 296:12 311:4,9

**disclaimer** 299:18

**disconnect** 255:16

**discuss** 299:1

**discussed**

310:13

**discussing** 221:19

**discussion** 268:22,23 274:15,22 315:19

**discussions** 252:23 259:16 315:24

**dishes** 293:17, 19

**doc** 271:20 277:24

**document** 224:23 227:13 247:10 261:2,3 264:11,22 265:1 266:25 268:17,19 271:20,22,23 274:16,20 278:5,11 286:12 288:1 294:9 300:13

**documentation** 239:25 240:4,8 249:16 250:15 278:18 312:8

**documented** 316:11

**documents** 237:15 239:5 251:14 272:15 274:2,19 289:7 308:19 312:13 313:19 316:16

**dollar** 282:11, 15

**dollars** 310:12 318:10

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

| | | | | |
|---|---|---|---|---|
| **done** 227:18 230:5 244:8 279:24 295:23 306:17 308:18 | **during** 257:12 261:11 303:15 319:8 | **eliminated** 251:8,12,13,20 | **entries** 283:16, 19 | 228:5 230:22 240:1 241:11 278:25 285:10 290:16,18 302:20 303:25 312:14 317:14 318:22 |
| **double** 232:21 | **dwelling** 264:21 265:8 269:7 | **eliminating** 251:15 | **entry** 258:24 282:6,18,20 284:7 | |
| **double-paid** 301:15,18 | | **elkin** 221:4,10, 16 255:13,19 260:19 264:19 | **equal** 305:5 | **event** 230:13 259:8 295:20 |
| **down** 224:8 259:11 | **E** | 271:24 274:17 276:25 280:13 | **equity** 238:5 242:6 280:17, 20,23 281:5 | **events** 240:22 269:18 |
| **drywall** 228:5, 9,13,20 229:1, 6 230:9,22 231:17,23 232:3,9 233:4, 12,18,24 234:5,18,23 242:12 251:2 257:19 258:3, 4,11 272:21,23 273:2 280:23 281:5 289:2 290:1,7 297:11,15 314:22 318:8 | **e-mail** 311:21 | 286:15 297:20 298:8 301:4 307:20 309:24 313:12 319:12, 23 | 295:1,6,8,19 296:5,6,10,15 297:2 302:2,6 303:10,21 304:8,9 305:2, 4,11,20 306:2, 14 314:14 | **every** 244:9 316:9 |
| | **e.g.** 239:14 | | | **everybody** 296:13 |
| | **each** 241:20 246:25 303:20 | **employer** 260:24 | **establish** 223:15 231:7 | **everything** 248:4 265:2 293:15,16 |
| | **earlier** 230:25 287:19 | **end** 229:25 286:25 301:14 303:15 308:8 | **estate** 251:7 280:18 302:7 303:4,5,25 304:6 317:18 | **evidence** 225:8 244:23 247:2 248:13,22 249:2,5,9,13, 22 250:2,3 264:2 266:2,5, 6 275:14 309:14 |
| | **earliest** 229:7, 8 231:8 | **ended** 264:6 265:24 | **estimate** 245:15,17 271:4,13 287:7,9 | |
| **due** 230:1 239:13,18 240:8 287:13 306:22,23,24 313:5 | **early** 312:11 | **ending** 226:2 263:19 | | |
| | **easiest** 274:8 | **ends** 265:18 | **estimated** 243:17 287:20 | **evidenced** 245:4 |
| | **easy** 282:17 | **engage** 242:9 | **estimates** 244:24 245:21 246:1,5 | **exact** 253:2 |
| **duly** 221:12 | **effect** 241:19 | **engagement** 232:7 233:8 234:2,15 236:15 244:2 246:10 | | **exactly** 236:9 238:13 249:3 289:18 290:11 312:10 317:14 318:12,17 |
| **duplicates** 237:17 | **effectively** 306:19 | | **Etter** 222:21, 22,25 285:13, 20 315:13 | |
| **duplication** 285:2 | **effort** 273:4,20 | **enough** 233:11,17 285:6 286:11 299:22 300:25 | | |
| **duplications** 285:5 | **efforts** 259:12 | | **evaluated** 250:15 | **EXAMINATION** 221:14 |
| | **either** 227:13 238:14 239:13 244:22 247:8 296:14,16 313:17 | **entered** 228:13 | | |
| **Duraclean** 245:24 | | **entire** 243:13 257:9 | **evaluating** 252:22 | **example** 241:7 247:12,13 271:17 290:9 311:1 314:17, 19 |
| **Duraclean's** 245:17,22 | **electric** 270:18 | **entirely** 310:16 | **even** 222:11 223:19 224:5 | |
| | **electronic** 312:24 | **entitled** 263:16 | | |
| | **element** 291:7 | | | |
| | **eliminate** 251:5 | | | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Index: examples..follow

| | | | | |
|---|---|---|---|---|
| **examples** 237:5 252:5 | 238:19 | 250:3,25 253:24 | **fair** 241:12,24 242:4,9 244:7 280:21 285:6 286:11 287:18 289:6,10 296:7,20 299:22 300:25 316:1 | 253:19,21 254:4 |
| **Excel** 224:20 236:25 255:22 257:1 | **expenditures** 309:4 | **extension** 287:1,11,22 289:13 | | **find** 221:23 239:17 249:2 264:2,13 271:14 274:9, 10 277:14 |
| **except** 295:11 | **expense** 225:14 237:14 247:14,15 261:25 262:2, | **extensive** 307:13 | | 278:2 282:21 |
| **exception** 245:24 | 3,5,6,10 263:4 271:6,8 | **extent** 238:3, 18 244:11 | **fall** 285:23 | 285:9 300:13 310:11,21 |
| **exclude** 261:14 308:10 | 276:14,23 281:20 293:24 | 245:8 246:6 295:11,24 | **falls** 312:10 | **finding** 248:13 |
| **excluding** 238:12,13 | 299:20 307:13 | 303:3 305:21 316:11 | **familiar** 287:4 | **fine** 232:24 256:2,11 275:2 |
| **exclusion** 281:6 299:9 | **expenses** 238:4 250:22 251:5,11 | **exterior** 272:4, 22 | **February** 257:21,23 304:1 305:13 | 292:24 313:9 |
| **excuse** 225:10 267:18,21 281:13,21 | 252:17,19,20, 25 253:3,11, 12,13 254:17 257:10,12,22 | **F** | **federal** 290:6 | **firm** 291:1 |
| **exercise** 237:16 290:22 | 258:1 259:7 261:10,14,16 | **F000783** 258:18 | **fee** 300:3 | **first** 221:20 222:18 224:21 225:17,18 227:11 241:16, 21 257:5,18 |
| **exhibit** 225:2 226:18 254:14, | 262:17 270:9, 10,16 272:12 | **F000785** 261:4 | **feel** 238:18 318:13 319:17 | 258:24 262:22 264:20 287:25 |
| 15,20,21 255:6,12,18 256:14 257:15 258:18,19 | 281:14 283:15 284:9 286:1 291:22,23 292:8 293:1,7 303:7 | **face** 276:25 **fact** 226:23 228:19,25 229:5 230:10 | **fees** 250:19 251:6 **Feldkamps** 299:23 301:7 | 297:10 300:7 301:13 305:8 **fit** 238:19 253:11 |
| 274:8 283:24 286:13,15 289:20 307:9, | **explained** 299:8 | 231:22 232:5 233:10,16,23 234:4,17,22 | **few** 221:23 249:23 261:3 275:1 280:13 316:22 | **fits** 296:19 **five** 309:16 |
| 20,24 308:2 | **explanation** 247:14 | 246:13 247:14 249:7 251:1 | **fide** 235:21 | **flexibility** 287:16 |
| **exhibits** 256:5 | **explanations** | 254:1 268:24 269:6 294:24 | **fides** 235:15 | **Florida** 252:12 |
| **exist** 224:16 | 247:18 | 296:1,22 309:13 | **fifth** 284:13 | 260:16 261:9 |
| **existed** 310:22 | **express** 253:19 | **factor** 297:17 | **figure** 304:9 | 275:15 276:4 |
| **exists** 224:15 | **expressed** | 298:21 | **File** 287:2 | **flow** 269:18,19, 24 305:23,24 |
| **expect** 318:18 | 242:7 316:3 | **factored** | **filed** 287:13 | 306:8 |
| **expected** 249:16 318:25 | **expressing** 235:14 240:19 | 294:25 318:11, 22 | **filled** 289:12 **filtering** 237:16 | **focus** 256:14 313:21 |
| 319:2 | 241:24 242:4 | **factors** 314:22 | **financial** | **follow** 227:10 |
| **expenditure** | 245:20 246:12 | | 237:9,11 | 228:10 257:3 |

Case 2:09-md-02047-EEF-MBN Document 22263-55 Filed 11/19/19 Page 159 of 556
Case 2:12-cv-22408-MCE Document 29 Entered on FLSD Docket 08/15/2013 Page 375 of 388

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

309:24

**follow-on**
270:17

**followed**
285:15 309:11

**following**
246:25 287:15

**follows** 221:13
266:8

**food** 261:10

**Footnote** 239:9

**Ford** 261:11

**foreclosure**
295:13 296:14,
17

**foreclosures**
250:20 314:23

**foregoing**
264:4

**foregone**
263:4,16 264:1

**forensic**
237:16 242:10

**form** 230:24
232:18 234:6
248:17 286:25
287:23 288:1,
15,21 289:24

**format** 223:16

**formatted**
256:22

**formula** 222:10
227:1,8

**formulas** 222:7

**formulating**
246:22

**Fort** 261:9

**Foster** 252:10,
11,18 253:16
254:6,8,13,14
257:6,17,18
258:3,25
260:15,20
265:9 268:22
274:3,8 279:25

**Foster's**
257:10 258:18

**Fosters** 239:22
241:10 258:21
262:23 266:10
267:2 270:8,21
271:25 275:4
276:9

**Fosters'**
253:18,21
276:4

**found** 221:22
224:9 254:13
264:8 310:17
315:5

**four** 255:4
284:24

**frame** 302:4

**fresher** 240:13

**fridge** 283:15

**frig** 225:17,18
226:2

**front** 290:23
308:2

**full** 273:25
316:2 317:2

**furniture** 274:4
293:16

**further** 260:13
309:6 315:6,

11,16,23

---

**G**

---

**G-E-R-V-I-S**
308:8

**gatekeeper**
234:2,16
236:12 276:3

**gave** 224:23
247:8,9

**general** 223:22
230:12 253:19,
21 280:14
302:2

**Gervis** 307:15,
18 308:1,8,16
310:8 311:18

**get all** 312:15

**getting** 232:5
269:21 309:15
314:3

**give** 241:7
247:12 254:23
260:18 297:20
301:4 307:8
309:8 310:24

**given** 249:16

**giving** 246:1

**goal** 223:15

**goes** 255:4
303:12

**gone** 295:16

**good** 221:2,16,
17 280:5 298:7
317:17

**gotten** 290:13
306:12

**grab** 255:18

**greater** 313:14
314:2

**guess** 247:22,
23 294:11

**guessing**
255:25 256:9

**guidelines**
223:20 248:14

---

**H**

---

**hand** 229:22,
23 300:14

**handy** 271:1

**happen** 224:1
243:9

**happened**
227:9 256:9
295:9 312:19

**happening**
298:25

**hard-coded**
222:9

**Haverty's**
274:7,24

**having** 221:12
239:7 248:15
252:22 253:1
258:10 269:24
289:6 295:22
302:21 307:5
313:17

**help** 235:12
271:1 276:19,
21

**helps** 271:7
276:12 282:20
284:9

**here** 221:2
226:13 242:17
255:17,18
257:3 260:9
271:11 278:24
285:17 290:8
298:14 299:6
301:5,17
315:10,15
316:2,19
319:11

**here's** 312:17

**higher** 255:12
274:12

**highlighted**
284:12

**hold** 222:17
248:12 256:19

**home** 253:5
258:5 263:6,8
267:14 270:12
275:8,11
283:18 284:5
293:14 302:12
317:9

**homeowners**
251:6

**homes** 314:14,
20

**Hooker** 298:6

**hope** 232:22
233:1

**house** 228:4
245:14 258:9,
25 259:3,7,23,
25 260:6,16
272:23 276:4
293:16 302:22
303:16,19

**HUD** 302:13
303:5

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

| | | | | |
|---|---|---|---|---|
| **HUDS** 302:3 | **improvement** 279:14 | **increased** 269:11 | **inquire** 310:1 | 312:13 |
| **hurricane** 239:14 240:8, 16,25 | **include** 238:16 242:22 249:6 250:18 251:19 | **increasing** 270:6 | **inquiries** 241:18 253:18, 21 313:14 | **interrogatory** 251:18 |
| **hurricanes** 239:18 240:23 | 252:17 254:11 260:9,11 | **incur** 262:7 | 314:20 | **into** 222:12 223:7 224:8 |
| | 261:14 262:25 | **incurred** 250:17,22 | **inquiry** 240:15 | 225:16 228:4 231:10 232:6 |
| **I** | 263:2 269:1 283:8 291:21, | 252:6 262:13 | **inspect** 276:5 | 236:24 238:6, 19 239:2 249:7 |
| **ID** 264:11 271:20 277:24 | 22 301:6 302:3,7 315:23 | **incurring** 259:6 269:12 | **installed** 273:13,21 | 253:5,11,12, 18,21 263:6 |
| 278:5 | 317:6 | **independently** 246:8 | **instance** 245:25 304:18 | 267:14 270:11 272:12 276:4 |
| **idea** 308:13 | **included** 224:5 236:17 251:16 | **indicate** 248:7, 8 | 311:5 | 283:18,23,25 284:5,19,21,22 |
| **ideal** 309:7 | 252:19 261:17 262:19,23 | **indicated** | **instances** 239:13,17 246:3,7 251:22 | 285:16,23 291:7 294:25 |
| **ideas** 310:25 | 263:3,25 271:12 272:10 | 240:7 257:20 292:25 | 285:10 310:7, 19 | 295:5,7,16 297:17 298:16 |
| **identifiable** 238:2 | 279:17 281:17 291:10,11 | **indicates** 227:13 | **instantaneousl y** 230:10 | 302:13 307:5 313:20 316:14, 16 317:9 |
| **identification** 286:16 307:21 | 299:24 300:2, 10,22,23 | **indicating** 239:24 | **insurance** 303:6 318:9 | 318:16,22 |
| 309:6 | 307:25 | **indication** | **intend** 315:8 | **invalidate** 273:5 |
| **identify** 250:16 275:22 285:4 | **includes** 257:11 | 277:14 | **intended** 241:5 | **inventory** |
| **immediately** 266:8 | **including** 249:3 270:15 | **individual** 250:4 287:2 | 243:3,12 317:2 | 245:12 |
| **impact** 280:23 295:10,22 | 271:25 285:8 312:24 | **information** 229:15 237:22 | **intending** 248:16 | **invoice** 272:25 274:6,11,24,25 275:24 277:19, |
| 296:9 306:7 307:1 318:15 | **inclusion** 299:9 | 239:10,17 240:2 246:4,24 | **intention** 224:1 243:5 296:6 | 20 278:1 |
| 319:9 | **income** 250:18 | 247:3 249:14, 19 250:16 | **interest** 222:8 | **invoices** 236:1 239:11 |
| **impacted** 295:19 | 260:16 263:7, 17 290:7 | 253:8 294:1 310:15 311:17 | 223:5,13,20,21 224:10 226:5, | **issue** 229:19 232:2,6 242:2 |
| **impacts** 228:2 | **incorporated** | 313:18,23 315:5 | 17 228:3 229:25 230:3 | **issues** 253:4 |
| **implications** 241:6 | 316:14,16 | **initial** 257:14 | 237:4 243:11, 14,20 316:25 | 258:10 |
| **important** | **incorrect** 246:14 261:17 | 312:12 | 318:22 319:4 | **item** 224:2 225:17,18 |
| 229:11 | 305:20 | **initially** 252:19 | **Internet** 279:5 | 227:13,14,15 228:11 229:5 |
| **imposition** 248:14 | **increase** 270:7 | | **interrogatories** 236:2 249:25 | 238:15 244:15, |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Index: items..looking

16 257:5 260:9
272:1 276:13
277:1,2,3,6,9
285:5,8

**items** 227:25
228:3,8,24
230:10 231:21
239:2,15
243:23,24
244:3,10
245:2,14 246:5
249:22,23
250:5 272:11,
24 273:15
275:3,6,15
276:3 279:21
281:17 285:10
289:14 307:13
308:3

**J**

**Janet** 291:20,
22

**January** 297:9,
12

**job** 261:6

**judgment**
248:25

**judgments**
260:8

**July** 226:3
263:21 266:21
267:6

**June** 263:25
266:10,14,19
282:20 283:10
284:23

**jurisdiction**
223:18

**K**

**KALIL** 221:15
231:1,4 254:8,
9 279:24
280:4,12
286:14,17
307:8,22
309:15,23
313:4,9,11
319:12

**keep** 264:17

**Kentucky**
252:12 261:10
275:9,25

**Kevin** 286:12

**kind** 279:22

**knowing**
289:18

**Koch** 266:11

**Kochs** 269:3

**KROSEN**
288:20

**L**

**labeled** 227:12
281:18 284:12

**larger** 290:16

**largest** 282:16,
17

**last** 230:7
243:14 263:25
300:7 301:13,
15 315:18
319:14

**late** 259:20
306:21

**later** 237:19
243:4 263:20,
22 288:8
313:10

**lay** 223:22
230:4 295:15

**learned** 248:2

**lease** 264:6,9,
17,20,21
265:8,17,19,24
266:3,8,9,10,
14,17,20,23,25
267:1,19 268:9
269:2,3,7,8,13

**leased** 264:3
267:2

**leases** 268:2
269:18

**leasing** 266:10,
11 267:22
268:14

**least** 240:6
245:11 248:8
287:19 290:20
294:16 305:20

**leave** 301:3

**leaving** 279:1
282:8 306:8

**left** 290:4
293:13 309:17

**legal** 250:19
299:5,10

**less** 267:22
269:25

**let** 221:7,20
222:17 224:7
227:10 234:10
239:7 242:16
250:9 252:3,4
255:17 256:19

258:14 260:11,
17,18 262:21
265:3 269:6
271:11 274:5,7
281:2,12
283:18 285:2
286:11 296:3
301:4 302:3,9,
10 303:2
315:21

**level** 237:25
249:5

**liability** 236:7,
13,18 287:21
288:10

**like** 232:13
241:2 244:13
256:3 263:25
265:1 271:3
274:11 279:22
286:2 293:3
303:24 304:14
306:21 308:10
309:7 319:17

**likely** 305:24

**limit** 308:15

**limitations**
239:14

**limited** 249:24
253:13

**line** 239:25
249:22,23
257:5 288:11
297:7 298:15
303:23 304:19
305:8 308:5

**lines** 284:12
303:23

**linking** 237:14

**list** 307:13

**listed** 228:24
236:21 251:19
263:12 276:13,
22 294:12

**listing** 272:1
309:5

**litigation**
248:21

**little** 240:12
260:19 274:12
278:23 290:20
291:19 293:3
302:9 306:13
317:20

**live** 259:13
268:15 303:18

**lived** 303:16
304:7

**living** 247:15
250:21 252:12,
20,24 253:11
254:17 257:7,
10 263:4
267:16 270:9,
10,16 281:14,
19 303:8

**located** 233:23

**location**
275:21

**logical** 231:12

**logically**
228:11 230:20
231:9

**looked** 222:2
231:14 283:12
302:16 319:9

**looking** 235:25
237:16 239:11
243:8 250:5,14
254:10 255:20,

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Index: looks..minimum

21 264:22
274:10 285:9
291:18 310:25

looks 256:3
263:25 271:3
274:11 293:3
303:24

loss 240:16
242:6 244:10
260:16 288:14
289:9,24

losses 242:11
289:1,25

lost 238:5
240:8 250:18
262:23,25
263:2 279:15
280:16,20,23
281:5 295:1,6,
19 296:10
297:2 302:2,6
303:10,20
304:8,9 305:4,
11,19

lot 249:14
251:13 274:19
313:18,24
319:7

Louisville
256:17 259:1
261:7,9,22

Lowe's 226:3
282:18

lower 274:12

lowered
267:21

**M**

Maciejewski
266:12

made 221:21
222:1 224:12
227:20 228:18,
22 234:9
243:21 273:14
276:4 285:14
291:16 294:11
295:10 300:3,9
312:16 316:10,
20

magnitude
306:5

maintaining
259:7

make 224:3,17
229:4 230:3
231:14,15
232:8,20 233:8
240:15 241:18
246:21 250:12
253:18,20
258:6 260:15,
19,20 261:24
262:16 268:23
271:24 273:4,
20 278:25
279:13 285:7
296:3 311:23
313:7 314:20
317:4,7

makes 254:19
318:14

making 260:8
267:24 269:8
272:20 294:13
296:13,21,22,
25 297:4 302:8

manually
226:8

many 281:17
282:5,8 283:7
288:19 316:10

Marin 302:10

Marins 302:11
303:24 304:6,
18,24

Marins' 305:19

mark 258:15
286:12

marked 225:10
256:5 286:15
294:2,7
307:20,23
317:8

market 267:19
280:17

marketing
259:24

Martin 222:18
281:12

Martinez
222:5,20,21
223:4 224:10,
22 242:15,18,
19,21 247:13
281:13,14
285:16 315:5,7

Martinez's
225:21 317:11

Martinezes
282:3

master 273:8

Materials
221:11

matrix 312:16

matter 230:12
299:10

may 229:24
239:15 240:7
241:25 242:5
246:6,20

247:16,17
255:5,21
268:11 270:21
274:3 275:18
280:14 289:11,
13 290:13,14
294:20 295:25
302:10,20
312:18 316:13

maybe 241:1
253:2 255:8,23
263:14 264:16
265:10 270:17
275:1 278:1
285:16 298:13
312:4,14
314:17

mean 235:11,
19 238:8 263:1
278:16 286:2
306:9 310:23
313:16 314:13,
25

means 294:10

meant 268:7
281:20 293:4,5

meantime
260:4

measure
226:11

Measurement
227:2

measures
248:5

Media 221:3

memory 298:8

mention 248:3

mentioned
285:13

meritorious
235:3,10,12
238:16

methodology
223:16 247:1

Michael 221:4,
10 307:9
319:22

Michelle
266:11

Michigan
252:15

middle 255:9
256:6

might 221:23
223:21,25
228:13 230:4
235:20 237:6,
18,19 238:22
240:3,22
245:10 248:3
258:17 259:16
273:22 274:8,
12 289:14
290:4,19 291:3
292:15 295:11
296:18 316:12
317:23 318:16
319:9,10

mileage
260:20,23
261:8

million-plus
318:9

mind 240:13
264:23 280:3
298:4 308:12
314:18 318:6

minimum
243:16 248:1

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

**Minor** 299:22

**minute** 260:17

**minutes** 221:5
309:16

**Miranda** 297:1,
2

**miscellaneous**
226:3 281:18,
24 282:1,5,9
284:13

**miscoded**
300:16

**missed** 232:21

**missing**
239:18 243:2
255:5

**mistaken**
242:19

**mitigation**
296:17

**moment**
250:10

**money** 267:24
295:15,16
302:8

**month** 266:22
269:11,15
301:15

**month's** 300:7
301:13

**months**
263:20,22,23
288:8

**more** 263:23
268:7 269:15
272:14 275:1
280:13 285:7
289:7 294:1
296:4 306:1,13

313:18,24
314:2,9 316:21
317:20

**morning** 221:2,
16,17 285:15
315:4

**mortgage**
294:19,25
295:5,22 296:9
297:4 306:4

**move** 267:14
269:16 283:23
291:19 301:16

**move-in** 277:5

**move-out**
273:11,19

**moved** 222:11,
15 223:7 226:4
228:4,8 229:12
247:17 263:6
267:10 269:14
270:11 273:17
283:25 284:19,
20,22 317:9

**moving** 291:23
292:8 293:1,7,
24

**much** 251:15
253:8 292:2,
11,12 319:13

**multiple** 285:9

**Myers** 261:9

---

**N**

**name** 293:17

**names** 222:18

**Natalie** 312:19

**naturally**
222:14

**nature** 247:6
249:15 280:14
313:15,22

**necessarily**
247:7 249:12
285:5 312:3

**need** 235:4
261:18 314:10
316:20 317:23
318:21

**needed** 250:23
252:6 253:25
270:18

**needing**
268:15

**needs** 224:11
316:24 318:11
319:5

**negative**
232:21 269:19,
22,23

**neglected**
243:15

**neighborhood**
267:15

**net** 243:3,16
254:4 269:17

**never** 231:14,
15,20 317:2

**new** 221:11
267:9

**next** 226:15
255:4 266:25
293:12

**night** 243:15

**nine** 263:20,22,
23

**nobody** 311:13

**none** 309:9

**nonetheless**
307:2

**normally**
261:25 262:1

**note** 284:14,16

**noted** 222:7
239:5,6 243:4,
14,24 251:17
270:20 299:17
317:3

**notes** 222:1
268:23 311:23
312:3,6

**nothing** 316:5

**notice** 227:8
266:23

**November**
270:14

**nowhere** 250:1

**number** 221:3
222:8 230:5
238:15 247:8
258:16,19
261:2,4 264:18
273:14 274:25
278:7,8,10
283:6,7 285:22
288:20 289:21
307:25 310:5,6
317:16

**numbers**
237:13 238:4
244:9 247:11
305:14

---

**O**

**O'DONOHUE**

319:18

**oath** 221:8

**object** 230:24
234:6 248:17

**objection**
232:16

**obligation**
307:3

**obviously**
317:3

**occasions**
283:6,7

**occupied**
302:21 304:14

**occur** 230:21

**October**
263:18 273:10

**off** 261:18
265:4 274:15,
22 280:7
308:17 314:25
319:23

**offering** 233:2,
14,20 234:21
235:1,7
280:15,22
281:3

**office** 227:18,
21 258:17
311:9,14

**often** 230:2

**once** 314:8

**one** 222:17,19,
20 224:14
226:7,17 227:5
232:19 235:4
236:23 237:3,
14,18 238:23
240:6 242:17

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

Index: one-year..place

| | | | | |
|---|---|---|---|---|
| 244:9,17 | 280:15,19,22 | outside 233:23 | 243:7 246:10 | perfect 249:19 |
| 245:11 246:7 | 281:3 316:7,9, | over 222:10 | 259:16 263:3 | perhaps |
| 250:21 252:4, | 21 | 227:8 241:8 | 286:18 306:10 | 235:12 240:24 |
| 14 254:16,17, | opinions | 279:14 | particular | 258:15 263:11 |
| 23 255:17 | 223:9,12 | overall 280:18 | 227:25 229:5 | 300:15 316:10 |
| 256:19,21 | 241:25 242:5 | own 249:8 | 245:13 247:25 | period 257:12 |
| 258:12 260:18 | 246:23 248:16 | 265:24 279:8 | 248:4 275:19 | 263:15,19 |
| 264:20 266:9 | 250:4 316:3,10 | owns 258:25 | 290:5,23 | 303:15,18 |
| 267:23 268:4 | opportunity | | 313:21 | 304:21 |
| 269:20 270:20 | 267:13,17 | | parties 246:4,9 | person 248:8 |
| 271:17 272:11 | 268:12 | **P** | 311:3 | personal |
| 279:11 282:6,7 | opposed | | party 245:25 | 225:14 228:24 |
| 283:10,12,17, | 247:10 255:22 | package | pass 319:15,16 | 231:22 233:9, |
| 21 284:6,19, | 270:6 303:16 | 296:19 | passage | 15,21 238:4 |
| 21,23 285:14 | option 279:3 | pages 237:15 | 239:13 | 242:1 244:3,9 |
| 290:16 294:4 | order 237:22 | 255:4,23 | past 232:16 | 247:20 254:17 |
| 297:20 299:22 | 248:13 250:16 | 256:23 261:3 | patio 286:2 | 255:3 271:5,7 |
| 300:18 301:4, | 257:11 259:12 | 274:3,5 275:1 | pay 251:23 | 272:12 276:13, |
| 22 303:3,23 | 310:14 | 286:24 288:19 | 290:14 291:8 | 22 279:21 |
| 304:18 307:8 | ordered 309:11 | paid 237:19 | 309:13 | 281:19 283:14 |
| 308:8,10 | orders 306:4 | 261:10,11 | paying 269:3, | 284:8 285:20, |
| 312:11 313:21 | organized | 270:18 300:9 | 20 294:19,24 | 24 286:5 |
| 314:13 318:16 | 301:5 | 301:13 302:11, | 295:4,22 296:9 | 297:24 298:16, |
| one-year | orient 305:11 | 16 303:18 | 306:19 | 19,23 307:12 |
| 265:19 | original | 306:10,15,20 | payment | personally |
| ones 314:3,10 | 244:18,22,25 | 309:12 | 296:13 301:6, | 311:11 |
| only 226:25 | 268:14 273:23 | pans 293:17 | 14,17 308:22, | phone 259:17 |
| 269:25 270:4 | 277:9 278:15 | paper 312:1 | 24 309:5,8 | 310:5,6 311:6 |
| 293:18 295:10 | originally | papers 224:16 | 310:2,20,21 | phrased 234:7 |
| 298:25 309:11 | 242:22,24 | 286:19 | 311:17 | pick 221:18 |
| 312:21 314:14 | others 223:3 | Paragraph | payments | 223:23 |
| opining 281:8 | 249:6 311:14 | 246:20 | 237:17 295:9 | picked 237:20 |
| opinion 228:2, | 313:25 314:5 | parameters | 296:21,23 | pictures |
| 11,19,23 | 319:9 | 230:4 | 297:1,4 299:24 | 275:18,20,21 |
| 229:1,10,16, | otherwise | paraphrasing | 318:7 | piece 315:1 |
| 18,24 230:9, | 239:16 263:7 | 253:3 | PDF 255:22 | place 224:17, |
| 15,16 231:2,3, | 290:21 318:9 | part 225:7 | 257:1 | 18 247:9,17 |
| 16,21 232:1 | | 227:21 228:11, | people 261:25 | 253:9 268:15 |
| 233:3,15,21 | | 18,23 229:1 | percent 241:3 | 274:8 309:3 |
| 234:21 235:1, | | 230:17 236:15 | | |
| 7,14,15 236:17 | | | | |
| 240:19 245:21 | | | | |
| 246:12 250:25 | | | | |
| 253:20,25 | | | | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

places 237:18 275:19

plaintiff 258:7 276:20

plaintiffs 239:16

planning 229:18 315:6, 16

plus 238:18 310:12

pocket 307:6

point 224:13 226:7 227:5 228:5 245:16 252:14 270:1, 4,18 293:11 312:11,14 313:7 317:18

portion 289:15

position 254:4

positive 269:17,24

Positively 243:22

possible 227:7 249:23 282:14

possibly 239:21 279:4

potential 270:7 317:20

Pots 293:17

predated 226:4

predating 222:15

prejudgment 222:8 223:5, 13,19,21

224:10 226:5, 17 228:3 229:25 230:3 237:4 243:11, 14,20 316:25 318:22 319:4

preliminary 312:15

premises 236:5,7

prepared 245:13

preponderance 226:23

prescribe 248:22

prescribed 247:1 314:11

presence 230:21 234:4, 18,23

present 253:8

presenting 250:6

pretty 223:10 314:7

previously 221:12 277:6

price 273:21, 23,25

prices 280:18

primary 317:10

print 256:25

printed 257:1

printout 255:22 308:3

prior 223:6

258:2 264:3 268:9 274:16 277:6 283:2

Priority 223:7 231:17 232:10 233:4,10,16,22 234:3,16,22 235:2,8 236:3 240:6,21 241:13 242:11 244:4,17 245:7 246:25 249:20 250:17 280:16 281:4,9,15 290:6 295:4 296:8,15 297:22 298:22 299:13,19 302:5 303:4 311:8 313:12 314:5

private 285:18

probably 229:11 240:13 279:8 282:17 285:23 286:3,6 290:24 298:11 299:21 304:17 312:19 314:9 317:4 318:1

problems 258:9

procedures 314:4,6,7

proceeds 307:2 318:9

process 230:23 285:1,4

produced 309:9

profession 249:12

professional 231:16,21 232:1 233:3, 15,21 234:21 235:1,7,15 236:17 280:15, 22 281:3

profit 269:8,10, 13

proof 308:22, 24 309:5,8

proofs 310:2, 20,21 311:17

proper 225:7 258:7 276:19 299:18

properly 303:21 305:19

properties 222:4 223:8 228:19 231:18 232:10 233:5 250:19

property 222:2,12,13 225:14,23 228:12,14,24 231:9,22 233:9,15,21,23 238:4 240:17, 20 241:1 242:2 244:3,10 246:2 247:20 254:18 255:3 263:1 264:3 267:2,9, 22 271:5,7 272:12 276:14, 23 279:2,21 281:20 283:15, 24,25 284:8, 19,21,22 285:18,20,25 286:5 297:24

298:16,19,24 301:10 302:5, 14,19 303:8 304:7,14 307:12

proposal 308:20 309:25 311:18

proposals 308:3 309:11

propriety 271:25

prorated 303:5

proration 305:9

prorations 302:14,20 303:22 304:13

protocol 309:3

provide 223:20 247:7 254:3 310:15

provided 236:1 246:6 251:14 260:11 286:19 313:4 316:17

proximity 230:23 231:10 233:11,17 285:10

prudent 269:16

pull 258:15 277:23

pulled 309:10

purchase 243:12 273:21, 23

purchased 225:19 272:7

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)
Index: purchases..relied

273:16 275:7
284:20,23

**purchases**
279:9

**purpose** 307:6

**purposes**
229:10,23
244:7 287:21
318:13

**purview** 299:8

**put** 225:7
228:12 232:22
238:6 239:2
241:6 253:12
254:11 258:17
261:20 267:18
269:21 273:7
276:9 286:8,10
299:14 309:4
312:8

**putting** 231:8
236:24 238:1
240:10 260:4

**Q**

**qualitative**
246:23 247:3
248:4

**quality** 249:9
250:2,4 279:22

**quantification**
223:1 228:7

**quantified**
253:15

**quantify**
250:16

**quantitative**
246:24 247:10
248:5

**question**
230:25 232:14
234:7 235:17
244:13 248:18
251:15,25
252:2,23
262:4,5,12,13,
22 281:2 285:3
291:10 293:24
296:3 299:6
301:19 302:2
304:2,4,5
315:1

**questions**
232:17 280:13
315:17 319:18

**queued** 239:8

**quick** 265:5

**R**

**rank** 250:2

**rankings** 250:7

**rather** 285:24

**reach** 237:22
310:10

**reached** 249:8

**read** 234:12,13
235:4 236:16
239:20 247:6
303:24 319:19,
20

**reading** 258:24

**ready** 265:3

**real** 251:6
280:18 302:7,
13,19 303:4,5,
25 304:6
317:18

**really** 241:2
243:13 314:3
315:3 317:2

**reason** 230:20
256:21,23
296:8,18

**reasonable**
248:15

**reasons**
296:20

**recall** 223:3
239:19,24
240:4 241:3,9
242:18 252:13
253:17 254:6
258:8 264:10
267:15 270:23
278:16 279:3
290:17 292:19
293:13 294:19
296:25 297:2
298:25 301:21
311:25 312:19,
21

**recalled** 227:4

**recalling**
258:12

**receipts** 236:2
292:25 294:13,
15

**receive** 263:5

**received** 263:7
290:6 303:9
307:2

**recess** 280:9
309:20

**recognize**
229:11,13
305:24 308:5

**recognized**

258:8

**recognizing**
223:16

**recollection**
240:14

**recopied**
222:10 227:7

**record** 221:5
274:15,22
280:7,11
309:22

**records** 241:2

**recovery**
243:21 290:14
291:9

**reduce** 243:11
317:11

**reduced**
289:14 304:10
305:5 306:12,
14

**reducing**
243:10

**reduction**
305:10 319:3

**refer** 252:9
292:15

**reference**
239:6,12
254:20 294:11,
13 301:24

**referenced**
308:4

**referencing**
240:2

**referring** 247:4

**reflect** 305:22
316:21

**reflected**
257:14 278:18
291:4 316:6

**reflects** 305:23

**refrigerator**
282:25 283:1,
3,6 284:15,18

**refrigerators**
283:8 284:3,4

**regard** 222:5
228:2 236:13,
14 244:25
245:2,9 253:1
304:6 313:12
315:13

**regarding**
309:25

**regardless**
279:17

**regards** 311:17

**reimbursed**
260:23 261:19
262:14,18

**reimbursement**
298:23 299:19

**related** 222:12
242:12,20
252:25 253:4
286:1 296:12
303:18

**relates** 257:9
303:15,17
304:22

**relative** 246:24
253:8

**relevant**
249:14

**relied** 310:16,
23

| | | | | |
|---|---|---|---|---|
| **rely** 310:21 | **replaced** 227:14,15 244:22 245:3, 4,8,10 277:2,4, 15 284:6 | **requesting** 287:21 311:16 | **role** 235:25 | 274:3 285:5,8 289:20 291:14 296:19 300:18 304:12 305:23 307:5 315:14 |
| **remediation** 285:24 | | **requests** 312:7 | **Roreback** 265:11,12 266:2 | |
| **remember** 222:24 239:19, 20 240:10,24 245:11 252:1 274:20 279:11 292:8,11,12 293:11 297:3,5 301:20,22 | **replacement** 244:12,16,19 245:3,16 277:5,17 278:13,18 283:2 297:24 298:19,23 | **require** 221:23 222:16 | **Rosebeck** 265:10,13 | **Samsung** 276:10,14,23 277:18 278:21, 22,24,25 |
| | | **required** 237:11 287:6 313:24 | **Rosen** 286:12 307:10 | **satisfied** 307:3 |
| | | **residual** 243:24 244:5, 14 247:23,25 248:7 317:12 | **Rosens** 287:10 289:1,8 310:1 | **saved** 289:8 |
| **remind** 221:7 312:4,5 | **replacing** 277:9 | | **Rosens'** 291:5 | **savings** 291:3 |
| **removed** 282:2,5 | **report** 221:22 224:4,15,19,21 225:7 230:17 239:6,9 242:2, 7 246:19 250:1,10 254:12 272:11 280:25 294:8 299:15,18 301:25 315:7, 17 316:7,20 318:12,16 | **respect** 280:15 281:4 | **running** 223:14 | **saw** 243:14 284:7 |
| | | **response** 258:7 | **RV** 242:19,23 243:4,16 247:14 317:11 | **say** 223:11 229:9,21 231:8 232:23 233:1 241:6,12,24 242:4,9 244:4, 7 246:22 248:2,6 251:13 252:5 259:21 269:10 271:10 272:18 276:3 277:12 280:21 287:18 289:6, 10,15 290:25 294:7,15,18 295:24 296:7, 20 306:25 307:14 309:4 313:16 316:1 |
| **render** 231:15, 20,25 248:16 | | **responsibility** 304:23 | | |
| **rendering** 223:9,12 229:10,23,25 230:9 248:15 | | **responsible** 302:21 306:8 | **S** | |
| | | **result** 290:7 | **said** 224:10 234:8 239:18 244:17 251:6,9 253:18 254:10 278:17 284:10 285:17 292:7, 10 293:8,10 298:24 299:13, 14 | |
| **renew** 266:3 | | **retire** 253:5 | | |
| **rent** 260:4 262:23,25 263:2,3,4,5 264:1,4 300:7 301:18 | | **return** 250:23 252:6 253:1 254:1 287:2,14 288:2 290:23 302:7 | | |
| **rental** 250:18 260:16 263:7, 17 299:24 301:6,9 | **REPORTER** 221:7 | **returning** 258:2 | **sale** 259:4,8,19 295:13 296:14, 17 302:12 304:13 305:10 317:12,13 | **saying** 228:10, 15,17,22 229:3 230:11,19 259:18 264:4 266:12 293:4 310:8 313:21 |
| | **represent** 253:7 260:13 | | | |
| | **representation** 239:15 251:18 | **review** 239:3 | | |
| **renting** 267:23 | **representations** 249:4 | **reviewing** 285:19 | **sales** 250:20 274:25 314:23 | |
| **reorient** 260:17 | | **revised** 282:2, 23 | **Sally's** 256:16 | |
| **repair** 297:23 298:16 | **represented** 241:14,17,21 | | **Salon** 256:16 | |
| | **request** 230:2 311:19 313:4,8 | **ring** 297:1,24 | | **says** 257:6 261:8 278:22 284:16 288:7 294:10 298:17, |
| **repeat** 303:1 304:3 | | **Robert** 265:9 | **same** 224:17 255:14 256:3 261:2,3 271:23 | |
| **replace** 245:5 283:5 | **requested** 287:10 313:6 | **Robyne** 307:10 | | |

20 299:6
318:12

**schedule**
224:9,13
226:15 249:7
256:3 257:14
261:15,17,20
291:21,22
299:25 301:1,7
312:16

**schedules**
224:15 228:25
254:12 260:12
269:2 291:4
316:14

**scope** 232:7
233:8 234:1,15
244:2 273:6
280:24 290:25
315:22 318:20

**screening**
237:21 286:1,2

**scroll** 278:23

**search** 283:15

**second** 222:17
223:4 227:1
242:17,20
254:23 256:19
259:18 264:16
265:4 288:4
297:20 301:4
307:8

**seconds**
298:12

**section** 255:3
256:14 294:8
307:12 315:7

**seek** 244:13
246:8 310:14

**seeking** 297:23
298:15,18,23

299:14,19

**seem** 231:12
253:11 257:23

**seems** 264:18

**seen** 250:2
277:19

**self-described**
238:24

**sell** 259:10,12
260:2

**sellers** 303:13,
14 304:14

**sells** 302:5
303:4

**sense** 250:12
317:4,7

**sent** 312:18

**sentence**
259:19

**separate** 284:2
305:17

**September**
225:24 264:7
265:18,21,22,
25 276:18,22
283:25 288:6,
11 301:11,16,
17

**Series** 278:20

**set** 276:10
285:1,4

**settlement**
305:12

**settlements**
318:8

**seven** 221:5

**several** 308:18

**short** 250:20
295:13 296:14,
17 314:23

**should** 222:14
223:6,10,13
226:5 236:17
243:16,19
262:6,16 286:6
295:23 303:7
304:8,9,23,25
305:2,5,10,24
306:1 309:5

**shouldn't**
262:17 303:8

**show** 226:13,
15 237:5
254:12 255:13,
20 275:14,21
288:10 300:12
307:23

**showed** 257:14

**showing**
226:17

**shown** 276:17

**shows** 268:17
287:23

**shutters**
270:22,25
271:7,9 272:4,
5,23

**significant**
289:15 309:4

**similar** 277:10
285:10 307:7
317:21 319:10

**similarly** 305:8

**simple** 306:9

**simpler** 260:19

**simply** 229:3

262:17

**since** 243:13
259:4,19
269:13 270:21
273:12 289:12

**single** 313:13,
16

**singled** 313:17

**sir** 304:2

**sit** 315:10,15
316:19 319:11

**sitting** 316:2

**slight** 269:8

**slightly** 252:4
256:22

**slow** 230:23

**slowed** 259:11

**small** 308:1
316:12

**smallest**
282:16,17

**sold** 243:4,17
259:23 296:16
314:15,20

**somebody**
230:1 249:8
295:21 306:3
318:14

**someone**
229:4 239:24

**something**
222:9 223:23,
24 235:21
241:2 244:20,
21 245:9
255:5,8 260:11
262:12 294:25
295:5,18

296:21 302:22
307:25 312:5
314:8,9

**sometimes**
229:24

**somewhere**
222:7 239:25
264:15 279:6
287:19 313:2

**sorry** 226:12
227:24 232:13
265:21 271:13
273:8 274:12
281:18,19
291:21 297:20
300:19 301:2
308:17

**sort** 226:24
237:1 244:13
281:23 282:14
295:25

**sought** 246:4
249:2

**sounded**
232:13

**source** 239:10

**sources**
318:18

**speak** 286:9

**speaking**
292:23

**special** 313:13

**specific** 239:14
248:20 312:6

**specifically**
222:24 240:2
241:9 290:17
299:1 314:21

**spend** 269:25

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

314:2

**spent** 319:13

**spoke** 311:9,14

**spoken** 311:6

**SPPF** 294:3,10, 12

**SPPFS** 312:14

**spreadsheet** 242:23,25 273:8 282:3

**spreadsheets** 236:25

**stand** 280:8 309:19 319:23

**standard** 248:12 249:12

**standards** 248:21,24

**stands** 318:17

**start** 222:8 223:13,21 226:5 230:22

**started** 247:17 252:1 315:4

**starting** 222:11 292:22

**starts** 256:15, 17 261:6

**state** 297:22 298:1 308:19, 22

**stated** 224:4

**statement** 230:8 253:25 254:3 258:21 289:23 317:19

**statements** 237:13 298:22

**stating** 249:18 251:22,23 290:17

**statistical** 250:8

**stayed** 259:22 267:8

**staying** 258:25

**sticky** 312:4

**still** 221:8 235:17 242:24 259:24 269:19, 23 275:11 282:9 305:22, 23 313:1 318:12

**stopped** 270:2 294:18,24 295:4,21 296:8,13,22,25 297:3

**stopping** 296:21

**storm** 240:9 270:22 272:4, 22

**Stormtech** 270:24 271:6,8

**strictly** 248:5

**strong** 249:21

**stuff** 312:15

**subject** 223:19 224:5 228:9 229:14

**submit** 243:5

**such** 227:25

236:12 240:22 250:3

**suffered** 246:25

**sufficient** 238:14 249:13

**suggest** 279:5 309:16

**suggesting** 265:15

**suggests** 279:6

**SUHD** 278:21

**suited** 318:3

**summary** 274:13 294:16 297:12

**support** 238:14

**supported** 239:15

**supporting** 294:9 308:19 312:7

**suppose** 305:15

**suspect** 227:9 304:22

**sworn** 221:12 239:16

---

**T**
---

**Taishan** 319:18

**take** 242:17 252:4 253:24 264:24 265:3 268:3 280:4

281:12 287:25 290:4 298:12 302:13 309:16 314:1,19

**taken** 295:5,7

**taking** 248:6 253:9 260:10 289:1 291:7 312:3

**talk** 239:10 249:1

**talked** 238:21 245:18 253:16 271:16 290:3 316:6,13 318:2

**talking** 240:25 252:1 257:22 268:4 290:12

**talks** 294:22

**targeting** 314:21

**tax** 262:12 287:2,14,20 288:2,10 290:6,7,23 291:15,16 303:22

**taxes** 251:7 287:7,9 289:9 290:13,21 291:8 302:7 303:5,15,17,25 304:7 305:9 306:16 317:18

**taxpayers** 289:23

**Ted** 266:11

**telephone** 311:23

**telephonic** 311:22

**television** 276:10,15,23 277:18,20 278:13,15,19

**televisions** 279:1

**telling** 268:19

**ten** 241:9 266:22

**tenant** 267:9 268:15

**tennis** 319:17

**tens** 237:15

**terms** 265:24 306:7

**test** 246:16

**testified** 243:3 283:5

**testify** 221:12

**testimony** 239:16 249:3, 24 259:15 260:13 290:11 292:4 293:23 294:5,12 309:9,12

**testing** 236:4 286:3

**than** 230:20 248:2 257:1 263:23 265:15 267:22 268:7 272:14 285:24 290:16 306:1, 3,4 311:6 313:24 314:18

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)
Index: thefts..uncommon

| | | | | |
|---|---|---|---|---|
| **thefts** 288:23 | 316:11,22 | 287:1 293:8 | 257:13 | 233:8 234:2,15 |
| | 317:3,7,8,17 | 298:25 303:15 | | 242:10 260:12 |
| **their** 223:7 | 319:8 | 304:13 309:18, | **totals** 237:22 | 291:19 310:10 |
| 225:23 235:3,9 | | 21 314:2 | 255:2 | 311:3 |
| 236:3 245:15 | **thinking** | 319:13,21 | | |
| 246:5 247:13, | 317:10 | | **touched** | **trying** 222:24 |
| 19 249:8 | | **timeline** 247:8 | 242:16 246:21 | 231:7 232:20 |
| 262:23 263:4, | **third** 245:25 | | 250:11 | 241:7 245:11 |
| 25 267:8,21 | 246:4,9 284:21 | **times** 230:6 | | 256:14 264:13 |
| 272:1 273:14, | 311:3 | 251:15 308:18 | **town** 260:21 | 271:18 274:20 |
| 18 280:16 | | | | 278:22 279:21 |
| 281:5 283:8, | **third-party** | **timing** 223:10 | **traced** 250:7 | 311:1 312:15 |
| 14,24 284:8 | 246:13,16 | 224:4 243:8 | | |
| 287:10,20 | | 247:16 317:15 | **tracing** 237:12 | **Turkell** 307:14, |
| 288:1,10 289:8 | **thought** 227:4 | | | 18 308:15 |
| 290:21 291:15 | 236:16 268:7 | **tiny** 226:24 | **tracking** | 310:8 311:18 |
| 295:4 296:9,21 | 300:19 | | 312:11 | |
| 298:24 301:21 | | **titled** 264:20 | | **turn** 246:19 |
| 302:12 305:4, | **thousand** | 265:8 266:9 | **transaction** | 261:1 |
| 25 306:14 | 291:16 | | 267:25 | |
| 307:6 309:9,12 | | **today** 221:21 | | **TV** 277:10,17 |
| 310:5,6,24 | **thousands** | 313:3 315:10, | **transactions** | 278:21 |
| | 237:15 | 15,22 316:2, | 222:9 313:23 | |
| **theirs** 307:3 | | 13,19 | | **two** 222:23 |
| | **three** 254:16 | | **transparency** | 237:18 246:7 |
| **themselves** | 284:11 298:13 | **together** | 249:1 | 268:2 269:7,18 |
| 313:17 | | 296:19 | | 281:25 283:18 |
| | **through** 222:2, | | **travel** 250:22 | 284:2,4 286:24 |
| **theory** 243:9 | 19 224:2 | **told** 242:15 | 252:5,17 | 291:15 298:12 |
| | 235:2,8 239:16 | 260:14 272:17 | 261:19,21,25 | 305:14 311:6,8 |
| **thereabouts** | 251:17 265:22 | 274:9 275:16 | 262:9 | 315:18 319:14 |
| 276:13 | 271:2 291:19 | 276:5 278:15 | | |
| | 294:12 295:8, | 315:4 | **traveling** 252:5 | **type** 229:17 |
| **thing** 242:21 | 13 296:5,16 | | 257:10 | 237:6 285:2 |
| 260:18 270:20 | 305:10 309:12 | **took** 228:6 | | 317:4 319:3 |
| 291:14 293:18 | 319:7 | 247:9,19 248:9 | **treat** 302:22 | |
| 306:6 312:21 | | 262:18 273:23 | | **types** 310:25 |
| 317:10 | **throughout** | 290:19 293:18, | **treated** 244:9, | |
| | 245:6 268:8 | 19 | 12 316:12 | **typically** 262:9 |
| **things** 221:18, | | | | 312:1 |
| 23 223:19 | **time** 221:5 | **top** 292:20 | **treatment** | |
| 224:5 235:19 | 223:7 229:24 | 305:12 | 313:14 317:21 | |
| 236:23 237:3 | 237:19,20 | | 318:7 | **U** |
| 238:1,22 245:9 | 239:13 240:12 | **topic** 250:10 | | |
| 247:6,25 | 241:13,15 | | **tried** 223:22 | |
| 248:1,3,4,6 | 243:4,9 245:16 | **topics** 250:14 | | **Uh-huh** 285:21 |
| 251:7,19 | 257:12 261:11 | | **trier** 249:7 | |
| 285:23 305:5, | 263:15,19 | **total** 237:19 | | **ultimately** |
| 17 309:11 | 264:3,24,25 | 244:10 255:7, | **trips** 261:8 | 243:11 260:2 |
| 310:25 312:2 | 265:3 280:5,6, | 20 256:15 | | |
| | 10 285:11 | 282:11 307:17 | **true** 236:5,6 | **uncommon** |
| | | | 254:1 295:3 | 256:12 311:2 |
| | | **totalling** | 304:12 | |
| | | | | |
| | | | **try** 232:8,22 | |

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)
Index: under..wondering

**under** 221:8
225:13 230:7
249:16 254:15
259:19 278:3
281:13 284:8
291:23 311:2
318:20

**underlying**
236:5,7

**understand**
221:9 223:17
230:8 235:11,
12,17,25
257:17 258:22
267:11,13
271:18 275:3
278:12

**understanding**
259:11 261:16
268:11,20
277:7,16
278:12 311:13
315:22

**understood**
248:2 257:16
273:7 283:3
299:7

**undertake**
290:22

**uniform** 314:6,
7

**unrelated**
314:22

**until** 225:23
228:13 230:23
258:11 259:23
267:9 270:1,4
280:9 301:16
303:6 306:23,
24 309:20

**updated**
224:22 225:3

227:11

**updating** 312:2

**use** 244:18
280:2

**used** 240:9,11
244:22 245:3,
12 246:7 268:8
269:25 271:17
273:18

**using** 226:25
247:1

**utilities** 259:6
260:5

**V**

**vacated** 293:14
301:9

**validate** 238:15
273:5

**validating**
236:11,20
248:10

**validity** 245:21

**valuation**
244:19

**value** 243:24
244:5,14 245:1
246:1 247:23
248:1,8 276:25
282:11 317:12

**values** 246:8,
13,16

**varied** 250:4

**variety** 257:12

**various** 236:25
237:2

**vendor** 271:6,8
310:7

**verification**
310:11

**verifying**
235:20

**version**
255:20,23

**versus** 314:5

**Vicki** 265:8
274:8

**video** 221:4
280:7,11
309:22

**view** 230:11

**volume** 314:2

**voluntarily**
295:21,24
296:2

**W**

**wait** 297:7

**waive** 319:19

**Walshes** 269:4

**want** 221:18
224:19 230:5
232:15 250:12
264:24 265:4
271:21 280:1
282:16 294:20
304:16 306:20
317:19,22
318:1,19

**wanted** 246:21
315:1

**washable**
293:20

**water** 304:15,
20,23

**way** 225:6
231:9 232:22
234:7 235:21
236:1 238:2
246:17 257:1
277:23 281:8
284:25 294:4
295:10 297:18
300:14 302:4
303:11 316:7,9
317:25 318:16

**ways** 237:2

**weighing**
294:4

**went** 267:2
275:11 285:16

**whatever**
240:25 243:9
291:3 296:8
318:19

**whenever**
273:21

**whereupon**
319:24

**whether**
223:19 230:9
231:16,21
232:1,8 233:3,
9,15,21 234:2,
16,21 235:1,7,
21 236:5
237:17 238:16
240:15,20
241:25 242:5,
12 244:14
246:13 250:25
251:16,17,22
252:24 253:20,
25 260:9
261:24 262:1,

4,6,12,13,16
276:3 279:13
290:5,15
293:24 295:19,
21,22 296:1,9
297:17 299:5,7
303:21 312:11
313:6 314:21
318:8,24,25

**while** 231:13
232:5 239:5
240:12 242:16
247:24 254:10
259:7 260:21
261:22 270:5
285:17 312:1

**whole** 252:1
264:22

**will** 226:25
229:25 232:23
255:2,9 264:16
265:5 274:10
275:2 283:16
298:12 313:7
315:19

**within** 232:7
233:7 234:1,14
244:2 248:24
249:12 273:6
280:24 290:25
304:13

**without** 279:17
289:6 290:20
291:7 308:5

**witness** 221:9,
11 280:2
319:15,17,20

**witness's**
294:5

**wondering**
300:15 305:14

CONFIDENTIAL - MICHAEL P. ELKIN, CPA (VOL.II)

| | | |
|---|---|---|
| **word** 240:9 241:5 | 291:16 297:14 304:13 | |
| **words** 248:15 253:2 263:5 304:9 306:5 | **years** 241:9 | |
| **work** 224:16 237:7 248:21 250:23 252:7, 11 253:1 254:1 256:4 257:11 258:2 259:13 261:22,23,25 262:10 275:2, 12 286:18 289:7 290:5,20 291:1 312:1 315:16,22,23 | **yellow** 312:4 | |
| | **yesterday** 221:19 234:8 238:21 245:19 251:9 253:17 271:16 290:3, 12 291:14 318:10 | |
| | **yet** 315:12,25 | |
| | **yourself** 248:12 | |
| **worked** 252:15 | **Z** | |
| **working** 252:12 260:21 | **zero** 269:20 288:13 | |
| **world** 309:7 | | |
| **worries** 274:18 281:22 297:21 | | |
| **worth** 254:4 273:22 | | |
| **writing** 311:19 312:8 | | |
| **written** 249:24 312:22,24 | | |
| **Wrong** 298:9 | | |
| **wrote** 240:12 | | |
| **X** | | |
| **Xs** 312:17 | | |
| **Y** | | |
| **year** 287:2,7,14 | | |

# EXHIBIT G2

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/10/19 Page 174 of 556
Case 1:11-cv-22408-MGC Document 94-1 Entered on FLSD Docket 05/13/2019 Page 2 of
384
Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                  Case No. 1:11-CV-22408-MGC
 3
 4      -----------------------------------
        EDUARDO AND CARMEN AMORIN, et al.,
 5      individually, and on behalf of all
        others similarly situated,
 6
            Plaintiffs,
 7
        vs.
 8
        TAISHAN GYPSUM CO., LTD., f/k/a
 9      SHANDONG TAIHE DONGXIN CO., LTD.;
        TAI'AN TAISHAN PLASTERBOARD CO.,
10      LTD., et al.,
11          Defendants.
12      -----------------------------------
13
                              - - -
14
                    Monday, March 18, 2019
15
                              - - -
16
               CONFIDENTIAL - SUBJECT TO FURTHER
17                 CONFIDENTIALITY REVIEW
18                            - - -
19          Videotaped deposition of ANTHONY GRAZIANO,
        Volume 1, held at Colson Hicks Eidson, 255
20      Alhambra Circle, Penthouse, Coral Gables,
        Florida, commencing at 10:13 a.m., on the above
21      date, before Susan D. Wasilewski, Registered
        Professional Reporter, Certified Realtime
22      Reporter, Certified Realtime Captioner
23                            - - -
24             GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
25                 deps@golkow.com
```

```
 1    APPEARANCES:

 2    COLSON HICKS EIDSON
      BY:  PATRICK S. MONTOYA, ESQUIRE

 3         NATALIE M. RICO, ESQUIRE
      255 Alhambra Circle, Penthouse

 4    Coral Gables, Florida 33134
      Phone:  (305) 476-7400

 5    patrick@colson.com
      natalie@colson.com

 6    Representing Plaintiffs

 7

 8    BREIT CANTOR GRANA BUCKNER
      BY:  JEFFREY A. BREIT, ESQUIRE

 9    600 22nd Street, Suite 402
      Virginia Beach, Virginia 23451

10    Phone:  (757) 670-3888
      jeffrey@breitcantor.com

11    Representing Plaintiffs

12

13    ORRICK, HERRINGTON & SUTCLIFFE, LLP
      BY:  DIANA SZEGO FASSBENDER, ESQUIRE

14    1152 15th Street, NW
      Washington, D.C. 20005-1706

15    Phone:  (202) 339-8533
      dszego@orrick.com

16    Representing Defendant Beijing New Building
      Materials PLC

17

18

      ORRICK, HERRINGTON & SUTCLIFFE, LLP

19    BY:  DAN GUERRA, ESQUIRE
      405 Howard Street

20    San Francisco, California 94105-2669
      Phone:  (415) 773-5545

21    dguerra@orrick.com
      Representing Defendant Beijing New Building

22    Materials PLC

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/10/19 Page 176 of 556
Case 2:14-cv-02408-MCR Document 244 Attachment 13 Docket 05/13/2019 Page 5 of 384
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2       ABALLI MILNE KALIL
         BY:  JOSHUA D. POYER, ESQUIRE
 3           MICHEL AYUB, ESQUIRE
         1 Southeast 3rd Avenue, Suite 2250
 4       Miami, Florida 33131
         Phone:  (305) 373-6600
 5       jpoyer@aballi.com
         mayub@aballi.com
 6       Representing Defendants Beijing New Building
         Materials PLC
 7
 8       ALSTON & BIRD LLP
         BY:  STEVEN R. CAMPBELL, ESQUIRE
 9       90 Park Avenue, 15th Floor
         New York, New York 10016-1387
10       Phone:  (212) 210.9400
         steven.campbell@alston.com
11       Representing Defendant Taishan Gypsum Co., Ltd.
         and Tai'an Taishan Plasterboard Co., Ltd.
12
13       ALSTON & BIRD LLP
         BY:  AARON BLOCK, ESQUIRE
14           CAROLINE GIESER, ESQUIRE
         1201 West Peachtree Street
15       Atlanta, Georgia 30309-3424
         Phone:  (404) 881-7000
16       aaron.block@alston.com
         caroline.gieser@alston.com
17       Representing Defendant Taishan Gypsum Co., Ltd.
         and Tai'an Taishan Plasterboard Co., Ltd.
18
19    APPEARANCES VIA TELEPHONE:
20       ALSTON & BIRD LLP
         BY:  MIN JI KIM, ESQUIRE
21       1201 West Peachtree Street
         Atlanta, Georgia 30309-3424
22       Phone:  (404) 881-7000
         mj.kim@alston.com
23       Representing Defendant Taishan Gypsum Co., Ltd.
         and Tai'an Taishan Plasterboard Co., Ltd.
24
      ALSO PRESENT:  JOE MELLONI
25       RAUL TORRES, Videographer
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 177 of 556
Case 1:14-cv-22409-MGC Document 249-1 Entered on FLSD Docket 05/13/2015 Page 5 of 384
Confidential - Subject to Further Confidentiality Review

```
 1                       - - -
                       I N D E X
 2
                       Volume 1
 3
                 Monday, March 18, 2019
 4                       - - -
 5   Testimony of:  ANTHONY GRAZIANO            Page
 6       DIRECT EXAMINATION BY MR. BLOCK..............   7
 7
                     E X H I B I T S
 8
                 (Attached to transcript)
 9
      ANTHONY GRAZIANO DEPOSITION EXHIBITS        PAGE
10
     Exhibit 1    Market Analysis of the          23
11                Post-Remediation Impact of Chinese
                  Drywall On Residential Property
12                Values in Florida
                  February 15, 2019
13
     Exhibit 2    20 Priority Claimant-specific   24
14                Reports
15   Exhibit 3    Priority Clamant List           37
16   Exhibit 4    Post Discovery Submission Binder 50
17   Exhibit 5    Market / Pairing: Broward 10 - Value 90
                  Adjustment Conclusions
18
     Exhibit 6    Appraisal Report & Post-Remediation 147
19                Damage Related to Chinese Drywall
                  Etter, Steven & Cathy
20
     Exhibit 7    Real Estate Damages - Third Edition 161
21                Author: Randall Bell, PhD, MAI
22   Exhibit 8    Survey Responses               177
23   Exhibit 9    Hillsborough County Property    232
                  Appraiser Folio 127850-0100
24                3120 West Wallcraft Avenue
                  Tampa, FL
25
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 178 of 556
Case 1:14-cv-24414-MGC Document 24-1 Entered on FLSD Docket 05/30/2017 Page 6 of 384
Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2               (Attached to transcript)

 3      ANTHONY GRAZIANO DEPOSITION EXHIBITS           PAGE

 4   Exhibit 10    Martin County Property Appraiser    239

                   Document for 516 SW Akron Avenue,

 5                 Stuart, FL

 6   Exhibit 11    E-mail - Subject: Chinese Drywall   252

                   From Pete Albanis

 7

     Exhibit 12    E-mail - Subject: Comps for Graziano  256

 8                 From Patrick Montoya

 9   Exhibit 13    E-mail - Subject: Order - $105.91   257

                   per SF

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 179 of 556
Case 1:11-cv-22408-MGC Document 224 Entered on FLSD Docket 03/2015 Page 179 of
384

```
 1                       - - -

 2              THE VIDEOGRAPHER:  We are now on the record.

 3       My name is Raul Torres.  I am a videographer with

 4       Golkow Litigation Services.  Today is March 18th.

 5       The time is 10:13.  We're at 255 Alhambra Circle,

 6       Case Number 11-22408-CIV-Cooke for the court

 7       United States District Court, Southern District

 8       of Florida, for the deponent Anthony Graziano.

 9              Will all counsel please state their

10       appearance for the record.

11              MR. MONTOYA:  Patrick Montoya, Natalie Rico,

12       and Jeffery Breit for the Plaintiffs.

13              MR. BLOCK:  Aaron Block from Alston & Bird

14       for Taishan.

15              MR. CAMPBELL:  Steven Campbell from Alston &

16       Bird, Taishan.

17              MS. FASSBENDER:  Diana Fassbender, Orrick,

18       on behalf of Defendant Beijing New Building

19       Materials PLC.

20              MR. GUERRA:  Dan Guerra, Orrick, also on

21       behalf of BNB -- Beijing New Building Materials

22       PLC.

23              MR. POYER:  Joshua Poyer on behalf of

24       Beijing New Building Materials.

25              MR. AYUB:  Michel Ayub, Aballi Milne Kalil
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/10/19 Page 180 of 556
Case 2:14-cv-02408-MCR-GRJ Document 24-13 Filed 11/10/15 Page 180 of
384

Confidential - Subject to Further Confidentiality Review

```
 1        PA, Beijing New Building Materials PLC.

 2             MR. MONTOYA:  Is that it?

 3             THE COURT REPORTER:  Would you raise your

 4        right hand?

 5             Do you solemnly swear or affirm the

 6        testimony you're about to give will be the truth,

 7        the whole truth, and nothing but the truth?

 8             THE WITNESS:  I do.

 9             THE COURT REPORTER:  Thank you.

10             ANTHONY GRAZIANO, called as a witness by

11        Defendants Taishan Gypsum Co., Ltd. and Tai'an

12        Taishan Plasterboard Co., Ltd., having been duly

13        sworn, testified as follows:

14                       DIRECT EXAMINATION

15        BY MR. BLOCK:

16        Q.   Mr. Graziano, good morning.  Could you

17        please state and spell your name for the record?

18        A.   Anthony M. Graziano, G-r-a-z-i-a-n-o.

19        Q.   And, Mr. Graziano, where are you employed?

20        A.   Integra Realty Resources, Miami-Palm Beach.

21        Q.   And what's your role at Integra?

22        A.   I am the current -- currently the senior

23        managing director of the Miami office, and I am also

24        the chairman of the board of Integra Realty

25        Resources, corporate.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-55  Filed 11/10/19  Page 181 of 556
Case 1:11-cv-22408-MGC  Document 24-1  Entered on FLSD Docket 12/13/2012  Page 9 of
384
Confidential - Subject to further Confidentiality Review

1    Q.   Okay.  Can you explain a little bit about

2    what Integra Realty Resources, corporate, is in

3    relation to the local offices?

4    A.   Sure.  In 1999 we formed a -- an LLC, a C

5    corp LLC, which is a franchise corporation.  We are

6    stockholders in that corporation.  And I say "we."

7    The original founding shareholder of the corporation

8    were also the underlying offices that started the

9    company.

10        We created the license and the brand and the

11   technology, and each of those offices then entered

12   into a franchise agreement in their respective

13   states with the corporate parent, Integra Realty

14   Resources.

15   Q.   And you have -- just so I understand, you

16   have a role -- a management role at the local level,

17   Miami/Palm Beach, and you're the overall chairman of

18   Integra?

19   A.   That's correct.

20   Q.   What kinds of things does Integra do?

21   A.   Speaking specifically of the franchisor?

22   Q.   Sure.  Well, actually, let me -- let me ask

23   you a better question.

24        What -- you obviously do some expert witness

25   work?

```
1     A.   I do.

2     Q.   And Integra performs that work -- expert

3  witness services.  What else does Integra do?  I'm

4  speaking about the company.  What else --

5     A.   Sure.

6     Q.   -- does the company do?

7     A.   So many local offices throughout Integra do

8  provide expert witness work.  We have a national

9  specialty practice.  We have a special practice

10 leader that sits in Dallas that oversees that

11 litigation work.

12          But generally, the business -- the license

13 business of the firm, Integra Realty Resources,

14 comprises appraisal, consulting, market studies, and

15 general real estate advisory work.

16    Q.   And so what -- in that nonlitigation work,

17 you-all typically work with developers or large

18 property owners or what?

19    A.   Yes and yes.

20    Q.   Okay.  And individuals, as well?

21    A.   Yes.

22    Q.   Okay.  And what kind of things do you do for

23 developers and large property owners and

24 individuals?

25    A.   Anything ranging from market studies to real
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 183 of 556
Confidential - Subject to further Confidentiality Review
384

1   estate consulting work on the specific deals.  Many

2   times we'll be engaged to do valuations particularly

3   for developers if they need internal valuations done

4   for purposes of investor -- either financing and/or

5   reporting.

6        But the -- basically, we provide real estate

7   valuation and consulting expertise whenever it's

8   needed throughout the United States.

9        Q.   And how about you specifically?  Do you get

10  involved in that sort of nonexpert witness work?

11       A.   I do.

12       Q.   Okay.  And what do you do personally?

13       A.   I would say the majority of my engagements

14  surround some type of market study or consultation

15  on either an acquisition, disposition, or evaluation

16  of a real estate for private -- for the private

17  sector.

18       Q.   So --

19            THE COURT REPORTER:  Can we stop for one

20       second, please?

21            (Discussion off the record.)

22  BY MR. BLOCK:

23       Q.   So is it the kind of thing where a developer

24  wants to understand the potential investment that

25  they might make in some real estate and consult with

```
 1     them to determine whether it's a good opportunity or

 2     not?

 3         A.   Yes.

 4         Q.   What kind of licenses do you hold?

 5         A.   I hold a New Jersey real estate state

 6     appraisal license, federal state appraisal license.

 7     I hold a Florida real estate state appraisal

 8     license.  I'm an MIA designated member of the

 9     Appraisal Institute, and I'm a CRE member of the

10     Council of Real Estate.

11         Q.   Are you a licensed realtor?

12         A.   No.  I used to be.  In New Jersey I was a

13     licensed realtor, and I -- when I moved to Florida

14     in 2012, I gave up my realtor's license in New

15     Jersey.

16         Q.   So you've never been a realtor in Florida?

17         A.   No.

18         Q.   Okay.  Have you appraised properties in

19     Florida yourself?

20         A.   Yes, of course.

21         Q.   How often do you do that?

22         A.   My firm conducts -- the local firm here in

23     Miami, we conduct about 200 to 250 assignments a

24     year, not all of which are appraisals, so some

25     fraction of that.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 185 of 556
Confidential - Subject to further confidentiality Review
384

```
 1              The firm here in Florida is also comprised
 2    of our Orlando and Naples office.  And so combined,
 3    I would say we produce somewhere in the order
 4    magnitude of 13 to 1500 appraisals or assignments
 5    per year, 80 percent of which, plus or minus, would
 6    be appraisal work.
 7       Q.   Okay.  Of those, how many -- how many
 8    appraisals do you, yourself, get involved with a
 9    year?
10       A.   When you say "get involved with" --
11       Q.   Let me -- let me ask a better question.
12    That's a good point.
13              So how many appraisals in Florida per year
14    do you perform a substantive role in looking at the
15    property that's the subject of the appraisal and
16    comparing it to the market?
17       A.   I would say probably 100, plus or minus,
18    assignments per year, with a substantive role of --
19    I'm assuming you're defining that to include more
20    than just reviewing an appraisal that another person
21    prepared, right?
22       Q.   Can we define some terms?  Can we agree that
23    by stigma, we're referring to diminution in the
24    value of real estate based on perceptions in the
25    marketplace?  Is that a fair definition of stigma as
```

Confidential - Subject to Further Confidentiality Review

1    you might use it?

2        A.   If I could ask -- just ask you to restate

3    the question.  I did provide the actual definition

4    within the market analysis here that I did.

5        Q.   Well, give me your definition of stigma.

6        A.   Sure.  This is a definition of market

7    resistance, which reads:  "The risk, if any,

8    associated with the ongoing stage of a detrimental

9    condition's analysis.  Market resistance includes

10   the reluctance on the part of the real estate market

11   to buy a property that has historically been damaged

12   or tainted, sometimes called stigma."

13       Q.   Have you ever conducted an analysis of

14   stigma before?

15       A.   Yes.

16       Q.   What were the circumstances?

17       A.   The -- I'm working on a construction defect

18   case currently on a matter in Miami Beach where

19   there was water intrusion.  And the question there

20   is whether or not that water intrusion, once cured,

21   will continue to present a stigma or pose a stigma

22   problem.

23            I've been engaged on -- in various matters

24   to consult on stigma issues, one of which was a

25   construction defect on two condominiums here in

Confidential - Subject to Further Confidentiality Review

```
 1    Miami.  And then generally, I measure market

 2    resistance in most appraisals, right?

 3           I mean, every -- every property -- title

 4    conditions are a perfect example where there's a

 5    detrimental condition that goes for the life of the

 6    property.  So I would say all of the title cases

 7    represent a long-term detrimental condition

 8    analysis.

 9    Q.   Okay.  So let's focus on construction -- is

10    that --

11    A.   I apologize.  I'll turn that off.

12    Q.   So how many construction defect type stigma

13    cases or matters have you been involved with?

14    A.   I'd have to consult my list, if you don't

15    mind.

16    Q.   For the record, are you looking at your

17    testimony list that's appended to the back of your

18    claimant-specific reports?

19    A.   I am not.  I updated that list in the

20    discovery information I provided last week --

21    Q.   Okay.

22    A.   -- to update and reflect my most recent

23    cases.  The one that's in the report was outdated.

24    I included for it the initial submission, but this

25    was supplemented subsequently.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 188 of 556
Case 1:02-md-02047-MBN Document 201-11 Filed 05/13/19 Page 296 of 384
Confidential -- Subject to Further Confidentiality Review

```
 1      Q.   Now what are you looking at, sir?

 2      A.   This is a continuation of that list.  These

 3   are the settlement matters.

 4      Q.   How many are you up to so far on the list of

 5   cases that you have --

 6      A.   Seven.

 7      Q.   Seven?

 8      A.   Not including -- excluding this one.

 9      Q.   Okay.  Could you just read the case names,

10   just the first part of that, just so we know what

11   you're talking?

12      A.   Sure.  St. Regis Homeowners vs. MV

13   Construction was an arbitration hearing.  Do you

14   want the case numbers or --

15      Q.   No.

16      A.   -- you just want the case names?

17      Q.   You can just say the first part of the

18   name --

19      A.   Okay.

20      Q.   -- the first part before the V, and we'll

21   get it from there.

22      A.   Renegade at Hialeah Boulevard vs. Dynatech

23   Engineering; BAS -- BASF, Inc., Successor to

24   Ciba-Geigy, Inc., vs. The Township of Toms River;

25   Scott Netherlands, Inc., vs. State of New Jersey
```

```
 1    Department of Environmental Protection.  There was a
 2    separate arbitration matter, again, Township -- this
 3    was Township of Toms River vs. Ciba-Geigy, where
 4    Township of Toms River was the plaintiff in an
 5    arbitration, same property in New Jersey but
 6    different matter.
 7            And then Kyle Mosteller vs. Gayla Nieman.
 8    Q.   Did any of those cases involve Chinese
 9    drywall?
10    A.   No, sir.
11    Q.   Is this case the first time that you've been
12    involved with Chinese drywall?
13    A.   Yes.
14    Q.   When were you retained by the plaintiff in
15    these Chinese drywall cases?
16    A.   I would have to look back at the signed
17    contract.  Roughly late September.
18    Q.   And what was your understanding of your role
19    in these cases?
20    A.   My role was to prepare an expert report and
21    market analysis to determine whether or not any
22    damage existed -- or whether any residual damage
23    existed, stigma, if you will, post-remediation,
24    after the -- after the property is remediated from
25    drywall, recognizing full disclosure to any
```

```
 1    subsequent sellers would be a requirement or a

 2    condition of that estimate.

 3        Q.   We'll get to that in a second.

 4             You also calculated damages based on time

 5    out of the home and moving costs during

 6    construction, correct?

 7        A.   That's correct.

 8        Q.   We'll get back to that, too.

 9             Let's talk a little bit more about your --

10    yeah, about your background.  Do you hold yourself

11    out as an expert in statistics?

12        A.   No, sir.

13        Q.   Do you hold yourself out as an expert in

14    survey design?

15        A.   I don't understand the question.

16        Q.   Do you hold yourself out in the professional

17    community as someone who is an expert in designing

18    surveys?

19        A.   By virtue of my experience and training, I

20    do regularly conduct methodology and surveys as part

21    of my regular practice every day, yes.

22        Q.   What kinds of surveys do you conduct as part

23    of your regular practice?

24        A.   Ordinarily we conduct surveys on market

25    statistics.  We talk to brokers on a regular basis
```

1    as to what's happening in th -- in the marketplace.

2         I am the author of the Downtown Development

3    Authority's Miami Residential Real Estate Report.

4    We've been the author of that report for the last

5    four-plus years, where we survey various agents and

6    brokers and people within the marketplace to get an

7    understanding of what's happening in the market.

8         I would say the general practice that we

9    conduct in all the market studies relates to

10   designing and surveying the marketplace and

11   designing market research to demonstrate what's

12   happening the marketplace, in the market.

13   Q.   Do you have any formal training in the

14   design of studies -- excuse me -- surveys?

15   A.   I would say that all of the appraisal

16   training includes formal training on how to conduct

17   market research of the type that I regularly

18   conduct, both in this case and others.

19   Q.   Do you -- backing up to statistics, I

20   noticed that you used the word "correlation" in your

21   report a few times.  Do you mean correlation in a

22   statistical sense?

23   A.   I would have to know what correlation means

24   in a statistical sense.  No.  In my -- in my role, a

25   correlation is an analysis of the data and a final

```
 1    determination of what the opinion is going to be.

 2    That's a correlation, after consider -- after having

 3    considered all the data and the quality of the data

 4    and the nature of the data, then to render a result

 5    that results in a correlation.

 6        Q.   But you're not claiming that your results

 7    are statistically significant, and they're

 8    correlated in a statistically significant way?

 9        A.   I'm not using correlation in that way, no.

10        Q.   And you don't claim to have used formal

11    statistics in any of your work in this case,

12    correct?

13        A.   Not other than, you know, basic statistics,

14    such as mean and median and things of that nature.

15        Q.   Okay.  Have you spoken with any of the other

16    expert witnesses for the plaintiffs in these cases?

17        A.   I would have to know who all of those expert

18    witnesses are.  I don't -- I don't know all the

19    expert witnesses.

20        Q.   Okay.  Who have you -- who outside of

21    Integra and the lawyers in these cases have you

22    spoken with about your work?

23        A.   I only had a brief conversation with Randy

24    Bell.  That was the -- I think that's the only one

25    that I can recall, unless there is somebody else I
```

```
 1    may have spoken to that may be an expert that I

 2    don't know about.

 3        Q.   How many conversations with Randy Bell have

 4    you had about Chinese drywall?

 5        A.   I don't know that -- I would say about

 6    probably one.

 7        Q.   And when was that?

 8        A.   I'd have to look back on my notes.  Possibly

 9    mid to late January.

10        Q.   What was the purpose of that conversation?

11        A.   Originally, Patrick and I were discussing

12    the methodology and things of that nature, and he

13    was asking me questions about the methodology.  And

14    I said, "Well, you should just go talk to the guy

15    that wrote the book.  He's got the methodology

16    questions, and he can explain it, you know, as best

17    as anyone."

18             And so I connected Patrick with Randy Bell

19    and told him to call him, and we did an initial

20    call, and that was it.

21        Q.   And what was the substance of your

22    discussion with Randy Bell on that call?

23        A.   I don't -- there really wasn't any

24    substance.  Randy was trying to make sure that we

25    weren't asking him within the time frame to review
```

Confidential – Subject to Further Confidentiality Review

 1   my report or in any way to certify to the methods

 2   that I used.

 3        He asked me some general questions about the

 4   nature of my study, but he was very clear that if he

 5   was to be retained as an expert on the case, his job

 6   would be to just talk about the general theory and

 7   to understand what the peer-accepted practices were;

 8   that he wasn't going to render or develop any

 9   opinions with respect to my report.

10   Q.   Did you tell Dr. Bell what your results

11   were?

12   A.   No.  I don't recall that I had even results

13   at that time.  We had a general discussion about

14   methodology that I was using.  That was it.

15   Q.   Okay.  Is Randy Bell someone that you would

16   defer to on the proper analysis of stigma or market

17   resistance?

18   A.   No, because I've been on the other side to

19   him, so when you say defer to him, not always.

20   Q.   Is -- well, he has a book that you cite in

21   your report, correct?

22   A.   Yes.

23   Q.   And it's Real Estate Damages Third Edition?

24   A.   It is.

25   Q.   And that's something you rely on in your

```
 1    report and in your opinions in this case, correct?

 2    A.    I certainly use that as a credible source of

 3    reliance for methodology, yes.

 4    Q.    Is there anything in Real Estate Damages

 5    Third by Dr. Randy Bell that you disagree with?

 6    A.    It's a 500-page book.  I'm sure there is.  I

 7    can't think of anything off the top of my head.

 8          I mean, I think the general framework is

 9    well-accepted, and we generally tend to follow that

10    framework within our practice.  But I can't say that

11    I agree with every single thing in the book.

12    Q.    Have you read any of Dr. Bell's other work

13    other than his Real Estate Damages Third Edition?

14    A.    I keep up with journal articles and various

15    articles, many of which he's written over the years,

16    yes.

17    Q.    Can you identify any as we sit here?

18    A.    No.

19    Q.    What questions about methodology did you

20    want to discuss with Dr. Randy Bell?

21    A.    I didn't want to discuss any of them.  We

22    just happened to be on the telephone call.  And

23    during that telephone call, he was talking about

24    what his scope was going to be and asked me what

25    methods I used.  I think specifically, he wanted to
```

```
1    know, you know, how I define my methods, which I
2    laid out for him.
3        Q.   Why don't we turn to your expert reports.
4    Let's -- let's do this.  Let's define them.  And
5    we're going to mark as Exhibit 1 your -- what I
6    think of as your general report entitled Market
7    Analysis of the Post-Remediation Impact of Chinese
8    Drywall On Residential Property in Florida.
9            (Graziano Exhibit 1 was marked for
10   identification.)
11           MR. BLOCK:  You have a copy, I assume,
12       and -- you need it?
13           MR. MONTOYA:  Is that the general?  Yeah.
14   BY MR. BLOCK:
15       Q.   Do you have a copy, Mr. Graziano?
16       A.   I do.
17       Q.   And can we call this your general report for
18   brevity?
19       A.   Sure.
20       Q.   Okay.  And then in addition to the general
21   report, you have 20 claimant-specific reports that
22   relate to the 20 Priority Claimants in these cases;
23   is that true?
24       A.   That's true.
25       Q.   Okay.  And let's collectively mark those as
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 197 of 556 of
Confidential - Subject to further confidentiality Review
384

```
 1    Exhibit 2, the 20 Priority Claimant-specific

 2    reports.  We're not going to talk about them just

 3    yet.

 4            (Graziano Exhibit 2 was marked for

 5    identification.)

 6    BY MR. BLOCK:

 7        Q.   And you -- in the last couple of weeks we

 8    received from the plaintiffs, I believe, three

 9    amended Priority Claimant-specific reports.  Is that

10    your understanding, as well?  There are three

11    amendments?

12        A.   That sounds correct.

13        Q.   Okay.  We'll -- in Exhibit 2, which we'll

14    assemble on a break, we'll use the most updated, the

15    amended version for those three.

16        A.   Just to make sure that I'm working with a

17    correct copy, I would like copies of those.

18        Q.   Yeah, yeah.  We'll deal with that at a break

19    here.

20            So if we're looking at your general report,

21    as I understand things, you have two basic

22    categories of damages opinions, the 10 percent

23    stigma damages factor and then the -- what I think

24    of as alternative living expenses.  Is that your

25    understanding?
```

```
 1      A.   Yes.

 2      Q.   Okay.  And you say on Page 4 of your general

 3   report that the 10 percent stigma factor is a

 4   uniform damages analysis, correct?  Do you see that?

 5      A.   I do.  I just don't know if that's what it

 6   says.  I'm trying to make sure that it doesn't --

 7   what you asked me is -- it says:  "For purposes of

 8   developing and applying a uniform damage analysis

 9   which is both fair and reasonable, it's my expert

10   opinion."

11           So I determined that a uniform damage

12   analysis was best to withstand minor variations in

13   the market, yes.

14      Q.   So you have a uniform damages analysis of 10

15   percent stigma impact, correct?

16      A.   That's correct.

17      Q.   And you applied the same uniform damage

18   analysis of 10 percent stigma to all of the 20

19   Priority Claimants, correct?

20      A.   That's correct.

21      Q.   Now, did you -- let me ask you a couple of

22   questions here.  The general report has an effective

23   date on the front cover of February 15th, 2019,

24   correct?

25      A.   Yes.
```

```
 1      Q.   And that's the date we received it from
 2   plaintiffs.  Is that the date that you finished your
 3   general report?
 4      A.   Yes.
 5      Q.   Okay.  What is the -- in your appraisal
 6   world, what is the meaning of an effective date of a
 7   study?
 8      A.   The effective date of the study is the date
 9   that the study was conducted across.  So if I
10   issue -- it says:  "Effective date of the study:
11   February 15, 2019.  Covering the period from 2009 to
12   2018."
13           So effective date is generally the --
14   identified within the report as the date in which
15   the study results are valid.
16      Q.   Okay.  So if I'm understanding correctly,
17   the -- your results are valid as of the effective
18   date of February 15th, 2019?
19      A.   And all of the other -- it says:  "Covering
20   the period 2009 to 2018."  That's what the cover
21   says or that's what my cover says.
22      Q.   So your results are valid, in your view, for
23   2009 to 2019, that 10-year period?
24      A.   2018, correct.
25      Q.   Let's -- all right.  Let's back up.  When
```

Confidential - Subject to further confidentiality Review

```
 1    are your results -- over what period are your

 2    results valid?

 3        A.   Over the period of the study date within the

 4    report, so all of the data that's contained within

 5    the report sets the framework for the effective

 6    date.

 7        Q.   Okay.  But we're here in 2019, and in

 8    theory, we're going to trial in July of 2019.

 9        A.   Yes.

10        Q.   Okay.  When are your results valid for?  Are

11    they valid for trial in July of 2019, or are they

12    valid for July of 2009, or the whole period from

13    2009 to 2019?

14        A.   I would say that they're valid for the whole

15    period from 2009 through the last date of data

16    that's contained within here.  And I would -- I

17    would suggest that if new data were to come to light

18    in May of 2019, that's not going to be covered in

19    the study, right?

20             I mean, I'm not suggesting that I wouldn't

21    consider that in rendering my opinion, but any --

22    any of the information that's not contained in the

23    study that I don't know about today obviously

24    couldn't have informed my opinion as of February

25    15th of 2019.
```

Confidential - Subject to Further Confidentiality Review

```
 1              So the reason that we put an effective date

 2      is to frame for the reader what our study data

 3      contains, and it's relevant as of those dates.

 4      Q.   And is one of the limitations that the real

 5      estate market is dynamic, and so what may be true in

 6      the real estate market in 2018 may not be true in

 7      2019 or '20 or '21 and so on?

 8      A.   I think that's characteristic of any market,

 9      that everything is always changing, right?  So of

10      course.

11      Q.   Now, your stigma damages analyses for the 20

12      Priority Claimants, those are predictions of

13      potential future damages, correct?

14      A.   Those are predictions of my professional

15      effort as to what they would have suffered as of the

16      date of value within that -- within their respective

17      reports.

18              So it's not a prediction necessarily of the

19      future; it's a prediction of the value diminution as

20      if the property had been remediated as of those

21      effective dates.

22      Q.   Is it your opinion that any of the 20

23      Priority Claimants actually experienced stigma

24      damages of 10 percent?

25      A.   Some of them experienced damages more.  Some
```

```
 1    of them lost their homes in foreclosure.  Some of

 2    them didn't remediate immediately and suffered other

 3    damages that -- and so they had not, at that point,

 4    experienced those stigma damages, but they would

 5    have, in the cumulative, experienced those stigma

 6    damages, yes.

 7        Q.  So my question was a little different.  My

 8    question is:  Is it your opinion that any of the 20

 9    Priority Claimants actually experienced stigma

10    damages of 10 percent?

11        A.  Yes.

12        Q.  Which of the Priority Claimants experienced

13    stigma damages of 10 percent?

14        A.  The people that lost their homes, people

15    that took severe discounts on their homes at sale

16    that were unremediated.  Those purchase prices

17    incorporated the buyer's expectation that they

18    would, on resale, suffer damage.  So there was

19    stigma embedded in that.

20            And then many of the property owners that

21    have held their homes, it's a current effective

22    date.  And my position is if they were to disclose

23    that today and put the property on the market, my

24    prediction is they would experience it.  But to your

25    point, they haven't experienced it yet in those
```

Confidential - Subject to Further Confidentiality Review

```
1    cases.  The people that held their homes have not

2    experienced it yet.

3        Q.   So let's back out a little bit.  Your theory

4    is that after a home is remediated, it will sell for

5    10 percent less than a similar home that never had

6    Chinese drywall, correct?

7        A.   Yes, yes.  Subject to some other conditions,

8    of course, including the required disclosure of the

9    remediated Chinese drywall, depending on what their

10   Chinese drywall remediation documentation looks

11   like.  All of those things embedded additionally

12   give rise for that discount.

13       Q.   So you're talking about at post-remediation

14   effect?

15       A.   Correct.

16       Q.   Okay.  So if someone sold or lost their home

17   prior to remediation, they could not have suffered

18   the 10 percent stigma -- 10 percent post-remediation

19   stigma impact that you claim?

20       A.   No.  I would suggest that that's cumulative

21   in the other damages that they suffer, because any

22   buyer is expecting that once they remediated,

23   they're going to suffer that 10 percent.  So they're

24   going to incorporate that into their thinking in

25   terms of what to pay for the property.
```

Confidential - Subject to Further Confidentiality Review

```
1    Q.   Can you show me where you say that in your
2    report?
3    A.   I just -- I don't know that I do say that in
4    the report.  I think that that's implicit in the
5    concept of damages.  The Bell framework says that
6    the damages are cumulative.
7         If you review the report, on Page 8 I show
8    the detrimental conditions model that Bell puts
9    forth.  At the point at which a detrimental
10   condition occurs, all of the value diminution
11   accrues.  That then comes back at various periods
12   throughout the life.  And the market resistance to
13   get back to full market value unaffected by any
14   market resistance is the last piece.
15        So by its very nature, it's cumulative.  So
16   anybody that suffers all of the value diminution and
17   sells unremediated, inclusive of that, they're
18   suffering that market resistance.
19   Q.   But that's not an opinion that you disclosed
20   in your expert report, is it?
21   A.   I don't know that's true.  I have the
22   methodology in here and --
23   Q.   Do you, anywhere in any Priority Claimant
24   expert report, explain mathematically the damages
25   that someone lost prior to remediation via a stigma
```

```
 1    impact that you've just described?

 2    A.   No.

 3    Q.   All right.  So I think you're telling me --

 4    well, let's -- on one level, you're telling me that

 5    stigma damages occur after a home is remediated?

 6    A.   That's correct.

 7    Q.   And that's really the focus of your

 8    analysis, is post-remediation stigma damages,

 9    correct?

10    A.   That's correct.

11    Q.   That's the title of your general report, and

12    that's the title of your individual claimant

13    reports, correct?

14    A.   Yes, sir.

15    Q.   Okay.  Let's talk about post-remediation

16    stigma impacts.

17    A.   Okay.

18    Q.   No one can experience post-remediation

19    stigma impacts unless they have actually remediated

20    their home, correct?

21    A.   I just testified to that.  I believe that if

22    you don't sell your home, you're still subject to

23    having suffered those from the -- from the

24    perspective of an equity diminution, right?  You --

25    whether you actually sell your home or not, your
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 206 of 556
Case 2:14-cv-02722-NGG Document 294-1 Filed on 01/13/19 in TXSD Page 1 of
384

Confidential - Subject to Further Confidentiality Review

```
 1    economics are affected because the value of your

 2    home is different.

 3        Q.   But the out-of-pocket loss for

 4    post-remediation stigma occurs after remediation,

 5    correct?

 6        A.   You could -- you could look at it that way,

 7    sure.

 8        Q.   Okay.  And the out-of-pocket loss for

 9    post-remediation stigma also requires that you

10    presently own the home, correct, and are selling it?

11        A.   Well, no, no.  As I said, if you lost the

12    home, you suffered -- you suffered that additional

13    damage at the time you sold the home because the

14    buyer of the home has already priced that into

15    their -- what they're willing to pay you for not

16    only what they expect the market resistance to be

17    once they remediate it, plus their cost to cure,

18    plus a profit motivation.

19        Q.   And can we call that pre-remediation stigma,

20    as opposed to post-remediation stigma?

21        A.   Well, you can call it whatever it want --

22    you want.  It's just a different stage in the -- in

23    the detrimental condition framework.  It's -- but

24    they are -- but the stages are cumulative.

25        Q.   But the focus of your report is on post -- I
```

```
 1    want to drill down on what's actually in your

 2    report.

 3          Okay.  Your report is about post-remediation

 4    stigma.  I understand, I think, what you're trying

 5    to say about pre-remediation stigma that assumes

 6    there will be a future in which there is

 7    a remediation and a sale by -- at some point in the

 8    future, but I don't want to talk about that.

 9    A.    Okay.

10    Q.    I want to talk about what's in your report.

11    A.    Okay.

12    Q.    Okay.  To experience post-remediation stigma

13    effects, you have to remediate the home, correct?

14    A.    What I'd like to say is to observe

15    post-remediation stigma effects, I have to make

16    observations of homes that have been remediated.

17    Q.    I'm -- let me ask a different question.  If

18    someone sold the home or lost the home in 2009,

19    prior to remediation, can they experience an

20    out-of-pocket loss due to post-remediation stigma in

21    2019?

22    A.    No, not in 2019.  They experienced a loss at

23    the time that they lost the home.

24    Q.    And that would not be a post-remediation

25    stigma loss because the home hadn't been remediated,
```

Case 2:09-md-02047-EEF-MBN   Document 22363-55   Filed 11/18/19   Page 208 of 556 of
Confidential - Subject to further Confidentiality Review
384

1    in my hypothetical?

2        A.    I understand your hypothetical, but what I'm

3    saying to you is that my analysis of the diminution

4    that results post-remediation, and my quantification

5    of that, is a piece of the total loss.

6            When you -- when a property owner or

7    Priority Claimant may have lost their home, there

8    may have been other damages.  Those are cumulative

9    to the post-remediation damage that's already

10   considered.  It's baked into the overall loss.

11           Their losses would be greater than if they

12   had remediated and then sold post-remediation

13   because they're also suffering all of the other

14   components of loss, the profit that's necessary to

15   motivate someone to undertake the remediation, the

16   risk that's necessary, the costs that are necessary.

17           So that enhances the overall discount, but

18   this quantification of market resistance persists

19   for any subsequent buyer.  So that -- they're going

20   to experience that loss embedded within their

21   overall loss inclusive of other damages.

22       Q.    So the 10 percent stigma effect, that just

23   runs with the home for eternity?

24       A.    The claimant suffers it upon initial loss

25   and then as the property -- then the remediation

```
 1    would happen, and that buyer would expect to sell

 2    the property for less going forward.  But they've

 3    already -- they've already counted for that in their

 4    initial purchase price.

 5          So although we may -- we may observe that

 6    the price may be lower, and we may see that with

 7    full disclosure over time, that stigma may continue,

 8    the suffering of the damages only happens on the

 9    first sale.

10    Q.   And do you know whether this first sale

11    stigma impact pre-remediation that you're talking

12    about -- do you know whether that happens to any of

13    the 20 Priority Claimants?

14    A.   Yes.  I think there were some Priority

15    Claimants that sold their property post-remediation,

16    yes.

17    Q.   So you'd need to look at the reports to

18    answer that question with more specificity?

19    A.   Or my summary.

20          THE WITNESS:  Joe, do you have the summary

21     of the -- do you have my -- the Priority Claimant

22     summary?

23          MR. MELLONI:  Yes.

24    Q.   So while -- I guess Joe is someone who works

25    with you and --
```

```
 1     A.   Yes.

 2     Q.   -- is helping you today?

 3     A.   Yes.

 4          THE WITNESS:  Thank you.

 5     Q.   And for the record, what are you looking at,

 6     Mr. Graziano?

 7     A.   This is entitled a Priority Claimant List.

 8     I updated this through yesterday.  As I was

 9     reviewing for this deposition, I made various notes

10     and transmitted this onto a piece of paper.  This

11     list, I think, exists in the discovery material.  I

12     just included in the list the specific Priority

13     Claimant counties and the testing on each one of

14     these relative to the date of value if there were

15     subsequent sales.

16          So of the 20 Priority Claimants, my

17     information indicates that three of them had been

18     remediated, and four of them were classified as

19     partially remediated.  The balance all sold

20     impaired.

21     Q.   We'll mark that summary you're looking at as

22     Exhibit 3 and make a copy on a break.

23          (Graziano Exhibit 3 was marked for

24     identification.)

25     BY MR. BLOCK:
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   So let's go back to the theory you have here

 2   about pre-remediation stigma.  I think what you're

 3   telling me is that that anticipation of

 4   post-remediation stigma is priced into the

 5   pre-remediation sale price?

 6        A.   That's correct.

 7        Q.   Okay.  And so the way we would calculate the

 8   amount of that pre-remediation anticipatory stigma

 9   is to look at the sale price, correct?

10        A.   I'm not sure I understand the question.

11        Q.   Well, how --

12        A.   I mean, the scope of my analysis wasn't to

13   look at the pre-remediation, or I'll call it

14   impaired status.  The scope of my report didn't

15   cover that.  So I would have to give some thought to

16   the design of that.

17        Q.   Okay.  So --

18        A.   I don't know if I can answer that question

19   today as I sit here.

20        Q.   So in your reports, do you claim that there

21   actually is a stigma as to the Priority Claimant

22   homes or just that there will be upon some future

23   sale?

24        A.   I -- my report, I believe, by the

25   preponderance of the data that I analyzed,
```

```
 1    demonstrate that -- demonstrates that 10 percent

 2    stigma is applicable.  We analyzed that across

 3    geography, time, and concluded that although there

 4    were some ranges in the stigma, the 10 percent was a

 5    good, reliable estimate.

 6         I then applied that to each of the Priority

 7    Claimants' then current value as of the effective

 8    dates that the attorneys requested me to calculate

 9    those damages.

10    Q.   We'll come back to that.

11         So your alternative living expenses, can you

12    define what you're -- what kind of damages you're

13    trying to cover there?

14    A.   Sure.  As part of our analysis, we had

15    identified a number of sales that were sold

16    impaired, subsequently remediated, and resold.  And

17    so we looked at the marketing times, the time frames

18    it took from the acquisition of an impaired property

19    to then turn around and renovate the property

20    completely and sell it back into the marketplace.

21         That time frame represents the approximate

22    time frame that someone would need to move out of

23    the home, to put it back into a remediated

24    condition, to then sell it remediated.  So that time

25    frame represents a loss of the utilization of the
```

1    property and an alternative cost for them to be

2    somewhere else.

3         So we estimated that time frame.  And then

4    as part of our appraisals of the unimpaired values

5    in each of the markets, we estimated what the rental

6    rate was for that home to represent a proxy for the

7    economic loss associated with being -- with being

8    out of the home for that amount of time.

9         In addition to that, the claimants that --

10   or the property owners to move out of the home would

11   also have to pack and move twice, once to get out,

12   once to come back in.  And so we estimated that

13   cost, as well and included those two costs as

14   additional damages to reach the point of selling the

15   home as of the effective date and suffering a

16   post -- remediate it and then suffering a

17   post-remediation damage.

18   Q.   All right.  Let's go to -- we will come back

19   to alternative living expenses.

20        Let's -- let's stay with your general

21   report, which is Exhibit 1.  And if you can turn

22   with me to Page 2, I'd like to try and understand a

23   little bit more about your method.  What method do

24   you think you used to calculate this 10 percent

25   stigma factor?

```
 1       A.    We used paired sales analysis on a number of

 2    the -- what we call control pairings of properties

 3    that had been remediated compared to properties that

 4    were not affected by Chinese drywall in the

 5    marketplace.

 6            We used a survey method to survey properties

 7    as -- in conjunction with our confirmations.  We

 8    also conducted surveys of the realtors that sold.

 9            So we used the paired sales analysis.  We

10    used market interviews and surveys -- paired sales,

11    p-a-i-r-e-d, paired sales analysis.

12            We then looked at the -- at any of the

13    properties that may have sold or resold.  So we did

14    some subsequent testing on that after we prepared

15    the case studies.

16            And so I outline, actually, on Page 10 that

17    we applied various methods, including paired sales

18    analysis, paired sales comparables, market resistant

19    estimates, sale/resale analysis, and what I'll call

20    case study analysis, which incorporates all of

21    those.

22       Q.    When you say that you looked at properties

23    that may have sold or resold, you did some

24    subsequent testing on that after we prepared the

25    case study, what are you referring to there?
```

```
1      A.   So as I went into each of the claimant

2   reports, where we identified those properties that

3   sold, we made some additional notes on the -- on

4   the -- you know, the testing of those.

5           And then I also identified additional sales.

6   As we were -- as I was reviewing for deposition, I

7   also reviewed some additional sales that occurred

8   post our date of value, and we tested those with

9   some additional comparables.

10      Q.   So it sounds like you did work on your

11   analysis after the date of your expert report and

12   before today's deposition?

13      A.   Well, I was -- I was preparing for the

14   deposition, and so what I was doing was really

15   looking at the -- at the data on -- from the

16   Priority Claimants' perspective, on subsequent

17   sales.  Now, those subsequent sales occurred after

18   the date of value.  So all I was really doing was

19   testing to see the subsequent dates.

20           But that -- you know, obviously, our damage

21   analysis is as of a retrospective date, so that's

22   really when our opinion stops.  But, of course, I

23   wanted to test to see if any of those subsequent

24   sales continued to demonstrate the damage that I

25   estimated.
```

 1       Q.   Okay.  So -- and I'm just asking sort of a

 2   factual process question.

 3       A.   Sure.

 4       Q.   You did some analyses that relate to your

 5   report after February 15th, 2019?

 6       A.   Sure.

 7       Q.   Okay.  And are those written down?

 8       A.   Yes.

 9       Q.   And do you have copies with you here today?

10       A.   I do.

11       Q.   Could you please give those to us?  We

12   haven't seen them before --

13       A.   Sure.

14       Q.   -- I don't think, unless they were in the

15   production and I missed them.

16       A.   Well, that's the summary copy of the

17   results.

18       Q.   This is Exhibit 3.  Back up.  Actually, what

19   you just handed me was Exhibit 3 that you reviewed

20   before the -- well, let me -- let me just get you --

21   can you explain what we're looking at here that I've

22   marked as Exhibit 3?

23       A.   Sure.  This is entitled Priority Claimant

24   List.  IRR - Miami.  Update: 3/17/2019.  This list

25   should exist in the various discovery materials in

```
 1     various versions.

 2         Q.   That's the list that Joe handed you 15

 3     minutes ago?

 4         A.   That's correct.

 5         Q.   Okay.  All right.  And so now -- we can take

 6     that.

 7         A.   Yes.

 8         Q.   Now you're looking for something else that

 9     reflects work that you did subsequent to the

10     February 15th, 2019 date of your expert reports?

11         A.   Correct.  These are the notes that -- in

12     preparation for my deposition today.  These are the

13     notes and additional backup research related to

14     those notes based on my preparation to arrive today.

15     So I've entitled them and put them in a separate

16     binder called Post-Discovery Submission.

17         Q.   Okay.  And do you have just the one copy

18     here today?

19         A.   I do.

20         Q.   And is this the original, or do you have

21     electronic access?

22         A.   No.  This is the original.

23         Q.   Okay.  We'll make a copy of this, and we're

24     going to mark it as an exhibit --

25         A.   Sure.
```

Confidential - Subject to further Confidentiality Review

```
1     Q.   But we'll make a copy first.

2     A.   Sure.

3          (Discussion off the record.)

4          MR. MONTOYA:  We're going to mark this as 4?

5          MR. BLOCK:  Yeah, that will be 4.

6          THE WITNESS:  Are we at a logical point for

7     me to take a break?

8          MR. BLOCK:  Yeah, we can -- we can take a

9     break.  Yeah.

10         THE WITNESS:  Thank you.  I appreciate it.

11         THE VIDEOGRAPHER:  Off record, 10:58.

12       (Recess from 10:58?a.m. until 11:09?a.m.)

13         THE VIDEOGRAPHER:  On record, 11:09.

14   BY MR. BLOCK:

15    Q.   Mr. Graziano, let's do a little housekeeping

16   before we go back into questions.

17         What all have you brought with you today?

18   We see a large number of binders over there and

19   boxes over here by Joe.  So can you describe what

20   you brought with you today?

21    A.   Sure.  I have a binder for each of the 20

22   Priority Claimants reflective of my individual

23   reports for each of those, damage estimates, and the

24   unimpaired appraisals that are a part of those

25   reports that have been exchanged; all of the work
```

```
 1    file documentation behind those reports that either

 2    we've compiled and/or Valucentric compiled as part

 3    of their unimpaired evaluations.  Those are filed in

 4    a separate binder for each of the separate

 5    individual Priority Claimants.

 6         I also have a copy of the -- what you're

 7    referring to as the general report, entitled Market

 8    Analysis of Post-Remediation Impact of Chinese

 9    Drywall On Residential Property Values in Florida.

10         I also have a binder reflective of the

11    pairings and analyses that went into the compilation

12    of that general report, so all of the backup

13    material, the MLS listings, copies of the interview

14    notes that we had with each of the respective agents

15    regarding those sales and that research.

16         I also have with me a number of the

17    textbooks that govern my education, knowledge, and

18    experience in the matter.

19         THE WITNESS:  And, Joe, can you hand me

20       those two binders?

21       A.   I also have a binder entitled Not Used.

22       Q.   Uh-huh.

23       A.   These reflect control pairings that were not

24    included in the report, some of which are referenced

25    as having been excluded.
```

```
 1            And then I have another binder entitled

 2      Additional Support, and these are some of the

 3      control pairings that were on properties that were

 4      sold impaired that were not fully developed.  But we

 5      identified them as impaired -- impaired through the

 6      course of our assignment and then excluded them

 7      because they were impaired at the time of sale.

 8      They were not post-remediation sales.

 9      Q.   So it looks like you might have three other

10      binders in a box that weren't Priority Claimant

11      binders, but I can't see from here.

12      A.   I can't see from here, either.

13            THE WITNESS:  Joe.

14            (Discussion off the record.)

15            THE WITNESS:  Bring me all the binders that

16      I haven't described so far.  Thank you.

17      A.   These three volumes entitled Chinese Drywall

18      Volumes 1 of 3, 2 of 3, and 3 of 3 constitute what

19      I'll call library research that had been compiled

20      over time within my firm, as well as additional

21      research that we supplemented and included in these.

22            This is the background on the Chinese

23      drywall problem, a lot of the different reports and

24      Consumer Product Safety Commission issues, reports,

25      and otherwise that were included as part of my lit
```

```
 1     review and also part of my foundational documents.
 2          MR. BLOCK:  We won't need to look at those,
 3       Joe, if you want to get those in a convenient
 4       spot.
 5       Q.   And can you just quickly identify for the
 6     record the books that you brought with you today
 7     that you say you rely on?  I can see Dr. Bell Real
 8     Estate Damages Third Edition, but what else do you
 9     have?
10       A.   Sure.  This book is entitled The Appraisal
11     of Real Estate 14th Edition by the Appraisal
12     Institute; The Dictionary of Relevant Estate
13     Appraisal Sixth Edition by the Appraisal Institute;
14     Real Estate Valuation in Litigation, Second Edition,
15     by James Eaton, published by the Appraisal
16     Institute.
17       Q.   And those are all books that you rely on for
18     your opinions in this case?
19       A.   Yes.
20       Q.   We may make some copies of some of that and
21     mark some, but we'll deal with that later.
22          I want to do another housekeeping matter.  I
23     want to get on the same page with you about what
24     Priority Claimants still own their homes and which
25     do not.  Okay?
```

```
1     A.   Okay.

2     Q.   Do you have a -- you're -- you pulled out a

3   sheet.  Do you think you have a sheet that has this

4   information?

5     A.   I do.

6     Q.   Okay.

7     A.   I think you marked it as Exhibit 3.

8     Q.   3 or 4, which I think is --

9          MR. BLOCK:  Do y'all have 3?

10         MS. RICO:  They're copying it right now.

11         MR. BLOCK:  They're copying it.

12         MS. RICO:  Sorry about the --

13         MR. BLOCK:  All right.

14         MR. MONTOYA:  3 was pretty short, right?

15         MR. BLOCK:  It was just --

16         MS. RICO:  It was just one page.  I will

17   write and see.

18         MR. MONTOYA:  If you want to start on 3, I

19   can run and grab 3 if it keeps you in the flow.

20         MR. BLOCK:  Yeah.  I mean, let's --

21         MR. BREIT:  I'll do it.

22         MR. MONTOYA:  Do you know where the room is?

23         MR. BREIT:  No, but I'm going to find it.

24   I've been lost before and found.

25         MR. MONTOYA:  First door on the right.
```

```
 1              MR. BREIT:  After I walk in, the far door on

 2      the left.

 3              MR. BLOCK:  We'll come back to that.

 4              MR. MONTOYA:  Second right.

 5              (Graziano Exhibit 4 was marked for

 6      identification.)

 7      BY MR. BLOCK:

 8      Q.   Well, and we don't have the work that you --

 9      we're copying, I should say, the work that you did

10      subsequent to the date of your report, but can

11      you --

12      A.   Can I interrupt you for one second?

13              THE WITNESS:  Did you tell them not to

14      remove the paper clips?  Did you explain what --

15      okay.

16      A.   Sorry.  There's -- it's organized in a way

17      that was meant to be able so that I could quickly

18      reference it, and if they pull it apart too much, it

19      may be more difficult for me.

20      Q.   I understand.  Can you just give us a high

21      level description of what you did?  We're going to

22      need to look at those documents and ask you about

23      them later, but just generally speaking, what did

24      you do to create that work product after the date of

25      your report?
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 224 of 556
Case 2:14-cv-02722-MCE Document 221-1 Filed 05/13/2019 Page 52 of 384
Confidential - Subject to Further Confidentiality Review

 1      A.   Are you referring to the work product that's

 2   being copied currently?

 3      Q.   As Exhibit 4, yes.

 4      A.   Sure.  So as I reviewed each of the Priority

 5   Claimant binders in conjunction with preparation for

 6   this deposition, I asked -- I asked my staff to

 7   determine whether --

 8           MR. BREIT:  How's that?

 9           MR. BLOCK:  Good.

10      A.   -- any of those properties sold post the

11   date of value.  That originally wasn't within the

12   original review that we did, but what I was seeking

13   to determine was, were there any sales of those

14   properties after our effective date of value?  If

15   there were, we attempted to identify those sales

16   through MLS records, printed those MLS records,

17   which are included in that binder.

18           We then searched for analogous sales and

19   tried to identify at least one sale in close

20   proximity that would have been representative of a

21   comparable sale, a paired sale that was not

22   impaired, and then tested that against the

23   subsequent sales.

24      Q.   Why did you do that analysis after the

25   February 15th date of your expert report?

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 225 of 556
Confidential - Subject to further confidentiality Review
384

```
1     A.   Because I wanted to be able to address any

2     questions.  Some of -- some of that -- we identified

3     some of those post sales as part of the Priority

4     Claimants analysis within the initial analysis.

5     Some of those are included in the individual

6     claimant reports.

7          But as we discovered that there were

8     additional sales -- and as an example one of the

9     sales closed, you know, February 25th of 2019, after

10    the date that we had delivered the reports.  As I

11    started to identify those, I wanted to have a

12    complete view of when those properties sold to be

13    able to test our estimates.

14    Q.   Is your opinion any different -- is your

15    opinion, sitting here today, any different than it

16    was on February 15th as a result of that subsequent

17    analysis?

18    A.   I would need -- if you don't mind, may I see

19    Exhibit 3?

20    Q.   Yes.

21    A.   I think Exhibit 3 largely reflects similar

22    results as what we found, and so, no, that does not,

23    at this time, change my opinion.

24    Q.   Okay.  And we're -- we're going to have to

25    share Exhibit 3 for a few minutes, but -- so
```

1    Exhibit 3, is this a summary of the results of your

2    post February 15th, analysis?

3        A.    Really only with respect to the one column

4    entitled Percent Diminution Testing and the date of

5    subsequent sales, which we updated as part of that,

6    yes.

7            MR. BLOCK:  Oh, I see.  Yeah.

8        Q.    My colleague pointed out that the Excel cell

9    is minimized, so that some of the text is not

10   legible.  So if you look at the third one there, it

11   looks like there might be words underneath.  You

12   know, you might have to expand the cell a little

13   bit.

14       A.    Okay.

15       Q.    We can -- we can --

16       A.    On break I can have somebody --

17       Q.    Yeah.

18       A.    -- PDF me -- possibly PDF me a copy

19   expanding that cell on a break.

20            (Discussion off the record.)

21       Q.    Okay.  All right.  Let's -- let's get on the

22   same page about which priority claims still own the

23   property as of today's date.  Okay?

24       A.    Sure.

25       Q.    So if we can just share here, just go down

```
 1    the line.  So Miranda -- in your view, Miranda no
 2    longer owns the property as of today's date.  Is
 3    that your understanding?
 4        A.   Yes.  My notes indicate that there was a
 5    foreclosure final judgment, and the house was
 6    vacated on June 8th of 2018.  I could check the
 7    individual claimants, but I believe that the home
 8    was foreclosed upon, and therefore, they no
 9    longer -- correct.
10        Q.   And that's consistent with my understanding
11    from the supplemental plaintiff profile forms, as
12    well.
13        A.   That's a good start.
14        Q.   Yeah.  Yours is -- your sheet is easier to
15    work with if we agree.
16             So the Nunez family, they are also former
17    owners, in your understanding, correct?
18        A.   Correct.
19        Q.   And that's my understanding, too.
20             Who do you have next as a former owner?
21        A.   Rosen Case 3.  There are two Rosens.
22        Q.   Yeah.  Is that Kevin Rosen?
23        A.   Kevin and Stacy Rosen, correct.
24        Q.   We agree on that one.
25             Who is your next one?
```

Confidential - Subject to Further Confidentiality Review

```
1       A.   Marc and Jennifer Wites, Case Number 4.  I

2   believe they're a current owner.

3       Q.   Oh, sorry.  Who is your next former owner?

4       A.   Oh, okay.  So you want to go through just

5   the formers?

6       Q.   Just the former.

7       A.   I know that this is an exhibit.  Are you

8   okay if I make a note on -- notes on these?

9       Q.   That will work.  We're going to need another

10  copy anyway.

11      A.   Okay.  So Diane and David Griffin was a May

12  2010 foreclosure.

13      Q.   Okay.  That's my understanding, as well.

14      A.   Michael and Robyn Rosen, August of 2009, I

15  believe they sold the property.

16      Q.   That's my understanding, as well.

17      A.   Cathy and Steven Etter, September 28th,

18  2016, I believe they sold the property.

19      Q.   My understanding, as well.

20      A.   Kelly and Lori O'Brien.

21      Q.   That's my understanding, as well.

22      A.   Janet Avery.

23      Q.   My understanding, as well.

24      A.   Mary and Rosalee Walls.

25      Q.   My understanding on that one, too.
```

```
 1      A.   Andrew and Dawn Feldkamp.

 2      Q.   That's what I have.

 3      A.   Gul and Deborah Lalwani.

 4      Q.   That's what I have.

 5      A.   Cassandra Yvette Marin.

 6      Q.   That's what I have.

 7      A.   And Deborah and David Deeg.

 8      Q.   Okay.  That's what I have.  And that is 13

 9 of the 20 Priority Claimants or couples who are no

10 longer owners of the property?

11      A.   That is correct.

12      Q.   Okay.  So do you -- do you have the opinion

13 that those 13 former owners will experience

14 post-remediation stigma, as you calculate it in your

15 expert report?

16      A.   Yes.  That embedded within their damage --

17 embedded within their damage analysis should be

18 consideration of any post-remediation stigma.

19      Q.   I understand that's what you're saying, but

20 I'm asking about your calculations in your expert

21 reports.  Okay.  For the 13 former owners --

22      A.   Yes.

23      Q.   -- people who don't own the property as of

24 today's date or a month ago, the date of your

25 report --
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 230 of 556
Confidential — Subject to further Confidentiality Review
384

```
 1      A.   Yes.

 2      Q.   -- do you calculate post-remediation stigma

 3   damages that those people, those 13 Priority

 4   Claimants or couples, will experience upon the

 5   future sale of their -- of a home they don't own?

 6      A.    You're asking me a question in a way that is

 7   mischaracterizing what that damage represented to

 8   them at the time of sale or at the time they lost

 9   the property.

10          As I stated before, the damage that they

11   suffered or would have suffered at post-remediation,

12   had they had financial capacity to remediate or

13   otherwise, the damage that they would have suffered

14   is cumulative to the other damages that they

15   suffered at that -- at that time --

16      Q.   So --

17      A.    -- because it's embedded in all of the costs

18   to cure elements and the expectations that a buyer

19   would take, and the buyer would have discounted

20   that, knowing that when the buyer then subsequently

21   remediates and attempts to make a profit, they may

22   suffer market resistance on the other side.

23      Q.   Okay.  But the post-remediation stigma

24   damages that you calculate at 10 percent in your

25   expert reports --
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   -- is it your testimony that 13 claimants

 3   who do not own the home and, therefore, cannot sell

 4   the home in a post-remediated state, with one

 5   possible exception, is it your testimony that those

 6   people will experience the 10 percent

 7   post-remediation stigma impact that you calculate in

 8   your expert report?

 9      A.   My testimony and my opinion is that the

10   cumulative diminution in value is -- includes the

11   consideration of that post-remediation stigma, yes.

12      Q.   But we -- as we discussed earlier, that's

13   not in your reports.  I wanted to focus on the 10

14   percent stigma impact that you calculated and apply

15   for 20 Priority Claimant homes in your expert

16   reports, not work that you could have done in a

17   different report.  Okay?  We can ask it claimant by

18   claimant.  Okay?

19      A.   Well, if we're going to do that, do you mind

20   if I grab the Priority Claimant -- I mean, if we're

21   going to go claimant by claimant, can we look at

22   the --

23      Q.   We can do that, but I think we can make it

24   easier without getting out 20 binders.  Okay?

25      A.   I just don't know if I can answer that
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 232 of 556
Case 2:14-cv-02722-NGG Document 242-1 Filed 01/30/Docket 13-2019 Page 60 of 384

Confidential - Subject to further Confidentiality Review

```
 1    without --

 2        Q.   Well, okay.

 3        A.   -- the material in front of me.

 4        Q.   So here's -- here's -- let me ask you this,

 5    then.  Just conceptually, if the Mirandas sold their

 6    home in -- or lost it to foreclosure in 2017, before

 7    it was remediated --

 8        A.   Yes.

 9        Q.   -- are you testifying that they will sell

10    the home in 2019 as of the effective date of your

11    report and experience 10 percent stigma damages?

12        A.   No, that's not my testimony.

13        Q.   Okay.  And would that be the same answer for

14    anyone -- any Priority Claimant who sold their home

15    prior to remediation and does not own it today?

16        A.   Yes.

17        Q.   Okay.  All right.  I -- thank you.  We

18    can actually just put 3 --

19             MR. BLOCK:  Steven, you can have that.

20        Q.   So I want to focus, for the most part, on

21    the claimants who do own the properties as of today.

22        A.   Okay.

23        Q.   Okay.  Not entirely, but that leaves us --

24    if 13 of the 20 sold their homes, there are seven

25    claimants or couples who still own the home and
```

Confidential - Subject to Further Confidentiality Review

```
 1    might be in a position to experience

 2    post-remediation stigma upon sale of the home,

 3    correct?

 4        A.   Correct.

 5        Q.   Logically, that's just correct?

 6        A.   Yes.

 7        Q.   Okay.  All right.  And that would be the --

 8    you might need that -- Nguyen, Hernandez, Wites --

 9    you want to start over?

10        A.   No, that's okay.

11        Q.   Nguyen, Hernandez, Wites, Gody, Foster,

12    Martinez, and Chatmon, those are the current owners,

13    in your understanding?

14        A.   Yes.

15        Q.   Okay.  So if they -- if those seven current

16    owners or couples sell their homes in the future,

17    they might experience, in your opinion, a 10 percent

18    stigma impact upon sale of their home after it's

19    remediated?

20        A.   Yes.  But I've quantified that into an

21    actual dollar damage based on a effective date of

22    value of January 1st of 2019 based on the unimpaired

23    value of their homes as expressed as of that date.

24    So the 10 percent is quantified into a dollar

25    estimate as of a specific date.
```

```
 1      Q.   Okay.  Is that 10 percent estimate and

 2   associated dollar value good for every date between

 3   now and 2030?

 4      A.   It's good as of the effective date because

 5   it's a percentage of the unimpaired value.  So the

 6   unimpaired value forms the basis of that estimate

 7   and when multiplied by 10 percent, that becomes a

 8   dollar amount.

 9      Q.   So to understand the actual dollar amount of

10   the damages in July of 2019, do we need to update

11   your analysis of the value of the home?

12      A.   I intend to present testimony as the

13   effective dates that we provided the estimates.  So

14   I wasn't intending to provide testimony as of July

15   of 2019.  I would be testifying as to the value

16   damage as of the dates of value that are stated in

17   my report.

18      Q.   Okay.  And the date of -- or, excuse me, the

19   amount of damages could be different depending on

20   the date that -- value that you use?

21      A.   Yes.  As the dates change and as values

22   change, then that would change the estimate of

23   damages as of that new effective date.  That's

24   correct.

25      Q.   Okay.  Let's go back to Exhibit 1, which is
```

```
 1    your general report.  And I'd like to -- do you have

 2    that in front of you?

 3        A.   I do.

 4        Q.   Okay.  And if we can go to Page 3 together,

 5    on Page 3 is one place where you summarize the scope

 6    of your stigma opinions, correct?

 7        A.   Yes.

 8        Q.   And the method that you undertook?

 9        A.   Yes.

10        Q.   Okay.  And if I understand correctly --

11    well, we need to go back a page.  Actually, let's go

12    back a page to Page 2, as well, and drill down on

13    the effective date.

14             So you write on Page 2:  "The effective date

15    of the study covers the time period December 1, 2009

16    through August 8, 2016 based on the relevant case

17    study evidence developed in this matter."  Correct?

18        A.   Yes.

19        Q.   And what you're saying there is the case

20    study you performed used home values that were dated

21    between December 1 of 2009 and August 8th of 2016,

22    correct?

23        A.   Correct.

24        Q.   And then you used interview methods, your

25    survey, to extend that date through a current
```

Confidential - Subject to Further Confidentiality Review

 1    February 2019 date, correct?

 2        A.   Correct.

 3        Q.   So if I understand correctly, you used

 4    market data and your paired sales analysis for

 5    December 1, 2009 through August 8th, 2016, and then

 6    you used the survey to bring your results from

 7    August 8th of 2016 to -- current through February of

 8    2019, correct?

 9        A.   I --

10        Q.   2019.

11        A.   I think there's that.  I think also the case

12    study analysis demonstrates that the impacts were

13    relatively consistent over time from 2009 to 2016.

14    So there is no reason for me to believe that between

15    2017 and '18, that those impacts didn't continue to

16    exist.  In other words, there was no systematic

17    declination in the impacts as a result of time or

18    geography.

19             So the -- my opinion is that the case

20    studies are representative of the time period.  I

21    factually describe what that time period is, but,

22    you know, upon reasonable belief and after analysis

23    of these case studies, it would seem to me that this

24    continues to hold true.

25        Q.   Did you -- prior to serving your expert

1    report on February 15th, did you analyze market data

2    or perform a case study involving valuation dates

3    from August 9th, 2016 to February 15th, 2019?

4       A.   None of the case studies that we identified

5    that were remediated fell within that time frame.

6       Q.   Why is that?

7       A.   I don't know.  I don't know that we -- as we

8    were identifying the sales, we had -- we were

9    looking for sales all the way as current as

10   possible, and the identification of the control

11   sales just fell within that pattern.  There were --

12   I didn't -- we were not able to identify a

13   remediated control sale within the geographies

14   defined after August 8th of 2016.

15      Q.   You're saying that no homes in Florida that

16   had Chinese drywall and were remediated were sold

17   between August 9th, 2016 and February 15th, 2019?

18      A.   No, that's not what I'm saying.  What I said

19   was, when we -- when we were identifying the control

20   sales, we were not able to identify any that we

21   could see had been disclosed within the MLS listing

22   as having had Chinese drywall that were within those

23   date ranges.

24           We just didn't -- we were not able to

25   identify those sales through the MLS that had

1    disclosure during that date.  I'm not saying that

2    none sold.  I presume there may be some, but we

3    didn't -- we weren't able to identify them.

4        Q.   Who looked in the MLS system for homes that

5    had Chinese drywall and were remediated and sold

6    between August 9, 2016 -- excuse me -- August 8th,

7    2016 and February 15th, 2019?

8        A.   That primary research was done by Joe

9    Melloni, who's here today, Yuliya Georgiva, and Juan

10   Gamio in my office.

11       Q.   You, yourself, did not go into the MLS

12   system and look for homes in that time frame?

13       A.   No.  I had them exporting.  These were --

14   these were lists of properties that we were scanning

15   through the comments to identify Chinese drywall.

16   There is no systematic way within the MLS to search

17   for a disclosure form or Chinese drywall.  We had to

18   do it by comment identification.

19       Q.   Well, we'll come back.

20            So if it's your belief that it was not

21   necessary to look for paired sales data between

22   August 9th, 2016 and February 15th, 2019, why did

23   you conduct the survey to examine that time period?

24       A.   I don't know that I testified it was my

25   belief that it wasn't necessary.  What I testified

```
 1    was that I -- it wasn't possible.  We were not able

 2    to identify any sales post August 8th, 2016 within

 3    the datasets that we initially compiled.

 4          I'm sure with enough time, effort, and pick

 5    and shovel we probably could identify those sales.

 6    We weren't able to do it within the time frame of

 7    our study.

 8      Q.   Mr. Graziano, who designed the case study

 9    analysis that you did?

10      A.   I did.

11      Q.   Okay.  And who helped you with that?

12      A.   As I said, my staff, Joe Melloni, Yuliya

13    Georgiva, Juan Gamio, Paul Jones, Peter Kayworth,

14    all assisted in market research involved in the data

15    that's included within these case studies.

16      Q.   So when you say you designed the study, can

17    you tell me the specific elements of the study that

18    you, yourself, designed?

19      A.   I designed the entire study in terms of

20    research and methodology, and then I gave

21    instruction to my staff on the data and analysis

22    that we were seeking.  And then I managed that data

23    analysis as it came in, and I analyzed it within the

24    context of these control pairings.

25          The interview sheets that we conducted
```

1    had -- in conjunction with these control pairings

2    were designed by myself, with input from Paul Jones,

3    who did the original draft of that with me.  And

4    then that survey was disseminated, a form of that

5    survey was disseminated to my staff and overseen by

6    me.

7        Q.   Did you have a written protocol for the

8    conduct of the study prior to beginning work on it?

9        A.   No.

10       Q.   Why not?

11       A.   One, time, but also because my staff and I

12   are located in a physical space where we're close,

13   and we were meeting every day on this case.  So

14   there wasn't any reason to write down the protocol.

15           We had a written script for the

16   confirmations.  We had an understanding of what the

17   study design was going to be to identify both

18   impaired and unimpaired control sales, identify

19   which markets those were in, geographically array

20   those, and then to identify unimpaired sales that

21   could be compared to the control sales.

22       Q.   When you began your research, did you assume

23   that you would find a stigma impact on

24   post-remediated homes?

25       A.   No, sir.

```
 1      Q.   Did you assume that you would not find an

 2   impact?

 3      A.   No, sir.

 4      Q.   Did plaintiffs' counsel have any input into

 5   the design of the study?

 6      A.   No, sir.

 7      Q.   Did you discuss with plaintiffs' counsel, as

 8   you were conducting -- don't tell me what you said,

 9   but did you discuss with them a design of your

10   study --

11      A.   No.

12      Q.   -- as it was ongoing?

13      A.   Not that I recall.

14      Q.   If we stay -- if we go back to Page 3, you

15   say in the middle that you found no published

16   appraisal in general real estate literature

17   involving case studies on the post-remediation

18   effect on the value of defective Chinese drywall.

19   Is that right?

20      A.   Yes, with respect to any findings and

21   diminution findings, that's correct.

22      Q.   And there was a lack of published literature

23   on studies of defective drywall pre- or

24   post-remediation?

25      A.   Yes.
```

```
 1        Q.   Okay.  So as far as you know, is yours the

 2   first study to demonstrate a post-remediation stigma

 3   effect from Chinese drywall?

 4        A.   Well, I wouldn't know that because a lot of

 5   these studies are conducted in conjunction with

 6   litigation and are not readily available to me.

 7        Q.   Okay.  Well, in the appraisal literature,

 8   you're not aware of a study like yours that purports

 9   to find a stigma effect after remediation of Chinese

10   drywall?

11        A.   That's correct.  I've -- I've not been able

12   to locate anything to -- of that nature --

13        Q.   What --

14        A.   -- in the appraisal literature.

15        Q.   What did you do to search the appraisal

16   literature?

17        A.   So we have -- the Louise T. Lum Library is

18   managed by the Appraisal Institute.  It's an online

19   index of all of the materials within the Lum Library

20   -- Library, I believe dating back to the 1980s.

21   That is indexed.

22             So we searched the Lum Library on various

23   keywords, such as defective drywall, Chinese

24   drywall, drywall.  We also searched under value

25   diminution, stigma, and reviewed the literature in
```

```
 1    that regard to see if there was any cross-reference

 2    on that literature within that dataset.

 3            And then we did a typical Google search, and

 4    I don't recall if we did a Westlaw search or not.  I

 5    don't -- I don't think we did Westlaw, a Westlaw

 6    search.

 7    Q.   You say in the next paragraph, beginning

 8    with "Our development," you're -- in that paragraph,

 9    are you describing the market survey that you

10    conducted?

11    A.   Yes.

12    Q.   And you describe that has a contingent

13    valuation method?

14    A.   Yes.

15    Q.   And you interviewed real estate brokers and

16    salespeople?

17    A.   Yes.

18    Q.   Okay.  And you say that the interview

19    process informed your correlation of why the impacts

20    are not uniformly measurable or distributed,

21    correct?

22    A.   Yes.

23    Q.   What do you mean there?

24    A.   So during the process of our interviews with

25    the various market participants as it related to
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 244 of 556
Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 244 of 556

Confidential - Subject to Further Confidentiality Review
384

1    Chinese drywall, we discovered that some market

2    participants, particularly real estate agents, were

3    very adverse to even dealing with a property with

4    Chinese drywall.  They believed that disclosure was

5    absolutely mandatory and that there was always going

6    to be a problem and always going to be a stigma.

7         There were people on the other side of the

8    fence that said, you know, as long as you have an

9    engineer report, it's not a big deal, and, you know,

10   I don't know -- I don't know how much it would have

11   an impact.  Most of the brokers refused -- refused

12   to give us any type of percentage impact.

13        But what I can say is that based on a review

14   of all of the interviews that we conducted, it was

15   clear to me that market participants viewed the

16   problem differently, and as -- particularly as it

17   relates to the brokerage community, probably

18   informed their clients differently as to, you know,

19   measurable risks and value impacts.

20   Q.   So I think what you're telling me is that

21   some realtors or brokers do not think there is a

22   stigma impact after remediation of Chinese drywall,

23   correct?

24   A.   That's my findings, correct.

25   Q.   Okay.  And skipping down a couple lines, you

```
 1     say -- this is now under your case study, you say

 2     that:  "The analysis of the 20 case studies

 3     demonstrates a wide range of value impacts to

 4     properties that have completed effective Chinese

 5     drywall remediation from zero to 30 percent."

 6     Correct?

 7         A.   Yes.

 8         Q.   And is that your -- was that the finding of

 9     your case study, that the value impact ranges from

10     zero to 30 percent?

11         A.   Yes.  If you look at the individual value

12     diminution study by study, what you'll see that the

13     impacts vary, and some of them are zero, and some of

14     them are as high as 30 percent post-remediation.

15         Q.   Is it your testimony under oath that the low

16     side of the impact is zero?

17         A.   Yes.  I don't think -- I guess let me --

18     just so that I understand the question, are you

19     suggesting that people would pay a premium for

20     having had previous defective drywall?  Because that

21     would be the answer that would be nonzero, that

22     somebody would pay a premium.  That would be the

23     opposite of value diminution.  Is that the question

24     you're asking me?

25         Q.   I'm asking about what your results were.  Is
```

```
 1     it your testimony that your results range from a

 2     value impact of zero to 30 percent?

 3         A.   Yes.  We did find sales -- we did find, in

 4     our paired sales analysis, that there were instances

 5     where the Chinese drywall did not have an impact.

 6     Yes, that's correct.

 7         Q.   All right.  Now, when you applied -- or you

 8     made damages estimates for the Priority Claimants --

 9     when you made damages estimates for the Priority

10     Claimants, did you account -- let me strike that.

11              You gave every Priority Claimant the same

12     damages estimate impact -- damages impact estimate

13     of 10 percent, correct?

14         A.   I did.

15         Q.   Okay.  Your damages estimates do not vary

16     like your data does, correct?

17         A.   Well, I correlate it to the 10 percent based

18     on the variance in the data.  So the data

19     demonstrated in that some cases, it might be zero.

20     In some cases, it might be 30.  The majority of the

21     data ranged within what I considered to be a tighter

22     range, and I correlated it to a 10 percent damage

23     impact, so --

24         Q.   But --

25         A.   There are things that could affect that,
```

```
 1    right, supply and demand of homes in the market at

 2    the time, if there was only one property of that

 3    particular type.

 4            Our interview of the realtors indicated that

 5    in some cases, you know, the quality of the

 6    renovations masked the impact.  In other words,

 7    people were buying a 2006 home in 2016, but the home

 8    was completely renovated.  So when you're comparing

 9    that to similar homes that were built in 2006 that

10    hadn't been renovated, you're -- those impacts are

11    offsetting, right?  People would rather say, well,

12    I'll buy a renovated home.

13            And you may just find a magic buyer.  I

14    mean, there are instances where you find the one

15    buyer that doesn't have a big problem with it and

16    doesn't necessarily have an impact.

17            But what you're betting on if you don't

18    assess any -- if you don't assess any impact

19    whatsoever, what you're betting on is that all of

20    the Priority Claimants and all of the people within

21    this class of impairment would all find magic

22    buyers.  And I find that not to -- not to be

23    credible.

24            So the 10 percent, you know, assumes full

25    disclosure, proper remediation, and represents the
```

1    general market level impacts that we would expect to

2    see based on the case studies.

3        Q.   So the actual impacts, if any, that a seller

4    of a remediated home might experience could be

5    different than 10 percent based on all the variables

6    you just described?

7        A.   It could be, but my estimate of damages is

8    also as of a certain date.  So if somebody were

9    to -- let's just say, for instance, on a certain

10   date, I say it's a 10 percent impact on a $50,000

11   [sic] home.  I'm quantifying that impact at $50,000.

12            Five or eight or nine years from now, they

13   sell the home for $900,000.  Maybe it's only an

14   eight percent impact, but it's still the same

15   $48,000.  They still suffered that quantified dollar

16   damage.

17            So it's my opinion that the 10 percent

18   reflects a fair statement of what the

19   post-remediation stigma is which, when applied as of

20   the particular value date, it estops the damage as

21   to a dollar amount and probably represents their

22   economic loss that they would suffer even in the

23   future.

24       Q.   But in your actual case study, not all of

25   the remediated properties did experience a 10

```
1     percent reduction in value, correct?

2         A.   Correct.  And some of them were more, and

3     some of them were less.  That's correct.

4         Q.   Why did you still assign every single

5     Priority Claimant the same 10 percent value when

6     that's not what your data showed?

7         A.   Because my estimate was informed by all the

8     data that -- and reflects what I considered to be,

9     in my professional opinion, the correct assessment

10    of a relevant damage that these property owners are

11    likely to suffer.

12        Q.   Can you explain the math behind that,

13    please?

14        A.   When you say the math -- I don't understand

15    the question.  When you say the math behind -- are

16    you talking about the math behind the likelihood?

17        Q.   Your data, as you describe it, shows impacts

18    from zero to 30 percent.

19        A.   Correct.

20        Q.   And yet you gave -- and that's more or less

21    consistent with what the realtors told you, which is

22    sometimes there's an impact, and sometimes there's

23    not an impact?

24        A.   That's correct.

25        Q.   But you chose to apply the same 10 percent
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 250 of 556
Confidential - Subject to further Confidentiality Review
384

1    constant to every single Priority Claimant.  So I'm

2    asking you to explain the math that gets you from no

3    impact to 30 percent and giving everyone that's a

4    Priority Claimant 10 percent.

5       A.   So I don't know that I would classify it as

6    mathematical.  But I think that within the case

7    study analysis, I've arrayed the range of impacts,

8    and I've looked at that across types of impact.

9            So in other words, we arrayed that by

10   geography.  We arrayed it by time.  We arrayed it by

11   price segmentation to see if there was any

12   systematic difference between -- in other words,

13   were all the homes in the lower end of range more

14   severely impacted than homes in a -- in a higher

15   price segment?  Were homes in a particular geography

16   more -- more impacted than those?

17           And for each of those sortings, it didn't

18   appear to me that there was any systematic

19   difference between price segmentation by date or by

20   county, but the answer was clearly not zero.  And

21   the variation at the higher end of the range, there

22   were some, maybe 25 or 30 percent that were higher.

23   But in seeking out what I considered to be a fair

24   estimate, I had to give consideration to both and

25   the variations in -- that happen in the normal

```
 1    market data.

 2           So my estimate at 10 percent is based on my

 3    review of these 20 case studies and the order of

 4    magnitude of the various impacts and my professional

 5    opinion and correlation as to the impacts.

 6       Q.   You don't mean statistical correlation?

 7       A.   No.  As I testified before, correlation

 8    is -- I review the data, and I estimate based on

 9    what I consider to be the -- what the data is

10    telling me.

11       Q.   So very briefly, there is no math that gives

12    you from a range of zero to 30 percent to exactly,

13    precisely 10 percent, correct?

14       A.   Well, there is math to do that, and if you

15    were to run the math --

16       Q.   That you did.  There's no math that you did?

17       A.   There's no math that I did to arrive at that

18    10 percent.

19       Q.   Okay.  Now, I think you testified a minute

20    ago that the effect isn't zero percent.  But isn't

21    that what -- if you look at Page 20 of your general

22    report, the low impact for at least four of the case

23    studies is zero percent?

24       A.   I'm sorry.  Could you restate the question?

25       Q.   So if you -- we're both on Page 20 --
```

```
 1       A.   Yes.

 2       Q.   -- as it happens.  The low impact for four

 3   case studies is zero percent, correct?

 4       A.   Yes.  That's reflected there, yes.

 5       Q.   And Broward 3 is three percent, which I --

 6   you consider anything under five percent to be sort

 7   of not a discernable effect, correct?

 8       A.   Did I testify to that?

 9       Q.   I -- well, I think -- I think you write it

10   in your report, yeah.  If you go to the bottom of

11   Page 21 and into Page 22 you say:  "Price variations

12   of five percent, plus or minus, would be considered

13   within the normal variation in the market with or

14   without detrimental conditions."

15       A.   Sure.

16       Q.   Okay.  So I think what you're saying there

17   is if the putative impact is five percent or less,

18   it's consistent with no impact at all.  That could

19   just be normal variation of the market, not stigma

20   damages.

21       A.   That's how I would view it.

22       Q.   Okay.

23       A.   Correct.

24       Q.   So if we -- if we go back to Page 20, the

25   low and the high impact for three of your case
```

```
 1    studies is basically consistent with no impact from

 2    drywall at all, correct?

 3         A.   Correct, out of 20.

 4         Q.   Right.

 5         A.   Three out of 20, right.

 6         Q.   Did you assign zero stigma damages to three

 7    out of 20 Priority Claimants?

 8         A.   No.

 9         Q.   Why not?

10         A.   Because the majority of the case studies

11    indicated that there was a damage, some of which

12    were in excess of 20 percent, and I rendered the

13    opinion based on analysis of this case study that if

14    I studied 20 case studies and three of them are

15    zeros and 17 of them were greater than five percent,

16    that, in my estimation, that would indicate that the

17    damage would have to be greater than five percent.

18              I then arrayed those on the high side level

19    the same way that you just did on the low side

20    level, and I said if seven of the 20 case studies

21    were greater than 20 percent, then the likelihood

22    that the damages might be greater than 20 percent is

23    actually more likely, right?  Seven out of 20 versus

24    three out of 20, it's more likely that the damages

25    would be greater than 20 percent.
```

1          I considered this sort of normal variation

2    by other factors that ordinarily happens not only

3    just as a functions of the marketplace, but also a

4    function of the transparency of the data in the

5    marketplace, right?

6          So I have seven out of 20 that are greater

7    than 20 percent.  I have three out of 20 that are

8    less than five percent, n?e zero, and everything

9    else falls in the middle of that.  And so based on

10    that, I correlated to 10 percent.

11    Q.   What is the name of the methodology you used

12    to extrapolate from results that do not show a

13    consistent of 10 percent to giving every single

14    Priority Claimant 10 percent stigma damages?

15    A.   I don't know that there is a name of a

16    methodology that does that.  I regularly, as a part

17    of my practice and experience, assign values, both

18    for adjustment purposes and for analysis purposes,

19    based on looking at an array of data, reaching a

20    conclusion, and applying that conclusion to other

21    factors.  That's a normal part of my practice.

22    Q.   Can -- if we're -- if you stay with me on

23    Page 20, Page 20 is where you summarize the low and

24    high impact of post-remediation stigma damages in

25    your view, correct?

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 255 of 556
Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 255 of 556

Confidential - Subject to Further Confidentiality Review
384

 1      A.   Yes.

 2      Q.   Okay.  And this is sort of the same table

 3   that you present on a few other pages, but this is

 4   organized a little differently, and a it's little

 5   bigger and, therefore, more legible, fair?

 6      A.   It should be actually the same table, only

 7   sorted on different factors.

 8      Q.   Yeah, yeah.  Okay.  Well, I like 20 because

 9   it's -- the font is bigger, so it's a little easier

10   to read.  So can we use that one?

11      A.   Sure.

12      Q.   Okay.  So it looks to me -- and I want to --

13   I want to understand how you get to low and high

14   impact.  But it looks to me like the highest and --

15   the highest impact you found was Broward 10,

16   correct, low impact of 48, high impact of 50

17   percent?

18      A.   Yes.  And I think there's a -- there

19   actually is an error on that particular case study.

20   I want to --

21      Q.   Yeah.  I wanted to ask you --

22      A.    -- be able to modify that, because there's

23   a -- there's the -- in reviewing this, that was

24   actually a home that sold pre-remediation and then

25   post-remediation.  And my notes in that case study

```
 1    reflect both numbers.

 2         But when they prepared the final sheet on

 3    the case study, they actually put the

 4    pre-remediation discount, instead of the

 5    post-remediation discounts.  It's shown on my notes

 6    in there, but that would need to be edited and

 7    rearrayed.

 8    Q.   Right.  And so if you turn with me to the

 9    table for Broward 10, which is toward the back of

10    your report --

11    A.   Yes.

12    Q.   It's not numbered, but -- oh, is it?  Do

13    you -- I think in the back of the general report, at

14    least in my copy.

15    A.   Right.  Probably in the back of the general

16    report, this sheet --

17    Q.   I have these in the -- I have --

18    A.   And I should, too.  I don't know why --

19    Q.   Okay.

20    A.   -- my staff didn't --

21    Q.   All right.

22    A.   -- didn't --

23    Q.   Well, let's --

24    A.   -- give me the complete copy.

25    Q.   Hold on.  I might -- I might be able to help
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 257 of 556
Case 1:16-cv-24660-MGC Document 1312-5 Entered on FLSD Docket 12/09/19 Page 95 of 384

confidential - Subject to further confidentiality Review

1    you out here.  Yeah.  This is clean.

2          So I'm going to give you just a clean copy

3    of your general report, and I'll let you find

4    Broward 10.

5      A.   Okay.

6          (Discussion off the record.)

7          MR. BLOCK:  That's Exhibit 1.  And, Patrick,

8      do you have a copy?

9          MR. MONTOYA:  Yeah.

10         MR. BLOCK:  The tables at the back.  Okay.

11   BY MR. BLOCK:

12     Q.   Are you there?

13     A.   I am.

14     Q.   Okay.  And so the mistake in the Broward 10

15   data is that your staff used the pre-remediation

16   value for the control home, correct?

17     A.   That's correct.

18     Q.   Okay.  And that's not a mistake you caught

19   before signing your expert report?

20     A.   No, because these case studies were -- these

21   case studies were formatted and published as we were

22   working on them, and I had Broward 10 -- in the

23   exchanged material, you'll see I had both -- I had

24   both indications in my notes here, and it just

25   didn't get translated into this chart.  So I did not

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/18/19 Page 258 of 556
Case 2:12-cv-01924-NGG Document 221-1 Filed on 11/30 in TXSD Page 296 of
384

Confidential - Subject to Further Confidentiality Review

```
 1    catch the error on that --

 2        Q.   Okay.

 3        A.   -- before it got translated into the report.

 4        Q.   So the pre-remediation sale price that you

 5    used in your report and that's reflected on the

 6    chart in Page 20 of your general report is $390,000,

 7    but the post-remediation sales price is actually

 8    755,000, correct?

 9        A.   That's correct.

10        Q.   Okay.  Have you done the math using the

11    correct value for the control property of $755,000?

12        A.   Yes.  I had actually done the math in my

13    work papers.  It just didn't get translated into the

14    final number.  And the math is 2.6 to 5.6 percent,

15    low to high --

16        Q.   Okay.  And that's --

17        A.   -- based on the correlated value of 775 to

18    800,000.

19        Q.   And that's basically no effect, correct?

20        A.   I mean, the high is greater than five

21    percent, but essentially, that would -- that would

22    indicate a nominal effect, correct.

23        Q.   Okay.  So your highest data point is

24    actually either nominal or not meaningful at all,

25    correct, no impact?
```

```
 1      A.   Right.  I would remove this 48 to 50 from

 2    this and replace that with 2.6 percent to 5.6

 3    percent, at which point we can agree to classify

 4    that as being -- one, two, three, four, five --

 5    five -- I'm sorry -- one, two, three -- four out of

 6    the 20 case studies that would be, you know, less

 7    than five percent impact.

 8      Q.   Okay.

 9      A.   And/or zero.

10      Q.   Thank you.  Is there -- are there any other

11    mistakes that you're aware of on the sheet for

12    Broward 10?

13      A.   Yes.  There was a display entry -- there was

14    a display entry problem, Comp Number -- control

15    subject -- I'm sorry.  The Unimpaired Comparable

16    Number 1 was duplicated twice, and that display

17    error, that Comp 1, was actually in Parkland

18    Estates, 10430 Majestic Court in Parkland.  And so

19    the -- what the -- there was a duplication of

20    Comparable Number 2 into Comparable Number 1.

21      Q.   Let me see if I understand.  What I see in

22    the copy that I have of the table for Broward 10 is

23    that 7003 Lost Garden Terrace in Parkland is listed

24    twice.

25      A.   That's correct.
```

1    Q.   Okay.  And you're telling me that -- and

2    because it's listed twice, 7003 Lost Garden Terrace,

3    it's entered twice into the calculation of the

4    average and the concluded value range, correct?

5    A.   That's correct.

6    Q.   Okay.  So it's double-counted?

7    A.   Well, it's not double-counting.  The low and

8    the high is based on the lowest adjusted sale price

9    and the highest adjusted sale price -- oh, the

10   comparable sale price average may be affected.

11   You're correct.

12   Q.   Okay.  All right.  And so are you telling me

13   that one of those references to 7003 Lost Garden

14   Terrace should refer to a different property?

15   A.   Correct.  If you look at my work papers that

16   were exchanged here, the Unimpaired Comp Number 1

17   and my adjustments to those unimpaired comparables

18   are included in Broward -- in the Broward 10 case

19   study with my hand notes on them.

20        That reflects the development of that sale

21   and the adjustments that I made to that sale against

22   all of -- with all of the other sales.  When that

23   was translated into the display copy, there was a

24   copying error, and it just didn't carry over Comp 1.

25   But in my work papers, I have the relevant dates.

```
 1              I also noted that there was some discrepancy

 2    in one of the adjustments that I had made for the

 3    number of bedrooms.  You'll see a Comp 4 had six

 4    bedrooms, and I had made an adjustment in my work

 5    papers, and they didn't translate that adjustment

 6    into the -- into the grid.

 7       Q.   Could you -- could you show me your work

 8    paper of Broward 10?

 9       A.   Sure.

10       Q.   And is this something that you produced to

11    us?

12       A.   Yes.

13       Q.   Okay.  And can you just turn it so I can --

14       A.   Sure.

15       Q.   -- see it on the screen?

16       A.   No problem.

17       Q.   So one -- so it looks like the second 7003

18    Lost Garden Terrace should refer to 10925 Northwest

19    71st Court in Parkland; is that correct?

20       A.   I'm sorry, I lost you.

21       Q.   Well, so if you look at the copy I have --

22       A.   Yes.

23       Q.   -- of your Broward 10 table --

24       A.   Yes.

25       Q.   -- we have two 7003 Lost Garden Terraces,
```

```
 1    and one of those, are you telling me, should be a

 2    different property that's at 10 -- no, it's --

 3    10925 is on here.

 4        A.   10430 Majestic Court.

 5        Q.   10430 Majestic Court.

 6        A.   In Parkland --

 7        Q.   Okay.

 8        A.   -- should have been Comp 1.  And what you'll

 9    see is that Comp 2 had been copied twice.

10        Q.   Okay.

11        A.   So this has been supplemented.  I did an

12    errata sheet here.  I did an errata sheet here.  I

13    dated it 3/16 when we discovered the error.

14        Q.   Okay.

15        A.   And I made the relative adjustments, and I

16    calculated the low and high impact.

17        Q.   All right.  I -- and this is in Exhibit 4

18    that we're copying?

19        A.   You have copies of all that.  I would tag --

20    let's tag this.

21        Q.   Yeah, let's tag that.

22        A.   This is an errata sheet that I will provide

23    a copy of to you.

24        Q.   Okay.

25        A.   But you already have the work paper --
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 263 of 556
Case 2:14-cv-02722-NGG Document 21-1 mended on FSD Docket 11/20/2003 Page 91 of
384

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Yeah.

 2      A.   -- copies.

 3      Q.   I'm going to -- just for recordkeeping

 4   purposes, we're going -- we can make that Exhibit 5.

 5   That's the errata sheet --

 6      A.   Sure.

 7      Q.   -- for Broward 10.

 8           (Graziano Exhibit 5 was marked for

 9   identification.)

10   BY MR. BLOCK:

11      Q.   Okay.  And so can you walk me through your

12   math here?  Well, in the errata sheet, it looks like

13   you're still using the pre-remediation sale price

14   for the control home, 6935 Long Leaf Drive.

15      A.   No.  We just -- we displayed it.  It's

16   displayed in both, but the calculations and the

17   percentages are against --

18      Q.   Based on the --

19      A.   -- the 775.

20      Q.   Okay.

21      A.   Or, I'm sorry, 755.

22      Q.   755.  Okay.  And so when we have the correct

23   sale price for the remediated home at 8935 Long Leaf

24   Drive and we only have one version of Lost Garden

25   Terrace, 7003, and we have 10430 Majestic Court and
```

```
 1    the other three comps, you get an average of

 2    727,800, correct?

 3        A.    Correct.

 4        Q.    And that is lower than the sale price of the

 5    remediated home, correct?

 6        A.    Yes.  But that average is -- that average is

 7    an average of the overall adjusted, which includes

 8    Comp Number 3 that was really given much less weight

 9    in the analysis.

10        Q.    We're going to come to that, but just

11    facially, when you corrected the table for Broward

12    10, the remediated property sold for more than

13    average of the comparable properties, correct?

14        A.    Sure.

15        Q.    Okay.  So how do you get from average to the

16    next entry for high and low?

17        A.    Well, the high and the low is just that.

18    It's the maximum adjusted price along the right-hand

19    column where it says "adjusted sale price."

20            So the adjusted sales price considers all

21    the material differences that affect value that

22    we've made adjustments for, number of bedrooms,

23    number of baths, the lot size, the average -- the

24    condition of the home, the age of the home.  All of

25    those result in adjustments that are applied against
```

```
 1    the respective comparable's price.  That adjusted

 2    sale price then has a maximum and a minimum.  And so

 3    the high is 835, and the low adjusted sales price is

 4    805.

 5        Q.   Okay.  And so in this case, Broward 10, the

 6    remediated home sold for $250,000 than the lowest

 7    comparable home that never had drywall, correct?

 8        A.   Correct.

 9        Q.   How do you get from the average and the high

10    and the low to the concluded value range that has a

11    high and a low?

12        A.   Right.  So we look for those properties that

13    are most comparable, those that tend to have, you

14    know, adjustments that are best supported.  And then

15    also looking at the range in the comparables, I have

16    five adjusted sales prices, 795,000, 804,000,

17    505,000, 835,000, and 700,000.

18             So amongst those comparables, if -- I'm

19    looking for a correlation that -- I'm saying, what

20    should this property have sold for unimpaired?  I'm

21    placing most weight on the comparables that were in

22    the Parkland Golf & Country Club.  That's Comparable

23    Number 2 at 804,000.

24             And I'm also looking at the overall

25    magnitude of the various net adjustments and saying,
```

1    well, you know, we made some adjustments for --

2    large adjustments for location.  What are the other

3    adjustments that reflect a five bedroom,

4    four-and-a-half bath on half-acre to three-quarters

5    of an acre in good condition that were built in

6    2007, and -- you know, recognizing that some of

7    these homes -- the $700,000 correlation was built in

8    2000.  The 505,000 built in 2004.

9         So really, the first two comparables reflect

10   the closest in age to the subject property, and so

11   that ranged from 795 to 804.

12        And then, again, looking at the balance of

13   the three comparables, I've really placed most

14   weight on the first two comparables with support

15   from Comparables Numbers 4 and 5 and placed almost

16   no reliance on Comparable Number 3.  I mean, it's

17   out of range.  There is likely something in that

18   data that we either didn't know about or that

19   couldn't be confirmed.

20   Q.   So the explanation that you just gave for

21   how you arrived at the concluded value range, is

22   that written down anywhere in your expert reports?

23   A.   No.  It's part of the body of knowledge of

24   how, you know, real estate is analyzed.  I mean,

25   that's the way that brokers operate.  It's the way

Case 2:14-cv-02046-NGC Document 291-1 Filed 05/13/19 Page 95 of 384
Confidential - Subject to Further Confidentiality Review

```
1     that -- if you went to a real estate broker and
2     said, what do you think the price of my home is, the
3     real estate broker is going to follow similar
4     methodology.  They're going to go out.  They're
5     going to do a CMA.  They're going to show you the
6     last five homes in your neighborhood that sold.
7              They're going to say, you know, your home is
8     a little nicer, it's got one extra bedroom, but your
9     bedrooms are a little small and we're going to do --
10    and so they go through this process of comparing all
11    the features of the home and how the buyers might
12    react and then they render an opinion as to what
13    they think that they could sell your home for.  And
14    then you say, well, I want $50,000 more.  So they
15    take the listing and they let market set the price
16    of the home.
17       Q.   So the short answer is that that process is
18    not written down anywhere in your expert reports?
19       A.   No.  It's part of my body of knowledge.
20       Q.   Did you write that process down for each of
21    the 20 case studies in any of the notes or
22    documentation that you have produced to us or
23    brought with you to the deposition or have at your
24    office?
25       A.   No.  It's in the book The Appraisal of Real
```

Confidential – Subject to Further Confidentiality Review

1    Estate.

2        Q.    But the -- but the math that you did and

3    analysis that -- by which you determined that some

4    comparables are more comparable than others, that's

5    not written down anywhere?

6            MR. MONTOYA:   Objection; asked and answered.

7            Go ahead.

8        A.    It's part of my training and experience.

9    That's what I do.  That's the -- that's the training

10   and experience that I have that allows me to do what

11   I do.  It's what makes me an expert.

12       Q.    What's the difference between what you do

13   and what you did here and what a real estate agent

14   or broker does?

15       A.    Well, a real estate agent or a broker

16   obviously is responsible for assisting in pricing

17   the home, but the process is largely similar.  When

18   a real estate broker or sales agent is conducting a

19   comparable market analysis, they're going to look at

20   homes that recently sold in the market and use

21   the -- make adjustments for the various features of

22   the homes to indicate what the likely price -- the

23   selling price of their principal's home would be in

24   the marketplace.

25       Q.    So if we go back really quickly to the

```
 1    uncorrected Broward 10, the one that's in your

 2    expert report --

 3        A.   Okay.

 4        Q.   -- and where we do have two versions of 7003

 5    Lost Garden Terrace, can you -- can you tell me why

 6    you have a $50,000 price adjustment, an upward value

 7    adjustment, for the first iteration of 7003 and a

 8    $50,000 negative adjustment for the second version

 9    of 7003?

10        A.   Yes, because all of the -- as I testified --

11    maybe I wasn't clear.  I'll try to be clear again.

12    The comparable information along that row was what

13    was transposed.  The actual adjustments, which is in

14    a separate line, were not changed.  So if you

15    compare Exhibit 5 to the sheet that's in Exhibit --

16        MR. MONTOYA:  1.

17        A.   -- 1, what you'll see is that the adjustment

18    carried over.  It's the labels of that comparable

19    that didn't carry over.

20        Q.   So I'm not sure I'm reading that the same

21    way, because if you go to original Broward 10, the

22    one in your report --

23        A.   Uh-huh.

24        Q.   -- the price -- for both versions of 7003

25    Lost Garden Terrace, the price is the same,
```

```
1    $849,000.  The date of sale is the same, 3/4/2010.

2    The square feet are the same.  The bedrooms are the

3    same.  The bathrooms are the same.  The lot sizes

4    are the same.  Everything is the same.

5        A.   Okay.

6        Q.   Right?  And that's different than what

7    you're saying the real comp should have been, isn't

8    it?

9        A.   Okay.  Let's make sure we're talking about

10   the same thing.  There is a row that has the

11   address.

12       Q.   Uh-huh.  For 7003?

13       A.   Correct.  And we're clear on what rows and

14   columns, right?

15       Q.   Uh-huh.

16       A.   So there is a row that has the address, and

17   when you carry that row all the way across, that row

18   in the display copy of this material was copied

19   incorrectly.

20            The row immediately below it are the

21   adjustments.  And those adjustments relate to what's

22   above, but that row was not incorrectly copied.  In

23   other words, Exhibit 1 and the errata sheet, those

24   adjustments match exactly.  So the row above it,

25   that's wrong, those adjustments don't relate to
```

Confidential - Subject to Further Confidentiality Review

```
 1    that.

 2          Do you understand?

 3     Q.   So -- okay.  I think -- I think I

 4    understand.

 5     A.   It's just a display -- it's just a display

 6    error.

 7     Q.   Yeah.  Okay.  Okay.  All right.  Who made

 8    the decision about how much to adjust each one of

 9    the comps for subdivision, date of sale, square

10    foot, bedrooms, so on?

11     A.   I did.

12     Q.   Every single one?

13     A.   Yes.

14     Q.   For all 20 case studies?

15     A.   Yes, sir.

16     Q.   Did you have any help from anyone on your

17    staff?

18     A.   Not other than if I needed support, mapping

19    support.  You know, we looked at various maps, and I

20    had the staff prepare maps to understand the

21    locational adjustments in each of these -- you know,

22    where these sales were relative to one another and

23    relative to the control sale.

24          In some cases, we did some supplemental

25    analysis.  I know in this case, you know, the golf
```

1    course had a large influence on the value.  And so,

2    you know, we did some supplemental research on golf

3    course premiums and which properties were within

4    Parkland Estates Golf & Country Club versus Parkland

5    Isle versus Grand Cypress.

6        Q.    If you go back to the table on Page 20 for a

7    minute.

8        A.    Sure.

9        Q.    The lowest low impact on the table on Page

10   20 is zero percent, correct?

11       A.    The lowest low impact is zero percent.

12       Q.    All right.

13       A.    Yes.

14       Q.    But if you actually look at the underlying

15   tables, you, in some cases, found a negative impact;

16   in other words, a price benefit for the remediated

17   homes compared to comps, correct?

18       A.    I don't know that that's true, but that's

19   probably true.  I did the math.  So if that -- you

20   know, if the home did sell higher than what I

21   considered to be the correlated unimpaired value,

22   then I did that math, and it may have reflected a

23   negative indication.  But I certainly don't believe

24   that anyone was paying a premium as a result of the

25   prior existence of drywall, so I correlated to -- I

Confidential - Subject to Further Confidentiality Review

```
 1      showed that as zero.

 2      Q.   We'll come back to that.

 3           If you can turn with me to the table for

 4      Broward 3 toward the back -- you're going to need

 5      the --

 6      A.   Oh, thank you.

 7      Q.   -- copy there.  And you can keep Table 20 in

 8      front of you that I'll be using.  Okay.  So are you

 9      at Broward 3?

10      A.   Yes.

11      Q.   The low impact that you found in the

12      underlying data for Broward 34 is negative 1.8

13      percent?

14      A.   Yes.

15      Q.   Okay.  And in principle, that means that the

16      remediated home sold for 1 -- excuse me -- 1.8

17      percent more than the comp hopes that never had

18      drywall, correct?

19      A.   Well, no.  In principle, what it means is

20      that I reflected a concluded value range to the

21      subject.  Based on my concluded value -- my low

22      concluded value range to the subject unimpaired,

23      that means that it sold more than what I would have

24      considered to be the low impact.

25      Q.   But just very simply, when the low impact --
```

```
 1    well, really, when either impact, high or low, is a
 2    negative number, that means the remediated home sold
 3    for more than the comp's home -- comp homes,
 4    correct?
 5         A.   More than the indicated range that I -- that
 6    it was my opinion would be the subject unimpaired.
 7         Q.   Right.  And in plain English, what that
 8    means is the remediated home sold for more than the
 9    comp homes, correct?  That's what a negative number
10    means?
11         A.   No, because again --
12              MR. MONTOYA:  Objection.
13         A.   -- let's look at Broward, Page 3.  Just to
14    your question, you said:  Does that mean that the
15    remediated home sold for more than the comp homes?
16              Well, no.  The control sale sold for
17    814,000.  Comp 1 on Broward 3 sold for 845.  Comp 2
18    sold for 837.  So in that case, it sold for less --
19         Q.   Right.
20         A.   -- against those adjusted prices.  Comp 3,
21    my adjusted price was 794.  Comp 4, my adjusted
22    price was 720.  So it did sell for more than those
23    two, but I can't make a general statement that the
24    unimpaired some hold -- home sold for more than all
25    of the comparables, because that's not true.
```

```
 1        Q.   I think we're talking about different

 2   things.

 3        A.   Okay.

 4        Q.   So your concluded value range, the high and

 5   the low, that is your, sort of, estimate of where

 6   the comparable homes that are most like the

 7   remediated home sold, correct?

 8        A.   No.  That is my estimate of what I believe

 9   the subject property would have sold for unimpaired

10   based on a review of the comparable data.  It

11   doesn't say anything about the value of the

12   comparable homes.  I'm adjusting all the comparable

13   homes to the subject property to make them analogous

14   to what the subject property should sell for

15   unremediated.

16        Q.   So the concluded value range item is

17   actually your estimate of what the remediated home

18   should have sold for in a world where it never had

19   drywall in the first place -- Chinese drywall in the

20   first place?

21        A.   Perfect.  I wish I had said that five

22   minutes ago.

23        Q.   But turning back though to the percent value

24   diminution, when there is a negative number in high

25   or low, that means what?
```

```
 1      A.   That means that my low estimate of what I

 2   thought the subject might sell for unimpaired, that

 3   it sold for more than my low estimate of what I

 4   thought the subject might sell for unimpaired.

 5      Q.   All right.  So Broward 3 has a negative

 6   number.  It's the low column, it's a negative 1.8

 7   percent, correct?

 8      A.   Correct.

 9      Q.   If you look at page 20, do you reflect that

10   negative number on the table there?

11      A.   No.

12      Q.   Okay.  Turn with me, if you would, please,

13   to -- keep going, Tampa 27.  Are you there?

14      A.   I am.

15      Q.   Okay.  And the low impact --

16           MR. MONTOYA:  Give me a minute.  I'm sorry.

17      Tampa 27?

18           MR. BLOCK:  Uh-huh.

19           MR. MONTOYA:  Got it.  Thank you.

20      Q.   The low impact is a negative 29 percent,

21   correct?

22      A.   Yes.

23      Q.   And that low impact of negative 29 percent

24   is also not reflected on Table 20, excuse me, the

25   table on page 20, correct?
```

```
 1        A.   Correct, but this is a perfect example.  If
 2   you look at Tampa 27, I have three comparables, the
 3   adjusted prices of the comparables are 130, 131,000
 4   and 92,000.  That 92,000 represents the lower range
 5   of the three comparables.  So I reflected that.  For
 6   credibility and to demonstrate that there is
 7   variability.  But if you really look at that
 8   comparable, it's substantially larger, and I made a
 9   size adjustment, and that size adjustment at $38,000
10   represents the bulk of the difference between the
11   low and the high.  And what that really means is
12   that that comparable property didn't get a premium
13   for the additional square footage.  In other words,
14   that comparable property -- the other properties
15   that were smaller were selling for 120, 121,000, and
16   that property got 126,000, so they really only got a
17   four or $5,000 premium.  And so in correlating, I
18   mean, if I were to do a single point appraisal and I
19   had the three comparables, I would have called the
20   value 130,000 unimpaired.
21        Q.   So just a factual question.
22        A.   Sure.
23        Q.   That is low value, that impact of negative
24   29 percent -- that's not reflected on the table on
25   page 20, is it?
```

```
1         A.    No, it's not.  I only demonstrate -- I only
2    put the percentage impacts at that point on page 20,
3    I believe.
4         Q.    You put zero percent instead of negative 29
5    percent, correct?
6         A.    Correct.  But again, it's not my position
7    that anything could be negative because that would
8    imply that somebody is paying a premium for Chinese
9    drywall and I don't think that the data demonstrates
10   that.
11        Q.    Okay.  So your math shows negative 27
12   percent but you choose to disagree with that because
13   you don't believe that be true?
14        MR. MONTOYA:  Objection; mischaracterizes
15     his testimony.  Go ahead.
16        A.    I'm not suggesting that at all.  My math is
17   calculating based on the range.  I intentionally put
18   a range to be able to demonstrate credibility in
19   understanding that these concluded values are
20   estimates and those estimates can vary to a certain
21   extent, and so all of that is -- in this case, I
22   don't think a zero is inappropriate.  I think if I
23   look at this conclusion, I would have concluded -- I
24   would have concluded -- I just as easily could've
25   concluded, based on the comparable data here, to a
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 279 of 556
Case 2:14-cv-02846-EEF-MBN Document 321-4 Entered on FLSD Docket 09/15/2014 Page 307 of 384
Confidential - Subject to Further Confidentiality Review

1    single point in value at 130,000.

2        Q.   But you actually concluded that the low

3    impact was negative 29 percent and chose to omit

4    that from the table on page 20.

5        A.   I didn't intentionally omit that.  That is a

6    mischaracterization.  I included these charts --

7        Q.   It's not on the table in page 20, is it?

8             MR. MONTOYA:   Same objection.

9        A.   It's not on the table on page 20 because as

10   I've testified where the impacts were negative, I

11   reflected that as zero in the tables within the

12   report, but I did not conceal that in any way.  All

13   of these materials were included in the addendum --

14   appendix of this report, all the support material is

15   included.  There is no intent to, in any way,

16   manipulate the data or anything else.  I don't know

17   if that's what the attempt to characterize what I'm

18   doing but I've testified to you that I don't think

19   Chinese drywall conveys a premium.  If it doesn't

20   convey a premium, then if the answer is negative, it

21   has to be zero.

22       Q.   So -- but your data for Tampa 27, as you

23   wrote it down and gave it to us under oath, shows a

24   low impact of negative 29 percent, instead of

25   reflecting that in the table on page 20 in the body

```
1    of your report you change negative 29 percent to

2    zero percent because you don't believe in the

3    negative 29 percent, correct?

4         MR. MONTOYA:  Asked and answered multiple

5       times.  Go ahead.

6         A.   Okay.

7         Q.   All right.  So if you turn with me to Fort

8    Myers 23.

9         MR. MONTOYA:  Before or after --

10        Q.   Real quick -- it is actually three or four

11   before -- let's stay with Tampa 27 for a second, in

12   the notes it actually says no impact indicated,

13   correct?

14        A.   Yes.

15        Q.   And that's not reflected in the table on

16   page 20, is it?

17        A.   Well, that's reflected -- it is reflected

18   because if you see what I did was I highlighted in

19   gold those that had a -- you know, a nominal impact.

20   You and I previously talked about those with zero

21   impacts, and part of what I was doing was to study

22   how many of those case studies potentially impacted

23   no impact.  So by virtue of the fact that all the

24   zeros are colored, obviously with the exception of

25   the errata on Broward 10 that would be 2.6 to 5.6,
```

```
 1    but again, that wasn't zero so I probably wouldn't
 2    have colored it, you know, the ones that have five
 3    percent plus or minus of an impact to zero or even
 4    negative, I colored those.  If I had put the
 5    negatives there, I would have still colored them.  I
 6    would have still concluded that those case studies
 7    really didn't demonstrate a demonstrable impact on
 8    value.  That the data demonstrates -- that that
 9    particular remediated home was probably not impacted
10    by the existence of -- and disclosure of the Chinese
11    drywall.
12        Q.   Okay.  So there are four case studies on the
13    table on page 20 that are colored and after you
14    corrected Broward 10, that should be colored as well
15    as basically showing no impact from Chinese drywall,
16    correct?
17        A.   Maybe.  It's not zero.  I mean, I really
18    colored the zeros of where the low impact, you know,
19    where the low impact was zero and the high impact
20    was, you know, greater than five.  I could color it,
21    sure.
22        Q.   Sure.  So that would take us up to five out
23    of the 20 or 25 percent of the time in your case
24    study there was no effect from Chinese drywall after
25    remediation?
```

```
 1      A.   Right.  25 percent of this sample, that's

 2   correct.

 3      Q.   Okay.  I want to go back to the tables to

 4   the end, Fort Myers 23, which is three or four after

 5   Tampa 27.  Are you there?

 6      A.   I am.

 7      Q.   And the high and low impact are both

 8   negative numbers, correct?

 9      A.   Yes.

10      Q.   And that is not reflected on Table 20, on

11   Table 20 you listed both of those high and low as

12   zeros instead of negative numbers, correct?

13      A.   Correct.

14      Q.   I want to drill down a little bit.

15      A.   May I get a cup of coffee.

16           MR. BLOCK:  Yeah.  Let's take a break.

17           THE VIDEOGRAPHER:  Off the record, 12:20.

18        (Recess from 12:20?p.m. until 12:38?p.m.)

19           THE VIDEOGRAPHER:  On record, 12:38.

20   BY MR. BLOCK:

21      Q.   Just a couple more questions about the table

22   on page 20 and then we'll move to a different topic.

23   If we look at just the low impact column,

24   Mr. Graziano, am I right that there are one, two,

25   three, four, five, six -- seven that are explicitly
```

Confidential – Subject to Further Confidentiality Review

```
 1    labeled as zero, one that's two percent, one

 2    that's three percent, one that is five percent, so

 3    that would be 10 that are five percent or less on

 4    the low impact side?

 5       A.    Seven zeros, three that are less than five

 6    percent on the low impact, not accounting for

 7    Broward 10, which we had -- which by amendment would

 8    be a 2.6 therefore less than five, so that would

 9    actually be four.

10       Q.    So that would take us to 11 -- 11 of the low

11    impact data points on the table on page 20 would be

12    effectively no impact after remediation, correct?

13       A.    Correct, based on the correlation of the low

14    end of the value range.  The interpretation there

15    would be, you would have to be correlating to the

16    lowest end of the value range in expressing an

17    unimpaired value to the control sale.

18       Q.    But what that means in plain English is that

19    on the low impact side in your data, a little more

20    than half the time there is potentially no price

21    difference between a remediated home and a

22    comparable home that never had Chinese drywall,

23    correct?

24       A.    If by that the low impact is the -- is --

25    would ultimately be the correlated value of the
```

1    home, that's correct.

2        Q.   And it was your decision to use a low impact

3    column and include the low impact in your analysis,

4    correct?

5        A.   Yes, sir.

6        Q.   And so, if I just look at your low impact

7    data and take that for what it's worth, I would see

8    that 11 out of 20 times there is no effect from

9    Chinese drywall?

10       A.   That's what the data indicates, yes.

11       Q.   Do you say that anywhere in your expert

12   report?

13       A.   I narrate in a number of instances where the

14   impacts were zero, so I don't know if I get to the

15   11 of the 20, but I prepared a number of analyses

16   that demonstrated the number of case studies that

17   suggests high or low impact boundary, but I don't

18   know if I specifically addressed the 11 of the 20,

19   which even in analyzing the data at the time it

20   would have been 10 out of the 20.  I don't know that

21   I said --

22       Q.   You correctly calculated Broward 10 would be

23   11 out of the 20?

24       A.   Correct.

25       Q.   When you made damages estimates for the

1    Priority Claimants, how did you account for the fact

2    that 11 out of 20 times on the low impact side there

3    is no effect from Chinese drywall post-remediation?

4        A.    Well, again, the conclusion in this report

5    was to look at the 11 out of 20 on the low impact.

6    The same analysis could be said on the high impact

7    and I could say that out of the 20, 17 of the 20

8    indicated an impact greater than five percent in the

9    order of magnitudes 12, 13, 15, up to 28 percent.

10    So in looking at that, the way in which I accounted

11    for it is, I arrayed the low impacts, I arrayed the

12    high impacts, I considered the variability in that

13    data and when I correlated the 10 percent that

14    considers the array of data in the low and the array

15    of data in the high.

16        Q.    So in reality or in the reality of your

17    data, sometimes the effect is nonexistent from

18    Chinese drywall, correct?

19        A.    There are cases, I testified before, that

20    you find a magic buyer and they like the house and

21    they don't discount the home and there are going to

22    be instances like that.  But not in the majority of

23    the cases, the fact is that even at the lowest

24    impact level in my analysis -- I'll give you the

25    precise, for the record -- 45 percent of the cases

```
1    even in the lowest analysis, 45 percent of the cases

2    demonstrated an impact of five percent or greater.

3    And on the highest, right, because that's the

4    inverse, nine of 11 would be 45 percent.  And so if

5    11 out of the 20 demonstrated an impact of five

6    percent or less, then nine out of the 20

7    demonstrated five percent or greater, so in 45

8    percent of the cases, under the most -- the lowest

9    testing possible, 45 percent of those cases

10   demonstrated an impact greater than five percent.

11         And then on the high side impact, 17 out of

12   the 20 or 85 percent of the time on the high impact

13   side, the numbers were greater than five percent,

14   and in most cases there is a percentage there which

15   I could recalculate probably greater than 70 percent

16   of the time the number was greater than 10 percent.

17   If I look at that range of impacts and I correlate

18   to 10 percent, I think that's a reasonable

19   interpretation of the data.

20   Q.   So it's important to you that you observed a

21   result in 45 percent of your data on the low impact

22   side?

23   A.   It is.

24   Q.   Okay.  So that -- so when something happens

25   45 percent of the time in your study, that's a
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 287 of 556
Case 1:14-cv-22484-MGC Document 29-11 Entered on FLSD Docket 09/15/2014 Page 595 of 384

Confidential - Subject to Further Confidentiality Review

1    meaningful result?

2       A.   That's a different question.  You said was

3    it important to me in my analysis that in 45 percent

4    of the time on the low impact I observed impacts.

5    If -- and the answer is yes.  Because if in this

6    analysis all of the -- 75 or 85 or 90 percent of the

7    low impact there was no damage and on the high side

8    75, 80, 90 percent there was a damage, then it would

9    be evenly distributed to say, well, maybe in some --

10   you know, the data would be evenly distributed -- I

11   would have to wonder whether the analysis of the

12   unimpaired values was tight enough, credible enough

13   to make a conclusion.

14       In this case, even under the most adverse

15   interpretation of the data, the low impact still

16   demonstrated five percent or greater impact, 45

17   percent of the time, I think that's relevant.

18       Q.   But when you actually applied your findings

19   to specific cases, why didn't you vary the damages

20   estimates the way your own data varied?

21       MR. MONTOYA:  Object.  I'm sorry.  I don't

22   understand the question.  Vague.  Go ahead.

23       A.   Yeah.  I felt like I've answered the

24   question.  Restate the question for me again.

25       Q.   In your own data as you present it, the

```
 1    effects range from a negative number or zero percent

 2    as you write them on Table 20 to an impact from

 3    Chinese drywall.  Okay?  So in your data set,

 4    sometimes Chinese drywall remediated homes sell for

 5    more than comps and sometimes they sell for less

 6    than comps?

 7        A.   Correct.

 8        Q.   In every single instance when you went to

 9    make damages estimates for the plaintiffs, you gave

10    them the exact same estimate of 10 percent?

11        A.   Correct.

12        Q.   Why?  Why did you not in your damages

13    estimates reflect the variability that exists in

14    your data?

15        A.   Because the variability that exists in my

16    data was asymmetrical.  In other words, if I had

17    grouped -- let's just say by location, all of the

18    zeros or negatives, if you want to call them that,

19    and all of the sudden all the properties in a

20    particular location had demonstrated zero impacts

21    then I may have concluded that location was a

22    significant variable and I would have had to study

23    that location.  And if all of that data centered

24    around a particular location like Broward, then I

25    may have concluded that Broward doesn't demonstrate
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 289 of 556
Case 1:11-cv-22408-MGC Document 31-1 Entered on FLSD Docket 05/15/2014 Page 7 of 384

Confidential - Subject to Further Confidentiality Review

```
 1    an impact.

 2         I also did it by price segmentation.  I

 3    looked at all of these impacts and if all the zeros

 4    had centered around homes in the million-and-a-half

 5    dollar plus range, I might have concluded that the

 6    impacts decline the higher the price of the home

 7    goes or the lower the price home goes, whatever the

 8    data demonstrated.

 9         But as they have grouped these zeros, there

10    was no systematic appearance of these zeros and/or

11    negative impacts by price, by age of the home, by

12    date of sale or by location.  So there was no

13    variation, there were certain instances where the

14    home was not affected based on my review of the

15    data.  I acknowledge that.  But there were instances

16    where it was significantly higher, more affected to

17    the high side and there certainly were no instances

18    where it was lower than zero.

19         So in the correlation, knowing that there

20    wasn't any systematic difference between price

21    segmentation, geography, date of the sale, et

22    cetera, there was no way for me to conclude to a

23    variability impact.  I had to conclude, based on the

24    data, that there was an impact.  I estimated that

25    impact at 10 percent and I applied that 10 percent
```

1    uniformly to all the Priority Claimants.

2        Q.   So using your method, there was no way for

3    you to approve of -- strike that.

4            I'm just looking at your testimony here.

5    Using your method that you used in your expert

6    report, there was no way to assign variable impacts

7    to the claimant properties?

8        A.   That's correct.  I don't think the data

9    demonstrated that there were variable impacts for

10   the different characteristics, correct.

11       Q.   But there were variable impacts for

12   different properties and different elements of your

13   case study as we've talked about for an hour,

14   correct?

15       A.   Yes.  Specific case studies demonstrated in

16   certain instances that there was no impact.

17       Q.   What I'm asking is, was there a way in your

18   method, that you used to write your expert report,

19   for you to assign variable impacts to claimant

20   properties that -- or not?

21       A.   I don't think the -- I don't think that the

22   data demonstrates that would be required.  I don't

23   think that -- it's not a matter that there wasn't a

24   way in the method.  There was a way in the method,

25   as I testified.  If all of the zeros had been

1    concentrated by geography or age or date built,

2    et cetera, I would have correlated differently.  The

3    method would have demonstrated those specific

4    differences.  It didn't.  And therefore, there was

5    no reason for me to correlate the different impacts

6    in different geographies or different price

7    segmentations.

8        Q.   Would another way to determine whether the

9    claimant homes experienced a post-remediation stigma

10   impact be to look at whether, after remediation,

11   those claimant homes sell for less than comparable

12   homes?

13       A.   Well, that would be testing whether that

14   estimate holds true in the future.

15       Q.   So that's doable?

16       A.   Sure.  In fact, Exhibit 3 does that.  That's

17   some of the material I prepared in Exhibit 3.

18       Q.   Thank you.

19            MR. BLOCK:  Do you have a copy?

20            MR. MONTOYA:  Yeah.  Thank you.

21       Q.   So I'm going to have to study Exhibit 3 over

22   lunch because we just got it, but can you -- we just

23   got it today.  Can you tell me what you did to

24   generate Exhibit 3?

25       A.   Sure.  Exhibit 4 entitled Post Discovery

1    Submission reflects the MLS data that was researched

2    on the sales of the priority claimant homes, and

3    then behind each of those -- and there are

4    separators that demonstrate, you know, which

5    Priority Claimant testing, and then using the same

6    method as the case studies but without the benefit

7    of being able to develop four comparable sales and

8    confirm all those sales and confirm the sale and the

9    disclosure, you know, I looked at the MLS for the

10   Priority Claimant home that sold.  If the MLS

11   indicated that, you know, whether there were remarks

12   or otherwise in that MLS that disclosure was made,

13   or if on page -- most of these occurs on page 2, you

14   will see that there is an area where they can upload

15   the disclosure.  So I'm looking for that disclosure

16   but, you know, we weren't, obviously, able to

17   confirm the disclosures in all cases.

18          And then behind that, in each case study is

19   what I considered to be, sort of, the most analogous

20   sale in that market within the same time frame,

21   bedroom, size, range, et cetera, we took one sale

22   and said -- and said here's a sale compared to the

23   other sale and we calculated the difference.

24      Q.   So you did a version of a paired sales

25   analysis?

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/18 Page 293 of 556
Case 2:09-cv-22484-MCW Document 2011 Entered on FLSD Docket 09/15/2011 Page 391 of 384
Confidential – Subject to Further Confidentiality Review

```
 1      A.   It is a paired sales analysis but it's only

 2   with one sale.

 3      Q.   Does that limit the reliability of

 4   the paired sales analysis to only use one comp?

 5      A.   Not necessarily, but it certainly doesn't

 6   allow me to develop a high and low range.  It forces

 7   me into a single point range.

 8      Q.   How do I interpret, I'm looking at

 9   Exhibit 3, the second to last column, percent

10   diminution testing, how do I interpret what you're

11   saying there?

12      A.   Within the post discovery submission I have

13   a sale that sold around the same time as the

14   Priority Claimant's sale and I calculated the

15   difference between that test sale and the Priority

16   Claimant's sale to reflect that percentage

17   diminution comparing again on most of the same

18   elements we did in the paired case study size,

19   bedrooms, lot size, et cetera.

20      Q.   Did you use all of the same adjustment

21   elements in Exhibit 3 that you did in your paired

22   sales analysis that's part of your expert report?

23      A.   No, not at this time.

24      Q.   So the negative number, I am looking at the

25   percent diminution testing, why did you use
```

1    different adjustment elements?

2    A.   I don't understand the question.

3    Q.   Well, you just said that you used in

4    Exhibit 3 and I guess 4, compared to your expert

5    report, you did not use the same adjustment

6    elements?

7    A.   No.  I largely did use the same adjustment

8    elements.  These are all in the same location, so

9    the comparable selection brings them all into the

10   same location, preferably the same neighborhood,

11   same relative date of value and then I reviewed each

12   of those for size, bedrooms, baths, lot size,

13   condition and year built.  So yes, I used the same

14   adjustment elements.  I didn't adjust them on a grid

15   the same way as I did with these.

16   Q.   But you did make numerical adjustments the

17   same way you did in your expert report?

18   A.   I did.  And in fact, each of the yellow tabs

19   within this post discovery submission has my

20   handwritten notes on that.

21   Q.   Okay.  So if we go back on Exhibit 3 I just

22   want to understand the way this is presented.  You

23   have a column second to the right -- second from the

24   right, excuse me, percent diminution testing, I'm

25   looking at the Miranda home because it's the first

Confidential - Subject to Further Confidentiality Review

1    row, and you write negative 2.50 percent, what does

2    that mean?

3       A.   That means that the sale of the Miranda

4    residence was 2.5 percent less than the comparable

5    sale or the analog sale that I developed.

6       Q.   And a difference in sales price of 2.5

7    percent is within the range that you consider

8    basically no effect, it's under five percent,

9    correct?

10      A.   Correct.

11      Q.   So did the -- if we were to get out the

12   report that you did for Miranda, the individual

13   claimant report that you had opined that there would

14   be a 10 percent price impact, that was not born out

15   by the post report analysis that you did?

16      A.   Well, it was not born out by the single

17   comparable but in the case of Miranda, you know,

18   Miranda was foreclosed in November of 2017 and a

19   year later it's, you know, it closed and we had an

20   unimpaired value estimate already there.  So I don't

21   know when you say the 10 percent -- oh, you're

22   saying the 10 percent conclusion?

23      Q.   Yes.

24      A.   Yes.  I'm sorry.  Let me -- I'm answering a

25   question you didn't ask.  Please say it again.

Confidential – Subject to Further Confidentiality Review

1      Q.   I'll ask it again.

2      A.   Thank you.

3      Q.   In your claimant report for the Miranda

4    family, you opined that there are -- the property

5    would experience a 10 percent price decrease due to

6    stigma but when you tested the Miranda property

7    against a neighboring property after serving your

8    expert report, you actually found essentially no

9    difference in the price, correct?

10     A.   The subsequent seller of that property that

11   subsequently remediated did not suffer that damage,

12   but Miranda potentially did because they lost it and

13   so that's -- they suffered on the -- on their sale

14   of the property to a speculator.

15     Q.   I'm just asking a math question.

16     A.   Yeah.  The math question is that -- in that

17   particular case, the 10 percent diminution did not

18   apply for the subsequent seller that sold it

19   remediated, that's correct.

20     Q.   Okay.  And if we look at Kevin and Stacy

21   Rosen, row 3, is that a negative seven percent?

22     A.   That's right.  There was a seven percent --

23   I should not have put these in as negatives to be

24   consistent with the prior report, so just for the

25   record, these negatives reflect a diminution in

1   value.

2       Q.   Okay.

3       A.   So the 2012 demonstrated a seven percent

4   diminution without making any adjustments for the

5   difference between the date of sale and the impaired

6   value.

7           And then as you say, that area is cut off, I

8   will get you a clean sheet during lunch, but that

9   showed a seven percent impact.

10      Q.   So that again did not -- you didn't hit your

11  10 percent estimate with the Kevin Rosen home?

12      A.   Correct.  Based again on one sale.

13      Q.   Sure.

14      A.   And the estimate of unimpaired value based

15  on one sale, that's correct.

16      Q.   So we go to Michael and Robin Rosen, row 6,

17  you write "inconc," does that stand for

18  inconclusive?

19      A.   Yes, sir.

20      Q.   What do you mean?

21      A.   I could only identify one sale that was,

22  I'll call it, reasonably comparable.  You should see

23  the photographs, I've included the sale in there.

24  The sale traded for about a million nine, and if you

25  look at that analog sale, I'll call it, that million

1    nine is based on, you know, the remediated property

2    being a very, very high end property and the

3    unaffected property being a very, very high end

4    property and I didn't think it was appropriate to

5    compare a 1.9 million dollar sale to a 1.3 million

6    dollar remediated property and conclude that that

7    was all a result of Chinese drywall because there

8    were just so many differences in the features of

9    that home that I considered that to be inconclusive.

10   It would have if I applied that million nine against

11   the million five or the million four, it would have

12   demonstrated a very large impact, something in the

13   order of magnitude of 26 percent, but the complexity

14   of that home just didn't, in my view, didn't rise to

15   the level saying that I could assign all of that

16   impact.  Having no way to assign a portion of that

17   impact, I chose to just label it as inconclusive.

18       Q.   So when you studied the Michael and Robin

19   Rosen home after serving your expert report, you did

20   not confirm your report's estimate at a 10

21   percent price impact?

22       A.   I didn't have the -- I don't think the data

23   existed based on what I reviewed to date.  I

24   couldn't find the data to confirm that.  That's

25   correct.

 1    Q.   If we go to the next one, it is the Etter

 2    family home, you write the zero percent could not

 3    confirm disclosure --  and I don't know if there is

 4    other text.  But the number is zero percent,

 5    correct?

 6    A.   Yes.

 7    Q.   This is another one where after serving your

 8    expert report you studied the claimant property and

 9    could not confirm a 10 percent price impact?

10    A.   Right.  We could also not confirm that the

11    property was -- that the disclosure occurred, so,

12    you know, in the view -- in the case where a zero

13    percent occurs and disclosure is not confirmed, I'm

14    not sure that's as relevant.

15    Q.   Okay.  But mathematically, you did not

16    confirm the 10 percent estimate that you had made in

17    your report --

18    A.   Correct.  And in fact, as I may say, as it

19    relates to Catherine and Steven Etter, we -- they

20    sold the property in December 2016, we appraised the

21    property unimpaired as of December 2016 and our

22    unimpaired appraised value came in at a million 58.

23    So we had the comparables, you know, unimpaired

24    comparables, we did a full appraisal analysis and

25    that demonstrated zero percent.

```
1      Q.   We'll come back to the Etters in a little
2   bit here.
3           So O'Brien, you got a negative 14 and a
4   negative 7.5 percent depending on the sale, right?
5      A.   Correct.  And again, you will see the note,
6   it says subject --
7      Q.   I think we lost somebody on the phone.
8      A.   Oh okay.  It says subject to disclosure
9   confirmation, in other words, the negative
10  seven-and-a-half percent, I think, if we review that
11  data, we will see is that 2017 sale there was
12  nothing in the MLS that indicated that there was
13  disclosure at that time.
14     Q.   You don't have any personal knowledge of
15  whether the seller of that home disclosed the prior
16  existence and remediation of Chinese drywall in the
17  O'Brien home, do you?
18     A.   No, I just know that it's not listed in the
19  MLS.
20     Q.   Just because it's not listed in the MLS,
21  doesn't mean that the seller and the buyer didn't
22  talk about it, right?
23     A.   Correct.
24     Q.   So with that limitation in mind, for the
25  2017 sale, you didn't hit your 10 percent estimate,
```

Confidential – Subject to Further Confidentiality Review

```
 1    correct?

 2         A.   Correct.

 3         Q.   The Avery home, row 11, 8.5 percent, you did

 4    not hit your 10 percent estimate there?

 5         A.   That's correct.

 6         Q.   You write limited data on row 16 for the

 7    Walls family?

 8         A.   Yes.

 9         Q.   What does that mean?

10         A.   We were not able to identify anything that I

11    believed was comparable within the -- within that

12    marketplace.  There was just limited data available

13    from which to pair, so I just tagged it as limited

14    data.  It wasn't that I found data and deemed the

15    data to be inconclusive, we were just unable to find

16    relevant data to pair.

17         Q.   Okay, but the next -- okay.  But in any

18    event you were not able to confirm your 10 percent

19    estimate for the Walls?

20         A.   Correct.

21         Q.   The next row, 17, Feldkamp, you have a

22    range, negative 15 to negative 20.  Is that based on

23    the two sales that are in the next column to the

24    right or do you know what the basis for that is?  Do

25    we need to go to Exhibit 4 and look at that?
```

```
 1    A.    Yes.

 2    Q.    Okay.  So let's do that.

 3    A.    That 15 to 20 percent relates to the 2018

 4    estimate, based on the data contained herein.

 5    Q.    Okay.  Help me out here.  In the value

 6    opinion as of date of value column, Exhibit 3, for

 7    the Feldkamps you have $152,000?

 8    A.    That's correct.

 9    Q.    And then for the January 18, 2018 sale for

10    the Feldkamps you have a sale value of $220,000,

11    right?

12    A.    No, I'm sorry, for the January of 2018,

13    222,000.

14    Q.    Yeah.  I got the date wrong.  So how do you

15    then arrive at negative 15 to negative 20 percent?

16    A.    Well, you can't compare our appraisal in

17    2015 to the values in 2018.  So you have to go find

18    a sale in 2018 based on the relative values, in

19    2018, to get to the 15 to 20 percent.

20    Q.    And that would be in Exhibit 4 somewhere?

21    A.    Correct.  So if you look in -- did you find

22    the Feldkamp cover sheet?

23    Q.    Yeah.

24    A.    So the first sheet is the Feldkamp

25    documentation that we had available, and I'll note
```

Confidential – Subject to Further Confidentiality Review

```
1    that -- for the record that there is no listing data

2    here, I believe that this is the property record

3    card, so we should get a copy of the listing data if

4    we have it.  I don't know that we could locate it.

5            And then behind that we have a comparable

6    property that sold for $289,000.  It was built in

7    2006 -- I'm sorry, the list price was 289.

8            Under contract as of September and the sold

9    price was 289.  Okay.

10           So we looked again at the square footage and

11   the number of bedrooms, number of baths, the

12   relative date of value so in the Feldkamp's case,

13   you know, this comparable occurred nine months after

14   the Feldkamp sale in January of 2018.  So, you know,

15   adjustment for date of sale, land size, small land

16   size adjustments, indicated that that comparable

17   when paired should put a range of 259 to 279 to the

18   Feldkamps and they closed at 222,000.

19       Q.   Who selected the comps that you have

20   included here in Exhibit 4?

21       A.   I did.

22       Q.   Did you have any help from your staff?

23       A.   My staff, you know, brought the relevant

24   data and, you know, identified based on my criteria

25   and then I reviewed that data and incorporated that
```

1    data based on my review of the comparables.

2        Q.   So who went on the MLS and searched for

3    comparables?

4        A.   I don't know in any particular case, but

5    probably Joe did a lot of the work for me and Yuliya

6    Georgiva and Juan Gamio.

7        Q.   Was it -- you, yourself, did not go into the

8    MLS and look for the comparables that you used in

9    Exhibit 4?

10       A.   No, sir.

11       Q.   And what criteria did you give your staff to

12   search for comparables in the MLS to create

13   Exhibit 4?

14       A.   To identify comparables that were within an

15   approximate date range, if available, the date range

16   was selected, needed to be expanded, so be it,

17   geography was important, try to find me comparables

18   that are closest in terms of age, size, bedroom

19   count, bathroom count and that's it.  Find

20   properties that the market would deem comparable.

21       Q.   Sure.  When you were identifying comparable

22   properties in your claimant-specific reports, the

23   ones that you served on February 15, you used local

24   appraisers to identify the comparable properties,

25   correct?

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 305 of 556
Case 2:14-cv-02094-EEF-JCW Document 341-43 Entered on FLSD Docket 08/15/2019 Page 383 of
384

```
 1      A.   I did.

 2      Q.   Why didn't you use local appraisals to

 3   identify comparable properties for Exhibit 4, your

 4   post report analysis?

 5      A.   Well, I was obviously prepared for the

 6   deposition with a time certain and so I didn't -- I

 7   wasn't able -- I wasn't able to go back and get

 8   those local appraisers to engage in the -- within

 9   the time frame I had.

10      Q.   Let's just finish with Exhibit -- well, this

11   part of Exhibit 3.  So you move to the Lalwani's,

12   you found an impact of negative eight to negative 19

13   percent based on a 2015 sale; is that right?

14      A.   Yes.

15      Q.   For the Marins, negative 8.5 percent based

16   on a 2013 sale?

17      A.   Correct.

18      Q.   And a -- for the Deegs, number 20, row 20,

19   negative one percent based on a 2017 sale, right?

20      A.   Yes.

21      Q.   Okay.  So of the -- how many -- let's count

22   how many you tested here.  How many of your claim --

23   strike that.

24           I'd like to count how many Priority

25   Claimants you tested, whether your 10 percent
```

```
 1     prediction hit the market for.  Okay?

 2         A.   Okay.

 3         Q.   So let's count on Exhibit 3 there are one,

 4     two, three, four, five, six, seven, eight, nine, 10,

 5     11, as I count them, 11 rows where you have some

 6     sort of diminution testing information written down;

 7     is that right?

 8         A.   Yes.

 9         Q.   In how many of those 11 instances did your

10     10 percent estimate hit the mark?

11         A.   How do you want to define hitting the mark?

12     Because if it came in at 15 to 20 and I estimated

13     10, that's a 10 percent rate of error.  If I

14     estimated 10 and it came in at eight, that's a two

15     percent rate of error, so do you want to give me

16     some type of rate of error to clarify that?

17         Q.   Sure.  Did you hit -- I will be happy to do

18     that.  So when you tested your 10 percent diminution

19     in value estimate for 11 of the Priority Claimant

20     properties, did any of those claimant properties

21     actually experience 10 percent diminution in value

22     in your testing?

23         A.   Yes.

24         Q.   Which ones?

25         A.   Feldkamp, Lalwani within a range of 8 to 19
```

 1    percent, O'Brien during the 2014 sale.

 2       Q.   But not during the 2017 sale, correct?

 3       A.   Correct, but again, subject to disclosure

 4    confirmation and subject to the fact that I only had

 5    one sale, so this is a single point estimate.

 6       Q.   Okay.  Well, so do you want to count both

 7    O'Briens and we'll have our denominator be 12 here?

 8    We are going to count both O'Briens sales that you

 9    tested.

10       A.   Well, I counted both O'Briens in the 11.

11       Q.   Which one are you not counting?  You have

12    something written -- here's what I was driving at?

13       A.   Okay.

14       Q.   You have some words or numbers written down

15    in 11 rows in the diminution testing column.

16       A.   Yes.

17       Q.   And actually, it looks like there might be a

18    2018 -- something for Kevin Rosen, I can't tell but

19    based on what I can see here you have something

20    written in 11 rows.  So what are you not counting

21    that I am counting?

22       A.   I am not counting the inconclusive Number 6,

23    and I'm not counting the limited data Number 16, and

24    if I have two tests that have a percentage that I

25    can see, and I'll acknowledge that in case Number 3

```
 1    there may be a number there and I can't see it, but

 2    all of the percentages that I can see, whether zero

 3    or not, I'm counting.  So if I have percentages in

 4    there, that's case one, three -- I'm going to give

 5    it to you.  So I'm counting one, two, three, four,

 6    five, six, seven, eight, nine, 10.  How did I

 7    miscount?  I apologize.  I see it's 10.  I thought

 8    you had asked me 11 and I confirmed it but it looks

 9    like it's 10.

10        Q.   We'll go with 10 the way you're counting it.

11    Let's just go row by row.  Did you confirm your 10

12    percent prediction for the Miranda property?

13        A.   No.

14        Q.   Okay.  So that's one, no confirm.

15             Did you confirm your 10 percent prediction

16    for Kevin Rosen?

17        A.   It was seven.  I think that's within -- so

18    it did not -- it was not 10 percent or greater, so

19    I'll say no.

20        Q.   Did you confirm your 10 percent estimate for

21    the Etter family?

22        A.   No.

23        Q.   Did you confirm your 10 percent estimate for

24    the O'Brien family?

25        A.   Yes in 2014 at 14 percent; and no in 2017 at
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 309 of 556
Case 2:09-md-02047-EEF-MBN Document 22366-55 Filed 08/15/2019 Page 309 of
384
Confidential - Subject to Further Confidentiality Review

```
 1    seven-and-a-half percent.

 2        Q.   So we'll put one in both rows.

 3        A.   What are you putting --

 4        Q.   I'm going to add these up.

 5        A.   So it's one no --

 6        Q.   It's one no and one yes.

 7        A.   Perfect.

 8        Q.   Okay.  For the O'Briens.  All right.  So for

 9    the Averys -- or Ms. Avery, did you confirm your 10

10    percent estimate?

11        A.   It is not greater than 10 percent.

12        Q.   For the Feldkamps did you confirm your 10

13    percent estimate?

14        A.   Yes.

15        Q.   And you're saying yes because it's higher

16    than 10 percent?

17        A.   Correct.  That's the criteria you were

18    using, right?

19        Q.   I'll spot you that, yes, we're saying the

20    same thing.

21        A.   Yeah.

22        Q.   All right.  So for the Feldkamps did you

23    confirm your 10 percent?

24        A.   Yes.

25        Q.   For the Morins, Ms. Morin, did you confirm
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 310 of 556
Case 1:11-cv-22408-MGC Document 291 Entered on FLSD Docket 08/15/2011 Page 388 of
384
Confidential – Subject to Further Confidentiality Review

 1    your 10 percent?

 2        A.   Did we skip Lalwani?

 3        Q.   Not intentionally but -- let's go back here.

 4    You told me you confirmed your 10 percent one time

 5    for the O'Briens?

 6        A.   Correct.

 7        Q.   And you confirmed your 10 percent for the

 8    Feldkamps?

 9        A.   Correct.

10        Q.   And then the Lalwanis.  So I have three

11    times that you think you've confirmed?

12        A.   Correct.

13        Q.   So we're on the same page about that.

14        A.   Correct.

15        Q.   Did you confirm your 10 percent estimate for

16    Ms. Morin?

17        A.   The number is less than 10 percent, so under

18    your definition, no.  The characterization that I

19    didn't confirm my 10 percent, if I saw an

20    eight-and-a-half or a seven-and-a-half or a nine

21    percent impact, in my view, that confirms my 10

22    percent, and I think when we talk about the

23    individual Priority Claimants you will see why

24    that's relevant as well.  Because if I apply 10

25    percent to a 2012 or 2013 unimpaired value and I

```
 1    said there is a 40,000 impact and then five years

 2    later the property sold and it might only represent

 3    a seven percent impact but it's seven percent of a

 4    much higher number, it's still 30, 40, $50,000, that

 5    damage estimate as a dollar amount holds even though

 6    the percentage doesn't necessarily hold.  And as

 7    we've discussed, if you are going to exclude

 8    everything that has a low boundary of zero or

 9    negative up to five percent, based on my testimony

10    that that's difficult to discern in the market,

11    that's fine.  But I think to be fair, that suggests

12    an error rate of plus or minus five percent.  So if

13    I correlated a 10 and the answer is eight, to me

14    that's confirmation that my 10 is reasonable.

15         MR. BREIT:  At the end of that sentence,

16         we'd like to get our iPads back on.  It stopped

17         during that answer.  I hope the court reporter

18         didn't stop but the answers on our machines

19         didn't come through.

20         MR. MONTOYA:  No.

21         MR. BREIT:  Do you see anything on your

22         iPad?

23         MR. BLOCK:  No.

24         MR. BREIT:  Can we take a technological

25         moment because I'd like to be able to see that
```

```
 1        answer in particular.

 2               THE WITNESS:  Me too.

 3               THE VIDEOGRAPHER:  Off the record, 1:15.

 4          (Recess from 1:15?p.m. until 1:19?p.m.)

 5               THE VIDEOGRAPHER:  On record, 1:19.

 6   BY MR. BLOCK:

 7        Q.   Mr. Graziano, on the break you and your

 8   colleague Joe went out in the hall to talk about

 9   something.  Were you talking about this case?

10        A.   No, not specifically.  I just explained to

11   him when we were done, the rules of depositions as I

12   generally understand them, is that I don't have any

13   contact with any of the attorneys, that he and I are

14   just going to get up and go to lunch.  We aren't

15   having lunch with the attorneys.  We aren't going to

16   talk to anybody.

17        Q.   That's all -- you didn't discuss the

18   substance of your analysis?

19        A.   No, sir.

20        Q.   So we left off right before the Deeg family

21   and you did not hit your 10 percent damages estimate

22   for the Deeg family, correct?

23        A.   Correct.

24        Q.   So out of the 10, I count that seven out of

25   10 times you did not hit your 10 percent damages
```

```
 1    estimate, correct?

 2        A.   That's your characterization of it, correct.

 3        Q.   Why did you conduct the analysis that's

 4    reflected in Exhibit 3 and 4 after serving your

 5    expert report on February 15th?

 6        A.   Because I wanted to be prepared to address

 7    the individual claimant issues and I fully expected

 8    that we were going to talk about things that

 9    happened after the fact, even though I did my

10    appraisal analysis as of a particular effective

11    date.  I expected that some question of some of

12    these sales may occur and I wanted to be prepared.

13        Q.   Most of the sales that you analyzed in

14    Exhibit 3 and 4 predate your February 15th, 2019

15    expert report, correct?

16        A.   Well, they predate my preparation of the

17    report but they don't predate the value dates of

18    reports.

19        Q.   Why are this -- why do the value dates in

20    your Priority Claimant reports vary from, as I

21    understand it, 2009 to 2018 or 2019?

22        A.   I believe -- well, they were directed by the

23    attorneys that gave me those dates that those were

24    the dates and values that they wanted for each of

25    the Priority Claimants and I am going to assume that
```

Confidential — Subject to Further Confidentiality Review

1    that's their claim as to their date of loss, so the

2    damage estimate would apply as to that date.

3        Q.   So you used valuation dates for the claimant

4    properties but you do not know the significance of

5    those valuation dates?

6        A.   Well, no.  I mean, when you say I don't know

7    the significance, I didn't develop those dates.

8    That was my testimony.  That's what I was trying to

9    get across.  I was told that those were the dates

10   that the attorneys were alleging damages as of, and

11   of course, you know, if you look at, like, the dates

12   of foreclosure, those correspond to the value dates,

13   so that was the date that the claimant lost the

14   home.  Current owners got a current value date.  If

15   an owner sold the home, then that value date became

16   the relevant date.  So I believe I fully understand

17   why they selected the date.

18       Q.   That was not your choice to use those

19   valuation dates?

20       A.   Correct.  That was my point in the first

21   answer.

22       Q.   Okay.  All right.  So in terms of

23   availability of the market data, it would have been

24   possible for you to conduct analysis, the testing of

25   your predictions that is reflected in Exhibit 3 and

1    4 before you served your expert report, correct?

2        A.   Subject to additional time.  I mean I had to

3    10 -- I would have had an additional 10 case studies

4    to develop in addition to the work that we did, so

5    it -- it would have just been a function of time or

6    staffing.

7        Q.   But it would have been possible?

8        A.   Of course.  Anything is possible.

9        Q.   So if instead of doing the case -- well, let

10    me back out a little bit.

11        Your case study that you actually did in

12    your expert report, why did you use the homes that

13    you did instead of looking at the Priority Claimant

14    homes?

15        A.   Well, one reason is in the design of the

16    study I wanted to avoid any claim that there was

17    bias by looking at the Priority Claimant homes.

18    They have their own set of allegations and their own

19    set of damages that result from a number of

20    different reasons, and I didn't want my case studies

21    to be influenced by specific facts and allegations

22    within the claimant homes.  So I intentionally

23    stayed away from the claimant homes and tried to

24    look at properties that were not related to the

25    claimants.  Again, within the case studies, we

1    attempted to confirm all of the control sales with

2    the parties to the transaction and I didn't think

3    that considering the litigation that level of

4    confirmation with the primary party to the

5    transaction that happens to be a claimant would have

6    been considered good evidence.

7        Q.   You know that one of your case study homes

8    is a Priority Claimant home, don't you?

9        A.   I was not aware of that.  In fact, we

10   scrubbed the case studies and I eliminated one or

11   two of them as being claimants, so if that's the

12   case, we should look at that case study.

13       Q.   I'm pretty sure that's right but we'll look

14   at it together after lunch.  And you know that in

15   your survey one of the people you interviewed was

16   Ryan Greenblatt, who is an expert for the

17   plaintiffs?

18       A.   Yes, but he told me that he -- he declined

19   to comment on the record.  We did interview him as

20   part of the process because he was one of the

21   listing agents on one of the homes.

22       Q.   Kevin Rosen?

23       A.   Okay, Kevin Rosen.  And he declined to

24   comment on the record on that.

25       Q.   We'll -- all right.  If instead of doing the

1   case study you did in your expert report based on 19

2   or 20 nonclaimant homes, you had simply analyzed the

3   Priority Claimant homes, would you have arrived at

4   the same 10 percent stigma damages estimate?

5       A.   Without any of the other case study support,

6   I would have just been working with this sample of

7   10, is that what you're asking me?

8       Q.   Yes.

9       A.   I think again, based on the weighting I

10  would have had fewer homes, I would have had about

11  30 percent of the homes that showed zero -- if I had

12  used the -- again, let me caveat.  There is only one

13  sale tested against all of these tests, so if I had

14  fully developed these, you know, the percentage

15  indications may have changed.  Right?  If I had used

16  three or four comparable sales, if I was able to

17  confirm all the disclosures, the data may have

18  changed.  I have a zero here that we're counting as

19  a zero for purposes of today's discussion but I

20  wasn't able to confirm disclosure.  I had fully

21  developed that case study that may have impacted

22  this.  But based on the data that I have here today,

23  recognizing its limitations, it looks like there

24  were three or four that were zeros or near zeros,

25  minus 2.5, zero, but I could not confirm disclosure,

Confidential - Subject to Further Confidentiality Review

```
 1    minus 1 percent on Deeg, so that was about 30
 2    percent of the case studies that demonstrated the
 3    zero.  And then I've got one, two, three case
 4    studies, about 30 percent of the case studies that
 5    demonstrated greater than 14 percent, and then the
 6    balance of the case studies are at between zero to
 7    nine percent, and so probably based on this data I
 8    would have been at around 10 percent.
 9         Q.   Or would you have just offered a damaged
10    opinion based on the specific claimant home and the
11    punitive diminution value that that claimant home
12    experienced?
13         A.   Well, again you have to recognize though
14    that if I only had these 10, then from a geographic
15    specificity I would not have been able to array on
16    geography and time and a lot of these impacts are
17    after the date of value.  So -- my date of value, as
18    an example, my date of value on Lalwani was March of
19    2011 but the home didn't sell until 2015, so whether
20    that particular diminution would have been relevant
21    in 2011, I could have only tested if I had enough
22    2011 data, 2013 data, 2015 data to see that there
23    was no pattern that time didn't matter.  So I don't
24    think that the analysis would have been of just
25    these 10 Priority Claimants, I don't think that the
```

1    analysis would have been as comprehensive as the

2    analysis that I did which allowed me to consider

3    time and geography, et cetera, across a wider

4    spectrum of data.  I don't think it changes my

5    opinion, and I don't think the data does anything to

6    erode my opinion but I wouldn't have wanted to rely

7    on just the Priority Claimant numbers.

8        Q.   You would not want to rely on the Priority

9    Claimant numbers to determine whether the Priority

10   Claimants, themselves, actually experienced

11   diminution in value after remediating their homes?

12         MR. MONTOYA:  Objection, mischaracterizes

13       his testimony.  You can answer.

14       A.   Sure.  Again, some of these Priority

15   Claimants are impaired at the time, you know, these

16   are unimpaired estimates.  I wouldn't have used the

17   specific percentages from that particular case study

18   on sales that happened two, three, four, five years

19   down the line, correct, that wouldn't be, in my

20   opinion, appropriate methodology.

21       Q.   Let's do one more thing and we can take a

22   break for lunch.

23       A.   Okay.

24       Q.   Let's look at the claimant -- I'm going to

25   look at -- if you can grab the claimant-specific

1    report for the Etter family and we'll mark that as 6

2    when we get it.

3         (Graziano Exhibit 6 was marked for

4    identification.)

5    BY MR. BLOCK:

6    Q.   Have we got a clean copy to mark?  I'm not

7    sure -- we had a clean copy to mark.  Yeah.  I'll

8    just give this to you, you can look in your binder

9    but Exhibit 6 is going to be the claimant-specific

10   report for the Etter family dated -- well, the

11   effective date is September 28, 2016, but the letter

12   that's page 2 is February 7, 2018, and is this the

13   most up-to-date report for the Etters?

14   A.   I believe so.

15   Q.   This isn't one you amended?

16   A.   I do not believe this is one that I amended.

17   Q.   Okay.  If you turn with me to page 7 of

18   Exhibit 6, which is your report for the Etters, you

19   found that after the Etters remediated and sold

20   their home, they did not experience any

21   post-remediation stigma discount, correct?

22   A.   Based on the unimpaired valuation I

23   completed, it did not appear as if they suffered

24   that post-remediation discount, that's correct.

25   Q.   In fact, the Etter home after it was

```
1    remediated, sold for exactly what you appraised it

2    at, $1.58 million, correct?

3        A.   Correct.

4        Q.   Why do you still opine that the Etters are

5    entitled to $158,000 in post-remediation stigma

6    damages?

7        A.   At the time -- at the time I looked at the

8    MLS and I thought that my records reflect that there

9    was -- that they did not disclose the prior drywall

10   remediation.  In attempting to reconcile this issue,

11   however, I spoke to the Etters attorney and he

12   provided information that the Etters said they

13   provided it to their listing realtor but I was not

14   able to -- I am still not able to confirm or have

15   not confirmed whether the buyers were aware of that

16   issue.

17           If it is found, however, that they did not

18   disclose -- or that they did disclose the drywall

19   and the buyers knew of the drywall, this is a

20   perfect sample where they hit the lottery.  They

21   found a magic buyer that it didn't impact, and I

22   think if you look at the photographs in the Etters'

23   home, this is a very, very nice home on Jupiter

24   Inlet with some very unique features and probably

25   not many perfectly analogous replacement properties,
```

1    so if this happens -- if it happens to be true that

2    the Etters did disclose the drywall and didn't

3    suffer the actual damage, I would agree with you

4    that they should not be compensated for the damage.

5        Q.   Are you assuming that the Etters concealed

6    the existence or prior existence of Chinese drywall?

7        A.   I was making no such assumption.  I am

8    telling you that I was not able to confirm that the

9    buyers were made aware that the representation from

10   the Etters is that they provided the FLABAR

11   disclosure to the realtor.

12       Q.   Is it your opinion that disclosure of the

13   prior existence of Chinese drywall is required as a

14   matter of Florida law or real estate practice?

15          MR. MONTOYA:  Objection; outside the scope,

16       calls for a legal conclusion, among others, go

17       ahead.  You can answer.

18       A.   I was going to say that's outside my scope.

19   It is the premise, though, of my damage analysis

20   that the disclosure is required in perpetuity.

21       Q.   So it's a premise of your research but it's

22   outside your scope?

23       A.   No.  It's a -- yes, it's a premise of my

24   research but outside of my scope to opine as to

25   whether or not that is legally accurate.

1    Q.   All right.  So assuming that the Etters did

2    disclose the prior existence of Chinese drywall as

3    you assumed they were required to do and as they

4    appeared to have represented they did, they did not

5    experience any post-remediation stigma and are not

6    entitled to $158,000 in post-remediation stigma

7    damages, correct?

8         MR. MONTOYA:  Objection; improper

9    hypothetical.  You can answer.

10   A.   That is correct.  I don't -- if they did not

11   experience that diminution, then, you know, whether

12   that's applicable to their damage or not, it was up

13   to the jury, but I would suggest that if it's zero

14   and they didn't experience it, then they didn't

15   experience the damage, they are not entitled to

16   compensation for it.

17   Q.   So if they did experience the damage, would

18   it have -- I mean, you're basically saying that if

19   they experienced the damage, it's because they

20   concealed the prior existence of Chinese drywall.

21        MR. MONTOYA:  Objection; mischaracterizes

22   testimony.

23   A.   I don't know that I said that or not.  What

24   I'm saying is that if this buyer was not aware, and

25   therefore was not influenced, and did not make a

1    conscious decision to accept the Chinese drywall,

2    then the observed price for purposes of measuring

3    the damage is not relevant.

4        Q.    Do you think the Etters are entitled to

5    damages if they concealed the existence of Chinese

6    drywall?

7              MR. MONTOYA:   Objection.   That's a jury

8        question and a legal question.

9              THE COURT REPORTER:   I didn't get the

10       answer.

11       A.    I have no opinion on that.

12       Q.    What have you done to determine whether the

13   Etters disclosed the prior existence of Chinese

14   drywall?

15       A.    I reviewed the MLS listing agreement, I

16   believe, that's in my file, and I contacted the

17   Priority Claimant attorney and asked him to confirm

18   with the Etters whether or not a disclosure was

19   made, and his response was that his clients advised

20   him that they made the disclosure to their selling

21   broker.

22       Q.    When was that that you had those

23   conversations?

24       A.    I have an e-mail within the last two weeks.

25       Q.    Is that one that -- we'll look and see if

1    that's one we got.  We got a few e-mails the other

2    day.  I don't know if we got that one or not.

3        A.   And you may not have it because it probably

4    was after the disclosure requirement.

5        Q.   And your information -- the information that

6    you received in that e-mail from the Etters' lawyer

7    was that the Etters disclosed the prior Chinese

8    drywall to their agent, the selling agent?

9        A.   Right.  That they provided the seller's

10   disclosure to the selling agent, that's correct.

11       Q.   And pretty typical that the seller's agent

12   would convey information like that to the buyer and

13   the buyer's agent, correct?

14       A.   I would think so.

15       Q.   Standard practice in real estate?

16       A.   I'm not opining on standard practice in a

17   profession that I don't practice in anymore, but I

18   would say that generally the agents are going to

19   provide any disclosures to buyers, yes.

20       Q.   All right.  I think we're at a good time to

21   take a break so let's go off the record.

22            THE VIDEOGRAPHER:  Off record, 1:34.

23            (Recess from 1:34 p.m. until 2:41 p.m.)

24            THE VIDEOGRAPHER:  On record, 2:41.

25   BY MR. BLOCK:

Case 2:09-md-02047-EEF-MBN Document 22360-55 Filed 11/19/19 Page 326 of 556
Case 1:91-cv-22448-MCG Document 23-1 Entered on FLSD Docket 09/15/2019 Page 354 of 384

Confidential – Subject to Further Confidentiality Review

```
 1      Q.   Mr. Graziano, we're back after lunch and you

 2      brought with you, what I understand to be, a version

 3      of Exhibit 3 that's just with the cells expanded a

 4      little bit so they are more legible; is that right?

 5      A.   Yes.

 6      Q.   Okay.  Is there anything about -- anything

 7      else I need to know about Exhibit 3 for the newly

 8      expanded version?

 9      A.   I don't think.

10      Q.   Okay.  We'll combine that and make -- We'll

11      combine that with the first page of Exhibit 3 so

12      they can just together be Exhibit 3.

13      A.   Okay.

14      Q.   And that will -- I think that will be easier

15      for us down the road.  Let's put those here for

16      safekeeping.

17           THE COURT REPORTER:  Here's Exhibit 3.

18 BY MR. BLOCK:

19      Q.   Mr. Graziano, I'd like to talk with you

20      about the survey that you did.

21      A.   Okay.

22      Q.   Can you put us all on the same page.  What

23      was the purpose of conducting a survey as part of

24      your opinions in this case?

25      A.   There were two principal portions of the
```

 1    survey.  One in developing the survey, that was

 2    meant to represent an interview or a script during

 3    the control pairing, concerning the control pairing

 4    verifications.  So each of the sales and the control

 5    sale were attempted to be verified with respect to,

 6    you know, the control sale, the level of disclosure,

 7    whether the sale was arm's lengths, et cetera,

 8    et cetera, and then the same script was used for

 9    verification of the paired sales, the unimpaired

10    properties that sold just to verify that there

11    wasn't any Chinese drywall present or any other

12    situations present that were adverse, potential

13    detrimental conditions that would skew the results.

14            During the course of that survey we also

15    continued to ask questions from those realtors as to

16    what their opinion was with respect to price impacts

17    related to Chinese drywall, post-remediation,

18    pre-remediation, whether they have been involved in

19    those types of transaction and then in listing or

20    marketing other homes in the market whether they

21    noticed the price impact on homes that had Chinese

22    drywall and if so, what percentage impact.

23        Q.   What role does the survey play in your 10

24    percent stigma damages estimates for the Priority

25    Claimants?

```
 1       A.    Within the report we summarized and analyzed

 2    the character and nature of those surveys and

 3    identified any situations where realtors indicated

 4    that it might lead to a damage or that there may be

 5    a value diminution associated with Chinese drywall

 6    and then we classified all of those comments which

 7    we summarized in the report and then when -- in

 8    looking at the overall classification of the

 9    comments, really tried to understand from all the

10    surveys that we conducted, you know, whether there

11    was a predominance of comments that indicated they

12    were an impact or were not an impact.

13          So the role that it would have played or

14    that it played in my mind is if through these

15    interviews we had all of the realtors that said, oh,

16    no, you know, after remediation it has no impact,

17    you know, I would have had to give that

18    consideration in reconciling to the data.

19       Q.    What about if almost half of the realtors

20    said it had no impact, is that something you give

21    consideration to?

22       A.    Well, the way in which we classified it, and

23    I think we did give consideration to it.  I think we

24    weighed that in consideration of the 10 percent

25    impact and we weighed that in consideration of, you
```

```
 1    know, our overall analysis.  So I think we did give

 2    consideration to it.  We did have a number of

 3    realtors that said, you know, if remediated not

 4    much, but they didn't indicate, you know, a

 5    percentage, and we even classified those as, you

 6    know, comments that were -- that demonstrated no

 7    impact.

 8        Q.   Who designed the survey?

 9        A.   I did.

10        Q.   Did you have any help?

11        A.   No.  I worked with Paul Jones to transcribe

12    the initial text and we did some initial testing on

13    the survey with, you know, the first four or five

14    interviews that we did.  I attended those interviews

15    as each of the people in my office were doing those

16    interviews.  You know, I attended some of those

17    interviews to solicit and understand how much time

18    people were spending with them and what types of

19    answers were being gleaned from that information.

20    And just, you know, oversaw but I developed the

21    survey questions themselves.

22        Q.   Have you ever designed a survey for use in

23    litigation before?

24        A.   Yes.

25        Q.   How many times?
```

```
 1       A.   I would say more than a half a dozen.

 2       Q.   Have any of those surveys ever been excluded

 3  by a court?

 4       A.   Yes.

 5       Q.   How many times?

 6       A.   Once.

 7       Q.   Do you know what the case is?

 8       A.   Yes.  It's referenced on my errata sheet on

 9  the case history here as Island Estates Homeowners

10  Association vs. Two Island Development Corp, Gary

11  Cohen and NI Holdings.

12       Q.   Do you know who the judge was?

13       A.   I believe it was Judge Thomas.

14       Q.   Is that the only time that your testimony

15  has been excluded by a court?

16       A.   Yes.

17       Q.   What was Judge Thomas's critique?

18       A.   Well, I only had the benefit of the hearing

19  and questions that Judge Thomas asked and I believe

20  the order was written by opposing counsel so he just

21  signed the order, but essentially the critique was,

22  I was retained in a matter where a property

23  developer was subject of a stop work order

24  injunction on an active development plan.  That stop

25  work order was put in place in late 2014 at a time
```

```
 1    in the condominium market in Miami that was

 2    extremely favorable for selling condos and they

 3    didn't get the injunction released until the latter

 4    part of 2015, so they had a period of about a year

 5    where the project was essentially put on hold.

 6         I was retained by the attorneys in the

 7    matter to estimate what would the absorption -- the

 8    number of sales of preconstruction or during

 9    construction units, what number of sales should the

10    property have -- should the property have received

11    during that time frame if it hadn't been under the

12    injunction and stop work order.

13         I explained to the client when I took the

14    case that the only way to get that information to be

15    evidentiary would be to actually -- have the actual

16    sales sheets from developers and that was going to

17    be impossible to be able to enter into evidence,

18    that there was no way that, A, I was going to be

19    able to release confidential information where I had

20    information regarding the actual sales history of

21    these projects, and B, there was no way I was going

22    to get my clients, or anybody was going to be able

23    to get their clients, to release confidential

24    information about the number of sales that were

25    happening.  So I said the only way to get the
```

```
 1    information is to conduct a survey of the

 2    development community and brokers and survey how

 3    much -- how many sales per month they were doing.

 4    But the problem with that from an evidentiary

 5    perspective was that that survey method had to stand

 6    on its own and there might be a Daubert challenge

 7    resulting from the compilation of that material, and

 8    in fact, that's exactly what happened.

 9         I advised the client when we took on the

10    assignment that it was a risk and they knew about it

11    going in and the method was not flawed but Judge

12    Thomas's position was that I may have accurately

13    been able to -- I may have accurately represented

14    what the sales rate per month was on all of the

15    competitive projects, but I didn't -- I was not able

16    to reconcile how many cancellations of those sales

17    occurred so that it wasn't a fair comparison to the

18    subject, and so the order reads, you know, a bit

19    strong because like I said, opposing counsel

20    prepared the order but essentially, I think, Judge

21    Thomas's position as the gatekeeper was you're not

22    comparing apples and oranges and he excluded my

23    testimony.

24    Q.   Is it your opinion that your sample size in

25    your survey is statistically representative of all
```

Confidential - Subject to Further Confidentiality Review

1    realtors in Florida?

2      A.    No.

3      Q.    Is it your opinion that realtors, the

4    opinions of realtors as reflected in your survey,

5    are representative of the opinions and actions of

6    buyers and sellers in the actual marketplace?

7      A.    I do -- I do believe that the realtors

8    opinions about Chinese drywall do affect the actions

9    of the market participants, buyers and sellers in

10   the marketplace, yes.

11     Q.    So my question was a little bit different

12   and maybe it wasn't a good question.

13         Buyers and sellers in the marketplace might

14   act differently than realtors who are offering

15   opinions in the context of a survey, correct?

16     A.    I'm sorry.  Could you ask that question

17   again?

18     Q.    Buyers and sellers in the marketplace might

19   act differently than realtors who are offering

20   opinions in the context of a survey, correct?

21     A.    Sure.

22     Q.    So does your survey actually predict how

23   buyers and sellers in the marketplace will act in

24   reality?

25     A.    No.  My survey reflects the opinions of a

1    components of the market participants and their

2    impressions as to the impact of Chinese drywall.

3    It's an attitude survey, if you will.

4        Q.   You describe your survey on page 3 of your

5    general report as a contingent valuation method.  Is

6    that right?

7        A.   Yes, I believe that's -- that's how Bell

8    defined survey techniques.

9        Q.   So you rely on Dr. Bell for the proper

10   definition of a contingent valuation technique?

11       A.   Yes.

12       Q.   Okay.  Do you have your copy of Dr. Bell's

13   book, Real Estate Damages 3rd?

14       A.   I do.

15       Q.   We'll -- we'll mark Bell's book as Exhibit 7

16   and figure out the copying later.

17            (Graziano Exhibit 7 was marked for

18   identification.)

19   BY MR. BLOCK:

20       Q.   Can you turn with me to page 50 -- let's

21   start on 53 of Dr. Bell's book.  Are you there?

22       A.   Yes, I am.

23       Q.   And at the very bottom of page -- oh, do

24   y'all have a copy?

25            MR. MONTOYA:  Yeah.

1    Q.   Page 53 is where Dr. Bell begins his

2    discussion of contingent valuation surveys, correct?

3    A.   Yes.

4    Q.   Let's turn to the next page.  Can you look,

5    the third -- it's really the second full paragraph

6    that reads as follows:  "A concern about contingent

7    valuation surveys in general is the respondent's

8    actual behavior may differ from stated preferences."

9         Do you agree with Dr. Bell?

10   A.   Yes.

11   Q.   All right.  Skip down to the next paragraph:

12   "The use of contingent valuation in measuring the

13   value of private goods, including environmental and

14   other property damages, has nonetheless remained

15   controversial transactional data from the market

16   when available is clearly a preferred alternative."

17        Do you agree with Dr. Bell?

18   A.   I do.

19   Q.   Continuing.  "The appraisal literature

20   indicates the contingent valuation is generally a

21   less reliable and less accurate indicator of value

22   pending analysis of the market data."

23        Do you agree with Dr. Bell?

24   A.   I would add a qualifier there.  When used in

25   isolation or when used by itself, I would agree with

Confidential - Subject to Further Confidentiality Review

1    that.

2        Q.  So for the period in your study from August

3    2016 to February 15th, 2019, you only -- you do not

4    have market data, correct?

5        A.  I do not have market data for that period,

6    that's correct.

7        Q.  All right.  Dr. Bell continues:

8    "Accordingly, it is appropriate to use contingent

9    valuation in the rare circumstance of market data

10   being unavailable or as a tertiary approach to

11   confirm a market data analysis."

12           Do you agree with Dr. Bell?

13       A.  My apologies.  Can you give me that page

14   number again?  I closed it.

15       Q.  Yeah, it's the same as 54.

16       A.  Thank you.  I am sorry.

17       Q.  "Accordingly, it is appropriate to use

18   contingent valuation in the rare circumstance of

19   market data being unavailable or as a tertiary

20   approach to confirm a market data analysis.

21   Contingent valuation is not generally accepted as

22   primary valuation method when transactional market

23   data is ample and available."

24           Do you agree with Dr. Bell?

25       A.  Actually, that's what I just testified to.

1    When you asked me the question I would say, you

2    know, as a standalone method, it tends to be viewed

3    as less reliable and that's exactly what the next

4    two sentences say.

5        Q.   So you agree with Dr. Bell?

6        A.   I do.

7        Q.   Okay.  Let's turn to the next page, 55, the

8    second paragraph.  Dr. Bell writes:  "A common

9    pitfall with surveys is that without proper

10   discipline, planning and thought they can become

11   little more than casual conversations in which

12   preconceived ideas and notions become superficially

13   validated.  Surveys can, in some instances, provide

14   valuable insight into market behavior although the

15   use of surveys is rarely a substitute for the

16   analysis of actual market data when it is available.

17   It should be noted that formal surveys, particularly

18   such specialized techniques as contingent valuation

19   and conjoint analysis are beyond the expertise of

20   many appraisers and may require the use of

21   specialized experts."

22       Do you agree with Dr. Bell?

23       A.   Yes.

24       Q.   You did not use a specialized expert in

25   designing and conducting your survey, did you?

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 338 of 556
Case 1:11-cv-22408-MGC Document 291 Entered on FLSD Docket 05/15/2013 Page 166 of
384
Confidential - Subject to Further Confidentiality Review

```
 1        A.    I consider myself to have the specialized

 2    expertise.  I have knowledge, training and

 3    experience in conducting surveys on a regular basis,

 4    and again, you know, I didn't use it as the sole

 5    method, it was a tertiary approach.

 6        Q.    But it's the only method that you used for

 7    the period from August 2016 to February 2019,

 8    correct?

 9        A.    No.  That's your characterization.  You

10    asked me -- if I had any data after -- after August

11    of 2016 and I answered no.  But you asked me

12    previously in this morning's conversation if I

13    relied only on the survey method for the dates after

14    2016 and I should have -- I did, and I believe,

15    responded no, that my study of the data from the

16    2009 to 2016 time frame indicated that time was not

17    a variable in the estimate, that there was no

18    systematic grouping or declination of the diminution

19    over time, and I applied that in the subsequent

20    period.

21        Q.    Since you didn't have data or didn't examine

22    data from August 2016 to February 2019, you don't

23    know what the impact or the diminution in value or

24    any effect of stigma was during that period, do you?

25        A.    I think that the data that I have in my
```

```
 1    report suggests that there would be.  I think that

 2    the -- or suggests that the damage persists over a

 3    longer time frame from 2009 to 2016 and I'm

 4    extending that into the period up through the

 5    current date of value and we're talking about a

 6    period of a couple of years and I studied a period

 7    over seven prior years, so the data suggests that

 8    time was not a factor, that that diminution

 9    continues to exist.

10        Q.   To go back to my question, you don't know

11    what the data looked like for August 2016 to

12    February 2019 because you didn't study those data?

13        A.   That I will agree with.

14        Q.   On page 11 of your report, your general

15    report, Exhibit 1 -- I'll let you get that -- you

16    said toward the bottom:  As part of the case study

17    and paired sales development, the Integra team

18    conducted and collected dozen's of in-person

19    interviews with listing and selling realtors and so

20    on.

21             Did you conduct any of the survey in-person?

22        A.   No.  They were all telephone interviews.

23        Q.   And some were done via text and e-mail,

24    correct?

25        A.   Yes.
```

 1      Q.   Okay.  So that's not accurate on page 11

 2   when it says that you conducted and collected dozens

 3   of in-person interviews?

 4      A.   No, we did collect dozens of in-person

 5   interviews.  We also had a number of them that

 6   weren't in-person -- if e-mail is not considered in

 7   person, that's okay.  We conducted and collected

 8   dozens.  We also had follow-ups by e-mail.

 9      Q.   So are you telling me you interviewed in

10   person, face to face, the realtors that you

11   interviewed in your survey?

12      A.   My apologies.  This term "in person" means

13   person to person, not physically in the same room

14   together.

15      Q.   The survey instrument that you used, the set

16   of questions?

17      A.   Yes.

18      Q.   We'll look at that in a second.

19      A.   Okay.

20      Q.   You wrote those questions?

21      A.   I did.

22      Q.   Okay.  Did you validate the survey

23   instrument?

24      A.   No.

25      Q.   Why not?

1    A.   Because I was using it as a secondary or

2    tertiary method, number one and number two the

3    validation would have required a statistical

4    analysis of the survey questions and responses and

5    the data was too asymmetrical for it to be

6    statistically validated.  We were asking open-ended

7    questions about certain things.  It wasn't something

8    that could have been statistically validated, in my

9    opinion.

10    Q.   Do you have enough training and experience

11    in statistics to know whether a survey instrument

12    can be validated statistically or not?

13    A.   No.  As I testified before, I'm not an

14    expert statistician but I do understand the theory

15    of statistics and I understand that the types of

16    questions that we were asking and the design of the

17    survey would not have allowed it to be statistically

18    validated.

19    Q.   But without the expertise and statistics to

20    decide that it couldn't be statistically validated,

21    you just chose not to validate it?

22    A.   Okay.

23    Q.   So let's -- who actually conducted the

24    interviews in your survey?

25    A.   My records reflect that my staff, Paul

1    Jones, Juan Gamio, Joe Melloni and Peter Kayworth.

2        Q.   Did you yourself conduct any of the survey

3    interviews?

4        A.   No, I attended a number of the phone

5    interviews, I would say approximately 20 to 25

6    percent, but I didn't do the individual

7    confirmations.

8        Q.   Did you give the staff members who were

9    conducting interviews any written instructions about

10   how to conduct the interviews?

11       A.   No.

12       Q.   Did you give them any formal training about

13   how to conduct the interviews?

14       A.   Well, yes, as I said, I sat through the

15   interviews with them and explained to them that I

16   wanted them to stick directly to the questions.

17   Some people try to lead you off the questions and

18   give you additional information, and I showed them

19   in a couple of instances how to try and drive the

20   follow-up questions that put people back on track.

21   So I would say in about 20 to 25 percent of the

22   cases those were training -- you know, training

23   ground as well.

24       Q.   Did you instruct your interviewers not to

25   ask probing questions?

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 343 of 556
Case 1:11-cv-22408-MGC Document 291-1 Entered on FLSD Docket 08/15/2014 Page 371 of
384
Confidential - Subject to Further Confidentiality Review

```
1        A.    No.

2        Q.    The questioners knew that they were working

3    on litigation testimony for the plaintiffs, correct?

4        A.    No.  We did not disclose that.

5        Q.    I'm sorry.  Not to cut you off.  Your staff

6    who asked the questions of the survey respondents,

7    your staff knew what they were working on, correct?

8        A.    Yes.

9        Q.    All right.  So at the time that your staff

10    members conducted interviews, they knew they were

11    working on a litigation report on behalf of the

12    plaintiffs?

13       A.    I don't know what they knew.  I mean, they

14    knew what the assignment was, they knew who our

15    client was but I don't know if they were aware.  I

16    would be speculating on what they knew.

17       Q.    Your staff that helped you write your report

18    didn't know it was on behalf of the plaintiffs?

19       A.    Well, my staff didn't help me write the

20    report.  They collected information at my direction,

21    but my staff is not really looking into plaintiffs

22    versus defendants or anything like that.  They are

23    just following my instructions as to what to do and

24    what to research.

25       Q.    The term you used for your staff's
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 344 of 556
Case 1:11-cv-22408-MGC Document 124-1 Entered on FLSD Docket 08/15/2013 Page 372 of
384

Confidential – Subject to Further Confidentiality Review

1    assistance, I think, is significant appraisal

2    assistance, right, that's a term of art?

3        A.   Well, it's not a term of art.  It's actually

4    a requirement under the state law that I have to

5    disclose who provided any significant assistance.

6    So it's a regulatory requirement in the state of

7    Florida.

8        Q.   How much time did your staff spend putting

9    -- helping you and giving you significant assistance

10   in your reports in this litigation?

11       A.   I don't know.  I would have to look at my

12   time records but I would say, you know, amongst the

13   four or five staff members that participated

14   internally, better part of 200 hours plus.

15       Q.   And it's your testimony that they, in all

16   that time, never became aware that they were working

17   on a report for the plaintiffs in this litigation?

18       A.   No.  It's my testimony that I don't know

19   what they know.  You asked me whether they knew.  I

20   don't know that answer.

21       Q.   Did you ever discuss with them the fact that

22   you were working on behalf of the plaintiffs in this

23   litigation?

24       A.   Not explicitly.  I mean they knew that we

25   were studying the impacts of drywall remediation,

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 345 of 556
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 09/15/2011 Page 373 of
384
Confidential - Subject to Further Confidentiality Review

```
 1    post-remediation impacts of Chinese drywall.  That

 2    was the scope that they understood.

 3         Q.   Did any of them ever ask you which side of

 4    the litigation you were on?

 5         A.   Not that I can recall.

 6         Q.   Was there any quality control process during

 7    the survey -- during the running of the survey to

 8    ensure that the interviewers were asking the

 9    questions appropriately and following the survey

10    instruments?

11         A.   Well, I was reviewing the survey results as

12    they were coming through and, you know, counseling

13    and coaching those that were doing the interviews to

14    be clear on certain things or to make sure that

15    their -- the transcription of the notes were clear,

16    and as I said, you know, I attended probably 20 to

17    25 percent of those interviews so that I was, you

18    know, overseeing that process.  From a quality

19    control perspective, I think that we did a

20    reasonably good job in documenting, you know, the

21    times, the dates, who we spoke to, what the

22    follow-ups were, and, you know, accurately recorded

23    the information that we collected.

24         Q.   So sort of an ad hoc quality control process

25    as you were going?
```

```
 1      A.   I don't know, I mean, I don't know if I
 2   would consider it to be ad hoc.  I'll let you make
 3   that determination.
 4      Q.   Did your quality control process follow a
 5   written protocol that you had established in
 6   advance?
 7      A.   Well, we had a written script and the
 8   protocol was to stick to the script.
 9      Q.   I'm asking a different question.  Did you
10   have a protocol in advance for how to conduct
11   quality control on the study?  In other words, to
12   make sure that people participating in the study
13   were following your instructions and accurately
14   giving out the -- asking questions on the survey
15   instrument?
16      A.   By observation, yes, I mean, I was
17   overseeing the conduct of those surveys.  There was
18   no written protocol as to -- there was no written
19   protocol, if that's what you were asking.
20      Q.   Do you remember which interviews
21   specifically you attended?
22      A.   I don't.
23      Q.   Did you analyze whether there is nonresponse
24   bias in your survey data?
25      A.   Yes.  I've identified the number of surveys
```

1    we conducted against all the surveys, and then I've

2    also looked at, you know, within the surveys what

3    the interviewee comments demonstrated, whether they

4    were responsive and I classified those.

5        Q.   I'll try and define the term.  I'm referring

6    to whether the people who declined to participate in

7    your survey are different than the people who do

8    participate in your survey.  That's what I mean by

9    nonresponse bias.

10       A.   Well --

11       Q.   Is that a concept you're familiar with?

12       A.   No.  I don't think so.  Not the way in which

13   you're defining it.  I mean, the people that

14   declined to participate couldn't possibly have been

15   the people that participated.  I mean, either you

16   did or you didn't.

17       Q.   Yeah.  Selection bias is another word for

18   it.  The question is whether the people who didn't

19   participate in your survey are different somehow

20   than the people who do say:  Yes, I'll participate

21   in the survey.

22            That's not something you analyzed?

23       A.   No.

24       Q.   Is that something you know how to analyze?

25       A.   No.

```
 1      Q.   Did your team use the same questionnaires

 2   for all survey respondents?

 3      A.   Yes.

 4      Q.   Let's -- I'm going to -- we'll look at the

 5   survey, the actual responses in a second, but let's

 6   look at your summary of the survey results.

 7      A.   Okay.

 8      Q.   Which I will find a more general report.

 9   Okay.  So if you can turn with me to page 23 -- I'm

10   going to look at the written text.

11      A.   Sure.

12      Q.   23 of your general report.  And this is the

13   part of your expert report where you summarize the

14   conduct and results of your contingent valuation

15   survey, correct?

16      A.   Yes.

17      Q.   And you say that among the 45 responses, 13

18   responses were classified as unclear whether the

19   respondent meant pre-remediation or

20   post-remediation; is that right?

21      A.   Yes.

22      Q.   So 13 over 45 is almost a third, right?

23      A.   Yes.

24      Q.   So almost a third of survey respondents

25   didn't know whether you were asking about
```

 1   pre-remediation, stigma or post-remediation stigma,

 2   correct?

 3       A.   I classified them as unclear because the

 4   notes that my team transcribed were not clear as to

 5   whether they were talking about post or pre.  So I

 6   don't want to say that the respondents didn't

 7   understand.  It may have also been a transcription

 8   error in the notes.

 9       Q.   So whether it was the survey respondents or

10   your staff's notes, it is not possible to tell for a

11   third of survey respondents whether they were

12   referring to pre- or post-remediation stigma?

13       A.   Correct.

14       Q.   And the key question -- let me go ahead and

15   hand you, these are the survey responses that you

16   have listed on page 24 of your report.

17            MR. BLOCK:  I've got a copy for you, too,

18       Patrick, just give me a second to get organized.

19            MR. MONTOYA:  Thank you.

20   BY MR. BLOCK:

21       Q.   So these are for you, Mr. Graziano, and

22   then -- actually, this -- no, those are yours, those

23   are yours.  You're good, those are yours.  And these

24   are for you.

25            MR. MONTOYA:  Thank you.

```
 1      Q.   And so, Mr. Graziano, what we did was we

 2   went through the production of documents that the

 3   plaintiffs gave us a little while ago and we pulled

 4   out the survey responses for the -- yeah, we're

 5   going to mark that as Exhibit -- let's mark all of

 6   those as Exhibit 8, if you would, please.  Thank

 7   you.

 8           (Graziano Exhibit 8 was marked for

 9   identification.)

10   BY MR. BLOCK:

11      Q.   So we pulled out the survey responses that

12   you have tabulated on page 24 of your general expert

13   report.  Okay?

14      A.   Yes.

15      Q.   Just getting oriented and it should be 45,

16   45 responses and on your copy, just to keep you

17   organized, I have them tabulated, there is the PR

18   minus minus, PR minus plus and qualified, which

19   corresponds to the way that you categorized them and

20   I think we just didn't get to that, Patrick, on

21   yours but it's minus plus and then qualified.  Okay.

22      A.   Yes.

23      Q.   All right.  So let's look at the first one,

24   for example.  I have the interviewee Bette Abrams,

25   Broward 2 Comp 2.  Okay?
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 351 of 556
Case 1:01-cv-12058-MLC Document 291 Enterococci USO Docket 08/15/2019 Page 379 of
384

Confidential - Subject to Further Confidentiality Review

```
1    A.   Yes.

2    Q.   Which is the question or questions from

3    which you derive your results that you reflect on

4    the table on page 24?

5    A.   So Broward 2 Comp 2 will be coded as B2C2.

6    So this would be one, two, three, four, five, six,

7    seven, eight, nine, 10, 11 lines down on the table

8    on page 24.

9    Q.   Uh-huh.

10   A.   You will see it says Bette Abrams -- I am

11   going to try and correlate -- 10055 Bay Leaf Court,

12   that would have been the property that Bette was

13   either the listing or selling agent on that we were

14   confirming with her, you know, that that property

15   did not have Chinese drywall.  I think that was used

16   as a comparable.

17   Q.   It may be Bette Abrams.  I might have said

18   Allman.

19   A.   I am just following your -- it's difficult

20   for me to --

21   Q.   Betty A.

22   A.   Right, Betty A.

23   Q.   Okay.  So --

24   A.   So that would be B2C2, which is 11 lines

25   down, and then you will see to the right it says
```

Confidential - Subject to Further Confidentiality Review

 1    interviewee comment and then it's a quote from line

 2    7.

 3        Q.   Okay.  So line 7 is the -- or question 7 is

 4    the question that you used to categorize realtors as

 5    to whether they indicate a price impact or not from

 6    stigma, price remediation stigma?

 7        A.   Right.  We asked a number of these questions

 8    but the question with respect to the sales price

 9    being impacted by the prior existence of Chinese

10    drywall even though remediated was a question that

11    would follow if the control sale was what was being

12    interviewed, but Question 7 was the general

13    questions we asked all of the realtors, that's

14    correct.

15        Q.   In order to classify a realtor who is

16    responding to the survey as indicating a price

17    impact or no impact or qualified response, are you

18    looking primarily at Question 7?

19        A.   It really depends on the control sales.

20    Some people answered the questions in Question 5 and

21    6 and then followed up in Question 7.

22        Q.   Okay.  All right.  So you have to look at

23    the whole sheet to see what their view is on stigma

24    or not?

25        A.   Correct.

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 353 of 556
Case 2:14-cv-22408-MCC Document 24-1 Entered on FLSD Docket 08/15/2017 Page 181 of
384
Confidential – Subject to Further Confidentiality Review

1    Q.   Okay.  All right.  So if you will go with

2    me, keep Betty A and then go with me to your next

3    tab, actually and you will see Natalie Betancur,

4    sale for Comp 4.  It looks to me like this survey

5    instrument actually has different question numbering

6    and different questions.  And the reason I say that

7    is because on the second one we go from 7 to 8 to 8A

8    and on the first one we only have 8A, there is no 8.

9    Do you see what I'm talking about?

10   A.   Yes, and -- well, it's formatted a little

11   different.

12   Q.   So do you know why there are at least two

13   different versions of the survey instrument?

14   A.   I do not.

15   Q.   All right.  I want to look at -- right.  I

16   think -- oh, I should say one of my colleagues

17   handed me a note.  We could not find one of the

18   questionnaire response forms for Ed Poirier, who I

19   think you had classified as a price impact -- yeah,

20   it's the one in Broward, B2C4, we didn't have that

21   in the production.  So just telling that you the

22   stack I gave you is missing one because we were

23   missing one.

24   A.   Which one is that?

25   Q.   It's Broward B2C4, it's the second from the

Confidential – Subject to Further Confidentiality Review

```
 1    bottom of that first chunk.

 2        A.   Okay.

 3        Q.   We couldn't find it.  All right.  Is it your

 4    testimony that in your tabulation on page 24 you

 5    included all of the realtors who -- excuse me, who

 6    responded that there is no price impact or stigma

 7    from Chinese drywall after remediation?

 8        A.   Yes, if there were comments that said that,

 9    we recorded them all, to the best of my knowledge.

10        Q.   I'm going to hand you some comments to look

11    at.  The first one I want to hand you is for a

12    realtor named Nestor Asencio.  Do you see that?

13        A.   Yes.

14        Q.   Okay.  So that is a control pairing

15    verification script that we got via a production

16    from the plaintiffs.  Does that look like one of

17    your scripts or your team's scripts?

18        A.   Yes.

19        Q.   Okay.  And if you look at Nestor Asencio's

20    answer to Question 7, he says there is no pricing

21    impact on homes that had Chinese drywall, correct?

22        A.   Yes.

23        Q.   Can you look on page 24 and see if you see

24    Nestor Asencio listed here?

25        A.   I do not.
```

Confidential - Subject to Further Confidentiality Review

```
1        Q.    I'll hand you --

2        A.    Was this -- if I may ask, was this in the

3    case study material of the control sales that we

4    used or was this in the backup material of other

5    material?

6        Q.    I think you -- y'all produced three or four

7    large PDFs of 700 odd pages each and these were in

8    there.  I don't know which specific file.  We could

9    look at that at break.

10       A.    Okay.  Because you asked me the question

11   and, you know, it may be an incomplete answer and I

12   want to be clear.  We have an entire binder as thick

13   as this primary production on -- on properties that

14   sold impaired and we had started down the road of

15   comparing the impaired discounts.  We had been doing

16   research on the impaired discounts so we may have a

17   number of surveys in those packages that were not

18   reflected in the control sales and not reflected in

19   the -- in otherwise that were surveys that were not

20   used.  They were surveys that were representative of

21   our surveys for -- an impaired analysis that we

22   never finally developed.  So there may be additional

23   surveys that are not included but this list

24   comprised all the surveys of people related to the

25   case studies that we have in this report.
```

1    Q.   Okay.  I'm going to hand you another one of

2    these scripts.  This is Mike Rimkevicius.  I'm going

3    to give you a copy as well.  Here's your copy of

4    Mike Rimkevicius, I'm probably misspelling.

5         This is another one of your control pairing

6    verification scripts T27S.  Do you see if you look

7    at page 24, do you see Mike Rimkevicius' name -- or

8    actually, I didn't even ask you what he says.  I am

9    going to do that.  Mike Rimkevicius' answer to

10   Question 7 says:  No impact.

11        Right?

12   A.   Yes.

13   Q.   Do you see Mike Rimkevicius listed in your

14   table on page 24?

15   A.   No.

16   Q.   Okay.  I'll give you another one.  This is

17   William Figueroa.  There you go.  And if you look at

18   William Figueroa's response to Question 7, when you

19   asked -- or your staff asked:  Have you noticed a

20   pricing impact on the homes that had Chinese

21   drywall?

22        He responded:  Not anymore.

23        Right?

24   A.   Yes.

25   Q.   Do you see William Figueroa listed in your

```
1    table on page 24?

2        A.   No.

3        Q.   Okay.  All right.  So I'm going to hand you

4    another one.  This is Dennis Boyle, and here is

5    Dennis Boyle for you.  And in response to Question 7

6    Dennis Boyle says:  "The market was impacted by

7    mortgage prices so it's hard to say if there was any

8    Chinese drywall involved."

9            Which I assume means involvement, right?

10       A.   Okay.

11       Q.   So this is another realtor who is telling

12   you that he can't say that there is a stigma impact

13   on post-remediation homes, right?

14       A.   I could -- you could -- I could classify it

15   that way, sure.

16       Q.   Do you see Dennis Boyle listed in your table

17   on page 24?

18       A.   No.

19       Q.   Okay.  Here is another one, Hernando

20   Santacoloma.  Here's your copy.  And if you look at

21   this one, for Hernando Santacoloma, he actually

22   responds in Question 5, when he was asked:  "In your

23   opinion, was the sales price impacted by the prior

24   existence of Chinese drywall even though

25   remediated?"
```

Confidential - Subject to Further Confidentiality Review

1          His answer was:  "No, price was the top of

2    the market, appraiser had trouble finding comps to

3    justify price value."

4          Right?

5     A.    Yes.

6     Q.    This is another realtor telling you he

7    wasn't aware of stigma of post-remediated home,

8    correct?

9     A.    No.  What he was saying I think in response

10   to this question, was related to the sale above that

11   was sold to a military family, he was saying that he

12   did not believe this one was but in this case we

13   asked that the -- it says:  "First, the listing

14   information indicates that the property did not

15   mention Chinese drywall and it was remediated, is

16   this correct?"

17         So in this case the realtor is saying yeah,

18   we didn't disclose it, it was remediated by Lennar,

19   we didn't disclose it.

20    Q.    It should have been disclosed elsewhere,

21   just not in the listing.

22    A.    That's what those follow-up questions were

23   about.  We said:  According to the MLS, the property

24   was listed on.

25         If you recall, can you please describe your

Confidential - Subject to Further Confidentiality Review

```
 1    buyer's reaction.

 2            Was this timeline impacted by the Chinese

 3    drywall?

 4            He said no.

 5            Can you recall your buyer's reaction?

 6            He said they had a certificate and the house

 7    sold a year before pre-remediation.  So he was

 8    saying they had a certificate.  And then we asked:

 9    Was it impacted by the prior existence?

10            And he said:  No, the price was at the top

11    of the market.

12            So he was referring to the actual sale,

13    transfer, you know, that particular sale, not the

14    general market.

15        Q.   But in that sale was there a stigma?

16        A.   No.

17        Q.   Okay.  Is Hernando Santacoloma listed in

18    your table on page 24?

19        A.   No.

20        Q.   Okay.  I'll give you another one.  This is

21    Paul De La Torres.  There you go.

22            If I can get to -- in response to Question

23    7, when he is asked whether there -- In listing and

24    marketing other homes in this market he has noted a

25    pricing impact on the homes that had Chinese
```

```
1     drywall, he says:  "Hard to say."

2              Right?

3        A.   Sure.

4        Q.   Okay.  Is this a realtor who is telling you

5     that there is a stigma impact post-remediation?

6        A.   I would call that a qualified comment.

7        Q.   You would put him at the bottom of your

8     chart on page --

9        A.   Yeah, I don't even think that's indicative

10    of -- I mean "hard to say" doesn't, to me, indicate

11    any way, one way or the other.  He says it's hard to

12    say.

13       Q.   He doesn't say yes does he?

14       A.   He doesn't say yes, he doesn't say no.

15       Q.   Is he on your chart on page 24?

16       A.   No.

17       Q.   I'll hand you one more of these, this is

18    Steve Norrito.

19              In response to Question 7, Steve Norrito

20    says:  "If electrical had not remediated, allowed

21    for cost in the sales price, adjusted for any

22    remediation."

23              All right.  Is this a realtor who is telling

24    you that there is a stigma impact post-remediation?

25       A.   Not necessarily, I mean he's qualifying his
```

1    opinion.  He's saying if the electrical was not

2    remediated, you have to allow for the cost in the

3    sale price, which indicates that there would be some

4    stigma if the electrical hadn't been remediated.  So

5    I guess the answer is yes.

6        Q.   Well.  Isn't he saying that if you had

7    remediated, including the electrical, there would

8    not be a pricing impact?

9        A.   You could interpret it that way.  I wouldn't

10   but you could turn it around and characterize it

11   that way, sure.

12       Q.   Do you see Steve Norrito listed in your

13   table on page 24?

14       A.   No.

15       Q.   All right.  So we've looked now at one, two,

16   three, four, five -- well, we've looked at six

17   people who gave survey responses, five of whom did

18   not tell you that there is stigma or said there is

19   no stigma and they are not reflected in your table

20   on page 24, right?

21       A.   Correct.

22       Q.   Do you know why that is?

23       A.   Maybe we just didn't do as -- we may have

24   missed them.  I mean, there may be just as many that

25   have negative comments that were not compiled.  As I

Confidential - Subject to Further Confidentiality Review

```
 1    said to you before, we conducted a number of surveys

 2    and case studies that we put aside and in putting

 3    those aside, we may have just, you know, missed

 4    compiling those in the survey results.

 5         Q.   But as we sit here today, you can't testify

 6    as to why survey respondents who told you there was

 7    no stigma were omitted from the tabulation of your

 8    results?

 9         A.   I think I did testify to that.  I would have

10    to cross-reference these against the surveys that we

11    used in the case studies and control sales versus

12    those that we set aside.  Part of what I'm

13    testifying to and what I'm telling you is the truth

14    is that, some of these surveys may have been in

15    binders that were in the case studies that we

16    ultimately didn't end up using, and therefore they

17    weren't compiled.

18         Q.   You had these survey responses in your

19    files, and they didn't end up in Table 24 where you

20    tabulated the results and I think what you're

21    telling me today is that you don't know why, as we

22    sit here, why these respondents aren't in the table

23    on 24?

24         A.   Okay.

25         Q.   Do you know which case studies and surveys
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 363 of 556
Case 2:14-cv-22484-MCR Document Enterreconel S1 Docket 08/15/2019 Page 591 of
Confidential – Subject to Further Confidentiality Review
384

1   you did set aside and why?

2       A.   Yes.  All of the surveys that were included

3   in the control pairs were all analyzed.  I believe

4   there was only one out of these, so far, that you've

5   shown me that should have gotten transferred to this

6   survey, but again, we were looking through, you

7   know -- I mean there's 40 on this list and there is

8   probably another 30 or 40, close to 100 surveys

9   potentially that we conducted, some of which weren't

10  included in this case study.  They were on

11  properties that were impaired.  So the compilation,

12  we missed a few, and I'm sure we may have missed a

13  few that also had negative comments.  I'll have to

14  go back and look.

15      Q.   If we add to your survey results some of the

16  responses that you omitted, the percentage of

17  realtors who say there is no stigma would increase,

18  wouldn't it?

19      A.   Yes, if there wasn't a corresponding

20  increase in the number of negative comments that we

21  might discover by a similarly scrutinizing look at

22  our survey method.

23      Q.   How did you decide whether to classify a

24  response as qualified or price impact or no impact?

25      A.   Based on what I consider to be the clarity

1    of the transcription of the response.  So if it

2    was -- if someone made a response that says there

3    was stigma, deals fell through, people either stayed

4    away or trusted in the repairs, I mean, that to me

5    qualified as a negative response.

6              If somebody said, you know, there is a huge

7    impact and that's all they said, then I made that a

8    qualified statement because it wasn't clear that

9    they were talking about remediated properties, they

10   weren't clear of what their definition of huge was.

11   So I qualified those statements that couldn't be

12   seen as clearly articulating a yes or a no to a

13   negative or positive impact.

14        Q.   Wasn't one of the problems that some people

15   said there was a price impact but they appeared to

16   be referring to homes pre-remediation?

17        A.   There were some situations like that where

18   to me the transcription of the answer or the answer

19   itself was not clear.

20        Q.   All right.  If you go to your table on page

21   24, the third one down says:  Absolutely but don't

22   hear about those since five years ago.

23             How do we know that respondent is talking

24   about stigma on pre-remed -- excuse me, homes

25   post-remediation as opposed to homes that five years

1    ago actually had Chinese drywall?

2        A.    I'd have to go look at the specific survey

3    response, if you will give me a second.  PB2C1.

4        Q.    While you're looking for that, does the fact

5    that about a third of survey respondents couldn't

6    give -- only ambiguous answers to Questions 7 and 8

7    suggest that the questions might be vague and hard

8    to answer accurately?

9        A.    I'm sorry.  Could you -- I'm just --

10       Q.    Yeah.  Does the fact that about a third of

11   survey respondents couldn't figure out whether, in

12   Questions 7 and 8, you were referring to pre- or

13   post-remediation homes, doesn't that suggest that

14   the questions are vague and hard to answer

15   accurately?

16       A.    No, because I wasn't directing them to give

17   me a specific answer post- and pre-remediation.  As

18   I testified previously, this initial survey design

19   was based on studying both impacts.

20           My scope to -- to reach just the

21   post-remediation impacts, you know, developed as

22   a -- through -- through the course of the

23   assignment.  So originally we intentionally asked

24   the question this way to elicit responses that would

25   be classified as clear or not clear.

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 366 of 556
Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/13/19 Page 394 of 384
Confidential -- Subject to Further Confidentiality Review

```
 1              So I would say that was part -- part of the

 2     survey design was to not just ask about

 3     post-remediation; we were asking about general

 4     impacts of Chinese drywall overall.

 5       Q.   Okay.  So just make sure I understand.

 6              When you designed the survey, your intent

 7     was to ask about pre- and post-remediation stigma,

 8     not to isolate post-remediation stigma?

 9       A.   Right, except in the case where we asked the

10     specific question, you know, "even though

11     remediated," which would be Question Number 5.

12       Q.   But the intent of the survey was to just ask

13     about stigma generally pre- and post-remediation?

14       A.   Well, the intent of the survey was to elicit

15     responses so the realtors would tell us whether it

16     was or wasn't either post or pre; but the question

17     was structured to elicit a response -- intentionally

18     to have a conversation and elicit a response that

19     would demonstrate both or either.

20              And we asked the question both ways because

21     we said above, you know, were the sales prices

22     impacted by the prior existence of Chinese drywall

23     even though remediated, so we asked that question in

24     the previous question.

25       Q.   Okay.  So I think what you're telling me is
```

1    that the design of your survey meant that

2    respondents might answer Question 7 in reference to

3    pre- or post-remediation impacts from Chinese

4    drywall, right?

5         A.    Yes.

6         Q.    Okay.  You mentioned a minute ago that the

7    scope of your opinion or project changed during the

8    course of your -- preparing your opinion.

9             Did I -- did I understand that correctly?

10        A.    Yes.

11        Q.    What was the initial scope of your work?

12        A.    When we originally started to compile the

13   survey materials and the case studies, we were going

14   to study both the post-remediation impacts and

15   pre-remediation impacts.  Within about a week or two

16   of the engagement, you know, I advised the attorneys

17   that there was going to be insufficient time to do

18   both.  We had developed 30 or 40 potential case

19   studies in both -- both scenarios, and at that time,

20   I think it was early January, Mr. Montoya called me

21   and told me that the exchange date had been moved

22   from, like, March to February, or that the -- that

23   the original date was February 15th.  I don't recall

24   what the specific questioning on date was.

25             I explained there was no way we could be --

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 368 of 556
Case 2:14-cv-24008-MCR Confidential – Subject to Further Confidentiality Review Page 196 of
384

1    get done both in the six-week time frame.

2        Q.   So you changed the scope of your work based

3    on the litigation schedule?

4        A.   Well, we changed the scope of the work based

5    on what I agreed our scope of work to be with

6    Mr. Montoya.

7        Q.   And that was driven by pressures of the

8    litigation schedule?

9        A.   From my perspective, I -- I told him what I

10   was going to be able to do and I told him that --

11   and I explained -- that's it.  I explained to him

12   what I was going to be able to do within the time

13   frame.  So yes, driven by approximate litigation

14   schedule and my other work assignments.

15       Q.   So if you had more time, you might have

16   designed and conducted your work differently?

17       A.   Look, I think we would have made

18   improvements to -- we could always make improvements

19   to these.  So if I had more time, sure, we would --

20   we would have made improvements in the survey

21   method, sure.

22       Q.   When did you originally design the survey?

23       A.   I would say first two to three weeks in

24   January.

25       Q.   And at -- at some point also in January,

```
 1    you -- you discussed with counsel revising the scope

 2    of your work; is that right?

 3        A.   Yes.

 4        Q.   Okay.  Was that discussion with counsel

 5    after you designed the survey?

 6        A.   Roughly.  I don't know the -- all those two

 7    or three weeks blend together.  I couldn't say.

 8        Q.   But as we sit here today, your report is

 9    based on a scope of work that's different than the

10    one you originally set out to perform?

11        A.   No.  The scope of work that my report covers

12    is the scope of work that we agreed was ultimately

13    going to be my scope of work.  It evolved, though,

14    since -- from -- from -- since the date of the

15    original engagement in late December.

16        Q.   Did you -- I -- I distracted you, but were

17    you able to find the response, Lorma -- Loma Swartz?

18        A.   Yes.

19        Q.   Okay.  So you have that in your binder?

20        A.   I do.

21        Q.   Let's look at her together.

22             MR. BLOCK:  Yeah, it's in what you have,

23    Patrick.

24             MR. MONTOYA:  In Exhibit 8?

25             MR. BLOCK:  Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 370 of 556
Case 1:11-cv-22408-MGC Document 29 Entered on FLSD Docket 08/15/2013 Page 398 of
384
Confidential – Subject to Further Confidentiality Review

```
 1             MR. MONTOYA:  Which tab?

 2             MR. BLOCK:  Yeah.  It's -- it should be the

 3       first tab because she's a price impact; and I

 4       think those are alphabetical, so she -- she's at

 5       the ends, very last one.

 6             MR. MONTOYA:  Last tab or first tab?

 7             MR. BLOCK:  Sorry.  First tab -- last --

 8       last person in the first tab.  There's no page

 9       numbers.

10             MR. MONTOYA:  Loma?  Loma what?

11             MR. BLOCK:  Swartz.

12             MR. MONTOYA:  Got it.

13  BY MR. BLOCK:

14       Q.  So you classified Ms. Swartz as a price

15  impact -- a post-remediation price impact person,

16  realtor?

17       A.  I classified her as a post-remediation price

18  impact, yes.

19       Q.  Okay.  How are you sure that she is talking

20  about post-remediation as opposed to

21  pre-remediation?

22       A.  As I sit here today, I can't say that I am.

23  I can see that it wasn't clear that -- it

24  remediate -- her comment on remediation is not clear

25  here.  This would be a qualified impact.
```

```
 1      Q.   Okay.  So let's move her down to

 2   "qualified."

 3           And -- and the reason is that the Question 7

 4   doesn't make clear whether you are asking about pre-

 5   or post-remediation impacts from Chinese drywall,

 6   right?

 7      A.   Correct.

 8      Q.   Okay.  Let's look at another one of these.

 9   This is -- gosh, Robert Auerbach; and in your -- in

10   the binder that I -- or the stacks that I gave you

11   two, he would be the second one.  If you want to do

12   it either way.  If you --

13      A.   I'm sorry.  You -- okay.  You gave me --

14      Q.   Yeah.  If you look there, it'll just be the

15   second one.

16      A.   Thank you.  In here?

17      Q.   Yeah.  If you look in there, that's the

18   second one.  Are you there?

19           Robert Auerbach.  It's a little easier to

20   read the address, 6725 Northwest 122nd.

21      A.   My apologies.  Did you say it was the second

22   one?  Because it's not the second one.

23      Q.   It was the first -- sorry, the first tab.

24      A.   First tab?

25      Q.   And then the second -- should be the second
```

Confidential - Subject to Further Confidentiality Review

```
 1    response.  Do you not have that?

 2        A.   No.  I've got David Grima or "Grima."

 3        Q.   Shoot.  I'll give you -- I'll give you my

 4    copy.  This is --

 5             MR. BLOCK:  Do you have it, Patrick?

 6             MR. MONTOYA:  I do.

 7             MR. BLOCK:  Okay.  You've got it.  All

 8    right.

 9    BY MR. BLOCK:

10        Q.   Well, here's -- you can have mine.  It's

11    David Auerbach.  In response to Question 7, he says:

12    "Yes of course."

13        A.   Just for the record --

14        Q.   Yes.

15        A.   Just for the record, so this is Exhibit 8?

16        Q.   Yes.

17        A.   And now you're giving me pieces of your --

18        Q.   Yeah.  It looks like we maybe left a page

19    out of your Exhibit 8.

20             You should have had the piece of paper I

21        just gave you.  Patrick has it.

22        A.   Okay.

23        Q.   I had it.  You didn't have it.

24        A.   Okay.

25        Q.   So we're just giving it to you.
```

```
 1      A.   All right.  So there is no problem that this
 2   is the marked exhibit and there was missing pages?
 3      Q.   We'll clean it up.
 4           MR. BLOCK:  Let the record reflect that I
 5      handed you a piece of paper that should be in
 6      your copy of Exhibit 8.
 7      A.   Okay.
 8   BY MR. BLOCK:
 9      Q.   It's a good -- it's a fair question.
10      A.   Yeah.
11      Q.   Lot of paper here.  Okay.
12           Mr. Auerbach, in response to Question 7,
13   said what?
14      A.   He said that he has noted a pricing impact
15   of homes that had Chinese drywall.
16      Q.   Okay.  And that verbal tense is unclear,
17   whether he meant -- whether he meant had Chinese
18   drywall five years ago and still had it at that time
19   or don't have Chinese drywall today but had it five
20   years ago, right?
21      A.   Yep.  I see your point.
22      Q.   Okay.  So that's another one that should be
23   qualified?
24      A.   It could be.  I mean, I -- I certainly
25   qualified this as he said, "Yes, of course," there's
```

```
 1    an impact.  So I qualified it as negative.  There

 2    was no qualifier that said before or after

 3    remediation.  He just said, "Yes, if you had Chinese

 4    drywall, there is going to be an impact."

 5       Q.   Okay.

 6       A.   I considered that to be a positive -- or

 7    a -- you know, a negative comment -- you know,

 8    post-remediation.

 9       Q.   But as we sit here today and look at that,

10    it's unclear whether he's referring to pre- or

11    post-remediation, correct?

12       A.   I can see how you'd look at it that way.

13       Q.   All right.  So let's look at Alex Curcio --

14    mangle that.  He should be just another couple

15    people forward, or you can look at him on your table

16    on Page 24.

17            Do you have Alex?

18       A.   No.

19            (Discussion off the record.)

20    BY MR. BLOCK:

21       Q.   We'll -- all right.  Well, let's -- let's

22    look at what you tabulated for Alex in the interim.

23            On Page 24, you wrote "yes."  His answer to

24    Question 7 was "yes."

25       A.   Do you mind if I look at the entire survey?
```

```
 1        Q.   Yeah.  Yeah.  Okay.  I'll hand you my copy

 2   of Alex Curcio's response.

 3        A.   Yes.

 4        Q.   Okay.  Is that another one that doesn't make

 5   clear whether he's referring to pre- or

 6   post-remediation impacts?

 7        A.   I don't see him on -- on the first table.

 8        Q.   He's --

 9        A.   Oh, here he is.

10        Q.   -- on -- yeah.

11        A.   I see.  Yes, I got him.  Thank you.  My

12   apologies.

13             Yes.

14        Q.   Is it your -- your answer was yes, he might

15   be a qualified respondent because it's not clear

16   whether he's referring to pre- or post-remediation

17   stigma?

18        A.   If -- if you believe that the past tense of

19   "had Chinese drywall" doesn't refer to remediated,

20   then yes, I can see how you would qualify that.

21        Q.   And sitting here today, we really don't know

22   how the realtors interpreted that verb, do we?

23        A.   Right.

24        Q.   And so --

25             MR. CAMPBELL:  They are all in there.
```

```
 1        You're just going to have to get through it.

 2             THE WITNESS:  They're not in order.

 3             MR. BLOCK:  Yeah, we'll --

 4             THE WITNESS:  Yeah.

 5             MR. BLOCK:  I'm not going to --

 6   BY MR. BLOCK:

 7        Q.   All right.  So just pausing right here for a

 8   minute, we've talked about three respondents who you

 9   qualified as indicating a stigma from

10   post-remediation that might actually better belong

11   in the third category for qualified respondents

12   where it's not clear whether they are talking about

13   pre- or post-remediation, right?

14        A.   Yes.

15        Q.   Okay.  Now, if we -- if we took those three

16   people -- you can set aside those for a second --

17   and look back at your report, you initially had 18

18   of the respondents saying that there would be market

19   resistance even after remedial actions were

20   completed?  It's on Page 23 of your report.

21        A.   Yes.

22        Q.   Okay.  So that might -- that number might

23   actually be 15 of the 45?

24        A.   Yes.

25        Q.   Okay.  And we could keep going, but let's
```

```
1    pause right there.

2           So if we -- if we look just at the -- if we

3    just look at the people who gave qualified

4    responses, as you tabulated, you have 32 people who

5    gave clear responses, "Yes, there is stigma," "No,

6    there is no stigma," right?

7       A.   I don't know the count at this point.

8       Q.   Okay.

9       A.   I'm -- I'm confused as to whether you're

10   asking me based on your new tabulation or based on

11   the -- based on the old tabulation.

12      Q.   Well, I -- I -- the point I'm trying to make

13   is that it is possible to reclassify some of the

14   survey responses -- respondents when we actually

15   look at the forms, and that's going to affect the

16   bottom line calculations of your survey, right?

17      A.   It will affect the percentages based on the

18   classification, that's correct.

19      Q.   Okay.  And so if we take the people who said

20   there was a stigma and put them into the qualified

21   category, we're going to be less than half of

22   realtors who answered the question clearly enough

23   for us to know what they were talking about and said

24   there was a stigma, right?

25      A.   Sure.
```

```
 1        Q.   Does that affect your analysis at all?

 2        A.   I would have to go back and retabulate that

 3   to really make that determination.

 4        Q.   All right.  Now, what if we add the people

 5   who, for whatever reason, gave an answer that there

 6   is no stigma and are, for whatever reason, omitted

 7   from your table?  If we add them into the "no

 8   stigma" column, that also would mean that more than

 9   half of respondents and realtors said there was no

10   stigma, right?

11        A.   It could.  But as I said, I would like to

12   understand the reasoning why those were excluded;

13   and I'd also like the opportunity to go back and

14   look if any other surveys were excluded because that

15   could also affect all the percentages.  So there may

16   be other surveys which, you know, indicate -- add --

17   add some clarity or balance those out.

18             I primarily focused on tabulating the ones

19   that were related to those case studies.  So, you

20   know, if I did that, all of the percentages would

21   change.

22        Q.   All right.  So as -- as you sit here today,

23   can you stand behind the survey results as you have

24   them tabulated, or do you need to go back and do a

25   little more work?
```

```
1        A.    I mean, I'm -- look, I'm prepared to -- to
2    acknowledge that there may be a few that could be
3    classified a different way.  In terms of adding the
4    other ones, I'm not prepared to add the other ones
5    unless I take a comprehensive look and add them all.
6             So if there were some that were missing that
7    you identified in my materials, then I would want
8    the opportunity to go back and identify all the ones
9    that were missing from my materials and retabulate
10   them.
11       Q.    Well, let's look at just the three that we
12   would move from the "yes, there is a stigma" column
13   to the "qualified" column.
14       A.    Okay.
15       Q.    All right.  And let's -- let's just count.
16       A.    And -- excuse me.
17       Q.    So -- yeah.
18       A.    Are you saying then that all the other ones
19   are substantively clear that you agree that they are
20   negative?
21       Q.    I'm -- I'm not agreeing, but let's just take
22   it at face value.
23       A.    Okay.
24       Q.    All right.  So let's -- let's see.
25            If we have your first third on Table 24, you
```

```
 1   started out with -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,

 2   11, 12, 13, 14, 15, 16, 17 -- 18 people in the "PR

 3   minus, minus, yes, there is stigma," right?

 4       A.   That was the original, yes.

 5       Q.   Yes.  Okay.  All right.

 6            And if we move three of those people down to

 7   qualified, that leaves us with 15 in the "yes, there

 8   is stigma" column, right?

 9       A.   Post-remediation stigma, yes.

10       Q.   Uh-huh.

11       A.   Yes.

12       Q.   Okay.  And -- and if we don't do anything to

13   the people who -- the second column that says there

14   is no stigma, that's 14, right?

15       A.   I think it was 13.  Let me -- the qualified?

16       Q.   No, the second column that says --

17       A.   My apologies.

18       Q.   -- there is no stigma?

19       A.   My apologies.

20            That's 14, correct.

21       Q.   And I note also that if you -- if you go

22   back to the upper column, the third one from the

23   gray bar that's Broward B10-C4 -- excuse me, the

24   fourth one, Broward B10-S2, it says:  "Little bit of

25   stigma still - 5 percent."  That's the range that
```

1    you consider more or less nonexistent stigma, right?

2        A.   But she interviewed that there was a --

3    there was stigma.

4        Q.   So you want to keep her in the stigma camp?

5        A.   Well, I would think so, particularly since I

6    had studies that -- some of which demonstrated at

7    two-and-a-half to 7 percent and she's saying 5

8    percent.  I mean, I think that --

9        Q.   Okay.  All right.  Well, just -- if -- if

10   all we do is -- is stick with this adjustment here,

11   we've got 15 for stigma and 14 against stigma, which

12   is very close to fifty-fifty, right?

13       A.   Yes.

14       Q.   Okay.  It's kind of a coin flip whether

15   there is going to be stigma or no stigma if you look

16   at the survey respondents, right?

17       A.   Base -- based on this survey, it's

18   fifty-fifty of realtors that said that clearly

19   remediation, there was or wasn't any impact; and of

20   the ones that said that there was no impact, most of

21   those were qualified by saying, you know, there has

22   to be an inspection report, there has to be -- has

23   to be a clean remediation.  So there -- there was

24   qualified statements; but yes, fifty-fifty.

25       Q.   If your survey results are at more or less

Confidential – Subject to Further Confidentiality Review

1    fifty-fifty whether there is stigma or not and your

2    paired sales analysis data show a number of

3    instances where there is no stigma, can you again

4    explain to me why you think there will be stigma

5    damages in every single one of the Priority

6    Claimants' cases?

7        A.   Yes, because the -- I have 50 percent of the

8    realtor market saying clearly there is

9    post-remediation stigma, some of them quantifying it

10   by percentage; and others -- and other people

11   saying, "No, as long as it's in" -- and then

12   another -- if, you know, approximately -- and if, by

13   the way, it's -- if we're going to use the 29, in

14   fairness to the transcripts --

15       Q.   Yeah.

16       A.   -- it's really 52 percent that said there is

17   a problem, and 49 percent roughly that say that

18   there's -- there is no stigma post-remediation.

19       Q.   And for a survey with only 29 respondents,

20   that's a very small sample, right?

21       A.   It's -- admittedly, we can call it

22   fifty-fifty for discussion purposes.

23       Q.   Okay.  For --

24       A.   But in either case, I have realtors that

25   say, "Absolutely, there is post-remediation."  And

```
1    it's not a few.  It's 50 percent of 29 interviews,

2    and it may be more, again, if we go back and review

3    the additional interviews.

4         I do an analysis and I have a paired sale

5    analysis and I have 75 percent of the sample

6    properties demonstrate some level of impact.  The

7    other 25 percent were zero to 5 percent, we talked

8    about that earlier today.

9         But 75 percent of the properties showed an

10   impact post-remediation, so I certainly think that

11   that data, combined with the survey data, indicates

12   then there is an impact.

13        Then the question is how much of an impact,

14   and this is where you're saying, "Well, how do you

15   get to the 10 percent," and we talked about all that

16   this morning.

17   Q.   Yeah.

18   A.   So I don't think that moving a couple people

19   around up here on the survey materially changes the

20   percentages enough for me to say that I would change

21   the 10 percent.  But if I have ranges going up to

22   25, 30 percent or even if 15, 20 percent and I

23   correlate to 10 and you tell me it's a fifty-fifty

24   flip, I kind of got the fifty percent of what the

25   max impact would be zero from 20, 10 percent is
```

Confidential – Subject to further Confidentiality Review

1    fifty-fifty.

2    Q.   All right.  The -- the realtors, if you take

3    them at face value, say 50 percent of the time,

4    there is no impact.

5    A.   Uh-huh.

6    Q.   You don't assign no impact for a single

7    Priority Claimant, do you?

8    A.   No.

9    Q.   So -- so this is my question.  It's not how

10   do you get to 10 percent.  It's how do you get to

11   any impact at all when essentially half of your

12   realtors are telling you that there is no impact;

13   and in a significant fraction of your case study

14   analysis, there is no impact?  How do you make that

15   data go away so that you can say every single time

16   for the 20 Priority Claimants, there will be an

17   impact?

18   A.   I'm not trying to make that data go away.

19   I'm actually disclosing the results of my

20   independent analysis.  I've shown you the survey

21   results.  I've demonstrated my analysis.  I don't

22   want the data to go away.

23        I absolutely recognize that in some cases

24   there may be -- that somebody may get the lucky

25   buyer that doesn't care, or they may look at the

1    upgrades that were done to the home and say, "You

2    know what, I will take the shot, I love this home."

3        Q.   What percentage of realtors saying there is

4    no stigma in a survey like you did would be required

5    for you to change your opinion that there is always

6    going to be stigma for the Priority Claimants?

7        A.   I would say greater than 85 or 90 percent.

8    It would have to -- to me, it would have to be

9    substantial portion of the realtors that say, "This

10   is not a problem."

11       Q.   But you don't set the same 85 or 90 percent

12   standard to conclude that there will be a stigma

13   impact, do you?

14       A.   No.

15       Q.   If the -- if your survey accurately reflects

16   the real estate market, then shouldn't there be no

17   impact about half the time?

18       A.   If the survey statistically represents the

19   broader real estate market, that would be an

20   inference you could draw, yes; but I didn't suggest

21   that it does.  In fact, I testified that my survey

22   is not statistically validated.

23           And further, you know, these surveys are not

24   segregated by geography or price class or otherwise.

25   These were based on the available realtors that we

Confidential – Subject to Further Confidentiality Review

```
 1    could reach, so in conjunction with the case study

 2    sales that we were studying.  So there would --

 3    there would need to be certainly a much more

 4    extensive survey to be able to say that the

 5    respondents statistically represent the prevalence

 6    of an impact.

 7        Q.   Okay.  Is -- do you know how many homes in

 8    Florida formerly had Chinese drywall and have been

 9    remediated, ballpark?

10        A.   That have been remediated?

11        Q.   Uh-huh.

12        A.   I -- I don't know that answer off the top of

13    my head.  I could -- I could -- I probably have the

14    data in my file.

15        Q.   If -- if I told you that data from Knauf --

16    you know who Knauf is?

17        A.   I'm sorry?

18        Q.   Do you know who Knauf is?

19        A.   Yes.  K -- K-n-a-u-f-f, yes.

20        Q.   If I showed you data from Knauf showing that

21    they had remediated about 2,000 homes in Florida

22    that had their Chinese drywall, would that sound

23    right to you?

24        A.   I would have no idea.  I would have to look

25    at the overall reports.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  Well, is it plausible to you that

 2   there are at least a few thousand homes in Florida

 3   had Chinese drywall and have been remediated?

 4        A.   It's possible.  Sure.

 5        Q.   Okay.  Well, is it a few hundred?  Are you

 6   comfortable with a few hundred?

 7        A.   I would be comfortable with a few hundred.

 8        Q.   Okay.

 9        A.   Sure.

10        Q.   All right.  Is it your testimony that every

11   single one of those homes that has been remediated

12   will sell for 10 percent less?

13        A.   No.

14        Q.   All right.  Now, do -- are you aware that in

15   addition to the Priority Claimants, there is a

16   broader group of litigants that, I don't know, might

17   number 1,700, maybe more, in Florida that are more

18   or less similarly situated?

19        A.   Yes.

20        Q.   Okay.  Is it your testimony that all of

21   those other claimants will experience a 10 percent

22   stigma effect?

23        A.   No.  It's -- it's my testimony that the

24   correct measure of damages for compensation of those

25   claimants is 10 percent on the basis that some of
```

1    them may suffer more and some of them may suffer

2    less; but the impacts being unknown, the 10 percent

3    fairly compensates them for damages that they've

4    either incurred or may incur in the future.

5        Q.   And you could know what the damages are if,

6    at the time of sale, you compared the sale price to

7    comparable ones, right?

8        A.   Well, that -- again, that would be -- yes,

9    that would be one way to do it.  But, again, I would

10   say that the fact that somebody may just hit the

11   market right or find the magic buyer and not suffer

12   a damage is just a consequence of good luck.

13           For purposes of ascribing damage, you really

14   should be looking to what the -- what the overall

15   market is doing on the longer term basis.

16       Q.   Do you intend, for your report, to support

17   the theory that all of the other claimants in

18   Florida beyond the Priority Claimants are entitled

19   to 10 percent stigma damages?

20       A.   I don't know that I was aware that my

21   opinion was going to be extrapolated beyond the 20

22   Priority Claimants, no.

23       Q.   Would you need to do more work before you

24   were comfortable with that kind of extrapolation?

25       A.   I would want to know what the geographic

Confidential - Subject to Further Confidentiality Review

```
 1    distribution of those were, certainly.

 2       Q.   And --

 3       A.   And the -- and the time, you know, the time

 4    elements.

 5       Q.   And so you would need to do more work before

 6    you could offer that kind of opinion as to the rest

 7    of the claimants in Florida?

 8       A.   Right.  My -- my report was specifically to

 9    address the 20 Priority Claimants before me.

10       Q.   All right.  Is -- are your results and your

11    theory of a 10 percent stigma impact, do they apply

12    outside of Florida?

13       A.   They may.

14       Q.   You don't know, sitting here today, whether

15    they do or not?

16       A.   No, that would not -- that would not

17    constitute my opinion.  I would apply this in

18    Florida.

19       Q.   Okay.

20            MR. BLOCK:  This is probably a good time for

21       a break, just to get paper organized.  Let's go

22       off the record.

23            THE VIDEOGRAPHER:  Off record, 3:55.

24            (Recess from 3:55 p.m. until 4:19 p.m.)

25            THE VIDEOGRAPHER:  On record, 4:19.
```

```
 1    BY MR. BLOCK:

 2        Q.   Mr. Graziano, I want to -- I want to go back

 3    to Exhibit 3, but just as a tool, okay, rather than

 4    getting at your claimant-specific reports because

 5    they are large and across the room.

 6             So -- but first I need to understand,

 7    Exhibit 3 tells us whether somebody is a current

 8    owner or not, right?

 9        A.   Yes.

10        Q.   And does Exhibit 3 also have your -- the

11    valuation date for your opinion for those claimants?

12        A.   Yes.

13        Q.   Okay.  So that's basically the information

14    we would get -- the value date is the information we

15    would get if we just grabbed your reports over

16    there?

17        A.   Yes.  And I just reserve the right that if

18    there happen to be -- there happens to be any

19    conflict, obviously I would defer to what's in the

20    binder.

21        Q.   To your report, the binder.  Okay.  All

22    right.

23             Let's look at the first current owner on

24    Exhibit 3 which I think is Marc and Jennifer Wites.

25    Are you with me?
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 391 of 556
Case 2:14-cv-02094-MCE-DB Document 2-6 Entered on FLSD Docket 08/15/2019 Page 391 of 384

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I am.

 2        Q.   And your valuation date for them, the Wites

 3   family, is January 1st, 2019, right?

 4        A.   Yes.

 5        Q.   Okay.  And so I think what that means in

 6   your method is that you calculate their 10 percent

 7   stigma impairment as of January 1st, 2019, right?

 8        A.   Correct.  Because that's the valuation date

 9   of which I understand will be ascribing damages.

10        Q.   Okay.  And do you also use January 1st, 2019

11   as the appraisal date for the Wites' home?

12        A.   I believe so, yes.

13        Q.   Okay.  If the Wites sold their house on a

14   different date, like January 1st, 2020, a year after

15   your valuation date, would they experience a 10

16   percent stigma impact to the value of their home?

17        A.   They may.

18        Q.   Is it your testimony that they would?

19        A.   No.  It's my testimony that if we ascribe a

20   10 percent damage as of January 1st of 2019, that

21   would represent $150,000 impact against that value.

22   If they sold the home subsequently and the values

23   went up and they had already been compensated for

24   the $150,000, that that could represent some lesser

25   percentage in the future of the actual unimpaired
```

1    future value of their home.

2            So the values are relative to the effective

3    date.

4        Q.   So if they sold their home on January 1st,

5    2020, would they experience a 10 percent stigma

6    impact to the value of their home?

7        A.   Most likely.

8        Q.   Okay.  Are you -- is that something you can

9    testify to as a certainty?

10       A.   That's something I intend to testify to,

11   that the impact is 10 percent, yes.

12       Q.   Is it going to be 10 percent on January 1st,

13   2020?

14       A.   I don't know.  I don't know what the market

15   conditions are going to be on January 1st, 2020.

16   I'm only evaluating the 10 percent as of the

17   effective date.

18       Q.   And the -- Lillian Chatmon, who is Number 8

19   on your list, current owner, you also value her home

20   as of January 1 -- January 1st, 2019, right?

21       A.   Yes.

22       Q.   Okay.  If she sells her home on January 1st,

23   2021, can you tell me what the stigma impact will

24   be?

25       A.   My estimate would be the 10 percent of her

1    home today would be $14,500, and that that would

2    compensate her for any diminution in value.

3        Q.   Okay.  What if she suffers less diminution

4    in value in 2021?

5        A.   That's possible, but it's also possible that

6    she suffers more.  I mean, that's the difficulty

7    with a single point estimate.  Some may suffer

8    slightly more; some may suffer slightly less.

9        Q.   What about John Hernandez, Number 9, current

10   owner.  If he sells his home on January 1st, 2022,

11   will he experience a 10 percent stigma impact

12   against the value of his home on January 1st, 2022?

13       A.   I don't know.  I don't know what the value

14   of his home is going to be.  The quantification of

15   the percentage was used to apply the unimpaired

16   values to represent a dollar amount.  That dollar

17   amount over time is going to reflect a different

18   percentage in the future depending on what happens

19   to the market conditions of the home.

20       Q.   So in the future, the stigma impact might be

21   different than 10 percent?

22       A.   As a percentage of unimpaired value, which

23   is likely to be different based on the market

24   conditions, yes.

25       Q.   So -- so your 10 percent estimate is good

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 394 of 556
Case 2:12-cv-02284-MCE-EFB Document 129-1 Entered on FLSD Docket 08/15/2019 Page 392 of 384
Confidential - Subject to Further Confidentiality Review

```
 1    for January 1st, 2019.  You're not sure whether it's

 2    accurate for subsequent dates, right?

 3        A.   Well, I'm -- I'm not -- I'm not suggesting

 4    that it's not accurate.  I'm saying that the

 5    quantification of the 10 percent against the

 6    unimpaired value will reflect a dollar amount.  That

 7    dollar amount, once -- once fixed, will then

 8    represent some future percentage that will depend on

 9    whatever the -- that relationship is to the future

10    value.

11        Q.   But if we want to know what stigma impact,

12    if any, Mr. Hernandez would suffer if he sold his

13    home January 1st, 2022 instead of January 1st, 2019,

14    when you value his home?

15        A.   Then you'd need to know what his unimpaired

16    value would be in January 1st of 2022; and if you

17    can figure out how to do that, let me know.  We'll

18    make a fortune.

19        Q.   All right.  So William and Vicki Foster,

20    Number 12, they are current owners.  What if they

21    had sold their home in, I don't know, January 1st,

22    2018, about a year ago, what would their stigma

23    damages be as a percentage of the value of their

24    home?

25        A.   Are we speculating here?  As a percentage, I
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 395 of 556
Case 2:14-cv-02722-MCE Confidential – Subject to Further Confidentiality Review
384

1    would say 10 percent.  As a dollar amount, I would

2    have to know what the value of their home was during

3    the effective date that you just stated.  So I would

4    need to know -- it would be 10 percent of their

5    unimpaired value, so I would need to know what their

6    -- his retrospective unimpaired value is.

7        Q.   Okay.  Is it your opinion that 10 percent

8    applies irrespective of time?  In other words, it's

9    10 percent every year?

10       A.   In the time frames that I've studied, yes.

11       Q.   Okay.  But you only studied through

12   February 15th, 2019 --

13       A.   Right.

14       Q.   -- using your survey?

15       A.   Right.  And I think that there -- there is a

16   reasonably close proximity between that date and the

17   current, another year or two goes by; but that study

18   time frame, that held up over time.  And based on

19   the correlated numbers, 10 percent, you know, that's

20   over that time frame.

21            I wouldn't want to suggest to you or to the

22   court that that's going to hold up forever and ever

23   and ever; that that, you know, 10 percent over time

24   could be modified in the future depending on

25   continued exposure.

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 396 of 556
Case 2:14-cv-22408-MCR Document 22611 Enterprise on FLSD Docket 08/15/2019 Page 524 of
Confidential - Subject to Further Confidentiality Review
384

```
 1        Q.   Might it also depend on the conditions of

 2   the local real estate market at the time of the

 3   sale?

 4        A.   Sure.

 5        Q.   And that's not something you can analyze?

 6   The -- the conditions of the local real estate

 7   market at the time of sale are not something you can

 8   analyze in the future, of course?

 9        A.   Correct.

10        Q.   They could be analyzed at the time of sale,

11   though, right?

12        A.   Yes.

13        Q.   All right.  The testimony you have given,

14   would it apply to the -- just now, would this apply

15   to the other Priority Claimants who still own their

16   home?

17        A.   Yes.

18        Q.   Do you believe that stigma tends to

19   dissipate over time?

20        A.   It depends.

21        Q.   What does it depend on?

22        A.   A lot of different factors.

23        Q.   Like what?

24        A.   Well, what -- what's giving rise to the

25   stigma, what is the stigma related to, what are the
```

1    conditions which create the stigma.  So for

2    instance, in this particular case, the disclosure is

3    one of the things that, you know, certainly causes

4    people to be put on notice.  And some people prefer

5    not to buy homes that have -- where they know

6    they're going to have to make a subsequent

7    disclosure.

8         So if the facts were that you would make an

9    initial disclosure and sell the home and then

10   subsequently you didn't have to make any further

11   disclosure about the prior existence of Chinese

12   drywall, then that might be a condition that might

13   cause the diminution to fade.

14        But if, I believe as plaintiffs allege, you

15   would always be required to make the disclosure,

16   then that likely will demonstrate that the stigma

17   conditions will persist.

18        So --

19   Q.   What do you -- what is it that drives stigma

20   in the minds of potential buyers?

21   A.   Generally, risk is the primary driver of

22   stigma.

23   Q.   In the case of Chinese drywall, what is it

24   that drives stigma in the minds of potential buyers?

25   A.   Risk.

1    Q.   Risk of what?

2    A.   By forward pricing risk that the disclosure

3    will result in a price that will be less in the

4    future because they have to make a disclosure; risk

5    that they may decide to sell the -- they may decide

6    or need to sell their home at a time in the market

7    where there is more homes in the market and more

8    available properties that are competitive; and at

9    that point, they will be going out with a property

10   that's inferior where disclosure is required, and

11   that they may suffer deeper pricing discounts; risk

12   and recognition that their investment in the home is

13   not going to appreciate so their -- as quickly; and

14   just general -- a general understanding that maybe

15   if this condition comes back, they may have capital

16   costs that they don't -- that are unknown.

17        So the risks of potentially having to

18   further remediate or have something wrong with the

19   home and the risks associated with the future

20   disclosure and its impact on pricing are the two

21   things that are -- that drive the primary resist --

22   market resistance, in my opinion.

23   Q.   Do you think that those factors are likely

24   to dissipate over time as people have more

25   experience living with remediated homes that do not

```
 1    continue to have the problems associated with

 2    Chinese drywall, like off-gassing and smells and so

 3    on?

 4        A.   I'm sorry.  Could you repeat that question?

 5             MR. BLOCK:  Could you read it back?

 6        (The question was read by the reporter.)

 7        A.   I think that the presence or the -- the

 8    continued -- I think that if the market continues to

 9    demonstrate that the remedial activities don't pose

10    a callback risk, where people have to go back in and

11    spend additional capital, I think that element of

12    risk will help diminish the impact.

13             However, I think the disclosure risk is

14    really the primary concern of the home buyer.  It's

15    that having to constantly make that disclosure.

16    It's like trying to sell a car with a big dent in

17    it.  You just have to -- it's just -- it's a -- it's

18    a sore and there is just some people that weren't

19    going to want to accept that disclosure.

20    BY MR. BLOCK:

21        Q.   And what is the basis for those beliefs of

22    yours?

23        A.   The -- you asked me to quantify what

24    detrimental condition or what stigma, what gives

25    rise to stigma; and I answered risk.  And I think
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 400 of 556
Confidential – Subject to further Confidentiality Review
384

1    that having conducted the interviews here and having

2    looked at other stigma issues and market resistance

3    before, that's generally what gives rise.  These are

4    my impressions of what creates that pricing gap.

5       Q.   You don't have any data from actual buyers

6    where they say that they're concerned about

7    disclosure risks, do you?

8       A.   From buyers, no.

9            But the realtors, certainly realtors, you

10   know, have indicated that, you know, there are

11   certain buyers that just stay away from these types

12   of things.  They don't want to be involved in

13   anything that has any type of future disclosure

14   requirement.

15      Q.   Are there other conditions that must be

16   disclosed that cause stigma, other conditions other

17   than Chinese drywall?

18      A.   Give me an example.

19      Q.   I'm going to defer to you as the real estate

20   expert.  Are there other conditions, like mold or

21   what have you that --

22      A.   Yeah, sure.

23      Q.   -- that are required to be disclosed in the

24   sale of a home?

25      A.   Sure.  Structural -- structural issues would

1    require disclosure.  If you had, you know, any type

2    of adverse structural condition, you would have to

3    disclose.

4         Q.   Do those kinds of conditions lead to stigma?

5         A.   In my experience?  Yes, but I can't say that

6    I've -- you know, I've studied them in -- on a

7    discrete, particular example before, particularly as

8    it relates to structural issues, you know.

9              But any adverse condition that would alter a

10   buyer's opinion of the property should be disclosed.

11        Q.   Have you ever seen -- outside of Chinese

12   drywall in your experience in this case, have you

13   ever seen a defect or environmental condition or

14   detrimental condition that leads to a uniform stigma

15   impact for all affected properties?

16        A.   I think there are detrimental conditions

17   that generally fall within a range, and so, yes.  I

18   mean --

19        Q.   Do they all hit exactly the same number like

20   you did here?

21        A.   No.

22        Q.   What about things like water intrusion that

23   have been remediated, do those lead to stigma?

24        A.   They can, yes.

25        Q.   And if you want to know if there was a

1    stigma in that case, would you study the individual

2    property to see how it fared to comparable ones in

3    the market?

4         A.   That would be one method, sure.

5         Q.   Is that the main method?

6         A.   No.  Ideally what you would do is study

7    other homes that sold that had the water intrusion

8    in disclosures the same way that I did the subject

9    study.  I mean, you identify a control sale that had

10   water intrusion and I -- and compare it to sales

11   that didn't have the water intrusion problem.

12        Q.   Can you explain why you omitted Lee County

13   from your case study?

14        A.   Yes.  When we looked at the distribution of

15   drywall cases within Lee County and when we looked

16   at the overall presence of the number of cases, we

17   felt that that would be, you know, adverse to -- to

18   the study that county because it was the highest

19   prevalence of Chinese drywall installations.

20             And so we did not -- we intentionally

21   omitted Lee from our study area because we thought

22   that would be adverse to the defendants.  In other

23   words, the amount of -- the amount and public --

24   publication of the Lee County remediation problem

25   was most extensive in Florida.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Did you research any properties in Lee

 2   County before deciding to exclude Lee County from

 3   your study?

 4        A.   I think we probably have some Lee County.

 5   We probably have some Lee County case studies

 6   started.  I think most of them were impaired,

 7   though.  I don't recall if -- there were three or

 8   four case studies that we omitted because we either

 9   couldn't confirm the sale had the control sale

10   properly.  I don't think any of those were in Lee,

11   though.

12        Q.   Why did you omit Collier County from your

13   case study?

14        A.   I don't know that we intentionally omitted

15   Collier County.  I don't know -- I just don't think

16   that we -- I don't know if had the developed -- if

17   we had any developed cases there.

18        Q.   I'm going to ask you about the same question

19   about Indian River, Pinellas, Sarasota, and Pasco

20   County, all of which you did not include in your

21   case study, looking at Page 14 of your report.  Why

22   did you exclude those counties from your case study?

23        A.   We did not intentionally exclude them.  We

24   just didn't identify any control sales to run down

25   in those counties.
```

```
 1        Q.   Do your -- does your damage estimate of 10

 2   percent apply to the counties that you excluded from

 3   your study -- or strike that.  That wasn't a good

 4   question.  I'm anticipating the objection.

 5             Does your damage estimate of 10 percent

 6   apply for the counties for which you had no cases in

 7   your case study?

 8        A.   Yes.

 9        Q.   So let's look at some estimates that you

10   did.  So I'd like to -- if -- I was going to ask Joe

11   for help getting binders.

12             Can we -- can we grab some binders from your

13   Priority Claimant?

14        A.   Sure.

15             (Discussion off the record.)

16   BY MR. BLOCK:

17        Q.   I just -- I want you to have your --

18        A.   Thank you.

19             THE WITNESS:  So Case 10, Patrick.

20             (Discussion off the record.)

21   BY MR. BLOCK:

22        Q.   Do you have your O'Brien claimant report?

23        A.   I do.

24        Q.   Okay.  All right.

25             MR. BLOCK:  Could you, John, hand --
```

1          (Discussion off the record.)

2     BY MR. BLOCK:

3        Q.   We're handing you, Mr. Graziano, a copy of

4     data from the Hillsborough County Property

5     Appraiser's website for the O'Brien's address of

6     3120 West Wallcraft Avenue in Tampa.

7          Do you see that?

8        A.   I do.

9        Q.   And we will mark that website printout as

10    Exhibit 9.

11         (Graziano Exhibit 9 was marked for

12    identification.)

13         MR. BLOCK:  I'll get better at this next

14    time.

15         (Discussion off the record.)

16    BY MR. BLOCK:

17       Q.   And if you look at your claimant-specific

18    report, or I guess you're looking at Exhibit 3, I'm

19    looking at Page 7 of your claimant-specific report,

20    and I'll let you get there.  Are you there, on

21    Page 7?

22       A.   I am.

23       Q.   Okay.  You have a hypothetical value as if

24    remediated of $508,500, right?

25       A.   With the damage applied, correct.

```
 1        Q.   Yes.  Yes.  So basically what that means is

 2   you are opining that as of February 17th, 2012,

 3   which is the date from the front page of the report,

 4   the property that the O'Brien's own would sell,

 5   because of stigma, for $508,500, right?

 6        A.   Correct.

 7        Q.   Okay.  On Exhibit 9 that I've handed you,

 8   the Hillsborough County Property Appraiser's

 9   website, do you see where the O'Brien house sold in

10   2012 for $542,000?

11        A.   I do.

12        Q.   Okay.  That's more than you estimated the

13   O'Brien house would sell for, correct?

14        A.   That's correct.

15        Q.   Have you -- you've got a calculator there,

16   and I can -- and you can check my math, but we

17   calculate that the actual sales price as being about

18   $33,500 than your stigmatized prediction, and it's

19   about 6.59 percent higher.  Do you want to check me

20   on that?

21        A.   I could check you on that.  I'm not sure

22   that it -- the record is clear on that.  I think

23   what you're -- are you suggesting that the $542,000

24   that's reflected on the tax record was

25   post-remediation, that was the post-remediation
```

Confidential - Subject to Further Confidentiality Review

```
 1    sale?

 2       Q.   Well, if it's the pre-remediation sale, then

 3    your estimate is off by quite a bit?

 4       A.   Right.  But that was -- but it's a July -- I

 5    mean, we agree it's a July 2012 sale at 542,000.

 6       Q.   It's -- it's quite a bit more than the

 7    February 2012 sale, so it does seem likely to be the

 8    post-remediation sale.  That's -- that's how I would

 9    interpret the property records.

10       A.   Okay.

11       Q.   Okay?  And so what I'm asking you is whether

12    the actual sales price for the O'Brien home in July

13    of 2012 is higher than the estimate that you

14    predicted on Page 7 of your report for the O'Briens?

15       A.   It is.

16       Q.   And if you look on Exhibit 9, you will see

17    that the property sold again in June of 2017 for

18    $749,900, right?

19       A.   Yes.

20       Q.   And that is also higher than you predicted

21    the home would sell for several years earlier in

22    2012, right?

23       A.   I mean, five years earlier and in a

24    completely different economic market from 2012 to

25    2017, yes, admitted.
```

```
1                And let me also make the point that you're
2     comparing the July 2012 value at $542,000 against my
3     February 2012 value of $508, so whatever market
4     conditions time adjustment would be required in
5     there, you would need to make some adjustment for
6     that, too.
7        Q.   So is it your testimony that in the five
8     months between February of 2012 and July of 2012,
9     something about the market changed that explains why
10    your estimate of $508,500 is not matching the actual
11    sales price?
12       A.   Yeah.  I'm suggesting that, yes, property
13    values do change as a result of market conditions
14    and market appreciation.  And during that period,
15    coming out of the Great Recession between 2012 and
16    '13 and '14, property values were changing rather
17    rapidly.  Yes, that is my testimony.
18       Q.   Okay.  But if we look at the actual sales
19    data for this property in July of 2012, is there any
20    indication that it suffered the 10 percent stigma
21    impact leading to a sales price of $508,500 that you
22    offer in your report?
23       A.   There is an indication that it suffered
24    value diminution because by February 2012,
25    unimpaired value was $565,000.  So if I compare the
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 409 of 556
Case 2:14-cv-02722-EEF-MBN Document 22363-55 Filed 11/19/19 Page 408 of 384
Confidential - Subject to Further Confidentiality Review

1    565,000 to the 542,000 where it actually sold,

2    that's actually a 4 percent diminution in value; or,

3    said another way, in whole dollars, it represents a

4    $23,000 price impact.  That's number one.

5         Number two, the O'Briens sold the home

6    unimpaired.  So their discount when they sold the

7    home at 342 -- or $340,000, according to the tax

8    record, they already suffered that 10 percent

9    diminution against the impairment.  They took such a

10   deep discount on the sale of the property impaired,

11   that they -- they already suffered that damage.

12        Now, you're -- you are extrapolating that

13   into the future, which is fine, but you have to

14   consistently understand that as the market

15   conditions change, to compare apples to apples, you

16   have to make a market conditions adjustment.

17        So the proper analysis would be do an

18   unimpaired value estimate as of July 2012 and

19   compare that number to $542,000.  That would match

20   my methodology.

21        But what you're doing is you are comparing

22   prices from two different time frames.  Now, I

23   understand they are relatively close, and for

24   purposes of our discussion today, I'm happy to have

25   the discussion.  But it doesn't to me prove that my

1    10 percent is wrong just because the answer came out

2    to be 4 percent, but you're using my unimpaired

3    value from six months prior.

4        Q.    Well, let me ask you this:  The actual sales

5    data, does it prove that your 10 percent impairment

6    leading to a value of $508,500 got it right?

7        A.    I'm suggesting that unless you had sales

8    data or a transaction that happened on or, you know,

9    within, you know, a couple of weeks or a month of

10   that -- that date of value that I estimated,

11   comparing the price to my value doesn't -- doesn't

12   make me -- you know, doesn't make me wrong or right.

13   I mean, once -- once you get past that date, you

14   have to make other adjustments.

15            There are ways to do it.  I -- you know, I

16   adjusted for various conditions, differing

17   conditions of properties.  But we're here having the

18   conversation today, and you're say -- you're, I

19   think, trying to get me to admit that my estimate

20   wasn't accurate; but you're comparing it to

21   something that's apples and oranges.

22            And I also might add, I don't have the

23   listing data, so I appreciate the Hillsborough

24   County Property Appraiser's website.

25            But the other question that I would have is,

Confidential – Subject to Further Confidentiality Review

```
 1    you know, that 542,000 price, was that on the market

 2    for 340 days and all the other properties in the

 3    market took 60 or 90 days to sell?  Did it

 4    experience seven price changes before we reached the

 5    point?  Was it listed for $529,000 and maybe three

 6    buyers came in at the same time and had a bidding

 7    war?

 8            So I think you need more information than

 9    just to look at the property appraiser recorded

10    price and make a direct comparison for me to be able

11    to accurately test that.

12    Q.   You could have gone to the Hillsborough

13    County Property Appraiser website and collected the

14    sales data, right?

15    A.   Yes.

16    Q.   Okay.  Did you do that?

17    A.   I said in the report, actually, right there

18    at the conclusion that the subject sold in February

19    2012 to an investor who remediated and flipped the

20    property in July of 2012, which offers a reasonable

21    evidence of the loss of use.

22            In other words, the investor bought it in

23    February and flipped it in July.  February, March,

24    April, May, June, July -- six months to renovate and

25    resell the home.
```

```
 1                    "The flip to a new buyer post-remediation

 2      reflects a 4 percent discount versus the Integra

 3      2012 unimpaired estimate assuming no value

 4      appreciation between February and July."

 5              So I would suggest yes, I did test it.

 6      Q.   Did you look at -- well, you didn't.  I

 7      understand.

 8              Did you look at the 2017 sale on the

 9      Hillsborough County website?

10      A.   Not within this report, but it is tested in

11      the -- in the supplemental information that we

12      talked about today, and that indicated about a 7.5

13      percent discount.

14      Q.   All right.

15      A.   And that was -- incidentally, that was a 7.5

16      percent discount against 749,000, which is

17      $56,000 and -- 56,175, which is almost to the penny

18      what my postimpairment damage is on Page 7.

19      Q.   Can we grab the Deeg -- Deeg Hooker report?

20      It's Number 20, I believe.

21              (Graziano Exhibit 10 was marked for

22      identification.)

23              MR. BLOCK:  This will be Exhibit 10.

24              MR. MONTOYA:  Thank you.

25      A.   So we're done with O'Brien for now?
```

```
 1   BY MR. BLOCK:

 2       Q.   Yeah, we're done with O'Brien.  Yeah.

 3       A.   Thank you.

 4            THE WITNESS:  You're actually being useful.

 5            MR. MELLONI:  Once in a while.

 6   BY MR. BLOCK:

 7       Q.   Do you have the Deeg report?

 8       A.   I do.

 9       Q.   Okay.  And the effective date of the

10   appraisal for Deeg was May 2nd, 2016?

11       A.   Yes.

12       Q.   Right?

13            And you estimate a hypothetical value,

14   including stigma impact, of $405,000, right?

15       A.   Correct.

16       Q.   Okay.  And we've handed you as Exhibit 10 a

17   printout from the Martin County Property Appraiser

18   website and that shows a sale in January of 2017, so

19   about eight -- eight months later, roughly speaking,

20   for $533,000 -- excuse me, $530,000.

21            Do you see that?

22       A.   I do.

23       Q.   Okay.  And the difference between your

24   estimate and the actual sales price eight months

25   later was about -- well, it was $125,000, correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 414 of 556
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 09/15/2014 Page 92 of
384
Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.  The difference between the sales

 2   price and -- sales price in January 2017, the

 3   difference between 530,000 and 405,000 is 125,000,

 4   correct.

 5      Q.   It's about a 30.86 percent difference,

 6   right, between your prediction and the sale eight

 7   months later?

 8      A.   Yes.  But my -- I mean, the difference

 9   between my unimpaired value and the actual sales

10   price later was already a 18 percent difference,

11   right?  So that would indicate that some market

12   condition, appreciation must have been evident

13   because we did an appraisal as of -- as of the date

14   unimpaired.

15           Forgetting about any discount or how far the

16   discount was, we were -- we start with unimpaired

17   value at 450; and even if you say there was no

18   impact of Chinese drywall, then the 530,000 sale

19   represents an 18 percent appreciation rate just

20   between that time frame.

21           Do you understand?

22      Q.   You're telling me that the market was

23   increasing at a pretty good clip during that time

24   period?

25      A.   That's what the data suggests, yes.
```

```
1       Q.    But is there any evidence in this actual

2    market sale for $530,000 that the Deeg home

3    experienced a stigma impact of 10 percent?

4       A.    Not based on the -- not based on a

5    comparison to the January 2016 data, no.

6             But, again -- I'll say it again -- the Deegs

7    actually sold the home in May '16 -- in May of 2016

8    unremediated at 330,000, so they already

9    experienced that post -- they already experienced

10   the deep discount which included the buyer's

11   expectation of risk when they go to resell the home.

12            The fact that the subsequent buyer didn't --

13   didn't have that damage, I don't think that your

14   plaintiffs are suggesting that every time a

15   remediated home sells, your client should have to

16   come out-of-pocket 10 percent of the price.  You're

17   paying the 10 percent once based on the claimant's

18   first experience with the home, whether they lost

19   it, whether they had remediated it, whether they

20   sold it remediated.  You're ask -- you're being

21   asked to pay as damages.

22            Once subsequent buyers that don't -- that

23   may or may not experience future damages have

24   already priced that.  They've already gotten the

25   price benefit.  It's the claimants that suffer the
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 416 of 556
Case 2:14-cv-02494-CJC-DU-Rn Confidential – Subject to Further Confidentiality Review
384

```
 1    damage.

 2        Q.   Is it -- is it plausible in your mind that

 3    if you have two homes that are roughly comparable,

 4    or even identical, and one of them has been -- had

 5    Chinese drywall but has a brand-new interior because

 6    it's been remediated, that might actually sell at a

 7    premium to the neighboring home that never had

 8    Chinese drywall and has an interior that five or ten

 9    years old?

10        A.   I -- I believe that is absolutely masking

11    part of the -- part of the diminution.  I believe

12    that in this case, the remedial action -- the

13    remedial action is to renovate the home, and many

14    times completely.  So you are getting new, upgraded

15    HVAC.  You're getting new, upgraded wiring --

16        Q.   Appliances --

17        A.   -- all --

18        Q.   Windows, everything?

19        A.   -- a lot because you're ripping out the

20    drywall.  You're doing -- while you're there, you're

21    going to do the kitchen, you're going to do the

22    flooring.

23            And so, again, I think that in this study

24    method, you know, we've assumed reasonably

25    comparable condition with all the comparables, but
```

```
 1    we've attempted to pair the comparables with

 2    comparable aged homes, not all of which have been

 3    remediated.

 4          So I agree with you in some cases because

 5    the remediation remedy is to renovate the home, that

 6    actually is probably masking the post-remediation

 7    discount more than it otherwise would because some

 8    people look at it and say, "Well, I'm going to buy a

 9    2006 home and it's got a brand-new interior, a

10    brand-new kitchen, brand-new everything, you know,

11    I'm going to pay more for that than a home that's,

12    you know, ten years old that's never been

13    renovated."

14          That's -- that's part of the -- I think

15    that's part of the bias I think to the benefit of

16    the defendants.

17    Q.   Well, couldn't it just be that people are

18    paying more for homes with brand-new interiors

19    because they like brand-new interiors more than old

20    interiors?

21    A.   Sure.  But the correct reference point would

22    be to compare -- would be to compare homes that

23    are -- have also recently been renovated against

24    your comparables.  So ideally to -- to really

25    measure that post-remediation impact, you -- we
```

```
 1    should be having a control sale that has a Chinese

 2    drywall disclosure and is completely remediated and

 3    then having four control sales of the same age that

 4    have been recently renovated.

 5             And if you did that, the impacts could be

 6    higher -- the measurement of the impacts might be

 7    higher than what we've measured because not all of

 8    the homes that we used as comparable homes had been

 9    comparably renovated.

10             So there absolutely is some element of home

11    buyers that say, "You know what?  I'm buying a

12    10-year-old home, but it's brand-new inside and it's

13    beautiful, and I'll deal with the Chinese drywall

14    issue because I'm getting a new renovated home."

15    Q.   So -- so isn't that double-counting to -- to

16    get the remediation cost, to recover the remediation

17    cost, get the brand-new interior, and then say that

18    you should be compared against your neighbors who

19    also have a brand-new interior in your hypothetical?

20             MR. MONTOYA:  Objection as --

21    A.   No, because --

22             MR. MONTOYA:  Objection as to scope, as to

23        his hypothetical, and also as to the rule of law

24        that's been established in the case as to

25        remediation damages.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 419 of 556
Case 1:11-cv-22408-MGC Document 220-1 Entered on FLSD Docket 08/15/2011 Page 247 of
384
Confidential - Subject to Further Confidentiality Review

```
 1            You can answer.

 2            MR. BLOCK:  I don't think any ruling

 3       established that you can do it like that.  We'll

 4       just talk about that later.

 5       A.   You're asking me as it relates to damage

 6  theory, is it double-dipping?

 7  BY MR. BLOCK:

 8       Q.   Yes.

 9       A.   And the answer is no, because if I didn't

10  have any drywall issues, I own a home, I always have

11  the right to renovate.  I have the ability to

12  upgrade the quality of the home to get an enhanced

13  price.

14            When I have Chinese drywall, if I'm

15  compensated to -- to do the remediation and I do the

16  remediation, I still had those rights before.  I

17  mean, everybody has the right to renovate their

18  home.  So if renovating your home yields you a

19  better price, so be it.

20            I mean, it's not a double dip.  You're

21  renovating your home as the remedy.  The fact that

22  you're getting some benefit of having a remediated

23  home and it -- and therefore you may not suffer as

24  much post-remediation damage as you otherwise would,

25  in my view, is a benefit to the defendants, not to
```

```
 1   the claimants.
 2          It's not double-dipping.  It's the reverse
 3   of double-dipping.  Your -- the remediation is
 4   masking the depth of the -- of the issue.
 5      Q.   So if you are entitled to be made whole,
 6   shouldn't you be compared to someone who is just
 7   like you but for the Chinese drywall; and if you
 8   hadn't -- you didn't remediate but for the Chinese
 9   drywall, isn't the proper comparison your neighbor
10   who didn't have Chinese drywall and didn't
11   remediate?
12      A.   I -- I think that's for somebody else to
13   decide, I think.  I don't -- I don't think that the
14   claimants have a choice.  They have to remediate.
15   They can't leave the property in an unremediated
16   condition.
17      Q.   You have a choice about the comparison that
18   you are doing?
19      A.   I agree.
20      Q.   Okay.  So if you want to compare like with
21   like, for purposes of evaluating damages, the -- the
22   people should be alike but for the Chinese drywall
23   and the remediation, right?
24      A.   I -- the only -- the implication of what
25   you're asking me is then what -- you're saying that
```

Confidential - Subject to Further Confidentiality Review

```
 1    I should have done was to estimate the

 2    post-remediation impacts as if they hadn't done a

 3    full renovation of the home.  That's the implication

 4    of what you're asking me.  Do you understand that?

 5        Q.   No.  I -- I think you're saying that you

 6    should -- the proper method is to compare a

 7    remediated home that was remediated due to drywall

 8    against a comparable home that was remediated just

 9    because.  Is that what you're saying?

10        A.   Well, I don't want to call it "remediated

11    just because."  I -- I'm saying you compare it to

12    similar age homes that are in a similar age and

13    condition as your subject.

14             So if I have five 2006 comparables and none

15    of the kitchens have been renovated, those are going

16    to tend to trade at a price lower than the homes

17    where the kitchens have been recently renovated.

18             So if -- and I make the control sale -- if

19    the control sale has drywall remediation disclosure

20    requirement and it has a brand-new, renovated

21    kitchen and I then compare it to five comparables

22    that don't have brand-new, renovated kitchens, don't

23    have brand-new everything inside, the resulting

24    unimpaired indication from those five comparable

25    sales is naturally going to assume that the home is
```

```
 1    in that condition.
 2            So then when I compare that to the sale
 3    price of a brand-new, renovated home, it's going to
 4    look at if there is no damages.  But that's not true
 5    because --
 6       Q.   Well, there might not be stigma damages,
 7    right?
 8       A.   No.  No.  But you're -- the definition of
 9    what you're trying to quantify has to recognize that
10    they renovated the home.  Now they sold it.  If it
11    didn't have the drywall problem, what could they
12    have sold it for in that condition on the date?
13       Q.   But it would never have -- but we're saying
14    that but for the drywall, it would not have been
15    remediated?
16       A.   You're saying that, but I'm saying that --
17       Q.   Yes.
18       A.   -- at any time, they had the right to put it
19    in that condition.
20       Q.   Tell me which of the 20 Priority Claimants
21    you can testify would have remediated their home but
22    for the drywall and the need to remediate their home
23    because of the Chinese drywall?
24       A.   I would only know that by talking to the
25    individuals as to whether they intended to renovate.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 423 of 556
Case 2:09-md-02047-EEF-MBN Document 21763-51 Filed 09/15/2019 Page 251 of 384
Confidential – Subject to further Confidentiality Review

```
1    I don't know how I could testify to that at this
2    time.  But everybody renovates their home over the
3    course of the life of their home, or most people
4    renovate their home over the course of the life of
5    their home.
6        Q.   A full tear-out down to the studs with all
7    brand-new appliances, most people do that over the
8    course of owning a home?
9        A.   I think there's -- there are many, many
10   examples where people buy older homes and renovate
11   it, including gut renovations.  When you rip out
12   your kitchen --
13       Q.   Okay.
14       A.   -- you get all new appliances.
15           MR. BREIT:  Just answer the questions.  Not
16       a time to get into a fight.
17   BY MR. BLOCK:
18       Q.   So you -- actually, you -- you produced in
19   your reliance materials or your production some
20   media and government websites, things from the CPSC,
21   news stories, so on and so forth.
22           Do you remember that?
23       A.   I do.
24       Q.   And a lot of that -- if I understand
25   correctly, a lot of that material was somewhat
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 424 of 556
Case 2:09-cv-02045-MCL-TC Document 23-1 Entered on FLSD Docket 03/15/2017 Page 52 of 384
Confidential – Subject to Further Confidentiality Review

```
1    dated, you know, to 2009, '10, '11, '12.  I didn't

2    see a lot that was '17, '18, '19; is that correct?

3        A.   I think that's accurate.

4        Q.   Okay.

5        A.   I'm sorry.  Are we finished with Deeg?

6        Q.   Yes.

7             So when you did your search and collected

8    your reliance materials, is it -- am I understanding

9    that you didn't really find a lot of articles and

10   government websites, news sources, media coverage,

11   and the like about Chinese drywall in the last two

12   or three years?

13       A.   I think that's a fair characterization,

14   sure.

15       Q.   Might that affect the market's perceptions

16   of Chinese drywall, the relative dearth of media

17   coverage?

18       A.   It may.

19       Q.   Is that something you accounted for in your

20   expert report?

21       A.   No.

22       Q.   I'm going to ask you about some -- you can

23   just put that in the stack.

24            I'm going to ask you about some e-mails that

25   we got in the last couple of days.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 425 of 556
Case 1:21-cv-00048-CL Document 22-11 Entered on FLSD Docket 08/15/2009 Page 353 of
384
Confidential – Subject to Further Confidentiality Review

```
 1      A.   Okay.

 2      Q.   So this will be 11, Exhibit 11.

 3           (Graziano Exhibit 11 was marked for

 4      identification.)

 5      BY MR. BLOCK:

 6      Q.   This -- sorry.  Thank you.

 7           This is an e-mail exchange that I've handed

 8      you between you and Pete Albanis who is a lawyer at

 9      Morgan -- Morgan & Morgan -- Morgan & Morgan law

10      firm.  Does that -- yeah, forthepeople.com.

11           Does that sound right to you?

12      A.   Yes, sir.

13      Q.   Okay.  And he tells you on February 14th,

14      2019, so that's the day before you served your

15      expert report, right?

16      A.   Yes.

17      Q.   Okay.  And he says he wants to make sure

18      that you have their January 2006 appraisal showing

19      an appraised value of $635,000, right?

20      A.   Yes.

21      Q.   Okay.  Why was he -- why was Mr. Albanis,

22      giving you that appraisal?

23      A.   Well, I think it was in the Dropbox.  I

24      think he was making -- he wanted to make sure that I

25      had looked at it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 426 of 556
Case 1:11-cv-22408-MGC Document 29-1 Entered on FLSD Docket 09/15/2011 Page 254 of
384

Confidential – Subject to Further Confidentiality Review

```
 1      Q.   Okay.

 2      A.   And his -- I think -- my conversations with

 3   Mr. Albanis are confidential.

 4      Q.   There's a line.

 5      A.   Where is the line?  Can you draw it for me?

 6      Q.   I can't advise you.

 7           MR. MONTOYA:  What are you asking him?

 8   BY MR. BLOCK:

 9      Q.   I -- well, I'm asking:  This looks like --

10   well, this is an e-mail that you-all gave to us, and

11   it looks like Mr. Albanis was at least pointing you

12   to look at some information to consider for your

13   expert report, and I'm wanting to ask about that.

14      A.   Okay.  And I'll just allow Patrick time to

15   object --

16      Q.   Yeah.

17      A.   -- and tell me whether I need to answer the

18   question.

19      Q.   Okay.  Well, let me ask you this, then:  If

20   you go down in the e-mail, there is an e-mail from

21   Mr. Albanis to you on February 7, 2019, and it says:

22   "240 West End Drive 121 in Punta Gorda is the one

23   that should be removed."

24           What does that refer to?

25           MR. MONTOYA:  If it's -- if he relied upon
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 427 of 556
Case 1:11-cv-22408-MGC Document 291 Entered on FLSD Docket 08/15/2013 Page 255 of
384
Confidential - Subject to Further Confidentiality Review

```
 1        it, I think it's a fair question.  Outside of

 2        his --

 3             MR. BLOCK:  Yeah.

 4             MR. MONTOYA:  -- for his report.  Outside of

 5        that, I don't think it is.

 6    BY MR. BLOCK:

 7        Q.   Yeah.  I'm not asking about strategy; but

 8    what is -- it's a piece of property, I'm assuming,

 9    based on the description.

10        A.   I had -- and I have to look back at my

11    notes, but I had asked -- I had asked the attorneys

12    to review against the case studies that we did to

13    make sure that there were no claimants included in

14    the case studies, and I believe that that related to

15    an identified potential case study that Mr. Albanis

16    said was a claimant; and what he was telling me was

17    that should be removed from consideration from the

18    case study set.  Otherwise, I was going to be doing

19    a case study on a claimant, which is not desired.

20        Q.   What -- what is the impact of doing a case

21    study on a claimant?

22        A.   Well, again, you know, part of the case

23    study method that we used was to confirm the sales

24    with the parties to the transaction, including the

25    brokers and others.  And so the impact would be
```

```
 1    that, A, I may not be able to fully develop the case

 2    study because I may not get information because

 3    people may not want to disclose that information

 4    because it's part of their case; and, you know, the

 5    brokers and so forth know that the property is

 6    subject to a litigation, they are not going to

 7    answer questions.

 8         Or alternatively, that somebody might claim

 9    that that case study was irrelevant because it's a

10    claimant property, and so we were trying to stay --

11    I was trying to stay away intentionally from the

12    claimant properties in developing the case studies

13    so there weren't problems and issues of

14    confidentiality or, you know, answers that we got or

15    claims from the defendant that the answers that we

16    received during the confirmation were biassed

17    because they have a lawsuit going on.

18         It just -- it just created questions in my

19    mind whether the case study would be independent.

20    Q.   Do you know that at least one Priority

21    Claimant home did end up in your case study?

22    A.   You mentioned that.

23    Q.   Yeah.  So if you go -- if you have your

24    report, which is Exhibit 1, your general report,

25    and -- I'll let you get towards the back.  It's
```

```
1    going to be Palm Beach-Boca 2.

2        A.   This is Monte Vista Drive?

3        Q.   Yeah.  We think that 17830 Monte Vista Drive

4    in Boca Raton is Kevin and Stacey Rosen.  So if you

5    look at Exhibit 3, your Exhibit 3 that you made --

6    yeah, you've got it.  They are the third one down.

7        A.   Uh-huh.

8        Q.   Okay.  So these issues that you've

9    discussed, the problems with including a claimant

10   home in the case study did, in fact, happen in your

11   case study?

12       A.   Okay.

13       Q.   I wanted to go back to e-mails, although I

14   think this ties to the Rosens as well.  The next one

15   that I'll hand you is going to be 12.  Let me see

16   that.

17            (Graziano Exhibit 12 was marked for

18   identification.)

19            MR. MONTOYA:  Thank you.

20            MR. BLOCK:  This is going to be yours.

21   BY MR. BLOCK:

22       Q.   This is an e-mail -- I'm sorry.  Can you --

23       A.   That's okay.

24       Q.   This is an e-mail actually between

25   Mr. Montoya and you, January 24th, 2019 and it looks
```

```
 1    like Mr. Montoya sends you a link that says:  "See

 2    attached link re comps in the Oaks."

 3           Is that right?

 4    A.    That's what the e-mail says, yes.

 5    Q.    And if you look, there is a file attached

 6    and it says MWITES and it has the Bates Number 655

 7    to 689, "Letter Regarding Preparation of Taxes Re

 8    Chinese Drywall," right?

 9    A.    Okay.

10    Q.    Do you -- but do you have a recollection of

11    what that is, that attachment was?

12    A.    No.

13    Q.    Okay.  I'm going to hand you -- I should

14    have handed you as 12, which will be 13 --

15           (Graziano Exhibit 13 was marked for

16    identification.)

17    BY MR. BLOCK:

18    Q.    I'm handing you Exhibit 13.  This is an

19    e-mail exchange between you and Ms. Rico,

20    Mr. Montoya, January 25th, 2019, and it looks like

21    another version of the transmission of this MWITES

22    655 to 689 document, and it's described as "some

23    comparable sales obtained by Priority Claimant Marc

24    Wites."  Reflect -- "it reflects some of the

25    comparable sales in the Oaks community."
```

1          Am I reading that correctly?

2     A.   Yes.

3     Q.   And it -- Mr. Wites attached the comparable

4  sales to a letter to his accountant for purposes of

5  the preparation of his taxes, right?

6     A.   Yes.

7     Q.   Okay.  So are you -- were you relying on the

8  plaintiffs to help identify comparable sales for use

9  in preparing your report?

10    A.   No.

11    Q.   Why not?

12    A.   Because that's not how I select comparables.

13 I select comparables based on reviewing the best

14 market information available.

15         Most of these e-mails that came from

16 claimants or their attorneys or otherwise are

17 generated by a request probably from the claimants

18 themselves to say, "Make sure the appraiser has

19 this, and make sure the appraiser has that."

20         And the lawyers are really just responding

21 to that request and saying, "Consider it if you

22 will."

23         But I wouldn't characterize this as -- you

24 know, I didn't rely on the information.  I don't

25 even know -- I could pull the file.  I don't even

```
 1    know if I printed the information.

 2        Q.   So you think it's important to go and

 3    independently find your own comps?

 4        A.   I do.

 5        Q.   All right.  Can we look at, coming back to

 6    your report, general report, Exhibit 1, and that's

 7    it for the e-mails.  You can -- how are we on time?

 8        A.   Are we at a -- we have plenty of time.

 9        Q.   Do you want to take a break?

10        A.   Would you mind?

11        Q.   Yeah, let's go off the record and coordinate

12    your --

13        A.   I thought we were at a logical point, right?

14             MR. BLOCK:  Yeah, yeah.

15             THE WITNESS:  Thank you.

16             THE VIDEOGRAPHER:  Off record, 5:08.

17             (Recess from 5:08?p.m. until 5:23?p.m.)

18             THE VIDEOGRAPHER:  On record, 5:23.

19    BY MR. BLOCK:

20        Q.   Mr. Graziano, could you look at Page 22 of

21    your general report, Exhibit 1.

22        A.   Yes.

23        Q.   Okay.  You write in the second full

24    paragraph:  "I would expect these value diminution

25    impacts to decline over time after numerous resales
```

```
 1    of the same property where no adverse conditions

 2    persist."

 3           Right?

 4      A.   Yes.

 5      Q.   Okay.  And what you're saying there is that

 6    you would expect the 10 percent value diminution to

 7    decline over time after numerous resells, right?

 8      A.   Well, as I testified before, the 10 percent

 9    is going to decline as a function of a percentage of

10    the sales price because prices are going to go up.

11    So based on the damage impacts that I estimated

12    today, as you move forward in time, the diminution

13    as a percentage is going to go down.

14      Q.   So what's the equation there?  I'm not

15    following.

16      A.   Well, the unimpaired value of a home today

17    is $400,000.  Based on 10 percent, the damage

18    estimate is $40,000.  Five years from now, the

19    property sells for $800,000; but the damage impact

20    was $40,000 as of today, so that represents 5

21    percent of the future sales price.

22      Q.   Now you're -- okay.

23           Are -- you're not saying that the -- I don't

24    know, 10 percent stigma effect might be 9 percent

25    in, you know, five years from now after numerous
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/18 Page 434 of 556
Case 2:14-cv-02094-CJC Document 291-3 Entered on FLSD Docket 08/15/2014 Page 262 of
384
Confidential – Subject to Further Confidentiality Review

```
 1    resales, 9 percent of the then-present value of the

 2    home?

 3       A.   Not if the disclosure continues to be

 4    required.

 5       Q.   Okay.  So you think -- you think 10 percent

 6    will hold constant -- 10 percent of the then-present

 7    value of the property or the home will hold constant

 8    throughout time as long as disclosure continues to

 9    exist?

10       A.   Correct.

11       Q.   Okay.  I -- let's talk about a different

12    topic, which is what you describe as loss of use and

13    I think of that as alternative living expenses, so

14    let's make sure we're on the same page.

15       A.   Sure.

16       Q.   What are you measuring in when you say "loss

17    of use"?

18       A.   Which page are you referring to?

19       Q.   Well, this -- well, if you have a

20    claimant-specific report in front of you, I happen

21    to have Kevin and Stacey Rosen, but I just want to

22    understand the concepts, just if you've got one

23    handy.  That's not -- is that one?

24       A.   Yeah.

25       Q.   Okay.  So how do you define "loss of use" as
```

```
 1    you use it in your claimant-specific reports?

 2       A.   So "loss of use" relates to you being

 3    displaced from the home that you were living in

 4    while it's being remediated.  Alternate living

 5    expenses are the costs that you incur on the other

 6    side of the equation where you have to go out and be

 7    somewhere else.

 8       Q.   So those are different things in your mind,

 9    "loss of use" and "alternative living expenses"?

10       A.   Well, I mean, unless somebody is not going

11    to pay the real estate taxes during the remediation.

12       Q.   Okay.  Well, let's -- let's go at it this

13    way.  You -- the components of your loss of use

14    damages category are the rental rate times the

15    number of months that someone is out of the home

16    during remediation?

17       A.   Correct.

18       Q.   And then you also added moving and storage

19    cost for your personal effects while you're out of

20    the home during the remediation, correct?

21       A.   Correct.

22       Q.   Okay.  And that strikes me as consistent

23    with the definition of "alternative living expenses"

24    I've seen elsewhere in the litigation, but we'll

25    call it "loss of use" today for you.  Okay?
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 436 of 556
Confidential – Subject to further Confidentiality Review
384

```
1      A.   Okay.

2      Q.   But conceptually, what "loss of use" means

3   for you is the cost that a claimant will incur while

4   they can't live in their home during the remediation

5   of their home, right?

6      A.   Right.  It's an economic proxy for what

7   would otherwise be their complete inability to use

8   the home during the time that they're not in it.

9      Q.   Okay.  Is that a type of damages you have

10  calculated before outside of the Chinese drywall

11  context?

12     A.   Yes.

13     Q.   In what context have you calculated those

14  kinds of damages?

15     A.   In the context of any kind of temporary loss

16  of use.  In Florida, it's generally that held the

17  loss of use -- an economic rental rate is the rental

18  rate proxy because it's a gross rent that includes

19  all the carrying costs associated with the home, and

20  it represents the economic quantification of that

21  loss of use for that particular home.  So I've done

22  it many times.

23     Q.   Okay.  And is that something that appraisers

24  typically do?

25     A.   Appraisers can do it, sure.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Is --

 2      A.   I don't think you need to be an appraiser to

 3   estimate it, but I think that appraisers do

 4   ordinarily conduct that type of analysis.

 5      Q.   And outside litigation context, would an

 6   appraiser estimate the duration of remediation or

 7   construction and the rental rate for alternative

 8   housing during remediation or construction?

 9      A.   It depends.

10      Q.   Have you ever done that as an appraiser

11   outside of litigation?

12      A.   I have.

13      Q.   And --

14      A.   Well, outside of litigation, yeah, sure, in

15   title cases which, you know, aren't ordinarily

16   litigation.

17      Q.   Well, it's -- okay.

18           In the business world, let's say, do you --

19   have you ever have in the business world, in your

20   work as an appraiser, have you ever estimated the

21   length of a construction project and what it would

22   cost a human being to live somewhere else during the

23   construction project?

24      A.   Other than the human being part.  I mean, we

25   often have to do a lease-up analysis where we say,
```

Confidential - Subject to Further Confidentiality Review

```
1    you know, the property is unstabilized; and 12

2    months from now the future value is going to be X,

3    but I have to deduct all of the occupancy cost

4    expenses and the carrying cost of the property

5    during the lease-up period.  So we regularly do that

6    for commercial properties.

7            I'd have to really think on the residential

8    property side, but we often make, you know,

9    absorption time frame estimates, how long it's going

10   to take to either get the property rented up in a

11   residential context for multifamily.

12           So yes, the answer is we regularly estimate

13   those time periods.

14   Q.   Do you regularly -- outside of the

15   litigation context, do you regularly estimate the

16   duration of construction projects?

17   A.   No.  We would ordinarily take the -- you

18   know, there would ordinarily be a construction

19   schedule.  Somebody would, you know, come to me and

20   say, "This is going to take six months or 12

21   months."

22           But absent that schedule, I'm perfectly

23   qualified to say what should this class of

24   construction project take.

25   Q.   What makes you qualified to estimate the
```

```
1    duration of a construction project?

2        A.    Based on my observations in the marketplace

3    as to how long things take to complete.

4        Q.    What data did you rely on to estimate how

5    long it would take remediation to occur for the

6    Priority Claimants?

7        A.    I looked at a number of the properties that

8    were purchased impaired and then the subsequent sale

9    date of when the property sold post-remediation, and

10   I quantified the number of months between when the

11   investor purchased the property and when the

12   investor subsequently resold the property.

13       Q.    When the investor purchased the property and

14   sold the property doesn't tell you how long the

15   property was uninhabitable, does it?  I mean, it

16   might set an outer bound but doesn't tell you what

17   the actual duration of the period in which no one

18   could live in the home was, right?

19       A.    There -- there may be some variation in

20   there, but if somebody -- if -- if the investor

21   bought it, remediated it and, you know, sold it or

22   rented it, you know, that occupancy rate is going to

23   be plus or minus his marketing time.

24            I mean, when the property -- when he put it

25   back on the market to sell it, presumably it would
```

```
 1    have been prepared and ready for C of O.  So if we

 2    look at the difference between when he bought it and

 3    when he listed it, that would represent the

 4    construction time frame.  Because presumably the

 5    minute the construction was done and the CO was

 6    available, he's putting it on the market.

 7            In fact, in some cases, he may put it on the

 8    market two or three weeks in advance, expecting that

 9    everybody is going to come and make him offers.  And

10    by the time he gets a sales contract, he'll have his

11    CO.  So I would say plus or minus 30 days.  That's a

12    good way to do it.  It's a good method.

13    Q.   But 30 days in your method adds thousands of

14    dollars to the estimate of how much it's going to

15    cost to secure alternative housing, right?

16    A.   In most cases.  I mean, I would say most of

17    the -- most of the market rental rates range from 2-

18    to $6,000.  So there could be, you know, a 2- to

19    $6,000 variation based on 30 days.

20    Q.   Okay.  And -- and to be clear, the -- for

21    the -- excuse me.

22            The case study homes that you looked at, you

23    don't know how long the construction actually took

24    in any of those cases, do you?

25    A.   Well, I don't -- I don't know how you're
```

```
 1    defining construction.  I mean, does permitting

 2    count as construction?  The actual construction may

 3    have taken a certain time frame; but you also have

 4    to obtain permits, and you have to wait -- you know,

 5    you have to get subs, and you have to order

 6    materials.

 7         I mean, the actual banging of nails is one

 8    thing; but from beginning to end, there is lot more

 9    that goes into it than just building.

10    Q.  Well, let me use a different term.  Let me

11    use -- I'm trying to drill down on the period in

12    which someone can't live in the home because it's

13    being remediated and therefore needs to live

14    somewhere else.

15    A.  Okay.

16    Q.  All right.  You don't know how long that

17    period was for any of the case studies, do you?

18    A.  I need you to ask the question again.  You

19    prefaced it and I missed the question.

20    Q.  Sure.  Yeah.  So if we are defining the

21    period as from when the home become uninhabitable

22    because it's being remediated to the period in which

23    it is habitable after remediation, you don't know

24    what that period was for any of the case studies

25    that you rely on, do you?
```

```
 1        A.    I do think that I have some case studies

 2     that sold and resold, and I have those time frames,

 3     yes.

 4        Q.    But we just discussed that sale and resale

 5     date may not correspond exactly to the period in

 6     which the home is not something you can live in

 7     because it's an active construction site, right?

 8        A.    Okay.

 9        Q.    So you don't know the period in which the

10     home was an active construction site for any of the

11     case study properties, do you?

12        A.    I would suggest to you that the date you

13     move out, it becomes an active construction site.

14     So if the home -- if an investor bought the home,

15     he's not going to sit around for 30 days and not

16     start construction.  He's going to commence

17     immediately.

18           But the investor that buys a home at a

19     foreclosure and with the remediation in process and

20     says it's as-is, he's not going to work around

21     people's furniture.  He's not working around

22     anybody's personal effects.  So there is going to be

23     a time frame that it's going to take you to move

24     out, and you -- you know, I don't think you should

25     have to pay for that.
```

```
 1              So you move out; and then on the date you

 2     move out, that's when somebody can start, and I

 3     think you're going to time that around the time that

 4     you're going to get permits and it becomes

 5     uninhabitable.

 6         Q.   And the investor who buys the home in your

 7     example may have to wait some period for

 8     construction financing, right?

 9         A.   Not necessarily.  You can do it all cash.

10         Q.   But do you know whether that was true or not

11     true for any of the case studies you rely on?

12         A.   I don't know what the financing arrangements

13     were.  But if he purchased the home, he's not

14     waiting for construction financing at that point.

15     The date that he closed on the home, his

16     construction financing presumably would be in place,

17     as would any follow-on financing to do the

18     remediate -- I mean to do the renovation.  He's not

19     going to buy the home and then go get financing to

20     do the construction.

21         Q.   You also rely on Zillow for some aspects of

22     your loss of use for alternative living expenses

23     calculation, right?

24         A.   I think there may be a Zillow article

25     referencing sort of average moving costs.  I think
```

```
 1    related to the moving cost estimate.  There was an

 2    article or two there.

 3           I mean, the moving cost estimate, you know,

 4    is based on an average size home.  I didn't -- I

 5    didn't -- I didn't scale the moving cost estimate

 6    really too much.  I just said, you know, to move in

 7    and move out on average is going to cost you $1500.

 8       Q.   Okay.

 9       A.   It could be more; it could be a little less.

10       Q.   So how many studies -- when you say you

11    relied on your case studies to -- to estimate the

12    construction duration, how many case studies did you

13    look at?

14       A.   I don't know.  I would have to go back

15    and -- and look at the specific sales.  I would say

16    at least a half a dozen where I had the time frames

17    between remediated and post-remediated sales with

18    listing dates.

19       Q.   Okay.  You did not look at data for the

20    thousands of Chinese drywall remediation projects

21    that have already been completed?

22       A.   No.

23       Q.   Did you examine whether any of the -- let me

24    strike that.

25           Before you offered an opinion about the
```

```
 1    costs that the Priority Claimants would incur to

 2    live somewhere else during the remediation of their

 3    home, did you look at the actual cost that any of

 4    those claimants incurred?

 5        A.   No.  That would -- that's the subject I

 6    believe of a different expert.

 7        Q.   Okay.  If the actual costs are different

 8    than your predictions, which number should the court

 9    go with?

10            MR. MONTOYA:  I'm going to object to the

11        scope on that.  It calls for a legal conclusion.

12        It's also a jury question, and the judge is going

13        to designate that number and has designated that

14        number in the adoption of Judge Fallon's ruling.

15            So I'm going to instruct you not to answer

16        the question.

17    BY MR. BLOCK:

18        Q.   All right.  Well, if your prediction doesn't

19    match reality, what does that mean for your

20    calculations?

21            MR. MONTOYA:  Same objection.

22            THE WITNESS:  Same instruction?

23            MR. MONTOYA:  Same instruction.

24    BY MR. BLOCK:

25        Q.   Well, listen to my question because I'm
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 446 of 556
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 03/15/2011 Page 274 of
384

Confidential - Subject to Further Confidentiality Review

1  asking -- I'm not asking you what the decision-maker

2  should do with it.  I'm asking you:  As a -- as an

3  expert, if you've made predictions of loss of use

4  damages that are different than the actual expenses

5  that real people incurred for those items, what does

6  that say about your predictions?

7       MR. MONTOYA:  Same objection as to -- same

8    instruction.

9    Q.   I think I've cured the problem, if there was

10  one, with that question; but you're not going to

11  answer on the basis of what counsel is saying?

12   A.   Well, I mean, he's instructed me not to

13  answer.  Of course I'm not going to answer.

14   Q.   Okay.  Did you ask for any data on or seek

15  to obtain from any source any data on actual costs

16  of alternative housing for construction duration?

17   A.   No.

18   Q.   Why not?

19   A.   Because in reviewing the scope of the

20  assignment, I discussed with Mr. Montoya our

21  approach and that was part of the scope.  I said

22  that, you know, rent would be considered the

23  economic loss as a proxy.  That's the way Florida

24  law handles it.  That's the way I've handled it in

25  the past, and that's the scope of what I was going

1    to do.

2           So I developed a rental estimate, or I had

3    the local appraisers with local competency develop a

4    rental estimate for each property.

5           And then I worked on the duration based on

6    my analysis of the sale/resales of properties that

7    had been individually remediated.

8       Q.   How many real estate markets would you say

9    there are in a state like Florida?

10      A.   For which type of property?

11      Q.   Residential.

12      A.   Yeah.  Probably thousands.

13      Q.   Is it your testimony that a remediated home

14   will experience the exact same stigma amount of

15   damages across all of those thousands of real estate

16   markets in Florida?

17      A.   Yes.  Unless there is data to the contrary,

18   that's my opinion currently.  That's -- that's what

19   my data demonstrates currently.

20      Q.   How many real estate markets did you study

21   in your case study?

22      A.   Some of them were in the same market; so

23   amongst 20 some-odd case studies, I don't -- I never

24   looked to see what the actual dispersion was, but

25   let me review my report.

```
1              So I would suggest that we could start with

2       the counties.  So there is eight distinct counties.

3       We have 21 total case studies and eight distinct

4       counties and then a number of them are in sort of

5       similar markets, so probably a dozen.

6       Q.   So --

7       A.   Because some of them overlap --

8       Q.   Yeah.

9       A.   -- and then some of them are in the same

10      exact market.

11      Q.   Okay.  So you are willing to testify on the

12      basis of a case study involving a dozen markets what

13      the stigma impact will be on the thousands of other

14      residential real estate markets in Florida without

15      examining the facts and circumstances of those other

16      markets?

17      A.   I think I testified earlier today that my --

18      the application of my 10 percent was developed to

19      relate specifically to these 20 Priority Claimants,

20      not to be applied across thousands of properties in

21      different markets.  I think my testimony will

22      reflect that.

23           MR. BLOCK:  This is probably a good place

24       for us to stop for the day.

25           THE WITNESS:  That won't be objectionable to
```

Confidential - Subject to Further Confidentiality Review

```
1        me.

2                (Discussion off the record.)

3                THE VIDEOGRAPHER:  Off record, 5:40.

4                (Whereupon, the deposition recessed at

5        5:40 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 450 of 556 of
384
Confidential - Subject to further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2          I, SUSAN D. WASILEWSKI, Registered

 3   Professional Reporter, Certified Realtime Reporter

 4   and Certified Realtime Captioner, do hereby certify

 5   that, pursuant to notice, the deposition of ANTHONY

 6   GRAZIANO was duly taken on Monday, March 18, 2019,

 7   at 10:13 a.m. before me.

 8          The said ANTHONY GRAZIANO was duly sworn by

 9   me according to law to tell the truth, the whole

10   truth and nothing but the truth and thereupon did

11   testify as set forth in the above transcript of

12   testimony.  The testimony was taken down

13   stenographically by me.  I do further certify that

14   the above deposition is full, complete, and a true

15   record of all the testimony given by the said

16   witness, and that a review of the transcript was

17   requested.

18

19   _____

20   Susan D. Wasilewski, RPR, CRR, CCP

21   (The foregoing certification of this transcript does

22   not apply to any reproduction of the same by any

23   means, unless under the direct control and/or

24   supervision of the certifying reporter.)

25
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully

 5      and make any necessary corrections.  You should

 6      state the reason in the appropriate space on the

 7      errata sheet for any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10      and date it.  It will be attached to your

11      deposition.

12

13           It is imperative that you return the

14      original errata sheet to the deposing attorney

15      within thirty (30) days of receipt of the deposition

16      transcript by you.  If you fail to do so, the

17      deposition transcript may be deemed to be accurate

18      and may be used in court.

19

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22380-55 Filed 11/19/19 Page 452 of 556
Case 2:14-cv-02094-EEF-JCW Document 220-1 Enter on FLSD Docket 09/15/2017 Page 280 of 384
Confidential - Subject to further confidentiality review

```
 1                          - - -

 2                      E R R A T A

 3                       VOLUME 1

 4       PAGE    LINE     CHANGE

 5       _____   _____    _____

 6         REASON: _____

 7       _____   _____    _____

 8         REASON: _____

 9       _____   _____    _____

10         REASON: _____

11       _____   _____    _____

12         REASON: _____

13       _____   _____    _____

14         REASON: _____

15       _____   _____    _____

16         REASON: _____

17       _____   _____    _____

18         REASON: _____

19       _____   _____    _____

20         REASON: _____

21       _____   _____    _____

22         REASON: _____

23       _____   _____    _____

24         REASON: _____

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 453 of 556
Case 2:14-cv-02494-EEF-MBN Document 29-1 Entered on FLSD Docket 09/15/2014 Page 281 of 384
Confidential - Subject to further Confidentiality Review

```
 1                 ACKNOWLEDGMENT OF DEPONENT

 2

 3        I, _____, do hereby

 4   acknowledge that I have read the foregoing pages, 1

 5   through 279, and that the same is a correct

 6   transcription of the answers given by me to the

 7   questions therein propounded, except for the

 8   corrections or changes in form or substance, if any,

 9   noted in the attached Errata Sheet.

10

11

12   _____        _____

13   ANTHONY GRAZIANO                              DATE

14

15

16

17

18   Subscribed and sworn to before me this

19   _____ day of _____, 20___.

20   My Commission expires: _____

21

22   _____

     Notary Public

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 454 of 556
Case 1:14-cv-24848-CMA Document 29-1 Entered on FLSD Docket 03/15/2017 Page 382 of 384
Confidential - Subject to further confidentiality Review

```
 1                          LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____   _____

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```

Case 2:09-md-02047-EEF-MBN   Document 22363-55   Filed 11/19/19   Page 455 of 556
Case 1:11-cv-22408-MGC   Document 561-1   Entered on FLSD Docket 08/15/2019   Page 583 of
384
Confidential - Subject to Further Confidentiality Review

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2
                     Case No. 1:11-CV-22408-MGC
 3
 4     ----------------------------------
       EDUARDO AND CARMEN AMORIN, et al.,
 5     individually, and on behalf of all
       others similarly situated,
 6
           Plaintiffs,
 7
       vs.
 8
       TAISHAN GYPSUM CO., LTD., f/k/a
 9     SHANDONG TAIHE DONGXIN CO., LTD.;
       TAI'AN TAISHAN PLASTERBOARD CO.,
10     LTD., et al.,
11         Defendants.
12     ----------------------------------
13
                            - - -
14
                   Tuesday, March 19, 2019
15
                            - - -
16
                CONFIDENTIAL - SUBJECT TO FURTHER
17                    CONFIDENTIALITY REVIEW
18                          - - -
19         Videotaped deposition of ANTHONY GRAZIANO,
       Volume 2, held at Colson Hicks Eidson, 255
20     Alhambra Circle, Penthouse, Coral Gables,
       Florida, commencing at 9:05 a.m., on the above
21     date, before Susan D. Wasilewski, Registered
       Professional Reporter, Certified Realtime
22     Reporter, Certified Realtime Captioner
23                          - - -
24             GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 456 of 556
Case 1:21-cv-22084-MGC Document 2411 Entered on FLSD Docket 08/15/2017 Page 384 of
384
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        COLSON HICKS EIDSON
          BY:  PATRICK S. MONTOYA, ESQUIRE
 3            NATALIE M. RICO, ESQUIRE
          255 Alhambra Circle, Penthouse
 4        Coral Gables, Florida 33134
          Phone:  (305) 476-7400
 5        patrick@colson.com
          natalie@colson.com
 6        Representing Plaintiffs

 7

 8        BREIT CANTOR GRANA BUCKNER
          BY:  JEFFREY A. BREIT, ESQUIRE
 9        600 22nd Street, Suite 402
          Virginia Beach, Virginia 23451
10        Phone:  (757) 670-3888
          jeffrey@breitcantor.com
11        Representing Plaintiffs

12

13        ORRICK, HERRINGTON & SUTCLIFFE, LLP
          BY:  DIANA SZEGO FASSBENDER, ESQUIRE
14        1152 15th Street, NW
          Washington, D.C. 20005-1706
15        Phone:  (202) 339-8533
          dszego@orrick.com
16        Representing Defendant Beijing New Building
          Materials PLC
17
18
          ORRICK, HERRINGTON & SUTCLIFFE, LLP
19        BY:  DAN GUERRA, ESQUIRE
          405 Howard Street
20        San Francisco, California 94105-2669
          Phone:  (415) 773-5545
21        dguerra@orrick.com
          Representing Defendant Beijing New Building
22        Materials PLC

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 457 of 556
Case 2:14-cv-02494-EEF-MBN Document 210-1 Entered on FLSD Docket 08/15/2017 Page 285 of
384
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2       ABALLI MILNE KALIL
         BY:   JOSHUA D. POYER, ESQUIRE
 3            MICHEL AYUB, ESQUIRE
         1 Southeast 3rd Avenue, Suite 2250
 4       Miami, Florida 33131
         Phone:  (305) 373-6600
 5       jpoyer@aballi.com
         mayub@aballi.com
 6       Representing Defendant Beijing New Building
         Materials PLC

 7

 8       ALSTON & BIRD LLP
         BY:   STEVEN R. CAMPBELL, ESQUIRE
 9       90 Park Avenue, 15th Floor
         New York, New York 10016-1387
10       Phone:  (212) 210.9400
         steven.campbell@alston.com
11       Representing Defendants Taishan Gypsum Co., Ltd.
         and Tai'an Taishan Plasterboard Co., Ltd.

12

13       ALSTON & BIRD LLP
         BY:   AARON BLOCK, ESQUIRE
14            CAROLINE GIESER, ESQUIRE
         1201 West Peachtree Street
15       Atlanta, Georgia 30309-3424
         Phone:  (404) 881-7000
16       aaron.block@alston.com
         caroline.gieser@alston.com
17       Representing Defendants Taishan Gypsum Co., Ltd.
         and Tai'an Taishan Plasterboard Co., Ltd.

18

19

      ALSO PRESENT:
20
         RAUL TORRES, Videographer
21

22

23

24

25
```

```
 1                        - - -

                      I N D E X
 2
                      Volume 2
 3
                Tuesday, March 19, 2019
 4                        - - -
 5    Testimony of:  ANTHONY GRAZIANO              Page
 6         DIRECT EXAMINATION BY MR. BLOCK.............. 287
 7         CROSS-EXAMINATION BY MR. GUERRA.............. 340
 8
 9                   E X H I B I T S
10              (Attached to transcript)
11    ANTHONY GRAZIANO DEPOSITION EXHIBITS            PAGE
12    Exhibit 14   Article:  The Impact of Detrimental  297
                   Conditions on Property Values
13                 By Arthur Bell, MAI
14    Exhibit 15   Web Page:  Value Diminution          297
                   Services
15
      Exhibit 16   Miami Herald Article:  A good time   301
16                 to sell in real estate?  What's
                   your timing?
17                 By Anthony M. Graziano
18    Exhibit 17   Value Diminution Analysis            304
19
20
21
22
23
24
25
```

```
 1                      - - -

 2          THE VIDEOGRAPHER:  Good morning.  We're now

 3      on the record.  This is Day 2 of Anthony

 4      Graziano's deposition, Case Number 11-22408-CIV-

 5      Cooke.  The time is 9:05.

 6          Would all counsel please state their

 7      appearance for the record.

 8          MR. MONTOYA:  Patrick Montoya and Jeffrey

 9      Breit on behalf of the Plaintiffs.

10          MR. BLOCK:  Aaron Block and Caroline Gieser

11      and Steven Campbell from Alston & Bird for

12      Taishan.

13          MR. GUERRA:  Dan Guerra, Orrick Herrington &

14      Sutcliffe, for BNBM PLC.

15          MR. POYER:  Joshua Poyer of Aballi Milne

16      Kalil for BNBM PLC.

17          MS. FASSBENDER:  Diana Fassbender of Orrick

18      for BNBM PLC.

19          MR. BLOCK:  Good morning, Mr. Graziano.

20          THE COURT REPORTER:  Let me remind you you

21      are still under oath.

22          THE WITNESS:  Thank you.

23          ANTHONY GRAZIANO, called as a witness by

24  Defendants Taishan Gypsum Co., Ltd. and Tai'an

25  Taishan Plasterboard Co., Ltd., having been duly
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 460 of 556
Case 1:14-cv-21048-MGC Document 29-1 Entered on FLSD Docket 08/15/2014 Page 388 of
384
Confidential – Subject to Further Confidentiality Review

```
 1    sworn, testified as follows:
 2                    DIRECT EXAMINATION
 3    BY MR. BLOCK:
 4        Q.   Good morning.
 5        A.   Good morning.
 6        Q.   Did you do any work on your expert opinions
 7    after we broke last night and before this morning?
 8        A.   No, sir.
 9        Q.   Didn't look at your materials, review
10    anything?
11        A.   No.  I left them here in the room.
12        Q.   Okay.  Did you discuss this case with
13    anybody since we broke last night?
14        A.   Not other than with Mr. Breit and Montoya,
15    who wanted to confirm that I was -- my trial
16    availability in July, just talking about the
17    scheduling of the trial and so forth, to make sure I
18    didn't make vacation plans during that time.
19        Q.   Very good.  So it sounds like you are
20    available?
21        A.   Yes.
22             MR. BREIT:  He started off by saying "no."
23        Q.   They turned you around.  All right.
24             Do you plan to -- other than the work that
25    you did after serving your report that was reflected
```

```
1    in Exhibit 3 and 4 that we discussed yesterday,

2    other than that, do you plan on doing any additional

3    work relating to your opinions before the time of

4    trial in these cases?

5       A.   Well, certainly I'm going to review the file

6    and prepare for the trial, and anything that I find

7    in that time frame, certainly I would want to be

8    able to talk about.

9            And I'd also, you know, after this

10   deposition, like the opportunity to review the

11   deposition.  And based on some of the things that we

12   talked about yesterday, I am going to go back and

13   take a look at the surveys and some of the other

14   issues to understand, you know, what the issues are

15   there.

16      Q.   Okay.  So if I'm understanding you

17   correctly, you intend to review the existing work

18   product in preparation for trial?

19      A.   Yes.

20      Q.   And you intend to review some of the

21   potential mistakes and other issues that we

22   discussed yesterday that may exist in your existing

23   report.  And do you plan to make corrections, if

24   necessary?

25      A.   Yes, I would expect that I would be making
```

1    corrections.

2      Q.   And do you intend to do any additional

3    research or analysis beyond that?  In other words,

4    things like going into the MLS, doing more

5    calculations, looking at -- pulling more comps,

6    whatever it is, do you plan to do anything of that

7    nature?

8      A.   I can't say at this time.  You know,

9    possibly, if that's warranted, if it's -- you know,

10   for me, it's a matter of looking at the information

11   and making sure that I have the best available

12   information at the trial.  So if that's required, I

13   do intend to do that.

14        MR. BLOCK:  Okay.  What I -- what I'd say to

15     you, Patrick, is that we should have a

16     conversation about that.  As we go forward, I do

17     get a little concerned when we have a report

18     that's kind of a moving target, but we can talk

19     about that offline.

20        THE WITNESS:  Okay.

21        MR. BLOCK:  I just wanted to make that

22     known.

23        MR. MONTOYA:  Agreed.

24   BY MR. BLOCK:

25     Q.   All right.  I would like to look with you at

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 463 of 556
Case 1:14-cv-09148-MGC Document 2301 Entered on FLSD Docket 08/15/2017 Page 291 of 384
Confidential – Subject to Further Confidentiality Review

```
 1    Dr. Bell's book, Real Estate Damages Third Edition.

 2    Do you have a copy?

 3       A.   I've got a copy over there.

 4            MR. BREIT:  I've got it.  I've got it.

 5            THE WITNESS:  Thank you.

 6            MR. BLOCK:  All right.

 7            MR. MONTOYA:  Give me 30 seconds.  I'm going

 8       to grab my copy.

 9            MR. BLOCK:  Let's go off the record.

10            THE VIDEOGRAPHER:  Off the record, 9:08.

11            (Recess from 9:08 a.m. until 9:11?a.m.)

12            THE VIDEOGRAPHER:  On record, 9:11.

13    BY MR. BLOCK:

14       Q.   Mr. Graziano, you have in front of you a

15    copy of Exhibit 7, Dr. Bell's book, Real Estate

16    Damages Third Edition, correct?

17       A.   Yes.

18       Q.   Okay.  And this is a book you rely on and

19    cite in your expert report in this case, correct?

20       A.   Yes.

21       Q.   Okay.  Could you turn with me -- well,

22    actually, let me ask you this.  You consider -- in

23    your expert report, Exhibit 1, you consider Chinese

24    drywall to be a Class V building construction

25    condition, right?
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 464 of 556
Case 1:14-cv-22408-MGC Document 29-1 Entered on FLSD Docket 08/15/2014 Page 392 of
384

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I thought it was Class VI.

 2        Q.   Well, let's look at your report.

 3        A.   Okay.

 4        Q.   Actually, I'm going to -- you know what?  I

 5   did the translation from Roman to Arabic numerals

 6   incorrectly.  You're right.  It's a Class VI

 7   construction defect.

 8        A.   Yes.

 9        Q.   All right.  If you will turn with me to Page

10   385 of Dr. Bell's book -- actually, before we go to

11   that, if you could turn with me to Page 175, which

12   is the beginning of Chapter 6.  Chapter 6.  Go back

13   one page.  Sorry, 173.  Sorry.  We're on 173 of

14   Dr. Bell's book.

15        A.   Yes.  And I'll --

16        Q.   Chapter 6.

17        A.   Yes.  And I'll note that particular page is

18   unnumbered, but the next page is 174.

19        Q.   Right.

20        A.   Right.

21        Q.   Right, right, right.  Okay.  Dr. Bell

22   describes Class VI detrimental conditions as those

23   conditions that are associated with the construction

24   of improvements such as construction defects and

25   then some other items, correct?
```

```
 1      A.   Yes.

 2      Q.   Okay.  And in the second paragraph Dr. Bell

 3   writes:  "A basic premise of Class VI detrimental

 4   conditions is that they are manmade, which generally

 5   means that they can be physically repaired."

 6   Correct?

 7      A.   Yes.

 8      Q.   And he goes on to say:  "Often the full

 9   value of the property is restored upon the

10   completion of repairs."  Correct?

11      A.   Correct.

12      Q.   Turn with me to Page 6 of Dr. Bell's book,

13   if you would.  Are you there?

14      A.   Yes.

15      Q.   Okay.  This is at the beginning of

16   Dr. Bell's book where he is describing some summary,

17   overview concepts as it relates to appraisal and

18   real estate damages, right?

19      A.   Yes.  The introduction is titled

20   Fundamentals of Property Valuation.

21      Q.   Right.  And on Page 6, the substantive text

22   is a discussion at the top of Dr. Bell's definition

23   of term "value," right, where he begins, "There are

24   various definitions of the term value," and he

25   refers to market value and other concepts, right?
```

Confidential – Subject to Further Confidentiality Review

```
 1     A.   Yes.

 2     Q.   Okay.  And value is something that you

 3   consider in forming your opinions, right?

 4     A.   Yes.  The unimpaired value is one of the

 5   premises upon which to apply the diminution; that's

 6   correct.

 7     Q.   In the first paragraph, Dr. Bell writes:

 8   "Of course, like any valuation assignment, the date

 9   of value is a critical issue in measuring real

10   estate damages as values change over time."

11   Correct?

12     A.   Correct.

13     Q.   Do you have any reason to disagree with

14   Dr. Bell there?

15     A.   No.  In fact, I think my testimony yesterday

16   reflects exactly that.

17     Q.   Turn with me to Page 323 of Dr. Bell's book,

18   if you would.

19     A.   323?

20     Q.   323, yes.  On Page 322, running into 323,

21   Dr. Bell is discussing market data, correct?

22     A.   Yes.

23     Q.   Okay.  And at the end of that discussion on

24   Page 323, I'd like to direct you to the last

25   paragraph.  He says that -- Dr. Bell writes that:
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 467 of 556
Confidential – Subject to further Confidentiality Review
384

```
 1      "Failing to research and apply relevant market data

 2      is the single most common flaw noted in the analysis

 3      of detrimental conditions."  Right?

 4          A.   That's what it, says.

 5          Q.   Okay.  And he concludes that discussion by

 6      saying:  "The effect of a detrimental condition

 7      cannot be generalized and is unique to a particular

 8      market and the facts of a particular property at a

 9      specific date of value."  Correct?

10          A.   Yes.

11          Q.   Do you have any reason to disagree with what

12      Dr. Bell writes?

13          A.   No.

14          Q.   You can set that aside for the time being.

15               I'd like to ask you about an article that

16      Dr. Bell wrote called The Impact of Detrimental

17      Conditions on Property Values.

18               MR. MONTOYA:  Thank you.

19          Q.   And this is an article that Dr. Bell wrote

20      and published in the Appraisal Journal in October

21      1998.  Do you see that?  It will show up on the

22      second page -- third page.

23          A.   Yes.

24          Q.   Okay.  Is this an article that you have

25      reviewed before?
```

1      A.   Yes.

2      Q.   Okay.  Is this an article you rely on?

3      A.   The substance of this article has been

4    subsequently incorporated in the book.  Some of the

5    materials may have been incorporated.  I think at

6    this time -- and you can check with Mr. Bell -- the

7    Second Edition of Real Estate Damages had not been

8    issued.  And in 1998, this was probably some of the

9    precursor work that gave rise to his class on

10   detrimental conditions.

11        So you'll see that the classification of the

12   conditions are the same.  The bell chart -- the

13   initial version of the bell chart, or what he calls

14   the detrimental conditions model, is included.  So

15   this is generally the book in its earliest version.

16     Q.   Okay.  On Page 385 of this article, do you

17   see where Dr. Bell has a discussion of Class VI

18   building construction condition defects?

19     A.   I do.

20     Q.   Okay.  And we see similar languages in the

21   book, at the beginning of this paragraph, about the

22   basic premise of both Class VI and Class VII DCs is

23   that they are manmade, which means they can often be

24   repaired.  That's consistent, if not largely

25   identical, to text in his book, correct?

Case 2:09-md-02047-EEF-MBN Document 22263-55 Filed 11/19/19 Page 469 of 556
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 08/15/2017 Page 297 of 384
Confidential — Subject to further Confidentiality Review

```
1       A.   Right.

2       Q.   Okay.  And a couple of sentences later,

3   Dr. Bell writes:  "Class VI DCs" -- detrimental

4   conditions -- "involve construction issues above

5   grade.  As such, they are relatively easy to assess

6   and often result in the restoration of the

7   property's full value upon completion of the

8   repairs."  Right?

9       A.   Yes.

10      Q.   Do you have any reason to disagree with what

11  Dr. Bell writes in this 1998 article?

12      A.   No.  I think he says they often result,

13  which means there are times which they don't, and I

14  don't disagree.

15           I mean, sometimes the construction condition

16  is they didn't install, you know, the flooring

17  correctly, and all you have to do is reinstall the

18  flooring.  Or somebody put the air-conditioning in

19  backwards, and that doesn't necessarily create a

20  long-term detrimental condition.  You reinstall the

21  air-conditioning.

22           So I think he's right.  Often you can cure

23  those things, and there's no associated disclosure

24  required or other requirements, and sometimes --

25  often they do.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 470 of 556
Case 1:14-cv-22848-MGC Document 1 Entered on FLSD Docket 08/15/2014 Page 296 of 384
Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Thanks.  You can set that aside.

 2            THE COURT REPORTER:  Did you want to mark

 3      that?

 4            MR. BLOCK:  Yeah, let's mark that as 14.

 5            (Graziano Exhibit 14 was marked for

 6      identification.)

 7   BY MR. BLOCK:

 8      Q.    Thank you.  You can put that in that pile.

 9      A.    Sure thing.

10      Q.    Okay.  I'm going to hand you, Mr. Graziano,

11   what we will mark as Exhibit 15, which is a --

12            (Graziano Exhibit 15 was marked for

13      identification.)

14            MR. BLOCK:  Here you go.

15   BY MR. BLOCK:

16      Q.    -- printout --

17            MR. MONTOYA:  Thank you.

18      Q.    -- from the website for your company,

19   Integra.  Do you recognize this?

20      A.    I do.

21      Q.    Okay.  And this is something we printed out

22   from the value diminution section of the Integra

23   website a few days ago.  Does this accurately

24   reflect what you understand to be on the Integra

25   website?
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 471 of 556
Case 1:14-cv-22440-JAL Document 220 Entered on FLSD Docket 08/15/2017 Page 299 of
384
Confidential - Subject to Further Confidentiality Review

```
 1      A.   I haven't reviewed the website in some time,

 2   but it looks reasonably current, yes.

 3      Q.   Okay.  If you look at the URL at the bottom,

 4   this is the part of the Integra website that

 5   discusses litigation support and expert testimony,

 6   correct?

 7      A.   Yes.

 8      Q.   And that's what you're doing here today,

 9   right?

10      A.   Correct.

11      Q.   And in these cases, right?

12      A.   Yes.

13      Q.   Okay.  And when you are -- what is the

14   purpose of this part of Integra's website?

15      A.   This is just to explain the different

16   services that we provide and to provide any

17   potential users or existing clients of our services

18   and acknowledgment of, you know, who provides this

19   type of work throughout the company.

20      Q.   Is this material that is used for marketing

21   purposes?

22      A.   Yes.

23      Q.   In other words, when you are telling

24   potential customers how you conduct your work as an

25   expert witness, you -- this is what you're doing
```

1    with this web page, right?

2        A.   Well, I wouldn't say I'm doing it.  I mean,

3    we have a marketing division that prepares this work

4    product.  I don't have any direct hand in this.

5        Q.   You're the boss of the whole company, right?

6        A.   Well, I'm the chairman of the board, but --

7    and, yes, I guess I am the boss of the whole

8    company, but I'm not involved in the day-to-day

9    marketing components.  I mean, we have a marketing

10   director that oversees a team of people, and they

11   work on this on a regular basis.

12       Q.   In the second sentence, Integra writes on

13   your website:  "Diminution in value may arise from a

14   wide variety of causes, including soil substance,

15   viewer access impairment, defective title matters,

16   various types of easements, nearby nuisances, and

17   construct defects to name a few."

18            Is that correct?

19       A.   That's what it says, yes.

20       Q.   Okay.  Integra goes on to say on your

21   website:  "As an initial step, we determine whether

22   or not the property's value is truly impaired.  If

23   there is impairment, our next step is to quantify

24   the value diminution with a solid foundation of

25   appropriate market-based evidence."

Case 2:09-md-02047-EEF-MBN  Document 22363-55  Filed 11/19/19  Page 473 of 556
Case 2:14-cv-02094-EEF-MBN  Document 201-1  Filed 08/15/2017  Page 301 of 384
Confidential – Subject to Further Confidentiality Review

1          Is that what you say on your website?

2     A.   That's what it says.

3     Q.   All right.  So the first step is to

4  determine whether a property's value is truly

5  impaired, and the second step, according to the

6  Integra website, is to quantify the effect or the

7  amount of impairment, right?

8     A.   I wouldn't say that that was my method, but

9  I see that that's what the marketing material says.

10    Q.   Why would you say that's not your method?

11    A.   Because you can't determine whether a

12 property's value is truly impaired until you've

13 conducted the research and quantified the research,

14 so this marketing collateral is inaccurate.

15    Q.   Do you know why that would be?

16    A.   Because some marketing kid wrote it up in

17 New York and published it on the website, and none

18 of our litigation experts have been cross-examined.

19 I guarantee this will be changed by tomorrow.

20    Q.   What do you intend to change it to say?

21    A.   To accurately reflect what -- how the -- how

22 the scope of these assignments normally work.

23    Q.   And what is the scope of how these

24 assignments normally work that you're referring to?

25    A.   Well, I'm not going to, you know, rewrite

```
 1    the marketing collateral during our deposition,

 2    unless you want me to.  But clearly, it's not

 3    accurate to say that you make a determination

 4    whether something is impaired and then go do the

 5    study.

 6            So I think the proper scope here is that we

 7    will, you know, scope the assignment with the client

 8    and understand the nature of the problem, identify

 9    the problem, prepare research and et cetera,

10    et cetera, until we reach an understanding of what

11    the problem is and quantify the problem one way or

12    the other.  That's the correct process.

13        Q.  You can set that aside.

14            (Graziano Exhibit 16 was marked for

15    identification.)

16    BY MR. BLOCK:

17        Q.  I'm going to hand you what I'm marking

18    Exhibit 16, which is a printout from the Miami

19    Herald -- the website for the Miami Herald.  This is

20    an article or a piece that I believe you wrote

21    called:  A good time to sell in real estate?  What's

22    your timing?  And it was published in August of

23    2016.

24        A.  Yes.

25        Q.  And updated a little -- a day later in
```

1    August 2016.  And is this an article that you wrote?

2        A.    It is.

3        Q.    Okay.  And you chose to have it published in

4    the Miami Herald?

5        A.    The Miami Herald actually asked me to write

6    for them, which I wrote a number of articles for

7    them in the 2016-2017 time frame for their Business

8    Monday edition.

9        Q.    If you -- if you turn with me -- well, and

10   so this article accurately reflected your views

11   about real estate?

12       A.    Yes.

13       Q.    Okay.  If you turn with me to the third

14   page, which is the end of your article, you -- the

15   third-to-last paragraph that begins:  "It's always a

16   good time to buy, and always a good time to sell, so

17   long as you are never compelled by time or

18   circumstances to do either."

19             Do you see that paragraph?

20       A.    I do.

21       Q.    And you conclude that paragraph by saying:

22   "The only thing that is certain is that real estate

23   will rise and fall with the general economic

24   conditions in which it is situated."  Correct?

25       A.    Yes.

Case 2:09-cv-03047-EFB-MBN Document 23363-55 Filed 11/19/18 Page 476 of 556
Case 1:91-cv-02048-MCL Confidential – Document 23363-55 Filed 11/19/18 Page 504 of 384
Confidential – Subject to Further Confidentiality Review

1    Q.   Is that true?

2    A.   Yes.

3    Q.   And you conclude by saying:  "And last,

4    remember my Dad's cardinal rule of real estate

5    investing:  'Timing isn't everything, it's the only

6    thing.'"

7         Is that what you wrote?

8    A.   Yes.

9    Q.   Is that true?

10   A.   That is what my dad said, yes.

11   Q.   Is that an opinion about real estate that

12   you believe in?

13   A.   I think timing is extremely important, and

14   most -- a lot of times the only thing that corrects

15   for your market is your market timing.  There are

16   some things you can't control.

17   Q.   You can set that aside.

18        MR. BLOCK:  Let's go off the record just so

19   we can get some paper organized.

20        THE VIDEOGRAPHER:  Off record, 9:25.

21        (Recess from 9:25?a.m. until 9:35 a.m.)

22        THE VIDEOGRAPHER:  On record, 9:35.

23   BY MR. BLOCK:

24   Q.   In front of you -- well, you have in front

25   of you a binder that you brought with you yesterday,

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 477 of 556
Case 1:11-cv-22408-MGC Document 220-1 Entered on FLSD Docket 08/15/2014 Page 305 of
384
Confidential - Subject to Further Confidentiality Review

```
 1    correct?

 2         A.   Yes.

 3         Q.   And it's called Value Diminution Analysis

 4    Chinese Drywall?

 5         A.   Yes.

 6         Q.   All right.  Let's go ahead and mark that as

 7    Exhibit 17.

 8              (Graziano Exhibit 17 was marked for

 9    identification.)

10    BY MR. BLOCK:

11         Q.   And, Mr. Graziano, is that the -- well, what

12    is that binder of materials?  What does it contain?

13         A.   This constitutes the work file materials for

14    all of the control pairings that are outlined in

15    the -- what you call the general report.

16         Q.   And this is sort of a backup for the work

17    that's reflected in the general report, Exhibit 1?

18         A.   That's correct.

19         Q.   Okay.  And we have a -- we received an

20    electronic copy of this file or this folder called

21    Value Diminution Analysis.pdf.  Does that sound

22    right to you?

23         A.   I don't know what the PDF was called.

24         Q.   Okay.  Well, it's, I guess -- it's a

25    712-page PDF.  Does that -- sounds about right.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 478 of 556
Case 2:14-cv-22408-CJ Document 1 Entered on FLSD Docket 09/15/2019 Page 306 of
384
Confidential — Subject to Further Confidentiality Review

```
1      A.    Looks roughly correct.

2      Q.    Okay.  Well, that's what we're going to be

3   looking at on a computer, and let's hope it matches

4   what you have in front of you, and if not, we'll

5   figure out why.

6           So could you turn with me to the --

7   actually, it would be helpful, too, if you have in

8   front of you a copy of your general report, as well,

9   which is Exhibit 1.

10          And what we're going to be doing is looking

11  at the tables that are at the back of your general

12  report that reflect the conclusions of your case

13  study or your paired sales analysis for various

14  cases and understanding the arithmetic, so we need a

15  copy of your general report that has the tables.  So

16  it's the --

17          MR. MONTOYA:  I think he's got it there.

18          MR. BLOCK:  A copy --

19     A.    This copy doesn't have the tables.

20     Q.    Yeah, I know.

21     A.    And this copy is double-sided.  That's going

22  to be frustrating.

23     Q.    Yeah.

24     A.    Okay.  Thank you.

25     Q.    Yeah.  I think -- so if you could go with me
```

Confidential - Subject to Further Confidentiality Review

```
1    to the table for Tampa 12 at the back of your

2    general report, Exhibit 1.  Are you there?

3        A.   I am.

4        Q.   Okay.  I'd like to --

5             MR. MONTOYA:  You're on the last table?

6        Which one?

7             MR. BLOCK:  Tampa 12, close to the end.

8        Q.   So if you -- so you have Tampa 12 in front

9    of you, the table for Tampa 12, and then can you go

10   to Tampa 12 in your work file in Exhibit 17?

11       A.   Yes.

12       Q.   Okay.  You're there?  So the first page that

13   we have for Tampa 12 in your work file is the -- we

14   actually have a control pairing verification script

15   right after the yellow piece of paper.  Okay?

16       A.   Yes.

17       Q.   And so what's the name on that script, just

18   so we're on the same?  Is it Rich -- Rick something?

19   Yeah.

20       A.   Yes.

21       Q.   Okay.  We're on the same page there.

22       A.   It should have marking up top that says

23   T12S.

24       Q.   Yeah.  Okay.  All right.  So if you can go,

25   then, to the next page, and the next page after that
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 480 of 556
Case 1:14-cv-22489-UC Document 22-1 Entered on FLSD Docket 08/15/2015 Page 308 of
384
Confidential - Subject to Further Confidentiality Review

```
1     actually, this is the MLS printout for 1211 East

2     Giddens Avenue in Tampa.  Is that what you have?

3         A.   Yes.

4         Q.   Okay.  And that's -- is that the MLS

5     printout for the subject home for the Tampa 12

6     analysis?

7         A.   Yes.

8         Q.   Okay.  And -- all right.  So on your -- in

9     Exhibit 1, under the lot size square footage column,

10    you list a lot size square footage of 1,947 square

11    feet, correct?

12        A.   Are you referring to the MLS, or are you

13    referring to my --

14        Q.   Tampa -- in the -- your table for Tampa 12

15    in Exhibit 1.

16        A.   Okay.  Yes, I see it.

17        Q.   Okay.  You see it.

18        A.   It says lot size square footage --

19        Q.   Okay.

20        A.   1,947.

21        Q.   If you go back to the MLS printout that's in

22    Exhibit 17, do you -- and you go under land, site,

23    and tax information -- I'll wait till you're there.

24        A.   Yes.

25        Q.   Do you see where the lot size is actually
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 481 of 556
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 06/15/2011 Page 309 of
384
Confidential - Subject to Further Confidentiality Review

 1    listed at 6,650 square feet?

 2        A.   No.  I see in the MLS printout, it's listed

 3    up to 10,889.  I don't know if you -- where are you

 4    looking at the 6,000?

 5        Q.   Under land, site, and tax information, under

 6    that heading, if you go to the end of that section,

 7    so --

 8        A.   Yes, I see it here, 6,650 square feet.

 9        Q.   Okay.  Do you know why the MLS lot size

10    square footage is different than the lot size square

11    footage you use in your Tampa 12 table in your

12    general report, Exhibit 1?

13        A.   It looks like somebody took the total area,

14    which would be the garage areas from the

15    residential, and as we transposed that over into the

16    grid, they didn't transpose the lot size over

17    correctly into that grid.  So the lot sizes are

18    reflected inaccurately in my grid from what the MLS

19    statements are.

20        Q.   So that's a mistake in the table for Tampa

21    12 in your general report?

22        A.   That's a transcription error for that -- of

23    the land size, yes.

24        Q.   And we can keep going through these, but if

25    you look through, the lot sizes in the tables that

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/18 Page 482 of 556
Case 1:11-cv-22408-MGC Document 294 Entered on FLSD Docket 05/15/2013 Page 310 of 384

Confidential - Subject to Further Confidentiality Review

 1    you have for the properties tend to be fairly small,

 2    on the order of 2,000 square feet or less, pretty

 3    consistently.  Is that right?

 4        A.   Yes.  I think once this error -- once this

 5    error has occurred and they've taken the total area,

 6    they consistently created that error.  So if you

 7    want to go through each of these lot sizes from the

 8    MLS, I think you'll see that they're all about 7 --

 9    6,600 and 7,300 square foot lots.

10        Q.   And lot size is a variable that you use to

11    adjust the sale price in your comparison, right?

12        A.   Yes.  If the lot sizes are materially

13    different, that might have -- that might have an

14    impact on value, and we would adjust for it; that's

15    correct.

16        Q.   Okay.  And in order to see the impact of

17    correcting for this error, you would need to do

18    additional work, correct?

19        A.   Well, I mean, I can go through it now.  I

20    mean, all -- I just looked through all the lot

21    sizes, and they're all 6,600 to 7,300 square feet.

22    So there is no material different in the lot size.

23        Q.   Well, you have -- how many -- how many

24    properties are involved in your case study, roughly

25    speaking?

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 483 of 556
Case 1:11-cv-22408-MGC Document 29-1 Entered on FLSD Docket 09/15/2011 Page 391 of
384

1      A.   Four.

2      Q.   Oh, sorry.  Let's -- I mean across your

3    whole 20-case study --

4      A.   I've --

5      Q.   -- we've got almost 100 properties or 70-odd

6    properties?

7      A.   Sure.  I mean, if there is 20 case studies

8    and four comps per, there's at least 80 comparables.

9      Q.   I don't -- I don't want to sit here and

10   readjust all of those on the fly.  But I'm -- what

11   I'm asking you is:  Would you need to go through all

12   of these -- throughout your general report, all of

13   these where the lot size appears to be based on the

14   home and not the actual lot and correct the

15   adjustment?

16     A.   I would certainly -- having identified this

17   error transcription, at least in the Tampa MLS,

18   because the -- I know that in some of the -- many of

19   the case studies, we reflect a quarter acre to half

20   an acre, and that's certainly not referencing a

21   building size.  But, yes, I would go through and

22   check these again to make sure that no additional

23   adjustments were necessary.

24     Q.   Well, if you look at Tampa 25, which is the

25   next page on Exhibit 1, you see those are also lot

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/49/19 Page 484 of 556
Case 1:11-cv-22408-MGC Document 230 Entered on FLSD Docket 08/15/2013 Page 512 of
384
Confidential - Subject to Further Confidentiality Review

1    sizes that are almost all under 2,000 square feet or

2    under 3,000 square feet and also appear to be based

3    on the size of the home and not the lot.

4        A.   Okay.

5        Q.   And in Tampa 26, they're a little over 2,000

6    square feet, but also appear to be the home size and

7    not the lot, right?

8        A.   Yes.  Let me just check.

9        Q.   Uh-huh.

10       A.   I'm out -- I'm out of order here.  We were

11   talking originally about --

12       Q.   We were on Tampa 12.  You can --

13       A.   We were originally on Tampa 12, correct?

14       Q.   Yes.

15       A.   And now you're asking me regarding --

16       Q.   Tampa 25, 26, and 27, and Fort Myers 20 and

17   Fort Myers 21 and Fort Myers 22 and Fort Myers 23.

18   Those all appear to be incorrect lot sizes, correct?

19       A.   Yes.

20       Q.   All right.  Let me ask you a numbering

21   question.  Why do the case study numbers jump from

22   in this -- for example, Tampa 12 to Tampa 25?  Why

23   not Tampa 13, 14, and so on?

24       A.   When we did the original research, we

25   identified all of the potential control sales in the

1    study.  Then we determined that some of them were

2    sold impaired or -- we were looking specifically for

3    the properties that sold remediated.

4            So when we developed the case studies, we

5    numbered all of the control sales initially and then

6    eliminated those if they were determined to be

7    impaired or we couldn't confirm them or whatever

8    the -- whatever the nature of that control sale was.

9            They were initially all numbered for

10   tracking purposes, and we didn't switch

11   properties -- to my knowledge, we didn't switch

12   properties in and out.  I did discover -- there was

13   one case study where the property changed, and I

14   flagged that, but I'd have to go back and look at

15   it.

16           But other than that, the control sales

17   carried those case study numberings, so to the

18   extent that they're skipping, that's because we had

19   identified a control sale and -- you know,

20   identified -- identified the control sale and then

21   maybe didn't use it.

22       Q.   Uh-huh.  So in the case of Tampa, the

23   highest number that we have reflected here is Tampa

24   27, and the only Tampa case studies that are

25   included in your report are Tampa 12, 25, 26, and

1    27.  So we have four out of as many as 27 addresses

2    for Tampa that made it into your report.  Am I

3    understanding that correctly?

4        A.    Could you just ask the question again?

5        Q.    Yeah.

6        A.    I didn't understand it.

7        Q.    Yeah, sure.  So the highest number we have

8    for Tampa -- the highest case study number we have

9    for Tampa is Tampa 27.

10       A.    Okay.

11       Q.    Right.

12       A.    Yes.

13       Q.    In your report, in your general report,

14   Exhibit 1, I see a table for Tampa 12, 25, 26, and

15   27.  So I have four Tampa tables out of a potential

16   of 27, if not more, that you began analysis with?

17       A.    Correct.

18       Q.    Okay.  Do you know specifically why you

19   excluded the 23 or more other addresses in Tampa?

20       A.    I would have to go back and look, but I'm

21   going to suspect that either some were confirmed as

22   either not having drywall.  Some were confirmed as

23   being claimants.  As I mentioned yesterday in my

24   testimony, I sent the original control sale list

25   around and asked if -- asked if any were on the

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 487 of 556
Case 1:11-cv-22408-MGC Document 22-1 Entered on FLSD Docket 09/15/2011 Page 315 of 384
Confidential - Subject to Further Confidentiality Review

1    claimant side within the entire suit.  So if these

2    were, we knocked those out.  And then some were

3    confirmed as having sold impaired, so they weren't

4    post-remediation sales.

5        Q.   Do you -- have you produced the addresses

6    for the control sales that you did not use in your

7    study?

8        A.   I believe so.

9        Q.   And do you know where those would be?

10       A.   There are a number of -- sorry.  Was there a

11   question?

12       Q.   Well, is that in the Not Used file?

13       A.   They should be in the Not -- yes, in the Not

14   Used file and the Additional Support file.

15       Q.   We'll take a look at those.

16       A.   Okay.

17       Q.   Would you have -- if they're not in those

18   PDFs, would you have records somewhere at your

19   office indicating which addresses you identified

20   initially, but did not use in your study and why you

21   excluded them from your study?

22       A.   Yes, probably.

23       Q.   I'm going to go back to Tampa 12, the table

24   for Tampa 12 in Exhibit 1, your general report.  Are

25   you there?

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 489 of 556
Case 2:14-cv-02094-MCE-DB Document 22-1 Entered on FLSD Docket 08/15/2018 Page 316 of
384
Confidential - Subject to Further Confidentiality Review

1   A.   Yes.  Just give me one second.

2   Q.   Okay.

3   A.   I have to get to the binder section.  I'm

4   having a little bit of a space problem over here.

5   Q.   Yeah?

6        THE WITNESS:  Thank you.  You're fine.

7   A.   Okay.

8   Q.   So you've got the table for Tampa 12 in

9   front of you?

10  A.   I do.

11  Q.   Okay.  So the first unimpaired comp is at

12  1413 East Comanche Avenue, right?

13  A.   Yes.

14  Q.   And if you look at the -- if you go toward

15  the right, you have a column for condition.  What is

16  the purpose of having an adjustment for the

17  condition of the property?

18  A.   So various property conditions affect -- you

19  know, the condition of the property can affect the

20  desirability of the -- of the comparable, and we've

21  made adjustments to make the property comparable to

22  the subject property in its condition as of that

23  date.

24  Q.   Are you basically -- making these

25  adjustments, are you trying to adjust for inherent

Case 2:09-md-02047-EEF-MBN   Document 22363-55   Filed 11/19/19   Page 489 of 556
Case 2:09-md-02047-EEF-MBN   Document 22363-55   Filed 11/19/19   Page 89 of 17 of
384
Confidential – Subject to Further Confidentiality Review

1    differences among the properties so that you're

2    comparing apples to apples?

3        A.   Yes.

4        Q.   So for the first comp, 1413 East Comanche

5    Avenue, you deducted $75,000 from the actual sales

6    price because the condition of that property was

7    new, right?

8        A.   Yes.

9        Q.   Okay.  And the purpose of deducting $75,000

10   was to account for the fact that a new home is

11   likely to be worth more than a good quality home

12   like the remediated control home, right?

13       A.   Broadly, yes.  I mean, there are -- there's

14   obviously issues of incurable -- what we call

15   incurable physical depreciation, right?  So a -- not

16   only does a new home come with new appliances and

17   new features, but it's also functionally new.  So

18   it's upgraded to current -- current building code

19   standards, and you have a new roof.

20           And so the overall -- it's just -- it's not

21   just a condition perception, it's also the market's

22   recognition that there's probably no near term

23   replacement issues that will come up.

24       Q.   So if you look at the second comp,

25   Unimpaired Comp 2, at 931 East McBerry Street, you

Confidential - Subject to Further Confidentiality Review

```
1    deduct -- well, the condition of that home is good,

2    right?

3        A.   Yes.

4        Q.   And good is not as good as new, right?

5        A.   Correct.

6        Q.   Okay.  You deducted $97,200 from Comp Number

7    2, which is $22,200 more than you deducted for the

8    new home in Unimpaired Comp 1.

9        A.   Yes.

10       Q.   Why?

11       A.   Why is it -- why is it more, or why is it --

12   I don't understand the question, why.

13       Q.   Well, both of those.  But why did you deduct

14   more for the good quality home than for the new

15   quality home?

16       A.   When you look at the sales -- you know, we

17   do -- we entertain or we do a process called

18   pairing.  So we're also looking between the

19   comparables.

20           As you'll note, the second comparable is

21   larger than the first comparable, so, you know, at

22   $50 a square foot for the condition, the adjustment

23   is larger for home -- the second home because it's a

24   larger home.

25           So that just recognizes the condition, and
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 491 of 556
Case 1:11-cv-22408-MGC Document 23 Entered on FLSD Docket 09/15/2011 Page 319 of 384
Confidential – Subject to Further Confidentiality Review

1    my estimate of the condition in that case based on

2    the photographic evidence and otherwise was that

3    that home was -- and based on a pairing of the

4    price, the market demonstrated that that home traded

5    as if it were new.  So there was a premium to that

6    home by pairing that sale with the other sales in

7    the grid.

8         Q.   So you mentioned -- in that answer, you

9    mentioned size, which I understand you actually

10   account for in a different column called size,

11   square -- SF for square footage, right?

12        A.   Correct.

13        Q.   So I want to focus just on the condition of

14   the home which you have a specific column for,

15   labeled condition.  And I'm trying to understand why

16   you deducted more for the good condition home than

17   you did for the new condition home, based solely on

18   the condition, not on other variables that you

19   account for the other places in your analysis.

20        A.   Sure.  And what I'm saying to you in each

21   case, this reflects a $50 per square foot

22   adjustment.  So I didn't deduct more.  It's a -- I

23   actually deducted the same amount for all four of

24   the comparables.  It's a function, if one comparable

25   is bigger than the other, that the gross adjustment

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 492 of 556
Case 1:11-cv-22408-MGC Document 291-1 Entered on FLSD Docket 03/15/2013 Page 320 of
384
Confidential – Subject to Further Confidentiality Review

1    is bigger.

2         Q.   Did -- so you're telling me you used a 50

3    square foot -- $50 a square foot adjustment factor

4    for condition of the home in Tampa 12?

5         A.   That's correct.

6         Q.   Did you use the same $50 a square foot

7    adjustment factor for condition of home in the other

8    19 cases in your case study?

9         A.   No.  I -- each one of the case -- each one

10   of the case -- I don't know.  I'd have to look, but

11   each one of the case studies are paired against the

12   comparables that are within that case study.  So

13   they're unique to that particular case study.

14        Q.   Why $50 a square foot?

15        A.   When I looked at the -- when I looked at the

16   comparison -- so if you compare Comparable Number

17   1 -- if you pair Comparable Number 1 with Comparable

18   Number 2, the overall difference in that price was

19   about $29,000.

20             And then we look across all of the

21   various -- varying characteristics, and we say, what

22   are the differences between those two comparables?

23   Right?  And that $21,000 is accounted for between

24   1,944 square feet and 1,493 square feet.  That

25   variation is one data point that we look at.

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 493 of 556
Case 2:14-cv-02722-EEF-JCW Document 1 Entered on FLSD Docket 09/15/2015 Page 321 of
384
Confidential - Subject to Further Confidentiality Review

```
 1              And obviously if the entire -- and if you

 2     take a look at the difference in size between a

 3     $38,000 adjustment and 69, remembering those are

 4     adjustments to your comparables, really, there is a

 5     $21,000 difference between those two sizes, so

 6     everything being equal, right, except for the age of

 7     the home and the size.

 8              We then looked at Comparable Number 1 versus

 9     3, and we say, okay, there's a 291,000 price in

10     Comparable Number 1, 268 in Comparable Number 3, so

11     that's a $23,000 difference in price.  How do those

12     prices vary?

13              And so we look at the price variation

14     amongst the comparables to extract what the

15     difference would be, based on those differences, and

16     then apply them to the subject.

17     Q.   Is that arithmetic that you just described

18     written down anywhere in your general report or the

19     backup materials?

20     A.   Well, the actual adjustments are noted in my

21     backup documents.  So you'll see on the next page it

22     says:  "All comps and significantly better finishes

23     estimated at $50 per square foot for condition."

24              The base price on the adjustments, we

25     looked -- I did the math on, you know, what these
```

Confidential – Subject to Further Confidentiality Review

```
 1    homes were selling for against the average square
 2    footage, and I applied a 60 percent factor for size.
 3    And so I estimated that it was about $100 per square
 4    footage for differentials in size.
 5           And I noted that this particular case study
 6    was heavily dependent upon the gross condition
 7    adjustments.
 8           Now, I'll say -- you know, I'll note that if
 9    the gross conditions adjustments are too heavy, if
10    they're too severe, and we change those gross
11    condition adjustments, that would then raise the
12    adjusted price of the unimpaired comparables, which
13    would then raise the overall diminution discount
14    relative to the impairment analysis.
15           So to whatever extent these condition
16    adjustments are heavy, then, you know, that
17    obviously would make a difference as to the level of
18    impairment.
19           I would also note on my work papers that in
20    these four comparables, I have notes as to the days
21    on market.  So Comparable Number 1 was 59 days on
22    the market.  Comparable Number 2 was seven days on
23    the market.  3 was 92 days on the market.
24    Comparable Number 4 was 42 days on the market.  And
25    the subject property that sold for $179,000, with
```

Confidential - Subject to Further Confidentiality Review

```
 1    the disclosure, compared to the four comps selected

 2    that, albeit in better condition, ranged from

 3    $268,000 to $353,000.  Despite the similar size,

 4    three-bedroom, two-bath home, it took 11 months to

 5    sell that comparable.

 6         And when you look at the confirmation notes

 7    on that comparable that we conducted with the

 8    listing agent, he said that the marketing time was

 9    substantially affected by the presence of the

10    Chinese -- of the remediated Chinese drywall.

11    Q.   If the adjustment for the new condition was

12    too low, instead of too heavy, in your terminology,

13    that would bias the comparison against the

14    remediated home and make it look as if the

15    difference between the remediated home and the

16    unimpaired homes was too high, right,

17    mathematically?

18    A.   Mathematically, if you increase the overall

19    condition adjustment by some factor, then that would

20    change the value diminution; that's correct.

21    Q.   If we look -- if we just go back to Tampa 12

22    and look through the condition column, you adjust

23    all of the comparable homes for the condition --

24    whether it's new or good, you adjust them all by 70,

25    80, $90,000, almost $100,000, correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 496 of 556
Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 496 of 556
Confidential - Subject to Further Confidentiality Review
384

```
 1      A.   Right.

 2      Q.   Okay.  Turn with me to the next page in

 3   Exhibit 1, which is the table for Tampa 25.  Are you

 4   there?

 5      A.   I am.

 6      Q.   Okay.  I want to look at that same column

 7   for condition.  You didn't make any adjustments in

 8   your Tampa 25 analysis for the condition of the

 9   homes, right?

10      A.   Correct.

11      Q.   All four of the comparable homes are new,

12   and they were built in 2011, the same year that they

13   were sold, correct?

14      A.   Correct.

15      Q.   The remediated home was built in 2007, and

16   you classified that as only good, correct?

17      A.   Correct.

18      Q.   Why did you not account for the fact that

19   the comparable homes were all brand-new?

20      A.   Well, they were brand-new in 2011 relative

21   to a home that was built in 2007 that had been

22   remediated and renovated.  And when I looked at the

23   renovated conditions -- or the renovated condition

24   of the subject and the photographs relative to the

25   subject and the condition of the -- and the
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 497 of 556
Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 325 of
384

Confidential - Subject to Further Confidentiality Review

1    photographs of the other homes, the condition

2    appeared to be equal, equivalent.

3       Q.   You're telling me -- let's talk about just

4    the exterior.  You're telling me that the exterior

5    of a home that was built in 2007 is equivalent to

6    the exterior of four homes that had been built a few

7    months prior in 2011?

8       A.   Based on the photographic evidence, I'm

9    telling you that I could not see a discernible

10   difference in the exterior condition.  All of them

11   appeared to be freshly painted, well-manicured.  I

12   mean, other than three years' worth of aging on the

13   roof, all of the interior -- I mean exterior quality

14   condition, landscaping was, you know, similar, in my

15   opinion.

16      Q.   Are you telling me that the interior of the

17   remediated home was just as good as the interior of

18   the brand-new homes built in 2011?

19      A.   Yes.  I'm telling you that the builder's

20   grade finishes that were evident in those four

21   comparables were comparable to the builder's grade

22   finishes in the comparable based on the listing at

23   the time, post-remediation.

24      Q.   So after this drywall home that is the

25   control subject was remediated, it looked just as

1    good as the brand-new homes built only a few months

2    before?

3        A.   Yes.  And I think if anybody looks at the

4    pictures, you'll see a lot of the cabinetry is the

5    same.  In addition, I might add, I have a note here

6    in my notes that the control sale remediation was

7    done by KB Homes.  So the builder actually did the

8    remediation.  He was the one -- I say "he."  The

9    company, KB Homes, conducted that remediation.

10           So the fact that those finishes are

11   consistent with the new homes is not -- you know,

12   with builder grade finishes is very consistent with

13   what I would expect if the builder did the

14   renovation.

15       Q.   I think what you're telling me is that a

16   home that's been remediated for a Chinese drywall

17   can look every bit as good as a brand-new home?

18       A.   Yes, or better, depending on how much you

19   spend on the finishes.  I mean, you can -- you can

20   spend a lot of money on finishes to make upgrades to

21   a home that, if done properly with design and

22   otherwise, can absolutely add value by virtue of

23   renovation, certainly.

24       Q.   Why did you not account for the age of the

25   roof in this analysis?

```
 1      A.   Because I don't think that the market

 2   demonstrates an age discount in -- for a roof that's

 3   two or three years older.

 4      Q.   In the pictures that you have, can you see

 5   what the quality of the roof is, or are your

 6   pictures just picking up the edge of the roof from

 7   the road?

 8      A.   Well, the MLS pictures are what they are.

 9   So certainly there -- it's a street-fronting

10   picture.  There are no pictures of the roofs

11   themselves.  But, you know, the home was constructed

12   by a builder, so it would have a 10-year warranty on

13   the roof.  And if I bought a home in 2011 that came

14   with a 10-year warranty and I bought a home in two

15   thousand -- I bought a 2007 home and transferred the

16   warranty, I'd have six years remaining on the home

17   warranty -- I mean, on -- you know, on the roof

18   warranty or the builder's warranty.  So we generally

19   don't see an impact of the -- of that nature unless

20   there is obviously a known problem with the home

21   inspection.

22      Q.   And you didn't have the home inspection for

23   any of these homes, right?

24      A.   Of course not.

25      Q.   And you didn't have pictures of the roof,
```

Confidential – Subject to Further Confidentiality Review

```
 1    right?

 2    A.   No.

 3    Q.   And you don't know if there was a warranty

 4    on any of these roofs, right?

 5    A.   No, I don't know that.

 6    Q.   In terms of the appearance of the homes

 7    being equivalent in your mind, is it possible --

 8    actually, strike that.  Strike that.

 9         All else being equal, would you rather have

10    a ten-year warranty or a six-year warranty on your

11    roof?

12    A.   I'd rather buy a house that I want to buy.

13    I mean, I -- you know, there is other -- I don't

14    think the home warranty or the roof warranty is

15    having a material effect on people's decision to

16    buy.

17    Q.   In your experience, do buyers show a

18    preference for new construction?

19    A.   It depends on the buyer.

20    Q.   It's possible for buyers to have a

21    preference for new construction?

22    A.   It's possible that some buyers have a

23    preference for new construction, sure.

24    Q.   It depends on the specific home, specific

25    time, specific market?
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 501 of 556
Case 1:21-cv-22894-FGC Document 321 Entered on FLSD Docket 08/15/2017 Page 329 of
384
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Well, it depends on the buyer.  I mean, it's

 2    a buyer -- it's a buyer preference, right?  I mean,

 3    some buyers would like -- you know, like -- would

 4    like a new home.  Maybe they've never owned a new

 5    home before.

 6        Some buyers want the home, and it's seasoned

 7    and decorated and painted.  I mean, there's certain

 8    benefits for buying a new home.  You know, it's

 9    brand-new, and oftentimes it comes with some builder

10    guarantees, but it also comes sometimes with

11    construction defects.

12        So you take on a new home, and you have to

13    paint all the rooms, and you have to do different

14    things and add your touch to it, and that costs you

15    money.  You buy an older home, sometimes you have to

16    replace things.  I mean -- but different buyers want

17    different things.

18        Q.    Does new construction typically receive a

19    premium over sales of older homes?

20        A.    Not always.  It depends on the condition of

21    the older home or the features.

22        Q.    Sometimes an older home can receive a

23    premium over a new home?

24        A.    Let me say it another way.  Sometimes --

25    many times older homes sell for more than comparable
```

```
 1   size newer homes because of the features are

 2   embedded, yes.

 3       Q.   And it's possible for a drywall remediated

 4   home to sell for a premium over a new construction

 5   home, right?

 6       A.   Well, with the disclosure, if the buyers are

 7   okay with the disclosure, it's possible, sure.

 8       Q.   So if you can turn with me to the table for

 9   Tampa 26, please.  Okay.  Are you there?

10       A.   Yes.

11       Q.   All right.  In the table for Table 26 --

12   excuse me -- Tampa 26, you make adjustments for the

13   date of sale, correct?

14       A.   Yes, correct.

15       Q.   Okay.  And why did you adjust for the date

16   of sale?

17       A.   When you -- when you review the data -- when

18   I reviewed the data and I made the other adjustments

19   that were relevant, the difference in price between

20   the -- the difference in price between Comparables

21   Number 2, 3, and 4 indicated that a time adjustment

22   was required.  The subject control sale sold in

23   February of 2013.

24            If you look at the difference between

25   Comparables Number 3 and 4, making the other
```

Confidential – Subject to Further Confidentiality Review

1    adjustments as I made them, there was about an 11

2    percent price difference between April and July,

3    with the only difference being the time.

4         And so we made a time -- I made a time

5    adjustment relative from the February to July time

6    frame.  The comparable suggested that time was an

7    element here.

8    Q.   Okay.  If you go back to Tampa 12, for

9    example, you did not adjust based on the date of

10   sale, correct?

11   A.   That is correct.  But I'll note that the

12   first sale actually preceded the control sale by a

13   couple of months, and then the second sale was

14   actually closed within 10 days of the control sale.

15   The third sale closed within 30 days, and the fourth

16   sale closed within about 60 days of the time frame.

17   There wasn't as much of a time variation in the --

18   in Tampa 12 as there was in Tampa 26.

19   Q.   All right.  Go to Fort Myers 20, which is a

20   couple further on in Exhibit 1.  And there, again,

21   you didn't adjust for the date of sale.  And as I

22   understand it, the control home sold in April of

23   2010, and a couple of the comps at the higher end

24   sold four months later in August of 2010.  Is that

25   right?

```
 1      A.    It is.

 2      Q.    Do you know why you didn't adjust for the

 3  date of sale in that analysis?

 4      A.    The data didn't suggest that an adjustment

 5  was warranted.  If you look at Comparable Number 4,

 6  that transacted in January of 2010, and the adjusted

 7  price there was actually higher than closings that

 8  happened in August of 2010 and even March of 2010.

 9            So the adjustments demonstrate -- and the

10  pairings demonstrate that no time adjustment was

11  required because all of the adjusted comparables

12  fell within a relatively tight range.  And that

13  tight range -- that range, with all the other

14  adjustments having been made to one another, would

15  indicate there was nothing in the data to suggest

16  that a time adjustment was appropriate.

17      Q.    Let's go back to Tampa 26.  Are you there?

18      A.    I am.

19      Q.    Okay.  The Unimpaired Comp 3 is 11120

20  Running Pine Drive, correct?

21      A.    Comparable Number 3 --

22      Q.    Uh-huh.

23      A.    -- is 11120 Running Pine Drive, correct.

24      Q.    Yes.  Okay.  And are you aware that 11120

25  Running Pine Drive has a pool?
```

Confidential – Subject to Further Confidentiality Review

```
 1      A.   Yes.  I have that noted in my -- in my notes

 2   here, yes.

 3      Q.   Okay.

 4      A.   That was --

 5      Q.   You did not make an adjustment for the fact

 6   that 11120 Running Pine Drive, Comp 3, has a pool?

 7      A.   No, that's not true.  Under the condition,

 8   in my hand notes, you'll see the hand notes say,

 9   under condition, very good, pool, 40,000.

10      Q.   So you included the adjustment for the pool

11   in the condition of the home column?

12      A.   Correct.

13      Q.   I thought the condition of the home column

14   had to do with the age and wear level, wear and tear

15   level of the home.

16      A.   That's true, but, I mean, in this case, as I

17   said, you know, it also has to do with the buyer's

18   perception of condition.  And I put the pool

19   adjustment in that column because I didn't have, you

20   know, a separate column for every single feature,

21   you know, for, like, pools.  But obviously

22   there's -- you know, that could have an impact.

23      Q.   So sometimes you adjusted for pools in

24   condition, and sometimes you did not?

25      A.   Correct.
```

1    Q.   All right.  So if we stay with Tampa 26,

2    Unimpaired Comp 1 sold on July 26th of 2013, and

3    Unimpaired Comp 3 sold for July 30th of 2013, so

4    four days later, right?

5    A.   Yes.

6    Q.   And you adjust -- based on the sales price,

7    you adjust $3,700 more for the second sale that was

8    four days later, correct?

9    A.   Yes.

10   Q.   And that's more than a 50 percent increase

11   in the amount of adjustment from the first sale to

12   the second sale four days later, correct?

13   A.   I don't know.  I would need to calculate

14   that.

15   Q.   Well, 3,700 is more than half of 6,300,

16   right?

17   A.   If that's what you're asking, yes.

18   Q.   Yes.  Okay.  Why did you adjust in such a

19   significant amount based on a sale occurring only

20   four days later?

21   A.   The days on market adjustments here indicate

22   that all three of these comparables sold within 15

23   days on the market.  I'd have to look at the

24   specific confirmation on that sale.

25   Q.   Well, so my question is just the date of

1    sale column, not time on market.  I understand you

2    to be saying that the date of -- you adjust for date

3    of sale because of changes in the overall market

4    conditions.  And I'm wondering what was so profound

5    that happened in the broader market in four days in

6    July of 2013 that changed the adjustment amount?

7        A.   I think it's probably a percentage

8    adjustment of the base, but I'm just checking if I

9    have the -- yeah, it's a 5 percent adjustment to the

10   base price.  I used a 5 percent adjustment based on

11   appreciation factor between the February 2013 sales

12   price and the July 2013 closing, but if you use 5

13   percent of the price as the market adjustment that

14   was occurring and you apply that to the base price

15   of the home, that's where you get the delta in the

16   time adjustments, but again, because we're adjusting

17   the comparable prices to the subject property, that

18   adjustment should reflect the impact of time against

19   the overall price.  So that relationship is

20   important to capture, it's not -- the relationship

21   between $6300 and $10,000, between the two

22   comparables is not what's important.  It's how do

23   you adjust the comparable price to the subject and

24   you need to do that as a percentage adjustment

25   because, obviously, the higher priced homes are

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 508 of 556
Case 1:14-cv-22494-CH Document Entered Panel FLSD Docket 08/15/2017 Page 386 of 384
Confidential – Subject to Further Confidentiality Review

1    compounding based on market time.

2    Q.   The -- in Tampa 26, the subject home, the

3    remediated home had a lake view -- or has a lake

4    view, correct?

5    A.   Yes.

6    Q.   You say that actually in the notes.

7    A.   Yes.

8    Q.   And you did not adjust for having a lake

9    view; is that right?

10   A.   I did not adjust for that property having a

11   lake view because that property took 60 days on the

12   market and to the extent -- you wouldn't adjust the

13   subject in any case.  What I would have done, had I

14   thought the lake view had an impact on the marketing

15   or should have had an impact on the marketing, is I

16   would have adjusted the comparables for their lack

17   of lake view, which then would have drove the

18   comparable prize indications up, which would have

19   drove the diminution estimate up and then you would

20   have asked me what my proofs were for the fact that

21   the comparables didn't have lakes and the control

22   sale did and how do you know that that lake view --

23       So I didn't adjust for the lake view to

24   avoid any discussions about how do I prove the

25   adjustment that I made for the lake view because

1    that artificially inflates the diminution estimate.

2        Q.    Well, is that right?  If the subject home

3    has a lake view and the other homes don't, shouldn't

4    you adjust the comp homes down to reflect the fact

5    that they don't have a lake view?

6        A.    No.  That would have -- I would pay more for

7    the -- I would -- the -- the comparables in that

8    case would be considered to be inferior.  Right?  So

9    they get an upward adjustment, because if the

10   comparable sold for $200,000 and it wasn't on the

11   lake, then theoretically if it was on the lake, it

12   would have sold for $210,000.  So you would make

13   that adjustment for inferior conditions upward,

14   which would then magnify the diminution estimate

15   which then would have been subject to critique

16   because I didn't have any comparable sales that had

17   lake views by which to extract that adjustment so I

18   would have been making an unsupported adjustment and

19   you guys would have jumped all over me saying,

20   you're making unsupported adjustments to demonstrate

21   your diminution estimate.  So I recognize I did have

22   in my notes that the subject had a lake view.  I

23   also have in my notes that the subject took 60 days

24   to market and Comp 1 took six and Comp 2 took two

25   days and Comp 3 was 13 days on the market.  I also

```
 1    didn't make a days on market adjustment.  And say

 2    the subject's days on market indicate that those

 3    prices were actually very favorable.

 4        Q.   Okay.  Let's leave Tampa and go south to

 5    Fort Myers 20.

 6        A.   But I like Tampa.  Let's keep talking about

 7    Tampa.

 8        Q.   You had a good answer on Tampa.

 9        A.   Where are we going?

10        Q.   Fort Myers 20.

11        A.   Okay.  I have to go back to my index.

12    Please give me a moment.

13        Q.   Yeah.  Are you there?

14        A.   Not yet.  A lot of paper.

15        Q.   Yeah.

16        A.   Okay.  I'm here.

17        Q.   On Fort Myers 20, the table for Fort Myers

18    20 in your general report, I'm going to stay with

19    the condition column.  You adjust two of the comp

20    homes downward by $10,000 for being in good

21    condition and do not adjust two of the other comp

22    homes downward at all, even though they are also in

23    good condition.  Do you know why you adjusted

24    differently for four homes that are all in good

25    condition?
```

```
 1      A.   Yes.  Comparables number 1 and 2, if you

 2   look at my hand notes, comparables number 1 and 2

 3   had a pool and comparables number 3 and 4 did not

 4   have a pool.  They were all in, what we deemed to

 5   be, comparable condition but the pool adjustment is

 6   embedded in comparables number 1 and 2.

 7      Q.   Didn't you adjust a home by $40,000 for

 8   having a pool in Tampa 26?

 9      A.   No.  I adjusted it $40,000 and my testimony

10   was that that included the adjustment for the pool

11   but the condition was noted as very good, better

12   than the other comparables, so the cumulative

13   adjustment inclusive of the pool was $40,000, but

14   that also reflected the improved condition of that

15   home.

16      Q.   Why adjust by $10,000 for a pool?

17      A.   Again, I think if you look at the -- if you

18   pair -- if you pair your analysis, if I had not

19   adjusted -- let's say comparable number 2.  Okay?

20   Comparable number 2 was a three bedroom, two bath

21   home 1849 square feet.  If I pair that with

22   comparable number 4 and I had not made a $10,000

23   adjustment for the pool, then comparable number 4 --

24   I mean comparable number 2 and 3, you know,

25   together, pretty much represented a very similar
```

```
 1    home.  I'm sorry, comparable number 2 and 3

 2    represented a pretty similar home in terms of size

 3    and overall size, as did 4.

 4          There is a delta, though, of about $10,000

 5    for the pool.  If I put the pool adjustment back in,

 6    that that pool -- that would have adjusted to

 7    $149,000 and Comp Number 1 would have adjusted to

 8    $140,000, so you can extract a $10,000 adjustment

 9    for the pool if you look at comparables number 2 and

10    4.  In other words, the adjusted price was 1399, but

11    if I put the $10,000 back in that becomes 1499 and

12    the comparable number 4 would have been at 140.

13    Yes?  So the delta between those two is the

14    difference and the difference is the pool, so I

15    adjusted the pool downward by $10,000.

16       Q.   Do you consistently adjust the comps

17    downward by $10,000 for having a pool?

18       A.    In any given data set, once I've made a

19    pairing or created an extraction, then I'm going to

20    apply that consistently, even if that may not make

21    the data fall perfectly in line and may come --

22    there may be slight differences.  Once I've created

23    that extraction within a particular case study, then

24    that's the adjustment I'm going to make in that case

25    study, but just like every real estate appraiser
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 513 of 556
Case 1:11-cv-22408-MGC Document 79-1 Entered on FLSD Docket 08/15/2011 Page 341 of
384
Confidential – Subject to Further Confidentiality Review

1    does, nobody should be making a $10,000 pool

2    adjustment.  Right?  My pool might be a $25,000 pool

3    adjustment.  Your pool in Atlanta, might be $35,000.

4    You may have waterfalls, you may have had the guy

5    from Florida come up --

6        Q.   Zero dollars for my pool.

7        A.   Zero dollars for your pool.  The point is

8    that it obviously relates to the quality of the pool

9    and the size and the size of the home and things

10   like that.

11        MR. BLOCK:  All right.  Let's go off the

12   record for a minute.

13        THE VIDEOGRAPHER:  Off the record, 10:24.

14     (Recess from 10:24?a.m. until 10:52 a.m.)

15        THE VIDEOGRAPHER:  On record, 10:52.

16        MR. BLOCK:  Mr. Graziano, I think these are

17   all the questions I have for you so thank you for

18   your time and I'm going to turn the questioning

19   over to one of my colleagues from Orrick.

20        THE WITNESS:  Thank you.

21              CROSS-EXAMINATION

22   BY MR. GUERRA:

23        Q.   Good morning, Mr. Graziano.

24        A.   Good morning.

25        Q.   We met yesterday.  I'm Dan Guerra from

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 514 of 556
Case 1:14-cv-22848-MGC Document 294-1 Entered on FLSD Docket 08/15/2015 Page 342 of 384
Confidential - Subject to Further Confidentiality Review

```
 1    Orrick Sutcliffe and I've got a few follow-up

 2    questions for you.

 3        A.   Sure.

 4        Q.   If we could start with Exhibit 1, Broward

 5    10.

 6        A.   Yes.

 7        Q.   Before we took a break you said that once in

 8    a given data set, you apply an adjustment

 9    consistently; is that correct?

10        A.   Yes.

11        Q.   So if you could look at the bathroom's

12    column table for Broward 10?

13        A.   Yes.

14        Q.   Can you take a look at those adjustments for

15    the comps on bathrooms, please?

16        A.   Yes.

17        Q.   Now, were those applied consistently?

18        A.   No.  But we have as Exhibit 5 an entitlement

19    called errata sheet which I had identified this.  I

20    think this is an exhibit because I have an exhibit

21    note on here, where there was an error in the

22    adjustment to Comparable Number 3 on the bathroom

23    that was a downward adjustment that should have been

24    an upward adjustment, so that's been corrected in

25    Exhibit 5.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 515 of 556
Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 515 of 556
Confidential - Subject to Further Confidentiality Review
384

1    Q.   And is there a reason why Comps 1 and 2 have

2    adjustment of $5,000 for four-and-a-half baths and

3    Comp Number 4 has a $10,000 adjustment for also

4    four-and-a-half baths?

5    A.   I'm sorry.  Could you ask the question

6    again?

7         (The question was read by the reporter.)

8    A.    Again, the errata sheet modifies that

9    adjustment, so what happened was that, as I

10   testified yesterday, this home sold impaired in

11   2010, April, and then sold remediated in September

12   of 2010.  When they sold the home remediated, they

13   had added an additional half bathroom on the

14   remediated home as part of the remediation and so in

15   comparing the remediated comparable, comparables 1,

16   2 and 4 have a $5,000 adjustment reflective of them

17   having four-and-a-half baths but not the extra half

18   bath and comparables 3 and 5 in my errata sheet

19   Exhibit 5 have a $10,000 adjustment.  Reflective of

20   being short two half baths.

21   Q.   And if you could turn to page 22 of

22   Exhibit 1, please.

23   A.   Sorry, page 21 you said?

24   Q.   22, please.  And while you're doing that,

25   how many errata sheets have you submitted to your

1     report?

2         A.   I don't know off the top of my head, I'd

3     have to go through each of these.  There were

4     supplemental post-discovery information that I -- we

5     marked as an Exhibit 4, I believe, if I'm reading

6     that correct, yesterday, so there is a number of

7     things in there but I don't know the answer to the

8     number of modifications at this point.

9         Q.   Okay.

10        A.   Do I need this book for the moment?

11        Q.   Exhibit 1.

12        A.   Is this Exhibit 1?

13        Q.   Yes, please.

14             So yesterday, I believe your testimony was

15    that the 10 percent diminution value stigma damage

16    is as of the effective date so if it's $40,000 as of

17    that date it wouldn't necessarily be 10 percent in

18    the future based on market conditions, but it would

19    still be that $40,000.  Is that correct?

20        A.   I would have to review the record.  I mean,

21    you're characterizing my testimony and I'm not sure

22    I can answer that.

23        Q.   Sure.  Why don't you go ahead and explain

24    what you think I'm talking about from yesterday.

25        A.   Okay.  So there were a number of different

1    questions relative to this 10 percent.  We applied

2    the 10 percent as of the effective date of value to

3    each of the Priority Claimants.  That 10 percent was

4    then translated into a whole dollar damage.  The

5    line of questioning yesterday regarding, well, what

6    happens in the future?  I believe my testimony

7    reflects that this damage is imposed upon the

8    Priority Claimants as of their effective date of

9    value, that that damage would not continue to occur

10   over time because you will have already paid for it

11   and any future buyers that buy the property will

12   have already received the discount and therefore

13   they wouldn't be subsequently damaged by any

14   post-remediation diminution that they may suffer in

15   the future because their purchase of the property

16   was already at the discount.  That's my line -- that

17   was my discussion.

18        And then someone -- Mr. Block asked me:

19   Well, does that mean that in the future all these

20   properties are going to be forever damaged by 10

21   percent?

22        I said I can't answer that because I would

23   have to be able to study that information into the

24   future and I can't do that.

25        Q.   Okay.  So say a Priority Claimant still has

1   their property, has not sold it yet.

2       A.   Correct.

3       Q.   And you determine as of the effective data

4   of whatever it was in the past, say January 1st,

5   2019 for those people --

6       A.   Yes.

7       Q.   -- that they suffered a diminution value of

8   10 percent?

9       A.   They would -- they would suffer -- my

10  opinion is that they would have -- would suffer a

11  diminution value of 10 percent as of that effective

12  date, that's correct.

13      Q.   And that gives you some real damage value of

14  X, say $40,000, for example.

15      A.   Relative to the unimpaired value of their

16  home, correct.

17      Q.   And you're saying that if they sold their

18  house three years from now, that value X, $40,000,

19  would still impact the sale of their home; is that

20  correct?

21      A.   No.  If the damage is compensated for, as of

22  that effective date of value, then they've already

23  received that money so in the future whatever

24  diminution that they may suffer, you've already

25  compensated for it based on the effective date of

```
 1    value.  So in the future, if they sold the home and

 2    it only reflected an 8 percent or a 7 percent

 3    diminution, that may be the case but you will have

 4    compensated for them on the effective date of value

 5    based on 10.  The actual -- the actuality of what

 6    happens in the future they've already been

 7    compensated for.

 8         And the damage theory says that as of the

 9    date, if you've compensated them for it, then they

10    have the money to reinvest and they're not going to

11    get the appreciation on that money.  It's as if they

12    bought the home for 10 percent less, so any

13    diminution that they suffer is already accounted

14    for.  The same way if somebody had purchased their

15    home and got in the discount, they wouldn't be

16    suffering in the future because they've already

17    received the discount.

18    Q.    But the diminution in value doesn't actually

19    occur until the sale happens, correct?

20    A.    No.  The diminution in value is a diminution

21    in value of what they could sell the house for on

22    the effective date so it also affects their current

23    equity status.  Right?  It affects the value of

24    their home as of that date.

25    Q.    But there are no actual damages that accrue
```

1    unless they actually sell and get the full value

2    they would have otherwise received?

3        A.    That's a determination of how you calculate

4    damages.    That's like saying I have $100,000 in the

5    bank, if now I have $90,000 in the bank I'm not

6    affected because I didn't spend the money.    If I

7    have $100,000 in the bank or $90,000 in the bank,

8    there is a difference.    The fact that I didn't need

9    the money or didn't go to spend the money at that

10   particular time doesn't negate the fact that there

11   is $10,000 less in my bank account.    Real estate is

12   an asset, so if the asset value goes down, you've

13   suffered the damage.    The fact that you haven't sold

14   the house to actually realize, it's the difference

15   between realized and unrealized gains.    Right?    So

16   the potential -- if you've suffered that damage,

17   then -- but just because you haven't sold the home,

18   that means you didn't realize the loss at that time,

19   but the loss has occurred.

20       Q.    So it's a difference between realized and

21   unrealized gains or in this case, realized or

22   unrealized damages?

23       A.    I'm saying the damages are real.    They

24   are -- it does affect the value of the home and

25   therefore it is realized.    The fact that they

1    haven't sold it or not just means that they haven't,

2    you know, that they haven't actually -- what do I

3    want to say?  They haven't realized it, that's

4    correct.  It's -- the damage that they've suffered

5    is real and I don't want to confuse realize with

6    real.  Their asset value is impaired and therefore

7    they have suffered that damage as of the effective

8    date.

9        Q.   Okay.  If you could turn to page 22, could

10   you read the first full sentence of -- or first

11   sentence of the second full paragraph, please?

12       A.   Where it starts "I would expect."

13       Q.   Uh-huh.

14       A.   "I would expect these value diminution

15   impacts to decline over time after numerous resales

16   of the same property where no adverse conditions

17   persist."

18            Would you like me to continue?

19       Q.   No, that's it.  So over time if there is

20   shown to be no adverse impacts post-remediation, you

21   would expect this diminution in value to decline,

22   correct?

23       A.   That's my prediction, yes.

24       Q.   So if buyers -- or if the homeowners don't

25   sell their home for 10, 20 years, they will

1    potentially never have realized any damages related

2    to diminution in value?

3        A.    No.  This doesn't relate to the Priority

4    Claimants, specifically.  This relates to my market

5    analysis and what I'm saying here is that, I would

6    expect that over time as, you know, I just testified

7    yesterday as to what the risk factors were, is that

8    over time that the fact that no additional

9    callbacks, no additional problems may occur, may

10   over time reduce those impacts.  But also because

11   these claimants are getting damages today over time

12   as those things occur, that percentage impact may be

13   different.  That was my testimony yesterday and I

14   stand by it.

15       Because we're quantifying the impact today

16   based on 10 percent, based on the unimpaired values

17   today, as values increase over time as a percentage

18   diminution, those will decline, that percentage will

19   decline.

20       Q.    Does this sentence here say anything about

21   market changes and value changes in the home value?

22       A.    I think that's implicit in the phrase "over

23   time."

24       Q.    All right.  Let's move on to a different

25   topic.  I think you can put that away for now.

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 523 of 556
Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 523 of 556
Confidential - Subject to Further Confidentiality Review
384

```
 1              So with respect to the Priority Claimant

 2     reports, Exhibit 2, those were the comps in the

 3     analysis and the appraisals were all done by third

 4     parties, correct?

 5         A.   Yes.

 6         Q.   And did you give them any instructions?

 7         A.   I gave them instructions that I wanted the

 8     valuations done on an unimpaired basis.  I did not

 9     want them to consider any impact of the remediation

10     and, in all cases, where the properties obviously

11     were in an unremediated condition, that's a

12     hypothetical condition, so I told the appraisers

13     they would be valuing this hypothetically, assuming

14     no impact to the drywall.

15              That has certain implications on their

16     consideration of the sales data, so they were not to

17     include the sale of the subject property as -- they

18     could report it, which is required under our

19     standards, but they weren't to consider that in

20     their final correlation.  I told everybody, you

21     know, we had -- we were bounded by external

22     inspections, but I'd like them to inspect the

23     exterior of the comparables in the subject property

24     and then based on those appraisals when they came

25     back, you know, my staff and I reviewed those
```

1     appraisals and interfaced with the appraisers.  If

2     we felt there were any data issues that needed to be

3     resolved or adjustment issues that needed to be

4     resolved, so we participated in that process with

5     the local appraisers that have local competency and

6     that was really the instruction, appraise it

7     unimpaired as the effective date of value.

8          Q.   And so did the work you and your staff do,

9     did it serve to provide a quality control on the

10    work of the appraisers at all?

11         A.   I think so.

12         Q.   And were you, by and large, able to make

13    sure that they were consistent in their applications

14    of adjustments and the selections of comps?

15         A.   I think that we wanted to make sure that the

16    selection of comps was relevant for the local market

17    area and we interfaced with the appraisers

18    individually within that selection process, but we

19    really left it up to -- we didn't select the

20    comparables, we asked the local residential

21    appraisers with local competency to select the

22    comparables.

23         Q.   Did you have any concerns about some of the

24    homes being in gated communities and the appraisers

25    not having access to them at all?

```
 1       A.   We did.  I mean, it was a limitation on our

 2   ability to inspect some of the homes and one of the

 3   homes, I forget which case number it was, I think it

 4   was Case Number 4, the Wites, where we asked them

 5   for access and they gave us access to go back out

 6   and inspect.  I think there were three other homes

 7   that due to the gate access we were not able to

 8   inspect from the exterior.

 9       Q.   Did you adjust the valuations any way to

10   take into account that or find any way to mitigate

11   any sort of uncertainty that could introduce into

12   the process?

13       A.   We did what we would ordinarily do as part

14   of our peer practice, we relied upon public record

15   data, MLS data, photographic evidence, aerials,

16   things of that nature.

17       Q.   Okay.  And then about your surveys, I

18   believe at one point yesterday you said that a much

19   more comprehensive survey would be necessary for

20   respondents to statistically represent the

21   prevalence of an impact.  Does that sound familiar?

22       A.   I remember the line of questioning.  I don't

23   know if I would characterize it that way, but what's

24   the question?

25       Q.   So if a much broader survey would be
```

```
 1    necessary to represent the prevalence of an impact,

 2    what exactly were you using the survey for?

 3        A.   I was using the survey to gather information

 4    as part of the control case studies and I was also

 5    using the survey to represent our investigation into

 6    the market with respect to brokers and how they

 7    handled this type of a problem and whether they felt

 8    this was a consistent or persistent problem and then

 9    I classified those comments and arrayed those

10    comments to be able to understand based on the

11    surveys that we conducted, the order of magnitude of

12    prevalence or nonprevalence, how brokers were

13    reacting and what their reactions were to the

14    knowledge of the problem.

15        Q.   So if a larger survey is necessary to

16    statistically represent the prevalence of impact,

17    then how can you use it for that?

18        A.   I don't know that I testified that I was

19    using it for that.  I use it to inform my

20    understanding of what the -- how the brokerage

21    community was handling it, whether they felt that

22    there were price impacts, how they believed the

23    market perceived the impacts, and to collect that

24    information to help inform my case studies, but I

25    did not use it as a standalone survey.  I think the
```

Confidential – Subject to Further Confidentiality Review

```
 1    line of questioning with respect to using surveys

 2    yesterday related to a contingent valuation method

 3    where there was no market data and, you know, what

 4    the process would be in that -- within that type of

 5    a survey method.  I said in my testimony yesterday

 6    that this was not statistically validated.

 7        Q.   Okay.  So but there was no market data for

 8    post, I believe, August 2016 through your extension

 9    date of February 15 of 2019 that used the surveys

10    for, correct?

11        A.   I have no case studies that demonstrate a

12    value or price example of remediated property after

13    August of 2016, that's correct.

14        Q.   So the surveys are what you're relying on

15    primarily to extend it to that?

16        A.   No.  As I testified yesterday, the case

17    study dates range from 2009 to 2016.  We arrayed

18    those and looked at the dates and the locations and

19    the segmentation of price and I did not see any

20    discernible difference as it related to date, and so

21    that demonstrated to me that if date is not a factor

22    or an isolating factor to demonstrate that, you

23    know, a grouping of impacts that may be less, the

24    date was not an issue.  And so I carried that

25    forward from August of 2016 to January 2019.
```

```
 1              I'm not using the survey to bridge the lack

 2    of data, the data was studied over a seven-year time

 3    frame and the gap between our effective date,

 4    current effective dates of value and August of 2016,

 5    is a couple of years.

 6       Q.   So roughly a third of the period, correct?

 7       A.   You could classify it that way, sure.

 8       Q.   So with respect to the survey, why only

 9    limit it to your case sample and the comps, the

10    individuals involved with those sales?

11       A.   Because those were the people that we were

12    interviewing in conjunction with the case study that

13    we knew would have direct knowledge of potentially

14    remediated issues.  They were -- these were brokers

15    that were involved -- either involved in the control

16    sale and/or brokers that were involved in selling

17    properties in markets where the control sale existed

18    and therefore would have presumably had some

19    knowledge or experience with Chinese drywall.

20    Although some indicated that they didn't and we

21    noted that.

22       Q.   So I believe yesterday you said you

23    initially did about 100 of those surveys, that's

24    correct, approximately?

25       A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 529 of 556
Case 2:11-cv-03094-MCG-JCW Document 12 Entered on FLSD Docket 09/15/2015 Page 357 of
384
Confidential - Subject to Further Confidentiality Review

    1     Q.   Why exclude those other surveys?

    2     A.   Not -- I didn't -- I did not exclude them

    3   intentionally, as I testified yesterday.  We

    4   developed a number of case studies -- we were

    5   developing a number of case studies on impaired

    6   properties and those surveys were ongoing.  When we

    7   compiled the results of these studies, I believe,

    8   these will reflect the case studies that were --

    9   these interviews reflect the interviews that were in

   10   conjunction with the case studies that we used for

   11   the remediated properties, but I do intend to go

   12   back and compile all of the surveys and make sure

   13   that that's accurately reflected.

   14     Q.   Okay.  So to the extent the surveys had been

   15   completed before you changed methodology in -- or

   16   scope of your work, would those responses be equally

   17   as valid as the ones from -- that you actually

   18   included in your final work?

   19     A.   I don't know.  I'd have to review them.

   20     Q.   Okay.  What would make them invalid?

   21     A.   Well, if there is no comments, if there is

   22   no experience by the broker, if the broker indicates

   23   no knowledge, you know, I probably would not include

   24   those.  If the broker indicates very clearly some

   25   remediation -- post-remediation impact or very

Confidential - Subject to Further Confidentiality Review

1    clearly that there is no post-remediation impact.

2    Then I would include those.

3        Q.   Wouldn't a lack of knowledge of Chinese

4    drywall impact suggest that it's not an issue that

5    is prevalent to the market?

6        A.   No.  It's just a reflection that that broker

7    may not have handled that problem before or seen

8    that problem in occurrence.  It's not that the

9    problem isn't prevalent, it's just that that agent

10   doesn't have any experience.  I didn't qualify every

11   one of these surveys by saying how many years of

12   experience do you have in the marketplace.  I could

13   be calling agents today and they have a listing and

14   we've called them on the listings and maybe they've

15   only been a practicing agent for three months.  You

16   know, I don't know.

17       Q.   So would you agree that in limiting the

18   survey responses to only the people involved in your

19   case study and the comparables, that that increases

20   the risk of confirmation bias in the results?

21       A.   Equally on both sides, I would agree with

22   that.  I think that it would tend to focus the

23   answers on people that either believe there is a

24   post-remediation impact or those that don't.  I

25   don't know that that biases the results for the

```
1    purposes of the study because whether there is

2    confirmation bias one way or the other, it's equal

3    on both sides.

4        Q.   Well, confirmation bias with respect to what

5    you're looking at, so you're looking at those 20

6    sample cases, correct?

7        A.   Yes.

8        Q.   And you're talking to people related to

9    those 20 sample cases?

10       A.   Or the unimpaired comparables behind them.

11       Q.   Correct.

12       A.   Yes.

13       Q.   So to the extent that those aren't

14   representative of the broader market, you could be

15   creating confirmation bias by only relying on

16   surveys with people associated with those -- with

17   your original analysis?

18       A.   I think to the extent there is confirmation

19   bias, it's to the defendant's benefit at least, we

20   surveyed and reviewed and interviewed brokers that

21   had sold four unimpaired comparables and one

22   impaired control sale.  So 20 percent of the sample

23   that we would have interviewed had direct experience

24   with a post-remediation drywall problem and the

25   other 70 or 80 percent of those interviewed were
```

```
 1    interviews related to an unimpaired comparable and

 2    then we asked them, have you seen this problem, have

 3    you experienced this before, do you have any

 4    experience with Chinese drywall.  So I mean to the

 5    extent that there is confirmation bias, it's 80/20

 6    in your favor.

 7        Q.   Okay.  But --

 8        A.   I would -- excuse me.  Let me just

 9    emphasize.  I would understand your point if

10    everybody -- if we interviewed agents that all had a

11    remediated Chinese drywall listing and those were

12    only the people that we interviewed.  Then I would

13    suggest to you that that would present confirmation

14    bias, but the way that we've done it and the way

15    that you're asking the question, I think if there is

16    any confirmation bias it's in your favor, not ours.

17        Q.   Presumably the comps are in the same

18    neighborhoods and the realtors there would have to

19    deal with the same problems, so if there was a

20    drywall in a bunch of homes in those neighborhoods,

21    the realtors would probably be aware of it, correct?

22        A.   Yes.

23        Q.   So that distinction you just made about a

24    realtor related to a -- involved with a remediated

25    home and one that isn't involved with a remediated
```

```
 1    home, doesn't necessarily reflect knowledge of CDW

 2    or experience with CDW for those other realtors,

 3    correct?

 4        A.   I don't agree at all.  In fact, I don't

 5    understand what your point is.  If we interviewed

 6    realtors that operated in a market where Chinese

 7    drywall was present.  That's exactly what we're

 8    supposed to be doing.  I mean, if I called a bunch

 9    of realtors in Kansas who had never seen a Chinese

10    drywall problem before, then they wouldn't have any

11    knowledge and so those wouldn't be qualified.  We

12    interviewed the realtors that are in a market and

13    they understand this is an issue.  Realtors are

14    trained with continuing education, they are trained

15    on detrimental conditions that have to be disclosed,

16    they are trained on disclosure.  They are constantly

17    updating their knowledge base about things that

18    affect value in the marketplace.  So I don't see how

19    interviewing these people within an area that may

20    have had Chinese drywall prevalence creates

21    confirmation bias.  That's exactly the group of

22    people we want to interview.

23        Q.   I know, but you were suggesting that it

24    would it be a four to one ratio to our benefit but

25    you didn't actually ask these realtors that were
```

```
 1    involved with comp sales whether they had experience

 2    with Chinese drywall, in terms of other sales that

 3    would influence them, correct?

 4        A.   We did.  Question 7 said:  "Finally, in

 5    listing and marketing other homes in this market,

 6    have you noted a pricing impact on homes that had

 7    Chinese drywall?"

 8             So yes, we did interview them for their

 9    experience outside of the property that we were

10    confirming.

11        Q.   Okay.  So to the -- so do you know how many

12    actually answered that they did have experience with

13    them?

14        A.   Not as I sit here today.  As I said, I would

15    want to go through all of the surveyed responses and

16    compile those again.

17        Q.   Okay.  So the four to one ratio you

18    mentioned earlier is not necessarily correct,

19    though?

20        A.   The four to one ratio I mentioned earlier

21    related to -- you were characterizing these

22    interviews as having confirmation bias on the basis

23    that we were interviewing people that all had a

24    property listed with Chinese drywall and therefore

25    wouldn't they have had the problem and therefore
```

1    felt bias against it.  What I was saying is we

2    interviewed, in each case study, four sales that did

3    not have Chinese drywall, so the confirmation bias

4    was in your favor.  I was only making a point that

5    in every case study, if we did five interviews, one

6    of them was with a Chinese drywall listing agent and

7    four of them were not.  If they had other

8    experience, then I wanted to know what that

9    experience was.  That was part of the survey.

10       Q.   Okay.  Moving on to different topic.  So you

11   said yesterday that originally the scope of your

12   work was going to be analysis of pre-remediation

13   diminution value and post-remediation diminution

14   value, correct?

15       A.   That was my understanding, yes.

16       Q.   Before you changed the scope of your work,

17   did you have preliminary findings for each?

18       A.   I did not.

19       Q.   Okay.  And then you said yesterday because

20   of time you decided to -- you could only do one of

21   the investigations; is that correct, analysis?

22       A.   I did -- I did advise the attorneys that to

23   develop the unremediated damage analysis was going

24   to require, materially, more time and they said, you

25   don't have any more time.

```
1        Q.    Okay.  So is it -- is my understanding

2   correct that you chose to focus on the

3   post-remediation diminution value analysis because

4   the pre-remediation analysis would take

5   substantially more time?

6        A.    You could say that, yes, or I couldn't do

7   both.

8        Q.    Okay.  To -- so were they going to take

9   about comparable time to one another?

10        A.    It probably would have taken an equal amount

11   of time to what I spent and, obviously, I was

12   concerned and I communicated to the attorneys that

13   it wasn't going to do any good to get half done with

14   both.  So they were going -- we were going to have

15   to, you know, pick one.

16        Q.    So why did you pick the post-remediation

17   analysis instead of the pre-remediation analysis?

18        A.    I didn't.  The attorneys told me what their

19   preference was for me to complete just the

20   post-remediation analysis.

21        Q.    And if you guys initially planned to do

22   both, how can you apply the post-remediation

23   analysis to the pre-remediation analysis that you

24   were previously going to do independently?

25        A.    I don't understand the question.
```

```
 1        Q.   So presumably you were doing both separately

 2    for a reason as opposed to combining them from the

 3    get go.  What was that reason?

 4        A.   Well, I don't know that when you say

 5    combining them or separately, I mean, it just would

 6    have required a completely different data set.

 7    Right?  I would have to develop all of the homes

 8    that sold pre-remediation and there is some

 9    additional complications there because some of the

10    homes that sold pre-remediation were foreclosures,

11    so there is a sale record in the database that

12    reflect as price, but that price is reflective of

13    the bank's outstanding note which includes interest.

14    There is a price that is not -- that price is not as

15    pristine, if you will, as a sale price.  It's not an

16    arm's lengths transaction.

17            There were many sales, as we started to

18    identify those control sales.  There were control

19    sales that were purchased by, I'll call them

20    speculators, builders, flippers, some even drywall

21    companies were buying these sales, you know,

22    pre-remediation at fairly deep discounts.

23            But then the question that we would have had

24    to be able to confirm in the time frame was how much

25    were they planning on spending, how expensive was
```

1    the drywall, what did the remediation reports say, I

2    mean there were so many factors that would have

3    needed to be considered to properly isolate that

4    damage, that it just would have required a lot more

5    time and a lot more data confirmation, digging, than

6    eight to 10 weeks of study would permit.

7        Q.   So you chose to just focus on the

8    post-remediation?

9        A.   As I testified, I didn't choose to, the

10   attorneys instructed me to.

11       Q.   Sorry.  There is no change to that.  And

12   given that, in the computations you just mentioned,

13   how are you are you able to extrapolate that 10

14   percent or build it into the pre-remediation damages

15   or -- for the people that have lost or sold their

16   home without remediating?

17       A.   I feel like you've asked me two questions

18   there.  Could I either get it read back or could you

19   ask me the question again?

20       Q.   Let me -- let me try to clean it up.

21            So the scope changed to just

22   post-remediation damages?

23       A.   Yes.

24       Q.   And initially you were just talking about

25   the complications with isolating pricing and

```
 1    determining the pre-remediation damages, correct?

 2        A.   Initially we were doing both.

 3        Q.   Yes.

 4        A.   Yes.

 5        Q.   And yesterday, I believe your testimony was

 6    that the 10 percent post-remediation damages is

 7    built into the pre-remediation damages?

 8        A.   That's right.  At the time that the Priority

 9    Claimants sold their home or lose it in foreclosure

10    or otherwise, the discount that they take on that

11    price is cumulative because the buyer that's buying

12    the property intends to buy it unremediated, expend

13    money, cost to cure, direct cost to cure, and have

14    to leave the property vacant during its remediation

15    time, i.e. loss of use, and then they reach a point

16    where they've cured the problem at additional cost,

17    and then they have to sell the property and they

18    know that when they sell the property they are going

19    to suffer some level of -- they are going to have to

20    disclose it and they may suffer some level of

21    post-remediation discount and they have to make a

22    profit, has to be an inventive for them there.  So

23    the combination of all those things, cumulatively,

24    is already included when the Priority Claimant

25    suffers a pre-remediation sale that's all ready
```

Case 2:09-md-02047-EEF-MBN Document 22380-55 Filed 11/19/19 Page 540 of 556
Case 2:14-cv-02722-MSG Document 29-1 Filed 05/15/2015 Page 368 of
384
Confidential - Subject to Further Confidentiality Review

1    implicit in there.

2      Q.   So if that's true, then why was the original

3    scope of the research to break up the two portions,

4    why calculate them separately?

5      A.   I didn't say I was going to calculate them

6    separately.  I said I was going to quantify them

7    separately but I would have had to acknowledge

8    within the pre-remediation analysis I would have to

9    acknowledge that -- I wouldn't have added the two

10   together.  In other words, I wouldn't have taken the

11   pre-remediated damage and then say oh, you know,

12   let's say I studied it and the overall range was 50

13   percent or 60 percent, right?  I wouldn't say oh

14   it's 60 percent plus 10 percent.  The 60 percent

15   would already include the 10 percent.

16     Q.   So can you apply post-remediation analysis

17   findings to pre-remediation because -- despite the

18   fact that pre-remediation analysis requires a

19   different data set?

20     A.   Yes, because the -- we -- by estimating the

21   value of the unimpaired home and applying that

22   post-remediation discount, what we're doing is

23   quantifying that piece that remains uncured by the

24   cost to cure.  So the cost to cure is one element

25   and that's in a separate track of this case, as I

```
 1    understand it.  The damage that you would suffer

 2    once cured is the damage and so those two taken

 3    together would represent the cumulative damages that

 4    the claimants suffered.

 5         Q.   Okay.  Can we go back to Exhibit 1, please.

 6         A.   Sure.

 7         Q.   On page 15 you're talking about price

 8    limitation?

 9         A.   Yes.

10         Q.   Can you read the paragraph that starts with

11    "notably," on that page?

12         A.   Yes.  "Notably the price segmentation is

13    heavily skewed towards case studies that developed

14    in the $750,000 range.  This overweighting of the

15    greater than 750,000 price segment resulted because

16    five of the seven case studies excluded from final

17    development fell within the other price ranges."

18         Q.   What are the risks of having such a skew?

19         A.   The risks are that of the 20 case studies

20    developed, the heavy percentage the $750,000 may,

21    depending on what the results are for those, may

22    have affected the overall percentages, you know, the

23    lower priced homes or the testing in the 300,000 to

24    750 price range home has less testing data points,

25    fewer testing data points.
```

```
1        Q.   And so the higher range could have a

2    different impact as opposed to the lower range; is

3    that correct?

4        A.   No.  We didn't see that.  I mean, that's

5    analyzed within the report, but if I had more data

6    within the 300,000 to $750,000 range, then I would

7    have more data to array to determine if price

8    segmentation had as big of an impact.

9        Q.   But if price segmentation was skewed

10   further, it potentially could skew your results?

11       A.   No, I'm not saying that it skews the

12   results.  I used the word skewed to say that the

13   price segmentation is heavily weighted or -- I used

14   the word skewed but I didn't mean it to skew results

15   or to give me bad results.  I used it to mean, to

16   demonstrate that the price segmentation was heavily

17   weighted towards properties in the plus $750,000

18   range.

19            I mean, it's also heavily weighted toward

20   those in the 150 to $300,000 range.  All I'm saying

21   is it's not an evenly distributed sample by price

22   segmentation.

23       Q.   Sure.

24       A.   Probably a better way for me to have said

25   it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 543 of 556
Case 1:91-cv-02384-CIC Document 2gg - Entered on FLSD Docket 08/15/2013 Page 371 of
384

Confidential – Subject to Further Confidentiality Review

1        Q.    Would you turn to page 16?

2        A.    Sure.

3        Q.    Where you say 12 -- 60 percent of the 20

4    case studies fall within the median home price

5    averages.  What do you mean by that?

6        A.    I mean that of the 20 case studies, 12 of

7    those case studies occurred within the median home

8    price average within the respective time frame.

9        Q.    So what is the median home price average, is

10   that the line on the graph above it?

11       A.    It is.

12       Q.    Okay.  Can you just do me a favor and tell

13   me what you think the -- that graph shows for 2010

14   what the price is for a median home price average,

15   just looking at it.  You can eyeball it.

16       A.    I would be forced to eyeball it.  The

17   details on the graph, I mean, if you change this

18   median home price over a shorter time frame, you

19   know, you can obviously see the clear delineations,

20   if you were to draw a line -- you said 2010?

21       Q.    Yes.

22       A.    If you were to draw a line from 2010

23   straight across, that number is something less than

24   $143,000, if I'm eyeballing it, I would say 125 or

25   130,000.

```
 1       Q.   And for 2011?

 2       A.   Something less than 2010 at the end of 2011,

 3   maybe something in the $100,000 price range.

 4       Q.   And 2012?  I'm sorry, let me give it back to

 5   you, in 2010 you said 125 to 130, 2011, 100K, make

 6   it easier for you.

 7       A.   Thank you, I appreciate it.  2013 you said?

 8       Q.   Sorry, 2012.

 9       A.   2012.  I would put back into the 125 to 130

10   category.

11       Q.   Okay.  2013?

12       A.   140.

13       Q.   2014?

14       A.   Again, something between 143 to 189, I'll

15   call it 152.

16       Q.   2015?

17       A.   160.

18       Q.   2016?

19       A.   One -- something less than 189, 180.

20       Q.   2017?

21       A.   200.

22       Q.   Looks to me like it's right on the 189.  Is

23   that --

24       A.   This is 2017?

25       Q.   Yes.
```

```
1        A.    Okay.  I think -- it's approximation.  Let's
2    say 190.
3        Q.    Okay.  So looking at that, if you can turn
4    to your chart on page 17, the next page.
5        A.    Okay.
6        Q.    So Broward 1, sold for one million, so
7    that's well above the median price for any year.
8        A.    Yeah.
9        Q.    Broward 10 sold for 390 in 2017.  That's
10   also well above, correct?
11       A.    Yes.
12       Q.    Same for Broward 2, which sold for 855, and
13   Broward 3 which sold for 814.
14       A.    Okay.
15       Q.    Broward 5 also sold for 585, which is also
16   above any year.
17       A.    Agreed.  Agreed.
18       Q.    So for -- let's see here.  It is FM20, it
19   sold for 110 in 2010.  So that is below the median,
20   correct?
21       A.    Yes.
22       Q.    And FM21 sold for 115 in 2010, which is also
23   below the median; is that correct?
24       A.    Yes.
25       Q.    FM22 sold for 148 in 2013, which is above
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 546 of 556
Case 1:11-cv-22408-MGC Document 1-1 Entered on FLSD Docket 06/15/2011 Page 374 of
384
Confidential - Subject to Further Confidentiality Review

```
 1   the median; is that correct?

 2       A.   148 is --

 3       Q.   You said 140K, so that's $8,000 over?

 4       A.   I'm sorry, we're on FM23?

 5       Q.   22.

 6       A.   22 is 148 and -- in November 2013 and, I

 7   think, I said 152 was the median.

 8       Q.   You said that for 2014.  For 2013 you said

 9   it was 140.

10       A.   No.  I think we said -- I'm sorry.  I

11   apologize.  I'd have to go back and look.  I made my

12   notes here.  I have 2010 at 125 to 130, 2011 at 100,

13   2012 at 140, 2013 at 152.

14       Q.   So you said 2012 was back to 125, 130; 2013,

15   140; 2014, 152; 2015,160; 2016, 180; 2017,190.

16       A.   Okay.  I'd have to go back and look at that.

17   That's -- I agree with you, I may have missed a

18   number here.  Okay.  So let's acknowledge that we'll

19   take that at slightly below the median.

20       Q.   Slightly above, correct?

21       A.   I mean slightly above the median, yes.

22       Q.   Okay.  And then FM23 sold for 159,650 in

23   2014, which is also above the median; is that

24   correct, of 152?

25       A.   I thought that was the one we were talking
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 547 of 556
Case 1:14-cv-22692-MGC Document 291 Entered on FLSD Docket 08/15/2016 Page 375 of
384
Confidential - Subject to Further Confidentiality Review

1    about but okay, yes.

2       Q.   And then so Hialeah -- I probably butchered

3    that name.

4       A.   It's all right.  It's Hialeah, but that's

5    fine.

6       Q.   Sold for 233 in 2017, which is well above

7    the median, because 2017 was 190, so that's 43,000?

8       A.   Yeah.

9       Q.   Likewise, the next one, Miami-Dade 1, sold

10   for 276, which is above any median we had, and

11   Miami-Dade 2 is 210, which is also above any median

12   we had.  Boca 1 was 1.2 million, also above.  Boca 2

13   was 940,000, which is also above.  And PSL Number 6

14   is 228, which is also above any median we had.

15   Stewart 1 is 333,500, which is also above any median

16   we had.  Tampa 12 sold for 179 in 2016.  That is

17   actually, according to what we just agreed on, at

18   the median.

19      A.   Below.

20      Q.   Below?

21      A.   I had it at 180.

22      Q.   So that's okay.  Just note that.  Sorry, one

23   second here.  Change my notes.  Okay on that one.

24           And then so the next two in Tampa 25 and 26

25   are well below the median for both those years.

Confidential - Subject to Further Confidentiality Review

1    Tampa 27 in 2012 is also per the measure below.

2         So if we count those all up, you're at a

3    below median in one, two, three, four, five, six out

4    of the 20 and the rest are above the median, is that

5    correct?

6    A.   For the entire state of Florida, that's

7    correct.

8    Q.   Okay.  But on the previous page you say that

9    12 out of the 20 fall within the median home price

10   averages?

11   A.   Yes.

12   Q.   But we just did the math here and it looks

13   like it's only six, can you explain the difference?

14   A.   Sure.  What I should do, is I should array

15   the median home price averages by county or by a

16   smaller geography, because, obviously, the entire

17   state of Florida median home price averages

18   incorporate a lot of areas that are much more lower

19   value than Miami-Dade or Broward.  So --

20   Q.   Sure.

21   A.   I included this chart and then I said --

22   then I classified this against the median home price

23   averages and I think going back and clarifying which

24   home price average, whether it's throughout the

25   state of Florida, will be important but I

1    acknowledge that based on your analysis here, it's

2    six of the 20 if we're talking about the Florida

3    median home price average of $222,000.

4        Q.   That's the chart, the Florida one is what

5    you included in your report so that's presumably

6    what this sentence is referring to; is that correct?

7        A.   I agree that you could read it that way,

8    yes, but I would tend to look at these on a more

9    discrete basis, on a countywide basis, and probably

10   include this chart but include the other charts that

11   relate to the areas, because the most important

12   element, obviously, is whether the prices are

13   typical within the area.

14       Q.   Sure but the report as written does not

15   include those and so any reader would have to assume

16   that you're referring to the chart that you did

17   include in the report?

18       A.   I concede that, yes.

19       Q.   Okay.

20           MR. GUERRA:  I don't have any other

21       questions.

22           MR. POYER:  Before you end your line of

23       questioning, can we go off the record for five

24       minutes?

25           THE VIDEOGRAPHER:  Off record, 11:37.

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 550 of 556
Case 1:11-cv-22408-MGC Document 241 Entered on FLSD Docket 08/15/2013 Page 378 of
384
Confidential – Subject to Further Confidentiality Review

```
 1              (Recess from 11:37 a.m. until 11:43 a.m.)

 2          THE VIDEOGRAPHER:  On record, 11:43.

 3      BY MR. GUERRA:

 4      Q.   Mr. Graziano, I just have one more line of

 5      questioning.

 6      A.   Okay.

 7      Q.   How many hours have you spent so far working

 8      on your report?

 9      A.   I would have to look at my time records.

10      It's over 100, 130, 140 hours, something in that

11      neighborhood.

12      Q.   And what is your hourly rate?

13      A.   $400 per hour.

14      Q.   And I believe you said yesterday among your

15      associates, that they had spent approximately 200

16      hours working on this report?

17      A.   Sounds about right.

18      Q.   What is their hourly rate?

19      A.   It ranges from, I think, $100 to $350 an

20      hour.  Okay.

21          MR. GUERRA:  No further questions.

22          MR. BLOCK:  Just before we go off, just to

23      reiterate -- we don't need this on the video.

24          THE VIDEOGRAPHER:  Off record, 11:44.

25          THE WITNESS:  Thank you very much.
```

```
 1              (Whereupon, the deposition concluded at

 2    11:44 a.m.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2          I, SUSAN D. WASILEWSKI, Registered

 3     Professional Reporter, Certified Realtime Reporter

 4     and Certified Realtime Captioner, do hereby certify

 5     that, pursuant to notice, the deposition of ANTHONY

 6     GRAZIANO was duly taken on Tuesday, March 19, 2019

 7     at 9:05 a.m. before me.

 8          The said ANTHONY GRAZIANO was duly sworn by

 9     me according to law to tell the truth, the whole

10     truth and nothing but the truth and thereupon did

11     testify as set forth in the above transcript of

12     testimony.  The testimony was taken down

13     stenographically by me.  I do further certify that

14     the above deposition is full, complete, and a true

15     record of all the testimony given by the said

16     witness, and that a review of the transcript was

17     requested.

18

19     _____

20     Susan D. Wasilewski, RPR, CRR, CCP

21     (The foregoing certification of this transcript does

22     not apply to any reproduction of the same by any

23     means, unless under the direct control and/or

24     supervision of the certifying reporter.)

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 553 of 556
Case 2:11-cv-02349-MCE-DB Document 29-1 Entered on FLSD Docket 08/15/2013 Page 381 of
384

Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should

 6     state the reason in the appropriate space on the

 7     errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your

11     deposition.

12

13          It is imperative that you return the

14     original errata sheet to the deposing attorney

15     within thirty (30) days of receipt of the deposition

16     transcript by you.  If you fail to do so, the

17     deposition transcript may be deemed to be accurate

18     and may be used in court.

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
1                    - - - - - -

2                  E R R A T A

3                   VOLUME 2

4    PAGE    LINE    CHANGE

5    _____   _____   _____

6       REASON: _____

7    _____   _____   _____

8       REASON: _____

9    _____   _____   _____

10      REASON: _____

11   _____   _____   _____

12      REASON: _____

13   _____   _____   _____

14      REASON: _____

15   _____   _____   _____

16      REASON: _____

17   _____   _____   _____

18      REASON: _____

19   _____   _____   _____

20      REASON: _____

21   _____   _____   _____

22      REASON: _____

23   _____   _____   _____

24      REASON: _____

25
```

Case 2:09-md-02047-EEF-MBN Document 22380-55 Filed 11/19/19 Page 555 of 556
Case 2:14-cv-02722-MCE Document 291-1 Entered on FLSD Docket 09/15/2017 Page 583 of
384

Confidential - Subject to Further Confidentiality Review

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, _____, do hereby

 4    acknowledge that I have read the foregoing pages,

 5    282 through 381, and that the same is a correct

 6    transcription of the answers given by me to the

 7    questions therein propounded, except for the

 8    corrections or changes in form or substance, if any,

 9    noted in the attached Errata Sheet.

10

11

12    _____          _____

13    ANTHONY GRAZIANO                              DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    ____ day of _____, 20___.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-55 Filed 11/19/19 Page 556 of 556
Case 2:14-cv-02484-CED Document 22-1 Entered on FLSD Docket 09/15/2015 Page 384 of
384

Confidential - Subject to further confidentiality Review

```
 1                        LAWYER'S NOTES

 2        PAGE     LINE

 3        _____    _____    _____

 4        _____    _____    _____

 5        _____    _____    _____

 6        _____    _____    _____

 7        _____    _____    _____

 8        _____    _____    _____

 9        _____    _____    _____

10        _____    _____    _____

11        _____    _____    _____

12        _____    _____    _____

13        _____    _____    _____

14        _____    _____    _____

15        _____    _____    _____

16        _____    _____    _____

17        _____    _____    _____

18        _____    _____    _____

19        _____    _____    _____

20        _____    _____    _____

21        _____    _____    _____

22        _____    _____    _____

23        _____    _____    _____

24        _____    _____    _____

25
```