# EXHIBIT 38

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **EDUARDO AND CARMEN AMORIN,** *et al.*, **individually, and on behalf of all others similarly situated,** | |
| **Plaintiffs,** | **Case No. 1:11-CV-22408-MGC** |
| **v.** | |
| **TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD.,** *et al.*, | |
| **Defendants.** | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR
## SUMMARY JUDGMENT ON NON-FORMULA DAMAGES

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................1

II.    RELEVANT PROCEDURAL BACKGROUND ...........................................3

    A.    Background of the Proceedings in the MDL................................3

    B.    Proceedings in this Court. ..............................................................6

III.   RELEVANT FACTUAL BACKGROUND ...................................................7

IV.   DEFENDANTS' SUMMARY JUDGMENT MOTION AS
     TO "OTHER DAMAGES" SHOULD BE DENIED....................................13

    A.    Summary Judgment Standard. ........................................................13

    B.    All Plaintiffs Have Produced Evidence of Their Damages. ..................13

          1.    Cost of Remediation.................................................14
          2.    Diminution in Value/Stigma/Lost Equity. ..............................15
          3.    Alternate or Alternative Living Expenses. ..............................19
          4.    Personal Property.....................................................20
          5.    Loss of Use and Enjoyment. .....................................23

    C.    Facts Determined in this Litigation Along with Other
        Record Evidence Supports the Imposition of Punitive Damages. ..........24

    D.    It is Premature to Assess Plaintiffs Who Received a Negative
        Product ID Recommendation from the Special Master.........................27

V.    DEFENDANTS' ATTEMPT TO RELITIGATE LIABILITY
     SHOULD BE REJECTED OUT OF HAND..................................................27

    A.    Breach of Express and/or Implied Warranties (Count IV) ...................28

    B.    Private Nuisance (Count VII). ...........................................................30

    C.    Unjust Enrichment (Count VIII).........................................................31

    D.    Misrepresentation and Concealment...................................................32

VI.   CONCLUSION ...........................................................................................32

## I.  <u>**INTRODUCTION**</u>

Contrary to the picture painted by Defendants in their Motion for Summary Judgment on Non-Formula Damages,[1] an extensive factual record has been developed over the course of this ten-plus year-old *Chinese Drywall* litigation. Judge Fallon held several evidentiary hearings and issued extensive findings of facts and conclusions of law establishing that Defendants' toxic drywall causes extensive damages to homeowners who had the bad fortune of having that drywall in their homes. Plaintiffs submitted substantial documentation of their ever-accruing damages, and after this Court entered its Omnibus Order Regarding Trial Plan ("Trial Plan") (ECF No. 112), the Priority Claimants answered discovery, produced voluminous evidence of their damages, sat for depositions to answer detailed questioning about their damages, and produced expert reports summarizing their damages.[2] It is unquestionable that Plaintiffs have been damaged, and the evidence produced in this case raises a genuine issue of material fact as to the amount of those damages.

This Court adopted <u>**all**</u> of Judge Fallon's findings of facts and conclusions of law. Those rulings set forth unambiguously the harm that defective Chinese drywall causes. Defendants suggest they are being treated unfairly because the history of their misconduct has been the hallmark of this litigation dating back to the case's origins. However, often lost in the discussion of Defendants' misconduct is the fact that the wrongdoing at issue in the litigation – *i.e.*, the sale and distribution of defective off-gassing high-sulfur drywall for installation in people's homes – is horrific and causes extensive financial and emotional damage to Plaintiffs. But, that fact, is made clear by the extensive findings of fact and conclusions of law entered by Judge Fallon and adopted by the Court.

Judge Fallon made clear that unlike a typical class action where the issue of causation may need to be litigated even after a determination of liability (*i.e.*, did the wrongdoing cause the harm), Chinese drywall is unique because causation is settled – if you had defective Chinese drywall in your home, it unquestionably *caused* a specific set of damages that resulted from the corrosive environment. *See, e.g.*, *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627, at *6-8, 14 (E.D. La. Apr. 21, 2017); *In re Chinese-Manufactured Drywall*

---

[1] Defs.' Mot. and Mem. for Summary Judgment on Non-Formula Damages (ECF No. 245) ("Defs.' SJ Mot.").
[2] Evidence of damages is presented in Plaintiffs' Statement of Material Facts in Opposition to Defs.' SJ Mot. ("Statement of Facts" or "SOF"), filed herewith.

*Prod. Liab. Litig.*, 706 F.Supp.2d 655, 664-66 (E.D.La. 2010) (*Germano* FOFCOL). In fact, the presence of a corrosive environment is a determining factor as to whether a home contained defective Chinese drywall. *See Chinese Drywall*, 706 F.Supp.2d at 672-73. This is what led to Judge Fallon's rulings that liability and causation were conclusively established and that "the only remaining issue is the amount of the [damages] award." (ECF No. 112). Because there was no reason to litigate settled matters, this Court entered a dual track approach to address only damages – one track for remediation damages and one track for other non-formula damages ("other damages"). Notably, the Court did this over Defendants' objection that they were entitled to fully litigate liability and causation despite the fact they were in default.[3]

Yet, having been limited to challenging only the quantum of Plaintiffs' damages, Defendants' Motion attacks liability and causation, once again looking to *de facto* vacate the defaults.[4] Despite the fact that the purpose of a summary judgment motion is to test whether Plaintiffs have adduced sufficient evidence to create a genuine issue of material fact, Defendants do little to combat Plaintiffs' evidence beyond attacking its credibility, an inappropriate consideration at the Summary Judgment phase. *See, e.g., Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir.1986) (credibility issues require resolution by trier of fact). As Judge Fallon specifically found, the damages incurred by homeowners with defective Chinese drywall include (1) complete remediation (under the *Germano* protocol),[5] (2) diminution in value, (3) alternate living expenses, (4) costs associated with foreclosures and/or bankruptcy, (5) additional amounts owed due to mortgage deferral, (6) bankruptcy or inability to refinance, (7) loss of income, and (8) loss of use and enjoyment. *See Chinese Drywall*, 706 F.Supp.2d at 691-93. Plaintiffs have produced evidence to support damages in these categories. In addition, even though Defendants' liability for punitive damages is presumably established by their default, there are sufficient facts in the record from which a reasonable fact-finder could conclude that Defendants acted with an intentional or reckless disregard for the safety of consumers purchasing their products and installing them in their homes.[6]

---

[3] *See, e.g.*, Defendants' Trial Plan Proposal (ECF No. 53) at 9 ("This plan provides for non-bifurcated complete discovery followed by an initial set of trials."); Trial Plan at 1 (Defendants' trial plan seeks "to reopen discovery into liability and causation").

[4] *See, e.g.*, Defs.' SJ Mot. at 3-4, 22-29.

[5] Pursuant to Trial Plan, Plaintiffs' remediation damages are being calculated by the Special Master.

[6] *See* Section V (C), *infra*, at 24.

Beyond attempting to do an end-run around the defaults and attack the credibility of Plaintiffs' evidence, Defendants' Summary Judgment Motion raises numerous challenges to the measure of damages. If Defendants were to be believed, every Plaintiff would be left with no avenue to be made whole for the extensive financial and emotional damage caused by Defendants' defective products beyond the cost to repair their ruined home or the diminished value of the home if that amount is less than the cost to repair.[7] That is not the law of Florida. Much like Virginia law applied by Judge Fallon in *Germano*, Florida law provides that "[a] proper damages calculation will 'place the plaintiff in the same financial position [ ] that [it] occupied before the property was damaged.'" *Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, 2015 WL 3905018, at *26 (S.D.Fla. Jun. 25, 2015) (quoting *Ocean Elec. Co. v. Hughes Labs., Inc.*, 636 So.2d 112, 114 (Fla.3d DCA 1994)) (alteration in original). Defendants' approach seeks to leave Plaintiffs empty-handed for most of their damages.

For these reasons, Defendants' Summary Judgment Motion should be denied.

## II.   RELEVANT PROCEDURAL BACKGROUND

### A.   Background of the Proceedings in the MDL.

After the devastation of Hurricanes Katrina and Rita along the Gulf Coast in 2005, and as a result of a housing boom, there was a shortage of drywall available domestically. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627, at *1 (E.D. La. Apr. 21, 2017). This created an opportunity for foreign manufacturers to sell their drywall to American customers. *See id.* In response to the increased demand, from 2005-2008, Taishan exported at least 86 million square feet of Chinese drywall to the U.S. for installation in homes and condominiums. *See, generally, In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F.Supp.2d 819 (E.D. La. 2012), *aff'd*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

Unfortunately for these property owners, some drywall imported from China was defective because it emits corrosive sulfur gases that create a toxic environment. *See Chinese Drywall*, 2017 WL 1421627, at *1. When the defects of Chinese drywall started to become apparent, homeowners began to file suit in various state and federal courts against the manufacturers and their parent entities, as well as homebuilders, developers, installers, suppliers, importers, exporters, and distributors in the Chinese drywall supply chain. *See id.*

---

[7] *See* Defs.' SJ Mot. at 10.

The defective Chinese drywall at issue was predominately manufactured by two groups of defendants: (1) Knauf entities, and (2) Taishan entities. *See id.* On June 15, 2009, all federal cases involving Chinese drywall were consolidated in MDL 2047,[8] where the cases proceeded for nine years prior to their remand to this Court on June 7, 2018.[9]

The litigation against Knauf proceeded in a relatively uneventful fashion. In early 2010, Judge Fallon presided over a bellwether trial against Knauf (the *Hernandez* case). *See id.* From that trial, Judge Fallon issued detailed Findings of Fact and Conclusions of Law and entered a judgment in favor of the Plaintiff. *See id.* Using the remediation protocol formulated in the *Hernandez* trial as a starting point, Knauf entered into a pilot remediation program, later expanded to include all Plaintiffs with Knauf drywall. *See id.* at *2. On December 20, 2011, Knauf entered into a class settlement designed to resolve all Knauf-related, Chinese drywall claims.[10] *See id.* Over 3,000 homes containing Knauf drywall were remediated. *See id.*

The litigation against the Taishan entities took a vastly different course because of the dilatory decisions made by Defendants. Defendants' misconduct began in 2009, when Taishan and its parent companies, CNBM and BNBM, orchestrated a plan to ignore the lawsuits against them and allow default judgments to be entered. They determined that willful default was the best strategy for handling this litigation because: responding to the lawsuits would incur a large amount of attorneys' fees; there is no judicial treaty signed between China and the U.S. on mutual recognition and enforcement of court judgments; Taishan and BNBM do not have assets within the continental U.S.; and even if the lawsuits were lost, the U.S. courts cannot execute on Defendants' assets in China.[11]

While Defendants sat on the sidelines in China for a year, the Court proceeded with a bellwether trial (the *Germano* case). *See Chinese Drywall*, 2017 WL 1421627, at *3. Plaintiffs presented evidence specific to seven properties. Following the hearing, Judge Fallon issued detailed Findings of Fact & Conclusions of Law. *See id.*; *see also Chinese Drywall*, 706

---

[8] *In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* 626 F.Supp.2d 1346 (J.P.M.L. 2009).
[9] Florida Remand Order (ECF No. 13).
[10] In addition to the Knauf Settlement Agreement, hundreds of defendants in the chain-of-commerce with Knauf entered into class settlements, the effect of which settled almost all of the Knauf litigation.
[11] *See* Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan, May 11, 2009 (ECF No. 64-3).

F.Supp.2d 655. In May 2010, a final default judgment was entered against Taishan in *Germano* in the amount of $2,609,129.99. *See Chinese Drywall*, 2017 WL 1421627, at *3.

When the $2.6 million judgment in *Germano* was entered, Defendants arranged for Taishan to enter an appearance in the MDL on the last day to appeal the *Germano* judgment, but *solely* to contest jurisdiction and open the default. *See id.* at *3-4. In doing so, Taishan claimed falsely that "it did not respond because it did not understand the significance of [the lawsuits] and it was ignorant of the U.S. legal system." *See Chinese Drywall*, 894 F.Supp.2d at 863. Not only was Taishan aware of this litigation since even before the MDL was formed, but it was "inclined not to respond,"[12] and was guided in its decisions by American counsel.[13]

Two years later, following significant discovery, including a week of depositions in Hong Kong personally overseen by Judge Fallon, and extensive briefing and oral argument, Judge Fallon issued a comprehensive jurisdictional opinion addressing Taishan's targeting of U.S. customers for sales of its drywall. *See id.* at 881-82. Judge Fallon refused to vacate the default judgments against Taishan and determined that it was subject to the Court's jurisdiction under Louisiana, Virginia, and Florida law. *Id.* These rulings were upheld on appeal two years later by two different panels of the Fifth Circuit Court of Appeals. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

Faced with having to pay the *Germano* judgment, Defendants devised a plan for Taishan to fire its counsel of record in the MDL and refuse to appear in open court for a judgment debtor examination. *See Chinese Drywall*, 2017 WL 1421627, at *4. Such blatant disrespect for the decorum of our courts resulted in a civil and criminal contempt order against Taishan on July 17, 2014. *Id.* Judge Fallon ordered Taishan to pay a fine and attorneys' fees and enjoined Taishan and its affiliates from conducting any business in the U.S. until Taishan returned to the jurisdiction to participate in these judicial proceedings. *Id.*

During the period of contempt and deliberate absence from the jurisdiction, Plaintiffs filed a Motion for Class Certification pursuant to Rule 23(b)(3). *Id.* On September 26, 2014, Judge Fallon certified the *Amorin* class of homeowners with defective drywall manufactured by the Taishan Defendants. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2014 WL

---

[12] Taishan Informational Report (ECF No. 64-3 at TG-0208430).
[13] "The Course of Events on Hiring Law Firms for the Gypsum Board Litigation in the United States" (ECF No. 99-1 at BNBMPLC-E-0059967).

4809520 (E.D.La. Sept. 24, 2014) ("Class Certification FOFCOL"). Judge Fallon scheduled a hearing to determine class damages. *See Chinese Drywall*, 2017 WL 1421627, at *5.

On the day of the class damages hearing in February 2015, BNBM appeared for the first time and requested a continuance, which was granted. *See id.* Shortly thereafter, Taishan returned to the litigation and paid the *Germano* judgment, plus fines. *Id.* Upon their return, Defendants fought hard to reopen every issue that was decided in their absence – seeking to challenge jurisdiction, decertify the *Amorin* class, and avoid a class damages verdict. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629 (E.D. La. Jan. 2, 2018).

On June 9, 2015, the MDL Court oversaw the class damages hearing. *See Chinese Drywall*, 2017 WL 1421627, at *5. Following extensive pretrial briefing and *Daubert* motions, Plaintiffs presented evidence of class remediation damages, which Defendants vigorously contested. *Id.* After a failed attempt at mediation in 2016, Judge Fallon issued "Findings of Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing" ("Class Damages FOFCOL") on April 21, 2017. *Id.* Prior to remanding the Florida *Amorin* cases, Judge Fallon denied Defendants' motions to decertify the *Amorin* class[14] and vacate the default judgments against them. *Chinese Drywall*, 2018 WL 279629, at *8. In denying the motion to vacate, Judge Fallon lamented the fact that "delay tactics have permeated every aspect of Defendants' litigation strategy: from their initial failure to appear to their now perpetual motions to re-litigate settled matters." *Id.* On March 17, 2018, Judge Fallon issued a Suggestion of Remand, Opinion & Order for approximately 1,700 Florida *Amorin* Plaintiffs.[15]

### B. Proceedings in this Court.

Upon remand, this Court ordered the parties to propose a plan for resolution of the pending claims. The parties submitted competing trial plans,[16] BNBM argued it was not in default and entitled to litigate issues of liability and causation,[17] and Taishan and BNBM sought to have the Court reject the remediation damages formula. The Court requested briefing on the deference to be afforded to Judge Fallon's rulings in the MDL.[18]

---

[14] *See* Order & Reasons dated 4/21/2017 [MDL Rec. Doc. 20740].
[15] MDL Rec. Doc. 21242.
[16] *See, e.g.,* ECF Nos. 52, 53, 64, 65, 69 & 71; *see also* ECF No. 112 at 1.
[17] *See, e.g.,* ECF No. 67; *see also* ECF No. 112 at 1
[18] *See* ECF No. 91; *see also* ECF No. 112 at 2.

On November 16, 2018, the Court issued its Trial Plan adopting all of Judge Fallon's "finding of facts and conclusions of law." (ECF No. 112 at 3). The Court found that Judge Fallon's decisions were "well-reasoned and well-supported by the evidentiary record" and made clear it would "not revisit any of his rulings absent a compelling showing of an intervening change in law and fact." *Id*. The Court specifically noted that Defendants "have been held in default"; "Defendants constitute a single business enterprise for purposes of piercing the corporate veil and holding each of the defendants – including BNBM – liable for the conduct of their affiliated entities"; "Class certification was appropriate"; "Liability has been conclusively established as to all defendants and the only remaining issue is the amount of the award"; and "The remediation formula represents a reasonable and reliable measure of the remediation damages which the Court will properly apply to determine the appropriate amount of property damages." *Id*. The Court established two tracks for resolution – one for property damages and the other for "other damages" including, alternate living expenses, loss of use and enjoyment, lost rent, bankruptcy, foreclosure and short sale. *Id*. at 6-9.

Since that time, the parties have worked diligently to execute the Court's Trial Plan. The current Summary Judgment Motion relates to the track for "other damages" (none of the Priority Claimants are asserting personal injury claims). Plaintiffs identified twenty (20) "Priority Claimants," who responded to interrogatories, sat for depositions and exchanged expert discovery. Mediation is scheduled for May 22-23, 2019.[19] Trial is scheduled to begin on "other damages" on July 22, 2019 (ECF No. 112 at 11).

## III.  RELEVANT FACTUAL BACKGROUND

Drywall is a widely used construction material, also known as gypsum board, wallboard, plasterboard, sheetrock, and Gyproc; that is composed of a layer of hardened gypsum plaster sandwiched between two layers of paper liner. *Chinese Drywall*, 706 F.Supp.2d at 660. Gypsum used to make drywall can be created naturally and synthetically and if being made synthetically, the amount and types of trace materials and unreacted sorbents found in the source material can vary among power plants and among mines from which it originates.[20] *Id*. Defective Chinese drywall differs from normal drywall in that, among other things:

---

[19] ECF No. 235.
[20] *See Chinese Drywall*, 706 F.Supp.2d at 660-61 (detailed description of drywall manufacturing that is unnecessary for purposes of resolving the instant motion).

- It has a significantly higher average concentration of strontium and significantly more detectable levels of elemental sulfur.

- Chinese drywall releases reduced sulfur gases.

- The sulfur gases released by Chinese drywall are irritating to the human body. Exposed individuals reported irritation of the eyes, respiratory system, and skin.

- The sulfur gases released by Chinese drywall cause offending odors in homes, making them hard if not impossible to live in.

- The sulfur gases released by Chinese drywall are corrosive to metals, particularly copper and silver. "Corrosion" is defined by the ASTM as the chemical or electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the materials and its properties. Copper and silver metal components in the Plaintiffs' houses are extremely vulnerable to corrosion from exposure to the sulfur gases. The sulfur gases, in reacting with metals, form sulfide deposits on the surfaces of the metals.

- The corrosion on metals caused by the sulfur gases emitted by Chinese drywall causes premature failure of electrical & mechanical devices.

- The corrosion on metals caused by the sulfur gases emitted by Chinese drywall poses a fire risk. The corrosion increases resistance in the circuitry of appliances and electronics. Increased resistance increases heat in appliances and electronics. This increased resistance can cause excessive heating of the connection when energized. Complete failure of a switch can lead to fires or other life safety problems, depending on the intended function of the switch.

*See id*. at 663-666. The pervasive corrosive environment created by defective Chinese drywall has been universally accepted, including by the Consumer Products Safety Commission and the Florida Division of Health Standards. *Id*. at 666-67. All of the Priority Claimants reported some or all of these problems. SOF at ¶ 60, Exs. A-1 through A-36.

Judge Fallon issued a specific protocol to efficiently remediate a Chinese drywall home in the most cost-effective manner. For example, "[t]he scientific evidence demonstrated that corrosion has damaged most components that contain copper and silver"; "[t]he practical evidence demonstrated that selective removal of only [Chinese drywall] is not feasible or cost-effective in this case"; "[t]he practical evidence further revealed that attempting to gently remove, store and clean or protect carpet, cabinetry or flooring is not feasible or cost-effective"; and "[t]he practical evidence also indicates that items such as trim work and base boards will likely be ruined or extensively damaged when the drywall is removed." *Chinese Drywall*, 706 F.Supp.2d at 671. Even Defendants concede that "drywall is defective and must be removed and the property remediated." *Chinese Drywall*, 2017 WL 1421627, at *15.

At the time they were injured and seeking to remediate, all of the Plaintiffs were entitled to replace all of the drywall, all electrical wires, all copper pipes, the HVAC units, carpets, hardwood or vinyl flooring, cabinets, countertops, trim and molding, bathroom fixtures, insulation, and broken tiles, and have the house cleaned with a HEPA vacuum, and a certification provided. *Chinese Drywall*, 706 F.Supp.2d at 671-686. To the extent someone has done less than this level of remediation (likely because they could not afford it), they have not been made whole. *Id.* at 693 (discussing what is required to make Plaintiffs whole).

In addition, Plaintiffs with Chinese drywall in their homes have been injured because their homes may have decreased in value even after the repairs were completed. *Id.* at 691. They will incur alternate living expenses during the remediation and could incur "costs associated with foreclosures and/or bankruptcy, additional amounts owed due to mortgage deferral, bankruptcy or inability to refinance, and loss of income." *Id.* at 691-92. Further, Plaintiffs are "entitled to recover damages for loss of use and enjoyment of a residential property." *Id.* Loss of use and enjoyment could include "past and future displacement from the home, exposure to obnoxious gases, failures of electrical equipment, increase risk of electric failure and fire, and total loss of enjoyment of the home." *Id.* at 693.

Here, through discovery, Plaintiffs have submitted voluminous documentation (*e.g.*, receipts, invoices, cancelled checks, leases, etc.) of their damages including alternate living expenses, diminution in value, damage to personal property, lost rent, and bankruptcy and/or foreclosure. SOF at ¶¶ 58-60. Detailed evidence of Plaintiffs' damages was produced to Defendants *via* the BrownGreer portal, Plaintiff Profile Forms and Supplemental Profile Forms, and through deposition testimony. Further, Plaintiffs' damages were presented to Defendants in summary form, in part, through Plaintiffs' expert, Mr. Michael Elkin, CPA. SOF at ¶¶ 33-34, 58. In the event the Court disregards Mr. Elkin's expert testimony,[21] Plaintiffs seek to submit the summaries attached to Mr. Elkin's report pursuant to Rule 1006. SOF at ¶¶ 58. The evidence of damages exists as Defendants do not dispute that the report accurately summarizes the information contained in the documents upon which the summaries are based. Plaintiffs have responded to interrogatories regarding damages and testified at length regarding their damages and the documents they submitted in support of

---

[21] Defendants moved to strike Mr. Elkin's expert report (ECF No. 248), and Plaintiffs have opposed that motion.

those damages. SOF at ¶60. Most poignant has been the testimony regarding the toll the Chinese drywall and the delays in the Chinese drywall litigation (*i.e.*, Defendants' delays) have had on these Plaintiffs. SOF at ¶¶ 60, Exs. A-1 through A-36. To illustrate, a few examples are provided:

- **William Foster**: "For 12 years now we've been dealing with Chinese drywall. We're in our 60s. That's a sixth of our life we have had to deal with Chinese drywall, and nothing's been done. We've been married 21 years. Over 50 percent of our married life we have been dealing with Chinese drywall. Of the 21 years, almost seven years, or a third of our life, we have been separated. We couldn't be together because I had to go somewhere and work to pay for Chinese drywall. And during this whole time, we had to sit there and watch what -- we moved stuff out of our house to try to live somewhere and watch all of your neighbors get -- not all of them, many of them, excuse me -- get their house taken care of by Knauf in 2010 and 2011. And we went eight and nine years with nothing being done for us. And it's a travesty. It's a travesty is what's happened."

- **Vicki Foster**: "This was our home. This was our sanctuary. This is where we wanted to retire and be together for the rest of your lives and enjoy life after working all of our life, and that was taken away from us."

- **Candace Gody**: "This toxic Chinese drywall situation" "has taken over so much. This is one-seventh of my life I have been dealing with this. I am 71 years old, and I had to deal with all this."

- **Dailyn Martinez**: "[T]here's no money in the world that -- the nine years that I have passed that my family and I have suffered because of all of this problem. I'm a Cuban. I came in a boat, in a raft three days in the water with the -- with -- … sharks next to me in order to arrive at this country, this powerful country. I have worked very hard. I bought my house, the American dream, and look what's happened to us. Everything for money. Nine years. Would anybody believe that this would happen in this country? Illnesses, many, many problems that you can't even imagine. That's what I wanted to tell you."

- **Monica Alba-Nunez**: "It's things that we're still suffering and will suffer for the rest of your life because you can't get that time back. You can't undo the damage that was done emotionally, physically. So you will suffer that the rest of your life because the memory is there. The girls, their father, when he found out that we were living in a house with toxic drywall in it, threatened to take me to court to take custody away from the kids because he didn't want them living there. So then you have to choose between do we ruin our entire credit, our chances of ever being able to be a homeowner, or do I let my kids go? We can't afford to fix the house. We can't afford custody battles with my ex-husband. We can't afford -- so, yeah, all of those things were a personal loss to me."

- **Larry Walls**: "We couldn't enjoy our home no more. We loved that house. My wife loved the house. I loved the house. Mentally and her health and stuff, it ruined us. It just ruined us. She drives a school bus. She goes by that damn house. She has

a spot down the street – two houses down from that house. She sees that house every day. When school is going on, twice a day she sees that house. She comes home crying, all messed up."

- **Marc Wites**: "We bought that house as our dream house, as a place where we wanted to raise our children and make memories in, and of course we've continued to live there after it was remediated, but I don't like the house. I have no affection towards the house. I have no affinity towards the house. It's a physical place where we live."

- **Kevin Rosen**: "[Y]ou would ever want your two-year-old or three-year-old child in a house inhaling this gas that was poisonous enough to destroy the coils in my air conditioner, blacken and sooten my electric outlets, create a gas leak in my home, smell and breathe and be sick from this, it's a nightmare I will never get over and a worry I'll never give up like asbestos and other diseases people get when they get exposed to this."

  "[Taishan's] drywall destroyed our house -- and then to wind up living through this nightmare where we had to leave our home, throw out our personal property, me being sick, moving us into a rental, and doing the honorable thing, which is selling the house in the best way we could to get the few dollars we could out of that house, my wife's inheritance, so we could get on with our life, we did what we had to do. And I can tell you this, I enjoyed none of it. All those memories that we should have had in there were robbed, and we were ripped off. And it is a horrible, horrible tragedy. And unlike [Taishan], who, for nine years hasn't stepped up to help us, I paid and my wife paid our obligations all through this process."

This testimony is merely a snapshot of the ways Plaintiffs have been harmed. And, it went beyond having had to deal with the Chinese drywall in the first instance because it was exacerbated by having to wait while Taishan fled the jurisdiction seemingly never to return.

The record is replete with evidence that Taishan had little regard for the quality and safety of the drywall it shipped to the United States. Taishan's manufacturing process had little consistency and controls.[22] With respect to the drywall at issue in *Germano*, Taishan "originally contracted to meet United States' ASTM standards" but subsequently "insisted that the drywall it sold to Venture Supply, Inc. would not be required to meet these standards." *Chinese Drywall*, 706 F.Supp.2d at 662. That drywall "was never tested pursuant to the United States ASTM standard." *Id.* The distributor, Venture Supply, "relied on a representation that Chinese testing was equivalent to U.S. testing standards. However, the

---

[22] During the Product ID deposition, Taishan's corporate representative testified about marking Taishan's drywall, which reflected the same lack of procedures and controls that, in conjunction with the other facts and evidence, would lead a reasonable fact-finder to conclude that Taishan had little regard for oversight and quality control over the products shipped into the U.S. SOF at ¶¶ 61.

Chinese tests were accomplished by a government agency of the Republic of China and not by an independent testing laboratory." *Id.* (internal citation omitted). "Certificates of Quality were likewise issued by a government agency" and "the Certificate of Quality Management System Certification issued predate[d] the production of the drywall shipped to the United States by at least two (2) years." *Id.* Safety standards were treated as inconsequential.

In addition, there is evidence in the record that Defendants did not care about whether their products were harmful or whether they met any required standards, Defendants would simply defer to customers. SOF at ¶¶ 61. In fact, in one exchange discussing BNBM pricing, a Knauf employee noted "[t]he board does not comply with the ASTM nor do they have any certification. From the Shandong plant they are currently using Phosphor gypsum. In the past we know they have received 'top up' loads from TaiHe group which are quite ordinary in quality and use Asbestos in same plants instead of glass fibre." *Id.*

Not surprisingly, there is evidence in the record that shows Defendants were on notice of defects in Taishan's drywall. *Id.* In one instance, a customer complained that the boards were brittle and breaking or crumbling during transit. *Id.* In fact, to combat Taishan's claim that the issues arose during shipping, an analysis was done of Taishan's boards with those shipped by Pingyi Baier Building Materials Co., Ltd. ("Baier") and testing showed no issues with the Baier boards and significant issues with the Taishan boards. *Id.* Baier's boards were also found not to be defective when tested by the CSPC. *Id.* Because Taishan had little regard for the quality and safety of its boards, it was more than content to ignore these warning signs.

There is no doubt that Taishan's defective drywall caused the harm bestowed upon Plaintiffs. "Chinese drywall presents a truly unique dilemma, and the damages from Chinese drywall are not easily analogized to those of typical class actions." *Chinese Drywall*, 2017 WL 1421627, at *15. "In most class actions, even if liability is established, the issue of causation is often inextricably intertwined with damages and remains to be litigated. In other words, even if a court finds that a defendant was negligent and that a plaintiff suffered damages, the court must still determine whether those damages were *caused* by that negligence." *Id.* (emphasis in original). In contrast, "[w]ith regard to Taishan…, there is no issue of liability or causation" because "Taishan has been held liable for defective drywall, and any properties containing Chinese drywall are defective, requiring removal of the drywall." *Id.*

With this factual record, Plaintiffs have raised genuine issues of material fact as to their entitlement to each of the categories of damages at issue.

## IV.   DEFENDANTS' SUMMARY JUDGMENT MOTION AS TO "OTHER DAMAGES" SHOULD BE DENIED

### A.   Summary Judgment Standard.

"'A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.'" *Goussen v. Mendez Fuel Holdings LLC*, 350 F.Supp.3d 1283, 1287 (S.D. Fla. 2018) (Cooke, J.) (quoting FRCP 56(a)). Because liability and causation are established, Defendants' Summary Judgment Motion is only appropriately addressed to Plaintiffs' claims for "other damages." Therefore, to grant summary judgment, the Court must assess whether there is a genuine dispute as to the existence or amount of Plaintiffs' "other damages." *See id*. A genuine factual dispute exists where, based upon the evidence, a reasonable jury could find on behalf the non-moving party. *See Gomez v. General Nutrition Corp.*, 323 F.Supp.3d 1368, 1373-74 (S.D. Fla. 2018) (Cooke, J.) (quoting *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999)).

When reviewing a motion for summary judgment, the Court should "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant.'" *Goussen*, 350 F.Supp.3d at 1287 (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (internal citation omitted)). The Court should not weigh the evidence at this stage but instead, should merely assess whether there are genuine issues to be tried. *See id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In other words, Defendants' motion should only be granted if, looking at all of the evidence in the light most favorable to Plaintiffs, no reasonable juror could find for Plaintiffs.

### B.   All Plaintiffs Have Produced Evidence of Their Damages.

Plaintiffs produced extensive documentation and provided sworn testimony and discovery responses to support their claim for the following categories of damages sustained as a result of the presence of defective Chinese drywall in their homes: (1) complete remediation (under *Germano* protocol), (2) diminution in value, (3) alternate living expenses, (4) costs associated with foreclosures and/or bankruptcy, (5) additional amounts owed due to mortgage deferral, (6) bankruptcy or inability to refinance, (7) loss of income, and (8) loss

of use and enjoyment. SOF at ¶60; *see also Chinese Drywall*, 706 F.Supp.2d at 691-93. In addition, Plaintiffs retained, Mr. Michael P. Elkin, CPA, who incorporated the data into a database from which he calculated Plaintiffs' damages in a summary report. *Id.* at ¶58.

Mr. Elkin's damage summaries include, where applicable: (1) remediation expenses; (2) alternate living expenses; (3) personal property damage expenses; (4) lost rental income from affected properties; (5) legal fees and costs in connection with foreclosures, short-sales or bankruptcy; (6) lost equity, and (7) additional damages. *Id.* at ¶¶ 58. Mr. Elkin's Report provides a clear articulation of any given Plaintiff's total damages calculation. *Id.* For example, in the case of Andrew and Dawn Feldkamp, Mr. Elkin utilized their interrogatory responses, deposition testimony and exhibits, SPPF, and documents produced in this litigation (including invoices, cancelled checks, etc.) to prepare a summary of their damages. *Id.* Not including a claim for damages pursuant to the remediation formula,[23] the Feldkamps are seeking $37,989 in alternate living expenses, $970 in personal property damage, and $9,064 in lost equity. *Id.* at Ex. 5. A similar summary, with supporting documentation, was done for the damages incurred by each Priority Claimant. *Id.* at Exs. 1-20. As a result, each Plaintiff has produced sufficient evidence to establish their entitlement to damages. In addition, Plaintiffs used expert appraiser Anthony Graziano and expert realtor Ryan Greenblatt to evaluate the stigma/diminution in value attributed to Plaintiffs' homes as a result of Chinese drywall.

### 1. <u>Cost of Remediation.</u>

This category of damages was claimed by Priority Claimants Etter, Foster, Gody, Hernandez, Nguyen and Tuyen, and Wites; and supported by testimony, discovery responses, documentation and the summary provided by Mr. Elkin. *Id.* at ¶¶ 58, 60. Defendants do not appear to challenge these damages but instead, use this category of damages to bootstrap a challenge to various forms of diminished value including diminution in value/stigma damages as well as lost equity damages. As Judge Fallon noted, a property can be fully remediated and still have a reduced value because of the fact that it previously had tainted drywall. In fact, when Defendants deposed realtor J. Vance Brinkerhoff, he was asked if

---

[23] It is Plaintiffs' position that the Feldkamps are entitled to remediation formula damages even though they did not remediate their home. Defendants argue they should be limited to diminution in value as former owners. Defs.' SJ Mot. at 14-15. This is discussed further in Section IV.B.2, *infra*, at 15-17.

buyers had any problems buying Chinese drywall homes that had been remediated and he responded that "[t]here is a stigma regarding it." *Id.* at ¶ 13.

### 2. Diminution in Value/Stigma/Lost Equity.

Defendants do not contend any given Plaintiff failed to produce evidence of these damages but instead challenge entitlement to these damages. In addition, Defendants lump these measures of damage together, arguing they overlap and would result in duplicative recovery not permitted under Florida law.[24] However, these claims are measures of separate and distinct harms. To the extent these theories of recovery have some overlap, Defendants misstate the law. A party is allowed to proceed on alternate theories of liability but is not entitled to recover duplicative damages. The procedure for ensuring that duplicative recovery does not occur is not to grant summary judgment on claims, but to allow the jury to hear all of the claims without consideration of any duplication and then have the court modify or alter the judgment to make sure duplicative recovery is avoided. *See, e.g., EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 742 (8th Cir.2000) (court "specifically instructed the jury not to account for duplication, explaining that it would later modify the damages award to eliminate any duplicative amounts."). There is no reason to grant summary judgment.

*Lost Equity*. Defendants' argument that "lost equity" is not a recognized measure of damage to real property under Florida law misses the mark.[25] To be clear, lost equity is a measure of damage that is separate and apart from the value of the property. As Defendants consistently reiterate, the purpose of damages in Florida is to make the aggrieved party whole. *See, e.g., National Union Fire Ins. Co. of Pittsburgh*, 2015 WL 3905018, at *26 (damages intended to put the plaintiff in the same position they would have been had it not been for the damage). Here, returning lost equity helps do exactly that. Simply put, the Plaintiffs invested cash into the home and were never able to recoup the cash upon disposition of the property because of the defective drywall. Summary judgment should be denied as to lost equity damage.

*Stigma*. Defendants acknowledge that stigma-related damages are recognized in Florida but then suggest, with no authority, that any actual stigma is subsumed in diminution in value.[26] The law in Florida is clear that a seller of residential property must disclose those

---

[24] Defs.' SJ Mot. at 10-15.
[25] Defs.' SJ Mot. at 12.
[26] Defs.' SJ Mot. at 12.

facts materially affecting the value of the property which are not readily observable and not known to a buyer. *See Johnson v. Davis*, 480 So.2d 625, 629 (Fla. 1985). When such a disclosure causes permanent harm, plaintiffs are entitled to recover diminution in value, *i.e.*, stigma damages. *See Bisque Associates of Fla., Inc. v. Towers of Quayside No. 2 Condominium Association, Inc.*, 639 So.2d 997, 999 (Fla.3d DCA 1994).[27] That is precisely the case here where the presence of defective Chinese drywall in a home at any time must be disclosed in a home sale even if repaired or remediated. Plaintiffs are entitled to stigma damages.

Defendants also argue that Plaintiffs have not presented adequate evidence to support their claim for stigma damages.[28] Defendants assert that the reduction in value caused by the required disclosure of the presence of defective Chinese drywall should be measured by a comparison of before and after injury, yet Plaintiffs' expert "merely opined that all 20 of the Priority Claimants' properties would, even if fully remediated, still suffer some decline in value related to Chinese Drywall."[29] But stigma damages are distinct from the diminution in value "before and after" market analysis that Defendants are referencing. Whether the value of a Plaintiff's home dropped immediately upon the discovery of Chinese drywall because a potential buyer would understand, among other things, the need to invest large amounts of money post-purchase to remediate a home is a separate and distinct harm from the permanent diminution in value caused by a potential buyer's fear, whether reasonable or not, that would cause them to pay less for a home that at one time had been contaminated with a pollutant such as Chinese drywall. *See, e.g., Florida Power & Light Co. v. Jennings*, 518 So.2d 895 (Fla. 1987) ("The public's 'fear' as a factor which may be relevant to the issue of just compensation may be utilized as a basis for an expert's valuation opinion regardless of whether this fear is objectively reasonable."). Plaintiffs' experts have established that the stigma associated with a Chinese drywall home is 10%. Summary judgment should be denied.

***Diminution in Value***. This aspect of diminution in value is separate from the stigma associated with a Chinese drywall home. Defendants argue that other than the cost to repair,

---

[27] Defendants' citation to *Finklestein v. Dep't of Transportation*, 656 So.2d 921, 925 (Fla. 1995), for the proposition that long-term stigma is subsumed within a separate assessment of diminution of value is incorrect. Defs.' SJ Mot. at 13. *Finklestein* supports Plaintiffs' stigma damages claim as separate from the market analysis accompanying diminution in value. *Id.*

[28] Defs.' SJ Mot. at 12.

[29] Defs.' SJ Mot. at 12.

this is the only proper measure of damages and in fact, it is the most appropriate measure of damages when it is less than the cost to repair.[30] If a Plaintiff ceased owning the affected property, often because they lost the home to short sale or foreclosure because of the Chinese drywall, Defendants claim the Plaintiff is limited to diminution in value.[31]

However, Plaintiffs contend that the full cost to remediate is the proper measure of damages and that if someone performed a complete remediation, they are entitled to reimbursement of those costs, whereas any Plaintiff who did not completely remediate is entitled to damages under the remediation formula. The *Germano* remediation protocol establishes what is required to fix a Chinese drywall home. When homeowners do less than a full remediation because that is all they can afford (because Defendants delayed the litigation), they are not made "whole" by simply reimbursing them for the cost of a patchwork repair. SOF at ¶ 9. Plaintiffs are entitled to formula damages because at the time the damage was discovered, they were entitled to the costs to properly repair their homes.

To the extent the Court determines that diminution in value is the appropriate measure for some or all of the Plaintiffs, Plaintiffs have offered expert opinion as to the amount of those damages. SOF at ¶¶ 59. Defendants have moved to exclude those experts, and the Court will make that determination separately, but regardless of the Court's ruling, it does not warrant granting summary judgment.[32] For example, according to Defendants, Mr. Graziano's analysis fails because he picked an arbitrary date in the future to measure the diminution instead of picking a date "immediately after the injury,"[33] which results in a hypothetical damage. But as Mr. Graziano explained, that is not the case. Defendants' position is ironic given that in Louisiana, where the law is the same regarding when to measure the damage to property, Defendants argued that Judge Fallon should measure diminution at the time the affected properties were sold. Nonetheless, Defendants' argument does nothing more than reiterate their motion to strike the testimony of Plaintiffs' expert and requires no further discussion here.[34]

---

[30] Defs.' SJ Mot. at 10-11, 13.

[31] Defs.' SJ Mot. at 14-15.

[32] *See* ECF Nos. 246, 247.

[33] *See* Defs.' SJ Mot. at 13.

[34] *See* Def.'s Mot. in Limine to Exclude Opinions of Anthony Graziano, MAI, CRE (ECF No. 246). Plaintiffs incorporate by reference the arguments in their opposition to that motion, filed May 13, 2019 (ECF No. 273).

More importantly, expert testimony is not required to establish the value of property. *See, e.g., Dorvil v. Nationstar Mortgage LLC*, 2019 WL 1992932, at \*19 (S.D. Fla. Mar. 26, 2019) (owner may testify to the value of his property). In addition, in certain circumstances, Courts have found that the cost to repair can be used to establish the difference in market value before and after an injury, *i.e.* the diminution in value. *See, e.g., Kerns v. Pro-Foam of South Alabama, Inc.*, 572 F.Supp.2d 1303, 1306 (S.D. Ala. 2007) (finding that under Alabama law, a jury can consider out-of-pocket repair costs as evidence of the difference between the fair market value of the property immediately before and after the damage); *Bow to Stern Maint., Inc. v. Jackson*, 2006 WL 8432016, at \*3 (S.D.Fla. Dec. 29, 2006) ("In admiralty, the cost of repairs is the equivalent of value-diminution."). Here, that cost to repair is encapsulated in the remediation damages formula. *See Chinese Drywall*, 2017 WL 1421627, at \*24-25. Because calculation of diminution in value so far back is inherently imprecise, the cost to repair stands as a close approximation because it is what would have been required to make the Plaintiff whole at the time the damage was discovered.

Judge Fallon took this approach this month when faced with this dilemma, in the context of former owners, in the ongoing *Chinese Drywall Litigation* in Louisiana. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2019 WL 1984097, at \*6 (E.D.La. May 3, 2019). Judge Fallon found that former owners who did not remediate their properties prior to transfer of ownership were limited to diminution of value but that did not necessarily mean that the remediation damage formula had no applicability. *Id.* Judge Fallon continued:

> the Court must consider how to properly calculate diminution in value of the properties in question. Had Defendants not chosen a course of "delay, delay, delay," which in many cases caused the property owners to lose their property and become former owners, the process of ascertaining the fair market value of a house before the defected drywall was installed and its value thereafter might not have been a difficult one. But the reality is that these injuries were sustained more than ten years ago to homes sold or foreclosed upon many years ago. Calculating the diminution in value of the homes at issue many years after the fact presents a Herculean task made so as a consequence of Defendants' actions.

*Id.* "Because remediating the home prior to sale or foreclosure likely would have restored the home's value, the cost of remediating that property informs the Court's analysis of its diminution damages." *Id.* Judge Fallon found that for Plaintiffs who had not remediated and

sold their property, "the remediation damages calculation shall serve as a rebuttable presumption of a prior owner's diminution damages." *Id*. This approach would be sound here as well and leave the fact-finder a basis upon which to fashion a diminution in value award.

Summary judgment should be denied as to diminution in value.

### 3.    Alternate or Alternative Living Expenses.

Defendants do not contest the appropriateness of this category of damages but instead present a line-by-line challenge to the expenses asserted by four Priority Claimants – Janet Avery, Lillian Chatmon, William and Vicki Foster, and Tracy Nguyen and Mai Tuyen.[35] Each Plaintiff has provided sufficient evidence to support their claim for alternate living expenses in the form of their own testimony, interrogatory answers, exhibits to their depositions, documents produced in the litigation and the Elkin report. SOF at ¶¶ 60. Defendants essentially present a factual dispute -- whether the witnesses incurred the claimed expenses or whether the expenses in question are, in fact, for alternate living expenses. But, such a credibility determination is not appropriate at the summary judgment stage. *See, e.g., Tippens*, 805 F.2d at 954.

To the extent Defendants attempt to couch their credibility challenges as being challenges based on the "uncontroverted factual record," those claims are misguided. For example, Lillian Chatmon testified she had a second home in Georgia where she spent half the year when she was not in the Chinese drywall home. SOF at ¶ 60. When she was forced to vacate her Chinese drywall, she took the belongings she needed and moved in with her daughter in Florida and paid a reasonable rent. *Id*. At that point, she continued splitting time between her Georgia home and her daughter's in Florida. *Id*. Defendants seek to reduce Ms. Chatmon's alternate living expenses in half because they disingenuously claim she only lived with her daughter half of the year and spent the other half of the year in Georgia. *Id*. Defendants deliberately ignore that Ms. Chatmon testified that she kept a room at her daughter's year-round where she kept her things so she could come and go as she had when she had access to the Chinese drywall home. *Id*. She is entitled to reimbursement for these expenses and in any event that is a determination for the trier-of-fact.

---

[35] Defs.' SJ Mot. at 15-17.

Similar problems afflict Defendants' analysis of the remaining alternate living expense issues. The presence of Chinese drywall forced Janet Avery to find an alternate living arrangement. *Id*. She incurred expenses, and Defendants are liable. *Id*. The fact that Mrs. Avery stopped paying her mortgage because she couldn't afford two housing payments and Defendants were intent on not appearing to participate in this litigation, does not render her payments for alternate living expenses unrecoverable. *Id*. Mrs. Avery was obligated to make her mortgage payments at the same time she was obligated to pay the alternate living expenses, and to the extent she was forced to stop paying the mortgage payment, it is clear that the failure to pay resulted in an increase in her overall liability to the bank. *Id*. Defendants appear to be arguing that if they forced a homeowner into foreclosure, they should get the benefit because you "saved money" on your mortgage. That argument is facially absurd and ignores basic financial principles.

The same is true for Defendants' purely factual challenges to the claims of Foster and Nguyen/Tuyen. Defendants are not questioning their entitlement to alternate living expenses, they are questioning the validity of some of the claimed expenses.[36] These are credibility determinations and questions of fact to be made by the fact-finder. Plaintiffs have submitted records supporting these claims. *Id*. Summary judgment should be denied.

### 4.    **Personal Property.**

The majority of the Priority Claimants are seeking damages to personal property ranging from HVAC systems to televisions to furniture to clothing. *Id*.  It is well-established that Chinese drywall ruins the very types of electronic, fabric, wood and metal items that comprise Plaintiffs' claims. *See, e.g., Chinese Drywall*, 706 F.Supp.2d at 681-693 (discussing electronics), 705 (replacing items such as mattresses because smell wouldn't come out). In light of consequences of sulfur contamination caused by Chinese drywall, Defendants inexplicably argue that Plaintiffs failed to show "that the personal property damage was in fact caused *in each instance* by Chinese Drywall."[37] Putting aside that causation has been established by default, the evidence shows that Plaintiffs' personal property was in their Chinese drywall home, defective Chinese drywall contamination causes very specific types of

---

[36] *See* Defs.' SJ Mot. at 16-17 (challenging cable charges, lack of receipts, intent behind incurring certain expenses, etc.).

[37] *See* Defs.' SJ Mot. at 19 (emphasis added).

problems (*e.g.*, electronic failures, odor contamination in anything that is made of absorbing material, HVAC failures, etc.), and Plaintiffs' personal property was afflicted with precisely those types of problems. *Id.* This is enough evidence from which a reasonable fact-finder could conclude the damage was caused by defective Chinese drywall.

Defendants offer no evidence to controvert that logical chain but instead suggest, without support, that something more is required of Plaintiffs. Indeed, Defendants claim that Plaintiffs' "own corrosion expert testified that not all metal in a home with defective drywall would necessarily be corroded, much less have failed."[38] This argument misses the point. While all metal in a Chinese drywall home may not have corroded, if metal that was in a Chinese drywall home had corroded, it is more likely than not that it was caused by the off-gassing of the defective drywall.[39] Defendants' causation argument should be rejected.

Beyond that, Defendants do not contest their obligation to pay for personal property that was destroyed by defective Chinese drywall but instead argue that expert testimony is needed as to the fair market value of the property in question. Defendants misapprehend the nature of the analysis into personal property. The very case they cite, *Ocean Elec.*, 636 So.2d 112, illustrates the flaw in their analysis.[40] It is true that market value is the determining factor in assessing Plaintiffs' damages, but the key part of the analysis is that "[t]he 'appropriate economic market to be used in approximating reasonable market value is the usual market where the property or goods had been purchased.'"[41] *See Ocean Elec.*, 636 So.2d at 114. For the plaintiff in *Ocean Elec.*, the relevant market was the wholesale market; however, the court made clear that the relevant market for assessing market value for ***consumers, like the Plaintiffs here, is the retail market***. *See id*. Thus, consumers such as Plaintiffs here can recover the price for purchasing in the retail market, *i.e.* the equivalent type of store where they bought the original product. *Id*. (citing Restatement (Second) of Torts § 911 cmt. d (1979)).

Defendants suggest that expert valuation is needed where depreciation and life of the product are considered. But, this proposition ignores the market where consumers buy these

---

[38] *See* Defs.' SJ Mot. at 20.

[39] Defendants' reference to Mrs. Foster's decision to discard property misses the mark. *See* Defs.' SJ Mot. at 20.

[40] *See* Defs.' SJ Mot. at 18.

[41] *See* Defs.' SJ Mot. at 18.

products. Unlike the high-end items in the cases cited by Defendants,[42] there is no resale sub-market for used couches, clothing, DVD players and other retail consumer items. Plaintiffs participate in retail markets and are therefore entitled to the retail price of their property which can be clearly identified without the use of an expert. In fact, Plaintiffs' testimony and documents reflect several ways in which the retail market value of the damaged personal property can be assessed including, but not limited to, the original purchase price of the item or the cost to purchase a replacement item. SOF at ¶¶ 60. These expenses were catalogued by Plaintiffs' expert Mr. Elkin. *See id.* at ¶ 58. In addition, contrary to Defendants' statement, a plaintiff can testify to the value of the property that was damaged, an expert is not necessary. *See, e.g., Morsch v. JP Morgan Chase Bank, N.A.*, 2018 WL 5830557, at *5-6 (M.D. Fla. Nov. 7, 2018) (stating that plaintiff may testify as to contents and value of items in her safety deposit box, such as jewelry); *Dorvil*, 2019 WL 1992932, at *19; *Johnson v. Thor Motor Coach, Inc.*, 2016 WL 1182792, at *6 (M.D. Fla. Mar. 28, 2016); *Welsh v. Newman Intern. Transp., Inc.*, 2011 WL 5570800, at *2 (M.D. Fla. Nov. 16, 2011).

Finally, Defendants' contention that a receipt is required to claim damages to personal property should be rejected. As noted above, a plaintiff can always testify to his or her damages. This is a credibility issue that is not appropriate for summary judgment. For example, Defendants specifically point to the claim by the O'Briens for damages to a mattress where they: "did not provide receipts for these damages, did not provide evidence showing the property was damaged, and did not make any effort to mitigate or repair the damage."[43] First, the record is clear that the odor caused by the off-gassing of the defective Chinese drywall absorbs into anything with fabric, including mattresses. *See Chinese Drywall*, 706 F.Supp.2d at 705 ("The Michaux family has had to prioritize items to replace due to the smell for financial reasons. The children got new mattresses. Other items were kept simply because the family cannot afford to replace them."). Furthermore, it is unclear what steps could be taken to mitigate damage to a mattress, nor do Defendants suggest any.

---

[42] The cases Defendants rely upon to support their position bear little factual relation to Plaintiffs' claims. *See Sarasota Yacht & Ship Servs., Inc. v. Harris*, 813 So.2d 231 (Fla. Dist. Ct. App. 2002) (used yacht); *Burtless v. Pallero*, 570 So.2d 1140 (Fla. Dist. Ct. App. 1990) (used car); *Ocean Elec.*, 636 So.2d 112 (plaintiff-distributor's inventory is wholesale price); *Bizrocket.com, Inc. v. Interland, Inc.*, 2005 WL 6745909 (S.D.Fla. May 23, 2005) (proprietary software); *McDonald Air Conditioning, Inc. v. John Brown, Inc.*, 285 So.2d 697 (Fla. Dist. Ct. App. 1973) (welding machines); *Port Largo Club, Inc. v. Warren*, 476 So.2d 1330 (Fla. Dist. Ct. App. 1985) (time-share condominiums).
[43] *See* Defs.' SJ Mot. at 20.

The same is true for the Fosters, who Defendants noted are seeking personal property damages "totaling at least $87,400." They make the factual challenge that the Fosters "are missing at least one receipt for blinds, and they produced at least one duplicate receipt."[44] The Fosters are lay people and Vicki Foster was managing the Chinese drywall catastrophe all by herself because her husband had returned to work to help pay for the remediation. SOF at ¶ 60. Yet, despite the cards being stacked against her, Mrs. Foster gathered voluminous documentation to support her claim for personal property damages. *Id*. at ¶ 60. It is for the jury to decide if the missing receipt for blinds or the duplicative receipt renders her testimony that she replaced the blinds credible. A genuine issue of material fact exists.

Similarly, Defendants propose that Kevin Rosen, who had a vivid memory of purchasing two $3,500 TVs destroyed by Chinese drywall, should receive no compensation because he failed to save the receipts for this purchase, even though he had no reason at the time to suspect he would ever need them. *Id*. at ¶ 60. Summary judgment should be denied.

### 5. <u>Loss of Use and Enjoyment.</u>

Defendants acknowledge the availability of damages in Florida in nuisance[45] cases for "loss of use or loss of rental value as a general measure of damages recoverable for a temporary nuisance to the property itself" – referred to as general nuisance damages.[46] In addition, they acknowledge the existence of special nuisance damages: "Florida courts have expanded the interests protected by the nuisance actions to the intangible interests of mental and emotional welfare because they generally relate to the right to use and enjoy one's own land in comfort and safety."[47] In fact, "the plaintiff may recover such special or incidental damages as he may be able to prove, i.e., annoyances, discomfort, inconveniences, or sickness. This is true whether the injury is permanent or temporary...." *Nitram Chems., Inc. v. Parker*, 200 So.2d 220, 225 (Fla.2d DCA 1967). The court in *Nitram* continued, quoting Dean Prosser's "excellent review of the damages recoverable in nuisance...the loss of the rental **or use value** of the property for the duration of a temporary nuisance,... and **in addition the value**

Page 24

---

[44] *See* Defs.' SJ Mot. at 20.

[45] Defendants incorrectly assert that despite the defaults, Plaintiffs' private nuisance claim should be dismissed. Plaintiffs have properly asserted a claim for private nuisance and Defendants' argument to the contrary is addressed in Section V (C), *infra*.

[46] Defs.' SJ Mot. at 20.

[47] Defs.' SJ Mot. at 21 n.9.

*of any personal discomfort or inconvenience which the plaintiff has suffered, or of any injury to health or other personal injury sustained by the plaintiff, or by members of his family so far as they affect his own enjoyment of the premises*, as well as any reasonable expenses which he has incurred on account of the nuisance." *Id*. (emphasis added).

The deposition transcripts and testimony of Plaintiffs are replete with explanations of the full impact of their discomfort and inconvenience as well as the loss of enjoyment they experienced. *See* Section III, *supra.* Defendants' objection to these damages seems to be that Plaintiffs have not articulated a formula for assessing the damages.[48] But, a person's mental anguish is not the type of damage that lends itself to a formulaic approach. It is a question of fact appropriately considered by the trier of fact based on facts contained in the record.

As for general nuisance damages measured by reference to rental value, Plaintiffs have presented that evidence. Defendants concede as much but claim Plaintiffs are seeking double or duplicative recovery.[49] Even though a party is not allowed double recovery, they are allowed to proceed on alternate theories of liability that may ultimately result in duplicative damages. Avoidance of duplicative recovery is not accomplished by way of a motion for summary judgment but instead by a motion to modify or alter the judgment after a verdict is reached. *See, e.g., EFCO Corp.*, 219 F.3d at 742 (district court "specifically instructed the jury not to account for duplication, explaining that it would later modify the damages award to eliminate any duplicative amounts."). Summary judgment should be denied.

C.     **Facts Determined in this Litigation Along with Other Record Evidence Supports the Imposition of Punitive Damages.**

Defendants argue extensively against the applicability of punitive damages to this case. To reach this conclusion, Defendants ignore the *Germano* FOFCOL, Class Certification FOFCOL and Class Damages FOFCOL, as well as additional record evidence that shows that Taishan acted with reckless disregard for the "life, safety, [and] rights" of the consumers, like the Priority Claimants, who were the intended users of their product.

Under Florida law, "[a] defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." Fla.Stat. §768.72(2) (2018). In this

---

[48] *See* Defs.' SJ Mot. at 21.
[49] *See* Defs.' SJ Mot. at 21.

context, "[g]ross negligence means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard to the life, safety, or rights of persons exposed to such conduct." *Id*. at §768.72(2)(b). The effects of Chinese drywall on the well-being of the homeowners who had it installed in their homes is well-documented and reflects a number of physical conditions as well as the property and emotional damage. There can be no doubt that the impact of defective Chinese drywall goes to the "life, safety, or rights or persons exposed" to it. The question is whether there is evidence in the record to show that Defendants had a reckless disregard for the impact that introducing potentially defective drywall into the United States generally, and Florida specifically, would have on the people affected.

Here, the evidence strongly suggests they did act with such disregard. As has already been established, Taishan disregarded manufacturing standards, "originally contract[ing] to meet United States' ASTM standards" but subsequently "insist[ing] that the drywall it sold to Venture Supply, Inc. would not be required to meet these standards." *Chinese Drywall*, 706 F.Supp.2d at 662. Never testing that drywall, providing false representations regarding the quality of the testing done on the boards, and issuing outdated quality certificates. *Id*. Safety standards were treated as inconsequential, and that is consistent with relaxed practices exhibited by Taishan with respect to marking and labelling boards. SOF at ¶ 61.

There is record evidence that supports this conclusion. SOF at ¶ 61. There is evidence indicating that Taishan boards did not comply with U.S. standards, they were "quite ordinary in quality," and "use Asbestos in same plants instead of glass fibre." SOF at ¶ 61. There is additional evidence that customers complained about the poor quality of certain boards, which led to an analysis of comparing Taishan's boards to a competitor, which resulted in a finding that Taishan's boards had problems and the competitor's, Baier's, did not. SOF at ¶¶ 61. For a company with a normal sense of responsibility, proper testing and follow-up with potential problems would have been expected. Instead, Taishan's approach amounted to, at a minimum, "looking the other way," but the more likely inference from all of the record evidence is that Defendants simply did not care so long as they were profiting from the sale of the drywall, defective or not. Taken together, this evidence supports Plaintiffs' claim for punitive damages and the denial of summary judgment on this issue.

Additionally, Defendants claim that Florida's litigation privilege bars the Court's consideration of post-filing conduct as a factor in punitive damages.[50] However, this privilege is an affirmative defense, and affirmative defenses are waived by virtue of the default. *See Diamond Resorts Int'l, Inc. v. Aaronson*, 2019 WL 1445181, at *16 n.21 (M.D.Fla. Mar. 5, 2019) (litigation privilege is an affirmative defense and defendant bears the burden of proof); *see also Suntrust Bank v. Baum*, 2009 WL 1097975, at *1 (S.D.Fla. Apr. 22, 2009) (default results in waiver of affirmative defenses); *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1221-22 (11th Cir.2012) ("Failure to plead an affirmative defense generally results in a waiver of that defense."); *UC Acquisition Corp. v. Salem Nursing & Rehab Center of Tuskegee, Inc.*, 2012 WL 95422, at *1 n.1 (M.D.Ala. Jan.12, 2012) (courts should not raise affirmative defenses *sua sponte* for party in default and citing authority). Therefore, the Court should disregard Defendants' attempted invocation of the litigation privilege.

The Court should consider the post-filing conduct of Defendants because this is a unique case where the post-filing conduct became part of the wrongdoing, exacerbating Plaintiffs' damages and delaying recovery to a point where many of the Plaintiffs have given up and moved on. As Judge Fallon has said, "delay tactics have permeated every aspect of Defendants' litigation strategy: from their initial failure to appear to their now perpetual motions to re-litigate settled matters." *Chinese Drywall*, 2018 WL 279629, at *8. Indeed, "the whole approach is just delay. Delay because people die, delay because they lose their homes, delay because they're frustrated and giving up."[51] And, the Court can see that the strategy has paid off as Defendants come to the Court with a motion seeking to punish homeowners who have been foreclosed upon or can't find receipts from seven or eight years ago to support a particular claim for damage. As a result of these damages, Plaintiffs continue to accrue damages, particularly if they have not remediated. This strategy was part of a deliberate strategy to deny homeowners their day in Court and should be contemplated when considering the imposition of punitive damages. Summary judgment should be denied.

### D.     It is Premature to Assess Plaintiffs Who Received a Negative Product ID Recommendation from the Special Master.

---

[50] *See* Defs.' SJ Mot. at 9-10.
[51] *See* Transcript of MDL Proceedings, August 15, 2018, at 24:2-11.

Defendants move for summary judgment on the five Priority Claimants whose properties contained drywall with markings that the Special Master recommended not be attributable to Taishan.[52] By way of further explanation, two of the Priority Claimants – (1) Kevin and Stacey Rosen and (2) Michael and Robyn Rosen – also have blank boards in their home that were found by the Special Master to be not attributable to Taishan. On April 29, 2019, Plaintiffs filed their Objections to and Appeal from the Special Master's Report & Recommendation Regarding Product ID Categories Attributable to Taishan Gypsum Co., Ltd.[53] These Objections, incorporated herein by reference, seek to overrule the Special Master's recommendation with respect to the boards contained in these five Priority Claimants' homes as well as the blank boards found in the homes of both of the Rosen families. *See* ECF No. 253 at 11-20. Pending the Court's ruling on the Objections, it is premature to dismiss these Priority Claimants from the litigation, and summary judgment should be denied without prejudice on this issue.

## V. DEFENDANTS' ATTEMPT TO RELITIGATE LIABILITY SHOULD BE REJECTED OUT OF HAND

Defendants' final argument addresses the viability of those claims set forth in Counts II, IV, V, VI, VII, VIII, IX, and X. Recall, by virtue of their default, liability and causation are established. Thus, the Defendants' challenges to these different causes of action are not permitted at this juncture. Defendants inaccurately portray default jurisprudence to make their arguments. And while it is true that a court can seek additional information prior to finding liability after accepting the well-plead facts upon default, no such situation existed here where the Court already found Defendants liable and that causation was inextricably intertwined with liability. *See, e.g., Chinese Drywall*, *Chinese Drywall*, 2017 WL 1421627, at *15.

Because the Court adopted the finding of liability and causation, the Court denied Defendants' request for discovery into these matters. Defendants now argue that Plaintiffs should come forward with evidence to support the private nuisance cause of action. In other words, the lack of discovery occasioned by Defendants' default should be used in Defendants' favor. This argument fails. Judge Fallon had all of the evidence needed when he found

---

[52] *See* Defs.' SJ Mot. at 6; *see also* Special Master's Report & Recommendation Regarding Product ID Categories Attributable to the Taishan Defendants (ECF No. 233) ("Special Master's Product ID R&R").
[53] *See* ECF No. 253 (the "Objections").

Defendants liable and causation intertwined with liability, and those findings were "well-reasoned and well-supported by the evidentiary record." (ECF No. 112 at 3).

Notwithstanding that fact, even if the Court reviewed the allegations in Plaintiffs' Omni Complaint, the challenged causes of action have been adequately pled. However, because this was an Omni Complaint encompassing Plaintiffs from numerous jurisdictions with state-specific causes of action, there are non-Florida claims not applicable to Florida Plaintiffs. To be clear, Plaintiffs are <u>not</u> pursuing claims for Redhibition; Louisiana Products Liability Act; Alabama Deceptive Trade Practices Act, Mississippi Consumer Protection Act, North Carolina Consumer Protection Act, and Texas Deceptive Trade Practices-Consumer Protection Act; and Equitable and Injunctive Relief and Medical Monitoring.[54]

### A.     Breach of Express and/or Implied Warranties (Count IV)

Lumping Plaintiffs' claims for breach of express and implied warranties together, Defendants mount a multi-pronged attack on these claims under Florida law, none of which has merit.

***Express Warranties***. Defendants assert that a lack of privity between Defendants and Plaintiffs precludes recovery along with a lack of specific allegations of the terms of the warranty at issue.[55] However, Defendants ignore the Complaint allegations that "Defendants and/or their agents were in privity with plaintiffs and class members and/or plaintiffs and class members were foreseeable third-party beneficiaries of any warranty" and that Defendants were aware their product would end up in the Plaintiffs' homes.[56] In *Smith v. Wm. Wrigley Jr. Co.,* 663 F.Supp.2d 1336 (S.D.Fla. 2009), after surveying caselaw dating back to 1953, the court noted "[t]he privity requirement in Florida warranty claims is a moving target which depends on factors including whether the warranty is express or implied and the type of injury alleged" and ultimately found the plaintiff had asserted a valid claim for breach of express warranty, ***despite the absence of privity between plaintiff and the manufacturer***. *Id.* at 1342 (emphasis added); *see also, Mesa v. BMW of North America, LLC*, 904 So.2d 450, 458 (Fla. Dist.Ct.App. 2006)("If Mesa could not enforce the warranty against BMWNA…, the

---

[54] Because Plaintiffs' negligence *per se* claim is largely duplicative or, at least, subsumed within their negligence claim, Plaintiffs do not address it separately.

[55] Defs.' SJ Mot. at 24.

[56] ECF No. 1 at ¶ 167-68.

manufacturer's promises and the vehicle's warranty would be meaningless."); *Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1032 (11th Cir. 2017) ("Florida courts have found the privity requirement to be satisfied when a manufacturer directly provides a warranty to, or otherwise has direct contact with, a buyer who purchases from a third party"); *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.,* 2018 WL 3109632, *6-7 (S.D.Fla. Apr. 5, 2018) (finding privity was satisfied for express and implied warranty claims as plaintiffs were alleged to be third party beneficiaries of the warranties associated with the product since they were the ultimate consumer). Accordingly, privity has been satisfied.[57]

>*Implied Warranties*. Defendants assert Plaintiffs' breach of warranty claim fails for failure to describe the "particular purpose" for which the drywall was to be used. Defendants' argument is misplaced. Defendants ignore the fact that there are two implied warranties: merchantability and fitness for a particular purpose. Merchantability applies to all products when used for their ordinary purposes. Fitness for a particular purpose applies when the buyer uses the product for a particular (non-ordinary) purpose and the seller knows about this purpose but does not disclaim the implied warranty. *Armadillo Distribution Enterprises, Inc. v. Hai Yun Musical Instruments Mfr. Co., Ltd.,* 142 F.Supp.3d 1245, 1254 (M.D.Fla. 2015). Using drywall in a house is its ordinary purpose, so merchantability applies. "A cause of action for breach of implied warranty of merchantability requires allegations that (1) the plaintiff was a foreseeable user of the product, (2) the product was used in the intended manner at the time of the injury, (3) the product was defective when transferred from the warrantor, and (4) the defect caused the injury." *Nature's Prod., Inc. v. Natrol, Inc.*, 990 F.Supp.2d 1307, 1321 (S.D. Fla. 2013) (citation omitted). Plaintiffs alleged all of the required elements for a breach of implied warranty of merchantability claim.[58]

>Finally, in their unrelenting effort to relitigate all aspects of this case, Defendants claim Florida's Economic Loss Rule ("ELR") prevents Plaintiffs from recovering on both their tort and contract claims. While giving lip service to Judge Fallon's ruling on ELR issued almost

---

[57] Defendants claim Plaintiffs were required to give pre-suit notice. Despite such notice being essentially impossible to provide to Chinese companies who have purposefully refused to respond even to lawsuits properly served under the Hague Convention, the plain language of the statute applies only to sellers, not manufacturers. *Tershakovec v. Ford Motor Co.*, 2018 WL 3405245, at *6 (S.D.Fla. July 12, 2018) ("Florida courts recognize that notice is required to be given to the seller, not the manufacturer under Florida law." (internal citations omitted)).
[58] ECF No. 1 at ¶¶ 166-173.

a decade ago where he found the "ELR has no relevance" where a product such as Chinese drywall poses an unreasonable risk of harm to a plaintiff's property, as opposed to a product which simply fails to meet a plaintiff's economic expectations, *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 680 F.Supp.2d 780, 790 (E.D.La. 2010),[59] Defendants persist in asserting the ELR requires that Plaintiffs elect whether to recover under tort or contract, but are not entitled to recover under both.[60] Contrary to Defendants' contention, Plaintiffs' contract claims are independent of their tort claims and the ELR does not prevent recovery under either or both. *See Lamm v. State St. Bank & Trust*, 749 F.3d 938, 947 (11th Cir. 2014) (recognizing ELR now has limited application in products liability and the contours of any limitations on contract claims are unclear). Summary judgment should be denied.

### B. Private Nuisance (Count VII).

The elements of a private nuisance claim in Florida are: 1) the defendant carried out or substantially participated in an activity in such a way *as to seriously interfere with plaintiffs' use and enjoyment* of their property interest; 2) plaintiffs owned or possessed an actual property interest in the real property that is the subject of this action; 3) *defendant's interference with Plaintiffs' use and enjoyment of the property resulted in unreasonable and substantial harm*; 4) defendant's creation of the nuisance was the legal cause of the damage to plaintiff's property; and 5) defendant's actions were not reasonable under the circumstances. *Beckman v. Marshall,* 85 So.2d 552 (Fla. 1956); *Durrance v. Sanders,* 329 So.2d 26 (Fla.1st DCA 1976); *Prior v. White,* 180 So. 347 (Fla. 1938) (emphasis added). Plaintiffs' allegations satisfy these elements.[61]

Anything that annoys or disturbs one's free use, possession or enjoyment of his property or renders its ordinary use or occupation physically uncomfortable may become a "nuisance" and be restrained. *Palm Corp. v. Walters*, 4 So.2d 696, 699 (Fla. 1941); *Town of Surfside v. County Line Land Co.,* 340 So.2d 1287, 1289 (Fla.3d DCA 1977). "Although no particular type of conduct on behalf of defendants is necessary to establish nuisance, it is generally agreed that nuisance may rest on intentional invasion of person's property rights, *on negligence,* or on conduct abnormal and out of place in its surroundings." *Durrance,* 329 So.2d at 29 (emphasis added).

---

[59] *See also In re Chinese Drywall Litig.*, 2009 WL 6408999 (Miami-Dade Cty, Fla.Cir.Ct. Dec. 18, 2009).
[60] Defs.' SJ Mot. at 25.
[61] ECF No. 1 at ¶¶ 195-201.

Injuries arising out of a permanent nuisance include "annoyance, discomfort, inconvenience or sickness," and no physical impact is required. *See Exxon Corp. U.S.A. v. Dunn,* 474 So.2d 1269, 1273-74 (Fla.1st DCA 1985); *QBE Specialty Ins. Co. v. Scrap, Inc.,* 2018 WL 7198151, at *6 (N.D.Fla. Mar. 2, 2018). In *Exxon,* the court reaffirmed that "a cause of action for nuisance does not arise from negligent acts but from the annoyances, smoke, odors, et cetera, arising from the proven nuisance itself. The 'injury' arising from a nuisance is annoyance, discomfort, inconvenience, *or* sickness." 474 So.2d at 1273 (citation omitted).

Defendants allege Plaintiffs' private nuisance claim fails because it does not "establish an unreasonable use of Defendants' property."[62] To allege a cognizable claim in nuisance, plaintiff's complaint must include facts that defendant's conduct obstructed the free use of plaintiff's property. *Gates v. W.R. Grace & Co.*, 2009 WL 1455316, at *3-4 (M.D.Fla. May 21, 2009) (Plaintiff's nuisance claim was not sufficient as he failed to allege "any facts suggesting that he was annoyed or disturbed in the use or enjoyment of his property" resulting from Defendants' discharge of contaminants); *Lee-Bolton v. Koppers Inc.*, 2012 WL 12818344, at *3 (N.D.Fla. Feb. 10, 2012) ("In alleging that Defendant's conduct caused hazardous materials to enter onto Plaintiffs' property and this obstructed the use of its land, Plaintiffs have pled sufficient facts to allege a claim for nuisance."). Moreover, a nuisance action is "dependent upon an interference with the plaintiff's health, comfort, safety, or proprietary rights." *Navelski v. Int'l Paper Co.*, 244 F.Supp.3d 1275, 1309 (N.D.Fla. Mar. 25, 2017) (citation omitted). Focusing on the allegations of Defendants' conduct in their totality, it is clear that a private nuisance has been pled. Summary judgment should be denied.

## C.    Unjust Enrichment (Count VIII).

Defendants contend summary judgment should be granted as to Plaintiffs' unjust enrichment claim because Plaintiffs failed to allege they have no adequate legal remedy.[63] Under Florida law, a plaintiff must allege the following elements to sustain a claim for unjust enrichment: (1) plaintiff has conferred a benefit on defendant; (2) defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for defendants to retain it without paying the value thereof. *Carriuolo v. Gen. Motors*

---

[62] Defs.' SJ Mot. at 26.
[63] Defs.' SJ Mot. at 28.

*LLC*, 72 F.Supp.3d 1323, 1326 (S.D. Fla. Dec. 11, 2014) (quoting *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir.2012)). Plaintiffs' Complaint alleges these elements.[64]

In support of this argument, Defendants cite *Denarii Sys., LLC v. Arab*, 2013 WL 6162825, at *6 (S.D. Fla. Nov. 25, 2013) and *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 955 F.Supp.2d 1311 (S.D.Fla. 2013), for the proposition that a plaintiff may only proceed on an unjust enrichment claim, an equitable remedy, if there is no adequate remedy at law. An election of remedies, however, need not be made until "after a verdict is entered but prior to entry of judgment." *Bonilla v. Crystal Graphics Equip., Inc.*, 2012 WL 360145, at *4 (S.D.Fla. Feb. 2, 2012); *see also Adrimar Investments, LLC v. Mexam Imp. Exp. Corp.*, 2013 WL 12094883, at *3 (S.D.Fla. Mar. 22, 2013) ("[T]he case remains at the pleading stage, and it is hornbook law that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically...."). Summary judgment is inappropriate until the remainder of Plaintiffs' claims are addressed. Summary judgment should be denied.

### D.   Misrepresentation and Concealment.

Defendants contend Plaintiffs' "veiled attempts to assert claims based on alleged misrepresentation" are insufficient because the Complaint does not meet the heightened pleading standard for fraud. Plaintiffs are not asserting a fraud claim. "[A] plaintiff relying on the doctrine of fraudulent concealment must show affirmative actions by the defendant constituting concealment." *McCourtney-Bates v. Bates*, 681 Fed. Appx. 760, 762 (11thCir. 2017) (quoting *Hill v. Texaco, Inc.*, 825 F.2d 333, 335 (11th Cir. 1987)). To defeat summary judgment, Plaintiff "must demonstrate the existence of specific facts demonstrating a genuine issue for trial [to]…support[] a defense of equitable tolling." *Washington v. LaSalle Bank Nat. Ass'n*, 817 F.Supp.2d 1345, 1351 (S.D.Fla. 2011). The concealment and misrepresentation allegations relate to equitable tolling of Plaintiffs' claims.[65] While Defendants have not alleged Plaintiffs' claims are time-barred, the inclusion of these allegations protects such a defense. Plaintiffs identified specific facts to support equitable tolling. Summary judgment is not appropriate.

### VI.   CONCLUSION

Plaintiffs request that the Court deny Defendants' Motion for Summary Judgment.

Dated:  May 13, 2019                                    Respectfully Submitted,

---

[64] ECF No. 1 at ¶¶ 202-05.
[65] ECF No. 1 at ¶¶ 25, 96-98, 208.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL  33134-2351
Telephone:  (305) 476-7400
Facsimile:  (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Southern District of Florida by using the CM/ECF System, which will send a notice of electronic filing on this 13th day of May, 2019.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

# EXHIBIT

# "H"

NROEN - 0002279



MRGEN - 0000280



MROEN - 000282



Case 2:11-cv-22408-MSC Document 290-1 Entered on FLSD Docket 09/13/2019 Page 5 of 7



MROEN - 000283



MROEN - 000284



MROEX-3X0285

Case 2:09-md-02047-EEF-MBN   Document 22363-66   Filed 11/10/19   Page 45 of 453

# EXHIBIT

## "I"

Rosen, K-Indicia-0013

Rosen, K-Indicia-0014



Rosen, K-Indicia-0015





Rosen, K-Indicia-0016



Rosen, K-Indicia-0017



Rosen, K-Indicia-0033

Rosen, K-Indicia-0034



Case 2:09-cv-02047-EEF-MBN Document 284-2 Entered on FLSD Docket 05/13/2019 Page 9 of 12

Rosen, K-Indicia-0035



Rosen, K-Indicia-0036





Rosen, K-Indicia-0037

Rosen, K-Indicia-0038

# EXHIBIT

# "K"

Case 2:09-md-02047-EEF-MBN  Document 22363-66  Filed 11/19/19  Page 58 of 453
Case 2:09-md-02047-EEF-MBN  Document 22363-66  Filed 11/19/19  Page 58 of 453 of
321
Confidential - Subject to Further Confidentiality Review

```
 1    UNITED STATES DISTRICT COURT
 2    EASTERN DISTRICT OF LOUISIANA
 3    ********************************************
 4    IN RE:  CHINESE-MANUFACTURED   MDL NO. 2047
       DRYWALL PRODUCTS LIABILITY
 5    LITIGATION                     SECTION:  L
 6    THIS DOCUMENT APPLIES TO       JUDGE FALLON
       ALL CASES
 7                                   MAG. JUDGE
                                     WILKINSON
 8
       ********************************************
 9
10         CONFIDENTIAL - SUBJECT TO FURTHER
11            CONFIDENTIALITY REVIEW
12           Tuesday, January 22, 2019
13
14
15
16         Videotaped 30(b)(6) Deposition of
       TAISHAN GYPSUM CO., LTD f/k/a SHANDONG TAIHE
17    DONGXIN CO., LTD. RE: PRODUCT IDENTIFICATION,
       through the testimony of GANG CHE, held at
18    Alston & Bird LLP, 1201 West Peachtree
       Street, Atlanta, Georgia, commencing at
19    8:49 a.m., on the above date, before
       Michael E. Miller, Registered Diplomate
20    Reporter, Certified Realtime Reporter and
       Notary Public.
21
22
23                 __ __ __
24         GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
25              deps@golkow.com
```

Confidential - Subject to Further Confidentiality Review
321

```
 1    A P P E A R A N C E S:
 2    COUNSEL FOR THE PLAINTIFF CLASS:
 3        COLSON HICKS EIDSON
          BY:  PATRICK S. MONTOYA, ESQUIRE
 4            patrick@colson.com
          255 Alhambra Circle
 5        Penthouse
          Coral Gables, Florida 33134
 6        (305) 476-7400
 7
 8        LAW OFFICES OF RICHARD J. SERPE PC
          BY:  RICHARD J. SERPE, ESQUIRE
 9            rserpe@serpefirm.com
          580 East Main Street
10        Suite 310
          Norfolk, Virginia 23510
11        (757) 233-0009
12
13        HERMAN HERMAN & KATZ LLC
          BY:  STEVE HERMAN, ESQUIRE
14            sherman@hhklawfirm.com
              820 O'Keefe Avenue
15        New Orleans, Louisiana 70113
          (504) 581-4892
16
17        LEVIN FISHBEIN SEDRAN & BERMAN
          BY:  SANDRA L. DUGGAN, ESQUIRE
18            sduggan@lfsblaw.com
              ARNOLD LEVIN, ESQUIRE
19            alevin@lfsblaw.com
          510 Walnut Street
20        Suite 500
          Philadelphia, Pennsylvania 19106
21        (215) 592-1500
22
23
24
25
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 60 of 453
Case 1:01-at-00000 Document 244 Filed in TXSD Docket 05/13/2010 Page 4 of 321
Confidential - Subject to Further Confidentiality Review

```
 1      A P P E A R A N C E S:
 2          IRPINO LAW FIRM
            BY:  PEARL A. ROBERTSON, ESQUIRE
 3               probertson@irpinolaw.com
            2216 Magazine Street
 4          New Orleans, Louisiana 70130
            (504) 525-1500
 5
 6          BARRIOS KINGSDORF & CASTEIX LLP
            BY:  EMMA SCHWAB, ESQUIRE
 7               eschwab@bkc-law.com
            701 Poydras Street
 8          Suite 3650
            New Orleans, Louisiana 70139-3650
 9          (504) 524-3300
10
            LAW OFFICE OF ALLISON GRANT, P.A.
11          BY:  ALLISON KAY GRANT, ESQUIRE
                 agrant@allisongrantpa.com
12          14 Southeast 14th Street
            Boca Raton, Florida 33432
13          (561) 994-9646
14
            SEEGER WEISS LLP
15          BY:  CAROLINE CHOE, ESQUIRE
                 cchoe@seegerweiss.com
16          1515 Market Street
            Philadelphia, Pennsylvania 19102
17          (215) 564-2300
18
19    COUNSEL FOR TAISHAN GYPSUM COMPANY:
20          ALSTON & BIRD LLP
            BY:  BERNARD TAYLOR, ESQUIRE
21               bernard.taylor@alston.com
                 CHRISTY HULL EIKHOFF, ESQUIRE
22               christy.eikhoff@alston.com
            One Atlantic Center
23          1201 West Peachtree Street
            Atlanta, Georgia 30309-3424
24          (404) 881-7000
25
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 61 of 453
Case 1:19-cv-00024-MR-E Document 284 Filed 05/13/2010 Page 5 of
321
Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:

 2        ALSTON & BIRD LLP
          BY:  HELEN SU, ESQUIRE
 3            helen.su@alston.com
          1950 University Avenue
 4        5th Floor
          East Palo Alto, California 94303
 5        (650) 838-2000

 6

 7        AKERMAN LLP
          BY:  ENJOLIQUÉ D. AYTCH, ESQUIRE
 8            enjolique.aytch@akerman.com
          350 East Las Olas Boulevard
 9        Suite 1600
          Fort Lauderdale, Florida 33301
10        (954) 463-2700

11

12   COUNSEL FOR BNBM DEFENDANTS:

13        ORRICK HERRINGTON & SUTCLIFFE LLP
          BY:  ANDREW K. DAVIDSON, ESQUIRE
14            adavidson@orrick.com
          The Orrick Building
15        405 Howard Street
          San Francisco, California 94105
16        (415) 773-5700

17

18   ALSO PRESENT:

19        YAN GAO, HERMAN HERMAN & KATZ

20        JING XU, ALSTON & BIRD

21        SUNNY WANG, MANDARIN INTERPRETER

22        JOSH COLEMAN, VIDEOGRAPHER

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 62 of 453
Case 1:01-cv-12257-PBS Document 2944 Filed 09/05/13 Page 62 of 453
Confidential - Subject to Further Confidentiality Review
321

```
 1                          INDEX
 2
     PROCEEDINGS                                    8
 3
 4
     EXAMINATION OF GANG CHE:
 5
          BY MR. MONTOYA                            9
 6
          BY MR. SERPE                            153
 7
 8
     CERTIFICATE                                 193
 9
     ERRATA                                      195
10
     ACKNOWLEDGMENT OF DEPONENT                  196
11
     LAWYER'S NOTES                              197
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1                        DEPOSITION EXHIBITS
                               GANG CHE
 2                           January 22, 2019
 3    NUMBER              DESCRIPTION                    PAGE
 4    Exhibit     Color Photographs                        16
      PID-1
 5    Exhibit     Excerpted Color Photographs             133
      PID-1B      from Exhibit PID-1
 6
      Exhibit     Excerpted Color Photographs              30
 7    PID-1D      from Exhibit PID-1
 8    Exhibit     Excerpted Color Photographs              17
      PID-1E      from Exhibit PID-1
 9
      Exhibit     Excerpted Color Photographs              54
10    PID-1F      from Exhibit PID-1
11    Exhibit     Excerpted Color Photographs             140
      PID-1G      from Exhibit PID-1
12
      Exhibit     Excerpted Color Photographs              77
13    PID-1H      from Exhibit PID-1
14    Exhibit     Excerpted Color Photographs             101
      PID-1I      from Exhibit PID-1
15
      Exhibit     Excerpted Color Photographs             114
16    PID-1J      from Exhibit PID-1
17    Exhibit     Appendix 1 to the Parties'               10
      PID-2       Joint Submission to Special
18                Master Regarding Product
                  Identification Discovery and
19                Adjudication
20    Exhibit     CDW PID Position Chart                   10
      PID-3
21
      Exhibit     Taian Taishan Plasterboard               14
22    PID-7       Co., Ltd. Manufacturer
                  Profile Form
23
      Exhibit     Pretrial Order #1                       154
24    PID-9
25
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 64 of 453
Case 2:14-cv-02048-MDL Document 284 Filed 05/15/2019 Page 4 of 538
Confidential – Subject to Further Confidentiality Review
321

```
 1                    DEPOSITION EXHIBITS
 2
      Exhibit    Taian Taishan Packing List          45
 3    PID-15
 4    Exhibit    11/06 E-mail from Jiapo Yang       119
      PID-20     w/Attachment(s)
 5               TG-0234499 - TG-0234511
 6    Exhibit    Color Photograph                    67
      PID-28
 7
      Exhibit    10/05 E-mail(s)                     90
 8    PID-35     w/Attachment(s)
               TG-0234633 - TG-0234639
 9
      Exhibit    2/06 E-mail(s) from Tian Wu         54
10    PID-37     w/Attachment(s)
               TG-0082861 - TG0082862
11
      Exhibit    Color Photographs                   38
12    PID-41     TG-PID-000001 - TG-PID-000033
13    Exhibit    Amended Notice of Deposition        29
      PID-48
14
      Exhibit    Color Photograph                   144
15    PID-50     TG-PID-000079 - TG-PID-000080
16    Exhibit    Color Photograph                    76
      PID-51
17
18
19
20
21
22
23
24
25
```

Case 2:09-md-02047-EEF-MBN   Document 22363-66   Filed 11/19/19   Page 65 of 453
Case 1:14-cv-24074-MGC   Document 184-1   Entered on FLSD Docket 05/13/2016   Page 65 of
321

Confidential - Subject to Further Confidentiality Review

```
1              PROCEEDINGS

2            (January 22, 2019 at 8:49 a.m.)

3            THE VIDEOGRAPHER:  We are now

4       on the record.  My name is Josh

5       Coleman.  I'm the videographer for

6       Golkow Litigation Services.  Today's

7       date is January 22nd, 2019.  The time

8       is approximately 8:49 a.m.

9            This video deposition is being

10      held in Atlanta, Georgia in the matter

11      of In re Chinese Manufactured Drywall

12      Product Liability Litigation before

13      the United States District Court for

14      the Eastern District of Louisiana.

15           The deponent is Che Gang, a

16      30(b)(6) witness for Taishan, with the

17      interpreter, Sunny Wang.

18           Counsel will be noted on the

19      stenographic record.

20           The court reporter is Mike

21      Miller, who will now swear in the

22      witness.

23           (Interpreter was reminded of

24      her oath.)

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 66 of 453
Case 1:11-cv-00894-WCG Document 241-3 entered on FLSD Docket 08/15/2019 Page 30 of
321

Confidential - Subject to further confidentiality Review

1           GANG CHE,

2       having been first duly sworn,

3           testified as follows:

4               EXAMINATION

5   BY MR. MONTOYA:

6       Q.      Good morning.

7       A.      Good morning.

8       Q.      Tell us your name please, sir.

9       A.      Che Gang.

10      Q.      Sir, you're here today to

11  testify as the corporate representative on

12  behalf of Taian Taishan Plasterboard and

13  Taishan Gypsum, correct?

14      A.      Correct.

15      Q.      For the purposes of this

16  deposition, I'm going to use the term

17  "Taishan" to refer to both Taishan Gypsum and

18  Taian Taishan Plasterboard.

19              Is that acceptable to you?

20      A.      Yes.

21      Q.      In the past depositions we've

22  used the term TG and TTP.  Do you recall

23  those terms?

24      A.      I don't have a clear

25  recollection on that.  There was such an

1    understanding.

2         Q.    When I refer to "Taishan" in

3    the deposition, I mean both Taishan and Taian

4    Taishan Plasterboard.

5              You understand that, correct?

6         A.    All right.

7         Q.    Sir, I'm going to show you what

8    we've marked as Exhibit 2 and Exhibit 3 to

9    this deposition.

10             (Deposition Exhibit PID-2

11        marked.)

12             (Deposition Exhibit PID-3

13        marked.)

14             MR. MONTOYA:  Hand one to your

15        counsel.

16             And, Bernard, I'm going to

17        represent to you that Exhibit 2 is the

18        previous version of the product ID

19        position chart that was later revised.

20        I'm not going to spend, frankly, any

21        time on Exhibit 2.  I'm going to go to

22        Exhibit 3, which is the revised one.

23             MR. TAYLOR:  Got it.

24    BY MR. MONTOYA:

25        Q.    Sir, Exhibit 2 has a Chinese

Confidential - Subject to Further Confidentiality Review

1    translation attached to it.

2              Do you see that?

3    A.      I'm looking at it right now.

4    Q.      Did you assist in the

5    preparation of Exhibit 2 to your deposition?

6    A.      Yes.

7    Q.      I'm going to ask you to put

8    Exhibit 2 aside.  I'm going to give you

9    Exhibit 3.  I'm going to hand a copy to your

10   counsel and to you as well.

11             Sir, Exhibit 3 to your

12   deposition is what we've called the Chinese

13   Drywall Product ID Position Chart.  It also

14   has a translation attached.

15             Do you see that?

16   A.      I see that.

17             MS. EIKHOFF:  Mr. Montoya, I

18        think you may have inadvertently

19        misspoken.  You said that Exhibit 2

20        was a prior version and Exhibit 3 was

21        a corrected version?

22             MR. MONTOYA:  Are they

23        reversed?

24             MS. EIKHOFF:  There was no

25        correction.  Exhibit 2 was filed with

```
 1              the Florida court, and it is the only

 2              version that's ever been filed with

 3              the Florida court, and no correction

 4              was needed or made on that.

 5                   Exhibit 3 is what we submitted

 6              to you as part of our discovery

 7              process to provide you with additional

 8              PID information and categories that

 9              were not at issue in Florida.

10                   MR. MONTOYA:  So my

11              understanding was PID-3 was the

12              revised chart.

13                   MS. EIKHOFF:  It's not revised.

14              It was -- it's --

15                   MR. MONTOYA:  Or amended.

16                   MS. EIKHOFF:  I guess... right.

17              But I just want to make clear for the

18              record that PID-2 is what we have

19              filed in Florida, and it is correct.

20              And it -- no revisions are needed for

21              the purposes of the Florida

22              litigation.

23                   MR. MONTOYA:  Okay.  I got it.

24              As to Florida, I understand.

25                   MS. EIKHOFF:  As to Florida,
```

Confidential - Subject to Further Confidentiality Review

1        yes.

2                MR. MONTOYA:  I'm with you.

3        Okay.

4    BY MR. MONTOYA:

5        Q.     Sir, I'm going to discuss with

6    you Exhibit 3.

7        A.     What are the differences

8    between the two?

9        Q.     We just discussed the

10   differences between the two.  Exhibit 3

11   contains descriptions of brands named DUN,

12   D-U-N, and Crescent City.

13               Sir, did you have a role in

14   helping to prepare Exhibit 3.

15       A.     Those copies contain DUN.

16   They're the same.

17       Q.     Sir, we're going to work off of

18   Exhibit 3 for today, okay?

19               Did you assist in preparing

20   Exhibit 3?

21       A.     Let me put it this way:  Before

22   the deposition, during preparation, I have

23   prepared for this one that was submitted by

24   Alston.

25       Q.     And when you say "this one,"

Confidential - Subject to Further Confidentiality Review

1    you're referring to Exhibit 3, correct?

2         A.     If Exhibit 3 is the one that

3    Alston had submitted, that would be correct.

4              MR. MONTOYA:  Counsel, we're

5         comfortable with that?

6              MS. EIKHOFF:  Yes.

7              MR. MONTOYA:  Okay.

8              MS. EIKHOFF:  It was Exhibit 3.

9    BY MR. MONTOYA:

10        Q.     Sir, I'm going to hand you what

11   we're marking as Exhibit 7 to your

12   deposition, which is the Taian Taishan

13   Plasterboard Company's Manufacturer Profile

14   Form.

15             (Deposition Exhibit PID-7

16        marked.)

17             MR. MONTOYA:  I've handed a

18        copy to your counsel.

19             THE INTERPRETER:  The

20        interpreter will repeat her

21        interpretation.

22             (Translation.)

23             THE INTERPRETER:  May the

24        interpreter clarify?

25             MR. MONTOYA:  Yes.

Confidential - Subject to Further Confidentiality Review

```
 1                THE INTERPRETER:  What is the

 2        translation of "profile" in this

 3        context?

 4                MR. MONTOYA:  That's what it's

 5        titled.

 6                THE INTERPRETER:  This is the

 7        interpreter speaking.  Would

 8        "manufacturer record" be --

 9                MS. ROBERTSON:  Sunny, the

10        Chinese follows the English.

11                THE INTERPRETER:  I can just

12        translate?  Okay.  Thank you.  The

13        interpreter will reinterpret.

14                (Translation.)

15   BY MR. MONTOYA:

16        Q.    Sir, did you review Exhibit 7

17   in preparation for your deposition today?

18        A.    Yes.

19        Q.    Are you prepared to testify on

20   behalf of Taishan regarding Exhibit 7?

21        A.    Yes.

22        Q.    And we'll refer to this

23   document, Exhibit 7, as the Manufacturer

24   Profile Form.

25                So I'm going to hand you what
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 73 of 453
Case 1:16-cv-01394-WCG Document 245 Filed 04/08/19 Page 53 of 317
Confidential - Subject to Further Confidentiality Review
321

```
 1    we're going to mark as Exhibit 1 to your

 2    deposition, with a copy to your counsel.

 3              (Deposition Exhibit PID-1

 4         marked.)

 5    BY MR. MONTOYA:

 6         Q.    So I'll represent to you that

 7    Exhibit 1 is a collection of 44 photographs

 8    that were on the Court's website.

 9              Have you seen these documents

10    before?

11              MS. EIKHOFF:  Objection.  These

12         documents were not posted on the

13         Court's website.  These are documents

14         that have been submitted by the

15         parties in agreement that these are

16         exemplars of product ID photographs.

17              MR. MONTOYA:  I'm with you.

18         That's my mistake.

19    BY MR. MONTOYA:

20         Q.    Sir, that was my error.  Let me

21    restate my question.

22              Sir, are you familiar with

23    Exhibit 1?

24         A.    I'm not sure I have reviewed

25    every one of these pictures, but for the
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 74 of 453
Case 1:16-cv-05037-AMD-JO Document 248-3 Filed 06/15/2018 Page 18 of
321

Confidential - Subject to Further Confidentiality Review

 1    majority of it, I'm sure that I have reviewed

 2    during the time of my preparation.

 3         Q.     Did you use Exhibit 1, the

 4    photographs, to help in preparing Exhibit 3,

 5    the chart?

 6         A.     Yes.

 7         Q.     And did you review Exhibit 1,

 8    the photographs, in preparation for your

 9    deposition today?

10         A.     Yes.

11         Q.     Are you prepared to testify on

12    behalf of Taishan regarding Exhibit 1?

13         A.     Yes.

14         Q.     All right, sir.  Throughout

15    this deposition today, I'm going to take

16    smaller pieces of Exhibit 1 and break it into

17    smaller parts, so I'm going to hand you

18    Exhibit 1E, I believe.

19              (Deposition Exhibit PID-1E

20         marked.)

21    BY MR. MONTOYA:

22         Q.     So I'm handing your counsel a

23    copy of Exhibit 1E, and if you look at

24    Exhibit 1E, if you go to page 42 of

25    Exhibit 1, you'll see it's the same

1    photograph.

2              Do you see that?

3        A.      I see page 42.

4        Q.      And you know that page 42 is

5    just one page out of Exhibit 1?

6        A.      All right.

7        Q.      Sir, Taishan agrees that it

8    produced the drywall that is photographed in

9    Exhibit 1E, correct?

10       A.      If the picture at the bottom

11   and picture -- the two pictures on the top

12   are from the same board, Taishan does not

13   deny that Taishan had produced the board.

14              But Taishan also does not

15   exclude the possibility that somebody faked

16   the brand of Taishan.

17       Q.      How are you able to determine

18   that Taishan stamped the markings on the back

19   of the drywall in Exhibit 1E?

20       A.      Because in the Taishan

21   Manufacturer Profile Form, it is marked that

22   Taishan had produced the DUN brand product.

23       Q.      Did you do anything other than

24   look at the Manufacturer Profile Form to

25   determine that the drywall photographed in

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 76 of 453
Case 1:11-cv-02480-WCG Document 294-3 Entered on FLSD Docket 09/15/2015 Page 30 of
321
Confidential - Subject to Further Confidentiality Review

1    Exhibit 1E was manufactured by Taishan?

2        A.      Can you repeat that?

3        Q.      Sure.

4        A.      And it is pretty long.

5                THE INTERPRETER:  The

6        interpreter -- may the interpreter

7        repeat it for him?

8                MR. MONTOYA:  Yes.

9                (Translation.)

10       A.      Yes.

11   BY MR. MONTOYA:

12       Q.      Did you look at anything other

13   than the Manufacturer Profile Form to

14   determine that the drywall in Exhibit 1E was

15   produced by Taishan?

16       A.      Besides referring to Taishan

17   Manufacturer Profile Form, I had also tried

18   hard to look into the Taishan's warehouse and

19   to find some residue products from those

20   years which produced by Taishan with American

21   sizes.

22               In addition to that, with the

23   assistance of attorneys, I've also reviewed a

24   large quantity of pictures regarding to the

25   marking.

Confidential - Subject to Further Confidentiality Review

```
1         Q.      Are you able to determine by

2    looking at Exhibit 1E, by the markings alone,

3    whether the board was manufactured by

4    Taishan?

5         A.      Are you referring to this one?

6         Q.      Yes.

7         A.      I have just said that by

8    looking at the top two pictures alone, we do

9    not deny that it was produced by Taishan;

10   however, we also do not exclude the

11   possibility that somebody faked Taishan's

12   brand.  Because in China, Taishan is a known

13   brand and a reliable brand.

14        Q.      Are you able to tell by the

15   font, F-O-N-T, in Exhibit 1E whether the

16   drywall is manufactured by Taishan?

17        A.      The same one?

18        Q.      Yes.

19        A.      From looking at the font alone,

20   I'm not able to determine the source of this

21   gypsum board.  I'll need more time to make a

22   decision on that.

23        Q.      Are you able to look at the

24   font alone in pictures 1 through 44 of

25   Exhibit 1 to determine if Taishan produced
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 78 of 453
Case 1:16-cv-02028-WFK Document 24-3 Entered on FLSD Docket 08/13/2015 Page 32 of
321
Confidential - Subject to Further Confidentiality Review

1    the board?

2              MR. TAYLOR:  To be sure that

3         we're clear on the question you're

4         asking, are you asking to go through

5         each one and respond?

6              MR. MONTOYA:  No.  What I'm

7         asking is simply by the font alone,

8         can he determine whether or not they

9         manufactured the board.

10    A.      Are we going to discuss one by

11    one or something else?

12    BY MR. MONTOYA:

13    Q.      No.  Sir, my question is:  If

14    you look through Exhibit 1, is Taishan able

15    to say, just by the font alone, whether they

16    manufactured the drywall or not?

17    A.      This is a booklet of 40 pages

18    with different fonts.  If I look at fonts

19    alone, without other information to support

20    it, I'm not able to determine who

21    manufactured the boards because, from what I

22    learned from customers, at the time there

23    were many manufacturers produced similar

24    boards with American sizes, not only Taishan.

25    Q.      Sir, in Exhibit 1E, you see the

Case 2:09-md-02047-EEF-MBN   Document 22363-66   Filed 11/19/19   Page 79 of 453
Case 2:11-cv-01408-EEF-MBN   Document 204-3   Filed Under Seal 01/13/2015   Page 33 of 321
Confidential - Subject to Further Confidentiality Review

```
 1    words "As Per ASTM C1396-04" in the photo on

 2    the lower part of the page?

 3         A.      I see that.

 4         Q.      And after that phrase, do you

 5    see numbers?  It looks like 0704 and then

 6    some other numbers?

 7         A.      I see that.

 8         Q.      What are those numbers?

 9         A.      I believe those are sequential

10    numbers.

11         Q.      What are the sequential numbers

12    for?

13         A.      I'm not sure about this.

14         Q.      Did you do any research to find

15    out what those numbers were?

16         A.      I did check some relevant

17    information, but it's been quite a while.  It

18    was not able to be determined what those

19    numbers represent -- represented at the time.

20               And I am also not sure by only

21    looking at the picture at the bottom alone

22    that it belongs to Taishan.

23         Q.      Is it your testimony here today

24    that the lower picture on Exhibit 1E was not

25    manufactured by Taishan?
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 80 of 453
Case 1:16-cv-14022-WGY Document 244-1 Entered on FLSD Docket 11/20/19 Page 34 of 321
Confidential - Subject to Further Confidentiality Review

1      A.     I am only expressing that by

2  looking at the bottom picture alone, I can no

3  longer determine whether or not it was

4  manufactured by Taishan.

5            By looking at the two top

6  pictures, we do not deny that it was

7  manufactured by Taishan; however, we also do

8  not exclude the possibility that someone

9  might have faked the mark of Taishan's board.

10     Q.     Sir, what numbers -- I'm sorry,

11 let me start over again.

12            Sir, what markings -- let me

13 start over again.

14            Does Taishan put any batch

15 numbers or factory numbers on its board when

16 it creates it?

17            MR. TAYLOR:  Objection to form.

18            THE WITNESS:  Do I need to

19     answer that question?

20            MR. MONTOYA:  Yes.

21            THE WITNESS:  I would like to

22     hear from my attorney whether or not I

23     need to answer that question.

24            MR. TAYLOR:  You can go ahead

25     and answer, to the extent you can.

1       A.      For this question, you have to

2   specifically determine for each batch.  You

3   cannot make a general statement for that.

4   BY MR. MONTOYA:

5       Q.      Is it Taishan's practice to put

6   a batch number on the boards that it

7   manufactures?

8               MR. TAYLOR:  Object to the

9           form.

10              THE WITNESS:  Do I need to

11          answer that?

12              MR. MONTOYA:  Yes, sir.

13              MR. TAYLOR:  Yes.

14      A.      As I said earlier, Taishan's

15  practice is not to make a general statement

16  on whether or not to put batch number on it.

17  It would have to be determined according to

18  specific circumstances.

19  BY MR. MONTOYA:

20      Q.      Are there any documents that

21  you could look at to determine whether or not

22  a batch number was put on drywall that

23  Taishan produced?

24      A.      If it were for the domestic

25  product made by Taishan, we have documents to

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 82 of 453
Case 2:14-cv-02094-EEF-MBN Document 243-3 Entered on FLSD Docket 08/13/2019 Page 82 of 321

Confidential - Subject to Further Confidentiality Review

1    check.  Now we're talking about Taishan --

2    Taishan's own brand products.  If it was a

3    product by customer special request, we would

4    not be able to determine the information.

5    All these are made according to the

6    customers' requests.

7         Q.     Is the DUN brand a known brand

8    in China?

9         A.     DUN brand in China is not a

10   famous brand, but Taishan in China is a

11   famous brand.  Therefore, many companies, in

12   order to fake Taishan's manufacture the

13   product did not limit on faking Taishan brand

14   alone because the products produced by

15   Taishan are reliable; therefore, its products

16   are trusted by others, therefore, a

17   possibility of being imitated.

18        Q.     How would you know if another

19   manufacturer made a fake board with DUN?

20             MR. TAYLOR:  Objection, form.

21             MR. MONTOYA:  What's the

22        objection?  I'm sorry.

23             MR. TAYLOR:  It's unclear.

24        "Fake board with DUN" is pretty broad.

25             ///

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 83 of 453
Case 1:11-cv-04028-WGC Document 243-3 Entered on FLSD Docket 01/13/2013 Page 37 of 321

Confidential - Subject to Further Confidentiality Review

1    BY MR. MONTOYA:

2        Q.      How would Taishan know if the

3    DUN board was a counterfeit board?

4        A.      I was only saying that Taishan

5    does not exclude the possibility that someone

6    faked Taishan's products.

7        Q.      Do you have any information

8    that the DUN brand was faked by another

9    manufacturer?

10       A.      Currently for Taishan's product

11   in China, we have a specific department to

12   fight the fake products.  They will search

13   all products under the title of Taishan which

14   are counterfeit.

15               If you want -- if you want the

16   current record for fighting the counterfeit

17   product, we do have those current records,

18   but they're not necessarily records for DUN

19   brand because it's impossible for the

20   counterfeiters to manufacture DUN brand

21   product according to your request.  They

22   manufactured Taishan's brand in a counterfeit

23   manner randomly and purposefully.

24       Q.      How long has Taishan had a

25   department to deal with counterfeiting?

1    A.    It's been a long time.  I do

2  not remember the specific time because, as a

3  Chinese famous brand of products, Taishan has

4  been there for a long time as well.

5    Q.    Sir, you said that you have

6  current records regarding counterfeiting.  Do

7  you have any -- does Taishan have any records

8  from 2005 through 2007 regarding

9  counterfeiting of drywall?

10    A.    When I was preparing for the

11  deposition as the corporate representative, I

12  did search for information in this regard.

13  But unfortunately, they were not kept.

14    Q.    Who did you talk to?

15    A.    I finalized that with the

16  department of fighting counterfeit products.

17    Q.    Who specifically did you talk

18  to in that department about the records from

19  2005 to 2007, if anyone?

20    A.    I finalized that by approaching

21  the department manager, Mr. Zhuo.

22        THE INTERPRETER:  Interpreter

23    spelling, Z-H-U-O.

24  BY MR. MONTOYA:

25    Q.    How long has Mr. Zhuo -- I'm

1   going to get the name wrong -- been working

2   for Taishan?

3       A.    Also for a long time, but I

4   don't have a clear recollection on that

5   because it is not included in my depo

6   preparation.

7       Q.    How many people are in

8   Taishan's department that works with fake

9   products?

10       MR. TAYLOR:  Objection to form.

11       A.    I'm not sure because I did not

12   finalize this area because I do not think

13   it's relevant to the deposition this time.

14   BY MR. MONTOYA:

15       Q.    Did Taishan produce any DUN

16   drywall with any other markings on the edge

17   sealing tape other than "DUN Drywall"?

18       A.    I don't understand your

19   question.

20       Q.    For the DUN drywall in

21   Exhibit 1E, is there edge sealing tape?

22       MR. TAYLOR:  Objection to form.

23     Objection to form.

24       MS. EIKHOFF:  Yeah.  And,

25     Patrick, it's probably best for you to

Confidential - Subject to Further Confidentiality Review

```
 1        not say "edge sealing tape," because

 2        that could be interpreted as

 3        C-E-I-L-I-N-G or S-E-A-L-I-N-G.  I

 4        think we talked before that just "edge

 5        tape" is better terminology for

 6        everyone to understand.

 7             MR. MONTOYA:  Okay.  I'm just

 8        going off the form, so I'll reask the

 9        question.

10   BY MR. MONTOYA:

11        Q.    Sir, does the DUN Gypsum brand

12   drywall have edge tape?

13        A.    Reflected from the

14   manufacturer's information, DUN brand board

15   does have edge tapes.

16        Q.    I'm going to show you what

17   we've marked as Exhibit 48 to your

18   deposition, which is the deposition notice

19   and a translation.

20             (Deposition Exhibit PID-48

21        marked.)

22   BY MR. MONTOYA:

23        Q.    Sir, you're testifying here

24   today on behalf of Taishan for topics 1

25   through 10, listed on Exhibit 48, correct?
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 87 of 453
Case 2:09-cv-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 31 of 321
Confidential – Subject to Further Confidentiality Review

1     A.     Yes.

2     Q.     I'm going to hand you

3  Exhibit 1D, like dog, 1D to your deposition.

4            (Deposition Exhibit PID-1D

5       marked.)

6  BY MR. MONTOYA:

7     Q.     I'll represent to you that

8  Exhibit 1D is photographs 27, 28 and 29 from

9  Exhibit 1.

10           Do you see that?

11    A.     I see that.

12    Q.     I'll ask you also to take a

13  look at Exhibit 3, and the photographs 27, 28

14  and 29 correspond to Crescent City Gypsum.

15           Do you see that?

16    A.     I see that.

17    Q.     And Taishan agrees that at

18  Exhibit 1D, photograph 29, that it

19  manufactured boards with those markings,

20  correct?

21    A.     Can you repeat that?

22    Q.     Sure.

23    A.     I did not hear clearly.

24    Q.     Taishan agrees that the

25  markings contained in photograph 29 of

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 88 of 453
Case 2:09-cd-02047-EEF-MBN Document 22363-66 Filed 08/13/2019 Page 32 of
321
Confidential -- Subject to further confidentiality Review

1    Exhibit 1D were produced by Taishan?

2         A.    Taishan does not deny the

3    number 29 was produced by Taishan.

4         Q.    Sir, do you know what the

5    term -- the letters 16, 1-6, OC on photograph

6    29 mean?

7         A.    I do not know.

8         Q.    Did you see documents in your

9    research that show that Taishan stamped

10   "16OC" on some of the drywall that it

11   manufactured?

12        A.    During the depo preparation as

13   the corporation representative, we tried very

14   hard to look and found in a corner of a

15   warehouse residue boards bearing the American

16   size marks at the time.  Included in those

17   boards are the markings similar to the

18   markings on page 29.

19             Upon comparing the residue

20   boards with American size with the boards on

21   the picture, the conclusion we made is

22   Taishan denies that it has produced the

23   product on the picture of 27 and 28.

24             But Taishan does not deny that

25   the product bearing the marking on picture 29

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 89 of 453
Case 1:16-cv-04044-JFG Document 294-3 entered on FLSD Docket 11/16/18 Page 33 of
321

Confidential - Subject to Further Confidentiality Review

 1    was produced by Taishan.

 2                 MR. TAYLOR:  Counsel, we're

 3         right within that 50- to 60-minute

 4         period.  I don't want to --

 5                 MR. MONTOYA:  That's fine.

 6         We're at a break.

 7                 THE VIDEOGRAPHER:  We're now

 8         going off the video record.  The time

 9         is currently 9:45 a.m.  This is the

10         end of Media No. 1.

11                 (Recess taken, 9:45 a.m. to

12         9:59 a.m.)

13                 THE VIDEOGRAPHER:  We are now

14         back on the video record with the

15         beginning of Media No. 2.  The time is

16         currently 7:59 a.m. -- I'm sorry,

17         9:59 a.m.

18    BY MR. MONTOYA:

19         Q.    Sir, Exhibit 1D, photograph 29,

20    is that the same drywall that is identified

21    at line 214 of Exhibit 7 in the Manufacturer

22    Profile Form?

23                 THE WITNESS:  Can you

24         reinterpret what line it was?

25                 THE INTERPRETER:  The

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 90 of 453
Case 1:11-cv-01408-CG-B Document 244-3 entered on FLSB Docket 08/15/2019 Page 34 of
321
Confidential - Subject to Further Confidentiality Review

1    interpreter will reinterpret.

2         MR. MONTOYA:  Sure.  Line 214

3    of Exhibit 7.

4    A.     During the deposition

5    preparation as a corporate representative, we

6    tried hard, and according to the comparison

7    of what we have found in Taishan's warehouse,

8    the residual board, with the picture

9    number 29, we believe it is the product

10   reflected on line 214.

11   BY MR. MONTOYA:

12        Q.     If we look at line 214, the

13   product marking says "Made in China,

14   Ceiling."

15             Do you see that?

16   A.     I see that.

17        Q.     Do you agree with me that

18   photograph 29 also has the words "16OC" after

19   "Ceiling"?

20             THE WITNESS:  Can you repeat

21   your interpretation?

22             THE INTERPRETER:  The

23   interpreter will repeat.

24        (Translation.)

25   A.     Yes.

Confidential - Subject to Further Confidentiality Review

```
1    BY MR. MONTOYA:

2         Q.     Do you agree that the words --

3                MR. MONTOYA:  Read back my last

4         question, please, I'm sorry.

5                (The following portion of the

6         record was read.)

7                "QUESTION:  Do you agree with

8         me that photograph 29 also has the

9         words '16OC' after 'Ceiling'?"

10               (End of readback.)

11               MR. MONTOYA:  And the answer is

12        yes, correct?

13               THE REPORTER:  Yes.

14   BY MR. MONTOYA:

15        Q.     Sir, do the words "16OC" appear

16   at line 214 of Exhibit 7?

17               THE WITNESS:  Can you repeat

18        the interpretation?

19               THE INTERPRETER:  The

20        interpreter will repeat.

21               (Translation.)

22        A.     No.

23   BY MR. MONTOYA:

24        Q.     Sir, I'm going to direct your

25   attention to line 1 of Exhibit 7, the profile
```

```
 1    form.

 2         A.     Yes.

 3         Q.     Sir, line 1 is for 82,000

 4    sheets of drywall; is that correct?

 5         A.     Approximately 82,000 sheets.

 6         Q.     Do you see the product marking

 7    listed at line 1 says "Made in China Cr"?

 8         A.     I see that.

 9         Q.     Do you know what the "Cr" means

10    in the product markings?

11         A.     I do not.  I do not know.  I

12    believe it is written that way in accordance

13    with the customer's request.

14         Q.     What documents do you have to

15    show the customer's request to have "Made in

16    China Cr" stamped on the drywall?

17         A.     Usually the customers' requests

18    are confirmed by e-mails, telephones and

19    contracts; therefore, if we're looking for

20    information in that regard and if the e-mail

21    had confirmed it, we have already submitted

22    all those e-mails to attorneys.

23         Q.     Is it your position that your

24    counsel, your lawyers, have given over

25    documents that would show orders for "Made in
```

Confidential - Subject to Further Confidentiality Review

```
 1      China Cr" to be stamped on the back of

 2      Taishan drywall?

 3              THE INTERPRETER:  The

 4          interpreter needs to clarify a

 5          translation for law firm.

 6              MR. MONTOYA:  You can say

 7          attorneys.  That's fine.

 8              THE INTERPRETER:  Mr. Che

 9          specifically said law firm's name in

10          Chinese.  Not sure how to --

11              MS. ROBERTSON:  Hogan Lovells?

12              THE INTERPRETER:  Thank you.

13      A.      I was not saying that I handed

14      over those documents to my attorney.  I was

15      saying that we have submitted all the

16      documents in 2010 to Hogan Lovells --

17              MS. ROBERTSON:  L-O-V-E-L-L-S.

18      A.      -- attorneys, and again, in

19      2015, upon the compilation of Austin --

20      Sidley Austin and submitted to the Court.  If

21      you cannot still find it, it was probably

22      made through telephone calls or face-to-face

23      in our company by our customers.

24      BY MR. MONTOYA:

25      Q.      As you prepared to be the
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 94 of 453
Case 2:14-cv-02694-EEF-MBN Document 43-1 entered on FLSD Docket 01/13/2015 Page 38 of
321

Confidential - Subject to Further Confidentiality Review

```
 1    corporate representative for Taishan today,

 2    did you see any documents where a customer

 3    requested the markings "Made in China Cr"?

 4         A.    I did not see that.

 5         Q.    Sir, Exhibit 1D, photograph 27,

 6    can you take a look at that, please?  Can you

 7    hold that up to the camera for us so he can

 8    get a view of it?

 9         A.    (Witness complies.)

10         Q.    I appreciate that.  Thank you.

11              Would you agree with me that

12    photograph 27 has white edge tape in it?

13         A.    I do not see that.

14         Q.    Do you know what the white

15    stripes are in photograph 27?

16         A.    It should be a tape of edge

17    connection.

18              THE INTERPRETER:  This is the

19         interpreter speaking.  That's a

20         literal translation.

21         A.    Which means that during the

22    production of the board, in between two

23    boards, they will need to be connected by the

24    edge connection tape.  The purpose of it is

25    to prevent cracks created between the two
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 95 of 453
Case 1:11-cv-04003-NGG Document 284-3 entered on FLSD Docket 09/13/2019 Page 39 of
321

Confidential - Subject to Further Confidentiality Review

1    boards.

2    BY MR. MONTOYA:

3        Q.    Sir, is it your position that

4    in Exhibit 27 -- or photograph 27, in the

5    lower left-hand corner, that this is not

6    white edge tape?

7        A.    According to my experience of

8    working in this industry for years, the edge

9    tape is supposed to be positioned on its

10   short side.  The spray marking is parallel

11   with the long side of the board.

12            So when you look at the spray

13   marking parallel to the long side of the

14   board, for sure it is not, an edge tape.  The

15   only possibility is that its an edge

16   connection tape.  This is determined

17   according to my years of experience working

18   in this industry.

19       Q.    Sir, I want to ask you to take

20   a look at Exhibit 41.

21            (Deposition Exhibit PID-41

22       marked.)

23            THE WITNESS:  May I have a

24       copy?  Thank you.

25            MR. MONTOYA:  Bernard, do we

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/18 Page 96 of 453
Case 11:16-md-02047-EEF-MBN Document 21841 entered on FLSD Docket 01/13/2019 Page 40 of 321
Confidential - Subject to Further Confidentiality Review

1    have a stipulation that Exhibit 41

2    were the photographs that were

3    produced to us late last week,

4    TG-PID-1 through -- on Saturday, 1

5    through 33?

6         MR. TAYLOR:  So stipulated.

7         THE WITNESS:  In the document,

8    look at TG-PID-000022.  It is clearly

9    represented that the edge tape is at a

10   vertical position in relation to the

11   spray marking.

12        Therefore, the question you

13   just asked, which that is paralleled

14   with the spray marking, for sure it is

15   not the edge tape.

16        The most possible explanation

17   is it is the edge connection tape

18   during the production.

19 BY MR. MONTOYA:

20   Q.    When you said the edge

21 connection tape, you're referring to

22 Exhibit 1D, photograph 27, correct?

23   A.    Correct.

24   Q.    And Exhibit 41 is photographs

25 that were taken in China at a Taishan

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 97 of 453
Case 1:16-cv-02009-WFK Document 294-3 entered on FLSD Docket 03/13/2019 Page 41 of
321
Confidential - Subject to Further Confidentiality Review

1    factory, correct?

2        A.      It is during my depo

3    preparation as a corporate representative

4    that we have found this board in the corner

5    of the Taishan warehouse when searching for

6    markings.  It took us a lot of efforts.

7        Q.      Sir, I'm going to ask you to

8    look at Exhibit 41, photograph 2.  Do you

9    agree with me that is drywall that Taishan

10   manufactured?

11       A.      Yes.

12       Q.      It also has a white edge that

13   runs parallel with the product markings,

14   correct?

15               THE WITNESS:  Can you

16       reinterpret it?

17               THE INTERPRETER:  The

18       interpreter will reinterpret.

19               (Translation.)

20       A.      The edge -- the white tape is

21   not edge tape.  It is a face paper of the

22   gypsum board.  There are two papers in the

23   gypsum board during production.  One is on

24   top; one is at the bottom.

25               The side that have spray

1    marking, we call it the back.  In order to

2    distinguish the front side with the back

3    side, each paper has a different color.

4             When you look at the white

5    strip of paper parallel with the spray

6    marking, it is a face paper, not an edge

7    tape, just like the picture that I showed you

8    just now.  It clearly reflected this issue.

9    BY MR. MONTOYA:

10        Q.    Sir, I want to ask you to turn

11   to photograph 15 of Exhibit 41.  Sir, does --

12   Taishan agrees that it manufactured board

13   with the markings at photograph 15, correct?

14        A.    This is only part of our

15   markings.

16        Q.    I'm sorry, my question was:

17   Does Taishan admit that it manufactured

18   boards with the markings contained at

19   Exhibit 15 -- I'm sorry, photograph 15.

20        A.    The more complete picture of

21   this marking can be found on page 23.  This

22   is a more complete information.  The picture

23   just mentioned is only part of it.

24        Q.    At Exhibit 41, photograph 23,

25   Taishan admits that it produced drywall with

1    these markings, correct?

2         A.    Correct.

3         Q.    What was the edge sealing tape

4    on photograph 23?

5         A.    The edge tape of picture 23 can

6    be seen on page 25.

7         Q.    And that edge tape at

8    photograph 25 says "Manufactured in P.R.C.,

9    Crescent City Gypsum, Incorporated," correct?

10        A.    Are you reading this?

11        Q.    Yes.

12        A.    Yes.

13        Q.    Sir, I'm going to ask you to

14   take a look at Exhibit 1D, photograph 28.

15   Yes, number 28.  Do you see photograph 28?

16        A.    Yes.

17        Q.    And I'm going to ask the

18   interpreter to interpret the words:  Does

19   photograph 28 contain the words "Ceiling

20   16OC, Wall 21OC"?

21             THE INTERPRETER:  This is the

22        interpreter speaking.  The original

23        document is in English.

24             MR. MONTOYA:  Yes.

25             THE INTERPRETER:  Would you

1          like me to interpret into Chinese and

2          ask the deponent whether it is written

3          in Chinese as I interpret it?

4                    MR. MONTOYA:  No.  No.

5                    THE INTERPRETER:  Just read it

6          as it is?

7                    MR. MONTOYA:  Just read it,

8          yes.

9                    (Translation.)

10         A.      I see that.

11   BY MR. MONTOYA:

12         Q.      Do you agree that in picture 28

13   of Exhibit 1D has the same words, "16OC Wall

14   21OC" as the drywall that was photographed in

15   your factory at picture 23 of Exhibit 41?

16         A.      No.  In fact, this is the

17   result of our effort in collecting

18   information for the purpose of my deposition

19   preparation as a corporate representative.

20   We actually found in the warehouse the

21   residual board with American size carrying

22   this spray marking.

23                  This is a conclusion made after

24   we have compared the actual board we

25   discovered in the warehouse with the picture

Confidential - Subject to Further Confidentiality Review

1    as well as the manufacturer's profile.

2            Taishan does not deny that a

3    product reflected in picture 29 might have

4    been produced by Taishan, but we deny that

5    the products on picture 27 and 28 belong to

6    Taishan.

7            The products with such a spray

8    marking reflecting from the manufacturer's

9    profile, there was only a production of 2600

10   sheets; therefore, picture 28 is not a

11   product of Taishan.

12        Q.    Sir, what did you rely upon --

13   what does Taishan rely upon to deny that it

14   manufactured the boards in Exhibit 1D,

15   photograph 27?

16            THE WITNESS:  Can you

17       reinterpret it?

18            THE INTERPRETER:  The

19       interpreter will reinterpret it.

20            I have not yet found the

21       document.  This one.

22            THE WITNESS:  (In English)

23       Thank you.

24            (Translation.)

25        A.    For the word some-some city, it

1    is only a spray marking on Taishan's product

2    as stamped on the edge tape, but it is not

3    reflected on the spray marking.  This is not

4    consistent with the spray marking we found on

5    the residual boards in our warehouse.

6    BY MR. MONTOYA:

7        Q.    Sir, I'm going to hand you

8    Exhibit 15 to your deposition.

9            (Deposition Exhibit PID-15

10       marked.)

11   BY MR. MONTOYA:

12       Q.    Sir, you've seen Exhibit 15

13   before, correct?

14       A.    I don't have a clear

15   recollection on that.

16       Q.    Is Exhibit 15 a packing list

17   and invoice from Taian Taishan Plasterboard

18   Company, Limited?

19       A.    From what is reflected on the

20   document, that is the wording.

21       Q.    Do you know who signed it?

22       A.    Right here, you mean?

23       Q.    I'm sorry, the Chinese

24   characters, do you know who signed it?

25       A.    Mr. Liu, L-I-U; Ms. Tang,

Confidential - Subject to Further Confidentiality Review

```
 1    T-A-N-G.  I do not know this.

 2              MS. EIKHOFF:  Counsel, just for

 3        the record, it says "to."

 4              MR. MONTOYA:  It does.

 5    BY MR. MONTOYA:

 6        Q.    Do you recall a sale from Taian

 7    Taishan Plasterboard to Stone Pride

 8    International Corporation?

 9        A.    It's a long time ago.  I do not

10    have a clear recollection on that.

11        Q.    Is this the -- are these the

12    boards that Taishan admits to at line 227 of

13    Exhibit 7 in the Manufacturer Profile Form?

14        A.    From comparing the respective

15    information, it should be the board.  There

16    is only a discrepancy on the date.  It should

17    be it.

18        Q.    What is the discrepancy on the

19    dates?

20        A.    Here it reflects November

21    the 20th, 2006, but over here it reflects

22    December the 2nd, 2006.

23        Q.    Do you know what date Taishan

24    used to fill out the column with dates in the

25    Manufacturer Profile Form?
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 104 of 453

1    A.    During my depo preparation as a

2  corporate representative, I have reviewed the

3  deposition information of Mr. Peng, P-E-N-G.

4  I believe the date over here is prepared

5  according to the date of the invoice.  That's

6  why I said that should be the transaction.

7    Q.    Sir, Exhibit 41, the

8  photographs that were taken in the factory,

9  Taishan agrees that it manufactured the

10  boards that have the markings in Exhibit 41,

11  correct?

12    A.    Yes, if those are the

13  photographs provided you by Alston Bird's

14  attorneys, they are the products we have

15  discovered from Taishan's warehouse as

16  residual boards.

17    Q.    Just a clarification, are we

18  saying residue or residual?

19    A.    Residual.

20      MR. MONTOYA:  Okay.  And

21      does -- to the interpreter, if we

22      correct that throughout the record, is

23      that acceptable to you?

24        THE INTERPRETER:  That is

25      correct.  I stand corrected.

```
 1    BY MR. MONTOYA:

 2          Q.     At Exhibit 41, photograph 21,

 3    can you hold that up for the camera, please.

 4          A.     (Witness complies.)

 5          Q.     Thank you.

 6                 In the Manufacturer Profile

 7    Form when Taishan says "white edge sealing

 8    tape" or "white edge tape," is this the tape

 9    that Taishan was referring to?

10          A.     Correct.  The white edge tape

11    is the kind of tape, not the tape reflected

12    in the picture.

13          Q.     Can you explain that for us,

14    please?

15          A.     To explain what?

16          Q.     I don't understand what you

17    meant by "the tape" versus --

18                 MR. MONTOYA:  If you want to

19          read back his answer, that would help

20          me.

21                 (The following portion of the

22          record was read.)

23                 "ANSWER:  Correct.  The white

24          edge tape is the kind of tape, not the

25          tape reflected in the picture."
```

Confidential - Subject to Further Confidentiality Review

```
 1              (End of readback.)

 2      A.      White edge tape is a type of

 3  tape.  If you say "the white edge tape," in

 4  Chinese it means the specific tape that

 5  you're referring to.

 6              According to the information we

 7  learned from customers, at the time while

 8  producing the gypsum board with American

 9  sizes, a lot of manufactured -- manufacturers

10  used the white edge tape just like this kind

11  without words on it, even to the point that

12  there were no spray marking on the back of

13  the board.

14              THE INTERPRETER:  The

15          interpreter needs to clarify with

16          deponent.

17              (Translation.)

18      A.      Even including some of the

19  spray marking without brand name, just like

20  the one we mentioned earlier, et cetera.

21  Similar products produced according to

22  customers' requests.

23  BY MR. MONTOYA:

24      Q.      Sir, as an example, if I look

25  at Exhibit 41, photograph 21, in the
```

Confidential - Subject to Further Confidentiality Review

1    Manufacturer Profile Form -- here's what I'm

2    going to read, from the Manufacturer Profile

3    Form, line 227.

4         A.    I have got it.

5    BY MR. MONTOYA:

6         Q.    When the Manufacturer Profile

7    Form says "white edge sealing,"

8    S-E-A-L-I-N-G, "tape (without words [printed

9    thereon])," is that the tape that Taishan is

10   referring to and is photographed in

11   photograph 21?

12        A.    Correct.

13             MS. EIKHOFF:  Counsel, I do

14        want to make a clarification for the

15        record that I can make a

16        representation that the photograph at

17        21 is a photograph of the same board

18        pictured at photograph 20.

19        A.    Which is to say that reflected

20   on picture 21, there was only the edge tape.

21   It did not reflect, however, what is on

22   line 227 where it says no spray marking.

23             According to the information we

24   learned from our customers, many

25   manufacturers had produced boards with white

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 108 of 453
Case 2:14-cv-02722-MLCF Document 21847-3 Filed 06-13-16 Docket 13491 Page 52 of 321

1  edge tape without wording on the spray

2  marking.

3          Therefore, by only looking at

4  something that is white, without wording and

5  is edge tape and it has no spray markings on

6  it, you cannot really decide it is a product

7  produced by Taishan.  We need more

8  comprehensive information in order to confirm

9  the product.

10 BY MR. MONTOYA:

11      Q.    Sir, I need to go back to a

12 question I asked you earlier when you

13 referenced the Manufacturer Profile Form.  I

14 believe that you said that you had spoke to a

15 Mr. Peng or Pang in one of your answers.

16          Which Mr. Peng did you speak

17 to?

18      A.    The Mr. Peng here is referred

19 to a Mr. Wenlong Peng, W-E-N-L-O-N-G,

20 P-E-N-G, the gentleman who came for his

21 deposition here.

22      Q.    When did you last speak with

23 him?

24      A.    I inquired Mr. Peng in

25 regarding to the issue of markings when I was

Confidential - Subject to Further Confidentiality Review

1  preparing for my deposition as a corporate

2  representative recently.

3      Q.    Is Mr. Peng still employed by

4  one of the Taishan companies?

5      A.    No.

6      Q.    Are you friends with Mr. Peng?

7      A.    We used to be colleagues.

8      Q.    Did Mr. Peng participate in the

9  meetings to prepare for your deposition?

10      A.    No.

11      Q.    Did you meet with him,

12  Mr. Peng, to prepare for your deposition as

13  the corporate representative of Taishan?

14      A.    I contact him via telephone.

15      Q.    How many times did you talk to

16  him to prepare for your deposition today?

17      A.    I don't have a clear

18  recollection as of how many times I've talked

19  to him, but during the preparation of my

20  deposition as the corporate representative, I

21  have contacted a lot of people for relevant

22  information either through telephone or

23  through face-to-face conversation.

24          I've tried very hard in that

25  regard and talked to many people; therefore I

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 110 of 453
Case 2:09-cv-02046-MBN Document 20418 Entered on FLSD Docket 12/19/19 Page 94 of 321
Confidential - Subject to Further Confidentiality Review

1    do not remember exactly how many times I've

2    talked to him.  However, a lot of questions I

3    asked him, he also did not have a clear

4    recollection.  After all, he has left Taishan

5    for quite a while.

6              And also I've tried to contact

7    a salesperson by the name of Yang Yabo,

8    Y-A-N-G, space, Y-A-B-O, and asking this

9    person to try to recollect information in

10   regarding to the gypsum boards' markings

11   bearing American size, and also ask him to

12   try to contact his former customers to see

13   whether or not there are records for the

14   markings.

15             But unfortunately, we did not

16   get any good information because -- because

17   after all, they have all left.  They are no

18   longer a member of Taishan's employees.

19   Therefore, the best effort we could make is

20   to be able to get in touch with them.

21        Q.    Thank you.

22             Sir, I'm going to hand you

23   what's been marked as Exhibit 1F to your

24   deposition.  It is photographs 30, 31, 32 and

25   33 from Exhibit 1.

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 111 of 453
Case 2:14-cv-02722-MRGD Document 234-3 Entered on FLSD Docket 01/12/2016 Page 55 of
321

```
1            (Deposition Exhibit PID-1F

2       marked.)

3            MR. TAYLOR:  Counsel, after

4       these questions.

5            MR. MONTOYA:  Sure.  You want

6       to do it now?  Interpreter would like

7       a break, absolutely.

8            MR. TAYLOR:  Sure, let's do it

9       now.

10            THE VIDEOGRAPHER:  We're now

11       going off the record.  The time is

12       currently 10:57 a.m.  This is the end

13       of Media 2.

14            (Recess taken, 10:57 a.m. to

15       11:10 a.m.)

16            THE VIDEOGRAPHER:  We are now

17       back on the video record with the

18       beginning of Media No. 3.  The time is

19       currently 11:10 a.m.

20            (Deposition Exhibit PID-37

21       marked.)

22   BY MR. MONTOYA:

23       Q.    Sir, I'm going to show you what

24   we're going to mark as Exhibit 37 to your

25   deposition.  The translation is at the top,
```

confidential - Subject to Further Confidentiality Review

1    and the Chinese e-mail is at the last page.

2              MR. TAYLOR:  Are you starting

3        with 37?  Okay.

4    BY MR. MONTOYA:

5        Q.     Sir, Exhibit 37 is an e-mail to

6    you with label art attached?

7        A.     Yes.

8        Q.     And your e-mail address was

9    sdth818@163.com, correct?

10       A.     Yes.

11       Q.     And Mr. Tian Wu with the e-mail

12   address wuyu374@126.com sent this e-mail to

13   you?

14       A.     Yes.

15       Q.     And the subject was American

16   adhesive tape?

17       A.     Yes.

18       Q.     And the attachment is entitled

19   Design of Sealing, S-E-A-L-I-N-G, tape,

20   correct?

21       A.     What it says is the edge tape

22   sealing, S-E-A-L-I-N-G, tape sample.

23       Q.     Thank you.

24              MR. MONTOYA:  And I've been

25        spelling out "sealing" for your -- for

Confidential - Subject to further confidentiality Review
321

```
1          the interpreter's benefit, to

2          distinguish between sealing,

3          S-E-A-L-I-N-G, and ceiling,

4          C-E-I-L-I-N-G.  That was for you.

5                    THE INTERPRETER:  Thank you.

6    BY MR. MONTOYA:

7          Q.    And the importance was high,

8    correct?

9          A.    What is that word, importance?

10                   THE INTERPRETER:  The

11         interpreter will interpret that into

12         Chinese.

13                   (Translation.)

14         A.    Yes, importance.

15   BY MR. MONTOYA:

16         Q.    Did you receive this e-mail

17   with the attachment of the sealing tape that

18   says "Crescent City Gypsum, Incorporated,

19   Manufactured in P.R.C."?

20         A.    This sealing tape is exactly

21   the sealing tape on PID-41.

22         Q.    Do you know where the board --

23   the drywall with the sealing tape was sent

24   to?

25         A.    I do not know.
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 114 of 458
Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 05/13/2019 Page 58 of 321
Confidential - Subject to Further Confidentiality Review

 1      Q.      Who was Tian Wu who sent you

 2    the e-mail at Exhibit 37?

 3      A.      I don't have a clear

 4    recollection.  It's been quite a while ago.

 5      Q.      Was it obvious to you at the

 6    time that the drywall with the Crescent City

 7    Gypsum, Incorporated sealing tape was going

 8    to be sent to the United States?

 9      A.      That's what the marking said;

10    however, at the time we did the business, the

11    transaction was concluded in RMB.  We

12    delivered the product from our factory, but

13    whether or not specifically it was then sent

14    to Vietnam or to Thailand or any other

15    country, I'm not sure about that.  It's been

16    a while ago.

17      Q.      Sir, can we go back to

18    Exhibit 1D?  No, it's different.  That's F.

19    We need 1D.  Sorry.

20            MR. MONTOYA:  Do you have a

21        copy, Sunny?

22            MR. TAYLOR:  He can have mine.

23    BY MR. MONTOYA:

24      Q.      Sir, I think you said in your

25    testimony that photograph 29 you confirmed

confidential - Subject to Further confidentiality Review

1    with the photographs that are in Exhibit 41

2    at your factory recently; is that correct?

3         A.    Can you say it again slowly?

4              THE INTERPRETER:  The

5         interpreter will reinterpret.

6              (Translation.)

7         A.    I'm sorry, can you ask again?

8    BY MR. MONTOYA:

9         Q.    Sure.  No problem.

10             Sir, I think you've told us

11   that Exhibit 1D, photograph 29, are the same

12   markings in Exhibit 41, photograph 23; is

13   that correct?

14        A.    I said that we do not deny this

15   photograph because the degree of similarity

16   is very high.

17        Q.    Sir, you've also told us that

18   you believe that Exhibit 1D, photographs 27

19   and 28, are different than 29, correct?

20        A.    Correct.

21        Q.    But you have no evidence

22   sitting here today that Taishan did also not

23   make the drywall at photographs 27 and 28 in

24   the 2005 to 2007 time frame?

25             MR. TAYLOR:  Objection to form.

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 116 of 453
Case 2:14-cv-02722-NGG Document 2041-3 Entered on FLSD Docket 05/13/2016 Page 80 of
321
Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  May I answer the
 2       question?
 3              MR. TAYLOR:  Yes.
 4              THE WITNESS:  Can you ask
 5       again?  I forgot.
 6              THE INTERPRETER:  The
 7       interpreter will repeat the question.
 8              (Translation.)
 9       A.     Correct.
10  BY MR. MONTOYA:
11       Q.     I'm going to ask you to turn
12  your attention to Exhibit 1F.  Exhibit 1F,
13  photograph 30, Taishan denies that it
14  manufactured the board with the markings in
15  photograph 30?
16       A.     Correct.
17       Q.     What evidence do you have that
18  Taishan did not manufacture the board in
19  Exhibit 30?
20       A.     During the preparation of my
21  deposition as a corporate representative, I
22  have reviewed a large quantity of
23  information, and I have referred to the
24  manufacturer's profile as well as compared
25  the residual boards in our warehouse.  In
```

1    addition to that, I have also reviewed a

2    large quantity of pictures.

3              There is no evidence to support

4    that Taishan has manufactured the gypsum

5    board reflected in the picture with the

6    marking "IMT" on it reflected from Taishan's

7    manufacturer's profile.

8              The Taishan manufactured board

9    with "IMT" marking on it, the marking is on

10   the blue-and-white edge tape.  The spray

11   marking only reflects the drywall 4 feet by

12   12 feet by half inch.  It did not spray the

13   wording of "IMT" on the back of the board;

14   therefore Taishan deny the products bearing

15   these markings were produced by Taishan.

16        Q.    What documents do you rely upon

17   to say that Taishan did not manufacture

18   drywall with the markings "IMTGypsum.com" on

19   it?

20        A.    The wordings reflected on the

21   manufacturer's profile, "IMT," is different

22   from the wording reflected from the pictures;

23   therefore no records was discovered that

24   Taishan had sprayed the marking of "IMT" on

25   the back of its boards.

1     Q.    Sir, you relied upon Mr. Song's

2  work from about eight or nine years ago in

3  your answer, correct?

4         MR. TAYLOR:  By "Mr. Song," are

5     you referring to Mr. Peng?

6         MR. MONTOYA:  No.

7         MR. TAYLOR:  Okay.  Sorry.

8         MR. MONTOYA:  Mr. Song.

9         THE INTERPRETER:  S-O-N-G?

10        MR. MONTOYA:  Yeah.

11      (Translation.)

12     A.    Which Mr. Song are you

13  referring to?

14  BY MR. MONTOYA:

15     Q.    The one who signed the

16  Manufacturer Profile Form on behalf of

17  Taishan.

18     A.    Can you ask the question again?

19     Q.    Sure.

20      When Taishan determined that it

21  did not mark drywall "IMTGypsum.com" you went

22  to look at Mr. Song Qing Hai's work from the

23  Manufacturer Profile Form, correct?

24     A.    Correct.

25     Q.    You didn't talk to Mr. Song

```
 1    Qing Hai in preparation for your deposition,
 2    correct?
 3         A.    Correct, because the
 4    compilation of the document was done by
 5    Mr. Peng; therefore I communicated and
 6    confirmed some information with Mr. Peng.
 7         Q.    Is there a file that Mr. Peng
 8    created when he did the work on the
 9    Manufacturer Profile Form?
10              MR. TAYLOR:  Objection to form.
11              You should answer.
12              THE WITNESS:  Ask again.
13              THE INTERPRETER:  The
14         interpreter will reinterpret.
15              (Translation.)
16         A.    During my preparation for the
17    deposition as the corporation's
18    representative, I did read what Mr. Peng had
19    created in regarding to the detailed
20    American-sized gypsum board.
21    BY MR. MONTOYA:
22         Q.    I presume that there's a file
23    of documents that Mr. Peng used to create the
24    Manufacturer Profile Form; am I correct?
25              MR. TAYLOR:  Objection to form.
```

Confidential - Subject to Further Confidentiality Review

1      A.      I don't know what you are

2   referring to because you said the word "file"

3   and "documents" in a general term.

4   BY MR. MONTOYA:

5      Q.      Did Mr. Peng give you any

6   documents to reflect the work that he did to

7   create the listings in the Manufacturer

8   Profile Form?

9      A.      I don't have any documents in

10   this regard because during my telephonic

11   conversation with Mr. Peng, he did not recall

12   a lot of information.

13            During my preparation of

14   deposition as corporation representative, I

15   have reviewed a lot of information and I

16   believe Mr. Peng also had diligently prepared

17   information in regarding to American-sized

18   gypsum boards.

19            As far as my understanding as

20   colleagues of many years with Mr. Peng, I

21   believe Mr. Peng had tried his very best to

22   collect relevant information.  With the help

23   of the attorneys of Hogan Lovells he had

24   diligently prepared this document.

25      Q.      Did Mr. Peng ever tell you that

Confidential - Subject to Further Confidentiality Review

```
 1     there was a collection of documents that

 2     provided the information that went in to

 3     create the manufacture -- Taishan's answers

 4     in the Manufacturer Profile Form?

 5                    THE INTERPRETER:  The

 6          interpreter needs to clarify.

 7                    (Translation.)

 8          A.     As a corporate representative

 9     preparing for the deposition, I did review

10     relevant information regarding to Mr. Peng's

11     deposition.  Mr. Peng said that he did review

12     and prepared a lot of documents at the time.

13     BY MR. MONTOYA:

14          Q.     Sir, no one's ever handed you a

15     file of documents that are the backup

16     information for the Manufacturer Profile

17     Form, correct?

18                    MR. TAYLOR:  Objection to form.

19                    THE WITNESS:  I don't quite

20          understand what he said.  Can you ask

21          again?

22                    THE INTERPRETER:  The

23          interpreter -- oh.

24                    THE WITNESS:  Or paraphrase it.

25                    ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 122 of 453
Case 2:14-cv-02722-NGG Document 2091-1 Entered on FLSD Docket 05/13/2019 Page 86 of
321

Confidential - Subject to Further Confidentiality Review

```
1    BY MR. MONTOYA:

2         Q.     What I'm looking for is a file

3    or a compilation or documents.  That's the

4    term I'm trying to get across.

5         A.     Yes.

6         Q.     Where is that file?

7         A.     It is kept in the company.

8         Q.     Do you know if those documents

9    have ever been given to the plaintiffs in

10   this case?

11        A.     Whether or not it was given to

12   the plaintiff is not something that I would

13   know.  But in 2010, Hogan Lovells had

14   collected a lot of information in Taishan.

15             In 2015, Alston law firm also

16   tried to collect many information.  And they

17   have also submitted those documents to the

18   court representing Taishan.

19             As of what are those documents

20   and whether or not they are in your hands,

21   I'm not sure about that.

22        Q.     Do you know why Mr. Peng did

23   not sign the Manufacturer Profile Form when

24   he did all the work?

25        A.     Because there might have been
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 123 of 453
Case 2:09-cv-02047-MBN Document 22363-66 Filed 1/18/19 Page 123 of 453

confidential - Subject to further confidentiality Review
321

1    certain requirements for signatures.  I

2    believe the signature should have been the

3    signature of a legal person or a supervisor.

4          Q.    You would agree with me that

5    Mr. Peng and not Song Qing Hai did the work

6    to create the Manufacturer Profile Form on

7    behalf of Taishan?

8              MR. TAYLOR:  Objection to form.

9          A.    I think at the time the most

10   knowledgeable person as well as the person

11   who was able to collect the best information

12   for submission to the court or according to

13   the requirement of the attorneys and the

14   court is Mr. Peng, because at the time

15   Mr. Peng had the most direct contact of the

16   work and who did the work directly as well.

17   BY MR. MONTOYA:

18         Q.    Sir, I'm going to ask you to

19   take a look at the Manufacturer Profile Form

20   at Exhibit 7 and ask you to look at lines 59

21   to 61.  Let me start this another way.  I'm

22   sorry.

23              Sir, I'm going to ask you to

24   accept that lines 59 through 61, 67 through

25   112, 118 through 119, 121, and 125 to 126

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 124 of 453
Case 2:09-md-02047-MCD Document 20413 Entered on FLSD Docket 11/20/19 Page 88 of 321

Confidential - Subject to Further Confidentiality Review

1    state that the edge sealing tape markings are

2    blue-and-white edge sealing tape with the

3    words "IMTGypsum."

4              You can take your time in

5    looking at those lines.

6         A.      Correct.

7              (Deposition Exhibit PID-28

8         marked.)

9    BY MR. MONTOYA:

10        Q.      I'm going to ask you to take a

11   look at Exhibit 28, which I'm handing to you

12   and your counsel.  Is the blue-and-white edge

13   sealing tape with "IMTGypsum" in the profile

14   form at lines 59 through 61, 67 through 112,

15   118 to 119, 121, and 125 and 126 the same

16   edge tape as Exhibit 28?

17        A.      This information is not

18   complete.  I cannot make such a decision.

19        Q.      What does the blue-and-white

20   edge tape in the Manufacturer Profile Form

21   with "IMTGypsum" look like?

22        A.      I was not able to discover the

23   edge tape during my depo preparation as the

24   corporation's representative.  As far as I

25   know, this company, which is Beijing Building

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 125 of 453
Case 2:09-md-02047-EEF-MBN Document 20841-3 Entered on FLSD Docket 11/29/19 Page 89 of
321
Confidential - Subject to Further Confidentiality Review

1    Material Import & Export Company, had

2    manufactured in a lot of factories, the

3    American-sized products.

4              According to the description of

5    many customers, at the time in the very

6    beginning, they started to make

7    American-sized gypsum board in many small

8    factories such as Pingyi or Zaozhuang,

9    because the small factories had comparatively

10   low price.

11             Later, because the quantity of

12   products manufactured by the small factories

13   could not meet the demand of the customers,

14   therefore it approached Taishan to process

15   part of their boards.

16             Therefore, if you're only

17   showing me the information contained in this

18   one picture, I'm not able to determine

19   whether or not it was manufactured by

20   Taishan.

21        Q.    Sir, what document do you have

22   that is evidence in lines 59 through 61, 67

23   through 112, 118 and 119, 121 and 125 to 126

24   that Taishan made blue-and-white edge sealing

25   tape with the words "IMTGypsum"?

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 126 of 453
Case 2:14-cv-02722-MLCF Document 284-1 Entered on FLSD Docket 03/13/2017 Page 30 of
321

1      A.      It is reflected on the

2  manufacturer's profile chart.  We have to

3  believe it is the best information that we

4  could have collected and compiled.

5              Also, in picture 28, it did not

6  show what is the sprayed mark.  If you look

7  at this picture together with picture

8  number 30, then Taishan would deny that it is

9  a product of Taishan because Taishan's spray

10 mark does not include "IMT."  "IMT" was only

11 included on the edge tapes.

12             Therefore, we need more

13 information on this picture to make a

14 determination.

15     Q.    Sir, we --

16            MS. EIKHOFF:  I'm sorry.  Could

17        we get a counsel representation as to

18        the origin of PID-28?  There's no

19        Bates number on it so I just wanted to

20        see if you all know where it came

21        from.

22            MS. SCHWAB:  Yeah, we'll get it

23        to you at a break.

24            MS. EIKHOFF:  Okay.  Thank you.

25            ///

BY MR. MONTOYA:

    Q.    Sir, what document can Taishan point me to to justify its answer in the Manufacturer Profile Form that there's blue-and-white edge tape marked "IMTGypsum"?

    A.    Can I ask -- can you ask your question again?  I don't feel like it is a question.

        THE INTERPRETER:  May the interpreter repeat or would you like to rephrase?

        MR. MONTOYA:  Repeat it one more time.

        (Translation.)

    A.    From the manufacturer profile, it did say that there are wording as of "IMTGypsum."  However, from our product, we only have the drywall spray marked as 4 feet by 12 feet by half inch; therefore, you cannot determine it is a product of Taishan only by looking at edge tape.

        Of course, there are other ways to make the determination.  One is that if you provide more information to me, I can make comparison.

1          Number two, from the chemical

2  analysis channel, we can compare whether the

3  component of chemical from this board is the

4  same as the chemical component which is

5  covered from the residual boards in Taishan's

6  warehouse.

7          Another way would be the

8  manufacturer can be discovered by reviewing

9  the customers' invoices, and from the

10  manufacturer, to discover the importer.

11  Therefore, you will discover the supply chain

12  and to find out which manufacturer produced

13  those products.

14          Maybe through that way, you

15  would discover that many small manufacturers

16  had produced products with the same labels.

17  I don't know if those matters are visible in

18  the United States.

19  BY MR. MONTOYA:

20      Q.     Sir, do you remember when we

21  looked at Exhibit 37, there was a picture of

22  the edge tape for Crescent City?

23      A.     I do remember that.

24      Q.     Taishan doesn't have the label

25  that it lists in the Manufacturer Profile

```
 1    Form when it says blue-and-white edge sealing
 2    tape with "IMTGypsum," correct?
 3         A.    But on the tape, it had
 4    reflected the most important words.  The
 5    information contained on the manufacturer's
 6    profile is correct.  Some information may not
 7    be most precise, but it wouldn't be just like
 8    this scenario, which is different.
 9              For example, what's reflected
10    on the picture of PID-1F, 30, which reflects
11    a complete different sprayed marking from
12    ours.
13         Q.    Sir, Taishan doesn't have a
14    picture of the label -- I'm sorry.
15              Sir, Taishan doesn't have a
16    picture of the edge tape markings contained
17    at lines 59 to 61 of the profile form,
18    correct?
19         A.    I indeed did not discover
20    either the picture or the physical object of
21    this edge tape during the preparation of my
22    deposition as the corporation's
23    representative.  I'm talking about page 59.
24         Q.    And the same answer is true
25    from Taishan for lines 67 to 112, from 118 to
```

1    119, 121, and 125 through 126, that Taishan

2    does not have a picture of the label that's

3    identified in the Manufacturer Profile Form

4    as blue-and-white edge tape with "IMTGypsum"

5    on it.

6         A.    If the numbers you have just

7    mentioned are the numbers that you have

8    earlier confirmed, that is correct.

9         Q.    And there's no art, like you

10   got for Crescent City for those same lines,

11   59 through 61, 67 through 112, 118 to 119,

12   121, and 125 to 126?

13        A.    No, there was no Crescent City.

14        Q.    My question was:  Is there any

15   art like you've got for Crescent City for

16   lines 59 through 61 for the blue-and-white

17   edge sealing tape with "IMTGypsum"?

18             THE WITNESS:  Can you

19        reinterpret it?

20   BY MR. MONTOYA:

21        Q.    Sir, you don't have any artwork

22   or any drawing that shows the blue-and-white

23   edge sealing tape with "IMTGypsum" printed on

24   it?

25        A.    I indeed did not discover

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 131 of 453
Confidential - Subject to further confidentiality review
321

1   pictures or products which bears the wording

2   of "IMTGypsum" on the blue-and-white edge

3   tape during my preparation of the deposition

4   as the capacity of corporation

5   representative.

6       Q.    Did you do a search of the

7   residual dry board -- drywall in your

8   factories to see if there was any drywall

9   with blue-and-white edge tape with

10  "IMTGypsum" on it?

11      A.    During my preparation of

12  deposition as a corporation representative,

13  not only had I searched for blue-and-white

14  edge tape with the wording of "IMT" on it,

15  but also I searched for all American-sized

16  boards that were possible residual boards

17  from every corners of the warehouse.

18              In the end -- in the end I have

19  discovered those residual boards, and also I

20  have informed our Alston lawyer.  And the

21  Alston lawyer came to the site and took

22  onsite pictures of those residual products.

23              THE WITNESS:  May I take a

24      break?  I'm out of water.

25              MR. TAYLOR:  Is it okay to stop

1        for lunchtime?

2                MR. MONTOYA:  Yes, it is.

3                THE VIDEOGRAPHER:  We are now

4        going off the video record.  The time

5        is currently 12:09 p.m.  This is the

6        end of Media No. 3.

7                (Recess taken, 12:09 p.m. to

8        1:12 p.m.)

9                THE VIDEOGRAPHER:  We are now

10       back on the video record with the

11       beginning of Media No. 4.  The time is

12       currently 1:12 p.m.

13   BY MR. MONTOYA:

14       Q.     Sir, good afternoon.

15       A.     Good afternoon.

16       Q.     Earlier we talked about

17   Exhibit 28 and the blue-and-white edge tape.

18              Do you recall looking at

19   Exhibit 28?

20       A.     Yes.

21       Q.     My recollection of your

22   testimony is that you said you needed more

23   information to say whether or not the edge

24   tape in Exhibit 28 was made by Taishan.

25       A.     Correct.

```
 1          Q.      Let me show you what we've

 2    marked as Exhibit 51 to your deposition.

 3                  (Deposition Exhibit PID-51

 4          marked.)

 5    BY MR. MONTOYA:

 6          Q.      Do you see Exhibit 51?

 7          A.      I see that.

 8          Q.      Exhibit 51 shows the

 9    blue-and-white edge tape along with the

10    markings on the back of the drywall, correct?

11                  THE WITNESS:  Repeat that,

12          please.

13                  THE INTERPRETER:  Interpreter

14          will repeat.

15                  (Translation.)

16          A.      Correct.

17    BY MR. MONTOYA:

18          Q.      Does Exhibit 51 give you enough

19    information to -- for Taishan to tell us if

20    that is the blue-and-white edge tape that's

21    marked "IMTGypsum"?

22          A.      Merely from looking at

23    Picture No. 51, the blue-on-white sealing

24    tape, it is impossible to recognize it

25    because it's hard to tell; however, from the
```

```
 1    spray marking, it is not Taishan's product.
 2              During my deposition
 3    preparation as the corporation's
 4    representative, I have tried to search many
 5    information in regarding to Taishan's
 6    products.  I did not discover anything marked
 7    with the three words "IMT" on it.
 8              MR. MONTOYA:  For the record,
 9         Exhibit 51 is from Scott and Jordana
10         Saltzman's home, S-A-L-T-Z-M-A-N, at
11         8485 Breezy Hill Drive.  That's in
12         Boynton Beach.
13              MS. EIKHOFF:  Thank you.
14              (Deposition Exhibit PID-1H
15         marked.)
16    BY MR. MONTOYA:
17         Q.    I'm going to hand you
18    Exhibit 1H to your deposition.
19              Sir, Taishan agrees that the
20    drywall in photographs 1, 14, 15, and 16 was
21    manufactured by Taishan, correct?
22         A.    Taishan does not deny that
23    these are products manufactured by Taishan.
24         Q.    Sir, I'm going to ask you to
25    look at Exhibit 7, the Manufacturer Profile
```

Confidential - Subject to Further Confidentiality Review

```
 1    Form, line 177, please.

 2         A.       I see that.

 3         Q.       The product markings contain

 4    the phone number 813-994-6499, correct?

 5         A.       Correct.  That's what it says

 6    under Product Markings.

 7         Q.       And that's the same information

 8    for line 183 in Exhibit 7?

 9         A.       Correct.  183 and line 177 are

10    the same.

11         Q.       Lines 177 and 183 say that the

12    edge tape is "TTPC."

13                  Do you see that?

14         A.       I see that.

15         Q.       Can you describe the edge tape

16    with "TTPC" on it?

17         A.       During the preparation of my

18    deposition in the capacity of corporation

19    representative, I tried hard to search for

20    information; however, I did not see any edge

21    tape bearing the words "TTPC" either as a

22    sample or as the object.

23         Q.       Do you know what color the edge

24    tape that is in lines 177 and 183 is?

25         A.       The manufacturer's profile does
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 136 of 453
Case 2:09-md-02047-MLCF Document 634-1 Entered on FLSD Docket 11/18/19 Page 80 of
321

Confidential - Subject to Further Confidentiality Review

1    not reflect that information.

2         Q.    Did you ask Mr. Peng what color

3    the "TTPC" edge tape was at lines 177 and

4    183?

5         A.    I did not ask such detailed

6    questions; however, as a representative of

7    the corporation, while preparing my

8    deposition, I did make phone call to Mr. Peng

9    in regarding to the markings.

10            Mr. Peng, since he has already

11   left a long time ago, he did not recall a lot

12   of the information, and also, it's been quite

13   a while ago.

14        Q.    Did you take any notes of your

15   conversations with Mr. Peng regarding the

16   Manufacturer Profile Form at Exhibit 7?

17        A.    No.

18        Q.    You agree with me that in many

19   instances Taishan was able to report what

20   color the edge tape was in the Manufacturer

21   Profile Form?

22            THE WITNESS:  Reinterpret that.

23            THE INTERPRETER:  The

24       interpreter will reinterpret.

25            (Translation.)

1      A.      If it is reflected in the

2   profile information, it can be described;

3   however, if Mr. Peng did not have that

4   information, well, it would need sufficient

5   information to reflect that.

6   BY MR. MONTOYA:

7      Q.      Do you know, for example, with

8   the "IMTGypsum" blue-and-white label, how

9   Mr. Peng determined that it was blue and

10  white?

11     A.      I believe Mr. Peng should have

12  had the information regarding the description

13  of the edge tape which he input in the

14  document.

15     Q.      You've never seen that

16  description of the colors of the end tape in

17  writing, though, correct?

18             MR. TAYLOR:  Objection to form.

19     A.      Can you be more specific as to

20  the color of which edge tape?

21  BY MR. MONTOYA:

22     Q.      The "IMTGypsum" tape was

23  described in the profile form as white and

24  blue.  You've never seen a writing that says

25  that the "IMTGypsum" tape was white and blue,

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 138 of 453
Case 2:09-md-02047-EEF-MBN Document 20443-3 Filed 06/16/16 Page 139 of 282 of
321
Confidential - Subject to Further Confidentiality Review

1    correct?

2              MR. TAYLOR:  Objection to form.

3        A.    I don't recall that I have seen

4    a handwritten -- an edge tape which is

5    described as "IMTGypsum."

6    BY MR. MONTOYA:

7        Q.    Sir, I'm going to ask you to

8    take a look at Exhibit 1H again, the

9    photographs, and at the same time -- and at

10   the same time look at the Manufacturer

11   Profile Form at line 9.

12             Do you see line 9?

13       A.    Yes.

14       Q.    Do you see where it says the

15   edge tape is Taishan edge sealing tape?

16       A.    Yes.

17       Q.    Is the Taishan edge sealing

18   tape that's identified in line 9 of the

19   Manufacturer Profile Form any of the edge

20   tape that's in photographs 1, 14, 15 or 16?

21       A.    It's impossible to determine

22   that number 1 is the edge tape of Taishan

23   because the information is not complete.

24             Number 14, from the top two

25   pictures and the one on -- correction.

1          The two pictures on the left

2     should be Taishan's edge tapes.  If the two

3     pictures on the right are from the same

4     picture -- same pictures on the left, then

5     they should also be Taishan's edge tape.

6               Number 15 and number 16's

7     pictures, if you look at them alone, it's

8     impossible to determine that they are

9     Taishan's edge tapes.

10              But because the attorney told

11    us that all these pictures are from one set,

12    which is to say they're together; therefore,

13    we do not deny that the products with these

14    marks are products of Taishan.

15         Q.    I want to focus your attention

16    on page 14.  The four photographs on page 14

17    of Exhibit 1H, is that the same tape that's

18    identified in line 9 as Taishan edge sealing

19    tape?

20         A.    I can't be sure that the

21    Taishan edge tape over here is the edge tape

22    reflected on picture 14, but I do not deny

23    that those edge tapes are Taishan's edge

24    tapes.

25         Q.    I'm going to give you a long

```
 1    question.  Be prepared for it.
 2              In the following lines of the
 3    Manufacturer Profile Form, lines 9 through
 4    10, 64 to 66, 113 to 117, 120, 123 to 124,
 5    127 to 130, 132 to 176, 179 to 182, 185 to
 6    197, and 202 to 213 at the Manufacturer
 7    Profile Form, it states that there's Taishan
 8    edge sealing tape.
 9              Is that marking in the
10    Manufacturer Profile Form the same that is in
11    the photographs at Exhibit 1H, photograph 14?
12        A.    The edge tapes that you
13    mentioned with those numbers are indeed
14    marked Taishan edge tapes.
15        Q.    I want to go back to the first
16    page of Exhibit 1H.  My understanding is that
17    Taishan is now denying that these -- that the
18    drywall depicted in the photographs on
19    Exhibit 1 were manufactured by it; is that
20    correct?
21              MS. EIKHOFF:  On every page?
22              MR. MONTOYA:  No, just
23         photograph 1.
24              MR. TAYLOR:  Photograph 1.
25        A.    The first photograph, Taishan
```

Confidential - Subject to Further Confidentiality Review

1    did not deny the first photograph.

2    BY MR. MONTOYA:

3        Q.    Okay.  I want to make sure I

4    understood your testimony correctly.

5            So the drywall board markings

6    and the end tape on page 1 of Exhibit 1H,

7    Taishan admits to?

8        A.    Taishan did not admit that it

9    is Taishan's edge tape because from the edge

10    tape picture alone, we cannot be sure that it

11    is a product of Taishan.

12            The reason we do not deny that

13    this set of product is a product of Taishan,

14    because it carries the spray mark of Taishan.

15    The photograph on page 14 is a photograph

16    carrying Taishan's edge tapes.

17            And our attorney told us that

18    these four photographs consist of one set of

19    photographs; therefore, based on this

20    information, we do not deny that these two

21    photographs reflected that the products are

22    manufactured by Taishan.

23        Q.    Photograph 15 in Exhibit 1H,

24    would you please look at that.  The 15 is at

25    the bottom of the page.

Confidential - Subject to Further Confidentiality Review

1        Can you tell me where on the

2   Manufacturer Profile Form that the markings

3   in Exhibit 15 are?

4            MS. EIKHOFF:  You mean page 15?

5            MR. MONTOYA:  I'm sorry,

6        page 15, yes.

7        A.    I cannot be sure of that.  I'll

8   need more information than merely looking at

9   these pictures.

10  BY MR. MONTOYA:

11       Q.    Do you consider the edge tape

12  in -- on page 15 to be Taishan edge tape?

13       A.    I cannot be sure of that.

14       Q.    Do you consider the edge tape

15  at photograph -- or page 16 of Exhibit 1H to

16  be Taishan edge tape?

17       A.    I also cannot be sure of that.

18       Q.    Am I correct that you cannot

19  tell me, for the edge tape at pages 15 or 16,

20  where that edge tape is present on the

21  Manufacturer Profile Form?

22            THE WITNESS:  Reinterpret that,

23        please.

24            THE INTERPRETER:  The

25        interpreter will repeat.

Confidential - Subject to Further Confidentiality Review

1                  (Translation.)

2        A.        If you merely show me the

3    pictures on page 15 and 16, it is true that I

4    cannot confirm which manufacturer -- which

5    manufacturer's edge tape do these edge tape

6    belong to.

7                  But according to our attorney,

8    if you are to say that page 1, 14, 15, 16

9    form a set, then we do not deny it is a

10   product of Taishan's.

11                 Because in China a lot of small

12   factories are imitating the edge tape and

13   markings of Taishan.  They use edge tapes

14   almost exact the same as Taishan's with the

15   change of only one word on top of it or a

16   change of a little bit something; therefore,

17   if you do not look at the complete

18   information, I really cannot confirm whether

19   or not this is Taishan's edge tape.

20                 Therefore, after I have

21   reviewed the whole set of information, I do

22   not deny that this is a product manufactured

23   by Taishan.

24   BY MR. MONTOYA:

25        Q.        What did you rely on to

1    determine that Taishan does not deny the

2    drywall on pages 15 or 16?

3         A.    I relied on the statements made

4    by my attorneys to me that the picture 15 and

5    16's drywalls is the same set of drywall as

6    the ones before.  Comparatively, page 14 has

7    more complete information.

8              Based on that, we're able to

9    determine that we do not deny that these

10   products are Taishan's product.  Because the

11   attorneys told us is it's one set of

12   products; therefore, we do not deny that the

13   products reflected in all four pictures is

14   Taishan's product.

15             MR. TAYLOR:  Are you beginning

16        to move to another topic?

17             MR. MONTOYA:  Not yet.  A few

18        more on this.

19             MS. ROBERTSON:  We've only been

20        going like 40 minutes.

21             MR. TAYLOR:  No, no, no.

22        There's one point we want to clarify

23        with our client.

24             MS. EIKHOFF:  With our witness,

25        please.

Case 2:09-md-02047-EEF-MBN  Document 22363-66  Filed 11/18/19  Page 145 of 453
Case 4:16-cv-01345-MGL  Document 294-3  Entered on FLSD Docket 12/13/2019  Page 89 of
321

1          MR. TAYLOR:  And then I think

2     it will help with the testimony, so we

3     would like to do that, okay?

4          MS. EIKHOFF:  And we can go off

5     the record, but we're just thinking we

6     would step out and come back in.

7          MR. MONTOYA:  That's fine.

8          THE VIDEOGRAPHER:  We are now

9     going off the video record.  The time

10    is currently 1:49 p.m.

11         (Recess taken, 1:49 p.m. to

12    1:56 p.m.)

13         THE VIDEOGRAPHER:  We are now

14    back on the video record.  The time is

15    currently 1:56 p.m.

16         MR. TAYLOR:  I want to thank

17    counsel for allowing us to go out and

18    correct an issue.  As we know, there

19    are a lot of pictures and photos that

20    we're going to be looking at in

21    regards to various drywall markings.

22         And we were always afraid that

23    there would be some problem or there

24    would be some confusion in regards to

25    the markings, at least in the regards

Confidential - Subject to Further Confidentiality Review

1    to the photographs, and that's what we

2    believe has happened here.  And the

3    witness has -- we've talked to the

4    witness, and the witness is ready to

5    explain the issue.

6         THE WITNESS:  First of all, I

7    apologize.  Perhaps it was because my

8    description of a set of pictures might

9    have initiated some mis- -- some

10   confusion from the opposing counsels,

11   even to our own counsel at Alston.

12        Now, what I said by a set of

13   pictures, I meant that for the

14   pictures on each page, Alston

15   attorneys had provided me with more

16   pictures corresponding to that page of

17   pictures.

18        What I'm trying to say is they

19   provided more pictures based on the

20   pictures of page 1, page 14, page 15,

21   and page 16 for me to make

22   determinations.

23        By providing more information

24   to me, I was able to say that Taishan

25   does not deny such and such marks or

Confidential - Subject to Further Confidentiality Review

1     such and such sealing tapes.

2   BY MR. MONTOYA:

3     Q.     Where are those photographs?

4     A.     Those pictures should be kept

5   in your picture pool.

6     Q.     Do you know if those

7   photographs were provided to us?

8     A.     It is not that I provided them

9   to you.  It is that you have a pool of

10  pictures to be provided to me in order for me

11  to determine the gypsum boards and to refer

12  to those pictures in that regard.

13          (Deposition Exhibit PID-35

14     marked.)

15  BY MR. MONTOYA:

16     Q.     I'm going to hand you

17  Exhibit 35 to your deposition.  I'm going to

18  ask the witness to read the Chinese

19  characters after the English language word

20  "Attachments" and have that be interpreted.

21     A.     "American Packing Method."

22  BY MR. MONTOYA:

23     Q.     Sir, are you familiar with the

24  term "tapered edge," T-A-P-E-R-E-D, edge?

25     A.     I am familiar with it.

 1          Q.      From 2005 to 2007, did Taishan

 2   manufacture drywall with tapered edge?

 3          A.      According to my experience of

 4   working in this industry for years, there are

 5   only two types of edges.  One is tapered

 6   edge.

 7                  THE INTERPRETER:  The

 8          interpreter needs to clarify.

 9                  (Translation.)

10          A.      Another one is square edge.

11                  The normal gypsum board,

12   meaning the gypsum board used for ordinary

13   projects, we use only square edge.

14                  THE INTERPRETER:  Interpreter

15          correction.

16          A.      For ordinary projects we use

17   tapered edge.  When under ordinary

18   construction, there is a gap left between two

19   tapered edges.

20                  THE INTERPRETER:  Interpreter

21          needs to check dictionary for a word.

22                  Interpreter clarifying with

23          deponent.

24                  (Translation.)

25                  THE WITNESS:  May I explain to

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 149 of 453
Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 93 of 321
Confidential - Subject to Further Confidentiality Review

1    the interpreter?

2              (Translation.)

3        A.      In between the two tapered

4    edge, the crack has been filled up by a

5    filling powder in shape of upside-down

6    triangle or trapezoidal shape.

7    BY MR. MONTOYA:

8        Q.      Sir, I appreciate your answer.

9    My question was:  Did Taishan manufacture

10   drywall with tapered edges in 2005 to 2007?

11             THE WITNESS:  I'm not done yet.

12             MR. MONTOYA:  I'm sorry.

13       A.      And after it's been filled up

14   and flattened, you will put a joint tape,

15   which we mentioned in the morning, on top of

16   that.  That is to prevent a crack created

17   between two gypsum boards when they are

18   connected together.  Therefore, the gypsum

19   board in the world are usually use -- are

20   usually being manufactured by using tapered

21   edges.

22             When using a square edge, it is

23   usually to process something on top of the

24   gypsum board, to cut and divide them into

25   small boards, about the size of 600 by 600,

Confidential - Subject to Further Confidentiality Review

1    or 1.2 meter by 600, which is to be used

2    together with trapezoidal-shaped structure.

3            Therefore, ordinarily, most of

4    the gypsum boards have tapered edges.  Square

5    edges are rarely used.  It is only used in

6    the small numbers of the board.  This is a

7    universal use for gypsum boards in the world.

8    BY MR. MONTOYA:

9        Q.    Sir, I appreciate your answer.

10            The question I asked requires a

11   yes-or-no answer:  Did Taishan manufacture

12   boards with a tapered edge from the years

13   2005 through 2007, yes or no?

14       A.    Yes.

15       Q.    Did customers from time to time

16   request that Taishan put the words "Tapered

17   Edge" on the edge tape?

18       A.    That's possible.

19       Q.    I'm going to ask you to look at

20   Exhibit 35 and the photograph numbered

21   TG-0234635.

22            Did Taishan manufacture drywall

23   with edge tape as shown in TG-0234635?

24       A.    Do you not have a Chinese

25   version for that?

Confidential - Subject to Further Confidentiality Review

1    Q.    My only question is:  Is the

2    photograph -- is that edge tape that was

3    created by or manufactured by Taishan?

4    A.    This picture is very much

5    unclear.  If you look at it from afar, it

6    looks similar in a small degree that

7    resembles that of Taishan's; however, it

8    would be great if you can give me a more

9    clear version of it.

10    Q.    Sir, do you see the words

11    "Taihe" in that photograph on the labels?

12    A.    Well, I can only see the

13    Chinese character "mountain."  It was blurry

14    before the character and it was pretty blurry

15    after.  If I were to speculate, and I can

16    only speculate, it might be Taishan's edge

17    tape.

18    Q.    Sir, I'm going to ask you to

19    take a look at the Manufacturer Profile Form,

20    Exhibit 7, at line 6, please.

21    Do you see line 6?

22    A.    Yes.

23    Q.    I'd ask you to focus on the

24    column that says Edge Sealing Tape Markings

25    where it says "white edge sealing tape

```
 1    (without words [printed thereon])."

 2              Do you see that?

 3       A.      Yes.

 4       Q.      Do you know what that white

 5    edge sealing tape without words looks like?

 6       A.      Yes.

 7       Q.      Is the white edge tape without

 8    words the tape that we looked at from the

 9    photographs from your plants at Exhibit 41?

10              MR. TAYLOR:  Objection, form.

11       A.      Can you tell me which one is

12    it?

13    BY MR. MONTOYA:

14       Q.      Sure.  Photograph 19, TG-19.

15              MR. TAYLOR:  In Exhibit 41?

16              MR. MONTOYA:  Yes.

17              MR. TAYLOR:  That was the

18        nature of the objection.

19       A.      Correct.  Number 19 reflects

20    white edge tape without words.  Many

21    manufacturers use that kind of tape.

22    BY MR. MONTOYA:

23       Q.      Is that the same for photograph

24    21?

25       A.      Yes.  21 is the unpacked
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/10/19 Page 153 of 453
Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/10/19 Page 153 of 453

Confidential - Subject to Further Confidentiality Review
321

1  product in 19.

2          Q.      So if -- when I look through

3  the Manufacturer Profile Form and I see the

4  words "white edge sealing tape (without words

5  [printed thereon])," there are examples in

6  Exhibit 41, photographs 19 and 21; is that

7  correct?

8          A.      What is 49?  What is

9  Exhibit 49?

10         Q.      I'm sorry, Exhibit 41.

11         A.      Correct, Exhibit 19 reflects a

12  white edge tape without words.

13         Q.      Just to be clear, in

14  Exhibit 41, page 19 and page 21 are examples

15  of white edge sealing tape without words as

16  in the Manufacturer Profile Form, correct?

17         A.      Yes, it is this kind of sealing

18  tape.

19         Q.      I'm going to direct your

20  attention to line 9 of the Manufacturer

21  Profile Form.  At line 9 of the Manufacturer

22  Profile Form, there's a description in the

23  Edge Sealing Tape column that says "Taishan

24  edge sealing tape."

25                 Do you see that?

1    A.    Yes.

2    Q.    Can you describe what the

3    Taishan edge sealing tape looks like?

4    A.    On Exhibit PID-1H, page 14,

5    you'll see two pictures on the left.  One is

6    on the top; one is at the bottom.  Those

7    basically were the edge tapes used at the

8    time by Taishan.

9    Q.    When I see the terms "Taishan

10   edge sealing tape" in the Manufacturer

11   Profile Form, is that the edge tape that is

12   depicted in Exhibit 1H at page 14 in the two

13   left -- photos on the left-hand side?

14   A.    From the face of the wording,

15   it can be understood that way.  However, I do

16   not know whether or not the customer had any

17   requests for changing the edge tape at the

18   time.

19   Q.    Are you able to tell me, based

20   on reading the Manufacturer Profile Form,

21   when Taishan says "Taishan edge sealing

22   tape," what that sealing tape looks like in

23   each entry of the Manufacturer Profile Form?

24   A.    Can you repeat the question

25   again?  What do you mean by each entry?

Confidential - Subject to Further Confidentiality Review

1      Q.      Sure.  I'll ask it better, or

2  at least I'll try.

3              In lines 9 and 10 of the

4  Manufacturer Profile Form, it says "Taishan

5  edge sealing tape," correct?

6      A.      Correct.

7      Q.      Is it your testimony that you

8  can't tell me what the Taishan edge sealing

9  tape looks like at lines 9 and 10 for that

10  drywall?

11      A.      I was saying that if the

12  customer did not request for a change,

13  Taishan's edge tape would look like the edge

14  tape reflected on page 14.

15      Q.      Would those customer changes be

16  reflected in the Manufacturer Profile Form?

17      A.      It depends on whether or not

18  there were remarks on the documents when the

19  documents were being collected and compiled

20  together.

21      Q.      Are there any notations in the

22  Manufacturer Profile Form where a customer

23  requested a change to Taishan's edge tape?

24      A.      Therefore, I'm only saying I

25  cannot confirm, but I do not deny.

1    Q.    So if I look at entries 9 and

2    10, 64 to 66, 113 to 117, 120, 123 and 124,

3    127 through 130, 132 to 176, 179 to 182, 185

4    to 197, and 202 to 213, my understanding of

5    your testimony is that the Taishan edge tape

6    in those Manufacturer Profile Form entries is

7    going to be similar to Exhibit 1H, page 14,

8    the left-hand side photograph, except for any

9    changes that a customer might have made?

10    A.    Similar?  You can say that.

11    Q.    As Taishan's corporate

12   representative, you're not aware of any

13   documents that show a customer requesting a

14   change to Taishan's edge tape in the line

15   items that we just discussed?

16    A.    I do know there were such

17   requests from customers, but as for which

18   specific change had been made, currently

19   there is no record that can be discovered.

20        During my deposition

21   preparation as the corporation's

22   representative, I have reviewed many

23   documents; however, I did not discover

24   records in this regard.

25    Q.    Were there ever any documents

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 157 of 453
Case 1:14-cv-22069-WCC Document 294-1 Entered on FLSD Docket 09/15/2014 Page 53 of 321
Confidential — Subject to Further Confidentiality Review

1    that showed those changes?

2              MR. TAYLOR:  Objection to form.

3         A.      Usually when we are working on

4    the nondomestic orders, we would make

5    markings that are different from that of

6    domestic orders according to customers'

7    requests.  You had to see whether or not the

8    customers have those requests in the regard.

9    BY MR. MONTOYA:

10        Q.      Sir, I'm going to give you a

11   long list of numbers again.  I apologize.

12              In the Manufacturer Profile

13   Form at lines --

14              MR. MONTOYA:  It's going to be

15        the same list, Sunny.

16   BY MR. MONTOYA:

17        Q.      -- 6 through 10, 12 through 14,

18   64 to 66, 113 to 117, 120, 123 to 124, 127 to

19   130, 132 to 176, 179 to 182, 185 to 197, and

20   202 to 213, in those entries on the

21   Manufacturer Profile Form, the product

22   markings all contain the words "Meet and

23   Exceed" in the singular form; is that

24   correct?

25              MS. EIKHOFF:  Objection.  I

Confidential - Subject to Further Confidentiality Review

 1          think you misstated.

 2                    MR. MONTOYA:  I'm sorry, "Meet

 3          or Exceed."  I apologize.

 4          A.     You mean do they all have the

 5     words "Meet or Exceed"?

 6     BY MR. MONTOYA:

 7          Q.     In the singular.

 8          A.     Yes.

 9                 (Deposition Exhibit PID-1I

10          marked.)

11     BY MR. MONTOYA:

12          Q.     Okay.  I'm going to hand you

13     Exhibit 1I.

14                    MR. MONTOYA:  My understanding

15          is we've got less than five minutes on

16          the tape, so we'll switch out.

17                    MS. EIKHOFF:  Okay.

18                    THE VIDEOGRAPHER:  We are now

19          going off the video record.  The time

20          is currently 2:34 p.m.  This is the

21          end of Media No. 4.

22                 (Recess taken, 2:34 p.m. to

23          2:46 p.m.)

24                    THE VIDEOGRAPHER:  We are now

25          back on the video record with the

1          beginning of Media No. 5.  The time is

2          currently 2:46 p.m.

3    BY MR. MONTOYA:

4          Q.     Sir, I'm going to ask you to

5    look at Exhibit 1I, page 13.

6               Do you see it?

7          A.     Yes.

8          Q.     And Taishan does not deny that

9    the markings in -- on page 13 are its?

10         A.     Correct.

11         Q.     And the word "Meet" is singular

12   on page 13?

13         A.     Correct.

14         Q.     How did you determine that

15   page 13 were markings from Taishan?

16         A.     During preparing for the

17   deposition as Taishan's corporate

18   representative, I've tried hard to search for

19   products, and finally we found in a corner of

20   our warehouse the American-sized gypsum

21   board.

22               And because the spray marking

23   on those residual American-sized gypsum board

24   is similar to the picture depicted here;

25   therefore, we do not deny it is the spray

Case 2:09-md-02047-EEF-MBN Document 22263-66 Filed 11/19/19 Page 160 of 453
Case 2:14-cv-22408-EEF-MBN Document 2041 Entered on FLSD Docket 05/15/2019 Page 534 of 321
Confidential - Subject to Further Confidentiality Review

 1    marking of Taishan.

 2          Q.    Sir, I'm going to ask you to

 3    look at page 17 of Exhibit 1I.  My

 4    understanding is that Taishan does not deny

 5    that the markings on page 17 are from

 6    Taishan.

 7          A.    Correct.

 8          Q.    The word "Meet" on page 17 is

 9    singular?

10          A.    Yes.

11          Q.    And the word "Exceeds" is

12    plural, correct?

13          A.    Yes.

14          Q.    How did you determine that this

15    is one of Taishan's boards at page 17 of

16    Exhibit 1I?

17          A.    During preparation on my

18    deposition as Taishan's corporate

19    representative, we went to the warehouse and

20    tried to discover, and we did discover, some

21    American-sized residual gypsum boards.  And

22    one of the kind of the boards that we have

23    discovered bears the spray marking

24    information which is similar to that on top

25    of page 17; therefore, we do not deny that

```
 1    this is Taishan's board.

 2         Q.    I want you to hold page 13 and

 3    17 side by side.  Or I'll just show them to

 4    you.

 5              MR. TAYLOR:  Yeah, he'd have to

 6         tear it apart.

 7    BY MR. MONTOYA:

 8         Q.    Is the font the same in

 9    photograph 13 and 17?

10         A.    Comparatively similar.

11         Q.    I'd like you to turn to page 20

12    of Exhibit 1I.  My understanding is that

13    Taishan does not deny that the board markings

14    at Exhibit A are from Taishan?

15              And I should have said at

16    page 20, not Exhibit A.  I'm sorry.

17              MR. TAYLOR:  Yeah.

18         A.    Correct.

19    BY MR. MONTOYA:

20         Q.    I'm going to ask you to take a

21    look at photograph 18 of Exhibit 1I.  Taishan

22    denies that the markings on page 18 of

23    Exhibit 1I are from Taishan?

24         A.    Correct.

25         Q.    The markings on page 18 use the
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 162 of 453
Case 2:09-cv-02048-MCC Document 2941 Entered on FLSD Docket 05/15/2017 Page 306 of 321
Confidential - Subject to Further Confidentiality Review

1    term "Meets" in the plural, correct?

2         A.    Correct.

3         Q.    The markings on the drywall on

4    page 18 uses the term "Exceeds" in the

5    plural, correct?

6         A.    Correct.

7         Q.    What did you rely upon to

8    determine that the drywall in Exhibit 18 was

9    not from Taishan?

10        A.    In preparing for my deposition

11   as Taishan's corporate representative, we

12   have tried to look for, and I have reviewed

13   many information and we have discovered --

14             THE INTERPRETER:  The

15             interpreter would like to reinterpret

16             the last sentence.

17        A.    I have reviewed many

18   information and also a big quantity of

19   pictures.  We have discovered in the corners

20   of our warehouse the residual American-sized

21   gypsum board which has the sprayed markings

22   on them.

23             Comparing those spray markings

24   with the ones specified on the manufacturer

25   profile, we decide those words, "Meet,"

1    without S, are not from Taishan.  Therefore,

2    we --

3                THE INTERPRETER:  Interpreter

4         needs to correct herself.  The

5         interpreter needs to clarify with the

6         deponent.

7                (Translation.)

8                THE INTERPRETER:  The

9         interpreter will reinterpret the last

10        part where she stopped at.

11        A.    After the comparison with the

12   manufacturer's profile, we decided that those

13   words with the word "Meet," without S, are

14   the spray markings on the boards that belong

15   to Taishan; therefore, we deny that the spray

16   markings on page 18, which has the word --

17   the letter S, that is a board from Taishan.

18                We have also not discovered any

19   records in Taishan that records the word

20   "Meet" with the letter S.

21   BY MR. MONTOYA:

22        Q.    Sir, I asked you some questions

23   earlier, just a few minutes ago, where we

24   went through the entries in the Manufacturer

25   Profile Form where it said "Meet or Exceed"

1    in the singular and the descriptions.

2              Do you remember that?

3    A.      I remember that.

4    Q.      The photographs we received

5    from the factory on Saturday show that the

6    Taishan board says "Exceeds" in the plural.

7              Which of these is correct?

8              MR. TAYLOR:  Objection to form.

9              THE WITNESS:  Do I need to

10   answer that?

11             MR. TAYLOR:  Yes.

12             MR. MONTOYA:  Yes.

13   A.      I believe the Manufacturer

14   Profile Form created by Mr. Peng is correct,

15   but it's possible that it's not very

16   accurate.  It did not pay attention to small

17   details, such as the changes between plural

18   and singular forms.

19             However, while preparing for

20   the deposition, while as the Taishan

21   corporate representative, we have discovered

22   the residual American-sized gypsum board in

23   the storage with the spray marking, which can

24   actually give a remedy to the defects such as

25   that, which is to say that all our

```
 1    information is accurate.

 2    BY MR. MONTOYA:

 3         Q.    Sir, if you could take a look

 4    at page 18 of Exhibit 1I, and if you hold it

 5    horizontally, do you see the edge tape in the

 6    lower right-hand corner?

 7         A.    I see that.

 8         Q.    Is that Taishan edge tape?

 9         A.    Left -- lower left or lower

10    right?

11         Q.    Where the circle is.

12         A.    (Indicating.)

13         Q.    Yes, sir.

14         A.    I see that.

15         Q.    Is that Taishan edge tape?

16         A.    I cannot confirm that.

17         Q.    Why not?

18         A.    The information is much lacking

19    on it.

20         Q.    What other information would

21    you need to confirm it?

22         A.    More complete and comprehensive

23    information.

24         Q.    Such as?

25         A.    Such as information on page 14.
```

1    Q.    So you have -- on page 18, you

2  have the colors of the edge tape, correct?

3    A.    Yes.

4    Q.    You have the words "Meets or

5  Exceeds," correct?

6    A.    What is after "Meets"?

7         Yes.

8    Q.    You have the font?

9    A.    Yes.  But as I said before,

10  Taishan's edge tapes were imitated by many

11  manufacturers in terms of its layout and

12  color.  It has been a problem in the past and

13  it is still a problem today.

14         The only thing is we did not

15  keep a record on our information fighting

16  counterfeit products in the past, but if you

17  have an opportunity to look at Chinese market

18  today, you will still find some of the edge

19  tapes of gypsum boards, even the sprayed

20  markings.

21         Of course, those are all

22  manufactured by those small factories.

23  You'll find all of them are the product of

24  imitating Taishan.

25         MR. MONTOYA:  You know,

1    Counsel, I've got to stop this,

2    because all I asked him was whether he

3    had the font or not, and I'm getting a

4    narrative over half a page long.

5         MR. TAYLOR:  I understand, but

6    let him finish because I had an

7    objection that I wanted to make to

8    that.

9         MS. ROBERTSON:  You could make

10   an objection before he --

11        MR. TAYLOR:  I couldn't because

12   I couldn't get it in.

13        MS. ROBERTSON:  But he doesn't

14   need to finish the answer first,

15   right?

16        MR. TAYLOR:  My objection is an

17   objection to form because of the use

18   of the term "fonts" without further

19   explanation.

20   BY MR. MONTOYA:

21   Q.    Sir, I'm going to move on to

22   the next question.  I'd ask you to just

23   respond to my question if you could and focus

24   upon it.

25        If we go to the Manufacturer

Confidential - Subject to Further Confidentiality Review

1    Profile Form at line 15, please.  Do you see

2    line 15?

3         A.     I see that.

4         Q.     I'm going to ask you to look at

5    lines 22 to 23 and 29 through 58.  Do you

6    agree with me that the product markings for

7    each of those lines, 15, 22 to 23, and 29

8    through 58, is "DRYWALL" in all capital

9    letters --

10        A.     Stop for a moment.  I

11   apologize.  First of all, let me know which

12   document you want me to look at and then let

13   me know which part of the document you want

14   me to look at before you ask a question.

15            It's important -- it's

16   impossible for me to look through everything

17   and then come back to the specific lines you

18   asked me to look at.

19   BY MR. MONTOYA:

20        Q.     I'm looking at the same

21   Manufacturer Profile Form as you have in your

22   hands.

23            MR. TAYLOR:  Counsel --

24        A.     Which part of line 15 do you

25   want me to focus on?

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 169 of 453
Case 2:14-cv-02722-MCE-AC Document 284-1 Entered on FLSD Docket 08/15/2014 Page 113 of 321

```
 1   BY MR. MONTOYA:

 2        Q.     Sure.  The Product Marking

 3   section.

 4        A.     All right.

 5        Q.     And I'm going to ask you to

 6   look at the same Product Marking sections for

 7   line 15, 22 through 23, and 29 through 58.

 8               MR. TAYLOR:  Counsel, we

 9        appreciate you giving him the

10        opportunity.  Thank you.

11        A.     I see that.

12   BY MR. MONTOYA:

13        Q.     And in all of those lines, the

14   product markings are "DRYWALL" in all capital

15   letters, correct?

16        A.     Correct.

17        Q.     How do you know -- how does

18   Taishan know that the word "DRYWALL" is in

19   all capital letters for the drywall that

20   Taishan manufactured at lines 15, 22 to 23,

21   and 29 to 58?

22        A.     Like I said earlier, the

23   Manufacturer Profile Form created by Mr. Peng

24   is correct but not necessarily precise

25   because it did not distinguish capital letter
```

1    with lowercase letter.

2        Q.    Is it possible that Taishan

3    manufactured drywall with product markings

4    with the word "Drywall" but not in all

5    capital letters?

6            THE WITNESS:  Ask again,

7        please.

8            THE INTERPRETER:  The

9        interpreter will reinterpret.

10           (Translation.)

11           (Pause.)

12           MR. MONTOYA:  There's still a

13       pending question, correct?

14       A.    During my preparation for the

15   deposition as representative of Taishan

16   Corporation, I have tried very hard to search

17   for many materials, including compare sample

18   boards, compare the Manufacturer Profile

19   Forms and many pictures.

20           I did not discover any direct

21   information regarding the word "Drywall";

22   therefore, I cannot be sure of that.

23       Q.    Sir, I'm going to ask you to

24   focus on my question.

25           Is it possible that Taishan

Confidential – Subject to Further Confidentiality Review

1  manufactured drywall with the term -- with

2  the word "Drywall" not in all capital letters

3  from 2005 to 2007?

4      A.    Because I've not received more

5  information in that regard; therefore I

6  cannot confirm with you about that.  I have

7  not discovered relevant record in Taishan.

8           (Deposition Exhibit PID-1J

9       marked.)

10 BY MR. MONTOYA:

11      Q.    Sir, I'm going to hand you

12 Exhibit 1J to your deposition.  Sir, you

13 agree with me that Taishan does not deny that

14 the drywall markings contained at Exhibit 1J,

15 page 2, were manufactured by Taishan?

16      A.    We're not sure whether or not

17 the product depicted on Exhibit PID-1J,

18 page 2 is from Taishan.  The W in the word

19 "Drywall" is similar to the W we have

20 discovered on the spray marking on the boards

21 which have American sizes and are residual

22 that we have discovered in Taishan's

23 warehouse.

24 BY MR. MONTOYA:

25      Q.    All I'm trying to find out is:

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 172 of 453
Case 2:12-cv-02084-CEF-MBN Document 31 Entered on FLSD Docket 05/15/2019 Page 316 of
321

Confidential - Subject to Further Confidentiality Review

```
1    In Exhibit 3, my understanding is that

2    Taishan does not deny that page 2 of

3    Exhibit 1J was manufactured by Taishan.

4              Am I mistaken?

5              MR. TAYLOR:  Objection to form.

6         A.   Can you repeat which exhibit --

7    BY MR. MONTOYA:

8         Q.   Sure.  I'm sorry.

9         A.   -- you were referring to?

10        Q.   Exhibit 3, category J.

11        A.   PID-3, first of all, Taishan

12   denied the product markings on 5, 6, 7, 8, 9,

13   10, 11.

14        Q.   I'm asking you about 2.

15             MR. TAYLOR:  I don't think he

16   was finished.

17        A.   As for 2, we neither confirm

18   nor deny that it is a product of Taishan

19   because of the significant lack of

20   information on it.

21   BY MR. MONTOYA:

22        Q.   Are there any other answers

23   regarding product ID in Exhibit 3 that you're

24   changing as corporate representative of

25   Taishan today?
```

```
1                 MR. TAYLOR:  Objection to form.

2                 THE INTERPRETER:  The

3           interpreter needs to inquire of

4           counsel the meaning for "you're

5           changing as corporate representative

6           of Taishan today."

7                 Can you paraphrase as for

8           "changing"?

9    BY MR. MONTOYA:

10         Q.     My reading of Exhibit 3,

11   category J, is that Taishan does not deny the

12   markings in photograph 2.  What you're

13   telling me today is that you can neither

14   confirm nor deny the markings in

15   photograph 2.

16                 Is my understanding correct?

17                 MR. TAYLOR:  Objection, form.

18         A.     I do not deny the possibility

19   that 2 is a product of Taishan, as a

20   possibility.

21   BY MR. MONTOYA:

22         Q.     And as we look at photograph 2,

23   the word "Drywall" contains both capital

24   letters and lowercase letters, correct?

25         A.     Correct.
```

1            MR. TAYLOR:  Objection to form.

2    BY MR. MONTOYA:

3        Q.      You'd agree with me that the

4    Manufacturer Profile Form at Exhibit 7 does

5    not distinguish between capital letters or

6    lowercase letters in the Product Marking

7    section with the word "Drywall"?

8            MR. TAYLOR:  Did you give a

9        line number?  No, you didn't.

10           MR. MONTOYA:  No, I'm talking

11       about the entire form.

12           MR. TAYLOR:  Okay.  All right.

13       Just objection, form.

14       A.      The "Drywall" in the entire

15   document?

16   BY MR. MONTOYA:

17       Q.      Here's what I'm asking:  In the

18   Manufacturer Profile Form at Exhibit 7, when

19   the word "Drywall" is contained as a product

20   marking, the Manufacturer Profile Form does

21   not distinguish between capital letters and

22   lowercase letters, correct?

23       A.      It uses all capital letters

24   under Product Markings column.

25       Q.      And that's because Mr. Peng did

1   not distinguish between capital letters and

2   lowercase letters when reporting in the

3   Manufacturer Profile Form, correct?

4           MR. TAYLOR: Objection to form.

5      A.    I cannot confirm that because I

6   was not the one who created the Manufacturer

7   Profile Form.

8   BY MR. MONTOYA:

9      Q.    I'm going to ask you to look at

10   Exhibit J, photographs 2 and 9, which I'll

11   hold out in front of you. Is the Y in

12   "Drywall" at page 2 the same as the Y in

13   "Drywall" at page 9?

14      A.    There's some similarities.

15      Q.    What about the W? Is the W on

16   page 2 the same as the W on page 9 of

17   Exhibit 1J?

18      A.    I cannot see the W very

19   clearly. I would need you to provide me with

20   more information, because I believe every

21   picture should have a set of pictures that

22   come with it, not only this one picture.

23      Q.    You can hand those back to me,

24   sir.

25           If you could take a look at

1    Exhibit 1J, number 5, please.  My

2    understanding is that Taishan denies that it

3    marked drywalls -- drywall as depicted in the

4    photograph at page 5 of Exhibit 1J; is that

5    correct?

6          A.     Correct.

7                 (Deposition Exhibit PID-20

8          marked.)

9    BY MR. MONTOYA:

10         Q.     I'm going to show you what's

11   been marked as Exhibit 20 to your deposition.

12                Sir, before I ask you a

13   question about Exhibit 20, could you tell me

14   what Taishan relied upon to deny the markings

15   at page 5 of Exhibit 1J?

16         A.     Based on my years of experience

17   in the gypsum board industry, the marking on

18   page 5 is not a sprayed marking, but rather a

19   painted marking.

20         Q.     How are you able to tell that?

21         A.     Usually the markings sprayed by

22   marking sprayer machine is not in such a

23   density, neither this dark.  Just like the

24   sample board -- sample board we have

25   provided, it is aggregated by many very tiny

Confidential – Subject to Further Confidentiality Review

```
 1    dots or a little bigger dots, because while

 2    spraying, the mark spraying machine injects

 3    needle-like sprays, not paintings.

 4         Q.     Sir, I'm going to ask you

 5    questions about Exhibit 20 now, if you could

 6    turn to that, please.

 7              Exhibit 20 is an e-mail dated

 8    November 1st, 2006 from Jiapo Yang to Wenny

 9    Yin.

10              Do you see that?

11         A.     I see that.

12         Q.     And Jiapo Yang was also known

13    as Apollo Yang?

14         A.     Apollo Yang, Yang Jiapo.  His

15    English name is Apollo Yang.  That is

16    correct.

17         Q.     And he's a Taishan -- or was a

18    Taishan employee?

19         A.     Yes.

20         Q.     And he sent pictures of

21    container packages to Wenny Yin, correct?

22         A.     That's what is reflected from

23    the document.

24         Q.     I'm going to ask you to take a

25    look at the photograph that's attached to
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 178 of 453
Case 1:11-cv-22408-MGC Document 294-1 Entered on FLSD Docket 03/15/2011 Page 532 of
321

Confidential - Subject to Further Confidentiality Review

```
 1   Exhibit 20 that's labeled TG-234500.

 2              Do you see that?

 3              Sir, I'm asking you to look at

 4   the photograph that you have right in front

 5   of you.

 6        A.    I see that.

 7        Q.    I'd like you to take a look at

 8   the photograph at TG-234500, and at the same

 9   time page 5 of Exhibit 1J that's right in

10   front of you.

11              Would you agree with me that

12   the markings contained at TG-234500 are the

13   same as that as in Exhibit 1J, page 5?

14        A.    There's some similarities of

15   fonts, but because the picture is in black

16   and white, you cannot see whether or not it

17   is injected by needle sprayer.  In addition

18   to that, this set of pictures cannot prove

19   that the products are from Taishan.

20        Q.    When Mr. Yang took pictures

21   back in 2006, did he take them in color?

22              MR. TAYLOR:  Objection to form.

23        A.    You provided this document.  I

24   do not know what was -- what was it like from

25   what he took.  I am also not certain whether
```

Confidential - Subject to Further Confidentiality Review

1   or not these were taken by Jiapo Yang because

2   there is no explanation or remarks whatsoever

3   contained in the e-mail.

4   BY MR. MONTOYA:

5       Q.      Sir, I'm going to ask you to

6   look at Exhibit 1J again.  At Exhibit 1J,

7   Taishan is denying photographs 6, 7, 8 and 10

8   and 11; is that correct?

9               MR. TAYLOR:  Objection to form.

10      A.      Yes.

11  BY MR. MONTOYA:

12      Q.      What did Taishan rely upon to

13  deny 6, 7, 8 and 10 and 11 of Exhibit 1J?

14              MR. TAYLOR:  Is it all right,

15          Counsel, if he takes them one at a

16          time?

17              MR. MONTOYA:  Sure.

18              MR. TAYLOR:  Okay.

19  BY MR. MONTOYA:

20      Q.      Sir, if you would like to go

21  through the photographs one at a time, that's

22  acceptable.

23      A.      Remember at the time we were

24  determining the picture on number 6, we had

25  our attorney provided us also with a set of

1    pictures.  I don't know if you have those

2    pictures in hand.

3         Q.    When was that?

4         A.    While we were determining

5    PID-3, at that time, because we could not see

6    clearly from the picture on number 6;

7    therefore, we raised a question to the

8    attorney to see whether there are more

9    pictures or more details.

10             But if I'm not mistaken in my

11   memory, there are other more detailed

12   pictures, as a set of pictures, under

13   number 6.

14        Q.    Is your -- is Taishan's

15   position that it doesn't have enough

16   information to admit that it manufactured

17   drywall with the markings at photograph 6?

18        A.    At the time we required more

19   information in order to make the

20   determination, and also, you should be the

21   one that provided those information.

22        Q.    Why was number 7 denied by

23   Taishan?

24             THE WITNESS:  How long has it

25   been?  I would like to take a break.

```
 1              MR. TAYLOR:  Yeah.

 2              THE WITNESS:  I'd like to go to

 3         the restroom.

 4              MR. MONTOYA:  I just want to

 5         get an answer to that question.

 6              MR. TAYLOR:  Okay.  Just answer

 7         one question.

 8         A.    The basis for determining

 9    number 7 is because the W on page 7 is

10    different from our W.  The W from Taishan

11    resembles a rounder bottom, but this W is

12    more squared.

13              While preparing for the

14    deposition as company's representative, I

15    tried hard to discover many information, but

16    I have not found that Taishan had any

17    spray -- sprayed marks like this one.

18              MR. MONTOYA:  Take a break.

19              MR. TAYLOR:  Okay.  Thanks.

20              THE VIDEOGRAPHER:  We're now

21         going off the video record.  The time

22         is currently 3:43 p.m.  This is the

23         end of Media No. 5.

24              (Recess taken, 3:43 p.m. to

25         3:59 p.m. )
```

```
 1              THE VIDEOGRAPHER:  We are now

 2        back on the video record with the

 3        beginning of Media No. 6.  The time is

 4        currently 3:59 p.m.

 5   BY MR. MONTOYA:

 6        Q.     Sir, I'm going to ask you to go

 7   briefly back to Exhibit 20, please.  That was

 8   the e-mail from Apollo Yang.

 9        A.     I see that.

10        Q.     I just wanted to clarify that

11   the first page of Exhibit 20 is the English

12   translation, but the originals are TG-234499

13   through 234511.  Do you see that?

14              Do you acknowledge that the

15   e-mail was written by Apollo Yang?

16              MR. TAYLOR:  Objection, form.

17              MR. MONTOYA:  What's the

18        objection?

19              MS. EIKHOFF:  Form.

20              MR. TAYLOR:  Form.

21              MR. MONTOYA:  But what's wrong

22        with it?

23              MR. TAYLOR:  We don't know

24        that.  That's what it says, but I

25        don't know if he can acknowledge that.
```

```
 1              MR. MONTOYA:  Let me ask you
 2      this way then:  Is there a business
 3      records problem, exception 803(6)
 4      problem with this document?  I'm
 5      asking for a stipulation because I
 6      don't want to have to walk him through
 7      it.
 8              MR. TAYLOR:  Yeah.  I think
 9      we'd have to look at it and think
10      about it, but as far as we know, this
11      document says it came from Apollo
12      Yang, but --
13              MS. EIKHOFF:  It was produced
14      by Hogan Lovells, right?
15              MS. ROBERTSON:  No, no, it was
16      produced from Peng's computer in 2015.
17              MR. TAYLOR:  Oh, is that right?
18              MS. EIKHOFF:  Okay.  Well, I
19      appreciate that clarification.
20              MR. TAYLOR:  Then those
21      stipulations are okay.
22              MR. MONTOYA:  All right.
23              You can put that exhibit down
24      now, sir, thank you.
25              ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 184 of 453
Case 1:11-cv-22408-MGC Document 284-1 Entered on FLSD Docket 08/15/2011 Page 328 of
321

Confidential – Subject to Further Confidentiality Review

 1   BY MR. MONTOYA:

 2        Q.      I'm going to ask you to take

 3   another look at Exhibit 41.  In your earlier

 4   testimony you had referenced the letter W in

 5   some of the photographs that were taken at

 6   the Taishan factory.

 7                Do you recall that?

 8        A.      Yes.

 9        Q.      And you described the W as

10   having a rounder bottom and having some

11   different characteristics.

12                Do you recall that?

13        A.      Yes.

14        Q.      Where is the W that you were

15   referring to in the photographs in

16   Exhibit 41?

17        A.      Page 18, the W on page 18.

18        Q.      Does the W at page 18 appear to

19   be the same W at Exhibit 1, page 2?

20        A.      Very similar.

21        Q.      Does the Manufacturer Profile

22   Form, Exhibit 7 -- does it contain any

23   information as to whether the markings are

24   painted on the drywall?

25        A.      The Manufacturer Profile Form

1    does not contain the information whether or

2    not it was painted; however, as a corporate

3    representative of Taishan in preparing of my

4    deposition, I've learned and confirmed that

5    ever since 2004 Taishan had already started

6    to use the spray marking.

7         Q.    Who did you get that

8    information from?

9         A.    I confirmed with the personnel

10   of our purchasing department as well as our

11   production department.

12        Q.    Can you give me any names?

13        A.    The person in the production

14   department is a lady by the name of Madam

15   Zhu, Z-H-U.  I'm not sure about her full

16   name.

17             In purchasing department at the

18   time, it was a Mr. Pi, who was in charge of

19   the spray marking machine.

20        Q.    I'll take you back to

21   Exhibit 1J.  I'd ask you to look at page 8.

22             Why does Taishan deny that it

23   manufactured the drywall with the markings

24   contained at page 8?

25        A.    During the preparation of the

Confidential - Subject to Further Confidentiality Review

1  deposition as Taishan's corporate

2  representative, I have done a lot of research

3  and have searched for a lot of information.

4  And the conclusion made out of that is that

5  Taishan's 4x12x1/2, the symbol of

6  multiplication sign, is actually not the sign

7  itself, but a checkmark.  It is not the star

8  sign.

9      Q.    And for clarification, when you

10  say the checkmark, is it the English letter

11  x?

12     A.    Multiplication sign.

13     Q.    That looks like an x in

14  English.

15     A.    Correct.

16     Q.    Is it Taishan's position that

17  it has never manufactured drywall with

18  markings with the asterisk at page 8?

19     A.    From my discovery through much

20  effort in researching, I discovered

21  information and materials in my capacity as

22  the corporate representative for preparing

23  the deposition; I did not find any record

24  which shows the asterisk as the

25  multiplication sign.

1    Q.    What evidence do you have that

2  Taishan never manufactured a drywall board

3  with the markings -- with an asterisk in the

4  markings?

5    A.    I have not -- I have not

6  discovered any record containing Taishan's

7  information with asterisk sign in it while I

8  was preparing for my deposition as Taishan's

9  corporate representative.

10    Q.    If a customer asked you --

11  asked Taishan from 2005 to 2007 to prepare

12  markings with an asterisk, could Taishan have

13  done it?

14        MR. TAYLOR:  Objection to form.

15    A.    Currently we have not

16  discovered the record of Taishan using

17  asterisk as multiplication sign so far.  We

18  have also not discovered any request from

19  customer as to replace multiplication sign

20  with asterisk.

21        Customarily, using a

22  multiplication sign is easier to operate than

23  using an asterisk.

24  BY MR. MONTOYA:

25    Q.    Sir, what do you call the --

Case 2:09-md-02047-EEF-MBN Document 22263-66 Filed 11/19/19 Page 188 of 453
Confidential - Subject to further Confidentiality Review
321

1    this symbol here on page 8?  Is that an

2    asterisk or a multiplication sign?  How do

3    you refer to it?

4          A.     We call it asterisk.

5          Q.     Please focus on my question:

6    Did Taishan have the ability to put an

7    asterisk as a product marking in its

8    factories from 2005 to 2007 on drywall?

9              MR. TAYLOR:  Objection to form.

10             THE WITNESS:  Do I need to

11        answer?

12             MR. TAYLOR:  Yes, answer.

13        A.     I'm not sure about that because

14   I have not discovered Taishan's record for

15   putting the asterisk sign; therefore, I'm not

16   sure whether or not Taishan is capable of

17   putting that sign.

18   BY MR. MONTOYA:

19        Q.     You just don't know.

20        A.     I did not find relevant records

21   while I was preparing as a witness for the

22   company as a corporate representative.

23        Q.     Sir, what evidence does Taishan

24   rely upon to deny that its -- that the

25   markings contained on the drywall at page 10

Confidential - Subject to Further Confidentiality Review

1   of Exhibit 1J?

2       A.      Because all letters on the

3   picture of page 10 are capital letters.  We

4   did not discover any similar letters from

5   Taishan's record while I was preparing for

6   the deposition as a corporate representative.

7       Q.      What evidence does Taishan rely

8   upon to deny that it manufactured the drywall

9   shown in photograph 11 of Exhibit 1J?

10      A.      It's because the W contained on

11  page 11 is cornered and squared.  It is not

12  like the W of Taishan's product, which is

13  round.

14      Q.      Taishan doesn't have any

15  documents to show that it did not mark its

16  drywall with the W as depicted in

17  photograph -- or page 11, correct?

18      A.      During the preparation of my

19  deposition as the corporate representative,

20  we have discovered from the warehouse the

21  American-sized residual gypsum board has the

22  injected W which is different from this one.

23      Q.      Is the W that you're referring

24  to the W in Exhibit 41 that you showed us at

25  photograph 18, I believe?

Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2         (Deposition Exhibit PID-1B

3    marked.)

4    BY MR. MONTOYA:

5    Q.    I'm going to hand you

6    Exhibit 1B to your deposition.  Sir, what

7    evidence does Taishan have to deny that it

8    manufactured the boards -- or the drywall in

9    the photograph at Exhibit 1B, page 34?

10   A.    During my preparation for the

11   deposition as Taishan's corporate

12   representative, I have done a lot of

13   research, acquiring information.  I have not

14   found any record showing that Taishan had

15   manufactured any edge tape or sprayed marking

16   bearing the letters "C&K."

17         And according to my knowledge,

18   C&K is also a gypsum board manufacturer; its

19   Chinese name is Chenxiang.  And from the

20   information I learned from customers, at that

21   time, Chenxiang had also manufactured a lot

22   of the products with white edge tape and

23   without sprayed letters.

24         THE INTERPRETER:  The

25   interpreter needs clarification.

1              (Translation.)

2      A.      Or it has manufactured

3  according to the request of the customers,

4  the American size label -- sprayed labeled

5  universal-sized board.

6              THE INTERPRETER:  Interpreter

7      needs clarifying.

8              (Translation.)

9              THE INTERPRETER:  There's no

10     correction on the interpretation.

11             MR. MONTOYA:  No correction?

12             THE INTERPRETER:  No

13     correction.

14  BY MR. MONTOYA:

15     Q.      Which customers did you speak

16  with?

17     A.      I don't have a clear

18  recollection of that, but it is a common

19  knowledge in the industry.  We have learned

20  relevant information from our many

21  interactions with customers.

22             At the time there were many

23  small factories in Pingyi, such as Chenxiang,

24  Baier, or Zhongxing, et cetera, and also

25  Kang Yijia in Taian, and some small factories

1    in Zaozhuang.

2              All have produced a lot -- a

3    lot of universal-sized product according to

4    the request of the customers with spray

5    marking which has the American sizes.

6              THE INTERPRETER:  The

7         interpreter needs to clarify.

8              (Translation.)

9              THE INTERPRETER:  The

10        interpreter needs to make a

11        correction:  As for universal size, it

12        should be interpreted as the markings

13        without labels.

14             MS. ROBERTSON:  I don't

15        think -- I don't think we want that

16        word is why I don't think we can agree

17        to it.

18             MS. EIKHOFF:  Okay, but -- all

19        right.  I'm just -- I don't --

20             MS. ROBERTSON:  My question is,

21        is what is the problem with her

22        correction saying markings without

23        labels?

24             MS. EIKHOFF:  Because it could

25        be a marking.

```
1              MS. ROBERTSON:  But if that's
2         what he said.
3              MS. SU:  That's not what he
4         said.
5              MS. EIKHOFF:  That's the
6         problem with the translation.  Why
7         don't we note it for the record as a
8         translation issue that we can revisit.
9              MR. MONTOYA:  Is there an
10        objection to the translation?
11             MR. TAYLOR:  Yes.  Yes.
12             MR. MONTOYA:  Okay.
13             THE INTERPRETER:  May the
14        interpreter make a comment?
15             MR. MONTOYA:  Sure.
16             THE INTERPRETER:  So for
17        literal translation, the Chinese
18        character "tong ma" means universal
19        size.  Therefore, the interpreter have
20        been using that all along until the
21        interpreter found a similar
22        contradictory statement.
23             Therefore, upon clarification
24        with Mr. Che, it was clarified by
25        Mr. Che that it actually meant
```

1          "without label" in the English

2          translation.

3    BY MR. MONTOYA:

4        Q.      What records do you have to

5    support your statements that all these

6    companies that you mentioned produced the

7    drywall that you've described?

8        A.      First of all, this kind of

9    information was open at the time in the

10   industry.

11          Secondly, if you could check,

12   you'll find all those manufacturers were

13   included in your initial complaint.  In other

14   words, you know about it.

15       Q.      Did you take any notes of your

16   conversations with your customers?

17       A.      In China, how should I put it,

18   we don't have this kind of behavior.

19       Q.      Here's what I'm asking:  When

20   you prepared for your testimony as the

21   corporate representative and you inquired

22   about the C&K drywall, my understanding is

23   you called customers to get information.

24          Did you take any notes of those

25   conversations?

Confidential – Subject to Further Confidentiality Review

```
 1              MR. TAYLOR:  Objection to form.
 2         A.       There have been many changes,
 3    one after another, between 2006 and 2007 as
 4    for the customer information.  It's been so
 5    long that we're not even sure whether or not
 6    those companies still exist.
 7              Because at the time, between
 8    2005 to 2007, while Taishan was manufacturing
 9    American-sized gypsum board, I was only a
10    salesperson; therefore, I have had
11    interactions with many customers, but no
12    records were left.
13    BY MR. MONTOYA:
14         Q.       Sir, did Taishan ever
15    manufacture any drywall for the company
16    Chenxiang?  And I'm sorry for my
17    pronunciation.
18         A.       No.  We're competitors.  It's
19    impossible for us to manufacture gypsum board
20    for them.  The quality of our products far
21    exceeds that of theirs.
22         Q.       Did Taishan ever enter into any
23    contracts with the company Chenxiang?
24         A.       Not according to my knowledge,
25    because we're competitors.  There is an
```

```
 1    unspoken rule in the industry.  It's

 2    impossible for me to use my product, which is

 3    very good, to gold coating such a small

 4    factory.

 5         Q.     Sir, did Taishan do any

 6    business with York Building Supply Company

 7    that you're aware of?

 8              MR. TAYLOR:  Can you say that

 9         name again?

10              MR. MONTOYA:  Yes.

11    BY MR. MONTOYA:

12         Q.     York Building Supply.

13              MR. TAYLOR:  Okay.  Thanks.

14         Thank you.

15    BY MR. MONTOYA:

16         Q.     Like New York.

17         A.     Is that a Chinese company or a

18    foreign company?

19         Q.     It's a company outside of

20    China.

21         A.     York?  Is it listed on the

22    Manufacturer Profile Form?

23         Q.     No, sir.

24         A.     I really do not recall there is

25    such a company.
```

1    Q.    Do you know if Taishan ever did

2  any business with a company called

3  HLK Industries?  And I will also tell you it

4  is not on the Manufacturer Profile Form.

5    A.    I also don't recall that.

6          (Deposition Exhibit PID-1G

7     marked.)

8  BY MR. MONTOYA:

9    Q.    Sir, I'm going to hand you

10 Exhibit 1G to your deposition.

11          Sir, does Taishan deny that it

12 manufactured the board, the drywall, shown on

13 page 43 of Exhibit 1G?

14   A.    Correct.

15   Q.    Please tell us why.

16   A.    During the time to prepare for

17 my deposition on behalf of the corporation,

18 Taishan, as its representative, I have

19 reviewed a lot of materials as well as

20 compared a lot of information.

21          I did not find any information

22 of Taishan having produced products for

23 ProWall.

24   Q.    Is your answer the same for

25 page 44 of Exhibit 1G?

1    A.    Page 44?

2    Q.    Yes, sir.

3    A.    Correct.

4    Q.    From 2006 to 2007, did Taishan

5    manufacture drywall that said on the edge

6    tape "Fire Resistive Gypsum"?

7    A.    Edge?  Which edge are you

8    referring to?

9    Q.    The edge tape.

10    A.    What is information reflected

11    in there?

12    Q.    My question is:  Did Taishan

13    ever manufacture any drywall -- manufacture

14    any drywall with the edge tape that had the

15    words "Fire Resistive Gypsum" on it from 2006

16    to 2007?

17    A.    Are you talking about American

18    size?

19    Q.    Yes.

20    A.    If you are talking about

21    American size, then during the preparation of

22    my deposition as Taishan corporate

23    representative, I did not find any

24    information with the edge tape bearing the

25    words fire resistive, something, something,

1    gypsum board.

2         Q.    From 2006 to 2007, did Taishan

3    manufacture drywall according to the ASTM C36

4    and 1396 standard?

5         A.    From 2006 and 2007, Taishan did

6    produce American-sized gypsum boards.

7         Q.    Did it contain the markings

8    "ASTM C36/1396"?

9                   MR. TAYLOR:  Objection to form.

10                  MS. EIKHOFF:  Pat, did you mean

11        did he?  Because your question was did

12        it produce, did it contain the

13        marking, and he had just referred to

14        like every board they ever produced.

15                  MS. ROBERTSON:  I think

16        every --

17                  (Clarification requested by the

18        reporter.)

19                  MS. ROBERTSON:  I said I think

20        that "it" refers to Taishan, not

21        boards.

22                  MS. EIKHOFF:  It said did it --

23                  MR. MONTOYA:  Sorry.  My

24        question was -- that he didn't answer

25        was do they manufacture to the ASTM

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/18 Page 200 of 453
Case 2:12-cv-02068-MCE Document 284-1 Entered on FLSD Docket 08/15/2014 Page 534 of 321
Confidential – Subject to Further Confidentiality Review

1    standard or not, which I still haven't

2    gotten an answer to.  That's all I'm

3    trying to ask.

4         MS. EIKHOFF:  Okay.

5         THE WITNESS:  Please ask your

6    question again.

7  BY MR. MONTOYA:

8    Q.    Sir, from 2006 to 2007, did

9  Taishan manufacture boards with the marking

10  "ASTM C36/1396"?

11   A.    C36/1396?  Is that correct?

12   Q.    Yes.

13        Sir, I think maybe my question

14  is confusing to you because you're looking at

15  the Manufacturer Profile Form.

16        All I'm asking you is whether

17  or not Taishan produced board in 2006 and

18  2007 that had the ASTM C36 or -- slash, 1396

19  stamped on it.

20   A.    During my preparation for the

21  deposition as a corporate representative, I

22  have reviewed a lot of materials.  I did not

23  find that Taishan had manufactured gypsum

24  boards bearing C36 and, slash, 1396.

25   Q.    You do agree that Taishan

```
 1    manufactured boards from 2006 and 2007 with

 2    the markings "ASTM C1396-04" standard,

 3    correct?

 4              THE WITNESS:  Can you

 5         reinterpret the number again?

 6              THE INTERPRETER:  The

 7         interpreter will reinterpret.

 8              (Translation.)

 9    A.      Correct.

10              (Deposition Exhibit PID-50

11         marked.)

12    BY MR. MONTOYA:

13         Q.    I'm going to hand you what's

14    been marked as Exhibit 50 to your deposition.

15              THE WITNESS:  How long has it

16         been?

17              MR. TAYLOR:  We're almost --

18              MR. MONTOYA:  We're almost

19         done.

20              MR. TAYLOR:  We've got about

21         ten more minutes.

22              Did you only give him one copy?

23              MR. MONTOYA:  No, there's more

24         there.

25              MR. TAYLOR:  Okay.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MONTOYA:

 2         Q.     Can you tell us what Exhibit 50

 3    is, sir?

 4         A.     It is an invoice.

 5         Q.     An invoice from whom?

 6         A.     It should be from -- it should

 7    be from Taishan.

 8         Q.     Is this --

 9         A.     It is a common invoice.

10         Q.     Did you say the term "common

11    invoice"?

12         A.     Correct.

13         Q.     What do you mean by common

14    invoice?

15         A.     There are two types of invoices

16    in China.  The invoice for ordinary taxpayers

17    is called an invoice for added value.

18                THE INTERPRETER:  Interpreter

19         needs to clarify.

20                (Translation.)

21         A.     The small-scale taxpayers

22    invoice belongs to the category of commercial

23    invoice.  In China, only ordinary taxpayers

24    may issue a common invoice and value-added

25    tax invoice.
```

1          But a small-scale taxpayer can

2    also accept common invoice; he cannot accept

3    value-added tax invoice, and he can only

4    issue common invoice.

5    BY MR. MONTOYA:

6          Q.     Sir, Exhibit 50 is an invoice

7    from Taishan to Run & Fly (Jinan) New

8    Materials Company, Limited, correct?

9          A.     Correct.

10          Q.     And it's dated May 8th, 2006?

11          A.     Correct.

12          Q.     Did Run & Fly (Jinan) New

13    Materials Company, Limited request that

14    Taishan make drywall for it pursuant to this

15    invoice?

16          A.     Manufacturing gypsum boards is

17    not to be in accordance with an invoice.  The

18    invoice is something like a receipt after a

19    sales transaction is completed.

20          Q.     Sir, does this invoice tell you

21    that Taishan manufactured drywall for Run &

22    Fly (Jinan) New Materials Company, Limited?

23          A.     Correct.  We call it gypsum

24    board.

25          Q.     Okay.  What dimensions were

1 produced by Taishan for Run & Fly (Jinan) New

2 Materials?

3        A.    It's 3.66 meter by 1.22 meter

4 by 12.7.

5        Q.    Is that the same as the

6 dimensions 4 feet by 12 feet by 1/2 inch?

7        A.    When you make the conversion,

8 it is the same.

9        Q.    How many pieces of drywall

10 total were ordered by Run & Fly (Jinan) New

11 Materials from Taishan?

12        A.    I'll need to add them.

13        Q.    What are the numbers in this

14 invoice?

15        A.    There are two numbers.

16        Q.    What are those two numbers?

17        A.    There is a total when you add

18 those two together.

19        Q.    What's the total?

20        A.    May I have a calculator?

21        Q.    Well, can you tell me what the

22 numbers are?

23        A.    The line on top is 598.  The

24 line at the bottom is 9,338.

25               MR. SERPE:  Counsel, can we get

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 205 of 453
Case 1:19-cv-22485-MGC Document 1-1 Entered on FLSD Docket 08/15/2019 Page 319 of 321
Confidential - Subject to Further Confidentiality Review

1       a stipulation that the total is 9,936?

2              MR. TAYLOR:  I object to your

3       question.  Somebody wants to go home,

4       I think.

5              MR. SERPE:  No, no, I got the

6       calculator out.  I'm trying to be

7       helpful here.

8              MR. TAYLOR:  Okay.  We're good.

9  BY MR. MONTOYA:

10      Q.     Do we agree that the total is

11  9,936 boards?

12             MR. TAYLOR:  Yes.

13      A.     If this gentleman does not have

14  any problem with your math, it should be

15  correct.

16  BY MR. MONTOYA:

17      Q.     Okay.  Is the sale to Run & Fly

18  (Jinan) New Materials reported in the

19  Manufacturer Profile Form, Exhibit 7?

20      A.     No.

21      Q.     Why not?

22      A.     Because at the time it issued a

23  common invoice; therefore, we do not think it

24  is for exporting because all that is involved

25  in exporting would want a value-added tax

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 206 of 453
Case 1:11-cv-22408-MGC Document 1 Entered on FLSD Docket 08/15/2011 Page 330 of
321

Confidential - Subject to further Confidentiality Review

```
1    invoice.

2              If it did not request a

3    value-added tax invoice but you're exporting

4    it, you have to supplementally pay an

5    additional tax to the Chinese custom, which

6    is not a good deal.

7              Therefore, at the time, we did

8    not believe it was for exporting.

9        Q.    Do you know what the markings

10   are on this drywall that was produced for

11   Run & Fly (Jinan) New Materials?

12       A.    White edge tape with no

13   writings without spray marking.

14       Q.    White edge tape and no spray

15   marking, correct?

16       A.    Correct.

17       Q.    And you later found out that

18   these boards went to the United States,

19   correct?

20             MR. TAYLOR:  Objection to the

21       form.

22       A.    We did not find out that it

23   went to the United States.  But afterwards,

24   we confirmed that the size is American size.

25             ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 207 of 453
Confidential – Subject to further confidentiality review

BY MR. MONTOYA:

Q.    How did you find out that the
size was American size?

A.    Because later, everybody was
saying the size of 4 feet by 12 feet by half
inch is an American size.

Q.    What other sales did you do
with Run & Fly (Jinan) New Materials?

A.    For Jinan Run & Fly New
Material Company, we have only made this one
batch with American size, and also, it was
with the white edge tape with no writings and
no spray marking on the back.  And common
invoice was issued.

From what we learned
afterwards, because Taishan's price is
comparatively high, then it went to Kang
Yijia and made purchase for a lot of gypsum
boards with American size.

Q.    Can you explain the last part
of your answer for us, when you say that
the -- I think what you said is the drywall
went to Kang Yijia, which I can't pronounce,
and they made a lot of purchase of gypsum
boards for the American size.

Confidential – Subject to Further Confidentiality Review

```
 1            Explain that for us.
 2            MR. TAYLOR:  Objection to the
 3       form.
 4       A.    What kind of explanation you're
 5  asking?
 6  BY MR. MONTOYA:
 7       Q.    I didn't understand the second
 8  part of your answer.  Can you explain it more
 9  for us?
10       A.    Afterwards, according to what
11  we have learned, Jinan Run & Fly New Material
12  Company, Limited had only ordered one batch
13  of American-sized gypsum board from Taishan,
14  and also, it was white edge tape without
15  writings and without spray marking on the
16  back.
17            Afterwards, because Taishan's
18  product price was comparatively high, Jinan
19  Run & Fly New Material Company ordered a lot
20  of American-sized gypsum board from Kang
21  Yijia.
22            Am I helping you to understand
23  now?
24       Q.    Yes, I understand now.  Thank
25  you.
```

1              MR. MONTOYA:  Just one more

2       quick one.

3              MR. TAYLOR:  Okay.

4  BY MR. MONTOYA:

5       Q.     Did Taishan ever do any

6  business with a company called Manchester in

7  Home?

8       A.     I don't believe it's listed on

9  the Manufacturer Profile Form.

10      Q.     It is not on the Manufacturer

11 Profile Form.

12      A.     Because I really don't recall

13 there is such a company.

14      Q.     Sir, did Taishan ever do any

15 business directly with a company named Stock

16 Building Supply?

17      A.     Is it also not included on the

18 manufacturers list?

19      Q.     It is not.

20      A.     Because I also do not recall

21 such a company.

22             MR. MONTOYA:  I think we can

23      adjourn for the day.

24             MR. TAYLOR:  Right, get started

25      again at 7:00 a.m.

```
 1              THE WITNESS:  Is he done with
 2         his questions, so tomorrow is --
 3              MR. TAYLOR:  7:00 a.m.  He'll
 4         finish his questions tomorrow.
 5              (Interruption by the reporter.)
 6              THE VIDEOGRAPHER:  We are now
 7         going off the video record.  The time
 8         is currently 5:05 p.m.  This is the
 9         end of Media No. 6.
10              (Recess taken, 5:05 p.m. to
11         5:26 p.m.)
12              THE VIDEOGRAPHER:  We are now
13         back on the video record with the
14         beginning of Media No. 7.  The time is
15         currently 5:26 p.m.
16                   EXAMINATION
17    BY MR. SERPE:
18         Q.    Good afternoon, Mr. Che.  My
19    name is Richard Serpe, we met earlier.  I
20    appreciate your offer to continue to go later
21    this evening.  Thank you, sir.
22         A.    Thank you.
23         Q.    Will you stop me if you become
24    tired from the long exertions today?
25         A.    All right.  Thank you.
```

```
1          Q.      Please take out Exhibit 48,

2    which is in the stack in front of you, as

3    I'll be asking you several questions from it.

4               MS. EIKHOFF:  Sunny, we put

5          them in numerical order.

6               MS. ROBERTSON:  So, Mr. Che, at

7          the bottom there will be a 48.

8    BY MR. SERPE:

9          Q.      Mr. Che, I direct your

10   attention to item number 9, which is listed

11   on the notice of deposition, PID-48.

12               Are you prepared to testify on

13   behalf of Taishan with respect to the

14   document retention policy of Taishan since

15   2004?

16         A.      I see that, that's correct.

17         Q.      I'm going to hand you an

18   exhibit which we've marked as PID-9.

19               (Deposition Exhibit PID-9

20         marked.)

21               MS. ROBERTSON:  Patrick will

22         hand it to Bernard.

23               MR. TAYLOR:  Thank you, sir.

24               MS. EIKHOFF:  So if you just

25         hand them all here, then we'll pass
```

 1          them down.

 2     BY MR. SERPE:

 3          Q.     Mr. Che, have you ever seen

 4     Exhibit PID-9 before?

 5          A.     Yes.

 6          Q.     I direct your attention to

 7     paragraph 14 of PID-9.

 8          A.     I see that.

 9          Q.     Taishan understood that this

10     was an order from Judge Fallon in the court

11     case with respect to preserving evidence, did

12     it not?

13          A.     It should be the case.

14          Q.     And Taishan understood that the

15     order required Taishan to preserve all

16     evidence regarding its U.S. exports, correct?

17          A.     Taishan's understanding is that

18     according to the order of Judge Fallon, that

19     Taishan has the responsibility to keep all

20     evidence related to the case.

21          Q.     When did Taishan first receive

22     a copy of Judge Fallon's order, Pretrial

23     Order 9, regarding preservation of evidence?

24               MS. EIKHOFF:  Richard, did you

25          mean PTO 1?

Confidential - Subject to Further Confidentiality Review

1           MR. SERPE:  I'm sorry, PTO 1.

2      Thank you, Christy.

3      A.     I don't recall the detailed

4  date; however, I do remember that in 2010,

5  when the lawsuit was initiated, Hogan Lovells

6  showed us the court order and requested us to

7  comply with the court order to preserve all

8  relevant information that is relevant to this

9  case.

10 BY MR. SERPE:

11     Q.     The order on Exhibit 9 has a

12 date at the top of June 16th, 2009.

13          Do you see that?

14     A.     I see that.

15     Q.     Is it your testimony under oath

16 today that Taishan did not receive a copy of

17 the judge's order until 2010, over six months

18 after the date of the order?

19     A.     Because at the time I was

20 preparing for the deposition as company

21 representative, I did review the depositions

22 of President Jia and Mr. Peng.

23          From that I understand that

24 Taishan had entered into the lawsuit in 2010;

25 therefore, before that I believe Taishan did

Confidential - Subject to further confidentiality Review

1   not have any other way to receive such a

2   document.  Because President Jia twice

3   demanded Taishan's relevant personnel in 2010

4   and 2011 to preserve documents and evidence

5   in relation to this lawsuit.

6       Q.    How did President Jia order

7   relevant personnel in 2010 to preserve

8   documents and evidence in relation to this

9   lawsuit?

10      A.    While I was preparing for my

11  deposition as the corporation representative,

12  I reviewed President Jia and Mr. Peng's

13  record in this regard.

14            I believe in two separate

15  meetings, President Jia demanded that

16  relevant personnel should preserve documents

17  and evidence in relation to the American

18  lawsuit.

19      Q.    Did President Jia give written

20  instructions at those meetings?

21      A.    When I was reviewing documents

22  for the preparation of my deposition as

23  representative of the company, I did not find

24  in the record any instructions in that regard

25  in writing.

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 215 of 453
Case 1:11-cv-22408-MGC Document 291-1 Entered on FLSD Docket 08/15/2011 Page 559 of
321

Confidential - Subject to further Confidentiality Review

1    Q.    Did you attend either meeting

2  personally?

3    A.    No.

4    Q.    You were in the foreign sales

5  department in 2010?

6    A.    Correct.

7    Q.    You were in the foreign sales

8  department during the time period when

9  Taishan made drywall for U.S. export?

10    A.    You should say that while

11  Taishan was manufacturing American-size

12  gypsum board, I was in the sales department.

13    Q.    You would agree that you would

14  be a relevant personnel, as you used those

15  words, that should have been provided the

16  instructions to preserve documents and

17  evidence; wouldn't you agree?

18        MR. TAYLOR:  Objection to form.

19    Objection to the form.

20    A.    At the time I received the

21  notice in regarding to preserve evidence

22  related to American lawsuit, but it was not

23  through President Jia; but Mr. Peng informed

24  us of that, because at the time, Mr. Peng was

25  our manager.

1  BY MR. SERPE:

2      Q.     What information did Mr. Peng

3  provide you regarding the requirement to

4  preserve evidence for the American lawsuit?

5      A.     I remember at the time Mr. Peng

6  required our department to preserve all

7  e-mails, documents, evidence related to

8  manufacturing of the American-sized gypsum

9  board.

10     Q.     Did Mr. Peng give you written

11  instructions?

12     A.     No.

13     Q.     When you received the

14  instructions from Mr. Peng, what steps did

15  you take to preserve your e-mails, documents

16  and evidence related to manufacturing of the

17  American-sized gypsum board?

18     A.     At the time our strategy was

19  that we no longer could delete anything from

20  our e-mails.  We would wait for the attorneys

21  from Hogan Lovells to collect information.

22            At the same time, it also

23  applies to the documents in the computer.  At

24  the same time, to keep all documents related

25  to American-sized information at hand.

Confidential - Subject to further Confidentiality Review

1    Q.    Did the attorneys from

2   Hogan Lovells collect the information from

3   you?

4         MR. TAYLOR:  Objection to form.

5    A.    Yes.

6   BY MR. SERPE:

7    Q.    Did they search your computer

8   for e-mails?

9         MS. EIKHOFF:  Object to form.

10         MR. TAYLOR:  Objection, form.

11         And you can answer.

12    A.    Yes.

13   BY MR. SERPE:

14    Q.    Who did that?

15    A.    At the time, we left our

16   mailbox and our computer to Hogan Lovells for

17   their operation because at the time, the

18   contact person for Hogan Lovells is Mr. Peng;

19   therefore I'm not as familiar with those

20   people as I am with the lawyers of Alston, so

21   I cannot really name their names.

22         I believe there was a Mr. Chen.

23    Q.    For a few more questions I want

24   to ask about you personally, your computer.

25   I'm going to switch back to what Taishan did

Case 2:09-md-02047-EEF-MBN  Document 22363-66  Filed 11/19/19  Page 218 of 453
Case 2:14-cv-02408-MCE  Document 294-11  Entered on FLSD Docket 09/15/2014  Page 332 of
321

Confidential – Subject to Further Confidentiality Review

```
 1   later.

 2               Who took your computer to

 3   search?

 4               MR. TAYLOR:  Objection to the

 5        form.

 6        A.    I think at the time there was

 7   no taking away of the computers, but rather

 8   we have changed our mailbox password into

 9   something simple and to give that to

10   Hogan Lovells' attorneys so that they can

11   operate on our computers.

12   BY MR. SERPE:

13        Q.    In addition to giving the

14   mailbox password, did Hogan Lovells take

15   documents that were stored in the memory of

16   your computer?

17               MR. TAYLOR:  Objection to form.

18               You can answer.

19        A.    I'm not sure about that.  We

20   give them the passwords, we left our seats,

21   and we let them do their operation on it.

22   BY MR. SERPE:

23        Q.    As Taishan's representative,

24   what is Taishan's understanding as to what

25   information was removed or copied from the
```

Confidential - Subject to Further Confidentiality Review

1    computers at that time?

2        A.    We trust that Hogan Lovells'

3    attorneys, as attorneys, could better

4    understand the court's order.  We were open

5    to the information collection of

6    Hogan Lovells.  We provided our mailboxes'

7    passwords and computers for them to operate.

8            As for what information had

9    been collected specifically, it was decided

10   by the attorneys.

11       Q.    Did the attorneys at

12   Hogan Lovells tell you after they sat down

13   with the computer that it was okay for you to

14   delete or destroy the computer afterwards?

15       A.    No.

16            MR. TAYLOR:  Objection to form.

17   BY MR. SERPE:

18       Q.    What type of computer were you

19   using in 2005, 2006 and 2007?  Was it a

20   laptop or a larger computer on the desktop?

21       A.    It was definitely not a laptop.

22   We were not that advanced.

23       Q.    Did you have a different

24   computer now than you had in 2005 and 2006?

25       A.    The computer I have right now

1    is different from the computer I had in 2005

2    and 2006.

3         Q.    Where is the computer you had

4    in 2005 and 2006?

5         A.    It is being preserved.

6         Q.    Where is it being preserved?

7         A.    In my office.

8         Q.    The computer you're preserving,

9    did it continue to be used by you until 2009?

10              THE INTERPRETER:  The

11         interpreter is clarifying a company's

12         name with the deponent.

13              (Translation.)

14         A.    In 2015, upon the coordination

15    of Alston attorneys, Zhi Tong collected the

16    computer information.

17    BY MR. SERPE:

18         Q.    How did Zhi Tong collect the

19    computer information?

20         A.    This, I would be very clear

21    because I was the one who was coordinating

22    most of the work.  At the time, upon

23    retrieving our mailbox passwords, Zhi Tong

24    downloaded the documents in the mailbox to

25    the computer's hardware, and then the entire

1    hardware was copied.

2        Q.    When in 2015?

3        A.    I don't have a clear

4    recollection on the exact dates, but it was

5    in 2015.  I believe it was in the second half

6    year of 2015.

7        Q.    What is Taishan's understanding

8    as to what Zhi Tong did with the information

9    once they downloaded it from your computer?

10       A.    We would continue to preserve

11   our information.

12       Q.    Did Taishan ask Zhi Tong to

13   search your computer for evidence or e-mails

14   concerning American-sized drywall?

15       A.    Taishan did not order how

16   Zhi Tong should do.  We had only provided

17   mailbox passwords to Zhi Tong, and then it

18   was Zhi Tong's operating personnel to operate

19   on our computer alone.

20       Q.    What is Taishan's understanding

21   of what Zhi Tong was looking for on your

22   computer?

23       A.    Well, we know that Zhi Tong was

24   entrusted by the attorneys to copy all our

25   information.  We do not know what specific

1    information that they referred to.  All we

2    did was to try our best to work with

3    Zhi Tong's work, even though we were not very

4    willing in our hearts but we still respect

5    the requirement of the company.

6        Q.    In preparing for testifying as

7    Taishan's corporate representative, did you

8    look at your own computer hardware and

9    e-mails to look for evidence of

10   American-sized drywall?

11       A.    No, because the attorneys

12   already have all the documents and evidence.

13   It would be unefficient for unprofessionals

14   like us to work on that.  In that case, you

15   have to wait until next year to depose me.

16       Q.    Have you been told that you

17   were provided with all of the documents and

18   e-mails from your computer that had to do

19   with American-sized drywall?

20            MR. TAYLOR:  Objection to form,

21       and it's -- I'm sorry.  Is she

22       finished?  Objection to form, and it's

23       difficult for me to understand the

24       scope of your question, and so I think

25       I probably need -- if you're asking

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 223 of 453
Case 2:14-cv-02494-MCE-DB Document 204-1 Filed 09/15/2017 Page 337 of 321
Confidential - Subject to Further Confidentiality Review

```
 1        him what his attorneys told him, I
 2        would need to assert the
 3        attorney-client privilege.
 4             MR. SERPE:  I'm asking him what
 5        he reviewed to prepare for the
 6        deposition and what specifically --
 7             MR. TAYLOR:  Let me finish.
 8             MR. SERPE:  Oh, I'm sorry, I
 9        thought you were done.  I really did.
10             MR. TAYLOR:  Yeah.  So assert
11        attorney-client privilege and instruct
12        him not to answer in regards to any
13        discussions he had with his attorneys
14        on that issue.
15             Other than that, he can
16        respond.
17             THE WITNESS:  I'm sorry, then I
18        cannot say anything.
19   BY MR. SERPE:
20        Q.    To your knowledge, have you
21   been provided with all of the e-mails and
22   documents from your computer regarding
23   American-sized drywall?
24             MR. TAYLOR:  Objection to form.
25             THE WITNESS:  Do I need to
```

Confidential - Subject to further confidentiality Review

1    answer?

2        MR. TAYLOR:  Yes.

3        A.    First of all, when I was

4    preparing for my deposition as a witness

5    representing Taishan Company, Alston

6    attorneys gave me one document.  In the

7    document, there are about ten items I would

8    need to prepare and learn.

9            I've also tried my best to

10   accommodate Alston's attorney to search for

11   relevant material.  As whether or not, as you

12   said, that's all of it, I cannot be sure.

13   BY MR. SERPE:

14       Q.    In the 2015 project with

15   Zhi Tong, what other computers besides yours

16   did they make copies of?

17       A.    Yes.

18       Q.    Which other computers?

19       A.    The computer of Che Gang, the

20   computer of You Zedong, the computer of

21   Zhang Jianchun, the computer of Wang Lifeng,

22   and the computer of Peng Wenlong.

23       Q.    Were the computers that were

24   collected for those five Taishan employees

25   the computers that they were using between

1      2005 and 2009?

2          A.      Yes.

3          Q.      Is Taishan aware whether or not

4      those five computers were searched for

5      e-mails and other evidence regarding

6      American-sized drywall?

7          A.      We knew that Zhi Tong was

8      searching for documents and evidence related

9      to the American lawsuit.  As for specifically

10     what they were searching for, I think they

11     should have their related requirements.  We

12     were only trying our best to accommodate.

13         Q.      Taishan was never told what

14     they found on the computers?

15             MR. TAYLOR:  Objection to form.

16         And I guess, unfortunately, I have to

17         assert the attorney-client privilege

18         to any information that was passed on

19         to Taishan from their attorneys in

20         regards to this matter and instruct

21         him not to answer in that regard.

22             MR. SERPE:  Bernard, before --

23         are you instructing him not to answer

24         the question?

25             MR. TAYLOR:  Just in regards to

1     whatever came from his attorneys to

2     him.  He can -- anything other than

3     that, he can answer.

4          MR. SERPE:  For the record, I

5     believe that in a 30(b)(6) context,

6     when asking a witness about his

7     preparation, what documents he did or

8     did not review, that your instruction

9     to him to not answer what documents he

10    received even from his counsel, if

11    they're substantive evidence on which

12    the inquiry is valid, that that's not

13    a proper instruction.

14          I don't want to argue that with

15    you now, but we can --

16          MR. TAYLOR:  That wasn't your

17    question.  I disagree with you, but

18    that wasn't your question.

19          Your question was whether we

20    told -- whether he was told what

21    documents were obtained from the

22    computer, and I just indicated that if

23    that information came from his

24    attorneys, then that's attorney-client

25    privileged, and I would instruct him

1          not to answer in regards to that

2          limited subset of any discussion he

3          had with his lawyers.

4                But he can answer in regards to

5          anything else.

6                MR. SERPE:  So --

7                MS. EIKHOFF:  The pending

8          question was at 18, right, 17, if you

9          want to look at it.

10               MR. SERPE:  What were they

11         told?

12               MS. EIKHOFF:  It says Taishan

13         was never told what they found on the

14         computers?

15               MR. SERPE:  Yeah, Zhi Tong.

16         Right.

17               MS. EIKHOFF:  Are you talking

18         about in preparation for 30(b)(6) or

19         at any time?

20               I think Bernard's instruction

21         stands.

22     BY MR. SERPE:

23         Q.    At any time in preparation for

24     your deposition today, did you review what

25     you believed to be the results of the

Confidential - Subject to Further Confidentiality Review

```
 1    searches of the five computers that you just

 2    told me about?

 3         A.     First of all, I believe

 4    Zhi Tong had copied all the documents.  I've

 5    told you from the very beginning that

 6    Zhi Tong even copied the hardware; therefore,

 7    it was not necessary to inform me what

 8    documents it had copied.

 9         Q.     Mr. Che, you gave a deposition

10    in 2015.  Do you recall that?

11         A.     Yes.

12         Q.     Did the search with Zhi Tong

13    take place before or after your deposition?

14              MR. TAYLOR:  Objection to form.

15              But you can answer.

16         A.     I don't have a clear

17    recollection, but I believe it was close to

18    that time.

19    BY MR. SERPE:

20         Q.     Do you still have Exhibit 48 in

21    front of you, the notice of deposition?

22         A.     Yes.

23         Q.     Would you look at item

24    number 10.

25         A.     Yes, I see it.
```

```
 1        Q.      I'd like to ask you about the

 2   methodology that Taishan used to prepare you

 3   to testify on behalf of Taishan including the

 4   materials reviewed and the persons consulted.

 5              Do you understand?

 6        A.      I understand.

 7        Q.      In preparing for the

 8   deposition, did you review materials that

 9   were found on the five computers that had

10   been searched by Zhi Tong?

11              MR. TAYLOR:  Objection to the

12        form.

13        A.      While I was preparing as a

14   witness for the deposition representing

15   Taishan Company, I've reviewed a large

16   quantity of relevant material, including the

17   Manufacturer Profile Form and a large

18   quantity of pictures.  I have also reviewed

19   the relevant deposition record of

20   President Jia and Mr. Peng.

21              I have made a great effort to

22   have discovered from the warehouse the gypsum

23   board that was of American size and were

24   residual boards, and I have also confirmed

25   with our purchasing department and production
```

Confidential - Subject to Further Confidentiality Review

```
1    department for relevant material.

2              I have also discussed with

3    Party Director Mr. Zhang and President Jia

4    for related information.  At the same time in

5    order to confirm the marking information, I

6    have also called those who had already left

7    the employment, such as Peng Wenlong and

8    Yang Jiapo.

9              MR. SERPE:  Are you finished?

10        Do you remember what my question was?

11             THE WITNESS:  You asked me what

12        kind of preparation I did.

13             MR. SERPE:  No, sir.  Mr. Court

14        Reporter, would you read back my last

15        question.

16             (The following portion of the

17        record was read.)

18             "QUESTION:  In preparing for

19        the deposition, did you review

20        materials that were found on the five

21        computers that had been searched by

22        Zhi Tong?"

23             (End of readback.)

24        A.    Now we have reviewed some

25    materials, and we have reviewed some relevant
```

Confidential - Subject to Further Confidentiality Review

 1    materials.  I believe all of those materials

 2    were copied from Zhi Tong and provided by

 3    Hogan Lovells except those material that you

 4    have provided us with.

 5                    MR. TAYLOR:  Richard, we're

 6           right in that 50- to 60-minute period.

 7           I should check with the client to see

 8           if he wants to take a little break.

 9                    MR. SERPE:  Yeah.

10                    THE WITNESS:  Take a break,

11           please.

12                    THE VIDEOGRAPHER:  We are now

13           going off the video record.  The time

14           is currently 6:19 p.m.  This is the

15           end of Media No. 7.

16                    (Recess taken, 6:19 p.m. to

17           6:31 p.m.)

18                    THE VIDEOGRAPHER:  We are now

19           back on the video record with the

20           beginning of Media No. 8.  The time is

21           currently 6:31 p.m.

22    BY MR. SERPE:

23        Q.    Mr. Che, you told me just

24    before the break that all of the materials

25    that were copied by Zhi Tong had been

Confidential - Subject to Further Confidentiality Review

1    provided to you.

2              How many pages of materials had

3    been provided from them to you?

4              MR. TAYLOR:  Objection, form.

5         A.     I think you might have

6    misunderstood what I just said.  I said that

7    Zhi Tong had already copied all the

8    documents.

9    BY MR. SERPE:

10        Q.     Did Taishan provide you with

11   any materials that had been copied by

12   Zhi Tong to prepare you for your deposition

13   today?

14        A.     While preparing for my

15   deposition as a witness of Taishan, in

16   representing of Taishan, we have gone through

17   item by item according to the deposition

18   notice, including some of the Manufacturer

19   Profile Forms, some documents we have

20   submitted, and some of the old e-mails, and

21   some of the old documents that are relevant.

22   I have reviewed and made a reference of them.

23              They are so much material, it

24   is impossible for me to count page by page.

25        Q.     Can you tell for certain that

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 233 of 453
Confidential – Subject to further Confidentiality Review
321

 1    even one page that had been copied by

 2    Zhi Tong had been provided to you?

 3         A.      You only want me to give you an

 4    example?

 5         Q.      Yes.

 6              THE WITNESS:   Is it in the

 7         scope of the attorney-client

 8         privilege?

 9              MR. TAYLOR:   No.

10              THE WITNESS:   All right.

11         A.      I have reviewed a statistic and

12    explanation for American-sized gypsy board --

13    gypsum board collected by Mr. Peng.

14    Explanation, those are two documents.

15    BY MR. SERPE:

16         Q.      And how could you tell that

17    those were taken or copied by Zhi Tong?

18         A.      I don't understand why you ask

19    the question the way you asked.  We did not

20    make the copy ourselves and submit them.

21         Q.      Would it be a fair statement

22    that you don't know how many documents that

23    were collected by Zhi Tong from the five

24    computers you told me about have been

25    provided to you to review for today?

1   A.  Correct.  I did not know how

2 many documents Zhi Tong had copied and taken

3 from our computer, but Zhi Tong had indeed

4 copied all of our documents.

5   Q.  How many of them were provided

6 to you to review to prepare for the

7 deposition today?

8     MR. TAYLOR:  Objection to form.

9     But you can answer, if you

10  know.

11   A.  I have just answered you

12 earlier.  You said it was okay for me to only

13 give you an example.  Why did you not keep

14 your promise?

15 BY MR. SERPE:

16   Q.  Mr. Che?

17   A.  (In English)  Yeah.

18   Q.  I'm not going to argue with

19 you.

20     Did Zhi Tong collect the

21 computer from Yang Jiapo?

22   A.  Zhi Tong did not collect a

23 computer from Yang Jiapo because it was

24 Hogan Lovells that has collected the

25 documents from Yang Jiapo.

1    Q.    Do you still have Yang Jiapo's

2  computer?

3    A.    Yang Jiapo's computer should be

4  in the company because at the time Zhi Tong

5  did not make a requirement of that.  I will

6  have to yet search for it.

7    Q.    Yang Jiapo was a salesperson

8  who worked with U.S. customers, wasn't he?

9    A.    Yang Jiapo was the salesperson

10  at the time, at the time we did receive some

11  American-sized gypsum board businesses.  But

12  as for whether or not his customers were

13  American customers, I cannot be sure of that.

14    Q.    Would you look at Exhibit 35,

15  please.  Mr. Che, this is an e-mail from Yang

16  Jiapo to an American customer, isn't it?

17    A.    I don't think this e-mail is

18  consistent from the beginning to the end, so

19  I don't know what it meant.  From the title,

20  it seems to be an e-mail sent from Yang Jiapo

21  to Leon Liu.  But the e-mail underneath that

22  changed into an e-mail sent by Leon to Yang

23  Jiapo; therefore, I don't know how this

24  e-mail was created.  It was inconsistent, the

25  front part and the back part.

1    Q.    This e-mail was provided to us,

2  and we were told it came from Mr. Peng's

3  computer.  Do you have any reason to

4  disbelieve that?

5    A.    I did not say that I didn't

6  trust what you said, but I just don't

7  understand why the e-mail had the

8  inconsistency from the beginning to the end.

9         From the e-mail, you can also

10 not tell that this Liu is an American

11 customer, and I also don't know why it was an

12 e-mail sent from Yang Jiapo to Mr. Liu and

13 then it turned into an e-mail sent from

14 Mr. Liu to Mr. Yang Jiapo.

15        If it is possible, please show

16 me e-mails that are more consistent from the

17 beginning to the end.

18   Q.    Before I do that --

19   A.    Merely looking at that, I

20 really can't confirm any information.

21   Q.    Sorry.  I didn't mean to

22 interrupt you.  I apologize.

23   A.    That's fine.

24   Q.    Before I do that, without

25 respect to Exhibit 35, I have a new question

```
 1        for you.  Is that fair?

 2             A.        Yes.

 3             Q.        Is it Taishan's position that

 4        Yang Jiapo never had U.S. customers with whom

 5        he had e-mails?

 6             A.        I never said that.  I'm only

 7        not sure whether or not this Leon Liu on the

 8        e-mail is an American customer because his

 9        cell phone over there on the page is a

10        Chinese cell phone number.

11             Q.        Without regard to Exhibit 35,

12        does Taishan have any information that Yang

13        Jiapo had United States customers?

14             A.        I cannot make a judgment on

15        your answer before you're able to provide me

16        with more relevant information.  If you can

17        provide more information to me, I can help

18        you to explain it.

19             Q.        You understand you're

20        testifying for Taishan as a representative?

21             A.        Correct.

22             Q.        Is it your testimony that

23        without input from a United States attorney,

24        Taishan won't take a position as to whether

25        Yang Jiapo had U.S. customers for drywall?
```

```
 1              MR. TAYLOR:  Objection to form.
 2         It's beyond -- did you finish?  I'm
 3         sorry.
 4              Objection to form.  It's
 5         beyond -- I'm sorry -- oh, she's
 6         repeating what I just said.  It's
 7         beyond the scope of the noticed
 8         categories for the deposition.
 9              But the witness can answer.
10    A.      Because while I was preparing
11    as a witness for the deposition on behalf of
12    Taishan, it was -- I was not involved in this
13    question.
14              But if you could provide me
15    with more information under the pretense that
16    I could understand it, I'm very much willing
17    to help you to understand that.
18    BY MR. SERPE:
19    Q.      One last question about Yang
20    Jiapo:  Is it correct that his computer was
21    not copied by Zhi Tong because Taishan
22    considered him not to be involved in U.S.
23    sales?
24              MR. TAYLOR:  Objection, form.
25    A.      Hogan Lovells' attorneys had
```

Confidential - Subject to Further Confidentiality Review

1    copied Yang Jiapo's e-mail box and computer.

2    But in 2015, when Zhi Tong went there to copy

3    the computer, because of many personal

4    reasons, Yang Jiapo -- Mr. Yang Jiapo had

5    already left his employment, plus that he did

6    not play an important role in this.

7              Therefore, Zhi Tong did not go

8    ahead and copy his information because he

9    left his employment not long after

10   Hogan Lovells made the copy.

11   BY MR. SERPE:

12        Q.    Did he take his computer with

13   him?

14        A.    I don't think so.  I'll go back

15   and check.

16        Q.    Did Zhi Tong copy and search

17   the computer for Fu Tinghuan?

18        A.    No.

19        Q.    Does Taishan believe that

20   Judge Fallon's order to preserve evidence

21   should include Fu Tinghuan's computer?

22              MR. TAYLOR:  Objection to form.

23        A.    Mr. Fu Tinghuan has never

24   involved in any businesses relevant to

25   American-sized gypsum board; therefore, he

Confidential - Subject to Further Confidentiality Review

1    should not have been included in the scope

2    required by the judge.

3              As for matters related to him,

4    he should have already made a clear

5    explanation at his deposition in 2012.

6    BY MR. SERPE:

7         Q.    Other than your computer and

8    the five other computers you told me about,

9    did Zhi Tong copy any other computers?

10        A.    I remember it seems that they

11   have copied Chairman Jia's computer.  I don't

12   have a clear memory on that, so I'll need to

13   confirm that.  I think it was because that

14   the boss didn't really use computer that

15   much.

16        Q.    That sounds like our boss.

17              Any other computers that

18   Zhi Tong copied?

19        A.    As far as I know, all the

20   information I have already provided to you.

21        Q.    You mentioned that one of the

22   people you spoke to was a Mr. Pi, who was in

23   charge of the spray marking machine.  Do you

24   recall that?

25        A.    It was not really he was in

1    charge of the spraying mark -- marking, but

2    it was because that he was knowledgeable

3    about this matter.

4        Q.    Who would a salesperson tell in

5    the manufacturing department what marks to

6    spray on a board?  How would that information

7    be communicated?

8        A.    Sometimes it would be through

9    something we call sales plan notice,

10    sometimes through oral communication,

11    sometimes through telephonic communication or

12    even face-to-face communication.

13        Q.    For American customers who were

14    giving a specific mark, how would that mark

15    information be provided to the manufacturing

16    people so they could set the printer up to

17    spray it?

18        A.    I can only say that when a

19    nondomestic customer come to communicate us

20    with the spray markings, sometimes we would

21    communicate that to the manufacturing

22    department through sales plan notice.

23            And also sometimes if the

24    specification requested is the same as the

25    specification that was currently in

Case 2:09-md-02047-EEF-MBN Document 22263-66 Filed 11/19/19 Page 242 of 453
Case 2:14-cv-02094-EEF-JCW Document 294-1 Entered on FLSD Docket 03/15/2013 Page 336 of
321

Confidential - Subject to Further Confidentiality Review

1  production, perhaps in that case we would

2  print out the sprayed marking with -- on an

3  A4 paper to approach a production personnel

4  so that the information can be inputted into

5  the spraying -- sprayed marking machine.

6      Q.    Did the spray marking machine

7  have a computer to input the information?

8      A.    The spray marking machine has a

9  machine head which can input information in,

10  and then there is a spring head over there.

11      Q.    Do you have to type the

12  information for every board?

13          MR. TAYLOR:  Objection to form.

14      A.    If the specification for spray

15  marking is different from the one before, you

16  have to reinput it to replace the one before.

17  If the information is the same as the one

18  before in a specification, we would use the

19  preserved information.

20  BY MR. SERPE:

21      Q.    And when you say preserved

22  information, the machine head memory,

23  computer memory?

24          MR. TAYLOR:  Objection to form.

25          THE WITNESS:  Do I answer it?

Confidential - Subject to Further Confidentiality Review

```
 1                 MR. TAYLOR:  You can answer.

 2                 THE WITNESS:  Ask again,

 3        please.

 4                 MR. TAYLOR:  Sorry.

 5    BY MR. SERPE:

 6        Q.    When you used the words

 7    "preserved information," the printing machine

 8    had memory, computer memory, of what needed

 9    to be printed.

10        A.    When you don't make any

11    replacement, the information is preserved

12    there.  If you need to replace it with a new

13    spray marking, then it will be replaced by

14    the new one, and the old information will be

15    covered or replaced.

16        Q.    To make sure I understand, let

17    me ask you about Venture Supply.  You had two

18    orders for them.  Do you recall that?

19        A.    When I was preparing for my

20    deposition as a witness representing the

21    company, I did see two orders of Venture

22    Supply from the Manufacturer Profile Form.

23                 Also reflected from the depo

24    record of Mr. Peng, Venture Supply should

25    have been Mr. Peng's customer.
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 244 of 453
Case 2:09-cv-07628-WCE Document 2841-1 Entered on FLSD Docket 03/15/2014 Page 538 of 321
Confidential – Subject to further Confidentiality Review

1    Q.    If there were two months

2   between those orders, would the Venture

3   Supply information have to be put back into

4   the printing machine or was the old order

5   still in memory?

6          MR. TAYLOR:  Objection to form.

7    A.    It's hard to explain this

8   question.  There are many different kinds of

9   scenarios.  One would be that the prior

10  information was replaced; then in that case

11  you have to reenter the information according

12  to the customer's request.

13          If -- just in case this spray

14  marking machine had a problem while producing

15  Venture Supply's order, it will be replaced.

16  After you have troubleshoot the problem and

17  you reinstall it back, it should have still

18  stored Venture Supply's information.

19  BY MR. SERPE:

20   Q.    How many different printing

21  machines did Taishan use between 2005 and

22  2009 to spray markings on American-sized

23  drywall?

24          MR. TAYLOR:  Objection to form,

25      misconstrues the witness' prior

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 245 of 453
Case 1:21-cv-22484-MGC Document 204-1 Entered on FLSD Docket 08/15/2024 Page 339 of 321

Confidential — Subject to Further Confidentiality Review

```
 1              testimony.
 2                      THE WITNESS:  Do I need to
 3              answer the question?
 4                      MR. TAYLOR:  Yes, please.
 5      A.      Taishan during the period of
 6      2005 and 2007 manufactured American-sized
 7      gypsum board.
 8                      While I was preparing for my
 9      witness testimony on behalf of the company of
10      Taishan, I reviewed material and found that
11      at the time there were three production lines
12      in Taishan that manufactured the
13      American-sized gypsum board.
14                      According to my communication
15      with the personnel in the production
16      department, one production line should have
17      at least one to two sprayed marking machine,
18      which is to say it is possible that there are
19      three to six spray marking machines for the
20      three production lines.  This is only our
21      speculation based on the description of the
22      production department.
23                      For details, it's been a while,
24      so they also did not have a clear
25      recollection.
```

```
1    BY MR. SERPE:
2          Q.     What efforts were made to
3    search the spray marking machines at the
4    three production lines to determine whether
5    they still had American-sized drywall
6    markings stored in them?
7                 MR. TAYLOR:  Objection to form.
8                 You can answer.
9                 THE WITNESS:  May I take a
10          break?
11                MR. TAYLOR:  Well, I think
12          we're almost finished.  He's only got
13          ten minutes left.
14                MR. SERPE:  Can we get an
15          answer, finish this last section?
16                MR. TAYLOR:  Yeah, once we
17          answer this question, we can -- once
18          we answer this question, we'll be
19          finished for the night.
20                THE WITNESS:  All right.  Will
21          you reask your question?
22   BY MR. SERPE:
23         Q.     What efforts were made to
24   search the spray marking machines at the
25   three production lines to determine whether
```

```
 1    they still had American-sized drywall

 2    markings stored in them?

 3              MR. TAYLOR:   Objection to form.

 4        A.    We tried to look for the spray

 5    marking machine that was left from the years

 6    in the back in the production department, but

 7    the information provided by the production

 8    department, according to their recollection,

 9    is at the time there were a few suppliers of

10    the spray marking machine that supplied the

11    machine for us.

12              THE INTERPRETER:   The

13         interpreter needs to clarify.

14              (Translation.)

15        A.    One is Hewlett-Packard,

16    Xiaobawang.  Another one is Duo Finuo, and

17    the other one is Wei Dijie.  And yet another

18    one is called Xiamen Liantai.  As for who

19    used which one, they also did not remember

20    clearly.

21              Plus the fact that some of the

22    spray marking machine was given to Taishan as

23    a gift because the suppliers of those

24    machines wanting to sell their ink.

25              When there were problems with
```

1  the spray marking machine or if the machine

2  did not work the way it's supposed to work,

3  they would take them away.  Also, based on

4  the production quantity of Taishan, all those

5  spray marking machines did not have a long

6  lifespan.

7            I am now trying to search but

8  have not found the spray marking machine of

9  those brands because many years ago Taishan

10  had changed all its spray marking machine to

11  Hitachi.

12            MR. SERPE:  May I ask one more?

13            MR. TAYLOR:  Okay.  I figured

14       there'd be a follow-up on that one.

15  BY MR. SERPE:

16       Q.    Was the manufacturing

17  department told in 2010 that the spray

18  marking machines were to be preserved under

19  Judge Fallon's preservation order?

20       A.    When I was preparing for the

21  witness deposition representing Taishan as a

22  corporation in 2010, I reviewed Chairman Jia

23  and Mr. Peng's deposition record.

24            Mr. Peng is one of our managers

25  in the sales department.  He did notice us to

Case 1:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 249 of 453
Confidential — Subject to further Confidentiality Review
321

1   preserve relevant documents and material.

2   That, I know.

3            Chairman Jia had notified us to

4   preserve relevant documents and material in

5   the two meetings held in 2010 and 2011, but

6   according to his deposition record, he did

7   not remember who were present at the meeting

8   at the time.

9            MR. TAYLOR:  Okay?

10           MR. SERPE:  Okay.

11           MR. TAYLOR:  All right.

12           THE VIDEOGRAPHER:  We are now

13       going off the video record.  The time

14       is currently 7:22 p.m.  This is the

15       end of Media No. 8.

16           (Proceedings recessed at

17       7:22 p.m.)

18              --o0o--

19

20

21

22

23

24

25

```
 1                     CERTIFICATE
 2            I, MICHAEL E. MILLER, Fellow of
      the Academy of Professional Reporters,
 3    Registered Diplomate Reporter, Certified
      Realtime Reporter, Certified Court Reporter
 4    and Notary Public, do hereby certify that
      prior to the commencement of the examination,
 5    GANG CHE was duly sworn by me to testify to
      the truth, the whole truth and nothing but
 6    the truth.
 7            I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
              I DO FURTHER CERTIFY that pursuant
11    to FRCP Rule 30, signature of the witness was
      requested by the witness or other party
12    before the conclusion of the deposition.
13            I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17
18    _____
      MICHAEL E. MILLER, FAPR, RDR, CRR
19    Fellow of the Academy of Professional Reporters
      NCRA Registered Diplomate Reporter
20    NCRA Certified Realtime Reporter
      Certified Court Reporter
21
      Notary Public
22    My Commission Expires:  7/9/2020
23    Dated: January 24, 2019
24
25
```

```
1                    INSTRUCTIONS TO WITNESS

2

3             Please read your deposition over

4   carefully and make any necessary corrections.

5   You should state the reason in the

6   appropriate space on the errata sheet for any

7   corrections that are made.

8                    After doing so, please sign the

9   errata sheet and date it.

10                   You are signing same subject to

11  the changes you have noted on the errata

12  sheet, which will be attached to your

13  deposition.

14                   It is imperative that you return

15  the original errata sheet to the deposing

16  attorney within thirty (30) days of receipt

17  of the deposition transcript by you.  If you

18  fail to do so, the deposition transcript may

19  be deemed to be accurate and may be used in

20  court.

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                      ERRATA

 2    PAGE   LINE   CHANGE

 3    _____  _____  _____

 4           REASON: _____

 5    _____  _____  _____

 6           REASON: _____

 7    _____  _____  _____

 8           REASON: _____

 9    _____  _____  _____

10           REASON: _____

11    _____  _____  _____

12           REASON: _____

13    _____  _____  _____

14           REASON: _____

15    _____  _____  _____

16           REASON: _____

17    _____  _____  _____

18           REASON: _____

19    _____  _____  _____

20           REASON: _____

21    _____  _____  _____

22           REASON: _____

23    _____  _____  _____

24           REASON: _____

25
```

Confidential - Subject to Further Confidentiality Review

```
1                ACKNOWLEDGMENT OF DEPONENT

2

3

4           I, GANG CHE, do hereby certify
     that I have read the foregoing pages and that
5    the same is a correct transcription of the
     answers given by me to the questions therein
6    propounded, except for the corrections or
     changes in form or substance, if any, noted
7    in the attached
     Errata Sheet.

8

9

10

11

12   _____

      GANG CHE                           DATE
13

14

15   Subscribed and sworn to before me this
16   _____ day of _____, 20 _____.
17   My commission expires: _____
18

19   _____
20   Notary Public
21

22

23

24

25
```

```
1                      LAWYER'S NOTES

2

3    PAGE      LINE

4    _____     _____     _____

5    _____     _____     _____

6    _____     _____     _____

7    _____     _____     _____

8    _____     _____     _____

9    _____     _____     _____

10   _____     _____     _____

11   _____     _____     _____

12   _____     _____     _____

13   _____     _____     _____

14   _____     _____     _____

15   _____     _____     _____

16   _____     _____     _____

17   _____     _____     _____

18   _____     _____     _____

19   _____     _____     _____

20   _____     _____     _____

21   _____     _____     _____

22   _____     _____     _____

23   _____     _____     _____

24   _____     _____     _____

25
```

Confidential - Subject to Further Confidentiality Review

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF LOUISIANA

 3   *********************************************

 4   IN RE:  CHINESE-MANUFACTURED   MDL NO. 2047
     DRYWALL PRODUCTS LIABILITY

 5   LITIGATION                     SECTION:  L

 6   THIS DOCUMENT APPLIES TO       JUDGE FALLON
     ALL CASES

 7                                  MAG. JUDGE
                                    WILKINSON

 8
     *********************************************

 9

10

11       CONFIDENTIAL - SUBJECT TO FURTHER

12           CONFIDENTIALITY REVIEW

13          Wednesday, January 23, 2019

14

15

16       Videotaped 30(b)(6) Deposition of
     TAISHAN GYPSUM CO., LTD f/k/a SHANDONG TAIHE

17   DONGXIN CO., LTD. RE: PRODUCT IDENTIFICATION,
     through the testimony of GANG CHE, VOLUME 2,

18   held Alston & Bird LLP, 1201 West Peachtree
     Street, Atlanta, Georgia, commencing at

19   8:03 a.m., on the above date, before
     Michael E. Miller, Registered Diplomate

20   Reporter, Certified Realtime Reporter and
     Notary Public.

21

22

23              __ __ __

24       GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax

25          deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22263-66 Filed 11/19/19 Page 256 of 453
Case 1:14-cv-22848-MGC Document 284-1 Entered on FLSD Docket 08/15/2018 Page 330 of 321
Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S:
 2   COUNSEL FOR THE PLAINTIFF CLASS:
 3       COLSON HICKS EIDSON
         BY:  PATRICK S. MONTOYA, ESQUIRE
 4           patrick@colson.com
         255 Alhambra Circle
 5       Penthouse
         Coral Gables, Florida 33134
 6       (305) 476-7400
 7
 8       LAW OFFICES OF RICHARD J. SERPE PC
         BY:  RICHARD J. SERPE, ESQUIRE
 9           rserpe@serpefirm.com
         580 East Main Street
10       Suite 310
         Norfolk, Virginia 23510
11       (757) 233-0009
12
13       HERMAN HERMAN & KATZ LLC
         BY:  STEVE HERMAN, ESQUIRE
14           sherman@hhklawfirm.com
             820 O'Keefe Avenue
15       New Orleans, Louisiana 70113
         (504) 581-4892
16
17       LEVIN FISHBEIN SEDRAN & BERMAN
         BY:  SANDRA L. DUGGAN, ESQUIRE
18           sduggan@lfsblaw.com
             ARNOLD LEVIN, ESQUIRE
19           alevin@lfsblaw.com
         510 Walnut Street
20       Suite 500
         Philadelphia, Pennsylvania 19106
21       (215) 592-1500
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2        IRPINO LAW FIRM
          BY:  PEARL A. ROBERTSON, ESQUIRE
 3            probertson@irpinolaw.com
          2216 Magazine Street
 4        New Orleans, Louisiana 70130
          (504) 525-1500
 5
 6        BARRIOS KINGSDORF & CASTEIX LLP
          BY:  EMMA SCHWAB, ESQUIRE
 7            eschwab@bkc-law.com
          701 Poydras Street
 8        Suite 3650
          New Orleans, Louisiana 70139-3650
 9        (504) 524-3300
10
          LAW OFFICE OF ALLISON GRANT, P.A.
11        BY:  ALLISON KAY GRANT, ESQUIRE
              agrant@allisongrantpa.com
12        14 Southeast 14th Street
          Boca Raton, Florida 33432
13        (561) 994-9646
14
          SEEGER WEISS LLP
15        BY:  CAROLINE CHOE, ESQUIRE
              cchoe@seegerweiss.com
16        1515 Market Street
          Philadelphia, Pennsylvania 19102
17        (215) 564-2300
18
19    COUNSEL FOR TAISHAN GYPSUM COMPANY:
20        ALSTON & BIRD LLP
          BY:  BERNARD TAYLOR, ESQUIRE
21            bernard.taylor@alston.com
              CHRISTY HULL EIKHOFF, ESQUIRE
22            christy.eikhoff@alston.com
          One Atlantic Center
23        1201 West Peachtree Street
          Atlanta, Georgia 30309-3424
24        (404) 881-7000
25
```

```
 1    A P P E A R A N C E S:
 2         ALSTON & BIRD LLP
           BY:  HELEN SU, ESQUIRE
 3             helen.su@alston.com
           1950 University Avenue
 4         5th Floor
           East Palo Alto, California 94303
 5         (650) 838-2000
 6
 7         AKERMAN LLP
           BY:  ENJOLIQUÉ D. AYTCH, ESQUIRE
 8             enjolique.aytch@akerman.com
           350 East Las Olas Boulevard
 9         Suite 1600
           Fort Lauderdale, Florida 33301
10         (954) 463-2700
11
12    COUNSEL FOR BNBM DEFENDANTS:
13         ORRICK HERRINGTON & SUTCLIFFE LLP
           BY:  ANDREW K. DAVIDSON, ESQUIRE
14             adavidson@orrick.com
           The Orrick Building
15         405 Howard Street
           San Francisco, California 94105
16         (415) 773-5700
17
18    ALSO PRESENT:
19         YAN GAO, HERMAN HERMAN & KATZ
20         JING XU, ALSTON & BIRD
21         SUNNY WANG, MANDARIN INTERPRETER
22         JOSH COLEMAN, VIDEOGRAPHER
23
24
25
```

Case 2:09-md-02047-EEF-MBN Document 22263-66 Filed 11/19/18 Page 259 of 453
Case 1:14-cv-22069-MGC Document 204-3 Entered on FLSD Docket 09/15/2014 Page 393 of
321
Confidential - Subject to Further Confidentiality Review

```
 1                        INDEX
 2
    PROCEEDINGS                              204
 3
 4
    EXAMINATION OF GANG CHE:
 5
         BY MR. SERPE                        204
 6
 7
    CERTIFICATE                              316
 8
    ERRATA                                   318
 9
    ACKNOWLEDGMENT OF DEPONENT               318
10
    LAWYER'S NOTES                           320
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    DEPOSITION EXHIBITS
                          GANG CHE
 2                     January 23, 2019
 3     NUMBER              DESCRIPTION              PAGE
 4     Exhibit     Taishan Gypsum Co., Ltd.         293
       PID-6       Manufacturer Profile Form
 5
       Exhibit     6/10 E-mail(s)                   294
 6     PID-8       w/Attachment(s)
                   TG-0129674 - TG-0129676
 7
       Exhibit     2/07 E-mail(s) w/Attachment(s)   248
 8     PID-11      TG-0023841 - TG-0023843
 9     Exhibit     4/06 E-mail(s) w/Attachment(s)   227
       PID-22      TG-0220595 - TG0220597
10
       Exhibit     Explanation of Statistics of     299
11     PID-30      2005-2007 Exports to the
                   United States
12                 TG-0211704 - TG-0211705
13     Exhibit     Notification of Collaborative    313
       PID-38      Processing
14                 TG-0211709 - TG-0211711
15     Exhibit     Notification of Collaborative    313
       PID-39      Processing
16                 TG-0211712 - TG-0211713
17     Exhibit     Notification of Collaborative    307
       PID-40      Processing
18                 TG-0211714
19     Exhibit     Sales Plan Notifications         275
       PID-42      TS-PID-000035 - TG-PID-000078
20
       Exhibit     Quality Management Policy        289
21     PID-49      TG-PID-000081 - TG-PID-000166
22
23
24
25
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 261 of 453
Case 2:14-cv-02408-MCE-DB Document 204-1 Entered on FLSD Docket 08/15/2014 Page 305 of 321
Confidential - Subject to Further Confidentiality Review

```
  1                      PROCEEDINGS

  2            (January 23, 2019 at 8:03 a.m.)

  3            THE VIDEOGRAPHER:  We are now

  4      back on the video record with the

  5      beginning of Media No. 1, Volume 2 in

  6      the deposition of Che Gang with the

  7      interpreter Sunny Wang.

  8            The time is currently 8:03 a.m.

  9      and the date is January 23rd, 2019.

 10            (The interpreter was reminded

 11      of her oath.)

 12                      GANG CHE,

 13      having been previously duly sworn,

 14          testified as follows:

 15                    EXAMINATION

 16   BY MR. SERPE:

 17      Q.     Good morning, Mr. Che.

 18      A.     Good morning.

 19      Q.     Did you have a pleasant

 20   evening?

 21      A.     Very good.

 22      Q.     Are you ready to give more

 23   testimony on behalf of Taishan this morning?

 24      A.     Yes.

 25      Q.     When we left off yesterday you
```

1    were explaining to me that you had spoken to

2    the production department about the suppliers

3    of spray marking machines.

4              Do you recall that?

5         A.    Not during -- not during the

6    break, but while I was being deposed.

7         Q.    Yes.

8         A.    I did say that.

9         Q.    No, not during the break.

10   During the deposition, before we broke last

11   night.

12             Mr. Che, if I ask a confusing

13   question, will you stop me today and ask me

14   to ask a new question?

15        A.    All right.

16        Q.    If you don't stop me, would it

17   be fair for me to assume you understood my

18   question?

19             MR. TAYLOR:  Objection to form.

20        A.    If I don't stop you, I might be

21   asking you to repeat your question,

22   re-express your question.

23   BY MR. SERPE:

24        Q.    That's fair.

25        A.    Or to paraphrase it, to explain

```
 1   it to me again.

 2        Q.      Xie xie.

 3        A.      Thank you.

 4        Q.      Before the end of the

 5   deposition yesterday, you were telling me

 6   about having spoken to the production

 7   department about their recollection of the

 8   spray marking machines.

 9             Do you recall that?

10        A.      Yes.

11        Q.      And you told me about five

12   different spray marking machines and gave me

13   their names.

14        A.      Those information about marking

15   machines were acquired during my preparation

16   of the deposition as a representative of

17   Taishan Corporation through communication

18   with our production department as well as

19   purchasing department, so those are most of

20   the information I could get out of it.

21             And also we tried to find the

22   old spray marking machine that we possibly

23   could find, and we also tried to recover the

24   specific spray mark information that Taishan

25   did before so that we could accommodate the
```

1    attorneys and the judge to correctly

2    distinguish Taishan's products, but

3    unfortunately we did not find the old spray

4    marking machine.

5              And also the people in the

6    production and purchasing department

7    explained to me that the spray marking

8    machine is only a machine with a spraying

9    head.  When the information you input later

10   replaced the information prior, the prior

11   information is gone.

12             Assume that I could find the

13   spray marking machine, there wouldn't be any

14   prior information in it.  We could even not

15   be able to open the machine itself.  But we

16   still tried our very best to look for the old

17   machines, but we did not find them.

18        Q.    Am I correct that when you -- a

19   machine operator puts in a new spray marking,

20   it removes the last spray marking from the

21   previous production?

22        A.    Not removed, but rather

23   replaced.

24        Q.    Replaced.

25        A.    Covered.

1    Q.    Replaced, and you can't go back

2    and get it back again.

3    A.    After it was replaced, the

4    information shown would only be the new

5    information.  If you want to input old

6    information again, you have to redo it.

7    Q.    And if you want to input old

8    information again, does the machine operator

9    have a keyboard to type on?

10    A.    Using the keyboard, which is

11    connected to the machine and input it.

12    Q.    So, for example, he could type

13    the letters for Venture Supply,

14    V-E-N-T-U-R-E, et cetera?

15         MR. TAYLOR:  Objection to the

16    form.

17         THE WITNESS:  I don't

18    understand his question.  Can he

19    reask?

20         THE INTERPRETER:  Interpreter

21    can repeat if it's okay.

22         MR. SERPE:  Sunny, you tell me

23    is it better for me to ask a new

24    question or can you reinterpret for

25    me?

```
 1              THE INTERPRETER:  I can try to

 2         repeat it first, reinterpretation.

 3              MR. SERPE:  Thank you.

 4              (Translation.)

 5         A.     You can input letters.

 6    BY MR. SERPE:

 7         Q.     Does the machine operator have

 8    the ability to choose a specific print font?

 9              MR. TAYLOR:  Objection to the

10         form.

11         A.     I have confirmed this issue

12    with the people in the production and

13    purchasing department while I was preparing

14    for my deposition as a witness representing

15    Taishan, the corporation.

16              The font and size of the spray

17    marking machine can be adjusted within a

18    limited scope.  Usually, the input of a spray

19    marking machine is in accordance with the

20    same size and same fonts.  This is the

21    practice of the production department.

22    BY MR. SERPE:

23         Q.     Spray marking machines come

24    with their own standard fonts and sizes,

25    don't they?
```

```
1              MR. TAYLOR:  Objection to form.

2              MR. SERPE:  I'm not

3        understanding these objections to the

4        form.

5              MR. TAYLOR:  Because you're

6        talking about multiple machines.  And

7        when you're making a statement that's

8        specific in regards to what that

9        operator can do with that machine,

10       then it's vague and ambiguous.

11             MR. SERPE:  Thank you for the

12       clarification.

13             MR. TAYLOR:  Yeah.

14  BY MR. SERPE:

15       Q.    Mr. Che, thank you for your

16  patience.  I've had a conversation with your

17  counsel.  I'm going to ask a new question.

18             You told us yesterday that

19  Hewlett-Packard made one of the spray marking

20  machines that was utilized by Taishan.  Do

21  you recall that?

22       A.    No.  I said there is a brand by

23  the name of Hewlett-Packard Xiaobawang.  I'm

24  not sure it is a product of Hewlett-Packard.

25  Because in China there are a lot of
```

```
 1    counterfeiters counterfeiting Taishan's
 2    products; some of them go the name of
 3    Taiyishan, and that's not our product.  It
 4    sounds like we're together.
 5         Q.     So it may be that
 6    Hewlett-Packard Xiaobawang was not really a
 7    Hewlett-Packard product, but a counterfeit;
 8    is that correct?
 9         A.     I'm not sure.
10         Q.     But it's possible?
11                MR. TAYLOR:  Objection to the
12         form.
13         A.     It's up to your judgment.
14    BY MR. SERPE:
15         Q.     Between 2005 and 2007, the
16    printers that Taishan used to make
17    American-sized drywall were made by different
18    printing companies, weren't they?
19         A.     During my preparation of
20    witness deposition representing Taishan, I
21    have tried to communicate with our production
22    and purchasing department.
23                The results from most of the
24    information I have acquired is that in the
25    very beginning we have used those few type --
```

1     types of the spray marking machine the most.

2            And also those three production

3     lines that produced American-sized gypsum

4     board, the spray marking machine used is

5     between three to six, but as for what brands

6     were being used, they could not be sure.

7       Q.      And between 2005 and 2007, the

8     spray marking machines on those three to six

9     production lines were changed frequently; is

10     that correct?

11            MR. TAYLOR: Objection to form.

12       A.      I think there might be a

13     mistake in your question. I did not say

14     there were six production lines producing

15     American-sized gypsum board; I said three

16     lines.

17     BY MR. SERPE:

18       Q.      Three lines with between three

19     and six marking machines; is that correct?

20       A.      Are you asking me?

21       Q.      Yes. Is that correct?

22       A.      Perhaps that is the number.

23       Q.      Thank you for that

24     clarification.

25            Were the employees in the

1    production department given any written

2    instructions on using the spray machines to

3    put markings on American-sized drywall?

4        A.    While I was preparing for my

5    witness deposition representing Taishan, I

6    looked for many documents in regarding to

7    markings.  I've also inquired relevant

8    personnel as well as tried to have them

9    recall the situation at the time.

10            As for the exported gypsum

11   board or the gypsum board that we did not use

12   domestically, not only American size, usually

13   we operate according to the customer's

14   request.  We did not have a standard method

15   to stipulate that.

16            For our domestic products,

17   which are the products that carry Taishan's

18   brand, the customer would make a demand

19   according to Taishan's request.  We have a

20   requirement in regarding to their markings

21   universally; that's there is a written

22   record.

23            And along with the changes in

24   the market as well as production, all these

25   documents have been modified in different

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 271 of 453
Case 2:14-cv-02722-MCE Document 29-1 Entered on FLSD Docket 06/15/2014 Page 315 of
321
Confidential - Subject to Further Confidentiality Review

1    time phases.

2              I'm done.

3         Q.    Focusing only on the

4    American-sized, or nondomestic, drywall,

5    there was no standard method for printing

6    given to the machine operators; is that

7    correct?

8              MR. TAYLOR:  Objection to form.

9              THE WITNESS:  Do I need to

10         answer?

11             MR. TAYLOR:  Yes.  Sorry I was

12         trying to...

13             (Comments off the stenographic

14         record.)

15             THE WITNESS:  Reinterpret that.

16             THE INTERPRETER:  The

17         interpreter will reinterpret that.

18             (Translation.)

19        A.    While I was preparing for the

20   witness testimony representing Taishan, I

21   tried to find relevant information and try to

22   recall the situation at the time.  There was

23   no written instruction on the operation.

24   Usually we did what the customers requested.

25             ///

1    BY MR. SERPE:

2        Q.    Between 2005 and 2007, if the

3    customer did not specify what font they

4    wanted English words to be printed in, would

5    the machine operator type the words in and

6    let the machine's automatic font be used?

7            MR. TAYLOR:  Objection, form.

8        A.    I don't think the machine has a

9    capability to automatically choose fonts, but

10   according to our memory and speculation,

11   usually it would use the font left from the

12   prior work, only to change the content of the

13   spray mark.  People are always lazy.

14   BY MR. SERPE:

15       Q.    I'm going to ask you about some

16   specific font types and ask you whether or

17   not spray machines used by Taishan between

18   2005 and 2007 to manufacture American-sized

19   drywall used these specific printing fonts.

20           Did you understand the

21   question?

22       A.    I think you were making a

23   statement.

24       Q.    Do you understand the

25   statement.

Confidential - Subject to Further Confidentiality Review

1       A.      You're not asking a question.

2               I have a general understanding.

3       Q.      Good.  Did those printers in

4    that time use the Serif typeface?

5               MR. TAYLOR:  Objection to form.

6               THE WITNESS:  Do I need to

7         answer?

8               MR. TAYLOR:  Yes.

9       A.      I apologize, that was a very

10   professional question.  I don't know what is

11   Serif.

12   BY MR. SERPE:

13      Q.      I'm going to name some

14   additional fonts.  If you recognize them or

15   know them, please acknowledge.  If you don't,

16   that's fine, if you do not know the font.

17      A.      All right.

18      Q.      Arial font?

19      A.      I've never heard of it.

20      Q.      Times New Roman?

21      A.      It came to my understanding

22   that this attorney might have misunderstood

23   what I said about the spray marking machine.

24   There are limited fonts in the spray marking

25   machine.  It's not like what you may choose

1  the many fonts from the computer.

2          What you have just said, well,

3  I'm not very sensitive with English; however,

4  it appears to be some choices of fonts that

5  you can select from Word.

6          THE INTERPRETER:  Interpreter

7     needs to clarify.

8          (Translation.)

9     A.     When we were working on Word,

10  we mostly like -- likely to use the font

11  called FangSong.

12          The spray marking machine is

13  not as complicated as a computer.  It only

14  has a few fonts, and they're not the same

15  fonts that you may choose from the computers.

16          I don't know if my explanation

17  helped you to understand that issue.

18  BY MR. SERPE:

19     Q.     It does.  Thank you.

20          What are the few fonts that the

21  spray marking machines had available between

22  2005 and 2007 for the machines used to make

23  American-sized drywall?

24     A.     Well, as I was preparing for my

25  deposition as a witness representing Taishan,

1    I tried very hard to look for the relevant

2    information as well as the spray marking

3    machine that was used at the time.

4            According to the recollection

5    of the people at the time, mainly there were

6    four spray marking machine that were used.

7    Each spray marking machine had a different

8    setting; therefore, I also cannot be sure

9    that which type of spray marking machine and

10   which type of font were used.

11           I'm done with my answer.

12       Q.      I've been asking you about the

13   machines to spray markings on the back of the

14   board, and I want to switch to the printing

15   of edge tapes.

16       A.      All right.

17       Q.      Did Taishan print its own edge

18   tapes or did it send it to other factories to

19   make for it?

20       A.      While I was preparing my

21   deposition as witness representing Taishan, I

22   specifically went and searched for the issues

23   of edge tapes.  Taishan started to make its

24   own tapes in 2005.  Before that, it ordered

25   tapes from a manufacturer by the name of

```
1    Shanghai Luda.
2              I'm done with the answer.
3        Q.    When in 2005 did Taishan start
4    making its own edge tapes?
5        A.    From what I have confirmed, it
6    was approximately in the months of August or
7    September, but there is a process from the
8    initial production until the production meets
9    the standard.  I think that would be
10   approximately the time phase for that.
11       Q.    When did the production meet
12   Taishan's standards?  What month?
13             MR. TAYLOR:  Objection to the
14        form.
15             THE WITNESS:  Do I need to
16        answer?
17             MR. TAYLOR:  Yes.
18       A.    Nobody could actually remember
19   that because that was the time phase when we
20   started to produce tapes for machines.
21   Perhaps that was a case it was not normal in
22   the morning, but it was producing normal
23   products in the evening.
24   BY MR. SERPE:
25       Q.    That sounds like my day.
```

1    Did Taishan print edge tapes at

2  a different factory or in the same factory

3  that the drywall was produced?

4    A.    I believe your question should

5  have a time frame or a specific tape

6  included.

7    Q.    Thank you for asking for

8  clarification.

9    All of the questions I'm going

10  to ask you are between 2005 and 2007.  If

11  it's a different time frame, I'll let you

12  know.  And I'd like to ask you only about

13  edge tapes that were made for nondomestic

14  customers that wanted English words on the

15  label.

16    A.    I'd also like to clarify

17  something else.  Was your question referring

18  to products of all English tapes or only the

19  American-sized products tape?

20    Q.    The question is between 2005

21  and 2007 for American-sized drywall with

22  English words on the edge tape.

23    A.    If your question was only

24  limited to the American-sized edge tapes

25  between 2005 and 2007, I believe those tapes

```
 1    should be the tapes manufactured by Taishan

 2    itself.  Because we only had contact with

 3    American-sized gypsum board in the end of

 4    2005.  At that time Taishan's tape factory

 5    was already in existence.

 6         Q.    Where was the tape factory?

 7         A.    I'd like to clarify:  Not tape

 8    factory, but tape production department.

 9         Q.    Where was the tape production

10    department?

11         A.    In Taian.

12         Q.    In what's referred to as the

13    industrial park?

14         A.    No.

15         Q.    Factory 4?

16         A.    No.

17         Q.    Which Taishan facility in Taian

18    was the tape production department?

19         A.    It was an independent

20    production department, neither in Factory 4

21    nor in the industry park.

22         Q.    Did Taishan use e-mail to

23    communicate with the independent production

24    department which produced the tapes?

25         A.    Not only via e-mail.  It was
```

1   possible through e-mail or through flash

2   drive or by printing out paper or

3   face-to-face communication or telephonic

4   confirmation according to customers'

5   requests.

6        Q.    Was the independent production

7   department which manufactured the tapes told

8   of Judge Fallon's preservation order to

9   protect evidence of U.S. markings?

10       A.    While I was preparing for my

11  witness deposition on behalf of Taishan, I

12  checked President Jia and Mr. Peng's

13  deposition record in regarding to

14  preservation.

15             I have found from the record

16  that all relevant departments have been

17  notified to preserve documents and evidence

18  in according to the court order during the

19  American lawsuit.

20       Q.    Who in the tape production

21  department was responsible for preserving

22  evidence of American drywall markings?

23             MR. TAYLOR:  Objection to form.

24       A.    First of all, as I was

25  preparing for the witness deposition

Confidential – Subject to Further Confidentiality Review

1   representing Taishan, I specifically went to

2   look for relevant issues regarding to tapes,

3   markings, productions.  I have also tried to

4   look for the tapes, the molding tools

5   information and material in regarding to the

6   American-sized tapes.

7           First of all, the effective

8   life usage span for tape is approximately

9   half a year.  Usually when the molding tool

10  is not being used for six months, which is

11  not conventional, it would be sent back to

12  the molding tool factory to open up new

13  moldings.

14          And also during my preparation

15  as a witness for the deposition representing

16  Taishan, through my comparison with the

17  material I have discovered regarding to

18  Taishan's production, the last time Taishan

19  produced American-sized gypsum board was

20  approximately in the first half year of 2007.

21          I believe the evidence

22  preservation order from Judge Fallon in

23  relation to Taishan's American lawsuit was

24  made in 2009 according to the information I

25  got yesterday.  Taishan entered into the

```
 1    lawsuit in 2010; therefore, these records

 2    were no longer in existence in 2008 and 2009.

 3    This is a common practice.

 4              MR. TAYLOR:  Counsel, if the

 5         witness is finished with his answer...

 6              MR. SERPE:  Just a second,

 7         Bernard.

 8              MR. TAYLOR:  Okay.

 9              (Conference out of the hearing

10         of the reporter.)

11              MR. SERPE:  Two questions and I

12         think we'll take a break.

13              MR. TAYLOR:  Okay.  Are you

14         okay with that?

15              THE WITNESS:  Can we take a

16         break right now?

17              MS. ROBERTSON:  The question

18         was a who did you talk to, and he

19         didn't answer it.

20              MR. TAYLOR:  Okay.

21              THE WITNESS:  Two more

22         questions and we're all done?

23              MR. TAYLOR:  No, no, no.

24              MR. SERPE:  Break.

25              THE WITNESS:  Okay.  Then let's
```

1      take a break.  It's been too long.

2              MR. TAYLOR:  Whoa, whoa.

3              MR. SERPE:  Can I ask two

4      questions before the break?

5              MR. TAYLOR:  Before the break,

6      just two questions.

7              THE WITNESS:  Would that be

8      long?

9              MR. SERPE:  No.

10             Do you remember my last

11     question?

12             THE WITNESS:  Would you remind

13     me of that?

14             MR. SERPE:  Mike?

15             (The following portion of the

16     record was read.)

17             "QUESTION:  Who in the tape

18     production department was responsible

19     for preserving evidence of American

20     drywall markings?"

21             (End of readback.)

22             MR. TAYLOR:  And there was an

23     objection to the form of the question.

24     A.     As for that question, I believe

25   every Taishan employee that has relevant

Case 2:09-md-02047-EEF-MBN Document 22380-66 Filed 11/19/19 Page 283 of 453
Case 1:14-cv-02484-LGS-SLC Document 261-1 Entered on FLSD Docket 05/15/2019 Page 327 of 321
Confidential - Subject to Further Confidentiality Review

1    material in regarding to American-sized

2    products has the responsibility to preserve

3    the evidence.

4                There is no such thing that any

5    specific person will need to be in charge of

6    specific preserving the evidence.  Just like

7    Mr. Peng at the time was our sales manager,

8    but not only Mr. Peng preserved relevant

9    documents and information.  Upon his request

10   I also preserved relevant information and

11   documents.  We had strictly complied with

12   this requirement.

13               I'm done with my answer.

14               MR. SERPE:  I'll ask more after

15        the break.

16               THE VIDEOGRAPHER:  We are now

17        going off the video record.  The time

18        is currently 9:05 a.m.  This is the

19        end of Media No. 1.

20               (Recess taken, 9:05 a.m. to

21        9:21 a.m.)

22               THE VIDEOGRAPHER:  We are now

23        back on the video record with the

24        beginning of Media No. 2.  The time is

25        currently 9:21 a.m.

Confidential - Subject to Further Confidentiality Review

```
 1              (Deposition Exhibit PID-22

 2         marked.)

 3    BY MR. SERPE:

 4         Q.    Mr. Che, I'm going to hand you

 5    Exhibit 22.  If you would hand this one to

 6    your lawyer, please.  I'll represent to you

 7    that this e-mail was given to us by your

 8    lawyers.  The original Chinese is attached.

 9              Will you let me know after you

10    have read it.

11              (Document review.)

12         A.    I'm done.

13    BY MR. SERPE:

14         Q.    Exhibit 22 are e-mail exchanges

15    between you and a Mr. Lin from the Zhejiang

16    Wanxin Printing Company; am I correct?

17         A.    Correct.

18         Q.    On April 2nd of 2006, he sent

19    you a design draft for adhesive tape; is that

20    correct?

21         A.    Yes.

22         Q.    Two days later, you wrote back

23    to him and requested that he make changes to

24    the adhesive tape label; is that correct?

25         A.    You mean two days after
```

1   April the 2nd?  Why don't you go ahead, just

2   tell me the date.

3        Q.     Oh, I'm sorry.  It's April 5th.

4   I apologize.

5        A.     I think on April the 5th he

6   sent me an e-mail.

7        Q.     You wrote an e-mail to Mr. Lin

8   on April 5th at 9:30 in the morning.  Do you

9   see that?

10            MR. TAYLOR:  Objection to the

11       form.  Withdraw the objection.

12            MR. MONTOYA:  Want to translate

13       that, the withdraw the objection?

14       Thank you.

15            MR. TAYLOR:  You can answer.

16       A.     He sent me e-mail on

17   April the 5th.

18   BY MR. SERPE:

19       Q.     I'm going to ask you to look on

20   Exhibit 22 just below half.  I'm holding up a

21   copy for you and pointing at the section.

22            MS. EIKHOFF:  You're pointing

23       at the English version.

24   BY MR. SERPE:

25       Q.     Let me hand you the Chinese

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 286 of 453
Case 1:11-cv-22408-MGC Document 294-1 Entered on FLSD Docket 08/15/2014 Page 230 of
321
Confidential - Subject to Further Confidentiality Review

1    version with the area circled.

2         A.    Yes.

3         Q.    In that e-mail, you asked

4    Mr. Lin to make changes to the adhesive tape

5    label; is that correct?

6         A.    That is what is reflected on

7    it, but the reflection does not say "tape,"

8    but the design draft of a tape.

9         Q.    What were you referring to when

10   you said in your e-mail:  Please add

11   "Manufactured to Meet ASTM C36 and ASTM C1396

12   Standards"?

13        A.    On the face of the e-mail, it

14   appears to be an information reflecting

15   customer's request.

16        Q.    Customer's request on what they

17   wanted on edge tape?

18        A.    Correct.

19        Q.    In the last e-mail from Mr. Lin

20   back to you on April 5th, he attaches

21   something to the e-mail.  Do you see that?

22        A.    I see that.

23        Q.    It's a file type .gif.  Do you

24   recognize .gif?

25        A.    That's what it says.

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 287 of 453
Case 1:14-cv-22069-MGC Document 304-1 Entered on FLSD Docket 09/15/2014 Page 531 of
321

Confidential - Subject to Further Confidentiality Review

1      Q.      And there are attachments to

2  the e-mail on page 597.  Do you see that?

3      A.      I see that.

4      Q.      This is the .gif attachment

5  that Mr. Lin sent to you on April 5th of

6  2006, isn't it?

7      A.      Yes, that's what it says.

8      Q.      And you recall having received

9  this from Mr. Lin?

10     A.      I don't have a clear

11 recollection on that, but that's what the

12 document reflects.

13     Q.      And because you don't have a

14 clear recollection, it would be important to

15 search your computer to look for e-mails

16 about edge tapes in this time frame, wouldn't

17 it be?

18             MR. TAYLOR:  Objection to form.

19     A.      Reflected from this e-mail,

20 Mr. Lin was only making a sample design.  He

21 is not a manufacturer of tapes.

22 BY MR. SERPE:

23     Q.      What does Mr. Lin's company do?

24     A.      From my recollection, it should

25 be a company that makes tape molding tools.

```
 1         Q.      And the molding tool is what

 2    the Taishan production factory would use to

 3    make Taishan edge tapes?

 4         A.      Correct.

 5         Q.      Taishan did not make its own

 6    molding tools; is that correct?

 7         A.      Taishan does not have its own

 8    molding tool factory.

 9         Q.      So for every molding tool that

10    was used for a custom American-sized drywall,

11    some other factory would have had to have

12    made that for Taishan?

13                 THE WITNESS:  Can you repeat

14         the question?

15                 THE INTERPRETER:  The

16         interpreter will repeat.

17                 (Translation.)

18         A.      Correct.

19    BY MR. SERPE:

20         Q.      Other than Mr. Lin's company,

21    are you aware of any other company that made

22    molding tools for Taishan between 2005 and

23    2007 that would have been used for

24    American-sized drywall?

25         A.      There are also other companies
```

1    that make relevant molding tools for Taishan

2    but not necessarily only for the

3    American-sized gypsum board.

4         Q.    Am I correct that Taishan did

5    not check with Mr. Lin's company to determine

6    what records he had of molding tools for

7    American-sized drywall between 2005 and 2007?

8              THE WITNESS:  I don't

9         understand.  Ask again.

10              THE INTERPRETER:  The

11        interpreter will repeat.

12              (Translation.)

13        A.    Regarding the manufacturer of

14   the tape molding tool, this is what generally

15   happens.  When manufacturing the tape molding

16   tool, usually a big-sized metal roller was

17   used.  The required information to be printed

18   on a tape is to be engraved on it.

19              However, when the tape is no

20   longer to be used, because there is a high

21   value of the metal roller, we will return the

22   metal roller back to the mold tool

23   manufacturer.  After erasing the information

24   on the roller, it will be used again to make

25   new molding tools.

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 290 of 453
Case 2:14-cv-02846-CJ-DOL Document 2041 Entered on FLSD Docket 08/15/2014 Page 534 of
321

1          Therefore, the price we pay for

2    the roller will be a lot cheaper than

3    purchasing a brand-new roller for the molding

4    tools; therefore, molding tool factory's

5    information had already been sent back to

6    Taishan.

7          For the information

8    communicated with the molding tool

9    manufacturer, if they do exist, they are all

10   here.

11        Q.    Mr. Che, you did not see

12   Exhibit 22 as you prepared for today's

13   deposition, did you?

14        A.    Correct.

15        Q.    How do you know that Exhibit 22

16   still exists at Taishan?

17              MR. TAYLOR:  Objection to form.

18        A.    This information of yours was

19   copied from Taishan.  Those are information

20   we have preserved.  Did you go to Zhejiang

21   Wanxin Printing Company, Limited to copy the

22   information?

23   BY MR. SERPE:

24        Q.    Is it your testimony that

25   Exhibit 22 still exists and has been

```
 1      preserved by Taishan?

 2                 MR. TAYLOR:  Objection to the

 3           form.

 4                 THE WITNESS:  Do I need to

 5           answer?

 6                 MR. TAYLOR:  Yes.

 7           A.      Yes.

 8      BY MR. SERPE:

 9           Q.      Mr. Che, Exhibit 48 is at the

10      bottom of your stack.  Would you pull it out

11      for me.

12           A.      (Witness complies.)

13           Q.      Mr. Che, this is the list of

14      topics that you agreed to testify as the

15      corporate representative.  Do you see that?

16           A.      I see that.

17           Q.      You see topic number 1 on

18      page 2?

19           A.      I see that.

20           Q.      I'd like to ask you about the

21      specific topic that we listed, Taishan's

22      practice for marking edge and end packing

23      tapes.

24                 Do you see that?

25           A.      Are you talking about item
```

```
1    number 1?

2         Q.    Yes.

3         A.    I see that.

4         Q.    What steps did Taishan take to

5    provide you documents regarding edge tapes to

6    prepare for the deposition?

7              MR. TAYLOR:  Objection to form.

8         A.    When I was preparing for my

9    witness testimony in the deposition

10   representing Taishan, I tried very hard to

11   search for, confirm and communicate the

12   relevant material and evidence in relation to

13   the tapes with the help of my attorney.  I

14   have also reviewed a lot of relevant pictures

15   as well as Manufacturer Profile Forms.

16             MR. SERPE:  Sunny, are you

17        done?

18             THE WITNESS:  Yes.

19   BY MR. SERPE:

20        Q.    Other than Exhibit 22, were you

21   provided any other e-mails that you

22   personally wrote to a molding tool company

23   that was making edge tape for Taishan?

24        A.    When I was preparing for the

25   witness deposition representing Taishan, I
```

1  did search for a lot of related information;

2  however, I was not able to find this part of

3  material because there are too much to be

4  prepared for -- to be prepared.

5      Q.    Do you know if anyone searched

6  the computers that were preserved by Zhi Tong

7  to determine whether the word "edge tape"

8  showed up in any e-mails?

9          THE WITNESS:  Reinterpret.

10         THE INTERPRETER:  The

11     interpreter will repeat.

12         (Translation.)

13     A.    While I was preparing for my

14  witness deposition representing Taishan, the

15  majority of my work is to work with the

16  attorneys to check the issues that the

17  attorneys had questions with and only the

18  information helping the opposing attorney and

19  the judge to discover the truth and to work

20  with the material provided by our attorney to

21  prepare for the witness testimony in the

22  deposition.

23         The attorneys had showed me a

24  lot of pictures related to tapes and also

25  including documents, but I'm not sure about

1  the communication between the attorneys

2  themselves internally.

3          I'm done with my answer.

4  BY MR. SERPE:

5      Q.      Do you remember the question?

6      A.      Yes.  I think I've answered

7  your question.

8      Q.      Who searched the computers that

9  were preserved by Zhi Tong to determine

10  whether the word "edge tape" showed up in any

11  e-mails?

12          MR. TAYLOR:  Objection to form

13      and objection, assert the

14      attorney-client privilege to any

15      activities that the attorney was

16      involved in in preparing this witness

17      for his deposition.

18          Any searches we conducted, we

19      assert the attorney-client privilege

20      and would instruct the witness not to

21      answer in regards to the attorneys'

22      activities.

23          Other than the attorneys'

24      activities, the witness can respond.

25          MR. SERPE:  Bernard, we'll have

 1          the continuing understanding that we

 2          disagree with you, that the clear

 3          scope of the 30(b)(6) is what was done

 4          or not done to prepare the witness.

 5          We get to ask that question.  So we'll

 6          sort that out later.

 7                MR. TAYLOR:  Yeah.

 8                MR. SERPE:  But we'll do that

 9          on a continuing basis so we don't

10          argue about it on the transcript.

11                MR. TAYLOR:  Yep.

12                THE WITNESS:  Do I need to

13          answer it?

14                MR. TAYLOR:  Only in regards to

15          knowledge you have that didn't come

16          from your attorneys directly.

17          A.     Then I think I had clearly

18   explained myself to you earlier.  You can

19   just read it again.

20                MR. TAYLOR:  And to clarify,

21          once again, only in regards to

22          knowledge you have that didn't come

23          from your attorneys directly regarding

24          the searches and the activities that

25          the attorneys pursued in searching for

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 296 of 453
Confidential – Subject to further Confidentiality Review
321

```
 1          documents.

 2     A.     Then I can't answer those

 3   questions for you.  While I was preparing for

 4   my witness testimony, I have communicated all

 5   relevant questions to my attorneys.

 6   BY MR. SERPE:

 7     Q.     Did any employee of Taishan

 8   search any Taishan computer for e-mails in

 9   2005 to 2007 on American-sized drywall that

10   contain the word "edge tape"?

11     A.     When I was preparing for the

12   witness deposition on behalf of Taishan, I

13   believe I do not possess the capability to

14   search every computer and every e-mail of

15   Taishan because all relevant information that

16   are the most complete and most detailed had

17   already been copied and taken by Zhi Tong.

18            As far how the both parties'

19   attorney used the information that Zhi Tong

20   copied is not what I have the --

21            THE INTERPRETER:  Interpreter

22       needs to clarify.

23            (Translation.)

24     A.     -- is not something that I

25   would have knowledge of.
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 297 of 453
Case 1:11-cv-22408-MGC Document 284-1 Entered on FLSD Docket 08/15/2014 Page 84 of 321
Confidential - Subject to Further Confidentiality Review

```
 1              When I was preparing for my
 2   witness testimony, both myself and Taishan's
 3   employee had tried our best effort to
 4   discover the truth of the deposition -- of
 5   the deposition.
 6              For the words that required the
 7   effort of attorneys, what I have done is to
 8   work with them and to accept them.
 9              I'm done with my answer.
10   BY MR. SERPE:
11        Q.    Did the employees in the tape
12   production factory for Taishan have computers
13   in the 2005 to 2007 time frame?
14        A.    This job does not require
15   computer.
16        Q.    Mr. Che, earlier you told me
17   you used e-mail to communicate with members
18   of the factory tape production department.
19   Do you recall that?
20        A.    From the e-mail, you should be
21   able to see the communication is with the
22   molding tool company.  Maybe my explanation
23   was not clear.  The tape factory's employee
24   only need to take the molding tool for
25   printing.  It does not have the design
```

1  capability.

2        Q.      If a customer ordered more edge

3  tape and you had to communicate with the

4  factory that you needed enough tape for

5  another 100,000 boards, is it correct that

6  you can use e-mail to communicate with the

7  tape production factory that you need more

8  tape for a customer?

9        A.      Please clarify when you said

10  100,000, did you mean 100,000 same tapes or

11  100,000 different molding tools or 100,000

12  different designs?

13        Q.      If a customer called and asked

14  for 100,000 square meters of drywall and you

15  did not have enough tape to make that from

16  your existing tape inventory -- same molding

17  tool, but you needed more tape -- you used

18  e-mail to ask the tape production factory to

19  make more tape for you; is that correct?

20                MR. TAYLOR:  Objection to form.

21                THE WITNESS:  Do I need to

22        answer?

23                MR. TAYLOR:  Yes.

24                THE WITNESS:  Do I need to

25        answer?  Do I need to answer?

Confidential – Subject to Further Confidentiality Review

```
 1              MR. TAYLOR:  Yes.  Yes.

 2              THE WITNESS:  Do I need to

 3       answer?

 4              Ask the question again.

 5              THE INTERPRETER:  Interpreter

 6       will repeat.

 7              (Translation.)

 8       A.     So my answer is:  It's not

 9  necessary.  All I needed to do was to make a

10  phone call.

11  BY MR. SERPE:

12       Q.     I understand "not necessary."

13              The question is:  Did you ever

14  use e-mail to communicate with the tape

15  production factory?

16       A.     I don't recall that I have used

17  e-mail to communicate with the tape

18  production factory.

19       Q.     Did Taishan check with the tape

20  production factory to see if any computers

21  had been preserved from between 2005 and

22  2007?

23              MR. TAYLOR:  Counsel, I think

24       we're on the same page, but I just

25       want to be sure on one point.
```

Confidential - Subject to Further Confidentiality Review

```
 1                     You started off asking about
 2           the tape production factory early on,
 3           and I think that was more narrowly
 4           defined as a department.  And I just
 5           want to be sure we're still talking
 6           about the same thing.
 7                     MR. SERPE:  Yeah, it's the
 8           Taishan independent --
 9                     MR. TAYLOR:  Got it.  Okay.
10                     MS. EIKHOFF:  Department.
11                     MR. TAYLOR:  Department.
12                     MR. SERPE:  It's a department.
13                     MR. TAYLOR:  Okay.
14                     MR. SERPE:  But it's within --
15           it's Taishan's department.  It's not a
16           separate company.
17                     MR. TAYLOR:  Yeah.
18                     MS. EIKHOFF:  But he corrected
19           you earlier.  It's not a factory.
20                     MR. TAYLOR:  It's not a
21           factory.
22                     MR. SERPE:  It's a department,
23           but it's in a different location.
24                     MR. TAYLOR:  Yeah.  I just want
25           to be sure we're on the same page.
```

```
 1              MR. SERPE:  Okay.

 2              MS. EIKHOFF:  We're not

 3      arguing.

 4              MR. SERPE:  How will I

 5      recognize you?

 6              THE WITNESS:  Do I need to

 7      answer?

 8              MR. TAYLOR:  Yes.

 9              THE WITNESS:  Ask the question

10      again.

11  BY MR. SERPE:

12      Q.     Did Taishan check with the

13  production department -- with the tape

14  production department to see if any computers

15  had been preserved that were in use between

16  2005 and 2007?

17      A.     I have already answered your

18  question earlier in my deposition that it is

19  not necessary for the production department

20  of tape to use computer.  All our e-mails

21  were sent to the molding tool production

22  company.

23      Q.     Is it your testimony that there

24  were no computers in Taishan's tape

25  production department in the era of 2005 to
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 302 of 453
Case 2:09-cv-07260-MCF-JCB Document 294-1 Entered on FLSD Docket 08/15/2019 Page 846 of
321

Confidential - Subject to Further Confidentiality Review

```
 1   2007?

 2              MR. TAYLOR:  Objection to form.

 3        A.      During my preparation for the

 4   witness deposition for Taishan as its

 5   representative, I did not find relevant

 6   evidence that the tape factory in Taishan

 7   used computer for the period of 2005 and

 8   2007.

 9   BY MR. SERPE:

10        Q.      Did the tape production

11   department have paper records of the tape

12   that they produced between 2005 and 2007?

13        A.      The tape production department

14   is only a department supplementing the

15   production.  It is not a department that

16   output to the outside.  It was only to

17   accommodate the production of the gypsum

18   boards edge tape.

19              The quantity of the tape

20   requested is determined by the production

21   department's request for the production of

22   the boards, and also during the production,

23   the tape itself is a consumptive item;

24   therefore, the quantity that it needs is not

25   very accurate.
```

 1                  Usually if ten reels of tapes

 2     is needed, it's not a problem if you produce

 3     12.  Usually only by making a phone call they

 4     will make it.

 5          Q.     The tape production department

 6     is in a separate location from the drywall

 7     production department; is that true?

 8          A.     They're not in the same

 9     courtyard.

10          Q.     The workers in the tape

11     production department between 2005 and 2007,

12     did they have any paper that they used to

13     help them remember what to do with their

14     work?

15               MR. TAYLOR:  Objection to form.

16               THE WITNESS:  Ask the question.

17               THE INTERPRETER:  Interpreter

18          will repeat.

19                  (Translation.)

20          A.     During my preparation as a

21     witness for the deposition representing

22     Taishan, I did not discover any relevant

23     documents in the tape production department

24     to prove what kind of work they have done

25     during the time frame of 2005 to 2007.

```
 1              THE INTERPRETER:  Interpreter

 2        needs to clarify.

 3              (Translation.)

 4        A.    They only make their

 5   productions according to the printing molding

 6   sheet as well as the quantity they are to be

 7   produced to make the production.

 8   BY MR. SERPE:

 9        Q.    What is the printing molding

10   sheet?

11              THE INTERPRETER:  Interpreter

12        needs to clarify.

13              (Translation.)

14        A.    Molding sheet, that's what I

15   talked about earlier about the roller.

16   BY MR. SERPE:

17        Q.    Oh, the molding tool?

18        A.    Correct.

19        Q.    And I would like to confirm

20   that the tape production department kept no

21   written records as to the quantity of tape to

22   make for any production.

23              MR. TAYLOR:  Objection to form.

24        A.    I think your question is not a

25   matter of whether or not it's been kept; it's
```

Confidential - Subject to Further Confidentiality Review

```
 1   a matter that this did not exist.  It is only

 2   an internal production department serving the

 3   purpose of assisting our production.

 4   BY MR. SERPE:

 5        Q.     So in the tape production

 6   department that's in a different location for

 7   Taishan, there are no computers and no

 8   records kept -- I'm sorry, no records had

 9   ever existed for production between 2005 and

10   2007?

11             MR. TAYLOR:  Objection to form.

12        A.     I indeed did not discover any

13   relevant documents or evidence while I was

14   preparing for my witness testimony for

15   Taishan.

16             MR. SERPE:  I've got one short

17        topic I think we can finish, and then

18        I know the interpreter has a phone

19        call at 10:30.

20             MR. TAYLOR:  A phone call,

21        yeah.

22             (Deposition Exhibit PID-11

23        marked.)

24   BY MR. SERPE:

25        Q.     I'd like to hand you
```

```
 1    Exhibit 11.  There's one there for your
 2    attorney.
 3                (Document review.)
 4    BY MR. SERPE:
 5         Q.     Mr. Che, I've given you an
 6    opportunity to review it.  Would you let us
 7    know when you're done.
 8         A.     Do you have a Chinese version
 9    of it?
10         Q.     Mr. Che, this was produced to
11    us by your attorneys, and it's our
12    understanding that the English was yours.
13         A.     In China when we write English,
14    we usually use the translation software.
15         Q.     Mr. Che, do you see there's a
16    second exhibit stamp here that says 9?
17         A.     Yes, I see that.
18         Q.     That was the deposition of
19    Manager Jia.  Do you see that?  And that's
20    the deposition that you had the opportunity
21    to previously review?
22         A.     I have not seen this document.
23         Q.     Do you recall that we handed
24    you this same document at your deposition in
25    2012?
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 307 of 453
Case 1:11-cv-22408-MGC Document 294-1 Entered on FLSD Docket 03/15/2013 Page 251 of 321
Confidential - Subject to Further Confidentiality Review

```
 1          A.      I don't have a clear

 2   recollection.

 3          Q.      Do you see the e-mail address

 4   just at the top of the document,

 5   sdth818@163.com?

 6          A.      I see that.

 7          Q.      Is it your testimony that you

 8   cannot understand this document without a

 9   computer to give you an English

10   translation -- I'm sorry, a Chinese

11   translation?

12          A.      I don't have a problem with

13   simple ones.

14          Q.      Let me ask you about the bottom

15   of the document where the words are in bold.

16   Do you recognize the words "Very Important"?

17          A.      Yes.

18          Q.      Did you understand that this

19   customer was telling you that it was

20   mandatory to have the words "Made in China"

21   stamped on the back of the drywall?

22                  Mr. Che, I've made a mistake in

23   my question.  I'm going to ask a new one.

24                  MR. TAYLOR:  Can I make a

25          comment while you formulate your
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 308 of 453
Case 2:14-cv-02722-MCE-DB Document 294-1 Entered on FLSD Docket 09/15/2015 Page 252 of
321
Confidential - Subject to Further Confidentiality Review

```
 1          question?

 2               MR. SERPE:  Yes.

 3               MR. TAYLOR:  The only problem

 4          we have is that the witness has made

 5          it clear that he can only understand

 6          some of it, not all of it, in English.

 7               MR. SERPE:  Before you

 8          translate, Madam Interpreter --

 9               MR. TAYLOR:  Don't translate

10          because I'm not going to educate the

11          witness on this.

12               MR. SERPE:  There's an

13          agreement between counsel that we're

14          not going to interpret the colloquy

15          between counsel at this point.

16               MR. TAYLOR:  Yeah.  Yeah.  At

17          this point.

18               So to ask the question to ask

19          him to interpret what it says without

20          giving it to him in Mandarin is --

21          makes it difficult for the witness to

22          be able to respond.

23               MR. SERPE:  The -- I understand

24          your objection.

25               MR. TAYLOR:  It's not an
```

1          objection.  It's more of a how can we

2          make this work a little better.  And

3          maybe it's if you have Sunny read it

4          to him and then he can respond.  That

5          might be the better way to go.  That's

6          my only suggestion.

7               MR. SERPE:  Very good.

8     BY MR. SERPE:

9          Q.    So, Mr. Che, thank you for your

10    patience.  I'm going to ask the interpreter

11    to read number 3 to you in Chinese.

12               (Translation.)

13    BY MR. SERPE:

14         Q.    Mr. Che, I'm going to read in

15    English, so the record is clear, number 3.

16               "Very Important:  By customs

17    regulation, we have to have Made in China

18    stamped somewhere in the drywall.  If you do

19    not actually have it on the gypsum board

20    itself, we will need to add it on the binding

21    tape.  If that is the case, add a small line

22    at the end of the tape in the lower side."

23               Mr. Che, did you understand

24    that this customer was advising you that it

25    was mandatory under U.S. Customs regulation

1  that the words "Made in China" be stamped

2  somewhere on your drywall?

3       A.      It only says customs here.

4  According to customs regulations, the word

5  "Made in China" will need to be stamped

6  somewhere in the drywall.

7       Q.      Taishan knew in 2007 that

8  United States Customs regulations required

9  the words "Made in China" be stamped

10 somewhere on the drywall?

11           MR. TAYLOR:  Objection to form.

12      A.      I don't recall that.  I only

13 recall that some of the customers requested

14 to stamp the word "Made in China" on the back

15 of the boards or somewhere on the boards.

16 BY MR. SERPE:

17      Q.      And to clarify, Taishan has no

18 knowledge of whether U.S. Customs required

19 the words "Made in China" to be stamped

20 somewhere on the drywall between 2005 and

21 2007?

22           MR. TAYLOR:  Objection to form.

23           THE WITNESS:  Do I need to

24      answer?

25           MR. TAYLOR:  Yes.

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 311 of 453
Case 1:11-cv-22408-MGC Document 284-1 Entered on FLSD Docket 09/15/2011 Page 255 of
321
Confidential - Subject to Further Confidentiality Review

1      A.      Customers from many countries

2  have requested to stamp "Made in China"

3  somewhere on the product.  From what I

4  learned through years of experience in the

5  industry, some of that was for the purpose of

6  customs clearance; some of them was for the

7  tariff of the most favorable country.

8              So we cannot be sure which

9  country it is.  It has been a request from

10  the customers of many countries.

11              THE WITNESS:  May I take a

12       break now?

13              MR. SERPE:  Yes.

14              THE VIDEOGRAPHER:  We are now

15       going off the video record.  The time

16       is currently 10:34 a.m.  This is the

17       end of Media No. 2.

18              (Recess taken, 10:34 a.m. to

19       11:02 a.m.)

20              THE VIDEOGRAPHER:  We are now

21       back on the video record with the

22       beginning of Media No. 3.  The time is

23       currently 11:02 a.m.

24  BY MR. SERPE:

25       Q.    Mr. Che, I'd like to ask you

```
 1   some questions from the notice of deposition,

 2   which is Exhibit 48, item number 2, Taishan's

 3   knowledge and position as to the manufacture

 4   of boards with certain markings as shown in

 5   exemplar photographs of drywall boards.

 6               MR. TAYLOR:  Counsel, before

 7         you get started, I'm assuming this

 8         would be separate and distinct and not

 9         duplicative of what Mr. Montoya asked?

10               MR. SERPE:  You're correct.

11               THE INTERPRETER:  The

12         interpreter hasn't finished her

13         interpretation.  She'll continue right

14         now.

15               MR. SERPE:  I apologize.

16               (Translation.)

17   BY MR. SERPE:

18         Q.    Mr. Che, we were provided this

19   week with a new set of photographs that have

20   been marked as PID-41.  We would like to know

21   where this drywall was found.

22               MR. TAYLOR:  That is

23         duplicative.  We went over that

24         extensively yesterday.

25               MR. SERPE:  The -- I think
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 313 of 453
Case 1:14-cv-22069-CE Document 204-1 Entered on FLSD Docket 08/15/2011 Page 87 of
321

Confidential - Subject to further confidentiality Review

```
 1            you'll see --
 2                  MR. TAYLOR:  Okay.
 3                  MR. SERPE:  -- that there are
 4        going to be refined questions,
 5        Bernard.
 6                  MR. TAYLOR:  All right.
 7                  MR. SERPE:  Mr. Che, I'm going
 8        to ask you a new question.
 9                  THE INTERPRETER:  This is the
10        interpreter speaking.  As Mr. Che was
11        looking at me while you two attorneys
12        were conversing with each other, I
13        told Mr. Che that there is a
14        stipulation that the interpreter would
15        not interpret the colloquy between the
16        two attorneys but she will interpret
17        for Mr. Che any objections or anything
18        related to the objections.
19                  MR. SERPE:  Right.
20                  MR. TAYLOR:  That's good.
21                  MR. SERPE:  Very good.
22    BY MR. SERPE:
23        Q.    Mr. Che, which factory location
24    were the boards that are pictured in
25    Exhibit 41 found in?
```

```
 1        A.      During my preparation as a

 2   witness for the deposition representing

 3   Taishan, I have tried very hard to search for

 4   documents and evidence that is relevant to

 5   the deposition.  In the end that I have found

 6   these boards at a warehouse corner at the

 7   location of what we now call the industry

 8   park.  I have found those American-sized

 9   residual gypsum board.

10        Q.      Who did the search in the

11   industrial park warehouse for the residual

12   American-sized boards?

13        A.      Myself and Party Director

14   Zhang.

15        Q.    Is that Mr. Jianchun?

16           MS. ROBERTSON:  Zhang Jianchun.

17   BY MR. SERPE:

18        Q.    Is that Mr. Zhang Jianchun?

19           MS. EIKHOFF:  Maybe you could

20       just ask him what his full name is.

21           MR. SERPE:  Thank you, Christy.

22   BY MR. SERPE:

23        Q.    The other gentleman, what is

24   his full name?

25        A.    Zhang Jianchun.
```

1    Q.      When did you search the

2    industrial park warehouse for residual

3    American-sized board?

4    A.      During my preparation of

5    witness testimony in deposition on behalf of

6    Taishan, in order to confirm our, Taishan's,

7    markings of the product as well as our

8    position, Party Director Zhang and I have

9    searched the industrial park as well as

10   Factory 4's warehouse, in fact, every corner

11   of the warehouse, and we have found the

12   American-sized residual gypsum boards.

13   Q.      When?

14   A.      I don't remember the exact date

15   because during the course of my preparation

16   for the witness testimony in depositions

17   representation Taishan, I've done a lot of

18   preparation work, and I have kept on

19   searching and communicating among a few

20   departments.  I believe it was this December,

21   but I do not remember the exact date.

22         MR. TAYLOR:  We're having a

23         little bit of a technical problem.

24            (Comments off the stenographic

25         record.)

Confidential - Subject to Further Confidentiality Review

```
1            THE VIDEOGRAPHER:  We are now

2       going off the video record.  The time

3       is 11:11 a.m.

4            (Recess taken, 11:11 a.m. to

5       11:17 a.m.)

6            THE VIDEOGRAPHER:  We are now

7       back on the video record.  The time is

8       currently 11:17 a.m.

9  BY MR. SERPE:

10       Q.    In addition to going to

11  Industrial Park and Factory No. 4, did you

12  and Party Director Zhang go to Factory No. 2

13  to look for residual American-sized drywall?

14       A.    Factory No. 2 is not the

15  factory that produces gypsum board.  It had

16  not produced American-sized gypsum board.

17       Q.    Did you and Party Director

18  Zhang go to Weifang Aotai factory to look for

19  residual American-sized drywall?

20       A.    No.

21       Q.    So the only location that

22  residual American-sized drywall was located

23  in the warehouse was Industrial Park; is that

24  correct?

25       A.    While I was preparing for my
```

1  witness testimony in deposition representing

2  Taishan, I tried my very best to search for

3  every corner of the warehouses in the factory

4  that produced American-sized gypsum board.

5  These are all that I have found.

6          We also hope to discover more

7  residual gypsum boards so that we can find

8  out and distinguish the facts of the markings

9  of our gypsum boards; however, Taishan had

10  never kept its products.  The gypsum boards

11  discovered luckily were the one happened to

12  be residual from that time.

13      Q.    When you say that Taishan still

14  hopes to discover more residual boards, where

15  will Taishan look for them?

16      A.    I was saying that that was the

17  hope of Taishan.  I'm not saying that Taishan

18  would find it somewhere.

19          If you could help me to

20  discover the sample of Taishan-produced

21  gypsum board for us to make a comparison,

22  that would be even better, but the premise is

23  it has to be a product of Taishan.

24      Q.    Has Taishan looked in all of

25  its factories carefully to find residual

Confidential - Subject to Further Confidentiality Review

```
 1    American-sized drywall?

 2                 MR. TAYLOR:  Objection to form.

 3                 THE WITNESS:  Do I need to

 4         answer?

 5                 MR. TAYLOR:  Yes.

 6         A.      Currently Taishan has over 40

 7    branch factories in China; many of them were

 8    established after 2007.  And those factories

 9    have never produced American-sized gypsum

10    boards, and many of those factories are far

11    away from the ports but located in the inland

12    of China or west of China.

13                 I'm done with my answer.

14    BY MR. SERPE:

15         Q.      Has Taishan completed its

16    search of the factories which made

17    American-sized drywall to look for residual

18    American-sized boards?

19         A.      While I was preparing for my

20    witness testimony in deposition representing

21    Taishan, we have tried our best to search

22    everywhere in Taishan that possibly had

23    produced American-sized residual gypsum

24    boards.  In the end we had only discovered

25    those on the picture that we have provided to
```

1    you the American-sized residual gypsum

2    boards.

3         Q.    So you took pictures of all of

4    the American-sized gypsum board which you

5    found in your search?

6         A.    Also, during the time of our

7    attorneys went to China, we led our attorneys

8    to the site and looked at those gypsum boards

9    so that our attorneys in Alston could have

10   firsthand experience of what the Taishan-made

11   American-sized gypsum boards look like.

12        Q.    The pictures that you have

13   provided of American-sized gypsum board are

14   of all of the types of boards that you found;

15   is that correct?

16             MR. TAYLOR:  Objection to form.

17        A.    These are the American-sized

18   gypsum board that I could ever discovered

19   during my preparation of witness testimony

20   deposition representing Taishan.

21   BY MR. SERPE:

22        Q.    When were the boards that are

23   pictured in Exhibit 41 manufactured?

24        A.    There's no information

25   regarding the date of production on gypsum

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 320 of 453
Case 1:11-cv-22408-MGC Document 284-1 Entered on FLSD Docket 05/15/2015 Page 354 of
321
Confidential - Subject to Further Confidentiality Review

1    boards, but they were definitely produced

2    between 2005 and 2007 because Taishan had

3    only produced during that period of time the

4    American-sized gypsum boards.

5        Q.    Why were there still

6    American-sized drywall boards in Taishan's

7    factory 11 or more years after they were

8    made?

9        A.    Those are only the residual

10   boards in there.  As for why it is located in

11   there, I do not know either.  Luckily, I

12   found them during my preparation as a witness

13   for the deposition representing Taishan.  I

14   believe it can better help us to understand

15   the truth about Taishan products' markings.

16       Q.    Would it be a fair statement

17   that Taishan had no requirement to save

18   samples of every type of American-sized

19   drywall that it manufactured?

20            MR. TAYLOR:  Objection to form.

21            THE INTERPRETER:  The

22        interpreter will reinterpret.

23            (Translation.)

24            MR. TAYLOR:  Objection to form.

25            THE WITNESS:  I answer?

```
 1              MR. TAYLOR:  Yes.

 2       A.     Taishan have never a

 3   requirement or a practice to keep any samples

 4   of gypsum boards.  We try to reduce the

 5   difference between the customers' demand and

 6   our production in terms of quantity because a

 7   lot of the residual boards are wasted.

 8              However, very luckily, during

 9   my preparation of witness testimony in

10   deposition representing Taishan, these

11   American-sized residual boards were

12   discovered.

13              That's it.

14   BY MR. SERPE:

15       Q.     Will you look at page 4 of

16   Exhibit 41.

17       A.     I see that.

18       Q.     Will you tell us what that

19   says?

20       A.     White sealing edge, which is

21   the abbreviation of white edge tape.

22       Q.     Mr. Che, I see three types of

23   drywall in Exhibit 41:  "Made in China, Meet

24   or Exceeds ASTM," "Crescent City," and white

25   board with white edge tape.
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 322 of 453
Case 1:11-cv-22408-MGC Document 294-1 Entered on FLSD Docket 08/15/2013 Page 326 of 321
Confidential - Subject to Further Confidentiality Review

```
 1                    MR. TAYLOR:  Objection to form.

 2   BY MR. SERPE:

 3        Q.     Is it fair to say that those

 4   are the three types of markings that you

 5   found on the American-sized drywall?

 6                    THE WITNESS:  Can you reask

 7        your question, please?

 8                    MR. SERPE:  I'm going to ask

 9        the question a different way.

10   BY MR. SERPE:

11        Q.     On Exhibit -- page 20, there's

12   a stack of drywall.  I call that a pallet.

13   Would that be an acceptable term to you?

14        A.     Why don't we just call it a lot

15   of gypsum boards or -- comparatively it's a

16   lot of gypsum boards.

17        Q.     Would you look at page 22 for

18   me.

19        A.     I see that.

20        Q.     When you found the drywall

21   that's pictured in page 22, were all of those

22   boards together like that when you found

23   them?

24        A.     When I found those gypsum

25   boards, they are as what you see on the
```

Confidential – Subject to further confidentiality Review

 1    picture; but if you see the plastic wrap on

 2    the top, the plastic was covering it,

 3    covering them.

 4              And there is a wasted board

 5    which was covering those boards on top, and

 6    it was full of dust on top.

 7        Q.    In the drywall pictured on

 8    page 22, I see the stamp on there.  Is that

 9    the "Made in China" stamp?

10        A.    You should be able to find more

11    detailed information from the pictures before

12    this picture for the spray marks on the

13    boards.

14        Q.    Is it the drywall we see in

15    picture 20?

16              MR. TAYLOR:  We want to help.

17              MR. SERPE:  I hear you.

18        A.    The font was too far away.  I

19    cannot see it very clearly, but I'm sure it

20    is -- it is one of those spray marks depicted

21    from the picture before this one.

22              MR. TAYLOR:  Richard?

23              MR. SERPE:  Yeah.

24              MR. TAYLOR:  One of the ways --

25        and this is between us and not to

```
 1          be --
 2               MR. SERPE:  Yes, colloquy
 3          between counsel, not being
 4          interpreted.
 5               MR. TAYLOR:  We could give you
 6          the Bates ranges of the documents that
 7          reflects the boards that go together,
 8          if that would help.
 9               MR. SERPE:  So we may be able
10          to do this just by stipulation, but
11          we're wondering how many pallets --
12          was all of the "Made in China" one
13          pallet, one Crescent City --
14               MS. EIKHOFF:  We have counts.
15               MR. SERPE:  Pardon?
16               MS. EIKHOFF:  We have counts of
17          each of the three categories.
18               MR. SERPE:  Okay.  And --
19               MS. EIKHOFF:  But he doesn't
20          have them memorized.
21               MR. SERPE:  But generally
22          speaking, are we talking about ten
23          pallets?  Are we talking about three
24          pallets?  Not so much --
25               MS. EIKHOFF:  I've got it in my
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 325 of 453
Case 2:14-cv-02494-MCS Document 394-1 Entered on FLSD Docket 08/15/2019 Page 389 of 321
Confidential - Subject to Further Confidentiality Review

1      notebook, but it's -- there's some --

2      there's more of some and less of

3      others.  So of the three, there's a

4      varying degree of the numbers of

5      boards, but we did count the boards.

6              MR. SERPE:  Okay.

7              MS. EIKHOFF:  And he could -- I

8      mean, in his preparation, we could

9      give him that, but he just doesn't

10     have those precise numbers in his

11     head.

12             MR. SERPE:  So --

13             MS. EIKHOFF:  Or we could

14     just --

15             MR. SERPE:  I'm going to hit

16     the pause button on this, and let's

17     talk about it at lunchtime.

18             MS. EIKHOFF:  Sure.

19             MR. TAYLOR:  Got it.

20   BY MR. SERPE:

21       Q.    Did Taishan take any efforts

22   when it learned of Judge Fallon's

23   preservation order to search its facilities

24   to determine if residual American-sized

25   drywall was located in the warehouses?

1          MR. TAYLOR:  Objection to form.

2      A.      During my preparation of

3  witness testimony for the deposition

4  representing Taishan, I reviewed the

5  deposition record of Chairman Jia and

6  Mr. Peng related to preserving documents, and

7  Taishan required to preserve relevant

8  documents and material to the American

9  lawsuit.  But no one required us to find

10  these American-sized gypsum board because at

11  that time there was no use of it at all.

12          This time while I was preparing

13  for the witness testimony in deposition

14  representing Taishan Corporation, in order to

15  confirm the markings of the Taishan

16  American-sized gypsum boards, in order to

17  better serving the purpose of find out the

18  Taishan American-sized gypsum boards'

19  markings, we tried our very best and found

20  these, found these American-sized residual

21  gypsum boards in the warehouse.

22  BY MR. SERPE:

23      Q.      Taishan took no steps when it

24  learned of Judge Fallon's preservation order

25  to determine whether samples of

Confidential - Subject to Further Confidentiality Review

```
 1   American-sized drywall were still in

 2   Taishan's possession; isn't that correct?

 3              MR. TAYLOR:  Objection to form.

 4       A.     Taishan received the judge's

 5   order, and Taishan's understanding is to

 6   preserve the relevant documents and material.

 7   It is Taishan to preserve.

 8              At that time nobody required us

 9   to find those American-sized residual gypsum

10   boards.  If at the time somebody required us

11   to find these American-sized residual gypsum

12   boards, Taishan would definitely execute and

13   respect the opinion of the judge and to

14   preserve those.

15              Even though Taishan does not

16   have a requirement nor a practice to keep

17   gypsum board samples, the best result is that

18   during my preparation for the witness

19   testimony for the deposition as Taishan's

20   representative, in order to discover the

21   truth about Taishan's American-sized gypsum

22   boards, those were discovered.

23       Q.     Taishan was not advised by

24   anyone to preserve samples of American-sized

25   drywall after receiving Judge Fallon's order?
```

```
 1                  MR. TAYLOR:  Objection to form.

 2                  THE WITNESS:  Do I need to

 3           answer it?

 4                  MR. TAYLOR:  Yes.

 5      A.       While I was preparing for the

 6  witness testimony for the deposition

 7  representing Taishan, I've only discovered

 8  the order to have Taishan preserving

 9  documents and materials related to the

10  American lawsuit.  I did not discover any

11  record that anyone had required Taishan to

12  preserve these American-sized residual gypsum

13  boards.

14                  MR. SERPE:  Bernard, I'm about

15           to start a topic that's going to take

16           45 minutes or more.

17                  MR. TAYLOR:  Well, we're

18           about -- we're right at lunchtime.

19           You know he's got to start heading out

20           of here 2:30, 2:45.

21                  MS. ROBERTSON:  You said 3:00

22           yesterday.

23                  MR. TAYLOR:  Hmm?

24                  MS. ROBERTSON:  You said 3:00

25           yesterday.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. TAYLOR:  Yeah.  Well, I
 2         know.
 3              MS. EIKHOFF:  Bernard --
 4         Bernard says earlier than other
 5         people.
 6              MR. TAYLOR:  Yeah, I always
 7         leave early, and so, I mean, the
 8         question is:  Will we make it?
 9              MS. DUGGAN:  Could we take a
10         shorter lunch in light of that?
11              MR. TAYLOR:  Well, that's my
12         question.  I mean, do you think we're
13         going to make it?
14              MS. EIKHOFF:  Should we go off
15         the record?
16              MR. SERPE:  Let's go off the
17         record.
18              THE VIDEOGRAPHER:  We are now
19         going off the video record.  The time
20         is currently 11:54 a.m.
21              (Recess taken, 11:54 a.m. to
22         12:26 p.m. )
23              THE VIDEOGRAPHER:  We are now
24         back on the video record with the
25         beginning of Media No. 4.  The time is
```

```
1         currently 12:26 p.m.
2              MR. TAYLOR:  Counsel, the --
3         there was some confusion in the
4         Taishan witness' prior testimony
5         regarding requirements that -- of the
6         judge's order concerning drywall, and
7         the witness would like to clarify that
8         now.  Sunny, I think you need to --
9              THE INTERPRETER:  Oh, okay.
10             MR. TAYLOR:  Should I say it
11        again?
12             THE INTERPRETER:  It's okay.
13        I've got it.
14             MR. TAYLOR:  Okay.
15             (Translation.)
16             THE WITNESS:  Perhaps when I
17        was making a narrative statement
18        and which confused someone, what I
19        said was that no one required Taishan
20        to look for the residual
21        American-sized gypsum board.
22             Taishan did, according to the
23        requirements of the judge, preserve
24        documents, material and the residual
25        gypsum boards with American sizes.
```

1     Taishan has strictly complied and

2     executed the order of the judge.

3          I'm done answering your

4     question.

5  BY MR. SERPE:

6     Q.     What information do you base

7  your updated answer on that someone at

8  Taishan preserved American-sized gypsum

9  boards when they received Judge Fallon's

10 order?

11    A.     It is based on that the judge's

12 court order required Taishan to preserve all

13 documents, materials, including gypsum

14 boards, related to the American lawsuit.

15 Taishan has also strictly executed this

16 requirement.

17    Q.     Did you find a document which

18 told you that a Taishan employee placed the

19 drywall in the warehouse so that they could

20 preserve American-sized drywall for the

21 preservation order?

22         THE WITNESS:  Reinterpret it.

23         THE INTERPRETER:  The

24    interpreter will repeat.

25         (Translation.)

1    A.    While I was preparing for the

2    witness testimony in deposition representing

3    Taishan, the material that I saw on the court

4    order is that Taishan is to preserve

5    documents, materials, including gypsum

6    boards, related to the American lawsuit.

7    BY MR. SERPE:

8         Q.    Are you done?

9         A.    Yes.

10              (Deposition Exhibit PID-42

11        marked.)

12   BY MR. SERPE:

13        Q.    Would you look at Exhibit 42.

14        A.    I see it.

15        Q.    Can you identify what that is

16   for us?

17        A.    This is sales plan

18   notification.  It was written by the

19   salespeople in the sales department, a

20   requirement for the production plan.

21              MR. SERPE:  Counsel, I want to

22        confirm our agreement that we're going

23        to reserve our right to object to

24        the -- or come up with an alternative

25        translation of the characters since we

Confidential – Subject to Further Confidentiality Review

1       received this on the 19th and have not

2       had time to process it.

3               MR. TAYLOR:  I'm confused.  I

4       don't understand what's the --

5               MS. EIKHOFF:  These are not --

6       these are not the agreed-upon final

7       translations.

8               MR. SERPE:  Yeah.  Right.  We

9       just received these translations.

10              MR. TAYLOR:  Oh.  Okay.  All

11      right.

12              MR. SERPE:  We looked at them.

13      We disagree with some of them.

14              MR. TAYLOR:  Yeah.

15              MR. SERPE:  And we just want to

16      reserve the right to come back and

17      offer our own translations --

18              MR. TAYLOR:  Translations.

19              MR. SERPE:  -- or come up with

20      an agreed set.

21              MR. TAYLOR:  That's fine.

22      That's absolutely fine.

23  BY MR. SERPE:

24      Q.    Once the sales plan

25  notifications were written by the people in

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 334 of 453
Case 1:11-cv-22408-MGC Document 294-1 Entered on FLSD Docket 08/15/2013 Page 378 of
321
Confidential – Subject to Further Confidentiality Review

```
 1   the sales department, were they given to the

 2   production department?

 3        A.     Yes.

 4        Q.     Where were these documents

 5   found that are now in Exhibit 42?

 6        A.     The documents in Exhibit 42 was

 7   kept in our sales department.

 8        Q.     Had the documents that were

 9   collected in Exhibit 42 ever been provided to

10   anyone outside the sales department before

11   the last few weeks?

12             MR. TAYLOR:  Objection to form.

13        A.     It is definitely to be sent to

14   the production department for production

15   requirement instructions.

16   BY MR. SERPE:

17        Q.     When was the Exhibit 42

18   documents first provided as part of the

19   lawsuit over American-sized drywall to the

20   attorneys in the case?

21             THE WITNESS:  Can you repeat

22        your question?

23             THE INTERPRETER:  Interpreter

24        can repeat.

25             (Translation.)
```

1    A.      While I was preparing for the

2  witness testimony in deposition representing

3  Taishan, in order to truly discover the

4  relevant information regarding to Taishan's

5  American-sized gypsum board, I have found

6  these documents and have given the

7  information to the attorneys.  But as for

8  whether or not this information was copied

9  and taken by Zhi Tong or Hogan Lovells, I'm

10  not sure.

11  BY MR. SERPE:

12    Q.      Where in the sales department

13  were the sales plan notifications which are

14  now in Exhibit 42 found?  For example, were

15  they in a box, or were they in a cabinet?

16    A.      Upon receiving the court order

17  requiring us to preserve documents and

18  materials in relation to the U.S. lawsuit, I

19  have -- we have kept relevant material in a

20  cabinet.

21          As I was preparing for the

22  witness testimony and deposition for Taishan,

23  I have reviewed a lot of materials, and I

24  have discovered this material which I think

25  is helpful for us to have a better

1  understanding of Taishan's markings;

2  therefore, I shared the material with the

3  attorneys.

4       Q.    Who put the sales notification

5  documents in the cabinet that was being used

6  to preserve documents for the U.S. lawsuit?

7            MR. TAYLOR:  Objection to form.

8            THE WITNESS:  Do I need to

9       answer that?

10           MR. TAYLOR:  Yes.

11           THE WITNESS:  Can you repeat

12      that?

13           THE INTERPRETER:  Interpreter

14      will repeat.

15           (Translation.)

16      A.    As regarding to the

17  preservation of the related material on

18  American-sized gypsum board, at the time it

19  was Mr. Peng who compelled it and put it in

20  the cabinet.

21  BY MR. SERPE:

22      Q.    Has Taishan ever maintained a

23  listing of all of the documents that were

24  being preserved for the purposes of the U.S.

25  lawsuit?

1    A.    While I was preparing for my

2    witness testimony for the deposition

3    representing Taishan, I did not discover such

4    a document list.  However, when Mr. Peng left

5    his employment, he said all the documents in

6    the cabinets are the documents related to

7    American lawsuit, and they are to be strictly

8    preserved.  That's why those documents have

9    always been kept in there.

10    Q.    Are the sales notification

11    plans that are contained in Exhibit 42 all of

12    the sale notification plans that were in the

13    cabinet being used to preserve documents for

14    the U.S. litigation?

15          MR. TAYLOR:  Objection to form.

16    A.    While I was preparing for the

17    witness testimony for the deposition

18    representing Taishan, I searched relevant

19    documents, and the documents in the cabinet

20    in that time frame should be all

21    sales-related documents, not necessarily only

22    related to American lawsuit.

23          In it, there are also domestic

24    documents as well as documents to other

25    countries.  These are the documents that I

Confidential - Subject to further confidentiality review

1    could find in regarding to American-sized

2    gypsum boards sales plan notices.

3    BY MR. SERPE:

4         Q.    Were you the only person that

5    went through the sales notification plans to

6    pick out the sales plans that were for

7    American-sized drywall or did someone else

8    also look?

9         A.    While I was preparing for the

10   witness testimony for the deposition

11   representing Taishan, I looked for all

12   American-sized gypsum board-related sales

13   plan notices and documents.  Then I picked

14   them out one by one and had my colleague help

15   me to make copies and to scan the documents,

16   and then I submitted them to share with my

17   attorneys.

18        Q.    Did you copy and scan every

19   page of the sales notification plans for

20   American-sized drywall?

21             MR. TAYLOR:  Objection to form.

22             THE WITNESS:  Do I need to

23        answer?

24             MR. TAYLOR:  Shi de.

25        A.    I did copy, scan and share all

1    the sales plan notices relating to

2    American-sized gypsum board and shared with

3    my attorneys.

4           THE INTERPRETER:  Interpreter

5        correction:  The deponent actually

6        said in addition to all those notices

7        that I could find.

8    BY MR. SERPE:

9        Q.    Will you look at page 34 on the

10   top.

11       A.    I see that.

12       Q.    That's a sales notification

13   plan for a sale to Venture

14   Supply, Incorporated; is that correct?

15       A.    It was issued as a sales plan

16   notification in regarding to the entering of

17   a contract with Venture Supply Company.

18       Q.    And the information contained

19   in the sales plan notification included

20   specific requirements for the contract?

21       A.    It should be the requirements

22   for the production of these sizes of gypsum

23   board.

24       Q.    And how many requirements are

25   listed for the sales plan notification that's

Confidential - Subject to further confidentiality review

1    at the top of page 34?

2         A.      I don't understand your

3    question.

4         Q.      Mr. Che, is there a section for

5    specific requirements on the printed form?

6         A.      Yes.

7         Q.      How many specific requirements

8    were listed for the sales notification plan

9    to Venture Supply that's at the top of

10   page 34 of Exhibit 42?

11        A.      The sales plan notice is for

12   the purpose of notification internally;

13   therefore, the information is not that

14   strict.

15             There are four requirements

16   listed on this notice requirements, but the

17   requirements about the tapered edge is listed

18   on it.  It is listed on the top, right after

19   12.7.

20        Q.      What is the fourth requirement

21   under the Specific Requirements section?

22        A.      The requirement number 4 says

23   the spray mark is attached.

24             THE INTERPRETER:  Interpreter

25        needs to clarify.

```
 1                    (Translation.)

 2                    THE INTERPRETER:  There's no

 3          change on the interpretation.

 4                    MR. SERPE:  Question for the

 5          interpreter.

 6                    (Conference out of the hearing

 7          of the reporter.)

 8    BY MR. SERPE:

 9          Q.     Where is the attached ink jet

10    code that was referenced as the fourth

11    specific requirement to this sales

12    notification plan?

13                    MR. TAYLOR:  Objection to form.

14          A.     Let me explain to you the

15    operation process, because at the time I

16    happened to be a salesperson working on it.

17                    For example, the two sales plan

18    notification on page 34, the point number 4

19    below that specified what are those spray

20    markings, but because Chinese are not very

21    sensitive to English --

22                    THE INTERPRETER:  The

23          interpreter needs to clarify.

24                    (Translation.)

25          A.     -- when the worker who would
```

1    initially input the spray marking would not

2    be able to understand it completely, in that

3    circumstance, the person who issued the plan

4    notification would print out a more formal

5    spray marking requirement attached to it.

6              The information of spray

7    marking that is attached is for the use of

8    the spray marking worker who input the

9    information.  When this person completed

10   inputting this information, this piece of

11   paper will be thrown away.  This is our

12   common operation practice.

13   BY MR. SERPE:

14        Q.    Who issued the sales

15   notification plan at the top of PID-42,

16   page 34?

17        A.    Definitely it was issued by a

18   salesperson from the sales company, but there

19   was no name identified.

20        Q.    Would you look on Exhibit 42

21   right next to requirement number 4 and tell

22   me whose name is written there in Chinese.

23        A.    Fu Tinghuan.  But this is the

24   signature of the approving boss who approved

25   the issuance of the sales plan notification.

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 343 of 453
Confidential — Subject to further Confidentiality Review
321

 1   It is a different font or writing from the
 2   one who issued the production.
 3              Of course I'm not blaming you
 4   for that.  If I were to look at English, I
 5   wouldn't be able to distinguish who wrote
 6   what.
 7        Q.    A minute ago you said the
 8   answer:  "Definitely it was issued by a
 9   salesperson from the sales company, but there
10   was no name identified."
11              Do you remember testifying
12   under oath to that?
13              THE INTERPRETER:  Interpreter
14        needs to clarify.
15              (Translation.)
16        A.    There was no signature, which
17   means the person did not sign his name on it.
18   Let me explain what I meant one more time.
19              What I was trying to say is the
20   person who issued this sales plan
21   notification did not sign his name on it.
22   The signature on it is the signature of the
23   approving boss who approved the issuance of
24   the sales plan notification.  It is a
25   different person from the one who filled out

1    this sales plan notification.

2    BY MR. SERPE:

3         Q.     Yesterday you told me that Fu

4    Tinghuan was not involved in sales of

5    American-sized drywall.  Do you recall that

6    testimony?  And that, therefore, it was not

7    necessary to search his computer.

8         A.     At the time Mr. Fu Tinghuan was

9    a sales manager of Taishan Company.  Because

10   the sales plan notification would need a

11   boss' signature; therefore, he was only in

12   charge of signing it.  He was not involved in

13   any specific businesses.

14              This sales plan notification

15   was filled out by a salesperson, submitted to

16   the boss for signature as approval, and then

17   it would be issued downwards.

18        Q.     Done?

19        A.     Yes.

20        Q.     Between 2005 and 2007, did the

21   industrial park retain spray markings from

22   American-sized drywall?

23              MR. TAYLOR:  Objection to form.

24        A.     Regarding to spray marking, I

25   believe I have done ample explanation during

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/18 Page 345 of 453
Case 2:14-cv-02722-MCL Document 391-1 Entered on FLSD Docket 08/15/2014 Page 89 of 321
Confidential – Subject to Further Confidentiality Review

1    the prior question about spray marking

2    machines.  Can you be specific in your

3    question?

4    BY MR. SERPE:

5         Q.    Did any of the employees who

6    worked for Taishan in the industrial park

7    between 2005 and 2007 make it a practice to

8    retain copies of the spray markings that were

9    being put on American-sized drywall?

10             MR. TAYLOR:  Objection to form.

11        A.    Maybe I was not very clear on

12   my prior explanation.  Let me explain the

13   process one more time for you.

14             After our attached spray

15   marking was handed over to the spray marking

16   worker to be input, inputted, when the input

17   of the spray marking was completed, this

18   piece of paper would be trash and be thrown

19   away.  This sales plan notification would

20   also be thrown away after this batch of

21   production has finished its delivery.

22             I don't know whether or not my

23   explanation may be of help to you.

24   BY MR. SERPE:

25        Q.    Done?

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 346 of 453
Case 1:14-cv-22069-MGC Document 2841 Entered on FLSD Docket 08/15/2019 Page 290 of 321
Confidential - Subject to further confidentiality review

1     A.     Done.

2            (Deposition Exhibit PID-49

3     marked.)

4            MR. SERPE:  Bernard, there's

5     highlightings on the sets that have

6     been handed to you.  We have another

7     set for Helen.

8            MR. TAYLOR:  Yes.  Okay.

9            MR. SERPE:  The rest of these

10    sets are not highlighted.

11           MS. EIKHOFF:  Okay.

12           MR. SERPE:  Okay?

13    BY MR. SERPE:

14    Q.     Can you identify Exhibit PID-49

15    in front of you?

16    A.     Do you want me to read the

17    title on top of it?

18    Q.     Yes, please.

19    A.     Right here?  Quality Management

20    Policy.

21           MS. EIKHOFF:  Counsel, could I

22    just ask a clarifying question:  Is

23    this a composite of two documents or

24    is this just one?

25           MS. ROBERTSON:  That's correct.

1     As we got from the FTP site, the
2     Chinese was one file and the machine
3     translations yesterday were two files.
4     This does not include the machine, but
5     it is one document containing two --
6     the two manuals that were produced by
7     Taishan on Monday.
8          MS. EIKHOFF:  Thank you.
9  BY MR. SERPE:
10     Q.    Mr. Che, if you look where
11  we've put the yellow divider at page 143, is
12  this a different document?
13     A.    This is the management policy
14  for product marking usage.
15     Q.    Mr. Che, we received these
16  documents on Monday and have not had a chance
17  to do a thorough translation into English.
18  We would like you to --
19     A.    In fact -- I'm sorry.
20          MR. TAYLOR:  Wait for the
21     question.
22  BY MR. SERPE:
23     Q.    We would like to direct your
24  attention to pages where we have highlighted
25  Chinese characters and ask you to tell us

1    what they say so that the interpreter can

2    provide English translations for us.

3                 Will you turn to page 82.  What

4    is highlighted at the bottom of document

5    82 -- page 82?  I apologize.

6        A.     I didn't quite understand you

7    just now.  Did you want me to read it --

8        Q.     Yes, please.

9        A.     -- or did you want the

10   interpreter interpret it --

11       Q.     Good question.

12       A.     -- directly?

13       Q.     I would like you to read it so

14   the interpreter can interpret it.

15       A.     All right.  If it is not a

16   waste of your time.

17                 This document first revision

18   issuance date is March the 1st, 2008.  The

19   second revision issuance date is

20   October the 20th, 2009.  The third revision

21   issuance date is January the 20th, 2016.

22   Approved by Jia Tongchun.  Verified by Ren

23   Xulian.

24                 That's it.

25       Q.     Go to the second document that

1    begins on page 143.  And if you flip to the

2    next page, please read the characters so I

3    can ask the interpreter to interpret.

4         A.    This document's revision

5    issuance is as follows:  The first revision

6    issuance date is July the 15th, 2007.  The

7    second revision issuance date is

8    August the 1st, 2008.  The third revision

9    issuance date is September the 20th, 2009.

10   The fourth revision issuance date is January

11   the 10th, 2011.  The fifth revision issuance

12   date is May the 1st, 2013.  The sixth

13   issuance --

14              THE INTERPRETER:  Interpreter

15        start over again.

16        A.    The sixth revision issuance

17   date is August the 10th, 2014.  Approved by

18   Ren Xulian.  Verified by Wang Ruikun.

19              MR. SERPE:  Bernard, we're at

20        an hour, and I'm sensitive to not

21        plunging into another area that's

22        going to hang us up.

23              MR. TAYLOR:  How are we doing

24        on getting ready?

25              MR. SERPE:  I can tell you that

Confidential - Subject to further confidentiality Review

```
 1          when we get back.

 2                  MR. TAYLOR:  All right.

 3                  THE VIDEOGRAPHER:  We're now

 4          going off the video record.  The time

 5          is currently 1:23 p.m.  This is the

 6          end of Media No. 4.

 7                  (Recess taken, 1:23 p.m. to

 8          1:38 p.m.)

 9                  THE VIDEOGRAPHER:  We are now

10          back on the video record with the

11          beginning of Media No. 5.  The time is

12          currently 1:38 p.m.

13                  (Deposition Exhibit PID-6

14          marked.)

15  BY MR. SERPE:

16          Q.      I hand you Exhibit PID-6.

17  Mr. Che, will you identify what PID-6 is?

18          A.      Taishan Gypsum Company, Limited

19  Manufacturer Profile Form.

20          Q.      Please look at Section III,

21  number 2.  I believe it's on page 0009 in

22  Chinese --

23                  MR. TAYLOR:  And 3.

24  BY MR. SERPE:

25          Q.      -- and page 3 in English.
```

1     Please tell us the amount of

2   drywall exported by Taishan Gypsum that was

3   identified in this document.

4        A.     Reflected from the document, it

5   was 100,000 sheets and 53,912 sheets,

6   according to the document.

7        Q.     Thank you, sir.

8               (Deposition Exhibit PID-8

9        marked.)

10  BY MR. SERPE:

11       Q.     Please identify PID-8 for me.

12  What is this document?

13       A.     This is an e-mail and a

14  statistic form.

15       Q.     Mr. Che, going back to

16  Exhibit 48, the notice of deposition, items 5

17  and 6 -- take your time, please.

18              MR. TAYLOR:  Mr. Che, take

19        mine.

20  BY MR. SERPE:

21       Q.     Items 5 and 6.

22       A.     I see that.

23       Q.     The U.S. attorneys specifically

24  identified this document as part of the

25  notice of deposition to make an inquiry of

```
 1    the corporate representative.

 2                You're aware of that?

 3         A.      I'm aware of that.

 4         Q.      Mr. Peng sent this e-mail in

 5    June of 2010; is that correct?

 6         A.      The document says the e-mail

 7    was sent on June the 27th, 2010.

 8         Q.      And who did he send the e-mail

 9    to?

10         A.      It says to Chief Jian Zhang?

11                MR. SERPE:  A question for the

12         interpreter.  How should I refer to

13         Chief Jian?  Will that be adequate to

14         identify the person the e-mail was

15         sent to for your -- if I say that,

16         will you know who I'm talking about?

17                THE INTERPRETER:  The

18         interpreter would understand, yes.

19                MR. SERPE:  I want to refer to

20         the recipient of the e-mail, Chief

21         J-I-A-N Z-H-A-N-G.  How can I do that

22         without spelling?

23                THE INTERPRETER:  The

24         interpreter?

25                MR. SERPE:  Uh-huh.
```

Confidential – Subject to Further Confidentiality Review

```
 1              THE INTERPRETER:  You just
 2       pronounce the way that you usually
 3       pronounce.
 4              MR. SERPE:  Okay.
 5   BY MR. SERPE:
 6       Q.     Am I correct that Chief Jian
 7   Zhang worked for CNBM?
 8       A.     While I was preparing for the
 9   witness testimony for the deposition
10   representing Taishan, I reviewed Mr. Peng,
11   Chief Peng's deposition record.  In
12   Mr. Peng's deposition record, he claims that
13   from the suffix of the e-mail, he could tell
14   that it is CNBM.
15       Q.     If you turn to the attachment
16   to the e-mail, TG-0129675 -- the English
17   version is the fourth page of the exhibit --
18   would you read for me the title of this
19   attachment, what it says across the top in
20   bold characters.
21       A.     Statement on the Data and
22   Statistics of Exports to the U.S. from 2005
23   to 2007.
24       Q.     Why do you use the phrase
25   "American-sized drywall" while Mr. Peng used
```

```
 1       the phrase "exports to the United States"?

 2                  MR. TAYLOR:  Objection to form.

 3                  THE WITNESS:  Do I need to

 4            answer it?

 5                  MR. TAYLOR:  Shi de.

 6            A.      The reason why I used

 7       "American-sized gypsum board" is because the

 8       gypsum board of this kind of size is

 9       generally used in American and the other

10       country generally do not use this size of

11       gypsum boards.  That's our understanding.

12       BY MR. SERPE:

13            Q.      If you look -- I'm sorry, I

14       didn't realize you weren't done.

15            A.      The reason Mr. Peng wrote it

16       that way -- while preparing for the witness

17       testimony for the deposition representing

18       Taishan, I have read Mr. Peng's deposition

19       record, and on the record there should be a

20       remark or explanation in this regard.

21            Q.      Are you done?

22                  If you look at the bottom of

23       the next page, it's got the date of June 27,

24       2010; is that correct?

25            A.      That's what the document says.
```

Confidential - Subject to Further Confidentiality Review

1    Q.    That's the same date as the

2    cover e-mail from Mr. Peng.

3            MR. TAYLOR:  Just to clarify --

4            MR. SERPE:  English is the

5        third page.

6            MR. TAYLOR:  Yeah, got it.

7            MR. SERPE:  Chinese is two

8        pages.  He's looking at the Chinese.

9            MR. TAYLOR:  I just wanted to

10        make sure we said that.  Okay.

11   BY MR. SERPE:

12    Q.    The cover e-mail from Mr. Peng

13   to Chief Jian Zhang was also June 27th, 2010.

14   You see that?

15    A.    I see that.

16    Q.    In this June 27th, 2010

17   document, Mr. Peng wrote in the first

18   paragraph that the total volume exported to

19   the United States was 7,292,804.536 square

20   meters.

21            Did I read that correctly?

22    A.    I see that.

23    Q.    What records did Mr. Peng use

24   to calculate the total volume of exports to

25   the United States in this document that he

```
 1    wrote on June 27th, 2010?
 2        A.    While I was preparing for my
 3    deposition as a witness representing Taishan,
 4    I did review this document.  Now, Mr. Peng
 5    also does not remember.
 6              THE WITNESS:  What was his
 7        question?
 8    BY MR. SERPE:
 9        Q.    What documents did Mr. Peng use
10    in order to write the memorandum June 27th,
11    2010 marked as Peng 801-1?
12              MR. TAYLOR:  I think the
13        question was to come up with the
14        amount of --
15              MR. SERPE:  The total volume,
16        yes.
17        A.    Currently, Mr. Peng also does
18    not have a clear recollection on this
19    situation at that time, but by looking at
20    this document, the -- he used the attached
21    chart after this document to come up with the
22    statement in the front.
23              (Deposition Exhibit PID-30
24        marked.)
25              ///
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 357 of 453
Case 1:14-cv-08445-CM Document 304-1 Entered on FLSD Docket 08/15/2019 Page 301 of 321
Confidential - Subject to Further Confidentiality Review

```
 1     BY MR. SERPE:

 2          Q.     I hand you Exhibit 30.

 3                 MR. SERPE:  Counsel, for the

 4          record, this manual translation was

 5          provided by Alston & Bird to us as

 6          part of the sanctions order on the

 7          Peng computer.

 8                 MS. EIKHOFF:  Is it a

 9          translation of the same document?

10                 MR. SERPE:  No.

11                 MS. EIKHOFF:  Okay.

12     BY MR. SERPE:

13          Q.     Mr. Che, could you identify for

14     us what PID-30 is?

15          A.     Do you need me to read what's

16     on it?

17          Q.     Start by reading the characters

18     that are in bold at the top of the document.

19          A.     The Explanation of Statistics

20     of 2005 to 2007 Exports to the United States.

21          Q.     Is that the identical title to

22     the last exhibit you were looking at,

23     Exhibit 8?

24          A.     Yes.

25          Q.     If you look at the second page,
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 358 of 453
Case 1:14-cv-22848-MGC Document 241 Entered on FLSD Docket 08/15/2019 Page 302 of 321
Confidential - Subject to further Confidentiality Review

1   will you tell me what date is on this version

2   of the document?

3        A.     The date reflected at the

4   bottom of the document is October the 20th,

5   2010.

6        Q.     From Exhibit 30, am I reading

7   correctly that the exports to the United

8   States during 2005 to 2007 totaled up to

9   8,237,661.6596 square meters?

10            (Pause.)

11  BY MR. SERPE:

12       Q.     Did I read that correctly?

13       A.     I'm sorry, I thought you had a

14  question for me.

15            MR. SERPE:  Mike, can you read

16  the question back?

17            (The following portion of the

18       record was read.)

19            "QUESTION:  From Exhibit 30, am

20       I reading correctly that the exports

21       to the United States during 2005 to

22       2007 totaled up to 8,237,661.6596

23       square meters?

24            "Did I read that correctly?"

25            (End of readback.)

```
 1        A.      That's what's reflected on the

 2   document.

 3   BY MR. SERPE:

 4        Q.      Between the original version of

 5   this document on June 27th, 2010 and the

 6   updated version of the document on

 7   October 20th, 2010, Taishan was reporting

 8   a million more square meters of drywall

 9   exported to the United States; isn't that

10   correct?

11              MR. TAYLOR:  Objection to form.

12        A.      It is actually 944,857.1801

13   meters more.

14   BY MR. SERPE:

15        Q.      What documents did Mr. Peng use

16   between June of 2010 and October of 2010 to

17   increase his statement on exports to the

18   United States by 944,857.1801 square meters?

19        A.      The added number should be the

20   number that -- for the purpose of processing

21   for Tai Gao Company.

22        Q.      Who is Tai Gao Company?

23        A.      I believe it's a trading

24   company.

25        Q.      What processing did Taishan do
```

Confidential - Subject to Further Confidentiality Review

1  for Tai Gao Company?

2       A.      To analyze from the document, I

3  believe we have manufactured American-sized

4  gypsum board for it.

5       Q.      Why would that not have been in

6  the earlier June version of the memo?

7       A.      I did not find an answer to it

8  while I was preparing my witness testimony

9  for the deposition representing Taishan, and

10  while I searched --

11            THE INTERPRETER:  Interpreter

12       correction.

13       A.      -- while I reviewed Mr. Peng's

14  deposition record?

15  BY MR. SERPE:

16       Q.      So in all of your diligent

17  preparation and all of the documents you

18  reviewed and reading Mr. Peng's deposition

19  and everything you did to prepare, you have

20  no idea where an additional million square

21  meters of drywall came from between these two

22  versions of the document.

23            MR. TAYLOR:  Objection.

24       Objection to form.

25       A.      I did not find relevant

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 361 of 453
Case 1:11-cv-22408-MGC Document 204-1 Entered on FLSD Docket 08/15/2013 Page 305 of
321
Confidential - Subject to Further Confidentiality Review

1    records.   To analyze only from the document

2    itself, the number comes up with is the

3    number of Tai Gao companies.   Because if you

4    deduct this number, you will have the number

5    equal to the prior number.

6    BY MR. SERPE:

7        Q.    What do you base the number of

8    square meters of drywall that were processed

9    by Tai Gao upon?

10       A.    That's what is mentioned in the

11   document, the document of PID-30.

12       Q.    Will you show me where in

13   PID-30 it says that Tai Gao manufactured

14   944,857.1801 square meters.

15       A.    Can you see that?

16       Q.    What number on the bottom of

17   the page?

18       A.    705.

19       Q.    Mr. Che, I'm looking at the

20   area you pointed us to, and just before

21   Tai Gao, it says it was processed by the

22   Weifang Aotai factory.   Do you see that?

23       A.    I see that.

24       Q.    Taishan does not own Weifang

25   Aotai factory, does it?

```
 1          A.      Taishan should be Weifang Aotai

 2    shareholder, but I'm not sure about the

 3    specific structure.  But from the document,

 4    it was TTP who entrusted Weifang Aotai to

 5    have produced 944,000 --

 6                  THE INTERPRETER:  Interpreter

 7          correction.

 8          A.      -- 920,000 square meters.

 9                  MR. SERPE:  Counsel, we want to

10          make a request.  In Exhibit 30,

11          first -- second line:  Refer to

12          attached table for details?

13                  MR. TAYLOR:  Uh-huh.

14                  MR. SERPE:  In the document

15          that was provided to us, there were no

16          attached tables.  The next sequential

17          number in the Bates sequence is a

18          different document.

19                  MR. TAYLOR:  Which page are you

20          referring to?

21                  MR. SERPE:  If you look at the

22          very first page of 30.

23                  MR. TAYLOR:  Yeah.

24                  MR. SERPE:  Right at the top,

25          the first paragraph:  Based on the
```

```
 1          recorded statistics, the exports to

 2          the United States during 2005 to 2007

 3          totaled --

 4              MR. TAYLOR:  Okay.

 5              MR. SERPE:  Then it says:

 6          Refer to attached table for details.

 7          We didn't -- there was no attached

 8          table.

 9              MS. EIKHOFF:  We'll look into

10          it.

11              MR. SERPE:  Thank you.

12  BY MR. SERPE:

13      Q.    Other than Weifang Aotai, what

14  other factories that were not owned by

15  Taishan were used to produce American-sized

16  drywall?

17              THE WITNESS:  Reinterpret it.

18              THE INTERPRETER:  The

19          interpreter will repeat the

20          interpretation.

21              (Translation.)

22      A.    I think your question is a

23  little bit vague.  Are you talking about all

24  manufacturers who had ever produced

25  American-sized drywall?
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 364 of 453
Case 2:14-cv-02408-CAC-DEK Document 2041 Entered on FLSD Docket 08/15/2015 Page 338 of
321

1    BY MR. SERPE:

2        Q.    Exhibit 30 is calculating the

3    amount of drywall exported to the United

4    States between 2005 and 2007 by Taishan

5    Gypsum Company, not other drywall

6    manufacturers who ever produced

7    American-sized drywall; am I correct?

8                MR. TAYLOR:  Objection to form.

9        A.    From the document it is a

10    statistics explanation made by Taishan Gypsum

11    Board Company.  It is a statistic explanation

12    of Taishan Company based on its self-operated

13    exporting as well as indirect exporting.

14                (Deposition Exhibit PID-40

15        marked.)

16    BY MR. SERPE:

17        Q.    Mr. Che, will you look at

18    Exhibit 40 and tell me after you've had a

19    chance to read it over.

20        A.    I see that.

21        Q.    Please confirm for me that

22    Taishan collaborated with Weifang Aotai to

23    produce American-sized gypsum board in 2006.

24        A.    This is a notification that

25    Taian Taishan Plasterboard Company, Limited

1    entrusted Weifang Aotai Gypsum Company to

2    process gypsum board.  That's what is

3    reflected from the document, but there are

4    neither stamps nor signatures on it.

5         Q.    Do you recognize Exhibit 40 as

6    a document that came from Taishan's records?

7              MR. TAYLOR:  Counsel, just to

8         preserve the record, we have an

9         objection in regards to scope, and

10        we'll decide whether we have to deal

11        with it later.  It's in regards to

12        PID-30 and PID-40.  But you can

13        proceed.

14             MR. SERPE:  Can we read the

15        question back?

16             (Translation.)

17             MR. TAYLOR:  And because this

18        was an objection, Sunny, would you

19        translate that also?

20             MS. ROBERTSON:  She just did.

21             MS. EIKHOFF:  She just did.

22             MR. TAYLOR:  Oh, did she?

23        Okay.

24             MR. SERPE:  Sunny, he's

25        wondering what just happened.  Would

```
1          you explain that?
2                  MR. TAYLOR:  Yeah, she said she
3          translated my objection.
4                  MR. SERPE:  I know, but he
5          heard us talking, and now he's
6          concerned about what it is we're
7          saying now.  So would you reassure him
8          that we're all set.
9                  (Translation.)
10                 THE WITNESS:  You just said
11         half of it.
12                 THE INTERPRETER:  The
13         interpreter said it in its complete
14         form.  She did not say it in half.
15                 MR. SERPE:  Do you -- I'm
16         sorry.
17                 THE INTERPRETER:  Just to make
18         sure the record is clear.
19   BY MR. SERPE:
20         Q.    Do you recognize Exhibit 40 as
21   a document that came from Taishan's business
22   records?
23         A.    I do not know.  Because there's
24   no signature nor stamp on this document;
25   therefore, I cannot be sure of it.
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 367 of 453
Case 2:09-cv-02068-MCE-Document 2984-1 Entered-on FLSD Docket-08/15/2013 Page 331 of 321
Confidential - Subject to Further Confidentiality Review

 1          Q.      Let me ask you about one detail

 2    in the document and see if this is the sort

 3    of information that Taishan used as part of

 4    its sales notifications.

 5                  MR. TAYLOR:  Which document,

 6         Counsel?

 7                  MR. SERPE:  40, on the first

 8         page.

 9    BY MR. SERPE:

10          Q.      If you look under Section 1,

11    Specifications, did the spray codes include

12    the date of manufacture and the work shift as

13    part of standard markings for Taishan in

14    2006?

15                  THE INTERPRETER:  Interpreter

16         needs clarification from counsel.

17                  When counsel said "work shift,"

18         did counsel mean work shift of the

19         production?

20                  MR. SERPE:  For the

21         interpreter, I'm reading the word on

22         PID-40, third line down near the end.

23         Here, "work shift."

24                  THE INTERPRETER:  The

25         interpreter will reinterpret it using

1          the Chinese characters for -- on the

2          document for the word "work shift."

3                    MR. SERPE:  Thank you.

4                    THE INTERPRETER:  You're

5          welcome.

6                    (Translation.)

7                    MR. TAYLOR:  Unfortunately, I

8          had an objection to form that I

9          couldn't get in because of the

10         translation.

11                   MR. SERPE:  Stipulated.  Yeah.

12         A.       The document says:

13    Specifications: 3660 by 1220 by 12.7mm

14    regular drywall; the design of the edge

15    sealing tape will be provided by party A; the

16    ink-jetted code; the date of manufacture and

17    the work shift; the quantity: 924,287.4696

18    square meters.

19                   However, that's merely

20    reflected from the document.  There's no

21    signature, no stamp on it; therefore,

22    currently I cannot confirm whether or not it

23    was eventually executed.

24                   MR. TAYLOR:  Counsel, it's now

25         2:35.

 1             MR. SERPE:  I'm going to stick

 2        to my commitment.

 3             MR. TAYLOR:  Because he's

 4        got --

 5             MR. SERPE:  Cut myself off in

 6        midsentence at 2:45.

 7             MR. TAYLOR:  I understand what

 8        you're saying.  He just has to run

 9        across the street in that time.

10   BY MR. SERPE:

11        Q.    What efforts did Taishan make

12   to determine whether the Weifang Aotai

13   factory continues to have records of any

14   drywall manufactured collaboratively with

15   Taishan between 2005 and 2007?

16             THE WITNESS:  Reinterpret that.

17             THE INTERPRETER:  The

18        interpreter will repeat her

19        interpretation.

20             (Translation.)

21             MR. TAYLOR:  Counsel -- was the

22        interpreter finished?  Okay.

23             Counsel, continue our objection

24        in regards to scope on this line of

25        questioning.

1          A.       From my preparation for the

2    witness testimony of the deposition

3    representing Taishan, I reviewed the

4    deposition record of Mr. Peng and

5    Chairman Jia from which I learned that

6    Taishan did require Taishan's employees to

7    keep all the documents and material which

8    including American-sized gypsum board related

9    to American lawsuit.

10                (Deposition Exhibit PID-39

11        marked.)

12                (Deposition Exhibit PID-38

13        marked.)

14    BY MR. SERPE:

15        Q.     I'm going to hand you

16    Exhibit 39 and Exhibit 38.  Mr. Che,

17    Exhibit 38 too.

18                MR. SERPE:  Counsel, I'll

19        represent these were also Alston &

20        Bird translations pursuant to the

21        sanctions order.

22                MS. EIKHOFF:  I just want to

23        clarify they were not translations

24        actually performed by Alston & Bird

25        but on behalf of Alston & Bird by a

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/19/19 Page 371 of 453
Case 2:12-cv-02084-MCE-DB Document 294-1 Filed 06/15/2015 Page 315 of 321
Confidential - Subject to Further Confidentiality Review

1          third-party vendor.

2                    MR. SERPE:  Agreed.

3                    MS. EIKHOFF:  And I should say

4          on behalf of Alston & Bird on behalf

5          of Taishan.

6                    MR. SERPE:  Right.

7    BY MR. SERPE:

8          Q.      Mr. Che, starting with

9    Exhibit 39, am I correct that in April of

10   2006, TTP asked TG to produce drywall and

11   stamp "Made in China, Meet or Exceed

12   ASTM C1396-04 Standard"?

13         A.      Which one you want me to look

14   at?

15         Q.      Exhibit 39.

16                  THE WITNESS:  Sorry, can you

17         reinterpret?

18                  THE INTERPRETER:  The

19         interpreter will repeat.

20                  (Translation.)

21         A.      From the face of the document

22   it says that Taian City, Taian Plasterboard

23   Company, Limited entrusted Shandong Taihe

24   Dongxin Company, Limited to process gypsum

25   board in April.

```
 1              However, since the same problem

 2   exists, which is it carries no stamp nor

 3   signatures, therefore, I also cannot be sure

 4   that this was eventually executed or the

 5   actual operation was derived from it.

 6              MR. SERPE:  Let's go off the

 7        record.

 8              THE VIDEOGRAPHER:  We are now

 9        going off the video record.  The time

10        is currently 2:44 p.m.

11              (Proceedings recessed at

12        2:44 p.m.)

13              (In discussion off the record,

14        all parties agreed that the witness

15        would read and sign the deposition

16        transcript.)

17                     --o0o--

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE
 2              I, MICHAEL E. MILLER, Fellow of
      the Academy of Professional Reporters,
 3    Registered Diplomate Reporter, Certified
      Realtime Reporter, Certified Court Reporter
 4    and Notary Public, do hereby certify that
      prior to the commencement of the examination,
 5    GANG CHE was duly sworn by me to testify to
      the truth, the whole truth and nothing but
 6    the truth.
 7              I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
                I DO FURTHER CERTIFY that pursuant
11    to FRCP Rule 30, signature of the witness was
      requested by the witness or other party
12    before the conclusion of the deposition.
13              I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17
18    _____
      MICHAEL E. MILLER, FAPR, RDR, CRR
19    Fellow of the Academy of Professional Reporters
      NCRA Registered Diplomate Reporter
20    NCRA Certified Realtime Reporter
      Certified Court Reporter
21
      Notary Public
22    My Commission Expires:  7/9/2020
23    Dated: January 24, 2019
24
25
```

```
 1                INSTRUCTIONS TO WITNESS

 2

 3                Please read your deposition over

 4     carefully and make any necessary corrections.

 5     You should state the reason in the

 6     appropriate space on the errata sheet for any

 7     corrections that are made.

 8                After doing so, please sign the

 9     errata sheet and date it.

10                You are signing same subject to

11     the changes you have noted on the errata

12     sheet, which will be attached to your

13     deposition.

14                It is imperative that you return

15     the original errata sheet to the deposing

16     attorney within thirty (30) days of receipt

17     of the deposition transcript by you.  If you

18     fail to do so, the deposition transcript may

19     be deemed to be accurate and may be used in

20     court.

21

22

23

24

25
```

Confidential - Subject to further confidentiality Review

```
 1                    ERRATA

 2   PAGE   LINE   CHANGE

 3   _____  _____  _____

 4          REASON: _____

 5   _____  _____  _____

 6          REASON: _____

 7   _____  _____  _____

 8          REASON: _____

 9   _____  _____  _____

10          REASON: _____

11   _____  _____  _____

12          REASON: _____

13   _____  _____  _____

14          REASON: _____

15   _____  _____  _____

16          REASON: _____

17   _____  _____  _____

18          REASON: _____

19   _____  _____  _____

20          REASON: _____

21   _____  _____  _____

22          REASON: _____

23   _____  _____  _____

24          REASON: _____

25            ACKNOWLEDGMENT OF DEPONENT
```

```
 1

 2

 3          I, GANG CHE, do hereby certify
      that I have read the foregoing pages and that
 4    the same is a correct transcription of the
      answers given by me to the questions therein
 5    propounded, except for the corrections or
      changes in form or substance, if any, noted
 6    in the attached
      Errata Sheet.

 7

 8

 9

10

11    _____
       GANG CHE                                    DATE
12

13

14    Subscribed and sworn to before me this

15    _____ day of _____, 20 _____.

16    My commission expires: _____

17

18    _____

19    Notary Public

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2

 3     PAGE      LINE

 4     _____     _____      _____

 5     _____     _____      _____

 6     _____     _____      _____

 7     _____     _____      _____

 8     _____     _____      _____

 9     _____     _____      _____

10     _____     _____      _____

11     _____     _____      _____

12     _____     _____      _____

13     _____     _____      _____

14     _____     _____      _____

15     _____     _____      _____

16     _____     _____      _____

17     _____     _____      _____

18     _____     _____      _____

19     _____     _____      _____

20     _____     _____      _____

21     _____     _____      _____

22     _____     _____      _____

23     _____     _____      _____

24     _____     _____      _____

25
```

# EXHIBIT

# "J"

Case 2:09-md-02047-EEF-MBN Document 22263-66 Filed 11/19/19 Page 379 of 453
Case 2:09-cv-02049-MLCF Document 284 Entered on FLSD Docket 08/13/2019 Page 23 of 67
Confidential - Subject to Further Confidentiality Review

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
 2

 3                                      MDL NUMBER: 2047
                                        SECTION L
 4                                      JUDGE FALLON
                                        MAG JUDGE WILKINSON
 5

 6   IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS
     LIABILITY LITIGATION
 7

 8
     THIS DOCUMENT APPLIES TO ALL
 9   CASES

10   PLAINTIFF: BRENDA OWENS

11

12    CONFIDENTIAL - SUBJECT TO FURTHER CONFIDENTIALITY
                            REVIEW
13

14

15              REALTIME DEPOSITION OF
                  J. VANCE BRINKERHOFF
16

17

                 Monday, January 14th, 2019
18               6:31 p.m. - 7:34 p.m.

19

20           COLDWELL BANKER PARADISE
                   U.S. Highway
21           Vero Beach, Florida 32960

22

23          Stenographically Reported By:
               MaryKay Kline, RPR, CRR
24          Certified Realtime Reporter

25
```

```
 1   APPEARANCES:

 2

 3   On behalf of Plaintiff Brenda Owens:

 4        BARON & BUDD, P.C.
          3102 Oak Lawn Avenue

 5        Suite 1100
          Dallas, Texas 75219

 6        (214)521-3605
          BY:  HOLLY WERKEMA, ESQ.

 7        (appearing via telephone)
          LEVIN, SEDRAN & BERMAN

 8        510 Walnut Street, Suite 500
          Philadelphia, Pennsylvania 19106

 9        (215)592-1500
           BY:  KEITH J. VERRIER, ESQ.

10

11

12   On behalf of Defendant CNBM and BNBM:

13        ORRICK, HERRINGTON & SUTCLIFFE, LLP
          Columbia Center

14        1152 15th Street, N.W.
          Washington, D.C. 20005

15        (202)339-8533
          BY:  DIANA S. FASSBENDER, ESQ.

16        (appearing via telephone)

17

18

19   On behalf of Defendant PSC:

20        GORDON ARATA MONTGOMERY BARNETT,
          L.L.P.

21        201 St. Charles Avenue
          40th Floor

22        New Orleans, LA 70170-4000
          (504)582-1111

23        BY:  ALEX ROTHENBERG, ESQ.
          (appearing via telephone)

24

25
```

```
 1

 2      On behalf of Defendant Taishan Gypsum:

 3          ALSTON & BIRD

            One Atlantic Center

 4          1201 West Peachtree Street

            Suite 4900

 5          Atlanta, Georgia 30309

            (404)888-7000

 6          BY:  MICHAEL J. BARRY, ESQ.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X
 2
 3  Proceedings                              Page
 4  Direct            By Mr. Barry              5
    Cross             By Mr. Verrier           42
 5  Redirect          By Mr. Barry            61
 6  Stipulations                              64
    Certificate of Oath                       65
 7  Certificate of Reporter                   66
 8
 9                  E X H I B I T S
10  No.                                      Page
```

```
11    1   MLS #117881 for 4590 Kodiak Dr., Vero    24
          Beach, 32967 for $550,000
12
      2   Status Report - Coldwell Banker Ed       24
13        Schlitt LC for Indian River MLS#154259
14    3   Status Report - Coldwell Banker Ed       24
          Schlitt LC for Property address 4590
15        Kodiak Drive, Vero Beach, FL 32967
16    4   Status Report - Coldwell Banker Ed       24
          Schlitt LC property address 4590
17        Kodiak Drive, Vero Beach, Fl 32967
18    5   Email string ending with 12/29/2018      30
          email from: Deborah Lalwani to: Holly
19        Werkema, subject: Fw: FW:, attachment:
          Estimate.pdf
20
      6   Email string ending with 12/29/2018      48
21        email from: Deborah Lalwani to: Holly
          Werkema, subject: Fw: Chinese Drywall
22
      7   Document titled Findings of Fact &       49
23        Conclusions of Law In re: Chinese
          Manufactured Drywall Products
24        Liability Litigation, MDL No. 2047,
          Section: L, Judge Fallon
25
```

```
 1    Thereupon,

 2    the following proceedings began at 6:31 p.m.:

 3              THE COURT REPORTER:  Would you raise your

 4         right hand?

 5              Do you swear or affirm that the testimony

 6         you're about to give is true and accurate to

 7         the best of your ability?

 8              THE WITNESS:  To the best of my ability I

 9         do.  Yes.

10    Thereupon:

11                    J. VANCE BRINKERHOFF

12    having been first duly sworn, was examined and

13    testified as follows:

14                    DIRECT EXAMINATION

15      BY MR. BARRY

16         Q.  Mr. Brinkerhoff, we met a little bit

17    before.  I represent Taishan Gypsum.

18              MR. BARRY:  Just, since not everyone's in

19         the room, if we can go around and introduce

20         ourselves, starting with the folks on the

21         phone.

22              MS. FASSBENDER:  This is Diana Szego

23         Fassbender.  I'm on behalf of the CNBM and

24         BNBM.

25              MR. ROTHENBERG:  Alex Rothenberg, Gordon
```

Confidential - Subject to Further Confidentiality Review

```
1         Arata, on behalf of PSC.

2             MS. WERKEMA:  Holly Werkema with Barron

3         and Budd, PC, on behalf of the plaintiff,

4         Brenda Owens.

5             MR. VERRIER:  Keith Verrier on behalf of

6         the plaintiffs.

7    BY MR. BARRY

8         Q.   Now, Mr. Brinkerhoff, I am going to ask

9    you only a couple questions.  We're not going to

10   talk -- take too much time out of your day.

11   Appreciate you doing this.  I know we're digging

12   back into your memory and talking a little bit about

13   something that happened many years ago, that you've

14   sold many homes since then, and this is probably one

15   of many.

16            So I'm going to walk you through kind of

17   the ground rules how we're going to do this.  And

18   the important point of what I'm saying there is, I

19   know it will blur together with a lot of different

20   houses.  Big part of this is trying to understand

21   what you know.

22        A.   I'm pretty good.

23        Q.   I -- I'm sure you are.

24            But part of this is understanding what you

25   know.
```

Case 2:09-md-02047-EEF-MBN   Document 22263-66   Filed 11/19/19   Page 385 of 453
Case 2:14-cv-02722-MLCF   Document 224-4   Filed 08/15/18   Page 35 of 67
Confidential - Subject to Further Confidentiality Review

```
 1              So if you don't know something, saying "I
 2   don't know" is perfectly just as fine as anything
 3   else.
 4       A.   Okay.
 5       Q.   When I ask you a question, I'm going to
 6   ask you a question, I'm going to try to finish it
 7   completely and clearly.  I ask that you wait until I
 8   finish it before answering.
 9              It's not like a normal conversation.
10   We've got to make sure that our court reporter here
11   can get everything down.  And if I'm talking when
12   you're talking, and you're talking when I'm talking,
13   she can't get it down.  If I interrupt you, tell me
14   to stop.  If anything -- if I interrupt you -- if
15   you interrupt me, I'm probably going to make a
16   mention of it, but please don't take it with any
17   offense.  It's only for her.
18              The other part of that, too, is that every
19   once in a while, Counsel injects an objection, you
20   may want to wait until they're answered -- until
21   they're objected to.  For the most part, you'll be
22   able to answer immediately afterwards.
23              The last thing I will say on that note is
24   you are going to sometimes want to nod yes and no
25   like you are right now to questions.  When you are
```

Case 2:09-md-02047-EEF-MBN Document 22263-66 Filed 11/19/19 Page 386 of 453
Case 2:14-cv-02046-EEF-MBN Document 94 Entered on FLSD Docket 13/2019 Page 53 of 67
Confidential - Subject to Further Confidentiality Review

```
 1    answering the question, make sure you answer audibly
 2    so that we can get it written down.  She's not going
 3    to write down nodding her head yeah -- nodding his
 4    head yes.
 5              We're going to be short.  I don't know if
 6    you need breaks.  Also, if I ask an unclear
 7    question, don't hesitate to ask me to rephrase it
 8    because it may just be something I thought right in
 9    my head, it just doesn't sound right.
10              Mr. Brinkerhoff, have you ever sat for a
11    deposition before?
12        A.   I -- we were just discussing that,
13    actually.  There was -- this was what it was about.
14        Q.   What -- what was it about?
15        A.   Well, one of my customers found a -- one
16    of America's largest treasure ships ever.  It's
17    called the U.S.S. Central America, "Ship of Gold,"
18    and I went and retrieved this so I could share it
19    with you guys.
20              And, actually, he found -- anyway, so it's
21    well documented, and here was -- that's what it
22    looks like on the bottom of the ocean floor.
23        Q.   Wow.
24        A.   It was a ship that sunk in 1857, was
25    coming from the San Francisco Mint around to the
```

Confidential - Subject to Further Confidentiality Review

1     New York marketplace and sunk in a hurricane.

2              Anyway, the man who found it was Tommy

3     Thompson, and I rented him a house for eight years.

4         Q.   Oh, that's too funny.

5         A.   And there was a civil case that was

6     involved, and the judge put a warrant out for his

7     arrest, and I found out about it, and since I was

8     renting him the house, and -- and basically had the

9     utilities in my name, so nobody would call, I called

10    and turned him in.

11             Because I was concerned about aiding and

12    abetting.

13        Q.   Right, right, right.

14        A.   And I clearly knew who he was and his

15    background, so it didn't take long to get a lot of

16    people very interested in it, and I did have to do a

17    deposition there for that.

18        Q.   I think there's -- talking about a ship of

19    gold being found, I think there's a plaintiff's

20    lawyer joke in there, but I'll refrain for a minute.

21        A.   Okay.

22        Q.   But how long ago was that?

23        A.   I'd say it was about 2012, is what I'm

24    going to tell you.

25        Q.   Well, I will tell you, this is probably

1   going to be a lot less interesting than that one.

2          A.   Yeah.

3          Q.   That sounds a lot more fascinating than

4   the one I've got.

5          A.   You'll know about it forever more now.

6          Q.   I know I'm going to look it up after this.

7          A.   You'll be watching TV, you will find it

8   fascinating.

9          Q.   That is significantly more fascinating

10  than what we're going to be talking about here

11  today.

12         A.   That's a good thing.

13         Q.   Have you ever been a party to a lawsuit

14  before?

15         A.   Well, let's see.  I mean, I've been

16  involved with, like, short sales.

17         Q.   Yes.

18         A.   Okay.

19         Q.   Have you ever been a plaintiff or a

20  defendant where you are -- you know, someone's suing

21  you or you're suing someone?

22         A.   Well, let's see.

23              So I just have to explain it.  I -- the --

24  it's kind of a long story, always, but the bank was

25  going to foreclose on the property and wasn't

Confidential - Subject to Further Confidentiality Review

```
 1    allowed to because they didn't have their paperwork

 2    right.

 3            And so the owner of the property had moved

 4    out, and the bank moved in to take care of the

 5    property.  Well, once they didn't have their

 6    paperwork in order and was -- the court -- was

 7    thrown out of court, all of a sudden, the bank

 8    stopped taking care of the property and the owner

 9    didn't know what was going on.

10            So I was contacted if I was interested in

11    buying it on a quitclaim deed, going in and fixing

12    up the property, which is what I did, and then

13    rented the property for a number of years while I

14    was actually trying to get the bank to sell it to me

15    on a short sale.

16            Which, ultimately, they did and currently

17    I own the property.

18            So I don't know if that's really, like,

19    a --

20       Q.   No.

21       A.   -- lawsuit or anything.

22       Q.   That's not -- was there any other kind of

23    cases other than that?  Have you ever been a

24    plaintiff as having someone sued you, have you ever

25    been a class action plaintiff?  I mean, you know,
```

1    you've received those things in the mail.

2         A.   No.

3         Q.   Not that, because your name would be on

4    the lawsuit.

5         A.   Not, it's -- silly things happened.

6              I sat in the courtroom once because I -- I

7    advertised that a warranty was included with a

8    transaction of a home, and the agent for the buyer

9    didn't negotiate at a lower price but didn't include

10   the warranty in the transaction so I put it off to

11   the side.

12             We closed, the air conditioner broke down,

13   and she sued me for not getting her warranty, and it

14   was thrown out.  So it was just thrown out.  It was

15   kind of silly, nothing dramatic.  Nothing very

16   interesting.

17             This really isn't a lawsuit either, so...

18        Q.   Now, you -- you have -- having been a part

19   of a deposition before, you do understand that you

20   are testifying under oath as if you are in court

21   with the judge sitting right next to you?

22        A.   Right.  Right.

23        Q.   Are you on any medications that might

24   affect your ability --

25        A.   No.

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 391 of 453
Case 1:07-md-2047-MDL Document 2844 attested on ESD Docket 05/13/2019 Page 14 of 67
Confidential - Subject to Further Confidentiality Review

```
 1          Q.    -- to give truthful testimony?

 2          A.    No.

 3          Q.    Mr. Brinkerhoff, what is your employment?

 4          A.    I'm a real estate agent for Coldwell

 5    Banker Paradise.

 6          Q.    And where is Coldwell Banker Paradise?

 7          A.    1950 U.S. Highway 1, Vero Beach, Florida

 8    32960.

 9          Q.    And I'll ask some dumb questions, since we

10    know that answer.  I just need to make sure it's

11    clear on the record.  So indulge me a little bit

12    when I'm asking something dumb like that.

13          A.    Sure.

14          Q.    How long have you been a real estate

15    agent?

16          A.    Nineteen years.

17          Q.    And have you been with Coldwell Banker

18    that whole time?

19          A.    I have.

20          Q.    And do you have any type of specialty?

21    Are you more of a listing agent, more of a buyers'

22    agent?

23          A.    Now you're getting to marketing.  I'm a

24    retail realtor.

25          Q.    Okay.
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.    I'm here for everybody.

 2                I worked with a $700,000 transaction

 3    today, and I worked with literally a $3,000 vacant

 4    lot today.  So I'm not one of the guys that are on

 5    the island that are saying, "If you're under a

 6    million, I'm not paying attention to you."

 7                Everyone's important.  Everybody's

 8    somebody.  Everybody has a family.  Everybody has a

 9    capability of buying a house.  Everybody has, if I

10    do a good job, something nice to say about me.

11                So I call myself a retail realtor.

12          Q.    And were -- do you have any specialty in

13    geographic areas, or --

14          A.    I do.  Yeah.

15                My territory would be northern St. Lucie

16    County, all of Indian River County, and very

17    southern Brevard County.

18                I would be considered an expert in that

19    area.

20          Q.    Is that a pretty broad geographic scope

21    for a realtor?

22          A.    I don't think so.  Some people would

23    travel longer distances.  You might find somebody

24    going all the way down to Miami to put a transaction

25    together.  I would not do that.  I would refer
```

```
 1    something like that out.

 2          So I -- I specialize in this area.  I

 3    don't think it's that broad, actually.  In my mind,

 4    it's pretty close.  Everybody's 25, 30 minutes away

 5    at most, so...

 6       Q.   Now, we're talking about the Lalwanis,

 7    Deborah Lalwani --

 8       A.   Lalwani.

 9       Q.   I did this during their deposition, too.

10          For the -- when did you come to know the

11    Lalwanis?

12       A.   '11, 2011.

13       Q.   Did you know them before then?

14       A.   No, I stayed in touch with them on and off

15    before we really put it on the market.  And I didn't

16    really know them beforehand.

17       Q.   Okay.

18       A.   Yeah.

19       Q.   Did you ever -- were you the one -- so --

20    are you aware what property they ultimately lived

21    in?

22       A.   The house --

23       Q.   The address?

24       A.   -- I am a aware of the property, this --

25    intimately.
```

confidential — Subject to further confidentiality Review

```
 1        Q.    Yes.

 2        A.    Better than they do.

 3        Q.    Okay.  What property is that?

 4        A.    That's the one in Black Bear Reserve,

 5   whatever -- without consulting -- again, Black Bear

 6   Reserve, four-bedroom, den, with a three-car garage,

 7   with a swimming pool.  That address we're talking

 8   about.

 9              It's --

10        Q.    You can refer for it.

11        A.    Okay.  It's 4590 Kodiak Drive in Black

12   Bear Reserve.

13        Q.    Now, were you one of the ones who helped

14   the Lalwanis purchase that property?

15        A.    No, I was not.

16        Q.    Do you know what realtor they used to

17   purchase the property?

18        A.    Nope.  Don't remember.  Maybe they do.

19        Q.    When --

20        A.    They bought it from GHO, I'll tell you

21   that.

22              And at the time, GHO and Woodside were a

23   joined builder, and it's just disappointing because

24   there was a number of Chinese drywall homes in the

25   neighborhood at -- that came up, unfortunately.
```

```
 1        Q.   Do you know how the Lalwanis were referred

 2   to you?

 3        A.   I don't know.  I like to think that my

 4   marketing and advertising was out there, and they

 5   said, "This is the right person for me," but I don't

 6   know.  I really don't.

 7        Q.   When the Lalwanis first came to you

 8   discussing whether to sell the home, what was --

 9   what was their reason for why they wanted to sell

10   the house?

11        A.   Well, they started out -- they thought

12   they were going to live there, but things changed

13   and they're not living there anymore.

14             And then, of course, we ran into the

15   Chinese drywall problem, and that depreciated the

16   value of the house.

17             They were -- I remember kind of discussing

18   what they wanted for the house first.  It was, like,

19   $850,000.  I'm, like, "That's not going to happen.

20   It's a bad time for our economy."

21             So I probably sat back, didn't do much.

22   Then they came back after me.  We wound up putting

23   it on the market for 450 or so, and then trying to

24   see what we could dig up and what was going on out

25   there.  And I did wind up having two competing
```

```
1    buyers.  I do recall that pretty clearly.  I do

2    recall that, too.

3           But -- and we went back and forth and back

4    and forth, and finally put the transaction together.

5     Q.   You said that it -- and maybe I'm just not

6    understanding the timeline right -- they were

7    initially wanting to live there permanently?

8     A.   Right.

9     Q.   And then they decided they wanted to sell?

10    A.   Right.

11    Q.   Then they learned of the Chinese drywall;

12   is that the correct timeline?

13    A.   I would put it at -- it's kind of their

14   life moreover than my life but, yeah, they went

15   through a period of decision-making.

16          They would actually come down and stay a

17   little bit, and then go back up, I guess it was to

18   New Jersey.  And then -- and not knowing what to do.

19   And I guess they never made the actual move itself.

20    Q.   You said that they were thinking about

21   moving there.  What did -- did they ever tell you

22   why they decided not to move there?

23    A.   Well, the Chinese drywall.

24    Q.   You --

25    A.   It's a health hazard.
```

1    Q.    But -- and maybe I'm misunderstanding the

2    timeline.

3          You said something along the lines of they

4    had wanted to move there, then they decided not to?

5    A.    Yeah.

6    Q.    And then they learned of Chinese drywall?

7    A.    Well --

8    Q.    So was there a factor beforehand that they

9    were not wanting to move to the house?

10         MR. VERRIER:  I'm going to object.

11   A.    I really don't know.

12   BY MR. BARRY

13   Q.    Do you have any recollection before they

14   learned of the Chinese drywall of something they

15   said about why they didn't want to move into the

16   property?

17   A.    Nope.  I -- I don't remember.

18         Other than -- they were kind of wanting to

19   move down here.  They built this beautiful house

20   that was a Taj Mahal for them, and all I remember is

21   it really wasn't -- they were coming and going,

22   coming and going.

23         And I guess they discovered that it was

24   Chinese drywall and really couldn't live in it.  The

25   truth was, they couldn't live in it.  You'll have to

Confidential - Subject to Further Confidentiality Review

```
 1    ask them better because they know their life.  I'm
 2    kind of -- I -- I was still kind of on the outside.
 3    I wasn't listed at the time.
 4           So...
 5    Q.   Were you speaking to them before they
 6    learned of Chinese drywall?
 7    A.   No.  I -- I -- we knew that it was Chinese
 8    drywall all along.  I knew it was Chinese drywall
 9    all along.  They didn't know how bad it was and how
10    devastating it was going to be at first.
11    Q.   Why did you know it was Chinese drywall?
12    A.   I used to say, "Have you guys ever been in
13    a haunted house?"  And they'd be, "What do you mean,
14    what do you mean?"
15           It would be when you walk into this house,
16    it was fire and brimstone.  It was the absolute
17    smell of Hell.  It just -- it got in your clothes,
18    it got in your nose.  It got in your ears.  It got
19    in your hair.
20           It was like walking into the devil's
21    house.  It absolutely -- it just blew you away.  It
22    ate everything up, too.  It would go -- the mirrors
23    in the bathrooms were -- it ate all of the backing
24    in the mirrors, so it was all this cloudiness.  It
25    was kind of, like, spooky.
```

```
 1              So it was smelly and spooky.  So it was a
 2   haunted house.
 3       Q.   So when you first walked into the
 4   property, did you observe all the characteristics
 5   you were discussing?
 6       A.   Yeah, I did.
 7       Q.   Okay.  And do you believe that you were
 8   the one who told them that they had Chinese drywall
 9   in the house?
10       A.   I probably was.  Probably was.  I probably
11   was.  I -- I don't know.  They might have known
12   themselves because it was such a strong smell.  He
13   was coming and going, and -- and I wasn't living
14   there.  And I -- you know, I knew them, and I was
15   back and forth and so forth.
16              You can't help but know that there's a
17   problem.
18       Q.   Were you aware of other homes in the
19   neighborhood that had Chinese drywall?
20       A.   I was.  And am.
21       Q.   Was -- did you recall if -- and I think
22   you said it was Black Bear or something?
23       A.   Black Bear Reserve --
24       Q.   Black Bear Reserve?
25       A.   -- is the name of the community.
```

```
 1        Q.   Do you know if Black Bear Reserve, all of

 2   the homes had Chinese drywall?

 3        A.   Not all of them.

 4        Q.   So some did and some didn't?

 5        A.   Correct.

 6        Q.   You -- you said earlier that when you were

 7   trying to sell the house, you were considering an

 8   $800,000 listing, you said that wasn't --

 9        A.   When he first started saying the value of

10   the house was, and I was talking about marketing the

11   property, he was thinking 850, 900.

12             And it's -- and I was, like, "That isn't

13   going to go anywhere," so I -- I didn't bother much.

14        Q.   Why did --

15        A.   I just remember getting blown away like

16   that.

17        Q.   Why did you believe that the house

18   couldn't sell for that amount of money?

19        A.   Well, the marketplace had dropped.  He --

20   he had the vision of building it, and he has the

21   experience, like a lot of people do, of the -- the

22   New Jersey or the Eastern Seaboard market values and

23   so forth.

24             And a property like that up there, even at

25   that time when we were dropping our real estate
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 401 of 453

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 401 of 453
Confidential - Subject to Further Confidentiality Review
67

1    values significantly because of the recession, he

2    still had hope that he built this house that had

3    that kind of value in it.  And it just didn't.

4           So... and I was probably one of the guys

5    who laid it on the line to him.

6       Q.   What were the reasons that you believe

7    that the value -- the value of the house dropped?

8       A.   The economy dropped overall.  It was -- I

9    mean, it's pretty clearly -- we lost -- so we lost

10   the Dodgers in town.  We -- the economy completely

11   crashed.  And all of our beautiful upper-level

12   subdivisions with these gorgeous homes, we were

13   trying to build this beautiful environment in Indian

14   River County, had Chinese drywall.

15          We just got slammed all at once terrible.

16      Q.   Mr. Brinkerhoff, did you bring any

17   documents with you to today's deposition?

18      A.   I do have some.  Let's see.  Several.

19      Q.   Do you have copies we can look at?

20      A.   You actually can have all these because I

21   can re-create all these from my digital archives and

22   so forth.

23      Q.   Okay.  Do you mind if I take a look at

24   them?

25      A.   Not at all.

```
1              MR. BARRY:  I'll share these with you
2         after.
3              And if you don't mind, I'll take a second
4         to look at it.
5              THE WITNESS:  Sure.
6              MR. BARRY:  Mr. Brinkerhoff, I'm going to
7         introduce these -- at some point during the
8         deposition we're going to be introducing
9         documents to you.
10             I'm going to be introducing you
11        documents -- four documents, all four of the
12        ones that you brought and just handed to me,
13        we're going to be introducing them as Exhibits
14        1, 2, 3, and 4, but we're putting them all on
15        the record now so it's clear the documents you
16        brought.
17             If the court reporter might mark them.
18             (Marked for Identification is Exhibit 1.)
19             (Marked for Identification is Exhibit 2.)
20             (Marked for Identification is Exhibit 3.)
21             (Marked for Identification is Exhibit 4.)
22             THE WITNESS:  550.  What did I say, 450?
23        I probably did.  Wow.  Wow.
24    BY MR. BARRY
25        Q.  So if you look at Exhibit 2, which is the
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 403 of 453
Case 2:09-md-02047-MDL Document 2341-1 terms of DE SDL docket 13-2019 Page 36 of
confidential - Subject to further confidentiality review
67

1    second document in your stack here.

2         A.    Uh-huh.

3         Q.    What is that document?

4         A.    This is John Marine Protection Foundation

5    selling the property to Lynne Hollingsworth, who is

6    the current owner of the property now.  And that was

7    sold for 410, is my recollection.

8              And, let's see.  This was the listing.

9              We had listed it -- interestingly enough,

10   the listing says 400.  So this is a copy of the

11   listing.  Copy of the deposit check.  Copy of the

12   closing statement.  It was 410, was the contract

13   sales price.

14        Q.    Were you involved in that sale, too?

15        A.    Yep.  This was a referral coming out of

16   New Jersey.  And she was looking for a house to buy.

17        Q.    Do you remember why -- what was the -- do

18   you remember what the price that the Lalwanis sold

19   the house to the Manchecs?

20        A.    174.

21        Q.    Do you know why the price increased to

22   410,000 --

23        A.    Because John did $100,000-plus work of

24   renovating the property and getting rid of all the

25   problems, and putting in new air conditioners, and

1 putting in solar panels, and putting in some

2 sprinkler systems, and improving the property.

3          Plus, the market increase -- value in the

4 marketplace pendulum swung.  It went back up.

5 But -- when you put a number to it, you're looking

6 at 200 and 300, and the market increase, and 400,

7 that's still not a lot of money.

8     Q.   Were -- did -- do you know if the Lalwanis

9 ever considered putting work in the house like

10 Manchec did?

11    A.   I don't know.  I'm sure we discussed it.

12 If I -- and I'm trying to remember accurately.

13          I -- I really -- I knew a -- a

14 contractor's name by the -- by the name of McAlhany.

15 And we did have some Chinese drywall problems going

16 on in the area.  So I talked to McAlhany.  I

17 probably had him out there to look at it and give us

18 a bid.

19          I seem to recall -- and this is, again,

20 off the top of my head, it's somewhere around

21 105,000, give or take a few things.  Maybe he could

22 have done less and it would have been 90.  Maybe --

23 I -- but I fairly remember 105 as a round number.

24          And again, that's top of my head.  No

25 documentation that I have, anyway.

1      Q.   And --

2      A.   So I don't -- I don't think after spending

3   whatever it cost him to build that, which had to be

4   probably close -- because they built it in 2005, I'm

5   pretty sure.  It was built in 2006, so they

6   contracted in 2005, built it in 2000 -- took -- took

7   physical possession of it in 2006, which was the

8   height of our market.  And the height of things

9   going up.

10          Which means they didn't pay a lot of money

11   for it.  So for them to actually start throwing good

12   money after bad, I don't think they were thinking of

13   that.  And, really, they were thinking probably more

14   along the lines of what -- "How can we write this

15   off?  How can I take this level of a loss?"

16          And a lot of people, quite frankly -- I

17   might be elaborating more than you need it -- but

18   the guy next door, for instance, was a young guy.

19   It was his dream house.  It was a beautiful house.

20   His whole family was there.  They got sick, they

21   couldn't live in it, they had to move out.  He filed

22   bankruptcy.

23          Lost the house, foreclosed on the house.

24   It was all Chinese drywall.  Wasn't his fault.  It

25   wasn't the builder's fault.  It was the whole

```
 1    time -- lost everything.  He had to start over

 2    again.

 3           And the Lalwanis, luckily enough, had

 4    the -- some kind of financial capabilities, and --

 5    beyond his capabilities to be able to sell the

 6    property and hope that they could recoup some of it,

 7    which is why we're here now.

 8           So maybe I elaborated too much.

 9    Q.   No, no, you're the one answering the

10    questions.  I -- you answer it how you want to.

11           I know we talked a little bit about there

12    were homes in Black Bear Reserve that also were --

13    that did not have Chinese drywall.

14    A.   Correct.

15    Q.   Were you ever part of selling any -- or

16    involved in selling those homes?

17    A.   Sure.

18    Q.   Were you at all involved in selling those

19    homes during the time period when the Lalwanis were

20    selling their home?

21    A.   No.

22    Q.   When were you involved with selling those

23    homes?

24    A.   Well, I can be accurate with a computer in

25    front of me, but I know --
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.   If you want to ball park it.

 2          A.   There was a house that was a custom built

 3    home not by GHO and Woodside, but with a custom

 4    builder.  And he probably completed that.

 5               He didn't do well.  But there was -- my

 6    buyer did very well.  I'm going to have to say --

 7    going to have to say that was -- probably -- did I

 8    sell that -- that was probably that -- '13, '12,

 9    '13.  I guess that was similar time range.  Yeah.

10               So -- but they bought it, okay?  I guess

11    I'm thinking in my head, I actually turned around

12    and sold it some number of years later.

13          Q.   Okay.

14          A.   2016, '17.

15          Q.   When they bought it 2012, 2013, do you

16    remember how much they purchased it for?

17          A.   I'm thinking that 400 range comes into

18    mind.  I can be dead accurate, by -- by --

19          Q.   Just -- just what -- what you remember.

20          A.   Right.  I'm going to say 400.

21          Q.   And do you remember what you ended up -- I

22    know you said you turned around and sold it.  Do you

23    remember what you turned around and sold it for?

24          A.   Probably upper 400s.  Uh-huh.

25          Q.   So there was not a substantial price gain.
```

Confidential - Subject to Further Confidentiality Review

```
 1    It wasn't, you know, $400- --

 2         A.    Right.

 3         Q.    -- to $800,000?

 4         A.    Right.  Was not.

 5         Q.    How did that house compare to the

 6    Lalwanis' home?  Of course, putting aside Chinese

 7    drywall.

 8         A.    It was more customized.  He put in

 9    high-impact windows which, of course, GHO just gave

10    you storm shutters.

11              It had some unique features like coffered

12    ceilings.  I will say, going back to the next-door

13    neighbors to the Lalwanis, they could do coffered

14    ceilings but they didn't.

15              So they did some up -- they did some --

16    working some extra upgrades with the crown molding

17    inside, the coffered step.  And the kitchen was

18    really nice.  Stepped crown molding.  So it -- like,

19    three layers of crown molding.

20              It sunk inside the square coffered

21    ceilings.  That's pretty spectacular.  A lot of

22    upper-level woodwork and trim.  Pretty house.

23              MR. BARRY:  I'm going to introduce a

24         document to you.  We're going to mark this as

25         Exhibit 5.
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 409 of 453
Case 2:09-md-02047-MBN Document 22341-3 Filed 06-11 SPD Docket 05/13/2019 Page 532 of 67
Confidential - Subject to Further Confidentiality Review

```
 1              (Marked for Identification is Exhibit 5.)

 2              MR. VERRIER:  Which document is this,

 3         Mike?  Do you have an extra copy?

 4      BY MR. BARRY

 5         Q.   If you want to take a second to look

 6     through this document.  I won't be asking you about

 7     much of it, but just want to say --

 8         A.   So I did give them that.

 9         Q.   Well --

10         A.   And it was McAlhany.

11         Q.   Why don't we wait until you look through

12     it and I'm going to put a question on the table.  I

13     love the eagerness, but there has to be a little bit

14     of a back and forth at some point here.

15         A.   Okay.

16         Q.   So this -- do you recognize this email,

17     Mr. Brinkerhoff?

18         A.   Well, I do now.

19         Q.   Okay.  And I'll represent for the record

20     this is an email with the latest number on the chain

21     is Tuesday, June 23rd, 2009.  It's from Vance

22     Brinkerhoff to debg610@yahoo.

23              Who is debg610@yahoo?

24         A.   It must be Deborah Lalwani.  She's right

25     there at the top.
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 410 of 453
Case 2:09-md-02047-EEF-MBN Document 22344 Entered on FLSD Docket 11/20/19 Page 33 of
confidential – Subject to further confidentiality Review
67

1    Q.   Now, Mr. Brinkerhoff, before I rudely cut

2    you off there --

3              MR. VERRIER:  Did we mark this as

4        Exhibit 5?

5              MR. BARRY:  Yes.

6      BY MR. BARRY

7        Q.   Before I rudely cut you off there, what

8    were you saying about this document?

9        A.   Well, it clearly shows that I was doing my

10   job, that I was giving all reasonable options to

11   her, which is what I should have been doing all

12   along.  I didn't remember -- I didn't remember that.

13             I didn't save any of my emails themselves.

14   I just saved these documents here that are -- that

15   are in our archives.  So I -- I'm not surprised.  I

16   did remember sharing that name with you, Jim, the

17   McAlhany.  I do remember that.  And -- and look at

18   this.  Here's a whole bid that he gave us.  97,000.

19   So that was 90 -- I remember that 95 to 105.

20             You know, the 105 might have come off the

21   top of my head because -- well, here's now -- now we

22   got -- because there was different numbers that were

23   thrown around.  Here's now 119.

24             So there was different numbers quoted

25   based on different kinds of things that needed to be

Confidential – Subject to Further Confidentiality Review

1    done.

2        Q.   105, 119, I'm still impressed by your

3    memory either way.

4        A.   Okay.  Right.  Yeah.

5        Q.   It's still... were you at this time

6    advising clients to pursue -- pursue repair on their

7    home?

8        A.   I gave them just an option.  It was an

9    option I worked to try and give them so they knew

10   and -- knew and understood all of their options that

11   were available to them.

12       Q.   Did you consider at that time this to be

13   an expensive repair on the high end of the price

14   that you were receiving quotes on?

15       A.   No.  I kind of figured that's about what

16   it is.  That's kind of market cost at the time,

17   because -- because it doesn't have anything to do

18   with market values of real estate, and demand for

19   real estate.  It has to do with people, time,

20   effort, energy and materials, and this guy's skills

21   and ability.

22            And he did do quite a few homes, and he

23   had reputation in the area for doing quite a few

24   Chinese drywall homes.

25       Q.   Did you have any clients --

```
 1        A.    He wound up not doing this one, by the

 2   way.  I'm sorry.

 3        Q.    Did you have any clients whose homes you

 4   sold who did remediate the property before selling

 5   them?

 6        A.    Good question.

 7              I had -- yes.  In Amelia Plantation, he

 8   remediated the house completely.  I actually saw it,

 9   but didn't have relationship with the seller.

10              I actually saw it because I was messing

11   around with McAlhany, and he took me over there and

12   showed it to me.  And later on, I -- they contacted

13   me to sell the property completely renovated.

14              And they had saved all of the

15   documentation, they had taken pictures and all kinds

16   of stuff, and they had a -- so I was able to give to

17   the buyer, you know, a jump drive with all of the --

18   a lot of the background and information on it.

19              So that -- yes.  That -- yes.  Not a lot

20   of them, though.  Let's see.  What else have I done?

21              I've sold some Chinese drywall homes.  But

22   that one, I -- I actually represented buyers in

23   Chinese drywall homes, but also -- but this one I

24   recommended -- represented the seller in that -- in

25   that transaction.
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 413 of 453
Case 2:09-md-02047-EEF-MBN Document 23614 entered on FLSD Docket 13/26/19 Page 36 of
67
Confidential - Subject to further confidentiality Review

1    Q.   That client who you said remediated their

2    property, how much did that increase the value of

3    their property?

4         MR. VERRIER:  Objection.

5    A.   Yeah, I'd have to remember what it sold

6    for.

7         It was another -- it was another -- it was

8    another GHO home.  It was a very similar floor plan

9    to this right here.

10        So he lost money.  He -- by the -- when he

11   built that house, he paid a lot of money, like these

12   folks did.  The whole economy went down, and then

13   they -- he'd pay to remediate it.  Whether he got

14   any money from an insurance settlement or not, I do

15   not know.

16        But he wound up losing quite a bit of

17   money any way you look at it, I'm sure.  But that

18   same 400 number comes to my mind really quick.

19   BY MR. BARRY

20   Q.   When you were trying to sell the Lalwanis'

21   home, you said they were initially considering a

22   listing price of $400,000; is that right?

23   A.   450 is what I said.

24   Q.   450?

25   A.   When I looked at that number there, it was

Confidential — Subject to Further Confidentiality Review

1  550, actually.

2      Q.   Did you list for that amount?

3      A.   I did.

4      Q.   Did anyone make offers on the house?  No?

5      A.   Not at that.  That was way out of line.  I

6  did that to keep Paul happy, as I recall.

7          You know, and -- no, the -- I finally had

8  two investors.  You can't -- obviously, somebody

9  wants to move into a house can't move into a

10  drywall -- Chinese drywall house.  You can't live in

11  it.  You have to be -- you have to be somebody who

12  has capital to be able to remediate the property,

13  and John was one of them.

14         And there was one other gentleman who was

15  interested in remediating the property, and doing it

16  as an investor.

17         John actually wound up moving into it and

18  living there for a number of years after it was

19  remediated.  The other guy, still in the house that

20  he bought many years ago would have flipped it.

21  Would have just flipped it.

22         But in the end, I didn't represent any

23  flippers.

24      Q.   Did you have prior relationships with John

25  and the other gentlemen who were these people that

confidential - Subject to further confidentiality Review

1    you had helped identify for the Lalwanis?

2        A.   I knew both of them.  Yeah.  I worked with

3    both of them.

4        Q.   Were both of them buying a number of

5    Chinese drywall homes?

6        A.   You know what?  They knew about the

7    Chinese drywall homes.  They knew it was an

8    opportunity.

9            They would have, but I don't think either

10   one of them, other than John buying this one and

11   moving into it, did any other Chinese drywall homes.

12       Q.   When you were representing the Lalwanis

13   when they were trying to sell their home, were they

14   ever down in Vero Beach?  Were they ever visiting

15   the home?

16       A.   Yep, they came home.

17       Q.   Were they ever living in the home?

18       A.   I wouldn't call it living in the home.

19   Maybe staying in the home.  I'm not sure -- you

20   know, there's a difference between living and

21   staying.

22           So it was pretty much a vacant house, but

23   they would stay there and probably took a shower

24   there.  The bed -- I don't even know if it was a

25   real bed.  It might have been a blow-up bed, I don't

1    remember.  But they were staying in the home.  They

2    weren't living in the home.

3        Q.   Do you recall if they had furniture in the

4    home?

5        A.   No.  I don't -- I don't think they did

6    have any furniture to speak of.  Like I said, I'm

7    not sure if it was a blow-up mattress or real bed.

8    I don't remember.

9        Q.   When you were first hired by the Lalwanis,

10   did they have furniture in the home?

11       A.   No.  No.  No.

12       Q.   Did --

13       A.   I don't recall that they did, anyway.

14       Q.   Do you know if they had been living in the

15   home prior to the time when you were contacted?

16       A.   I don't think they were.  I think they --

17   they built it, would come down and visit and stay.

18            And I think they knew that it was a

19   problem, so I don't think they ever did really move

20   in fully.  They wanted to.  I remember them wanting

21   to.  They really liked the idea of living in Vero,

22   really liked the house, but couldn't bring

23   themselves to doing it.

24       Q.   Do you remember them saying they were

25   staying there with Ms. Lalwani' parents?

```
1        A.   I don't.

2        Q.   Okay.  Do you ever remember them saying

3    they were moving furniture out of the home, having a

4    moving company coming through?

5        A.   No, I don't remember.

6        Q.   Have you sold any other homes for the

7    Lalwanis?

8        A.   No.

9        Q.   Have you helped them purchase other homes?

10       A.   No.  Hope to.

11       Q.   Now, when you say -- what was -- in this

12   area during that time period, what was the general

13   diminution in price value because of the economy?

14   What was the general amount you saw home prices

15   dropping?

16            MR. VERRIER:  Objection.

17       A.   More than -- at least 50 percent.  I don't

18   mind answering that because they were at least

19   50 percent.  I don't know if I can answer it or not.

20            MR. VERRIER:  You can.

21            MR. BARRY:  So there's two --

22            MR. VERRIER:  Yeah.

23            MR. BARRY:  We can go off the record.

24            (Discussion off the record.)

25            MR. BARRY:  Back on the record.
```

```
 1        A.    It wasn't -- it was definitely not a good
 2   time to be in real estate.
 3             It was very -- because all the people that
 4   I had been helping and putting into these beautiful
 5   houses -- and this is a good example -- and building
 6   in this area in the 2003, '4, what happened here is
 7   we had two hurricanes, Frances and Jeanne, in 2004.
 8             Uniquely -- and you've asked it, so you're
 9   listening -- so uniquely, the way I see it is, we
10   had insurance.  We had people that had money, we
11   had -- in this area right here.
12             So the -- the -- the devastation that was
13   caused by those hurricanes brought a lot of money
14   into our area.  Lot of -- lot of jobs, a lot of
15   speculation on value.  Brought a lot of people up
16   out of south Florida and in here to put
17   speculation -- buy not just one house but two or
18   three houses to do, you know, the flip and so forth
19   and so on.
20             Kept going on and on and on.  So '4, '5
21   and '6, we were -- we were booming.
22        BY MR. BARRY
23        Q.    Right.
24        A.    And by '8 and '9 and '10, we were dying
25   because it went way down.
```

Confidential - Subject to Further Confidentiality Review

1          If you think back -- I hate to say it --

2     but Rita and Katrina, because it really caused the

3     change, I think, because that population there

4     didn't have the economic funds to be able to weather

5     the storms the way we did on the eastern coast of

6     Florida, or the demand of property there.

7          So that dragged -- that's really when --

8     if you look back at it, I think you'll see that

9     dragged the United States back into the recession

10    that we had.  That seemed to be a trigger in my

11    mind.

12          But, anyway...

13    Q.   Now, was there any specific -- other than

14    Chinese drywall, was there any specific

15    characteristic of homes that were losing their

16    value?

17    A.   You know, I'd like to say there was.  But

18    you'd see the brand new homes, you'd think they'd be

19    more -- hold up a little bit better, and people

20    would desire them a little bit more.

21          But they lost a lot, too, all of those.

22    Then you think older homes need more repair, upkeep

23    and maintenance.  But they lost a lot of value, too.

24    It was just across the board.

25    Q.   Did custom homes lose value at a greater

```
 1    amount than lesser homes?

 2       A.   Yeah, the more valuable homes, they're

 3    going to lose more value than the less expensive

 4    homes.  So I would have to say yes.  On a percentage

 5    ratio basis, sharing that 50 percent that I said,

 6    probably similar but on a dollar value basis,

 7    dramatically different.

 8            MR. BARRY:  Okay.  I have no further -- I

 9        have no questions at this time.  If you have

10        any questions.

11            MR. VERRIER:  Oh, all right.  I do have a

12        couple.

13            MR. BARRY:  And I also reserve to my

14        codefendants on the line, too.

15            MR. VERRIER:  Well, they should go first.

16            MR. BARRY:  Yeah.

17            MR. VERRIER:  Does anyone from BNBM want

18        to ask any questions?

19            MS. WERKEMA:  No.

20            MS. FASSBENDER:  Not from Diana either.

21    Thank you.

22            MR. VERRIER:  So give me two seconds.

23            MR. BARRY:  Yeah.

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                    CROSS EXAMINATION

 2     BY MR. VERRIER

 3          Q.   So, Mr. Brinkerhoff, I'm Keith Verrier, I

 4     represent the plaintiffs.  Holly is on the line;

 5     she's one of the Lalwanis' local attorneys.

 6               I had a couple questions I wanted to

 7     follow up with you.  You testified at the time that

 8     Gui wanted to list the house and wanted to put it in

 9     for 850,000; is that right?

10          A.   We talked about it.

11          Q.   Yeah.

12          A.   I wouldn't let him do it.

13          Q.   At that time, did he know the house had

14     Chinese drywall in it?

15          A.   Yeah.

16          Q.   He did?

17          A.   Yeah.

18          Q.   Okay.  And when did -- do you know when

19     they bought the home?

20          A.   No.  I don't recall.  My -- I could look

21     at my records and tell you.

22          Q.   Right.

23               But from your memory, you don't recall?

24          A.   Uh-uh.

25          Q.   And you were their sales agent when they
```

1    were going to sell --

2        A.   They bought it in 2006.

3        Q.   Okay.

4        A.   That was when -- I mean, they didn't --

5    they contracted in 2005, and they didn't say that.

6    And they bought -- and they closed on it in 2006.

7            MR. BARRY:  And what document are you

8        referring to that -- just to clear up the

9        record.

10           THE WITNESS:  My MLS sheet.

11           MR. BARRY:  Which was introduced as a

12       record?

13           THE WITNESS:  So the year built was 2006,

14       but they would have contract -- had to contract

15       on that a year beforehand to go under contract

16       to make choices, and options and tile, and

17       countertops and cabinets, and all the choices

18       it takes that -- and a pool and everything to

19       build the house.

20           So it took a year to build the house, and

21       it was COed in 2006.  So there you go.

22    BY MR. VERRIER

23       Q.   And so you were brought in eventually when

24    they wanted to sell the home; is that right?

25       A.   Right.

1       Q.    And prior to that time, you didn't know

2   the Lalwanis?

3       A.    No.

4       Q.    Okay.  I want to turn your attention to

5   Exhibit 5.  This is the bid --

6       A.    Okay.

7       Q.    And if you could, turn to -- I guess it

8   would be -- probably the third page.  I'm working

9   off of a digital copy.

10            This is the actual estimate.  The next

11  page.  Oh, here, this would be helpful.

12      A.    Right.

13      Q.    It would be the third page where it has,

14  like, a list.  Looks like this.

15      A.    Oh, okay.

16      Q.    Yeah.

17      A.    Yeah, this one.

18      Q.    And this is kind of running through all

19  the various things that he plans on doing to the

20  house for that price; is that right?

21      A.    Yep.

22      Q.    Now, is it your understanding that this is

23  kind of a full remediation, or would this be a

24  partial remediation?

25      A.    This should be -- this should have been a

```
 1   full remediation.

 2        Q.   And if you just look -- for example, are

 3   you aware, I guess, at some point that a protocol

 4   came down in the Chinese drywall litigation for what

 5   constituted a full remediation?

 6             MR. BARRY:   Objection.

 7        A.   I knew there was guidelines that a

 8   judge -- I'm trying to remember in, like,

 9   Louisiana -- New Orleans or something came down with

10   some guidelines.

11             Intermittently aware of the specifics of

12   the guidelines, I am not.

13     BY MR. VERRIER

14        Q.   Okay.  Did Mr. McAlhany, did he ever

15   discuss the guidelines with you -- or his opinion --

16   well, let me break that down.

17             Did he ever discuss the guidelines with

18   you?

19        A.   You know, he -- he -- I don't think --

20   this might have been earlier than that was even done

21   there.

22             You know, I -- I know that he knew what he

23   was doing, and he had a full crew ready to do it.

24   And how he did it, and blew everything out and take

25   everything out.  So do I -- I remember, but I don't
```

Confidential — Subject to further confidentiality Review

```
1    remember what timeframe all of this came down.

2           Because I remember there was a lawsuit

3    that was -- and there was a prescribed direction

4    that people are supposed to do to do an adequate

5    remediation process.

6           I think I shared with you also that one of

7    my friends and business associates was directly

8    involved with making sure that appropriate

9    remediations were done and was in the business of

10   selling an insurance policy that was $100,000

11   insurance policy to verify that as long as they did

12   it correctly, that the insurance policy would take

13   care of any kind of question in the future.

14          And I tried to get John to buy that and to

15   use him, but John never did, and I don't recall

16   dragging -- even pushing the Lalwanis to do that

17   because -- but I do see on the contract where we

18   agreed to set aside items of -- to prove that it was

19   Chinese drywall on the contract itself.

20       Q.   Do you have --

21       A.   But I didn't --

22       Q.   Yeah, let's focus you back to Exhibit 5

23   for a second.

24       A.   Sorry.

25       Q.   Actually, go back to the first page of
```

```
1    Exhibit 5.

2         A.   Oh, 5.

3         Q.   That's the one you have.

4         A.   Here.

5         Q.   The date on that document is June 23rd,

6    2009; is that right?

7         A.   Oh, this one.

8         Q.   The email.  The original email where

9    you're --

10        A.   Yeah, June 23rd, 2009.

11        Q.   Okay.

12             MR. VERRIER:  I'm going to introduce this

13        document.  I appear to only have one copy, but

14        I will see if I can find another one.

15             MR. BARRY:  All right.

16             MR. VERRIER:  I definitely made others.

17             (Marked for Identification is Exhibit 6.)

18             THE WITNESS:  Is this the same thing?

19             MR. BARRY:  Different email.

20             MR. VERRIER:  Yeah.

21             MR. BARRY:  What's the date on that email?

22             MR. VERRIER:  It is --

23             THE WITNESS:  April 11th.

24             MR. VERRIER:  April 11th, 2010.

25
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. VERRIER
 2        Q.   So I'm showing you what's been marked as
 3    Exhibit 6.
 4        A.   Yeah, it's him, Tim Zorc.
 5        Q.   Okay.  So if I can turn your attention to
 6    the email at the bottom that is dated April 9th,
 7    2010.  Do you see that?
 8        A.   "News regarding remediation protocols," I
 9    do.
10        Q.   Yes.
11        A.   Okay.  So I did share that with them.
12        Q.   Right.  So this is now some period later?
13        A.   Yes.
14        Q.   Yeah.
15             So does this refresh your recollection
16    that there was kind of an evolution of what --
17        A.   Evolution.  That's what I was trying to --
18        Q.   A remediation process?
19        A.   There was a timing that we started
20    earlier, and it was kind of progressed.  That's
21    true.  Yep.
22        Q.   Okay.
23        A.   That much I knew.  These dates I don't.
24        Q.   All right.
25             MR. VERRIER:  I'm going to introduce this
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 428 of 453
Case 2:09-md-02047-MBN Document 2844 entered on FSD Docket 11/20/19 Page 51 of
Confidential - Subject to Further Confidentiality Review
67

```
 1        document as Exhibit 7.

 2              (Marked for Identification is Exhibit 7.)

 3              MR. BARRY:  I'll do a rolling objection to

 4        this document and his answers to it.

 5              MR. VERRIER:  You want to state the basis

 6        of the objection, just for the record?

 7              MR. BARRY:  This -- the witness is not a

 8        legal expert and you're providing him a legal

 9        document.

10              THE WITNESS:  Yeah, I remember the name

11        Fallon.  I think -- I guess.  I don't know.

12              Oh, so what --

13              MR. BARRY:  You keep the one with the

14        sticker on it.

15              THE WITNESS:  Okay.

16     BY MR. VERRIER

17        Q.   Now, showing you what's been marked as

18     Exhibit 7, you just noted that you have -- you've

19     heard of Judge Fallon previously?

20        A.   Well, was he from Louisiana -- there it

21     is.  Yeah.

22        Q.   Right.

23              So you've kind of -- so are you familiar,

24     generally speaking, with the lawsuit going on in the

25     Eastern District of Louisiana regarding drywall?
```

```
 1        A.   Not right now.  Way back when.

 2        Q.   Right.

 3        A.   Way back when.  But I don't know what's

 4   going on now.  It's pretty much over with here.

 5        Q.   So --

 6        A.   And I don't like to remember it.  This

 7   wasn't a good time.

 8        Q.   Turning your attention to this document,

 9   you'll -- the date on this document is April 8th,

10   2010; is that right?

11        A.   Which one are you --

12        Q.   Exhibit 7.

13        A.   This thing?

14        Q.   Yep.

15        A.   Where do you see that date?

16        Q.   If you look across the top there's a

17   ticker --

18        A.   There, yeah.

19        Q.   Filed April 8th, 2010; do you see that?

20        A.   I do see that.

21        Q.   And that's the day after the email that we

22   just looked at?  Exhibit 6, is that correct?  The

23   day before.  I'm sorry.

24        A.   Okay.  Okay.

25        Q.   Is that right?
```

```
 1       A.    Well, it is.  I mean, you -- yeah.

 2       Q.    So turning your attention back to

 3   Exhibit 6, where Mr. Zorc says, "Aware there has

 4   been a lot of news regarding the remediation

 5   protocols."

 6             Do you see that?

 7       A.    Yep.

 8       Q.    And he discusses in the next page, "I now

 9   have all the parts in the puzzle to complete a

10   proposal for services for drafting the remediation

11   guidelines."

12             Do you see that?

13       A.    And I'll share with you my recollection.

14   It was in the ballpark of about 5 grand.

15       Q.    What's that?

16       A.    The cost -- what he would have done to

17   represent -- so I did introduce Tim to him,

18   apparently.

19       Q.    For coming up with an actual -- some sort

20   of checklist?

21       A.    So what Tim did.

22       Q.    Guidelines?

23       A.    Tim's -- oversaw the -- the contractors

24   who remediated it to make sure they did the right

25   thing.
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 431 of 453
Case 2:09-md-02047-MBN Document 2041 Homestead-SPD Docket 13/2019 Page 54 of 67
Confidential - Subject to further confidentiality Review

1      Q.   I -- I -- I've got you.

2      A.   Yeah.

3      Q.   Yeah.  So --

4      A.   So --

5      Q.   -- what he's referring to at that point in

6   time, though, is that these guidelines you're being

7   shown in Exhibit 7 had just come out?

8      A.   Right.  I agree to that.

9      Q.   Okay.  So if I could just turn your

10   attention back to Exhibit 7.  And I would like to

11   point you to page 26 in the numbers at the bottom.

12      A.   Okay.

13      Q.   And do you see where he says "scope of

14   remediation"?

15      A.   I do.

16      Q.   If I could turn your attention to the next

17   page.  You'll see there's a series of numbers, "All

18   drywall in the plaintiff intervenors' homes needs to

19   be removed or replaced."

20           Do you see that?

21      A.   I do.

22      Q.   So is it your understanding for the home

23   to be completely remediated, it has to have, for

24   example --

25      A.   The ceiling included.

```
 1        Q.    -- all drywall in the home to be removed

 2   and replaced?

 3        A.    That's what it's saying.

 4        Q.    Yeah.

 5        A.    I mean, I'll share with you the gossip if

 6   you want me to.

 7        Q.    That's okay.

 8        A.    I'll just shut up.  Okay.

 9        Q.    Might ask you for the gossip.

10              So if you look through this back through

11   the table of contents, so we don't have to spend

12   your entire night here going through this, you'll

13   see there's a listing of Scope of Remediation in

14   letter E.

15              Do you see that?

16        A.    Yep, right here.

17        Q.    And then you'll see, 1, "All drywall needs

18   to be removed and replaced."

19              Do you see that?

20        A.    Uh-huh.

21        Q.    And then if I turn your attention to the

22   next page, it says, "All electrical wires."

23        A.    Yeah.

24        Q.    No. 2?

25        A.    Yeah, yeah.
```

1    Q.   Number 3 says, "All copper pipes needs to

2  be replaced."

3    A.   Yep.

4    Q.   Goes through 13 different items, you see?

5    A.   Yep.

6    Q.   Now, that's what we would consider a

7  complete remediation under these guidelines; is that

8  your understanding of that?

9    A.   And -- and they had to off-gas it.  They

10  had to open the whole house and blow fans through

11  it.

12    Q.   So have you had an experience with home --

13  well, can we -- prior to -- strike that question.

14         If I could turn your attention back to

15  Exhibit 5, which is, I think, probably under that

16  email.

17    A.   This is 6.

18    Q.   It's this one.

19    A.   Okay.  Sorry.

20    Q.   In this list we had been looking at on

21  page 3, Exhibit 5.

22    A.   Uh-huh.

23    Q.   So can we -- would you agree with me that

24  as of at least a year after the time this proposal

25  was put out, this would be not a complete

1    remediation under the standards set forth by

2    Judge Fallon?

3         A.    Maybe.  I -- I mean --

4         Q.    Well, if we look --

5         A.    Take me in the analysis, I would have to

6    look -- read it through and go line by line.  Says

7    "electrical repair."

8         Q.    I'll give you one -- well, we can give one

9    example if we wanted to.

10            So turn your attention back to

11   Judge Fallon's protocol.

12        A.    Uh-huh.

13        Q.    On page 2.  Item No. --

14        A.    -- 2, electrical wires.

15        Q.    No, no, no, page 2.

16        A.    Three?

17        Q.    Hold on one second.

18            Page 2.  I just lost my place.  Oh, here

19   we go.  Item No. 7 on page 2.  "Items which must be

20   removed may not be -- need to be replaced."

21        A.    Oh, okay.

22        Q.    But (a), "Cabinets must be replaced."

23            Do you see that?

24        A.    Does say that.

25        Q.    And then if you look back at the first

1    item --

2        A.   It doesn't.  They weren't doing that.

3        Q.   Yeah.

4        A.   He didn't do that.

5        Q.   Right.

6        A.   He took the cabinets out.  He put them in

7    the garage and he took everything else out.

8             And I'm going to tell you something else,

9    if you want to hear it.  I don't know -- I think

10   what they were doing were snipping the ends of

11   the -- because the electrical head has extra coating

12   on it, so I think they were snipping the ends and

13   resplicing it after they took all the drywall out.

14            So that might have been one thing they

15   were missing, too.

16       Q.   And what was that again?  What were they

17   snipping the end?  I'm a little bit of a novice when

18   it comes to home improvement.

19       A.   All of the wiring.

20       Q.   Okay.

21       A.   If you were having to pull out all the

22   wiring and put in new wiring.

23       Q.   Oh.

24       A.   You have a wiring that has all the plastic

25   covering on it that protects it, that's -- really,

Confidential - Subject to Further Confidentiality Review

```
 1    you need to snip that part off.  Get rid of the

 2    catalyst, which was the drywall.  Snip that off and

 3    resplice the -- resplice the wire so you'd expose

 4    fresh, clean copper ends.

 5         Q.   I see.

 6         A.   So that was -- I think that's what -- and

 7    that was common practice.  It was -- I saw what

 8    they -- they would save the cabinetry.

 9         Q.   Did they ever, for example, not replace

10    rugs?  Would they clean the rugs sometimes?

11         A.   No.

12         Q.   Always replace the rugs?

13         A.   Oh, yeah.

14         Q.   Okay.

15         A.   Anything -- anything that had any kind of

16    cloth in it was gone.  Couldn't stick around.

17         Q.   Have you ever -- you've been practicing

18    real estate here for a long time, according to your

19    testimony.

20         A.   Nineteen years.

21         Q.   Yeah.

22              So having sold homes since the Chinese

23    drywall problem afflicted this area, have you been

24    in homes that were not completely remediated?

25         A.   I was in one recently, as a matter of
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 437 of 453
Case 2:09-md-02047-EEF-MBN Document 20444 tered on FLSD Docket 11/26/19 Page 90 of
Confidential -- Subject to Further Confidentiality Review
67

```
 1   fact.

 2            And I didn't say a word, but I was biting

 3   my lip because she -- she bought -- she bought this

 4   beautiful $500-, 600,000 house in a beautiful

 5   neighborhood called Antilles right up the street.

 6            And Antilles was rampant with Chinese

 7   drywall, too.  And I went to visit her on -- on a

 8   civic organization we are part of here, which is

 9   what the meeting was for, the Exchange Club.  That

10   issue we sold a bunch of Christmas trees for -- and

11   gave the money, the proceeds, to the band and to the

12   scholarship.

13            But, anyway, I went in there to sit down,

14   and she was bragging about such a good deal.  She

15   bought that house for 130,000.  And she cursorarily

16   remediated -- I don't know who she got to do it, but

17   it wasn't -- I don't think it was McAlhany -- and it

18   still smelled.

19            It just was -- it wasn't as thick and

20   heavy as what I shared with you earlier where it

21   would just get in all your nose and your hair and

22   your clothes, but it was definitely a light, faint

23   hint of the sulfer smell in the house.

24            So she thought she remediated it.

25   Something's not right in the house, I don't know
```

```
 1    what it is.  It's just not right.

 2         Q.   So it didn't rise to the level of a

 3    haunted house?

 4         A.   It did not.  That was the haunted house.

 5    That's right.  That was...

 6         Q.   And, you know, having taken a lot of

 7    people around and show -- I assume you show a lot of

 8    houses for people that are interested in buying.

 9         A.   I do, yeah.

10         Q.   And if you take people into a house that's

11    a Chinese drywall --

12         A.   I have to disclose it.  Has to be

13    disclosed, and -- it should be disclosed.  Most of

14    the time we know what it is because you know what it

15    is.

16              And, frankly, I warn them, and they'll go

17    in, and we've had some recently.  And they'll go in,

18    and I'm saying, "This is it."  I mean, I don't

19    really want to go in.  I just tell them, "I don't

20    want to go in."

21              I have walked in with them but it doesn't

22    take them long to just go, "Okay, that's terrible."

23    And even when we get back in the car and leave, you

24    can still -- you got the ickiness of the sulfer and

25    everything still all over you.
```

Confidential - Subject to Further Confidentiality Review

1     Q.    What about if it's a house that had

2     Chinese drywall that had been remediated?

3     A.    Right.

4     Q.    And you take someone to show them that

5     house?

6     A.    I -- I have no problem with that.  If it

7     was remediated correctly, you wouldn't -- shouldn't

8     smell it.

9     Q.    Do those people have any problems buying

10    those houses?

11    A.    There is a stigma regarding it.

12          I think anything that was dramatically

13    done to a property -- and, of course, we have rules

14    within our real estate agents -- our real estate

15    laws that says, you know, you can't -- AIDS, for

16    instance, can't necessarily be disclosed that there

17    was an AIDS.

18          But the -- the fact there was a Chinese

19    drywall home, I've had people go, even though it's

20    all been done, it's all been redone, they don't

21    care.

22          "We're not touching it."  Don't want to

23    have -- "Don't you love it?  Yeah, I love it,

24    everything about it, but I'm not buying any Chinese

25    drywall remediated home.  No."

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 440 of 453
Case 2:09-md-02047-MBN Document 20414 renumbered 01 SC docket 11/2019 Page 83 of 67
Confidential - Subject to further confidentiality Review

1          So there is a stigma that has to be

2     overcome or you move on to the next deal.

3          MR. VERRIER:  I don't have any more

4     questions.

5               REDIRECT EXAMINATION

6     BY MR. BARRY

7     Q.   Just have a few.

8          Mr. Brinkerhoff, if you can refer to

9     Exhibit 6, which is the document in your left hand.

10         You got it right in front of you?

11    A.   Yep.

12    Q.   No.

13    A.   Six.

14    Q.   Is that 6 -- is it 7, perhaps?

15    A.   This is 7.

16    Q.   Okay.  If you can refer to Exhibit 7.

17         Have you ever seen this document before

18    tonight?

19    A.   No.

20    Q.   Are you a lawyer?

21    A.   No.

22    Q.   Have you read through all 108 pages of

23    that document?

24    A.   No.

25    Q.   Are you a contractor?

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 441 of 453
Case 2:09-md-02047-MCN Document 23841-6 Filed 09/19 Docket 11/18/19 Page 84 of 67

Confidential - Subject to Further Confidentiality Review

```
1          A.    No.

2          Q.    Do you have experience as a contractor?

3          A.    No.

4          Q.    Okay.

5                MR. BARRY:  No more questions.

6                THE WITNESS:  Okay.

7                MR. VERRIER:  No more from me.

8                Anybody on the phone want to ask anything?

9                MS. WERKEMA:  This is Holly.  I don't have

10         any questions.

11               MS. FASSBENDER:  I don't have any

12         questions.  Thank you.

13               MR. VERRIER:  Thank you.  We're done, all

14         right, you guys?

15               MR. BARRY:  Do you want to read and sign?

16         Which means that they will be providing you

17         with the transcript.  You can read through it.

18         You can make corrections to it.

19               THE WITNESS:  I don't think I need to.

20               MR. BARRY:  Okay.  I don't -- it's -- some

21         clients like to do it.  It's up to you.

22               THE COURT REPORTER:  Are you ordering?

23               MR. BARRY:  Yes.  And a rough.

24               (Examination was concluded at 7:34 p.m.)

25
```

Case 2:09-md-02047-EEF-MBN Document 22363-66 Filed 11/18/19 Page 442 of 453
Case 1:14-cv-02494-MCA-LDW Document 284-4 filed 09/30/19 Sd Docket 03/13/2019 Page 65 of 67
confidential - Subject to further confidentiality Review

1     _____

2                     STIPULATIONS

3          It is stipulated and agreed by and between

4     counsel for the respective parties that:

5          Reading and subscription of the deposition

6     by the witness are waived.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF INDIAN RIVER

 5

 6          I, MARYKAY KLINE, RPR, CRR, Notary Public,

 7       State of Florida, certify that J. VANCE

 8       BRINKERHOFF personally appeared before me on

 9       January 14th, 2019 and was duly sworn.

10

11          Signed this 16th day of January, 2019.

12

13

14       _____

         MARYKAY KLINE, RPR, CRR

15       Notary Public, State of Florida

         My Commission No. GG 222824

16       Expires: 5/29/2022

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3

 4   STATE OF FLORIDA

 5   COUNTY OF INDIAN RIVER

 6

 7            I, MARYKAY KLINE, RPR, CRR, do hereby

 8       certify that I was authorized to and did

 9       stenographically report the foregoing deposition

10       of J. VANCE BRINKERHOFF; that a review of the

11       transcript was not requested; and that the

12       transcript is a true record of my stenographic

13       notes.

14            I FURTHER CERTIFY that I am not a

15       relative, employee, attorney, or counsel of any

16       of the parties, nor am I a relative or employee

17       of any of the parties' attorney or counsel

18       connected with the action, nor am I financially

19       interested in the action.

20            Dated this 16th day of January, 2019.

21

22       _____

         MARYKAY KLINE, RPR, CRR

23

24

25
```

# EXHIBIT

# "L"

# FILED UNDER SEAL

# EXHIBIT
# "M"

# FILED UNDER SEAL

# EXHIBIT

# "N"

# FILED UNDER SEAL

# EXHIBIT
# "O"


# FILED UNDER SEAL

# EXHIBIT

# "P"

# FILED UNDER SEAL

# EXHIBIT

# "Q"

# Tab #15

CPSC Identifies Manufacturers of Problem Drywall Made in China                Page 1 of 2

Case 2:09-md-02047-EEF-MBN  Document 22363-66  Filed 11/19/19  Page 452 of 453
Case 1:11-cv-22408-MGC  Document 204-10  Entered on FLSD Docket 05/13/2015  Page 3 of 4



# NEWS from CPSC



## U.S. Consumer Product Safety Commission

Office of Information and Public Affairs                     Washington, DC 20207

FOR IMMEDIATE RELEASE                **CPSC Recall Hotline: (800) 638-2772**
May 25, 2010                             CPSC Media Contact: (301) 504-7908
Release #10-243

## CPSC Identifies Manufacturers of Problem Drywall Made in China

WASHINGTON, D.C. - The U.S. Consumer Product Safety Commission (CPSC) is releasing today the names of the drywall manufacturers whose drywall emitted high levels of hydrogen sulfide in testing conducted for the agency by Lawrence Berkeley National Laboratory (LBNL). There is a strong association between hydrogen sulfide and metal corrosion.

Of the samples tested, the top ten reactive sulfur-emitting drywall samples were all produced in China. Some of the Chinese drywall had emission rates of hydrogen sulfide 100 times greater than non-Chinese drywall samples.

"Homeowners who have problem drywall in their homes are suffering greatly", said CPSC Chairman Inez Tenenbaum. "I appeal to these Chinese drywall companies to carefully examine their responsibilities to U.S. families who have been harmed and do what is fair and just".

At the U.S.-China Strategic and Economic Dialogue meetings in Beijing May 24-25, U.S. officials pressed the Chinese government to facilitate a meeting between CPSC and the Chinese drywall companies whose products were used in U.S. homes, and which exhibit the emissions identified during the testing procedures. The Strategic and Economic Dialogue represents the highest-level bilateral forum to discuss a broad range of issues between the two nations.

The following list identifies the top 10 drywall samples tested that had the highest emissions of hydrogen sulfide, along with the identity of the manufacturer of the drywall and the year of manufacture, from highest to lowest.

- Knauf Plasterboard (Tianjin) Co. Ltd.: (year of manufacture 2005) China
- Taian Taishan Plasterboard Co. Ltd.: (2006) China
- Shandong Taihe Dongxin Co.: (2005) China
- Knauf Plasterboard (Tianjin) Co. Ltd.: (2006) China
- Taian Taishan Plasterboard Co. Ltd.: (2006) China
- Taian Taishan Plasterboard Co. Ltd.: (2006) China
- Shandong Chenxiang GBM Co. Ltd. (C&K Gypsum Board): (2006) China
- Beijing New Building Materials (BNBM): (2009) China
- Taian Taishan Plasterboard Co. Ltd.: (2009) China
- Shandong Taihe Dongxin Co.: (2009) China

Other Chinese drywall samples had low or no detectable emissions of hydrogen sulfide as did the drywall samples tested that were manufactured domestically. They include: Knauf Plasterboard Tianjin: (2009) China; Tiger ***ShiGao JianCai***liangpianzhuang: (2006) China; USG Corporation: (2009) U.S.; Guangdong Knauf New Building Material Products Co. Ltd.: (2009) China; 3/8" drywall manufacturer uncertain (date uncertain): China; Knauf Plasterboard (Wuhu) Co. Ltd.: (2009) China; CertainTeed Corp.: (2009) U.S.; Georgia Pacific Corp.: (2009) U.S.; Dragon Brand, Beijing New Building Materials Co. Ltd.: (2006) China; CertainTeed Corp.: (2009) U.S.;

CPSC Identifies Manufacturers of Problem Drywall Made in China          Page 2 of 2

Case 2:09-md-02047-EEF-MBN  Document 22363-66  Filed 11/19/19  Page 453 of 453
Case 1:11-cv-22408-MGC  Document 204-10  Entered on FLSD Docket 05/13/2015  Page 4 of 4

Pingyi Baier Building Materials Co. Ltd.: (2009) China; Sample purchased in China, manufacturer unknown: (2009) China; Panel Rey S.A.: (2009) Mexico; Lafarge North America: (2009) U.S.; National Gypsum Company: (2009) U.S.; National Gypsum Company: (2009) U.S.; Georgia Pacific Corp.: (2009) U.S.; Pabco Gypsum: (2009) U.S.; Temple-Inland Inc.: (2009) U.S.; and USG Corporation: (2009) U.S.

Last month, CPSC released the results of drywall emissions tests by LBNL. The studies showed a connection between certain Chinese drywall and corrosion in homes. In addition, the patterns of reactive sulfur compounds emitted from drywall samples show a clear distinction between certain Chinese drywall samples manufactured in 2005/2006 and other Chinese and non-Chinese drywall samples.

To date, CPSC has spent over $5 million to investigate the chemical nature and the chain of commerce of problem drywall. Earlier this year, CPSC and HUD issued an identification protocol to help consumers identify problem drywall in their homes. Last month, CPSC and HUD issued remediation guidance to assist impacted homeowners.

See the chart (pdf) listing drywall chamber test results.

---

The U.S. Consumer Product Safety Commission is charged with protecting the public from unreasonable risks of serious injury or death from thousands of types of consumer products under the agency's jurisdiction. The CPSC is committed to protecting consumers and families from products that pose a fire, electrical, chemical, or mechanical hazard. The CPSC's work to ensure the safety of consumer products - such as toys, cribs, power tools, cigarette lighters, and household chemicals - contributed significantly to the decline in the rate of deaths and injuries associated with consumer products over the past 30 years.

To report a dangerous product or a product-related injury, call CPSC's Hotline at (800) 638-2772 or CPSC's teletypewriter at (301) 595-7054. To join a CPSC e-mail subscription list, please go to https://www.cpsc.gov/cpsclist.aspx. Consumers can obtain recall and general safety information by logging on to CPSC's Web site at www.cpsc.gov.

