# EXHIBIT 39

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

EDUARDO AND CARMEN AMORIN, *et al.*, individually, and on behalf of all others similarly situated,

     Plaintiffs,

     v.

TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD., et al.,

     Defendants.

Case No. 1:11-CV-22408-MGC

## PLAINTIFFS' NOTICE OF FILING CORRECTED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON NON-FORMULA DAMAGES (ECF. NO. 284)

NOTICE IS HEREBY given that due to formatting issues within the current ECF No. 284, it was filed with incorrect page numbers that were inadvertently placed on the lower left-hand corner of the document. Plaintiffs intended to file their "Opposition to Defendants' Motion for Summary Judgment on Non-Formula Damages" with correct page numbers placed at the bottom center of each page. Attached as Exhibit "A" is a Corrected Opposition Memorandum. The Corrected Opposition Memorandum, Ex. A, contains: (1) corrected page numbers placed at the bottom center of each page, (2) corrected formatting in the Table of Contents, and (3) the addition of a Table of Authorities for ease of reference. No substantive changes have been made to ECF No. 284.

## CERTIFICATE OF SERVICE

I hereby certify that that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Southern District of Florida by using the CM/ECF System, which will send a notice of electronic filing on this 16th day of May, 2019.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya

Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

# EXHIBIT

## "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

EDUARDO AND CARMEN AMORIN,
*et al.*, individually, and on behalf of all
others similarly situated,

     Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. f/k/a
SHANDONG TAIHE DONGXIN CO.,
LTD.; TAIAN TAISHAN
PLASTERBOARD CO., LTD., *et al.*,

     Defendants.

Case No. 1:11-CV-22408-MGC

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON NON-FORMULA DAMAGES**

# TABLE OF CONTENTS

Table of Authorities......................................................................................................ii

I. INTRODUCTION................................................................................................1

II. RELEVANT PROCEDURAL BACKGROUND .................................................3

    A. Background of the Proceedings in the MDL..................................................3

    B. Proceedings in this Court. ..............................................................................6

III. RELEVANT FACTUAL BACKGROUND .........................................................7

IV. DEFENDANTS' SUMMARY JUDGMENT MOTION AS
TO "OTHER DAMAGES" SHOULD BE DENIED.........................................13

    A. Summary Judgment Standard. .....................................................................13

    B. All Plaintiffs Have Produced Evidence of Their Damages. .......................13

        1. Cost of Remediation.........................................................................14
        2. Diminution in Value/Stigma/Lost Equity. .....................................15
        3. Alternate or Alternative Living Expenses. ......................................19
        4. Personal Property..............................................................................20
        5. Loss of Use and Enjoyment. ............................................................23

    C. Facts Determined in this Litigation Along with Other
Record Evidence Supports the Imposition of Punitive Damages. ..............24

    D. It is Premature to Assess Plaintiffs Who Received a Negative
Product ID Recommendation from the Special Master.............................27

V. DEFENDANTS' ATTEMPT TO RELITIGATE LIABILITY
SHOULD BE REJECTED OUT OF HAND.....................................................27

    A. Breach of Express and/or Implied Warranties (Count IV) ........................28

    B. Private Nuisance (Count VII). .....................................................................30

    C. Unjust Enrichment (Count VIII).................................................................31

    D. Misrepresentation and Concealment............................................................32

VI. CONCLUSION ..................................................................................................32

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adrimar Investments, LLC v. Mexam Imp. Exp. Corp.,*
    2013 WL 12094883 (S.D.Fla. Mar. 22, 2013) ................................................................ 32

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................................................ 13

*Armadillo Distribution Enterprises, Inc. v. Hai Yun Musical Instruments Mfr. Co., Ltd.,*
    142 F.Supp.3d 1245 (M.D.Fla. 2015) ............................................................................ 29

*Beckman v. Marshall,*
    85 So.2d 552 (Fla. 1956) ................................................................................................ 30

*Bisque Associates of Fla., Inc. v. Towers of Quayside No. 2 Condominium Association, Inc.,*
    639 So.2d 997 (Fla.3d DCA 1994) ................................................................................ 16

*Bizrocket.com, Inc. v. Interland, Inc.,*
    2005 WL 6745909 (S.D.Fla. May 23, 2005) .................................................................. 22

*Bonilla v. Crystal Graphics Equip., Inc.,*
    2012 WL 360145 (S.D.Fla. Feb. 2, 2012) ...................................................................... 32

*Bow to Stern Maint., Inc. v. Jackson,*
    2006 WL 8432016 (S.D.Fla. Dec. 29, 2006) ................................................................. 18

*Burtless v. Pallero,*
    570 So.2d 1140 (Fla. Dist. Ct. App. 1990) .................................................................... 22

*Carriuolo v. Gen. Motors LLC,*
    72 F.Supp.3d 1323 (S.D. Fla. Dec. 11, 2014) ............................................................... 32

*Damon v. Fleming Supermarkets of Florida, Inc.,*
    196 F.3d 1354 (11th Cir. 1999) ..................................................................................... 13

*Denarii Sys., LLC v. Arab,*
    2013 WL 6162825 (S.D. Fla. Nov. 25, 2013) ............................................................... 32

*Diamond Resorts Int'l, Inc. v. Aaronson,*
    2019 WL 1445181 n.21 (M.D.Fla. Mar. 5, 2019) ......................................................... 26

*Dorvil v. Nationstar Mortgage LLC,*
    2019 WL 1992932 (S.D. Fla. Mar. 26, 2019) ........................................................... 18, 22

*Durrance v. Sanders,*
    329 So.2d 26 (Fla.1st DCA 1976) ......................................................... 30, 31

*EFCO Corp. v. Symons Corp.,*
    219 F.3d 734 (8th Cir.2000) ............................................................. 15, 24, 25

*Exxon Corp. U.S.A. v. Dunn,*
    474 So.2d 1269 (Fla.1st DCA 1985) ......................................................... 31

*Feliciano v. City of Miami Beach,*
    707 F.3d 1244 (11th Cir. 2013) ................................................................ 13

*Finklestein v. Dep't of Transportation,*
    656 So.2d 921 (Fla. 1995) ......................................................................... 16

*Florida Power & Light Co. v. Jennings,*
    518 So.2d 895 (Fla. 1987) ......................................................................... 16

*Gates v. W.R. Grace & Co.,*
    2009 WL 1455316 (M.D.Fla. May 21, 2009) .............................................. 31

*Global Quest, LLC v. Horizon Yachts, Inc.,*
    849 F.3d 1022 (11th Cir. 2017) ................................................................ 29

*Gomez v. General Nutrition Corp.,*
    323 F.Supp.3d 1368 (S.D. Fla. 2018) ........................................................ 13

*Goussen v. Mendez Fuel Holdings LLC,*
    350 F.Supp.3d 1283 (S.D. Fla. 2018) ........................................................ 13

*Hill v. Texaco, Inc.,*
    825 F.2d 333 (11th Cir. 1987) .................................................................. 32

*In re Chinese Drywall Litig.,*
    2009 WL 6408999 (Miami-Dade Cty, Fla.Cir.Ct. Dec. 18, 2009) .................. 30

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
    626 F.Supp.2d 1346 (J.P.M.L. 2009) .......................................................... 4

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
    680 F.Supp.2d 780 (E.D.La. 2010) ............................................................ 30

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.,*
    706 F.Supp.2d 655 (E.D.La. 2010) .................................................... passim

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
   742 F.3d 576 (5th Cir. 2014) ...................................................................................... 5

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
   753 F.3d 521 (5th Cir. 2014) ...................................................................................... 5

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
   894 F.Supp.2d 819 (E.D. La. 2012) ..........................................................................3, 5

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
   2017 WL 1421627 (E.D.La. Apr. 21, 2017) ........................................................passim

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
   2018 WL 279629 (E.D. La. Jan. 2, 2018) .........................................................6, 7, 26

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
   2019 WL 1984097 (E.D.La. May 3, 2019) ........................................................ 18, 19

*In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*,
   955 F.Supp.2d 1311 (S.D.Fla. 2013) ....................................................................... 32

*Johnson v. Davis*,
   480 So.2d 625 (Fla. 1985) ........................................................................................ 16

*Johnson v. Thor Motor Coach, Inc.*,
   2016 WL 1182792 (M.D. Fla. Mar. 28, 2016) ........................................................ 22

*Kerns v. Pro-Foam of South Alabama, Inc.*,
   572 F.Supp.2d 1303 (S.D. Ala. 2007) ..................................................................... 18

*Lamm v. State St. Bank & Trust*,
   749 F.3d 938 (11th Cir. 2014) .................................................................................. 30

*Lee-Bolton v. Koppers Inc.*,
   2012 WL 12818344 (N.D.Fla. Feb. 10, 2012) ........................................................ 31

*McCourtney-Bates v. Bates*,
   681 Fed. Appx. 760 (11thCir. 2017) ....................................................................... 32

*McDonald Air Conditioning, Inc. v. John Brown, Inc.*,
   285 So.2d 697 (Fla. Dist. Ct. App. 1973) ............................................................... 22

*Mesa v. BMW of North America, LLC*,
   904 So.2d 450 (Fla. Dist.Ct.App. 2006) ................................................................. 28

*Morsch v. JP Morgan Chase Bank, N.A.*,
    2018 WL 5830557 (M.D. Fla. Nov. 7, 2018) ............................................................. 22

*Nature's Prod., Inc. v. Natrol, Inc.*,
    990 F.Supp.2d 1307 (S.D. Fla. 2013) ....................................................................... 29

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*,
    2015 WL 3905018 (S.D.Fla. Jun. 25, 2015) ..........................................................3, 15

*Navelski v. Int'l Paper Co.*,
    244 F.Supp.3d 1275 (N.D.Fla. Mar. 25, 2017) ........................................................ 31

*Nitram Chems., Inc. v. Parker*,
    200 So.2d 220 (Fla.2d DCA 1967) .......................................................................... 24

*Ocean Elec. Co. v. Hughes Labs., Inc.*,
    636 So.2d 112 (Fla.3d DCA 1994) ..................................................................3, 21, 22

*Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*,
    2018 WL 3109632 (S.D.Fla. Apr. 5, 2018) .............................................................. 29

*Palm Corp. v. Walters*,
    4 So.2d 696 (Fla. 1941) ........................................................................................... 30

*Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*,
    684 F.3d 1211 (11th Cir.2012) ................................................................................ 26

*Port Largo Club, Inc. v. Warren*,
    476 So.2d 1330 (Fla. Dist. Ct. App. 1985) .............................................................. 22

*Prior v. White*,
    180 So. 347 (Fla. 1938) ........................................................................................... 30

*QBE Specialty Ins. Co. v. Scrap, Inc.*,
    2018 WL 7198151 (N.D.Fla. Mar. 2, 2018) ............................................................ 31

*Sarasota Yacht & Ship Servs., Inc. v. Harris*,
    813 So.2d 231 (Fla. Dist. Ct. App. 2002) ................................................................ 22

*Smith v. Wm. Wrigley Jr. Co.*,
    663 F.Supp.2d 1336 (S.D.Fla. 2009) ...................................................................... 28

*Suntrust Bank v. Baum*,
    2009 WL 1097975 (S.D.Fla. Apr. 22, 2009) ........................................................... 26

*Tershakovec v. Ford Motor Co.*,
  2018 WL 3405245 (S.D.Fla. July 12, 2018) ................................................................. 29

*Tippens v. Celotex Corp.*,
  805 F.2d 949 (11th Cir.1986) ......................................................................... 2, 19, 20

*Town of Surfside v. County Line Land Co.*,
  340 So.2d 1287 (Fla.3d DCA 1977) ............................................................................ 30

*UC Acquisition Corp. v. Salem Nursing & Rehab Center of Tuskegee, Inc.*,
  2012 WL 95422 (M.D.Ala. Jan.12, 2012) ................................................................... 26

*Virgilio v. Ryland Grp., Inc.*,
  680 F.3d 1329 (11th Cir.2012) ................................................................................... 32

*Washington v. LaSalle Bank Nat. Ass'n*,
  817 F.Supp.2d 1345 (S.D.Fla. 2011) .......................................................................... 32

*Welsh v. Newman Intern. Transp., Inc.*,
  2011 WL 5570800 (M.D. Fla. Nov. 16, 2011) ........................................................... 22

## **Statutes**

Fed. R. Civ. P. 56 ............................................................................................................ 13

Fla.Stat. §768.72 (2018) ................................................................................................. 25

## **Other Authorities**

Restatement (Second) of Torts § 911 ............................................................................. 22

## I.     __INTRODUCTION__

Contrary to the picture painted by Defendants in their Motion for Summary Judgment on Non-Formula Damages,[1] an extensive factual record has been developed over the course of this ten-plus year-old *Chinese Drywall* litigation. Judge Fallon held several evidentiary hearings and issued extensive findings of facts and conclusions of law establishing that Defendants' toxic drywall causes extensive damages to homeowners who had the bad fortune of having that drywall in their homes. Plaintiffs submitted substantial documentation of their ever-accruing damages, and after this Court entered its Omnibus Order Regarding Trial Plan ("Trial Plan") (ECF No. 112), the Priority Claimants answered discovery, produced voluminous evidence of their damages, sat for depositions to answer detailed questioning about their damages, and produced expert reports summarizing their damages.[2] It is unquestionable that Plaintiffs have been damaged, and the evidence produced in this case raises a genuine issue of material fact as to the amount of those damages.

This Court adopted **__all__** of Judge Fallon's findings of facts and conclusions of law. Those rulings set forth unambiguously the harm that defective Chinese drywall causes. Defendants suggest they are being treated unfairly because the history of their misconduct has been the hallmark of this litigation dating back to the case's origins. However, often lost in the discussion of Defendants' misconduct is the fact that the wrongdoing at issue in the litigation – *i.e.*, the sale and distribution of defective off-gassing high-sulfur drywall for installation in people's homes – is horrific and causes extensive financial and emotional damage to Plaintiffs. But, that fact, is made clear by the extensive findings of fact and conclusions of law entered by Judge Fallon and adopted by the Court.

Judge Fallon made clear that unlike a typical class action where the issue of causation may need to be litigated even after a determination of liability (*i.e.*, did the wrongdoing cause the harm), Chinese drywall is unique because causation is settled – if you had defective Chinese drywall in your home, it unquestionably ***caused*** a specific set of damages that resulted from the corrosive environment. *See, e.g., In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627, at *6-8, 14 (E.D. La. Apr. 21, 2017); *In re Chinese-Manufactured Drywall*

---

[1] Defs.' Mot. and Mem. for Summary Judgment on Non-Formula Damages (ECF No. 245) ("Defs.' SJ Mot.").
[2] Evidence of damages is presented in Plaintiffs' Statement of Material Facts in Opposition to Defs.' SJ Mot. ("Statement of Facts" or "SOF"), filed herewith.

1

*Prod. Liab. Litig.*, 706 F.Supp.2d 655, 664-66 (E.D.La. 2010) (*Germano* FOFCOL). In fact, the presence of a corrosive environment is a determining factor as to whether a home contained defective Chinese drywall. *See Chinese Drywall*, 706 F.Supp.2d at 672-73. This is what led to Judge Fallon's rulings that liability and causation were conclusively established and that "the only remaining issue is the amount of the [damages] award." (ECF No. 112). Because there was no reason to litigate settled matters, this Court entered a dual track approach to address only damages – one track for remediation damages and one track for other non-formula damages ("other damages"). Notably, the Court did this over Defendants' objection that they were entitled to fully litigate liability and causation despite the fact they were in default.[3]

Yet, having been limited to challenging only the quantum of Plaintiffs' damages, Defendants' Motion attacks liability and causation, once again looking to *de facto* vacate the defaults.[4] Despite the fact that the purpose of a summary judgment motion is to test whether Plaintiffs have adduced sufficient evidence to create a genuine issue of material fact, Defendants do little to combat Plaintiffs' evidence beyond attacking its credibility, an inappropriate consideration at the Summary Judgment phase. *See, e.g., Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir.1986) (credibility issues require resolution by trier of fact). As Judge Fallon specifically found, the damages incurred by homeowners with defective Chinese drywall include (1) complete remediation (under the *Germano* protocol),[5] (2) diminution in value, (3) alternate living expenses, (4) costs associated with foreclosures and/or bankruptcy, (5) additional amounts owed due to mortgage deferral, (6) bankruptcy or inability to refinance, (7) loss of income, and (8) loss of use and enjoyment. *See Chinese Drywall*, 706 F.Supp.2d at 691-93. Plaintiffs have produced evidence to support damages in these categories. In addition, even though Defendants' liability for punitive damages is presumably established by their default, there are sufficient facts in the record from which a reasonable fact-finder could conclude that Defendants acted with an intentional or reckless disregard for the safety of consumers purchasing their products and installing them in their homes.[6]

---

[3] *See, e.g.*, Defendants' Trial Plan Proposal (ECF No. 53) at 9 ("This plan provides for non-bifurcated complete discovery followed by an initial set of trials."); Trial Plan at 1 (Defendants' trial plan seeks "to reopen discovery into liability and causation").

[4] *See, e.g.*, Defs.' SJ Mot. at 3-4, 22-29.

[5] Pursuant to Trial Plan, Plaintiffs' remediation damages are being calculated by the Special Master.

[6] *See* Section V (C), *infra*, at 24.

Beyond attempting to do an end-run around the defaults and attack the credibility of Plaintiffs' evidence, Defendants' Summary Judgment Motion raises numerous challenges to the measure of damages. If Defendants were to be believed, every Plaintiff would be left with no avenue to be made whole for the extensive financial and emotional damage caused by Defendants' defective products beyond the cost to repair their ruined home or the diminished value of the home if that amount is less than the cost to repair.[7] That is not the law of Florida. Much like Virginia law applied by Judge Fallon in *Germano*, Florida law provides that "[a] proper damages calculation will 'place the plaintiff in the same financial position [ ] that [it] occupied before the property was damaged.'" *Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, 2015 WL 3905018, at *26 (S.D.Fla. Jun. 25, 2015) (quoting *Ocean Elec. Co. v. Hughes Labs., Inc.*, 636 So.2d 112, 114 (Fla.3d DCA 1994)) (alteration in original). Defendants' approach seeks to leave Plaintiffs empty-handed for most of their damages.

For these reasons, Defendants' Summary Judgment Motion should be denied.

## II.    RELEVANT PROCEDURAL BACKGROUND

### A.    Background of the Proceedings in the MDL.

After the devastation of Hurricanes Katrina and Rita along the Gulf Coast in 2005, and as a result of a housing boom, there was a shortage of drywall available domestically. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627, at *1 (E.D. La. Apr. 21, 2017). This created an opportunity for foreign manufacturers to sell their drywall to American customers. *See id*. In response to the increased demand, from 2005-2008, Taishan exported at least 86 million square feet of Chinese drywall to the U.S. for installation in homes and condominiums. *See, generally, In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F.Supp.2d 819 (E.D. La. 2012), *aff'd*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

Unfortunately for these property owners, some drywall imported from China was defective because it emits corrosive sulfur gases that create a toxic environment. *See Chinese Drywall*, 2017 WL 1421627, at *1. When the defects of Chinese drywall started to become apparent, homeowners began to file suit in various state and federal courts against the manufacturers and their parent entities, as well as homebuilders, developers, installers, suppliers, importers, exporters, and distributors in the Chinese drywall supply chain. *See id*.

---

[7] *See* Defs.' SJ Mot. at 10.

The defective Chinese drywall at issue was predominately manufactured by two groups of defendants: (1) Knauf entities, and (2) Taishan entities. *See id.* On June 15, 2009, all federal cases involving Chinese drywall were consolidated in MDL 2047,[8] where the cases proceeded for nine years prior to their remand to this Court on June 7, 2018.[9]

The litigation against Knauf proceeded in a relatively uneventful fashion. In early 2010, Judge Fallon presided over a bellwether trial against Knauf (the *Hernandez* case). *See id.* From that trial, Judge Fallon issued detailed Findings of Fact and Conclusions of Law and entered a judgment in favor of the Plaintiff. *See id.* Using the remediation protocol formulated in the *Hernandez* trial as a starting point, Knauf entered into a pilot remediation program, later expanded to include all Plaintiffs with Knauf drywall. *See id.* at *2. On December 20, 2011, Knauf entered into a class settlement designed to resolve all Knauf-related, Chinese drywall claims.[10] *See id.* Over 3,000 homes containing Knauf drywall were remediated. *See id.*

The litigation against the Taishan entities took a vastly different course because of the dilatory decisions made by Defendants. Defendants' misconduct began in 2009, when Taishan and its parent companies, CNBM and BNBM, orchestrated a plan to ignore the lawsuits against them and allow default judgments to be entered. They determined that willful default was the best strategy for handling this litigation because: responding to the lawsuits would incur a large amount of attorneys' fees; there is no judicial treaty signed between China and the U.S. on mutual recognition and enforcement of court judgments; Taishan and BNBM do not have assets within the continental U.S.; and even if the lawsuits were lost, the U.S. courts cannot execute on Defendants' assets in China.[11]

While Defendants sat on the sidelines in China for a year, the Court proceeded with a bellwether trial (the *Germano* case). *See Chinese Drywall*, 2017 WL 1421627, at *3. Plaintiffs presented evidence specific to seven properties. Following the hearing, Judge Fallon issued detailed Findings of Fact & Conclusions of Law. *See id.*; *see also Chinese Drywall*, 706

---

[8] *In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* 626 F.Supp.2d 1346 (J.P.M.L. 2009).

[9] Florida Remand Order (ECF No. 13).

[10] In addition to the Knauf Settlement Agreement, hundreds of defendants in the chain-of-commerce with Knauf entered into class settlements, the effect of which settled almost all of the Knauf litigation.

[11] *See* Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan, May 11, 2009 (ECF No. 64-3).

F.Supp.2d 655. In May 2010, a final default judgment was entered against Taishan in *Germano* in the amount of $2,609,129.99. *See Chinese Drywall*, 2017 WL 1421627, at *3.

When the $2.6 million judgment in *Germano* was entered, Defendants arranged for Taishan to enter an appearance in the MDL on the last day to appeal the *Germano* judgment, but *solely* to contest jurisdiction and open the default. *See id.* at *3-4. In doing so, Taishan claimed falsely that "it did not respond because it did not understand the significance of [the lawsuits] and it was ignorant of the U.S. legal system." *See Chinese Drywall*, 894 F.Supp.2d at 863. Not only was Taishan aware of this litigation since even before the MDL was formed, but it was "inclined not to respond,"[12] and was guided in its decisions by American counsel.[13]

Two years later, following significant discovery, including a week of depositions in Hong Kong personally overseen by Judge Fallon, and extensive briefing and oral argument, Judge Fallon issued a comprehensive jurisdictional opinion addressing Taishan's targeting of U.S. customers for sales of its drywall. *See id.* at 881-82. Judge Fallon refused to vacate the default judgments against Taishan and determined that it was subject to the Court's jurisdiction under Louisiana, Virginia, and Florida law. *Id.* These rulings were upheld on appeal two years later by two different panels of the Fifth Circuit Court of Appeals. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

Faced with having to pay the *Germano* judgment, Defendants devised a plan for Taishan to fire its counsel of record in the MDL and refuse to appear in open court for a judgment debtor examination. *See Chinese Drywall*, 2017 WL 1421627, at *4. Such blatant disrespect for the decorum of our courts resulted in a civil and criminal contempt order against Taishan on July 17, 2014. *Id.* Judge Fallon ordered Taishan to pay a fine and attorneys' fees and enjoined Taishan and its affiliates from conducting any business in the U.S. until Taishan returned to the jurisdiction to participate in these judicial proceedings. *Id.*

During the period of contempt and deliberate absence from the jurisdiction, Plaintiffs filed a Motion for Class Certification pursuant to Rule 23(b)(3). *Id.* On September 26, 2014, Judge Fallon certified the *Amorin* class of homeowners with defective drywall manufactured by the Taishan Defendants. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2014 WL

---

[12] Taishan Informational Report (ECF No. 64-3 at TG-0208430).
[13] "The Course of Events on Hiring Law Firms for the Gypsum Board Litigation in the United States" (ECF No. 99-1 at BNBMPLC-E-0059967).

4809520 (E.D.La. Sept. 24, 2014) ("Class Certification FOFCOL"). Judge Fallon scheduled a hearing to determine class damages. *See Chinese Drywall*, 2017 WL 1421627, at *5.

On the day of the class damages hearing in February 2015, BNBM appeared for the first time and requested a continuance, which was granted. *See id*. Shortly thereafter, Taishan returned to the litigation and paid the *Germano* judgment, plus fines. *Id*. Upon their return, Defendants fought hard to reopen every issue that was decided in their absence – seeking to challenge jurisdiction, decertify the *Amorin* class, and avoid a class damages verdict. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig*., 2018 WL 279629 (E.D. La. Jan. 2, 2018).

On June 9, 2015, the MDL Court oversaw the class damages hearing. *See Chinese Drywall*, 2017 WL 1421627, at *5. Following extensive pretrial briefing and *Daubert* motions, Plaintiffs presented evidence of class remediation damages, which Defendants vigorously contested. *Id*. After a failed attempt at mediation in 2016, Judge Fallon issued "Findings of Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing" ("Class Damages FOFCOL") on April 21, 2017. *Id*. Prior to remanding the Florida *Amorin* cases, Judge Fallon denied Defendants' motions to decertify the *Amorin* class[14] and vacate the default judgments against them. *Chinese Drywall*, 2018 WL 279629, at *8. In denying the motion to vacate, Judge Fallon lamented the fact that "delay tactics have permeated every aspect of Defendants' litigation strategy: from their initial failure to appear to their now perpetual motions to re-litigate settled matters." *Id*. On March 17, 2018, Judge Fallon issued a Suggestion of Remand, Opinion & Order for approximately 1,700 Florida *Amorin* Plaintiffs.[15]

**B.     Proceedings in this Court.**

Upon remand, this Court ordered the parties to propose a plan for resolution of the pending claims. The parties submitted competing trial plans,[16] BNBM argued it was not in default and entitled to litigate issues of liability and causation,[17] and Taishan and BNBM sought to have the Court reject the remediation damages formula. The Court requested briefing on the deference to be afforded to Judge Fallon's rulings in the MDL.[18]

---

[14] *See* Order & Reasons dated 4/21/2017 [MDL Rec. Doc. 20740].
[15] MDL Rec. Doc. 21242.
[16] *See, e.g.,* ECF Nos. 52, 53, 64, 65, 69 & 71; *see also* ECF No. 112 at 1.
[17] *See, e.g.,* ECF No. 67; *see also* ECF No. 112 at 1
[18] *See* ECF No. 91; *see also* ECF No. 112 at 2.

On November 16, 2018, the Court issued its Trial Plan adopting all of Judge Fallon's "finding of facts and conclusions of law." (ECF No. 112 at 3). The Court found that Judge Fallon's decisions were "well-reasoned and well-supported by the evidentiary record" and made clear it would "not revisit any of his rulings absent a compelling showing of an intervening change in law and fact." *Id*. The Court specifically noted that Defendants "have been held in default"; "Defendants constitute a single business enterprise for purposes of piercing the corporate veil and holding each of the defendants – including BNBM – liable for the conduct of their affiliated entities"; "Class certification was appropriate"; "Liability has been conclusively established as to all defendants and the only remaining issue is the amount of the award"; and "The remediation formula represents a reasonable and reliable measure of the remediation damages which the Court will properly apply to determine the appropriate amount of property damages." *Id*. The Court established two tracks for resolution – one for property damages and the other for "other damages" including, alternate living expenses, loss of use and enjoyment, lost rent, bankruptcy, foreclosure and short sale. *Id*. at 6-9.

Since that time, the parties have worked diligently to execute the Court's Trial Plan. The current Summary Judgment Motion relates to the track for "other damages" (none of the Priority Claimants are asserting personal injury claims). Plaintiffs identified twenty (20) "Priority Claimants," who responded to interrogatories, sat for depositions and exchanged expert discovery. Mediation is scheduled for May 22-23, 2019.[19] Trial is scheduled to begin on "other damages" on July 22, 2019 (ECF No. 112 at 11).

## III.   RELEVANT FACTUAL BACKGROUND

Drywall is a widely used construction material, also known as gypsum board, wallboard, plasterboard, sheetrock, and Gyproc; that is composed of a layer of hardened gypsum plaster sandwiched between two layers of paper liner. *Chinese Drywall*, 706 F.Supp.2d at 660. Gypsum used to make drywall can be created naturally and synthetically and if being made synthetically, the amount and types of trace materials and unreacted sorbents found in the source material can vary among power plants and among mines from which it originates.[20] *Id*. Defective Chinese drywall differs from normal drywall in that, among other things:

---

[19] ECF No. 235.

[20] *See Chinese Drywall*, 706 F.Supp.2d at 660-61 (detailed description of drywall manufacturing that is unnecessary for purposes of resolving the instant motion).

- It has a significantly higher average concentration of strontium and significantly more detectable levels of elemental sulfur.

- Chinese drywall releases reduced sulfur gases.

- The sulfur gases released by Chinese drywall are irritating to the human body. Exposed individuals reported irritation of the eyes, respiratory system, and skin.

- The sulfur gases released by Chinese drywall cause offending odors in homes, making them hard if not impossible to live in.

- The sulfur gases released by Chinese drywall are corrosive to metals, particularly copper and silver. "Corrosion" is defined by the ASTM as the chemical or electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the materials and its properties. Copper and silver metal components in the Plaintiffs' houses are extremely vulnerable to corrosion from exposure to the sulfur gases. The sulfur gases, in reacting with metals, form sulfide deposits on the surfaces of the metals.

- The corrosion on metals caused by the sulfur gases emitted by Chinese drywall causes premature failure of electrical & mechanical devices.

- The corrosion on metals caused by the sulfur gases emitted by Chinese drywall poses a fire risk. The corrosion increases resistance in the circuitry of appliances and electronics. Increased resistance increases heat in appliances and electronics. This increased resistance can cause excessive heating of the connection when energized. Complete failure of a switch can lead to fires or other life safety problems, depending on the intended function of the switch.

*See id*. at 663-666. The pervasive corrosive environment created by defective Chinese drywall has been universally accepted, including by the Consumer Products Safety Commission and the Florida Division of Health Standards. *Id*. at 666-67. All of the Priority Claimants reported some or all of these problems. SOF at ¶ 60, Exs. A-1 through A-36.

Judge Fallon issued a specific protocol to efficiently remediate a Chinese drywall home in the most cost-effective manner. For example, "[t]he scientific evidence demonstrated that corrosion has damaged most components that contain copper and silver"; "[t]he practical evidence demonstrated that selective removal of only [Chinese drywall] is not feasible or cost-effective in this case"; "[t]he practical evidence further revealed that attempting to gently remove, store and clean or protect carpet, cabinetry or flooring is not feasible or cost-effective"; and "[t]he practical evidence also indicates that items such as trim work and base boards will likely be ruined or extensively damaged when the drywall is removed." *Chinese Drywall*, 706 F.Supp.2d at 671. Even Defendants concede that "drywall is defective and must be removed and the property remediated." *Chinese Drywall*, 2017 WL 1421627, at *15.

At the time they were injured and seeking to remediate, all of the Plaintiffs were entitled to replace all of the drywall, all electrical wires, all copper pipes, the HVAC units, carpets, hardwood or vinyl flooring, cabinets, countertops, trim and molding, bathroom fixtures, insulation, and broken tiles, and have the house cleaned with a HEPA vacuum, and a certification provided. *Chinese Drywall*, 706 F.Supp.2d at 671-686. To the extent someone has done less than this level of remediation (likely because they could not afford it), they have not been made whole. *Id.* at 693 (discussing what is required to make Plaintiffs whole).

In addition, Plaintiffs with Chinese drywall in their homes have been injured because their homes may have decreased in value even after the repairs were completed. *Id.* at 691. They will incur alternate living expenses during the remediation and could incur "costs associated with foreclosures and/or bankruptcy, additional amounts owed due to mortgage deferral, bankruptcy or inability to refinance, and loss of income." *Id.* at 691-92. Further, Plaintiffs are "entitled to recover damages for loss of use and enjoyment of a residential property." *Id.* Loss of use and enjoyment could include "past and future displacement from the home, exposure to obnoxious gases, failures of electrical equipment, increase risk of electric failure and fire, and total loss of enjoyment of the home." *Id.* at 693.

Here, through discovery, Plaintiffs have submitted voluminous documentation (*e.g.*, receipts, invoices, cancelled checks, leases, etc.) of their damages including alternate living expenses, diminution in value, damage to personal property, lost rent, and bankruptcy and/or foreclosure. SOF at ¶¶ 58-60. Detailed evidence of Plaintiffs' damages was produced to Defendants *via* the BrownGreer portal, Plaintiff Profile Forms and Supplemental Profile Forms, and through deposition testimony. Further, Plaintiffs' damages were presented to Defendants in summary form, in part, through Plaintiffs' expert, Mr. Michael Elkin, CPA. SOF at ¶¶ 33-34, 58. In the event the Court disregards Mr. Elkin's expert testimony,[21] Plaintiffs seek to submit the summaries attached to Mr. Elkin's report pursuant to Rule 1006. SOF at ¶¶ 58. The evidence of damages exists as Defendants do not dispute that the report accurately summarizes the information contained in the documents upon which the summaries are based. Plaintiffs have responded to interrogatories regarding damages and testified at length regarding their damages and the documents they submitted in support of those damages. SOF

---

[21] Defendants moved to strike Mr. Elkin's expert report (ECF No. 248), and Plaintiffs have opposed that motion.

at ¶60.  Most poignant has been the testimony regarding the toll the Chinese drywall and the
delays in the Chinese drywall litigation (*i.e.*, Defendants' delays) have had on these Plaintiffs.
SOF at ¶¶ 60, Exs. A-1 through A-36. To illustrate, a few examples are provided:

- **William Foster**: "For 12 years now we've been dealing with Chinese drywall.
  We're in our 60s. That's a sixth of our life we have had to deal with Chinese
  drywall, and nothing's been done. We've been married 21 years. Over 50 percent
  of our married life we have been dealing with Chinese drywall. Of the 21 years,
  almost seven years, or a third of our life, we have been separated. We couldn't be
  together because I had to go somewhere and work to pay for Chinese drywall. And
  during this whole time, we had to sit there and watch what -- we moved stuff out
  of our house to try to live somewhere and watch all of your neighbors get -- not all
  of them, many of them, excuse me -- get their house taken care of by Knauf in 2010
  and 2011. And we went eight and nine years with nothing being done for us. And
  it's a travesty. It's a travesty is what's happened."

- **Vicki Foster**: "This was our home. This was our sanctuary. This is where we
  wanted to retire and be together for the rest of your lives and enjoy life after
  working all of our life, and that was taken away from us."

- **Candace Gody**: "This toxic Chinese drywall situation" "has taken over so much.
  This is one-seventh of my life I have been dealing with this. I am 71 years old, and
  I had to deal with all this."

- **Dailyn Martinez**: "[T]here's no money in the world that -- the nine years that I
  have passed that my family and I have suffered because of all of this problem. I'm
  a Cuban. I came in a boat, in a raft three days in the water with the -- with -- …
  sharks next to me in order to arrive at this country, this powerful country. I have
  worked very hard. I bought my house, the American dream, and look what's
  happened to us. Everything for money. Nine years. Would anybody believe that
  this would happen in this country? Illnesses, many, many problems that you can't
  even imagine. That's what I wanted to tell you."

- **Monica Alba-Nunez**: "It's things that we're still suffering and will suffer for the
  rest of your life because you can't get that time back. You can't undo the damage
  that was done emotionally, physically. So you will suffer that the rest of your life
  because the memory is there.  The girls, their father, when he found out that we
  were living in a house with toxic drywall in it, threatened to take me to court to
  take custody away from the kids because he didn't want them living there. So then
  you have to choose between do we ruin our entire credit, our chances of ever being
  able to be a homeowner, or do I let my kids go?  We can't afford to fix the house.
  We can't afford custody battles with my ex-husband. We can't afford -- so, yeah,
  all of those things were a personal loss to me."

- **Larry Walls**: "We couldn't enjoy our home no more. We loved that house. My
  wife loved the house. I loved the house. Mentally and her health and stuff, it ruined
  us. It just ruined us. She drives a school bus. She goes by that damn house. She has
  a spot down the street – two houses down from that house. She sees that house

10

every day. When school is going on, twice a day she sees that house. She comes home crying, all messed up."

- **Marc Wites**: "We bought that house as our dream house, as a place where we wanted to raise our children and make memories in, and of course we've continued to live there after it was remediated, but I don't like the house. I have no affection towards the house. I have no affinity towards the house. It's a physical place where we live."

- **Kevin Rosen**: "[Y]ou would ever want your two-year-old or three-year-old child in a house inhaling this gas that was poisonous enough to destroy the coils in my air conditioner, blacken and sooten my electric outlets, create a gas leak in my home, smell and breathe and be sick from this, it's a nightmare I will never get over and a worry I'll never give up like asbestos and other diseases people get when they get exposed to this."

"[Taishan's] drywall destroyed our house -- and then to wind up living through this nightmare where we had to leave our home, throw out our personal property, me being sick, moving us into a rental, and doing the honorable thing, which is selling the house in the best way we could to get the few dollars we could out of that house, my wife's inheritance, so we could get on with our life, we did what we had to do. And I can tell you this, I enjoyed none of it. All those memories that we should have had in there were robbed, and we were ripped off. And it is a horrible, horrible tragedy. And unlike [Taishan], who, for nine years hasn't stepped up to help us, I paid and my wife paid our obligations all through this process."

This testimony is merely a snapshot of the ways Plaintiffs have been harmed. And, it went beyond having had to deal with the Chinese drywall in the first instance because it was exacerbated by having to wait while Taishan fled the jurisdiction seemingly never to return.

The record is replete with evidence that Taishan had little regard for the quality and safety of the drywall it shipped to the United States. Taishan's manufacturing process had little consistency and controls.[22]  With respect to the drywall at issue in *Germano*, Taishan "originally contracted to meet United States' ASTM standards" but subsequently "insisted that the drywall it sold to Venture Supply, Inc. would not be required to meet these standards." *Chinese Drywall*, 706 F.Supp.2d at 662. That drywall "was never tested pursuant to the United States ASTM standard." *Id.* The distributor, Venture Supply, "relied on a representation that Chinese testing was equivalent to U.S. testing standards. However, the Chinese tests were accomplished by a government agency of the Republic of China and not

---

[22] During the Product ID deposition, Taishan's corporate representative testified about marking Taishan's drywall, which reflected the same lack of procedures and controls that, in conjunction with the other facts and evidence, would lead a reasonable fact-finder to conclude that Taishan had little regard for oversight and quality control over the products shipped into the U.S. SOF at ¶¶ 61.

by an independent testing laboratory." *Id*. (internal citation omitted). "Certificates of Quality were likewise issued by a government agency" and "the Certificate of Quality Management System Certification issued predate[d] the production of the drywall shipped to the United States by at least two (2) years." *Id*. Safety standards were treated as inconsequential.

In addition, there is evidence in the record that Defendants did not care about whether their products were harmful or whether they met any required standards, Defendants would simply defer to customers. SOF at ¶¶ 61. In fact, in one exchange discussing BNBM pricing, a Knauf employee noted "[t]he board does not comply with the ASTM nor do they have any certification. From the Shandong plant they are currently using Phosphor gypsum. ln the past we know they have received 'top up' loads from TaiHe group which are quite ordinary in quality and use Asbestos in same plants instead of glass fibre." *Id*.

Not surprisingly, there is evidence in the record that shows Defendants were on notice of defects in Taishan's drywall. *Id*. In one instance, a customer complained that the boards were brittle and breaking or crumbling during transit. *Id*. In fact, to combat Taishan's claim that the issues arose during shipping, an analysis was done of Taishan's boards with those shipped by Pingyi Baier Building Materials Co., Ltd. ("Baier") and testing showed no issues with the Baier boards and significant issues with the Taishan boards. *Id*. Baier's boards were also found not to be defective when tested by the CSPC. *Id*. Because Taishan had little regard for the quality and safety of its boards, it was more than content to ignore these warning signs.

There is no doubt that Taishan's defective drywall caused the harm bestowed upon Plaintiffs. "Chinese drywall presents a truly unique dilemma, and the damages from Chinese drywall are not easily analogized to those of typical class actions." *Chinese Drywall*, 2017 WL 1421627, at *15. "In most class actions, even if liability is established, the issue of causation is often inextricably intertwined with damages and remains to be litigated. In other words, even if a court finds that a defendant was negligent and that a plaintiff suffered damages, the court must still determine whether those damages were *caused* by that negligence." *Id*. (emphasis in original). In contrast, "[w]ith regard to Taishan..., there is no issue of liability or causation" because "Taishan has been held liable for defective drywall, and any properties containing Chinese drywall are defective, requiring removal of the drywall." *Id*.

With this factual record, Plaintiffs have raised genuine issues of material fact as to their entitlement to each of the categories of damages at issue.

## IV.    DEFENDANTS' SUMMARY JUDGMENT MOTION AS TO "OTHER DAMAGES" SHOULD BE DENIED

### A.    Summary Judgment Standard.

"'A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.'" *Goussen v. Mendez Fuel Holdings LLC*, 350 F.Supp.3d 1283, 1287 (S.D. Fla. 2018) (Cooke, J.) (quoting FRCP 56(a)). Because liability and causation are established, Defendants' Summary Judgment Motion is only appropriately addressed to Plaintiffs' claims for "other damages." Therefore, to grant summary judgment, the Court must assess whether there is a genuine dispute as to the existence or amount of Plaintiffs' "other damages." *See id*. A genuine factual dispute exists where, based upon the evidence, a reasonable jury could find on behalf the non-moving party. *See Gomez v. General Nutrition Corp.*, 323 F.Supp.3d 1368, 1373-74 (S.D. Fla. 2018) (Cooke, J.) (quoting *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999)).

When reviewing a motion for summary judgment, the Court should "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant.'" *Goussen*, 350 F.Supp.3d at 1287 (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (internal citation omitted)). The Court should not weigh the evidence at this stage but instead, should merely assess whether there are genuine issues to be tried. *See id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In other words, Defendants' motion should only be granted if, looking at all of the evidence in the light most favorable to Plaintiffs, no reasonable juror could find for Plaintiffs.

### B.    All Plaintiffs Have Produced Evidence of Their Damages.

Plaintiffs produced extensive documentation and provided sworn testimony and discovery responses to support their claim for the following categories of damages sustained as a result of the presence of defective Chinese drywall in their homes: (1) complete remediation (under *Germano* protocol), (2) diminution in value, (3) alternate living expenses, (4) costs associated with foreclosures and/or bankruptcy, (5) additional amounts owed due to mortgage deferral, (6) bankruptcy or inability to refinance, (7) loss of income, and (8) loss of use and enjoyment. SOF at ¶60; *see also Chinese Drywall*, 706 F.Supp.2d at 691-93. In

addition, Plaintiffs retained, Mr. Michael P. Elkin, CPA, who incorporated the data into a database from which he calculated Plaintiffs' damages in a summary report. *Id.* at ¶58.

Mr. Elkin's damage summaries include, where applicable: (1) remediation expenses; (2) alternate living expenses; (3) personal property damage expenses; (4) lost rental income from affected properties; (5) legal fees and costs in connection with foreclosures, short-sales or bankruptcy; (6) lost equity, and (7) additional damages. *Id.* at ¶¶ 58. Mr. Elkin's Report provides a clear articulation of any given Plaintiff's total damages calculation. *Id.* For example, in the case of Andrew and Dawn Feldkamp, Mr. Elkin utilized their interrogatory responses, deposition testimony and exhibits, SPPF, and documents produced in this litigation (including invoices, cancelled checks, etc.) to prepare a summary of their damages. *Id.* Not including a claim for damages pursuant to the remediation formula,[23] the Feldkamps are seeking $37,989 in alternate living expenses, $970 in personal property damage, and $9,064 in lost equity. *Id.* at Ex. 5. A similar summary, with supporting documentation, was done for the damages incurred by each Priority Claimant. *Id.* at Exs. 1-20. As a result, each Plaintiff has produced sufficient evidence to establish their entitlement to damages. In addition, Plaintiffs used expert appraiser Anthony Graziano and expert realtor Ryan Greenblatt to evaluate the stigma/diminution in value attributed to Plaintiffs' homes as a result of Chinese drywall.

      1.    **Cost of Remediation.**

This category of damages was claimed by Priority Claimants Etter, Foster, Gody, Hernandez, Nguyen and Tuyen, and Wites; and supported by testimony, discovery responses, documentation and the summary provided by Mr. Elkin. *Id.* at ¶¶ 58, 60. Defendants do not appear to challenge these damages but instead, use this category of damages to bootstrap a challenge to various forms of diminished value including diminution in value/stigma damages as well as lost equity damages. As Judge Fallon noted, a property can be fully remediated and still have a reduced value because of the fact that it previously had tainted drywall. In fact, when Defendants deposed realtor J. Vance Brinkerhoff, he was asked if

---

[23] It is Plaintiffs' position that the Feldkamps are entitled to remediation formula damages even though they did not remediate their home. Defendants argue they should be limited to diminution in value as former owners. Defs.' SJ Mot. at 14-15. This is discussed further in Section IV.B.2, *infra*, at 15-17.

buyers had any problems buying Chinese drywall homes that had been remediated and he responded that "[t]here is a stigma regarding it."  *Id.* at ¶ 13.

### 2.    Diminution in Value/Stigma/Lost Equity.

Defendants do not contend any given Plaintiff failed to produce evidence of these damages but instead challenge entitlement to these damages. In addition, Defendants lump these measures of damage together, arguing they overlap and would result in duplicative recovery not permitted under Florida law.[24] However, these claims are measures of separate and distinct harms. To the extent these theories of recovery have some overlap, Defendants misstate the law. A party is allowed to proceed on alternate theories of liability but is not entitled to recover duplicative damages. The procedure for ensuring that duplicative recovery does not occur is not to grant summary judgment on claims, but to allow the jury to hear all of the claims without consideration of any duplication and then have the court modify or alter the judgment to make sure duplicative recovery is avoided. *See, e.g., EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 742 (8th Cir.2000) (court "specifically instructed the jury not to account for duplication, explaining that it would later modify the damages award to eliminate any duplicative amounts."). There is no reason to grant summary judgment.

*Lost Equity*. Defendants' argument that "lost equity" is not a recognized measure of damage to real property under Florida law misses the mark.[25] To be clear, lost equity is a measure of damage that is separate and apart from the value of the property. As Defendants consistently reiterate, the purpose of damages in Florida is to make the aggrieved party whole. *See, e.g., National Union Fire Ins. Co. of Pittsburgh*, 2015 WL 3905018, at *26 (damages intended to put the plaintiff in the same position they would have been had it not been for the damage). Here, returning lost equity helps do exactly that. Simply put, the Plaintiffs invested cash into the home and were never able to recoup the cash upon disposition of the property because of the defective drywall. Summary judgment should be denied as to lost equity damage.

*Stigma*. Defendants acknowledge that stigma-related damages are recognized in Florida but then suggest, with no authority, that any actual stigma is subsumed in diminution in value.[26] The law in Florida is clear that a seller of residential property must disclose those

---

[24] Defs.' SJ Mot. at 10-15.
[25] Defs.' SJ Mot. at 12.
[26] Defs.' SJ Mot. at 12.

facts materially affecting the value of the property which are not readily observable and not known to a buyer. *See Johnson v. Davis*, 480 So.2d 625, 629 (Fla. 1985). When such a disclosure causes permanent harm, plaintiffs are entitled to recover diminution in value, *i.e.*, stigma damages. *See Bisque Associates of Fla., Inc. v. Towers of Quayside No. 2 Condominium Association, Inc.*, 639 So.2d 997, 999 (Fla.3d DCA 1994).[27] That is precisely the case here where the presence of defective Chinese drywall in a home at any time must be disclosed in a home sale even if repaired or remediated. Plaintiffs are entitled to stigma damages.

Defendants also argue that Plaintiffs have not presented adequate evidence to support their claim for stigma damages.[28] Defendants assert that the reduction in value caused by the required disclosure of the presence of defective Chinese drywall should be measured by a comparison of before and after injury, yet Plaintiffs' expert "merely opined that all 20 of the Priority Claimants' properties would, even if fully remediated, still suffer some decline in value related to Chinese Drywall."[29] But stigma damages are distinct from the diminution in value "before and after" market analysis that Defendants are referencing. Whether the value of a Plaintiff's home dropped immediately upon the discovery of Chinese drywall because a potential buyer would understand, among other things, the need to invest large amounts of money post-purchase to remediate a home is a separate and distinct harm from the permanent diminution in value caused by a potential buyer's fear, whether reasonable or not, that would cause them to pay less for a home that at one time had been contaminated with a pollutant such as Chinese drywall. *See, e.g., Florida Power & Light Co. v. Jennings*, 518 So.2d 895 (Fla. 1987) ("The public's 'fear' as a factor which may be relevant to the issue of just compensation may be utilized as a basis for an expert's valuation opinion regardless of whether this fear is objectively reasonable."). Plaintiffs' experts have established that the stigma associated with a Chinese drywall home is 10%. Summary judgment should be denied.

*Diminution in Value*. This aspect of diminution in value is separate from the stigma associated with a Chinese drywall home. Defendants argue that other than the cost to repair,

---

[27] Defendants' citation to *Finklestein v. Dep't of Transportation*, 656 So.2d 921, 925 (Fla. 1995), for the proposition that long-term stigma is subsumed within a separate assessment of diminution of value is incorrect. Defs.' SJ Mot. at 13. *Finklestein* supports Plaintiffs' stigma damages claim as separate from the market analysis accompanying diminution in value. *Id.*

[28] Defs.' SJ Mot. at 12.

[29] Defs.' SJ Mot. at 12.

this is the only proper measure of damages and in fact, it is the most appropriate measure of damages when it is less than the cost to repair.[30] If a Plaintiff ceased owning the affected property, often because they lost the home to short sale or foreclosure because of the Chinese drywall, Defendants claim the Plaintiff is limited to diminution in value.[31]

However, Plaintiffs contend that the full cost to remediate is the proper measure of damages and that if someone performed a complete remediation, they are entitled to reimbursement of those costs, whereas any Plaintiff who did not completely remediate is entitled to damages under the remediation formula. The *Germano* remediation protocol establishes what is required to fix a Chinese drywall home. When homeowners do less than a full remediation because that is all they can afford (because Defendants delayed the litigation), they are not made "whole" by simply reimbursing them for the cost of a patchwork repair. SOF at ¶ 9. Plaintiffs are entitled to formula damages because at the time the damage was discovered, they were entitled to the costs to properly repair their homes.

To the extent the Court determines that diminution in value is the appropriate measure for some or all of the Plaintiffs, Plaintiffs have offered expert opinion as to the amount of those damages. SOF at ¶¶ 59. Defendants have moved to exclude those experts, and the Court will make that determination separately, but regardless of the Court's ruling, it does not warrant granting summary judgment.[32] For example, according to Defendants, Mr. Graziano's analysis fails because he picked an arbitrary date in the future to measure the diminution instead of picking a date "immediately after the injury,"[33] which results in a hypothetical damage. But as Mr. Graziano explained, that is not the case. Defendants' position is ironic given that in Louisiana, where the law is the same regarding when to measure the damage to property, Defendants argued that Judge Fallon should measure diminution at the time the affected properties were sold. Nonetheless, Defendants' argument does nothing more than reiterate their motion to strike the testimony of Plaintiffs' expert and requires no further discussion here.[34]

---

[30] Defs.' SJ Mot. at 10-11, 13.

[31] Defs.' SJ Mot. at 14-15.

[32] *See* ECF Nos. 246, 247.

[33] *See* Defs.' SJ Mot. at 13.

[34] *See* Def.'s Mot. in Limine to Exclude Opinions of Anthony Graziano, MAI, CRE (ECF No. 246). Plaintiffs incorporate by reference the arguments in their opposition to that motion, filed May 13, 2019 (ECF No. 273).

More importantly, expert testimony is not required to establish the value of property. *See, e.g., Dorvil v. Nationstar Mortgage LLC*, 2019 WL 1992932, at *19 (S.D. Fla. Mar. 26, 2019) (owner may testify to the value of his property). In addition, in certain circumstances, Courts have found that the cost to repair can be used to establish the difference in market value before and after an injury, *i.e.* the diminution in value. *See, e.g., Kerns v. Pro-Foam of South Alabama, Inc.*, 572 F.Supp.2d 1303, 1306 (S.D. Ala. 2007) (finding that under Alabama law, a jury can consider out-of-pocket repair costs as evidence of the difference between the fair market value of the property immediately before and after the damage); *Bow to Stern Maint., Inc. v. Jackson*, 2006 WL 8432016, at *3 (S.D.Fla. Dec. 29, 2006) ("In admiralty, the cost of repairs is the equivalent of value-diminution."). Here, that cost to repair is encapsulated in the remediation damages formula. *See Chinese Drywall*, 2017 WL 1421627, at *24-25. Because calculation of diminution in value so far back is inherently imprecise, the cost to repair stands as a close approximation because it is what would have been required to make the Plaintiff whole at the time the damage was discovered.

Judge Fallon took this approach this month when faced with this dilemma, in the context of former owners, in the ongoing *Chinese Drywall Litigation* in Louisiana. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2019 WL 1984097, at *6 (E.D.La. May 3, 2019). Judge Fallon found that former owners who did not remediate their properties prior to transfer of ownership were limited to diminution of value but that did not necessarily mean that the remediation damage formula had no applicability. *Id.* Judge Fallon continued:

> the Court must consider how to properly calculate diminution in value of the properties in question. Had Defendants not chosen a course of "delay, delay, delay," which in many cases caused the property owners to lose their property and become former owners, the process of ascertaining the fair market value of a house before the defected drywall was installed and its value thereafter might not have been a difficult one. But the reality is that these injuries were sustained more than ten years ago to homes sold or foreclosed upon many years ago. Calculating the diminution in value of the homes at issue many years after the fact presents a Herculean task made so as a consequence of Defendants' actions.

*Id.* "Because remediating the home prior to sale or foreclosure likely would have restored the home's value, the cost of remediating that property informs the Court's analysis of its diminution damages." *Id.* Judge Fallon found that for Plaintiffs who had not remediated and

sold their property, "the remediation damages calculation shall serve as a rebuttable presumption of a prior owner's diminution damages." *Id.* This approach would be sound here as well and leave the fact-finder a basis upon which to fashion a diminution in value award.

Summary judgment should be denied as to diminution in value.

### 3.      Alternate or Alternative Living Expenses.

Defendants do not contest the appropriateness of this category of damages but instead present a line-by-line challenge to the expenses asserted by four Priority Claimants – Janet Avery, Lillian Chatmon, William and Vicki Foster, and Tracy Nguyen and Mai Tuyen.[35] Each Plaintiff has provided sufficient evidence to support their claim for alternate living expenses in the form of their own testimony, interrogatory answers, exhibits to their depositions, documents produced in the litigation and the Elkin report. SOF at ¶¶ 60. Defendants essentially present a factual dispute -- whether the witnesses incurred the claimed expenses or whether the expenses in question are, in fact, for alternate living expenses. But, such a credibility determination is not appropriate at the summary judgment stage. *See, e.g.,* *Tippens*, 805 F.2d at 954.

To the extent Defendants attempt to couch their credibility challenges as being challenges based on the "uncontroverted factual record," those claims are misguided. For example, Lillian Chatmon testified she had a second home in Georgia where she spent half the year when she was not in the Chinese drywall home. SOF at ¶ 60. When she was forced to vacate her Chinese drywall, she took the belongings she needed and moved in with her daughter in Florida and paid a reasonable rent. *Id.* At that point, she continued splitting time between her Georgia home and her daughter's in Florida. *Id.* Defendants seek to reduce Ms. Chatmon's alternate living expenses in half because they disingenuously claim she only lived with her daughter half of the year and spent the other half of the year in Georgia. *Id.* Defendants deliberately ignore that Ms. Chatmon testified that she kept a room at her daughter's year-round where she kept her things so she could come and go as she had when she had access to the Chinese drywall home. *Id.* She is entitled to reimbursement for these expenses and in any event that is a determination for the trier-of-fact.

---

[35] Defs.' SJ Mot. at 15-17.

19

Similar problems afflict Defendants' analysis of the remaining alternate living expense issues. The presence of Chinese drywall forced Janet Avery to find an alternate living arrangement. *Id*. She incurred expenses, and Defendants are liable. *Id*. The fact that Mrs. Avery stopped paying her mortgage because she couldn't afford two housing payments and Defendants were intent on not appearing to participate in this litigation, does not render her payments for alternate living expenses unrecoverable. *Id*. Mrs. Avery was obligated to make her mortgage payments at the same time she was obligated to pay the alternate living expenses, and to the extent she was forced to stop paying the mortgage payment, it is clear that the failure to pay resulted in an increase in her overall liability to the bank. *Id*. Defendants appear to be arguing that if they forced a homeowner into foreclosure, they should get the benefit because you "saved money" on your mortgage. That argument is facially absurd and ignores basic financial principles.

The same is true for Defendants' purely factual challenges to the claims of Foster and Nguyen/Tuyen. Defendants are not questioning their entitlement to alternate living expenses, they are questioning the validity of some of the claimed expenses.[36] These are credibility determinations and questions of fact to be made by the fact-finder. Plaintiffs have submitted records supporting these claims. *Id*. Summary judgment should be denied.

### 4. Personal Property.

The majority of the Priority Claimants are seeking damages to personal property ranging from HVAC systems to televisions to furniture to clothing. *Id*.  It is well-established that Chinese drywall ruins the very types of electronic, fabric, wood and metal items that comprise Plaintiffs' claims. *See, e.g., Chinese Drywall*, 706 F.Supp.2d at 681-693 (discussing electronics), 705 (replacing items such as mattresses because smell wouldn't come out). In light of consequences of sulfur contamination caused by Chinese drywall, Defendants inexplicably argue that Plaintiffs failed to show "that the personal property damage was in fact caused *in each instance* by Chinese Drywall."[37] Putting aside that causation has been established by default, the evidence shows that Plaintiffs' personal property was in their Chinese drywall home, defective Chinese drywall contamination causes very specific types of

---

[36] *See* Defs.' SJ Mot. at 16-17 (challenging cable charges, lack of receipts, intent behind incurring certain expenses, etc.).

[37] *See* Defs.' SJ Mot. at 19 (emphasis added).

problems (*e.g.*, electronic failures, odor contamination in anything that is made of absorbing material, HVAC failures, etc.), and Plaintiffs' personal property was afflicted with precisely those types of problems. *Id.* This is enough evidence from which a reasonable fact-finder could conclude the damage was caused by defective Chinese drywall.

Defendants offer no evidence to controvert that logical chain but instead suggest, without support, that something more is required of Plaintiffs. Indeed, Defendants claim that Plaintiffs' "own corrosion expert testified that not all metal in a home with defective drywall would necessarily be corroded, much less have failed."[38] This argument misses the point. While all metal in a Chinese drywall home may not have corroded, if metal that was in a Chinese drywall home had corroded, it is more likely than not that it was caused by the off-gassing of the defective drywall.[39] Defendants' causation argument should be rejected.

Beyond that, Defendants do not contest their obligation to pay for personal property that was destroyed by defective Chinese drywall but instead argue that expert testimony is needed as to the fair market value of the property in question. Defendants misapprehend the nature of the analysis into personal property. The very case they cite, *Ocean Elec.*, 636 So.2d 112, illustrates the flaw in their analysis.[40] It is true that market value is the determining factor in assessing Plaintiffs' damages, but the key part of the analysis is that "[t]he 'appropriate economic market to be used in approximating reasonable market value is the usual market where the property or goods had been purchased.'"[41] *See Ocean Elec.*, 636 So.2d at 114. For the plaintiff in *Ocean Elec.*, the relevant market was the wholesale market; however, the court made clear that the relevant market for assessing market value for ***consumers, like the Plaintiffs here, is the retail market***. *See id.* Thus, consumers such as Plaintiffs here can recover the price for purchasing in the retail market, *i.e.* the equivalent type of store where they bought the original product. *Id.* (citing Restatement (Second) of Torts § 911 cmt. d (1979)).

Defendants suggest that expert valuation is needed where depreciation and life of the product are considered. But, this proposition ignores the market where consumers buy these

---

[38] *See* Defs.' SJ Mot. at 20.

[39] Defendants' reference to Mrs. Foster's decision to discard property misses the mark. *See* Defs.' SJ Mot. at 20.

[40] *See* Defs.' SJ Mot. at 18.

[41] *See* Defs.' SJ Mot. at 18.

products. Unlike the high-end items in the cases cited by Defendants,[42] there is no resale sub-market for used couches, clothing, DVD players and other retail consumer items. Plaintiffs participate in retail markets and are therefore entitled to the retail price of their property which can be clearly identified without the use of an expert. In fact, Plaintiffs' testimony and documents reflect several ways in which the retail market value of the damaged personal property can be assessed including, but not limited to, the original purchase price of the item or the cost to purchase a replacement item. SOF at ¶¶ 60. These expenses were catalogued by Plaintiffs' expert Mr. Elkin. *See id*. at ¶ 58. In addition, contrary to Defendants' statement, a plaintiff can testify to the value of the property that was damaged, an expert is not necessary. *See, e.g., Morsch v. JP Morgan Chase Bank, N.A.*, 2018 WL 5830557, at *5-6 (M.D. Fla. Nov. 7, 2018) (stating that plaintiff may testify as to contents and value of items in her safety deposit box, such as jewelry); *Dorvil*, 2019 WL 1992932, at *19; *Johnson v. Thor Motor Coach, Inc.*, 2016 WL 1182792, at *6 (M.D. Fla. Mar. 28, 2016); *Welsh v. Newman Intern. Transp., Inc.*, 2011 WL 5570800, at *2 (M.D. Fla. Nov. 16, 2011).

Finally, Defendants' contention that a receipt is required to claim damages to personal property should be rejected. As noted above, a plaintiff can always testify to his or her damages. This is a credibility issue that is not appropriate for summary judgment. For example, Defendants specifically point to the claim by the O'Briens for damages to a mattress where they: "did not provide receipts for these damages, did not provide evidence showing the property was damaged, and did not make any effort to mitigate or repair the damage."[43] First, the record is clear that the odor caused by the off-gassing of the defective Chinese drywall absorbs into anything with fabric, including mattresses. *See Chinese Drywall*, 706 F.Supp.2d at 705 ("The Michaux family has had to prioritize items to replace due to the smell for financial reasons. The children got new mattresses. Other items were kept simply because the family cannot afford to replace them."). Furthermore, it is unclear what steps could be taken to mitigate damage to a mattress, nor do Defendants suggest any.

---

[42] The cases Defendants rely upon to support their position bear little factual relation to Plaintiffs' claims. *See Sarasota Yacht & Ship Servs., Inc. v. Harris*, 813 So.2d 231 (Fla. Dist. Ct. App. 2002) (used yacht); *Burtless v. Pallero*, 570 So.2d 1140 (Fla. Dist. Ct. App. 1990) (used car); *Ocean Elec.*, 636 So.2d 112 (plaintiff-distributor's inventory is wholesale price); *Bizrocket.com, Inc. v. Interland, Inc.*, 2005 WL 6745909 (S.D.Fla. May 23, 2005) (proprietary software); *McDonald Air Conditioning, Inc. v. John Brown, Inc.*, 285 So.2d 697 (Fla. Dist. Ct. App. 1973) (welding machines); *Port Largo Club, Inc. v. Warren*, 476 So.2d 1330 (Fla. Dist. Ct. App. 1985) (time-share condominiums).
[43] *See* Defs.' SJ Mot. at 20.

The same is true for the Fosters, who Defendants noted are seeking personal property damages "totaling at least $87,400." They make the factual challenge that the Fosters "are missing at least one receipt for blinds, and they produced at least one duplicate receipt."[44] The Fosters are lay people and Vicki Foster was managing the Chinese drywall catastrophe all by herself because her husband had returned to work to help pay for the remediation. SOF at ¶ 60. Yet, despite the cards being stacked against her, Mrs. Foster gathered voluminous documentation to support her claim for personal property damages. *Id.* at ¶ 60. It is for the jury to decide if the missing receipt for blinds or the duplicative receipt renders her testimony that she replaced the blinds credible. A genuine issue of material fact exists.

Similarly, Defendants propose that Kevin Rosen, who had a vivid memory of purchasing two $3,500 TVs destroyed by Chinese drywall, should receive no compensation because he failed to save the receipts for this purchase, even though he had no reason at the time to suspect he would ever need them. *Id.* at ¶ 60. Summary judgment should be denied.

**5.  Loss of Use and Enjoyment.**

Defendants acknowledge the availability of damages in Florida in nuisance[45] cases for "loss of use or loss of rental value as a general measure of damages recoverable for a temporary nuisance to the property itself" – referred to as general nuisance damages.[46] In addition, they acknowledge the existence of special nuisance damages: "Florida courts have expanded the interests protected by the nuisance actions to the intangible interests of mental and emotional welfare because they generally relate to the right to use and enjoy one's own land in comfort and safety."[47] In fact, "the plaintiff may recover such special or incidental damages as he may be able to prove, i.e., annoyances, discomfort, inconveniences, or sickness. This is true whether the injury is permanent or temporary...." *Nitram Chems., Inc. v. Parker*, 200 So.2d 220, 225 (Fla.2d DCA 1967). The court in *Nitram* continued, quoting Dean Prosser's "excellent review of the damages recoverable in nuisance...the loss of the rental *or use value* of the property for the duration of a temporary nuisance,... and *in addition the value*

---

[44] *See* Defs.' SJ Mot. at 20.
[45] Defendants incorrectly assert that despite the defaults, Plaintiffs' private nuisance claim should be dismissed. Plaintiffs have properly asserted a claim for private nuisance and Defendants' argument to the contrary is addressed in Section V (C), *infra*.
[46] Defs.' SJ Mot. at 20.
[47] Defs.' SJ Mot. at 21 n.9.

*of any personal discomfort or inconvenience which the plaintiff has suffered, or of any injury to health or other personal injury sustained by the plaintiff, or by members of his family so far as they affect his own enjoyment of the premises*, as well as any reasonable expenses which he has incurred on account of the nuisance." *Id*. (emphasis added).

The deposition transcripts and testimony of Plaintiffs are replete with explanations of the full impact of their discomfort and inconvenience as well as the loss of enjoyment they experienced. *See* Section III, *supra.* Defendants' objection to these damages seems to be that Plaintiffs have not articulated a formula for assessing the damages.[48] But, a person's mental anguish is not the type of damage that lends itself to a formulaic approach. It is a question of fact appropriately considered by the trier of fact based on facts contained in the record.

As for general nuisance damages measured by reference to rental value, Plaintiffs have presented that evidence. Defendants concede as much but claim Plaintiffs are seeking double or duplicative recovery.[49] Even though a party is not allowed double recovery, they are allowed to proceed on alternate theories of liability that may ultimately result in duplicative damages. Avoidance of duplicative recovery is not accomplished by way of a motion for summary judgment but instead by a motion to modify or alter the judgment after a verdict is reached. *See, e.g., EFCO Corp.*, 219 F.3d at 742 (district court "specifically instructed the jury not to account for duplication, explaining that it would later modify the damages award to eliminate any duplicative amounts."). Summary judgment should be denied.

**C.** **Facts Determined in this Litigation Along with Other Record Evidence Supports the Imposition of Punitive Damages.**

Defendants argue extensively against the applicability of punitive damages to this case. To reach this conclusion, Defendants ignore the *Germano* FOFCOL, Class Certification FOFCOL and Class Damages FOFCOL, as well as additional record evidence that shows that Taishan acted with reckless disregard for the "life, safety, [and] rights" of the consumers, like the Priority Claimants, who were the intended users of their product.

Under Florida law, "[a] defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." Fla.Stat. §768.72(2) (2018). In this

---

[48] *See* Defs.' SJ Mot. at 21.
[49] *See* Defs.' SJ Mot. at 21.

context, "[g]ross negligence means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard to the life, safety, or rights of persons exposed to such conduct." *Id.* at §768.72(2)(b). The effects of Chinese drywall on the well-being of the homeowners who had it installed in their homes is well-documented and reflects a number of physical conditions as well as the property and emotional damage. There can be no doubt that the impact of defective Chinese drywall goes to the "life, safety, or rights or persons exposed" to it. The question is whether there is evidence in the record to show that Defendants had a reckless disregard for the impact that introducing potentially defective drywall into the United States generally, and Florida specifically, would have on the people affected.

Here, the evidence strongly suggests they did act with such disregard. As has already been established, Taishan disregarded manufacturing standards, "originally contract[ing] to meet United States' ASTM standards" but subsequently "insist[ing] that the drywall it sold to Venture Supply, Inc. would not be required to meet these standards." *Chinese Drywall*, 706 F.Supp.2d at 662. Never testing that drywall, providing false representations regarding the quality of the testing done on the boards, and issuing outdated quality certificates. *Id.* Safety standards were treated as inconsequential, and that is consistent with relaxed practices exhibited by Taishan with respect to marking and labelling boards. SOF at ¶ 61.

There is record evidence that supports this conclusion. SOF at ¶ 61. There is evidence indicating that Taishan boards did not comply with U.S. standards, they were "quite ordinary in quality," and "use Asbestos in same plants instead of glass fibre." SOF at ¶ 61. There is additional evidence that customers complained about the poor quality of certain boards, which led to an analysis of comparing Taishan's boards to a competitor, which resulted in a finding that Taishan's boards had problems and the competitor's, Baier's, did not. SOF at ¶¶ 61. For a company with a normal sense of responsibility, proper testing and follow-up with potential problems would have been expected. Instead, Taishan's approach amounted to, at a minimum, "looking the other way," but the more likely inference from all of the record evidence is that Defendants simply did not care so long as they were profiting from the sale of the drywall, defective or not. Taken together, this evidence supports Plaintiffs' claim for punitive damages and the denial of summary judgment on this issue.

25

Additionally, Defendants claim that Florida's litigation privilege bars the Court's consideration of post-filing conduct as a factor in punitive damages.[50] However, this privilege is an affirmative defense, and affirmative defenses are waived by virtue of the default. *See Diamond Resorts Int'l, Inc. v. Aaronson*, 2019 WL 1445181, at *16 n.21 (M.D.Fla. Mar. 5, 2019) (litigation privilege is an affirmative defense and defendant bears the burden of proof); *see also Suntrust Bank v. Baum*, 2009 WL 1097975, at *1 (S.D.Fla. Apr. 22, 2009) (default results in waiver of affirmative defenses); *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1221-22 (11th Cir.2012) ("Failure to plead an affirmative defense generally results in a waiver of that defense."); *UC Acquisition Corp. v. Salem Nursing & Rehab Center of Tuskegee, Inc.*, 2012 WL 95422, at *1 n.1 (M.D.Ala. Jan.12, 2012) (courts should not raise affirmative defenses *sua sponte* for party in default and citing authority). Therefore, the Court should disregard Defendants' attempted invocation of the litigation privilege.

The Court should consider the post-filing conduct of Defendants because this is a unique case where the post-filing conduct became part of the wrongdoing, exacerbating Plaintiffs' damages and delaying recovery to a point where many of the Plaintiffs have given up and moved on. As Judge Fallon has said, "delay tactics have permeated every aspect of Defendants' litigation strategy: from their initial failure to appear to their now perpetual motions to re-litigate settled matters." *Chinese Drywall*, 2018 WL 279629, at *8. Indeed, "the whole approach is just delay. Delay because people die, delay because they lose their homes, delay because they're frustrated and giving up."[51] And, the Court can see that the strategy has paid off as Defendants come to the Court with a motion seeking to punish homeowners who have been foreclosed upon or can't find receipts from seven or eight years ago to support a particular claim for damage. As a result of these damages, Plaintiffs continue to accrue damages, particularly if they have not remediated. This strategy was part of a deliberate strategy to deny homeowners their day in Court and should be contemplated when considering the imposition of punitive damages. Summary judgment should be denied.

**D.**     <u>**It is Premature to Assess Plaintiffs Who Received a Negative Product ID Recommendation from the Special Master.**</u>

---

[50] *See* Defs.' SJ Mot. at 9-10.
[51] *See* Transcript of MDL Proceedings, August 15, 2018, at 24:2-11.

Defendants move for summary judgment on the five Priority Claimants whose properties contained drywall with markings that the Special Master recommended not be attributable to Taishan.[52] By way of further explanation, two of the Priority Claimants – (1) Kevin and Stacey Rosen and (2) Michael and Robyn Rosen – also have blank boards in their home that were found by the Special Master to be not attributable to Taishan. On April 29, 2019, Plaintiffs filed their Objections to and Appeal from the Special Master's Report & Recommendation Regarding Product ID Categories Attributable to Taishan Gypsum Co., Ltd.[53] These Objections, incorporated herein by reference, seek to overrule the Special Master's recommendation with respect to the boards contained in these five Priority Claimants' homes as well as the blank boards found in the homes of both of the Rosen families. *See* ECF No. 253 at 11-20. Pending the Court's ruling on the Objections, it is premature to dismiss these Priority Claimants from the litigation, and summary judgment should be denied without prejudice on this issue.

## V.   DEFENDANTS' ATTEMPT TO RELITIGATE LIABILITY SHOULD BE REJECTED OUT OF HAND

Defendants' final argument addresses the viability of those claims set forth in Counts II, IV, V, VI, VII, VIII, IX, and X. Recall, by virtue of their default, liability and causation are established. Thus, the Defendants' challenges to these different causes of action are not permitted at this juncture.  Defendants inaccurately portray default jurisprudence to make their arguments. And while it is true that a court can seek additional information prior to finding liability after accepting the well-plead facts upon default, no such situation existed here where the Court already found Defendants liable and that causation was inextricably intertwined with liability. *See, e.g., Chinese Drywall*, *Chinese Drywall*, 2017 WL 1421627, at *15.

Because the Court adopted the finding of liability and causation, the Court denied Defendants' request for discovery into these matters. Defendants now argue that Plaintiffs should come forward with evidence to support the private nuisance cause of action. In other words, the lack of discovery occasioned by Defendants' default should be used in Defendants' favor. This argument fails. Judge Fallon had all of the evidence needed when he found

---

[52] *See* Defs.' SJ Mot. at 6; *see also* Special Master's Report & Recommendation Regarding Product ID Categories Attributable to the Taishan Defendants (ECF No. 233) ("Special Master's Product ID R&R").
[53] *See* ECF No. 253 (the "Objections").

Defendants liable and causation intertwined with liability, and those findings were "well-reasoned and well-supported by the evidentiary record." (ECF No. 112 at 3).

Notwithstanding that fact, even if the Court reviewed the allegations in Plaintiffs' Omni Complaint, the challenged causes of action have been adequately pled. However, because this was an Omni Complaint encompassing Plaintiffs from numerous jurisdictions with state-specific causes of action, there are non-Florida claims not applicable to Florida Plaintiffs. To be clear, Plaintiffs are <u>not</u> pursuing claims for Redhibition; Louisiana Products Liability Act; Alabama Deceptive Trade Practices Act, Mississippi Consumer Protection Act, North Carolina Consumer Protection Act, and Texas Deceptive Trade Practices-Consumer Protection Act; and Equitable and Injunctive Relief and Medical Monitoring.[54]

## A. Breach of Express and/or Implied Warranties (Count IV)

Lumping Plaintiffs' claims for breach of express and implied warranties together, Defendants mount a multi-pronged attack on these claims under Florida law, none of which has merit.

*Express Warranties*. Defendants assert that a lack of privity between Defendants and Plaintiffs precludes recovery along with a lack of specific allegations of the terms of the warranty at issue.[55] However, Defendants ignore the Complaint allegations that "Defendants and/or their agents were in privity with plaintiffs and class members and/or plaintiffs and class members were foreseeable third-party beneficiaries of any warranty" and that Defendants were aware their product would end up in the Plaintiffs' homes.[56] In *Smith v. Wm. Wrigley Jr. Co.,* 663 F.Supp.2d 1336 (S.D.Fla. 2009), after surveying caselaw dating back to 1953, the court noted "[t]he privity requirement in Florida warranty claims is a moving target which depends on factors including whether the warranty is express or implied and the type of injury alleged" and ultimately found the plaintiff had asserted a valid claim for breach of express warranty, ***despite the absence of privity between plaintiff and the manufacturer***. *Id.* at 1342 (emphasis added); *see also, Mesa v. BMW of North America, LLC*, 904 So.2d 450, 458 (Fla. Dist.Ct.App. 2006)("If Mesa could not enforce the warranty against BMWNA…, the

---

[54] Because Plaintiffs' negligence *per se* claim is largely duplicative or, at least, subsumed within their negligence claim, Plaintiffs do not address it separately.

[55] Defs.' SJ Mot. at 24.

[56] ECF No. 1 at ¶ 167-68.

manufacturer's promises and the vehicle's warranty would be meaningless."); *Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1032 (11th Cir. 2017) ("Florida courts have found the privity requirement to be satisfied when a manufacturer directly provides a warranty to, or otherwise has direct contact with, a buyer who purchases from a third party"); *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.,* 2018 WL 3109632, *6-7 (S.D.Fla. Apr. 5, 2018) (finding privity was satisfied for express and implied warranty claims as plaintiffs were alleged to be third party beneficiaries of the warranties associated with the product since they were the ultimate consumer). Accordingly, privity has been satisfied.[57]

    ***Implied Warranties***. Defendants assert Plaintiffs' breach of warranty claim fails for failure to describe the "particular purpose" for which the drywall was to be used. Defendants' argument is misplaced. Defendants ignore the fact that there are two implied warranties: merchantability and fitness for a particular purpose. Merchantability applies to all products when used for their ordinary purposes. Fitness for a particular purpose applies when the buyer uses the product for a particular (non-ordinary) purpose and the seller knows about this purpose but does not disclaim the implied warranty. *Armadillo Distribution Enterprises, Inc. v. Hai Yun Musical Instruments Mfr. Co., Ltd.,* 142 F.Supp.3d 1245, 1254 (M.D.Fla. 2015). Using drywall in a house is its ordinary purpose, so merchantability applies. "A cause of action for breach of implied warranty of merchantability requires allegations that (1) the plaintiff was a foreseeable user of the product, (2) the product was used in the intended manner at the time of the injury, (3) the product was defective when transferred from the warrantor, and (4) the defect caused the injury." *Nature's Prod., Inc. v. Natrol, Inc.*, 990 F.Supp.2d 1307, 1321 (S.D. Fla. 2013) (citation omitted). Plaintiffs alleged all of the required elements for a breach of implied warranty of merchantability claim.[58]

    Finally, in their unrelenting effort to relitigate all aspects of this case, Defendants claim Florida's Economic Loss Rule ("ELR") prevents Plaintiffs from recovering on both their tort and contract claims. While giving lip service to Judge Fallon's ruling on ELR issued almost

---

[57] Defendants claim Plaintiffs were required to give pre-suit notice. Despite such notice being essentially impossible to provide to Chinese companies who have purposefully refused to respond even to lawsuits properly served under the Hague Convention, the plain language of the statute applies only to sellers, not manufacturers. *Tershakovec v. Ford Motor Co.*, 2018 WL 3405245, at *6 (S.D.Fla. July 12, 2018) ("Florida courts recognize that notice is required to be given to the seller, not the manufacturer under Florida law." (internal citations omitted)).

[58] ECF No. 1 at ¶¶ 166-173.

a decade ago where he found the "ELR has no relevance" where a product such as Chinese
drywall poses an unreasonable risk of harm to a plaintiff's property, as opposed to a product
which simply fails to meet a plaintiff's economic expectations, *In re Chinese-Manufactured
Drywall Prod. Liab. Litig.*, 680 F.Supp.2d 780, 790 (E.D.La. 2010),[59] Defendants persist in
asserting the ELR requires that Plaintiffs elect whether to recover under tort or contract, but
are not entitled to recover under both.[60] Contrary to Defendants' contention, Plaintiffs'
contract claims are independent of their tort claims and the ELR does not prevent recovery
under either or both. *See Lamm v. State St. Bank & Trust*, 749 F.3d 938, 947 (11th Cir. 2014)
(recognizing ELR now has limited application in products liability and the contours of any
limitations on contract claims are unclear). Summary judgment should be denied.

### B.  Private Nuisance (Count VII).

The elements of a private nuisance claim in Florida are: 1) the defendant carried out
or substantially participated in an activity in such a way ***as to seriously interfere with plaintiffs'
use and enjoyment*** of their property interest; 2) plaintiffs owned or possessed an actual property
interest in the real property that is the subject of this action; 3) ***defendant's interference with
Plaintiffs' use and enjoyment of the property resulted in unreasonable and substantial harm***; 4)
defendant's creation of the nuisance was the legal cause of the damage to plaintiff's property;
and 5) defendant's actions were not reasonable under the circumstances. *Beckman v. Marshall,*
85 So.2d 552 (Fla. 1956); *Durrance v. Sanders,* 329 So.2d 26 (Fla.1st DCA 1976); *Prior v. White,*
180 So. 347 (Fla. 1938) (emphasis added). Plaintiffs' allegations satisfy these elements.[61]

Anything that annoys or disturbs one's free use, possession or enjoyment of his
property or renders its ordinary use or occupation physically uncomfortable may become a
"nuisance" and be restrained. *Palm Corp. v. Walters*, 4 So.2d 696, 699 (Fla. 1941); *Town of
Surfside v. County Line Land Co.,* 340 So.2d 1287, 1289 (Fla.3d DCA 1977). "Although no
particular type of conduct on behalf of defendants is necessary to establish nuisance, it is
generally agreed that nuisance may rest on intentional invasion of person's property rights,
***on negligence,*** or on conduct abnormal and out of place in its surroundings." *Durrance,* 329
So.2d at 29 (emphasis added).

---

[59] *See also In re Chinese Drywall Litig.*, 2009 WL 6408999 (Miami-Dade Cty, Fla.Cir.Ct. Dec. 18, 2009).
[60] Defs.' SJ Mot. at 25.
[61] ECF No. 1 at ¶¶ 195-201.

Injuries arising out of a permanent nuisance include "annoyance, discomfort, inconvenience or sickness," and no physical impact is required. *See Exxon Corp. U.S.A. v. Dunn,* 474 So.2d 1269, 1273-74 (Fla.1st DCA 1985); *QBE Specialty Ins. Co. v. Scrap, Inc.,* 2018 WL 7198151, at *6 (N.D.Fla. Mar. 2, 2018). In *Exxon,* the court reaffirmed that "a cause of action for nuisance does not arise from negligent acts but from the annoyances, smoke, odors, et cetera, arising from the proven nuisance itself. The 'injury' arising from a nuisance is annoyance, discomfort, inconvenience, *or* sickness." 474 So.2d at 1273 (citation omitted).

Defendants allege Plaintiffs' private nuisance claim fails because it does not "establish an unreasonable use of Defendants' property."[62] To allege a cognizable claim in nuisance, plaintiff's complaint must include facts that defendant's conduct obstructed the free use of plaintiff's property. *Gates v. W.R. Grace & Co.*, 2009 WL 1455316, at *3-4 (M.D.Fla. May 21, 2009) (Plaintiff's nuisance claim was not sufficient as he failed to allege "any facts suggesting that he was annoyed or disturbed in the use or enjoyment of his property" resulting from Defendants' discharge of contaminants); *Lee-Bolton v. Koppers Inc.*, 2012 WL 12818344, at *3 (N.D.Fla. Feb. 10, 2012) ("In alleging that Defendant's conduct caused hazardous materials to enter onto Plaintiffs' property and this obstructed the use of its land, Plaintiffs have pled sufficient facts to allege a claim for nuisance."). Moreover, a nuisance action is "dependent upon an interference with the plaintiff's health, comfort, safety, or proprietary rights." *Navelski v. Int'l Paper Co.*, 244 F.Supp.3d 1275, 1309 (N.D.Fla. Mar. 25, 2017) (citation omitted). Focusing on the allegations of Defendants' conduct in their totality, it is clear that a private nuisance has been pled. Summary judgment should be denied.

### C. Unjust Enrichment (Count VIII).

Defendants contend summary judgment should be granted as to Plaintiffs' unjust enrichment claim because Plaintiffs failed to allege they have no adequate legal remedy.[63] Under Florida law, a plaintiff must allege the following elements to sustain a claim for unjust enrichment: (1) plaintiff has conferred a benefit on defendant; (2) defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for defendants to retain it without paying the value thereof. *Carriuolo v. Gen. Motors*

---

[62] Defs.' SJ Mot. at 26.
[63] Defs.' SJ Mot. at 28.

*LLC*, 72 F.Supp.3d 1323, 1326 (S.D. Fla. Dec. 11, 2014) (quoting *Virgilio v. Ryland Grp., Inc.*,
680 F.3d 1329, 1337 (11th Cir.2012)). Plaintiffs' Complaint alleges these elements.[64]

In support of this argument, Defendants cite *Denarii Sys., LLC v. Arab*, 2013 WL
6162825, at *6 (S.D. Fla. Nov. 25, 2013) and *In re Horizon Organic Milk Plus DHA Omega-3
Mktg. & Sales Practice Litig.*, 955 F.Supp.2d 1311 (S.D.Fla. 2013), for the proposition that a
plaintiff may only proceed on an unjust enrichment claim, an equitable remedy, if there is no
adequate remedy at law. An election of remedies, however, need not be made until "after a
verdict is entered but prior to entry of judgment." *Bonilla v. Crystal Graphics Equip., Inc.*, 2012
WL 360145, at *4 (S.D.Fla. Feb. 2, 2012); *see also Adrimar Investments, LLC v. Mexam Imp. Exp.
Corp.*, 2013 WL 12094883, at *3 (S.D.Fla. Mar. 22, 2013) ("[T]he case remains at the pleading
stage, and it is hornbook law that "[a] party may set out 2 or more statements of a claim or
defense alternatively or hypothetically...."). Summary judgment is inappropriate until the
remainder of Plaintiffs' claims are addressed. Summary judgment should be denied.

**D.** **Misrepresentation and Concealment.**

Defendants contend Plaintiffs' "veiled attempts to assert claims based on alleged
misrepresentation" are insufficient because the Complaint does not meet the heightened
pleading standard for fraud. Plaintiffs are not asserting a fraud claim. "[A] plaintiff relying on
the doctrine of fraudulent concealment must show affirmative actions by the defendant
constituting concealment." *McCourtney-Bates v. Bates*, 681 Fed. Appx. 760, 762 (11thCir. 2017)
(quoting *Hill v. Texaco, Inc.*, 825 F.2d 333, 335 (11th Cir. 1987)). To defeat summary judgment,
Plaintiff "must demonstrate the existence of specific facts demonstrating a genuine issue for
trial [to]…support[] a defense of equitable tolling." *Washington v. LaSalle Bank Nat. Ass'n*, 817
F.Supp.2d 1345, 1351 (S.D.Fla. 2011). The concealment and misrepresentation allegations
relate to equitable tolling of Plaintiffs' claims.[65] While Defendants have not alleged Plaintiffs'
claims are time-barred, the inclusion of these allegations protects such a defense. Plaintiffs
identified specific facts to support equitable tolling. Summary judgment is not appropriate.

**VI.** **CONCLUSION**

Plaintiffs request that the Court deny Defendants' Motion for Summary Judgment.

---

[64] ECF No. 1 at ¶¶ 202-05.
[65] ECF No. 1 at ¶¶ 25, 96-98, 208.

Dated: May 13, 2019                           Respectfully Submitted,

                                           /s/ Patrick S. Montoya, Esq.
                                           Patrick Shanan Montoya
                                           Fla. Bar No. 0524441
                                           Email: Patrick@colson.com
                                           Colson Hicks Eidson
                                           255 Alhambra Circle, PH
                                           Coral Gables, FL  33134-2351
                                           Telephone:  (305) 476-7400
                                           Facsimile:  (305) 476-7444
                                           *Interim Lead Counsel for Plaintiffs*