# EXHIBIT 50

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

| | |
|---|---|
| **EDUARDO AND CARMEN AMORIN** et al., **Plaintiffs,** v. **TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG TAIHE DONGXIN CO., LTD. et al.,** **Defendants.** | Civil Action No. 2:11-cv-377-MSD-RJK |

**JOINT APPENDIX**
**VOLUME I (*AMORIN* PLAINTIFFS)**

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO, P.C.
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
*Counsel for Plaintiffs*

Richard J. Serpe
THE LAW OFFICES OF RICHARD J. SERPE, PC
580 East Main Street, Suite 310
Norfolk, Virginia 23510
*Counsel for Plaintiffs*

Arnold Levin
Frederick S. Longer
Sandra L. Duggan
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
*Counsel for Plaintiffs*

James L. Stengel
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
*Counsel for Defendant Beijing New
Building Materials Public Limited Company*

Eric Cook
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
*Counsel for Defendants Taishan Gypsum
Company Ltd. and Taian Taishan
Plasterboard Co., LTD.*

Bernard Taylor, Sr.
Christina H. Eikhoff
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
*Counsel for Defendants Taishan Gypsum
Company Ltd. and Taian Taishan
Plasterboard Co., LTD.*

William Poynter
KALEO LEGAL
4456 Corporation Lane, Suite 135
Virginia Beach, Virginia 23462
*Counsel for Defendant Beijing New
Building Materials Public Limited Company*

# INDEX

## *Chinese Drywall* Rulings - Fifth Circuit

| Tab | Description |
|---|---|
| 1 | *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014) (affirming MDL jurisdictional ruling in *Germano*) |
| 2 | *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014) (affirming MDL jurisdictional ruling in *Mitchell*, *Gross*, *Wiltz*) |

## *Chinese Drywall* Rulings - MDL

| Tab | Description |
|---|---|
| 3 | *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 706 F. Supp. 2d 655 (E.D. La. 2010) (*Germano* Findings of Fact and Conclusions of Law) |
| 4 | *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012) (Taishan Jurisdictional Order in *Germano*, *Mitchell*, *Gross*, *Wiltz*), *aff'd*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014) |
| 5 | Order dated 7/9/2013 (Order approving Virginia Settlements) (MDL Rec. Doc. 16934) |
| 6 | Order dated 7/17/2014 (Contempt Order and Injunction) (MDL Rec. Doc. 17869) |
| 7 | Order dated 12/17/2014 (Order approving Supplemental *Amorin* Class Notice and setting hearing for Class Damages Hearing) (MDL Rec. Doc. 18217) |
| 8 | *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2014 WL 4809520 (E.D. La. Sept. 26, 2014) (*Amorin* Class Certification Order) |
| 9 | Minute Entry dated 3/26/2015 (MDL Rec. Doc. 18559) |
| 10 | Order & Reasons dated 8/3/2015 (regarding Taishan's Motion to Exclude Plaintiffs' Class Spreadsheet) (MDL Rec. Doc. 19355) |
| 11 | Order dated 10/23/2015 (granting Class Counsel's Motion for Authority to Disburse Funds from the Four Virginia-based Settlements for Other Loss) (MDL Rec. Doc. 19639) |
| 12 | Order dated 1/8/2016 (imposing sanctions on Taishan) (MDL Rec. Doc. 19959) |
| 13 | Minute Entry dated 2/17/2016 (MDL Rec. Doc. 20092) |
| 14 | *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1476595 (E.D. La. Apr. 21, 2017) (CNBM-BNBM Jurisdictional Order) (appeal pending) |
| 15 | *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2017 WL 1421627 (E.D. La. Apr. 21, 2017) (Class Damages Order) |
| 16 | *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629 (E.D. La. Jan. 2, 2018) (Order & Reasons denying motion to vacate default judgments) |
| 17 | *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 3972041 (E.D. La. Aug. 20, 2018) (Suggestion of Remand Order) |
| 18 | Order and Reasons dated 10/11/2018 (accepting the Plaintiffs' Steering Committee's notice clarifying the composition of the *Amorin* class (MDL Rec. Doc. 21846) |

| 19 | Order & Reasons dated 10/12/2018 (trial plan for the Louisiana *Amorin* cases) (MDL Rec. Doc. 21847) |
| 20 | Order & Reasons dated 11/19/2018 (staying Florida and Virginia-based claims in the Louisiana *Amorin* complaint) (MDL Rec. Doc. 21935) |

### *Chinese Drywall* Rulings – Southern District of Florida

| Tab | Description |
| --- | --- |
| 21 | *Amorin v. Taishan Gypsum Co. Ltd.*, Case No. 11-22408-CIV-MGC, Order (S.D. Fla. Nov. 16, 2018) (ECF No. 112) ("Florida *Amorin* Trial Plan") |

### MDL Transcripts

| Tab | Description |
| --- | --- |
| 22 | Transcript of MDL Proceedings dated 1/22/2015 |
| 23 | Transcript of MDL Proceedings dated 8/15/2018 |
| 24 | Transcript of MDL Proceedings dated 12/20/2018 |

### Other Documents and Deposition Transcripts

| Tab | Description |
| --- | --- |
| 25 | Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan Gypsum Company Limited dated 5/11/2009 ("Informational Report on U.S. Class Actions") (MDL Rec. Doc. 21641-4) |
| 26 | BNBM Announcement dated 5/28/2010 (MDL Rec. Doc. 21641-258) |
| 27 | CNBM Announcement on Recent Developments in the Gypsum Board Litigation in the US dated 2/15/2015 (MDL Rec. Doc. 21641-196) |
| 28 | The Course of Events on Hiring Law Firms for the Gypsum Board Litigation in the United States ("Course of Events Memo") (MDL Rec. Doc. 21641-192) |
| 29 | CNBM Announcement: Acquisition of Equity Interest in Taishan Gypsum Through Share Issuance of BNBM dated 10/13/2015 (MDL Rec. Doc. 21641-49) |
| 30 | Chart of Taishan Sales to the United States (MDL Rec. Doc. 14843-3) |
| 31 | The Course of Events on Hiring Law Firms for the Gypsum Board Litigation in the United States – Brief Version of the Related Meetings ("Course of Events Memo – Brief Version") (MDL Rec. Doc. 21641-245) |
| 32 | Statement on the Data and Statistics of Exports to the U.S. from 2005 to 2007 (TG-0129675-76) (MDL Rec. Doc. 21641-203) |
| 33 | Statistics of U.S. Gypsum Boards by Self-managed Export during 2005-2007 (TG-0129677) (MDL Rec. Doc. 21641-204) |
| 34 | *Amorin* Class Notice (MDL Rec. Doc. 18028-1) |
| 35 | Supplemental *Amorin* Class Notice (MDL Rec. Doc. 18086-18) |

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 5 of 1680

| 36 | Declaration of Mary Michelle Germano dated 12/21/2016 |
|---|---|
| 37 | Transcript of Deposition of William Foster dated 1/8/2019 |
| 38 | Transcript of Vicki Foster dated 1/8/2019 |
| 39 | Transcript of Deposition of Candace Gody dated 12/12/2018 |
| 40 | Transcript of Deposition of Vicki Foster dated 12/7/2018 |
| 41 | Transcript of Deposition of Jeovany Nunez dated 12/19/2018 |
| 42 | Transcript of Deposition of Andrew Feldkamp dated 12/13/2018 |
| 43 | Transcript of Deposition of Dailyn Martinez dated 12/14/2018 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

EDUARDO AND CARMEN AMORIN
  et al.,

              **Plaintiffs,**

v.

TAISHAN GYPSUM CO., LTD. F/K/A
SHANDONG TAIHE DONGXIN CO.,
LTD. et al.,

              **Defendants.**

Civil Action No. 2:11-cv-377-MSD-RJK

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 18th day of January 2019, I have electronically filed the Joint

Appendix with the Clerk of the Court using CM/ECF system, which will then send a notification

of such filing (NEF) to counsel of record.

                                                           /s/

Jeffrey A. Breit, Esquire
VSB No. 18876
Breit Drescher Imprevento, P.C.
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia  23451
(757) 670-3888 Office
(757) 670-3939 Facsimile
jeffrey@breit.law
*Counsel for Plaintiffs Eduardo and Carmen
Amorin, et al.*

# JOINT APPENDIX TAB # 1

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/19/19 Page 8 of 1680
In re Chinese-Manufactured Drywall Products Liability Litigation, 742 F.3d 576 (2014)

Prod.Liab.Rep. (CCH) P 19,322

Original Image of 742 F.3d 576 (PDF)

742 F.3d 576
United States Court of Appeals,
Fifth Circuit.

In re CHINESE–MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION.
Michelle Germano, Individually and on behalf
of all others similarly situated; et al, Plaintiffs,
Jerry Baldwin; Inez Baldwin; Steven Heischober;
Elizabeth Heischober; Joseph Leach; Kathy
Leach; Preston McKellar; Rachael McKellar;
J. Frederick Michaux; Vannessa Michaux;
William Morgan; Deborah Morgan; Robert
Orlando; Lea Orlando, Intervenors–Appellees,
v.
Taishan Gypsum Company, Limited,
formerly known as Shandong Taihe Dongxin
Company, Limited, Defendant–Appellant.

Nos. 10–30568, 12–31017.
|
Jan. 28, 2014.

**Synopsis**
**Background:** Homeowners brought class actions against
manufacturers of Chinese drywall, among others, alleging
negligence, negligence per se, breach of express and
implied warranties, and violation of various consumer
protection acts, among other claims, after defective
drywall was installed in their homes. Cases were later
transferred to create multi-district litigation (MDL), and
hundreds of actions were consolidated. The United States
District Court for the Eastern District of Louisiana, Eldon
E. Fallon, J., 706 F.Supp.2d 655, entered preliminary
default judgment against one manufacturer. Later, the
District Court, Fallon, J., 894 F.Supp.2d 819, denied
manufacturer's motions to vacate default judgment, and
to dismiss two of complaints based on lack of personal
jurisdiction. Manufacturer appealed.

**Holdings:** The Court of Appeals, Jennifer Walker Elrod,
Circuit Judge, held that:

[1] manufacturer had sufficient minimum contacts for
exercise of personal jurisdiction;

[2] plaintiffs' claims arose out of or related to manufacture,
and sale, of drywall, as required for exercise of personal
jurisdiction;

[3] exercise of personal jurisdiction did not offend
traditional notions of fair play and substantial justice;

[4] default judgment was not void, even though
manufacturer asserted it was not properly served with
second amended complaint or homeowners' motion to
intervene; and

[5] District Court did not abuse its discretion by refusing
to vacate default judgment entered against manufacturer.

Affirmed.

West Headnotes (29)

[1] **Federal Courts**
    Default judgment and opening thereof
    A District Court's denial of a motion to vacate
    a default judgment made on the ground that
    the judgment is void for lack of personal
    jurisdiction is subject to de novo review.

    10 Cases that cite this headnote

[2] **Federal Courts**
    Personal jurisdiction
    Absent any dispute as to the relevant facts,
    whether personal jurisdiction can be exercised
    over a defendant is a question of law and
    subject to de novo review.

    1 Cases that cite this headnote

[3] **Federal Courts**
    Questions of Law in General
    **Federal Courts**
    Questions of fact in general
    A District Court's determination of the legal
    significance of the facts is subject to de novo
    review.

Cases that cite this headnote

**[4] Federal Courts**
👉 "Clearly erroneous" standard of review in general

A District Court's findings of fact are subject to review based on a "clearly erroneous" standard.

2 Cases that cite this headnote

**[5] Federal Courts**
👉 Definite and firm conviction of mistake

A District Court's finding of fact is "clearly erroneous" when there is no evidence to support it, or if the reviewing court, after assessing all of the evidence, is left with the definite and firm conviction that a mistake has been committed.

4 Cases that cite this headnote

**[6] Federal Courts**
👉 Presumptions and burden of proof

The plaintiff bears the ultimate burden of establishing jurisdiction over a non-resident defendant.

9 Cases that cite this headnote

**[7] Constitutional Law**
👉 Business, business organizations, and corporations in general
**Federal Courts**
👉 Corporations and business organizations
**Federal Courts**
👉 Personal jurisdiction

In general, federal District Court may only exercise personal jurisdiction over a foreign corporation if such jurisdiction is authorized by the long-arm statute of the state in which it sits and application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[8] Constitutional Law**
👉 Non-residents in general

The Fourth Circuit employs a three-part inquiry to determine whether the exercise of specific jurisdiction over a party comports with Due Process, considering: (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[9] Constitutional Law**
👉 Non-residents in general

The Due Process Clause prohibits a court from exercising personal jurisdiction over a defendant unless that defendant has certain minimum contacts such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[10] Federal Courts**
👉 Purpose, intent, and foreseeability; purposeful availment

For purposes of rule requiring that party have certain "minimal contacts" with state as a prerequisite to District Court's exercise of personal jurisdiction over him, contacts exist when a defendant purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its law.

Cases that cite this headnote

**[11] Federal Courts**

🔑 Purpose, intent, and foreseeability; purposeful availment

Purposeful availment requirement for long-arm jurisdiction ensures that defendant will not be haled into a jurisdiction solely as the result of random, fortuitous, or attenuated contacts.

Cases that cite this headnote

**[12]** **Federal Courts**
🔑 Defective, dangerous, or injurious products;products liability

The Fourth Circuit uses the "stream-of-commerce-plus" framework when assessing whether or not an out-of-state manufacturer of an allegedly defective product has established minimum contacts with the forum state where the end-user of the product resides.

4 Cases that cite this headnote

**[13]** **Federal Courts**
🔑 Manufacture, Distribution, and Sale of Products

The stream-of-commerce-plus test is premised on the notion that once a manufacturer has placed its product into distribution channels, it is foreseeable that the stream will eventually sweep the product into the forum state.

3 Cases that cite this headnote

**[14]** **Federal Courts**
🔑 Manufacture, Distribution, and Sale of Products

The stream-of-commerce-plus test, in addition to "mere foreseeability" that the stream will eventually sweep the product into the forum state, requires additional conduct of the defendant that may indicate an intent or purpose to serve the market in the forum state.

5 Cases that cite this headnote

**[15]** **Constitutional Law**

🔑 Manufacture, distribution, and sale

**Federal Courts**
🔑 Particular Entities, Contexts, and Causes of Action

Chinese-based manufacturer of drywall had sufficient minimum contacts with Virginia for exercise of specific personal jurisdiction, in accordance with due process, over manufacturer in action brought against it by homeowners for claims arising after defective drywall was installed in homes; although manufacturer had no physical contacts with Virginia, it did possess substantial Virginia-specific contacts which demonstrated it purposefully directed its sales of drywall at Virginia, and it placed its drywall into stream of commerce with knowledge drywall would end up in and be used in Virginia. U.S.C.A. Const.Amend. 14.

16 Cases that cite this headnote

**[16]** **Constitutional Law**
🔑 Non-residents in general

Even a single contact may be sufficient to create jurisdiction over a nonresident, for due process purposes, when the cause of action arises out of that contact, provided that the principle of fair play and substantial justice is not thereby offended. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[17]** **Constitutional Law**
🔑 Manufacture, distribution, and sale

**Federal Courts**
🔑 Agents, Representatives, and Other Third Parties

Virginia homeowners' claims arising after defective drywall was installed in their homes arose out of, or related to, manufacture of drywall by Chinese-based manufacturer, and sale of that drywall in Virginia, as required for exercise of specific personal jurisdiction over manufacturer so as to accord with due process; manufacturer's minimum contacts with Virginia, included

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 11 of 1680
In re Chinese Manufactured Drywall Products Liability Litigation, 742 F.3d 576 (2014)

Prod.Liab.Rep. (CCH) P 19,322

its design, manufacture, marketing and sale of drywall for a Virginia-based company, which manufacturer knew would be delivered to Virginia and used in Virginia properties. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[18]    **Constitutional Law**
          ⚷ Due process

Once a plaintiff has established minimum contacts in accordance with due process, the burden shifts to the defendant to establish a compelling case that the presence of some other considerations would render jurisdiction unreasonable. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

[19]    **Constitutional Law**
          ⚷ Non-residents in general

In determining whether state's assertion of personal jurisdiction over nonresident defendant offends traditional notions of fair play and substantial justice so as to violate Fourteenth Amendment due process requirements, the court must consider: (1) the defendant's burden; (2) the forum state's interest; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

[20]    **Federal Courts**
          ⚷ In general;factors considered

The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.

Cases that cite this headnote

[21]    **Federal Courts**
          ⚷ In general;factors considered

Once minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.

Cases that cite this headnote

[22]    **Constitutional Law**
          ⚷ Manufacture, distribution, and sale

        **Federal Courts**
          ⚷ Particular Entities, Contexts, and Causes of Action

Exercise of personal jurisdiction over Chinese-based manufacturer of drywall, in action brought against it by homeowners for claims arising after defective drywall was installed in homes, did not offend traditional notions of fair play and substantial justice; although manufacturer would face burdens if subjected to personal jurisdiction, Virginia had great interest in its citizens being able to litigate against manufacturer for alleged damages caused to their properties, homeowners had strong interest in obtaining efficient relief against manufacturer for damages caused by manufacturer's own defective product to their homes and properties, judicial system had great interest in effectively and efficiently resolving drywall-related claims, and it was in states' shared interest to discourage the manufacture and distribution of defective products. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[23]    **Federal Courts**
          ⚷ Altering, amending, modifying, or vacating judgment or order;proceedings after judgment

Denial of a motion for relief from judgment, unless the judgment is otherwise void, is reviewed for abuse of discretion. Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A.

2 Cases that cite this headnote

**[24]    Federal Civil Procedure**
🗝 Process or notice to sustain judgment

Default judgment entered against Chinese manufacturer of drywall in multi-district litigation (MDL) brought by homeowners for claims arising after defective drywall was installed in homes was not void, even though manufacturer asserted it was not properly served with second amended complaint or homeowners' motion to intervene; the second amended complaint did not assert any new claims against manufacturer, but only amended the first amended complaint insofar as expanding the class definition against manufacturer to a national class and expanding Virginia consumer protection claims to consumer protection claims for each state involved, plaintiff-intervenors were all Virginia homeowners within the class covered by the first amended complaint, and manufacturer was properly served with the first amended complaint and therefore was on notice that a class action of Virginia homeowners had been filed against it.

Cases that cite this headnote

**[25]    Federal Courts**
🗝 Default judgment and opening thereof

Because of the seriousness of a default judgment, and although the standard of review is abuse of discretion, even a slight abuse of discretion may justify reversal.

6 Cases that cite this headnote

**[26]    Federal Courts**
🗝 Default judgment and opening thereof

Any factual determinations underlying a default judgment are reviewed for clear error.

Cases that cite this headnote

**[27]    Federal Civil Procedure**
🗝 Grounds and Factors

**Federal Civil Procedure**
🗝 Meritorious cause of action or defense

To determine whether or not good cause is present to set aside an entry of default or default judgment, reviewing court considers three factors: (1) whether the default was willful, (2) whether setting aside the default judgment would prejudice plaintiffs, and (3) whether defendants presented a meritorious defense; a finding of willful default ends the inquiry, for when the court finds an intentional failure of responsive pleadings there need be no other finding. Fed.Rules Civ.Proc.Rules 55(c), 60(b), 28 U.S.C.A.

28 Cases that cite this headnote

**[28]    Federal Civil Procedure**
🗝 Affidavits and other evidence

In determining whether to set aside an entry of default or default judgment, when a defendant's neglect is at least a partial cause of its failure to respond, the defendant has the burden to convince the court that its neglect was excusable, rather than willful, by a preponderance of the evidence. Fed.Rules Civ.Proc.Rules 55(c), 60(b), 28 U.S.C.A.

19 Cases that cite this headnote

**[29]    Federal Civil Procedure**
🗝 Excusable neglect

District Court did not abuse its discretion by refusing to vacate default judgment entered against Chinese manufacturer of drywall on basis of excusable neglect, in action brought by homeowners for claims arising after defective drywall was installed in homes; although manufacturer asserted that it failed to respond to the complaint because it was involved in another suit and did not understand that it was being served in a new case, if manufacturer did not fully understand the significance of the complaint, it should have sought legal advice. Fed.Rules Civ.Proc.Rules 55(c), 60(b), 28 U.S.C.A.

2 Cases that cite this headnote

Prod.Liab.Rep. (CCH) P 19,322

**Attorneys and Law Firms**

**\*580** Frederick S. Longer, Arnold Levin (argued),
Levin, Fishbein, Sedran & Berman, Philadelphia, PA,
Leonard Arthur Davis, Russ M. Herman (argued), Esq.,
Senior Attorney, Herman Herman & Katz, L.L.C., New
Orleans, LA, Robert Gary, Gary, Naegele & Theado,
L.L.C., Lorain, OH, Faris Ghareeb, Hausfeld, L.L.P.,
Washington, DC, Richard James Serpe, Norfolk, VA,
Richard W. Stimson, Bradenton, FL, for Intervenors–
Appellees.

Frank T. Spano, Courtney Lynne Colligan, Joe Cyr
(argued), Eric D. Statman, Joanna F. Wasick, Hogan
Lovells US, L.L.P., New York, NY, Thomas Patrick
Owen, Jr., Esq., Richard C. Stanley, Esq., Stanley, Reuter,
Ross, Thornton & Alford, L.L.C., New Orleans, LA, for
Defendant–Appellant.

Stephen Richard Mysliwiec, DLA Piper, L.L.P.,
Washington, DC, for National Association of Home
Builders.

Edward Francis Sherman, Tulane University Law School,
John Giffen Weinmann Hall, New Orleans, LA, for
United States Senators and Congressmen.

Appeals from the United States District Court for the
Eastern District of Louisiana.

Before REAVLEY, ELROD, and HAYNES, Circuit
Judges.

**Opinion**

JENNIFER WALKER ELROD, Circuit Judge:

This is a products liability case arising from the sale of
allegedly defective drywall from a Chinese manufacturer
(Taishan Gypsum Co. Ltd., or "TG"), through a
Virginia distributor (Venture Supply, Inc., or "Venture"),
to Virginia homeowners ("Plaintiffs").[1] TG contests
the district court's determination that it had personal
jurisdiction over TG. TG further asserts that, even if
the district court does have jurisdiction, it abused its
discretion in refusing to vacate the default judgment
against TG. We disagree, and accordingly AFFIRM the
district court on both issues.

I.

Venture is a Virginia company that distributed drywall
and other building materials to customers in multiple
states, including **\*581** Virginia.[2] In November 2005,
a Venture agent contacted TG—a Chinese corporation
with its principal place of business in Tai'an City,
Shandong Province, China—to inquire about purchasing
TG's drywall.[3] This call initiated a business relationship
that lasted approximately two years. Shortly after the
initial phone call, a Venture agent traveled to China where
he negotiated a contract to purchase drywall from TG.
The first contract between TG and Venture was executed
on November 17, 2005. Venture signed the contract
in Virginia and faxed its signature to TG in China.
The first contract provided that TG would manufacture
and sell 100,000 sheets of TG drywall to Venture for
$358,000.00. The contract specified that delivery would
occur at a Chinese port, and that Venture was responsible
for arranging and paying for transportation to Virginia
from that port. All disputes under the contract were to
be settled by negotiation, or submitted to the Foreign
Trade Arbitration Commission of the China Council for
the Promotion of International Trade. The contract noted
Venture's address in Virginia.

Following this first contract, the two companies had
extensive discussions regarding future business. During
these discussions TG offered to lower the price of the
drywall for Venture and to give Venture priority in
purchasing drywall. TG sought to increase its business
with Venture and to make Venture the exclusive
distributor of its drywall in the United States. TG also
sought Venture's assistance in providing a third-party with
shipping information for its drywall. TG's representative
communicated in English during these discussions and
used an Americanized version of his name. TG also
considered sending one of its employees to visit the United
States. Based on these discussions, the district court found
that TG and Venture both sought to expand future
drywall sales in the United States through Venture.

In December 2005, Venture's agent returned to China
to inspect the drywall it purchased under the first
contract, and entered into a second contract with TG
on behalf of Venture. The terms of the second contract
were nearly identical to the first, with TG agreeing
to sell an additional 100,000 sheets of drywall for

Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 14/19/19 Page 14 of 1680

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in... 742 F.3d 576 (2014) Page 8 of 18 PageID# 492

Prod.Liab.Rep. (CCH) P 19,322

$366,800.00. TG imprinted the drywall that is sold to Venture under these contracts with the following marks: "VENTURE SUPPLY INC. MFG: SHANDONG TAIHE, CHINA" and placed sealing tape around the edges of the drywall marked "GYPSUM BOARD DISTRIBUTED BY VENTURE SUPPLY INC. 757–855–5433 VENTURESUPPLY.COM." The drywall was also cut to Venture's specifications.

Venture retained a shipping agent that TG recommended to deliver the drywall from the Chinese port to Virginia for the first shipment, and to New Jersey for the second shipment. The second shipment was then taken by rail to Virginia. TG received invoices from the shipping agent, which noted Venture's address in Virginia and that the drywall was shipped to Virginia. Venture shipped and sold TG's drywall to customers in at least three states **582** other than Virginia, including New York, Georgia, Florida, and possibly Alabama. Venture sold a substantial amount of the TG drywall to Porter–Blaine Corp., which in turn sold the drywall to subcontractors, who allegedly used it to build homes in Virginia.

Plaintiffs Michelle Germano, Dennis and Sharon Jackson, and Jason and Lisa Dunaway (collectively "Original Plaintiffs") commenced a putative class action against TG on May 1, 2009, in the Eastern District of Virginia. Original Plaintiffs are all Virginia homeowners who allege that they suffered property damage due to the presence of TG's defective drywall in their homes. Specifically, they assert claims against TG for negligence, negligence per se, breach of express and/or implied warranties, private nuisance, unjust enrichment, and violation of the Virginia Consumer Protection Act. They also seek equitable and injunctive relief and medical monitoring to prevent health problems as a result of exposure to the allegedly defective drywall. In their First Amended Complaint, Original Plaintiffs asserted claims against TG as individuals, and also in their capacity as proposed representatives of a class of Virginia property owners similarly affected. Original Plaintiffs served TG with the First Amended Complaint on August 3, 2009, in Chinese and in accordance with the Hague Convention. It is undisputed that TG was properly served with the First Amended Complaint.

Contractors installed hundreds of millions of square feet of drywall imported from China in homes across the United States between 2005 and 2008. A number of the owners and occupiers of these homes filed suit in state and federal courts against those involved in the drywall chain of distribution. Like Plaintiffs, these homeowners also allege that this drywall caused them property damage and health problems. Beginning in the summer of 2009, the Panel on Multi-district Litigation began transferring drywall-related lawsuits to the Eastern District of Louisiana as part of a multi-district litigation captioned *In re Chinese Manufactured Drywall Products Liability Litigation,* No. 09–MD–2047 (E.D.La.) ("MDL"), to oversee and manage pre-trial proceedings. This case was transferred to the MDL in October 2009. As part of this MDL, the district court is also overseeing claims raised against TG's wholly-owned subsidiary, Taian Taishan Plasterboard Co, Ltd. ("TTP"), which are not relevant to the case here. [4]

On November 18, 2009, the district court granted Original Plaintiffs' motion to file a default judgment against TG pursuant to Federal Rule of Civil Procedure 55 for TG's failure to appear or otherwise defend the action and issued a preliminary default judgment. That same day, the district court also granted Original Plaintiffs' motion to file a Second Amended Complaint. The Second Amended Complaint did not assert any new claims, but did expand the plaintiff class to a nationwide class. On December 21, 2009, the district court granted the motion of seven couples (collectively "Plaintiff–Intervenors") [5] to intervene in this action. Plaintiff–Intervenors **583** allege that they are also Virginia homeowners who suffered losses due to TG and other defendants' allegedly defective drywall.

In February 2010, the district court held a two-day hearing on damages allegedly suffered by Plaintiff–Intervenors. On May 11, 2010, the Court issued a default judgment ("Default Judgement") against TG awarding Plaintiff–Intervenors damages, pre-judgment interest, post-judgment interest, and costs. [6] TG waited until June 10, 2010, to file an appearance in this action. That same day, TG filed a notice of appeal seeking to have the Default Judgment vacated for (1) lack of personal jurisdiction, and (2) because the service of process was procedurally defective. This court remanded TG's appeal to the district court for the limited purpose of permitting it to rule on TG's motion to vacate the Default Judgment.

The parties spent more than a year and a half engaged in extensive discovery regarding personal jurisdiction over

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 12/18/19 Page 15 of 1680
In re Chinese Manufactured Drywall Products Liability Litigation, 742 F.3d 576 (2014) Page 9 of 18 PageID #: 493
Prod.Liab.Rep. (CCH) P 19,322

TG. Discovery was closely monitored by the district court. On June 29, 2012, the district court presided over a hearing on TG's motions, after which it ruled that Plaintiffs had established that there was personal jurisdiction over TG by a preponderance of the evidence ("Order & Reasons").[7] The district court concluded that, as the MDL transferee court, it should apply the substantive state law of the transferor court (Virginia) and the federal law of its own circuit (the Fifth Circuit). The district court applied Virginia's long-arm statute, and found that subsections (A)(4) and (A)(5) of § 8.01–328.1 of the Virginia Code applied to TG because it had obtained substantial revenue from Virginia.[8]

The district court acknowledged the disparate approaches to the personal jurisdiction minimum contacts analysis that have followed the Supreme Court's plurality opinions in both *Asahi Metal Industry Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), and *J. McIntyre Machinery, Ltd. v. Nicastro,* —— U.S. ——, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011). Following Fifth Circuit precedent, the district court applied the stream-of-commerce test from Justice Brennan's concurrence in *Asahi. See Ainsworth v. Moffett Eng'g, Ltd.,* 716 F.3d 174, 178 (5th Cir.2013), *cert. denied,* —— U.S. ——, 134 S.Ct. 644, 187 L.Ed.2d 420 (2013). The district court concluded that it had specific jurisdiction over TG for this suit because "TG placed its drywall into the stream of commerce with the knowledge that its drywall would end up in and be used in Virginia." The **\*584** district court then concluded that the Plaintiffs' claims "relate to" or "arise out of" TG's contacts with Virginia because the presence of TG's drywall in Virginia properties was the alleged cause of their injuries. The district court declined to impute the contacts of TG's wholly-owned subsidiary, TTP, onto TG for the purposes of determining personal jurisdiction, noting that "the present evidence demonstrates that TTP had no contacts with Virginia during the relevant time period, leaving no forum contacts to impute to TG." The district court also determined that exercising jurisdiction over TG comported with "traditional notions of fair play and substantial justice."

TG also argued that the Default Judgment was invalid because it had not been properly served with the Second Amended Complaint or motion to intervene prior to the entry of the Default Judgment. The district court denied TG's motion to vacate the Default Judgment in its Order &

Reasons. As the district court explained, TG was properly served with the First Amended Complaint, and the Second Amended Complaint

> only amended the First Amended Complaint insofar as expanding the class definition against [TG] to a national class and expanding the Virginia consumer protection claims to consumer protection claims for each state involved. None of these amendments would have affected Intervening Plaintiffs' claims. Thus, the Court finds that whether or not the Second Amended Complaint was properly served upon [TG], the Court has sufficient jurisdiction ... as a result of the proper service of the First Amended Complaint since Intervening Plaintiffs' claims were properly within the First Amended Complaint.

TG timely filed separate notices of appeal contesting both the Default Judgment and the Order & Reasons. We consolidated the two appeals. Because the Default Judgment is only proper if the district court had personal jurisdiction over TG, we begin with that issue.

## II.

[1] [2] [3] [4] [5] A district court's denial of a motion to vacate a default judgment made on the ground that the judgment is void for lack of personal jurisdiction is subject to *de novo* review. *Jackson v. FIE Corp.,* 302 F.3d 515, 521 (5th Cir.2002). Absent any dispute as to the relevant facts, whether personal jurisdiction can be exercised over a defendant is a question of law and subject to *de novo* review. *Dickson Marine Inc. v. Panalpina, Inc.,* 179 F.3d 331, 335 (5th Cir.1999); *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 418 (5th Cir.1993). A district court's determination of the legal significance of the facts is also subject to *de novo* review. *Martinez– Aguero v. Gonzalez,* 459 F.3d 618, 621 (5th Cir.2006). A district court's findings of fact are subject to review based

on a "clearly erroneous" standard. *See* Fed.R.Civ.P. 52(a)(6); *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). A finding is "clearly erroneous" when there is no evidence to support it, or if the reviewing court, after assessing all of the evidence, is left with the definite and firm conviction that a mistake has been committed. *See Anderson,* 470 U.S. at 573, 105 S.Ct. 1504 (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). [9]

**[6]** The plaintiff bears the ultimate burden of establishing jurisdiction over a **\*585** non-resident defendant. *Caldwell v. Palmetto State Sav. Bank of S.C.,* 811 F.2d 916, 917 (5th Cir.1987). Because the district court held an evidentiary hearing on the issue of personal jurisdiction, Plaintiffs must establish personal jurisdiction by a preponderance of the admissible evidence. *See Walk Haydel & Assocs., Inc.,* 517 F.3d at 241–42. [10] Once Plaintiffs establish minimum contacts, the burden shifts to TG to show that the assertion of personal jurisdiction in the forum would be unfair or unreasonable. *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266, 271 (5th Cir.2006) (citations omitted); *see also ESAB Grp., Inc. v. Zurich Ins. PLC,* 685 F.3d 376, 392–93 (4th Cir.2012).

### III.

TG argues that had the district court applied Fourth Circuit precedent rather than our circuit's precedent then it would have concluded that there was no personal jurisdiction over TG. According to TG, the Fourth Circuit requires a stronger showing to establish minimum contacts over a foreign defendant than we do. This difference in approaches stems from how our circuit and the Fourth Circuit have interpreted the Supreme Court's most recent personal jurisdiction decisions, which have not produced a majority for any one rationale regarding when an out of state defendant has "purposefully availed" itself of the forum state. In *Asahi,* the Supreme Court split on whether the foreign defendant had sufficient minimum contacts with the forum to satisfy specific personal jurisdiction, but it agreed that exercising personal jurisdiction over the defendant in that case violated Due Process on fairness and reasonableness grounds. 480 U.S. 102, 107 S.Ct. 1026. Justice Brennan's concurring opinion held that when a manufacturer places a product in the stream of commerce, the defendant has purposefully

availed itself of the forum so long as it is foreseeable that the product would end up in the forum state. *Id.* at 116, 107 S.Ct. 1026. (Brennan, J., concurring). In contrast, Justice O'Connor's opinion for the plurality would require "additional conduct" beyond merely placing the product in the stream of commerce in order to exercise jurisdiction over a defendant. *Id.* at 112, 107 S.Ct. 1026. The approach advocated by Justice Brennan has become known as the stream-of-commerce test, and Justice O'Connor's approach is referred to as the stream-of-commerce-plus test.

Following *Asahi,* the Supreme Court addressed minimum contacts in another plurality decision. *McIntyre,* 131 S.Ct. 2780. In *McIntyre,* the majority of the Supreme Court agreed that New Jersey did not have personal jurisdiction over a foreign defendant who had never marketed or directly sold its products into the forum state. *Id.* at 2785, 2791. Justice Kennedy's plurality opinion emphasized that the defendant must purposefully avail itself of the forum state, explaining that "as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State.... This Court's precedents make clear that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *Id.* at 2788–89. In his concurrence, Justice Breyer explained that, "on the record present here, resolving this case requires no more than adhering to our precedents." *Id.* at 2792 (Breyer, J., concurring). He emphasized that "[n]one of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient" and noted that "the Court, in **\*586** separate opinions, has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place." *Id.* at 2792.

In assessing minimum contacts, the Fourth Circuit has repeatedly applied the stream-of-commerce-plus test from Justice O'Connor's opinion in *Asahi* and cited Justice Kennedy's plurality opinion in *McIntyre*. *See, e.g., Unspam Technologies,* 716 F.3d at 328; *ESAB Grp.,* 685 F.3d at 392; *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939, 946–47 (4th Cir.1994). In contrast, we apply the stream-of-commerce test from Justice Brennan's concurrence in *Asahi,* and Justice Breyer's concurrence in *McIntyre. See Ainsworth,* 716 F.3d at 178.

TG argues that the district court should have applied Fourth Circuit law based on our decision in *In re Ford Motor,* 591 F.3d 406, 413 n. 15 (5th Cir.2009). In *Ford Motor* we held that the transferee court should apply the transferor court's interpretation of federal law when addressing issues of forum-availability. *Id. Ford Motor* addressed which circuit's law should apply to a forum *non conveniens,* rather than personal jurisdiction, question in an MDL transfer case. TG argues that the language in *Ford Motor* suggests that its result should apply here as well. Specifically, in *Ford Motor* we said that "because forum-availability law is 'geographically non-uniform,' a transferee court should use the rule of the transferor forum." *Id.* TG argues that personal jurisdiction is also a question of forum-availability. In response, Plaintiffs argue that personal jurisdiction is not a question of "forum-availability" or "geographically non-uniform" federal law. They argue that instead we should apply the law of our own forum because "it is logically inconsistent to require one judge to apply simultaneously different and conflicting interpretations of what is supposed to be a unitary federal law." *In re Korean Air Lines Disaster of Sept. 1, 1983,* 829 F.2d 1171, 1175–76 (D.C.Cir.1987), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989).

We disagree with TG's assessment. First, *Ford Motor* is not determinative of which circuit's precedent applies here, as it dealt with the separate issue of forum *non conveniens. See Ford Motor,* 591 F.3d at 411. Moreover, we need not reach the issue of which circuit's law should apply because regardless of which circuit's approach we use, the outcome is the same. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 839 n. 20, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) ("[F]alse conflict really means no conflict of laws. If the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them.") (internal quotation marks omitted) (citing R. Leflar, American Conflicts Law § 93 (3d ed.1977); E. Scoles & P. Hay, Conflict of Laws § 2.6 (1982)).

[7] We now analyze TG's forum contacts under the Fourth Circuit's more stringent approach and consider only TG's contacts with Virginia.[11] "In general, federal **\*587** district court may only exercise personal jurisdiction over a foreign corporation if such jurisdiction is authorized by the long-arm statute of the state in which it sits and application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment." *ESAB Grp., Inc. v. Zurich Ins. PLC,* 685 F.3d 376, 391 (4th Cir.2012) (internal quotation marks and citations omitted). Because the scope of Virginia's long-arm statute is coextensive with the Due Process Clause, we proceed directly to the constitutional analysis.[12] *See Danville Plywood Corp. v. Plain & Fancy Kitchens, Inc.,* 218 Va. 533, 238 S.E.2d 800, 801 (Va.1977) (citing *Carmichael v. Snyder,* 209 Va. 451, 164 S.E.2d 703, 707 (1968)).

[8] "Since *International Shoe* [*Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ], specific jurisdiction has become the centerpiece of modern jurisdiction theory, while general jurisdiction [has played] a reduced role." *Daimler AG v. Bauman,* ––– U.S. ––––, 134 S.Ct. 746, 755, 187 L.Ed.2d 624 (2014) (internal quotation marks and citations omitted).[13] The Fourth Circuit employs a three-part inquiry to determine whether the exercise of specific jurisdiction over a party comports with Due Process. *ESAB Grp.,* 685 F.3d at 391–92 (citing *Consulting Eng'rs Corp. v. Geometric Ltd.,* 561 F.3d 273, 278 (4th Cir.2009)). Under this test, the Fourth Circuit considers "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Id.* (internal quotation marks and citations omitted). We address each prong in turn.

### A.

[9] [10] [11] "[T]he Due Process Clause prohibits a court from exercising personal jurisdiction over a defendant unless that defendant has certain minimum contacts ... such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Unspam Technologies, Inc. v. Chernuk,* 716 F.3d 322, 328 (4th Cir.2013) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). "Such contacts exist when a defendant 'purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its law.' " *Id.* (quoting **\*588** *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283

(1958)). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

> Jurisdiction ... may not be avoided merely because the defendant did not physically enter the forum State.... [I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Id.* at 476, 105 S.Ct. 2174 (citation omitted); *see also Daimler,* 134 S.Ct. at 755 ("*International Shoe* [ ] ... unleashed a rapid expansion of tribunals' ability to hear claims against out-of-state defendants when the episode in-suit occurred in the forum or the defendant purposefully availed itself of the forum.").

It does not appear that the Fourth Circuit has addressed the precise situation at issue here, where an out-of-state defendant sold an allegedly defective product to a forum-resident distributor. Instead, most cases address contacts when a product only reaches the forum state after an out-of-state distributor sells the out-of-state defendant's product into the forum. *See, e.g., Lesnick,* 35 F.3d at 946–47. The fact that TG knowingly sold its products directly to Venture—a Virginia resident—is, on its own, a significant contact with the forum. We need not decide whether this contact alone would suffice to meet the first prong of the minimum contacts test because TG also designed its product for market in Virginia, and because it was not an isolated sale.

**[12]  [13]  [14]**  The Fourth Circuit uses the "stream-of-commerce-plus" framework developed in *Asahi* and its progeny when assessing whether or not the out-of-state manufacturer of an allegedly defective product has established minimum contacts with the forum state where the end-user of the product resides. *See, e.g., Lesnick,* 35 F.3d at 946–47. The stream-of-commerce-plus test is premised on the notion that once a manufacturer has placed its product into distribution channels, it is foreseeable that the stream will eventually sweep the product into the forum state. *Asahi,* 480 U.S. at 110, 107 S.Ct. 1026. In addition to this "mere foreseeability," the stream-of-commerce-plus test requires "[a]dditional conduct of the defendant" that "may indicate an intent or purpose to serve the market in the forum State." *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026. In *Asahi,* Justice O'Connor provided several explicit examples of such conduct, including "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id; see also Daimler,* 134 S.Ct. at 755 n. 7 ("[S]pecific jurisdiction may lie over a foreign defendant that places a product into the 'stream of commerce' while also 'designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.' ") (quoting *Asahi,* **\*589**  480 U.S. at 112, 107 S.Ct. 1026 (opinion of O'Connor, J.)).

**[15]**  Here, TG designed its product and packaging for Venture, a Virginia resident. TG manufactured its drywall to Venture's requested dimensions on a made-to-order basis. It also imprinted the drywall with the following marks: "VENTURE SUPPLY INC. MFG: SHANDONG TAIHE, CHINA" and placed sealing tape on its edges that read "GYPSUM BOARD DISTRIBUTED BY VENTURE SUPPLY INC. 757–855–5433 VENTURESUPPLY.COM." These were active steps, specifically taken by TG, to purposefully direct its product toward Virginia. TG not only included the name of a Virginia company on its product, it also included a phone number with a Virginia area code. Through its own acts, TG connected its product to Virginia, and ensured that the product's end-users would identify its product with a Virginia resident. Thus, by "designing the product

Case 1:09-md-02047-EEF-MBN Document 22863-781 Filed 11/19/19 Page 19 of 1680
In re Chinese Manufactured Drywall Products Liability Litigation, 742 F.3d 576 (2014) Page 13 of 16 PageID #: 497

Prod.Liab.Rep. (CCH) P 19,322

for the market in the forum State" TG engaged in the "additional conduct" necessary for the district court to exercise personal jurisdiction here. *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026.

[16] Moreover, TG's contact with Virginia was neither random nor isolated. "[E]ven a single contact may be sufficient to create jurisdiction when the cause of action arises out of that ... contact, provided that the principle of 'fair play and substantial justice' is not thereby offended." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d 390, 397 (4th Cir.2003); *see also Daimler,* 134 S.Ct. at 755 n. 7 ("[I]f the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.") (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)); *Chung v. NANA Dev. Corp.,* 783 F.2d 1124, 1129 (4th Cir.1986). TG entered into not just one, but two contracts to sell a substantial amount of drywall to a company that it knew to be a Virginia resident. Each sale was for 100,000 made-to-order sheets of drywall, and in each case TG was to receive more than $350,000.00 from its sale into Virginia. Nor is this a case where the defendant was unaware that it was selling to a forum resident. TG dealt directly with Venture during the negotiations and contracting. Venture representatives made several trips to China to meet with TG, and TG was involved in ongoing communications with Venture regarding these two sales over multiple months. Both the contracts and shipping receipts clearly stated TG's address in Virginia, as did the markings on the drywall tape. Unlike cases where the manufacturer sells its product through an out-of-state intermediary, TG knowingly sold its product directly to a Virginia resident. As the district court noted, the communications between TG and Venture were regular and relatively extensive.[14] **\*590** For example, TG sought to increase its business with Venture and discussed making Venture the exclusive distributor of its drywall in the United States. TG also sought Venture's assistance in providing a third-party with shipping information for its drywall. As the district court noted, TG sought to expand its future drywall sales in the United States through Venture. Given these facts, TG's contacts were not "of

an isolated or unsolicited character." *See Chung,* 783 F.2d at 1128–29 ("The factors considered in determining whether the defendant purposefully established minimum contacts with the forum include 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.' " (citing *Burger King,* 471 U.S. at 479, 105 S.Ct. 2174)).

This case is thus distinguishable from cases in which there was "no evidence that [the defendant] designed the products for the market in Virginia, advertised in Virginia, established channels for providing regular advice to customers in the forum, or marketed the product through a distributor who agreed to serve as the sales agent in Virginia." *St. Jarre v. Heidelberger Druckmaschinen, A.G.,* No. 93–1848, 1994 WL 95944, at \*3 (4th Cir. Mar. 25, 1994) (quoting *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026) (unpublished but persuasive). Here, TG *did* market its product to a forum resident. By contracting with Venture, TG *did* benefit legally from the laws of the forum and economically from indirect sales to forum residents. *Cf. Fed. Ins. Co. v. Lake Shore Inc.,* 886 F.2d 654, 659 (4th Cir.1989) (finding no personal jurisdiction and explaining that "[this] case is therefore distinguishable from those 'stream of commerce' cases *where a manufacturer employs an intermediary or distributor in the forum state* and thereby benefits legally from the protection provided by the laws of the forum and economically from indirect sales to forum residents.") (emphasis added) (citing *Nelson v. Park Indus., Inc.,* 717 F.2d 1120, 1125–26 (7th Cir.1983); *Oswalt v. Scripto, Inc.,* 616 F.2d 191, 199–200 (5th Cir.1980)).

In addition, TG *did* design its product for the Virginia market. *Cf. Lesnick,* 35 F.3d at 946–47 (finding no purposeful availment but acknowledging that "the result might be different if Hollingsworth & Vose had changed production to comply with Maryland regulations"). By designing its product in this way, TG sought to directly benefit from Venture's distribution system into Virginia. *Cf. Fed. Ins. Co.,* 886 F.2d at 659. Following the sales, TG continued to deal with Venture to discuss both shipping arrangements and the possibility of future business. *See Cancun Adventure Tours, Inc. v. Underwater Designer Co.,* 862 F.2d 1044, 1046–47 (4th Cir.1988) ("[A]ppellants subsequently negotiated and undertook a contractual obligation with a Virginia resident. UDC mailed purchase orders to Cancun Adventure Tours in Virginia and accepted payment from Virginia. After sale of the air

compressor, UDC and Califano continued to deal with Cancun Adventure Tours in Virginia by telephone and through the mails. These contacts were such that litigation in Virginia was reasonably foreseeable."). TG accepted payment from Virginia for these sales. Indeed, TG showed a desire to use Venture as a gateway for future sales in the U.S. market, including in Virginia.

**\*591** This case is also very different from the situation in *McIntyre*, where the manufacturer sold to an out-of-state distributor, and a few products happened to make their way into the forum state as a result of the distribution chain. *McIntyre,* 131 S.Ct. at 2786. Here, TG directly contracted to sell a significant amount of drywall to a forum resident through multiple sales, and personally designed its product in a way that identified it with the forum resident. TG purposefully availed itself of Virginia. The first prong is therefore met. [15]

### B.

[17]   While the first prong of the personal jurisdiction test assesses the connection between the defendant and the forum, the second prong looks at the relationship between the defendant's forum contacts and the plaintiffs' claims. Under Fourth Circuit precedent, the second prong "requires that the defendant's contacts with the forum state form the basis of the suit." *Consulting Eng'rs Corp.,* 561 F.3d at 278–79. "Where activity in the forum state is 'the genesis of [the] dispute,' this prong is easily satisfied." *See Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., Ltd.,* 682 F.3d 292, 303 (4th Cir.2012), *cert. denied,* ––– U.S. ––––, 133 S.Ct. 846, 184 L.Ed.2d 655 (2013) (citing *CFA Inst. v. Inst. of Chartered Fin. Analysts of India,* 551 F.3d 285, 295 (4th Cir.2009)). Here, TG's contacts with Virginia stem from its sales to Venture, and the basis of the suit is that Plaintiffs' Virginia homes were allegedly injured by TG's drywall. TG's allegedly defective drywall only ended up in Plaintiffs' Virginia homes as a result of TG's sales to Venture. TG's contacts with Virginia thus form the basis for this suit. Accordingly, I agree with the district court that the second prong is met.

### C.

[18]   [19]   The third prong, constitutional reasonableness, protects a party from litigation "so

gravely difficult and inconvenient that [the] party unfairly is at a severe disadvantage in comparison to [its] opponent." *ESAB Grp., Inc.,* 685 F.3d at 392 (citing *Burger King,* 471 U.S. at 478, 105 S.Ct. 2174). The burden is on the defendant to establish a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 393 (internal quotation marks and citations omitted). In assessing this prong, the Fourth Circuit considers additional factors including: "(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies." *Consulting Eng'rs Corp.,* 561 F.3d at 279 (citing *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174).

[20]   [21]   The first factor addresses the burden on the defendant. "The unique burdens placed upon one who must defend oneself in a foreign legal system should **\*592** have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi,* 480 U.S. at 114, 107 S.Ct. 1026. Once minimum contacts have been established, however, "often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Id.* TG is a foreign defendant, and the district court determined that this first factor was "undeniably the strongest in opposition to personal jurisdiction." The district court found that TG "will face burdens if it is subjected to personal jurisdiction in Virginia." The district court noted, however, that this burden was somewhat offset by TG's size and the magnitude of TG's operations. [16] *See CFA,* 551 F.3d at 296 (personal jurisdiction over foreign defendant appropriate because "[a]s shown by these proceedings, [the defendant] has been able to secure counsel to represent its interests, and its litigation burden is thus no more substantial than that encountered by other entities that choose to transact business in Virginia. More simply, [the defendant] is not shielded from civil liability in Virginia because it is headquartered in India.").

Regarding the second and third factors, the district court found that Virginia has a great interest in its citizens being able to litigate against TG for the alleged damages caused to their homes, and that Plaintiffs likewise had a strong interest in obtaining efficient relief against TG. *See*

Case 1:09-md-02047-EEF-MBN Document 22362-81 Filed 11/19/19 Page 21 of 1680
*In re Chinese Manufactured Drywall Products Liability Litigation, 742 F.3d 576 (2014)* Page 15 of 18 PageID# 499
Prod.Liab.Rep. (CCH) P 19,322

*also* *CFA Inst.,* 551 F.3d at 297 (citing *Lee v. Walworth Valve Co.,* 482 F.2d 297, 299 (4th Cir.1973) (recognizing forum state's "paternal interest in the recovery by one of its citizens of appropriate compensation, if there is a substantive cause of action")).

The district court determined that the fourth factor also weighed in favor of jurisdiction because the judicial system has a strong interest in resolving related, consolidated claims against TG in the MDL. TG argues that the second, third, and fourth factors do not weigh in favor of jurisdiction because Venture has already agreed to settle with all Plaintiffs, and Venture can seek indemnification from TG in the Chinese arbitration. TG did not, however, cite any record facts or cases supporting this argument. As a result, it did not meet its burden in proving that these factors weigh in its favor.

**[22]** Finally, the district court determined that the fifth factor also indicated that the assertion of personal jurisdiction here comports with traditional notions of fair play and substantial justice. Although it recognized that China may not favor personal jurisdiction over its manufacturers, it concluded that given the global nature of the economy, "it is in everyone's interest to discourage the manufacture and distribution of defective products." The district court determined that in their totality, these factors weigh in favor of exercising jurisdiction. Based on the record **\*593** before this court, we agree that TG has not met its burden to prove that these factors weigh against exercising jurisdiction. For essentially the same reasons as given by the district court, we hold that this third and final prong of the Due Process analysis is met here.[17] The district court therefore has personal jurisdiction over TG with regard to Plaintiff–Intervenors, and all Original Plaintiffs who have met their burden in proving that their claims arise out of TG's contacts with Virginia.

## IV.

**[23]** Because the district court had personal jurisdiction over TG, we now turn to whether it erred by refusing to vacate the Default Judgment against TG.[18] We hold that it did not. Denial of a motion for relief from judgment under Rule 60(b), unless the judgment is otherwise void, is reviewed for abuse of discretion. *See Behringer v. Johnson,* 75 F.3d 189, 190 (5th Cir.1996); *Fackelman v. Bell,* 564

F.2d 734, 736 (5th Cir.1977). TG argues that the Default Judgment was void because TG was not properly served with the Second Amended Complaint or the motion to intervene.[19] We disagree. TG was already in default when the district court granted Plaintiffs' motion to file the Second Amended Complaint and motion to intervene. As a result, Federal Rule of Civil Procedure 5(a)(2) governs the service requirements for these two pleadings. Rule 5(a)(2) does not require a party in default be served with a pleading unless that pleading that asserts a *new claim* for relief. Because Rule 24(c) provides that, "[a] motion to intervene must be served on the parties as provided in Rule 5," Plaintiff–Intervenors only needed to serve TG with the Second Amended Complaint and motion to intervene if either pleading raised new claims.

**[24]** The district court concluded that the Second Amended Complaint did not assert any new claims against TG, but "only amended the First Amended Complaint insofar as expanding the class definition against [TG] to a national class and expanding the Virginia consumer protection claims to consumer protection claims for each state involved. None of these amendments would have affected Intervening Plaintiffs' claims."[20] We agree. Plaintiff–Intervenors are all Virginia homeowners within the class covered by the First Amended Complaint. They raise identical claims as those in the First Amended Complaint. TG was properly **\*594** served with the First Amended Complaint, and was thus on notice that a class action of Virginia homeowners with these claims had been filed against it. Likewise, the motion to intervene did not raise any new claims. Accordingly, the Default Judgment was not void.

**[25]** **[26]** **[27]** We now review TG's remaining arguments for vacating the Default Judgment under the abuse of discretion standard. *See Behringer,* 75 F.3d at 190. "Because of the seriousness of a default judgment, and although the standard of review is abuse of discretion, even a slight abuse of discretion may justify reversal." *Lacy v. Sitel Corp.,* 227 F.3d 290, 292 (5th Cir.2000). Any factual determinations underlying that decision are reviewed for clear error. *Id.* We have adopted a policy in favor of resolving cases on their merits and against the use of default judgments. *Rogers v. Hartford Life & Accident Ins. Co.,* 167 F.3d 933, 936 (5th Cir.1999). "This policy, however, is counterbalanced by considerations of social goals, justice and expediency, a weighing process [that] lies largely within the domain of the trial judge's discretion."

*Id.* (internal quotation marks and citations omitted). Rule 60(b) provides several statutory bases for vacating a default judgment, including mistake, inadvertence, surprise, or excusable neglect. Fed.R.Civ.P. 60(b). As we have previously explained, Rules 55(c) and 60(b) allow a district court to set aside an entry of default or default judgment for "good cause." *Lacy,* 227 F.3d at 291–92. To determine whether or not good cause is present, we consider three factors: (1) whether the default was willful; (2) whether setting aside the default judgment would prejudice Plaintiffs; and (3) whether TG presented a meritorious defense. *Id.* at 292. We may also consider other factors, including whether TG acted expeditiously to correct the default. *Id.*

**[28]** "A finding of willful default ends the inquiry, for when the court finds an intentional failure of responsive pleadings there need be no other finding." *Id.* (internal quotation marks and citations omitted). The district court did not decide whether TG's failure to respond was willful. TG claims that it was not; instead, it explains that it was "wholly unsophisticated and unfamiliar with U.S. litigation practice, and failed to understand the significance of the complaint." When, as here, a defendant's neglect is at least a partial cause of its failure to respond, the defendant has the burden to convince the court that its neglect was excusable, rather than willful, by a preponderance of the evidence. *See Rogers,* 167 F.3d at 939 (citation omitted); *In re OCA, Inc.,* 551 F.3d 359, 372 (5th Cir.2008). TG did not meet that burden here.

TG cites our decision *Lacy* and argues that its default was not willful, but rather an excusable neglect, because it promptly retained counsel in China and the United States after the district court issued the Default Judgment, and has since fully cooperated in this litigation. TG would thus have us consider its conduct after the district court issued the Default Judgment. In making this argument, TG misunderstands the relevant time period. Our inquiry properly focuses on whether TG willfully failed to respond to the First Amended Complaint within the allotted time period, and not how it responded once it was already in default. Based on our assessment of TG's conduct following service of the First Amended Complaint, we conclude that TG has not demonstrated that its default was excusable. In *Lacy,* we found that the defendant's default was not willful when the defendant "concede[d] that it mistakenly assumed that the April 27–ordered mailing was redundant and wrongly failed to realize that

service was **\*595** validly effected with that mailing." *Lacy,* 227 F.3d at 292. In *Lacy,* we noted that the defendant was not choosing to "play games" with the court:

> Quite to the contrary, counsel for Sitel made repeated contacts with Lacy in an attempt to resolve the suit. During those contacts, which began within two weeks of Sitel's first receipt of the petition, counsel requested written confirmation that Lacy was representing himself in the litigation so that they could begin discussing potential resolutions of the matter.

*Id.* at 292–93.

In contrast, TG waited nearly a year after it was served with the First Amended Complaint to file a notice of appearance. *See In re Chinese–Manufactured Drywall Products Liab. Litig.,* 706 F.Supp.2d 655, 659 (E.D.La.2010) (noting that "[o]n August 3, 2009, Plaintiffs received notice that service of process of the First Amended Complaint was perfected on Defendant [TG]"). Moreover, unlike the defendant in *Lacy,* TG has not offered any evidence that it made similar efforts to engage with opposing counsel before the district court entered the Default Judgment.

**[29]** TG's argument that its default was not willful because it was unfamiliar with U.S. litigation practice likewise fails. We have already rejected this argument in *Matter of Dierschke,* 975 F.2d 181, 184 (5th Cir.1992). In that case, the defendant admitted that he had received the complaint, but explained that he had failed to respond because he was involved in another suit and did not understand that he was being served in a new case. *Id.* Based on those facts, the district court found, and we affirmed, that the defendant willfully failed to respond. *Id.* ("Dierschke chose to make a decision that he hadn't been served when, in fact, he had."). Here, TG presents a very similar argument that it did not understand the legal implications of the First Amended Complaint. TG does not contest that it was served with the First Amended Complaint, which was translated into Chinese. If TG

did not fully understand the significance of the First Amended Complaint, it should have sought legal advice. Based on these facts, TG has not met its burden to prove that its neglect was excusable. When pressed at oral argument, TG was again unable to provide any justification acceptable under our case law for its failure to make a timely response. *See Lacy,* 227 F.3d at 292. While the district court did not determine whether TG's default was willful, it did conclude that the default was not the result of excusable neglect. Even assuming *arguendo* that TG's default was not willful, TG has not demonstrated that the district court abused its discretion in declining to vacate the Default Judgment. The district court weighed several relevant factors, including the merit of TG's asserted defense, before concluding that vacatur was unwarranted. Accordingly, the district court did not abuse its discretion by refusing to vacate the Default Judgment.

V.

For the reasons stated above, we AFFIRM.

**All Citations**

742 F.3d 576, Prod.Liab.Rep. (CCH) P 19,322

Footnotes

1    This case involves both a group of "Original Plaintiffs," and "Plaintiff–Intervenors." Where the distinction matters, we refer to the groups by these names. Where it does not, we refer to them collectively as "Plaintiffs."

2    The district court made a number of factual findings about the contacts between TG and Venture, some of which TG contests on appeal. To the extent that any of the facts included here are contested, we hold that these findings are supported by the extensive record before us, and were not clearly erroneous.

3    It is undisputed that TG does not have any physical presence in Virginia and that the vast majority of TG's drywall is sold and used within the domestic Chinese market. All of TG's contacts with the State of Virginia relevant to this case involve its business relationship with Venture.

4    The district court frequently referred to TG and TTP collectively as "Taishan" or "Taishan Entities." As explained below, the district court found that TTP had no contacts with Virginia during the relevant time period. As a result, only TG's actions are relevant to this case.

5    Plaintiff–Intervenors are Jerry and Inez Baldwin, Steven and Elizabeth Heischober, Joseph and Kathy Leach, Preston and Rachael McKellar, J. Frederick and Vanessa Michaux, William and Deborah Morgan, and Robert and Lea Orlando.

6    According to TG, it owes a total of $2,758,356.20 to Plaintiff–Intervenors under the Default Judgment. As counsel for TG confirmed at oral argument, only the Plaintiff–Intervenors are parties to the Default Judgment against TG. Original Plaintiffs only have a preliminary default judgment against TG, and the district court has not yet held a hearing on damages for these claims.

7    The district court determined that it had held an evidentiary hearing on discovery because it relied on discovery evidence, including depositions. As a result, Plaintiffs had to prove that there was personal jurisdiction over TG by a preponderance of the evidence. *See Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.,* 517 F.3d 235, 241–42 (5th Cir.2008).

8    The parties appear to agree that the relevant question is whether TG established minimum contacts with Virginia, rather than the MDL court, necessary to give rise to personal jurisdiction. We agree that the analysis properly focuses on TG's contact with Virginia, rather than Louisiana. *See* Charles Alan Wright et al., 4 Federal Practice & Procedure Civil § 1067.3 (3d ed.) ("It also seems clear that the minimum contacts requirement does not apply to a plaintiff's contacts with the transferee forum in a case transferred pursuant to the multidistrict litigation (MDL) statute.").

9    The Fourth Circuit applies the same standard of review. *See Consulting Eng'rs Corp. v. Geometric Ltd.,* 561 F.3d 273, 276 (4th Cir.2009).

10   *See also Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 59–60 (4th Cir.1993).

11   In *McIntyre* both the plurality and concurring opinions emphasized that the defendant must have an intent to serve a market in the particular forum state, rather than simply the "U.S. market." 131 S.Ct. at 2790. Thus, the proper inquiry focuses exclusively on forum-specific, rather than nationwide contacts. *Id.* at 2790; *id.* at 2793 (Breyer, J., concurring). Given the Supreme Court's directive in *McIntyre,* our analysis focuses exclusively on TG's potential contacts with Virginia, rather than "U.S. contacts." Plaintiffs frequently cite facts regarding the nationwide contacts of TG and its wholly owned subsidiary, TTP, which Plaintiffs collectively refer to as "Taishan." The district court found that TTP did not have any contacts with Virginia during the relevant time period and did not impute TTP's contacts onto TG. Defendants have not

Case 2:09-md-02047-EEF-MBN  Document 22362-781  Filed 11/19/19  Page 24 of 1680
In re Chinese Mfd. Drywall Products Liability Litigation, 742 F.3d 576 (2014)  Page 18 of 18  PageID #: 902
Prod.Liab.Rep. (CCH) P 19,322

contested this finding on appeal. As a result, we consider only TG's contacts with Virginia. *See Windsor v. Spinner Indus. Co., Ltd.,* 825 F.Supp.2d 632, 638 (D.Md.2011), *as amended* (Dec. 15, 2011).

12   The district court applied Virginia's long-arm statute, and found that subsections (A)(4) and (A)(5) of § 8.01–328.1 of the Virginia Code applied to TG because it had obtained substantial revenue from Virginia. We agree.

13   In *Daimler* the Supreme Court determined that there was no general jurisdiction over the defendant. Here, we hold that there is specific jurisdiction over TG. *See Daimler,* 134 S.Ct. at 751 ("In *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. ——, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011), we addressed the distinction between general or all-purpose jurisdiction, and specific or conduct linked jurisdiction."); *id.* at 758 (noting the differences between the Supreme Court's general and specific jurisdiction jurisprudence and stating that "Plaintiffs have never attempted to fit this case into the specific jurisdiction category").

14   Although TG contests the extent of these communications, the district court cited a number of employee affidavits, declarations, depositions, and emails that support its finding. In particular, the district court cited and quoted from several e-mails that a TG employee wrote to Venture emphasizing TG's desire to continue to work with Venture in the future, and to use TG as a point from which it might expand its market. The district court was actively involved in overseeing the discovery process, and even attended a number of depositions. The Order & Reasons demonstrates that the district court was intimately familiar with the extensive record in this case. While TG points to other information in the record that could support a contrary conclusion, the district court's conclusions here are well-supported. TG has not met its burden to show that these findings were clearly erroneous.

15   TG argues that because the two contracts with Venture specified that any disputes would be settled by arbitration in China that it was not reasonably foreseeable that it would be haled into court in Virginia. Plaintiffs were not party to these contracts, and their products liability claims are not governed by the arbitration clauses. TG knew that Venture was a drywall distributor, and that it would sell TG's drywall on to end-users. Given that TG made two large sales to a Virginia distributor, and designed the product in a way that identified the product with that Virginia distributor, was reasonably foreseeable that Virginia residents might bring suit against TG as a result of these sales.

16   As the district court noted, this case is different from the scenario presented in *Asahi,* where the Supreme Court found that it was not fair and reasonable to exercise jurisdiction over the foreign plaintiff:

In *Asahi,* the Court concluded that the exercise of personal jurisdiction over a foreign defendant was unreasonable and unfair because of the burden placed on the foreign defendant to litigate in the United States, the argument raised by [TG], but also on the basis that the only remaining claims against the foreign defendant were by another foreign defendant, diminishing the forum's interest in these entirely foreign claims. *See* 480 U.S. at 114, 107 S.Ct. 1026. Here, the claims against [TG] are made by forum plaintiffs who were injured by [TG's] products in the forum, maximizing the interest of the forum state, the forum plaintiffs, the shared states, and the judicial system.

17   Although the district court considered this question under Fifth Circuit law, the Fourth Circuit considers the same factors for this part of the analysis, and both circuits place the burden of proof on the defendant.

18   As we noted in footnote 7, only TG and Plaintiff–Intervenors were parties to the Default Judgment; at present the Original Plaintiffs only have a preliminary default judgment against TG. As we hold that there is personal jurisdiction over TG, it naturally follows that TG's argument that the Default Judgment is void for lack of personal jurisdiction is unavailing. We now consider TG's other arguments for vacating the order.

19   The district court addressed this argument under Rule 60(b)(6), which allows a district court to vacate a default judgment for "any other reason that justifies relief." Fed.R.Civ.P. 60(b)(6). Rule 60(b)(6) "is a catch-all provision, meant to encompass circumstances not covered by Rule 60(b)'s other enumerated provisions. Rule 60(b)(6) motions will be granted only if extraordinary circumstances are present." *Hess v. Cockrell,* 281 F.3d 212, 216 (5th Cir.2002) (citations omitted).

20   The district court did not decide whether or not TG was properly served with the Second Amended Complaint, because it determined that no new claims were raised in the Second Amended Complaint.

---

**End of Document**                                           © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# JOINT APPENDIX TAB # 2

Prod.Liab.Rep. (CCH) P 19,399

📄 Original Image of 753 F.3d 521 (PDF)

753 F.3d 521
United States Court of Appeals,
Fifth Circuit.

In re CHINESE–MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION.
Taishan Gypsum Company, Limited;
Tai'An Taishan Plasterboard, Company,
Limited, Defendants–Appellants
v.
David Gross; Cheryl Gross; Lois Velez,
individually and on behalf of others
similarly situated, Plaintiffs–Appellees.
In re Chinese–Manufactured
Drywall Products Liability Litigation.
Taishan Gypsum Company,
Limited, Defendant–Appellant
v.
Mitchell Company Incorporated,
individually and on behalf of others
similarly situated, Plaintiff–Appellee.
In re Chinese–Manufactured
Drywall Products Liability Litigation.
Taishan Gypsum Company, Limited;
Tai'An Taishan Plasterboard, Company,
Limited, Defendants–Appellants
v.
Kenneth Wiltz, individually and on behalf
of all others similarly situated, Barbara
Wiltz, individually and on behalf of all others
similarly situated, Plaintiffs–Appellees.

No. 12–31213.
|
May 20, 2014.

**Synopsis**
**Background:** Homeowners and homebuilders brought
class actions against manufacturers of Chinese drywall,
after defective drywall was installed in their homes. Cases
were later transferred to create multi-district litigation
(MDL), and hundreds of actions were consolidated. The
United States District Court for the Eastern District
of Louisiana, Eldon E. Fallon, J., 706 F.Supp.2d
655, entered preliminary default judgment against one

manufacturer, and, later, denied manufacturer's motions
to vacate default judgment, and to dismiss complaints
based on lack of personal jurisdiction. Manufacturer
appealed.

**Holdings:** The Court of Appeals, Higginson, Circuit
Judge, held that:

[1] manufacturer's subsidiary was acting as manufacturer's
"agent," within meaning of Florida agency law, and thus
subsidiary's contacts with Florida could be imputed to
manufacturer;

[2] manufacturer had sufficient minimum contacts for
exercise of personal jurisdiction;

[3] plaintiffs' claims arose out of or related to manufacture,
and sale, of drywall, as required for exercise of personal
jurisdiction;

[4] exercise of personal jurisdiction did not offend
traditional notions of fair play and substantial justice;

[5] refusal to vacate default judgment was not abuse of
discretion; and

[6] subsidiary was alter ego of manufacturer under
Louisiana law, and thus subsidiary's contacts with
Louisiana could be imputed to manufacturer.

Affirmed.

West Headnotes (30)

[1]    **Federal Courts**
       👉 Personal jurisdiction

       Whether personal jurisdiction can be
       exercised over a defendant is a question of law
       subject to de novo review.

       6 Cases that cite this headnote

[2]    **Federal Courts**
       👉 Personal jurisdiction

A district court's jurisdictional findings of fact are reviewed for clear error.

1 Cases that cite this headnote

**[3]** **Federal Courts**
👉 Presumptions and burden of proof

Burden of establishing personal jurisdiction over a non-resident defendant lies with the plaintiff.

1 Cases that cite this headnote

**[4]** **Federal Courts**
👉 Weight and sufficiency

Where a district court has held an evidentiary hearing on personal jurisdiction, plaintiffs must establish personal jurisdiction by a preponderance of the evidence.

15 Cases that cite this headnote

**[5]** **Federal Civil Procedure**
👉 Grounds and Factors

A district court may set aside an entry of default for good cause. Fed.Rules Civ.Proc.Rules 55, 60(b), 28 U.S.C.A.

11 Cases that cite this headnote

**[6]** **Federal Courts**
👉 Unrelated contacts and activities;general jurisdiction
**Federal Courts**
👉 Related contacts and activities;specific jurisdiction

The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation; this is in contrast to "general" or "all purpose" jurisdiction, which permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit.

14 Cases that cite this headnote

**[7]** **Federal Courts**
👉 Findings and conclusions

Court of Appeals was not required to choose whether to apply forum state's law or Chinese law, for purpose of determining whether Chinese drywall manufacturer's subsidiary's contacts with forum state could be imputed to manufacturer, as required to exercise specific jurisdiction over manufacturer in products liability action, where Chinese law was not materially different on this issue from the law of the forum state, and the outcome should be the same under either law.

2 Cases that cite this headnote

**[8]** **Courts**
👉 Related or affiliated entities;parent and subsidiary

Under Florida law, a foreign parent corporation is generally not subject to the jurisdiction of a forum state merely because a subsidiary is doing business there; however, if the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction or its separate corporate status is formal only and without any semblance of individual identity, then the subsidiary's business will be viewed as that of the parent and the latter will be said to be doing business in the jurisdiction through the subsidiary for purposes of asserting personal jurisdiction.

2 Cases that cite this headnote

**[9]** **Principal and Agent**
👉 Nature of the relation in general

Essential to the existence of an actual agency relationship under Florida law is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent.

1 Cases that cite this headnote

**[10]** **Principal and Agent**
🔑 Nature of the relation in general

Under Florida law, the issue of control is critical to the determination of agency.

Cases that cite this headnote

**[11]** **Corporations and Business Organizations**
🔑 Parent and subsidiary corporations in general

Under Florida law, for a parent corporation to be liable for its subsidiary's acts under agency theory, the parent corporation must exercise control to the extent the subsidiary manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation.

Cases that cite this headnote

**[12]** **Corporations and Business Organizations**
🔑 Jurisdiction over shareholders, directors, or officers of foreign corporations

**Federal Courts**
🔑 Particular Entities, Contexts, and Causes of Action

Chinese drywall manufacturer's subsidiary was acting as manufacturer's "agent," within meaning of Florida agency law, and thus subsidiary's contacts with Florida could be imputed to manufacturer, as required to determine whether district court in Florida had specific jurisdiction over manufacturer in products liability action; manufacturer created subsidiary solely to execute sales accompanied by value added tax invoices, manufacturer's employees sat on subsidiary's board of directors, manufacturer capitalized, staffed, and dealt with subsidiary, subsidiary held itself out to be the same entity as manufacturer, and manufacturer wound down subsidiary upon its discontinuance.

Cases that cite this headnote

**[13]** **Constitutional Law**
🔑 Non-residents in general

**Federal Courts**
🔑 Actions by or Against Nonresidents; "Long-Arm" Jurisdiction

**Federal Courts**
🔑 Personal jurisdiction

A federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution. U.S.C.A. Const.Amend. 14.

17 Cases that cite this headnote

**[14]** **Courts**
🔑 Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Florida's long-arm statute is to be strictly construed. West's F.S.A. § 48.193.

Cases that cite this headnote

**[15]** **Federal Courts**
🔑 Particular Entities, Contexts, and Causes of Action

Chinese drywall manufacturer, through its agent, had sufficient minimum contacts with Florida for exercise of specific personal jurisdiction, in accordance with due process, over manufacturer in action brought against it by homebuilders for claims arising after defective drywall was installed in homes; manufacturer sold 200,000 sheets of its drywall to Florida customers or customers doing business in Florida and made almost $800,000 from those sales, manufacturer negotiated with Florida companies and arranged shipping to Florida, and manufacturer granted a Florida company the sole right to purchase a specific brand of its drywall. U.S.C.A. Const.Amend. 14; West's F.S.A. § 48.193.

1 Cases that cite this headnote

**[16]    Courts**

🔑 **Business contacts and activities; transacting or doing business**

In order to satisfy Florida's long-arm statute, defendant's activities must be considered collectively and show a general course of business activity in Florida for pecuniary benefit. West's F.S.A. § 48.193(1)(a)(1).

Cases that cite this headnote

**[17]    Courts**

🔑 **Business contacts and activities; transacting or doing business**

Under Florida's long-arm statute, it is not necessarily the number of transactions, but rather the nature and extent of the transactions that determines whether a person is "carrying on a business venture" within the state. West's F.S.A. § 48.193(1)(a)(1).

Cases that cite this headnote

**[18]    Constitutional Law**

🔑 **Manufacture, distribution, and sale**

**Federal Courts**

🔑 **Particular Entities, Contexts, and Causes of Action**

Florida homebuilders' claims arising after defective drywall was installed in homes arose out of, or related to, manufacture of drywall by China-based manufacturer, and sale of that drywall in Florida, as required for exercise of specific personal jurisdiction over manufacturer so as to accord with due process; homebuilders incurred costs because they installed manufacturer's drywall, the profile forms submitted by the parties demonstrated that the drywall at issue was traceable to manufacturer, and testimony from Florida homebuilder identified 400 homes containing manufacturer's drywall. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[19]    Constitutional Law**

🔑 **Non-residents in general**

For specific jurisdiction to be proper, Due Process requires (1) minimum contacts by the defendant purposefully directed at the forum state, (2) a nexus between the defendant's contacts and the plaintiff's claims, and (3) that the exercise of jurisdiction over the defendant be fair and reasonable. U.S.C.A. Const.Amend. 14.

19 Cases that cite this headnote

**[20]    Constitutional Law**

🔑 **Non-residents in general**

To satisfy Due Process, a foreign defendant's connection with the forum state must be such that it should reasonably anticipate being haled into court in the forum state. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

**[21]    Constitutional Law**

🔑 **Non-residents in general**

In assessing fair play and substantial justice prong of test for specific jurisdiction, courts balance (1) the defendant's burden; (2) the forum state's interests; (3) the plaintiffs interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies.

3 Cases that cite this headnote

**[22]    Constitutional Law**

🔑 **Manufacture, distribution, and sale**

**Federal Courts**

🔑 **Particular Entities, Contexts, and Causes of Action**

Exercise of personal jurisdiction over China-based drywall manufacturer, in action brought against it by homebuilders for claims arising after defective drywall was installed in homes, did not offend traditional notions of fair play and substantial justice; although manufacturer would face burdens

Prod.Liab.Rep. (CCH) P 19,399

if subjected to personal jurisdiction, Florida had great interest in its citizens being able to litigate against manufacturer for alleged damages, homebuilders had strong interest in litigating in United States rather than China, and judicial system had great interest in effectively and efficiently resolving drywall-related claims. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[23]**  **Federal Civil Procedure**
   👈 Grounds and Factors

**Federal Civil Procedure**
   👈 Meritorious cause of action or defense

In determining whether to set aside a default decree, the district court should consider whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented. Fed.Rules Civ.Proc.Rules 55, 60(b), 28 U.S.C.A.

10 Cases that cite this headnote

**[24]**  **Federal Civil Procedure**
   👈 Grounds and Factors

In determining whether to set aside a default decree, the district court may consider whether the public interest was implicated, whether there was significant financial loss to the defendant, and whether the defendant acted expeditiously to correct the default. Fed.Rules Civ.Proc.Rules 55, 60(b), 28 U.S.C.A.

10 Cases that cite this headnote

**[25]**  **Federal Civil Procedure**
   👈 Grounds and Factors

District Court did not abuse its discretion by refusing to vacate default judgment entered against Chinese drywall manufacturer in products liability action; manufacturer was served in its native language, manufacturer was aware that it sold drywall to several Florida companies, plaintiffs had invested a significant amount of time and money to serve

manufacturer, manufacturer's defense was speculative, public had an interest in seeing that plaintiffs harmed by defective foreign products be accorded relief for their damages, and manufacturer did not appear until it was notified of default judgment. Fed.Rules Civ.Proc.Rules 55, 60(b), 28 U.S.C.A.

1 Cases that cite this headnote

**[26]**  **Courts**
   👈 Particular Nonresident Entities

**Courts**
   👈 Agents, Representatives, and Other Third Parties, Contacts and Activities of as Basis for Jurisdiction

In Louisiana, courts may impute contacts between two entities under either an alter-ego or agency theory, in determining whether they may exercise personal jurisdiction over a nonresident. LSA–R.S. 13:3201(A).

7 Cases that cite this headnote

**[27]**  **Courts**
   👈 Corporations and business organizations

Under Louisiana law, courts consider a number of factors when determining whether an entity should be considered an alter ego for personal jurisdiction purposes: (1) corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control; (2) common directors or officers; (3) unified administrative control of corporations whose business functions are similar or supplementary; (4) directors and officers of one corporation act independently in the interest of that corporation; (5) corporation financing another corporation; (6) inadequate capitalization; (7) corporation causing the incorporation of another affiliated corporation; (8) corporation paying the salaries and other expenses or losses of another corporation; (9) receiving no business other than that given to it by its affiliated corporations; (10) corporation using the property of another corporation as its

Case: 2:09-md-02047-EEF-MBN Document 22363-79 Filed 12/2/19 Page 31 of 1680

Case 2:09-md-02047-EEF-JCW Document 22363-79 Filed 11/21/19 Page 7 of 27 PageID# 509
In re Chinese Manufactured Drywall Products Liability Litigation, 753 F.3d 521 (2014)

Prod.Liab.Rep. (CCH) P 19,399

own; (11) noncompliance with corporate formalities; (12) common employees; (13) services rendered by the employees of one corporation on behalf of another corporation; (14) common offices; (15) centralized accounting; (16) undocumented transfers of funds between corporations; (17) unclear allocation of profits and losses between corporations; and (18) excessive fragmentation of a single enterprise into separate corporations.

2 Cases that cite this headnote

[28] **Corporations and Business Organizations**
👈 Jurisdiction over shareholders, directors, or officers of foreign corporations

**Federal Courts**
👈 Particular Entities, Contexts, and Causes of Action

**Federal Courts**
👈 Agents, Representatives, and Other Third Parties

Chinese drywall manufacturer's subsidiary was alter ego of manufacturer under Louisiana law, and thus subsidiary's contacts with Louisiana could be imputed to manufacturer, as required to determine whether district court in Louisiana had specific jurisdiction over manufacturer in products liability action; manufacturer authorized subsidiary to use its trademark in producing drywall but did not charge subsidiary for this authorization, manufacturer and subsidiary did not accurately report their dealings with each other in their financial reports, and some of subsidiary's board members did not receive compensation from subsidiary.

Cases that cite this headnote

[29] **Constitutional Law**
👈 Manufacture, distribution, and sale

**Federal Courts**
👈 Particular Entities, Contexts, and Causes of Action

China-based drywall manufacturer had sufficient minimum contacts with Louisiana for exercise of specific personal jurisdiction, in accordance with due process, over manufacturer in action brought against it by homeowners for claims arising after defective drywall was installed in homes; although manufacturer had no physical contacts with Louisiana, it sold drywall to Louisiana customers, and manufacturer absolutely knew it was shipping drywall to Louisiana. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[30] **Constitutional Law**
👈 Manufacture, distribution, and sale

**Federal Courts**
👈 Particular Entities, Contexts, and Causes of Action

Louisiana homeowners' claims arising after defective drywall was installed in their homes arose out of, or related to, manufacture of drywall by China-based manufacturer, and sale of that drywall in Louisiana, as required for exercise of specific personal jurisdiction over manufacturer so as to accord with due process; a close nexus existed between manufacturer's marketing and selling drywall to Louisiana customers and arranging shipping to Louisiana and homeowners' claims that manufacturer's drywall was installed in their homes and injured them. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*526** Frederick S. Longer, Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Leonard Arthur Davis, Russ M. Herman, Esq., Senior Attorney, Herman Herman & Katz, L.L.C., Brooke C. Tigchelaar, Stone Pigman Walther Wittmann, L.L.C., New Orleans, LA, Steven L. Nicholas, Esq., George M. Dent, III, David George Wirtes, Jr., Esq., Cunningham Bounds, L.L.C., Mobile, AL, Elizabeth Joan Cabraser, Lieff,

Cabraser, Heimann & Bernstein, L.L.P., San Francisco, CA, Jonathan David Selbin, Lieff, Cabraser, Heimann, & Bernstein, L.L.P., New York, NY, for Plaintiff–Appellee.

Frank T. Spano, Courtney Lynne Colligan, Joe Cyr, Hogan Lovells US, L.L.P., New York, NY, Thomas Patrick Owen, Jr., Esq., Richard C. Stanley, Esq., Stanley, Reuter, Ross, Thornton & Alford, L.L.C., New Orleans, LA, for Defendants–Appellants.

Ervin Amado Gonzalez, Colson Hicks Eidson, Coral Gables, FL, Elliot H. Scherker, General Attorney, Greenberg Traurig, L.L.P., Miami, FL, for Amicus Curiae.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before SMITH, DeMOSS, and HIGGINSON, Circuit Judges.

**Opinion**

HIGGINSON, Circuit Judge:

This appeal encompasses three cases in the Chinese Drywall multidistrict litigation—*Mitchell, Gross,* and *Wiltz.* Picking up where we left off in *Germano v. Taishan Gypsum Company, Ltd.,* 742 F.3d 576 (5th Cir.2014) (affirming as to a fourth), we hold that personal jurisdiction lies over Taishan Gypsum Company, Limited and Tai'an Taishan Plasterboard Company, Limited, in their respective cases. We further hold that the district court did not abuse its discretion when it refused to vacate the preliminary default entered in *Mitchell.* We therefore AFFIRM.

## I.

From 2005 to 2008, a housing boom coincided with the destruction of Hurricanes Katrina and Rita to sharply increase the demand for construction materials in the Gulf South and East Coast. In response, Chinese companies manufactured considerable quantities of gypsum wallboard ("Chinese drywall") and sold it to United States companies. Homeowners experienced problems with the drywall,[1] and affected **\*527** parties sued entities involved in manufacturing, importing, and installing the Chinese drywall. The cases multiplied, and the Judicial Panel on Multidistrict Litigation transferred

the cases to a single court in the Eastern District of Louisiana (the "MDL" court). The Honorable Eldon E. Fallon presides over the MDL.

Four cases in the MDL have reached our court: *Germano, Mitchell, Gross,* and *Wiltz. Germano* is a class action originally filed by Virginia homeowners in the United States District Court for the Eastern District of Virginia. *Mitchell* is a class action originally filed by homebuilders in the United States District Court for the Northern District of Florida. *Gross* and *Wiltz* are class actions on behalf of property owners and were directly filed in the MDL in the Eastern District of Louisiana.

Plaintiffs–Appellees are the class-action plaintiffs in each of the four cases. Defendants–Appellants are two Chinese companies that manufacture and sell drywall: Taishan Gypsum Company, Limited ("TG") and Tai'an Taishan Plasterboard Company, Limited ("TTP") (collectively "Taishan"). Both entities are defendants in *Gross* and *Wiltz,* but only TG is a defendant in *Germano* and *Mitchell.* TG and TTP appeal in their respective cases from the MDL court's omnibus September 4, 2012 order. In *Germano v. Taishan Gypsum Company, Ltd.,* 742 F.3d 576 (5th Cir.2014), our court affirmed the district court's decision finding personal jurisdiction over TG. We are tasked with the three remaining appeals: *Mitchell, Gross,* and *Wiltz.*

### A. *Mitchell, Gross,* and *Wiltz*

#### 1. *Mitchell*

The Mitchell Company ("Mitchell") is an Alabama construction company that has built homes and apartments in Alabama, Mississippi, Louisiana, Georgia, and Florida. On March 6, 2009, Mitchell sued TG, among others, in the United States District Court for the Northern District of Florida. Mitchell sued on behalf of itself and a class "composed of all persons and entities" in Alabama, Mississippi, Louisiana, Georgia, Texas, and Florida who "constructed an improvement to real estate using drywall manufactured or distributed by Defendants" and incurred expenses associated with repairing the drywall itself, repairing property damage that the drywall caused, and liability to property owners as a result of the damage.

Mitchell properly served TG on May 8, 2009. On June 15, 2009, the MDL panel transferred *Mitchell* to the

Eastern District of Louisiana. TG failed to appear, and Mitchell moved for a default judgment. The Clerk entered a preliminary default against TG on September 22, 2009, and on June 10, 2010, TG made its first appearance. TG moved to vacate the preliminary default under Rule 55(c) and also moved to dismiss the case for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). The MDL court denied TG's motions in its omnibus September 4, 2012 order.

### 2. *Gross*

The *Gross* plaintiffs filed directly in the MDL court on October 7, 2009. The plaintiffs sued, among others, TG and TTP, on behalf of themselves and all United States homeowners who have defective drywall in their homes. They allege that defendants' drywall has caused them economic harm from the costs of inspection, costs of repairs, and devaluation of their homes, and physical harm such as an increased risk of disease. Because plaintiffs concede that **\*528** they have failed to "identify the manufacturer of the product that caused the harm," they urge liability for the defendants "in ratio to their proportionate share of the relevant market." [2] After jurisdictional discovery, TG and TTP moved to dismiss for lack of personal jurisdiction under Rule 12(b)(2). The district court denied the motion in its omnibus September 4, 2012 order.

### 3. *Wiltz*

The *Wiltz* plaintiffs also filed directly in the MDL court. They are suing, among others, TG and TTP, on behalf of themselves and all owners and residents of property containing defective Chinese drywall. After completing jurisdictional discovery, TG and TTP moved to dismiss *Wiltz* for lack of personal jurisdiction under Rule 12(b)(2). The district court denied the motion in its omnibus September 4, 2012 order. [3]

### B. The Taishan Entities (TG and TTP)

TG is a Chinese corporation with its principal place of business in Ta'in City, Shandong Province, China. It began manufacturing drywall in 1992 and has grown to be one of the largest drywall manufacturers in China. In 2006, TG formed a wholly owned subsidiary, TTP. TTP stopped operating in 2008. TG and TTP are referred to collectively as "Taishan."

### C. The District Court's Order

On September 4, 2012, the district court ruled on Taishan's motions in *Germano, Mitchell, Gross,* and *Wiltz* in a 142–page order. In *Germano* the district court determined that personal jurisdiction was proper over TG in Virginia. The district court also denied TG's motion to vacate the default judgment. [4] In *Mitchell,* the district court determined that personal jurisdiction was proper over TG in Florida. In so holding, the district court determined that TTP's contacts with Florida could be imputed to TG for the purposes of personal jurisdiction. The district court also denied TG's motion to vacate the preliminary default. In *Gross* and *Wiltz,* [5] the district court determined that personal jurisdiction was proper over TG and TTP in Louisiana. The district court again held that TTP's contacts could be imputed to TG for the purposes personal jurisdiction. The district court subsequently certified an interlocutory appeal under 28 U.S.C. § 1292(b), and this court granted permission to appeal.

### II.

**[1] [2] [3] [4]** Whether personal jurisdiction can be exercised over a defendant is a **\*529** question of law subject to *de novo* review. *Patin v. Thoroughbred Power Boats Inc.,* 294 F.3d 640, 652 (5th Cir.2002) (citing *Dickson Marine, Inc. v. Panalpina, Inc.,* 179 F.3d 331, 335 (5th Cir.1999)). A district court's jurisdictional findings of fact, however, are reviewed for clear error. *Lonatro v. United States,* 714 F.3d 866, 869 (5th Cir.2013). "The burden of establishing personal jurisdiction over a non-resident defendant lies with the *plaintiff.*" *Ainsworth v. Moffett Eng'g, Ltd.,* 716 F.3d 174, 176 (5th Cir.), *cert. denied,* —— U.S. ——, 134 S.Ct. 644, 187 L.Ed.2d 420 (2013). Because the district court held an evidentiary hearing on personal jurisdiction, the plaintiffs must establish personal jurisdiction by a preponderance of the evidence. *Germano,* 742 F.3d at 585; *see also Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.,* 517 F.3d 235, 241–42 (5th Cir.2008).

**[5]** Under Federal Rules of Civil Procedure 55(c) and 60(b), a district court may set aside an entry of default for "good cause." *Lacy v. Sitel Corp.,* 227 F.3d 290, 291–92 (5th Cir.2000). The denial of such relief is reviewed for abuse of discretion and any factual determinations

underlying the district court's decision are reviewed for clear error. *Id.*

### III.

[6]  We begin with the *Mitchell* appeal, in which TG argues that the district court erred in finding specific jurisdiction over it in Florida. "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,* ––– U.S. ––––, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014) (internal quotations omitted). "This is in contrast to 'general' or 'all purpose' jurisdiction, which permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit (*e.g.,* domicile)." *Id.* at n. 6; *see also Daimler AG v. Bauman,* ––– U.S. ––––, 134 S.Ct. 746, 757–58, 187 L.Ed.2d 624 (2014).

#### A. TTP's contacts may be imputed to TG
TG first argues that TTP's contacts with Florida may not be imputed to TG for purposes of personal jurisdiction. We hold that they can.

##### 1. Choice of law
[7]  TG faults the district court for applying the forum state's law (Florida law) instead of Chinese law to the question of whether to impute TTP's Florida contacts to TG. TG concedes, however, that "Chinese law is not materially different on this issue from Florida law, and the outcome should be the same under either law." Accordingly, we need not choose because "if the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 839 n. 20, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Therefore, we apply Florida law. [6]

##### *530  2. Imputation under Florida Law
[8]  Under Florida law, a foreign parent corporation is generally not "subject to the jurisdiction of a forum state merely because a subsidiary is doing business there." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1272 (11th Cir.2002). But if:

the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction or its separate corporate status is formal only and without any semblance of individual identity, then the subsidiary's business will be viewed as that of the parent and the latter will be said to be doing business in the jurisdiction through the subsidiary for purposes of asserting personal jurisdiction.

*Id.* (quoting Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1069.4 (3d ed.2002)). Indeed, Florida's long-arm statute recognizes that an agent's contacts with Florida can be imputed to its principal for jurisdictional purposes: "A person, whether or not a citizen or resident of this state, who personally *or through an agent* does any of the acts enumerated in this subsection thereby submits ... to the jurisdiction of the courts of this state." Fla. Stat. Ann. § 48.193(1) (a) (emphasis added); *see also Dev. Corp. of Palm Beach v. WBC Constr., LLC,* 925 So.2d 1156, 1161 (Fla.Dist.Ct.App.2006) ("While a parent corporation is not subject to jurisdiction in Florida solely because its subsidiary does business here, the control of a parent over a subsidiary may permit the conclusion that the subsidiary is acting as the agent of the parent, thus subjecting the parent to jurisdiction under section 48.193(1) and supporting 'minimum contacts.' " (internal citations omitted)).

[9]  [10]  [11]  "Essential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Goldschmidt v. Holman,* 571 So.2d 422, 424 n. 5 (Fla.1990). "The issue of control is critical to the determination of agency." *State v. Am. Tobacco Co.,* 707 So.2d 851, 854 (Fla.Dist.Ct.App.1998). The parent's control "must be high and very significant." *Enic, PLC v. F.F. S. & Co., Inc.,* 870 So.2d 888, 891 (Fla.Dist.Ct.App.2004). "[T]he parent

corporation, to be liable for its subsidiary's acts under the ... agency theory, must exercise control to the extent the subsidiary manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." *Id.*

### 3. Imputation and Due Process

While Florida law contemplates the imputation of jurisdictional contacts between an agent and its principal, authority is split **\*531** over whether imputation on the basis of an agency relationship comports with Federal Due Process. In *Daimler AG v. Bauman,* the Supreme Court was presented with the question of whether a principal can be subject to general jurisdiction based on its agent's contacts with the forum state. —— U.S. ——, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014). The court recognized: "Daimler argues, and several Courts of Appeals have held, that a subsidiary's jurisdictional contacts can be imputed to its parent only when the former is so dominated by the latter as to be its alter ego." The court, however, then decided "we need not pass judgment on invocation of an agency theory in the context of general jurisdiction, for in no event can the appeals court's analysis be sustained." *Daimler,* 134 S.Ct. at 759. As for agency imputation in *specific* jurisdiction cases, the Court noted:

> Agency relationships, we have recognized, may be relevant to the existence of specific jurisdiction.... *As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there....* It does not inevitably follow, however, that similar reasoning applies to general jurisdiction.

*Id.* at 759 n. 13 (emphasis added). *Daimler* therefore embraces the significance of a principal-agent relationship to the specific-jurisdiction analysis, though it suggests that an agency relationship alone may not be dispositive. *See id.* at 759 ("Agencies ... come in many sizes and shapes ... [a] subsidiary, for example, might be its parent's agent for claims arising in the place where the subsidiary operates, yet not its agent regarding claims arising elsewhere.").[7]

*Daimler*'s illustrative example of when the principal-agent relationship informs the specific-jurisdiction analysis of related entities is present here. The agency relationship between TG and TTP reflects TG's purposeful availment of the Florida forum. *See* **\*532** *Daimler,* 134 S.Ct. at 759 n. 13. The record, as set forth by the district court, and assessed below, demonstrates that TG's parental control over its agent, TTP, pervaded TTP's dealings with the forum, and therefore allows TTP's contacts with Florida to be imputed to TG for the purpose of specific jurisdiction. *See, e.g., Pesaplastic, C.A. v. Cincinnati Milacron Co.,* 750 F.2d 1516, 1521–23 (11th Cir.1985) (upholding finding of specific jurisdiction based on agency relationship); *John Scott, Inc. v. Munford, Inc.,* 670 F.Supp. 344, 347 (S.D.Fla.1987) (assessing specific jurisdiction, and holding that "the contacts of ASIAN ARTS's agent MUNFORD, whose agency relationship has been established by *prima facie* evidence, may be attributed to ASIAN ARTS for the purposes of satisfying due process.").

### 4. TG and TTP

**[12]**    To find that TTP was acting as TG's agent in order to impute its contacts to TG, we must examine their corporate relationship. The district court based its factual findings on the entities' relationship on almost two years of jurisdictional discovery, multiple rounds of briefing, and a hearing. The district judge also personally attended depositions taken in Hong Kong. With the benefit of these efforts, we describe the entities' relationship.

### a. TG creates TTP.

TG is a Chinese corporation with its principal place of business in Ta'in City, Shandong Province, China. TG began manufacturing drywall in 1992 and has become one of the largest drywall manufacturers in China. TG's former names include Shandong Taihe Taishan Plasterboard Main Factory (Group) and Shandong Taihe Dongxin Co., Ltd. ("Taihe"). Because TG uses recycled materials, it was exempt from the value added tax ("VAT"), but in 2006 the Chinese tax bureau informed TG that if it "wants to continue to enjoy the exemption for VAT tax, [it] cannot issue VAT invoices to these customers." Some of TG's customers, however, still required VAT invoices. Accordingly, in 2006, TG formed

Case 1:09-md-02047-EEF-MBN Document 22362-781 Filed 11/19/19 Page 36 of 1680
In re Chinese-Manufactured Drywall Products Liability Litigation, Not Reported... (2014) Page 12 of 27 Page ID #: 914
Prod.Liab.Rep. (CCH) P 19,399

a wholly owned subsidiary, TTP, to execute its sales accompanied with VAT invoices.

### b. TG employees sit on TTP's Board of Directors.

TTP appointed Peng Shiliang ("Peng"), Fu Tinghuan ("Fu"), and Wang Fengquin ("Wang") to its Board of Directors. All three directors of TTP "came from TG." Peng had offices at both TG and TTP. Fu did not receive compensation for his position on TTP's board, and was "only compensated by TG" for his position as TG's Deputy General Manager and Director of Sales. TTP held board meetings "irregularly, [but] usually once a year." TTP submitted written monthly reports to TG, and at times TTP's directors—specifically Peng—would report directly to TG. These reports would tell TG "the specifics of the production and also the volume of sales."

### c. TG capitalizes, staffs, and deals with TTP.

TG provided TTP with a capital contribution, sold it equipment, and rented it a factory. TG's initial capital contribution was RMB 15,000,000, and TG provided a subsequent capital contribution of RMB 7,234,900. TTP purchased manufacturing equipment from TG, but TTP's financial records do not show how much TTP paid for the equipment. When TTP ceased operation, TG purchased back the equipment, offices, and factory it had sold or rented to TTP. TG's financial reports do not account for the amounts of the buy-back purchases.

TG's headquarters was located about 1,000 meters west of TTPs office, and TG and TTP maintained separate offices and **\*533** factories. But TTP conducted "all of the export sales" previously executed by TG. TG also authorized TTP to "use the Taishan name," i.e. the "brand name." TTP did not pay TG for the use of the Taishan brand, which is TG's trademark. Many of TTP's employees had previously worked for TG, and when TTP ceased operation, they "went back to work at TG." To staff TTP, TG instructed its employees to simply "volunteer." TTP's employees continued to use TG email addresses, and phone numbers; sign emails "Taihe Group"; and use TG business cards when dealing with customers. TTP employees also directed their customers and potential customers to TG's website at "www.taihegroup.com." When TTP salespeople gave an introduction to their

company they would introduce their company as TG, would not mention TTP at all, and would include "Taihe Dongxin Co., Ltd." (TG) under their signature.

### d. TTP holds itself out to be the same entity as TG.

TTP consistently held itself out as being synonymous with TG in its dealings with two American companies. In particular, it referred to itself as "Taihe." Guardian Building Supplies ("Guardian"), a South Carolina company, entered into dealings with an entity it knew only as "Taihe." When Guardian's representative, John Gunn, visited China, Taihe's representatives did not discuss TG or TTP. Gunn met with Taihe representative Apollo Yang, who told Gunn that he worked for Taihe and gave Gunn a business card that represented he worked for Taihe Dongxin. Taihe, however, was the "only name [Gunn] knew." Guardian purchased drywall from Taihe, and Gunn "understood it was buying Taihe drywall."

While Gunn's purchase order went to Taihe, Taian Taigo Trading Corporation ("TTT") served as the broker. At the time of the transaction, however, Gunn "had no idea of [TTT's] existence." When homeowners began to complain about the drywall, Guardian alerted Taihe and went to China to meet with them. When Gunn traveled to China in October 2006, he met with TTT, and "[t]his was the first time [he] realized there's someone else involved." Gunn testified that TTT "was a front set up by Taihe to distance ... Guardian [ ] from Taihe." Gunn traveled to China again in 2008 to work out a settlement with Taihe. In these discussions, however, Gunn was dealing with Taihe. Specifically, Gunn thought he was meeting with the General Manager of Taihe. Nevertheless, Guardian eventually settled with TTP.

Oriental Trading Company ("OTC"), a Florida company, had a similar experience. TTP's representatives never differentiated between TG and TTP, but instead consistently represented themselves to be "Taihe." TTP and OTC entered into an agreement in which TTP agreed to sell OTC "DUN" brand drywall, and make OTC the sole sales agent of "DUN" drywall in the United States. Importantly, TG exclusively produced DUN drywall, and TG never formally authorized TTP to produce DUN brand drywall. But authorization was obvious: TTP sold OTC 60,000 pieces of DUN drywall. Moreover, OTC made a $100,000 deposit to TTP, but it was TG that

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/19/19 Page 37 of 1680
In re Chinese-Manufactured Drywall Products Liability Litigation, 753 F.3d 521 (2014) Page 13 of 27 PageID #: 615
Prod.Liab.Rep. (CCH) P 19,399

worked to return that deposit to TTP at the end of their business relationship.

### e. TG winds down TTP.

In 2008, the boards of directors of TG and TTP decided to have TTP discontinue producing drywall. TTP remains incorporated, though it has no income and TG or one of its subsidiaries pays TTP's remaining employees.

**\*534 5. Imputation is Proper**

The record demonstrates that TTP acted as TG's agent under Florida law when it conducted its Florida contacts. This principal-agent relationship allows for imputation of TTP's contacts to TG for the purposes of personal jurisdiction. *See Pesaplastic,* 750 F.2d at 1522–23. First, TG allowed TTP to act on its behalf, and TTP did act on TG's behalf. *See, e.g., Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino,* 447 F.3d 1357, 1361–63 (11th Cir.2006) (finding an agency relationship supporting imputation when, among other things, the agent "acted as an advertising and booking department" for the principal); *Benson v. Seestrom,* 409 So.2d 172, 173 (Fla.Dist.Ct.App.1982) ("Even where an agent's act is unauthorized, the principal is liable if the agent had the apparent authority to do the act and that apparent authority was reasonably relied upon by the third party dealing with the agent."). For instance, TG authorized TTP to use TG's trademark in producing drywall but did not charge TTP for this authorization. TTP also sold the exclusive right to purchase TG's "DUN" brand of drywall even though TG did not formally authorize TTP to sell this brand. *See id.* at 173 ("While Paschall was not cloaked with authority to execute contracts on appellant's behalf, he certainly had the apparent authority necessary to conduct negotiations between the parties.").

Second, TG and TTP held themselves out to be the same entity to customers such as OTC (a Florida company) and Guardian. *See, e.g., John Scott,* 670 F.Supp. at 346 (finding fact that entity acted on behalf of principal in negotiating contracts was a factor favoring agency relationship). TTP employees used TG email address, fax numbers, phone numbers, business cards, and websites when dealing with customers. *See Stubbs,* 447 F.3d at 1362 (finding an agency relationship supporting imputation when, among other things, the principal listed the agent's

address on checks). Moreover, the entities settled each other's debts.

Third, TTP was formed to conduct a narrow function for TG and it acted only to serve TG. *See, e.g., Stubbs,* 447 F.3d at 1362–63 (noting that imputation was appropriate when the Florida subsidiary conducted business "solely for the nonresident corporation[ ]"); *Meier,* 288 F.3d at 1275 (finding that one factor to consider in determining imputation is whether the subsidiary "render [s] services on behalf of" the parent that are "sufficiently important" to the parent that the parent would "perform the equivalent services if [the subsidiary] did not exist"). For example, some of TTP's board members did not receive compensation from TTP, TG rented or sold to TTP offices, factories, and equipment, and TTP returned these properties to TG when it ceased operating; TG and TTP did not accurately report their dealings with each other in their financial reports,[8] and TTP and TG were used interchangeably in contracts. *See, e.g., PFM Air, Inc. v. Dr. Ing. hc. F. Porsche A.G.,* 751 F.Supp.2d 1264, 1276 (M.D.Fla.2010) (finding imputation appropriate when, among other things, the parent paid the salaries of the subsidiary's employees and the parent "controlled the warranty program" that issued in the subsidiary's name).

These factors demonstrate TG's control over TTP. As *Lennar Homes* summarized, "TTP had no independent purpose outside of servicing TG's needs and, as such, was **\*535** its agent under Florida law." *Lennar Homes,* No. 09–7901 CA 42, at 5. Accordingly, because TTP acted as TG's agent when it executed its Florida contacts, those contacts can be imputed to TG for the purposes of personal jurisdiction.

### B. The Florida Long–Arm Statute

**[13]** **[14]** "A federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution." *Ainsworth,* 716 F.3d at 177 (quoting *Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir.1999)). The first prong of this two-prong jurisdictional analysis asks "whether the long-arm statute of the forum state confers personal jurisdiction over the defendant." *Stripling v. Jordan Prod. Co., LLC,* 234 F.3d 863, 869 (5th

Case 1:09-md-02047-EEF-MBN Document 22362-781 Filed 11/19/19 Page 38 of 1680
In re Chinese-Manufactured Drywall Products Liability Litigation, 753 F.3d 521 (2014) Page 14 of 27 PageID #: 816
Prod.Liab.Rep. (CCH) P 19,399

Cir.2000). It is undisputed that Florida's long-arm statute
—Fla. Stat. Ann. § 48.193—applies. Florida's long-arm
statute provides in relevant part:

> (1)(a) A person, whether or not a citizen or resident
> of this state, who personally or through an agent
> does any of the acts enumerated in this subsection
> thereby submits himself or herself and, if he or she is a
> natural person, his or her personal representative to the
> jurisdiction of the courts of this state for any cause of
> action arising from any of the following acts:
>
> 1. Operating, conducting, engaging in, or carrying on a
>    business or business venture in this state or having an
>    office or agency in this state.
>
> 2. Committing a tortious act within this state.
>
> ...
>
> 6. Causing injury to persons or property within this state
>    arising out of an act or omission by the defendant
>    outside this state, if, at or about the time of the injury,
>    either:
>
>    a. The defendant was engaged in solicitation or
>       service activities within this state; or
>
>    b. Products, materials, or things processed, serviced,
>       or manufactured by the defendant anywhere were
>       used or consumed within this state in the ordinary
>       course of commerce, trade, or use.

§ 48.193. "Florida's long-arm statute is to be strictly
construed," *Sculptchair Inc. v. Century Arts, Ltd.,* 94
F.3d 623, 627 (11th Cir.1996) (citing *Oriental Imports
& Exports, Inc. v. Maduro & Curiel's Bank, N.V.,*
701 F.2d 889, 891 (11th Cir.1983)), and some courts
interpreting Florida's statute have noted that it "confers
less jurisdiction upon Florida courts than allowed by
the Due Process Clause." *Am. Investors Life Ins. Co.
v. Webb Life Ins. Agency, Inc.,* 876 F.Supp. 1278, 1280
(S.D.Fla.1995); *see also McRae v. J.D./M.D., Inc.,* 511
So.2d 540, 543 n. 4 (Fla.1987) ("It has been held by other
courts that our long arm statute requires more activities
or contacts than is mandated by the constitution." (citing
*Mallard v. Aluminum Co. of Canada, Ltd.,* 634 F.2d 236,
241 (5th Cir.1981))).

First we overlay Taishan's (TTP and TG's) contacts
with Florida and then analyze their sufficiency under §
48.193(1)(a)(1). [9]

**\*536 1. Taishan's contacts with Florida**

**[15]** Having concluded that TTP was TG's agent under
Florida law allowing imputation of TTP's contacts to TG,
we next ask whether the entities' contacts with Florida
were sufficient to allow personal jurisdiction over TG
in Florida. Again, we benefit from the district court's
extensive factual findings on Taishan's contacts with
Florida.

**a. Taishan deals with OTC.**

Taishan sold 200,000 sheets of its drywall to Florida
customers or customers doing business in Florida and
made almost $800,000 from these sales. Taishan's specific
dealings with OTC, however, are particularly relevant
to our jurisdictional analysis. TTP entered into a sole
agency agreement with OTC—a Florida company—in
which OTC agreed to purchase at least 20,000 sheets of
TTP drywall between November 2006 and February 2007,
and not less than 1,000,000 sheets in the following twelve
months. The agreement with OTC was notarized under
Florida law, OTC paid a $100,000 deposit to TTP under
the agreement, and OTC purchased about 57,800 sheets
of drywall for $208,711.20 from TTP.

Taishan knew through communications with OTC that
its drywall would be shipped to Florida, as invoices
and emails provided that shipments would be to Miami,
Florida. [10] TTP also issued export invoices on 44,490
pieces of drywall sold to OTC and shipped to Miami. OTC
and Taishan discussed expanding the sales in the United
States, and Taishan said it would help OTC market and
sell the drywall.

Further, OTC requested that the drywall meet American
Codes and Standards. Specifically, Taishan customized
its drywall to meet American Society for Testing and
Materials ("ASTM") standards and provided ASTM
certificates. Taishan also manufactured its drywall in
inches, altered its DUN brand colors to reflect the colors
of the American flag, and shipped samples of its drywall to
Florida. Moreover, Taishan hosted OTC's representative
for a visit in China.

Taishan arranged shipments from China to Florida, and although the shipping was FOB China, Taishan handled and paid for the shipping of drywall to Florida.[11] Taishan made suggestions as to which Florida port would be best for shipping,[12] and all of OTC's shipments went to Florida. Taishan also complied with Florida Department of Transportation's regulations. After their business relationship ended, OTC and Taishan discussed a new business relationship, in which Taishan would provide electronics to OTC in the United States.

### b. Taishan deals with B. America.

TTP also sold drywall to B. America Corporation through Onyx GBB Corporation—both Florida companies. B. America **\*537** purchased 1,320 sheets of TTP drywall, compliant with ASTM standards, and delivered "CFR MIAMI." B. America wired half of the purchase price to TTP, but the deal fell through when the American market suffered. B. America tried to get a refund for the wire transfer, but TTP refused. As a result, B. America purchased the drywall from TTP and contacted R & R Building Materials ("R & R") to purchase this drywall from B. America. TTP prepared an invoice selling 660 sheets to B. America in exchange for $5,656.20 and noting that the delivery was "CIF [cost, insurance, freight] Miami Port." In communications to Onyx and B. America, Taishan wrote: "We will arrange the shipping to Miami Port at an early time." TTP took out insurance on its shipment to B. America, and the policy notes that the shipment is going to Florida. After the shipment reached Florida, Onyx sold it to R & R in Miami.

### c. Taishan deals with Wood Nation.

Wood Nation, Inc.—another Florida company-also purchased drywall from TTP. Richard Hannam, the president of Wood Nation, visited TTP in China, and entered into a contract with TTP for the purchase of 333,000 sheets of TTP drywall. The contract provided that the port of discharge was Tampa, Florida and that Wood Nation was registered at Tampa, Florida. TTP provided Wood Nation with test reports showing that it qualified with ASTM standards. Wood Nation requested that TTP customize the drywall by putting "ASTM C 1396–04" on the back of each piece of drywall, and TTP stamped each board with "Tampa, Florida" as the contact location as well as a Florida phone number as the contact phone number.[13] Wood Nation revised its contract to purchase only 26,000 sheets of drywall in order to accommodate a smaller order from its customer. Wood Nation handled shipping the drywall from China to Florida.

### d. Taishan sells drywall to Devon.

A Pennsylvania company, Devon International Trading, was also interested in purchasing Chinese drywall. Devon's president toured Taishan's factory in China, and TG sent samples of its drywall to Devon. Devon and another company, North Pacific Group, entered a purchase order of 485,044 sheets of drywall to be sent to Pensacola, Florida. Devon requested to purchase drywall from TG to satisfy the North Pacific purchase order. The product was purchased through a trading company, Shanghai Yu Yuan Import & Export Company, and the Devon logo was stamped on each package. Each piece of drywall was also stamped with a guarantee that it met ASTM standards. In the course of the drywall's transit to Pensacola, Florida, about half of the drywall was damaged, and North Pacific only purchased a fraction of what it original ordered. Devon sold the left over drywall to distributors, wholesalers, and some individuals. Devon sold some drywall to Emerald Coast Building Supply, and Emerald Coast sold 840 boards of drywall to Rightway Drywall, who finally sold it to Mitchell—the named plaintiff. This drywall had the same markings requested by Devon, specifically, the drywall is stamped that it is "made in China" and "Meet[s] or exceeds ASTM C1396 04 standard." Mitchell then used the drywall to build homes in Florida.

### e. Taishan sends Carn Construction samples in Florida.

Carn Construction Corporation, a Florida company, also contacted Taishan to **\*538** purchase drywall after it discovered Taishan through *Alibaba.com.* Taishan represents on this website that it exports drywall on *Alibaba.com,* and when Carn contacted Taishan and informed Taishan that it was a Florida company, Taishan represented that it exported to the United States and said it was willing to "ship their products to [Carn] in Florida." Taishan sent drywall samples to Carn in Florida. "[F]or

marketing purposes," Taishan would "give [Carn] the option in [the] order to mark a brand" on the drywall.[14]

### 2. Conducting business within Florida

[16]   Under § 48.193(1)(a)(1) TG is subject to jurisdiction in Florida for "any cause of action arising from ... [o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." In order to satisfy this provision, "[t]he activities of the [defendant] sought to be served ... must be considered collectively and show a general course of business activity in the State for pecuniary benefit." *Sculptchair,* 94 F.3d at 627 (quoting *Dinsmore v. Martin Blumenthal Assocs., Inc.,* 314 So.2d 561, 564 (Fla.1975)); *see also Future Tech. Today, Inc. v. OSF Healthcare Sys.,* 218 F.3d 1247, 1249 (11th Cir.2000) (per curiam); *Golant v. German Shepherd Dog Club of Am., Inc.,* 26 So.3d 60, 63 (Fla.Dist.Ct.App.2010) (noting the same); *Citicorp Ins. Brokers (Marine), Ltd. v. Charman,* 635 So.2d 79, 81 (Fla.Dist.Ct.App.1994) (noting the same).

[17]   Further, "[i]t is not necessarily the number of transactions, but rather the nature and extent of the transaction(s) that determines whether a person is 'carrying on a business venture' within the state." *Joseph v. Chanin,* 869 So.2d 738, 740 (Fla.Dist.Ct.App.2004). In *Horizon Aggressive Growth, L.P. v. Rothstein–Kass, P.A.,* 421 F.3d 1162, 1167 (11th Cir.2005), the court highlighted "[f]actors relevant, but not dispositive" to this analysis. These include: (1) "the presence and operation of an office in Florida," (2) "the possession and maintenance of a license to do business in Florida," (3) "the number of Florida clients served," and (4) "the percentage of overall revenue gleaned from Florida clients." *Id.* (citing Florida cases utilizing each factor).

The third and fourth factors are relevant here. First, Taishan sold 200,000 sheets of drywall for about $800,000 in Florida.[15] Second, Taishan negotiated with Florida companies, and arranged shipping to Florida. *See Robert D. Harley Co. v. Global Force (U.K.) Ltd.,* No. 05–21177–CIV, 2007 WL 196854, at *4 (S.D.Fla. Jan. 23, 2007) **539** (jurisdiction proper under Florida law because, among other reasons, defendant "shipped from [its] factories in Jordan and China directly to VF Corp's Tampa location"). Third, Taishan granted a Florida company the sole right to purchase a specific brand of its

drywall. *See Sierra v. A Betterway Rent–A–Car, Inc.,* 863 So.2d 358, 360 (Fla.Dist.Ct.App.2003) (finding statute satisfied when defendants "were aware that its vehicles were driven in Florida," "did not discourage or prohibit its customers from driving in Florida," and advertised itself as a "global system of rental agencies, available for worldwide rental arrangements"). Fourth, Taishan specifically altered some boards by stamping "Tampa, Florida" and a Florida phone number; shipped samples to Florida; and insured its shipments to Florida.

These and the other Florida contacts "show a general course of business activity in the state for pecuniary benefits." *Citicorp Ins.,* 635 So.2d at 81 (deriving commissions of $600,000 over five years, "sending numerous letters and telefaxes back and forth to negotiate a deal with a Florida insurance broker," and responding to a request by the Florida Insurance broker to provide coverage for a vessel moored in Florida, all supported long-arm jurisdiction); *see Lennar Homes,* No. 09–07901 CA 42, at 8 (holding that "Taishan was 'carrying on business' in Florida and that the Court may assert jurisdiction over Taishan under Section 48.193(1)(a)(1) of the Florida long-arm statute."), *aff'd sub nom., Taishan Gypsum Co. Ltd.,* 123 So.3d at 637.

### 3. "Arise-from" requirement

[18]   Florida's long-arm statute also requires that plaintiff's cause of action arise from the defendant's acts. TG argues that the statute is not satisfied because plaintiffs' causes of action do not arise from its contacts with Florida.[16] As the Court in *Lennar Homes* recognized: "It is enough under the long-arm statute that the type of Taishan drywall that injured homeowners, and caused the damages sustained by plaintiffs, was otherwise available for purchase in Florida."[17] The arise-from requirement is met because Mitchell's complaint alleges that the homebuilders incurred costs because they installed Taishan's drywall, the profile forms submitted by the parties demonstrate that the drywall at issue in *Mitchell* is traceable to Taishan, and testimony from Lennar—a Florida homebuilder—identifies 400 homes containing Taishan drywall.

Additional evidence supports tracing Taishan drywall to the *Mitchell* plaintiffs: Devon and North Pacific Group, entered a purchase order of 485,044 sheets of drywall *to be sent to Pensacola, Florida.* Devon requested to purchase

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Prod.Liab.Rep. (CCH) P 19,399

drywall from TG to satisfy the North Pacific purchase order. The product was purchased through a trading company, Shanghai Yu Yuan Import & Export Company, and the Devon logo was stamped on each package. Devon sold some drywall to Emerald Coast Building Supply, and Emerald Coast sold 840 boards of drywall to Rightway Drywall, who finally sold it to Mitchell—the named plaintiff. Accordingly, the district court properly found the Florida long-arm statute satisfied.

### C. Due Process

**[19]** **[20]** Having satisfied Florida's long-arm statute, Taishan's contacts must also support a finding of personal jurisdiction consistent with Due Process. For specific jurisdiction to be proper, Due Process **\*540** requires (1) minimum contacts by the defendant purposefully directed at the forum state, (2) a nexus between the defendant's contacts and the plaintiff's claims, and (3) that the exercise of jurisdiction over the defendant be fair and reasonable. *ITL Int'l, Inc. v. Constenla, S.A.,* 669 F.3d 493, 498 (5th Cir.2012). In sum, to satisfy Due Process, the defendant's connection with the forum state must be such that it "should reasonably anticipate being haled into court" in the forum state. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

### 1. Choice of Law

As explained below, circuit authority varies in interpreting the Due Process requirements of personal jurisdiction. TG argues that the district court should have applied the Eleventh Circuit's more demanding minimum-contacts test instead of the Fifth Circuit's more permissive interpretation. As in *Germano,* "we need not reach the issue of which circuit's law should apply because regardless of which circuit's approach we use, the outcome is the same." *Germano,* 742 F.3d at 586. Even under the Eleventh Circuit's more demanding test, TG (through its agent TTP) has the requisite contacts with Florida.

### 2. Minimum Contacts

#### a. Supreme Court Precedent

Fractured opinions in the Supreme Court have allowed for two different understandings of the quality of contacts a defendant must have with the forum state in order to satisfy Due Process. In *Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cnty.,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Court split over whether simply placing products in the stream of commerce could satisfy personal jurisdiction. Justice O'Connor's plurality opinion explained:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State ... [b]ut a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

480 U.S. at 112, 107 S.Ct. 1026. Justice Brennan's concurrence disagreed with Justice O'Connor's "stream of commerce plus" test:

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise....

*Id.* at 117, 107 S.Ct. at 1034 (Brennan, J., concurring). Most recently in *J. McIntyre Machinery, Ltd. v. Nicastro,* ⸺ U.S. ⸺, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011), the Court was divided still. Justice Kennedy's plurality opinion embraced the "stream of commerce plus" test:

Since *Asahi* was decided, the courts have sought to reconcile the competing opinions. But Justice Brennan's concurrence, advocating a rule based on general notions of fairness and foreseeability, is inconsistent with the premises of lawful judicial power. This Court's precedents make clear that it is the defendant's actions, not **\*541** his expectations, that empower a State's courts to subject him to judgment.

*McIntyre,* 131 S.Ct. at 2789. Justice Breyer's concurring opinion, however, did not explicitly embrace Justice O'Connor's stream of commerce plus theory, but instead opined:

> I do not doubt that there have been many recent changes in commerce and communication, many of which are not anticipated by our precedents. But this case does not present any of those issues. So I think it unwise to announce a rule of broad applicability without full consideration of the modern-day consequences.... In my view, the outcome of this case is determined by our precedents.

*Id.* at 2791 (Breyer, J., concurring).

Circuit courts interpreting *McIntyre* have concluded that under *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), Justice Breyer's concurring opinion "furnished the narrowest grounds for the decision and controls." *Ainsworth,* 716 F.3d at 178; *see also AFTG–TG, LLC v. Nuvoton Tech. Corp.,* 689 F.3d 1358, 1363 (Fed.Cir.2012). As this court noted in *Ainsworth,* the narrowest ground, as expressed in Justice Breyer's

concurrence, is that the law remains the same after *McIntyre,* and that circuit courts may continue to attempt to reconcile the Supreme Court's competing articulations of the stream of commerce test. *See Ainsworth,* 716 F.3d at 178–79 (noting that "Justice Breyer's concurrence was explicitly based on Supreme Court precedent and on *McIntyre*'s specific facts" and citing with approval the Federal Circuit's holding that the Supreme Court's framework had not changed and that it should apply its circuit precedent interpreting these decisions).

### b. TG satisfies the stream of commerce plus test

Unlike the Fifth Circuit, *see Ainsworth,* 716 F.3d at 178, the Eleventh Circuit has not yet interpreted *McIntyre;* instead "[r]elevant Eleventh Circuit case law is unclear as to which test it would adopt," because "the Eleventh Circuit had applied, but had never explicitly adopted [the stream of commerce plus test], which arose from Justice O'Connor's plurality opinion in [*Asahi* ]." *Hatton v. Chrysler Canada, Inc.,* 937 F.Supp.2d 1356, 1365 (M.D.Fla.2013); *Simmons v. Big No.1 Motor Sports, Inc.,* 908 F.Supp.2d 1224, 1228–29 (N.D.Ala.2012) ("It is unclear which of the two tests the Eleventh Circuit endorses."). But, even assuming that the Eleventh Circuit would conclusively embrace the stream of commerce plus test after *McIntyre* (or had done so prior to *McIntyre* ), Taishan's contacts with Florida suffice.

The evidence demonstrates that Taishan engaged in "additional conduct such that it could be said to have 'purposefully availed' itself of the privilege of conducting business in" Florida. *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1549 (11th Cir.1993). Among other availments, Taishan entered into a sole agency agreement with a Florida company to sell its products and arranged the shipping of its drywall to Florida. *See Vermeulen,* 985 F.2d at 1548 (noting that defendant "created and controlled the distribution network that brought its products into the United States"). TTP agreed to sell OTC TG's exclusive brand of drywall and make OTC— a Florida company—the sole sales agent of TG's drywall, which reflects TG's purposeful availment of Florida through its agency relationship with TTP. *See Daimler,* 134 S.Ct. at 759 n. 13 (recognizing that "a corporation can purposefully avail itself of a forum by directing its agents or distributors **\*542** to take action there"); *id.* (noting approvingly that " 'marketing [a] product

Case 1:09-md-02047-EEF-MBN Document 22862-781 Filed 11/19/19 Page 43 of 1680
In re Chinese-Manufactured Drywall Products Liability Litigation, 753 F.3d 521 (2014) Page 19 of 27 Page ID# 921
Prod.Liab.Rep. (CCH) P 19,399

through a distributor who has agreed to serve as the sales agent in the forum State' may amount to purposeful availment." (quoting *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026 (opinion of O'Connor, J.))).

Moreover, Taishan specifically altered its products to suit the forum state by marking its packaging "Tampa," stamping a Florida phone number on the packaging, and marking its drywall with a certification that it met or exceeded American standards. *See Asahi,* 480 U.S. at 112, 107 S.Ct. 1026 (noting that "[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State"); *Germano,* 742 F.3d at 589 (holding the stream-of-commerce-plus test satisfied because "TG not only included the name of a Virginia company on its product, it also included a phone number with a Virginia area code. Through its own acts, TG connected its product to Virginia, and ensured that the product's end-users would identify its product with a Virginia resident."). Similarly here, Wenlong Peng testified: "We would stamp it for the customer." These actions go beyond merely placing a product in the stream of commerce and demonstrate purposeful availment.[18]

TG relies on *Banton Indus., Inc. v. Dimatic Die & Tool Co.,* 801 F.2d 1283, 1284–85 (11th Cir.1986), which addressed whether "the due process sole contact with the forum state was an out-of-state sale of goods to a resident of the forum state." *Id.* at 1284. Jurisdiction did not lie, the court held, because

> Dimatic is not an Alabama corporation and has no contacts with that state other than its sale of goods to an Alabama resident. Nor does Dimatic actively seek business in Alabama. In fact, the contract and sale upon which Banton bases its claim arose out of Banton's unsolicited order of goods from Dimatic. Furthermore, Dimatic tendered the goods to Banton in Omaha, Nebraska. At no time did any

representative of Dimatic enter Alabama.

*Id.* at 1284.

Here, Taishan made more than a single sale to a Florida company and did actively seek business in Florida—it entered a sole sales agreement with a Florida company to sell TG drywall, arranged shipping to Florida ports on multiple occasions, expressed a willingness to expand shipping to Florida, and expressed a desire to expand its sales in the United States with OTC, a Florida company.[19] Accordingly, even assuming **\*543** that TG would benefit from the most stringent minimum-contacts test, jurisdiction would still be proper.

### 3. "Arise out of or relate to" requirement

The second prong of the Due Process specific-jurisdiction test asks if "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The Supreme Court has yet to distinguish between the "arise out of" and "relate to" requirements. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415 n. 10, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) ("Absent any briefing on the issue, we decline to reach the questions (1) whether the terms 'arising out of' and 'related to' describe different connections between a cause of action and a defendant's contacts with a forum, and (2) what sort of tie between a cause of action and a defendant's contacts with a forum is necessary to a determination that either connection exists.").

The Eleventh Circuit has held that "the defendant's contacts with the forum must relate to the plaintiff's cause of action or have given rise to it," and explained "[n]ecessarily, the contact must be a 'but-for' cause of the tort, yet the causal nexus between the tortious conduct and the purposeful contact must be such that the out-of-state resident will have fair warning that a particular activity will subject [it] to the jurisdiction of a foreign sovereign." *Oldfield v. Pueblo De Bahia Lora, S.A.,* 558 F.3d 1210, 1220–21, 1223 (11th Cir.2009) (internal citations and quotation marks omitted); *see also id.* at 1224 ("While we do not suggest that our decision today establishes a definitive relatedness standard—as flexibility is essential to the jurisdictional inquiry—we do find that the fact-

sensitive inquiry must hew closely to the foreseeability and fundamental fairness principles forming the foundation upon which the specific jurisdiction doctrine rests.").

TG asks us to read the *Mitchell* complaint narrowly to require the plaintiffs to prove that the drywall it installed can be traced directly to Taishan's Florida related activities. Even assuming that this is required by the "arise from and *relate to* " test, a chain of transactions traces the Mitchell plaintiffs' drywall to Taishan's contact with Florida. Devon purchased drywall *to be sent to Pensacola, Florida,* and there is evidence showing a series of transactions placing the drywall with Mitchell. At this stage, Mitchell must only establish personal jurisdiction by a preponderance of the evidence, and in light of the evidence in the record, Mitchell has established that it is more likely than not that Taishan drywall connected from the Devon transaction ended up in Mitchell's hands and forms the basis of this action.

But Mitchell's complaint is not as narrow as Appellants represent. As the district court noted, Mitchell sues on behalf of homebuilders and alleges that Taishan has "continuously and systematically distributed and sold drywall to numerous purchasers in the State of Florida and Taishan's drywall is installed in numerous homes in Florida." These claims therefore, arise out of and relate to Taishan's extensive Florida contacts. In *Oldfield,* the Eleventh Circuit focused on whether the defendant could foresee being haled into this **\*544** forum to answer plaintiffs' claims. 558 F.3d at 1220–21. Here, Taishan sold allegedly faulty drywall to Florida companies, shipped drywall to Florida, entered into a sole agency agreement with a Florida company, and even marked some drywall boards with Florida phone numbers. It should come as no surprise to Taishan that it is defending suit in Florida. Accordingly, this test is also satisfied.

#### 4. Fairness

[21] The specific jurisdiction inquiry next asks whether jurisdiction "would comport with 'fair play and substantial justice.' " *Licciardello v. Lovelady,* 544 F.3d 1280, 1284 (11th Cir.2008) (quoting *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559). In assessing fair play, courts balance (1) the defendant's burden; (2) the forum state's interests; (3) the plaintiffs interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5)

the state's shared interest in furthering fundamental social policies. *Burger King,* 471 U.S. at 476–77, 105 S.Ct. 2174.

[22] The district court found that TG would face burdens if subjected to jurisdiction, and that this factor cut strongest in TG's favor. Balanced, however, against TG's sophistication, Florida's interest in litigating against defendants that harmed its residents, the plaintiffs' interest in litigating in the United States as opposed to China, the judicial system's interest in resolving these cases (and TG's failure to appear), and the interests of comity, the district court nonetheless found jurisdiction proper. *See Asahi,* 480 U.S. at 114, 107 S.Ct. 1026 ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."). The district court's balancing of these factors is consistent with cases upholding jurisdiction over foreign manufacturer defendants. *Mitchell* is distinguishable from *Asahi,* where the claim was for "indemnification asserted by Cheng Shin, a Taiwanese corporation, against Asahi," and "[t]he transaction on which the indemnification claim is based took place in Taiwan." *Asahi,* 480 U.S. at 114–15, 107 S.Ct. 1026. In contrast, *Mitchell* includes Florida-based plaintiffs alleging causes of action arising in Florida. Accordingly, the district court did not err in finding that notions of fair play and substantial justice were not offended by exercising jurisdiction over TG. *See Germano,* 742 F.3d at 593 ("For essentially the same reasons as given by the district court, we hold that this third and final prong of the Due Process analysis is met here.").

Personal jurisdiction is therefore proper over TG in Florida.

#### IV.

TG next argues that the district court abused its discretion when it denied TG's motion to set aside the entry of preliminary default under Rule 55(c).

#### A. Standard

[23] [24] Rule 55(c) provides: "The court may set aside an entry of default for good cause, and it may set aside a default judgment under Rule 60(b)." Fed.R.Civ.P. 55(c). [20] "In determining whether **\*545** to set aside a

Prod.Liab.Rep. (CCH) P 19,399

default decline, the district court should consider whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented." *One Parcel of Real Prop.,* 763 F.2d at 183. Because the same factors identified in Rule 60(b) are "typically relevant," *Johnson v. Dayton Elec. Mfg. Co.,* 140 F.3d 781, 783 (5th Cir.1988), courts may also consider:

whether the public interest was implicated, whether there was significant financial loss to the defendant, and whether the defendant acted expeditiously to correct the default. The district court need not consider all of the above factors in ruling on a defendant's 60(b)(1) motion; the imperative is that they be regarded simply as a means of identifying circumstances which warrant the finding of "good cause."

*In re OCA,* 551 F.3d 359, 369 (5th Cir.2008) (quotations omitted).

### B. Application [21]

[25] The district court did not find that TG's failure to appear was willful. Nevertheless, it declined to set aside the entry of default because (1) TG was served with the complaint in its native language, (2) TG was aware that it sold drywall to several Florida companies, (3) the plaintiffs had invested a significant amount of time and money to serve TG, (4) TG's defense is speculative, and (5) the public has an interest in seeing that plaintiffs harmed by defective foreign products be accorded relief for their damages. The district court also doubted whether TG acted expeditiously because TG did not appear in the MDL until it was notified of the default judgment in *Germano,* and even then TG only appeared on the last day possible to challenge that default judgment. The district court acknowledged, however, that TG would suffer significant financial losses.

"The decision to set aside a default decree lies within the sound discretion of the district court," *One Parcel of Real Prop.,* 763 F.2d at 183, and the district court accounted for the relevant interests. Consistent with *Germano,* which held that the district court did not abuse its discretion by refusing to vacate the default judgment,[22] and *Lennar Homes,* which declined to vacate a default judgment against TG because "Taishan waited an inexplicably long time before moving to set aside the default, and has not put forth any evidence of exceptional circumstances justifying

the delay,"[23] the district court did not abuse its discretion when it determined that TG did not show good cause to vacate the preliminary entry of default in *Mitchell.* Fed.R.Civ.P. 55(c).

### V.

TG and TTP challenge the district court's finding of personal jurisdiction in *Gross* and *Wiltz.* Although the forum is different, the outcome is the same—specific jurisdiction is proper over TG and TTP in Louisiana.

### *546 A. TTP's contacts may be imputed to TG

#### 1. Choice of Law

Though it argues that the district court should have applied Chinese law rather than Louisiana law to test the appropriateness of imputation, Taishan, however, concedes that that "the outcome would be the same under the application" of either Chinese or Louisiana law. Accordingly, there is no conflict and we apply Louisiana law. *See Shutts,* 472 U.S. at 839 n. 20, 105 S.Ct. 2965.

#### 2. Imputation under Louisiana Law

[26] In Louisiana, courts may impute contacts between two entities under either an alter-ego or agency theory. *See, e.g., Admins. of Tulane Educational Fund v. Ipsen, S.A.,* 450 Fed.Appx. 326, 330–33 (5th Cir.2011) (noting that imputation may stem from both theories); La.Rev.Stat. Ann. § 13:3201(A) ("A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent...."). Because Taishan's corporate relationship establishes alter-ego imputation under Louisiana law, we need not address the district court's alternate finding of an agency relationship. *See Jackson v. Tanfoglio Giuseppe, S.R.L.,* 615 F.3d 579, 586 (5th Cir.2010) (recognizing that contacts can be imputed to alter-egos for the purpose of specific jurisdiction).

[27] This court has noted that "the alter ego test for attribution of contacts, *i.e.,* personal jurisdiction, is less stringent than that for liability." *Stuart v. Spademan,* 772 F.2d 1185, 1198 n. 2 (5th Cir.1985). Under Louisiana law, courts consider a number of factors when determining whether an entity should be considered an alter ego:

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/19/19 Page 46 of 1680
In re Chinese-Manufactured Drywall Products Liability Litigation, 753 F.3d 521 (2014) Page 22 of 27 Page ID# 924

Prod.Liab.Rep. (CCH) P 19,399

1. corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control; 2. common directors or officers; 3. unified administrative control of corporations whose business functions are similar or supplementary; 4. directors and officers of one corporation act independently in the interest of that corporation; 5. corporation financing another corporation; 6. inadequate capitalization ("thin incorporation"); 7. corporation causing the incorporation of another affiliated corporation; 8. corporation paying the salaries and other expenses or losses of another corporation; 9. receiving no business other than that given to it by its affiliated corporations; 10. corporation using the property of another corporation as its own; 11. noncompliance with corporate formalities; 12. common employees; 13. services rendered by the employees of one corporation on behalf of another corporation; 14. common offices; 15. centralized accounting; 16. undocumented transfers of funds between corporations; 17. unclear allocation of profits and losses between corporations; and 18. excessive fragmentation of a single enterprise into separate corporations.

*Green v. Champion Ins. Co.,* 577 So.2d 249, 257–58 (La.Ct.App.1991).

 [28]  As discussed and considered above, the district court found facts implicating many of these factors. For instance, TG authorized TTP to use TG's trademark in producing drywall but did not charge TTP for this

authorization, TG and TTP did not accurately report their dealings with each other in their financial reports, and some of TTP's board members did not receive compensation from TTP. *See e.g., Green,* 577 So.2d at 258–259. Appellants rely on *Jackson,* which found imputation improper because "there [was] **\*547** no evidence of undocumented transfers of funds between various entities," "no evidence of unclear allocation of profits and losses between corporations," and no evidence that the entities paid another entities' employees. *Jackson,* 615 F.3d at 587. *Jackson* is inapposite because of the undocumented transfers between TG and TTP, as well as the evidence that TG paid TTP's employees; additionally, many of the factors that *Jackson* recognized as favoring imputation are present here:

> For instance, the Tanfoglio entities appear to have been operated in a way that their brands and products appear identical and their business relationships are deeply intertwined. The Tanfoglio entities shared office space, phone numbers, and the Tanfoglio siblings were officers and directors of each of the Tanfoglio entities.... As well, the Tanfoglio entities were indebted to one another through a variety of business transactions.

*Id.* at 587. Accordingly, TG and TTP are alter egos under Louisiana law, and imputation is proper. Treated as one, each entity's Louisiana contacts reflect its collective availment of the forum.

**B. Due Process**
The Louisiana Supreme Court has held that "[t]he limits of the Louisiana Long-arm Statute and the limits of constitutional due process are now coextensive," accordingly, "the sole inquiry into jurisdiction over a nonresident is a one-step analysis of the constitutional due process requirements." *Petroleum Helicopters, Inc. v. Avco Corp.,* 513 So.2d 1188, 1192 (La.1987). All parties agree that *Gross* and *Wiltz* are governed by Fifth Circuit law.

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.  21

**1. Taishan's Louisiana Contacts**

[29]   The district court recognized that Taishan lacked direct physical contacts with Louisiana. Taishan has never manufactured drywall, advertised, or performed services in Louisiana. Taishan is not registered to do business, does not have an office, bank account, or an agent appointed to accept service of process in Louisiana. Taishan has never paid taxes nor had a mailing address or telephone in Louisiana.

Nevertheless, Taishan's Louisiana contacts are substantial. Taishan sold at least 45,756 sheets of drywall that ended up in Louisiana and earned Taishan $195,915.29. A potential customer emailed Taishan and informed it: "After Hurricane Katrina, the Great New Orleans area need rebuild[sic], and housing market in USA is very hot in these days. The both effects, we hope you and us can both take advantage from it." Taishan told its customers it was able and willing to sell its drywall to Louisiana. OTC's representative explained that Taishan was "very familiar with what port to use depending on what areas in the United States we were trying to sell to" and Taishan provided shipping information and rates for sending drywall to New Orleans.

Taishan's dealings with American companies also show relevant contacts with Louisiana. Taishan sold drywall to Advanced Products International Corp. ("API") and GD Distributors, LLC ("GD Distributors"). GD Distributors, a Louisiana company, emailed Taishan about shipping drywall to the United States. They discussed "sizes of the sheetrock, how to get transported over," and the history of the company. GD Distributors' owner traveled to China to visit Taishan's factory. At the visit, the parties discussed the product, price, and ASTM certification. Taishan provided GD Distributors with test reports asserting that its drywall met ASTM standards. Taishan provided a sample to GD Distributors. GD Distributors agreed to purchase 1,320 sheets of drywall in exchange for $11,601.22. The invoice for the **\*548** purchase was "CIF NEW ORLEANS." Taishan arranged the shipment of the drywall to New Orleans. GD Distributors's owner testified that he "told them that I lived in New Orleans ... [and] I'm assuming that's why ... they set it up to come to the Port of New Orleans." According to GD Distributors, Taishan "absolutely" knew that the drywall was going to New Orleans.[24] GD

Distributors sold the drywall it purchased from Taishan to Helton Construction, another Louisiana company.

TTP also sold 5,676 sheets of drywall for $24,123.00 to API, which is based in California. The invoices marked the sale as FOB China with a final destination of New Orleans, Louisiana. API made a second purchase of 5,760 sheets of drywall for $24,998.40 from TTP. The invoice provided that shipment was FOB China with final destination New Orleans, Louisiana. TTP did not ship this drywall. API handled the shipping arrangements from China to New Orleans. Another Louisiana company, Interior Exterior Building Supply, LP, purchased TTP drywall from Metro Resources Corporation. Taishan also sent samples of drywall to TP Construction, a Louisiana corporation. Finally, Taishan shipped 100,000 boards to New Orleans for an entity named Phoenix.

**2. Minimum Contacts**

In *Ainsworth,* we interpreted our law as unchanged after *McIntyre.* As such, in order to satisfy the minimum contacts requirements, plaintiffs must show that "the defendant delivered the product into the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state." *Ainsworth,* 716 F.3d at 177. "Under that test, mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce, but [t]he defendant's contacts must be more than random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Id.* (internal quotations and citations omitted).

This test is more than satisfied in *Gross* and *Wiltz* because, again, there is evidence showing that Taishan "absolutely" knew that the drywall was going to New Orleans.[25] Taishan sold drywall to Louisiana customers, facilitated the shipment of drywall to New Orleans, and received an email explaining that after Hurricane Katrina, there was an increased demand for construction materials in the New Orleans area. Moreover, Taishan did not conduct an isolated sale. Rather, Taishan sold at least 45,756 sheets of drywall, which ended up in Louisiana and earned Taishan $195,915.29. *See McIntyre,* 131 S.Ct. at 2791; *Ainsworth,* 716 F.3d at 179 ("This is not a case of a single, or even a few, isolated sales in Mississippi. The facts in the record establish that Moffett could have 'reasonably anticipated'

being haled into court in Mississippi.").²⁶ Accordingly, **\*549** Taishan has the requisite minimum contacts with Louisiana.

### 3. "Arise out of or relate to" requirement

This court has framed the second prong of the due-process test as requiring that "the plaintiff's cause of action ... arise[ ] out of or result [ ] from the defendant's forum-related contacts." *ITL,* 669 F.3d at 500 (quoting *Luv N' Care, Ltd. v. Insta–Mix, Inc.,* 438 F.3d 465, 469 (5th Cir.2006)); *see also Clemens v. McNamee,* 615 F.3d 374, 378–79 (5th Cir.2010).

[30]   In *Gross,* the plaintiffs are asserting a market-share liability claim, which rests on the theory that Taishan drywall, among other defective drywall, was shipped to Louisiana and injured them. The plaintiffs' market-share theory arises from Taishan's Louisiana contacts—Taishan marketed, sold, and shipped drywall to Louisiana customers. For instance, Taishan sold drywall to GD Distributors, which in turn sold the drywall to another Louisiana company, Helton Construction. As the district court held,

> The profile forms, TIP inspections, and photographic catalog, all Court-ordered and providing information on the type of drywall in homes, also demonstrate the presence of Taishan's drywall in the homes of Louisiana plaintiffs. The Court finds no law which supports Taishan's narrow reading of the "arise from" and "relate to" requirement for specific personal jurisdiction.

Moreover, this record contrasts sharply with that in *Irvin v. S. Snow Mfg., Inc.,* 517 Fed.Appx. 229 (5th Cir.2013). In *Irvin,* there was not an adequate nexus between the defendant's contacts and the plaintiff's claim based on an "arose-out-of" theory because "Southern Snow sold the machine to a Louisiana customer and had no knowledge that, years later, Irvin unilaterally transported it into Mississippi." *Id.* at 232. Additionally, we recognized:

> Irvin's claims [do not] sufficiently "relate to" Southern Snow's Mississippi contacts. Although Irvin points to the allegedly large figure of sales by Southern Snow to various Mississippi-based customers, this number includes sales of syrup and other snowball-making accessories—which did not cause Irvin's injuries—and no evidence in the record allows a comparison of the amount of sales attributable to these types of accessories versus the sales attributable to actual snowball machines. Indeed, on this record, we have no basis to determine how many snowball machines Southern Snow sends outside of Louisiana in general, or to Mississippi in particular.

*Id.* Conversely, a close nexus exists between Taishan's marketing and selling drywall to Louisiana customers and arranging shipping to Louisiana and plaintiffs' claims that Taishan's drywall was installed in their homes and injured them. While Taishan challenges the validity of the *Gross* plaintiffs' market-share theory, our inquiry is whether "*the plaintiff's cause of action ... arise[s] out of or result[s] from the defendant's forum-related contacts*," *ITL,* 669 F.3d at 500 (emphasis added), whatever the claims' ultimate merits. Accordingly, plaintiffs' claims—that Taishan sold drywall to the Louisiana market and injured them—arise out of or relate to Taishan's Louisiana contacts of marketing, selling, and shipping drywall to Louisiana customers.

The *Wiltz* plaintiffs' claims also rest on the allegedly faulty Taishan drywall installed in their homes. These claims too arise from Taishan's manufacturing allegedly faulty drywall, marketing it to Louisiana customers, and shipping it to Louisiana. We need not express any view of the merits of plaintiffs' claims because at this **\*550** preliminary jurisdictional inquiry the plaintiffs' burden is to prove the appropriateness of jurisdiction by a preponderance of the evidence. They have satisfied

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/19/19 Page 49 of 1680
In re Chinese-Manufactured Drywall Products Liability Litigation, 753 F.3d 521 (2014) Page 25 of 27 PageID #: 527

Prod.Liab.Rep. (CCH) P 19,399

their burden here as their claims arise from or relate to Taishan's Louisiana contacts.

### 4. Fairness

The same reasons that jurisdiction is fair and reasonable over TG in Florida are applicable to TG and TTP in Louisiana. Accordingly, personal jurisdiction lies over TG and TTP in *Gross* and *Wiltz.*

### VI.

The record in this case reflects an intimate relationship between TG and TTP. By virtue of this relationship, they capitalized on a spike in demand for drywall in the Gulf South. As their dealings demonstrate, TG and TTP availed themselves of Florida and Louisiana—two of the market's focal points. We perceive no statutory or constitutional impediment to their now defending suit there. We therefore AFFIRM the district court in *Mitchell, Gross,* and *Wiltz.*

### All Citations

753 F.3d 521, Prod.Liab.Rep. (CCH) P 19,399

Footnotes

1   For example, they allege that the drywall "emits various sulfide gases," damages the structural, mechanical and plumbing systems of the home, and damages other appliances in the home. We express no view on these allegations.

2   Two sets of plaintiffs intervened in the *Gross* action contending that they were absent class members: the *Benes* plaintiffs and the *Jaen* plaintiffs. Like *Gross,* both allege market-share liability theories with respect to the manufacturers of the defective drywall. Unlike *Gross,* the intervening plaintiffs have identified defendants in the chain of distribution. Appellants point out that many of the plaintiffs in the *Gross* action (including the intervening classes) do not reside in Louisiana. The district court held that this concern is resolved "by the PSC's [Plaintiffs' Steering Committee] suggestion to sever and transfer any non-Louisiana plaintiffs from *Gross.*"

3   The similarities between *Gross* and *Wiltz* allow for merged consideration of the personal jurisdiction issues in this appeal. As the district court noted, the key difference in the actions is that the *Gross* plaintiffs are alleging market-share liability because they cannot determine the appropriate defendants, while the *Wiltz* plaintiffs identify TG and TTP as the manufacturers of the drywall in their properties.

4   As discussed, our court affirmed this ruling.

5   The district court applied the same analysis to both cases.

6   Applying Florida law is also consistent with *Lennar Homes, LLC v. Knauf Gips KG,* No. 09–07901 CA 42, 2012 WL 3800187 (Fla.Cir.Ct. Aug. 31, 2012). As noted in the district court opinion, Judge Fallon and Judge Farina coordinated their hearings because of the overlapping issues in TG's motions in the MDL court and those in the Florida court. In *Lennar Homes,* the court held that Florida law applied to the imputation question:

    Here, Florida is not only the place of business for many of the parties, but it is also the place where the injuries that gave rise to the causes of action occurred. The property damage suffered by hundreds of Florida residents comprises the foundation of this litigation, and this factor weighs heavily in finding that Florida law should apply in determining whether TTP's actions can be attributed to TG under Florida principles of agency. *Lennar Homes,* No 09–07901 at 2. The Third District Court of Appeal in Florida summarily affirmed Judge Farina's decision. *Taishan Gypsum Co. Ltd. v. Lennar Homes, LLC,* 123 So.3d 637 (Fla.Dist.Ct.App.2013) (per curiam). In support of its affirmance, the court relied on the portion of Judge Fallon's September 4, 2012 Order discussing *Mitchell,* which applied Florida law to the imputation decision.

    *Lennar Homes* is instructive because "when the supreme court of a state has not spoken to a particular issue, the well-established practice of this Circuit is to follow the opinion of the highest court which *has* written on the matter." *Birmingham Fire Ins. Co. of Pa. v. Winegardner & Hammons, Inc.,* 714 F.2d 548, 550 (5th Cir.1983); *see also Temple v. McCall,* 720 F.3d 301, 307 (5th Cir.2013).

7   Even accepting that the principles of imputation translate to specific-jurisdiction analysis, there are material differences between the Ninth Circuit's agency test and Florida's (and the Eleventh Circuit's) agency test that mitigate concerns about imputation in this case. *Daimler* described the Ninth Circuit's test as "a less rigorous test" than alter-ego inquiries focusing on the parent's domination of the subsidiary. *Daimler,* 134 S.Ct. at 759. The Ninth Circuit's agency analysis "is satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have a *representative* to perform them, the corporation's

Case 1:09-md-02047-EEF-MBN Document 22362-781 Filed 11/19/19 Page 50 of 1680
In re Chinese-Manufactured Drywall Products Liability Litigation, 753 F.3d 521 (2014) Page 26 of 27 PageID #: 228

Prod.Liab.Rep. (CCH) P 19,399

own officials would undertake to perform substantially similar services." *Bauman v. DaimlerChrysler Corp.,* 644 F.3d 909, 920 (9th Cir.2011), *rev'd sub nom., Daimler AG v. Bauman,* —— U.S. ——, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014). An alter-ego finding in the Ninth Circuit, however, "is predicated upon a showing of parental *control* over the subsidiary." *Id.* As discussed, unlike the agency test in the Ninth Circuit, under Florida law an agency relationship is predicated on the parent's control of the subsidiary: "[T]he parent corporation, to be liable for its subsidiary's acts under the ... agency theory, must exercise control to the extent the subsidiary manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." *Enic,* 870 So.2d at 891. This control-focused inquiry overlaps with the alter-ego test adopted by most circuits. *See Daimler,* 134 S.Ct. at 759 (noting that several Courts of Appeals impute jurisdictional contacts when "when the former is so dominated by the latter as to be its alter ego."). Accordingly, the Eleventh Circuit (and the Fifth Circuit) recognize that imputation of jurisdictional contacts between an agent and its principal can comport with Due Process. *See, e.g., Dickson Marine,* 179 F.3d at 339 ("Therefore we are convinced that Dickson failed to carry the burden of establishing a prima facie showing of sufficient control to establish an alter-ego or agency relationship between Air Sea and Panalpina Gabon.").

8   As the district court found: "[T]he financial records of the companies do not reflect the exact amount of these transactions" and "[t]hese rental and sales transactions were not accurately reflected in the financial records of either company."

9   Though the district court found that jurisdiction was proper under § 48.193(1)(a)(1), (2), and (6), because we find § 48.193(1)(a)(1) satisfied, we do not need to address these alternative grounds for long-arm jurisdiction.

10  Indeed OTC emailed TTP instructing, "I think the best thing to do right now is to let you operate the ocean freight and shipping from Qingdao to Miami, Fl" and "Half of this order will have Miami, FL as a destination; the other half will go to Orlando, FL."

11  As Ivan Gonima of OTC testified: "[T]hey were in charge of finding the shipping company, they were in charge of making the deal with the shipping company, and we were to pay, because they said that they could get a better price through their connections in China ... So, yes, it was free on board, the price they were giving us was free on board, but they were the ones hiring or making the arrangements for the shipping."

12  Gonima explained that they would take care of the shipping and that "they also mentioned ... Jacksonville, Florida" as a possible port.

13  Wenlong Peng testified, "We would stamp it for the customer."

14  The district court also noted other contacts between Taishan and Florida. For instance, Taishan sold drywall to Beijing Building Materials Import and Export Co., Ltd., which sold the drywall to Rothchilt International, Ltd., which shipped it to La Suprema Enterprises, Inc. and La Suprema Trading, Inc., which finally sold it to Banner in Florida. Taishan also represented that it could ship to Florida when contacted by SCI Co., Ltd. Guardian also purchased drywall from Taishan, which was subsequently shipped to Stock Building Supplies, which in turn sold it to builders in Florida.

15  TG argues that the amounts attributed to TG were clearly erroneous and takes issue with Exhibit 1, which it objected to below. The district court overruled its objection. On appeal, TG argues that this exhibit was based on inadmissible evidence, but does not explain in any detail how the district court abused its discretion in admitting it beyond this assertion. Further, the district court computed its amounts by looking at multiple sources including testimony explaining that 30% of the $4,000,000 purchase order was paid up front.

16  § 48.193.

17  No. 09–07901 CA 42, at 10.

18  As our court in *Germano* recognized, these facts do not present a traditional "stream-of-commerce" case: "most cases address contacts when a product only reaches the forum state after an out-of-state distributor sells the out-of-state defendant's product into the forum." *Germano,* 742 F.3d 576. As in *Germano,* that Taishan "knowingly sold its products directly to" Florida residents "is, on its own, a significant contact with the forum." *Id.* But we also "need not decide whether this contact alone would suffice to meet the first prong of the minimum contacts test because [Taishan] also designed its product for market in [Florida], and because it was not an isolated sale." *Id.*

19  Moreover, that some of Taishan's shipments were marked "FOB" does not vitiate its other contacts with Florida because Taishan arranged the shipping to Florida despite the FOB notation. Even if Taishan faithfully followed the FOB notation, Taishan's other contacts with Florida would outweigh its shipping mark. OTC's representative explained:

    [T]hey were in charge of finding the shipping company, they were in charge of making the deal with the shipping company, and we were to pay, because they said that they could get a better price through their connections in China ... So, yes, it was free on board, the price they were giving us was free on board, but they were the ones hiring or making the arrangements for the shipping.

Prod.Liab.Rep. (CCH) P 19,399

20    This circuit has "interpreted Rule 60(b)(1) as incorporating the Rule 55 'goodcause' standard applicable to entries of default." *In re OCA, Inc.,* 551 F.3d 359, 369 (5th Cir.2008). "This inquiry follows a recognition in our previous holdings that courts apply essentially the same standard to motions to set aside a *default* and a *judgment by default.*" *Id.* (citations and quotations omitted). This court has also held that "[a]lthough a motion to set aside a default decree under Fed.R.Civ.P. 55(c) is somewhat analogous to a motion to set aside a judgment under Fed.R.Civ.P. 60(b), the standard for setting aside a default decree is less rigorous than setting aside a judgment for excusable neglect." *United States v. One Parcel of Real Prop.,* 763 F.2d 181, 183 (5th Cir.1985).

21    TG argues that the district court did not have jurisdiction to enter the default. This issue is resolved above.

22    *See* Germano, 742 F.3d at 595.

23    No. 09–07901 CA 42, at 13–15.

24    When asked if his understanding was "that they 100 percent knew the product was coming into New Orleans," Darrin Steber, owner of GD Distributors, testified "Oh, absolutely."

25    "Q: It's your understanding that they 100 percent knew the product was coming into New Orleans, correct? A: Oh, absolutely."

26    As *Ainsworth* recognized, "Our stream-of-commerce test, in not requiring that the defendant target the forum, is in tension with [*McIntyre's* ] plurality opinion." Ainsworth, 716 F.3d at 178. Nevertheless, the record evidences Taishan's purposeful availment of the Louisiana forum. Taishan sold to Louisiana customers and arranged shipments to Louisiana. Even under the *McIntyre* plurality's more demanding test, Taishan's contacts demonstrate that it "target[ed]" Louisiana. McIntyre, 131 S.Ct. at 2788 (Kennedy, J.).

---

End of Document                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# JOINT APPENDIX TAB # 3

📄 Original Image of 706 F.Supp.2d 655 (PDF)

706 F.Supp.2d 655
United States District Court,
E.D. Louisiana.

In re CHINESE MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION.
This Document Relates to Germano, et al.
v.
Taishan Gypsum Co. Ltd., et al. case no. 09–6687.

MDL No. 2047.
|
April 8, 2010.

**Synopsis**

**Background:** Homeowners brought class action against
manufacturer of Chinese drywall, among others, alleging
negligence, negligence per se, breach of express and
implied warranties, and violation of various consumer
protection acts, among other claims, after defective
drywall was installed in their homes. Preliminary
default judgment was entered against manufacturer, and
additional homeowners were permitted to intervene.

**Holdings:** The District Court, Eldon E. Fallon, J., held
that:

[1] proper measure of damages for loss to real property
was cost of repair plus amount of depreciation;

[2] homeowners could recover damages for losses
associated with alternative living costs and foreclosure
costs; and

[3] homeowners were entitled to recover damages for loss
of use and enjoyment of their homes.

Ordered accordingly.

West Headnotes (7)

[1]  **Damages**
        👉 Buildings or other improvements

Under Virginia law, proper measure of
damages for injury to real property in
homeowners' class action alleging negligence
against manufacturer of defective Chinese
drywall was cost of repair, including removing
and replacing all drywall, flooring, and
electrical wires after drywall emitted sulfuric
gasses that corroded metal in homeowners'
electrical devices, plus amount their properties
depreciated due to damage caused by drywall.

3 Cases that cite this headnote

[2]  **Damages**
        👉 Mode of estimating damages in general
     **Damages**
        👉 Mode of estimating damages in general

In general, the measure of damages under
Virginia law in a negligence action is the
amount necessary to compensate the injured
party for the damage proximately caused by
the tortious conduct.

1 Cases that cite this headnote

[3]  **Damages**
        👉 Injuries to Real Property

With respect to injury to real property,
Virginia law allows damages to be measured
by diminished value, the cost of repair, or a
combination of both.

Cases that cite this headnote

[4]  **Damages**
        👉 Injuries to personal property

Under Virginia law, where personal property
has been either destroyed or damaged, the
general rule for determining the amount
of damages is the fair market value of
the property before and immediately after
the property was damaged, plus necessary
reasonable expenses incurred by the owner in
connection with the injury.

Cases that cite this headnote

[5]  **Damages**

👉 *Injuries to personal property*

Under Virginia law, where personal property has been damaged and can be restored by repairs, if the repairs would be less than the diminution in value because of the injury, the amount recoverable in damages is the cost of repairs and the diminution in market value of the injured property, if any, after the repairs are made.

Cases that cite this headnote

**[6]** **Damages**

👉 *Injuries to personal property*

Under Virginia law, in class action against manufacturer of defective Chinese drywall alleging negligence, homeowners could recover damages for losses associated with alternative living costs and foreclosure costs proximately caused by manufacturer's drywall after it emitted sulfuric gasses that corroded metal in their electrical devices.

Cases that cite this headnote

**[7]** **Damages**

👉 *Buildings or other improvements*

Under Virginia law, homeowners were entitled to recover damages for loss of use and enjoyment of their homes in class action against manufacturer of defective Chinese drywall alleging negligence after drywall emitted sulfuric gasses that corroded metal in homeowners' electrical devices.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*656** Phillip A. Wittmann, Stone, Pigman, Walther, Wittmann, LLC, **\*657** Judy Y. Barrasso, Barrasso, Usdin, Kupperman, Freeman & Sarver, LLC, New Orleans, LA, for Chinese Manufactured Drywall Products Liability Litigation.

***FINDINGS OF FACT & CONCLUSIONS OF LAW***

ELDON E. FALLON, District Judge.

## *TABLE OF CONTENTS*

I. Background & Procedural History........................................................................ ....... 659

II. Findings of Fact & Conclusions of Law...................................................................... 660

   A. Background: Gypsum & Drywall........................................................................ ....... 660

   B. intervenor Homes........................................................................................... 661

   C. General Scientific Findings on Chinese Drywall Which Distinguish it From Typical, Benign Drywall.............................................................................. 663

   D. Environment Produced by Chinese Drywall...................................................... ....... 666

      1. CPSC Standards................................................................................................ 666

      2. Florida Division of Health Standards.................................................................. 667

      3. Indicate the Corrosion Found in Plaintiff-intervenor Homes isSevere....................... 667

         a. Qualitative Criteria for Corrosivity........................................................... ............. 667

b. Quantitative Criteria for Corrosivity.................................................................................. 668

4. Peer–reviewed Literature & Expert Opinion Consensus........................................................... 669

E. Scope of Remediation.............................................................................................. 671

1. All Drywall in the Plaintiff-intervenor Homes Needs to be Removed & Replaced......................... 671

a. Drywall sales and delivery records, where available, lack the reliability and precision necessary to locate all of the Chinese drywall in a mixed drywall home............................. 672

b. The Knauf proposed method, or combination of methods, for selective drywall identification do not rise above the level of experimental, and lack the scientific reliability necessary to conduct a board-by-board removal system at the present time................................. 672

c. Removal of all drywall in a mixed home is efficient and cost effective................................. 673

d. It is not practical or economical to detect, selectively remove, and replace individual boards of Chinese drywall......................................................................................... 674

2. All Electrical Wires in the Plaintiff-intervenor Homes Need to be Replaced................................. 675

a. Scientific Reasons........................................................................................................... 675

b. Economic & Practical Reasons......................................................................................... 677

3. All Copper Pipes in the Plaintiff-intervenor Homes Need to be Replaced................................... 677

a. Scientific Reasons........................................................................................................... 677

b. Economic & Practical Reasons......................................................................................... 678

4. HVAC Units in the Plaintiff-intervenor Homes Need to be Replaced......................................... 678

a. Scientific Reasons........................................................................................................... 678

b. Economic & Practical Reasons......................................................................................... 680

5. Selective Electrical Devices & Appliances in the Plaintiff-intervenor Homes Need to be Replaced....................................................................................................................... 681

a. Scientific Reasons........................................................................................................... 681

b. Economic & Practical Reasons......................................................................................... 683

6. Whether Flooring Needs to be Replaced............................................................................. 683

a. Carpet Must be Replaced............................................................................................... 683

b. Hardwood or Vinyl Flooring Must be Replaced.................................................................. 683

       c.   Tile Flooring May Need to be Replaced...................................................................... 683

   7.   Items Which Must be Removed With the Drywall May Need to be Replaced......................................... 683

       a.   Cabinets Must be Replaced....................................................................................... 683

       b.   Countertops Must be Replaced.................................................................................. 684

       c.   Trim, Crown Molding and Baseboards Must be Replaced............................................ 684

       d.   Bathroom Fixtures Must be Replaced......................................................................... 684

   8.   Insulation Must be Replaced............................................................................................ 684

   9.   Air-out After Remediation.............................................................................................. 685

   10.  Company Should Certify that the Homes are Safe for Occupation....................................... 685

   11.  The Scope of Work is Consistent with Chinese Drywall Remediation by National Homebuilders................................................................................................................ 685

   12.  The Court's Scope of Remediation as Compared to the NAHB & CPSC Remediation Protocols..................................................................................................................... 686

   13.  The Plaintiff-intervenor Families Will be out of Their Homes for 4–6 Months During Remediation................................................................................................................. 686

F.  **The Costs of Repairing Virginia CDW Homes is on Average $86/Square Foot**.................................................................................................................... 687

G.  **It is Not Certain that Plaintiff-intervenors Have Suffered Property Devaluation Caused by the Chinese Drywall Contamination**.................................. 688

H.  **Chinese Drywall Effects on Plaintiff-intervenors & Their Homes, & Their Resulting Damages**.................................................................................................. 689

   1.   Cross-section of Homes Contaminated by Chinese Drywall & Persons Harmed by Chinese Drywall......................................................................................................................... 689

   2.   Law Applicable to Plaintiff-intervenors' Recovery of Damages............................................ 690

   3.   Plaintiff–intervenors & Their Damages............................................................................. 693

       a.   Deborah and William Morgan................................................................................... 693

          i. Background..................................................................................................... 693

          ii. Damages....................................................................................................... 695

       b.   Jerry and Inez Baldwin............................................................................................ 696

          i. Background..................................................................................................... 696

          ii. Damages....................................................................................................... 698

c.  Joe and Cathy Leach..................................................................................................... 698

     i.  Background........................................................................................................... 698

     ii. The Leach home is a unique example of known, localized use of Chinese drywall
         which can be repaired as a standalone unit of the home, without removing
         all drywall in the home............................................................................. .............. 700

     iii. Damages...................................................................................................... .............. 701

d.  Robert and Lisa Orlando................................................................................................ 701

     i.  Background........................................................................................................... 701

     ii. Damages.............................................................................................................. 703

e.  Fred and Vanessa Michaux........................................................................... .............. 704

     i.  Background........................................................................................................... 704

     ii. Damages........................................................................................................... .............. 706

f.  Preston and Rachel McKellar........................................................................ .............. 706

     i.  Background........................................................................................................... 706

     ii. Damages.................................................................................................... .............. 708

g.  Steven and Elizabeth Heischober...................................................................... .............. 710

     i.  Background........................................................................................................... 710

     ii. Damages...................................................................................................... .............. 711

III.  Conclusion................................................................................................................ 712

## *659  I. BACKGROUND & PROCEDURAL HISTORY

From 2004 through 2006, the housing boom and rebuilding efforts necessitated by various hurricanes led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used in the construction and refurbishing of homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall. Accordingly, these homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as

multidistrict litigation pursuant to 28 U.S.C. § 1407. In response to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, 626 F.Supp.2d 1346 (Jud.Pan.Mult.Lit.2009), all federal cases involving Chinese drywall were transferred and consolidated for pretrial proceedings in the U.S. District Court, Eastern District of Louisiana.

The present matter commenced when Plaintiffs, on behalf of themselves and all other similarly situated owners and tenants, brought a class action against Defendants Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd. ("Taishan"); Tobin Trading, Inc.; Venture Supply, Inc.; Harbor Walk Development, LLC; and The Porter–Blaine Corp. Plaintiffs filed their initial complaint in the Eastern District of Virginia on May 1, 2009. Thereafter, on May 26, 2009, Plaintiffs filed their First Amended Complaint. On August 3, 2009, Plaintiffs received notice that service of process of the First Amended Complaint was perfected on Defendant Taishan. Plaintiffs' case was then transferred to the Eastern District of Louisiana on October 13, 2009. Subsequent to transfer, Plaintiffs moved to amend the First Amended Complaint to assert a national class against Taishan. Plaintiffs' motion to amend was granted.

The Second Amended Class Action Complaint asserts claims against Taishan for negligence, negligence per se, breach of express and/or implied warranties, private nuisance, unjust enrichment, violation of the Consumer Protection Acts and for equitable injunctive and medical monitoring. Since Taishan did not timely respond to the Complaint or enter its appearance in this litigation, Plaintiffs moved for a default judgment. On November 20, 2009, the Court granted a preliminary default against Taishan.

On November 25, 2009, the Court issued a scheduling order setting an evidentiary hearing to address the scope and extent of appropriate remediation, and the cost of remediation. Pursuant to the Court's scheduling order, interested parties were permitted to intervene in the proceeding. The Court granted a motion to intervene filed by William and Deborah Morgan, Preston and Rachel McKellar, Frederick and Vanessa Michaux, J. Jerry and Inez Baldwin, Joseph and Kathy Leach, Robert and Lea Orlando, and Steven and Elizabeth Heischober. These parties are known as the Plaintiff-intervenors. Knauf Plasterboard Tianjin Co. Ltd. and The

Mitchell Company, Inc. also moved for and were granted intervention.

**\*660** Vigorous discovery was conducted by the Intervenors. Depositions were taken and expert reports were exchanged. A *Daubert* hearing was held on January 29, 2010. Subsequently, the Intervenors filed numerous motions *in limine*. On the eve of the evidentiary hearing, both Knauf and The Mitchell Co. voluntarily withdrew from the proceeding, leaving only the Plaintiff-intervenors to put on evidence.

This default matter came on for hearing without a jury on February 19, 2010, and culminated on February 22, 2010. The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence, as well as the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

In this opinion, the Court will first discuss the general background of gypsum and drywall, then it will consider how and when the defective Chinese drywall was installed in the Plaintiff-intervenors' homes, next the scientific findings regarding Chinese drywall, the nature and level of the corrosive environment in the Plaintiff-intervenors' homes, the type and degree of resulting damages, the proper scope of remediation, and the costs of this remediation.

## II. FINDINGS OF FACT & CONCLUSIONS OF LAW

### A. BACKGROUND: GYPSUM & DRYWALL

Drywall is a widely used construction material that is also known as gypsum board, wallboard, plasterboard, sheetrock, and gyproc. P2.0006–0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)). A drywall panel is composed of a layer of hardened gypsum plaster sandwiched between two layers of paper liner. *Id.* Gypsum is a hydrated calcium sulfate, composed of two molecules of water ($H_2O$) and one of calcium sulfate ($CaSO4$). *Id.*

The gypsum used to make drywall can be created both naturally and synthetically. *Id.* Naturally occurring gypsum is a deposit largely the result of the evaporation of water in ancient inland seas which contains large amounts of dissolved gypsum. P.2.0051–001 (*Treatment and Disposal of Gypsum Board Waste,* Construction Dimension, February 1992 at 5). Synthetic gypsum is chemically identical to mineral gypsum, but the amount and types of trace materials and unreacted sorbents found in the source material can vary among power plants and among mines from which it originates. P.2.0006– 0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)). Synthetic gypsum is generally obtained in the final stage of industrial processes, where sulfuric acid is neutralized by a calcium salt; for example it is produced as a byproduct of coal combustion power plants. *Id.;* P.2.0240.0014 (ASTM International report).

To make drywall from gypsum, first gypsum is crushed or ground up and heated to about 350 degrees Fahrenheit to remove approximately seventy-five percent (75%) of its water content in a process called calcining, thereafter becoming a fine white powder. P.2.0006–0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)); P.2.0051–0001 (*Treatment and Disposal of Gypsum Board Waste,* Construction Dimensions, February 1992 at 5). Second, the calcined gypsum is mixed with water, foam, and other additives to form a slurry which is **\*661** fed between continuous sheets of paper on a continuous belt line. *Id.* Third, as the board moves down the belt line, the calcined gypsum recrystalizes or rehydrates, reverting to its original gypsum state, and the paper sheets become firmly bonded to the rehydrated core. *Id.* Finally, the board is cut to length and conveyed through dryers to remove free moisture. *Id.*

Historically, gypsum was used as far back as 3700 B.C. by the Egyptians as a base to preserve the wall murals in the pyramids. P.2.0051–0001(*Treatment and Disposal of Gypsum Board Waste,* Construction Dimension, February 1992 at 6); P.2.0240–0022 to –0023 (ASTM International, Oct. 2009 at 9–10). The Roman Empire used gypsum for interior purposes, such as the interior walls of Pompeii. *Id.* There is little information of the use of gypsum plaster during the Middle Ages. *Id.* The modern science of gypsum began with the discoveries by Antoine Lavoisier outlined in his two papers on gypsum presented to the French Academy of Sciences in 1765 and 1766. P.2.0240– 0022 to –0023 (ASTM International, Oct. 2009 at 11). In the United States, the use of gypsum board started in the early 1950s and was driven by the following issues, (1) avoiding the drying time of plaster which allowed earlier occupancy of buildings, and (2) the lack of skilled plasterers in many locations. P.2.0240–0026(ASTM International, Oct. 2009, pg. 13). Gypsum is fire resistant, thus making it a preferable material for drywall. P.2.0051– 0001 (*Treatment and Disposal of Gypsum Board Waste,* Construction Dimensions, February 1992 at 6).

## B. HOW & WHEN THE CHINESE DRYWALL WAS INSTALLED IN THE PLAINTIFF INTERVENOR HOMES

The Chinese drywall in the present cases was manufactured by Shandong Taihe Dongxin Co., Ltd. which on September 10, 2007, changed its name to Taishan Gypsum Co., Ltd. P.3.0629–1000 (Affidavit of Russ M. Herman In Support of the Plaintiffs' Steering Committee's Evidentiary Presentation Regarding Taishan Gypsum Co., Ltd. ¶ 15); Trial Transcript at 2/19 Vol. I p. 9–18, P.3.0629–0150; P.3.0629–0177 (Herman Opening). Hereafter, Shandong Taihe Dongxin Co., Ltd. and Taishan Gypsum Co., Ltd. shall be referred to as "Taishan."

On November 9, 2005, Venture Supply, Inc., a company in Norfolk, Virginia, provided an original letter of credit in the amount of $429,600.00 to the order of Shandong Taihe Dongxin Co. for 120,000 sheets of drywall to meet all USA ASTM ratings and fire rating standards. P.3.0629– 1000 (Affidavit of Russ M. Herman ¶ 5), P.1802–0063 to 0068. On November 14, 2005, Frank Clem, manager of Venture Supply, was advised that the manufacturer was not clear on U.S. ASTM ratings and Venture Supply was requested to remove U.S. ASTM requirements from the letter of credit and rely solely upon Chinese ratings. P.3.0629–1000 (Affidavit of Russ M. Herman ¶ 7). Venture Supply then contracted with Taishan to purchase drywall. P.3.0629–1000 (Affidavit of Russ M. Herman ¶¶ 7–8), P.1802–0070. Although it originally contracted to meet United States' ASTM standards, Taishan insisted that the drywall it sold to Venture Supply, Inc. would not be required to meet these standards. *Id.* Accordingly, on November 15, 2005, Venture Supply directed its bank to remove the U.S. ASTM requirement from the letter of credit to Taishan. *Id.* Pursuant to contract, on December 25, 2005, Taishan had 2,000 pallets of drywall shipped

aboard the M/V Glykofillousa from the Chinese Port of Loading, Lianyungang. P3.0629–1000 (Affidavit of Russ M. Herman ¶¶ 10–11), P1.1802–0091, P1.1802–0003. The shipment **\*662** arrived in the United States in February, 2006. *Id.*

On December 16, 2005, a second contract was signed between Venture Supply and Shandong Taihe Dongxin Co. for 100,000 sheets on 2,000 pallets to be shipped to Norfolk, Virginia. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 12), P1.1802–0089, P1.1802–0003, P1.1802–0007. However, the second shipment of drywall was reduced to 53,912 sheets on 586 pallets, which was shipped onboard the M/V Atlantic Fortune from the Chinese Port of Loading, Lianyungang. *Id.* This shipment was offloaded in Camden, New Jersey. *Id.*

All of Taishan's drywall sold to Venture Supply bore the following legend on end binding label tape: "4#x12#x1/2# Gypsum Board Distributed by Venture Supply, Inc." and on the back of the board: "Venture Supply, Inc. MFG. Shandong Taihe Dongxin, Co., Ltd., China." P3.0629–1000 (Affidavit of Russ M. Herman ¶ 6), Deposition of Samuel G. Porter (12/16/09, 12/17/09) at 321–322.

The Porter–Blaine Corporation, a company related to Venture Supply, Inc., purchased Taishan drywall from Venture Supply, Inc. *See* 2/19/10 Trial Transcript at p. 17 (12–14). Venture Supply, Inc. shipped Taishan drywall to each of the seven intervening plaintiffs' (hereinafter "Plaintiff" or "Plaintiff-intervenor") homes and the drywall was thereupon installed by the Porter–Blaine Corporation in the homes. *See* Trial Transcript at 2/19 Vol. I p. 17(9–14), p. 13(16–20), p. 16(22)-17(2), p. 20(17–24) (Herman Opening).

The drywall product from China was never tested pursuant to the United States ASTM standard. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 13), P1.1802–0046 to 0061, P1.1802–0023; Deposition of Samuel G. Porter (12/16/09) at p. 84–85. Venture relied on a representation that Chinese testing was equivalent to the U.S. testing standards. *Id.* However, the Chinese tests were accomplished by a government agency of the Republic of China and not by an independent testing laboratory. *Id.* Certificates of Quality were likewise issued by a government agency. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 14), P1.1802–0045, P1.1802–0043. But the Certificate of Quality Management System Certification

issued predates the production of the drywall shipped to the United States by at least two (2) years. *Id.*

On March 19, 2005, BNBM became the largest shareholder of Taihe Dongxin by purchasing sixty-five percent (65%) of the equity of Taishan Dongxin. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 16), P3.0629–0150, P3.0629–0177. The state-owned Assets Supervision and Administration Commission of the State Counsel (SASAC) of the People's Republic of China controls the "plasterboard" manufacturing, exportation and certification industry. P3.0629–1000 (Affidavit of Russ M. Herman ¶¶ 18 –20), P3.0629–0113, P3.0629–0136, 0137. The SASAC supervises and manages the State-owned assets of the enterprises engaged in drywall production, including Taishan. *Id.* The degree of control SASAC (Government of China) exerts and influences is extensive. *Id.* For example, SASAC assumes the responsibility as the investor on behalf of the state; it supervises and manages the state-owned assets and enterprises; controls the value preservation and increment of the state-owned assets; guides and pushes forward the reform and restructuring of SOEs; appoints and removes top executives of SOEs; is responsible for organizing SOEs to turn gains over to the state; is responsible for urging SOEs to carry out laws and regulations for safety production; directs and supervises the management work of local state-owned assets; and undertakes other tasks assigned by the State Council. *Id.* Furthermore, SASAC oversees and **\*663** controls 150 large central state-owned enterprises (SOEs), including China National Building Material Group Corporation (AS CNBM Group). P3.0629–1000 (Affidavit of Russ M. Herman ¶ 18), P3.0629–0113 to 0116. SASAC has a presence in the United States through CNBM USA Corporation, located at 17800 Castleton Street, City of Industry, California 91748. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 21), P3.0629–0122. SASAC owns 100% of the CNBM Group. *Id.* CNBM Group, in turn, owns 56.4% of the China National Building Material Company, Limited (CNBM Co., Ltd); 75% of BNBM; 100% of CNBM Import and Export Co. and 100% of CNBM Academy. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 19), P3.0629–0117 to 0120, P3.0629–0123 to 0125. CNBM Co., Ltd. Owns 52.40% of Beijing New Building Material Co., Ltd. (BNBM). *Id.* CNBM Group, in turn, owns 56.4% of the China National Building Material. *Id.* CNBM USA was established in 2006 the same year that Taihe (Taishan) sold Chinese-

manufactured drywall to Venture Supply Inc. *Id.* CNBM (USA) Corporation has the announced mission to provide all kinds of building materials and services in the national market. *Id.*

CNBM's Gypsum Board business production on December 31, 2008 from its wholly owned subsidiary, Taishan Gypsum Co., was $262.3 million yuan. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 22), P3.0629–0125, P3.0629–0331, 0332. Taihe's (Taishan) revenue for 2006 was 773,000,000 yuan. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 23), P3.0629–0130. A yuan is worth approximately 6.8 dollars. *Id.* Taishan manufactures more than 60 types of products including standard plasterboard. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 24), P3.0629–0153. In addition to the shipments in 2006 to Venture Supply, Taishan Plasterboard Co., Ltd. shipped 76 shipments of plasterboard to the U.S. between March 2006 and August 2007 to four U.S. ports. P3.0629–1000 (Affidavit of Russ M. Herman ¶ 25), P3.0629–0175.

## C. GENERAL SCIENTIFIC FINDINGS ON CHINESE DRYWALL WHICH DISTINGUISH IT FROM TYPICAL, BENIGN DRYWALL

Chinese drywall is different from typical, benign drywall for the following reasons:

1. Chinese drywall has a significantly higher average concentration of strontium and significantly more detectable levels of elemental sulfur. P2.0135–0003.

2. Chinese drywall releases reduced sulfur gases. P1.2025–0003, 0004, (Streit Supplemental Report), Trial Transcript at 2/19 Vol. II p. 57(23)-p. 58(18) (Scully Testimony) (The Court has accepted Dr. Scully as an expert in the fields of corrosion, metallurgy, and materials science. Trial Transcript at 2/19 Vol. I, p. 46 (19–24) (Scully Testimony)). The three main gases that are released from CDW are hydrogen sulfide ($H_2S$), carbonyl sulfide (COS), and carbon disulfide ($CS_2$). Trial Transcript at 2/19 Vol. II p. 57(23)-58(18) (Scully Testimony), Trial Deposition of Lori Streit (2/16/10) at p. 68(21)-p. 69(3). The CDW also releases elemental sulfur. P1.2025–0003, 0004 (Streit Supplemental Report). The Plaintiffs' experts have detected reduced sulfur gas emissions by conducting laboratory tests on samples of Chinese drywall. Trial Deposition of Lori Streit (2/16/10) at p. 24(16)-p. 25(1). These

emissions are also confirmed by strong odors. Trial Deposition of Lori Streit (2/16/10) at p. 55(10–14), Trial Transcript at 2/22 Vol. I p. 101(7–14) (Rutila Testimony). The fact that **\*664** Chinese drywall emits sulfur gases has also been reported by the U.S. Consumer Products Safety Commission, the Florida Department of Health, and other investigatory agencies and firms. Trial Deposition of Lori Streit (2/16/10) at p. 68(21)-p. 69(3), p. 80(1–17).

3. The sulfur gases released by Chinese drywall are irritating to the human body. Trial Deposition of Lori Streit (2/16/10) at p. 55(15–21), Trial Transcript at 2/22 Vol. I p. 101(17–19) (Rutila Testimony). Exposed individuals reported irritation of the eyes, respiratory system, and skin, among other things. *Id.*

4. The sulfur gases released by Chinese drywall cause offending odors in homes, making them hard if not impossible to live in. Trial Transcript at 2/19 Vol. I p. 53(23)-pg. 54(7)(Morgan testimony), Trial Transcript at 2/22 Vol. I p. 8(4–17)(Michaux Testimony), Trial Deposition of Lori Streit (2/16/10) at p. 55(10–1)

5. The sulfur gases released by Chinese drywall are corrosive to metals, particularly copper and silver. Trial Deposition of Lori Streit (2/16/10) at p. 80(8–17), p. 90(23)-p. 91(7), Trial Transcript at 2/19 Vol. II p. 56 (19)-p. 57(12), p. 59(3–12) (Scully Testimony)). "Corrosion" is defined by the ASTM as the chemical or electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the materials and its properties. P1.1852–0002 (ASTM Terminology), Trial Transcript at 2/19 Vol. II p. 51(20)-p. 52(5) (Scully Testimony). Copper and silver metal components in the Plaintiffs' houses are extremely vulnerable to corrosion from exposure to the sulfur gases. P2.0076–0001, 0002 (Graedel 1983 (copper)), Trial Transcript at 2/19 Vol. II p. 56(19–24) (Scully Testimony), P2.0202–0001, 0002 (Chudnovsky 2008 (silver)), Trial Transcript at 2/19 Vol. II p. 157(13–18) (Galler Testimony). The sulfur gases, in reacting with metals, form sulfide deposits on the surfaces of the metals. Trial Deposition of Lori Streit (2/16/10) at p. 80(8–17). For example, a reaction of sulfur gases with copper pipes will form copper sulfide on the metals. Trial Deposition of Lori Streit (2/16/10) at p. 72(18–24). The reaction of sulfur

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 11/19/19 Page 62 of 1680

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in F.Supp.2d (2010)... Page 11 of 49 PageID #: 940

gases with metals can be said to be "consuming" the useful, pure metals by replacing those metals with sulfides. Trial Transcript at 2/19 Vol. II p. 141 (15–16) (Galler Testimony) (The Court has accepted Mr. Galler as an expert in the fields of electrical engineering, power electronics, electrical machinery, and failure analysis. Trial Transcript at 2/19 Vol. I, p. 128 (3–7) (Galler Testimony)).

6. The corrosion on metals caused by the sulfur gases emitted by Chinese drywall causes premature failure of electrical & mechanical devices. P1.2001–0019, 0020, 0021 (CTL/Krantz Original Report, HVAC Coil Failure due to Corrosion), P3.0625–0001, 0002 (FRE 1006 Summary of HVAC Coil Failure Data), P1.2053–0001 (Virginia Corrosion Thicknesses Exceed Failure Standard), Trial Transcript at 2/19 Vol. II p. 55(24)-p. 156(17) (Galler Testimony), Trial Transcript at 2/19 Vol. II p. 100(17)-p. 101(16), p. 152(22)-p. 153(1) (Scully Testimony), Trial Transcript at 2/22 Vol. I p. 90(3–23) (Barnett Testimony proffer) (The PSC tenders Dr. Barnett, and the Court accepts him as, an **\*665** expert in Engineering and Fire Safety. Trial Deposition of Jonathan Barnett (2/12/10) at p. 11(14)-18(22), P1.2015–0019—P1.2015–0024 (Barnett Report, C.V.). The Plaintiff-intervenors have reported many premature failures of major appliances and consumer electronics in their homes during their first three years of use of these homes. P1.2018–0014, 0015, 0046 (SGH/Rutila Supplemental Report), Trial Transcript at 2/22 Vol. II p. 11(23)-p. 12(13)(Rutila Testimony). Laboratory analysis of these copper and silver components from the Virginia homes identified the corrosion as the cause of an HVAC coil failure and severe corrosion deposits at the operative connections in the appliances and in consumer electronics. P1.2018–0015, 0046 (SGH/Rutila Supplemental Report), P1.2001–0019, 0020, 0021 (CTL/Krantz Original Report), P1.2020–0002, 0003, 0004, (Original Galler Report), Trial Transcript at 2/19 Vol. II p. 48(23)-p. 149(6)(Galler Testimony), Trial Transcript at 2/19 Vol. II p. 52(18)-p. 53(4), p. 65(6–16), p. 111(18–23) (Scully Testimony). Mechanical, electrical, and electronic failures have been shown to have occurred prematurely due to the severe industrial corrosive environments in these Chinese Drywall homes. P1.2001–0019, 0020, 0021 (CTL/Krantz Original Report, HVAC Coil Failure due

to Corrosion), P3.0625–0001, 0002 (FRE 1006 Summary of HVAC Coil Failure Data), P1.2053–0001 (Virginia Corrosion Thicknesses Exceed Failure Standard), Trial Transcript at 2/19 Vol. II p. 55(24)-p. 156(17) (Galler Testimony), Trial Transcript at 2/19 Vol. II p. 100(17)-p. 101(16), p. 152(22)-p. 153(1) (Scully Testimony), Trial Transcript at 2/22 Vol. I p. 90(3–23) (Barnett Testimony proffer) (The PSC tenders Dr. Barnett, and the Court accepts him as, an expert in Engineering and Fire Safety. Trial Deposition of Jonathan Barnett (2/12/10) at p. 11(14)-18(22), P1.2015–0019—P1.2015–0024 (Barnett Report, C.V.). Evaluation of comparable HVAC systems, appliances, and electronics in *control* homes (e.g., similar homes without Chinese Drywall) do not show premature failures of HVAC systems, appliances, and electronics, and the wires do not have corrosion product thicknesses that would predict premature failures. P1.2022–0005, 0006, 0007, 0008 (Scully Supplemental Report), Trial Transcript at 2/19 Vol. II p. 1(23)-p. 112(2) (Scully Testimony), Trial Transcript at 2/22 Vol. II p. 12(18)-p. 13(22), p. 23(6–14) (Rutila Testimony), P1.1892–0001, 0002, 0003, P1.2057–0001, 0002, P1.2057–0001, 0002 (comparisons between corroded electronics from CDW homes and electronics from control homes), Trial Transcript at 2/19 Vol. II p. 144(2–19), p. 149(7–16) (Galler Testimony).

7. The corrosion on metals caused by the sulfur gases emitted by Chinese drywall poses a fire risk. Trial Transcript at 2/19 Vol. II p. 130 (3–14) (Galler Testimony). The corrosion increases resistance in the circuitry of appliances and electronics. See P1.2020–0004 (Galler Report); *see also* P2.0202–0001 (Chudnovsky, Corrosion of Electrical Conductors), Trial Transcript at 2/19 Vol. II p. 130 (3–14) (Galler Testimony). Increased resistance increases heat in appliances and electronics. P1.2020–0002 (Galler Report), Trial Transcript at 2/19 Vol. II p. 130 (3–14) (Galler Testimony). This increased **\*666** resistance can cause excessive heating of the connection when energized. See Trial Transcript at 2/19 Vol. II p. 129(25)-p. 130 (2) (Galler Testimony); *see also* P2.0202–0001 (Chudnovsky 2008). Complete failure of a switch can lead to fires or other life safety problems, depending on the intended function of the switch. Trial Transcript at 2/19 Vol. II p. 130 (3–14) (Galler Testimony).

Knauf Plasterboard Tianjin (hereinafter "Knauf" or "KPT") and Plaintiffs Steering Committee (hereinafter "PSC") experts agree that all of the problematic Chinese drywall products share similar chemical and physical properties. P1.2025–0003, 0004, (Streit Supplemental Report), Deposition of Matthew Perricone Ph.D. (1/21/10) Ex. 2 (Perricone Original Report) at p.i (¶ 4.7), Deposition of Sandy Sharp (2/5/10) at p. 148(15)-p. 150(11), Trial Deposition of Lori Streit (2/16/10) at p. 24(6)-p. 25(1), p. 26(11–12), p. 27(21)-p. 28(7) (finding commonalities among Chinese drywall products).

## D. PLAINTIFF–INTERVENOR HOMES HAVE BEEN EXPOSED TO A CORROSIVE ENVIRONMENT PRODUCED BY CHINESE DRYWALL

The level of corrosive sulfur gases emitted by Chinese drywall in the Plaintiff-intervenors' homes exceed the safe level established by recognized standards, peer reviewed literature, and expert opinions and this corrosive environment has had a significant impact on the expose property.

### 1. CPSC Standards

The seven Plaintiff intervenors' homes meet the CPSC "Interim Guidance—Identification of Homes with Corrosion from Problem Drywall (January 28, 2010)." P1.1844–0001 (CPSC Guidance Problem Drywall), Trial Transcript at 2/22 Vol. II p. 6(25)-p. 7(5) (Rutila Testimony). P1.1844–0001 (CPSC Guidance Problem Drywall), Trial Transcript at 2/22 Vol. II p. 11(1–19) (Rutila Testimony). The CPSC Guidance sets forth "Corroborating Evidence" for the presence of CDW in such homes. *Id.* The CPSC Guidance requires that 4 out of 6 types of corroborating evidence be met to establish a "Problem Drywall" home. *Id.* The six types of evidence are: (a) corrosive conditions demonstrated by copper sulfide on copper coupons or confirmation of sulfur in blackening of grounding wires and/or air conditioning coils; (b) confirmed markings of Chinese origin on the drywall; (c) strontium levels (excluding the exterior paper) exceeding 1200 ppm; (d) laboratory elevated sulfur readings above 10 ppm; (e) elevated levels of $H_2S$, COS, $CS_2$; and (f) corrosion of copper to form copper sulfide when copper is placed in test chambers with drywall samples from the home. *Id.* The seven Plaintiff intervenors' homes meet the corroborating evidence

criteria set forth in the CPSC Guidance. P1.2025–0003, 0004. (Streit Supplemental Report, off gassing studies), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I p. 39(24)-p. 40(4), p. 42 (8–14), p. 51(13–25), p. 59 (14)-p. 60 (6) (Streit Testimony), P1.1824 FRE 1006 Summary of Screening Data for Virginia Homes, (copper strips in mason jars and laboratory verification of copper sulfide on HVAC and wire), P1.2001–0019, 0026, 0036, P1.2002–0007 (CTL/Krantz Original and Supplemental Reports, laboratory confirmation copper sulfide on wires and HVAC), P1.2021–0008, 0010, 0011, P1.2022–0020, 0021, 0022 (Scully Original and Supplemental Reports, laboratory confirmation of copper sulfide on wires and HVAC), Trial Transcript at 2/19 Vol. II p. 111(13–22) (Scully Testimony, copper sulfide on wires and HVAC) (The PSC tenders Brad Krantz, and the Court accepts him, as an expert in corrosion science. P1.2001–0001 (Original CTL/Krantz Report, C.V.)), Trial **\*667** Transcript at 2/22 Vol. II p. 5(13–17) (Rutila Testimony).

### 2. Florida Division of Health Standards

The Florida Case Definition for "Confirmatory Evidence of Drywall Associated Corrosion" includes three items. P1.1841–0001–0004 (FLA Case Definition), Trial Transcript at 2/22 Vol. II p. 5(7)-p. 8(25) (Rutila Testimony). If any one of the three is positive, that is considered confirmatory evidence. *Id.* The three types of confirmatory evidence are: (1) laboratory testing for elemental sulfur indicating that the gypsum source in the drywall contributes to the reduced sulfur gases emitted from the corrosive drywall; (2) laboratory analysis (i.e., headspace) for reduced sulfur gas emissions capable of causing copper corrosion in the house; and (3) qualitative analysis of suspect drywall for its ability to cause corrosion/blackening of copper under controlled conditions indicating drywall samples from the house emit gasses capable of corroding copper. *Id.* The Taishan drywall in the seven Virginia Plaintiff intervenors' homes meets at least one of the types of the confirmatory evidence criteria for the Florida Case Definition. P1.2025–0003, 0004 (Streit Supplemental Report laboratory results for elevated sulfur, $H_2S$, COS, and $CS_2$), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I p. 39(24)-p. 40 (5) (Streit Testimony); *see also* P1.2023–0011 (Streit Original Report), P1.1824–0001 (FRE 1006 Summary of Screening Data for Virginia Homes, "aging" tests showing blackening of copper strips in mason jars (chamber test)).

### 3. Battelle & International Standards Association Classifications Indicate the Corrosion Found in Plaintiff-intervenor Homes is Severe

The Plaintiff intervenors' homes demonstrate levels of corrosion found in the most severe industrial corrosive environment. Trial Transcript at 2/19 Vol. II p. 112(9–15) (Scully Testimony). P.2.0195–0026, 0065, 0066 (Abbott, 1993, MTI # 38), Trial Transcript at 2/19 Vol. II p. 92 (11–18), p. 83 (8–14) (Scully Testimony); *see also* P.2.0228–0012 (p. 360) (Sinclair text), P.2.0245–0003 (Abbott 1988). According to the Battelle Classification scheme, the recognized standard for measuring corrosivity of environments, there are four Classifications ranging from benign to severe industrial. *Id.* The Classifications are characterized as I (benign), II (mild), III (moderately severe), and IV (severe industrial). *Id.* The International Standards Association (ISA) has developed a parallel corrosivity classification scheme. P.1.0176–0003, 0014, Trial Transcript at 2/19 Vol. II p. 91(12–15) (Scully Testimony). Additionally, the corrosivity classification schemes established by standard-setting organizations such as International Standards Organization (ISO) mirror the Battelle and the ISA standards. P.1.1836–0001, (ISO 11844 Corrosivity Standard), P.1.0091 (IEC 654–4 Corrosivity Standard), Trial Transcript at 2/19 Vol. II p. 112 (6–15) (Scully Testimony).

The Battelle Classification Scheme for Corrosive Environments establishes qualitative and quantitative criteria to be used to classify environments. P.2.0195–0017, 0026, 0065, 0066 (Abbott 1993, MTI # 38), P.2.0228–0012 (Sinclair text), Trial Transcript at 2/19 Vol. II p. 91(6–15) (Scully Testimony). These criteria are discussed in turn.

#### a. Qualitative Criteria for Corrosivity

The qualitative criteria for Battelle Corrosivity Classifications schemes are as follows:

a. No significant corrosion observed, well-controlled environment;

**\*668** b. Pore corrosion mechanism begins, operating reliability affected, unprotected copper contains oxide and chloride;

c. Moderately severe environment, associated with industrial operation, pore corrosion and creep,

corrosion product on unprotected copper rich in sulfide and oxide; and

d. Severe industrial environment, corrosion mechanism dominated by creep, corrosion product on copper primarily a sulfide. P.2.0195–0026, 0065, 0066 (Abbott 1993, MTI # 38), P.2.0228–0012 (Sinclair text), Trial Transcript at 2/19 Vol. II p. 91(5)-94(4) (Scully Testimony).

The wires and HVAC coils that were removed from the Plaintiff-intervenor homes were shown in the laboratory to have a corrosion product that is primarily copper sulfide and/or rich in sulfide. P.2.0195–0066 (Abbott 1993, MTI # 38), P.2.0228–0012 (Sinclair text), P.1.2001–0019, 0026, 0036, 0040, 0042, 0043, 0044, 0045, 0046, P.1.2002–0007 (CTL/Krantz Original and Supplemental Reports), P.1.2021–0008, 0010, 0011, 0012, 0013, 0017, 0018, 0027, 0029, 0031, 0033, 0035, P.1.2022–0020, 0021, 0022, 0023, 0024, 0025, 0030, 0031, (Scully Original and Supplemental Reports), Trial Transcript at 2/19 Vol. II p. 1 11(18–22) (Scully Testimony). The wires and HVAC coils that were removed from the Plaintiff intervenors' homes demonstrated both pore corrosion and creep corrosion. P.1.2022–0006, 0007, 0008 (Scully Supplemental Report), Trial Transcript at 2/19 Vol. II p. 51 (3–19) (Scully Testimony). Based solely on these qualitative Battelle corrosivity criteria, the homes of the Plaintiff intervenors are classified as severe industrial corrosive environments. Trial Transcript at 2/19 Vol. II p. 83(8–14), p. 112(3–8) (Scully Testimony). Sandia National Laboratories (SNL) also established that wires taken from Chinese Drywall (CDW) in Virginia, Florida, and Louisiana homes in the SNL study demonstrated a corrosion product rich in copper sulfide, pore corrosion and creep corrosion, and classified the CDW environments from which the wires were taken to be severely corrosive. P.1.0060–0050, 0057, 0063 (CPSC/Sandia Report), Trial Transcript at 2/19 Vol. II p. 80(2)-p. 81(17), p. 82(24)-p. 83(14), p. 94 (7–20) (Scully Testimony).

#### b. Quantitative Criteria for Corrosivity

The Battelle Corrosivity Classifications, as well as ISA and the other corrosivity standards, also have quantitative criteria for the levels of corrosive environments. The qualitative criteria are based on corrosion product thickness measurements, measured in angstroms, units

used to measure electromagnetic radiation equal to one ten-billionth of a meter, or microns, linear measurements equivalent to one-millionth of a meter. The Battelle qualitative thickness criteria are as follows:

    a. < 300 angstroms for 30 days (< .03 microns)

    b. 300–1000 angstroms for first year (.03–.1 microns)

    c. 1000–4000 angstroms for first year (.1–.4 microns)

    a. > 4000 angstroms for first year (> .4 microns)

P2. 0195–0026, 0065, 0066 (Abbott, 1993 MTI # 38), P2.0228–0012 (Sinclair text), Trial Transcript at 2/19 Vol. II p. 92(11)-p. 93(14) (Scully Testimony).

The wires that were removed from the Plaintiff intervenors' homes demonstrated corrosion product thicknesses far above the severe industrial corrosivity environment 4000 angstroms threshold, adjusted to a 3 year thickness (Virginia Plaintiff intervenor homeowners resided in the homes approximately 3 years). P1.2053–0001 (Examples of Virginia Components Exceeding Three Year Battelle Standard), **669** Trial Transcript at 2/19 Vol. II p. 82(24)-p. 83(14) (Scully Testimony). The measured corrosion thicknesses on the wires from the Virginia homes meet the Battelle Classification IV quantitative criteria for a severely industrial corrosive environment based on either a "linear growth law" or a "Parabolic growth law." P1.2053–0001 (Examples of Virginia Components Exceeding Three Year Battelle Standard), Trial Transcript at 2/19 Vol. II p. 97(5)-p. 98(10), p. 99(11–15) (Scully Testimony). Corrosion product thickness measurements on wires from the Virginia homes that meet the quantitative criteria for Battelle Corrosive Classification IV (severe industrial) were also documented by measurements on wires from CDW homes by the Sandia National Laboratory and by three other laboratories performing expert work in this case. P1.0060–0013, 0050, 0055, 0057, 0063 (CPSC/Sandia Report), P1.2002–0007 (CTL/Krantz Laboratory), P1.2022–0009, 0010 (Scully, UVa.Laboratory), P1.2018–0010, 0011, 0012 (SGH/Rutila laboratory), Trial Transcript at 2/19 Vol. II p. 110(14)-p. 111(10) (Scully Testimony). Thus, the bottom line is that the Plaintiff intervenors' homes demonstrate a Battelle classification for corrosivity which is a "severe industrial" environment, whether one applies the qualitative or the quantitative Battelle corrosivity criteria to corroded wires and corroded HVAC samples

taken from these homes. Trial Transcript at 2/19 Vol. II p. 112(3–15)(Scully Testimony).

### 4. Peer-reviewed Literature & Expert Opinion Consensus

The application of Battelle, ISA, and other corrosive environment criteria to real world components is demonstrated in the peer-reviewed literature. P1.2051–0001, 0002 (Literature re Corrosion Real World Components), P2.0223–0003 (Abbott 1991), P2.0222–0006 (Abbott Review Flowing Mixed Gases), P2.0229–0003, 0004, 0005, 0008 (Comizolli, 1992), Trial Transcript at 2/19 Vol. II p. 92(18–25), p. 159(23)-p. 160(2) (Scully Testimony). The application of Battelle, ISA, and other corrosive environment criteria to real world components is demonstrated in industry standards for corrosivity such as the International Society of Corrosion Engineers (NACE) Standard Recommended Practice Preparation, Installation, Analysis, and Interpretation of Corrosion Coupons in Oilfield Operations. P1.1853–0004 (NACE Standard). The application of Battelle, ISA, and other corrosive environment criteria to real world components is also demonstrated by the Chinese Drywall Investigation performed by Sandia National Laboratories as documented in the CPSC/Sandia "Interim Report on the Status of Electrical Components Installed in Homes with Chinese Drywall." P1.060–0050, 0057 (CPSC/Sandia Report), Trial Transcript at 2/19 Vol. II p. 82(24)-p. 83(12), p. 99(7–15)(Scully Testimony). The application of Battelle, ISA, and other corrosive environment criteria to real world components is supported by the expert opinion of Dr. John Scully, a leader in the field of corrosion science in the academic, military, and publishing arenas, as well as by other leaders in the field. P1.2022–0009, 0009, 0010 (Original and Supplemental Reports of John Scully), P1.2052–0001, 0002 (List of Individuals Contacted by John Scully regarding Measurements on Real Components and use of Standards), Trial Transcript at 2/19 Vol. II p. 39(15–25), p. 40(1–8), p. 41(5)-p. 42(14), p. 112(3–8) (Scully Testimony).

Based on the Battelle corrosivity criteria, corrosion scientists have established a "failure threshold" to predict electrical and electronic failures based on measuring corrosion product thicknesses on real world components or copper reactivity coupons standardized to a given period of time that the copper is exposed to the corrosive environment. The standard failure **670** threshold is 1000 angstroms (.1 micron) for the first year of exposure,

or 300 angstroms (.3 micron) for 30 days of exposure. P2.0195–0017, 0026, 0028, 0065, 0066 (Abbott 1993 MTI # 38), P1. 0176–0014 (ISA Standard 71.04), Trial Transcript at 2/19 Vol. II p. 92 (11–23), p. 94 (24)-p. 95(5), p. 103(5–10), p. 111 (3–10) (Scully Testimony). The components at issue in this case that were taken from Virginia homes and analyzed in the laboratory do exceed the recognized 1000 angstroms (.1 micron) failure threshold standard for the first year of exposure by many multiples and even by orders of magnitude in some cases. P1.2053–0001 (Examples of Virginia Components with Thicknesses Over Failure Threshold), P1.2022–0009, 0010 (Scully Supplemental Report), P1.2002–0007 (CTL/Krantz Supplemental Report), P1.2018–0009, 0010, 0011, 0012 SGH/Rutila Supplemental Report), Trial Transcript at 2/19 Vol. II p. 98 (11)-p. 99(15), p. 104(3–14), p. 110(16)-p. 112(8)(Scully Testimony). Thus, premature failures are predicted by Dr. John Scully. *Id.*

As set forth in the peer-reviewed literature, consensus standards, the opinion of several experts in the field, and the expert opinion of Dr. John Scully, the use of real world components under real world exposure conditions and durations of exposure provide more comprehensive and accurate information than the use of copper reactivity coupons, particularly if the coupons are deployed for short periods (such as less than one year). P1.1843–0001 (ASTM Standard for Corrosion Tests), recommend exposures over one year to account for seasonal variation and other variables), P2.0236–0001 (Perkins, Corrosion Manual), P2.0205–0009 (Tran 2003), P1.2051–0001, 0002 (Literature Regarding Corrosion Assessment of Real Components), P1.2052 (List of Individuals Contacted regarding use of Real Components), Trial Transcript at 2/19 Vol. II p. 108(17–25) (Scully Testimony). Nevertheless, the use of copper reactivity coupons may provide useful corrosion information, particularly when the real world components are not available for testing. P2.0228–0001 (Sinclair, Corrosion Manual), P2.0236–0001 (Perkins, Corrosion Manual). The limitations of copper reactivity coupons are that they tend to underestimate corrosion thicknesses particularly when deployed for short durations of time. P2.0247–0002 (Dean, Corrosion Text), P1.1843–0001 (ASTM Standard for Corrosion Tests), P2.0205–0009 (Tran 2003). Nevertheless, even with the limitations described above, the use of copper reactivity coupons in CDW homes produces data which also predicts premature electrical and electronic failures. The prediction of failure of

electronic and electrical components (standardized to one year) in Florida and Louisiana CDW homes is also confirmed by the Knauf expert, Dr. Sandy Sharp, based on Dr. Sharp's copper reactivity coupon data from MeadWestVaco (MWV) and Dr. Sharp's own published industrial electrical and electronic equipment corrosion failure threshold. P1.2056–0001 (FRE 1006 Florida, Louisiana, and Virginia Coupon Data), Deposition of Sandy Sharp (2/5/10) at 2/22 Vol. II p. 39(17)-p. 40(1), p. 40(7–9), p. 42(5–14) (Sharp Testimony), Trial Transcript at 2/19 Vol. II p. 102(15)-p. 03(10) (Scully Testimony). The CPSC also utilized copper reactivity coupons in the 51 Home Study and this process revealed that the corrosion thickness measurements on these coupons from CDW homes in Virginia, Florida, and Louisiana exceed the 300 angstrom failure threshold for 30 days and also predicted premature failures. P1.0019–0084, 0085, 0086, 0129 (CPSC 51 Home Study), Trial Transcript at 2/19 Vol. II p. 111(3–10) (Scully Testimony). Thus, based on measuring the thickness of the corrosion product on real world components in four different laboratories (Sandia, Scully/U Va, CTL/Krantz, and **\*671** SGH/Rutila), and on copper reactivity coupons in two different laboratories (MWV and CPSC); these six different laboratories predict premature electrical and electronic failures in CDW homes due to the corrosivity of the environment produced by Chinese drywall. P1.2022–0009, 0010 (Supplemental Scully Report), Trial Transcript at 2/19 Vol. II p. 10(10)-p. 112(15), p. 100(23)-p. 101(16), p. 104(3–14) (Scully Testimony).

In summary, by any recognized standard, high levels of corrosive gases are present in the representative homes. This condition is clearly irritating and harmful to residents and destructive to property. It has to be remediated. The challenge for the Court is to determine the scope of this remediation.

**E. SCOPE OF REMEDIATION**
The evidence supports the conclusion that the appropriate remediation for the Plaintiff-intervenor homes includes the removal of all drywall, all electrical wiring, the entire HVAC system, and many other items such as appliances, carpet, cabinetry, trim work and flooring. P1.1888–0003 (Beazer Scope of Remediation), P1.2058–0001 (Wright Scope of Remediation), Trial Transcript at 2/19 Vol. I at 77(4)-84(24) (Phillips Testimony), Trial Transcript at 2/22 Vol. I p. 98(13–21), 99(16–22) (Rutila Testimony), Trial Transcript at 2/22 Vol. II p. 28(10–13) (Rutila

Testimony). The scope of this remediation is supported by both the scientific and practical evidence presented. Trial Transcript at 2/22 Vol. II p. 28(10–13) (Rutila Testimony), p. 69 (2–10) (Wright Testimony).

The scientific evidence demonstrated that corrosion has damaged most components that contain copper or silver. P1.2016–0109 (SGH Original Report), Trial Transcript at 2/22 Vol. II p. 28(4–6), (10–13) (Rutila Testimony). The practical evidence demonstrated that selective removal of only CDW is not feasible or cost-effective in this case. Trial Transcript 2/19 Vol. I p. 75 (10–25) (Phillips Testimony). The practical evidence further revealed that attempting to gently remove, store or clean or protect carpet, cabinetry or flooring is not feasible or cost-effective. P1.2050–0003 (Summaries of Cost Estimates), Trial Transcript at 2/19 Vol. I p. 79 (1–13) (carpets), p. 77(18–20) (cabinets), p. 86(2–19) (wood floors) (Phillips Testimony). The practical evidence also indicates that items such as trim work and base boards will likely be ruined or extensively damaged when the drywall is removed. P1.2016–0087 (SGH Original Report), Trial Transcript 2/19 Vol. I p. 87(2–6) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 91(13–16) (Wright Testimony). The Court will now discuss the details of and justification for the scope of this remediation.

### 1. All Drywall in the Plaintiff-intervenor Homes Needs to be Removed & Replaced

As indicated above, the Chinese drywall in the Plaintiff-intervenors' homes emits a foul odor, irritates the human body, and emits sulfur gases which corrode copper and silver, metals of which most electronic and mechanical objects are made, thus reducing these objects life span and posing a fire risk and making the homes hard, if not impossible, to live in. Accordingly, all Chinese drywall must be removed from the Plaintiff-intervenors' homes. There seems to be little or no dispute on this issue. There is dispute, however, over the scope of remediation where the home contains both Chinese drywall and non-Chinese drywall. The issue is whether all drywall should be removed or only the problematic drywall in this case. The overwhelming evidence reveals that in such mixed structures it is necessary to remove all the drywall, both Chinese and other, for the following reasons.

*672 *a. Drywall sales and delivery records, where available, lack the reliability and precision necessary to locate all of the Chinese drywall in a mixed drywall home.*

During the construction phase of the Intervenors' homes, available sales records from Venture Supply, Inc., showed that between 45 and 212 sheets of CDW were delivered to each of these homes. P1.2016–0017, 0018 (SGH/Rutila Original Report), Trial Transcript at 2/22 Vol. I p. 5(5–9)(Michaux Testimony), Trial Transcript at 2/22 Vol. II p. 17(5–9)(Rutila Testimony), 2/22 Vol. II p. 53(14–17) (Orlando Testimony). Trial Transcript at 2/19 Vol. I p. 22(11–13)(Opening Statement). In some, but not all cases, additional "stacking" records were provided, indicating the number of domestic boards as opposed to CDW which were placed on a given Plaintiff-intervenors' floor. Trial Transcript at 2/22 Vol. II p. 19(10–18) (Rutila Testimony). In the home with the second least number of boards (45 boards in the Michaux home according to these Venture records), Chinese drywall was found to be scattered among all three floors of the home. Trial Transcript at 2/22 Vol. I p. 5(5–9), p. 12(24)-p. 13(6) (Rutila Testimony). Trial Transcript at 2/22 Vol. I p. 5(5–9)(Michaux Testimony). In another Intervenor family's home (Baldwin), the stacking records indicated 77 sheets were placed only on the first floor of the home. The second floor air conditioning zone of the Baldwin home, which is fed by air wholly from this floor, has suffered copper sulfide corrosion from gases released by CDW. Trial Transcript at 2/22 Vol. II p. 20(6–15) (21–24)-p. 21(3) (Rutila Testimony). The second floor of the house also has light switches which have suffered silver sulfide corrosion from gases released by CDW. P1.2049–0008 to –0011 (SGH analysis of Baldwin light switches showing silver sulfide corrosion) P3.0636–0001 (Schematic of second floor, with sample locations), Trial Transcript at 2/22 Vol. II p. 20(6–15), p. 22(3–15)(Rutila Testimony). The experts retained by Knauf documented second floor switches and outlets that had suffered visible copper sulfide corrosion. P1.2003–3686 (Floor plan with corrosion locations), Trial Transcript at 2/22 Vol. II p. 24(1–18)(Rutila Testimony). In a home with identical "stacking" records, testing by SGH has demonstrated that CDW has been scattered among domestic board on the second floor of a home that was supposed to be, according to the records, CDW free. P1.1870–0001–018 and 027, P1.2062–001 and 002 (Nguyen Venture and Porter Blaine records, photographs of Venture label cut from second floor), Trial Transcript

at 2/22 Vol. II p. 26(21)-p. (27)(15)(Rutila Testimony). Accordingly, the Court finds that these records were not sufficiently reliable to conclude that the second floor of the home did not contain CDW. P1.2028–0047 and 0048 (Venture and Porter records), Trial Transcript at 2/22 Vol. II p. 17(5–13) (Rutila Testimony).

*b. The Knauf proposed method, or combination of methods, for selective drywall identification do not rise above the level of experimental, and lack the scientific reliability necessary to conduct a board-by-board removal system at the present time.*

Experts retained by Knauf suggested that using a combination of screening tools (including XRF and the subjective color coding of wires) eliminated the need to remove all drywall in a home with mixed sources of drywall. For the reasons set forth in the Court's Order of February 18, 2010, granting the PSC's Daubert motion in part, the Court finds that handheld XRF is unreliable for the purpose of identifying CDW on a board-by-board basis. The Court similarly finds that the observation of corrosion on electrical and mechanical **\*673** systems in homes informs the determination of whether the home, as a whole, suffers from corrosive attack associated with CDW as reflected in the screening definitions for Florida and CPSC set forth, supra. P1.1841–0001–0004 (FLA Case Definition), P1.1844–0001(CPSC Guidance Problem Drywall), Trial Transcript at 2/19 Vol. II p. 8(1–24) (Smith Testimony), Trial Transcript at 2/22 Vol. II p. 4 (22)-p. 7 (5)(Rutila Testimony). Despite the utility of these methods for home characterization, they lack the precision and accuracy necessary to conduct individual board identification as evidenced by the decision by Florida and the CPSC to eliminate this method from any confirmatory testing. Trial Transcript at 2/22 Vol. II p. 7(18)-p. 8(17)(Rutila Testimony). PSC expert Dean Rutila explained six reasons why observation of corrosion on a wire is not a reliable tool to be used for the purpose of selective identification and removal of CDW. The six reasons are: (1) CPSC and FDOH have determined that it is a screening tool, not a tool for CDW board by board identification; (2) no governmental or peer-reviewed endorsement exists for board by board identification; (3) it is an incorrect assumption that effects of corrosive CDW are only very localized-these gases actually disburse throughout the house; (4) there are no available receptacles next to many boards in house, e.g.,

"scarce" in ceilings; (5) it is impractical to determine where one drywall board stops and next one starts; and (6) there is no guarantee that all CDW contamination can be removed or certify the same to code officials. Trial Transcript at 2/22 Vol. II p. 9(9)-p. 10(2) (Rutila Testimony). Defendant Knauf provided expert reports extensively reporting on the visible corrosion of wires as well as findings from their field use of XRF. The Court finds that this method, like the handheld XRF gun, also produced "false negatives," e.g., concluding that ceilings and rooms within homes were CDW-free, when subsequent testing of the homes demonstrates CDW labels and follow-up laboratory testing confirmed that the board was Chinese and was releasing corrosive gases. P1.1851–0003 to 0005, 0029 to 0051 (Streit Supplemental Data, ICP and sulfur offgas studies show Orlando and Baldwin boards deemed not CDW, are in fact CDW and do offgas at excessive levels), Trial Transcript at 2/22 Vol. II p. 34 (8–25) (Baldwin Testimony), Trial Transcript at 2/22 Vol. II. p. 58(17)-p. 59(10) (Orlando Testimony). The intervenor homes have suffered corrosive attack and, in order to make the plaintiff whole, any system that lacks the ability to definitely identify the offensive drywall is unacceptable and rejected by this Court. The regulatory and scientific record demonstrates that removing all drywall from a mixed drywall home is the only method that ensures this goal is obtained.

*c. Removal of all drywall in a mixed home is efficient and cost effective*

Large Florida homebuilders with extensive experience in CDW remediation have determined that removal of all drywall in affected homes is efficient and cost-effective, and that attempted selective identification and removal of CDW is neither efficient nor cost-effective. P1.1888–0001 to 0016 (Beazer scope of work, authorization), Trial Transcript at 2/19 Vol. I p. 75 (10)-p. 76 (2)(Phillips Testimony), Trial Transcript at 2/22 Vol. I p. 98(13–21), p. 99(6–15)(Rutila Testimony). The Court finds that removal of all drywall from a CDW home has been demonstrated repeatedly to be an efficient method of repair. Trial Transcript at 2/19 Vol. I p. 74(74–75), p. 76(1–3), p. 88 (11–14), p. 93(5–11)(Phillips Testimony), Trial Transcript 2/19 Vol. II p. 17 (14–19)(Smith Testimony). In testimony from homebuilders in Florida, coupled with photographic and **\*674** videographic evidence, the Court finds that a home can be stripped of all drywall in a

matter of hours. Trial Transcript at 2/19 Vol. II p. 16 (25)-p. 17(7)(Smith Testimony), Trial Transcript at 2/19 Vol. I p. 93 (5–11) (Phillips Testimony). For complete drywall removal, the removal process does not call for highly-skilled workers and removes drywall from the home rapidly and efficiently. Trial Transcript at 2/19 Vol. II p. 17(14–19) (Smith Testimony), Trial Transcript at 2/19 Vol. I p. 93 (5–11)(Phillips Testimony). In contrast, for attempted selective drywall removal, assuming that boards could be accurately identified (which the Court rejects), CDW would have to be "surgically excised" from a mixed CDW home, followed by the installation of new board in its place. The record shows this is neither practical nor cost-efficient. Trial Transcript at 2/19 Vol. I p. 98(1–16)(Phillips Testimony), Trial Transcript at 2/19 Vol. II p. 17(20)-p. 18(7)(Smith Testimony). The Court finds that selective removal of drywall, with the corresponding need to patch the borders between old and new board, is time-consuming and requires a highly-skilled drywall installer to attempt to conceal the patch. Beazer Homes projected that to do this type of patchwork would require a four-to five-fold increase in cost per square foot, which estimate matched the estimate for such patch work provided by the experts retained by the PSC. Trial Transcript at 2/19 Vol. I p. 95 (6–17), p. 98 (1–6) (Phillips Testimony), Trial Transcript at 2/19 Vol. II p. 17 (8–13)(Smith Testimony). The Court also finds that walls with certain types of finish applied are extremely difficult to repair as it is not possible to "feather" the finish. Repairs of this sort will not restore the home to its original condition. Trial Transcript at 2/19 Vol. I p. 98 (1–16)(Phillips Testimony), Trial Transcript at 2/19 Vol. II p. 17(20)-p. 18(7)(Smith Testimony).

*d. It is not practical or economical to detect, selectively remove, and replace individual boards of Chinese drywall*

Impacted homes were frequently built with a mixture of Chinese drywall and domestic drywall. P1.2016–0017, 0018 (Original Wright Report, summary of delivery records), P1.2016–0017, 0018 (SGH/Rutila Original Report, number of boards on delivery records) Trial Transcript at 2/19 Vol. I p. 67 (2–14) (Phillips Testimony). The 4′ x 12′ Chinese drywall boards manufactured by Taishan were cut to fit a myriad of locations around these homes, resulting in sections of boards divided and installed as needed to fit the specific room. Trial Transcript at 2/19 Vol. I p. 92(25)-p. 93(4)(Phillips

Testimony), Trial Transcript at 2/19 Vol. II p 12 (3–13) (Smith Testimony), P1.2050–0007, 0008, 0009 (Drywall layout diagrams by Ron Wright). Trial Transcript at 2/22 Vol. II p. 74 (1–9) (Wright Testimony). The Court received evidence of a typical home drywall installation that included a closet with many small pieces of drywall segments and a ceiling with 11 segments of drywall. Trial Transcript at 2/19 Vol. I p. 15 (6–9)(Opening Statement), Trial Transcript at 2/19 Vol. II p. 14(1–5) (Smith Testimony). P1.2050–0007, 0008, 0009 (Drywall layout diagrams by Ron Wright). In rooms with ceilings greater than 8 feet in height, drywall installers frequently install a narrow band of drywall to make up the distance between two horizontal boards (8#) and the ceiling. Trial Transcript at 2/19 Vol. I p. 26 (2–5)(Opening Statement), Trial Transcript at 2/19 Vol. II p. 30 (20–24)(Smith Testimony). P1.1803–0121, 0122 (Photos of Ron Wright holding sections of drywall at Beazer home). As a large drywall board is cut to fit a given area, the remaining portion of the board is set aside for use in an area of the home that requires a similarly sized board. In this way, a single board will frequently be cut **\*675** into segments that are within a room, a floor, and a home. Trial Transcript at 2/19 Vol. I p. 26(25)-p. 27(7)(Opening Statement), Trial Transcript at 2/19 Vol. II p. 12(14–22) (Smith Testimony). P1.2050–0007, 0008, 0009 (Drywall layout diagrams by Ron Wright). Once installed, the finishing process for drywall, which includes taping and multiple layers of drywall finish followed by sanding and painting, renders the demarcation between drywall segments almost impossible and certainly impractical to detect. Trial Transcript at 2/19 Vol. II p. 75(16–21), p. 92 (2–16)(Phillips Testimony), Trial Transcript at 2/19 Vol. II p. 12(23)-p. 13(2)(Smith Testimony). P1.1803–0121, 0122 (Photos of Ron Wright holding sections of drywall at Beazer home). Additionally, many of the drywall boards are placed behind kitchen cabinets, bathroom vanities, appliances, mechanical equipment, and other objects that further conceal their location. Trial Transcript at 2/19 Vol. I p. 85(12–23)(Phillips Testimony), 2/22 Vol. II p. 90(1–15) (Wright Testimony).

## 2. All Electrical Wires in the Plaintiff-intervenor Homes Need to be Replaced

*a. Scientific Reasons*

The electrical systems of the seven homes include copper low voltage wires which carry current to smoke detectors, fire alarms, and thermostats, among other devices. Trial Transcript at 2/22 Vol. I, p. 98 (16–21) (Rutila Testimony). The homes also have copper high voltage electrical wires which carry current between electrical components such as circuit breakers, receptacles, and switches. Trial Transcript at 2/19 Vol. II, p. 25(19–24) (Smith Testimony). Corrosive gases emitted from Chinese drywall cause significant damage to copper high and low voltage wires as a result of the buildup of thick films or corrosion product. P1.0060–0011, (CPSC/Sandia Report).

CDW also causes pitting to occur on wires as was demonstrated by the Sandia National Laboratories. P1.0060–0011, 0063 (CPSC/Sandia Report). Pits in the wires from the Plaintiff intervenors' homes ranged from 10 microns to 29 microns in depth. P1.2002–0007 (CTL/ Krantz Supplemental Report), P1.1808–0001 (ASTM Pitting Evaluation Standard), Trial Transcript at 2/19 Vol. II p. 83(5–7)(Scully Testimony). It is highly probable that there exist in the Plaintiff intervenors' homes corroded wires with a distribution of pit sizes, some of which would be larger than the deepest pit measured by CDW investigators. P1.1808–0001 (ASTM Pitting Evaluation Standard), P1.1806–0001, 0002 (ASTM Standard on Statistics and Corrosion), Trial Transcript at 2/19 Vol. II p. 68(14–15) (Scully Testimony). This further confirms the corrosion is due to the exposure to Chinese drywall.

In failure analysis, where the concern is the "weakest link" because the goal is to prevent failures and protect against life safety issues connected to failures (i.e., corrosion increases resistance which increase heat and generates a fire risk), one must focus on the most vulnerable components. P1.0195–0017, 0028 (Abbott 1993, MTI # 38), Trial Transcript at 2/19 Vol. II p. 69(3–13) (Scully Testimony), Trial Transcript at 2/19 Vol. II p. 159(9–22) (Galler Testimony), Deposition of Jonathan R. Barnett (2/12/10) at p. 46(12–23). For example, in failure analysis of a copper tube, it is important not only to look at average thickness of the copper material to determine if a leak is possible, but more importantly to look at the weakest link in the tube. *Id.* Thus, the maximum corrosion thickness and the maximum pit depth are important considerations in failure analysis. *Id.* Wires from homes without CDW, namely the control homes, did not show the severe corrosion thicknesses associated with predicted failure, did not show thick **\*676** copper sulfide deposits,

and did not show severe pitting found on the wires from CDW homes. P1.2022–0045 (Scully Original Report), P2.2022–0041, 0042, 0048 (Supplemental Scully Report), Trial Transcript at 2/19 Vol. II p. 109(15–17) (Scully Testimony).

The insulation jackets on electrical wires do not adequately protect them from corrosive attack. P1.2001–0017 (Original CTL/Krantz Report), P1.2022–0053, 0058 (Supplemental Scully Report), Trial Transcript at 2/19 Vol. II p. 98(19)-p. 99(3) (Scully Testimony), Trial Transcript at 2/22 Vol. II p. 79(22)-p. 80(8) (Wright testimony), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I p. 64(7–23). Reactive sulfur gases permeate the sheathing and corrode wires from the inside out. *Id.* This penetration of wire insulation has been demonstrated in both "lamp cord" wires and under the jackets of Romex high voltage wire on the grounding wire which lacks its own insulation. P1.2022–0053, 0058 (Supplemental Scully Report) (evaluation lamp chord, BDM–5), P1.2001–0017 (Original CTL/Krantz Report) (evaluation of ground wire under Romex, BDM–39), Trial Transcript at 2/19 Vol. II p. 98(19)-p. 99(3) (Scully Testimony), Trial Transcript at 2/22 Vol. II p. 79(22)-p. 80(8) (Wright Testimony), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I p. 64(7–23) (Streit Testimony). The corrosive attack from CDW occurs even on insulated wires within the walls of the home. *See* P1.1981 (switch box from Beazer home). This was demonstrated on the marked wire attached to a light switch box taken from one of the Beazer homes. *Id.* The corrosive attack also occurs on lamp cords which are in the center of a room away from drywall sources. P1.2022–0053, 0058 (Scully Supplemental Report), Trial Transcript at 2/22 Vol. I p. 122(20)-p. 123(24) (Rutila Testimony).

The corrosive environments in these homes will result in premature failures of the electrical system according to the expert analysis of both PSC experts and at least one Knauf expert. P1.2001–0019, 0020, 0021 (CTL/Krantz Original Report, HVAC Coil Failure due to Corrosion), P3.0625–0001, 0002 (FRE 1006 Summary of HVAC Coil Failure Data), P1.2053–0001 (Virginia Corrosion Thicknesses Exceed Failure Standard), Trial Transcript at 2/19 Vol. II p. 55(24)-p. 156(17) (Galler Testimony), Trial Transcript at 2/19 Vol. II p. 100(17)-p. 101(16), p. 152(22)-p. 153(1) (Scully Testimony), Trial Transcript at 2/22 Vol. I p. 90(3–23) (Barnett Testimony proffer) (The PSC tenders Dr. Barnett, and the Court accepts him as, an expert in Engineering and Fire Safety. Trial Deposition of

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in F.Supp.2d (2010...

Case 2:09-md-02047-EEF-MBN Document 22862-781 Filed 11/19/19 Page 20 of 49 PageID# 849

Jonathan Barnett (2/12/10) at p. 11(14)-18(22), P1.2015–0019—P1.2015–0024 (Barnett Report, C.V.).

It is not feasible to clean the wires of corrosion product to render them free of risk of future failure. Trial Transcript at 2/19 Vol. II p. 84(3–11) (Scully testimony), Trial Transcript at 2/19 Vol. I p. 80(15–22) (Phillips testimony), Trial Transcript at 2/22 Vol. I p. 125(2–17) (Rutila testimony). To do this, one would have to remove the wire, remove the insulation on the wire, clean the wire, and reinstall the wire insulation. *Id.* Such a process is not only time consuming but needs special equipment and expertise. *Id.*

The Romex insulation utilized in Plaintiffs' homes was type NM which is not sufficient for corrosive environments. Trial Transcript at 2/22 Vol. I p. 124(3, 12–14, 20–21) (NM not suitable for corrosive environment) (Rutila Testimony), Trial Transcript at 2/22 Vol. I p. 125(18–23) (Wires must be removed once exposed) (Rutila Testimony, Trial Deposition of Jonathan R. Barnett (2/12/10) at p. 27(13–16), 38(15)-39(4). Engineering standards require the **\*677** replacement of wires which have been exposed to this environment. *Id.*

Building codes are drafted for life safety purposes and generally set a minimum level of safety. Trial Deposition of Jonathan Barnett (2/12/10) at p. 19(10)-20(19). A building code is usually prescriptive and not discretionary. Trial Deposition of Jonathan Barnett (2/12/10) at p. 19(10)-p. 20(19). Corrosion on active residential wiring is a violation of the national safety code as well as the safety and building codes of the various states. Trial Deposition of Jonathan Barnett (2/12/10) at p. 26(13)-p. 29(16), 38(5)-p. 38(18), p. 39(7)-p. 40(21), 43(9)-p. 43(24), p. 46(1)-48(18), p. 55(3)-p. 56(1), p. 120(4)-p. 122(10); P1.1807–0003, –0006 (Excerpt from Electrical Code); P1.1818–0001 (ASTM B–3);P1.1819–0003 (NFPA 921, Guide for Fire and Explosion Investigations, section 8.9.2.3 "Poor Connections");P2.0195–0027 (Abbott, Atmospheric Corrosion on Control Equipment, 1993); P2.0202–0004 (Chudnovsky, Corrosion of Electrical Conductors, 2008); P2.0234–0005 (Glowing Connections, Fire Technology Journal, Vol. I8, No. 4, 1982). The "corrosive residue" on, and "deterioration by corrosion" to, the wires are violations of electrical codes promulgated by Virginia. P1.1814–0003 (Integrity of Electrical Equipment), P1.1817–0003 (Integrity of Electrical Equipment), Trial Transcript at Trial

Transcript at 2/22 Vol. II p. 77(8–13) (Wright Testimony), Deposition of Jonathan R. Barnett (2/12/10) at p. 35(18–24)).

*b. Economic & Practical Reasons*

It is practical to remove the wiring while all the drywall is out of the home because of the ease of access to the cavities where the wiring is located. The replacement of the electrical wires, requires access to wall and ceiling cavities currently covered by drywall. Trial Transcript at 2/22 Vol. II p. 30(4–13) (Rutila Testimony), Trial Transcript at 2/22 Vol. II p. 79(9–16), p. 82(20)-p. 83(22) (Wright Testimony). The Court was presented evidence that the network of wires in the home, including low and high voltage, phone, cable, and other system wires, is extremely complex and dispersed throughout the ceilings and walls. *Id.* Electrical wires are stapled in place within the wall cavities pursuant to applicable building codes. Trial Transcript at 2/22 Vol. II p. 80 (11–14), p. 81(3–22), p. 82(13)-p. 83 (3) (Wright Testimony). These wires cannot be removed without gaining access to the wall cavity. *Id.* The evidence also demonstrates that replacement of all wiring is warranted because of practical cost considerations. P1.2050–003 (Summaries of Cost Estimates); Trial Transcript at 2/19 Vol. I pg. 79(22)-pg. 80(10), p. 81(1–6).

The Court finds that it both economical and practical to remove all the wiring while the drywall is gone, rather than removing only some of the wiring at this time and then risk later have to tear down the drywall again in the case that additional wiring exposed to the sulfur gases is harmed or fails. Additionally, the low-voltage wiring supporting life and safety devices such as fire alarms and smoke detectors should be removed and replaced because of the low cost of replacement when compared with the high risk of injury or death if these devices are not functioning properly.

### 3. All Copper Pipes in the Plaintiff-intervenor Homes Need to be Replaced

*a. Scientific Reasons*

Copper pipes are utilized to carry water and copper plumbing components form integral parts of the plumbing system, including risers (attached fixtures to delivery

lines), shower control devices, pressure regulators, and a variety of other applications. Trial Transcript at 2/22 Vol. I p. **678** 108(19–22) (Rutila Testimony). The corrosive gases responsible for destroying copper in wiring have also damaged the plumbing and mechanical copper components. P1.1848–0001, 0002 (Rutila Dew Point Analysis), P1.2016–0421, 0422, 0424 (SGH/Rutila Original Report), Trial Transcript at 2/22 Vol. I p. 108(19)-p. 109(2) (Rutila Testimony), Trial Transcript at 2/19 Vol. II. p. 81(25)-p. 83(14), p. 88(25)-p. 89(17) (Scully Testimony). This corrosion caused pitting which leaves corrosion product in the wall of the pipe. *Id.* From a scientific standpoint, under normal operating conditions, humidity and microscopic moisture on these pipes (or other copper surfaces such as coils or wire) will create the conditions for the deepening of these pits by the reactivation of the corrosion inside the pit, regardless of whether or not the defective drywall is removed. P2.0241–2804, 2805 (Jacobs 2000), P1.1836–0021 (ISO 11844–1 Corrosion Standard), P2.0228–0011 (Sinclair, Corrosion Manual), P2.0070–0006, 0010, 0015, 0016(Freeman 2009), Trial Transcript at 2/19 Vol. II p. 84(19)-p. 87(8) (Scully Testimony). The evidence supports the conclusion that copper pipes with significant corrosion and pits cannot be adequately "cleaned." Trial Transcript at 2/19 Vol. II p. 84(3–11) (Scully Testimony).

### b. Economic & Practical Reasons

The plumbing systems in homes are impossible to remove or replace in walls and ceilings when drywall is present. Trial Transcript at 2/19 Vol. II at p. 23(17)-p. 24(3) Smith Testimony, Trial Transcript at 2/22 Vol. II p. 90 (1–15) (Wright Testimony). Thus it is practical to remove the plumbing while all the drywall is out of the home because of the ease of access to the cavities where the plumbing is located. *Id.* Also from a practical standpoint, builders have rejected the prospect of "cleaning" the corrosion off of copper components, finding it is more cost-effective and less time-consuming to simply remove and replace them. Trial Transcript at 2/19 Vol. I p. 79(22)-p. 81(6) (Phillips Testimony).

### 4. The HVAC Units in the Plaintiff-intervenor Homes Need to be Replaced

### a. Scientific Reasons

Heating, ventilating, and air-conditioning ("HVAC") units contain both copper and silver components, all of which are corroded by the sulfur gases emitted by Chinese drywall. KPT experts agree that the HVAC systems in the seven (7) Plaintiff homes have been badly corroded by CDW. P1.2022–0009 (Scully Supplemental Report), Trial Transcript at 2/22 Vol. I p. 111 (12–16) (Rutila Testimony). For example, the air handlers of the HVAC systems of the Plaintiff-intervenor homes are corroding in multiple areas including the coils, circuit board, and contactor switch. P1.2018–0006 (SGH/Rutila Report), P4.0002–0054 (Galler Report), P1.2020–0028 to 0034 (Galler Original Report for Air Handling Contactor), Trial Transcript at 2/22 Vol. I p. 110 (6–21), p. 113 (7)-p. 114 (10) (Rutila Testimony), Trial Transcript at 2/19 Vol. II p. 146 (1–25), p. 153 (8)-p. 155 (5) (Galler Testimony).

The copper coils of HVAC systems are similarly failing because of the sulfur gas emitted from CDW. P1.2006–0016 (Bailey Report) (The PSC tenders Ronald Bailey, and the Court accepts him as an expert in Engineering and Indoor Air Quality, P1.2006–0001 (Original Bailey Report, C.V.), P1.2016–0078 (SGH Original Report) Trial Transcript at 2/22 Vol. I p. 111 (12–16) (Rutila Testimony). The coils are part of the air handler in the HVAC system. P1.2016–0067 (SGH Original Report), Trial Transcript at 2/22 Vol. I p. 104 (18–19), p. 110 (6–21) (Rutila Testimony). The sulfur gas from CDW causes a heavy black corrosion on HVAC coils. P1.2016–0077 (SGH **679** Original Report), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I p. 52 (6–10), p. 68 (25)-p. 69 (17) (Streit Testimony). The sulfur gas from CDW causes copper sulfide corrosion on HVAC coils. P1.2016–0077 (SGH Original Report), Trial Transcript at 2/19 Vol. II p. 61 (22–25) (Scully Testimony). The copper sulfide corrosion causes pitting in the HVAC coils. P1.2001–0018 to 0020 (CTL Original Report), Deposition of Lori Streit (2/16/10) at 2/19 Vol. II p. 65 (1–23), p. 66(1) (Streit Testimony). The copper sulfide corrosion in the pits of the HVAC coils will continue even after the CDW is removed and replaced. P1.2021–0013 (Scully Original Report), Trial Transcript at 2/19 Vol. II p. 85 (1–25), p. 86 (1–13) (Heischober Testimony). The corrosion caused by CDW causes the copper to develop a spongiform texture. Trial Transcript at 2/19 Vol. II p. 80 (11–25), p. 81 (1–20) (Scully Testimony); *see also* P1.060–0010

and 0011 (CPSC/Scandia Report discussing spongiform texture.). The corrosion caused by CDW has resulted in multiple failures of HVAC coils in Plaintiffs' homes. P3.0635 (RE 1006 Summary of HVAC Coil Failure Data), Trial Transcript at 2/22 Vol. I p. 111 (12–16) (Rutila Testimony).

By contrast the HVAC coils from control homes do not demonstrate corrosive attacks. P1.2016–0066 (SGH Original Report with photo of shiny HVAC copper tubes in control home), Trial Transcript at 2/19 Vol. I p. 111(23)- p. 112(2) (Scully Testimony), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I p. 47 (10–17) (Streit Testimony), Trial Transcript at 2/22 Vol. I p. 96(7–8), p. 111(16) (Rutila Testimony). The HVAC coils from control homes have no copper sulfide corrosion. P1.2016–0066 (SGH Original Report), P1.2018–0007 (SGH/Rutila Report), Trial Transcript at 2/19 Vol. II p. 154 (11–23)-p. 155 (2) (Galler Testimony), Trial Transcript at 2/22 Vol. I p. 96(7–8), p. 111(16) (Rutila Transcript), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I p. 47 (10–17) (Streit Testimony).

Additionally, the corrosion caused by CDW in the Virginia homes attacks the brazes that connect copper pipes. P1.2001–0019 (CTL Original Report), Trial Transcript at 2/22 Vol. I p. 108 (22–25), p. 109 (1–12) (Rutila Testimony), Trial Transcript at 2/22 Vol. I p. 111(4–8) (Rutila Testimony).

The circuit boards of the air handler are also corroding. P1.1866–0003 (Photo of corrosion on Morgan HVAC circuit board), Trial Transcript at 2/22 Vol. I p. 114 (11– 25), p. 115(1–5) (Rutila Testimony), Trial Transcript at 2/19 Vol. II p. 153 (8–25), p. 154 (1–25), p. 155(1–2) (Rutila Testimony). Corrosion on circuit boards increases resistance which leads to premature failure. P1.2020–0003 (Galler Original Report), Trial Transcript at 2/19 Vol. II, p. 89 (15–25), p. 90 (1–23) (Scully Testimony). The contactor switches of the air handler are also corroding. P1.2020–0028 to 0034 (Galler Original Report), Trial Transcript at 2/22 Vol. I p. 113 (10–25, p. 114 (1– 10) (Rutila Testimony), Trial Transcript at 2/19 Vol. II p. 146 (1–25) (Rutila Testimony). Corrosion on contactor switches increases resistance which leads to failure. P1.2020–0028 to 0034 (Galler Original Report), Trial Transcript at 2/19 Vol. II p. 130 (3–16) (Galler Testimony), Trial Transcript at 2/22 Vol. II p. 146 (21–25) (Galler Testimony).

Due to the corrosion in multiple areas of the air handler units in these homes, the entire unit must be replaced. P1.2016–0109 (SGH Original Report Conclusions), Trial Transcript at 2/22 Vol. II p. 87 (13–25), p. 88 (1– 11) (Wright Testimony). The air handler units of other national builders such as Beazer and Lennar exhibit similar problems and are being replaced. P1.1888–0003 (Beazer Scope of Work), P1.2016–0105 (SGH Original Report discussing **680** Lennar scope of repair), Trial Transcript at 2/22 Vol. I p. 116 (23–25). p. 117 (1–11) (Rutila Testimony).

The refrigerant that causes cooling in an HVAC system is circulated through a copper pipe called a "line set." P1.1848–0001 and 0002 (Rutila Analysis of Dew Point); Trial Transcript at 2/19 Vol. II p. 21 (7–10) (Smith Testimony), Trial Transcript at 2/22 Vol. I p. 104 (8– 14), p. 117(4–6) (Rutila Testimony). The line set pipe connects the interior air handling units to the outside compressor units. Trial Transcript at 2/19 Vol. II p. 21 (7– 10) (Smith Testimony), Trial Transcript at 2/22 Vol. I p. 104 (8–14), p. 116 (23–25), p. 117(1–6) (Rutila Testimony), Trial Transcript at 2/19 Vol. I p. 21 (11–15) (Morgan Testimony). The line set pipes run through the interior walls from the air handler unit until it exits the house to connect to the air compressor. Trial Transcript at 2/19 Vol. II p. 22 (21–25), p. 23 (1–16) (Smith Testimony). The line sets in these homes have a heavy black corrosion caused by CDW sulfur gasses. P1.1871–0002 and 0003 (CTL Supplement No. 2), Trial Transcript at 2/19 Vol. II p. 21 (20–25), p. 22 (1–3, 9–10) (Smith Testimony), Trial Transcript at 2/22 Vol. I p. 116 (9–16) (Rutila Testimony), Trial Transcript at 2/22 Vol. I p. 105 (8–17) (Rutila Testimony). When the temperature of any copper pipe, such as the line set, in a house drops below the "dew point," moisture will form and make the pipe particularly susceptible to the CDW sulfur gases. P1. 1848–0001 and 0002 (Rutila Analysis of Dew Point), Trial Transcript at 2/22 Vol. I p. 103 (6–16) (Rutila Testimony). Cross-sections of the line set pipe in these homes demonstrate deep pitting caused by CDW sulfur gasses. P1.1871–0002, 0003 (CTL Supplement No. 2), Trial Transcript at 2/19 Vol. II p. 64 (10–15) (Scully Testimony). The line set pipes of other national builders such as Beazer and Lennar exhibit similar problems and are being replaced. P1.1888– 0003 (Beazer Scope of Work), Trial Transcript at 2/22 Vol. I p. 116 (23–25), p. 117 (1–11) (Rutila Testimony), Trial Transcript at 2/19 Vol. I p. 77(2–4) (Streit Testimony). The

heavy corrosion to the line set pipes requires replacement. Trial Transcript at 2/22 Vol. II p. 23 (20–25) (Wright Testimony).

### b. Economic & Practical Reasons

The "line-sets" described above are installed in a home in one continuous piece from outside compressor to the air handler unit. Trial Transcript at 2/19 Vol. I p. 76 (8–16) (Phillips Testimony), Trial Transcript at 2/19 Vol. II p. 21 (7–10)(21–25), p. 22 (21)-p. 24(3) (Smith Testimony). For upstairs air handler units, these lines frequently run through interior walls and ceilings. *Id.* These lines are installed first, and wiring, insulation, and other equipment are installed over them, rendering them impossible to access for removal and replacement without first removing all drywall. *Id.* Replacement of the line set pipes requires removal of all drywall in those areas of the walls where the pipe runs. Trial Transcript at 2/19 Vol. II p. 23 (17–25), p. 24(1–3) (Smith Testimony). Accordingly, it makes sense to replace these items since they are suffering from corrosion and are most easily removed and replaced while the drywall is gone.

The outside compressors may need to be replaced in these homes, and should be evaluated on a case-by-case basis. P1.2006–0016 (Bailey Original Report), Trial Transcript at 2/22 Vol. II p. 88 (4–11) (Wright Testimony), Trial Transcript at 2/22 Vol. II p. 27 (4–25), p. 28 (1–13), p. 30 (4–23) (Rutila Testimony). The outside compressors demonstrate excessive wear from excessive operation. Trial Transcript at 2/22 Vol. I p. 116 (23–25), p. 117 (1–11) (Rutila Testimony), Trial Transcript at 2/22 Vol. II p. 30 (4–23) (Rutila Testimony). The excessive operation of the compressor **\*681** is caused by attempting to circulate coolant through a failed and corroded coil in the air handling unit. Trial Transcript at 2/22 Vol. I p. 98 (22–25), p. 99(1–4); p. 30 (4–23) (Rutila Testimony). The outside compressor may also need to be replaced to match the connections on new air handling units, and should be evaluated on a case-by-case basis. P1.2006–0016 (Bailey Original Report), Trial Transcript at 2/19 Vol. I p. 98 (22–25), p. 99(1–5), p. 117 (7–11) (Rutila Testimony), Trial Transcript at 2/22 Vol. II p. 88 (4–11) (Wright Testimony). The connections between the air handler and compressor have been altered due to changes in refrigerant regulations. P1.2006–0016 (Bailey Original Report).

The duct work that runs from and to the air handling unit must be replaced. P1.2006–0017 (Bailey Original Report), Trial Transcript at 2/19 Vol. I p. 77(25), p. 78 (1–11) (Phillips Transcript), Trial Transcript at 2/22 Vol. II p. 88 (21–23) (Wright Testimony). Particulate matter from the CDW is in the ductwork. PP1.2006–0017 (Bailey Original Report), Trial Transcript at 2/19 Vol. I, p. 78(3–5) (Phillips Testimony). The duct work cannot be adequately cleaned. P1.2006–0018 (Bailey Original Report), Trial Transcript at 2/19 Vol. I p. 78(6–9) (Phillips Testimony). The contractors for these homes could not obtain quotes to even attempt cleaning of the ductwork. P1.2050–0003 (Summaries of Cost Estimates), Trial Transcript at 2/19 Vol. I p. 47 (2–10) (Opening Statement). Even if attempts could be made at cleaning the ductwork, the cost of cleaning would be greater than simply replacing the ductwork. P1.2027–0023 (Wright Report), Trial Transcript at 2/19 Vol. I p. 77(25), p. 78(11) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 88 (12–23) (Wright Testimony). Other national builders like Beazer and Lennar are replacing the duct work. P1.1888–0003 (Beazer Scope of Work), Trial Transcript at 2/19 Vol. I p. 77(25), p. 78 (1–11) (Phillips Testimony).

### 5. Selective Electrical Devices & Appliances in the Plaintiff-intervenor Homes Need to be Replaced

### a. Scientific Reasons

Silver is a very conductive metal and is used in the electronic contacts in practically every device that carries electrical current. P1.2020–0004 (Galler Original Report), Trial Transcript at 2/19 Vol. II p. 128 (12–24) (Galler Testimony). For example, silver is present in circuit breakers, light switches, thermostats, computers, televisions, and generally "[a]nything that has a button." P1.2020–0004 (Galler Original Report), Trial Transcript at 2/19 Vol. II p. 128(13)-p. 129(8) (Galler Testimony). It is a preferred metal because it has good resistance to corrosion attacks from most sources. Trial Transcript at 2/19 Vol. II p. 157 (13–14) (Galler Testimony). However, like copper, its Achille's heel is sulfur. P1.2020–0004 (Galler Original Report), Trial Transcript at 2/19 Vol. II p. 157 (13–18) (Galler Testimony). Silver is readily corroded by sulfur. *Id.* When it is exposed to sulfur, silver sulfides are produced. Trial Transcript at 2/19 Vol. II p. 158 (6–10) (Galler Testimony); *see also* P2.0202 (Chudnovsky 2008).

**WESTLAW**   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

When a sulfide corrosion product exists, it dramatically increases resistance of electrical current through the connection. *See* Trial Transcript at 2/19 Vol. II p. 129 (20–24) (Galler Testimony); *see also* P2.0202–0001 (Chudnovsky 2008). This increased resistance can cause either complete failure or excessive heating of the connection when energized. *See* Trial Transcript at 2/19 Vol. II p. 129(25)-p. 130 (2) (Galler Testimony); *see also* P2.0202–0001 (Chudnovsky 2008). Complete failure and/ or excessive heat of a switch can lead to fires or other life safety problems, depending on **\*682** the intended function of the switch. Trial Transcript at 2/19 Vol. II p. 130 (3–14) (Galler Testimony). For example, a malfunctioning safety cut-off switch in a clothes dryer might cause a fire. *Id.*

Corrosion can also lead to premature failure of the electrical device or appliance. Trial Transcript at 2/19 Vol. II p. 130 (15–16); see also P2.0202–0001, et seq. (Chudnovsky 2008), P2.0195–0001, –0027, 0028 (Abbott, 1993 Fig. 1 (Effects of Film Thickness on Contact Resistance) and Fig 2. (Effects of Environmental Severity on Component Failure Mechanism)). The lifespan of devices with silver corrosion has been seriously diminished. Trial Transcript at 2/19 Vol. II p. 156 (10–13) (Galler Testimony). The silver corrosion found on the Plaintiffs' devices indicates that they were in a "Level III" or "Level IV" corrosive environment as measured on an objective corrosion scale. Trial Transcript at 2/19 Vol. II p. 160 (6–9) (Galler Testimony). Level IV is the worst. *Id.* In a Level III environment, equipment failure rates increase by a factor of 100. Trial Transcript at 2/19 Vol. II p. 160 (3–6) (Galler Testimony); see also P2.0195–0001, –0027, 0028 (Abbott, 1993, Fig. 1 (Effects of Film Thickness on Contact Resistance) and Fig 2. (Effects of Environmental Severity on Component Failure Mechanism)). The lifespan of devices with silver corrosion can be decreased to a tenth or a quarter of its normal lifespan. Trial Transcript at 2/19 Vol. II p. 156 (14–17) (Galler Testimony).

Most of the appliances and electronics located in the representative homes need to be replaced due to corrosion on metallic contact surfaces and on other metallic components. P1.2018–0012 (SGH/Rutila Report), Trial Transcript at 2/19 Vol. I p. 81 (18–25) (Phillips Testimony), Trial Transcript at 2/19 Vol. II at 156 (18–19) (Galler Testimony). As discussed above, the corrosion has damaged the copper wiring in the appliances and electronics. P1.2018–0006 (SGH/Rutila Report), Trial Transcript at 2/19 Vol. II p. 156(2–9) (Galler Testimony), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I p. 69 (11–17) (Streit Testimony). The corrosion also has damaged the silver contacts in the appliances and electronics. P1.2018–0006 (SGH/Rutila Report), Trial Transcript at 2/19 Vol. II p. 129 (16)-p. 130 (2), p. 141 (15–20) (Galler Testimony).

Refrigerators are particularly susceptible to damage from the sulfur gasses due to the cool copper lines and compressor which circulate refrigerant. P1.2018–0007 (SGH/Rutila Report). They are also particularly susceptible to damage from the sulfur gasses due to the high air flow caused by the compressor fan. P1.2018–0008 (SGH/Rutila Report), Trial Transcript at 2/19 Vol. II p. 19 (2–14) (Smith Testimony).

Electronic systems in the Plaintiff-intervenors' homes houses have failed. P1.2018–0014 (SGH/Rutila Report, Appendix 1, Summary of Failures), Trial Transcript at 2/22 Vol. II pp. 11(20)-12(5) (Rutila Testimony). Electronic systems in the Plaintiff intervenors' homes are damaged by the corrosion. P1.2020–0003 (Galler Report), Trial Transcript at 2/22 Vol. II p. 89 (15–20) (Wright Testimony), Trial Transcript at 2/19 Vol. II pp. 155(24)-156(9) (Galler Testimony). Electronic systems in the Plaintiff intervenors' homes are likely to fail before their normal and expected periods of use end. P1.2020–0003 (Galler Report), P1.2006–0018 (Bailey Report), Trial Transcript at 2/19 Vol. II p. 156 (10–17) (Galler Testimony). Examples of damaged or failed electronic systems include televisions, computers, and any other item with a circuit board. P1.2018–0014 (SGH/Rutila Report, Appendix 1, Summary of Failures), Trial Transcript at 2/19 Vol. II p. 12 (6–13) (Smith Testimony).

**\*683** *b. Economic & Practical Reasons*

Replacement of electronic devices and appliances damaged by sulfur gases emitted by Chinese drywall makes sense under practical cost considerations. P1.2050–0003 (Summaries of Cost Estimates); Trial Transcript at 2/19 Vol. I pg. 77. It is more cost effective to replace items such as smoke detectors, than to remove them from the home, transport them to and store them in a facility, and transport them back to the home. *Id.*

### 6. Whether Flooring Needs to be Replaced

#### a. Carpet Must be Replaced

The carpet in the houses cannot be adequately protected during the remediation process. P1.2027–022 (Wright Original Report), P1.2006–0015 and –0023 (Bailey Original Report), Trial Transcript at 2/19 Vol. I p. 79(4–6) (Phillips Testimony), Trial Transcript at 2/22 Vol. II. p. 92 (10–14) (Wright Testimony). Attempting to remove and store the carpet during the remediation is not cost-effective. P1.2027–022 (Wright Original Report), P1.2006–0015 and –0023 (Bailey Original Report), P1.2050 (Summaries of Cost Estimates), Trial Transcript at 2/19 Vol. I p. 79 (6–13) (Phillips Testimony). The evidence indicates that it would be cheaper to replace the carpet than attempt storage and reinstallation. P1.2027–022 (Wright Original Report), P1.2006–0015, 0023 (Bailey Original Report), Trial Transcript at 2/19 Vol. I p. 79 (11–13) (Phillips Testimony).

#### b. Hardwood or Vinyl Flooring Must be Replaced

The hardwood or vinyl flooring pose a challenge in some circumstances and in some climates. P1.2016–0089 (SGH Original Report), Trial Transcript at 2/19 Vol. I p. 86(7–8) (Phillips Testimony). The unconditioned air during the remediation process can damage hardwood floors. P1.2016–0089 (SGH Original Report), Trial Transcript at 2/19 Vol. I p. 86 (11–17) (Phillips Testimony). Dust generated during the remediation process will intrude into the cracks and crevices of the flooring and may require resanding and refinishing the floors. P1.2006–0015 (Bailey Original Report), Trial Transcript at 2/22 Vol. II p. 92 (10–14) (Wright Testimony), 2/19 Vol. I p. 78(2–5) (Phillips Testimony). In the representative cases, the evidence supports the conclusion that the hardwood or vinyl flooring must be replaced as part of the remediation. P1.2058–001 (Wright Scope of Remediation), Trial Transcript at 2/19 Vol. I p. 86 (11–19) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 92 (10–16) (Wright Testimony).

#### c. Tile Flooring May Need to be Replaced

The evidence shows that tile flooring may be properly protected during the remediation process, and if this can be done, the Court finds that it does not need to be removed and replaced. In the case if the tile flooring is damaged, then it should be removed and replaced. Additionally, tile that is affixed to the drywall will be ruined during the drywall removal and should be replaced. 2/19 Vol. I, p. 82 (18–21) (Phillips Testimony).

### 7. Items Which Must be Removed With the Drywall May Need to be Replaced

#### a. Cabinets Must be Replaced

The cabinets in the houses must be removed to gain access to the drywall. P1.2016–0088 (SGH Original Report), Trial Transcript at 2/19 Vol. I p. 91 (10–16) (Phillips Testimony). The testimony reveals that it would not be cost-effective to attempt to gently remove the cabinets and store them in a climate-controlled storage unit. Trial Transcript at 2/19 Vol. I p. 83 (13–20) (Phillips Testimony), Trial Transcript **\*684** at 2/19 Vol. II p. 20 (16–22) (Smith Testimony), Trial Transcript at 2/22 Vol. II pp. 107 (22–25)-108(1–2) (Wright Testimony). It is more cost-effective to replace the cabinets than attempt removal and storage. Trial Transcript at 2/19 Vol. I at p. 83 (13–20) (Phillips Testimony), Trial Transcript at 2/22 Vol. II, p. 107 (22–25)-p. 108 (1–2) (Wright Testimony).

#### b. Countertops Must be Replaced

The countertops must be removed during the remediation to gain access to the drywall. P1.2005–0342 (Virtexco Quote for Morgan house. All other quotes are the same on this issue.), Trial Transcript at 2/19 Vol. I p. 82 (11–15) (Phillips Testimony). The contractors providing estimates for the Virginia homes indicate from experience that the countertops will chip or break during removal. P1.2005–0342 (Virtexco Quote for Morgan house. All other quotes are the same on this issue.). Beazer testified that the countertops in Florida homes being remediated broke during removal. Trial Transcript at 2/19 Vol. I p. 84 (9–15) (Phillips Testimony). Because of these factors, the countertops should be replaced as part of the remediation. P1.2005–0342 (Virtexco Quote for Morgan house. All other quotes are the same on this issue.); Trial

Transcript at 2/19 Vol. I pp. 83 (21–25)-84 (1–19) (Phillips Testimony).

### c. Trim, Crown Molding and Baseboards Must be Replaced

Trim, crown molding and baseboards are placed on top of the drywall. P1.2016 (SGC Original Report), Trial Transcript at 2/19 Vol. I p. 87 (2–6) (Phillips Testimony). They will have to be removed to get to the defective drywall. *Id.* In most instances it is less costly to replace these items than to take additional time to gently remove, store and put back the original materials. *Id.* This is the case with the representative homes. *Id.* Accordingly, the Court finds that these items should be replaced.

### d. Bathroom Fixtures Must be Replaced

Sinks, toilets and shower enclosures generally must be removed when the drywall is removed because they are installed on top of drywall or to enable the remediation workers to move freely. It is more cost-effective to replaced these items than to gently remove, safely transport and store, and reinstall at a later date. P1.2050–0003 (Summaries of Cost Estimates); Trial Transcript at 2/19 Vol. I p. 82(11)-p. 83(1), p. 84(20–24). Thus these items should be removed and replaced.

### 8. Insulation Must be Replaced

The insulation cannot be adequately protected during the remediation process. P1.2058–001 (Wright Scope of Remediation). The insulation will be damaged during the removal of the drywall. P1.2058–001 (Wright Scope of Remediation), Trial Transcript at 2/19 Vol. I p. 78 (15–17) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 93(5–7) (Wright Testimony). It will also be contaminated with drywall dust produced during the removal of the drywall. P1.2058–001 (Wright Scope of Remediation), Trial Transcript at 2/19 Vol. I p. 78 (12–14) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 93(1–3) (Wright Testimony). The drywall dust cannot be properly cleaned or removed from the insulation. P1.2058–001 (Wright Scope of Remediation), P1.2027–0023 (Wright original Report), P1.2016–0088 (SGH Original Report), Trial Transcript at 2/19 Vol. I p. 78 (12–25) (Phillips Testimony), P1–1803–0013, 0036

and 0012 (Photos of debris and dust in insulation fibers after CDW removal from a Beazer home). It is more cost-effective to replace the insulation. P1.2058–001 (Wright Scope of Remediation), Trial Transcript at 2/19 Vol. I p. 78 (19–23) (Phillips Testimony).

### *685  9. The Plaintiff-intervenor Homes Will Need to be Cleaned With a HEPA Vacuum, Wet-wiped or Power-washed, & Allowed to Air-out After Remediation

In order to eliminate the tremendous amount of dust produced from removal of the drywall, and to eliminate the offensive odor of the Chinese drywall, Plaintiff-intervenors' homes will need to be cleaned and aired-out after remediation is complete. A HEPA vacuum should be used to remove the fine drywall dust and other particles. Additionally, the homes should be wet-wiped or power washed to eradicate any remaining particles. Finally, the houses will need to air out for between fifteen (15) and thirty (30) days. P1.2006–0083 (Bailey Original Report), P1.2009–0067 (Debbas Original Report), Deposition of Ronald Bailey (2/2/10) at 304 (21–24). The cleaning and airing-out is necessary to insure that all sulfur odors are gone. P1.2006–0083 (Bailey Original Report), P1.2016–0087 (SGH Original Report), Trial Transcript at 2/19 Vol. II p. 34 (11–15) (Smith Testimony).

### 10. After Remediation, an Independant, Qualified Engineering Company Should Certify that the Homes are Safe for Occupation

Following the deconstructing phase of the remediation process, the houses will need to be inspected by an independent and qualified engineering company. P1.2016–0084 (SGH Original Report), Trial Transcript at 2/22 Vol. II pp. 123(24)-124(7) (Wright Testimony). This is important for insurance, resale potential, and peace of mind for the present occupants. The independent and qualified engineering company should provide a letter or report indicating that the remediation has been correctly performed. P1.2016–0084 (SGH Original Report), Trial Transcript at 2/19 Vol. I p. 80 (11–14) (Phillips Testimony). The company should also provide a letter or report indicating that the homes are safe to be reoccupied. P1.2016–0084 (SGH Original Report), Trial Transcript at 2/22 Vol. II p. 123 (24)-p. 124 (7) (Wright Testimony).

**11. The Scope of Work is Consistent With Chinese Drywall Remediation by National Homebuilders**

The necessary remediation proposed by the PSC is essentially the same in all material respects as the scope of remediation being utilized by national builders Beazer Homes and Lennar Homes. Compare P1.2058–0001 (Wright Scope of Remediation) with P1.1888–0003 (Beazer Scope of Work) with P1.2016–0105 (Lennar Scope of Work), Trial Transcript at 2/22 Vol. I p. 99 (16–22) (Rutila Testimony). National builders Beazer and Lennar have also independently assessed the need for their remediation through scientific evidence, practical cost considerations, and hands-on experience with the problem. Trial Transcript at 2/19 Vol. I p. 69(3–8), p. 77 (4)-p. 84 (24) (Phillips Testimony). Although in theory, a thorough cleaning or selective replacement of contaminated drywall may be an option, in practice however, the evidence however does not support the feasibility of such an option. The alternative remedies to a complete remediation that have been tried or suggested, such as selective identification and removal of Chinese Drywall, "cleaning" corroded wires, switches, and contact points, leaving corroded wires and switches in place, clipping the exposed ends of the corroded wires and splicing wires, or making new junction boxes, will not make the plaintiff whole, will not be adequate from a scientific or practical standpoint, and will not provide safety and marketability to the homeowner. P3.0544–0068–0070 (Acks Report) Trial Transcript at 2/19 Vol. I p. 75 (10–25) (selective removal of CDW impossible) (Phillips Testimony), Trial Transcript at **\*686** 2/22 Vol. I p. 125 (2–17) (impossible to reverse damage to wires by cleaning) (Rutila Testimony), Trial Transcript at 2/19 Vol. I p. 80 (6–10, 15–22) (leaving wires in place, clipping and splicing through junction boxes not to code and impossible to certify as safe) (Phillips Testimony). The impractical and time-consuming prospect of clipping, stripping and/or cleaning separate wires in a switch or junction box is demonstrated by reference to the sample switch box removed by Beazer's Jerry Smith from one of the Beazer homes. P1.1981 (sample switch box with wiring taken from Beazer home). The only economically feasible option, at least at the present time, is to totally gut the structure, take it down to the studs and remove and replace all wiring.

**12. The Court's Scope of Remediation as Compared to the NAHB & CPSC Remediation Protocols**

After the hearing in the *Germano* matter, the National Association of Home Builders (NAHB) and the Consumer Product Safety Commission (CPSC), each released their own remediation protocols. In its protocol, the NAHB recommends taking out all drywall in a home unless the Chinese drywall is in a contained area. Rebecca Mowbray, *Chinese Drywall Guidance Offered by National Association of Home Builders,* The Times–Picayune, March 18, 2010, http://www. nola.com/business/index.ssf/2010/03/ chinese_drywall_guidance_offer.html. It also recommends taking out all plumbing, low-voltage wiring, and carpet. *Id.* Further, the NAHB recommends the use of HEPA-filter vacuums to suck up dust, airing out homes over a period of time, and paying for temporary living expenses for displaced families. *Id.* These recommendations are consistent with the Court's own findings.

However, in contrast to the Court, the NAHB recommends removing only the damaged ends of high-voltage wiring, but advises builders who are concerned about meeting building codes or being cost-effective to take all wiring out. *Id.* It also provides that tile floors, cabinets, and doors do not need to be replaced, unless it is more expensive to do so. *Id.* After hearing considerable evidence in the crucible of a judicial hearing, the Court is convinced that at least with regard to the representative cases this is not feasible or economically realistic.

The CPSC remediation protocol is largely consistent with the Court's protocol. Both call for the replacement of all possible problem drywall, all fire safety alarm devices, all electrical components and wiring, and all gas service piping and fire suppression sprinkler systems. *Interim Remediation Guidance for Homes with Corrosion from Problem Drywall,* Consumer Product Safety Commission & Department of Housing and Urban Development, April 2, 2010. However, if a portion of drywall can be reasonably identified as non-problematic drywall, the CPSC allows for leaving that drywall in place. *Id.*

The evidence reviewed by this Court indicates that the better and more realistic approach dictates the removal of all drywall in those homes in which there is a substantial mixture. This is necessary in order to remove and replace wires, pipes, and insulation, and to adequately clean the home. Furthermore, the evidence indicates that it is

virtually impossible to detect with reasonable accuracy which is and which is not Chinese drywall.

### 13. The Plaintiff–Intervenor Families will be Out of Their Homes for 4–6 Months During Remediation

The evidence indicates that with regard to the representative homes, the remediation process will require the removal and **\*687** demolition of most interior building components in the homes. P1.2058 (Wright's Scope of Remediation), Trial Transcript at 2/22 Vol. II p. 91 (6–16) (Wright Testimony). Accordingly, the families will need to move out of their homes during the remediation. Trial Transcript at 2/19 Vol. I p. 72 (24–25) (Phillips Testimony). The contractors providing independent estimates to perform the remediation estimate that the process will take four (4) to six (6) months to complete. P1.2050–0003 (Summaries of Cost Estimates), Trial Transcript at 2/19 Vol. I p. 73(5–6) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 95(25)-p. 26(6) (Wright Testimony). The families are entitled to alternate living expenses during the remediation process. Trial Transcript at 2/19 Vol. I p. 72 (22–24), p. 73 (8–10) (Phillips Testimony).

### F. THE COSTS OF REPAIRING VIRGINIA CDW HOMES IS ON AVERAGE $86/SQUARE FOOT

The evidence supports the conclusion that the average cost per square foot to repair the *Germano* homes is $86. P1.20509–0001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II p. 120 (12–14) (Wright Testimony). The average cost is the average of independent quotes from two local reputable Virginia contractors. P1.2050–0003 (Summaries of Cost Estimates), Trial Testimony at 2/22, Vol. II p. 117 (14–20) (Wright Testimony). Each contractor was provided a defined scope of work for the homes. P1.2027–0130 (Portion of Contractor Scope), Trial Testimony at 2/22, Vol. II p. 104 (8–11) (Wright Testimony). The defined scope of work for the homes is virtually identical to the Beazer scope of work. P1.1888–0003 (Beazer Scope of Work), Trial Testimony at 2/22 Vol. II p. 95 (11–13) (Wright Testimony). An independent quote was obtained from a smaller contractor that specializes in the remodeling and new construction of homes. P1.2050–0003 (Summaries of Cost Estimates), Trial Testimony at 2/22, Vol. II, p. 103 (9–13) (Wright Testimony). Additionally, an independent quote was obtained from a larger contractor that specializes in

multi-family and commercial construction. P1.2005–0364 (Portion of Virtexco Estimate), Trial Testimony at 2/22 Vol. II p. 103 (20–23) (Wright Testimony).

The cost per square foot to repair includes the following:

1. Demolition and disposal of all damaged and affected building components in the homes. P1.2058–0001 (Wright's Scope of Remediation), P1.2050–0003 (Summaries of Cost Estimates), Trial Testimony at 2/22 Vol. II p. 93 (13–21) (Wright Testimony),

2. Replacement of all drywall. P1.2058–0001 (Wright's Scope of Remediation), Trial Testimony at 2/22 Vol. II, p. 70 (12–17) (Wright Testimony); *see also* P2.0239–0007 (Muller, Control of Corrosive Gases),

3. Replacement of the entire HVAC assembly. P1.2058–0001 (Wright's Scope of Remediation), Trial Testimony at 2/22 Vol. II p. 87 (13–16) (Wright Testimony).

4. Replacement of all electrical wiring and devices such as receptacles and switches. P1.2058–0001 (Wright's Scope of Remediation), Trial Testimony at 2/22 Vol. II p. 75 (11–16) (Wright Testimony).

5. Replacement of items that are damaged during the removal of the drywall, i.e., trim and baseboards. P1.2058–0001 (Wright's Scope of Remediation), Trial Testimony at 2/22 Vol. II p. 91 (6–16) (Wright Testimony).

   **\*688** 6. Replacement of items that are less expensive to replace than store, i.e., carpet. P1.2058–0001 (Wright's Scope of Remediation), Trial Testimony at 2/22 Vol. II p. 92 (8–16) (Wright Testimony).

However, the cost per square foot to repair does not include the replacement of the exterior shell of the house, including windows, exterior doors, structural members, exterior siding, roof trusses, the roof, concrete, and nails. P1.2058–0001 (Wright's Scope of Remediation).

The average cost to repair complies with RS Means data. Trial Testimony at 2/22 Vol. II p. 116 (16–22) (Wright Testimony). RS Means is a publication which compiles data on a national basis for cost to repair and replace building components. P1.2027–0162–0165 (RS Means Data Excerpt, Trial Testimony at 2/22, Vol. II p. 112(25), p. 113(1–8) (Wright Testimony).

The average cost to repair the Plaintiff-intervenors' homes based upon the average cost to repair per square foot are as follows:

1. The average cost to repair the Morgan house is $232,491. P1.2059–0001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II, p. 117 (22–24) (Wright Testimony).

2. The average cost to repair the Baldwin house is $257,730. P1.2059–001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II p. 117(25), p. 118(1) (Wright Testimony).

3. The average cost to repair the Orlando house is $249,140. P1.2059–001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II, p. 118(2–3) (Wright Testimony).

4. The average cost to repair the Leach house is $14,957. P1.2059–001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II, p. 118(4–5) (Wright Testimony).

5. The average cost to repair the Michaux house is $198,142. P1.2059–001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II, p. 118(6–7) (Wright Testimony).

6. The average cost to repair the McKellar house is $194,720. P1.2059–001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II p. 118(8–9) (Wright Testimony).

7. The average cost to repair the Heischober house is $312,755. P1.2059–001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II p. 118 (10–11) (Wright Testimony).

## G. IT IS NOT CERTAIN THAT PLAINTIFF–INTERVENORS HAVE SUFFERED PROPERTY DEVALUATION CAUSED BY THE CHINESE DRYWALL CONTAMINATION

There is testimony that the representative properties suffered a diminution in value because of the presence of the contaminated drywall. Trial Deposition of Kenneth Acks (2/2/10) at 10–28. Kenneth Acks is an expert in the field of estimating economic impacts of environmental hazards upon real estate. *Id.* Mr. Acks utilized reliable methodologies in reaching his conclusions with respect to the diminution in values of the seven properties as a result of the contaminated Chinese drywall. *Id.* Trial Deposition of Kenneth Acks (2/2/10) at p. 60–p. 72, p. 80–p. 82, p. 84–p. 102. According to Ack's testimony, the diminution in value of each of the seven properties as a result of the contaminated Chinese drywall, assuming that the property has been remediated or will be **\*689** remediated with costs not borne by the property owner, is as follows:

(1) 4020 Dunbarton Circle in Williamsburg—appraised value of $382,000, diminution of 25% and a diminution value of $95,500;

(2) 4043 Dunbarton Circle in Williamsburg—appraised value of $475,000, diminution of 10% and a diminution value of $46,500;

(3) 4091 Dunbarton Circle in Williamsburg—appraised value of $381, 000, diminution of 25% and a diminution value of $95,250;

(4) 8495 Ashington Way in Williamsburg—appraised value of $382,000, diminution of 25% and a diminution value of $95,500;

(5) 1008 Hollymeade Circle in Newport News—appraised value of $230,000, diminution of 20% and a diminution value of $46,000;

(6) 901 Eastfield Lane in Newport News—appraised value of $267,500, a diminution value of 20% and a diminution value of $53,500; and

(7) 214 A 80th Street in Virginia Beach, appraised value of $635,000, diminution of 30% and a diminution value of $190,500. P3.0563–0001 (Table with the descriptions of the seven properties, the assessed values, and the appraised values as of August 31, 2008) and P3.0569–0001 (Table with the diminution in values of the seven properties) Trial Deposition of Kenneth Acks (2/2/10) at p. 46–p. 48, p. 106–p. 109.

Assuming that these properties are unremediated, according to Ack's testimony, the value of each of the seven homes as a result of the contaminated Chinese drywall decreases by an additional 5%, except for 4043 Dunbarton Circle which remains at a diminution value of 10%, plus the costs of the remediation. Trial Deposition of Kenneth Acks (2/2/10) at p. 112–p. 113. Although

diminution in value is a recognized item of damages under Virginia law, *see Averett v. Shircliff*, 218 Va. 202, 208, 237 S.E.2d 92, 95 (Va.1977), the Court finds that at this point it is more speculative than actual. If the repairs are made properly there may be no diminution in value or at least it may be minimal. So this item of damage will not be allowed.

## H. CHINESE DRYWALL EFFECTS ON PLAINTIFF–INTERVENORS & THEIR HOMES, & THEIR RESULTING DAMAGES

### 1. The Plaintiff-intervenors Cases Provide a Representative Cross-section of Homes Contaminated by Chinese Drywall & Persons Harmed by Chinese Drywall

The homes of the seven Plaintiff-intervenors are representative of a cross-section of contaminated homes, including single family homes, duplex construction, and townhomes. P1.2016–0009 (Original SGH/Rutila Report) (The Court has accepted Mr. Rutila as an expert in multidisciplinary investigations of building and construction problems. Trial Transcript at 2/22 Vol. II, p. 95 (22–25) (Rutila Testimony)), P3.0544–0003, 0010, 0011, 0012, 0013 (Acks Report) (Kenneth Acks, MBA was tendered as, and the Court accepted him as, an expert in property devaluation and environmental impacts on property value. Trial Deposition of Kenneth Acks (2/2/10) at 28). They include a range of values, type of construction, and amount of drywall. For example:

a. The original costs of these homes reflect a broad cross-section ranging from that of a modest townhome to that of a higher-end custom home, including an elevator and custom floors and cabinetry throughout the home. P3.0544–0002 (Acks Report).

b. The homes are representative of new home construction as well as of **\*690** an additional alteration made to a home after initial construction. P1.2027–0007 (Original Report of Ron Wright) (The Court has accepted Mr. Wright as an expert in civil engineering. Trial Transcript at 2/22 Vol. II, p. 65 (15–17) (Wright Testimony)).

c. The use of drywall in the homes, based upon sales and delivery records, spans a spectrum from a small delivery of 8 boards to homes built with over

200 4#x12# sheets of drywall. P1.2016–0017–0018 (Original SGH/Rutila Report).

The Court was presented evidence by both PSC and Knauf experts that the chemical and physical properties of Chinese-manufactured drywall (hereinafter "CDW" or "Chinese drywall") do not differ significantly from region to region or state to state. P1.2025–0003, 0004 (Streit Supplemental Report) (Lori Streit, Ph.D. was tendered as, and the Court accepted her as, an expert in chemistry. Trial Deposition of Lori Streit (2/16/10) at p. 11(4)-p. 14(17), P.2023–0015—P2023–0020 (Original Streit Report, C.V.)), Deposition of Matthew Perricone (1/21/10) at Exhibit 2, p. i, ¶ 4.7, Deposition of Sandy Sharp (2/5/10) at p. 148(15)-p. 150(11), Trial Deposition of Lori Streit (2/16/10) at p. 24(6)-p. 25(1) (receiving different kinds of samples), p. 26(11–12), p. 27(21)-p. 28(7) (finding commonalities among Chinese products) (finding samples from different sources to be similar).

These homeowners represent a broad cross-section demographically of families, ranging from families with young children to couples approaching retirement, with a broad cross-section of employments, including law enforcement, the military, the insurance industry, academia, religious ministry, and business management. Trial Transcript at 2/19 Vol. I pp. 49–61 (Morgan Testimony), Trial Transcript at 2/19 Vol. II pp. 113–122 (McKellar Testimony), Trial Transcript at 2/22 Vol. I pp. 4–14 (Michaux Testimony), Trial Transcript at 2/22 Vol. I pp. 78–87 (Heischober Testimony), Trial Transcript at 2/22 Vol. II pp. 31–38 (Baldwin Testimony), Trial Transcript at 2/22 Vol. II pp. 43–52 (Leach Testimony), Trial Transcript at 2/22 Vol. II pp. 52–62 (Orlando Testimony). The economic disruption and hardship suffered by these families are found to be representative of the impact CDW has on homeowners. *Id.* Because of the wide spectrum encompassed by these representative structures, the general principles found applicable to them will have relevance, if not in toto, at least partially, to all of the homes contaminated by defective Chinese drywall.

### 2. Law Applicable to Plaintiff-intervenors' Recovery of Damages

[1] The Court finds that Plaintiff-intervenors' interests in their real properties have been injured by defendant Taishan's negligence in producing a defective product, and that they are entitled to recover the damages proximately caused by same. The applicable law is the law of Virginia

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/19/19 Page 82 of 1680
In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in F.Supp.2d (2010)
...ge 31 of 49 PageID# 360

as the facts indicate that the real property of the Plaintiff-intervenors is situated in Virginia, and the losses which are the subject of this proceeding likewise occurred in Virginia. Additionally, no intervenor has disputed that Virginia law applies to the claims of the intervening homeowners against the defendant Taishan.

**[2]** **[3]** Plaintiff intervenors' negligence claims are not barred by Virginia's economic loss rule. *See Proto v. The Futura Group, LLC., et al.,* CL09–2455, Hearing Tr., Dec. 7, 2009 (Va.Cir.Ct.) at 68 (overruling demurrer with respect to negligence); *see also In re: Chinese Manufactured Drywall Prod. Liab. Litig.,* 680 F.Supp.2d 780 (E.D.La.2010) (rejecting the arguments that the economic loss rule **\*691** barred plaintiffs' tort claims); *In re: All Pending Chinese Drywall Cases,* CL 09–3105, *et al.,* at 5–10, 2010 WL 1654127 (Va.Cir.Ct. March 29, 2010). In general, the measure of damages in Virginia for a negligence action is "the amount necessary to compensate the injured party for the damage proximately caused by the tortious conduct." *Lochaven Co. v. Master Pools by Schertle, Inc.,* 233 Va. 537, 541, 357 S.E.2d 534, 537 (Va.1987). With respect to injury to real property, Virginia allows damages to be measured by diminished value, the cost of repair or a combination of both. "Both rules are merely evidentiary methods for determining that amount which will compensate the owner for his actual pecuniary loss sustained as a result of a negligent wrongful act." *Averett v. Shircliff,* 218 Va. 202, 208, 237 S.E.2d 92, 95 (Va.1977); *accord, St. Martin v. Mobil Exploration & Producing U.S., Inc.,* No. 95–4128, 1998 WL 474211, at \*9–10, 1998 U.S. Dist. LEXIS 12808, at \*28–29 (E.D.La.1998) (property damages may include cost of restoration that has been reasonably incurred or the value of the property unless disproportionate); *McMinis v. Phillips,* 351 So.2d 1141 (Fla.App. 1977) (plaintiff may elect to recover reasonable cost of repairs).

Pursuant to Virginia law, the Plaintiff-intervenors' can recover both the cost of repair and the loss in value of their property after the repairs are completed. The evidence at trial established that for each of the properties at issue the damage is not permanent and is in fact repairable. Under these circumstances, the proper measure of damages is the cost of repair, plus the amount the property was depreciated, if any, because it was damaged. *Lee v. Bell,* 237 Va. 626, 379 S.E.2d 464 (Va.1989) (cost of repair is proper measure of damages if evidence has been introduced showing repair costs); *Lochaven,* 233 Va. at

543, 357 S.E.2d at 538 (plaintiff entitled to recover all costs necessary to repair damage to embankment and pool deck caused by negligence of pool cleaning company); *Westlake Props. v. Westlake Pointe Prop. Owners Ass'n,* 273 Va. 107, 126, 639 S.E.2d 257, 269 (Va.2007) (jury was properly instructed that measure of damages was reasonable cost of repairing or replacing the property, whichever is less, plus necessary expenses shown by the evidence to have been incurred by the plaintiff); *Wittmann Family Trust v. Renaissance Housing Corp.,* 2000 WL 33406773, 2000 Va. Cir. LEXIS 523 (Va.Cir., Nov. 30, 2000) (in case involving defective siding material (EIFS), court held that "the measure of compensatory damages is the cost of repair, unless the cost of repair would constitute economic waste."); Virginia Model Jury Instructions, Instruction No. 9.060 (Property Damage: Partial Loss) ("When personal property is partially damaged, the measure of damages is the reasonable cost of repairing the property plus the amount, if any, the property was depreciated because it was damaged, plus the necessary and reasonable expenses shown by the evidence to have been incurred by the plaintiff as a result of the damage to the property.").

**[4]** **[5]** In addition to damage to real property, plaintiff intervenors' may recover damages to their personal property shown to be caused by the defective Taishan drywall. The measure of damages for injury to personal property in Virginia is similar to that for real property. Where personal property has been either destroyed or damaged "the general rule for determining the amount of damages for injury to personal property is the fair market value of the property before and immediately after the property was damaged, plus necessary reasonable expenses incurred by the owner in connection with the injury." *Averett,* 218 Va. at 206, 237 S.E.2d at 95 (Va.1977). As with **\*692** realty, the exception to the rule is where personal property has been damaged and can be restored by repairs. If the repairs would be less than the diminution in value because of the injury, the amount recoverable is the cost of repairs and the diminution in market value of the injured property, if any, after the repairs are made. *Averett,* 218 Va. at 206, 237 S.E.2d at 95. Thus, if personal property has been destroyed, the measure of damages is market value plus any reasonable and necessary expenses incurred as a result of the injury. However, if the personal property has been damaged but not destroyed, the proper measure of damages is either (1) the diminution in market value plus reasonable and necessary expenses incurred or (2) the reasonable cost of

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/19/19 Page 83 of 1680

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in F.Supp.2d (2010)... 32 of 49 PageID #: 961

repair plus a reasonable amount for lost value because of the injury, whichever is less.

[6] Plaintiff-intervenors may recover damages to compensate for other losses caused by Taishan's defective drywall, including alternative living costs, costs associated with foreclosures and/or bankruptcy, additional amounts owed due to mortgage deferral, bankruptcy or inability to refinance, and the loss of income. Under Virginia law, a plaintiff's recovery of damages includes all damages proximately caused by the tortious conduct. *Lochaven,* 233 Va. at 541, 357 S.E.2d at 537 ("The measure of damages in a negligence action is that amount necessary to compensate the injured party for the damages proximately caused by the tortious conduct."); *see also Packett v. Herbert,* 237 Va. 422, 377 S.E.2d 438 (Va.1989) (damages to real property are not limited to the diminution in value and may include damages for loss in use and other consequential injuries); Restatement (Second) of Torts § 929 (1979) (providing that damages for injury to real property include compensation for loss of use of the property and other consequential injuries in addition to any permanent property damage, whether measured by restoration or market value); *Averett,* 218 Va. at 206, 237 S.E.2d at 95 (citing with approval Section 928 of the Restatement of the Law of Torts, which allows compensation for loss of use); *Seymour v. McDonald,* 24 Va. Cir. 531 (1981) (consequential damages recoverable in addition to damages for injury to real property); 5C Michie's Jurisprudence, Damages, § 32 (2006) (rule encompasses recovery of expenses incidental to irreparable injury); J. Costello, Virginia Remedies, Damages, § 21.04[2][a] (foreseeable consequential damages recoverable); *accord Bailey v. Missouri P.R. Co.,* 383 So.2d 397, 402 (1980) (tortfeasor must compensate his victim "for even the most improbable severe consequences of his wrongful act."), citing, *Gallick v. B & O R.R.,* 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963); *McMinis,* 351 So.2d at 1141 (relying on Section 928 of the Restatement of Torts). Damages for these consequential injuries are therefore all recoverable under Virginia law.

[7] Plaintiff-intervenors are entitled to recover damages for loss of use and enjoyment of a residential property. This is supported by *Bowers v. Westvaco Corp.,* 244 Va. 139, 419 S.E.2d 661, 668 (1992), where the Virginia Supreme Court held that a loss of use and enjoyment award of $473,000 was not excessive where the defendant

operated a 24/7 truck staging operation 20 feet from the plaintiff's driveway. Additionally, the New Hampshire Supreme Court upheld a $360,000 loss of use and enjoyment award in a case where plaintiff's only loss was the loss of enjoyment in hiking and camping on his land after defendant cut down trees on the land. *Berliner v. Clukay,* 150 N.H. 80, 834 A.2d 297 (2003). In *Hackney v. Courtland Homes,* 2006 WL 4394647 (Super.Ct.Ariz, 2006), a case arising from the **\*693** construction of homes on expansive soils, the jury awarded each of the five homeowners compensation for the cost of repair, $25,000 for diminished value, and $40,800 for loss of use and enjoyment. In *Hadaway v. Arvida,* 1996 WL 33100325 (Ga.Super.1996), a jury awarded the plaintiff homeowner $25,000 for property damage and $20,000 for loss of use and enjoyment in a case arising from damages caused by water runoff from an upstream subdivision. A jury awarded owners of a home located next to a cabinet manufacturer $50,000 for loss of use in enjoyment in *Gubacz v. Smith,* 1990 WL 1084178 (Mich.Cir.Ct.). In *Lyons v. Sparkle Plenty Car Wash,* 2002 WL 32138270 (Fla.Cir.Ct.), the jury awarded $10,000 for loss of use and enjoyment to homeowners who bought their lots before construction of an adjacent carwash; and in *Pollock v. City of San Antonio,* 2003 WL 21695559 (Tex.Dist.), the jury awarded the plaintiff, whose home was located adjacent to a negligently-maintained landfill, $10,000 for loss of use and enjoyment. The loss of use and enjoyment suffered by the Virginia CDW plaintiff intervenors (including past and future displacement from the home, exposure to obnoxious gases, failures of electrical equipment, increase risk of electric failure and fire, and total loss of enjoyment of the home) is significant and more severe than several of the scenarios presented in the above-referenced jurisprudence. In light of the above, to properly compensate the plaintiff intervenors for damages to their real property, the Court finds that the cost of repair shall include the cost of removing the source of corrosion from each home.

As discussed above, in order to make the Plaintiff-intervenors whole, they must be awarded a remedy which replaces all drywall, the electrical, electronic, and HVAC systems in the home, copper pipes in the home, and other copper and silver components in the home. The remedy also must provide a written guarantee to the owner from a certified environmental company that the home is free of contamination and damaged corroded components. Furthermore, in order to make the plaintiff

intervenors whole, they must be awarded compensation for damaged personal property and other compensable damages as specified herein. The Court will now discuss this remediation protocol as it applies to the individual Plaintiff-intervenors' and their properties. In doing so, it will first provide detailed descriptions of each family and their circumstances arising from the Chinese drywall in their homes. The Court will then follow each description with a list of damages recoverable under the applicable law.

### 3. Plaintiff-intervenors & Their Damages

#### a. Deborah and William Morgan

##### i. Background

Deborah and William Morgan own 8495 Ashington Way, Williamsburg, VA. P3.0419–0001–P3.0419–0003, P3.0398–0001 (Morgan deed, Morgan house photo), Trial Transcript at 2/19, Vol. I, p. 49(25)-p. 50 (5), (Morgan's Testimony). The Morgan home has 3,079 square feet. P1.2059–0001 (Remediation Estimate Averages). The Morgans have been married 27 years, and have two daughters and a grandchild on the way. Trial Transcript at 2/19, Vol. I, p. 49 (17–24), (Morgan's Testimony). Bill Morgan retired from the Newport News police force as a master police detective after 24 years. He works now as a security manager for Camp Perry in Williamsburg. Trial Transcript at 2/19, Vol. I, p. 50 (11)-p. 51 (2), (Morgan's Testimony). Deborah teaches teachers as an instructional coach for the Newport News public school system. She was named teacher of the year for 3 years during her career. **\*694** Trial Transcript at 2/19, Vol. I, p. 51 (3–9), (Morgan's Testimony).

The Morgans purchased their home on July 14, 2006, for $383,199.89. P3.0419–0001–P3.0419–0003 (Morgan deed), Trial Transcript at 2/19, Vol. I, p. 51 (10–13), (Morgan's Testimony), P3.0637–0011–P3.0637–0012 (Tuthill's Supplemental Exhibit Morgan–1 (Revised for Trial Testimony) (The PSC tenders Ms. Tuthill, and the Court accepts her, as an expert in financial accounting and analysis. Trial Deposition of J.C. Tuthill (2/4/10) at p. 19–p. 24)). For a 2007 refinance, the home was appraised for $470,000.00. P3.0419–0001–P3.0419–0003, P3.0426–0001–P3.0426–18 (Morgan Refinance Appraisal April 2007).

The Morgans chose to move inland to higher ground to avoid flooding. Trial Transcript at 2/19, Vol. I, p. 52 (12–16), (Morgan's Testimony). Bill and Deborah developed a strong attachment to 8495 Ashington Way the first time they saw it. While it was under construction they would drive to see it 2–3 times per week. Mr. Morgan would climb through the windows to look at it. It was their dream home. Trial Transcript at 2/19, Vol. I, p. 52 (17)-p. 53 (1), (Morgan's Testimony). The house was two stories. The entire rear of the house is basically one room. The dining room opens to the kitchen, the kitchen into the family room. Trial Transcript at 2/19, Vol. I, p. 53 (5–13), (Morgan's Testimony).

The Morgans moved in on July 13 or 14, 2006. Trial Transcript at 2/19, Vol. I, p. 54 (17–21), (Morgan's Testimony). They moved out of the home on June 23, 2009, having lived there just one month short of 3 years. P3.0407–0001–P3.0407–0014 (Lease), Trial Transcript at 2/19, Vol. I, p. 55 (1–6), p. 58 (1–5), (Morgan's Testimony). The Morgans complained that the house had a rotten chemical smell while the Morgans lived there. Trial Transcript at 2/19, Vol. I, p. 53 (23)-p. 54 (7), (Morgan's Testimony). Mrs. Morgan noticed the odor from the first day that they moved into the house; Mr. Morgan noticed it when they would leave for the weekend and then return. *Id.* The hot water heater of the Morgan home failed in the summer or fall of 2008, only two years after they moved in. Trial Transcript at 2/19, Vol. I, p. 54 (7–12), p. 54 (22–25), (Morgan's Testimony). Initially the electronic control box for it was replaced, but that remedy didn't work and the entire hot water heater was replaced. *Id.* After the water heater failed, one of their upstairs outlets failed, which tripped a circuit breaker. Trial Transcript at 2/19, Vol. I, p. 55 (7–13), (Morgan's Testimony). Then two separate outlets in different rooms upstairs failed, but those failures did not trip the circuit breaker. *Id.* There was also an electrical short in the Morgans' HVAC system which caused a burning smell. Trial Transcript at 2/19, Vol. I, p. 55 (7–25), (Morgan's Testimony). When the system was turned off awhile, the burning smell stopped; but when it was turned back on, the smell returned. *Id.* The Morgans slept through the night without heat. Mr. Morgan called an HVAC repair service, which advised that the short happened because a nut holding wires together had been burned through; but the repairman could not explain why that happened after testing the system. *Id.* The Morgans arranged for a more

experienced company to inspect the HVAC system. *Id.* The inspector noticed a leak in the system, following which it was necessary to replace the HVAC coils in March or April 2009. P3.0433–0001 P3.0437–0001 (Morgan HVAC Repair Receipts), Trial Transcript at 2/19, Vol. I, p. 56 (2–16), (Morgan's Testimony).

Due to their concern for fire safety following these developments, the Morgans bought two fire extinguishers for their home. P3.0430001–P3.0430–0002 (Morgan Fire Extinguisher Receipts), Trial Transcript **\*695** at 2/19, Vol. I, p. 56 (17–25), (Morgan's Testimony). Still, Mr. Morgan worried when he and his wife went to sleep that the house might catch fire, since the outlets had failed without tripping the circuit breakers. *Id.* In addition, the Morgans' smoke detector stopped working a year ago, as did a couple of computers, and a TV. Trial Transcript at 2/19, Vol. I, p. 58 (6–14), (Morgan's Testimony). The control panel for the security system had to be replaced. *Id.* Counsel sent the Morgan's TV for laboratory analysis and the TV circuitry was found to be corroded. Trial Transcript at 2/19, Vol. I, p. 58 (17–24), (Morgan's Testimony).

Mr. Morgan initially was reluctant to believe his home had CDW. Trial Transcript at 2/19, Vol. I, p. 57 (13–14), (Morgan's Testimony). Mr. Morgan eventually found a "Venture Supply" label on the CDW in his attic. Trial Transcript at 2/19, Vol. I, p. 57 (18–23), (Morgan's Testimony). The Venture label was discovered in March or April 2009, and the Morgans moved out on June 23, 2009. Trial Transcript at 2/19, Vol. I, p. 58 (1–5), (Morgan's Testimony).

After the Morgans left their home, they moved into a rental home for which they pay $1,900 per month. P3.0409–0001, P3.0407–0001–P3.0404–0014 (Morgan Chapter 13 Receipt, Morgan Lease), Trial Transcript at 2/19, Vol. I, p. 59 (4–13), (Morgan's Testimony). They could not also afford to pay their mortgage of $2,835 per month, so they filed for bankruptcy protection. *Id.* Filing for bankruptcy was made necessary because the Morgans could not afford their mortgage payments. Trial Transcript at 2/19, Vol I, p. 59 (14–15); p. 59 (16–25), (Morgan's Testimony). Both Mr. Morgan and his elder daughter are cancer survivors, and the Morgans' younger daughter still lived with them at 8495 Ashington Way. The family was unwilling to endure further exposure to Chinese drywall. Trial Transcript at

2/19, Vol. I, p. 59 (25)-p. 60 (3), (Morgan's Testimony). Mr. Morgan was credible in his testimony as to the difficulty of missing mortgage payments. Trial Transcript at 2/19, Vol. I, p. 60 (4–7), (Morgan's Testimony). The Morgans are still in bankruptcy. They paid out-of-pocket costs for their bankruptcy filing as well as attorney's fees. P3.0409–0001 (Morgan Chapter 13 Receipt), Trial Transcript at 2/19, Vol. I, p. 60 (8–12), (Morgan's Testimony), Trial Transcript at 2/19, Vol. I, p. 60 (4–7), (Morgan's Testimony). The Morgans have received a letter from the bankruptcy trustee to the effect that the mortgage company will be allowed to foreclose on their home; and this probably will occur in the near future, unless the company decides it does not want the property. Trial Transcript at 2/19, Vol. I, p. 60 (13–18), (Morgan's Testimony).

Mr. Morgan has spent a significant amount of time allowing access to his home for testing and inspection, and gathering receipts for all of his expenses. Experts have reviewed all of his damaged possessions in order to obtain estimates on costs. He also worked with a CPA in New Orleans to prepare a summary of economic losses. The summary is a fair and accurate statement reflecting his economic damages. Trial Transcript at 2/19, Vol. I, p. 60 (21)-p. 61 (20), (Morgan's Testimony).

### ii. Damages

The average cost of remediation of the Morgan home is $232,491. P1.2059–0001, P3.0637–0011–P3.0637–0012 (Remediation Estimate Averages, Tuthill's Supplemental Exhibit Morgan–1 (Revised for Trial Testimony)).

The loss of the Morgan's personal property is $886. P3.0546–0001–P3.0546–0039, P3.0637–0011–P3.0637–0012 (David Maloney's expert report (David J. Maloney is a Certified Member of the International Society **\*696** of Appraisers (ISA), and the PSC requests that the Court accept his expert opinions in the discipline of personal property appraisal. P3.0545–0009) (Maloney C.V.)), Tuthill's Supplemental Exhibit Morgan–1 (Revised for Trial Testimony)).

The past and future repair costs for the Morgans, including the Home Environmental Inspection post-remediation, is $13,876.29. P3.0637–0011–P3.0637–0012

(Tuthill's Supplemental Exhibit Morgan–1 (Revised for Trial Testimony)).

The economic losses associated with the Morgan's foreclosure and bankruptcy are $120,080. P3.0637–0011–P3.0637–0012 (Tuthill's Supplemental Exhibit Morgan–1 (Revised for Trial Testimony)), Deposition of J.C. Tuthill (2/4/10) p. 95–p. 103.

The alternative living costs recurring on a monthly basis during remediation to their home are $2380 per month. Assuming the remediation will take six months, the total recurring monthly costs are $14,280.

The Morgans have suffered the loss of use and enjoyment of their home and personal property. Repeated electronic failures and the real possibility of electrical fires, coupled with concerns for their family's health, forced the Morgans to abandon their home, to put the home into foreclosure and to file for bankruptcy. The Morgans moved out of the house on June 23, 2009 and will never return. Trial Transcript at 2/19, Vol. I, p. 49(17)-p. 61(25) (Morgan's Testimony), P3.0546–0001–P3.0546–0039 (Expert report of David Maloney), P3.0637–0011–P3.0637–0012 (Tuthill's Supplemental Exhibit Morgan–1 (Revised for Trial Testimony).

Assuming remediation is complete within six months, the total of damages proven by the Morgans is $381,613.29, plus an award for loss of use and enjoyment of the home to be determined by the Court. P3.0637–0011–P3.0637–0012 (Tuthill's Supplemental Exhibit Morgan–1 (Revised for Trial Testimony).

### b. Jerry and Inez Baldwin

### i. Background

Jerry and Inez Baldwin bought their single-family home with Chinese drywall at 4020 Dunbarton Circle in Williamsburg, Virginia, on November 21, 2006, for $376,719.15. P3.0179–0001 (Baldwin Deed), Trial Transcript at 2/22, Vol. II, p. 31 (13–20) (Baldwin's Testimony). They lived in the Atlanta area when Mr. Baldwin accepted a new position with his employer in Newport News, VA. Trial Transcript at 2/22, Vol. II, p. 32 (15–19) (Baldwin's Testimony). The Baldwins selected this newly-constructed home at the time when Mrs. Baldwin's

mother was living with them, they needed a house with a full bathroom and bedroom on the first floor for her convenience. Trial Transcript at 2/22, Vol. II, p. 32 (20)-p. 33 (7) (Baldwin's Testimony). The Baldwin residence has 2,957 square feet. P1.2059–0001 (Wright's Remediation Estimate Averages). The Baldwins' down payment was $100,000, and they also paid for $12,000 in upgrades. The Baldwins made this down payment in order to reduce their mortgage payments. Trial Transcript at 2/22, Vol. II, p. 33 (8–17) (Baldwin's Testimony). The move-in date was late November 2006. Trial Transcript at 2/22, Vol. II, p. 32 (9–10) (Baldwin's Testimony).

Jerry and Inez Baldwin still live in the house at 4020 Dunbarton Circle because they cannot afford to move out and make both pay mortgage and rent payments. Trial Transcript at 2/22, Vol. II, p. 32 (11–14) (Baldwin's Testimony). Mr. Baldwin worries about the health of his family, including his 33–year old son and grandchildren when they visit. Trial Transcript at 2/22, Vol. II, p. 38 (12–16) (Baldwin's Testimony).

**\*697**  The Baldwin house has Chinese drywall from Venture Supply. P3.0200–0001 (Venture Supply Invoice), Trial Transcript at 2/22, Vol. II, p. 34 (23–25) (Baldwin's Testimony).

The Baldwins have experienced numerous electrical failures in their home. They are on a third set of HVAC coils in the garage (the previous two having failed). Their microwave and refrigerator failed; and their thermostat failed. P3.0207–0001–P3.0211–0001, P3.0212–0001, P3.0215–0001, P3.0204–0001, P3.0205–0001, P3.0206–0001 (HVAC Repairs, Microwave repairs, Refrigerator repairs), Trial Transcript at 2/22, Vol. II, p. 32 (1–10) (Baldwin's Testimony). Two computers in the Baldwin home also have failed. These were located in the office on the first floor, what would have been Mrs. Baldwin's mother's bedroom. P3.0204–0001, P3.0205–0001, P3.0206–0001 (Computer repair & replacement), Trial Transcript at 2/22, Vol. II, p. 32 (1–10), p. 33 (18–24) (Baldwin's Testimony). When the computers failed, the Baldwin family lost personal photography, recipes, and documents. They had not backed up the computer and the data was irretrievable. Trial Transcript at 2/22, Vol. II, p. 35 (3–8) (Baldwin's Testimony). This irreplaceable personal property had unique and significant value for these Plaintiffs.

Knauf's experts tested the ceiling in the first floor office, and reported that the drywall was domestic and not Chinese. Mr. Rutila (plaintiffs' expert) drilled core samples and tested them in a lab; he concluded that the drywall was indeed Chinese and was releasing corrosive gases. Trial Transcript at 2/22, Vol. II, p. 34 (8)-p. 35 (2) (Baldwin's Testimony). However, Mr. and Mrs. Baldwin wish to remediate their whole house, both floors, because they have had failures on both floors. Trial Transcript at 2/22, Vol. II, p. 35 (17–18) (Baldwin's Testimony). For example, the coils on their second floor air handler are black, and the Baldwins have been told that they need to be replaced. Trial Transcript at 2/22, Vol. II, p. 35 (9–18) (Baldwin's Testimony). Additionally, the lamp brought into the courtroom was also in the first floor office. (The lamp was discussed by Mr. Rutila as having corrosion in its cord.) Trial Transcript at 2/22, Vol. II, p. 33 (23)-p. 34 (4) (Baldwin's Testimony).

When the home is remediated, the Baldwins will have to move out of the house, which will represent a hardship for them. Trial Transcript at 2/22, Vol. II, p. 35 (19–22) (Baldwin's Testimony).

The Baldwin's mortgage lender offered a forbearance of payments for three months. Trial Transcript at 2/22, Vol. II, p. 35 (23)-p. 36 (25) (Baldwin's Testimony). The interest would accrue and would be due at the end of the 3 months. *Id.* The lender was willing to discuss extending the forbearance at the end of the 3 months. *Id.* The Baldwins declined. *Id.* Jerry and Inez Baldwin have tried to refinance their mortgage loan to take advantage of lower interest rates, but they were unable to find a lender which would loan money for a Chinese drywall home. Trial Transcript at 2/22, Vol. II, p. 37 (1–12) (Baldwin's Testimony). Jerry Baldwin is 59 and had hoped to retire in 6 years to collect a higher social security payment. However, the home in Williamsburg represents a major portion of his financial assets. If the bank forecloses and the $265,000 mortgage balance becomes due, this would deplete virtually all of this family's savings. Trial Transcript at 2/22, Vol. II, p. 37 (13)-p. 38 (6) (Baldwin's Testimony). Mr. and Mrs. Baldwin have been diligent in saving and planning for retirement; but the economic consequences of the events associated with CDW have had a devastating impact on their lives. Trial Transcript at **\*698** 2/22, Vol. II, p. 38 (19–25) (Baldwin's Testimony).

Mr. and Mrs. Baldwin worked with counsel and a forensic accountant (J.C. Tuthill) to verify that the summary exhibit attached to the Tuthill report is an accurate statement of the financial damages these plaintiffs have suffered. P3.0637–0001–P3.0637–0002 (Tuthill's Supplemental Exhibit Baldwin–1 (Revised for Trial Testimony).

*ii. Damages*

The cost of remediation of the Baldwin home is $257,730.00. P1.2059–0001 (Wright's Remediation Estimate Averages), P3.0637–0001–P3.0637–0002 (Tuthill's Supplemental Exhibit Baldwin–1 (Revised for Trial Testimony).

The remediation of the Baldwin home should take between 4 and 6 months.

The future alternative living costs, non-recurring, for the Baldwins is $7,895.43. P3.0637–0001–P3.0637–0002 (Tuthill's Supplemental Exhibit Baldwin–1 (Revised for Trial Testimony).

The alternative living costs recurring on a monthly basis post-trial until the remediation is done are $4,844.98. P3.0637–0001–P3.0637–0002 (Tuthill's Supplemental Exhibit Baldwin–1 (Revised for Trial Testimony). Assuming the remediation of their home is going to take six months, the total recurring monthly costs are $29,069.88.

The loss of personal property of the Baldwins is $2,075.00. P3.0546–0001–P3.0546–0039 (Expert report of David Maloney), P3.0637–0001–P3.0637–0002 (Tuthill's Supplemental Exhibit Baldwin–1 (Revised for Trial Testimony).

The cost for repairs of the Baldwin property, both past and future, including the Home Environmental Inspection post-remediation, is $17,769.80. P3.0637–0001–P3.0637–0002 (Tuthill's Supplemental Exhibit Baldwin–1 (Revised for Trial Testimony).

The Baldwins have suffered the loss of use and enjoyment of their home. Jerry and Inez Baldwin worked during their 40 year marriage to build enough equity in their home which would enable them to retire in 7 years. They

pride themselves in never missing a mortgage payment. They have lost that financial security their home provided. The Baldwins have also lost 2 computers (and the data thereon), a refrigerator, a microwave, and have suffered through more air conditioning problems in the 3 years they have been in the home than the average person experiences in their lifetime. P3.0546–0001–P3.0546–0039 (Expert report of David Maloney), P3.0637–0001–P3.0637–0002 (Tuthill's Supplemental Exhibit Baldwin–1 (Revised for Trial Testimony), Trial Transcript at 2/22, Vol. II, p. 31 (12)-p. 38 (25) (Baldwin's Testimony).

Assuming remediation is complete within six months of trial, the total of economic damages proved by the Baldwins is $341,699.11 plus an award for loss of use and enjoyment of the home to be determined by the Court. P3.0637–0001–P3.0637–0002 (Tuthill's Supplemental Exhibit Baldwin–1 (Revised for Trial Testimony).

### c. Joe and Cathy Leach

#### i. Background

Joe and Cathy Leach purchased a single family home at 4043 Dunbarton Circle in Williamsburg, Virginia, on July 23, 2008, for $475,000.00. P3.0295–0001–P3.0295–0003 (Lead Deed), Trial Transcript at 2/22, Vol. II, p. 44 (4–11) (Leach's Testimony). The house is a ranch-style construction with a full basement. It is built in equal sizes on both levels, and features a bonus room above the garage. The main level is three bedrooms, dining and living rooms and kitchen; the downstairs has an office, an entertainment room and another full master suite. Trial Transcript at 2/22, **\*699** Vol. II, p. 44(21)-p. 45(2) (Leach's Testimony). The house is two levels on a hill. The basement is fully redone. Trial Transcript at 2/22, Vol. II, p. 45 (3–10) (Leach's Testimony).

The previous owners added a wine room to the basement, which has the Chinese Drywall. Trial Transcript at 2/22, Vol. II, p. 46 (19–25), p. 44 (12–16) (Leach's Testimony). The wine room had been added by the previous owners to maximize space by finishing off the under part of the porch. It is 10 feet by 10 feet. Trial Transcript at 2/22, Vol. II, p. 46 (9–18) (Leach's Testimony). The house only has 8 sheets of Chinese Drywall. Trial Transcript at 2/22, Vol. II, p. 46 (19–25), p. 44 (12–16) (Leach's Testimony).

The wine room has no HVAC vents so the air doesn't circulate when the door is closed. They keep the door closed all the time. Trial Transcript at 2/22, Vol. II, p. 51 (14–19), p. 52 (1–6) (Leach's Testimony). The prior owners used a dehumidifier in the home's wine room, but the dehumidifier failed. Trial Transcript at 2/22, Vol. II, p. 51 (21–25) (Leach's Testimony).

Cathy and Joe Leach currently live in the home with their two children, Joseph and Sarah. Trial Transcript at 2/22, Vol. II, p. 45 (11–13) (Leach's Testimony). Mr. Leach is a military officer for the Department of Defense, working on special operations projects. He often is called to duty away from home. Trial Transcript at 2/22, Vol. II, p. 43 (17–25), p. 48 (17–21) (Leach's Testimony). Cathy Leach's parents used to live in the full suite in the basement. When the family's young son Joseph went downstairs to visit his grandparents, he would get nosebleeds. Joseph was instructed not to go downstairs for two weeks; the nosebleeds stopped. Once, he went downstairs and the bleeds began. Trial Transcript at 2/22, Vol. II, p. 45 (14)-p. 46 (1) (Leach's Testimony). Cathy Leach's parents lived in the finished basement of the house, but moved out because of the Chinese drywall and the respiratory symptoms the family linked to Chinese Drywall. Trial Transcript at 2/22, Vol 2, p. 47(12)-p. 48 (19–37) (Leach's Testimony). When Cathy Leach's parents moved out, this imposed a burden on the family because Mrs. Leach works during the day and Mr. Leach is out-of-town for his job. The loss of this prior support was disruptive for the family. Trial Transcript at 2/22, Vol. II, p. 48 (14–21) (Leach's Testimony). Cathy Leach works outside the home for an insurance company in Richmond. When her parents moved out, she had to find day care and after school care for the children. They moved out so quickly that Mrs. Leach had to make hurried arrangements for the children. Trial Transcript at 2/22, Vol. II, p. 49(2–9) (Leach's Testimony).

The Leach family lost about 2400 square feet of their home when they shut off the basement due to CDW. P3.0284–0001 (Leach Floor Plan), Trial Transcript at 2/22, Vol. II, p. 48 (9–13) (Leach's Testimony). Chinese Drywall, even confined to one room in the Leach house, has greatly impacted this family. Trial Transcript at 2/22, Vol. II, p. 49 (10–13) (Leach's Testimony).

Joe Leach wished to remediate the house himself, trying to arrange something with the builder. This plan did

not work; the Chinese Drywall remains. Trial Transcript at 2/22, Vol. II, p. 49 (14–25) (Leach's Testimony). Mr. and Mrs. Leach recognize that CDW remediation will be a very extensive project, due to the need to run new electrical wires from the wine room to the electrical panel. Trial Transcript at 2/22, Vol. II, p. 50 (1–9) (Leach's Testimony).

Cathy and Joe Leach tried to refinance their mortgage when interest rates dropped by 2 percentage points, but were unable to do so because of the presence of **\*700** Chinese Drywall. The refinance would have saved them about $600 per month. P3.0302–0001, P3.303–0001–P3.303–0002 (Leach Refinance Denials), Trial Transcript at 2/22, Vol. II, p. 50 (10–23) (Leach's Testimony).

Joe Leach has missed a couple of job opportunities due to the Chinese Drywall; he had to turn down two job offers because he would have to move out of Virginia, and it would not have been possible to sell this Chinese Drywall house quickly enough. Trial Transcript at 2/22, Vol., p. 50 (18)-p. 51(1) (Leach's Testimony). The Chinese Drywall has had a significant impact on Mr. Leach's ability to earn a living for his family. Trial Transcript at 2/22, Vol. II, p. 52 (2–5) (Leach's Testimony).

The odor in the room of the Leach home with Chinese drywall is very noticeable and strong. Trial Transcript at 2/22, Vol. II, p. 52 (12–13) (Leach's Testimony). Mr. Leach described the smell as pungent, like swamp gas or a sewer-type odor. It was this odor which originally led the family to have the room inspected; they thought there was water damage in the area. P3.0285–0001–P3.0285–0003 (Inspection Report); Trial Transcript at 2/22, Vol. II, p. 52 (7–13) (Leach's Testimony).

Mr. and Mrs. Leach worked with counsel, the appraisers and a forensic accountant (J.C. Tuthill) to assure the summary exhibit attached to the latter's report was an accurate statement of financial damages. P3.0637–0005–P.3.0637–0006 (Tuthill's Supplemental Exhibit Leach–1 (Revised for Trial Testimony), Trial Transcript at 2/22, Vol. II, p. 51 (6–11) (Leach's Testimony).

*ii. The Leach home is a unique example of known localized use of Chinese drywall which*

*can be repaired as a stand-alone unit of the home, without removing all drywall in the home*

The Leach home is an example of an extremely localized use of CDW in a single room added to the home after home construction was completed. P1.2016–0018, 0110 (Original SGH/Rutila Report), Trial Transcript at 2/22, Vol. II, p. 44(12–16), p. 46(19–25), p. 51(14–19), p. 52(1–6), p. 46(2–7), p. 46(9–18) (Leach Testimony). The room was small, and was conceived by the original owner to be used as a wine room. P1.2016–0018, 0110 (Original SGH/Rutila Report), Trial Transcript at 2/22, Vol. II, p. 44(12–16), p. 46(19–25), p. 51(14–19), p. 52(1–6), p. 46(2–7), p. 46(9–18) (Leach Testimony). The plaintiffs purchased the home from the original owner, but the room had never been utilized for its intended purpose. *Id.* Because this small room was to be climate-controlled, there were no HVAC registers or returns for the HVAC system on the lower floor of the house where the room was added. P1.2016–0018, 0110 (Original SGH/Rutila Report), Trial Transcript at 2/22, Vol. II, p. 44(12–16), p. 46(19–25), p. 51(14–19), p. 52(1–6), p. 46(2–7), p. 46(9–18) (Leach Testimony). After careful investigation, the experts retained by the PSC concluded that no damage had been done to the mechanical systems of the Leach home due to the lack of air circulation to or from the room. P1.2016–0018, 0110 (Original SGH/Rutila Report), Trial Transcript at 2/22, Vol. II, p. 44(12–16), p. 46(19–25), p. 51(14–19), p. 52(1–6), p. 46(2–7), p. 46(9–18) (Leach Testimony). In the context of a small repair or addition such as this where the corrosive gases from CDW are isolated from the other portions of the home by physical and mechanical barriers, drywall removal only in such an area is feasible. P1.2016–0018, 0110 (Original SGH/Rutila Report), Trial Transcript at 2/22, Vol. II, p. 44(12–16), p. 46(19–25), p. 51(14–19), p. 52(1–6), p. 46(2–7), p. 46(9–18) (Leach Testimony). The Court finds, however, that the installation of even small numbers of Chinese drywall boards in a home requires extensive repairs and results in significant **\*701** other consequential damages as set forth in the following.

*iii. Damages*

The cost of remediation of the Leach home is $14,957.00. P1.2059–0001 (Wrights' Remediation Estimate Averages), P3.0637–0005–P.3.0637–0006 (Tuthill's Supplemental Exhibit Leach–1 (Revised for Trial Testimony).

The loss of personal property of Joe and Cathy Leach is $5,564.00. P3.0546–0001–P3.0546–0039 (Expert report of Dave Maloney), P3.0637–0005–P.3.0637–0006 (Tuthill's Supplemental Exhibit Leach–1 (Revised for Trial Testimony).

The costs for repair of the Leach property, both past and future, including the Home Environmental Inspection post-remediation, is $13,199.12. P3.0637–0005–P.3.0637–0006 (Tuthill's Supplemental Exhibit Leach–1 (Revised for Trial Testimony)).

The Leach's lost about $600 per month due to their inability to refinance their mortgage because of the Chinese drywall in their home. Over twelve months, the Leach's additional costs due to their inability to refinance are $7,200. P3.0637–0005–P.3.0637–0006 (Tuthill's Supplemental Exhibit Leach–1 (Revised for Trial Testimony). This amount will be allowed, but to extend this amount into the future is too speculative.

The total monthly recurring economic damages for the Leach's is $1,635.29 per month for March-August 2010. Assuming the remediation takes six months, the total monthly recurring economic damages are $9,811.74. P3.0637–0005–P.3.0637–0006 (Tuthill's Supplemental Exhibit Leach–1 (Revised for Trial Testimony).

Joe and Cathy Leach have suffered a loss of the use and enjoyment of their home and their personal property. When the Chinese Drywall was discovered in August 2009, their large home was essentially divided in half, one half being a basement. The basement of the house now is closed off due to the Chinese Drywall in the wine room. Mr. Leach bought a new computer and moved his office upstairs. No one can use the elaborate entertainment system in the basement. P3.0546–0001–P3.0546–0039 (Expert report of David Maloney), P3.0637–0005–P.3.0637–0006 (Tuthill's Supplemental Exhibit Leach–1 (Revised for Trial Testimony), Trial Transcript at 2/22, Vol. II, p. 43 (17)-p. 52 (13) (Leach's Testimony).

Assuming remediation is complete within six months of trial, the total of all economic damages proven by Joe and Cathy Leach is $59,676.86, plus an award for loss of use and enjoyment of the home to be determined by the Court. P3.0637–0005–P.3.0637–0006

(Tuthill's Supplemental Exhibit Leach–1 (Revised for Trial Testimony).

### d. Robert and Lisa Orlando

#### i. Background

Robert and Lisa Orlando purchased a single family home at 4091 Dunbarton Circle, Williamsburg, Virginia, for $369,500 on June 4, 2009. P3.0500–0001–P3.0500–0003 (Orlando deed), P3.0637–0013–P3.0637–0014 (Supplemental Exhibit Orlando–1 (Revised for Trial testimony)), Trial Transcript at 2/22, Vol. II, p. 53 (5–13) (Orlando's Testimony). The appraised value of the home at the time of the sale was $372,000. P3.0519–0002 (Orlando appraisal for purchase). The Orlando residence has 3,245 square feet. P1.2059–0001. The Orlandos put down $150,000 when they purchased the house. The money for the down payment was all the money they had saved. This $200,000 investment was the biggest they had ever made. It was a little under 1/2 of the purchase price. P3.0521–0001–P3.0521–0002 (Settlement Statement), Trial Transcript at 2/22, Vol. II, p. 55 (20–24), p. 55 (1)-p. 56 (7) (Orlando's **\*702** Testimony). The Orlandos looked forward to the move because the home was to have an in-ground pool. Trial Transcript at 2/22, Vol. II, p. 54 (16–23) (Orlando's Testimony). They paid $50,000 for the in-ground pool. *Id.*

The Orlandos have three sons (twins who are 18 and one who is 13). The family moved down from upstate New York to Virginia when Mr. Orlando accepted a job in 2009. This was a significant move because the twins missed their senior year in high school in New York. Trial Transcript at 2/22, Vol. II, p. 54 (1–3), p. 54 (9–12) (Orlando's Testimony).

The Orlando house had 163 4x12 boards of Venture Supply drywall delivered to it. Trial Transcript at 2/22, Vol. II, p. 53 (14–17) (Orlando's Testimony).

After living in the home for four weeks, having just finished the landscaping and the pool, the Orlandos received a letter from the builder saying that they may have 172 sheets of Chinese drywall. P3.0507–0001 (Orlando Letter from American Eastern dated 7/16/09), Trial Transcript at 2/22, Vol. II, p. 55 (3–7) (Orlando's Testimony). The families in Mrs. Orlando's community

who have Chinese Drywall have shared information with one another during the past months. Trial Transcript at 2/22, Vol. II, p. 55 (16–19) (Orlando's Testimony). The Orlandos first noticed a smell when they toured the house; they thought it was from the previous owner's two children in diapers. After they moved in, the smell got progressively worse. Trial Transcript at 2/22, Vol. II, p. 56 (8–19) (Orlando's Testimony). The Orlandos had all the carpets in the home cleaned, but the smell did not go away. P3–0523–0001 (Orlando carpet cleaning receipt), Trial Transcript at 2/22, Vol. II, p. 56 (17–18) (Orlando's Testimony). Mrs. Orlando describes the odor as similar to the smell of spent fireworks. Trial Transcript at 2/22, Vol. II, p. 56 (20–22) (Orlando's Testimony).

The Orlando's hot water heater failed. The previous owner told them that in three years the air conditioner went out 2 times. The Orlandos had problems with their HVAC unit the summer of 2009. The person who came to look at their HVAC unit in August 2009 showed them the pits in the HVAC coils and could not believe that the coils were only a year old. He thought the unit was much older. P3.0524–0001 (Orlando email from Atlantic Constructors), Trial Transcript at 2/22, Vol. II, p. 55 (25)-p. 57 (9).

Mr. and Mrs. Orlando remained in the house 7 months. It was not a difficult decision to move out because they believed that, if Chinese Drywall caused pitting in metal that it also posed a risk to the family's young children's health. Trial Transcript at 2/22, Vol. II, p. 57 (10–17) (Orlando's Testimony). For as long as they were in the house, Mr. and Mrs. Orlando believed there was more Chinese drywall upstairs than downstairs. They brought mattresses downstairs, and one son slept on a mattress on the floor in the study while the rest of the family slept in the master bedroom. Nathan Orlando, age 17, was embarrassed that he had to sleep in the same room as his parents. Trial Transcript at 2/22, Vol. II, p. 57 (20)-p. 58 (1), p. 58 (4–10) (Orlando's Testimony). Mrs. Orlando put a curtain across the top of the stairs to try to trap the air and gases and smell upstairs. Trial Transcript at 2/22, Vol. II, p. 58 (2–3) (Orlando's Testimony). The Orlando family was careful to figure out how to move out of this home and not jeopardize their credit. Trial Transcript at 2/22, Vol. II, p. 57 (17–19) (Orlando's Testimony).

Having moved out of their CDW home, the Orlando family pays rent of $2,000, higher than the home's mortgage payment **703** of $1,211.89. Still, they prefer to

be out of the CDW house. P3.0637–0013–P.3.0637–0014 (Tuthill's Supplemental Exhibit Orlando–1 (Revised for Trial Testimony)), Trial Transcript at 2/22, Vol. II, p. 58 (11–16) (Orlando's Testimony), P3.0506–0001–P3.0506–0005 (Lease).

Knauf experts reported that there was no Chinese Drywall in the ceilings of the bedroom or in two tested places in the living room of the Orlando house. Trial Transcript at 2/22, Vol. II, p. 58 (17–24) (Orlando's Testimony). The Orlandos thereafter allowed their counsel to remove the entire ceiling of the house; and, on the back of the removed drywall, there were markings of Venture Supply, i.e., Taishan. Trial Transcript at 2/22, Vol. II, p. 59 (1–10) (Orlando's Testimony).

The Orlandos desire that their home be stripped to the studs with new drywall and with complete mechanical and electrical systems replaced. Trial Transcript at 2/22, Vol. II, 59:11–15 (Orlando's Testimony).

Mr. and Mrs. Orlando have worked with counsel, the appraisers and a forensic accountant (J.C. Tuthill) to assure the summary exhibit attached to the latter's report is an accurate statement of financial damages. P3.0637–0013–P.3.0637–0014 (Tuthill's Supplemental Exhibit Orlando–1 (Revised for Trial Testimony)), Trial Transcript at 2/22, Vol 2, p. 59 (16–25) (Orlando's Testimony).

### ii. Damages

The cost of remediation of the Orlando home is $249,140. P1.2059–0001, P3.0637–0013–P3.0637–0014 (Remediation Estimate Averages, Tuthill's Supplemental Exhibit Orlando–1 (Revised for Trial Testimony)).

The remediation of the Orlando home should take between 4 and 6 months.

The alternative living costs, non-recurring, both past and future, for the Orlandos are $16,656.23. P3.0637–0013–P.3.0637–0014 (Tuthill's Supplemental Exhibit Orlando–1 (Revised for Trial Testimony)), Trial Deposition of J.C. Tuthill (2/4/10) at p. 31(110–112).

The alternative living costs recurring on a monthly basis post trial are $2,368.92. P3.0637–0013–P.3.0637–0014

(Tuthill's Supplemental Exhibit Orlando–1 (Revised for Trial Testimony)), Trial Deposition of J.C. Tuthill (2/4/10) at p. 31(110–112). Assuming remediation occurs within six months, the total recurring monthly living costs are $14,213.52.

The loss of personal property of the Orlando belongings is $2,375. P3.0546–0001–P3.0546–0039, P3.0637–0013–P.3.0637–0014 (Expert report of Dave Maloney, Tuthill's Supplemental Exhibit Orlando–1 (Revised for Trial Testimony)).

The repair costs of the Orlando property, both past and future, including the Home Environmental Inspection post-remediation, are $14,426.09. P3.0637–0013–P.3.0637–0014 (Tuthill's Supplemental Exhibit Orlando–1 (Revised for Trial Testimony)).

The additional amounts owed by the Orlandos for mortgage deferral for 1 year are $11,094.60. P3.0637–0013–P.3.0637–0014 (Tuthill's Supplemental Exhibit Orlando–1 (Revised for Trial Testimony), Trial Deposition of J.D. Tuthill (2/4/10) at p. 113(15)-p. 115(15).

The Orlandos have suffered the loss of use and enjoyment of their home and personal property. Lisa and Bob Orlando and their sons lived in their home only 7 months moving out February 1, 2010. The move has cost them the use of their home. They essentially abandoned their second story as the majority of the Chinese Drywall is believed to be there. The family lived in one-half of the house for 7 months. Trial Transcript at 2/22, Vol. II, p. 53(1)-p. 59(25) (Orlando's Testimony), P3.0546– **704** 0001–P3.0546–0039 (Expert report of David Maloney, P3.0637–0013–P.3.0637–0014 (Tuthill's Supplemental Exhibit Orlando–1 (Revised for Trial Testimony)).

Assuming remediation is complete within six months of trial, the total of all economic damages proven by the Orlando's is $307,905.44 plus an award for loss of use and enjoyment of the home and personal property to be determined by the Court. P3.0637–0013–P.3.0637–0014 (Tuthill's Supplemental Exhibit Orlando–1 (Revised for Trial Testimony)).

*e. Fred and Vanessa Michaux*

*i. Background*

Fred and Vanessa Michaux purchased their townhouse with Chinese drywall at 901 Eastfield Lane, Newport News, VA, on November 1, 2007, for $267,500. P3.0464–0001 (Michaux Deed) Trial Transcript at 2/22, Vol. I, p. 4 (17–20), p. 5 (1–4) (Michaux Testimony). The Michaux residence has 2,367 square feet and is a 3 story townhome. P1.2059–0001 (Wright's Remediation Estimate Averages), P3.0443–0001 (Photo of townhome), Trial Transcript at 2/22, Vol. I, p. 5 (12–25) (Michaux Testimony). On the first floor is Mr. Michaux's office, which is like a living room, a half bath, 2 car garage, and a laundry room; the second floor is the main living space with living room, half bath, dining room, great room, and TV room; the third floor has 3 bedrooms and 2 full baths. P3.0444–0001–P3.0444–0003 (Michaux floor plan), Trial Transcript at 2/22, Vol. I, p. 5 (16–22) (Michaux Testimony). The down payment was $40,000 which took the Michauxs 10 years to accrue. P3.0466–0001–P3.0466–0004 (Michaux Mortgage Documents), Trial Transcript at 2/22, Vol. I, p. 13 (14–15) (Michaux Testimony).

Mr. Michaux is a pastor of the City Life Church in Newport News. Trial Transcript at 2/22, Vol. I, p. 6 (20–23) (Michaux Testimony). They have three children: Derrick (9), Ethan (7) and Claire (5). Trial Transcript at 2/22, Vol. I, p. 6 (15–17) (Michaux Testimony). Mr. and Mrs. Michaux were attracted to this home because it provided space for their career activity. The couple offers marriage counseling, which they could provide in the privacy of the first floor. The second floor afforded space for hosting church meetings, which they conduct about twice a week. The Michaux children are home-schooled in the townhome. The Michaux family life, church life and school life were all accommodated within the townhome. Trial Transcript at 2/22, Vol. I, p. 7 (3–25) (Michaux Testimony). City Life Church does not own a building; therefore, various church meetings were held in the Michaux home. Trial Transcript at 2/22, Vol. I, p. 6(24)-p. 7 (2) (Michaux Testimony).

This townhouse is in the same neighborhood as the McKellar's, i.e., Hollymeade, where 36 or 37 of the 67 units have Chinese drywall. Chinese drywall has had a major impact on the neighborhood, as it is now about

half-vacant. Trial Transcript at 2/22, Vol. I, p. 6 (3–14) (Michaux Testimony). Venture Supply's records show that 45 sheets of Chinese drywall were delivered to the house during construction. P3.0494–0001, P3.0495–0001 (Venture Supply Documents), Trial Transcript at 2/22, Vol. I, p. 5 (5–9) (Michaux Testimony). The expert testing by Knauf and the PSC confirmed that there is Chinese drywall on every floor of the Michaux home. Trial Transcript at 2/22, Vol. I, p. 12 (24)-p. 13 (6) (Michaux Testimony).

When Mr. and Mrs. Michaux moved into the house, they smelled an unusual odor, but thought it was from new construction. They noticed that the smell was even stronger when they got back from vacations after the house had been closed. Mrs. Michaux thought that the smell would fade as time passed, but it didn't. It got stronger. Trial Transcript at 2/22, **\*705** Vol. I, p. 7 (4–13) (Michaux Testimony). The smell lingers in the kids' school books, in all clothing and linens, and possessions. Mrs. Michaux cannot get the smell out of these things even now, although the family has not been back to live at the home in 6 months. Trial Transcript at 2/22, Vol. I, p. 8 (20–23), p. 9 (1–11) (Michaux Testimony). The Michaux family has had to prioritize items to replace due to the smell for financial reasons. The children got new mattresses. Other items were kept simply because the family cannot afford to replace them. Trial Transcript at 2/22, Vol. I, p. 9 (11–16) (Michaux Testimony).

Mr. and Mrs. Michaux moved out of the townhome on September 5, 2009, just 2 days after confirmation that it had Chinese Drywall. They were concerned with CDW associated health issues with the children which prompted them to find an apartment and move out quickly. Trial Transcript at 2/22, Vol. I, p. 8 (17–19), p. 9 (3), p. 10 (8–12) (Michaux Testimony). The Michaux son suffers from eczema and allergies. Trial Transcript at 2/22, Vol. I, p. 12 (2–6) (Michaux Testimony).

One evening, Mr. and Mrs. Michaux turned off the power to the home, looked with a flashlight at their copper wires, and found them black. Trial Transcript at 2/22, Vol. I, p. 9 (17)-p. 10 (3) (Michaux Testimony). In the Michaux home there has been HVAC coil failures, as well as many electronic failures. P3.0480–0001–P3.0486–0001 (HVAC repair records), Trial Transcript at 2/22, Vol. I, p. 10 (4–8) (Michaux Testimony).

The Michaux family's church moved the family from their home into a small apartment while they were on vacation, so the family would not have to sleep in a Chinese Drywall house anymore. Trial Transcript at 2/22, Vol. I, p. 12 (7–14) (Michaux Testimony). It was emotionally difficult for this family to move out of their house. Mrs. Michaux thought they would spend many years in it. Trial Transcript at 2/22, Vol. I, p. 11 (21)-p. 12 (2) (Michaux Testimony).

For five months Mr. and Mrs. Michaux paid both their rent and their monthly mortgage of $1,263.94. This was a great financial hardship for the family. P3.0637–0009–P3.0637–0010 (Supplemental Tuthill Exhibit), Trial Transcript at 2/22, Vol. I, p. 10 (14–16) (Michaux Testimony). To survive the 5 months of paying rent and the mortgage, the Michaux family used emergency savings and cashed in stock. They did everything a family would do to protect their credit. P3.0455–0001–P3.0455–0002 (Line of credit statement), Trial Transcript at 2/22, Vol. I, p. 11 (5–9) (Michaux Testimony). In January, 2010, Mr. and Mrs. Michaux received a mortgage deferral from their mortgage company. While they do not make mortgage payments now, interest continues to accrue, and at the end of the deferral their mortgage schedule will be reassessed. The mortgage company will only commit to a 90 day deferral each time, so the deferral must re-negotiated every three months to ask for a new deferral. P3.0456–0001–P3.0456–0003 (Michaux Mortgage Deferral), Trial Transcript at 2/22, Vol. I, p. 10 (10–14), p. 10 (19–25) (Michaux Testimony). The bank will not guarantee extending the deferral; it remains possible that Mr. and Mrs. Michaux will have to walk away from their home and relinquish ownership to the bank. Trial Transcript at 2/22, Vol. I, p. 11 (12–14) (Michaux Testimony). This accrued interest is also a hardship for the Michaux family. Trial Transcript at 2/22, Vol. I, p. 11(1–5) (Michaux Testimony). They have already met with a bankruptcy lawyer. Trial Transcript at 2/22, Vol. I, p. 10 (14–17) (Michaux Testimony). The Michaux family moved out of the small apartment on February 1, 2010 to a rental house that could more comfortably accommodate the **\*706** family. P3.0450–0001–P3.0450–0010 (Lease), Trial Transcript at 2/22, Vol. I, p. 10 (5–9) (Michaux Testimony).

Mr. and Mrs. Michaux worked with counsel and the accountant to make sure the summary exhibit was an accurate statement of the financial damages. P3.0637–

0009–P3.0637–0010 (Tuthill's Supplemental Exhibit Michaux–1 (Revised for Trial Testimony), Trial Transcript at 2/22, Vol. I, p. 13 (18)-p. 14 (2) (Michaux Testimony).

### ii. Damages

The cost of remediation of the Michaux home is $198,142.00. P1.2059–0001 (Wright's Remediation Estimate Averages), P3.0637–0009–P3.0637–0010 (Tuthill's Supplemental Exhibit Michaux–1 (Revised for Trial Testimony), Trial Transcript at 2/22, Vol. I, p. 13 (18)-p. 14 (2) (Michaux Testimony).

The remediation of the Michaux home should take between 4 and 6 months.

The alternative living costs, non-recurring, both past and future for the Michaux's are $10,576.70. P3.0637–0009–P3.0637–0010 (Tuthill's Supplemental Exhibit Michaux–1 (Revised for Trial Testimony).

The alternative living costs recurring on a monthly basis post trial are $2,397.90. P3.0637–0009–P3.0637–0010 (Tuthill's Supplemental Exhibit Michaux–1 (Revised for Trial Testimony). Assuming remediation will occur in six months, the total monthly living costs are $14,387.40.

The loss of personal property of the Michauxs is $7,620.00. P3.0546–0001–P3.0546–0039 (Expert report of Dave Maloney), P3.0637–0009–P3.0637–0010 (Tuthill's Supplemental Exhibit Michaux–1 (Revised for Trial Testimony).

The costs for repair of the Michaux property, both past and future, including the Home Environmental Inspection post remediation, is $14,606.73. P3.0637–0009–P3.0637–0010 (Tuthill's Supplemental Exhibit Michaux–1 (Revised for Trial Testimony).

The additional amounts owed by the Michauxs for mortgage deferral for 12 months are $11,701.08. P3.0637–0009–P3.0637–0010 (Tuthill's Supplemental Exhibit Michaux–1 (Revised for Trial Testimony).

The additional expenses, offset by the property tax savings due to an assessment reduction, are a credit of $1,426.11. P3.0637–0009–P3.0637–0010 (Tuthill's

Supplemental Exhibit Michaux–1 (Revised for Trial Testimony), P3.0459–0001 (Property tax assessment).

Fred and Vanessa Michaux sustained a loss of use and enjoyment of both personal property and their home. After living in their townhome for only 19 months, they abandoned it due to Chinese Drywall. Within 2 days of confirmation of the Chinese Drywall they moved out, fearing for their health. This townhome was the center of the family, pastoral, and educational lives of the entire family, and the church. P3.0546–0001–P3.0546–0039 (Expert report of Dave Maloney), P3.0637–0009–P3.0637–0010 (Tuthill's Supplemental Exhibit Michaux–1 (Revised for Trial Testimony), Trial Transcript at 2/22, Vol. I, p. 4 (12)-p. 14(2) (Michaux's Testimony)

Assuming remediation is complete within six months of trial, the total of damages proven by the Michauxs are $255,607.80 plus an award for loss of use and enjoyment of the home and personal property to be determined by the Court. P3.0637–0009–P3.0637–0010 (Tuthill's Supplemental Exhibit Michaux–1 (Revised for Trial Testimony).

### f. Preston and Rachel McKellar

### i. Background

Preston and Rachel McKellar own a townhome at 1008 Hollymeade Circle, **\*707** Newport News, Virginia. P3.0357 (McKellar's deed), Trial Transcript at 2/19, Vol. II, p. 113 (11–14) (McKellar's Testimony). Preston and Rachel McKellar purchased the home on August 30, 2006 for the sum of $197,110. P3.0357 (McKellar's deed), P3.0358 (McKellar's deed), Trial Transcript at 2/19, Vol. II, p. 114(24)-p. 115(2) (McKellar's Testimony). The townhome was appraised for $198,000 at the time of purchase. P3.0360–0001–0012 (McKellar's 2006 Appraisal). The townhome was appraised for $249,000 at the time of refinance in April 2008. P3.0364–0001–0011 (McKellar's 2008 Appraisal). The townhome has 2,115 square feet. P1.2059–0001 (Wrights' Remediation Estimate Averages).

Preston and Rachel McKellar moved in the townhome in August of 2006. Trial Transcript at 2/19, Vol. II, p. 116 (8) (McKellar's Testimony), P3.0637–0007 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial

Case 2:09-md-02047-EEF-MBN  Document 22362-781  Filed 11/19/19  Page 44 of 49  PageID #: 673

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in..., 2019 WL 3856133...

Testimony). This was Mr. and Mrs. McKeller's first home. Mr. McKellar is a middle school teacher who teaches science and social studies. Mrs. McKellar was a pediatric nurse but has been a housewife since William was born. Trial Transcript at 2/19, Vol. II, p. 114 (14–23) (McKellar's Testimony). Trial Transcript at 2/19, Vol. II, p. 116 (8) (McKellar's Testimony). Preston McKeller described how pleased the couple was with the home initially. Trial Transcript at 2/19, Vol. II, p. 116 (5–6) (McKellar's Testimony). Preston and Rachel McKellar lived in the townhome until their son, William, was born. Trial Transcript at 2/19, Vol. II, p. 113 (21–25) (McKellar's Testimony).

The McKellars lived in their townhome about 3 years. Trial Transcript at 2/19, Vol. II, p. 116 (11–13) (McKellar's Testimony). The McKellars moved out of the townhome about a month or two after they found out about Chinese Drywall. Trial Transcript at 2/19, Vol. II, p. 114 (10–13) (McKellar's Testimony). Preston, Rachel, and William McKellar moved out of the townhome on November 7, 2009 as a consequence of suspected health effects of Chinese drywall. P3.0637–0007 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony), Trial Transcript at 2/19, Vol. II, p. 113 (19–20) (McKellar's Testimony), Trial Transcript at 2/19, Vol. II, p. 118 (1–15) (McKellar's Testimony). The McKellars' ultimately made the decision to move out of their townhome based on health concerns for their son symptoms associated with CDW. William had trouble breathing in his second floor nursery. Mrs. McKellar was having constant headaches. Mr. McKellar was congested and could hardly breathe. Once they learned the house had Chinese drywall, they decided to get out of the house as soon as they could. Trial Transcript at 2/19, Vol. II, p. 118 (91–115) (McKellar's Testimony).

The McKellar's infant son's nursery was on the second floor of the townhome, the same floor which showed severe corrosion on wires, according to the testimony of Plaintiffs' expert Dr. John Scully. Hearing Dr. Scully's testimony was frightening for Mr. McKellar. Trial Transcript at 2/19, Vol. II, p. 118 (16–25) (McKellar's Testimony). Rachel McKellar gave birth to a second son, Gabriel, 4 weeks ago. Trial Transcript at 2/19, Vol. II, p. 114 (1–3) (McKellar's Testimony).

The townhome has Venture Supply Chinese Drywall. Trial Transcript at 2/19, Vol. II, p. 115 (3–5) (McKellar's

Testimony). The McKellars' first became aware they had Chinese drywall in their house when they received a letter saying the townhome may have Chinese Drywall. They asked their builder about it, and the builder assured them that the home did not. Trial Transcript at 2/19, Vol. II, p. **708** 115 (6–12) (McKellar's Testimony). The McKellars began experiencing persistent air conditioner and electrical problems and ultimately Mr. McKellar crawled into the attic, moved some insulation aside and saw that the drywall said Venture Supply on it. Trial Transcript at 2/19, Vol. II, p. 115 (13–19) (McKellar's Testimony). The existence of Chinese drywall was confirmed by inspectors and scientists hired by counsel. Trial Transcript at 2/19 Vol. II, p. 115 (19–22) (McKellar's Testimony).

The McKellars' first noticed electrical equipment failures within thirty (30) days after moving into their home. Trial Transcript at 2/19, Vol. II, p. 116 (14–18), p. 117 (1) (McKellar's Testimony). Virtually every month, there was an AC or heating failure in the McKellar home. Trial Transcript at 2/19, Vol. II, p. 117 (1–3) (McKellar's Testimony). The HVAC technicians called on by the McKellars were required to constantly return. Mr. McKellar persisted in seeking their attention and eventually had the HVAC coil replaced. Trial Transcript at 2/19, Vol. II, p. 117 (4–9) (McKellar's Testimony).

The community of Hollymeade is a close-knit group with an advisory board. Mr. McKellar and Mr. Michaux and 3 other homeowners sit on the board. Trial Transcript at 2/19, Vol. II, p. 117 (13–17) (McKellar's Testimony). Mr. McKellar kept in touch with other people in the community and noticed that all had similar complaints about their homes. Trial Transcript at 2/19, Vol. II, p. 117 (18–22) (McKellar's Testimony).

The McKellars now live in an apartment in the Featherstone Apartments. They have an 8 month lease. The apartment has 3 small bedrooms. Trial Transcript at 2/19, Vol. II, p. 119 (1–7) (McKellar's Testimony).

Prior to the discovery of Chinese drywall in their home, the McKellars' prided themselves on being able to pay their bills and support the family. Mr. McKellar never thought he would ever have to think of bankruptcy. He has been researching bankruptcy. Trial Transcript at 2/19, Vol. II, p. 120 (13–21) (McKellar's Testimony). Since discovering CDW and moving out of their home

Case 2:09-md-02047-EEF-MBN Document 22862-781 Filed 11/19/19 Page 96 of 1680

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in F.Supp.2d (2010)...        Page 45 of 49 - Page ID # 974

and into an apartment, the McKellars' are subsisting through loans and assistance from family and friends, as well as a mortgage moratorium. Trial Transcript at 2/19, Vol. II, p. 119 (11–14) (McKellar's Testimony). The McKellars received a six (6) month moratorium on their mortgage beginning in January, although interest continues to run. Trial Deposition of J.D. Tuthill (2/4/10) at p. 77 (24)-p. 78(20). Their moratorium will expire in June and the McKellars will try to get an extension. Trial Transcript at 2/19, Vol. II, p. 119 (18–19) (McKellar's Testimony). Even with the moratorium, the McKellars have to pay association dues, moving expenses, and a second mortgage note. P3.0637–0007–P3.0637–0008 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony), Trial Transcript at 2/19, Vol. II, p. 119 (19–24) (McKellar's Testimony). Mr. McKellar has gotten a second job, working more hours, which takes him away from his family. Trial Transcript at 2/19, Vol. II, p. 121 (2–3) (McKellar's Testimony). The McKellar's savings are almost gone. Trial Transcript at 2/19, Vol. II, p. 119 (23) (McKellar's Testimony). Mr. McKellar's cannot afford to pay both the mortgage of $1,139 and rent of $1,204 monthly indefinitely. P3.0637–0007–P3.0637–0008 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony), Trial Transcript at 2/19, Vol. II, p. 120 (11–12) (McKellar's Testimony).

*ii. Damages*

Mr. McKellar has identified as accurate the summary of damages compiled by J.C. Tuthill. Trial Transcript at 2/19, Vol. II, **\*709** p. 121(13)-p. 122(2) (McKellar Testimony), P3.0637–0007–P3.0637–0008, P3.0622–0008–P3.0622–0009 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony).

The cost to remediate the McKellar townhome is $194,720. P3.0637–0007–P3.0637–0008, (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony), P1.2059–0001 (Wright's Remediation Estimate Averages).

The remediation will take between 4 and 6 months.

The alternative living costs for the McKellars which are non-recurring, both past and future, is $19,623.21. P3.0637–0007–P3.0637–0008 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial

Testimony), Trial Deposition of J.D. Tuthill (2/4/10) at p. 31 (12–18).

The alternative living costs for the McKellars which recur monthly total $1,211.13 monthly for the months of March–June 2010 and $2,029.43 for July 2010 forward. P3.0637–0007–P3.0637–0008 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony), Trial Deposition of J.D. Tuthill (2/4/10) at p. 72 (14)-p. 73(16). Assuming it will take six months to remediate the McKeller's home, the total of monthly living costs will be $8903.38.

On July 1, 2010 the McKellars will move into a larger rental property as the apartment is too small for their growing family. P3.0637–0007–P3.0637–0008 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony).

The personal property loss of the McKellars' belongings total $3,585. P3.0546–0001–P3.0546–0039 (Expert report of David Maloney), P3.0637–0007–P3.0637–0008 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony).

The cost to repair items damaged by Chinese Drywall, including the home environment inspection post-remediation, is $13,998.35. P3.0637–0007–P3.0637–0008 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony).

The additional costs associated with the McKellar mortgage moratorium for 12 months are $10,914.48. P3.0637–0007–P3.0637–0008 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony).

Mr. McKellar's lost income from his teaching job as a result of having to miss work and be home for repairmen is $1336.60. P3.0637–0007–P3.0637–0008 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony).

The McKellars' property assessment was lowered to $100,600, resulting in a savings to the family of $1,339.80. P3.0616–0001 (McKellar City of Newport News Property Information), P3.0637–0007–P3.0637–0008 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony).

The McKellars have suffered the loss of use and enjoyment of their home. They began to experience failures of the air conditioning and heat within 30 days of moving into their townhome, and only lived in the townhome (albeit in less than ideal living conditions due to numerous and frequent mechanical and electrical failures) for 35 months. They have been out of their townhome since November 2009. Trial Transcript at 2/19, Vol. II, p. 113 (8)-p. 122 (2) (McKellar's Testimony), P3.0546–0001–P3.0546–0039 (Expert report of David Maloney), P3.0637–0007– P3.0637–0008 (Tuthill's Supplemental Exhibit McKellar–1) (Revised for Trial Testimony).

Assuming remediation is complete within six months of trial, the total of damages **\*710** proven by the McKellars is $251,741.22, plus an award for loss of use and enjoyment of the home to be determined by the Court. P3.0637–0007– P3.0637–0008 (Tuthill's Supplemental Exhibit McKellar–1 (Revised for Trial Testimony).

### g. Steven and Elizabeth Heischober

#### i. Background

Steven and Elizabeth Heischober purchased their Chinese drywall duplex at 214A 80th Street, Virginia Beach, VA on November 10, 2006, for $795,000. P3.0253–0001–P3.0253–0002 (Heischober Deed), Trial Transcript at 2/22, Vol. I, p. 78 (25)-p. 79 (4) (Heischober's Testimony), P3.0637–0003–P3.0637–0004 (Tuthill's Supplemental Exhibit Heischober–1 (Revised for Trial Testimony). The Heischobers had previously lived in one home for 20 years and, when they sold that home, they made a substantial amount of money. They searched for a home in which to retire for more than a year. They wanted a first floor bedroom or elevator, and this home had both. It was ideal for them, and would suit them in their later years. Trial Transcript at 2/22, Vol. I, p. 81 (8–23) (Heischober's Testimony). The Heischobers made a down payment of $345,000, a significant investment for them. Trial Transcript at 2/22, Vol. I, p. 84 (25)-p. 85 (1) (Heischober's Testimony). The duplex has 3,055 square feet. P1.2059–0001 (Wright's Remediation Estimate Averages). The duplex is 1 ½ blocks from the Atlantic Ocean; west of the home is a state park with an entrance from the end of the street. The Heischobers enjoy long walks in the park and on the

beach. They enjoy having pet dogs in the neighborhood. Trial Transcript at 2/22, Vol. I, p. 79 (20)-p. 80 (3), p. 80 (14–15) (Heischober's Testimony). The Heischober duplex is well situated within walking distance from restaurants, festivals and events at the beach in the summer. Trial Transcript at 2/22, Vol. I, p. 80 (4–6) (Heischober's Testimony). Steven and Elizabeth Heischober live in their duplex with their daughter Allison, who is a senior in college and lives with them for summer vacation and holidays. Trial Transcript at 2/22, Vol. I, p. 80 (21)-p. 81 (1–3) (Heischober's Testimony). Allison Heischober experienced some physical symptoms that have been associated with Chinese Drywall: rashes and respiratory issues. Trial Transcript at 2/22, Vol. I, p. 81 (4–7) (Heischober's Testimony).

The Heischobers moved out of the duplex on August 28, 2009, about 6 weeks after finding out that it contained Chinese drywall. Trial Transcript at 2/22, Vol. I, p. 80 (23–25) (Heischober's Testimony). Ten months after the Heischobers moved into the duplex, the transformer in their home was replaced. They experienced problems with both HVAC units' coils. The home had 2 air conditioners (upstairs and downstairs) and 7 coils were replaced in less than 3 years. The frequency of the replacements increased. The sixth coil was replaced in August 2009 and the replacement turned black in two months. The seventh coil was removed in December 2009 and not replaced. P3.0266–0001, P3.0267– 0001, P3.0268–0001, P3.0269–0001, P3.0270–0001– P3.0270–0002, P.30271–0001, P3.0272–0001–p3.0272– 0002, P3.0273–0001, P3.0274–0001, P3–0275–0001, P3.0627–0001, P.3–0628–0001, P.30630–0001 (Invoices and work orders from Metro Mechanical for HVAC repairs), Trial Transcript at 2/22, Vol. I, p. 82 (1–12), p. 83 (3–7) (Heischober's Testimony), P3.0637–0003–P3.0637– 0004 (Tuthill's Supplemental Exhibit Heischober–1 (Revised for Trial Testimony). One of the Heischober HVAC coils (number 6) was sent to Charlottesville to Dr. Scully as SLH 27. Trial Transcript at 2/22, Vol. I p. 83 (8–12) (Heischober's Testimony). The Heischober's experienced many electric failures: a computer monitor failed and the hard drive crashed. Trial Transcript at 2/22, **\*711** Vol1, p. 82 (19–24) (Heischober's Testimony); in the spring of 2008 the Heischober TV failed, Trial Transcript at 2/22, Vol. I, p. 82 (25)-p. 83 (1) (Heischober's Testimony); a switch in the Heischober master bedroom closet failed. Trial Transcript at 2/22, Vol. I, p. 83 (1–2) (Heischober's Testimony). The Heischober's clothes dryer

In re Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in F.Supp.2d (2010)...

was tested, which testing revealed corrosion on the inside of the dryer. Trial Transcript at 2/22, Vol. I, p. 83 (13–25), p. 84 (6–9) (Heischober's Testimony). The Heischobers are seeking replacements for all their appliances. Trial Transcript at 2/22, Vol. I, p. 84 (10–12) (Heischober's Testimony).

One of Mrs. Heischober's biggest concerns is the potential of improper remediation in the other owner's duplex side. With the common wall possibly being made of stacked drywall, if the other owner remediates later than the Heischobers, the dust and debris can come into their side. Trial Transcript at 2/22, Vol. I, p. 84 (13–24), p. 85 (3–4) (Heischober's Testimony)

The Heischobers moved out of their home on August 28, 2009. They do not plan to return, without full remediation of the property. Trial Transcript at 2/22, Vol. I, p. 85 (5–6) (Heischober's Testimony).

The Heischobers, on discovering that their home had Chinese drywall, obtained estimates on their own to have their home fixed. The amount of the estimate was staggering, and the bank would not loan them the money for the remediation. Trial Transcript at 2/22, Vol. I, p. 85 (9–22) (Heischober's Testimony). The Heischobers have delayed any action to repair, pending a proper protocol to remediate. Trial Transcript at 2/22, Vol. I, p. 85 (22)-p. 86 (1) (Heischober's Testimony).

Mrs. Heischober worked with counsel and a forensic accountant to calculate damages. She has reviewed the latter's summary and finds it accurate and complete. Trial Transcript at 2/22, Vol. I, p. 86 (18)-p. 87 (3) (Heischober's Testimony).

### ii. Damages

The remediation of the Heischober home will take between 4 and 6 months.

The cost of remediation of the Heischober side of the duplex is $312,755. P1.2059–0001 (Wright's Remediation Estimate Averages), P3.0637–0003–P3.0637–0004 (Tuthill's Supplemental Exhibit Heischober–1 (Revised for Trial Testimony).

The non-recurring alternative living costs, both past and future, for Mr. and Mrs. Heischober are $11,006.84. P3.0637–0003–P3.0637–0004 (Tuthill's Supplemental Exhibit Heischober–1 (Revised for Trial Testimony).

The monthly recurring alternative living costs for the Heischobers post-trial are $1,822.50 monthly. P3.0637–0003–P3.0637–0004 (Tuthill's Supplemental Exhibit Heischober–1 (Revised for Trial Testimony). Assuming the remediation will take six months, the total monthly recurring costs are $10,935.

The Heischober's loss of personal property is $12,004. P3.0546–0001–P.30546–0039 (Expert Report of David Maloney), P3.0637–0003–P3.0637–0004 (Tuthill's Supplemental Exhibit Heischober–1 (Revised for Trial Testimony).

The repair costs of the Heischobers, including both past and future expenses and the Home Environmental Inspection post-remediation, are $17,314.66. P3.0637–0003–P3.0637–0004 (Tuthill's Supplemental Exhibit Heischober–1 (Revised for Trial Testimony).

The additional costs the Heischobers will pay for the mortgage deferral for 12 months are $19,656.48. P3.0637–0003–P3.0637–0004 (Tuthill's Supplemental Exhibit Heischober–1 (Revised for Trial Testimony), **712** Trial Deposition of J.C. Tuthill (2/4/10) at p. 48 (4)-p. 49 (19).

The Heischobers were granted a property tax reduction by the assessor of $2,785.71. P3.0637–0003–P3.0637–0004 (Tuthill's Supplemental Exhibit Heischober–1 (Revised for Trial Testimony), Trial Deposition of J.C. Tuthill (2/4/10) at p. 49 (20)-p. 50 (21).

The Heischobers have suffered the loss of use and enjoyment of their home and their personal property. Their retirement home in an idyllic neighborhood is now their albatross. The electronic breakdowns began just 10 months after they moved into the home. From that month forward, they were plagued with appliance failures and attempted repairs. They had 7 HVAC coils replaced in about a 2 year period. They abandoned the home and their belongings in August 2009. Deprived of the use and enjoyment of their home for more than 7 months, they now live in a state of disruption. Trial Transcript at 2/22, Vol. I, p. 78 (19)-p. 87

(14) (Heischober's Testimony), P3.0546–0001–P3.0546–0039 (Expert report of David Maloney), P3.0637–0003–P3.0637–0004 (Tuthill's Supplemental Exhibit Heischober–1 (Revised for Trial Testimony)).

Assuming remediation is complete within six months of trial, the total of damages proven by the Heischobers is $380,886.27, plus an award for loss of use and enjoyment of the home to be determined by the Court. P3.0637–0003–P3.0637–0004 (Tuthill's Supplemental Exhibit Heischober–1 (Revised for Trial Testimony).

### III. CONCLUSION

In summary, based upon the Findings of Fact and Conclusions of Law, the Court finds that scientific, economic, and practicality concerns dictate that the proper remediation for the Plaintiff-intervenors is to remove all drywall in their homes, all items which have suffered corrosion as a result of the Chinese drywall, and all items which will be materially damaged in the process of removal. Accordingly, the Court further finds that the Plaintiff-intervenors are entitled to recover damages as follows:

a. Plaintiff intervenors William and Deborah Morgan have suffered property damages, personal property damages, and other forms of compensable damages in the amount of $381,613.29. In addition, the Court finds that Plaintiff intervenors William and Deborah Morgan have suffered loss of use and enjoyment damages in the amount of $100,000.00. The Court awards Plaintiff intervenors William and Deborah Morgan total damages, caused by Taishan, in the amount of $481,613.29.

b. Plaintiff intervenors Jerry and Inez Baldwin have suffered property damages, personal property damages, and other forms of compensable damages in the amount of $341,699.11. In addition, the Court finds that Plaintiff intervenors Jerry and Inez Baldwin have suffered loss of use and enjoyment damages in the amount of $100,000.00. The Court awards Plaintiff intervenors Jerry and Inez Baldwin total damages, caused by Taishan, in the amount of $441,699.11.

c. Plaintiff intervenors Joseph and Cathy Leach have suffered property damages, personal property damages,

and other forms of compensable damages in the amount of $59,676.86. In addition, the Court finds that Plaintiff intervenors Joseph and Cathy Leach have suffered loss of use and enjoyment damages in the amount of $30,000.00. The Court awards Plaintiff intervenors Joseph and Cathy Leach total damages, caused by Taishan, in the amount of $89,676.86.

d. Plaintiff intervenors Bob and Lisa Orlando have suffered property damages, personal property damages, and **\*713** other forms of compensable damages in the amount of $307,905.44. In addition, the Court finds that Plaintiff intervenors Bob and Lisa Orlando have suffered loss of use and enjoyment damages in the amount of $100,000.00. The Court awards Plaintiff intervenors Bob and Lisa Orlando total damages, caused by Taishan, in the amount of $407,905.44.

e. Plaintiff intervenors J. Frederick and Vannessa Michaux have suffered property damages, personal property damages, and other forms of compensable damages in the amount of $255,607.80. In addition, the Court finds that Plaintiff intervenors J. Frederick and Vannessa Michaux have suffered loss of use and enjoyment damages in the amount of $100,000.00. The Court awards Plaintiff intervenors J. Frederick and Vanessa Michaux total damages, caused by Taishan, in the amount of $355,607.80.

f. Plaintiff intervenors Preston and Rachel McKeller have suffered property damages, personal property damages, and other forms of compensable damages in the amount of $251,741.22. In addition, the Court finds that Plaintiff intervenors Preston and Rachel McKeller have suffered loss of use and enjoyment damages in the amount of $100,000.00. The Court awards Plaintiff-intervenors Preston and Rachel McKellar total damages, caused by Taishan, in the amount of $351,741.22.

g. Plaintiff intervenors Steven and Elizabeth Heischober have suffered property damages, personal property damages, and other forms of compensable damages in the amount of $380,886.27. In addition, the Court finds that Plaintiff intervenors Steven and Elizabeth Heischober have suffered loss of use and enjoyment damages in the amount of $100,00.00. The Court awards Plaintiff intervenors Steven and Elizabeth Heischober's total damages, caused by Taishan, in the amount of $480,886.27.

In sum, the Court awards all seven Plaintiff intervenor families monetary damages for their losses caused by the defendant Taishan in the total amount of $2,609,129.99.

**All Citations**

706 F.Supp.2d 655

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# JOINT APPENDIX TAB # 4

📄 Original Image of 894 F.Supp.2d 819 (PDF)

894 F.Supp.2d 819
United States District Court,
E.D. Louisiana.

In re CHINESE MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION.

MDL No. 2047.
|
Sept. 4, 2012.

**Synopsis**

**Background:** Homeowners brought class actions against manufacturers of Chinese drywall, among others, alleging negligence, negligence per se, breach of express and implied warranties, and violation of various consumer protection acts, among other claims, after defective drywall was installed in their homes. Cases were later transferred to create multi-district litigation (MDL), and hundreds of actions were consolidated. The District Court, Eldon E. Fallon, J., 706 F.Supp.2d 655, entered preliminary default judgment against one of manufacturers. Manufacturer brought motions to vacate default judgment, and to dismiss two of complaints.

**Holdings:** The District Court, Fallon, J., held that:

[1] Virginia long-arm statute provision governing tortious injury provided personal jurisdiction over manufacturer;

[2] manufacturer had sufficient minimum contacts for exercise of personal jurisdiction;

[3] plaintiffs' claims arose out of or related to manufacture, and sale, of drywall, as required for exercise of personal jurisdiction;

[4] exercise of personal jurisdiction did not offend traditional notions of fair play and substantial justice;

[5] it was not appropriate to vacate default judgment against manufacturer; and

[6] manufacturer's wholly-owned subsidiary operated as manufacturer's alter ego or agent in Florida.

Motions denied.

West Headnotes (53)

[1]   **Federal Courts**
      👉 Evidence;Affidavits

      **Federal Courts**
      👉 Presumptions and burden of proof

      When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident, and the court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery. Fed.Rules Civ.Proc.Rule 12(b)(2), 28 U.S.C.A.

      1 Cases that cite this headnote

[2]   **Federal Courts**
      👉 Weight and sufficiency

      When a court hears a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, the plaintiff need only present a prima facie case of personal jurisdiction; when there is an evidentiary hearing, however, the plaintiff is held to the higher standard of preponderance of the evidence. Fed.Rules Civ.Proc.Rule 12(b)(2), 28 U.S.C.A.

      1 Cases that cite this headnote

[3]   **Constitutional Law**
      👉 Non-residents in general

      **Federal Courts**
      👉 Actions by or Against Nonresidents; "Long-Arm" Jurisdiction

      **Federal Courts**
      👉 Personal jurisdiction

      A federal district court sitting in diversity may exercise personal jurisdiction over a foreign

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

defendant if: (1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the Due Process Clause. U.S.C.A. Const.Amend. 14.

4 Cases that cite this headnote

**[4]  Courts**
   👉 Business contacts and activities; transacting or doing business

Virginia's long-arm statute is a single-act statute requiring only one transaction in Virginia to confer jurisdiction on its courts. West's V.C.A. § 8.01–328.1.

Cases that cite this headnote

**[5]  Constitutional Law**
   👉 Non-residents in general

Once the Virginia long-arm statute is satisfied, the question simply becomes whether the defendant has sufficient minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14; West's V.C.A. § 8.01–328.1.

Cases that cite this headnote

**[6]  Courts**
   👉 Contract disputes

In order for Virginia long-arm statute provision, which provides personal jurisdiction over person contracting to supply services or things in state, the court must conclude either the defendant made a contract in the forum or contracted to perform obligations in the forum. West's V.C.A. § 8.01–328.1(A)(2).

Cases that cite this headnote

**[7]  Courts**
   👉 Contract disputes

In determining whether the consummation of a contract provides personal jurisdiction under Virginia long-arm statute provision,

which provides personal jurisdiction over person contracting to supply services or things in state, courts are to consider: (1) where the contract was negotiated and executed; (2) who initiated the contact; (3) the extent of the communications, both telephonic and written; and (4) where the obligations of the parties under the contract were to be performed. West's V.C.A. § 8.01–328.1(A)(2).

Cases that cite this headnote

**[8]  Federal Courts**
   👉 Particular Entities, Contexts, and Causes of Action

Virginia long-arm statute provision, which provided personal jurisdiction over person contracting to supply services or things in state, did not permit exercise of jurisdiction over Chinese-based manufacturer of Chinese drywall in action brought against it by homeowners for claims arising after defective drywall was installed in homes; manufacturer entered into two contracts for sale of drywall with Virginia-based company, contractual negotiations occurred over telephone, through email, and in-person in China, communications were regular and relatively extensive, first contract was executed via fax in Virginia and second was executed in person in China, and obligations under contracts were to be performed by manufacturer in China, where it manufactured drywall and shipped it free on board (FOB) to company at Chinese port. West's V.C.A. § 8.01–328.1(A)(2).

Cases that cite this headnote

**[9]  Federal Courts**
   👉 Particular Entities, Contexts, and Causes of Action

Virginia long-arm statute provision, which provided personal jurisdiction over person who caused tortious injury in state by act outside of state, while deriving substantial revenue from goods used in state, or via tortious injury through breach of warranty

of goods sold in state, permitted exercise of jurisdiction over Chinese-based manufacturer of Chinese drywall in action brought against it by homeowners for claims arising after defective drywall was installed in homes; manufacturer, through obtaining $724,800.00 in revenue from two contracts with Virginia-based company, derived substantial revenue through sales in state. West's V.C.A. § 8.01–328.1(A)(4, 5).

Cases that cite this headnote

[10] **Constitutional Law**
    👉 Non-residents in general

The Due Process Clause operates to limit the power of a state to assert in personam jurisdiction over a nonresident defendant, and a court's exercise of personal jurisdiction over a foreign defendant is consistent with due process only when: (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

[11] **Constitutional Law**
    👉 Non-residents in general

For due process jurisdictional purposes, there are two types of minimum contacts: those that give rise to specific personal jurisdiction and those which give rise to general jurisdiction. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[12] **Constitutional Law**
    👉 Non-residents in general

"Specific jurisdiction" exists, in accordance with due process, when the defendant has purposefully directed his activities at residents of the forum and the litigation results from

alleged injuries that arise out of or relate to those activities. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[13] **Constitutional Law**
    👉 Non-residents in general

For specific personal jurisdiction to attach in accordance with due process, the non-resident's purposefully directed activities in the forum must be such that he could reasonably anticipate being haled into court in the forum state. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[14] **Constitutional Law**
    👉 Non-residents in general

Specific personal jurisdiction, so as to accord with due process, requires a sufficient nexus between the non-resident's contacts with the forum and the cause of action. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[15] **Constitutional Law**
    👉 Non-residents in general

A defendant who purposefully avails himself of the privilege of conducting activities in the forum state invokes the benefits and protections of the forum's laws, for purposes of application of specific personal jurisdiction in accordance with due process, and the purposeful availment requirement ensures that a defendant will not be hauled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

[16] **Constitutional Law**
    👉 Non-residents in general

For purposes of specific personal jurisdiction, the activities of a defendant are not measured by quantity, but rather quality, as a single act by the defendant directed at the forum state

can be enough to confer personal jurisdiction, in accordance with due process, if that act gives rise to the claim being asserted. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[17]  Courts**
👉 Number of judges concurring in opinion, and opinion by divided court

When a fragmented Supreme Court decides a case, and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds.

1 Cases that cite this headnote

**[18]  Constitutional Law**
👉 Manufacture, distribution, and sale

**Federal Courts**
👉 Particular Entities, Contexts, and Causes of Action

Chinese-based manufacturer of Chinese drywall had sufficient minimum contacts with Virginia for exercise of specific personal jurisdiction, in accordance with due process, over manufacturer in action brought against it by homeowners for claims arising after defective drywall was installed in homes; although manufacturer had no physical contacts with Virginia, it did possess substantial Virginia-specific contacts which demonstrated it purposefully directed its sales of drywall at Virginia, and it placed its drywall into stream of commerce with knowledge drywall would end up in and be used in Virginia. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[19]  Constitutional Law**
👉 Manufacture, distribution, and sale

**Federal Courts**
👉 Particular Entities, Contexts, and Causes of Action

Virginia homeowners' claims arising after defective drywall was installed in their homes arose out of, or related to, manufacture of drywall by Chinese-based manufacturer, and sale of that drywall in Virginia, as required for exercise of specific personal jurisdiction over manufacturer so as to accord with due process; manufacturer's minimum contacts with Virginia, included its design, manufacture, marketing and sale of drywall for a Virginia-based company, which manufacturer knew would be delivered to Virginia and used in Virginia properties. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[20]  Constitutional Law**
👉 Non-residents in general

Even if minimum contacts exist, the exercise of personal jurisdiction over a non-resident defendant will fail to satisfy due process requirements if the assertion of personal jurisdiction offends traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[21]  Constitutional Law**
👉 Due process

Once a plaintiff has established minimum contacts in accordance with due process, the burden shifts to the defendant to show the assertion of personal jurisdiction in the forum would be unfair or unreasonable. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[22]  Constitutional Law**
👉 Non-residents in general

In determining whether state's assertion of personal jurisdiction over nonresident defendant offends traditional notions of fair play and substantial justice so as to violate Fourteenth Amendment due process requirements, the court must consider: (1)

the defendant's burden; (2) the forum state's interest; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[23]**    **Constitutional Law**
     🔑   Manufacture, distribution, and sale

     **Federal Courts**
     🔑   Particular Entities, Contexts, and Causes of Action

Exercise of personal jurisdiction over Chinese-based manufacturer of Chinese drywall, in action brought against it by homeowners for claims arising after defective drywall was installed in homes, did not offend traditional notions of fair play and substantial justice; although manufacturer would face burdens if subjected to personal jurisdiction, Virginia had great interest in its citizens being able to litigate against manufacturer for alleged damages caused to their properties, homeowners had strong interest in obtaining efficient relief against manufacturer for damages caused by manufacturer's own defective product to their homes and properties, judicial system had great interest in effectively and efficiently resolving drywall-related claims, and it was in states' shared interest to discourage the manufacture and distribution of defective products. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[24]**    **Federal Civil Procedure**
     🔑   By Default

Although default judgments are disfavored as a matter of policy, this policy is counterbalanced by considerations of social goals, justice and expediency, a weighing process that lies largely within the domain of the trial judge's discretion. Fed.Rules Civ.Proc.Rule 55, 28 U.S.C.A.

Cases that cite this headnote

**[25]**    **Federal Civil Procedure**
     🔑   Grounds and Factors

When deciding a motion to set aside a default judgment, the court must consider the following factors: (1) final judgments should not lightly be disturbed; (2) such a motion is not to be used as a substitute for appeal; (3) such a motion should be liberally construed in order to do substantial justice; (4) whether the motion was made within a reasonable time; (5) whether the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of the judgment; (6) whether there are any intervening equities that would make it inequitable to grant relief; and (7) any other factors relevant to the justice of the judgment under attack. Fed.Rules Civ.Proc.Rules 55, 60(b), 28 U.S.C.A.

Cases that cite this headnote

**[26]**    **Federal Civil Procedure**
     🔑   Grounds and Factors

In determining whether good cause exists to set aside a default judgment, court may consider whether: (1) the default was willful; (2) setting it aside would prejudice the adversary; (3) a meritorious defense is presented; (4) the public interest was implicated; (5) there was significant financial loss to the defendant; and whether (6) the defendant acted expeditiously to correct the default. Fed.Rules Civ.Proc.Rules 55, 60(b)(1), 28 U.S.C.A.

Cases that cite this headnote

**[27]**    **Federal Civil Procedure**
     🔑   Excusable neglect

It was not appropriate to vacate, on basis of excusable neglect, default judgment entered against Chinese manufacturer of Chinese drywall, in action brought against it by homeowners for claims arising after defective drywall was installed in homes; manufacturer

was served with complaint in its native language, it was aware it had previously sold its drywall to Virginia-based company, which was also named in complaint, homeowners invested substantial amounts of money, time, and effort in serving manufacturer and preparing for and presenting default judgment hearing, yet homeowners who were awarded damages under judgment were still suffering property damage from presence of manufacturer's drywall in their homes, and public had interest in seeing that persons harmed by defective, foreign products be accorded relief for their damages. Fed.Rules Civ.Proc.Rules 55, 60(b)(1), 28 U.S.C.A.

1 Cases that cite this headnote

**[28]** **Federal Civil Procedure**
👉 Catch-all provisions
**Federal Civil Procedure**
👉 Catch-all provisions

Relief under catch-all provision of rule governing motions for relief from judgment or order is not available if the type of relief sought is covered by the other subsections in rule, and is available only if extraordinary circumstances exist. Fed.Rules Civ.Proc.Rule 60(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[29]** **Corporations and Business Organizations**
👉 Jurisdiction over shareholders, directors, or officers of foreign corporations
**Federal Courts**
👉 Related or affiliated entities; parent and subsidiary

Piercing the corporate veil is not necessary for imputing contacts of one affiliated corporation to another for purposes of personal jurisdiction, but rather is the test conducted for imposing liability as between related corporations.

1 Cases that cite this headnote

**[30]** **Corporations and Business Organizations**
👉 Parent and subsidiary corporations
**Courts**
👉 Related or affiliated entities; parent and subsidiary

Under Florida law, the general rule is that a parent and subsidiary are separate and distinct corporate entities, and the presence of one in a forum state may not necessarily be attributed to the other for purposes of personal jurisdiction.

Cases that cite this headnote

**[31]** **Corporations and Business Organizations**
👉 Jurisdiction over shareholders, directors, or officers of foreign corporations
**Courts**
👉 Related or affiliated entities; parent and subsidiary

Under Florida law, a plaintiff may establish personal jurisdiction in the forum over a nonresident parent corporation by virtue of its subsidiary's activities in the forum when, the parent exercises sufficient control over the subsidiary to render the subsidiary an agent or alter ego of the parent.

Cases that cite this headnote

**[32]** **Corporations and Business Organizations**
👉 Jurisdiction over shareholders, directors, or officers of foreign corporations
**Courts**
👉 Related or affiliated entities; parent and subsidiary

Under Florida law, ownership of a resident subsidiary corporation by an out-of-state parent corporation, without more, will not sustain the assertion of personal jurisdiction over the foreign parent; generally, proof of control by the parent over the internal business operations and affairs of the subsidiary is required to fuse the two for jurisdictional purposes, and the degree of control exercised by the parent must be greater than that normally associated with ownership and directorship.

1 Cases that cite this headnote

**[33]**   **Corporations and Business Organizations**
👉 Jurisdiction over shareholders, directors, or officers of foreign corporations
**Courts**
👉 Related or affiliated entities;parent and subsidiary

Under Florida law, if a subsidiary is a mere instrumentality of a parent corporation, the parent corporation will be subject to personal jurisdiction.

Cases that cite this headnote

**[34]**   **Corporations and Business Organizations**
👉 Jurisdiction over shareholders, directors, or officers of foreign corporations
**Federal Courts**
👉 Related or affiliated entities;parent and subsidiary

Wholly-owned subsidiary of Chinese drywall manufacturer operated as manufacturer's alter ego or agent in conducting its Florida-related business, as required to impute subsidiary's contacts to manufacturer for purposes of personal jurisdiction in action brought against manufacturer by home and property owners for claims arising after defective drywall was installed in homes and properties; although subsidiary was created with separate articles of incorporation, registered with Chinese business licensing department, and submitted financial reports separate from manufacturer, manufacturer created subsidiary specifically to manufacture its products, particularly drywall, and sell drywall to manufacturer's existing customers, manufacturer and subsidiary held themselves out to customers and potential customers as a single entity, and manufacturer's employees "volunteered" to work for subsidiary.

Cases that cite this headnote

**[35]**   **Courts**

👉 Actions by or Against Nonresidents, Personal Jurisdiction In;"Long-Arm" Jurisdiction

Courts are required to strictly construe Florida's long-arm statute. West's F.S.A. § 48.193.

Cases that cite this headnote

**[36]**   **Courts**
👉 Business contacts and activities; transacting or doing business

As used in Florida's long arm statute, the term "arising from" the operation of a business is broad; it does not mean proximately caused by, but only requires a direct affiliation, nexus, or substantial connection to exist between the basis for the cause of action and the business activity. West's F.S.A. § 48.193(1).

Cases that cite this headnote

**[37]**   **Courts**
👉 Business contacts and activities; transacting or doing business

To invoke long arm jurisdiction under provision of Florida's long-arm statute relating to actions arising from operating a business in the state, the activities of the corporation must be considered collectively and show a general course of business activity in the state for pecuniary benefit; importantly, it is not necessarily the number of transactions, but rather the nature and extent of the transactions that determines whether a person is carrying on a business or business venture within the state. West's F.S.A. § 48.193(1)(a).

Cases that cite this headnote

**[38]**   **Federal Courts**
👉 Particular Entities, Contexts, and Causes of Action
**Federal Courts**
👉 Related or affiliated entities;parent and subsidiary

Chinese manufacturer of drywall and its wholly-owned subsidiary had sufficient Florida-related business in state through its sale of almost 200,000 sheets of drywall in several transactions to Florida customers, or customers doing business in Florida, as required for exercise of long-arm jurisdiction over manufacturer in action brought against it by home and property owners for claims arising after defective drywall was installed in homes and properties; although manufacturer was never physically present in Florida, it had extensive contacts within state incident to its negotiation and execution of sales, and it made almost $800,000 from sales. West's F.S.A. § 48.193(1)(a).

Cases that cite this headnote

[39]  **Courts**
      👉 Torts in general

Under Florida's long arm statute, a court has specific personal jurisdiction over a defendant where it commits a tortious act within the state. West's F.S.A. § 48.193(1)(b).

Cases that cite this headnote

[40]  **Courts**
      👉 Torts in general

In order to commit a tortious act within Florida, as required for Florida to exercise personal jurisdiction over a non-resident defendant under long-arm statute, the defendant's physical presence in Florida is not required, as statute also applies to defendants committing tortious acts outside state that cause injury in Florida. West's F.S.A. § 48.193(1)(b).

Cases that cite this headnote

[41]  **Courts**
      👉 Torts in general

While a non-resident defendant's physical presence in Florida is not required to confer personal jurisdiction under state's long-arm statute, it is not, however, enough that the

actions of a defendant committed outside of Florida ultimately have consequences in Florida; instead, his actions must directly cause injury or damage within the state. West's F.S.A. § 48.193(1)(b).

Cases that cite this headnote

[42]  **Courts**
      👉 Torts in general

In order for assertion of specific personal jurisdiction for tortious act, under Florida's long-arm statute, the plaintiff must demonstrate that the non-resident defendant committed a substantial aspect of the alleged tort in Florida, and such a showing is made by establishing that the activities in Florida were essential to the success of the tort. West's F.S.A. § 48.193(1)(b).

Cases that cite this headnote

[43]  **Federal Courts**
      👉 Particular Entities, Contexts, and Causes of Action
      **Federal Courts**
      👉 Related or affiliated entities;parent and subsidiary

Chinese-based manufacturer of Chinese drywall and its wholly-owned subsidiary, through its sale of defective drywall in Florida and its failure to warn of defects, committed tortious activity in Florida, as required for exercise of specific personal jurisdiction over manufacturer in action brought against it by home and property owners for claims arising after defective drywall was installed in homes and properties. West's F.S.A. § 48.193(1)(b).

Cases that cite this headnote

[44]  **Federal Courts**
      👉 Particular Entities, Contexts, and Causes of Action
      **Federal Courts**
      👉 Related or affiliated entities;parent and subsidiary

Chinese-based manufacturer of Chinese drywall and its wholly-owned subsidiary had sufficient minimum contacts with Florida for exercise of specific personal jurisdiction over manufacturer in action brought against it by home and property owners for claims arising after defective drywall was installed in homes and properties; over course of approximately two years, manufacturer deliberately negotiated and entered into several contracts for sale of hundreds of thousands of sheets of its drywall with Florida companies and companies doing business in Florida, manufacturer engaged in extensive email, phone and in-person communications with Florida customers in support and furtherance of their business relationships, welcomed Florida-based customers to its offices and factory in China, sent samples of drywall to Florida to facilitate sales, made plans with Florida customers to expand its drywall marketing business in Florida and United States, and its drywall ended up in Florida and was used in Florida properties. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[45]** **Federal Courts**
👉 Particular Entities, Contexts, and Causes of Action

**Federal Courts**
👉 Related or affiliated entities;parent and subsidiary

Florida home and property owners' claims arising after defective drywall was installed in their homes and properties arose out of or related to manufacture of drywall by Chinese-based manufacturer and its wholly-owned subsidiary, and sale of that drywall in Florida, as required for exercise of specific personal jurisdiction over manufacturer; manufacturer's minimum contacts with Florida included its design, manufacture, marketing and sale of drywall to Florida customers and customers doing business in Florida. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[46]** **Corporations and Business Organizations**
👉 Jurisdiction over shareholders, directors, or officers of foreign corporations

**Courts**
👉 Related or affiliated entities;parent and subsidiary

Louisiana law recognizes the possibility of imputing contacts of a subsidiary to a parent for purposes of personal jurisdiction when the subsidiary is actually an alter ego of the parent.

1 Cases that cite this headnote

**[47]** **Corporations and Business Organizations**
👉 Separate Corporations;Disregarding Separate Entities

**Corporations and Business Organizations**
👉 Single business enterprise

Under Louisiana law, the factors to be considered to determine whether one entity is an alter ego of another, or whether two entities are a single business enterprise, are similar, and include but are not limited to: (1) common ownership; (2) common directors and officers; (3) common employees; (4) common offices; (5) unified administrative control; (6) similar or supplementary business functions; (7) one corporation financing the other; (8) inadequate capitalization; (9) one corporation's creation of the other; (10) one corporation paying the salaries, expenses, or losses of the other corporation; (11) one corporation receiving no business other than that given to it by the affiliated corporation; (12) shared property; (13) noncompliance with corporate formalities; (14) services rendered by the employees of one corporation on behalf of another corporation; (15) centralized accounting; (16) undocumented transfer of funds between corporations; (17) unclear allocation of profits and losses between corporations; and (18) excessive fragmentation of a single enterprise into separate corporations.

Cases that cite this headnote

**[48]**    **Principal and Agent**
👉 Presumptions and burden of proof

Under Louisiana law, an agency relationship cannot be presumed; it must be clearly established.

Cases that cite this headnote

**[49]**    **Principal and Agent**
👉 Implied Agency

**Principal and Agent**
👉 Implied and Apparent Authority

For an implied agency under Louisiana law, the principal has the right to control the conduct of the agent and the agent has the authority to bind the principal.

Cases that cite this headnote

**[50]**    **Principal and Agent**
👉 Conduct of parties in general

Under Louisiana law, implied agency is established by the words and conduct of the parties and the circumstances of the case.

Cases that cite this headnote

**[51]**    **Corporations and Business Organizations**
👉 Jurisdiction over shareholders, directors, or officers of foreign corporations

**Federal Courts**
👉 Related or affiliated entities; parent and subsidiary

Wholly-owned subsidiary of Chinese drywall manufacturer operated as manufacturer's alter ego or agent in conducting its Louisiana-related business, as required to impute subsidiary's contacts to manufacturer for purposes of personal jurisdiction in action brought against manufacturer by home and property owners for claims arising after defective drywall was installed in homes and properties; subsidiary was formed to sell manufacturer's products to portion of its

existing customer base, entities' employees and board members overlapped, subsidiary held itself out as manufacturer in dealing with customers and potential customers, manufacturer authorized subsidiary to use its registered trademarks, entities interchanged in conducting business and settling debts with customers, and after subsidiary stopped production, manufacturer continued to pay the salaries of subsidiary's remaining employees and handled its business affairs.

Cases that cite this headnote

**[52]**    **Courts**
👉 Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

The limits of Louisiana's long arm statute and the limits of constitutional due process are now coextensive; under the express wording of the statute, the sole inquiry into the jurisdiction over a nonresident is a one-step analysis of the constitutional due process requirements. U.S.C.A. Const.Amend. 14; LSA–R.S. 13:3201.

Cases that cite this headnote

**[53]**    **Federal Courts**
👉 Particular Entities, Contexts, and Causes of Action

**Federal Courts**
👉 Related or affiliated entities; parent and subsidiary

Chinese-based manufacturer of Chinese drywall and its wholly-owned subsidiary had sufficient minimum contacts with Louisiana for exercise of specific personal jurisdiction over manufacturer in action brought against it by home and property owners for claims arising after defective drywall was installed in homes and properties; although manufacturer had no physical contacts with Louisiana, it did possess substantial Virginia-specific contacts which demonstrated it purposefully directed its sales of drywall at Virginia, and it placed its drywall into stream of commerce with

knowledge drywall would end up in and be used in Louisiana. U.S.C.A. Const.Amend. 14.

14 Cases that cite this headnote

**Attorneys and Law Firms**

**\*827** Phillip A. Wittmann, Stone, Pigman, Walther, Wittmann, LLC, Judy Y. Barrasso, Barrasso, Usdin, Kupperman, Freeman & Sarver, LLC, New Orleans, LA, for Homebuilders and Installers Steering Committee and Insurer Steering Committee.

### *ORDER & REASONS*

ELDON E. FALLON, District Judge.

Before the Court are the following four motions: (1) Taishan Gypsum Co. Ltd's ("TG") Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint in *Germano v. Taishan Gypsum Co., Ltd.,* Case No. 09–6687 (R. Doc. 13490); (2) TG's Renewed Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate the Entry of Default and Dismiss This Action in *The Mitchell Co., Inc. v. Knauf Gips KG,* Case No. 09–4115 (R. Doc. 13566); (3) TG and Taian Taishan Plasterboard Co., Ltd.'s ("TTP") (collectively "Taishan" or "Taishan Entities") Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Gross v. Knauf Gips KG,* Case No. 09–6690 (R. Doc. 13590); and (4) TG and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Wiltz v. Beijing New Building Materials Public Ltd., Co.,* Case No. 10–361 (R. Doc. 13591). Extensive discovery was conducted in preparation for the motions, followed by lengthy briefing and an evidentiary hearing with oral arguments. The Court has now reviewed the parties' arguments, the relevant evidence, and the applicable law, and it is ready to rule.

## *TABLE OF CONTENTS*

I. BACKGROUND ..................................................................................................... 829

    A. The MDL Litigation ........................................................................................ 829

    B. The Knauf Entities ......................................................................................... 830

    C. The Taishan Entities ...................................................................................... 831

II. TG'S RENEWED MOTION TO VACATE THE DEFAULT JUDGMENT & DISMISS THE COMPLAINT IN *GERMANO* .......................................................... 834

    A. Present Motion & Summary of the Parties' Positions .................................... 834

        *1. TG's Motion* ........................................................................................... 834

        *2. The PS's Responses in Opposition* ....................................................... 835

            *a. Response to the Motion* ................................................................. 835

            *b. Global Memorandum* ..................................................................... 835

        *3. TG's Reply* ............................................................................................. 835

    B. Motion to Dismiss for Lack of Personal Jurisdiction ...................................... 836

        *1. Standard of Review* ............................................................................... 836

2.    Applicable Law...................................................................................................... 836

3.    Personal Jurisdiction Over a Foreign Defendant................................................... 837

4.    Virginia's Long–Arm Statute................................................................................. 837

        a.    Subsection (A)(2)-Contracting to Supply Services...................................... 839

        b.    Warranty........................................................................................................ 840

5.    Due Process Clause............................................................................................... 841

6.    Minimum Contacts................................................................................................. 841

        a.    Specific Personal Jurisdiction...................................................................... 842

        b.    Jurisdiction.................................................................................................... 842

        c.    Effect of J. McIntyre on the Specific Personal Jurisdiction Analysis........... 846

        d.    Fifth Circuit's Interpretation of Specific Personal Jurisdiction.................... 848

7.    TG's Minimum Contacts in Germano..................................................................... 849

        a.    TG's Lack of Physical Contacts in Virginia.................................................. 849

        b.    TG's Nationwide Contacts............................................................................ 849

        c.    TG's Virginia Contacts.................................................................................. 851

        d.    Specific Personal Jurisdiction...................................................................... 854

8.    Cause of Action Arises From Forum Minimum Contacts....................................... 857

9.    Fair Play & Substantial Justice.............................................................................. 858

        a.    Burden on TG................................................................................................ 859

        b.    Virginia's Interest.......................................................................................... 859

        c.    Plaintiffs' Interest.......................................................................................... 860

        d.    Judicial System's Interest............................................................................. 860

        e.    States' Shared Interest.................................................................................. 860

        f.    The Exercise of Personal Jurisdiction Over TG is Fair & Reasonable.......... 860

10.   Imputation of Contacts Between TG & TTP........................................................... 861

C.  **The Court's Ruling on Vacating the Default Judgment**................... 862

1.    Applicable Law...................................................................................................... 862

2. Personal Jurisdiction.................................................................................................. 863

3. Excusable Neglect..................................................................................................... 863

4. Other Reason That Justifies Relief............................................................................ 864

    a. Failure to Serve.................................................................................................. 864

    b. Failure to State a Claim Under the VCPA........................................................... 864

### III. TG'S RENEWED MOTION TO VACATE THE ENTRY OF DEFAULT & DISMISS THE ACTION IN *MITCHELL*................................................................. 865

#### A. Present Motion & Summary of the Parties' Arguments............................... 865

1. TG's Motion................................................................................................................ 865

2. The PSC's Response.................................................................................................. 865

3. Mitchell's Response.................................................................................................... 865

4. Certain Florida Homebuilders' Amicus Curiae Response........................................... 865

5. The Banner Entities' Response.................................................................................. 866

6. TG's Reply................................................................................................................. 866

#### B. The Court's Ruling on TG's Motion to Dismiss for Lack of Personal Jurisdiction........................................................................................................ 866

1. Standard of Review.................................................................................................... 866

2. Applicable Law........................................................................................................... 866

3. Personal Jurisdiction Over a Foreign Defendant....................................................... 867

4. Imputing TTP's Forum Contacts to TG for Purposes of Personal Jurisdiction............ 867

    a. Piercing the Corporate Veil................................................................................. 867

    b. Applicable Law.................................................................................................... 867

    c. Facts Regarding the Relationship Between TG & TTP......................................... 869

    d. Agency and/or Alter Ego Exists Between TG & TTP........................................... 872

5. Florida's Long–Arm Statute....................................................................................... 874

    a. Subsection (a)-Business in the State.................................................................. 874

        i. Applicable Law........................................................................................... 874

ii. *The Parties' Arguments*..................................................................................875

iii. Facts Regarding Taishan's Florida–Related Business.................................................875

iv. Taishan's Florida–Related Business Satisfies Subsection (a) of the Florida
Long–Arm Statute.............................................................................................881

   *b.* *Subsection (b)-Tortious Activity in the State*..........................................................882

   *c.* *Subsection (f)-Causing Injury in the State*...........................................................883

6. *Due Process Requirements for Specific Personal Jurisdiction*...........................................885

7. *Taishan's Minimum Contacts With Florida*...............................................................885

8. *Cause of Action Arises From Forum Minimum Contacts*....................................................888

9. *Fair Play & Substantial Justice*.......................................................................889

## C. The Court's Ruling on Vacating the Preliminary Default............................889

1. *Applicable Law*........................................................................................890

2. *Personal Jurisdiction*.................................................................................890

3. *Excusable Neglect*.....................................................................................890

4. *Other Reason That Justifies Relief–Failure to Serve*.................................................890

## D. Adverse Inference Against Taishan..................................................891

## IV. TG & TTP'S MOTION TO DISMISS THE COMPLAINT IN GROSS.................892

## A. Present Motion & Summary of the Parties' Positions.................................892

1. *Taishan's Motion*......................................................................................892

2. *PSC's Response*........................................................................................892

3. *Interior Exterior's Response*.........................................................................892

4. *Taishan's Reply*.......................................................................................893

## B. The Court's Ruling on TG's Motion to Dismiss for Lack of Personal Jurisdiction...................................................................................893

1. *Standard of Review*....................................................................................893

2. *Applicable Law*........................................................................................893

3. *Personal Jurisdiction Over a Foreign Defendant*......................................................893

4.     *Imputing TTP's Forum Contacts to TG* ........................................................................ ............. 893

     a.    *Piercing the Corporate Veil* .......................................................................................... 893

     b.    *Applicable Law* ................................................................................................................ 894

     c.    *TTP's Minimum Contacts are Imputable to TG* ............................................... ............. 895

5.     *Louisiana Long–Arm Statute* ..................................................................................... ............. 896

6.     *Due Process Requirements for Specific Personal Jurisdiction* ..................................... ............. 896

7.     *Minimum Contacts* ...................................................................................................... ............. 897

     a.    *Taishan's Minimum Contacts* .................................................................................... 897

        i. Taishan Lacks Physical Contacts With Louisiana ....................................................... 897

        ii. Taishan's Nationwide Contacts ................................................................................... 898

        iii. Taishan's Louisiana–Related Contacts ....................................................................... 898

     b.    *Taishan has Sufficient Minimum Contacts With Louisiana to Satisfy Due Process* ......... ............. 899

8.     *Cause of Action Arises From or Relates to Minimum Contacts* ........................................... 901

9.     *Fair Play & Substantial Justice* ....................................................................................... ............. 902

**V. TG & TTP'S MOTION TO DISMISS THE COMPLAINT IN *WILTZ*** .................... ........ 903

**VI. CONCLUSION** ........................................................................................................... ....... 903

**\*829  I. BACKGROUND**

**A. MDL Litigation**

The present litigation arises from alleged property damage and personal injuries sustained as a result of the presence of Chinese-manufactured drywall in homes and other buildings in a number of states. During approximately 2005 to 2008, hundreds-of-millions **\*830** of square feet of gypsum wallboard manufactured in China ("Chinese drywall") were exported to the United States, primarily along the East Coast and Gulf South, as a result of an exceptionally high demand for building supplies in the aftermaths of Hurricanes Rita and Katrina, as well as a general new-housing boom. The Chinese drywall was then installed in newly-constructed and reconstructed properties. After installation of this drywall, owners and occupants of the properties began noticing unusual odors, blackening of silver and copper items and components, and the failure of appliances, including microwaves, refrigerators, and air-conditioning units. Some also experienced health problems, such as skin and eye irritation, respiratory issues, nose bleeds, and headaches. As a result, these property owners began filing suit in both state and federal courts against those involved with Chinese drywall, including the installers, homebuilders, suppliers, importers, exporters, and manufacturers, as well as their insurers and sureties.

On June 15, 2009, 626 F.Supp.2d 1346 (Jud.Pan.Mult.Lit.2009), this Court was designated as the transferee court for all federal cases involving Chinese-manufactured drywall, creating Multi–District Litigation 2047 (the "MDL"). *See* (R. Doc. 1). Since

the inception of MDL 2047, over three years ago, hundreds of lawsuits involving thousands of plaintiffs and defendants, have been filed and the cases consolidated before this Court. The Court has worked to oversee and manage this complex litigation, including: presiding over numerous regularly-scheduled hearings and monthly status conferences, which are attended by hundreds of counsel; vetting and appointing counsel to steering committees (plaintiff, defendant, homebuilder, installer, insurer), mediators, special masters, and a *pro se* curator; communicating and coordinating with state and federal judges who preside over related Chinese drywall litigation; issuing 26 pretrial orders which govern procedure in the MDL, as well as countless orders and minute entries; maintaining a public MDL website; presiding over ten bellwether trials and proceedings, as well as issuing detailed findings of fact and conclusions of law; facilitating numerous settlement negotiations and mediations; monitoring the pilot remediation program; and managing the 15,000–plus record documents filed into the litigation. *See* Case No. 09–md–2047.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities, and (2) the Taishan Entities. The litigation has focused upon these two entities and their downstream associates, and has proceeded on separate tracks for the claims against each group as described as follows.

### B. Knauf Entities
The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), manufactured and sold its Chinese drywall in the United States. The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts. The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009. *See* (R. Doc. 18). On November 2, 2009, in Pretrial Order No. 17, KPT agreed to a limited waiver of service. *See* (R. Doc. 401). On March 15– 19, 2010, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG,* Case No. 09–6050, involving a homeowner's claims against KPT for defective drywall. *See* (R. Doc. 2713). For purposes of the trial, KTP stipulated that its Chinese drywall "emits certain reduced sulfur gases and the drywall emits an odor." *Id.* The Court **\*831** found in favor of the plaintiff family in *Hernandez,* issued a detailed Findings of Fact and Conclusions of

Law, *see id.,* and entered a Judgment in the amount of $164,049.64. *See* (R. Doc. 3012).

Thereafter, on October 14, 2010, the Knauf Entities entered into a pilot remediation program with the Plaintiffs' Steering Committee ("PSC") in the MDL. This program was largely based upon the remediation protocol formulated by the Court in *Hernandez.* The Knauf pilot remediation program is ongoing and is in the process of remediating 2,000 homes containing KPT Chinese drywall. At the Court's urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which is designed to resolve all Knauf-related, Chinese drywall claims. *See* (R. Doc. 12061–5). This Agreement is the most significant step thus far towards global resolution of all Chinese drywall claims.

In addition to the Knauf Settlement Agreement, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. These additional class action settlement agreements involve the following defendants and in most cases, their insurers: Interior Exterior Building Supply, LP ("Interior Exterior"); the Banner Entities; L & W Supply Corp. and USG Corp.; and a group of numerous homebuilders, installers, suppliers. *See* (R. Docs. 10033–3, 12258–3, 13375–2, 14404–2). The Court has granted preliminary approval to all of the foregoing settlement agreements which are the subject of the final fairness hearing set for November 2012.

### C. Taishan Entities
The second group of manufacturer defendants in the litigation and the defendants who are challenging personal jurisdiction in the present motions, are the Chinese-based Taishan Entities, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). As discussed below, the course of the litigation involving the Taishan Entities has not followed the same trajectory or enjoyed the same measure of success as that involving the Knauf Entities.

As an alleged manufacturer of Chinese drywall which has been installed in plaintiffs' properties, Taishan is a named defendant in numerous cases in both the MDL litigation and litigation filed in state courts. The Court's inquiry for purposes of the present motions pertains to four cases in the MDL in which Taishan has been served, entered an appearance, and in two of these cases, subjected to default judgment proceedings. These four cases are: *Germano v. Taishan Gypsum Co., Ltd.,* Case No. 09–6687; *The Mitchell Co., Inc. v. Knauf Gips KG,* Case No. 09–4115; *Gross v. Knauf Gips KG,* Case No. 09–6690; and *Wiltz v. Beijing New Building Materials Public Ltd., Co.,* Case No. 10–361. The Court will briefly discuss each of these cases as they pertain to Taishan before detailing the overall course of the MDL litigation involving the claims against Taishan.

*Germano* has served as the main vehicle for the MDL litigation involving Taishan, particularly TG, all of which will be discussed in greater detail below. *Germano* was filed originally in the U.S. District Court for the Eastern District of Virginia as a Virginia class action against TG by the owners of homes located in Virginia which allegedly contain TG-manufactured **\*832** Chinese drywall. *See* (R. Docs. 1–1, 1–2)(Case No. 09–6678). On August 3, 2009, TG was served. *See* (R. Doc. 1–7)(Case No. 09–6687). *Germano* was then transferred to the U.S. District Court for the Eastern District of Louisiana and consolidated with the MDL litigation on October 13, 2009. (R. Doc. 1) (Case No. 09–6678). Thereafter, the class was expanded to a nationwide class. *See* (R. Doc. 470)(Case No. 09–md–2047).

*Mitchell* was originally filed in the U.S. District Court for the Northern District of Florida as a class action on behalf of homebuilders in the states of Louisiana, Georgia, Texas and Florida who used drywall manufactured by TG for the construction, repair, or remodeling of properties, and who, as a result, incurred expenses associated with repair or replacement of this drywall and/or other property damaged by the drywall, and/or incurred liability for property damages. *See* (R. Doc. 1–1)(Case No. 09–4115). On May 8, 2009, service was executed on TG. *See* (R. Doc. 52)(Case No. 09–md–2047). Shortly thereafter, *Mitchell* was transferred to the Eastern District of Louisiana and consolidated with the MDL litigation. *See* (R. Doc. 1) (Case No. 09–4115).

*Gross* and *Wiltz* were both filed in the Eastern District of Louisiana and consolidated with the MDL litigation as nationwide class actions by property owners whose homes contain Taishan-manufactured Chinese drywall. *See* (R. Doc. 1)(Case No. 09–6690); (R. Docs. 1, 1–1) (Case No. 10–361). Taishan was served or entered an appearance in both cases. *See* (R. Docs. 2140, 2141, 2553); (R. Docs. 7408, 7409). The cases are distinguishable by the fact that *Gross* involves claims against "indeterminate defendants" who have allegedly concealed their identity and are allegedly responsible for the Chinese drywall in plaintiff class members' properties. *See* (R. Doc. 1)(Case No. 09–6690). *Wiltz,* on the other hand, is a more typical class action filed on behalf of property owners against Taishan as a result of the damage caused by the presence of Taishan's drywall in their properties. *See* (R. Docs. 1, 1–1) (Case No. 10–361).

The first issues in the MDL litigation involving Taishan arose when TG failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano,* although TG had been properly served in each case. *See* (R. Doc. 52); (R. Doc. 1–7)(Case No. 09–6687). As a result, the Court entered preliminary defaults against TG in both of these cases. *See* (R. Docs. 277, 487).

After affording TG more than a reasonable amount of time to answer or enter an appearance, the Court moved forward with an evidentiary hearing in furtherance of the Preliminary Default in *Germano* on the claims of 14 intervening plaintiffs (the "Intervening–Plaintiffs"). *See* (R. Doc. 502, 1223, 1258, 2380). Following this hearing, which occurred on February 19 and 20, 2010, the Court issued detailed Findings of Fact & Conclusions of Law. *See* (R. Doc. 2380). On May 11, 2010, the Court issued a Default Judgment against TG in *Germano,* in favor of the Intervening–Plaintiffs, in the amount of $2,609,129.99. (R. Doc. 3031). On the last day to timely do so, June 10, 2010, TG filed a Notice of Appeal of the Default Judgment in *Germano.* (R. Doc. 3670). On this same day, TG also entered its appearance in *Germano* and *Mitchell. See* (R. Doc. 3668).

After TG entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction, as well as on procedural grounds. *See* (R. Docs. 5436, 5583). However, because of the pending appeal, this Court was without jurisdiction **\*833**

to address any motions filed by TG. *See* (R. Doc. 5504). Accordingly, TG sought and was granted by the Fifth Circuit, a stay of its appeal to allow this Court to provide an indicative ruling on TG's motions to vacate the preliminary default and final judgments. *See* (R. Doc. 5649). In response, this Court issued an order pursuant to Federal Rule of Civil Procedure 62.1 to allow it to consider TG's motions. *See* (R. Doc. 6101). In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve TG's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan been served, including *Gross* and *Wiltz.*

Formal personal jurisdiction discovery of Taishan began in October 2010, *see e.g.* (R. Docs. 5839, 5840), and continued over the year-and-a-half leading up to the filing of the present motions. Discovery has included the production of both written and electronic documents, as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery has not been without trials and tribulations, requiring close supervision by the Court. The Court has presided over regularly-scheduled status conferences to keep the parties on track, and conducted hearings and issued rulings to resolve numerous discovery-related disputes. *See e.g.* (R. Docs. 7136, 7511).

The first Taishan depositions were held in Hong Kong on April 4–8, 2011. *See* (R. Docs. 8296, 8297). Thirteen attorneys traveled to Hong Kong and deposed the following three Taishan witnesses: (1) Jia Tongchun, General Manager, Director of Board of Directors, and five-percent owner of TG; (2) Peng Wenglong (a.k.a. Frank Clem), Manager of Foreign Trade Department of TG in 2005, salesperson at TTP from 2006–07, and current Manager of Foreign Trade Department at TG; and (3) Zhang Jianchun, Secretary of TG and TTP. *See id.*

Upon return to the United States, several motions were filed seeking to schedule a second round of Taishan depositions as a result of problems during the depositions and seeking discovery sanctions against Taishan. *See* (R. Docs. 8685, 8695, 8755, 8758, 8768, 8792, 8805). Taishan opposed these motions. *See* (R. Docs. 8841, 8842). The Court, after reviewing the transcripts from the depositions, concluded that the "depositions were ineffective because of disagreement between interpreters,

counsel, and witnesses, translation difficulties, speaking objections, colloquy among counsel and interpreters, and in general ensuing chaos." *See* (R. Doc. 9107). Accordingly, the Court ordered the parties to move forward with further written discovery and to schedule a second-round of Taishan depositions, but this time with knowledgeable and prepared witnesses, a single translator, and Court supervision. *See id.* The parties complied with the Court's orders and met regularly with the Court to resolve their further discovery disputes. *See* (R. Docs. 9524, 10092, 9649, 9944, 10007, 10216, 10269, 10799, 11175, 10804, 11138, 11192, 11326).

The Court scheduled the second round of Taishan depositions for the week of January 9, 2012, in Hong Kong. *See* (R. Docs. 10804, 11138, 11192). The Court appointed a Federal Rule of Evidence 706 expert to operate as the sole interpreter at the depositions. *See* (R. Doc. 11533). Counsel for the interested parties and Judge Fallon traveled to Hong Kong for these depositions. The following witnesses were deposed or re-deposed: (1) Peng Wenglong (a.k.a. Frank Clem); (2) Jia Tongchun; (3) Che Gang (a.k.a. Bill Cher), Manager of International Trading for **\*834** Taishan, salesperson at TG from 2001–06 and 2009–12, and salesperson at TTP from 2006–07; (4) Peng Shiliang, General Manager and Chairman of Board of Directors of TTP from 2006–09, employee of TTP, and Plant Manager of TG from 2009–12; and (5) Fu Tinghuan, Supervisor at TG, Deputy General Manager at TG, and Director of TTP. Because the Court was present at the depositions, objections were ruled upon immediately and the majority of problems which plagued the first round of depositions were absent. Also, the Court was able to observe the comments, intonation, and body language of the deponents. Upon return from Hong Kong, the parties informed the Court that minimal further discovery was necessary before briefing could be submitted on Taishan's personal jurisdiction challenges.

In April 2012, TG and TTP filed the present motions. Responses in opposition were filed by the PSC, Interior Exterior, the Banner Entities, and Certain Florida Homebuilders, (R. Docs. 14202, 14204, 14209, 14216, 14356, 14372, 14390, 14392, 14391–4), with other parties joining in these motions, including the State of Louisiana (collectively the "Respondents"). Prior to the hearing, evidentiary objections were raised by Taishan, which the Respondents addressed. [1] On June 29, 2012, over three years since the creation of MDL 2047, and after a year-

and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with Judge Joseph Farina of the 11th Judicial Circuit Court of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

The Court will now address and rule-upon the motions filed by Taishan in *Germano, Mitchell, Gross,* and *Wiltz.*

## II. TG'S RENEWED MOTION TO VACATE THE DEFAULT JUDGMENT & DISMISS THE COMPLAINT IN *GERMANO*

The first Motion addressed by the Court is TG's Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint in *Germano.* (R. Doc. 13490).

### A. Present Motion & Summary of the Parties' Positions

#### 1. TG's Motion

TG raises four arguments in support of its Motion. First, TG argues that the Default Judgment should be vacated and the claims against it dismissed because the Court lacks personal jurisdiction over it in *Germano.* As a threshold matter, TG argues that Virginia and Fourth Circuit law governs the question of personal jurisdiction. Next, TG argues that plaintiffs are unable to satisfy Virginia's long arm statute, as is required for personal jurisdiction, because TG did not transact business in Virginia and it does not regularly do or solicit business in Virginia. Finally, TG argues that plaintiffs are unable to satisfy the due process requirements of personal jurisdiction because: (1) plaintiffs cannot establish that TG had minimum contacts with Virginia; (2) plaintiffs cannot establish that their causes of action arose out of or resulted from TG's contacts with Virginia; and (3) the exercise of personal jurisdiction over TG would be unreasonable and offend traditional notions of fair play and substantial justice.

Second, TG argues that the Default Judgment should be set aside because plaintiffs failed to serve the pleadings upon which the Default Judgment was based, specifically the motion for intervention and the Second Amended Complaint.

**\*835** Third, TG argues that the Default Judgment should be set aside on the grounds of excusable neglect. In

support, TG alleges: its default was not willful; vacating the judgment will not prejudice the plaintiffs; it has a meritorious defense; it will incur significant financial losses if the default stands; and it acted expeditiously to vacate the default.

Fourth, TG argues that the Complaint fails to state a claim under the Virginia Consumer Protection Act ("VCPA").

#### 2. The PSC's Responses in Opposition

The PSC filed both a specific Response in opposition to TG's Motion (R. Doc. 14202) and a Global Memorandum of law in opposition to all four of Taishan's motions. (R. Doc. 14209). The Court will now summarize each.

##### a. Response to the Motion

The PSC first addresses TG's personal jurisdiction arguments. As a threshold matter, the PSC argues that the Court must apply Virginia's long-arm statute and the Due Process Clause, as informed by the law of the Fifth Circuit, in determining whether there exists personal jurisdiction over TG. It then argues that TG, based upon its Virginia contacts, is subject to personal jurisdiction under Virginia's long-arm statute and the Due Process Clause.

Second, the PSC argues that the Court previously and correctly ruled that jurisdiction over TG was accomplished by proper service of the First Amended Complaint.

Third, the PSC argues that TG is not entitled to have the Default Judgment vacated on the basis that plaintiffs allegedly failed to state a claim under the VCPA, since the claims against TG which support the Default Judgment include a number of non-VCPA allegations.

Fourth, the PSC argues that TG has not shown excusable neglect in its failure to timely respond to the Default Judgment.

##### b. Global Memorandum

The PSC's Global Memorandum addresses the issue at the center of all four of Taishan's motions, personal jurisdiction. Therein, the PSC first argues that the Court may exercise personal jurisdiction over TG because it purposefully sold its drywall products to customers in the United States with the expectation that these products would be delivered to Virginia, Florida, Louisiana, and other states. According to the PSC, these activities constitute sufficient "minimum contacts" in the personal jurisdiction context. The PSC contends that the Supreme Court's recent decision in *J. McIntyre Machinery, Ltd. v. Nicastro,* —— U.S. ——, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011), does not change this conclusion. Finally, the PSC argues the exercise of personal jurisdiction over TG comports with the due process requirements of fair play and substantial justice.

The second section in the PSC's Global Memorandum argues for the imputation of TTP's forum contacts to TG for purposes of personal jurisdiction on the basis that, pursuant to Chinese law, the corporate personalities of TG and TTP are commingled. In support of this argument, the PSC presents the opinions of three Chinese legal experts.

Third, the PSC argues that its right to pursue the entities upstream to Taishan, namely China National Building Materials Group Corp. ("CNBM") and Beijing New Building Material Group Co. Ltd. ("BNBM"), should be preserved since the PSC was precluded from taking any discovery from these entities.

### *3. TG's Reply*

TG filed a Reply in further support of its Motion. (R. Doc. 14572). TG expands upon the arguments in its original briefing. It argues that plaintiffs fail to demonstrate by preponderance of the evidence that this Court possesses specific personal jurisdiction **\*836** over it pursuant to the Virginia long-arm statute or due process. TG interprets *J. McIntyre* as supporting its position that its contacts with Virginia are insufficient for personal jurisdiction. It also argues, citing to its own Chinese law expert, that TTP's contacts cannot be imputed to TG for purposes of personal jurisdiction. TG accuses plaintiffs of relying upon inadmissible hearsay evidence.

### B. The Court's Ruling on TG's Motion to Dismiss for Lack of Personal Jurisdiction

As noted, TG seeks dismissal of the claims against it in *Germano* on the basis of lack of personal jurisdiction. *See* (R. Doc. 13490).

### *1. Standard of Review*

**[1]** Federal Rule of Civil Procedure 12(b)(2) provides a right to dismissal of claims against a defendant when personal jurisdiction is lacking. "When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident. The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Stuart v. Spademan,* 772 F.2d 1185, 1192 (5th Cir.1985)(citing *Thompson v. Chrysler Motors Corp.,* 755 F.2d 1162, 1165 (5th Cir.1985)).

**[2]** When a court hears a Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff need only present a *prima facie* case of personal jurisdiction. *See Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.,* 517 F.3d 235 (5th Cir.2008). When there is an evidentiary hearing, however, the plaintiff is held to the higher standard of preponderance of the evidence. *See id.* (citing *Brown v. Slenker,* 220 F.3d 411, 419 (5th Cir.2000)). The Fifth Circuit "has never explicitly laid out the criteria necessary to constitute a 'full evidentiary hearing,' " *Kwik–Kopy Corp. v. Byers,* 37 Fed.Appx. 90, at \*4 (5th Cir. May 9, 2002), but has concluded for purposes of an evidentiary hearing, "both parties must be allowed to submit affidavits and to employ all forms of discovery, subject to the district court's discretion and as long as the discovery pertains to the personal-jurisdiction issue." *Walk Haydel & Assocs., Inc.,* 517 F.3d at 242. The distinguishing factor between a mere hearing and an "evidentiary hearing" is the presentation of evidence "beyond the written materials." *See Kwik–Kopy Corp.,* 37 Fed.Appx. at \*4 (quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.,* 557 F.2d 1280 (9th Cir.1977)). The Court finds that the hearing on the present Motion falls into the evidentiary hearing category, because the Court is relying on evidence representing the full extent of personal jurisdiction discovery and depositions. This conclusion

requires plaintiffs to establish personal jurisdiction by a preponderance of the evidence.

### 2. Applicable Law

As noted, *Germano* was originally filed in the U.S. District Court for the Eastern District of Virginia, within the Fourth Circuit, and then transferred to the MDL Court seated in the Eastern District of Louisiana, within the Fifth Circuit, for consolidated and coordinated pretrial proceedings. *See* Case No. 09–6687. The parties agree that for purposes of determining personal jurisdiction in *Germano,* the applicable substantive law is the law of Virginia, but they disagree as to whether Fourth Circuit or Fifth Circuit law applies as federal law. Thus, before beginning any personal jurisdiction analysis, the Court must determine the applicable law.

The Court concludes that as the MDL transferee court, it is obliged to apply, **\*837** consistent with the parties' own positions, the substantive state law of the transferor court, Virginia law, and the federal law of its own circuit, the Fifth Circuit. This conclusion is overwhelmingly supported by both the jurisprudence and legal scholarship. *See In re Gen. Am. Life Ins. Co. Sales Practices Litig.,* 391 F.3d 907, 911 (8th Cir.2004); *Murphy v. F.D.I.C.,* 208 F.3d 959, 965 (11th Cir.2000); *Bradley v. United States,* 161 F.3d 777, 782 n. 4 (4th Cir.1998); *Newton v. Thomason,* 22 F.3d 1455, 1460 (9th Cir.1994); *Menowitz v. Brown,* 991 F.2d 36, 40–41 (2d Cir.1993); *In re Korean Air Lines Disaster of Sept. 1, 1983,* 829 F.2d 1171, 1175–76 (C.A.D.C.1987); *In re Vioxx Prods. Liab. Litig.,* 861 F.Supp.2d 756, 759–60 (E.D.La.2012); *In re BP S'holder Derivative Litig.,* 2011 WL 4345209, at \*12 (S.D.Tex. Sept. 15, 2011)(citing *In re Parmalat Sec. Litig.,* 659 F.Supp.2d 504, 517 (S.D.N.Y.2009)); *Various Plaintiffs v. Various Defendants,* 856 F.Supp.2d 703, 707–08 (E.D.Pa.2012); *Briggs v. Air & Liquid Sys. Corp.,* 2012 WL 975875, at \*1 n. 1 (E.D.Pa. Feb. 13, 2012); *Floyd v. Air & Liquid Sys. Corp.,* 2012 WL 975639, at \*1 n. 1 (E.D.Pa. Feb. 8, 2012); *Aikins v. Gen. Elec. Corp.,* 2011 WL 6415117, at \*1 n. 1 (E.D.Pa. Dec. 9, 2011); *In re Hydroxycut Mktg. & Sales Practices Litig.,* 810 F.Supp.2d 1100, 1106 (S.D.Cal.2011); *In re DirecTV Early Cancellation Litig.,* 738 F.Supp.2d 1062, 1074 (C.D.Cal.2010); *In re Zicam Cold Remedy Mktg., Sales Practices, & Prods. Liab. Litig.,* 797 F.Supp.2d 940, 941 (D.Ariz.2011); *Hinds Cty., Miss. v. Wachovia Bank,*

*N.A.,* 708 F.Supp.2d 348, 366 n. 11 (S.D.N.Y.2010); *In re Zyprexa Prods. Liab. Litig.,* 671 F.Supp.2d 397, 430 (E.D.N.Y.2009); *In re Conagra Peanut Butter Prods. Liab. Litig.,* 2009 WL 799422, at \*1 (N.D.Ga.2009); 15 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Joan E. Steinman, Catherine T. Struvel, and Vikram David Amar, Federal Practice and Procedure § 3866 (3d ed.2009); Daniel A. Richards, An *Analysis of the Judicial Panel on Multidistrict Litigation's Selection of Transferee District and Judge, 78 Fordham L.Rev. 311, 316 (2009).* This conclusion is also consistent with the Court's dicta earlier in the litigation. *See In re Chinese Manufactured Drywall Prods. Liab. Litig.,* 767 F.Supp.2d 649, 656 n. 2 (E.D.La.2011). Accordingly, the Court now addresses Fifth Circuit federal law and Virginia state law on personal jurisdiction.

### 3. Personal Jurisdiction Over a Foreign Defendant

**[3]**  It is axiomatic under Fifth Circuit law that a federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant if: (1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the Due Process Clause of the United States Constitution. *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir.2010) (citing *Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir.1999)); *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266, 270 (5th Cir.2006) (citing *Mink v. AAAA Dev. LLC,* 190 F.3d 333, 335 (5th Cir.1999)); *Paz v. Brush Engineered Materials, Inc.,* 445 F.3d 809, 812 (5th Cir.2006) (quoting *Allred v. Moore & Peterson,* 117 F.3d 278 (5th Cir.1997)); *Ouazzani–Chahdi v. Greensboro News & Record, Inc.,* 200 Fed.Appx. 289, 291 (5th Cir.2006) (citing *Revell v. Lidov,* 317 F.3d 467, 469 (5th Cir.2002)); *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 418 (5th Cir.1993). The Court now addresses each of these requirements in turn.

### 4. Virginia's Long–Arm Statute

**[4]**   **[5]**   In *Germano,* the Court is obliged to apply Virginia's long-arm statute under the first prong of the personal jurisdiction **\*838** inquiry. The Virginia long-arm statute provides in relevant part,

A. A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:

    1. Transacting any business in this Commonwealth;

    2. Contracting to supply services or things in this Commonwealth;

    3. Causing tortious injury by an act or omission in this Commonwealth;

    4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth;

    5. Causing injury in this Commonwealth to any person by breach of warranty expressly or impliedly made in the sale of goods outside this Commonwealth when he might reasonably have expected such person to use, consume, or be affected by the goods in this Commonwealth, provided that he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth.... Va.Code Ann. § 8.01–328.1.

The Virginia Supreme Court has stated that "[t]he purpose of our 'long arm statute' is to assert jurisdiction, to the extent permissible under the Due Process Clause of the Constitution of the United States, over nonresidents who engage in some purposeful activity in Virginia." *Danville Plywood Corp. v. Plain & Fancy Kitchens, Inc.,* 218 Va. 533, 534, 238 S.E.2d 800 (1977)(citing *Carmichael v. Snyder,* 209 Va. 451, 456, 164 S.E.2d 703 (1968)); *Caldwell v. Seaboard S.R., Inc.,* 238 Va. 148, 153, 380 S.E.2d 910 (1989); *John G. Kolbe, Inc. v. Chromodern Chair Co., Inc.,* 211 Va. 736, 740, 180 S.E.2d 664 (1971). Virginia's long-arm statute is a "single-act statute requiring only one transaction in Virginia to confer jurisdiction on our courts." *Nan Ya Plastics Corp. U.S.A. v. DeSantis,* 237 Va. 255, 260, 377 S.E.2d 388 (Va.1989); *Danville Plywood Corp.,* 218 Va. at 534–35, 238 S.E.2d 800; *I.T. Sales, Inc. v. Dry,* 222 Va. 6, 9, 278 S.E.2d 789 (1981). " '[T]he statutory inquiry [of the Virginia long arm statute] necessarily merges with the constitutional [due process] inquiry, and the two inquiries essentially become one.' " *Young v. New*

*Haven Advocate,* 315 F.3d 256, 261 (4th Cir.2002)(quoting *Stover v. O'Connell Assocs., Inc.,* 84 F.3d 132, 135–36 (4th Cir.1996)). Once the Virginia long-arm statute is satisfied, the question simply becomes "whether the defendant has sufficient 'minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' " *Id.* (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *Processing Research, Inc. v. Larson,* 686 F.Supp. 119, 121 (E.D.Va.1988). The Court's first task in its personal jurisdiction analysis, thus, is to determine whether TG's activities fall into one of the enumerated categories of the Virginia long-arm statute.

TG argues that plaintiffs are unable to satisfy Virginia's long-arm statute because: (1) it did not transact business in Virginia, (2) it did not contract to supply things in Virginia, and (3) it does not regularly do or solicit business in Virginia. *See* (R. Docs. 13490, 14572). Plaintiffs counter, arguing that TG is subject to personal jurisdiction under the Virginia long-arm statute because TG entered into multiple contracts with Venture Supply, a Virginia company, for the purchase and sale of thousands of **\*839** sheets of defective Chinese drywall, earning TG hundreds of thousands of dollars. (R. Doc. 14202). According to plaintiffs, these facts satisfy subsections (A) (2), (4), and (5) of the Virginia long-arm statute; thus, the Court now addresses these subsections of the statute.

### a. Subsection (A)(2)—Contracting to Supply Services

**[6]** **[7]** Pursuant to subsection (A)(2) of the Virginia long-arm statute, "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's .... [c]ontracting to supply services or things in this Commonwealth." Va.Code Ann. § 8.01–328.1(A)(2). In order for subsection (A)(2) to apply, the court must conclude that either the defendant made a contract in the forum or contracted to perform obligations in the forum. *Richard v. Ivy Grp. Int'l, Inc.,* 2011 WL 1814929, at *6 (E.D.Va. May 11, 2011)(citing *Promotions, Ltd. v. Brooklyn Bridge Centennial Comm.,* 763 F.2d 173, 175 (4th Cir.1985)). In determining whether the consummation of a contract provides personal jurisdiction under subsection (A)(2), courts are to consider: (1) where the contract was negotiated and executed, (2) who initiated the contact, (3) the extent of the communications, both telephonic and

written, and (4) where the obligations of the parties under the contract were to be performed. *Decision Insights, Inc. v. Quillen,* 2005 WL 2757930, at *5 (E.D.Va. Oct. 21, 2005)(quoting *Affinity Memory & Micro, Inc. v. K & Q Enters.,* 20 F.Supp.2d 948, 952 (E.D.Va.1998)). The Court will now examine the evidence pertaining to the factors of subsection (A)(2).

[8] TG entered into two contracts for the sale of its drywall with Venture Supply, Inc., a Norfolk, Virginia company. *See* (Russ M. Herman Aff. Exs. 1, 80, 81, May 7, 2012); (Frank Spano Decl. Ex. 8, Apr. 2, 2012); (R. Doc. 14215–2, p. 30, 33–34); (R. Docs. 13490, pp. 7–10; 14572). Contractual negotiations occurred over the telephone, through email, and in-person in China. *See* (Spano Decl. Ex. 1 (Jia Tongchun Dec. ¶¶ 26, 27, Aug. 15, 2010); Ex. 3 (Peng Wenlong Dep. 366:10–370:8, 519:6–17, Apr. 7, 2011); Ex. 5 (Gang Che Dep. 60:8–22, Jan. 11, 2012); Ex. 9); (Herman Aff. Exs. 44; 70; 71; 72 (Samuel Porter Dep. 28:2–6, 130:1–6, 345:1–15, 346:17–347:8, Dec. 16, 2009); 73, 74; 75; 76; 78). The communications between TG and Venture were regular and relatively extensive during the time period the parties were engaged in a business relationship. *See id.* The first contract was executed via fax in Virginia [2] and the second was executed in person, in China. *See* (Herman Aff. Exs. 80, 81); (Decl. Spano Ex. 6 (Dep. Tinghuan Fu Ex. 3, Jan. 10, 2010)); (R. Docs. 14202, pp. 10–11; 14215–2, p. 34; 14572, p.). Phillip Perry of Tobin Trading, Inc., on behalf on Venture, initiated contact with TG in November 2005. *See* (Spano Decl. Ex. 1 (Tongchun Dec. ¶ 26); Ex. 3 (P. Wenglong Dep. 519:6–17)); (Herman Aff. Ex. 72 (Porter Dep. 28:2–6)). The obligations under the contracts were to be performed by TG in China where it manufactured the drywall and shipped it F.O.B. to Venture at a Chinese port. *See* (Herman Aff. Exs. 80, 81).

This evidence renders a decision under subsection (A)(2) difficult. Because the contract negotiations and communications involving the Venture–TG contracts occurred **\*840** in both China and Virginia and one contract was executed in Virginia and the other in China, these facts do not favor or oppose Virginia as the forum. The remaining two factors—who initiated the contact and the obligations under the contract—however, are China-based, leaving the Court to conclude that the facts do not sufficiently support the application of subsection (A)(2) to TG in *Germano* by a preponderance of the evidence.

This conclusion is bolstered by a case cited by TG, *Frizzell v. Danieli Corp.,* No. CL09–5120, 2010 WL 8697177 (Va.Cir.Ct., Dec. 22, 2010), in which the court held that subsection (A)(2) of the Virginia long-arm statute did not apply to a manufacturer, even though it assisted in shipping its products to the forum state and may have known that the products were going to the forum state, because it sold its products F.O.B. outside of the forum. Similarly, in *Processing Research, Inc. v. Larson,* 686 F.Supp. 119, 122 (E.D.Va.1988), the Eastern District of Virginia held that a contract entered into outside of Virginia to supply an aircraft outside of Virginia did not satisfy subsection (A)(2) simply because the aircraft was purchased by a Virginia plaintiff, the tort involving the aircraft occurred in Virginia, and the nonresident defendant profited off the sale. This case further suggests subsection (A)(2) is inapplicable. Thus, the Court must consider the remaining provisions of the Virginia long-arm statute to determine whether personal jurisdiction exists over TG in *Germano.*

### b. Subsections (A)(4) & (A)(5)— Tortious Injury & Breach of Warranty

Subsections (A)(4) and (A)(5) of the Virginia long-arm statute prove more favorable for the plaintiffs. Under subsection (A)(4) of the Virginia long-arm statute, a court may exercise personal jurisdiction over a defendant who causes tortious injury in the State by an act or omission outside the State if the defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth." Va.Code Ann. § 8.01–328.1(A)(4). Under subsection (A)(5), a court may exercise personal jurisdiction over a defendant who causes injury in the State by breach of warranty, express or implied, made in the sale of goods outside of the State, if he might reasonably have expected the injured person to "use, consume, or be affected by the goods in [the State], provided that [the defendant] also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in [the State]." Va.Code Ann. § 8.01–328.1(A)(5).

It does not appear that TG disputes that the plaintiffs allege its drywall caused "tortious injury" or breached

warranties in Virginia. *See* (R. Docs. 13490, p. 14; 14572, p. 8). However, TG does dispute that it "regularly does or solicits business or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in [Virginia]," a requirement for both subsections (A)(4) and (A)(5) of the Virginia long arm statute. *See id.* Plaintiffs rely on the latter part of this requirement—"derives substantial revenue from goods used or consumed or services rendered"—in support of their argument. *See* (R. Doc. 14202, p. 11). They note and TG admits that it obtained $724,800.00 in revenue from the two Venture Supply contracts. *See id.;* (R. Doc. 13490, p. 15 n. 18). The difference of opinion lies in whether this amount constitutes "substantial revenue." *See id.*

 **[9]** The jurisprudence demonstrates "a trend toward liberal construction of 'substantial revenue' provisions." *Ajax Realty* **\*841** *Corp. v. J.F. Zook, Inc.,* 493 F.2d 818, 822 (4th Cir.1972). "Although percentage of total sales may be a factor to be considered, it cannot be dispositive, for a small percentage of the sales of a [corporate] giant may indeed prove substantial in an absolute sense. On the other hand, it is difficult to identify an absolute amount which ipso facto must be deemed 'substantial.' " *Id.* In the limited jurisprudence on the issue, it has been held that revenues of $37,000 and $25,000 constituted "substantial" revenues for purposes of the Virginia long-arm statute, but that $13,955 was not substantial. *See id.; compare Gordonsville Indus., Inc. v. Am. Artos Corp.,* 549 F.Supp. 200, 203 (W.D.Va.1982). Upon review of this jurisprudence and giving due consideration to the fact that these cases are decades old, the Court finds that TG incurred substantial revenues for purposes of subsections (A)(4) and (A)(5). Certainly $724,800 is substantial revenue when compared to $37,000 and $25,000, and although it may only represent a small percentage of TG's total sales revenue, *see* (R. Doc. 13490, p. 15 n. 18), percentage is not dispositive factor and the trend is to broadly construe the substantial revenue requirement. Further, TG or its affiliates have derived over 8.5 million dollars from its drywall sales in the United States, and its drywall has been found in thousands of homes in the United States. *See* (Herman Aff. Ex. 1 Amend.).

Because the Court finds that personal jurisdiction exists over TG pursuant to the Virginia long-arm statute, specifically subsections (A)(4) and (A)(5), it is next necessary to address the second requirement for personal

jurisdiction, whether the exercise of personal jurisdiction comports with the Due Process Clause.

### 5. Due Process Clause

 **[10]** "The Due Process Clause 'operates to limit the power of a State to assert in personam jurisdiction over a nonresident defendant.' " *Ouazzani–Chahdi,* 200 Fed.Appx. at 291 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)); *Asahi Metal Indus. Co., Ltd. v. Superior Court of Ca.,* 480 U.S. 102, 109, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)(citing *Kulko v. Ca. Superior Court.,* 436 U.S. 84, 91, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978)). A court's exercise of personal jurisdiction over a foreign defendant is consistent with due process only when: (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Paz,* 445 F.3d at 813 (quoting *Panda Brandywine Corp. v. Potomac Elec. Power Corp.,* 253 F.3d 865, 867 (5th Cir.2001)); *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir.2010)(citing *Revell v. Lidov,* 317 F.3d 467, 470 (5th Cir.2002)); *Ouazzani–Chahdi,* 200 Fed.Appx. at 291 (quoting *Revell,* 317 F.3d at 470); *Ruston Gas Turbines, Inc.,* 9 F.3d at 418 (citing *Int'l Shoe Co.,* 326 U.S. at 316, 66 S.Ct. 154). The limits of the Due Process Clause "have been substantially relaxed over the years .... largely attributable to a fundamental transformation in the American economy." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292–93, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)(internal citations omitted). The Court will now address the due process requirements in turn, beginning with minimum contacts.

### 6. Minimum Contacts

 **[11]**     **[12]** "The 'constitutional touchstone' of the inquiry to determine if personal **\*842** jurisdiction can be exercised is whether the defendant 'purposefully established minimum contacts in the forum state.' " *Seiferth,* 472 F.3d at 271 (quoting *Asahi Metal Ind. Co.*

*v. Super. Ct.,* 480 U.S. 102, 108–09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citing *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154). There exist two types of minimum contacts: those that give rise to specific personal jurisdiction and those which give rise to general jurisdiction. *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir.2010) (citing *Wilson v. Belin,* 20 F.3d 644, 647 (5th Cir.1994)); *Seiferth,* 472 F.3d at 271; *Revell v. Lidov,* 317 F.3d 467, 470 (5th Cir.2002); *Ruston Gas Turbines, Inc.,* 9 F.3d at 418. Only specific personal jurisdiction is alleged by plaintiffs. *See* (R. Doc. 14209, p. 7). Specific jurisdiction exists when " 'the defendant has "purposefully directed" his activities at residents of the forum ... and the litigation results from alleged injuries that arise out of or relate to those activities.' " *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir.2010) (quoting *Burger King v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)); *Seiferth,* 472 F.3d at 271 (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir.2002)). The Court now addresses the applicable law for specific personal jurisdiction.

### a. Specific Personal Jurisdiction

**[13]  [14]  [15]  [16]**  For specific personal jurisdiction to attach, "[t]he non-resident's purposefully directed activities in the forum must be such that he could reasonably anticipate being haled into court in the forum state." *Id.* (quoting *Burger King,* 471 U.S. at 474, 105 S.Ct. 2174). Specific personal jurisdiction requires a sufficient nexus between the non-resident's contacts with the forum and the cause of action. *Id.* at 378–79 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). A defendant who purposefully avails himself of the privilege of conducting activities in the forum state invokes the benefits and protections of the forum's laws. *Id.* at 379 (citing *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). "The 'purposeful availment' requirement ensures that a defendant will not be hauled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Id.* (citing *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174). The activities of a defendant are not measured by quantity, but rather quality as "[a] single act by the defendant directed at the forum state ... can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston Gas Turbines,*

*Inc.,* 9 F.3d at 419. In order for the Court to make a proper decision on specific personal jurisdiction over TG in *Germano,* it will place the matter in perspective by reviewing the relevant Supreme Court and Fifth Circuit jurisprudence.

### b. Supreme Court Jurisprudence
### on Specific Personal Jurisdiction

The Court begins its review of the Supreme Court's jurisprudence on specific personal jurisdiction with the decision in *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). *World–Wide Volkswagen* was a products liability case filed in Oklahoma and involved personal injuries sustained by plaintiffs while operating their vehicle, which was purchased in New York and while being driven to Arizona, was involved in an accident in Oklahoma. *See id.* at 288, 100 S.Ct. 559. Two of the defendants, the New York vehicle distributor and the New York vehicle dealer, objected to personal jurisdiction in the Oklahoma **\*843** court. *See id.* at 288–89, 100 S.Ct. 559. The Supreme Court agreed with these defendants and held that personal jurisdiction was lacking, because the defendants: (1) carried on no activity whatsoever in Oklahoma, (2) they closed no sales in Oklahoma, (3) they performed no services there, (4) they availed themselves of none of the privileges or benefits of Oklahoma law, (5) they did not solicit business in Oklahoma either through salespersons or advertising reasonably calculated to reach the State, and (6) they did not regularly sell cars at wholesale or retail to Oklahoma customers or residents or serve or seek to serve the Oklahoma market. *See id.* at 295, 100 S.Ct. 559. The Court noted in support of its holding, "[i]n short, respondents seek to base [personal] jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma." *Id.* During its analysis, the Court distinguished the facts before it from a situation in which "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 298, 100 S.Ct. 559. This statement spawned what is now referred to as the

"stream-of-commerce" doctrine, which has been applied and explained in subsequent cases.

The Supreme Court next addressed specific personal jurisdiction in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). *Burger King* involved a suit by a Florida fast-food restaurant franchisor against a Michigan-based franchisee alleging breach of franchise obligations and trademark infringement in a Florida district court. *See id.* at 464–68, 105 S.Ct. 2174. With regard to specific personal jurisdiction the Court remarked,

> [W]here the defendant 'deliberately' has engaged in significant activities within a State, or has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well. *Id.* at 475–76, 105 S.Ct. 2174 (internal citations omitted).

The Court further noted that personal jurisdiction "may not be avoided merely because the defendant did not physically enter the forum State .... [since] it is an escapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines," and concluded "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* at 476, 105 S.Ct. 2174. With regard to contract-related contacts with the forum, the Court stated,

> If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient

minimum contacts in the other party's home forum, we believe the answer is clearly that it cannot.... It is these factors-prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing-that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum. **\*844** *Id.* at 478–79, 105 S.Ct. 2174 (emphasis in original).

The Court ultimately concluded that specific personal jurisdiction existed over the nonresident defendant, even though he lacked any physical ties with the forum. The Court based its decision on the following facts: (1) the franchise dispute grew directly out of a contract which had a "*substantial* connection" with the forum; (2) the defendant reached out and negotiated with the forum plaintiff for a long-term franchise and benefits which would derive from the forum plaintiff; (3) defendant entered into a 20–year contractual relationship with the forum plaintiff that envisioned continuing contacts with the plaintiff; (4) the defendant's alleged breaches caused foreseeable injuries to the forum plaintiff in the forum; (5) defendant knew he was affiliating himself with the plaintiff in the forum based on the contractual documents; (6) the plaintiff's forum office made the key negotiating decisions; and (7) the contract contained a forum choice-of-law provision. *See id.* at 479–82, 105 S.Ct. 2174.

The next instructive case is *Asahi Metal Industry Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). In *Asahi,* the Court was split on the issue of whether the foreign defendant had sufficient minimum contacts with the forum to satisfy specific personal jurisdiction, but it agreed that due process was violated by the exercise of personal jurisdiction over the defendant on fairness and reasonableness grounds. *See id. Asahi* involved products liability claims brought by plaintiffs injured in the forum state, California, while riding a motorcycle containing tire tubes manufactured by a Taiwanese defendant. *See id.* The Taiwanese defendant filed a cross-claim against the Japanese manufacturer of tire valves which were used in

the Taiwanese defendant's tire tubes, *see id.* at 105–06, 107 S.Ct. 1026, and the Japanese manufacturer contested personal jurisdiction in the forum. *See id.* at 106, 107 S.Ct. 1026.

Justice O'Connor wrote for a plurality of the Court finding that minimum contacts with the forum were lacking. Justice O'Connor characterized the stream-of-commerce doctrine as follows,

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State. *Id.* at 112, 107 S.Ct. 1026.

This characterization is sometimes referred to as the "stream-of-commerce-plus" test. Under this reasoning, Justice O'Connor concluded that the Japanese manufacturer's "awareness that some of [its] valves sold to [the Taiwanese tube manufacturer] would be incorporated into tire tubes sold in California" did not constitute sufficient minimum contacts with the forum, since the Japanese manufacturer: (1) did no business in the forum, (2) had no office, agents, employees, or property in the forum, (3) did not advertise or solicit business in the forum, (4) did not create, control, or employ the distribution system that brought its valves to the forum;

**\*845** and (5) did not design its product in anticipation of sales in the forum. *Id.* at 112–13, 107 S.Ct. 1026.

Justice Brennan's concurring opinion disagreed with both the plurality's interpretation of the stream-of-commerce theory and its conclusion that the Japanese defendant did not purposefully avail itself of the forum state. *See id.* at 116, 107 S.Ct. 1026. Justice Brennan reasoned,

> Under [the plurality's] view, a plaintiff would be required to show 'additional conduct' directed toward the forum before finding the exercise of jurisdiction over the defendant to be consistent with the Due Process Clause. I see no need for such a showing, however. The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final products in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State. Accordingly, most courts and commentators have found that jurisdiction premised on the placement of a product into the stream of commerce is consistent with the Due Process Clause, and have not required a showing of

additional conduct. *Id.* at 116–17, 107 S.Ct. 1026 (internal citations omitted).

Justice Brennan criticized the plurality's "marked retreat from the analysis in *World–Wide Volkswagen.*" *Id.* at 118, 107 S.Ct. 1026. He concluded by affirming the lower court's finding of minimum contacts on the basis that " 'although [the Japanese manufacturer] did not design or control the system of distribution that carried its valve assemblies into [the forum], the [manufacturer] was aware of the distribution system's operation, and it knew that it would benefit economically from the sale in [the forum] of products incorporating its components.' " *Id.* at 121, 107 S.Ct. 1026.

The Supreme Court's most recent pronouncement on specific personal jurisdiction was in *J. McIntyre Machinery, Ltd. v. Nicastro,* ––– U.S. ––––, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011), a products-liability case involving personal injuries caused by the foreign defendant's machinery in the forum. Despite the intent to clarify the "decades-old questions left open in *Asahi* " of the proper test under the stream-of-commerce doctrine, *see id.* at 2785, *J. McIntyre* failed to produce a majority opinion from the Court. *See id.*

The plurality opinion, announced by Justice Kennedy, held that minimum contacts were lacking between the foreign manufacturer of the machine and the forum where the plaintiff was injured by the manufacturer's machine. The plurality relied upon the following facts in reaching its decision: (1) the distributor of defendant's machines agreed to sell the machines in the United States generally; (2) the manufacturer's officials attended trade shows in the United States, but not in the forum state; (3) up to four of the manufacturer's machines ended up in the forum; (4) the manufacturer had no office in the forum; (5) the manufacturer did not own property or pay taxes in the forum; (6) the manufacturer did not advertise in the forum; and (7) the manufacturer did not send any employees to the forum. *Id.* at 2790. The plurality criticized the "stream of commerce" doctrine **\*846** as espoused by Justice Brennan's concurrence in *Asahi* and in *World–Wide Volkswagen,* reasoning "as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State.... This Court's precedents make clear that it is the defendant's actions, not

his expectations, that empower a State's courts to subject him to judgment." *Id.* at 2788–89.

Justice Breyer wrote the concurring opinion in *J. McIntyre*[3], finding that based upon existing Supreme Court precedent and the facts involving the defendant's forum activities, the plaintiff failed to meet his burden of demonstrating personal jurisdiction over the foreign defendant. *See id.* at 2791. Justice Breyer distinguished his decision from both, in his characterization, the plurality's embrace of a narrow view of personal jurisdiction over a foreign defendant and the lower court's substantially broader view. *See id.* at 2793.

Justice Ginsburg authored the dissenting opinion in *J. McIntyre,* concluding that the foreign defendant had sufficient minimum contacts with the forum state to exercise specific personal jurisdiction. *See* 131 S.Ct. at 2794–2804. In support of this conclusion, Justice Ginsburg noted the following: (1) the defendant's regular attendance and exhibitions at business conventions in the United States, and (2) the defendant's engagement of a U.S. distributor to sell its machines throughout the country. *See id.* at 2797. According to the dissent, these contacts evidenced purposeful steps and targeting to reach customers for the defendant's products in the United States. Justice Ginsburg concluded that the machine did not randomly or fortuitously reach the forum, but was there as a result of defendant's deliberate connections with the United States through a local distributor. *See id.*

### c. Effect of J. McIntyre on Specific Personal Jurisdiction Analysis

The parties rely upon *J. McIntyre* in support of their respective positions, but their interpretations of the case and its effects on specific personal jurisdiction are diametrically opposed. TG argues that a majority of the Court in *J. McIntyre* rejected the stream-of-commerce doctrine, because both the plurality and concurrence rejected the proposition that a defendant who introduces his products into the stream of commerce is subject to personal jurisdiction merely because the defendant could foresee or expect that its product would be sold in the forum state. *See* (R. Docs. 13490, pp. 24–29, 14572, pp. 9–17). TG further argues that its position on *McIntyre* is supported by a "growing number of courts," and that the Fourth and Fifth Circuits have likewise rejected the

stream-of-commerce doctrine. Accordingly, TG asks the Court to disregard any jurisprudence which applies the stream-of-commerce doctrine.

In response, Plaintiffs argue: (1) *J. McIntyre's* plurality opinion is not binding and therefore cannot be held to change Fifth Circuit jurisprudence; (2) the jurisdictional minimum contacts that the plurality and the concurrence held were lacking in *J. McIntyre* are present in *Germano;* (3) a majority of the Supreme Court in *J. McIntyre* applied the stream-of-commerce doctrine; and (4) the concurrence left open the question of whether a foreign defendant could be subject to suit in a state where it marketed its products via the internet. *See* (R. Doc. 14209, pp. 15–20).

**\*847** **[17]** As noted, the Supreme Court in *J. McIntyre* failed to reach a majority opinion, leaving three separate decisions: (1) the plurality opinion by Justice Kennedy, (2) the concurrence by Justice Breyer, and (3) the dissent by Justice Ginsburg. *See* 131 S.Ct. 2780. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....' " *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977)(quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Under this accepted jurisprudential rule, Justice Breyer's concurrence, based on the narrowest grounds, constitutes the holding of the Court in *J. McIntyre. See id.* This has been recognized by a plethora of courts. *See e.g. Frito–Lay N. Am., Inc. v. Medallion Foods, Inc.,* 867 F.Supp.2d 859, 867 (E.D.Tex.2012) ("[T]he plurality opinion in *McIntyre,* written by Justice Kennedy, is not the precedential holding of the Supreme Court.... Justice Breyer's concurrence is the controlling opinion ..."); *Eskridge v. Pac. Cycle, Inc.,* 2012 WL 1036826, at \*4 (S.D.W.Va. Mar. 27, 2012) ("Because [J. McIntyre] did not produce a majority opinion adopting either Justice O'Connor's or Justice Brennan's reliance on current Supreme Court precedent, post-*Asahi* Fourth Circuit case law remains binding."); *Huddleston v. Fresenius Med. Care N. Am.,* 2012 WL 996959, at \*5 (S.D.Ohio Mar. 22, 2012) ("However, because no opinion in *J. McIntyre* commanded five votes, Justice Breyer's concurrence controls."); *Graham,* 2012 WL 893748, at \*3 ("This [plurality] opinion, however, did not command a majority of the justices and is not binding on this Court.... Justice Breyer's concurrence [ ] is binding."); *Askue v.*

*Aurora Corp. of Am.,* 2012 WL 843939, at \*7 (N.D.Ga. Mar. 12, 2012) (finding Justice Breyer's concurrence constitutes the holding of the Supreme Court in *J. McIntyre* ); *Sieg v. Sears Roebuck & Co.,* 855 F.Supp.2d 320, 326–27 (M.D.Pa.2012) (relying on Supreme Court precedent for personal jurisdiction analysis because the *J. McIntyre* Court was unable to reach a majority); *UTC Fire & Sec. Ams. Corp., Inc. v. NCS Power, Inc.,* 844 F.Supp.2d 366, 376 (S.D.N.Y.2012) ("However, because no opinion in *J. McIntyre* commanded five votes, Justice Breyer's concurrence controls."); *Lindsey v. Cargotec USA, Inc.,* 2011 WL 4587583, at \*7 (W.D.Ky. Sept. 30, 2011) (adhering to existing precedent on purposeful availment in the wake of *J. McIntyre* because there was no majority consensus on a single test); *Dram Techs., LLC v. Am. II Grp., Inc.,* 2011 WL 4591902, at \*2 (E.D.Tex. Sept. 30, 2011) ("Under the rule from *Marks,* the concurring opinion by Justice Breyer, which concurs in the Judgment on much narrower grounds, is the binding holding from the Supreme Court."); *Bluestone Innovations Tx., LLC v. Formosa Epitaxy, Inc.,* 822 F.Supp.2d 657, 662 (E.D.Tex.2011) (characterizing Justice Breyer's concurrence as the controlling opinion in *J. McIntyre* ). Thus, the Court applies Justice Breyer's concurrence as controlling law.

In writing the concurrence, Justice Breyer emphasized on no less than four occasions that he was relying entirely upon Supreme Court *precedent* regarding specific personal jurisdiction and the stream-of-commerce doctrine. *See id.* at 2791 ("In my view, the outcome of this case is determined by our precedents."); 2792 ("[T]his case requires no more than adhering to our precedents."); 2793 ("[T]his is an unsuitable vehicle for making broad pronouncements that refashion basic jurisdictional rules."); 2794 ("I again reiterate that I would adhere strictly to our precedents." **\*848** ). The precedent relied upon by Justice Breyer includes the Supreme Court's decisions in *World–Wide Volkswagen* and *Asahi. See id.* at 2792. Notably, Justice Breyer quoted the portion of *World–Wide Volkswagen* which created the stream-of-commerce doctrine. *See id.*

Justice Breyer applied this precedent to the three facts relied upon by the lower court: (1) a U.S. distributor, on a single occasion, sold one of the defendant's machine to a forum customer, (2) the defendant permitted and wanted its distributor to sell its machines to anyone, anywhere in the U.S., and (3) representatives of the defendant attended

trade shows in the United States, but not the forum. Justice Breyer concluded "[n]one of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort here, is sufficient [for personal jurisdiction]." *Id.* at 2791–92. Justice Breyer then reasoned,

> Here, the relevant facts found by the [lower court] show no 'regular flow' or 'regular course' of sales in [the forum]; and there is no 'something more,' such as special state-related design, advertising, advice, marketing, or anything else. [Plaintiff], who here bears the burden of proving jurisdiction, has shown no specific effort by the [defendant] to sell in [the forum]. [Plaintiff] has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows. And [plaintiff] has not otherwise shown that the [defendant] 'purposefully availed itself of the privilege of conducting activities' within [the forum], or that it delivered its goods in the stream of commerce 'with the expectation that they will be purchased' by [forum] users. *Id.* at 2792 (quoting *World–Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. 559).

Justice Breyer concluded by declaring, "I would not work such a change to the law in the way either the plurality or the [lower court] suggests." He characterized the plurality opinion as espousing a "seemingly strict no-jurisdiction rule" and the lower court's opinion as an "absolute approach," under which "a producer is subject to jurisdiction so long as it 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.' " *Id.* at 2793 (emphasis in original). Justice Breyer's concurrence provides a clear directive to the Court to apply existing Supreme Court precedent on specific personal jurisdiction and the stream-of-commerce doctrine. Because the Court looks to Fifth Circuit law when applying federal law in the present matter, it now addresses the Fifth Circuit's interpretation of the foregoing Supreme Court precedent.

### d. Fifth Circuit's Interpretation of Specific Personal Jurisdiction

The Fifth Circuit has not addressed specific personal jurisdiction over foreign defendants and the stream-of-commerce doctrine since the issuance of *J. McIntyre. See Graham v. Hamilton,* 2012 WL 893748, at *3 n. 2 (W.D.La. Mar. 15, 2012); *Powell v. Profile Design,* LLC,

838 F.Supp.2d 535, 543–44 (S.D.Tex.2012); *Ainsworth v. Cargotec USA, Inc.,* 2011 WL 6291812, at *4 (S.D.Miss. Dec. 15, 2011). However, the Circuit has previously stated " '[a]bsent rejection by a majority on the Supreme Court, we have continued to apply the stream of commerce analysis found in our pre-*Asahi* cases.' " *Id.* (quoting *Ham v. La Cienega Music Co.,* 4 F.3d 413, 416 & n. 11 (5th Cir.1993)). As discussed above, a majority of the *J. McIntyre* Court did not reject the stream-of-commerce doctrine; only the plurality rejected the doctrine with the concurrence and dissent both applying the doctrine, albeit with different interpretations and **\*849** applications. Justice Breyer's concurrence, the governing decision, expressly requires the application of existing Supreme Court precedent on specific personal jurisdiction, leaving unaltered the pre-*J. McIntyre* jurisprudence relied upon by the Fifth Circuit. Thus, the Court applies the Fifth Circuit's law as informed by Supreme Court precedent on specific personal jurisdiction and the stream-of-commerce doctrine.

The Fifth Circuit has unequivocally declared its adherence to Justice Brennan's concurrence in *Asahi* and the stream-of-commerce doctrine originated in *World–Wide Volkswagen. See Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.,* 615 F.3d 364, 373 (5th Cir.2010)(citing *Ruston Gas Turbines, Inc. v. Donaldson Co.,* 9 F.3d 415, 420 (5th Cir.1993)( "In the years after *Asahi,* the Fifth Circuit has continued to follow the original 'stream-of-commerce' theory established in the majority opinion of *World–Wide Volkswagen,* and has rejected the 'stream-of-commerce-plus' theory advocated by the *Asahi* plurality.")). Thus, the Court must reject the "stream-of-commerce-plus" approach to specific personal jurisdiction in favor of the less stringent "stream-of-commerce" approach. This latter, applicable approach was recently described by the Fifth Circuit as follows:

> Where a nonresident's contact with the forum state 'stems from a product, sold or manufactured by the foreign defendant, which has caused harm in the forum state, the court has specific jurisdiction if it finds that the defendant delivered the product into the stream of commerce with the expectation that it would be purchased or used by consumers in the forum state.' Under this 'relatively expansive' theory, only 'mere foreseeability' that a defendant might be haled into court because it purposely availed itself of the benefits of the forum state is required. A defendant need not have 'purposely directed' its activities to the forum.

*Jackson v. Tanfoglio Giuseppe, S.R.L.,* 615 F.3d 579, 585 (5th Cir.2010).

The Court will apply the foregoing jurisprudence to the evidence in *Germano.*

### 7. TG's Minimum Contacts in Germano

The Court considers the following personal jurisdiction-related evidence in *Germano.*

#### a. TG's Lack of Physical Presence in Virginia

It is undisputed that TG lacks any physical presence in Virginia: (1) TG manufactures drywall exclusively in China; (2) TG does not sell drywall in Virginia; (3) TG has never manufactured products in Virginia; (4) TG has never performed services in Virginia; (5) TG does not have offices and does not own or lease real or personal property in Virginia; (6) TG does not maintain any bank account in Virginia; (7) TG has never appointed an agent to accept service of process in Virginia; (8) TG has never paid taxes or incurred tax liability in Virginia; (9) TG is not registered to do business in Virginia; (10) TG has never been incorporated in Virginia; (11) TG has never maintained any corporate books or records in Virginia; (12) TG does not have a mailing address or telephone number in Virginia; (13) TG does not have officers, directors, employees or agents in Virginia, and none maintain a residence or place of business in Virginia; and (14) None of TG's officers, directors, employees, or agents have visited Virginia for business purposes. (Spano Decl. Ex. 1 (Tongchun Decl.)).

#### b. TG's Nationwide Contacts

TG has a number of contacts with the United States generally. TG or its affiliated companies manufactured and sold approximately 1,825,202 sheets of drywall which were shipped to and used in the **\*850** United States from 2005 to 2009. *See* (Herman Aff. Ex. 1). Several of these sales were directly with U.S. companies. *See e.g.* (Herman Aff. Exs. 10, 20, 80, 81, 86, 100, 103, 123, 157). Additionally, certain drywall shipments to the United States were arranged by TG or its affiliates. *See e.g.* (Herman Aff. Ex. 64, 127).

TG holds itself out as a Chinese manufacturer of new building materials, particularly drywall, that exports its products world-wide, including the United States. (Spano Decl. Ex. 2 (Tongchun Dep., Pl.s' Ex. 20); Ex. 3 (P. Wenglong Dep. Ex. 20)); (Herman Aff. Exs. 5, 10, 16, 22, 73). In TG's marketing and informational brochure, it includes an illustration of its world-wide marketing web, including an arrow pointing from China to the United States. (Spano Decl. Ex. 2 (Tongchun Dep., Pl.s' Ex. 20)).

TG has operated a website since approximately 2003. (Spano Decl. Ex. 3 (P. Wenglong Dep. 541:16–542:12)); (Herman Aff. Exs. 5, 22). Some portions of the website are written in English. *See id.* The website does not allow for online purchase of TG's drywall or other products; nor does it provide access to online communications with TG. *See id.* at 542:21–543:5. TG maintains the website to inform people about TG and to encourage the purchase of its products. (Spano Decl. Ex. 2 (Tongchun Dep. 929:1–9)). Specifically, when asked about the intent behind the TG website, TG's representative responded, "[t]he reason for setting up the website is to have more people know Taishan Gypsum," and when asked if the website was created so customers would buy TG's product, TG's representative responded, "I don't exclude that intention." *See id.* The TG website, like its brochure, states that TG is one of the largest drywall manufacturers in the world and that it exports its product world-wide, including the United States. (Herman Aff. Ex. 22).

Additionally, TG published and advertised its products on a third-party website, Alibaba.com. (Herman Aff. Ex. 23 (Carlos Rios Dep. 16:16–24, 32:2–10, Dec. 8, 2011); Ex. 24 (Yongzhi (Charley) Yang Dep. 79:4–81:10, Feb. 21, 2012); Ex. 143 (John Gunn Dep. 88:2–19, July 22, 2011)). Alibaba.com is an Asian website comparable to Ebay or Craigslist in the United States, which allows for the sale of products via the internet on a global basis. (Herman Aff. Ex. 23 (Rios Dep. 32:4–10)). Some customers in the United States have purchased drywall from TG utilizing the Alibaba.com website. (Herman Aff. Ex. 24 (Yang Dep. 80:2–6); Ex. 25 (Darrin Steber Dep. 16:4–21, Dec. 30, 2011)).

TG's employees used Americanized names and communicated in English with U.S. customers. *See e.g.* (Herman Aff. Exs. 10, 27, 28, 44, 59, 64, 70, 71, 73, 74, 75, 76). For example, two sales employees of Taishan, Peng

Wenglong and Che Gang, used the names Frank Clem and Bill Cher, respectively, when dealing with U.S. customers. *See id.* TG employed salespersons and workers specifically for the U.S. market. *See* (Herman Aff. Ex. 10).

TG shipped to U.S. customers and potential customers samples of its drywall, usually at the request and cost of the customer. *See* (Spano Decl. Ex. 3 (P. Wenglong Dep. 268:1–270:2); Ex. 5 (Che Dep. 285:12–286:2, 288:13–289:3); Ex. 143 (Gunn Dep. 69:17–19, 70:24–71:11)); (Herman Aff. Exs. 34, 49, 52, 53, 54, 55, 57, 73).

Taishan encouraged, welcomed, and accommodated representatives of U.S. companies to visit its drywall offices and factories in China. *See* (Herman Exs. 57, 58, 59).

TG manufactured its drywall specifically for U.S. customers by: representing its drywall satisfied American Society for Testing and Materials ("ASTM") standards; measuring the drywall in U.S. **\*851** measurements; placing on the drywall, labels written in English and information and colors as requested by U.S. customers; and employing packing and shipment of the drywall for the United States. *See* (Herman Aff. Exs. 10, 13, 16, 35, 42, 43, 73, 100, 103, 123, 143 (Gunn Dep. 58:3–60:16, 83:16–20, 84:1–13, 214:19–24)). For example, Taishan altered one of its logos so that it was printed on drywall sold to a U.S. customer in the colors of the U.S. flag-red, white and blue. *See id.* at 42, 43.

### c. TG's Virginia Contacts

In addition, TG has the following Virginia-specific contacts, most involving its business relationship with Venture Supply, Inc., a Virginia company.

In November 2005, Phillip Perry of Tobin Trading, Inc., a Virginia-based entity, contacted TG to inquire about TG's drywall and represented he was an agent of Venture Supply, Inc., a Virginia company. (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 26); Ex. 3 (Peng Dep. 519:6–17)); (Herman Aff. Ex. 72 (Porter Dep. 28:2–6)). This contact initiated the business relationship between Venture and TG, which spanned two years.

During the course of the business relationship between Venture and TG, Venture's main contact at TG was Peng

Wenglong. *See* (Spano Decl. Ex. 5 (Che Dep. 60:8–22)). Mr. Wenglong used the Americanized name of "Frank Clem" and communicated in English when dealing with Venture. *See* (Herman Aff. Exs. 44, 70, 71, 73, 74, 75, 76). Mr. Perry communicated on behalf of Venture with TG both over the telephone and in person regarding the purchase of TG's drywall. (Spano Decl. Ex. 3 (Peng Dep. 366:10–370:8)). Additionally, Samuel Porter, Venture's owner, communicated with TG. *See* (Herman Aff. Ex. 72 (Samuel Porter Dep. Dec. 17, 2009 345:1–15)).

Shortly after his initial communications with TG, Mr. Perry, on behalf of Venture, traveled to China and met with representatives of TG. (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 27); Ex. 3 (Peng Dep. 366:10–17)). During his visit with TG in China, Mr. Perry negotiated a contract with TG for the sale of TG drywall. (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 27)).

On November 7, 2005, after Mr. Perry's trip to China, he reported to Venture that samples of TG's product would be sent from Hong Kong, and TG had told him "that a lot of American companies have made enquires, but I was the first to show enough interest to make the trip. If we continue this size purchases or increase the volume, they will make us the USA representative." (Herman Aff. Ex. 73).

On November 9, 2005, Venture provided a letter of credit to TG in the amount of \$429,600.00 for the purchase of 120,000 sheets of drywall manufactured to Venture's specifications and in compliance with all applicable U.S. ASTM and fire rating standards. (Herman Aff. Ex. 79). Venture received documentation from TG showing that the TG drywall satisfied ASTM standards. *See* (Herman Ex. 72 (Porter Dep. 57:21–58:3, 59:10–12)). Specifically, Venture "received documentation [from TG] that the ASTM tests were done [in China]." *See id.*

On November 17, 2005, the first contract between TG and Venture was executed in Virginia. [4] (Spano Decl. Ex. 3 (P. Wenglong Dep. 370:10–16, 531:6–20); Ex. 8; Ex. 12). The contract provided that TG would manufacture and sell to Venture, 100,000 sheets of TG drywall at the price of \$358,000.000. (Herman Aff. Ex. 80). Delivery was specified to occur at a Chinese port, with Venture responsible for the arrangement and payment for transportation to **\*852** Virginia from the Chinese port. *See id.* All disputes under the contract were to

be settled by negotiation, and if not, then submitted to the Foreign Trade Arbitration Commission of the China Council for the Promotion of International Trade. *See id.* The contract noted Venture's address in Virginia. *See* (Spano Decl. Ex. 12).

Following the execution of the first contract, Venture and TG engaged in extensive discussions regarding their current and future business relationship. For example, after Venture inquired about becoming TG's exclusive drywall distributor in the United States, *see* (Herman Aff. Ex. 74), Peng Wenglong a.k.a. Frank Clem wrote on behalf of TG to Mr. Perry, "First, it is our hope to cooperate with you to enlarge the market at your end. We have adjusted largely the producing line for you. And we will let this line only for you if you like." (Spano Decl. Ex. 9); (Herman Aff. Ex. 70). This email also stated the pricing for the TG drywall and that Mr. Clem was working to persuade the TG sales manager and factory to negotiate on the price. *See id.* Then again, on December 2, 2005, Mr. Clem wrote to Venture,

> It is our hope to cooperate with you especially in the field of gypsum board. We know that you are one of the powerful companies to deal with the gypsum products in your country. And we would like to introduce ourself as one of the biggest gypsum board producing factor with the annual production of more than 200 million square meters. We are confident that there is a bright future for our cooperation by joint efforts. (Herman Aff. Ex. 71).

In mid-December 2005, TG and Venture again discussed the concept of Venture becoming the exclusive distributor of TG drywall in the United States, and future sales were contemplated. *See* (Herman Aff. Ex. 75). Additionally, around this same time, TG reached out to Venture to assist a third company in importing TG's drywall to the United States. *See* (Herman Aff. Ex. 76). On December 15, 2005, Mr. Perry and TG communicated again via email, during which the following information was revealed: TG anticipated and hoped for a long-term business

relationship with Venture; TG agreed to give Venture priority treatment for sales of its drywall; TG would produce the drywall pursuant to Venture's specifications; TG would send samples of its drywall to Venture in the United States for testing purposes; and TG planned to send an employee to the United States. *See* (Herman Aff. Ex. 78). Throughout their business relationship, TG and Venture discussed designating Venture as the exclusive distributor of TG's drywall in the United States, but these discussions never developed into a formal agreement. *See* (Herman Aff. Ex. 72 (Porter Dep. 130:1–6, 346:17–347:8)).

On December 16, 2005, Mr. Perry, returned to China to inspect the TG drywall purchased in the first contract between TG and Venture. (Spano Decl. Ex. 1 (Tongchun Dec. ¶ 29)). While Mr. Perry was in China, he entered into a second contract, on behalf of Venture, with TG for the purchase of additional TG drywall. (Spano Decl. Ex. 1 (Tongchun Dec. ¶ 30); Ex. 3 (Peng Dep. 370:10–16, 531:6–20); Ex. 8; Ex. 13). The second contract, similar to the first, provided for the purchase of 100,000 sheets of TG drywall by Venture, at a price of $366,800.00, with delivery to a Chinese port. *See id.* The contract placed responsibility on Venture for shipping the drywall from the Chinese port to Virginia. *See* (Herman Aff. Ex. 81). All disputes under the contract were to be settled by negotiation, and if not, then submitted to the Foreign Trade Arbitration Commission of the China Council for the Promotion of International Trade. *See id.* This contract also noted Venture's address in Virginia. *See* (Spano Decl. Ex. **\*853** 13). On or about March 11, 2006, Mr. Perry again visited TG in China to inspect the drywall involved in the second contract. (Spano Decl. Ex. 1 (Tongchun Dec. ¶ 31)).

Pursuant to its contracts with Venture, TG "manufactured drywall to U.S. dimensions on a made-to-order OEM [original equipment manager] basis." (Spano Decl. Ex. 8). This "drywall was imprinted with the following marks: VENTURE SUPPLY INC. MFG: SHANDONG TAIHE, CHINA. *Id.* The TG–Venture drywall also had sealing tape on its edges with the marking "Venture Supply." *Id.;* (Herman Aff. Ex. 44, Ex. 72 (Dep. Porter 60:9–62:14)).

As noted, both contracts between TG and Venture provided that Venture was responsible for transporting the TG drywall from China to Virginia. (Spano Decl. Ex. 1 (Tongchun Decl. ¶¶ 28, 30, 34); Ex. 3 (P. Wenglong Dep.

518:3–10); Ex. 12; Ex. 13). However, TG assisted with this shipping. On November 17, 2005, Mr. Perry sent an email to TG inquiring about the earliest date for shipment of the drywall to Virginia, the names of shipping companies, and other shipping-related assistance. *See* (Spano Decl. Ex. 16). TG provided Mr. Perry with contact information for shipping agents and passed on information concerning available ships, freight rates, as well as other details. (Spano Decl. Ex 3 (P. Wenlong Dep. 357:12–358:14, 372:13–374:8); Ex. 16). Venture used this information and the contacts provided by TG to arrange for shipment of the TG drywall to Virginia. *See id.;* (Spano Decl. Ex. 3 (Peng Dep. 371:13–24)).

Pursuant to the two contracts for the purchase of drywall between TG and Venture, TG delivered two shipments to the Lianyungang port in China for shipment to Venture in Virginia. (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 33); Ex. 3 (Peng Dep. 370:17–24, 526:11–24)). The Taian Shandong Province Special Invoices for Export list "FOB" as the term of delivery for this drywall. (Spano Decl. Ex. 1 (Tongchun Dec. ¶ 34)). The packing lists/invoices for the two shipments also indicated the shipments were "FOB any port in China." (Spano Decl. Exs. 14, 15).

Venture retained a shipping agent recommended by TG to deliver the TG drywall from the Lianyungang port in China to Virginia for the first shipment and to New Jersey for the second shipment. *See* (Spano Decl. Exs. 17, 18); (Herman Aff. Ex. 72 (Dep. Porter 33:234:1, 278:7–16)). The shipment to New Jersey was transported via railcar to Virginia. *See* (Herman Aff. Ex. 72 (Porter Dep. 278:7–16)). TG obtained the invoices from the shipping agent. (Spano Decl. Ex. 3 (Peng Dep. 362:10–364:5)). Both the commercial and packing invoices noted Venture's address in Virginia and that the drywall was to be shipped to Virginia. *See* (Spano Decl. Exs. 14, 15). Venture received the bargained-for 100,000 sheets of drywall for the first contract, but only received a partial shipment of 59,000 out of 100,000 sheets of drywall for the second contract. *See* (Herman Aff. Ex. 72 (Porter Dep. 28:11–21, 103:15–19)).

The TG drywall contained in these shipments ultimately ended up in the homes of the *Germano* Intervening–Plaintiffs and other Virginia properties. *See* (R. Doc. 2380, pp. 9–10); (Herman Ex. 72 (Porter Dep. 74:16–80:18)). Venture sold a substantial amount of the TG drywall to Porter–Blaine Corp., a Virginia company, which then

sold the drywall to subcontractors who worked with Porter–Blaine in construction of homes in Virginia. *See generally* (Herman Aff. Ex. 72 (Porter Dep. 38:21–41:13)). Based upon Venture's own records and the unique drywall labeling requested by Venture and applied by **\*854** TG, Venture is able to identify properties in Virginia which contain Venture-purchased TG drywall. *See* (Herman Aff. Ex. 72 (Porter Dep. 312:3–12, 321:17–322:4)).

TG alleges that it had no knowledge or information concerning whether the drywall it sold and delivered to Venture in China would be distributed or used in Virginia. (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 33); Ex. 2 (Jia Tongchun Dep. 543:1–14, Apr. 4, 2011)). However, the evidence refutes this position. TG was told by Mr. Perry that the drywall TG sold to Venture would be shipped to and used in Virginia. (Spano Decl. Ex. 3 (Peng Dep. 332:5–333:4, 371:13–17)). Also, Mr. Perry emailed TG specifically requesting information for shipment of the TG drywall to Virginia. (Spano Decl. Ex. 16). A report issued by TG itself provides, "Mr. Phillip Perry replied that our plasterboard after arriving at the destination (Norfolk, Virginia) was well received by the market and had already been used in the projects, without having any negative feedback." (Spano Decl. Ex. 3 (Peng Dep. Ex. 14)). Additionally, TG sought out the shipment location for its drywall, provided this information on tax forms required by the Chinese government, and kept records of this information. (Spano Decl. Ex. 3 (Wenglong Dep. 323:20–325:22)).

Although the evidence before the Court shows Venture as the only Virginia company which conducted business with TG in the United States, other U.S. companies which purchased TG's drywall sold or used this drywall in Virginia. For example, Guardian Building Products Distribution, Inc. purchased drywall from TG; then Guardian sold this TG drywall to Builders First Source, which in turn sold this drywall in Virginia. *See* (Herman Aff. Ex. 143 (Gunn Dep. 25:14–26:15, 79:22–80:2)).

### d. TG has Sufficient Minimum Contacts With Virginia for Specific Personal Jurisdiction

[18] Based upon the foregoing evidence and the applicable law on personal jurisdiction, the Court finds that TG possesses sufficient minimum contacts with Virginia to support the exercise of specific personal

jurisdiction over TG in *Germano.* While TG has no physical contacts with the forum, it did possess contacts which demonstrate it purposefully directed its activities at the forum such that it reasonably could anticipate being haled into court there. *See Burger King,* 471 U.S. at 476, 105 S.Ct. 2174. TG's contacts with Virginia are beyond mere random, fortuitous, or attenuated contacts. *Compare World–Wide Volkswagen,* 444 U.S. at 295, 100 S.Ct. 559. TG placed its drywall into the stream of commerce with the knowledge that its drywall would end up in and be used in Virginia. *See Ruston,* 9 F.3d at 419. TG had more than reasonable knowledge that its products *might* end up in Virginia; it knew its products *would* end up in Virginia. *See J. McIntyre,* 131 S.Ct. at 2793.

In comparing the facts in *Germano* with those in *J. McIntyre,* TG has more substantial contacts with Virginia than the defendant in *J. McIntyre* did with its forum. The relevant contacts in *J. McIntyre* were limited to: (1) a U.S. distributor on one occasion sold one of the defendant's machines to a forum customer; (2) the defendant permitted and wanted its distributor to sell its machines to anyone, anywhere in the U.S.; and (3) representatives of the defendant attended trade shows in the U.S., but not in the forum. *See* 131 S.Ct. at 2791–92 (Breyer, J., concurring). TG's substantial Virginia-related contacts are analyzed as follows.

Over the course of two years, TG actively and deliberately negotiated with and **\*855** entered into two contracts for the sale of approximately 150,000 sheets of its drywall with a Virginia company. TG benefitted from these sales financially, profiting almost three-fourths-of-a-million dollars. "A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final products in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity." *Asahi,* 480 U.S. at 116–17, 107 S.Ct. 1026 (Brennan, J. concurring). Indeed, the Fifth Circuit has found personal jurisdiction on the basis of a foreign defendant's sale of products bound for the forum. *See Luv N' Care, Ltd. v. Insta–Mix, Inc.,* 438 F.3d 465, 471 (5th Cir.2006); *see also Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 420–21 (5th Cir.1993); *Irving v. Owens–Corning Fiberglas Corp.,* 864 F.2d 383, 386 (5th Cir.1989).

TG engaged in email, phone, and in-person communications with Venture in support and furtherance of their business relationship. While these communications were first initiated by Venture and the in-person communications occurred in China, *see Growden v. Ed Bowlin & Assocs., Inc.,* 733 F.2d 1149, 1151–53 (5th Cir.1984); *S. Copper, Inc. v. Specialloy, Inc.,* 245 F.3d 791, at \*3 (5th Cir. Dec. 22, 2000), based upon review of all communications, the Court finds that TG was as involved as Venture in their business relationship and negotiations. *See Burger King,* 471 U.S. at 478–79, 105 S.Ct. 2174 (considering prior negotiations and actual course of dealing in personal jurisdiction analysis). For example: TG offered to lower the prices of the drywall for Venture and to give Venture priority in purchasing drywall; it sought to increase its business with Venture and make Venture the exclusive distributor of its drywall in the United States; and it sought Venture's assistance in providing a third-party with shipping information for its drywall. TG's representative communicated in English and used an Americanized version of his name. TG planned to send one of its employees to the United States.

As noted, TG and Venture both sought to expand future drywall sales in the United States through Venture. Although this plan never came to fruition, the Supreme Court has recognized that contemplated future consequences and negotiations for long-term, forum-related business are factors which favor personal jurisdiction in the forum. *See Burger King,* 471 U.S. at 479–82, 105 S.Ct. 2174.

TG sent samples of its drywall to Virginia to facilitate the sale of TG's drywall to Venture. TG accommodated Venture's representative at its factory and offices in China. The Supreme Court has recognized that special state-related marketing or advertising is a factor to be considered in favor of exercising personal jurisdiction in that state. *See J. McIntyre,* 131 S.Ct. at 2792 (Breyer, J. concurring); *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026 (O'Connor, J. plurality).

TG manufactured drywall for Venture based upon Venture's specifications and U.S. standards. TG marked the drywall's face and endtapes with Venture's name. "[D]esigning the product for the market in the forum state" is an example of "[a]dditional conduct of the defendant [that] may indicate an intent or purpose to serve the market in the forum state." *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026 (O'Connor, J., plurality); *accord J. McIntyre,* 131 S.Ct. at 2791–92 (Breyer, J. concurring)(finding

special state-related design of a product supportive of personal jurisdiction).

Although TG did not ship the drywall to Virginia, it assisted Venture with shipping the drywall from China to Virginia by providing information on shipping companies, dates, prices and other logistics. TG attempts to insulate itself from personal **\*856** jurisdiction on the basis that it used F.O.B. shipping terms, but the Fifth Circuit has held that "a F.O.B. term does not prevent a court from exercising personal jurisdiction over a non-resident where other factors ... suggest that jurisdiction is proper," *Luv N' Care,* 438 F.3d at 471–72; these "other factors" are present here. Taishan's argument also fails because it relies on cases which pre-date the Supreme Court's decision in *World–Wide Volkswagen,* the case which forms the basis of the Fifth Circuit's current minimum contacts test. The sole post-*World–Wide Volkswagen* case relied upon by Taishan regarding the effect of an F.O.B. shipment term on minimum contacts, *Southern Copper,* 245 F.3d 791, is unpublished and predates the Fifth Circuit's published decision in *Luv N' Care,* 438 F.3d 465, cited above and which reaches a different conclusion from *Southern Copper* on F.O.B. shipments. *See also Irving,* 864 F.2d at 386 (finding personal jurisdiction where defendant conveyed products to third party for shipment to the forum); *Ruston,* 9 F.3d at 420–21 (finding personal jurisdiction where defendant delivered products to third party for shipment to the forum).

Despite TG's claims to the contrary, the evidence demonstrates that it possessed knowledge and information that the drywall it sold to Venture would be shipped to Virginia and used in Virginia. Its contracts with Venture and invoices for the Venture-purchased drywall, as well as its own records and tax documents, noted Venture was a Virginia company with a Virginia address and that the Venture-purchased drywall would be shipped to Virginia. TG was told by Venture that the drywall was used in Virginia properties. TG provided Virginia-related shipping information to Venture. TG's own internal report recognized the use of its drywall in Virginia. "As long as a [defendant] is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Asahi,* 480 U.S. at 116–17, 107 S.Ct. 1026 (Brennan, J. concurring). TG possessed more than mere awareness or expectation that its drywall would be delivered, sold,

and installed in Virginia. *See Asahi,* 480 U.S. at 121, 107 S.Ct. 1026 (Brennan, J. concurring); *J. McIntyre,* 131 S.Ct. at 2788–89 (Kennedy, J. plurality); *see also Paz v. Brush Engineered Materials, Inc.,* 445 F.3d 809, 813–14 (5th Cir.2006)(finding personal jurisdiction over foreign distributor because it knew its products sold outside of the forum would be used in the forum); *Luv N' Care,* 438 F.3d at 471 (finding personal jurisdiction in part on the basis that foreign defendant knew, based upon sales invoices, that its product would reach the forum); *Ruston Gas,* 9 F.3d at 420–21 (finding jurisdiction part because foreign defendant knew its products, after delivering them to a third-party shipper, would be delivered to a specific user in the forum); *Bean Dredging Corp. v. Rogers–Olympic Corp.,* 744 F.2d 1081 (5th Cir.1984)(finding personal jurisdiction over foreign component part manufacturer solely on the basis that the manufacturer produced thousands of products which were sold nationwide); *Austin v. N. Am. Forest Prods.,* 656 F.2d 1076, 1090 (5th Cir.1981)(finding subject to personal jurisdiction in large part because defendant knew its product would be shipped to and installed in the forum); *Oswalt v. Tokai–Seiki KK,* 616 F.2d 191, 199–200 (5th Cir.1980)(finding personal jurisdiction over foreign manufacturer who delivered its products to a distributor with the understanding its product would be sold in a nationwide market).

TG's Venture-purchased drywall did in fact end up in Virginia and was used in Virginia properties. TG asserts that it did not know the ultimate buyer or user of its drywall in Virginia. The Fifth Circuit, however, has concluded that such lack of **\*857** knowledge does not insulate a foreign defendant from personal jurisdiction in the forum. *See Irving,* 864 F.2d at 386 ("Personal jurisdiction does not require certain knowledge of the user's identity.").

Even applying the *Asahi* and *J. McIntyre* pluralities' requirement that personal jurisdiction may attach under the stream of commerce doctrine only when there is "something else" connecting the defendant to the forum, that "something else" is present here. TG conformed its drywall to meet U.S. standards, placed the name of a Virginia company on its drywall, and facilitated in shipping this drywall to Virginia for use in Virginia.

Because the Court finds TG's forum contacts with Virginia satisfy the minimum contacts necessary for specific

personal jurisdiction, the Court must address the second prong of the minimum contacts test.

*8. Cause of Action Arises From Forum Minimum Contacts*

The second prong of the specific personal jurisdiction, minimum contacts, test is the requirement that "the litigation results from alleged injuries that arise out of or relate to [defendant's] activities [in the forum].' " *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir.2010) (quoting *Burger King v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)); *Seiferth,* 472 F.3d at 271 (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir.2002)).

TG argues that this requirement cannot be satisfied unless plaintiffs prove that the drywall they allege caused their damages is traceable to the drywall that TG sold to Venture, and that the mere presence of TG's drywall in plaintiffs' homes is insufficient to confer personal jurisdiction. Plaintiffs respond that they have demonstrated that their claims arise from and relate to TG's manufacture and sale of defective Chinese drywall, and they are not required for purposes of personal jurisdiction to directly trace the drywall in their homes to the drywall sold by TG to Venture.

**[19]** The Second Amended Complaint in *Germano* alleges that TG "designed, manufactured, exported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall at issue in this case." (R. Doc. 470). The *Germano* plaintiffs bring tort claims against TG for their personal injuries and property damage caused by TG's "defective" and "unfit" drywall. *See id.* The class definition in *Germano* provides in relevant part: "All owners and landlords of real properties located in the United States containing defective Chinese drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by [TG]." *See id.* TG's minimum contacts with Virginia, discussed extensively above, include its design, manufacture, marketing, and sale of its drywall for Venture, a Virginia company, which TG knew would be delivered to Virginia and was used in Virginia properties. The presence of TG's drywall in Virginia properties is the alleged cause of the *Germano* plaintiffs' injuries. Accordingly, the Court finds that the claims against TG in *Germano* "relate to" and "arise from" TG's minimum contacts with Virginia.

The Court does not read the "arise from" or "relate to" requirements as narrowly as TG suggests; nor does it find any jurisprudence supporting this narrow interpretation. The Supreme Court has not yet addressed "what sort of tie between a cause of action and a defendant's contacts with a forum" is required for specific personal jurisdiction. *See Helicopteros,* 466 U.S. at 416 n. 10, 104 S.Ct. 1868. The plain language of this requirement alone indicates a broader interpretation of the nexus between minimum contacts and the allegations against the foreign defendant. The **\*858** method suggested by TG is more akin to a Rule 12(b)(6) challenge for failure to state a claim, while here the Court is only at the juncture of determining personal jurisdiction.

Even if the Court were to apply the tracing requirement urged by TG, the Court finds the evidence does trace the drywall TG sold to Venture to drywall in plaintiffs' Virginia homes. The Court previously determined from the evidence presented that the drywall in the *Germano* Plaintiff–Intervenors' homes is TG-brand drywall. [5] *See* (R. Doc. 2380, pp. 9–10). The Venture-purchased TG drywall contains specific markings which have been identified in Virginia—contaminated homes pursuant to the Court-ordered Threshold Inspection Program ("TIP") of Pretrial Order 13 and the photo-catalog required by Pretrial Order 10. *See* (R. Docs. 171, 181). Both TG and the plaintiffs were required to and did submit profile forms which indicate for TG, the type of drywall sold to Venture, and for the plaintiffs, the type of TG drywall in their homes. *See e.g.* (Spano Dec. Ex. 8). Venture itself has identified the drywall it purchased from TG in contaminated Virginia properties. Notably, at the evidentiary hearing on the Motion, TG admitted that its drywall sold to Venture is located in two of the Plaintiff–Intervenors' contaminated homes. *See* Tr. Hr'g (June 29, 2012).

Finally, the Court recognizes the argument raised by Taishan at the hearing that because the *Germano* class is a nationwide class, any non-Virginia plaintiffs' claims against TG would not "arise from" or "relate to" TG's minimum contacts in Virginia. The Court finds that the solution suggested by the PSC in response to this argument—severing and transferring non-Virginia cases—would resolve TG's dispute. *See id.* Though at this time, all of the Plaintiff–Intervenors are Virginia homeowners.

### 9. Fair Play & Substantial Justice

**[20]** **[21]** **[22]** Under the final prong of the due process inquiry, "[e]ven if minimum contacts exist, the exercise of personal jurisdiction over a non-resident defendant will fail to satisfy due process requirements if the assertion of personal jurisdiction offends 'traditional notions of fair play and substantial justice.' " *Ruston Gas Turbines, Inc.,* 9 F.3d at 421 (quoting *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154). Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show the assertion of personal jurisdiction in the forum would be unfair or unreasonable. *Seiferth,* 472 F.3d at 271 (citing *Nuovo Pignone,* 310 F.3d at 382); *Wien Air Alaska v. Brandt,* 195 F.3d 208, 215 (5th Cir.1999) (citing *Akro Corp. v. Luker,* 45 F.3d 1541, 1547 (Fed.Cir.1995)). "It is rare to say the assertion is unfair after minimum contacts have been shown." *Id.* (citing *Akro Corp.,* 45 F.3d at 1549). A court is to consider the following factors in making the fairness determination: (1) the defendant's burden, (2) the forum state's interest, (3) the plaintiff's interest in convenient **\*859** and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the state's shared interest in furthering fundamental social policies. *Paz,* 445 F.3d at 814; *Ruston Gas Turbines, Inc.,* 9 F.3d at 421.

**[23]** TG argues that the exercise of jurisdiction over it would be unreasonable and would offend traditional notions of fair play and substantial justice. (R. Doc. 13490). It cites *Asahi* in support of its argument. The plaintiffs disagree, arguing that due process is not violated by the exercise of personal jurisdiction over TG. The Court will address the parties' arguments for each of the due process factors as follows.

### a. Burden on TG

The first factor is the burden on the defendant. TG argues this factor is "particularly compelling" since it is a foreign defendant who, if subjected to U.S. law, would face logistical and bureaucratic difficulties in terms of transportation, translation, governmental approval, deep-seated cultural differences, all of which are prohibitively expensive. In response, plaintiffs argue the case law provides that when minimum contacts have been

established, serious burdens on a foreign defendant may be justified.

The Court agrees that TG will face burdens if it is subjected to personal jurisdiction in this forum. As evidenced by the already difficult, time-consuming, and expensive discovery process, further litigation will burden TG, as well as the Court and other litigants. This factor is undeniably the strongest in opposition to personal jurisdiction. The Supreme Court has stated in this context "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi,* 480 U.S. at 114, 107 S.Ct. 1026.

This factor, however, needs to be balanced against the benefit received or sought by TG. Clearly, TG considered its Virginia-related dealings as an opportunity for a new market. TG boasted about being a world-wide supplier of drywall and cited its business in the United States as an example. To reap these benefits and now claim hardship is a bit disingenuous. Additionally, the Supreme Court recognizes, "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *World–Wide Volkswagen,* 444 U.S. at 294, 100 S.Ct. 559. Further, the larger and more sophisticated the defendant, the less burdensome it is to defend in a foreign country. *See e.g. Bean Dredging Corp. v. Dredge Tech. Corp.,* 744 F.2d 1081, 1085 (5th Cir.1984)("Given the magnitude of [defendant's] operations, the court is compelled to hold that it is not unreasonably inconvenient for [defendant] to defend the suit in [the forum]."). As evidence of its ability to defend, the Court notes that Taishan has had the ability and resources to procure excellent counsel who have aggressively and ably advanced its position.

### b. Virginia's Interest

The second factor is the interest of the forum state. TG argues that because it did not engage in any activities in Virginia, personal jurisdiction is not favored by Virginia, especially since Virginia has an interest in its citizens pursuing defendants who acted in the State and are subject to personal jurisdiction there. The Court finds that Virginia has a great interest in its citizens being able to litigate against TG for the alleged damages caused to their

properties, especially after years of suffering in homes contaminated with Chinese drywall and considering the great efforts and expenses incurred to bring TG to the **\*860** United States in an effort to hold TG accountable for these damages.

### c. Plaintiffs' Interest

The third factor is the plaintiffs' interest. TG argues that the plaintiffs' interests can be best served by allowing them to proceed against the domestic defendants alleged to have supplied, distributed, or installed the drywall in their homes. In response, plaintiffs argue they have a strong interest in obtaining efficient relief against TG for the damages caused by TG's own defective product to their homes and properties. The Court agrees with the plaintiffs and notes that, even if the Court possesses personal jurisdiction over the domestic defendants in the stream of commerce with TG, many of these defendants were innocent sellers, distributors, and installers, and some have little-to-no assets and/or insurance coverage. Further, it would be immensely burdensome for the plaintiffs to litigate their claims against TG in China. Thus, the plaintiffs' interest is strong.

### d. Judicial System's Interest

The fourth factor is the judicial system's interest. TG argues that this factor does not favor the exercise of personal jurisdiction because of the aforementioned difficulties with intercontinental, multi-lingual, and cross-cultural adjudication. Plaintiffs respond that the judicial system has strong interest in this Court's adjudication of the related, consolidated claims against TG. The Court agrees that the judicial system has a great interest in the exercise of personal jurisdiction over TG. The MDL Panel authorized this Court to conduct proceedings in all Chinese drywall-related cases, but the Court's progress has been stymied by, at first, TG's failure to appear in the litigation, and later by the massive discovery required to resolve the present personal jurisdiction challenge. The judicial system has an interest in this Court effectively and efficiently resolving the Chinese drywall-related claims, and it can best satisfy this interest by having TG, a major manufacturer defendant, before the Court while the litigation remains consolidated.

### e. States' Shared Interest

The fifth factor is the shared interest of the several states. TG argues that neither China nor international comity would favor the exercise of personal jurisdiction over it given its lack of contacts with the forum and the Chinese arbitration clause in the contracts with Venture. In considering the interests of the several states, the Court should "consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction." *Asahi,* 480 U.S. at 115, 107 S.Ct. 1026. The Court recognizes that the adjudication of a foreign entity's rights in the United States may not be favored by principals of international comity, but it also cannot be argued that international comity is opposed to holding manufacturers of an allegedly defective product liable for the damage caused by their product. In a "flat world" in which we now live, markets are world-wide and it is in everyone's interest to discourage the manufacture and distribution of defective products. Additionally, at oral argument TG admitted that its contract with Venture providing for arbitration in China would not govern the claims of plaintiff property owners. *See* Tr. Hr'g (June 29, 2012).

### f. The Exercise of Personal Jurisdiction Over TG is Fair & Reasonable

When considered all together, even in light of the great burden placed on TG to litigate in this forum, the Court finds that the exercise of personal jurisdiction over TG in this forum does not offend traditional notions of fair play and substantial justice. At least four out of five of the factors favor the exercise of personal jurisdiction over TG. As the Supreme Court **\*861** has stated "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi,* 480 U.S. at 114, 107 S.Ct. 1026.

Taishan invokes *Asahi* in support of its argument that the exercise of personal jurisdiction over it is unfair and unreasonable. However, *Asahi* is distinguishable. In *Asahi,* the Court concluded that the exercise of personal jurisdiction over a foreign defendant was unreasonable and unfair because of the burden placed on the foreign defendant to litigate in the United States, the argument

raised by Taishan, but also on the basis that the only remaining claims against the foreign defendant were by another foreign defendant, diminishing the forum's interest in these entirely foreign claims. *See* 480 U.S. at 114, 107 S.Ct. 1026. Here, the claims against Taishan are made by forum plaintiffs who were injured by Taishan's products in the forum, maximizing the interest of the forum state, the forum plaintiffs, the shared states, and the judicial system.

Now that the Court has determined there exists specific personal jurisdiction over TG in *Germano,* it next will consider whether this personal jurisdiction may be bolstered by imputing TTP's forum contacts to TG.

### 10. Imputation of Contacts[6]

Although it is not clear plaintiffs intend to do so in *Germano,* to the extent that plaintiffs seek to impute the forum contacts of TTP to TG for purposes of personal jurisdiction in *Germano,* TG opposes any such imputation. TG argues that TTP's contacts with the United States do not assist plaintiffs in their personal jurisdiction claim, and there exist insufficient grounds to impute TTP's activities to TG for the purpose of asserting personal jurisdiction over TG. Plaintiffs counter that the evidence pertaining to the relationship between TG and TTP provides sufficient basis to attribute TTP's forum contacts to TG for purposes of personal jurisdiction. Both parties agree that Chinese law applies to the analysis of whether TTP's contacts may be imputed to TG for purposes of personal jurisdiction, but they disagree on the interpretation and application of Chinese law and have presented competing expert opinions on this law.

The Court finds no reason to address the parties' arguments on imputing the contacts of TTP to TG for purposes of personal jurisdiction in *Germano,* because the present evidence demonstrates that TTP had no contacts with Virginia during the relevant time period, leaving no forum contacts to impute to TG. TTP was not created until after the sales of drywall from TG to Venture were completed. *See* (Spano Decl. Exs. 12, 13), *compare* (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 38); Ex. 2 (Tongchun Dep. 474:13–16, Def.'s Exs. 33A, 34A)); *see also Jackson,* 615 F.3d at 589 (finding subsidiary of non-resident defendant could not be subject to personal jurisdiction on the basis that the subsidiary **\*862** did

not manufacture any of the relevant products during the applicable time period); *PBM Prods. v. Mead Johnson Nutrition, Co.,* 2009 WL 3175665, at \*3 (E.D.Va. Sept. 29, 2009)(requiring subsidiary to have forum contacts for imputation of contacts to parent for purposes of personal jurisdiction). This conclusion is inconsequential to the Court's ultimate determination on personal jurisdiction over TG, however, because the Court finds that TG, on its own, satisfies the requirements for specific personal jurisdiction in *Germano.* Because the Court finds personal jurisdiction over TG in *Germano,* the Court will now address the second form of relief requested by TG in its Motion, an order from the Court vacating the Default Judgment against it in *Germano.*

### C. The Court's Ruling on Vacating the Default Judgment

The Court entered a Default Judgment in *Germano* against TG pursuant to Federal Rule of Civil Procedure 55 for TG's failure to appear or otherwise defend the action. (R. Doc. 3013). TG's Motion seeks to have this Default Judgment vacated. The Court will now discuss the applicable law on vacating a default judgment pursuant to Federal Rules of Civil Procedure 55(c) and 60(b), followed by TG's arguments under this law.

### 1. Applicable Law

[24]  [25]  Rule 55(c) provides that "[t]he court may set aside an entry of a default for good cause, and it may set aside a default judgment under Rule 60(b)." Fed.R.Civ.P. 55(c). Although default judgments are disfavored as a matter of policy, this policy "is counterbalanced by considerations of social goals, justice and expediency, a weighing process that lies largely within the domain of the trial judge's discretion." *Rogers v. Hartford Life & Accident Ins. Co.,* 167 F.3d 933, 936 (5th Cir.1999) (quoting *Pelican Prod. Corp. v. Marino,* 893 F.2d 1143, 1146 (10th Cir.1990)); *Recreational Props., Inc. v. Sw. Mortg. Serv. Corp.,* 804 F.2d 311, 313–14 (5th Cir.1986). There are seven general factors for a court to consider in addressing a Rule 60(b) motion: (1) final judgments should not lightly be disturbed; (2) a Rule 60(b) motion is not to be used as a substitute for appeal; (3) Rule 60(b) should be liberally construed in order to do substantial justice; (4) whether the motion was made within a reasonable time; (5) whether—if the judgment

was a default—the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of the judgment; (6) whether there are any intervening equities that would make it inequitable to grant relief; and (7) any other factors relevant to the justice of the judgment under attack. *In re Marinez,* 589 F.3d 772, 777 (5th Cir.2009) (citing *Edward H. Bohlin Co., Inc. v. The Banning Co., Inc.,* 6 F.3d 350, 353 (5th Cir.1993)). In addition, Rule 60(b) provides the following statutory bases for vacating a default judgment:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

TG seeks to vacate the Default Judgment on the grounds found in subsections (1), **\*863** (4), and (6). *See* (R. Doc. 13490, p. 10). The Court will now address the parties' arguments under these subsections.

### 2. Personal Jurisdiction

Invoking subsection (4) of Rule 60(b), TG seeks to have the Default Judgment vacated for lack of personal jurisdiction. "Rule 60(b)(4) authorizes a court to vacate a judgment as 'void' when personal jurisdiction is lacking. Under such circumstances, [the Fifth Circuit] has determined that 'the district court has no discretion, the judgment is either void or it is not.' " *Magness v. Russian Fed'n,* 247 F.3d 609, n. 19 619 (5th Cir.2001) (citing *Recreational Props., Inc. v. Sw. Mortg. Serv. Corp.,* 804 F.2d 311, 313–14 (5th Cir.1986)); *Fowler Rodriguez Valdes–Fauli, LLP v. Medford,* 2011 WL 6258493, at \*1 (E.D.La. Dec. 15, 2011); *see e.g. Jackson v. Tanfoglio*

*Giuseppe, S.R.L.,* 615 F.3d 579 (5th Cir.2010). "If the judgment is void, the district court must set it aside." *Jackson v. FIE Corp.,* 302 F.3d 515, 524 (5th Cir.2002). Because the Court has already concluded that there is personal jurisdiction over TG in *Germano,* this argument is quickly dismissed.

### 3. Excusable Neglect

Additionally, TG seeks to vacate the Default Judgment pursuant to subsection (1) of Rule 60(b) on the basis of excusable neglect. (R. Docs. 13490, 14572). TG admits it was served with the Complaint in *Germano,* but claims it did not respond because it did not understand the significance of it and it was ignorant of the U.S. legal system. According to TG, once it learned of and understood the Default Judgment against it, it expeditiously took measures to appear and participate in the litigation. TG argues that vacating the Default Judgment will not prejudice the plaintiffs, it has a meritorious defense, and it will incur significant financial losses if the Default stands.

In response, plaintiffs argue that the Default Judgment should not be vacated because TG was on notice of the claims against it in *Germano* when it was served with the First Amended Complaint, but it failed to timely enter an appearance. Plaintiffs note that the First Amended Complaint was translated into TG's native language, Chinese, and it contains several references to Venture, whom TG contracted with in English. Plaintiffs also argue that TG does not have a meritorious defense.

**[26]** "In assessing a motion to vacate a default judgment, [the Fifth Circuit has] interpreted Rule 60(b) (1) as incorporating the Rule 55 'good-cause' standard applicable to entries of default." *In re OCA, Inc.,* 551 F.3d 359, 369 (5th Cir.2008). The following factors are to be considered for good cause under subsection (1): whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented. *Id.* (quoting *Jenkens & Gilchrist v. Groia & Co.,* 542 F.3d 114, 119 (5th Cir.2008)). Additionally, courts may consider: whether the public interest was implicated, whether there was significant financial loss to the defendant, and whether the defendant acted expeditiously to correct the default. *Id.* A court need not consider all of these factors, but instead these factors

are to be used to identify circumstances which warrant a finding of "good cause." *Id.*

**[27]** The Court finds that vacating the Default Judgment on the basis of TG's excusable neglect is not warranted. While the Court does not conclude whether the failure to respond on TG's behalf was "wilful," it does note that TG was served with the First Amended Complaint in its native language, and it was aware that it had previously sold its drywall to Venture, the Virginia company also named in the Complaint, all rendering questionable TG's alleged **\*864** naivete. Additionally, the plaintiffs invested substantial amounts of money, time, and effort in serving TG and preparing for and presenting the Default Judgment hearing, yet the Intervening–Plaintiffs who were awarded damages under the Default Judgment are still suffering property damage from the presence of TG's drywall in their homes. Whether or not TG's defense is meritorious is speculative, especially since the Court finds personal jurisdiction exists over TG and it has voluminous evidence before it indicating that TG manufactured and sold a defective product, placed this product into the stream of commerce, and profited from its sales. The public has an interest in seeing that persons harmed by defective, foreign products be accorded relief for their damages. The Court recognizes that TG will suffer financial losses if ordered to pay under the Default Judgment, but at the same time TG incurred a financial gain by its business transactions with Venture. Finally, whether TG acted expeditiously upon receiving service of the Complaint is also questionable, since TG did not act when it was first served, but only after service of the Default Judgment against it, and then it appeared the last day permissible to appeal the Default Judgment.

### 4. Other Reason That Justifies Relief

**[28]** Rule 60(b)(6), the final basis set forth by TG for vacating the Default Judgment, provides a "catch-all" provision for vacating a default judgment. Indeed, "[r]elief under subsection (6) is not available if the type of relief sought is covered by the other subsections in Rule 60(b), and is available only if extraordinary circumstances exist." *United States v. $670,706.55,* 367 Fed.Appx. 532, 535 (5th Cir.2010)(citing *Hess v. Cockrell,* 281 F.3d 212, 216 (5th Cir.2002)). The Court categorizes TG's final two argument under this provision. These arguments are: (1)

plaintiffs' failure to serve TG with required pleadings, and (2) plaintiffs' failure to state a claim under the VCPA.

### a. Failure to Serve

TG argues that the Default Judgment must be set aside because plaintiffs failed to serve it with the pleadings upon which the Default Judgment was based. (R. Doc. 13590). Specifically, TG notes that it was never served with the motion for intervention, the Intervention Complaint, or the Second Amended Complaint. In response, plaintiffs argue that the Court previously and correctly ruled that jurisdiction over TG was accomplished by proper service of the First Amended Complaint. (R. Doc. 14202). Indeed, the Court has already addressed and denied the argument raised by TG. *See* (R. Doc. 4872). The Court incorporates its previous Order & Reasons herein, denying TG's same argument for purposes of the present Motion.

### b. Failure to State a Claim under the VCPA

TG also argues that the Complaint fails to state a claim under the VCPA, and as a result, the Default Judgment cannot be based on this claim. (R. Doc. 14572). Plaintiffs respond that the Default Judgment was based upon more claims than those under the VCPA so even without the VCPA claims, the Default Judgment stands. (R. Doc. 14204). TG is correct that the *Germano* Complaint fails to state a claim under the VCPA. *See* (R. Doc. 4872). The Court issued an Order & Reasons reaching this conclusion and it incorporates and adopts this ruling herein. *See id.* Even without the VCPA claims, however, several viable claims remain against TG in *Germano* which support the damages awarded in the Default Judgment. Thus, the Court finds no basis to vacate the Default Judgment against TG in *Germano.*

### \*865 III. TG'S RENEWED MOTION TO VACATE THE ENTRY OF DEFAULT & DISMISS THE ACTION IN *MITCHELL*

The second motion addressed by the Court is TG's Renewed Motion Pursuant to Rules 55(C) and 12(b)(2) to Vacate the Entry of Default and Dismiss the Action in *Mitchell.* (R. Doc. 13566).

## A. Present Motion & Summary of Parties' Arguments

### 1. TG's Motion

TG filed the present Motion seeking to vacate the Preliminary Default and dismiss the claims against it in the *Mitchell* case. (R. Doc. 13566). TG first argues that the Preliminary Default should be vacated and the claims against it dismissed because the Court lacks personal jurisdiction. TG argues that Florida and Eleventh Circuit law are applicable to the personal jurisdiction analysis, and thereunder, plaintiffs fails to overcome their burden of demonstrating TG has sufficient Florida contacts to satisfy the Florida long arm statute and due process. TG next argues that TTP's Florida-related contacts cannot be attributed to it for personal jurisdiction purposes. With regard to TTP individually, TG also argues that plaintiffs are unable to satisfy the Florida long arm statute requirements for exercise of personal jurisdiction and due process would be violated if the Court exercised personal jurisdiction over TTP.

In addition to lack of personal jurisdiction, TG argues that the Preliminary Default should be set aside because plaintiffs failed to serve it with the pleadings upon which the Default was based and on the basis of excusable neglect.

### 2. The PSC's Response

The PSC filed a Response in opposition to TG's Motion. (R. Doc. 14216). The PSC first argues that TG and TTP are both subject to personal jurisdiction under the Florida long-arm statute and due process, and it urges the Court to treat TG and TTP as the same entity for purposes of personal jurisdiction. Second, the PSC argues that the Preliminary Default should stand, because TG acknowledges it was properly served with the original Complaint. Additionally, the PSC has filed a Global Memorandum, which the Court has already summarized, that responds to all of TG and TTP's motions, addressing the common issue in all motions, personal jurisdiction. *See supra* Section II.A.2.b.

### 3. Mitchell's Response

Mitchell, the named plaintiff, filed a Response in opposition to TG's Motion. (R. Doc. 14372). It first argues that this Court may properly exercise personal jurisdiction over TG pursuant to the Florida long-arm statute, and this exercise of personal jurisdiction comports with the Due Process Clause. Second, Mitchell argues that the Preliminary Default is properly based upon the initially served Complaint. Third, Mitchell argues that TG's neglect in failing to timely appear in this Court is not excusable.

### 4. Certain Florida Homebuilders' Amicus Curiae Response

Certain Florida Homebuilders [7] filed an *Amicus Curiae* Response in opposition to TG's Motion. (R. Doc. 14390). The Homebuilders first argue that TTP acted as TG's agent in the sale of drywall, permitting imputation of TTP's forum activities to TG for purposes of evaluating personal **\*866** jurisdiction. According to the Homebuilders, Florida law applies to determine the question of agency.

Second, the Homebuilders argue that the Court may assert personal jurisdiction under the Florida long-arm statute over both TG and TTP, because they were carrying on business in Florida, committed tortious acts in Florida, and their drywall caused injury to Florida customers while they sought to serve the Florida market with their products.

Third, the Homebuilders argue that the Court may assert specific personal jurisdiction over Taishan consistent with the Due Process Clause, because Taishan has purposefully availed itself of the benefits and protections of Florida law, and the Amended Complaint's allegations arise out of Taishan's intent to serve the Florida market.

Fourth, the Homebuilders allege they have not been permitted to obtain discovery from Taishan's upstream entities, CNBM and BNBM, and seek to reserve this right.

### 5. The Banner Entities' Response

The Banner Entities [8] also filed a Response in opposition to TG's Motion. (R. Doc. 14392). Banner first argues that TG and TTP's contacts with Florida satisfy the

three separate personal jurisdiction requirements under the State's long-arm statute. Second, Banner argues that TTP and TG's contacts with Florida satisfy the requirements for exercising personal jurisdiction under the Due Process Clause. Third, Banner argues that TTP's Florida contacts should be attributed to TG for purposes of personal jurisdiction. Fourth, Banner argues that an adverse inference against Taishan is warranted because of Taishan's failure to maintain required documents and disclose accurate information regarding its drywall sales.

### 6. TG's Reply

TG filed a Reply in further support of its Motion, largely reiterating and expanding upon the arguments in its original brief. (R. Doc. 14573).

### B. The Court's Ruling on TG's Motion to Dismiss for Lack of Personal Jurisdiction

In its first request for relief, TG seeks dismissal of the claims against it and TTP in *Mitchell* on the basis of lack of personal jurisdiction.

### 1. Standard of Review

The standard of review the Court considers for a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction is discussed above and incorporated and adopted herein. *See supra* Section II.B.1. In short, Rule 12(b)(2) permits dismissal of claims against a defendant when personal jurisdiction is lacking. *See id.* The initial burden is on the *Mitchell* plaintiffs to demonstrate personal jurisdiction over the foreign defendant by a preponderance of the evidence. *See id.*

### 2. Applicable Law

*Mitchell* was originally filed in the Northern District of Florida, within the Eleventh Circuit, and then transferred to the MDL Court seated in the Eastern District of Louisiana, within the Fifth Circuit, for consolidated and coordinated pretrial proceedings. See Case No. 09–4115. As a result, the Court will apply Florida state law as

the substantive law and Fifth Circuit law as federal, procedural law. *See supra* Section II.B.2.

**\*867** *3. Personal Jurisdiction Over a Foreign Defendant*

As noted, a federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant if: (1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the Due Process Clause of the United States Constitution. *See supra* Section II.B.3.

### 4. Imputing TTP's Forum Contacts to TG for Purposes of Personal Jurisdiction

Before the Court considers whether there exists personal jurisdiction over TG individually in *Mitchell,* it will determine whether, as argued in the response briefs, TG and TTP may be treated as a single entity under this inquiry by virtue of imputing TTP's forum contacts to TG. TG opposes any such imputation. TG argues that TTP's contacts with the United States do not assist plaintiffs in their personal jurisdiction claim, and there exist insufficient grounds to disregard TG and TTP's separate corporate personhood, as is required to attribute TTP's contacts to TG. Respondents counter that the corporate personalities of TG and TTP have been commingled, and thus, TTP's separate personhood can be disregarded and its forum contacts attributed to TG for purpose of personal jurisdiction.

### a. Piercing the Corporate Veil

**[29]** TG and most Respondents agree that Chinese law on piercing the corporate veil applies to the analysis of whether TTP's contacts may be imputed to TG for purposes of personal jurisdiction, but they disagree on the interpretation and application of this law and have presented competing expert opinions on this law. However, the Court finds it need not at this juncture of the litigation determine whether TTP's corporate veil can be pierced to determine whether TG is liable for TTP's forum-related actions. Piercing the corporate veil is not necessary for imputing contacts of one affiliated corporation to another for purposes of *personal*

*jurisdiction,* but rather is the test conducted for imposing *liability* as between related corporations. *See Hudson Drydocks, Inc. v. Wyatt Yachts, Inc.,* 760 F.2d 1144, 1148 (11th Cir.1985); *Tara Prods., Inc. v. Hollywood Gadgets, Inc.,* 2010 WL 1531489, at *12 (S.D.Fla. Apr. 16, 2010); *Def. Control USA, Inc. v. Atlantis Consultants Ltd. Corp.,* 4 So.3d 694, 697–98 (Fla.App. 3 Dist.2009); *Davis v. Vinnell Corp.,* 2007 WL 2462010, at *3 (N.D.Fla. Aug. 27, 2007). The Court will address the parties' arguments regarding piercing the corporate veil when and if such a determination becomes appropriate. For now, it will address the applicable law for imputing forum contacts between companies for purposes of personal jurisdiction and apply this law to the facts of the present case.

*b. Applicable Law*

Notably, in the recent Supreme Court cases addressing personal jurisdiction over foreign defendants the Court either declined to address the imputation of minimum contacts between affiliated corporate entities, *see Goodyear Dunlop Tires Operations, S.A. v. Brown,* —— U.S. ——, 131 S.Ct. 2846, 2857, 180 L.Ed.2d 796 (2011), or the issue was not before the Court. *See J. McIntyre,* 131 S.Ct. 2780. However, the Supreme Court in *Cannon Manufacturing. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), recognized the possibility of imputing the forum contacts of a subsidiary to a parent for personal jurisdiction purposes, but declined to do so where these affiliates maintained separate and distinct corporate entities. Numerous courts have since read *Cannon* as permitting, in certain circumstances, based on the relationship of affiliated corporations, imputation of one corporation's **\*868** forum contacts to another for personal jurisdiction purposes. *See e.g. Bauman v. DaimlerChrysler Corp.,* 644 F.3d 909 (9th Cir.2011); *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide,* 545 F.3d 357, 362 (6th Cir.2008); *Steinbuch v. Cutler,* 518 F.3d 580, 589 (8th Cir.2008); *Stubbs v. Wyndham Nassau Resort,* 447 F.3d 1357, 1361 (11th Cir.2006); *Pro Axess, Inc. v. Orlux Distrib., Inc.,* 428 F.3d 1270, 1278 (10th Cir.2005); *Freudensprung v. Offshore Technical Servs., Inc.,* 379 F.3d 327, 346 (5th Cir.2004). Generally, the jurisprudence considers a number of factors to determine if the level of "control" or "importance" between the corporate entities is sufficient for the imputation of forum contacts. *See e.g. id.*

Because *Mitchell* is before the Court pursuant to jurisdiction under the Class Action Fairness Act ("CAFA")[9], the Court is obliged to apply the state law of the forum to determine whether a subsidiary's forum contacts may be imputed to a parent company for purposes of personal jurisdiction. *See Admin. of Tulane Educ. Fund v. Ipsen, S.A.,* 450 Fed.Appx. 326, 330 n. 5 (5th Cir.2011). The forum in *Mitchell* is Florida; thus, the Court will apply Florida law on this issue.

[30] [31] Under Florida law, the general rule is that, "a parent and subsidiary are separate and distinct corporate entities, and the presence of one in a forum state may not necessarily be attributed to the other." *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino,* 447 F.3d 1357, 1361 (11th Cir.2006); *Meier v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1272 (11th Cir.2002)(citing *Consol. Dev. Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1293 (11th Cir.2000)). However, a plaintiff may establish personal jurisdiction in the forum over a non-resident parent corporation by virtue of its subsidiary's activities in the forum when "the parent exercises sufficient control over the subsidiary to render the subsidiary an agent or alter ego of the parent." *Schwartzberg v. Knobloch,* 98 So.3d 173, 182 (Fla.App. 2 Dist.2012); *Meier,* 288 F.3d at 1272 (quoting Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1069.4 (3d ed.2002)).

[32] [33] "[O]wnership of a resident subsidiary corporation by an out-of-state parent corporation, without more, will not sustain the assertion of personal jurisdiction over the foreign parent." *Brownsberger v. Gexa Energy, LP,* 2011 WL 197464, at *3 (S.D.Fla. Jan. 20, 2011). "Generally, proof of control by the parent over the internal business operations and affairs of the subsidiary is required to fuse the two for jurisdictional purposes, and the degree of control exercised by the parent must be greater than that normally associated with ownership and directorship." *Id.*

"Thus, a parent's ownership of all of its subsidiary's stock is an insufficient reason, standing alone, to disregard distinct corporate entities: Actual domination, rather the opportunity to exercise control must be shown, with the day-to-day control of the subsidiary by the parent so complete as to render the subsidiary, in fact, an 'agent' or 'mere department' of the parent for jurisdictional purposes." *Id.* (internal citations omitted).

Put another way, "[t]he relevant inquiry is whether the level of control is so extensive that the subsidiary 'functions solely to achieve the purpose of the dominant corporation.' " *Estate of Miller v. Toyota Motor Corp.,* 2008 WL 4525058, at *5 (M.D.Fla. Oct. 6, 2008). "[I]f a subsidiary is a mere **\*869** instrumentality, the parent corporation will be subject to personal jurisdiction." *Knights Armament Co. v. Optical Sys. Tech., Inc.,* 2008 WL 2157108, at *6 (M.D.Fla. May 21, 2008). "Another factor to consider is whether the nonresident corporation would perform the equivalent services if its subsidiary did not exist." *PFM Air, Inc. v. Dr. Ing. hc. F. Porsche A.G.,* 751 F.Supp.2d 1264, 1276 (M.D.Fla.2010); *Estate of Miller v. Toyota Motor Corp.,* 2008 WL 4525058, at *5 (M.D.Fla. Oct. 6, 2008) (citing *Wiwa v. Royal Dutch Petrol. Co.,* 226 F.3d 88, 95 (2d Cir.2000)).

With this law in mind, the Court now reviews the evidence to determine whether TTP was acting as an alter ego or agent of TG while conducting its Florida-related business.

### c. Facts Regarding the Relationship Between TG & TTP

TG is a Chinese corporation with its principal place of business in Tai'an City, Shandong Province, People's Republic of China. (Spano Decl. Ex. 1 (Jia Tongchun Decl. ¶ 4, Aug. 15, 2010)). TG was previously known as Shandong Taihe Taishan Plasterboard Main Factory (Group) and later as Shangdong Taihe Dongxin Co., Ltd., but in 2007 it changed its name to TG. *Id.* at ¶ 3. TG began manufacturing drywall in 1992, exclusively in China, and is now one of the largest drywall manufacturers in that country. *Id.* at ¶¶ 6, 7, 8.

At some time around or before 2005, the Chinese government began to incentivize manufacturers to utilize recycled materials by providing an exemption from value added tax ("VAT") on the sale of products manufactured with recycled materials. *See* (R. Doc. 13566). In 2005, TG, by its use of recycled materials in manufacturing drywall, qualified for this VAT exemption. *Id.;* (Spano Decl. Ex. 4 (Dep. Zhang 141:15–18)). However, certain of TG's customers who sold their products outside of China, for economic reasons, desired to pay VAT on the purchase of TG's products. (Spano Decl. Ex. 2 (Dep. Tongchun 481:8– 21, 645:10–12); Ex. 4 (Dep. Zhang 141:15–17, 142:5–6); Ex. 6 (Dep. Fu 109:18–19)). In 2006, the Chinese tax

bureau informed TG that it could not enjoy the benefits of the VAT exemption if it continued to issue VAT invoices to its customers. *See* (Spano Decl. Ex. 2 (Dep. Tongchun 481:4–7, 645:14–22); Ex. 4 (Dep. Zhang 141:24–142:6)). As a result, TG formed TTP as a company to sell its products to customers who desired to pay VAT. *See* (Spano Decl. Ex. 2 (Dep. Tongchun 481:16–24, 644:3–8); Ex. 4 (Dep. Zhang 141:24–142:21); Ex 6 (Fu Dep. 109:16– 22)). TG did not form TTP specifically for the purpose of selling drywall to U.S. importers, *see* (Spano Decl. Ex. 2 (Dep. Tongchun 480:19–23)), but after TTP was formed, TTP conducted all of the export sales that were previously done by TG. *See* (Spano Decl. Ex. 6 (Fu Dep. 108:4–7)).

TTP was incorporated in February 2006 to produce and sell products, including drywall, as a wholly-owned subsidiary of TG. (Spano Decl. Ex. 1 (Tongchun Decl. ¶ 39)); Ex. 2 (Tongchun Dep. 474:13–116, Def.'s Exs. 33A, 34A). That is, TG owns 100–percent of TTP. (Spano Decl. Ex. 2 (Dep. Tongchun 646:17–21, Def.'s Exs. 33A, 34A)). TG created Articles of Incorporation for TTP. (Spano Decl. Ex. 2 (Dep. Tongchun Def.'s Ex. 34A)). TTP prepared financial reports for the years 2006, 2007, and 2008. *See* (Spano Decl. Ex. 2 (Dep. Tongchun Exs. 45A, 46A, 47A)). TTP held board of director meetings "irregularly," but at least once a year. *See* (Herman Aff. Ex. 110 (S. Peng Dep. 33:21–34:3)). Approximately once a month, TTP would submit written reports to TG. *See* (Spano Decl. Ex. 2 (Tongchun Dep. 131:6–132:9)). Additionally, TTP would verbally communicate with TG. *See id.* at 132:9–16. These communications generally involved TTP's **\*870** production and volume of sales. *See id.* at 132:14–19, 443:18–445:5.

Peng Shiliang, Fu Tinghuan, and Wang Fengqin, all from TG, were appointed to the board of directors of TTP. (Spano Decl. Ex. 2 (Tongchun Dep. Def.'s Ex. 35A), Ex. 6 (Fu Dep. 111:8–10)). Peng Shiliang was assigned to be the general manager of TTP. *Id.* at 646:17–647:6, 653:8–13. Peng Shiliang is an employee of both TG and TTP, having offices at both companies. *See* (Herman Aff. Ex. 110 (S. Peng Dep. 74:12–76:22)). Fu Tinghuan was not compensated by TTP for his role as a member of the board of directors of TTP. (Spano Decl. Ex. 6 (Fu Dep. 115:4–17)). Fu Tinghuan also served as the Deputy General Manager and Director of Sales for TG. *See* (Spano Decl. Ex. 6 (Fu Dep. 29:11–30:5, 34:2–12)). Since 2010, Jianchun Zhang has served as the Secretary of the

Board of Directors of both TG and TTP. *See* (Spano Decl. Ex. 4 (Zhang Dep. 20:1–23, 22:21–23:2)).

TTP was registered with the Chinese business licensing department. *See* (Spano Decl. Ex. 2 (Tongchun Dep., Def.'s Ex. 33A)). To fulfill the requirements for this registration: TTP received a capital contribution from TG, TTP purchased equipment from TG, TTP rented a manufacturing site from TG, and TTP bought offices from TG. *See id.* at 648:22–649:18, Def.'s Exs. 37A, 40A, 42A, 43A. In February 2006, TG made an initial capital contribution to TTP in the amount of 15 million RMB. *See id.* at Def's Ex. 37A. TG made a second capital contribution of seven million RMB in June 2006. *See id.* at Def.'s Ex. 38A. On February 10, 2006, TG entered into a lease agreement with TTP for property to be used as TTP's manufacturing site; the price for this lease was 80,000 RMB. *See id.* at 174:7–9, Def.'s Ex. 40A. On February 20, 2006, TG and TTP entered into a written agreement whereby TG sold manufacturing equipment to TTP for RMB 35,727,650.75. *See id.* at 174:2–4, 474:23–475:5, 662:12–20, Def.'s Ex. 42A; (Herman Aff. EX. 175). TTP's financial records do not reflect the exact amount for the purchase. *See* (Herman Aff. Ex. 176). TTP maintained its office, factory, equipment, and warehouse separate from those of TG. *See id.* at 170:14–171:9, 647:21–23, 648:9–11; (Spano Decl. Ex. 4 (Zhang Dep. 111:3–6, 126:21–127:7)). When TTP was no longer active, it sold-back and/or leased-back its plant, offices, and equipment to TG. *See* (Spano Decl. Ex. 2 (Tongchun Dep. Ex. 44A); Ex. 4 (Zhang Dep. 155:6–9); Ex. 6 (Fu. Dep. 111:11–19)). However, the financial records of the companies do not reflect the exact amount of these transactions.

On February 20, 2006, TG authorized TTP to "use the 'Taishan brand' and other trademarks registered by [TG] for a period of use tentatively set at five years." *See id.* (Spano Ex. 2 (Tongchun Dep. 175:10–21, 474:13–16, Def.'s Ex. 41A); Ex. 6 (Fu Dep. 110:204)). TTP sold this TG-brand drywall. *See generally id.* However, TTP did not pay compensation for this authorization. *See* (Spano Decl. Ex. 2 (Tongchun Dep. 676:14–677:2)).

TTP and TG did not directly share employees. (Spano Decl. Ex. 2 (Tongchun Dep. 171:10–12, 877:23–878:5). However, TTP employed several employees who previously worked for TG, including, but not limited to: Gang Che, Peng Wenglong, Yang Jiapo, and Peng Shiliang. (Spano Decl. Ex. 3 (S. Peng Dep. 384:13–17); Ex.

5 (Che Dep. 20:2–25:14, 148:11–14)); (Herman Aff. Ex. 110 (S. Peng. Dep. 29:10–19)). Gang Che, Peng Wenglong, and Yang Jiapo were on the sales staff at TG before going to TTP to conduct its sales. *See* (Herman Aff. Ex. 110 (S. Peng. Dep. 55:18–23)); (Spano Decl. Ex. 6 (Fu Dep. 39:4–40:3)). Peng Shiliang was the director of production at TG before going to TTP. *See* **\*871** *id.* at 30:10–11. While TTP was in active business, employees of TTP were paid by TTP. (Spano Decl. Ex. 2 (Tongchun Dep. 196:1–8), Ex. 4 (Zhang Dep. 42:4–6)). When TTP ceased production, the former TG employees at TTP returned to TG. *See* (Spano Decl. Ex. 5 Che Dep. 20:2–9), Ex. 6 (Fu Dep. 110:13–20)). In hiring employees at TTP, there was no interview or notification process; TG merely informed its employees that they could "volunteer" to work at TTP, which the TG employees apparently did. *See* (Spano Ex. 6 (Fu Dep. 110:13–20, 116:15–24)).

While the former employees of TG were working at TTP, they used TG telephone and fax numbers, email addresses, and business cards in dealing with customers. *See* (Spano Decl. Ex. 2 (Tongchun Dep. Pl.s' Ex. 20, p. 16)); *compare* (Spano Decl. Ex. 2 (Tongchun Dep. 788:21–789:5)); Ex. 3 (W. Peng Dep. 509:8–22, Ex. 4); (Herman Aff. Ex. 4 (Peng W. Dep. 87:7–88:4); Ex. 28; Ex. 100, Ex. 143 (Gunn Dep. 49:6–51:14); Ex. 156; Ex. 159). TTP employees directed their customers and potential customers to TG's website for information about the company and its products. *See* (Herman Aff. Ex. 4 (W. Peng. Dep. 285:5–12)).

In dealing with customers and potential customers, TG and TTP held themselves out as operating as a single business entity. *See* (Spano Decl. Ex. 3 (Peng W. Dep. 484:17–485:9)); (Herman Aff. Ex. 9 (Gonima Dep. 27:3–14)). TG and TTP's business relationships with two U.S. companies in particular demonstrate this.

The first company is Guardian Building Supplies, a South Carolina company. Guardian entered into communications with a Chinese company it knew simply as "Taihe" through this company's representative Yang Jiapo a.k.a. Apollo Yang. *See* (Herman Aff. Ex. 143 (Gunn Dep. 49:2–52:13, 67:3–11, 74:24–75:1, 86:17–23, 185:6–11, 208:15–19, 209:10–12)). Mr. Yang's business card, which he provided to Guardian, indicated that he worked for TG. *See id.* at 50:1–51:19, 86:17–23, 208:22–209:1; (Herman Ex. 156). Apollo Yang initially worked for TG, then TTP, and returned back to TG after the cessation of TTP. *See* (Herman Ex. 143 (Gunn Dep.

30:19–31:1, 49:2–51:20, 67:3–11, 208:15–23); Ex. 156). When a representative of Guardian traveled to China to purchase drywall, he met with individuals who represented themselves as "Taihe" or TG employees. *See* (Herman Ex. 143 (Gunn Dep. 30:19–31:1, 49:2–51:20, 67:3–11, 208:15–23); Ex. 156). In April 2006, Guardian entered into a sales agreement with an entity it believed was "Taihe" or TG's predecessor for the purchase of TG drywall. *See* (Herman Aff. Ex. 143 (Gunn Dep. 74:24–76:15, 86:17–23, 112:11–14, 166:2–16, 209:10–12); Ex. 157). Although the contract was for the purchase of "Taihe" or TG drywall, the seller listed on the contract was Taian Taigao Trading Corporation ("TTT"). *See* (Herman Aff. Ex. 143 (Gunn Dep. 74:24–76:15, 112:11–17); Ex. 157). When Guardian began to receive complaints from its customers regarding defects in the drywall that Guardian purchased from TG, Guardian contacted TG and sent representatives to meet with TG in China. *See* (Herman Aff. Ex. 143 (Gunn Dep. 122:8–15, 138:24–139:12, 141:8–145:14, 166:2–167)). It was not until the trip to China that Guardian became aware that "Taihe" or TG was involved with TTT, which Guardian believed "was a front set up [by Taihe] to distance [Guardian]." *See id.* at 139:6–140:25, 166:20–167:24. Guardian dealt with TG, including a man it believed to be the general manager of TG, and TTT during these discussions. *See id.* at 145:129–14, 237:4–238:10; (Herman Ex. 161). In October 2008, Guardian finally resolved its dispute with TG by entering into a settlement agreement with TTP, not TG or **\*872** TTT. *See id.* at 173:24–177:15; (Herman Ex. 158).

The second company is Oriental Trading Company, LLC ("OTC"), a Florida company. While representatives of OTC were in China, TTP employees held themselves out as working for Taishan or Taihe or TG, all part of a single building materials business group. *See* (Herman Aff. Ex. 9 (Gonima Dep. 26:10–27:15, 96:11–25)). On October 20, 2006, TTP entered into a Sole Agency Agreement with OTC whereby TTP agreed to sell to OTC drywall manufactured by TTP "under the brand name of 'DUN'" and certified that OTC was "its exclusive agent for the DUN brand in the United States of America." (Herman Aff. Exs. 20, 26). DUN was a brand that TG was exclusively authorized to produce. *See id.;* (Spano Decl. Ex. 2 (Tongchun Dep. 800:22–805:4); Ex. 5 (Che Dep. 40:19–41:1)). TG never authorized TTP to produce or sell DUN brand drywall. *See id.* Nonetheless, TTP sold approximately 60,000 sheets of DUN brand drywall to OTC pursuant to its agreement with OTC. *See* (Herman

Aff. Ex. 9 (Gonima Dep. 77:25–78:9), Ex. 27). As part of the Sole Agency Agreement, OTC paid a $100,000.00 deposit to TTP. *See* (Herman Aff. Ex. 60 (Gonima Dep. 51:17–20, 53:20, 54:12, 66:5–67:6)). When the business relationship ended between OTC and TTP, it was TG, not TTP, which OTC dealt with in seeking return of the deposit. *See* (Herman Aff. Ex. 6 (Che Dep. 79:4–82:6); Ex. 9).

TTP's last sale to a U.S. company was in July 2007. *See* (Herman Aff. Ex. 19). TTP ceased production of drywall in 2008 "for the consideration of economic interests." (Spano Decl. Ex. 4 (Zhang Dep. 151:16–19)). The demand for TTP's drywall from non-VAT customers was not sufficient to warrant further production. *See id.* at 152:4–154:20. The decision to stop TTP's production of drywall was made jointly by the board of directors of each TG and TTP. *Id.* at 155:1–5.

TTP legally remains incorporated, with two employees and some assets, including factories and equipment, and some business accounts. *See* (Spano Decl. Ex. 4 (Zhang Dep. 57:5–23)). Shiliang Peng is one of these remaining employees. *See* (Herman Aff. Ex. 110 (S. Peng Dep. 74:12–76:22)). TTP, however, no longer operates or produces any products, including drywall. *See id.* at 57:9–10, 21–23. TTP currently has no income from its operations. (Spano Decl. Ex. 4 (Zhang Dep. 66:1–3). TG, or one of its subsidiaries, pays the salaries of TTP's remaining two employees. *Id.* at 66:4–8; (Herman Aff. Ex. 110 (S. Peng Dep. 75:8–24)). Additionally, TG has handled TTP's business affairs since TTP stopped production. *See* (Herman Aff. Ex. 9 (Ivan Gonima Dep. Dec. 13, 2011 143:5–160:17), Ex. 143 (John Gunn Dep. July 22, 2011))).

### d. Agency & Alter Ego Exists Between TG & TTP

[34] Applying the foregoing law to the facts deduced by the Court, the Court finds that TTP was operating as an alter ego or agent of TG in conducting its business. While the Court recognizes that TTP was created with separate articles of incorporation, registered with the Chinese business licensing department, and submitted financial reports separate from TG, the facts demonstrate TTP's alter ego or agent status.

TG created TTP specifically to manufacture TG's products, particularly drywall, and sell this drywall to

TG's existing customers. *See Stubbs,* 447 F.3d at 1363 (noting that subsidiary which conducted business solely for parent constituted agent or alter ego of that parent); *PFM Air,* 751 F.Supp.2d at 1276 (finding alter ego or agency relationship where subsidiary existed to provide support to parent in the **\*873** forum country); *Enic, PLC v. F.F. South & Co., Inc.,* 870 So.2d 888, 891 (Fla. 5th DCA 2004) (finding agency relationship established where subsidiary functions solely to achieve the purposes of the parent). TTP essentially became the export sales wing of TG. *See id.* If TTP did not exist, then TG would perform the equivalent services, a fact in favor of an agency or alter ego relationship. *See PFM Air,* 751 F.Supp.2d at 1276.

TG authorized TTP to use a TG trademark in producing drywall, but it did not charge and TTP did not pay for this right. *See id.; compare Knights Armament,* 2008 WL 2157108, at \*6 (finding no agency relationship between a subsidiary and parent where subsidiary applied for its own trademark); *Gen. Cigar Holdings, Inc. v. Altadis, S.A.,* 205 F.Supp.2d 1335 (S.D.Fla.2002)(finding no agency or alter ego relationship in part because subsidiary distributed its own products through its own sales organization). In addition, TTP sold the exclusive right to purchase a brand of drywall owned by TG which TG did not authorize TTP to sell. *See id.*

TG and TTP held themselves out to customers and potential customers as a single entity. *See State v. Am. Tobacco Co.,* 707 So.2d 851, 855 (Fla. 4th DCA 1998) (noting that subsidiary and parent's interchangeable involvement in business affairs with plaintiff favored alter ego or agency relationship); *compare Enic,* 870 So.2d at 892 (finding no agency or alter ego relationship where subsidiary did not hold itself out as parent in business negotiations). TTP employees used TG's fax and telephone numbers, email addresses, business cards, and website when dealing with customers. *See id.; see also Stubbs,* 447 F.3d at 1362 (finding alter ego or agency relationship in part because related entities used the same address in advertisements and checks); *Knights Armament,* 2008 WL 2157108, at \*6 (finding shared website a factor in favor of agency relationship). The names of the companies were used interchangeably on business contracts and agreements. *See Am. Tobacco,* 707 So.2d at 855; *compare Enic,* 870 So.2d at 892 (finding no agency or alter ego relationship where subsidiary did not hold itself out as parent in business negotiations). TG and TTP settled one another's debts and disputes with customers. *See id.*

TG employees "volunteered" to work for TTP, particularly the members of TG's foreign sale staff, and these employees returned to TG after TTP stopped production of drywall. There was no interview or notification process for these employees when they joined TTP.

TG wholly-owned TTP. *But see Schwartzberg,* 98 So.3d at 182 (noting that indirect ownership of affiliated entity does not support finding of alter ego or agency). TG and TTP shared board members. *See Enic,* 870 So.2d at 891 (noting common board members as suggestive of agency or alter ego relationship). Not all of TTP's board members received compensation from TTP. TTP only held irregular board meetings. TTP reported to TG on its business affairs. *See Enic,* 870 So.2d at 891 (finding a subsidiary's reporting to parent a factor in favor of agency or alter ego).

TG rented or sold to TTP a factory, offices, and equipment for the manufacturing and sale of TG brand drywall. When TTP stopped production of drywall, it turned these properties back over to TG. These rental and sales transactions were not accurately reflected in the financial records of either company. *See Am. Tobacco,* 707 So.2d at 855 (considering whether financial reports of affiliated companies reflect ownership of manufacturing plants in alter ego and agency analysis).

**\*874** When TTP stopped production and sales of drywall, TG or its subsidiary paid the salaries of the remaining TTP employees and handled TTP's remaining business affairs. *See Am. Tobacco,* 707 So.2d at 855 (noting a company's paying the salaries of employees of an affiliated company is a factor in favor of alter ego or agency); *compare Gen. Cigar Holdings,* 205 F.Supp.2d at 1344 (finding no agency or alter ego relationship in part because subsidiary paid its own employees).

Based upon the foregoing, the forum contacts of TTP are imputed to TG and considered in determining personal jurisdiction over these entities.

### 5. Florida's Long–Arm Statute

Because Florida serves as the forum for *Mitchell,* in determining whether there exists personal jurisdiction

over Taishan, the Court must first inquire whether the Florida long-arm statute brings Taishan within the personal jurisdiction of the State. *See supra* Section II.B.2–3.

**[35]** **[36]** The Florida long-arm statute provides in relevant part:

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent [10] does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing or any of the following acts:

(a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

(b) Committing a tortious act within this state.

— -

(f) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at the time of the injury, either:

1. The defendant was engaged in solicitation or service activities within this state; or

2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use. Fla. Stat. Ann. § 48.193.

" 'Courts are required to strictly construe the long-arm statute.' " *Caiazzo v. Am. Royal Arts Corp.,* 73 So.3d 245, 256 (Fla. 4 Dist.App.Ct.2011) (quoting *Seabra v. Int'l Specialty Imps., Inc.,* 869 So.2d 732, 733 (Fla. 4 Dist.App.Ct.2004)). "As used in [subsection (1) of] the long arm statute, 'the term 'arising from' is broad; it does not mean 'proximately caused by,' but only requires a direct affiliation, nexus, or substantial connection to exist between the basis for the cause of action and the business activity.' " *Golant v. German Shepherd Dog Club of Am., Inc.,*

26 So.3d 60, 62 (Fla. 4 Dist.Ct.App.2010) (quoting *Citicorp Ins. Brokers (Marine), Ltd. v. Charman,* 635 So.2d 79, 82 (Fla. 1 Dist.Ct.App.1994)). The Court will now discuss these three provisions under the Florida Long–Arm Statute which are at issue: subsections (a), (b), and (f).

*a. Subsection (a)—Business in the State*

i. Applicable Law

**[37]** As noted, the Florida long-arm statute confers personal jurisdiction over an entity which is or was "(a) [o]perating, **\*875** conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." Fla. Stat. Ann. § 48.193(1)(a). "To invoke long arm jurisdiction under section 48.193(1)(a), the activities of the corporation 'must be considered collectively and show a general course of business activity in the State for pecuniary benefit.' " *Golant,* 26 So.3d at 63 (quoting *Dinsmore v. Martin Blumenthal Assocs., Inc.,* 314 So.2d 561, 564 (Fla.1975)). "It is not necessarily the number of transactions, but rather the nature and extent of the transaction(s) that determines whether a person is 'carrying on a business or business venture' within the state." *Joseph v. Chanin,* 869 So.2d 738, at 740 (Fla. 4 Dist.Ct.App.2004)(citing *Silver v. Levinson,* 648 So.2d 240 (Fla. 4 Dist.Ct.App.1994)).

ii. The Parties' Arguments

TG argues that subsection (a) is not satisfied here because: (1) it has never had an office, bank account, or any property in Florida; (2) it has no officers, directors, or employees in the State, nor have they visited the State; and (3) it has never sold drywall to any companies located in the State. Respondents counter that subsection (a) is satisfied because: (1) Taishan systematically conducted a general course of business activity in Florida for pecuniary benefit, as evidenced by its sale of hundreds-of-thousands of sheets of drywall in numerous transactions with Florida buyers from May 2006 to July 2007; (2) it knew that its products would end up in the State; (3) it shipped its products to Florida on a number of occasions; and (4) it solicited business in the State. They argue that the injury-causing product need not be the one sold in the course of business, only that it be manufactured by the defendant.

### iii. Facts Regarding Taishan's
### Florida–Related Business [11]

In order to determine whether subsection (a) of the Florida Long Arm Statute applies to Taishan, the Court must examine the evidence of Taishan's Florida-related business activities. A detailed summary of this evidence follows.

From 2006 to 2007, Taishan sold almost 200,000 sheets of its drywall, through several transactions, to Florida customers or customers doing business in Florida. *See* (Herman Aff. Exs. 1, 38, 39, 88, 89, 90, 100, 167, 170). Taishan made almost $800,000.00 from these sales. *See id.;* (Herman Ex. 165 (Sharf Dep. 132:14–133:9)). Although Taishan has no physical contacts with Florida, as discussed at length below, it had extensive contacts with the State incident to its negotiation and execution of these sales.

**Oriental Trading Company, LLC.** On October 20, 2006, TTP entered into a "Sole Agency Agreement" with Oriental Trading Company, LLC ("OTC"), a Miami, Florida, limited liability corporation, *see* (Herman Aff. Ex. 26), whereby TTP granted to OTC the sole right to purchase TTP's drywall of a specific size and under the brand name of "DUN" within the United States. *See* (Herman Aff. Exs. 20, 64); (Spano Decl. Ex. 5 (Che Dep. 36:23–40:18, 45:23–46:2)). OTC agreed to purchase not less than 20,000 sheets of TTP drywall between November 2006 to February 2007, and not less than 1,000,000 sheets in the following 12 months. *See id.* The agreement was notarized under Florida law. *See id.* Incident to this agreement, OTC paid a $100,000 deposit to TTP. *See* (Herman Aff. **\*876** Ex. 60 (Gonima Dep. 51:17–20, 53:20, 54:12, 66:5–67:6)). From December 2006 to July 2007, OTC purchased drywall from TTP on ten occasions, totaling approximately 57,800 sheets of drywall at a cost of $208,711.20, and each purchase was shipped to Florida. *See* (Herman Aff. Exs. 1, 19).

Ivan Gonima served as OTC's registered agent and manager during OTC's business relationship with Taishan. *See* (Herman Aff. Ex. 9 (Gonima Dep. 13:10–13), Ex. 26). In 2006 and 2007, Che Gang on behalf of Taishan and Ivan Gonima on behalf of OTC exchanged hundreds of instant messages and emails in English

regarding this business relationship. *See e.g.* (Herman Aff. Exs. 21, 27, 28, 29, 36, 43, 46, 49, 57, 61, 62, 64, 65). Che Gang used the Americanized name "Bill Cher" in communicating with OTC. *See id.*

Taishan knew through communications and business records with OTC that the Taishan drywall purchased by OTC would be shipped to Florida. *See* (Herman Aff. Ex. 9 (Gonima Dep. 33:11–18); Ex. 25, pp. 25–26; Ex. 64). For example, the Pro Forma Invoice of December 30, 2006, for a shipment of 20,100 sheets of TTP drywall, specifically provided that delivery would be to Miami, Florida. *See* (Herman Aff. Ex. 84). Again on April 12, 2007, Mr. Gomina emailed Bill Cher, informing him that half of a drywall order would be shipped to Miami, the other half to Orlando, and Mr. Cher provided Mr. Gonima with information on shipping to Miami. *See* (Herman Aff. Ex. 64); (Spano Decl. Ex. 5 (Che Dep. 66:7–9, 209:18–23)). TTP issued export invoices for approximately 44,490 pieces of drywall which were sold to OTC and shipped to Miami. *See* (Herman Aff. Ex. 85, Ex. 110 (S. Peng Dep. 95:9–96:15)).

Several communications between Mr. Gonima and Bill Cher involved a plan for future marketing and expanding the sale of Taishan drywall in the United States. *Id.* at Ex. 64. Taishan offered to assist OTC with marketing and selling its drywall in the United States. *See* (Herman Aff. Ex. 60 (Gonima Dep. 55:9–15)).

In working with Taishan, OTC requested that the Taishan drywall it purchased meet "American Codes & Standards." *Id.* at 36. In response, Taishan customized its manufacturing to meet American Society for Testing and Materials ("ASTM") standards and provided ASTM certificates to OTC. *Id.* at Ex. 9 (Gonima Dep. 141:23–25). Taishan also manufactured its drywall for American customers in inches rather than metric measurements. *Id.* at 43:10–16. Specific to OTC, Taishan agreed to alter the typical Taishan DUN brand logo to appear in "BLUE RED and WHITE because those are the colors of the American Flag." (Herman Aff. Ex. 9 (Gonima Dep. 129:4–133:1); Ex. 27, pp. 5–7; Ex. 43). Taishan also agreed at OTC's request, to manufacture its drywall with specific designs, colors, labels, barcodes, and endtapes, all in an effort to better target the U.S. market. *See* (Herman Aff. Ex. 9 (Gonima Dep. 51:1–3, 113:22–115:18); Ex. 27; Ex. 43; Ex. 46).

As was its practice, *see* (Spano Decl. Ex. 3 (Peng W. Dep. 268–271), Ex. 5 (Che Dep. 288:9–290:11, 312:6–313:6)); (Herman Aff. Ex. 50), Taishan shipped samples of its drywall to OTC in Florida. *See* (Herman Aff. 9 (Gomina Dep. 109:23–110:2); Ex. 27, pp. 30–31; Ex. 49).

Bill Cher welcomed Mr. Gomina's visit to China on behalf of OTC. *See* (Herman Aff. Ex. 27, pp. 34–35; Ex. 57). Mr. Cher asked for Mr. Cher's trip itinerary in advance and provided airport and hotel recommendations. *See* (Herman Aff. Ex. 27). During the trip, Bill Cher picked up Mr. Gomina from his hotel and provided a tour of the Taishan factory and offices; thereafter, they had lunch at the Taishan **\*877** cafeteria, and Mr. Gonima was given promotional materials. *See* (Herman Aff. Ex. 9 (Gonima Dep. 32:3–8, 40:19–42:13, 44:9–21)).

Taishan arranged for shipment of the drywall purchased by OTC from China to Florida. *See* (Herman Aff. Ex. 9 (Gomina Dep. 35:5–9, 46:24–47:1, 138:5–15); Ex. 62). Although all of OTC's drywall purchases with Taishan were F.O.B. China, Taishan actually handled and paid for the shipping of the drywall to Florida. *See* (Herman Aff. Ex. 60 (Gomina Dep. II 45:4–9, 58:1–59:16)). OTC would place an order with Taishan through Bill Cher, instruct Mr. Cher as to the area where the drywall needed to be shipped, and Mr. Cher took care of it. *See* (Herman Aff. Ex. 9 (Gomina Dep. 35:10–21)). Often, Mr. Cher would make suggestions as to which Florida port would be best for shipment. *See* (Herman Aff. Ex. 9 (Gomina Dep. I 81:12–82:6); Ex. 60 (Gomina Dep. II 59:17–60:21)). All of OTC's drywall shipments went to Florida. *See id.* at 35:22–36:7; (Herman Aff. Ex. 60 (Gomina Dep. II 60:22–25)). Taishan ensured that its OTC drywall shipments to Florida satisfied the Florida Department of Transportation's regulations. *See* (Herman Aff. Ex. 64).

Ultimately because the market demand dropped and OTC was unable to find any buyers for the drywall it purchased from Taishan, OTC donated its Taishan drywall. *See* (Herman Aff. Ex. 60 (Gomina Dep. 55:22–57:10)).

When OTC sought the return of its $100,000 deposit from Taishan, Taishan did not return any of the deposited funds. *See id.* at 56:10–13. Instead, TTP urged OTC to purchase more of its drywall or its other products, such as screws, paper tape, and frames, and use the deposit money as payment for these items. *See id.* at 62:3–63:11. OTC was not interested in purchasing other products from China

and used a third-party to have the deposit transferred to the third-party's bank account in China. *See id.* at 63:18–65:5. However, OTC has not yet received this money and the issue remains pending in the Chinese court system. *See id.* at 65:5–66:2.

Taishan sought a "long term relationship" with OTC, including the future sale of metal studs, framing, tracking, toilets, and sinks. *See* (Herman Aff. Ex. 27). In December 2007, Mr. Cher and OTC communicated about a new business relationship whereby Taishan would provide Chinese products, particularly electronics, to OTC in the United States. *See* (Herman Aff. Ex. 21).

**B. America Corporation, Onyx Gbh Corporation and R & R Building Materials.**

TTP also engaged in the sale of its drywall with B. America Corporation, a Florida company. In B. America's dealings with TTP, Onyx Gbh Corporation, also a Florida company, served as B. America's purchase agent and negotiated on behalf of B. America. *See* (Herman Aff. Ex. 97 (Rafael Sardi Dep. 9:3–6, 16:7–20, 21:23–22:11, Feb. 9, 2012)). On September 2, 2006, TTP and B. America entered into a contract for the sale of 1,320 sheets of TTP drywall. *See id.* at 21:4–9, 25:9–10; (Herman Aff. Ex. 86). The drywall was to be produced to meet ASTM standards. *See id.* Further, the contract provided "DELIVERY TERM: CFR MIAMI." *Id.* B. America wired half of the contract price to TTP. *See* (Herman Aff. Ex. 87, Ex. 97 (Sardi Dep. 25:5–6)). However, on November 23, 2006, the contract was cancelled by the parties due to the fact that "both parties can not bear the dropped price in the American market." (Herman Aff. Ex. 87, Ex. 97 (Sardi Dep. 9–10)).

Thereafter, seeking a refund for the money paid by B. America to TTP for the **\*878** cancelled contract, a representative from Onyx communicated via email with TTP. *See* (Herman Aff. Ex. 97 (Sardi Dep. 21:10–17, 25:11–16)). When it became apparent that TTP would not refund the money to B. America, B. America decided to purchase drywall from TTP, using as payment, the money it had previously wired to TTP for the earlier, terminated contract. *See id.* at 21:18–22, 25:16–20, 55:22–56:19. B. America identified another Florida company, R & R Building Materials, to purchase this drywall from B. America. *See id.* at 21:18–22. The representative from Onyx then communicated further, in English, with Che

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/12/19 Page 154 of 1680

In re Chinese Manufactured Drywall Products Liability Litigation, 894 F.Supp.2d 819... Case 2:09-md-02047-EEF-MBN Document... Page 54 of 741 PageID #: 632

Gang, a.k.a. Bill Cher, of Taishan regarding a contract for and the price of TTP's drywall. *See* (Herman Aff. Ex. 87).

On April 7, 2007, TTP prepared an invoice and packing list showing B. America as the buyer of 660 sheets of drywall for $5,656.20, to be shipped from China "CIF Miami Port." *See* (Herman Aff. Ex. 87, 88, 89, 90). "CIF" stands for "cost, insurance and freight." *See* (Herman Aff. Ex. 97 (Sardi Dep. 71:20–72:4)).

Also, in April 2007, a representative from Onyx and a representative of B. America emailed with Bill Cher, during which Mr. Cher wrote "[w]e will arrange the shipping to Miami Port at an early time .... the destination port is Miami." *See* (Herman Aff. Ex. 63). TTP then made the shipping arrangements for the drywall to be shipped to B. America in Miami, Florida. *See* (Herman Aff. Ex. 97 (Sardi Dep. 63:6–64:15)).

On May 7, 2007, TTP took out a Cargo Transportation Insurance Policy on the drywall purchased by B. America. *See* (Herman Aff. Ex. 87). This Insurance Policy provides that Miami, Florida is the destination for the drywall. *See id.*

Shipping and customs documents involving the TTP drywall purchased by B. America show the drywall was shipped from China on May 1, 2007, and reached Miami, Florida on June 11, 2007. *See* (Herman Aff. Exs. 63, 87). After the drywall reached Florida, Onyx shipped and sold the drywall to R & R in Miami. *See* (Herman Aff. Exs. 94; 97 (Sardi Dep. 66:6–9, 77:2–7)).

In 2008, Bill Cher, on behalf of Taishan, emailed a representative of B. America and expressed enthusiasm towards working further together. *See* (Herman Aff. Ex. 99).

**Wood Nation, Inc.** Wood Nation, Inc., a Tampa, Florida company engaged in the business of buying and selling drywall, also purchased drywall from TTP. *See* (Herman Aff. Ex. 38; Ex. 39 (Richard Hannam Dep. 95:17–98:11, Feb. 13, 2012)). Richard Hannam was the president of Wood Nation at this time. *See id.* Wood Nation communicated with TTP through David Wei of BNBM USA. *See* (Herman Aff. Ex. 101 (Richard Hannam Dep. II 48:14–19, Feb. 14, 2011)). Taishan told Mr. Hannam that it was exporting its products to the United States. *See id.* at 49:25–50:8. During the course of Wood Nation's

relationship with Taishan, Mr. Hannam was under the impression that Wood Nation and Taishan would be engaged in future sales of drywall. *See id.* at 51:19–23, 79:6–12.

On or about June 7, 2006, Mr. Hannam traveled to China and visited a plant where TTP was manufacturing drywall. *Id.* David Wei emailed Peng Wenglong a.k.a. Frank Clem and Yang Jiapo a.k.a. Apollo Yang information on Mr. Hamman's flight schedule and requested Taishan provide travel and four or five star hotel accomodations for Mr. Hamman. *See* (Hermann Aff. Ex. 58). During the trip, Mr. Hannam met with Apollo Yang, as well as other Taishan employees. *See* (Hermann Aff. Ex. 101 (Hannam Dep. 50:18–51:2)).

**\*879** On June 10, 2006, Mr. Hannam, on behalf of Wood Nation, entered into a contract with TTP for the purchase of 330,000 sheets of TTP drywall produced to ASTM standards. *See* (Herman Aff. Ex. 38; Ex. 39 (Hannam Dep. 95:17–98:11); Ex. 100). The contract provided Wood Nation's address as in Tampa, Florida, and it provided Tampa, Florida as the port of discharge. *See* (Herman Aff. Ex. 100). TTP provided Mr. Hannam with test reports stating the TTP drywall met ASTM standards. *See* (Herman Aff. Ex. 37; Ex. 38; Ex. 39 (Richard Hannam Dep. 95:17–98:11); Ex. 100). Wood Nation provided these reports to its customer, Suncoast Building Materials, Inc. (Herman Aff. Ex. 38).

Wood Nation requested that the drywall it purchased from TTP: contain custom endtape with certain colors; state the drywall met ASTM standards; designate on the back of the boards that the drywall is manufactured by TTP per ASTM standards; state the contact information as Tampa, Florida, with a local phone number; and to contain writing only in English. *See* (Herman Aff. Ex. 47; Ex. 48). TTP agreed to stamp the drywall boards with the contact phone number and location of Tampa, Florida. *See* (Herman Aff. Ex. 19; Ex. 201 (W. Peng Dep. 514:10–515:6)).

Suncoast ultimately agreed to buy from Wood Nation only 40 containers of TTP's drywall, manufactured to ASTM standards and shipped to the Port of Tampa, Florida in two shipments, one in July 2006 and a second in August 2006. *Id.;* (Herman Aff. Ex. 101 (Hannam Dep. 82:19–83:5)). Accordingly, on July 4, 2006, Wood Nation entered into a revised contract with TTP for the purchase

of only 40 containers, or 26,4000 sheets, of drywall. *Id.* Delivery under this contract was F.O.B. China, and Wood Nation arranged for the shipment from China to Florida. *See* (Herman Aff. Ex. 39 (Hannam Dep. 79:1–80:20)). Suncoast picked up the drywall shipment at the Port of Tampa. *Id.*

**Devon International Trading.** In 2006, Devon International Trading, a Pennsylvania company, was approached by North Pacific Group about arranging for the purchase of drywall manufactured in China. *See* (Herman Ex. 165 (Robert Sharf Dep. 41:20–42:43:7, Mar. 24, 2011)); (R. Doc. 14844). Robert Sharf, president of Devon, traveled to China and toured potential factories to produce this drywall, one of which was Taishan's factory. *See id.* at 50:12–19. TG sent samples of its drywall to Devon. *See id.* at 338:22–339:5.

On February 8, 2006, North Pacific and Devon executed a purchase order for the purchase of 485,044 sheets of drywall from China, to be manufactured at standards which exceed ASTM standards, and to be delivered to the port in Pensacola, Florida. *See* (Herman Aff. Ex. 166). Accordingly, Devon issued an Order Request on March 15, 2006, to TG to purchase the drywall requested by North Pacific. *See* (Herman Aff. Ex. 167, p. 15). On March 30, 2006, a Sales Confirmation was issued reflecting that the trading company Shanghai Yu Yuan Import & Export Company would be the seller of the TG drywall to Devon. *See id.* at pp. 2, 16–17. These agreements provided that the Devon logo would be imprinted on the TG drywall. *See id.* at pp. 4, 16–17. The Devon logo, as provided for in the agreements, was stamped on the TG drywall purchased by Devon. *See id.* at p. 4; (Herman Aff. Ex. 165 (Sharf Dep. 129:9–21, 274:10–18; Ex. 168).

Devon inquired as to whether the TG drywall satisfied ASTM standards, and TG responded that its drywall did satisfy ASTM standards and provided test reports to Devon. *See* (Herman Aff. Ex. 165 (Sharf Dep. 62:16–64:21)). Every piece of drywall that Devon purchased from TG was stamped with the guarantee that the **\*880** drywall met or exceeded ASTM standards. *See id.* at 86:7–13, 111:5–9, 133:23–134:9, 168:13–169:10.

Devon purchased and imported 484,044 sheets of drywall purchased from TG, which were delivered in Pensacola, Florida on or about June 16, 2006. *See* (Herman Aff.

Ex. 167; Ex. 168). In the course of transit, however, 255,680 sheets were damaged and rendered unusable, leaving 229,364 sheets available for sale. *See id.* Because of the damage to the drywall, North Pacific only purchased a portion of its original order. *See* (Herman Aff. Ex. 169). Devon then sold the remaining drywall to distributers and wholesalers, with some sold to individuals via Ebay. *See* (Herman Aff. Ex. 167, Ex. 168). These buyers included Mazer, Gulf Coast Shelter, and Shelter Products. *See* (Herman Aff. Ex. 165 (Sharf Dep. 223:8–24)).

Another customer that Devon sold the drywall to was Emerald Coast Building Supply. *See* (Herman Aff. Ex. 170); (R. Doc. 14372–4 (Kristen Law Sagafi Decl. Ex. 5, May 17, 2012)); (R. Doc. 14844). Between April and July 2006, Rightway Drywall, Inc. purchased at least 840 boards of drywall from Emerald Coast. *See* (R. Docs. 14372–9, 14372–10 (Mike Jenkins Dec. Ex. A, Apr. 30, 2012)); (R. Doc. 14844). Mitchell then purchased drywall from Rightway, containing the same imprint as the Devon Taishan drywall, for the purpose of building homes in Pensacola, Florida. *See id.;* (R. Doc. 14372–1 (Chuck Stefan Dec. Apr. 30, 2012); R. Doc. 14372–2).

**Carn Construction Corp.** Carn Construction Corporation, of Weston, Florida, also communicated with Taishan regarding the purchase and shipment of Taishan drywall. Carn became familiar with Taishan through the website Alibaba.com, an Asian-based website for the sale and purchase of products online. *See* (Herman Aff. Ex. 23 (Carlos Rios Dep. 17:17–24, 31:23–32:10, Dec. 8, 2012)). On this site Taishan described itself as a drywall exporter. *See id.* Carn communicated with Taishan in English via telephone and email. *See id.* at 20:3–21:15. During these conversations, Taishan held itself out to Carn as an exporter of its products worldwide, including the United States and Florida. *See id.* at 30:25–31:19. Taishan provided Carn with information on pricing for shipment, storage and transportation of its drywall. *Id.* at 28:3–29:3. At the request of Carn's agent, Taishan sent samples of its drywall to Carn in Florida. (Herman Aff. Ex. 23 (Rios Dep. 25:13–22); Ex. 53; Ex. 54). Carn requested and Taishan confirmed that the drywall met U.S. standards. *See id.* at 53:4–14. Taishan told Carn that it had the option to have its drywall marked with a brand for marketing purposes. *See id.* at 39:1–14.

**Miscellaneous.** There is also evidence demonstrating that Taishan sold drywall to Beijing Building Materials Import

and Export Co., Ltd., which sold this drywall to Rothchilt International, Ltd., which shipped the drywall to La Suprema Enterprises, Inc. and La Suprema Trading, Inc., which finally sold the Taishan drywall to Banner in Florida where Banner delivered it to homes throughout the State. *See* (R. Doc. 14390, Exs. 15–23). Moreover, Taishan responded to inquiries from Tanader Tang from Bluefire International and Wenny Yin from SCT Co., Ltd., expressing a willingness to ship product to Florida. *See* (Herman Aff. Ex. 105, Ex. 106). Venture learned from shipping agents that TG sent at least one container shipment to Miami which was originally supposed to go to Venture. *See* (Herman Aff. Ex. 72 (Porter Dep. 97:11–99:20)). Guardian Building Products Distribution Inc. purchased drywall from Taishan which was shipped to Florida and sold to Stock Building Supplies, which sold the drywall to builders and contractors in Florida. *See* **\*881** (Herman Aff. Ex. 143 (Gunn Dep. 24:2–25:3, 78:12–79:25, 183:2–5)).

### iv. Taishan's Florida–Related Business Satisfies Subsection (a) of the Florida Long–Arm Statute

**[38]** The Court finds, based upon the foregoing evidence, that subsection (a) of the Florida long arm statute is satisfied by Taishan's Florida-related business and its targeting of customers in the Florida market for the sale of its drywall. As mentioned, Taishan sold almost 200,000 sheets of its drywall in several transactions to Florida customers or customers doing business in Florida from 2006 to 2007. *See* (Herman Aff. Exs. 1, 38, 39, 88, 89, 90, 100, 167, 170). Taishan made almost $800,000.00 from these sales. *See id.;* (Herman Ex. 165 (Sharf Dep. 132:14–133:9)).

Although Taishan was never physically present in Florida, it had extensive contacts within the State incident to its negotiation and execution of these sales. The evidence demonstrates that over the course of at least two years: (1) Taishan negotiated and contracted with a number of Florida companies and companies doing business in Florida for the sale of its drywall; (2) as a result of these sales, Taishan's drywall was shipped to Florida; (3) in some instances, Taishan took care of or assisted with the shipping to Florida; (4) Taishan granted a Florida business the sole right to purchase a specific brand of its drywall in the United States; (5) Taishan engaged in extensive communications with its Florida customers

or customers who were sending or selling its drywall to Florida; (6) these communications were conducted in English with Taishan employees who used Americanized versions of their names; (7) Taishan knew or reasonably should have known, based upon its communications with customers and sales-related documents, that its drywall was shipped to and ended-up in Florida; (8) Taishan specially manufactured its drywall to meet U.S. standards and measurements, and stamped it with information, logos, colors, and designs to appeal to the U.S. market, including imprinting the drywall with Florida-specific information; (9) Taishan shipped samples of its product to Florida; (10) Taishan welcomed and accommodated at its factory and offices in China, representatives of Florida and Florida-related companies; (11) on at least one occasion, Taishan took out cargo insurance on drywall it had sold to a Florida customer and destined for Florida; (12) Taishan tested its drywall to determine if it met U.S. standards and provided these reports to its Florida-related customers; (13) Taishan held itself out to customers as doing business in Florida; and (14) Taishan's drywall ended up in Florida and installed in Florida properties. Based upon the applicable jurisprudence, the foregoing contacts with the State satisfy subsection (a) of the Florida long-arm statute. *See Robert D. Harley Co. v. Global Force (H.K.) Ltd.,* 2007 WL 196854, at \*4 (S.D.Fla. Jan. 23, 2007)(finding personal jurisdiction under subsection (a) of the Florida long-arm statute where defendant executed agreement which contemplated business with a Florida subsidiary, this business resulted in $5–6 million per year for three years, defendant shipped its goods directly to Florida, and it attended a meeting in Florida.); *Sierra v. A Betterway Rent–A–Car, Inc.,* 863 So.2d 358, 360 (Fla. 3 Dist.Ct.App.2003)(finding personal jurisdiction over defendant who knew its products were used in Florida, did not discourage or prohibit the use of its products in Florida, advertised globally, and three accidents involving its products occurred in Florida.); *Gillins v. Trotwood Corp.,* 682 So.2d 693, 693–94 (Fla. 5 Dist.Ct.App.1996)(finding personal jurisdiction over foreign defendant in Florida who although was not authorized to do **\*882** business or solicited business in the state and had no office, agent, or property in the State, specially-manufactured a machine outside of the state which it knew was destined to be used in Florida.); *McHugh v. Kenyon,* 547 So.2d 318, 319 (Fla. 4 Dist.Ct.App.1989)(finding personal jurisdiction over defendant who conducted no business in Florida, had no salesperson or distributors in the State, and no other

ties to Florida, on the basis that the defendant produced hundreds of thousands of product units which were distributed over five-years in the United States, with 6,000 marketed in Florida.); *compare Promex, LLC v. Perez Distrib. Fresno, Inc.,* 2010 WL 3452341, at *3–4 (S.D.Fla. Sept. 1, 2010)(finding no personal jurisdiction over defendant who sold products to two Florida customers, because no evidence that defendant sold its products on more occasions or of a series of acts involving these transactions, the latter of which may have conferred jurisdiction).

TG cites in support of its Motion, *Travel Opportunities of Fort Lauderdale, Inc. v. Walter Karl List Management, Inc.,* 726 So.2d 313, 314 (Fla. 4 Dist.Ct.App.1998), where the court found long-arm jurisdiction under subsection (a) was lacking because the foreign defendant had no physical presence in the state, did not solicit business in the state, and merely sold 19 lists over a period of two years with a value exceeding $198,000. The present matter is easily distinguishable, especially since in *Travel Opportunities* the court noted that the defendant did not have a business relationship with the forum over a period of years, and it did not send extensive business correspondence to Florida, *see id.,* both of which Taishan had. Taishan also cites *Reflection Manufacturing, LLC v. I.S.A. Corp.,* 2011 WL 972570, at *6–7 (M.D.Fla. Mar. 18, 2011), but this case too is distinguishable for the fact that Taishan's business-related contacts are more pervasive than the defendant's contacts in *Reflection* which included: no physical presence; a single, unsolicited transaction with forum resident; business communications; and delivery outside of the forum. *See id.* Although the Court need not address the other two subsections alleged as bases for personal jurisdiction under the Florida long-arm statute, it will do so in the interest of thoroughness.

#### b. Subsection (b)—Tortious Activity in the State

**[39]  [40]  [41]  [42]**  Pursuant to subsection (b) of the Florida long arm statute, "[a] court has specific jurisdiction over a defendant where [it] 'commits a tortious act within this state.' " *Reiss v. Ocean World, S.A.,* 11 So.3d 404, 406 (Fla. 4 Dist.Ct.App.2009). "In order to commit a tortious act within this state, a defendant's physical presence in Florida is not required," *id.* (citing *Wendt v. Horowitz,* 822 So.2d 1252, 1260 (Fla.2002)), as subsection (b) also applies to "defendants committing tortious acts outside the state that cause injury in Florida." *Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209, 1217 (11th Cir.1999). "While a defendant's physical presence in the state is not required, it is not, however, enough that the actions of a defendant committed outside of Florida ultimately have consequences in Florida. Instead, [defendant's] actions must directly cause injury or damage within the state." *Blumberg v. Steve Weiss & Co., Inc.* 922 So.2d 361, 364 (Fla. 3 Dist.Ct.App.2006)(citing *Korman v. Kent,* 821 So.2d 408, 411 (Fla. 4 Dist.Ct.App.2002)). "[T]he plaintiff must demonstrate that the non-resident defendant 'committed a substantial aspect of the alleged tort in Florida' .... such a showing is properly made by establishing that the activities in Florida 'were essential to the success of the tort.' " *Williams Elec. Co., Inc. v. Honeywell, Inc.,* 854 F.2d 389, 394 (11th Cir.1988)(quoting *Watts v. Haun,* 393 So.2d 54, 56 (Fla.Dist.Ct.App.1981)).

**\*883**  TG argues that because it did not sell drywall to any Florida entity, it did not commit tortious activity in Florida. TG, citing *Blumberg v. Steve Weiss & Co., Inc.,* 922 So.2d 361 (Fla. 3d DCA 2006), claims that Florida courts have held that downstream injury in Florida caused by a product placed into the stream of commerce outside of Florida does not constitute commission of a substantial aspect of the tort for purposes of the long arm statute. TG, also argues, citing *Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209, 1220 (11th Cir.1999), that because the alleged economic injury here occurred in Alabama and not Florida, subsection (b) does not apply.

Respondents counter, arguing subsection (b) is satisfied because the damages to plaintiffs involving Taishan's defective drywall occurred in Florida, and Taishan's failure to warn, a tortious offense, occurred in Florida. They factually distinguish the cases relied upon by Taishan.

In *Mitchell,* the Complaint alleges that Taishan manufactured and sold its defective drywall, and this drywall was shipped to Florida where it was installed in properties and caused tortious damage. *See* (R. Doc. 1)(Case No. 09–4115). The evidence demonstrates that Taishan sold and marketed this drywall to Florida or Florida-related companies, it shipped or assisted with shipping its drywall to Florida pursuant to these sales, and it knew or it was reasonable for it to know its drywall would be sold and used in Florida. *See supra*

Section III.B.5.a.iii. Accordingly, under the applicable law, although Taishan did not have a physical presence in Florida, it allegedly committed tortious acts in the State.

*Blumberg,* cited by Taishan, is distinguishable. Unlike Taishan, the defendant in *Blumberg* was not the manufacturer of the product, but rather a seller of another manufacturer's component product.

**[43]** The Court also finds *Posner* unpersuasive. Taishan cites *Posner* as barring personal jurisdiction under subsection (b) because the *Mitchell* plaintiffs suffered only economic injury and suffered this injury outside of Florida. The claim at issue in *Posner* was breach of fiduciary duty to a Bermuda corporation, which the court characterized as an allegation of damage to the defendant's business interest in Bermuda. Here, however, the torts at issue allegedly caused damage to properties, which in turn obligated the plaintiffs to repair or replace the damage, causing plaintiffs to incur their own damages. *See* (R. Doc. 1)(Case No. 09–4115). The plaintiffs' damages were incurred in Florida, as well as other states. Even if these damages were purely economic, many of the remediating homebuilder plaintiffs have received assignments from homeowners to pursue the homeowners' property damage claims against Taishan. *See* Tr. Hr'g (June 29, 2012).

### c. Subsection (f)—Causing Injury in the State

Pursuant to subsection (f) of Florida's long arm statute, an entity is subject to personal jurisdiction when it is,

> Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at the time of the injury, either: 1. The defendant was engaged in solicitation or service activities within this state; or 2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the

ordinary course of commerce, trade, or use. Fla. Stat. Ann. § 48.193(f).

TG, citing *Sun Bank, N.A. v. E.F. Hutton & Co.,* 926 F.2d 1030, 1033 (11th Cir.1991), argues that the mere economic injury suffered by Mitchell and other homebuilders **\*884** does not satisfy subsection (f). TG also argues that even if plaintiffs demonstrate non-economic injury, subsection (f) is not satisfied, because TG was not engaged in solicitation or service activities in the state, nor were plaintiffs' injuries caused by products that Taishan sold and were used and consumed in the State.

Respondents counter that subsection (f) applies because Taishan caused injury to plaintiffs in Florida by manufacturing and designing defective drywall and failing to warn plaintiffs of the defect, all while: (1) Taishan was engaged in solicitation of drywall-related business in Florida, and (2) Taishan's defective products were used in Florida in the ordinary course of commerce when its drywall was installed in Florida homes. They further argue that this Court has already determined that the loss to plaintiffs in the MDL constitutes more than mere economic loss.

Taishan also argues that subsection (f) does not apply because it was not engaged in solicitation or service activities and its products were not used in Florida at the time of plaintiffs' alleged injuries. The evidence demonstrates that Taishan caused property damage and possibly personal injuries in Florida as a result of the drywall it designed, manufactured, sold, and, on occasion, shipped to Florida. *See supra* Section III.B.45.a.iii. Additionally, at the time of these injuries, Taishan was soliciting customers in the State through business communications and by sending samples of its product to the State. *See id.* Also at this time, Taishan's drywall was being used in Florida in the construction and reconstruction of homes and other buildings. *See id.* Thus, subsection (f) of the Florida long arm statute is satisfied. *See N. Star Int'l Seafood Co., Inc. v. Banner Beef & Seafood Co., Inc.,* 677 So.2d 1003, 1004 (Fla. 3 Dist.Ct.App.1996) (finding subsection (f) of Florida long-arm statute satisfied by non-resident defendant's single sale of food to the forum where the food caused injury); *Cal–Mar Indus., Inc. v. Wilson Research Corp.,* 442 F.Supp. 796, 799 (D.C.Fla.1977) (finding personal jurisdiction over defendant who shipped samples of its

product to a Florida corporation). This conclusion applies even to claims of plaintiffs whose Taishan drywall ended up in and caused damage in Florida, but did not reach Florida directly as a result of Taishan's Florida-related activities, for example after being handled by out-of-state defendants in the chain-of-commerce of Taishan and later brought into Florida. *See Davis v. Pyrofax Gas Corp.,* 492 So.2d 1044, 1046 (Fla.1986); *Wetzel v. Fisherman's Wharf of Pompano Beach,* 771 So.2d 1195, 1198 (Fla. 4 Dist.Ct.App.2000); *Kravitz v. Gebrueder Pletscher Druckgusswaremfabrik,* 442 So.2d 985, 987 (Fla. 3 Dist.Ct.App.1983).

Taishan argues that no injury occurred in Florida as a result of its drywall because any alleged injury was merely economic, which is outside the scope of subsection (f). The Court recognizes that the case cited by Taishan, *Sun Bank,* holds that "[t]he Florida Supreme Court has decided that a purely economic injury of the sort alleged in this case is insufficient to confer jurisdiction over a defendant under [subsection (f) ]." 926 F.2d at 1033. However, *Sun Bank* is distinguishable because it involved claims of fraudulent misrepresentation, *see id.,* while here, the allegations in the Complaint arise out of property damage. Although *Mitchell* is brought on behalf of homebuilders who "incurred any expense" associated with Taishan's drywall, and not on behalf of the property owners who actually sustained the damage to their properties, many property owners have assigned their property damage claims to the remediating homebuilder plaintiffs. *See* Tr. Hr'g (June 29, 2012).

**\*885** Because the Court finds that the Florida long arm statute has been satisfied by Taishan's Florida-related activities, it must now address the second prong of the personal jurisdiction inquiry, the due process analysis.

### *6. Due Process Requirements for Specific Personal Jurisdiction*

In conjunction with the specific personal jurisdiction analysis for TG's *Germano* Motion, the Court reviewed the applicable law under due process for subjecting a foreign defendant to specific personal jurisdiction. *See supra* Section II.B.3, 5. This law requires that: (1) the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and (2) the

exercise of personal jurisdiction over this defendant does not offend traditional notions of fair play and substantial justice. *See id.* The Court then addressed at length the type and extent of minimum contacts with the forum required for specific personal jurisdiction and the stream-of-commerce doctrine. *See supra* Section II.B.6. The Court's due process legal findings and conclusions in *Germano* are equally applicable to *Mitchell* and are incorporated herein. *See id.* Applying this law, the Court will next address Taishan's minimum contacts in *Mitchell,* whether the cause of action arises from and/or relates to these minimum contacts, and finally, whether the exercise of personal jurisdiction is fair and reasonable.

### *7. Taishan's Minimum Contacts With Florida*

In applying the applicable law on the minimum contacts required for specific personal jurisdiction to the present facts, the Court finds that Taishan has sufficient minimum contacts with Florida to support the exercise of specific personal jurisdiction over Taishan in *Mitchell.* Because the Court has already discussed these facts at length during its analysis under the Florida Long–Arm Statute, *see supra* Section III.B.5.a.iii., the Court adopts these factual findings for purpose of the due process analysis and makes the following observations and conclusions based thereon.

While Taishan has no physical contacts with Florida, it does possess contacts which demonstrate it purposefully directed its activities at the State such that it reasonably could anticipate being haled into court there. *See Burger King,* 471 U.S. at 476, 105 S.Ct. 2174. Taishan's contacts with Florida are beyond mere random, fortuitous, or attenuated contacts. *Compare World–Wide Volkswagen,* 444 U.S. at 295, 100 S.Ct. 559. Taishan placed its drywall into the stream-of-commerce with the knowledge that its drywall would end up in and be used in Florida. *See Ruston,* 9 F.3d at 419.

Contrary to Taishan's arguments, the Fifth Circuit does not prescribe to the dictate of the *Asahi* and *J. McIntyre* pluralities that personal jurisdiction may attach under the stream of commerce doctrine only when there is "something else" connecting the defendant to the forum. Rather, following the concurrences in these same cases, as is required by the Fifth Circuit, the Court finds Taishan has minimum contacts with Florida because, during its course of production, Taishan demonstrated a regular and

anticipated flow of its drywall to Florida, it marketed its drywall to Florida-based customers, and it benefitted economically from doing so. Taishan had more than reasonable knowledge that its products *might* end up in Florida; it knew its products *would* end up in Florida. *See J. McIntyre,* 131 S.Ct. at 2793.

In comparing the facts in *Mitchell* with those in *J. McIntyre,* Taishan has more substantial contacts with Florida than the **\*886** defendant in *J. McIntyre* did with its forum. As noted, the relevant contacts in *J. McIntyre* were limited to: (1) a U.S. distributor on one occasion sold one of the defendant's machines to a forum customer; (2) the defendant permitted and wanted its distributor to sell its machines to anyone, anywhere in the U.S.; and (3) representatives of the defendant attended trade shows in the U.S., but not in the forum. *See* 131 S.Ct. at 2791–92.

 **[44]**   Over the course of approximately two years, Taishan actively and deliberately negotiated and entered into several contracts for the sale of hundreds of thousands of sheets of its drywall with Florida companies and companies doing business in Florida. Among these contracts was a "sole agency agreement" with a Florida business, which granted this business the sole right to purchase a specific brand of Taishan drywall. These contacts evidence "regular and anticipated flow of products from manufacture to distribution to retail sale" as the Supreme Court requires for minimum contacts, *see Asahi,* 480 U.S. at 116–17, 107 S.Ct. 1026 (Brennan, J. concurring), as opposed to a single, isolated sale to the forum which is insufficient for specific personal jurisdiction. *See J. McIntyre,* 131 S.Ct. at 2792. Taishan benefitted from these sales financially, making almost a million dollars from the sales. "A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final products in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity." *Id.* Indeed, the Fifth Circuit has found personal jurisdiction on the basis of a foreign defendant's sale of products bound for the forum. *See Luv N' Care,* 438 F.3d at 471; *see also Ruston,* 9 F.3d at 420–21; *Irving,* 864 F.2d at 386.

Taishan engaged in extensive email, phone, and in-person communications with Florida customers in support and furtherance of their business relationships. Taishan's representatives communicated in English and used Americanized versions of their names. These prior

negotiations are relevant to the minimum contacts analysis and favor personal jurisdiction. *See Burger King,* 471 U.S. at 478–79, 105 S.Ct. 2174 (considering parties' course of dealings in minimum contacts analysis).

Taishan welcomed Florida-based customers to its offices and factory in China. Taishan assisted these customers with travel accommodations, and provided transportation, tours, and provided promotional materials, and lunch. These facts too favor personal jurisdiction. *See Asahi,* 480 U.S. at 103, 107 S.Ct. 1026 (considering marketing tactics in minimum contacts analysis); *Burger King,* 471 U.S. at 478–79, 105 S.Ct. 2174 (considering parties' course of dealings in minimum contacts analysis).

Taishan sent samples of its drywall to Florida to facilitate the sale of its drywall to Florida-based customers. The Supreme Court has recognized that special state-related marketing or advertising is a factor to be considered in favor of exercising personal jurisdiction in that state. *See J. McIntyre,* 131 S.Ct. at 2792 (Breyer, J. concurring); *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026 (O'Connor, J. plurality).

Taishan made plans with Florida customers to expand its drywall marketing and business in the United States and Florida. Although these plans did not reach fruition, the Supreme Court had recognized that contemplated future consequences and negotiations for long-term, forum-related business is evidence in favor of personal jurisdiction. *See Burger King,* 471 U.S. at 479–82, 105 S.Ct. 2174.

Taishan designed and manufactured drywall for its Florida-related customers to meet American standards, and it used **\*887** inches instead of the metric system for measurements of the drywall. Taishan imprinted on its drywall destined to Florida, custom designs, colors, labels, barcodes, and endtapes. On one shipment, Taishan agreed to label the drywall with "Tampa" and include a Florida-based phone number. "[D]esigning the product for the market in the forum state" is an example of "[a]dditional conduct of the defendant [that] may indicated an intent or purpose to serve the market in the forum state." *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026 (O'Connor, J., plurality); *accord J. McIntyre,* 131 S.Ct. at 2791–92 (Breyer, J. concurring)(finding special state-related design of a product supportive of personal jurisdiction).

In some instances, Taishan handled and paid for the shipping of its drywall to Florida. It also made suggestions to customers on shipping to Florida-based ports. It catered its shipping to satisfy Florida shipping requirements. Taishan took out shipping insurance on a drywall shipment destined for Florida.

TG attempts to insulate itself from personal jurisdiction on the basis that it used F.O.B. shipping terms, but the Fifth Circuit has held that "a F.O.B. term does not prevent a court from exercising personal jurisdiction over a non-resident where other factors ... suggest that jurisdiction is proper," *Luv N' Care,* 438 F.3d at 471–72; these "other factors" are present here. Taishan's argument also fails, as it did in *Germano,* because it relies on cases which pre-date the Supreme Court's decision in *World–Wide Volkswagen,* the case which forms the basis of the Fifth Circuit's current minimum contacts test. Also, once again, the only post-*World–Wide Volkswagen* case relied upon by Taishan regarding the effect of an F.O.B. shipment term on minimum contacts, *Southern Copper,* 245 F.3d 791, is unpublished and predates the Fifth Circuit's published decision in *Luv N' Care,* 438 F.3d 465, cited above and which reaches a different conclusion from *Southern Copper* on F.O.B. shipments.

Despite Taishan's claims to the contrary, it possessed knowledge and information that the drywall it sold to Florida customers and customers doing business in Florida would be shipped to Florida, sold in Florida, and used in Florida. This knowledge was demonstrated by sales and shipping related documents, as well as communications with these customers. Taishan also held itself out to customers as doing business in Florida. "As long as a [defendant] is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Asahi,* 480 U.S. at 116–17, 107 S.Ct. 1026 (Brennan, J. concurring). Taishan possessed more than mere awareness or expectation that its drywall would be delivered, sold, and installed in Florida. *See Asahi,* 480 U.S. at 121, 107 S.Ct. 1026 (Brennan, J. concurring); *J. McIntyre,* 131 S.Ct. at 2788–89 (Kennedy, J. plurality); *see also Paz,* 445 F.3d at 813–14 (finding personal jurisdiction over foreign distributor because it knew its products sold outside of the forum would be used in the forum); *Ruston Gas,* 9 F.3d at 420–21 (finding personal jurisdiction part because foreign defendant knew its products, after

delivering them to a third-party shipper, would be delivered to a specific user in the forum); *Bean Dredging,* 744 F.2d 1081 (finding personal jurisdiction over foreign component part manufacturer solely on the basis that the manufacturer produced thousands of products which were sold nationwide); *Oswalt,* 616 F.2d at 199–200 (finding personal jurisdiction over foreign manufacturer who delivered its products to a distributor with the understanding its product would be sold in a nationwide market); *Austin,* 656 F.2d at 1090 (finding defendant subject to personal jurisdiction in large part because the evidence demonstrated **\*888** that it knew its product would be shipped to and installed in the forum); *Luv N' Care,* 438 F.3d at 471 (finding personal jurisdiction in part on the basis that foreign defendant knew, based upon sales invoices, that its product would reach the forum).

Finally, Taishan's drywall did in fact end-up in Florida and was used by plaintiffs in Florida properties. Taishan seeks to insulate itself from personal jurisdiction by arguing that it did not know the identity of the final purchasers or users of its drywall. The evidence suggests otherwise. Moreover, the Fifth Circuit has held that the this lack of knowledge is inconsequential to the personal jurisdiction inquiry. *See Irving,* 864 F.2d at 386 ("Personal jurisdiction does not require certain knowledge of the user's identity.").

### 8. Cause of Action Arises From Forum Minimum Contacts

Taishan next argues that personal jurisdiction is lacking because the claims against it in *Mitchell* do not arise from its forum minimum contacts as is required for specific personal jurisdiction. According to Taishan, there is no evidence to connect the drywall used and replaced by the plaintiffs to its own drywall which is alleged to have been sold in Florida. Rather, according to Taishan, plaintiffs allege they purchased drywall from two entities, neither of whom purchased their drywall from Taishan or anyone with Taishan drywall.

The Respondents argue that there exists a clear and demonstrated nexus between Taishan's conduct in manufacturing and selling defective drywall and the plaintiffs' damages, because plaintiffs are seeking to recover for damages they suffered as a result of the defective drywall that Taishan purposely directed to Florida. They further argue that Taishan improperly reads

a "tracing" requirement in the analysis, when in fact all that needs to be shown is that the claims relate to or arise from a defendant's forum contacts.

As noted, "specific personal jurisdiction exists when 'the defendant has "purposefully directed" his activities at residents of the forum ... and the litigation results from alleged injuries that arise out of or relate to those activities.' " *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir.2010) (quoting *Burger King v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)); *Seiferth,* 472 F.3d at 271 (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir.2002)). Taishan's challenge is to the latter portion of this sentence; that is, whether the claims in *Mitchell* against it arise from or relate to its minimum contacts with the forum.

**[45]** The Complaint in *Mitchell,* in relevant part, contains claims on behalf of a class of homebuilders who constructed homes using Taishan's drywall and then, as a result of using this drywall, incurred expenses in repairing and/or replacing this drywall, as well as incurred liability for property damages caused by the drywall. *See* (R. Doc. 1–1)(Case No. 09–4115). The Complaint further alleges that Taishan designed, manufactured, marketed, warranted, distributed and sold to the plaintiffs this defective drywall. *See id.* Taishan's minimum contacts with Florida, discussed extensively above, include its design, manufacture, marketing, and sale of its drywall to Florida customers and customers doing business in Florida. Thus, the claims against Taishan in *Mitchell* arise from or relate to its forum-related contacts.

Taishan urges the Court to require every plaintiff in *Mitchell* to prove that the drywall it was involved with was drywall sold by Taishan to Florida customers or was shipped to or used in Florida. The Supreme Court has yet to address the exact standard for the "arise from" or **\*889** "relate to" requirements for specific personal jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415 n. 10, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Consistent with the plain language of "relate to" and "arise out of," the jurisprudence on the issue is absent of the narrow interpretation insisted upon by Taishan. Further, as noted, the Florida Supreme Court does not require for personal jurisdiction to attach that the actual injury-causing product be directly linked to the defendant's sale of the product in the forum;

the defendant's general business in the forum involving the product is sufficient. *See Davis,* 492 So.2d at 1046. Nonetheless, the drywall at issue in *Mitchell* can be tracked to Taishan and its Florida-related activities. This is supported by the information found in profile forms submitted by the parties, the Court-ordered Threshold Inspection Program ("TIP") which requires inspection and recording of the type of drywall in homes, and the Court's photo-catalog which displays the trademarks of various drywall manufacturers, including Taishan. At the hearing on the present Motion, Lennar, one of the major Florida homebuilders, stated that it has identified at least 400 homes in Florida which it has remediated and which contain Taishan's drywall. *See* Tr. Hr'g (June 29, 2012).

Taishan also takes issue with the fact that *Mitchell* involves non-Florida plaintiffs whose claims do not arise from or relate to its Florida-related activities. However, as alleged in the Complaint, non-Florida plaintiffs did work in Florida involving Taishan's drywall. *See* (R. Doc. 1–1) (Case No. 09–4115). To the extent that plaintiffs have no connection to Florida, the Court finds that the PSC's offer to sever and transfer all non-Florida claims would remedy the issue raised by Taishan.

The Court finds that the plaintiffs' claims against Taishan in *Mitchell* arise from and relate to Taishan's minimum contacts with Florida in manufacturing, marketing, selling, and shipping its drywall to this State.

### 9. Fair Play & Substantial Justice

The Court previously reviewed the applicable law for determining the final requirement for personal jurisdiction: whether the exercise of personal jurisdiction over a foreign defendant complies with traditional notions of fair play and substantial justice. *See supra* Section II.B.9. In short, this requirement places the burden on the defendant to demonstrate that the exercise of personal jurisdiction over it offends traditional notions of fair play and substantial justice based on the following factors: (1) the defendant's burden, (2) the state's interest, (3) the plaintiff's interest in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the state's shared interest. *See id.* For the same reasons stated by the Court in *Germano,* particularly that the last four factors all favor personal jurisdiction, the Court finds that the exercise of personal

jurisdiction over Taishan in *Mitchell* does not offend traditional notions of fair play and substantial justice. *See id.*

Now that the Court has determined that it possesses personal jurisdiction over Taishan in *Mitchell,* it will address Taishan's arguments for vacating the Preliminary Default issued against it in *Mitchell.*

### C. The Court's Ruling on Vacating the Preliminary Default

As noted, the Court entered a Preliminary Default entered against TG in *Mitchell* pursuant to Federal Rule of Civil Procedure 55 for TG's failure to appear or otherwise defend the action. (R. Doc. 277). The Court will address the applicable law for vacating a default and apply **\*890** this law to the arguments raised by Taishan.

#### 1. Applicable Law

The applicable law the Court considers for a motion to vacate a default judgment is discussed above in the *Germano* analysis and incorporated herein. *See* Section II.C.1. In essence, it is appropriate to vacate a default judgment where, as argued by Taishan, the failure to appear is due to excusable neglect, the Court lacks personal jurisdiction over the defaulted defendant, and/or "any other reason that justifies relief." *See id.* The Court will focus first on the personal jurisdiction argument because it is also implicated in Taishan's Rule 12(b)(2) argument, then it will address excusable neglect, and finally Taishan's remaining argument of failure to serve.

#### 2. Personal Jurisdiction

Because the Court has concluded that it may exercise personal jurisdiction over Taishan in *Mitchell,* Taishan's argument for vacating the Preliminary Default for lack of personal jurisdiction fails. *See also supra* Section II.C.2.

#### 3. Excusable Neglect

Taishan also argues that the Preliminary Default against it in *Mitchell* should be set aside on the grounds of excusable neglect. The Court previously addressed the applicable

law for considering whether a defaulted defendant's failure to timely appear constitutes excusable neglect, which permits a default to be vacated. *See supra* Section II.C.3. The Court adopts and incorporates this applicable law herein. To determine whether a default judgment should be vacated for a defendant's excusable neglect, the following factors are to be considered by the Court: (1) whether the default was wilful, (2) whether vacating the default will prejudice the plaintiff, (3) whether a meritorious defense is presented, (4) whether defendant will suffer significant financial loss, (5) whether the public interest is implicated, and (6) whether defendant acted expeditiously in correcting the default. *See id.*

Considering the facts under this law, the Court finds that vacating the Default Judgment on the basis of TG's excusable neglect is not warranted. While the Court does not conclude whether the failure to respond on TG's behalf was "wilful," it does note that TG was served with the original Complaint in its native language, and it was aware that it had previously sold its drywall to several Florida-related companies, all suggesting TG was properly put on notice of the claims against it in *Gross.* Additionally, the plaintiffs invested substantial amounts of money, time and effort in serving TG. Whether or not TG's defense is meritorious is speculative, especially since the Court finds personal jurisdiction exists over Taishan in *Mitchell* and it has voluminous evidence before it indicating that TG and TTP manufactured and sold a defective product, placed this product into the stream of commerce, and profited from its sales. The public has an interest in seeing that persons harmed by defective, foreign products be accorded relief for their damages. The Court recognizes that TG will suffer significant financial losses if ordered to pay under the Preliminary Default, but at the same time Taishan incurred a financial gain by its Florida-related sales. Finally, whether TG acted expeditiously is also questionable; it appears that TG did not act in the MDL, until it was notified of the Default Judgment against it in *Germano* and it appeared the last day permissible to appeal that Default Judgment.

#### 4. Other Reason That Justifies Relief–Failure to Serve

Taishan also argues that the Preliminary Default against TG in *Mitchell* should be set aside for the additional reason that plaintiffs failed to serve the pleadings upon which it was based. Specifically, Taishan **\*891** argues

that pursuant to Federal Rule of Civil Procedure 5(a)(2), plaintiffs were required to serve the Amended Complaint on TG in accordance with Federal Rule of Civil Procedure 4, because the Amended Complaint introduced new claims. Respondents argue that the Preliminary Default against TG is properly based upon the initially served Complaint. They deny that the Amended Complaint introduced new claims since it only proposes alternative class definitions.

Federal Rule of Civil Procedure 5(a)(2) generally does not require service of pleadings and other papers which do not assert additional claims, but it does require that "a pleading that asserts a new claim for relief against such a party must be served on that party pursuant to Rule 4." Here, the parties argue as to whether the Preliminary Default should be vacated or remain in effect based upon the plaintiffs' failure to serve TG with the Amended Complaint. However, neither of the parties address the fact that the Amended Complaint "filed" by plaintiffs was marked deficient by the Court on July 7, 2009, *see* (R. Doc. 42), and to date this deficiency has not been remedied. Thus, the Preliminary Default was based upon the only valid complaint filed in the litigation, the original Complaint filed in the Northern District of Florida on March 6, 2009, prior to the case's consolidation with the MDL litigation. There is no basis to vacate the Preliminary Default for failure to serve the Amended Complaint since it currently has no legal effect.

### D. Adverse Inference Against Taishan

Banner alleges Taishan's emails reveal that Taishan exported to the United States millions more square feet of drywall than is accounted for in its Manufacturer Profile Forms and other discovery, even though it is required to maintain such records under Chinese law for a period of 10 years. As a result, Banner seeks to have the Court either: (1) deem that Taishan is subject to personal jurisdiction in this Court, or (2) draw an adverse inference that the missing or incomplete discovery supports the Court's exercise of personal jurisdiction. Taishan has not addressed this issue in its briefing.

Under Federal Rule of Civil Procedure 37(b)(2), a court may issue an order "directing that the matters embraced in the [discovery] order or other designated facts be taken as established for purposes of the act, as the prevailing party claims." In *Insurance Corporation of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 695–

96, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), the Supreme Court held that pursuant to this Rule, a district court may, consistent with basic constitutional guarantees, conclude that a party who has violated a discovery order is subject to personal jurisdiction. The Supreme Court cautioned, however, that for this sanction to be proper, it must meet two standards. *See id.* "First, [the] sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Id.* at 707, 102 S.Ct. 2099.

Since the requested sanction is "specifically related" to the personal jurisdiction discovery ordered by the Court, the Court will focus its inquiry on whether this sanction is just. With regard to the "just" standard, courts have been hesitant to impose an *Insurance Corp.*-type sanction except in instances of especially egregious conduct. *See id.* at 698–99, 102 S.Ct. 2099 (resisting discovery requests for nearly three years and violating several orders compelling discovery); *Compaq Computer Corp. v. Ergonome, Inc.,* 387 F.3d 403, 413 (5th Cir.2004)(requiring two years to conduct sufficient alter ego discovery mostly **\*892** due to defendants' obstructive behavior in filing unsuccessful petitions for writs of mandamus, recusal, and bankruptcy petition). While Taishan has posed some challenges to successful personal jurisdiction discovery, particularly in the first round of Rule 30(b)(6) depositions conducted in Hong Kong, in instances where the plaintiffs have raised questions about the legitimacy of Taishan's discovery responses, Taishan has provided affidavits from its corporate representative asserting the discovery was properly and thoroughly conducted and Taishan's counsel has represented the same to the Court. If the Court does learn that Taishan has been less than forthcoming with relevant discovery, severe penalties may be appropriate, including perjury. At this time, however, the Court declines to find a basis for any presumptions or sanctions under Rule 37.

## IV. TG & TTP'S MOTION TO DISMISS THE COMPLAINT IN *GROSS*

The third motion addressed by the Court is TG and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Gross.* (R. Doc. 13590).

### A. Present Motion [12] & Summary of Parties' Positions

### 1. Taishan's Motion

Taishan argues that the claims against it in *Gross* must be dismissed because the Court lacks personal jurisdiction over both TG and TTP. According to Taishan, plaintiffs cannot establish that either TG or TTP had minimum contacts with Louisiana, because any Louisiana-related sales of drywall were isolated and occurred in China. Taishan further argues that plaintiffs cannot demonstrate their causes of action arose out of or resulted from TG or TTP's contacts with Louisiana, particularly since plaintiffs cannot trace the drywall in their homes to Taishan. According to Taishan, even if it has minimum contacts with the forum, the exercise of personal jurisdiction would be unreasonable and would offend traditional notions of fair play and substantial justice. Finally, Taishan argues that, under both Chinese and Louisiana law, the activities of other entities—particularly TTP and upstream entities—cannot be attributed to TG.

### 2. PSC's Response

The PSC filed a Response in opposition, addressing Taishan's motions to dismiss in both *Gross* and *Wiltz.* (R. Doc. 14204). The PSC first argues that TG and TTP may be treated as a single entity for purposes of the personal jurisdiction analysis, and it concludes that these entities' contacts with Louisiana are sufficient to satisfy both the Louisiana long-arm statute and the minimum contacts required by federal due process. Next, the PSC argues that the plaintiffs' causes of action exist because of Taishan's forum-related activities, demonstrating their claims arise out of Taishan's contacts with Louisiana. The PSC also filed a Global Memorandum of Law in Opposition to all of Taishan's motions. (R. Doc. 14209). The Court summarized this Response above and adopts and incorporates this summary herein. *See supra* Section II.A.2.b.

### 3. Interior Exterior's Response

Interior Exterior Building Supply, LP also filed a Response in opposition to TG's motions to dismiss in *Gross* and *Wiltz.* (R. Doc. 14356). Interior Exterior adopts the **\*893** filings of the PSC. In addition, Interior Exterior alleges that Taishan produced 33,000 sheets of drywall which were sold to Interior Exterior, a Louisiana company, through Metro Resources Corporation, a company with offices in Canada and Michigan. Finally, Interior Exterior argues that the Louisiana long-arm statute provides this Court with jurisdiction over Taishan as a result of the foreseeability of Taishan's drywall ending up in Louisiana and Taishan's marketing and selling its drywall directed for Louisiana.

### 4. Taishan's Reply

Taishan filed a Reply in further support of its Motion to Dismiss. (R. Doc. 14575). Taishan largely reiterates and expands upon the arguments in its original briefing.

### B. Court's Ruling on Taishan's Motion to Dismiss for Lack of Personal Jurisdiction

Taishan seeks dismissal of the claims against it in *Gross* pursuant to Rule 12(b)(2) for lack of personal jurisdiction.

### 1. Standard of Review

The standard of review under which a Court considers a motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction is discussed above and incorporated and adopted herein. *See supra* Sections II.B.1, III.B.1. In summary, Rule 12(b)(2) provides a defendant with a right to dismissal of the claims against it when personal jurisdiction is lacking, and in the present Motion, the proper burden of proof is preponderance of the evidence since the Court conducted an evidentiary hearing on Taishan's personal jurisdiction objections. *See id.*

### 2. Applicable Law

The Court previously addressed the applicable law for analyzing personal jurisdiction. *See supra* Sections II.B.2, III.B.2. The Court incorporates and adopts this law for purposes of the *Gross* Motion. In essence, the Court concluded that the applicable law is the substantive law of the original forum state and the federal law of the Fifth Circuit. *See id. Gross* was originally filed in the Eastern District of Louisiana, within the Fifth Circuit, and was automatically consolidated and coordinated with the MDL for pretrial proceedings. *See* Case No. 09–6687.

Thus, the Court must apply the substantive state law of Louisiana and the federal law of its own circuit, the Fifth Circuit.

### 3. Personal Jurisdiction Over a Foreign Defendant

As noted in conjunction with the *Germano* and *Mitchell* motions, a federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant if: (1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the Due Process Clause of the United States Constitution. *See supra* Sections II.B.3, III.B.3.

### 4. Imputing TTP's Forum Contacts to TG

Before the Court proceeds with its analysis of whether there exists personal jurisdiction over TG and TTP individually, it will determine whether these two entities may be treated as a single entity for purposes of personal jurisdiction. Taishan opposes the attribution of contacts from affiliated entities, such as TTP, to TG, while plaintiffs argue that such attribution of contacts is appropriate.

### a. Piercing the Corporate Veil

For the reasons provided in the analysis of Taishan's Motion in *Mitchell, see supra* Section III.B.4.a., the Court finds that it need not at this time, for purposes of determining personal jurisdiction over Taishan, apply the law for piercing the corporate veil, which determines liability between related corporations under corporate **\*894** law. Instead, the Court applies the following law.

### b. Applicable Law

The Court finds that the imputation of minimum contacts between affiliated business entities for purpose of personal jurisdiction is permissible in certain limited situations. The Court addressed the applicable jurisprudence supporting this conclusion in its analysis of Taishan's Motion in *Mitchell. See supra* Section III.B.4.b. The Court

incorporates and adopts this legal summary and analysis for purposes of the present issue.

**[46]** **[47]** Because *Gross* is before the Court pursuant to jurisdiction under CAFA, the Court is obliged to apply the law of the state of the forum to determine whether the forum contacts of a subsidiary company may be imputed to its parent company for purposes of personal jurisdiction. *See Admins. of Tulane,* 450 Fed.Appx. at 330 n. 5. As noted, the forum here is Louisiana. Louisiana law recognizes the possibility of imputing contacts of a subsidiary to a parent for purposes of personal jurisdiction when the subsidiary is actually an alter ego of the parent. *See e.g. id.; Jackson v. Tanfoglio Giuseppe, S.R.L.,* 615 F.3d 579, 587 (5th Cir.2010); *Whitener v. Pliva, Inc.,* 2012 WL 1343964, at *5 (E.D.La. Apr. 18, 2012); *Puckett v. Advance Sports, Inc.,* 2009–0507 (La.App. 1 Cir. Oct. 26, 2009); 2009 WL 3430283, at *5; *Davis v. Dempster, Inc.,* 790 So.2d 43, 48 (La.App. 3 Cir.2000). "Under Louisiana law, the factors to be considered to determine whether one entity is an alter ego of another or whether two entities are a 'single business enterprise' are similar." *Jackson,* 615 F.3d at 587 (citing *Green v. Champion Ins. Co.,* 577 So.2d 249, 257–58 (La.Ct.App.1991)). These factors include, but are not limited to: (1) common ownership, (2) common directors and officers, (3) common employees, (4) common offices (5) unified administrative control, (6) similar or supplementary business functions, (7) one corporation financing the other, (8) inadequate capitalization, (9) one corporation's creation of the other, (10) one corporation paying the salaries, expenses, or losses of the other corporation, (11) one corporation receiving no business other than that given to it by the affiliated corporation, (12) shared property, (13) noncompliance with corporate formalities, (14) services rendered by the employees of one corporation on behalf of another corporation, (15) centralized accounting, (16) undocumented transfer of funds between corporations, (17) unclear allocation of profits and losses between corporations, and (18) excessive fragmentation of a single enterprise into separate corporations. *See Green,* 577 So.2d at 257–58; *accord Jackson,* 615 F.3d at 587. "This list is illustrative and is not intended as an exhausted list of relevant factors. No one factor is dispositive...." *Id.* at 258; *accord Jackson,* 615 F.3d at 587.

**[48]** **[49]** **[50]** Additionally, Louisiana law recognizes that personal jurisdiction may be imputed to a foreign defendant based upon the forum-related contacts of its

agent. *See* La.Rev.Stat. § 13:3201(A); *Gillespie v. Bynum,* 508 So.2d 628, 630 (La.App. 2 Cir.1987). Under Louisiana law, agency is termed as "mandate" and defined as "a contract by which a person, the principal, confers authority on another person, the mandatory, to transact one or more affairs for the principal." La. Civ.Code art. 2989. A mandate relationship can be express or implied. *See Admin. of Tulane,* 450 Fed.Appx. at 333; *E. Smith Plumbing, Inc. v. Manuel,* 2011–1277, p. 7 (La.App. 3 Cir. 3/28/12); 88 So.3d 1209, 1215. " '[A]n agency relationship cannot be presumed, it must be clearly established.' " *Id.* (quoting *Roberson Adver. Serv., Inc. v. Winnfield Life Ins., Co.,* 453 So.2d 662, 665 (La.App. 5 Cir.1984)). For **\*895** an implied agency, " 'the principal has the right to control the conduct of the agent and the agent has the authority to bind the principal.' " *Commercial Capital Holding Corp. v. Team Ace Joint Venture,* 2000 WL 726880, at \*4 (E.D.La. June 2, 2000)(quoting *Urbeso v. Bryan,* 583 So.2d 114, 117 (La.App. 4 Cir.1991)). Implied agency "is established 'by the words and conduct of the parties and the circumstances of the case.' " *Id.* (quoting *Self v. Walker Oldsmobile Co., Inc.,* 614 So.2d 1371, 1375 (La.App. 3 Cir.1993)).

### c. TTP's Minimum Contacts are Imputable to TG

**[51]** Applying this law to the facts already deduced by the Court involving the relationship between TTP and TG, *see supra* Section III.B.4.c., the Court finds sufficient basis to impute the forum contacts of TTP to TG for purposes of personal jurisdiction in *Gross.* The following facts are conclusive of an alter ego and/or agency relationship between TG and TTP: (1) TG specifically formed TTP to sell TG products to a portion of TG's existing customer base; (2) TTP was a wholly-owned subsidiary of TG; (3) all of TTP's board of directors came from TG; (4) At least one board of director of TTP was not compensated for his position; (5) certain employees and board of directors overlapped at TG and TTP; (6) TTP purchased or rented all of its equipment, factory, and offices from TG, and then sold them back to TG, but the financial records of the entities do not accurately reflect the sale or rental prices exchanged; (7) several TG employees "volunteered" to work at TTP and returned to their jobs at TG once TTP stopped production; (8) the former TG employees continued to use the same telephone and fax numbers, email addresses, and business cards that they used at TG while they worked for TTP; (9) TTP, in dealing with customers and potential customers, held itself out as TG or represented that TTP and TG were the same entity; (10) TG authorized TTP to use its registered trademarks, particularly the "Taishan" trademark; (11) TTP entered into an agreement with a U.S. customer whereby the customer was given exclusive rights to a TG brand which TG had not authorized TTP to use or sell; (12) TG and TTP interchanged in conducting business; (13) TTP only held irregular board meetings; (14) TG and TTP interchanged in settling debts with customers; and (15) after TTP stopped production, TG or its subsidiary continued to pay the salaries of TTP's remaining employees and handled TTP's business affairs. This conclusion is consistent with the applicable jurisprudence. *See Jackson,* 615 F.3d at 587 (finding the following factors weigh in favor of an alter ego relationship: operating in a way that the entities' brands and products appear identical and their business relationships are deeply intertwined; shared phone numbers; common officers and directors; evidence of undocumented transfers of funds between the entities; one entities' payment of the employee salaries of the other); *Whitener v. Pliva, Inc.,* 2012 WL 1343964, at \*6–7 (E.D.La. Apr. 18, 2012)(finding no alter ego relationship between parent and subsidiary, but noting as relevant factors in the inquiry: 100% ownership, common board members, conducting a website which holds out the parent and subsidiary as a single entity, paying the salaries of the subsidiary, undocumented transfers between the entities); *In re Chinese Manufactured Drywall Prods. Liab. Litig.,* 767 F.Supp.2d 649, 667 (E.D.La.2011)(finding alter ego based in part on 100% ownership by the parent of the subsidiary, common officers and directors, common phone number and website, and common employees); *Green,* 577 So.2d at 258–59 (finding single business enterprise where controlling shareholder, common employees, employees were compensated **\*896** by both companies, employees performed services without regard to which of the corporations they worked for, the companies only did business given to it by the related businesses, financial activities were not properly reflected in the books, and funds were transferred without repayment schedule). Thus, the Court will consider the contacts of both TTP and TG in the following personal jurisdiction analysis and the entities will be referred to as "Taishan" collectively. This analysis begins with a brief review of the Louisiana long arm statute requirements, followed by the due process requirements of minimum contacts and fairness.

### 5. Louisiana Long–Arm Statute

**[52]** Under the first requirement for personal jurisdiction in *Gross,* the Louisiana long-arm statute must be satisfied. The Louisiana long-arm statute provides in relevant part:

A. A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from any one of the following activities performed by the nonresident:

(1) Transacting any business in this state.

(2) Contracting to supply services or things in this state.

(3) Causing injury or damage by an offense or quasi offense committed through an act or omission in this state.

(4) Causing injury or damage in this state by an offense or quasi offense committed through an act or omission outside of this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in this state.

— -

(8) Manufacturing of a product or component thereof which caused damage or injury in this state, if at the time of placing the product into the stream of commerce, the manufacturer could have foreseen, realized, expected, or anticipated that the product may eventually be found in this state by reason of its nature and the manufacturer's marketing practices.

B. In addition to the provisions of Subsection A, a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and of the Constitution of the United States. La.Rev.Stat. § 13:3201.

" '[T]he limits of the Louisiana Long-arm Statute and the limits of constitutional due process are now coextensive .... under the express wording of the present Long–Arm Statute, the sole inquiry into the jurisdiction over a nonresident is a one-step analysis of the constitutional due process requirements.' " *Alonso v. Line,* 2002–2644 (La.5/20/03); 846 So.2d 745, 750 (quoting *Ruckstuhl v. Owens Corning Fiberglas Corp.,* 98–1126 (La.4/13/99);

731 So.2d 881, 885). The specific contacts listed in section A once set out the limits of Louisiana's long-arm jurisdiction, but now section A merely "serve[s] as a 'valuable list of contacts sufficient to give rise to in personam jurisdiction.' " *Id.* (quoting Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise, Vol. 1, Civil Procedure § 2.3, p. 15 (1991)). Thus, the Court need not conduct an independent analysis of the Louisiana long arm statute requirements before moving to the due process analysis for specific personal jurisdiction over Taishan in *Gross.*

### 6. Due Process Requirements for Specific Personal Jurisdiction

The Court has already set out at length the applicable law and the Court's interpretation **\*897** thereof for determining whether the exercise of specific personal jurisdiction comports with the Due Process Clause. *See supra* Sections II.B.5–6. The Court adopts and incorporates this law and analysis for purposes of Taishan's Motion in *Gross.* In short, due process permits a court to exercise personal jurisdiction over a foreign defendant when that defendant has purposefully availed itself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice. *See id.* For purposes of specific personal jurisdiction, which is at issue in the present matter, the defendant's minimum contacts with the forum must demonstrate that the defendant purposefully directed its activities at the forum, and the litigation results from alleged injuries which arise out of or relate to those activities. *See id.* The Court's analysis in *Gross* is governed and informed by jurisprudence from the Supreme Court and the Fifth Circuit. *See id.*

Taishan argues that neither TG nor TTP have sufficient contacts with Louisiana to satisfy due process, and neither entity has purposefully availed itself of the Louisiana market simply based upon TTP's isolated sales of drywall in China and its alleged awareness of sales of this same drywall in Louisiana. Taishan concedes that TTP made two isolated sales in China to two companies —Advanced Products International, Corp. ("APIC") and GD Distributors, LLC ("GD Distributors")—who

advised TTP that they intended to ship the drywall to Louisiana.

Plaintiffs respond that Taishan has more than sufficient contacts with Louisiana to satisfy personal jurisdiction, as evidenced by Taishan's manufacture and sale of its drywall to entities, some Louisiana-based, with the knowledge and intent that its drywall would be shipped to and used in Louisiana.

### 7. Minimum Contacts

The first inquiry under the due process analysis for specific personal jurisdiction is whether Taishan has sufficient minimum contacts with the forum, Louisiana. The Court finds the following evidence relevant to this inquiry.

### a. Taishan's Minimum Contacts

#### i. Taishan Lacks Physical Contacts With Louisiana

First, the Court addresses the contacts Taishan does not have with Louisiana. Taishan has never manufactured drywall in Louisiana. *See* (Spano Decl. Ex. 1 (Decl. Jia Tongchun)). Taishan has never advertised in Louisiana or performed any services there. *See id.* TG has a website, but the website is entirely passive and TTP does not have its own website. *See* (Spano Decl. Ex. 3 (W. Peng Dep. 283:15–16, 542:1–543:5, Apr. 7, 2011)). Taishan has never registered to do business nor has had an office, bank account or agent appointed to accept service of process in Louisiana. *See* (Spano Decl. Ex. 1; Ex. 2 (Tongchun Dep. 536:1–4, 12–15, 537:5–8, Apr. 4, 2011)). Taishan has never paid taxes nor had a mailing address or telephone in Louisiana. *See* (Spano Decl. Ex. 1; Ex. 2 (Tongchun Dep. 537:1–4)). Taishan has never owed or leased any real or personal property in Louisiana. *See* (Spano Decl. Ex. 1; Ex. 2 (Tongchun Dep. 535:20–24, 538:15–18)). Taishan has never been registered to do business in Louisiana. *See* (Spano Decl. Ex. 1, Ex. 2 (Tongchun Dep. 536:12–15)). No employee, officer, director, or agent of Taishan ever has maintained a place of business or resided in Louisiana, or visited Louisiana. *See* (Spano Decl. Ex. 1; Ex. 2 (Tongchun Dep. 537:13–17); Ex. 3 (W. Peng Dep. 38:3–5, 275:7–11); Ex. 4 (Jianchun Zhang **\*898** Dep. 82:6–24, Apr. 6, 2011); Ex. 12). None of Taishan's

employees have ever attended a trade show or exhibition in the United States. *See* (Spano Decl. Ex. 3 (W. Peng Dep. 273:13–274:13)).

#### ii. Taishan's Nationwide Contacts

The Court previously addressed Taishan's nationwide contacts in its analysis of minimum contacts in *Germano* and *Mitchell*. *See supra* Sections II.B.7, III.B.5.a.iii. Rather than repeat these lengthy findings, the Court adopts and incorporates these facts for purposes of the *Gross* Motion.

#### iii. Taishan's Louisiana–Related Contacts

Finally, the Court addresses Taishan's Louisiana-related contacts. During 2006 and 2007, Taishan sold at least 45,756 sheets of drywall, through a number of transactions, which ended up in Louisiana, earning Taishan a profit of $195,915.29. *See* (Herman Aff. Ex. 1 Amend.). It had specific communications with customers regarding the manufacture and shipment of its drywall to Louisiana. *See* (Spano Decl. Ex. 13). In one particular email, Taishan was informed that "[a]fter Hurricane Katrina, the Great New Orleans area need rebuild, and housing market in USA is very hot in these days." (Herman Aff. Ex. 108). Taishan held itself out to its U.S.-based customers as interested in and selling its drywall to Louisiana. *See* (Herman Aff. Ex. 9 (Gonima Dep. 72:16–18, 73:19–23, 74:2–6, 75:2–8, 79:23–80:4); Ex. 24 (Yongzhi Yang Dep. 81:11–17, Feb. 21, 2012); Ex. 72 (Porter Dep. 34:18–22, 97:11–99:20); Ex. 143 (Gunn Dep. 56:5–8)). It also provided shipping information and rates to its customers regarding shipment of drywall to New Orleans, Louisiana. *See* (Herman Aff. Exs. 64; 65). Venture Supply learned that containers of TG drywall originally destined for it in Virginia were actually shipped and discharged to New Orleans, Louisiana. *See* (Herman Aff. Ex. 72 (Porter Dep. 97:11–99:20)).

TTP admits it sold its drywall to two companies— Advanced Products International Corp. ("API") and GD Distributors, LLC ("GD Distributors")—who informed TTP that they intended to ship the drywall they purchased to Louisiana. *See* (Spano Decl. Ex. 12). The facts involving Taishan's business relationship with these companies are addressed in turn.

**GD Distributors, LLC.** Sometime around 2006, the owner of GD Distributors, LLC, a Louisiana company, learned about Taishan on the internet, particularly on Alibaba.com. *See* (Herman Aff. Ex. 25 (Steber Dep. 15:20–16:24)). He sent an email to Taishan, and thereafter the parties emailed back-and-forth in English regarding Taishan's business, factory, the price and size of its drywall, and shipping the drywall to the United States. *See id.* at 17:5–20.

At some time during GD Distributor's business relationship with Taishan, the owner of GD Distributors traveled to China to visit Taishan's factory. *See id.* During this trip, Taishan recommended to the owner a hotel to stay in, sent a driver and interpreter to the hotel to bring him to tour the Taishan offices and factory, and provided lunch at the factory. *See id.* at 23:15–25, 24:18–20, 30:2–3. At the tour, the parties discussed the product, price, and ASTM certification. *See id.* at 26:8–12. Taishan provided English interpreters during the tour of its office and factory. *See id.* 18:7–12.

Taishan provided GD Distributors with test reports which stated that the Taishan drywall satisfied ASTM standards. *See id.* at 28:8–21, 54:25–58:19; (Herman Aff. Ex. 40). Additionally, Taishan provided a sample of its drywall to GD Distributors. *See id.* at 34:4–36:6.

On July 11, 2006, GD Distributors entered into an agreement with TTP for the purchase of 1,320 sheets of drywall for the **\*899** amount of $11,601.22. *See* (Herman Aff. Ex. 25 (Steber Dep. 45:9–13); Ex. 40; Ex. 109); (Spano Decl. Ex. 15). The Invoice provided that the delivery term was "CIF New Orleans." *See id.*

Taishan set up the shipment of the drywall to the Port of New Orleans. *See id.* at 21:3–22:5, 27:5–7. According to GD Distributors, Taishan "absolutely" knew its drywall was being shipped to New Orleans, Louisiana. *See id.* at 22:22–25. The shipping for the drywall to GD Distributors was included in the price of the drywall sale. *See id.* at 22:9–21.

GD Distributors sold the drywall it purchased from Taishan to another Louisiana company, Helton Construction. *See id.* at 69:7–18; (Herman Aff. Ex. 40).

**Advanced Products International Corp.** API, based in California, purchased 5,676 sheets of drywall for $24,123.00 from TTP on July 3, 2006. *See* (Spano Decl. Ex. 7 (S. Peng Dep. Ex. 4)). The Invoice for this transaction notes that the sale was done F.O.B. China with a final destination of New Orleans, Louisiana. *See id.* Again on July 20, 2006, API purchased 5,760 pieces of drywall for $24,998.40 from TTP. *See* (Spano Decl. Ex. 7 (S. Peng Dep. Ex. 5)); (Herman Aff. Ex. 110 (S. Peng Dep. 83:18–84:4)). The Invoice for this transaction indicates the sale as F.O.B. China with the final destination in New Orleans, Louisiana. *See id.* TTP did not ship this drywall to Louisiana. *See* (Spano Decl. Ex. 5 (Che Dep. 370:13–371:4); Ex. 7 (S. Peng Dep. 84:16–85:5)). API's representative handled the shipping arrangements for the drywall to be shipped from China to Triax Trading & Logistics, LLC in New Orleans, Louisiana. *See* (Spano Decl. Ex. 5 (Che Dep. 371:5–11); Ex. 4; Ex. 5; Ex. 6; Ex. 7).

**Interior Exterior Building Supply, LP.** 33,000 sheets of Taishan's drywall were sold to Interior Exterior Building Supply, LP, a Louisiana company, by Metro Resources Corporation, a corporation with offices in Canada and Michigan. *See* (R. Doc. 14356–1, Ex. A). Metro provided Interior Exterior with a testing report for this drywall which shows that the drywall was manufactured by TTP on February 9, 2006. *See* (R. Doc. 14356–2, Ex. B).

**Miscellaneous.** In July 2006, Taishan shipped samples of its drywall to TP Construction, Inc. in Jefferson, Louisiana. *See* (Herman Aff. Ex. 51). TG shipped 100,000 boards to New Orleans, Louisiana for an entity identified as "Phoenix." *See* (Herman Aff. Ex. 165 (Sharf Dep. 237:8–238:20, 162:21–163:3)).

### b. Taishan has Sufficient Minimum Contacts With Louisiana to Satisfy Due Process

**[53]** While there is no evidence of Taishan's physical presence in Louisiana, its other nonphysical contacts with the State demonstrate it purposefully directed its activities at the forum such that it reasonably could anticipate being haled into court there. *See Burger King,* 471 U.S. at 476, 105 S.Ct. 2174. Taishan's contacts with Louisiana are beyond mere random, fortuitous, or attenuated contacts. *Compare World–Wide Volkswagen,* 444 U.S. at 295, 100 S.Ct. 559. Taishan placed its drywall into the stream of

commerce with the knowledge that its drywall would end up in Louisiana. *See Ruston,* 9 F.3d at 419.

Contrary to Taishan's arguments, the Fifth Circuit does not prescribe to the dictate of the *Asahi* and *J. McIntyre* pluralities that personal jurisdiction may attach under the stream of commerce doctrine only when there is "something else" connecting the defendant to the forum. Rather, following the concurrences in these same cases, as is required by the Fifth Circuit, the Court finds Taishan has minimum contacts with Louisiana because, during its course of production, Taishan **\*900** demonstrated a regular and anticipated flow of its drywall to Louisiana, it marketed its drywall to Louisiana-based customers, and it benefitted economically from doing so. Taishan had more than reasonable knowledge that its products *might* end up in Louisiana; it knew its products *would* end up in Louisiana. *See J. McIntyre,* 131 S.Ct. at 2793.

In comparing the facts in *Gross* with those in *J. McIntyre,* Taishan has more substantial contacts with Louisiana than the defendant in *J. McIntyre* did with its forum. The relevant contacts in *J. McIntyre* were limited to: (1) a U.S. distributor on one occasion sold one of the defendant's machines to a forum customer; (2) the defendant permitted and wanted its distributor to sell its machines to anyone, anywhere in the U.S.; and (3) representatives of the defendant attended trade shows in the U.S., but not in the forum. *See* 131 S.Ct. at 2791–92.

Over the course of two years, Taishan manufactured and sold, through a number of transactions, 45,756 sheets of drywall destined for Louisiana and/or Louisiana customers, earning $195,915.29.

Taishan manufactured its drywall specifically to match U.S. specifications in size and quality, and often used English-language markings. *See J. McIntyre,* 131 S.Ct. at 2792; *Asahi,* 480 U.S. at 113, 107 S.Ct. 1026. Taishan provided samples of its drywall to at least two different Louisiana businesses. *See id.* The owner of a Louisiana company traveled to China to visit Taishan's drywall factory. *See id.* The Supreme Court recognizes that the defendant's designing the product for sale in the forum and forum-specific marketing both favor personal jurisdiction in the forum. *See id.*

Taishan engaged in extensive communications with U.S.-based companies regarding the manufacture, sale, and shipment of its drywall to Louisiana. *See Burger King,* 471 U.S. at 478–79, 105 S.Ct. 2174 (considering prior negotiations and actual course of dealing in personal jurisdiction analysis).

Taishan knew that its drywall was sold to and would end up in Louisiana. It held itself out as interested in and actively marketing and selling its drywall to Louisiana. It provided to customers and potential customers information and pricing for shipping its product from China to Louisiana. Taishan sold its drywall to at least two companies in the U.S. which informed it that they would be shipping the drywall to Louisiana. Taishan itself arranged the shipment of its drywall to Louisiana. "As long as a [defendant] is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Asahi,* 480 U.S. at 116–17, 107 S.Ct. 1026 (Brennan, J. concurring). Taishan possessed more than mere awareness or expectation that its drywall would be delivered, sold, and installed in Louisiana. *See Asahi,* 480 U.S. at 121, 107 S.Ct. 1026 (Brennan, J. concurring); *J. McIntyre,* 131 S.Ct. at 2788–89 (Kennedy, J. plurality); *see also Paz,* 445 F.3d at 813–14 (finding personal jurisdiction over foreign distributor because it knew its products sold outside of the forum would be used in the forum); *Ruston Gas,* 9 F.3d at 420–21 (finding personal jurisdiction in part because foreign defendant knew its products, after delivering them to a third-party shipper, would be delivered to a specific user in the forum); *Bean Dredging,* 744 F.2d 1081 (finding personal jurisdiction over foreign component part manufacturer solely on the basis that the manufacturer produced thousands of products which were sold nationwide); *Oswalt,* 616 F.2d at 199–200 (finding personal jurisdiction over foreign manufacturer who delivered its products to a distributor with the understanding its product would be sold in a nationwide market); **\*901** *Austin,* 656 F.2d at 1090 (finding personal jurisdiction in large part because defendant knew its product would be shipped to and installed in the forum); *Luv N' Care,* 438 F.3d at 471 (finding personal jurisdiction in part on the basis that foreign defendant knew, based upon sales invoices, that its product would reach the forum).

Taishan attempts to insulate itself from personal jurisdiction by arguing that its sales, even to customers who informed it that its drywall was going to Louisiana, were conducted F.O.B. in China, which transferred title

of the drywall in China, thereafter leaving Taishan with no further obligations involving the drywall. Taishan's argument fails for the following reasons. First, several of the cases relied upon by Taishan pre-date the Supreme Court's decision in *World–Wide Volkswagen,* the case which forms the basis of the Fifth Circuit's current minimum contacts test. Second, the sole modern case relied upon by Taishan regarding the effect of an F.O.B. shipment term on minimum contacts, *Southern Copper,* 245 F.3d 791, is unpublished and predates the Fifth Circuit's published decision in *Luv N' Care,* 438 F.3d 465, which reaches a different conclusion from Southern Copper on F.O.B. shipments. Specifically, *Southern Copper* found that a defendant's knowledge that it product would end up in a forum through indirect F.O.B. shipments on its own did not satisfy minimum contacts with the forum, but recognized this fact might be relevant when considered with other forum contacts. 245 F.3d at *4. *Luv N' Care* later held,

> Jurisdiction, however, 'does not depend on the technicalities of when title passes;' rather, jurisdiction may attach both to manufacturers who supply their own delivery systems and to those that make use of the distribution systems of third parties .... we conclude that a F.O.B. term does not prevent a court from exercising personal jurisdiction over a nonresident where other factors ... suggest that jurisdiction is proper. 438 F.3d at 471–72; *accord Irving,* 864 F.2d at 386.

Likewise, the Court finds that the use of an F.O.B. term in Taishan's Louisiana-related contracts does not, on its own, insulate Taishan from personal jurisdiction in *Gross.*

Finally, Taishan's drywall did end up in Louisiana and was used in Louisiana properties. Taishan argues that because it lacked knowledge of the ultimate buyer and location of its drywall, there is no personal jurisdiction over it in *Gross.* The evidence does not support this position, but in any event, the Fifth Circuit disagrees, concluding that lack of knowledge is inconsequential to personal jurisdiction. *See Irving,* 864 F.2d at 386 ("Personal jurisdiction does not require certain knowledge of the user's identity.").

Because the Court finds Taishan has minimum contacts with Louisiana, it must now determine whether these contacts arise from or relate to the claims against it in *Gross.*

*8. Cause of Action Arises From or Relates to Minimum Contacts*

The second half of the minimum contacts requirement for specific personal jurisdiction is that "the litigation results from alleged injuries that arise out of or relate to" the foreign defendant's minimum contacts with the forum. *See Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir.2010)(quoting *Burger King v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)); *Seiferth,* 472 F.3d at 271 (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir.2002)).

Taishan argues that because the *Gross* plaintiffs' alternative liability theory is that **\*902** they cannot identify it as the manufacturer of the drywall that caused their injuries, plaintiffs cannot show that their cause of action arose out of or related to Taishan's contacts with Louisiana. Taishan also argues that even if the Louisiana plaintiffs can demonstrate a sufficient nexus between Taishan's activities in Louisiana and their damages from drywall, the non-Louisiana plaintiffs cannot demonstrate the same since they do not reside in Louisiana or claim any injury from drywall in Louisiana.

Plaintiffs respond that their Chinese drywall claims arise from Taishan's contacts with the forum, specifically its manufacture and sale of Chinese drywall destined for Louisiana. With regard to their alternative liability theory, plaintiffs argue that Taishan's challenge is properly raised under a Rule 12(b)(6) challenge, not under Rule 12(b)(2). However, if the Court does address the alternative liability issue, plaintiffs argue that Louisiana law recognizes the alternative liability theory.

*Gross* was filed as a nationwide class action on behalf of owners of homes containing defective Chinese drywall manufactured, exported, imported, distributed, delivered, supplied, marketed, or sold by numerous defendants. See (R. Doc. 366, Amended Complaint). TG and TTP are among the defendants named in the Amended Complaint. *See id.* The reason for this style of pleading is "[d]efendants have marketed their products in a manner designed to conceal their identity." *Id.*

The evidence discussed in the preceding section, *see supra* Section IV.B.7.a.iii, demonstrates that Taishan manufactured, exported, marketed and/or sold its drywall

to Louisiana customers or to customers doing business in Louisiana. The profile forms, TIP inspections, and photographic catalog, all Court-ordered and providing information on the type of drywall in homes, also demonstrate the presence of Taishan's drywall in the homes of Louisiana plaintiffs. The Court finds no law which supports Taishan's narrow reading of the "arise from" and "relate to" requirement for specific personal jurisdiction. *See e.g. Helicopteros,* 466 U.S. at 415 n. 10, 104 S.Ct. 1868. Instead, the Court finds the plain language "arise from" and "relate to" as suggesting a broader interpretation of the required nexus. Because the Court is only dealing with personal jurisdiction at this juncture, it finds that plaintiffs' claims against Taishan arise from or relate to Taishan's manufacture, marketing, and sale of its drywall to Louisiana, the forum state.

Taishan's challenge to the application of the alternative liability theory is, as noted by plaintiffs, to be raised in a Rule 12(b)(6) challenge and not in the personal jurisdiction context.

Finally, Taishan's argument pertaining to non-Louisiana plaintiffs is resolved by the PSC's suggestion to sever and transfer any non-Louisiana plaintiffs from *Gross.*

Because the Court finds the first prong of the due process, personal jurisdiction test is satisfied, it now turns to the second and final prong of this test.

### 9. Fair Play & Substantial Justice

The Court previously reviewed the applicable law for determining the final requirement for personal jurisdiction: whether the exercise of personal jurisdiction over a foreign defendant comports with traditional notions of fair play and substantial justice. *See supra* Section II.B.9. In short, this requirement places the burden on the defendant to demonstrate that the exercise of personal jurisdiction over it offends traditional notions of fair play and substantial justice based on the following factors: (1) the defendant's burden, (2) the state's interest, (3) the plaintiff's interest in convenient and effective relief, (4) the judicial system's interest **\*903** in efficient resolution of controversies, and (5) the state's shared interest. *See id.* For the same reasons stated by the Court

in *Germano* and *Mitchell,* particularly that the last four factors all favor personal jurisdiction, the Court finds that the exercise of personal jurisdiction over Taishan in *Gross* does not offend traditional notions of fair play and substantial justice. *See id.*

For all of the foregoing reasons, the Court concludes that the exercise of specific personal jurisdiction over Taishan in *Gross* is proper.

## V. TG & TTP'S MOTION TO DISMISS THE COMPLAINT IN *WILTZ*

The fourth and final motion addressed by the Court is TG and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Wiltz.* (R. Doc. 13591). This Motion is substantially the same as Taishan's Motion to Dismiss Pursuant to Rule 12(b)(6) in *Gross,* which the Court addresses directly above. *See supra* Section IV. Because of the similarity in these motions, as well as the responses, particularly shown by the fact that the respondents filed joint responses to both the *Gross* and *Wiltz* motions, the Court incorporates and adopts herein its summaries, analyses, findings, and conclusions in *Gross,* and it ultimately concludes that the exercise of specific personal jurisdiction over Taishan in *Wiltz* is proper. *See id.*

## VI. CONCLUSION

For the foregoing reasons it is ordered that the following motions are DENIED: (1) TG's Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint in *Germano v. Taishan Gypsum Co., Ltd.,* Case No. 09–6687 (R. Doc. 13490); (2) TG's Renewed Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate the Entry of Default and Dismiss This Action in *The Mitchell Co., Inc. v. Knauf Gips KG,* Case No. 09–4115 (R. Doc. 13566); (3) TG and TTP'S Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Gross v. Knauf Gips KG,* Case No. 09–6690 (R. Doc. 13590); and (4) TG and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Wiltz v. Beijing New Building Materials Public Ltd., Co.,* Case No. 10–361 (R. Doc. 13591).

### All Citations

894 F.Supp.2d 819

## Footnotes

1.   Although the Court did not entertain a formal hearing on the evidentiary objections, the evidence relied upon by the Court in the present Order & Reasons reflects its rulings.

2.   Taishan does not dispute the plaintiffs' allegation that the first contract between Venture and TG was executed via fax in Virginia. Although the Court finds no specific evidence to support this allegation, because it is not contested and because the contract provides that "fax copies are regarded as valid," *see* (Herman Aff. Ex. 80), the Court takes this allegation as true.

3.   The Court will explore Justice Breyer's concurrence in greater detail in the following section. *See infra* Section II.B.6.c.

4.   *See supra* n. 2.

5.   The Court may take judicial notice of the record in prior, related proceedings. *See* Fed.R.Evid. 201(b)("The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also Enriquez–Gutierrez v. Holder,* 612 F.3d 400, 410–11 (5th Cir.2010). Taishan cites in opposition to the Court's use of judicial notice, *Jackson v. FIE Corp.,* 302 F.3d 515 (5th Cir.2002). The Court finds *Jackson* does not present a bar to the use of judicial notice here as *Jackson* merely requires that the Court provide Taishan the opportunity to raise personal jurisdiction as a defense and challenge its identity as the manufacturer of the drywall in *Germano.* As evidenced by this very Order & Reasons, the Court has provided Taishan the opportunity to do both.

6.   The PSC, as well as other parties who have filed responses in opposition to the present motions, seeks to preserve its right to argue that the contacts of entities upstream to TG and TTP may be imputed to TG and TTP on the basis that the PSC was precluded from taking any discovery from two of these entities, CNBM and BNBM. *See* (R. Doc. 14209). TG objects, alleging the PSC previously represented that it did not intend to assert personal jurisdiction on this basis and that personal jurisdiction discovery was complete. *See* (R. Doc. 14572). The Court permits the PSC and others to preserve their right to argue for personal jurisdiction over CNBM and BNBM, but limits this right to personal jurisdiction over these entities only, not for purposes of imputing personal jurisdiction to TG and TTP since the personal jurisdiction of these entities is intended to be fully resolved by the present discovery and motions.

7.   Certain Florida Homebuilders include: Lennar Corporation; Lennar Homes, LLC; U.S. Home Corporation; Meritage Homes of Florida, Inc.; G.L. Building Corporation; Boynton Beach Associates XVI, LLP; G.L. Homes of Davie Associates II, Ltd.; and G.L. Homes of Davie IV Corporation.

8.   The Banner Entities are: Banner Supply, Co.; Banner Supply Co. Fort Myers, LLC; Banner Supply Co. Pompano, LLC; Banner Supply, Co. Port St. Lucie, LLC; Banner Supply Co. Tampa, LLC; and Banner Supply International, LLC.

9.   CAFA is based upon federal diversity jurisdiction. *See Audler v. CBC Innovis, Inc.,* 519 F.3d 239, 248 (5th Cir.2008) (citing *Braud v. Transp. Serv. Co.,* 445 F.3d 801, 803 (5th Cir.2006)).

10.   Because the Court has already determined that TTP was operating as an agent or alter ego of TG in its Florida-related activities, *see supra* Section III.B.4, the Court need not readdress this issue for purposes of the Florida long arm statute analysis.

11.   As discussed in conjunction with TG's *Germano* Motion, Taishan also had extensive contacts and business activities with the United States generally. *See supra* Section II.B.7.b. The Court adopts and incorporates these factual findings herein.

12.   The Banner entities filed a joint Response in opposition to Taishan's motions in *Mitchell, Gross* and *Wiltz.* (R. Doc. 14392). Because Banner's Response argues for personal jurisdiction over Taishan in a Florida federal forum, and the Court already addressed this issue at length with regard to Taishan's *Mitchell* motion, the Court need not reiterate its Florida-related analysis for purposes of *Gross* and *Wiltz.*

---

**End of Document**             © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# JOINT APPENDIX TAB # 5

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L |
| THIS DOCUMENT RELATES TO: | JUDGE FALLON MAG. JUDGE WILKINSON |
| *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al* Case No. 11-cv-080 (E.D. La.) | |
| *Almeroth, et al. v. Taishan Gypsum Co., Ltd f/k/a Shandong Taihe Dongxin Co., Ltd., et al* Case No. 12-cv-0498 (E.D. La.) | |
| *Amato, et al. v. Liberty Mutual Insurance Company*, Case No. 2:10-cv-00932 (E.D.La.) | |
| *Germano et al. v. Taishan Gypsum Co., Ltd. et al.* Case No. 2:09-cv-06687 (E.D. La.) | |
| *Gross, et al. v. Knauf Gips, KG, et al* Case No. 09-cv-6690 (E.D. La.) | |
| *Haya, et al. v. Taishan Gypsum Co., Ltd f/k/a Shandong Taihe Dongxin Co., Ltd, et al* Case No. 11-cv-1077 (E.D. La.) | |
| *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al* Case No. 10-cv-361 (E.D. La.) | |

**ORDER AND JUDGMENT: (1) CERTIFYING EACH OF FOUR CHINESE DRYWALL CLASS SETTLEMENTS (NATIONWIDE INSUREDS SETTLEMENT AGREEMENT, PORTER-BLAINE/VENTURE SUPPLY SETTLEMENT AGREEMENT, TOBIN TRADING AND INSTALLERS SETTLEMENT AGREEMENT, AND BUILDERS MUTUAL INSUREDS SETTLEMENT AGREEMENT) RELATING TO VIRGINIA AND CERTAIN OTHER REMAINING CLAIMS; (2) GRANTING FINAL APPROVAL TO THE FOUR CHINESE DRYWALL CLASS SETTLEMENTS; AND (3) APPROVING AN ALLOCATION PLAN FOR THE FOUR CLASS SETTLEMENTS**

Before the Court is a Motion of Settlement Class Counsel for certification of four

settlement classes: (1) Nationwide Insureds Settlement Class; (2) Porter-Blaine/Venture Supply

Settlement Class; (3) Tobin Trading & Installers Settlement Class; and (4) Builders Mutual

Insureds Settlement Class; and seeking final approval of the four related settlements and the

related allocation plan. (R. Doc. 16806). The Court heard oral arguments from counsel and pro

se objectors at a final Fairness Hearing on May 21, 2013, and, having considered those

arguments and the parties' submissions, now issues this Order and Judgment.

## I.     BACKGROUND

The present litigation arises from alleged property damage and personal injuries caused

by the presence of Chinese drywall in homes and other buildings. Hurricanes Katrina and Rita

devastated the Gulf Coast in 2005. These disasters, coinciding as they did with a boom in new

housing construction, helped precipitate a shortage of drywall for the construction and

reconstruction of homes in the United States. Responding to this shortage, Chinese-

manufactured drywall entered the United States market from approximately 2005 to 2008,

changing hands in the chain of commerce, and ultimately finding its way into thousands of

homes and buildings in the United States, primarily in Florida, Louisiana, Alabama, Mississippi,

Texas, and Virginia. Sometime after the installation of Chinese drywall in these properties,

homeowners, residents, and occupants began to notice and complain of odd odors, corrosion of

metal components, failure of electronics and appliances, and in some cases, physical ailments,

such as nose bleeds, skin irritation, and respiratory problems. In response to these complaints, a

number of governmental agencies and special interest groups, notably the federal Consumer

Products Safety Commission and the Department of Housing and Urban Development, began to

investigate, conduct testing, and issue remediation protocols related to Chinese drywall.

The present litigation commenced with the filing of law suits in 2009 in both federal and state courts by property owners and occupants damaged by the Chinese drywall installed in their residences and businesses, in addition to suits filed by some homebuilders who repaired these properties.  Defendants and declaratory judgment plaintiffs include homebuilders, developers, installers, retailers, realtors, brokers, suppliers, importers, exporters, and distributors, as well as their insurers and the insurers of homeowners, who were involved with the Chinese drywall in the affected properties.  Because of the commonality of facts in the various federal lawsuits, the litigation was designated as Multi-District Litigation 2047 by the Judicial Panel on Multidistrict Litigation.  On June 15, 2009, the Panel transferred all federal actions alleging damages from Chinese drywall to this Court, the United States District for the Eastern District of Louisiana, for coordinated and consolidated proceedings.  (R. Doc. 1).

Since the inception of MDL 2047, approximately four years ago, numerous cases have been consolidated, containing thousands of claims; the Court has appointed steering committees and liaison counsel for plaintiffs, homebuilders, insurers, installers, and manufacturers; it has presided over monthly status conferences, hearings, and several bellwether trials; it has issued numerous opinions, pretrial orders, and minute entries; the Court has facilitated several mediations; and over 16,000 record documents have been filed.  When discovery disputes threatened to cause unreasonable delay, the Court traveled to China in order to supervise depositions.  Additionally, the Court has corresponded and coordinated with a number of state and federal court judges who also preside over related Chinese drywall cases.

The discovery revealed that the manufacturers of the drywall in question generally fell

into two groups: the Knauf entities[1] and the Taishan entities[2]. After one of the Taishan entities was held in preliminary default, the Court conducted a bellwether evidentiary default hearing. Shortly thereafter, the Court held its first bellwether, bench trial involving one of the Knauf entities. With regard to these bellwether proceedings, the Court issued detailed findings of fact and conclusions of law, concluding that the Chinese drywall at issue was in fact defective due to its release of corrosive gasses, requiring remediation of properties containing this drywall. The Court also issued a remediation protocol. One of the Taishan entities finally entered the action by filing an appeal of the judgment entered against it with the United States Court of Appeals for the Fifth Circuit, arguing that this Court lacked personal jurisdiction. The Fifth Circuit remanded the case to this Court to allow for jurisdictional discovery. After ample time for discovery, the Court issued an Order and Reasons holding that the Taishan entities are subject to the Court's jurisdiction. The Taishan entities' appeal of this ruling is currently pending before the Fifth Circuit.

Meanwhile, the parties finalized, and the Court granted final approval of, settlements of the claims against the Knauf entities after a series of breakthroughs. The first notable breakthrough towards resolving the MDL litigation claims against Knauf came in October 2010, when the PSC and the Knauf entities entered into a Court-approved pilot program for remediation of homes containing drywall manufactured by Knauf. In addition to the Knauf entities, a number of defendants in the chain-of-commerce contributed funds to the program.

---

[1] The term "Knauf entities" includes: Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), Knauf Plasterboard (Wuhu) Co., Ltd., Guangdong Knauf New Building Material Products Co., Ltd., Knauf Gips KG, Gebr. Knauf Verwaltungsgesellschaft KG, Knauf International GmbH, Knauf Insulation GmbH ("KI"), Knauf UK GmbH, Knauf AMF GmbH & Co. KG, Knauf do Brasil Ltda. and PT Knauf Gypsum Indonesia

[2] The term "Taishan entities" includes: Taishan Gypsum Co. Ltd. and Taian Taishan Plasterboard Co. Ltd., among others.

The pilot program has since been implemented, with homes being added to and completed on a regular basis since early spring 2011. To date, contractors have completed remediation of over one thousand five hundred homes through this program.

The second notable breakthrough occurred in the spring of 2011, when Interior Exterior Building Supply ("InEx"), a major supplier of Chinese drywall in the gulf coast, entered into a class action settlement agreement. This agreement provides for the tendering of all of InEx's primary insurance proceeds, in the amount of approximately $8 million, for the benefit of a national class with claims against InEx involving Chinese drywall.

The third notable breakthrough occurred in the summer of 2011, when the Banner entities, also major suppliers of Chinese drywall in the gulf coast, entered into a class action settlement agreement. The Banner settlement agreement provides that Banner and its insurers will provide over $50 million for the benefit of a nationwide class consisting of all persons or entities with claims against Banner arising from or otherwise related to Chinese drywall.

The fourth, and most notable breakthrough, occurred in December 2011, when the Knauf entities entered into a class action settlement agreement with plaintiffs. The Court granted preliminary approval of this settlement agreement in January of 2012.

The fifth breakthrough in the litigation came in March 2012 when L&W, a third major Chinese drywall supplier, entered into a class action settlement agreement. The L&W Settlement is a component of the plan for global resolution of the Knauf/KPT supply chain in this litigation.

The sixth breakthrough in this litigation involved various builders, suppliers, and installers, and these parties' insurers, who have entered into a class action settlement agreement (the "Global Settlement") with the plaintiffs. The Global Settlement was entered into by the

Plaintiffs' Steering Committee on behalf of claimants, except those with affected properties in Virginia, and certain Builders, Installers, and Suppliers. The Global Settlement provides for a total payment of over $70 million for class members regardless of the type or brand of Chinese drywall in their properties and regardless of whether they filed their claims in the MDL or another forum.

After a Fairness Hearing in November of 2012, the Court granted final approval of the five interrelated and interdependent settlements in February of 2013. (R. Doc. 16570). They resolve all claims, counterclaims, and third-party claims among the settling parties.

The present Motion seeks final approval of four additional settlements, the "Virginia settlements," involving hundreds of claimants, the vast majority of whom reside in Virginia. (R. Doc. 16806). The total value of the settlement funds in the Virginia settlements exceeds $17 million. The participating Defendants include several downstream entities in the Taishan chain of commerce and their insurers.

Upon being advised of the four Virginia settlements and after reviewing the parties' Motions seeking preliminary approval, the Court held a hearing for the purpose of evaluating whether each proposed settlement appeared to merit the expense of notice, and therefore merited preliminary approval. The Court granted preliminary approval of these settlements on January 17, 2013. (R. Doc. 16516). The parties issued notice in accordance with the Court's Order. The Court held a final Fairness Hearing on May 21, 2013, during which the Court heard the arguments of counsel representing both the settlements' proponents and certain objectors.

## II.    PRESENT MOTION

### A. Movants' Position

The Settlement Proponents seek certification of four settlement classes and final approval

of the class settlements resolving claims against (1) Nationwide-related insurance companies[3] and over thirty entities[4] to whom they issued liability insurance policies (the "Nationwide Insureds Settlement"); (2) Venture Supply, Porter-Blaine Corporation, and their insurers, the Hanover-related insurance companies[5] (the "Porter-Blaine/Venture Supply Settlement"); (3) Tobin Trading, Inc., Builders Plaster & Drywall, LLC, JMM Drywall Co., LLC, and State Farm-related insurance companies[6] (the "Tobin Trading and Installers Settlement"); and (4) Builders Mutual Insurance Company and nineteen entities[7] to whom it issued liability insurance policies (the "Builders Mutual Insureds Settlement"). They also seek approval of the revised allocation plan.

In support of their Motion, the Movants argue that the settlements will provide substantial benefits to the Class Members and together constitute a significant recovery for the Class Members, especially when considered in light of the procedural posture of the litigation, the range of estimates of damages, the financial condition of the Participating Defendants, the risks and uncertainty regarding apportionment of liability to the Participating Defendants, and the information revealed during discovery and settlement negotiations. Movants note the serious obstacles to establishing both liability and damages against the Participating Defendants, evidenced by the fact that several Participating Defendants have prevailed on coverage actions

---

[3] Nationwide Mutual Insurance Co., Nationwide Mutual Fire Insurance Co., and Nationwide Property & Casualty Insurance Co. (collectively "Nationwide").

[4] *See* (R. Doc. 15969-5) (listing participating Defendants insured by Nationwide).

[5] Citizens Insurance Co. of America and Hanover Insurance Company (collectively "Hanover").

[6] State Farm Florida Insurance Company and State Farm Fire and Casualty Company (collectively "State Farm").

[7] *See* (R. Doc. 16463-5) (listing participating Defendants insured by Builders Mutual).

involving pollution exclusion clauses.  Movants further note that, in the absence of the Virginia settlements, many of the Participating Defendants could be expected to file bankruptcy proceedings.

**B. Objections to the Motion**

Four pro se objections to the Virginia settlements were filed by Class Members; no Class Members asked to opt-out of any settlement.  The Court received and reviewed objections from: (1) Colleen and Tuan Nguyen; (2) Richard D. Illich; (3) Candi C. Roberts; and (4) Thomas and Jill Roskowski.  The Court also heard oral arguments from Colleen Nguyen at the Fairness Hearing.  With the exception of the Roskowski objection, the language of which is identical to the Nguyen objection, the Court will discuss each objection separately.

> 1. Objection by Colleen and Tuan Nguyen  and Objection of Thomas and Jill Roskowski

Colleen and Tuan Nguyen contacted the Court via a letter of May 20, 2013 and expressed concerns relating to all four settlements, which the Court will interpret as an objection thereto. (R. Doc. 16823-1).  Colleen Nguyen also spoke at the Fairness Hearing.  The Nguyens' concerns include the following: (1) their belief that the Virginia settlements do not adequately compensate claimants; (2) their belief that, under Section 4.3 of the Nationwide Insureds Settlement, the Tobin Trading and Installers Settlement, and the Builders Mutual Insureds Settlement, class members will be liable under certain circumstances; (3) their concern with the fairness of the simultaneous negotiation of attorney fees; (4) their inability to calculate the precise value of the settlements to each claimant; (5) a question as to the validity of objections lodged without the assistance of counsel; (6) their disagreement with language indicating that the participating Defendants deny liability; and (7) several concerns related to the proposed allocation plan.

As noted above, Tom and Jill Roskowski filed an objection using identical language to that of the Nguyen objection.  (R. Doc. 16823-4).

### 2. Objection by Richard D. Ilich

Richard D. Ilich expresses similar concerns regarding the Virginia settlements, which the Court will interpret as an objection thereto.  (R. Doc. 16823-2).  Mr. Ilich's objections closely resemble those of the Nguyens, discussed above, with one addition: Mr. Ilich adds an objection to the qualifying procedures in the belief that the agreement would unfairly exclude bankrupt victims.

### 3. Objection by Candi C. Roberts

Candi C. Roberts also submitted a letter regarding the Virginia settlements, which the Court will interpret as an objection thereto.  (R. Doc. 16823-3).  The Roberts objections closely resemble those of the Nguyens, discussed above, with one addition: Ms. Roberts adds an objection to the allocation plan based on her belief that the plan excludes families who have deeded their homes rather than undergo foreclosure.

### 4. Objection by Thomas and Jill Roskowski

Thomas and Jill Roskowski also express concerns regarding the Virginia settlements, which the Court will interpret as an objection thereto.  (R. Doc. 16823-4).  As noted above, the language of the Roskowski objection mirrors exactly that of the Nguyen objection.

## IV. LAW & ANALYSIS

### A. Final Fairness Evaluation

Pursuant to Federal Rule of Civil Procedure 23, governing class actions, "[r]eview of a proposed class action settlement generally involves two hearings," the first of which is a

"preliminary fairness evaluation" made by the Court. Manual for Complex Litigation (Fourth) §
21.632 (2004). Indeed, within the Fifth Circuit it is routine to conduct a preliminary fairness
evaluation prior to the issuance of notice. *See, e.g.*, *Cope v. Duggins*, 2001 WL 333102, at *1
(E.D. La. Apr. 4, 2011); *In re Shell Oil Refinery*, 155 F.R.D. 552, 555 (E.D. La. 1997); *see also*
Manual for Complex Litigation § 21.6 (4th ed. 2004) ("The two-step process for evaluation of
proposed settlements has been widely embraced by the trial and appellate courts."). During this
evaluation, the Court "should make a preliminary determination that the proposed class satisfies
the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)." *Id.*
Additionally, the Court "must make a preliminary determination on the fairness, reasonableness,
and adequacy of the settlement terms and must direct the preparation of notice of the
certification, proposed settlement, and date of the final fairness hearing." *Id.* After having
granted preliminary approval and allowed the notice process to move forward, the Court
conducts a more thorough and rigorous analysis of the same factors in order to determine the
appropriateness of granting final approval. Manual for Complex Litigation § 21.6; *see also In re*
*OCA, Inc. Securities & Derivative Litig.*, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008).
"Counsel for the class and the other settling parties bear the burden of persuasion that the
proposed settlement is fair, reasonable, and adequate." Manual for Complex Litigation (Fourth)
§ 21.631 (2004); *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 459 (E.D. La. 2006).

### B. Class Action Settlement Prior to Class Certification

"Before an initial class ruling, a proposed class settlement may be effectuated by
stipulation of the parties agreeing to a temporary settlement class for purposes of settlement
only." William B. Rubinstein, Alba Conte, and Herbert B. Newberg, 4 Newberg on Class
Actions § 11:22 (4th ed. 2010). "[A]pproval of a classwide settlement invokes the requirements

of Rule 23(e)." *Id.* Rule 23(e) provides that "[t]he claims . . . of a certified class may be

settled . . . or compromised only with the court's approval." Fed. R. Civ. P. 23(e); *Amchem*

*Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). "Settlement classes--cases certified as class

actions solely for settlement--can provide significant benefits to class members and enable the

defendants to achieve final resolution of multiple suits." Manual for Complex Litigation (Fourth)

§ 21.612 (2004). However, "[c]ourts have held that approval of settlement class actions under

Rule 23(e) requires closer judicial scrutiny than approval of settlements reached only after class

certification has been litigated through the adversary process." *Id.*

Although "[s]ettlement is relevant to a class certification," as mentioned above, the

criteria of Rule 23, particularly that found in subsections (a) and (b), must still be satisfied.

*Amchem*, 521 U.S. at 619-20. "Together subsection (a) and (b) requirements insure that a

proposed class has 'sufficient unity so that the absent class members can fairly be bound by

decisions of the class representatives.'" *In re FEMA Trailer*, 2008 WL 5423488, at *3 (quoting

*Amchem*, 521 U.S. 591 (1997)). All of the requirements of Rule 23(a) must be met:

One or more members of a class may sue or be sued as representative parties on behalf of

all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or
> defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the
> class. Fed. R. Civ. P. 23(a).

As this Court has previously recognized,

> The first two requirements focus on the characteristics of the class; the second
> two focus instead on the desired characteristics of the class representatives. The
> rule is designed 'to assure that courts will identify the common interests of class
> members and evaluate the named plaintiffs' and class counsel's ability to fairly
> and adequately protect class interests.' *In re FEMA Trailer Formaldehyde Prods.*

*Liab. Litig.*, 2008 WL 5423488, at \*3 (E.D. La. Dec. 29, 2008) (*quoting In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 419 (S.D. Tex. 1999)).

Additionally, for class certification, at least one of the subsections of Rule 23(b) must be met. To satisfy this requirement, the Movants urge the Court to find subsection (b)(3) is satisfied by the pending settlements. This subsection provides,

> A class action may be maintained if Rule 23(a) is satisfied and if:
> - - - - - - - - - - -
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> (A) the class members' interests in individually controlling the prosecution or defense or separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b).

"To succeed under Rule 23(b)(3), Plaintiffs must sufficiently demonstrate both predominance of common class issues and that the class action mechanism is the superior method of adjudicating the case." *In re FEMA Trailer*, 2008 WL 5423488, at \*3 (*citing Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 623-24 (5th Cir. 1999)).

**C. Rule 23 Criteria**

Notably, none of the responses to the Motion raise any objections to the Rule 23 criteria. The Court will nevertheless review the applicable law on Rule 23 for each criteria and consider the Movants' arguments under each criteria.

**1. Numerosity**

As cited above, Rule 23(a)(1) provides that a class action is maintainable only if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "To demonstrate numerosity, the [Movants] must establish that joinder is impracticable through

'some evidence or reasonable estimate of the number of purported class members.'" *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 459 (E.D. La. 2006) (*quoting Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000)). Rule 23 does not provide a clear formula for determining whether the numerosity requirement has been met; thus, Courts evaluate numerosity based upon the facts, circumstances, and context of the case. 1 Newberg on Class Actions § 3:3 (4th ed. 2010). Indeed, "[t]here is enormous disparity among the decisions as to the threshold size of the class that will satisfy the Rule 23(a)(1) prerequisites." *Id.* Although the plaintiff bears the burden of showing joinder is impracticable, "a good-faith estimate should be sufficient when the number of class members is not readily ascertainable," and the numerosity requirement "ordinarily receives only summary treatment . . . and has often gone uncontested." *Id.*

The Movants argue that these settlement classes satsify the numerosity requirement because of the many hundreds of plaintiffs who have filed suit against the Participating Defendants and Participating Insurers, which themselves number in the hundreds. The Court agrees that the numerosity requirement is satisfied in this case.

### 2. Commonality

The commonality requirement under Rule 23(a)(2) requires for maintenance of a class action that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality "does not require that all questions of law or fact raised in the litigation be common. The test or standard . . . is qualitative rather than quantitative." Rubinstein, 1 Newberg on Class Actions § 3:10; *see also In re FEMA Trailer*, 2008 WL 5423488, at *6. Indeed, "[t]he commonality requirement is satisfied if at least one issue's resolution will affect all or a significant number of class members." *In re Vioxx*, 239 F.R.D. at 459 (*citing James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001)). The Rule 23(a)(2) commonality "requirement is

easily met in most cases." *Id.*

Movants argue that these settlements easily satisfy the commonality requirement because the Judicial Panel on Multidistrict Litigation ordered the subject cases consolidated in the MDL based upon commonality of facts, and because the factual and legal issues arising from Chinese drywall, including damages, fault, and apportionment of fault, are common to all claimants. The Court agrees that these settlements satisfy the commonality requirement.

### 3. Typicality

Rule 23(a)(3) provides that a class action may be maintained only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality criterion focuses on whether there exists a relationship between the plaintiff's claims and the claims alleged on behalf of the class." Rubinstein, 1 Newberg on Class Actions § 3:13. "Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims or other claims members, and if his or her claims are based on the same legal theory. When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of varying fact patterns which underlie individual claims. However, this is not a foregone conclusion." *Id.*

Movants argue that these settlements satisfy the typicality requirement because each of the potential Class Members is seeking money from the settling defendants for the costs of remediation and other damages, and the proposed Class representatives have claims against the settling defendants which are typical of all plaintiffs. The Court agrees that these settlements satisfy the typicality requirement.

### 4. Adequacy of Representation

Rule 23(a)(4) requires for maintenance of a class action that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The purpose of this requirement is to protect the legal rights of absent class members. First, the representatives must not possess interests . . . antagonistic to the interests of the class. Second, the representatives' counsel must be qualified, experienced, and generally able to conduct the litigation." Rubinstein, 1 Newberg on Class Actions § 3:21; *see also Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982) ("[T]he adequacy of representation requirement . . . also raises concerns about the competency of class counsel and conflicts of interest."). With regard to the former, a court is to "look at the circumstances of the plaintiff individually to determine if the plaintiff has any conflict with class members." Rubinstein, 1 Newberg on Class Actions § 3:23. "Only those material conflicts pertaining to the issues common to the class will bar a class action." *Id.* As to the latter requirement, "courts consider the competence and experience of class counsel, attributes which will most often be presumed in the absence of proof to the contrary." *Id.* at § 24.

Movants argue that these settlements satisfy the adequacy of representation requirement because the named representatives do not possess interests antagonistic to class members, and because the proposed Settlement Class Counsel include members of the Plaintiffs' Steering Committee, whom the Court selected based upon their expertise and experience. The Court agrees that these settlements amply satisfy the adequacy of representation requirement.

### 5. Common Questions of Law & Fact Predominate

Rule 23(b)(3) provides that a class action is maintainable if all the prerequisites of subsection (a) are satisfied and "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and

that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Factors for the Court to consider in its determination include:

> (A) the class members' interests in individually controlling the prosecution or defense or separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b).

There is "considerable overlap" between commonality and the predominance of common questions of law and fact, resulting in many courts handling both issues together. Rubinstein, et al., 2 Newberg on Class Actions § 4:22. However, "the predominance test is 'far more demanding' than the commonality test." *In re FEMA Trailer*, 2008 WL 5423488, at *12 (*quoting Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005)). "To predominate, common issues must form a significant part of individual cases." *In re Vioxx*, 239 F.R.D. 450, 460 (E.D. La. 2006) (*citing Mullen*, 186 F.3d at 626). "Judicial economy factors and advantages over other methods for handling the litigation as a practical matter underlie the predominance and superiority requirements for class actions certified under Rule 23(b)(3)." Rubinstein, et al., 2 Newberg on Class Actions § 4:24.

Movants argue that common questions of law and fact predominate because: it makes good sense to resolve the claims against the participating defendants through the class action device; the issues of the participating defendants' liability predominate over any individual issues involving the plaintiffs; a class settlement will insure that funds are available to remediate the plaintiffs' properties and provide compensation; and, in light of the suits pending in various forums, final approval of the settlement agreements benefits all parties. The Court finds that

common questions of law and fact predominate.

### 6. Fairness, Reasonableness, & Adequacy

The Court is also required to render a determination on the fairness, reasonableness, and adequacy of the Settlement Agreement. The settling parties argue approval of these settlements is appropriate because they were reached after arm's length negotiations, by parties possessed of adequate information on the strengths and weaknesses of the litigation, represented by counsel who are competent and have many years of experience, after extensive discovery and briefing on motions. Furthermore, the litigation is complex, expensive, uncertain, and has the potential for lengthy duration.

Though the objections to the Motion do not directly invoke Rule 23 requirements, the Court will interpret the non-Rule 23 concerns as objections to the fairness, reasonableness, and adequacy of the interrelated settlements. As noted above, the Court has received four very similar objections, two of which are in fact identical. The Court received and reviewed objections from: (1) Colleen and Tuan Nguyen; (2) Richard D. Illich; (3) Candi C. Roberts; and (4) Thomas and Jill Roskowski. The Court also heard oral arguments from Colleen Nguyen at the Fairness Hearing. With the exception of the Roskowski objection, the language of which is identical to the Nguyen objection, the Court will discuss each objection separately.

> a. Objection by Colleen and Tuan Nguyen and Objection of Thomas and Jill
> Roskowski

Colleen and Tuan Nguyen's first listed concern is their belief that the Virginia settlements do not adequately compensate claimants. The settlements' proponents acknowledge that no negotiated settlement ever provides "100% relief." It is inherent in a compromise that neither side achieves all that might have been achieved at trial. However, in light of relevant

circumstances including the difficulties faced by Class Members in pursuing this litigation, the Court concludes that the amount of funding provided by these settlements is fair, reasonable, and adequate.

The Nguyens' second concern is their belief that, under Section 4.3 of the Nationwide Insureds Settlement, the Tobin Trading and Installers Settlement, and the Builders Mutual Insureds Settlement, class members will be liable under certain circumstances. During oral argument at the Fairness Hearing, the settlement proponents clarified the meaning of Section 4.3 to the satisfaction of those objectors who were present. The Court notes further that the settlement proponents have added clarifying language, which the Court adopts below. *See* (R. Docs. 16823, 16823-7). The Court agrees with the settlement proponents that Class Members need not shoulder liability for problematic drywall as long as they comply with the applicable remediation provisions. Therefore the Court finds that the amended liability provisions are fair, reasonable, and adequate.

The Nguyens' third concern involves the fairness of the simultaneous negotiation of attorney fees. The settlement proponents note that no fee request is currently pending before this Court, and that the relevant fees were negotiated after the settlement negotiations successfully concluded. The Court agrees that the proper award of attorney fees is not currently before it. The Court further notes that the effect of the instant settlements is to limit, rather than to guarantee, the amount of attorney fees associated with these settlements. At an appropriate time, and after hearing from all interested parties, the Court will make a determination as to appropriate attorney fees. In light of these and other relevant facts and circumstances, the Court finds that the settlements' provisions relating to attorney fees are fair, reasonable, and adequate.

The Nguyens express concern regarding Class Members' inability to calculate the precise

value of the settlement(s) for each claimant. The Nguyens note that a pro-rata reduction for opt-outs appears to suggest a dollar value for each claim. The settlement proponents note that the total amounts and allocation criteria have been disclosed. The Court observes that the value of each settlement to each Class Member will vary according to a variety of factors; in light of this fact, the provision for a pro-rata reduction is a device negotiated by the parties in order to enable planning for certain contingencies, rather than a device intended to indicate a base value for an individual Class Member's claim. Considering the applicable precedents and the relevant facts and circumstances, the Court finds that the inability of a Class Member to calculate a precise value in advance does not render the proposed settlements unfair or unreasonable.

In their objection, the Nguyens raise a question as to the validity of objections lodged without the assistance of counsel. As this Court's analysis makes clear, all four letters have received thorough review and have been construed as valid objections.

The Nguyens further voice their disagreement with language indicating that the participating Defendants deny liability. The settlement proponents point out that the relevant provisions, which are commonplace in settlement agreements, merely indicate that these settlement agreements do not constitute admissions of wrongdoing by the participating Defendants. Having considered the facts and circumstances, the Court finds that the relevant provisions are fair, reasonable, and adequate.

Finally, the Nguyens voice several concerns related to the proposed allocation plan. First, they express concern that the square-footage calculation for Real Property Payments does not fairly reflect damages due to lost equity. The settlement proponents note that the Other Loss Funds provide separate recovery for lost equity. Second, the Nguyens express concern that the settlements do not cover alternative living costs for homeowners who sold their homes. The

settlement proponents point out that such claims are covered by the Other Loss Funds. Third, the Nguyens note that the proposed allocation plan does not establish a fund for unknown possible future health costs. The settlement proponents point out that the available scientific evidence does not indicate a known risk of future long-term chronic injuries resulting from defective drywall, and that any allocation of funds for such injuries would be speculative. The Court notes that the allocation plan does provide a remedy for known personal injuries. The Court, having considered the relevant scientific evidence and the facts and circumstances of this case, finds that the relevant provisions are fair, reasonable, and adequate.

As noted above, Tom and Jill Roskowski filed an objection using identical language to that of the Nguyen objection. (R. Doc. 16823-4).

### b. Objection by Richard D. Ilich

Richard D. Ilich also objects to the allocation plan insofar as he believes that Section 6(h) would exclude Class Members who have declared bankruptcy. The settlement proponents point out that Section 13 provides specifically for a special allocation procedure for such Class Members. The Court finds that the special allocation procedure is fair, reasonable, and adequate.

### c. Objection by Candi C. Roberts

Candi C. Roberts also objects to the allocation plan based on her belief that the plan excludes families who have deeded their homes rather than undergo foreclosure. The settlement proponents note that Section 7 of the allocation plan allows such Class Members to make claims for lost equity. Having considered all the facts and circumstances, the Court finds that Section 7 of the allocation plan is fair, reasonable, and adequate.

After considering the documents presented, the arguments of counsel, and the law

applicable to this matter, the Court agrees with the settlement proponents.  Accordingly, the Court finds that the four proposed settlements in their entirety are fair, reasonable, and adequate.

## IV.     CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the present Motion is **GRANTED**.  **IT IS FURTHER ORDERED** that the Consent Motion to Withdraw Objections filed by attorney Christopher A. Bandas on behalf of Ronnie Garcia, Jan Petrus, Saul Soto, and Ernest Vitela (R. Doc. 16357) is hereby **GRANTED IN PART** insofar as to allow the withdrawal of the objections therein and **TAKEN UNDER SUBMISSION IN PART** insofar as other relief requested therein shall be addressed in a separate Order and Reasons.  **IT IS FURTHER ORDERED** that:

1.      Capitalized terms used in this Order and Judgment shall have the same meaning as those defined in the Nationwide Insureds Settlement [Rec. Doc. No. 15969-5]; Porter-Blaine/Venture Settlement [Rec. Doc. No. 15969-6]; Tobin Trading and Installers Settlement [Rec. Doc. No. 15969-7]; Builders Mutual Insureds Settlement [Rec. Doc. No. 16478-3], which have been filed of record in this case.

2.      The Motion of Settlement Class Counsel for Final Approval of the Nationwide Insureds, Porter-Blaine/Venture Supply, Tobin Trading & Installers, and Builders Mutual Insureds Settlement Agreements and Certification of the Nationwide Insureds, Porter-Blaine/Venture Supply, Tobin Trading & Installers, and Builders Mutual Insureds Settlement Classes is GRANTED.

3. Unless otherwise specified, the Nationwide Insureds, Porter-Blaine/Venture Supply, Tobin Trading & Installers, and Builders Mutual Insureds Settlement Agreements will be governed by the laws of Virginia.

4. The Nationwide Insureds Settlement Class is certified pursuant to Fed. R. Civ. P. 23(a), (b)(3) & (e).

5. The Court finds that the Nationwide Insureds Settlement is fair, reasonable, and adequate, that the Nationwide Insureds Settlement was entered into in good faith and without collusion, and that the Nationwide Insureds Settlement should be approved pursuant to Fed. R. Civ. P. 23(e).

6. The Court finds that the indemnity, defense and judgment reduction provisions in Section 5.2.4 of the Nationwide Insureds Settlement are valid, binding, and enforceable; and therefore, bars the assertion by any Nationwide Insureds Settlement Class Member of any contribution, indemnification, subrogation, or other claims related to or arising out of Chinese Drywall against the Participating Defendants or Participating Insurers, excluding only any Reserved Claims.

7. Any and all Nationwide Insureds Settlement Class Members, including, but not limited to, those who have not properly opted out of the Nationwide Insureds Settlement Class, are enjoined and forever barred from maintaining, continuing, prosecuting, and/or commencing the Litigation, CDW-Related Actions, Related Claims, or any action, pending or future, against the Settling Parties (but excluding any Reserved Claims) that arises from, concerns, or otherwise relates, directly or indirectly, to Chinese Drywall.

8. Other than as it relates to Reserved Claims or Assigned Claims in the Nationwide Insureds Settlement, or to enforce any term of the Nationwide Insureds Settlement, or as to insurance matters concerning depletion or exhaustion of one or more policies of insurance, or

prior compensation for a claimed loss or set-off, no person or entity may use or refer to any aspect of the Nationwide Insureds Settlement in any litigation in which any Participating Defendant or Participating Insurer is a party.

9.      The Nationwide Insureds Settlement shall not constitute a waiver of any coverage defense or position taken by any Participating Defendant and/or its insurers, whether a Participating Insurer or not, related to Chinese Drywall and no insurer, whether a Participating Insurer or not, shall be estopped from raising any coverage issue or defense by reason of the Nationwide Insureds Settlement.  In addition, any payment by a Participating Insurer as set forth in Section 4 of the Nationwide Insureds Settlement, shall not be considered a confession of judgment or trigger any obligation to pay attorney's fees.

10.     Except for any Reserved Claims referenced in Section 5.5 of the Nationwide Insureds Settlement, the Court finds that by entering this Settlement, each Participating Insurer has acted in good faith and fairly, reasonably, and honestly towards its insured Participating Defendant, and any actual and/or potential Nationwide Insureds Settlement Class Members and with due regard for the Participating Insurer's Participating Defendant, and any potential Nationwide Insureds Class Members' interests regarding Chinese Drywall.

11.     Except for any Reserved Claims referenced in Section 5.5 of the Nationwide Insureds Settlement, the Court finds that the actions and positions of the Participating Insurers, being in good faith, upon the Nationwide Insureds Settlement becoming Final, precludes any Participating Defendant and any actual and/or potential Nationwide Insureds Settlement Class Member from asserting, maintaining or assigning any statutory and/or common law bad faith claim against any Participating Insurer.

12. The Nationwide Insureds Settlement shall not constitute a waiver or release by any Participating Defendant or Participating Insurer of any claims or defenses related to any actual or alleged obligations under a policy of insurance that such Participating Defendant or Participating Insurer may have against any person or entity, including another Participating Insurer, in any manner related to or connected in any way with the Chinese Drywall claims of Nationwide Insureds Settlement Class Members who opt-out of the Nationwide Insureds Settlement.

13. The Porter-Blaine/Venture Supply Settlement Class is certified pursuant to Fed. R. Civ. P. 23(a), (b)(3) & (e).

14. The Court finds that the Porter-Blaine/Venture Supply Settlement is fair, reasonable, and adequate, that the Porter-Blaine/Venture Supply Settlement was entered into in good faith and without collusion, and that the Porter-Blaine/Venture Supply Settlement should be approved pursuant to Fed. R. Civ. P. 23(e).

15. The Court finds that the indemnity, defense and judgment reduction provisions in Section 5.2.4 of the Porter-Blaine/Venture Supply Settlement are valid, binding, and enforceable; and therefore, bars the assertion by any Porter-Blaine/Venture Supply Settlement Class Member of any contribution, indemnification, subrogation, or other claims related to or arising out of Chinese Drywall against the Participating Defendants or Participating Insurers, excluding only any Reserved Claims.

16. Any and all Porter-Blaine/Venture Supply Settlement Class Members, including, but not limited to, those who have not properly opted out of the Porter-Blaine/Venture Supply Settlement Class, are enjoined and forever barred from maintaining, continuing, prosecuting, and/or commencing the Litigation, CDW-Related Actions, Related Claims, or any action,

pending or future, against the Settling Parties (but excluding any Reserved Claims) that arises from, concerns, or otherwise relates, directly or indirectly, to Chinese Drywall.

17.     Other than as it relates to Reserved Claims or Assigned Claims in the Porter-Blaine/Venture Supply Settlement, or to enforce any term of the Porter-Blaine/Venture Supply Settlement, or as to insurance matters concerning depletion or exhaustion of one or more policies of insurance, or prior compensation for a claimed loss or set-off, no person or entity may use or refer to any aspect of the Porter-Blaine/Venture Supply Settlement in any litigation in which any Participating Defendant or Participating Insurer is a party.

18.     The Porter-Blaine/Venture Supply Settlement shall not constitute a waiver of any coverage defense or position taken by any Participating Defendant and/or its insurers, whether a Participating Insurer or not, related to Chinese Drywall and no insurer, whether a Participating Insurer or not, shall be estopped from raising any coverage issue or defense by reason of the Porter-Blaine/Venture Supply Settlement.  In addition, any payment by a Participating Insurer as set forth in Section 4 of the Porter-Blaine/Venture Supply Settlement, shall not be considered a confession of judgment or trigger any obligation to pay attorney's fees.

19.     Except for any Reserved Claims referenced in Section 5.5 of the Porter-Blaine/Venture Supply Settlement, the Court finds that by entering this Settlement, each Participating Insurer has acted in good faith and fairly, reasonably, and honestly towards its insured Participating Defendant, and any actual and/or potential Porter-Blaine/Venture Supply Settlement Class Members and with due regard for the Participating Insurer's Participating Defendant, and any potential Porter-Blaine/Venture Supply Class Members' interests regarding Chinese Drywall.

20.     Except for any Reserved Claims referenced in Section 5.5 of the Porter-Blaine/Venture Supply Settlement, the Court finds that the actions and positions of the Participating Insurers,

being in good faith, upon the Porter-Blaine/Venture Supply Settlement becoming Final,

precludes any Participating Defendant and any actual and/or potential Porter-Blaine/Venture

Supply Settlement Class Member from asserting, maintaining or assigning any statutory and/or

common law bad faith claim against any Participating Insurer.

21.    The Porter-Blaine/Venture Supply Settlement shall not constitute a waiver or release by

any Participating Defendant or Participating Insurer of any claims or defenses related to any

actual or alleged obligations under a policy of insurance that such Participating Defendant or

Participating Insurer may have against any person or entity, including another Participating

Insurer, in any manner related to or connected in any way with the Chinese Drywall claims of

Porter-Blaine/Venture Supply Settlement Class Members who opt-out of the

Porter-Blaine/Venture Supply Settlement.

22.    The Tobin Trading & Installers Settlement Class is certified pursuant to Fed. R. Civ. P.

23(a), (b)(3) & (e).

23.    The Court finds that the Tobin Trading & Installers Settlement is fair, reasonable, and

adequate, that the Tobin Trading & Installers Settlement was entered into in good faith and

without collusion, and that the Tobin Trading & Installers Settlement should be approved

pursuant to Fed. R. Civ. P. 23(e).

24.    The Court finds that the indemnity, defense and judgment reduction provisions in Section

5.2.4 of the Tobin Trading & Installers Settlement are valid, binding, and enforceable; and

therefore, bars the assertion by any Tobin Trading & Installers Settlement Class Member of any

contribution, indemnification, subrogation, or other claims related to or arising out of Chinese

Drywall against the Participating Defendants or Participating Insurers, excluding only any

Reserved Claims.

25.     Any and all Tobin Trading & Installers Settlement Class Members, including, but not limited to, those who have not properly opted out of the Tobin Trading & Installers Settlement Class, are enjoined and forever barred from maintaining, continuing, prosecuting, and/or commencing the Litigation, CDW-Related Actions, Related Claims, or any action, pending or future, against the Settling Parties (but excluding any Reserved Claims) that arises from, concerns, or otherwise relates, directly or indirectly, to Chinese Drywall.

26.     Other than as it relates to Reserved Claims or Assigned Claims in the Tobin Trading & Installers Settlement, or to enforce any term of the Tobin Trading & Installers Settlement, or as to insurance matters concerning depletion or exhaustion of one or more policies of insurance, or prior compensation for a claimed loss or set-off, no person or entity may use or refer to any aspect of the Tobin Trading & Installers Settlement in any litigation in which any Participating Defendant or Participating Insurer is a party.

27.     The Tobin Trading & Installers Settlement shall not constitute a waiver of any coverage defense or position taken by any Participating Defendant and/or its insurers, whether a Participating Insurer or not, related to Chinese Drywall and no insurer, whether a Participating Insurer or not, shall be estopped from raising any coverage issue or defense by reason of the Tobin Trading & Installers Settlement.  In addition, any payment by a Participating Insurer as set forth in Section 4 of the Tobin Trading & Installers Settlement, shall not be considered a confession of judgment or trigger any obligation to pay attorney's fees.

28.     Except for any Reserved Claims referenced in Section 5.5 of the Tobin Trading & Installers Settlement, the Court finds that by entering this Settlement, each Participating Insurer has acted in good faith and fairly, reasonably, and honestly towards its insured Participating Defendant, and any actual and/or potential Tobin Trading & Installers Settlement Class

Members and with due regard for the Participating Insurer's Participating Defendant, and any potential Tobin Trading & Installers Class Members' interests regarding Chinese Drywall.

29.    Except for any Reserved Claims referenced in Section 5.5 of the Tobin Trading & Installers Settlement, the Court finds that the actions and positions of the Participating Insurers, being in good faith, upon the Tobin Trading & Installers Settlement becoming Final, precludes any Participating Defendant and any actual and/or potential Tobin Trading & Installers Settlement Class Member from asserting, maintaining or assigning any statutory and/or common law bad faith claim against any Participating Insurer.

30.    The Tobin Trading & Installers Settlement shall not constitute a waiver or release by any Participating Defendant or Participating Insurer of any claims or defenses related to any actual or alleged obligations under a policy of insurance that such Participating Defendant or Participating Insurer may have against any person or entity, including another Participating Insurer, in any manner related to or connected in any way with the Chinese Drywall claims of Tobin Trading & Installers Settlement Class Members who opt-out of the Tobin Trading & Installers Settlement.

31.    The Builders Mutual Insureds Settlement Class is certified pursuant to Fed. R. Civ. P. 23(a), (b)(3) & (e).

32.    The Court finds that the Builders Mutual Insureds Settlement is fair, reasonable, and adequate, that the Builders Mutual Insureds Settlement was entered into in good faith and without collusion, and that the Builders Mutual Insureds Settlement should be approved pursuant to Fed. R. Civ. P. 23(e).

33.    The Court finds that the indemnity, defense and judgment reduction provisions in Sections 5.2.4 of the Builder Mutual Insureds Settlement are valid, binding, and enforceable; and

therefore, bars the assertion by any Builder Mutual Insureds Settlement Class Member of any contribution, indemnification, subrogation, or other claims related to or arising out of Chinese Drywall against the Participating Defendants or Participating Insurers, excluding only any Reserved Claims.

34.     Any and all Builder Mutual Insureds Settlement Class Members, including, but not limited to, those who have not properly opted out of the Builder Mutual Insureds Settlement Class, are enjoined and forever barred from maintaining, continuing, prosecuting, and/or commencing the Litigation, CDW-Related Actions, Related Claims, or any action, pending or future, against the Settling Parties (but excluding any Reserved Claims) that arises from, concerns, or otherwise relates, directly or indirectly, to Chinese Drywall.

35.     Other than as it relates to Reserved Claims or Assigned Claims in the Builder Mutual Insureds Settlement, or to enforce any term of the Builder Mutual Insureds Settlement, or as to insurance matters concerning depletion or exhaustion of one or more policies of insurance, or prior compensation for a claimed loss or set-off, no person or entity may use or refer to any aspect of the Builder Mutual Insureds Settlement in any litigation in which any Participating Defendant or Participating Insurer is a party.

36.     The Builder Mutual Insureds Settlement shall not constitute a waiver of any coverage defense or position taken by any Participating Defendant and/or its insurers, whether a Participating Insurer or not, related to Chinese Drywall and no insurer, whether a Participating Insurer or not, shall be estopped from raising any coverage issue or defense by reason of the Builder Mutual Insureds Settlement.  In addition, any payment by a Participating Insurer as set forth in Section 4 of the Builder Mutual Insureds Settlement, shall not be considered a confession of judgment or trigger any obligation to pay attorney's fees.

37.     Except for any Reserved Claims referenced in Section 5.5 of the Builder Mutual Insureds Settlement, the Court finds that by entering this Settlement, each Participating Insurer has acted in good faith and fairly, reasonably, and honestly towards its insured Participating Defendant, and any actual and/or potential Builder Mutual Insureds Settlement Class Members and with due regard for the Participating Insurer's Participating Defendant, and any potential Builder Mutual Insureds Class Members' interests regarding Chinese Drywall.

38.     Except for any Reserved Claims referenced in Section 5.5 of the Builder Mutual Insureds Settlement, the Court finds that the actions and positions of the Participating Insurers, being in good faith, upon the Builder Mutual Insureds Settlement becoming Final, precludes any Participating Defendant and any actual and/or potential Builder Mutual Insureds Settlement Class Member from asserting, maintaining or assigning any statutory and/or common law bad faith claim against any Participating Insurer.

39.     The Builder Mutual Insureds Settlement shall not constitute a waiver or release by any Participating Defendant or Participating Insurer of any claims or defenses related to any actual or alleged obligations under a policy of insurance that such Participating Defendant or Participating Insurer may have against any person or entity, including another Participating Insurer, in any manner related to or connected in any way with the Chinese Drywall claims of Builder Mutual Insureds Settlement Class Members who opt-out of the Builder Mutual Insureds Settlement.

40.     Section 4.3 of the Nationwide Insureds, Tobin Trading & Installers, and Builders Mutual Insureds Settlements, which requires Class Members to "apply the settlement proceeds they receive…to assist in the remediation of their Affected Property," shall not apply to Class Members who no longer own their homes at the time the Settlements receive Final Approval.

41.     Pursuant to and in full compliance with Rule 23 of the Federal Rules of Civil Procedure, this Court hereby finds and concludes that due and adequate notice was directed to all persons and entities who are Class Members, advising them of the Plan of Allocation and of their right to object thereto, and a full and fair opportunity was accorded to all such persons and entities to be heard with respect to the Plan of Allocation.

42.     The Court hereby finds and concludes that the Revised Proposed Plan of Allocation, which is attached to the Memorandum in Support of Settlement Class Counsel's Motion for an Order at Exhibit 3, provides a fair and equitable basis upon which to allocate the proceeds of the Settlement Funds among the Class Members.

43.     The Court hereby finds and concludes that the Plan of Allocation is, in all respects, fair.

44.     The Court finds that, pursuant to Fed. R. Civ. P. 54(b), there is no just reason for delay of entry of final judgment with respect to the foregoing.

New Orleans, Louisiana, this 9th day of July, 2013.

_____
UNITED STATES DISTRICT JUDGE

# JOINT APPENDIX TAB # 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL | : MDL NO. 2047 |
| PRODUCTS LIABILITY LITIGATION | : SECTION: L |
| | : |
| | : JUDGE FALLON |
| | : MAG. JUDGE WILKINSON |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO:** *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Case No. 2:09-cv-6687 (E.D. La.)**

<u>ORDER</u>

From 2005 to 2008, a housing boom coincided with the destruction caused by Hurricanes Katrina and Rita to sharply increase the demand for construction materials in the Gulf South and East Coast. In response, Chinese companies manufactured, and sold to homeowners throughout the United States, considerable quantities of gypsum wallboard which came to be known as "Chinese drywall." Homeowners experienced problems with the drywall. Specifically, the drywall emits various sulfide gases, damages structural mechanical and plumbing systems of the home, and damages other appliances in the home. The affected parties sued the entities involved in the manufacturing, importing, and installing the Chinese drywall. The cases multiplied and the Judicial Panel on Multidistrict Litigation ("MDL"), declared the matter an MDL and transferred the cases to this Court. After a period of discovery, it became clear that there were two principal manufacturers, (1) the Knauf Entities, and (2) the Taishan Entities. There are four cases in particular in which Taishan Entities have been served (via international means at the Hague, costing at least $100,000 per service of process). These four cases are *Germano*, *Mitchel*, *Gross*, and *Wiltz*. The matters were set to trial and default judgments were entered. In the instant case, *Germano*, Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd ("Taishan") is the

Defendant. Taishan refused to participate in any of these proceedings.

The day before the expiration of the window for appeal, Taishan appeared and appealed to the Fifth Circuit Court of Appeals, arguing – for the first time – that this Court lacked personal jurisdiction. The matters were remanded to this Court for further discovery on the jurisdictional issue. After a period of discovery, this issue was briefed and argued. In due course, this Court rendered an opinion finding it had jurisdiction over the Defendant Taishan. The Defendant appealed the Court's judgment. Ultimately, two separate Fifth Circuit panels affirmed this Court's exercise of jurisdiction over Taishan. In *Germano*, the time for seeking writs to the Supreme Court has passed, so such judgment has become final and enforceable. In order to execute the judgment, Plaintiffs moved for a Judgment Debtor Examination. The Court ordered Taishan to appear in open court on the morning of July 17, 2014 for a Judgment Debtor Examination (Rec. Doc. 17774).

Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination. Taishan, in fact, has *refused* to appear in open court for the Examination. As stated by counsel for Taishan, both in open court and in a brief (Rec. Doc. 17846), Taishan has received notice of the Examination and has refused to appear or otherwise participate in the proceedings.

As a consequence of Taishan's refusal to appear at this Judgement Debtor Examination, in direct, willful violation of this Court's June 20, 2014 order, the Court holds Taishan in contempt of court, both criminally and civilly. This refusal to appear is a direct contemptuous act occurring in open court after actual notice of the proceedings. Such disobedience of the Court's order harms both the many other parties in this case and the decorum of the Court. Due to the "affront to the Court's dignity [that] is [] widely observed," it is necessary to summarily punish

Taishan's contempt. *Pounders v. Watson*, 521 (U.S. 982, 988-89) (1997); Fed. Rule Crim. Pro. 42(b).

In punishing Taishan's contempt, the Court "has broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process." *Test Masters Educational Servs. v. Singh*, 428 F.3d 559 (5th Cir. 2005). In this massive suit, the harm from Taishan's noncompliance is high and requires strong sanctions to coerce compliance and restore integrity to these proceedings. *Lamar Financial Corp. v. Adams*, 918 F.2d 564, 567 (5th Cir. 1990) (setting forth four factors by which the Court assesses an appropriate contempt sanction); *see Manhattan Industries v. Sweater Bee, Ltd.*, 885 F.2d 1, 6 (2d Cir. 1989) (affirming the propriety of an award of unjust enrichment contempt sanctions aligned with the contemptor's profits to punish the wrongdoing). Accordingly,

**IT IS ORDERED** that Taishan pay **$15,000** in attorneys' fees to Plaintiffs' counsel.

**IT IS FURTHER ORDERED** that Taishan pay **$40,000** as a penalty for contempt.

**IT IS FURTHER ORDERED** that Taishan, and any of its affiliates or subsidiaries, is hereby **ENJOINED** from conducting any business in the United States until or unless it participates in this judicial process. If Taishan violates this injunction, it must pay a further penalty of **25%** of the profits earned by the company or its affillates who violate the order, for the year of the violation.

**IT IS FURTHER ORDERED** that the clerk of court forward this contempt order to the U.S. Secretary of Commerce, the Chair of the U.S. Senate Committee on Commerce**,** Science, and Transportation, and the U.S. Attorney General, so that these officials are aware of the seriousness of the situation, and for any appropriate action they may see fit.

New Orleans, Louisiana this 17th day of July, 2014.

UNITED STATES DISTRICT JUDGE

CC:    Secretary Penny Pritzker
U.S. Department of Commerce
1401 Constitution Ave., NW
Washington, DC 20230

U.S. Senator Jay Rockefeller
Chair of U.S. Senate Committee on Commerce, Science, and Transportation
Russell Senate Building, Room 254
2 Constitution Ave., NE
Washington, DC 20002

U.S. Attorney General Eric Holder
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530-0001

# JOINT APPENDIX TAB # 7

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |

**THIS DOCUMENT RELATES TO:**

*Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, **Case No. 09-6687 (E.D.La.);**

*Gross, et al. v. Knauf Gips, KG, et al.*, **Case No. 09-6690 (E.D.La.);**

*Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, **Case No 10-361 (E.D.La.);**

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, **Civ. Action No. 11-1672 (E.D.La.);**

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, **Civ. Action No. 11-1395 (E.D.La.);**

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, **Civ. Action No. 11-1673 (E.D.La.))**

## ORDER APPROVING SUPPLEMENTAL NOTICE

AND NOW, on this __17th__ Day of __December__, 2014, upon consideration of

the Plaintiffs' Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(B) and

Request for Approval of Supplemental Notice, it is hereby ORDERED, ADJUDGED AND

DECREED that the Supplemental Notice that is attached to Plaintiffs' motion as Exhibit "E"

is hereby approved, **provided that the Notice is modified to include notice that the Court will**

**consider the Motion for Assessment of Class Damages on February 12, 2015, immediately**

**following February Monthly Status Conference**.  It is further ORDERED that Class Counsel

shall disseminate the Supplemental Notice to class members within 10 days of the date of this

Order.  The opt out period shall be 40 days from the date of this Order.

      New Orleans, Louisiana, this <u>17th</u> day of <u>  December  </u>, 2014.

_____

Eldon E. Fallon
United States District Court Judge

# JOINT APPENDIX TAB # 8

Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 01/19/19 Page 216 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in... Page 2 of 17 PageID# 694
2014 WL 4809520

2014 WL 4809520
Only the Westlaw citation is currently available.
United States District Court,
E.D. Louisiana.

In re CHINESE–MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION.
This document relates to Germano, et al.
v.
Taishan Gypsum Co., Ltd., f/k/
a Shandong Taihe Dongxin Co. Ltd.,
et al., Case No. 09–6687 (E.D.La.);
Gross, et al.
v.
Knauf Gips, KG, et al., Case No. 09–6690 (E.D.La.);
Wiltz, et al.
v.
Beijing New Building Materials Public
Limited Co., et al., Case No 10–361 (E.D.La.);
Amorin, et al.
v.
Taishan Gypsum Co., Ltd. f/k/a
Shandong Taihe Dongxin Co., Ltd., et
al., Civ. Action No. 11–1672 (E.D.La.);
Amorin, et al.
v.
Taishan Gypsum Co., Ltd. f/k/a
Shandong Taihe Dongxin Co., Ltd., et
al., Civ. Action No. 11–1395 (E.D.La.);
Amorin, et al.
v.
Taishan Gypsum Co., Ltd. f/k/a
Shandong Taihe Dongxin Co., Ltd., et
al., Civ. Action No. 11–1673 (E.D.La.).

MDL No. 2047.
|
Signed Sept. 26, 2014.

***FINDINGS OF FACT AND CONCLUSIONS
OF LAW WITH RESPECT TO PLAINTIFFS'
OMNIBUS MOTION FOR CLASS CERTIFICATION
PURSUANT TO RULES 23(a)(1)-(4) and 23(b)(3)***

ELDON E. FALLON, District Judge.

***FINDINGS OF FACT***

### I. *Introduction*

**\*1** 1. This matter involves the claims of thousands of class members who have suffered property damages arising from defective Chinese-manufactured drywall ("CDW" or "Chinese Drywall") manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants and used in plaintiffs' properties.

2. The plaintiffs are active litigants (either in the original action or in complaints in intervention) named in *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,* Case No. 09–6687 (E.D.La.); *Gross, et al. v. Knauf Gips, KG, et al.,* Case No. 09–6690 (E.D.La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.,* Civ. Action No. 10–361 (E.D.La); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–080 (E.D.La); *Haya, et al. v. Taishan Gypsum Corp. Ltd., et al.,* Civ. Action No. 11–1077 (E.D.La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.,* Civ. Action. 12–0498 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1395 (E.D.La.); and/or *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1673 (E.D.La.).

3. The "Taishan Defendants" are comprised of the following entities: Taishan Gypsum Co. Ltd. (hereafter "Taishan"); Beijing New Building Materials Limited Co. (hereafter "BNBM"); Beijing New Building Materials Group Co., Ltd. (hereafter "BNBM Group"); China National Building Materials Co., Ltd. (hereafter "CNBM"); China National Building Materials Group Corporation (hereafter "CNBM Group"); and Tai'an Taishan Plasterboard Co., Ltd. (hereafter "TTP").

4. The "Taishan Affiliates" are comprised of the following entities: BNBM, BNBM Group, CNBM, CNBM Group, and TTP.

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 3 of 17
In re Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in... Page 3 of 17 PageID# 695
2014 WL 4809520

5. From 2005 through 2008, the housing boom and rebuilding efforts necessitated by Hurricanes Katrina and Rita led to a shortage of construction materials in the United States, including drywall. As a result, drywall manufactured in China was brought into the United States and used in the construction and refurbishing of homes in coastal areas of the country, notably the East Coast and Gulf South. After the installation of the Chinese Drywall, property owners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. *In re Chinese–Manufactured Drywall Prod. Liab. Litig.,* 894 F.Supp.2d 819, 829–30 (E.D.La.2012), *aff'd,* 742 F.3d 576 (5th Cir.2014).

6. On June 15, 2009, the Judicial Panel on Multidistrict Litigation transferred all federal civil actions alleging damages from Chinese Drywall to the United States District Court for the Eastern District of Louisiana for coordinated and consolidated pretrial proceedings in MDL 2047 pursuant to 28 U.S.C. § 1407. *In re Chinese–Manufactured Drywall Prod. Liab. Litig.,* 626 F.Supp.2d 1346 (J.P.M.L.2009).

## A. *The Representative Plaintiffs*

**\*2** 7. Eduardo and Carmen Amorin are participants in *Wiltz, Gross, Abel,* and each of the Amorin complaints. They own a property located at 240 West End Drive # 721, Punta Gorda, FL 33950. It has been determined, following an inspection, that it property contains defective Taishan Chinese Drywall.

8. Albert and Betsy Butzer are participants in *Haya* and each of the *Amorin* complaints. They own a property at 9519 26th Bay Street, Norfolk, VA 23518. It has been determined, following an inspection, that this property contains defective Taishan Chinese Drywall.

9. Jack and Anna McGinn are participants in *Wiltz* and each of the *Amorin* complaints. They own a property located at 4301 Blackthorne Court, Virginia Beach, VA 23455. It has been determined, following an inspection, that this property contains defective Taishan Chinese Drywall.

10. Thomas and Virginia Spencer are participants in *Wiltz, Almeroth,* and each of the *Amorin* complaints. They own a property located at 2481 Lakewood Manor Drive,

Athens, GA 30606. It has been determined, following an inspection, that this property contains defective Taishan Chinese Drywall.

11. Elliot and Angelina Everard are participants in *Gross, Abel,* and each of the *Amorin* complaints. They own a property located at 3000 N. Palm Drive, Slidell, LA 70458. It has been determined, following an inspection, that this property contains defective Taishan Chinese Drywall.

## B. *Procedural History*

12. The *Germano* Plaintiffs (Michelle Germano, Dennis and Sharon Jackson, Jason and Lisa Dunaway), on behalf of themselves and all other similarly situated owners, initiated a class action against Defendant Taishan on May 1, 2009, by filing a complaint in the Eastern District of Virginia. Thereafter, on May 26, 2009, Plaintiffs filed their First Amended Complaint. On August 3, 2009, Plaintiffs received notice that service of process of the First Amended Complaint was perfected on Taishan. On October 13, 2009, Plaintiffs' case was then transferred to the Eastern District of Louisiana as part of MDL 2047. Subsequent to transfer, on October 30, 2009, Plaintiffs moved to amend the First Amended Compliant to assert a national class against Taishan. Plaintiffs' motion to amend was granted on November 18, 2009. *See* Rec.Doc. # 469.

## C. *Default Judgments Have Been Entered Against All the Taishan Defendants*

13. The *Germano* Plaintiffs obtained a default judgment against Taishan on November 20, 2009 (Rec.Doc.# 487);[1] furthermore, seven intervenor Plaintiff families in *Germano* (Robert and Lisa Orlando, William and Deborah Morgan, Joseph and Vannessa Michaux, Preston and Rachel McKellar, Steven and Elizabeth Heischober, Jerry and Inez Baldwin, and Joseph and Cathy Leach), who are Virginia homeowners with Taishan Chinese Drywall in their properties, obtained a default judgment against Taishan on May 11, 2010 (Rec.Doc.# 3013).

14. The Taishan Affiliates have also been held in default with respect to the proceedings in Wiltz, Gross, and Amorin. On February 1, 2011, BNBM, BNBM Group, CNBM, and CNBM Group were held in default in the Gross proceedings. *See* Rec.Doc.# 7302. These same entities were again held in default in Gross on August 7, 2012 (i.e., as to the omnibus intervention complaint

that was filed in Gross). *See* Rec.Doc. # 15687. On February 24, 2011, BNBM was held in default in the Wiltz proceedings. *See* Rec.Doc. # 7735. On July 1, 2014, Taishan, TTP, and CNBM were held in default with respect to the Amorin case originally filed in this Court (Case No. 2:11–CV–1395). *See* Rec.Doc. # 17814. Pursuant to this same Order, Taishan and TTP were held in default with respect to the *Amorin* complaint originally filed in the Southern District of Florida prior to its transfer to this Court (Case No. 2:11–CV–1672). *Id.* Also on July 1, 2014, Taishan, TTP, BNBM, CNBM, and

CNBM Group were held in default with respect to the *Amorin* complaint originally filed in the Eastern District of Virginia prior to its transfer to this Court (Case No. 2:11–CV–1673). *See* Rec.Doc. # 17815. These default judgments are summarized in the chart below:

### CASES WHERE THE TAISHAN DEFENDANTS HAVE BEEN HELD IN DEFAULT

|  | Taishan | TTP | BNBM | BNBM Group | CNBM Group | CNBM |
|---|---|---|---|---|---|---|
| *Germano* | X |  |  |  |  |  |
| *Wiltz* |  | X |  |  |  |  |
| *Gross* |  |  | X | X |  | X | X |
| *Amorin* (Virginia) | X | X |  | X | X | X |
| *Amorin* (Louisiana) | X | X |  |  |  | X |
| *Amorin* (Florida) | X | X |  |  |  |  |

**\*3** 15. The Court held an evidentiary hearing in the *Germano* proceedings on February 19 and 22, 2010, and issued Findings of Fact and Conclusions of Law on April 8, 2010. *See Germano* Findings of Fact and Conclusions of Law, (hereinafter "FOFCOL"), Rec.Doc. # 2380. [2] In the FOFCOL, the Court made judicial findings regarding the scope of remediation and property damages sustained by the intervenor *Germano* Plaintiffs as a result of defective Taishan Chinese Drywall. The Court entered a final default judgment with awards to the seven Plaintiff Intervenors on May 10, 2010. *See* Rec.Doc. # 3013.

16. Following the *Germano* bellwether trial, counsel for Taishan entered a limited appearance, filed a notice of appeal, and contested the Court's exercise of personal jurisdiction of the Defendant. The parties agreed to stay the appeal for purposes of conducting jurisdictional discovery. At the conclusion of the jurisdictional discovery, the parties briefed the issue of whether or not this Court could exercise personal jurisdiction over Taishan.

17. On September 4, 2012, this Court issued its Order and Reasons denying (1) Taishan's Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint in *Germano v. Taishan Gypsum, Co., Ltd.,* Case No. 09–6687 [Rec.Doc. # 13490]; (2) Taishan's Renewed Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate the Entry of Default and Dismiss this Action in *The Mitchell Co., Inc., v. Knauf Gips, KG,* Case No. 09–4115 [Rec.Doc. # 13566]; (3) Taishan and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Gross v. Knauf Gips KG,* Case No. 09–6690 [Rec.Doc. # 13590]; and (4) Taishan and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Wiltz v. Beijing New Building Materials Public Ltd., Co.,* Case No. 10–361 [Rec.Doc. # 13591]. *See In re Chinese–Manufactured Drywall Prod. Liab. Litig., 894 F.Supp.2d 819 (E.D.La.2012)* (hereafter the "Jurisdictional Rulings"). [3] On January 28, 2014, the Fifth Circuit affirmed this Court's jurisdictional ruling in the *Germano* action. *See In re Chinese–Manufactured Drywall Prod. Liab. Litig., 742 F.3d 576 (5th Cir.2014).* More recently, the Fifth Circuit affirmed the Court's September 4, 2012 Order as it related to the *Gross, Wiltz* and *Mitchell* actions. *See In re Chinese–Manufactured Drywall Prod. Liab. Litig., 753 F.3d 521*

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 219 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in... Page 5 of 17 PageID #697
2014 WL 4809520

(5th Cir.2014). The Fifth Circuit's Orders affirming this Court's Jurisdictional Rulings are now final, as no petitions for a writ of certiorari to the United States Supreme Court were filed. Pursuant to these rulings, jurisdiction over Taishan and TTP has been conclusively established.

### D. *Taishan's and TTP's Contacts with the United States*

18. Taishan and its wholly-owned subsidiary TTP have a number of contacts with the United States. From 2005 to 2009, Taishan, TTP, and/or their affiliated companies manufactured and sold approximately 1,825,202 sheets of Chinese Drywall that were shipped to and used in the United States. *See Jurisdictional Rulings,* 894 F.Supp.2d at 849–50. Taishan holds itself out as a Chinese manufacturer of new building materials, particularly drywall, that exports its products world-wide, including the United States. *See Jurisdictional Rulings,* 894 F.Supp.2d at 850. During the relevant period, Taishan's marketing and informational brochure included an illustration of its world-wide marketing web, which depicted an arrow pointing from China to the United States. *See Jurisdictional Rulings,* 894 F.Supp.2d at 850. Taishan's website, like its brochure, states that Taishan is one of the largest drywall manufacturers in the world and that it exports its product world-wide, including to the United States. *See Jurisdictional Rulings,* 894 F.Supp.2d at 850. Taishan also advertises and sells its drywall onAlibaba.com, which allows customers to purchase its drywall worldwide, including in the United States. *See Jurisdictional Rulings,* 894 F.Supp.2d at 850. The employees of Taishan and TTP use Americanized names, and speak English, and TTP's employees were employed by Taishan specifically to solicit business and service the United States market. *See Jurisdictional Rulings,* 894 F.Supp.2d at 850. Taishan and TTP manufactured drywall specifically for U.S. customers by: representing their drywall satisfied American Society for Testing and Materials ("ASTM") standards; measuring the drywall in U.S. measurements; placing on the drywall, labels written in English and information and colors as requested by U.S. customers; and employing packing and shipment of the drywall for the United States. *See Jurisdictional Rulings,* 894 F.Supp.2d at 850–51.

**\*4** 19. Taishan and TTP shipped large quantities of drywall to the states of Virginia, Florida, and Louisiana. For instance, Taishan directed shipments of drywall to Venture Supply in Virginia totaling 159,000 sheets. *See Jurisdictional Rulings,* 894 F.Supp.2d at 853. From 2006 to 2007, Taishan and/or TTP sold almost 200,000 sheets of its drywall, through several transactions, to Florida customers or customers doing business in Florida. *See Jurisdictional Rulings,* 894 F.Supp.2d at 875. During 2006 and 2007, Taishan and/or TTP sold at least 45,756 sheets of drywall, through a number of transactions, which ended up in Louisiana. *See Jurisdictional Rulings,* 894 F.Supp.2d at 898.

20. In addition to drywall, Taishan also imported and/or sought to import metal studs, framing, tracking, toilets, and sinks to the United States. *See Jurisdictional Rulings,* 894 F.Supp.2d at 877. Taishan has also delivered shipments of drywall to California, New York, and North Carolina. *See* Exhibit "1" to Affidavit of Russ M. Herman in Support of the Plaintiffs' Steering Committee's Global Statement of Facts and Memorandum of Law in Opposition to: (1) Taishan's Renewed Motions to Vacate the Default Judgments and Dismiss the Complaints in Germano and Mitchell and (2) Taishan's Motions to Dismiss the Complaints in Gross and Wiltz, Rec.Doc. # 14843–3.

### II. *Judicial Findings Regarding the Defective Nature of Chinese–Manufactured Drywall and the Need for and Scope of Remediation*

21. It has been established by the Consumer Product Safety Commission ("CPSC") and in these proceedings that Chinese Drywall releases reduced sulfur gases. FOFCOL at 12. The three main gases that are released from Chinese manufactured drywall are hydrogen sulfide (H2S), carbonyl sulfide (COS), and carbon disulfide (CS2). FOFCOL at 12. The CPSC and Plaintiffs' experts have detected reduced sulfur gas emissions by conducting laboratory tests on samples of Chinese drywall. FOFCOL at 12. These emissions are often associated with strong odors. FOFCOL at 12. The fact that Chinese Drywall emits sulfur gases has been reported by the CPSC, the Florida Department of Health, and other investigatory agencies and firms. FOFCOL at 12–13.

22. The sulfur gases released by Chinese Drywall causes offending odors in homes, making them hard if not impossible to live in, and are corrosive to metals, particularly copper and silver. FOFCOL at 13.

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 6 of 17 PageID #: 698
In re: Chinese Manufactured Drywall Products Liability Litigation, Not Reported in... Page 6 of 17 PageID #: 698
2014 WL 4809520

23. As a result of this Court having held the evidentiary hearing to determine the scope of remediation, cost of remediation and other property damages caused by Taishan Chinese Drywall to the seven Plaintiff—Intervenors, (February 19, 2010, February 22, 2010), the Court's April 8, 2010 FOFCOL resolved a multitude of factual and legal issues for the seven Plaintiff Intervenors' claims against Taishan (such as scope and cost of remediation and the right to recover remediation damages). To properly remediate plaintiffs' homes, it is established that homeowners will be out of their homes for 4–6 months during remediation, and that families thus are entitled to alternate living expenses during the remediation process. FOFCOL at 56–57. Moreover, the average cost of repairing class members' homes is subject to calculation on a formulaic, square footage basis. Indeed, this Court made similar findings in the later *Hernandez* trial. *See* April 27, 2010 Findings of Fact and Conclusions of Law, Rec.Doc. # 2713. The same approach to the determination of damages for repair and remediation is applicable to the class representatives and class members subject to appropriate cost adjustments.

### III. *Alter Ego and/or Piercing the Corporate Veil*

**\*5** 24. The State-owned Assets Supervision and Administration Commission of the State Counsel (hereafter "SASAC") of the People's Republic of China controls the "plasterboard" manufacturing, exportation and certification industry. FOFCOL at 10.

25. The SASAC supervises and manages the State-owned assets of the enterprises engaged in drywall production, including Taishan and its affiliate companies. FOFCOL at 10. The degree of control SASAC (Government of China) exerts and influences over the Taishan Defendants is extensive. FOFCOL at 10. For example, SASAC assumes the responsibility as the investor on behalf of the state; it supervises and manages the state-owned assets and enterprises; controls the value preservation and increment of the state-owned assets; guides and pushes forward the reform and restructuring of state-owned enterprises (hereafter "SOEs"); appoints and removes top executives of SOEs; is responsible for organizing SOEs to turn gains over to the state; is responsible for urging SOEs to carry out laws and regulations for safety production; directs and supervises the management work of local state-owned assets; and undertakes other tasks assigned by the State Council. FOFCOL at 10–11.

26. Furthermore, SASAC oversees and controls 150 large central SOEs, including CNBM Group. FOFCOL at 11. SASAC owns 100% of the CNBM Group. FOFCOL at 11. CNBM Group, in turn, owns 56.4% of the CNBM and 75% of BNBM. CNBM owns 52.40% of BNBM. FOFCOL at 11. On March 19, 2005, BNBM became the largest shareholder of Taihe Dongxin (Taishan) by purchasing sixty-five percent (65%) of the equity of Taishan Dongxin. FOFCOL at 10.

27. This Court's Order of September 4, 2012 found that Taishan and TTP are one and the same entity under an alter-ego and/or agency theory. *See Jurisdictional Rulings,* 894 F.Supp.2d at 869–72. For instance, in concluding that TTP's jurisdictional contacts with the state of Florida could to be attributed to Taishan under an alter-ego or agency theory, this Court made several important findings regarding the relationship between the companies, including, but not limited to, the facts that: Taishan controlled 100% of TTP's shares; that several high-ranking Taishan employees were appointed to the board of directors of TTP; that several former Taishan employees became employees of TTP, were paid by Taishan during the time they worked for TTP, and then returned to Taishan after TTP ceased production; that TTP was authorized to use Taishan's brand, but did not pay for this authorization; that TTP sold Taishan brand drywall; and that when dealing with customers Taishan and TTP regularly held themselves out as operating as a single business enterprise. *See Jurisdictional Rulings,* 894 F.Supp.2d at 869–72. After applying Florida law to these facts this Court concluded that TTP's jurisdictional contacts should be imputed to Taishan. *See Jurisdictional Rulings,* 894 F.Supp.2d at 869–72. The Court reached the same conclusion for purposes of applying TTP's jurisdictional contacts to Taishan for purposes of asserting personal jurisdiction over these companies under Louisiana law. *See Jurisdictional Rulings,* 894 F.Supp.2d at 895. [4]

**\*6** 28. CNBM, CNBM Group, BNBM, and BNBM Group are affiliates of Taishan. *See* Request for Admissions at ¶¶ 7 and 8. [5]

29. At all relevant times, BNBM and CNBM had and still have control over Taishan and all of its subsidiaries. *See* Request for Admissions at ¶ 85 and ¶ 87.

30. BNBM owned sufficient stock and/or equity ownership in Taishan to give it actual working control over Taishan. *See* Request for Admissions at ¶ 19. At all relevant times, BNBM was Taishan's dominant stockholder. *See* Request for Admissions at ¶ 33. At all relevant times, BNBM exerted sufficient control over Taishan as its dominant stockholder. *See* Request for Admissions at ¶ 34.

31. Taishan and TPP shared common officers, directors, board members, and/or chairmen with BNBM and BNBM Group. *See* Request for Admissions at ¶ 20. BNBM and BNBM Group had common employees with Taishan and TPP. *See* Request for Admissions at ¶ 21. BNBM and BNBM Group had common personnel and management with Taishan. *See* Request for Admissions at ¶ 52. The control of Taishan, BNBM and BNBM Group was unified into a single body of oversight and control. *See* Request for Admissions at ¶ 23. At all relevant times, the directors and officers of Taishan who were also the directors and officers of BNBM and BNBM Group acted in concert in the interest of BNBM and BNBM Group. *See* Request for Admissions at ¶ 24.

32. Taishan and TPP shared common officers, directors, board members, and/or chairmen with CNBM and CNBM Group. *See* Request for Admissions at ¶ 49. CNBM and CNBM Group had common employees with Taishan and TPP. *See* Request for Admissions at ¶ 50. CNBM and CNBM Group had common personnel and management with Taishan. *See* Request for Admissions at ¶ 51. The administrative control of Taishan, CNBM and CNBM Group was unified into a single body of oversight and control. *See* Request for Admissions at ¶ 54. At all relevant times, the directors and officers of Taishan who were also the directors and officers of CNBM and CNBM Group acted in concert in the interest of CNBM and CNBM Group. *See* Request for Admissions at ¶ 55.

33. At all relevant times, Taishan was undercapitalized, inadequately capitalized, and thinly incorporated such that it was insufficiently funded, or had insufficient capital to support its operations. *See* Request for Admissions at ¶ 26.

34. At all relevant times, Taishan never complied with requisite corporate formalities including, but not limited to, issuance of stock, annual shareholder meetings, formal board meetings, and corporate authorization for major transactions. *See* Request for Admissions at ¶ 46.

35. At all relevant times, BNBM, BNBM Group, CNBM, and CNBM Group directly and/or indirectly, financed all or substantially all of Taishan's operations. *See* Request for Admissions at ¶¶ 27–28. At all relevant times, BNBM, BNBM Group, CNBM, and CNBM Group paid all or substantially all of Taishan's expenses. *See* Request for Admissions at ¶¶ 29–30.

**\*7** 36. At all relevant times, the salaries and other expenses or losses of Taishan were paid by or paid directly with funds originating from BNBM, BNBM Group, CNBM, and/or CNBM Group or any of their parents, subsidiaries, or sister entities. *See* Request for Admissions at ¶ 41 and ¶ 60.

37. At all relevant times, the same person(s) directly controlled the finances of Taishan BNBM, BNBM Group, CNBM, and/or CNBM Group, including but not limited to: loan agreements between Taishan and BNBM, BNBM Group, CNBM, and/or CNBM Group (formal or informal, written or verbal); wire transfers of funds to Taishan from BNBM, BNBM Group, CNBM, and/or CNBM Group; wire transfers of funds to Taishan from BNBM, BNBM Group, CNBM, and/or CNBM Group; and a joint banking and/or checking account for Taishan, BNBM, BNBM Group, CNBM, and/or CNBM Group. *See* Request for Admissions at ¶ 25 and ¶ 56.

38. At all relevant times, Taishan, BNBM, BNBM Group, CNBM, and/or CNBM Group had centralized accounting. *See* Request for Admissions at ¶ 43 and ¶ 62.

40. At all relevant times, BNBM, BNBM Group, CNBM, and CNBM Group siphoned funds from Taishan. *See* Request for Admissions at ¶¶ 31–¶ 32.

39. At all relevant times, there were multiple undocumented transfers of funds between Taishan and BNBM, BNBM Group, CNBM, and/or CNBM Group —both from Taishan to BNBM, BNBM Group, CNBM, and/or CNBM Group and from BNBM, BNBM Group, CNBM, and/or CNBM Group to Taishan. *See* Request for Admissions at ¶ 44 and ¶ 63.

41. At all relevant times, BNBM, BNBM Group, CNBM, and/or CNBM Group had the authority to withdraw

money from Taishan's operating account, and actually did so on several occasions without notice to or permission by Taishan. *See* Request for Admissions at ¶ 45 and ¶ 64.

42. At all relevant times, Taishan, BNBM, BNBM Group, CNBM, and CNBM Group used the same office spaces and shared resources including, but not limited to: facsimile machines; telephones; internet servers; email accounts; secretarial staff; and office supplies. *See* Request for Admissions at ¶¶ 39 and 59.

43. At all relevant times, employees of Taishan rendered services on behalf of BNBM, BNBM Group, CNBM, and/or CNBM Group and vice versa-employees of BNBM, BNBM Group, CNBM, and/or CNBM Group rendered services on behalf of Taishan in fulfilling its contractual or business obligations. *See* Request for Admissions at ¶ 42 and ¶ 61.

44. The allocation of profits and losses as between BNBM, BNBM Group, CNBM, and/or CNBM Group and Taishan is unclear and virtually non-existent. *See* Request for Admissions at ¶ 47 and ¶ 66.

45. BNBM and Taishan's development and production capacities were reported as one in CNBM's May 2010 Overseas Regulatory Announcement. *See* Request for Admissions at ¶ 101. BNBM and Taishan's development and production capacities were reported as one unified report in the 2009 BNBM Annual Report. *See* Request for Admissions at ¶ 102. BNBM and Taishan's development and production capacities were reported as one unified report in the Summary of BNBM 2008 Annual Report. *See* Request for Admissions at ¶ 103. At all relevant times, BNBM and Taishan's development and production capacities were reported as one unified report in the 2006 BNBM Annual Report. *See* Request for Admissions at ¶ 104.

**\*8** 46. The Corporate Restructuring of CNBM and CNBM Group, wherein BNBM purchased Taishan stock, was not an arms-length transaction, was for inadequate consideration, and was for the purpose of defrauding Taishan's creditors. *See* Request for Admissions at ¶ 77, ¶ 79, and ¶ 80.

47. At all relevant times, Taishan and/or TTP were express and/or implied mandataries (*i.e.* agents) of BNBM, BNBM Group, CNBM, and/or CNBM Group, in that

BNBM, BNBM Group, CNBM, and/or CNBM Group had and still has the right to control the conduct and/or actions of Taishan and TTP, and Taishan and/or TTP have authority to bind BNBM, BNBM Group, CNBM, and/or CNBM Group. *See* Request for Admissions at ¶¶ 82–83.

### CONCLUSIONS OF LAW

**I.** *The Taishan Affiliates are Liable to the Class as Affiliates of Taishan or Under the Theory of Alter Egol Piercing the Corporate Veil*

48. "[T]he dictionary definition of the term affiliate in Black's Law Dictionary (7th ed.1999) is a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation ...". *Hopkins v. Howard,* 930 So.2d 999, 1007 (La.App. 4 Cir.2006), *writ denied,* 930 So.2d 984 (La.2006). In *Southern Capital Enterprises, Inc. & F. David Tutt v. Conseco Services, L.L.C., et al.,* 476 F.Supp.2d 589 (M.D.La.2007), the court equated the term affiliate to the single business enterprise theory of piercing the corporate veil. *Id.* at 595. Under the single business enterprise theory, a court "may disregard the concept of corporate separateness and extend liability to each of the affiliated corporations to prevent fraud or to achieve equity." *Id.* (quoting *Brown v. Auto. Casualty Ins. Co.,* 644 So.2d 723, 727 (La.Ct.App.1995)).

49. In *Green v. Champion Ins. Co.,* 577 So.2d 249 (La.Ct.App. 1st Cir.1991), *writ denied,* 580 So.2d 668 (La.1991), the court set forth a non-exclusive eighteen-factor test to determine whether a group of affiliated entities constituted a single business enterprise. Those factors as set forth by the court are as follows:

1. Corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control;

2. Common directors or officers;

3. Unified administrative control of corporations whose business functions are similar or supplementary;

4. Directors and officers of one corporation act independently in the interest of that corporation;

5. Corporation financing another corporation;

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 223 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in... Page 9 of 17 PageID #: 701
2014 WL 4809520

6. Inadequate capitalization ("thin corporation");

7. Corporation causing the incorporation of another affiliated corporation;

8. Corporation paying the salaries and other expenses or losses of another corporation;

9. Receiving no business other than that given to it by its affiliated corporations;

10. Corporation using the property of another corporation as its own;

**\*9** 11. Noncompliance with corporate formalities;

12. Common employees;

13. Services rendered by the employees of one corporation on behalf of another corporation;

14. Common offices;

15. Centralized accounting;

16. Undocumented transfers of funds between corporations;

17. Unclear allocation of profits and losses between corporations; and

18. Excessive fragmentation of a single enterprise into separate corporations.

*Green,* 577 So.2d at 257–58. These factors do not constitute an exhaustive list. *Id.* at 258. Moreover, no one factor is dispositive on the issue of whether a single business enterprise exists. *Id.* Establishing these facts is common to every class member, thus making class certification appropriate.

50. Based upon the Court's above findings of fact, the Court concludes that Taishan, TTP, BNBM, BNBM Group, CNBM, and CNBM Group constitute a single business enterprise for purposes of piercing the corporate veil and holding each of these entities liable for the conduct of their affiliated entities. *See supra* at ¶¶ 21–47. More specifically, the Court concludes that Class Counsel has satisfied factors 1–8 and 10–18 of the *Green* eighteen-factor test. In light of these conclusions as well as this Court's prior conclusions involving the relationship between the Taishan Affiliates, the Court concludes that

the Taishan Affiliates may be held liable for the conduct of their affiliated entities.

51. Although the above analysis involves the application of Louisiana law, the Court concludes that Taishan, TPP, BNBM, BNBM Group, CNBM, and CNBM Group may be held liable for the conduct of their affiliated entities under the laws of Virginia, Florida, Mississippi, and Alabama law. Under Virginia law, a court may pierce the corporate veil to find that an individual (or corporation) is the alter-ego of another corporation where it finds "(i) a unity of interest and ownership between the two entities; and (ii) that one entity used the other "to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *C.F. Trust, Inc. v. First Flight Ltd. P'ship,* 306 F.3d 126, 132 (4th Cir.2002). Thus, for a court to disregard the corporate veil, the plaintiff must show that a subsidiary is organized and operated as a mere instrumentality or conduit of the stockholders, and it must further appear that recognition of the separate corporate entities would aid an unjust loss or injury. *Marsh Broadcasting of Washington, D.C., Inc. v. George Mason Univ. Found.,* 21 Va. Cir. 89, 91 (Fairfax County Cir. Ct.1990) (citing *Beale v. Kappa Alpha Order,* 192 Va. 382, 386, 64 S.E.2d 789 (1951)). To "pierce the corporate veil" under Florida law, three factors must be proven: (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant. *See Gasparini v. Pordomingo,* 972 So.2d 1053, 1055 (Fla. 4th DCA 2008). Under Mississippi law, courts will disregard corporate identity if it is shown that one corporation is a "mere instrumentality or agency or adjunct in that sense, or as a sham or is used in fraud, by the dominant corporation." *Buchanan v. Ameristar Casino Vicksburg, Inc.,* 957 So.2d 969, 978 (Miss.2007) (quoting *Johnson & Higgins of Miss., Inc. v. Comm'r of Ins.,* 321 So.2d 281, 285 (Miss.1975)). To pierce the corporate veil, under Alabama law, a plaintiff must show fraud in asserting the corporate existence or must show that recognition of the corporate existence will result in injustice or inequitable consequences. *See Econ Marketing, Inc. v. Leisure American Resorts, Inc.,* 664 So.2d 869, 870 (Ala.1994). The corporate veil may be pierced where a corporation is set up as a subterfuge,

2014 WL 4809520

where shareholders do not observe the corporate form, where the legal requirements of corporate law are not complied with, where the corporation maintains no corporate records, where the corporation maintains no corporate bank account, where the corporation has no employees, where corporate and personal funds are intermingled and corporate funds are used for personal purposes, or where an individual drains funds from the corporation. *Id.*

### II. *Plaintiffs are Entitled to Class Certification*
**\*10** As a threshold matter, the Court's analysis of the instant motion for class certification is greatly simplified by the status of the Taishan Defendants as default judgment defendants. Because of the default judgments, liability is conclusively established, and the Court need only determine whether it is appropriate to certify a class under Rule 23 to determine class-wide damages pursuant to Rule 55(b)(2)(B). For the reasons discussed in detail below, the Court concludes that class certification is appropriate.

### A. *Standard of Review*
52. Courts that have addressed default judgments in the class certification context have ruled that the admissions of fact in the complaint are not sufficient for class certification. Following the "rigorous analysis" standard set forth in *General Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982), these courts have reasoned that the legal conclusions of Rule 23 are not waived or admitted by the default. *See, e.g., Davis v. Hutchins,* 321 F.3d 641, 648–49 (7th Cir.2003) (where the court vacated the district court's findings of class damages because class certification had not been determined). The court in *Davis,* held:

> There is the general principle that factual allegations in the complaint are deemed admitted by the defendant upon default; however, application of that general principle does not solve the class-certification issue. Rule 23(c) imposes an independent duty on the district court to determine by order that the requirements of Rule 23(a) are

met regardless of the defendant's admissions.

*Davis,* 321 F.3d at 648–49. *See also Partington v. American Int'l Specialty Lines Ins. Co.,* 443 F.3d 334, 341 (4th Cir.2006) (notwithstanding the entry of default judgment, courts must formally address whether class certification is appropriate under a rigorous Rule 23 analysis). Thus, the Court will engage in rigouours analysis of Rule 23's prepreqisites.

53. The proponents of the class bear the burden of demonstrating that the case is appropriate for class treatment. *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 479 n. 4 (5th Cir.2001). Class certification is soundly within the district court's discretion, and this decision is essentially a factual inquiry. *Vizena v. Union Pac. R.R. Co.,* 360 F.3d 496, 502–03 (5th Cir.2004). In some cases it is necessary for a district court to go beyond the pleadings to understand the claims, defenses, substantive law, and relevant facts in order to make a meaningful certification decision. *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2556 (U.S.2011). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,* 133 S.Ct. 1184, 1194–95 (U.S.2013). Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *Id.*

### B. *Plaintiffs have Established the Requirements of Rule 23(a)*

#### 1. *Numerosity—Rule 23(a)(1)*
**\*11** 54. To demonstrate numerosity, Plaintiffs must establish that joinder is impracticable through "some evidence or reasonable estimate of the number of proposed class members." *Pederson v. La. State Univ.,* 213 F.3d 858, 868 (5th Cir.2000). "Although the number of members of any proposed class is not determinative of whether joinder is impracticable," the Fifth Circuit has generally set the threshold of 100 to 150 people as satisfying the numerosity requirement. *Mullen v. Treasure Chest Casino LLC,* 186 F.3d 620, 624 (5th Cir.1999).

55. Since the class is comprised of active litigants, Plaintiffs have proven that the class consists of approximately

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/12/19 Page 11 of 172 PageID #: 703
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in... Page 11 of 172 PageID #: 703
2014 WL 4809520

4,150 members.[6] Joinder of 4,150 class members is impracticable and would lead to a squandering of judicial economy and resources of the parties. The presently available evidence of such a large class demonstrates that the proposed class clearly meets the numerosity requirement. *See In re Chinese–Manufactured Drywall Prod. Liab. Litig.,* 2012 WL 92498, *9 (E.D.La. Jan. 10, 2012)* (finding numerosity requirement satisfied where, "[there were a] large number of potential claimants who may benefit from the Settlement Agreement.").

### 2. Commonality—Rule 23(a)(2)

56. The threshold for establishing commonality is not high since "for purposes of Rule 23(a)(2) even a single common question will do." *Dukes,* 131 S.Ct. at 2556. As per *Dukes,* to satisfy Rule 23's commonality requirement, class claims "must depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." 131 S.Ct. at 2551. The Supreme Court explained that the key consideration in assessing commonality is not whether the class raises common claims, but whether a class action can "generate common answers apt to drive the resolution of the litigation." *Id.* "To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon,* 739 F.3d 790, 810 (5th Cir.2014).

57. Here, determining class-wide property damages for the class will affect all class members in a similar manner. The factual determination of class-wide property damages is common to the class members, and resolution of this common question will generate common answers apt to drive the resolution of the litigation. *See Chinese Drywall,* 2012 WL 92498 at *10* ("because the Judicial Panel on Multidistrict Litigation ordered the subject cases to be consolidated in the MDL based upon commonality of facts, and the factual and legal issues arising from KPT Chinese drywall are common to all claimants."); *Turner v. Murphy Oil USA, Inc.,* 234 F.R.D. 597, 605 (E.D.La.2006) (finding commonality where a few common, central issues affected all or most of the class members).

### a. Collateral Estoppel Effect of *Germano* Findings of Fact and Conclusions of Law and Res Judicata Effect of the Court's Jurisdictional Rulings

*12 58. Under the doctrine of collateral estoppel, the Court may also rely on the extensive findings already made by the Court in the *Germano* default judgment proceedings. (Rec.Doc.# 2380). The Supreme Court has approved the use of offensive, non-mutual collateral estoppel under certain circumstances.

> Generally stated, The doctrine of collateral estoppel ... bars a party from relitigating in a second proceeding an issue of fact or law that was litigated and actually decided in a prior proceeding, if that party had a full and fair opportunity to litigate the issue in the prior proceeding and the decision of the issue was necessary to support a valid and final judgment on the merits.

*Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 330–31 (1979); *see also U.S. v. Davenport,* 484 F.3d 321, 326 (5th Cir.2007). The *Parklane* court noted that certain circumstances might exist in a case to justify a court's refusal to apply collateral estoppels, including where: (a) a defendant has little incentive to defend vigorously, (b) the second action affords the defendant procedural opportunities not available in the first action that could cause a different result, and (c) "if the judgment relied upon as a basis for the estoppels is itself inconsistent with one or more previous judgments in favor of the defendant. *Parklane,* 439 U.S. at 330–31; *In re Plunk,* 481 F.3d 302, 308 (5th Cir.2007).

59. Under the *Parklane* standards, it is appropriate to give the Findings of Fact and Conclusions of Law a preclusive effect in this class proceeding. The defendant has had a full opportunity to litigate, but chose not to respond to process.[7] FOFCOL at 5. It is also clear that the Court's findings on the scope and cost of remediation and property damages were "necessary to support a valid and final judgment on the merits." *Parklane,* 439 U.S. at 330–31. Furthermore, none of the *Parklane* factors

which would justify a court's refusal to apply collateral estoppel is present on the *Germano* record. Therefore under *Parklane* and *Plunk,* the Court holds that the Findings of Fact and Conclusions of Law (Rec.Doc.# 2380) are entitled to be given preclusive effect in this class proceeding.

60. With respect to the Court's Jurisdictional Rulings, Taishan vigorously opposed personal jurisdiction at both the district court level and at the Fifth Circuit Court of Appeals. Taishan lost at both levels. Therefore, the Court's Jurisdictional Rulings are entitled to res judicata effect. "Res judicata means a thing decided; the doctrine states that a final judgment on the merits rendered by a court of competent jurisdiction is conclusive as to the parties and their privies; therefore, attempts to litigate the matter further are barred." *German v. Corr. Corp. of Am.,* 2006 WL 2583732, *1 (N.D.Miss. Sept. 6, 2006) (internal quotes omitted), *citing Cromwell v. County of Sac.,* 94 U.S. 351, 352 (1876); *Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.,* 575 F.2d 530, 535 (5th Cir.1978).

*13 61. In sum, the Findings of Fact and Conclusions of Law from the proceeding for the seven Plaintiff Intervenors are entitled to be given a preclusive effect under the *Parklane* standards. The Court's Jurisdictional Rulings are likewise entitled to preclusive effect.

### 3. Typicality—Rule 23(a)(3)

61. Rule 23(a)(3) requires that the claims of the class representatives be typical of the class's claims or defenses. "The typicality criterion focuses on whether there exists a relationship between the plaintiff's claims and the claims alleged on behalf of the class." NEWBERG ON CLASS ACTIONS § 3:13. Again, the threshold for typicality is low: class representatives must show similarity between their legal and remedial theories and the theories of the rest of the class. *Mullen,* 186 F.3d at 625. Typicality does not require that the claims of the class are identical, but rather that they share the same essential characteristics —a similar course of conduct, or the same legal theory. *See James v. City of Dallas, Tex.,* 254 F.3d 551, 571 (5th Cir.2001) (*quoting* 5 James W. Moore, *et al.,* MOORE'S FEDERAL PRACTICE ¶ 23.24 [4] (3d ed.2000)).

63. The property damage claims of the class representatives are typical of, if not identical in nature to, those of the class members. The determination of these damages depends on the same factual predicate as

to the manufacturer of the defective product, product identification, the mechanism of damage occurring in class members' homes, the need for remediation, the scope of remediation, the square footage costs of accomplishing the remediation, and alternative living expenses during remediation. *See Chinese Drywall,* 2012 WL 92498 at *10 ("typicality is satisfied because each of the plaintiffs is seeking money from the Knauf defendants for the costs of remediation ... and the proposed Class and Subclass representatives have claims against KPT which are typical of all plaintiffs."). Thus, the typicality requirement is met.

### 4. Adequacy of Representation—Rule 23(a)(4)

64. Rule 23(a)(4) demands that the named class representatives fairly and adequately represent the claims of the other class members. There can be differences between the class representatives and other class members so long as these differences do not "create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen,* 186 F.3d at 626. A district court should evaluate whether the class representatives have a sufficient stake in the outcome of the litigation, and whether the class representatives have interests antagonistic to the unnamed class members. *Id.* (citing *Jenkins v. Raymark Indus.,* 782 F .2d 468, 472 (5th Cir.1971)). In addition, the district court should inquire into the zeal and competence of the class representatives' counsel and into the class representatives' willingness to take an active role in the litigation and to protect the interests of absentees. *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 479 (5th Cir.2001).

*14 65. Under Fed.R.Civ.P. 23(g), a district court must appoint class counsel at the time the class is certified, unless otherwise provided by statute. The class counsel must fairly and adequately represent the interests of the class, and the court must review the counsel's work in investigating claims, experience in handling class action litigation, knowledge of the applicable law, and the resources counsel will commit to representing the class. *See* Rule 23(g)(1)(B),(C).

66. The class representatives have the same interest as class members in obtaining property damage relief from the Taishan Defendants. They also all share the same interest in the enforcement of a class judgment and the collection of that judgment against the Taishan Defendants. The class representatives have demonstrated their commitment to the litigation by subjecting their

2014 WL 4809520

residences to screening inspections to establish product identification and the fact of corrosion damage. Further, these class representatives have timely completed the court ordered Plaintiffs Fact Sheets.

67. The proposed Class Counsel are experienced in class action practice, and are well-respected, and competent lawyers. This Court has already had the opportunity to work extensively with each of the proposed Class Counsel and their firms in proceedings related to the default judgment against Taishan and the evidentiary hearing and associated legal briefing relevant to this Court's Findings of Fact and Conclusions of Law as to the seven Intervenor Plaintiffs. Indeed, this Court has previously determined that proposed Class Counsel are adequate for purposes of serving as Class Counsel with respect to the settlements that have been approved by the Court. *See Chinese Drywall,* 2012 WL 92498 at *10–11. The Court has also appointed Class Counsel as lead counsel (Arnold Levin) and Plaintiffs' Liaison Counsel (Russ Herman) in the instant litigation. Thus, the Court finds that the proposed class representatives, (Eduardo and Carmen Amorin, Albert and Betsy Butzer, Jack and Anna McGinn, Thomas and Virginia Spencer, and Elliot and Angelina Everard), as well as the proposed Class Counsel (Russ Herman and Arnold Levin) are adequate. [8]

### C. *Plaintiffs have Established All of the Requirements of Rule 23(b)(3)*

68. Rule 23(b)(3) requires that the common questions identified in Rule 23(a)(3) predominate and that the class procedure is the superior method of litigating the claims.

#### 1. *Predominance*

68. Predominance is established where common answers to common questions are likely to "drive the resolution of the [instant] litigation." *See Dukes,* 131 S.Ct. at 2551 ("what matters to class certification is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceedings to generate common answers apt to drive the resolution of the litigation.") (citations omitted). In *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,* 133 S.Ct. 1184 (U.S.2013), the Supreme Court explained that, "Rule 23(b)(3) ... does not require a plaintiff seeking class certification to prove that each "elemen[t] of [her] claim [is] susceptible to classwide proof." *Id.* at 1196. What the rule does require is that common questions "predominate over any questions

affecting only individual [class] members." Fed. Rule Civ. Proc. 23(b)(3) (emphasis added)." *Amgen,* 133 S.Ct. at 1196. A district court should consider how the cases would proceed to trial, that is, whether any cases would require individual trials on particular issues. *See Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744–45 (5th Cir.1996) (finding that certification was inappropriate where individual trials would be necessary to determine an element of the plaintiffs' fraud claims).

**\*15** 70. In order to satisfy Rule 23(b)(3)'s requirement that common questions of law and fact predominate, "the predominance test asks whether a class suit for the unitary adjudication of common issues is economical and efficient in the context of all the issues in the suit." NEWBERG ON CLASS ACTIONS § *see also Amchem,* 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.")(citing 7A Wright, Miller, & Kane 518–19).

71. Because the only claims at issue here are against default judgment defendants, and because the Court has already found sufficient facts to establish the causation issue associated with these types of claims, all that is required is an assessment of damages. Liability is conceded by default. Accordingly, the Court will establish class-wide damages pursuant to Rule 55(b)(2)(B).

72. The Plaintiffs have demonstrated a methodology to calculate class-wide damages in compliance with *Monumental Life Insurance Co. v. National Life,* 365 F.3d 408, 419 (5th Cir.2004) ("The policy variables are identifiable on a classwide basis and, when sorted, are capable of determining damages for individual policy owners; none of these variables is unique to particular plaintiffs. The prevalence of variables common to the class makes damages computation 'virtually a mechanical task.' ").

73. As the Eleventh Circuit noted in the *Klay v. Humana:*

> Plaintiffs need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class wide basis. Particularly where damages can be computed according to

some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification.

382 F.3d at 1259–60 (internal brackets, quotations and footnotes omitted).

74. Damages were previously presented in *Germano* and *Hernandez* and sufficed to allow the Court to make per square foot damage calculations for all affected plaintiffs. *See* FOFCOL (awarding $86/square foot for Virginia); *see also* April 27, 2010 Findings of Fact and Conclusions of Law, Rec.Doc.# 2713 (awarding $81/square foot for Louisiana). Such aggregate proof is sufficient to meet Plaintiffs' obligations subject to appropriate cost adjustments. *See In re Terazosin Hydrochloride,* 220 F.R.D. 672, 699 (S.D.Fla.2004) ("Assuming the jury renders an aggregate judgment, allocation will become an intra class matter accomplished pursuant to a court approved plan of allocation, and such individual damages allocation issues are insufficient to defeat class certification."); *In re NASDAQ,* 169 F.R.D. at 525 ("Aggregate computation of class monetary relief is lawful and proper.").

75. Given that the Court has already found that the costs of remediation can be calculated on a square footage basis and the Court has already determined what other property damages are recoverable, class-wide damages can be established in an efficient manner without the need for a trial. [9] The Court can likewise determine the cost of remediation, through the submission of affidavits, expert evidence and from data gathered by Moss & Associates (subject to appropriate cost adjustments), for remediation costs generally (*i.e.,* empirical evidence concerning the cost or remediation performed by Moss & Associates under the Knauf settlement program). For purposes of calculating class-wide damages, data concerning class members currently before the Court (*i.e.,* data from BrownGreer PLC concerning the square footage of class members' homes) can be used to estimate the size of the class so that damages can be calculated on an aggregate basis. Thus, Plaintiffs can establish a formulaic method to determine class-wide property damages as required by the Rule 23(b)(3) predominance requirement. *Monumental,*

365 F.3d at 419. Indeed, damages are simply calculated by using a mathematical formula similar to what the Court utilized in *Germano* and *Hernandez* (*i.e.,* price per square foot to remediate X number of square feet in class members' homes = damages).

**\*16** 76. Thus, for the reasons set forth above, all of the requirements of Rule 23(b)(3) predominance are readily established.

### 2. *Superiority—Rule 23(b)(3)*

77. Under Rule 23(b)(3), a district court must evaluate four factors to determine whether the class action format is superior to other methods of adjudication: the class members' interest in individually controlling their separate actions, the extent and nature of existing litigation by class members concerning the same claims, the desirability of concentrating the litigation in the particular forum, and the likely difficulties in class management. Fed.R.Civ.P. 23; *Mims v. Stewart Title Guar. Co.,* 590 F.3d 298, 304 (5th Cir.2009). [10]

78. Class proceedings are a superior method to adjudicate the damage assessment remaining in this case. This case presents a factual and procedural status that makes certification appropriate as a result of the entry of a default judgment on liability and the fact this Court has already made extensive findings that are applicable to a cross-section of class members. The narrow scope of the factual determinations left to be made—the amount of damages for the class—and the exhaustive record of the relevant factual evidence already reviewed by and ruled on by this Court greatly enhances the manageability of this matter. In addition, the Court has already determined that these claims are meritorious. FOFCOL at 17–59. A class proceeding will facilitate an expeditious and streamlined resolution for all impacted residents. Given the extreme costs involved in litigating this matter, class members (as a whole) have no ability to individually prosecute these matters. For all the reasons stated above, as well as the procedural advantages of avoiding duplicate hearings on identical issues, class adjudication is the superior method to resolve the remaining issues in this dispute. [11]

79. Therefore, based upon the Findings of Fact and Conclusions of Law, the Court finds that class certification is appropriate pursuant to Fed.R.Civ.P. 23(a)(1)-(4) and 23(b)(3) and concludes as follows:

2014 WL 4809520

A. The certified class is defined as follows:

> All owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin, Germano, Gross,* and/ or *Wiltz* (*i.e.,* not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.

B. The above-defined class is comprised of active litigants (either in the original action or in complaints in intervention) who are participants in *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,* Case No. 09–6687 (E .D.La.); *Gross, et al. v. Knauf Gips, KG, et al.,* Case No. 09–6690 (E.D.La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.,* Civ. Action No. 10–361 (E.D.La.); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–080

(E.D.La); *Haya, et al. v. Taishan Gypsum CorF Ltd., et al.,* Civ. Action No. 11–1077 (E.D.La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.,* Civ. Action. 12–0498 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1395 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1673 (E.D.La.). [12]

**\*17** C. Plaintiffs, Eduardo and Carmen Amorin, Albert and Betsy Butzer, Jack and Anna McGinn, Thomas and Virginia Spencer, and Elliot and Angelina Everard shall serve as class representatives.

D. Russ Herman of Herman, Herman & Katz, LLC, and Arnold Levin of Levin, Fishbein, Sedran & Berman are appointed as Class Counsel.

E. The notice appended hereto as Exhibit "A" is hereby approved, as modified, by the Court. The opt out period shall be 30 days from the date of this Order.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4809520

Footnotes

1   See *In re Chinese–Manufactured Drywall Prod. Liab. Litig.,* 742 F.3d 576 (5th Cir.2014).

2   This Court's FOFCOL is supported by the evidence presented during the evidentiary hearing on confirmation of the default against Taishan, including the Affidavit of Russ M. Herman In Support of the Plaintiffs' Steering Committee's Evidentiary Presentation Regarding Taishan Gypsum Co., Ltd. Dated February 19, 2010, the trial transcripts, the testimony and reports of Plaintiffs' expert witnesses, as well as the exhibits admitted into evidence. A complete list of all witnesses providing testimony during these proceedings (whether by live testimony or deposition transcript) and all exhibits admitted into evidence is set forth in this Court's minute entries dated February 22, 2010 and February 26, 2010. *See* Rec.Doc.# s 1258 and 1497.

3   This Court's Jurisdictional Rulings are supported by the evidentiary record created by the parties and at oral argument. The evidentiary record submitted by the parties includes:
    • The exhibits to Taishan's Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint, *see* Rec.Doc.# s 13490–2 to 13490–29;
    • The exhibits to Taishan's renewed motion pursuant to rules 55(c) and 12(b)(2) to vacate the entry of default and dismiss this action, *see* Rec.Doc.# s 13566–2 to 13566–15;
    • The exhibits to Defendants Taishan Gypsum Co. Ltd. and Tai'an Taishan Plasterboard Co., Ltd.'s motion pursuant to Rule 12(b)(2) to Dismiss the Complaint, *see* Rec.Doc.# s 13590–2 to 13590–31;
    • The exhibits to Defendants Taishan Gypsum Co. Ltd. and Tai'an Taishan Plasterboard Co., Ltd.'s motion pursuant to Rule 12(b)(2) to Dismiss the Complaint, *see* Rec.Doc.# s 13591–2 to 13591–31;

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/12/19 Page 16 of 17
In re: Chinese Manufactured Drywall Products Liability Litigation, Not Reported in... Page 16 of 17 PageID #: 708

2014 WL 4809520

- The exhibits appended to the PSC's Response in Opposition to Taishan Gypsum Co., Ltd.'s Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint, *see* Rec.Doc.# s 14202–1 and 14202–2;
- Plaintiffs' Expert Declarations of Professor Liu Junhai, Bing Cheng and Professor James V. Feinerman in Support of the PSC's Response in Opposition to: (1) Taishan's Renewed Motions to Vacate the Default Judgments and Dismiss the Complaints in *Germano* and *Mitchell* and (2) Taishan's Motions to Dismiss the Complaints in *Gross* and *Wiltz, see* Rec.Doc. # 14203;
- The exhibits to the PSC's Response in Opposition to Taishan's Motions Pursuant to Rule 12(b)(2) to Dismiss Complaints, *see* Rec.Doc. # s 14204–1 to 14204–3;
- The PSC's Global Statement of Facts and exhibits thereto, *see* Rec.Doc. # 14215;
- The exhibits to Interior Exterior's Memorandum in Support of the PSC's Response in Opposition to Taishan's Motions Pursuant to Rule 12(B)(2) to Dismiss and to Provide Additional Support in Response Thereto, *see* Rec.Doc. # s 14356–1 and 14356–2;
- The exhibits to RESPONSE/MEMORANDUM in Opposition filed by Mitchell Company Inc. re MOTION to Vacate the Default Judgment and Dismiss the Complaint, *see* Rec.Doc.# s 14372–1 to 14372–10;
- The exhibit to Certain Florida Homebuilders' Amicus Curiae Response to Taishan Gypsum Co. Ltd.'s Renewed Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate the Entry of Default and Dismiss this Action, *see* Rec.Doc.# s 14390–1 to 14390–26;
- The exhibits to the Memorandum of Taishan Gypsum Co. Ltd. in Reply to Plaintiffs' Opposition to the Renewed Motion to Vacation the Default Judgment and Dismiss the Complaint, *see* Rec.Doc.# s 14572–1 to 14572–12;
- The exhibits to the Memorandum of Taishan Gypsum Co. Ltd. in Reply to Plaintiffs' Opposition to the Renewed Motion to Vacate the Default Judgment and Dismiss this Action, *see* Rec.Doc.# s 14573–1 to 14573–12;
- The exhibits to the Memorandum of Defendants Taishan Gypsum Co. Ltd. and Tai'an Taishan Plasterboard Co., Ltd. in Reply to Opposition to Their Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint, *see* Rec.Doc. # s 14575–1 to 14575–11; and
- The exhibits to the Memorandum of Defendants Taishan Gypsum Co. Ltd. and Tai'an Taishan Plasterboard Co., Ltd. in Reply to Opposition to Their Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint. *See* Rec.Doc. # s 14574–1 to 14574–11.

4   With the exception of TTP none of the other Taishan Affiliates entered an appearance or otherwise participated in these proceedings. While the discovery involving TTP established that Plaintiffs properly pierced the corporate veil as to TTP, the Plaintiffs were unable to proceed with any discovery involving the other Taishan Affiliates in light of their default status.

5   In addition to the above findings, the PSC served Taishan and TPP with a Request for Admissions on July 21, 2014. *See* Exhibit "A" (hereinafter "Request for Admissions") to Notice of Filing (Admission of Fact by Taishan Gypsum Co., Ltd. f/k/ a Shandong Taihe Dongxin Co., Ltd. to Request for Admissions Dated July 21, 2014), Rec.Doc. # 17993. Since neither Taishan nor TPP timely responded to the PSC's Request for Admissions within 30 days after being served, the Request for Admissions are deemed admitted in accordance with Fed.R.Civ.P. 36(a)(3).

6   *See Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,* Case No. 09–6687 (E.D.La.); *Gross, et al. v. Knauf Gips, KG, et al.,* Case No. 09–6690 (E.D.La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.,* Civ. Action No. 10–361 (E.D.La); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–080 (E.D.La) (service of this complaint on the Taishan Defendants is ongoing); *Haya, et al. v. Taishan Gypsum Corp. Ltd., et al.,* Civ. Action No. 11–1077 (E.D.La.) (service of this complaint on the Taishan Defendants is ongoing); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.,* Civ. Action. 12–0498 (E.D.La.) (service of this complaint on the Taishan Defendants is ongoing); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1395 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1673 (E.D.La.).

7   It is noteworthy that intervenor Knauf, prior to withdrawing from the *Germano* proceedings, vigorously contested Plaintiffs' evidence on the scope of remediation and cost of remediation through the process of filing expert reports, cross-examining Plaintiffs' experts at depositions, and filing *Daubert* challenges against Plaintiffs' remediation and damages experts (which were denied). FOFCOL at 5–6.

8   Various courts consider *ascertainability* to be a requirement under Rule 23. Ascertainability pertains to the ability of the court based on record evidence to utilize objective criteria to determine who is a class member (and who is not). The Fifth Circuit has referred to ascertainability as an "implied prerequisite of Rule 23." *National Security Fire and Casualty Company, 501 F.3d 443, 445 (5t Cir.2007); see also DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir.1970)* ("It is

elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."); *In re A.H. Robins Co., Inc.,* 880 F.2d 709, 728 (4th Cir.1989); *Simer v. Rios,* 661 F.2d 655, 669 (7th Cir.1981);* 5 James W. Moore, et al., MOORE'S FEDERAL PRACTICE § 23.21[1], at 23–47 (Matthew Bender 3d ed. 1997) ("It is axiomatic that in order for a class action to be certified, a class must exist ."). Because this class action seeks certification of a class comprised of active litigants, all class members are presently before the Court. The identification of these class members is easily verifiable by reference to the PSC's Omnibus Class Action Complaints or the complaints in intervention thereto. *See Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,* Case No. 09–6687 (E.D.La.); *Gross, et al. v. Knauf Gips, KG, et al.,* Case No. 09–6690 (E.D.La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.,* Civ. Action No. 10–361 (E.D.La); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–080 (E.D.La); *Haya, et al. v. Taishan Gypsum Corp. Ltd., et al.,* Civ. Action No. 11–1077 (E.D.La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.,* Civ. Action. 12–0498 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1395 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11–1673 (E.D.La.).

9 The claims process in the instant proceedings will be especially streamlined since the parties are already in possession of data needed to establish: (1) product identification for each claimant; and (2) the square footage of each property impacted by the Taishan Defendants' defective drywall.

10 The Fifth Circuit in *Castano* advised that a district court's superiority analysis should include consideration of the negative impact upon a defendant of certification of a mass tort. *Castano,* 84 F.3d at 746. The court noted that class certification magnifies unmeritorious claims, increases plaintiffs' damage awards, and creates "insurmountable pressure" upon defendants to settle—all of which could be tantamount to "judicial blackmail." *Id.* As noted above, this Court has recognized that the types of claims represented herein are meritorious. FOFCOL at 17–59. In addition, Taishan's contemptuous refusal to appear at the judgment debtor proceedings, should serve to alleviate concern that this particular defendant is experiencing pressure of any kind to resolve these claims, due to so-called "judicial blackmail" or otherwise.

11 Moreover, in light of the JPML's Order transferring these cases and consolidating them before this Court pursuant to 28 U.S.C. § 1407, "[t]his factor should ... be of little or no significance in resolving the superiority issue." NEWBERG ON CLASS ACTIONS, § 4:31. The JPML previously considered, pursuant to 28 U.S.C. § 1407, the desirability of centralizing the Chinese Drywall litigation in this particular forum.

12 For administrative reasons the class definition is limited to the actions in *Amorin, Germano, Gross* and *Wiltz.* All class members are named plaintiffs in the *Amorin* actions.

---

**End of Document**        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# JOINT APPENDIX TAB # 9

**MINUTE ENTRY**
**FALLON, J.**
**MARCH 26, 2015**

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | : | **MDL NO. 2047** |
| **IN RE: CHINESE-MANUFACTURED DRY WALL** | : | |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION:  L** |
| | : | |
| | : | **JUDGE FALLON** |
| | : | **MAG. WILKINSON** |
| .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. | : | |

**THIS DOCUMENT RELATES TO ALL CASES**

The monthly status conference was held on this date in the Courtroom of District Judge Eldon E. Fallon.  Prior to the conference, the Court met with liaison counsel and the chairs of the steering committees.  Liaison Counsel reported to the Court on the topics set out in Joint Report No. 66.  (Rec. Doc. 18538).  The conference was transcribed by Ms. Terri Hourigan, Official Court Reporter.  Counsel may contact Ms. Hourigan at (504) 589-7775 to request a copy of the transcript.

### I.      PRE-TRIAL ORDERS

The Court has issued the following Pre-Trial Orders:

Pre-Trial Order No. 1 entered June 15, 2009 – Initial Case Management

Pre-Trial Order No. 1A entered August 28, 2009 – Counsel must Enter Appearances for Served Parties or risk Default Judgment

Pre-Trial Order No. 1B entered October 9, 2009 – Amending Pre-Trial Order No. 1

JS10(00:90)

to clarify the preservation of physical evidence during home remediation.

Pre-Trial Order No. 1C entered November 24, 2009 – Lifting the stay on motion practice, but continuing all motions filed in the MDL without date. Pursuant to a November 25, 2009 Order, all motion practice in the *Gross* matter (09-6690) is stayed.

Pre-Trial Order No. 1D entered January 8, 2010 – Clarifies Pre-Trial Order 1C and lifts the stay with regard to responsive pleadings.

Pre-Trial Order No. 1E entered February 12, 2010 – Regarding stay of responsive pleadings in *Gross.*

Pre-Trial Order No. 1F entered March 9, 2010-Clarifying the deadline dates for responsive pleadings, notices of appearance, profile forms, and alleviating the need to file motions for extensions in all cases.

Pre-Trial Order No. 1G entered May 27, 2010-Further clarifying deadlines for notices of appearances, profile forms, and responsive pleadings in all cases.

Pre-Trial Order No. 1H entered October 22, 2010-Regarding the PSC's Notice of Completion to the Omni Complaints

Pre-Trial Order No. 1I entered January 24, 2012 – Preservation of Physical Evidence

Pre-Trial Order No. 1J entered March 20, 2015 – Preservation and Disposal of Physical Evidence

Pre-Trial Order No. 2 entered June 16, 2009 – Notice to Transferor Court

Pre-Trial Order No. 2A entered September 18, 2009 – Means of Tracking Remands in MDL 2047

Pre-Trial Order No. 3 entered July 6, 2009 – Designation of Plaintiffs' Liaison Counsel

Pre-Trial Order No. 4 entered July 6, 2009 – Designation of Defendants' Liaison Counsel

Pre-Trial Order No. 5 entered July 6, 2009 – Contact Information

Pre-Trial Order No. 5A entered July 9, 2009 – Counsel Contact Information Form

Pre-Trial Order No. 6 entered July 21, 2009 – Electronic Service (LexisNexis)

Pre-Trial Order No. 7 entered July 27, 2009 – Appointment Defendants' Steering Committee

Pre-Trial Order No. 7A entered August 4, 2009 – Amending PTO 7 re: Defendants' Steering Committee

Pre-Trial Order No. 7B entered August 27, 2009 – Amending PTO 7 re: list containing Defendants' Steering Committee and lists responsibilities for same

Pre-Trial Order No. 8 entered July 28, 2009 – Appointing Plaintiffs' Steering Committee

Pre-Trial Order No. 8A entered January 11, 2011 – Appointing Plaintiffs' Steering Committee for a one year term, beginning January 11, 2011.

Pre-Trial Order No. 8B entered March 19, 2012 – Appointing Plaintiffs' Steering Committee for a one year term, beginning March 19, 2012.

Pre-Trial Order No. 8C entered March 12, 2013 – Appointing Plaintiffs' Steering Committee for a one year term, beginning March 12, 2013.

Pre-Trial Order No. 8D entered April 7, 2014 – Appointing Plaintiffs' Steering Committee for a one year term, beginning April 7, 2014.

Pre-Trial Order No. 9 entered July 28, 2009 – Time and Billing Guidelines/Submissions

Pre-Trial Order No. 9A entered March 16, 2012 – Reporting of Common Benefit Time by State Court Counsel.

Pre-Trial Order No. 10 entered August 21, 2009 – All parties to provide PLC or DLC with photographic catalog of markings, brands, endtapes and other identifying markers found in affected homes by August 26, 2009. PSC and DSC to collect and submit data to the Court and inspection company for TIP a joint catalog of data to assist in training of inspections no later than August 28, 2009.

Pre-Trial Order No. 11 entered August 17, 2009 - Profile forms to be distributed to appropriate parties and filed and returned on or before September 2, 2009

Pre-Trial Order No. 12 entered August 25, 2009 – Court will prepare final version of Distributor Profile Form.

Pre-Trial Order No. 12A entered August 25, 2009 – Court adopted Distributor Profile Form be distributed to appropriate parties and returned to DLC Kerry Miller

on or before 9/8/09, either electronically or by hard copy

Pre-Trial Order No. 13 entered August 27, 2009 – Court institutes and will supervise Threshold Inspection Program (TIP). Court appoints Crawford & Company to carry out the inspections.

Pre-Trial Order No. 13(A) entered November 24, 2009 – Amending the Threshold Inspection Program (TIP).

Pre-Trial Order No. 14 entered September 24, 2009 - Court approves Exporter, Importer or Broker Profile Form, and provides requirements for issuance and return of the form.

Pre-Trial Order No. 14(A) entered October 13, 2009 – Court approves a revised Exporter, Importer or Broker Defendant Profile Form.

Pre-Trial Order No. 15 entered September 25, 2009 – Counsel must provide privilege log for documents withheld in response to discovery requests. Also, the accidental production of privileged information does not constitute a waiver of the privilege.

Pre-Trial Order No. 16 entered September 25, 2009 – Pertains to the disclosure, use and protection of confidential information produced during the course of this MDL.

Pre-Trial Order No. 17 entered November 2, 2009 – Recognizing and Confirming KPT's Agreement to Accept Service of PSC's Omnibus Class Action Complaint.

Pre-Trial Order No. 18 entered November 5, 2009 – Appointing Phillip A. Wittmann to be the Homebuilders and Installers Liaison Counsel.

Pre-Trial Order No. 19 entered March 18, 2010—Appointing a State and Federal Coordination Committee.

Pre-Trial Order No. 20 entered April 6, 2010 – Appointment of Insurer Steering Committee.

Pre-Trial Order No. 21 entered April 6, 2010 – Retailer Profile Form.

Pre-Trial Order No. 22 entered April 27, 2010 – Privileged communications relating to PTO 20.

Pre-Trial Order No. 23 entered April 27, 2010 – Insurer Profile Form.

Pre-Trial Order No. 24 entered April 27, 2010 – Subpoenas/30(b)(6) depositions issued re insurance.

-4-

Pre-Trial Order No. 25 entered November 3, 2011 – Setting November 15, 2011 deadline for submission of profile forms.

Pre-Trial Order No. 26 entered March 29, 2012 – Appointing a self-remediated homes committee, creating a self-remediated homes pilot program, and setting April 28, 2012 deadline for submission of documentation for self-remediated homes.

Pre-Trial Order No. 27 entered September 10, 2013 – Establishment of System for Creating and Tracking Chinese Drywall Settlement Program Claims Administration Procedures.

Pre-Trial Order No. 28 entered January 10, 2014 – Attorney Fee and Cost Reimbursement Guidelines (with Exhibits A, B and C)

Pre-Trial Order No. 28(A) entered January 27, 2014 – Clarification of Pre-Trial Order No. 28 (Attorney Fee and Cost Reimbursement Guidelines)

Pre-Trial Order No. 28(B) entered March 25, 2014 – Extending some deadlines outlined in Pre-Trial Order No. 28.

Pre-Trial Order No. 28(C) entered April 28, 2014 – Extending some deadlines outlined in Pre-Trial Order No. 28 and extended in Pre-Trial No. 28(B).

Pre-Trial Order No. 28(D) entered July 9, 2014 – Appointing Leonard A. Davis of Herman Herman & Katz, LLC as the Assistant Secretary of the Fee Committee.

Pre-Trial Order No. 28(E) entered October 6, 2014 – Extending and modifying deadlines outlined in Pre-Trial Order Nos. 28, 28(A), 28(B) and/or 28(C).

Pre-Trial Order No. 29 entered December 23, 2014 – Order approving procedure for payment of Other Loss Claims.

II.     STATE COURT TRIAL SETTINGS

 Norfolk, VA trial settings:

1.  *Nguyen v. Venture Supply, Inc., et al.*, Case No. CL09-3105, set for a 2 day trial period beginning March 30, 2015.

2.  *Jackson v. Harbor Walk Development, LLC, et al.*, Case No. CL09-4672, set for a 1 day trial on April 6, 2015.

3.  *Brown v. HHJV, LLC, et al.*, Case No. CL09-6331, set for a 1 day trial on April 7, 2015.

-5-

III.     STATE/FEDERAL COORDINATION

On March 18, 2010, the Court entered Pre-Trial Order No. 19 appointing State and Federal Coordination Committees. The parties will be prepared to discuss State/Federal coordination at the monthly status conference on March 26, 2015.

IV.     OMNIBUS CLASS ACTION COMPLAINTS

The following is a list of filed Omni Complaints and Complaints in intervention:

Omni I:  *Sean and Beth Payton, et al v. Knauf Gips KG, et al,* Case No. 2:09-cv-07628 (E.D.La.). Omni IA, IB and IC have been filed. Numerous Motions to Dismiss have been filed.

Omni II: *Kenneth and Barbara Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civil Action No.10-361(E.D.La.). Omni IIA, IIB and IIC have been filed. Numerous Motions to Dismiss have been filed.;

Omni III: *Gross, et al. v. Knauf Gips, K.G., et al.*, Case No. 09-6690 (E.D.La.), the PSC filed a Motion in Intervention (attaching a proposed Complaint in Intervention, *Mary Anne Benes, et al. v. Knauf Gips, K.G., et al.,* (E.D.La.) (Omni III). Omni IIIA has been filed. Numerous Motions to Dismiss have been filed.

Omni IV:  *Joyce W. Rogers, et al. v. Knauf Gips, K.G., et al.*, Case No. 10-362 (E.D.La.) (Omni IV). Omni IVA, IVB and IVC have been filed. Numerous Motions to Dismiss have been filed.

Omni V:  *Amato v. Liberty Mutual Ins. Co., et al.*, Case No. 10-932. Numerous Motions to Dismiss have been filed. On January 14, 2015, Plaintiffs filed a Motion to Amend Complaint by Interlineation [Rec. Doc. 18263]. On February 10, 2015 the Court issued an Order [Rec. Doc. 18317] setting the motion for submission, with oral argument, following the March 26, 2015 status conference.

Omni VI:  *Charlene and Tatum Hernandez v. AAA Insurance*, Case No. 10-3070. This Omni VI Complaint has been dismissed;

Omni VII: *Kenneth Abel v. Taishan Gypsum Co., Ltd., et al,* No. 11-080.  Numerous Motions to Dismiss have been filed.

Omni  VIII: *Daniel Abreu v. Gerbrueder Knauf, et al,* No. 11-252.   Numerous Motions to Dismiss have been filed.

Omni IX:   *Laura Haya, et al, v. Taishan Gypsum Co., Ltd., et al,* No. 11-1077.  Numerous Motions to Dismiss have been filed.

Omni X:   *Block v. Gebrueder Knauf Verwaltungsgesellschaft KG, et al*, No. 11-1363.  Numerous Motions to Dismiss have been filed.

Omni XI:  *Benoit, et al v. Lafarge, S.A., et al*, No. 11-1893.  Numerous Motions to Dismiss have been filed.

Omni XII: *Arndt, et al v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al,* No. 11-2349.  Numerous Motions to Dismiss have been filed.

Omni XIII:       *Richard and Constance Almeroth, et al, v. Taishan Gypsum Co., Ltd., et al,* No. 12-0498.  Numerous Motions to Dismiss have been filed.

Omni XIV: *Jessica Cassidy, et al v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al,* No. 11-3023.  Numerous Motions to Dismiss have been filed.

Omni XV:  *Eduardo and Carmen Amorin, et al v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al*, No. 11-1672.

Omni XVI:  *Eduardo and Carmen Amorin, et al v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al*, No. 11-1395.

Omni XVII:  *Eduardo and Carmen Amorin, et al v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al*, No. 11-1673.

Omni XVIII:  *Paul Beane, et al v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al,* No. 13-609.  On June 6, 2013, the PSC filed a Motion for Leave to File Plaintiffs' First Supplemental and Amended Omnibus Class Action Complaint (XVIII) [Rec. Doc. 16892], which was granted on June 10, 2013 [Rec. Doc. 16896].  On June 10, 2013, the PSC filed a Motion for Leave to File Plaintiffs' Second Supplemental and Amended Omnibus Class Action Complaint (XVIII) [Rec. Doc. 16895], which was granted on June 11, 2013 [Rec. Doc. 16906].  On July 8, 2013, the PSC filed a Motion for Leave to File Plaintiffs' Third Supplemental and Amended Omnibus Class Action Complaint (XVIII) [Rec. Doc. 16933], which was granted on July 9, 2013 [Rec. Doc. 16935].  On July 30, 2013, the PSC

filed a Motion for Leave to File Plaintiffs' Fourth Supplemental and Amended Omnibus Class Action Complaint (XVIII) [Rec. Doc. 16965], which was granted on July 31, 2013 [Rec. Doc. 16970]. On July 31, 2013, the PSC filed a Motion for Leave to File Plaintiffs' Fifth Supplemental and Amended Omnibus Class Action Complaint (XVIII) [Rec. Doc. 16967], which was granted on August 13, 2013 [Rec. Doc. 17004].

Omni XIX:    *Eduardo and Carmen Amorin, et al v. The State-Owned Assets Supervision and Administration Commission of the State Council, Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al*, No. 14-1727.

On April 5, 2013, the PSC filed a Rule 6(b) Motion for Extension of Time for Service of Process Under Rule 4(m) [Rec. Doc. 13567].

On July 23, 2014, an Plaintiffs' Omnibus Motion for Class Certification Pursuant to Rules 23(a)(1)-(4) and 23(b)(3) was filed [Rec. Doc. 17883] and the Court issued an Order [Rec. Doc. 17882]. A hearing took place on September 18, 2014 and on September 26, 2014, the Court issued Findings of Fact and Conclusions of Law With Respect to Plaintiffs' Omnibus Motion for Class Certification Pursuant to Rules 23(a)(1)-(4) and 23(b)(3) [Rec. Doc. 18028], which also issued Legal Notice [Rec. Doc. 18028-1]. Notices were sent in accordance with the Court's Order.

V.    CLASS ACTION COMPLAINT

On November 13, 2014, a Class Action Complaint entitled *Bennett, et. al v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et. al,* case number 5:14-cv-2204, was filed in the United States District Court for the Northern District of Alabama, naming certain Knauf entities as defendants. The Complaint seeks alleged damages for "[A]ll owners and residents (past and present) of real property located in the United States containing problematic/defective Chinese drywall manufactured, sold, distributed, and/or supplied by Knauf." The action has been transferred to the assigned MDL Court. Counsel for the Knauf entities has reviewed the Complaint and note that some

putative class representatives are currently undergoing remediation pursuant to Option 1 or Option 2 of the Knauf Class Settlement Agreement.

VI.    PLAINTIFFS' MOTIONS TO ESTABLISH A PLAINTIFFS'
       LITIGATION FEE AND EXPENSE FUND

On March 22, 2011, the PSC filed a Motion to Establish a Court Supervised Account for Voluntary Deposit of Funds to Compensate and Reimburse Common Benefit Counsel [Rec. Doc. 8308].    The PSC filed the motion because many of the settling parties have approached the PSC about the prospect of setting aside a portion of the settlement proceeds to preserve a *res* to compensate and reimburse common benefit counsel.  On April 13, 2011, the Court entered an Order directing that any party may voluntarily deposit seventeen percent (17%) of settlement proceeds for comment benefit fees (12%) and costs (5%) into the registry of the Court [Rec. Doc. 8545.]   A number of voluntary deposits have been made to the Clerk of Court pursuant to the motion.

VII.   REMEDIATION PROGRAM

The Lead Contractor in the Knauf settlements, Moss & Associates, continues to estimate the cost of remediation for homes.  Remediation is complete on 2,527 homes and condominiums, work has begun on 71 homes and condominiums, and 29 more remediations are set to begin soon.  Homeowners and/or counsel with questions about remediations are encouraged to call the helpline created by Moss & Associates at 1-888-91 MOSSUSA (1-888-916-6778).

To date, Moss has mailed out 3,362 Work Authorization packets to homeowners in the various states.  Moss has received 2,643 executed Work Authorization packets, and 49 Work Authorization packets are outstanding.

The parties will be prepared to discuss this further at the monthly status conference on March 26, 2015.

VIII.    INEX, BANNER, KNAUF, L&W and GLOBAL SETTLEMENTS

On February 7, 2013, the Court entered an Order and Judgment:  (1) Certifying the INEX, Banner, Knauf, L&W, and Global Settlement Classes, and (2) Granting Final Approval to the INEX, Banner, Knauf, L&W, and Global Settlements [Rec. Doc. 16570].  On February 19, 2013, the Court issued an Order Correcting Clerical Error [Rec. Doc. 16580] in the February 7, 2013 Order [16570].

On March 13, 2013, the PSC and Settlement Class Counsel filed a Motion for an Order:  (1) Appointing Allocation Committees for the INEX and Global Settlements; and (2) Approving Allocation Plans for the INEX, Banner and Global Settlements [Rec. Doc. 16609].  On March 15, 2013, the Court entered an Order and Judgment:  (1) Appointing Allocation Committees for the INEX and Global Settlements; and (2) Approving Allocation Plans for the INEX, Banner and Global Settlements [Rec. Doc. 16616].   On April 24, 2013, the Court entered an Order and Judgment (1) Appointing Allocation Committees for the INEX and Global Settlements; and (2) Approving Allocation Plans for the INEX, Banner and Global Settlements [Rec. Doc. 16782].

The registration period for the Knauf, Banner, INEX, Global, and/or L&W Class Settlements expired on July 8, 2013.  On May 23, 2013, the Court issued an Order [Rec. Doc. 16877] outlining the process for submission of claims, which process began on May 27, 2013. On September 27, 2013, the Court issued an Order extending the Claims Submission period up until and through October 25, 2013 [Rec. Doc. 17157].  On February 18, 2015, the Court issued an Order

-10-

[Rec. Doc. 18356] stating "the Court will make a final ruling regarding the status of any late-filed claims at the March status conference."

BrownGreer, the court appointed Settlement Administrator, has had several telephone and in-person meetings with various counsel to address issues regarding the claims process. A representative from BrownGreer will be present at the status conference to address settlement claims issues. BrownGreer filed Notices of Approved Claims Administrator Procedures [Rec. Doc. 17090 and 17160], which included:

1. CAP 2013-1(September 12, 2013) – Establishes a CAP process and sets out the procedures for issuing CAPs.

2. CAP 2013-2 (September 12, 2013) - Sets out a detailed explanation of how the Settlement Administrator will review claims for indicia of Chinese Drywall and other facts related to builder, supplier and installer information for an Affected Property and adopts an Affected Property Information Affidavit for use by Claimants who do not have documentary evidence of their builder, supplier or installer.

3. CAP 2013-3 (September 12, 2013) - Sets out a detailed explanation of the procedure that the Settlement Administrator will follow in processing incomplete claims, including establishment of time frames to cure deficiencies.

4. CAP 2013-4 (October 1, 2013) – Sets forth the timing by which claimants, the Knauf Defendants or the Lead Contractor may request mediation with the Special Master pursuant to Knauf Settlement Agreement.

5. CAP 2013-5 (October 1, 2013) – Sets out a detailed explanation of the appellate procedure available to claimants after the Settlement Administrator issues an Eligibility, Denial, or Incompleteness Denial for a claim.

6. CAP 2013-6 (January 2, 2014) – Sets forth the timing by which claimants may supplement claims made after the October 25, 2013 deadline.

7. CAP 2014-7 (April 21, 2014) – Deadline for return of Work Authorization Packets for Option 1 remediation and all documentation for Option 2 or 3 pursuant to the Knauf Class Settlement.

8. CAP 2014-8 (July 15, 2014) – Sets forth the proof requirements for the claims submitted by the Knauf Defendants for payment out of the Global, Banner, and INEX settlements.

9. CAP 2014-9 (September 11, 2014) – Distribution of funds from the Global, Banner, and Inex Repair and Relocation Qualified Settlement Funds.

On August 12, 2013, a Joint Notice of Filing of Settlement Documents was filed by PLC and DLC [Rec. Doc. 16978] attaching the Settlement Agreement Regarding Post-December 9, 2011 Claims Against the Knauf Defendants in MDL No. 2047, with attached exhibits. On October 3, 2013, a Joint Motion and Incorporated Memorandum to Substitute Fourth Amendment to Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047 was filed with the Court [Rec. Doc. 17165]. On November 1, 2013, the Court issued an Order approving the Motion to Substitute the Fourth Amendment [Rec. Doc. 17220].

On August 19, 2013, Class Counsel filed a Motion to Establish Various Qualified Settlement Funds (QSFs) and to Appoint Fund Administrator and Depository Bank relating to the Global, Knauf, Banner, InEx and L&W Settlements [Rec. Doc. 17009]. On September 9, 2013, the Court issued various Orders approving the QSFs [Rec. Docs. 17064 thru 17076].

On October 31, 2013, the Court issued an Order in connection with the Knauf Settlement substituting the Whitney National Bank as Escrow Agent in place of U.S. Bank in connection with the depository bank for the Remediation Fund [Rec. Doc. 17219].

On September 25, 2013, Class Counsel and Insurance Liaison Counsel filed a Joint Motion to Disburse Settlement Funds [Rec. Doc. 17152] in connection with the Global Settlement, and on October 21, 2013, the Court issued an Order [Rec. Doc. 17178].

On October 23, 2013, Class Counsel and counsel for InEx filed a Joint Motion to Disburse Settlement Funds [Rec. Doc. 17185] in connection with the InEx settlement. On

-12-

November 5, 2013, the Court issued an Order granting the Motion [Rec. Doc. 17228].

On November 7, 2013, the Court issued an Order requiring all settling defendants in the various settlements to deposit their settlement proceeds into the Court registry [Rec. Doc. 17236]. Philip Garrett has performed an analysis of the various settlements and the funding, and Class Counsel filed a Motion to Authorize Deposit of Settlement Funds on December 12, 2013 [Rec. Doc. 17321]. On January 17, 2014, the Court issued an Order authorizing the deposit of the settlement funds into the various QSFs [Rec. Doc. 17398] and on February 11, 2014 the Court issued an Amended Order [Rec. Doc. 17426].

On April 3, 2014, an Order was issued [Rec. Doc. 17590] directing all Class Members who are participating in the Various Settlements to administratively dismiss all state court cases.

On October 23, 2014, The Fee Committee's Inspection Costs and Hold Back Motion Pursuant to Pre-Trial Order No. 28(E) was filed with the Court [Rec. Doc. 18081]. An Order was issued on November 18, 2014 setting the motion for hearing, with oral argument, following the December 17, 2014 status conference [Rec. Doc. 18141]. On December 18, 2014, the Court entered an Order granting the Fee Committee's Inspection Cost and Hold Back Motion [Rec. Doc. 18215].

The parties will be prepared to discuss these matters further at the status conference on March 26, 2015.

IX.   SHARED COSTS FUND

On December 28, 2011, the Plaintiffs' Steering Committee filed a Motion to Establish a Shared Costs Fund [Rec. Doc. 12086] in compliance with the Knauf Settlement. On December 29, 2011, the Court entered an Order [Rec. Doc. 12102] authorizing Russ M. Herman, Plaintiffs'

Liaison Counsel, and Arnold Levin, Plaintiff's Lead Counsel, to establish a Shared Costs Fund with

Esquire Bank. The Shared Costs Fund has been established. On July 3, 2012, the PSC filed a

Second Motion for Disbursement of Funds From the MDL 2047 PSC Shared Costs Fund (For

Expenses) [Rec. Doc. 15209]. On July 9, 2012, the Court entered an Order granting the motion

[Rec. Doc. 15231]. On November 9, 2012, the PSC filed a Third Motion for Disbursement of Funds

From the MDL 2047 PSC Shared Costs Fund [Rec. Doc. 16145]. On November 29, 2012, the Court

entered an Order granting the motion [Rec. Doc. 16329]. On January 16, 2013, the PSC filed a

Fourth Motion for Disbursement of Funds From the MDL 2047 Costs Fund [Rec. Doc. 16506]. On

February 4, 2013, the Court entered an Order granting the motion [Rec. Doc. 16555].

The parties will be prepared to discuss this further at the monthly status conference

on March 26, 2015.

## X.     TAISHAN DEFENDANTS

On September 4, 2012, the Court issued an Order & Reasons [Rec. Doc. 15755]

denying Defendant Taishan Gypsum Co., Ltd.'s Renewed Motion to Vacate the Default Judgment

and Dismiss the Complaint [Rec. Doc. 13490] relating to *Germano, et al vs. Taishan Gypsum Co.,*

*Ltd., et al* (EDLA No. 09-6687), Renewed Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate

Entry of Default and Dismiss This Action [Rec. Doc. 13566] relating to *The Mitchell Co., Inc. vs.*

*Knauf Gips KG, et al* (EDLA No. 09-4115), and Motion Pursuant to Rule 12(b)(2) to Dismiss the

Complaint relating to *Gross vs. Knauf Gips KG, et al* (EDLA No. 09-6690) [Rec. Doc. 13590] and

*Wiltz vs. Beijing New Building Materials Public, Ltd. Co., et al* (EDLA No. 10-361) [Rec. Doc.

13591]. In addition, Judge Farina issued an Order on August 31, 2012 denying Taishan Gypsum

Co., Ltd.'s Motion to Vacate the Entry of Default and to Dismiss the Complaint, in the matter of

*Lennar Homes, LLC, et al vs. Knauf Gips KG, et al*, In the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Chinese Drywall Division, Case No.: 09-07901 CA 42.

On September 14, 2012, Taishan Gypsum Co., Ltd. filed a Motion Pursuant to 28 U.S.C. § 1292(b) to Certify the Court's Order & Reasons for Interlocutory Appeal and Stay Further Proceedings Pending the Appeal in the *The Mitchell Co., Inc. vs. Knauf Gips KG, et al* (EDLA No. 09-4115) matter [Rec. Doc. 15812]. On September 14, 2012, Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd. filed a Motion Pursuant to 28 U.S.C. § 1292(b) to Certify the Court's Order & Reasons for Interlocutory Appeal and Stay Further Proceedings Pending the Appeal in the *Gross vs. Knauf Gips KG, et al* (EDLA No. 09-6690) and *Wiltz vs. Beijing New Building Materials Public, Ltd. Co., et al* (EDLA No. 10-361) matters [Rec. Doc. 15813]. On October 16, 2012, the Court issued an Order & Reasons granting these Motions [Rec. Doc. 15952].

On October 24, 2012, Taishan Gypsum Co. Ltd. and Tai'an Taishan Plasterboard Co., Ltd. filed a Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b) with the United States Court of Appeals, Fifth Circuit, in the *Gross vs. Knauf Gips KG, et al* matter. On October 25, 2012, Taishan Gypsum Co. Ltd. and Tai'an Taishan Plasterboard Co., Ltd. filed a Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b) with the United States Court of Appeals, Fifth Circuit, in the *Wiltz vs. Beijing New Building Materials Public, Ltd. Co., et al* matter. On October 26, 2012, Taishan Gypsum Co. Ltd. filed a Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(B) with the United States Court of Appeals, Fifth Circuit, in *The Mitchell Co., Inc. vs. Knauf Gips KG, et al* matter. On December 4, 2012, the Fifth Circuit granted Taishan's Motion for Leave to Appeal. The case number for the Fifth Circuit Court of Appeals regarding the *Gross, Mitchell* and *Wiltz*

-15-

matters is No. 12-31213. These three (3) consolidated appeals were argued in Houston, Texas, on February 5, 2014. On May 20, 2014, the Fifth Circuit issued an opinion affirming the District Court [Document: 00512636188]. On June 11, 2014, a mandate was issued affirming the Judgment of the District Court and filed with the United States District Court, Eastern District of Louisiana [Rec. Doc. 17756].

On October 2, 2012, Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. filed a Notice of Appeal in the *Germano, et al vs. Taishan Gypsum Co., Ltd., et al* (EDLA No. 09-6687) [Rec. Doc. 15871]. On October 16, 2012, this appeal (5th Cir. Case No. 12-31017) was consolidated with the previous appeal in *Germano* (5th Cir. Case No. 10-30568). This appeal was heard, with oral argument, before the Fifth Circuit Court of Appeals on Wednesday, October 9, 2013. On January 28, 2014, the Fifth Circuit issued an opinion affirming the District Court [Document: 00512513792]. On February 19, 2014, a mandate was issued affirming the Judgment of the District Court and filed with the United States District Court, Eastern District of Louisiana [Rec. Doc. 17458]. On July 2, 2014, a Bill of Costs was filed with the Court by Plaintiffs [Rec. Doc. 17825], a conference was held on September 18, 2014, the Chief Deputy Clerk issued an Order [Rec. Doc. 18014] allowing the filing of a supplemental memorandum to the Bill of Costs, and on October 3, 2014, the PSC filed a Supplemental Memorandum of Law in Support of Bill of Costs [Rec. Doc. 18034]. On March 23, 2015, the Clerk's Office filed its Bill of Costs and Reason's for Taxation of Costs [Rec. Doc. 18531]. On June 16, 2014, the PSC filed a Motion to Examine Judgment Debtor of Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. [Rec. Doc. 17760]. On June 20, 2014, the Court ordered Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. to appear in open court on July 17, 2014 to be examined as a judgment debtor [Rec. Doc. 17774].

Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination and the Court issued an Order [Rec. Doc. 17869] ordering that Taishan pay $15,000.00 in attorney's fees to Plaintiffs' counsel; that Taishan pay $40,000.00 as a penalty for contempt; that Taishan, and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process, and if Taishan violates the injunction, it must pay a further penalty of 25% of the profits earned by the Company or its affiliate who violate the Order for the year of the violation; and that the Clerk of Court forward the Contempt Order to the U.S. Secretary of Commerce, the Chair of the U.S. Senate Committee on Commerce, Science and Transportation and the U.S. Attorney General so that these officials are aware of the seriousness of the situation, and for any appropriate action they may see fit.  On July 28, 2014, Senator Nelson appeared on the floor of the United States Senate and issued a statement regarding Chinese drywall and the Chinese Government and its companies' moral and legal obligations.  (*See* Congressional Record Vol. 160, No. 119, July 28, 2014, at page S4977.  Additionally, *see* Senator Vitter's comments of July 29, 2014, at page S5044.)

On July 14 and 15, 2014, counsel for Taishan Gypsum Co. Ltd. filed two Motions to Withdraw as Counsel of Record, one in *Germano* and another in eleven other listed cases [Rec. Doc. 17846 and Rec. Doc. 17858].  On July 16, 2014, the PSC filed a Consolidated Opposition to Motions to Withdraw as Counsel of Record [Rec. Doc. 17863] and on July 23, 2014, a Supplemental Memorandum in Support of PSC's Consolidated Opposition to Motions to Withdraw as Counsel of Record was filed [Rec. Doc. 17881].  On August 6, 2014, a Reply Memorandum in Support of Motion to Withdraw as Counsel of Record was filed by Hogan Lovells LLP and Stanley, Reuter, Ross, Thornton & Alford LLC [Rec. Doc. 17938].  On September 2, 2014, the PSC filed a Motion

-17-

for Extension to File Sur-Reply [Rec. Doc. 17984] and on September 3, 2014, the Court issued an Order [17989] granting the motion giving the PSC up until and through thirty (30) days after the Taishan Defendants provide responses to the PSC of discovery propounded to the Taishan Defendants by the PSC. The Motions to Withdraw [Rec. Docs. 17846 and 17858] are to be scheduled for hearing at a later date. On October 10, 2014, the PSC filed a Motion to Compel Document Production for *In Camera* Inspection, which was filed UNDER SEAL. An Order & Reasons was issued by the Court on December 11, 2014, granting in part and denying in part the Motion to Compel [Rec. Doc. 18196]. On December 22, 2014, the PSC filed a Supplemental Memorandum Pursuant to Order & Reasons Dated December 12, 2014 UNDER SEAL. On December 29, 2014, Hogan Lovells LLP and Stanley, Reuter, Ross, Thornton & Alford LLC filed a Response to the Court's Order & Reasons Concerning *In Camera* Review of Privilege Log Items UNDER SEAL. On January 13, 2015, the Court issued an additional Order & Reasons [Rec. Doc. 18256] after conducting an *in camera* review of documents. On January 22, 2015, Hogan Lovells LLP and Stanley, Reuter, Ross, Thornton & Alford LLC filed an Expedited Motion to Stay the Court's January 13, 2015 Order Pending Petition for a Writ of Mandamus [Rec. Doc. 18272]. On January 22, 2015, the Court issued an Order [Rec. Doc. 18275] granting the motion. On February 16, 2015, Plaintiffs and the PSC filed an Answer to the Petition for Writ of Mandamus with the Fifth Circuit Court of Appeal [Document: 00512938024], and on February 20, 2015, the Fifth Circuit issued an Order denying the Petition for Writ of Mandamus [Document: 00512943262]. On March 10, 2015, Hogan Lovells US LLP and Stanley, Reuter, Ross, Thornton & Alford LLC filed a Motion to Set Motions to Withdraw As Counsel of Record For Hearing [Rec. Doc. 18456] and the Court issued an Order [Rec. Doc. 18469] stating the Court will consider the Motion to Withdraw

-18-

immediately following the March 26, 2015 status conference.  On March 23, 2015, the PSC filed

a Motion to Strike Hogan Lovells' Designation of Documents as Highly Confidential [Rec. Doc.

18530].

On February 10, 2015, Plaintiff-Intervenors and the PSC filed a Motion for an

Expedited Hearing to Enforce the Court's July 17, 2014 Contempt Order and Injunction [Rec. Doc.

18302].  On March 2, 2015, Plaintiff-Intervenors and the PSC filed a Supplemental Memorandum

of Law in Support of the motion [Rec. Doc.18433] and on March 9, 2015, filed a Motion to

Substitute a Corrected Supplemental Memorandum in Support of the motion [Rec. Doc. 18447]

(Note: redacted versions were filed publicly and unredacted versions were filed UNDER SEAL).

On March 9, 2015, Taishan Gypsum Ltd. Co. filed a Response in Opposition to the motion [Rec.

Doc. 18451].    On March 11, 2015, the Court issued an Order [Rec. Doc. 18468] that it will

establish a briefing schedule on the Motion to Enforce at the March 26, 2015 status conference.

On September 4, 2014, the Plaintiffs-Intervenors/Judgment Creditors and Putative

Plaintiff Class Members filed a Notice of Filing (Admission of Fact by Taishan Gypsum Co., Ltd.

f/k/a Shandong Taihe Dongxin Co., Ltd. to Request for Admissions dated July 21, 2014) [Rec. Doc.

17993].

On September 2, 2014, the Plaintiffs' Steering Committee propounded Request for

Production of Documents on Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd.

and Taihe Tai'an Plasterboard Co., Ltd. and filed a Motion for Expedited Return on Discovery and

to File Discovery Under Seal [Rec. Doc. 17983].  On September 3, 2014, the Court issued an Order

[Rec. Doc. 17988] granting the motion and ordering the Taishan Defendants to respond to the

Request for Production of Documents issued to it by the PSC no later than 15 days from the issuance

-19-

and ordering the discovery filed under seal.

In connection with enforcement and collection of the Court's Judgment in the *Germano* matter, the PSC issued a number of Notices of Depositions including issuing notices to:

1. Beijing New Building Material (Group) Co. Ltd. [Rec. Docs. 18458 and 18498];
2. Beijing New Building Materials Public Limited Co.[Rec. Docs. 18368 and 18499];
3. China National Building Materials Company Limited [Rec. Docs. 18421 and 18506];
4. China National Building Materials Group Corporation [Rec. Docs. 18420 and 18504];
5. China National Building Materials Import and Export Corporation [Rec. Docs. 18460 and 18503];
6. CNBM (USA) Corp. [Rec. Docs. 18377 and 18513];
7. CNBM Forest Products (Canada) Ltd. [Rec. Docs. 18459 and 18505];
8. CTIEC-TECO American Technology, Inc. [Rec. Docs. 18378 and 18517];
9. New Jersey Institute of Technology [Rec.Doc. 18516];
10. Sunpin Solar Development LLC a/k/a Sunpin Solar LLC [Rec.Doc. 18510];
11. Tai'an Taishan Plasterboard Co., Ltd. ("TPP") [Rec.Doc. 18501 and Rec. Doc. 18522];
12. Taishan Gypsum Co. Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd. [Rec. Docs. 18369 and 18500];
13. United Suntech Craft, Inc. [Rec. Docs. 18379 and 18514];
14. Wal-Mart Stores, Inc. [Rec. Docs. 18363 and 18511];
15. Tommy Li, President Sunpin [Rec. Doc. 18512];
16. Jia Tongchun (chairman of Taishan and board member of BNBM) [Rec.Doc. 18502];
17. Peng Wenlong (Taishan's Chief of Foreign Trade Department) [Rec.Doc. 18502];
18. Chungang Dong (foreign attorney at Jingtian & Gongcheng) [Rec.Doc. 18502];
19. Peng Shou (Chairman of China Triumph, executive director of CNBM and VP of CNBM) [Rec.Doc. 18502];
20. Cao Jianglin (BNBM, BNBM Group, CNBM & CNBM Group) [Rec.Doc. 18502];
21. Song Xhiping a/k/a Sonz Zhiping (CNBM and CNBM Group) [Rec.Doc. 18502];
22. Chang Zhangli (BNBM & CNBM)[Rec.Doc. 18502];
23. Wang Bing (BNBM & CNBM) [Rec.Doc. 18502];
24. JinYu Hu (BNBM & CNBM) [Rec.Doc. 18502];
25. Cui Xingtai (BNBM & CNBM) [Rec.Doc. 18502];
26. JP Morgan Chase & Co. [Rec.Doc. 18304];

-20-

27. Morgan Stanley [Rec.Doc. 18305];
28. The AES Corporation [Rec.Doc. 18312];
29. T. Rowe Price Group, Inc. [Rec.Doc. 18309];
30. Lowe's Companies, Inc. [Rec.Doc. 18361];
31. The Bank of New York Mellon Corporation [Rec.Doc. 18311];
32. Citigroup, Inc. [Rec.Doc. 18303];
33. State Street Corporation [Rec.Doc. 18308];
34. General Growth Properties, Inc. [Rec.Doc. 18310];
35. Costco Wholesale Corporation [Rec.Doc. 18359];
36. Northern Trust Corporation [Rec.Doc. 18306];
37. Amazon.com [Rec.Doc. 18358];
38. Plum Creek Timber Company, Inc. [Rec.Doc. 18307];
39. The Home Depot [Rec.Doc. 18360];
40. Target Corporation [Rec.Doc. 18362];
41. Westerlund Log Handlers, LLC [Rec. Doc. 18525]; and
42. Murphy Overseas USA Astoria Forest Products, LLC [Rec. Doc. 18527].

Several of the depositions have been set on an expedited basis and the PSC is in the process of scheduling and setting up the depositions. On March 24, 2015, the PSC filed a Discovery Plan Regarding Future Discovery Against Taishan and its Affiliates and Status of Discovery Ordered by the Court on March 17, 2015, and the Orders of March 20, 2015 and March 24, 2015 Authorizing Expedited Return on Discovery Requests and Shortened Time to Notice Depositions [Rec. Doc. 18537].

On July 31, 2014, the PSC filed a Motion for Contempt against corporate officers of Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd., Chairmen Jia Tonchun and Peng Shiliang [Rec. Doc. 17920]. On September 18, 2014, the Court heard the Motion for Contempt and took the matter under advisement. The parties await a ruling.

On July 29, 2014, the *Eduardo and Carmen Amorin, et al v. The State-Owned Assets Supervision and Administration Commission of the State Council, Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al*, No. 14-1727, Omni XIX Complaint was filed which names as Defendants the State-Owned Assets Supervision and Administration Commission of the State

Council, Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., Tai'an Taishan Plasterboard Co., Ltd., Beijing New Building Materials Public Limited Co., China National Building Material Co., Ltd., Beijing New Building Materials (Group) Co., Ltd., China National Building Materials Group Corporation. The Court has ruled that several of these Defendants are subsidiaries and affiliates of the Judgment Debtor, Taishan Gypsum Co., Ltd.

   The PSC has filed three complaints, (1) *Eduardo and Carmen Amorin, et al v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al,* No. 2:11-cv-377, United States District Court, Eastern District of Virginia; (2) *Eduardo and Carmen Amorin, et al v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al,* No. 1:11-cv-22408-MGC, United States District Court, Southern District of Florida; and (3) *Eduardo and Carmen Amorin, et al v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al,* No. 2:11-cv-1395, United States District Court, Eastern District of Louisiana, against Taishan and allegedly related companies that the PSC claims reinforces the purposeful availment of these companies to federal jurisdiction by marketing their products to the United States. These cases will be served pursuant to the Hague Convention in due course. The *Amorin* complaints filed in Florida and Virginia were transferred to the MDL on July 19, 2011, and all three have been filed into the record as Omnibus Class Action Complaints in Intervention (see Section VI above).

   On September 27, 2012, Plaintiffs filed a Motion for Preliminary Default Judgment against CNBM USA Corp. and BNBM of America, Inc. in the matter of *Eduardo and Carmen Amorin, et al v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al,* No. 2:11-cv-1395 [Rec. Doc. 15847]. The matter is not yet set for hearing.

-22-

On September 11, 2013, the appeal filed with the Third District Court of Appeal, State of Florida, in the *Taishan Gypsum Co., Ltd. v. Lennar Homes, LLC,* No. 3D12-2591, Lower Tribunal No. 09-7901, matter was AFFIRMED.

On June 13, 2014, the Plaintiffs' Steering Committee filed a Motion to Lift Stay to Permit Further Proceedings Against Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd. and Begin Proceedings Against Remaining Defendants [Rec. Doc. 17754]. On June 23, 2014, the Court issued an Order granting the motion [Rec. Doc. 17777].

On June 24, 2014, the Plaintiffs' Steering Committee filed a Motion to Approve Alternative Service of Process Pursuant to Fed.R.Civ.P. 4(f)(3) [Rec. Doc. 17782] with respect to the Taishan Defendants. On June 25, 2014, the Court issued an Order granting the motion [Rec. Doc. 17790].

On October 29, 2014, Plaintiffs filed a Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(B) and Request for Approval of Supplemental Notice [Rec. Doc. 18086]. An Order was issued on October 30, 2014 [Rec. Doc. 18097] setting the matter for hearing, with oral argument, following the December 17, 2014 status conference. On December 18, 2014, the Court entered an Order granting the "notice" portion of the Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(B) [Rec. Doc. 18216] and a separate Order approving the supplemental notice [Rec. Doc. 18217]. On February 5, 2015, Declaration of Arnold Levin in Support of Plaintiffs' Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(B) was filed with the Court [Rec. Doc. 18294]. On March 2, 2015, Plaintiffs filed a Proposed Findings of Fact and Conclusions of Law [Rec. Doc. 18405] with respect to the Motion for Assessment of Class

Damages.  A Minute Entry was filed on March 17, 2015 [Rec. Doc. 18493] setting the motion for hearing, with oral argument, on April 28, 2015 at 9:00 a.m.

On February 20, 2015, the PSC filed a Motion to Preclude Taishan or Any of Its Affiliates from Participating in Proceedings Involving Plaintiffs' Motion for Assessment of Class Damages [Rec. Doc. 18367].  On March 9, 2015, Taishan Gypsum Ltd. Co. filed a Response in Opposition to the motion [Rec. Doc. 18450]; CNBM Group and CNBM filed an Opposition to the motion [Rec. Doc. 18453]; and Beijing New Building Material (Group) Co., Ltd. filed an Opposition to the motion [Rec. Doc. 18454].  A special hearing was conducted on March 17, 2015, and the Court issued a Minute Entry [Rec. Doc. 18493].  In complying with deadlines established in the Minute Entry, the PSC issued/served numerous discovery requests and filed motions to expedite on March 19, 2015.  The parties will meet and confer and provide the Court with an update at the monthly status conference on March 26, 2015.

On March 13, 2015, the PSC filed an Omnibus Response/Reply to Motions Regarding Contempt, Enforcement of Contempt Order, Class Damages Hearing, and Motion to Withdraw as Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd. [Rec. Doc. 18520].  On March 24, 2015, a Motion for Leave to File Counsel's Reply to Omnibus/Reply to Motions Regarding Contempt, Enforcement of Contempt Order, Class Damages Hearing, and Motion to Withdraw as Counsel for Tai'shan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd. was filed with the Court [Rec. Doc. 18532].

On January 8, 2015, the PSC filed a Notice of Filing of Motion to Intervene in Oregon Litigation [Rec. Doc. 18251].  The motion to intervene was filed in the matter of *China National Building Materials Import and Export Corporation, et al v. Murphy Overseas USA Astoria*

-24-

*Forest Products, LLC, et al,* Civil No. 3:14-cv-00746-ST, United States District Court, District of Oregon (Portland Division). On January 20, 2015, the Honorable Magistrate Judge Janice M. Stewart issued a minute entry denying the motion to intervene. On January 22, 2015, the PSC filed objections to the Magistrate's minute entry requesting that the district court overrule the minute entry.

On February 2, 2015, certain plaintiffs appointed by this Court as class representatives in the matter of *Eduardo and Carmen Amorin, et al v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al,* No. 2:11-cv-1395, filed a Complaint for Declaratory Judgment and Other Relief in the United States District Court for the District of Oregon against China National Building Materials Import and Export Corporation and CNBM Forest Products (Canada) Ltd. On February 3, 2015, the PSC filed a Notice of Potential Tag-Along Action with regard to the aforementioned case with the Judicial Panel on Multidistrict Litigation.

## XI. VENTURE SUPPLY & PORTER BLAINE DEFENDANTS

On January 15, 2013, the Court entered a Minute Entry [Rec. Doc. 16505] granting (1) Preliminarily Approving Each of Four Chinese Drywall Class Settlements (Nationwide Insureds Settlement Agreement, Porter-Blaine/Venture Supply Settlement Agreement, Tobin Trading and Installers Settlement Agreement, and Builders Mutual Insureds Agreement) Relating to Virginia and Certain Other Remain Claims; Conditionally Certifying the Settlement Classes and Approving the Form Notice to Class Members.

On May 8, 2013, the Plaintiffs filed a Motion for an Order (1) Certifying Each of Four Chinese Drywall Class Settlements (Nationwide Insureds Settlement Agreement, Porter-Blaine/Venture Supply Settlement Agreement, Tobin Trading and Installers Settlement Agreement,

and Builders Mutual Insureds Settlement Agreement) Relating to Virginia and Certain Other Remaining Claims; (2) Granting Final Approval to the Four Chinese Drywall Class Settlements; and (3) Approving an Allocation Plan for the Four Class Settlements [Rec. Doc. 16806]. On July 9, 2013, the Court entered an Order (1) Certifying Each of Four Chinese Drywall Class Settlements (Nationwide Insureds Settlement Agreement, Porter-Blaine/Venture Supply Settlement Agreement, Tobin Trading and Installers Settlement Agreement, and Builders Mutual Insureds Settlement Agreement) Relating to Virginia and Certain Other Remaining Claims; (2) Granting Final Approval to the Four Chinese Drywall Class Settlements; and (3) Approving an Allocation Plan for the Four Class Settlements [Rec. Doc. 16934]. On July 12, 2013, Class Counsel filed a Motion to Approve Funding, Administration and Special Master Services [Rec. Doc. 16939] and the Court entered an Order granting the motion on July 19, 2013 [Rec. Doc. 16956].

The Claims process for the Four Virginia-based Settlements is structured to take place in two phases: Real Property Claims and Other Loss Claims. On October 14, 2013, Class Counsel filed a Motion for an Order (1) Approving the Real Property Claim Form and (2) Setting a Deadline of December 16, 2013 for Filing Real Property Claims in each of the Four Virginia-Based Chinese Drywall Class Settlements [Rec. Doc. 17170]. On October 24, 2013, the Court entered an Order approving the Real Property Claim Form and setting a claim filing deadline of December 16, 2013 [Rec. Doc. 17208]. On November 11, 2014, Class Counsel filed a Motion for Authority to Disburse Funds From the Virginia Settlements for Real Property Loss [Rec. Doc. 18117]. Pursuant to an Order that was issued on November 13, 2014 [Rec. Doc. 18129], Class Counsel, Phil Garrett and the Settlement Administrator appeared before the Court to address open issues regarding distribution from the Four Virginia-Based Settlements.

On November 20, 2014 the Court entered and Order approving the Proposed Real Property Allocation and directing distribution of funds accordingly [Rec. Doc. 18145]. In accordance with the Court's Order, the Garretson Resolution Group (the Claims Administrator for the Four Virginia-based Settlements) has issued all Real Property Payments.

On December 6, 2013, Class Counsel filed a Motion for an Order (1) Approving the Other Loss Claim Form and (2) Setting a Deadline of March 17, 2014 for Filing Other Loss Claims in Each of the Four Virginia-Based Chinese Drywall Class Settlements [Rec. Doc. 17308]. On December 9, 2013, the Court issued an Order (1) Approving the Other Loss Claim Form and (2) Setting a Deadline of March 17, 2014 for Filing Other Loss Claims in Each of the Four Virginia-Based Chinese Drywall Class Settlements [Rec. Doc. 17319]. Garretson Resolution Group continues to review such claims and is working with Class Counsel to resolve questions arising from such reviews.

On August 19, 2013, Class Counsel filed a Motion to Establish Various Qualified Settlement Funds (QSFs) and to Appoint Fund Administrator and Depository Bank (Virginia Settlements) [Rec. Doc. 17010]. On September 9, 2013, the Court issued various Orders approving the QSFs [Rec. Docs. 17077 thru 17084].

On February 25, 2014, Class Counsel filed a Motion for an Order Granting Incentive Awards [Rec. Doc. 17460] seeking to award sixteen households for their extraordinary support to the Court during the *Germano* trial and various Virginia state court trial settings. On May 5, 2014, the Court issued an Order granting the Motion for Order Granting Incentive Awards [Rec. Doc. 17663].

-27-

On May 21, 2014, Matthew Garretson, Claims Administrator for the Four Virginia-based Settlements, wrote the Court regarding the Statue of Limitations criteria under Section 10 of the Four Virginia-based Settlements Allocation Plan, document [16800 -7], and the Court issued a Show Cause Order [Rec. Doc. 17703]. On June 23, 2014, the Court issued an Order [Rec. Doc. 17778].

On May 22, 2014, Venture Supply, Inc. and the Porter-Blaine Corporation filed a Notice of Disposal of Physical Evidence [Rec. Doc. 17706]. On June 6, 2014, the PSC filed a Motion to Preclude Disposal of Physical Evidence [Rec. Doc. 17723]. On June 10, 2014, Venture Supply, Inc. and the Porter-Blaine Corporation filed a Memorandum in Opposition to the motion [Rec. Doc. 17733]. On June 18, 2014, the Court entered an Order which states that if the Plaintiffs' Steering Committee finds it necessary to preserve the 20 sheet of Taishan drywall in questions, then they must take over all responsibility for the preservation [Rec. Doc. 17769]. On June 24, 2014, the Plaintiffs' Steering Committee filed a Motion Regarding Disposal of Physical Evidence (Venture Supply, Inc. and Porter-Blaine Corporation) and for Expedited Consideration [Rec. Doc. 17779]. On July 1, 2014, the Court issued an Order [Rec. Doc. 17813] granting the motion and approving the protocol outlined by the Plaintiffs' Steering Committee. The Plaintiffs' Steering Committee has preserved the drywall in accordance with the protocol.

On November 19, 2014, Class Counsel filed a Motion for Distribution of Settlement Funds relating to the Four Virginia-Based Settlements [Rec. Doc. 18139]. An Order was issued on December 17, 2014 granting the motion [Rec. Doc. 18221] and Garretson Resolution Group has distributed the settlement funds accordingly.

## XII.  PLAINTIFF AND DEFENDANT PROFILE FORMS

-28-

On November 3, 2011, the Court entered Pre-Trial Order No. 25 [Rec. Doc. 11151] setting a deadline of November 15, 2011 for the completion and submission of profile forms. On February 6, 2012, the PSC filed a Motion to Compel or Alternatively For Sanctions in Accordance With Pre Trial Order No. 25 for Certain Defendants to Produce Completed Profile Forms [Rec. Doc. 12435]. On February 22, 2012, the PSC filed a First Notice of Errata to the Motion to Compel or Alternatively For Sanctions in Accordance with Pre Trial Order No. 25 for Certain Defendants to Produce Completed Profile Forms [Rec. Doc. 12548].

XIII. FREQUENTLY ASKED QUESTIONS

The "MDL FAQs" may be found at www.laed.uscourts.gov/Drywall/FAQ.htm. Liaison counsel reminds the parties to review the FAQs before contacting Liaison Counsel. The parties will be prepared to discuss this issue at the monthly status conference on March 26, 2015.

XIV. MATTERS SET FOR HEARING FOLLOWING THE CURRENT STATUS CONFERENCE

1. Plaintiffs' Motion to Amend Complaint by Interlineation (Amato) [Rec. Doc. 18263].

2. Motions to Withdraw as Counsel of Record [Rec. Doc. 17846, Rec. Doc. 17858 and Rec. Doc. 18456].

3. Motion to Dismiss the Knauf Defendants' Settlement Obligations for Certain Already Remediated Home Claims, Special Master Appeal [Rec. Doc. 18446].

XV. *PRO SE* CLAIMANTS

On November 8, 2011, the Court issued an Order [Rec. Doc. 11327] appointing Robert M. Johnston of Johnston, Hoefer, Holwadel & Eldridge, 400 Poydras Street, Suite 2450, New Orleans, Louisiana 70130, as a *pro se* curator to assist the growing number of *pro se* claimants in the MDL litigation who are seeking information and/or representation.

-29-

## XVI.   PHYSICAL EVIDENCE PRESERVATION ORDER

On October 9, 2009, the Court issued Pre-Trial Order 1(B) relating to the preservation of physical evidence from properties that may be repaired during the course of these MDL proceedings.  The PSC, HSC and Knauf have agreed on a revised evidence preservation order, proposed Pre-Trial Order No. 1(I), that reduces the amount of physical evidence required to be preserved from a repaired home.  Pre-Trial Order 1I was entered by the Court on January 24, 2012 [Rec. Doc. 12257].  The Homebuilders' Steering Committee and the PSC proposed a  revised Pre-Trial Order that would amend and modify the preservation and disposal requirements in certain circumstances, and on March 20, 2015 the Court entered Pre-Trial Order 1(J) [Rec. Doc. 18528]. The parties will be prepared to address this matter at the status conference on March 26, 2015.

## XVII.  ENTRY OF PRELIMINARY DEFAULT

Pursuant to Minute Entry dated February 23, 2012 [Rec Doc. 12687], the Plaintiffs' Omnibus Motion for Preliminary Default Judgment [Rec. Doc. 11234] and errata thereto [Rec. Doc. 11773, 12265, 12551] was granted.  On February 24, 2012, the Court signed an Entry of Preliminary Default [Rec. Doc. 12599] of defendants listed on Exhibit A attached to the Entry of Preliminary Default.

On July 18, 2012, Plaintiffs filed a Second Omnibus Motion for Preliminary Default Judgment [Rec. Doc. 15412].  An Errata to Plaintiffs' Second Omnibus Motion for Preliminary Default was filed on October 8, 2012 [Rec. Doc. 15898].  On October 10, 2012, the Court granted the motion, but excluded Cornerstone Construction and Distinctive Drywall.  On October 19, 2012, Plaintiffs filed a Third Amended Errata to Plaintiffs' Second Omnibus Motion for Preliminary

Default Judgment as to the Defaulting Defendants [Rec. 15972]. On October 26, 2012, the Court granted an Order clarifying which entities were in default [Rec. Doc. 16030]. Homebuilders' Liaison Counsel has received requests from several builders, asking that the Court address personal jurisdiction over the entities identified in the motion for entry of preliminary default prior to the entry of any final default judgment. On September 12, 2013, Plaintiffs' third Omnibus Motion for Preliminary Default was filed with the Court [Rec. Doc. 17089]. On October 15, 2013, Errata to Plaintiffs' Third Omnibus Motion for Preliminary Default Judgment was filed with the Court [Rec. Doc. 17172]. On June 5, 2014, an Amended Errata to Plaintiffs' Third Omnibus Motion for Preliminary Default Judgment was filed with the Court [Rec. Doc. 17722]. On January 10, 2014, Plaintiffs' Fourth Omnibus Motion for Preliminary Default Judgment was filed with the Court [Rec. Doc. 17378]. On June 24, 2014, the Plaintiffs' Steering Committee filed the Fifth Omnibus Motion for Preliminary Default [Rec. Doc. 17781]. On June 25, 2014, the Court granted Plaintiffs' Third Omnibus Motion for Preliminary Default [Rec. Doc. 17792], Fourth Omnibus Motion for Preliminary Default [Rec. Doc. 17793], and Plaintiffs' Fifth Omnibus Motion for Preliminary Default [Rec. Doc. 17791]. On June 30, 2014, the Plaintiffs' Steering Committee filed a Motion to Amend/Correct Order Granting Plaintiffs' Third Omnibus Motion for Preliminary Default [Rec. Doc. 17800], which was granted by the Court on July 1, 2014 [Rec. Doc. 17814]. On July 1, 2014, the Plaintiffs' Steering Committee filed a Motion to Amend/Correct Order Granting Plaintiffs' Fourth Omnibus Preliminary Default [Rec. Doc. 17802], which was granted by the Court on July 1, 2014 [Rec. Doc. 17815], and Motion to Amend/Correct Order Granting Plaintiffs Fifth Omnibus Motion for Preliminary Default [Rec. Doc. 17803], which was granted on July 1, 2014 [Rec. Doc.

17816]. The parties will be prepared to discuss this further at the monthly status conference on March 26, 2015.

### XVIII.  ALREADY REMEDIATED HOMES

The Already Remediated Homes Committee has met on several occasions to discuss properties that have not yet been resolved. Plaintiffs' Liaison Counsel and Knauf scheduled meetings in April and May 2014 with various counsel to address deficiencies and resolution of claims for Already Remediated Properties. The parties will be prepared to discuss this further at monthly status conference on March 26, 2015.

### XIX.  LOUISIANA ATTORNEY GENERAL

On April 7, 2014, a joint letter submission concerning the Louisiana Attorney General was submitted to the Court. On April 29, 2014, the parties filed a Joint Scheduling Order concerning amendments to the pleadings and removal from Louisiana state court [Rec. Doc. 17641]. On May 20, 2014, the Court issued a Joint Scheduling Order outlining specific deadline dates [Rec. Doc. 17697]. On June 27, 2014, the State of Louisiana filed a Notice of Compliance with Court Orders [Rec. Doc. 17796]. On September 17, 2014, the State of Louisiana filed a Motion to Amend/Correct Petition [Rec. Doc. 18011] and a Motion to Withdraw Remand [Rec. Doc. 18012]. On September 26, 2014, the Court issued an Order [Rec. Doc. 18027] withdrawing the State of Louisiana's Motion to Remand and an Order [Rec. Doc. 18029] filing the State of Louisiana's Second Amended and Restated Petition. The parties will be prepared to discuss this matter at the monthly status conference on March 26, 2015.

On June 9, 2014, the State of Louisiana filed a Motion to Prohibit Disposal of Physical Evidence by the Knauf Defendants [Rec. Doc. 17730] and Request for Oral Argument

[Rec. Doc. 17732]. On June 18, 2014, the Court entered an Order setting forth that if Knauf incurs additional costs associated with moving or testing the boards, as a result of the Louisiana Attorney General's actions, Knauf should save all receipts and records of these expenses, If the matter proceeds to trial and the Court determines that the evidence recovered is not relevant to the issues at trial, the Louisiana Attorney General will have to reimburse Knauf for these expenses [Rec. Doc. 17769]. Disposal of the drywall began on January 20, 2015.

**XX.**   **NEXT STATUS CONFERENCE**

The Court has scheduled the next monthly status conference on April 17, 2015 at 9:00 a.m. The class damages hearing is set for April 28, 2015. The May monthly status conference will be held on May 20, 2015 at 9:00 a.m. The conference call-in information for these conferences, as always, can be found on the Court's MDL website on the Calendar page.

-33-

# JOINT APPENDIX TAB # 10

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: CHINESE-MANUFACTURED DRYWALL | CIVIL ACTION
PRODUCTS LIABILITY LITIGATION |
| NO. 09-02047
| SECTION "L" (5)

<u>**ORDER & REASONS**</u>

Before this Court is Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co.,

Ltd.'s ("Taishan") Motion to Exclude the Plaintiffs' Class Spreadsheet (the "Spreadsheet") (Rec.

Doc. 19191).[1]  Having read the parties' briefs and reviewed the applicable law, the Court now

issues this Order & Reasons.

Plaintiffs' Class Spreadsheet is a spreadsheet that was introduced and admitted into

evidence as Exhibit 79 at the June 9, 2015 Hearing on Class Damages.  *See* Class Damages Hr'g

Tr. 86:16-87:5, June 9, 2015.  The spreadsheet, which was prepared by Brown Greer, shows the

individual remediation damages estimate for 2,686 properties.

Taishan argues that the Spreadsheet should be excluded because it contains errors

regarding ownership status, product identification, prior remediation status, and duplicate entries.

Taishan contends that, given these errors, the Spreadsheet should not form the basis for any

damages calculations.  Plaintiffs argue that the Court, as fact-finder, may properly consider

Exhibit 79 and determine the weight it should be given.  Plaintiffs argue further that each of the

alleged issues raised by the Defendants are administrative in nature and can be resolved through

routine claims processing. (Rec. Doc. 19254).  Notably, Counsel for the Defendants objected on

---

[1] Defendants BNBM PLC and BNBM Group joined in this Motion (Rec. Doc. 19193).

the record to the introduction of the Spreadsheet as proof of Taishan drywall.  June 9 Hearing Tr.

87:1-4.  Court overruled Defendants' objection as it went to the "validity of the accuracy" of the

list and not its admissibility.  *See id.* at 87:5-7.

"Evaluating the admissibility of evidence is a matter within the sound discretion of the

district court." *United States v. Dixon*, 132 F.3d 192, 196-97 (5th Cir. 1997) (quoting *United*

*States v. Sparks,* 2 F.3d 574, 582 (5th Cir.1993).   Assuming *arguendo* that there are "serious

errors and deficiencies" in the Spreadsheet, it is nonetheless admissible into evidence.  The

Plaintiffs correctly assert that Defendants' arguments relate to the weight of the Spreadsheet as

evidence and not its admissibility.  Challenges to the factual bases or underpinnings of an expert

opinion go to the weight and credibility of evidence, not its admissibility.   *In re Katrina Canal*

*Breaches Consol. Litig.*, No. CA 10-866, 2012 WL 4328354, at *1 (E.D. La. Sept. 20, 2012)

(citing *Moss v. Ole South Real Estate, Inc.,* 993 F.2d 1300, 1307 (5th Cri.1991); *Matador*

*Drilling Co. v. Post,* 662 F.2d 1190, 1199 (5th Cir.1981)); *see also Viterbo v. Dow Chem. Co.,*

826 F.2d 420, 422 (5th Cir.1987) ("[Q]uestions relating to the bases and sources of an expert's

opinion affect the weight to be assigned that opinion rather than its admissibility and should be

left for the [trier of fact's consideration.").

Moreover, the Court will not be misled by any inaccuracies in the Spreadsheet when it

issues its upcoming Finding of Facts and Conclusions of Law regarding the Damages Hearing.

*See Whitehouse Hotel Ltd. P'ship v. C.I.R.,* 615 F.3d 321, 330 (5th Cir.2010) ("[T]he importance

of the trial court's gatekeeper role is significantly diminished in bench trials ... because, there

being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence.").

Accordingly, **IT IS ORDERED** that the Motion to Exclude Plaintiffs' Class Spreadsheet

is **DENIED**.

New Orleans, Louisiana this 3rd day of August 2015.

_____
UNITED STATES DISTRICT JUDGE

# JOINT APPENDIX TAB # 11

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L |
| THIS DOCUMENT RELATES TO: | JUDGE FALLON MAG. JUDGE WILKINSON |
| *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al* Case No. 11-cv-080 (E.D. La.) | |
| *Almeroth, et al. v. Taishan Gypsum Co., Ltd f/k/a Shandong Taihe Dongxin Co., Ltd., et al* Case No. 12-cv-0498 (E.D. La.) | |
| *Amato, et al. v. Liberty Mutual Insurance Company*, Case No. 2:10-cv-00932 (E.D.La.) | |
| *Germano et al. v. Taishan Gypsum Co., Ltd. et al.* Case No. 2:09-cv-06687 (E.D. La.) | |
| *Gross, et al. v. Knauf Gips, KG, et al* Case No. 09-cv-6690 (E.D. La.) | |
| *Haya, et al. v. Taishan Gypsum Co., Ltd f/k/a Shandong Taihe Dongxin Co., Ltd, et al* Case No. 11-cv-1077 (E.D. La.) | |
| *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al* Case No. 10-cv-361 (E.D. La.) | |

**O R D E R**

Considering Class Counsel's Motion for Authority to Disburse Funds From the Four Virginia-based Settlements for Other Loss;

IT IS ORDERED BY THE COURT that the Proposed Other Loss Allocation is hereby APPROVED and the Settlement Administrator, Matthew Garretson, is DIRECTED to distribute

the remainder of the Settlement Funds in accordance with the attached Other Loss Allocation

(Ex. A) to the appropriate claimants.

New Orleans, Louisiana, this 23rd day of _____October_____, 2015.

_____
Eldon E. Fallon
United States District Court Judge

# EXHIBIT "A"

## CHINESE DRYWALL FOUR VIRGINIA-BASED CLASS SETTLEMENTS OTHER LOSSES ALLOCATION

| Settlement | Total Claimant Funds Avail. | Real Property Allocation | Other Losses Funds Available |
|---|---|---|---|
| Nationwide | $6,500,000.00 | $5,213,793.10 | $1,286,206.90 |
| Builders | $1,105,000.00 | $886,344.83 | $218,655.17 |
| Installers | $1,105,000.00 | $886,344.83 | $218,655.17 |
| Porter / Blaine Venture | $1,950,000.00 | $1,564,137.93 | $385,862.07 |
| Tobin | $650,000.00 | $521,379.31 | $128,620.69 |
| | $11,310,000.00 | $9,072,000.00 | $2,238,000.00 |

| Claimant Number | Nationwide Allocated Amount | Builders Allocated Amount | Installers Allocated Amount | Porter/Venture Allocated Amount | Tobin Allocated Amount | Total Other Loss Allocation |
|---|---|---|---|---|---|---|
| CDW00016 | | | | $85.16 | $28.39 | $113.55 |
| CDW00021 | $1,683.49 | | | $451.01 | $150.34 | $2,284.83 |
| CDW00036 | | | | $202.23 | $67.41 | $269.64 |
| CDW00046 | | | | $479.58 | $159.86 | $639.44 |
| CDW00051 | | | | $3,415.41 | $1,138.47 | $4,553.87 |
| CDW00126 | | | | $193.79 | $64.60 | $258.38 |
| CDW00129 | | | | $596.78 | $198.93 | $795.71 |
| CDW00162 | $9,215.15 | | | $2,468.74 | $822.91 | $12,506.81 |
| CDW00181 | | | | $1,326.64 | $442.21 | $1,768.85 |
| CDW00187 | | | $6,349.06 | $443.12 | $147.71 | $6,939.88 |
| CDW00213 | $0.00 | | | $0.00 | $0.00 | $0.00 |
| CDW00250 | | | | $628.49 | $209.50 | $837.99 |
| CDW00264 | | | | $109.00 | $36.33 | $145.34 |
| CDW00274 | $1,811.75 | | | $485.37 | $161.79 | $2,458.91 |
| CDW00296 | $0.00 | | | $0.00 | $0.00 | $0.00 |
| CDW00324 | $529.08 | | | $141.74 | $47.25 | $718.06 |
| CDW00359 | $0.00 | | | $0.00 | $0.00 | $0.00 |
| CDW00372 | $6,472.44 | $4,255.26 | | $1,465.33 | $488.44 | $12,681.48 |
| CDW00389 | | | | $534.93 | $178.31 | $713.23 |
| CDW00410 | $4,625.43 | $3,040.96 | | $1,047.17 | $349.06 | $9,062.62 |
| CDW00466 | | | | $220.20 | $73.40 | $293.60 |
| CDW00498 | $816.05 | | | $218.62 | $72.87 | $1,107.55 |
| CDW00502 | | | | $420.58 | $140.19 | $560.77 |
| CDW00510 | | | | $1,780.29 | $593.43 | $2,373.73 |
| CDW00511 | | | | $141.89 | $47.30 | $189.18 |
| CDW00515 | | | | $0.00 | $0.00 | $0.00 |
| CDW00516 | | | | $886.76 | $295.59 | $1,182.35 |
| CDW00517 | | | | $411.51 | $137.17 | $548.68 |
| CDW00518 | | | | $693.76 | $231.25 | $925.01 |
| CDW00519 | | | | $45.40 | $15.13 | $60.53 |
| CDW00520 | | | | $1,165.70 | $388.57 | $1,554.27 |
| CDW00534 | | | | $228.02 | $76.01 | $304.02 |
| CDW01001 | $14,196.90 | | | $3,803.35 | $1,267.78 | $19,268.04 |

| Claimant Number | Nationwide Allocated Amount | Builders Allocated Amount | Installers Allocated Amount | Porter/Venture Allocated Amount | Tobin Allocated Amount | Total Other Loss Allocation |
|---|---|---|---|---|---|---|
| CDW01003 | $530.28 | $348.63 | | $120.05 | $40.02 | $1,038.98 |
| CDW01004 | $0.00 | | | $0.00 | $0.00 | $0.00 |
| CDW01005 | $3,457.63 | | | $926.30 | $308.77 | $4,692.70 |
| CDW01006 | $84,127.91 | | | $22,537.88 | $7,512.63 | $114,178.42 |
| CDW01007 | $2,004.75 | | | $537.07 | $179.02 | $2,720.85 |
| CDW01008 | $2,073.90 | | | $555.60 | $185.20 | $2,814.70 |
| CDW01009 | $615.71 | | $1,240.93 | $86.61 | $28.87 | $1,972.11 |
| CDW01010 | $9,307.51 | | | $2,493.48 | $831.16 | $12,632.15 |
| CDW01011 | $12,278.82 | | | $3,289.50 | $1,096.50 | $16,664.82 |
| CDW01012 | $26,417.17 | | $53,242.32 | $3,715.91 | $1,238.64 | $84,614.04 |
| CDW01013 | $2,540.05 | | | $680.48 | $226.83 | $3,447.36 |
| CDW01014 | $799.68 | $525.74 | | $181.04 | $60.35 | $1,566.81 |
| CDW01015 | | | | $1,398.46 | $466.15 | $1,864.61 |
| CDW01016 | $22,631.10 | | $45,611.70 | $3,183.35 | $1,061.12 | $72,487.26 |
| CDW01017 | $4,507.92 | | | $1,207.67 | $402.56 | $6,118.15 |
| CDW01018 | $7,665.44 | | | $2,053.57 | $684.52 | $10,403.53 |
| CDW01019 | | | | $1,348.98 | $449.66 | $1,798.64 |
| CDW01020 | $4,709.85 | | | $1,261.77 | $420.59 | $6,392.21 |
| CDW01021 | | | | $8,287.83 | $2,762.61 | $11,050.44 |
| CDW01022 | $0.00 | | | $0.00 | $0.00 | $0.00 |
| CDW01023 | | | | $858.02 | $286.01 | $1,144.02 |
| CDW01024 | $3,545.26 | | | $949.78 | $316.59 | $4,811.62 |
| CDW01025 | $33,641.39 | $22,117.29 | | $7,616.24 | $2,538.75 | $65,913.66 |
| CDW01026 | $2,904.34 | | $5,853.53 | $408.53 | $136.18 | $9,302.57 |
| CDW01027 | $927.54 | | | $248.49 | $82.83 | $1,258.85 |
| CDW01028 | $1,129.58 | | | $302.61 | $100.87 | $1,533.06 |
| CDW01029 | $3,040.64 | | | $814.59 | $271.53 | $4,126.76 |
| CDW01030 | $226.53 | | | $60.69 | $20.23 | $307.45 |
| CDW01031 | | | | $683.12 | $227.71 | $910.83 |
| CDW01032 | $276.72 | | | $74.13 | $24.71 | $375.57 |
| CDW01033 | | | | $455.36 | $151.79 | $607.15 |
| CDW01034 | | | | $770.82 | $256.94 | $1,027.76 |
| CDW01035 | $304.59 | | | $81.60 | $27.20 | $413.39 |
| CDW01038 | $177.36 | | | $47.51 | $15.84 | $240.71 |
| CDW01039 | $257.10 | | | $68.88 | $22.96 | $348.93 |
| CDW01040 | $2,162.37 | | | $579.30 | $193.10 | $2,934.76 |
| CDW01041 | $21,398.52 | | | $5,732.67 | $1,910.89 | $29,042.08 |
| CDW01042 | | | | $103.75 | $34.58 | $138.33 |
| CDW01043 | $517.04 | $339.92 | | $117.06 | $39.02 | $1,013.04 |
| CDW01044 | | | | $1,094.55 | $364.85 | $1,459.40 |
| CDW01046 | $39,585.27 | $26,025.05 | | $8,961.91 | $2,987.30 | $77,559.53 |
| CDW01048 | | | $1,817.75 | $126.86 | $42.29 | $1,986.90 |
| CDW01049 | $4,232.11 | | | $1,133.78 | $377.93 | $5,743.82 |

| Claimant Number | Nationwide Allocated Amount | Builders Allocated Amount | Installers Allocated Amount | Porter/Venture Allocated Amount | Tobin Allocated Amount | Total Other Loss Allocation |
|---|---|---|---|---|---|---|
| CDW01051 | | | | $3,690.32 | $1,230.11 | $4,920.43 |
| CDW01052 | | $46.17 | | $15.90 | $5.30 | $67.37 |
| CDW01053 | $4,899.53 | $3,221.16 | | $1,109.23 | $369.74 | $9,599.65 |
| CDW01054 | $9,555.99 | $6,282.51 | $16,275.70 | $1,135.92 | $378.64 | $33,628.76 |
| CDW01055 | $325.00 | | $655.01 | $45.71 | $15.24 | $1,040.96 |
| CDW01056 | $678.93 | $446.36 | $1,156.35 | $80.70 | $26.90 | $2,389.25 |
| CDW01057 | $193.95 | | $390.90 | $27.28 | $9.09 | $621.23 |
| CDW01058 | | | $8,065.90 | $562.94 | $187.65 | $8,816.48 |
| CDW01059 | $2,033.42 | | | $544.75 | $181.58 | $2,759.76 |
| CDW01060 | | $726.53 | | $250.18 | $83.39 | $1,060.10 |
| CDW01062 | $137.31 | | | $36.79 | $12.26 | $186.36 |
| CDW01063 | $2,928.20 | | | $784.47 | $261.49 | $3,974.16 |
| CDW01064 | $365.20 | | | $97.84 | $32.61 | $495.64 |
| CDW01065 | $0.00 | | | $0.00 | $0.00 | $0.00 |
| CDW01066 | $0.00 | | | $0.00 | $0.00 | $0.00 |
| CDW01068 | | | | $55.84 | $18.61 | $74.46 |
| CDW01069 | | | | $1,199.27 | $399.76 | $1,599.02 |
| CDW01070 | $876.24 | | | $234.75 | $78.25 | $1,189.24 |
| CDW01071 | $0.00 | | | $0.00 | $0.00 | $0.00 |
| CDW01072 | $21,226.30 | $13,955.07 | | $4,805.53 | $1,601.84 | $41,588.74 |
| CDW01073 | $6,467.15 | | | $1,732.55 | $577.52 | $8,777.22 |
| CDW01075 | | | | $713.41 | $237.80 | $951.21 |
| CDW01076 | $1,867.89 | | | $500.41 | $166.80 | $2,535.10 |
| CDW01077 | $18,276.94 | | | $4,896.40 | $1,632.13 | $24,805.47 |
| CDW01078 | $3,480.96 | | | $932.55 | $310.85 | $4,724.36 |
| CDW01079 | $3,973.05 | | | $1,064.38 | $354.79 | $5,392.22 |
| CDW01080 | $89,702.09 | | | $24,031.21 | $8,010.40 | $121,743.69 |
| CDW01081 | | | $1,489.42 | $103.95 | $34.65 | $1,628.02 |
| CDW01082 | $3,463.76 | | $6,981.01 | $487.22 | $162.41 | $11,094.40 |
| CDW01083 | | | | $151.97 | $50.66 | $202.63 |
| CDW01084 | $1,628.86 | | | $436.37 | $145.46 | $2,210.69 |
| CDW01085 | $7,321.44 | | | $1,961.42 | $653.81 | $9,936.66 |
| CDW01086 | $4,313.32 | | $8,693.25 | $606.72 | $202.24 | $13,815.53 |
| CDW01088 | $432.90 | | | $115.97 | $38.66 | $587.53 |
| CDW01089 | $23,578.97 | | | $6,316.81 | $2,105.60 | $32,001.39 |
| CDW01090 | $7,671.16 | | | $2,055.11 | $685.04 | $10,411.30 |
| CDW01091 | $12,404.30 | $8,155.12 | | $2,808.27 | $936.09 | $24,303.78 |
| CDW01092 | $60.64 | | | $16.25 | $5.42 | $82.31 |
| CDW01093 | $1,044.94 | | | $279.94 | $93.31 | $1,418.19 |
| CDW01094 | $6,616.75 | | | $1,772.63 | $590.88 | $8,980.25 |
| CDW01095 | $3,901.17 | | | $1,045.13 | $348.38 | $5,294.67 |
| CDW01096 | | | | $1,059.72 | $353.24 | $1,412.96 |
| CDW01098 | $4,839.10 | | | $1,296.40 | $432.13 | $6,567.63 |

| Claimant Number | Nationwide Allocated Amount | Builders Allocated Amount | Installers Allocated Amount | Porter/Venture Allocated Amount | Tobin Allocated Amount | Total Other Loss Allocation |
|---|---|---|---|---|---|---|
| CDW01100 | $32.42 | | | $8.69 | $2.90 | $44.00 |
| CDW01101 | | | | $1,131.41 | $377.14 | $1,508.54 |
| CDW01103 | | | | $1,666.67 | $555.56 | $2,222.22 |
| CDW01104 | $27.65 | | | $7.41 | $2.47 | $37.53 |
| CDW01105 | $2,537.79 | | | $679.87 | $226.62 | $3,444.29 |
| CDW01106 | $1,151.20 | | | $308.41 | $102.80 | $1,562.41 |
| CDW01107 | $3,482.20 | | | $932.88 | $310.96 | $4,726.04 |
| CDW01108 | $311.24 | | | $83.38 | $27.79 | $422.42 |
| CDW01109 | $19,067.20 | $12,535.59 | | $4,316.72 | $1,438.91 | $37,358.42 |
| CDW01110 | $6,051.29 | | | $1,621.14 | $540.38 | $8,212.81 |
| CDW01111 | $0.00 | | | $0.00 | $0.00 | $0.00 |
| CDW01112 | | | | $1,154.96 | $384.99 | $1,539.94 |
| CDW01114 | $2,688.65 | | | $720.29 | $240.10 | $3,649.04 |
| CDW01115 | $8,741.78 | | | $2,341.93 | $780.64 | $11,864.35 |
| CDW01116 | $2,862.53 | | | $766.87 | $255.62 | $3,885.03 |
| CDW01117 | $10,149.11 | | | $2,718.95 | $906.32 | $13,774.38 |
| CDW01118 | $2,850.80 | | | $763.73 | $254.58 | $3,869.11 |
| CDW01119 | $320.22 | | | $85.79 | $28.60 | $434.61 |
| CDW01120 | $67.51 | | | $18.09 | $6.03 | $91.63 |
| CDW01121 | $15,488.79 | | $31,216.78 | $2,178.69 | $726.23 | $49,610.49 |
| CDW01122 | | | $6,034.88 | $421.19 | $140.40 | $6,596.46 |
| CDW01123 | $1,072.64 | $705.20 | | $242.84 | $80.95 | $2,101.63 |
| CDW01124 | | | | $284.92 | $94.97 | $379.90 |
| CDW01125 | $164,188.21 | | | $43,986.05 | $14,662.02 | $222,836.28 |
| CDW01126 | $3,075.21 | | | $823.85 | $274.62 | $4,173.68 |
| CDW01127 | $6,543.27 | | | $1,752.94 | $584.31 | $8,880.53 |
| CDW01128 | $0.00 | | | $0.00 | $0.00 | $0.00 |
| CDW01129 | $12,282.49 | | | $3,290.48 | $1,096.83 | $16,669.80 |
| CDW01130 | | $2,861.59 | | $985.41 | $328.47 | $4,175.46 |
| CDW01131 | $8,358.41 | | | $2,239.22 | $746.41 | $11,344.04 |
| CDW01132 | $1,234.85 | | | $330.82 | $110.27 | $1,675.94 |
| CDW01133 | $19,401.50 | $12,755.37 | | $4,392.40 | $1,464.13 | $38,013.41 |
| CDW01134 | $5,976.06 | | | $1,600.99 | $533.66 | $8,110.71 |
| CDW01135 | $5,466.31 | | | $1,464.43 | $488.14 | $7,418.88 |
| CDW01136 | $1,668.40 | | $3,362.56 | $234.68 | $78.23 | $5,343.86 |
| CDW01137 | $2,282.81 | | | $611.57 | $203.86 | $3,098.23 |
| CDW01138 | $1,262.54 | | | $338.24 | $112.75 | $1,713.53 |
| CDW01139 | $23,108.88 | $15,192.77 | | $5,231.73 | $1,743.91 | $45,277.30 |
| CDW01140 | $0.00 | | | $0.00 | $0.00 | $0.00 |
| CDW01141 | | | | $259.39 | $86.46 | $345.85 |
| CDW01142 | $6,966.88 | | | $1,866.43 | $622.14 | $9,455.45 |
| CDW01143 | $21,317.26 | | | $5,710.90 | $1,903.63 | $28,931.79 |
| CDW01144 | $2,307.60 | | | $618.21 | $206.07 | $3,131.88 |

| Claimant Number | Nationwide Allocated Amount | Builders Allocated Amount | Installers Allocated Amount | Porter/Venture Allocated Amount | Tobin Allocated Amount | Total Other Loss Allocation |
|---|---|---|---|---|---|---|
| CDW01145 | $49,432.19 | | | $13,242.89 | $4,414.30 | $67,089.38 |
| CDW01146 | $717.77 | | | $192.29 | $64.10 | $974.16 |
| CDW01148 | $1,403.35 | | $2,828.37 | $197.40 | $65.80 | $4,494.92 |
| CDW01149 | $25,174.40 | | | $6,744.23 | $2,248.08 | $34,166.70 |
| CDW01150 | | | $11,241.93 | $784.60 | $261.53 | $12,288.07 |
| CDW01151 | | $394.76 | | $135.94 | $45.31 | $576.01 |
| CDW01152 | | | | $3,663.69 | $1,221.23 | $4,884.92 |
| CDW01154 | | $11,584.51 | | $3,989.21 | $1,329.74 | $16,903.46 |
| CDW01155 | $7,468.30 | | | $2,000.76 | $666.92 | $10,135.98 |
| CDW01156 | $2,109.37 | | $4,251.32 | $296.71 | $98.90 | $6,756.31 |
| CDW01157 | $55,075.28 | | | $14,754.68 | $4,918.23 | $74,748.19 |
| CDW01158 | $219.68 | | | $58.85 | $19.62 | $298.14 |
| CDW01159 | $5,700.75 | | | $1,527.23 | $509.08 | $7,737.06 |
| CDW01160 | $3,021.15 | | | $809.37 | $269.79 | $4,100.31 |
| CDW01161 | $4,116.10 | | | $1,102.70 | $367.57 | $5,586.37 |
| CDW01162 | $940.98 | | $1,896.49 | $132.36 | $44.12 | $3,013.96 |
| CDW01163 | | $3,135.89 | | $1,079.86 | $359.95 | $4,575.71 |
| CDW01165 | $1,201.48 | | | $321.88 | $107.29 | $1,630.65 |
| CDW01166 | $25,045.28 | | | $6,709.64 | $2,236.55 | $33,991.46 |
| CDW01167 | $3,178.17 | | | $851.43 | $283.81 | $4,313.41 |
| CDW01168 | $109.66 | | | $29.38 | $9.79 | $148.83 |
| CDW01170 | | $17,890.10 | | $6,160.58 | $2,053.53 | $26,104.21 |
| CDW01171 | | $5,232.98 | | $1,802.01 | $600.67 | $7,635.67 |
| CDW01172 | $259.15 | | | $69.43 | $23.14 | $351.71 |
| CDW01173 | $3,740.32 | | | $1,002.03 | $334.01 | $5,076.36 |
| CDW01174 | $77,309.00 | | | $20,711.10 | $6,903.70 | $104,923.80 |
| CDW01175 | | $1,145.19 | | $394.35 | $131.45 | $1,670.99 |
| CDW01176 | | | | $796.23 | $265.41 | $1,061.64 |
| CDW01177 | $1,965.27 | | | $526.50 | $175.50 | $2,667.27 |
| CDW01178 | $3,048.10 | | | $816.59 | $272.20 | $4,136.88 |
| CDW01179 | $893.03 | | | $239.24 | $79.75 | $1,212.02 |
| CDW01180 | $2,017.49 | $1,326.38 | | $456.75 | $152.25 | $3,952.87 |
| CDW01181 | $393.48 | | | $105.41 | $35.14 | $534.03 |
| CDW01182 | | | | $913.94 | $304.65 | $1,218.59 |
| CDW01183 | $0.00 | | | $0.00 | $0.00 | $0.00 |
| CDW01184 | $165.38 | | | $44.31 | $14.77 | $224.45 |
| CDW01186 | $67,548.20 | $44,409.07 | | $15,292.57 | $5,097.52 | $132,347.37 |
| CDW01187 | | | | $1,404.85 | $468.28 | $1,873.13 |
| | $1,286,206.90 | $218,655.17 | $218,655.17 | $385,862.07 | $128,620.69 | $2,238,000.00 |

# JOINT APPENDIX TAB # 12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | : : : : : : | MDL NO. 2047 SECTION L JUDGE FALLON MAGISTRATE JUDGE WILKINSON |
| .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. | : | |

**THIS DOCUMENT RELATES TO:** ALL CASES

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW FROM THE NOVEMBER 17, 2015 EVIDENTIARY HEARING

### I.     INTRODUCTION

In the course of discovery regarding alter ego relationships between and among Taishan

Gypsum Co., Ltd. ("TG") and its wholly-owned subsidiary and alter ego Taian Taishan

Plasterboard Co., Ltd. ("TTP") (collectively, "Taishan") and its parent companies and whether

any of Taishan's affiliates or subsidiaries violated the injunction prong of the Court's July 17,

2014 Contempt Order, it came to the Court's attention that Taishan may have endeavored to keep

from discovery the computers and electronic mail of its former employee, Mr. Peng Wenlong

("Mr. Peng") and preclude further testimony by Mr. Peng in this litigation.  Accordingly, on

September 18, 2015, the Court directed that an evidentiary hearing take place to determine

whether Taishan's actions amounted to spoliation, contempt, and/or required adverse inferences

relating to allegations that:

(1) Taishan knew of and refused or intentionally failed to disclose the current (i.e., post-employment) business relationships with and the locations or whereabouts of Mr. Peng; and
(2) Taishan knew that Mr. Peng had documents and/or computer-stored information but denied knowing the same or intentionally failed to disclose it and did not take proper measures to protect or collect these documents and/or computer-stored information. (R. Doc. 19657)

(R. Doc. 19657). The Court has now received the parties' argument and evidence and issues the following findings of fact and conclusions of law.

## II.     FINDINGS OF FACT

### a.     Taishan's Initial Appearance and the Subsequent Default Judgment

1.     Upon receipt of the June 15, 2009 transfer order from the Judicial Panel for Multidistrict Litigation, this Court promptly issued Pretrial Order No. 1, on June 16, 2009, and posted it on the Court's official website. *See* R. Doc. 2. Paragraph 14 of PTO 1 made clear the duty of each party and each counsel in the consolidated proceedings to preserve documents and, it further specified the potential consequences for the breach of this duty: "All parties and their counsel are reminded of their duty to preserve evidence that may be relevant to this action…Failure to comply may lead to dismissal of claims, striking of defenses, imposition of adverse inferences or other dire consequences."

2.     The first perfected service on Taishan in this litigation was on May 8, 2009 in *Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115. *Mitchell* was originally filed on March 6, 2009 in the U.S. District Court for the Northern District of Florida. *See* (R. Doc. 1-1, Case No. 09-4115).

3.     On May 1, 2009, *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687 was filed in the U.S. District Court for the Eastern District of Virginia as a Virginia class action against Taishan by the owners of homes located in Virginia which were alleged to contain Taishan-manufactured Chinese drywall. *See* (R. Docs. 1-1, 1-2, Case No. 09-6678). On August 3, 2009, Taishan was served in that matter pursuant to the Hague Convention. *See* (R. Doc. 1-7, Case No. 09-6687). *Germano* was then transferred to the U.S. District Court

2

for the Eastern District of Louisiana and consolidated with this MDL litigation on October 13, 2009. Thereafter, the class was expanded to a nationwide class. *See* (R. Doc. 470).

4.      Taishan failed to timely answer the complaints or otherwise enter an appearance in *Mitchell* and *Germano*, although it had been properly served in both matters. (R. Doc. 52). As a result, the Court after encouraging a response and allowing extensive delay finally entered preliminary defaults against Taishan in *Germano* and *Mitchell*. (R. Docs. 277, 487); *see In re Chinese Manufactured Drywall Products Liab. Litig.*, 894 F. Supp. 2d 819, 832 (E.D. La 2012) *aff'd*, 742 F.3d 576 (5th Cir. 2014) and 753 F.3d 521 (5th Cir. 2014).

5.      After affording Taishan more than a reasonable amount of time to answer or enter an appearance, the Court moved forward with an evidentiary hearing under FRCP 55, in order to monetize the claims of 14 intervening plaintiffs in *Germano* as a predicate for entry of a default judgment. (R. Docs. 502, 1223, 1258, 2380). Following this hearing on February 19 and 20, 2010, the Court issued detailed Findings of Fact & Conclusions of Law. (R. Doc. 2380). On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of the intervening plaintiffs, in the amount of $2,609,129.99. (R. Doc. 3031). On June 10, 2010, the last day to timely do so, Taishan filed a Notice of Appeal of the Default Judgment in *Germano*. (R. Doc. 3670). On this same day, Taishan also entered its appearance in *Germano* and *Mitchell*. (R. Doc. 3668).

6.      After Taishan entered its appearance in the MDL through its then-counsel Hogan Lovells LLP ("Hogan Lovells"), it immediately sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction, as well as on procedural grounds. (R. Docs. 5436, 5583).

7.      The Court of Appeal recognized that Taishan's motion for the first time raised jurisdictional issues which were not raised or addressed by the district court.  The Court of Appeal thus remanded the case to the district court to address the jurisdictional issue.

8.      Formal personal jurisdiction discovery of Taishan began in October 2010.  *See* (R. Docs. 5839, 5840).  Discovery included the production of both written and electronic documents, as well as the depositions of Taishan's corporate representatives.  This discovery required close supervision by the Court.  The first Taishan depositions were held in Hong Kong on April 4-8, 2011.  *See* (R. Docs. 8296, 8297).  Upon return to the United States, several motions were filed seeking to schedule a second round of Taishan depositions as a result of problems during the depositions.  The Court, after reviewing the transcripts from the depositions, concluded that the "depositions were ineffective." (R. Doc. 9107).  Accordingly, the Court ordered the parties to move forward with further written discovery and to schedule a second round of Taishan depositions, but with knowledgeable and prepared witnesses, a single translator, and Court supervision.  *See id.*

9.      The Court scheduled the second round of Taishan depositions for the week of January 9, 2012 in Hong Kong.  Counsel for the interested parties and Judge Fallon traveled to Hong Kong for these depositions.  On June 29, 2012, after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions to dismiss.  The Court coordinated its hearing with Judge Joseph Farina of the 11th Judicial Circuit of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

10.      Subsequently, on September 4, 2012, this Court determined that is had jurisdiction over TG and its alter ego TTP and denied the motions to vacate and dismiss.

4

Taishan appealed the decision of this Court. However, the rulings of this Court were affirmed by the Court of Appeals for the Fifth Circuit. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

11.     Taishan filed no petition for *writ of certiorari*, and the judgment in *Germano* became final and enforceable. In order to execute the judgment, Plaintiffs moved for a Judgment Debtor Examination. On June 20, 2014, the Court ordered Taishan to appear in open court on the morning of July 17, 2014 for the Judgment Debtor Examination. (R. Doc. 17774).

12.     Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination. Accordingly, on July 17, 2014, the Court entered an Order holding Taishan in contempt and assessing penalties, fees, and enjoining Taishan or its affiliates or alter egos from doing business in the United States until it purged itself of its contempt. (R. Doc. 17869). The Contempt Order further provided that if Taishan violated the injunction, it must pay a further penalty of 25% of the profits earned by the company or its affiliates who violate the order. *Id.*

**b. Taishan's Return to the Litigation and the Contempt Track**

13.     On February 17, 2015, Taishan returned to the litigation with the appearance of new counsel, Alston & Bird LLP ("Alston Bird").

14.     On February 20, 2015, the Plaintiffs' Steering Committee (the "PSC)") sought to continue its discovery of Taishan, issuing a 30(b)(6) deposition notice and seeking production of documents regarding, *inter alia*, Taishan's assets in the United States and entities affiliated with Taishan in an effort to determine if they or any affiliated entities did business in the United States in violation of the injunction. (R. Doc. 18369).

15.      On March 17, 2015, the Court ordered BNBM, BNBM Group, CNBM, CNBM Group, and Taishan to participate in an expedited discovery track related to the issue of whether Taishan or any of its affiliates or alter egos violated the Court's injunction by doing business in the United States during the period it was in contempt of Court.

16.      On March 19, 2015, the PSC served Taishan with a 30(b)(6) Notice of Deposition and expedited document requests related to violations of the Contempt Order (R. Doc. 17869) and alter-ego relationships among Taishan, BNBM, BNBM Group, CNBM, and CNBM Group.  (R. Doc. 18500).  The PSC also sought the deposition of Mr. Peng.  (R. Doc. 18502).

17.      On April 6, 2015, Taishan's counsel and the PSC engaged in a meet-and-confer-conference where Taishan's counsel informed the PSC of its intention to investigate the status of Mr. Peng's files and his current whereabouts.  (PSC Exhibit 30).

18.      On April 24, 2015, Mr. Herman of the PSC reported to the Court that little progress had been made and the PSC still had not been made aware of Mr. Peng's whereabouts or the location of his files.  (PSC Exhibit 70, pp. 10:10-13, 11:18-21, 13:21-14:1).

19.      On April 28, 2015, Taishan filed a discovery status report stating that Mr. Che Gang ("Mr. Che") would serve as Taishan's 30(b)(6) witness and that Mr. Peng had left Taishan's employment in the Spring of 2014.  (R. Doc. 18765).

20.      In an email to counsel for Taishan dated May 18, 2015, Mr. Herman of the PSC again inquired about Mr. Peng's files: "Have you located the e-files and other custodial files of Jia Tongchun and Wenlong Peng? When may we expect production?" (PSC Exhibit 44).

In that email, the PSC further requested that Taishan "concentrate efforts on the custodial files of Che Gang, Peng, Jia…" *Id.*

21.     Beginning on June 2, 2015, the PSC moved forward with the examination of Taishan's corporate designee, Mr. Che.  (PSC Exhibit 44).

22.     At the June 2, 2015 30(b)(6) deposition, Mr. Che testified that Mr. Peng had formally left Taishan's employment but had continued to assist Taishan with the U.S. Drywall litigation until that function was transitioned to Mr. Che.  (PSC Exhibit 85, 6/2/15 Deposition of Che Gang ("Che Depo."), 49:3-21).  While Mr. Che claimed to not know where Mr. Peng worked, he had been in telephone contact with Mr. Peng in preparation for and leading up to his deposition as the corporate representative for Taishan.  He stated he believed Mr. Peng lived in Taian City and provided Mr. Peng's phone number.  Che Depo., 6/2-4/2015, pp. 29:8-11, 49:3-21, 105:20-21, 106:1-107:19, 108:3-12, 150:3-13, 206:10-19.

23.     There were several topics about which Mr. Che was not fully able to testify, such as details about the refusal of Taishan to appear at the Judgment Debtor Hearing.  *See id.* 264:2-23. For such topics, he indicated that Mr. Peng was the person from Taishan who could have best answered these questions.  *Id.* 265:15-22.

     **c.  Discovery Related to Mr. Peng**

24.     From April 2015 through August 2015, Taishan and the PSC engaged in numerous meet-and-confer sessions on discovery-related issues, including the location of Mr. Peng's custodial files and his whereabouts.  (Taishan Supplemental Exhibits 3-24).

25.     Following a discovery-related meet-and-confer on August 28, 2015, and as evidenced by an email from the PSC to counsel for Taishan dated August 31, 2015, the PSC

was under the impression that Mr. Peng's laptop was unsearchable and/or incapable of providing responsive documents.  (PSC Exhibit 16).

26.    On August 31, 2015, Taishan produced a declaration from Chairman Jia, which stated that Mr. Peng had been the Manager of TG's Foreign Trade Department and Chairman Jia had "tasked Mr. Peng with the responsibility of monitoring the developments in the lawsuit, working with TG's counsel, and coordinating TG's involvement" in the litigation.  (PSC Exhibit 12, ¶ 4).  When Mr. Peng left Taishan in March 2014, Chairman Jia asked that he continue as "a special consultant continuing in the role that he served while an active employee," which he did "on-and-off as needed for several months, including in TG's decision to retain new counsel and resume participation in the U.S. lawsuits."  *Id*. at ¶ 5, 6.  Because of his continued assistance as a consultant, Mr. Peng and Taishan "entered into a more formal consulting agreement for his services for which he received a onetime lump sum payment."  *Id.* at ¶ 6.

27.    Despite Mr. Peng's continuing role as a consultant, Chairman Jia also stated, under penalty of perjury that "Mr. Peng voluntarily left the employment of TG in March 2014, to pursue another career at a company unrelated to TG, TTP, and to my knowledge, [and the knowledge of] any of the Defendants in this action, including any BNBM or CNBM entity" and Mr. Peng "never told me the name of the company where he currently works, nor has he told anyone at TG to my knowledge."  *Id.* at ¶ 3.  Chairman Jia, like Mr. Che, did offer a phone number, but said that Mr. Peng was no longer cooperating.  *Id.* at ¶ 7.

28.    On September 12, 2015, Taishan located Mr. Peng's desktop computer.  Taishan was unsuccessfully in locating Mr. Peng's work computer in April and May of 2015 but

ultimately located the computer in September, after Chairman Jia learned of the issue and insisted that the computer be found. (Taishan Supplement Exhibit 1).

29.     On September 13, 2015, the PSC emailed the Court with copies to opposing counsel alleging that a PSC-retained private investigator had discovered information about Mr. Peng's whereabouts and current employment. The PSC's email to the Court with copies to opposing counsel alleged spoliation and other discovery misconduct and averred that such misconduct may require the Court to impose sanctions. (PSC Exhibit 37).

30.     On September 16, 2015, on the eve of its continued deposition, Taishan provided the PSC with two new documents: a Declaration of Jia Tongchun for Clarification and Supplementation and an "Employment Agreement" with Mr. Peng from February 2015.

31.     The "Employment Agreement," dated February 2, 2015 (more than 11 months after Mr. Peng left Taishan but continued to consult with on an "as needed" basis), provided that "[b]ased on Mr. Peng's full understanding of the Taishan Chinese drywall litigations in U.S., [Taishan] hires [Mr. Peng] to be the consultant for these cases" for the sum of 50,000 Yuan plus expenses. (PSC Exhibit 46).

32.     In his new declaration, Chairman Jia "clarifies" some points he made in his prior declaration. (PSC Exhibit 11). First, while he had claimed that he was not told where Mr. Peng worked, he did in fact know the entire time that Mr. Peng worked at Shenyang Taishi Rock Wool Co., Ltd. ("Shenyang") which is a wholly-owned subsidiary of Taishi Rock Wool Co. Ltd. ("Taishi"). *Id.* at ¶ 4. While he claimed that Mr. Peng was at a company "unrelated" to Taishan or any of the other Defendants, in fact, Taishi was owned by Shandong Taihe Building Material Co., Ltd., which owns 92 percent of Taishi and 14 percent of Taishan, and is itself owned by Chairman Jia and his family. *Id.* at ¶ 4 ("I and my family are one of 503

9

individual shareholders or Shandong Taihe Building Material Co., Ltd.).  Notwithstanding the foregoing, Chairman Jia says that he held a "sincere belief that Sheyang is unrelated to any Defendant in this action" and he insisted that his prior declaration was "technically correct", but acknowledged that "it gave the misimpression that I personally did not know where Mr. Peng currently works, when in fact I do and I did know." *Id.* at ¶ 6.

33.  On September 17 and 18, 2015, the PSC deposed Chairman Jia in Hong Kong. As is pertinent to Mr. Peng's whereabouts, Chairman Jia testified that:

a.  He knew at all times where Mr. Peng worked.  (PSC Exhibits 92 and 93, 2015 Jia Deposition ("Jia Depo."), pp. 109:14-110:17, 110:19-11:18).

b.  Mr. Peng is Executive Director of Taishi.  *Id.*, pp. 110:19-111:18.

c.  Chairman Jia's wife is Chairman of the Board at Taishi.  *Id.*, p. 171:12-13.

d.  Chairman Jia first learned about Mr. Peng's employment at Taishi from his nephew who is, among other things, the legal representative of Shenyang.  *Id.*, p. 171:10-11.

34.  As is pertinent to Mr. Peng's computer, Chairman Jia testified that Mr. Peng continued to use his computer as a litigation consultant and it contains some of the information he kept about the litigation.  *Id.*, pp. 45:13-19, 86:14-18.

35.  The day after Taishan's 30(b)(6) deposition concluded, Taishan provided Mr. Peng's home address to the PSC.  (PSC Exhibit 32).

36.  On September 17, 2015, the Court ordered an evidentiary hearing on issues of spoliation, contempt, adverse inferences and possible penalties related to the discovery and disclosure of information related to Mr. Peng.  After the discovery of Mr. Peng's desktop

computer on September 12, the Court ordered Taishan to refrain from changing, deleting or modifying any aspect of the computer or its hard drive. (R. Doc. 19526).

37.    At an October 13, 2015 status conference, the Court ordered Taishan to produce from Mr. Peng's custodial files all non-privileged documents regardless of relevance to the contempt track or other issues in the litigation. The Court directed Taishan to produce the documents to the PSC on a rolling basis and to produce a privilege log.

38.    From October 16, 2015, through November 4, 2015, Taishan produced on a rolling basis over 84,000 documents from Mr. Peng's custodial files. The number of pages produced was more than 383,000. (PSC Exhibit 50). Taishan also provided a privilege log describing 3,150 items. (Taishan Supplemental Exhibit 1 and Taishan Exhibit 6).

### d.  The Deposition of Mr. Peng

39.    Mr. Peng who purportedly had previously refused to cooperate now agreed to voluntarily make himself available for a deposition.

40.    Mr. Peng voluntarily traveled from China to appear for two and half days of deposition testimony in New York City from November 12, 2015 through November 14, 2015. (PSC Supplemental Exhibit 145, 2015 Peng Depo. ("Peng Depo.")). During his deposition, he testified to the following:

   a.  He confirmed he consulted with Taishan for, and assisted Mr. Che with, matters related to the litigation. *Id.*, pp. 173:20-174:8, 195:6-196:4.

   b.  He used his personal computer and desktop for Taishan business, including his work on the litigation. *Id.* pp. 203:18-204:1, 204:15-205:12, 206:2-207:9.

   c.  All the documents relating to the litigation are electronic and were on his computers and emails. *Id.*, p. 223:13-23.

11

d. He was told in 2010 to preserve documents for the litigation. *Id.*, p. 226:4-15.

e. He left his desktop at Taishan when he last left his office in February 2014, but took his laptop with him. *Id.*, pp. 219:12-17, 240:21-241:5, 242:18-243:9, 277:13, 278:9-13.

f. He continued to serve as the litigation consultant with Taishan into 2015 when he gradually began to hand these responsibilities over to Mr. Che. *Id.*, p. 231:19-232:2.

g. He continued to use his laptop for business, including emails related to Taishan and the litigation, even after he left Taishan. *Id.*, pp. 204:15-205:12, 206:2-207:9, 209:10-13, 209:22-24, 211:6-15, 291:17-291:3.

h. He used a special email address when communicating on behalf of Taishan about the litigation and stopped using it in March 2015. *Id.*, pp. 334:24-335:2, 336:8-11, 336:25-337:10, 337:17-338:6, 339:3-13.

i. He turned over his laptop, the only one he ever used for Taishan business, to Mr. Che in October 2015. *Id.*, pp. 334:15-335:13.

j. He was not consulted about the Chain of Custody declaration that had been produced by Taishan and signed by Mr. Che. *Id.*, p. 351:16-22.

k. He willingly testified when Chairman Jia requested him to do so. *Id.*, pp. 172:24-173:9.

41. Because of this factual scenario, a hearing was set for November 17, 2015 to determine whether Taishan's actions amounted to spoliation, contempt and/or required adverse inferences and, if so, to determine the appropriate consequences regarding those actions.

12

### e. The November 17, 2015 Hearing

42.     On November 9, 2015, Taishan produced the Chain of Custody Statement of Che Gang, which outlines the chain of custody of Mr. Peng's desktop computer. The statement states that Taishan unsuccessfully attempted to locate Mr. Peng's work computer in April and May of 2015 and eventually located the computer on September 12, 2015. On September 25, 2015, after the 30(b)(6) depositions had concluded, Taishan learned that Mr. Peng had a laptop. On September 29, 2015, discovery vendor Grant Thorton imaged Mr. Peng's desktop computer hard drive and searched three of Mr. Peng's email addresses. On October 8, 2015, Mr. Peng tendered his laptop to Mr. Che, and the vendor imaged that laptop. On that date, each of three imaged drives were sealed into containers in the vendor's possession in China. On October 27, 2015, two additional emails for Mr. Peng are identified and searched. (PSC Exhibit 105).

43.     Prior to the November 17, 2015 evidentiary hearing, the Parties agreed to disclosure deadlines but could not agree on the scope of the hearing. At the October 21 status conference, the PSC proposed a broad scope. The Court rejected the PSC's proposal in favor of a more limited scope focused on Taishan's discovery conduct since Taishan's return to the litigation in February 2015. (R. Doc. 19656).

44.     The Court directed that an evidentiary hearing take place to address issues of spoliation, contempt, and/or adverse inferences relating to allegations that:

    a. Taishan knew of and refused or intentionally failed to disclose the current (i.e.,
       post-employment) business relationships with and the locations or whereabouts of
       Mr. Peng; and

      b.   Taishan knew that Mr. Peng had documents and/or computer-stored information but denied knowing the same or intentionally failed to disclose it and did not take proper measures to protect or collect these documents and/or computer-stored information. (R. Doc. 19657)

45.    The evidentiary hearing was held on November 17, 2015. Opening statements were made by counsel for the PSC and Taishan and exhibits were offered and admitted by both sides, subject to objections lodged with the Court. (R. Doc. 19752). Closing arguments were heard on December 15, 2015.

## III.    CONCLUSIONS OF LAW

46.    The Court finds, as a matter of law, that Taishan engaged in discovery abuses. Specifically, Taishan's protracted withholding of relevant evidence, as more fully described below, is sanctionable under Rule 37 of the Federal Rules of Civil Procedure and through this Court's inherent powers to issue discovery sanctions.

47.    When considering discovery abuses, the court must consider the suitability of remedies based on defendants' conduct. *See Coane v. Ferrara Pan Camdy Co.*, 898 F.2d 1030 (5th Cir. 1990). The court's remedies must be just and related to the conduct of the defendants. *Insurance Corp. of Ireland v. Campagnie Des Bauxites de Guinee*, 456 U.S. 694, 707 (1984). Thus, the issue before the Court is the type and nature of the appropriate remedies.

### a.   **The PSC Has Not Proven Spoliation**

48.    This Court's Pretrial Order No. 1, entered on June 16, 2009, required all parties to "take reasonable steps to preserve all documents, data and tangible things containing information potentially relevant to the subject matter of this litigation." (R. Doc. 2)

49.     The Court finds insufficient evidence of intentional failure to preserve evidence under PTO 1 to justify a finding of spoliation.  The PSC has failed to prove that Taishan destroyed, lost, or altered evidence relevant to potential violations of the injunction or the relationship between Taishan, BNBM, and CNBM during the contempt period.  *See Williams v. Briggs Co.*, 62 F.3d 703, 708 (5th Cir. 1995) (no finding of spoliation where "the evidence in issue was not destroyed or lost" and plaintiff offered no evidence to suggest defendant did anything to alter the condition of the evidence in issue).

50.     The PSC does not claim that any relevant Taishan evidence is missing, or that Taishan destroyed any relevant evidence.

51.     The Court does not find evidence that Taishan intentionally violated PTO 1 or the general duty of preservation.

52.     Taishan's corporate representative, Mr. Che, pursuant to the PSC's request, provided a chain of custody affidavit regarding Mr. Peng's two computers.  Mr. Peng's desktop computer, which was Taishan's property, was preserved and eventually imaged.  Notably, the desktop was misplaced for a period of time but Taishan ultimately located it and produced documents on the device to the PSC.  Mr. Peng also delivered his personal laptop to Taishan, which produced the documents on that device to the PSC.  Taishan also obtained emails from multiple web-based email accounts belonging to Mr. Peng.

53.     In the absence of proof of missing evidence, the Court will not impose any adverse inferences.  *See Williams*, 62 F.3d at 708.

54.     Notwithstanding the fact that the evidence does not support a finding of spoliation to justify imposing adverse inferences, the evidence is sufficient to support of finding of discovery abuses warranting sanctions.

15

### b. The PSC Has Proven Intentional Delay in Responding to the Contempt Track Discovery Warranting Sanctions

55.     When issuing discovery sanctions, Courts consider pleadings, motions, papers, and prior discovery orders to determine whether defendants' conduct warrants providing remedies to the opposing party.  Often it is necessary to consider orders entered by the court and motions filed by the parties requesting and compelling discovery to make findings regarding whether a party committed any discovery abuses.  The court may consider promises made by counsel when considering discovery abuses.  *Metropolitan Life Ins. Co. v. Camman*, No. 88 C 5549, 1989 WL 153558, at * 4 (N.D. Ill. November 7, 1989) (violation of an order found where party failed to deliver documents it promised it would produce).

56.     The court should apply its review of evidence even-handedly, but is not bound by the rules of evidence.  *See Jensen v. Phillips Screw Company*, 546 F.3d 59, n.5 (1st Cir. 2008) ("We do not suggest that the rules of evidence necessarily apply to fact finding in the context of sanctions.  That is not the case.")  Thus, the court should consider based on its judgment whether the evidence is reliable and its opinions will not be disturbed unless it abuses its discretion.  *See Moore v. CITGO Refining and Chemicals Co., LP*, 735 F.3d 309 (5th Cir. 2013).

57.     Rule 37 provides that a district court may impose sanctions for a party's failure to comply with discovery orders.  Fed.R.Civ.P. 37(b)(2)(A).

58.     An award of sanctions under Rule 37(b)(2)(A) must be both "just" and "fair", meaning that the conduct is sanctionable and that the sanction is appropriate to the wrong. *See Insurance Corp. of Ireland v. Compagnie des Bauxites*, 456 U.S. 694, 707 (1982).

59.     Additionally, an award of fees and expenses must be made in addition to sanctions under Rule 37(b)(2)(A).  Rule 37(b)(2)(C) provides that "the court must order the

16

disobedient party, the attorney advising the party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

60.   Taishan has conceded its failure to relay Mr. Peng's whereabouts and produce documents from his computer in a timely manner.  There is no justification for this failure.  Chairman Jia admitted that he knew where Mr. Peng worked and Taishan has produced no evidence to justify the delay in locating Mr. Peng's computers.

61.   Ultimately, there was a delay of approximately eight months between the March 2015 request for Mr. Peng's documents and deposition and the October 16 initial production of Mr. Peng's documents and Mr. Peng's November 2015 deposition.

62.   Taishan should be made accountable for those costs and expenses attributable to its unjustified eight-month delay in complying with discovery requests.  Such expenses will relate to the time the PSC spent briefing the instant issue, expenses related to both the delay and eventual deposition of Mr. Peng, and such other expenses as may be relevant to the tasks forced upon the PSC by Taishan's delay in complying with the discovery orders of this Court.  The PSC shall submit to the Court within (30) days of the entry of this order, to serve on Taishan and produce to the Court the expenses it believes were incurred as a result of Taishan's delay from March 19, 2015 through Mr. Peng's November 2015 deposition.

63.   Having conceded that Rule 37 is applicable, Taishan claims that there is no prejudice to justify further sanctions.  However, this is not the standard under Rule 37.  Even if a party eventually cures a violation of Rule 37, such as by a late production of withheld evidence, they are still subject to sanction.  *Chilcutt v. United States*, 4 F.3d 1313, 1319 (5th Cir. 1993) (affirming the trial court's finding that discovery sanctions were warranted where

17

the Government had disadvantaged the plaintiffs by producing the documents on the eve of trial and by causing the plaintiffs' counsel to devote a great amount of time, not to preparing for trial, but to dealing with the Government's discovery abuses).

64.     The question turns to what is "just and fair" for a party that has answered orders and discovery with evasiveness, possible outright lies, and delay.  Any sanctions need have some relationship to the claim at issue.  Accordingly, Courts have typically considered the striking of factual defenses or adverse inferences related to the information that a party has kept from discovery.  As the information at issue in the present proceeding was eventually produced to the PSC, neither the striking of factual defenses nor the finding of adverse inferences is warranted.

65.     However, the culpability evidenced in this case is clear.  According to Chairman Jia's Declaration for Clarification, Taishan acted in bad faith in keeping the whereabouts of Mr. Peng concealed.  Additionally, Taishan offered no evidence as to why two prior searches for Mr. Peng's computer revealed nothing whereas mere insistence by Chairman Jia that the computer be found in September 2015 proved fruitful.

66.     Accordingly, **IT IS ORDERED** that

a.   All documents produced from Mr. Peng's computers and emails since October 2016 be accurately (non-machine) translated into English by Taishan and at Taishan's cost.

b.   Taishan pay all litigation costs and fees to the PSC that are related to the discovery delay by Taishan from March 19, 2015 through Mr. Peng's deposition, the amount of which will be determined based on records to be submitted to the Court by the PSC.

18

   c.  Taishan pay $40,000 as a discovery penalty, which is equivalent to $5,000 per month for the eight-month delay attributable to Taishan in keeping the whereabouts of Mr. Peng concealed and in failing to produce Mr. Peng's ESI documents in a timely manner.

67.   **IT IS FURTHER ORDERED** that Taishan's Motion to Quash Plaintiffs' Subpoena for Production of Items Related to Peng Wenlong (R. Doc. 19733) and Taishan's Motion to Exclude Plaintiffs' Proposed Exhibits and Irrelevant Depositions Designations for the November 17, 2015 Hearing (R. Doc. 19731) are **DISMISSED** as **MOOT**.

New Orleans, Louisiana, this 8th day of January, 2016.

UNITED STATES DISTRICT JUDGE

# JOINT APPENDIX TAB # 13

**MINUTE ENTRY**
**FALLON, J.**
**FEBRUARY 17, 2016**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 |
| | SECTION: L |
| | JUDGE FALLON |
| | MAG. WILKINSON |

**THIS DOCUMENT RELATES TO ALL CASES**

The monthly status conference was held on this date in the Courtroom of District Judge Eldon E. Fallon.  Prior to the conference, the Court met with liaison counsel and the chairs of the steering committees.  Liaison Counsel reported to the Court on the topics set out in Joint Report No. 75.  (Rec. Doc. 19964).  The conference was transcribed by Ms. Jodi Simcox, Official Court Reporter.  Counsel may contact Ms. Simcox at (504) 589-7780 to request a copy of the transcript.

    I.       PRE-TRIAL ORDERS

All Pre-Trial Orders are posted on the court's website located at www.laed.uscourts.gov, which has a tab that links directly to "Drywall MDL."  The Court's website also includes other postings relevant to the litigation.

    II.      STATE COURT TRIAL SETTINGS

    (1) None.

1

JS10(00:29)

III.  STATE/FEDERAL COORDINATION

On March 18, 2010, the Court entered Pre-Trial Order No. 19 appointing State and Federal Coordination Committees. The parties will be prepared to discuss State/Federal coordination at the monthly status conference on January 14, 2016.

IV.  OMNIBUS ("OMNI") CLASS ACTION COMPLAINTS

The following is a list of filed Omni Complaints and Complaints in intervention:

Omni I:  *Sean and Beth Payton, et al v. Knauf Gips KG, et al,* Case No. 2:09-cv-07628 (E.D.La.). Omni IA, IB and IC have been filed. Numerous Motions to Dismiss have been filed.

Omni II:  *Kenneth and Barbara Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civil Action No.10-361(E.D.La.). Omni IIA, IIB and IIC have been filed. Numerous Motions to Dismiss have been filed.;

Omni III:  *Gross, et al. v. Knauf Gips, K.G., et al.*, Case No. 09-6690 (E.D.La.), the PSC filed a Motion in Intervention (attaching a proposed Complaint in Intervention, *Mary Anne Benes, et al. v. Knauf Gips, K.G., et al.*, (E.D.La.) (Omni III). Omni IIIA has been filed. Numerous Motions to Dismiss have been filed.

Omni IV:  *Joyce W. Rogers, et al. v. Knauf Gips, K.G., et al.*, Case No. 10-362 (E.D.La.) (Omni IV). Omni IVA, IVB and IVC have been filed. Numerous Motions to Dismiss have been filed.

Omni V:  *Amato v. Liberty Mutual Ins. Co., et al.*, Case No. 10-932. Numerous Motions to Dismiss have been filed. On January 14, 2015, Plaintiffs filed a Motion to Amend Complaint by Interlineation [Rec. Doc. 18263]. On March 26 2015, the Court granted the Motion to Amend Complaint by Interlineation [Rec. Docs. 18551 & 18590].

Omni VI:  *Charlene and Tatum Hernandez v. AAA Insurance*, Case No. 10-3070. This Omni VI Complaint has been dismissed;

Omni VII:  *Kenneth Abel v. Taishan Gypsum Co., Ltd., et al,* No. 11-080. Numerous Motions to Dismiss have been filed.

Omni VIII:  *Daniel Abreu v. Gerbrueder Knauf, et al,* No. 11-252. Numerous Motions to Dismiss have been filed.

Omni IX:       *Laura Haya, et al, v. Taishan Gypsum Co., Ltd., et al,* No. 11-1077. Numerous Motions to Dismiss have been filed.

Omni X:        *Block v. Gebrueder Knauf Verwaltungsgesellschaft KG, et al*, No. 11-1363. Numerous Motions to Dismiss have been filed.

Omni XI:       *Benoit, et al v. Lafarge, S.A., et al*, No. 11-1893. Numerous Motions to Dismiss have been filed.

Omni XII:      *Arndt, et al v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al,* No. 11-2349. Numerous Motions to Dismiss have been filed.

Omni XIII:     *Richard and Constance Almeroth, et al, v. Taishan Gypsum Co., Ltd., et al.,* No. 12-0498. Numerous Motions to Dismiss have been filed.

Omni XIV:      *Jessica Cassidy, et al v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al,* No. 11-3023. Numerous Motions to Dismiss have been filed.

Omni XV:       *Eduardo and Carmen Amorin, et al v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al*, No. 11-1672.

Omni XVI:      *Eduardo and Carmen Amorin, et al v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al*, No. 11-1395.

Omni XVII:     *Eduardo and Carmen Amorin, et al v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al*, No. 11-1673.

Omni XVIII:    *Paul Beane, et al v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al,* No. 13-609.

Omni XIX:      *Eduardo and Carmen Amorin, et al v. The State-Owned Assets Supervision and Administration Commission of the State Council, Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al*, No. 14-1727. On August 11, 2015, the PSC filed a Motion for an Order Directing the Clerk of Court to serve SASAC Through Diplomatic Channels [Rec. Doc. 19376]. On August 19, 2015 the Court issued an Order [Rec. Doc. 19402] granting the motion. The PSC has complied with the Court's Order and has provided all necessary documentation to the Clerk of Court for service through diplomatic channels pursuant to the Foreign Sovereign Immunities Act.

Omni XX:       *Stephen and Diane Brooke, et al. v. The State-Owned Assets Supervision and Administration Commission of the State Council, Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et*

*al.*, No. 15-4127. Summonses have been issued on Taishan and TTP, through counsel, and on SASAC via the Hague Convention. Service was perfected on Taishan and TTP, and an Affidavit of Service was filed on October 16, 2015 [Rec. Doc. 19610]. On September 18, 2015, the PSC filed a Motion to Approve Alternative Service of Process on BNBM and CNBM Entities [Rec. Doc. 19522]. On September 30, 2015 BNBM filed their opposition to the PSC's motion [Rec. Doc. 19558] and CNBM filed a Notice of Joinder [Rec. Doc. 19559]. On October 6, 2015, the PSC filed a Reply Brief in Support of its Motion [Rec. Doc. 19598] and on October 9, 2015, BNBM filed a Sur-Reply [Rec. Doc. 19615]. On October 20, 2015, the PSC filed Plaintiffs' Amended Omnibus Class Action Complaint (XX) [Rec. Doc. 16925]. Summonses have been issued on Taishan and TTP, through counsel, and on SASAC via the Hague Convention. On November 9, 2015, the Court granted the motion and issued Order & Reasons [Rec. Doc. 19713].

V.     <u>PLAINTIFFS' MOTIONS TO ESTABLISH A PLAINTIFFS' LITIGATION FEE AND EXPENSE FUND</u>

On March 22, 2011, the PSC filed a Motion to Establish a Court Supervised Account for Voluntary Deposit of Funds to Compensate and Reimburse Common Benefit Counsel [Rec. Doc. 8308]. On April 13, 2011, the Court entered an Order directing that any party may voluntarily deposit seventeen percent (17%) of settlement proceeds for common benefit fees (12%) and costs (5%) into the registry of the Court [Rec. Doc. 8545.] A number of voluntary deposits have been made to the Clerk of Court pursuant to the motion.

VI.     <u>KNAUF REMEDIATION PROGRAM</u>

The Lead Contractor in the Knauf settlements, Moss & Associates, continues to estimate the cost of remediation for homes. Remediation is complete on 2,140 homes and 629 condominiums, work has begun on 34 homes / 2 condominiums, and 13 more remediations are set to begin soon. To date, Moss has mailed out 2,850 Work Authorization packets to homeowners in the various states. Moss has received 2,845 executed Work Authorization packets, and 5 Work Authorization packets are outstanding. Moss is also scheduled to perform Xactimate inspections

for 6 homes within the next 10 days. Homeowners and/or counsel with questions about remediations may call Moss & Associates at 1-954-524-5678.

VII.  INEX, BANNER, KNAUF, L&W and GLOBAL SETTLEMENTS

On February 7, 2013, the Court entered an Order and Judgment:  (1) Certifying the INEX, Banner, Knauf, L&W, and Global Settlement Classes, and (2) Granting Final Approval to the INEX, Banner, Knauf, L&W, and Global Settlements [Rec. Doc. 16570].  On February 19, 2013, the Court issued an Order Correcting Clerical Error [Rec. Doc. 16580] in the February 7, 2013 Order [16570].

On March 13, 2013, the PSC and Settlement Class Counsel filed a Motion for an Order:  (1) Appointing Allocation Committees for the INEX and Global Settlements; and (2) Approving Allocation Plans for the INEX, Banner and Global Settlements [Rec. Doc. 16609].  On March 15, 2013, the Court entered an Order and Judgment:  (1) Appointing Allocation Committees for the INEX and Global Settlements; and (2) Approving Allocation Plans for the INEX, Banner and Global Settlements [Rec. Doc. 16616].   On April 24, 2013, the Court entered an Order and Judgment (1) Appointing Allocation Committees for the INEX and Global Settlements; and (2) Approving Allocation Plans for the INEX, Banner and Global Settlements [Rec. Doc. 16782]. The registration period for the Knauf, Banner, INEX, Global, and/or L&W Class Settlements expired on October 25, 2013 [Rec. Doc. 17157].

A representative from BrownGreer will be present at the status conference to address settlement claims issues. BrownGreer filed Notices of Approved Claims Administrator Procedures [Rec. Doc. 17090 and 17160]; these procedures are recited in nine Claims Administrator Procedures from September 12, 2013 through September 11, 2014.

On August 12, 2013, a Joint Notice of Filing of Settlement Documents was filed by PLC and KLC [Rec. Doc. 16978] attaching the Settlement Agreement Regarding Post-December 9, 2011 Claims Against the Knauf Defendants in MDL No. 2047, with attached exhibits.

On August 19, 2013, Class Counsel filed a Motion to Establish Various Qualified Settlement Funds (QSFs) and to Appoint Fund Administrator and Depository Bank relating to the Global, Knauf, Banner, InEx and L&W Settlements [Rec. Doc. 17009]. On September 9, 2013, the Court issued various Orders approving the QSF's [Rec. Docs. 17064 thru 17076]. The Whitney National Bank was substituted as Escrow Agent in place of US Bank as the depository bank for the Remediation Fund [Rec. Doc. 17219].

On October 23, 2014, The Fee Committee's Inspection Costs and Hold Back Motion Pursuant to Pre-Trial Order No. 28(E) was filed with the Court [Rec. Doc. 18081] and on December 18, 2014, the Court entered an Order granting the Fee Committee's Inspection Cost and Hold Back Motion [Rec. Doc. 18215].

On August 31, 2015, the Knauf Defendants filed a Motion to Reconsider Order Regarding Oceanique's Motion for Court Review of Special Master's Opinion [Rec. Doc. 19428]. On September 15, 2015, Oceanique filed an Opposition to the Motion to Reconsider [Rec. Doc. 19502]. On October 16, 2015, Knauf filed a Reply to the Opposition [Rec. Doc. 19624]. On November 2, 2015, the Court entered an Order [Rec. Doc. 19683] setting the motion for hearing following the November status conference. After the Motion to Reconsider was granted [Rec. Doc. 19753], an Evidentiary Hearing took place on December 7, 2015. On December 21, 2015, Oceanique filed its Proposed Findings of Fact and Conclusions of Law Related to the December 7, 2015 Evidentiary Hearing [Rec. Doc. 19925] and the Knauf Defendants filed their Proposed Findings of Fact and Conclusions of Law Regarding Oceanique Development Company

Evidentiary Hearing [Rec. Doc. 19930]. On January 21, 2016, the Court issued its Findings of Fact and Conclusions of Law regarding the December 7, 2015 Oceanique Evidentiary Hearing [Rec. Doc. 19994].

On January 21, 2016, the Knauf Defendants and the PSC filed a Joint Motion for Court Approval of Calculation and Amount of Attorney's Fees Pursuant to the L&W Settlement Agreement [Rec. Doc. 19993].

VIII.   TAISHAN, BNBM AND CNBM DEFENDANTS

The Court has issued Orders establishing three (3) tracks in connection with proceedings involving the Taishan, BNBM and CNBM Defendants [see Rec. Docs. 18757 and 18844].

**1.   The Court's July 17, 2014 Contempt Court Track:**

On June 20, 2014, the Court ordered Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. to appear in open court on July 17, 2014 to be examined as a judgment debtor [Rec. Doc. 17774]. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination and the Court held Taishan in contempt [Rec. Doc. 17869] and Ordered that Taishan pay $15,000.00 in attorney's fees to Plaintiffs' counsel; that Taishan pay $40,000.00 as a penalty for contempt; that Taishan, and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process, and if Taishan violates the injunction, it must pay a further penalty of 25% of the profits earned by the Company or its affiliate who violate the Order for the year of the violation.

On July 31, 2014, the PSC filed a Motion for Contempt against corporate officers of Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd., Chairmen Jia Tonchun and Peng Shiliang [Rec. Doc. 17920]. On September 18, 2014, the Court heard the Motion for

Contempt and took the matter under advisement. In addition, on February 10, 2015, the PSC filed a Motion of Plaintiff-Intervenors and the PSC for and Expedited Hearing to Enforce the Court's July 17, 2014 Contempt Order and Injunction [Rec. Doc. 18302, and supplemented at Rec. Doc. 18404]. On February 10, 2016, Plaintiffs-Intervenors and the PSC filed a Motion for Leave to Substitute Motion to Enforce the Court's July 17, 2014 Contempt Order and Injunction and Accompanying Memorandum of Law in Support Thereof, In Their Entirety, Under Seal [Rec. Doc. 20032]. The CNBM and BNBM entities expect to file a response to the PSC's Motion for Leave.

Taishan entered an appearance with the Court in February 2015 and to satisfy the contempt. Taishan paid both the sum of $15,000 in attorney's fees to Plaintiffs' counsel and the contempt penalty of $40,000 in March 2015 [Rec. Doc. 18764]. In addition, Taishan voluntarily paid the full amount of the *Germano* judgment and all court costs associated with the *Germano* lawsuits; therefore, on April 20, 2015, the Court issued Order & Reasons (Awarding Disbursement of the Germano Intervenors' Judgment) [Rec. Doc. 18725]. Taishan filed a motion to formally "lift" the order of contempt by showing compliance and that motion [Rec. Doc. 18449] is still pending.

On March 17, 2015, the Court ordered BNBM, BNBM Group, CNBM, CNBM Group, and Taishan to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists" [Rec. Doc. 17869]. The Court at the time was unable to assess whether there is a need to enforce the associated penalty of 25% of profits.

On April 24, 2015, the Court explained to all parties that: "there are two tracks of these proceedings regarding which the Court has ordered the parties to focus discovery: (1) the Court's July 17, 2015 contempt order; and (2) class damages. For the former, the parties must focus the present discovery on (a) which, if any, entities constitute "affiliates," and (b) whether any such

8

affiliate(s) conducted any business in the United States subsequent to the Court's July 17, 2014 Order through March 2015.

On June 12, 2015, the PSC filed a Motion to Extend Discovery Deadline With Respect to the Contempt Track Discovery [Rec. Doc. 19124]. On June 15, 2015, BNBM filed a Response [Rec. Doc. 19136]. On June 16, 2015, the Court issued an Order [Rec. Doc. 19146] extending the deadline for completion of the contempt track discovery through August 14, 2015.

On July 9, 2015, the CNBM Entities filed a Motion to Clarify the July 17, 2014 Contempt Order or, in the alternative, to Vacate the Order to the Extent it Applies to the CNBM entities [Rec. Doc. 19271 and 19356], which was joined by the BNBM Entities [Rec. Doc. 19294 and 19358]. On July 14, 2015 and July 16, 2015, the Court issued Orders [Rec. Doc. 19300 and 19309, respectively] setting the Motion for hearing following the monthly status conference on August 7, 2015. The motion was denied on August 17, 2015 (Rec. Doc. 19373), and CNBM and BNBM filed notices of appeal from the Court's denial of the Motion. (Rec. Doc. 19448 and 19534). The BNBM Entities filed a motion to strike the affidavit of Russ Herman [Rec. Doc. 19354-1], which was granted. The PSC filed a motion to dismiss the CNBM and BNBM Appeals with the Fifth Circuit Court of Appeals and on November 17, 2015, the Fifth Circuit Court of Appeals granted the Plaintiffs' motion to dismiss the Appeals.

On July 16, 2015, China National Building Material Investment Co. Ltd. ("CNBMI"), BNK International, LLC ("BNK"), and Jeffrey J. Chang ("Chang") (collectively the "Texas Litigants") filed a Joint Request for Direction regarding the July 17, 2014 Contempt Order [Rec. Doc. 19311]. On July 20, 2015, CNBM filed a Response [Rec. Doc. 19318], on July 23, 2015, the PSC filed their Response [Rec. Doc. 19328]; and on July 29, 2015, CNBM filed a Reply [Rec. Doc. 19342]. The Court's Order denying the Motion to Clarify the July 17, 2014 Contempt Order

or, in the alternative, to Vacate the Order to the Extent it Applies to the CNBM entities held that the issues of (i) whether CNBMI is an affiliate or subsidiary of Taishan and (ii) whether CNBMI's Texas lawsuit constitutes conducting business in the United States in violation of the contempt order be deferred until the relevant discovery and any necessary evidentiary hearing is completed [Rec. Doc. 19392].

Taishan filed a motion to dismiss the Ace complaint [Rec. Doc. 19296], which was heard following the August 7th monthly status conference. The matter was taken under advisement and the parties await a ruling from the Court.

2.   **Class Damages Track**:

On July 23, 2014, Omnibus Motion for Class Certification Pursuant to Rules 23(a)(1)-(4) and 23(b)(3) was filed by Plaintiffs [Rec. Doc. 17883] and on September 26, 2014, the Court issued Findings of Fact and Conclusions of Law With Respect to Plaintiffs' Omnibus Motion for Class Certification Pursuant to Rules 23(a)(1)-(4) and 23(b)(3) [Rec. Doc. 18028], which also issued Legal Notice [Rec. Doc. 18028-1]. The PSC advises that notices were sent in accordance with the Court's Order.

On October 29, 2014, Plaintiffs filed a Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(B) and Request for Approval of Supplemental Notice [Rec. Doc. 18086].  An Order was issued on October 30, 2014 [Rec. Doc. 18097] setting the matter for hearing, with oral argument, following the December 17, 2014 status conference.  On December 18, 2014, the Court entered an Order granting the "notice" portion of the Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(B) [Rec. Doc. 18216] and a separate Order approving the supplemental notice [Rec. Doc. 18217].  On March 2, 2015, Plaintiffs filed Proposed Findings of Fact and Conclusions of Law [Rec. Doc. 18405] with respect to the Motion for Assessment of Class

10

Damages.  On April 13, 2015, the PSC filed a Revised Trial Plan for the Assessment of Class Damages [Rec. Doc. 18673].  On April 15, 2015, the PSC filed a Memorandum Regarding Effects of Default and Issue Preclusion in April 28, 2015 Class-Wide Damages Trial (REDACTED)[Rec. Doc. 18694].  On April 24, 2015, the PSC filed a Second Revised Trial Plan for the Assessment of Class Damages [Rec. Doc. 18753].  Further, on May 8, 2015, Taishan moved to decertify the class [Rec. Doc. 18879] and the BNBM and CNBM entities have joined in Taishan's motion [Rec. Docs. 18883 and 18885, respectively]. (*See* May 28, 2015 Minute Entry [Rec. Doc. 19035] and Transcript.)  An evidentiary hearing, with oral argument, occurred on June 9, 2015.  On September 8, 2015 the PSC notified the Court that its proposed class of claimants for remediation decreased again from 3,852 claimants to potentially fewer than 1,800 as a result of the Plaintiffs' voluntary dismissals.  In response, Taishan submitted a supplemental class damages opposition to address the Plaintiffs' class damages revisions.  Rec. Doc. 19490.  Taishan also filed a motion to set a briefing schedule on class decertification.  Rec. Doc. 19546.  BNBM joined in Taishan's motion for a briefing schedule.  On October 5, 2015, the PSC filed its Opposition [Rec. Doc. 19572].  The Court has not yet established that briefing schedule.

Following the evidentiary hearing on June 23, Taishan filed Proposed Findings of Fact and Conclusions of Law [Rec. Doc. 19194], BNBM filed Proposed Findings of Fact and Conclusions of Law [Rec. Doc. 19198], and the PSC filed a Proposed Findings of Fact and Conclusions of Law Related to the June 9, 2015 Remediation Damages Trial [Rec. Doc. 19197].

On June 23, 2015, Taishan also filed a Motion to Exclude Plaintiffs' Class Spreadsheet [Rec. Doc. 19191], and BNBM filed a Notice of Joinder [Rec. Doc. 19193].  On July 6, 2015, the Plaintiffs filed their Opposition [Rec. Doc. 19254].   On July 8, 2015, Taishan filed a Reply Memorandum [Rec. Doc. 19279], and BNBM filed a Notice of Joinder [Rec. Doc. 19266] and on

July 13, 2015, the Plaintiffs filed a Sur-Reply [Rec. Doc. 19302]. On July 16, 2015, Taishan filed

a Notice Regarding Taishan's Motion to Exclude Plaintiffs' Class Spreadsheet [Rec. Doc. 19310]

and on July 17, 2015, Plaintiffs' filed a Response [Rec. Doc. 19317]. On August 3, 2015, the

Court entered Order & Reasons [Rec. Doc. 19355] denying the motion. Subject to the

aforementioned September 8, 2015 correspondence from the PSC and the related requests by

Taishan and BNBM to submit briefing regarding the damages sought by Plaintiffs and subject to

the above-described motion by Taishan (joined by BNBM) to set a briefing schedule on the class

decertification, the motion on the class assessment of damages is ready for consideration by the

Court, and the parties will be prepared to discuss this further at the January 14, 2016 status

conference.

On November 6, 2015, the PSC filed a Motion for Expedited Hearing on Setting Phased

Individual Damage Trials Against Taishan [Rec. Doc. 19705]. On November 10, 2015, Taishan

filed its preliminary response/opposition to the PSC's Motion for Expedited Hearing [Rec. Doc.

19712]. On November 12, 2015, the PSC filed a Motion for Leave to File PSC reply and proposal

for scheduling individual damages mini trials [Rec. Doc. 19721]. On November 16, 2015, BNBM

filed its response to the PSC's motion for Individual Damage Trials [Rec. Doc. 19738].

**3.**     <u>**Jurisdiction Track**</u>:

On April 1, 2015, CNBM and CNBM Group filed a Motion for Order Preserving Defenses

[Rec. Doc. 18581]. On April 2, 2015, the Court granted the motion [Rec. Doc. 18583].

On April 29, 2015, BNBM PLC filed a Motion to Dismiss the Complaints Pursuant to

Rules 12(B)(2) and 12(B)(5) [Rec. Doc. 18841], a Motion to Dismiss for Lack of Personal

Jurisdiction [Rec. Doc. 18849], and a Motion to Vacate Entries of Preliminary Default [Rec. Doc.

18851].   On June 12, 2015, the Court issued Order & Reasons [Rec. Doc. 19127] denying the motions as premature.

On June 16, 2015, China New Building Materials Group, China New Building Materials Co., CNBMIT Co., CNBMIT Co., Ltd., CNBM USA Corp., and United Suntech Craft, Inc. filed a Motion to Dismiss the Complaints Pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(4) and 12(b)(5) [Rec. Doc. 19179].   On July 9, 2015, CNBM Group requested the Court schedule for hearing on September 16, 2015 its pending motion to dismiss based upon sovereign immunity [Rec. Doc. 19267]. Additional letter briefs were submitted by the parties and on July 22, 2015, the Court issued an Order [Rec. Doc. 19323] setting CNBM's Motion to Dismiss the Complaints Pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(4) and 12(b)(5) [Rec. Doc. 19179] to be heard on the date of the December 2015 status conference and issued another Order rescheduling CNBM's Amended Motion to Dismiss.  [Rec. Doc. 19549].

CNBM Group filed a revised motion to dismiss based upon the Foreign Sovereign Immunities Act (FSIA) ("FSIA Motion").  [Rec. Doc. 19403.]  On September 25, 2015, CNBM Group filed a Motion for Reconsideration of Court's Minute Order [Rec. Doc. 19526] Resetting Briefing Schedule on Motion to Dismiss [Rec. Doc. 19542]. On October 14, 2015, the Court issued Order & Reasons vacating a portion of the September 17, 2015 Minute Entry [Rec. Doc. 19612]. On November 2, 2015, the State of Louisiana filed its response to the FSIA Motion [Rec. Doc. 19667], on October 29, 2015, the PSC filed its response UNDER SEAL [Rec. Doc. 19689], on November 24, 2015, CNBM Group filed a reply brief [Rec. Doc. 19798], on November 30, 2015, the PSC filed a Supplemental Response under seal [Rec. Doc. 19681], on December 3, 2015, CNBM Group filed a Motion for Leave to File Supplemental Reply [Rec. Doc. 19870], on December 22, 2015, the PSC filed a Motion for Leave to File Second Supplemental Response

13

[Rec. Doc. 19934], on December 23, 2015, CNBM Group filed a Response to the Motion for Leave to File Second Supplemental Response [Rec. Doc. 19936], and on December 28, 2015, the PSC filed a Motion for Leave to File a Reply to the Response filed by CNBM Group [Rec. Doc. 19937]. On January 8, 2016, the PSC filed a Second Supplemental Response UNDER SEAL [Rec. Doc. 19980] and on January 12, 2016, CNBM Group filed their Second Supplemental Reply [Rec. Doc. 19962], pursuant to the Court's order permitting same [Rec. Doc. 19953]. On November 25, 2015, the PSC filed a motion to strike CNBM's declarations [Rec. Doc. 19800] and on December 1, 2015, CNBM filed a response to this motion [Rec. Doc. 19834]. The matter was heard on December 8, 2015.

On October 22, 2015, Beijing New Building Materials Public Limited Company filed a Motion to Dismiss the Complaints Pursuant to Rules 12(b)(2) and 12(b)(5) [Rec. Doc. 19646], and on October 26, 2015, Beijing New Building Material (Group) Co., Ltd. filed a Motion to Dismiss the Complaints Pursuant to Rules 12(b)(2) and 12(b)(5) [Rec. Doc. 19664]. On December 18, 2015, the Court issued a Second Amended Order [Rec. Doc. 19920] setting CNBM's and BNBM's Motions to Dismiss on Personal Jurisdiction and Failure to Serve for February 18, 2016 at 9:00 o'clock a.m., with oral argument, and establishing briefing deadlines. On January 22, 2015, the PSC and the Attorney General filed separate opposition memoranda to BNBM and CNBM's motions to dismiss [Rec. Docs. 19995, 20000 and 20001]. On February 12, 2016, BNBM and CNBM filed reply memoranda in support of their pending motions to dismiss. Rec. Docs. 20038, 20040, 20041, 20042, and 20043. On January 22, 2016, the PSC filed a motion to strike and/or limit the declarations of BNBM's expert witnesses, Bruce Deal and Jeff Gordon [Rec. Docs. 19996 and 20037] and the State of Louisiana filed a Notice of Joinder [Rec. Doc. 20024]; BNBM filed its response to this motion on February 12, 2016. Rec. Doc. 20035. On February 15, 2016, the

PSC filed a motion for leave to file a reply memorandum in support of the PSC's motion to strike and/or limit the declarations of Gordon and Deal. Rec. Doc. 20046. On February 15, 2016, the PSC filed a motion to strike the February 11, 2016 declaration of Donald Clarke [Rec. Doc. 20045]. The PSC filed a motion for alternative service of process on the BNBM and CNBM entities. [Rec. Doc. 19522]. On September 30, 2015 BNBM filed their opposition to the PSC's motion. [Rec. Doc. 19558]. CNBM joined in opposing the PSC's motion seeking alternative service. [Rec. Doc. 19559]. On October 9, 2015, the PSC filed a reply memorandum, Rec. Doc. 19598, and on October 16, 2015 BNBM filed a sur-reply, Rec. Doc. 19615. BNBM has requested oral argument regarding Plaintiffs' motion for alternative service. [Rec. Doc. 19594]. On November 9, 2015, the Court granted the motion and issued Order & Reasons [Rec. Doc. 19713]. In accordance with the Court's Order, the PSC claims that service has been perfected on various CNBM and BNBM entities in regards to various different complaints, and Affidavits of Service have been filed.

On November 30, 2015, the PSC filed a motion under seal to compel a second wave of corporate 30(b)(6) depositions of various CNBM, BNBM, and Taishan entities [Rec. Doc. 19815]. On December 17, 2015, the PSC filed an Unopposed Motion to Withdraw Motion to Compel [Rec. Doc. 19913].

In connection with the three (3) tracks, the PSC has undertaken discovery of the Taishan Defendants, as well as third-parties. The following depositions have been taken:

1.  04/17/2015 Steve Kim (Sunpin Solar Development);
2.  04/16/2015 Rosemary Daszkiewicz (Plum Creek Timber);
3.  04/22/2015 Donald H. Sebastian, Ph.D. (New Jersey Institute of Technology);
4.  04/24/2015 Fred Paulsen (CTIEC-TECO American Technology, Inc.);
5.  05/13/2015 Samuel I. Hull (Hull Forest Products, Inc.);
6.  05/18/2015 Steven Zika (Hampton Companies);
7.  05/19/2015 George Inglis, P.E.;
8.  05/20/2015 Jeffrey J. Chang;
9.  05/21/2015 M. Laurentius Marais;
10. 05/22/2015 David Pogorilich;

15

11. 05/26/2015 Jacob S. Woody (BrownGreer);
12. 06/02/2015 Gang Che (Taishan Gypsum Co., Ltd. & Tai'an Taishan Plasterboard Co., Ltd. ("TTP"));
13. 06/03/2015 Gang Che (Taishan Gypsum Co., Ltd. & TTP);
14. 06/04/2015 Gang Che (Taishan Gypsum Co., Ltd. & TTP);
15. 06/05/2015 Zhangli Chang (CNBM);
16. 06/06/2015 Zhangli Chang (CNBM);
17. 06/07/2015 Zhangli Chang (CNBM);
18. 06/16/2015 Guoping Zhou (CNBM Group);
19. 06/17/2015 Guoping Zhou (CNBM Group);
20. 06/18/2015 Guoping Zhou (CNBM Group);
21. 07/08/2015 Yu Chen (BNBM);
22. 07/09/2015 Yu Chen (BNBM);
23. 07/10/2015 Yu Chen (BNBM);
24. 07/11/2015 Yu Chen (BNBM);
25. 07/15/2015 Yanming Zhao (BNBM Group);
26. 07/16/2015 Yanming Zhao (BNBM Group);
27. 07/17/2015 Yanming Zhao (BNBM Group);
28. 07/27/2015 Triorient Trading, Inc.;
29. 08/04/2015 Great Western Building Materials;
30. 08/04-05/2015 Cao Jianglin (BNBM, BNBM Group, CNBM & CNBM Group);
31. 08/19/2015 PABCO (Emil Kopilovich);
32. 08/25-27/2015 Wang Bing (BNBM, CNBM & Taishan Gypsum);
33. 09/04/2015 Stephan Company;
34. 09/14-15/2015 Song Zhiping (CNBM, CNBM Group & BNBM Group);
35. 09/16/2015 Peng Shou (CNBM Co., Ltd.);
36. 09/17-18/2015 Jia Tongchun;
37. 10/27/2015 United Suntech;
38. 10/28/2015 CNBM Forest Products (Canada), Ltd.;
39. 11/03/2015 CNBM (USA) Corp.; and
40. 11/04/2015 CNBM Trading;
41. 11/12-13/2015 PENG Wenlong;
42. 11/13/2015 Morgan Stanley;
43. 11/17-18/2015 Jushi USA Fiberglass Co., Ltd.;
44. 12/07/2015 JinYu Hu (BNBM & CNBM);
45. 12/17/15 Bruce Deal;
46. 01/15/16 Jeffrey Gordon; and
47. 02/03/16  Curtis Milhaupt.

The following depositions may be taken or have been noticed:

1.  TBD China Jushi Co., Ltd.;
2.  TBD Jushi Group Co., Ltd.;
3.  TBD JP Morgan Chase & Co.;
4.  TBD Baoan International Investment Co., Ltd.;

16

5. TBD Cui Xingtai (BNBM/CNBM deposition notice cancelled on Oct. 13, 2015); and

6. TBD Chungang Dong.

Several of the depositions were set on an expedited basis and additional depositions are in the process of being scheduled and set up.

A telephone status conference took place on September 17, 2015, and the Court issued a Minute Entry [Rec. Doc. 19526] setting an evidentiary hearing on spoliation, contempt, adverse inferences and possible penalties, if necessary, on November 10, 2015 at 9:00 a.m. On October 21, 2015, the Court issued an Order and Plan for November 10, 2015 Evidentiary Hearing [Rec Doc. 19630], on October 29, 2015, issued an Amended Order and Plan [Rec. Doc. 19657] and on November 3, 2015 issued a Second Amended Order and Plan [Rec. Doc. 19681]. The Evidentiary Hearing took place on November 17, 2015 and on December 15, 2015, the Court heard closing arguments from both sides regarding the November 17, 2015 hearing. On January 8, 2016, the Court entered Findings of Fact and Conclusions of Law [Rec. Doc. 19559].

IX.     VENTURE SUPPLY & PORTER BLAINE DEFENDANTS

On July 9, 2013, the Court entered an Order (1) Certifying Each of Four Chinese Drywall Class Settlements (Nationwide Insureds Settlement Agreement, Porter-Blaine/Venture Supply Settlement Agreement, Tobin Trading and Installers Settlement Agreement, and Builders Mutual Insureds Settlement Agreement) Relating to Virginia and Certain Other Remaining Claims; (2) Granting Final Approval to the Four Chinese Drywall Class Settlements; and (3) Approving an Allocation Plan for the Four Class Settlements [Rec. Doc. 16934]. On July 12, 2013, Class Counsel filed a Motion to Approve Funding, Administration and Special Master Services [Rec. Doc. 16939] and the Court entered an Order granting the motion on July 19, 2013 [Rec. Doc. 16956].

17

On November 20, 2014 the Court entered and Order approving the Proposed Real Property Allocation and directing distribution of funds accordingly [Rec. Doc. 18145]. In accordance with the Court's Order, the Garretson Resolution Group (the Claims Administrator for the Four Virginia-based Settlements) has issued all Real Property Payments.

On December 6, 2013, Class Counsel for the Virginia-based settlements filed a Motion for an Order (1) Approving the Other Loss Claim Form and (2) Setting a Deadline of March 17, 2014 for Filing Other Loss Claims in Each of the Four Virginia-Based Chinese Drywall Class Settlements [Rec. Doc. 17308]. On December 9, 2013, the Court issued an Order (1) Approving the Other Loss Claim Form and (2) Setting a Deadline of March 17, 2014 for Filing Other Loss Claims in Each of the Four Virginia-Based Chinese Drywall Class Settlements [Rec. Doc. 17319]. Processing of all Other Loss claims is now complete. On October 23, 2015, the Court issued and entered an Order directing distribution of Other Loss payments in accordance with the Settlement Administrator's proposed allocation [Rec. Doc. 19639]. In accordance with the Court's Order, the Garretson Resolution Group (the Settlement Administrator for the Four Virginia-based Settlements) is in the process of issuing all Other Loss payments, which are scheduled to be mailed on November 3, 2015.

On January 6, 2016, Class Counsel filed a Motion for Distribution of Settlement Funds [Rec. Doc. 19951] and on January 20, 2016 the Court issued an Order [Rec. Doc. 19990].

X.  PLAINTIFF AND DEFENDANT PROFILE FORMS

On November 3, 2011, the Court entered Pre-Trial Order No. 25 [Rec. Doc. 11151] setting a deadline of November 15, 2011 for the completion and submission of profile forms.

The BNBM and CNBM entities advise that they have submitted Profile Forms subject to their pending motions.

18

## XI. FREQUENTLY ASKED QUESTIONS

The "MDL FAQs" may be found at www.laed.uscourts.gov/Drywall/FAQ.htm. Liaison counsel reminds the parties to review the FAQs before contacting Liaison Counsel. The parties will be prepared to discuss this issue at the monthly status conference on November 17, 2015.

## XII. MATTERS SET FOR HEARING FOLLOWING THE CURRENT STATUS CONFERENCE

1. Gary and Patricia Lustberg's Motion to Submit a Late Filed Foreclosure Claim [Rec. Doc. 19948].

2. Plaintiff Fernando Cerna's Motion to Compel Settlement Administrator to Disburse GBI Funds [Rec. Doc. 19666].

3. Plaintiff Samuel Perone's Motion for Rehearing and/or Reconsideration of Order Denying Global, Banner, In-Ex Repair and Relocation Expenses Claim [Rec. Doc. 19832].

## XIII. PHYSICAL EVIDENCE PRESERVATION ORDER

On October 9, 2009, the Court issued Pre-Trial Order 1(B) relating to the preservation of physical evidence from properties that may be repaired during the course of these MDL proceedings. Pre-Trial Order 1(I) was entered by the Court on January 24, 2012 [Rec. Doc. 12257] and on March 20, 2015 the Court entered Pre-Trial Order 1(J) [Rec. Doc. 18528]. The parties will be prepared to address this matter at the status conference on January 14, 2016.

## XIV. ENTRY OF PRELIMINARY DEFAULT

Pursuant to Minute Entry dated February 23, 2012 [Rec Doc. 12687], the Plaintiffs' Omnibus Motion for Preliminary Default Judgment [Rec. Doc. 11234] and errata thereto [Rec. Doc. 11773, 12265, 12551] was granted. On February 24, 2012, the Court signed an Entry of Preliminary Default [Rec. Doc. 12599] of certain defendants identified on Exhibit A thereto. Thereafter, additional Motions for Preliminary Defaults and Clarifications were issued by the

Court [Rec. Docs Nos. 15412, 15898, 15972, 16030, 17089, 17172, 17722, 17378, 17781, 17792, 17793, 17791, 17800, 17814, 17802, 17815, 17803, 17816]. The PSC has not yet certified to the Court that it has completed the filing of Plaintiffs' amended complaints. The parties will be prepared to discuss this further at the monthly status conference on January 14, 2016.

## XV.    ALREADY REMEDIATED HOMES

The Already Remediated Homes Committee has met on several occasions to discuss properties that have not yet been resolved and the Knauf Defendants are in the process of filing motions with the Court to address those unresolved properties. The parties will be prepared to discuss this further at monthly status conference on February 17, 2016.

## XVI.    NEXT STATUS CONFERENCE

The next monthly status conference is scheduled for March 22, 2106, at 9:00 a.m. Any interested persons unable to attend in person may listen-in via telephone at (800)-260-0702. The access code will be 384126 and the Chairperson will be Judge Fallon. The April monthly status conference will take place on April 26, 2016 at 9:00 a.m. The conference call information for the conference will be available on the Court's MDL website on the calendar page.

# JOINT APPENDIX TAB # 14

Case 2:09-md-02047-EEF-MBN Document 22365-78 Filed 11/19/19 Page 2 of 4 PageID #: 799
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed....
2017 WL 1476595

2017 WL 1476595
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

IN RE: CHINESE-MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION
This Document Relates to: All Cases

CIVIL ACTION NO. 09-02047
|
Signed 04/21/2017

**SECTION "L" (5)**

**ORDER & REASONS**

ELDON E. FALLON, UNITED STATES DISTRICT
JUDGE

*\*1* Before this Court are four motions pursuant to Rule
12(b) of the Federal Rules of Civil Procedure seeking
an order dismissing complaints against the Defendants
for lack of personal jurisdiction and for insufficient
process and service of process. Specifically, these motions
are as follows: (1) Motion to Dismiss by China New
Building Materials Group ("CNBM Group"), China New
Building Materials Co. ("CNBM"), CNBMIT Co. Ltd.
("CNBMIT"), CNBM USA Corp. ("CNBM USA"),
and United Suntech Craft, Inc. ("United Suntech")
(collectively, the "CNBM Entities") (R. Doc. 19527); (2)
Motion to Dismiss by Beijing New Building Materials
Public Limited Company ("BNBM") (R. Doc. 19646);
(3) Motion to Dismiss by Beijing New Building Material
Group ("BNBMG") (R. Doc. 19664); and (4) Motion
to Dismiss the State of Louisiana's Second Amended
and Restated Petition by BNBM and BNBM Group
(collectively, the "BNBM Entities") (R. Doc. 19663).
Having read the parties' briefs, evaluated the relevant
jurisdictional discovery, reviewed the applicable law, and
heard the parties on oral argument, the Court now issues
this Order and Reasons.

**Table of Contents**

I. BACKGROUND...——

II. PROCEDURAL BACKGROUND...——

III. FACTUAL BACKGROUND...——
A. The Corporate Structure of the CNBM Business
Group...——

  1. CNBM Group's Role as Parent of the CNBM
Business Group...——

  2. BNBM Group is a Minority Shareholder in
CNBM...——

  3. CNBM Group is a Shareholder in CNBM...——

  4. CNBMIT, CNBM USA, and United Suntech are
companies within the CNBM Corporate Family...——

  5. CNBM is a Majority Shareholder in BNBM...——

  6. BNBM's Relationship with its Subsidiary
Taishan...——

B. BNBM PLC's Contacts with Florida...——

C. Defendant Entities' Response to the Instant
Litigation...——

IV. IMPUTING TAISHAN'S FORUM CONTACTS
TO PARENT CORPORATIONS FOR PURPOSES OF
PERSONAL JURISDICTION...——
A. Standard of Review...——

B. Legal Standards Governing Alter Ego
Relationships...——

  1. Choice of Law...——

  2. Chinese Company Law...——

  3. Forum State Law...——

C. Legal Standard Governing Agency
Relationships...——

D. Imputation Analysis...——

  1. Chinese Cultural and Economic Context...——

  2. Analysis Under Florida Law...——

  3. Analysis Under Virginia Law...——

Case 2:09-md-02047-EEF-MBN Document 22366-78 Filed 11/19/19 Page 3 of 44 PageID# 800
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed..., Page 3 of 44

2017 WL 1476595

4. Analysis Under Louisiana Law...——

V. PERSONAL JURISDICTION OVER BNBM BY VIRTUE OF ITS CONTACTS IN FLORIDA...——
A. Personal Jurisdiction Over a Foreign Defendant...——

B. Florida's Long-Arm Statute...——

  1. BNBM's Business in the state...——

  2. Tortious Acts within the State...——

  3. Causing Injury in the State...——

C. Due Process Clause...——

D. Minimum Contacts...——

  1. Specific Jurisdiction...——

E. Cause of Action Arises from Minimum Contacts...——

F. Fair Play and Substantial Justice...——

**\*2** VI. SERVICE OF PROCESS...——

VII. CONCLUSION...——

## I. BACKGROUND

The present MDL litigation arises from alleged property damage and personal injuries sustained as a result of the presence of Chinese-manufactured drywall in homes and other buildings in a number of states. In the instant motions, Defendants are contesting personal jurisdiction and service of process. Defendants move to dismiss on the grounds that they do not have sufficient minimum contacts with the forum states to meet the long arm statutes or satisfy due process. Defendants contend they are not alter egos of Taishan and, thus, imputing jurisdiction is not justified. Against these contentions, Plaintiffs assert that there is substantial evidence that these foreign corporate entities acted as alter egos, agents, or within a single business enterprise, in unison with Taishan to sell defective drywall to American customers. It is the law of the case that personal jurisdiction has been established over Taishan. *Chinese Drywall*, 742 F.3d 576 & 753 F.3d 521. Therefore, the critical issue before this Court is whether the CNBM and BNBM Entities are alter egos or agents of Taishan or in a single business enterprise

such that Taishan's contacts with the forum states, which were sufficient to establish personal jurisdiction, may be imputed to the CNBM and BNBM Entities.

Given the substantially similar nature of the arguments in the four pending motions, this Order & Reasons will analyze the four pending motions in the following manner. First, it will briefly summarize the procedural background of this litigation. Second, it will describe the factual background relevant to the personal jurisdiction arguments. Third, it will address the critical issue of whether Taishan's contacts with the forum states should be imputed to the CNBM and BNBM Entities. Fourth, it will address whether the BNBM Entities' contacts in Florida are sufficient to establish this Court's personal jurisdiction over the BNBM Entities. Finally, it will address the Defendants' insufficient service and service of process arguments.

## II. PROCEDURAL BACKGROUND

From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 829 (E.D. La. 2012), *aff'd*, 742 F. 3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall. Accordingly, these homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 2047 in the U.S. District Court, Eastern District of Louisiana.

Case 2:09-md-02047-EEF-MBN Document 22365-78 Filed 11/19/19 Page 4 of 44 PageID #: 801
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...

2017 WL 1476595

**\*3** The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities, and (2) the Taishan Entities. The litigation has focused upon these two entities and their downstream associates, and has proceeded on strikingly different tracks for the claims against each group as described below:

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts. The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009. *See* (R. Doc. 18). Thereafter, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall. *See* (R. Doc. 2713). The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed Findings of Fact and Conclusions of Law and entered a Judgment in the amount of $164,049.64, including remediation damages in the amount of $136,940.46, which represented a cost of $81.13 per square foot based on the footprint square footage of the house. *See* (R. Doc. 3012).

Subsequently, the Knauf Entities entered into a pilot remediation program with the Plaintiffs' Steering Committee ("PSC") in the MDL. This program was largely based upon the remediation protocol formulated by the Court from the evidence in *Hernandez.* The Knauf pilot remediation program is ongoing and has, at present, remediated more than 2,200 homes containing KPT Chinese drywall using the same general protocol. At the Court's urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which is designed to resolve all Knauf-related, Chinese drywall claims. *See* (R. Doc. 12061-5). In addition to the Knauf Settlement Agreement, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles

almost all of the Knauf Entities' chain-of-commerce litigation. Although the Court occasionally must deal with settlement administration and enforcement issues, the Knauf portion of this litigation is largely resolved.

The litigation against the Chinese entities has taken a different course. The Chinese Defendants in the litigation include the principal Chinese-based Defendant Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include the CNBM and BNBM Entities.

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687; (2) *The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115; (3) *Gross v. Knauf Gips KG*, Case No. 09-6690; and (4) *Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361. The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. *See* (R. Doc. 52); (R. Doc. 1-7) (Case No. 09-6687). Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both of these cases. *See* (R. Docs. 277, 487).

**\*4** Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the Preliminary Default in *Germano* on the Plaintiffs' claimed damages. *See* (R. Doc. 502, 1223, 1258, 2380). At this hearing, the Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases. Following this hearing, which occurred on February 19 and 20, 2010, the Court issued detailed Findings of Fact & Conclusions of Law. *See* (R. Doc. 2380). On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano*, in favor of the Plaintiffs. (R. Doc. 3031). On the last day to timely do so, June 10, 2010, Taishan filed a Notice of Appeal of the Default Judgment in *Germano* and entered its appearance in *Germano* and *Mitchell*. (R. Docs. 3668, 3670).

After TG entered its appearance in the MDL, it quickly sought to have the Final Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction, as well as on procedural grounds. *See* (R. Docs. 5436, 5583). However, because of the

Case 2:09-md-02047-EEF-MBN Document 22365-78 Filed 11/19/19 Page 5 of 44 PageID# 802
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...

2017 WL 1476595

pending appeal, this Court was without jurisdiction to address any motions filed by TG. *See* (R. Doc. 5504). Accordingly, TG sought and was granted by the Fifth Circuit, a stay of its appeal to allow this Court to provide an indicative ruling on TG's motions to vacate the preliminary default and default judgments. *See* (R. Doc. 5649). In response, this Court issued an order pursuant to Federal Rule of Civil Procedure 62.1 to allow it to consider TG's motions. *See* (R. Doc. 6101). In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve TG's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. *See, e.g.*, (R. Docs. 5839, 5840). Discovery has included the production of both written and electronic documents, as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery has often been contentious, requiring close supervision by the Court. The Court has presided over regularly-scheduled status conferences to keep the parties on track, and conducted hearings and issued rulings to resolve numerous discovery-related disputes. *See, e.g.*, (R. Docs. 7136, 7511).

The first Taishan depositions were held in Hong Kong on April 4-8, 2011. *See* (R. Docs. 8296, 8297). Thirteen attorneys traveled to Hong Kong and deposed the following three Taishan witnesses: (1) Jia Tongchun, General Manager, Director of Board of Directors, and five-percent owner of TG; (2) Peng Wenglong (a.k.a. Frank Clem), Manager of Foreign Trade Department of TG in 2005, salesperson at TTP from 2006-07, and current Manager of Foreign Trade Department at TG; and (3) Zhang Jianchun, Secretary of TG and TTP. *See id.*

Upon return to the United States, several motions were filed seeking to schedule a second round of Taishan depositions as a result of problems during the depositions and seeking discovery sanctions against Taishan. *See* (R. Docs. 8685, 8695, 8755, 8758, 8768, 8792, 8805). Taishan opposed these motions. *See* (R. Docs. 8841, 8842). The Court, after reviewing the transcripts from the depositions, concluded that the "depositions were ineffective because of disagreement between interpreters,

counsel, and witnesses, translation difficulties, speaking objections, colloquy among counsel and interpreters, and in general ensuing chaos." *See* (R. Doc. 9107). Accordingly, the Court ordered the parties to move forward with further written discovery and to schedule a second-round of Taishan depositions, but this time with knowledgeable and prepared witnesses, a single translator, and Court supervision. *See id.* The parties complied with the Court's orders and met regularly with the Court to resolve their further discovery disputes. *See* (R. Docs. 9524, 10092, 9649, 9944, 10007, 10216, 10269, 10799, 11175, 10804, 11138, 11192, 11326).

**\*5** The Court scheduled the second round of Taishan depositions for the week of January 9, 2012, in Hong Kong. *See* (R. Docs. 10804, 11138, 11192). The Court appointed a Federal Rule of Evidence 706 expert to operate as the sole interpreter at the depositions. *See* (R. Doc. 11533). Counsel for the interested parties and Judge Fallon traveled to Hong Kong for these depositions. The following witnesses were deposed or re-deposed: (1) Peng Wenglong (a.k.a. Frank Clem); (2) Jia Tongchun; (3) Che Gang (a.k.a. Bill Cher), Manager of International Trading for Taishan, salesperson at TG from 2001-06 and 2009-12, and salesperson at TTP from 2006-07; (4) Peng Shiliang, General Manager and Chairman of Board of Directors of TTP from 2006-09, employee of TTP, and Plant Manager of TG from 2009-12; and (5) Fu Tinghuan, Supervisor at TG, Deputy General Manager at TG, and Director of TTP. Because the Court was present at the depositions, objections were ruled upon immediately and the majority of problems which plagued the first round of depositions were absent. Also, the Court was able to observe the comments, intonation, and body language of the deponents. Upon return from Hong Kong, the parties informed the Court that minimal further discovery was necessary before briefing could be submitted on Taishan's personal jurisdiction challenges.

In April 2012, Taishan filed various motions, including its motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with Judge Joseph Farina of the 11th Judicial Circuit Court of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

Case 2:09-md-02047-EEF-MBN Document 22367-78 Filed 11/19/19 Page 6 of 44 PageID# 803
In re: Manufactured Drywall Products Liability Litigation, Not Reported in Fed...

2017 WL 1476595

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss, and held that it maintained personal jurisdiction over Taishan. *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG. The Court certified an interlocutory appeal and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan and TTP. *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 753 F.3d 521 (5th Cir. 2014); *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 742 F.3d 576 (5th Cir. 2014). The time for writs of certiorari passed and the issue of personal jurisdiction over Taishan became firmly settled.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. (R. Doc. 17774). Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination and the Court held Taishan in contempt and ordered that Taishan pay $15,000.00 in attorney's fees to Plaintiffs' counsel; that Taishan pay $40,000.00 as a penalty for contempt; that Taishan, and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process, and if Taishan violates the injunction, it must pay a further penalty of 25% of the profits earned by the Company or its affiliate who violate the Order for the year of the violation. (R. Doc. 17869).

On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). (R. Doc. 17883). Taishan did not appear and, on September 26, 2014, this Court certified a class of "[a]ll owners of real properties in the United States, who are named Plaintiffs [in the various MDL complaints] asserting claims for remediated damages arising from, or otherwise related to, Taishan drywall." *See* (R. Doc. 18028 at 34-35).

Taishan entered an appearance with the Court in February 2015 and, to satisfy the contempt, Taishan paid both the sum of $15,000 in attorney's fees to Plaintiffs' counsel and the contempt penalty of $40,000 in March 2015. (R. Doc. 18764). On March 17, 2015,

the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists." (R. Doc. 17869). The instant motions are directly concerned with this relationship.

**\*6** Most recently, in March 2016, this Court granted CNBM Group's Motion to Dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act and therefore outside the jurisdiction of this Court. 28 U.S.C. § 1603(b). The Court determined that the tortious activity exception did not apply, because the alleged tortious conduct did not occur within the United States. 28 U.S.C. § 1605(a)(5). Further, the Court found that the commercial activity exception did not apply in this case, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because Plaintiffs failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the Motion and dismissed CNBM Group from the present litigation. *See* (R. Doc. 20150).

## III. FACTUAL BACKGROUND

### A. The Corporate Structure of the CNBM Business Group

#### 1. CNBM Group's Role as Parent of the CNBM Business Group

At the top of the CNBM Corporate family tree is CNBM Group, a state-owned entity organized under the laws of the People's Republic of China. CNBM Group is—and was, at the time this suit was filed—directly and wholly owned by the state. *See* Cao Decl. ¶¶ 3-6. CNBM Group conducts no business in the United States, and does not itself manufacture, produce, market, distribute, ship or sell any building products or construction materials, including drywall. *Id.* ¶ 9. Since 2005, CNBM Group has been a controlling shareholder of BNBM Group by directly and/or indirectly holding 100% of BNBM Group's shares. *See* Zhao Dep. at 385:4-24 [MTD Ex. 5]. Beginning in 2005, CNBM Group was the sole shareholder of BNBM Group, directly holding 100% of BNBM Group's stock. *See* 2005 CNBM Annual Report at 8. On December 31, 2005, CNBM Group transferred 25% of its equity

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 7 of 44 PageID #: 804
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed..., 2017 WL 1476595
2017 WL 1476595

holding in BNBM Group to CNBM Import and Export, another wholly-owned subsidiary of CNBM Group. *See* 2005 BNBM Group Auditor's Report at 6 [MTD Ex. 17]. Thereafter, CNBM Group continued to maintain total ownership of BNBM Group's stock, although the percentages of CNBM Group's direct holdings of BNBM Group's shares, and the corresponding percentages of its indirect holdings, have shifted over the years. No entity in which CNBM Group is *directly* invested, including BNBM Group, is directly engaged in any aspect of the drywall business.

As the ultimate parent, CNBM Group acts as the strategic center for the business conglomerate in four primary aspects: (1) strategy management—CNBM Group "guides all subsidiaries to strictly adhere to the Group Corporation's determined strategy on business activities, to ensure the realization of the Group Corporation's strategic goals"; (2) decision making management—"exercises the decision making power as the fund contributor on major issues such as its subsidiaries' investment and financing, restructuring, etc."; (3) resource management—"coordinates and integrates various domestic and overseas resources ...", and (4) culture management—"guides subsidiaries ... [in] forming a set of unified enterprise culture values within [CNBM Group]." *See* [MTD Ex. 57].

CNBM Group issues technical safety codes to its gypsum plasterboard enterprises, and assigns BNBM with specific responsibility "for drafting of the code." *See* [MTD Ex. 68]. CNBM Group's policies control the "safety technology of gypsum plasterboard enterprises," and are mandatory in nature. *Id.* CNBM also requires that its subsidiaries complete annual Comprehensive Risk Management Reports "stating what are the risks for [the particular] year, what are the things that need to be done and how to prevent." *See* Taishan's 2011 Risk Management Report.

CNBM Group provides training to the middle- and senior-level leaders of BNBM Group, CNBM, BNBM, and Taishan. In 2011, CNBM Group held a three-day course for "people in charge of a functional department in the headquarters of the Group Corporation and the people of a higher level, and the personnel who come from a subsidiary (group) company or a research institute but are managed by the Group Corporation or are subject to the pre-placement archival management." *See* [MTD Ex.

74]. Taishan's Chairman Jia Tongchun was directed by BNBM to attend this course. *Id.*

### 2. BNBM Group is a Minority Shareholder in CNBM

**\*7** In 1996, with the investment of CNBM Group, BNBM Group became a wholly state-owned limited liability company. In 1997, seeking to raise public capital for its drywall manufacturing business, BNBM Group formed BNBM PLC ("BNBM"), a public company listed on the Shenzen stock exchange. After BNBM was formed, BNBM Group stopped manufacturing drywall and BNBM became the sole manufacturer of Dragon Brand drywall. BNBM Group continued to operate in other sectors of the building materials market.

As part of the 2004 corporate restructuring in preparation for CNBM's public offering (discussed in more detail below), BNBM Group transferred its 60.33% equity interest in BNBM to CNBM. In consideration, BNBM Group acquired a minority interest in CNBM. *See* 2005 BNBM PLC Annual Report. Thus, BNBM Group no longer had any direct ownership in BNBM at the time BNBM acquired its ownership interest in Taishan. At present, BNBM Group owns approximately 27.5% of CNBM. *See* 2014 CNBM Annual Report.

The CNBM Articles of Association limit BNBM Group's power as a stockholder. Many important business decisions must be decided by a "special resolution," which requires "more than two-thirds of the voting rights represented by the shareholders." *See* Articles of Association of CNBM, January 17, 2014, at 32, Art. 8.16. Such decisions include increasing or decreasing capital, issuing stock, warrants, or similar securities, issuing bonds, engaging in mergers, undergoing dissolution or liquidation, amending the articles of association, or taking other actions "likely to have a material impact" on the company. *Id.* at 34, Art. 8.23. BNBM Group is also precluded from assuming management of CNBM. "Unless prior approval is obtained at a general meeting" of the shareholders, "the Company shall not enter into any contract with any persons other than Directors, supervisors, general managers and other senior management members pursuant to which such person shall be responsible for managing the whole or any part of the Company's business." *Id.* at 27, Art. 8.3. As a 30% stockholder of CNBM, BNBM Group may not exercise

Case 2:09-md-02047-EEF-MBN Document 22365-78 Filed 11/19/19 Page 8 of 44 PageID# 305
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed..., 2017 WL 1476595

2017 WL 1476595

its voting rights "in a manner prejudicial to the interests of all or some of the shareholders of the Company." *Id.* at 25, Art. 7.5.

### 3. CNBM Group is a Shareholder in CNBM

Like its parent (CNBM Group), CNBM is not directly engaged in the manufacture or sale of building materials. It is a holding company with investments in other Chinese entities engaged in various businesses related to the building industry, including cement, fiberglass, solar energy, lumber, steel, and drywall. CNBM does not manufacture, produce, market, distribute, ship or sell any drywall. *See* Chang Decl. ¶ 3. On March 28, 2005, CNBM was converted into a publicly traded joint stock limited company on the Hong Kong Stock Exchange ("HKSE"), with CNBM Group and several wholly-owned CNBM Group subsidiaries possessing approximately 95% of the share capital of CNBM immediately prior to the Global Offering. *See* Global Offering at 153 [MTD Ex. 38]. To accomplish this Public Offering, CNBM Group executed a reorganization of its subsidiaries aimed to "position the Company [CNBM], then a wholly-owned subsidiary of [CNBM Group] as the holding company" of its building materials products and engineering services businesses. *Id.* at 89.

The conversion of CNBM into a publicly listed company on the HKSE shifted CNBM Group's ownership of share capital in CNBM. CNBM Group "is deemed to own the shares directly held by BNBM Group, CNBM Import & Export, and Building Materials Academy." *See* 2006 CNBM Annual Report at 45 n.1. Thus, by virtue of its shareholdings, after completion of the Global Offering, CNBM Group directly and indirectly held 60.34% of CNBM's total share capital, making CNBM Group the "controlling shareholder" of CNBM. [1] *Id.* at 43-45. Following the Global Offering, CNBM Group's direct and indirect ownership in CNBM's shares has declined slightly. [2] However, it continued to control the highest percentage of CNBM's total shares, and consequently, has been and remains the "Controlling Entity" of CNBM. [3] That said, over half the shares of CNBM are owned by public investors. *See* 2014 CNBM Annual Report.

**\*8** CNBM Group and CNBM share common employees. Since 2005, Song Zhiping has been the

Chairman of CNBM Group and the Chairman and Executive Director of CNBM. [4] *See* [MTD Ex. 1]. Zhou Guoping is the Chief Economist for CNBM Group and, since 2005, a Supervisor for CNBM. *Id.* Additionally, Chang Zhangli is the Vice President and Executive Director of CNBM and has been a Secretary to the Board for CNBM since 2005. [5] *Id.*

### 4. CNBMIT, CNBM USA, and United Suntech are companies within the CNBM Corporate Family.

CNBMIT is a Chinese entity that acts as an import and export agent for Chinese companies. *See* Chaun Decl. ¶ 6. CNBMIT has never manufactured, produced, marketed, distributed, shipped or sold drywall in either China or the United States. However, it does conduct some of its import and export business in the United States. CNBMIT has an office in the United States from which it "promotes Chinese building material and machinery and establishes a distribution network in North America. With a localized professional sales team and matured sales channels, [CNBMIT] has become an important supplier of building materials and machinery in the USA and North American markets." *See* CNBMIT webpage, "CNBMI USA" Tab, available at http://www.cnbmit.com/en/overseas/Detail.aspx?MenuID=050602 (last visited 2/22/2016).

CNBM USA and United Suntech were registered business entities located in California from 2005 to 2009. CNBM USA was established in 2006 as the United States branch of CNBM Group, and tasked with the mission to distribute CNBM products throughout the United States. To develop business in the United States, CNBM USA emphasized the fact that the "CNBM has become the largest building supplier in China ... [and] will improve our market share and become one of the largest building supply companies known throughout the world." *See* CNBM USA "Building a Mutually Rewarding Partnership" Powerpoint dated 4/2/2007 [MTD Ex. 163]. In 2011, immediate ownership of CNBM USA was transferred to an intermediary entity, CNBM International. *Id.*

CNBMIT and United Suntech are subsidiaries of CNBM Investment. [6] CNBM Investment (f/k/a BND) was majority-owned by BNBM until December 2007, when

Case 2:09-md-02047-EEF-MBN Document 22365-78 Filed 11/19/19 Page 9 of 44 PageID# 806
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...., Page 9 of 44 PageID# 806
2017 WL 1476595

BNBM's Board of Directors announced a resolution on transferring its 80% share ownership in BND to CNBM. *See* 12/7/2007 BNBM Announcement of Final Resolution of the 30 [th] Interim Meeting of the 3 [rd] Session of Board of Directors [MTD Ex. 262]. In addition to the 80% share acquisition, CNBM acquired the remaining 20% of equity shares from China Fiberglass, making China Fiberglass Investment a wholly-owned subsidiary of CNBM by 2008. *See* 2008 CNBM Annual Report at 59.

### 5. CNBM is a Majority Shareholder in BNBM

BNBM is a subsidiary of CNBM, which, as discussed above, is itself a subsidiary of CNBM Group via direct and indirect equity interest. In each of BNBM's annual reports from 2005 to 2014, CNBM is defined as BNBM's "Controlling Shareholder" and CNBM Group is defined as its "Actual Controller." [7] In June 2006, CNBM Group paid for a "share conversion of BNBM stock in order to transfer 45,630,000 of CNBM's non-tradeable BNBM shares into tradable shares. *See* 2006 CNBM Annual Report at 101 n. (a). As a result of this share conversion, CNBM directly held 52.40% equity interest in BNBM, which it retained through 2013. *See* 2007 CNBM Annual Report at 10, 17 & 113; 2013 BNBM Annual Report at 53. From 2005 to 2010, CNBM held between 60.33% and 52.40% direct ownership interest in BNBM's shares; and, CNBM Group, by virtue of its direct and indirect ownership in CNBM, held between 41.16% and 23.11% indirect ownership interest in BNBM. Additionally, from 2005 through 2015, among the top ten shareholders of BNBM, CNBM has been the only shareholder with a 5% or higher stake in BNBM. *See* 2005-2014 BNBM Annual Reports.

**\*9** Because its stock is listed on the Hong Kong Stock Exchange, CNBM is subject to the rules and regulations of the Exchange. Under HKSE rules, CNBM Group is a "Close Associate" of CNBM, which in turn is a "Close Associate" of BNBM, which is a "Close Associate" of Taishan, meaning that each company is able to "exercise or control the exercise of 30% ... or more of the voting power at general meetings, or to control the composition of a majority of the board of directors and any subsidiary of this other company." *See* Keyes Dep. at 39:2-21 [MTD Ex. 40]; HKSE Rules, Chapter 1 [MTD Ex. 42]. Further, under HKSE Rules, CNBM Group is the "Controlling

Shareholder" [8] of CNBM; CNBM is a "Substantial Shareholder" [9] of BNBM and BNBM is a "Substantial Shareholder" of Taishan. *See* Keyes Dep. at 48:16-19; 74:13-79:20. Additionally, CNBM, BNBM, and BNBM Group have shared the same accounting firm. CNBM has used the accounting firm of Baker Tilley Hong Kong Ltd. since 2010; BNBM Group has used the same firm since 2012 and BNBM has used Baker Tilley since 2013.

### 6. BNBM's Relationship with its Subsidiary Taishan

BNBM manufactures building materials, including drywall, in China. BNBM is a public company traded on the Shenzhen Stock Exchange, with over 21,000 shareholders. It is a majority shareholder in Taishan. *See* 2014 BNBM PLC Annual Report. BNBM neither created nor incorporated Taishan. Taishan began as a separate and independent manufacturer of drywall. When BNBM first purchased shares, Taishan already had revenues of RMB 48.2 million. *See* 2005 Asset Appraisal Report [BNBM Ex. 8]. BNBM acquired its equity stake in Taishan in two separate actions. BNBM paid fair value to acquire its interest in Taishan, subject to a third-party audit and asset valuation process. *See* Yang Decl. ¶ 8. In March and April 2005, BNBM entered into a Share Subscription Agreement to purchase 65,362,500 shares of Taishan, representing 42% of the registered capital of the company. *See* March 19, 2005 Share Subscription Agreement [MTD Ex. 126]. The subscription price paid by BNBM was approximately RMB 117.65 million. *Id.* A professional third-party appraisal of the value of Taishan confirmed the adequacy of the purchase price with reference to the net asset value of Taishan. *See* 2005 Asset Appraisal Report [BNBM Ex. 8]. Taishan's shareholders and BNBM's Board of Directors voted on and approved the acquisition in compliance with each company's articles of association.

CNBM's August 2008 Announcement regarding BNBM's acquisition of a controlling interest in Taishan states the following as the reason for the purchase:

> Following BNBM's acquisition of the 42% equity interest of Taihe, the Company [CNBM] has become the largest producer of gypsum boards

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 329 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp. (2017)
2017 WL 1476595

in the PRC. The acquisition has also enhanced the Company's ability to serve a broader base of customers. The directors of the Company believe that the Acquisition will enable *CNBM Group* to further enhance its competitiveness and consolidate the leading position in the PRC gypsum board market *as it will participate more actively in the daily operations and management of Taihe* with a view to improving its profitability.

See CNBM Announcement: "Connected Transaction Acquisition" [MTD Ex. 13].

Taishan's articles of incorporation were amended as part of the transaction. *See* Articles of Incorporation [BNBM Ex. 10]. In addition to providing minority stockholder protections, the articles were amended to provide for a seven person Board of Directors (four nominated by BNBM). *Id.* at Art. 67. The Taishan Board was later downsized to five directors, with three BNBM designees.

**\*10** In 2006, BNBM acquired an additional, indirect 23% equity interest in Taishan through the purchase of one of Taishan's shareholders, Taian Donglian Investment Trade Co., Ltd. ("Donglian"). *See* Song Dep. at 51:20-52:2 [MTD Ex. 36]. [10] The acquisition left BNBM with 65% equity interest in Taishan. *See* Yang Decl. ¶ 8 [BNBM Ex. 3]. Taishan's Chairman and General Manager Jia Tongchun (who was also Deputy General Manager and Director of BNBM from 2005-2012) personally retained 5% equity ownership in Taishan, and was the majority shareholder and legal representative of an investment company, which owned 14% of Taishan's equity shares. *See* 8/28/2006 Connected Transaction Announcement at Q000011-12 [MTD Ex. 127].

Under Chinese law, BNBM is the "controlling shareholder" of Taishan. [11] As such, it exercises a certain degree of authority over Taishan. On October 16, 2007, BNBM issued an inter-company special inspection report on the management and control of its branches and subsidiaries. *See* BNBM's Report on Management and Control of its Branches and Subsidiaries, 10/16/07 [MTD Ex. 75]. The report specified Taishan as a "controlled

subsidiary," and stated that BNBM (1) "strictly followed the relevant regulations to conduct management and control of the daily operation and important activities of the branches and subsidiaries" and (2) "emphasized and strengthened the control of its controlled subsidiaries' related party transactions, outside guarantees, usage of financing funds, major investments, information disclosure and other activities." *Id.*

BNBM unifies auditing and financial control and administration of Taishan and its other subsidiaries. BNBM's audit committee, which serves under BNBM's Board of Directors, also conducts annual financial audits of Taishan. *See* 11/28/2009 "Letter of Communication and Confirmation about the Audit Schedule for the 2009 Financial Statements." BNBM and Taishan shared the same external auditing firm between 2006 and 2010. Also, Taishan must submit monthly, quarterly, and yearly budget plans and financial reports to BNBM. Notably, however, Chinese accounting and exchange rules require BNBM to consolidate its financial reporting with Taishan, because it holds a majority of Taishan's stock. *See* Accounting Standards No. 33 at Art. 47 [BNBM Ex. 47]. [12] Additionally, BNBM and Taishan prepare separate audited financial statements, maintain separate books and records, file separate tax returns, and maintain separate bank accounts. *See* Chen Tr. at 596:3-11; 600:3-8 [BNBM Ex. 2].

BNBM guarantees loans that Taishan receives from third-party banks and Taishan is prohibited from requesting guarantees from any companies other than BNBM. *See* Chen Dep. at 363:18-23 [MTD Ex. 77]. At the beginning of 2006, BNBM's Board approved guarantees for Taishan with eight banks. *See* BNBM Announcement of Final Decision of the 15th Meeting of the 3rd Session of the Board of Directors, 1/23/06 [MTD Ex. 146]. In June of 2007, BNBM provided a guarantee for a capital expenditure proposed by Taishan to finance the "technological transformation of the original gypsum board production line" of Taishan. *See* BNBM Announcement of the Resolution of the Final Resolution of the 25th Interim Meeting of the 3rd Session of the Board of Directors, 6/15/2007 [MTD Ex. 138]. BNBM's General Manager Chen Yu confirmed that "from 2005 through 2014, there are ... substantial guarantees, provided to Taishan each and every year in order for Taishan to maintain its profitability

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 01/18/19 Page 330 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed..., 2017 WL 1476595
2017 WL 1476595

and business interest." *See* Chen Dep. at 363:18-23. Additionally, BNBM approves all of Taishan's loan increases. However, BNBM does not finance Taishan's operations by providing non-repayable funds; it has never paid for Taishan's debts, losses, or expenses and it has not made any direct loans to Taishan.

**\*11** BNBM exercises a high degree of control over Taishan's operational management. After Taishan's Board of Directors passes certain resolutions that require significant capital expenditures, Taishan must seek approval from BNBM—its controlling shareholder —regarding those resolutions. *See* Shandong Taihe Dongxin 3rd Meeting of the 3rd Board of Directors, 4/15/2006 [MTD Ex. 132]. BNBM requires that its subsidiaries report their board resolutions, shareholder meeting resolutions, and other important documents and financial statements to the relevant departments within BNBM. With regard to the resolutions, BNBM's relevant departments will "conduct analyses and researches (sic), raise questions and give suggestions, and protected [BNBM's] interest to the maximum." *See* 10/16/2007 Special Inspection Report. With regard to Taishan's financial statements, BNBM's relevant departments will "conduct analyses and researches (sic), so as to timely grasp the production and operation situation and financial situation and to raise relevant disposal opinions at proper timing, to ensure profit realization and risk control of the equity investments." *Id.*

For example, Taishan's Board of Directors needed to get the approval of BNBM before it could build additional factories. *See* Chen Dep. at 345-46, 349. BNBM invested in the construction of drywall factories, plants, and gypsum board production lines by offering guarantees to Taishan. BNBM tracked its investments made in Taishan's production lines through weekly reports. *See* "Rectification Status on the Inversion of Procedure in the Fixed Investment Projects of the Stock Company" [MTD Ex. 137]. Taishan also had to seek approval from BNBM regarding the design, quality, technology, and processes of drywall production. *See* 4/15/2006 Taishan Board of Directors Resolutions (requiring shareholder [BNBM] approval of gypsum board factory construction projects with specifications for production).

In 2005, the Taishan shareholder meeting resolved that: (1) if any Taishan subsidiary must have more than two shareholders, BNBM will purchase 5% of equity shares;

and (2) for any Taishan subsidiary to be established in the future, if the subsidiary must have more than two shareholders, BNBM will hold 20% interest of equity shares. *See* 6/26/2005 Resolution of the 4th Extraordinary General Meeting of Shareholders [MTD Ex. 129]. Notably, this resolution was implemented to accommodate the Chinese Company Law requirement that limited liability subsidiaries have more than one shareholder. *See* Jia Tr. 758:21-760:16. Following the adoption of this resolution, BNBM became a co-owner in three different Taishan drywall manufacturing subsidiaries. In 2007, BNBM acquired a 30% equity interest in a fourth Taishan subsidiary; the reason for the acquisition was for "CNBM Group to benefit from the synergy between BNBM and Taishan, increase its competitiveness and consolidate its leading position in the gypsum board market ..." *See* 4/13/2007 CNBM Announcement at 2, 7. Additionally, in 2008, to "ensur[e] the on-going and stable supply of raw materials to Taishan Gypsum for production of paperbacked plasterboards," BNBM added ownership in a fifth Taishan subsidiary when it and Taishan jointly established Taihe Decoration. 6/30/2008 BNBM Announcement of the 3rd Session; BNBM Annual Report at 42.

In October, 2015, CNBM made a public announcement that as a result of an agreement between BNBM and Taishan's minority shareholders, "BNBM will directly and indirectly hold 100% equity interest in Taishan Gypsum.... Both BNBM and Taishan will remain as subsidiaries." *See* 10/13/2015 CNBM Announcement: Acquisition of Equity Interest in Taishan Gypsum Through Share Issuance of BNBM.

Since 2005, BNBM Directors and Officers have maintained voting control over Taishan's Board of Directors. *See, e.g.,* 4/23/07 BNBM Reply on Inquiry Letter about 2006 Annual Report Verification. Seven BNBM directors/officers have served in concurrent positions at Taishan. *See* Summary Chary of Overlapping Executives and Officers [MTD Ex. 1]. However, Chairman Jia, who was Taishan's General Manager before BNBM acquired an interest in the company, was the only BNBM director who also served as a Taishan executive. *Id.* From 2005 to 2009, Wang Bing was the General Manager and a Director of BNBM while contemporaneously a Director of Taishan (a position he still holds today). <sup>13</sup> *Id.* That said, Mr. Wang testified that

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 331 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed..., 2017 WL 1476595

2017 WL 1476595

if an issue arose with BNBM and Taishan, he recused himself from voting on Taishan's Board of Directors. *See* Wang Tr. at 281:18-24, 284:2-7, 291:4-12 [BNBM Ex. 38]. Similarly, from 2005 to 2009, Cao Jianglin was the Chairman of BNBM & Secretary to the Party Committee of BNBM, while contemporaneously serving as Chairman of the Supervisory Committed of Taishan. [14] As with Mr. Wang, Mr. Cao did not serve in any executive role during his time as Chairman of BNBM and he recused himself from voting on Taishan's board of directors on any issue involving BNBM. *Id.*

*\*12* Notwithstanding the foregoing, Taishan is a successful and autonomous company. Prior to BNBM first investing in 2005, Taishan had a 58.4% share of the Chinese low-cost drywall market, was the largest producer of gypsum board in China in terms of production capacity, and made RMB 58,000 in net profits. *See* Deal Decl., Table 18 [BNBM Ex. 11]. Taishan's revenues have continued to grow since 2005. In each year since BNBM invested in Taishan, Taishan's annual net revenues and profit margins have exceeded BNBM's. *See* Gordon Decl. ¶ 55-59 [BNBM Ex. 12]. In 2014, Taishan's revenue was over 5.5 billion yuan. *Id.* Figure 1. By contrast, BNBM's revenue was approximately 2.789 billion. Taishan is not undercapitalized. At least since BNBM's acquisition of its interest in Taishan, Taishan has complied with Chinese corporate legal requirements, such as holding shareholder and board of director meetings and obtaining corporate authorizations for major transactions. *See* Chen Decl. ¶ 11 [BNBM Ex. 67]. Taishan conducts periodic meetings of the board of directors and stockholders, and obtains required corporate authorizations for major transactions.

BNBM also complies with corporate governance requirements. Taishan's finances and accounting functions operate independently of BNBM. *See* Yang Decl. ¶¶ 11-16; Chen Tr. 596:3-11. Each company is responsible for its own debts, liabilities and losses. *See* Chen Tr. 600:3-8. BNBM and Taishan manage and use their assets separately. They have never had joint bank accounts. *See* Yang Decl. ¶ 11. Neither can access the other's bank accounts. *Id.* ¶ 14,15. They have never had common accounting books. *Id.* ¶ 12. [15] While BNBM guaranties working capital lines for Taishan, BNBM has never had to perform on these guarantees. *See* "Draft Public Announcement on the External Guarantees for the Year 2015" [BNBM Ex. 56]. [16] The headquarters

and plants for BNBM are in a different province than Taishan's offices and operations, roughly 330 hundred miles apart. *See* Wang Tr. 151:16-19.

Nevertheless, as mentioned above, from 2005 to 2012, Jia Tongchun held concurrent positions at Taishan and BNBM while also owning 5% of Taishan. He was appointed Chairman of Taishan's Board of Directors and General Manager of Taishan in 2002; and, from 2005-2012, he served as Deputy General Manager of BNBM; and, from 2006 to 2012, he served as a Director on BNBM's Board of Directors. *See* 2011 BNBM Annual Report at 12; 2012 BNBM Annual Report at 52; *see also* Jia Dep. at 745:18-746:9 [MTD Ex. 105]. Holding these dual roles while owning 5% stock in Taishan was flagged as an issue in a 2012 SASAC-sponsored audit of BNBM. *See* [MTD Ex. 123]. However, Mr. Jia resigned his position as Deputy General Manager at BNBM in September 2012 to ensure no conflict existed with his Taishan share ownership. Relatedly, in its annual reports, BNBM stated that "Mr. Jia Tongchun received no remuneration from the Company [BNBM] as he also held a position in the proprietary subsidiary Taishan Gypsum Co., Ltd." *See, e.g.*, 2006 BNBM Annual Report at 16. However, like all BNBM board members, he did receive a fee of 25,000 RMB. *See* Jia Tr. at 880:17-23, 935:8-936:3. That said, he did not receive any payment from BNBM for his position as a Deputy General Manager because that position was purely honorary. Additionally, in 2012, he received an award for Taishan's "outstanding performance" in raising its operating revenue and net profits. *See* Award for Significant Business Contributors from Taishan Gypsum and BNBM Homes [MTD Ex. 122].

**B. BNBM PLC's Contacts with Florida**
*\*13* In 2000, the BNBM Entities established BNBM of America in Florida. The leadership of BNBM of America included Song Zhiping as Chairman and Cao Jianglin as Director. "BNBM Group also assigned special people to the U.S. to take charge of sales work ..." for BNBM of America. *See* BNBM Group's "Explanation on accounts receivable of BNBM of America [MTD Ex. 214]. From approximately 2001 through 2004, BNBM of America had approximately 8 permanent employees, paid U.S. taxes, sold over $1 million of BNBM drywall in the U.S., and purchased and rented heavy equipment. *See* Hannam Dep. at 33:23-37:7 [MTD Ex. 213]. Although BNBM of America was winding-down its business in 2004, in 2005,

Case 2:09-md-02047-EEF-MBN   Document 22363-78   Filed 01/19/19   Page 332 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.... 2017 WL 1476595

2017 WL 1476595

and into 2006, it still maintained its mailing address and principal place of business in Tampa, Florida as well as its status as a Florida corporation. BNBM of America shut down its drywall sales "somewhere in between 2002 and 2003," and ceased its corporate existence in 2006. *Id.* at 75:8-14.

In 2005, BNBM hosted representatives from two Florida drywall distributor companies—Davis Construction Supply, LLC ("Davis Construction") and EAC & Sons Corporation ("EAC")—at its facilities in China. *See* Chaparro Dep. at 28:22-30:4 [MTD Ex. 216]; Davis Dep. [MTD Ex. 217]. BNBM assisted with obtaining business visas for Stefan Davis of Davis Construction and Edgar Chaparro of EAC by sending them "invitation letters" as such letters are necessary to obtain a Chinese travel visa. *See* Chaparro Dep. at 24:7-21, 29:3-30:4; Davis Dep. at 29:16-30:1. Davis and Chaparro's initial visit to China was in 2005. During that visit, Davis and Chaparro met with Cai Kai, Manager of BNBM's Drywall Division, and were taken on a tour of BNBM's factory. *See* Chaparro Dep. at 28:22-30:4. Later on in their dealings with BNBM, Davis and Chaparro met with BNBM General Manager Wang Bing—who expressed a clear interest in doing business with the United States. *See* Davis Dep. at 36:2-22 (stating that BNBM was "very interested" in doing business in the United States and had already started the process of getting additional UL certification). Throughout the course of EAC's dealings with BNBM, Chaparro visited China to meet with BNBM approximately 10-20 times. *See* Chaparro Dep. 29:3-21.

BNBM acquired U.S. authorization for its drywall and manufactured its drywall to meet U.S. standards. BNBM knew that its drywall had to meet proper U.S. codes and regulations in order for its U.S. sales efforts to be successful. Accordingly, in October of 2005, BNBM acquired authorization to use U.S.-based Underwriters Laboratories ("UL") certifications on its 5/8" Type X drywall. *See* 10/10/2005 UL Authorization [MTD Ex. 219]; Davis Dep. at 52:1-7. Additionally, BNBM manufactured its drywall to meet American Society for Testing and Materials ("ASTM") standards and to conform to U.S. drywall size specifications. *See* Chaparro Dep. at 93:19-23; Davis Dep. at 42:23-43:11. The fact that BNBM obtained the UL certificate and met ASTM standards specifically attracted EAC and Davis Construction to conduct business with BNBM in 2005. While researching potential drywall

sources online, EAC and Davis Construction chose to purchase from BNBM because it was the only available manufacturer with a UL certification. *See* Chaparro Dep. at 24:22-25, 25:1-11. BNBM's product was listed on UL's website as having a UL certification. *Id.* at 25:12-25, 26:1-18. Notably, however, BNBM manufactures fire resistant drywall, and a UL certification is necessary to be fire rated. Hamman Dep. at 38:24-39:9. Further, UL certification requires that drywall meet ASTM standards. Chaparro Dep. at 50:19-21. The ASTM and UL specifications are international standards used around the world, including in China. *See, e.g.,* http://www.astm.org/ABOUT/faqs.html#used; http://china.ul.com. In fact, both ASTM and UL have offices in China. http://ul.com/aboutul/locations; http://www.atsm.org/ABOUTfactsheet.html.

BNBM also provided Davis Construction (via its agent EAC), with a Material Safety Data Sheet ("MSDS") pursuant to standards prescribed by the U.S. Occupational Safety and Health Administration ("OSHA"); EAC required a MSDS as a condition of accepting shipment. *Id.* at 153:22-154:8. BNBM's MSDS for its drywall detailed compliance with various U.S. standards and regulations, including UL, American National Standards Institute, U.S. Department of Transportation, OSHA, and numerous U.S. Environmental Protection Agency regulations. *See* 2006 BNBM Drywall MSDS [MTD Ex. 222].

**\*14** For Davis Construction, BNBM agreed to add Davis Construction's label to its drywall. Specifically, the contract provided that "BNBM PLC will sell the products under its brand. On the end tapes of all products will be printed: 'Produced by BNBM PLCE and distributed by Davis in USA.' " *See* Chaparr Dep. at 84:21-86:1 (quoting Section 2.42 of Davis Purchase Agreement). This customized labeling was used for one shipment to the United States. *Id.* at 85:10-86:1.

BNBM labeled its drywall with certifications that it met American standards, including a UL certification. *See* Davis Dep. at 42:23-43:11. BNBM's contracts with Davis Construction and EAC included requirements that: a) "All gypsum board products shall be designed and manufactured in full compliance and in strict accordance with ASTM 1396-04, ASTM 1264-05 and UL Standards" and b) "All products shall be stamped with the appropriate UL certification and the correct board

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 333 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp.... 14 (2014)
2017 WL 1476595

designation (i.e., 5/8" Type X gypsum board ...)". *See* 3/12/06 Exclusive Purchase & Supply Agreement [MTD Ex. 223].

BNBM and BNBM Group arranged shipping of BNBM drywall to Florida ports. On November 18, 2005, BNBM entered into an initial agreement with EAC for the sale of 200,000 boards of BNBM drywall to be shipped CIF to the Port of Tampa in Florida. *See* 11/18/05 Sales Contract [MTD Ex. 224]. BNBM drafted the initial agreement. Chaparro Dep. 67:9-23. The contract price for this drywall was $2,350,000. *See* [MTD Ex. 224 at 2]. According to EAC, BNBM made all the shipping arrangements for the board to be shipped to the Port of Tampa in Florida. Chaparro Dep. at 43:22-46:19 (testifying that, pursuant to this November 18, 2005 CIF contract for drywall, "BNBM [did] all the shipping transaction[s] and the deliver[y] and everything to the point that [EAC] take[s] the material from the ship once it's inside the port."). Similarly, on November 16, 2005, BNBM agreed to sell and ship (CFR) 240,000 boards of BNBM drywall to Wood Nation in Port Manatee, Florida. *See* 1/6/06 BNBM Invoice to Wood Nation at 2 [MTD Ex. 225]. The contract price for this drywall was $2,040,541.00. *Id.* BNBM made all the shipping arrangements for this shipment as well. *See* Wood Nation Dep. at 63:1-25 (testifying that "BNBM lined up the ship and the transportation for this drywall shipment to Port Manatee, Florida."). Additionally, on June 5, 2006, BNBM shipped almost 300,000 sheets of drywall (at a price of $1,778,013.60) to the Everglades port in Florida for Triorent Trading. *See* BNBM "Statistical Spreadsheet of Gypsum Boards" [MTD Ex. 143].

On March 12, 2006, BNBM entered into an agreement with Davis Corporation, a Florida drywall distributor company, to sell BNBM drywall in the United States. *See* 3/12/2006 Exclusive Purchase & Supply Agreement at 5 [MTD Ex. 223]. The discussions between BNBM and Davis Construction specifically identified drywall sales to include the entire Southeast and Eastern seaboard of the U.S. BNBM "certainly knew that [Davis Construction] was based out of Florida." Davis Dep. at 37:19-38:6. In fact, Davis "absolutely" spoke with BNBM about the drywall distribution plan involving Florida and other states. *Id.* at 38:7-18. The effective dates of the agreement were March 12, 2006 through December 31, 2006. [MTD Ex. 223]. Two BNBM drywall shipments were made under the agreement. The first shipment from BNBM to

Davis Construction consisted of more than 250,000 sheets of drywall, and the second shipment consisted of more than 100,000 sheets. *See* 6/3/09 Letter from Stefan Davis [MTD Ex. 226]. The agreement contained an exclusivity provision. However, the exclusivity agreement never took effect because Davis failed to pay BNBM the prerequisite $1 million needed to trigger the provision. [MTD Ex. 223].

**\*15** As of June 15, 2015, over 200,000 sheets of BNBM's drywall were being stored in a Davis Construction warehouse in Ocala, Florida. 6/15/15 Sworn Statement of Stephan Davis at 4:16-5:23 [MTD Ex. 229]. The inventory includes 139,000 sheets of 5/8" Type X drywall 4 x 12, and 87,000 sheets of 1/2" drywall 4 x 12, totaling 226,000 sheets. This drywall has been in the Ocala warehouse for eight years. *Id.*

BNBM manufactured and sold over 68 million square feet—more than $10,000,000—of its drywall to United States customers. [MTD Ex. 143]. In 2006, BNBM sold and exported at least eight shipments of drywall to U.S. customers consisting of 1,435,238 sheets of drywall. *Id.* Of these BNBM drywall sales, six of the shipments (constituting over 1,300,000 sheets if drywall and amounting to more than $9,000,000.00) were exported to ports in Florida. [17] *Id.*

### C. Defendant Entities' Response to the Instant Litigation

On April 21, 2009, the Chairman of Knauf wrote to CNBM Group's Chairman, SONG Zhiping, regarding the U.S. Chinese Drywall lawsuits. *See* 5/15/2009 Knauf Letters [MTD Ex. 187]. On May 8, 2009, Taishan was served with process under the Hague Convention in the first of hundreds of lawsuits complaining of defects with Taishan's Chinese-manufactured drywall. Three days later, Taishan compiled for its leaders at CNBM Group an "Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan Gypsum Company Limited." *See* [MTD Ex. 3]. Taishan prepared this report for CNBM Group "so that the leaders can understand the facts of the case and give relevant instructions." *Id.* Despite acknowledging that more than 70 million square feet of its drywall were sent to the U.S. and were the subject of complaints from customers, Taishan reported that "[it] is not inclined to respond to the lawsuit" and asked Chiefs Song and Cao for instructions and approval as to whether such inaction was appropriate. *Id.* Taishan

Case 2:09-md-02047-EEF-MBN   Document 22362-78   Filed 01/18/19   Page 334 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed....   15 cv-4114 Page ID# 812
2017 WL 1476595

further proposed that "when necessary, it will provide documents that are beneficial to Taishan Company to the court that accepted the case." *Id.*

On May 15, 2009, Knauf again wrote to request "that CNBM and BNBM ... take effective measures to respond to the U.S. consumer lawsuits and media coverage as soon as possible;" Knauf express its "willing[ness] to, under the leadership of CNBM, safeguard the international reputation of Chinese-made building materials ..." *See* Knauf Letter [MTD Ex. 187]. Shortly after Knauf's second entreaty to CNBM Group, Peng Wenlong of Taishan, at the "arrangements of the Company's leaders," corresponded with China Buildings Materials Academy, a wholly-owned subsidiary of CNBM Group that took the lead in researching and analyzing the issues related to American reports of defective gypsum board. *See* 7/9/2010 CNBM Group Corporation Meeting Minutes of the 5th Work Meeting of Managers of CNBM Group [MTD Ex. 192].[18]

On June 3, 2010, less than a month after the *Germano* judgment was entered, CNBM Group hosted two telephonic conferences. First, the Manager of CNBM Group's Business Administration Department had a telephonic meeting with Wang Bing of BNBM, Jia Tongchun of Taishan, and two attorneys to discuss the strategy for responding to the litigation. *See* Course of Events on Hiring Foreign Law Firms [MTD Ex. 186]. A memorandum produced by BNBM in this litigation provides a summary of the meeting:

> **\*16** Mr. Knauf visited Zhiping Song, chairman of the board of directors, and hoped that CNBM Group could offer a helping hand to them in responding to the United States drywall event.
>
> ...
>
> Chairman Song agreed that CNBM Group should organize the response to the litigation, but the purposes of the response are: 1. for the images of Chinese products and Chinese enterprises; 2. for the friendship with Mr. Knauf of more than years. Reluctant to see the Knauf Company fighting alone; 3. insisting on the position that our products do not have any problems. We should consider the situations as we deal with the litigation. The Company may ask the Knauf Company to help recommend attorneys for us and delay the effectiveness of judgment.

*Id.*[19] A second teleconference also took place on June 3, 2010, which included Chiefs Cao and Zhang Jian of CNBM Group, Chang Zanghli of CNBM, Yu Chen of BNBM, Jia Tongchun of Taishan, and attorney Dong Chungang. *Id.* The topic of the call was "the strategy for responding to the United States gypsum board litigation." *Id.* The discussion addressed the strengths and weaknesses of hiring the Hogan Lovells law firm. *Id.* The summary memorandum memorializing these teleconferences indicates that (1) the owner of Taishan's competitor invited Song Zhiping and CNBM Group to consider a collaborative effort in responding to the lawsuit; (2) Chairman Song would organize the response to the litigation; (3) CNBM Group's Board of Directors would decide the direction of the litigation; and (4) Taishan should retain Hogan Lovells. *Id.*

Also on June 3, 2010, Zhang Jian of CNBM Group circulated via email to Wang Bing (BNBM Chairman, CNBM VP, and Taishan Director), BNBM's General Manager and Director, and Jia Tongchun (Taishan Chairman and BNBM Director) an "Opinion Soliciting Draft" from CNBM Groups' Board of Directors titled, "Informational Report on Seriously and Proactively Doing a Good Job in Responding to the Incident of 'Problematic Gypsum Boards Shipped to the United States.'" *See* [MTD Ex. 195]. The report, which describes the timeline of the lawsuit in great detail, states that "[d]uring the entire development process of the incident, CNBM Group has required and arranged BNBM PLC and Taishan Gypsum to actively cooperate with quality examinations, various kinds of investigations, surveys, and field inspections organized by the government departments based on the attitude of being responsible for the consumers." *Id.*

On June 27, 2010, Taishan's Foreign Sales Manager, Peng Wenlong, wrote to Chief Zhang of CNBM Group in an effort to comply with a request from CNBM Group to report the relevant statistics to CNBM Group. *See* [MTD Ex. 196]. The email included a detailed analysis of the lawsuits, the origin of the gypsum used in Taishan's boards, and a spreadsheet showing Taishan's U.S. exports for the years 2005-2007. *Id.* The Chairman and Secretary of Taishan were copied on the email. *Id.*

**\*17** Throughout the litigation, the Defendants have shared attorneys and law firms. On November 29, 2010, all

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 335 of 1680
Case: In re: Manufactured Drywall Products Liability Litigation, Not Reported in Fed... 16 of 44 PageID# 813

2017 WL 1476595

of the parties—CNBM Group, CNBM, CNBM (USA), BNBM, Taishan, TTP, and Weifang—signed a Common Interest, Joint Defense and Confidentiality Agreement ("2010 JDA"). *See* [MTD Ex. 199]. Chris Vejnoska (who is the current counsel of record for the CNBM Entities) then represented BNBM. Joe Cyr of Hogan Lovells represented Taishan, TTP, and Weifang, and his firm had been retained previously by BNBM. *See* Chen Dep. at 509. Since the beginning of the litigation, attorney Dong Chungang has appeared at numerous meetings of all of the CNBM/BNBM and Taishan Defendants. None of the Defendants claim Dong as their legal counsel, but he is a signatory to the more-recent Joint Defense Agreement. *See* [MTD Ex. 202].

CNBM Group approved Taishan's decision not to appear at the Court-ordered Judgment Debtor Examination on July 17, 2014. On July 7, 2014, CNBM Group issued a notice summoning Taishan's Chairman Jia to appear at its Board of Directors meeting scheduled for July 11, 2014. *See* Notice of 17th Meeting. The third item on the agenda was "[d]eliberating on the proposal on strategies of coping with the event of gypsum board transported to the U.S." *Id.* At the July 11, 2014 CNBM Group Board of Directors meeting, CNBM Group deliberated on and signed a unanimous resolution (11-0) authorizing Taishan's decision "not to attend the judgment debtor hearing on July 17, 2014." *See* CNBM Group Resolution No. 17. CNBM Group's Chairman Song stated that the Board of Directors unanimously resolved to "respect" the decision for Taishan not to appear before this Court, but he disclaimed any "support" for the decision.

However, also on July 7, 2014—with awareness of the Plaintiffs' effort to collect on the *Germano* judgment and in anticipation of the repercussions of Taishan's contempt of court—CNBM Group directed its subsidiaries to cease depositing any funds in New York banks and to have personnel use their own personal email accounts, rather than company emails, when doing business internationally. *See* Requirements for International Business Risk Prevention. Also on July 7, 2014, attorney Dong Chungang informed Hogan Lovells via email that "It's not Mr. Jia who can make the decision. This case involves many high-level officers at CNBM Group now." *See* [MTD Ex. 209].

Following entry of the Contempt Order in this case, CNBM Group continued to monitor the litigation.

During CNBM Group's Board of Directors meeting on August 15, 2014, Zhang Jian indicated that the CNBM Group need not be concerned about an American judgment: "Regardless of the ruling in the United States, the domestic assets will not be subject to enforcement." *See* 18th Meeting. At the same meeting, Cao (General Manager of CNBM Group) stated that "There is one thing we need preliminary decision on: Beijing New Building Materials is not going to respond to the lawsuit." *Id.* Similarly, CNBM Group's Chairman Song stated that SASAC "wrote a letter to have us engage in litigation. Engage in limited response to the lawsuit, dealing with an order of over 2 million [presumably referring to *Germano*]. Now we really can't engage." *Id.*

## IV. IMPUTING TAISHAN'S FORUM CONTACTS TO PARENT CORPORATIONS FOR PURPOSES OF PERSONAL JURISDICTION

In the current motions, Defendants CNBM Group, CNBM, CNBMIT, CNBM USA, United Suntech, BNBM, and BNBM Group have filed motions to dismiss for lack of personal jurisdiction. As mentioned, it is the law of the case that this Court has jurisdiction over Taishan. Thus, if any entity exerts substantial control and dominance over Taishan, sufficient to allow the two corporations to be treated as a single entity under a theory of alter ego and/or agency, that entity (or entities) would also be subject to the jurisdiction of this Court. The question is whether this control occurred. The Court will review the law and facts to seek an answer.

### A. Standard of Review

**\*18** Federal Rule of Civil Procedure 12(b)(2) permits a defendant to seek a dismissal of a complaint based on lack of personal jurisdiction. "When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident. The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Stuart v. Spademan,* 772 F.2d 1185, 1192 (5th Cir. 1985) (citing *Thompson v. Chrysler Motors Corp.,* 755 F.2d 1162, 1165 (5th Cir. 1985)).

When a court hears a Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff need only present a *prima facie* case of personal jurisdiction. *See Walk*

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 336 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed..., 2017 WL 1476595

2017 WL 1476595

*Haydel & Assocs., Inc. v. Coastal Power Prod. Co.,* 517 F.3d 235 (5th Cir. 2008). Alternatively, when there is an evidentiary hearing, the plaintiff is held to the higher standard of preponderance of the evidence. *See id.* (citing *Brown v. Slenker,* 220 F.3d 411, 419 (5th Cir. 2000)). The Fifth Circuit "has never explicitly laid out the criteria necessary to constitute a 'full evidentiary hearing,' " *Kwik–Kopy Corp. v. Byers,* 37 Fed. Appx. 90, at *4 (5th Cir. May 9, 2002), but has concluded for purposes of an evidentiary hearing, "both parties must be allowed to submit affidavits and to employ all forms of discovery, subject to the district court's discretion and as long as the discovery pertains to the personal-jurisdiction issue." *Walk Haydel & Assocs., Inc.,* 517 F.3d at 242. The distinguishing factor between a mere hearing and an "evidentiary hearing" is the presentation of evidence "beyond the written materials." *See Kwik–Kopy Corp.,* 37 Fed. Appx. at *4 (quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.,* 557 F.2d 1280 (9th Cir. 1977)). The Court finds that the hearing on the present Motions constitutes an evidentiary hearing, because the Court is relying on evidence representing the full extent of personal jurisdiction discovery and depositions. This conclusion requires plaintiffs to establish personal jurisdiction by a preponderance of the evidence, rather than the more lenient standard of a prima facie showing.

**B. Legal Standards Governing Alter Ego Relationships**

As the MDL transferee court, this Court is required to apply the substantive state law of the transferor court, and the federal law of its own circuit. *See In re Chinese Manufactured Drywall Prod. Liab. Litig.,* 894 F. Supp. 2d 819, 837 (E.D. La. 2012), *aff'd,* 742 F.3d 576 (5th Cir. 2014), and *aff'd sub nom. In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* 753 F.3d 521 (5th Cir. 2014) (citing cases). Thus, the Court will analyze the jurisdictional question according to Fifth Circuit federal procedural law and the substantive law of the transferor states.

It is axiomatic under Fifth Circuit law that a federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant if: (1) the long arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the Due Process Clause of the United States Constitution. *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir. 2010) (citing *Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir. 1999)); *Seiferth*

*v. Helicopteros Atuneros, Inc.,* 472 F.3d 266, 270 (5th Cir. 2006). Further, the Fifth Circuit acknowledges that in some cases, the relationship between affiliated corporations requires the forum contacts of one entity to be imputed to another for the purpose of personal jurisdiction. *See, e.g., Freudensprung v. Offshore Technical Servs., Inc.,* 379 F.3d 327, 345 (5th Cir. 2004); *Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1159 (5th Cir. 1983); *In re Chinese Manufactured Drywall Prod. Liab. Litig.,* 894 F. Supp. 2d 819, 867–68 (E.D. La. 2012), *aff'd,* 742 F.3d 576 (5th Cir. 2014), and *aff'd sub nom. In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* 753 F.3d 521 (5th Cir. 2014). The theory behind this principle is that the relationship between the parent and subsidiary is so intertwined "that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction." 2 J. Moore & Lucas, *supra,* at 4–273; *see* 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1069, at 255–57 (1969).

**\*19** A subsidiary's contacts may be attributed or imputed to the parent for personal jurisdiction purposes where the subsidiary is the parent's alter ego or general agent. *See Chinese Drywall,* 753 F.3d at 546; *see also Jackson v. Tanfoglio Giuseppe, S.R.L.,* 615 F.3d 579, 586 (5th Cir. 2010); *Minnesota Min. & Mfg. Co. v. Eco Chem, Inc.,* 757 F.2d 1256, 1265 (Fed. Cir. 1985). Additionally, Courts are not limited to imputing the jurisdictional contacts of subsidiaries to direct parent companies only, but may impute the contacts of any related entity if warranted by the facts. *See, e.g., Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.,* 210 F.3d 18, 29 (1st Cir. 2000) ("While alter ego liability may be most common in an ordinary parent-subsidiary context, 'the equitable doctrine of piercing the corporate veil is not limited to parent-subsidiary relationship.' ") (quoting *C M Corp. v. Oberer Dev. Co.,* 631 F.2d 536, 539 (7th Cir. 1980)).

As this Court has previously explained, "[p]iercing the corporate veil is not necessary for imputing contacts of one affiliated corporation to another for purposes of *personal jurisdiction,* but rather is the test generally conducted for imposing *liability* as between related corporations." *In re Chinese Manufactured Drywall Prod. Liab. Litig.,* 894 F. Supp. 2d 819, 867 (E.D. La. 2012), *aff'd,* 742 F.3d 576 (5th Cir. 2014), and *aff'd sub nom. In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* 753 F.3d 521 (5th Cir. 2014). Thus, the Court will address the parties' arguments regarding corporate veil piercing for

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 337 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed..., 2017 WL 1476595
2017 WL 1476595

the purposes of liability if and when such a determination becomes necessary. At present, the Court will discuss the applicable law for imputing forum contacts between companies for purposes of personal jurisdiction and apply this law to the facts of the present case. If the facts demonstrate by a preponderance of the evidence that a Defendant entity is so intertwined with Taishan "that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction," that Defendant would also be subject to the jurisdiction of this Court. 2 J. Moore & Lucas, *supra*, at 4–273; *see also* 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1069, at 255–57 (1969).

### 1. Choice of Law

"In MDL cases where a federal court applies state law, such as this one, the transferee court is generally bound to apply the law the transferor court would follow." *In re Mastercard Int'l, Inc. Internet Gambling Litig.*, No. 00-cv-0661, 2004 WL 287344, at * 2 (E.D. La. Feb. 12, 2004) (citation omitted). Moreover, applying "the law of the transferor forum [in a MDL] ... include[es] the transferor forum's choice-of-law rules." *In re Vioxx Prod. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007); *Varnado v. Danek Med., Inc.*, No. 95-1802, 1998 WL 524896, at *3 n.1 (E.D. La. Aug. 19, 1998) ("A transferee court applies the choice of law rules of the transferor court.") (citation omitted). The forum states in this instance are Louisiana, Virginia, and Florida. The forum states' choice of law rules mandate applying Chinese law i.e., the law of the state of incorporation, to determine alter ego status.

Under Louisiana law, "the law of the state of incorporation governs the determination when to pierce a corporate veil." *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 647 (5th Cir. 2002) (analyzing alter ego status and applying that conclusion to personal jurisdiction). The same is true under Virginia law; "the law of the state of incorporation determines whether the corporate veil may be pierced." *Brainware, Inc. v. Scan-Optics, Ltd.*, No. 11-cv-755, 2012 WL 1999549, at *5 (E.D. Va. May 9, 2012) (analyzing personal jurisdiction). Similarly, Florida law provides that the internal affairs of a corporation are governed by the laws of the state of incorporation. *See Mukamal v. Bakes*, 378 Fed.Appx. 890, 897 (11th Cir. 2010); *see also In re Hillsborough Holdings Corp.*, 123 B.R. 1004, 1014 (Bankr. M.D. Fla. 1990) ("the

veil piercing issue must be resolved with reference to the laws of the state where the corporation is incorporated"). The CNBM and BNBM Entities were incorporated in China. Accordingly, under each of the forum state's choice of law rules, Chinese law applies.

### 2. Chinese Company Law

**\*20** Companies formed under the laws of China are subject to the country's Company Law. The pertinent provision in the 2005 Company Law states that

> Where shareholders of a corporation abuse the corporate independent status or the limited liability of shareholders for the purpose of escaping debts, and seriously injures the interests of the creditors of the corporation, such shareholders shall be jointly and severally liable for the debts of the corporation. [20]

To pierce the corporate veil in China, Plaintiffs must demonstrate that the shareholder has "abuse[d] the independent status of the company as a legal person or the limited liability of shareholders" in order to "evade[ ] debts," and thereby "seriously damage[ ] the interests of the creditors of the company." Clarke Decl.¶ 21; Clarke Supp. Decl. ¶ 16. Regulations interpreting China's veil-piercing Company Law look to corporate separateness, considering factors such as the comingling of shareholder and company income, funds, and business and whether the company's business transactions are under complete control of its shareholders. Clarke Decl.¶ 24; Clarke Supp. Decl. ¶ 17. "Chinese law generally respects the legal separateness provided by the corporate form, and requires a strong showing of comingling in order to negate it." Clarke Decl.¶ 59; Clarke Supp. Decl. ¶ 17.

### 3. Forum State Law

The substantive state law of Louisiana, Virginia, and Florida regarding alter ego status is similar to Chinese law.

2017 WL 1476595

This Court has noted that "the alter ego test for attribution of contacts, *i.e.,* personal jurisdiction, is less stringent than that for liability." *In re Chinese-Manufactured Drywall Products Liab. Litig.,* 753 F.3d 521, 546 (5th Cir. 2014) (quoting *Stuart v. Spademan,* 772 F.2d 1185, 1198 n.2 (5th Cir. 1985)). However, the case on which this Court relied in making that distinction i.e., *Stuart v. Spademan,* applied only Texas law, and not the forum states' law that Plaintiffs assert govern this litigation.[21] Notably, *assuming arguendo* that a distinction is proper and the alter ego test for personal jurisdiction is less stringent than that for liability, the test for jurisdiction is still difficult to satisfy.

While Texas law may apply a different alter ego standard to impute jurisdiction than impose liability, relevant jurisprudence suggests that the forum states— Florida, Virginia, and Louisiana—apply the same alter ego analysis in the jurisdictional context as they do in the liability context. Each requires proof of wrongdoing, fraud, or abuse. Under Florida law, to pierce the corporate veil under an alter ego theory, the plaintiff must establish "*both* that the corporation is a 'mere instrumentality' or alter ego of the defendant, *and* that the defendant engaged in 'improper conduct' in the formation or use of the corporation." *WH Smith, PLC v. Benages & Associates, Inc.,* 51 So. 3d 577, 581 (Fla. Dist. Ct. App. 2010) (emphasis in original). When plaintiffs fail to "meet their burden of proving that an alter ego relationship was maintained for an improper purpose," they cannot obtain personal jurisdiction over a defendant on the theory of alter ego. *McFadden Ford, Inc. v. Mancuso ex rel. Mancuso,* 766 So. 2d 241, 243 (Fla. Dist. Ct. App. 2000); *Hobbs v. Don Mealey Chevrolet,* 642 So. 2d 1149, 1156 (Fla. Dist. Ct. App. 1994) ("Without evidence that AFSLIC was formed or used for some illegal, fraudulent, or other unjust purpose, the mere fact of American Way Group's and Warmus's ownership and control of AFSLIC was insufficient to justify piercing AFSLIC's corporate veil.").

 **\*21** Likewise, under Virginia law, if a subsidiary corporation is an alter ego of their parent, the actions of the subsidiary are imputed to the parent for purposes of jurisdiction. *PBM Products v. Mead Johnson Nutrition Co.,* No. 3:09-CV-269, 2009 WL 3175665, at\*3-4 (E.D. Va. Sept. 29, 2009) (*citing* Va. Code Ann. § 8.01–328.1(A)); *Schmitt-Doss v. Am. Regent, Inc.,* No. 6:12-CV-00040, 2012 WL 6474038, at \*7 (W.D. Va. Dec. 13, 2012). "Alter

ego liability may attach where there is such unity between a corporation and an individual that the separateness of the corporation has ceased." *William v. AES Corp.,* 28 F. Supp. 3d 553, 562 (E.D. Va. 2014) (quotation omitted). "The alter ego doctrine states that, when the corporation is deemed an instrumentality or business conduit of another corporation or person, the corporate form may be disregarded." *Wu v. Tseng,* No. 06-346, 2007 WL 201087, at \*7 (E.D. Va. Jan. 24, 2007). In making an alter ego determination, "courts look at factors such as whether the corporations maintain the necessary formalities, have separate books, have separate officers, directors, and employees, separately manage their own day to day affairs, and the degree of control exercised by the parent over the subsidiary." *Long v. Chevron Corp.,* No. 4:11CV47, 2011 WL 3903066, at \*7 (E.D. Va. Sept. 2, 2011).

Like Florida and Virginia, Louisiana law allows jurisdictional imputation based on alter ego status. "Under Louisiana law, the factors to be considered to determine whether one entity is an alter ego of another or whether two entities are a 'single business enterprise' are similar." *Jackson,* 615 F.3d at 587 (citing *Green v. Champion Ins. Co.,* 577 So. 2d 249, 257-58 (La. Ct. App. 1991)). In *Hargrave v. Fibreboard Corp.,* the Fifth Circuit explained that when evaluating whether an alter ego relationship exists for the purposes of jurisdiction, the court should consider the following factors: (1) the amount of common stock owned by the corporate entities, (2) whether the entities share corporate headquarters, (3) whether the entities share common officers and directors, (4) whether the entities observe corporate formalities, (5) whether the entities share bank accounts, accounting and payroll systems, insurance contracts, budgets, financial records, and tax returns, (6) whether the parent has authority over general policy decisions of the subsidiary, and (7) whether the parent has authority over the subsidiary's day-to-day business and operations decisions. 710 F.2d 1154 (5th Cir. 1983); *Freudensprung v. Offshore Tech. Servs., Inc.,* 379 F.3d 327, 346 (5th Cir. 2004); *see also Adm'rs of Tulane Educ. Fund,* 687 F. Supp. 2d 620, 625 (E.D. La. 2009). "When the corporate entity is invoked to frustrate the ends of justice, it will be disregarded by the courts, leaving the shareholders personally chargeable with the acts and obligations of the purported corporation." § 9:170. Liability of majority shareholders—Piercing the corporate veil, 1 La. Prac.

Corp. § 9:170 (2016-2017 ed.) (citing *Brown v. Benton Creosoting Co.*, 147 So. 2d 89 (La. Ct. App. 2d Cir. 1962)).

Additionally, Louisiana courts recognize that liability may be imputed to related corporations in a 'single business enterprise.' In *Brown v. ANA Insurance Group*, the Louisiana Supreme Court explained that the single business enterprise doctrine is "a theory for imposing liability where two or more business entities act as one. Generally under the doctrine, when corporations integrate their resources in operations to achieve a common business purpose, each business may be held liable for wrongful acts done in pursuit of that purpose." *Brown v. ANA Ins. Grp.*, 2007-2116 (La. 10/14/08), 994 So. 2d 1265, 1267 n.2. To determine whether multiple corporate entities are a single business enterprise, the Court should consider the following factors: (1) common ownership, (2) common directors and officers, (3) common employees, (4) common offices (5) unified administrative control, (6) similar or supplementary business functions, (7) one corporation financing the other, (8) inadequate capitalization, (9) one corporation's creation of the other, (10) one corporation paying the salaries, expenses, or losses of the other corporation, (11) one corporation receiving no business other than that given to it by the affiliated corporation, (12) shared property, (13) noncompliance with corporate formalities, (14) services rendered by the employees of one corporation on behalf of another corporation, (15) centralized accounting, (16) undocumented transfer of funds between corporations, (17) unclear allocation of profits and losses between corporations, and (18) excessive fragmentation of a single enterprise into separate corporations. *See Green*, 577 So. 2d at 257-58; *accord Jackson*, 615 F.3d at 587. "This list is illustrative and is not intended as an exhausted list of relevant factors. No one factor is dispositive...." *Green*, 577 So. 2d at 258; *accord Jackson*, 615 F.3d at 587. As this Court has previous reasoned, the single business enterprise theory is a valid concept under Louisiana law. *See Chinese Drywall*, 2014 WL 4809520, at *8 (Class Cert FOFCOL); *see also Southern Capitol Enterprises, Inc.*, 476 F. Supp. 2d 589, 595 (M.D. La. 2007).

## C. Legal Standard Governing Agency Relationships

**\*22** In addition to recognizing jurisdiction based on an alter ego status, each of the forum states recognizes that jurisdiction can exist based on an agency relationship between a corporate parent and subsidiary. Florida's long-arm statute recognizes that an agent's contacts with Florida can be imputed to its principal for jurisdictional purposes: "A person, whether or not a citizen or resident of this state, who personally *or through an agent* does any of the acts enumerated in this subsection thereby submits ... to the jurisdiction of the courts of this state." Fla. Stat. Ann. § 48.193(1)(a) (emphasis added); *see also Dev. Corp. of Palm Beach v. WBC Constr., LLC*, 925 So. 2d 1156, 1161 (Fla. Dist. Ct. App. 2006) ("While a parent corporation ... is not subject to jurisdiction in Florida solely because its subsidiary does business here, the control of a parent over a subsidiary may permit the conclusion that the subsidiary is acting as the agent of the parent, thus subjecting the parent to jurisdiction under section 48.193(1) and supporting 'minimum contacts.' ") (internal citations omitted).

Under Florida law, "[t]he issue of control is critical to the determination of agency." *State v. Am. Tobacco Co.*, 707 So. 2d 851, 854 (Fla. Dist. Ct. App. 1998). "Generally, proof of control by the parent over the internal business operations and affairs of the subsidiary is required to fuse the two for jurisdictional purposes, and the degree of control exercised by the parent must be greater than that normally associated with ownership and directorship." *Brownsberger v. Gexa Energy, LP*, 2011 WL 197464, at *3 (S.D. Fla. Jan. 20, 2011). The parent's control "must be high and very significant." *Enic, PLC v. F.F. S. & Co., Inc.*, 870 So. 2d 888, 891 (Fla. Dist. Ct. App. 2004). The crux of any Florida agency analysis is control. *Chinese Drywall*, 894 F. Supp. 2d at 868 ("[P]roof of control by the parent over the internal business operations and affairs of the subsidiary is required to fuse the two for jurisdictional purposes.") (citations omitted).

Like Florida, Virginia law also recognizes that if a subsidiary corporation is an agent of the parent, the two entities are treated as one for jurisdictional purposes. *PBM Products v. Mead Johnson Nutrition Co.*, No. 3:09-CV-269, 2009 WL 3175665, at *3-4 (E.D. Va. Sept. 29, 2009) (*citing* Va. Code Ann. § 8.01–328.1(A)); *Schmitt-Doss v. Am. Regent, Inc.*, No. 6:12-CV-00040, 2012 WL 6474038, at *7 (W.D. Va. Dec. 13, 2012). Under Virginia law, "the determining factor when evaluating whether an agency relationship exists is the principal's power of control." *First Am. Title Ins. Co. v. First All. Title, Inc.*, 718 F. Supp. 2d 669, 678–79 (E.D. Va. 2010), *aff'd on other grounds sub nom. First Am. Title Ins. Co. v. W. Sur. Co.*, 491 Fed.Appx. 371 (4th Cir. 2012) (citing *Va. Employment Comm'n v. A.I.M. Corp.*, 302 S.E. 2d 534

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 19

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 340 of 1680
Case ... In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp. ... 2:09-md-... Page ID # 818
2017 WL 1476595

(1983)). In making this determination, a court need not find actual control—"it is the right to control which is determinative." *Whitfield v. Whittaker Mem'l Hosp.*, 169 S.E. 2d 563 (1969); *see also Butterworth v. Integrated Resources Equity Corp.*, 680 F.Supp. 784, 789 (E.D. Va. 1988) ("The question is not whether the party exercises control over the agent, but whether he has it."). Thus, like Florida, the crucial factor for determining whether an agency relationship exists under Virginia law is control.

Louisiana law also recognizes that personal jurisdiction may be imputed to a foreign defendant based upon the forum-related contacts of its agent. *See* La. Rev. Stat. § 13:3201(A); *Gillespie v. Bynum*, 508 So. 2d 628, 630 (La. App. 2 Cir. 1978). Under Louisiana law, agency is termed as "mandate" and defined as "a contract by which a person, the principal, confers authority on another person, the mandatory, to transact one or more affairs for the principal." La. Civ. Code art. 2989. A mandate relationship can be express or implied. *See Admin. of Tulane*, 450 Fed.Appx. at 333; *E. Smith Plumbing, Inc. v. Manuel*, 2011-1277, p.7 (La. App. 3 Cir. 3/28/12); 88 So. 3d 1209, 1215. " '[A]n agency relationship cannot be presumed, it must be clearly established.' " *Id.* (quoting *Roberson Adver. Serv., Inc. v. Winnfield Life Ins., Co.*, 453 So. 2d 662, 665 (La. App. 5 Cir. 1984)). For an implied agency, " 'the principal has the right to control the conduct of the agent and the agent has the authority to bind the principal.' " *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, 2000 WL 726880, at *4 (E.D. La. June 2, 2000) (quoting *Urbeso v. Bryan*, 583 So. 2d 114, 117 (La. App. 4 Cir. 1991)). Implied agency "is established 'by the words and conduct of the parties and the circumstances of the case.' " *Id.* (quoting *Self v. Walker Oldsmobile Co., Inc.*, 614 So. 2d 1371, 1375 (La. App. 3 Cir. 1993)).

**\*23** Notably, each of the Defendants acknowledges that, whether the Court applies Chinese or forum-state law, there is no meaningful difference in outcome. *See* BNBM Group's Brf. at 23 ("The result is the same if the law of Florida, Louisiana, or Virginia is applied."); BNBM's Brf. at 60 ("Even if this Court were to apply the law of the forum states, there is still no basis to impute Taishan's forum contacts to BNBM PLC as an alter ego."); CNBM Entities Brf. at 43 n.37 & n.44 ("Nor, based on the factual record, would an alter ego relationship exist under the forum states' laws" & "Under both Chinese and U.S. law, exercising controlling shareholder rights fall far short of demonstrating that a subsidiary is so totally

subsumed by a shareholder that they should be treated as a single entity."). Additionally, when Art. 20 of the Chinese Company law has been interpreted, legal scholars have concluded that it effectively states the U.S. common law doctrine of piercing the corporate veil. *See* Chao Xi, *Piercing the Corporate Veil in China: How Did We Get There?*, 5 J. Bus. L. 413, 424 (2011).

Finally, this very same result was acknowledged previously in these proceedings. Taishan conceded in its jurisdictional challenge that no difference in outcome derives from the application of Chinese or U.S. forum law, in regard to the jurisdictional imputation of contacts. On this basis, the Fifth Circuit declined to find an actual conflict of law and therefore applied the forum law in addressing Taishan's jurisdictional challenge:

> TG faults the district court for applying the forum state's law (Florida law) instead of Chinese law to the question of whether to impute TTP's Florida contacts to TG. TG concedes, however, that "Chinese law is not materially different on this issue from Florida law, and the outcome should be the same under either law." Accordingly, we need not choose because "if the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 839 n.20, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Therefore, we apply Florida law.

*Chinese Drywall*, 753 F.3d 521, 529 (5th Cir. 2014). In other words, the Fifth Circuit held that because Chinese law is not materially different than the forum state's law on the question of imputing contacts for personal jurisdiction, there is no real conflict between them and the forum state's law can be applied. *Id.* Thus, considering the foregoing in conjunction with (1) the lack of authoritative interpretation of the applicable Chinese law, (2) the influence of Chinese culture and politics on the applicable Chinese law, and (3) Defendants' acknowledgement that no real conflict exists, this Court is inclined to apply the laws of the forum states which govern the claims at issue. [22]

### D. Imputation Analysis
Before applying the law to the facts of this case, it is necessary to consider the weight the Court must give to the parties' evidence. Both Plaintiffs and Defendants have presented myriad facts regarding the relationships

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 341 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp....
2017 WL 1476595

between these various entities. However, the parties characterize these facts in different ways. In evaluating whether these facts support the existence of a single business enterprise, alter ego, or agency relationship, the Court must "give Plaintiff the benefit of any 'favorable inferences' supported by the record." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 62 (4th Cir. 1993); *see also Schmitt-Doss v. Am. Regent, Inc.*, No. 12-0040, 2012 WL 6474038, at *2 (W.D. Va. Dec. 13, 2012) ("When the court addresses the question of personal jurisdiction on the basis of motion papers, legal memoranda, allegations in the complaint, and jurisdictional discovery, the facts are viewed in the light most favorable to the plaintiff.").

**\*24** Furthermore, the Court notes that this analysis must consider real as well as formal relationships, including a pragmatic approach to the nebulous power structure of modern corporations; particularly in the context of large Chinese corporate groups, where the parent company is owned by the Chinese Government. *See Bulova Watch Co. v. K. Hattori & Co.*, 508 F. Supp. 1322, 1340 (E.D.N.Y. 1981) ("It would be helpful were the law to provide some grand jurisdictional ledger sheets upon which formal points such as these could be assigned weights and totted up. That is not possible in our real world where so much depends on nuances, on a sense of interrelationships and on a realistic appraisal of subtle economic and power connections."). In embarking on such an analysis, it is important to consider the unique cultural tradition which influences the business and personal relationships within these corporate entities.

### 1. Chinese Cultural and Economic Context

In evaluating the relationships between these entities, it is essential to understand that the doctrines of corporate separateness and veil-piercing are decidedly Western legal concepts. Their development and application have been shaped by Western culture and economic theories—namely democracy and capitalism. The jurisprudence applying these doctrines in Eastern cultures is far less formal. Scholars are in agreement that Chinese corporate law, and indeed Chinese corporations themselves, embody China's "unique socio-economic environment." Shuangge Wen, *The Ideals and Reality of A Legal Transplant-the Veil-Piercing Doctrine in China*, 50 Stan. J. Int'l L. 319, 322 (2014) ("China's legal system, while heavily influenced by Western legal norms, is embedded in a complex economic,

political, and ideological system that is unique and distinct from its Western counterparts."); *see also* Donald C. Clarke, *What's Law Got to Do with It? Legal Institutions and Economic Reform in China*, 10 UCLA Pac. Basin L.J. 1, 3 (1991-92). One salient feature of this unique economic environment is the state's pervasive dominance in the Chinese economy. State entities control natural resources, utilities, and infrastructure. The state maintains control over even public corporations through concentrated ownership. Through this state ownership, "government representatives generally dominate the boards of these corporations." Wen, *supra, at 335; see* Qiao Liu, *Corporate Governance in China: Current Practices, Economic Effects, and Institutional Determinants*, 52 CESifo Econ. Stud. 415, 429 (2006).

China's Confucian tradition has also made a significant and indelible impact on Chinese corporate culture even in privately owned corporations. The "historical heritage of Confucianism demands collectivism and hierarchical obedience." Wen, *supra, at 337.* One scholar has argued these cultural values "dominate the structure, organisation and behaviour of eastern enterprises [and] impose near-irresistible codes of conduct" on Chinese corporations. Clyde D. Stoltenberg, *Globalization, "Asian Values," and Economic Reform: The Impact of Tradition and Change on Ethical Values in Chinese Business*, 33 Cornell Int'l L.J. 711, 719 (2000); *see* Richard D. Lewis, *When Cultures Collide: Managing Successfully Across Cultures* 81 (1996). This Confucian influence encourages "paternalistic attitudes to employees and their dependents, top-down obligations, bottom-up loyalty, obedience and blind faith." Lewis, *supra, at 81.* These concepts and values pervade the management structure of Chinese corporations and their related entities, resulting in strict hierarchal internal control, where the parent corporation dominates and controls even the minor activities of its subsidiaries through concepts of "respect" rather than a controlling economic interest. Jingyun Ma, Mel Marquis, *Business Culture in East Asia and Implications for Competition Law*, 51 Tex. Int'l L.J. 1, 18–19 (2016) (discussing the influence of Confucian culture in East Asian business). Because of the emphasis on respect, deference to authority, and unwavering loyalty within the corporate hierarchy, this control often exists without the formal, externally visible mechanisms used to control Western corporations.

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 342 of 1680
Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 23 of 44 PageID #: 820

2017 WL 1476595

**\*25** As a result, a parent corporation that may only have a minority share in its subsidiary, or a minority of the seats on its Board of Directors has the potential to exert far more control over its subsidiary than a similarly-situated parent in a Western, capitalistic market. In some cases, even a single seat on the Board may guarantee control over the entire corporation, as other Board members are bound to vote in accordance with the parent corporation's judgment. *See* Ma, & Marquis, *supra* at 18–19; Lewis, *supra*, at 81. Thus, in applying the concept of corporate separateness to economic systems outside of the tradition of Western capitalism, the Court faces the challenge of fitting a square peg in a round hole. "In this as in so many other areas of the law, stuffing new and complex factual patterns into absolutely rigid legal cubbyholes often results in distortion of the facts. Some give in the categories is desirable lest the law lose touch with the real world." *Bulova Watch Co. v. K. Hattori & Co.*, 508 F. Supp. 1322, 1327 (E.D.N.Y. 1981). It is with this background in mind that the Court begins its analysis.

As noted above, there is scant authority interpreting Chinese Company Law. Furthermore, this Court has already established that Chinese law is not materially different than the law of the forum states on the question of imputing contacts for personal jurisdiction. Thus, the bulk of the Court's analysis will focus on the alter ego and agency law of the forum states as it applies to the contextual facts of the present case.

Nevertheless, the Court cannot ignore the external influence of social and cultural factors in its analysis. In evaluating whether to impute the jurisdictional contacts of a subsidiary corporation to its parent, Chinese law considers whether the subsidiary's business transactions were under the complete control of its shareholders. In the United States, this would be determined by ascertaining who had the most shares. As discussed above, in China, the answer is revealed by an analysis of the evidence of control—including both formal and informal relationships, explicit corporate power structure, as well as more subtle means of influence. The evidence in this case demonstrates BNBM controlled Taishan. It determined how Taishan would grow, controlled its capital expenditures, and dictated how Taishan would manufacture drywall. The two entities shared directors and officers. BNBM has admitted it controlled the daily operation and important activities of Taishan. *See* 10/16/2007 BNBM Special Inspection Report on

the "Management and Control of its Branches and Subsidiaries." Government representatives employed by CNBM Group were able to manage and control BNBM and its subsidiary Taishan. *See generally*, Wen, *supra*, at 335. As the outcome of the analysis for imputing jurisdictional contacts under Chinese law is no different than that of the forum states, the Court will use the law of Florida, Virginia, and Louisiana to determine whether the Court's personal jurisdiction over Taishan should be imputed to other entities within the CNBM Group corporate family. *See Chinese Drywall*, 742 F.3d 576, 753 F.3d 521.

### 2. Analysis Under Florida Law

Unlike Texas, where either fraud or the existence of a shell corporation is sufficient to pierce the corporate veil, Florida law requires Plaintiff to demonstrate "*both* that the corporation is a 'mere instrumentality' or alter ego of the defendant, *and* that the defendant engaged in 'improper conduct' in the formation or use of the corporation." *Compare Stuart v. Spademan*, 772 F.2d 1185, 1198 n.2 (5th Cir. 1985), *with WH Smith, PLC v. Benages & Associates, Inc.*, 51 So. 3d 577, 581 (Fla. Dist. Ct. App. 2010).

Here, Plaintiffs have not demonstrated that Taishan's separate existence was maintained for an illegal or improper purpose. *See McFadden Ford, Inc. v. Mancuso ex rel. Mancuso*, 766 So. 2d 241, 243 (Fla. Dist. Ct. App. 2000). Without proof of fraud or abuse, Florida law does not support a finding of alter ego liability. *Id.* Therefore, the Court finds that the evidence in this case does not demonstrate Taishan was the alter ego of any of the BNBM or CNBM entities under Florida law.

**\*26** However, as this Court has previously noted, an agent's contacts with Florida can be imputed to its principal for jurisdictional purposes. *Chinese Drywall*, 894 F. Supp. 2d at 868. To determine if Taishan was an agent of any or all of its parent companies such that jurisdiction can be imputed to the BNBM or CNBM entities, the Court must determine if parent corporations controlled Taishan's internal business operations and affairs. *See Brownsberger v. Gexa Energy, LP*, 2011 WL 197464, at \*3 (S.D. Fla. Jan. 20, 2011).

As discussed in detail below, the Court finds that BNBM exercised a degree of control over Taishan such that Taishan was in fact an agent of BNBM. Therefore, Taishan's contacts with the forum state can be imputed to BNBM for jurisdictional purposes. Plaintiffs argue that BNBM Group and CNBM should also be treated as agents of Taishan for the purposes of determining jurisdiction. However, CNBM and BNBM Group did not have the same relationship with Taishan as BNBM. CNBM and BNBM Group did not have the "high and very significant" level of control necessary to create an agency relationship. *See Enic, PLC v. F.F. S. & Co., Inc.,* 870 So. 2d 888, 891 (Fla. Dist. Ct. App. 2004).

For example, Taishan was not required to seek approval from CNBM or BNBM Group before making capital investments. Neither CNBM nor BNBM Group had the right to appoint directors to the Taishan Board. Neither entity shared property with Taishan, or dictated how Taishan manufactured drywall. While these entities had the ability to influence and exert some level of control over Taishan by virtue of their ownership in BNBM, the evidence does not demonstrate either CNBM or BNBM Group controlled Taishan's "internal business operations and affairs." *See Brownsberger v. Gexa Energy, LP,* No. 10-81021, 2011 WL 197464, at *3 (S.D. Fla. Jan. 20, 2011).* Therefore, Taishan's jurisdictional contacts cannot be imputed to CNBM or BNBM Group under Florida law.

However, based on the extensive jurisdictional discovery in this case, the Court finds that BNBM exerted such dominion and control over Taishan that Taishan's contacts with Florida can be imputed to BNBM for jurisdictional purposes. The following facts are conclusive of an agency relationship between Taishan and BNBM:

### i. Taishan and BNBM share Directors, Officers, and Executives

As Song Zhiping, the Chairman of CNBM Group explained, "Although a limited company, Taishan is not independent." *See* 2/26/2014 Meeting Minutes of the Seminar on Deepening Reform, CNBM Group Board of Directors [MTD Ex. 10]. Taishan and other subsidiaries within the CNBM Corporate family are controlled by Board Members who are not only appointed, but also controlled by CNBM Group. When BNBM

acquired Taishan—at CNBM Group's direction—BNBM was guaranteed the right to appoint a majority of Taishan's Board Members, giving it direct control over Taishan's corporate strategy. *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors [MTD Ex. 52]. CNBM Group, through BNBM, also protected its ability to control Taishan's financial and strategic decisions.

For example, BNBM board members must comply with directives from the CNBM Group on such matters as how to report to the parent corporation, how to seek approval from CNBM Group, and how to vote at Taishan's Board Meetings. *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors [MTD Ex. 52]. Through this hierarchy, CNBM Group can ensure BNBM is "[c]arefully implementing and executing the Group Corporation's development strategy, scheme, and plan, giv[ing] an expression of the Group Corporation's minds and requirements, faithfully protecting the lawful rights and interests of the Group Corporation." *Id.* By appointing and controlling Board Members of BNBM and Taishan, CNBM Group is able to control BNBM, who in turn controls Taishan. [23]

**\*27** Furthermore, directors and officers frequently sit on the boards of multiple entities within the CNBM Group conglomerate. For example, Wang Bing has served as the Chairman of BNBM and the Vice President of CNBM since 2009, and a Director at Taishan from 2005 to the present. Cao Jianglin has been the Director of CNBM Group, Chairman of BNBM Group's Supervisory Committee, and the President and Executive Director of CNBM since 2005, the Chairman of BNBM's Supervisory Committee since 2009, and from 2005-2011, was the Supervisor and Chairman of the Supervisory Committee of Taishan. Jia Tongchun has been the Chairman and General Manager of Taishan since 2002, while also employed as the Deputy General Manager of BNBM from 2005-2012, and a Director of BNBM from 2008-2012. *See* Summary Chart of Overlapping Executives and Officers at p. 3 & Ex. 10. While Defendants argue this is nothing more than the typical oversight a parent would exercise over its subsidiary corporation, the Court finds this system of overlapping board membership provides a mechanism of control which exceeds the typical parent subsidiary relationship.

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 344 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...., 2017 WL 1476595
2017 WL 1476595

Defendants acknowledge the control they obtained as a result of their Board positions. BNBM has indicated its ability to appoint Taishan's directors enables BNBM to "influence [Taishan's] production and operation decision-making." *See* 4/23/2007 BNBM Reply on the Inquiry Letter about 2006 Annual Report Verification. CNBM Group has also explained the ability to appoint BNBM Board Members allows it to "regulat[e] the corporate governance structure and manag[e] the representatives" of its subsidiaries, including Taishan. *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors. BNBM has a majority on Taishan's Board of Directors, but it also exerts more informal control as Taishan's corporate parent. The culture of deference to corporate hierarchy makes it implausible that Taishan would act independently of BNBM's instructions. BNBM acquired Taishan in order to "maintain control" of the corporation's long-term, strategic decisions and day to day operations. Thus, the Court finds that by controlling Taishan's Board of Directors, BNBM was able to exert the "high and very significant" level of control required to fuse Taishan and BNBM for jurisdictional purposes. *Enic, PLC v. F.F. S. & Co., Inc.*, 870 So. 2d 888, 891 (Fla. Dist. Ct. App. 2004).

### ii. BNBM controls Taishan's financial and strategic business decisions

In addition to the control and oversight BNBM exerts over Taishan vis-à-vis subsidiary Board Members, BNBM also controls Taishan's long-term strategic decisions. For example, Taishan can only obtain loans that are guaranteed by BNBM, and BNBM must approve any substantial capital expenditures. *See* 4/15/2006 Taishan Board of Director Resolution (requiring BNBM to approve drywall production specifications). Such approval is required for specific elements of the manufacturing process, such as the capacity of new factories, the type of drywall Taishan wishes to manufacture, and where the product will be marketed and sold. If BNBM does not approve it, Taishan cannot manufacture, sell, or distribute it. This provides BNBM a high level of control and oversight over Taishan's business strategy that goes beyond the standard parent subsidiary relationship. *Enic, PLC,* 870 So. 2d at 891. However, BNBM does not act alone in this supervision. Before

BNBM can provide a guarantee to Taishan, CNBM Group must approve the decision. This allows CNBM Group to control Taishan's finances through BNBM. CNBM Group also must approve Taishan's decisions to:

> "change[ ] its general manager, chief financial officer, or chief accountant ... any decisions on significant investments and directions of operation ... investment increase plan, profit (income) distribution plan, or bond issuance ... provide[ ] guarantees to any other entities ... Any other matters that may affect the capital contributor's rights and interests."

*See* 4/15/2006 Taishan Board of Director Resolutions. By requiring approval on major decisions regarding its subsidiaries' financing, investment, and strategic growth, CNBM Group is able to ensure "all subsidiaries [ ] strictly adhere to the Group Corporation's determined strategy on business activities, to ensure the realization of the Group Corporation's strategic goals." *See* China National Building Material Group Corporation Sample Document. Thus, BNBM has both direct and indirect control over Taishan's business decisions—often as directed by CNBM Group.

### iii. BNBM exerts control over Taishan's day to day operations

**\*28** From the time BNBM acquired a majority interest in Taishan, BNBM and CNBM Group have acknowledged that the acquisition was completed in order to better control the "daily operation and important activities of the branches and subsidiaries" in the CNBM Group. *See* 10/16/2007 BNBM Special Inspection Report on the "Management and Control of its Branches and Subsidiaries." For example, BNBM directs Taishan's production requirements. BNBM issues mandatory safety codes for gypsum production within CNBM Group. *See* Technical Code for Safety of Gypsum Plasterboard Enterprises: Instructions for Preparation. BNBM is then able to monitor Taishan's compliance by virtue of the Board Members it is entitled to appoint to Taishan's Board of Directors. BNBM has explained that these directors "are the majority ... and can influence [Taishan's] production and operation decision-making." *See* 4/23/2007 BNBM Reply on the Inquiry Letter about 2006 Annual Report Verification.

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 01/18/19 Page 345 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed..., 2017 WL 1476595

2017 WL 1476595

Furthermore, BNBM had the power through the directors it appointed to Taishan's Board and mandatory approval of Taishan's financial investments to control the capacity of Taishan drywall factories, the manufacturing process, the type of gypsum manufactured, and where Taishan would market and sell its gypsum. *See* 4/15/2006 Taishan Board of Director Resolutions—requiring shareholder [BNBM] approval of gypsum board factory construction projects. As part of this process, Taishan was required to submit its annual production and operation plans to BNBM for approval. This level of control and oversight demonstrates that BNBM was involved in Taishan's day to day operations—and, importantly, the decisions regarding drywall production, manufacturing, sales, and distribution, which are directly germane to this lawsuit.

Additionally, BNBM had authority to assign and manage Taishan's directors, supervisors, and management personnel. *See* 10/16/2007 BNBM Special Inspection Report. This oversight allowed CNBM Group, through BNBM, to "ensure effective control of its branches and subsidiaries," including Taishan. *See* 10/16/2007 BNBM Special Inspection Report. CNBM Group and BNBM also controlled Taishan's human resources and were responsible for hiring and conpensation, including "selecting, appointing (recommending), adjusting, evaluating, giving rewards and penalties to the representatives of capital contributors." *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors. This included employee training and performance evaluations. *See* 5/28/2014 Beijing New Building Materials (Group) Company Limited Internal Control System Construction Work Summary; *see* 6/29/2011 Email and attachment to JIA Tongchun re: Notice on Matters Relevant to CNBM Group's Training Class in 2011 for Leaders at Middle and Senior Levels.

These facts describe a corporate culture by which Taishan's strategic and daily business decisions were monitored and approved by BNBM. If Taishan failed to comply with the directives of its parent corporation, CNBM Group would outline the necessary corrective action and BNBM would use its control of Taishan's Board of Directors to ensure compliance. Many of Taishan's top executives were also employed by BNBM or CNBM Group. Taishan employees were hired, managed, trained, and reviewed by CNBM Group. The

parent corporations set standards for drywall safety and production. Further, CNBM Group is a state-owned entity organized under the law of the People's Republic of China. It is directly and wholly owned by the state. As scholars have noted, despite China's recent shift toward a market-based economy, Chinese corporate law is still influence by its socio-economic tradition. [24] State-appointed representatives dominated BNBM and Taishan's Boards of Directors. Not only did BNBM have the formal power and relationships to control Taishan, but the cultural atmosphere also indicates BNBM could have exerted this influence even without these formal structures.

**\*29** One notable example of this informal control occurred shortly before Taishan failed to appear for the Judgment Debtor Examination in this Court. After receiving an update on the status of this litigation, CNBM Group instructed its subsidiaries "to avoid depositing funds in banks that have branches in the State of New York, United States," and ordered its overseas employees to "carry out business activities only in the name of their own legal person unit," use "special email accounts" to communicate regarding overseas projects, and that "business personnel use their own [personal] emails." *See* 7/11/2014 Statement on Implementing the Requirements from the Group Corporation's Meeting of International Business Risk Prevention. These instructions were not the result of a formal Board resolution, nor were they issued after consulting with the leadership of each individual corporation. Instead, they were a top-down initiative, and it was assumed all subsidiaries would immediately comply. Instructions of this detail—including what email accounts employees must use to conduct business—reveal that parent corporations within the CNBM family had the power to control even the minute details of a subsidiary's daily operations even without owning a majority of its shares.

### iv. BNBM occasionally held themselves out as the same entity as Taishan

Publicly, entities within the CNBM Group advertised the interrelatedness of their corporate group, and sought to benefit from one another's reputations. When BNBM increased its formal ownership in Taishan, BNBM explained the acquisition would "enable CNBM Group to further enhance its competitiveness and consolidate

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 01/18/19 Page 346 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...

2017 WL 1476595

its leading position in the PRC gypsum board market." *See* 8/28/2006 Connected Transaction Announcement; *see also* 3/23/2007 "General Manager Bing Wang's work report at the 3rd meeting of the 5th session of BNBM staff representative meeting." In marketing materials to potential customers, BNBM combined its drywall production data with Taishan's to demonstrate the global strength of their drywall brand. *See* 2008 BNBM Annual Report at 30. Similarly, CNBM Group publicly boasted of its position as the "Largest gypsum board producer in the world." *See* 2014 CNBM Group's Social Responsibility Report at 6. This advertising was based on the combined production of BNBM and Taishan.

Further, the CNBM, BNBM and Taishan entities all share a common logo and many of the entities refer to one another in their names. *See* ZHOU Dep. at 291:16-292:5, *see* 11/2/2010 Email and attachment from PENG Wenlong to Manager XU (revising Taishan Gypsum's logo to read, "China National Building Material Group Taishan Gypsum Company."). Finally, during various periods since 2005, these entities have shared office space, and used each other's offices for shareholder meetings. *See* 2005 BNBM Group Auditor's Report at 6; *see also* 2005 CNBM Annual Report at 4; 2005 BNBM Annual Report at 3; 6/12/2010 Taishan Gypsum Co., Ltd., Resolution of the Fifth Extraordinary General Meeting in 2010; 8/11/2011 Taishan Gypsum Co., Ltd., Resolutions of the 2010 General Meeting of Shareholders.

#### v. Commingling and Shared Property

Finally, there is some evidence which suggests at least occasional commingling occurred between the companies. In 2008, CNBM Group transferred 40,000,000 RMB from CNBM Group to Taishan, and from Taishan to BNBM. This transaction was not explicitly accounted for. *See* 7/7/2008 BNBM "Report on the Improvement and Solution of Relevant Issues Raised in the [June 2008] Site Inspection of Beijing Securities Regulatory Bureau [MTD Ex. 134]. Defendants argue this only demonstrates they made a mathematical mistake, while Plaintiffs contend it is evidence of an alter ego relationship. While this factor alone may not lead to a conclusion that these companies were alter egos, it is evidence that, at the very least, BNBM had the ability to abuse the corporate form with respect to internal transfers of funds between BNBM and Taishan. In another example, during Taishan's Fourth

Interim Meeting of the Shareholders' general committee, which took place in BNBM's conference room, BNBM approved Taishan's decision to investment in its gypsum production line. This was a 10 million Yuan project, 80% of which was paid by Taishan, and 20% paid by BNBM. *See* 6/26/2005 Fourth Interim Meeting of the Shareholders' [MTD Ex. 68]. In this transaction, BNBM's investment was not limited to guaranteeing Taishan's loans, but directly providing capital for its new business venture, which included joint ownership of property.

**\*30** Based on the foregoing, the Court finds that BNBM had a degree of control over Taishan such that Taishan was an agent of BNBM under Florida law. *See State v. Am. Tobacco Co.,* 707 So. 2d 851, 854 (Fla. Dist. Ct. App. 1998). As discussed above, the touchstone of an agency relationship under Florida law is control. BNBM controlled Taishan's long-term strategic business decisions, and decisions regarding Taishan's financial investment and growth. This control extended to Taishan's day to day operations, as BNBM had the ability to control the Taishan Board of Directors, appoint executives, and train and evaluate employees. *See Brownsberger v. Gexa Energy, LP,* No. 10-81021, 2011 WL 197464, at \*3 (S.D. Fla. Jan. 20, 2011). Importantly, BNBM controlled Taishan's production, by specifying the capacity of its factories, the processes for manufacturing gypsum, and even dictating where drywall could be sold. *See Ugalde v. Dyncorp, Inc.,* No. 98 Civ. 5459, 2000 WL 217502, at \*3 (S.D.N.Y. Feb. 23, 2000) (finding subsidiaries were mere departments of parent when parent imposed standard operating procedures on subsidiaries). These external indicators, in light of the hierarchal obedience prevalent in Chinese corporations, demonstrate that BNBM had a "high and very significant" level of control over Taishan. *Enic, PLC v. F.F. S. & Co., Inc.,* 870 So. 2d 888, 891 (Fla. Dist. Ct. App. 2004); *see* Stoltenberg, *supra*, at 719.

It is true that BNBM did not act alone. Instead, BNBM's control over Taishan was dictated by CNBM Group, which used its ability to appoint directors and officers to control BNBM's decisions. But unlike BNBM, CNBM Group is wholly-owned by the Republic of China. A strict analysis of the Foreign Sovereign Immunities Act ("FSIA") required their dismissal. BNBM, however, is publicly owned and not entitled to claim immunity under FSIA. Based on the overwhelming evidence of the actual control of all significant aspects of Taishan's operations by

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 347 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp...., 2017 WL 1476595

2017 WL 1476595

BNBM, afforded to it by both formal and informal means, the Court concludes that the Plaintiffs have demonstrated that Taishan was an agent of BNBM such that the Court's jurisdiction over Taishan is imputed to BNBM.

### 3. Analysis Under Virginia Law

Like Florida, Virginia law requires a finding that the corporation was used "to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage" to support an alter ego relationship. *C.F. Trust, Inc. v. First Flight L.P.*, 580 S.E. 2d 806, 809–10 (2003). As discussed in Section IV.D.3, the evidence does not demonstrate Taishan was created or used for a fraudulent purpose. Without proof of such fraud or abuse, Virginia law does not support a finding of alter ego liability. *Id.*; *see also Greenberg v. Com. ex rel. Atty. Gen. of Virginia*, 499 S.E. 2d 266, 272 (1998) (explaining that piercing the corporate veil through the an alter ego theory is only justified in rare circumstances, where the "separateness would work an injustice."). However, Virginia law treats two corporations as one for jurisdictional purposes when the subsidiary corporation is an agent of the parent. *PBM Products v. Mead Johnson Nutrition Co.*, No. 3:09-CV-269, 2009 WL 3175665, at *3-4 (E.D. Va. Sept. 29, 2009).

Under Virginia law, "the determining factor when evaluating whether an agency relationship exists is the principal's **power** of control." *First Am. Title Ins. Co. v. First All. Title, Inc.*, 718 F. Supp. 2d 669, 678–79 (E.D. Va. 2010), *aff'd on other grounds sub nom. First Am. Title Ins. Co. v. W. Sur. Co.*, 491 Fed.Appx. 371 (4th Cir. 2012) (emphasis added). Nevertheless, the Court need not find actual control, as "it is the right to control which is determinative" under Virginia Law. *Whitfield v. Whittaker Mem'l Hosp.*, 169 S.E. 2d 563 (1969); *see also Butterworth v. Integrated Resources Equity Corp.*, 680 F.Supp. 784, 789 (E.D. Va. 1988) ("The question is not whether the party exercises control over the agent, but whether he has it."). The facts demonstrate that BNBM had control over Taishan and exercised this control such that Taishan was an agent of BNBM under Virginia law.

***31** However, the Court finds that CNBM and BNBM Group did not have sufficient control over Taishan to support an agency relationship between Taishan and either of these entities. *See Whitfield v. Whittaker Mem'l Hosp.*, 169 S.E. 2d 563 (1969); *see also Butterworth v. Integrated Resources Equity Corp.*, 680 F.Supp. 784, 789 (E.D. Va. 1988) ("The question is not whether the party exercises control over the agent, but whether he has it."). The Court's findings on the relationship between Taishan and BNBM Group and CNBM are equally applicable under Virginia law. *See* section IV.D.3. Therefore, Taishan's jurisdictional contacts cannot be imputed to either BNBM Group or CNBM under Virginia law.

However, based on the extensive jurisdictional discovery in this case, the Court finds that BNBM exerted such dominion and control over Taishan that Taishan's contacts with Virginia can be imputed to BNBM for jurisdictional purposes. The following facts are conclusive of an agency relationship between Taishan and BNBM under Virginia law:

First, BNBM exerts control over Taishan's Board of Directors. BNBM's appoints a majority of Taishan's Board Members. *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors [MTD Ex. 52]. As a result, three of the five seats on the Taishan Board are directly controlled by BNBM. Viewing these facts in the overall context of the relationships between these entities, the remaining two Board Members are not entirely independent. As discussed previously, Chinese corporations operate according to principles of extreme deference to authority and respect for their parent corporations. Based on the control BNBM had over so many facets of Taishan's business, it is improbable any Taishan director would have voted contrary to the positions of the BNBM-appointed Directors—particularly when CNBM Group was directing the votes of the BNBM-appointees. [25]

BNBM also exercised control over Taishan's executive team, as multiple Taishan directors were also employed by BNBM. For example, Jia Tongchun has been the Chairman and General Manager of Taishan since 2002, while also employed as the Deputy General Manager of BNBM from 2005-2012, and a Director of BNBM from 2008-2012. *See* Summary Chart of Overlapping Executives and Officers at p. 3 & Ex. 10. With overlapping directors and employees BNBM had the ability to control Taishan's strategic financial and business decisions, which satisfies the requirements for an agency

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 348 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...., 2017 WL 1476595

2017 WL 1476595

relationship under Virginia law. *Whitfield v. Whittaker Mem'l Hosp.*, 169 S.E. 2d 563 (1969). Additionally, as discussed above, Taishan executive employees were hired, trained, and evaluated by BNBM and CNBM Group. *See* China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors. In light of the Chinese cultural heritage which influenced these business relationships, it is improbable that employees who were hired and trained by Taishan's corporate parents would act counter to the parents' recommendations. *See* Lewis, *supra*, at 81 (arguing China's cultural traditions manifests in corporations by way of "top-down obligations, bottom-up loyalty, obedience and blind faith.").

**\*32** Beyond board members and executives, BNBM had the formal power to approve or deny Taishan's business decisions and financial investments. For example, only BNBM was allowed to guarantee Taishan's loans.[26] *See* 4/15/2006 Taishan Board of Director Resolution (requiring BNBM to approve drywall production specifications). Before Taishan could build a factory, it needed approval from both BNBM and CNBM Group. *See* 4/15/2006 Taishan Board of Director Resolutions. These limitations effectively prevented Taishan from making independent decisions regarding how to grow and expand its international drywall business, demonstrating BNBM's control. *Copiers Typewriters Calculators, Inc. v. Toshiba Corp.*, 576 F. Supp. 312 (D. Md. 1983) (asserting that jurisdiction over a foreign parent is appropriate where the parent must approve significant decisions of the domestic subsidiary).

To further regulate Taishan's drywall business, BNBM specified the manufacturing capacity and processes Taishan would use in new factories and determined where the product could be marketed and sold. This level of regulation and oversight goes beyond a typical parent-subsidiary relationship, and demonstrates that BNBM had the ability to exert a high level of control over Taishan, such that Taishan was an agent of BNBM. *See, e.g., Dorfman v. Marriott Int'l Hotels, Inc.*, No. 99 CIV 10496 (CSH), 2002 WL 14363, at \*7 (S.D.N.Y. Jan. 3, 2002) (finding an agency relationship when "[t]he evidence construed in the light most favorable to plaintiff shows that Otis Elevator supervises the activities of Otis Felvonó not as a stockholder watching over its investment but as the headquarters of a worldwide business making sure that its products and services meet

uniform company standards."); *In re Polyester Staple Antitrust Litigation*, 2008 WL 906331 (W.D.N.C. 2008) (nature of decisions made by subsidiary provide evidence of symbiotic relationship between subsidiary and parent company sufficient to find personal jurisdiction over nonresident parent company).

Finally, these entities publicized these individual corporations as one corporate group. CNBM Group, BNBM and Taishan used similar logos, and BNBM combined its production capability with Taishan's in marketing materials. *See* 2014 CNBM Group's Social Responsibility Report at 6. By presenting themselves as one, multi-national corporation, they sought to benefit from the size and resources of this conglomerate. Despite taking full advantage of these benefits, BNBM now seeks to separate itself from Taishan to protect its assets—assets which are due in part to Taishan's profits. Such a separation is not supported in fact or law. *See Pepsi-Cola Bottling Co. of Ft. Lauderdale-Palm Beach v. Buffalo Rock Co.*, 593 F. Supp. 1559, 1565 (N.D. Ala. 1984) ("Nor can a foreign corporation escape the jurisdiction of a state simply because the business activities conducted there, though clearly contemplated by the corporate defendant and redounding to its financial benefit, were conducted through "intermediaries" of one kind or another.").

Under Virginia law, when a parent corporation exerts high levels of control over its subsidiaries such that an agency relationship exists, the personal jurisdiction of the agent is imputed to the parent. Here, Plaintiffs have demonstrated by a preponderance of the evidence that BNBM controlled Taishan, creating an agency relationship. As such, the Court has jurisdiction over BNBM under Virginia law. *First Am. Title Ins. Co. v. First All. Title, Inc.*, 718 F. Supp. 2d 669, 678–79 (E.D. Va. 2010), *aff'd on other grounds sub nom. First Am. Title Ins. Co. v. W. Sur. Co.*, 491 Fed.Appx. 371 (4th Cir. 2012) (citing *Va. Employment Comm'n v. A.I.M. Corp.*, 302 S.E. 2d 534 (1983)).

### 4. Analysis Under Louisiana Law

**\*33** Unlike Florida and Virginia, Louisiana utilizes the theory of "single business enterprise" when evaluating whether corporate entities are the same for purposes of jurisdiction. While the tests for alter ego liability and single-business enterprise vary slightly, the two theories are somewhat related. *Jackson v. Tanfoglio*

Case 2:09-md-02047-EEF-MBN Document 22363-780 Filed 01/18/19 Page 349 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...

2017 WL 1476595

*Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010) ("Under Louisiana law, the factors to be considered to determine whether one entity is an alter ego of another or whether two entities are a "single business enterprise" are similar.").

In *Hargrave v. Fibreboard Corp.*, the Fifth Circuit explained that when evaluating whether an alter ego relationship exists for the purposes of jurisdiction, the court should consider the following factors: (1) the amount of common stock owned by the corporate entities, (2) whether the entities share corporate headquarters, (3) whether the entities share common officers and directors, (4) whether the entities observe corporate formalities, (5) whether the entities share bank accounts, accounting and payroll systems, insurance contracts, budgets, financial records, and tax returns, (6) whether the parent has authority over general policy decisions of the subsidiary, and (7) whether the parent has authority over the subsidiary's day-to-day business and operations decisions. 710 F.2d 1154 (5th Cir. 1983). Accordingly, to determine whether Taishan is an alter ego of any of its parent corporations, the Court will discuss each factor in turn, realizing that this concept is a legal theory created and nurtured by Western legal regimes. These facts may have to be informed by the evidence of the actual control exerted by the involved entities.

### i. Amount of common stock

Given the layered ownership interest in Taishan, it is necessary to analyze the shared ownership interest that exists between many of the entities within the CNBM Group. Since 2005, CNBM Group has been a controlling shareholder of BNBM Group by directly and/or indirectly holding 100% of BNBM Group's shares. *See* Zhao Dep. at 385:4-24 [MTD Ex. 5]. Until 2014, BNBM Group had a 27.5% ownership interest in CNBM. CNBM Group also owns a majority of CNBM, as after completion of the Global Offering in 2005, CNBM Group directly and indirectly held 60.34% of CNBM's total share capital, making CNBM Group the "controlling shareholder" of CNBM. From 2005 to 2010, CNBM held between 60.33% and 52.40% direct ownership interest in BNBM's shares; and, CNBM Group, by virtue of its direct and indirect ownership in CNBM, held between 41.16% and 23.11% indirect ownership interest in BNBM. Additionally, from 2005 through 2015, among the top

ten shareholders of BNBM, CNBM has been the sole shareholder with a 5% or higher stake in BNBM. *See* 2005-2014 BNBM Annual Reports. From 2006 to 2016, BNBM owned a 65% equity interest in Taishan. *See* Yang Decl. ¶ 8 [BNBM Ex. 3]. In 2016, BNBM acquired complete ownership of Taishan. *See* Announcement of Beijing New Building Materials Public Limited Company Regarding Approval for the Company's Issuance of Shares to Purchase Assets by The Review Committee on Merger, Acquisition and Restructuring of China Securities Regulatory Commission and Resumption of Trading of Company's Shares.

Unlike the entities in *Hargrave* who owned 100% of their subsidiary during the relevant time period, the parent companies here did not *all* own 100% of their subsidiaries. However, CNBM Group did own 100% of BNBM Group. Further, CNBM Group had a majority interest in CNBM, which in turn had a majority interest in BNBM during the relevant time period. BNBM owned a majority of Taishan, until it acquired 100% ownership in 2016. In *Hargrave*, the Court looked to stock ownership because it was indicative of who controlled the company's operations. In the United States, stock ownership typically equates with voting power. However, the evidence and context of this case demonstrates that stock ownership alone does not equate to independent voting power—particularly if that vote is controlled by another parent entity. *See, supra*, Section IV.C.

**\*34** For example, CNBM Group does not own 100% of BNBM, but, according to the Stock Listing Rules of the Shenzhen Stock Exchange ("SZSE"), CNBM Group is BNBM's Actual Controller, which is defined as "any natural person, legal person or other organization that is **capable of dominating and actually dominating** the conducts of the Company by virtue of investment relationship, agreement or any other arrangement." *Id.* at Chapter XVIII, 18.1(6) (emphasis added). Based on this definition, CNBM Group controls BNBM. Similarly, CNBM Group is the "controlling shareholder" of CNBM, and after the Global Offering directly and indirectly owned 60.34% of CNBM. Thus, this factor also leans in favor of finding an alter ego relationship between CNBM and CNBM Group. Next, from 2005 to 2010, CNBM held between 60.33% and 52.40% direct ownership interest in BNBM's shares, giving it a majority share in the company. Finally, at the time of the relevant conduct, BNBM owned 65% of Tiashan's shares. Thus, evaluating the entities

stock ownership in light of the rules of the SZSE, this factor weighs in favor of finding Taishan is an alter ego of BNBM, CNBM, and CNBM Group.

### ii. Shared corporate headquarters

BNBM's headquarters and plants are in a different province than Taishan's. *See* Wang Tr. 151:16-19. However, during various periods since 2005, these entities occasionally shared office space, and have used each other's offices to conduct shareholder meetings. *See* 2005 BNBM Group Auditor's Report at 6; *see also* 2005 CNBM Annual Report at 4; 2005 BNBM Annual Report at 3; 6/12/2010 Taishan Gypsum Co., Ltd., Resolution of the Fifth Extraordinary General Meeting in 2010; 8/11/2011 Taishan Gypsum Co., Ltd., Resolutions of the 2010 General Meeting of Shareholders. Furthermore, at least one CNBM officer, Wang Bing, who simultaneously served as the Chairman of BNBM and the Vice President of CNBM, testified that while he was employed at CNBM, his sole job duty was to ensure the profitability of BNBM —and that he did not have an office at CNBM in connection with his employment there. It appears that the various entities may have occasionally shared office space by virtue of employees who had dual roles at multiple corporate entities. However, the facts do not demonstrate that these entities always shared corporate headquarters. Therefore, the factor is neutral in the court's analysis.

### iii. Common officers and directors

As discussed in full above, many directors and officers within the CNBM Group simultaneously hold leadership and executive positions at multiple entities, including BNBM and Taishan, within this larger corporate group. *See infra* IV.2.i. This factor strongly weighs in favor of finding that Taishan is an alter ego of BNBM.

### iv. Corporate formalities

Taishan and its parent corporations maintain many of the formalities required to preserve the separate corporate form. When BNBM acquired Taishan, a professional third-party appraised Taishan and confirmed the purchase price, which demonstrates at least portions of the acquisition were conducted as an arm's length transaction. *See* 2005 Asset Appraisal Report [BNBM Ex. 8]. Taishan's shareholders and BNBM's Board of Directors voted on and approved the acquisition in compliance with each company's articles of association. Each entity within the CNBM Corporate family, with the exception of United Suntech, has regular board meetings. *See* LIU Dep. at 49:7-50:3 (The corporate designee is not aware of either a United Suntech shareholder meeting or board of director meeting since June 2010). The entities are not undercapitalized. They do not share bank accounts and there is not substantial evidence they have comingled funds. Thus, this factor weighs against a finding of alter ego identity.

### v. Common bank accounts, accounting, payroll, budgets, tax returns

There is no evidence to suggest these entities have common bank accounts, payroll, or tax records. BNBM's audit committee, which serves under BNBM's Board of Directors, conducts annual financial audits of Taishan, but the evidence indicates these audits are still conducted separately. *See* 11/28/2009 "Letter of Communication and Confirmation about the Audit Schedule for the 2009 Financial Statements." BNBM and Taishan shared the same external auditing firm between 2006 and 2010. However, BNBM and Taishan prepare separate audited financial statements, maintain separate books and records, file separate tax returns, and maintain separate bank accounts. *See* Chen Tr. at 596:3-11; 600:3-8 [BNBM Ex. 2]. Thus, this factor weighs against a finding of alter ego identity.

### vi. Parental authority over general policy decisions of subsidiary

**\*35** As discussed above, CNBM Group exercises high-levels of control and authority over its subsidiaries. This authority is applied in a cascading manner, such that Taishan is controlled by BNBM, who is controlled by CNBM Group. This authority includes the power to control the financial decisions, capital expenditures, human resources, marketing, and manufacturing processes of the subsidiaries. *See infra* IV.C.2.ii-iii. This factor weighs in favor of finding an alter ego relationship between BNBM and Taishan.

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 351 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.... 2017 WL 1476595
2017 WL 1476595

### vii. Parental authority over daily business and operations decisions

BNBM acknowledges that it acquired Taishan in order to manage and control the "daily operation and important activities of the branches and subsidiaries" within the CNBM Group corporate family. *See* 10/16/2007 BNBM Special Inspection Report on the "Management and Control of its Branches and Subsidiaries." In order to control Taishan's daily operations, BNBM dictates the protocols and standards for Taishan's drywall manufacturing process. *See infra* IV.C.2.ii-iii. BNBM has the capability to "influence [Taishan's] production and operation decision-making." *See* 4/23/2007 BNBM Reply on the Inquiry Letter about 2006 Annual Report Verification. CNBM Group controls the daily operations of its subsidiaries—including CNBM, BNBM, and Taishan—by hiring, training, and evaluating employees, including providing performance evaluations. *See* 5/28/2014 Beijing New Building Materials (Group) Company Limited Internal Control System Construction Work Summary; *see* 6/29/2011 Email and attachment to JIA Tongchun re: Notice on Matters Relevant to CNBM Group's Training Class in 2011 for Leaders at Middle and Senior Levels.

As previously discussed, at one point CNBM Group instructed its subsidiaries conducting business in the United States to refrain from depositing funds in United States banks, only use their personal names in international business, and use personal emails when conducting business overseas. *See* 7/11/2014 Statement on Implementing the Requirements from the Group Corporation's Meeting of International Business Risk Prevention. The Court does not necessarily view these instructions as proof of the parent corporation's authority over daily business and operations, but considers them an example of the standard operating procedure for companies within the CNBM Group corporate family. A parent corporation without control over its subsidiaries' business decisions would not be able to issue a directive dictating which email addresses and even the *names* its employees were to use when conducting business, unless it already exerted significant control and influence over the day-to-day operations of the subsidiary. Thus, the evidence demonstrates that CNBM Group and BNBM had direct and indirect control over Taishan's daily

business and operations decisions. This factor weighs in favor of a finding of alter ego identity.

Applying the *Hargrave* factors to this case, only the first factor supports a finding that Taishan is an alter ego of CNBM. However, factors one, three, six and seven support a finding that Taishan is an alter ego of BNBM. Factors four and five weigh in favor of maintaining the corporate separateness between these entities. Factor two is neutral. Thus, viewing "[a]ll the relevant facts and circumstances surrounding the operations of the[se] parent[s] and subsidiary[ies]" in the light more favorable to Plaintiffs, the Court concludes that Taishan is an alter ego of BNBM under Louisiana law. *Hargrave*, 710 F.2d at 1160.

**\*36** Furthermore, Louisiana courts also recognize that liability may be imputed to related entities within a "single business enterprise." The test for a single-business enterprise, while similar to the test for alter ego, provides additional factors the Court should consider in its analysis. To determine whether multiple corporate entities are a single business enterprise, the Court should consider the following factors: (1) common ownership, (2) common directors and officers, (3) common employees, (4) common offices (5) unified administrative control, (6) similar or supplementary business functions, (7) one corporation financing the other, (8) inadequate capitalization, (9) one corporation's creation of the other, (10) one corporation paying the salaries, expenses, or losses of the other corporation, (11) one corporation receiving no business other than that given to it by the affiliated corporation, (12) shared property, (13) noncompliance with corporate formalities, (14) services rendered by the employees of one corporation on behalf of another corporation, (15) centralized accounting, (16) undocumented transfer of funds between corporations, (17) unclear allocation of profits and losses between corporations, and (18) excessive fragmentation of a single enterprise into separate corporations. *See Green,* 577 So. 2d at 257-58; *accord Jackson,* 615 F.3d at 587.

As discussed above, the corporate entities within the CNBM Group had common ownership, directors, officers, and employees; factors one, two, and three strongly support a finding of a single business enterprise. Similarly, the Court has already addressed that while the entities do not share permanent offices, at least some officers use the office space of one corporation in their

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 352 of 1680

In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp. (2017)

2017 WL 1476595

work for a related entity, and shareholders of one entity have used other entities' offices for their shareholder meetings; this factor is neutral.

The evidence demonstrates that these entities were all controlled—directly and indirectly—by CNBM Group. As the ultimate authority, or actual shareholder, over all the subsidiaries, CNBM Group appointed directors and officers, approved loan guarantees, directed its subsidiaries on how to vote, audited and gave recommendations for corrective action to its subsidiaries, and even specified the safety regulations and production standards for Taishan's drywall. *See* 4/15/2006 Taishan Board of Director Resolution. While CNBM Group is no longer a party to this case, its control and dominance is still considered when evaluating whether it and its downstream publicly-owned corporate entities constitute a single-business enterprise.

Additionally, at least some of the entities within this corporate family shared property. For example, in 2005, Taishan and BNBM agreed, without negotiations, that Taishan will own 80% and BNBM will own 20% of the two new plasterboard factories and gypsum powder plant Taishan was building. *See* 6/26/2005 Resolution of the 4th Extraordinary General Meeting of Shareholders for the Year of 2005 of Shandong Taihe Dongxin Co., Ltd. (now Taishan Gypsum) [MTD Ex. 129] at 1-2. This factor favors the existence of a single business enterprise.

Many of the entities within the CNBM Group serve similar or supplementary business functions. CNBMIT is an import export company, which supplies building materials to the North American market. *See* CNBMIT webpage, "CNBM USA" Tab, available at http://www.cnbmit.com/en/overseas/Detail.aspx?MenuID=050602 (last visited 2/22/2016). CNBM USA was established in 2006 in order to distribute CNBM products in the United States. *See* Papers Relating to Incorporation from the State of California, Secretary of State [MTD Ex. 168]; CNBM Group "Contact Us," USA Tab. Not only did it receive exclusive business from CNBM, but it rendered services on behalf of CNBM. Finally, there is some evidence that employees of one corporation render services on behalf of other corporations. *See infra* IV.C.2.i. While employed as a vice-president at CNBM, Wang Bing, the Chairman of BNBM explained that his sole job duty was to ensure the profitability of BNBM. Many other officers and directors

served in such dual capacities, thereby performing services for a corporation other than the entity with which they were currently employed. *See infra* IV.C.2.i.

As to whether one corporation financed, or created the other corporation, factors seven and nine, there are some instances where this has occurred, but those instances seem to be the exception rather than the rule. When BNBM acquired Taishan, it was an existing corporation, and the largest producer of gypsum board in China. *See* Deal Decl., Table 18 [BNBM Ex. 11]. However, BNBM has made annual guarantees on Taishan's behalf in order to ensure Taishan's continued financial success. While BNBM did not create Taishan, BNBM was formed by BNBM Group in 1997, in order to raise capital for its drywall business. After creating BNBM, BNBM Group stopped manufacturing drywall, and instead relied on the drywall manufactured by BNBM. These facts are insufficient to demonstrate these entities consistently financed one another and therefore these factors are neutral in the Court's analysis.

**\*37** On the other hand, there are some factors which do not support the finding of a single business enterprise. Taishan and other entities within the CNBM Group conglomerate are apparently adequately capitalized. There is no evidence that one corporation pays the salaries or losses of the other corporations. Most of the entities comply with corporate formalities such as Board and shareholder meetings, even if many of the board members and shareholders have positions with multiple corporate entities. *See* Chen Decl. ¶ 11 [BNBM Ex. 67]. Taishan, CNBM Group, CNBM, BNBM Group, and BNBM use the same accounting firms and auditors, but these firms prepare separate reports for each entity. There is only evidence of one undocumented transfer of funds between the corporations. Finally, there is a clear allocation of profits and losses between corporations.

Applying the factors for a single-business enterprise to the facts of this case, the Court finds the evidence supports the existence of a single business enterprise under Louisiana law. These entities were led and controlled by CNBM Group, who ensured each of the entities under it were working to maximize the profits of CNBM Group. "When a corporation integrates their resources ... to achieve a common business purpose, each business may be held liable for the wrongful acts done in pursuit of that purpose." *Brown*, 996 So. 2d at 1267 n.2. Here, the

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 353 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp. (2017)
2017 WL 1476595

entities within the CNBM Group corporate umbrella have integrated their resources to ensure their success as an international building materials company. Thus, each business within the larger corporate family—including BNBM, BNBM Group, and CNBM—may be held liable for the wrongful acts done in pursuit of that purpose. *Id.*

To borrow a metaphor from Judge Weinstein of the Eastern District of New York, CNBM Group and its subsidiaries "do maintain some independence about as much as the egg and vegetables in a western omelette. Just as, from a culinary point of view, we focus on the ultimate omelette and not its ingredients, so, too, from a jurisdictional standpoint, it is the integrated international operation of [CNBM Group] affecting activities in [the forum states] that is the primary focus of our concern." *Bulova Watch Co. v. K. Hattori & Co.*, 508 F. Supp. 1322, 1341 (E.D.N.Y. 1981); *see also* Blumberg, The Law of Corporate Groups, supra note 3, at § 3.06.1 (explaining that more courts are focusing on the "mutual dependence" between components of a corporate group in determining whether the actions of a subsidiary can be imputed to the parent for the purpose of jurisdiction).

CNBM Group controlled, directed, and monitored the activities of its subsidiaries. It provided approval for financing to build drywall factories, established manufacturing guidelines, and set production limits. CNBM Group, along with its subsidiaries clearly contemplated that Taishan drywall would end up in the forum states; and received the financial benefit from these sales. Under the Louisiana single-enterprise doctrine, the Court finds that Taishan, BNBM, BNBM Group, and CNBM constitute a single business enterprise. This single business enterprise is therefore considered one entity for the purposes of imputing personal jurisdiction under Louisiana law.

## V. PERSONAL JURISDICTION OVER BNBM BY VIRTUE OF ITS CONTACTS IN FLORIDA

Assuming, arguendo, that BNBM and Taishan do not have an agency relationship, (which the overwhelming evidence supports existed) the Court may still have jurisdiction over BNBM by virtue of the business it conducted in Florida.

### A. Personal Jurisdiction Over a Foreign Defendant

It is axiomatic under Fifth Circuit law that a federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant if: (1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the Due Process Clause of the United States Constitution. *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir. 2010) (citing *Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir. 1999)); *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266, 270 (5th Cir. 2006) (citing *Mink v. AAAA Dev. LLC,* 190 F.3d 333, 335 (5th Cir. 1999)); *Paz v. Brush Engineered Materials, Inc.,* 445 F.3d 809, 812 (5th Cir. 2006) (quoting *Allred v. Moore & Peterson,* 117 F.3d 278 (5th Cir. 1997)); *Ouazzani–Chahdi v. Greensboro News & Record, Inc.,* 200 Fed. Appx. 289, 291 (5th Cir. 2006) (citing *Revell v. Lidov,* 317 F.3d 467, 469 (5th Cir. 2002)); *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 418 (5th Cir. 1993). The Court now addresses each of these requirements in turn.

### B. Florida's Long-Arm Statute

**\*38** The Florida long-arm statute provides in relevant part:

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent [10] does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing or any of the following acts:

(a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

(b) Committing a tortious act within this state.

—

(f) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at the time of the injury, either:

1. The defendant was engaged in solicitation or service activities within this state; or

2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 354 of 1680
In re: Chinese Manufactured Drywall Products Liability Litigation, Not Reported in Fed...., 35 So. 44 (2017)

2017 WL 1476595

consumed within this state in the ordinary course of commerce, trade, or use.

Fla. Stat. Ann. § 48.193. " 'Courts are required to strictly construe the long-arm statute.' " *Caiazzo v. Am. Royal Arts Corp.,* 73 So. 3d 245, 256 (Fla. 4 Dist. App. Ct. 2011) (quoting *Seabra v. Int'l Specialty Imps., Inc.,* 869 So. 2d 732, 733 (Fla. 4 Dist. App. Ct. 2004)). "As used in [subsection (1) of] the long arm statute, 'the term 'arising from' is broad; it does not mean 'proximately caused by,' but only requires a direct affiliation, nexus, or substantial connection to exist between the basis for the cause of action and the business activity.' " *Golant v. German Shepherd Dog Club of Am., Inc.,* 26 So. 3d 60, 62 (Fla. 4 Dist. Ct. App. 2010) (quoting *Citicorp Ins. Brokers ( Marine ), Ltd. v. Charman,* 635 So. 2d 79, 82 (Fla. 1 Dist. Ct. App. 1994)). The Court will now discuss the three provisions under the Florida Long–Arm Statute which are at issue in this litigation: subsections (a), (b), and (f).

### 1. BNBM's Business in the state

Beginning in 1999, BNBM Group worked as BNBM's export agent to sell BNBM drywall to the United States. *See* ZHAO Dep. at 183:15-184:18. In 2000, the BNBM Entities registered BNBM of America, Inc. ("BNBM of America") in Florida, and bought equipment and leased warehouse space in relation to its business in the state. *See* Wood Nation Dep. at 20:22-21:2; 2000-2005 BNBM of America, Inc. Business Reports to Florida Secretary of State. From approximately 2001 through 2004, BNBM of America had approximately eight permanent employees, paid U.S. taxes, and sold over $1 million of BNBM drywall to United States customers. *See* Hannam Dep. at 33:33-37:7 [MTD Ex. 213]. Although BNBM of America was winding-down its business in 2004, in 2005, and into 2006, it still maintained its mailing address and principal place of business in Tampa, Florida as well as its status as a Florida corporation. BNBM of America shut down its drywall sales "somewhere in between 2002 and 2003," and ceased its corporate existence in 2006. *Id.* at 75:8-14.

**\*39** During this period, BNBM hosted representatives from two Florida drywall distributors, Davis Construction and EAC & Sons Corporation, at its manufacturing facilities in China. *See* Chaparro Dep. at 28:22-30:4 [MTD Ex. 216]; Davis Dep. [MTD Ex. 217]. To assist in arranging this trip, BNBM sent "invitation

letters" to Stefan Davis of Davis Construction and Edgar Chaparro of EAC to ensure they were able to obtain travel visas. *See* Chaparro Dep. at 24:7-21, 29:3-30:4; Davis Dep. at 29:16-30:1. BNBM gave Davis and Chaparro tours of their factories, arranged meetings with Cai Kai, Manager of BNBM's Drywall Division, and Wang Bing, BNBM's General Manager—who expressed a clear interest in doing business in the United States. *See* Davis Dep. at 36:2-22. Chaparro visited China to meet with BNBM approximately 10-20 times. *See* Chaparro Dep. 29:3-21.

In order to establish its presence in the U.S. drywall market, BNBM manufactured its drywall to meet American Society for Testing and Materials ("ASTM") standards and to conform to U.S. drywall size specifications. *See* Chaparro Dep. at 93:19-23; Davis Dep. at 42:23-43:11. BNBM gave Davis and EAC a Material Safety Data Sheet ("MSDS") pursuant to standards prescribed by the U.S. Occupational Safety and Health Administration ("OSHA"). It received authorization that its drywall met U.S. standards—which in turn, led Davis and EAC to conduct business with BNBM in 2005. *See* Chaparro Dep. at 24:22-25, 25:1-11.

BNBM arranged to have its drywall shipped to Florida. On November 18, 2005, BNBM entered into an initial agreement with EAC for the sale of 200,000 boards of BNBM drywall to be shipped CIF to the Port of Tampa in Florida. *See* 11/18/05 Sales Contract [MTD Ex. 224]. The contract price for this drywall was $2,350,000. *See* [MTD Ex. 224 at 2]. Similarly, on November 16, 2005, BNBM agreed to sell and ship (CFR) 240,000 boards of BNBM drywall to Wood Nation in Port Manatee, Florida. *See* 1/6/06 BNBM Invoice to Wood Nation at 2 [MTD Ex. 225]. The contract price for this drywall was $2,040,541.00. *Id.* Additionally, on June 5, 2006, BNBM shipped almost 300,000 sheets of drywall (at a price of $1,778,013.60) to the Everglades port in Florida for Triorent Trading. *See* BNBM "Statistical Spreadsheet of Gypsum Boards" [MTD Ex. 143].

Based on the foregoing, the Court finds that BNBM's business activities in Florida were sufficient to satisfy subsection (a) of the Florida long-arm statute. BNBM manufactured and sold over 68 million square feet—more than $10,000,000—of its drywall to United States customers. [MTD Ex. 143]. In 2006, BNBM sold and exported at least eight shipments of drywall to U.S. customers consisting of 1,435,238 sheets of drywall. *Id.*

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 36 of 44 Page ID #: 833

In re Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp....

2017 WL 1476595

Of these BNBM drywall sales, six of the shipments (constituting over 1,300,000 sheets of drywall and amounting to more than $9,000,000.00) were exported to ports in Florida. [27] *Id.* BNBM established an American subsidiary, BNBM America in Florida to help develop these sales. BNBM solicited representatives from Florida corporations, arranged for them to visit BNBM facilities in China, and negotiated sales contracts. BNBM ensured its drywall met U.S. standards, arranged for its product to be shipped to Florida. It undoubtedly knew its drywall would end up in Florida. These contacts satisfy subsection (a) of the Florida long-arm statute. *See Robert D. Harley Co. v. Global Force (H.K.) Ltd.*, 2007 WL 196854, at *4 (S.D. Fla. Jan. 23, 2007) (finding personal jurisdiction under subsection (a) of the Florida long-arm statute where defendant executed agreement which contemplated business with a Florida subsidiary, this business resulted in $5–6 million per year for three years, defendant shipped its goods directly to Florida, and it attended a meeting in Florida.); *Sierra v. A Betterway Rent–A–Car, Inc.*, 863 So. 2d 358, 360 (Fla. 3 Dist. Ct. App. 2003) (finding personal jurisdiction over defendant who knew its products were used in Florida, did not discourage or prohibit the use of its products in Florida, advertised globally, and three accidents involving its products occurred in Florida.); *Gillins v. Trotwood Corp.*, 682 So. 2d 693, 693–94 (Fla. 5 Dist. Ct. App. 1996) (finding personal jurisdiction over foreign defendant in Florida who although was not authorized to do business or solicited business in the state and had no office, agent, or property in the State, specially-manufactured a machine outside of the state which it knew was destined to be used in Florida.); *McHugh v. Kenyon*, 547 So. 2d 318, 319 (Fla. 4 Dist. Ct. App. 1989) (finding personal jurisdiction over defendant who conducted no business in Florida, had no salesperson or distributors in the State, and no other ties to Florida, on the basis that the defendant produced hundreds of thousands of product units which were distributed over five years in the United States, with 6,000 marketed in Florida.); *compare Promex, LLC v. Perez Distrib. Fresno, Inc.*, 2010 WL 3452341, at *3–4 (S.D. Fla. Sept. 1, 2010) (finding no personal jurisdiction over defendant who sold products to two Florida customers, because no evidence that defendant sold its products on more occasions or of a series of acts involving these transactions, the latter of which may have conferred jurisdiction.)

### 2. Tortious Acts within the State

**\*40** Pursuant to subsection (b) of the Florida long arm statute, "[a] court has specific jurisdiction over a defendant where [it] 'commits a tortious act within this state.' " *Reiss v. Ocean World, S.A.*, 11 So. 3d 404, 406 (Fla. 4 Dist. Ct. App. 2009). "In order to commit a tortious act within this state, a defendant's physical presence in Florida is not required," *id.* (citing *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002)), as subsection (b) also applies to "defendants committing tortious acts outside the state that cause injury in Florida." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1217 (11th Cir. 1999). "While a defendant's physical presence in the state is not required, it is not, however, enough that the actions of a defendant committed outside of Florida ultimately have consequences in Florida. Instead, [defendant's] actions must directly cause injury or damage within the state." *Blumberg v. Steve Weiss & Co., Inc.*, 922 So. 2d 361, 364 (Fla. 3 Dist. Ct. App. 2006) (citing *Korman v. Kent*, 821 So. 2d 408, 411 (Fla. 4 Dist. Ct. App. 2002)). "[T]he plaintiff must demonstrate that the non-resident defendant 'committed a substantial aspect of the alleged tort in Florida' .... such a showing is properly made by establishing that the activities in Florida 'were essential to the success of the tort.' " *Williams Elec. Co., Inc. v. Honeywell, Inc.*, 854 F.2d 389, 394 (11th Cir. 1988) (quoting *Watts v. Haun*, 393 So. 2d 54, 56 (Fla. Dist. Ct. App. 1981)).

According to Stephan Davis, as of June 15, 2015, over 200,000 sheets of BNBM's defective drywall were being stored in a Davis Construction warehouse in Ocala, Florida. Sworn Statement of Stefan Davis dated 6/15/2015 ("Davis Sworn Statement") [MTD Ex. 229] at 4:16-5:23. BNBM argues that there is no evidence this drywall is defective, as Plaintiffs have not put forth any evidence that this particular drywall was tested. However, if the drywall was safe, it is unlikely that Davis would have continued to store it for more than a decade. Thus, the Court finds that this contradictory evidence, viewed in the light most favorable to the Plaintiff, is sufficient to satisfy subsection (b) of the Florida long arm statute. *See Schmitt-Doss v. Am. Regent, Inc.*, No. 12-0040, 2012 WL 6474038, at *2 (W.D. Va. Dec. 13, 2012) ("When the court addresses the question of personal jurisdiction on the basis of motion papers, legal memoranda, allegations in the complaint,

2017 WL 1476595

and jurisdictional discovery, the facts are viewed in the light most favorable to the plaintiff.").

### 3. Causing Injury in the State

Pursuant to subsection (f) of Florida's long arm statute, an entity is subject to personal jurisdiction when it is:

> Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at the time of the injury, either: 1. The defendant was engaged in solicitation or service activities within this state; or 2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

Fla. Stat. Ann. § 48.193(f). As this Court has previously held, economic injury is sufficient to satisfy section (f) of the Florida long-arm statute. Further, Defendant admits that 69 claims identified "BNBM," "Dragon," or "Beijing," as the manufacturer of drywall found in their homes. *See* R. Doc. 19646 at 22. While Defendants are correct that this is only a small portion of the claims in Florida, it does indicate that BNBM drywall caused injury in the state. Thus, at this stage in the proceeding, Plaintiffs have satisfied subsection (f) of Florida's long arm statute.

### C. Due Process Clause

"The Due Process Clause 'operates to limit the power of a State to assert in personam jurisdiction over a nonresident defendant.' " *Ouazzani–Chahdi,* 200 Fed. Appx. at 291 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14 (1984)); *Asahi Metal Indus. Co., Ltd. v. Superior Court of Ca.,* 480 U.S. 102, 109 (1987); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980) (citing *Kulko v. Ca. Superior Court.,* 436 U.S. 84, 91 (1978)). A court's exercise of personal jurisdiction over a foreign defendant is consistent with due

process only when: (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945); *Paz,* 445 F.3d at 813 (quoting *Panda Brandywine Corp. v. Potomac Elec. Power Corp.,* 253 F.3d 865, 867 (5th Cir. 2001)); *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir. 2010) (citing *Revell v. Lidov,* 317 F.3d 467, 470 (5th Cir. 2002)); *Ouazzani–Chahdi,* 200 Fed. Appx. at 291 (quoting *Revell,* 317 F.3d at 470); *Ruston Gas Turbines, Inc.,* 9 F.3d at 418 (citing *Int'l Shoe Co.,* 326 U.S. at 316, 366). The limits of the Due Process Clause "have been substantially relaxed over the years.... largely attributable to a fundamental transformation in the American economy." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292–93 (1980) (internal citations omitted). The Court will now address the due process requirements in turn, beginning with minimum contacts.

### D. Minimum Contacts

**\*41** "The 'constitutional touchstone' of the inquiry to determine if personal jurisdiction can be exercised is whether the defendant 'purposefully established minimum contacts in the forum state.' " *Seiferth,* 472 F.3d at 271 (quoting *Asahi Metal Ind. Co. v. Super. Ct.,* 480 U.S. 102, 108–09 (1987)); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985) (citing *Int'l Shoe,* 326 U.S. at 316). There exist two types of minimum contacts: those that give rise to specific personal jurisdiction and those which give rise to general jurisdiction. *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir. 2010) (citing *Wilson v. Belin,* 20 F.3d 644, 647 (5th Cir. 1994)); *Seiferth,* 472 F.3d at 271; *Revell v. Lidov,* 317 F.3d 467, 470 (5th Cir. 2002); *Ruston Gas Turbines, Inc.,* 9 F.3d at 418. Only specific personal jurisdiction is alleged by plaintiffs. *See* (R. Doc. 14209, p. 7). Specific jurisdiction exists when " 'the defendant has "purposefully directed" his activities at residents of the forum ... and the litigation results from alleged injuries that arise out of or relate to those activities.' " *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir. 2010) (quoting *Burger King v. Rudzewicz,* 471 U.S. 462, 472 (1985)); *Seiferth,* 472 F.3d at 271 (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir. 2002)). The Court now addresses the applicable law for specific personal jurisdiction.

Case 2:09-md-02047-EEF-JMBN Document 22363-78 Filed 01/18/19 Page 357 of 1680
In re: Chinese Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp..., 2017 WL 1476595 (2017)... Page 38 of 44

2017 WL 1476595

### 1. Specific Jurisdiction

For specific personal jurisdiction to attach, "[t]he non-resident's purposefully directed activities in the forum must be such that he could reasonably anticipate being haled into court in the forum state." *Id.* (quoting *Burger King,* 471 U.S. at 474). Specific personal jurisdiction requires a sufficient nexus between the non-resident's contacts with the forum and the cause of action. *Id.* at 378–79 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n.8 (1984)). A defendant who purposefully avails himself of the privilege of conducting activities in the forum state invokes the benefits and protections of the forum's laws. *Id.* at 379 (citing *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)). "The 'purposeful availment' requirement ensures that a defendant will not be hauled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Id.* (citing *Burger King,* 471 U.S. at 472). The activities of a defendant are not measured by quantity, but rather quality as "[a] single act by the defendant directed at the forum state ... can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston Gas Turbines, Inc.,* 9 F.3d at 419.

Where a nonresident's contact with the forum state "stems from a product, sold or manufactured by the foreign defendant, which has caused harm in the forum state, the court has specific jurisdiction if it finds that the defendant delivered the product into the stream of commerce with the expectation that it would be purchased or used by consumers in the forum state." *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 380 (5th Cir. 2002). Under this 'relatively expansive' theory, only 'mere foreseeability' that a defendant might be haled into court because it purposely availed itself of the benefits of the forum state is required. *Id.* A defendant need not have 'purposely directed' its activities to the forum. *Jackson v. Tanfoglio Giuseppe, S.R.L.,* 615 F.3d 579, 585 (5th Cir. 2010). It is the law of the case that "the Court must reject the "stream-of-commerce-plus" approach to specific personal jurisdiction in favor of the less stringent "stream-of-commerce" approach." *In re Chinese Manufactured Drywall Prod. Liab. Litig.,* 894 F. Supp. 2d 819, 849 (E.D. La. 2012), *aff'd,* 742 F.3d 576 (5th Cir. 2014), and *aff'd sub nom. In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* 753 F.3d 521 (5th Cir. 2014).

**\*42** First, the Court will review BNBM PLC's ("BNBM's") contacts with Florida. In order to begin selling drywall in the U.S. market, BNBM established BNBM America in Florida, and registered that entity with the secretary of state. However, as BNBM America was winding down, BNBM began to negotiate directly with two Florida companies to arrange for future sales. Beginning in 2005, BNBM developed a relationship with two corporate representatives—Stefan Davis of Davis Construction and Edgar Chaparro of EAC & Sons Construction—in order to sell drywall to the U.S. This demonstrates that the parties had an extensive relationship, with the explicit goal of selling drywall to the forum states. *See Burger King,* 471 U.S. at 478–79 (considering parties' course of dealings in minimum contacts analysis). BNBM helped to arrange Davis and Chaparro's visit to China, arranged meetings with high level BNBM and CNBM executives, and gave them a tour of the BNBM factory. This also indicates the parties had the requisite contacts to satisfy specific jurisdiction. *See Asahi,* 480 U.S. at 103 (considering marketing tactics in minimum contacts analysis).

In October of 2005, BNBM obtained certification that its drywall met U.S. manufacturing standards, and included this certification on its marketing materials. BNBM modified the labels on its drywall in order to reach a sales contract with these Florida companies. Such targeted marketing demonstrates BNBM purposely availed itself of the forum state. *See J. McIntyre,* 131 S.Ct. at 2792 (Breyer, J. concurring); *Asahi,* 480 U.S. at 112, (O'Connor, J. plurality) (reasoning special state-related marketing or advertising is a factor to be considered in favor of exercising personal jurisdiction in that state.). After reaching the sales agreement, BNBM drafted the contract, and arranged for its drywall to be shipped **to Florida.** *See* 11/18/2005 Sales Contract for 200,000 boards of BNBM PLC drywall to EAC [MTD Ex. 224]; Chaparro Dep. at 43:22-46:19. This process was repeated a second time, when on November 16, 2005, BNBM agreed to sell and ship 240,000 boards of its drywall to Port Manatee, Florida. *See* 1/6/2006 BNBM Invoice to Wood Nation for 240,000 sheets of drywall [MTD Ex. 225] at 21; *see also* BNBM "Statistical Spreadsheet of Gypsum Boards Exported to the U.S. in the Year 2006" at 2.

After these initial sales, BNBM entered an agreement with Davis Construction, where Davis agreed to distribute BNBM drywall throughout the southeastern United

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 358 of 1680
In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in Fed.... (2017)

2017 WL 1476595

States—including Florida. *See* 3/12/2006 Exclusive Purchase & Supply Agreement at 5. In accordance with this agreement, BNBM sent two additional shipments of its drywall to Florida. After it arrived, the parties continued to communicate regarding how the drywall was being distributed throughout the United States, and Mr. Davis wrote in April, 2006 that "BNBM material is now being distributed throughout the Southeastern United States and we expect future shipments to be distributed along the Eastern Seaboard of the United States."

Based on these facts there can be no doubt that BNBM delivered its drywall into the stream of commerce with the expectation that it would be purchased or used by consumers in Florida. *See Jackson,* 615 F.3d at 585. BNBM marketed its drywall to Florida companies, entered into sales contracts to sell its drywall in Florida, and repeatedly shipped its drywall to the state. These contacts demonstrate a "regular and anticipated flow of products from manufacture to distribution to retail sale" as required for minimum contacts. *See Asahi,* 480 U.S. at 116–17 (Brennan, J. concurring).

**E. Cause of Action Arises from Minimum Contacts**
As noted, "specific personal jurisdiction exists when 'the defendant has "purposefully directed" his activities at residents of the forum ... and the litigation results from alleged injuries that arise out of or relate to those activities.' " *Clemens v. McNamee,* 615 F.3d 374, 377 (5th Cir. 2010) (quoting *Burger King v. Rudzewicz,* 471 U.S. 462, 472 (1985)); *Seiferth,* 472 F.3d at 271 (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir. 2002)). BNBM argues that as its "limited contracts with Florida companies were made and performed in China, plaintiffs cannot demonstrate the requisite nexus between their claims and BNBM conduct directed at those states." R. Doc. 19646 (citing *Prejean,* 652 F.2d at 1270 n.21.). However, as this Court has previously explained, these plaintiffs have filed tort claims seeking damages caused by defective drywall, and therefore their claims do not solely relate to the sales contracts BNBM entered in China, but the actions BNBM took as a result of that contract. The class definition in *Amorin* includes:

> **\*43** All owners of real properties in the United States, who are a

named Plaintiff on the complaint in *Amorin*, *Germano*, *Gross*, and *Wiltz* (*i.e.*, not an absent class member), asserting claims arising from, or otherwise related to Chinese Drywall **manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered** by the Taishan Defendants.[28]

*See* R. Doc. 17883 (emphasis added). Thus, BNBM's contacts with Florida include its marketing, advertising, design, manufacturing, sale, and shipment of its drywall. As this Court has explained,

> The Court does not read the "arise from" or "relate to" requirements as narrowly as [defendant] suggests; nor does it find any jurisprudence supporting this narrow interpretation. The Supreme Court has not yet addressed "what sort of tie between a cause of action and a defendant's contacts with a forum" is required for specific personal jurisdiction. *See Helicopteros,* 466 U.S. at 416 n.10, 104 S.Ct. 1868. The plain language of this requirement alone indicates a broader interpretation of the nexus between minimum contacts and the allegations against the foreign defendant.

*In re Chinese Manufactured Drywall Prod. Liab. Litig.,* 894 F. Supp. 2d at 857. BNBM targeted its marketing and manufacturing in order to enter into sales contracts with Florida customers. It was aware its drywall would be delivered, sold, and used in Florida. Accordingly, the Court finds that the claims against BNBM in *Amorin* "relate to" and "arise from" BNBM's minimum contacts with Florida.

**F. Fair Play and Substantial Justice**
Under the final prong of the due process inquiry, "[e]ven if minimum contacts exist, the exercise of personal jurisdiction over a non-resident defendant will fail to satisfy due process requirements if the assertion of personal jurisdiction offends 'traditional notions of fair play and substantial justice.' " *Ruston Gas Turbines, Inc.,* 9 F.3d at 421 (quoting *Int'l Shoe,* 326 U.S. at 316). Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show the assertion of personal jurisdiction in the forum would be unfair or unreasonable. *Seiferth,* 472 F.3d at 271 (citing *Nuovo Pignone,* 310 F.3d

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 01/18/19 Page 359 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp. (2017)
2017 WL 1476595

at 382); *Wien Air Alaska v. Brandt,* 195 F.3d 208, 215 (5th Cir. 1999) (citing *Akro Corp. v. Luker,* 45 F.3d 1541, 1547 (Fed. Cir. 1995)). "It is rare to say the assertion is unfair after minimum contacts have been shown." *Id.* (citing *Akro Corp.,* 45 F.3d at 1549). A court is to consider the following factors in making the fairness determination: (1) the defendant's burden, (2) the forum state's interest, (3) the plaintiff's interest in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the state's shared interest in furthering fundamental social policies. *Paz,* 445 F.3d at 814; *Ruston Gas Turbines, Inc.,* 9 F.3d at 421.

**\*44** First, the Court will address the potential burden on Defendants. The Court recognizes that BNBM will incur costs as a result of defending these claims. BNBM argues it will need to translate thousands of documents, travel to and from Louisiana for depositions, and endure "surmounting logistical difficulties in litigating a matter half way around the globe." R. Doc. 19646 at 83. However, as the Supreme Court recognizes, "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *World–Wide Volkswagen,* 444 U.S. at 294. Further, the larger and more sophisticated the defendant, the less burdensome it is to defend in a foreign country. *See, e.g., Bean Dredging Corp. v. Dredge Tech. Corp.,* 744 F.2d 1081, 1085 (5th Cir. 1984) ("Given the magnitude of [defendant's] operations, the court is compelled to hold that it is not unreasonably inconvenient for [defendant] to defend the suit in [the forum]."). As evidence of its ability to defend, the Court notes that not only was BNBM able to overcome these challenges in marketing its drywall within the United States, but it has also managed to retain excellent counsel who have emphatically and capably represented the Defendant.

The second factor is the interest of the forum state. BNBM argues the interests of the forum states are not served by exercising jurisdiction, as BNBM does not have property or employees in the forum states. The Court finds that Florida has a great interest in its citizens seeking compensation against BNBM for the alleged damages caused to their properties, especially after years of suffering in homes contaminated with Chinese drywall and the vast delays that have plagued this litigation, preventing a resolution of this matter.

The third factor is the Plaintiffs' interest. BNBM again argues the Plaintiffs' interest will not be best served by requiring BNBM to defend this litigation here. The Court disagrees. As this Court has previously noted, it would be immensely burdensome for the Plaintiffs to litigate their claims against BNBM in China. Thus, the Plaintiffs' interest is strong.

The fourth factor is the judicial system's interest. BNBM argues that this factor does not favor the exercise of personal jurisdiction because of the previously mentioned difficulties regarding travel, translation, and discovery. Again, the Court disagrees and finds that the judicial system has a great interest in exercising personal jurisdiction over BNBM. The MDL Panel authorized this Court to conduct proceedings in all Chinese drywall-related cases, but the Court's progress has been repeatedly stymied. First by Taishan's failure to appear in the litigation, and later by the massive discovery required to resolve the present personal jurisdiction challenge. The judicial system has an interest in this Court effectively and efficiently resolving the Chinese drywall-related claims, and it can best satisfy this interest by having BNBM, a major manufacturer defendant, before the Court while the litigation remains consolidated.

Finally, the fifth factor requires that the Court consider the state's shared interest in furthering fundamental social policies. While the Court recognizes the inherent conflict in determining the rights of foreign entities in United States Courts, this conflict is overshadowed by the importance—and necessity—of holding manufacturers of defective products liable for the damages caused by their product. In a "flat world" in which we now live, markets are worldwide and it is in everyone's interest to discourage the manufacture and distribution of defective products. *In re Chinese Manufactured Drywall Prod. Liab. Litig.,* 894 F. Supp. 2d 819, 860 (E.D. La. 2012), *aff'd,* 742 F.3d 576 (5th Cir. 2014), and *aff'd sub nom. In re Chinese-Manufactured Drywall Prod. Liab. Litig.,* 753 F.3d 521 (5th Cir. 2014).

When considered *in toto,* even in light of the burden placed on BNBM to litigate in this forum, the Court finds that the exercise of personal jurisdiction over BNBM in this forum does not offend traditional notions of fair play and substantial justice. At least four out of five of the factors favor the exercise of personal jurisdiction over BNBM. As the Supreme Court has stated "[w]hen minimum contacts have been established, often the interests of the plaintiff

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 360 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp.... 41 Cases Page 360 of 1680

2017 WL 1476595

and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi,* 480 U.S. at 114.

## VI. SERVICE OF PROCESS

**\*45** Finally, Both the BNBM and CNBM Entities argue these complaints should be dismissed for failure to effect service of process in accordance with Federal Rule of Civil Procedure 12(b)(4) and 12(b)(5). First, CNBM argues that CNBMIT was never properly served as they were not named in the summons—instead the summons named "CNBMI." Plaintiffs aver this is a typo that should not render service ineffective, particularly in light of the fact CNBMIT was on notice of the suit. Second, the CNBM Entities argue that the complaints in *Abner, Morris,* and *Posey* should be dismissed, as these complaints were either not served at all, or service was not completed by the required deadline. Plaintiffs aver that the complaint in *Abner* was eventually served on Defendants, and any delay was the result of the challenges inherent in effecting service in China, and should not disqualify the complaint. In regards to *Morris* and *Posey,* Plaintiffs aver these complaints are included in the PSC's other omnibus complaints such that separate service should not be required. Third, BNBM PLC argues it was never served in *Gross, Wiltz,* or *Amorin.* Plaintiffs respond that a translation "understandably" led to confusion in *Wiltz,* but in every complaint, the record demonstrates that complete service was effectuated on BNBM PLC in relation to these complaints. Finally, BNBM Group argues that is was not properly served in *Gross* or *Amorin,* as the service arrived at the incorrect address. Plaintiffs argue that this was the correct address according to the publicly available documents at the time, and the fact that service occurred at BNBM PLC's address, rather than BNBM Group's is immaterial, as these entities are alter egos of one another.

In sum, Defendants' issues with service are summarized as follows: service as to CNBMIT contained a typographical error; the *Abner, Morris,* and *Posey* complaints against the CNBM Entities were not served timely; BNBM PLC was never served in *Gross, Wiltz,* or *Amorin,* and BNBM Group was incorrectly served at BNBM PLC's address in the *Gross* or *Amorin* Complaints.

"To acquire jurisdiction over the person, a court must serve on the person a document, such as a summons, notice, writ, or order." *McGuire v. Sigma Coatings,* 48

F.3d 902, 907 (5th Cir. 1995) (citing *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind,* 841 F.2d 646, 649 (5th Cir. 1988) (per curiam)). Other circuits have reasoned that "service of process is not legally defective simply because the complaint misnames the defendant in some insignificant way." *Morrel v. Nationwide Mut. Fire Ins. Co.,* 188 F.3d 218, 224 (4th Cir. 1999). The Fifth Circuit has applied this reasoning in the context of arbitration awards reasoning that a "technical defect" did not render the district court's decision erroneous and "certainly does not require reversal." *Cigna Ins. Co. v. Huddleston,* 986 F.2d 1418 (5th Cir. 1993). Here, like the parties in *Huddleston,* "everyone involved in the action ... knew of and could identify the entity being sued[,] and that the misnomer ... 'injured no one.' " *Huddleston,* 986 F.2d at 1418 (quoting *United States v. A.H. Fischer Lumber Co.,* 162 F.2d 872, 874 (4th Cir. 1947)).

As this Court has previously explained:

> Motions for service of process are procedural, not substantive motions. Furthermore, the purpose of requiring satisfactory service of process is to assure that the potential litigant receives full, valid and accurate notice of complaints or lawsuits brought against them. Its purpose is not to compel the expenditure of excessive costs, or cause undue delay or encourage evasive action. This lawsuit has been going on for over five years. Numerous depositions have been taken in this country and in China. Dozens of motions have been filed, briefed, and argued. All of the parties have been enthusiastically and competently represented. It is time to focus on substantive issues and not continue to conjure up and construct procedural roadblocks to impede the progress of this litigation.

*See* Order of November 9, 2015 (R. Doc. 19713). "[T]he core function of service is to supply notice of the pendency

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 361 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.S... 42 ou'4 Page ID # 839

2017 WL 1476595

of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections." *Henderson v. United States*, 517 U.S. 654, 672 (1996). The Hague Convention exists in order to facilitate service of process abroad and assure foreign defendants adequate notice. *Volkswagenwerk*, 486 U.S. at 704-05; *see also Burda Media, Inc. v. Viertel*, 417 F.3d 292, 300 (2d Cir. 2005) ("The Hague Convention of 1965 was intended to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time.") (internal quotation omitted). Thus, the Court must determine whether service of the Chinese Defendants provides the Entities with adequate notice of this litigation.

*46 Based on the extensive procedural history of this case, the Court is convinced service on these entities has satisfied due process. Even without considering the agency and alter-ego relationships that exist between many of these related corporations, the evidence demonstrates the entities received adequate notice of this action and sufficient time to present their defenses. Additionally, these entities have refused to accept service at various points in this history of this litigation. To now argue these minor technical deficiencies should warrant dismissal is disingenuous. Thus, the Defendants' motion is denied in regards to their arguments that these claims should be dismissed for lack of proper service of process.

## VII. CONCLUSION

In sum, the Court finds it has jurisdiction over BNBM in relation to Plaintiffs' claims in Louisiana, Florida, and Virginia. Under both Florida and Virginia law, the evidence demonstrates Taishan was BNBM's agent, such that Taishan's jurisdictional contacts in Florida and Virginia are imputed to BNBM. Applying Louisiana law, BNBM and Taishan were members of a single business enterprise, such that the two entities are treated as one for purposes of determining jurisdiction.

Furthermore, the Court finds it has jurisdiction over CNBM and BNBM Group in relation to Plaintiffs' claims in Louisiana. Under Louisiana law, Taishan, BNBM, BNBM Group, and CNBM were members of a single business enterprise, such that Taishan's contacts in Louisiana are imputed to the other entities in the enterprise. However, the Court finds it does not have jurisdiction over CNBM or BNBM Group in relation to

Plaintiffs' claims in Florida or Virginia. Under Florida and Virginia law, Taishan was neither an agent nor an alter ego of CNBM or BNBM Group, and therefore Taishan's activities in Florida and Virginia cannot be imputed to CNBM or BNBM Group.

Additionally, the Court also finds that it has jurisdiction over BNBM by virtue of BNBM's contacts in Florida. This jurisdiction is consistent with Florida's long arm statute and the Due Process Clause. Therefore, for the foregoing reasons:

IT IS ORDERED that the CNBM Entities' Motion to Dismiss, (R. Doc. 19527) is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** with respect to CNBMIT Co. Ltd., CNBM USA Corp., and United Suntech Craft, Inc., as the evidence does not support jurisdiction over these entities. It is also **GRANTED** with respect to Plaintiffs' claims against CNBM in Florida and Virginia, as CNBM does not have an agency or alter ego relationship with Taishan under Florida or Virginia law. However, the motion is **DENIED** with respect to Plaintiffs' claims against CNBM under Louisiana law, as the Court finds the evidence demonstrates CNBM was part of a single business enterprise with Taishan. Therefore, Taishan's contacts in Louisiana are imputed to CNBM, such that the Court has jurisdiction over CNBM in relation to Plaintiffs' claims based on Louisiana law.

IT IS FURTHER ORDERED that BNBM Group's Motion to Dismiss (R. Doc. 19664) is **GRANTED** with respect to Plaintiffs' claims against BNBM Group under Florida and Virginia law, as BNBM Group does not have an agency or alter ego relationship with Taishan under the laws of those states. However, it is **DENIED** with respect to Plaintiffs' claims against BNBM Group under Louisiana law, as the Court finds the evidence demonstrates BNBM Group was part of a single business enterprise with Taishan under Louisiana law. As such, Taishan's contacts in Louisiana are imputed to BNBM Group.

IT IS FURTHER ORDERED that BNBM's Motion to Dismiss Complaints Pursuant to Rules 12(b)(2) and 12(b)(5) (R. Doc. 19646) is **DENIED**. The Court finds Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to BNBM. Further, the evidence demonstrates BNBM and Taishan were members of a single business

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 362 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed..., 2017 WL 1476595
2017 WL 1476595

enterprise, such that Taishan's contacts in Louisiana are imputed to BNBM under Louisiana law.

**\*47** **IT IS FURTHER ORDERED** that the BNBM Entities' Motion to Dismiss the State of Louisiana's Second Amended and Restated Petition Pursuant to Rule 12(b)(2), Rule 12(b)(5) and Rule 12(b)(6) (R. Doc. 19663) is **DENIED**. As stated above, BNBM, BNBM Group, and Taishan were members of a single business enterprise;

therefore these entities are treated as one for the purposes of jurisdiction under Louisiana law.

**IT IS FURTHER ORDERED** that CNBM USA Corp.'s Motion to Dismiss (R. Doc. 2346), is **DISMISSED AS MOOT**.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1476595

**Footnotes**

1   Controlling Shareholder is defined as "any shareholder ... entitled to exercise, or control the exercise of 30% ... or more of the voting power at general meetings of a new applicant or who is in a position to control the composition of a majority of the board of directors of the new applicant." HKSE Rules, Sec. 19A.14

2   CNBM Group's direct ownership in CNBM ranged from 16.9% in 2005 to 13.67% in 2009; its direct/indirect ownership ranged from 60.34% in 2005 following the Global Offering to 44.10% in 2010.

3   "Controlling Entity" is defined as a person who, either alone or with any of his associates is entitled to exercise or control the exercise of not less than 20%, has the right to nominate any of the directors of the corporation; or has an interest in shares carrying the right to veto any resolution; or amend, modify, limit or add conditions to any resolution, at general meetings of the corporation. *See* Chapter 571 (Securities and Futures Ordinance of the Hong Kong Special Administrative Region of the PRC).

4   He is also the Chairman of BNBM Group.

5   He is also a Director of BNBM.

6   By 2008, CNBM Investment acquired full ownership of United Suntech.

7   Under the stock listing rules of the Shenzen Stock Exchange ("SZSE"), where BNBM's stock is listed, "Controlling Shareholder" is defined as the "shareholder whose equity shares account for more than 50% of the Company's total stock; or the shareholder who holds less than 50% of equity shares, but still has major influence on the resolutions made by the general meeting of shareholders because of the voting rights entitled to the equity shares thereof." Partial Translation of SZSE Stock Listing Rules (2014 Revision) No. 378, Chapter XVIII, 18.1(5). "Actual Controller" is defined as "any natural person, legal person or other organization that is capable of dominating and actually dominating the conducts of the Company by virtue of investment relationship, agreement or any other arrangement." *Id.* at Chapter XVIII, 18.1 (6).

8   Controlling Shareholder is defined as "any shareholder ... entitled to exercise, or control the exercise of 30% ... or more of the voting power at general meetings of a new applicant or who is in a position to control the composition of a majority of the board of directors of the new applicant." HKSE Rules, Sec. 19A.14

9   Substantial Shareholder is defined as "a person ... who is entitled to exercise, or control the exercise of, 10% or more of the voting power at any general meeting of the company ..."

10   CNBM published BNBM's increased equity acquisition of Taishan as a "Connected Transaction" on the HKSE, stating that the acquisition was made to "enable CNBM Group to further enhance its competiveness and consolidate its leading position in the PRC gypsum board market." *See* 8/26/2006 Connected Transaction Announcement.

11   Controlling Shareholder is defined as "any shareholder ... entitled to exercise, or control the exercise of 30% ... or more of the voting power at general meetings of a new applicant or who is in a position to control the composition of a majority of the board of directors of the new applicant." HKSE Rules, Sec. 19A.14

12   American accounting rules provide the same standard.

13   Since 2009, Mr. Wang has also served as a Vice President of CNBM.

14   Since 2005, Mr. Cao has also been a director of CNBM Group and President and Executive Director of CNBM.

15   While Plaintiffs attempt to claim that CNBM, BNBM and Taishan comingled and improperly transferred funds between and among each other, the only evidence for this claim is a 2008 audit report that found two payment vouchers to be inaccurate. *See* Communications about the Problems of BNBM [MTD Ex. 124]. Thus, this evidence merely demonstrates that corporate group audit controls were in place to ensure that proper accounting practices were being followed and funds were not being comingled. *Id.*

2017 WL 1476595

16  It is standard practice for a bank to require loan guarantees, and they are typically provided by the biggest shareholder. *See* Wang Tr. 363:1-9. 364:17-366:1. It is also routine practice in the United States. Major American companies such as Federal Express and the Walt Disney Company guarantee the loans of their subsidiaries. *See* Gordon Decl. ¶¶ 67, 70, 76 [BNBM Ex. 12].

17  The other two shipments were exported to California.

18  In this correspondence, Peng Wenlong offered a report on Taishan's drywall manufacturing and attached a questionnaire that included answers to questions imposed upon Taishan about the quality of its drywall, shipping and loading information for the boards exported to the U.S., and whether the packages were sealed. *See* [MTD Ex. 191, 193].

19  Song did not have a clear recollection as to most of the facts set forth in the memorandum of this meeting. *See* Song Dep. at 107-108. He did, however, recall that he was not in any way involved in a plan to delay the effectiveness of the judgment against Taishan. *Id.* at 108:2-4. ("as a shareholder, I encouraged Taishan to actively respond to the litigation. That I remember."). The PSC contends, however, that the weight of the evidence refutes Song's testimony on this point.

20  At present, Company Law Art 20(3) similarly states: "Where the shareholder of a company abuses the independent status of the company as a legal person or the limited liability of shareholders, evades debts and thus seriously damages the interests of the creditors of the company, he shall assume joint and several liability for the debts of the company. (R. Doc. 19179-9).

21  In *Stuart,* the Fifth Circuit noted that under Texas law, "for jurisdiction to exist, there need not be both the existence of a mere shell corporation and fraud. Rather, either factor, a shell corporation or fraud is sufficient by itself to justify jurisdiction." 772 F.2d at 1198 n.12 (citation and quotation omitted).

22  Furthermore, China's Company Law is not nearly as detailed as the veil-piercing law of the forum states. *See* Mark Wu, *Piercing China's Corporate Veil: Open Questions from the New Company Law*, 117 Yale L.J. 329, 330 (2007) (discussing the ambiguities and uncertainties regarding veil-piercing in China's Company Law).

23  As this Court previously held, CNBM Group is an agent or instrumentality of a foreign state, and was therefore dismissed from this litigation pursuant to the Foreign Sovereign Immunities Act. 28 U.S.C. § 1603(b). Nonetheless, evaluating CNBM Group's role in the overall corporate group provides valuable context for this analysis.

24  The "historical heritage of Confucianism demands collectivism and hierarchical obedience," which can result in paternalistic attitudes and authoritarian control within Chinese corporations. Ma & Marquis, *supra* at 18–19; Wen, *supra*, at 337. *See* Section IV.D.1.

25  CNBM Group did not just appoint the board members of its subsidiaries. It dictated how subsidiaries should report matters to the parent corporation, how to seek CNBM Group's approval on important decisions, and even how to vote at Board Meetings—including Board meetings where BNBM was approving Taishan's decisions. See China National Building Material Group Corporation Administrative Measures for Appointing Representatives of Capital Contributors [MTD Ex. 52]. In turn, BNBM had authority, with CNBM Group's oversight, to appoint three of the five directors on the Taishan Board. With the power to control Board Member's votes, CNBM Group had control over Taishan's important business and financial decisions. See Butterworth v. Integrated Resources Equity Corp., 680 F.Supp. 784, 789 (E.D. Va. 1988).

26  These guarantees were subject to CNBM Group approval.

27  The other two shipments were exported to California.

28  The "Taishan Defendants" are comprised of the following entities: Taishan Gypsum Co. Ltd. (hereafter "Taishan"); Beijing New Building Materials Limited Co. (hereafter "BNBM"); Beijing New Building Materials Group Co., Ltd. (hereafter "BNBM Group"); China National Building Materials Co., Ltd. (hereafter "CNBM"); China National Building Materials Group Corporation (hereafter "CNBM Group"); and Tai'an Taishan Plasterboard Co., Ltd. (hereafter "TTP").

---

**End of Document**                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.    43

# JOINT APPENDIX TAB # 15

Case 2:09-md-02047-EEF-MBN Document 22366-78 Filed 11/19/19 Page 2 of 24 PageID #: 843
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed....

2017 WL 1421627

2017 WL 1421627
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

IN RE: CHINESE-MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION
This Document Relates to: All Cases

MDL NO. 2047
|
Signed 04/21/2017

**FINDINGS OF FACT & CONCLUSIONS
OF LAW RELATED TO THE JUNE
9, 2015 DAMAGES HEARING**

**SECTION: L**

ELDON E. FALLON, UNITED STATES DISTRICT
JUDGE

**I. PROCEDURAL HISTORY**

**\*1** The following procedural history has been recited
in several of the Court's previous opinions, but in order
to place the current issues in context it is restated here.
From 2004 through 2006, the housing boom in Florida
and rebuilding efforts necessitated by Hurricanes Rita
and Katrina led to a shortage of construction materials,
including drywall. As a result, drywall manufactured in
China was brought into the United States and used in the
construction and refurbishing of homes in coastal areas
of the country, notably the Gulf Coast and East Coast.
Sometime after the installation of the Chinese drywall,
homeowners began to complain of emissions of smelly
gasses, the corrosion and blackening of metal wiring,
surfaces, and objects, and the breaking down of appliances
and electrical devices in their homes. *In re Chinese-
Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d
819, 829 (E.D. La. 2012), *aff'd*, 742 F. 3d 576 (5th Cir.
2014). Many of these homeowners also began to complain
of various physical afflictions believed to be caused by
the Chinese drywall. Accordingly, these homeowners
began to file suit in various state and federal courts
against homebuilders, developers, installers, realtors,
brokers, suppliers, importers, exporters, distributors,
and manufacturers who were involved with the
Chinese drywall. Because of the commonality of facts

in the various cases, this litigation was designated
as multidistrict litigation. Pursuant to a Transfer
Order from the United States Judicial Panel on
Multidistrict Litigation on June 15, 2009, all federal cases
involving Chinese drywall were consolidated for pretrial
proceedings in MDL 2047 in the U.S. District Court,
Eastern District of Louisiana.

The Chinese drywall at issue was largely manufactured
by two groups of defendants: (1) the Knauf Entities, and
(2) the Taishan Entities. The litigation has focused upon
these two entities and their downstream associates, and
has proceeded on strikingly different tracks for the claims
against each group as described below:

**A. Knauf Entities**
The Knauf Entities are German-based, international
manufacturers of building products, including drywall,
whose Chinese subsidiary, Knauf Plasterboard (Tianjin)
Co., Ltd. ("KPT"), advertised and sold its Chinese
drywall in the United States. The Knauf Entities are
named defendants in numerous cases consolidated with
the MDL litigation and litigation in state courts. The
Knauf Entities first entered their appearance in the MDL
litigation on July 2, 2009. *See* (R. Doc. 18). On November
2, 2009, in Pretrial Order No. 17, KPT agreed to a
limited waiver of service. *See* (R. Doc. 401). On March
15-19, 2010, the Court presided over a bellwether trial in
*Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving
a homeowner's claims against KPT for defective drywall.
*See* (R. Doc. 2713). For purposes of the trial, KPT
stipulated that its Chinese drywall "emits certain reduced
sulfur gases and the drywall emits an odor." *Id.* The
Court found in favor of the plaintiff family in *Hernandez*,
issued a detailed Findings of Fact and Conclusions of Law
("*Hernandez* FOFCOL"), *see id.*, and entered a Judgment
in the amount of $164,049.64, including remediation
damages in the amount of $136,940.46, which represented
a cost of $81.13 per square foot based on the footprint
square footage of the house. *See* (R. Doc. 3012).

**\*2** Thereafter, on October 14, 2010, the Knauf Entities
entered into a pilot remediation program with the
Plaintiffs' Steering Committee ("PSC") in the MDL.
This program was largely based upon the remediation
protocol formulated by the Court in *Hernandez*. The
Knauf pilot remediation program is ongoing and has, at
present, remediated over 2,200 homes containing KPT
Chinese drywall using the same protocol. At the Court's

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 3 of 24 PageID #: 844

In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.... 

2017 WL 1421627

urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which is designed to resolve all Knauf-related, Chinese drywall claims. *See* (R. Doc. 12061-5). In addition to the Knauf Settlement Agreement, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. These additional class action settlement agreements involve the following defendants and in most cases, their insurers: Interior Exterior Building Supply, LP ("Interior Exterior"); the Banner Entities; L&W Supply Corp. and USG Corp.; and a group of numerous homebuilders, installers, suppliers. *See* (R. Docs. 10033-3, 12258-3, 13375-2, 14404-2). The Court first granted preliminary approval to all of the foregoing settlement agreements, and after the fairness hearing, certified and granted approval for the class settlements. Although the Court occasionally must deal with common benefit fees, settlement administration and enforcement issues, the Knauf portion of this litigation is largely resolved.

### B. Chinese Defendants

In contrast to the straightforwardness with which the MDL litigation proceeded against the Knauf Defendants, the litigation against the Chinese entities has taken a different course. The Chinese Defendants in the litigation include the principal Chinese-based Defendant Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include the CNBM Defendants ("CNBM"), comprised of the China National Building Materials Group Corporation, China National Building Materials Company Limited, China National Building Materials & Equipment Import & Export Corporation, and CNBM Forest Products (Canada) Ltd.; and the BNBM Defendants ("BNMB"), comprised of Beijing New Building Materials Public Limited Company, and Beijing New Building Material (Group) Co. Ltd. As discussed below, the course of the litigation involving the Taishan Entities and other Chinese-based defendants has not followed the same trajectory or enjoyed the same measure of resolution as that involving the Knauf Entities.

As an alleged manufacturer of Chinese drywall which has been installed in plaintiffs' properties, Taishan is a named defendant in numerous cases in both the MDL litigation and litigation filed in state courts. The Court's initial inquiry regarding Taishan involved four cases in the MDL in which Taishan was served, entered an appearance, and in two of these cases, subjected to default judgment proceedings. These four cases are: *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687; *The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115; *Gross v. Knauf Gips KG*, Case No. 09-6690; and *Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361. The Court will briefly discuss each of these cases as they pertain to Taishan before detailing the overall course of the MDL litigation involving the claims against Taishan.

**\*3** *Germano* has served as the main vehicle for the MDL litigation involving Taishan, particularly TG. *Germano* was filed originally in the U.S. District Court for the Eastern District of Virginia as a putative class action against TG by the owners of homes located in Virginia which allegedly contain TG-manufactured Chinese drywall. *See* (R. Docs. 1-1, 1-2) (Case No. 09-6678). On August 3, 2009, TG was validly served. *See* (R. Doc. 1-7) (Case No. 09-6687). Thereafter, on October 13, 2009, *Germano* was transferred to the U.S. District Court for the Eastern District of Louisiana and consolidated with the MDL litigation on October 13, 2009. (R. Doc. 1) (Case No. 09-6678). Subsequent to transfer, Plaintiffs filed a Second Amended Complaint ("SAC"), which was granted, expanding the class to a nationwide class. *See* (R. Doc. 470) (Case No. 09-md-2047). The Court then permitted the intervention of 14 individual plaintiffs (the "Intervening-Plaintiffs"). (R. Doc. 641).

*Mitchell* was originally filed in the U.S. District Court for the Northern District of Florida as a class action on behalf of homebuilders in the states of Louisiana, Georgia, Texas and Florida who used drywall manufactured by TG for the construction, repair, or remodeling of properties, and who, as a result, incurred expenses associated with repair or replacement of this drywall and/or other property damaged by the drywall, and/or incurred liability for property damages. *See* (R. Doc. 1-1) (Case No. 09-4115). On May 8, 2009, service was executed on TG. *See* (R. Doc. 52) (Case No. 09-md-2047). Shortly thereafter, *Mitchell* was transferred to the Eastern District of Louisiana and

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 4 of 24 PageID #: 845

In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...

2017 WL 1421627

consolidated with the MDL litigation. *See* (R. Doc. 1) (Case No. 09-4115).

*Gross* and *Wiltz* were both filed in the Eastern District of Louisiana and consolidated with the MDL litigation as nationwide class actions by property owners whose homes contain Taishan-manufactured Chinese drywall. *See* (R. Doc. 1) (Case No. 09-6690); (R. Docs. 1, 1-1) (Case No. 10-361). Taishan was served or entered an appearance in both cases. *See* (R. Docs. 2140, 2141, 2553); (R. Docs. 7408, 7409). *Gross* involves claims against "indeterminate defendants" who have allegedly concealed their identity and are allegedly responsible for the Chinese drywall in plaintiff class members' properties. *See* (R. Doc. 1) (Case No. 09-6690). *Wiltz*, on the other hand, is a more typical class action filed on behalf of property owners against Taishan as a result of the damage caused by the presence of Taishan's drywall in their properties. *See* (R. Docs. 1, 1-1) (Case No. 10-361).

The first issues in the MDL litigation involving Taishan arose when TG failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that TG had been properly served in each case. *See* (R. Doc. 52); (R. Doc. 1-7) (Case No. 09-6687). After affording TG more than a reasonable amount of time to answer or enter an appearance, the Court entered a preliminary default against TG in both cases (R. Docs. 277, 487) and moved forward with an evidentiary hearing in furtherance of the Preliminary Default in *Germano* on the Intervening-Plaintiffs' claimed damages. *See* (R. Doc. 502, 1223, 1258, 2380). At this hearing, the Intervening-Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases. Following this hearing, which occurred on February 19 and 20, 2010, the Court issued detailed Findings of Fact & Conclusions of Law. *See* (R. Doc. 2380, hereinafter "*Germano* FOFCOL"). The *Germano* FOFCOL noted that the average cost per square foot to repair the *Germano* properties was $86 and that the average cost was based on "the average of independent quotes from two local reputable Virginia contractors." *Id.* at 57. Further, the *Germano* FOFCOL found that the "homes of the seven Plaintiff-intervenors are representative of a cross-section of contaminated homes." *Id.* at 62. On May 11, 2010, the Court issued a Final Default Judgment against TG in *Germano*, in favor of the Intervening-Plaintiffs, in the amount of $2,609,129.99. (R. Doc. 3031). On the last day to timely do so, June 10, 2010, TG filed a Notice of Appeal

of the Default Judgment in *Germano*. (R. Doc. 3670). On this same day, TG also entered its appearance in *Germano* and *Mitchell*. *See* (R. Doc. 3668).

**\*4** After TG entered its appearance in the MDL, it quickly sought to have the Final Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction, as well as on procedural grounds. *See* (R. Docs. 5436, 5583). However, because of the pending appeal, this Court was without jurisdiction to address any motions filed by TG. *See* (R. Doc. 5504). Accordingly, TG sought and was granted by the Fifth Circuit, a stay of its appeal to allow this Court to provide an indicative ruling on TG's motions to vacate the preliminary default and default judgments. *See* (R. Doc. 5649). In response, this Court issued an order pursuant to Federal Rule of Civil Procedure 62.1 to allow it to consider TG's motions. *See* (R. Doc. 6101). In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve TG's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010, *see, e.g.*, (R. Docs. 5839, 5840), and continued over the year-and-a-half leading up to the filing of Taishan's motions. Discovery has included the production of both written and electronic documents, as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery has often been contentious, requiring close supervision by the Court. The Court has presided over regularly-scheduled status conferences to keep the parties on track, and conducted hearings and issued rulings to resolve numerous discovery-related disputes. *See, e.g.*, (R. Docs. 7136, 7511).

In April 2012, TG and TTP re-filed various motions: a motion to dismiss for lack of personal jurisdiction, a motion to vacate the entry of default and to dismiss the action in *Gross*, a motion to dismiss the complaint in *Gross*, a motion to dismiss the complaint in *Wiltz*. Responses in opposition were filed by the PSC, Interior Exterior, the Banner Entities, and Certain Florida Homebuilders, (R. Docs. 14202, 14204, 14209, 14216, 14356, 14372, 14390, 14392, 14391-4), with other parties joining in these motions, including the State of Louisiana

(collectively the "Respondents"). Prior to the hearing, evidentiary objections were raised by Taishan, which the Respondents addressed. On June 29, 2012, over three years since the creation of MDL 2047, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with Judge Joseph Farina of the 11th Judicial Circuit Court of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to vacate, denied the motions to dismiss, and held that it maintained personal jurisdiction over Taishan. *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that TTP was operating as the alter ego of TG. The Court certified an interlocutory appeal and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan and TTP. *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 753 F.3d 521 (5th Cir. 2014); *In re: Chinese-Manufactured Drywall Products Liability Litigation,* 742 F.3d 576 (5th Cir. 2014). The time for writs of certiorari passed and the issue of personal jurisdiction over Taishan became firmly settled.

This Court set a judgment debtor examination for July 17, 2014 and ordered Taishan to appear. Instead of appearing, however, Taishan fired its Hogan Lovells attorneys and indicated that it was again "withdrawing" from the litigation. The Court held Taishan in contempt of court. (R. Doc. 17869). Pursuant to this contempt order, Taishan was ordered to pay $15,000 in attorneys' fees to Plaintiffs' counsel and $40,000 as a penalty for contempt. The contempt order also enjoined Taishan and its affiliates and subsidiaries from conducting business in the United States until or unless it participated in the judicial process. In addition, the contempt order provided that if Taishan or its affiliates or alter egos did business in violation of the contempt order, they would forfeit 25% of the earnings. The Court did not immediately permit Taishan's terminated attorneys to withdraw from the litigation, in order to ensure that Taishan was on notice of

the progress of the proceedings, Taishan's contempt and "withdrawal" notwithstanding.

**\*5** On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b) (3). (R. Doc. 17883). Taishan did not appear and, on September 26, 2014, this Court certified a class of "[a]ll owners of real properties in the United States, who are named Plaintiffs [in the various MDL complaints] asserting claims for remediated damages arising from, or otherwise related to [Taishan] drywall. *See* (R. Doc. 18028 at 34-35, hereinafter "Class Certification FOFCOL"). The Court so ruled following a motion from the PSC. (R. Doc. 18086). The motion was unopposed by any party.

The Court set a class damages hearing for February 12, 2015. At that hearing, BNBM entered an appearance for the first time in this litigation and asked for a continuance to prepare for a class damages hearing. (R. Doc. 18331). The Court granted the request for a continuance. Taishan subsequently entered an appearance with its new counsel, Alston & Bird, LLP. (R. Doc. 18352). CNBM also entered an appearance for the first time in this litigation. On March 17, 2015, the Court ordered Taishan to purge itself of contempt and again continued the damages hearing to April 28, 2015. (R. Doc. 18831). Thereafter, the Court granted yet another request for a continuance and set the class damages hearing for June 9, 2015.

The hearing on damages proceeded on June 9, 2015. The PSC presented two witnesses. First, the PSC called Jacob Woody to testify. Mr. Woody is an attorney employed by BrownGreer. BrownGreer serves as Settlement Administrator for the Knauf Settlement and Claims Administrator for the Global, Banner, and InEx Settlements (collectively referred to as the "GBI settlements"). The PSC then called George J. Inglis, a Professional Engineer and Senior Project Consultant with Berman & Wright Architecture, Engineering and Planning, as its designated expert to testify about remediation damage estimates. Defendants called David Pogorolich as their first damages rebuttal expert. Pogorolich is a Director at Navigant Consulting and a licensed Certified General Contractor in the State of Florida. Defendants called Dr. M. Laurentis Marais as their second expert. Dr. Marais is Vice President and Principal Consultant at William E. Wecker Associates, Inc. The Court earlier held that Dr. Marais was an expert in statistical science and sampling but was not qualified to

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 4

testify about building damage or remediation estimation methodology.

The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the hearing, as well as the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such. Notwithstanding the foregoing, the Court would like to make clear at the outset that the instant Findings of Fact and Conclusions of Laws relate to the property damages caused by Chinese Drywall. The June 9, 2015, Hearing was held for the sole purpose of hearing testimony regarding the property damages aspect of this MDL litigation. Accordingly, the findings and conclusions herein do not address issues of alter ego, jurisdiction or contempt.

## II. BACKGROUND—GYPSUM & DRYWALL

Drywall is a widely used construction material that is also known as gypsum board, wallboard, plasterboard, and sheetrock. P2.0006-0003 *(Cozen O'Connor, Chinese Drywall Litigation: Subrogation Whitepaper* (2009)). A drywall panel is composed of a layer of hardened gypsum plaster sandwiched between two layers of paper liner. *Id.* Gypsum is a hydrated calcium sulfate, composed of two molecules of water (H2O) and one of calcium sulfate (CaSO4). *Id.* The gypsum used to make drywall can be created both naturally and synthetically. *Id.* Naturally occurring gypsum is a deposit largely the result of the evaporation of water in ancient inland seas which contains large amounts of dissolved gypsum. P2.0051-001 *(Treatment and Disposal of Gypsum Board Waste,* Construction Dimension, February 1992 at 5). Synthetic gypsum is chemically identical to mineral gypsum, but the amount and types of trace materials and unreacted sorbents found in the source material can vary among power plants and among mines from which it originates. P2.0006-0003 *(Cozen O'Connor, Chinese Drywall Litigation: Subrogation Whitepaper* (2009)). Synthetic gypsum is generally obtained in the final stage of industrial processes, where sulfuric acid is neutralized by a calcium salt; for example it is produced as a byproduct of coal combustion power plants. *Id.;* P2.0240.0014 (ASTM International report). To make drywall from gypsum, first gypsum is crushed or ground up and heated to

about 350 degrees Fahrenheit to remove approximately seventy-five percent (75%) of its water content in a process called calcining, thereafter becoming a fine white powder. P2.0006-0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)); P2.0051-0001 *(Treatment and Disposal of Gypsum Board Waste,* Construction Dimensions, February 1992 at 5). Second, the calcined gypsum is mixed with water, foam, and other additives to form a slurry which is fed between continuous sheets of paper on a continuous belt line. *Id.* Third, as the board moves down the belt line, the calcined gypsum recrystalizes or rehydrates, reverting to its original gypsum state, and the paper sheets become firmly bonded to the rehydrated core. *Id.* Finally, the board is cut to length and conveyed through dryers to remove free moisture. *Id.*

**\*6** Historically, gypsum was used as far back as 3700 B.C. by the Egyptians as a base to preserve the wall murals in the pyramids. P2.0051-0001 *(Treatment and Disposal of Gypsum Board Waste,* Construction Dimension, February 1992 at 6); P2.0240-0022 to -0023 (ASTM International, Oct. 2009 at 9-10). The Roman Empire used gypsum for interior purposes, such as the interior walls of Pompeii. *Id.* There is little information of the use of gypsum plaster during the Middle Ages. *Id.* The modern science of gypsum began with the discoveries by Antoine Lavoisier outlined in his two papers on gypsum presented to the French Academy of Sciences in 1765 and 1766. P2.0240-0022 to -0023 (ASTM International, Oct. 2009 at 11). In the United States, the use of gypsum board started in the early 1950s and was driven by the following issues, (1) avoiding the drying time of plaster which allowed earlier occupancy of buildings, and (2) the lack of skilled plasterers in many locations. P2.0240-0026 (ASTM International, Oct. 2009, pg. 13). Gypsum is fire resistant, thus making it a preferable material for drywall. P2.0051-0001 *(Treatment and Disposal of Gypsum Board Waste,* Construction Dimensions, February 1992 at 6). Since the 1950's, drywall has become a primary source material for buildings in the United States. As mentioned above, due to a shortage of U.S.-manufactured drywall, Chinese-manufactured drywall was brought into the United States.

## III. GENERAL FINDINGS ON CHINESE DRYWALL

### A. Chinese Drywall is Defective

**1.** As established by the U.S. Consumer Product Safety Commission ("CPSC"), the Florida Dept. of Health,

Case 2:09-md-02047-EEF-MBN Document 22636-78 Filed 03/19/20 Page 7 of 24 PageID# 848
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...
2017 WL 1421627

other scientific entities, and this Court in the *Germano* FOFCOL, the defective nature of this Chinese drywall is undisputed.

**2.** The Chinese drywall in question has a significantly higher average concentration of strontium and significantly more detectable levels of elemental sulfur. It releases three main gases: (i) hydrogen sulfide ($H_2S$), (ii) carbonyl sulfide (COS), and (iii) carbon disulfide ($CS_2$). *Germano* FOFCOL at 12. The Plaintiffs' experts detected sulfur gas emissions by conducting laboratory tests on samples of this Chinese drywall. The CPSC, Florida Dept. of Health and other investigatory agencies and firms also reported that Chinese drywall emits sulfur gases. *Id.* at 12-13.

**3.** The sulfur gases released by Chinese drywall are irritating to the human body during exposure. Exposed individuals reported irritation of the eyes, respiratory system, and skin, among other things. *Id.* at 13.

**4.** The sulfur gases released by this Chinese drywall cause offending odors in homes, making them hard if not impossible to live in, and are corrosive to metals, particularly copper and silver, which are uniquely vulnerable to corrosion from sulfur gases. *Id.* The sulfur gases emitted from Chinese drywall create an environment classified among the most severe industrial corrosive environments in the Battelle Classification scheme and the standards established by the International Standards Association. *Id.* at 19-20.

**5.** Forensic examination by scientific and technical experts, including testing of building materials in the damaged homes of the *Germano* Plaintiffs, further confirmed the wide-spread impact of the corrosive environment, which included corrosion of copper wiring, copper pipes and silver-based components in electronics, including HVAC circuitry and brazing on pipes, causing premature failure of electrical and mechanical devices. *Id.* at 14, 23.

### B. Property Damage Arising From Chinese Drywall Requires Total Remediation

**6.** The Court adopts and incorporates herein the *Germano* FOFCOL, which accurately explains the scope of remediation required for class plaintiffs' properties. *Germano* FOFCOL at 29-31; *In re Chinese Manufactured*

*Drywall Prod. Liab. Litig.*, 706 F. Supp. 2d 655 (E.D. La. 2010).

**7.** After considered analysis of the impracticality and risks of the selective remediation approach, the Court found in *Germano* and re-affirms herein that remediating a Chinese drywall property requires complete remediation and cleaning; thus, the Court again rejects any remediation approach that favors selective remediation such as the one originally proposed by the Knauf experts in *Germano*. *Id.* The remediation protocol fashioned in *Germano* is evidence based and has been confirmed via its application in the actual remediation of several thousand homes.

**\*7** **8.** The scientific and practical constructability evidence presented before this Court, which relies on long-term observation, sampling and testing of properties with Chinese drywall, scientific investigation of Chinese drywall and the science of corrosion, practical construction experience (particularly the experience of the national builders), and electric and building codes, demonstrates that proper remediation of the danger posed by Chinese drywall must include the removal of *all* drywall, all electrical wiring, the entire HVAC system, and many other items such as appliances, carpet, cabinetry, trim work and flooring. *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34; Transcript at pp. 106:8-110:3.

**9.** This scope of remediation is necessary even in homes with "mixed" drywall, where Chinese and non-reactive drywall may be found, because the sulfur gases disburse and circulate creating a generally corrosive environment and, moreover, there is no reliable or practicable method for selective identification and removal of Chinese drywall in mixed homes. *Germano* FOFCOL at 27-40. Large Florida homebuilders with extensive experience in Chinese drywall remediation have determined that removal of all drywall in affected homes is efficient and cost-effective, and that attempted selective identification and removal of CDW is neither efficient nor cost-effective. *Id.* at 31.

**10.** It is both economical and practical to remove all the wiring while the drywall is removed, rather than removing only some of the wiring at the time of remediation and then risk later having to tear down the drywall again in the event that additional wiring exposed to the sulfur gases is harmed or fails. Additionally, the low-voltage wiring

supporting life and safety devices such as fire alarms and smoke detectors should be removed and replaced because of the low cost of replacement when compared with the high risk of injury or death if these devices are not functioning properly. *Id.* at 39.

**11.** Copper pipes and HVAC units must be replaced. It is more cost-effective and less time consuming to remove and replace all copper pipes and the HVAC units in Chinese drywall properties as opposed to attempting to "clean" the corrosion off copper components and HVAC ductwork. *Id.* at 39-46.

**12.** The evidence shows that carpeting must be replaced because attempting to remove and store the carpet during the remediation is not cost-effective. Similarly, hardwood or vinyl flooring must be replaced because dust generated during the remediation process will intrude into the cracks and crevices of the flooring. However, tile flooring may be properly protected during the remediation process, and if this can be done, the Court finds that it does not need to be removed and replaced. *Id.* at 49-50.

**13.** Similarly, it is more cost-effective to replace cabinets, countertops, trim, crown molding, baseboards, bathroom fixtures, and insulation than attempt exacting removal, storage and subsequent re-installation. *Id.* at 51-53.

**14.** In order to eliminate the tremendous amount of dust produced from removal of the drywall, and to eliminate the offensive odor of the Chinese drywall, properties need to be cleaned and aired-out after remediation is complete. A HEPA vacuum should be used to remove the fine drywall dust and other particles. Additionally, properties should be wet-wiped or power washed to eradicate any remaining particles. *Id.* at 53.

**15.** Following the deconstructing phase of the remediation process, the properties will need to be inspected by an independent and qualified engineering company. This is important for insurance, resale potential, and peace of mind for the present occupants. The independent and qualified engineering company should provide a letter or report indicating that the remediation has been correctly performed. *Id.* at 53-54.

 **\*8  16.** The necessary remediation proposed by the PSC is essentially the same in all material respects as the scope of remediation being utilized by national builders

Beazer Homes and Lennar Homes. National builders Beazer and Lennar have also independently assessed the need for complete remediation through scientific evidence, practical cost considerations, and hands-on experience with the problem. Although in theory, a thorough cleaning or selective replacement of contaminated drywall may be an option, in practice, the evidence does not support the feasibility of such an option. The alternative remedies to a complete remediation that have been tried or suggested, such as selective identification and removal of Chinese drywall, "cleaning" corroded wires, switches, and contact points, leaving corroded wires and switches in place, clipping the exposed ends of the corroded wires and splicing wires, or making new junction boxes, will not make the plaintiff whole, will not be adequate from a scientific or practical standpoint, and will not provide safety and marketability to the property owner. *Id.* at 54.

**17.** Thus, in sum, the appropriate scope of remediation includes: removal and disposal of all damaged and affected building components in the properties, replacement of all drywall, replacement of entire HVAC assembly, replacement of entire electrical system (including receptacles and switches), replacement of all copper and silver plumbing and electrical switches, replacement of all items that are likely to be damaged during demolition (i.e., cabinets, trim and baseboards), replacement of items that are ultimately more efficient to replace than restore, such as carpet and flooring, a complete cleaning of the premises, and confirmation from an independent and qualified engineering company to confirm the quality and completeness of the cleanup and provide the necessary assurances for insurance, resale potential and peace of mind for the affected property owners. As mentioned, the scope of remediation is supported by the testimony of the experts and confirmed by the remediation of over 2,200 homes carried out in the Knauf Settlement Program.

## IV. LIABILITY FOR EXPOSURE IN CLASS PLAINTIFFS' PROPERTY

**18.** The *Germano* FOFCOL resolved a multitude of factual and legal issues including the scope of remediation and the right to recover remediation damages. The Class Certification FOFCOL essentially adopted the *Germano* ruling regarding liability and causation. The Court adopts and incorporates herein the *Germano* and Class Certification Tools and emphasizes its prior holding that Taishan and its affiliates are liable to the Class Plaintiffs.

Case 2:09-md-02047-EEF-MBN Document 22366-78 Filed 11/19/19 Page 9 of 24 PageID# 850

In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...

2017 WL 1421627

**19.** The Court already has found the Taishan Defendants in default. The *Germano* Plaintiffs obtained a default judgment against Taishan on November 20, 2009. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). Additionally, the Taishan affiliates have also been held in default with respect to the proceedings in *Wiltz*, *Gross*, and *Amorin.* On February 1, 2011, BNBM, BNBM Group, CNBM, and CNBM Group were held in default in the *Gross* proceedings. (R. Doc. 7302). These same entities were again held in default in *Gross* on August 7, 2012 (*i.e.*, as to the omnibus interventions complaint that was filed in *Gross*). (R. Doc. 15687). On February 24, 2011, BNBM was held in default in the *Wiltz* proceedings. (R. Doc. 7735). On July 1, 2014, Taishan, TTP, and CNBM were held in default with respect to the *Amorin* case originally filed in this Court (Case No. 2:11-cv-1395) (R. Doc. 17814). Pursuant to this same Order, Taishan and TTP were held in default with respect to the *Amorin* complaint originally filed in the Southern District of Florida prior to its transfer to this Court (Case No. 2:11-cv-1672). *Id.* Also on July 1, 2014, Taishan, TTP, BNBM, CNBM, and CNBM Group were held in default with respect to the *Amorin* complaint originally filed in the Eastern District of Virginia prior to its transfer to this Court (Case No. 2:11-cv-1673) (R. Doc. 17815). (R. Docs. 7735, 17814, 17815). Moreover, the Court already determined that the Defendants' liability was conceded by their default. Class Certification FOFCOL at 31.

**\*9  20.** Given that the defectiveness and corrosive effect of Chinese drywall is well-established, defendants are in default, there is no contributory negligence, and this Court already entered a liability judgment, the only issue currently pending before the Court is the amount of damages which should be awarded to the Plaintiffs in order to accomplish the necessary remediation.

## V. EVIDENCE AT THE JUNE 9, 2015 DAMAGES HEARING

**21.** As discussed *supra*, in September of 2014, the Court conducted a certification and liability phase of this MDL, finding the Defendants liable and certifying a class of real property owners asserting claims for remediated damages arising from or related to the Chinese drywall manufactured, sold, distributed, supplied, marketed, inspected, imported, or delivered by the Defendants and their affiliates. On June 9, 2015, this Court held an

evidentiary hearing to deal with the second phase of the Chinese drywall litigation: damages. The purpose of the hearing was, simply, to determine how much the Defendants and their affiliates owe the class to remediate their homes due to the damages caused by toxic, corrosive Chinese drywall. The Plaintiffs called two witnesses—Jacob Woody and George Inglis—to present their formulaic class-wide damages approach. In response, the Defendants called two witnesses—David Pogorolich and Dr. M. Laurentis Marais—to demonstrate that the Plaintiffs' formulaic approach fails to provide a reasonable estimate of remediation costs.

**22.** First, Plaintiffs called Jacob Woody to testify. Mr. Woody is an attorney employed by BrownGreer. BrownGreer has served, and continues to serve, as a settlement administrator for various settlements that have been entered into in these consolidated proceedings, including the Knauf remediation class settlement and the Global, Banner, and INEX ("GBI") Class Settlements. Tr. at 26:1-17. In connection with the settlements, BrownGreer has amassed a database containing square footage and other information regarding properties that have been the subject of claims in this litigation, including many of the properties that the PSC sought to include in the class. Tr. at 39:12-22.

**23.** BrownGreer utilizes a quality assurance protocol in the work it does as a claims administrator. 18:21-22. The QA protocol includes processes to review both the eligibility of claims as well as the allocation of payment to eligible clams. 19:1-9. In the course of its claims administration activity, BrownGreer allows audits by any party on request, and would have allowed Taishan to request such an audit had it chosen to be, and remain, an active litigant in the MDL as claims were being submitted and verified. Tr. at 19:10-20.

**24.** Mr. Woody testified that, at all pertinent times, BrownGreer has endeavored to provide the best available claims information to all parties, has remained mindful of its Court-appointed position in this case, and has taken no interest in which party prevails in the class damages hearing. Tr. at 102:08-17.

**25.** In October 2014, at the request of the PSC, Mr. Woody oversaw a project to provide information regarding square footage of class properties as well as, to a lesser extent, to

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/08/19 Page 373 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...   10 of 24   PageID # 851
2017 WL 1421627

provide information regarding product identification. Tr. 39-41; 47-50.

**26.** BrownGreer used three sources of information to verify the square footage of class members' properties: (1) BrownGreer's prior GBI review process; (2) public sources such as tax appraisals, property ownership records and official government websites; and, if those two sources were unavailable, (3) square foot data from the Court-approved Plaintiff Profile Forms (PTO 11, R. Doc. 168-1). Tr. 44-47. The form specifies that it is to be completed under oath and signed under penalty of perjury, requires identification of the manufacturer of the Chinese drywall found on the property, and requests the amount of square footage for the property. It further allows for claimants to supplement information on an ongoing basis, permitting attachments such as photographs, inspection reports, etc. Tr. at 22:7-23:23. According to Mr. Woody, BrownGreer would not have relied solely on the square footage data from the Plaintiff Profile Forms in connection with the Knauf or GBI settlements. Tr. at 44:25-47:11; 71:24-72:9.

**\*10 27.** With regards to product identification, BrownGreer utilized both a Court-approved photograph catalog (PTO 10, R. Doc. 171) and a Court-approved "Drywall Indicia Guide" (PTO 27, R. Doc. 17060) in order to identify the types of drywall and the manufacturers of drywall associated with the properties on the class list. Tr. at 23:23-25:4; 34:15-19; 47:12-49:19.

**28.** Relying on photographic evidence and inspection reports, Mr. Woody was able to verify that 1,285 properties on the original class list of approximately 3,700 class members had Taishan drywall. As to the remaining 2,449 properties on the original class list, the only proof that Taishan or Chinese drywall was used in the claimants' properties was the claimants' statements on the Plaintiff Profile Forms. Tr. 55:23-56:10; 100:14-101:1. Mr. Woody did not undertake, and has not yet been asked to undertake, a review of attachments to the Plaintiff Profile Forms. Tr. 49:24-51:16. If and when BrownGreer determined that a property contained 100% Knauf drywall, not Taishan drywall, those properties were removed from the class list. Tr. 76-79.

**29.** Mr. Woody acknowledged that information on Plaintiff Profile Forms was not always reliable and, absent verifiable supporting evidence, such as photographs or inspection reports, he did not regard a statement

on a profile form as sufficient evidence of product identification. Tr. 75.

**30.** In any allocation process to follow the Court's aggregation or assessment of class-wide remediation damages, Mr. Woody confirmed that BrownGreer would be able to use its existing systems and protocols to verify Plaintiff Profile Form statements identifying the presence and amount of Taishan drywall for a given property. Tr. 51:23-52:3. None of the changes to the list of properties for this first phase of damages proofs—the calculation of class-wide remediation damages—changed the class definition, but rather only refined it, by decreasing the number of properties, the list of properties that is the subject of remediation damages proof during this initial phase. Tr. 64:11-65:2.

**31.** At Defendants' request following their re-appearance in the litigation, Mr. Woody provided Knauf remediation data which, initially, included both remediation and move-in/move-out payments. Tr. 29:19-30:4. Following a second request from Defendants, Mr. Woody modified the Knauf remediation payment data to include only remediation data and not move-in/move-out payments. The Knauf Settlement remediation payments recorded by BrownGreer and provided to Defendants exclude the following cost items:

> Any delay payments made due to problems with Knauf remediation;
>
> (1) Still-open remediation properties (a total of 655 as of the time the information was provided by BrownGreer);
>
> (2) Insurance premiums for subcontractor or drywall disposal activities;
>
> (3) Both pre- and post-remediation inspection (including Xactimite and bid proposals) costs;
>
> (4) Certified Industrial Hygienist/Environmental charges for inspection and testing (clearance) remediation of a property, which is required in every case if remediation by Knauf;
>
> (5) "Economies of scale" associated with the Knauf use of Moss as a single, general contractor for the remediation settlement; and

Case 2:09-md-02047-EEF-JMBN Document 22363-78 Filed 01/18/19 Page 374 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed..., 2017 WL 1421627
Page 11 of 24 PageID #: 852

2017 WL 1421627

(6) Remediation administration/oversight fees and costs for Moss' services as general contractor. Tr. at 59:4-61:23; 62:17-19.

**\*11** Thus, the average cost of $65.16 per square foot for the Knauf remediation under this calculation method does not reflect remediation-related costs for general contractor oversight, certified industrial hygienist (CIH) charges, inspection costs, or insurance premiums. Tr. at 98:4-11.

**32.** Second, Plaintiffs called George J. Inglis. Mr. Inglis is a Professional Engineer and Senior Project Consultant with Berman and Wright Architecture, Engineering, and Planning ("Berman & Wright"). He has 40 years of experience in project and construction management, building diagnostics, building forensics and remediation of building defect damages. 103:25-104:6.

**33.** After joining Berman & Wright's predecessor (Buric) in 2010, Mr. Inglis performed forensic engineering services to identify construction deficiencies and compliance with building codes, design documents, and manufacturers' specifications. He determined cause and effect relationships that resulted in damage to residential, multifamily, industrial, and commercial buildings, including damages such as water intrusion, mold, structural repairs, roofing repairs and replacement, and costs to remediate homes constructed with reactive Chinese drywall. Additionally, he has identified possible sources of defects that lead to water intrusion and/or mold problems and has worked with buildings in post-Hurricane Katrina and post-Hurricane Wilma settings to determine specific causes of damages and related cost estimations. 103:25-106:16.

**34.** Mr. Inglis' professional engineering engagements also include multi-state building defect cases, including the assessment and remediation of damages caused by synthetic stucco on buildings across several states. 105:17-106:7.

**35.** Mr. Inglis and his firm have widespread general experience estimating cost of repair damages and utilizing RS Means, which is a generally accepted method of calculating building costs. Specifically, they have been assessing construction estimates for remediating Chinese drywall properties since 2009. 106:8-107:5. In fact, they were instrumental in determining the appropriate scope

and costs of remediating the Chinese drywall properties in *Germano*. 107:17-110:3. They continued their work on a variety of Chinese drywall properties across several states into 2015, establishing the scope of remediation for these properties and estimating the costs of remediation. 112:6-19; 157:8-18.

**36.** Mr. Inglis determined the remediation damages for each of the properties with verified under air square footage based on the following factors:

o A uniform and well-defined scope of work necessary to eliminate the harm and remediate the damage that is caused by Chinese drywall to the interior of each property;

o An established cost on a per-square-foot basis converted to present value;

o A measure of the under air space to remediated;

o Consideration of local factors related to building labor and materials

**37.** As this Court earlier determined and Mr. Inglis confirms, there is a well-established and defined scope of work necessary to fully remediate a Chinese drywall property. *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34; Tr. at 157:8-158:5; 159:21-160:1. This well-established evidence-based and field-tested scope of work for remediating a Chinese drywall property requires that the interior of the home be stripped to the studs (with all wiring, plumbing, fixtures, cabinets, HVAC systems and insulation removed), cleaned by wet-wipe and HEPA vacuum, and examined and tested by an independent entity before the property is brought back to its originally intended condition. *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34. This scope of work was established based on long-term observation of properties with Chinese drywall (including sampling and testing), scientific investigation of Chinese drywall and the science of corrosion, practical construction experience (particularly the experience of national builders, and electric and building codes). *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34; Tr. at 106:8-110:3. The scope of work is the same regardless of the type of building or the location of the property. The only difference is the square footage of the contaminated area of the building.

**\*12 38.** Mr. Inglis' determination regarding remediation damages for each property begins with a benchmark figure of $86 per square foot to remediate a property. This $86 figure was developed in 2010 using data from the *Germano* properties. In 2010 in the *Germano* litigation, Berman & Wright established that the cost of remediating the seven *Germano* homes was $86 per square foot. This figure was based on two competitive bids for the appropriate scope of work i.e., total remediation, with a pricing cross-check developed through R.S. Means, which has been recognized by this Court to be a standard textbook and reference tool for building construction estimation. *Germano* FOFCOL at 57-86; 110:14-23. 111:7-24. Over the following years of experience with many Chinese drywall properties in several states, Mr. Inglis and his firm Berman & Wright have found that $86 per square foot is a reliable measure of the costs on a square foot basis for a full scope remediation of Chinese drywall properties, when adjusted for location and time. 111:23-112:3, 113:23-114:19, 116:21-117:3, 163:22-:24, 165:22-166:1, 166:16-117:17.

**39.** Using the widely-recognized R.S. Means, Mr. Inglis adjusted the $86 per square foot cost to reflect the then-current-day building materials and labor costs. 119:8-11. Thereafter, he generated a national square foot unit price by adjusting for the local building labor and material costs for Norfolk, Virginia where all of the *Germano* properties were located. *Id.* In making both of these adjustments, Mr. Inglis used data from R.S. Means to adjust for local material and labor costs listed by zip code. *Id.*

**40.** Initially, Mr. Inglis computed his estimations incorrectly because of a local cost factor error in the online R.S. Means tool he used. However, Mr. Inglis discovered this error and corrected it prior to the hearing. 120:14-123:10.

**41.** Defendants raised concerns that Mr. Inglis did not consider whether each property was in an urban, suburban or rural setting. However, the Court is satisfied that the use of R.S. Means data, a standard cost reference used by professionals in the field, keyed to the zip code of each property sufficiently and reliably accounts for location factors in the individual and aggregate damages estimate. 159:19-24, 170:20-171:2.

**42.** Finally, Mr. Inglis added 6% of the remediation costs to the national square foot unit price to pay for the pre-

and post-remediation inspection, sampling, testing and certification of the homes. 110:21-23.

**43.** The final, national square foot unit price with CIH costs included is $105.91. However, this is reduced by the local building costs factors in nearly every state in which class properties exist. (R. Doc. 19197 at 37).

**44.** This method is in accordance with the Court's *Class Certification* FOFCOL which provided that remediation damages should be calculated based on existing data regarding scope of work and square footage of class members homes: "*i.e.*, price per square foot remediate X number of square feet in class members' homes = damages." (R. Doc. 18028 at 32, 33).

**45.** Mr. Inglis' estimate applies to each of the Taishan properties, regardless of whether they have been remediated by the Taishan Property Owners in the past or are yet to be remediated. Each Taishan Property Owner is entitled to a sum that would pay for a proper, full remediation.

**46.** Following the testimony by the Plaintiffs' experts, Defendants called two experts. The Defendants' experts do not have building damage and cost of repair experience comparable to that of Mr. Inglis. First, Defendants called David Pogorolich as their first damages rebuttal expert at the hearing. Mr. Pogorilich is a Director in the Construction Practice at Navigant Consulting. He was qualified and accepted by the Court as an expert in the field of construction cost estimating and project management for construction sites.

**47.** However, Mr. Pogorolich's experience with Chinese drywall is limited to only five homes in Florida for which he assisted an insurance adjustor. He has no experience with establishing or implementing the remediation protocol for Chinese drywall homes, which were already being remediated when he was retained. 207:4-19; 210:11-213:24. While Mr. Pogorolich agrees with the Plaintiffs that the drywall must come out of the home, he supports a remediation approach where each home is inspected and a project specific location estimate is developed for each home. 189:8-20. According to Mr. Pogorolich, "the only way to prepare a reasonable estimate for a particular house is to visit the house, look at the layout, look at the qualitative and quantitative issues, [and] look at the fit and finish." 189:14-18. However, this

In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...

2017 WL 1421627

approach is impractical and ill-advised given the number of homes needing remediation and the more than six-year wait already endured by the homeowners. To deal with tragedy on a case-by-case or home-by-home basis where liability has already been established would result in decades of delay and would vary with the passing of time.

**\*13 48.** Additionally, the task of stripping a property to the studs and rebuilding does not present the same variability in costs as does an entirely new construction (*i.e.*, building a new house). 161:125-162:9. With Chinese drywall remediation, the bulk of the costs is in nearly uniform demolition of the drywall and replacement of standard building materials—differences in finish from home to home add little variability to the total damages estimate. *Id.*

**49.** Thus, the hypothetical problem posed by Mr. Pogorolich at the damages hearing when he compared two equally sized properties with very different lay-outs is not a problem; it is a routine aspect of damage estimation. Such variations, to the extent they exist in some outlier homes, present minimal cost variation in the final total remediation damages estimate. Defendants' Exhibit 34; 195:22-196:19. Most of the Taishan properties are typical single family homes—like the *Germano* homes—where variations in trim and standard appliances will ultimately make no significant difference in the cost of repair. 125:3-22. Furthermore, the potential risk of any minimal cost variation is greatly outweighed by the fact that the alternative—individually inspecting each home to determine a project specific estimate—is both inefficient and unjust given the number of Plaintiffs who are still awaiting resolution of their claims where liability has already been established.

**50.** Second, Defendants called Dr. M. Laurentius Marais as their second damages rebuttal expert at the hearing. Dr. Marais is Vice President and Principal Consultant at William E. Wecker Associates, Inc., specializing in applied mathematical and statistical analysis, including statistical extrapolations based on sampling and calculation of damages.

**51.** This Court held earlier that Dr. Marais is not qualified to address the Court regarding building damage or remediation estimation methodology, but may only offer, to the extent relevant, testimony about raw statistics. (R. Doc. 19092 at 4) ("There is no basis for him to

provide expert testimony regarding methods or scope of remediation or accuracy of square footage cost data.").

**52.** Dr. Marais is an expert in statistical science and statistical sampling. 231:14-20. Dr. Marias testified that Mr. Inglis' damages methodology is an extrapolation in that it attempts to determine, based on information obtained from a sample of properties, conclusions about the large group of properties that comprise the class. 234:4-23. According to Dr. Marais, Mr. Inglis' methodology does not comport with well-established principles for obtaining statistically and scientifically valid extrapolations from samples, and, therefore, cannot be relied upon to estimate class-wide damages or damages for individual class members. 233:4-238:1.

**53.** The Plaintiffs' expert, Mr. Inglis, however, testified that he did not rely on statistical sampling in reaching his opinions. 156:14-25. While he did calculate averages in forming his opinion, his opinion was grounded in his extensive professional experience evaluating the cost of repair for Chinese drywall buildings and extensive historical scope of work and cost of repair data. 116-116; 156-157. Like any engineer, he made use of basic statistics but his estimates relied on professional experience, not statistical science. 156:17-158:11.

**54.** The statistical opinion of Dr. Marais does not alter this Court's conclusion regarding the adequacy of Plaintiffs' formulaic damages calculation. In forming his opinion, Dr. Marais neither relied on (nor was he qualified as an expert to opine on) the Court's Finding of Facts and Conclusions of Law in *Germano* and *Hernandez* regarding the scope of work or costs or repair to remediate Chinese drywall homes. 278:17-25; 280:6-10. Dr. Marais offered no statistical sampling alternative utilizing historical data of remediation activities.

**\*14 55.** Given the unique circumstances surrounding Chinese drywall and the absence of efficient and appropriate alternatives, a formulaic method used to calculate remediation damages is fair and reasonable. Mr. Inglis' estimation of remediation costs—rather than a series of individual inspections and individual mini-trial estimates—spares the Taishan Property Owners from the costs and further delay of individual inspections, which may cost thousands of dollars per person, take several months or years to complete and, most likely, will not lead

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 377 of 1680
In re Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.... 14 of 24 PageID# 855

2017 WL 1421627

to a more precise estimate than the ones provided by Mr. Inglis. [1]

**56.** That said, there will have to be a claims process, similar to that utilized in the Knauf settlement, to ensure that properties contained Taishan-manufactured Chinese drywall and to verify the under-air square footage. BrownGreer will be tasked with establishing and implementing this process. Such a process will ensure that damages are accurately allocated to each individual class member.

## VI. CONCLUSIONS OF LAW

### A. Nature of the Proceedings Under Rule 55

**57.** This Court has (1) already found the Taishan Defendants in default pursuant to Fed. R. Civ. P. 55(a) and (2) already determined in its *Class Certification* FOFCOL that the Defendants' liability has been conceded by their default. *See Class Certification* FOFCOL at 31. As a result of Defendants' default, the defectiveness and the corrosive effect of Chinese drywall were resolved in favor of Class Members. Even the Defendants' experts agree that the drywall is defective and needs to be removed. Thus, the only issue before the Court is the amount of damages which should be awarded to the Class for property remediation.

**58.** Since Defendants are in default and this Court already entered a liability judgment, Rule 55(b)(2) governs the procedure for determining the amount of damages. Pursuant to Rule 55(b)(2), the Court may conduct hearings to determine the amount of damages. Although the Rule does not mandate such a hearing, this Court determined that a damages hearing was appropriate under the circumstances to determine a damages calculation. *James v. Frame*, 6 F.3d 307, 311 (5th Cir. 1993).

**59.** The June 9, 2015, Damages Hearing was the first hearing of what will be multiple hearings that the Court will hold in order to assess the full amount of damages owed to class members. On June 9, 2015, the Court considered only remediation damages for current owners. Other damages, such as alternative living expenses, bodily injury, foreclosure, and/or lost rent, may be considered at other proceedings in this Court or other Courts where appropriate. The Court divided the hearings into phases because it is the most fair and efficient way to assess damages in this complex litigation. As discussed further

below, remediation damages in this unique Chinese Drywall MDL can be calculated on an aggregated formulaic basis and, thus, it is in the best interest of all parties to consider remediation damages together in the first stage of the damages proceedings. This approach will also allow the prompt remediation of homes so they can be re-inhabited comfortably and safely.

***15 60.*** It is well-established in this Circuit that this Court may divide hearings regarding damages into phases, particularly in complex cases where, as here, such a division would serve judicial efficiency by separating common issues from individual ones. *See, e.g., In re Deepwater Horizon*, 739 F.3d 790, 816 (5th Cir.) *cert. denied sub nom. BP Expl. & Prod. Inc. v. Lake Eugenie Land & Dev., Inc.*, 135 S. Ct. 754, 190 L.Ed. 2d 641 (2014) ("[P]redominance may be ensured in a mass accident case when a district court performs a sufficiently 'rigorous analysis' of the means by which common and individual issues will be divided and tried. In many circuits, this has been accomplished by means of multi-phase trials under Rule 23(c)(4), which permits district courts to limit class treatment to 'particular issues' and reserve other issues for individual determination."); *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1023 (5th Cir. 1992) *on reh'g*, 53 F.3d 663 (5th Cir. 1994) (affirming and "express[ing] [its] admiration" for the district court's trial plan, which included three damages phases and allowed the district court to adjudicate common class issues in the first phase and alter adjudicate individualized issues in later phases, despite due process challenge).

**61.** Further, this Court finds that the Class Notice and Supplemental Class Notice issued on September 26, 2014, and December 30, 2014, (*see* R. Doc. 18231-1 at 4) were sufficient under Rules 23(c)(2) and 23(d)(2) to inform class members about the nature of the litigation, the class claims, and their legal rights. *See* (R. Doc. 18998). Although Plaintiffs made certain changes to their damages model leading up to the June 9, 2015, hearing, these changes did not alter the sufficiency of the class notices. *Id.* at 4-5. The Class definition has remained the same and there is no precedent to suggest that changes to a damages model require supplemental class notice. *Id.* at 5.

**62.** While the default judgment conclusively establishes liability, it is not conclusive of the class damages for remediation costs which Plaintiffs seek. Liability and damages require separate and equally "rigorous analysis."

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 01/19/19 Page 378 of 1680
In re Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.... 15 of 24 PageID# 856
2017 WL 1421627

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). The June 9, 2015, damages hearing provided the opportunity for the Court to engage in such rigorous analysis and determine that, given the uniqueness of the instant action, the Plaintiffs have presented a reasonable and reliable method of calculating remediation damages on a class-wide basis and have accommodated individual class damage issues by shifting the individual damage components to subsequent adjudicative phases.

### B. Chinese Drywall—A Unique Class Action

**63.** Chinese drywall presents a truly unique dilemma, and the damages from Chinese drywall are not easily analogized to those of typical class actions. *See Pella Corp. v. Saltzman*, 606 F.3d 391, 396 (7th Cir. 2014) (quoting *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)) ("Under Rule 23, district courts are permitted to 'devise imaginative solutions to problems created by the presence in a class action litigation of individual damage issues.' "). In most class actions, even if liability is established, the issue of causation is often inextricably intertwined with damages and remains to be litigated. In other words, even if a court finds that a defendant was negligent and that a plaintiff suffered damages, the court must still determine whether those damages were *caused* by that negligence.

**64.** With regards to the Taishan drywall in this case, in contrast to these typical class actions, there is no issue of either liability or causation. The fact that each Taishan property owner suffered the same harm to their property and the same type of damages puts this case in contrast to cases where each plaintiff suffers a distinctly different *kind* of individualized wrong. Here, Taishan has been held liable for defective Chinese drywall, and any properties containing Chinese drywall are defective, requiring the removal of the Chinese drywall. As mentioned above, even the Defendants agree that the drywall is defective and must be removed and the property remediated. Thus, the only variation is the *extent* of the damages suffered based on the square footage of involved property. *See In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) (" 'Even wide disparity among class members as to the amount of damages' does not preclude class certification 'and courts, therefore, have certified classes even in light of the need for individualized calculations of damages.' ") (quoting *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003)). This variation can be uniformly recognized by a square footage analysis established using

a representative statistical sample. Indeed, recently, the Supreme Court held that, under certain circumstances, statistical evidence may be used to make class-wide determinations depending on the purpose for which the evidence is being introduced and on the elements of the underlying cause of action. *Tyson Foods, Inc. v. Bouaphekeo*, 136 S. Ct. 1036, 1046 (2016) (citing *Erica P. John Fund, Inc. v. Haliburton Co.*, 563 U.S. 804, 809 (2011)). A comparison of this class action to other more typical types of class actions is useful to demonstrate why a formulaic statistical method for calculating damages is appropriate in this case, even though it may not be appropriate under other circumstances.

### 1. Asbestos

**\*16 65.** Asbestos class actions generally involve vast disparities among not only the degree of injury, but also the type of injury. In contrast to asbestos, the level of exposure to Chinese drywall in this case is immaterial because the class is not asserting personal injury claims, but rather property damage claims. No matter how long the Chinese drywall has been inside the walls, a property owner has no choice but to remove it and replace it, which inevitably involves time and expense. As a result, Chinese drywall damages cannot be easily analogized to asbestos damages.

**66.** In asbestos cases, plaintiffs share the common fact that they have all been exposed to asbestos at some point; however, the resultant health effects often vary dramatically and warrant individual adjudication to determine damages. Asbestos exposure does not guarantee illness, and even if sickness does occur, the degree of injury among plaintiffs varies according to the diversity of class members' characteristics, including their preexisting physical conditions, their health habits, the type and duration of the exposure, the severity and nature of the resulting diseases, the type of treatments received, etc. The variations among plaintiffs' injuries resulting from asbestos also preclude calculation of damages by formula because some individuals become more seriously ill than others. Additionally, the stakes for the defendants are relatively high in asbestos cases, rendering individual adjudication more appropriate than class action.[2]

**\*17 67.** In *Amchem Products, Inc. v. Windsor*, the Supreme Court considered certification of a class for

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 01/19/19 Page 379 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp.... 16 of 24 PageID #: 857
2017 WL 1421627

settlement that included some individuals who had been exposed to asbestos and had become ill, and others that had been exposed but had yet to manifest any injuries. 521 U.S. 591 (1997). The Court held that the class failed to satisfy Rule 23's predominance and adequacy-of-representation requirements because the class members' shared experience of asbestos exposure was outweighed by the variety of questions that pertained to the various subclasses and individual members. For example, some of the plaintiffs had been exposed but had experienced no symptoms at all and, even among those experiencing health problems, the degree of health issues were diverse. [3] *Id.* at 626–28.

**68.** Defendants cite to other asbestos cases such as *In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990) and *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998) for the claim that Fifth Circuit law does not permit the assessment of tort damages derived from extrapolation formulas using averaged results from prior cases. However, both asbestos-related cases are distinguishable from the present case, which only involves property damage.

**69.** In *In re Fibreboard Corp.*, the Fifth Circuit reluctantly vacated a trial plan in mass tort litigation involving the claims of 3,031 plaintiffs asserting asbestos-related injuries. 893 F.2d 706 (5th Cir. 1990). The phase of the trial plan at issue called for a jury to ascertain damages for the entire class on the basis of a trial of the specific claims of eleven class representatives, together with evidence the parties presented about the claims of thirty illustrative plaintiffs, and the testimony of experts about damages to the entire class. The Fifth Circuit blocked the proposed plan because it failed to require each claimant to prove both causation and damages, as required by Texas law, and because it asked the jury to ascertain damages for a group of claimants who suffered widely divergent injuries on the basis of a statistical profile. *Id.* at 710-711.

**70.** In *Cimino*, which involved the same asbestos cases from *Fibreboard*, the same plaintiffs proposed a new plan that contemplated trying 160 sample cases and then awarding the remaining 2,128 plaintiffs "an amount of actual damages equal to the average of the awards made in the sample cases." 151 F.3d at 319. The Court held that the damages plan "plainly contravenes *Fibreboard*'s holding" and "permit[ing] recoverable tort damages to be determined in a lump sum for the entire class" is

simply contrary to *Fibreboard*. *Id.* at 319. As described *supra*, the focus in *Fibreboard* was not the number of sample cases; rather, it was the fact that "[i]n Texas, it is a fundamental principle of traditional products liability law that the plaintiffs must prove that the defendant supplied the product which caused the injury" and the fact that there were such great disparities among the class members. 893 F.2d at 710-711.

**\*18 71.** Specifically, the so-called "class" of plaintiffs in *In re Fibreboard* and *Cimino* consists of persons with different occupations, different exposure periods, who were claiming different diseases. *Id.* at 710. Additionally, the plaintiffs' admissions of fact in those cases show the following additional disparities among class members: (a) the class includes persons who do not have legal claims against one defendant; (b) one or more members of the class may be barred from prosecuting claims against one defendant by virtue of their prior employment with that defendant; (c) the severity and type of physical and mental injuries varies among class members; (d) the nature and type of damages varies among class members; (e) not all of the plaintiffs were injured by the acts or omissions, conduct, or fault of all of the defendants; (f) the dates of exposure to asbestos-containing products varies among class members; (g) the types of products to which class members were exposed varies among class members; and (h) the dates that class members knew or should have known of their exposure to asbestos-containing products is not identical among class members. *Id.*

**72.** The instant drywall action is highly distinguishable from *In re Fibreboard* because the Plaintiffs' characteristics in MDL 2047 cannot be described as particularly diverse and there is no issue relating to causation of injury. All of the Plaintiffs in MDL 2047 have the same complaint; they own properties requiring remediation as a result of defective drywall. There is no variation with regard to the severity and type of injury or the nature and type of the damages. All Plaintiffs [4] are entitled to total remediation of their homes. The duration of exposure or quantity of drywall installed does not change the nature of damages, and the solution to their problems (remediation) is identical in every instance. Here, unlike most asbestos cases, including *In re Fibreboard*, (and unlike other similar circumstances, such as exposure to second-hand smoke), plaintiffs' property damages in the Chinese drywall class do not vary according to duration or intensity of exposure

2017 WL 1421627

or resulting health effects that would require individual minitrials to ascertain the origins of the damages.[5]

## 2. Mass Accidents

**\*19 73.** The Advisory Committee commentary discussing the predominance requirement in FRCP 23(b)(3) specifically mentions mass accident victims as the type of class that would typically not meet the requirement, because the individual interests of each injured plaintiff would be too disparate and therefore better managed in individual adjudications. *See* Fed. R. Civ. P. 23 advisory committee's note to the 1966 amendments. However, as the Supreme Court noted in *Amchem*, "the text of the Rule does not categorically exclude mass tort cases from class certification, and District Courts, since the late 1970's, have been certifying such cases in increasing number." 521 U.S. 591, 625 (1997); *accord. Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006) (noting that "it is theoretically possible to satisfy the predominance and superiority requirements of Rule 23(b)(3) in a mass tort or mass accident class action, a proposition this court has already accepted.").

**74.** Unlike asbestos cases where the exposure occurs over long periods of time, mass tort cases frequently arise following a single incident. Despite resulting from a single occurrence, most mass tort class actions are complicated, even if liability is established, because the issue of causation is inextricably intertwined with damages and remains to be litigated. For example, in *Robertson v. Monsanto Co.*, the Fifth Circuit found that class certification was inappropriate when the defendant was liable for an ammonia gas release at its plant, but the plaintiffs had highly individualized determinations regarding both causation and damages for mental distress, physical injuries, property damage, economic injuries, medical expenses, etc. 287 Fed. Appx. 354, 361-62 (5th Cir. 2008). In particular, the *Monsanto* plaintiffs were seeking damages for emotional distress and other intangible injuries, which are impossible to calculate using a formula because they "implicate[ ] the subjective differences of each plaintiff's circumstances [and] cannot be calculated by objective standards."[6] *Id.* at 362 (quoting *Steering Comm.*, 461 F.3d at 602); *but see Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 607 n.6 (E.D. La. 2006) (finding presence of claims for personal injury and mental anguish damages did not undermine a finding

of predominance when they did not form a significant portion of the plaintiffs' claims).

**75.** As with asbestos cases, damages resulting from mass accidents can be highly individualized because they involve such factors as "location, exposure, dose, susceptibility to illness, nature of symptoms, type and cost of medical treatment, and subsequent impact of illnesses on individuals." *Steering Comm.*, 461 F.3d at 602. The damages resulting from the oil spill at issue in *In re Deepwater Horizon*, for example, varied drastically depending on multiple "individual questions." 739 F.3d 790, 815 (5th Cir. 2014). In *Deepwater Horizon*, these questions presumably included disparities such as proximity to the oil spill, the type of claimant (whether a business or a property owner), and the amount of oil taken in, etc. *See also Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 553 (5th Cir. 2011) (remanding class certification to the district court for further consideration of whether the predominance requirement was met when plaintiffs exposed to petroleum coke dust from a nearby refinery "sought a variety of damages, including personal injury, fear, anguish, discomfort, inconvenience, pain and suffering, emotional distress, psychiatric and psychological damages, evacuation, economic damages, and property damages").

**\*20 76.** In contrast to mass tort plaintiffs complaining of personal injuries, the Chinese drywall plaintiffs' property damage claims vary only according to the cost of remediation based on the under-air square footage of the contaminated property and are therefore subject to formulaic calculation by objective standards. In the instant case, the class experienced class-wide damages directly tied to liability: the need to replace the defective drywall. This injury is common to every class member, with the only difference being how much drywall each class member had to replace and how much the contractor charged in order to perform the work. This case is thus more analogous to *Turner v. Murphy Oil USA, Inc.*, in which a class action was brought against an oil company when plaintiffs suffered property damage as a result of an oil storage tank spill. 234 F.R.D. at 601. This court found that the class negligence claims would not require extensive individualized proof that would preclude class treatment:

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 381 of 1680
In re Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.Supp... 18 of 24 PageID #: 859

2017 WL 1421627

Defendant has argued that Plaintiffs' claims for personal injury and mental anguish do not meet the predominance requirement because certain factual elements of their claims will require individualized inquiry—when the plaintiff first learned of the oil spill, what preventative measures were taken to avoid personal injury, and what pre-existing health and mental conditions existed for each plaintiff. While some individualized inquiry will be required, the Court does not believe that this inquiry will be extensive.

*Id.* at 607 n.6. This court reasoned that "[t]he presence or degree of injury or damage is an issue of quantum that may be dealt with individually in a bifurcated proceeding, if necessary." *Id.* at 607. Similarly, in this case, individualized trials are not necessary to determine either liability or the existence or nature of damages. The defective drywall was found in the walls of each property, and there is no real variation as to the type of claimant since all of the Claimants are property owners. The only variation among Claimants is the cost of remediation as determined by the under-square footage of the contaminated property. For those few property owners who feel that their properties are unique and not similar other class members may opt out and have their properties individually inspected and then evaluated by a jury.

### 3. Antitrust

**77.** Antitrust class actions are also distinct from the instant action alleging property damage. Antitrust injuries are often speculative: but for the defendant's conduct, the market might have been more competitive, entry for new producers may have been easier, or prices hypothetically would have been lower. *See Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 297 (5th Cir. 2003)* (recognizing that because "the nature of an antitrust claim means that 'some plaintiffs can only hypothesize about what the state

of their affairs would have been absent the wrong,' " antitrust plaintiffs are not held "to the same burden of proof of damages as demanded of plaintiffs in other civil cases") (internal citation omitted) (quoting *H&B Equip. Co. v. Int'l Harvester Co., 577 F.2d 239, 246 (5th Cir. 1978)*)). Antitrust injuries can be difficult to measure when they arise from multiple theories of liability or when the variegated nature of the plaintiffs affected makes an individualized damages determination more appropriate. In the instant matter, these types of problems observed with calculating damages resulting from antitrust injuries are not present: the injury is not speculative, and but for the production and installation of defective drywall, the plaintiffs would not have been required to remediate their properties.

**78.** For example, a divided Supreme Court in *Comcast Corp. v. Behrend* reversed a class certification in an action against a cable television company allegedly engaging in anticompetitive conduct because the plaintiffs could not demonstrate that "damages [were] capable of measurement on a classwide basis." *133 S. Ct. 1426, 1433 (2013).* The plaintiffs in *Comcast* included some who "*may* have been overcharged because of petitioners' alleged elimination of satellite competition," others who "*may* have paid elevated prices because of petitioners' increased bargaining power vis-à-vis content providers," and others who "*may* have paid rates produced by the combined effects of multiple forms of alleged antitrust harm." *Id. at 1434* (emphasis added). Unlike the supra-competitive prices imposed upon consumers in *Comcast*, which were potentially attributable to multiple other causes besides the defendant's specific anticompetitive conduct at issue, the property damages in this matter related to defective drywall are susceptible of estimation without raising similar questions of liability.[7] *Id. at 1434.*

**\*21 79.** Even when causation is clear, antitrust violations can cause drastically different levels of injury depending on the specific circumstances of various class members, such that determining injuries such as lost profits or lost labor productivity can be significantly more fact-intensive than the straightforward and uniform property damages at issue in this case. For example, in *Bell Atl. Corp. v. AT&T Corp.,* a class of businesses sued a telecommunications company under the Clayton Act, alleging that the defendant attempted to monopolize the "caller ID" market and, as a result, the service was unavailable to some users during the class period.

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 382 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...., 2018 WL 2/4 Page ID# 360
2017 WL 1421627

339 F.3d at 297. The plaintiffs' proposed formula used a nationwide average for labor costs and a national average for the amount of time that class members would have saved per telephone call had the caller ID service been available on long-distance calls during the class period. *Id.* at 304. However, the Fifth Circuit affirmed the district court's denial of class certification on the grounds that the individualized nature of the damages precluded certification when "[t]he record indicate[d] that rather than merely examining lost time and average labor costs, any adequate estimation of actual damages suffered would require consideration of the variegated nature of the businesses included in both the proposed classes, together with the range of uses, depending on the size and technological sophistication of any given business, to which caller ID could be applied." *Id.* Moreover, the plaintiffs in *Bell Atlantic* failed to demonstrate that the absence of caller ID would have had any noticeable effect at all on some of the businesses in the proposed class. [8] *Id.* The circumstances in *Bell Atlantic* in which class members could have been compensated who had not even incurred *any* damages whatsoever are therefore distinguishable from the present case where the proposed class does not contain any individual who did not possess Chinese drywall.

### C. Aggregate Damages are Superior to an Individualized Alternative

#### 1. Plaintiffs Use an Appropriate Formula to Calculate Remediation Damages

**80.** $86 per square foot, which is evidence based, is a reliable benchmark estimate for the costs of remediation. The remediation costs take into account the uniform scope of the repair for each class member, the *limited* nature of repair (interiors only), and the use of well-established mid-points as the baseline for each damages estimate before considering individualized square footage and local building cost factors. Given these considerations, the degree of variability of square footage costs for remediation of these homes is typical of what is expected in the discipline of damages estimation, and is not significant when viewed in relation to the total costs of repair. Even the Defendants' suggestion—house by house inspection by a contractor—is not likely to lead to a more precise estimate, given the acknowledged variation of at least 17% in that method of estimation recognized by the

estimation textbook authorities. Defendants Exhibit 7 at pg. 77. Considering this, pursuing the alternative is not only unreasonable and inefficient, it is also unjust in light of the continued suffering of the Plaintiffs.

**81.** Plaintiffs' expert relied on multi-disciplinary corrosion science (as discussed at length in the Court's earlier FOFCOLs in *Germano* and *Hernandez*, particularly when defining the scope of work for remediation), in conjunction with bid-pricing, unit pricing, square footage pricing, and localized construction cost factors, to establish the damages formula. While his formula stemmed from average calculations of the *Germano* properties, it was grounded in the relevant science and historical cost data. Mr. Inglis used well-established estimation methods in arriving at the base $86 per square foot measure, and then used RS Means to adjust this sum to current building material and labor costs and then to reflect the local building and material costs for each Taishan property. RS Means provides reliable data for such a calculation. *Germano* FOFCOL at p. 58 ("RS Means is a well-recognized and accepted publication which compiles national data on a national basis for cost to repair and replace building components.").

#### 2. Fifth Circuit Law Does Not Bar Plaintiffs' Damages Proposal

**82.** The Fifth Circuit has explained that a formula-based calculation of class damages is appropriate in circumstances where individual trials are not required, particularly when the damages portion of the suit can be severed from the liability inquiry:

> **\*22** Even wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate, and courts, therefore, have certified classes even in light of the need for individualized calculations of damages. Class treatment, however, may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where

Case 2:09-md-02047-EEF-JMBN Document 22363-780 Filed 01/18/19 Page 383 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed.S... 20 824 Page ID# 861
2017 WL 1421627

the formula by which the parties propose to calculate individual damages is clearly inadequate.

*Bell Atlantic*, 339 F.3d at 306 (internal citation omitted). *See also Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) (aggregating class damages by a formulaic calculation is acceptable in circumstances where individualized damage calculations are not required); *Corley v. Orangefield Indep. Sch. Dist.*, 152 Fed.Appx. 350, 354-55 (5th Cir. 2005) (recognizing that damages which are "capable by means of objective standards" are permissible so long as there exists a "suitable formula for calculation of damages"). This standard is met by Mr. Inglis' damages methodology, which is a formulaic calculation of class wide damages based on objective standards and verifiable data for each property.

Nonetheless, the Fifth Circuit has also held:

[B]efore a trial court may utilize results from a bellwether trial for a purpose that extends beyond the individual cases tried, it must, prior to any extrapolation, find that the cases tried are representative of the larger group of cases or claims from which they are selected. Typically, such a finding must be based on competent, scientific, statistical evidence that identifies the variables involved and that provides a sample of sufficient size so as to permit a finding that there is a sufficient level of confidence that the results obtained reflect results that would be obtained from trials of the whole.

*In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997). Defendants argue that the Court, bound by the holding in *Chevron*, must reject the Plaintiffs' request for an award of aggregate damages based on the Inglis method because his damages calculation stems from the $86 per square foot estimate from the seven *Germano* properties. In the abstract, this is a compelling argument. However, given the *sui generis* nature of this Chinese

Drywall litigation, *Chevron*, like most of the cases cited by Defendants is distinguishable.

**83.** In *Chevron*, plaintiffs asserted tort claims for industrial pollution of a residential subdivision, claiming that hazardous substances that were improperly stored by defendants' in defendants' waste pits migrated into the environment causing personal injury and property damage. *Id.* at 1017. The trial plan invalidated by the Fifth Circuit "provided for a unitary trial on the issues of 'general liability or causation' on behalf of the remaining plaintiffs, as well as the individual causation and damage issues of the selected plaintiffs, and ordered the selection of a bellwether group of thirty (30) claimants, fifteen (15) to be chosen by the plaintiffs and fifteen (15) to be chosen by Chevron." *Id.* at 1017. The goal of the trial in *Chevron* "was to determine its liability, or lack thereof, in a single trial and to establish bellwether verdicts to which the remaining claims could be matched for settlement purposes." *Id.*

**84.** In rejecting the plan, the Fifth Circuit was particularly concerned that the district court's trial plan was "devoid of safeguards designed to ensure that the claims against Chevron of the non-represented plaintiffs as they relate to liability or causation are determined in a proceeding that is reasonably calculated to reflect the results that would be obtained if those claims were actually tried." *Id.* at 1020. Instead, the court found the procedure created potential liability to 3,000 plaintiffs "by a procedure that is completely lacking in the minimal level of reliability necessary for the imposition of such liability." *Id.* The court focused its concern on the fact that a nonrepresentative bellwether sample group would be tasked with "answer[ing] troubling causation or liability issues" for the entire universe of plaintiffs and "the lack of fundamental fairness contained in a system that permits the extinguishment of claims or the imposition of liability in nearly 3,000 cases based upon results of a trial of a non-representative sample of plaintiffs." *Id.* at 1019, 1021.

***23 85.** In the instant case, claims will not be extinguished nor will liability be imposed on the basis of Mr. Inglis' methodology. Mr. Inglis' calculations are not an answer to causation or liability issues. Causation and liability have been conclusively established. Additionally, these concerns regarding the potential unrepresentativeness of plaintiffs are understandably alarming in a case like *Chevron* where there are so many variables. In *Chevron*

2017 WL 1421627

(as in the asbestos-related cases), liability, causation, and damages may vary significantly according to the diversity of the class members' characteristics, including their preexisting physical conditions, their health habits, the type and duration of the exposure to the hazardous substance, the severity and nature of the resulting diseases, the type of treatments received, etc. In contrast to *Chevron*, duration of exposure to Chinese drywall is immaterial. No matter how long the Chinese drywall has been inside the walls, a property owner has no choice but to remove it and replace it. The use of data from the *Germano* homes does not present the same problems as the use of bellwethers in *Chevron* would have presented. The limited diversity among properties in the instant matter is not comparable to that of the personal injury and property damage claims in *Chevron*. Moreover, there is no dispute as to liability or causation in the present case. The Defendants are liable and the Chinese drywall caused the damage to the properties and it has to be removed.

### 3. Aggregate Damages are Favorable Given the Limited Variation Present in Chinese Drywall Litigation

**86.** District courts are encouraged to "devise imaginative solutions to problems created by the presence in a class action of individual damages issues." *Pella Corp. v. Saltzman*, 606 F.3d 391, 391 (7th Cir. 2014). Plaintiffs have devised a reasonable and reliable solution to calculate remediation damages on a class-wide basis and accommodate individual class damage issues by shifting the individual damage components to subsequent adjudicative phases.

**87.** Under the circumstances of this case and given the *sui generis* nature of Chinese Drywall, the Plaintiffs' proposal to calculate remediation damages is not "clearly inadequate," and a formulaic approach is superior to the thousands of individual proceedings that would result if Defendants' proposal for property by property inspection and estimation were accepted. The costly and wasteful individualized mini-trials that would result from Defendants' proposal would further burden the Taishan property owners and further delay the benefits they can hope to receive from this litigation. This Court has already ruled that damages may be calculated in a formulaic manner. *Class Certification* FOFCOL at 11-12 ("[T]he average cost of repairing class members' homes is subject to calculation on a formulaic, square footage basis.").

**88.** The Court does not deny that there is some variation, but concludes that the time, expense, and inefficiency of inspecting every affected property would result in an inequitable solution, given the delay these property owners have already experienced in obtaining relief. As evidenced by Mr. Pogorolich's testimony, many properties will have varying remediation costs based on factors such as ceiling height, number of partitions, and quality of interior finishes. However, the variations among damages in this case are so relatively minor that the damages are susceptible to being calculated by a formula. [9]

**\*24 89.** As discussed *supra*, the class remediation damages here do not present significant individualized issues, in contrast to physical ailments and loss of business profits. Rather, the only variance is in the amount required to pay for each remediation, which can be determined using a formulaic methodology. Unlike asbestos and mass accident cases, the damage issues presented in Chinese Drywall litigation are so distinct from questions of liability and causation (questions which have already been answered in favor of the Plaintiffs), it is proper and just to award aggregate damages. Mr. Inglis' formula, which calculates remediation damages based on square footage for each of the Taishan properties with verified under air square footage, is superior to the thousands of individual proceedings which would result if Defendants' proposal for property by property inspection and estimation were accepted. Defendants' alternative amounts to cruel and unusual treatment of innocent homeowners. To now require individuals who have been displaced for more than six years to pursue individual claims and incur individual costs in a case where liability and fault have been established is not only an imposition on the courts, but also and more importantly, a serious injustice to those who have been harmed by the Defendants' actions.

**90.** Each class member suffered the same kind of damage, and the only individualized determination required— the amount it will cost to remediate the properties —can be calculated using a formula to estimate the amount of each class member's damages. It is therefore unnecessary and unjust to hold individual mini-trials to determine remediation damages in this case. The damages calculation need not be exact. *See, e.g., Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 385 of 1680
Case in re Manufactured Drywall Products Liability Litigation, Not Reported in Fed....

2017 WL 1421627

(1931) (ruling that damages estimates are appropriate even where "they cannot be measured ... with exactness and precision ...").

**91.** The fact that each Taishan property owner suffered the same harm and the same nature of damages puts this case in contrast to cases where each plaintiff suffers a distinctly different *kind* of individualized wrong. *See supra* Section VI (B). The class remediation damages here do not present significant individualized issues, like physical ailments and loss of business profits. *Id.* Rather, the only variance is in the amount required to pay for each remediation, which can be readily determined using the formulaic methodology presented by Mr. Inglis in accordance with the following protocol.

**VII. CONCLUSION**
**92.** Plaintiffs have offered a reasonable and reliable measure (superior to any alternative) of the remediation damages for the Taishan Properties with verified under air living square footage. The Court adopts Mr. Inglis' damages *methodology* to quantify the aggregate damages.

**93.** To implement this remediation process:

**IT IS ORDERED** that the Plaintiffs Steering Committee, under the supervision of BrownGreer, submit an updated Class Plaintiffs' Spreadsheet endeavoring to include only Taishan properties with verified under air living square footage. Any costs associated with Brown Greer's assistance in revising the Class Plaintiffs' Spreadsheet are to be borne by the Defendants.

**IT IS FURTHER ORDERED** that the revised Class Plaintiffs' Spreadsheet, on which the Court will rely to determine the aggregate total of these remediation damages, be submitted to the Court within two months of this Order. Taishan will then be permitted to review and contest or seek set-offs.

The damages awarded will be calculated by multiplying the under air square footage of the affected properties listed in the revised Class Plaintiffs' Spreadsheet by $105.91 [10] *as adjusted* by the RS Means location factor. Ultimately, all such claims will be based on verifications, not only of the under air living space square footage of the contaminated property, but also the presence of Taishan Drywall in those properties.

The relevant case law supports the appropriateness and reliability of the Inglis remediation damages methodology presented at the June 9, 2015 hearing. Therefore, the Court finds the Inglis remediation damages methodology to be a reliable, fair and reasonable estimate of aggregate remediation damages. The final determination of these damages shall be made pursuant to the subsequent set-offs and claims proceedings.

**\*25** This method is in accordance with the Court's *Class Certification* FOFCOL which provided that remediation damages should be calculated based on existing data regarding scope of work and square footage of class members homes: "*i.e.*, price per square foot remediate X number of square feet in class members' homes = damages." (R. Doc. 18028 at 32, 33).

The alternative to estimating property damages on a class-wide basis would be a series of costly (and wasteful), individualized mini-trials, inspections, and estimates that would not provide a meaningfully more reliable estimate for class remediation damages. The Taishan Property Owners will still have an opportunity at later phases to seek damages for alternative living expenses and loss of use and enjoyment of their properties.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1421627

**Footnotes**
1   Estimations, even when they are competitive bids performed by a builder personally inspecting the property, are still merely estimations. As the American Association of Profession Estimators notes in a leading treatise, variations even among several competitive bids can reach up to 30% with an average of a 17% difference. "If general contractors, bidding with the same documents, can't get closer than a 15-20% spread, it is unrealistic to guarantee an estimate to be within a specific, small percentage." Defendants' Exhibit 7 at p. 77.
2   Plaintiffs seeking compensation for property damage do not stand to recover nearly as much as plaintiffs would in actions for wrongful death, and accordingly have less incentive to litigate individually. *See Bevrotte v. Caesars Entm't Corp.*, No.

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/18/19 Page 386 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Not Reported in Fed...

2017 WL 1421627

11-543, 2011 WL 4634174 at *5 (E.D. La. Oct. 4, 2011). Defendant BNBM's reliance on *McLaughlin v. Am. Tobacco Co.* for the proposition that a court should not estimate gross damages for the class and then adjust the total amount later on when processing individual claims is misplaced: whereas the plaintiffs bringing civil fraud claims against tobacco companies in *McLaughlin* proposed "an aggregate determination [that was] likely to result in an astronomical damages figure that does not accurately reflect the number of plaintiffs actually injured by defendants and that bears little or no relationship to the amount of economic harm actually caused by defendants," in this case, Plaintiffs' class damages proposal does not appear to compensate potential claimants who had not actually been affected by the presence of Chinese drywall. 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008). The Second Circuit in *McLaughlin* was concerned that claimants who had perhaps never relied upon the defendants' misrepresentations about cigarettes or whose reliance was not the proximate cause of each individual's loss might still be allowed to recover despite not having a viable fraud claim, a circumstance distinguishable from the instant case where no proof of individual reliance on any representation is required. *Id.* at 231. Moreover, the *McLaughlin* plaintiffs had proposed disposing of the residue through a cy pres distribution rather than returning any overpayment to the defendants, which further increased the risk of overpayment in the aggregate. *Id.* at 232. However, the Second Circuit even acknowledged that "the fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." *Id.* at 231.

3   The Supreme Court was also concerned that the notice might be insufficient to justify the preclusion of almost every class member from pursuing future litigation: "Even if they fully appreciate the significance of [the] notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether" to participate in the class settlement. *Id.* at 628. Here, the *Amchem* Court's concern about sufficiency of notice to potential asbestos claimants is less relevant because the damages arising from Chinese drywall are not dependent on slowly-developing symptoms of illness that perhaps may be undiscoverable during a long latency period. Another factor distinguishing the Chinese drywall class from *Amchem* is that the class representatives in the matter currently before this Court possess the same interest and had suffered the same injuries as the other class members.

4   When this Court refers to the Plaintiffs, it is not referring to the Plaintiffs listed on the Class Spreadsheet presented at the June 9, 2015, hearing, which the Court is aware has been subsequently modified. Rather, the Court is referring to those claimants who are able to adequately prove that the property they own contains Taishan/TTP drywall.

5   Notably, both *Fibreboard* and *Cimino* rely on due process and Article III concerns relating to the fact that the assessment of tort damages is ultimately grounded in state tort law. However, these concerns stemmed primarily and specifically from the fact that there was no trial determination regarding causation. *Cimino*, 151 F.3d at 319. Under Texas law, the Seventh Amendment gives the right to a jury trial to make a causation determination. In *Cimino*, there was no such trial determination made, and no jury determined, that exposure to [Defendant's] products was a cause of the asbestos disease of any of the 160 sample plaintiffs. Since there was no causation determination regarding the sample plaintiffs, there could be no causation determination extrapolated to the remaining 2,128 plaintiffs. For these remaining cases, there was also no trial and no jury determination that any individual plaintiff suffered an asbestos-related disease. Predictably, the lack of causation determination renders any damages determination "likewise fatally defective." *Id.* at 319-320. With regard to the instant MDL, which related to drywall, not asbestos, there has been a conclusive determination regarding causation. Chinese drywall causes offending odors in homes and is corrosive to metals, requiring total property remediation. The Article III and due process concerns present in the aforementioned cases are no present in MDL 2047. Accordingly, this Court rejects Defendants' suggestion that it is ignoring its *Erie* obligation under Article III to "remain faithful" to the applicable law of each state in these diversity cases by accepting Plaintiffs' proposed formulaic damages plan. *See Fibreboard*, 893 F.2d at 711. Given that liability and the scope of remediation have been conclusively determined, awarding solely remediation damages to claimants whose homes require remediation due to the presence of Taishan drywall does not present a conflict with the *Erie* doctrine.

6   Another important distinguishing factor was that the *Monsanto* class consisted entirely of named plaintiffs, eliminating some of the usual benefits of class actions such as identification and notification of potential unnamed class members as well as issuance of a single binding judgment in order to foreclose indefinite, repetitive litigation. 287 Fed. Appx. at 363.

7   In *In re Deepwater Horizon*, the Fifth Circuit observed that *Comcast's* holding that "a district court errs by premising its Rule 23(b)(3) decision on a formula for classwide measurement of damages whenever the damages measured by that formula are incompatible with the class action's theory of liability" is "simply inapplicable" in cases that do not involve numerous common issues of liability. 739 F.3d at 815. *Comcast* is distinguishable from this case because there is only one theory of liability: that the defendants manufactured and distributed defective drywall.

2017 WL 1421627

8   For example, some of the businesses potentially for inclusion in the proposed classes utilized telephone systems that were incompatible with the defendant's caller ID service, such that it would have been impossible for those businesses to have ever used the service even if the defendant had not engaged in the alleged conduct. *Id.* at 305-06.

9   Defendants assert that Plaintiffs' formula for calculating damages is inadequate because it relies on "averages." (Rec. Doc. 18879 at 12). In support of their argument, they cite to *Corley v. Orangefield Indep. Sch. Dist.*, in which the court reversed a class certification on the grounds that "the injur[ies] to the landowners varie[d] in substantial ways, depending on the value, character and location of the property." 152 Fed.Appx. 350, 355 (5th Cir. 2005). However, *Corley* did not involve property damage, but rather involved unauthorized transmissions of voice, data and video communications across private land by telecommunications companies. The reason that the damages were so varied in *Corley* was because some parcels "might be situated in a geographic 'choke point' such that a telecom company would be forced go many miles out of its way if that parcel proved unavailable." *Id.* at 354. Defective drywall does not involve such drastic variations in damages.

10  This figure is the national square foot unit price with certified industrial hygienist (CIH) costs included and was calculated by Mr. Inglis using R.S. Means to adjust the $86 per square foot cost to reflect current-day building materials and labor.

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

# JOINT APPENDIX TAB # 16

2018 WL 279629
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

IN RE: CHINESE-MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION
This Document Relates to:
Gross v. Knauf Gips KG, 2:09-cv-6690
Amorin v. Taishan Gypsum, 2:11-cv-1395
Amorin v. Taishan Gypsum, 2:11-cv-1673
Wiltz v. Beijing New Building Materials
Public Limited Co., 10-cv-361

CIVIL ACTION MDL NO. 09-2047
|
Signed 01/02/2018

SECTION L (5)

**ORDER AND REASONS**

ELDON E. FALLON, United States District Judge

 *1 Defendants China National Building Materials
Co., Ltd. ("CNBM Company"), Beijing New Building
Material (Group) Company, Limited ("BNBM Group"),
and Beijing New Building Materials Public Limited
Company ("BNBM PLC") (collectively, the "Movants"
or "Defendants") have filed a motion to vacate the
Court's default judgments against them. Rec. Doc.
21050. Plaintiffs oppose the motion. The Court held oral
argument on this matter on December 14, 2017. Having
considered the parties' submissions, the extensive record,
and the applicable laws, the Court now issues this Order
and Reasons.

**I. BACKGROUND**
From 2004 through 2006, the housing boom in Florida
and rebuilding efforts necessitated by Hurricanes Rita
and Katrina led to a shortage of construction materials,
including drywall. As a result, drywall manufactured
in China was brought into the United States and used
to construct and refurbish homes in coastal areas of
the country, notably the Gulf Coast and East Coast.
Sometime after the installation of the Chinese drywall,
homeowners began to complain of emissions of smelly

gasses, the corrosion and blackening of metal wiring,
surfaces, and objects, and the breaking down of appliances
and electrical devices in their homes. *See In re Chinese-
Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d
819, 829-30 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir.
2014). Many of these homeowners also began to complain
of various physical afflictions believed to be caused by the
Chinese drywall.

These homeowners then began to file suit in
various state and federal courts against homebuilders,
developers, installers, realtors, brokers, suppliers,
importers, exporters, distributors, and manufacturers who
were involved with the Chinese drywall. Because of the
commonality of facts in the various cases, this litigation
was designated as a multidistrict litigation. Pursuant to a
Transfer Order from the United States Judicial Panel on
Multidistrict Litigation on June 15, 2009, all federal cases
involving Chinese drywall were consolidated for pretrial
proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured
by two groups of defendants: (1) the Knauf Entities and
(2) the Taishan Entities. The litigation has focused upon
these two entities and their downstream associates, and
has proceeded on strikingly different tracks for the claims
against each group.

**A. The Knauf Defendants**
The Knauf Entities are German-based, international
manufacturers of building products, including drywall,
whose Chinese subsidiary, Knauf Plasterboard (Tianjin)
Co., Ltd. ("KPT"), advertised and sold its Chinese drywall
in the United States. The Knauf Entities are named
defendants in numerous cases consolidated with the MDL
litigation and litigation in state courts.

The Knauf Entities first entered their appearance in
the MDL litigation on July 2, 2009. Rec. Doc. 18.
Thereafter, the Court presided over a bellwether trial
in *Hernandez v. Knauf Gips KG*, Case No. 09-6050,
involving a homeowner's claims against KPT for defective
drywall. *See* Rec. Doc. 2713. The Court found in favor
of the plaintiff family in *Hernandez*, issued a detailed
Findings of Fact and Conclusions of Law, and entered
a Judgment in the amount of $164,049.64, including
remediation damages in the amount of $136,940.46—
which represented a cost of $81.13 per square foot based

2018 WL 279629

on the footprint square footage of the house. *See* Rec. Doc. 3012.

**\*2** Subsequently, the Knauf Entities entered into a pilot remediation program with the Plaintiffs' Steering Committee ("PSC") in the MDL. This program was largely based upon the remediation protocol formulated by the Court from the evidence in *Hernandez.* The Knauf pilot remediation program is ongoing and has, at present, remediated more than 2,200 homes containing KPT Chinese drywall using the same general protocol. At the Court's urging, the parties began working together to monetize this program and make it available to a broader class of plaintiffs.

On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which is designed to resolve all Knauf-related, Chinese drywall claims. *See* Rec. Doc. 12061-5. In addition to the Knauf Settlement Agreement, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. Although the Court occasionally must deal with settlement administration and enforcement issues, the Knauf portion of this litigation is largely resolved.

### B. The Chinese Defendants

The litigation against the Chinese entities has taken a different course. The Chinese Defendants in the litigation include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include the CNBM and BNBM Entities.

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. *See* Rec. Docs. 52 & 1-7 (Case

No. 09-6687). Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both of these cases. *See* Rec. Docs. 277 & 487.

Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the Preliminary Default in *Germano* on the Plaintiffs' claimed damages. *See* Rec. Docs. 502, 1223, 1258 & 2380. At this hearing, the Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases. Following this hearing on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. *See* Rec. Doc. 2380. On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of the Plaintiffs. Rec. Doc. 3013. On June 10, 2010, the last day to timely appeal, Taishan filed a Notice of Appeal of the Default Judgment in *Germano* and entered its appearance in *Germano* and *Mitchell.* Rec. Docs. 3668 & 3670.

After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. *See* Rec. Docs. 5436 & 5583. In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz.*

**\*3** Formal personal jurisdiction discovery of Taishan began in October 2010. *See* Rec. Docs. 5839 & 5840. Discovery has included the production of both written and electronic documents, as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery has often been contentious, requiring close supervision by the Court. The Court has presided over regularly-scheduled status conferences to keep the parties on track, and conducted hearings and issued rulings to resolve numerous discovery-related disputes. *See* Rec. Docs. 7136 & 7511.

In April 2012, Taishan filed various motions, including its motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL, and after a year-and-a-half of personal jurisdiction

discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the 11th Judicial Circuit Court of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss, and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal.

In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan and TTP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to voluntarily participate in this suit.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Rec. Doc. 17774. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt and ordered that Taishan pay $15,000.00 in attorney's fees to Plaintiffs' counsel; that Taishan pay $40,000.00 as a penalty for contempt; that Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process; and that if Taishan violates the injunction, it must pay a further penalty of 25-percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation. *See* Rec. Doc. 17869.

On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Rec. Doc. 17883. Taishan did not appear and, on September 26, 2014, this Court certified a class of

> [a]ll owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (i.e., not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2014 WL 4809520, at *16 (E.D. La. Sept. 26, 2014).

**\*4** Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid both the sum of $15,000.00 in attorney's fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015. Rec. Doc. 18764. On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists." Rec. Doc. 17869.

In March 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b). The Court determined that the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found that the commercial activity exception did not apply in this case, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because Plaintiffs failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation. *See* Rec. Doc. 20150.

On April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised in four separate motions filed by Defendants. Rec. Doc. 20739. The Court found that Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to BNBM. This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to Defendants, and the Court has jurisdiction over Defendants in relation to Plaintiffs' claims based on Louisiana law.

Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing, and adopted Plaintiffs' damage calculations methodology related to remediation of properties. Rec. Doc. 20741.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify interlocutory appeal from this Court's jurisdiction order. *See* Rec. Doc. 20779. Because the Court found that its Order and Reasons involves a controlling question of law as to which there is substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal from that Order and Reasons may materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol–Myers Squibb v. Superior Court of California*. Rec. Doc. 20882. Based on *BMS*, Defendants contest this Court's findings of personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argue that the *BMS* opinion impacts questions raised on appeal. *See* Rec. Doc. 20898-2 (*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 5th Cir. Docket 17-90027 (Pet. for Permission to Appeal)). On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order [1] to avoid piecemeal litigations. The Court noted its duty to address the effect of *Bristol–Myers Squibb* on the jurisdictional issue before certifying the matter to the Fifth Circuit. Subsequently, on November 30, 2017, the Court denied Defendants' motion

to dismiss, holding that *Bristol–Myers* does not change this Court's jurisdictional findings and class certification.

**\*5** On October 20, 2017, Defendants CNBM Company, BNBM Group and BNBM PLC filed the instant motion to vacate the Court's default judgments. Rec. Doc. 21050. Specifically, these Defendants argue there is good cause to set aside the default judgments in *Gross* (Case No. 09-6690) (Louisiana); *Wiltz* (Case No. 10-351) (Louisiana); *Amorin* (Case No. 11-1395) (Louisiana); and *Amorin* (Case No. 11-1673) (Virginia). This opinion addresses Defendants' request.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 55(c) states that a court "may set aside an entry of default for good cause." FED. R. CIV. P. 55(c). "In determining whether to set aside a default decree, the district court should consider whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented." *Matter of Dierschke*, 975 F.2d 181, 183 (5th Cir. 1992) (quoting *United States v. One Parcel of Real Property*, 763 F.2d 181, 183 (5th Cir. 1985)). These factors, however, are neither "talismanic" nor exclusive, and courts have relied on "other factors including, [for example,] whether: (1) the public interest was implicated, (2) there was a significant financial loss to the defendant, and (3) the defendant acted expeditiously to correct the default." *Id.* at 184 (citations omitted). "Whatever factors are employed, the imperative is that they be regarded simply as a means of identifying circumstances which warrant the finding of 'good cause' to set aside a default." *Id.* Generally, courts favor resolving actions on the merits; therefore, "federal courts should not be agnostic with respect to the entry of default judgments which are 'generally disfavored in the law.'" *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) (internal citation omitted). Ultimately, nonetheless, "the decision to set aside a default is committed to the sound discretion of the trial court." *Dierschke*, 975 F.2d at 183.

## III. PRESENT MOTION

### A. Movants' Arguments

Movants proffer three reasons to set aside the Court's default judgments. First, Movants argue that, under Pre-Trial Orders 1G and 1H, they had no duty to respond to any complaint until Plaintiffs both submitted a notice

of completion and filed a Master Complaint. Therefore, because they were not obligated to respond, Movants claim that their defaults cannot be deemed willful.

Specifically, Pre-Trial Order 1H states:

> The Court ... is aware of inquiries regarding whether the triggering mechanism has been initiated, in other words, whether the Notice has been filed or not. Once the Amendments are filed and service is perfected the PSC shall file a Notice. Thereafter, the PSC is directed to file a Master Complaint within 60 days of the filing of the PSC's Notice. **Only after the Master Complaint is filed will counsel for any defendant identified therein be required to file responsive pleadings within thirty (30) days thereof.** The PSC is directed to file on the last day of each month a status report regarding the progress of the activities set forth above.

Pre-Trial Order 1H; Rec. Doc. 6083 at 2 (emphasis added). Movants say that neither of those events— filing of a notice of completion and Master Complaint— had occurred at the time the Court entered the default judgments. It was not until April 16, 2017 that Plaintiffs filed a notice of completion, but they still continue to file complaints thereafter. Plaintiffs have never filed a Master Complaint. Movants claim that they cannot have willfully defaulted because responsive pleadings were not yet due.

**\*6** Furthermore, Movants argue that some service were improper because of multiple defects (*i.e.*, complaints were often unserved or served on the wrong company).

Second, Movants aver that setting aside the defaults would not prejudice Plaintiffs because Plaintiffs long have been required to preserve evidence.

Finally, Defendants claim they have meritorious defenses. Defendants argue that Plaintiffs have failed to establish the requisite causation between Plaintiffs' injuries and the Movants' conduct because (1) Plaintiffs have not demonstrated that the vast majority of Plaintiffs' homes contained Taishan drywall; (2) Plaintiffs have not shown that most, if not all, of Plaintiffs' properties contained generic drywall that could have been manufactured by any company; (3) any alleged BNBM PLC drywall products were not defective; and (4) neither CNBM nor BNBM Group ever manufactured drywall for sale into the United States, and they had no role in Taishan's sales of drywall. Moreover, Defendants argue that *Bristol–Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017) defeats this Court's jurisdiction to grant defaults over non-Louisiana property claimants. [2]

### B. Plaintiffs' Response

Plaintiffs bring attention to Movants' extensive attempts in evading this litigation from the onset, which led this Court to enter default judgments against the Chinese entities.

First, Plaintiffs highlight that Movants had knowledge of this litigation, and voluntarily chose to sit aside as proceedings were ongoing. Thus, Plaintiffs argue that good cause does not exist to set aside the defaults against CNBM, BNBM Group, and BNBM because Movants willfully made a calculated gamble to initially refuse to participate in this litigation.

Second, Plaintiffs emphasize that any further delay—with this case in its ninth year—would result in prejudice to Plaintiffs.

Third, Plaintiffs claim that Movants do not have any meritorious defenses because all such defenses have already been brought and rejected. Specifically, jurisdiction over Movants is conclusively established with this Court's Agency Order and subsequent ruling on *Bristol–Myers*'s impact on this litigation.

## IV. DISCUSSION

### A. This Court Has Already Held That Plaintiffs Have Properly Served Defendants.

As this Court previously noted in its April 21, 2017 Agency Order, " '[t]o acquire jurisdiction over the person, a court must serve on the person a document, such as a summons, notice, writ, or order.' " Rec. Doc. 20739 (quoting *McGuire v. Sigma Coatings*, 48 F.3d 902, 907

(5th Cir. 1995)) (citing *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (5th Cir. 1988) (*per curiam*)). Other circuits have reasoned that "service of process is not legally defective simply because the complaint misnames the defendant in some insignificant way." *Morrel v. Nationwide Mut. Fire Ins. Co.*, 188 F.3d 218, 224 (4th Cir. 1999). The Fifth Circuit has applied this reasoning in the context of arbitration awards reasoning that a "technical defect" did not render the district court's decision erroneous and "certainly does not require reversal." *Cigna Ins. Co. v. Huddleston*, 986 F.2d 1418 (5th Cir. 1993).

**\*7** "[T]he core function of service is to supply notice of the pendency of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections." *Henderson v. United States*, 517 U.S. 654, 672 (1996). The Hague Convention exists in order to facilitate service of process abroad and assure foreign defendants adequate notice. *Volkswagenwerk*, 486 U.S. at 704-05; *see also Burda Media, Inc. v. Viertel*, 417 F.3d 292, 300 (2d Cir. 2005) ("The Hague Convention of 1965 was intended to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time.") (internal quotation omitted). Thus, the essential issue is whether service of the Chinese Defendants provided the Movant Entities with adequate notice of this litigation.

Here, Movants are, once again, repeating previously litigated and settled arguments—even after this Court held that Movants had adequate notice of this litigation. In their motions to dismiss for lack of jurisdiction, CNBM, BNBM Group, and BNBM already contended that the complaints against them were not properly served for a variety of reasons, including failure to serve, failure to timely serve, failure to serve at the correct address, and failure to correctly name the Defendant. *See In re Chinese-Manufactured Drywall*, 2017 WL 1476595, at \*45 (E.D. La. Apr. 21, 2017). Nonetheless, this Court found that "everyone involved in the action ... knew of and could identify the entity being sued[,] and that the misnomer ... 'injured no one.' " *Id.* (citing *Huddleston*, 986 F.2d at 1418) (quoting *United States v. A.H. Fischer Lumber Co.*, 162 F.2d 872, 874 (4th Cir. 1947)). Therefore, the Court denied Defendants' motions to dismiss and vacate defaults for improper service.

Movants had adequate notice of this litigation as the record indicates. For instance, on May 28, 2010, BNBM announced it had been served with notice of the allegations against the company concerning defects in its Chinese Drywall, but rather than respond to the lawsuits, "[t]he Company and Taishan Gypsum w[ould] continue to keep an eye on the progress of the incident, and address and handle the same with due prudence, so as to be responsible to investors, consumers and the industry." *See* BNBM Announcement No. 2010-009 in Relation to Event about Gypsum Board in US dated 5/28/2010 ("So far as is known to the Company, the aggregate number of this kind of complaints [referring to gypsum board of BNBM] is approximately 3,000."); *see also* BNBM 2010 Annual Report at 36, 38 & 143; BNBM 2011 Annual Report at 39 & 108; BNBM 2012 Annual Report at 36; BNBM 2013 Annual Report at 35, 95 & 96; BNBM 2014 Annual Report at 37; BNBM Announcement dated 2/13/2015 ("Since 2010, BNBM has engaged one US well-known law firm for legal consultation services in relation to the gypsum board litigation in the US.").

The evidence here indicates that the Chinese entities received notice of this action and had sufficient time to present their defense—but they did not. Moreover, these entities have refused to accept service at various points in this history of this litigation. Based on the extensive procedural history of this case, the Court is convinced service on these entities satisfies due process. "To now argue these minor technical deficiencies should warrant dismissal is with regard to service of process disingenuous." *In re Chinese-Manufactured Drywall*, 2017 WL 1476595, at \*46.

Not only did the Movants fail to respond, but also failed to initially appear in this action. It was only after the Court certified the *Amorin* class and scheduled a hearing on class remediation damages that Movants decided to appear in the MDL in 2015—almost six years after suits were filed against them—to challenge Plaintiffs' evidence of damages, class certification, and the Court's jurisdiction over them. With this in mind, the Court now considers some factors to determine whether good cause exists to set aside the default judgments.

**B. Good Cause Does Not Exist To Set Aside Judgments.**

### 1. Whether the Default was Willful

**\*8** "A willful default is an 'intentional failure' to respond to litigation." *In re OCA, Inc.*, 551 F.3d 359, 370 n.32 (5th Cir. 2008) (quoting *Lacy*, 227 F.3d at 292). Defendants' motion mainly rests on one argument—that Pre-Trial Orders 1G and 1H did not require any defendants to answer until a notice of completion and master complaint are filed. Therefore, Defendants suggest that it was improper for this Court to enter default judgments against Movants for failure to make an appearance because they were not obligated to answer.

Not so. Movants pinpoint this technicality to reason out of the default judgments. But never in their motion have Movants represented that they detrimentally relied on the language of PTO 1G and 1H as to not even appear before this Court in the first place. They merely point out the processes in which this Court established to promote efficiency in dealing with mass complaints. These procedures, nonetheless, never relinquished any defendants' obligation to participate in this litigation. Even though Movants had notice of this litigation early on when Plaintiffs filed their complaints, Movants chose not to appear or participate.

Even assuming *arguendo* that Defendants indeed failed to answer the complaints because Plaintiffs have not filed a notice of completion and a master complaint (which does not seem to be the case), Movants still did not make an appearance or participate until six years after the litigation commenced. Pre-Trial Order 1G, entered on May 27, 2010, clearly requires that "... counsel shall enter their appearance on behalf of their client(s) within twenty (20) days after service of a Complaint on a defendant." PTO 1G at 2. The Fifth Circuit has held that "[a] defendant's failure to appear is grounds for a default judgment." *Trang v. Bean*, 600 Fed. Appx. 191, 193 (5th Cir. 2015) (citing FED. R. CIV. P. 55(a)). Indeed, in *Metro. Life Ins. Co. v. Scott*, another section of this Court found that "a willful failure to participate in [ ] proceedings justifies entry of a default judgment." No. CV 15-362, 2015 WL 8478531, at \*2 (E.D. La. Dec. 10, 2015).

Likewise, the Second Circuit has also held that a defendant's failure to appear, failure to respond to a complaint, and failure to respond to a motion sufficiently demonstrate willfulness. *See United States v. Myers*, 236 F. Supp. 3d 702, 707 (E.D.N.Y. 2017); *see, e.g., S.E.C. v. McNulty*, 137 F.3d 732, 738-39 (2d Cir. 1998) (unexplained failure to respond to complaint indicates willfulness); *Indymac Bank v. Nat'l Settlement Agency, Inc.*, No. 07 Civ. 6865, 2007 WL 4468652, at \*1 (S.D.N.Y. Dec. 20, 2007) (finding defendants' failure to appear, failure to respond to the complaint and failure to respond to a motion for default judgment indicates willful conduct); *U.S. v. DiPaolo*, 466 F. Supp. 2d 476, 482 (S.D.N.Y. 2006) (grounds for default judgment were established by defendant's failure to answer the complaint, particularly in light of the fact that the defendant had expressed no intention to do so at a later time).

In this case, Plaintiffs' discovery has uncovered indications that Movants' early absence in this litigation was a calculated strategy—rather than a misunderstanding of this Court's pre-trial orders. Almost a year before Movants made an appearance before this Court, CNBM announced:

> Although the US lawyers of BNBM and Taishan Gypsum estimate that the damages that might be imposed in the US court's default judgments for the gypsum board cases might be very large, since the major assets of the Company, BNBM and Taishan Gypsum are all located in China, according to the US and Chinese lawyers whom BNBM and Taishan Gypsum have respectively consulted, there is no convention or treaty on mutual recognition and enforcement of judgments between China and the US such that the possibility of the US judgments being enforced in China is very low. Therefore, based on information currently available to the Company, the Company believes that the US courts' judgments will not result in significant economic loss to the Group and will not have material adverse impact on the Group's production and operation.

**\*9** CNBM Voluntary Announcement on Development of Gypsum Board Litigation in the U.S. dated July 18, 2014; *see also* BNBM Announcement dated July 18, 2014; CNBM Voluntary Announcement: Updates on Recent Development in the Gypsum Board Litigation in the U.S. dated August 20, 2014; CNBM Announcement dated February 13, 2015; BNBM Announcement dated February 13, 2015.

Such deliberate avoidance of litigation is precisely what default judgments aim to deter. As the United States Court of Appeals for the District of Columbia Circuit explained in *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, "a default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party." 432 F.2d 689, 691 (D.C. Cir. 1970). "In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights. The default judgment remedy serves as such a protection. Furthermore, the possibility of a default is a deterrent to those parties who choose delay as part of their litigative strategy." *Id.*

In this case, the Court is disheartened that delay tactics have permeated every aspect of Defendants' litigation strategy: from their initial failure to appear to their now perpetual motions to re-litigate settled matters. This Court recognizes that entry of default judgments are "generally disfavored in the law." *See Lacy*, 227 F.3d 292. But when Movants had refused to participate—for years—this Court had limited recourse: An entry of default was necessary to advance the case in the interest of fairness and justice to all litigants and avoid further delays. Given Movants' initial blatant disregard, the Court was forced to enter default judgments against Defendants.

Now, after multiple default judgments, Movants argue that those entries were unjustified. Movants contend that "willfulness" to default requires culpability and that they cannot be found willful because they were not obligated to respond yet. To support their position, Movants cite to *Artec Grp., Inc. v. Klimov*, where a district court in California held: "In assessing whether a defendant has engaged in culpable conduct, a court cannot treat a defendant 'as culpable simply for having made a conscious choice not to answer [or litigate]; rather, ... the [defendant] must have acted with bad faith, such as an 'intention to take advantage of the opposing party, interfere with

judicial decisionmaking, or otherwise manipulate the legal process.' " No. 15-CV-03449-EMC, 2017 WL 4098801, at \*1 (N.D. Cal. Sept. 15, 2017) (citation omitted).

*Artec* can be distinguished. There, the defendant had initially participated and "mounted a vigorous defense" when the lawsuit was filed. *Id.* at \*2. The *Artec* defendant "pursu[ed] its arguments that it should not be a party to this litigation. But once it had exhausted these arguments [via its motion to dismiss for lack of personal jurisdiction and motion to dismiss for failure to state a claim for relief] and was faced with [plaintiff's] legitimate claims against it and the relevant discovery, [the defendant] claimed to no longer be able to afford U.S. litigation." *Id.* The district court held that it was "not unreasonable" for the cash-strapped defendant to "conclude that it was no longer financially worthwhile to defend the lawsuit, but to still try to contest the default judgment motion which could render it financially liable and to still try to settle the dispute." *Id.* In this case, however, Movants had refused to participate in the litigation since the beginning —even before PTO 1G and 1H were entered. That is quite different from the *Artec* defendant who appeared and challenged jurisdiction, but eventually defaulted because it could not afford litigation.

**\*10** Movants also cite to *Henderson v. Compass Groups* to support their argument that a party cannot be held in default until it has failed to timely respond to the operative complaint in the litigation. *See* No. CIV.A. 10-447-RET, 2010 WL 3488137, at \*1 (M.D. La. Aug. 30, 2010). There, the *pro se* plaintiff requested the court to prematurely enter judgment even though defendant's response to the complaint was not yet due. *Id.* The court denied plaintiff's motion because the defendant could still respond and the "plaintiff has put forth no evidence that the defendant has elected not to answer the complaint." *Id.* In this case, nonetheless, ample evidence suggested to this Court from 2009 to 2015 that Movants had no intention to participate in this litigation. Accordingly, default judgments were entered.

From the record, it seems to this Court that Movants' refusal to participate was deliberate. Movants had knowledge of the ongoing litigation prior to the default judgments. Pursuant to Pre-Trial 1G, defendants were required, at the very least, to enter an appearance within 20 days of receiving the complaint. They did not, however, make an appearance until after this Court issued default

judgments and scheduled a hearing on class remediation damages in 2015. And Movants did not dispute these default judgments until October 20, 2017—after their jurisdictional and class certification challenges failed. Pre-Trial Orders 1G and 1H do not provide Movants with good cause to set aside defaults because Movants had actual notice of this litigation from the outset, but voluntarily decided not to make an appearance until after the default judgments were entered. Therefore, the Court finds that Movants' early absence and refusal to participate did not arise from detrimental reliance or confusion of the Court's pre-trial orders. Instead, it was, in whole or in part, willful.

"A finding of willful default ends the inquiry, for when the court finds an intentional failure of responsive pleadings there need be no other finding." *Lacy*, 227 F.3d at 292. Although such a finding of willful default is sufficient to end the instant inquiry, this Court will review other factors. Considering the totality—Movants' initial absence and the below factors—the Court finds that the entries of defaults were reasonable and within the Court's discretion.

### 2. Prejudice to Plaintiff

Nearing its ninth year, this case involving the Chinese Entities has only made glacial progress. This MDL was consolidated in 2009. Movants did not make an appearance until 2015. And now, in 2018, Movants are asking this Court to go back to square one.

Meanwhile, plaintiffs here—thousands of them—are still without remedy after installing defective Chinese drywalls and suffering from them. Additionally, Plaintiffs have expended significant time and money in this litigation. Any further delays would undeniably prejudice the plaintiffs.

### 3. Meritorious Defense

Movants claim that *Bristol–Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017) removes this Court of personal jurisdiction over non-Louisiana plaintiffs; therefore, Movants argue that this Court did not have jurisdiction to enter default judgments in those cases. The Court has already held that

*BMS* does not apply to this MDL, and now incorporates that prior ruling herein. *See generally In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. MDL 09-2047, 2017 WL 5971622 (E.D. La. Nov. 30, 2017). Accordingly, Movants' jurisdictional challenge is are not a meritorious defense.

Furthermore, as this Court previously recognized, "[g]iven that the defectiveness and corrosive effect of Chinese drywall is well-established, defendants are in default, [and] there is no contributory negligence.... [T]his Court already entered a liability judgment, [and] the only issue currently pending before the Court is the amount of damages which should be awarded to the Plaintiffs in order to accomplish the necessary remediation." *Chinese-Manufactured Drywall*, 2017 WL 1421627 at *9. Conducting discovery to measure the footage of Chinese-manufactured drywall in plaintiffs' homes and to determine property damages alleviates Movants' concerns that some properties may not contain Taishan or BNBM PLC drywall. Furthermore, Defendants will have an opportunity to challenge plaintiffs' discovery and measurements of Taishan-manufactured drywall. Accordingly, utilizing the class-wide formula in *Amorin* to calculate property damages is the proper next step in this litigation.

**\*11** Because jurisdiction and liability are firmly established in this case, this Court finds that Movants have not presented any viable defense. Any meritorious defense that Defendants now raise is speculative at best.

### 4. Public Interest

As this Court and the Fifth Circuit recognized in its opinions concerning Taishan, "the public has an interest in seeing that persons harmed by defective, foreign products be accorded relief for their damages." *Chinese-Manufactured Drywall*, 894 F. Supp. 2d 819, 864 (E.D. La. 2014); *Chinese-Manufactured Drywall*, 753 F.3d 521, 545 (5th Cir. 2014); *Chinese-Manufactured Drywall*, 742 F.3d 576 (5th Cir. 2014). The same holds here.

### 5. Significant Financial Loss

The Court recognizes that Movants will suffer financial losses if ordered to pay under the Default Judgments.

At the same time, however, Movants have benefitted financially from their agency relationship with Taishan from its earnings in drywall sales in the United States.

### 6. Whether Defendants Acted Expeditiously

As explained above, Movants did not act expeditiously upon receiving service of the Complaint. Movants did not make an appearance when they were first served. Instead, they waited six years—after the Court entered default judgments—before participating in this litigation, and waited two more years before filing the instant motion to vacate. Accordingly, the Court finds that Movants need to take responsibility for causing delay in this litigation.

### V. CONCLUSION

Considering the aforementioned reasons, accordingly,

**IT IS ORDERED** that Defendants CNBM Company, BNBM Group, and BNBM PLC's motion to vacate the Court's default judgments (Rec. Doc. 21050) is hereby **DENIED**.

### All Citations

Slip Copy, 2018 WL 279629

### Footnotes

1    Following the Order vacating this Court's 28 U.S.C. § 1292(b) certification, the Fifth Circuit denied Defendants' petition for permission to appeal.

2    The instant motion to vacate was filed on October 20, 2017 before the Court issued its ruling on the impact of *Bristol–Myers* in this litigation. On November 30, 2017, this Court held that the Supreme Court's decision in *Bristol–Myers* does not defeat the Court's jurisdiction over non-resident plaintiffs in the current litigation. Therefore, the Court denied Defendants' motion to dismiss.

**End of Document**        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:11-cv-00377-MSD-RJK Document 71-17 Filed 01/18/19 Page 1 of 36 PageID# 877

# JOINT APPENDIX TAB # 17

2018 WL 3972041
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

IN RE: CHINESE-MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION
This Document Relates to:
All Amorin Virginia Cases

MDL NO. 2047
|
Signed 08/20/2018

SECTION L (5)

SUGGESTION OF REMAND,
OPINION AND ORDER

ELDON E. FALLON, United States District Judge

I. BACKGROUND

 *1  From 2004 through 2006, a housing boom in parts
of the United States and rebuilding efforts necessitated
by Hurricanes Rita and Katrina in the Gulf South led to
a shortage of construction materials, including drywall.
As a result, drywall manufactured in China was brought
into the United States and used to construct and refurbish
homes in coastal areas of the country, notably the Gulf
Coast and East Coast. Sometime after the installation
of the Chinese drywall, homeowners began to complain
of emissions of foul-smelling gas, the corrosion and
blackening of metal wiring, surfaces, and objects, and
the breaking down of appliances and electrical devices
in their homes. See In re Chinese-Manufactured Drywall
Prods. Liab. Litig., 894 F. Supp. 2d 819, 829–30 (E.D. La.
2012), aff'd, 742 F.3d 576 (5th Cir. 2014). Many of these
homeowners also began to complain of various physical
afflictions believed to be caused by the Chinese drywall.

These homeowners then began to file suit in
various state and federal courts against homebuilders,
developers, installers, realtors, brokers, suppliers,
importers, exporters, distributors, and manufacturers who
were involved with the Chinese drywall. Because of the
commonality of facts in the various cases, this litigation
was designated as a multidistrict litigation. Pursuant to a
Transfer Order from the United States Judicial Panel on

Multidistrict Litigation on June 15, 2009, all federal cases
involving Chinese drywall were consolidated for pretrial
proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured
by two groups of defendants: (1) the Knauf Entities and
(2) the Taishan Entities. The litigation has focused upon
these two entities and their downstream associates, and
has proceeded on strikingly different tracks for the claims
against each group.

II. PROCEDURAL HISTORY AND RULINGS THAT
MIGHT AFFECT FUTURE PROCEEDINGS

A. The Knauf Defendants
The Knauf Entities are German-based, international
manufacturers of building products, including drywall,
whose Chinese subsidiary, Knauf Plasterboard (Tianjin)
Co., Ltd. ("KPT"), advertised and sold its Chinese drywall
in the United States. The Knauf Entities are named
defendants in numerous cases consolidated with the MDL
litigation and litigation in state courts.

The Knauf Entities first entered their appearance in the
MDL litigation on July 2, 2009. Thereafter, the Court
presided over a bellwether trial in Hernandez v. Knauf Gips
KG, Case No. 09-6050, involving a homeowner's claims
against KPT for defective drywall. The Court found in
favor of the plaintiff family in Hernandez, issued a detailed
Findings of Fact and Conclusions of Law, and entered
a Judgment in the amount of $164,049.64, including
remediation damages in the amount of $136,940.46—
which represented a remediation cost of $81.13 per square
foot based on the footprint square footage of the house.

Subsequently, the Knauf Entities agreed to institute a pilot
remediation program utilizing the remediation protocol
formulated by the Court from the evidence in Hernandez.
The Knauf pilot remediation program is now completed
and has remediated more than 2,200 homes containing
KPT Chinese drywall using the same general protocol. At
the Court's urging, the parties began working together to
monetize this program and make it available to a broader
class of plaintiffs.

 *2  On December 20, 2011, the Knauf Entities and the
PSC entered into a global, class Settlement Agreement
("Knauf Settlement Agreement"), which was designed
to resolve all Knauf-related, Chinese drywall claims. In

addition to the Knauf Settlement Agreement and after a jury trial in a bellwether case, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. The total amount of the Knauf Settlement is approximately $1.1 billion.

The Lead Contractor in the Knauf Settlement, Moss & Associates, managed the remediation for program homes and condominium units. Remediation is complete on approximately 2,209 homes and 633 condominiums. To date, Moss has mailed out 2,847 Work Authorization packets to homeowners in the various states. Moss has received 2,847 executed Work Authorization packets, and no Work Authorization packets are outstanding.

Although the Court occasionally had to deal with settlement administration and enforcement issues, with the assistance of Special Master Dan Balhoff, the Knauf portion of this litigation is now resolved.

### B. The Chinese Defendants

The litigation against the Chinese entities has taken a different course. The Chinese Defendants in the litigation include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include the CNBM and BNBM Entities.

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both of these cases.

Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the preliminary default in *Germano* on the Plaintiffs' claimed damages. At this

hearing, the Plaintiffs presented evidence specific to seven individual properties, which served as bellwether cases. Following this hearing on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of the Plaintiffs. On June 10, 2010, the last day to timely appeal, Taishan filed a Notice of Appeal of the Default Judgment in *Germano* and entered its appearance in *Germano* and *Mitchell*. Taishan challenged this Court's jurisdiction over the Defendants. As a result, because this was the first instance where Defendants raised jurisdictional issues, the Fifth Circuit remanded the case to this Court to determine whether this Court indeed has jurisdiction over Taishan.

After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

**\*3** Formal personal jurisdiction discovery of Taishan began in October 2010. Discovery has included the production of both written and electronic documents, as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery has often been contentious, requiring close supervision by the Court. The Court has presided over regularly-scheduled status conferences to keep the parties on track, and conducted hearings and issued rulings to resolve numerous discovery-related disputes.

The first Taishan depositions were held in Hong Kong on April 4–8, 2011. Thirteen attorneys traveled to Hong Kong and deposed several Taishan witnesses. However, upon return to the United States, several motions were filed seeking to schedule a second round of Taishan depositions as a result of problems during the depositions and seeking discovery sanctions against Taishan. The Court, after reviewing the transcripts from the depositions, concluded that the depositions were ineffective because of disagreement among interpreters, counsel and witnesses, translation difficulties, speaking

objections, colloquy among counsel and interpreters, and in general, ensuing chaos.

The Court scheduled the second round of Taishan depositions for the week of January 9, 2012 in Hong Kong. Due to the problems experienced at the first deposition, the Court appointed a Federal Rule of Evidence 706 expert to operate as the sole interpreter at the depositions. Counsel for the interested parties and the Court traveled to Hong Kong for these depositions. Because the Court was present at the depositions, objections were ruled upon immediately and the majority of problems which plagued the first round of depositions were absent. Also, the Court was able to observe the comments, intonation, and body language of the deponents. Upon return from Hong Kong, the parties informed the Court that minimal further discovery was necessary before briefing could be submitted on Taishan's personal jurisdiction challenges.

In April 2012, Taishan filed various motions, including its motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL, and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the Florida state court, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano, Mitchell, Gross*, and *Wiltz*, in which the Court denied the motions to dismiss, and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG and TPP. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal.

In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan, TG and TPP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became

firmly and finally settled. Nevertheless, Taishan refused to voluntarily participate in this suit.

**\*4** On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt and ordered that Taishan pay $15,000.00 in attorney's fees to Plaintiffs' counsel; that Taishan pay $40,000.00 as a penalty for contempt; that Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process; and that if Taishan violates the injunction, it must pay a further penalty of 25-percent of the profits earned by the Company or its affiliates who violate the Order for the year of the violation.

On July 23, 2014, Plaintiffs filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Taishan did not appear and, on September 26, 2014, this Court certified a class of all owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin, Germano, Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid both the sum of $15,000.00 in attorney's fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015. On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."

In March 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b). The Court determined that the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 403 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2018) Page 5 of 36 PageID #: 881
2018 WL 3972041

that the commercial activity exception did not apply in this case, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because Plaintiffs failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.

On April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised in four separate motions filed by Defendants. The Court found that Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to BNBM. This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to Defendants, and the Court has jurisdiction over Defendants in relation to Plaintiffs' claims based on Louisiana law.

Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing, and adopted Plaintiffs' damage calculations methodology related to remediation of properties.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify interlocutory appeal from this Court's jurisdiction order. Because the Court found that its Order and Reasons involves a controlling question of law as to which there is substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal from that Order and Reasons may materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

**\*5** On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol–Myers Squibb v. Superior Court of California.* Based on *Bristol-Myers*, Defendants contest this Court's findings of personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argue that the *BMS*

opinion impacts questions raised on appeal. On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order to avoid piecemeal litigations. The Court noted its duty to address the effect of *Bristol–Myers* on the jurisdictional issue before certifying the matter to the Fifth Circuit. Subsequently, on November 30, 2017, the Court denied Defendants' motion to dismiss, holding that *Bristol–Myers* does not change this Court's jurisdictional findings and class certification.

On January 2, 2018, the Court denied Defendants CNBM Company, BNBM Group, and BNBM PLC's motion to vacate the default judgments against them.

On March 5, 2018, the Court reinstated its order to certify interlocutory appeal of its April 2017 jurisdiction opinion arising from the Chinese Defendants' agency relationship. The Court, nevertheless, denied Defendants' request to certify the interlocutory appeal of its opinion involving *Bristol–Myers*'s impact (or lack thereof) on the Court's personal jurisdiction analysis. First, the Supreme Court's opinion in *Bristol–Myers* does not address class actions, and therefore is inapplicable to this MDL. Second, two separate panels on the Fifth Circuit have already reaffirmed the Court's original personal jurisdiction analysis in 2014. Any further litigation on the issue of personal jurisdiction for the Chinese Defendants would cause needless delay and waste judicial resources.

### III. SUGGESTION OF REMAND
After managing this MDL for nine years, the Court concludes that the purposes behind consolidating these related actions in this Court have now been served. The Court has addressed numerous discovery disputes, dispositive motions, and other pretrial issues involving facts and legal questions common to the various cases in this MDL proceeding. No further pretrial motions raising common questions are pending in these cases, and remand to the transferor courts appears to be in the interest of judicial efficiency and fairness to the parties.

Given the extensive motions practice and bellwether trials that have occurred in this MDL, the Court finds it appropriate to transfer the cases back to the transferor courts, beginning with cases from Florida, and now including cases from Virginia. This Court recognizes that parties may still need to conduct some discovery before trial. Nevertheless, this discovery is case-specific; thus, it can, and perhaps should, be supervised by the transferor

court. This Court has worked diligently for the past nine years, and transfer courts and parties are now equipped with abundant resources—evidence produced in discovery, a trial package, trial binders, and judicial opinions on numerous issues—to steer these cases to a fair and just conclusion. In particular, this Court has established and approved a class-wide, evidence-based formula and methodology to calculate property damages involving defective drywall. The transferor courts are strongly encouraged to utilize this formula to determine the appropriate award in each individual case. At this point in the litigation, centralizing these cases has minimal benefit to parties; local courts are well-suited to evaluate the property damages and other losses incurred by plaintiffs.

### IV. COMMON BENEFIT WORK

Attorneys in this MDL—in particular, the PSC —have expended significant resources and made substantial common-benefit contributions to the *Chinese-Manufactured Drywall* litigation. All counsel on the PSC or authorized by the PSC to do common benefit work are highly skilled and very capable professionals. Therefore, these attorneys should be entitled to the fair and equitable assessment of any potential recovery for the services performed and expenses incurred by attorneys acting for MDL administration and common benefit of all plaintiffs in this complex litigation. *See In re FedEx Ground Package Sys., Inc. Employment Practices Litig.*, No. 3:05-MD-527 RM, 2010 WL 785279, at *5–6 (N.D. Ind. Mar. 2, 2010).

**\*6** "The effect of an order remanding a case to the transferor court for trial is to divest the transferee court of jurisdiction in the case and to vest the transferor court with jurisdiction." *Id.* (citing DAVID F. HERR, Multidistrict Litigation Manual, § 10:5 (2005) ). "The Panel's power to sever and remand a portion of an action is limited to entire claims. The Panel cannot remand only part of a claim or only certain factual issues." *Id.* (citation omitted).

The award of attorney's fees, nevertheless, is a "collateral matter over which a court normally retains jurisdiction even after being divested of jurisdiction on the merits." *Id.*; *In re Zyprexa Prods. Liab. Litig*, 467 F. Supp. 2d 256, 274 (E.D.N.Y. 2006) (citations omitted); *see also In re Zyprexa Prods. Liab. Litig*, 594 F.3d 113, 2010 WL 367556, * 10 (2d Cir. 2010) (stating that an order imposing an assessment to create a fund that could be used to compensate attorneys who demonstrate that their efforts conferred a benefit on the plaintiffs generally is "even less related to the ultimate merits than orders awarding attorney's fees, which are collateral matters over which a court retains jurisdiction even if it ultimately is determined to lack subject matter jurisdiction"). Accordingly, because the fees awarded to the MDL attorneys for the common benefit of all plaintiffs is a collateral issue separate from the merits of this case, the Court suggests that it retain jurisdiction to consider the fair and equitable assessment of any potential recovery for the services performed and expenses incurred by attorneys acting for administration and common benefit of all MDL plaintiffs.

### V. CONCLUSION

Based on the foregoing reasons and pursuant to Rule 10.1(b)(i) of the Rules of the Judicial Panel on Multidistrict Litigation, the Court **SUGGESTS** that the cases listed in Appendix A be remanded to the transferor courts in Virginia for trial or further proceedings. The cases on the attached list involve property located in Virginia and were named in a class action complaint filed in the Eastern District of Virginia, *Amorin, et al. v. Taishan Gypsum Co., Ltd. et al.*, 2:11-cv-00377 (E.D. Va.), which was transferred to MDL 2047. *See Amorin, et al. v. Taishan Gypsum Co., Ltd., et al.*, 11-cv-1673 (E.D. La.). Here, Appendix B is that *Amorin* class action complaint, which was originally filed in the Eastern District of Virginia. Appendix C is a copy of the Panel's conditional transfer order, which transferred said Virginia *Amorin* case to this Court on July 19, 2011. The Court further **SUGGESTS** that this Court retain jurisdiction to consider the fair and equitable assessment of any potential recovery for the services performed and expenses incurred by attorneys acting for administration and common benefit of all MDL plaintiffs.

**IT IS SO ORDERED.**

Attachment A

2018 WL 3972041

*In re Chinese-Manufactured Drywall Products Liability Litigation , MDL No. 2047*
*Amorin Claimants-Virginia*

In re Chinese-Manufactured Drywall Products Liability Litigation , MDL No. 2047
Amwin Claimants-Virginia

Page 5

Page 7

In re Chinese-Manufactured Drywall Products Liability Litigation , MDL No. 2047
Amwin Claimants-Virginia

Page 6

Page 8

In re: Chinese-Manufactured Drywall Products Liability Litigation , MDL No. 2047
Amorin Claimants- Virginia

In re: Chinese-Manufactured Drywall Products Liability Litigation , MDL No. 2047
Amorin Claimants- Virginia

In re: Chinese-Manufactured Drywall Products Liability Litigation , MDL No. 2047
Amorin Claimants- Virginia

In re: Chinese-Manufactured Drywall Products Liability Litigation , MDL No. 2047
Amorin Claimants- Virginia

Page 9

Page 11

Page 10

Page 13

Attachment B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

EDUARDO AND CARMEN AMORIN; KENNETH ABEL; ARLEDYS GALLARDO; CHARMAINE FONG; PERRY AND CASSANDRA FONTENOT; JULIANNE AND JOSHUA FRANKZE; BRYON HAND; LAURA HAYA, DANIEL HAYA AND IRENE HAYA; ROBERT POPOVITCH; JASON PURSE; JOSEPH QUARTARARO; FRANK AND YVONNE TOPF; CATHY PARKER VAPY; HUGH AND TRACY VEST; AND KENNETH AND BARBARA WILTZ, **individually, and on behalf of all others similarly situated, Plaintiffs,**

*7 **v.**

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD.; QINHUANGDAO TAISHAN BUILDING MATERIALS CO., LTD. A/K/A QINHUANG DAO TAISHAN BUILDING; MATERIALS CO., LTD.; BEIJING NEW BUILDING MATERIALS PUBLIC LIMITED CO.; CHINA NATIONAL BUILDING MATERIAL CO., LTD.; BEIJING NEW BUILDING MATERIALS (GROUP) CO., LTD.; CHINA NATIONAL BUILDING MATERIALS GROUP CO.; CNBM USA CORP.; BNBM OF AMERICA, INC.; BNBM USA; UNITED SUNTECH CRAFT, INC.; CNBMI CO., LTD.; CHANGZHOU YINHE WOOD INDUSTRY CO., LTD.; FUXIN TAISHAN GYPSUM AND BUILDING MATERIAL CO., LTD.; HUBEI TAISHAN BUILDING MATERIAL CO., LTD.; JINAN RUN & FLY NEW MATERIALS CO., LTD.; NANHAI SILK IMP. & EXP. CORPORATION; PINGYI BAIER BUILDING MATERIALS CO., LTD.; QINHUANGDAO TAISHAN BUILDING MATERIAL CO., LTD.; SHANGHAI YU YUAN IMP & EXP CO., LTD.; SINKIANG TIANSHAN BUILDING MATERIAL AND GYPSUM PRODUCT CO., LTD.; SUNRISE BUILDING MATERIALS LTD.; TAI'AN JINDUN BUILDING MATERIAL CO., LTD.; TAISHAN GYPSUM CO., LTD. LUCHENG BRANCH; TAISHAN GYPSUM (BAOTOU) CO., LTD.; TAISHAN GYPSUM (CHONGQING) CO., LTD.; TAISHAN GYPSUM (HENAN) CO., LTD.; TAISHAN GYPSUM (PINGSHAN) CO., LTD.; TAISHAN GYPSUM (PIZHOU) CO., LTD.; TAISHAN GYPSUM (TONGLING) CO., LTD.; TAISHAN GYPSUM (XIANGTAN) CO. LTD.; YUNAN TAISHAN GYPSUM AND BUILDING MATERIAL CO.,

LTD.; SHAANXI TAISHAN GYPSUM CO., LTD.; TAISHAN GYPSUM (HENGSHUI) CO., LTD.; TAISHAN GYPSUM (JIANGYIN) CO., LTD.; TAISHAN GYPSUM (WENZHOU) CO., LTD.; BEIJING NEW MATERIAL INCUBATOR CO., LTD.; QINGDAO YILIE INTERNATIONAL TRADE CO., LTD.; SHANGHAI EAST BEST ARTS & CRAFTS CO., LTD.; SIIC SHANGHAI INTERNATIONAL TRADE (GROUP) CO., LTD.; TIANJIN TIANBAO CENTURY DEVELOPMENT CO., LTD.; SHANDONG ORIENTAL INTERNATIONAL TRADING CORP.; LIANYUNGANG YUNTAI INTERNATIONAL TRADE CO., LTD.; SHANGHAI YUYUAN MARKET IMPORT & EXPORT CO., LTD.; ORIENT INTERNATIONAL HOLDING SHANGHAI FOREIGN TRADE CO., LTD.; QINGDAO AONI DECORATION BOARD AND MATERIALS CO., LTD.; BEIJING BUILDING MATERIALS IMPORT & EXPORT CO., LTD.; TAIAN TAIGAO TRADING CO., LTD.; NANTONG ECONOMIC AND TECHNOLOGICAL DEVELOPMENT ZONE CORPORATION; QINGDAO KANGHONG IMPORT AND EXPORT CO., LTD.; ZHEJIANG PROVINCIAL SECOND LIGHT INDUSTRY ENTERPRISES GROUP IMP. & EXP. CO., LTD.; SIIC SHANGHAI INTERNATIONAL TRADE GROUP PUDONG CO., LTD.; JIANGSU SAINTY INTERNATIONAL ECONOMIC & TECHNICAL COOPERATION CO., LTD.; ZIBO INTERNTIONAL ECONOMIC AND TECHNICAL COOPERATION CORPORATION; SHANGHAI KAIDUN DEVELOPMENT CO., LTD.; SHANGHAI YUJIN INDUSTRY CO., LTD.; HANGZHOU GREAT IMPORT AND EXPORT CO., LTD.; XUZHOU HANBANG GLOBAL TRADE CO., LTD.; CHINA XUZHOU INTERNATIONAL ECONOMIC & TECHNOLOGICAL COOPERATION CO., LTD.; JIANGSU EASTHIGH GROUP IMPORT & EXPORT CO., LTD.; AND QINGDAO JOY INDUSTRIAL & DEVELOPMENT CO., LTD., **Defendants.**

Civil Action No. 2:11 CV 377

CLASS ACTION COMPLAINT

JURY TRIAL DEMAND

PLAINTIFFS' CLASS ACTION COMPLAINT

2018 WL 3972041

Pursuant to Fed. R. Civ. P. 23, the class representatives in this action bring suit on behalf of themselves and all other similarly situated owners and residents of real property containing problematic Chinese manufactured drywall that was designed, manufactured, imported, distributed, delivered, supplied, marketed, inspected, or sold by the Defendants. Each of the class representatives is pursuing a nationwide class action against Beijing New Building Materials Public Limited Co. ("BNBM"); China National Building Material Co., Ltd.; Beijing New Building Materials (Group) Co., Ltd. ("BNBM Group"); China National Building Materials Group Co. ("CNBM Group"); CNBM USA Corp.; BNBM of America, Inc.; BNBM USA; United Suntech Craft, Inc. ("United Suntech"); CNBMI Co., Ltd. ("CNBMI"); Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd.; Taian Taishan Plasterboard Co., Ltd. ("TTP"); and Qinhuangdao Taishan Building Materials Co., Ltd. a/k/a Qinhuang Dao Taishan Building Materials Co., Ltd. ("Qinhuangdao"); Changzhou Yinhe Wood Industry Co., Ltd.; Fuxin Taishan Gypsum And Building Material Co., Ltd.; Hubei Taishan Building Material Co., Ltd.; Jinan Run & Fly New Materials Co., Ltd.; Nanhai Silk Imp. & Exp. Corporation; Pingyi Baier Building Materials Co., Ltd.; Qinhuangdao Taishan Building Material Co., Ltd.; Shanghai Yu Yuan Imp & Exp Co., Ltd.; Sinkiang Tianshan Building Material And Gypsum Product Co., Ltd.; Sunrise Building Materials Ltd.; Tai'an Jindun Building Material Co., Ltd.; Taishan Gypsum Co., Ltd. Lucheng Branch; Taishan Gypsum (Baotou) Co., Ltd.; Taishan Gypsum (Chongqing) Co., Ltd.; Taishan Gypsum (Henan) Co., Ltd.; Taishan Gypsum (Pingshan) Co., Ltd.; Taishan Gypsum (Pizhou) Co., Ltd.; Taishan Gypsum (Tongling) Co., Ltd.; Taishan Gypsum (Xiangtan) Co. Ltd.; Yunan Taishan Gypsum And Building Material Co., Ltd.; Shaanxi Taishan Gypsum Co., Ltd.; Taishan Gypsum (Hengshui) Co., Ltd.; Taishan Gypsum (Jiangyin) Co., Ltd.; Taishan Gypsum (Wenzhou) Co., Ltd.; Beijing New Material Incubator Co., Ltd.; Qingdao Yilie International Trade Co., Ltd.; Shanghai East Best Arts & Crafts Co., Ltd.; Siic Shanghai International Trade (Group) Co., Ltd.; Tianjin Tianbao Century Development Co., Ltd.; Shandong Oriental International Trading Corp.; Lianyungang Yuntai International Trade Co., Ltd.; Shanghai Yuyuan Market Import & Export Co., Ltd.; Orient International Holding Shanghai Foreign Trade Co., Ltd.; Qingdao Aoni Decoration Board and Materials Co., Ltd.; Beijing Building Materials Import & Export Co., Ltd.; Taian Taigao Trading Co., Ltd.; Nantong Economic and Technological Development Zone Corporation; Qingdao Kanghong Import and Export Co., Ltd.; Zhejiang Provincial Second Light Industry Enterprises Group Imp. & Exp. Co., Ltd.; SIIC Shanghai International Trade Group Pudong Co., Ltd.; Jiangsu Sainty International Economic & Technical Cooperation Co., Ltd.; Zibo Interntional Economic and Technical Cooperation Corporation; Shanghai Kaidun Development Co., Ltd.; Shanghai Yujin Industry Co., Ltd.; Hangzhou Great Import and Export Co., Ltd.; Xuzhou Hanbang Global Trade Co., Ltd.; China Xuzhou International Economic & Technological Cooperation Co., Ltd.; Jiangsu Easthigh Group Import & Export Co., Ltd.; and Qingdao Joy Industrial & Development Co., Ltd. (collectively "the Taishan Defendants"). Each of the Defendants in this action arc liable for damages incurred by Plaintiffs due to their role in the design, manufacture, importing, distributing, delivery, supply, marketing, inspecting, or sale of the problematic drywall at issue in this litigation.

## JURISDICTION, PARTIES, AND VENUE

**\*8** 1. Original jurisdiction of this Court exists by virtue of 28 U.S.C. § 1332(d)(2) and the Class Action Fairness Act ("CAFA"). *See* 28 U.S.C. § 1711, *et. seq.* The Plaintiffs and certain of the Defendants in these actions are citizens of different states and the amounts in controversy in these actions exceed five million dollars ($5,000,000.00), exclusive of interest and costs.

2. Venue in this district satisfies the requirements of 28 U.S.C. § 1391(b) because Plaintiffs and a significant number of the absent class members reside in this jurisdiction and a substantial amount of the events and occurrences giving rise to these claims occurred in this District, or a substantial part of the property that is the subject of this action is situated in this district.

## PLAINTIFFS

3. For purposes of clarity, the Plaintiffs are asserting claims on behalf of all owners and residents of the subject properties, including but not limited to, minors and other residents of the properties who do not appear herein as named plaintiffs.

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 410 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2018) Page 12 of 36 PageID: 888

2018 WL 3972041

4. The Plaintiffs in this action are also asserting claims on behalf of all plaintiffs from prior complaints that have been filed in this Court or in the United States District Court for the Eastern district of Louisiana involving the Taishan Defendants. These plaintiffs include but are not limited to those plaintiffs who asserted claims against the Taishan Defendants in *Kenneth and Barbara Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civ. Action No. 10-361; *Gross, et al. v. Knauf Gips, KG, et al.*, Civ. Action No. 09-6690; *Kenneth Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-080; *Laura, Daniel and Irene Haya, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1077; and *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Civ. Action No. 9-6687.

5. Plaintiffs, Eduardo and Carmen Amorin are citizens of Florida and together own real property located at 240 West End Drive, Bldg. 7, Unit 721, Punta Gorda, Florida 33950. Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as class representatives for similarly situated individuals.

6. Plaintiff, Kenneth Abel is a citizen of Florida and owns real property located at 10400 SW Stephanie Way #5210, Port St. Lucie, Florida 34987. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

7. Plaintiff, Arledys Gallardo is a citizen of Florida and owns real property located at 4179 NE 16 Street, Homestead, Florida 33033. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

8. Plaintiff, Charmaine Fong is a citizen of Florida and owns real property located at 9816 Cobblestone Lakes Court, Boynton Beach, Florida 33472. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

9. Plaintiffs, Perry and Cassandra Fontenot are citizens of Virginia and together own real property located at 1016 Hollymeade Circle, Newport News, Virginia 23602. Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as a class representatives for similarly situated individuals.

 **\*9** 10. Plaintiffs, Julianne and Joshua Frankze are citizens of Florida and together own real property located at 1201 NW 2 Street, Cape Coral, Florida 33993. Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as class representative for similarly situated individuals.

11. Plaintiff, Bryon Hand is a citizen of Virginia and owns real property located at 3207 Arran Thistle, Williamsburg, Virginia 23188. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

12. Plaintiffs, Laura Haya, Daniel Haya, and Irene Haya are citizens of Florida and together own real property located at 7574 Tamarind Avenue, Tampa, Florida 33625. Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as class representatives for similarly situated individuals.

13. Plaintiff, Robert Popovitch is a citizen of Virginia and owns real property located at 1217 Avondale Lane, Newport News, Virginia 23602. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

14. Plaintiff, Jason Purse is a citizen of Virginia and owns real property located at 4309 Creekside Loop, Williamsburg, Virginia 23188. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

15. Plaintiff, Joseph Quartararo is a citizen of Louisiana and owns real property located at 5813 Ruth Street, Metairie, Louisiana 70003. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

16. Plaintiffs, Frank and Yvonne Topf are citizens of Virginia and together own real property located at 2417 Caitlan Loch Lane, Virginia Beach, Virginia 23602.

Case 2:09-md-02047-EEF-JMBN Document 22363-78 Filed 11/19/19 Page 411 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2018) · Page · 13 of 36 · PageID #: 889

2018 WL 3972041

Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as class representatives for similarly situated individuals.

17. Plaintiff, Cathy Parker Vapy is a citizen of Louisiana and owns real property located at 9700 Andover Drive, New Orleans, Louisiana 70127. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

18. Plaintiffs, Hugh and Tracy Vest are citizens of Virginia and together own real property located at 111 Eston's Run, Yorktown, Virginia 23693. Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as class representatives for similarly situated individuals.

19. Plaintiffs, Kenneth and Barbara Wiltz are citizens of Louisiana and together own real property located at 5337 Cameron Blvd., New Orleans, Louisiana 70112. Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as class representatives for similarly situated individuals.

## DEFENDANTS

20. Defendant, Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Defendant, together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Defendant has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Defendant manufactured and sold, directly and indirectly, to certain suppliers in the United States.

**\*10** 21. Defendant, Taian Taishan Plasterboard Co., Ltd. ("TTP") is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Defendant, together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Defendant has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Defendant manufactured and sold, directly and indirectly, to certain suppliers in the United States. Upon information and belief, certain of the problematic drywall manufactured, imported, exported, distributed, supplied and/or brokered by Defendant bear markings that state, "Crescent City Gypsum, Inc." or "Crescent City."

22. Defendant, TTP is a wholly owned subsidiary of Defendant Taishan. TTP works collaboratively with Taishan and purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

23. Defendant, Qinhuangdao Taishan Building Materials Co., Ltd. a/k/a Qinhuang Dao Taishan Building Materials Co., Ltd. ("Qinhuangdao") is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Defendant, together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Upon information and belief, Defendant has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Defendant manufactured and sold, directly and indirectly, to certain suppliers in the United States. Upon information and

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 412 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2018) Page 14 of 36 PageID# 890

2018 WL 3972041

belief, Defendant is the manufacturer, importer, exporter, distributor, supplier and/or broker of drywall bearing markings that state, "Crescent City Gypsum, Inc."

24. Defendant, Qinhuangdao Taishan Building Materials Co., Ltd. a/k/a Qinhuang Dao Taishan Building Materials Co., Ltd. is a wholly owned subsidiary of Defendant, Taishan Gypsum Co., Ltd. F/k/a Shandong Taihe Dongxin Co., Ltd.

25. During the period when Taishan and its subsidiaries were distributing problematic drywall to the United States, these entities consistently misrepresented the drywall they were exporting complied with ISO and ASTM quality standards. For instance, Taishan's website boasted that it was exporting large quantities of drywall to the United States and that its drywall complied with ISO quality standards. The employees of Taishan and its subsidiaries also sent emails to potential customers boasting about their experience exporting large quantities of drywall to the United States. These employees also provided false assurances that the drywall they were exporting complied with ASTM quality standards.

26. Upon information and belief, Taishan is owned and/or controlled by defendant Beijing New Building Materials Public Limited Co. ("BNBM"), which is a state-owned entity and respectively controlled by the Chinese government. BNBM is traded on the Shenzhen Stock Exchange. Defendant, BNBM caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

27. BMBM consistently exerted control over Taishan and its subsidiaries when these entities were exporting problematic drywall to the United States. For instance, one of BNBM's board members, Tongchun Jia, is the chairman of the board of directors and general manager of Taishan. Mr. Tongchun Jia occupies similar positions with most of Taishan's subsidiaries. Through Mr. Tongchun Jia's positon with Taishan and its subsidiaries, BNBM controls the actions and operations of these entities. Even where Tongchun Jia does not formally hold a position with a Taishan subsidiary, BNBM is able to exert its control over the subsidiary through Mr. Tongchun Jia's influence. For instance, the chairman of the board of TTP, Peng Shi Liang, was also an employee of Taishan. BNBM was thus able to control TTP since the chairman of its board reported directly to Tongchun

Jia. Accordingly, since BNBM had direct control over Taishan and its subsidiaries, it should be held responsible for their sale of problematic drywall.

*11 28. Defendant China National Building Material Co., Ltd. ("CNBM"), is a partially owned subsidiary of BNBM Group. Defendant, China National Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

29. Upon information and belief, defendant BNBM is owned and/or controlled by defendant Beijing New Building Materials (Group) Co., Ltd. ("BNBM Group"), which is a state owned entity and respectively controlled by the Chinese government. Defendant BNBM Group caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

30. Upon information and belief, BNBM Group is owned and/or controlled by China National Building Materials Group Co. ("CNBM Group"), which is a state owned entity and respectively controlled by the Chinese government. CNBM Group is traded on the Hong Kong stock exchange. Defendant CNBM Group caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

31. Defendant CNBM USA Corp. is a California corporation with a principal place of business in California. By information and belief, CNBM USA Corp. is a subsidiary of either BNBM, China National Building Material Co., Ltd., BNBM Group or CNBM Group. By information and belief, CNBM USA Corp. acted as an agent for BNBM, China National Building Material Co., Ltd., BNBM Group and/or CNBM Group by promoting and marketing the drywall at issue in this litigation to American suppliers. Accordingly, CNBM USA Corp. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

32. Defendant BNBM of American, Inc. ("BNBM America") is a Florida corporation with a principal place of business in Florida. By information and belief, BNBM America is a subsidiary of either BNBM, China National Building Material Co., Ltd., BNBM Group or CNBM Group. By information and belief, BNBM America acted

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 413 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2018) Page 15 of 36 PageID #: 891

2018 WL 3972041

as an agent for BNBM, China National Building Material Co., Ltd., BNBM Group and/or CNBM Group by promoting and marketing the drywall at issue in this litigation to American suppliers. Accordingly, BNBM America caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

33. Defendant BNBM USA is a indeterminate entity with an address that is unknown at this time. By information and belief, BNBM USA is a subsidiary of either BNBM, China National Building Material Co., Ltd., BNBM Group or CNBM Group. By information and belief, BNBM USA acted as an agent for BNBM, China National Building Material Co., Ltd., BNBM Group, CNBM Group and/or the Taishan entities by promoting and marketing the drywall at issue in this litigation to American suppliers. Accordingly, BNBM USA caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

34. Defendant United Suntech Craft, Inc. ("United Suntech") is a California corporation with a principal place of business in California. By information and belief, United Suntech is a subsidiary of either BNBM, China National Building Material Co., Ltd., BNBM Group, CNBM Group, or CNBMI Co., Ltd. By information and belief, United Suntech acted as an agent for BNBM, China National Building Material Co., Ltd., BNBM Group, CNBM Group and/or CNBMI Co., Ltd. by promoting and marketing the drywall at issue in this litigation to American suppliers. Accordingly, United Suntech caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

**\*12** 35. Defendant CNBMI Co., Ltd. ("CNBMI") is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, California, and Virginia. By information and belief, CNBMI is a subsidiary of either BNBM, China National Building Material Co., Ltd., BNBM Group or CNBM Group. By information and belief, CNBMI is the parent corporation of United Suntech. By information and belief, CNBMI acted as an agent for BNBM, China National Building Material Co., Ltd., BNBM Group and/or CNBM Group by promoting and marketing the drywall at issue in this litigation to American suppliers. Accordingly, CNBMI caused the drywall at issue in the case to be imported,

distributed, delivered, supplied, inspected, marketed and/or sold.

36. Upon information and belief, Defendant Changzhou Yinhe Wood Industry Co., Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Changzhou Yinhe Wood Industry Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Changzhou Yinhe Wood Industry Co., Ltd. manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Changzhou Yinhe Wood Industry Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Changzhou Yinhe Wood Industry Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

37. Defendant Fuxin Taishan Gypsum And Building Material Co., Ltd., is a foreign corporation and is a subsidiary of Taishan. Defendant Fuxin Taishan Gypsum And Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

38. Defendant Hubei Taishan Building Material Co., Ltd. is foreign corporation and is a manufacturer of gypsum. Defendant Hubei Taishan Building Material Co., Ltd. is a subsidiary of Defendant BNBM. Defendant Hubei Taishan Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

39. Upon information and belief, Defendant Jinan Run & Fly New Materials Co., Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Jinan Run & Fly New Materials Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Jinan Run & Fly New Materials Co., Ltd. manufactured, sold, distributed, marketed and/or placed within the

stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Jinan Run & Fly New Materials Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Jinan Run & Fly New Materials Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

40. Upon information and belief, Defendant Nanhai Silk Imp. & Exp. Corporation is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Nanhai Silk Imp. & Exp. Corporation is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Nanhai Silk Imp. & Exp. Corporation manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Nanhai Silk Imp. & Exp. Corporation has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Nanhai Silk Imp. & Exp. Corporation manufactured and/or sold to certain suppliers in the United States.

*13  41. Upon information and belief, Defendant Pingyi Baier Building Materials Co., Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Pingyi Baier Building Materials Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Pingyi Baier Building Materials Co., Ltd. manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina,

and Virginia. Pingyi Baier Building Materials Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Pingyi Baier Building Materials Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

42. Defendant Qinhuangdao Taishan Building Material Co., Ltd., is a foreign corporation and is a manufacturer of gypsum. Defendant Qinhuangdao Taishan Building Material Co., Ltd. is a subsidiary of Taishan. Defendant Qinhuangdao Taishan Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

43. Defendant Shanghai Yu Yuan Imp & Exp Co., Ltd. is a foreign corporation that is responsible for the import/export of the drywall at issue in this litigation to the United States. Defendant Shanghai Yu Yuan Imp & Exp Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

44. Defendant Sinkiang Tianshan Building Material And Gypsum Product Co., Ltd., is a foreign corporation and is a manufacturer of plasterboard. Defendant Sinkiang Tianshan Building Material And Gypsum Product Co., Ltd. is a subsidiary of Taishan. Defendant Sinkiang Tianshan Building Material And Gypsum Product Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

45. Defendant Sunrise Building Materials Ltd., is a Canadian Corporation with its principle place of business located at Unit 7, 55 Nugget Ave., Scarborough, Toronto, ON, Canada, M15 3LI. Sunrise Building Materials Ltd. is a supplier of drywall and related building products. By information and belief, Sunrise Building Materials Ltd., supplied the drywall at issue in this litigation in certain of the affected states.

46. Defendant Tai'an Jindun Building Material Co., Ltd., is a foreign corporation and is a manufacturer and wholesaler of gypsum products. Defendant Tai'an Jindun Building Material Co., Ltd. has joint-stock agreement with Defendant BNBM. Defendant Tai'an Jindun Building Material Co., Ltd. caused the drywall at

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 415 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2018) Page 17 of 36 PageID: 893

2018 WL 3972041

issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

47. Defendant Taishan Gypsum Co., Ltd. Lucheng Branch is a foreign corporation that operates a manufacturing plant. Defendant Taishan Gypsum Co., Ltd. Lucheng Branch is a subsidiary of Taishan. Defendant Taishan Gypsum Co. Ltd. Lucheng Branch caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

48. Defendant Taishan Gypsum (Baotou) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan. Defendant Taishan Gypsum (Baotou) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

49. Defendant Taishan Gypsum (Chongqing) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan. Defendant Taishan Gypsum (Chongqing) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

50. Defendant Taishan Gypsum (Henan) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan. Defendant Taishan Gypsum (Henan) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

*14 51. Defendant Taishan Gypsum (Pingshan) Co., Ltd., is a foreign corporation and is a manufacturer of gypsum products. Defendant Taishan Gypsum (Pingshan) Co., Ltd. is a subsidiary of Taishan. Defendant Taishan Gypsum (Pingshan) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

52. Defendant Taishan Gypsum (Pizhou) Co., Ltd. is a foreign corporation and is a manufacturer of gypsum. Defendant Taishan Gypsum (Pizhou) Co. is a subsidiary of Taishan. Defendant Taishan Gypsum (Pizhou) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

53. Defendant Taishan Gypsum (Tongling) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan.

Defendant Taishan Gypsum (Tongling) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

54. Defendant Taishan Gypsum (Xiangtan) Co. Ltd., is a foreign corporation. Defendant Taishan Gypsum (Xiangtan) Co. Ltd. is a subsidiary of Taishan. Defendant Taishan Gypsum (Xiangtan) Co. Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

55. Defendant Yunan Taishan Gypsum And Building Material Co., Ltd., is a foreign corporation and is a manufacturer and wholesaler of gypsum products. Defendant Yunan Taishan Gypsum And Building Material Co., Ltd. has a joint-stock agreement with Defendant BNBM. Defendant Yunan Taishan Gypsum And Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

56. Defendant Shaanxi Taishan Gypsum Co., Ltd., is a foreign corporation and subsidiary of Taishan. Defendant Shaanxi Taishan Gypsum Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

57. Defendant Taishan Gypsum (Hengshui) Co., Ltd., is a foreign corporation and is a manufacturer of gypsum. Defendant Taishan Gypsum (Hengshui) Co. Ltd., is a subsidiary of Taishan. Defendant Taishan Gypsum (Hengshui) Co. Ltd., caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

58. Defendant Taishan Gypsum (Jiangyin) Co., Ltd., is a foreign corporation and is a manufacturer of gypsum. Defendant Taishan Gypsum (Jiangyin) Co., Ltd. is a subsidiary of Taishan. Defendant Taishan Gypsum (Jiangyin) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

59. Defendant Taishan Gypsum (Wenzhou) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan. Defendant Taishan Gypsum (Wenzhou) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 11/19/19 Page 416 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2018) Page 18 of 36 PageID #: 894

2018 WL 3972041

60. Defendant Beijing New Material Incubator Co., Ltd., is a foreign corporation and is a subsidiary of Defendant BNBM. Defendant Beijing New Material Incubator Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

61. Upon information and belief, Defendant Qingdao Yilie International Trade Co., Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Qingdao Yilie International Trade Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Qingdao Yilie International Trade Co., Ltd. manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Qingdao Yilie International Trade Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Qingdao Yilie International Trade Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

*15 62. Upon information and belief, Defendant Shanghai East Best Arts & Crafts Co., Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Shanghai East Best Arts & Crafts Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Shanghai East Best Arts & Crafts Co., Ltd. manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Shanghai East Best Arts & Crafts Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Shanghai

East Best Arts & Crafts Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

63. Upon information and belief, Defendant Siic Shanghai International Trade (Group) Co., Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Siic Shanghai International Trade (Group) Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Siic Shanghai International Trade (Group) Co., Ltd. manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Siic Shanghai International Trade (Group) Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Siic Shanghai International Trade (Group) Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

64. Upon information and belief, Defendant Tianjin Tianbao Century Development Co., Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Tianjin Tianbao Century Development Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Tianjin Tianbao Century Development Co., Ltd. manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Tianjin Tianbao Century Development Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Tianjin Tianbao Century Development Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

65. Defendant, Shandong Oriental International Trading Corp., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

66. Defendant, Lianyungang Yuntai International Trade Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

67. Defendant, Shanghai Yuyuan Market Import & Export Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

**\*16** 68. Defendant, Orient International Holding Shanghai Foreign Trade Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

69. Defendant, Qingdao Aoni Decoration Board and Materials Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

70. Defendant, Beijing Building Materials Import & Export Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

71. Defendant, Taian Taigao Trading Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

72. Defendant, Nantong Economic and Technological Development Zone Corporation, is a foreign corporation

that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

73. Defendant, Qingdao Kanghong Import and Export Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

74. Defendant, Zhejiang Provincial Second Light Industry Enterprises Group Imp. & Exp. Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

75. Defendant, SIIC Shanghai International Trade Group Pudong Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

76. Defendant, Jiangsu Sainty International Economic & Technical Cooperation Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

77. Defendant, Zibo Interntional Economic and Technical Cooperation Corporation, is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

78. Defendant, Shanghai Kaidun Development Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

79. Defendant, Shanghai Yujin Industry Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard

Case 2:09-md-02047-EEF-JMBN Document 22363-78 Filed 11/19/19 Page 418 of 1680
Case: In re Manufactured Drywall Products Liability Litigation, Slip Copy (2018) / Page 20 of 96 PageID #: 896

2018 WL 3972041

products with product markings written in English designed for sale or resale in the United States.

**\*17** 80. Defendant, Hangzhou Great Import and Export Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

81. Defendant, Xuzhou Hanbang Global Trade Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

82. Defendant, China Xuzhou International Economic & Technological Cooperation Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

83. Defendant, Jiangsu Easthigh Group Import & Export Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

84. Defendant, Qingdao Joy Industrial & Development Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

85. To the extent any of the foreign defendants are deemed to be foreign sovereign entities, including but not limited to Taishan, BNBM, China National Building Material Co., Ltd., BNBM Group and CNBM Group, Plaintiffs bring their claims against these entities pursuant to 28 U.S.C. § 1605(a)(2), the commercial activity exception to the Foreign Sovereign Immunities Act, or alternatively under § 1605(a)(5), the tortious act exception. Plaintiffs allege that the claims against the foreign defendants are based upon commercial activities carried on in the United States along with entities such as CNBM USA Corp, BNBM American, and United Suntech. The claims

also seeks monetary damages against a foreign state for damage to property occurring in the United States, caused by the tortious acts or omissions of that foreign state, or of any official or employee of that foreign state while acting within the scope of his office or employment.

## FACTS REGARDING DEFENDANTS' CONDUCT

### A. DEFENDANTS PURPOSEFULLY AVAILED THEMSELVES OF THE BENEFITS OF CONDUCTING BUSINESS IN THE UNITED STATES AND COLLABORATED FOR PURPOSES OF CULTIVATING THE AMERICAN MARKET AND SELLING THEIR DRYWALL TO AMERICAN CONSUMERS

86. Many of the Taishan defendants that sell and/or resell Taishan drywall with markings written in English for the explicit purpose of sale to the United States market, had counsel for Taishan state on their behalf but without entering an appearance on their behalf that they have no expectation whatsoever that they were going to purposely avail themselves of state markets of any particular state in the United States.

87. Defendants were aware that their products were being sold in the United States notwithstanding this representation by their counsel. For instance, during the time period when its drywall was being sold to American consumers, Taishan's website boasted that it was exporting large quantities of drywall to the United States and that its drywall complied with ISO quality standards. In addition, Taishan's employees as well as the employees of its subsidiaries sent emails to potential customers boasting about their experience exporting large quantities of drywall to the United States and providing false assurances that their drywall complied with ASTM quality standards.

**\*18** 88. The Defendants in this litigation have not only purposefully availed themselves of the benefits of conducting business in the United States by marketing their products in the United States but also by establishing corporate entities with a physical presence in the United States. These entities were set up by Defendants to further market and promote the sale of their products to American consumers. For instance, the foreign defendants have incorporated at least three entities in the United States (CNBM USA Corp, BNBM America and United

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 419 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2018)    Page 21 of 30
2018 WL 3972041

Suntech) that operate within the United States and coordinate the sale of Defendants' products to American customers. These domestic entities are part of a larger effort to cultivate a market for Defendants' products in the United States.

89. By way of example of Defendants' efforts to cultivate a market for their products in the United States, discovery has revealed communications by an individual using an e-mail address that includes the term "BNBM USA" as part of the address. Although Plaintiffs have been unable to locate an entity by the name of BNBM USA, it is presumed that the individual using this e-mail address is employed by one of the BNBM entities. The use of a "BNBM USA" e-mail address by a BNBM employee demonstrates that Defendants intended to market their products in the United States.

90. Defendants also collaborated for purposes of cultivating the market in the United States and selling products to American consumers. Although Plaintiffs have been unable to locate an entity by the name of BNBM USA, the BNBM employee using the BNBM USA e-mail address coordinated the sale of Taishan products to American consumers. For instance, the individual using this e-mail address arranged for American customers to visit Taishan's factories in China.

91. By way of further example, Taishan and its subsidiaries operated as one entity for purposes of distributing drywall to the United States. For instance, TTP's employees often held themself out as Taishan employees through business cards and information communicated to potential customers via email. TTP's employees also participated in the sale of Taishan's drywall. Additionally, the sales people for Taishan and its subsidiaries would hold meetings to discuss matters involving the sale of drywall. Both Taishan and TTP also sold drywall under the same brand name.

**B. THE DEFENDANTS HAVE DELIBERATELY INCREASED PLAINTIFFS' LITIGATION EXPENSES, DELAYED THESE PROCEEDINGS AND THWARTED PLAINTIFFS' DISCOVERY EFFORTS**

92. Upon information and belief, the manufacturing defendants have deliberately delayed the progress of this litigation and taken measures to increase the litigation costs to plaintiffs. For instance, Defendants like Taishan

have only entered their appearances in a case after being served with a complaint consistent with the requirements of Hague Convention. Taishan refuses to accept service of process even though it has entered its appearance in this litigation and is represented by counsel. Taishan's clear purpose in refusing to accept service of process is to delay the service of complaints and to force plaintiffs to incur hundreds of thousands of dollars in service costs.

93. Taishan also deliberately increased plaintiffs' litigation costs by offering inadequate witnesses for the jurisdictional deposition conducted in Hong Kong and by obstructing plaintiffs' efforts to obtain discovery from these witnesses. Notwithstanding that plaintiffs incurred tens of thousands of dollars to attend the depositions in Hong Kong, Taishan produced inadequate witnesses, retained a check interpreter who repeatedly interupted the depositions, and did not allow adequate questioning of the witnesses.

94. Taishan also deliberately increased plaintiffs' litigation costs by refusing to participate in *Germano* until after plaintiffs had concluded default proceedings. Taishan was clearly aware of the *Germano* default proceedings since it managed to file an appeal within the time period contemplated by the Federal Rules of Civil Procedure. Instead of defending the case, Taishan allowed plaintiffs to incur additional litigation expenses while it observed the default proceedings. Taishan's appeal to the Fifth Circuit has further increased these litigation expenses to plaintiffs.

 **\*19** 95. Upon information and belief, the manufacturing defendants have also taken deliberate measures in concert with one another, designed to thwart discovery and to hide the interrelated nature of the manufacturing defendants. For instance, defendants such as BNBM and their related entities have been served with various complaints and have been held in default since they refuse to enter an appearance or offer any defense in this litigation. The clear purpose of this refusal is to hide the company's ownership interests in defendants like Taishan and to avoid discovery on these and other topics, and deprive plaintiffs of the knowledge of their ownership and relationship with each other. These defendants intransigence and failure to participate in federal judicial proceedings highlights their fraudulent business practices in this jurisdiction.

**C. PLAINTIFFS ARE ENTITLED TO THE EQUITABLE TOLLING OF THEIR CLAIMS**

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 420 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2019) Page 22 of 36

2018 WL 3972041

**SINCE DEFENDANTS FRAUDULENTLY CONCEALED THEIR ROLE IN THE DISTRIBUTION AND SALE OF THE DRYWALL AT ISSUE IN THIS LITIGATION**

96. The Defendants in this litigation distributed their drywall in a manner that was designed to conceal their role in the manufacture, distribution and sale of their drywall. For instance, Taishan and its subsidiaries often distributed and sold drywall that was customized according to their customers' specifications (*i.e.*, Taishan and its subsidiaries distributed and sold drywall that was marked "Crescent City Gypsum, Inc."). This customized drywall failed to identify Taishan or any of its related companies as the manufacturer of the drywall. By manufacturing, distributing and selling drywall in this manner, Defendants intentionally or fraudulently concealed from the injured parties the ability to identify those defendants responsible for the problematic drywall that was installed in their homes.

97. The Defendants also employed a complex distribution scheme that made it difficult for injured parties to identify the parties responsible for the manufacture, distribution and sale of the drywall installed in their homes. For instance, much of TTP's drywall was exported by Beijing Building Materials Import & Export Co., Ltd. Many parties attempting to identify the manufacturer of this drywall undoubtedly thought the manufacturer was BNBM, not TTP. By manufacturing, distributing and selling drywall in this manner, Defendants intentionally or fraudulently concealed from the injured parties the ability to identify those defendants responsible for the problematic drywall that was installed in their homes.

98. In light of this fraudulent concealment by Defendants, Plaintiffs are entitled to the equitable tolling of their claims.

**FACTS REGARDING DEFENDANTS' PROBLEMATIC DRYWALL**

99. Defendants' drywall is predominantly composed of gypsum.

100. In "problematic drywall" (such as that designed, manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold by Defendants herein), sulfur compounds exit the drywall.

101. The sulfur compounds, including Hydrogen Sulfide, Carbonyl Sulfide, and Carbon Disulfide, exit Defendants' drywall and cause rapid sulfidation and damage to personal property (such as air conditioning and refrigerator coils, faucets, utensils, electrical wiring, copper, electronic appliances and other metal surfaces and property).

102. Exposure to the sulfur compounds that exit Defendants' drywall, causes personal injury resulting in eye problems, sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm.

103. Although the drywall functions according to its intended purpose as a building component, it is unfit for this purpose due to the damaging side effects and/or because its use is so inconvenient that Plaintiffs would not have purchased Taishan drywall and/or their homes had the side effects been disclosed by Defendants.

 **\*20** 104. As a direct and proximate result of Defendants' actions and omissions, Plaintiffs' and the Class Members' structures, personal property, and bodies have been exposed to Defendants' problematic drywall and the harmful effects of the sulfur compounds that exit from Defendants' problematic drywall.

105. Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed and/or sold the problematic drywall, which was unfit for its intended purpose and unreasonably dangerous in its normal use in that the drywall caused rapid sulfidation and damage to personal property in Plaintiffs' and Class Members' homes, residences or structures and/or caused personal injury resulting in eye problems, a sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm.

106. Defendants recklessly, wantonly, and/or negligently manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed and/or sold the problematic drywall at issue in this litigation.

107. Defendants recklessly, wantonly and/or negligently implemented faulty procedures for purposes of formulating, preparing, testing, and otherwise ensuring

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   21

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 11/19/19 Page 22 of 36
Case 2:09-md-02047-EEF-JMBN Document 22363-78 Filed 01/18/19 Page 23 of 36 PageID 899
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2018)
2018 WL 3972041

the quality and/or character of the problematic drywall at issue in this litigation.

108. As a direct and proximate result of Defendants' problematic and unfit drywall and the harmful effects of the sulfur compounds exit these products, Plaintiffs and Class Members have suffered, and continue to suffer economic harm and/or personal injury.

109. As a direct and proximate result of Defendants' problematic and unfit drywall and the harmful effects of the sulfur compounds exit these products, the Plaintiffs and the Class Members have suffered, and continue to suffer damages. These damages include, but are not limited to, costs of inspection; costs and expenses necessary to remedy, replace and remove the problematic drywall and other property that has been impacted; lost value or devaluation of their homes, residences or structures and property as a direct result of damage caused to the property and indirect damage resulting from perceived defects to the property, including stigma damages; loss of use and enjoyment of their home and property; and/or damages associated with personal injuries.

110. As a direct and proximate result of Defendants' problematic and unreasonably dangerous drywall and the harmful effects of the sulfur compounds that exit these products, Plaintiffs and the Class Members have been exposed to harmful sulfur compounds, suffered personal injury, have been placed at an increased risk of disease, and have need for injunctive relief in the form of repair and remediation of their home, recision of contracts, the ordering of emergency/corrective notice, the ordering of testing and monitoring, and/or the ordering of medical monitoring.

## FACTS REGARDING UNITED STATES AND CHINESE INVESTORS WHO AIDED AND ABETTED DEFENDANTS

111. J.P. Morgan Chase & Co. ("J.P. Morgan"), Morgan Stanley and certain other corporations and entities (collectively the "Investing Entities"), engaged in a deliberate and/or reckless course of conduct designed to aid and abet Defendants in the manufacture, exporting, importing, distribution, delivery, supply, marketing, and/or sale of the defective drywall at issue in this litigation.

*21 112. By information and belief, but for these investments by the Investing Entities, Defendants would not have been able to manufacture, export, import, distribute, deliver, supply, market, and/or sell of the defective drywall at issue in this litigation.

113. The Investing Entities were aware or should have been aware that Defendants were manufacturing, exporting, importing, distributing, delivering, supplying, marketing, and/or selling the defective drywall at issue in this litigation with the intent to sell and distribute the drywall in the United States.

114. The Investing Entities were aware or should have been aware that Defendants were manufacturing, exporting, importing, distributing, delivering, supplying, marketing, and/or selling the defective drywall at issue in this litigation in a manner that would make it difficult for injured consumers (located in the United States) to accomplish service on the foreign defendants.

115. Notwithstanding their apparent knowledge and/or negligent failure to discover the tortious scheme by the foreign defendants, the Investing Entities purposefully made investments with these foreign defendants in a manner that was designed to shield them from liability to American property owners.

116. For instance, J.P. Morgan acquired a 12.3% interest in CNBM's tradeable shares with the understanding that this entity would profit from its exploitation of homeowners seeking to rebuild their lives after the devastation of hurricanes Rita and Katrina. This type of investment was ideal to the Investing Entities since these investments could be very profitable while avoiding the risk of loss where the foreign defendants can avoid the service of process by American consumers and responsibility for their tortious conduct.

117. Other entities that are known to own an interest in CNBM are Atlantis Investment Management Ltd., Schroder Investment Management Limited, Baillie Gifford & Co., Callander Alex, Menzies Robin, Plowden Charles, Telfer Andrew, Warden Alison, Whitley Sarah, and Government of Singapore Investment Corporation Pte Ltd.

118. Entities that are known to own an interest in BNBM are China Construction Bank, Cha Genlou, Industrial and Commercial Bank of China, Aerospace Science & Technology Finance Co., Ltd., China Social Insurance Fund Portfolia 108, Bank of China, Agricultural Bank of China, Zhongrong International Trust Co., Ltd.

119. By investing in entities such as CNBM and BNBM, the Investing Entities put themselves in a position to profit from the exploitation of American consumers who were injured by Defendants.

120. Accordingly, the Investing Entities engaged in a course of conduct, individually and/or collectively, that caused the Plaintiffs' and Class Members' exposure to the defective drywall at issue in this litigation by virtue of their interdependent conscious parallel conduct in investing in foreign entities responsible for the manufacture, exporting, importing, distribution, delivery, supply, inspection, marketing, and/or sale of the defective drywall.

121. Additional discovery will reveal the full role and responsibility of the Investing Entities for the damages incurred by Plaintiffs and Class Members and their potential as party defendants.

## CLASS ACTION ALLEGATIONS

**\*22** 122. All Plaintiffs bring this suit as a class action pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(cX4) of the Federal Rules of Civil Procedure, on behalf of themselves and the following Class comprised of:

> All owners and residents (past or present) of real property located in the United States containing problematic Chinese drywall manufactured, sold, distributed, and/or supplied by the Defendants.

123. The following Persons shall be excluded from the class: (1) Defendants and their subsidiaries, affiliates, officers and employees; (2) all persons who make a timely election to be excluded from the proposed Class;

(3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

124. Upon information and belief, Defendants' problematic and unreasonably dangerous drywall was installed in at least hundreds of homes, residences, or other structures owned by plaintiffs and class members. Therefore, the class is sufficiently numerous such that the joinder of all members of the class in a single action is impracticable.

125. There are numerous common questions of law and fact that predominate over any questions affecting only individual members of the class. Among these common questions of law and fact are the following:

a. whether Defendants' drywall products are problematic and/or unfit for their intended purpose;

b. whether Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold problematic drywall products;

c. whether plaintiffs are entitled to recover compensatory, exemplary, incidental, consequential, and/or other damages as a result of Defendants' unlawful and tortious conduct; and

d. whether plaintiffs are entitled to recover injunctive and/or equitable relief as a result of Defendants' unlawful and tortious conduct.

126. The legal claims of named Plaintiffs arc typical of the legal claims of other class members. Named plaintiffs have the same legal interests and need for legal remedies as other class members.

127. Named plaintiffs are adequate representatives of the class. Together with their legal counsel, each will fairly and adequately protect the interests of class members. Named plaintiffs have no known conflict with the class and arc committed to the vigorous prosecution of this action.

128. The undersigned counsel arc competent counsel experienced in class action litigation, mass torts, and complex litigation involving harmful products. Counsel will fairly and adequately protect the interests of the class.

129. The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other class members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

**\*23** 130. The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

131. A class action is superior in this case to other methods of dispute resolution. The class members have an interest in class adjudication rather than individual adjudication because of their overlapping rights. It is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class Members would protect their rights on their own without this class action case. Management of the class will be efficient and far superior to the management of individual lawsuits. Accordingly, plaintiffs' legal claims are properly certified pursuant to Rule 23(b)(3).

132. The issues particularly common to the class members' claims, some of which are identified above, are alternatively certifiable pursuant to Fed. R. Civ. P. 23(c)(4), as resolution of these issues would materially advance the litigation, and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

## COUNT I

## NEGLIGENCE

### (All Defendants)

133. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

134. Defendants owed a duty to plaintiffs and class members to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, I) marketing, and/or j) selling this drywall, including a duty to adequately warn of their failure to do the same.

135. Defendants knew or should have known that their wrongful acts and omissions would result in harm and damages in the manner set forth herein.

136. Defendants breached their duty to exercise reasonable care in the designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling the problematic drywall.

137. Defendants likewise breached their duties to plaintiffs and class members by failing to warn about the problematic nature of the drywall. Defendants, through the exercise of reasonable care, knew or should have known the nature of the problematic drywall and the adverse effects that it could have on the property and bodies of plaintiffs and class members.

138. Defendants breached their duty to exercise reasonable care to timely remove and/or recall from the market and/or otherwise prevent the continued contact of plaintiffs and class members with the drywall, upon leaning it had been sold in an unreasonably dangerous condition.

139. Given the problematic nature of Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to plaintiffs and class members.

140. As a direct and proximate cause of Defendants' acts and omissions, plaintiffs and class members were harmed and have incurred damages and/or personal injuries as described herein.

## COUNT II

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 26 of 36 PageID #: 902
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2018) Page 26 of 36 PageID #: 902
2018 WL 3972041

## NEGLIGENCE PER SE

### (All Defendants)

141. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

142. Defendants owed statutory duties to plaintiffs and class members to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, I) marketing, and/or j) selling this drywall.

**\*24** 143. Defendants breached their statutory duties to the plaintiffs and class members by failing to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, I) marketing, and/or j) selling this drywall.

144. Defendants likewise breached their statutory duties, including but not limited to those imposed under the International Building Code ("IBC") and other State and local Building Codes, to Plaintiffs and Class Members by failing to warn about the problematic nature of the drywall. For instance, it is specifically alleged that Defendants furnished the drywall in violation of ASTMC C 1396/C 1396M-069, and its predecessor(s).

145. Defendants, through the exercise of reasonable care, knew or should have known the nature of the problematic drywall and the adverse effects that it could have on the property and bodies of Plaintiffs and Class Members.

146. Given the problematic nature of Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to plaintiffs and class members.

147. As a direct and proximate cause of Defendants' acts and omissions, plaintiffs and class members were harmed and have incurred damages and/or personal injuries as described herein.

### COUNT III

## STRICT LIABILITY

### (All Defendants)

148. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

149. At all times relevant hereto, Defendants were in the business of distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

150. The drywall, including that installed in the homes of class members was placed by Defendants in the stream of commerce.

151. Defendants knew that the subject drywall would be used without inspection by consumers.

152. Defendants intended that the drywall reach the ultimate consumers, such as class members, and it indeed reached class members when it was installed in their homes.

153. When installed in class members' homes, the drywall was in substantially the same condition as it was in when Defendants manufactured, sold, and/or delivered it.

154. At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to Defendants, and in accordance with the Defendants' directions and instructions.

155. The subject drywall was not misused or altered by any third parties.

156. The Defendants' drywall was improperly manufactured, designed, inspected, tested, marketed, distributed, and sold.

157. The design impropriety was in designing drywall that allows high levels of sulfur compounds to exit the drywall.

158. The manufacturing impropriety was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur compounds that were too high and allow high levels of sulfur compounds to exit the drywall.

159. The drywall was also problematic because it was improperly exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold in a unacceptable condition, as described above.

160. The Defendants' negligence in manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to class members.

*25 161. The drywall is also problematic and unreasonably dangerous because Defendants failed to adequately warn and instruct class members of their negligent design, inspection, testing, manufacturing, marketing, and selling of the drywall.

162. Class Members were unaware of the unreasonably dangerous propensities and condition of the drywall, nor could class members, acting as reasonably prudent people discover that Defendants' drywall was problematic, as set forth herein, or perceive its danger.

163. Defendants' problematic drywall was much more dangerous and harmful than expected by the average consumer and by class members.

164. Defendants' problematic drywall benefit to class members, if any, was greatly outweighed by the risk of harm and danger to them.

165. The harmful and dangerous propensities of the drywall, as well as Defendants' failure to adequately warn class members of these propensities rendered the drywall unreasonably dangerous and was the direct and proximate cause of damages and/or personal injuries to class members.

## COUNT IV

## BREACH OF EXPRESS AND/ OR IMPLIED WARRANTIES

### (All Defendants)

166. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

167. Defendants and/or their agents were in privity with plaintiffs and class members and/or plaintiffs and class members were foreseeable third party beneficiaries of any warranty.

168. At the times Defendants utilized, supplied, inspected, and/or sold this drywall for use in structures owned by plaintiffs and class members, Defendants knew, or it was reasonably foreseeable, that the drywali would be installed in structures owned by plaintiffs and class members for use as a building material, and expressly or impliedly warranted the product to be fit for that use.

169. Defendants placed their drywall products into the stream of commerce in a problematic condition and these products were expected to, and did, reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

170. Although the drywall functions according to its intended purpose as a building component, it is unfit, problematic as alleged in Paragraph 100 and not merchantable for this purpose due to the damaging side effects and/or because its use is so inconvenient that Plaintiffs would not have purchased their homes had the side effects been disclosed by Defendants.

171. The Defendants breached their warranty because the drywall was not fit and safe for the particular purposes for which the goods were required (to be installed in structures owned by plaintiffs and class members as a building material) due to the problems set forth herein.

172. Defendants had reasonable and adequate notice of the plaintiffs' and the class members' claims for breach of warranty and failed to cure.

173. As a direct and proximate cause of Defendants' breach of warranties, plaintiffs and class members have incurred harm and damages and/or personal injuries as described herein.

## COUNT V

## REDHIBITION

Case 2:09-md-02047-EEF-JMBN Document 22363-78 Filed 01/19/19 Page 426 of 1680
Case No. Manufactured Drywall Products Liability Litigation, Slip Copy (2018) Page 28 of 30 PageID: 904

2018 WL 3972041

**(By Louisiana Plaintiffs Against All Defendants)**

174. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

175. The drywall manufactured, distributed and/or sold by Defendants was not reasonably fit for its ordinary and intended purpose as alleged in Paragraph 100 above.

**\*26** 176. Defendants are therefore liable to Louisiana Plaintiffs for all damages reasonable in the premises, in accordance with La. Civ. Code art. 2524.

177. In addition, or in the alternative, the drywall manufactured, distributed and/or sold by Defendants contained redhibitory defects, in that, at the time of delivery, the propensity to allow sulfur compounds to exit the drywall renders the drywall so useless and/or inconvenient that it must be presumed that Plaintiffs would not have purchased the drywall had they known of the redhibitory defect or defects.

178. In the alternative, the defects are redhibitory defects in that, while not rendering the drywall totally useless, diminish the drywall's use and/or value to such an extent that it must be presumed that the buyer would have bought it, but for a lesser price.

179. The Defendants are conclusively presumed to know of the redhibitory defects in the drywall manufactured by them.

180. In addition, it is believed and alleged that Defendants knew of the redhibitory defects in the drywall at the time the drywall was delivered and/or sold.

181. Defendants have had numerous opportunities to repair and/or replace the drywall and associated fixtures and/or building components and have failed to do so; in addition, and/or in the alternative, such requests have been, would have been and/or would be futile. All Defendants, in addition, or alternatively, had actual knowledge of the problems in the drywall and the need for replacement, remediation and/or repair.

182. All Defendants are therefore liable to all Louisiana Plaintiffs for a return of the purchase price, (with interest from the time it was paid), reimbursement of

the reasonable expenses occasioned by the sale and those incurred for the preservation of the drywall and associated items, for damages, and for reasonable attorneys' fees, in accordance with La. Civ. Code art. 2545.

## COUNT VI

## LOUISIANA PRODUCTS LIABILITY ACT

### (All Defendants)

183. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

184. In addition to any and all damages, attorneys fees and other remedies made available to Louisiana Plaintiffs under the warranty of fitness and/or warranty against redhibitory defects, the Manufacturing Defendants are liable to Louisiana Plaintiffs under the Louisiana Products Liability Act, ("LPLA"), La. R.S. 9:2800.51, *et seq.*

185. The Manufacturing Defendants, upon information and belief, expressly warranted that the gypsumboards manufactured and sold are guaranteed to be free from defects in materials and workmanship.

186. The drywall at issue is, in all cases, unreasonably dangerous by virtue of the unreasonable emission of sulfur compounds which do not in any way contribute to or enhance the utility of the drywall, yet pose a risk to the wiring, plumbing, appliances, personal property, overall economic value of the property and financial security of the owner, and/or the health of the residents of the property.

187. At all times pertinent and material hereto, there existed alternative feasible manufacturing processes and/or designs of drywall which perform all of the functions and utility of traditional drywall, without allowing unreasonable levels of sulfur compounds to exit the drywall.

**\*27** 188. At all times pertinent and material hereto, Manufacturing Defendants knew that their drywall was unreasonably dangerous and/or problematic as set forth herein.

Case 2:09-md-02047-EEF-JMBN Document 22363-78 Filed 01/19/19 Page 427 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2019)

2018 WL 3972041

189. In the alternative, Manufacturing Defendants should have, at all times pertinent and material hereto, known of the unreasonably dangerous and/or problematic characteristics and/or conditions, had they reasonably employed then-existing scientific and/or technical knowledge, reasonable testing, and/or other reasonable and then-accepted methods of quality assurance and/or quality control.

190. Defendants' drywall is unreasonably dangerous in composition or construction in that, at the time it left Defendant's control, it deviated in a material way from Defendant's own specifications or performance standards.

191. In addition, and in the alternative, Defendants' drywall is unreasonably dangerous in design, in that, at the time the drywall left Defendant's control, there existed an alternative design for the product that was capable of preventing Plaintiffs' damage, and the likelihood of causing the plaintiffs' damage and the gravity of that harm outweighed the burden (if any) on the Defendants in adopting such alternative design and the adverse effect (if any) on the utility of the drywall.

192. In addition, and in the alternative, Defendants' drywall is unreasonably dangerous in that it fails to conform to an express warranty about the product which induced the use of the product and caused damage to Plaintiffs to the extent that the warranty was untrue.

193. In addition, and in the alternative, Defendants' drywall is unreasonably dangerous due to an inadequate warning, in that, at the time the drywall left Defendant's control, the drywall possessed a characteristic that might cause damage and yet Defendant failed to use reasonable care to provide an adequate warning of such characteristics and/or dangers to users and/or handlers of the drywall.

194. Defendants are therefore liable to Louisiana Plaintiffs for all damages reasonable in the premises.

## COUNT VII

### PRIVATE NUISANCE

#### (All Defendants)

195. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

196. The Defendants' tortious or wrongful acts or omissions have caused sulfur compounds and/or other chemical leaching into structures owned by Plaintiffs and Class Members which has unreasonably interfered, and continues to interfere, with the Plaintiffs' and Class Members' use and enjoyment of their properties and caused them harm and damage as discussed herein.

197. Defendants* interference has impaired the rights of Plaintiffs' and Class Members' health, comfort, safety, free use of their property, and/or peaceful enjoyment of their property.

198. Defendants' invasions were intentional and unreasonable, and/or unintentional but otherwise negligent or reckless.

199. The interference with Plaintiffs' and Class Members' use of their property caused by Defendants is substantial and is ongoing.

200. Defendants' private nuisance was the direct, proximate, and foreseeable cause of Plaintiffs' and Class Members' damages, injuries, harm, loss, and increased risk of harm, which they suffered and will continue to suffer.

 **\*28** 201. As a direct and proximate cause of Defendants' creation of a private nuisance, Plaintiffs and Class Members have incurred harm and damages and/or personal injuries as described herein.

## COUNT VIII

### UNJUST ENRICHMENT

#### (All Defendants)

202. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

*In re Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2018)*
2018 WL 3972041

203. Defendants received money as a result of plaintiffs' and class members' purchases of Defendants' problematic drywall, or purchases of structures containing this drywall, either directly or through an agent, and Defendants wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

204. Defendants' acceptance and retention of these benefits under the circumstances make it inequitable and unjust for Defendants to retain the benefit without payment of the value to the plaintiffs and the class members.

205. Defendants, by the deliberate and tortious conduct complained of herein, have been unjustly enriched in a manner which warrants restitution.

## COUNT IX

### VIOLATION OF CONSUMER PROTECTION ACTS

#### (All Defendants)

206. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

207. This is an action for relief under the various Consumer Protection Acts of the jurisdictions in which affected properties are present, including but not limited to, L.SA-R.S. 51:1401, *et seq.* (Louisiana Unfair Trade Practices and Consumer Protection Law); Ala. Code 1975 § 8-19-1, *et seq.* (Alabama Deceptive Trade Practices Act); G.S. § 75-1.1, *et seq.* (North Carolina Consumer Protection Act); F.S. § 501.201, *et seq.* (Florida Deceptive and Unfair Trade Practices Act); Va. Code. Ann. § 59.1-196, *et seq.* (Virginia Consumer Protection Act); Tex. Bus. Com. Code Ann. § 17.41, *et seq.* (Texas Deceptive Trade Practices-Consumer Protection Act); Miss. Code Ann. § 75-24-1, *et seq.* (Mississippi Consumer Protection Act).

208. The Defendants' acts and omissions as well as their failure to use reasonable care in this matter as alleged in this complaint, including but not limited to, the knowing misrepresentation or failure to disclose the source, affiliation, origin, characteristics, ingredients, standards and quality of problematic drywall constitute

violation of the provisions of the Consumer Protection Acts of the Relevant States.

209. Plaintiffs and class members have suffered actual damages as a result of Defendants' violation of these Consumer Protection Acts and are entitled to relief.

210. As a direct and proximate cause of Defendants' violations of the Consumer Protection Acts of the Relevant States, plaintiffs and class members have incurred harm and damages as described herein.

## COUNT X

### EQUITABLE AND INJUNCTIVE RELIEF AND MEDICAL MONITORING

#### (All Defendants)

211. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

212. Plaintiffs and the class members are without adequate remedy at law, rendering injunctive and other equitable relief appropriate.

213. Plaintiffs and the class members will suffer irreparable harm if the Court does not render the injunctive relief and medical monitoring relief set forth herein, and if defendants are not ordered to recall, buy back, rescind, and/or repair the structures owned by plaintiffs and class members.

**\*29** 214. Plaintiffs, on behalf of themselves and all others similarly situated, demand injunctive and equitable relief and further, that defendants be ordered to: (1) to buy back or rescind the contracts for sale of the drywall installed in plaintiffs' and class members' homes or other structures, or in the alternative, remediate, repair and/or replace the drywall in such structures upon proof by the defendants of the feasibility of such remedy or repair; (2) cease and desist from misrepresenting to the Class and the general public that the drywall is not problematic and/or unreasonably dangerous as alleged herein; (3) institute, at their own cost, a public awareness campaign to alert the class and general public of the harm and dangers associated with

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 429 of 1680
In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2019) | Page 31 of 36

2018 WL 3972041

the drywall; and (4) create, fund, and support a medical monitoring program.

215. Until Defendants' problematic drywall has been removed and remediated, Defendants must provide continued air monitoring in the structures owned by plaintiffs and class members.

216. Plaintiffs and class members have been exposed to greater than normal levels of sulfur compounds as a result of exposures to Defendants' problematic and unfit drywall and have suffered personal injuries as a result.

217. The sulfur compounds which exit from the Defendants' drywall and to which plaintiffs and class members have been exposed are proven unreasonably dangerous.

218. Plaintiffs' and class members' exposures were caused by the Defendant's negligent or otherwise tortious conduct.

219. Plaintiffs' and class members' exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

220. The method and means for diagnosing the plaintiffs' and class members' potential medical problems are well accepted in the medical and scientific community and will be of great benefit to the plaintiffs and class members by preventing or minimizing health problems that they may encounter as a result of the problematic and unfit drywall.

221. As a proximate result of their exposure to sulfide and other noxious compounds from Defendants' problematic and unfit drywall, plaintiffs and class members have developed a significantly increased risk of contracting a serious latent disease.

222. Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

223. The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the class members, hereby demand a trial by jury as to all issues so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated demand upon Defendants jointly and severally for:

a. an order certifying the case as a class action;

b. an order certifying the class;

c. an order appointing plaintiffs as the class representatives of the class;

d. an order appointing undersigned counsel and their firms as counsel for the class;

e. compensatory and statutory damages;

f. punitive damages as allowed by law;

g. pre and post-judgment interest as allowed by law;

h. injunctive relief;

I. an award of attorneys' fees as allowed by law;

j. an award of taxable costs; and

k. any and all such further relief as this Court deems just and proper.

Respectfully submitted,

Dated: July 5, 2011

/s/ Richard J. Serpe
Richard J. Serpe (V.A. Bar No. 33340)
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

**\*30**

Ervin A. Gonzalez
COLSON, HICKS, EIDSON, COLSON MATTHEWS,
MARTINEZ, GONZALES, KALBAC & KANE
255 Alhambra Circle, Penthouse
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

**COURT APPOINTED PLAINTIFFS' STEERING COMMITTEE IN MDL 2047**

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhkc.com
*Plaintiffs' Liaison Counsel MDL 2047*

Arnold Levin
Fred S. Longer
Matthew C. Gaughan
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*

Dawn M. Barrios
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
BECNEL LAW FIRM. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Robert C. Josefsberg
PODHURST ORSECK, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Bruce William Steckler
BARON & BUDD, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Ervin A. Gonzalez
COLSON, HICKS, EIDSON, COLSON
MATTHEWS, MARTINEZ, GONZALES,
KALBAC & KANE
255 Alhambra Circle, Penthouse
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444

Ben W. Gordon, Jr.
LEVIN, PAPANTONIO, THOMAS, MITCHELL
ECHSNER & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL. 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
LAMBERT AND NELSON
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Gerald E. Meunier
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainshen.com

Jerrold Seth Parker
PARKER, WAICHMAN, ALONSO LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
MORGAN & MORGAN
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W
Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
rlewis@hausfeldllp.com

James Robert Reeves
LUMPKIN & REEVES
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
SEEGER WEISS, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
LEWIS & ROBERTS
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkb@lewis-roberts.com

Richard J. Serpe, Esquire
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

**OF COUNSEL TO COURT APPOINTED
PLAINTIFFS' STEERING COMMITTEE IN MDL 2047**

Jeremy W. Alters
ALTERS LAW FIRM, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Phone: (305) 571-8550
Fax: (305) 571-8559
jeremy@alterslaw.com

Andrew A. Lemmon
LEMMON LAW FIRM, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

**COUNSEL FOR INDIVIDUAL PLAINTIFFS[1]**

**Allison Grant, P.A.,**
*Counsel on Behalf of the Following Individual Plaintiffs:*

Haya, Laura and Haya, Daniel and Irene

**Berniard Law Firm, Gregory DiLeo and Kanner & Whiteley,**
*Counsel on Behalf of the Following Individual Plaintiffs:*

Wiltz, Kenneth & Barbara

**Baron & Budd and Alters, Boldt, Brown, Rash & Culmo**
*Counsel on Behalf of the Following Individual Plaintiffs:*

Amorin, Eduardo and Carmen

**Herman, Herman, Katz & Colar, LLP,**
*Counsel on Behalf of the Following Individual Plaintiffs:*

Quartararo, Joseph
Vapy, Cathy Parker

*Eduardo and Carmen Amori, et al. v. Taishan Gypsum Co., Ltd.
f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*

**Exhibit "A"–Plaintiffs' Counsel and Plaintiffs' Contact
Information in Plaintiffs' Class Action Complaint**

| PLAINTIFFS' COUNSEL |
| --- |
| Allison Grant, Esquire<br>Allison Grant, P.A.<br>950 Peninsula Corporate Circle<br>Suite 1022<br>Boca Raton, FL 33487<br>Phone: (561) 994-9646<br>agrant@allisongrantpa.com |
| Jeremy W. Alters<br>Alters Law Firm, P.A.<br>4141 N.E. 2nd Avenue<br>Suite 201<br>Miami, FL 33137<br>Phone: (305) 571-8550<br>Fax: (305) 571-8559<br>jeremy@abbrclaw.com |
| Bruce Steckler<br>Baron & Budd<br>3102 Oak Lawn Avenue<br>Suite 1100<br>Dallas, TX 75219-4281<br>Phone: (214) 521-3605<br>Fax: (214) 520-1181<br>hflowers@baronbudd.com |
| Jeffrey P. Berniard<br>Berniard Law Firm<br>643 Magazine Street, Suite 402<br>New Orleans, LA 70130<br>Phone: (504) 527-6225<br>Fax: (504) 617-6300<br>Jeffberniard@laclaim.com |

---

[1] Attached hereto as Exhibit "A" is the contact information for each plaintiff's counsel pro se plaintiff.

Page 1 of 3

**Levin, Fishbein, Sedran & Berman
Colson, Hicks, Eidson, Colson, Matthews, Martinez, Gonzales,
Kalbac & Kane; and Hausfeld, LLP,**
*Counsel on Behalf of the Following Individual Plaintiffs:*

Fong, Charmaine
Frankze, Julianne & Joshua

Gallardo, Arledys

**Levin, Fishbein, Sedran & Berman
Colson, Hicks, Eidson, Colson, Matthews, Martinez, Gonzales, Kalbac & Kane;
Hausfeld, LLP and Law Offices of Richard J. Serpe,**
*Counsel on Behalf of the Following Individual Plaintiffs:*

Fontenot, Perry &
Cassandra
Hand, Bryon

Popovitch, Robert
Purse, Jason
Topf, Frank & Yvonne

Vest\, Hugh & Tracy

**Parker Waichman Alonso, LLP,**
*Counsel on Behalf of the Following Individual Plaintiffs:*

Abel, Kenneth

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 34 of 36
Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 482 of 1680

In re: Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2018)
2018 WL 3972041

| PLAINTIFFS' COUNSEL |
| --- |
| Ervin A. Gonzalez<br>Colson, Hicks, Eidson, Colson<br>  Matthews, Martinez, Gonzales,<br>  Kalbac & Kane<br>255 Alhambra Circle, Penthouse<br>Cora Gables, FL 33134<br>Phone: (305) 476-7400<br>Fax: (305) 476-7444<br>Ervin@colson.com |
| Gregory Dileo<br>300 Lafayette Street, Suite 101<br>New Orleans, LA 70130<br>Phone: (504) 522-3456<br>Fax: (504) 522-3888<br>jjochumnola@gmail.com |
| Michael D. Hausfeld<br>Richard S. Lewis<br>Hausfeld LLP<br>1700 K Street, N.W.<br>Suite 650<br>Washington, DC 20006<br>Phone: (202) 540-7200<br>Fax: (202) 540-7201<br>rlewis@hausfeldllp.com |
| Russ M. Herman<br>Leonard A. Davis<br>Stephen J. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Ave., Suite 100<br>New Orleans, LA 70113<br>Phone: (504) 581-4892<br>Fax: (504) 561-6024<br>rherman@hhkc.com |

| PLAINTIFFS' COUNSEL |
| --- |
| Alan Kanner<br>Kanner & Whiteley, L.L.C.<br>701 Camp Street<br>New Orleans, LA 70130<br>Phone: (504) 524-5777<br>Fax: (504) 524-5763<br>M.Fuselier@kanner-law.com |
| Arnold Levin<br>Fred S. Longer<br>Matthew Gaughan<br>Levin, Fishbein, Sedran & Berman<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106<br>Phone: (215) 592-1500<br>Fax: (215) 592-4663<br>alevin@lfsblaw.com |
| Jerrold Parker<br>Jordan L. Chaikin<br>April S. Goodwin<br>Parker, Waichman, Alonso LLP<br>3301 Bonita Beach Road<br>Bonita Springs, FL 34134<br>Phone: (239) 390-1000<br>Fax: (239) 390-0055<br>Jchaikin@yourlawyer.com |
| Richard Serpe<br>Law Offices of Richard J. Serpe<br>Crown Center, Suite 310<br>580 East Main Street<br>Norfolk, VA 23510-2322<br>rserpe@serpefirm.com<br>Phone: (757) 233-0009<br>Fax: (757) 233-0455<br>rserpe@serpefirm.com |

Page 2 of 3

Page 3 of 3

```
Court Name: United States District Court
Division: 2
Receipt Number: 24683012032
Cashier ID: tlevinso
Transaction Date: 07/05/2011
Payer Name: BREIT DRESCHER IMPREVENTO
---------------------------------------
CIVIL FILING FEE
  For: BREIT DRESCHER IMPREVENTO
  Amount:        $350.00
---------------------------------------
CHECK
  Check/Money Order Num: 1723
  Amt Tendered: $350.00
---------------------------------------
Total Due:     $350.00
Total Tendered: $350.00
Change Amt:    $0.00

BREIT DRESCHER IMPREVENTO & WALKER
PC
2:11cv377
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 433 of 1680
Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 35 of 36 PageID# 911
In re Chinese-Manufactured Drywall Products Liability Litigation, Slip Copy (2019)
2018 WL 3972041

## CIVIL COVER SHEET

**JS 44** (Rev. 12/07)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
Eduardo and Carmen Amorin et al.

### DEFENDANTS
Taishan Gypsum Co., Ltd, f/k/a Shandong Taihe Dongxin Co., Ltd. et al.

**(b)** County of Residence of First Listed Plaintiff   **Punta Gorda, Florida**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   **China**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Richard J. Serpe, The Law Offices of Richard J. Serpe, 580 E. Main Street, #310, Norfolk, VA 23510, 757-233-0009

Attorneys (If Known)

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☒ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

*(form checkbox categories: CONTRACT, TORTS, FORFEITURE/PENALTY, BANKRUPTCY, OTHER STATUTES)*

☒ 365 Personal Injury - Product Liability

### V. ORIGIN (Place an "X" in One Box Only)
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332
Brief description of cause:
Product liability for defective drywall

### VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes

### VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE  Eldon Fallon/EDLA   DOCKET NUMBER  MDL 2047

DATE   07/05/2011

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY
RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

---

LAW OFFICES OF
RICHARD J. SERPE, P.C.

July 5, 2011

*VIA HAND DELIVERY*

Fernando Galindo, Clerk
United States District Court for the Eastern District of Virginia
Norfolk Division
United States Courthouse
600 Granby Street
Norfolk, VA 23510

In Re: Amorin et al. v. Taishan Gypsum Co., Ltd. f/k/a/ Shandong Taihe Dongxin Co., Ltd. et al.

Dear Mr. Galindo:

Enclosed please find the following for filing:

1. Original Complaint for the above-referenced matter;
2. Original Cover Sheet for Filing Civil Actions; and
3. A check in the amount of $350.00 in payment of the filing fee.

Please note that we will not be serving the above-referenced complaint at this time. If you have any questions regarding this matter, please do not hesitate to contact us.

Very truly yours,

Richard J. Serpe

RJS/tho
Enclosures

580 E. Main Street • Suite 310 • Norfolk, VA 23510-2322 • Phone: (757) 233-0009 • Toll Free: (877) 544-5323 • Fax: (757) 233-0455 • www.serpefirm.com

IN RE: CHINESE–MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION

FILED
U.S. DISTRICT C
EASTERN DISTRICT OF

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

2011 JUL 19 AN

LORETTA G. \
CLERK

SCHEDULE CTO–22 – TAG–ALONG ACTIONS

IN RE: CHINESE–MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION

| MDI | DIST | DIV. | C.A.NO. | CASE CAPTION |
|---|---|---|---|---|
| (SEE ATTACHED SCHEDULE) | FLORIDA SOUTHERN | | | |
| CONDITIONAL TRANSFER ORDER (CTO–22) | FLS | 1 | 11–22408 | Amorin et al v. Taishan Gypsum Co., Ltd., f/k Shandong Taihe Dongxin Co., Ltd. |
| | VIRGINIA EASTERN | | | |
| | VAE | 2 | 11–00377 | Amorin et al v. Taishan Gypsum Co., LTD. et |

On June 15, 2009, the Panel transferred 9 civil action(s) to the United States District Co
Eastern District of Louisiana for coordinated or consolidated pretrial proceedings purs
U.S.C. §1407. *See* 626 F.Supp.2d 1346 (J.P.M.L. 2009). Since that time, 150 additiona
have been transferred to the Eastern District of Louisiana. With the consent of that court, all such
actions have been assigned to the Honorable Eldon E Fallon.

**All Citations**

It appears that the action(s) on this conditional transfer order involve questions of fact that are
common to the actions previously transferred to the Eastern District of Louisiana and assigned to
Judge Fallon.

Slip Copy, 2018 WL 3972041

Pursuant to Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict
Litigation, the action(s) on the attached schedule are transferred under 28 U.S.C. §1407 to the
Eastern District of Louisiana for the reasons stated in the order of June 15, 2009, and, with the
consent of that court, assigned to the Honorable Eldon E Fallon.

This order does not become effective until it is filed in the Office of the Clerk of the United States
District Court for the Eastern District of Louisiana. The transmittal of this order to said Clerk shall
be stayed 7 days from the entry thereof. If any party files a notice of opposition with the Clerk of the
Panel within this 7–day period, the stay will be continued until further order of the Panel.



Inasmuch as no objection is
pending at this time, the
stay is lifted.

Jul 19, 2011

CLERK'S OFFICE
UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FOR THE PANEL:

Jeffery N. Lüthi
lerk of the Panel

CLERK'S OFFICE
A TRUE COPY
Jul 19 2011

Fee _____
Process _____
x  Dktd _____
CtRmDep _____
Doc. No. _____

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# JOINT APPENDIX TAB # 18

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL | * |
| PRODUCTS LIABILITY LITIGATION | * |
| | *  **CIVIL ACTION** |
| | * |
| | *  **MDL NO. 2047** |
| | * |
| | *  **SECTION L (5)** |
| THIS DOCUMENT RELATES TO: | * |
| ALL *AMORIN* CASES | * |
| | * |

## ORDER & REASONS

Before the Court is a Notice of Clarification Regarding the Composition of the *Amorin* Class filed by the Plaintiffs' Steering Committee (the "PSC"). R. Doc. 21741. Defendants have filed a Motion to Reject the PSC's Notice of Clarification, R. Doc. 21763, to which the PSC has responded, R. Doc. 21783.

## I.  BACKGROUND

From 2004 through 2006, a housing boom in parts of the United States and rebuilding efforts necessitated by Hurricanes Rita and Katrina in the Gulf South led to a shortage of construction materials, including drywall.  As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf and East Coasts.  Sometime after the Chinese drywall was installed, homeowners began to complain of foul-smelling odors, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes.  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829–30 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014).  Many of these homeowners also began to complain of various physical afflictions believed to have been caused by the Chinese drywall.

These homeowners then began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused on these two entities and their downstream associates and has proceeded on strikingly different tracks for the claims against each group.[1] Relevant to this Order are the Chinese Defendants. These Defendants include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include China New Building Materials Group ("CNBM Group"), China New Building Materials Co. ("CNBM"), CNBMIT Co. Ltd. ("CNBMIT"), CNBM USA Corp. ("CNBM USA"), and United Suntech Craft, Inc. ("United Suntech") (collectively the "CNBM Entities"), as well as the Beijing New Building Materials

---

[1] The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which was designed to resolve all Knauf-related, Chinese drywall claims. In addition to the Knauf Settlement Agreement and after a jury trial in a bellwether case, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. The total amount of the Knauf Settlement is approximately $1.1 billion. Although the Court occasionally had to deal with settlement administration and enforcement issues, with the assistance of Special Master Dan Balhoff, the Knauf portion of this litigation is now resolved.

2

Public Limited Company ("BNBM") and Beijing New Building Material Group ("BNBMG") (collectively the "BNBM Entities").

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both cases. Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the preliminary default in *Germano* on Plaintiffs' claimed damages. At the hearing, the PSC presented evidence specific to seven individual properties, which served as bellwether cases. Thereafter, on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of Plaintiffs.

On June 10, 2010, the last day to timely appeal the Default Judgment against them, Taishan filed a Notice of Appeal in *Germano* and entered its appearance in *Germano* and *Mitchell*. After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. Because this was the first time Defendants raised jurisdictional issues, the Fifth Circuit remanded the case to this Court to determine whether this Court indeed has jurisdiction over Taishan.

In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery,

3

the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. Discovery included the production of both written and electronic documents as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery was highly contentious, requiring close supervision by the Court. The Court presided over regularly-scheduled status conferences, conducted hearings, and issued rulings to resolve numerous discovery-related disputes.

In June 2011, the PSC filed identical complaints in Federal district courts in Florida, Virginia, and Louisiana (the "*Amorin* complaints"). The *Amorin* complaints include all Plaintiffs named in the *Wiltz*, *Gross*, *Abel*, and *Haya* actions. The Florida and Virginia actions were transferred by the JPML to the MDL; the PSC filed the Louisiana omnibus complaint directly into the MDL. It is undisputed that the allegations and Plaintiffs named in the *Amoin* complaints are identical. According to the PSC, these identical complaints were filed "out of an abundance of caution," because "there existed a colorable question regarding the application of the jurisdictional tests known as the 'stream-of commerce' test and the 'stream-of-commerce-plus' test reflected in the plurality opinions in *McIntyre* and *Asahi*, as well as Justice Brennan's concurring opinion in *Asahi*."

In April 2012, Taishan filed various motions, including motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the

Florida state court, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG and TTP. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan, TG, and TTP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to voluntarily participate in this suit.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt, ordering that Taishan pay $15,000.00 in attorneys' fees to Plaintiffs' counsel and $40,000.00 as a penalty for contempt; Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process; and if Taishan violates the injunction, it must pay a further penalty of twenty-five percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation.

On July 23, 2014, the PSC filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Taishan did not appear and, on September 26, 2014, this Court certified a class of all

5

owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants. R. Doc. 18028.

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid both the sum of $15,000.00 in attorneys' fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015. On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."

On March 10, 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b). R. Doc. 20150. The Court determined the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found the commercial activity exception did not apply, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because the PSC failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.

After concluding it lacked personal jurisdiction over CNBM Group, on April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised with respect to CNBM, BNBM Group, and BNBM. The Court found Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to

6

BNBM. This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to them, and that the Court has jurisdiction over CNBM, BNBM Group, and BNBM in relation to Plaintiffs' claims based on Louisiana law. Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing and adopted the PSC's damage calculations methodology related to remediation of properties.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify an interlocutory appeal from this Court's April 21, 2017 jurisdiction order. Because the Court found the April 21, 2017 Order & Reasons involved a controlling question of law as to which there was substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal might materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol-Myers Squibb v. Superior Court of California* ("*Bristol-Myers*"), 137 S. Ct. 1773 (2017). Based on *Bristol-Myers*, Defendants contested this Court's findings of personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argued *Bristol-Myers* impacted questions raised on appeal. On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order to avoid piecemeal litigations, noting its duty to address the effect of *Bristol–Myers* on the jurisdictional issue before certifying the matter to the Fifth Circuit. Subsequently, on November 30, 2017, the

Court denied Defendants' motion to dismiss, holding *Bristol-Myers* did not change this Court's jurisdictional findings and class certification.

On January 2, 2018, the Court denied Defendants CNBM, BNBM Group, and BNBM's motion to vacate the default judgments against them. On March 5, 2018, the Court reinstated its order to certifying the interlocutory appeal of its April 21, 2017 order. The Court nevertheless denied Defendants' request to certify the interlocutory appeal of its opinion involving *Bristol–Myers'* impact on the Court's personal jurisdiction analysis, as the Supreme Court's opinion in *Bristol–Myers* does not address class actions and because two separate panels of the Fifth Circuit had already affirmed the Court's original personal jurisdiction analysis with respect to Taishan in 2014. This issue remains with the Fifth Circuit.

On August 28, 2018, the PSC filed a "Notice of Clarification Regarding the Composition of the *Amorin* Class." R. Doc. 21741. On September 6, 2018, the CNBM and BNBM Entities filed a motion to reject the PSC's clarification, arguing that, although the PSC styled its memorandum as a "notice," it was in actuality a proposed modification to the class definition. R. Doc. 21763. The PSC filed its response on September 18, 2018. R. Doc. 21783.

## II.    THE PRESENT MOTION

The issue before the Court is whether the *Amoin* Class includes both current and former owners of homes affected by Chinese drywall. Although the Court initially certified the class in 2014, the issue was raised for the first time with the Court during a motion hearing held on August 15, 2018. R. Doc. 21709. During this hearing, at which the Court heard oral argument on the parties' proposed trial plans, counsel for Defendants distinguished between remediation and non-remediation damages, explaining:

Non-remediation damages covers other categories of damages that could still be considered property damage, but—and are not "personal injury damages." It includes personal injuries, alternative living expenses, loss of use and enjoyment, appliances, foreclosure, bankruptcy, short sale. There's a whole laundry list.

The distinction between remediation and non-remediation is important because this Court certified a class for remediation damages only, and this Court has also identified a formula that can be used for current owners only for remediation damages only. And I will get into why even that isn't quite as simple as it sounds.

But at this point, your Honor, the current owner remediation damages is actually a very small aspect of this case now, because in the original claimants and plaintiffs that came to the court, many have sold the properties so they're former owners now, and many have already remediated their properties and so they're outside of the class. The majority of this case, of the claimants in this case, your Honor, at this point are outside of the class.

*Id.* at 9:8–25. After hearing from Defense counsel, the Court addressed the issue with counsel for

Plaintiffs:

THE COURT: Let me ask you one question. The class they say include—does not include all owners, it just includes the present owners.
MR. LEVIN: It just included current owners at the time, yes. But you can take your findings and apply them to everybody else.

*Id.* 32:3–8. Following this exchange, the Court did not discuss the issue further at the hearing.

Thereafter, on August 28, 2018, the PSC filed a "Notice of Clarification Regarding the

Composition of the *Amorin* Class." R. Doc. 21741. In its notice, the PSC clarifies that the *Amorin*

Class includes both present and former homeowners whose homes were adversely affected by

Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or

delivered by the Taishan Defendants. In support of its clarification, the PSC points to the Class

Notice and Supplemental Class Notice, which state that the *Amorin* Class "includes *all current

and former owners* of properties in the United States containing drywall manufactured by [the

Taishan] defendants …." R. Doc. 18028-1 at n.2 (emphasis added); R. Doc. 18086-18 at n.2

(emphasis added).

9

On September 6, 2018, the CNBM and BNBM Entities filed a motion to reject the PSC's clarification. R. Doc. 21763. They argue the phrase "all owners" limits the class definition to only those who currently own their homes. According to Defendants, any person who was a class member but subsequently sold her home or lost the home to foreclosure or bankruptcy is no longer a member of the *Amorin* class. In support for their position, Defendants argue the Court certified the class for present owners only, and only with respect to remediation damages. Thus, according to Defendants, the PSC's notice is an attempt to amend the class definition, which requires the Court to undergo a separate analysis to expand the class definition under Rule 23.

The PSC filed its response on September 18, 2018. R. Doc. 21783. They argue Defendants' position with respect to who is included in the class definition is inequitable, as it would reward Defendants for their dilatory tactics in this litigation. The PSC further contends that, under Louisiana law, a former owner of real property maintains the right to sue a tortfeasor for damages, even after the owner sells the property in question. R. Doc. 21783 at 2 (citing *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 79 So. 3d 246, 256 (La. 2011)).

## III.  DISCUSSION

The Court must first determine whether the PSC's filing is, in fact, a clarification of the class' definition, or if the Court should construe it as a motion to amend the class definition, as Defendants contend. When called upon to determine the scope of an already certified class, "the district court construes the language of the class definition in much the same way that a court might construe the language of a contract or a statute." *In re Cement and Concrete Antitrust Litig.*, 817 F.2d 1435, 1443 (9th Cir. 1987), *rev'd on other grounds by California v. ARC Am. Corp.*, 490 U.S. 93 (1989).

The language at issue in this case is:

> [A]ll owners of real properties in the United States, who are named Plaintiffs on
> the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wilz* (*i.e.,* not an absent class
> member), asserting claims for remediated damages arising from, or otherwise
> related to Chinese Drywall manufactured, sold, distributed, supplied, marketed,
> inspected, imported or delivered by the Taishan Defendants.

A plain reading of this language includes any homeowner named in the *Amorin*, *Germano*, *Gross*,

and/or *Wilz* complaints whose home was damaged by Chinese Drywall manufactured, sold,

distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants—

having sold or otherwise lost possession of the home does not change the fact that the person's

home was damaged by Chinese Drywall.

The Class Notice and Supplemental Class Notice, which state that the *Amorin* Class

"includes *all current and former owners*" make this point clear. R. Doc. 18028-1 at n.2 (emphasis

added); R. Doc. 18086-18 at n.2 (emphasis added). *See cf. Carlough v. Amchem Prods., Inc.*, 158

F.R.D. 314, 334 (E.D. Pa. 1993) ("The objectors are incorrect in asserting, however, that the

additional information included in the notice, identifying specific asbestos-containing products,

further describing what constitutes "occupational exposure," and listing relevant occupations, is

inconsistent with the definition of the class as preliminarily certified."). Thus, although a district

court possesses "broad authority to redefine the class 'as appropriate in response to the progression

of the case,'" a modification of the class definition is not necessary in this case. *See, e.g.*,

*Montelongo v. Meese*, 803 F.2d 1341, 1352 (5th Cir. 1986) (quoting *Richardson v. Byrd*, 709 F.2d

1016, 1019 (5th Cir. 1983)).

Defendants apparently take the position that, if over the course of nine years any of the

Plaintiffs named in the *Amorin* complaints no longer own their homes, they should be excluded from

the class, notwithstanding the fact that their homes were allegedly damaged by Taishan's Drywall.

Under Defendants' definition, the composition of the class would be ever-changing, and given the

11

glacial speed with which this case has progressed, by the time the case is resolved, there will be very
few class members left, if any. Such a construction is untenable and leads to an absurd result. *See
Waggoner v. Gonzales*, 488 F.3d 632, 638 (5th Cir. 2007) ("[T]he common mandate of statutory
construction [is] to avoid absurd results.").

With their motion, Defendants effectively seek to significantly narrow the scope of the
*Amorin* class. Defendants had the opportunity to participate in sculpting the class definition in 2014,
an opportunity they declined. Moreover, Defendants were put on notice that the definition included
both present and former homeowners in 2014 when the Court issued its legal notice and amended
legal notice to the class, to which Defendants failed to object. R. Doc. 18214. The Court will not
amend the class definition to exclude those who have lost their homes at this late date.

## IV.   CONCLUSION

For the foregoing reasons, the Court **ACCEPTS** the Plaintiffs' Steering Committee's notice
clarifying the composition of the *Amorin* class. R. Doc. 21741. As a result, the CNBM and BNBM
entities' motion to reject the Plaintiff's Steering Committee's notice is **DENIED**. R. Doc. 21763.

New Orleans, Louisiana on this 11th day of October, 2018.

_____
Eldon E. Fallon
United States District Judge

12

# JOINT APPENDIX TAB # 19

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | * * * * * * * * * | CIVIL ACTION MDL NO. 2047 SECTION L (5) |
| THIS DOCUMENT RELATES TO: ALL *AMORIN* CASES | | |

## ORDER & REASONS

Before the Court is the CNBM and BNBM Defendants' motion to adopt their Louisiana *Amorin* Trial Plan, R. Doc. 21501; Defendant Taishan's motion to adopt its Louisiana *Amorin* Trial Plan, R. Doc. 21503; and the Plaintiffs' Steering Committee's omnibus opposition, wherein it moves the Court to adopt its plan, R. Doc. 21545. Considering the parties' pleadings and having held oral argument at the Court's monthly status conference, R. Doc. 21676, the Court now issues its trial plan for the Louisiana *Amorin* cases.

## I.   BACKGROUND

From 2004 through 2006, a housing boom in parts of the United States and rebuilding efforts necessitated by Hurricanes Rita and Katrina in the Gulf South led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf and East Coasts. Sometime after the Chinese drywall was installed, homeowners began to complain of foul-smelling odors, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829–30 (E.D. La. 2012),

*aff'd*, 742 F.3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to have been caused by the Chinese drywall.

These homeowners then began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused on these two entities and their downstream associates and has proceeded on strikingly different tracks for the claims against each group.[1] Relevant to this Order are the Chinese Defendants. These Defendants include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include China New Building Materials Group ("CNBM Group"), China New Building Materials Co. ("CNBM"), CNBMIT Co. Ltd. ("CNBMIT"), CNBM USA Corp. ("CNBM USA"), and United Suntech Craft, Inc. ("United

---

[1] The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which was designed to resolve all Knauf-related, Chinese drywall claims. In addition to the Knauf Settlement Agreement and after a jury trial in a bellwether case, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. The total amount of the Knauf Settlement is approximately $1.1 billion. Although the Court occasionally had to deal with settlement administration and enforcement issues, with the assistance of Special Master Dan Balhoff, the Knauf portion of this litigation is now resolved.

Suntech") (collectively the "CNBM Entities"), as well as the Beijing New Building Materials Public Limited Company ("BNBM") and Beijing New Building Material Group ("BNBMG") (collectively the "BNBM Entities").

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both cases. Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the preliminary default in *Germano* on Plaintiffs' claimed damages. At the hearing, the PSC presented evidence specific to seven individual properties, which served as bellwether cases. Thereafter, on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of Plaintiffs.

On June 10, 2010, the last day to timely appeal the Default Judgment against them, Taishan filed a Notice of Appeal in *Germano* and entered its appearance in *Germano* and *Mitchell*. After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction. Because this was the first time Defendants raised jurisdictional issues, the Fifth Circuit remanded the case to this Court to determine whether this Court indeed has jurisdiction over Taishan.

3

In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. Discovery included the production of both written and electronic documents as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery was highly contentious, requiring close supervision by the Court. The Court presided over regularly-scheduled status conferences, conducted hearings, and issued rulings to resolve numerous discovery-related disputes.

In June 2011, the PSC filed identical complaints in Federal district courts in Florida, Virginia, and Louisiana (the "*Amorin* complaints"). The *Amorin* complaints include all Plaintiffs named in the *Wiltz*, *Gross*, *Abel*, and *Haya* actions. The Florida and Virginia actions were transferred by the JPML to the MDL; the PSC filed the Louisiana omnibus complaint directly into the MDL. It is undisputed that the allegations and Plaintiffs named in the *Amoin* complaints are identical. According to the PSC, these identical complaints were filed "out of an abundance of caution," because "there existed a colorable question regarding the application of the jurisdictional tests known as the 'stream-of-commerce' test and the 'stream-of-commerce-plus' test reflected in the plurality opinions in *McIntyre* and *Asahi*, as well as Justice Brennan's concurring opinion in *Asahi*."

In April 2012, Taishan filed various motions, including motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on

4

Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the Florida state court, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG and TTP. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan, TG, and TTP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to voluntarily participate in this suit.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt, ordering that Taishan pay $15,000.00 in attorneys' fees to Plaintiffs' counsel and $40,000.00 as a penalty for contempt; Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process; and if Taishan violates the injunction, it must pay a further penalty of twenty-five percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation.

On July 23, 2014, the PSC filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Taishan did not appear and, on September 26, 2014, this Court certified a class of all

owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by Taishan. R. Doc. 18028.

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid both the sum of $15,000.00 in attorneys' fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015. On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."

On March 10, 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b). R. Doc. 20150. The Court determined the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found the commercial activity exception did not apply, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because the PSC failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.

After concluding it lacked personal jurisdiction over CNBM Group, on April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised with respect to CNBM, BNBM Group, and BNBM. The Court found Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to

6

BNBM. This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to them, and that the Court has jurisdiction over CNBM, BNBM Group, and BNBM in relation to Plaintiffs' claims based on Louisiana law. Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing and adopted the PSC's damage calculations methodology related to remediation of properties.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify an interlocutory appeal from this Court's April 21, 2017 jurisdiction order. Because the Court found the April 21, 2017 Order & Reasons involved a controlling question of law as to which there was substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal might materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol-Myers Squibb v. Superior Court of California* ("*Bristol-Myers*"), 137 S. Ct. 1773 (2017). Based on *Bristol-Myers*, Defendants contested this Court's findings of personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argued *Bristol-Myers* impacted questions raised on appeal. On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order to avoid piecemeal litigations, noting its duty to address the effect of *Bristol–Myers* on the jurisdictional issue before certifying the matter to the Fifth Circuit. Subsequently, on November 30, 2017, the

7

Court denied Defendants' motion to dismiss, holding *Bristol-Myers* did not change this Court's jurisdictional findings and class certification.

On January 2, 2018, the Court denied Defendants CNBM, BNBM Group, and BNBM's motion to vacate the default judgments against them. On March 5, 2018, the Court reinstated its order to certifying the interlocutory appeal of its April 21, 2017 order. The Court nevertheless denied Defendants' request to certify the interlocutory appeal of its opinion involving *Bristol–Myers*' impact on the Court's personal jurisdiction analysis, as the Supreme Court's opinion in *Bristol–Myers* does not address class actions and because two separate panels of the Fifth Circuit had already affirmed the Court's original personal jurisdiction analysis with respect to Taishan in 2014. This issue remains with the Fifth Circuit.

After managing the MDL for nine years, and having addressed numerous discovery disputes, dispositive motions, and other pretrial issues involving facts and legal questions common to the various cases, the Court concluded the purposes behind consolidating these related actions had been served. Accordingly, the Court began transferring cases back to their transferor courts, beginning with the Florida *Amorin* cases on March 12, 2018 and followed by the Virginia *Amorin* cases on August 20, 2018. The JPML accepted these suggestions of remand on August 6, 2018 and October 10, 2018, respectively. R. Docs. 21642, 21834. The *Amorin* complaint filed in Louisiana and the Louisiana claimants therein remain within the jurisdiction of this Court. The Court now turns its attention to preparing these claims for trial.

The Court provided the parties with a list of 921 Louisiana claimants in preparation for the Court's June Monthly Status Conference. R. Doc. 21339. Prior to the July Monthly Status Conference, the parties each submitted a proposed trial plan. Oral Argument on these motions was heard on Wednesday, August 15, 2018. R. Doc. 21676.

8

## II.    DISCUSSION

The CNBM and the BNBM Entity Defendants move the Court to adopt their Louisiana *Amorin* Trial Plan. R. Doc. 21501. They submit their plan is designed to handle two issues not yet resolved in this MDL. R. Doc. 21501 at 4. First, Defendants argue that the issue of piercing the corporate veil for the purposes of liability has not been resolved. R. Doc. 21501 at 4. Second, they assert that they retain their full rights to contest all issues, including liability and causation, in cases where defaults have not been entered against them. R. Doc. 21501.

Defendant Taishan moves the Court to adopt its proposed plan for the Louisiana *Amorin* claims. R. Doc. 21503. Taishan suggests the Court try the claims on an individual basis for all categories of damage. R. Doc. 21503 at 1. Taishan argues its plan is efficient and fair, and protects the due process rights of all parties. R. Doc. 21503. Taishan is particularly concerned that Plaintiffs bear the burden to prove their claims and that Taishan has a right to defense. R. Doc. 21503 at 10. Taishan further argues its plan should be limited to resolution of the Louisiana *Amorin* claims because the *Brooke* claims are in a different procedural posture. R. Doc. 21503 at 2.

The PSC responds in opposition to Defendants' motions and asks the Court to adopt its trial plan. R. Doc. 21545. The PSC argues Defendants' proposed plans serve only to prolong the disposition of the MDL. R. Doc. 21545 at 2. First, the PSC argues the *Amorin* claims involve limited remaining factual disputes and therefore require only limited additional discovery. R. Doc. 21545. Second, the PSC argues its plan is more efficient and will resolve all the Louisiana claims within one year. R. Doc. 21545 at 6. Third, the PSC argues Defendants have ignored several of the Court's rulings and therefore submit Defendants' proposed plans do not accurately reflect the record in this case. R. Doc. 21545 at 10, 12.

9

The Court has considered the parties' proposed plans and criticisms thereof and issues the following trial plan for the Louisiana cases in the *Amorin* class. The Court will address a trial plan for the *Brooke* class at a later date.

The PSC shall select twenty Louisiana cases from the *Amorin* class by no later than Monday, November 12, 2018. Thereafter, Defendants shall select twenty Louisiana cases from the *Amorin* class by no later than Wednesday, December 12, 2018. These cases will form the discovery pool from which the cases will be selected for trial at a later date. Discovery will close on Friday, April 12, 2019.

During discovery, with regard to non-remediation claims, the PSC shall advise Defendants of the elements of the non-property damages claimed and provide Defendants with any supporting documentation substantiating these claims. Counsel shall meet and confer to establish a timetable for this disclosure. If necessary, depositions shall proceed once this documentation has been exchanged.

With respect to property remediation, the PSC shall provide Defendants with an accounting identifying: the claimant owner, the square footage of drywall in the home, and proof of product I.D. Except for good cause shown, discovery shall be limited to these areas with respect to these claims.

## III. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the parties adhere to the trial plan as stated herein.

New Orleans, Louisiana on this 12th day of October, 2018.

_____

10

Eldon E. Fallon
United States District Judge

11

# JOINT APPENDIX TAB # 20

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:  CHINESE-MANUFACTURED DRYWALL  * 
PRODUCTS LIABILITY LITIGATION  *
*     CIVIL ACTION
*
*     MDL NO. 2047
*
*     SECTION L (5)
THIS DOCUMENT RELATES TO:  *
ALL *AMORIN* FLORIDA CASES  *
*

## ORDER & REASONS

Before the Court are motions to stay the Florida and Virginia-based claims in the Louisiana *Amorin* Complaint filed by the Plaintiffs' Steering Committee (the "PSC"). R. Docs. 21639, 21863. The CNBM and BNBM Defendants oppose the motions. R. Docs. 21728, 21758. Also before the Court is the Taishan Defendants' motion seeking dismissal of these same Florida and Virginia-based claims, R. Docs. 21729, 21913, to which the PSC has filed an opposition, R. Doc. 21758. Having heard oral argument on the parties' respective motions regarding the Florida-based claims on September 27, 2018, R. Doc. 21802, which the parties incorporate by reference in their subsequently filed motions concerning the Virginia-based claims, the Court is ready to rule.

## I.  BACKGROUND

From 2004 through 2006, a housing boom in parts of the United States and rebuilding efforts necessitated by Hurricanes Rita and Katrina in the Gulf South led to a shortage of construction materials, including drywall.  As a result, drywall manufactured in China was brought into the United States and used to construct and refurbish homes in coastal areas of the country, notably the Gulf and East Coasts.  Sometime after the Chinese drywall was installed, homeowners began to complain of foul-smelling odors, the corrosion and blackening of metal wiring, surfaces,

1

and objects, and the breaking down of appliances and electrical devices in their homes. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 829–30 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to have been caused by the Chinese drywall.

These homeowners then began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as a multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 09-2047 before this Court.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities and (2) the Taishan Entities. The litigation has focused on these two entities and their downstream associates and has proceeded on strikingly different tracks for the claims against each group.[1] Relevant to this Order are the Chinese Defendants. These Defendants include the principal Chinese-based Defendant, Taishan, namely, Taishan Gypsum Co. Ltd. ("TG") and its wholly-owned subsidiary, Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively "Taishan" or "Taishan Entities"). Other Chinese-based Defendants include China New Building

---

[1] The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. On December 20, 2011, the Knauf Entities and the PSC entered into a global, class Settlement Agreement ("Knauf Settlement Agreement"), which was designed to resolve all Knauf-related, Chinese drywall claims. In addition to the Knauf Settlement Agreement and after a jury trial in a bellwether case, numerous defendants in the chain-of-commerce with the Knauf Entities have entered into class settlement agreements, the effect of which settles almost all of the Knauf Entities' chain-of-commerce litigation. The total amount of the Knauf Settlement is approximately $1.1 billion. Although the Court occasionally had to deal with settlement administration and enforcement issues, with the assistance of Special Master Dan Balhoff, the Knauf portion of this litigation is now resolved.

Materials Group ("CNBM Group"), China New Building Materials Co. ("CNBM"), CNBMIT Co. Ltd. ("CNBMIT"), CNBM USA Corp. ("CNBM USA"), and United Suntech Craft, Inc. ("United Suntech") (collectively the "CNBM Entities"), as well as the Beijing New Building Materials Public Limited Company ("BNBM") and Beijing New Building Material Group ("BNBMG") (collectively the "BNBM Entities").

The Court's initial inquiry regarding Taishan involved four cases in this MDL: (1) *Germano v. Taishan Gypsum Co.* (Case No. 09-6687); (2) *The Mitchell Co. v. Knauf Gips KG* (Case No. 09-4115); (3) *Gross v. Knauf Gips KG* (Case No. 09-6690); and (4) *Wiltz v. Beijing New Building Materials Public Ltd.* (Case No. 10-361).

The first issues involving Taishan arose when Taishan failed to timely answer or otherwise enter an appearance in *Mitchell* and *Germano*, despite the fact that it had been properly served in each case. Thus, after an extended period of time, the Court entered preliminary defaults against Taishan in both cases. Thereafter, the Court moved forward with an evidentiary hearing in furtherance of the preliminary default in *Germano* on Plaintiffs' claimed damages. At the hearing, the PSC presented evidence specific to seven individual properties, which served as bellwether cases. Thereafter, on February 19 and 20, 2010, the Court issued detailed Findings of Fact and Conclusions of Law. On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of Plaintiffs.

On June 10, 2010, the last day to timely appeal the Default Judgment against them, Taishan filed a Notice of Appeal in *Germano* and entered its appearance in *Germano* and *Mitchell*. After Taishan entered its appearance in the MDL, it quickly sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction.

Because this was the first time Defendants raised jurisdictional issues, the Fifth Circuit remanded the case to this Court to determine whether this Court indeed has jurisdiction over Taishan.

In the fall of 2010, the Court directed the parties to commence the personal jurisdiction discovery necessary to resolve Taishan's motions to vacate. Sometime after the initial discovery, the parties agreed to expand the discovery beyond the *Germano* and *Mitchell* cases to other cases in which Taishan had been served, including *Gross* and *Wiltz*.

Formal personal jurisdiction discovery of Taishan began in October 2010. Discovery included the production of both written and electronic documents as well as depositions of Taishan's corporate representatives, with each type of discovery proceeding in a parallel fashion. This discovery was highly contentious, requiring close supervision by the Court. The Court presided over regularly-scheduled status conferences, conducted hearings, and issued rulings to resolve numerous discovery-related disputes.

In June 2011, the PSC filed identical complaints in Federal district courts in Florida, Virginia, and Louisiana (the "*Amorin* complaints"). The *Amorin* complaints include all Plaintiffs named in the *Wiltz*, *Gross*, *Abel*, and *Haya* actions. The Florida and Virginia actions were transferred by the JPML to the MDL; the PSC filed the Louisiana omnibus complaint directly into the MDL. It is undisputed that the allegations and Plaintiffs named in the *Amoin* complaints are identical. According to the PSC, these identical complaints were filed "out of an abundance of caution," because "there existed a colorable question regarding the application of the jurisdictional tests known as the 'stream-of commerce' test and the 'stream-of-commerce-plus' test reflected in the plurality opinions in *McIntyre* and *Asahi*, as well as Justice Brennan's concurring opinion in *Asahi*."

In April 2012, Taishan filed various motions, including motions to dismiss for lack of personal jurisdiction. On June 29, 2012, over three years since the creation of this MDL and after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions. The Court coordinated its hearing with the Honorable Joseph Farina of the Florida state court, who had a similar motion involving Taishan's challenge to personal jurisdiction.

On September 4, 2012, this Court issued a 142-page Order regarding Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz*, in which the Court denied the motions to dismiss and held that it maintained personal jurisdiction over Taishan. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). The Court also ruled that Taishan was operating as the alter ego of TG and TTP. The Court certified an interlocutory appeal, and the Fifth Circuit granted permission to appeal. In January and May of 2014, two different panels of the Fifth Circuit affirmed this Court's ruling and held that this Court maintained personal jurisdiction over Taishan, TG, and TTP. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). The time for writ of certiorari passed, and the issue of personal jurisdiction over Taishan became firmly and finally settled. Nevertheless, Taishan refused to voluntarily participate in this suit.

On June 20, 2014, the Court ordered Taishan to appear in open court on July 17, 2014 to be examined as a judgment debtor. Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination, and the Court held Taishan in contempt, ordering that Taishan pay $15,000.00 in attorneys' fees to Plaintiffs' counsel and $40,000.00 as a penalty for contempt; Taishan and any of its affiliates or subsidiaries be enjoined from conducting any business in the United States until or unless it participates in this judicial process; and if Taishan violates the injunction, it must pay

a further penalty of twenty-five percent of the profits earned by the Company or its affiliate who violate the Order for the year of the violation.

On July 23, 2014, the PSC filed their Omnibus Motion for Class Certification pursuant to Rule 23(b)(3). Taishan did not appear and, on September 26, 2014, this Court certified a class of all owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants. R. Doc. 18028.

Taishan finally entered an appearance with the Court in February 2015, and, to satisfy the contempt, Taishan paid both the sum of $15,000.00 in attorneys' fees to Plaintiffs' counsel and the contempt penalty of $40,000.00 in March 2015. On March 17, 2015, the Court ordered Taishan and the BNBM and CNBM Entities to participate in expedited discovery related to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists."

On March 10, 2016, this Court granted CNBM Group's motion to dismiss, finding it was an "agent or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), and therefore outside the jurisdiction of this Court under 28 U.S.C. § 1603(b). R. Doc. 20150. The Court determined the tortious activity exception did not apply because the alleged tortious conduct did not occur within the United States under 28 U.S.C. § 1605(a)(5). Further, the Court found the commercial activity exception did not apply, as CNBM Group did not directly manufacture, inspect, sell, or market drywall in the United States. Because the PSC failed to present evidence sufficient to overcome the presumption that CNBM Group was entitled to independent status for purposes of the FSIA, the Court granted the motion and dismissed CNBM Group from the present litigation.

6

After concluding it lacked personal jurisdiction over CNBM Group, on April 21, 2017, the Court issued a 100-page opinion related to jurisdictional challenges being raised with respect to CNBM, BNBM Group, and BNBM. The Court found Taishan was an agent of BNBM under Florida and Virginia law, such that Taishan's contacts in Florida and Virginia are imputed to BNBM. This Court further found that CNBM, BNBM Group, and BNBM were part of a single business enterprise with Taishan under Louisiana law, such that Taishan's contacts in Louisiana may be imputed to them, and that the Court has jurisdiction over CNBM, BNBM Group, and BNBM in relation to Plaintiffs' claims based on Louisiana law. Also on April 21, 2017, the Court issued its Findings of Fact and Conclusions of Law related to the June 9, 2015 damages hearing and adopted the PSC's damage calculations methodology related to remediation of properties.

On May 22, 2017, Defendants filed a motion pursuant to 28 U.S.C. § 1292(b) to certify an interlocutory appeal from this Court's April 21, 2017 jurisdiction order. Because the Court found the April 21, 2017 Order & Reasons involved a controlling question of law as to which there was substantial ground for difference of opinion, and because the Court further found that an interlocutory appeal might materially advance the ultimate termination of this MDL, on August 4, 2017, the Court certified an interlocutory appeal to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

On August 1, 2017, Defendants filed a motion to dismiss for lack of personal jurisdiction following the recent U.S. Supreme Court case of *Bristol-Myers Squibb v. Superior Court of California* ("*Bristol-Myers*"), 137 S. Ct. 1773 (2017). Based on *Bristol-Myers*, Defendants contested this Court's findings of personal jurisdiction, class certification, and agency relationship. On August 14, 2017, Defendants filed a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) in the Fifth Circuit, in which they argued *Bristol-Myers* impacted questions raised on

appeal.  On August 24, 2017, this Court vacated its 28 U.S.C. § 1292(b) certification order to avoid piecemeal litigations, noting its duty to address the effect of *Bristol–Myers* on the jurisdictional issue before certifying the matter to the Fifth Circuit.  Subsequently, on November 30, 2017, the Court denied Defendants' motion to dismiss, holding *Bristol-Myers* did not change this Court's jurisdictional findings and class certification.

On January 2, 2018, the Court denied Defendants CNBM, BNBM Group, and BNBM's motion to vacate the default judgments against them.  On March 5, 2018, the Court reinstated its order certifying the interlocutory appeal of its April 21, 2017 order. This issue remains with the Fifth Circuit.

On March 12, 2018, having found that the purpose behind consolidating these related actions in this Court had been served, the Court issued its suggestion of remand with respect to the Florida *Amorin* Plaintiffs. R. Doc. 21240. In its suggestion of remand, the Court specifically retained jurisdiction "to consider the fair and equitable assessment of any potential recovery for the services performed and expenses incurred by attorneys acting for administration and common benefit of all MDL plaintiffs." *Id.* On June 6, 2018, the JPML entered its remand order, remanding the Florida-based *Amorin* claims to the U.S. District Court for the Southern District of Florida, the Honorable Marcia G. Cooke presiding. *See Amorin, et al. v. Taishan Gypsum Co., Ltd.*, No. 11-22408 (S.D. Fla.)

On August 3, 2018, the PSC moved to stay all Florida-based claims brought in the *Amorin* complaints filed in Louisiana and Virginia. R. Doc. 21639. The CNBM and BNBM entities filed their motion in opposition on August 24, 2018. R. Doc. 21728. The same day, August 24, 2018, Thaishan filed a motion seeking dismissal of the Florida claims included in the Louisiana and Virginia *Amorin* complaints. R. Doc. 21729. The PSC filed an omnibus reply in support of its

motion to stay and in opposition to Taishan's motion to dismiss on September 6, 2018. R. Doc. 21758. On September 27, 2018, the Court heard oral argument on both motions. R. Doc. 21802.

Meanwhile, on October 16, 2018, the JPML formally remanded the Virginia *Amorin* claims to the Eastern District of Virginia, the Honorable Mark S. Davis presiding. *See Amorin, et al. v. Taishan Gypsum Co., Ltd.*, No. 11-377 (E.D. Va.). Thereafter, the PSC filed a second motion to stay, this time seeking to stay the Virginia-based *Amorin* claims, R. Doc. 21863, which the CNBM and BNBM entities opposed on November 13, 2018, R. Doc. 21913.

## II. MOTIONS TO STAY AND TO DISMISS

The PSC moves the Court to stay all Florida and Virginia claims in the Louisiana *Amorin* complaint. R. Docs. 21639, 21863. It argues a stay is appropriate, as outright dismissal of these claims would be unduly prejudicial to Plaintiffs and could be deemed an abandonment or non-suit of the claims. R. Doc. 21758 at 5; R. Doc. 21639-1 at 8. Defendants oppose a stay, arguing the Florida and Virginia cases in the Louisiana *Amorin* complaint should be dismissed without prejudice, as a stay would only further complicate the proceedings. R. Doc. 21738 at 4; R. Doc. 21729 at 1. In response, the PSC argues a stay is a necessary protective measure that is within the Court's discretion to order and that a stay would have the same impact on Defendants as would an outright dismissal of the Florida and Virginia-based *Amorin* claims. R. Doc. 21758 at 3, 5.

## III. LAW & ANALYSIS

The issue presently before the Court—whether to stay identical claims in an MDL after its companion cases have been remanded—is unique. It is clear, however, that the Federal Rules of Civil Procedure "endow the trial judge with formidable case management authority," *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 508 (5th Cir. 1999) (quoting *Rosario–Diaz v. Gonzalez*, 140 F.3d 312, 315 (1st Cir. 1998)), and that this Court has "broad discretion to stay proceedings as an

incident to its power to control its own docket," *Clinton v. Jones*, 520 U.S. 681, 706 (1997). Thus, in deciding whether to dismiss or stay the Florida and Virginia-based claims in the Louisiana *Amorin* complaint, the Court will weigh the equities of the options before it.

Prior to remanding the Florida and Virginia *Amorin* omnibus complaints, this Court issued several orders regarding personal jurisdiction. Since remanding the Florida action, however, Defendants have argued this Court's rulings should not be given preclusive effect in the Florida court. *See* No. 11-22408, R. Doc. 91 (S.D. Fla.). This factor militates in favor of granting a stay, as Plaintiffs could be prejudiced by a dismissal should Judge Cooke conclude her court lacks jurisdiction over Defendants.[2] *See cf. Burger v. Am. Maritime Officers Union*, 170 F.3d 184, *2 (5th Cir. 1999) ("When the jurisdiction of the first-filed court to hear the dispute is uncertain, it is an abuse of discretion to dismiss the claims in the second-filed court with prejudice, as it creates the risk that the merits of the claims could never be addressed." (citing *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 628–29 (9th Cir. 1991))).

On the other hand, staying these cases, as opposed to dismissing them, would not prejudice Defendants. A stay will not require Defendants to engage in any discovery or motion practice regarding the Florida and Virginia *Amorin* Plaintiffs in this Court, and these claims essentially will be removed from this Court's docket.

The PSC filed identical complaints in Florida, Virginia, and Louisiana as a protective measure, fearing both issues of personal jurisdiction and statute of limitations defenses. Given the convoluted nature of the case, particularly with the issue of personal jurisdiction, the Court finds

---

[2] Although the effect of a stay (as opposed to a dismissal without prejudice) appears to be a distinction without a difference, Plaintiffs could be prejudiced by a dismissal in the sense that, in the event Judge Cooke finds the Florida court lacks jurisdiction, Plaintiffs would have to refile their lawsuit in this Court and start the process anew, including serving Defendants. Given the difficulties the parties have had in this case, including with service, the Court finds the refiling of the Florida (and Virginia) cases would prejudice Plaintiffs.

it most prudent to stay the Florida and Virginia-based *Amorin* claims presently before it to avoid any unforeseen and unintended consequences an outright dismissal might cause. *See* 17 MOORE'S FEDERAL PRACTICE ¶ 111.13[1] [o] [ii] [A] (3d ed. 2016) ("If the first-filed action is vulnerable to dismissal on jurisdictional or statute of limitations grounds, the court in the second-filed action should stay it or transfer it, rather than outright dismiss it."). Thus, pursuant to the Court's "formidable case management authority," the Court will stay the Florida and Virginia-based claims in the Louisiana *Amorin* complaint. *See Rushing*, 185 F.3d at 508.

## V.   CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the Florida and Virginia-based claims in the Louisiana *Amorin* complaint be and hereby are **STAYED**.

New Orleans, Louisiana, this 19th day of November, 2018.

**ELDON E. FALLON**
United States District Judge

11

# JOINT APPENDIX TAB # 21

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 11-22408-Civ-COOKE

EDUARDO AND CARMEN AMORIN, *et al.*,
individually and on behalf of all others similarly
situated

       Plaintiffs,

vs.

TAISHAN GYPSUM CO., LTD., f/k/a
SHANDONG TIASHE DONGXIN CO. LTD.,
*et al.*,

       Defendants.

_____/

## ORDER

     Since the United States Judicial Panel on Multidistrict Litigation's remand to this Court, ECF No. 13, the parties to this action have filed a series of motions which, at bottom, seek to determine how much deference the Court would give to the decisions of Judge Fallon, who presided over the MDL in the United States District Court for the Eastern District of Louisiana. *See, e.g.*, Plaintiffs' Motion and Memorandum of Law to Adopt Plan for Resolution of Florida *Amorin* Plaintiffs' Claims for Remediation and Other Damages, ECF No. 52 ("Plaintiffs' Trial Plan Motion"); Defendants' Motion to Reject Application of Remediation Damages Formula, ECF No. 61 (the "Remediation Damages Formula Motion"); Defendants' Motion and Memorandum to Enforce Discovery Rights, ECF No. 66 (the "Discovery Rights Motion").

     In their papers, Plaintiffs argue that "the judicial labor here has been completed" because liability has been established. Plaintiffs' Trial Plan Motion at 7. Because they believe the only remaining issue is the amount of damages, Plaintiffs implore the Court to limit discovery to: 1) verification of square footage, 2) proof of Defendants' product in the property, and 3) proof of ownership. *Id.* at 5.

     Defendants disagree. Their motions seek to reopen discovery into liability and causation, reject application of the remediation damages formula, and challenge Judge

Fallon's determination that liability has been established as to all defendants—including BNBM. *See* Remediation Damages Formula Motion at 20; Discovery Rights Motions at 6; Beijing New Building Materials PLC's Motion to Enforce Trial Rights and Memorandum in Support at 1, ECF No. 67. To bridge the chasm between the parties' contentions, the Court ordered supplemental briefing and held a hearing on which level of deference the Court should afford Judge Fallon's rulings. *See* Endorsed Order Setting Hearing, ECF No. 91. After considering the arguments raised in the motions and at the hearing, the record, and the relevant legal authorities, the Court **ADOPTS all** of Judge Fallon's findings of facts and legal conclusions.

A survey of the legal landscape reveals three approaches to the preclusive effect of MDL orders. Under the first approach, courts employ a bright line rule preventing transferor courts from overruling transferee courts. *See, e.g.*, *In re Food Lion, Inc. Fair Labor Standards Act Effective Scheduling Litig.*, 73 F.3d 528, 531 (4th Cir.1996); *see also Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1202 n.5 (7th Cir.1996) (noting "it would vitiate most of the purposes of consolidating litigation if, after remand, parties could simply re-visit the transferee court's pre-trial rulings"). Alternatively, some courts reject the bright line rule in favor of a "substantial deference" approach. *See, e.g.*, *In re Ford Motor Co.*, 591 F.3d 406, 411 (5th Cir. 2009) (listing different levels of deference to reviewing decision of a transferee court); *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 460 F.3d 1217, 1228 (9th Cir. 2006). Others still follow the law-of-the-case rule where "a successor judge has the same discretion to reconsider an order as would the first judge, but should not overrule the earlier judge's order or judgment merely because the later judge might have decided matters differently." *United States v. O'Keefe*, 128 F.3d 885, 891 (5th Cir. 1997).

The Eleventh Circuit has not explicitly endorsed any of these approaches. However, the Court need not adopt a level of deference to dispose of Defendants' motions. All three approaches agree that absent an intervening change in law or fact, a transferor court should not overrule a transferee court's rulings. Here, Defendants have not shown "a significant change of circumstances." Manual for Complex Litigation, Fourth, § 20.133. Rather, Defendants seemingly seek to revisit the MDL's decisions because they disagree with Judge Fallon's conclusions. They cannot, for to do so would "frustrate the purposes of centralized pretrial proceedings." *In re Ford Motor Co.*, 591 F.3d at 411. The Court will not allow the

parties to pervert the MDL process. Instead, by giving preclusive effect to Judge Fallon's finding of fact and conclusions of law, the Court effectuates the purpose of a multidistrict litigation: to ensure the "just and efficient conduct" of this action. 28 U.S.C. § 1407(a).

Accordingly, the Court hereby **ORDERS and ADJUDGES** as follows:

- The Court finds Judge Fallon's decisions well-reasoned and well-supported by the evidentiary record. The Court **ADOPTS <u>all</u>** of Judge Fallon's factual findings and legal conclusions and will not revisit any of his rulings absent a compelling showing of an intervening change in law or fact. This includes, but is not limited to, the following:

  o Taishan, TTP, BNBM Group, CNBM Group, and CNBM have been held in default. *See* Findings of Fact and Conclusions of Law With Respect to Plaintiffs' Omnibus Motion for Class Certification Pursuant to Rules 23(a)(1)-(4) and 23(b)(3) at ¶¶ 13-15, Rec. Doc. 18028.

  o Under Florida law, Defendants constitute a single business enterprise for purposes of piercing the corporate veil and holding each of the defendants—including BNBM—liable for the conduct of their affiliated entities. *Id.* at ¶¶ 50-51.

  o Class certification was appropriate under Fed. R. Civ. P. 23(a)(1)-(4) and 23(b)(3). *Id.* at ¶ 79.

  o Liability has been conclusively established as to all defendants and the only remaining issue is the amount of the award. Findings of Fact and Conclusions of Law Related to the June 9, 2015 Damages Hearing at ¶ 20, Rec. Doc. 20741.

  o The remediation formula represents a reasonable and reliable measure of the remediation damages which the Court will apply to determine the appropriate amount of property damages. *Id.* at ¶ 92.

- The Court **ADOPTS** the Trial Plan included as Exhibit A to this Order.

- To the extent that they are inconsistent with this Order and Trial Plan, the Court **DENIES** *as moot*:

  o Plaintiffs' Motion and Memorandum of Law to Adopt Plan for Resolution of Florida *Amorin* Plaintiffs' Claims for Remediation and Other Damages (ECF No. 52);

  o Defendants' Motion to Adopt Defendants' Trial Plan (ECF No. 53);

  o Defendants' Motion to Reject Application of Remediation Damages Formula (ECF No. 61);

  o Beijing New Building Materials PLC's Motion to Enforce Trial Rights and Memorandum in Support (ECF No. 66); and

  o Defendants' Motion and Memorandum to Enforce Discovery Rights (ECF No. 67);

**DONE and ORDERED** in Chambers, at Miami, Florida, this 16th day of November 2018.

*[signature: Marcia G. Cooke]*

MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Counsel of Record*
*Tiffani G. Lee, Special Master*

4

# Attachment A

<u>**TRIAL PLAN FOR PROPERTY DAMAGE CLAIMS**</u>

1.  By **December 14, 2018**, Plaintiff will provide list of property damage claimants split into three categories: 1) claimants with completed forms who have not remediated damages; 2) claimants with completed forms who have remediated damages; 3) claimants without completed forms.[1]

2.  For the Claimants without completed forms,

    a.  By **January 14, 2019**, Plaintiffs must amend and complete forms or provide a compelling reason why their time to complete the forms should be extended.

    b.  If they fail to do so, these claimants will be **DISMISSED** *with prejudice*.

3.  For the Claimants with completed forms, Defendants may challenge only the following aspects of the damages calculation:

    a.  Product ID[2]

        i.  By **December 31, 2018**, Defendants will admit or deny in writing whether they manufactured the Product ID categories.

        ii.  By **January 14, 2019**, Plaintiffs will respond to Defendants denials in writing.

        iii.  If the Special Master determines there's a genuine dispute, Parties may engage in limited discovery.

        iv.  By **February 15, 2019**, all Product ID Discovery must be completed.

        v.  By **March 1, 2019**, Parties will submit simultaneous briefs on their Product ID contentions.

        vi.  By **April 1, 2019**, the Special Master will issue a Report and Recommendation as to whether the Product ID categories should be attributed to Defendants despite their denial.

---

[1] The Court notes that plaintiffs who have completely remediated may only recover the actual cost of remediation. Conversely, Plaintiffs who have not completely remediated may recover the amount provided by the remediation formula.

[2] The Product ID categories are: 1) BNBM/Dragon board; 2) C & K; 3) Chinese Manufacturer #2 (purple stamp); 4) Crescent City Gypsum; 5) DUN; 6) IMT Gypsum; 7) ProWall; 8) Taian Taishan or Taihe Tape; 9) Made in China Meet or Exceeds; 10) various Drywall dimensions, including 4feetx12feetx1/2 inch and 4feet*12feet*1/2inch; 11) Venture Supply; 11) White Edge Tape, boards with no markings or boards with no markings other than numbers; 12) others.

    b. Ownership Verification

        i. By **January 18, 2019**, Defendants will serve on Plaintiffs the discovery they seek regarding whether the Claimant owns or owned the affected property and whether an assignment of Claimant assigned their claim for remediation damages ("Ownership Verification discovery").

        ii. By **February 1, 2019**, Plaintiffs will respond to Defendants Ownership Verification discovery requests.

        iii. If the Parties disagree as to the necessity of any Ownership Verification discovery, the Special Master will resolve those disputes.

        iv. By **March 15, 2019**, all Ownership Verification Discovery must be completed.

        v. By **April 15, 2019**, the Special Master will issue a Report and Recommendation as to Ownership Verification.

    c. Square Footage

        i. By **February 1, 2019**, Defendants will serve on Plaintiffs the discovery they seek regarding whether the under air square footage of the property in question is accurate ("Square Footage discovery").

        ii. By **February 15, 2019**, Plaintiffs will respond to Defendants Square Footage discovery requests.

        iii. If the Parties disagree as to the necessity of any Square Footage discovery, the Special Master will resolve those disputes.

        iv. By **April 1, 2019**, all Square Footage Discovery must be completed.

        v. By **May 1, 2019**, the Special Master will issue a Report and Recommendation as to Square Footage.

    d. Contests and Requests for Set-offs

        i. By **February 11, 2019**, Defendants will submit in writing all contests and requests for set-offs.

        ii. By **February 25, 2019**, Plaintiffs will respond to Defendants contests and requests for set-offs.

        iii. By **April 1, 2019**, all Contests and Requests for Set-Offs Discovery must be completed.

      iv.  By **May 3, 2019**, the Special Master will issue a Report and Recommendation as to contests and requests for Set-offs.

4.  By **May 31, 2019**, the Special Master use the Remediation Formula to issue a Report and Recommendation as to the total award for Property Damage Claims.

### TRIAL PLAN FOR OTHER DAMAGES[3] AND PERSONAL INJURY CLAIMS

**November 7, 2018**:   Plaintiffs will select the first 20 Florida claims to be tried (the "Priority Claimants").

**December 14, 2018**: Parties shall furnish opposing counsel with a written list containing the names and addresses of all fact witnesses intended to be called at the Priority Claimant trial and only those witnesses listed shall be permitted to testify unless good cause is shown and there is no prejudice to opposing party.   The parties are under a continuing obligation to supplement discovery responses within <u>ten days</u> of receipt or other notice of new or revised information.

**January 14, 2019**:   All <u>fact</u> discovery must be completed for the Priority Claimants.

**February 15, 2019**:  All Priority Claimant-specific dispositive *and* other pretrial motions not explicitly excluded by S.D. Fla. L.R. 7.1.A.1 and accompanying memoranda of law, must be filed.

**February 15, 2019**:  Plaintiff must furnish expert witness list to the Defendant, along with the summaries/reports required by Fed. R. Civ. P. 26(a)(2), and only those expert witnesses shall be permitted to testify at the Priority Claimant Trial. Within the fourteen-day period thereafter, Plaintiff shall make its experts available for deposition by the Defendant.

**March 1, 2019**:       Defendant must furnish expert witness list to the Plaintiff along with the summaries/reports required by Fed. R. Civ. P. 26(a)(2), and only those expert witnesses shall be permitted to testify at the Priority Claimant Trial. Within the fourteen-day period thereafter, Defendant shall make its experts available for deposition by the Plaintiff.

**April 1, 2019**:       All <u>expert</u> discovery must be completed for the Priority Claimants.

**April 15, 2019**:      All *Daubert* and *Markman* motions and accompanying memoranda of law must be filed.

**May 31, 2019**:        For the Priority Claimant trial:

(a) A Joint Pretrial Stipulation must be filed.  The stipulation shall conform to Local Rule 16.1(c) and include a joint, neutral summary of the claims and defenses in the case, <u>not to exceed one short paragraph per litigant claim</u>, to be read as an introduction for *voir dire* examination. The pretrial stipulation shall also include Plaintiff's non-binding breakdown of damages with corresponding amounts and other relief sought. The parties shall meet at least one month prior to the deadline for filing the pretrial

---

[3] Other Damages includes, but is not limited to, claims for alternate living expenses, loss of use and enjoyment, lost rent, bankruptcy, foreclosure, and short sale.

stipulation to confer on preparation of that stipulation. The Court will not accept unilateral pretrial stipulations, and will strike *sua sponte* any such submissions. A copy of the joint pretrial stipulation shall be delivered to chambers in Microsoft Word format at the time of filing via email to cooke@flsd.uscourts.gov;

   (b) A Joint Summary of the Parties' Motion(s) *in Limine* must be **separately filed**.  The joint summary shall contain a cover page providing the style of the case and an index of the motion(s) *in limine*. For each evidentiary issue, the joint summary must include: a one page argument identifying the evidence sought to be excluded or included at trial and citing legal authority supporting exclusion or inclusion; and a one page response to the argument citing legal authority in support of admission or exclusion of the disputed evidence.  The parties shall work together to prepare the joint summary, and are encouraged to resolve evidentiary issues through stipulation.  Motions *in limine* will not be accepted in any other form.

  **July 12, 2019**:  (a) Final proposed jury instructions and verdict form must filed.[4] The parties shall submit a SINGLE, JOINT set of proposed jury instructions and verdict form, though the parties need not agree on the proposed language of each or any instruction or question on the verdict form. Where the parties do agree on a proposed instruction or question, that instruction or question shall be set forth in Times New Roman 14 point typeface. Instructions and questions proposed only by the plaintiff(s) to which the defendant(s) object shall be italicized. Instructions and questions proposed only the defendant(s) to which the plaintiff(s) object shall be bold-faced. Each jury instruction shall be typed on a separate sheet and must be supported by citations of authority. Each disputed jury instruction shall also state the basis for the objection(s) at the bottom of the sheet, before the citations of authority. In preparing their requested jury instructions, the parties shall utilize as a guide the Pattern Jury Instructions for Civil Cases approved by the United States Eleventh Circuit, including the Directions to Counsel contained therein. A copy of the proposed jury instructions and verdict form shall be delivered to chambers in Microsoft Word format at the time of filing via email to cooke@flsd.uscourts.gov;

   (b) A trial witness list indicating each witness who will testify at trial, a one-sentence synopsis of the testimony, and in consultation with opposing counsel, indicate the amount of time needed for direct and cross examination;

   (c) A list of witnesses with some identifying information (address or place of employment) to provide to jury; and

   (d) Proposed *Voir Dire* questions specific to the case (general *voir dire* questions should not be included).

   (e) Any proposed deposition designations, cross-designations, and objections therein. Parties must submit their designations in one table, with columns

---

4 If this action is to be set for a bench trial the Parties are directed to submit proposed findings of fact and conclusions of law in lieu of proposed jury instructions.

listing the witnesses' names, the deposition dates, the proposed designations by page and line, and any objections using the codes listed in Local Rule 16.1(e)(9).

**July 17, 2019**:        Calendar Call shall be held at 3:00 p.m. before the Undersigned United States District Judge at the Federal Courthouse, Courtroom 11-2, 400 North Miami Avenue, Miami, Florida.

**July 22, 2019**:        Trial is set for the Court's two-week trial period.

# JOINT APPENDIX TAB # 22

```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE: CHINESE-MANUFACTURED      )
     DRYWALL PRODUCTS LIABILITY       )
 5   LITIGATION                       )
                                      ) MDL 2047 "L"
 6                                    ) NEW ORLEANS, LOUISIANA
                                      ) THURSDAY, JANUARY 22, 2015
 7                                    ) 9:00 A.M.
     THIS DOCUMENT RELATES TO:        )
 8                                    )
     ALL CASES                        )
 9                                    )
                                      )
10   *******************************

11

12

13          TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

14        HEARD BEFORE THE HONORABLE ELDON E. FALLON

15                 UNITED STATES DISTRICT JUDGE

16

17

     OFFICIAL COURT REPORTER:         SUSAN A. ZIELIE, RMR, FCRR
18                                    EASTERN DISTRICT OF LOUISIANA
                                      500 POYDRAS STREET, ROOM B406
19                                    NEW ORLEANS, LA 70130
                                      susan_zielie@laed.uscourts.gov
20                                    504.589.7781

21

22

23   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER AIDED TRANSCRIPTION.
24

25
```

```
1    APPEARANCES:

2    FOR THE PLAINTIFFS'
     STEERING COMMITTEE:            HERMAN HERMAN KATZ
3                                   BY:  LEONARD DAVIS, ESQUIRE
                                    820 O'KEEFE AVENUE
4                                   NEW ORLEANS, LA 70113

5                                   LEVIN, FISHBEIN, SEDRAN & BERMAN
                                    BY:  ARNOLD LEVIN, ESQUIRE
6                                   510 WALNUT STREET, SUITE 500
                                    PHILADELPHIA, PA 19106

7    THE PLAINTIFFS:                DANIEL BECNEL, ESQUIRE
8                                   425 W. AIRLINE HIGHWAY
                                    SUITE B
9                                   LAPLACE, LA 70086

10   FOR THE STATE/FEDERAL
     COORDINATION COMMITTEE:        BARRIOS, KINGSDORF & CASTEIX
11                                  BY:  DAWN BARRIOS, ESQUIRE
                                    701 POYDRAS STREET, SUITE 3600
12                                  NEW ORLEANS, LA 70139

13   PRO SE CURATOR:                ROBERT MURRAY JOHNSTON, ESQ.
                                    LAW OFFICES OF
14                                    ROBERT M. JOHNSTON, LLC
                                    400 POYDRAS STREET
15                                  SUITE 2450
                                    NEW ORLEANS LA 70130

16
     DEFENDANT KNAUF:               Frilot, LLC
17                                  BY:  KERRY J. MILLER, ESQUIRE
                                    ENERGY CENTRE
18                                  1100 POYDRAS STREET
                                    SUITE 3700
19                                  NEW ORLEANS, LA 70163

20   FOR HOME BUILDERS:             STONE PIGMAN
                                    BY:  DOROTHY H. WIMBERLY, ESQ.
21                                  546 Carondelet Street
                                    New Orleans LA 70130
22                                  504.593.0849
                                    dwimberly@stonepigman.com
23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | NEW ORLEANS, LOUISIANA; THURSDAY, JANUARY 22, 2015 | 08:55AM |
| 2 | 9:00 A.M. | 08:55AM |
| 3 | THE COURT:  Be seated, please.  Good morning, call the | 08:59AM |
| 4 | case. | 09:00AM |
| 5 | CASE MANAGER:  In re:  2047 in re:  Chinese | 09:00AM |
| 6 | Manufactured Drywall Products Liability litigation. | 09:00AM |
| 7 | THE COURT:  This is our monthly status conference in | 09:00AM |
| 8 | this matter.  I'm hear from liaison counsel. | 09:01AM |
| 9 | MR. LEVIN:  Good morning, Your Honor.  Arnold Levin, | 09:01AM |
| 10 | substituting for Russ Herman, who is the plaintiff's liaison. | 09:01AM |
| 11 | MR. MILLER:  Good morning, Your Honor.  Kerry Miller on | 09:01AM |
| 12 | behalf of Knauf and the defense steering committee. | 09:01AM |
| 13 | THE COURT:  I met with lead and liaison counsel moment | 09:01AM |
| 14 | ago to discuss the agenda. | 09:01AM |
| 15 | We don't have any motions necessarily on the | 09:01AM |
| 16 | agenda but I'll take it on the order. | 09:01AM |
| 17 | Do we have anything on Pretrial Orders? | 09:01AM |
| 18 | MR. LEVIN:  No, sir.  But BrownGreer will issue a | 09:01AM |
| 19 | report to the Court today that speaks to the money that's | 09:01AM |
| 20 | flowing to the clients. | 09:01AM |
| 21 | THE COURT:  Anything on State Court Trial Settings? | 09:01AM |
| 22 | MS. BARRIOS:  Your Honor, the three cases that are | 09:01AM |
| 23 | listed in the joint report on page five are pending now in | 09:01AM |
| 24 | Virginia, and we have hopes that they'll be able to be resolved | 09:01AM |
| 25 | by Mr. Serpe. | 09:01AM |

```
 1                    But I'd like to just jump head and talk about the       09:01AM

 2    Virginia class action settlements.  Garretson Group did not come        09:02AM

 3    today.  They asked me to make a very simple report.                     09:02AM

 4                    The other loss fund deadline is over.  They are         09:02AM

 5    now reviewing all the claim forms.  They are in the process of          09:02AM

 6    preparing the deficiency notices, which should go out by the end        09:02AM

 7    of the month.  They've been in very close contact with Jake             09:02AM

 8    Woody at BrownGreer, particularly with regard to your last order        09:02AM

 9    on the other loss funds and the payouts.  And they're talking           09:02AM

10    about all issues with regard to it, particularly the                    09:02AM

11    Medicare-Medicaid injury with regard to the bodily injury               09:02AM

12    payments.                                                               09:02AM

13                    Thank you.                                              09:02AM

14             MR. LEVIN:  That's a segue for one thing on the                09:02AM

15    Virginia settlements.  Not necessarily the Virginia settlement,         09:02AM

16    but Mr. Serpe is explaining to the Taishan plaintiffs on a              09:02AM

17    one-to-one basis, answering calls and effectively steering them         09:02AM

18    to make decisions with regard to the class certification order          09:02AM

19    of this Court with regard to Taishan and the assessment of              09:03AM

20    damages hearing which will take place during the February               09:03AM

21    pretrial conference, sir.                                               09:03AM

22             THE COURT:  All right.  That case seems to be going            09:03AM

23    well.  I appreciate the help that the judge is giving to it.            09:03AM

24    She and I have worked closely on this matter and she's been a           09:03AM

25    great help to us in this proceeding.                                    09:03AM
```

| | | |
|---|---|---|
| 1 | While we are on that, Jake, give me a report on | 09:03AM |
| 2 | what's happening with regard to the money. | 09:03AM |
| 3 | MR. WOODY:  Good morning, Your Honor.  My name is Jake | 09:03AM |
| 4 | Woody, from BrownGreer.  I'm here to give the monthly status | 09:03AM |
| 5 | report for the Chinese Drywall settlement program. | 09:03AM |
| 6 | I'll start very briefly, just as I always do, with | 09:03AM |
| 7 | our total number of claims to set the stage. | 09:03AM |
| 8 | Total submitted claims is 22,491.  Of those, we | 09:04AM |
| 9 | reviewed 19,726.  We're complete with all claim types other than | 09:04AM |
| 10 | miscellaneous claims.  We're actively reviewing those claims and | 09:04AM |
| 11 | should be done with those in short order. | 09:04AM |
| 12 | Our largest claim type, as you know, is our Global | 09:04AM |
| 13 | Banner IN/EX repair and relocation claims.  Those are | 09:04AM |
| 14 | settlements for a pro rata share of three different settlements, | 09:04AM |
| 15 | the Global settlement, the Banner settlement and the IN/EX | 09:04AM |
| 16 | settlement.  We had just under 10,000 eligible claims in this | 09:04AM |
| 17 | category, 9,983.  We've denied 1,674 largely for insufficient | 09:04AM |
| 18 | documentation or because the claimants submitted a claim that | 09:04AM |
| 19 | they had previously assigned to another claim. | 09:04AM |
| 20 | THE COURT:  So the denied doesn't mean that they're not | 09:04AM |
| 21 | going to get some money but they're going to get it from another | 09:04AM |
| 22 | fund? | 09:04AM |
| 23 | MR. WOODY:  They are denied for this claim type, but | 09:04AM |
| 24 | they could potentially receive claim from other loss fund or for | 09:04AM |
| 25 | other loss claim. | 09:05AM |

OFFICIAL TRANSCRIPT
SUSAN A. ZIELIE, CCR, RMR, FCRR

1    These numbers change month to month largely    09:05AM

2  because we have claimants withdrawing claims.    09:05AM

3    We're at the stage in this claim type where we are    09:05AM

4  essentially reconciling duplicate claims.  We're only authorized    09:05AM

5  to make payment per property.  The claims that haven't been paid    09:05AM

6  are largely claims where we have that issue.  As we work through    09:05AM

7  them, claimants generally withdraw them.  We see duplicate    09:05AM

8  claims in many cases for spouses who submitted two claims out an    09:05AM

9  abundance of caution and also where we have competing claims    09:05AM

10  where one claimant has received an assignment and the other    09:05AM

11  assigned the claim.  We're reconciling those, and largely are    09:05AM

12  able to do that on our own.    09:05AM

13    We began issuing payments on GBI claims on    09:05AM

14  September 12th of last year.  So far, we've issued 11,770    09:05AM

15  checks.  The number of checks is larger than the number of    09:05AM

16  claimants because many claimants are eligible for payment from    09:05AM

17  multiple settlements.  So they would receive two checks for one    09:06AM

18  claim.  So far, we have distributed just over $54.8 million.    09:06AM

19  That's an increase of 1.7 million from the last status    09:06AM

20  conference.    09:06AM

21    We make payments every day.  The number fluctuates    09:06AM

22  as we're able to reconcile these duplicate claimant issues.  We    09:06AM

23  also require a W-9 and a verification of claims from claimants    09:06AM

24  before we make payment.  As we receive those, we put them in    09:06AM

25  line for payment and issue checks.    09:06AM

```
 1              Both of those forms are available on our website.    09:06AM
 2    I'll give the address at the end of this presentation.         09:06AM
 3              We have $21.3 million left to distribute.  As I       09:06AM
 4    mentioned, we continue to make payments every day and this     09:06AM
 5    process is largely stable and we're not seeing any problems with 09:06AM
 6    it.                                                            09:06AM
 7              The claims that are not Global, Banner, IN-EX        09:06AM
 8    claims, we refer to as Other Loss Claims, and these fit in a   09:06AM
 9    variety of categories.  Our four main Other Loss claims        09:07AM
10    are bodily injury; foreclosure and short sale; lost rent, use  09:07AM
11    and sales; and pre-remediation alternative living expenses,    09:07AM
12    which we abbreviate as PRALE here.                             09:07AM
13              We have just over 4,000 claims in these four claim   09:07AM
14    types; 428, to be exactly.  Of those 2,527 are eligible.  44 are 09:07AM
15    incomplete.  As I always mention, the incompleteness number    09:07AM
16    changes every month.  Last month, it was 100.  The month before, 09:07AM
17    I think it was 200.  So you can see the progress we're making in 09:07AM
18    reconciling those and moving them from either incomplete to    09:07AM
19    eligible if they satisfy the document requirements or denying  09:07AM
20    them for failure to submit those documents.                    09:07AM
21              Because of the low number of incomplete claims,      09:07AM
22    we're able to work with the parties and the Court to draft and 09:07AM
23    submit PTO-29, which allow us to begin making payments on      09:07AM
24    eligible Other Loss claims.                                    09:07AM
25              The Court entered this order on December 23rd.       09:07AM
```

| | |
|---|---|
| 1 | We've received a lot of questions, and I'd like to just go | 09:08AM |
| 2 | through some of the high points of PTO-29. | 09:08AM |
| 3 |       PTO-29 allow us to make what we call resolution | 09:08AM |
| 4 | offers on eligible Other Loss claims of varying amounts.  For | 09:08AM |
| 5 | bodily injury, it's up to $1,000.  For closure short sale | 09:08AM |
| 6 | claims, it's up to $10,000.  For loss use or sales, it's up to | 09:08AM |
| 7 | $10,000.  For lost rent, it's three times the verified monthly | 09:08AM |
| 8 | rent for rental property.  For PRALE claims, it's $14,400.  It's | 09:08AM |
| 9 | up to $14,400.  And miscellaneous tenant losses are up to | 09:08AM |
| 10 | $2,500. | 09:08AM |
| 11 |       These amounts are essentially modified pro rata | 09:08AM |
| 12 | share of the amount available for Other Loss claims, which is | 09:08AM |
| 13 | $37.7 millin.  It's not a straight pro rata or distribution | 09:08AM |
| 14 | because each claim has a different value.  But within each claim | 09:08AM |
| 15 | type, it is a pro rata number.  That's where we got those | 09:08AM |
| 16 | numbers from and that's how we're proceeding. | 09:09AM |
| 17 |       We will issue eligibility notices and have begun | 09:09AM |
| 18 | issuing eligibility notices on Other Loss claims that list the | 09:09AM |
| 19 | resolution offer. | 09:09AM |
| 20 |       I should also mention, before I move on, that the | 09:09AM |
| 21 | up to -- this is an up to number.  So, if we review the claim | 09:09AM |
| 22 | and determine that the verified losses are less than the numbers | 09:09AM |
| 23 | that I mentioned, we make the lower offer. | 09:09AM |
| 24 |       And whatever the offer is will be in the | 09:09AM |
| 25 | eligibility notice.  We'll issue these through our standard | 09:09AM |

| | | |
|---|---|---|
| 1 | notice process. | 09:09AM |
| 2 | The notices contain instructions on how to | 09:09AM |
| 3 | proceed.  Claimants have two options after receiving an | 09:09AM |
| 4 | eligibility notice.  They can accept offer and receive payment. | 09:09AM |
| 5 | Or they can, if they feel the offer is insufficient, request | 09:09AM |
| 6 | what we call a special master award.  Those claims, if you | 09:09AM |
| 7 | request that Special Master Award, those claims would be routed | 09:09AM |
| 8 | to the special master who will review them independently of us | 09:09AM |
| 9 | and make a determination. | 09:09AM |
| 10 | Claimants who do not take any action within thirty | 09:10AM |
| 11 | days will be deemed to have accepted the offer; and, if all | 09:10AM |
| 12 | payment documents are present, we'll make payment to them.  So, | 09:10AM |
| 13 | if you take no action, you will lose the chance to request the | 09:10AM |
| 14 | Special Master Award but you will receive the resolution offer. | 09:10AM |
| 15 | If the claimant requests a Special Master Award, | 09:10AM |
| 16 | the offer can change.  It can go up, it can go down or it can | 09:10AM |
| 17 | stay the same. | 09:10AM |
| 18 | What happens when a claimant requests this is yet | 09:10AM |
| 19 | to be determined.  There's a number of variables at issue.  The | 09:10AM |
| 20 | special master, as I mentioned, will do a review independent of | 09:10AM |
| 21 | ours and come up with a determination. | 09:10AM |
| 22 | If a claimant accepts the resolution offer, we | 09:10AM |
| 23 | will make payment rapidly.  Generally, within seven days of the | 09:10AM |
| 24 | acceptance.  Assuming, of course, that the W-9 verification of | 09:10AM |
| 25 | the claims form are present. | 09:10AM |

| | | |
|---|---|---|
| 1 | If you already submitted those documents in | 09:10AM |
| 2 | support of another claim, of a GBI claim, you do not need to | 09:10AM |
| 3 | submit them again.  We only need these documents once per claim. | 09:10AM |
| 4 | If a claimant wishes to request a Special Master | 09:11AM |
| 5 | Award, you cannot submit an additional documents.  The time to | 09:11AM |
| 6 | submit supporting documents has passed, along with the claims | 09:11AM |
| 7 | deadline.  You can, however -- and we prefer that you submit | 09:11AM |
| 8 | something that tells us where in your claim what we should look | 09:11AM |
| 9 | at:  A list of itemized expenses that you think support your | 09:11AM |
| 10 | request and you can refer to documents you've already admitted | 09:11AM |
| 11 | to us.  That will help streamline the special master review and | 09:11AM |
| 12 | speed up the process. | 09:11AM |
| 13 | Finally, we have received a lot of questions about | 09:11AM |
| 14 | the timeline associated with that special master.  We anticipate | 09:11AM |
| 15 | having the vast majority of all eligibility notices on Other | 09:11AM |
| 16 | Loss claims issued by the first week of February.  That will | 09:11AM |
| 17 | start the thirty-day clock on all the claims.  We will not be | 09:11AM |
| 18 | able to grant deadline extensions for those claims. | 09:11AM |
| 19 | So the deadline for almost all the Other Loss | 09:11AM |
| 20 | claims should expire some time in the first week of March.  Once | 09:11AM |
| 21 | we have a good idea of how many people want a special master | 09:12AM |
| 22 | review and how many want to be paid, we'll be able to make a | 09:12AM |
| 23 | better evaluation of how long it will take.  However, because | 09:12AM |
| 24 | all of the claim documents are already in because we've reviewed | 09:12AM |
| 25 | all the claims, it will not take as long as the claim process. | 09:12AM |

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/18 Page 496 of 1680
Case 2:14-cv-00591-MLCF-JCW Document 22-3 Filed 01/12/21 Page 13 of 71 PageID # 974

12

| | |
|---|---|
| 1 | It will be a shorter process. | 09:12AM |
| 2 | THE COURT: All right. We'll have some indication by | 09:12AM |
| 3 | next meeting, I would think. | 09:12AM |
| 4 | MR. WOODY: I think so. | 09:12AM |
| 5 | As I mentioned, have begun issuing eligible | 09:12AM |
| 6 | notices on these claims. So far, we've issued just over a | 09:12AM |
| 7 | thousand on three different claim types. We've issued all the | 09:12AM |
| 8 | eligibility notices for bodily injury and foreclosure and short | 09:12AM |
| 9 | sale claims and we've issued 200 notices on PRALE claims. And | 09:12AM |
| 10 | we'll continue to issue notices, as I mentioned, on all of the | 09:12AM |
| 11 | remaining PRALE claims as well as the lost rent, use and sales | 09:12AM |
| 12 | claims. | 09:12AM |
| 13 | So we've issued just over 1,000. We've received | 09:12AM |
| 14 | responses on 176 claims. 159 offers have been accepted. | 09:12AM |
| 15 | Seventeen have requested the special master review, which puts | 09:13AM |
| 16 | our acceptance rate at ninety percent. | 09:13AM |
| 17 | And we've also begun issuing payment on Other Loss | 09:13AM |
| 18 | claims. We began earlier this week. We've paid forty-three | 09:13AM |
| 19 | claims and disbursed $393,800. We'll continue make payments on | 09:13AM |
| 20 | accepted claims, and should have payment out pretty quickly | 09:13AM |
| 21 | within the date of acceptance and resolve as many of these | 09:13AM |
| 22 | claims as we can. | 09:13AM |
| 23 | Finally, our contact information, the best place | 09:13AM |
| 24 | to obtain the W-9 verification form I mentioned are on our | 09:13AM |
| 25 | website at www3.BrownGreer.com/drywall. If you need to email | 09:13AM |

| | | |
|---|---|---|
| 1 | us, you can do it at CDWquestions@BrownGreer.  And you can call | 09:13AM |
| 2 | us at 866-866-1729. | 09:13AM |
| 3 | THE COURT:  Thank you. | 09:13AM |
| 4 | The next item is Omnibus Class Actions.  Anything | 09:13AM |
| 5 | on that? | 09:14AM |
| 6 | MR. LEVIN:  Just one personal thing. | 09:14AM |
| 7 | The PSC has listened to the BrownGreer report each | 09:14AM |
| 8 | and every month, and I just want BrownGreer to know how | 09:14AM |
| 9 | appreciative we have of the work they are doing and the manner | 09:14AM |
| 10 | in which they're doing the work. | 09:14AM |
| 11 | THE COURT:  Yes.  They've done a good job, and I | 09:14AM |
| 12 | appreciate that also. | 09:14AM |
| 13 | MR. LEVIN:  With regard to the Class Action Complaints, | 09:14AM |
| 14 | the Omnibus, there's just one aspect of the complaints that's | 09:14AM |
| 15 | outstanding.  We have a complaint against SASAC in China right | 09:14AM |
| 16 | now.  And, if SASAC behaves as CMBM behaved and BMBM behaved in | 09:14AM |
| 17 | the past and doesn't enter an appearance and come in here, for | 09:14AM |
| 18 | whatever reasons, but appear in these proceedings, at that | 09:14AM |
| 19 | point, in about six weeks, we're prepared to take a default | 09:14AM |
| 20 | judgment against SASAC.  And then we will pursue assessment of a | 09:15AM |
| 21 | class action as we pursued against CMBM and BMBM an assessment | 09:15AM |
| 22 | of damages against SASAC, which is the umbrella corporation that | 09:15AM |
| 23 | has a lot of interests in the United States. | 09:15AM |
| 24 | THE COURT:  How about Class Action, the last item? | 09:15AM |
| 25 | MR. LEVIN:  That would be it, sir. | 09:15AM |

| | |
|---|---|
| 1 | THE COURT:  The next item is Fee Expense. | 09:15AM |
| 2 | MR. LEVIN:  There's nothing new on that. | 09:15AM |
| 3 | THE COURT:  In connection with that, I have received | 09:15AM |
| 4 | from Danny Becnel letters showing copies to you and to Arnold. | 09:15AM |
| 5 | Danny, you want to flesh that out for me, the | 09:15AM |
| 6 | issue here on Sean Payton. | 09:15AM |
| 7 | MR. BECNEL:  Judge, as you know, Sean was living across | 09:15AM |
| 8 | the lake in the Super Bowl year, in Mandeville, in a rather | 09:16AM |
| 9 | expensive home.  He and his wife, the minute it was finished, | 09:16AM |
| 10 | had to move out.  He then had to live in the Saint's training | 09:16AM |
| 11 | camp for the whole season, and his wife wound up having to get | 09:16AM |
| 12 | another house.  So she moved.  The Chinese drywall case really | 09:16AM |
| 13 | resulted in the dissolution of their marriage. | 09:16AM |
| 14 | And he approached me.  As you know, I represent | 09:16AM |
| 15 | many of the Saints:  Mickey Loomis, the general manager, Drew | 09:16AM |
| 16 | Brees and many of the team members. | 09:16AM |
| 17 | And so I handled that case by myself.  I | 09:16AM |
| 18 | negotiated the settlement by myself.  And I don't mind if all | 09:16AM |
| 19 | the other cases I have with the plaintiff's committee gets a | 09:16AM |
| 20 | fee.  But this case was purely me.  And I could have settled it | 09:16AM |
| 21 | probably a week after they were notified that I had Sean Payton. | 09:17AM |
| 22 | In any event, I'd like to get paid on it.  And | 09:17AM |
| 23 | it's been, I think I said -- I only got in at 1 o'clock so I | 09:17AM |
| 24 | didn't even have time to get my file this morning from Kansas | 09:17AM |
| 25 | City.  But I'd like to get paid on it. | 09:17AM |

```
 1              THE COURT:  All right.                        09:17AM

 2         MR. BECNEL:  And I don't think the PSC has a claim  09:17AM

 3    against those funds.                                     09:17AM

 4              I did the inspections myself.  In fact, it was 09:17AM

 5    inspected five different times.  Because it was kind of the 09:17AM

 6    poster child of how do you find what's wrong with the Chinese 09:17AM

 7    drywall case.                                            09:17AM

 8         THE COURT:  Well, you know, in this case, I guess the 09:17AM

 9    beauty of it is so forth, from the standpoint of the litigants 09:17AM

10    themselves, is that the defendant, the settlements call for the 09:17AM

11    defendant paying the attorney fees.                      09:17AM

12              Let me hear from Arnold.                       09:18AM

13         MR. LEVIN:  I will not hold it against Danny Becnel and 09:18AM

14    Sean Payton that they've had their way with the Philadelphia 09:18AM

15    Eagles for some time now.                                09:18AM

16              Getting to the merits of Mr. Becnel's request. 09:18AM

17    The fee committee has conducted extensive interviews with every 09:18AM

18    plaintiff's counsel that is seeking a common benefit fee, and 09:18AM

19    the fee committee has taken all of that under advisement.  And I 09:18AM

20    can assure Mr. Becnel that those issues are being discussed by 09:18AM

21    the fee committee.                                       09:18AM

22              There will be a report, and he will be able to 09:18AM

23    review that report and take whatever action.             09:18AM

24              I might add that, at the interview, the situation 09:18AM

25    with Sean Payton was not mentioned by Mr. Becnel.  However, the 09:18AM
```

```
 1    fee committee is available -- is aware of his representation of      09:18AM
 2    the lead plaintiff in the omnibus complaint, and we will treat       09:19AM
 3    him the way we treat everybody as to when a common benefit fee,      09:19AM
 4    how it advanced the litigation.  And also there's a segment of       09:19AM
 5    the fee for the individual attorneys on their retainer              09:19AM
 6    agreements.  And that is being actively pursued and is a very       09:19AM
 7    prolix and complex process, and Mr. Becnel will be treated as       09:19AM
 8    everybody else is.  And he will have -- there will be a report,     09:19AM
 9    the Court will see the report.  Danny Becnel could object to the    09:19AM
10    report, he could deal with it afterwards if he doesn't like what    09:19AM
11    the fee committee has done with regard to his particular claim.     09:19AM
12              But I can assure Danny that:  We know who he is,          09:19AM
13    we know who Sean Payton is, we know what this litigation is and     09:19AM
14    we will afford him due process.                                     09:19AM
15              THE COURT:  Okay.                                         09:20AM
16              MR. BECNEL:  Your Honor, let me just reply to that.       09:20AM
17              As you know, I got Sean Payton and the Saints to          09:20AM
18    do a commercial.  I paid the fee for sending to the advertising     09:20AM
19    counsel with the bar association, and it had all kinds of           09:20AM
20    commotion with it.  And we got a lot of cases as a result of the    09:20AM
21    public service announcement he made on Chinese Drywall.             09:20AM
22              The case was -- he and my first client,                   09:20AM
23    Dr. Parent, the dentist, that's the first two cases.  She's a       09:20AM
24    Taishan case, he was a Knauf case.                                  09:20AM
25              And, you know, I just don't think I should have to        09:20AM
```

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 11/19/18 Page 501 of 1680
Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 11/19/18 Page 21 of 979

17

```
 1   wait, especially with my health situation periodically.  I don't   09:20AM
 2   want to be here with my estate having to deal with something        09:20AM
 3   that I should have been paid on and could have been paid on         09:20AM
 4   directly, right off the bat.                                        09:21AM
 5            THE COURT:  The interesting thing in this particular       09:21AM
 6   case is that usually, as everybody knows, the fee comes from the    09:21AM
 7   litigants.  The litigants work out some arrangement with their      09:21AM
 8   attorney.  They hire the attorney, they agree to pay the            09:21AM
 9   attorney a fee.  Then the case comes to MDL.  The MDL sets an       09:21AM
10   amount for common benefit fee.  That common benefit generally       09:21AM
11   comes from the attorney's fee portion, not in addition to the       09:21AM
12   claimant.                                                           09:21AM
13            But, in this particular case, the interesting              09:21AM
14   thing was that the concept of the settlement was that the           09:21AM
15   claimants got their homes fixed, 100 percent of their homes         09:21AM
16   fixed; and, in addition to that, the defendants paid a fee.  So     09:21AM
17   the claimants didn't have to pay anything.  They got everything     09:21AM
18   done for them and plus their attorney fees.  So it's a little       09:22AM
19   different in this situation.                                        09:22AM
20            But I hear your comments, and nobody's going to            09:22AM
21   get any fee until I approve the fees.  So I'm going to give         09:22AM
22   everybody an opportunity express themselves, and I certainly        09:22AM
23   will take all of that into consideration.  Including a              09:22AM
24   fast-track type situation.  There are some people who may have      09:22AM
25   some issues, health and otherwise, that need to be dealt with,      09:22AM
```

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 11/18/19 Page 502 of 1680
Case 2:11-cv-00377-MSD-TEM Document 122-33 Filed 11/02/11 Page 18 of 69 PageID# 980

18

```
 1    and I'm conscious of that.  Thanks for bringing it to my          09:22AM

 2    attention.                                                        09:22AM

 3              How about the Remediation Program, anything,            09:22AM

 4    Kerry?                                                            09:22AM

 5         MR. MILLER:  Good morning, again, Your Honor.  Kerry         09:22AM

 6    Miller.                                                           09:22AM

 7              Nothing really new to report, Your Honor.  The         09:22AM

 8    remediation program is into I think the last inning of the game. 09:22AM

 9    Moss is complete with ninety-plus percent of the homes.  They're 09:23AM

10    trying to do their last shift, including the last group of pro   09:23AM

11    se homes we talked about last time, get those started this       09:23AM

12    spring, so that everything's done this year, Your Honor.         09:23AM

13         THE COURT:  Yes.                                            09:23AM

14              As everyone knows, with the Remediation Program,       09:23AM

15    as I mentioned several times, in this particular case, rather    09:23AM

16    than wait for the case to get over the defendants have          09:23AM

17    undertaken the remediation program which even predated the       09:23AM

18    settlement of the case.  And, so far, they've been able to       09:23AM

19    remediate several thousand homes, which has worked out well.     09:23AM

20              How about the IN\EX, Banner, Knauf settlement?         09:23AM

21         MR. LEVIN:  Nothing with regard to that.                    09:23AM

22         THE COURT:  Anything on Shared Costs?                       09:23AM

23         MR. LEVIN:  Nothing, sir.                                   09:23AM

24         THE COURT:  What about Taishan defendants?                  09:23AM

25         MR. LEVIN:  Well, if we're in the ninth inning with         09:23AM
```

| | | |
|---|---|---|
| 1 | regard to the Knauf remediation program, we're in the first | 09:24AM |
| 2 | inning or perhaps just batting practice with regard to Taishan. | 09:24AM |
| 3 | We are pursuing assets. We are pursuing | 09:24AM |
| 4 | litigation in Portland, Oregon. We have determined that Taishan | 09:24AM |
| 5 | affiliates have brought suit in Portland, Oregon and have | 09:24AM |
| 6 | utilized our court system, our federal court system, to pursue | 09:24AM |
| 7 | their commercial needs, where they have ignored us in the | 09:24AM |
| 8 | Eastern District of Louisiana and created another great wall | 09:24AM |
| 9 | between us and China. | 09:24AM |
| 10 | THE COURT: Is there any money in that? | 09:24AM |
| 11 | MR. LEVIN: There's $50,000 for attorneys fees in the | 09:24AM |
| 12 | case that was settled. We're not interested in hurting the | 09:24AM |
| 13 | attorneys that have handled the case there for the $50,000. | 09:24AM |
| 14 | But what we are interested in is finding out what | 09:24AM |
| 15 | their ongoing business is. It seems that they are purchasing | 09:24AM |
| 16 | timber in the Northwest because of this a shortage of timber in | 09:24AM |
| 17 | China. Just like we had a shortage of drywall and purchased | 09:25AM |
| 18 | from China drywall. | 09:25AM |
| 19 | We have not seen the settlement agreement. We've | 09:25AM |
| 20 | been precluded so far from seeing the settlement agreement. But | 09:25AM |
| 21 | we think the settlement agreement contains clauses with ongoing | 09:25AM |
| 22 | activities between the parties to the settlement. That's just | 09:25AM |
| 23 | one aspect of it. | 09:25AM |
| 24 | Once we perfect service on SASAC, and either they | 09:25AM |
| 25 | come in and defend or we get a default judgment against SASAC, | 09:25AM |

```
 1    that umbrella corporation has petroleum, banking and other        09:25AM
 2    interests around the world, including in the United States.       09:25AM
 3           And we just want to assure those poor unfortunates         09:25AM
 4    that didn't have Knauf board, so that their homes could be        09:25AM
 5    remediated, and had Taishan board, that eventually we are going   09:25AM
 6    to make them whole.  But, unfortunately, in the process, many of  09:26AM
 7    them have had foreclosures and gone bankrupt.                     09:26AM
 8         THE COURT:  As we know, the board that we're talking         09:26AM
 9    about was manufactured by basically two entities, one Knauf and   09:26AM
10    the other Taishan entities.                                       09:26AM
11           After discovery in trial, the Knauf entities              09:26AM
12    settled the case.  The Taishan entities did not.  They resisted   09:26AM
13    service, and then they resisted appearance.  And, eventually,     09:26AM
14    they showed up in court participating in an appeal.  They lost    09:26AM
15    the appeal, and then they decided that they were going to walk    09:26AM
16    away from the court because they didn't get their way.  They're   09:26AM
17    going to take their ball and go home, so to speak.                09:26AM
18           And, as a result, I gave them an opportunity to           09:26AM
19    explain why they did that.  They refused to participate in the    09:27AM
20    proceedings, so I found them in content of court.  And, in        09:27AM
21    addition to fining them, I provided that a percentage of any      09:27AM
22    fees or profits that they earned in this country, by either them  09:27AM
23    or any of their affiliates, would be seized by the Court.         09:27AM
24           So I would direct counsel to determine whether or         09:27AM
25    not there's any assets of that company, and I'll issue a seizure  09:27AM
```

1   order wherever they happen to be in the United States.  Because                     09:27AM

2   I do sit, as an MDL judge, I sit as a district judge in every                       09:27AM

3   district in the United States.  So let me know if there's any                       09:27AM

4   assets, and I will seize them.                                                      09:27AM

5            MR. BECNEL:  May it please the Court, I want to give                        09:27AM

6   the Court some additional information on Chinese assets.                            09:27AM

7                 About five weeks ago, six weeks, Cargill and then                      09:28AM

8   ADM filed suit in St. John Parish in our court system for money                     09:28AM

9   against Syngenta, which produced genetically engineered corn.                       09:28AM

10  There is a separate MDL which we had a hearing on yesterday in                      09:28AM

11  Kansas.                                                                             09:28AM

12                But they, Chinese, refused to accept it.                               09:28AM

13  Although, they already paid those companies.  And so the corn is                    09:28AM

14  all coming back, which has been paid for by China.                                  09:28AM

15                And I think we would have the ability -- -as the                       09:28AM

16  Court knows, the major grain exports come from Reserve,                             09:28AM

17  Louisiana, with all of the grain elevators there.  And we may be                    09:28AM

18  able to seize those grain.  You know, it could be sold here in                      09:29AM

19  the US for cattle feed and other things.  But it's something                        09:29AM

20  else that the Chinese sent back, that we may have an ability to                     09:29AM

21  get those assets.                                                                   09:29AM

22           THE COURT:  Okay.  Well, if there's some assets, any                        09:29AM

23  kind of assets from those companies or the affiliates of those                      09:29AM

24  companies, I will act on it.  Because I do owe the system the                        09:29AM

25  duty to effect my orders, and I ordered them to do that.  They                       09:29AM

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/18/18 Page 506 of 1680
Case 2:14-cv-00937-KDE-MBN Document 24-22 Filed 11/03/16 Page 23 of 72 PageID #: 984

22

```
 1    violated it.  I held them in contempt.  So I'll stand behind        09:29AM

 2    that.                                                               09:29AM

 3          MR. DAVIS:  Your Honor, we'll prepare the appropriate         09:29AM

 4    papers for the Court.                                               09:29AM

 5                But we'll ask Mr. Becnel or anyone else that has        09:29AM

 6    information, if they could get it to us and they could provide      09:29AM

 7    us the links to CMDM or BMDM or whoever it is so that we can        09:29AM

 8    make those links.                                                  09:29AM

 9          THE COURT:  Let's make sure it's an affiliate or the         09:29AM

10    company itself.  Because I don't want to wrongfully seize          09:30AM

11    anything.  But I will seize matters or material.                   09:30AM

12          MR. LEVIN:  Your Honor, we would request that madam          09:30AM

13    court reporter give us on an expedited basis, which we'll pay      09:30AM

14    for obviously, the transcript of these proceedings.  Because I     09:30AM

15    think this becomes very relevant for the judiciary in Portland,    09:30AM

16    Oregon to see.                                                     09:30AM

17          MR. BECNEL:  In addition to that, Judge, there's an MDL      09:30AM

18    judge on that very case.  And, yesterday, at the hearing, both     09:30AM

19    ADM and Cargill says they didn't want to be in the MDL; they      09:30AM

20    want it to come back.  Because almost all of the grain that goes   09:30AM

21    to China is shipped through Reserve.                               09:30AM

22          MR. DAVIS:  If you'll got us that link, Danny, so we         09:30AM

23    can make the connection, that that will be helpful.  Thank you.    09:30AM

24          THE COURT:  Venture Supply, anything on Venture Supply?      09:30AM

25          MR. LEVIN:  No, sir.  Just that the Virginia settlement      09:30AM
```

Case 2:09-md-02047-EEF-MBN Document 22369-78 Filed 01/13/18 Page 507 of 1680
Case 2:11-cv-00379-MSD-TEM Document 22-3 Filed 01/13/18 Page 24 Page 720 of 985

23

|    |                                                                                          |         |
|----|------------------------------------------------------------------------------------------|---------|
| 1  | is just between Your Honor, Judge Wall, Mr. Serpe and Dewan and                          | 09:30AM |
| 2  | others that have been working with them, is being run very                               | 09:31AM |
| 3  | effectively.                                                                             | 09:31AM |
| 4  |       THE COURT:  Okay. *                                   | 09:31AM |
| 5  |        Plaintiff and Defendant Profile, Fact Forms,    | 09:31AM |
| 6  | anything?                                                                                 | 09:31AM |
| 7  |       MR. LEVIN:  Nothing, sir.                             | 09:31AM |
| 8  |       THE COURT:  Nothing on Frequently Asked Questions.    | 09:31AM |
| 9  |        No pro se claimants?                            | 09:31AM |
| 10 |       MR. LEVIN:  Mr. Johnston has informed me that he      | 09:31AM |
| 11 | needn't come here --                                                                     | 09:31AM |
| 12 |       THE COURT:  He is here.                               | 09:31AM |
| 13 |       MR. JOHNSTON:  It's been so interesting that I decided | 09:31AM |
| 14 | to stay.                                                                                  | 09:31AM |
| 15 |        Let me make a brief comment for the Court.      | 09:31AM |
| 16 |        Since the November 25th status conference, I have | 09:31AM |
| 17 | worked certainly very, very well with counsel for Knauf and                              | 09:31AM |
| 18 | staff.  My office has provided every document, every piece of                            | 09:31AM |
| 19 | paper for every one of the group that I've called the late Knauf                         | 09:31AM |
| 20 | claimants, which we're all aware of, that we ended up being                              | 09:31AM |
| 21 | informed by Kerry Miller at the last status that remediation was                         | 09:32AM |
| 22 | going to be accomplished.  And I think it is going very, very                            | 09:32AM |
| 23 | well.  And I just want to notify the Court that we've had                                | 09:32AM |
| 24 | back-and-forth, but there's never been a negative moment since                           | 09:32AM |
| 25 | the last status conference.  And we'll continue try to help                              | 09:32AM |

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 01/18/18 Page 509 of 1680
Case 2:11-cv-03700-MSG-FHK Document 122 Filed 01/18/21 Page 25 Page 72 of 986

24

| | |
|---|---|
| 1 | these last group of people to get what they want, which is of | 09:32AM |
| 2 | course to have the remediation of their properties. | 09:32AM |
| 3 | THE COURT:  Okay.  I appreciate your work on it. | 09:32AM |
| 4 | As you all know, we had a number of pro se | 09:32AM |
| 5 | claimants.  They haven't hired attorneys.  They don't wish to | 09:32AM |
| 6 | hire an attorney.  And so I appointed Bob Johnston to help them | 09:32AM |
| 7 | navigate through this system.  He's been talking to them.  As a | 09:32AM |
| 8 | result of his efforts and efforts of Knauf, these individuals | 09:32AM |
| 9 | have been taken care of.  So I appreciate your work. | 09:32AM |
| 10 | MR. LEVIN:  Your Honor, I apologize to Bob.  Because he | 09:33AM |
| 11 | had told me before this hearing that he couldn't be here for the | 09:33AM |
| 12 | complete hearing; he had a personal situation.  And I didn't | 09:33AM |
| 13 | think he was in the courtroom when I started off. | 09:33AM |
| 14 | THE COURT:  All right. | 09:33AM |
| 15 | Anything on -- | 09:33AM |
| 16 | MR. JOHNSTON:  Did you hear what I said?  It was so | 09:33AM |
| 17 | interesting that I just had to stay. | 09:33AM |
| 18 | THE COURT:  Okay. | 09:33AM |
| 19 | Physical Evidence. | 09:33AM |
| 20 | MR. LEVIN:  Mr. Davis will respond to that. | 09:33AM |
| 21 | MR. DAVIS:  Yes, Your Honor. | 09:33AM |
| 22 | In light of your comments earlier, prior status | 09:33AM |
| 23 | conferences, we've met -- | 09:33AM |
| 24 | THE COURT:  This is the issue in the Physical Evidence. | 09:33AM |
| 25 | In this some type situation, the exposure to the board has | 09:33AM |

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 01/18/18 Page 509 of 1680
Case 2:14-cv-00913-MLCF-JCW Document 122-3 Filed 07/02/21 Page 26 of 72 PageID # 987

25

| | | |
|---|---|---|
| 1 | created physical problems with a lot of appliances, particularly | 09:33AM |
| 2 | with the copper-fit appliances.  It has some negative effect | 09:33AM |
| 3 | object those appliances.  Well, those appliances and a lot of | 09:33AM |
| 4 | other board had to be stored.  And you can imagine, there may be | 09:33AM |
| 5 | hundreds or thousands of refrigerators and things of that sort. | 09:34AM |
| 6 | The issue now is what do we do with it?  It's not really fair | 09:34AM |
| 7 | for the defendants to be required to continue to pay rent for | 09:34AM |
| 8 | these warehouses that I required them to keep the material in. | 09:34AM |
| 9 | So we have to recognize, however, the case is not | 09:34AM |
| 10 | over and some proof may be needed. | 09:34AM |
| 11 | So it seems to me that it's legitimate and | 09:34AM |
| 12 | appropriate for the defendants or liaison counsel and defendants | 09:34AM |
| 13 | to file a motion with the Court to find some other way.  And | 09:34AM |
| 14 | what we would do is take pictures of it, take samples of it, | 09:34AM |
| 15 | take video of it and have individuals look at it so that they | 09:34AM |
| 16 | can be able to testify. | 09:34AM |
| 17 | The reason I suggest the motion is that so there's | 09:34AM |
| 18 | no spoliation issue that's raised by a defendant later on saying | 09:34AM |
| 19 | that you intentionally and maliciously destroyed this material | 09:35AM |
| 20 | so that evidence should be used against you.  I don't see it | 09:35AM |
| 21 | that way.  It's a practicality. | 09:35AM |
| 22 | So file the motion and I'll authorize another way | 09:35AM |
| 23 | of preserving that evidence. | 09:35AM |
| 24 | MR. DAVIS:  Thank you, Your Honor. | 09:35AM |
| 25 | And, in light of that, we've also had discussions | 09:35AM |

| | | |
|---|---|---|
| 1 | with Ms. Bass and Ms. Wimberly of the Home Builders committee to | 09:35AM |
| 2 | try to reach some type of proposal that we will present to the | 09:35AM |
| 3 | Court. | 09:35AM |
| 4 | We appreciate that, Your Honor. | 09:35AM |
| 5 | THE COURT:  Okay. | 09:35AM |
| 6 | Anything from BASS?  From the builder, Moss?  Any | 09:35AM |
| 7 | problems? | 09:35AM |
| 8 | I always ask the Moss representative to be here. | 09:35AM |
| 9 | In case any litigants or lawyers have any issues, they can take | 09:35AM |
| 10 | it up directly with the remediation program manager, who is in | 09:35AM |
| 11 | charge of all of this. | 09:36AM |
| 12 | MR. MILLER:  Your Honor, Kerry Miller again. | 09:36AM |
| 13 | Phil Adams from Moss is here, as he has been for | 09:36AM |
| 14 | the last twenty or so status conferences.  Maybe more, I can | 09:36AM |
| 15 | remember.  And, if there are any issues, this presents a nice | 09:36AM |
| 16 | forum form discussion. | 09:36AM |
| 17 | But what we've seen, Your Honor, is the | 09:36AM |
| 18 | remediation program has certainly peaked and is on the down | 09:36AM |
| 19 | swing.  We don't have nearly the issues we used to. | 09:36AM |
| 20 | But, to the extent they do exist, Mr. Adams is | 09:36AM |
| 21 | here and certainly available to address them while in New | 09:36AM |
| 22 | Orleans. | 09:36AM |
| 23 | THE COURT:  Yes.  The people who are interested in | 09:36AM |
| 24 | remediating their homes have access to professional | 09:36AM |
| 25 | well-thought-of, well documented national group that's been | 09:36AM |

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 11/19/18 Page 571 of 1680
Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/18 Page 28 of 72 PageID #: 989

27

```
 1   doing this.                                                        09:36AM

 2              And, because of the numbers that they've worked         09:36AM

 3   on, they're able to have not only the quality but also some        09:37AM

 4   break for the numbers of cases that they're handling, and          09:37AM

 5   they're able to do it and do it efficiently.  While this has       09:37AM

 6   been going on.  So individuals have applied for this program.      09:37AM

 7   And, as in all remediation or as in all building programs,         09:37AM

 8   sometimes things don't work out.  And so Moss has been able to     09:37AM

 9   be at these meetings; and, any problems that people have had,      09:37AM

10   they've been able to bring them up at these meetings and they've   09:37AM

11   been able to get attention immediately for it.                     09:37AM

12              So I think the program has worked very well, and I      09:37AM

13   appreciate the cooperation of the parties in doing it.            09:37AM

14        MR. LEVIN:  Your Honor, lead and liaison counsel have        09:37AM

15   monitored what's going on with the remediation.  There's emails   09:37AM

16   every day confirming various problems and the resolution of       09:37AM

17   various problems.  And we can say that, with the undertaking      09:38AM

18   that Knauf has made through Kerry and what Moss has done, that    09:38AM

19   we only wish that the Taishan defendants behaved in the manner    09:38AM

20   in which Knauf, their counsel and Moss have behaved to the        09:38AM

21   clients that we represent.                                        09:38AM

22        THE COURT:  All right.                                       09:38AM

23              Any other items on the agenda?                         09:38AM

24              The Louisiana Attorney General, anything from the      09:38AM

25   attorney general?                                                 09:38AM
```

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 11/19/19 Page 512 of 1680
Case 2:14-cv-00513-MSG-FEK Document 22-1 Filed 11/02/19 Page 29 of 72 PageID# 990

28

| | | |
|---|---|---|
| 1 | The representative says no. | 09:38AM |
| 2 | The next meeting is February the 12th; and, | 09:38AM |
| 3 | following that, it's March the 26th.  March 26th. | 09:38AM |
| 4 | MR. MILLER:  Your Honor, one thing before we break. | 09:38AM |
| 5 | On the issue of Already Remediated Homes, that was | 09:38AM |
| 6 | right before the Louisiana Attorney General. | 09:38AM |
| 7 | Your Honor, Sean Payton was the actually first ARA | 09:38AM |
| 8 | that settled this part of that component of the class action | 09:38AM |
| 9 | settlement.  That was a protocol I had worked out with Mr. Davis | 09:38AM |
| 10 | in terms of documentation and putting books together and so on | 09:39AM |
| 11 | and so forth. | 09:39AM |
| 12 | On that, Your Honor, we've settled about 260 of | 09:39AM |
| 13 | those.  We have about 150 left.  The 260 we've settled were the | 09:39AM |
| 14 | cases that had the best documentation, such as Mr. Payton's home | 09:39AM |
| 15 | and others like that, where the attorneys kept and the clients | 09:39AM |
| 16 | kept very good records of what went on. | 09:39AM |
| 17 | For the 150 that are left, maybe some fall in that | 09:39AM |
| 18 | category.  But the others, at least to us, appear to have some | 09:39AM |
| 19 | evidentiary issues and so are more difficult to resolve. | 09:39AM |
| 20 | What we want to do, Your Honor is perhaps set up | 09:39AM |
| 21 | mediations, perhaps set up face-to-face meetings with counsel | 09:39AM |
| 22 | and their clients on these issues to try and wrap these up this | 09:39AM |
| 23 | year while we wrap up the other aspects of the program. | 09:39AM |
| 24 | THE COURT:  That's a good idea. | 09:39AM |
| 25 | What's the total number?  Some thousands? | 09:39AM |

```
1        MR. MILLER:  No.  Already remediated homes?  About 410.    09:39AM
2   So we've gotten about 260 done with about 150 left to go.        09:39AM
3        THE COURT:  All right.                                      09:40AM
4        MR. MILLER:  Your Honor, on that score, I've recently       09:40AM
5   switched firms.  I know that they were looking for some contact  09:40AM
6   information in terms of getting additional information in on      09:40AM
7   these already remediated homes that are unsettled or setting     09:40AM
8   mediation, things of that nature.  I provided Duncan, your law   09:40AM
9   clerk, with my new email address.  That will be available on the 09:40AM
10  Court's website.  And certainly me and the staff that I have at  09:40AM
11  my new firm will be very attentive to this issue moving forward  09:40AM
12  at this point.                                                    09:40AM
13       THE COURT:  Good luck to you at the new firm.  I know       09:40AM
14  you'll do a good job for them.                                    09:40AM
15            Court will stand in recess.  Thank you.                09:40AM
16            (9:38 a.m., proceedings recessed.)                     09:40AM
17                                                                    09:41AM
18
19                         CERTIFICATE
20
21
22  I, Susan A. Zielie, Official Court Reporter, do hereby
    certify that the foregoing transcript is correct.
23
24
25                         /S/ SUSAN A. ZIELIE, FCRR
                           _____
                                 Susan A. Zielie, FCRR
```

## $

**$1,000** [1] - 9:5
**$10,000** [2] - 9:6, 9:7
**$14,400** [1] - 9:8, 9:9
**$2,500** [1] - 9:10
**$393,800** [1] - 12:19
**$50,000** [1] - 19:11, 19:13

## /

**/S** [1] - 29:24

## 1

**1** [1] - 14:23
**1,000** [1] - 12:13
**1,674** [1] - 6:17
**1.7** [1] - 7:19
**10,000** [1] - 6:16
**100** [2] - 8:16, 17:15
**11,770** [1] - 7:14
**1100** [1] - 2:18
**12th** [2] - 7:14, 28:2
**150** [3] - 28:13, 28:17, 29:2
**159** [1] - 12:14
**176** [1] - 12:14
**19,726** [1] - 6:9
**19106** [1] - 2:6

## 2

**2,527** [1] - 8:14
**200** [2] - 8:17, 12:9
**2015** [2] - 1:6, 4:1
**2047** [2] - 1:5, 4:5
**21.3** [1] - 8:3
**22** [2] - 1:6, 4:1
**22,491** [1] - 6:8
**23rd** [1] - 8:25
**2450** [1] - 2:15
**25th** [1] - 23:16
**260** [3] - 28:12, 28:13, 29:2
**26th** [2] - 28:3

## 3

**3600** [1] - 2:11
**37.7** [1] - 9:13
**3700** [1] - 2:18

## 4

**4,000** [1] - 8:13
**400** [1] - 2:14
**410** [1] - 29:1
**425** [1] - 2:8

**428** [1] - 8:14
**44** [1] - 8:14

## 5

**500** [2] - 1:18, 2:6
**504.589.7781** [1] - 1:20
**504.593.0849** [1] - 2:22
**510** [1] - 2:6
**54.8** [1] - 7:18
**546** [1] - 2:21

## 7

**70086** [1] - 2:9
**701** [1] - 2:11
**70113** [1] - 2:4
**70130** [3] - 1:19, 2:15, 2:21
**70139** [1] - 2:12
**70163** [1] - 2:19

## 8

**820** [1] - 2:3
**866-866-1729** [1] - 13:2

## 9

**9,983** [1] - 6:17
**9:00** [2] - 1:7, 4:2
**9:38** [1] - 29:16

## A

**A.M** [1] - 1:7, 4:2
**a.m** [1] - 29:16
**abbreviate** [1] - 8:12
**ability** [2] - 21:15, 21:20
**able** [15] - 4:24, 7:12, 7:22, 8:22, 11:18, 11:22, 15:22, 18:18, 21:18, 25:16, 27:3, 27:5, 27:8, 27:10, 27:11
**abundance** [1] - 7:9
**accept** [2] - 10:4, 21:12
**acceptance** [3] - 10:24, 12:16, 12:21
**accepted** [3] - 10:11, 12:14, 12:20
**accepts** [1] - 10:22
**access** [1] - 26:24
**accomplished** [1] - 23:22

**act** [1] - 21:24
**Action** [2] - 13:13, 13:24
**action** [6] - 5:2, 10:10, 10:13, 13:21, 15:23, 28:8
**Actions** [1] - 13:4
**actively** [2] - 6:10, 16:6
**activities** [1] - 19:22
**Adams** [3] - 26:13, 26:20
**add** [1] - 15:24
**addition** [4] - 17:11, 17:16, 20:21, 22:17
**additional** [3] - 11:5, 21:6, 29:6
**address** [3] - 8:2, 26:21, 29:9
**ADM** [2] - 21:8, 22:19
**admitted** [1] - 11:10
**advanced** [1] - 16:4
**advertising** [1] - 16:18
**advisement** [1] - 15:19
**affiliate** [1] - 22:9
**affiliates** [2] - 19:5, 20:23, 21:23
**afford** [1] - 16:14
**afterwards** [1] - 16:10
**agenda** [3] - 4:14, 4:16, 27:23
**ago** [2] - 4:14, 21:7
**agree** [1] - 17:8
**agreement** [3] - 19:19, 19:20, 19:21
**agreements** [1] - 16:6
**AIDED** [1] - 1:23
**AIRLINE** [1] - 2:8
**ALL** [1] - 1:8
**allow** [2] - 8:23, 9:3
**almost** [2] - 11:19, 22:20
**alternative** [1] - 8:11
**amount** [2] - 9:12, 17:10
**amounts** [2] - 9:4, 9:11
**announcement** [1] - 16:21
**answering** [1] - 5:17
**anticipate** [1] - 11:14
**apologize** [1] - 24:10
**appeal** [2] - 20:14, 20:15
**appear** [2] - 13:18, 28:18
**appearance** [2] - 13:17, 20:13

**APPEARANCES** [1] - 2:1
**appliances** [4] - 25:1, 25:2, 25:3
**applied** [1] - 27:6
**appointed** [1] - 24:6
**appreciate** [6] - 5:23, 13:12, 24:3, 24:9, 26:4, 27:13
**appreciative** [1] - 13:9
**approached** [1] - 14:14
**appropriate** [2] - 22:3, 25:12
**approve** [1] - 17:21
**ARA** [1] - 28:7
**Arnold** [3] - 4:9, 14:4, 15:12
**ARNOLD** [1] - 2:5
**arrangement** [1] - 17:7
**aspect** [2] - 13:14, 19:23
**aspects** [1] - 28:23
**assessment** [3] - 5:19, 13:20, 13:21
**assets** [7] - 19:3, 20:25, 21:4, 21:6, 21:21, 21:22, 21:23
**assigned** [2] - 6:19, 7:11
**assignment** [1] - 7:10
**associated** [1] - 11:14
**association** [1] - 16:19
**assuming** [1] - 10:24
**assure** [3] - 15:20, 16:12, 20:3
**attention** [2] - 18:2, 27:11
**attentive** [1] - 29:11
**Attorney** [2] - 27:24, 28:6
**attorney** [7] - 15:11, 17:8, 17:9, 17:18, 24:6, 27:25
**attorney's** [1] - 17:11
**attorneys** [5] - 16:7, 19:11, 19:13, 24:5, 28:15
**authorize** [1] - 25:22
**authorized** [1] - 7:4
**available** [5] - 8:1, 9:12, 16:1, 26:21, 29:9
**AVENUE** [1] - 2:3
**award** [1] - 10:6
**Award** [4] - 10:7, 10:14, 10:15, 11:5
**aware** [2] - 16:1, 23:20

## B

**B406** [1] - 1:18
**back-and-forth** [1] - 23:24
**ball** [1] - 20:17
**banking** [1] - 20:1
**bankrupt** [1] - 20:7
**Banner** [4] - 6:13, 6:15, 8:7, 18:20
**bar** [1] - 16:19
**BARRIOS** [3] - 2:10, 2:11, 4:22
**basis** [2] - 5:17, 22:13
**BASS** [1] - 26:6
**Bass** [1] - 26:1
**bat** [1] - 17:4
**batting** [1] - 19:2
**beauty** [1] - 15:9
**Becnel** [7] - 14:4, 15:13, 15:20, 15:25, 16:7, 16:9, 22:5
**BECNEL** [6] - 2:7, 14:7, 15:2, 16:16, 21:5, 22:17
**Becnel's** [1] - 15:16
**becomes** [1] - 22:15
**BEFORE** [1] - 1:14
**began** [2] - 7:13, 12:18
**begin** [1] - 8:23
**begun** [2] - 9:17, 12:5, 12:17
**behalf** [1] - 4:12
**behaved** [4] - 13:16, 27:19, 27:20
**behaves** [1] - 13:16
**behind** [1] - 22:1
**benefit** [4] - 15:18, 16:3, 17:10
**BERMAN** [1] - 2:5
**best** [2] - 12:23, 28:14
**better** [1] - 11:23
**between** [4] - 19:9, 19:22, 23:1
**BMBM** [2] - 13:16, 13:21
**BMDM** [1] - 22:7
**board** [5] - 20:4, 20:5, 20:8, 24:25, 25:4
**Bob** [2] - 24:6, 24:10
**bodily** [4] - 5:11, 8:10, 9:5, 12:8
**books** [1] - 28:10
**Bowl** [1] - 14:8
**break** [2] - 27:4, 28:4
**Brees** [1] - 14:16
**brief** [1] - 23:15
**briefly** [1] - 6:6

**bring** [1] - 27:10
**bringing** [1] - 18:1
**brought** [1] - 19:5
**BrownGreer** [5] -
  4:18, 5:8, 6:4, 13:7,
  13:8
**builder** [1] - 26:6
**BUILDERS** [1] - 2:20
**Builders** [1] - 26:1
**building** [1] - 27:7
**business** [1] - 19:15
**BY** [7] - 1:23, 1:23,
  2:3, 2:5, 2:11, 2:17,
  2:20

## C

**camp** [1] - 14:11
**cannot** [1] - 11:5
**care** [1] - 24:9
**Cargill** [2] - 21:7,
  22:19
**Carondelet** [1] - 2:21
**case** [22] - 4:4, 5:22,
  14:12, 14:17, 14:20,
  15:7, 15:8, 16:22,
  16:24, 17:6, 17:9,
  17:13, 18:15, 18:16,
  18:18, 19:12, 19:13,
  20:12, 22:18, 25:9,
  26:9
**CASE** [1] - 4:5
**CASES** [1] - 1:8
**cases** [7] - 4:22, 7:8,
  14:19, 16:20, 16:23,
  27:4, 28:14
**CASTEIX** [1] - 2:10
**categories** [1] - 8:9
**category** [2] - 6:17,
  28:18
**cattle** [1] - 21:19
**caution** [1] - 7:9
**CDWquestions@**
  **BrownGreer** [1] -
  13:1
**CENTRE** [1] - 2:17
**certainly** [5] - 17:22,
  23:17, 26:18, 26:21,
  29:10
**CERTIFICATE** [1] -
  29:19
**certification** [1] - 5:18
**certify** [1] - 29:22
**chance** [1] - 10:13
**change** [2] - 7:1,
  10:16
**changes** [1] - 8:16
**charge** [1] - 26:11
**checks** [4] - 7:15,
  7:17, 7:25

**child** [1] - 15:6
**China** [6] - 13:15,
  19:9, 19:17, 19:18,
  21:14, 22:21
**Chinese** [4] - 4:5, 6:5,
  14:12, 15:6, 16:21,
  21:6, 21:12, 21:20
**CHINESE** [1] - 1:4
**CHINESE-**
**MANUFACTURED**
  [1] - 1:4
**City** [1] - 14:25
**claim** [24] - 5:5, 6:9,
  6:12, 6:18, 6:19,
  6:23, 6:24, 6:25, 7:3,
  7:11, 7:18, 8:13,
  9:14, 9:21, 11:2,
  11:3, 11:8, 11:24,
  11:25, 12:7, 15:2,
  16:11
**claimant** [7] - 7:10,
  7:22, 10:15, 10:18,
  10:22, 11:4, 17:12
**claimants** [5] - 6:18,
  7:2, 7:7, 7:16, 7:23,
  10:3, 10:10, 17:15,
  17:17, 23:9, 23:20,
  24:5
**Claims** [1] - 8:8
**claims** [45] - 6:7, 6:8,
  6:10, 6:13, 6:16, 7:2,
  7:4, 7:5, 7:6, 7:8,
  7:9, 7:13, 7:23, 8:7,
  8:8, 8:9, 8:13, 8:21,
  8:24, 9:4, 9:6, 9:8,
  9:12, 9:18, 10:6,
  10:7, 10:25, 11:6,
  11:16, 11:17, 11:18,
  11:20, 11:25, 12:6,
  12:9, 12:11, 12:12,
  12:14, 12:18, 12:19,
  12:20, 12:22
**class** [4] - 5:2, 5:18,
  13:21, 28:8
**Class** [3] - 13:4,
  13:13, 13:24
**clauses** [1] - 19:21
**clerk** [1] - 29:9
**client** [1] - 16:22
**clients** [4] - 4:20,
  27:21, 28:15, 28:22
**clock** [1] - 11:17
**close** [1] - 5:7
**closely** [1] - 5:24
**closure** [1] - 9:5
**CMBM** [2] - 13:16,
  13:21
**CMDM** [1] - 22:7
**coming** [1] - 21:14
**comment** [1] - 23:15

**comments** [2] - 17:20,
  24:22
**commercial** [2] -
  16:18, 19:7
**committee** [8] - 4:12,
  14:19, 15:17, 15:19,
  15:21, 16:1, 16:11,
  26:1
**COMMITTEE** [2] - 2:2,
  2:10
**common** [4] - 15:18,
  16:3, 17:10
**commotion** [1] - 16:20
**companies** [3] -
  21:13, 21:23, 21:24
**company** [2] - 20:25,
  22:10
**competing** [1] - 7:9
**complaint** [2] - 13:15,
  16:2
**Complaints** [1] -
  13:13
**complaints** [1] - 13:14
**complete** [2] - 6:9,
  18:9, 24:12
**complex** [1] - 16:7
**component** [1] - 28:8
**COMPUTER** [1] - 1:23
**concept** [1] - 17:14
**conducted** [1] - 15:17
**CONFERENCE** [1] -
  1:13
**conference** [5] - 4:7,
  5:21, 7:20, 23:16,
  23:25
**conferences** [2] -
  24:23, 26:14
**confirming** [1] - 27:16
**connection** [2] - 14:3,
  22:23
**conscious** [1] - 18:1
**consideration** [1] -
  17:23
**contact** [3] - 5:7,
  12:23, 29:5
**contain** [1] - 10:2
**contains** [1] - 19:21
**contempt** [1] - 22:1
**content** [1] - 20:20
**continue** [5] - 8:4,
  12:10, 12:19, 23:25,
  25:7
**cooperation** [1] -
  27:13
**COORDINATION** [1] -
  2:10
**copies** [1] - 14:4
**copper** [1] - 25:2
**copper-fit** [1] - 25:2
**corn** [2] - 21:9, 21:13

**corporation** [2] -
  13:22, 20:1
**correct** [1] - 29:22
**Costs** [1] - 18:22
**counsel** [10] - 4:8,
  4:13, 15:18, 16:19,
  20:24, 23:17, 25:12,
  27:14, 27:20, 28:21
**country** [1] - 20:22
**course** [2] - 10:24,
  24:2
**court** [8] - 19:6, 20:14,
  20:16, 20:20, 21:8,
  22:13, 29:15
**Court** [16] - 4:19, 4:21,
  5:19, 8:22, 8:25,
  16:9, 20:23, 21:5,
  21:6, 21:16, 22:4,
  23:15, 23:23, 25:13,
  26:3, 29:21
**COURT** [39] - 1:1,
  1:17, 4:3, 4:7, 4:13,
  4:21, 5:22, 6:20,
  12:2, 13:3, 13:11,
  13:24, 14:1, 14:3,
  15:1, 15:8, 16:15,
  17:5, 18:13, 18:22,
  18:24, 19:10, 20:8,
  21:22, 22:9, 22:24,
  23:4, 23:8, 23:12,
  24:3, 24:14, 24:18,
  24:24, 26:5, 26:23,
  27:22, 28:24, 29:3,
  29:13
**Court's** [1] - 29:10
**courtroom** [1] - 24:13
**created** [2] - 19:8,
  25:1
**CURATOR** [1] - 2:13

## D

**damages** [2] - 5:20,
  13:22
**DANIEL** [1] - 2:7
**Danny** [6] - 14:4, 14:5,
  15:13, 16:9, 16:12,
  22:22
**date** [1] - 12:21
**DAVIS** [5] - 2:3, 22:3,
  22:22, 24:21, 25:24
**Davis** [2] - 24:20, 28:9
**DAWN** [2] - 1:22
**days** [2] - 10:11, 10:23
**deadline** [4] - 5:4,
  11:7, 11:18, 11:19
**deal** [2] - 16:10, 17:2
**dealt** [1] - 17:25
**December** [1] - 8:25
**decided** [2] - 20:15,

  23:13
**decisions** [1] - 5:18
**deemed** [1] - 10:11
**default** [2] - 13:19,
  19:25
**defend** [1] - 19:25
**defendant** [2] - 15:10,
  15:11, 25:18
**DEFENDANT** [1] -
  2:16
**Defendant** [1] - 23:5
**defendants** [7] -
  17:16, 18:16, 18:24,
  25:7, 25:12, 27:19
**defense** [1] - 4:12
**deficiency** [1] - 5:6
**denied** [3] - 6:17,
  6:20, 6:23
**dentist** [1] - 16:23
**denying** [1] - 8:19
**destroyed** [1] - 25:19
**determination** [2] -
  10:9, 10:21
**determine** [2] - 9:22,
  20:24
**determined** [2] -
  10:19, 19:4
**Dewan** [1] - 23:1
**different** [5] - 6:14,
  9:14, 12:7, 15:5,
  17:19
**difficult** [1] - 28:19
**direct** [1] - 20:24
**directly** [2] - 17:4,
  26:10
**disbursed** [1] - 12:19
**discovery** [1] - 20:11
**discuss** [1] - 4:14
**discussed** [1] - 15:20
**discussion** [1] - 26:16
**discussions** [1] -
  25:25
**dissolution** [1] - 14:13
**distribute** [1] - 8:3
**distributed** [1] - 7:18
**distribution** [1] - 9:13
**District** [1] - 19:8
**DISTRICT** [4] - 1:1,
  1:2, 1:15, 1:18
**district** [2] - 21:2, 21:3
**document** [2] - 8:19,
  23:18
**DOCUMENT** [1] - 1:7
**documentation** [3] -
  6:18, 28:10, 28:14
**documented** [1] -
  26:25
**documents** [8] - 8:20,
  10:12, 11:1, 11:3,
  11:5, 11:6, 11:10,

11:24
**done** [7] - 6:11, 13:11, 16:11, 17:18, 18:12, 27:18, 29:2
**DOROTHY** [1] - 2:20
**down** [2] - 10:16, 26:18
**Dr** [1] - 16:23
**draft** [1] - 8:22
**Drew** [1] - 14:15
**Drywall** [3] - 4:6, 6:5, 16:21
**DRYWALL** [1] - 1:4
**drywall** [4] - 14:12, 15:7, 19:17, 19:18
**due** [1] - 16:14
**Duncan** [1] - 29:8
**duplicate** [3] - 7:4, 7:7, 7:22
**during** [1] - 5:20
**duty** [1] - 21:25
**dwimberly@ stonepigman.com** [1] - 2:22

## E

**Eagles** [1] - 15:15
**earned** [1] - 20:22
**Eastern** [1] - 19:8
**EASTERN** [2] - 1:2, 1:18
**effect** [2] - 21:25, 25:2
**effectively** [2] - 5:17, 23:3
**efficiently** [1] - 27:5
**efforts** [1] - 24:8
**either** [3] - 8:18, 19:24, 20:22
**ELDON** [1] - 1:14
**elevators** [1] - 21:17
**eligibility** [6] - 9:17, 9:18, 9:25, 10:4, 11:15, 12:8
**eligible** [7] - 6:16, 7:16, 8:14, 8:19, 8:24, 9:4, 12:5
**email** [2] - 12:25, 29:9
**emails** [1] - 27:15
**end** [2] - 5:6, 8:2
**ended** [1] - 23:20
**ENERGY** [1] - 2:17
**engineered** [1] - 21:9
**enter** [1] - 13:17
**entered** [1] - 8:25
**entities** [4] - 20:9, 20:10, 20:11, 20:12
**especially** [1] - 17:1
**ESQ** [2] - 2:13, 2:20
**ESQUIRE** [5] - 2:3,

2:5, 2:7, 2:11, 2:17
**essentially** [2] - 7:4, 9:11
**estate** [1] - 17:2
**evaluation** [1] - 11:23
**event** [1] - 14:22
**eventually** [2] - 20:5, 20:13
**Evidence** [2] - 24:19, 24:24
**evidence** [2] - 25:20, 25:23
**evidentiary** [1] - 28:19
**EX** [1] - 8:7
**exactly** [1] - 8:14
**exist** [1] - 26:20
**expedited** [1] - 22:13
**Expense** [1] - 14:1
**expenses** [2] - 8:11, 11:9
**expensive** [1] - 14:9
**expire** [1] - 11:20
**explain** [1] - 20:19
**explaining** [1] - 5:16
**exports** [1] - 21:16
**exposure** [1] - 24:25
**express** [1] - 17:22
**extensions** [1] - 11:18
**extensive** [1] - 15:17
**extent** [1] - 26:20

## F

**face** [1] - 28:21
**face-to-face** [1] - 28:21
**fact** [1] - 15:4
**Fact** [1] - 23:5
**failure** [1] - 8:20
**fair** [1] - 25:6
**fall** [1] - 28:17
**FALLON** [1] - 1:14
**far** [5] - 7:14, 7:18, 12:6, 18:18, 19:20
**fast** [1] - 17:24
**fast-track** [1] - 17:24
**FCRR** [3] - 1:17, 29:24, 29:25
**February** [3] - 5:20, 11:16, 28:2
**federal** [1] - 19:6
**fee** [16] - 14:20, 15:17, 15:18, 15:19, 15:21, 16:1, 16:3, 16:5, 16:11, 16:18, 17:6, 17:9, 17:10, 17:11, 17:16, 17:21
**Fee** [1] - 14:1
**feed** [1] - 21:19
**fees** [5] - 15:11, 17:18,

17:21, 19:11, 20:22
**file** [3] - 14:24, 25:13, 25:22
**filed** [1] - 21:8
**finally** [2] - 11:13, 12:23
**fining** [1] - 20:21
**finished** [1] - 14:9
**firm** [2] - 29:11, 29:13
**firms** [1] - 29:5
**first** [6] - 11:16, 11:20, 16:22, 16:23, 19:1, 28:7
**FISHBEIN** [1] - 2:5
**fit** [2] - 8:8, 25:2
**five** [3] - 4:23, 15:5, 21:7
**fixed** [2] - 17:15, 17:16
**flesh** [1] - 14:5
**flowing** [1] - 4:20
**fluctuates** [1] - 7:21
**following** [1] - 28:3
**FOR** [3] - 2:2, 2:10, 2:17
**foreclosure** [2] - 8:10, 12:8
**foreclosures** [1] - 20:7
**foregoing** [1] - 29:22
**form** [3] - 10:25, 12:24, 26:16
**forms** [2] - 5:5, 8:1
**Forms** [1] - 23:5
**forth** [3] - 15:9, 23:24, 28:11
**forty** [1] - 12:18
**forty-three** [1] - 12:18
**forum** [1] - 26:16
**forward** [1] - 29:11
**four** [2] - 8:9, 8:13
**Frequently** [1] - 23:8
**Frilot** [1] - 2:16
**fund** [2] - 5:4, 6:22, 6:24
**funds** [2] - 5:9, 15:3

## G

**game** [1] - 18:8
**Garretson** [1] - 5:2
**GBI** [2] - 7:13, 11:2
**general** [2] - 14:15, 27:25
**General** [2] - 27:24, 28:6
**generally** [3] - 7:7, 10:23, 17:10
**genetically** [1] - 21:9
**Global** [3] - 6:12, 6:15, 8:7
**grain** [4] - 21:16,

21:17, 21:18, 22:20
**grant** [1] - 11:18
**great** [2] - 5:25, 19:8
**group** [4] - 18:10, 23:19, 24:1, 26:25
**Group** [1] - 5:2
**guess** [1] - 15:8

## H

**handled** [2] - 14:17, 19:13
**handling** [1] - 27:4
**head** [1] - 5:1
**health** [2] - 17:1, 17:25
**hear** [4] - 4:8, 15:12, 17:20, 24:16
**HEARD** [1] - 1:14
**hearing** [5] - 5:20, 21:10, 22:18, 24:11, 24:12
**held** [1] - 22:1
**help** [5] - 5:23, 5:25, 5:11, 23:25, 24:6
**helpful** [1] - 22:23
**hereby** [1] - 29:21
**HERMAN** [1] - 2:2
**Herman** [1] - 4:10
**high** [1] - 9:2
**HIGHWAY** [1] - 2:8
**hire** [2] - 17:8, 24:6
**hired** [1] - 24:5
**hold** [1] - 15:13
**HOME** [1] - 2:20
**Home** [1] - 26:1
**home** [3] - 14:9, 20:17, 28:14
**homes** [9] - 17:15, 18:9, 18:11, 18:19, 20:4, 26:24, 29:1, 29:7
**Homes** [1] - 28:5
**Honor** [23] - 4:9, 4:11, 4:22, 6:3, 16:16, 18:5, 18:7, 18:12, 22:3, 22:12, 23:1, 24:10, 24:21, 25:24, 26:4, 26:12, 26:17, 27:14, 28:4, 28:7, 28:12, 28:20, 29:4
**HONORABLE** [1] - 1:14
**hopes** [1] - 4:24
**house** [1] - 14:12
**hundreds** [1] - 25:5
**hurting** [1] - 19:12

## I

**idea** [1] - 11:21, 28:24
**ignored** [1] - 19:7
**imagine** [1] - 25:4
**immediately** [1] - 27:11
**IN** [2] - 1:4, 8:7
**IN-EX** [1] - 8:7
**IN/EX** [2] - 6:13, 6:15
**IN\EX** [1] - 18:20
**including** [3] - 17:23, 18:10, 20:2
**incomplete** [3] - 8:15, 8:18, 8:21
**incompleteness** [1] - 8:15
**increase** [1] - 7:19
**independent** [1] - 10:20
**independently** [1] - 10:8
**indication** [1] - 12:2
**individual** [1] - 16:5
**individuals** [3] - 24:8, 25:15, 27:6
**information** [5] - 12:23, 21:6, 22:6, 29:6
**informed** [2] - 23:10, 23:21
**injury** [5] - 5:11, 8:10, 9:5, 12:8
**inning** [3] - 18:8, 18:25, 19:2
**inspected** [1] - 15:5
**inspections** [1] - 15:4
**instructions** [1] - 10:2
**insufficient** [2] - 6:17, 10:5
**intentionally** [1] - 25:19
**interested** [3] - 19:12, 19:14, 26:23
**interesting** [4] - 17:5, 17:13, 23:13, 24:17
**interests** [1] - 13:23, 20:2
**interview** [1] - 15:24
**interviews** [1] - 15:17
**issue** [14] - 4:18, 7:6, 7:25, 9:17, 9:25, 10:19, 12:10, 14:6, 20:25, 24:24, 25:6, 25:18, 28:5, 29:11
**issued** [6] - 7:14, 11:16, 12:6, 12:7, 12:9, 12:13
**issues** [9] - 5:10, 7:22, 15:20, 17:25, 26:9,

26:15, 26:19, 28:19, 28:22

**issuing** [4] - 7:13, 9:18, 12:5, 12:17

**item** [3] - 13:4, 13:24, 14:1

**itemized** [1] - 11:9

**items** [1] - 27:23

**itself** [1] - 22:10

## J

**Jake** [3] - 5:7, 6:1, 6:3

**JANUARY** [2] - 1:6, 4:1

**job** [2] - 13:11, 29:14

**john** [1] - 21:8

**JOHNSTON** [4] - 2:13, 2:14, 23:13, 24:16

**Johnston** [2] - 23:10, 24:6

**joint** [1] - 4:23

**Judge** [2] - 22:17, 23:1

**judge** [5] - 5:23, 14:7, 21:2, 22:18

**JUDGE** [1] - 1:15

**judgment** [2] - 13:20, 19:25

**judiciary** [1] - 22:15

**jump** [1] - 5:1

## K

**Kansas** [2] - 14:24, 21:11

**KATZ** [1] - 2:2

**keep** [1] - 25:8

**kept** [2] - 28:15, 28:16

**Kerry** [6] - 4:11, 18:4, 18:5, 23:21, 26:12, 27:18

**KERRY** [1] - 2:17

**kind** [2] - 15:5, 21:23

**kinds** [1] - 16:19

**KINGSDORF** [1] - 2:10

**Knauf** [12] - 4:12, 16:24, 18:20, 19:1, 20:4, 20:9, 20:11, 23:17, 23:19, 24:8, 27:18, 27:20

**KNAUF** [1] - 2:16

**knows** [3] - 17:6, 18:14, 21:16

## L

**LA** [7] - 1:19, 2:4, 2:9, 2:12, 2:15, 2:19,

2:21

**lake** [1] - 14:8

**LAPLACE** [1] - 2:9

**largely** [5] - 6:17, 7:1, 7:6, 7:11, 8:5

**larger** [1] - 7:15

**largest** [1] - 6:12

**last** [13] - 5:8, 7:14, 7:19, 8:16, 13:24, 18:8, 18:10, 18:11, 23:21, 23:25, 24:1, 26:14

**late** [1] - 23:19

**law** [1] - 29:8

**LAW** [1] - 2:13

**lawyers** [1] - 26:9

**lead** [3] - 4:13, 16:2, 27:14

**least** [1] - 28:18

**left** [4] - 8:3, 28:13, 28:17, 29:2

**legitimate** [1] - 25:11

**LEONARD** [1] - 2:3

**less** [1] - 9:22

**letters** [1] - 14:4

**LEVIN** [21] - 2:5, 2:5, 4:9, 4:18, 5:14, 13:6, 13:13, 13:25, 14:2, 15:13, 18:21, 18:23, 18:25, 19:11, 22:12, 22:25, 23:7, 23:10, 24:10, 24:20, 27:14

**Levin** [1] - 4:9

**LIABILITY** [1] - 1:4

**Liability** [1] - 4:6

**liaison** [5] - 4:8, 4:10, 4:13, 25:12, 27:14

**light** [2] - 24:22, 25:25

**line** [1] - 7:25

**link** [1] - 22:22

**links** [2] - 22:7, 22:8

**list** [2] - 9:18, 11:9

**listed** [1] - 4:23

**listened** [1] - 13:7

**litigants** [4] - 15:9, 17:7, 26:9

**litigation** [4] - 4:6, 16:4, 16:13, 19:4

**LITIGATION** [1] - 1:5

**live** [1] - 14:10

**living** [2] - 8:11, 14:7

**LLC** [2] - 2:14, 2:16

**look** [2] - 11:8, 25:15

**looking** [1] - 29:5

**Loomis** [1] - 14:15

**lose** [1] - 10:13

**Loss** [9] - 8:8, 8:9, 8:24, 9:4, 9:12, 9:18, 11:16, 11:19, 12:17

**loss** [5] - 5:4, 5:9, 6:24, 6:25, 9:6

**losses** [2] - 9:9, 9:22

**lost** [4] - 8:10, 9:7, 12:11, 20:14

**Louisiana** [4] - 19:8, 21:17, 27:24, 28:6

**LOUISIANA** [4] - 1:2, 1:6, 1:18, 4:1

**low** [1] - 8:21

**lower** [1] - 9:23

**luck** [1] - 29:13

## M

**madam** [1] - 22:12

**main** [1] - 8:9

**major** [1] - 21:16

**majority** [1] - 11:15

**maliciously** [1] - 25:19

**manager** [2] - 14:15, 26:10

**MANAGER** [1] - 4:5

**Mandeville** [1] - 14:8

**manner** [2] - 13:9, 27:19

**MANUFACTURED** [1] - 1:4

**manufactured** [1] - 20:9

**Manufactured** [1] - 4:6

**March** [3] - 11:20, 28:3

**marriage** [1] - 14:13

**master** [7] - 10:6, 10:8, 10:20, 11:11, 11:14, 11:21, 12:15

**Master** [1] - 10:7, 10:14, 10:15, 11:4

**material** [3] - 22:11, 25:8, 25:19

**matter** [2] - 4:8, 5:24

**matters** [1] - 22:11

**MDL** [6] - 17:9, 21:2, 21:10, 22:17, 22:19

**mDL** [1] - 1:5

**mean** [1] - 6:20

**MECHANICAL** [1] - 1:23

**mediation** [1] - 29:8

**mediations** [1] - 28:21

**Medicaid** [1] - 5:11

**Medicare** [1] - 5:11

**Medicare-Medicaid** [1] - 5:11

**meeting** [2] - 12:3, 28:2

**meetings** [3] - 27:9, 27:10, 28:21

**members** [1] - 14:16

**mention** [2] - 8:15,

9:20

**mentioned** [8] - 8:4, 9:23, 10:20, 12:5, 12:10, 12:24, 15:25, 18:15

**merits** [1] - 15:16

**met** [2] - 4:13, 24:23

**Mickey** [1] - 14:8

**might** [1] - 15:24

**MILLER** [7] - 2:17, 4:11, 18:5, 26:12, 28:4, 29:1, 29:4

**Miller** [4] - 4:11, 18:6, 23:21, 26:12

**millin** [1] - 9:13

**million** [3] - 7:18, 7:19, 8:3

**mind** [1] - 14:18

**minute** [1] - 14:9

**miscellaneous** [2] - 6:10, 9:9

**modified** [1] - 9:11

**moment** [2] - 4:13, 23:24

**money** [5] - 4:19, 6:2, 6:21, 19:10, 21:8

**monitored** [1] - 27:15

**month** [7] - 5:7, 7:1, 8:16, 13:8

**monthly** [3] - 4:7, 6:4, 9:7

**morning** [6] - 4:3, 4:9, 4:11, 6:3, 14:24, 18:5

**Moss** [7] - 18:9, 26:6, 26:8, 26:13, 27:8, 27:18, 27:20

**motion** [3] - 25:13, 25:17, 25:22

**motions** [1] - 4:15

**move** [2] - 9:20, 14:10

**moved** [1] - 14:12

**moving** [2] - 8:18, 29:11

**MR** [39] - 4:9, 4:11, 4:18, 5:14, 6:3, 6:23, 12:4, 13:6, 13:13, 13:25, 14:2, 14:7, 15:2, 15:13, 16:16, 18:5, 18:21, 18:23, 18:25, 19:11, 21:5, 22:3, 22:12, 22:17, 22:22, 22:25, 23:7, 23:10, 23:13, 24:10, 24:16, 24:20, 24:21, 25:24, 26:12, 27:14, 28:4, 29:1, 29:4

**MS** [1] - 4:22

**multiple** [1] - 7:17

**MURRAY** [1] - 2:13

## N

**name** [1] - 6:3

**national** [1] - 26:25

**nature** [1] - 29:8

**navigate** [1] - 24:7

**nearly** [1] - 26:19

**necessarily** [2] - 4:15, 5:15

**need** [4] - 11:2, 11:3, 12:25, 17:25

**needed** [1] - 25:10

**needn't** [1] - 23:11

**needs** [1] - 19:7

**negative** [2] - 23:24, 25:2

**negotiated** [1] - 14:18

**never** [1] - 23:24

**New** [2] - 2:21, 26:21

**new** [5] - 14:2, 18:7, 29:9, 29:11, 29:13

**NEW** [1] - 1:6, 1:19, 2:4, 2:12, 2:15, 2:19, 4:1

**next** [4] - 12:3, 13:4, 14:1, 28:2

**nice** [1] - 26:15

**ninety** [2] - 12:16, 18:9

**ninety-plus** [1] - 18:9

**ninth** [1] - 18:25

**nobody's** [1] - 17:20

**Northwest** [1] - 19:16

**nothing** [6] - 14:2, 18:7, 18:21, 18:23, 23:7, 23:8

**notice** [3] - 9:25, 10:1, 10:4

**notices** [9] - 5:6, 9:17, 9:18, 10:2, 11:15, 12:6, 12:8, 12:9, 12:10

**notified** [1] - 14:21

**notify** [1] - 23:23

**November** [1] - 23:16

**number** [11] - 6:7, 7:15, 7:21, 8:15, 8:21, 9:15, 9:21, 10:19, 24:4, 28:25

**numbers** [5] - 7:1, 9:16, 9:22, 27:2, 27:4

## O

**o'clock** [1] - 14:23

**O'KEEFE** [1] - 2:3

**object** [2] - 16:9, 25:3

**obtain** [1] - 12:24

**obviously** [1] - 22:14

**OF** [4] - 1:2, 1:13,

1:18, 2:13
**offer** [9] - 9:19, 9:23, 9:24, 10:4, 10:5, 10:11, 10:14, 10:16, 10:22
**offers** [2] - 9:4, 12:14
**office** [1] - 23:18
**OFFICES** [1] - 2:13
**Official** [1] - 29:21
**OFFICIAL** [1] - 1:17
**Omnibus** [2] - 13:4, 13:14
**omnibus** [1] - 16:2
**once** [3] - 11:3, 11:20, 19:24
**one** [11] - 5:14, 5:17, 7:10, 7:17, 13:6, 13:14, 19:23, 20:9, 23:19, 28:4
**one-to-one** [1] - 5:17
**ongoing** [2] - 19:15, 19:21
**opportunity** [2] - 17:22, 20:18
**options** [1] - 10:3
**order** [6] - 4:16, 5:8, 5:18, 6:11, 8:25, 21:1
**ordered** [1] - 21:25
**Orders** [1] - 4:17
**orders** [1] - 21:25
**Oregon** [3] - 19:4, 19:5, 22:16
**ORLEANS** [7] - 1:6, 1:19, 2:4, 2:12, 2:15, 2:19, 4:1
**Orleans** [2] - 2:21, 26:22
**otherwise** [1] - 17:25
**outstanding** [1] - 13:15
**owe** [1] - 21:24
**own** [1] - 7:12

## P

**PA** [1] - 2:6
**page** [1] - 4:23
**paid** [11] - 7:5, 11:22, 12:18, 14:22, 14:25, 16:18, 17:3, 17:16, 21:13, 21:14
**paper** [1] - 23:19
**papers** [1] - 22:4
**parent** [1] - 16:23
**Parish** [1] - 21:8
**part** [1] - 28:8
**participate** [1] - 20:19
**participating** [1] - 20:14

**particular** [4] - 16:11, 17:5, 17:13, 18:15
**particularly** [3] - 5:8, 5:10, 25:1
**parties** [3] - 8:22, 19:22, 27:13
**passed** [1] - 11:6
**past** [1] - 13:17
**pay** [4] - 17:8, 17:17, 22:13, 25:7
**paying** [1] - 15:11
**payment** [10] - 7:5, 7:16, 7:24, 7:25, 10:4, 10:12, 10:23, 12:17, 12:20
**payments** [6] - 5:12, 7:13, 7:21, 8:4, 8:23, 12:19
**payouts** [1] - 5:9
**Payton** [7] - 14:6, 14:21, 15:14, 15:25, 16:13, 16:17, 28:7
**Payton's** [1] - 28:14
**peaked** [1] - 26:18
**pending** [1] - 4:23
**people** [5] - 11:21, 17:24, 24:1, 26:23, 27:9
**per** [2] - 7:5, 11:3
**percent** [3] - 12:16, 17:15, 18:9
**percentage** [1] - 20:21
**perfect** [1] - 19:24
**perhaps** [3] - 19:2, 28:20, 28:21
**periodically** [1] - 17:1
**personal** [2] - 13:6, 24:12
**petroleum** [1] - 20:1
**Phil** [1] - 26:13
**Philadelphia** [1] - 15:14
**PHILADELPHIA** [1] - 2:6
**physical** [2] - 24:19, 25:1
**Physical** [1] - 24:24
**pictures** [1] - 25:14
**piece** [1] - 23:18
**PIGMAN** [1] - 2:20
**place** [2] - 5:20, 12:23
**plaintiff** [2] - 16:2, 23:5
**plaintiff's** [3] - 4:10, 14:19, 15:18
**plaintiffs** [1] - 5:16
**PLAINTIFFS** [1] - 2:7
**PLAINTIFFS'** [1] - 2:2
**plus** [2] - 17:18, 18:9
**point** [2] - 13:19,

29:12
**points** [1] - 9:2
**poor** [1] - 20:3
**portion** [1] - 17:11
**Portland** [3] - 19:4, 19:5, 22:15
**poster** [1] - 15:6
**potentially** [1] - 6:24
**POYDRAS** [4] - 1:18, 2:11, 2:14, 2:18
**practicality** [1] - 25:21
**practice** [1] - 19:2
**PRALE** [4] - 8:12, 9:8, 12:9, 12:11
**pre** [1] - 8:11
**pre-remediation** [1] - 8:11
**precluded** [1] - 19:20
**predated** [1] - 18:17
**prefer** [1] - 11:7
**prepare** [1] - 22:3
**prepared** [1] - 13:19
**preparing** [1] - 5:6
**present** [3] - 10:12, 10:25, 26:2
**presentation** [1] - 26:15
**presents** [1] - 26:15
**preserving** [1] - 25:23
**pretrial** [1] - 5:21
**Pretrial** [1] - 4:17
**pretty** [1] - 12:20
**previously** [1] - 6:19
**PRO** [1] - 2:13
**pro** [7] - 6:14, 9:11, 9:13, 9:15, 18:10, 23:9, 24:4
**problems** [6] - 8:5, 25:1, 26:7, 27:9, 27:16, 27:17
**proceed** [1] - 10:3
**proceeding** [2] - 5:25, 9:16
**proceedings** [4] - 13:18, 20:20, 22:14, 29:16
**PROCEEDINGS** [2] - 1:13, 1:23
**process** [9] - 5:5, 8:5, 10:1, 11:12, 11:25, 12:1, 16:7, 16:14, 20:6
**produced** [1] - 21:9
**PRODUCED** [1] - 1:23
**Products** [1] - 4:6
**PRODUCTS** [1] - 1:4
**professional** [1] - 26:24
**Profile** [1] - 23:5
**profits** [1] - 20:22

**program** [9] - 6:5, 18:8, 18:17, 19:1, 26:10, 26:18, 27:6, 27:12, 28:23
**Program** [2] - 18:3, 18:14
**programs** [1] - 27:7
**progress** [1] - 8:17
**prolix** [1] - 16:7
**proof** [1] - 25:10
**properties** [1] - 24:2
**property** [2] - 7:5, 9:8
**proposal** [1] - 26:2
**protocol** [1] - 28:9
**provide** [1] - 22:6
**provided** [3] - 20:21, 23:18, 29:8
**PSC** [2] - 13:7, 15:2
**PTO-29** [3] - 8:23, 9:2, 9:3
**public** [1] - 16:21
**purchased** [1] - 19:17
**purchasing** [1] - 19:15
**purely** [1] - 14:20
**pursue** [2] - 13:20, 19:6
**pursued** [2] - 13:21, 16:6
**pursuing** [2] - 19:3
**put** [1] - 7:24
**puts** [1] - 12:15
**putting** [1] - 28:10

## Q

**quality** [1] - 27:3
**Questions** [1] - 23:8
**questions** [2] - 9:1, 11:13
**quickly** [1] - 12:20

## R

**raised** [1] - 25:18
**rapidly** [1] - 10:23
**rata** [4] - 6:14, 9:11, 9:13, 9:15
**rate** [1] - 12:16
**rather** [2] - 14:8, 18:15
**re** [2] - 4:5
**RE** [1] - 1:4
**reach** [1] - 26:2
**really** [3] - 14:12, 18:7, 25:6
**reason** [1] - 25:17
**reasons** [1] - 13:8
**receive** [5] - 6:24, 7:17, 7:24, 10:4, 10:14
**received** [5] - 7:10,

9:1, 11:13, 12:13, 14:3
**receiving** [1] - 10:3
**recently** [1] - 29:4
**recess** [1] - 29:15
**recessed** [1] - 29:16
**recognize** [1] - 25:9
**reconcile** [1] - 7:22
**reconciling** [2] - 7:4, 7:11, 8:18
**RECORDED** [1] - 1:23
**records** [1] - 28:16
**refer** [2] - 8:8, 11:10
**refrigerators** [1] - 25:5
**refused** [2] - 20:19, 21:12
**regard** [1] - 5:8, 5:10, 5:11, 5:18, 5:19, 6:2, 13:13, 16:11, 18:21, 19:1, 19:2
**RELATES** [1] - 1:7
**relevant** [1] - 22:15
**relocation** [1] - 6:13
**remaining** [1] - 12:11
**remediate** [1] - 18:19
**Remediated** [1] - 28:5
**remediated** [3] - 20:5, 29:1, 29:7
**remediating** [1] - 26:24
**Remediation** [2] - 18:3, 18:14
**remediation** [10] - 8:11, 18:8, 18:17, 19:1, 23:21, 24:2, 26:10, 26:18, 27:7, 27:15
**remember** [1] - 26:15
**rent** [5] - 8:10, 9:7, 9:8, 12:11, 25:7
**rental** [1] - 9:8
**repair** [1] - 6:13
**reply** [1] - 16:16
**report** [12] - 4:19, 4:23, 5:3, 6:1, 6:5, 13:7, 15:22, 15:23, 16:8, 16:9, 16:10, 18:7
**REPORTER** [1] - 1:17
**reporter** [1] - 22:13
**Reporter** [1] - 29:21
**represent** [2] - 14:14, 27:21
**representation** [1] - 16:1
**representative** [2] - 26:8, 28:1
**request** [7] - 10:5, 10:7, 10:13, 11:4, 11:10, 15:16, 22:12

requested [1] - 12:15
requests [2] - 10:15, 10:18
require [1] - 7:23
required [2] - 25:7, 25:8
requirements [1] - 8:19
Reserve [2] - 21:16, 22:21
resisted [2] - 20:12, 20:13
resolution [5] - 9:3, 9:19, 10:14, 10:22, 27:16
resolve [2] - 12:21, 28:19
resolved [1] - 4:24
respond [1] - 24:20
responses [1] - 12:14
result [3] - 16:20, 20:18, 24:8
resulted [1] - 14:13
retainer [1] - 16:5
review [7] - 9:21, 10:8, 10:20, 11:11, 11:22, 12:15, 15:23
reviewed [2] - 6:9, 11:24
reviewing [2] - 5:5, 6:10
RMR [1] - 1:17
ROBERT [2] - 2:13, 2:14
ROOM [1] - 1:18
routed [1] - 10:17
run [1] - 23:2
Russ [1] - 4:10

## S

Saint's [1] - 14:10
Saints [2] - 14:15, 16:17
sale [3] - 8:10, 9:5, 12:9
sales [3] - 8:11, 9:6, 12:11
samples [1] - 25:14
SASAC [6] - 13:15, 13:16, 13:20, 13:22, 19:24, 19:25
satisfy [1] - 8:19
score [1] - 29:4
SE [1] - 2:13
se [3] - 18:11, 23:9, 24:4
Sean [8] - 14:6, 14:7, 14:21, 15:14, 15:25, 16:13, 16:17, 28:7

season [1] - 14:11
seated [1] - 4:3
SEDRAN [1] - 2:5
see [5] - 7:7, 8:17, 16:9, 22:16, 25:20
seeing [2] - 8:5, 19:20
seeking [1] - 15:18
segment [1] - 16:4
segue [1] - 5:14
seize [4] - 21:4, 21:18, 22:10, 22:11
seized [1] - 20:23
seizure [1] - 20:25
sending [1] - 16:18
sent [1] - 21:20
separate [1] - 21:10
September [1] - 7:14
Serpe [3] - 4:25, 5:16, 23:1
service [3] - 16:21, 19:24, 20:13
set [3] - 6:7, 28:20, 28:21
sets [1] - 17:9
setting [1] - 29:7
Settings [1] - 4:21
settled [6] - 14:20, 19:12, 20:12, 28:8, 28:12, 28:13
settlement [15] - 5:15, 6:5, 6:15, 6:16, 14:18, 17:14, 18:18, 18:20, 19:19, 19:20, 19:21, 19:22, 22:25, 28:9
settlements [4] - 5:2, 5:15, 6:14, 7:17, 15:10
seven [1] - 10:23
seventeen [1] - 12:15
several [2] - 18:15, 18:19
share [2] - 6:14, 9:12
Shared [1] - 18:22
shift [1] - 18:10
shipped [1] - 22:21
short [4] - 6:11, 8:10, 9:5, 12:8
shortage [2] - 19:16, 19:17
shorter [1] - 12:1
showed [1] - 20:14
showing [1] - 14:4
simple [1] - 5:3
sit [2] - 21:2
situation [6] - 15:24, 17:1, 17:19, 17:24, 24:12, 24:25
six [2] - 13:19, 21:7

sold [1] - 21:18
sometimes [1] - 27:8
sort [1] - 25:5
speaks [1] - 4:19
special [7] - 10:6, 10:8, 10:20, 11:11, 11:14, 11:21, 12:15
Special [4] - 10:7, 10:14, 10:15, 11:4
speed [1] - 11:12
spoliation [1] - 25:18
spouses [1] - 7:8
spring [1] - 18:12
St [1] - 21:8
stable [1] - 8:5
staff [2] - 23:18, 29:10
stage [2] - 6:7, 7:3
stand [2] - 22:1, 29:15
standard [1] - 9:25
standpoint [1] - 15:9
start [2] - 6:6, 11:17
started [2] - 18:11, 24:13
State [1] - 4:21
STATE/FEDERAL [1] - 2:10
STATES [2] - 1:1, 1:15
States [4] - 13:23, 20:2, 21:1, 21:3
status [8] - 4:7, 6:4, 7:19, 23:16, 23:21, 23:25, 24:22, 26:14
STATUS [1] - 1:13
stay [3] - 10:17, 23:14, 24:17
STEERING [1] - 2:2
steering [2] - 4:12, 5:17
STENOGRAPHY [1] - 1:23
STONE [1] - 2:20
stored [1] - 25:4
straight [1] - 9:13
streamline [1] - 11:11
STREET [5] - 1:18, 2:6, 2:11, 2:14, 2:18
Street [1] - 2:21
submit [6] - 8:20, 8:23, 11:3, 11:5, 11:6, 11:7
submitted [4] - 6:8, 6:18, 7:8, 11:1
substituting [1] - 4:10
suggest [1] - 25:17
suit [2] - 19:5, 21:8
SUITE [5] - 2:6, 2:8, 2:11, 2:15, 2:18
Super [1] - 14:8
Supply [2] - 22:24

support [2] - 11:2, 11:9
supporting [1] - 11:6
Susan [2] - 29:21, 29:25
SUSAN [2] - 1:17, 29:24
susan_zielie@laed.uscourts.gov [1] - 1:19
swing [1] - 26:19
switched [1] - 29:5
Syngenta [1] - 21:9
system [5] - 19:6, 21:8, 21:24, 24:7

## T

Taishan [10] - 5:16, 5:19, 16:24, 18:24, 19:2, 19:4, 20:5, 20:10, 20:12, 27:19
team [1] - 14:16
tenant [1] - 9:9
terms [2] - 28:10, 29:6
testify [1] - 25:16
THE [40] - 1:14, 2:2, 2:10, 4:3, 4:7, 4:13, 4:21, 5:22, 6:20, 12:2, 13:3, 13:11, 13:24, 14:1, 14:3, 15:1, 15:8, 16:15, 17:5, 18:13, 18:22, 18:24, 19:10, 20:8, 21:22, 22:9, 22:24, 23:4, 23:8, 23:12, 24:3, 24:14, 24:18, 24:24, 26:5, 26:23, 27:22, 28:24, 29:3, 29:13
themselves [2] - 15:10, 17:22
they've [7] - 5:7, 13:11, 15:14, 18:18, 27:2, 27:10
thirty [2] - 10:10, 11:17
thirty-day [1] - 11:17
thousand [2] - 12:7, 18:19
thousands [2] - 25:5, 28:25
three [5] - 4:22, 6:14, 9:7, 12:7, 12:18
THURSDAY [2] - 1:6, 4:1
timber [2] - 19:16
timeline [1] - 11:14
TO [1] - 1:7
today [2] - 4:19, 5:3

together [1] - 28:10
total [3] - 6:7, 6:8, 28:25
track [1] - 17:24
training [1] - 14:10
transcript [2] - 22:14, 29:22
TRANSCRIPT [2] - 1:13, 1:23
TRANSCRIPTION [1] - 1:23
treat [2] - 16:2, 16:3
treated [1] - 16:7
Trial [1] - 4:21
trial [1] - 20:11
try [3] - 23:25, 26:2, 28:22
trying [1] - 18:10
twenty [1] - 26:14
two [5] - 7:8, 7:17, 10:3, 16:23, 20:9
type [6] - 6:12, 6:23, 7:3, 9:15, 17:24, 24:25, 26:2
types [3] - 6:9, 8:14, 12:7

## U

umbrella [2] - 13:22, 20:1
under [2] - 6:16, 15:19
undertaken [1] - 18:17
undertaking [1] - 27:17
unfortunately [1] - 20:6
unfortunates [1] - 20:3
United [4] - 13:23, 20:2, 21:1, 21:3
UNITED [2] - 1:1, 1:15
unsettled [1] - 19:13
up [19] - 9:5, 9:6, 9:9, 9:21, 10:16, 10:21, 11:12, 14:11, 20:14, 23:20, 26:10, 27:10, 28:20, 28:21, 28:22, 28:23
US [1] - 21:19
utilized [1] - 19:6

## V

value [1] - 9:14
variables [1] - 10:19
variety [1] - 8:9
various [2] - 27:16, 27:17
varying [1] - 9:4

**vast** [1] - 11:15
**Venture** [2] - 22:24
**verification** [3] - 7:23, 10:24, 12:24
**verified** [2] - 9:7, 9:22
**video** [1] - 25:15
**violated** [1] - 22:1
**Virginia** [5] - 4:24, 5:2, 5:15, 22:25

## W

**W-9** [3] - 7:23, 10:24, 12:24
**wait** [2] - 17:1, 18:16
**walk** [1] - 20:15
**wall** [1] - 19:8
**Wall** [1] - 23:1
**WALNUT** [1] - 2:6
**warehouses** [1] - 25:8
**website** [3] - 8:1, 12:25, 29:10
**week** [4] - 11:16, 11:20, 12:18, 14:21
**weeks** [3] - 13:19, 21:7
**well-thought-of** [1] - 26:25
**whole** [2] - 14:11, 20:6
**wife** [2] - 14:9, 14:11
**Wimberly** [1] - 26:1
**WIMBERLY** [1] - 2:20
**wish** [2] - 24:5, 27:19
**wishes** [1] - 11:4
**withdraw** [1] - 7:7
**withdrawing** [1] - 7:2
**Woody** [2] - 5:8, 6:4
**WOODY** [3] - 6:3, 6:23, 12:4
**world** [1] - 20:2
**wound** [1] - 14:11
**wrap** [2] - 28:22, 28:23
**wrongfully** [1] - 22:10
**www3.BrownGreer. com/drywall** [1] - 12:25

## Y

**year** [4] - 7:14, 14:8, 18:12, 28:23
**yesterday** [2] - 21:10, 22:18

## Z

**Zielie** [2] - 29:21, 29:25
**ZIELIE** [2] - 1:17, 29:24

# JOINT APPENDIX TAB # 23

09:06:07

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

         ********************************************************
 3

 4       IN RE:  CHINESE-MANUFACTURED        Docket No. 09-MD-2047
         DRYWALL PRODUCTS LIABILITY          New Orleans, Louisiana
 5                                           Wednesday, August 15, 2018

 6
         ********************************************************
 7

 8                    TRANSCRIPT OF MOTION PROCEEDINGS
               HEARD BEFORE THE HONORABLE ELDON E. FALLON
 9                    UNITED STATES DISTRICT JUDGE

10       APPEARANCES:

11       FOR THE PLAINTIFF STEERING
         COMMITTEE:                     LEVIN, FISHBEIN, SEDRAN & BERMAN
12                                      BY:  ARNOLD LEVIN, ESQ.
                                        510 Walnut Street, Suite 500
13                                      Philadelphia, PA 19106

14

15       FOR THE TAISHAN DEFENDANTS:   ALSTON & BIRD
                                        BY:  CHRISTINA H. EIKHOFF, ESQ.
16                                      One Atlantic Center
                                        1201 West Peachtree St.
17                                      Suite 4900
                                        Atlanta, GA 30309-3424
18

19

20       FOR CNBM AND BNBM ENTITIES:   ORRICK
                                        BY:  JAMES STENGEL, ESQ.
21                                      51 West 52nd St.
                                        New York, NY 10019-6142
22

23                                      PHELPS DUNBAR
                                        BY:  HARRY ROSENBERG, ESQ.
24                                      365 Canal St., Suite 2000
                                        New Orleans, LA 70130

25
```

```
 1

 2   Official Court Reporter:        Karen A. Ibos, CCR, RPR, CRR
                                     500 Poydras Street, Room HB-406
 3                                   New Orleans, Louisiana 70130
                                     (504) 589-7776
 4

 5

 6     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:14-cv-02937-MSG-RK Document 60-23 Filed 01/18/19 Page 4 of 94 PageID #: 1002

```
 1                    P R O C E E D I N G S

 2              (WEDNESDAY, AUGUST 15, 2018)

 3                  (MOTION PROCEEDINGS)

 4

09:13:44  5      (OPEN COURT.)

09:13:44  6          THE COURT:  Be seated, please.  Good morning, ladies and

09:13:46  7   gentlemen.  Call the case, please.

09:13:47  8          THE DEPUTY CLERK:  MDL-2047, in re:  Chinese Manufactured

09:13:52  9   Drywall Products Liability Litigation.

09:13:53 10          THE COURT:  Counsel make their appearance for the record,

09:13:55 11   please.

09:13:55 12          MR. LEVIN:  Arnold Levin for the Plaintiff Steering

09:13:59 13   Committee, sir.

09:14:00 14          MS. EIKOFF:  Christy Eikhoff for Taishan.

09:14:03 15          THE COURT:  Let me say a word or two about the matter

09:14:03 16   first --  I'm sorry.

09:14:07 17          MR. STENGEL:  Jim Stengel for CNBM and BNBM.

09:14:09 18          THE COURT:  Anybody else?  Okay.  And we have a number of

09:14:13 19   other lawyers in the case.

09:14:19 20          We're here today to discuss the trial plan in the Taishan

09:14:23 21   cases.  As we all know, we've been dealing with this Chinese

09:14:32 22   drywall case, as we term it, for about nine years now, and a large

09:14:40 23   part of the case is over involving Knauf, but the Taishan, et al,

09:14:49 24   cases have not been able to be resolved.  So I am convinced that

09:14:55 25   after a number -- a lot of discovery that the parties conducted and
```

Case 2:09-md-02047-EEF-MBN Document 22360-79 Filed 11/18/19 Page 525 of 1680
Case 2:14-cv-02722-EEF-JCW Document 23-7 Filed 07/19/19 Page 5 of 15 Page ID #: 1003

4

09:15:03  1   a number of trials, both with and without a jury, that I've done

09:15:11  2   about as best as I can to give the attorneys an opportunity to look

09:15:15  3   at the case, to decide whether or not there's some way of globally

09:15:21  4   resolving the case, some method, some approach, something done.

09:15:28  5   But that hasn't worked.

09:15:29  6        So now it comes time to send the cases back, those that I

09:15:35  7   can send back, and those cases that are involving Louisiana

09:15:42  8   products, Louisiana houses, structures, to try the cases.  And so

09:15:51  9   that's where we are now.

09:15:53  10       I sent back a number of cases to Florida, I'll be sending

09:15:58  11  a number of cases back to Virginia so that those judges can begin

09:16:02  12  the process of resolving the cases by trials.  And I'll do that now

09:16:08  13  in Louisiana.

09:16:10  14       We've got two class action cases that we're dealing with:

09:16:21  15  One is the *Amorin* and the other is the *Brooke* cases.  They're both

09:16:26  16  together involving Louisiana products.  The Louisiana houses total

09:16:33  17  about 919.  We need to, as I mentioned to the parties a moment ago,

09:16:41  18  as I see it, at least at the outset -- and I shared this with them

09:16:47  19  because it's been my experience that in these cases the reason that

09:16:52  20  they can get resolved is that the lawyers involved in these types

09:16:57  21  of cases are really the best of the best.  It's just the way it is.

09:17:05  22  And this case is no exception.

09:17:09  23       And so I find that it's helpful to tap into that

09:17:13  24  experience, that knowledge, that ability in trying to come up with

09:17:21  25  plans to resolve the cases.  And so I always discuss these with the

09:17:27 1    attorneys and invite them to respond.

09:17:30 2         The way I see it, at least at the outset in any event,

09:17:35 3    and this is not in stone, it's in pencil, but I see that they're

09:17:41 4    the two areas:  The *Amorin* cases and the *Brooke* cases.

09:17:45 5         Now, the *Amorin* cases, I've tried a number of those and

09:17:50 6    liability in my opinion has been established in those cases.  There

09:17:57 7    have been two appeals, two different groups of appellate judges

09:18:05 8    affirmed the cases, no cert has been asked for, so it's final.

09:18:14 9         In the *Amorin* cases, therefore, liability has been

09:18:17 10   established.

09:18:18 11        The *Brooke* liability has not been established.  Most of

09:18:22 12   the *Brooke* cases really involve Florida properties, and that will

09:18:28 13   be dealt with by Judge Cook in that area.

09:18:32 14        But the *Amorin* cases is where my focus is going to be

09:18:36 15   primarily, and we first have to separate the *Amorin* docket from

09:18:44 16   those cases that are simply -- are just strict property damage

09:18:49 17   cases.  There are a large number of them that are property damage

09:18:53 18   cases.  There are also in there a number of property damage plus

09:19:00 19   personal injury cases.  We may have to separate those out.

09:19:05 20        With regard to the property damage cases, I would intend

09:19:10 21   to appoint a master to utilize the formula that has been

09:19:18 22   established in a number of cases, and to verify the square footage,

09:19:27 23   verify the present ownership, verify the location, address, things

09:19:34 24   of that sort, and then we'll simply apply the formula and come up

09:19:42 25   with a figure for the property damage.  Those cases, it seems to

09:19:48  1    me, are just administratively dealt with.  I don't see the

09:19:53  2    necessity for any trials in those cases, I think it's just I'll be

09:20:01  3    issuing judgments in that fashion.

09:20:03  4        With regard to the property plus personal injury, I think

09:20:07  5    that's a different grouping; and with personal injury, it seems to

09:20:13  6    me that jury trials need to be had for the jury to determine

09:20:19  7    personal injury.

09:20:20  8        Now, unlike the bellwether cases where I am trying to

09:20:27  9    give the lawyers an opportunity to view the case in the real world

09:20:32 10    setting of trials, I think that bellwethers work best if it's one

09:20:39 11    case at a time because that's closer to the real world.  It's a

09:20:43 12    bellwether case, it's not total real world, but you're getting a

09:20:46 13    jury, you're getting a case, one case, you're seeing how your

09:20:52 14    witnesses do, you're seeing how much it costs, you're seeing the

09:20:54 15    logistics of the trial.  It's best handled, in my opinion, one case

09:20:59 16    at a time.

09:21:00 17        But at this stage I am not -- no longer interested in

09:21:05 18    bellwether cases.  I am interested in resolution of cases.  So in

09:21:12 19    that area, I think multiple cases can be handled to the jury.  I

09:21:17 20    would like to start with maybe three cases and then work up to

09:21:20 21    maybe ten cases at a time so that we can finish with these cases.

09:21:32 22    And we'll be dealing with a jury who will set the damages, the

09:21:37 23    injuries and damages.

09:21:41 24        The challenging part is with regard to the property

09:21:45 25    aspect of those cases.  It seems to me that there's no need for the

09:21:51  1  jury to deal with property damage because we can deal with that

09:21:54  2  administratively.  So if that's the case, then do we do them

09:22:02  3  both -- those cases both at the same time and get the property

09:22:05  4  damage aspect with the personal injury damages and then I join

09:22:14  5  those together for a judgment?  I don't think it's appropriate to

09:22:19  6  have two judgments in every case, so it would be one judgment, but

09:22:24  7  I would use the property damage formula to figure the property

09:22:28  8  damage and then the jury response for the personal injury.

09:22:40  9       That's kind of what I envision based upon, you know,

09:22:45 10  dealing with this case for a long period of time, and also

09:22:49 11  reviewing the various briefs, which were very helpful to me, from

09:22:54 12  both sides.  But I shared that a moment ago with the attorneys for

09:22:59 13  both sides, and I would be interested in their responses and any

09:23:05 14  other comments that they might have.

09:23:06 15       Let me hear from the plaintiffs first.

09:23:09 16       MR. LEVIN:  Good morning, your Honor.  Arnold Levin.

09:23:16 17       We basically are very comfortable with what your Honor

09:23:19 18  has stated.  And as such, I probably should sit down.

09:23:26 19       But there are several issues that were briefed by the

09:23:32 20  defendants.  I think we've covered -- you've covered them at least

09:23:38 21  by what you've told us, but I would like to reserve my time in

09:23:41 22  rebuttal to deal with their arguments of due process, if they're

09:23:45 23  still going to make it; the jury trial demand, if they're still

09:23:48 24  going to make it; the nature of the default judgments, if they're

09:23:54 25  still going to make it.  And I think I can be very brief at that

Case 2:09-md-02047-EEF-MBN Document 23360-70 Filed 04/12/18 Page 529 of 1680
Case 2:14-cv-02722-MSG Document 1-23 Filed 07/18/19 Page 9 of 10 Page ID #1007

8

09:24:00  1    time, five or ten minutes; and if your Honor will give me leave,

09:24:03  2    I'll sit down.

09:24:05  3            THE COURT:  Okay.  Fine.  Christy.

09:24:08  4            We've talked also about the question of discovery, and

09:24:15  5    there's no question in my mind that the defendants need some

09:24:19  6    discovery in the personal injury aspects of the case.  They haven't

09:24:24  7    had anything, they, I assume, haven't received any recent reports.

09:24:30  8    So the discovery aspect of those cases needs to be done, so I

09:24:34  9    recognize that.  I would like to see if we can expedite it, but

09:24:40 10    discovery needs have to be satisfied.

09:24:42 11            MS. EIKOFF:  Sure, your Honor.  Christy Eikoff on behalf

09:24:47 12    of Taishan.  Jim Stengel is going to be making a separate argument

09:24:52 13    on behalf of his clients BNBM and CNBM.  And as the Court knows,

09:24:57 14    those parties are differently situated from Taishan.

09:25:00 15            THE COURT:  Right.

09:25:01 16            MS. EIKOFF:  We recognize, as the Court has said, that

09:25:02 17    the defaults have been upheld by the circuit court and that Taishan

09:25:05 18    is in default, so we are in a different situation from those other

09:25:09 19    entities.

09:25:10 20            Your Honor, I would -- I am going to slightly rearrange

09:25:15 21    the order that I was planning to cover things today because I want

09:25:19 22    to make sure I get clarification and share with the Court our

09:25:25 23    perspective of the categories of damages.

09:25:27 24            THE COURT:  Sure.

09:25:28 25            MS. EIKOFF:  The Court has referred to property damage

09:25:32 1  this morning versus personal injury damage.  Those are not the

09:25:36 2  distinctions that we have been using, and even, frankly, that the

09:25:39 3  PSC has been using in the course of this litigation.  The more

09:25:45 4  relevant distinction, your Honor, between categories of damages in

09:25:50 5  this case so far has been within the umbrella of property damage,

09:25:53 6  the distinction between remediation damages and non-remediation

09:25:57 7  damages.

09:25:58 8      Non-remediation damages covers other categories of

09:26:03 9  damages that could still be considered property damage, but -- and

09:26:09 10 are not "personal injury damages."  It includes personal injuries,

09:26:13 11 alternative living expenses, loss of use and enjoyment, appliances,

09:26:20 12 foreclosure, bankruptcy, short sale.  There's a whole laundry list.

09:26:27 13     The distinction between remediation and non-remediation

09:26:31 14 is important because this Court certified a class for remediation

09:26:35 15 damages only, and this Court has also identified a formula that can

09:26:44 16 be used for current owners only for remediation damages only.  And

09:26:57 17 I will get into why even that isn't quite as simple as it sounds.

09:27:03 18     But at this point, your Honor, the current owner

09:27:06 19 remediation damages is actually a very small aspect of this case

09:27:12 20 now, because in the original claimants and plaintiffs that came to

09:27:19 21 the court, many have sold the properties so they're former owners

09:27:23 22 now, and many have already remediated their properties and so

09:27:26 23 they're outside of the class.  The majority of this case, of the

09:27:30 24 claimants in this case, your Honor, at this point are outside of

09:27:33 25 the class.

09:27:33  1      And so that is the basis for the plan that we have

09:27:40  2  proposed, and I would like to go ahead and skip to the first slide.

09:27:44  3  I'm sure the Court is familiar with Occam's razor, which is the

09:27:49  4  principle that the simplest solution tends to be the right one.

09:27:52  5  And here, Taishan has submitted the simplest plan, but it's the

09:27:56  6  right plan because it is the most efficient.  And we'll show you,

09:28:02  7  it's not delay, it's not inefficient, it actually gets to judgment

09:28:07  8  quickly, well under a year.  It follows Fifth Circuit law and it

09:28:11  9  follows constitutional law.

09:28:12  10      And, your Honor, we need to point out the violations of

09:28:15  11  both Fifth Circuit and Constitution law that we think are embedded

09:28:19  12  in the plan that has been submitted by the PSC.

09:28:29  13      Our plan is quick.  We're saying that within 37 days of

09:28:35  14  when the Court enters its order, we will have priority claimants

09:28:38  15  selected, 24 priority claimants.  That will be enough for us to

09:28:42  16  really understand all of the variations.  Our proposal is that

09:28:47  17  those 24 be selected based on categories of the product ID that

09:28:52  18  they have, and it will also include former owners and also include

09:28:56  19  perhaps bankruptcy, short sale.  We will try to get a good variety

09:29:01  20  of the issues that we're dealing with.

09:29:04  21      Discovery would be complete 60 days after that.  If we

09:29:08  22  need experts -- I don't think either party has decided whether or

09:29:11  23  not they will need experts -- but if we need experts, that entire

09:29:15  24  expert discovery process - depositions, reports, rebuttal - all of

09:29:20  25  that would take 120 days.  And then we're into pretrial briefing

09:29:24 1  within 75 days after that.

09:29:25 2          So what we're looking for is we would be ready for the

09:29:29 3  first trial on damages in six to ten months.  That is an efficient

09:29:33 4  plan.  And it's more efficient than the PSC's plan and it makes

09:29:37 5  more sense because, as the Court has recognized, as the PSC has

09:29:41 6  recognized, we need to take depositions of everybody anyway because

09:29:47 7  everybody has non-remediation damages.  There are no claimants in

09:29:55 8  this case that have claimed only remediation damages and nothing

09:29:58 9  else.  They're asking for, on top of their remediation damages,

09:30:03 10 they want their loss of use and enjoyment, they want their

09:30:06 11 alternative living expenses, they want a whole host of other

09:30:09 12 things.

09:30:10 13         And I'll note, your Honor, that very, very few of the

09:30:12 14 claimants in these cases have alleged personal injury.  Personal

09:30:17 15 injury is a minuscule part of this case, if any part of this case

09:30:22 16 at all.  It's really about all property damage but the remediation

09:30:26 17 versus the non-remediation damages.

09:30:29 18         THE COURT:  Would you propose liability trials also?

09:30:32 19         MS. EIKOFF:  No.  No, your Honor.  Because, again,

09:30:34 20 Taishan, we know we're in default.  So what we're saying is that --

09:30:38 21 these damages, your Honor, are not liquidated.  When you have

09:30:41 22 unliquidated damages, even a defaulted defendant, it is entitled to

09:30:46 23 defend against that and the plaintiff has to prove the damages.

09:30:49 24         And so we're saying, let's do a short expedited discovery

09:30:55 25 period for everybody, for all categories of damages.  So just to

| | |
|---|---|
| 09:30:59 | 1 |
| 09:31:06 | 2 |
| 09:31:10 | 3 |
| 09:31:14 | 4 |
| 09:31:17 | 5 |
| 09:31:18 | 6 |
| 09:31:21 | 7 |
| 09:31:25 | 8 |
| 09:31:28 | 9 |
| 09:31:30 | 10 |
| 09:31:34 | 11 |
| 09:31:37 | 12 |
| 09:31:40 | 13 |
| 09:31:42 | 14 |
| 09:31:48 | 15 |
| 09:31:51 | 16 |
| 09:31:54 | 17 |
| 09:31:58 | 18 |
| 09:32:02 | 19 |
| 09:32:07 | 20 |
| 09:32:12 | 21 |
| 09:32:16 | 22 |
| 09:32:21 | 23 |
| 09:32:25 | 24 |
| 09:32:29 | 25 |

illustrate kind of the bizarreness of the PSC's plan, under their plan we're deposing everybody, we're deposing 800 claimants, we're deposing them all -- which, by the way, I don't think it's possible in the amount of time that they've proposed, but that's what they're proposing.

We propose we depose everybody. But in those depositions we can ask about them about certain of their property damages, but we can't ask them about other property damages unless we get leave of court, and that just doesn't make sense. If people are going to be deposed, let's ask about all of their damages. If there are going to be trials, let's try all of their damages together. So that's why we have proposed the priority claimants.

We've got a single track for all damages, it all gets done in six to ten months, and it's more efficient than their plan because we're going to be taking these depositions anyway. We might as well be asking them all of the questions that we have.

And to be clear, there are contested issues on even remediation damages. It sounds easy to say, well, there's a formula and there's square foot, but there's a lot of questions about whether they ever had Taishan drywall in their property and whether they have changed the size of their house and where it was and where the drywall came from. So there are questions that we have that make it more complex than just simply applying a formula.

But, your Honor, just to go to the next slide.

THE COURT: Would you propose one trial at a time or

09:32:32  1   multiple trials?

09:32:34  2          MS. EIKOFF:  So, your Honor, our proposal actually does

09:32:36  3   not directly address that question, but we have proposed 24

09:32:39  4   priority claimants.  I know that our client would be open to

09:32:44  5   grouping some of those if it makes sense to group some of those,

09:32:48  6   your Honor.

09:32:49  7          But one thing that is important to know about the

09:32:52  8   remediation damages, I just was saying that there's a lot of

09:32:56  9   contested issues there.  Well, the Fifth Circuit and Louisiana law

09:32:59  10  actually prohibits the application of the formula to a claimant who

09:33:04  11  has already remediated.  And we've got -- we cited it in our

09:33:10  12  briefs, we've got it here in the PowerPoint, that using an estimate

09:33:17  13  for property damage where the property has already been repaired is

09:33:22  14  improper because you need to look at the repairs.

09:33:24  15         Now, the PSC has often said, and it's a point well taken,

09:33:29  16  well, you know, people may not have done a good job because they

09:33:32  17  were doing the best they could with the resources they had.  That

09:33:35  18  is well and we get that but that is an assumption.  And in the

09:33:39  19  court of law, we can't just assume that they didn't do a good job.

09:33:43  20  We need to see what they actually did.  And if it wasn't a good job

09:33:47  21  and if the receipts show that they are entitled to more, then

09:33:52  22  that's how it would be litigated.  But we can't just assume that

09:33:57  23  everyone did an improper job and should get the formula anyway,

09:34:00  24  especially when you have binding law that says it's improper to use

09:34:04  25  an estimate when the damages have already been incurred.

09:34:10  1    Also, the PSC's plan says, well, we want to get judgment

09:34:15  2    on remediation damages, so we want Cal Mayo to work with the

09:34:18  3    spreadsheet; and then once he applies the formula and does the

09:34:21  4    math, then it's going to spit out a number.  And they've already

09:34:24  5    said they want that number to be more than half of a billion

09:34:29  6    dollars.  Well, that's not -- even if that were allowed -- and

09:34:32  7    we'll get into why we think that that violates the due process of

09:34:36  8    the defendants.  Even if that were allowed, they can't do anything

09:34:39  9    with it because it won't be a judgment.  The Fifth Circuit law

09:34:46 10    black letter says you can't collect or appeal anything that's a

09:34:50 11    judgment if it doesn't include all of the categories of damages.

09:34:55 12    So we think, again, that's another reason why their process is more

09:35:00 13    complex, more convoluted, and it doesn't gain anything.

09:35:04 14        The PSC -- we cited these in our brief.  The PCS's

09:35:08 15    response did not address these cases at all, so we see this as

09:35:14 16    undisputed.

09:35:15 17        Next please.

09:35:16 18        Finally, your Honor, constitutional due process.  The

09:35:21 19    plaintiff -- there are twin principles that are mutually

09:35:23 20    reinforceable in due process, and these principles apply to us even

09:35:27 21    in default.  The plaintiffs still have the burden of proof and the

09:35:31 22    defendants have a right to mount a defense.  That doesn't go away

09:35:35 23    under Rule 55, the Supreme Court has said that.  The PSC's plan

09:35:40 24    seeks to shift the burden to us to tell Cal Mayo why the drywall is

09:35:48 25    not Taishan.  So they say it's Taishan and then we have to prove

09:35:51  1   that it's not, that's improper.  The process that they say that we

09:35:57  2   need to go through has the Special Master making decisions on

09:36:03  3   categories, so they just say -- he just says any drywall that has a

09:36:08  4   made in China mark is Taishan or isn't Taishan.  Well, if you look

09:36:12  5   at what has been submitted for proof, there are dozens of

09:36:15  6   variations of drywall that say made in China.

09:36:20  7          And there are also dozens of variation of the quality of

09:36:24  8   proof.  Some claimants have a full inspection report with clear

09:36:28  9   pictures from every room, and some claimants have a single, blurry

09:36:33 10   photograph.  And they're saying that the special master would just

09:36:37 11   treat them the same.  Wouldn't even look at them.  Literally

09:36:41 12   wouldn't even look at it.  Would just decide, oh, well, if it says

09:36:44 13   made in China, it either is Taishan or it isn't Taishan.  That

09:36:49 14   violates our due process, your Honor.

09:36:51 15          And by saying that we can't dispose -- they're saying we

09:36:54 16   aren't allowed to depose anyone about their product ID, we can't

09:36:57 17   ask them any questions, so the single blurry photograph, the

09:37:01 18   example I gave, we can't ask the plaintiff:  "Well, where did this

09:37:04 19   picture come from?  What room was it taken in?  Who took it?"

09:37:10 20          And then, what's also very problematic about this is that

09:37:13 21   the PSC is seeking to expand the class definition.  And so if you

09:37:19 22   look at their plan, they say, "We have a formula.  We love it.  We

09:37:22 23   want it to apply not just to current owners," which is what the

09:37:25 24   class is defined, "we also want it to apply to people who have

09:37:29 25   already remediated," which we say violates Fifth Circuit law,

Case 2:09-md-02047-EEF-MBN Document 22362-79 Filed 11/13/19 Page 537 of 1680
Case 2:09-md-02047-EEF-MBN Document 22360-13 Filed 11/13/19 Page 17 of 1015

16

09:37:33 1    because it does, "we also want to apply it to former owners, even

09:37:38 2    though it's outside of the class.  We also want to apply it to new

09:37:40 3    owners.  Oh, and by the way, we also want to apply it in *Brooke*, a

09:37:45 4    case where liability has not even been established yet.  So let's

09:37:47 5    go ahead and work into our plan that we're going to be applying it

09:37:50 6    to *Brooke* as well."  That violates our due process, your Honor, and

09:37:54 7    it should not be permitted.

09:37:57 8            Finally, speaking of *Brooke* because we were accused of

09:38:02 9    ignoring it, we have not ignored it.  So here is what we propose on

09:38:07 10   *Brooke*.  It is improper to weave *Brooke* into the *Amorin* process.

09:38:13 11   This Court has already acknowledged that and we appreciate that.

09:38:17 12   There has been no default in *Brooke* as the Court has acknowledged.

09:38:21 13   There is no class.  So this idea of let's just go ahead and apply

09:38:24 14   the formula in *Brooke* in the next two months or something is simply

09:38:31 15   not permissible.

09:38:33 16           In fact, I just want to point out how far they're going

09:38:37 17   with *Brooke*.  They have in the first 45 days in their schedule,

09:38:41 18   they're going to submit motions for sanctions against us for our

09:38:48 19   conduct in other cases.  We've got to recognize *Brooke* for what it

09:38:56 20   is, which is a different case and a new case.  It is a case that

09:39:00 21   has the vast majority of its claimants in Florida, so we think

09:39:03 22   Florida should be the center of gravity for *Brooke*.

09:39:06 23           Your Honor has not remanded *Brooke* yet.  We think *Brooke*

09:39:10 24   should be remanded.  And when it is remanded, then we think that

09:39:14 25   the timetable for the hundred odd *Brooke* claimants in Louisiana

17

09:39:19 1  should mirror the timetable that is established by the Florida

09:39:23 2  court for the 800 plus *Brooke* claimants.

09:39:26 3         And then what we're going to advocate for in Florida is

09:39:30 4  that *Brooke*, the new case, needs to be trifurcated into three

09:39:34 5  threshold issues:  First, we need to look at statute of limitations

09:39:38 6  because the *Brooke* claims were filed so late in the game, years and

09:39:44 7  years after this litigation was underway; then we'll look at class

09:39:48 8  certification to see whether it can become a class; and then if it

09:39:53 9  is a class or isn't a class, we'll address issues of liability

09:39:57 10 which are available in that case because it is not presumed that

09:40:00 11 the drywall is defective, they have to prove it.

09:40:05 12        So, your Honor, I am happy to answer any questions for

09:40:08 13 the Court.

09:40:09 14        THE COURT:  No, that's fine.  Let me hear from Jim.

09:40:25 15        MR. STANGEL:  If you'll indulge us for a moment, your

09:40:30 16 Honor, we need to switch over some technology.

09:40:33 17        THE COURT:  Sure.

09:40:43 18        MR. STENGEL:  Your Honor, Jim Stengel for CNBM and BNBM.

09:40:47 19        I hesitate to enter into what happened before we appeared

09:40:52 20 in this litigation because there is an extensive prior procedural

09:40:56 21 record.  But one point that I am not sure I agree with your Honor

09:40:59 22 is we haven't had bellwethers in this case.  There were Virginia

09:41:04 23 properties tried in the *Germano* proceedings years ago, we have not

09:41:08 24 been involved in any such proceeding.  We have been through a

09:41:11 25 substantial amount of litigation before your Honor, obviously, but

09:41:14 1   there aren't bellwethers.

09:41:17 2          Your Honor observed early on that this is a case that

09:41:34 3   should settle and you probably have the personnel in the courtroom

09:41:37 4   to do that.  We agree with that.  But at the outset, I will say I

09:41:44 5   am responding to your Honor's description of a proposal this

09:41:47 6   morning, as well as the PSC.  I think what your Honor proposes,

09:41:51 7   while efficient in some ways, does further violence to due process

09:41:56 8   rights of the defendants.  And to do that to further skew that

09:42:00 9   value, to tilt the playing field in our perspective, from my

09:42:05 10  clients' perspective, is further away from what we would view as

09:42:09 11  balanced is a mistake, and I think it will complicate the process

09:42:12 12  of resolving these matters.

09:42:14 13         Now, we've made a slightly different proposal from

09:42:17 14  Taishan in terms of how to proceed, but in large measure, I won't

09:42:21 15  repeat what Ms. Eikhoff said because we largely agree in approach.

09:42:25 16  We do think we need discovery on alternate living expenses and

09:42:29 17  property damages that are components that we as the defendants know

09:42:32 18  nothing about.  We also believe the supplemental profile form,

09:42:37 19  although useful, is tantamount to interrogatory answers, it's not

09:42:45 20  the be all and end all of discovery, even as to their mediation

09:42:46 21  damage component.

09:42:46 22         So there's more work that needs to be done, and we think

09:42:50 23  our process is -- the Taishan and CNBM and BNBM proposals provide

09:42:53 24  the Court with a working structure to push these cases towards

09:42:58 25  resolution, and I'm afraid what the PSC has proposed and what your

09:43:03 1  Honor proposes takes us, frankly, further away from where we need

09:43:08 2  to be.

09:43:08 3       Now, specifically from the context of BNBM and CNBM.  And

09:43:13 4  I -- Mark, let's skip the description of the PSC plan because I

09:43:20 5  think we're dealing with something slightly different now.

09:43:24 6       The fact that Taishan is in default even if we were

09:43:28 7  proceeding under Rule 55 does not end the discovery rights of the

09:43:32 8  defendants - defendants being Taishan, BNBM and CNBM.  The PSC

09:43:40 9  tends to view this through the lens of:  We have liability, we have

09:43:44 10 a spreadsheet process, we're finished.  But as your Honor knows,

09:43:48 11 we've seen nothing on alternative living expenses, loss of use and

09:43:51 12 enjoyment, and there are a myriad of other issues embedded in the

09:43:55 13 damage determination that have to be addressed.

09:43:58 14      Next slide, Mark.  And the other sort of failing, I

09:44:04 15 think, from the PCS's approach -- and I want to make sure your

09:44:08 16 Honor doesn't fall into this trap as well -- as the Federal Rules

09:44:10 17 of Evidence apply with full force and default proceeding and we

09:44:13 18 can't shortcut this no matter how tempting it is in the name of

09:44:18 19 efficiency to do that.

09:44:19 20      So here we're going to have to have some form of

09:44:22 21 proceeding where there's real evidence and the burdens are in the

09:44:26 22 right place.

09:44:27 23      And here is one of our primary objections -- and your

09:44:31 24 Honor did not specifically address this point, but it's certainly

09:44:34 25 deeply embedded in the PSC's approach.  There is in effect, through

09:44:38    1    Cal Mayo's process or otherwise, an inversion of the burdens of

09:44:43    2    proofs, and there's no legal basis to do that.

09:44:46    3            The plaintiffs still bear the burden of proving their

09:44:49    4    claims, even under a default situation.  So nothing we do should

09:44:53    5    shorthand that, and again, why I think Taishan and CNBM and BNBM

09:44:59    6    moved in the direction of a more limited number of trials is the

09:45:04    7    idea that the trials themselves are going to have to be more

09:45:06    8    extensive proceedings than I'm afraid your Honor and the PSC may be

09:45:11    9    contemplating.

09:45:11   10            And now I am going to turn to the specific situation of

09:45:18   11    BNBM and CNBM, because your Honor has made statements about the

09:45:20   12    fact that there really aren't issues as to liability for us because

09:45:25   13    we're alter egos with Taishan.  Frankly, your Honor, I don't

09:45:28   14    believe that's sustainable.  This is a chart from your Honor's

09:45:32   15    findings of fact and conclusions of law.  You'll see in Louisiana,

09:45:37   16    *Amorin* only CNBM is in default; and that's not a default judgment,

09:45:41   17    that's a preliminary default.  Neither of the BNBM entities are in

09:45:47   18    default.  And that has legal significance in how we proceed here.

09:45:51   19            I don't think there's any basis to proceed on an

09:45:53   20    imputation basis to give the default to the BNBM entities for the

09:45:58   21    following reasons:  If it's BNBM to BNBM -- or excuse me, Taishan

09:46:05   22    to BNBM, your Honor ruled only that you found there was under, as

09:46:12   23    to Louisiana cases, SBE would apply but your Honor specifically in

09:46:19   24    your opinion limited that finding to jurisdictional purposes.

09:46:22   25    That's a fact reservation of some substantial significance here as

09:46:31 1   there are temporal components as to when the attribution theory can

09:46:35 2   apply.  So within the case, there is no basis to say because

09:46:39 3   Taishan is in default, we don't dispute that fact, BNBM and BNBM,

09:46:44 4   PLC should be also in default, or CNBM company for that matter.

09:46:48 5        They take another approach to say, no, no, no, it's not

09:46:52 6   an imputation theory, it's a matter of collateral estoppel or claim

09:46:57 7   preclusion.  Doesn't work either because the matter of black letter

09:47:01 8   law that the only preclusive aspects are matters that were actually

09:47:06 9   litigated and the black letter law is defaults to not create a

09:47:10 10  preclusive effect.

09:47:12 11        So we're left with parties with a substantial interest,

09:47:14 12  which are remote to the processes your Honor has noted, to

09:47:17 13  manufacturing, sales, any aspect to the actual production of

09:47:20 14  drywall.  But what the PSC would do is substantially truncate our

09:47:26 15  rights in the interest of making sure there are assets available.

09:47:31 16        Now, this also implicates some procedural rights.  And

09:47:36 17  our view is the B and C entity that's in this case are entitled to

09:47:44 18  try this matter before a jury.  We may ultimately elect not to do

09:47:48 19  that, but it's our right and one of the limitations we think on

09:47:50 20  shorthand approaches to trying these cases.  Certainly to mass

09:47:56 21  consolidations or the spreadsheet process is we think we retain

09:48:00 22  these rights.

09:48:00 23        And there are two grounds for that:  One, because we

09:48:05 24  think that are not taken from us.

09:48:08 25        The other is Rule 38 and this is -- there are obviously

09:48:12 1  courts that have come out both ways on this issue.  But the premise

09:48:15 2  is that once a party has elected, Rule 38 doesn't allow them to

09:48:19 3  unilaterally withdraw their demand for a jury.  And there are cases

09:48:24 4  in a default setting that say that's still the case.  So we

09:48:29 5  think -- and it may be a complication that's not welcome by the PSC

09:48:31 6  or, in fact, the Court, we have to design a program that maintains

09:48:35 7  the jury trial rights of CNBM and BNBM.

09:48:40 8          This gets us to who we choose, and I think this is

09:48:43 9  implicated in your Honor's proposal as well as the PSC's --

09:48:54 10          THE COURT:  I'm sorry.

09:48:55 11          MR. STENGEL:  Thank you, your Honor.

09:48:57 12          There is no reason, frankly, and this gets to my initial

09:49:00 13  point that I think we still need a bellwether process and that will

09:49:04 14  hopefully herd the cats into some form of resolution here.  But it

09:49:08 15  would be counterproductive under either the PSC's proposal or your

09:49:13 16  Honor's proposal to have a skewed, non-random distribution of cases

09:49:18 17  to be tried, because we all as experienced counsel will take

09:49:23 18  signals from the outcome of trials.  We're not irrational.  But to

09:49:29 19  the extent one party or the other is allowed to sort of tilt the

09:49:34 20  balance in favor of their best cases, it means you're getting

09:49:37 21  nothing but noise out of the process.  And I don't think it's on

09:49:41 22  the table at this point, although I hesitate given I don't think

09:49:45 23  *Germano* was intended to be preclusive and it became that through

09:49:48 24  the damage formula.  Obviously *Chevron* makes it absolutely clear

09:49:54 25  there can be no preclusive effect of bellwethers, or even initial

09:49:58 1     trials if we're going to try all of these things in short order.

09:50:02 2         *Brooke*, Ms. Eikhoff addressed. *Brooke* is a fresh start.

09:50:11 3     We may not like it, but it's a late filed case. There are no

09:50:13 4     defaults. Liability is still fully at issue. And we agree that

09:50:15 5     since the center of gravity in the *Brooke* litigation is in Florida,

09:50:20 6     and she may not welcome this, but *Brooke* is largely Judge Cook's

09:50:25 7     problem. But we ought not get too wrapped up with the Louisiana

09:50:28 8     *Brooke* claimants here. But I just want to make clear that we did,

09:50:31 9     in fact respond to the PSC on that point.

09:50:34 10         THE COURT: Okay.

09:50:35 11         MR. STENGEL: In closing, your Honor, we think Taishan

09:50:37 12     and CNBM and BNBM have made rational proposals. They are clearly

09:50:44 13     aggressive in terms of how quickly we would move through a

09:50:49 14     discovery process and get to bellwether trials. And granted,

09:50:52 15     there's a central premise there, which is different from your

09:50:55 16     Honor's, that bellwethers still would have some utility in this

09:50:58 17     litigation. But that is our belief and we don't see any way that

09:51:02 18     we can proceed with either the PSC's proposal, or in fairness your

09:51:06 19     Honor's, without doing substantial violence to the due process

09:51:09 20     rights of the defendants.

09:51:11 21         And to reiterate, it's counterproductive in terms of

09:51:16 22     moving towards a resolution for the defendants to be put in the

09:51:19 23     position where they think this court is in some way rolling over

09:51:22 24     their rights, that will merely harden positions and make it more

09:51:27 25     difficult to get to where we need to be.

09:51:29  1          So unless there are any questions.

09:51:31  2          THE COURT:  No.  Just the problem that I am faced with is

09:51:33  3     that we've been doing this for nine years now.  Every step of the

09:51:38  4     way the defendant has resisted looking at the case.  I mean, we've

09:51:48  5     had jurisdictional issues and a bunch of other things.  It just is

09:51:59  6     apparent -- it appears to me, or at least it's a strong argument,

09:52:03  7     that the whole approach is just delay.  Delay because people die,

09:52:10  8     delay because they lose their homes, delay because they're

09:52:16  9     frustrated and giving up.  And it's a method, and I am not talking

09:52:23 10     about counsel, but it's just -- I don't know how much more I can

09:52:30 11     give you to look at from the standpoint of bellwethers.

09:52:36 12          I mean, we've discovered this case now for nine years.

09:52:40 13     Even going to China to take depositions.  And I think everybody

09:52:45 14     knows the facts of this case pretty well, and it just seems to me

09:52:53 15     that we're just -- we're finding ourselves in, you know, a Dickens

09:53:03 16     kind of Bleak House where we just keep discovering and keep moving

09:53:11 17     the case at glacial speed, and pretty soon the glacier melts and

09:53:18 18     you don't have anything.  And that concerns me.  I am trying to

09:53:22 19     figure a way of just bringing this to a head and getting rid of the

09:53:28 20     case.

09:53:28 21          Not settlement.  I've given up on settlement.  I don't

09:53:31 22     think settlement is feasible, and if I have to be the one to

09:53:36 23     approve it, I am probably not going to approve it.  So we need

09:53:40 24     trials in these cases, and I just need to get either my colleagues

09:53:46 25     in state court, particularly those that have issues of punitive

Case 2:09-md-02047-EEF-MBN Document 22362-79 Filed 11/13/19 Page 546 of 1680
Case 2:09-md-02047-EEF-MBN Document 22360-79 Filed 11/13/19 Page 26 of 37 PageID # 1024

25

09:53:50 1  damages and things of that sort, they've got to get on with their

09:53:54 2  thing and I've got to get on with mine.  I just don't see starting

09:53:59 3  bellwethers again.  I mean, you know, we just --

09:54:03 4      It's nine years out at this time.  It's nine years.  And

09:54:08 5  I hear you and I understand your argument and it's not without

09:54:15 6  sincerity and it's certainly not without citations, but that's the

09:54:21 7  pickle that I am in dealing with the case.

09:54:23 8      MR. STENGEL:  Well, your Honor, but as a practical

09:54:25 9  matter, and we tried to address this -- and I am not going to

09:54:28 10 address what happened before we got involved in the litigation

09:54:31 11 because I simply don't know.  But if you take the span of the case

09:54:36 12 since the parties re-entered and re-engaged, it's been a little

09:54:41 13 slow, but we've largely been engaged, other than times where with

09:54:46 14 everyone's consent we stopped because we thought we had something

09:54:50 15 positive by way of resolution, so we lost time.  No one's fault but

09:54:55 16 it happened.

09:54:56 17     But, your Honor, our fundamental point is that it doesn't

09:55:02 18 behoove anyone's interest, certainly not the claimants -- and I am

09:55:06 19 not attempting to wrap myself in the interest of the claimants

09:55:10 20 here, obviously I represent a defendant.  But if something goes

09:55:13 21 forward, if a defective trial process is unleashed, we've already

09:55:17 22 got a matter before the Fifth Circuit, your Honor has heard me in

09:55:22 23 particular on the due process issues that we think are already

09:55:26 24 implicated with the damage model, with class certification, with

09:55:28 25 contempt, et cetera.

09:55:31 1    There are a broad buffet of issues here, most of them

09:55:35 2  worthy of consideration by this circuit.  We go forward with the

09:55:38 3  PSC plan or indeed with what your Honor has outlined -- granted in

09:55:44 4  outline form, not with precision -- I think we are buying greater

09:55:49 5  delay because I think the end result -- and I understand your

09:55:57 6  Honor's pessimism about settlement.  And I can't represent to you

09:56:01 7  that fortune will smile and we'll become reasonable and settle this

09:56:04 8  thing in X days.  I wish I could.  It should.  But it hasn't

09:56:07 9  happened yet for a variety of reasons.

09:56:09 10    But I don't think it's because some sinister orientation

09:56:13 11  towards delay on the part of my clients.  I think our behavior both

09:56:17 12  in resolution discussions and in litigation has been contrary to

09:56:21 13  that.  But I think your Honor should give due consideration to the

09:56:24 14  fact that our paths here diverge fairly substantially, but the real

09:56:32 15  risk is we unleash unlimited war, we're trying ten cases at a time

09:56:38 16  in what I would guess is probably under Rule 42 an improper

09:56:43 17  consolidation.  But we will, I will virtually guarantee your Honor,

09:56:46 18  end up on that in the Fifth Circuit at some point.

09:56:49 19    It will be a long time coming because we don't think

09:56:53 20  54(b) allows a partial damages judgment.  And we could spend

09:56:57 21  another two or three years -- and again, your Honor, I am trying to

09:57:00 22  be very careful, this is not a lawyer threatening your Honor --

09:57:04 23    THE COURT:  No, I understand that.

09:57:05 24    MR. STENGEL:  -- this is just an effort to make an

09:57:08 25  objective assessment of what's likely to happen.  We could be here

09:57:10  1    for sometime even under your Honor's notion.  If we're going to try

09:57:14  2    every case, 900 cases, unless we throw due process just completely

09:57:18  3    out the window, and even with the employment of all the district

09:57:24  4    judges here, who I believe have other things to do, we're going to

09:57:26  5    be here for years.  And we don't want to do that with the idea that

09:57:30  6    all it's going to do is arm the parties with what they think are

09:57:34  7    unlimited set of grounds for appeal.

09:57:36  8         So I think our proposals, and there is a leap of faith

09:57:39  9    for your Honor here, I admit that, that rationality will begin to

09:57:44 10    intrude and the parties will be pushed closer together.  But we at

09:57:48 11    least, I think, posit an exit strategy within some reasonable

09:57:54 12    amount of time.  And my perception of reasonable may be different

09:58:00 13    from your Honor's because I haven't lived through all nine and a

09:58:03 14    half or ten years.

09:58:04 15         THE COURT:  All right.  Thank you.

09:58:04 16         MR. STENGEL:  But that's where we're trying to go, your

09:58:04 17    Honor.

09:58:05 18         THE COURT:  I appreciate it.  Thank you very much.  Let

09:58:07 19    me hear from the plaintiffs.

09:58:12 20         MR. LEVIN:  Well, I wasn't going to mention the aborted

09:58:17 21    settlement, so I won't, whose at fault.  But, your Honor, you put

09:58:22 22    your finger right on what the problem was.  After counsel and the

09:58:26 23    Court invested so much time in this case over nine years, we're now

09:58:36 24    at square one.  Francis Scott Key had one song.  The defendants

09:58:40 25    have one position:  Delay.

09:58:48  1      Your Honor, they won two percent of the cases.  There's

09:58:53  2  no settlement.  There's no talk of settlement.  There's no want of

09:58:57  3  settlement on their part.  It would take 31.9 years to conclude

09:59:02  4  this.

09:59:03  5      This is not what an MDL is about.  An MDL at least was

09:59:11  6  established to get results in mass torts, whether they be

09:59:17  7  antitrust, securities, or mass torts.  And I invite your Honor to

09:59:21  8  look at the *PPA* case of the Ninth Circuit, 460 F.3d 1217.  "For all

09:59:38  9  its work, multidistrict litigation assumes cooperation by counsel

09:59:42 10  and macro-, rather than micro-, judicial management."  Why?

09:59:48 11  Because the Court's business and Counsel's business is to resolve

09:59:53 12  things.  And there's no resolution here.

10:00:00 13      Mr. Stengel says he's new to the process.  He wasn't here

10:00:04 14  when we began.  Your Honor, Orrick, his law firm, was here before I

10:00:14 15  was here in this case.  They were in China, they were in China

10:00:21 16  advising these defendants that they couldn't collect -- that we

10:00:26 17  couldn't collect judgments in the United States.  They were in

10:00:29 18  China advising these defendants that they didn't have to appear.

10:00:35 19  They are the fault of nine years.

10:00:50 20      This case can be resolved in a proper fashion with a

10:00:57 21  Special Master.  If it's a non-jury trial -- case, and I'll get to

10:01:03 22  why it should be a non-jury case -- the plaintiffs can make a prima

10:01:12 23  facie case before the Special Master with regard to move in/move

10:01:16 24  out, foreclosure, short sales.

10:01:19 25      God did we hear a story yesterday on foreclosures and

10:01:23  1    what a beautiful, personal injury, mental anguish case there would

10:01:30  2    be for what that fella went through that spoke to this court

10:01:35  3    yesterday.

10:01:36  4            The Special Master can make recommendations and then an

10:01:42  5    Article III judge can deal with the recommendations that the

10:01:46  6    Special Master makes.  If people want to resolve matters, they know

10:01:53  7    how to do it.  Some of us have been doing this for over 50 years.

10:02:08  8    Now --

10:02:08  9            THE COURT:  How would you propose to handle it?

10:02:11 10            MR. LEVIN:  I would propose putting *Brooke* aside, and I

10:02:15 11    don't believe that we should just let *Brooke* go to Florida for

10:02:19 12    resolution because your Honor has been involved in the liability

10:02:23 13    aspects of this case.  If the *Brooke* case is tried here and

10:02:27 14    processed here, there is an awful lot of knowledge that the Court

10:02:31 15    has that we don't have to re-invent the wheel in Florida.

10:02:38 16            I would propose that we use your plan, your Honor:  Have

10:02:43 17    a Special Master appointed; that we not have to redo the class

10:02:50 18    hearings; the remediation decision that your Honor wrote; that

10:02:58 19    square footage, ownership, and product ID be established before the

10:03:04 20    special master; and that we give a Special Master a plan with

10:03:10 21    regard to the non-pure remediation aspects; and that we present our

10:03:15 22    evidence, create our prima facie case, and let the Special Master

10:03:20 23    make recommendations.  Perhaps the best thing to do is to meet with

10:03:25 24    that Special Master collectively and provide a plan of the Special

10:03:30 25    Master for your court to view.

10:03:33   1          But we are not going to try all of these cases for

10:03:36   2    31 years.  And to pick out 24 cases and start right now after nine

10:03:43   3    years is just not proper.

10:03:45   4          THE COURT:  How do you deal with their constitutional

10:03:47   5    argument?

10:03:48   6          MR. LEVIN:  Well, let me tell you how we deal with the

10:03:51   7    constitutional argument, your Honor.

10:03:53   8          First of all, the Fifth Circuit has said in *Dierschke v.*

10:03:59   9    *O'Cheskey,* 975 F.2d 181, that there is no due process in a default

10:04:06  10    judgment, you don't have it.

10:04:08  11          How do we deal with the jury trial?  Rule 38 does not

10:04:14  12    come into play here.  Usually you get a default judgment, the

10:04:20  13    plaintiff has demanded a jury trial and he wants a jury trial in

10:04:24  14    default and that's how it goes up.  But there is a Northern

10:04:31  15    District of Texas case, Flexible Innovations v. IDEA Max, 2013

10:04:46  16    Westlaw 12126232.  I can't get used to those cites, your Honor, I'm

10:04:55  17    too old.  And in a Rule -- under Rule 55 you do not need the jury

10:05:02  18    trial.

10:05:05  19          As to the multiple defaults, every defendant has been

10:05:11  20    defaulted in this case in at least one of the *Amorin* cases, and the

10:05:16  21    *Amorin* cases are all the same in three different jurisdictions

10:05:21  22    because of the personal jurisprudence involved.  And they were all

10:05:28  23    before your Honor, we were dealing with them altogether.  It was an

10:05:32  24    MDL, and, your Honor, you know, has so indicated in your damage

10:05:36  25    opinion.  So I don't see a problem there.

Case 2:09-cv-02045-EEF-JCW Document 23368-79 Filed 11/18/19 Page 32 of 32 PageID# 1030

10:05:41  1    The problems that are here are created problems for delay

10:05:48  2    so that all -- because the defendants are playing the long game.

10:05:53  3    In the end, we'll all be dead.  Some of us chronologically we'll be

10:06:02  4    dead sooner than others, but eventually the entire client base will

10:06:07  5    be dead.

10:06:11  6    And for CNBM and BNBM who are single business

10:06:16  7    enterprises, alter egos, to come in here right now and say they

10:06:20  8    know nothing about this case, they have been in this case forever.

10:06:25  9    They have been formulating the plan as to how to defend this case

10:06:33  10   forever.  They were in China before they were in the United States

10:06:37  11   and before these cases were commenced, or at least when the first

10:06:42  12   complaint landed in China.  And for the defendants to say when they

10:06:48  13   came in here that they didn't understand American law when they had

10:06:51  14   American lawyers telling them what the American law was, only shows

10:06:55  15   that there is only one thing that they're interested in, and that's

10:07:00  16   delay.

10:07:01  17   Your Honor, give us a chance.  We'll take the chance with

10:07:05  18   regard to their due process arguments for the Chinese defendants.

10:07:09  19   We'll take the chance with regard to their argument that they know

10:07:12  20   want a jury trial.  We'll take the chance with the fact that there

10:07:15  21   is no -- that the defaults are inappropriate.  We'll take all of

10:07:19  22   those things because after nine years, we've got to do something

10:07:25  23   and we shouldn't -- I learned a long time ago that if you play the

10:07:32  24   game by other people's rules, you're apt to lose because they wrote

10:07:38  25   the rules.  And I think it's time not to play by the defendants'

10:07:43 1   rules.  And your Honor, you know, we'll be guided by what you have

10:07:48 2   to say.

10:07:49 3          THE COURT:  Let me ask you one question.  The class they

10:07:52 4   say include -- does not include all owners, it just includes the

10:07:57 5   present owners.

10:07:59 6          MR. LEVIN:  It just included current owners at the time,

10:08:01 7   yes.  But you can take your findings and apply them to everybody

10:08:05 8   else.  Now, there may be --

10:08:06 9          I would suggest that there are issues here, there's

10:08:08 10  always issues.  But like in pharmaceutical cases, you have a

10:08:15 11  science day.  Perhaps we have a motions day and the plaintiffs do

10:08:20 12  their motions, defendants do their motions, and we take them one at

10:08:24 13  a time over a day or two and resolve them all before your Honor.

10:08:28 14         THE COURT:  Okay.

10:08:30 15         MS. EIKOFF:  May I respond?

10:08:31 16         THE COURT:  Yes.  Sure.

10:08:39 17         MS. EIKOFF:  Your Honor, I just want to respond to a

10:08:41 18  couple of the things that Mr. Levin said.

10:08:44 19         I was surprised to hear him say that the Fifth Circuit

10:08:48 20  has held that due process doesn't apply to a defaulted defendant.

10:08:53 21  That is not the law.  I will cite to you a case *Frame v. SH, Inc.*,

10:09:01 22  967 F.2d 134 (VERBATIM), that says that discretion granted to

10:09:08 23  judges for damages adjudication under Rule 55 is bounded at its

10:09:13 24  outer limits by constitutional due process concerns.  That is

10:09:17 25  citing a Supreme Court case called *Hovey v. Elliott* from 1897.

10:09:23 1    I've gotten to know that case.  It was one of the first cases that

10:09:26 2    I read when we were engaged in this matter in 2015.  Alston & Bird

10:09:34 3    was never involved in the cases before that.

10:09:40 4         In that case, the argument that was being made by the

10:09:44 5    adverse party was that a party that was in contempt and that was in

10:09:48 6    default was entitled to no constitutional rights.  I thought that

10:09:51 7    was an interesting case based on where I was coming from and where

10:09:57 8    our client was at the time.

10:09:59 9         And that case holds, Supreme Court, in no uncertain terms

10:10:04 10   that the Constitution applies and whether a party is in default and

10:10:08 11   whether a party is in contempt, they are still allowed to defend

10:10:13 12   themselves against the imposition of damages, and that is the basis

10:10:16 13   of the due process issues that we've raised today.

10:10:19 14        I want to respond, also, to this allegation that our end

10:10:25 15   game is delay or driven by delay, all we want to do is delay, and

10:10:31 16   that our plan is for delay.  As I put up on the screen earlier and

10:10:36 17   we have in the packet, under the plan that we propose, they would

10:10:40 18   get to an appealable, collectable judgment through a trial, through

10:10:46 19   the first trial in less than a year, in six to ten months.

10:10:54 20        They say that their plan is so much faster.  Well, their

10:10:59 21   plan has changed today, because the plan that they submitted did

10:11:02 22   not have Cal Mayo doing all of the trials on all of the issues.

10:11:06 23   They've shifted to that because it's convenient for them.  Their

10:11:10 24   plan was for every single claimant, all 800 to 900 of them to be

10:11:16 25   deposed on non-remediation damages only and to have discovery on

10:11:22 1    non-remediation damages only and then for all of them to be tried.

10:11:27 2    Our plan is actually faster.  Our plan makes more sense.

10:11:31 3           And I will close on this note.  They say in their brief

10:11:34 4    that their plan is ambitious.  It's ambitious because it's

10:11:38 5    unbounded by constitutional principles.  It's also unbounded by

10:11:43 6    realistic principles.  And so I would ask that if the court does

10:11:49 7    consider their plan, they have a long list of things that they say

10:11:52 8    that the parties need to do in the first 15 days, it includes

10:11:58 9    extensive briefing, it includes obligations on both parties.  Of

10:12:04 10   course we would ask the Court to reject their entire plan; but if

10:12:08 11   it does accept their plan, we would ask that the first 15-day mark

10:12:12 12   be shifted to 30 just so that the parties can more realistically

10:12:16 13   get things done, your Honor.

10:12:17 14          THE COURT:  All right.  Thank you very much.

10:12:20 15          MR. STENGEL:  Your Honor.

10:12:22 16          THE COURT:  You want to respond, Jim?

10:12:24 17          MR. STENGEL:  And I won't respond to the ad hominem

10:12:28 18   attacks.  I think I was fairly precise in saying we hadn't been

10:12:30 19   involved here before your Honor, which was totally accurate.

10:12:34 20          I think two things are instructive there.  One was this

10:12:39 21   sort of on the fly expansion of what Cal Mayo would consider, to

10:12:42 22   include, apparently, claims that we have all, both sides conceded

10:12:46 23   had to be discovered and litigated.  That and the sort of fascicle

10:12:52 24   restructuring of what the class covers and does not, I think

10:12:55 25   bespeaks of a fairly substantial indifference to error here.

| | | |
|---|---|---|
| 10:13:01 | 1 | Procedural error matters and our clients do have rights |
| 10:13:04 | 2 | and we're here to assert those rights and will continue to do so. |
| 10:13:07 | 3 | And to the extent the PSC wants to take the position of, well, you |
| 10:13:11 | 4 | know, close is good enough.  It's not.  And that gets us exactly in |
| 10:13:15 | 5 | the adverse end game I outlined of we go through substantial |
| 10:13:21 | 6 | efforts here, we spend a lot of your time and our time and our |
| 10:13:26 | 7 | clients' time, and we end up with an indefensible outcome in the |
| 10:13:31 | 8 | circuit.  That serves no one's interest.  Thank you, your Honor. |
| 10:13:34 | 9 | THE COURT:  Okay.  I got it. |
| 10:13:34 | 10 | MR. LEVIN:  Your Honor, 30 seconds? |
| 10:13:38 | 11 | THE COURT:  Sure.  Go ahead. |
| 10:13:41 | 12 | MR. LEVIN:  Yes, we did expand what Cal Mayo would be |
| 10:13:45 | 13 | doing, and the reason we did that is we were listening to your |
| 10:13:49 | 14 | Honor and made the adjustment based on what we heard the Court say. |
| 10:13:54 | 15 | THE COURT:  Okay.  Harry. |
| 10:13:55 | 16 | MR. ROSENBERG:  Not substantively.  But when we were in |
| 10:13:59 | 17 | chambers this morning with your Honor, you suggested that it might |
| 10:14:02 | 18 | serve the Court to submit briefs after this hearing, your Honor, |
| 10:14:07 | 19 | because there are a number of issues that have been raised almost |
| 10:14:11 | 20 | for the first time, and we would respectfully ask the Court to |
| 10:14:15 | 21 | afford at least the parties ten business days to do so. |
| 10:14:19 | 22 | THE COURT:  Let's do it in five days, so I'll let you do |
| 10:14:22 | 23 | it. |
| 10:14:22 | 24 | MR. LEVIN:  If they can do five days, we would like five |
| 10:14:25 | 25 | days to reply. |

10:14:26  1    MR. ROSENBURG:  I expected it would be simultaneous, your

10:14:30  2 Honor.  Mr. Levin --

10:14:30  3    MR. LEVIN:  I don't know what the issues are.

10:14:32  4    MR. ROSENBERG:  Well, he heard all of the issue.  I don't

10:14:34  5 want to argue the case, but Mr. Levin was pretty articulate.  He

10:14:39  6 can raise the issues like we can, and we'll do it simultaneously.

10:14:42  7    THE COURT:  Yes, I agree, simultaneously.  Let's do it in

10:14:44  8 five days.  The court will stand in recess.  Thank you.

10:14:47  9    MR. ROSENBERG:  Thank you, your Honor.

10:14:48  10    THE DEPUTY CLERK:  All rise.

10:14:50  11   (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

12

13       * * * * * *

14

15      REPORTER'S CERTIFICATE

16

17    I, Karen A. Ibos, CCR, Official Court Reporter, United
States District Court, Eastern District of Louisiana, do hereby
18 certify that the foregoing is a true and correct transcript, to the
best of my ability and understanding, from the record of the
19 proceedings in the above-entitled and numbered matter.

20

     /s/ Karen A. Ibos
21     Karen A. Ibos, CCR, RPR, CRR, RMR
     Official Court Reporter
22

23

24

25

# JOINT APPENDIX TAB # 24

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2
      ****************************************************************
 3    IN RE:  CHINESE-MANUFACTURED DRYWALL
      PRODUCTS LIABILITY LITIGATION
 4
                                  Civil Action No.
 5    VS.                         Section "L"
                                  New Orleans, Louisiana
 6                                December 20, 2018 at 9:00 a.m.

 7    THIS DOCUMENT RELATES TO ALL CASES
      ****************************************************************
 8

 9                 TRANSCRIPT OF STATUS CONFERENCE
            HEARD BEFORE THE HONORABLE ELDON E. FALLON
10                 UNITED STATES DISTRICT JUDGE

11

12    APPEARANCES:

13    FOR THE PLAINTIFFS' LIAISON COUNSEL:

14                              RUSS M. HERMAN
                                HERMAN HERMAN KATZ
15                              820 O'KEEFE AVENUE
                                NEW ORLEANS, LA 70113
16
                                FRED LONGER
17                              LEVIN, SEDRAN & BERMAN
                                510 WALNUT STREET
18                              SUITE 500
                                PHILADELPHIA, PA 19106
19
      FOR THE TAISHAN GYPSUM CO., LTD,
20    AND TTP CO., LTD.:

21                              MATTHEW D. LAWSON
                                CHRISTINA H. EIKHOFF
22                              ALSTON & BYRD
                                ONE ATLANTIC CENTER
23                              1201 WEST PEACHTREE STREET
                                ATLANTA, GA 30309
24

25
```

─── OFFICIAL TRANSCRIPT ───

Page 1

```
1    FOR THE KNAUF LIAISON COUNSEL:

2                              KERRY J. MILLER
                               DANIEL S. DYSART
3                              BAKER DONELSON BEARMAN
                               201 ST. CHARLES AVENUE
4                              SUITE 3600
                               NEW ORLEANS, LA 70170
5
     FOR THE TAISHAN, BNMB ENTITIES
6    AND CNMB ENTITIES LIAISON COUNSEL:

7                              HARRY ROSENBERG
                               PHELPS DUNBAR
8                              365 CANAL STREET
                               SUITE 2000
9                              NEW ORLEANS, LA 70130

10   FOR THE BNMB AND CNMB ENTITIES:

11                             ANDREW K. DAVIDSON
                               ORRICK HERRINGTON & SUTCLIFFE
12                             THE ORRICK BUILDING
                               405 HOWARD STREET
13                             SAN FRANCISCO, CA 94105

14   Official Court Reporter:  Nichelle N. Drake, RPR, CRR
                               500 Poydras Street, B-275
15                             New Orleans, Louisiana 70130
                               (504) 589-7775
16
          Proceedings recorded by mechanical stenography,
17   transcript produced via computer.

18

19

20

21

22

23

24

25
```

————————OFFICIAL TRANSCRIPT————————

**P R O C E E D I N G S**

1

2              (Call to order of the court.)

3         THE DEPUTY CLERK:  MDL Number 2047, In Re:

4    Chinese-Manufactured Drywall Products Liability Litigation.

5         THE COURT:  Counsel, make your appearance for the

6    record, please.

7         MR. HERMAN:  May it please the Court, good morning,

8    Judge Fallon, Russ Herman for plaintiffs.

9         MR. MILLER:  Good morning, Judge Fallon, Kerry Miller

10   for the Knauf group.

11        MR. ROSENBERG:  Good morning, Your Honor, Harry

12   Rosenberg as liaison counsel for Taishan, BNBM and CNBM.

13        THE COURT:  We're here today for our monthly status

14   conference.  I met a moment ago with the liaison lead counsel

15   to discuss the agenda.  We will take them in the order

16   presented.

17        MR. HERMAN:  May it please the Court, good morning,

18   Judge Fallon, Russ Herman.

19              With regard to Joint Report Number 106, which may be

20   comparable to the age of some of the people in this

21   courtroom, the status report is -- will be, of course,

22   furnished of record.  I am going to cover very briefly a

23   number of matters.

24              For -- yesterday, Your Honor issued two orders, one

25   at page 23, denying plaintiff's request for Sixth Amendment.

1    At pages 27 and 28, the special master issued his report, and

2    Your Honor has said January 4th is a deadline at five o'clock

3    p.m. for any oppositions to be filed to that report.  And

4    Your Honor yesterday issued a trial plan in a particular case

5    with -- with reference to the only matter of -- matters of

6    note, page 18, of the status conference report, the issue of

7    confidentiality and its history is there.  And I understand

8    that argument will be after the conference.

9          Also, Mr. Miller is here regarding a matter that was

10   set regarding Knauf.

11         MR. DYSART:  Good morning, Judge, Danny Dysart on

12   behalf of Knauf.

13         On page 28 -- this is Rec Doc 21190 -- this is a

14   motion to extinguish we had filed some months ago and had

15   bumped a couple different times regarding the last remaining

16   Option 2 claims.  We are now down to the last two.  And we

17   had spoken with plaintiffs' counsel on this matter, and

18   because they're still held up, similar to what we've done for

19   some other claims, we're going to put the last two remaining

20   claims, the funds, into the court's registry and that will

21   allow -- to moot out our motion, number one; but, number two,

22   what it will do is resolve really all the remediation fund

23   issues for Knauf and allow BrownGreer to close out the QSFs

24   in this matter.

25         Again, we've spoken with liaison counsel for the

1  plaintiffs and with Jake Woody at BrownGreer, and we're all

2  in agreement that we will be submitting a motion, an order to

3  the Court, that will allow us to submit the remaining funds

4  from the court's registry from the Knauf fund with a return

5  for the excess going back to Knauf.

6      And then also I believe there are some funds left

7  with respect to the Global and Banner settlements that will

8  be deposited with the court's registry.  So we will be

9  submitting that to the Court this week.

10      THE COURT:  And that concludes Knauf's interest in

11  the litigation?

12      MR. DYSART:  That will conclude Knauf's interest but

13  for -- if matters come up with respect to warranty issues or

14  other appeal issues, but, yes, that concludes Knauf's

15  involvement with respect to the remediation fund.

16      THE COURT:  Well, it's been a long haul from the

17  standpoint of at least that aspect of litigation.  I'm glad

18  that that aspect is over and we're dealing only with the --

19  with the Taishan, et al., cases.

20      Okay.  Thank you very much.

21      MR. DYSART:  Thank you.

22      THE COURT:  Anything further?

23      MR. HERMAN:  May it please the Court, as a matter of

24  professional courtesy, Harry Rosenberg, liaison for

25  defendants, indicated that we have visitors from China both

1   representing the Chinese, both representing parties, and

2   there are a number of lawyers that we have become acquainted

3   with.  And they're in back of the courtroom, and we wish them

4   a happy holidays.

5       THE COURT:  Well, welcome to you all.  I appreciate

6   you being here.

7       The next dates then are -- January 30th is the next

8   conference, and then February the 21st is the one after that.

9       Let's go into the motions then if we -- anything

10  further, Harry?

11      MR. ROSENBERG:  Your Honor, just one thing that we

12  discussed in chambers which is that in terms of Louisiana

13  cases, those are moving expeditiously based upon the schedule

14  Your Honor established subject to the other court dates that

15  both the courts in Florida and in Virginia have established

16  as well.  So we're in three jurisdictions at the moment, but

17  we're still moving forward with Louisiana matters.

18      THE COURT:  Okay.  With regard to those cases,

19  Taishan, et al., cases, it looks like we have reached a point

20  where from my standpoint as an MDL judge I have exhausted

21  what I can do for the parties.  So what I've done is, I

22  suggested in a remand that a couple of thousand of them be

23  sent back to Florida and then the same number thereabouts

24  sent to Virginia so that they can be tried.  And the cases

25  here, from the standpoint of the houses that are here, we'll

1     start the trials, and hopefully by next year we will at least

2     have most of the trials finished because we're going to try

3     them in flights.  I think they're trying to do that in

4     Florida and I think also in Virginia, so we'll be trying 10

5     or 15 together.  There may be some problem with the punitive

6     damages in some of those states.  We don't necessarily have

7     that issue in this matter, but that's been done before.

8          I don't like to try flights with the -- with the

9     bellwether cases because the whole purpose of bellwether is

10    to give the parties an opportunity to see a particular case

11    tried so that they can see how the evidence is presented and

12    things of that nature.  But after I've exhausted that

13    opportunity and given the lawyers an opportunity to study the

14    case and look at the case and I realize that it's not going

15    to be resolved short of trial, then I move into the trial

16    mode and that's what we're in now.  So we'll be trying -- and

17    I'll be sending cases back, in Texas and also some of the

18    other states so we can get them through, spread around the

19    country so that they can be tried.

20         And some of the other judges in those districts are

21    thinking about breaking them up so they can go faster with a

22    number of judges dealing with them.  So we'll try to get them

23    out for you all so that you can get on with other cases.

24         MR. ROSENBERG:  I understand, Your Honor.  And, of

25    course, flights in 10 or 15 cases may be logistically

1   challenging, if not problematic, to all the parties, Your

2   Honor, but we're prepared to discuss that with the Court at a

3   later date.

4        THE COURT:  Yeah.  And I invite you to do so.  I'm

5   trying to do it so that you can do it.  I'm not trying to --

6   I know people can't be in two places at one time, so if you

7   keep me advised of the trial dates, I'll make sure that trial

8   dates don't conflict with those other judges.  They've been

9   kind enough to wait and give me an opportunity to do what I

10  can do, but now I'll give them the same courtesy.

11       MR. ROSENBERG:  We will, Your Honor.  We'll keep the

12  Court advised as always.

13       THE COURT:  Thank you, Harry.

14                    *  *  *  *

15   (WHEREUPON, the proceedings were adjourned at 9:10 a.m.)

16                    *  *  *  *

17              REPORTER'S CERTIFICATE

18       I, Nichelle N. Drake, RPR, CRR, Official Court
    Reporter, United States District Court, Eastern District of
19  Louisiana, do hereby certify that the foregoing is a true and
    correct transcript, to the best of my ability and
20  understanding, from the record of the proceedings in the
    above-entitled and numbered matter.

21

22              /s/ Nichelle N. Drake
                Official Court Reporter

23

24

25

────── OFFICIAL TRANSCRIPT ──────

Page 8

# JOINT APPENDIX TAB # 25

Translation of TG-0208428-0208430

TG-0208428

**Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan Gypsum Company Limited**

Respectful Chief Song, Chief Cao:

On the class action on quality defects of gypsum boards brought by the Mitchell Company in the U.S. and the individuals in the states of Florida, Mississippi, Louisiana, Alabama, Georgia, and Texas (abbreviated as the U.S. plaintiffs), Taishan Gypsum Company Limited (abbreviated as Taishan Company) received the civil action subpoenas and complaints from the U.S. federal district court in the Northern District of Florida on May 8, 2009. A written report on the facts of the case and the relevant information are hereby submitted to each leader so that the leaders can understand the facts of the case and give relevant instructions.

I. Brief Introduction of the Case Facts

On March 6, 2009, the U.S, plaintiffs brought lawsuits against the German Knauf Group, Knauf Plasterboard (Tianjin) Co., Ltd., Taishan Company, Interior Exterior Building Supply L.P. (U.S. Company), Rightway Drywall Co., Ltd. (U.S. Company). The factual allegations and grounds of complaints by the U.S. plaintiffs are summarized as follows: 1) the U.S. plaintiffs purchased and used the gypsum boards sold by Interior Exterior Building Supply L.P. and Rightway Drywall Co., Ltd., and the gypsum boards distributed by the two companies came from Knauf and Taishan Company; 2) The quality defects of the gypsum boards were mainly seen in: A. a very high level of sulfur used in the gypsum boards makes them unfit for its intended purpose; B. the chemical reactions between the gypsum boards and metal caused other metals to corrode; C. the cause of the problems related to the heater, ventilation, and air conditioning systems found in some households in the states of Alabama and Florida were related to the use of gypsum boards; 3) the scope of compensation demanded by the U.S. plaintiffs are: A. fixing or replacing the affected houses; B. other economic losses incurred by the U.S. plaintiffs as a result of fixing or replacing the houses; C. the unlawful gains or profits made by

MTD Exhibit #3

**PENG: Exhibit 825**

the Defendants from selling the gypsum boards shall be owned to the U.S. plaintiffs; D. the attorney's fees for the U.S. plaintiffs, etc. Analyzed from the scope of jurisdiction of the court that accepted the case, the amount of damages claimed by the U.S. plaintiffs should gravely surpass 5 million U.S. dollars in this case.

II. The Information on the Gypsum Boards Exported to the U.S. by Taishan Company

From 2005 to 2008, Taishan Company exported a total of 6656748.44 square meters of gypsum boards to the U.S., among them,

**TG-0208429**

822037.37 square meters of gypsum boards were directly exported to the U.S. under the name of Shandong Taihe Dongxin Company Limited (Taishan Gypsum Company Limited); 5834711.07 square meters of gypsum boards were exported under the name of Tai'an Taishan Plasterboard Company Limited through domestic import and export companies.

Categorized by dates, 446520.0 square meters were exported to the U.S. in 2005, 5952556.63 square meters were exported in 2006, 240763.584 square meters were exported in 2007, 16908.224 square meters were exported in 2008. Later on, under the influence of various factors such as the plunging price of U.S. building materials, the appreciation of Renminbi, the increase in ocean shipping cost, and the increase in domestic manufacturing costs, the export of gypsum boards faced increasing number of restrictions, and the volume of export business fell by a large margin, after August 2007, the orders for exporting gypsum boards to the U.S. almost completely halted.

When exporting gypsum boards to the U.S., the customers mainly ordered the goods through field inspection, ordering by samples, and field supervision. When signing contracts, the quality requirements for the gypsum boards mainly included the requirements on weight, size, and packaging. Our company strictly

followed the demands of the customers and the requirements in the contracts when producing, delivering, and shipping the gypsum boards. During actual business operation, all gypsum boards exported to the U.S. followed the demands of the customers in conducting either neutral packaging labeling or labeling the company name and brand of the customer's own company, neither the "Taishan" brand nor the company's name was indicated.

During the course of business and in the after-sales follow-ups, we have never received any quality objections or bad feedbacks from the customers. The customers stated that they had to stop the gypsum board import business due to the influence of various market factors such as demand and price.

III. The Deeper-Level Background and Cause of the U.S. Plaintiffs' Action

To summarize the relevant articles and comments on the various websites, the basic opinion is: during the 4 years of sharp real estate price increase and after the 2005 Hurricane Katrina disaster, the U.S. imported about 227 million tons of gypsum boards from China. With regard to the gypsum boards' quality defect, why was it not raised sooner or later, but a flourish of propaganda came out right after the eruption of the U.S. economic crisis, when the real estate market was plunging, what is the intention? I'm afraid this is the background and cause for blaming the quality of Chinese gypsum boards.

IV. The Measures and Reasons Adopted by Taishan Company to Prepare for the Lawsuit

After analysis, Taishan Company believes that this lawsuit is relatively complicated, and it plans not to respond, but when necessary, it will provide documents that are beneficial to Taishan Company to the court that accepted the case, the reasons are as follows: 1)

**TG-0208430**

The authoritative testing and inspection agencies in our country did not detect any quality defect pointed out in the written complaint of the U.S. plaintiffs about the gypsum boards exported to the U.S.; 2) the gypsum boards produced by Taishan

Company does not have any quality defect, and they were all produced according to the standards prescribed by the U.S. customers, and since the date of delivery till now no quality complaints by the relevant customers was ever received; 3) responding to the lawsuit would incur a large amount of attorney's fees and traveling fees; 4) the most important reason is that there is no judicial treaty signed between China and the U.S. on mutual recognition and enforcement of court judgements, and Taishan Company does not have assets within the continental U.S., even if the lawsuit was lost, the U.S. court cannot enforce Taishan's assets in China. 5) Taishan Company noticed that this time the quality of the gypsum boards did not involve personal injury like the skin rashes, nose bleeds, diseases of the respiratory system, etc. as reported before.

Summarizing the reasons above, Taishan Company is inclined not to respond to the lawsuit, but when necessary it will adopt methods such as mailing the evidence that is beneficial to Taishan Company to the U.S. court and having the government departments interfere, so as to eliminate and reduce some negative impact.

Please instruct and approve whether the information above is appropriate.

Regards,

Taishan Gypsum Company Limited

May 11, 2009

Case 2:09-md-02047-EEF-MBN Document 23863-2 Filed 11/18/19 Page 573 of 1680
Case 2:14-cv-00304-MSH Tuck v Down Document 21-25 Filed 04/13/14 Page 6 of 33 Page ID# 1050

Mentioned the situation report of group lawsuit to Taishan gypsum and other companies about US

Respect Song Zong, Cao Zong:
Individuals in American Mitcher Corporation and Florida, Mississippi, Louisiana, Alabama, Georgia and Texas (i.e. American plaintiffs) because of the group charge that the gypsum board quality flaw filed, the Taishan gypsum joint-stock company (i.e. Taishan Corporation) received the civil action subpoena and petition of American federation court of appeal Florida north district delivery in May 8, 2009. Presently makes case's case and form to fellow leaders written report, so that fellow leaders find out case, and gives the related instruction.

Case synopsis

On March 6, 2009, the American plaintiffs may bear the lucky group, to be possible to bear the lucky gypsum board to Germany (Tianjin) joint-stock company, Taishan Corporation and building inside and outside finishing material supply limited partnership companies (American Corporation), to come Turvey to do the wall plate limited company (American Corporation) to file the charge. The American plaintiffs proposed that the lawsuit fact and reason summary are: (The American plaintiffs have purchased and have used inside and outside the building the finishing material supply limited partnership company and come Turvey to do the gypsum board that the wall plate company sells on commission, but the gypsum board that two companies sell on commission from may bear the lucky and Taishan Corporation; The quality flaw that (gypsum board has mainly displays in: Material sulfur content that A and gypsum board use is very high, not suitable anticipated use; B, gypsum board and metal has the chemical reaction, causes other metal corrosions; C, has the problem and use gypsum board in Alabama and Florida certain houses' warm air well ventilated air-conditioning systems related; (The American plaintiffs scope that requests to compensate mainly have: The A repair or the replacement come under the influence the house; Other economic losses that the B American plaintiffs suffer because of repair replacement house; The C defendant sells the gypsum board illegal gains or profit belongs to the American plaintiffs; The attorney expense of D American plaintiff and so on. According to accepting the jurisdiction scope situation in case court analyzes, the compensation request amount of above-mentioned plan American plaintiff should be higher than 5 million US dollars by far.
Second, Taishan Corporation exports the American gypsum board the situation.
2005 - 2008 Taishan Corporation exports the American gypsum board total 6656748.44 square meters, takes the Shandong Taihe Dongxin limited liability company (Taishan gypsum limited liability company) name direct export the American quantity as 822037.37 square meters; Exports 5834711.07 square meters through the domestic import-export company by Tai'an Taishan paper surface gypsum board limited company name.

Divided in 2005 to export the American 446520.0 square meters according to the date, in 2006 exported 5952556.63 square meters, in 2007 exports 240763.584 square meters, in 2008 will export 16908.224 square meters. Latter was declined, Renminbi revaluation by the American building materials price and marine transportation cost enhancement and home manufacture cost enhancement and other factor influences, the restriction that the gypsum board export receives are also getting more and more, the export business volume descends largely, after August, 2007, exports US's gypsum board order form almost to stop completely.

When exporting the American gypsum board, customer mainly takes the scene to inspect and look at a sample the order and inspector general as the main order way. When signs the contract the quality requirement to gypsum board mainly includes to the weight, size and packing makes the request, our company strict produces and ships out the gypsum board according to the customer request and contract provision. In the real business, all exports US's gypsum board to press the customer to request to carry on the neutral packing indication perhaps labelling customer own corporate name and brand, has not labelled "Taishan" brand or corporate name.

When the service carries on the process and post-sale track, we have not received customer any quality objection and bad feedback. The customers said can only stop the gypsum board import business by the demand, price and other market factor influences.

American plaintiff lawsuit deep level background and reason.
Synthesizes threads and commentaries in various big websites, the basic viewpoint thinks: 4 year and in 2005 that US

Case 2:09-md-02047-EEF-MBN Document 23363-70 Filed 04/18/19 Page 573 of 1680

rises after the floor rate Katrina hurricane wind-caused disaster, imported about 227 million tons gypsum board from China. Regarding the gypsum board quality flaw, why early did not say that late did not say, erupts after the American economic crisis, the real estate being at a low ebb time carries on hypes wantonly, is what mind. Perhaps this is accuses Chinese gypsum board quality the background and reason.

Taishan Corporation to the case the measure and reason that prepares to take.

Taishan Corporation after analysis thinks that this case is quite complex, planned does not answer a charge, when necessity was sued the court to provide to the US to the Taishan Corporation advantageous material, the reason is as follows: (The authorities in our country examine the authorities in organization and US examine the department not to examine to export US's gypsum board to have the quality flaw that in the American plaintiff petition pointed out; The gypsum board that (Taishan Corporation produces does not have the quality flaw, and presses the standard production that the American customers provide, has not received the quality suit of related customer from the date of delivery; (Answers a charge must pay large amount attorney and business travel expense; (4) the most essential reason lies between China and US does not have the sign to acknowledge, the judicial agreement of execution court decision mutually, and Taishan Corporation does not have the property in the US territory, even if really lost the lawsuit, American Court is unable to carry out Taishan Corporation in China's property. (5) Taishan Corporation notes this gypsum board quality not to involve to the harm of person, like before the creation person who reported presents the skin rash, the class nosebleed and respiratory disorder and so on.

Synthesizes the above reason, Taishan Corporation favors the procedure that does not answer a charge, when necessity should accept to the American Court sending helps Taishan Corporation's evidence and through authority negotiation and other procedures, eliminates and reduces some negative influences.

The above situation does not know to work as otherwise, please do make written comments.

I herewith offer Taishan gypsum limited liability company

On May 11, 2009 PAGE

--- Summary Information ---
1: 1200 PID_TITLE: Filed the group charge the situation to report PID_SUBJECT to Taishan gypsum and other companies about US:
PID_AUTHOR: aa PID_KEYWORDS:
PID_COMMENTS:
PID_TEMPLATE: Normal.wpt PID_LASTAUTHOR:
PID_REVNUMBER:
PID_EDITTIME: Sat Dec 30 08:00: 00 CST 1899 PID_CREATE_DTM: Mon May 11 16:51: 47 CST 2009
PID_LASTSAVE_DTM: Sat Dec 30 08:00: 00 CST 1899 PID_LASTPRINTED: Sat Dec 30 08:00: 00 CST 1899
PID_PAGECOUNT: 0 PID_WORDCOUNT: 0 PID_CHARCOUNT: 0 PID_APPNAME:
PID_SECURITY: 0

--- Document Summary Information ---
PID_CODEPAGE: 1200 PID_COMPANY:
PID_CATEGORY:
PID_MANAGER:
PID_PARCOUNT: 0 PID_LINECOUNT: 0 17: 0 PID_PRESFORMAT:
PID_BYTECOUNT: 0 PID_SLIDECOUNT: 0 PID_NOTECOUNT: 0 PID_HIDDENCOUNT: 0
PID_MMCLIPCOUNT: 0 PID_SCALE: false PID_LINKSDIRTY: false 1: 1200 KSOProductBuildVer: 2052-6.3.0.1705

Case 2:09-md-02047-EEF-MBN Document 23269-21 Filed 04/16/21 Page 574 of 1680
Case 2:18-cv-00378-MSD-RJK Document 21-21 Filed 04/16/19 Page 8 of 19 PageID# 1052

## 关于美国方面对泰山石膏等公司提起集团诉讼的情况汇报

尊敬的宋总、曹总：

美国米切尔公司及佛罗里达州、密西西比州、路易斯安那州、阿拉巴马州、佐治亚州、德克萨斯州的个人（简称美国原告)因石膏板质量缺陷提起的集团诉讼，泰山石膏股份公司（简称泰山公司）已于 2009 年 5 月 8 日收到了美国联邦地区法院佛罗里达州北部管区送达的民事诉讼传票及诉状。现将案件的案情及相关情况向各位领导做出书面汇报，以便各位领导了解案件情况，并给予相关指示。

一、案情简介

2009 年 3 月 6 日，美国原告对德国可耐福集团、可耐福石膏板（天津）股份公司、泰山公司、建筑物内外装修材料供应有限合伙公司（美国公司）、来特威干墙板有限公司（美国公司）提起诉讼。美国原告提出诉讼的事实及理由概括为：①美国原告购买并使用了建筑物内外装修材料供应有限合伙公司及来特威干墙板公司经销的石膏板，而两公司经销的石膏板来自可耐福及泰山公司；②石膏板存在的质量缺陷主要表现在：A、石膏板采用的材料硫含量很高，不适合预期用途；B、石膏板与金属发生化学反应，导致其他金属腐蚀；C、在阿拉巴马州和佛罗里达州某些住宅的暖气通风空调系统出现问题与使用石膏板有关；③美国原告要求赔偿的范围主要有：A 修理或更换受到影响的房屋；B 美国原告因修理更换房屋而遭受的其他经济损失；C 被告出售石膏板的非法所得或盈利归美国原告所有；D 美国原告的律师费用等。根据受理案件法院的管辖权范围情况来分析，该案美国原告的赔偿请求数额应远远高于 500 万美元。

二、泰山公司出口到美国石膏板的情况。

2005 年—2008 年泰山公司出口美国石膏板共计 6656748.44 平米，其中以山东泰和东新股份有限公司（泰山石膏股份有限公司）名

TG-0208428

义直接出口美国数量为 822037.37 平米；以泰安市泰山纸面石膏板有限公司名义通过国内进出口公司出口 5834711.07 平米。

按日期划分 2005 年出口美国 446520.0 平米，2006 年出口 5952556.63 平米，2007 年出口 240763.584 平米，2008 年出口 16908.224 平米。后受美国建材价格走低、人民币升值、海运成本提高、国内制造成本提高等因素影响，石膏板出口受到的制约也越来越多，出口业务量大幅降落，2007 年 8 月以后出口美国的石膏板订单几乎全部停止。

在出口美国石膏板时，客户主要以现场考察、看样订货、现场监督为主要订货方式。签订合同时对石膏板的质量要求主要包括对重量、尺寸、包装作出要求，我公司严格按照客户要求和合同规定生产、发运石膏板。在实际业务中，所有出口到美国的石膏板均按客户要求进行中性包装标示或是标注客户自己的公司名称、品牌，均未标注"泰山"品牌或公司名称。

在业务进行过程及售后跟踪时，我们未收到客户任何质量异议和不良反馈。客户表示受需求、价格等市场因素影响只能停止石膏板进口业务。

三、美国原告方诉讼的深层次背景及原因。

综合各大网站上的相关文章及评论，基本的观点认为：美国在楼价急升的 4 年间及 2005 年卡特里娜飓风灾后，从中国进口了大约 2.27 亿吨石膏板。对于石膏板的质量缺陷，为何早不说，晚不说，偏偏在美国经济危机爆发后、房地产处于低潮期进行大肆炒作，是何居心？恐怕这是指责中国石膏板质量的背景及原因。

四、泰山公司对案件准备采取的措施及理由。

泰山公司经分析后认为本案比较复杂，打算不去应诉，但必要时向美国受诉法院提供对泰山公司有利的材料，理由如下：①我国的权

TG-0208429

Case 2:09-md-02047-EEF-MBN Document 22263-79 Filed 04/18/19 Page 16 of 680 Page ID #:1054

威检测机构及美国的权威检测部门没有检测出出口到美国的石膏板存在美国原告诉状中指出的质量缺陷；②泰山公司生产的石膏板不存在质量缺陷，且均按美国客户提供的标准生产，自交货之日至今未收到相关客户的质量投诉；③应诉需支付巨额的律师及差旅费用；④最关键的原因在于中国与美国之间没有签订相互承认、执行法院判决的司法协定，且泰山公司在美国本土没有财产，即使真是输了官司，美国法院也无法执行泰山公司在中国的财产。⑤泰山公司注意到此次石膏板质量没有涉及到对人身的损害，如以前报道的造成人身上出现皮疹、流鼻血和呼吸系统疾病等。

综合以上原因，泰山公司倾向于不去应诉的做法，但必要时应采纳向美国法院寄送有利于泰山公司的证据及通过政府部门交涉等做法，来消除和减少一些负面影响。

以上情况不知当否，请批示。

此致

泰山石膏股份有限公司

2009 年 5 月 11 日

TG-0208430

# JOINT APPENDIX TAB # 26

Stock name: BNBM        Stock code: 000786        Announcement No.: 2010-009

**Announcement of Beijing New Building Materials Public Limited Company in Relation to Event about Gypsum Board in US**

> The Company and all members of the board of directors hereby warrant the truthfulness, accuracy and completeness of the contents of this announcement, and that there are no false representations, misleading statements or material omissions contained herein.

Recently, certain media published or reproduced articles headed "Over 3,000 claims against BNBM were brought to the court for an amount probably exceeding US$1 billion in the US" and "Gypsum board of BNBM aroused complaints in US, experts insisted on its innocence", etc. So far as is known to the Company, the aggregate number of this kind of complaints is approximately 3,000. Such complaints were made to a number of manufacturers and domestic exporters, including a gypsum board plant wholly-owned and established in China by a gypsum board enterprise in Europe and several joint stock and private gypsum board enterprises in Mainland China. Not all of the complaints were registered directly against the Company and Taishan Gypsum Company Limited（hereinafter "Taishan Gypsum"）, a ~~holding~~ controlled subsidiary of the Company.

Accordingly, the above reported contents were not accurate and the statement of "Claims against the Company probably exceed US$1 billion" was groundless.

Being the origin of the global gypsum board industry, the US is also the largest country in terms of production and consumption volume of gypsum boards. Annual consumption volume of gypsum boards in the US exceeds 2 billion square meters. Since the market is dominated by leading domestic gypsum board companies, foreign gypsum board companies can barely sell their products in the US market. In particular, the largest gypsum board company in the US has an annual sales volume exceeding 1 billion square meters of gypsum boards. Moreover, gypsum boards are heavy yet low-value products which are unsuitable for export. In 2005, a number of weather catastrophes, such as Hurricane Katrina, occurred in the US, which led to collapse of many houses. After Hurricane Katrina, demand for gypsum boards surged significantly, resulting in a short period of shortage in gypsum board supply in the US and thus the import of a portion of gypsum boards from China. According to *China Building Materials Daily reports*, a total of 580,000 tonnes and 430,000 tonnes of gypsum boards were exported to the US by companies in the PRC in 2006 and 2007 respectively. In particular, in 2006-2007, total sales volume of gypsum boards of the Company and Taishan Gypsum amounted to 545.64 million square meters, among which 14.22 million square meters (weight per square meter amounting to approximately 10 kg) were exported to the US, representing 2.61% of the total sales volume. In 2008-2009, the Company exported no gypsum board to the US; in 2008, Taishan Gypsum exported 16,900 square meters of gypsum boards to the US, but no gypsum board was exported to the US in 2009. As shown from the above figures, the Company and Taishan Gypsum exported only a limited volume of gypsum boards to the US, accounting for a very small proportion of the total sales volume.

B: 7/8/15-7/11/15
Exhibit 24-R

**MTD Exhibit #252**

ALRMH-CNBM5105-R

Gypsum boards produced in the PRC and exported to the US are subject to a number of inspections by various parties including PRC producers, PRC exporters, US importers, US constructors and property developers, and only gypsum boards which have passed all the procedures may be used lawfully in building houses in the US. All gypsum boards exported to the US by the Company and its ~~holding~~ controlled subsidiary, Taishan Gypsum, are in compliance with the requirements of the US ASTM standards, and are produced in accordance with the requirements of US purchasers.

The Company is the largest new building materials industry group in China and the largest gypsum board industry group in Asia. It has developed its own intellectual property rights, and has some Well-known Brands in China and the title of China's Brand-name Products. It also owns a national technology center and a post-doctoral work station, boasting technology level and quality standards in a par with the world's advanced levels. Besides, the Company has introduced and established the ISO9001 Quality Management System, ISO14001 Environmental Management System, GB/T28001 Occupational Health and Safety Management System, ISO10012 Management System and Environmental Label Safeguarding Measures. In addition, its gypsum board products have clinched relevant international quality accreditations, including the US's UL accreditation and the UK's BS accreditation. The Company has strictly observed relevant national standards, and has all along carried out production based on international standards, and obtained relevant quality accreditations. The Company's gypsum boards and lightweight metal frame products are widely used in the Great Hall of the People, Bird's Nest National Stadium, the office building of the National People's Congress, the building complex of the Tianjin Jinta, Jinmen series, Shanghai World Expo Park, Guangzhou West Tower and other keylandmark construction projects.

Recently, the Company noted the US District Court for the Eastern District of Louisiana had made an order against Taishan Gypsum, a ~~holding~~ controlled subsidiary of the Company, requesting Taishan Gypsum to pay USD2,609,129.99 to seven plaintiffs in respect of the losses allegedly caused by the use of gypsum boards. Taishan Gypsum has not yet received the above order document from the US court, nor is it aware of the investigation procedures and bases behind the order. The gypsum boards produced by the Company and Taishan Gypsum have been monitored and examined by national authorities of all levels, and have met relevant quality standards. As of 28 May 2010, the Company was served a summon from the US concerning the litigation in relation to the use of Chinese gypsum boards, which involves an amount of USD150,000, while Taishan Gypsum was served some summons from the US concerning the litigation in relation to the use of Chinese gypsum boards, which involve an amount of USD5,225,000. The defendants of the above summons include not only the Company and Taishan Gypsum, but also tens of Chinese manufacturers and exporters engaged in export of gypsum boards to the US, as well as domestic importers, property developers, construction companies and a number of other enterprises in the US. The Company and Taishan Gypsum will continue to keep an eye on the progress of the incident, and address and handle the same with due prudence, so as to be responsible to investors, consumers and the industry.

Page 2

ALRMH-CNBM5106-R

The Company's designated media for information disclosure are *China Securities Journal*, *Shanghai Securities News*, *Securities Times* and *Securities Daily*, while the website designated for information disclosure is the CNINFO website (http://www.cninfo.com.cn). All statutory information of the Company disclosed by means of an announcement published on the above media shall prevail. The Company will make timely information disclosure in strict compliance with the laws, regulations, regulatory documents, as well as the regulations and requirements under the articles of association of the Company.

The board of directors of Beijing New Building Materials Public Limited Company

28 May 2010

ALRMH-CNBM5107-R

# JOINT APPENDIX TAB # 27

*Hong Kong Exchanges and Clearing Limited and The Stock Exchange of Hong Kong Limited take no responsibility for the contents of this announcement, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement.*



# CNBM

# China National Building Material Company Limited[*]

# 中 國 建 材 股 份 有 限 公 司

*(a joint stock limited company incorporated in the People's Republic of China with limited liability)*

(Stock Code: 3323)

## ANNOUNCEMENT
## FURTHER UPDATES ON RECENT DEVELOPMENTS IN
## THE GYPSUM BOARD LITIGATION IN THE US

References are made to the overseas regulatory announcement of China National Building Material Company Limited*(中國建材股份有限公司) (the "**Company**", the Company and its subsidiaries, together, the "**Group**") dated 30 May 2010 in respect of an announcement released by Beijing New Building Material Public Limited Company* (北新集團建材股份有限公司) (the "**BNBM**"), a 45.2% held subsidiary of the Company, relating to the gypsum board incident in the United States (the "**US**"), the information on the stage of development of the gypsum board cases in the US in the 2013 annual report of the Company and the voluntary announcements of the Company dated 18 July 2014 and 20 August 2014 respectively (the "**18 July Announcement**" and the "**20 August Announcement**").

**T: 6/2/15-6/4/15**
**Exhibit 31**

**MTD Exhibit #190**

— 1 —

CNBMCO00000329

# FURTHER DEVELOPMENTS IN THE GYPSUM BOARD CASES IN THE US

Service of the summons in respect of the civil action initiated by Eduardo and Carmen Amorin individually and on behalf of all others similarly situated plaintiffs (Case No.: 2:14-cv-1727) (the "**Amorin Case**") from the United States District Court of Eastern District of Louisiana (the "**US District Court**") has been made on the Company through Beijing Supreme People's Court in China. The 20 August Announcement of the Company has made reference to the Amorin Case and stated that Taishan Gypsum Company Limited* (泰山石膏股份有限公司) ("**Taishan Gypsum**"), a 65% held subsidiary of BNBM, had been notified that other plaintiffs had initiated a new action in the US District Court claiming that the defendants' gypsum board was installed in at least 3,700 homes, residences or other structures owned by the plaintiffs and class members. The plaintiffs claimed damages of more than US$1,500 million against the defendants which included, among others, the Company, BNBM and Taishan Gypsum. The Company is currently considering the appropriate action to take.

## IMPACT OF THE RECENT DEVELOPMENTS IN THE US GYPSUM BOARD LITIGATION

The impact of the US gypsum board litigation on the Company as of 20 August 2014 was set out in the 18 July Announcement and the 20 August Announcement. The Group's major assets and principal commercial activities are all located in China and as stated in the 18 July Announcement, since there is no convention or treaty on mutual recognition and enforcement of judgments between China and the US, the respective US and Chinese legal counsels of BNBM and Taishan Gypsum believe that the possibility of the US judgments being enforced in China is very low. At present, it is difficult to ascertain accurately the potential impact of the Amorin Case on the Company. The Company will continue to monitor the progress of the US gypsum board litigation and will make further announcements if and when necessary in accordance with the regulatory requirements.

This announcement is made by the Company pursuant to Part XIVA of the Securities and Futures Ordinance (Cap. 571 of the Laws of Hong Kong) and Rule 13.09 of the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited.

CNBMCO00000330

By order of the Board
**China National Building Material Company Limited***
**Chang Zhangli**
*Secretary of the Board*

Beijing, the PRC
13 February 2015

*As at the date of this announcement, the board of directors of the Company comprises Mr. Song Zhiping, Mr. Cao Jianglin, Mr. Peng Shou, Mr. Cui Xingtai and Mr. Chang Zhangli as executive directors, Mr. Guo Chaomin, Mr. Huang Anzhong and Mr. Tao Zheng as non-executive directors, and Mr. Shin Fang, Mr. Tang Yunwei, Mr. Zhao Lihua, Mr. Wu Liansheng and Mr. Sun Yanjun as independent non-executive directors.*

\* *For identification only*

— 3 —

CNBMCO00000331

# JOINT APPENDIX TAB # 28

BNBMPLC-E-0059967

## The Course of Events on Hiring Law Firms for the Gypsum Board Litigation in the United States

### I. The Course of Events on Hiring Foreign Law Firms

Background: Since the end of 2008, some homeowners, construction companies, and other companies in the United States have brought lawsuits against multiple Chinese gypsum board manufacturing enterprises in some federal courts and state courts of the United States. Beijing New Building Materials Public Limited Company (abbreviated below as "BNBM PLC") and Taishan Gypsum Company Limited (abbreviated below as "Taishan Gypsum") are listed as defendants in some cases.

#### Stage one: Hiring Foreign Law Firms to Issue Legal Opinions

1. After BNBM PLC and Taishan Gypsum were listed as defendants in some of the gypsum board lawsuits in the United States, BNBM PLC responded actively. According to the advice of Chungang Dong, Esq. from Beijing Jingtian & Gongcheng Law Firm (abbreviated below as "Jingtian & Gongcheng"), the Company's legal counsel, he suggested that BNBMPLC should officially appoint a U.S. law firm to provide an official legal opinion to serve as the basis for the official decision. After obtaining information on foreign law firms through various channels, BNBM PLC sent invitation letters to three preliminarily-determined law firms and one U.S. attorney. Among them, three law firms replied.

2. BNBM PLC and its subsidiary Taishan Gypsum discussed the gypsum board lawsuits in the United States, in which BNBM PLC and Taishan Gypsum were involved, with the three candidate law firms on September 10th, 2009 and September 15th, 2009, respectively. The three candidate law firms were Lovells International Law Firm[1] (abbreviated below as "Lovells"), Orrick, Herrington & Sutcliffe LLP (abbreviated below as "Orrick"), and K&L Gates LLP (abbreviated

[1] It should be Hogan Lovells. Hogan & Hartson LLP and Lovells merged in May 2010 to become Hogan Lovells. The

MTD Exhibit #186

SONG: Exhibit 331

below as "K&L Gates"). The three candidate law firms each provided the special information they had and their suggestions on the gypsum board litigation in the United States. The minutes of this meeting were provided by Chungang Dong, Esq. at Jingtian & Gongcheng.

<u>BNBMPLC-E-0059968</u>

3. On September 22nd, 2009, BNBM PLC and Taishan Gypsum continued the discussion about the candidate law firms for the gypsum board litigation in the United States, and the topic of the discussion was about *Hiring Attorneys for the "Toxic Drywall Event" and Responding to the Default Judgment.* Candidate law firms, Lovells and Orrick, provided the special information each of them had and their suggestions at this meeting.

This meeting solicited the opinions of Tongchun Jia and Gang Zhao at Taishan Gypsum on hiring attorneys. Tongchun Jia's opinions were: 1) according to the instructions of leaders, necessary and limited response to the litigation can be given; 2) at the same time, he thought that Taishan Gypsum was involved in a relatively large number of lawsuits and could not manage the responses to the lawsuits, and that the fees could be very high. He agreed to respond to the hearing on September 24th, and to make further judgments based on the situations after the response; 3) he agreed with the suggestion put forward by Yu Chen at BNBM PLC that the two companies appoint law firms separately and bear the fees on their own.

Gang Zhao's opinion was: for hiring law firms, he suggested to hire one firm, and he was inclined to hire Orrick, because: 1) Orrick paid close attention to the case; 2) there was no problem with their level of professionalism; 3) under the premise that there was no significant difference of the levels of professionalism among the U.S. law firms, Orrick had better attitudes.

4. On October 12th, 2009, the Legal Department of BNBM PLC issued the *Report on Hiring Foreign Lawyers for the Gypsum Board Litigation in the United States*, and reported relevant matters about hiring foreign law firms to provide legal opinions, and etc. This document gives a brief introduction of the three candidate foreign law firms; and, after considering the price offers and comprehensively

analyzing the advantages of the three law firms, BNBM PLC preliminarily decided to have Lovells answer its questions of concern, collect information, provide suggestions and strategies, and issue legal opinions letters.

The price offers of the three law firms are as follows:

K&L Gates: USD 98,500

<u>BNBMPLC-E-0059969</u>

Orrick: USD 75,000

Lovells: USD 60,000

**Stage two: Taishan Gypsum retained the law firm**

5. On April 8th, 2010, the time in the United State, Judge Eldon Fallon, a federal district judge in New Orleans, United States, issued an order in the lawsuit of the plaintiffs about the quality issues of the gypsum boards, and ruled that Taishan Gypsum Company Limited (abbreviated as "Taishan Gypsum") pay a sum of USD 2.6 million as the damages to 7 U.S. families. In the teleconference held on April 12th, 2010, BNBM PLC analyzed and discussed with Lovells in depth about the gypsum board litigation in the United States. Daozheng Chen, Esq. from Lovells made a preliminary analysis and judgment on the order.

6. 

7. In the teleconference on June 9th, 2010, CNBM Group, CNBM Co., Ltd., and BNBM PLC discussed the agency agreement; Hogan Lovells briefly introduced its thoughts on the litigation.

8. On June 10th, 2010, according to the results from the discussions on June 3rd and June 9th, Taishan Gypsum and Hogan Lovells signed the agency agreement. It was officially determined that Hogan Lovells would be the law firm to represent Taishan Gypsum in the gypsum board litigation in the United States in which Taishan Gypsum has been involved.

**BNBMPLC-E-0059970**

**Stage three: BNBM PLC retained the law firm**

9. To follow up with the gypsum board litigation in the United States, BNBM PLC considered whether to retain a law firm to provide legal advise. On July 28th, 2010, Attorney Chungang Dong from Jingtian & Gongcheng sent an email on the matter of hiring the law firm by BNBM PLC. In the email, he offered his own suggestions on how to proceed with hiring the law firm while BNBM PLC is following up with the gypsum board litigation in the United States.

According to the suggestions of Attorney Chungang Dong, the Legal Department of BNBM PLC issued the *Second Report on Hiring U.S. Attorneys* on August 12th, 2010, and submitted it together with the *Report on Hiring Foreign Attorneys for the Gypsum Board Litigation in the United States* issued on July 10th, 2010 to the Company's leaders for review. On September 17th, 2010, BNBM PLC signed the confirmation letter for the agency with Orrick, and it was confirmed that BNBM PLC retained Orrick as the legal consultant for the gypsum board litigation in the United States.

**BNBMPLC-E-0059971**

II.    Related Meetings and Contents of Discussions

| **Time of meeting: September 10, 2009 / September 15, 2009** |
| --- |

| Topic of meeting: U.S. Litigation Involving BNBM Group and Taishan Gypsum |
|---|
| **Attendees:** BNBM PLC: Yu Chen, Zheng Tao, Ziqiang Bian; Taishan Gypsum: Gang Zhao; Shandong Taishan Lantian Law Firm: Guangbin Liang, Esq. ; Jing Tian & Gong Cheng: Chungang Dong, Esq. |

**The following matters mainly involve facts, and the information and opinions provided by various foreign firms are either identical or similar;**

I.   The existing lawsuits on the quality issues of gypsum boards are being heard in the U.S. federal courts and state courts respectively, totaling to more than 1000 cases, of which, the 127 cases accepted by federal courts are being handled as the multidistrict litigation ("MDL") by the federal court in the state of Louisiana. The judge hearing the case is Eldon E. Fallon.

II.   There are additionally hundreds of cases (the specific number is increasing with time) filed in the courts of 26 states, the majority of which are in the state of Florida and the state of Louisiana. There is the possibility that the cases within each state could be heard in consolidation. Therefore, even if all cases were heard in consolidation, there are at least 27 consolidated cases.

III.   

IV.   Among all the Chinese enterprises listed as defendants, only the Chinese subsidiaries of KNAUF hired attorneys to participate in the litigation procedure. They have already filed the motion to dismiss, and raised the objection to jurisdiction.

V.

VI.  Judge Fallon already issued a warning to Taishan Gypsum. If Taishan Gypsum did not respond to the litigation before September 24, 2009, the judge will hold a hearing on September 24, 2009, and issue a default judgment against Taishan Gypsum.



BNBMPLC-E-0059972

| **Special Information and Suggestions Provided at the Meeting by the Law Firms and the Opinions of the Company's Legal Consultant** | |
| --- | --- |
| Lovells: Daozheng Chen, Gaston Fermandez, Ye Yuan | |



Orrick: Xiang Wang,
Raymond G. Mullady,
Fang Fu

| | |
|---|---|
| | |
| K&L Gates   Yujing Shu, Xianjin Tian, Miao Li, David Klaber, Eric Stone | I. Except for the juridical process, the CSPA and the EPA in the United States also conducted investigations on this case, but there has not been any conclusion as of now. The above agencies have also conducted cooperation with the relevant departments of the Chinese government, and will appoint a delegation group to China in October to conduct joint investigation with the AQSIQ[2] in China. |
| | II. The CSPA in the U.S. demanded that the construction companies shall take mitigation measures such as to fix, replace, or issue refunds to the homeowners' houses involved. Therefore, these construction companies are simultaneously facing pressures from three parties: the homeowners, the court, and the government. For the losses resulted from the above mitigations measures, the construction companies |

**BNBMPLC-E-0059973**

| | |
|---|---|
| | will also ask for indemnities from the manufacturers. |
| | |

---

[2] General Administration of Quality Supervision, Inspection and Quarantine of the People's Republic of China

| | |
|---|---|
| |  |
| Jingtian & Gongcheng: Chungang Dong | I. Lovells quoted USD 50,000 for issuing legal opinions about, but not limited to, the five questions consulted. Orrick quoted USD 75,000 (no additional charge for giving legal advice if the firm is retained to handle a case). K&L Gates quoted USD 98,500.<br><br>II. **The main advantage** of Lovells lies in the direct and rich experience possessed by the attorneys at its Chinese offices with regard to U.S. litigations, which allows it to complete the main work in their Chinese office. In addition, Lovells is the highest ranked and most renowned foreign law firm internationally out of the three.<br><br>III. **The main advantage of Orrick** lies in its striking passion and focus on this case. Also, its attorneys stationed in the U.S. also have good channels of communication with the plaintiffs' attorneys.<br><br>IV. **The main advantage of K&L Gates** lies in the fact that this firm has many offices located at the southern states of the U.S. where the lawsuits are congregated. This provides a convenient geographical condition for investigating the situation and communicating with the courts in the United States. Additionally, two of their foreign attorneys have abundant experience in product liability. |
| **Time of the Meeting: September 22, 2009 (Live meeting + telephone conference)** | |
| **Topic of the Meeting: Hiring Attorneys for the "Toxic Drywall Event" and the Response to the Default Judgement** | |
| Attendees: BNBM PLC: Yu Chen, Zheng Tao; Taishan Gypsum: Tongchun Jia, Gang Zhao | |
| **Main Contents of the Meeting:** | |

| I. The information acquired from the law firms includes, but is not limited to, 1) the current situation of the case, 2) suggestions from the attorneys, 3) whether response to the hearing proceeding means the acceptance of jurisdiction of the U.S. courts, whether it entails mandatory participation in the subsequent litigation? |
|---|
| II. Solicited opinions from Tongchun Jia and Gang Zhao of Taishan Gypsum about matters on hiring the law firm and responding to the hearing on September 24th. |

| **Special Information and Suggestions Provided by the Law Firms During the Meeting** |
|---|

| Lovells: Daozheng Chen |  |
|---|---|
| Orrick: Xiang Wang | |

| | |
|---|---|
| |  |
| K&L Gates: Xianjin Tian | None |
| Notes of this Stage | On October 12, 2009, the Legal Department of BNBM PLC issued the *Report on Hiring Foreign Lawyers for the Gypsum Board Litigation in the United States,* |

BNBMPLC-E-0059974

| | |
|---|---|
| | and it was preliminarily decided to have Lovells answer those questions of concern from BNBM PLC, collect information, provide suggestions and strategies, and issue legal opinion letters. |

**Time of the Meeting:** April 12, 2010 (Telephone Conference)

**Main Contents of the Meeting: Preliminary Introduction and Judgement on the Gypsum Board Litigation in the United States**

**Attendees:** BNBM: Yu Chen, Zhucai Chen; Jingtian & Gongcheng: Chungang Dong; Hogan Lovells: Daozheng Chen

**Main Contents of the Meeting:** On April 8, 2010, U.S. time, Eldon Fallon, a federal district court judge in New Orleans, U.S.A., issued an order in the lawsuit of the plaintiffs about the quality issues of gypsum boards. Taishan Gypsum Limited Company (abbreviated as "Taishan Gypsum") was ordered to pay a sum of USD 2,600,000 to 7 families in the United States in compensatory damages. Based on the progress of the case, (the meeting) made preliminary analysis and judgement on the case.

**Judgements and Suggestions Provided by Lovells and the Company's Legal Counsel**

| | |
|---|---|
| Lovells: <br><br> Daozheng |  |

Case 2:09-md-02047-EEF-MBN Document 22362-79 Filed 11/19/19 Page 598 of 1680
Case 2:14-cv-06007-EEF-JCW Document 42-22 Filed 01/15/15 Page 14 of 21 PageID #: 1076

| Chen |  |
|---|---|
| Jingtian & Gongcheng: | |

| Chungang Dong |  |

BNBMPLC-E-0059975



| | |
|---|---|
| **Time of the meeting**: June 3rd, 2010 (teleconference) | |
| **Topic of the Meeting: the Strategy for Responding to the Gypsum Board Litigation in the United States** | |

**Attendees**: CNBM Group: Jian Zhang; BNBM PLC: Bing Wang; Taishan Gypsum: Tongchun Jia; Jingtian & Gongcheng: Chungang Dong; and Lovells: Daozheng Chen

**Summary of the meeting:**

I. Mr. Knauf visited Zhiping Song, chairman of the board of directors, and hoped that CNBM Group could offer a helping hand to them in responding to the United States drywall event. The situations that Knauf reported were that the Knauf Company had done some work and that, for the construction companies, for the moment it did not explore the truth of the matter, nor did it divide up liabilities. They cooperated to fix the issue of home renovation, but the small homeowners who did their own decorations were waiting for the result of the litigation. Knauf was worried that their assets would be enforced in the United States. Knauf has 3 factories in the United States, and the main market is in the heat insulating materials. The plaintiffs have formed an attorney team of more than 100 people. Among them, a leadership body of 5 people has been established to negotiate with the defendants about the compensation. The goal of the team of plaintiffs' attorneys is to work hard to have the court make a judgment on 1-2 cases first and set a precedent for the ruling and settlement negotiations of other recent cases. For the judgment made against Knauf, the Knauf Company has appealed, hoping to delay the time and to reduce the amount of compensation.

Chairman Song agreed that CNBM Group should organize the response to the litigation, but the purposes of the response are: 1. for the images of Chinese products and Chinese enterprises; 2. for the friendship with Mr. Knauf of more than 30 years. Reluctant to see the Knauf Company fighting alone; 3. insisting on the position that our products do not have any problems. We should consider the situations as we deal with the litigation. The Company may ask the Knauf Company to help recommend attorneys for us and delay the effectiveness of the judgment.

II.

III.



---

[3] Fourth? typo

BNBMPLC-E-0059976



| |
|---|
| **Time of the meeting**: June 3rd, 2010 (teleconference) |
| **Topic of the meeting: the strategy for responding to the United States gypsum board litigation** |
| **Attendees**: CNBM Group: Chief (Jianglin) Cao and Jian Zhang; CNBM Co., Ltd.: Zhangli Chang; BNBM PLC: Yu Chen; Taishan Gypsum: Tongchun Jia; and Jingtian & Gongcheng: Chungang Dong |
| **Summary of the meeting:**<br><br>Abstract I: Introduction of the Lovells firm and its strengths after the merger, including Attorney Daozheng Chen, Attorney Weining Yang, the advantages are large scale and strong strengths, the attorneys in Shanghai and Beijing representative offices have strong capabilities, and are convenient in communications and exchanges.<br><br>Abstract II: The statistics from the Supreme Court showed that there are a total of 81 subpoenas that were served, involving 48 enterprises.<br><br>Abstract III: |





**Translation of BNBMPLC-E-0059977**



Case 2:19-cv-00037-RJS-EJF  Document 71-22  Filed 01/15/19  Page 21 of 121  PageID #:1083



# JOINT APPENDIX TAB # 29

*Hong Kong Exchanges and Clearing Limited and The Stock Exchange of Hong Kong Limited take no responsibility for the contents of this announcement, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement.*



# CNBM

# China National Building Material Company Limited[*]

# 中 國 建 材 股 份 有 限 公 司

*(a joint stock limited company incorporated in the People's Republic of China with limited liability)*

(Stock Code: 3323)

## DISCLOSEABLE TRANSACTION
## CONNECTED TRANSACTION
## ACQUISITION OF EQUITY INTEREST IN TAISHAN GYPSUM
## THROUGH SHARE ISSUANCE OF BNBM

The Company is pleased to announce that, on 13 October 2015, BNBM (an approximately 45.20%-owned subsidiary of the Company) entered into the Framework Agreement with Taishan Gypsum (a 65%-owned, directly and indirectly, subsidiary of BNBM) Minority Shareholders in relation to the acquisition of the 35% Equity Interest in Taishan Gypsum held by Taishan Gypsum Minority Shareholders collectively through a private issuance of BNBM shares to Taishan Gypsum Minority Shareholders. Pursuant to the Framework Agreement, upon completion of the transaction, BNBM will directly and indirectly hold 100% equity interest in Taishan Gypsum. Taishan Gypsum Minority Shareholders will become shareholders of BNBM, and the equity interest held by the Company in BNBM will reduce from approximately 45.20% to approximately 35.84%. Both BNBM and Taishan Gypsum will remain as subsidiaries of the Company.

## LISTING RULES IMPLICATIONS

As one of the applicable percentage ratios defined under Chapter 14 of the Listing Rules in respect of the Acquisition exceeds 5% but all such applicable percentage ratios are less than 25%, the Acquisition constitutes a discloseable transaction of the Company under Chapter 14 of the Listing Rules and is subject to the reporting and announcement requirements.

MTD Exhibit #48

– 1 –

Pursuant to the Framework Agreement, upon completion of the transaction, the equity interest held by the Company in BNBM will reduce from approximately 45.20% to approximately 35.84%. Therefore, the transaction contemplated under the Framework Agreement constitutes a Deemed Disposal of BNBM shares by the Company with respect to Rule 14.29 of the Listing Rules. As one of the applicable percentage ratios defined under Chapter 14 of the Listing Rules in respect of the Deemed Disposal exceeds 5% but all such applicable percentage ratios are less than 25%, the Deemed Disposal constitutes a discloseable transaction of the Company under Chapter 14 of the Listing Rules, and is subject to the reporting and announcement requirements.

As Guotai Min'an Investment, one of the Taishan Gypsum Minority Shareholders, is a substantial shareholder of Taishan Gypsum holding 16% equity interest in Taishan Gypsum and Jia Tongchun, one of the Taishan Gypsum Minority Shareholders, is a substantial shareholder of Taishan Gypsum holding 11.36% equity interest in Taishan Gypsum and chairman of the board and general manager of Taishan Gypsum, Guotai Min'an Investment and Jia Tongchun are connected persons of the Company at the subsidiary level under the Listing Rules. The transaction in relation to the acquisition of the 35% Equity Interest in Taishan Gypsum through private issuance of shares of BNBM constitutes a connected transaction of the Company involving connected persons of the Company at the subsidiary level.

One of the applicable percentage ratios under Chapter 14A of the Listing Rules in respect of the Acquisition and the Deemed Disposal exceeds 5%. Since (1) Guotai Min'an Investment and Jia Tongchun are connected persons of the Company at the subsidiary level; (2) the Directors (including the independent non-executive Directors) have approved the transactions contemplated under the Framework Agreement; (3) the independent non-executive Directors have confirmed that the terms of the transactions are fair and reasonable, the transactions are on normal commercial terms and in the interests of the Company and its shareholders as a whole, pursuant to rule 14A.101 of the Listing Rules, the Acquisition and the Deemed Disposal are only subject to the reporting and announcement requirements, but exempt from the circular, independent financial advice and shareholders' approval requirements.

## INTRODUCTION

The Company is pleased to announce that, on 13 October 2015, BNBM (an approximately 45.20%-owned subsidiary of the Company) entered into the Framework Agreement with Taishan Gypsum (a 65%-owned, directly and indirectly, subsidiary of BNBM) Minority Shareholders in relation to the acquisition of the 35% Equity Interest in Taishan Gypsum held by Taishan Gypsum Minority Shareholders collectively through a private issuance of 368,997.4 thousand BNBM shares to Taishan Gypsum Minority Shareholders.

Pursuant to the Framework Agreement, upon completion of the transaction, BNBM will directly and indirectly hold 100% equity interest in Taishan Gypsum. Taishan Gypsum Minority Shareholders will become shareholders of BNBM, and the equity interest held by the Company in BNBM will reduce from approximately 45.20% to approximately 35.84%. Both BNBM and Taishan Gypsum will remain as subsidiaries of the Company. The Group does not expect to record any profit or loss in relation to the Deemed Disposal.

## PRINCIPAL TERMS OF THE FRAMEWORK AGREEMENT

**Date**

13 October 2015

**Parties**

(1)   BNBM; and

(2)   Taishan Gypsum Minority Shareholders;

**Acquisition of Equity Interest in Taishan Gypsum**

BNBM shall acquire the 35% Equity Interest in Taishan Gypsum collectively held by the Taishan Gypsum Minority Shareholders.

Shareholding structure of Taishan Gypsum before the equity transfer:

| Name of shareholder | Number of shares *(thousand shares)* | Percentage of shareholding *(%)* |
|---|---|---|
| BNBM | 65,362.5 | 42% |
| Donglian Investment | 35,793.8 | 23% |
| Taishan Gypsum Minority Shareholders | 54,468.7 | 35% |
| **Total** | **155,625.0** | **100%** |

Donglian Investment is a wholly-owned subsidiary of BNBM, and BNBM holds 65% equity interest in Taishan Gypsum on its own and through Donglian Investment.

Shareholding structure of Taishan Gypsum after the equity transfer:

| Name of shareholder | Number of shares (*thousand shares*) | Percentage of shareholding (*%*) |
|---|---|---|
| BNBM | 119,831.2 | 77% |
| Donglian Investment | 35,793.8 | 23% |
| **Total** | **155,625.0** | **100%** |

BNBM will hold 100% equity interest in Taishan Gypsum on its own and through Donglian Investment.

**Share Issuance of BNBM**

As the consideration for the acquisition of the 35% Equity Interest in Taishan Gypsum, BNBM shall issue a total of 368,997.4 thousand A Shares through a private issuance to Taishan Gypsum Minority Shareholders, representing approximately 26.10% of the issued share capital of BNBM as of the date of this announcement or approximately 20.70% of the enlarged issued share capital of BNBM after the private issuance.

Shareholding structure of BNBM before the share issuance:

| Name of shareholder | Number of shares (*thousand shares*) | Percentage of shareholding (*%*) |
|---|---|---|
| CNBM | 639,065.9 | 45.20% |
| Public investors | 774,915.7 | 54.80% |
| **Total** | **1,413,981.6** | **100.00%** |

Shareholding structure of BNBM after the share issuance:

| Name of shareholder | Number of shares (thousand shares) | Percentage of shareholding (%) |
|---|---|---|
| CNBM | 639,065.9 | 35.84% |
| Taishan Gypsum Minority Shareholders | 368,997.4 | 20.70% |
| Public investors | 774,915.7 | 43.46% |
| **Total** | **1,782,979.0** | **100%** |

**Consideration and payment terms**

BNBM shall satisfy the total consideration of approximately RMB4,195,500.0 thousand payable to Taishan Gypsum Minority Shareholders for the 35% Equity Interest in Taishan Gypsum by way of issuing an aggregate of 368,997.4 thousand A Shares at an issue price of RMB11.37 per share.

**Basis of consideration**

For the purposes of the proposed transaction, ZhongHe Appraisal Co., Ltd has issued the Assets Appraisal Report ("Assets Appraisal Report") dated 25 September 2015 which adopted the income-based approach with 30 April 2015 as the Reference Date. All parties to the Framework Agreement are satisfied with the appraisal conclusion of the Assets Appraisal Report. The unaudited book value of net assets attributable to parent company corresponding to the 35% Equity Interest in Taishan Gypsum as at 30 April 2015 is approximately RMB1,133,681.7 thousand. According to the Assets Appraisal Report, the appraised value of the 35% Equity Interest in Taishan Gypsum as at 30 April 2015 is approximately RMB4,195,500.0 thousand. As agreed among the parties through negotiations, the consideration for the proposed acquisition of the 35% Equity Interest in Taishan Gypsum shall be approximately RMB4,195,500.0 thousand.

BNBM will issue shares at the price of RMB11.37 per share, which is determined with reference to 90% of the average trading price of BNBM shares for the 120 trading days prior to the Price Determination Date, as adjusted by the profit distribution of BNBM for 2014.

During the period from the Price Determination Date of this issuance of shares to the date of issuance, if any ex-right or ex-dividend event occurs, such as distribution of dividends, bonus issue, and capitalisation of capital reserve by BNBM, the issue price shall be adjusted accordingly in the light of relevant provisions by CSRC and Shenzhen Stock Exchange while the number of shares to be issued shall also be adjusted according to the issue price. The specific adjustment shall be subject to the resolution made by shareholders' meeting of BNBM.

Based on the appraisal value of the 35% Equity Interest in Taishan Gypsum and the aforesaid issue price of the BNBM shares, BNBM shall issue an aggregate of 368,997.4 thousand shares to Taishan Gypsum Minority Shareholders. The appraisal of such assets shall be approved by or filed with the competent authority, and subject to the appraisal conclusion as approved or filed. The number of shares to be issued by BNBM to Taishan Gypsum Minority Shareholders, as adjusted by the board of directors of BNBM as authorised at its shareholders' meeting with reference to the appraisal conclusion as approved by or filed with the competent authority, shall be finalised subject to the number of shares to be issued as approved by CSRC.

**Lock-up period of the shares to be issued**

Taishan Gypsum Minority Shareholders have undertaken that none of the shares of BNBM acquired through this transaction shall be transferred within 36 months after completion of the issuance. Such lock-up requirement shall also apply to any additional shares of BNBM that are acquired by Taishan Gypsum Minority Shareholders as a result of bonus issue or capitalisation of capital reserve of BNBM during such lock-up period.

**Completion of the transaction**

Completion of the transfer of the 35% Equity Interest in Taishan Gypsum shall take place within one month from the effective date of this transaction. Upon completion, all the rights and obligations in respect of such equity interest shall pass to BNBM.

## Arrangement for profit or loss

The accumulated retained profit of BNBM before completion of this transaction shall be shared on a pro rata basis among its existing and new shareholders following completion of this transaction.

The profits incurred by Taishan Gypsum during the period from the Reference Date to the date of completion are attributable to BNBM whereas the losses are to be borne by Taishan Gypsum Minority Shareholders on a pro rata basis with reference to their shareholdings in Taishan Gypsum.

After the completion of the acquisition of the 35% Equity Interest in Taishan Gypsum, the auditor responsible for preparing the annual report of BNBM will conduct a special audit on Taishan Gypsum to determine the profit or loss attributable to the 35% Equity Interest in Taishan Gypsum from the Reference Date to the date of completion. If the date of completion falls before the 15th day (inclusive) of a month, the Reference Date for audit of profit or loss for such period shall be the end of the preceding month; if the date of completion falls after the 15th day of a month, the Reference Date for audit of profit or loss for the period shall be the end of that month. In case of loss, Taishan Gypsum Minority Shareholders shall pay the respective portions of such loss to be borne by them to BNBM in cash within 5 working days from the day on which the aforesaid special audit report is issued.

## Conditions for the Framework Agreement to take effect

The Framework Agreement shall be formed upon signing and the affixing of the seal by authorised representatives of each party, and shall become effective upon the fulfilment of all the following conditions and on the date of the following conditions shall have been fulfilled, whichever is the latest:

1.    the approval by the shareholders' meeting of Taishan Gypsum;

2.    the approvals by the board of directors and shareholders' meeting of BNBM, respectively;

3.    an approval by the competent authority; and

4.    a written approval from CSRC.

## INFORMATION ON THE SUBJECT COMPANIES

Taishan Gypsum is mainly engaged in the production and sale of paper surfaced gypsum boards, gypsum products, lightweight steel frames and relevant products. According to Taishan Gypsum's audited accounts prepared under the PRC generally accepted accounting principles, the audited net profits (before tax) of Taishan Gypsum for the years 2014 and 2013 were approximately RMB1,184,353.5 thousand and RMB1,140,810.1 thousand respectively; and the audited net profits (after tax) of Taishan Gypsum for the years 2014 and 2013 were approximately RMB1,047,053.4 thousand and RMB1,004,381.3 thousand respectively. The audited net assets of Taishan Gypsum as at 31 December 2014 and 31 December 2013 were RMB3,739,706.2 thousand and RMB3,202,766.5 thousand respectively.

BNBM is mainly engaged in the operation of lightweight building materials business. According to BNBM's audited accounts prepared under the PRC generally accepted accounting principles, the audited net profits (before tax) of BNBM for the years 2014 and 2013 were approximately RMB1,662,667.2 thousand and RMB1,439,849.3 thousand respectively; and the audited net profits (after tax) of BNBM for the years 2014 and 2013 were approximately RMB1,469,126.6 thousand and RMB1,258,063.6 thousand respectively. The audited net assets of BNBM as at 31 December 2014 and 31 December 2013 were RMB8,525,151.4 thousand and RMB5,431,721.8 thousand respectively.

## REASONS FOR AND BENEFITS OF THE TRANSACTION

Upon completion of this transaction, Taishan Gypsum will be 100% owned by BNBM, enabling the Group to further integrate its internal resources, allowing BNBM to improve its operating results and further consolidate the Group's market position.

The Directors (including the independent non-executive Directors) believe that the acquisition of 35% Equity Interest in Taishan Gypsum through private issuance of shares of BNBM to Taishan Gypsum Minority Shareholders pursuant to the Framework Agreement is conducted by the Group and relevant parties (including the Company's connected persons) on normal commercial terms negotiated on an arm's length basis in the ordinary course of business of the Group, which are fair and reasonable and in the interest of the Company and the shareholders as a whole.

## LISTING RULES IMPLICATIONS

As one of the applicable percentage ratios defined under Chapter 14 of the Listing Rules in respect of the Acquisition exceeds 5% but all such applicable percentage ratios are less than 25%, the Acquisition constitutes a discloseable transaction of the Company under Chapter 14 of the Listing Rules and is subject to the reporting and announcement requirements.

Pursuant to the Framework Agreement, upon completion of the transaction, the equity interest held by the Company in BNBM will reduce from approximately 45.20% to approximately 35.84%. Therefore, the transaction contemplated under the Framework Agreement constitutes a Deemed Disposal of BNBM shares by the Company with respect to Rule 14.29 of the Listing Rules. As one of the applicable percentage ratios defined under Chapter 14 of the Listing Rules in respect of the Deemed Disposal exceeds 5% but all such applicable percentage ratios are less than 25%, the Deemed Disposal constitutes a discloseable transaction of the Company under Chapter 14 of the Listing Rules, and is subject to the reporting and announcement requirements.

As Guotai Min'an Investment, one of the Taishan Gypsum Minority Shareholders, is a substantial shareholder of Taishan Gypsum holding 16% equity interest in Taishan Gypsum and Jia Tongchun, one of the Taishan Gypsum Minority Shareholders, is a substantial shareholder of Taishan Gypsum holding 11.36% equity interest in Taishan Gypsum and chairman of the board and general manager of Taishan Gypsum, Guotai Min'an Investment and Jia Tongchun are connected persons of the Company at the subsidiary level under the Listing Rules. The transaction in relation to the acquisition of the 35% Equity Interest in Taishan Gypsum through private issuance of shares of BNBM constitutes a connected transaction of the Company involving connected persons of the Company at the subsidiary level.

One of the applicable percentage ratios under Chapter 14A of the Listing Rules in respect of the Acquisition and the Deemed Disposal exceeds 5%. Since (1) Guotai Min'an Investment and Jia Tongchun are connected persons of the Company at the subsidiary level; (2) the Directors (including the independent non-executive Directors) have approved the transactions contemplated under the Framework Agreement; (3) the independent non-executive Directors have confirmed that the terms of the transactions are fair and reasonable, the transactions are on normal commercial terms and in the interests of the Company and its shareholders as a whole, pursuant to rule 14A.101 of the Listing Rules, the Acquisition and the Deemed Disposal are only subject to the reporting and announcement requirements, but exempt from the circular, independent financial advice and shareholders' approval requirements.

## PROFIT FORECAST IN COMPLIANCE WITH LISTING RULES

Since the income-based approach is adopted for carrying out the asset appraisal regarding Taishan Gypsum in the Asset Appraisal Report (《資產評估報告》), such asset appraisal constitutes a profit forecast under Rule 14.61 of the Listing Rules.

Pursuant to Article 14.62(1) of the Listing Rules, the details of the principal assumptions (including commercial assumptions) upon which the Asset Appraisal Report is based are as follows:

1. **General Assumptions**

   ① There will be no material change to the national and regional laws, regulations, systems, social, political and economic policies that are currently in force and are required to be observed by Taishan Gypsum during its operation;

Case 2:19-cv-00378-RFB-MDL Document 120-29 Filed 01/15/19 Page 11 of 35 PageID# 1094

② Taishan Gypsum is to continue as a going concern and its current operating mode will be consistently adopted;

③ The State's existing tax base and tax rate, tax preferential policy, interest rate of bank facility and other charges due to policy will not undergo material changes;

④ There will be no material adverse change caused by force majeure or unforeseeable factors.

**2. Specific Assumptions**

① The technical team and the senior management of Taishan Gypsum will remain relatively stable over the years and there will be no issue of substantial loss of core professionals;

② In respect of the main operating entities of Taishan Gypsum, the existing and future operators are and will be responsible and diligent. Moreover, the Company's management can steadily promote the Company's development and maintain a good momentum of operation;

③ The future operators of Taishan Gypsum will comply with the relevant national laws and regulations and there will be no material violation affecting the Company's development or income realization;

④ The accounting policy adopted in the historical financial information provided by Taishan Gypsum and the accounting and audit method used in carrying out the profit forecast are fundamentally consistent in all material respects;

⑤ The parent company of Taishan Gypsum and Taishan Gypsum (Hubei) Co., Ltd. (泰山石膏（湖北）有限公司), which are companies within the appraisal scope, are high and new tech enterprises as of the Reference Date. For the purposes of this appraisal, it is assumed that the aforementioned companies will be able to obtain the authentication of the high and new tech enterprises and will be entitled to enjoy relevant preferential policy;

⑥ The operating mode of the appraised entities will remain unchanged; Enterprises operating by leasing will continue to operate by leasing.

⑦ Trademark being used by the appraised entities will be renewed upon expiry; such trademark can be used continually. Proprietary technology within the appraisal scope will be timely maintained during the term of statutory protection; the related annual fee will be paid in accordance with the requirements.

Case 2:19-cv-00373-RJS-DBP Document 262-79 Filed 11/18/19 Page 12 of 95 PageID #1095

In the event that future circumstances differ from the foregoing appraisal assumptions, the appraisal conclusion will be affected. Users of the Report shall take into account the impact on the appraisal results of the appraisal assumptions when using the Report.

Baker Tilly Hong Kong Limited, acting as the reporting accountant of the Company, has reviewed the method of calculation of the discounted future cash flow for the Valuation.

The Directors confirm that the Valuation, which constitutes a profit forecast under the Listing Rules, has been made after due and careful enquiry.

A letter from the Board and a letter from Baker Tilly Hong Kong Limited are included in the appendices to this announcement for the purpose of Rule 14.60A and 14A.68(7) of the Listing Rules.

As at the date of this announcement, Baker Tilly Hong Kong Limited does not have any shareholding, directly or indirectly, in any member of the Group or any right (whether legally enforceable or not) to subscribe for or to nominate person to subscribe for securities in any member of the Group.

To the best of the Directors' knowledge, information and belief, Baker Tilly Hong Kong Limited is a third party independent of and not connected with the Group.

Baker Tilly Hong Kong Limited has given and has not withdrawn its consent to the publication of this announcement with inclusion of its report and all references to its name in the form and context in which it is included.

**INFORMATION OF THE PARTIES**

The Company is a leading building materials company in China with significant operations in the cement, lightweight building materials, glass fibre and composite material and engineering services businesses.

Guotai Min'an Investment is a limited liability company, the business scope of which is the operation of state-owned capital within the authorised scope (except matters requiring pre-approval under national laws and regulations) (matters which require approvals under the law shall be subject to approval from relevant departments before the commencement of business). In 2002, Guotai Min'an Investment acquired 16% equity interest in Taishan Gypsum at a consideration of RMB23,904 thousand.

Jia Tongchun is the chairman of the board and general manager of Taishan Gypsum. Jia Tongchun acquired 11.36% of equity interest in Taishan Gypsum in 2015 at a consideration of RMB367,999 thousand.

Taishan Gypsum Minority Shareholders include ten limited partnership enterprises such as Tai'an Heda Investment Centre (LP), which are principally engaged in proprietary investment, business consulting, enterprise management consulting, etc..

To the best of the Directors' knowledge, information and belief and having made all reasonable enquiries, save that certain Taishan Gypsum Minority Shareholders are current or former employees of Taishan Gypsum or its subsidiaries, Taishan Gypsum Minority Shareholders (other than Guotai Min'an Investment and Jia Tongchun) and their ultimate beneficial owners are independent third parties who are independent of the Company and its connected persons (as defined under the Listing Rules). As Guotai Min'an Investment is a substantial shareholder of Taishan Gypsum holding 16% equity interest in Taishan Gypsum and Jia Tongchun is a substantial shareholder of Taishan Gypsum holding 11.36% equity interest in Taishan Gypsum and chairman of the board and general manager of Taishan Gypsum, Guotai Min'an Investment and Jia Tongchun are connected persons of the Company at the subsidiary level under the Listing Rules.

None of the Directors has any material interest in the connected transaction.

## DEFINITIONS

| | |
|---|---|
| "A Shares" | domestic listed shares with a nominal value of RMB1.00 per share in the share capital of BNBM, which are listed on the Shenzhen Stock Exchange and traded in Renminbi |
| "Acquisition" | the proposed acquisition of the 35% Equity Interest in Taishan Gypsum from Taishan Gypsum Minority Shareholders by BNBM pursuant to the Framework Agreement |
| "BNBM" | 北新集團建材股份有限公司(Beijing New Building Material Public Limited Company*), a joint stock limited company incorporated under the laws of the PRC, the A shares of which are listed on Shenzhen Stock Exchange |
| "Board" | the board of directors of the Company |
| "Company" | 中國建材股份有限公司(China National Building Material Company Limited*), a joint stock limited company incorporated under the laws of the PRC, the H shares of which are listed on the Stock Exchange |
| "CSRC" | China Securities Regulatory Commission |

Case 2:09-cv-07376-MSDF-EEM Document 262-1 Filed 01/15/19 Page 14 of 85 Page ID #:1097

| | |
|---|---|
| "Deemed Disposal" | the equity interest in BNBM held by the Company will reduce from approximately 45.20% to approximately 35.84% upon completion of the Acquisition, which is therefore deemed as a disposal of approximately 9.36% equity interest in BNBM by the Company to Taishan Gypsum Minority Shareholders |
| "Director(s)" | the director(s) of the Company |
| "Donglian Investment" | 北京東聯投資有限公司(Beijing Donglian Investment Co., Ltd.*), a limited liability company incorporated under the laws of the PRC |
| "Framework Agreement" | the Framework Agreement in relation to the Acquisition of Assets through Share Issue by Beijing New Building Material Public Limited Company* dated 13 October 2015 entered into between BNBM and Taishan Gypsum Minority Shareholders |
| "Group" | the Company and its subsidiaries |
| "Guotai Min'an Investment" | 泰安市國泰民安投資集團有限公司(Tai'an Guotai Min'an Investment Group Co., Ltd.*), a limited liability company incorporated under the laws of the PRC |
| "Listing Rules" | the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited |
| "Price Determination Date" | The date on which the resolution passed at the 11th extraordinary meeting of the 5th session of the board of directors of BNBM was announced |
| "Reference Date" | 30 April 2015, the reference date for valuation for the purpose of valuation of Taishan Gypsum of the transaction |
| "RMB" or "Renminbi" | Renminbi, the lawful currency of the People's Republic of China |
| "Stock Exchange" | The Stock Exchange of Hong Kong Limited |

| "Taishan Gypsum" | 泰山石膏股份有限公司(Taishan Gypsum Company Limited*), a joint stock limited company incorporated under the laws of the PRC |

| "Taishan Gypsum Minority Shareholders" | minority shareholders holding an aggregate of 35% Equity Interest of Taishan Gypsum, including Guotai Min'an Investment (holding 16% equity interest of Taishan Gypsum) and ten limited partnership enterprises such as Tai'an Heda Investment Centre (LP)* (泰安市和達投資中心(有限合夥)) and 35 natural persons such as Jia Tongchun (賈同春) (together holding an aggregate of 19% equity interest of Taishan Gypsum) |

| "35% Equity Interest in Taishan Gypsum" | the 35% Equity Interest in Taishan Gypsum held by Taishan Gypsum Minority Shareholders which is to be acquired by BNBM under the Framework Agreement |

By order of the Board
**China National Building Material Company Limited***
**Chang Zhangli**
*Secretary of the Board*

Beijing, the PRC,
13 October 2015

*As at the date of this announcement, the board of directors of the Company comprises Mr. Song Zhiping, Mr. Cao Jianglin, Mr. Peng Shou, Mr. Cui Xingtai and Mr. Chang Zhangli as executive directors, Mr. Guo Chaomin, Mr. Huang Anzhong and Mr. Tao Zheng as non-executive directors, and Mr. Shin Fang, Mr. Tang Yunwei, Mr. Zhao Lihua, Mr. Wu Liansheng and Mr. Sun Yanjun as independent non-executive directors.*

\* *For identification only*

In compliance with Rule 14.60A and 14A.68(7) of the Listing Rules, the letter from Baker Tilly Hong Kong Limited to the Directors confirming it has reviewed the calculations of the discounted future cash flow and the letter from the Board confirming the Valuation has been made after due and careful enquiry by the Directors both dated 13 October, 2015, for the purpose of, among other things, inclusion in this announcement are reproduced below:

## APPENDIX I – LETTER FROM THE BOARD

Listing Division
The Stock Exchange of Hong Kong Limited
11/F, One International Finance Centre,
1 Harbour View Street, Central
Hong Kong

13 October, 2015

Dear Sirs,

Re: Discloseable Transaction/Connected Transaction – Acquisition of 35% Equity Interest In Taishan Gypsum Through Shares Issuance of BNBM

We refer to the valuation report dated 25 September 2015 (the "Assets Appraisal Report") prepared by ZhongHe Appraisal Co., Ltd (the "Valuer") in relation to the valuation of Taishan Gypsum Company Limited (the "Taishan Gypsum"), which constitutes a profit forecast under Rule 14.61 of the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited.

We have discussed with the Valuer about the valuation of Taishan Gypsum, including the bases and assumptions upon which such valuation has been prepared, and reviewed the valuation for which the Valuer is responsible. We have also considered the letter from Baker Tilly Hong Kong Limited dated 13 October, 2015 regarding whether the discounted future cash flow of Taishan Gypsum, so far as the arithmetical calculations are concerned, have been properly compiled in all material respects in accordance with the bases and assumptions set out in the Appraisal Report. We note that the calculations of the discounted future cash flow do not involve the adoption of any accounting policies.

On the basis of the foregoing, we confirm that the above valuation has been made after our due and careful enquiry.

Yours faithfully,
For and on behalf of
**China National Building Material Company Limited**
**Chang Zhangli**
*Executive Director*

## APPENDIX II – LETTER FROM BAKER TILLY HONG KONG LIMITED

The following is the text of a letter from the Company's auditor Baker Tilly Hong Kong Limited for inclusion in this announcement.



13 October, 2015

21st Floor
Tower 2, Guohai Plaza
No. 17 Fuxing Road
Haidian District, Beijing
The PRC

**Report on the discounted future cash flows in connection with the assets valuation of Taishan Gypsum Company Limited**

**To The Board of Directors of China National Building Material Company Limited (the "Company")**

We have been engaged to report on the calculations of the discounted future cash flows on which the assets valuation (the "Valuation") date 25 September 2015 prepared by ZhongHe Appraisal Co., Ltd. (中和資產評估有限公司) in respect of the appraisal of the fair value of Taishan Gypsum Company Limited ("Taishan Gypsum") as at 30 April 2015 is based. The Valuation which is prepared based on the discounted future cash flows is regarded as a profit forecast under Rule 14.61 of the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited (the "Listing Rules").

**Directors' Responsibility for the Discounted Future Estimated Cash Flows**

The directors of the Company (the "Directors") are responsible for the preparation of the discounted future cash flows in accordance with the bases and assumptions determined by the directors and as set out in the Valuation (the "Bases and Assumptions"). This responsibility includes carrying out appropriate procedures relevant to the preparation of the discounted future cash flows for the Valuation and applying an appropriate basis of preparation; and making estimates that are reasonable in the circumstances.

– 16 –

Case 2:09-md-02047-EEF-MBN Document 23624-2 Filed 11/12/21 Page 18 of 35 PageID #:101

**Auditor's Responsibility**

It is our responsibility to report, as required by Rule 14.62(2) of the Listing Rules, on the calculations of the discounted future cash flows used in the Valuation. We are not reporting on the appropriateness and validity of the Bases and Assumptions on which the discounted future cash flows are based and our work does not constitute any valuation of Taishan Gypsum.

We conducted our work in accordance with the Hong Kong Standard on Assurance Engagements 3000 "Assurance Engagements Other Than Audits or Reviews of Historical Financial Information" issued by the Hong Kong Institute of Certified Public Accountants ("HKICPA"). This standard requires that we plan and perform our work to obtain reasonable assurance as to whether, so far as the calculations are concerned, the Directors have properly compiled the discounted future cash flows in accordance with the Bases and Assumptions as set out in the Valuation. We performed procedures on the arithmetical calculations and the compilations of the discounted future cash flows in accordance with the Bases and Assumptions. Our work is substantially less in scope than an audit conducted in accordance with Hong Kong Standards on Auditing issued by the HKICPA. Accordingly, we do not express an audit opinion.

The discounted future cash flows do not involve the adoption of accounting policies. The discounted future cash flows depend on future events and on a number of assumptions which cannot be confirmed and verified in the same way as past results and not all of which may remain valid throughout the period. Our work has been undertaken for the purpose of reporting solely to you under paragraph 14.62(2) of the Listing Rules and for no other purpose. We accept no responsibility to any other person in respect of our work, or arising out of or in connection with our work.

**Opinion**

Based on the foregoing, in our opinion, the discounted future estimated cash flows, so far as the arithmetical calculations are concerned, have been properly compiled in all material respects in accordance with the Bases and Assumptions.

Yours sincerely,

**Baker Tilly Hong Kong Limited**
Certified Public Accountants
Hong Kong,
Andrew David Ross
Practising Certificate Number P01183

*香港交易及結算所有限公司及香港聯合交易所有限公司對本公告的內容概不負責,對其準確性或完整性亦不發表任何聲明,並明確表示,概不對因本公告全部或任何部分內容而產生或因倚賴該等內容而引致的任何損失承擔任何責任。*



# CNBM

# China National Building Material Company Limited[*]
# 中 國 建 材 股 份 有 限 公 司
*(在中華人民共和國註冊成立的股份有限公司)*

(股份代碼:3323)

## 須 予 披 露 交 易
## 關 連 交 易
## 北 新 建 材 發 股 購 買 泰 山 石 膏 股 份

本公司欣然公佈,於二零一五年十月十三日,北新建材(本公司持有約45.20%股份的附屬公司)與泰山石膏(北新建材直接及間接持有65%股份的附屬公司)少數股東簽署框架協議,旨在北新建材通過向泰山石膏少數股東非公開發行股份的形式購買其合共持有的泰山石膏35%股份。根據框架協議,交易完成後北新建材將直接及間接持有泰山石膏100%股份,泰山石膏少數股東將成為北新建材股東,本公司持有北新建材股份由約45.20%降至約35.84%,北新建材及泰山石膏仍為本公司附屬公司。

**上 市 規 則 涵 義**

由於按照上市規則第14章項下就收購事項的適用百分比有某項超逾5%但所有適用百分比均低於25%,根據上市規則第14章,收購事項構成本公司的一項須予披露交易,須遵守申報及公告規定。

– 1 –

根據框架協議，交易完成後本公司持有北新建材股份由約45.20%降至約35.84%，因此，根據上市規則第14.29條，框架協議項下擬進行之交易構成本公司對北新建材股份之視作出售事項。由於按照上市規則第14章項下有關視作出售事項之適用百分比有某項超逾5%但所有適用百分比均低於25%，根據上市規則第14章，視作出售事項構成本公司的一項須予披露交易，須遵守申報及公告規定。

由於泰山石膏少數股東之國泰民安投資持有泰山石膏16%股份，買同春持有泰山石膏11.36%股份，均為泰山石膏的主要股東，且買同春為泰山石膏董事長及總經理，根據上市規則，國泰民安投資及買同春是本公司附屬公司層面的關連人士，故北新建材非公開發行股份以購買泰山石膏35%股份之交易構成涉及本公司附屬公司層面的關連人士的關連交易。

按照上市規則第14A章項下就收購事項及視作出售事項的適用百分比有某項超逾5%。由於(1)國泰民安投資及買同春為本公司附屬公司層面之關連人士；(2)董事(包括獨立非執行董事)已批准框架協議項下擬進行之交易；(3)獨立非執行董事已確認有關交易之條款誠屬公平合理，有關交易乃按一般商業條款訂立，符合本公司及其股東之整體利益，因此，根據上市規則第14A.101條，收購事項及視作出售事項只須遵守申報及公告規定，但獲豁免刊發通函、獨立財務意見及股東批准規定。

## 緒 言

本公司欣然公佈，於二零一五年十月十三日，北新建材(本公司持有約45.20%股份的附屬公司)與泰山石膏(北新建材直接及間接持有65%股份的附屬公司)少數股東簽署框架協議，旨在北新建材通過向泰山石膏少數股東非公開發行36,899.74萬股股份的形式購買其合共持有的泰山石膏35%股份。

根據框架協議，交易完成後北新建材將直接及間接持有泰山石膏100%股份，泰山石膏少數股東將成為北新建材股東，本公司持有北新建材股份由約45.20%降為約35.84%，北新建材及泰山石膏仍為本公司附屬公司。本集團不預期就視作出售事項錄得任何盈虧。

## 框架協議的主要條款

### 日期

二零一五年十月十三日

### 訂約方

(1) 北新建材；及

(2) 泰山石膏少數股東；

### 購買泰山石膏股份

北新建材向泰山石膏少數股東購買其合計持有泰山石膏35%股份。

股份轉讓前泰山石膏的股本結構：

| 股東名稱 | 股份數量 (萬股) | 佔股本比例 (%) |
|---|---|---|
| 北新建材 | 6,536.25 | 42% |
| 東聯投資 | 3,579.38 | 23% |
| 泰山石膏少數股東 | 5,446.87 | 35% |
| **合計** | **15,562.50** | **100%** |

東聯投資為北新建材持股100%的全資子公司，北新建材自身及通過東聯投資持有泰山石膏65%股份。

股份轉讓後泰山石膏的股本結構：

| 股東名稱 | 股份數量 | 佔股本比例 |
|---|---|---|
| | *(萬股)* | *(%)* |
| 北新建材 | 11,983.12 | 77% |
| 東聯投資 | 3,579.38 | 23% |
| **合計** | **15,562.50** | **100%** |

北新建材自身及通過東聯投資持有泰山石膏100%股份。

## 北新建材股份發行

作為獲得泰山石膏35%股份之對價，北新建材向泰山石膏少數股東非公開發行共36,899.74萬股A股股份，相當於北新建材截至發出本公告日的現有已發行股本約26.10%，及北新建材經非公開發行股份後擴大的已發行股本約20.70%。

股份發行前北新建材的股本結構：

| 股東名稱 | 股份數量 | 佔股本比例 |
|---|---|---|
| | *(萬股)* | *(%)* |
| 中國建材 | 63,906.59 | 45.20% |
| 公眾投資者 | 77,491.57 | 54.80% |
| **合計** | **141,398.16** | **100.00%** |

股份發行後北新建材的股本結構：

| 股東名稱 | 股份數量 | 佔股本比例 |
|---|---|---|
| | *(萬股)* | *(%)* |
| 中國建材 | 63,906.59 | 35.84% |
| 泰山石膏少數股東 | 36,899.74 | 20.70% |
| 公眾投資者 | 77,491.57 | 43.46% |
| **合計** | **178,297.90** | **100%** |

## 代價及支付條款

北新建材以發行共36,899.74萬股每股發行價人民幣11.37元的A股股份方式向泰山石膏少數股東支付購買泰山石膏35%股份價款合計人民幣約419,550.00萬元。

## 代價基準

為本次交易之目的，中和資產評估有限公司出具了以二零一五年四月三十日為基準日的按收益法釐定的日期為二零一五年九月二十五日的《資產評估報告書》（「《資產評估報告》」），框架協議各方對《資產評估報告》及評估結果均予以認可。二零一五年四月三十日泰山石膏35%股份對應未經審計歸母淨資產賬面值約為人民幣113,368.17萬元。根據《資產評估報告》，二零一五年四月三十日泰山石膏35%股份評估值約為人民幣419,550.00萬元。經各方協商一致同意，本次收購泰山石膏35%股份的代價約為人民幣419,550.00萬元。

本次北新建材發行股份的價格為其定價基準日前120個交易日股票交易均價的90%，並經北新建材2014年度利潤分配實施後相應調整，本次北新建材發行股份的價格調整為人民幣11.37元／股。

在本次發行的定價基準日至發行日期間，北新建材如有派息、送股、資本公積金轉增股本等除權、除息事項，則對本次發行價格根據中國證監會及深圳證券交易所的相關規定相應除權除息處理，本次發行數量也將根據發行價格的情況進行相應調整，具體調整方式以北新建材股東大會決議內容為準。

按照泰山石膏35%股份的評估值及北新建材股份發行價格計算，北新建材須向泰山石膏少數股東發行的股份數量共為36,899.74萬股。該等資產評估項目尚須經有權單位核准／備案，並以核准／備案的評估結果為準。北新建材最終向泰山石膏少數股東發行的股份數量，由北新建材董事會提請股東大會授權其董事會根據有權單位核准／備案的評估結果相應調整，以經中國證監會核准的發行數量為準。

## 發行股份的限售期

泰山石膏少數股東承諾其因本次交易所獲得的北新建材股份自發行完成之日起36個月內不得轉讓。本限售期內，泰山石膏少數股東如因北新建材實施送紅股、資本公積金轉增股本事項而增持的北新建材股份，亦應遵守上述限售期限的約定。

## 交割

泰山石膏35%股份應在本次交易生效之日起1個月內完成交割。自交割日起，其一切權利義務均由北新建材享有和承擔。

## 損益安排

本次交易完成前的北新建材滾存未分配利潤由本次交易完成後北新建材的新老股東按照其持有的股份比例共享。

泰山石膏自基準日至交割之日期間所產生的盈利由北新建材享有，所產生的虧損由泰山石膏少數股東按照其在泰山石膏持股比例承擔。

泰山石膏35%股份交割後，由北新建材年報審計機構對泰山石膏進行專項審計，確定基準日至交割日期間泰山石膏35%股份產生的損益。若交割日為當月15日(含15日)之前，則期間損益審計基準日為上月月末；若交割日為當月15日之後，則期間損益審計基準日為當月月末。如存在虧損，則泰山石膏少數股東應當於前述專項審計報告出具之日起五個工作日內將其應當承擔的虧損金額部分以現金方式支付給北新建材。

## 框架協議的生效

框架協議自各方有權代表簽字並加蓋公章之日起成立，自以下條件全部成就且其中最晚成就之日起生效：

1.　泰山石膏股東大會批准本次交易；

2.　北新建材董事會、股東大會分別批准本次交易；

3.　本次交易獲有權單位批准；及

4.　本次交易獲中國證監會具文核准。

## 有關標的公司資料

泰山石膏主要經營紙面石膏板、石膏製品及輕鋼龍骨等相關產品的生產和銷售。根據泰山石膏按照中國公認會計準則編製的中國經審計賬目,2014年及2013年泰山石膏經審計淨利潤(扣除稅項前)分別約為人民幣118,435.35萬元及人民幣114,081.01萬元,2014年及2013年泰山石膏經審計淨利潤(扣除稅項後)分別約為人民幣104,705.34萬元及人民幣100,438.13萬元。泰山石膏截至2014年12月31日止及2013年12月31日止經審計淨資產分別為人民幣373,970.62萬元及人民幣320,276.65萬元。

北新建材主要經營輕質建材業務。根據北新建材按照中國公認會計準則編製的中國經審計賬目,2014年及2013年北新建材經審計淨利潤(扣除稅項前)分別約為人民幣166,266.72萬元及人民幣143,984.93萬元,2014年及2013年北新建材經審計淨利潤(扣除稅項後)分別約為人民幣146,912.66萬元及人民幣125,806.36萬元。北新建材截至2014年12月31日止及2013年12月31日止經審計淨資產分別為人民幣852,515.14萬元及人民幣543,172.18萬元。

## 進行交易之理由及裨益

本次交易完成後,北新建材對泰山石膏將實現100%控股,有利於本集團進一步整合內部資源,提升北新建材經營業績,進一步鞏固本集團的市場地位。

董事會(包括獨立非執行董事)認為,框架協議項下北新建材通過向泰山石膏少數股東非公開發行股份以收購泰山石膏35%股份乃本集團及有關方(包括本公司之關連人士)在本集團日常業務中經公平磋商後按一般商業條款進行,條款屬公平合理且符合本公司及其股東的整體利益。

## 上市規則涵義

由於按照上市規則第14章項下就收購事項的適用百分比有某項超逾5%但所有適用百分比均低於25%,根據上市規則第14章,收購事項構成本公司的一項須予披露交易,須遵守申報及公告規定。

根據框架協議，交易完成後本公司持有北新建材股份由約45.20%降至約35.84%，因此，根據上市規則第14.29條，框架協議項下擬進行之交易構成本公司對北新建材股份之視作出售事項。由於按照上市規則第14章項下有關視作出售事項之適用百分比有某項超逾5%但所有適用百分比均低於25%，根據上市規則第14章，視作出售事項構成本公司的一項須予披露交易，須遵守申報及公告規定。

由於泰山石膏少數股東之國泰民安投資持有泰山石膏16%股份，買同春持有泰山石膏11.36%股份，均為泰山石膏的主要股東，且買同春為泰山石膏董事長及總經理，根據上市規則，國泰民安投資及買同春是本公司附屬公司層面的關連人士，故北新建材非公開發行股份以購買泰山石膏35%股份之交易構成涉及本公司附屬公司層面的關連人士的關連交易。

按照上市規則第14A章項下就收購事項及視作出售事項的適用百分比有某項超逾5%。由於(1)國泰民安投資及買同春為本公司附屬公司層面之關連人士；(2)董事(包括獨立非執行董事)已批准框架協議項下擬進行之交易；(3)獨立非執行董事已確認有關交易之條款誠屬公平合理，有關交易乃按一般商業條款訂立，符合本公司及其股東之整體利益，因此，根據上市規則第14A.101條，收購事項及視作出售事項只須遵守申報及公告規定，但獲豁免刊發通函、獨立財務意見及股東批准規定。

## 溢利預測上市規則合規

鑒於《資產評估報告》採用收益法對泰山石膏進行估值，根據上市規則第14.61條，估值構成溢利預測。

根據上市規則第14.62(1)條，作出《資產評估報告》的主要假設(包括商業假設)的詳情載列如下：

1. **一般性假設**

   ① 泰山石膏在經營中所需遵循的國家和地方的現行法律、法規、制度及社會政治和經濟政策與現時無重大變化；

② 泰山石膏將保持持續經營，並在經營方式上與現時保持一致；

③ 國家現行的稅賦基準及稅率，稅收優惠政策、銀行信貸利率以及其他政策性收費等不發生重大變化；

④ 無其他人力不可抗拒及不可預見因素造成的重大不利影響。

**2. 針對性假設**

① 泰山石膏各年間的技術隊伍及其高級管理人員保持相對穩定，不會發生重大的核心專業人員流失問題；

② 泰山石膏各經營主體現有和未來經營者是負責盡職的，且公司管理層能穩步推進公司的發展計劃，保持良好的經營態勢；

③ 泰山石膏未來經營者遵守國家相關法律和法規，不會出現影響公司發展和收益實現的重大違規事項；

④ 泰山石膏提供的歷史財務資料所採用的會計政策和進行收益預測時所採用的會計政策與會計核算方法在重要方面基本一致；

⑤ 評估範圍內的泰山石膏母公司及泰山石膏(湖北)有限公司評估基準日屬高新技術企業，本次評估假定上述兩家企業到期能夠獲得高新技術企業認證並享受有關優惠政策；

⑥ 假定被評估單位經營方式保持不變，以租賃方式經營企業仍採用租賃方式經營。

⑦ 假定被評估單位使用的商標到期能夠續展，能夠永續使用；假定評估範圍內的專利技術在法定保護期內企業能夠及時維護，按要求交納年費。

若將來實際情況與上述評估假設產生差異時，將對評估結論產生影響，報告使用者應在使用本報告時充分考慮評估假設對本評估結論的影響。

天職香港會計師事務所有限公司作為本公司的申報會計師，已審閱估值的未來現金流量折現的計算方法。

董事確認，估值構成上市規則項下溢利預測，乃經慎重查詢後作出。

董事會函件及天職香港會計師事務所有限公司函件已載列於本公告的附件內，以遵守上市規則第14.60A條及14A.68(7)條。

於本公告日期，天職香港會計師事務所有限公司概無直接或間接持有本集團任何成員公司的任何股權或有任何權利(不論在法律上可強制執行與否)，可認購或提名他人認購本集團任何成員公司持有證券。

就董事所深知、全悉及確信，天職香港會計師事務所有限公司為一獨立第三方及與本集團概無關連。

天職香港會計師事務所有限公司已發出，且未撤回以現時的形式及涵義於本公告中刊載其函件和所有意見的同意書。

**訂約方相關資料**

本公司乃中國建築材料行業之領軍企業，主營水泥、輕質建材、玻璃纖維及複合材料以及工程服務業務。

國泰民安投資是一間有限責任公司，經營範圍為授權範圍內的國有資本運營(國家法律法規規定需前置審批項目除外)(依法須經批准的項目，經相關部門批准後方可開展經營活動)。於2002年，國泰民安投資取得泰山石膏16%的股份，該等股份價款為人民幣2,390.4萬元。

賈同春為泰山石膏董事長及總經理。賈同春於2015年以人民幣36,799.9萬元的代價取得泰山石膏11.36%的股權。

泰山石膏少數股東當中包括泰安市和達投資中心(有限合夥)在內等10個有限合夥企業，主營以自有資金投資、商務諮詢、企業管理諮詢等業務。

經作出一切合理查詢後，據董事所深知、所悉及所信，除部分泰山石膏少數股東是泰山石膏或其附屬公司的當前或之前的員工，各泰山石膏少數股東(國泰民安投資及買同春除外)及其最終實益擁有人為獨立第三方，獨立於本公司及其關連人士(定義見上市規則)。由於國泰民安投資持有泰山石膏16%股份，買同春持有泰山石膏11.36%股份，為泰山石膏的主要股東，且買同春為泰山石膏董事長及總經理，根據上市規則，國泰民安投資及買同春是本公司附屬公司層面的關連人士。

本公司董事會無任何董事於關連交易中佔有重大利益。

## 釋義

| 「A股」 | 指 | 北新建材股本中每股面值人民幣1.00元的境內上市股票，於深圳證券交易所上市並以人民幣買賣 |
|---|---|---|
| 「收購事項」 | 指 | 北新建材根據框架協議向泰山石膏少數股東建議購買泰山石膏35%股份 |
| 「北新建材」 | 指 | 北新集團建材股份有限公司，一家根據中國法律註冊成立的股份有限公司，其A股於深圳證券交易所上市 |
| 「董事會」 | 指 | 本公司董事會 |
| 「本公司」 | 指 | 中國建材股份有限公司，一家根據中國法律註冊成立的股份有限公司，其H股於聯交所上市 |
| 「中國證監會」 | 指 | 中國證券監督管理委員會 |

| | | |
|---|---|---|
| 「視作出售事項」 | 指 | 由於收購事項完成後本公司持有北新建材股份將由約45.20%降至約35.84%，因此而視作出售北新建材之約9.36%股份予泰山石膏少數股東 |
| 「董事」 | 指 | 本公司董事 |
| 「東聯投資」 | 指 | 北京東聯投資有限公司，一家根據中國法律註冊成立的有限責任公司 |
| 「框架協議」 | 指 | 北新建材與泰山石膏少數股東訂立的日期為二零一五年十月十三日的《北新集團建材股份有限公司關於發行股份購買資產的框架協議》 |
| 「本集團」 | 指 | 本公司及其附屬公司 |
| 「國泰民安投資」 | 指 | 泰安市國泰民安投資集團有限公司，一家根據中國法律註冊成立的有限責任公司 |
| 「上市規則」 | 指 | 香港聯合交易所有限公司證券上市規則 |
| 「定價基準日」 | 指 | 北新建材第五屆董事會第十一次臨時會議決議公告日 |
| 「基準日」 | 指 | 為本次交易之目的，對泰山石膏進行評估的評估基準日，具體為二零一五年四月三十日 |
| 「人民幣」 | 指 | 人民幣，中華人民共和國法定貨幣 |
| 「聯交所」 | 指 | 香港聯合交易所有限公司 |

| 「泰山石膏」 | 指 | 泰山石膏股份有限公司，一家根據中國法律註冊成立的股份有限公司 |
| --- | --- | --- |
| 「泰山石膏少數股東」 | 指 | 合共持有泰山石膏35%股份的少數股東，包括持有泰山石膏16%股份的國泰民安投資，合計持有泰山石膏19%股份的泰安市和達投資中心(有限合夥)等10個有限合夥企業及賈同春等35名自然人 |
| 「泰山石膏35%股份」 | 指 | 框架協議項下北新建材擬收購的由泰山石膏少數股東持有的泰山石膏35%股份 |

承董事會命

**中國建材股份有限公司**

**常張利**

*董事會秘書*

中國•北京

二零一五年十月十三日

*於本公告日期，本公司之董事會成員包括執行董事宋志平先生、曹江林先生、彭壽先生、崔星太先生及常張利先生，非執行董事郭朝民先生、黃安中先生及陶錚先生，及獨立非執行董事方勳先生、湯雲為先生、趙立華先生、吳聯生先生及孫燕軍先生。*

\*　僅供識別

– 14 –

Case 1:09-cv-02672-LEH-RM Document 126-3 Filed 01/15/19 Page 33 of 56 PageID# 1116

遵照上市規則第14.60A及第14A.68(7)條，天職香港會計師事務所有限公司向董事發出的函件已確認其已審閱該估值的未來現金流量折現的計算方法，而董事會函件已確認該估值乃經董事審慎周詳查詢後作出。旨在(其中包括)載入本公告之日期為二零一五年十月十三日的函件的全文現轉載如下：

## 附錄一－董事會函件

**敬啟者：**

有關：須予披露交易／關連交易－北新建材發股購買泰山石膏35%股份

吾等謹此提述，中和資產評估有限公司(「估值師」)就泰山石膏股份有限公司(「泰山石膏」)的估值，編製日期為二零一五年九月二十五日的《資產評估報告書》(「《資產評估報告》」)，該估值構成香港聯合交易所有限公司證券上市規則第14.61條項下的溢利預測。

吾等已與估值師討論有關泰山石膏的估值，包括編製該等估值的基準及假設，並已審閱估值師負責出具的估值。吾等亦已考慮天職香港會計師事務所有限公司日期為二零一五年十月十三日的函件，內容有關泰山石膏的未來現金流量折現，就算術計算方法而言，是否已根據《評估報告》所載的基準及假設的各重大方面而妥為編製。吾等知悉該未來現金流量折現計算不涉及任何會計政策之採用。

根據上述基準，吾等確認上述估值乃經吾等審慎周詳查詢後作出。

此致

香港
中環
港景街1號
國際金融中心一期11樓
香港聯合交易所有限公司
上市科　台照

謹代表
**中國建材股份有限公司**
*執行董事*
**常張利**
謹啟

二零一五年十月十三日

– 15 –

附錄二－天職香港會計師事務所有限公司函件

下文為本公司核數師天職香港會計師事務所有限公司發出之函件全文，以供載入本公告。



二零一五年十月十三日

中國
北京市海澱區復興路17號
國海廣場2號樓21層

**有關泰山石膏股份有限公司資產估值之未來現金流量折現報告**

**致中國建材股份有限公司(「貴公司」)董事會**

吾等已獲委聘基於中和資產評估有限公司於二零一五年九月二十五日編製有關泰山石膏股份有限公司(「泰山石膏」)於二零一五年四月三十日的公平值估值的資產評估(「評估」)之未來現金流量折現之計算方式作出報告。此項評估乃基於未來估計現金流量折現所編製，故根據香港聯合交易所有限公司證券上市規則(「上市規則」)第14.61條，屬溢利預測。

**董事就未來估計現金流量折現承擔的責任**

貴公司董事(「董事」)須負責按照董事釐定並載於評估的基準及假設(「基準及假設」)編製未來估計現金流量折現。此項責任包括開展與就評估而編製未來現金流量折現有關的程序及應用適當編製基礎，並按情況作出合理估計。

Case 2:09-cv-03857-EEF-MBN Document 262-79 Filed 01/15/19 Page 35 of 35 PageID #:1118

**核 數 師 的 責 任**

吾 等 的 責 任 是 根 據 上 市 規 則 第14.62(2)條 就 評 估 所 使 用 的 未 來 現 金 流 量 折 現 計 算 作 出 報 告。吾 等 並 非 對 未 來 現 金 流 量 折 現 所 依 據 之 基 準 及 假 設 之 合 理 性 與 有 效 性 作 出 報 告,且 吾 等 的 工 作 並 不 構 成 泰 山 石 膏 之 任 何 估 值。

吾 等 已 遵 守 香 港 會 計 師 公 會(「香 港 會 計 師 公 會」)頒 佈 之 香 港 鑒 證 業 務 準 則 第3000號－「歷 史 財 務 信 息 審 核 或 審 閱 以 外 的 鑒 證 業 務」執 行 委 聘 工 作。 該 準 則 要 求 吾 等 應 計 劃 和 執 行 工 作,以 使 吾 等 合 理 確 定(就 計 算 而 言)董 事 是 否 根 據 評 估 所 載 基 礎 及 假 設 妥 善 編 製 未 來 現 金 流 量 折 現。吾 等 已 根 據 上 述 基 礎 及 假 設 對 未 來 現 金 流 量 折 現 之 算 術 計 算 及 編 製 執 行 鑒 證 程 序。吾 等 之 工 作 範 圍 明 顯 少 於 按 香 港 會 計 師 公 會 頒 佈 之 香 港 審 計 準 則 進 行 的 審 計。因 此,吾 等 不 發 表 任 何 審 計 意 見。

該 未 來 現 金 流 量 折 現 並 無 涉 及 應 用 會 計 政 策。未 來 現 金 流 量 折 現 取 決 於 未 來 事 件 及 多 項 無 法 按 過 往 業 績 予 以 釐 定 及 核 證 的 假 設,且 並 非 全 部 假 設 於 整 個 期 間 內 一 直 有 效。吾 等 的 工 作 旨 在 根 據 上 市 規 則 第14.62(2)條 僅 向 閣 下 作 出 報 告,而 不 作 其 他 用 途。吾 等 不 會 向 任 何 其 他 人 士 承 擔 委 聘 工 作 所 涉 及、產 生 或 相 關 之 任 何 責 任。

**意 見**

基 於 前 述 事 項,吾 等 認 為 就 算 術 計 算 而 言,未 來 現 金 流 量 折 現 在 各 重 大 方 面 均 已 按 照 上 述 基 準 及 假 設 妥 為 編 製。

此 致

**天 職 香 港 會 計 師 事 務 所 有 限 公 司**

執 業 會 計 師

香 港

Andrew David Ross

執 業 證 書 編 號P01183

謹 啟

– 17 –

# JOINT APPENDIX TAB # 30

# Taishan Gypsum Board Sales to United States

| TOTALS (Invoices & Manufacturer Profile Form (MPF))[1] | | | | |
|---|---|---|---|---|
| STATE IMPACTED | SHEETS OF DRYWALL | SQUARE FEET OF DRYWALL | VALUE ON INVOICE OR MPF | NOTES |
| USA Deliveries from MPF (State Unknown)[2] | 1,184,710 | 56,866,080[3] | 39,818,191 Chinese Yuan, totaled from MPFs | $6,317,038.85 USD as of April 26, 2012, based on exchange rate of 1 USD to 6.3033 Yuan[4] |
| California | 2,640 | 126,720 | $10,032.00 USD | |
| Florida | 195,820 | 9,399,360 | $772,863.40 USD | |
| Louisiana | 45,756 | 2,196,288 | $195,915.29 USD | |
| New York | 146,244 | 7,019,712 | $413,191.64 USD | |
| North Carolina | 96,120 | 4,613,760 | $388,324.80 USD | |
| Virginia | 153,912 | 7,387,776 | $564,549.22 USD | |
| US TOTALS | 1,825,202 | 87,609,696 | $8,661,915.20 USD[5] | |

[1] The amounts and values presented in this exhibit are derived from TG and TTPs' Manufacturer Profile Forms, invoices and depositions as noted.
[2] TTP has listed numerous transactions in its MPF without a known importer. In other words, TTP knows the drywall was shipped to the United States, but purports not to know where in the United States the drywall was shipped to. TG/TTP's position is incredible and shows a lack of candor. For example, the PSC has learned through the testimony of Mr. John Gunn that the TG drywall that Guardian Building Products bought from TG/TTP through Taian Taigao Trading Corp., Ltd. was delivered to Tampa, Florida and Wilmington, North Carolina. *See* Dep. of J. Gunn dated 7/22/11, at 79:7-79:25; Exhs. 151-152 Invoices. Nonetheless, TTP's Manufacturer Profile Form states that the importer was "unknown." TG/TTP used Taian Taigao as an "exporter" for the transaction, yet fully controlled the Guardian transaction, even stepping in to settle the matter with Guardian when Taian Taigao was supposedly the "exporter." *Id.* Accordingly, the PSC subtracted the Taian Taigao Trading Corp. entries from the "State Unknown" category above, and based on invoices produced from Guardian, added the Florida and North Carolina drywall shipments to those respective state totals above.
[3] Square Feet of Drywall is calculated by determining the number of square feet in a 4' x 12' piece of drywall as 48 square feet. Forty–eight square feet per sheet of drywall multiplied by 1,184,710 sheets equals 56,866,020 total square feet of drywall.
[4] http://themoneyconverter.com/usd/cny.aspx
[5] This total was reached by adding the $6,317,038.35 in drywall sales from the MPF where the exact U.S. location was unknown, converted from Chinese currency, to the state-by-state totals in CA, FL, LA, NY and NC that totaled $2,209,683.68. Thus, the $6,317,038.35 + $2,209,683.68= $8,526,722.68.

HERMAN AFFIDAVIT
EXHIBIT
1

# Taishan Gypsum Board Sales to United States

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **GYPSUM BOARD – CALIFORNIA** | | | | | | | | |
| | **Exporter** | **Importer** | **Invoice State** | **Port State** | **Product** | **Contract Amount** | **Number of Sheets of Gypsum** | **Date** | **Bates Number** |
| 1. | Taian Taishan Plasterboard Co., Ltd. | Stone Pride International Corp. | CA | CA | Gypsum Board | $10,032.00 | 2,640 | 12/2/2006 | TG0001658 **MPF #227** |
| | | | | | | **$10,032.00** | **2,640** | | |

# Taishan Gypsum Board Sales to United States

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **GYPSUM BOARD – FLORIDA** | | | | | | | | |
| | Exporter | Importer | Invoice State | Port State | Product | Contract Amount | Number of Sheets of Gypsum | Date | Bates Number |
| 1. | Taian Taishan Plasterboard Co., Ltd. | Wood Nation, Inc. | FL | FL | Gypsum Board | $55,440.00 | 13,200 | 8/2/2006 | TG0001545 **MPF #177** |
| 2. | Taian Taishan Plasterboard Co., Ltd. | Wood Nation, Inc. | FL | FL | Gypsum Board | $55,440.00 | 13,200 | 8/8/2006 | **MPF #183** |
| 3. | Taian Taishan Plasterboard Co., Ltd. | Oriental Trading Company | FL | FL | Gypsum Board | $77,385.00 | 20,100 | 12/30/06 | TG0000619 **(No MPF Entry)** |
| 4. | Taian Taishan Plasterboard Co., Ltd. | B America | FL | FL | Gypsum Board | $5,656.20 | 660 | 4/30/2007 | TG0001662 **MPF# 235** |
| 5. | Taian Taishan Plasterboard Co., Ltd. | Oriental Trading Company | FL | FL | Gypsum Board | $12,740.00 | 4,900 | 5/28/2007 | TG0001663 **MPF# 236** |
| 6. | Taian Taishan Plasterboard Co., Ltd. | Oriental Trading Company | FL | FL | Gypsum Board | $7,738.00 | 2,000 | 4/30/2007 | **MPF# 234 (No Invoice)** |
| 7. | Taian Taishan Plasterboard Co., Ltd. | Oriental Trading Company | FL | FL | Gypsum Board | $15,288.00 | 5,880 | 5/28/2007 | TG0001664 **MPF# 237** |
| 8. | Taian Taishan Plasterboard Co., Ltd. | Oriental Trading Company | FL | FL | Gypsum Board | $5,096.00 | 1,960 | 5/28/2007 | TG0001665 **MPF# 238** |
| 9. | Taian Taishan Plasterboard Co., Ltd. | Oriental Trading Company | FL | FL | Gypsum Board | $12,740.00[6] | 2,940 | 6/12/2007 | TG0001667 **MPF# 240** |
| 10. | Taian Taishan Plasterboard Co., Ltd. | Oriental Trading Company | FL | FL | Gypsum Board | $18,056.50 | 4,690 | 6/22/2007 | TG0021590 **(No MPF Entry)** |

---

[6] This invoice confirms the number of sheets detailed in the MPF, but indicates a different value.  The invoice states $7,644.00.

## Taishan Gypsum Board Sales to United States

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 11. | Taian Taishan Plasterboard Co., Ltd. | Oriental Trading Company | FL | FL | Gypsum Board | $7,738.50 | 2,010 | 6/26/2007 | TG0001668 **MPF# 241** |
| 12. | Taian Taishan Plasterboard Co., Ltd. | Oriental Trading Company | FL | FL | Gypsum Board | $25,795.00 | 6,700 | 7/3/2007 | **MPF# 242** TG0001669 |
| 13. | Taian Taishan Plasterboard Co., Ltd. | Oriental Trading Company | FL | FL | Gypsum Board | $25,795.00 | 6,700 | 7/3/2007 | **MPF# 243** TG0001670 |
| 14. | Taian Taishan Plasterboard Co., Ltd. | Guardian Building Supply | FL | FL | Gypsum Board[7] | $447,955.20 | 110,880 | 5/25/2006 | GBP000873 |
| | | | | | | **$772,863.40** | **195,820** | | |

---

[7] TTP has admitted to 194,630 sheets of drywall being shipped to the U.S.A. through Taian Taigao Trading Corp. Ltd. in its Manufacturer Profile Form at lines 16, 18-21, but purports not to know the exact destination in the U.S.A. because it did not list one in its MPF for those shipments.  The PSC has discovered through John Gunn of Guardian Building Products' testimony, that after lengthy negotiations with TG, that TG/TTP shipped the drywall via Taian Taigao Trading Corp. Ltd., to Guardian in Florida and Wilmington, North Carolina, as detailed herein.  It is not known if the five entries for Taian Taigao in TTP's profile form are repetitive of Guardian shipments by Taian Taigao, or if they were separate shipments.  Nonetheless, it is undisputed that TTP/TG shipped 110,800 sheets of drywall to Tampa, Florida, as reflected in this exhibit and the invoices produced in this litigation.  Ex. 151.

# Taishan Gypsum Board Sales to United States

| GYPSUM BOARD – LOUISIANA | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Exporter | Importer | Invoice State | Port State | Product | Contract Amount | Number of Sheets of Gypsum | Date | Bates Number |
| 1. | SIIC Shanghai International Trade Group Pudong Co., Ltd. | Interior/Exterior Building Products | LA | LA | Gypsum Board | $27,119.13[8] | 6,600 | 6/20/2006 | See MPF entries #114-115 |
| 2. | SIIC Shanghai International Trade Group Pudong Co., Ltd. | Interior/Exterior Building Products | LA | LA | Gypsum Board | $13,559.56[9] | 3,300 | 6/26/2006 | See MPF entries #123 |
| 3. | SIIC Shanghai International Trade Group Pudong Co., Ltd. | Interior/Exterior Building Products | LA | LA | Gypsum Board | $13,703.93[10] | 3,300 | 7/2/2006 | See MPF entries #129 |
| 4. | Taian Taishan Plasterboard Co. | APIC Building Materials/ Triax Trading & Logistics, LLC | LA | LA | Gypsum Board | $24,123.00 | 5,676 | 7/3/2006 | TG0020090 |
| 5. | Taian Taishan Plasterboard Co. | APIC Building Materials/ Triax Trading & Logistics, LLC | LA | LA | Gypsum Board | $24,998.40 | 5,760 | 7/20/2006 | TG0020091 |
| 6. | SIIC Shanghai International Trade Group Pudong Co., Ltd. | Interior/Exterior Building Products | LA | LA | Gypsum Board | $80,810.05[11] | 19,800 | 7/30/2006 | See MPF entries #171-176 |
| 7. | Taian Taishan Plasterboard Co., Ltd. | GD Distributors, LLC | LA | LA | Gypsum Board | $11,601.22 | 1,320 | 9/15/2006 | TG0001657 |
| | | | | | | $195,915.29 | 45,756 | | |

---

[8] MPF entries show price in Chinese Yuan in the combined amount of 170,940 Yuan. Using conversion rate of 6.3033 Yuan to $1 USD, amount paid in dollars is indicated in chart.
[9] MPF entries show price in Chinese Yuan in the combined amount of 85,470 Yuan. Using conversion rate of 6.3033 Yuan to $1 USD, amount paid in dollars is indicated in chart.
[10] MPF entries show price in Chinese Yuan in the combined amount of 86,380 Yuan. Using conversion rate of 6.3033 Yuan to $1 USD, amount paid in dollars is indicated in chart.
[11] MPF entries show price in Chinese Yuan in the combined amount of 509,370 Yuan. Using conversion rate of 6.3033 Yuan to $1 USD, amount paid in dollars is indicated in chart.

# Taishan Gypsum Board Sales to United States

| | GYPSUM BOARD – NEW YORK | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Exporter** | **Importer** | **Invoice State** | **Port State** | **Product** | **Contract Amount** | **Number of Sheets of Gypsum** | **Date** | **Bates Number** |
| 1. | Taian Taishan Plasterboard Co., Ltd. | Shenzhen Yongfeng Investment Company, Ltd. | NY | N/A | Gypsum Board | $10,847.25 | 3,640 | 9/15/2006 | TG0001547 **MPF# 215** |
| 2. | Taian Taishan Plasterboard Co., Ltd. | Shenzhen Yongfeng Investment Company, Ltd. | NY | N/A | Gypsum Board | $10,847.25 | 3,640 | 9/15/2006 | **MPF# 217 (No Invoice)** |
| 3. | Taian Taishan Plasterboard Co., Ltd. | Shenzhen Yongfeng Investment Company, Ltd. | NY | N/A | Gypsum Board | $8,105.60 | 2,730 | 9/15/2006 | TG0001548 **MPF# 216** |
| 4. | Taian Taishan Plasterboard Co., Ltd. | Shenzhen Yongfeng Investment Company, Ltd. | NY | N/A | Gypsum Board | $20,020.00 | 7,280 | 12/28/2006 | **MPF# 229 (No Invoice)** |
| 5. | Taian Taishan Plasterboard Co., Ltd. | Shenzhen Yongfeng Investment Company, Ltd. | NY | US (No State) | Gypsum Board | $25,025.00 | 9,100 | 11/16/2006 | TG0019961 **MPF# 223** |
| 6. | Taian Taishan Plasterboard Co., Ltd. | Shenzhen Yongfeng Investment Company, Ltd. | NY | N/A | Gypsum Board | $31,844.80 | 9,880 | 12/2/2006 | TG0001659 **MPF#s 229 + 230** |
| 7. | Taian Taishan Plasterboard Co., Ltd. | Shenzhen Yongfeng Investment Company, Ltd. | NY | NY | Gypsum Board | $22,742.20 | 5,720 | 2/9/2007 | TG0001660 **MPF#s 232 + 233** |
| 8. | Taian Taishan Plasterboard Co., Ltd. | TOV Trading | NY | USA (No State) | Gypsum Board | $57,800.00 | 23,120 | 6/21/2006 | TG0001138 **(No MPF Entry)** |
| 9. | Taian Taishan Plasterboard Co., Ltd. | TOV Trading | NY | USA (No State) | Gypsum Board | $61,056.00 | 23,040 | 6/21/2006 | TG0001140 **(No MPF Entry)** |

## Taishan Gypsum Board Sales to United States

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 10. | Taian Taishan Plasterboard Co., Ltd. | TOV Trading | NY | NY | Gypsum Board | $78,600.00 | 28,400 | 8/4/2006 | TG0000738 **(No MPF Entry)** |
| 11. | Taian Taishan Plasterboard Co., Ltd. | TOV Trading | NY | N/A | Gypsum Board | $6,753.54 | 1,294 | 8/25/2006 | TG0000728 **(No MPF Entry)** |
| 12. | Taian Taishan Plasterboard Co., Ltd. | TOV Trading | NY | NY | Gypsum Board | $5,200.00 | 2,000 | 10/5/2006 | TG0001550 **MPF# 219** |
| 13. | Taian Taishan Plasterboard Co., Ltd. | TOV Trading | NY | NY | Gypsum Board | $50,950.00 | 17,400 | 10/5/2006 | TG0001551 **MPF#s 220 + 221** |
| 14. | Taian Taishan Plasterboard Co., Ltd. | TOV Trading | NY | NY | Gypsum Board | $23,400.00 | 9,000 | 10/5/2006 | TG0001552 **MPF# 222** |
| | | | | | **$413,191.64** | **146,244** | | |

# Taishan Gypsum Board Sales to United States

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| GYPSUM BOARD – NORTH CAROLINA | | | | | | | | | |
| | Exporter | Importer | Invoice State | Port State | Product | Contract Amount | Number of Sheets of Gypsum | Date | Bates Number |
| 1. | Taian Taishan Plasterboard Co., Ltd. | Guardian Building Supply | SC | NC | Gypsum Board[12] | $388,324.80 | 96,120 | 5/25/2006 | GBP000879 |

---

[12] TTP has admitted to 194,630 sheets of drywall being shipped to the U.S.A. through Taian Taigao Trading Corp. Ltd. in its Manufacturer Profile Form at lines 16, 18-21, but purports not to know the exact destination in the U.S.A. because it did not list one in its MPF for those shipments. The PSC has discovered through John Gunn of Guardian Building Products' testimony, that after lengthy negotiations with TG, that TG/TTP shipped the drywall via Taian Taigao Trading Corp. Ltd., to Guardian in Florida and Wilmington, North Carolina, as detailed herein. It is not known if the five entries for Taian Taigao in TTP's profile form are repetitive of Guardian shipments by Taian Taigao, or if they were separate shipments. Nonetheless, it is undisputed that TTP/TG shipped 96,120 sheets of drywall to Wilmington, North Carolina, as reflected in this exhibit and the invoices produced in this litigation. Ex. 152.

## Taishan Gypsum Board Sales to United States

| | **GYPSUM BOARD – VIRGINIA** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Exporter | Importer | Invoice State | Port State | Product | Contract Amount | Number of Sheets of Gypsum | Date | Bates Number |
| 1. | Shandong Taihe Dongxin Co., Ltd | Venture Supply | VA | VA | Gypsum Board | $366,800.00 | 100,000 | 2/4/2006 | TG0001646; TG MPF |
| 2. | Shandong Taihe Dongxin Co., Ltd | Venture Supply | VA | VA | Gypsum Board | $197,749.22 | 53,912 | 7/20/2006 | TG0001647; TG MPF |
| | | | | | | **$564,549.22** | **153,912** | | |

# JOINT APPENDIX TAB # 31

Translation of BNBMPLC-E-0059965-0059966

BNBMPLC-E-0059965

**The Course of Events on Hiring Foreign Law Firms for the Gypsum Board Litigation in the United States——Brief Version of the Related Meetings**

| Stage One | Hiring Foreign Law Firms to Issue Legal Opinion Letters | |
|---|---|---|
| Date | Participants | Main Contents for Discussion |
| September 10, 2009/ September 15, 2009 | BNBM PLC: Yu Chen<br><br>BNBM PLC: Zheng Tao<br><br>BNBM PLC: Ziqiang Bian<br><br>Taishan Gypsum: Gang Zhao<br><br>Shandong Taishan Lantian: Guangbin Liang<br><br>Jingtian & Gongcheng: Chungang Dong,<br><br>Hogan Lovells: Daozheng Chen, Gaston Fernandez, Ye Yuan<br><br>Orrick: Xiang Wang, Raymond G. Mullady, Fang Fu<br><br>K&L Gates: Yujing Shu, Xianjin Tian, Miao Li, David Klaber, Eric Stone | The representatives of BNBM Group and Taishan Gypsum had meetings with the representatives of Orrick, Hogan Lovells, and K&L Gates (generally referred to as "foreign law firms") respectively. The main contents of the meetings were to consult with the above law firms about the relevant questions from BNBM Group and Taishan Gypsum on the litigation in the United States. |

MTD Exhibit #239

| September 22, 2009 (Live meeting + telephone conference) | BNBM: Yu Chen<br><br>BNBM PLC: Zheng Tao<br><br>Taishan Gypsum: Tongchun Jia<br><br>Tiashan Gypsum: Gang Zhao<br><br>Hogan Lovells: Daozheng Chen<br><br>Orrick: Xiang Wang | **Hiring Attorneys for the "Toxic Drywall Event" and the Response to the Default Judgement**<br><br>    I. The information acquired from the law firms includes, but is not limited to, 1) the current situation of the case, 2) suggestions from the attorneys, 3) ████████████████████████████████████████████████████████████████████████████████████<br><br>    II. Solicited opinions from Tongchun Jia and Gang Zhao of Taishan Gypsum about matters on hiring attorneys and attending the hearing on September 24th. |
| October 12, 2009 | | The Legal Affairs Department of BNBM PLC issued *the Report on Hiring Foreign Law Firms for the Gypsum Board Litigation in the United States*, preliminarily decided to have Hogan Lovells answer those questions of concern from BNBM PLC, collect information, provide suggestions and strategies, and issue legal opinions letters. |
| **Stage Two** | **Hiring the Law Firm by Taishan Gypsum** | |
| April 12, 2010 (Telephone Conference) | BNBM PLC: Yu Chen<br><br>Jingtian & Gongcheng: Chungang Dong | On April 8, 2010, U.S. time, Eldon Fallon, a federal district court judge in New Orleans, U.S.A., issued an order in the lawsuit of the plaintiffs about the |

| | Hogan Lovells: Daozheng Chen<br><br>BNBM PLC: Zhucai Chen | quality issues of gypsum boards. Taishan Gypsum Limited Company (abbreviated as "Taishan Gyspum") was ordered to pay a sum of USD 2,600,000 to 7 families in the United States as compensatory damages. Based on the progress of the case, (the meeting) made preliminary analysis and judgment on the case. |
|---|---|---|
| June 3, 2010 (Telephone Conference) | CNBM Group: Jian Zhang<br><br>BNBM PLC: Bing Wang<br><br>Taishan Gypsum: Tongchun Jia<br><br>Jingtian & Gongcheng: Chungang Dong<br><br>Hogan Lovells: Daozheng Chen | Abstract I: Chairman Song agreed that CNBM Group will organize the response to the litigation.<br><br>Abstract II: The document issued by the SASAC to CNBM Group held that the company's response to the Drywall Event in the United States was a little passive.<br><br>Abstract III: Discussion on litigation costs.<br><br>Abstract IV: Determined to adopt the "limited response to litigation" strategy.<br><br>Abstract V: Bing Wang from BNBM PLC opined that the response to the litigation means the recognition of jurisdiction of the U.S. courts. Although there was no treaty to facilitate judicial enforcement between China and the United States, |

BNBMPLC-E-0059966

| | | |
|---|---|---|
| | | the U.S. government would take this opportunity to pressure the Chinese government and make the enforcement of the judgement become an exception.<br><br>Abstract VI: The time limitation for appealing the judgement against Taishan Gypsum.<br><br>Abstract VII: The meeting reached preliminary consensuses: first, it is better to continuously let the Lovells firm, which had issued opinion letters to BNBM PLC before, institute the appeal. If the Lovells firm could not complete on schedule, then the attorney recommended by Knauf can be retained; second, when the appeal proceeded into the substantive stage, no attorney recommended by Knauf may be used because there is potential conflict of interest; third, continuing to reject the service of legal process; third[1], it is suggested that leaders should consider the method for ████████████████████████ ████████████████████████ ████████████████████████ Currently, Knauf is hiring an attorney team to respond to the litigation as a package. |
| June 3, 2010 (Telephone | CNBM Group: Chief Cao (Jianglin) | Abstract I: Introduction of the Lovells firm and its strengths after the merger. |

---

[1] Fourth? typo

| conference) | CNBM Group: Jian Zhang<br><br>CNBM Co., Ltd.: Zhangli Chang<br><br>BNBM PLC: Bing Wang<br><br>Taishan Gypsum: Tongchun Jia<br><br>Jingtian & Gongcheng: Chungang Dong | Abstract II: The statistics from the Supreme Court showed that there are a total of 81 subpoenas that were served, involving 48 enterprises.<br><br>Abstract III: ██████████████<br>████████████████████<br>████████████████████<br>████████████████████<br>████████████████████<br>████████████████████ |
| --- | --- | --- |
| June 9, 2010 (Telephone conference) | CNBM Group: Jian Zhang<br><br>CNBM Co., Ltd.: Zhangli Chang<br><br>BNBM PLC: Yu Chen<br><br>Taishan Gypsum: Tongchun Jia<br><br>Hogan Lovells: Daozheng Chen<br><br>Hogan Lovells: Weining Yang<br><br>Jingtian & Gongcheng: Chungang Dong | I. Discussion on the Retainer Agreement with Hogan Lovells<br>II. Litigation strategy, protection of attorneys in inspection and test |

| June 10, 2010 | | Taishan Gypsum signed the Retainer Agreement with Hogan Lovells, and officially determined Hogan Lovells as the representing law firm of Taishan Gypsum for the gypsum board litigation in the United States. |
|---|---|---|
| **Stage Three** | colspan | **Hiring the Law Firm by BNBM PLC** |
| July 28, 2010 – Sebtember15, 2010 (email exchanges) | Jingtian & Gongcheng: Chungang Dong<br><br>Orrick: Xiang Wang<br><br>BNBM PLC: Zhucai Chen | BNBM PLC and Xiang Wang, Esq. from Orrick communicated via email on Orrick's legal opinion letters, price quotes, and the retainer. Eventually, on September 17, BNBM PLC signed the confirmation letter on the retainer with the Orrick law firm, and confirmed to hire the Orrick law firm as the representing firm of BNBM PLC for the gypsum board litigation in the United States. |

# JOINT APPENDIX TAB # 32

Translation of TG-0129675-76

**TG-0129675**

### Statement on the Data and Statistics of Exports to the U.S. from 2005 to 2007

According to the exporting record statistics, from 2005 to 2007, the total volume exported to the U.S. was 7292804.536 square meters (the detailed spreadsheet is attached below), the detailed analysis is as follows:

**I. Categorized by the method of exporting:** The total volume of self-run export was 1241691.746 square meters, the indirect export was 6051112.79 square meters.

1. Among the 1241691.746 square meters of self-run exports: export via "Shandong Taihe Dongxin Company Limited" was 687247.86 square meters, export via "Tai'an Taishan Plasterboards Company Limited" was 554443.89 square meters.

Categorized by the destination port of export: exported 446520 square meters to the port of Norfolk (Virginia), exported 230627.58 square meters to the port of Miami (Florida), exported 117881.28 square meters to the port of Tampa (Florida), exported 240727.86 square meters to the port of Camden (New Jersey), and exported 205935.024 square meters to the port of New York (New York).

2. Indirect export: Tai'an Taishan Plasterboards Company Limited indirectly exported 6051112.79 square meters via trading company(s), the destination port is unknown.

**II. Categorized by the company operating the business:**

1. Shandong Taihe Dongxin Company Limited (abbreviated as Shandong Taihe in the detailed spreadsheet) signed the contracts and issued the invoices of 687247.86 square meters of gypsum boards;

2. Tai'an Taishan Plasterboards Company Limited (abbreviated as Taian Taishan in the detailed spreadsheet) signed the contracts and issued the invoices of 4790411.199 square meters of gypsum boards;

**PENG: Exhibit 801-1**

MTD Exhibit #197

3. Shandong Taihe Dongxin Company Limited signed the contracts, but Tai'an Taishan Plasterboards Company Limited issued the invoices of 1815145.475 square meters of gypsum boards;

**III. Categorized by the dispute resolution method:**

1. Court litigation is to resolve the disputes involving 3034359.405 square meters of gypsum boards;

2. China International Economic and Trade Arbitration Commission is to resolve the disputes involving 2676059.847 square meters of gypsum boards;

3. The "*Contract Law of the People's Republic of China"* is to resolve the disputes involving 122286.94 square meters of gypsum boards;

**TG-0129676**

4. China International Trade Promotion Committee is to resolve the disputes involving 117881 square meters of gypsum boards;

5. The dispute resolution method for the remaining 1342217.344 square meters of gypsum boards is unknown.

**IV. Categorized by label:**

1. There are 687247.86 square meters of gypsum boards with the coding of "Shandong Taihe Dongxin Company Limited" in its English name printed on the back;

2. There are 117881.28 square meters of gypsum boards with the coding of "Tai'an Taishan Plasterboards Company Limited" in its English name printed on the back;

3. 965614.38 square meters of gypsum boards used the "Taishan" brand of edge band;

4. 998778.91 square meters of gypsum boards had white unlettered edge band, no coding, and neutral packaging;

5. 3502532.647 square meters of gypsum boards were labeled the trademark (OEM) of foreign customers according to the customers' requirements;

6. The labeling for the remaining 1020749.452 square meters of gypsum boards is unknown.

**V: Categorized by the mineral origin:**

According to the conventional practice of gypsum board production, the production workshop would not conduct the corresponding tracking and recording of gypsum origins for the gypsum board products. Therefore, there is no way to confirm the corresponding mineral origins for each batch of gypsum board products. However, the rough calculations for the gypsum minerals purchased from different mining regions at the time are as follows:

Our company exported 7292804.536 square meters of gypsum boards to the U.S., calculating based on 9.6KG/square meters, approximately 70010 tons of gypsum was needed. According to the statistics from our company's Procurement Department, in 2006, our company procured 378924.72 tons of natural gypsum. The ratios of natural gypsum from different mineral companies are: Juyuan Mine 57.32%, Luneng Mine 1.47%, Linwen Mine 21.2%, Wenyang Mine 20.01%. Calculating based on the ratios above, the volumes of gypsum boards exported to the U.S. produced using the gypsum from different mineral regions are as follows:

Juyuan Mine: 4180235.56 square meters, Wenyang Mine: 1459290.19 square meters, Luneng Mine: 107204.23 square meters, Linwen Mine: 1546074.56 square meters.

Taishan Gypsum Company

June 27, 2010

2005 - 2007 exports American data statistics showing

After exporting record statistics, 2005 - after 2007 exports the American data equals 7292804.536 square meters (, attaches detailed list), concretely analyzes as follows:
According to export way classification: The self-management exports total 1241691.746 square meters, indirectly exports 6051112.79 square meters.

1st, self-management exports in 1241691.746 square meters: Exports 687247.86 square meters by "Shandong Taihe Dongxin limited liability company", exports 554443.89 square meters by "Tai'an Taishan paper surface gypsum board limited company".
According to exporting port of destination minute: Exports the Norfolk harbor (Virginia) 446520 square meters, exports the Miami harbor (Florida) 230627.58 square meters, exports the Tampa harbor (Florida) 117881.28 square meters, exports Camden harbor (New Jersey) 240727.86 square meters, exports the New York harbor (New York State) 205935.024 square meters.
2nd, indirect export: The Tai'an Taishan paper surface gypsum board limited company indirectly exports 6051112.79 square meters through the trading company, the port of destination is unclear.
Second, according to operation company minute:

1st, (in detailed list is called Shandong Taihe) sign contract, to draw up the gypsum board 687247.86 square meters that by the Shandong Taihe Dongxin limited liability company the receipt involves;
2nd, (in detailed list is called Tai'an Taishan) sign contract, to draw up the gypsum board 4790411.199 square meters that by the Tai'an Taishan paper surface gypsum board limited company the receipt involves;

3rd, is signed the contract by the Shandong Taihe Dongxin limited liability company, but is drawn up the gypsum board 1815145.475 square meters that by the Tai'an Taishan paper surface gypsum board limited company the receipt involves;
Third, according to dispute resolution format classification:

1st, stipulation dispute by involving gypsum board 3034359.405 square meters of court litigation solution;
2nd, stipulation dispute the involving gypsum board 2676059.847 square meters that is arbitrated by the Chinese international economy trade arbitration committee;

3rd, the stipulation dispute solution refers to "People's Republic of China Law of contract" involving gypsum board 122286.94 square meters;
4th, stipulation dispute by involving gypsum board 117881 square meters of International Chamber of Commerce China Committee ruling;

5th, the dispute resolution format of surplus 1342217.344 square meters gypsum board agreement is unclear.
Fourth, classifies according to the indication:

1st, back spurts the code to be printed with "Shandong Taihe Dongxin limited liability company" the English name inscription gypsum board 687247.86 square meters;
2nd, back spurts the code to be printed with "Tai'an Taishan paper surface gypsum board limited company" the English name inscription gypsum board 117881.28 square meters;

3rd, use Taishan seals the gypsum board 965614.38 square meters of sideband;
4th, white non-character Feng Biandai, does not spurt code neutral packing the gypsum board 998778.91 square meters;

5th, indicates the overseas customer trademark (OEM) gypsum board 3502532.647 square meters according to the customer request;
6th, surplus 1020749.452 square meters gypsum board indications are unclear.

Fifth, basis mineral resources division:
According to the gypsum board production convention convention, the production workshop does not carry on the gypsum origin and track record of gypsum board product correspondence, therefore is unable to check the gypsum ore origin of each raid gypsum board product correspondence. But was at that time as follows according to the different mining area gypsum ore inventory proportion rough estimate:

Our company exports American gypsum board 7292804.536 square meters, according to a 9.6KG/square meter computation, probably needs a gypsum 70010 tons gypsum. Counts according to our company purchase unit, in 2006 our company purchased the natural gypsum 378924.72 tons, the proportion of different mining industry company natural gypsum was: Gathering source ore 57.32%, Luneng ores 1.47%, near wen ore 21.2%, wen positive ore 20.01%. According to the above proportion computation, our company uses the different mining area gypsum production exports the American gypsum board the quantity are as follows:

Gathering source ore: 4180235.56 square meters, wen positive ore 1459290.19 square meter and Luneng ore 107204.23 square meters and near wen ore 1546074.56 square meters.

Taishan gypsum company 2010-6-27

--- Summary Information ---
1: 1200 PID_TITLE: 2005 - 2007 exports the American data statistics to show PID_SUBJECT: PID_AUTHOR: User PID_KEYWORDS:
PID_COMMENTS:
PID_TEMPLATE: Normal.dot PID_LASTAUTHOR: User PID_REVNUMBER: 61 PID_EDITTIME: Mon Jan 01 08:00: 00 CST 1601 PID_CREATE_DTM: Tue Jun 08 13:38: 00 CST 2010 PID_LASTSAVE_DTM: Sun Jun 27 14:23: 00 CST 2010 PID_LASTPRINTED: Sun Jun 27 14:12: 00 CST 2010 PID_PAGECOUNT: 1 PID_WORDCOUNT: 215 PID_CHARCOUNT: 1232 PID_APPNAME: Microsoft Office Word PID_SECURITY: 0

--- Document Summary Information ---
PID_CODEPAGE: 1200 PID_COMPANY: Microsoft PID_CATEGORY:
PID_MANAGER:
PID_PARCOUNT: 2 PID_LINECOUNT: 10 17: 1445 PID_PRESFORMAT:
PID_BYTECOUNT: 0 PID_SLIDECOUNT: 0 PID_NOTECOUNT: 0 PID_HIDDENCOUNT: 0
PID_MMCLIPCOUNT: 0 PID_SCALE: false PID_LINKSDIRTY: false 1: 1200 KSOProductBuildVer: 2052-6.5.0.1966

## 2005 年-2007 年出口美国数据统计说明

经出口记录统计，2005 年-2007 年出口美国数据合计 7292804.536 平方米（后附明细表），具体分析如下：

一、 **按出口方式分类**：自营出口共计 1241691.746 平方米，间接出口 6051112.79 平方米。

1、自营出口 1241691.746 平方米中：以"山东泰和东新股份有限公司"出口 687247.86 平方米，以 "泰安市泰山纸面石膏板有限公司" 出口 554443.89 平米。

按出口目的港分：出口到诺福克港口（弗吉尼亚州）446520 平方米，出口到迈阿密港口（佛罗里达州）230627.58 平方米，出口到坦帕港口（佛罗里达州）117881.28 平方米，出口到诺卡姆登港口（新泽西州）240727.86 平方米，出口到纽约港口（纽约州）205935.024 平方米。

2、间接出口：泰安市泰山纸面石膏板有限公司通过贸易公司间接出口 6051112.79 平方米，目的港不详。

二、**按业务操作公司分：**

1、由山东泰和东新股份有限公司（明细表中简称为山东泰和）签订合同、开具发票涉及的石膏板 687247.86 平方米；

2、由泰安市泰山纸面石膏板有限公司（明细表中简称为泰安泰山）签订合同、开具发票涉及的石膏板 4790411.199 平方米；

3、由山东泰和东新股份有限公司签订合同、但由泰安市泰山纸面石膏板有限公司开具发票涉及的石膏板 1815145.475 平方米；

三、 **按争议解决方式分类：**

1、规定争议由法院诉讼解决的涉及石膏板 3034359.405 平方米；

2、规定争议由中国国际经济贸易仲裁委员会仲裁的涉及石膏板 2676059.847 平方米；

3、规定争议解决参照《中华人民共和国合同法》的涉及石膏板 122286.94 平方米；

TG-0129675

4、规定争议由国际商会中国委员会裁决的涉及石膏板 117881 平方米;

5、剩余 1342217.344 平方米石膏板约定的争议解决方式不详。

**四、按标示分类:**

1、背面喷码印有"山东泰和东新股份有限公司"英文名称字样的石膏板 687247.86 平方米;

2、背面喷码印有"泰安市泰山纸面石膏板有限公司"英文名称字样的石膏板 117881.28 平方米;

3、使用"泰山"牌封边带的石膏板 965614.38 平方米;

4、白色无字封边带、不喷码中性包装的石膏板 998778.91 平方米;

5、按客户要求标示国外客户商标(OEM)的石膏板 3502532.647 平方米;

6、剩余 1020749.452 平方米石膏板标示不详。

**五、根据矿源划分:**

按照石膏板生产常规惯例,生产车间不进行石膏来源与石膏板产品对应的跟踪记录,所以无法核对每一批次的石膏板产品对应的石膏矿来源。但是根据当时不同矿区石膏矿进货比例匡算如下:

我公司出口美国石膏板 7292804.536 平方米,按 9.6KG/平米计算,大约需用石膏 70010 吨石膏。根据我公司采购部门统计,2006 年我公司采购天然石膏 378924.72 吨,不同矿业公司天然石膏的比例为:聚源矿 57.32%、鲁能矿 1.47%、临汾矿 21.2%、汶阳矿 20.01%。按以上比例计算,我公司使用不同矿区石膏生产的出口美国石膏板的数量如下:

聚源矿:4180235.56 平方米、汶阳矿 1459290.19 平方米、鲁能矿 107204.23 平方米、临汾矿 1546074.56 平方米。

泰山石膏公司

2010-6-27

# JOINT APPENDIX TAB # 33

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/18/19 Page 667 of 880
Case 2:14-cv-06019-EEF-MBN Document 32-4 Filed 07/17/18 Page 667 of 880

Translation of TG-0129677

| Statistics of U.S. Gypsum Boards by Self-managed Export during 2005-2007 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Customer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification (mm) | Volume (m²) | Method of Delivery | Destination Port | Value ($) | Export Method | Product label | Quality Standard | Dispute Resolution |
| 2/24/2006 | 0008655 | Shangdong Taihe | Shangdong Taihe | VENTURE SUPPLY INC | Shangdong Taihe | Shandong Mine | 3660*12200*12.7 | 446520 | FOB Lian Yuangang | Norfolk, Virginia | $358,000 | Self-managed Export | Edgeband: Venture Supply, Spray Code: MFG:SHANDONG TAIHE, CHINA | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 7/20/2006 | 00012282 | Shangdong Taihe | Shangdong Taihe | VENTURE SUPPLY INC | Shangdong Taihe | Shandong Mine | 3660*12200*12.7 | 240727.9 | FOB Lian Yuangang | Camden, New Jersey | $197,749 | Self-managed Export | Edgeband: Venture Supply, Spray Code: MFG:SHANDONG TAIHE, CHINA | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 8/2/2006 | 00012286 | Tai'an Taishan | Tai'an Taishan | WOOD NATION INC | Tai'an Taishan | Shandong Mine | 3660*12200*12.7 | 58940.64 | FOB Qingdao | Tampa, Florida | $55,440.00 | Self-managed Export | Edgeband: TTPC, Spray Code: TAIAN TAISHAN PLASTERBOARD CO., GYPSUM DRYWALL PER ASTM C 1396 04 CONTACT:813-994-6499 | ASTM C1396 | China Council for the Promotion of International Trade |
| 8/8/2006 | 00012286 | Tai'an Taishan | Tai'an Taishan | WOOD NATION INC | Tai'an Taishan | Shandong Mine | 3660*12200*12.7 | 58940.64 | FOB Qingdao | Tampa, Florida | $55,440.00 | Self-managed Export | Edgeband: TTPC, Spray Code: TAIAN TAISHAN PLASTERBOARD CO., GYPSUM DRYWALL PER ASTM C 1396 04 CONTACT:813-994-6500 | ASTM C1396 | China Council for the Promotion of International Trade |
| 9/15/2006 | 00012413 | Tai'an Taishan | Tai'an Taishan | SHENZHEN YONGFENG INVESTMENT CO., LTD. | Tai'an Taishan | Shandong Mine | 2440*12200*12.7 | 10835.55 | FOB Qingdao | New York, New York State | $10,847.20 | Self-managed Export | Edgeband / Spray Code: Marathon Construction, | ASTM C1396 | Chinese Contract Law |
| 9/15/2006 | 00012414 | Tai'an Taishan | Tai'an Taishan | SHENZHEN YONGFENG INVESTMENT CO., LTD. | Tai'an Taishan | Shandong Mine | 2440*12200*12.7 | 8126.664 | FOB Qingdao | New York, New York State | $8,105.60 | Self-managed Export | Edgeband / Spray Code: Marathon Construction, | ASTM C1396 | Chinese Contract Law |

**MTD Exhibit #198**

**PENG: Exhibit 801-2**

| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Customer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification (mm) | Volume (m²) | Method of Delivery | Destination Port | Value ($) | Export Method | Product label | Quality Standard | Dispute Resolution |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Statistics of U.S. Gypsum Boards by Self-managed Export during 2005-2007** | | | | | | | | | |
| 9/15/2006 | 00012415 | Tai'an Taishan | Tai'an Taishan | SHENZHEN YONGFENG INVESTMENT CO., LTD. | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 10835.55 | FOB Qingdao | New York, New York State | $10,847.20 | Self-managed Export | Edgeband / Spray Code: Marathon Construction, | ASTM C1396 | Chinese Contract Law |
| 9/15/2006 | 00012414 | Tai'an Taishan | Tai'an Taishan | SHENZHEN YONGFENG INVESTMENT CO., LTD. | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 8126.664 | FOB Qingdao | New York, New York State | $8,105.60 | Self-managed Export | Edgeband / Spray Code: Marathon Construction, | ASTM C1396 | Chinese Contract Law |
| 9/15/2006 | 00012415 | Tai'an Taishan | Tai'an Taishan | SHENZHEN YONGFENG INVESTMENT CO., LTD. | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 10835.55 | FOB Qingdao | New York, New York State | $10,847.20 | Self-managed Export | Edgeband / Spray Code: Marathon Construction, | ASTM C1396 | Chinese Contract Law |
| 10/5/2006 | 00013764 | Tai'an Taishan | Tai'an Taishan | TOV TRADING NEW YORK USA | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 41675.2 | FOB Qingdao | New York, New York State | $37,100.00 | Self-managed Export | Edgeband: OEG, no spray code | ASTM C1396 | China International Economic and Trade Arbitration Commission |
| 10/5/2006 | 00013764 | Tai'an Taishan | Tai'an Taishan | TOV TRADING NEW YORK USA | Tai'an Taishan | Shandong Mine | 3660*1220*12.7 | 15181.68 | FOB Qingdao | New York, New York State | $13,850.00 | Self-managed Export | Edgeband: OEG, no spray code | ASTM C1396 | China International Economic and Trade Arbitration Commission |
| 10/5/2006 | 00013765 | Tai'an Taishan | Tai'an Taishan | TOV TRADING NEW YORK USA | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 26791.2 | FOB Qingdao | New York, New York State | $23,400.00 | Self-managed Export | Edgeband: OEG, no spray code | ASTM C1396 | China International Economic and Trade Arbitration Commission |
| ######### | 00013769 | Tai'an Taishan | Tai'an Taishan | SHENZHEN YONGFENG INVESTMENT CO., LTD. | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 27088.88 | FOB Qingdao | New York, New York State | $25,025.00 | Self-managed Export | Edgeband / Spray Code: Marathon Construction, | ASTM C1396 | Chinese Contract Law |
| 12/2/2006 | 00017539 | Tai'an Taishan | Tai'an Taishan | STONE PRIDE INTERNATIONAL CORP | Tai'an Taishan | Shandong Mine | 3660*1220*12.7 | 7858.752 | FOB Qingdao | Miami, Florida | $10,032.00 | Self-managed Export | White letterless edgeband, no spray code | ASTM C1396 | Unspecified |

| Statistics of U.S. Gypsum Boards by Self-managed Export during 2005-2007 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Customer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification (mm) | Volume (m²) | Method of Delivery | Destination Port | Value ($) | Export Method | Product label | Quality Standard | Dispute Resolution |
| ######### | 00017585 | Tai'an Taishan | Tai'an Taishan | SHENZHEN YONGFENG INVESTMENT CO., LTD. | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 21671.1 | FOB Qingdao | New York, New York State | $20,020.00 | Self-managed Export | Edgeband / Spray Code: Marathon Construction, | ASTM C1396 | Chinese Contract Law |
| ######### | 00017585 | Tai'an Taishan | Tai'an Taishan | SHENZHEN YONGFENG INVESTMENT CO., LTD. | Tai'an Taishan | Shandong Mine | 2440*1220*15.9 | 7739.68 | FOB Qingdao | New York, New York State | $11,824.00 | Self-managed Export | Edgeband / Spray Code: Marathon Construction, | ASTM C1396 | Chinese Contract Law |
| 2/9/2007 | 00030752 | Tai'an Taishan | Tai'an Taishan | SHENZHEN YONGFENG INVESTMENT CO., LTD. | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 5417.776 | FOB Qingdao | New York, New York State | $5,005.00 | Self-managed Export | Edgeband / Spray Code: Marathon Construction, | ASTM C1396 | Chinese Contract Law |
| 2/9/2007 | 00030752 | Tai'an Taishan | Tai'an Taishan | SHENZHEN YONGFENG INVESTMENT CO., LTD. | Tai'an Taishan | Shandong Mine | 2440*1220*15.9 | 11609.52 | FOB Qingdao | New York, New York State | $17,737.20 | Self-managed Export | Edgeband / Spray Code: Marathon Construction, | ASTM C1396 | Chinese Contract Law |
| 4/30/2007 | 00001188 | Tai'an Taishan | Tai'an Taishan | ORINENTAL TRADING COMPANY | Tai'an Taishan | Shandong Mine | 3660*1220*12.7 | 89750.52 | FOB Qingdao | Miami, Florida | 77385.00 | Self-managed Export | Edgeband: DUN Drywall | ASTM C1396 | Unspecified |
| 4/30/2007 | 00001189 | Tai'an Taishan | Tai'an Taishan | B AMERICA CORPORATION | Tai'an Taishan | Shandong Mine | 3660*1220*12.7 | 2947.032 | FOB Qingdao | Miami, Florida | $5,656.20 | Self-managed Export | White letterless edgeband, no spray code | ASTM C1396 | Unspecified |
| 5/28/2007 | 00001196 | Tai'an Taishan | Tai'an Taishan | ORINENTAL TRADING COMPANY | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 14586.32 | FOB Qingdao | Miami, Florida | $12,740.00 | Self-managed Export | Edgeband: DUN Drywall | ASTM C1396 | Unspecified |
| 5/28/2007 | 00001198 | Tai'an Taishan | Tai'an Taishan | ORINENTAL TRADING COMPANY | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 17503.58 | FOB Qingdao | Miami, Florida | $15,288.00 | Self-managed Export | Edgeband: DUN Drywall | ASTM C1396 | Unspecified |
| 5/28/2007 | 00001199 | Tai'an Taishan | Tai'an Taishan | ORINENTAL TRADING COMPANY | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 5834.528 | FOB Qingdao | Miami, Florida | $5,096.00 | Self-managed Export | Edgeband: DUN Drywall | ASTM C1396 | Unspecified |
| 5/28/2007 | 00001200 | Tai'an Taishan | Tai'an Taishan | ORINENTAL TRADING COMPANY | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 14586.32 | FOB Qingdao | Miami, Florida | $12,740.00 | Self-managed Export | Edgeband: DUN Drywall | ASTM C1396 | Unspecified |

| Statistics of U.S. Gypsum Boards by Self-managed Export during 2005-2007 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Customer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification (mm) | Volume (㎡) | Method of Delivery | Destination Port | Value ($) | Export Method | Product label | Quality Standard | Dispute Resolution |
| 6/12/2007 | 00001202 | Tai'an Taishan | Tai'an Taishan | ORINENTAL TRADING COMPANY | Tai'an Taishan | Shandong Mine | 2440*1220*12.7 | 8751.792 | FOB Qingdao | Miami, Florida | $12,740.00 | Self-managed Export | Edgeband: DUN Drywall | ASTM C1396 | Unspecified |
| 6/26/2007 | 00001214 | Tai'an Taishan | Tai'an Taishan | ORINENTAL TRADING COMPANY | Tai'an Taishan | Shandong Mine | 3660*1220*12.7 | 8975.052 | FOB Qingdao | Miami, Florida | $7,738.00 | Self-managed Export | Edgeband: DUN Drywall | ASTM C1396 | Unspecified |
| 7/3/2007 | 00001218 | Tai'an Taishan | Tai'an Taishan | ORINENTAL TRADING COMPANY | Tai'an Taishan | Shandong Mine | 3660*1220*12.7 | 29916.84 | FOB Qingdao | Miami, Florida | $25,795.00 | Self-managed Export | Edgeband: DUN Drywall | ASTM C1396 | Unspecified |
| 7/3/2007 | 00001219 | Tai'an Taishan | Tai'an Taishan | ORINENTAL TRADING COMPANY | Tai'an Taishan | Shandong Mine | 3660*1220*12.7 | 29916.84 | FOB Qingdao | Miami, Florida | $25,795.00 | Self-managed Export | Edgeband: DUN Drywall | ASTM C1396 | Unspecified |
| 合计 | | | | | | | | 1241692 | | | $1002963.42 | | | | |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| \multicolumn{15}{c}{**Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007**} |
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 3/13/2006 | 06257961- 06257978 | Tai'an Taishan | Shandong Dongfang International Trading Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 366021.3744 | Ex-Works | Unspecif ied | ¥2,052,005 | Indirect Export | Unspecified | ASTM C1396 | Unspecified |
| 3/13/2006 | 06257979- 06258003 | Tai'an Taishan | Shandong Dongfang International Trading Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 488028.4992 | Ex-Works | Unspecif ied | ¥2,736,007 | Indirect Export | Unspecified | ASTM C1396 | Unspecified |
| 3/13/2006 | 06258004 | Tai'an Taishan | Shandong Dongfang International Trading Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20155.9128 | Ex-Works | Unspecif ied | ¥112,999 | Indirect Export | Unspecified | ASTM C1396 | Unspecified |
| 3/21/2006 | 06258044 | Tai'an Taishan | Lianyungang Yuantai International Trading Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 15628.2 | Ex-Works | Unspecif ied | ¥87,518 | Indirect Export | Unspecified | ASTMC1396 | Unspecified |
| 3/21/2006 | 06258045 | Tai'an Taishan | Lianyungang Yuantai International Trading Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 13395.6 | Ex-Works | Unspecif ied | ¥75,015 | Indirect Export | Unspecified | ASTMC1396 | Unspecified |
| 4/22/2006 | 06289900- 06289922 | Tai'an Taishan | Shanghai Yuyuanshangcheng Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 427230.336 | Ex-Works | Unspecif ied | ¥2,516,384 | Indirect Export | White Letterless Edgeband, Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Huangpu Distrcit People's Court |
| 4/22/2006 | 06289923 | Tai'an Taishan | Shanghai Yuyuanshangcheng Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18695.7924 | Ex-Works | Unspecif ied | ¥110,118 | Indirect Export | White Letterless Edgeband, Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Huangpu Distrcit People's Court |
| 4/22/2006 | 06289888- 06289899 | Tai'an Taishan | Shanghai Yuyuanshangcheng Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 185752.32 | Ex-Works | Unspecif ied | ¥1,094,080 | Indirect Export | White Letterless Edgeband, Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Huangpu Distrcit People's Court |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 4/23/2006 | 06289925-06289928 | Tai'an Taishan | Orient International Holding Shanghai Foreign Trade Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 15003.072 | Ex-Works | Unspecif ied | ¥87,024 | Indirect Export | White Letterless Edgeband, Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | China International Economic and Trade Arbitration Commission |
| 4/23/2006 | 06289925-06289928 | Tai'an Taishan | Orient International Holding Shanghai Foreign Trade Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 30006.144 | Ex-Works | Unspecif ied | ¥173,981 | Indirect Export | White Letterless Edgeband, Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | China International Economic and Trade Arbitration Commission |
| 4/26/2006 | 06289930 | Tai'an Taishan | Qingdao Ao'ni Decorative Materials Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 2053.992 | Ex-Works | Unspecif ied | ¥11,502 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |
| 4/28/2006 | 06289932-06289933 | Tai'an Taishan | Shanghai Yuyuanshangcheng Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 5804.76 | Ex-Works | Unspecif ied | ¥34,190 | Indirect Export | White Letterless Edgeband, Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Huangpu Distrcit People's Court |
| 4/28/2006 | 06289934-06290014 | Tai'an Taishan | Shanghai Yuyuanshangcheng Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 1497360.168 | Ex-Works | Unspecif ied | ¥8,819,442 | Indirect Export | White Letterless Edgeband, Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Huangpu Distrcit People's Court |
| 4/28/2006 | 06290015 | Tai'an Taishan | Shanghai Yuyuanshangcheng Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18204.6204 | Ex-Works | Unspecif ied | ¥107,225 | Indirect Export | White Letterless Edgeband, Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Huangpu Distrcit People's Court |
| 4/28/2006 | 06290016-06290025 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 196915.32 | Ex-Works | Unspecif ied | ¥1,062,810 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/12/2006 | 06290070 | Tai'an Taishan | Nantong Economic and Technology Development | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 17146.368 | Ex-Works | Unspecif ied | ¥116,796 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| colspan across all | | | | | | | | | | | | | | |

**Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007**

| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification | Volume (m²) | Method of Delivery | Destination Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/15/2006 | 06312793-06312800 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 146672.8896 | Ex-Works | Unspecified | ¥880,037 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/15/2006 | 06312801 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18360.9024 | Ex-Works | Unspecified | ¥110,165 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/15/2006 | 06312802 | Tai'an Taishan | Qingdao Kanghong Import & Export Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 32953.176 | Ex-Works | Unspecified | ¥95,645 | Indirect Export | Unspecified | ASTMC1396 | Unspecified |
| 5/15/2006 | 06312803 | Tai'an Taishan | Qingdao Kanghong Import & Export Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 32953.176 | Ex-Works | Unspecified | ¥95,645 | Indirect Export | Unspecified | ASTMC1396 | Unspecified |
| 5/18/2006 | 06312809 | Tai'an Taishan | Zhejiang No. Two Lightweight Enterprise Group Import & Export Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20500 | Ex-Works | Unspecified | ¥111,461 | Indirect Export | Unspecified | ASTM C1396 | Unspecified |
| 5/19/2006 | 06312817 | Tai'an Taishan | Lianyungang Yuantai International Trading Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 15628.2 | Ex-Works | Unspecified | ¥87,518 | Indirect Export | Unspecified | ASTM C1396 | Unspecified |
| 5/19/2006 | 06312818 | Tai'an Taishan | Lianyungang Yuantai International Trading Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 13038.384 | Ex-Works | Unspecified | ¥73,015 | Indirect Export | Unspecified | ASTM C1396 | Unspecified |
| 5/22/2006 | 06312823 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 16878.456 | Ex-Works | Unspecified | ¥89,926 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005–2007 |
| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification | Volume (㎡) | Method of Delivery | Destination Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/22/2006 | 06312824 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 16878.456 | Ex-Works | Unspecified | ¥89,926 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312825 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 11252.304 | Ex-Works | Unspecified | ¥60,732 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312826 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 20897.136 | Ex-Works | Unspecified | ¥111,337 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312827 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 20897.136 | Ex-Works | Unspecified | ¥111,337 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312828 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 20897.136 | Ex-Works | Unspecified | ¥111,337 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312829 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 20897.136 | Ex-Works | Unspecified | ¥111,337 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312830 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 20897.136 | Ex-Works | Unspecified | ¥111,337 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| \multicolumn{15}{c}{**Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007**} |
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 5/22/2006 | 06312831 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20897.136 | Ex-Works | Unspecif ied | ¥111,337 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312832 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20897.136 | Ex-Works | Unspecif ied | ¥111,337 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312833 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20897.136 | Ex-Works | Unspecif ied | ¥111,337 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312834 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20897.136 | Ex-Works | Unspecif ied | ¥111,337 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312835 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20897.136 | Ex-Works | Unspecif ied | ¥111,337 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312836 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18441.276 | Ex-Works | Unspecif ied | ¥102,350 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312837 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18441.276 | Ex-Works | Unspecif ied | ¥102,350 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| colspan="15" | **Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007** |
| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification | Volume (m³) | Method of Delivery | Destination Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 5/22/2006 | 06312838 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18441.276 | Ex-Works | Unspecified | ¥102,350 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312839 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18441.276 | Ex-Works | Unspecified | ¥102,350 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312840 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18441.276 | Ex-Works | Unspecified | ¥102,350 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312841 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18441.276 | Ex-Works | Unspecified | ¥102,350 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312842 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18441.276 | Ex-Works | Unspecified | ¥102,350 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312843 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18441.276 | Ex-Works | Unspecified | ¥102,350 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312844 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18441.276 | Ex-Works | Unspecified | ¥102,350 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 5/22/2006 | 06312845 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 2857.728 | Ex-Works | Unspecif ied | ¥15,859 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/22/2006 | 06312845 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 7635.492 | Ex-Works | Unspecif ied | ¥40,681 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/24/2006 | 06312850 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18664.536 | Ex-Works | Unspecif ied | ¥111,982 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/24/2006 | 06312852 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18664.536 | Ex-Works | Unspecif ied | ¥111,982 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/24/2006 | 06312853 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18664.536 | Ex-Works | Unspecif ied | ¥111,982 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/24/2006 | 06312854 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 19155.708 | Ex-Works | Unspecif ied | ¥114,934 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/24/2006 | 06312855 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 19155.708 | Ex-Works | Unspecif ied | ¥114,934 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification | Volume (m²) | Method of Delivery | Destination Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 5/24/2006 | 06312856 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 19155.708 | Ex-Works | Unspecified | ¥114,934 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/24/2006 | 06312857 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 19155.708 | Ex-Works | Unspecified | ¥114,934 | Indirect Export | White Letterless Edgeband, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/26/2006 | 06312885 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 13395.6 | Ex-Works | Unspecified | ¥80,370 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/26/2006 | 06312886 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 13127.688 | Ex-Works | Unspecified | ¥78,763 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 5/28/2006 | 06312891 | Tai'an Taishan | Qingdao Kanghong Import & Export Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 26791.2 | Ex-Works | Unspecified | ¥77,760 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |
| 5/28/2006 | 06312892 | Tai'an Taishan | Qingdao Kanghong Import & Export Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 6161.976 | Ex-Works | Unspecified | ¥17,885 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |
| 5/29/2006 | 06312893 | Tai'an Taishan | Orient International Holding Shanghai Foreign Trade Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 13502.7648 | Ex-Works | Unspecified | ¥81,564 | Indirect Export | "Taishan" Edgeband, Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | China International Economic and Trade Arbitration Commission |
| 5/29/2006 | 06312894 | Tai'an Taishan | Orient International Holding Shanghai Foreign Trade Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 1500.3072 | Ex-Works | Unspecified | ¥81,564 | Indirect Export | "Taishan" Edgeband, Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | China International Economic and Trade Arbitration Commission |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| colspan | | | | | | | | | | | | | | |

## Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007

| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification | Volume (m²) | Method of Delivery | Destination Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/29/2006 | 06312895 | Tai'an Taishan | Orient International Holding Shanghai Foreign Trade Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 30006.144 | Ex-Works | Unspecified | ¥97,877 | Indirect Export | "Taishan" Edgeband, Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312955 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 16164.024 | Ex-Works | Unspecified | ¥89,704 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312931 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 2440*1220*12.7mm | 11430.912 | Ex-Works | Unspecified | ¥63,439 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312932 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18753.84 | Ex-Works | Unspecified | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312933 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18753.84 | Ex-Works | Unspecified | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312934 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18753.84 | Ex-Works | Unspecified | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312935 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18753.84 | Ex-Works | Unspecified | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |

Indirect Export

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification | Volume (m²) | Method of Delivery | Destination Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 6/2/2006 | 06312936 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18753.84 | Ex-Works | Unspecified | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312937 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18753.84 | Ex-Works | Unspecified | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312938 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18753.84 | Ex-Works | Unspecified | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312939 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18753.84 | Ex-Works | Unspecified | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312940 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18753.84 | Ex-Works | Unspecified | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312941 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18753.84 | Ex-Works | Unspecified | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312942 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 18753.84 | Ex-Works | Unspecified | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| \multicolumn{15}{c}{**Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007**} |
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 6/2/2006 | 06312943 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18753.84 | Ex-Works | Unspecif ied | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312944 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18753.84 | Ex-Works | Unspecif ied | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312945 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18753.84 | Ex-Works | Unspecif ied | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312946 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18753.84 | Ex-Works | Unspecif ied | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312947 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18753.84 | Ex-Works | Unspecif ied | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312948 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18753.84 | Ex-Works | Unspecif ied | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312949 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18753.84 | Ex-Works | Unspecif ied | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 6/2/2006 | 06312950 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18753.84 | Ex-Works | Unspecif ied | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312951 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18753.84 | Ex-Works | Unspecif ied | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312952 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18753.84 | Ex-Works | Unspecif ied | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312953 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18753.84 | Ex-Works | Unspecif ied | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/2/2006 | 06312954 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 18753.84 | Ex-Works | Unspecif ied | ¥104,076 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/10/2006 | 06312964 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 16878.456 | Ex-Works | Unspecif ied | ¥89,926 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/11/2006 | 06312967 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 6025.0432 | Ex-Works | Unspecif ied | ¥34,934 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 6/13/2006 | 06312968 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20093.4 | Ex-Works | Unspecif ied | ¥116,505 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06312969 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20093.4 | Ex-Works | Unspecif ied | ¥116,505 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06132970 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20093.4 | Ex-Works | Unspecif ied | ¥116,505 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339676 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20093.4 | Ex-Works | Unspecif ied | ¥116,505 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339677 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20093.4 | Ex-Works | Unspecif ied | ¥116,505 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339678 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20093.4 | Ex-Works | Unspecif ied | ¥116,505 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339679 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 20084.4696 | Ex-Works | Unspecif ied | ¥116,453 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007** | | | | | | | | | | | | | | |
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 6/13/2006 | 06339680 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 2857.728 | Ex-Works | Unspecif ied | ¥16,214 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775- 1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339680 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 2857.728 | Ex-Works | Unspecif ied | ¥16,214 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775- 1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339681 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 17860.8 | Ex-Works | Unspecif ied | ¥99,120 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775- 1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339682 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 17860.8 | Ex-Works | Unspecif ied | ¥99,120 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775- 1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339683 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 17860.8 | Ex-Works | Unspecif ied | ¥99,120 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775- 1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339684 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 17860.8 | Ex-Works | Unspecif ied | ¥99,120 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775- 1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339685 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 16967.76 | Ex-Works | Unspecif ied | ¥94,164 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775- 1999 | China International Economic and Trade Arbitration Commission |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007** | | | | | | | | | | | | | | |
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 6/13/2006 | 06339686 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 9814.5096 | Ex-Works | Unspecif ied | ¥56,906 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339687 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 17860.8 | Ex-Works | Unspecif ied | ¥103,560 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339688 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 17860.8 | Ex-Works | Unspecif ied | ¥103,560 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339689 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 17860.8 | Ex-Works | Unspecif ied | ¥103,560 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339690 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 17860.8 | Ex-Works | Unspecif ied | ¥103,560 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/13/2006 | 06339693 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥85,470 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 6/13/2006 | 06339692 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥85,470 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Time** | **Serial No. of Invoice** | **Manufacturer** | **Exporter** | **U.S. Buyer** | **Company Issuing the Invoice** | **Source of Raw Materials (Natural Gypsum)** | **Specification** | **Volume (㎡)** | **Method of Delivery** | **Destination Port** | **Value (Yuan)** | **Export Method** | **Product Label** | **Quality Standard** | **Dispute Resolution** |

**Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007**

| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification | Volume (㎡) | Method of Delivery | Destination Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/21/2006 | 06339703 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 14735.16 | Ex-Works | Unspecified | ¥85,470 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 6/24/2006 | 06339714 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 14735.16 | Ex-Works | Unspecified | ¥85,470 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 6/24/2006 | 06339715 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 14735.16 | Ex-Works | Unspecified | ¥85,470 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 6/25/2006 | 06339717 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 14735.16 | Ex-Works | Unspecified | ¥81,774 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/25/2006 | 06339718 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 39124.0824 | Ex-Works | Unspecified | ¥226,848 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/25/2006 | 06339721 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 2440*1220*12.7mm | 11430.912 | Ex-Works | Unspecified | ¥66,278 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 6/26/2006 | 06339723 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 2440*1220*12.7mm | 2857.728 | Ex-Works | Unspecified | ¥16,570 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/26/2006 | 06339728 | Tai'an Taishan | Jiangsu Shuntian International Economic and Techinical Cooperation | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 2446.9296 | Ex-Works | Unspecified | ¥14,176 | Indirect Export | Unspecified | ASTMC1396 | Unspecified |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007** | | | | | | | | | | | | | | |
| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification | Volume (m²) | Method of Delivery | Destination Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 6/26/2006 | 06339732 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 14735.16 | Ex-Works | Unspecified | ¥85,470 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 6/26/2006 | 06339731 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 14735.16 | Ex-Works | Unspecified | ¥85,470 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 6/27/2006 | 06339734 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 6019.0896 | Ex-Works | Unspecified | ¥34,900 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/27/2006 | 06339735 | Tai'an Taishan | Beijing Building Materials Import & Export Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 3009.5448 | Ex-Works | Unspecified | ¥16,702 | Indirect Export | Blue White Edgeband: IMTGYPSUM, Spray Code: DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | China International Economic and Trade Arbitration Commission |
| 6/28/2006 | 06339740 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 5894.064 | Ex-Works | Unspecified | ¥34,188 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 6/28/2006 | 06339738 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 14735.16 | Ex-Works | Unspecified | ¥85,470 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 6/28/2006 | 06339739 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 14735.16 | Ex-Works | Unspecified | ¥85,470 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 6/28/2006 | 06339743 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 8841.096 | Ex-Works | Unspecified | ¥51,282 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 6/29/2006 | 06339736 | Tai'an Taishan | Zibo International Economic and Technical Cooperation Company | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 4393.7568 | Ex-Works | Unspecif ied | ¥25,484 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |
| 7/8/2006 | 06339759 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥86,380 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/8/2006 | 06339760 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥86,380 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/9/2006 | 06339763 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥86,380 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/9/2006 | 06339765 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥86,380 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/9/2006 | 06339762 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥86,380 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/10/2006 | 06339766 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥86,380 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/10/2006 | 06339767 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥86,380 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| colspan=15 | **Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007** |

| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/10/2006 | 06339768 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥86,380 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/13/2006 | 06339777 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/13/2006 | 06339776 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥86,380 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/14/2006 | 06339780 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/21/2006 | 06339795 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecif ied | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/21/2006 | 06339795 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecif ied | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/21/2006 | 06339794 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecif ied | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/21/2006 | 06339794 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecif ied | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 7/22/2006 | 06339796 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecif ied | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/22/2006 | 06339796 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecif ied | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/22/2006 | 06339797 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecif ied | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/22/2006 | 06339797 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecif ied | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/22/2006 | 06339798 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecif ied | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/22/2006 | 06339798 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecif ied | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/24/2006 | 06339803 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecif ied | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/24/2006 | 06339803 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecif ied | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification | Volume (m²) | Method of Delivery | Destination Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 7/24/2006 | 06339802 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 3393.552 | Ex-Works | Unspecified | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/24/2006 | 06339802 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 2440*1220*12.7mm | 10835.552 | Ex-Works | Unspecified | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/25/2006 | 06339815 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 14735.16 | Ex-Works | Unspecified | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/25/2006 | 06339809 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 3393.552 | Ex-Works | Unspecified | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/25/2006 | 06339809 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 2440*1220*12.7mm | 10835.552 | Ex-Works | Unspecified | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/25/2006 | 06339814 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 3393.552 | Ex-Works | Unspecified | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/25/2006 | 06339814 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 2440*1220*12.7mm | 10835.552 | Ex-Works | Unspecified | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/26/2006 | 06339818 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220*12.7mm | 14735.16 | Ex-Works | Unspecified | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |

## Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007

| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/26/2006 | 06339819 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/26/2006 | 06339834 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/27/2006 | 06339841 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/27/2006 | 06339845 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 8841.096 | Ex-Works | Unspecif ied | ¥50,937 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/27/2006 | 06339844 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 11788.128 | Ex-Works | Unspecif ied | ¥67,916 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/28/2006 | 06339848 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecif ied | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/28/2006 | 06339848 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecif ied | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/29/2006 | 06339854 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 8841.096 | Ex-Works | Unspecif ied | ¥50,937 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 7/29/2006 | 06339855 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/30/2006 | 06339867 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/30/2006 | 06339865 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/31/2006 | 06339869 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 7/31/2006 | 06339868 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/1/2006 | 06339870 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/3/2006 | 06339872 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecif ied | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/3/2006 | 06339872 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecif ied | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

## Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007

| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/3/2006 | 06339871 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecif ied | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/3/2006 | 06339871 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecif ied | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/15/2006 | 00785737 | Tai'an Taishan | Shanghai Kaidun Industrial Development Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 2827.96 | Ex-Works | Unspecif ied | ¥16,402 | Indirect Export | White Letterless Edgeband, Spray Code: Mega Gypsum | ASTMC1396 | Unspecified |
| 8/15/2006 | 00785742 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/15/2006 | 00785744 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/15/2006 | 00785746 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/15/2006 | 00785744 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 14735.16 | Ex-Works | Unspecif ied | ¥84,895 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/16/2006 | 00787387- 00787388 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 19646.88 | Ex-Works | Unspecif ied | ¥169,790 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 8/17/2006 | 00787394 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 8668.4416 | Ex-Works | Unspecif ied | ¥49,417 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/17/2006 | 00787394 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 2714.8416 | Ex-Works | Unspecif ied | ¥16,097 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/17/2006 | 00787395 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 2167.1104 | Ex-Works | Unspecif ied | ¥12,354 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/17/2006 | 00787395 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 678.7104 | Ex-Works | Unspecif ied | ¥4,024 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/17/2006 | 00787394 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 2714.8416 | Ex-Works | Unspecif ied | ¥16,097 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/17/2006 | 00787394 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 8668.4416 | Ex-Works | Unspecif ied | ¥49,417 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/17/2006 | 00787395 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 2167.1104 | Ex-Works | Unspecif ied | ¥12,354 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/17/2006 | 00787395 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 678.7104 | Ex-Works | Unspecif ied | ¥4,024 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/18/2006 | 00787403 | Tai'an Taishan | Shanghai Yujin Industrial Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 2813.076 | Ex-Works | Unspecif ied | ¥16,596 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufacturer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specification | Volume (㎡) | Method of Delivery | Destination Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 8/18/2006 | 00787402 | Tai'an Taishan | Hangzhou Geruide Import & Export Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 2232.6 | Ex-Works | Unspecified | ¥12,950 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |
| 8/18/2006 | 00787402 | Tai'an Taishan | Hangzhou Geruide Import & Export Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 2232.6 | Ex-Works | Unspecified | ¥12,950 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |
| 8/18/2006 | 00787403 | Tai'an Taishan | Shanghai Yujin Industrial Co., Ltd. | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 2813.076 | Ex-Works | Unspecified | ¥16,596 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |
| 8/21/2006 | 00787406 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecified | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/21/2006 | 00787406 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecified | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/21/2006 | 00787406 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecified | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/21/2006 | 00787406 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecified | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/22/2006 | 00787407 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecified | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/22/2006 | 00787407 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspecified | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecified | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |

| Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 8/22/2006 | 00785747 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecif ied | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/22/2006 | 00785747 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecif ied | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/23/2006 | 00787411 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecif ied | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/23/2006 | 00787411 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecif ied | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/23/2006 | 00787411 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 10835.552 | Ex-Works | Unspecif ied | ¥61,771 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 8/23/2006 | 00787411 | Tai'an Taishan | Shanghai Shangshi International Trading Group Pudong Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 3393.552 | Ex-Works | Unspecif ied | ¥20,122 | Indirect Export | "Taishan" Edgeband; Spray Code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | Plaintiff's Court |
| 9/8/2006 | 00787470 | Tai'an Taishan | Shandong Yuanhua International Trading Co., | Unspe cifie d | Tai'an Taishan | Shandong Mine | 3660*1220 *12.7mm | 11609.52 | Ex-Works | Unspecif ied | ¥71,630 | Indirect Export | Edgeband: CRESCENT CITY, Spray Code: Made in China, ceiling | ASTM C1396 | Unspecified |
| 11/24/2006 | 00751819 | Tai'an Taishan | Xuzhou Hanbang Commercial Trading Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 2857.728 | Ex-Works | Unspecif ied | ¥16,213 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Statistics of U.S. Gypsum Boards by Indirect Export during 2005-2007** | | | | | | | |
| Time | Serial No. of Invoice | Manufac turer | Exporter | U.S. Buyer | Company Issuing the Invoice | Source of Raw Materials (Natural Gypsum) | Specifica tion | Volume (m²) | Method of Delivery | Destinat ion Port | Value (Yuan) | Export Method | Product Label | Quality Standard | Dispute Resolution |
| 11/27/2006 | 00751842 | Tai'an Taishan | Xuzhou International Economic and Technical Cooperation Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 2411.208 | Ex-Works | Unspecif ied | ¥13,413 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |
| 11/27/2006 | 00751843 | Tai'an Taishan | Xuzhou International Economic and Technical Cooperation Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 446.52 | Ex-Works | Unspecif ied | ¥2,484 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |
| 12/26/2006 | 00754960 | Tai'an Taishan | Jiangsu Dongheng Group Import & Export | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 4048.448 | Ex-Works | Unspecif ied | ¥21,855 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTMC1396 | Unspecified |
| 1/12/2007 | 00754984 | Tai'an Taishan | Qingdao Jiuyuan Industrial Development Co., Ltd. | Unspe cifie d | Tai'an Taishan | Shandong Mine | 2440*1220 *12.7mm | 5715.456 | Ex-Works | Unspecif ied | ¥31,266 | Indirect Export | White Letterless Edgeband, No Spray Code | ASTM C1396 | Plaintiff's Court |
| Total | | | | | | | | 6051112.79m² | | | 34543000 Yuan | | | | |

TG-0129677

Self-management export

2005-2007 years self-management exports the American gypsum board statistics time invoice number producer exporter American customer writing a check company raw material (natural gypsum) the origin specification (mm) quantity (m²) delivery way port of destination amount ($) export way product marking quality specification to dispute that solves 2/24/060008655 Shandong Taihe Shandong Taihe VENTURE SUPPLY INC Shandong Taihe Shandong ore 3660*1220*12.7FOB Lian Yuangang Norfolk, Virginia reserved-358000x18 self-management export seals the sideband: Venture Supply, spurts the code: MFG:SHANDONG TAIHE, CHINAGB/T9775-1999 China international economy trade arbitration committee 7/20/0600012282 Shandong Taihe Shandong Taihe VENTURE SUPPLY INC Shandong Taihe Shandong ore 3660*1220*12.7FOB Lian Yuangang Camden, New Jersey reserved-197749x18 self-management export seals the sideband: Venture Supply, spurts the code: The MFG:SHANDONG TAIHE, CHINAGB/T9775-1999 China international economy trade arbitration committee 8/2/0600012286 Tai'an Taishan Tai'an Taishan WOOD NATION INC Tai'an Taishan Shandong ore 3660*1220*12.7FOB Qingdao Tampa, Florida reserved-55440x1a self-management export seals the sideband: TTPC, spurts the code: TAIAN TAISHAN PLASTERBOARD CO., the GYPSUM DRYWALL PER ASTM C 1396 04 CONTACT:813-994-6499ASTM C1396 International Chamber of Commerce China Committee 8/8/0600012286 Tai'an Taishan Tai'an Taishan WOOD NATION INC Tai'an Taishan Shandong ore 3660*1220*12.7FOB Qingdao Tampa, Florida reserved-55440x1a self-management export seals the sideband: TTPC, spurts the code: TAIAN TAISHAN PLASTERBOARD CO., GYPSUM DRYWALL PER ASTM C 1396 04 CONTACT:813-994-6499 ASTM C1396 International Chamber of Commerce China Committee 9/15/0600012413 Tai'an Taishan Tai'an Taishan SHENZHEN YONGFENG INVESTMENT CO., LTD.
Tai'an Taishan Shandong ore 2440*1220*12.7FOB Qingdao New York, New York State reserved-10847x1a self-management export seals sideband/to spurt the code: Marathon Construction, ASTM C1396 China law of contract 9/15/0600012414 Tai'an Taishan Tai'an Taishan SHENZHEN YONGFENG INVESTMENT CO., the LTD. Tai'an Taishan Shandong ore 2440*1220*12.7FOB Qingdao New York, New York State reserved-8106x1a self-management export seals sideband/to spurt the code: Marathon Construction, ASTM C1396 China law of contract 9/15/0600012415 Tai'an Taishan Tai'an Taishan SHENZHEN YONGFENG INVESTMENT CO., the LTD. Tai'an Taishan Shandong ore 2440*1220*12.7FOB Qingdao New York, New York State reserved-10847x1a self-management export seals sideband/to spurt the code: Marathon Construction, ASTM C1396 China law of contract 9/15/0600012414 Tai'an Taishan Tai'an Taishan SHENZHEN YONGFENG INVESTMENT CO., the LTD. Tai'an Taishan Shandong ore 2440*1220*12.7FOB Qingdao New York, New York State reserved-8106x1a self-management export seals sideband/to spurt the code: Marathon Construction, ASTM C1396 China law of contract 9/15/06 00012415 Tai'an Taishan Tai'an Taishan SHENZHEN YONGFENG INVESTMENT CO., the LTD. Tai'an Taishan Shandong ore 2440*1220*12.7FOB Qingdao New York, New York State reserved-10847x1a self-management export seals sideband/to spurt the code: The Marathon Construction, ASTM C1396 China law of contract 10/5/0600013764 Tai'an Taishan Tai'an Taishan TOV TRADING NEW YORK USA Tai'an Taishan Shandong ore 2440*1220*12.7FOB Qingdao New York, New York State reserved-37100x1a self-management export seals the sideband: OEG, does not spurt the code ASTM C1396 China international economy trade arbitration committee 10/5/0600013764 Tai'an Taishan Tai'an Taishan TOV TRADING NEW YORK USA Tai'an

Taishan Shandong ore 3660*1220*12.7FOB Qingdao New York, New York State
reserved-13850x1a self-management export seals the sideband: OEG, does not spurt
the code ASTM C1396 China international economy trade arbitration committee
10/5/0600013765 Tai'an Taishan Tai'an Taishan TOV TRADING NEW YORK USA Tai'an
Taishan Shandong ore 2440*1220*12.7FOB Qingdao New York, New York State
reserved-23400x1a self-management export seals the sideband: OEG, does not spurt
code ASTM C1396 China international economy trade arbitration committee
11/16/0600013769 Tai'an Taishan Tai'an Taishan SHENZHEN YONGFENG INVESTMENT CO.,
the LTD. Tai'an Taishan Shandong ore 2440*1220*12.7FOB Qingdao New York, New York
State reserved-25025x1a self-management export seals sideband/to spurt the code:
The Marathon Construction, ASTM C1396 China law of contract 12/2/0600017539 Tai'an
Taishan Tai'an Taishan STONE PRIDE INTERNATIONAL CORP Tai'an Taishan Shandong ore
3660*1220*12.7FOB Qingdao Miami, Florida reserved-10032x1a self-management export
white seals the sideband without the character, does not spurt code ASTM C1396
unclear 12/28/0600017585 Tai'an Taishan Tai'an Taishan SHENZHEN YONGFENG INVESTMENT
CO., the LTD. Tai'an Taishan Shandong ore 2440*1220*12.7FOB Qingdao New York, New
York State reserved-20020x1a self-management export seals sideband/to spurt the
code: Marathon Construction, ASTM C1396 China law of contract 12/28/0600017585
Tai'an Taishan Tai'an Taishan SHENZHEN YONGFENG INVESTMENT CO., the LTD. Tai'an
Taishan Shandong ore 2440*1220*15.9FOB Qingdao New York, New York State
reserved-11824x1a self-management export seals sideband/to spurt the code: Marathon
Construction, ASTM C1396 China law of contract 2/9/0700030752 Tai'an Taishan Tai'an
Taishan SHENZHEN YONGFENG INVESTMENT CO., the LTD. Tai'an Taishan Shandong ore
2440*1220*12.7FOB Qingdao New York, New York State reserved-5005x1a self-management
export seals sideband/to spurt the code: Marathon Construction, ASTM C1396 China
law of contract 2/9/07 00030752 Tai'an Taishan Tai'an Taishan SHENZHEN YONGFENG
INVESTMENT CO., the LTD. Tai'an Taishan Shandong ore 2440*1220*15.9FOB Qingdao New
York, New York State reserved-17737x1a self-management export seals sideband/to
spurt the code: The Marathon Construction, ASTM C1396 China law of contract
4/30/0700001188 Tai'an Taishan Tai'an Taishan ORIENTAL TRADING COMPANY LLC Tai'an
Taishan Shandong ore 3660*1220*12.7FOB Qingdao Miami, Florida 77385.OO
self-management export seals the sideband: The DUN DrywallASTM C1396 unclear
4/30/0700001189 Tai'an Taishan Tai'an Taishan B AMERICA CORPORATION Tai'an Taishan
Shandong ore 3660*1220*12.7FOB Qingdao Miami, Florida reserved-5656x1a
self-management export white seals the sideband without the character, does not
spurt the code ASTM C1396 unclear 5/28/0700001196 Tai'an Taishan Tai'an Taishan
ORIENTAL TRADING COMPANY LLC Tai'an Taishan Shandong ore 2440*1220*12.7FOB Qingdao
Miami, Florida reserved-12740x1a self-management export seals the sideband: The DUN
DrywallASTM C1396 unclear 5/28/0700001198 Tai'an Taishan Tai'an Taishan ORIENTAL
TRADING COMPANY LLC Tai'an Taishan Shandong ore 2440*1220*12.7 FOB Qingdao Miami,
Florida reserved-15288x1a self-management export seals the sideband: The DUN
DrywallASTM C1396 unclear 5/28/07 00001199 Tai'an Taishan Tai'an Taishan ORIENTAL
TRADING COMPANY LLC Tai'an Taishan Shandong ore 2440*1220*12.7FOB Qingdao Miami,
Florida reserved-5096x1a self-management export seals the sideband: The DUN
DrywallASTM C1396 unclear 5/28/0700001200 Tai'an Taishan Tai'an Taishan ORIENTAL
TRADING COMPANY LLC Tai'an Taishan Shandong ore 2440*1220*12.7FOB Qingdao Miami,
Florida reserved-12740x1a self-management export seals the sideband: The DUN
DrywallASTM C1396 unclear 6/12/0700001202 Tai'an Taishan Tai'an Taishan ORIENTAL

TG-0129677

TRADING COMPANY LLC Tai'an Taishan Shandong ore 2440*1220*12.7FOB Qingdao Miami, Florida reserved-12740x1a self-management export seals the sideband: The DUN DrywallASTM C1396 unclear 6/26/0700001214 Tai'an Taishan Tai'an Taishan ORIENTAL TRADING COMPANY LLC Tai'an Taishan Shandong ore 3660*1220*12.7FOB Qingdao Miami, Florida reserved-7738x1a self-management export seals the sideband: The DUN DrywallASTM C1396 unclear 7/3/0700001218 Tai'an Taishan Tai'an Taishan ORIENTAL TRADING COMPANY LLC Tai'an Taishan Shandong ore 3660*1220*12.7FOB Qingdao Miami, Florida reserved-25795x1a self-management export seals the sideband: The DUN DrywallASTM C1396 unclear 7/3/0700001219 Tai'an Taishan Tai'an Taishan ORIENTAL TRADING COMPANY LLC Tai'an Taishan Shandong ore 3660*1220*12.7FOB Qingdao Miami, Florida reserved-25795x1a self-management export seals the sideband: DUN Drywall ASTM C1396 equals $1002963.42 indirectly to export for 2005-2007 years indirectly to export the American gypsum board statistics time invoice number producer exporter US buyer writing a check company raw material unclear (natural gypsum) origin specification quantity (㎡) unit price delivery way port of destination amount (Yuan) export way product marking quality specification to dispute that solves 3/13/0606257961-06257978 Tai'an Taishan Shandong Eastern the international trade limited liability company unclear Tai'an Taishan Shandong Ore 3660*1220*12.7mm ex works unclear indirect export unclear ASTM C1396 unclear 3/13/0606257979-06258003 Tai'an Taishan Shandong Eastern the international trade limited liability company unclear Tai'an Taishan Shandong Ore 3660*1220*12.7mm ex works unclear indirect export unclear ASTM C1396 unclear 3/13/0606258004 Tai'an Taishan Shandong Eastern the international trade limited liability company unclear Tai'an Taishan Shandong Ore 3660*1220*12.7mm4514 ex worksUnclear ¥112,999 the indirect export unclear ASTM C1396 unclear 3/21/0606258044 Tai'an Taishan Lianyungang far Thai international trade limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3500 ex works unclear ¥87,518 the indirect export unclear ASTMC1396 unclear 3/21/06 06258045 Tai'an Taishan Lianyungang far Thai international trade limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3000 ex works unclear ¥75,015 the indirect export unclear ASTMC1396 unclear 4/22/0606289900-06289922 Tai'an Taishan Shanghai Yuyuan commercial city import and export limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm ex works unclear indirect export white seal the sideband without the character; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 Huangpu District people's court 4/22/0606289923 Tai'an Taishan Shanghai Yuyuan commercial city import and export limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4187 ex works unclear ¥110,118 the indirect export white seals the sideband without the character; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 Huangpu District people's court 4/22/0606289888-06289899 Tai'an Taishan Shanghai Yuyuan commercial city import and export limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm 41600 ex works unclear ¥1,094,080 the indirect export white seals the sideband without the character; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 Huangpu District people's court 4/23/0606289925-06289928 Tai'an Taishan Eastern international group Shanghai foreign trade limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm ex works unclear indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 China international

TG-0129677

economy trade arbitration committee 4/23/0606289925-06289928 Tai'an Taishan Eastern international group Shanghai foreign trade limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm ex works unclear indirect export "Taishan" seals the sideband; Spurts the code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 China international economy trade arbitration committee 4/26/0606289930 Tai'an Taishan Qingdao Australia decorate the plate limited company unclear Tai'an Taishan Shandong Ore 3660*1220*12.7mm460 ex works unclear ¥11,502 the indirect export white to seal the sideband without the character, does not spurt the code ASTMC1396 unclear 4/28/06 06289932-06289933 Tai'an Taishan Shanghai Yuyuan commercial city import and export limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm ex works unclear indirect export white to seal the sideband without the character; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 Huangpu District people's court 4/28/0606289934-06290014 Tai'an Taishan Shanghai Yuyuan commercial city import and export limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm ex works unclear indirect export white seal the sideband without the character; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 Huangpu District people's court 4/28/0606290015 Tai'an Taishan Shanghai Yuyuan commercial city import and export limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4077 ex works unclear ¥107,225 the indirect export white seals the sideband without the character; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 Huangpu District people's court 4/28/0606290016-06290025 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm ex works unclear indirect export white seal the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/12/0606290070 Tai'an Taishan Nantong economic development zone corporation unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm17146.368 ex works unclear ¥116,796 the indirect export white seals the sideband without the character, does not spurt the code ASTMC1396 unclear 5/15/0606312793-06312800 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm ex works unclear indirect export white to seal the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/15/06 06312801 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4112 ex works unclear ¥110,165 the indirect export white seals the sideband without the character, spurts the code: DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/15/0606312802 Tai'an Taishan Qingdao Kang Hong import and export limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm7380 ex works unclear ¥95,645 indirect export unclear ASTMC1396 unclear 5/15/0606312803 Tai'an Taishan Qingdao Kang Hong import and export limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm7380 ex works unclear ¥95,645 the indirect export unclear ASTMC1396 unclear 5/18/0606312809 Tai'an Taishan Zhejiang two light enterprise group import and export limited company unclear Tai'an Taishan Shandong Ore 3660*1220*12.7mm459120500 ex works unclear ¥111,461 the indirect export unclear ASTM C1396 unclear 5/19/0606312817 Tai'an Taishan Lianyungang far Thai international trade limited company unclear Tai'an Taishan Shandong ore

Page 4

Case 2:09-md-02047-EEF-MBN Document 22362-78 Filed 11/26/19 Page 38 of 782 Page ID #:181

TG-0129677

3660*1220*12.7mm3500 ex works unclear ¥87,518 the indirect export unclear ASTM C1396 unclear 5/19/0606312818 Tai'an Taishan Lianyungang far Thai international trade limited company is unclearTai'an Taishan Shandong Ore 3660*1220*12.7mm2920 ex works unclear ¥73,015 the indirect export unclear ASTM C1396 unclear 5/22/06 06312823 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3780 ex works unclear ¥89,926 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/22/0606312824 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3780 ex works unclear ¥89,926 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/22/0606312825 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm2520 ex works unclear ¥60,732 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/22/0606312826 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4680 ex works unclear ¥111,337 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/22/0606312827 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4680 ex works unclear ¥111,337 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/22/0606312828 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4680 ex works unclear ¥111,337 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/22/0606312829 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4680 ex works unclear ¥111,337 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/22/0606312830 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4680 ex works unclear ¥111,337 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/22/0606312831 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4680 ex works unclear ¥111,337 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/22/0606312832 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4680 ex works unclear ¥111,337 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy

Case 2:09-md-02047-EEF-MBN Document 22362-72 Filed 11/16/19 Page 39 of 192
Case 2:14-cv-00033-PAM-ESH Document 82 Filed 04/15/16 Page 704 of 1680 PageID #: 182

TG-0129677

trade arbitration committee 5/22/0606312833 Tai'an Taishan Beijing building
material import-export company unclear Tai'an Taishan Shandong ore
3660*1220*12.7mm4680 ex works unclear ¥111,337 the indirect export white seals the
sideband without the character, spurts the code: The DRYWALL
4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration
committee 5/22/0606312834 Tai'an Taishan Beijing building material import-export
company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4680 ex works unclear
¥111,337 the indirect export white seals the sideband without the character, spurts
the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy
trade arbitration committee 5/22/0606312835 Tai'an Taishan Beijing building
material import-export company unclear Tai'an Taishan Shandong ore
3660*1220*12.7mm4680 ex works unclear ¥111,337 the indirect export white seals the
sideband without the character, spurts the code: The DRYWALL
4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration
committee 5/22/0606312836 Tai'an Taishan Beijing building material import-export
company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4130 ex works unclear
¥102,350 the indirect export white seals the sideband without the character, spurts
the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy
trade arbitration committee 5/22/0606312837 Tai'an Taishan Beijing building
material import-export company unclear Tai'an Taishan Shandong ore
3660*1220*12.7mm4130 ex works unclear ¥102,350 the indirect export white seals the
sideband without the character, spurts the code: The DRYWALL
4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration
committee 5/22/0606312838 Tai'an Taishan Beijing building material import-export
company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4130 ex works unclear
¥102,350 the indirect export white seals the sideband without the character, spurts
the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy
trade arbitration committee 5/22/0606312839 Tai'an Taishan Beijing building
material import-export company unclear Tai'an Taishan Shandong ore
3660*1220*12.7mm4130 ex works unclear ¥102,350 the indirect export white seals the
sideband without the character, spurts the code: The DRYWALL
4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration
committee 5/22/0606312840 Tai'an Taishan Beijing building material import-export
company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4130 ex works unclear
¥102,350 the indirect export white seals the sideband without the character, spurts
the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy
trade arbitration committee 5/22/0606312841 Tai'an Taishan Beijing building
material import-export company unclear Tai'an Taishan Shandong ore
3660*1220*12.7mm4130 ex works unclear ¥102,350 the indirect export white seals the
sideband without the character, spurts the code: The DRYWALL
4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration
committee 5/22/0606312842 Tai'an Taishan Beijing building material import-export
company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4130 ex works unclear
¥102,350 the indirect export white seals the sideband without the character, spurts
the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy
trade arbitration committee 5/22/0606312843 Tai'an Taishan Beijing building
material import-export company unclear Tai'an Taishan Shandong ore
3660*1220*12.7mm4130 ex works unclear ¥102,350 the indirect export white seals the

Case 2:09-md-02047-EEF-MBN Document 22362-72 Filed 11/12/19 Page 46 of 79 PageID #:83

sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/22/0606312844 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4130 ex works unclear ¥102,350 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/22/0606312845 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm960 ex works unclear ¥15,859 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/22/0606312845 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm1710 ex works unclear ¥40,681 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/24/0606312850 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4180 ex works unclear ¥111,982 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/24/0606312852 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4180 ex works unclear ¥111,982 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/24/0606312853 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4180 ex works unclear ¥111,982 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/24/0606312854 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4290 ex works unclear ¥114,934 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/24/0606312855 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4290 ex works unclear ¥114,934 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/24/0606312856 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4290 ex works unclear ¥114,934 the indirect export white seals the sideband without the character, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/24/0606312857 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4290 ex works unclear ¥114,934 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/26/0606312885 Tai'an Taishan Beijing building material import and export common The department unclear

TG-0129677

Tai'an Taishan Shandong Ore 3660*1220*12.7mm3000 ex works unclear ¥80,370 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/26/0606312886 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm2940 ex works unclear ¥78,763 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 5/28/0606312891 Tai'an Taishan Qingdao Kang Hong import and export limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm6000 ex works unclear ¥77,760 the indirect export white seals the sideband without the character, does not spurt code ASTMC1396 unclear 5/28/06 06312892 Tai'an Taishan Qingdao Kang Hong import and export limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm1380 ex works unclear ¥17,885 the indirect export white to seal the sideband without the character, does not spurt the code ASTMC1396 unclear 5/29/0606312893 Tai'an Taishan Eastern the international group Shanghai foreign trade limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3024 ex works unclear ¥81,564 indirect export "Taishan" to seal the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 China international economy trade arbitration committee 5/29/0606312894 Tai'an Taishan Eastern the international group Shanghai foreign trade limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm 336 ex works unclear ¥81,564 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 China international economy trade arbitration committee 5/29/0606312895 Tai'an Taishan Eastern the international group Shanghai foreign trade limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm6720 ex works unclear ¥97,877 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 China international economy trade arbitration committee 6/2/0606312955 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3620 ex works unclear ¥89,704 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312931 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3840 ex works unclear ¥63,439 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312932 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312933 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312934 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals

Case 2:09-md-02047-EEF-MBN Document 23362-72 Filed 04/02/19 Page 42 of 92 PageID #185

TG-0129677

the sideband: IMTGYPSUM, spurts the code: The DRYWALL
4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration
committee 6/2/0606312935 Tai'an Taishan Beijing building material import-export
company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear
¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the
code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy
trade arbitration committee 6/2/0606312936 Tai'an Taishan Beijing building material
import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex
works unclear ¥104,076 the indirect export blue white seals the sideband:
IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China
international economy trade arbitration committee 6/2/0606312937 Tai'an Taishan
Beijing building material import-export company unclear Tai'an Taishan Shandong ore
3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals
the sideband: IMTGYPSUM, spurts the code: The DRYWALL
4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration
committee 6/2/0606312938 Tai'an Taishan Beijing building material import-export
company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear
¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the
code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy
trade arbitration committee 6/2/0606312939 Tai'an Taishan Beijing building material
import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex
works unclear ¥104,076 the indirect export blue white seals the sideband:
IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China
international economy trade arbitration committee 6/2/0606312940 Tai'an Taishan
Beijing building material import-export company unclear Tai'an Taishan Shandong ore
3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals
the sideband: IMTGYPSUM, spurts the code: The DRYWALL
4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration
committee 6/2/0606312941 Tai'an Taishan Beijing building material import-export
company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear
¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the
code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy
trade arbitration committee 6/2/0606312942 Tai'an Taishan Beijing building material
import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex
works unclear ¥104,076 the indirect export blue white seals the sideband:
IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China
international economy trade arbitration committee 6/2/0606312943 Tai'an Taishan
Beijing building material import-export company unclear Tai'an Taishan Shandong ore
3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals
the sideband: IMTGYPSUM, spurts the code: The DRYWALL
4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration
committee 6/2/0606312944 Tai'an Taishan Beijing building material import-export
company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear
¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the
code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy
trade arbitration committee 6/2/0606312945 Tai'an Taishan Beijing building material
import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex
works unclear ¥104,076 the indirect export blue white seals the sideband:

TG-0129677

IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312946 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312947 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312948 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312949 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312950 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312951 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312952 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312953 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/2/0606312954 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4200 ex works unclear ¥104,076 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/10/0606312964 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3780 ex works unclear ¥89,926 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/11/0606312967 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm2024 ex works unclear ¥34,934 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the

Page 10

TG-0129677

code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606312968 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4500 ex works unclear ¥116,505 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606312969 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4500 ex works unclear ¥116,505 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606132970 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4500 ex works unclear ¥116,505 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339676 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4500 ex works unclear ¥116,505 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339677 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4500 ex works unclear ¥116,505 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339678 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4500 ex works unclear ¥116,505 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339679 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4498 ex works unclear ¥116,453 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339680 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm960 ex works unclear ¥16,214 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339680 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm960 ex works unclear ¥16,214 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339681 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4000 ex works unclear ¥99,120 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339682 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore

3660*1220*12.7mm4000 ex works unclear ¥99,120 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339683 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4000 ex works unclear ¥99,120 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339684 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4000 ex works unclear ¥99,120 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339685 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3800 ex works unclear ¥94,164 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339686 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm2198 ex works unclear ¥56,906 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339687 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4000 ex works unclear ¥103,560 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339688 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4000 ex works unclear ¥103,560 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339689 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4000 ex works unclear ¥103,560 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339690 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm4000 ex works unclear ¥103,560 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/13/0606339693 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥85,470 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 6/13/0606339692 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥85,470 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 6/21/0606339703 Tai'an Taishan Kamiunakami solid

Case 2:09-md-02047-EEF-MBN Document 22362-72 Filed 11/26/19 Page 46 of 79 Page ID #1189

TG-0129677

international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥85,470 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 6/24/0606339714 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥85,470 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 6/24/0606339715 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥85,470 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 6/25/0606339717 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥81,774 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/25/0606339718 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm8762 ex works unclear ¥226,848 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/25/0606339721 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3840 ex works unclear ¥66,278 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 6/26/0606339723 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm960 ex works unclear ¥16,570 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/26/0606339728 Tai'an Taishan Jiangsu Shuntian international economic and technological cooperation limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm548 ex works unclear ¥14,176 the indirect export unclear ASTMC1396 unclear 6/26/0606339732 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥85,470 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD ASTM C1396 plaintiff court 6/26/0606339731 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥85,470 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD ASTM C1396 plaintiff court 6/27/0606339734 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm1348 ex works unclear ¥34,900 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL 4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/27/0606339735 Tai'an Taishan Beijing building material import-export company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm674 ex works unclear ¥16,702 the indirect export blue white seals the sideband: IMTGYPSUM, spurts the code: The DRYWALL

TG-0129677

4feetX12feetX1/2inchGB/T9775-1999 China international economy trade arbitration committee 6/28/0606339740 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm1320 ex works unclear ¥34,188 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD ASTM C1396 plaintiff court 6/28/0606339738 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥85,470 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD ASTM C1396 plaintiff court 6/28/0606339739 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥85,470 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD ASTM C1396 plaintiff court 6/28/0606339743 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm1980 ex works unclear ¥51,282 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD ASTM C1396 plaintiff court 6/29/0606339736 Tai'an Taishan Zibo international economic and technological cooperation limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm 4393.7568 ex works unclear ¥25,484 the indirect export white seals the sideband without the character, does not spurt the code ASTMC1396 unclear 7/8/0606339759 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥86,380 indirect export "Taishan" to seal the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/8/0606339760 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥86,380 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/9/0606339763 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥86,380 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/9/0606339765 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥86,380 indirect export "Taishan" seals the sideband; Spurts the code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/9/0606339762 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥86, 380 indirect exports "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/10/0606339766 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥86,380 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/10/0606339767 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥86,380 indirect export "Taishan" seals

Page 14

TG-0129677

the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/10/0606339768 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥86,380 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/13/0606339777 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/13/0606339776 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥86,380 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/14/0606339780 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/21/0606339795 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/21/0606339795 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/21/0606339794 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/21/0606339794 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/22/0606339796 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/22/0606339796 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/22/0606339797 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/22/0606339797 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works unclear ¥61,771 indirect export "Taishan" seals

TG-0129677

the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/22/0606339798 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/22/0606339798 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/24/0606339803 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/24/0606339803 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/24/0606339802 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/24/0606339802 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm364010835.552 ex works unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/25/0606339815 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/25/0606339809 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/25/0606339809 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/25/0606339814 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/25/0606339814 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/26/0606339818 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export

TG-0129677

"Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/26/0606339819 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/26/0606339834 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/27/0606339841 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/27/0606339845 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm1980 ex works unclear ¥50,937 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/27/0606339844 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm2640 ex works unclear ¥67,916 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/28/0606339848 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/28/0606339848 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/29/0606339854 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm1980 ex works unclear ¥50,937 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/29/0606339855 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/30/0606339867 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/30/0606339865 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/31/0606339869 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export

Case 2:09-md-02047-EEF-MBN Document 22362-72 Filed 12/18/19 Page 716 of 1680

"Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 7/31/0606339868 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/1/0606339870 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/3/0606339872 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/3/0606339872 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/3/0606339871 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/3/0606339871 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/15/0600785737 Tai'an Taishan Shanghai triumphant sincere industrial development limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm950 ex works unclear ¥16,402 the indirect export white seals the sideband without the character, spurts the code: The Mega GypsumASTMC1396 unclear 8/15/0600785742 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/15/0600785744 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/15/0600785746 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/15/0600785744 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm3300 ex works unclear ¥84,895 indirect export "Taishan" seals the sideband; Spurts the code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/16/0600787387-00787388 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm6600 ex works unclear indirect exports

TG-0129677

"Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/17/0600787394 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm2912 ex works unclear ¥49,417 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/17/0600787394 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm608 ex works unclear ¥16,097 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/17/0600787395 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm728 ex works unclear ¥12,354 indirect export "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/17/0600787395 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm152 ex works unclear ¥4,024 indirect export "Taishan" seals the sideband; Spurts the code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/17/0600787394 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm608 ex works unclear indirect exports "Taishan" seals the sideband; Spurts the code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/17/0600787394 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm2912 ex works unclear indirect exports "Taishan" seals the sideband; Spurts the code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/17/0600787395 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm728 ex works unclear indirect exports "Taishan" seals the sideband; Spurts the code: MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/17/0600787395 Tai'an Taishan Kamiunakami solid international trade group Pudong limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm152 ex works unclear indirect exports "Taishan" seals the sideband; Spurts the code: The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court 8/18/0600787403 Tai'an Taishan Shanghai abundant gold industry limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm 630 ex works unclear ¥16,596 the indirect export white seals the sideband without the character, does not spurt code ASTMC1396 unclear 8/18/0600787402 Tai'an Taishan Hangzhou Judes import and export limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm500 ex works unclear ¥12,950 the indirect export white to seal the sideband without the character, does not spurt code ASTMC1396 unclear 8/18/0600787402 Tai'an Taishan Hangzhou Judes import and export limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm500 ex works unclear ¥12,950 the indirect export white to seal the sideband without the character, does not spurt the code ASTMC1396 unclear 8/18/0600787403 Tai'an Taishan Shanghai abundant gold industry limited company to be unclearTai'an Taishan Shandong ore 3660*1220*12.7mm630 ex works unclear ¥16,596 the indirect export white seals the sideband without the character, does not spurt the code ASTMC1396 unclear 8/21/0600787406 Tai'an Taishan Kamiunakami solid international trade group Pudong

TG-0129677

limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works
unclear ¥61,771 indirect export "Taishan" to seal the sideband; Spurts the code:
The MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court
8/21/0600787406 Tai'an Taishan Kamiunakami solid international trade group Pudong
limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works
unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: MADE
IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court
8/21/0600787406 Tai'an Taishan Kamiunakami solid international trade group Pudong
limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works
unclear indirect exports "Taishan" seals the sideband; Spurts the code: MADE IN
CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court
8/21/0600787406 Tai'an Taishan Kamiunakami solid international trade group Pudong
limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works
unclear indirect exports "Taishan" seals the sideband; Spurts the code: The MADE IN
CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court
8/22/0600787407 Tai'an Taishan Kamiunakami solid international trade group Pudong
limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works
unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The
MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court
8/22/0600787407 Tai'an Taishan Kamiunakami solid international trade group Pudong
limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works
unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: MADE
IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court
8/22/0600785747 Tai'an Taishan Kamiunakami solid international trade group Pudong
limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works
unclear indirect exports "Taishan" seals the sideband; Spurts the code: MADE IN
CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court
8/22/0600785747 Tai'an Taishan Kamiunakami solid international trade group Pudong
limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works
unclear indirect exports "Taishan" seals the sideband; Spurts the code: The MADE IN
CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court
8/23/0600787411 Tai'an Taishan Kamiunakami solid international trade group Pudong
limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works
unclear ¥61,771 indirect export "Taishan" seals the sideband; Spurts the code: The
MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court
8/23/0600787411 Tai'an Taishan Kamiunakami solid international trade group Pudong
limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works
unclear ¥20,122 indirect export "Taishan" seals the sideband; Spurts the code: MADE
IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court
8/23/0600787411 Tai'an Taishan Kamiunakami solid international trade group Pudong
limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm3640 ex works
unclear indirect exports "Taishan" seals the sideband; Spurts the code: MADE IN
CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court
8/23/0600787411 Tai'an Taishan Kamiunakami solid international trade group Pudong
limited company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm760 ex works
unclear indirect exports "Taishan" seals the sideband; Spurts the code: The MADE IN
CHINA MEET OR EXCEED ASTM C1396 04 STANDARDASTM C1396 plaintiff court
9/8/0600787470 Tai'an Taishan Shandong Yuan China international trade limited

TG-0129677

company unclear Tai'an Taishan Shandong ore 3660*1220*12.7mm 2600 ex works unclear ¥71,630 the indirect export seals the sideband: CRESCENT CITY, spurts the code: The Made in China, ceilingASTM C1396 unclear 11/24/0600751819 Tai'an Taishan Xuzhou Chinese nation business limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm2857.728 ex works unclear ¥16,213 the indirect export white seals the sideband without the character, does not spurt the code ASTMC1396 unclear 11/27/0600751842 Tai'an Taishan Xuzhou international economic and technological cooperation limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm810 ex works unclear ¥13,413 the indirect export white to seal the sideband without the character, does not spurt the code ASTMC1396 unclear 11/27/0600751843 Tai'an Taishan Xuzhou international economic and technological cooperation limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm150 ex works unclear ¥2,484 the indirect export white to seal the sideband without the character, does not spurt the code ASTMC1396 unclear 12/26/0600754960 Tai'an Taishan Jiangsu eastern permanent group import and export limited company unclear Tai'an Taishan Shandong Ore 2440*1220*12.7mm1360 FactoryDelivers unclear ¥21, 855 indirect export white seals the sideband without the character, does not spurt the code ASTMC1396 unclear 1/12/0700754984 Tai'an Taishan Qingdao nine Yuan industrial development limited company unclear Tai'an Taishan Shandong ore 2440*1220*12.7mm 1920 ex works unclear ¥31,266 the indirect export white to seal the sideband without the character, does not spurt the code ASTM C1396 plaintiff court to equal 6051112.79 $m^2$ 34.543 million Yuan

--- Summary Information ---
1: 936 PID_AUTHOR:
PID_LASTAUTHOR:
PID_APPNAME: Microsoft Excel PID_LASTPRINTED: Sun Jun 27 14:57: 10 CST 2010
PID_CREATE_DTM: Wed Sep 13 19:21: 51 CST 2006 PID_LASTSAVE_DTM: Sun Jun 27 15:06: 17 CST 2010 PID_SECURITY: 0

--- Document Summary Information ---
PID_CODEPAGE: 936 PID_COMPANY:
23: 730895 PID_SCALE: false PID_LINKSDIRTY: false 19: false 22: false

Document Produced In Native Format

TG-0129677

**2005-2007年自营出口美国石膏板统计**

| 时间 | 发票号码 | 生产商 | 出口商 | 美国客户 | 开票公司 | 原料（天然石膏）来源 | 规格（mm） | 数量（m²） | 交货方式 | 目的港 | 金额（$） | 出口方式 | 产品标识 | 质量标准 | 争议解决 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/24/2006 | 0008655 | 山东泰和 | 山东泰和 | VENTURE SUPPLY INC | 山东泰和 | 山东矿 | 3660*1220*12.7 | 446520 | FOB Lian Yuangang | 诺福克，弗吉尼亚 | $358,000 | 自营出口 | 封边带：Venture Supply，喷码：MFG：SHANDONG TAIHE,CHINA | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 7/20/2006 | 00012282 | 山东泰和 | 山东泰和 | VENTURE SUPPLY INC | 山东泰和 | 山东矿 | 3660*1220*12.7 | 240727.9 | FOB Lian Yuangang | 卡姆登，新泽西 | $197,749 | 自营出口 | 封边带：Venture Supply，喷码：MFG：SHANDONG TAIHE,CHINA | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 8/2/2006 | 00012286 | 泰安泰山 | 泰安泰山 | WOOD NATION INC | 泰安泰山 | 山东矿 | 3660*1220*12.7 | 58940.64 | FOB Qingdao | 坦帕，佛罗里达 | $55,440.00 | 自营出口 | 封边带：TTPC，喷码：TAIAN TAISHAN PLASTERBOARD CO., GYPSUM DRYWALL PER ASTM C 1396 04 CONTACT:813-994-6499 | ASTM C1396 | 国际商会中国委员会 |
| 8/8/2006 | 00012286 | 泰安泰山 | 泰安泰山 | WOOD NATION INC | 泰安泰山 | 山东矿 | 3660*1220*12.7 | 58940.64 | FOB Qingdao | 坦帕，佛罗里达 | $55,440.00 | 自营出口 | 封边带：TTPC，喷码：TAIAN TAISHAN PLASTERBOARD CO., GYPSUM DRYWALL PER ASTM C 1396 04 CONTACT:813-994-6499 | ASTM C1396 | 国际商会中国委员会 |
| 9/15/2006 | 00012413 | 泰安泰山 | 泰安泰山 | SHENZHEN YONGFENG INVESTMENT CO., LTD. | 泰安泰山 | 山东矿 | 2440*1220*12.7 | 10835.55 | FOB Qingdao | 纽约，纽约州 | $10,847.20 | 自营出口 | 封边带/喷码：Marathon Construction, | ASTM C1396 | 中国合同法 |
| 9/15/2006 | 00012414 | 泰安泰山 | 泰安泰山 | SHENZHEN YONGFENG INVESTMENT CO., LTD. | 泰安泰山 | 山东矿 | 2440*1220*12.7 | 8126.664 | FOB Qingdao | 纽约，纽约州 | $8,105.60 | 自营出口 | 封边带/喷码：Marathon Construction, | ASTM C1396 | 中国合同法 |
| 9/15/2006 | 00012415 | 泰安泰山 | 泰安泰山 | SHENZHEN YONGFENG INVESTMENT CO., LTD. | 泰安泰山 | 山东矿 | 2440*1220*12.7 | 10835.55 | FOB Qingdao | 纽约，纽约州 | $10,847.20 | 自营出口 | 封边带/喷码：Marathon Construction, | ASTM C1396 | 中国合同法 |
| 9/15/2006 | 00012414 | 泰安泰山 | 泰安泰山 | SHENZHEN YONGFENG INVESTMENT CO., LTD. | 泰安泰山 | 山东矿 | 2440*1220*12.7 | 8126.664 | FOB Qingdao | 纽约，纽约州 | $8,105.60 | 自营出口 | 封边带/喷码：Marathon Construction, | ASTM C1396 | 中国合同法 |

| 9/15/2006 | 0001241 5 | 泰安泰 山 | 泰安泰 山 | SHENZHEN YONGFENG INVESTMENT CO., LTD. | 泰安泰山 | 山东矿 | 2440*122 0*12.7 | 10835.55 | FOB Qingdao | 纽约, 纽 约州 | $10,847.20 | 自营 出口 | 封边带/喷码: M arathon Construction, | ASTM C1396 | 中国合同 法 |
| 10/5/2006 | 0001376 4 | 泰安泰 山 | 泰安泰 山 | TOV TRADING NEW YORK USA | 泰安泰山 | 山东矿 | 2440*122 0*12.7 | 41675.2 | FOB Qingdao | 纽约, 纽 约州 | $37,100.00 | 自营 出口 | 封边带: OEG, 不喷码 | ASTM C1396 | 中国国际经 济贸易仲裁 委员会 |
| 10/5/2006 | 0001376 4 | 泰安泰 山 | 泰安泰 山 | TOV TRADING NEW YORK USA | 泰安泰山 | 山东矿 | 3660*122 0*12.7 | 15181.68 | FOB Qingdao | 纽约, 纽 约州 | $13,850.00 | 自营 出口 | 封边带: OEG, 不喷码 | ASTM C1396 | 中国国际经 济贸易仲裁 委员会 |
| 10/5/2006 | 0001376 5 | 泰安泰 山 | 泰安泰 山 | TOV TRADING NEW YORK USA | 泰安泰山 | 山东矿 | 2440*122 0*12.7 | 26791.2 | FOB Qingdao | 纽约, 纽 约州 | $23,400.00 | 自营 出口 | 封边带: OEG, 不喷码 | ASTM C1396 | 中国国际经 济贸易仲裁 委员会 |
| ######### | 0001376 9 | 泰安泰 山 | 泰安泰 山 | SHENZHEN YONGFENG INVESTMENT CO., LTD. | 泰安泰山 | 山东矿 | 2440*122 0*12.7 | 27088.88 | FOB Qingdao | 纽约, 纽 约州 | $25,025.00 | 自营 出口 | 封边带/喷码: M arathon Construction, | ASTM C1396 | 中国合同 法 |
| 12/2/2006 | 0001753 9 | 泰安泰 山 | 泰安泰 山 | STONE PRIDE INTERNATIONA L CORP | 泰安泰山 | 山东矿 | 3660*122 0*12.7 | 7858.752 | FOB Qingdao | 迈阿密, 佛罗里达 | $10,032.00 | 自营 出口 | 白色无字封边带 , 不喷码 | ASTM C1396 | 不详 |
| ######### | 0001758 5 | 泰安泰 山 | 泰安泰 山 | SHENZHEN YONGFENG INVESTMENT CO., LTD. | 泰安泰山 | 山东矿 | 2440*122 0*12.7 | 21671.1 | FOB Qingdao | 纽约, 纽 约州 | $20,020.00 | 自营 出口 | 封边带/喷码: M arathon Construction, | ASTM C1396 | 中国合同 法 |
| ######### | 0001758 5 | 泰安泰 山 | 泰安泰 山 | SHENZHEN YONGFENG INVESTMENT CO., LTD. | 泰安泰山 | 山东矿 | 2440*122 0*15.9 | 7739.68 | FOB Qingdao | 纽约, 纽 约州 | $11,824.00 | 自营 出口 | 封边带/喷码: M arathon Construction, | ASTM C1396 | 中国合同 法 |
| 2/9/2007 | 0003075 2 | 泰安泰 山 | 泰安泰 山 | SHENZHEN YONGFENG INVESTMENT CO., LTD. | 泰安泰山 | 山东矿 | 2440*122 0*12.7 | 5417.776 | FOB Qingdao | 纽约, 纽 约州 | $5,005.00 | 自营 出口 | 封边带/喷码: M arathon Construction, | ASTM C1396 | 中国合同 法 |
| 2/9/2007 | 0003075 2 | 泰安泰 山 | 泰安泰 山 | SHENZHEN YONGFENG INVESTMENT CO., LTD. | 泰安泰山 | 山东矿 | 2440*122 0*15.9 | 11609.52 | FOB Qingdao | 纽约, 纽 约州 | $17,737.20 | 自营 出口 | 封边带/喷码: M arathon Construction, | ASTM C1396 | 中国合同 法 |

| 4/30/2007 | 0000118 8 | 泰安泰山 | 泰安泰山 | ORINENTAL TRADING COMPANY LLC | 泰安泰山 | 山东矿 | 3660*122 0*12.7 | 89750.52 | FOB Qingdao | 迈阿密，佛罗里达 | 77385.00 | 自营出口 | 封边带：DUN Drywall | ASTM C1396 | 不详 |
| 4/30/2007 | 0000118 9 | 泰安泰山 | 泰安泰山 | B AMERICA CORPORATIO N | 泰安泰山 | 山东矿 | 3660*122 0*12.7 | 2947.032 | FOB Qingdao | 迈阿密，佛罗里达 | $5,656.20 | 自营出口 | 白色无字封边带，不喷码 | ASTM C1396 | 不详 |
| 5/28/2007 | 0000119 6 | 泰安泰山 | 泰安泰山 | ORINENTAL TRADING COMPANY LLC | 泰安泰山 | 山东矿 | 2440*122 0*12.7 | 14586.32 | FOB Qingdao | 迈阿密，佛罗里达 | $12,740.00 | 自营出口 | 封边带：DUN Drywall | ASTM C1396 | 不详 |
| 5/28/2007 | 0000119 8 | 泰安泰山 | 泰安泰山 | ORINENTAL TRADING COMPANY LLC | 泰安泰山 | 山东矿 | 2440*122 0*12.7 | 17503.58 | FOB Qingdao | 迈阿密，佛罗里达 | $15,288.00 | 自营出口 | 封边带：DUN Drywall | ASTM C1396 | 不详 |
| 5/28/2007 | 0000119 9 | 泰安泰山 | 泰安泰山 | ORINENTAL TRADING COMPANY LLC | 泰安泰山 | 山东矿 | 2440*122 0*12.7 | 5834.528 | FOB Qingdao | 迈阿密，佛罗里达 | $5,096.00 | 自营出口 | 封边带：DUN Drywall | ASTM C1396 | 不详 |
| 5/28/2007 | 0000120 0 | 泰安泰山 | 泰安泰山 | ORINENTAL TRADING COMPANY LLC | 泰安泰山 | 山东矿 | 2440*122 0*12.7 | 14586.32 | FOB Qingdao | 迈阿密，佛罗里达 | $12,740.00 | 自营出口 | 封边带：DUN Drywall | ASTM C1396 | 不详 |
| 6/12/2007 | 0000120 2 | 泰安泰山 | 泰安泰山 | ORINENTAL TRADING COMPANY LLC | 泰安泰山 | 山东矿 | 2440*122 0*12.7 | 8751.792 | FOB Qingdao | 迈阿密，佛罗里达 | $12,740.00 | 自营出口 | 封边带：DUN Drywall | ASTM C1396 | 不详 |
| 6/26/2007 | 0000121 4 | 泰安泰山 | 泰安泰山 | ORINENTAL TRADING COMPANY LLC | 泰安泰山 | 山东矿 | 3660*122 0*12.7 | 8975.052 | FOB Qingdao | 迈阿密，佛罗里达 | $7,738.00 | 自营出口 | 封边带：DUN Drywall | ASTM C1396 | 不详 |
| 7/3/2007 | 0000121 8 | 泰安泰山 | 泰安泰山 | ORINENTAL TRADING COMPANY LLC | 泰安泰山 | 山东矿 | 3660*122 0*12.7 | 29916.84 | FOB Qingdao | 迈阿密，佛罗里达 | $25,795.00 | 自营出口 | 封边带：DUN Drywall | ASTM C1396 | 不详 |
| 7/3/2007 | 0000121 9 | 泰安泰山 | 泰安泰山 | ORINENTAL TRADING COMPANY LLC | 泰安泰山 | 山东矿 | 3660*122 0*12.7 | 29916.84 | FOB Qingdao | 迈阿密，佛罗里达 | $25,795.00 | 自营出口 | 封边带：DUN Drywall | ASTM C1396 | 不详 |
| 合计 | | | | | | | | 1241692 | | | $1002963.42 | | | | |

## 2005-2007年间接出口美国石膏板统计

| 时间 | 发票号码 | 生产商 | 出口商 | 美国买方 | 开票公司 | 原料（天然石膏）来源 | 规格 | 数量(㎡) | 交货方式 | 目的港 | 金额(元) | 出口方式 | 产品标识 | 质量标准 | 争议解决 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/13/2006 | 06257961-06257978 | 泰安泰山 | 山东省东方国际贸易股份有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 366021.3744 | 工厂交货 | 不详 | ¥2,052,005 | 间接出口 | 不详 | ASTM C1396 | 不详 |
| 3/13/2006 | 06257979-06258003 | 泰安泰山 | 山东省东方国际贸易股份有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 488028.4992 | 工厂交货 | 不详 | ¥2,736,007 | 间接出口 | 不详 | ASTM C1396 | 不详 |
| 3/13/2006 | 06258004 | 泰安泰山 | 山东省东方国际贸易股份有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 20155.9128 | 工厂交货 | 不详 | ¥112,999 | 间接出口 | 不详 | ASTM C1396 | 不详 |
| 3/21/2006 | 06258044 | 泰安泰山 | 连云港远泰国际贸易有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 15628.2 | 工厂交货 | 不详 | ¥87,518 | 间接出口 | 不详 | ASTMC1396 | 不详 |
| 3/21/2006 | 06258045 | 泰安泰山 | 连云港远泰国际贸易有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 13395.6 | 工厂交货 | 不详 | ¥75,015 | 间接出口 | 不详 | ASTMC1396 | 不详 |
| 4/22/2006 | 06289900-06289922 | 泰安泰山 | 上海豫园商城进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 427230.336 | 工厂交货 | 不详 | ¥2,516,384 | 间接出口 | 白色无字封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 黄浦区人民法院 |
| 4/22/2006 | 06289923 | 泰安泰山 | 上海豫园商城进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18695.7924 | 工厂交货 | 不详 | ¥110,118 | 间接出口 | 白色无字封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 黄浦区人民法院 |
| 4/22/2006 | 06289888-06289899 | 泰安泰山 | 上海豫园商城进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 185752.32 | 工厂交货 | 不详 | ¥1,094,080 | 间接出口 | 白色无字封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 黄浦区人民法院 |
| 4/23/2006 | 06289925-06289928 | 泰安泰山 | 东方国际集团上海市对外贸易有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 15003.072 | 工厂交货 | 不详 | ¥87,024 | 间接出口 | "泰山"封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 中国国际经济贸易仲裁委员会 |
| 4/23/2006 | 06289925-06289928 | 泰安泰山 | 东方国际集团上海市对外贸易有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 30006.144 | 工厂交货 | 不详 | ¥173,981 | 间接出口 | "泰山"封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 中国国际经济贸易仲裁委员会 |

TG-0129677

间接出口

Page 4

| 4/26/2006 | 06289930 | 泰安泰山 | 青岛澳妮装饰板材有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 2053.992 | 工厂交货 | 不详 | ￥11,502 | 间接出口 | 白色无字封边带，不喷码 | ASTMC1396 | 不详 |
| 4/28/2006 | 06289932-06289933 | 泰安泰山 | 上海豫园商城进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 5804.76 | 工厂交货 | 不详 | ￥34,190 | 间接出口 | 白色无字封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 黄浦区人民法院 |
| 4/28/2006 | 06289934-06290014 | 泰安泰山 | 上海豫园商城进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 1497360.168 | 工厂交货 | 不详 | ￥8,819,442 | 间接出口 | 白色无字封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 黄浦区人民法院 |
| 4/28/2006 | 06290015 | 泰安泰山 | 上海豫园商城进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18204.6204 | 工厂交货 | 不详 | ￥107,225 | 间接出口 | 白色无字封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 黄浦区人民法院 |
| 4/28/2006 | 06290016-06290025 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 196915.32 | 工厂交货 | 不详 | ￥1,062,810 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/12/2006 | 06290070 | 泰安泰山 | 南通经济技术开发区总公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 17146.368 | 工厂交货 | 不详 | ￥116,796 | 间接出口 | 白色无字封边带，不喷码 | ASTMC1396 | 不详 |
| 5/15/2006 | 06312793-06312800 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 146672.8896 | 工厂交货 | 不详 | ￥880,037 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/15/2006 | 06312801 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18360.9024 | 工厂交货 | 不详 | ￥110,165 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/15/2006 | 06312802 | 泰安泰山 | 青岛康鸿进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 32953.176 | 工厂交货 | 不详 | ￥95,645 | 间接出口 | 不详 | ASTMC1396 | 不详 |
| 5/15/2006 | 06312803 | 泰安泰山 | 青岛康鸿进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 32953.176 | 工厂交货 | 不详 | ￥95,645 | 间接出口 | 不详 | ASTMC1396 | 不详 |
| 5/18/2006 | 06312809 | 泰安泰山 | 浙江省二轻企业集团进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 20500 | 工厂交货 | 不详 | ￥111,461 | 间接出口 | 不详 | ASTM C1396 | 不详 |
| 5/19/2006 | 06312817 | 泰安泰山 | 连云港远泰国际贸易有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 15628.2 | 工厂交货 | 不详 | ￥87,518 | 间接出口 | 不详 | ASTM C1396 | 不详 |
| 5/19/2006 | 06312818 | 泰安泰山 | 连云港远泰国际贸易有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 13038.384 | 工厂交货 | 不详 | ￥73,015 | 间接出口 | 不详 | ASTM C1396 | 不详 |
| 5/22/2006 | 06312823 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 16878.456 | 工厂交货 | 不详 | ￥89,926 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |

| 5/22/2006 | 06312824 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 16878.456 | 工厂交货 | 不详 | ￥89,926 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/22/2006 | 06312825 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 11252.304 | 工厂交货 | 不详 | ￥60,732 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312826 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 20897.136 | 工厂交货 | 不详 | ￥111,337 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312827 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 20897.136 | 工厂交货 | 不详 | ￥111,337 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312828 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 20897.136 | 工厂交货 | 不详 | ￥111,337 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312829 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 20897.136 | 工厂交货 | 不详 | ￥111,337 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312830 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 20897.136 | 工厂交货 | 不详 | ￥111,337 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312831 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 20897.136 | 工厂交货 | 不详 | ￥111,337 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312832 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 20897.136 | 工厂交货 | 不详 | ￥111,337 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312833 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 20897.136 | 工厂交货 | 不详 | ￥111,337 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312834 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 20897.136 | 工厂交货 | 不详 | ￥111,337 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312835 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 20897.136 | 工厂交货 | 不详 | ￥111,337 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312836 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 18441.276 | 工厂交货 | 不详 | ￥102,350 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312837 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220 *12.7mm | 18441.276 | 工厂交货 | 不详 | ￥102,350 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |

TG-0129677

间接出口

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/22/2006 | 06312838 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18441.276 | 工厂交货 | 不详 | ￥102,350 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312839 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18441.276 | 工厂交货 | 不详 | ￥102,350 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312840 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18441.276 | 工厂交货 | 不详 | ￥102,350 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312841 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18441.276 | 工厂交货 | 不详 | ￥102,350 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312842 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18441.276 | 工厂交货 | 不详 | ￥102,350 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312843 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18441.276 | 工厂交货 | 不详 | ￥102,350 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312844 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18441.276 | 工厂交货 | 不详 | ￥102,350 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312845 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 2857.728 | 工厂交货 | 不详 | ￥15,859 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/22/2006 | 06312845 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 7635.492 | 工厂交货 | 不详 | ￥40,681 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/24/2006 | 06312850 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18664.536 | 工厂交货 | 不详 | ￥111,982 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/24/2006 | 06312852 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18664.536 | 工厂交货 | 不详 | ￥111,982 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/24/2006 | 06312853 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18664.536 | 工厂交货 | 不详 | ￥111,982 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/24/2006 | 06312854 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 19155.708 | 工厂交货 | 不详 | ￥114,934 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |

| 5/24/2006 | 06312855 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 19155.708 | 工厂交货 | 不详 | ￥114,934 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/24/2006 | 06312856 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 19155.708 | 工厂交货 | 不详 | ￥114,934 | 间接出口 | 白色无字封边带，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/24/2006 | 06312857 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 19155.708 | 工厂交货 | 不详 | ￥114,934 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/26/2006 | 06312885 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 13395.6 | 工厂交货 | 不详 | ￥80,370 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/26/2006 | 06312886 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 13127.688 | 工厂交货 | 不详 | ￥78,763 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 5/28/2006 | 06312891 | 泰安泰山 | 青岛康鸿进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 26791.2 | 工厂交货 | 不详 | ￥77,760 | 间接出口 | 白色无字封边带，不喷码 | ASTMC1396 | 不详 |
| 5/28/2006 | 06312892 | 泰安泰山 | 青岛康鸿进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 6161.976 | 工厂交货 | 不详 | ￥17,885 | 间接出口 | 白色无字封边带，不喷码 | ASTMC1396 | 不详 |
| 5/29/2006 | 06312893 | 泰安泰山 | 东方国际集团上海市对外贸易有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 13502.7648 | 工厂交货 | 不详 | ￥81,564 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 中国国际经济贸易仲裁委员会 |
| 5/29/2006 | 06312894 | 泰安泰山 | 东方国际集团上海市对外贸易有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 1500.3072 | 工厂交货 | 不详 | ￥81,564 | 间接出口 | "泰山" 封边带：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 中国国际经济贸易仲裁委员会 |
| 5/29/2006 | 06312895 | 泰安泰山 | 东方国际集团上海市对外贸易有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 30006.144 | 工厂交货 | 不详 | ￥97,877 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312955 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 16164.024 | 工厂交货 | 不详 | ￥89,704 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312931 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 11430.912 | 工厂交货 | 不详 | ￥63,439 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |

| 6/2/2006 | 06312932 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312933 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312934 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312935 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312936 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312937 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312938 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312939 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312940 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312941 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312942 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312943 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |

TG-0129677

间接出口

| 6/2/2006 | 06312944 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/2/2006 | 06312945 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312946 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312947 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312948 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312949 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312950 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312951 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312952 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312953 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/2/2006 | 06312954 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 18753.84 | 工厂交货 | 不详 | ￥104,076 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/10/2006 | 06312964 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 16878.456 | 工厂交货 | 不详 | ￥89,926 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/11/2006 | 06312967 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 6025.0432 | 工厂交货 | 不详 | ￥34,934 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06312968 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 20093.4 | 工厂交货 | 不详 | ￥116,505 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06312969 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 20093.4 | 工厂交货 | 不详 | ￥116,505 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06132970 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 20093.4 | 工厂交货 | 不详 | ￥116,505 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339676 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 20093.4 | 工厂交货 | 不详 | ￥116,505 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339677 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 20093.4 | 工厂交货 | 不详 | ￥116,505 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339678 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 20093.4 | 工厂交货 | 不详 | ￥116,505 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339679 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 20084.4696 | 工厂交货 | 不详 | ￥116,453 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339680 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 2857.728 | 工厂交货 | 不详 | ￥16,214 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339680 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 2857.728 | 工厂交货 | 不详 | ￥16,214 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339681 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 17860.8 | 工厂交货 | 不详 | ￥99,120 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339682 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 17860.8 | 工厂交货 | 不详 | ￥99,120 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |

| 6/13/2006 | 06339683 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 17860.8 | 工厂交货 | 不详 | ￥99,120 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339684 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 17860.8 | 工厂交货 | 不详 | ￥99,120 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339685 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 16967.76 | 工厂交货 | 不详 | ￥94,164 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339686 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 9814.5096 | 工厂交货 | 不详 | ￥56,906 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339687 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 17860.8 | 工厂交货 | 不详 | ￥103,560 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339688 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 17860.8 | 工厂交货 | 不详 | ￥103,560 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339689 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 17860.8 | 工厂交货 | 不详 | ￥103,560 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339690 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 17860.8 | 工厂交货 | 不详 | ￥103,560 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/13/2006 | 06339693 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥85,470 | 间接出口 | "泰山"封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 6/13/2006 | 06339692 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥85,470 | 间接出口 | "泰山"封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 6/21/2006 | 06339703 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥85,470 | 间接出口 | "泰山"封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/24/2006 | 06339714 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥85,470 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 6/24/2006 | 06339715 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥85,470 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 6/25/2006 | 06339717 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥81,774 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/25/2006 | 06339718 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 39124.0824 | 工厂交货 | 不详 | ￥226,848 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/25/2006 | 06339721 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 11430.912 | 工厂交货 | 不详 | ￥66,278 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 6/26/2006 | 06339723 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 2857.728 | 工厂交货 | 不详 | ￥16,570 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/26/2006 | 06339728 | 泰安泰山 | 江苏舜天国际经济技术合作有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 2446.9296 | 工厂交货 | 不详 | ￥14,176 | 间接出口 | 不详 | ASTMC1396 | 不详 |
| 6/26/2006 | 06339732 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥85,470 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 6/26/2006 | 06339731 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥85,470 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 6/27/2006 | 06339734 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 6019.0896 | 工厂交货 | 不详 | ￥34,900 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |
| 6/27/2006 | 06339735 | 泰安泰山 | 北京市建筑材料进出口公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3009.5448 | 工厂交货 | 不详 | ￥16,702 | 间接出口 | 蓝白色封边带：IMTGYPSUM，喷码：DRYWALL 4feetX12feetX1/2inch | GB/T9775-1999 | 中国国际经济贸易仲裁委员会 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/28/2006 | 06339740 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 5894.064 | 工厂交货 | 不详 | ￥34,188 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 6/28/2006 | 06339738 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥85,470 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 6/28/2006 | 06339739 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥85,470 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 6/28/2006 | 06339743 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 8841.096 | 工厂交货 | 不详 | ￥51,282 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 6/29/2006 | 06339736 | 泰安泰山 | 淄博国际经济技术合作有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 4393.7568 | 工厂交货 | 不详 | ￥25,484 | 间接出口 | 白色无字封边带，不喷码 | ASTMC1396 | 不详 |
| 7/8/2006 | 06339759 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥86,380 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/8/2006 | 06339760 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥86,380 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/9/2006 | 06339763 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥86,380 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/9/2006 | 06339765 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥86,380 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/9/2006 | 06339762 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥86,380 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |

| 7/10/2006 | 06339766 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥86,380 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/10/2006 | 06339767 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥86,380 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/10/2006 | 06339768 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥86,380 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/13/2006 | 06339777 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥84,895 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/13/2006 | 06339776 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥86,380 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/14/2006 | 06339780 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥84,895 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/21/2006 | 06339795 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/21/2006 | 06339795 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/21/2006 | 06339794 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/21/2006 | 06339794 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/22/2006 | 06339796 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/22/2006 | 06339796 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/22/2006 | 06339797 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/22/2006 | 06339797 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/22/2006 | 06339798 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/22/2006 | 06339798 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/24/2006 | 06339803 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/24/2006 | 06339803 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/24/2006 | 06339802 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/24/2006 | 06339802 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山"封边带；喷码；MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/25/2006 | 06339815 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ¥84,895 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/25/2006 | 06339809 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ¥20,122 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/25/2006 | 06339809 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ¥61,771 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/25/2006 | 06339814 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ¥20,122 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/25/2006 | 06339814 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ¥61,771 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/26/2006 | 06339818 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ¥84,895 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/26/2006 | 06339819 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ¥84,895 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/26/2006 | 06339834 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ¥84,895 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/27/2006 | 06339841 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ¥84,895 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/27/2006 | 06339845 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 8841.096 | 工厂交货 | 不详 | ¥50,937 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/27/2006 | 06339844 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 11788.128 | 工厂交货 | 不详 | ¥67,916 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 | ASTM C1396 | 原告法院 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/28/2006 | 06339848 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 | ASTM C1396 | 原告法院 |
| 7/28/2006 | 06339848 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/29/2006 | 06339854 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 8841.096 | 工厂交货 | 不详 | ￥50,937 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/29/2006 | 06339855 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥84,895 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/30/2006 | 06339867 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥84,895 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/30/2006 | 06339865 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥84,895 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/31/2006 | 06339869 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥84,895 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 7/31/2006 | 06339868 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥84,895 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/1/2006 | 06339870 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥84,895 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/3/2006 | 06339872 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/3/2006 | 06339872 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山" 封边带：喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |

| 8/3/2006 | 06339871 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/3/2006 | 06339871 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/15/2006 | 00785737 | 泰安泰山 | 上海凯敦实业发展有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 2827.96 | 工厂交货 | 不详 | ￥16,402 | 间接出口 | 白色无字封边带，喷码：Mega Gypsum | ASTMC1396 | 不详 |
| 8/15/2006 | 00785742 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥84,895 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/15/2006 | 00785744 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥84,895 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/15/2006 | 00785746 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥84,895 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/15/2006 | 00785744 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 14735.16 | 工厂交货 | 不详 | ￥84,895 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/16/2006 | 00787387-00787388 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 19646.88 | 工厂交货 | 不详 | ￥169,790 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 | ASTM C1396 | 原告法院 |
| 8/17/2006 | 00787394 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 8668.4416 | 工厂交货 | 不详 | ￥49,417 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/17/2006 | 00787394 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 2714.8416 | 工厂交货 | 不详 | ￥16,097 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/17/2006 | 00787395 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 2167.1104 | 工厂交货 | 不详 | ￥12,354 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/17/2006 | 00787395 | 泰安泰山 | 上海上实国际贸易有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 678.7104 | 工厂交货 | 不详 | ￥4,024 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/17/2006 | 00787394 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 2714.8416 | 工厂交货 | 不详 | ￥16,097 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/17/2006 | 00787394 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 8668.4416 | 工厂交货 | 不详 | ￥49,417 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/17/2006 | 00787395 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 2167.1104 | 工厂交货 | 不详 | ￥12,354 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/17/2006 | 00787395 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 678.7104 | 工厂交货 | 不详 | ￥4,024 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/18/2006 | 00787403 | 泰安泰山 | 上海裕金实业有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 2813.076 | 工厂交货 | 不详 | ￥16,596 | 间接出口 | 白色无字封边带，不喷码 | ASTMC1396 | 不详 |
| 8/18/2006 | 00787402 | 泰安泰山 | 杭州格瑞德进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 2232.6 | 工厂交货 | 不详 | ￥12,950 | 间接出口 | 白色无字封边带，不喷码 | ASTMC1396 | 不详 |
| 8/18/2006 | 00787402 | 泰安泰山 | 杭州格瑞德进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 2232.6 | 工厂交货 | 不详 | ￥12,950 | 间接出口 | 白色无字封边带，不喷码 | ASTMC1396 | 不详 |
| 8/18/2006 | 00787403 | 泰安泰山 | 上海裕金实业有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 2813.076 | 工厂交货 | 不详 | ￥16,596 | 间接出口 | 白色无字封边带，不喷码 | ASTMC1396 | 不详 |
| 8/21/2006 | 00787406 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/21/2006 | 00787406 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/21/2006 | 00787406 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/21/2006 | 00787406 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/22/2006 | 00787407 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/22/2006 | 00787407 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/22/2006 | 00785747 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/22/2006 | 00785747 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/23/2006 | 00787411 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/23/2006 | 00787411 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/23/2006 | 00787411 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220*12.7mm | 10835.552 | 工厂交货 | 不详 | ￥61,771 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 8/23/2006 | 00787411 | 泰安泰山 | 上海上实国际贸易集团浦东有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 3393.552 | 工厂交货 | 不详 | ￥20,122 | 间接出口 | "泰山" 封边带；喷码：MADE IN CHINA MEET OR EXCEED ASTM C1396 04 STANDARD | ASTM C1396 | 原告法院 |
| 9/8/2006 | 00787470 | 泰安泰山 | 山东元华国际贸易有限公司 | 不详 | 泰安泰山 | 山东矿 | 3660*1220*12.7mm | 11609.52 | 工厂交货 | 不详 | ￥71,630 | 间接出口 | 封边带：CRESCENT CITY, 喷码：Made in China, ceiling | ASTM C1396 | 不详 |

| 11/24/2006 | 00751819 | 泰安泰山 | 徐州汉邦商贸有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220 *12.7mm | 2857.728 | 工厂交货 | 不详 | ￥16,213 | 间接出口 | 白色无字封边带,不喷码 | ASTMC1396 | 不详 |
| 11/27/2006 | 00751842 | 泰安泰山 | 徐州国际经济技术合作有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220 *12.7mm | 2411.208 | 工厂交货 | 不详 | ￥13,413 | 间接出口 | 白色无字封边带,不喷码 | ASTMC1396 | 不详 |
| 11/27/2006 | 00751843 | 泰安泰山 | 徐州国际经济技术合作有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220 *12.7mm | 446.52 | 工厂交货 | 不详 | ￥2,484 | 间接出口 | 白色无字封边带,不喷码 | ASTMC1396 | 不详 |
| 12/26/2006 | 00754960 | 泰安泰山 | 江苏东恒集团进出口有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220 *12.7mm | 4048.448 | 工厂交货 | 不详 | ￥21,855 | 间接出口 | 白色无字封边带,不喷码 | ASTMC1396 | 不详 |
| 1/12/2007 | 00754984 | 泰安泰山 | 青岛九元实业发展有限公司 | 不详 | 泰安泰山 | 山东矿 | 2440*1220 *12.7mm | 5715.456 | 工厂交货 | 不详 | ￥31,266 | 间接出口 | 白色无字封边带,不喷码 | ASTM C1396 | 原告法院 |
| 合计 | | | | | | | | 6051112.79㎡ | | | 3454.3万元 | | | | |

# JOINT APPENDIX TAB # 34

IMPORTANT LEGAL NOTICE

UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047**<br>**SECTION: L**<br>**JUDGE FALLON**<br>**MAG. JUDGE WILKINSON** |
| **THIS DOCUMENT RELATES TO:** | |
| *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,* **Case No. 09-6687 (E.D.La.);** | |
| *Gross, et al. v. Knauf Gips, KG, et al.,* **Case No. 09-6690 (E.D.La.);** | |
| *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.,* **Case No 10-361 (E.D.La.);** | |
| *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Civ. Action No. 11-1672 (E.D.La.);** | |
| *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Civ. Action No. 11-1395 (E.D.La.);** | |
| *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Civ. Action No. 11-1673 (E.D.La.)** | |

## NOTICE OF PENDENCY OF CLASS ACTION

TO:     ALL OWNERS OF REAL PROPERTIES IN THE UNITED STATES, WHO ARE NAMED PLAINTIFFS ON THE COMPLAINTS IN *AMORIN, GERMANO, GROSS,* AND/OR *WILTZ* (*I.E.,* NOT AN ABSENT CLASS MEMBER), ASSERTING CLAIMS FOR REMEDIATED DAMAGES ARISING FROM, OR OTHERWISE RELATED TO CHINESE DRYWALL MANUFACTURED, SOLD, DISTRIBUTED, SUPPLIED, MARKETED, INSPECTED, IMPORTED OR DELIVERED BY THE TAISHAN DEFENDANTS.

This Notice is given pursuant to Fed.Rule.Civ.P. 23(c)(2)(B), and an Order of the Honorable Eldon E. Fallon, Judge for the United States District Court for the Eastern District of Louisiana ("the Court") dated September 26, 2014, of the pendency of a class action on behalf of the above-defined class.  If you are a member of the class your legal rights may be affected.

**READ THIS NOTICE CAREFULLY–THIS NOTICE DESCRIBES THE CERTIFICATION OF AN ACTION ON BEHALF OF THE CLASS, AND YOUR RIGHTS TO EXCLUDE YOURSELF FROM THE CLASS.**

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU FILED A LAWSUIT AGAINST THE TAISHAN DEFENDANTS.**[1]

## THE LITIGATION

Class members have filed lawsuits identified in footnote 2 claiming the Taishan Defendants manufactured and distributed defective drywall.  These litigants are claiming that the Taishan Defendants' defective drywall emits foul odors and corrodes certain materials and appliances.  They are asking the Court to award repair relief to everyone who owns a property built with the Taishan Defendants' defective drywall.  The plaintiffs assert that the Taishan Defendants are legally responsible for the repair and replacement of class members' properties as a result of the installation of the Taishan Defendants' defective drywall in class members' homes.

The plaintiffs are not seeking to recover damages for personal injuries or medical monitoring as part of these class proceedings.  To the extent any class member seeks to recover damages for personal injuries and/or medical monitoring, such claims are reserved and must be separately pursued on an individual basis.

The plaintiffs have obtained default judgments against the Taishan Defendants.  Because of these default judgments, the Taishan Defendants will be precluded from offering any defenses concerning their liability to the Class.  In future proceedings, plaintiffs will establish class-wide damages pursuant to Rule 55(b)(2)(B).  Plaintiffs will prove class-wide damages on an aggregate basis by presenting evidence concerning the total square footage of properties owned by class members and the cost per square foot to repair and replace the defective drywall in class members' properties (*i.e.*, the current price per square foot to remediate multiplied by the number of square feet in class members' homes = damages).

---

[1] The "Taishan Defendants" are comprised of the following entities: Taishan Gypsum Co. Ltd. (hereafter "Taishan"); Beijing New Building Materials Limited Co. (hereafter "BNBM"); Beijing New Building Materials Group Co., Ltd. (hereafter "BNBM Group"); China National Building Materials Co., Ltd. (hereafter "CNBM"); China National Building Materials Group Corporation (hereafter "CNBM Group"); and Tai'an Taishan Plasterboard Co., Ltd (hereafter "TTP").

THE PURPOSE OF THIS NOTICE IS TO ADVISE YOU OF THESE EVENTS AND THEIR POTENTIAL EFFECT ON YOUR RIGHTS.

## DEFINITION OF THE CLASS

The Court has certified a Class defined as follows:

All owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.[2]

Plaintiffs, Eduardo and Carmen Amorin, Albert and Betsy Butzer, Jack and Anna McGinn, Thomas and Virginia Spencer, and Elliot and Angelina Everard ("Plaintiffs"), have been appointed by the Court to serve as representatives for the Class.

## FURTHER PROCEEDINGS

If you are a member of the Class you need do nothing at this time and your interests will be represented by the Plaintiffs and Class Counsel. If you choose, you may enter an appearance through your own attorney at your own expense. You may also request to be excluded from the Class (discussed below).

---

[2] This class action includes all current and former owners of properties in the United States containing drywall manufactured by these defendants who are participants (either in the original action or in complaints in intervention) in the Class Action Complaints in *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.); *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civ. Action No. 10-361 (E.D.La); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-080 (E.D.La); *Haya, et al. v. Taishan Gypsum Corp. Ltd., et al.*, Civ. Action No. 11-1077 (E.D.La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.*, Civ. Action. 12-0498 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.). For administrative reasons the class definition is limited to the actions in *Amorin*, *Germano*, *Gross* and *Wiltz*. All class members are named plaintiffs in the *Amorin* actions.

3

As a member of the Class, you will not be personally responsible for any attorneys' fees or litigation costs or expenses unless you retain your own attorney, in which case you will be responsible for your attorney's fees, costs and expenses.

If a recovery is ultimately obtained for the Class, either through a judgement or settlement, Class Counsel will seek to be awarded attorneys' fees and costs out of any recovery obtained on behalf of the Class. In such case, your share of the recovery will bear its proportionate share of those costs and fees.

As a member of the Class, you will be bound by the judgment or other final disposition of this lawsuit whether that disposition is favorable to the Class or to the Taishan Defendants. If relief is obtained for the Class, you may be entitled to participate in any measure of relief that is recovered. Also, you will have an opportunity to be heard respecting any proposed settlement or dismissal of the class action.

You may be required as a condition to participating in any recovery obtained through settlement or trial to present evidence respecting the presence of the Taishan Defendants' defective drywall in your property. You should, therefore, preserve any records that you have pertaining to the presence of the Taishan Defendants' defective drywall in your property.

## **EXCLUSION FROM CLASS**

If you fall within the definition of the Class (see above), you are automatically a Class member and need not do anything at this time unless you do not want to be a part of the Class. If you do not wish to be included in the Class, you must send a request for exclusion to HERMAN, HERMAN, HERMAN & KATZ, LLC, 820 O'Keefe Avenue, New Orleans, Louisiana 70113, in an envelope postmarked no later than **October 27, 2014**. Your request for exclusion should set forth your name, address, and telephone number. All requests for exclusion must be personally signed by the Class member requesting exclusion.

IF YOUR REQUEST FOR EXCLUSION DOES NOT INCLUDE ALL OF THE FOREGOING INFORMATION, IS NOT PERSONALLY SIGNED BY THE CLASS MEMBER, OR IS NOT POSTMARKED BY THE DEADLINE ABOVE, IT SHALL NOT BE A VALID REQUEST FOR EXCLUSION. THE PERSON OR ENTITY FILING AN INVALID REQUEST FOR EXCLUSION SHALL BE A MEMBER OF THE CLASS AND BOUND BY ANY FURTHER ACTION TAKEN BY THE COURT AFFECTING THE CLASS UNLESS LEAVE OF COURT IS OBTAINED.

If your valid request for exclusion is timely received, the Court will exclude you from the Class and you will not be bound by –or entitled to participate in–any judgment in this action. The judgment will bind plaintiffs and all members of the Class who have not timely requested exclusion from the Class.

## ADDITIONAL INFORMATION

The following law firms have been approved by the Court to serve as counsel for the Class ("Class Counsel"):

Russ M. Herman, Esquire                    Arnold Levin, Esquire
HERMAN, HERMAN & KATZ, LLC                 Levin, Fishbein, Sedran & Berman
820 O'Keefe Avenue                         510 Walnut Street, Suite 500
New Orleans, Louisiana 70113               Philadelphia, PA 19106
Phone: (504) 581-4892                      Phone: (215) 592-1500
Fax: (504) 561-6024                        Fax: (215) 592-466

If you remain a member of the Class and you wish to communicate with Class Counsel, or if you have any questions concerning any of the matters contained in this Notice, you should contact Class Counsel directly.

This Notice is issued pursuant to an order of the Court. Additional notice(s) may be provided as the Court directs.

PLEASE DO NOT TELEPHONE THE COURT REGARDING THIS NOTICE OR THE LITIGATION. ALL INQUIRES SHOULD BE DIRECTED TO CLASS COUNSEL.

BY ORDER OF THE HONORABLE
ELDON E. FALLON
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
LOUISIANA

DATED: September 26, 2014

# JOINT APPENDIX TAB # 35

IMPORTANT LEGAL NOTICE

UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047**<br>**SECTION: L**<br>**JUDGE FALLON**<br>**MAG. JUDGE WILKINSON** |
| **THIS DOCUMENT RELATES TO:**<br><br>*Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,* **Case No. 09-6687 (E.D.La.);**<br><br>*Gross, et al. v. Knauf Gips, KG, et al.,* **Case No. 09-6690 (E.D.La.);**<br><br>*Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.,* **Case No 10-361 (E.D.La.);**<br><br>*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Civ. Action No. 11-1672 (E.D.La.);**<br><br>*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Civ. Action No. 11-1395 (E.D.La.);**<br><br>*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Civ. Action No. 11-1673 (E.D.La.)** | |

**SUPPLEMENTAL NOTICE OF PENDENCY OF CLASS ACTION AND NOTICE OF REQUEST FOR ASSESSMENT OF CLASS DAMAGES**

TO: ALL OWNERS OF REAL PROPERTIES IN THE UNITED STATES, WHO ARE NAMED PLAINTIFFS ON THE COMPLAINTS IN *AMORIN, GERMANO, GROSS,* AND/OR *WILTZ (I.E.,* NOT AN ABSENT CLASS MEMBER), ASSERTING CLAIMS ARISING FROM, OR OTHERWISE RELATED TO CHINESE DRYWALL MANUFACTURED, SOLD, DISTRIBUTED, SUPPLIED, MARKETED, INSPECTED, IMPORTED OR DELIVERED BY THE TAISHAN DEFENDANTS.

This Notice is given pursuant to an Order of the Honorable Eldon E. Fallon, Judge for the United States District Court for the Eastern District of Louisiana ("the Court") dated October ____ , 2014, to further inform the class members of the pendency of a class action on behalf of the above-defined class and details about plaintiffs' request for an assessment of damages. This notice is in addition to and supplemental to the Notice dated September 26, 2014. If you are a member of the class your legal rights may be affected.

In the assessment of damages hearing plaintiffs will **only** seek damages for the cost of (1) repair/remediation; (2) alternative living expenses during repair/remediation; and (3) loss of use and enjoyment of the property. All other claims for relief and other forms of damages are **not** being sought and will be precluded from relief. If you intend to pursue other claims outside of this process, the relief requested in these proceeding, if successfully obtained, will not be afforded to you.

**READ THIS NOTICE CAREFULLY–THIS NOTICE DESCRIBES THE PLAINTIFFS' REQUEST FOR AN ASSESSMENT OF SPECIFIC CLASS DAMAGES, AND YOUR RIGHTS TO EXCLUDE YOURSELF FROM THE CLASS AND THAT RELIEF.**

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU FILED A LAWSUIT AGAINST THE TAISHAN DEFENDANTS.[1]**

### THE PLAINTIFFS' REQUEST FOR AN ASSESSMENT OF CLASS DAMAGES

Class members have filed lawsuits identified in footnote 2 claiming the Taishan Defendants manufactured and distributed defective drywall. These litigants are claiming that the Taishan Defendants' defective drywall emits foul odors and corrodes certain materials and appliances. The plaintiffs assert that the Taishan Defendants are legally responsible for the repair and replacement of class members' properties as well as other damages as a result of the installation of the Taishan Defendants' defective drywall in class members' homes.

The plaintiffs have obtained default judgments against the Taishan Defendants. Because of these default judgments, the plaintiffs are requesting an assessment of class-wide damages on an aggregate basis pursuant to Fed.R.Civ.P. 55 (b)(2)(B). Plaintiffs have requested that the Court assess damages only for the following categories of damages incurred by class members: (1) the cost to remove all defective drywall and repair/remediate the subject properties, (2) alternative living expenses during the repairs/remediation, and (3) damages for loss of use and enjoyment of class members' properties. All other claims for relief and other forms of damages are **not** being sought and will be precluded from relief.

---

[1] The "Taishan Defendants" are comprised of the following entities: Taishan Gypsum Co. Ltd.; Beijing New Building Materials Limited Co.; Beijing New Building Materials Group Co., Ltd.; China National Building Materials Co., Ltd.; China National Building Materials Group Corporation; and Tai'an Taishan Plasterboard Co., Ltd..

Plaintiffs have represented to the Court that class members own 3,852 properties with a total square footage of 7,688,739 square feet.

Plaintiffs have requested that the Court assess damages for (1) repair/remediation and (2) alternative living expenses based on the total square footage of the properties owned by class members (7,688,739 square feet). Specifically, the plaintiffs have argued the class is entitled to recover $101.83 per square foot for repair/remediation, and $12.38 per square foot in alternative living expenses (this figure includes rent, the cost of move-in/move-out and storage). Thus, total damages requested for repair and remediation equals $782,944,292.37 ($101.83 per square foot X 7,688,739 square feet). Total damages requested for alternative living expenses equals $95,186,588.82 ($12.38 per square foot X 7,688,739 square feet). Plaintiffs have also requested that the Court assess damages for loss of use and enjoyment for each impacted property in the amount of $100,000 for a total of $385,200,000 in damages ($100,000 per property X 3,852 properties owned by class members).

Thus, plaintiffs have requested that the Court assess a total of $1,263,330,881.19 in damages against the Taishan defendants comprised as follows:

$782,944,292.37 (for repair/remediation costs)
$95,186,588.82 (for alternative living expenses)
+   $385,200,000.00 (for loss of use and enjoyment)
$1,263,330,881.19 total damages for the class

There has been no recovery of damages at this time from the Taishan Defendants. Assuming the Court grants plaintiffs' request and plaintiffs are able to recover the full amount of the judgment assessed against the Taishan Defendants, it is anticipated that class members will be allocated payments based on the square footage of their subject property (or properties), plus an additional $100,000 per property for loss of use and enjoyment. For instance, for a home of 1,996 square feet, the anticipated recovery would be $203,252.68 for remediation costs ($101.83 per square foot X 1,996 square feet), $24,710.48 for alternative living expenses ($12.38 per square foot X 1,996 square feet), and $100,000 for loss of use and enjoyment, for a total of $327,963.16 in damages. Larger homes would be entitled to a higher recovery while smaller homes would be entitled to a lower recovery.

If and when a recovery is obtained from the Taishan Defendants, class members' allocated shares will be distributed to class members on a pro rata basis. In other words, if plaintiffs recover less than the full amount of damages assessed against the Taishan Defendants, each class members' share of the recovery will be reduced proportionately.

THE PURPOSE OF THIS NOTICE IS TO ADVISE YOU OF THESE EVENTS AND THEIR POTENTIAL EFFECT ON YOUR RIGHTS.

3

## DEFINITION OF THE CLASS

The Court has certified a Class defined as follows:

All owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.[2]

Plaintiffs, Eduardo and Carmen Amorin, Albert and Betsy Butzer, Jack and Anna McGinn, Thomas and Virginia Spencer, and Elliot and Angelina Everard ("Plaintiffs"), have been appointed by the Court to serve as representatives for the Class.

## FURTHER PROCEEDINGS

If you are a member of the Class you need do nothing at this time and your interests will be represented by the Plaintiffs and Class Counsel. If you choose, you may enter an appearance through your own attorney at your own expense. You may also request to be excluded from the Class (discussed below).

As a member of the Class, you will not be personally responsible for any attorneys' fees or litigation costs or expenses unless you retain your own attorney, in which case you will be responsible for your attorney's fees, costs and expenses.

If a recovery is ultimately obtained for the Class, either through a judgement or settlement, Class Counsel will seek to be awarded attorneys' fees and costs out of any recovery obtained on behalf of the Class. In such case, your share of the recovery will bear its proportionate share of those costs and fees.

---

[2] This class action includes all current and former owners of properties in the United States containing drywall manufactured by these defendants who are participants (either in the original action or in complaints in intervention) in the Class Action Complaints in *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.); *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civ. Action No. 10-361 (E.D.La); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-080 (E.D.La.); *Haya, et al. v. Taishan Gypsum Corp. Ltd., et al.*, Civ. Action No. 11-1077 (E.D.La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.*, Civ. Action. 12-0498 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.). For administrative reasons the class definition is limited to the actions in *Amorin*, *Germano*, *Gross* and *Wiltz*. All class members are named plaintiffs in the *Amorin* actions.

4

As a member of the Class, you will be bound by the judgment or other final disposition of this lawsuit whether that disposition is favorable to the Class or to the Taishan Defendants. If relief is obtained for the Class, you may be entitled to participate in the relief that is recovered. Any relief you receive through these class proceedings will be your exclusive remedy. Also, you will have an opportunity to be heard respecting any proposed settlement or dismissal of the class action.

You may be required as a condition to participating in any recovery obtained through settlement or trial to present evidence respecting the presence of the Taishan Defendants' defective drywall in your property. You should, therefore, preserve any records that you have pertaining to the presence of the Taishan Defendants' defective drywall in your property.

## EXCLUSION FROM CLASS

If you fall within the definition of the Class (see above), you are automatically a Class member and need not do anything at this time unless you do not want to be a part of the Class. If you do not wish to be included in the Class, you must send a request for exclusion to Russ M. Herman at Herman, Herman & Katz, LLC, 820 O'Keefe Avenue, New Orleans, Louisiana 70113 in an envelope postmarked no later than _____ (regardless of whether or not you requested exclusion from the class following the notice of pendency of class action that was mailed to class members on September 26, 2014). Your request for exclusion should set forth your name, address, the affected property address, and telephone number. All requests for exclusion must be personally signed by the Class member requesting exclusion.

IF YOUR REQUEST FOR EXCLUSION DOES NOT INCLUDE ALL OF THE FOREGOING INFORMATION, IS NOT PERSONALLY SIGNED BY THE CLASS MEMBER, OR IS NOT POSTMARKED BY THE DEADLINE ABOVE, IT SHALL NOT BE A VALID REQUEST FOR EXCLUSION. THE PERSON OR ENTITY FILING AN INVALID REQUEST FOR EXCLUSION SHALL BE A MEMBER OF THE CLASS AND BOUND BY ANY FURTHER ACTION TAKEN BY THE COURT AFFECTING THE CLASS UNLESS LEAVE OF COURT IS OBTAINED.

If your valid request for exclusion is timely received, the Court will exclude you from the Class and you will not be bound by –or entitled to participate in–any judgment in this action. The judgment will bind plaintiffs and all members of the Class who have not timely requested exclusion from the Class.

## ADDITIONAL INFORMATION

The following law firms have been approved by the Court to serve as counsel for the Class ("Class Counsel"):

Russ M. Herman, Esquire
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024

Arnold Levin, Esquire
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663

If you remain a member of the Class and you wish to communicate with Class Counsel, or if you have any questions concerning any of the matters contained in this Notice, you should contact Class Counsel directly.

This Notice is issued pursuant to an order of the Court. Additional notice(s) may be provided as the Court directs.

PLEASE DO NOT TELEPHONE THE COURT REGARDING THIS NOTICE OR THE LITIGATION. ALL INQUIRES SHOULD BE DIRECTED TO CLASS COUNSEL.

BY ORDER OF THE HONORABLE
ELDON E. FALLON
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
LOUISIANA

DATED:_____, 2014

6

# JOINT APPENDIX TAB # 36

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## DECLARATION OF MARY MICHELLE GERMANO

I, Mary Michelle Germano, declare under penalty of perjury, pursuant to 28 U.S.C.

§1746, that the following is true and correct:

1.      My name is Mary Michelle Germano.  I am a citizen and resident of the United

States and the Commonwealth of Virginia.

2.      I have personal knowledge of the information contained in this declaration, and I

give this declaration of my own free will.

3.      In April of 2009, following a series of health problems and concerns related to the

Taishan drywall contamination, I moved out of my home and abandoned the vast majority of my

earthly belongings.

4.      Although my mortgage bank (Chase) worked with me on a forbearance

agreement, my savings were depleted by my obligation to pay $385.00 per month in Home

Owners Association ("HOA") dues on top of my new rental home.

5.      In 2013, my HOA sued me to collect $26,000 in back dues on my toxic home

which I had not lived in since April of 2009.

6.      This HOA suit forced me to file a Chapter 13 Bankruptcy in which they were the

only creditor.

7.     Over the next three years, my HOA threatened to bring three additional suits against me, and blocked an offer from Chase to allow me to surrender my "deed in lieu of foreclosure." The HOA refused to foreclose on the property (as they have the right and ability to due under state law) and instead threatened to garnish my wages.

8.     Finally, in April of 2016 with the help of Senator Mark Warner, I was able to get a deed in lieu of foreclosure and the toxic property was no longer in my name.

9.     I now live in a rented home in Norfolk, Virginia waiting for the resolution of my claims against Taishan.

Date: _12.21.2016_

Mary Michelle Germano

# JOINT APPENDIX TAB # 37

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 760 of 1680
Case 1:11-cv-22408-MGC Document 37-3 Filed 01/10/20 Page 40 of 438
Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2              Case No. 1:11-CV-22408-MGC
 3      -------------------------------§
        EDUARDO AND CARMEN AMORIN et     §
 4      al., individually, and on behalf §
        of all others similarly          §
 5      situated,                        §
                                         §
 6          Plaintiffs,                  §
                                         §
 7      vs.                              §
                                         §
 8      TAISHAN GYPSUM CO., LTD. F/K/A    §
        SHANDONG THAIHE DONGXIN CO.,     §
 9      LTD.; TAIAN TAISHAN PLASTERBOARD §
        CO., LTD., et al,                §
10                                       §
            Defendants.                  §
11      ------------------------------- §
         - - -
12
                                - - -
13
                     TUESDAY, JANUARY 8, 2019
14
                                - - -
15
               Confidential - Subject to Further
16                    Confidentiality Review
17                              - - -
18
              Deposition of WILLIAM FOSTER, held at Morgan
19       & Morgan, 12800 University Drive, Suite 600, Fort
         Myers, Florida, commencing at 1:03 p.m., on the
20       above date, before Kelly J. Lawton, Registered
         Professional Reporter, Licensed Court Reporter,
21       and Certified Court Reporter.
22                              - - -
23               GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
24                    deps@golkow.com
```

```
 1    APPEARANCES:
 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff
 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE (Via Telephone)
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff
10
11    ALSTON & BIRD, LLP
      BY:  ALIYYA Z. HAQUE, ESQUIRE
12    BY:  PATRICK H. HILL, ESQUIRE
      BY:  BOYKIN LUCAS, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    aliyya.haque@alston.com
      patrick.hill@alston.com
16    boykin.lucas@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.
18
      ORRICK, HERRINGTON & SUTCLIFFE, LLP
19    BY:  MARC ROBERT SHAPIRO, ESQUIRE
      51 West 52nd Street
20    New York, New York 10019
      (212) 506-3546
21    mrshapiro@orrick.com
      Representing BNBM PLC
22
23   ALSO PRESENT:
24    Vicki Foster
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

                        I N D E X

 2                        - - -

 3    Testimony of:  WILLIAM FOSTER
```

```
 4        DIRECT EXAMINATION BY MS. HAQUE...............  4

 5        CROSS-EXAMINATION BY MR. ALBANIS..............  31

 6        REDIRECT EXAMINATION BY MS. HAQUE.............  33
```

```
 7

 8

 9                    E X H I B I T S

10               (Attached to Transcript)

11    DEFENDANTS'                                        PAGE

12    Exhibit 1    Housing and Utilities Accumulated    18

                   Due to Having to Return to Work

13                 Because of Unforeseen Costs

                   Stemming from Chinese Drywall -

14                 Bates Numbered F000783 to F000791

15    Exhibit 2    Receipts/Invoices - Re:              30

                   Alternative Living Expenses -

16                 Bates Numbered F000801 to F000904

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2             THE COURT REPORTER:  Sir, would you please

 3      raise your right hand.

 4             Do you swear or affirm that the testimony

 5      you're about to give will be the truth, the whole

 6      truth, and nothing but the truth?

 7             THE WITNESS:  I do.

 8             WILLIAM FOSTER, called as a witness by the

 9      Defendants, having been first duly sworn, testified

10      as follows:

11                     DIRECT EXAMINATION

12      BY MS. HAQUE:

13         Q.   Mr. Foster, good afternoon.

14         A.   Good afternoon.

15         Q.   Thank you for being here today.

16             You sat through your wife's deposition both

17      days, correct?

18         A.   Yes.

19         Q.   So just quickly, my name is Aliyya Haque.

20      I'm one of the attorneys representing Taishan Gypsum,

21      with my colleague here today, and I'm going to ask

22      you some follow-up questions related to your lawsuit

23      in this case.

24         A.   Okay.
```

```
 1        Q.    First, have you ever been deposed before?

 2        A.    No.

 3        Q.    So as I said to your wife, just some basic

 4   ground rules.  The court reporter is taking down all

 5   your information.  So just please remember to give a

 6   verbal response.

 7             If you need to take a break at any time, just

 8   let me know.  I will only ask that if I have a

 9   question pending, that you go ahead and answer before

10   we take a break.

11        A.    Okay.

12        Q.    Are you taking any medication today that may

13   impair your ability to answer my questions?

14        A.    No, ma'am.

15        Q.    How many times did you meet with your

16   attorney to prepare for the deposition today?

17        A.    I think we met a couple times over the last

18   month or so.  I couldn't remember exact dates or --

19   it wasn't for very long.

20        Q.    Other than your wife and your attorney,

21   Mr. Albanis, was anyone else present at these

22   meetings?

23        A.    I don't recall at this point.  I think Pete

24   might have been at one, maybe not.
```

```
 1            MR. ALBANIS:  Keith.

 2            THE WITNESS:  Keith.  I'm sorry.  That's it.

 3   BY MS. HAQUE:

 4       Q.   Have you spoken with anyone else other than

 5   your wife and your attorneys regarding this claim?

 6       A.   Awhile back we spoke to one of our neighbors,

 7   Candy Gody, about it.

 8       Q.   And what did you talk about?

 9       A.   We talked about how it's been 12 years and

10   Taishan has done nothing and we're still waiting.  I

11   mean, that's kind of the gist of what it is.

12       Q.   And did you review any documents to prepare

13   for this deposition today?

14       A.   Well, the only thing that I have looked at

15   would be the things that we have prepared, and only

16   some of them.

17       Q.   And did you have any additional -- did you

18   bring any additional documents with you today?

19       A.   No, ma'am.

20       Q.   Okay.  Mr. Foster, what is your educational

21   background?

22       A.   I have a master's -- I have a bachelor in

23   industrial technology, and I have a master's in

24   industrial technology.
```

```
1       Q.    Are you currently employed?

2       A.    I'm retired.

3       Q.    Where were you employed prior to your

4    retirement?

5       A.    Ford Motor Company.

6       Q.    And how long did you work for Ford Motor

7    Company?

8       A.    Before I retired the first time, I worked

9    30 years.  And I retired in -- back in 2007, but I

10   have been back to work twice since then.

11      Q.    And when was the first time you went back to

12   work and how long was that?

13      A.    I went back in March of 2008.  We went back

14   to work.  We were starting -- we'd had problems in

15   the house, as my wife told you in her deposition.

16   She was getting sick.  I had an opportunity to go

17   back.  So I went back with the plan that we would

18   make some money and put it away because we didn't

19   know what was going on with the house and all these

20   issues.  So we had planned on me maybe working a few

21   months or so.  But she kept getting sicker.  We kept

22   having more problems go wrong.  By this time, we'd

23   been in the house over the years, so some of the

24   warranties were gone.  So we ended up deciding that I
```

```
 1    would stay.  So I went ahead and worked through 2008.

 2              2009, we assessed our situation again.  It

 3    was getting worse.  So I worked through 2009.

 4              In October of -- or, October of 2009, my wife

 5    moved out of the house.  So costs were only going to

 6    get more because we now had no rent to pay for the

 7    condo.  So we decided I'd work in 2010, and I worked

 8    until August of 2010 at that time.

 9              At that point, I decided -- we decided that I

10    would come home.  We were hoping, because in 2010,

11    Knauf was starting to remediate houses on our street,

12    so we were hoping and praying that Taishan would step

13    up and do the same thing.  So we were wanting to

14    start figuring how to get our stuff out of our house,

15    get it safe.  Just see -- just look at our whole

16    situation.  So I came home in 2010.

17              And then in early 2011, when we still were

18    hoping that Taishan was going to step up and do the

19    right thing and they didn't, so our neighbor down the

20    street, Jack Walsh, had his house remediated by

21    Knauf.  They'd put him up, took care of everything.

22    So since 2010 and 2011, he hadn't had to worry about

23    that.  He tried to sell his house, because his wife

24    refused to move back in there; she didn't want
```

1    anything to do with the Chinese drywall stigma.  He

2    couldn't sell it; he couldn't even get anybody to

3    come look at it.

4           So we came up with a plan to rent that house

5    in July '11, at which point once we started renting

6    that house, then we were able, within a few months or

7    so, to get a renter in our place, make some money

8    back from there.  And the more important thing was we

9    were able to start trying to get some of our property

10   out of our house, try to clean it off, move it down

11   the street.  The problem was we could only put it in

12   the garage or out on a portion of the lanai that was

13   covered.

14          So that took months and months and months.

15   By the time we finally got that done, it was into

16   2012.  At that point we hired Polkow Construction to

17   remediate.  They started remediating.

18          In November of 2012, they still weren't done.

19   But we felt it was enough that we could move in and

20   still -- because we were trying to save some money.

21   Because, I mean, we were paying both places, right?

22   And I wanted to try to get the house completed,

23   because she had done been through enough hell before

24   I went back to work, because I knew I was going to

1    have to go back to work because we were on death's

2    end of money trying to pay the bills across the

3    board.

4         So then in -- we finally got the house

5    completed around June of 2013, and I went back to

6    work.  I went to Flat Rock, Michigan and worked for

7    Ford doing some of the similar work that I did before

8    that was in my expertise, and I worked there until

9    the end of 2015.

10        And then January of 2016, I went to another

11   Ford plant.  So in reality, I was still employed by

12   Ford as a supplemental employee, because I had

13   already retired.  And I worked there in 2016 and '17.

14   And I left -- the last time I worked there was in

15   December of 2017.

16   Q.   Was this supplemental employee placement, was

17   that also in Flat Rock, Michigan?

18   A.   Yes.  It was actually from March of 2008 when

19   I went back to work, I was supplemental then, too,

20   because I had retired.  So I basically went back two

21   different -- two different retirements, I guess you

22   could say.

23   Q.   Let me ask you a couple follow-up questions

24   on that.

```
 1        A.    Okay.

 2        Q.    Prior to your retirement from Ford Motor

 3    Company, was that -- did you work in Florida, or did

 4    you work in Michigan for Ford?

 5        A.    We bought the house in Florida in February or

 6    March of 2007.  I retired in -- and I worked in

 7    Louisville, Kentucky until August 1st of 2007.  So

 8    for that approximately six-month period, I was in

 9    Kentucky; she was in Florida.

10        Q.    And then when you -- the first chunk of time

11    when you went back to work post-retirement, was that

12    in Louisville, Kentucky as well, 2008?

13        A.    In March of 2008, I was in Louisville,

14    Kentucky until August of 2010, yes, ma'am.

15        Q.    And then 2010 to 2013 you were in Florida?

16        A.    From -- I was in Florida from August of 2010

17    until June of 2013.

18        Q.    And then June of 2013 until December 2017,

19    you were in Flat Rock, Michigan?

20        A.    I was in Flat Rock, Michigan from June of

21    2013 through December of 2015.  And then I went back

22    to Louisville, Kentucky in 2016 and 2017 to work and

23    try to make some money to put back in our account for

24    all that we've spent for this.
```

Case 2:09-md-02043-EEF-MBN Document 22368-79 Filed 11/12/19 Page 771 of 1680
Case 2:14-cv-00373-MSTERUK-MBN Document 13 Filed 11/18/19 Page 13 of 40 PageID# 249
Confidential - Subject to Further Confidentiality Review

 1      Q.   What was your job title prior to retirement?

 2      A.   I had many.

 3      Q.   I guess what was --

 4      A.   I can't exactly remember the last one.  I

 5   mean, sorry.

 6      Q.   No problem.

 7           When you went back to work in 2008, what was

 8   your job title and what were your duties in your

 9   profession?

10      A.   I was a manpower launch coordinator.  I

11   helped Ford Motor Company launch new products, and

12   the majority of it was spent -- I placed the people

13   and worked with the UAW to place people to get the

14   training done as quick as we could in the most

15   efficient way to get the product out at the cheapest

16   and best quality that we could safely.

17      Q.   And was that the same type of job that you

18   performed back when you -- I guess when you stopped

19   your second retirement and went back to work in June

20   of 2013?

21      A.   When I went back to work in June of 2013, I

22   did the same type work for approximately a year and a

23   half.  And then they asked me to help negotiate the

24   contract with the UAW, and I did that for one year.

```
1     And then when I went back to Kentucky, Louisville, in

2     2016, I did launches, manpower launch for them again.

3          Q.   Got it.  Okay.

4               Now, Mr. Foster, you're obviously married to

5     Mrs. Foster.

6          A.   Yes, ma'am.

7          Q.   How long have you guys been married?

8          A.   21 years.

9          Q.   And do you have any children?

10         A.   Yes, we do.  She has two from a previous

11    marriage and I have one.

12         Q.   And Mrs. Foster testified to their names and

13    ages on the record.

14         A.   Yes.

15         Q.   Okay.  Other than this lawsuit, have you ever

16    participated in a lawsuit yourself?

17         A.   No, ma'am.

18         Q.   Now, Mr. Foster, you sat through both days of

19    your wife's deposition.  Is that right?

20         A.   Yes, ma'am.

21         Q.   Do you disagree with anything your wife

22    testified to?

23         A.   No, I don't disagree with anything.  I do

24    have a couple of items that I would like to clarify.
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/12/19 Page 773 of 1680
Case 2:14-cv-00317-MSD-RJK Document 3-3 Filed 11/18/19 Page 15 of 40 PageID# 251
Confidential - Subject to Further Confidentiality Review

1    Q.   Please go ahead.

2    A.   You had asked her about during the

3    remediation process, did we have any renovations or

4    anything like that that we made, and she told you

5    about all of them that we had that was associated

6    with the remediation.  But we did put on a golf cart

7    garage.  We paid for.  I have all the check stubs to

8    prove that.  None of that cost went into anything to

9    do with remediation or property or any of that other

10   stuff.  So -- but that was added.

11        The second thing, you asked her about -- I'm

12   trying to remember the exact words, and I apologize

13   that I can't -- but you asked her about the loss of

14   use and enjoyment and how that -- how the presence of

15   Chinese drywall affected us for the loss of use and

16   enjoyment.

17        Well, as far as I'm concerned, when we moved

18   there in 2007, we didn't know it, but we had Chinese

19   drywall.  She had the health issues.  We had issues

20   with things going wrong that we had to fix.

21        It's currently 2019.  For 12 years now we've

22   been dealing with Chinese drywall.  We're in our 60s.

23   That's a sixth of our life we have had to deal with

24   Chinese drywall, and nothing's been done.

```
 1              We've been married 21 years.  Over 50 percent
 2      of our married life we have been dealing with Chinese
 3      drywall.
 4              Of the 21 years, almost seven years, or a
 5      third of our life, we have been separated.  We
 6      couldn't be together because I had to go somewhere
 7      and work to pay for Chinese drywall.
 8              And during this whole time, we had to sit
 9      there and watch what -- we moved stuff out of our
10      house to try to live somewhere and watch all of your
11      neighbors get -- not all of them, many of them,
12      excuse me -- get their house taken care of by Knauf
13      in 2010 and 2011.  And we went eight and nine years
14      with nothing being done for us.  And it's a travesty.
15      It's a travesty is what's happened.
16              And we sit here and we talk about how much
17      the remediation cost and how much the personal
18      property cost and how much the alternative living
19      was.  You can never give us back those years that you
20      have taken from us.  Those were supposed to be the
21      years that we were able to be together and enjoy our
22      life.  Both of us have a lot more medical issues now
23      because we're older; that's part of life.  But it's
24      getting harder and harder for us to do some things.
```

```
 1              And we're still not through this Chinese

 2      drywall thing.  So how much longer is it going to be?

 3      I don't know.

 4              But that, to me, tells the whole story.  The

 5      part of our life that we will never get back is worth

 6      a hell of a lot more -- excuse my language -- than

 7      the other cost all put together.

 8              So that, I wanted to add.

 9              The other thing you had asked her about --

10      and, again, I don't -- I can't recall all the --

11      excuse me.

12      Q.   We have more water right over there.

13      A.   Thank you.  I'll get that.

14              Thank you.

15              The other thing, in the previous deposition

16      that she gave, you had asked about -- and, again, I

17      can't remember all the exact words -- partial versus

18      full remediation.  And how we actually came across

19      that, through the Germano protocol, there was some

20      discussion about tiles need to be taken out.  And

21      once we seen that -- our tile wasn't taken out -- so

22      we got ahold of Pete, and we did tell him to change

23      that to partial, because we had those.  We had some

24      expensive light fixtures, as she has discussed, as
```

```
 1    well as that center aisle that she talked about.  So

 2    we did have some things that told us that should be

 3    partial, instead of full.

 4         And to the best of my recollection,

 5    everything else that she covered was, at this minute,

 6    accurate to the best of my recollection.

 7    Q.   Thank you for that.

 8         And I'm going to ask you some more questions

 9    kind of hitting on -- I'm not going to go through the

10    entire thing as I did with your wife --

11    A.   Okay.

12    Q.   -- but hitting on some categories.  If at any

13    point something triggers in your mind, please just

14    let me know.

15    A.   Yes, ma'am.

16    Q.   Just to follow up on that, I just want to

17    clarify:  You are not claiming the golf cart garage

18    as part of anything at this point?

19    A.   No.  I just -- I just -- it's there; it

20    wasn't there, you know, back before the remediation,

21    because we did it after.  But I just wanted you to

22    know, because it -- I think you guys are coming to

23    the house.  So you are going to see it.

24    Q.   Sure.
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/12/19 Page 777 of 1680
Case 2:12-cv-00342-DEK Document 13 Filed 01/18/13 Page 19 of 30 PageID #: 255
Confidential - Subject to Further Confidentiality Review

```
 1        A.   And if you remember the pictures before, it

 2   wasn't there.

 3        Q.   Got it.

 4        A.   So I thought it only the right thing to do,

 5   to let you know.

 6        Q.   Understood.  Thank you.

 7        A.   And we do have, like I said, the check stubs

 8   for that.

 9        Q.   Mr. Foster, I'm going to show you -- let's go

10   ahead and talk about specifically the alternative

11   living expenses.

12        A.   Yes, ma'am.

13        Q.   So I'm going to show you -- this is a

14   document that you put together.  Again, very helpful

15   for us.  So thank you for that.

16             Mr. Foster, I'm going to show you what's been

17   marked as Defense Exhibit Number 1.

18             (Defendants' Exhibit 1 was marked for

19   identification.)

20   BY MS. HAQUE:

21        Q.   Do you recognize this document?

22        A.   Yes, ma'am.

23        Q.   Did you put together this document?

24        A.   Yes, ma'am.
```

```
1        Q.    And, Mr. Foster, can you please state for the

2    record what this document is?

3        A.    It's a list of my housing and utilities that

4    I accumulated stemming from when I had to go back to

5    work to pay for the Chinese drywall and the Chinese

6    drywall related issues.

7        Q.    And you testified a little earlier today --

8    do you want to take a moment?  Are you okay?

9        A.    No, I'm okay.  Thank you.

10       Q.    You testified earlier today about the periods

11   of time in which you had to return to work following

12   your retirement.  Does this first page encompass all

13   of the years, months, and locations where you were

14   when you had to go back to work?

15       A.    Yes.  It appears it does.

16       Q.    Okay.  Now, when you made the decision to

17   return to work, what factor led you to go back to

18   Ford, and did you try to find a job in Florida?

19       A.    Well, as I explained earlier what my

20   expertise was, there's not many businesses where you

21   use that type of expertise, and there's nothing

22   around the Florida area of automotive-type jobs like

23   that.  So what would be natural is I went back to --

24   in Louisville, I had worked there.  I never worked in
```

```
 1    Flat Rock, but I had worked at Ford.  So it was
 2    logical that I go back there, because I knew what I
 3    would do, and I knew that they would hire me back to
 4    do that.
 5        Q.   And can you just briefly explain what your
 6    living arrangements were starting in 2008 --
 7        A.   Yes, ma'am.
 8        Q.   -- just for the record, please.
 9        A.   In 2008, I stayed at -- we owned a house in
10    Louisville that was up for sale.  I stayed there all
11    of 2008.  I stayed there through 3/20 of 2009,
12    because we sold the house.  And at that time, I
13    stayed with my mom, my elderly mom, until I quit
14    working in 2010.  Even though it was further from
15    work than I wanted to be, I stayed with her to help
16    her, in 2010.
17             Do you want me to continue going where I
18    stayed?
19        Q.   Yes.  Please go ahead.
20        A.   Okay.  I'm sorry.
21        Q.   No, no, no.  Take your time.
22        A.   In 2013, when I went back to Flat Rock -- and
23    I think it's in here -- the first approximate week or
24    two, the first approximate week or two I stayed in a
```

1  hotel while I was working.  And then I found a

2  co-worker who was -- who had an apartment, so I

3  rented his second bedroom.  And I stayed there

4  through the balance of 2013, 2014, and I stayed there

5  all of 2015.

6          But around the second quarter of 2015, he got

7  promoted away from there.  He got promoted away from

8  there, and because the apartment was in his name --

9  he knew I was working until the end of the year -- he

10 told me that I could just make the payments and then

11 pay him, you know, send the money to him for the

12 utility, which I did for the balance of that year.

13    Q.    Okay.

14    A.    Then in 2016, I rented a -- kind of an

15 apartment right around the corner from Ford.  It was

16 in a not desirable area, but it is what it is.  You

17 do what you have to do.  So I rented that apartment

18 for '16 and '17.  And that's where I stayed.

19    Q.    And then there were some average yearly

20 increases in the rental.  And that's just consistent

21 with the property manager?

22    A.    Yeah.  If you see going, you know, that's

23 what -- that's what that is in here.

24          And then in -- of course, in 2015, the last

```
 1    part of 2015, it was more expensive because I had the

 2    apartment by myself.

 3         Q.   Got it.

 4              Now, what other types -- in addition to the

 5    rental and in addition to the utilities, what other

 6    types of expenses did you incur?

 7         A.   Well, I had, of course, my gas, my travel to

 8    get there, back and forth to work because I didn't

 9    plan that on there, which is not in here -- my food.

10    And you might think, well, you are going to eat

11    anyway.  Well, that is true to an extent.  But when

12    two of you are eating, usually you can make meals

13    cheaper than when you are buying them separately.  So

14    there's some money there.

15              When I lived in Flat Rock in 2013, I bought a

16    small TV for the apartment.  I bought a small

17    sweeper.  I had to buy a bed, a real cheap bed, that

18    by the time I left in '15, it was already broke down.

19    So some basic stuff like that.  Other than that, you

20    know, I lived as meek as I could, because I didn't

21    want to spend the money.

22              In 2016, when I went to the apartment, for

23    those two years, I took an old lounge chair from our

24    house.  And that lounge chair was my living room for
```

```
1    two years.  I took the TV that I had bought up in --

2    years earlier, I took it with me.  Other than that,

3    from my home, I took plastic little shelves that you

4    make that I put an old lamp on; I didn't even have a

5    lamp shade for.  I mean, I lived as meek and as

6    little as I could.  Some of that stuff is not even in

7    here.  I mean, you know, I just put in this basically

8    the rent and the utilities.

9        Q.   And did Ford give you any type of move-in

10   writeoff or mileage writeoff or anything like that?

11       A.   No, ma'am.

12       Q.   What is the total amount that you are

13   claiming in alternative living expenses?  Do you

14   recall that total amount?

15            And we can bring it out.

16       A.   It's approximately 190,000, 180- to 190,000.

17   I have the sheet here still.

18       Q.   And this encompasses all of the charges --

19   or, all of the expenses that you came to calculate

20   that amount of $190,000?

21       A.   Yes, ma'am.  It's in that 190, yes.  This is

22   in that 190, yes.

23       Q.   Understood.  Okay.

24            Just a couple follow-up questions.
```

```
1              You said you sold your house back in March of

2       2009.  Do you recall how much the total price was for

3       which you were able to get -- let me rephrase.

4              How much did you sell the house for back in

5       2009?

6       A.   I bought the house for approximately 530, and

7       I sold it for 480.  So I lost quite a bit.  And those

8       are approximate.  It might have been 479-9.

9       Q.   Got it.  Okay.

10             Was anyone living in the house at the time?

11      Did you have a tenant in the Louisville home?

12      A.   No.  In fact, what we had talked about doing

13      before I went back to work, because we were having

14      trouble selling it, was renting it.  But then once we

15      saw the costs start coming, we got a little nervous

16      about -- because we take care of ourself.  We

17      don't -- we're not going to go bankrupt; we're not

18      going to do that garbage.  So once we decided that I

19      was going to go back to work, that's why I made sure

20      I went back to Louisville, because I already had a

21      house there.  I'm going to pay some sum to live there

22      somewhere.

23             In fact, you know, that last year and a half

24      that I spent with my mom, I mean, if I had known I
```

```
 1     was going to be there three years, I wouldn't have

 2     lived with my mom.  I would have rented anyway to

 3     stay close to where I worked.

 4          Q.   Was there still a mortgage on the Louisville

 5     house at that time, or was it paid off?  Do you

 6     remember?

 7          A.   No, there was a mortgage.  And I do not

 8     remember the exact amount.

 9          Q.   Okay.  So essentially, you were still paying

10     the mortgage when you moved to Florida?

11          A.   Yes, ma'am.

12          Q.   Okay.  And so as a part of -- as a part of

13     the amount that you are claiming for alternative

14     living expenses in 2008 -- before you sold your home

15     in March of 2009, are you claiming the mortgage

16     payments as part of the alternative living expenses?

17          A.   That's in the total rent and utilities --

18          Q.   In the total rent and utilities.  Okay.

19          A.   -- that's on that -- under 2008.

20          Q.   Okay.

21          A.   And then 2009, there's more for that portion

22     of the year.

23          Q.   Did you receive any inquiries?

24               Let me back up.
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/18/19 Page 27 of 49
Case 2:12-cv-00337-MSD-RJK Document 13 Filed 01/18/13 Page 785 of 1680 PageID# 263
Confidential - Subject to Further Confidentiality Review

```
 1              Was the house still up for sale at the time
 2    you were living there?
 3         A.   Yup.  I was even trying to have people come
 4    in and looking at it.  I just couldn't get it sold.
 5         Q.   Okay.  What had you been charging for rent on
 6    the Kentucky home?  Had you been charging anything?
 7         A.   I hadn't rented it out yet.
 8         Q.   Okay.
 9         A.   Remember, I left in August of 2007.  Okay?
10    So we had started talking about whether we were going
11    to do that, rent it or what we were going to do.  But
12    with all the issues she'd been having, that's when I
13    decided I was going to go back to work.  So it made
14    no sense to rent that out and then me rent another
15    place.
16         Q.   Right.  Okay.
17              Now, the house -- after the house was
18    remediated, were you involved at any point?  Did you
19    go back and check in?  And -- how -- I guess how
20    involved were you with the remediation process?
21         A.   Well, I was involved with my wife in the
22    remediation process.  I mean, I was there from two
23    thousand -- from August of 2010 until June of 2013.
24    So I was involved with her.  Again, because she had
```

1   went through most of the issues leading up to that,

2   she was probably more of a lead, you know, than me,

3   because, you know, she had been the one that had been

4   going through it.  But I was involved with some of

5   the issues, yes.

6       Q.   Okay.  The cell phone bill that you're

7   claiming -- because you have some cell phone charges

8   in here.

9       A.   In this one?

10      Q.   Yes.  In this exhibit.

11           Did you have to get a new cell phone for

12  work, or was this your pre-existing cell phone?

13      A.   Prior to -- I'm trying to think of the date

14  again.  Prior to March of 2008, had I never owned a

15  cell phone, never.

16           When I was gone those six months before I

17  came home, I called her from the office phone.  I

18  called her from the home phone.  But when I went back

19  to work, I got a cell phone.

20           Today, I'm not working.  I don't have a cell

21  phone.  I never wanted one.  I didn't -- I just never

22  had one.

23      Q.   That is impressive.

24      A.   I don't know if it is or not, but I didn't

Confidential - Subject to Further Confidentiality Review

1    have one.

2         Q.   And then did you have -- let's see.

3              A similar question to what I asked your wife

4    is whether the TV and some of these items that could

5    be considered personal property, are you considering

6    or counting them as part of your alternative living

7    expenses damages, or are you considering them as

8    personal property damages?

9         A.   In the -- in the alternative living, there is

10   approximately $60,000 for the condo, approximately

11   $20,000 for Jack Walsh's house, approximately $10,000

12   at the Chinese drywall house for things that you've

13   went through that she had the receipts for, and then

14   the balance is pretty much right here, the other

15   90,000 or so, give or take.  That's what designates

16   the alternative living at this point.

17        Q.   Okay.  Now, just a couple -- I think you can

18   go ahead and set this document aside.

19        A.   Okay.

20        Q.   Now, a couple questions that I had asked your

21   wife, I just want to sort of go over a couple things

22   with you as well.

23        A.   Sure.

24        Q.   When the house was built originally, did you

Confidential - Subject to Further Confidentiality Review

```
1    ever see any of the drywall or anything before it was

2    installed in the home?

3        A.   No, ma'am.

4        Q.   Did any -- did the original homebuilder ever

5    give you any guarantees as to where the drywall came

6    from?

7        A.   No, ma'am.

8        Q.   And the homebuilder never told you that he

9    was or she was using international-sourced drywall?

10       A.   I don't recall any of that --

11            MR. ALBANIS:  Object to the form.

12            But you may answer, if you know the answer,

13       Mr. Foster.

14            THE WITNESS:  I don't recall.

15   BY MS. HAQUE:

16       Q.   Do you remember the total cost of the drywall

17   installation?

18       A.   Of just the drywall?

19       Q.   Uh-huh.

20       A.   No, I don't know the total cost of just the

21   drywall.

22       Q.   Okay.

23       A.   Are you talking about the whole remediation

24   or just the drywall?
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/12/19 Page 789 of 1680
Case 2:14-cv-00322-MST-RJK Document 113 Filed 01/18/19 Page 31 of 40 PageID 267
Confidential - Subject to Further Confidentiality Review

```
 1       Q.    No, no, no.  Back in the original home build.

 2       A.    Oh, no, I don't.  Sorry, I just wanted to

 3   make sure I understood.

 4       Q.    Absolutely.  No, please clarify if you don't

 5   understand any question I have asked.

 6            MS. HAQUE:  Okay.  Let's take a five-minute

 7       break.  And I don't have much left to ask you,

 8       Mr. Foster.  So I don't want to ask you anything

 9       unnecessarily.  So give me five minutes, and then

10       we can speed this up.

11            (Recess from 1:36 until 1:44 p.m.)

12   BY MS. HAQUE:

13       Q.    Mr. Foster, I just want to put on the record

14   another set of documents that you produced with

15   respect to your alternative living expenses.  And

16   that is going to be Exhibit 2 to your deposition.

17       A.    Okay.

18            (Defendants' Exhibit 2 was marked for

19   identification.)

20   BY MS. HAQUE:

21       Q.    Do you recognize this stack of documents?

22       A.    Yeah.  I think this -- I'm looking.  Give me

23   a minute, please.

24       Q.    Yeah.  Take as much time as you need.
```

```
 1        A.    Yes, ma'am.

 2        Q.    And what is that stack of documents?

 3        A.    It's a copy of some of the costs that I

 4   incurred during my working period.

 5        Q.    And can we say that all of these receipts

 6   pertain to your alternative living expenses claim in

 7   this case?

 8        A.    Yes.

 9              MS. HAQUE:  We can go off the record for one

10        second.

11              (Discussion off the record.)

12              MS. HAQUE:  Mr. Foster, that is all I have

13        for you this afternoon.  Thank you very much for

14        coming down here.

15              And I pass the witness to Mr. Albanis.

16              MR. ALBANIS:  I just have a couple quick

17        follow-up questions.

18                    CROSS-EXAMINATION

19   BY MR. ALBANIS:

20        Q.    Mr. Foster, could you turn to Exhibit

21   Number 1 of Mrs. Foster's deposition from earlier

22   today, which would be Priority Claimant

23   Vicki Foster's Answers to Interrogatories.

24        A.    Okay.
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/19/19 Page 791 of 1680
Case 2:11-cv-00377-MSD-RJK Document 43-79 Filed 11/18/13 Page 31 of 40 PageID# 269
Confidential - Subject to Further Confidentiality Review

1    Q.   On the first page of the Answers to

2    Interrogatories, Interrogatory Number 1 states:

3    Identify all types of damages that you seek in this

4    lawsuit (e.g., alternative living expenses,

5    diminution in value, loss of use, enjoyment, et

6    cetera) and specify amounts sought for each category.

7         Do you see that interrogatory?

8    A.   Yes, I do.

9    Q.   Would you please read the first part of the

10   answer to Interrogatory Number 1 into the record,

11   just -- and when I say "first part of the answer," I

12   mean everything before the first comma.

13   A.   Okay.  It says:  We seek alternative living

14   expenses from October 2009 through November 2012 of

15   at least $190,727.01.

16   Q.   Thank you.

17        Is there any part about that statement that

18   you, now, sitting here today and having reviewed all

19   the documents, you would like to change?

20   A.   Yes.  The alternative living expenses, I

21   mean, we put October 2009 through November 2012 down

22   because that's when we were out of the house.  But

23   the expenses are, like, from March 2008 through

24   December of 2017.  But I thought that would be kind

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/19/19 Page 792 of 1680
Case 2:14-cv-00035-EEF-JCW Document 13-2 Filed 01/18/19 Page 34 of 40 PageID #: 270
Confidential - Subject to Further Confidentiality Review

```
1    of misleading on the sheet; that's why I didn't put

2    it there.  But, I mean, that's what it should be is

3    from -- from when I first started working until I

4    finished working, because that's part of the 190,000.

5    So you are right, I did have that there.

6        Q.   Okay.  So essentially you are saying that the

7    dates of October 2009 through November of 2012 would

8    need to be changed?

9        A.   Yes, yes.

10       Q.   Would that same change apply to your own

11   answer to interrogatory?

12       A.   Yes, it would.

13       Q.   Thank you.

14           MR. ALBANIS:  That's all that I have.

15           MS. HAQUE:  And just to follow up on that.

16                    REDIRECT EXAMINATION

17   BY MS. HAQUE:

18       Q.   Mr. Foster, could you please work with your

19   attorney to provide us with an updated amended

20   version of this document that reflects the correct

21   information?

22       A.   Yes.

23           MS. HAQUE:  Great.  Thank you.

24           MR. ALBANIS:  Nothing further.  We will
```

```
 1          reserve signature.

 2               (Whereupon, the deposition concluded at

 3     1:48 p.m.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                C E R T I F I C A T E

 2

 3           I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that, pursuant to

 6    notice, the deposition of WILLIAM FOSTER was duly

 7    taken on January 8, 2018, at 1:03 p.m. before me.

 8           The said WILLIAM FOSTER was duly sworn by me

 9    according to law to tell the truth, the whole truth

10    and nothing but the truth and thereupon did testify

11    as set forth in the above transcript of testimony.

12    The testimony was taken down stenographically by me.

13    I do further certify that the above deposition is

14    full, complete, and a true record of all the

15    testimony given by the said witness.

16

17    _____

18           KELLY J. LAWTON, RPR, LCR, CCR

19

20           (The foregoing certification of this

21    transcript does not apply to any reproduction of the

22    same by any means, unless under the direct control

23    and/or supervision of the certifying reporter.)

24
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5   and make any necessary corrections.  You should state

 6   the reason in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                   - - - - - -

 2                   E R R A T A

 3                   - - - - - -

 4     PAGE   LINE   CHANGE

 5     ____   ____   _____

 6        REASON: _____

 7     ____   ____   _____

 8        REASON: _____

 9     ____   ____   _____

10        REASON: _____

11     ____   ____   _____

12        REASON: _____

13     ____   ____   _____

14        REASON: _____

15     ____   ____   _____

16        REASON: _____

17     ____   ____   _____

18        REASON: _____

19     ____   ____   _____

20        REASON: _____

21     ____   ____   _____

22        REASON: _____

23     ____   ____   _____

24        REASON: _____
```

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, WILLIAM FOSTER, do hereby acknowledge that

 4     I have read the foregoing pages, 1 to 39, and that

 5     the same is a correct transcription of the answers

 6     given by me to the questions therein propounded,

 7     except for the corrections or changes in form or

 8     substance, if any, noted in the attached Errata

 9     Sheet.

10

11

12     _____   _____

13     WILLIAM FOSTER                                 DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     ____ day of _____, 20___.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____   _____

 4    _____   _____   _____

 5    _____   _____   _____

 6    _____   _____   _____

 7    _____   _____   _____

 8    _____   _____   _____

 9    _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 799 of 1680

# JOINT APPENDIX TAB # 38

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 800 of 1680
Case 1:11-cv-22408-MGC Document 33-3 Filed 01/19/19 Page 2 of Page ID#:278
Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2              Case No. 1:11-CV-22408-MGC
 3    -------------------------------§
      EDUARDO AND CARMEN AMORIN et    §
 4    al., individually, and on behalf §
      of all others similarly         §
 5    situated,                       §
                                      §
 6        Plaintiffs,                 §
                                      §
 7    vs.                             §
                                      §
 8    TAISHAN GYPSUM CO., LTD. F/K/A   §
      SHANDONG THAIHE DONGXIN CO.,     §
 9    LTD.; TAIAN TAISHAN PLASTERBOARD §
      CO., LTD., et al,                §
10                                     §
          Defendants.                  §
11    ------------------------------- §
       - - -
12
                              - - -
13
                      TUESDAY, JANUARY 8, 2019
14
                              - - -
15
               Confidential - Subject to Further
16                   Confidentiality Review
17                            - - -
18
              Deposition of VICKI FOSTER, held at Morgan &
19        Morgan, 12800 University Drive, Suite 600, Fort
          Myers, Florida, commencing at 11:32 a.m., on the
20        above date, before Kelly J. Lawton, Registered
          Professional Reporter, Licensed Court Reporter,
21        and Certified Court Reporter.
22                            - - -
23               GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
24                   deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 01/19/19 Page 801 of 1680
Case 2:14-cv-00382-WS-B Document 33-3 Filed 01/18/18 Page 3 of 79 PageID #: 279
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        MORGAN & MORGAN
          BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3        12800 University Drive, Suite 600
          Fort Myers, Florida 33907
 4        (239) 433-6880
          palbanis@forthepeople.com
 5        Representing Plaintiff

 6
          LEVIN, SEDRAN & BERMAN, LLP
 7        BY:  KEITH J. VERRIER, ESQUIRE (Via Telephone)
          510 Walnut Street, Suite 500
 8        Philadelphia, Pennsylvania 19106
          (215) 592-1500
 9        kverrier@lfsblaw.com
          Representing Plaintiff

10
11        ALSTON & BIRD, LLP
          BY:  ALIYYA Z. HAQUE, ESQUIRE
12        BY:  PATRICK H. HILL, ESQUIRE
          BY:  BOYKIN LUCAS, ESQUIRE
13        One Atlantic Center
          1201 West Peachtree Street
14        Atlanta, Georgia 30309
          (404) 881-7000
15        aliyya.haque@alston.com
          patrick.hill@alston.com
16        boykin.lucas@alston.com
          Representing Taishan Gypsum Co., Ltd. and Tai'an
17        Taishan Plasterboard, Co., Ltd.

18
          ORRICK, HERRINGTON & SUTCLIFFE, LLP
19        BY:  MARC ROBERT SHAPIRO, ESQUIRE
          51 West 52nd Street
20        New York, New York 10019
          (212) 506-3546
21        mrshapiro@orrick.com
          Representing BNBM PLC

22
23    ALSO PRESENT:
24        William Foster
```

```
 1                          - - -
                       I N D E X
 2                          - - -
 3   Testimony of:  VICKI FOSTER
 4       DIRECT EXAMINATION BY MS. HAQUE...............  4
 5
 6                    E X H I B I T S
 7                (Attached to Transcript)
 8   DEFENDANTS'                                        PAGE
 9   Exhibit 1   Priority Claimant Vicki Foster's         6
                 Answers to Interrogatories
10
     Exhibit 2   Foster, Vicki and William Damages        8
11               Spreadsheet - Personal Property
                 Damages
12
     Exhibit 3   Miscellaneous Claim Form Worksheet -    12
13               Bates Numbered 000076 to 000089
14   Exhibit 4   Receipts - Bates Numbered 00305 to      20
                 000425
15
     Exhibit 5   Receipts - Additional Items Replaced    21
16               When Cost-Effective - Bates Numbered
                 F000905 to F000915
17
     Exhibit 6   Receipts - Golf-Related Items -         32
18               Bates Numbered F000777 to F000782
19   Exhibit 7   Foster, Vicki and William Damages       33
                 Spreadsheet - Discarded but Not
20               Replaced
21   Exhibit 8   Foster, Vicki and William Damages       36
                 Spreadsheet - Items Wanting to be
22               Replaced
23   Exhibit 9   October 19, 2011 Polkow Construction    48
                 Chinese Drywall Remediation Proposal
24               - Bates Numbered 000090 to 000094
```

Confidential - Subject to Further Confidentiality Review

```
1                          - - -

2              THE COURT REPORTER:  Ma'am, would you please

3         raise your right hand.

4              Do you swear or affirm that the testimony

5         you're about to give will be the truth, the whole

6         truth, and nothing but the truth?

7              THE WITNESS:  Yes, I do.

8              VICKI FOSTER, called as a witness by the

9    Defendants, having been first duly sworn, testified

10   as follows:

11                    DIRECT EXAMINATION

12   BY MS. HAQUE:

13        Q.   Mrs. Foster, can you please state your name

14   again for the record?

15        A.   Vicki Foster.

16        Q.   Thank you again for coming in for the second

17   day of your deposition.  We just have some additional

18   questions to ask you specifically related to personal

19   property and just some clean-up questions from last

20   time.

21              Just a reminder, the rules of the road

22   regarding the deposition, please give verbal

23   responses for the court reporter.  If you need to

24   take a break, just let me know.  We will try to take
```

1    a break every hour or so.

2              And we will go ahead and get started.

3         A.    Okay.

4         Q.    Are you taking any medications today that may

5    impair your ability to understand and answer my

6    questions?

7         A.    No.

8         Q.    Did you meet with your attorney to prepare

9    for this specific deposition?

10        A.    I just met with him briefly when we just got

11   here.

12        Q.    And how long did you meet, approximately?

13        A.    Five minutes, perhaps.

14        Q.    Did you review any additional documents to

15   prepare for this deposition here today?

16        A.    No.

17        Q.    Did you bring any documents to this

18   deposition?

19        A.    No.

20        Q.    And did you do anything else to prepare for

21   this deposition?

22        A.    No.  I looked at pictures, but that was it.

23        Q.    Mrs. Foster, for this deposition, you

24   prepared a series of spreadsheets.  Do you recall

```
1    doing that?

2         A.   Yes.

3         Q.   First of all, thank you for doing that.  I

4    know it probably wasn't fun to go through that

5    process, but I promise you, it will make this

6    deposition go a lot smoother.

7              First I want to show you what we're going to

8    mark as Exhibit 1 to your deposition.

9              (Defendants' Exhibit 1 was marked for

10   identification.)

11   BY MS. HAQUE:

12        Q.   Have you seen that document before?

13        A.   Yes.

14        Q.   And what is that document?

15        A.   It is Priority Claimant Vicki Foster's

16   Answers to Interrogatories.

17        Q.   And do you recall signing this document?

18        A.   I have signed a lot of documents.

19        Q.   If you flip to the very back page.

20        A.   Yes, I did.

21        Q.   And you signed this on November 30th, 2018?

22        A.   Correct.

23        Q.   Can I turn your attention to Question

24   Number 1.  The question asks:  Identify all types of
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 806 of 1680
Case 2:14-cv-00327-WS-B Document 138-3 Filed 01/18/19 Page 8 of 14 PageID #: 4284
Confidential - Subject to Further Confidentiality Review

1    damages that you seek in this lawsuit (e.g.,

2    alternative living expenses, diminution in value,

3    loss of use/enjoyment, et cetera) and specify amounts

4    sought for each category.

5            Do you mind reading the first sentence of

6    your response out loud?

7    A.    "We seek alternative living expenses from

8    October 2009 through November 2012 of at least

9    $190,727.01, personal property damage expenses of

10   $87,483.50, loss equity, diminution of value, loss of

11   use and enjoyment, punitive damages, and prejudgment

12   interest."

13   Q.    Mrs. Foster, are you still claiming personal

14   property damage expenses of at least $87,483.50?

15   A.    Yes.

16   Q.    Thank you.  You can go ahead and set that

17   down.

18           Mrs. Foster, have you filed any homeowner's

19   or other insurance policy claims for personal

20   property specifically?

21   A.    No.

22   Q.    Other than the personal property items that

23   you gave to your attorney -- and those are items that

24   we were able to examine -- have you kept any of your

1    personal property?

2        A.    Yes.

3        Q.    What items have you kept?

4        A.    I still -- the major items that I still have

5    in the house is the master bedroom suite, I have a

6    grandfather clock, I have lighting fixtures that I

7    put back up, I have a dining room table, I have the

8    office furniture that's there, and then other items

9    as well.

10       Q.    Have you kept in storage or elsewhere any of

11   the items that you have put on your discarded items

12   spreadsheet?

13       A.    No.

14       Q.    The jewelry and other items that you gave to

15   your attorney for our inspection, are those items

16   that you are intending to discard, or do you intend

17   to keep those items?

18       A.    I'm sure I will discard them.

19       Q.    Let's go ahead and -- what we will mark as

20   Exhibit 2.

21           (Defendants' Exhibit 2 was marked for

22   identification.)

23   BY MS. HAQUE:

24       Q.    First of all, thank you again for putting

1    together the spreadsheet.

2            Did you, yourself, fill in these values?

3    A.    Yes.

4    Q.    And does this spreadsheet reflect your full

5    claim for personal property damages as a result of

6    damage due to Chinese drywall?

7    A.    Unfortunately, pertaining to the discarded

8    items, if I had more time -- when I was going through

9    the pictures, there's a lot more items on there,

10   and -- that I did not put on the list.  So the amount

11   would be substantially higher.

12   Q.    But as of today, like we saw in your

13   interrogatories, the $87,000 encompasses the amount

14   of damages that you are claiming?

15           MR. ALBANIS:  Object to the form.

16           But you may answer, if you can, Mrs. Foster.

17           THE WITNESS:  Would you repeat the question?

18           MS. HAQUE:  Sure.

19   BY MS. HAQUE:

20   Q.    So in the first document, Exhibit 1, you said

21   you are claiming personal property damages of

22   approximately $87,400.  That -- you still are not

23   changing that amount, correct?

24   A.    That's correct.

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/18/19 Page 809 of 1680
Case 2:12-cv-00033-EEF-JCW Document 138-3 Filed 11/18/19 Page 11 of 16 PageID #: 287
Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Is that the amount?

 2             Understood.

 3             I have a couple questions related to this

 4    document in particular.

 5             What are the status of receipts on this

 6    document that say that they are "on file"?  And I can

 7    turn your attention to -- it looks like there's two

 8    on this first page.

 9        A.   Right.  I could not find the receipts.  Some

10    of the receipts didn't come clear on the -- when they

11    were copied, so I could not read them.  And I

12    couldn't find the pictures on the document as well.

13        Q.   Do you know if they have been produced to

14    your attorney?

15        A.   It is my understanding that there were some

16    more pictures produced, because when I was going

17    through all these documents trying to line them up, I

18    realized some of the pictures were not on there that

19    should have been there.

20        Q.   So were some of the receipts potentially

21    lost?  Were any of the receipts potentially lost?

22        A.   Not to my knowledge.

23        Q.   Okay.  Are there any duplicate entries on

24    this list?
```

Case 2:09-md-02047-EEF-MBN Document 23368-79 Filed 11/12/19 Page 810 of 1680
Case 2:14-cv-00372-MSD-RJK Document 138-1 Filed 11/18/19 Page 12 of 51 PageID# 288
Confidential - Subject to Further Confidentiality Review

```
 1            MR. ALBANIS:  Before you answer, if I could

 2       just state for the record just so that we're

 3       clear, I believe the pictures that Mrs. Foster

 4       was referring to were the additional photos that

 5       I referenced in my e-mail to defendants' counsel

 6       last week, and all of those photos have now been

 7       produced in the most recent document production

 8       from last week.

 9            MS. HAQUE:  Understood.

10  BY MS. HAQUE:

11       Q.   Mrs. Foster, do you know if there -- to your

12  knowledge, have you produced everything?  Are there

13  any other areas that you need to search for for

14  receipts or anything like that?

15       A.   I have no idea if there's any more receipts.

16       Q.   Okay.  So back to my question:  To your

17  knowledge, do you know if there are any duplicate

18  entries on this list?

19       A.   Not to my knowledge.

20       Q.   Okay.  I have a couple questions to ask you

21  about that, but I'll follow up in a moment.

22            In the fifth column, the Original (Discarded)

23  Item column, how did you go about filling that out?

24       A.   When I was -- when I moved into the condo,
```

```
 1    like I said before, I didn't take many items with me,

 2    and there were -- when things came up, then I would

 3    order something or buy something as I went along,

 4    because I knew I had it before, previously; so,

 5    therefore, I would purchase it, as needed.

 6         Q.   And when filling this out, did you remove

 7    items from the list of items that were on the

 8    discarded items spreadsheet that you filled out

 9    before?

10         A.   Would you repeat the question?

11         Q.   Sure.

12              Actually, let me show you.  That might make

13    it a little easier.

14              I'm going to show you what's been marked as

15    Exhibit 3.

16              (Defendants' Exhibit 3 was marked for

17    identification.)

18    BY MS. HAQUE:

19         Q.   Do you recall preparing this document?

20         A.   Yes.

21         Q.   And how does this document factor into this

22    spreadsheet?  Did you use that as sort of a starting

23    point?

24         A.   No.  I -- it's quite possible that I did use
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/12/19 Page 812 of 1680
Case 2:14-cv-00372-MSE-RJK Document 138-2 Filed 01/18/19 Page 14 of 31 PageID: 290
Confidential - Subject to Further Confidentiality Review

```
 1     this.  I'm not exactly sure now.  I've been through

 2     so many documents.

 3         Q.   Sure.

 4              Let's turn back to Exhibit Number 2, which is

 5     the spreadsheet.  And then I'm just going to ask you

 6     about a couple of entries.

 7              On Page 3 -- so, sorry, on Page 3 of this

 8     document, towards the middle of the page, you'll see

 9     "Hayneedle, mirror replacement."

10         A.   Correct.

11         Q.   And there are two of those.

12         A.   Correct.

13         Q.   Do you recall how many Hayneedle mirrors in

14     total you had in the house?

15         A.   These mirrors were to replace the mirrors

16     that were above the bathroom [sic].  There should be

17     three, actually, on here, because I replaced three.

18              No, wait a minute.

19              No, two of that one.  That's correct, two.

20     That goes in the bathroom.  It replaced the mirror

21     above the sink.

22         Q.   How many -- can you repeat that?  How many

23     Hayneedle mirrors would you have in total in the

24     house?
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/12/19 Page 813 of 1680
Case 2:12-cv-00322-MSD-RJK Document 138-3 Filed 01/18/19 Page 15 of 31 PageID# 291
Confidential - Subject to Further Confidentiality Review

```
 1        A.    It's actually three.

 2        Q.    Three.

 3              And can I turn your attention to the very

 4    last page.  Fifth from the bottom you will see an

 5    entry called "wall mirrors."

 6        A.    Yes.

 7        Q.    And it's for $403.80.  Is that the third

 8    Hayneedle mirror?

 9        A.    It should be.  I'm not -- I know on Page 3

10    there are two.  But they are two different prices.  I

11    do remember that there's three of this one particular

12    mirror in the master bathroom.

13        Q.    Okay.

14        A.    And there should be three of them.

15        Q.    Okay.

16        A.    I don't know.  Maybe it was on sale.  You

17    know, at this -- right now, I don't remember.

18        Q.    And there's one last entry that's on Page 4

19    that says "mirror replacement."  It's all the way at

20    the bottom, and it's the $226.71.

21        A.    It's on Page 4?

22        Q.    Yeah.  The back of Page 2, Page 4.

23        A.    And which entry is that?

24        Q.    The very last one that says "mirror
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/19/19 Page 814 of 1680
Case 2:14-cv-00317-MSD-RJK Document 138-1 Filed 01/18/19 Page 16 of 65 PageID# 2292
Confidential - Subject to Further Confidentiality Review

1    replacement."

2           One more page.  Flip it.  Yeah, the back of

3    this one.

4       A.   On the very bottom?

5       Q.   The very bottom.

6       A.   On the bottom of mine it says "Overstock,

7    barstools."

8       Q.   It's a little bit -- I'm sorry.  It's a

9    little bit -- it's maybe a third of the way up, if

10   you start at the "Overstock, barstools."

11          Do you see that, there's an entry that says

12   "mirror replacement"?

13      A.   Correct.

14      Q.   And that's for $226.71.

15      A.   Correct.

16      Q.   So there are four entries for the mirrors.

17   So you are saying one of them -- were any of those

18   duplicate, or were there four mirrors?

19      A.   There are four mirrors.

20      Q.   Okay.

21      A.   Because one of the mirrors -- I would have to

22   look -- but one of the mirrors goes in the other

23   bathroom.

24      Q.   Okay.

```
 1       A.   There's three in the master bathroom, and

 2   there's one in the hall bathroom.

 3       Q.   Got it.

 4            You also replaced two iPods?

 5       A.   Correct.

 6       Q.   Now, generally with the electrical equipment

 7   that you replaced in this spreadsheet, what was --

 8   were -- did you just replace all of the electrical

 9   equipment, or were there different ones that actually

10   malfunctioned?

11       A.   The ones that I replaced had malfunctioned.

12       Q.   Do you recall what the problem with them was?

13       A.   They wouldn't come on.

14       Q.   Now, in terms of the other electrical items,

15   for example, there's on the first page a Seiko

16   musical clock, the -- and to save time I think I'm

17   going to ask you questions about group categories of

18   the personal property instead of going line by line.

19            For the electrical items such as, for

20   example, the Seiko musical clock, the Apple computer,

21   the Best Buy computer, were all of these damaged in

22   some way?  Or how did you go about making the

23   decision to replace them?

24       A.   It actually depends on what item you're
```

1    asking me about.  When I moved in the condo -- well,

2    when I lived in the Chinese drywall house, I had a

3    computer and printer and so forth.  When I moved into

4    the condo, I was afraid to take that computer with me

5    or any of those other items.  So I had to buy

6    another -- I actually bought a small computer, laptop

7    that I could use in the condo.

8            And that's how those items are.

9        Q.   Is it fair to say that for the electrical

10   items that you're claiming on the personal property

11   spreadsheet:  Some had malfunctioned; others you just

12   weren't sure what was going to happen, so you wanted

13   to buy a new one and not sort of wait for the effects

14   of Chinese drywall?

15           MR. ALBANIS:  Object to the form.

16           But you may answer, if you know, Mrs. Foster.

17           THE WITNESS:  Honestly, I believe it is in a

18       twofold.  When I moved into the condo and I

19       didn't have items that I had, and, therefore, I

20       had to have items in this condo to use, some of

21       the items didn't work and -- well, a lot of those

22       items went into the garbage.  So I was afraid to

23       take hardly anything electrical with me.  And I

24       don't know that I took anything electrical.

```
1    BY MS. HAQUE:

2        Q.   Got it.

3             Now, on this first page you have a steamer.

4        A.   Correct.

5        Q.   And then on page -- I guess it's the back

6    of -- the second to last page, there's another

7    steamer listed with the same price.  Were these two

8    separate steamers that were bought, or did you only

9    have one steamer?

10       A.   I would have to look at the receipt.

11            What was -- the first one was on page what?

12       Q.   The first page and it says "Amazon steamer"

13   for $32.22.

14       A.   Well, I do remember buying a steamer.  I

15   don't know at this point right now if there was two.

16       Q.   Okay.  And then on the second -- the back of

17   the first page, the second page, it says "dining

18   kitchen table."

19            Do you see that in the middle of the page?

20       A.   Yes.

21       Q.   For a thousand dollars?

22       A.   Correct.

23       Q.   And then on -- let's see.  This is Page 4, it

24   says "Lenoir Empire Furniture, kitchen table no
```

```
 1    chairs."

 2              Is that the same table, or is that a separate

 3    table?

 4              Do you see that?  It's, like, maybe a third

 5    of the way down.

 6         A.   I do.

 7              I believe that is a duplicate.

 8         Q.   That's a duplicate?  Okay.  Just checking.

 9              And then the last one that I see potentially

10    is on the back of -- or, Page 2, there's an entry for

11    a Dyson vacuum.  It's about a third -- two-thirds of

12    the way down, for $332.74.

13         A.   Yes.

14         Q.   And then -- okay.  I found it.  It is Page 5,

15    and it says "Sears, Dyson vacuum cleaner," but it's

16    for $688.99.  It's all the way at the bottom of

17    Page 5.

18         A.   Oh, five.

19              Right.  That's for two different vacuums.

20         Q.   Okay.

21              MR. ALBANIS:  And I'm sorry to interject --

22              MS. HAQUE:  Sure.

23              MR. ALBANIS:  -- Aliyya.  But going back to

24         the dining kitchen table and the Lenoir Empire
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/19/19 Page 819 of 1680
Case 2:11-cv-00377-MSD-TEM Document 138 Filed 11/18/13 Page 21 of 49 PageID# 297
Confidential - Subject to Further Confidentiality Review

```
1          Furniture, kitchen table no chairs, it appears as

2          though we are referencing two different photos.

3          For the dining kitchen table entry on Page 2, we

4          are referencing Document Number 365713, Page 9 of

5          that; and for the Lenoir Empire Furniture,

6          kitchen table no chairs, we're referencing

7          Document Number 124967, Page 101.

8   BY MS. HAQUE:

9       Q.   Okay.  Let's just go ahead and take a look at

10  the photos just to make sure that we are clear on the

11  record.  Because I think the $165 difference might be

12  the moving cost.  Does that sound about right, the

13  delivery charge?

14      A.   I do think that that delivery charge was 165.

15      Q.   Okay.

16      A.   But I did buy other Lenoir furniture.  So

17  there's a possibility that could be different, but

18  I'm not a hundred percent sure.

19      Q.   Let's just -- just for the record, let's just

20  go ahead and take a second and look at the photos.

21          And we'll show you what's been marked

22  Exhibit 4.

23          (Defendants' Exhibit 4 was marked for

24  identification.)
```

```
 1              MS. HAQUE:  And then here's the Exhibit 5
 2         where it says "Lenoir."
 3              (Defendants' Exhibit 5 was marked for
 4         identification.)
 5    BY MS. HAQUE:
 6         Q.   So the first one is going to be the big
 7    document on Page 4 -- we've put, for the ease of this
 8    deposition, page numbers.  Do you see on the bottom
 9    right-hand corner?
10         A.   Correct.
11         Q.   If you flip to Page 425.  I think it should
12    be way towards the back.  It's the last page.
13         A.   Yes.
14         Q.   And so that represents the first entry of
15    dining kitchen table.  And then if you -- keep that
16    page open.
17              And then on the second document, it is on
18    Page 913, I believe, which is the last page.
19              So it looks to be the same, right?
20         A.   Correct.
21         Q.   And the $165 is going to be the home delivery
22    charge?
23         A.   Correct.
24         Q.   Got it.  Okay.  Great.
```

```
1              You can go ahead and set that aside.

2              Now, on this first page -- let's turn back to

3    Exhibit 2.  Sorry.

4         A.   That's quite all right.

5         Q.   On this first page, all the way at the bottom

6    you have these two charges for Budget blinds.

7         A.   Correct.

8         Q.   We only see the first receipt, but there's

9    not an amount listed, unfortunately.  Do you have any

10   other documentation with these amounts, like, a quote

11   sheet or an estimate or anything like that?

12        A.   Are you talking about the Budget blinds?

13        Q.   Yes.

14        A.   So you have -- if I'm correct, you have the

15   receipt for the first one, the 5,084?

16        Q.   Let's -- I think that's in Exhibit 4.  Let's

17   pull that up.

18             So it doesn't look like there's an amount --

19   there's an amount listed at the bottom, but let's go

20   ahead and take a look at that.  And that is going to

21   be Exhibit 4, Page 078.

22        A.   07 --

23        Q.   I don't think that's right, because that only

24   goes -- that starts at Page --
```

```
 1        A.    305.

 2        Q.    -- 305.

 3              So while we wait for a document, let me ask

 4        you a couple more questions regarding the second

 5        spreadsheet.

 6        A.    Sure.

 7        Q.    So we talked about the electronic items.  In

 8        terms of the linens, everything from, you know,

 9        towels, table cloths, things like that, how did you

10        go about making the decision to discard or replace

11        those?

12        A.    In the beginning, I bought towels when I was

13        in the condo.  I didn't take -- like I said, I didn't

14        take anything with me.  So I purchased a few towels

15        while I was there.  And then once we started the

16        remediation, the odor was horrendous.  I bought a

17        chemical called Sniper.  And I tried washing them,

18        but it would take two to three loads to try to get

19        the odor out.  Some of them I just threw away.

20        Q.    Now, when you say "horrendous," are you

21        referring to the smell or the odor that was emanating

22        from these items?

23        A.    Correct.

24        Q.    Now, was that also the same story with
```

1     respect to your personal clothing?

2          A.   A lot of the clothing I did throw away.  Some

3     of them I did replace.  A lot of the clothing, after

4     they hung out in the garage, got better over time.

5     But a lot of the clothing was thrown away because

6     there's zippers on there; there's elastic in there.

7     The elastic would just -- not disintegrate, but it

8     would just -- there was no elasticity and buttons and

9     so forth.

10         Q.   So for your personal clothing you noticed

11    problems with the elastic in some of the clothing

12    items.

13              The buttons, would the buttons just fall off?

14         A.   No, they wouldn't fall off.  They would --

15    you could see, like, pitting on them, corrosion.

16         Q.   And the same with the zippers?

17         A.   On some of the garments, yes.

18         Q.   Okay.  What about your shoes?

19         A.   I had a lot of issues with shoes.  And you --

20    I know you have pictures of some of the shoes, but

21    not all of them.  I didn't -- I had a lot of shoes,

22    and I must have thrown out at least 40 pairs of

23    shoes.

24         Q.   And can you, just for the record, describe

Case 2:09-md-02047-EEF-MBN   Document 23368-79   Filed 11/12/19   Page 824 of 1680
Case 2:14-cv-00321-MSD-RJK   Document 138   Filed 01/18/19   Page 26 of 31   PageID# 302
Confidential - Subject to Further Confidentiality Review

1    the problems that you witnessed with the shoes?

2        A.    Depending on what type of shoe it was, if it

3    had any metal on it, it would corrode.  I had some

4    shoes that I would put my foot in, and the whole

5    lining would just disintegrate.  I had a pair of

6    shoes that even the backing just cracked.

7        Q.    Was this true of both your older shoes and

8    the more newer purchases?

9        A.    It was both.

10            My husband had a pair of shoes.  He came home

11    once, and we had a function at the club.  He had a

12    pair of brand new shoes in the closet, never been

13    worn.  He put those on, and they literally fell apart

14    while he was at the club.

15        Q.    When -- how long from when you first bought

16    these items did you first notice problems such as the

17    ones you have described with it falling apart?

18        A.    Repeat the question?

19        Q.    Sure.

20            Do you remember how long in time it was from

21    when you first bought these items to when you first

22    started noticing these problems, like, for example,

23    the sole coming apart?

24        A.    It would be very hard to answer that question

Confidential - Subject to Further Confidentiality Review

```
 1    because I was so sick at the time, and I don't recall

 2    exactly how long I had them.

 3         Q.   What about your golf shoes?  Because I think

 4    you had some entries on the spreadsheet relating to

 5    your golfing equipment.

 6         A.   Correct.

 7         Q.   What were your problems you had with the golf

 8    shoes?

 9         A.   They did the same thing.  Some of them had

10    cleats; some of them did not.  I think the major

11    problem with the golf shoes, the glue that adheres

12    the shoes together just disintegrated.  And so when I

13    wore a couple of pairs of those shoes, they just

14    flopped on me because the glue just separated the

15    shoe from the sole.

16         Q.   Do you recall how many pairs of golf shoes

17    you had at that time?

18         A.   I don't recall exact, how many.  But I had a

19    lot.

20         Q.   Now, did any of your golf shoes have metal in

21    the cleat part of the shoe?

22         A.   When we first moved into the home, we had

23    some shoes with metal.  And then I tried to replace

24    them with the rubber sole.  So I don't recall how
```

1    many had that.

2        Q.   Okay.  What about the furniture in the home,

3    for example, the dining table and the, you know,

4    chairs and other types of items that would be

5    considered furniture, did you notice any problems

6    with them?

7        A.   I noticed a lot of problems with the

8    furniture.  The dining room table that you saw the

9    receipt that I replaced, that was Hooker furniture.

10   It had -- it was, like, a dinette set, and it had

11   four chairs.  They were made of metal and wood.  The

12   metal literally just peeled off the frame and so

13   forth with -- because I had everything that matched:

14   The dining room table matched, the three bar stools

15   matched, the two end tables in the family room, and

16   then I had a large coffee table.  And it all had the

17   same motif on it, and all of it started just peeling

18   off.

19       Q.   And this was something that you noticed

20   primarily in the dining area, or were there other

21   parts of the house where you noticed maybe more or

22   less of this pitting in the furniture?

23       A.   The master bedroom set, the mirror has, like,

24   the black coming through, the black dots.  The

```
 1    handles, it's like -- it was -- was, like, a gold, a

 2    gold-ish color.  That has tarnished and darkened.

 3         Q.   So these are metal finishings on the

 4    furniture sets that you are referring to?

 5              Other than the mirror -- the golden handles

 6    and things, those were pieces that were added on to

 7    the furniture; is that right?

 8         A.   Well, the furniture is -- the bedroom suite

 9    is made of wood.

10         Q.   Okay.

11         A.   And, of course, it's put together with screws

12    and bolts and so forth that you can see the corrosion

13    on the handles.

14              And as far as the dining area, the barstools,

15    the end table, the two -- well, the big coffee table,

16    all of that --

17                   (Telephone interruption.)

18              THE WITNESS:  Is that my phone?

19              MS. HAQUE:  Don't worry about it.  If you

20         need to check it, go ahead.

21         A.   But that was made -- it was, like, a -- the

22    legs of it was metal, and it had wood around -- like,

23    a parquet wood around the top with glass around the

24    top.  But it was the metal that was just
```

```
 1    deteriorating.

 2         Q.   Got it.

 3              I think we have the page for the blinds.  It

 4    is 376.

 5              So we don't see an exact amount on here.  And

 6    so I'm wondering if you have any other -- for these

 7    two -- on Exhibit 2, you have one entry for $5,084

 8    and one entry for $2,450.

 9         A.   Correct.

10         Q.   Do you have any quotes or other sort of

11    estimate, maybe, for those amounts?

12         A.   You don't have the one --

13         Q.   No.  That's the only document that we have is

14    this 376.

15         A.   I have a document that shows -- I'm not sure

16    of the amount.

17         Q.   Okay.

18         A.   But, like, on a Discover statement that shows

19    Budget blinds.

20         Q.   Okay.  We'll look for that.

21              We'll take a look.  And if not, we'll talk to

22    your attorney to see if we can get that document.

23         A.   Okay.

24         Q.   Okay.  Thank you.
```

```
1            In terms of the jewelry that you also have on
2    the list, was that the pitting that you submitted to
3    us in terms of the personal property damage?  Is that
4    what you are describing in terms of problems with the
5    jewelry?
6        A.   I submitted that jewelry to show -- give you
7    an example of what Chinese drywall does to personal
8    property and jewelry.
9        Q.   And is that something that you sort of
10   noticed uniformly throughout your jewelry?
11       A.   Absolutely.
12       Q.   In terms of -- there's some items on here
13   that relate to a blood pressure monitor and some
14   other, I guess, health-related items.  What problems
15   did you experience with those?
16       A.   Well, they're electric, and they would stop
17   working.
18       Q.   Okay.
19       A.   I had one blood pressure cuff that was -- had
20   the battery, and it just -- it was pretty bad, the
21   corrosion on the inside of it, with the metal in
22   there.
23       Q.   Okay.  Now, one sort of last thing that I
24   want to ask you about on this document, Exhibit 2, is
```

```
 1    the Affordable Golf Carts.  And that's on the

 2    first -- Exhibit 2, sorry, this first page.  And it

 3    says you have Affordable Golf Carts -- it's right

 4    towards the top of the page -- $8,650.66.

 5        A.    Correct.

 6        Q.    What were the issues that you experienced

 7    with the golf cart?

 8        A.    The original golf cart we had, we had to keep

 9    replacing the batteries in it.  The batteries

10    wouldn't stay in there very long.  We had issues with

11    the golf charger itself.  In fact, we had replaced

12    the golf charger.

13          And there was other issues that I don't

14    recall at this moment that we had to get somebody out

15    to fix the golf cart.

16        Q.    Do you recall when you first started

17    experiencing problems with the golf cart?

18        A.    I don't recall.

19        Q.    And where did you -- where did you usually

20    store the golf cart when you weren't using it?

21        A.    In the garage.

22        Q.    And approximately how often did you have to

23    change the battery for the golf cart?

24        A.    I don't remember.
```

```
 1        Q.   Okay.  Let me show you what's been marked as

 2   Exhibit 6.

 3             (Defendants' Exhibit 6 was marked for

 4   identification.)

 5   BY MS. HAQUE:

 6        Q.   Do you recognize this document?

 7        A.   Yes.

 8        Q.   And what is this document to you?

 9        A.   This is the receipt for the golf cart, the

10   new one that we bought.

11        Q.   And it looks like you bought this back in

12   2013?

13        A.   Correct.

14        Q.   And do you recall having any problems post to

15   this date with any golf cart related issues?

16        A.   We were having issues with the golf cart.  I

17   can't give you the exact date.  But I know we were

18   having issues with the golf cart.

19        Q.   But buying the new one, did that sort of

20   remedy and solve the issues?

21        A.   No.  It doesn't solve the issue because we

22   had to put out more money for a new golf cart that we

23   really didn't want to put out.  And -- and we

24   shouldn't have had to be buying all this other stuff
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/19/19 Page 832 of 1680
Case 2:14-cv-00032-MSD-RJK Document 138-3 Filed 01/18/19 Page 34 of 61 PageID# 310
Confidential - Subject to Further Confidentiality Review

```
1    when we had perfectly good furniture when we came to

2    Florida.

3        Q.   Did you use the golf cart to move the -- move

4    furniture or other items from when you sort of had to

5    leave the house for remediation or whatnot?

6        A.   When we lived down the street in our

7    neighbor's house we rented, I do remember on a couple

8    occasions we had to move a ladder, a tall ladder; so

9    we strapped it to the back and we moved it down

10   there.  You can't get many items on a golf cart.  We

11   mainly used our bodies, because we would trolly

12   everything down the street on a dolly.

13       Q.   Okay.  I think -- we might have some more

14   questions on the spreadsheet, but I think you can go

15   ahead and set that one aside.

16            Let's go ahead and pull out the second

17   spreadsheet.

18            (Defendants' Exhibit 7 was marked for

19   identification.)

20   BY MS. HAQUE:

21       Q.   Mrs. Foster, do you recognize this document?

22       A.   I do.

23       Q.   And did you put together this document?

24       A.   Yes.
```

```
 1        Q.   And is this a spreadsheet of all of the
 2    property that was discarded but not replaced?
 3        A.   This is not a complete list of everything
 4    that we discarded.  If I had had more time, this
 5    would be even more thorough.
 6        Q.   And did you put together this list yourself?
 7        A.   Yes.
 8        Q.   Is that right?
 9             And for these items, again, I don't want to
10    go through it line by line, but for these same
11    categories of documents that we -- that you responded
12    to in the first spreadsheet, would you say the
13    same -- you experienced the same damage, for example,
14    with the electronic damages, with the linens, with
15    the clothing?
16        A.   Correct.
17        Q.   Now -- well, I guess on the first page
18    there's a Waterpik flosser.
19        A.   Correct.
20        Q.   Did you buy -- there was a replacement,
21    though, for that flosser, right?
22        A.   Correct.  We replaced one.
23        Q.   Okay.  How many did you have in total?
24        A.   Two.
```

```
 1         Q.   So for some -- so that may clear up some of

 2    the confusion.  For some of the items on here, you

 3    might have had multiple of those items?

 4         A.   Correct.

 5         Q.   So if you replaced only one, then you put the

 6    ones that you did not replace -- or, you kept the

 7    ones that you did not replace on the spreadsheet?

 8              Let me rephrase that, because I think that

 9    was a little confusing.

10              You may have had multiple versions of some of

11    these items, right?

12         A.   Absolutely.

13         Q.   So if you replaced one, that went on this

14    first spreadsheet, right?

15         A.   Correct.

16         Q.   But if you did not replace the item or you

17    only replaced one out of two, for example, you kept

18    it on this spreadsheet?

19         A.   Correct.

20         Q.   Okay.  Because we saw some telephones on this

21    spreadsheet.

22         A.   Correct.

23         Q.   So does that mean that you replaced some

24    telephones but not all of them?
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/19/19 Page 835 of 1680
Case 2:11-cv-00377-MSH-RJK Document 138-3 Filed 01/18/19 Page 37 of 51 PageID# 3313
Confidential - Subject to Further Confidentiality Review

```
 1        A.   I did replace -- like, the whole house

 2   phones?  I did replace those.

 3        Q.   Okay.  What about the carpet shampooer?  You

 4   do have a listing of a carpet shampooer on this

 5   spreadsheet.

 6        A.   Correct.

 7        Q.   Did you replace that or --

 8        A.   I have not replaced that to this day.

 9        Q.   Okay.

10             Okay.  You can go ahead and set that document

11   aside.

12             And then let's go ahead and look at the third

13   spreadsheet you provided to us.

14             (Defendants' Exhibit 8 was marked for

15   identification.)

16   BY MS. HAQUE:

17        Q.   This is what has been premarked as Exhibit 8.

18             Mrs. Foster, do you recognize this document?

19        A.   Yes.

20        Q.   What is this document?

21        A.   This document is just some of the items that

22   I have in my house that I would like to replace as

23   soon as the funds are available.

24        Q.   And did you create this spreadsheet?
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/12/19 Page 836 of 1680
Case 2:11-cv-00377-MSD-RJK Document 138 Filed 01/18/13 Page 38 of 51 PageID# 314
Confidential - Subject to Further Confidentiality Review

```
1      A.   Yes, I did.

2      Q.   Is all of this furniture still functional in

3   your home?

4      A.   The master bedroom suite is functional as far

5   as sleeping.  It's not as appealing to look at as it

6   was when I first bought it.  The mirror has pitting

7   on it.  And like I said before, the handles are

8   tarnished.

9           The office furniture, it has lighting in it,

10   and I don't even have it where the lights will come

11   on because I'm afraid of the electrical components of

12   it.

13          The office chair, the leather chair, I still

14   have that in there.  There's a lot of corrosion on

15   it.

16          And I meant to take the guest bedroom suite

17   off, because . . .

18      Q.   For the fixtures, when you had the

19   remediation contract with -- I believe it was Polkow?

20      A.   Correct.

21      Q.   Did they agree to replace and fix these as

22   part of the contract?

23      A.   No.

24      Q.   Okay.  We can take a look at that a little
```

```
 1    bit later.

 2         A.   He did say he would replace fixtures, but --

 3    that I recall at the moment, but he would not replace

 4    these fixtures.  These fixtures are very expensive.

 5         Q.   Is that why he -- did you ever ask him about

 6    replacing these specific ones, like the chandelier,

 7    et cetera?

 8         A.   He would not replace these.

 9         Q.   And he told you that?

10         A.   Yes.

11         Q.   Okay.  And as of today, you have not

12    purchased any replacements for these specific items?

13         A.   No.  And I'm afraid to turn them on.

14              I did have the one dining room fixture, one

15    of the lights -- because there's different globes on

16    there, it popped, and I called an electrician.  And I

17    don't recall the date that he came out.  But he was

18    able to just rewire that one.  But now I don't -- I

19    don't even want to turn them on.

20         Q.   Did he check the wiring of any of these other

21    fixtures?

22         A.   No.

23         Q.   Did he -- what did he say about using that

24    particular fixture that he replaced the one section
```

```
 1     of wiring?

 2        A.   He said at any time, any of that could go

 3     out.

 4        Q.   Even after he fixed it?

 5        A.   He said the whole fixture could go out,

 6     because he didn't look at all the wiring at it.

 7        Q.   And did he also attribute that problem to

 8     Chinese drywall?

 9        A.   It is all corroded.

10        Q.   Okay.  I think you can go ahead and set this

11     document aside.

12             I think that is exhibit -- so can I turn your

13     attention back to Exhibit 4 and Page 346.

14             So it looks like you purchased two wall

15     mounts at -- for the television for 49.99 each?

16        A.   Correct.

17        Q.   Is that right?

18             So the total cost is $99.98?

19        A.   For the two --

20        Q.   For the two?

21        A.   -- wall mounts, yes.

22        Q.   Yes.

23             Now, if you turn back to Exhibit Number 2 --

24     which I know there's a lot of paperwork.
```

```
 1        A.    Yeah.  That's okay.

 2        Q.    If you flip with me to the very last page.

 3   You'll see that the amount for wall mount for

 4   television is $215.98.

 5        A.    Correct.  The amount should be 99.98 plus

 6   tax.

 7        Q.    Okay.  I've got it.  I will make the

 8   correction.

 9              Great.  You can put that aside.

10              And then only other one that I want to bring

11   your attention to is on Exhibit 4, Pages 409 and 411,

12   it looks like it's a receipt for Laserlink --

13        A.    Correct.

14        Q.    -- for $259.  And then you received a hundred

15   dollar discount.

16        A.    Oh, yes.

17        Q.    So then on Exhibit 2, on Page 4 -- and if you

18   flip one more page.

19        A.    One more page?

20        Q.    Yeah.

21              Under Laserlink, can we go ahead and make

22   that correction from 259 to 159?

23        A.    Oh, yes.

24        Q.    Great.
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/29/19 Page 840 of 1680
Case 2:14-cv-00382-MSD-RJK Document 138-2 Filed 11/8/19 Page 42 of 54 PageID# 318
Confidential - Subject to Further Confidentiality Review

```
1            MS. HAQUE:  All right.  I think this is a

2       good place to take our first morning break.  I'm

3       pretty -- we're moving really quickly through

4       these.  So hopefully it's not too much more time

5       with you, Mrs. Foster.

6            (Recess from 12:25 until 12:39 p.m.)

7   BY MS. HAQUE:

8       Q.   Just a few items to clarify from what we just

9   discussed a little bit earlier with respect to the

10  electronic items.

11           You were concerned about turning on the

12  electrical items and what could happen as a result of

13  that.  Is that sort of your primary reason for

14  discarding them?

15           MR. ALBANIS:  Object to the form.

16           But you may answer, if you know, Mrs. Foster.

17           THE WITNESS:  It depends on what the item is.

18       Yes, if it is electrical.  But it could have

19       corroded; it could have stopped working; it could

20       have showed tarnish.  I mean, it depends on the

21       item.

22  BY MS. HAQUE:

23       Q.   For the electrical items, did you ever try

24  and get them fixed or call in an electrician to
```

```
1    evaluate the state of them?

2        A.   I called the electrician in on that one

3    fixture of mine, because I loved those fixtures when

4    I bought them, and I saved the money to buy them and

5    got what I wanted.  I had him to fix that.

6            As far as the other items, no, I didn't call

7    an electrician.  They charge too much.

8        Q.   For some of the portable electronic items

9    like the laptop and things like that, did you -- were

10   you afraid that those might have some type of problem

11   if you turned them on?

12       A.   I know from experience from living in the

13   Chinese drywall house -- I put four motherboards in

14   one computer alone -- so I knew it was a matter of

15   time because they were going to go out.

16       Q.   For any of these electrical items -- or, any

17   of the items that you put on Exhibit 2, that

18   spreadsheet, were those all discarded, or did you

19   donate any of them to Salvation Army or Goodwill or

20   anybody?

21       A.   I can't honestly say right now if I did

22   because of the frame of mind that I was in.  I know a

23   lot of things went into the garbage.  I couldn't

24   definitively say.
```

```
1        Q.   For all of the items on Exhibit 2, for

2    clarification purposes, you are only claiming -- for

3    all of those items on that list, you are only

4    claiming personal property damages?

5             And to back up, we want to make sure that we

6    are categorizing all of the categories of damages

7    properly.  So for everything on this list,

8    Category 2, those are all going into what you are

9    claiming for personal property damages specifically?

10       A.   These are the items that I replaced from

11   the -- when I had to buy something, I have the

12   receipts for all of these.  All the discarded items,

13   I do not have receipts for.  You're talking about a

14   lifetime of saving items.

15       Q.   Let me turn your attention to your response

16   for -- yeah, Exhibit 1 and sort of your response to

17   Question Number 1.  And you will see you have those

18   different categories of damages listed.

19       A.   Correct.

20       Q.   So is it fair to say that for this

21   spreadsheet we're including them in the personal

22   property damages and not the alternative living

23   expenses damages?

24       A.   Could you repeat the question?
```

```
 1      Q.   Sure.

 2           So for this spreadsheet in Exhibit Number 2,

 3      are we -- are you counting that towards the personal

 4      property damages that you have listed in your

 5      response to Question 1, or are some of these also

 6      counted towards where you have the alternative living

 7      expenses listed as $190,000?

 8      A.   I can't answer that question, because I'm not

 9      exactly sure.  I know this adds up to approximately

10      88,000.

11      Q.   Okay.  And that's very close to this personal

12      property damages number of 87,000.

13      A.   Correct.

14      Q.   So do you think it would be fair to say that

15      these go into that bucket of the personal property

16      damages, give or take a little, a small amount of

17      money?

18      A.   I don't recall.

19      Q.   Okay.  Let's turn to -- let's turn back to

20      Exhibit 4.

21           Now, I had asked you about a carpet shampooer

22      a little bit earlier.  Can you turn with me to

23      Page 393.

24      A.   Can I say something?
```

```
1        Q.   Sure.

2        A.   I do recall buying a shampooer when I was in

3    the condo.  I believe it was in the condo when I

4    bought one.

5        Q.   Yeah, that's what I wanted to clarify for

6    you -- with you.

7        A.   Yes.  But there is also another shampooer.

8    And I don't know if it's on that list or not.  But

9    it's a portable one, and I don't know if I even put

10   this on there.  But . . .

11       Q.   But just to clarify, that's a separate carpet

12   shampooer --

13       A.   Correct.

14       Q.   -- than Page 393?

15       A.   Right.  I do remember buying that.  And it

16   should have been in, like, 2009.  And it is.

17       Q.   Okay.  That is good to know.

18            Now, you also have a -- if you turn to

19   Exhibit 5.  There's a series of items that you

20   purchased listed.  And at the very bottom you will

21   see a leather couch.

22       A.   Correct.

23       Q.   Now, you also bought a leather couch in the

24   condo, right?  Or you bought from the --
```

```
 1        A.    I bought used furniture.

 2        Q.    Do you still have that leather couch, or did

 3   you discard that leather couch?

 4        A.    As we talked previously in the first

 5   deposition, I do not have that.  That was donated.

 6        Q.    Got it.  Good.  Okay.  I just wanted to

 7   clarify that.

 8              And on Exhibit 5, this is the replacement

 9   couch for the Chinese drywall home couch?

10        A.    Correct.  But we didn't buy -- I also had a

11   leather recliner rocking chair.  That was not

12   replaced.  That went with the original leather suite.

13   But when we bought this leather, we did not buy the

14   chair.

15              MS. HAQUE:  Keith, sorry about that.

16              I think he's on mute, too.

17              MR. VERRIER:  I was on mute.

18              MS. HAQUE:  Okay.

19              MR. VERRIER:  Can you hear me now?

20              MS. HAQUE:  Yeah.  Sorry about that.  We

21        started prematurely and forgot to unmute the

22        phone.

23              MR. ALBANIS:  Okay.  All right.  How long

24        have you been going, just for my own notes here?
```

```
 1            MS. HAQUE:  Five, ten minutes.  We're on

 2       Exhibit 5 right now.  I just asked a question

 3       about the leather couch.

 4            MR. VERRIER:  Okay.  Thank you.

 5            MS. HAQUE:  Sorry about that.

 6            MR. VERRIER:  All right.

 7   BY MS. HAQUE:

 8       Q.   So back to the leather couch, this was the

 9   partial replacement for the leather suite that you

10   initially had --

11       A.   Correct.

12       Q.   -- in the Chinese drywall home?

13       A.   Correct.

14       Q.   Were any of these furniture purchases that

15   you had -- actually, let me rephrase.

16            Were all of these furniture purchases in

17   Exhibit 5 replacement furniture purchases?

18       A.   Correct.

19       Q.   And were any upgrades, or were these pretty

20   much the same types of brands that you had previously

21   in the Chinese drywall home?

22       A.   The -- they're comparable except for the

23   leather couch.  This is a downgrade from what we had

24   before.
```

```
 1              The -- the dining room table is a downgrade.

 2      Q.    The Lenoir dining room table?

 3      A.    Yes.

 4              I would say the end table is definitely a

 5      downgrade.

 6      Q.    Do you recall how much -- I know it's a long

 7      time ago -- how much you originally paid for the

 8      original, I think you said Hooker --

 9      A.    Hooker.

10      Q.    -- furniture?

11      A.    I don't recall how much I paid.

12      Q.    You can go ahead and set that document aside.

13              Let's pull out next -- so part of our role is

14      to figure out sort of in which bucket each item falls

15      into, and I want to next talk about some of the

16      lighting and plumbing fixtures and just clarify that

17      for the record.

18              Let me show you -- and we've looked at this

19      before -- what has been marked as Exhibit 9.

20              (Defendants' Exhibit 9 was marked for

21      identification.)

22      BY MS. HAQUE:

23      Q.    Do you recall this document?

24      A.    Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/12/19 Page 848 of 1680
Case 2:12-cv-00377-MSD-RJK Document 138-3 Filed 01/18/19 Page 50 of 105 PageID# 326
Confidential - Subject to Further Confidentiality Review

1      Q.    What is this document?

2      A.    It is the remediation proposal.

3      Q.    And if you turn to Page, I think, 91.

4    There's a list of lighting and plumbing fixtures.

5    For the record, can you clarify what Polkow ended up

6    paying for in terms of the fixtures and what they

7    refused to pay for?

8      A.    Well, he refused to put new fixtures in like

9    I have, for one thing.  But he did agree to put --

10   for instance, I did put one up in the bathroom --

11   well, let's see.

12         The lighting fixtures in the foyer, dining

13   room, kitchen, I have a chandelier in the master

14   bedroom, and then I put a lighting fixture that I had

15   previously in the hall bath; he put those back up.

16   So I kept those.

17         The two lighting fixtures that I had in the

18   master bathroom, he did not put those up.  But he did

19   put lights in the ceiling, and he said his budget did

20   not -- he did not have the budget to replace the

21   light fixtures.

22     Q.    I think there was a difference -- I think in

23   this contract he said that he would charge $117,531.

24   And I think that is on Page 92 --

```
 1        A.    Yes.

 2        Q.    -- all the way at the bottom.

 3              But I think you all ended up claiming a

 4     remediation cost of 127,500-something dollars?

 5        A.    Correct.

 6        Q.    What accounts for that $10,000 difference?

 7     Is it these fixture we're talking about?

 8        A.    No.

 9        Q.    What would be the difference between those

10     two?

11        A.    Well, on here it says -- and he called it to

12     our attention -- let's see -- "prices per square foot

13     may vary due to upgrades existing currently in home

14     and any additional upgrades."

15              But I thought there was something else in

16     there that stated about the price could change, if

17     I'm not mistaken.

18        Q.    So he was the one that changed the price.  It

19     was basically due to his saying there might be some

20     upgrades or things I need to do?

21        A.    First off, I was there by myself.  I was very

22     sick going through all of this.  To be -- I can't

23     tell you what the -- what transpired back in 2012 to

24     make the differential between the two cost.  I just
```

1    know he came to me needing money.  I wrote him a

2    check.  I wanted to get it done as fast as I could.

3    I did everything that I could.

4        Q.   And he was still unwilling to sort of -- let

5    me back up.

6             So every fixture that's on Exhibit 2, the

7    personal property, he was just unwilling to make

8    those fixtures as part of the contract price?

9        A.   That was not in the contract for those

10   fixtures.

11       Q.   Okay.

12            Okay.  You can go ahead and set that document

13   aside.

14            Some questions about some of your outdoor

15   living.

16            There was an outdoor lighting system that you

17   had.  I guess it was in the lanai area, maybe?

18       A.   There was a sound system out there.

19       Q.   Was that also damaged as a result of Chinese

20   drywall?

21       A.   You're talking about the lighting?

22       Q.   Yes.  It's on Exhibit 4, Page 389.

23       A.   I'm sorry, what page?

24       Q.   389.

```
 1              Oh, sorry.  You were waiting for me.

 2              So this was outdoor lighting that you had,

 3     right?

 4         A.   On the front of the house, yes.

 5         Q.   On the front of the house?

 6         A.   Correct.

 7         Q.   And you have a note here saying "replaced

 8     corroded ones."

 9         A.   Well, they were corroded.

10         Q.   So then you noticed outside of the house

11     different fixtures and items that were damaged as a

12     result of Chinese drywall?

13         A.   It was my impression that these had to be

14     replaced because they were electrical.  The

15     electrical wiring goes through the house.  All the --

16     everything was torn out.

17         Q.   Okay.  And then let me turn your page -- or,

18     turn your attention to Page 380.

19              And this was an outdoor rug?

20         A.   It is an outdoor rug.

21         Q.   And was the original rug damaged as a result

22     of Chinese drywall?

23              Or I guess I should say:  Do you recall where

24     the original rug was located?
```

```
 1        A.   Well, when I first bought this rug, it was in

 2   the house.  It is now outside.

 3        Q.   Okay.  You can go ahead and set that document

 4   aside.

 5             Just a couple clean-up questions remain, and

 6   then we will be done.

 7             Did you receive -- back to the golf cart that

 8   you replaced, did you receive a trade-in from the

 9   golf cart company for the old golf cart?

10        A.   I don't recall.

11        Q.   And was the new golf cart an upgrade from the

12   old golf cart?  Do you remember?

13        A.   I don't -- I don't know if it would be an

14   upgrade or not.

15        Q.   Let me ask this general question,

16   Mrs. Foster.  For any of the condo move-in and

17   move-out receipts, are you claiming those as

18   alternative living expenses, or are there some items

19   that you are also claiming as personal property

20   damages?

21        A.   Repeat the question.

22        Q.   Sure.

23             For -- you have receipts, and you submitted

24   receipts to us that refer to when you had to move
```

Case 2:09-md-02047-EEF-MBN Document 22363-79 Filed 11/22/19 Page 853 of 1680
Case 2:14-cv-00317-MBN Document 138-20 Filed 11/8/19 Page 54 of 56 PageID #: 2331
Confidential - Subject to Further Confidentiality Review

1    into the condo.  For those receipts, are you claiming

2    all of those as alternative living expenses damages,

3    or are there some receipts in that stack that you are

4    also claiming as personal property damages?

5        A.   From my understanding, from what I see on

6    these documents, some of the receipts on this new

7    document that was prepared with the pictures, those

8    were expenses for moving into the condo, and then

9    there's replacement items on there.

10       Q.   Okay.  So we just want to make sure that

11   items are not sort of being double-counted.

12            So there's some items on the spreadsheet that

13   you are counting towards the personal property

14   damages, and there might be a handful of items that

15   are going into the condo receipts for the alternative

16   living expenses.  Is that right?

17       A.   I can't really answer that question at this

18   moment.

19            MS. HAQUE:  Okay.  I think we can go off the

20       record for a few moments, see if we have any

21       questions, and then pass the witness.

22            (Recess from 12:59 until 1:03 p.m.)

23            MS. HAQUE:  Mrs. Foster, those are all the

24       questions I have for you this afternoon.  Thank

```
1        you again for all your time, as well as all the

2        time it took to prepare these spreadsheets.  I

3        think they really helped us during today's

4        deposition.

5            I pass the witness to your attorney,

6        Mr. Albanis.

7            MR. ALBANIS:  I have no questions.  We

8        reserve signature with respect to the original

9        deposition and today's deposition.

10           (Whereupon, the deposition concluded at

11    1:02 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    C E R T I F I C A T E

 2

 3            I, KELLY J. LAWTON, Registered Professional

 4      Reporter, Licensed Court Reporter, and Certified

 5      Court Reporter, do hereby certify that, pursuant to

 6      notice, the deposition of VICKI FOSTER was duly taken

 7      on January 9, 2019, at 11:32 a.m. before me.

 8            The said VICKI FOSTER was duly sworn by me

 9      according to law to tell the truth, the whole truth

10      and nothing but the truth and thereupon did testify

11      as set forth in the above transcript of testimony.

12      The testimony was taken down stenographically by me.

13      I do further certify that the above deposition is

14      full, complete, and a true record of all the

15      testimony given by the said witness.

16

17      _____

18            KELLY J. LAWTON, RPR, LCR, CCR

19

20            (The foregoing certification of this

21      transcript does not apply to any reproduction of the

22      same by any means, unless under the direct control

23      and/or supervision of the certifying reporter.)

24
```

```
 1                      INSTRUCTIONS TO WITNESS

 2

 3

 4            Please read your deposition over carefully

 5    and make any necessary corrections.  You should state

 6    the reason in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8

 9            After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12            It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty

14    (30) days of receipt of the deposition transcript by

15    you.  If you fail to do so, the deposition transcript

16    may be deemed to be accurate and may be used in

17    court.

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                      - - - - - -

 2                      E R R A T A

 3                      - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6      REASON:  _____

 7    _____   _____   _____

 8      REASON:  _____

 9    _____   _____   _____

10      REASON:  _____

11    _____   _____   _____

12      REASON:  _____

13    _____   _____   _____

14      REASON:  _____

15    _____   _____   _____

16      REASON:  _____

17    _____   _____   _____

18      REASON:  _____

19    _____   _____   _____

20      REASON:  _____

21    _____   _____   _____

22      REASON:  _____

23    _____   _____   _____

24      REASON:  _____
```

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, VICKI FOSTER, do hereby acknowledge that I

 4     have read the foregoing pages, 1 to 60, and that the

 5     same is a correct transcription of the answers given

 6     by me to the questions therein propounded, except for

 7     the corrections or changes in form or substance, if

 8     any, noted in the attached Errata Sheet.

 9

10

11     _____    _____

12     VICKI FOSTER                                    DATE

13

14

15

16

17     Subscribed and sworn to before me this

18     _____ day of _____, 20___.

19     My Commission expires: _____

20

21     _____

       Notary Public

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____   _____

 4    _____   _____   _____

 5    _____   _____   _____

 6    _____   _____   _____

 7    _____   _____   _____

 8    _____   _____   _____

 9    _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____
```

# JOINT APPENDIX TAB # 39

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/12/19 Page 861 of 1680
Case 1:11-cv-22408-MGC Document 139-3 Entered on FLSD Docket 01/29/19 Page 2 of 1339
Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2              Case No. 1:11-CV-22408-MGC
 3    --------------------------------§
      EDUARDO AND CARMEN AMORIN et      §
 4    al., individually, and on behalf §
      of all others similarly          §
 5    situated,                        §
                                       §
 6       Plaintiffs,                   §
                                       §
 7    vs.                             §
                                       §
 8    TAISHAN GYPSUM CO., LTD. F/K/A   §
      SHANDONG THAIHE DONGXIN CO.,     §
 9    LTD.; TAIAN TAISHAN PLASTERBOARD §
      CO., LTD., et al,                §
10                                     §
         Defendants.                   §
11    -------------------------------- §
       - - -
12
                                    - - -
13
                   WEDNESDAY, DECEMBER 12, 2018
14
                                    - - -
15
               Confidential - Subject to Further
16                  Confidentiality Review
17                        - - -
18          Deposition of CANDACE GODY, held at Morgan &
      Morgan, 12800 University Drive, Suite 600, Fort
19    Myers, Florida, commencing at 11:33 a.m., on the
      above date, before Kelly J. Lawton, Registered
20    Professional Reporter, Licensed Court Reporter,
      and Certified Court Reporter.
21
                                    - - -
22
                  GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
                      deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff
 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff
10
11    ALSTON & BIRD, LLP
      BY:  MATTHEW D. LAWSON, ESQUIRE
12    BY:  METHAWEE MANUPIPATPONG, ESQUIRE
      BY:  LARA TUMEH, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    matt.lawson@alston.com
      mae.manupipatpong@alston.com
16    lara.tumeh@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.
18
      GORDON, ARATA, MONTGOMERY, BARNETT
19    BY:  ALEX B. ROTHENBERG, ESQUIRE
      201 St. Charles Avenue, 40th Floor
20    New Orleans, Louisiana 70170
      (504) 582-1111
21    arothenberg@gamb.law
      Representing BNBM PLC
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        ABALLI MILNE KALIL

          BY:  JOSHUA D. POYER, ESQUIRE

 3        2250 SunTrust International Center

          One Southeast Third Avenue

 4        Miami, Florida 33131

          (305) 373-6600

 5        jpoyer@alalli.com

          Representing BNBM PLC

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                        - - -

                       I N D E X

 2                        - - -

 3   Testimony of:  CANDACE GODY

 4       DIRECT EXAMINATION BY MR. LAWSON...............  6

 5       CROSS-EXAMINATION BY MR. ALBANIS.............. 175

 6

 7

 8                  E X H I B I T S

 9              (Attached to Transcript)

10   DEFENDANTS'                                       PAGE

11       Exhibit 1    Lee County Property Appraiser -    13
                      Property Data

12

         Exhibit 2    Plaintiff Profile Form -           23
13                    Residential Properties - Bates
                      Numbered GodyA00001 to GodyA00026

14

         Exhibit 3    Kross Inspectors - Inspection      49
15                    Report

16       Exhibit 4    Priority Claimant Candace Gody's    54
                      Answers to Interrogatories

17

         Exhibit 5    Receipts for Section III -         60
18                    Personal Property

19       Exhibit 6    Invoices - Wiegod & Sons, Inc. and  62
                      Certified Heating and Cooling

20

         Exhibit 7    Fourth Amended Supplemental        68
21                    Plaintiff Profile Form

22       Exhibit 8    Receipts for Alternative Living -   75
                      Section IV

23

         Exhibit 9    Photographs                        90

24
```

Case 2:09-md-02047-EEF-MBN Document 22368-79 Filed 11/12/19 Page 865 of 1680
Case 2:17-cv-00321-MSD-RJK Document 139-3 Filed 11/18/19 Page 865 of 1680 PageID# 3343
Confidential - Subject to Further Confidentiality Review

```
 1                  E X H I B I T S

 2    DEFENDANTS'                                          PAGE

 3    Exhibit 10    April 5, 2011 Polkow Construction,    103
                    Inc. Chinese Drywall Remediation
 4                  Proposal

 5    Exhibit 11    June 28, 2011 Polkow Construction,    105
                    Inc. Chinese Drywall Remediation
 6                  Proposal

 7    Exhibit 12    Wells Fargo Checks and Statements     129

 8    Exhibit 13    City of Fort Myers - Letter of        133
                    Completion
 9
      Exhibit 14    Payments Made for Remediation at      145
10                  10842 Tiberio Drive, Fort Myers,
                    Florida 33913
11
      Exhibit 15    Excel Spreadsheet - Expenses          154
12
      Exhibit 16    Intuitive Environmental Solutions,    155
13                  LLC Invoice

14    Exhibit 17    July 8, 2011 Intuitive               159
                    Environmental Solutions, LLC
15                  Report

16    Exhibit 18    August 31, 2011 Intuitive             162
                    Environmental Solutions, LLC
17                  Report

18    Exhibit 19    Supplemental Plaintiff Profile        168
                    Form
19
      Exhibit 20    First Amended Supplemental            171
20                  Plaintiff Profile Form

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                          - - -

 2                THE COURT REPORTER:  Ma'am, would you please

 3          raise your right hand.

 4                Do you swear or affirm that the testimony

 5          you're about to give will be the truth, the whole

 6          truth, and nothing but the truth?

 7                THE WITNESS:  I do.

 8                CANDACE GODY, called as a witness by the

 9     Defendants, having been first duly sworn, testified

10     as follows:

11                      DIRECT EXAMINATION

12     BY MR. LAWSON:

13       Q.   Good morning.  Could you please state your

14     name for the record.

15       A.   It's Candace, middle initial D, last name

16     Gody, G-o-d-y.

17       Q.   Thank you, Ms. Gody, and good morning.  I

18     wanted to introduce myself.  My name is Matt Lawson.

19     I'm an attorney for Taishan Gypsum.  I appreciate you

20     coming in today, and I just wanted to be able to ask

21     a few questions about your claim in this lawsuit.

22                Before we get started, I wanted to make sure

23     that it was your understanding that when you were

24     sworn just now, that you were agreeing to tell the
```

Confidential - Subject to Further Confidentiality Review

```
 1    truth during today's deposition.

 2         A.    Yes.

 3         Q.    All right.  I wanted to go over a few kind of

 4    rules of the road as we are doing this deposition

 5    today.

 6               As you probably understand, the court

 7    reporter here is transcribing everything that we are

 8    saying.  That means that we need to be able to talk

 9    slowly and to give pauses between each other's

10    questions and answers.

11               And that allows her to be able to transcribe

12    everything, it allows us to be able to hear each

13    other, and it allows your attorney to be able place

14    any objections that he has to the questions that I'm

15    asking you.

16               Now, if there is a question -- excuse me, if

17    there is an objection to one of my questions by

18    Mr. Albanis, then I will allow him to be able to

19    speak.  And unless he instructs you not to answer the

20    question, I would ask that you answer the question as

21    truthfully and completely as you can.

22               Please let me know if at any point you need a

23    break.  You are boss in that regard.  So if at any

24    point you need to take a break, just let me know.
```

```
 1              And, beyond that, if you need any

 2    clarification on any questions that I'm asking you,

 3    please let me know.  I'm happy to rephrase it, put it

 4    another way, to make sure that you understand what

 5    I'm asking you.

 6              Are you take any medications today that would

 7    impair your ability to answer questions truthfully

 8    and completely?

 9        A.    No.

10        Q.    Did you meet with your lawyer to prepare for

11    today's deposition?

12        A.    Yes.

13        Q.    How often did you meet to prepare for today's

14    deposition?

15        A.    I met with Attorney Albanis several times.

16        Q.    Okay.  Do you know about how many times?

17        A.    Several times.

18        Q.    Would you say it's more than five?

19        A.    No.

20        Q.    All right.  More than three?

21        A.    Four times.

22        Q.    Okay.  And have you met with him in the last

23    week?

24        A.    Yes.
```

```
 1        Q.   Did you meet with him yesterday?

 2        A.   No.

 3        Q.   Did you meet with him today, before today's

 4   deposition?

 5        A.   Yes.

 6        Q.   Did you review any documents when you met

 7   with Mr. Albanis?

 8        A.   I don't understand your question.

 9        Q.   Did you review any documents or look at

10   any -- any files or records when you met with him?

11        A.   Are you talking about just this morning or --

12        Q.   Any of the times that you met, the four

13   different times, did you look at documents with

14   Mr. Albanis?

15        A.   Yes.

16        Q.   Do you remember what you looked at?

17        A.   The documents that were presented to me to

18   review.

19        Q.   Okay.  Are you aware of any documents that

20   are in your possession that you haven't -- that are

21   related to your claims in this lawsuit that you

22   haven't given over to Mr. Albanis?

23        A.   No.

24        Q.   You believe you have handed over everything?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Ms. Gody, are you currently employed?

 3        A.   No.

 4        Q.   When was the last time you were employed?

 5        A.   In 1996.

 6        Q.   Okay.  And what was your career when you were

 7   employed back in 1996?

 8        A.   I was a government executive for Federal

 9   Express.

10        Q.   Are you married?

11        A.   Yes.

12        Q.   All right.  Who are you married to?

13        A.   Anthony T. Gody, Sr.

14        Q.   And how long have you been married to

15   Anthony?

16        A.   We will be married 40 years in March.

17        Q.   Oh, wow.  Congratulations.

18             Taking a step back, did you bring any

19   documents with you today to the deposition?

20        A.   No.

21        Q.   Now, have you ever been involved in a lawsuit

22   before this one?

23        A.   Define "lawsuit."

24        Q.   Have you ever been sued before?
```

```
1      A.   No.

2      Q.   Okay.  Have you ever sued anyone before?

3      A.   No.

4      Q.   Have you been deposed before, like today?

5      A.   Once.

6      Q.   Okay.  And when was that?

7      A.   In 1996.

8      Q.   And was that related to your work at Federal

9   Express?

10      A.   No.

11      Q.   Have you participated in -- excuse me.

12           Was the lawsuit that you were involved in or

13   that you were deposed in a class-action lawsuit?

14      A.   No.

15      Q.   And what is the address of the property that

16   you allege has been damaged by Chinese drywall?

17      A.   10842 Tiberio Drive, Fort Myers, Florida

18   33913.

19      Q.   And do you currently own that property?

20      A.   Yes.

21      Q.   When did you buy it?

22      A.   In April of 2007.

23      Q.   Where did you live before that?

24      A.   At 682 Catamaran Court in Naples, Florida.
```

```
 1        Q.   And why did you move to the property at

 2   Tiberio Drive?

 3        A.   Could I ask you a question?

 4        Q.   Sure.  Yeah.

 5        A.   Why is that relative?

 6        Q.   I want to be able to get the background of

 7   this property and just to be able to understand your

 8   claim.  But you can answer as best you can.

 9        A.   No.  The reason is, it's a beautiful 55-plus

10   community.  We have a beautiful home overlooking a

11   lake and a golf course.  And we were playing golf,

12   and we thought it would be a great place to live.

13        Q.   Was the home pre-existing when you bought it,

14   or did you build the home on that lot?

15        A.   It was pre-existing.

16        Q.   Okay.  Do you know when it was built

17   originally?

18        A.   In 2006.

19        Q.   And did you contract for the home to be

20   built, or did you buy it after someone else had paid

21   for it to be built?

22        A.   We bought it directly from WCI, the builder.

23        Q.   And did WCI build the homes in that community

24   that you were describing?
```

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/18/19 Page 873 of 1680
Case 2:11-cv-00252-MSD-RJK Document 79-39 Filed 01/18/19 Page 14 of 98 PageID# 9351
Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    To your understanding, did they build all the

 3   homes in that community?

 4        A.    Yes.

 5        Q.    Do you remember how much you paid for the

 6   house?

 7        A.    $480,000.

 8        Q.    And was that purchase financed, or did you

 9   pay in cash?

10        A.    Half of it was financed and half was cash.

11        Q.    Was there a mortgage on the property?

12              Was there a mortgage on the property?  Did

13   you enter into a mortgage agreement?

14        A.    Yes.

15        Q.    And how long was that -- the term of that

16   mortgage agreement?  Do you recall?

17        A.    Could you rephrase the question?

18        Q.    Yes.  Was it a 30-year mortgage, a 15-year

19   mortgage?  Do you remember the term?

20        A.    Yeah.  It was a 30-year mortgage.

21              (Defendants' Exhibit 1 was marked for

22   identification.)

23   BY MR. LAWSON:

24        Q.    Ms. Gody, I have handed you a document that's
```

1    been marked as Exhibit 1.

2          Have you seen a document like this before?

3    A.   No.

4    Q.   I represent to you this is a Lee County

5    property appraiser record.

6    A.   May I take a minute, please, to review this?

7    Q.   Absolutely.  Take your time.

8          MR. ALBANIS:  Matt, while Ms. Gody is

9          reviewing that, here is a copy of the documents

10         you requested earlier.

11         MR. LAWSON:  Thank you.

12         THE WITNESS:  May I ask a question?

13   BY MR. LAWSON:

14   Q.   Yes.

15   A.   What is the comment on here where it has

16   property description, it says, do not use for legal

17   documents.

18   Q.   I do not know what the purpose of that is

19   from the County.

20   A.   Then why are you asking me to review this?

21   Q.   Well, this is a public property record

22   related to your property.  So I wanted to -- from Lee

23   County, and I wanted to -- and it was also produced

24   by your attorneys --

```
1      A.    Okay.

2      Q.    -- for the purposes of this litigation, so I

3   wanted to ask you about it.

4            Have you had a chance to review it?

5      A.    Yes.

6      Q.    All right.  I'd like to turn your attention

7   to the sixth page of this exhibit.  It's titled "This

8   Special Warranty Deed."

9            Do you see that page?

10     A.    Yes.

11     Q.    Based on your review of this exhibit, does

12  this appear to be the warranty deed for your purchase

13  of the home at 10842 Tiberio Drive in Fort Myers,

14  Florida, on or around the 19th of April in 2007?

15     A.    I don't know.

16     Q.    And you would agree that this document lists

17  your name as well as your husband's name, correct?

18     A.    Yes.

19     Q.    And the date on the document that is

20  highlighted is April 19th of 2007; is that correct?

21     A.    Yes.

22     Q.    And the document refers to the address at

23  10842 Tiberio Drive in Fort Myers, Florida; is that

24  right?
```

```
 1        A.    Yes.

 2        Q.    And is that around the time that you

 3   purchased that property?

 4        A.    April 19th was the date of the closing.

 5        Q.    Okay.  So the closing on the property was

 6   April 19th, 2007.  Do you have any reason to believe

 7   this is not the warranty deed for the purchase of

 8   that property?

 9        A.    No.

10        Q.    I'd like to turn to the next page.  I'll

11   represent to you this appears to be a 2018 Lee County

12   property appraiser property record.  I'd like to turn

13   your attention to the top left, the section titled

14   "Owner of Record."

15              I'm sorry, I'm going on to the next page, two

16   pages following the warranty deed.  So there's a

17   warranty deed; that is two pages.  And then the next

18   page is a -- after that is a 2018 property record.

19        A.    What's the page number on this?

20        Q.    It says 1 of 5 on the bottom right corner,

21   and in the upper left corner it says December 5th,

22   2018.  You would see an image of the home on the

23   document, and it is the second page after the

24   warranty deed that we just looked at -- or, excuse
```

1    me, the first page of the warranty deed concludes.

2            Yes, that is the correct page that you are

3    looking at right now.

4            MR. VERRIER:  It says "Property Data."

5            THE WITNESS:  "Property Data."

6    BY MR. LAWSON:

7       Q.   Correct, "Property Data" at the top of the

8    page.  And I apologize, the numbering on these is

9    difficult to be able to communicate.

10           I wanted to first turn your attention to the

11   upper left-hand corner where it states "Owner of

12   Record, Tenants By Entirety."

13           Do you see that?

14      A.   Yes.

15      Q.   And that section states your name and your

16   husband's name, correct?

17      A.   Yes.

18      Q.   And you are owners of record of the property

19   as of today?

20      A.   Yes.

21      Q.   All right.  And the site address is

22   10842 Tiberio Drive in Fort Myers, Florida; is that

23   correct?

24      A.   Correct.

```
1        Q.   If you look down to the "Property Value

2    History" section -- that is at the conclusion of this

3    page -- I wanted to ask you about the property values

4    that this record shows for 2007.

5            On the just property value, it is listed as

6    $315,960.

7            Do you see that?

8        A.   Yes.

9        Q.   And then also for the market assessed

10   property value, it is listed at $315,960 as well.

11           Do you see that?

12       A.   Yes.

13       Q.   Now, if you go down to 2018, do you see that

14   the just property value in 2018 for the property is

15   listed at $301,195?

16       A.   I'm sorry, but I do not have 2018.

17       Q.   All right.  So I need you to look at the

18   warranty deed that you were looking at previously.

19           MR. ALBANIS:  Let me find it for you here.

20           Right here.

21           THE WITNESS:  Thank you.

22   BY MR. LAWSON:

23       Q.   So you should now be looking at the 2018 Lee

24   County property appraiser record.  It states
```

```
 1      "Property Data" at the top, and we're referring to

 2      the section titled "Property Value History" at the

 3      bottom of the page, specifically to the row referring

 4      to the 2018 tax year and the property values listed

 5      for that 2018 tax year.

 6              Do you see that?

 7      A.    Yes.

 8      Q.    And the property value for the just property

 9      value in 2018 is listed as $301,195.

10              Do you see that?

11      A.    Yes.

12      Q.    And the market assessed property value is

13      listed as $301,195 as well.

14              Do you see that?

15      A.    Yes.

16      Q.    Have you ever had the value of your property

17      appraised independently?

18      A.    Yes.

19      Q.    And what was the result of that appraisal?

20      A.    Could you please explain "result"?

21      Q.    Well, sure.

22              First, let me ask you:  When did you have

23      that appraisal done?

24      A.    To the best of my knowledge, three to four
```

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/19/21 Page 880 of 1680
Case 2:11-cv-00377-MSD-RJK Document 73-13 Filed 01/18/13 Page 21 of 198 PageID# 358
Confidential - Subject to Further Confidentiality Review

```
 1    years ago.

 2         Q.   Okay.  And at that time did you receive a

 3    property appraisal value from the appraiser?

 4         A.   Yes.

 5         Q.   And do you recall what that value was?

 6         A.   No.

 7         Q.   Okay.  Was it above $300,000?

 8         A.   I don't recall.

 9         Q.   How many years did you live at the Tiberio

10    Drive property after you moved into it originally in

11    2007?

12         A.   We moved in in the end of May in 2007, and

13    then we had to leave the house in June of 2010.

14         Q.   And did you move back into the property at

15    any point after that?

16         A.   We moved back into the property in September

17    of 2012.

18         Q.   So you were out of the property for a little

19    over two years?

20         A.   Yes.

21         Q.   Two years and two months?

22         A.   26 months, to be exact.

23         Q.   And do you live at the property today?

24         A.   Yes.
```

```
1        Q.    And how many people have resided in the house

2   while you have lived there?  How many people have

3   lived in the home since -- including you, since 2007

4   when you moved in?

5        A.    Two.

6        Q.    Okay.  So you and your husband?

7        A.    Yes.

8        Q.    Have you ever rented out the home for --

9        A.    No.

10        Q.    I'm sorry.  Just make sure I complete my

11   questions, and then you can complete your answers.

12              Do know the square footage of your home?

13        A.    Under air, 2249 square feet under air.

14        Q.    How do you know that?

15        A.    From the floor plan.

16        Q.    And have you ever had that square footage

17   determined by someone measuring it before?

18        A.    Not that I recall.

19        Q.    How many bedrooms are in the home?

20        A.    Three.

21        Q.    And how many bathrooms?

22        A.    Two and the half.

23        Q.    And has that always been the case since the

24   house was built?
```

```
1        A.    Yes.

2        Q.    To your knowledge, has there been any change

3   to the square footage of the home since it was built?

4        A.    No.

5        Q.    Looking to the document in front of you, the

6   2008 Lee County property appraisal that you were

7   looking at before, do you see the section that is

8   titled "Current Working Values" that's in the middle

9   of the page on the left side?

10            MR. ALBANIS:  Matt, I think you said 2008.

11            MR. LAWSON:  Oh, excuse me.  2018.  Lee

12       County property appraisal record.

13            MR. ALBANIS:  The ninth page of Exhibit 1.

14            MR. LAWSON:  That's right.  The one we were

15       looking at for the property values.

16            THE WITNESS:  Yes.

17   BY MR. LAWSON:

18       Q.    Do you see the row that is titled "Total

19   Living Area" in that section?

20       A.    Yes.

21       Q.    And you see that it lists the total living

22   area as 2246 square feet?

23       A.    Yes.

24       Q.    Do you have any reason to doubt that that
```

Case 2:09-md-02047-EEF-MBN   Document 22362-781  Filed 11/18/19   Page 883 of 1680
Case 2:11-cv-00377-MSD-RJK   Document 79-39   Filed 01/18/11   Page 24 of 98 PageID# 361
Confidential - Subject to Further Confidentiality Review

```
 1    number is accurate?

 2        A.   Excuse me.  We're talking about three square

 3    feet here.

 4        Q.   Yes.  I --

 5        A.   And off of the contract in my floor plan, it

 6    reflected 2249.

 7        Q.   Yes.  I just wanted to understand if you knew

 8    where this number might have come from, this 2246.

 9        A.   Yes.

10        Q.   Where did that number come from?

11        A.   I don't know -- I shouldn't say yes.  Please

12    take that back.  I don't know where that number came

13    from.

14        Q.   Okay.  But the floor plan, it has it at 2249?

15        A.   Nine.

16            (Defendants' Exhibit 2 was marked for

17    identification.)

18    BY MR. LAWSON:

19        Q.   Ms. Gody, you have been handed a document

20    that's been marked as Exhibit 2.

21            I'll give you a moment to be able to review

22    the document, and please let me know when you are

23    done.

24        A.   May I make notes on this?  Can I highlight
```

```
 1    something on here?

 2          MR. POYER:  Perhaps you could just point it

 3       out to Mr. Lawson what you would like to

 4       highlight verbally to him so he could -- that

 5       might be better than actually marking the exhibit

 6       that's attached to the deposition.

 7          MR. ALBANIS:  Right.  And if you want to

 8       change some of the information that's in here,

 9       you can certainly point that out.

10          THE WITNESS:  Okay.

11    BY MR. LAWSON:

12       Q.   Are you done reviewing the document?

13       A.   Yes.

14       Q.   Focusing on the first page of the document,

15    do you recognize this form, this Plaintiff Profile

16    Form?

17       A.   I don't recall.

18       Q.   Looking to the fifth page of this document,

19    marked as GodyA9005, do you see your signature on

20    that page?

21       A.   Yes, I do.

22       Q.   And you signed this document on October 9th

23    of 2009; is that correct?

24       A.   That's correct.
```

```
1        Q.   Did you understand when you signed this

2    document the information contained above the

3    signature lines saying that you were declaring under

4    penalty of perjury that the information contained

5    within it was true to the best of your knowledge?

6        A.   Yes.

7        Q.   And do you believe that this information was

8    true at the time that you signed this document?

9        A.   Yes.

10       Q.   Going through the document today, did you see

11   any items that you wanted to correct or change based

12   on information that you have now?

13       A.   This was prior to remediation.

14       Q.   It appears this form is from 2009, in

15   October.

16       A.   I'd like to include an additional inspection

17   report.

18       Q.   Okay.  And when was that inspection?

19       A.   On the same day that Allied Home Inspection

20   was done.

21       Q.   And who performed that inspection?

22       A.   That was Radon and Mold Remediators.

23       Q.   Is that the same Radon and Mold that is

24   listed in Section 4 of the form on Page 2 at the top?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Did they perform two inspections on the home,

 3   or are you referring to the same inspection?

 4        A.    May I expand on that and not give you just a

 5   yes or no answer?

 6        Q.    Oh, sure.  You are always welcome.  I would

 7   welcome the most complete answers that you can give.

 8        A.    We had contacted WCI because we knew we had a

 9   problem.  They sent a representative over who would

10   not confirm that we had a problem, and we waited and

11   waited for their findings, which we never did

12   receive.

13            So after multiple contacts with them and

14   trying to get it, we decided that we would have our

15   own inspections done.  So I researched and found

16   Radon Mold Professional and Allied, and I had them

17   done on the same day.

18        Q.    And what were the results of those

19   inspections performed by Radon and Allied?

20        A.    It was confirmed that there were electrical

21   issues with the darkening of the copper wiring.  With

22   Allied, there were high levels of strontium and

23   sulfuric gasses, and they did two different methods

24   of -- Radon came in and removed all -- with the
```

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/19/19 Page 887 of 1680
Case 2:11-cv-00073-MSD-RJK Document 79-19 Filed 01/18/19 Page 280 of 608 PageID# 9365
Confidential - Subject to Further Confidentiality Review

1    switch plates and things like that.  And the other

2    took readings on the environment in the house.

3        Q.   A moment ago you said that you had contacted

4    WCI because you knew that you had a problem with your

5    house.

6        A.   Yes.

7        Q.   Here in section, I believe, six at the bottom

8    of Page 2, there's an item that says that a notice

9    was sent to WCI Communities, Incorporated around

10   October 15th of 2009.

11           Do you see that?

12       A.   Yes.

13       Q.   What was the result of you contacting WCI to

14   tell them that you had an issue in your house?

15       A.   Denial.

16       Q.   What did they tell you?

17       A.   That they would check into it, they would

18   send somebody over.  And we were also told they would

19   put the house back to exactly the way it was the day

20   we bought it.

21       Q.   And did they do that?

22       A.   No.

23       Q.   What did they do?

24       A.   Two weeks after that, we were totally shut

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/18/19 Page 889 of 1680
Case 2:11-cv-00377-MSD-RJK Document 79-39 Filed 01/18/13 Page 290 of 408 PageID# 9366
Confidential - Subject to Further Confidentiality Review

1    out.

2         Q.   And what do you mean by that?

3         A.   When we called, our phone calls were not

4    answered; and when we inquired, we were told that

5    they were not allowed to speak of the Chinese drywall

6    situation.

7         Q.   Do you remember who it was who told you that

8    they would -- at WCI who told you that they would put

9    the house back to the way that it was?

10        A.   Yes.  The warranty department.

11        Q.   Did you ever file a legal claim or have your

12   counsel file a legal claim against WCI?

13             MR. ALBANIS:  Object to the form.

14             But you can answer.

15   BY MR. LAWSON:

16        Q.   To your knowledge.

17        A.   I don't know.

18        Q.   Has WCI ever paid you any money because of

19   the Chinese drywall that is in your home?

20             MR. ALBANIS:  Object to the form.

21             But you can answer.

22             THE WITNESS:  WCI had a trust fund set up.

23        Our distribution after that, after eight years,

24        was $775, in which we got a 1099 and I had to pay

Case 2:09-md-02047-EEF-MBN Document 22362-761 Filed 11/18/19 Page 890 of 1680
Case 2:11-cv-00977-MSD-RJK Document 74-39 Filed 01/18/13 Page 30 of 198 PageID# 367
Confidential - Subject to Further Confidentiality Review

```
 1          taxes on.

 2     BY MR. LAWSON:

 3          Q.   Do you know when you got that money?

 4          A.   I believe it was sometime this year, when

 5     they dissolved the trust fund.

 6          Q.   Did you have to sign anything when you

 7     claimed that money from the trust fund?

 8          A.   Receipt that I had received the check.

 9          Q.   WCI didn't make you sign any other kind of

10     agreement?

11          A.   No.

12          Q.   Did WCI ever tell you why you were receiving

13     money from that trust fund?

14          A.   No.

15               MR. ALBANIS:  Object to the form.

16               But you can answer.

17               THE WITNESS:  No.

18     BY MR. LAWSON:

19          Q.   And do you know if other homes in the

20     community that you live in had similar issues with

21     Chinese drywall?

22          A.   Yes.

23          Q.   Do you -- how many homes do you know of in

24     the community?
```

```
 1        A.    Twenty-seven out of 31.

 2        Q.    And did those -- to your knowledge, did those

 3    other homes also receive some amount of money from

 4    WCI from the trust fund?

 5        A.    I do not know that.

 6        Q.    Do you know if WCI ever made any guarantees

 7    to you about the quality of the products that they

 8    used to construct your home?

 9             MR. ALBANIS:  Object to the form.

10             But you can answer.

11             THE WITNESS:  No.

12    BY MR. LAWSON:

13        Q.    No, you don't know; or, no, they didn't?

14        A.    No, they didn't.

15        Q.    Do you know when the Chinese drywall was

16    installed in your home?

17        A.    When the house was built in 2006.

18        Q.    And do you know who WCI bought the Chinese

19    drywall from?

20        A.    Banner Supply.

21        Q.    And how do you know that?

22        A.    From the documents from the global

23    settlement.

24        Q.    Do you know what the Chinese drywall in your
```

```
 1    home looks like, if it has any identifying markings?

 2         A.   I don't recall at this time.

 3         Q.   Do you think you have seen it before inside

 4    of your home?

 5         A.   During remediation.

 6         Q.   Were you present during the remediation of

 7    your home?

 8         A.   Part of it, yes.

 9         Q.   And did someone show you drywall and tell you

10    that it was the Chinese drywall that was in your

11    home?

12         A.   I don't recall.

13         MR. ALBANIS:  With respect to that, Matt,

14         Ms. Gody has an evidence -- a bin of evidence

15         which includes drywall samples from the home,

16         which we have produced in this case.

17         Counsel for the defendants reviewed that

18         evidence bin and took pictures of the Chinese

19         drywall samples that were included in that

20         evidence bin at some point last week.  I believe

21         the date was December 5th.

22    BY MR. LAWSON:

23         Q.   Turning to the fourth page of this document

24    marked GodyA0004, do you see that page titled
```

```
1    "Section IV Inspection Information --

2         A.   Yes.

3         Q.   -- Continued"?

4              Does this appear to be a list of inspections

5    that were performed at your home on Tiberio Drive?

6         A.   It's not complete.

7         Q.   Yes.  As we discussed before, there was an

8    additional inspection from Radon that was performed

9    the same day as Allied Home?  And I believe there are

10   some others; is that right?

11        A.   Yes.

12        Q.   What other inspections are not on this list

13   that have been performed at your home?

14        A.   Kross Inspectors.

15        Q.   Okay.  What did those cost inspectors do at

16   your home?

17             MR. ALBANIS:  I believe she said Kross.

18             MR. LAWSON:  Oh, I'm sorry.

19             THE WITNESS:  Kross, yes.

20   BY MR. LAWSON:

21        Q.   Okay.  Who are Kross Inspectors?

22        A.   Who?

23        Q.   Yes, or what are Kross Inspectors?

24        A.   They are environmental inspectors,
```

Confidential - Subject to Further Confidentiality Review

```
1    specializing in Chinese drywall.

2         Q.   And do you know when they performed an

3    inspection on your home?

4         A.   Can I have a minute, please?

5         Q.   Of course.  We can take a break and go off

6    the record.

7         A.   No.

8              I just want to tell you, it was a very

9    difficult time.  They came in, and here's the house

10   that we bought that we thought we would spend the

11   rest of our time in, a beautiful home, and I had to

12   remove every picture.  They drilled walls -- holes

13   behind all my walls.  They took pieces of drywall

14   out.  My house was turned upside down to find this

15   evidence.

16             And -- and this is all dredging up a lot of

17   very difficult times for me and horrible memories of

18   what we went through.

19             MR. ALBANIS:  We did produce the Kross

20        report.  It is Document Number 365694 for the

21        record.

22   BY MR. LAWSON:

23        Q.   Ms. Gody, I appreciate you taking the time to

24   answer questions today.  And, again, like I said
```

1    before, if you want to take a break at any point, if

2    it becomes difficult to be able to go through all

3    these questions, I understand.  Please let me know.

4         I'm going to try to move this along as

5    quickly as I can.  And I really do appreciate you

6    answering these questions today.

7         What I wanted to understand from these

8    inspection reports and all the different inspections

9    that occurred is, to your knowledge, why were there

10   so many inspections that were performed in 2009 that

11   we see on this list on Page 4?  Do you know the

12   reason?

13     A.   Yes.  It was the different methods these

14   inspection companies used.  One was visual so that

15   they could take off the light fixtures.  The

16   electrical outlets.

17        The other company did, as I said, measured

18   the air quality in the house.

19        And Kross Inspectors came in, and they are

20   the ones who took samples.  And they knew -- and they

21   asked if they could do it, and I said yes.  And we

22   knew that we were going to be leaving the home, and

23   we wanted to be certain that this is what we were

24   dealing with.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   As a result of all these inspections, were

 2    you told there was confirmation that your home

 3    contained Chinese drywall?

 4        A.   Yes.

 5        Q.   I'd like to turn your attention to beginning

 6    at Page 6 of this exhibit, marked as GodyA00006.  And

 7    it continues through Page 11 of this document.

 8             Do you see that section?

 9        A.   Yes.

10        Q.   Is this a homeowner's policy from State Farm

11    for you and your house for your home at Tiberio

12    Drive?

13        A.   Yes.

14        Q.   And was this the homeowner's policy that you

15    had at Tiberio Drive when you moved into the home

16    around 2007?

17        A.   Yes.

18        Q.   To your knowledge, did you ever file a

19    homeowner's policy claim with State Farm related to

20    your home from Chinese drywall?

21        A.   No.

22        Q.   Why is that?

23        A.   Because when I inquired, they told me it was

24    not covered.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Did they give you any other reasons why it

 2    would not be covered?

 3        A.    No.  It wasn't one of the perils when the

 4    policy was established.

 5        Q.    And did you continue to have your homeowner's

 6    policy for this property with State Farm after you

 7    were told that the damage in your home would not be

 8    covered?

 9        A.    Yes.

10        Q.    And do you continue to have that policy with

11    them today?

12        A.    No.

13        Q.    And who is your policy with now?

14        A.    Tower Hill.

15        Q.    I'd like to turn your attention to the

16    fourteenth page of this exhibit.

17              Do you recognize this document?

18        A.    Yes.

19        Q.    And what is it?

20        A.    It's a floor plan of our house.

21        Q.    Is this the floor plan that you were

22    referring to earlier?

23        A.    Yes.

24        Q.    Is this the floor plan for you to buy WCI, to
```

Case 2:09-md-02047-EEF-MBN Document 22362-761 Filed 11/18/19 Page 897 of 1680
Case 2:11-cv-00078-MSD-RJK Document 39-1 Filed 01/18/11 Page 38 of 198 PageID# 375
Confidential - Subject to Further Confidentiality Review

```
 1    your knowledge?

 2        A.    Yes.

 3        Q.    Does this accurately reflect the floor plan

 4    of your house back in 2006 when it was built?

 5        A.    Yes.

 6        Q.    Is the floor plan for the home the same today

 7    as it was back in 2006?

 8        A.    Yes, with the exception of the drywall

 9    removed.

10        Q.    But the layout of the home --

11        A.    Yes.

12        Q.    -- is the same?

13        A.    Yes, yes.

14        Q.    Looking to Page 15, is this the purchase

15    contract for the home at Tiberio Drive?

16        A.    Yes, it is.

17        Q.    Have you ever been told where the Chinese

18    drywall was installed inside of your home?

19        A.    Yes.

20        Q.    And where were you told it had been

21    installed?

22        A.    If you review our environmental report, it's

23    color-coded, and it will show you exactly where it

24    was.
```

```
1      Q.   Do you recall?

2      A.   Oh, yes, yes.

3      Q.   Where is it?

4      A.   We had Chinese drywall in our owner's suite.

5   We had Chinese drywall in the family room.  We had

6   Chinese drywall in the dining room and also in the

7   living room.  We had Chinese drywall in the den, and

8   we also had it in the garage, around the air handler.

9      Q.   Do you know if you also had American drywall

10  that was installed in your home at the time that the

11  house was built in 2006?

12     A.   I would have only known from the inspection

13  report, from the environmental report.

14     Q.   But do you know that now, that there was

15  American drywall in the home as well?

16     A.   If that's what's listed on the environmental

17  report, yes.

18     Q.   When did you first suspect that there was

19  Chinese drywall in your home?

20     A.   I knew we had a problem within a year of

21  living there.  I developed nosebleeds, headaches,

22  rashes, bronchitis, insomnia, and went to all my

23  different doctors.

24          In addition to that, my dog was sick, running
```

```
 1    her to the vet all the time.  She was listless,

 2    wouldn't eat, lost weight.

 3           And then some of the appliances started to

 4    fail.  And we -- this was starting to come to light

 5    that there could be a problem.

 6       Q.   So you said that it was about a year --

 7    within a year?  Excuse me,

 8       A.   About a year after moving in, yes.  We

 9    started to see some signs that -- I mean, within a

10    year of living there, we were both having health

11    issues.

12       Q.   Were you having the health issues throughout

13    that first year or only after about a year had

14    elapsed of living in the home?

15       A.   We had those health issues until we vacated

16    the building.

17       Q.   So you had -- you claimed -- sorry -- excuse

18    me.

19           You had the health issues from the time you

20    moved in until you vacated or about a year in you

21    started having them until you --

22       A.   It was after a year in that we started

23    noticing all the health issues.

24       Q.   Okay.  Did -- and the appliances that you
```

```
1    mentioned that started to fail --

2         A.   Yes.

3         Q.   -- did that also begin about a year into

4    being in the home?

5         A.   Within a year to a year and a half, yes.

6         Q.   You listed a number of health issues that you

7    started to have about a year into living at the home.

8    Had you had any of those issues prior to living in

9    the home?

10        A.   No.

11        Q.   And when you went to the doctor or doctors,

12   as you said, what did they tell you about the health

13   issues that you were having?

14        A.   They could not diagnose why, but the fact

15   that it continued, I was told that it could possibly

16   be environmental.

17        Q.   What health issues did your husband suffer

18   from during the time that you were living in the

19   home?

20        A.   He suffered from some bronchitis.  He

21   suffered from headaches and -- not as severe as I

22   did.

23        Q.   And did he go to the doctor as well?

24        A.   Yes.
```

```
 1        Q.   Do you know what he was told by the doctors

 2   about his health issues?

 3        A.   Couldn't pinpoint why it -- why we were

 4   having these problems at that time.

 5        Q.   After you moved out of the home for the

 6   26 months that we discussed earlier, did you continue

 7   to have those same health issues?

 8        A.   No.

 9        Q.   Did all of those health issues go away?

10        A.   Yes, they did.

11        Q.   Once you moved back into the home, did you

12   have any of those health issues again?

13        A.   No.

14        Q.   And have you had them ever since at any time?

15        A.   No.

16        Q.   Other than the health issues that you

17   mentioned, the issues that your dog was having, and

18   the appliances failing in the home, were there any

19   other issues that you noticed in your home when you

20   began living in it in 2007 to the time that you moved

21   out?

22             MR. ALBANIS:  Object to the form.

23             But you can answer, if you can.

24             THE WITNESS:  We had had friends come to
```

```
1        visit, and they were affected by the drywall

2        before we knew what it was, tightening of her

3        throat, couldn't stay in the house.  She would

4        have to walk in and out, in and out.  So we

5        figured there was something wrong.

6             In that time period, we really wouldn't

7        invite anybody into our home or to stay.

8   BY MR. LAWSON:

9        Q.   And can you think of any other issues or

10  problems that arose while you lived in the home from

11  that period of 2007 through 2010?

12            MR. ALBANIS:  You're talking with just

13       respect to the Chinese drywall?

14            MR. LAWSON:  That's right.

15  BY MR. LAWSON:

16       Q.   That you believe is related to the Chinese

17  drywall.

18       A.   Well, we had quite a few appliances fail on

19  us, televisions, computers, replaced two dishwashers,

20  three wine coolers, two refrigerators, two burners on

21  a stove, a microwave totally went out.  We didn't

22  bother replacing that because we knew there was an

23  issue.

24       Q.   And those appliances, did they fail between
```

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/18/19 Page 3 of 6
Case 2:11-cv-00377-MSD-RJK Document 77-39 Filed 01/18/19 Page 34 of 49 PageID# 1381
Confidential - Subject to Further Confidentiality Review

```
 1    2008 and 2010?

 2         A.   Yes.

 3         Q.   Did you replace the televisions that you

 4    mentioned?

 5         A.   Yes.

 6         Q.   Did you replace the computers?

 7         A.   Yes.

 8         Q.   Did you replace the wine coolers?

 9         A.   Yes.  The first one failed.  We went back to

10    the -- where we had purchased it, and they couldn't

11    figure out why.  It was under warranty, so we got a

12    second one.  It failed as well.  Went back, and they

13    said we're not manufacturing that anymore so we

14    cannot replace that for you.  And then we bought a

15    third one, a smaller one, and it failed as well.

16         Q.   The burners on the stove, did you have those

17    repaired?

18         A.   No.

19         Q.   And do you know if you have any receipts for

20    the items that you had to replace within the home

21    that you purchased?

22         A.   I do have some receipts -- we do have some

23    receipts.

24         Q.   And have you given those to your attorney?
```

```
1      A.   Yes.

2      Q.   Did you notice any odor in the home when you

3   lived there from 2007 to 2010?

4      A.   Yes.

5      Q.   What did it smell like?

6      A.   Musty, moldy, mildew smell.  Certain areas of

7   the house like burnt matches, rotten egg.

8      Q.   Was the smell different in different parts of

9   the house?

10     A.   Stronger in some areas than others.

11     Q.   Where was it the strongest?

12     A.   I -- I don't recall at this time.

13     Q.   Did the smell get stronger or weaker over

14  time while you lived in the house from 2007 to 2010?

15     A.   Stronger.  We spent the summer of 2009

16  sitting outside for most of the summer and then

17  keeping our dog outside and then getting in the car

18  and taking rides because we couldn't be in the home.

19          And we purchased two air purifiers to put in

20  our bedroom so we could sleep at night, and we kept

21  the doors closed so we wouldn't be exposed to the

22  rest of the house.

23     Q.   Did you notice that the issues that you dealt

24  with that you believe were related to Chinese drywall
```

1    in your home were worse in particular seasons, like

2    the summer?

3         A.   No.

4         Q.   Why was it in the summer of 2009 that you

5    spent most of the time outside compared to the rest

6    of the year?

7         A.   Because of the smell.  And just we didn't

8    want to be exposed anymore.

9         Q.   Was it in 2009 that you knew that you had

10   Chinese drywall in your house?

11        A.   We suspected.

12        Q.   When was the first time where you knew that

13   you had Chinese drywall in your house?

14        A.   When we had the first inspection reports

15   done -- inspections done.

16        Q.   Did you have any issues with your

17   air-conditioning in the home?

18        A.   We replaced three air handlers.  The first

19   company that we engaged was Wiegold & Sons when we

20   were having a problem, and they replaced the air

21   handler because they said it was leaking coolant.

22   And we had a maintenance contract, which we would

23   have them come twice a year.

24             And then we hired Certainty to come, and

```
 1    Certainty Heating and Cooling replaced three air

 2    handlers for us.  And they were done all under

 3    warranty, but we had to pay for the labor to replace

 4    them.

 5            And through their experience as well, they

 6    said, we think you have Chinese drywall.

 7    Q.   Do you know when those replacements of the

 8    air handlers occurred, about?

 9    A.   I have submitted that.  I can't tell you

10    offhand what the exact dates -- I do know, yes,

11    because there are pictures of them.

12            We had one replaced in 2009.  I think in

13    '10 -- there was two of them in 2010.

14    Q.   Do you remember when you first heard about

15    Chinese drywall and that it was in homes in America?

16    A.   Yes.

17    Q.   When was that?

18    A.   I would say toward the end of like 2008,

19    beginning of 2009.

20    Q.   And where -- when -- where did you hear about

21    it first?

22    A.   The news.  The newspapers.  On television and

23    in newspapers.

24    Q.   And when you heard about that, did you
```

1    suspect that that was what was going on in your home?

2        A.    Yes.

3        Q.    During that time, did you talk to anyone else

4    in the community about whether they were having

5    similar issues to what you were having?

6        A.    Everyone was talking about it.

7        Q.    And what were they saying?

8        A.    They were experiencing the same problems:

9    appliances failures, illnesses.

10       Q.    Do you recall that other people were

11   suffering from the same illnesses or different ones?

12       A.    I don't recall.

13       Q.    Do you remember when you first spoke with an

14   attorney about Chinese drywall in your home?

15       A.    Yes.

16       Q.    And when was that?

17       A.    I believe it was in June of -- it was after

18   we did not get a response from WCI, and we contacted

19   Morgan & Morgan.

20       Q.    Can you think of any other appliances or

21   personal property items that you believe were damaged

22   by Chinese drywall in your home before you moved out

23   of it in 2010?

24       A.    A lot of the frames on our artwork were all

```
 1    being tarnished.

 2         Q.    Were those metal frames?

 3         A.    Metal frames, yes.

 4         Q.    Anything else?

 5         A.    Jewelry, sterling silver.  It was just very

 6    difficult to see all these things happening all at

 7    the same time and trying to make the right decisions

 8    on what to do.

 9         Q.    Do you know if you replaced the metal frames

10    that you were talking about earlier?

11         A.    No.

12         Q.    Did you replace the jewelry?

13         A.    No.

14         Q.    Did you replace the sterling silver?

15         A.    No.  I gave it to my sister.

16         Q.    With the different inspections that you had

17    performed on your home in 2009, do you know if you

18    paid for those inspections or if anyone else paid for

19    them?

20         A.    I paid for Allied and Radon and Mold

21    inspections, and there are receipts to prove it.

22         Q.    And for the other inspections, do you know

23    who paid for them?

24         A.    I know Kross Inspectors were done by Morgan &
```

1    Morgan.

2          (Defendants' Exhibit 3 was marked for

3    identification.)

4    BY MR. LAWSON:

5      Q.   I have handed you a document that has been

6    marked as Exhibit 3.

7          Do you recognize that document?

8      A.   Yes.

9      Q.   And what is it?

10     A.   It's an inspection report from Kross

11   Inspectors.

12     Q.   And when was that inspection performed?

13     A.   March 2010.

14     Q.   Did Kross Inspectors inspect your home

15   multiple times?

16     A.   No.

17     Q.   Okay.  So this was the one inspection that

18   they performed?

19     A.   Yes.

20     Q.   Were you present when this inspection was

21   performed?

22     A.   Yes.

23     Q.   And was anyone else there?

24     A.   My husband.

```
1          Q.    Did you answer questions for the inspector
2     while they were there?
3          A.    Yes.
4          Q.    And did you follow the inspector around while
5     they were doing the inspection?
6          A.    Yes.
7          Q.    Do you remember what questions the inspector
8     asked of you?
9          A.    May we take a large sample from this wall?
10    Do you mind if we drill in this wall?  Other than
11    that, I -- I don't recall.
12         Q.    Have you ever looked at the photos that were
13    taken during that inspection?  They begin on Page 2.1
14    of this report.
15         A.    Yes.
16         Q.    As best as you can tell, do these photos look
17    like they were taken at your home at Tiberio Drive?
18         A.    Yes.
19         Q.    And have you seen the photos of the drywall
20    markings that are on Page 2.2 before?
21         A.    Not before this report.
22         Q.    But since the report was created, have you --
23    you have seen these in the report before?
24         A.    I've seen them in the report and the
```

```
1    environmental inspection report.

2        Q.   Have you ever seen -- outside of photos but

3    actually physically seen -- the drywall marking that

4    is shown here that says C&K gypsum board inside of

5    your home?

6             It's in the middle of Page 2.2 on the left

7    side.

8        A.   Only during the time that they were

9    remediating and they tore all the drywall down.

10       Q.   When they tore the drywall out of your home

11   during remediation, you saw boards that said C&K

12   gypsum board?

13       A.   I saw many boards of drywall.

14       Q.   And do you remember seeing ones that said

15   C&K?

16       A.   Yes.

17       Q.   Looking back to Page 1.4, which is a few

18   pages back, there are comments and recommendations

19   from the inspector.

20            Let me know when you are on that page.

21       A.   Page number again, please.

22       Q.   Page 1.4.

23            And I would like to turn your attention to

24   the paragraph at the bottom and the middle of it --
```

```
1        A.   Excuse me, but on Page 1.4, it says "received

2    for services rendered."

3        Q.   There might be multiple pages of 1.4.  In

4    fact, I believe there are.  If you go a couple pages

5    forward in the document, it's just a couple pages

6    back from the photographs that we were looking at a

7    moment ago.

8        A.   Okay.

9        Q.   I apologize.

10            I would like to turn your attention to the

11   bottom paragraph, beginning in the middle of that

12   paragraph, the sentence that starts "in addition."

13            It states:  In addition, the inspector cut

14   multiple holes in interior walls throughout the home.

15   The inspector did identify several manufacturer stamps,

16   4 feet x 12 feet x 1/2 inch and USG that were

17   observed throughout the homes interior walls and

18   attic.

19            The manufacturer stamp C&K gypsum board was

20   observed on the unfinished surface of the garage's

21   attic hatch.

22            Did I read that correctly?

23       A.   Yes.

24       Q.   So the C&K board was found in the garage's
```

Confidential - Subject to Further Confidentiality Review

1    attic hatch by the inspector?  Is that what this

2    report says?

3        A.    That's what the report says.

4        Q.    And do you recall from being at the home when

5    it was being remediated whether there was C&K gypsum

6    board found in any other locations in the home?

7             MR. ALBANIS:  Object to the form.

8             But you can answer, Ms. Gody, if you know the

9        answer.

10            THE WITNESS:  I do not recall.

11   BY MR. LAWSON:

12       Q.    Do you recall seeing drywall boards that were

13   marked as 4 feet x 12 feet x 1/2 inch during the

14   remediation of the home?

15       A.    Yes.

16       Q.    And where did you see those boards pulled out

17   of the house?

18       A.    I don't recall.

19       Q.    And do you recall seeing boards that were

20   marked as USG being removed from the home during the

21   remediation?

22       A.    I just remember that the remediator showed me

23   different boards.

24       Q.    I wanted to ask whether since you have moved

```
1    back into the home after the home was remediated,

2    whether you have had any appliances that have failed?

3         A.   No.

4         Q.   And have you had -- and have you had any

5    issues with an odor in the house of any kind?

6         A.   No.

7         Q.   Do you have any of the issues that you recall

8    having that you believe were related to the Chinese

9    drywall in your home now that it has been remediated?

10        A.   No.

11             MR. LAWSON:  Okay.  We can go off the record.

12             (Recess from 12:43 until 1:08 p.m.)

13   BY MR. LAWSON:

14        Q.   Welcome back, Ms. Gody.

15             (Defendants' Exhibit 4 was marked for

16   identification.)

17        Q.   You have been handed a document that's been

18   marked as Exhibit 4.

19             This document is titled "Priority Claimant

20   Candace Gody's Answers to Interrogatories."

21             Have you seen this document before?

22        A.   Yes.

23        Q.   And have you reviewed this document before?

24        A.   Yes.
```

```
 1        Q.   I'd like to turn your attention to the first

 2   interrogatory that is on Page 1.  It asks you to

 3   identify all types of damages that you seek in the

 4   lawsuit and specifically amounts sought for each

 5   category.

 6             Do you see that?

 7        A.   Yes.

 8        Q.   Within your answer to that interrogatory, you

 9   stated that you're seeking personal property damage

10   expenses of at least $7,595.

11             Do you see that?

12        A.   No, I don't.

13        Q.   You don't see that line and that answer?

14        A.   Oh, wait.

15             Yes, I see that line.

16        Q.   So is that correct, that you are seeking --

17        A.   Yes.

18        Q.   -- personal property damage expenses of at

19   least $7,595 in this lawsuit?

20        A.   I do believe that is a revised number.

21        Q.   Okay.

22             MR. ALBANIS:  So, Matt, just for the record,

23        we did produce amended written responses to the

24        discovery requests that we received.  They have
```

```
1          been uploaded to the BrownGreer portal and served

2          upon you previous to today's date.

3               So that may be why Ms. Gody has some

4          confusion regarding the initial version of her

5          answers to interrogatories.

6               MR. LAWSON:  There seems be some confusion

7          here, because we received amended answers to the

8          second set of interrogatories, and we have

9          received an amended number to the amount of

10         alternative living expenses that are being

11         sought.  However, we did not receive an amendment

12         to the answers to this set of interrogatories,

13         the first set.  This is the latest version that

14         we have in our possession.

15              If you believe that that's incorrect and that

16         we should have been served with a different set,

17         then perhaps we can go off the record and resolve

18         that.

19              But, otherwise, we are going to move forward

20         assuming that this is the latest set of answers

21         to this first set of interrogatories, as opposed

22         to the second.

23              MR. ALBANIS:  Let's go off the record --

24              MR. LAWSON:  All right.
```

```
 1          MR. ALBANIS:  -- so I can try to get to the

 2      bottom of this.

 3          MR. LAWSON:  Great.

 4           (Recess from 1:11 until 1:17 p.m.)

 5          MR. ALBANIS:  So I apologize, Matt.  It was a

 6      clerical error on our part.  We intended to

 7      change the Answers to Interrogatories and to

 8      serve First Amended Answers to Interrogatories

 9      with the only change being the amount listed in

10      response to Interrogatory Number 1 for

11      alternative living expenses.

12          We intended to change it from $327,036.70 to

13      the amount that is listed on the Fourth Amended

14      Supplemental Plaintiff Profile Form for

15      alternative living expenses, which I believe is

16      right around $68,000 and change.

17          For formality purposes, I have instructed my

18      staff to go ahead and prepare the First Amended

19      Answers to Interrogatories today.  We will serve

20      those on you today.  I will submit to you that

21      that will be the only change to those answers

22      when we serve those on you.

23          MR. LAWSON:  Thank you.

24          And like yesterday, we would ask as well if
```

Confidential - Subject to Further Confidentiality Review

```
 1          there are any verifications that are forthcoming

 2          for these interrogatories or any supplemental or

 3          amended answers to the discovery responses that

 4          they be submitted as soon as practical for

 5          Ms. Gody or any of your other claimants.

 6               MR. ALBANIS:  I appreciate that, and we will

 7          serve those on you as well.

 8               MR. LAWSON:  Thank you.

 9     BY MR. LAWSON:

10          Q.   Ms. Gody, going back to this document that

11     you are looking at, Exhibit 4, we were discussing the

12     answer that you gave related to personal property

13     damage expenses and whether that figure of at least

14     $7,595 was accurate.

15               Based on what you just heard from your

16     attorney, would you agree that that is the accurate

17     amount of money that you are seeking for personal

18     property damage expenses?

19          A.   No.

20          Q.   Okay.  What amount are you seeking for

21     personal property damage expenses?

22          A.   It's -- this has to be amended as well.  It's

23     around $8,500.

24          Q.   $8,500?
```

```
1        A.   Yes.

2        Q.   And why do you say that this number needs to

3   be amended?  Is there something you know that is not

4   included in that $7,595?

5        A.   In the personal damages, yes.  We had come

6   across another invoice.

7        Q.   Okay.  What is that invoice for?

8        A.   I don't remember at this time.

9        Q.   Okay.  Have you produced that invoice to your

10  attorney?

11       A.   Yes, I have.

12            MR. LAWSON:  Okay.  Pete, obviously, if we

13       have it, please let us know if we can figure out

14       exactly what that is.  But if you know that that

15       has not been produced or you can figure out what

16       it is, please let us know, especially if we are

17       going to be amending this answer further to

18       change the amount to around $8,500.  I just want

19       to make sure we have all the documentation so we

20       can ask Ms. Gody about it.

21            MR. ALBANIS:  Understood, and I will let you

22       know.

23  BY MR. LAWSON:

24       Q.   Ms. Gody, is it correct there is only one
```

```
 1    additional invoice that would add to that total to

 2    make it $8,500 that you are requesting for personal

 3    property damage expenses?

 4         A.   I need to review the list that I presented to

 5    the attorney.

 6         Q.   All right.

 7              (Defendants' Exhibit 5 was marked for

 8    identification.)

 9    BY MR. LAWSON:

10         Q.   I've handed you a document that has been

11    marked as Exhibit 5.

12              Do you recognize this document?

13         A.   Yes.

14         Q.   And what is it?

15         A.   I prepared it.

16         Q.   And what is this document that you prepared?

17         A.   It's receipts for personal property.

18         Q.   And is this the list that you mentioned a

19    moment ago that you said that you had given to your

20    counsel?

21         A.   No.

22         Q.   Okay.  Is there a different list that you

23    have given your counsel?

24         A.   Yes.
```

```
1        Q.   Do you know when you gave him that list?

2        A.   I don't recall.

3        Q.   Okay.  Do you know when you created this

4    list?

5        A.   I don't recall.

6        Q.   Is it accurate to say that this list reflects

7    items that you believe were damaged by the Chinese

8    drywall in your home?

9        A.   Yes.

10       Q.   And this list includes at the top HVAC coils

11   for $360; is that right?

12       A.   I need to expound -- expand my statement on

13   this with prior -- with -- there is another list that

14   I presented that I was able to come across going

15   through all my documentation for eight years, and it

16   was a notebook that I kept that had the receipts in

17   it.

18            So there is an additional list of personal

19   property items.

20       Q.   Okay.  And we can get to that.

21            But I want to first address this list, if

22   possible.  And I guess I would like to understand if

23   the additional list that you are talking about also

24   contains these items and others or if this list
```

```
 1    includes the items separately.

 2        A.    This isn't included in the other list that I

 3    presented, to the best of my knowledge.

 4            (Defendants' Exhibit 6 was marked for

 5    identification.)

 6    BY MR. LAWSON:

 7        Q.    You have been handed a document that's been

 8    marked as Exhibit 6.

 9            Do you recognize this document?

10        A.    Yes.

11        Q.    And what is this?

12        A.    This is a repair document from Wiegold &

13    Sons.

14        Q.    And have you had a chance to review all of

15    the different invoices and receipts contained within

16    this exhibit?

17        A.    Yes -- give me a minute, please.

18        Q.    No problem.

19        A.    The only duplication on this list and the --

20    and the current list or the newer list I have

21    presented is $169.

22        Q.    Okay.  And do you know what that $169 is for?

23        A.    Yes.

24        Q.    And what is that?
```

```
 1        A.    Wiegold.

 2        Q.    Okay.  So there's an additional Wiegold

 3   invoice on the list that you presented more recently?

 4        A.    Yes.

 5        Q.    And it's for $169?

 6              MR. ALBANIS:  I think it may be best if we

 7        took a quick break so we can get to the bottom of

 8        this.

 9              THE WITNESS:  Yes, these receipts.

10              MR. ALBANIS:  Yes.

11              MR. LAWSON:  Sure.

12              MR. ALBANIS:  If that's okay with you, Matt.

13              THE WITNESS:  And -- can I ask a question

14        right now?

15              MR. ALBANIS:  No.  Let's just take a break.

16              THE WITNESS:  Okay.

17              MR. ALBANIS:  Thank you.

18              (Recess from 1:27 until 2:10 p.m.)

19   BY MR. LAWSON:

20        Q.    Okay.  We're back on the record.

21              We have had a break where plaintiff's counsel

22   and Ms. Gody have had an opportunity to be able to

23   explore the -- any discrepancy with the receipts

24   related to personal property expenses that we were
```

```
1    discussing before the break.

2           Is there any update on that before we

3    proceed?

4           MR. ALBANIS:  We had an opportunity to speak

5       with Ms. Gody, and we will be sticking with the

6       answer to interrogatory that has already been

7       produced and that you have identified as Exhibit

8       Number 4 with the exception of the change that I

9       mentioned earlier about the changing the

10      alternative living expenses number from $327,000

11      to right around $68,000, which was previously

12      disclosed in the Fourth Amended Supplemental

13      Plaintiff Profile Form.

14          There may be categories of personal property

15      that is -- that has been included within that

16      $68,000 alternative living expenses amount, but

17      all of the backup documentation for that claim,

18      as well as for the $7,595 for personal property

19      damage has been uploaded to the BrownGreer portal

20      and produced to you.

21          So I believe that any questions to Ms. Gody

22      about the total value of her damaged personal

23      property that she can approximate based on the

24      documentation that has been produced are
```

```
1        obviously fair game and that she -- she can

2        respond to.

3             MR. LAWSON:  Thank you.

4    BY MR. LAWSON:

5    Q.   All right.  Ms. Gody, let's go back to

6    Exhibit 5 that we looked at previously, which is that

7    list, along with some images of some receipts on the

8    following pages.

9             Looking at this list, does this include some

10   of the items that you are seeking compensation for

11   that are personal property expenses that you paid as

12   a result of damage from Chinese drywall?

13   A.   These are receipts that I submitted.

14   However, for the things that I did not have receipts

15   for, I did not submit for personal property because

16   I -- we disposed of three bedrooms worth of

17   furniture, dining room furniture, living room

18   furniture, kitchen furniture, and anything that

19   couldn't be put in a dishwasher or in a washing

20   machine because we were looking at the protocol that

21   had been produced.

22            And because of the health issues and

23   everything that we had, we did not want to have

24   anything to do with it.  We didn't want to take that
```

1    anywhere else and be exposed to it.

2         So my personal loss is much greater than

3    $7,500, let me tell you.

4    Q.    Looking at the receipts that are on the pages

5    that follow this list, are these the receipts for

6    some of the items that are listed on the first page

7    of Exhibit 5?

8    A.    These are all of the receipts.

9    Q.    Okay.  One of the items on this list is

10   365 -- $365 for HVAC coils from Certified Air.  Just

11   from my understanding, do you see that in the

12   receipts on Exhibit 4 -- excuse me, Exhibit 5, or are

13   they in the receipts that are shown in Exhibit 6?

14   A.    They are in Exhibit 6.

15   Q.    And is that the same for the Wiegold & Sons

16   August 5th, 2008, $169?

17   A.    Yes.

18   Q.    That is present in Exhibit 6 in a receipt; is

19   that right?

20   A.    Yes.

21   Q.    In fact, I think it's an invoice for $169 in

22   Exhibit 6, correct?

23   A.    Yes.

24   Q.    All right.  And you have other Wiegold & Sons

```
 1    invoices as well?

 2        A.   Yes.

 3        Q.   And those invoices list a check number on the

 4    left-hand side, around the middle of the page,

 5    showing payment --

 6        A.   Yes.

 7        Q.   -- of those invoices?

 8             Additionally, there are, in Exhibit 6,

 9    invoices from Certified Heating and Cooling; is that

10    right?

11        A.   Yes.

12        Q.   And these are for services provided by that

13    company related to your air-conditioning unit?

14        A.   Yes.

15        Q.   And then if you move on through Exhibit 6,

16    there are checks -- excuse me, invoices showing that

17    those bills with Certified Heating and Cooling have

18    been paid?

19        A.   Yes.

20        Q.   Is that right?

21             Are there, to your knowledge, any other

22    additional receipts that you have in your possession

23    for the $7,500 that you are pursuing in personal

24    property expenses beyond the ones that are shown in
```

```
 1     Exhibits 5 and 6 that we just looked at?

 2              MR. ALBANIS:  Object to the form.

 3              But you can answer, if you can.

 4              THE WITNESS:  Not that I recall.

 5              (Defendants' Exhibit 7 was marked for

 6     identification.)

 7     BY MR. LAWSON:

 8        Q.   Mrs. Gody, I have handed you a document

 9     that's been marked as Exhibit 7.

10              Do you recognize this document?

11        A.   Yes.

12        Q.   And what is it?

13        A.   The Fourth Amended Supplemental Plaintiff

14     Profile Form.

15        Q.   And is this the Fourth Amended Supplemental

16     Plaintiff Profile Form for your claim in the

17     Chinese-manufactured drywalls products liability

18     litigation?

19        A.   Yes.

20        Q.   And do you know about when this document was

21     created?  Specifically, you can look to the eighth

22     page of the document, which is the last page.

23              MR. ALBANIS:  Seven.

24              THE WITNESS:  I have seven.
```

```
 1    BY MR. LAWSON:

 2        Q.   Okay.  Do you not have a signature page or

 3    verification page at the back of your copy of the

 4    exhibit?

 5        A.   Page 7.

 6             MR. LAWSON:  Can we go off the record for a

 7        second.

 8             (Discussion off the record.)

 9    BY MR. LAWSON:

10        Q.   Ms. Gody, I think we have clarified that I

11    had a different copy of the Fourth Amended

12    Supplemental Plaintiff Profile Form, but we have

13    clarified that and I now have the same copy and

14    version that you do.  The pagination was a little bit

15    different.

16             Looking at Page 7 of this document, the date

17    that it was signed, or at least that it was

18    completed, appears to be December 11th, 2018; is that

19    correct?

20        A.   Yes.

21        Q.   And that was a couple of days ago; is that

22    right?

23        A.   Yes.

24        Q.   In fact, yesterday, correct?
```

```
 1        A.   Yes.

 2        Q.   Have you looked at this document before?

 3        A.   Yes.

 4        Q.   And did you assist in filling out this

 5   document or answering the questions in this document?

 6        A.   Yes.

 7        Q.   I'd like to turn your attention to the sixth

 8   page of this document.  At the top of the page, it

 9   states:  If you experience any loss of use and/or

10   loss of enjoyment of the property as a result of

11   Chinese drywall, identify the total amount of such

12   loss.

13             Do you see that?

14        A.   Yes.

15        Q.   And the amount listed is $200,000.

16             Is that what it says?

17        A.   Yes.

18        Q.   Can you tell me how you decided that that was

19   the amount of money that you identified as the --

20   your loss for loss of use of enjoyment of the

21   property?

22             MR. ALBANIS:  Object to the form.

23             But you may answer, if you can.

24             THE WITNESS:  First, no amount of money is
```

```
 1          going to put this horrible experience behind me,

 2          and I can't stress that enough with you.

 3              This amount was based upon a formula that was

 4          provided by Judge Fallon.

 5   BY MR. LAWSON:

 6      Q.   We talked a little bit earlier about the

 7   experience that you had in your home from 2007

 8   through 2010 while you lived in it.  You told me a

 9   little bit about the health effects, the odor, and

10   some of the things that you could not do, like have

11   people over to your house.

12              And I just wanted to give you this

13   opportunity if there were any other things that

14   contributed to your loss of use and enjoyment of the

15   property during that time, if you could explain those

16   to me now.

17      A.   Being in an environment that you knew that

18   was bad for your health and you wouldn't want to have

19   your family or friends to visit because you wouldn't

20   want them to be exposed.

21              And we didn't know what the outcome was going

22   to be.  We could not enjoy the house at all.  To us,

23   it was just a constant reminder of what we were going

24   through, and we didn't know if there was ever going
```

Confidential - Subject to Further Confidentiality Review

```
 1    to be a resolution to it.

 2           And for all the reasons that we moved there,

 3    we weren't enjoying it for that:  for the social

 4    aspect of it, for the golf, the tennis, everything

 5    that was there.  We were so consumed by everything

 6    that was going on with this that we couldn't enjoy

 7    anything.

 8       Q.   Has that changed since the home was

 9    remediated?

10       A.   Yes.  Because now we feel we are in a safe

11    environment and nothing is going to affect our health

12    as much as this did.

13       Q.   And since you have had the home remediated,

14    has anything limited your use or enjoyment of the

15    property?

16       A.   Are you referring to just the house?

17       Q.   Yes.

18       A.   No.

19       Q.   You feel like you get to fully use and enjoy

20    the home now that it's been remediated?

21       A.   Yes, yes.

22       Q.   I'd like to turn your attention to Page 5 of

23    this exhibit, the section at the bottom titled

24    "Section 7:  Other Damage."
```

1          Do you see that?

2     A.   Yes.

3     Q.   That section states:  If you incurred

4     alternative living expenses as a result of Chinese

5     drywall, identify the total moving costs and/or

6     alternative living expense you incurred.

7          Did I read that correctly?

8     A.   Yes.

9     Q.   And the amount that you have listed on this

10    form is $68,314.48, correct?

11    A.   Correct.

12    Q.   What kind of expenses are included in that

13    number of $68,314.48?

14         MR. ALBANIS:  Object to the form.

15         But you may answer if you can, Ms. Gody.

16         THE WITNESS:  When we vacated the property

17         and moved back to Elizabeth, Pennsylvania, to be

18         around family and also to get out of this toxic

19         environment and living in the house there, I

20         figured out -- I turned this in based upon the

21         46 months that I lived there:  mortgage,

22         utilities, furnishings to be able to live in the

23         house, a security system, taxes, and insurance.

24    ///

```
 1    BY MR. LAWSON:

 2        Q.   So that amount includes the mortgage that you

 3    paid and the property in Pennsylvania that you lived

 4    in during the 26 months that you were out of your

 5    home --

 6        A.   Yes.

 7        Q.   -- in --

 8             And so it includes all months of those

 9    mortgage payments for the 26 months?

10        A.   Yes.

11        Q.   And it includes the utilities that you paid

12    at the home during that time as well?

13        A.   Yes.

14        Q.   The home in Pennsylvania?

15        A.   Yes.

16        Q.   Excuse me.

17             And it also includes for a security system at

18    that home in Pennsylvania and monitoring, I would

19    imagine, for the security system?

20        A.   Yes.

21        Q.   And that's for all 26 months as well?

22        A.   Yes.

23        Q.   And also the taxes.  I assume the property

24    taxes you paid in Pennsylvania during that time?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   And then also the insurance.  Homeowner's

 3   insurance that you paid --

 4        A.   Yes.

 5        Q.   -- at the home in Pennsylvania?

 6        A.   Yes.

 7        Q.   Any other type of insurance beyond the

 8   homeowner's insurance for the home in Pennsylvania?

 9        A.   No.

10        Q.   So all of those items are for the 26-month

11   period that you were out of your home here in Florida

12   and that you were living in Pennsylvania, correct?

13        A.   Yes.

14        Q.   And you've submitted receipts and proof of

15   payment for those items to your lawyer as well?

16        A.   Yes.

17             MR. ALBANIS:  And we have produced all of

18        that documentation to you.  It has been uploaded

19        to the portal.

20             MR. LAWSON:  Thank you.

21             (Defendants' Exhibit 8 was marked for

22        identification.)

23   BY MR. LAWSON:

24        Q.   I have handed you a document that's been
```

```
1    marked as Exhibit 8.

2         A.    Yes.

3         Q.    Do you recognize this document?

4         A.    Yes.  I prepared it.

5         Q.    And what is it?

6         A.    It is receipts for alternative living.

7         Q.    And do you remember when you put this

8    together?

9         A.    No, I don't recall that.

10        Q.    Now, it's my understanding, based on what you

11   just told me, there may be some items that are not

12   part of the categories of expenses that we just

13   discussed.  But I wanted to go through it to be able

14   to understand what you are seeking compensation for

15   and what you are not, just to be clear on all of

16   that.

17             On the first page here it lists grocery

18   items, food that was paid from the period of -- it

19   looks like in 2010; is that right?

20        A.    Yes, from June 10th to July 14th.

21             The house in Pennsylvania was not ready for

22   us to move in.  We had to get rid of the house

23   because of the living conditions there, and we went

24   and stayed with family in New York.
```

1          And because they wouldn't accept any type of

2     compensation for us, we just paid for all the

3     groceries while we were there.

4          Q.   Okay.  Do you know if those grocery items and

5     the expenses that are listed on this first page of

6     the exhibit are included in this $68,314.68 that you

7     are seeking for alternative living expenses?

8          A.   I don't know that.

9          Q.   Okay.  Would you -- would you say that this

10    is groceries that you were paying for for the family

11    that you were staying with, as well as yourself?  Is

12    that right?

13         A.   Yes.

14         Q.   And this was a period where you were staying

15    with them for -- it looks like a little over a month;

16    is that right?

17         A.   Correct.

18         Q.   And in the following pages, the following --

19    it looks like seven pages are receipts for those

20    grocery items that -- and expenses that are listed on

21    the first page; is that right?

22         A.   Correct.

23         Q.   And to your knowledge, are all -- these all

24    of the receipts totaling up to numbers that you see

```
 1    on the first page of this exhibit?

 2         A.    Yes.

 3         Q.    Looking to the next page after the grocery

 4    receipts, what is this list?

 5         A.    This is receipts for alternative living when

 6    we moved into the house in Elizabeth, Pennsylvania.

 7         Q.    Okay.  When you moved to the house in

 8    Elizabeth, Pennsylvania, did you purchase that home?

 9         A.    Yes.

10         Q.    And this lists the base cost of that home; is

11    that right?

12         A.    Correct.

13         Q.    And that base cost is $254,400.50; is that

14    correct?

15         A.    Correct.

16         Q.    Now, you are not pursuing, based on the

17    number that we looked at earlier of $68,000-plus,

18    that amount in your alternative living expenses; is

19    that correct?

20              MR. ALBANIS:  Object to the form.

21              But you may answer, if you can.

22              THE WITNESS:  Could you repeat the question,

23         please?

24    ///
```

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/18/19 Page 939 of 1680
Case 2:11-cv-00377-EEF-JCW Document 139 Filed 01/18/13 Page 80 of 98 PageID #: 417
Confidential~ - Subject to Further Confidentiality Review

```
1    BY MR. LAWSON:
2        Q.   You are pursuing an amount of $68,314.68.
3    Now, the base cost of the home is much more than
4    that.  So I would imagine you are not pursuing the
5    base cost of the home in Pennsylvania in your
6    alternative living expenses damages; is that correct?
7        A.   I am not.  I am only claiming for the
8    26 months that I lived there.
9        Q.   However, there are some other items that are
10   on this list that I wanted to ask you about.  The
11   first item below and under "furnishings" are
12   appliances -- Voss appliances, to be specific, in an
13   amount of $19,588.95.
14           Do you see that there?
15       A.   Yes.
16       Q.   Okay.  Are those appliances for the home in
17   Pennsylvania?
18       A.   Yes.  Could not live there without
19   appliances.
20       Q.   So the appliances that you purchased, that
21   includes kitchen appliances for the home?
22       A.   It included a TV, it included an oven, a
23   warming drawer, a wine cooler, a refrigerator.
24       Q.   And do you know if those expenses for
```

```
 1    appliances for the home in Pennsylvania are included

 2    in the $68,000-plus that you are pursuing?

 3         A.   No, they are not.

 4         Q.   Did you sell the home in Pennsylvania after

 5    you lived there at some point?

 6         A.   Yes.

 7         Q.   And did you sell it with the appliances that

 8    you purchased included along with the house to the

 9    new owners?

10         A.   Yes.

11         Q.   The next item is the flooring for the home,

12    an amount of $2,833.  Is that amount included in the

13    amount that you are pursuing for alternative living

14    expenses?

15         A.   No.

16         Q.   Same question for the lighting that's listed

17    below for $5,343.

18         A.   No.

19         Q.   Also the plumbing fixtures that are listed

20    for $1,232.  Are those included in the ALE expenses?

21         A.   No.

22         Q.   And the furniture that is listed for $10,865.

23    Same question.

24         A.   Yes.
```

```
 1        Q.   So the furniture included a dining room

 2   table; is that right?

 3        A.   It included a dining room table and six

 4   chairs.

 5        Q.   Any other items that are included --

 6   furniture items that are included in that total of

 7   $10,865?

 8        A.   A sofa and two chairs.

 9        Q.   And did you keep those items with you after

10   you moved back into the home in Florida after it had

11   been remediated?

12        A.   Yes.

13        Q.   And you were not able to bring or did not

14   bring any furniture items from Florida up to

15   Pennsylvania when you moved there, correct?

16        A.   No.  I wouldn't want to contaminate that

17   house, too.

18        Q.   You also included bedding on this list, an

19   amount of $1,931.35.  Is that included in your ALE

20   expenses?

21        A.   Yes.

22        Q.   And did you bring that bedding back with you

23   to Florida after you moved back to the home --

24        A.   Yes.
```

```
1       Q.     -- in Florida?

2              You also have a television from Best Buy for

3       $826.  Is that included in your ALE expenses?

4       A.     Yes.

5       Q.     And did you bring that item back with you to

6       Florida when you moved back?

7       A.     Yes.

8       Q.     The security system from Guardian, is that

9       included in your ALE expenses?

10      A.     Not the physical unit, but the monitoring of

11      it is.

12      Q.     So the money that you paid during the

13      26 months for monitoring your security system with

14      whatever service, I would imagine Guardian --

15      A.     Yes.

16      Q.     -- that you used is included in your ALE

17      expenses?

18      A.     Yes.

19      Q.     The landscaping for $7,562, is that included

20      in your ALE expenses?

21      A.     No.

22      Q.     The irrigation system that is listed from

23      custom turf for $5,569, is that included in your ALE

24      expenses?
```

Case 2:09-md-02047-EEF-MBN Document 22362-781 Filed 11/19/19 Page 943 of 1680
Case 2:11-cv-00377-MSD-RJK Document 78-39 Filed 04/18/16 Page 34 of 98 PageID# 421
Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2        Q.    The deck that is listed for $2,352, same

 3   question.

 4        A.    No.

 5        Q.    The cabinets from Canonsburg General

 6   Woodcrafting for $6,386, are those included in your

 7   ALE expenses?

 8        A.    No.

 9        Q.    And the budget blinds for $2,008 that are

10   listed, are they included?

11        A.    No.

12        Q.    Are they included in your ALE expenses?

13        A.    No.

14        Q.    The linens and dishes and other domestic

15   items that are listed under -- for the amount of

16   $2,235, are those included in your ALE expenses?

17        A.    Yes.

18        Q.    And did you bring those back with you to

19   Florida after you moved back into your home?

20        A.    Yes.

21        Q.    There's a computer and a printer from Best

22   Buy that's listed for $965.  Is that included in your

23   ALE expenses?

24        A.    Yes.
```

```
 1        Q.   Did you have a computer or printer in Florida

 2   during the time that you lived in the home from 2007

 3   to 2010?

 4        A.   Yes.

 5        Q.   And was it functioning at the time that you

 6   moved to Pennsylvania?

 7        A.   No.

 8        Q.   Did this computer and printer replace a

 9   computer and printer that you had in Florida before

10   you moved?

11        A.   Not before I moved.

12        Q.   You said that the computer that you had

13   while --

14        A.   Failed.

15        Q.   It failed.

16             And then this computer was the only computer

17   that you had once you purchased it, and you used it

18   while you were in Pennsylvania; is that right?

19        A.   I purchased it in Pennsylvania when I

20   arrived.

21        Q.   And did you bring it back with you to Florida

22   after?

23        A.   Yes.

24             MR. ALBANIS:  You have to wait for Mr. Lawson
```

```
1        to finish his questions before you answer, okay?

2        It will be good for the court reporter if you did

3        that.

4    BY MR. LAWSON:

5        Q.    The last item, it says "miscellaneous," and

6    it includes tools and shelving according to the list,

7    and that's $812.  Is that included in your ALE

8    expenses?

9        A.    Yes.

10       Q.    Do you know any other items other than tools

11   and shelving that are included, or does that make up

12   the receipts for that category?

13       A.    To the best of my knowledge, yes.

14       Q.    What was the shelving for in the home?

15       A.    For in the garage.

16       Q.    And the tools that you purchased, do you

17   remember what kind of tools they were?

18       A.    They were shovels and rakes, a Shop-Vac.

19       Q.    And were those items the kind of items that

20   you had back in your home in Florida but decided not

21   to bring with you to Pennsylvania?

22       A.    No.  Excuse me.  Repeat that again.  Sorry.

23       Q.    Did you have those kind of items -- the

24   shovels, rakes, Shop-Vac -- back in your home in
```

```
 1    Florida but decided not to bring them to Pennsylvania

 2    with you?

 3         A.   Yes.

 4         Q.   Were the -- was the Shop-Vac functioning in

 5    Florida that you had before you moved out of the

 6    house?

 7         A.   I don't recall.

 8         Q.   And do you recall that there were any issues

 9    with the tools that you had in Florida that made you

10    not want to bring them with you to Pennsylvania when

11    you moved there?

12         A.   Anything that was in that house, we did not

13    want to take to another environment.

14         Q.   Now, in the pages that follow that list,

15    there's a series of invoices and receipts.  To your

16    knowledge, are these invoices and receipts for the

17    same items that are in the list that we just went

18    through?

19         A.   Yes.

20         Q.   And are there any invoices or receipts for

21    the items on that list that are not included in the

22    pages that follow the list?

23              Are there any missing, to your knowledge?

24              MR. ALBANIS:  Object to the form.
```

1          But you may answer if you can, Ms. Gody.

2          THE WITNESS:  I see one item that I did not

3      include on the list.

4  BY MR. LAWSON:

5      Q.   And what is that?

6      A.   For $326 for a bistro table and two chairs,

7  which we brought back to Florida.

8      Q.   So that is not included?

9      A.   Included in that -- no, it's not.

10      Q.   Just to finish my question, there's a line

11  item for furniture for $10,865.  You don't believe

12  that that table and chairs is included in that

13  amount?

14      A.   To the best of my knowledge, no.

15      Q.   Are there any other items that are included

16  in that list that do not have invoices or receipts in

17  the pages?

18      A.   Could you repeat that question again, please.

19      Q.   Yes.

20          Are there any other items that are included

21  in the list at the front that we just discussed that

22  do not have invoices or receipts on the pages?

23      A.   The best of my knowledge, no.

24      Q.   Okay.  And to your knowledge, are there any

```
1    invoices or receipts that are in those pages that are

2    not part of the items that are listed on that list at

3    the front, like the table and chairs that you just

4    mentioned?  Anything else other than that?

5        A.   Not to my knowledge.

6        Q.   All right.  After you get through all of

7    these receipts in this exhibit for those items that

8    you just went through, there's a page called "Travel

9    Expenses" that looks like you are on right now.

10       A.   Yes.

11       Q.   I would like to refer you to that one.

12            Could you tell me about this document?  Did

13   you put it together?

14       A.   Yes.

15       Q.   And what is it?

16       A.   It is our travel expenses that we incurred

17   during our trip -- oh, to begin the remediation at

18   10842 Tiberio Drive.  There is when we were living in

19   Elizabeth to Florida.

20       Q.   So you traveled back to Florida to begin the

21   remediation process?

22       A.   Yes, yes.

23       Q.   And you did that between June 20th and

24   July 27th of 2010?
```

```
 1        A.    Yes.

 2        Q.    So that was around the time that you were

 3    living with family, is that right, in 2010?

 4        A.    Let me review that a minute, please.

 5        Q.    No problem.

 6        A.    I'm just trying to think back on this date.

 7              I made a mistake.  This should be 2011.

 8        Q.    Okay.  So the travel expenses page should be

 9    June 20th to July 27th of 2011?

10        A.    Yes.

11        Q.    All right.  That makes sense.

12        A.    Yeah.

13        Q.    So these are the expenses that you had during

14    the trip where you had to come back to Florida once

15    the remediation of your home at Tiberio Drive began?

16        A.    Yes, yes.

17        Q.    Are these expenses that are shown in the

18    travel expenses page part of your alternative living

19    expenses that you are seeking in this lawsuit?

20        A.    No.

21        Q.    All right.  I had one question just going

22    back to the food items that we looked at before, just

23    so I could understand.  There's one batch that says

24    "items purchased for new home," and it's listed as
```

```
 1    $284.42.  That's at the beginning of the document on

 2    the first page for the receipts for alternative

 3    living.

 4         A.   Oh.

 5         Q.   Do you see that line?

 6         A.   Yes.

 7         Q.   So those were groceries that were purchased

 8    for your new house, right?

 9         A.   Yes.

10         Q.   To replace food items that you would normally

11    have in your home in Florida but did not have in

12    Pennsylvania?

13         A.   Correct.

14         Q.   Correct?

15              And would that have been in line with the

16    kind of food items that you would have purchased

17    normally while living in Florida?

18         A.   Yes.

19              (Defendants' Exhibit 9 was marked for

20    identification.)

21    BY MR. LAWSON:

22         Q.   I have handed you a document that's been

23    marked as Exhibit 9 if you can take a look at it and

24    let me know if you recognize this exhibit.
```

```
 1        A.    Are we finished with this?

 2        Q.    Yes, we are.  You can set that aside.

 3              Ms. Gody, is it correct that these are photos

 4    of your home at Tiberio Drive before the home was

 5    remediated?

 6        A.    Yes.

 7        Q.    And do you know about when these photos were

 8    taken?

 9        A.    No, I do not.

10        Q.    Did you take these photos, or do you know who

11    did?

12        A.    I don't recall.

13        Q.    So we've discussed that the remediation of

14    your home began sometime around June and July of 2011

15    when you returned from Pennsylvania to Florida to see

16    that process begin.

17              Can you tell me a little bit about what led

18    up to you contracting with someone to remediate the

19    home, how you decided to do that?

20        A.    We knew we had to come back at one point to

21    take care of this.  And since we didn't know how long

22    it was going to take, we just decided just to do it,

23    because this is -- we had been in Florida for awhile,

24    and this was our home and we just wanted to come
```

 1    back.  So it's where all our resources were, all our

 2    doctors, friends, and we wanted to come back and put

 3    our lives back in order and try to live a normal

 4    life.

 5          This has taken over so much.  This is

 6    one-seventh of my life I have been dealing with this.

 7    I am 71 years old, and I had to deal with all this.

 8    And I'm looking at these pictures, and I see how many

 9    things we had to dispose of, I'm never going to be

10    compensated for.

11          And I'll tell you one right now.  There is a

12    plaque here that was totally corroded that was given

13    to my mother.  She's been gone 39 years.  That was

14    given to my mother as a wedding gift that was

15    hand-painted with gold.  And we couldn't do anything

16    with it so we had to get rid of it.

17          All this furniture you see, with a few

18    exceptions, all went in a dumpster -- three or four

19    dumpsters.  Paintings.  There's pictures here that

20    were all corroded; we couldn't keep.  The backs of

21    them, the paper all curled up and the copper wire

22    that they were hanging on, broke.

23       Q.   Do you remember when you decided to remediate

24    the home?

```
1          MR. ALBANIS:  So just so that the record is
2      clear, Ms. Gody, the picture that was given to
3      your mother --
4          THE WITNESS:  Yeah.
5          MR. ALBANIS:  -- is on this page, correct?
6          THE WITNESS:  Yes.
7          MR. ALBANIS:  That is the 16th page of the
8      document.
9          THE WITNESS:  I don't recall the exact date
10     when we decided to do this, but we knew we had to
11     do it.
12 BY MR. LAWSON:
13     Q.   And how did you go about finding someone to
14 be able to remediate the home?
15     A.   There was a family that had already started
16 to remediate down the street from us, and he had
17 interviewed three people.  And he gave us the name of
18 the people that he had interviewed.  So we did the
19 same.
20          And the contractor that we chose -- and we
21 chose him first based upon price, but also he has
22 been doing -- was doing remediation for WCI in
23 Parkland, Florida, and he came to the house with the
24 protocol -- Judge Fallon's protocol and showed us how
```

```
 1     he had been following the protocol.

 2          Q.   This contract told you he could follow

 3     Judge Fallon's protocol in remediating your home?

 4          A.   Yes.

 5          Q.   And you ended up deciding to choose that

 6     contractor for your remediation?

 7          A.   Yes.

 8          Q.   And what was the name of that contractor?

 9          A.   Polkow Construction.

10          Q.   Do you know about when they started to work

11     on remediating the home?

12          A.   Yes.  It was in the beginning of July.  It's

13     on the environmental report.  I think it's July 2nd,

14     3rd, or maybe 5th of 6th.

15          MR. ALBANIS:  Before you continue with any

16          further questions, I'd like to assert a rolling

17          objection to any and all questions regarding the

18          remediation and remediation damages.  As you well

19          know, Ms. Gody has been identified as a priority

20          claimant in the nonremediation damages track

21          pursuant to Judge Cooke's November 16, 2018,

22          order.

23          Remediation damages are being addressed by a

24          separate track in this litigation, and,
```

```
1        therefore, we object to any and all questions

2        related to the remediation of her home or damages

3        associated with the remediation of her home.

4             Having asserted that objection, we will, of

5        course, allow the questioning to continue.

6             And, Ms. Gody, you may answer these questions

7        if you know the answers.

8             MR. LAWSON:  Objection's noted.

9             We believe that the remediation is part of

10        the overall and other damages that are subject to

11        this line of deposition [sic] and that we're

12        going to pursue that inquiry in this deposition

13        and proceed with these questions.

14   BY MR. LAWSON:

15        Q.   Ms. Gody, do you recall what you did while

16   you visited the home when the remediation process

17   began?

18             You said you traveled back to Florida to be

19   there when it started.  Do you recall what you did

20   while that process was ongoing?

21        A.   We rented a villa within Pelican Preserve.

22        Q.   And that's where you lived during that time?

23        A.   Yes.

24        Q.   How long was that?  How long of a time did
```

```
 1    you live in that villa?

 2        A.    Just give me a second, please.

 3              Contracted in June.  We were there in June of

 4    2011 for approximately five and a half to six weeks.

 5        Q.    And is that five and a half to six weeks the

 6    approximate length of time that it took for the

 7    remediation to complete, or did it take longer than

 8    that?

 9        A.    It took longer than that.

10        Q.    How long did it take?

11        A.    It took approximately a week to take

12    everything out of the house:  all the drywall, the

13    plumbing, the wiring, insulation, and cleanup.

14              Then they had a company come in and power

15    wash all the steel studs and then hand wipe them all

16    down.  Then they brought in equipment --

17    dehumidifiers and air blowers -- negative charged air

18    blowers that was blowing all the air out of the house

19    after that.

20              And that continued on for approximately two

21    weeks after we left.

22        Q.    And after that had completed that process for

23    that two weeks after you left, was that the end of

24    the remediation?
```

1      A.    Yes.

2      Q.    And when did you move back into the home?

3      A.    Could you just expand on -- what do you mean

4    the end of the remediation?

5      Q.    Well, you said that they had brought in

6    blowers to get the air out of the house, and that

7    that process took about two weeks after you had left

8    Florida, presumably to go back to Pennsylvania.

9          I wanted to understand when you moved back

10   into the house after that.

11     A.    Oh.  We didn't move back into the house until

12   September of 2012.  But prior to that -- three months

13   prior to that, they started the -- I still call it

14   part of the remediation -- the remediation to hang

15   the drywall, to do the wiring, the plumbing, the

16   air-conditioning, replace the cabinets.  Everything

17   it took to put us back in the house.

18     Q.    So the first part of the remediation process

19   was to remove --

20     A.    Yes.

21     Q.    -- all of the items that you described; and

22   then to have blowers and to be able to remove, you

23   know, any matter, I would imagine, that had collected

24   in the home; and then to rebuild the inside of the

1    home.

2          Is that right?

3    A.   We didn't start to rebuild the inside of the

4    home until June of the following year.  The house sat

5    vacant for a year.

6    Q.   So from around September of 2011 until

7    September of 2012 the home sat vacant until you moved

8    back in in September of 2012?

9    A.   The house sat vacant from when they finished

10   the remediation, which would have been somewhere

11   around the 15th or so of July.  It sat from there

12   until the following June when they started to put it

13   back together.

14   Q.   And what was the reason for that year that

15   elapsed between when they finished the first phase of

16   removing everything to the phase when they started

17   putting it back together?

18   A.   We wanted to make sure there was not one

19   single trace of toxic drywall left in the house.  So

20   we had it tested, and we had -- and we wanted it to

21   sit as long as possible.

22   Q.   Do you recall when you first had it tested to

23   be able to see if there were any remnants or effects

24   of Chinese drywall in the home after everything had

```
1    been taken out of it?

2       A.   I don't know the exact date.  It was part of

3    the protocol procedure where the environmental

4    engineer came back in and took samples of concrete

5    block and wood and sent it away for testing to make

6    sure there were no particles left.

7       Q.   And to your knowledge, by the time that you

8    moved back into the home, did tests show that there

9    were any remnants or particulates still from Chinese

10   drywall in your home after you moved back in?

11      A.   No.

12      Q.   I would like to talk you to a little bit

13   about what was taken out of the home when it was

14   remediated.

15           Was all of the drywall in the home removed --

16      A.   Yeah.

17      Q.   -- when the remediation occurred?

18      A.   Yes.

19      Q.   And that included both the Chinese drywall

20   and any American drywall that was in the home?

21      A.   Yes.

22      Q.   Was all of the electrical wiring removed from

23   the home?

24      A.   Yes.
```

```
 1      Q.   Was any copper plumbing removed from the

 2   home?

 3      A.   Yes.

 4      Q.   Was the HVAC system removed from the home?

 5      A.   Yes.

 6      Q.   And were any electrical appliances removed

 7   from the home?

 8      A.   Yes.  And if you look at this picture on the

 9   first page of my kitchen, that's a second

10   refrigerator I had, because the first one went.

11           MR. ALBANIS:  You are referring to Exhibit 9?

12           THE WITNESS:  Yeah, Exhibit 9.  I'm sorry.

13      The first page.

14           That is the second refrigerator we had.

15   BY MR. LAWSON:

16      Q.   Because you had to replace the refrigerator?

17      A.   Yes.  The one that was originally with it

18   left.

19      Q.   The second one that was pictured --

20      A.   It was removed.

21      Q.   It was removed from the home?

22      A.   Yes.  Into a dumpster.

23      Q.   Were there any carpets in the home that had

24   to be removed?
```

```
 1      A.   Three bedrooms.

 2      Q.   The bedrooms were carpeted?

 3      A.   Yes.

 4      Q.   And that carpet was taken out?

 5      A.   Yes.

 6      Q.   Were any hardwood floors or vinyl flooring

 7  removed from the home?

 8      A.   No.

 9      Q.   So was there hardwood flooring in the home?

10      A.   No.

11      Q.   Was there tile flooring in the home?

12      A.   Yes.

13      Q.   And was the tile flooring replaced or

14  removed?

15      A.   No.

16      Q.   Excuse me.  Was it removed?

17      A.   No.

18      Q.   So it stayed in the home?

19      A.   Yes.

20      Q.   Were any cabinets removed from the home?

21      A.   Yes.

22      Q.   And were any countertops removed from the

23  home?

24      A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 23868-78 Filed 11/18/19 Page 962 of 1680
confidential - Subject to further confidentiality review
1440

```
 1       Q.    Other than the tile flooring, can you think

 2    of any things that were not removed from the home?

 3       A.    The rafters.  The framing for around the

 4    cabinets was not removed.

 5       Q.    And do you know why those were not removed?

 6       A.    No.

 7       Q.    Did you request that they be removed?

 8       A.    No.

 9       Q.    Do you know if any crown moldings or

10    baseboards were removed from the house?

11       A.    Yes.

12       Q.    Any bathroom fixtures?  Were they removed

13    from the home?

14       A.    Yes.

15       Q.    And was the insulation removed from the home?

16       A.    Yes.

17       Q.    Now, once the remediation was completed, were

18    you satisfied that the contractor that you hired,

19    Polkow, had followed Judge Fallon's protocol to

20    remediate the home?

21            MR. ALBANIS:  Object to the form.

22            But you can answer if you can, Ms. Gody.

23            THE WITNESS:  To the best of my knowledge,

24       the protocol was followed because we demanded it.
```

```
 1              (Defendants' Exhibit 10 was marked for

 2      identification.)

 3      BY MR. LAWSON:

 4          Q.   I have handed you a document that's been

 5      marked as Exhibit 10.

 6              Have you seen this document before?

 7          A.   Yes.

 8          Q.   What is it?

 9          A.   It is the remediation proposal from Polkow

10      Construction.

11          Q.   And what is the date on this document?

12          A.   April 5th, 2011.

13          Q.   Is this the proposal that Polkow gave to you

14      for the remediation of the house in Florida?

15          A.   Yes.

16          Q.   And to your knowledge, is this the plan that

17      they followed or the proposal that they followed when

18      they did remediate your home?

19          A.   May I take a minute to look at this?

20          Q.   Of course.

21          A.   Okay.

22          Q.   Does this look like the proposal that you

23      agreed upon with Polkow for them to remediate your

24      home?
```

Case 2:09-md-02047-EEF-MBN Document 23865-78 Filed 11/10/19 Page 964 of 1680 PageID #:
confidential - Subject to further confidentiality Review
1442

```
 1      A.    Yes.  But I have a few items that I would
 2   like to dispute on here that weren't done.
 3      Q.    Okay.  What items are those?
 4      A.    Are you going to go through all these lists
 5   demolition?  Then I can do it --
 6      Q.    I would just like to know whatever items that
 7   you see on here that you believe were not performed
 8   inside of your home.
 9      A.    They removed the appliances, and it says "to
10   place in the garage."  We discarded the appliances.
11   We didn't do that.
12      Q.    Okay.
13      A.    We did not reinstall window treatments.
14      Q.    Polkow did not reinstall window treatments?
15      A.    No, we did not.
16      Q.    Did you have to do that at a later date?
17      A.    Yes. Where it says "windows and doors covered
18   for protection," the windows were, but the doors were
19   removed during demolition.
20      A.    Okay.
21      Q.    Do you see any other items that were not
22   performed that are in this proposal?
23      A.    Under Exclusions, even though it is an
24   exclusion, it says "tile or damage due to the work
```

Case 2:09-md-02047-EEF-MBN Document 22383-78 Filed 01/10/20 Page 965 of 1680
Case 2:09-md-02047-EEF-JCW Document 22383-78 Filed 01/10/20 Page 965 of 1680 Page ID #
Confidential - Subject to Further Confidentiality Review
1443

1   required."  They did not replace damaged tile, nor

2   did they remove the tile that was against the Chinese

3   drywall, which was according to Judge Fallon's

4   protocol in, I believe, the Germano case, when I

5   reviewed that again.  That was not done, and neither

6   was the framing for the cabinets.

7       Q.   Was the tile that -- you said was near the

8   Chinese drywall removed at the later date, not by

9   Polkow, but by someone else?

10      A.   No.

11      Q.   It remained there?

12      A.   Yeah.

13      Q.   And what about the cabinet framing, did that

14  remain there as well?

15      A.   Yes.

16          (Defendants' Exhibit 11 was marked for

17  identification.)

18  BY MR. LAWSON:

19      Q.   I've handed you a document that has been

20  marked as Exhibit 11.  This appears to be another

21  version of the Chinese drywall remediation proposal

22  from Polkow that we just discussed, but there are

23  some notations on it.

24          I'll give you a second to review, but I

```
 1      wanted to ask you about this version of the proposal.

 2          A.   Okay.

 3          Q.   Looking at the first page of this document,

 4      there's a note on it that says:  Total $108,717.

 5               Do you see that?

 6          A.   Yes.

 7          Q.   Do you know who wrote that?

 8          A.   I did.

 9          Q.   Okay.  And what does that mean?

10          A.   I don't remember at this time.  I don't

11      recall.

12          Q.   Is it possible that that was the total amount

13      that Polkow was asking that you pay them for the

14      remediation at that time?

15          A.   It could have been, since he was rather fluid

16      in his presentation and . . .

17          Q.   If you turn to the fourth page of the

18      proposal, near the top, there's an item that says

19      "Total Contact and Payment Terms."  That might be the

20      typo, meaning Total Contract and Payment Terms.

21          A.   Yes.

22          Q.   Do you see that?

23          A.   Yes.

24          Q.   And the total with change orders that's
```

Case 2:09-md-02047-EEF-MBN   Document 22862-78   Filed 11/10/19   Page 967 of 1680
Case 2:09-md-02047-EEF-MBN   Document 22865-78   Filed 11/19/19   Page 186 of 388 Page ID #
Confidential - Subject to Further Confidentiality Review
1445

```
 1       listed in that paragraph is $108,717.

 2            Do you see that?

 3       A.   Yes, yes.

 4       Q.   And that is the same amount that is listed on

 5  the front?

 6       A.   Yes.

 7       Q.   So that might be the total with change orders

 8  that was proposed by Polkow?

 9       A.   Yes.

10       Q.   Do you recall how much in total that you paid

11  to Polkow for the remediation of your property?

12       A.   Some of the payments were made directly to

13  the subcontractors, not directly to him.

14       Q.   Okay.  So do you know the total amount that

15  you paid for the remediation, regardless of who you

16  paid it to?

17       A.   Yes, I do.

18       Q.   And how much is that?

19       A.   $159,700 -- approximately $159,000.

20       Q.   Okay.  I'd like to turn your attention back

21  to Exhibit 7 that we looked at a little bit earlier.

22  And I apologize to make you go through that stack.

23       A.   That's okay.

24       Q.   It's the Supplemental Plaintiff Profile Form,
```

1   the fourth amended version that we were looking at a

2   little bit earlier this afternoon.

3        And it should be the fourth page that I want

4   to refer you to under Section 5, "Already Remediated

5   Property."

6        And if you look down near the bottom of that

7   page on Page 4, there is an item that says:  If the

8   property has been partially or completely remediated,

9   what was the total cost to date for the remediation

10  of the property.

11       Do you see that question?

12  A.   Yes.

13  Q.   And the amount that is listed is $159,517.

14       Do you see that?

15  A.   Yes.

16  Q.   So that is about what you said, $159,000.

17  That is the total amount that -- the remediation

18  costs that you had to pay; is that right?

19  A.   Yes.

20  Q.   And that's supported by the documentation

21  that you have presented and given to your attorney

22  and he has produced to us; is that right?

23  A.   Correct.

24  Q.   I'd like to turn back to this annotated

```
1    version of the Polkow proposal, which is Exhibit 11.

2         A.    Eleven.

3         Q.    And if you can go past the proposal, there's

4    a page that's titled "Specifications for Remediation,

5    Tony and Candace Gody."  It should be the seventh

6    page.

7               Have you seen this document before?

8         A.    Yes.

9         Q.    What is it?

10        A.    It's specifications for remediation.  I

11   prepared this document.

12        Q.    So you created a list of specifications that

13   you wanted Polkow and its subcontractors to follow in

14   remediating your home; is that right?

15        A.    Based upon Judge Fallon's protocol, yes.

16        Q.    So you read Judge Fallon's protocol and

17   created this list based on that; is that right?

18        A.    Correct.

19        Q.    And you -- I think you said earlier you

20   demanded that Polkow and the subcontractors followed

21   Judge Fallon's protocol; is that right?

22        A.    Correct.

23        Q.    So you demanded they follow those items that

24   you listed here in the specifications for remediation
```

```
1    document, correct?

2        A.    Correct.

3        Q.    And to your knowledge, did they follow the

4    specifications that you listed in this document?

5        A.    To the best of my knowledge, yes.

6        Q.    Okay.  I would like to turn your attention to

7    the punch list from May 19, 2012, that is contained

8    within Exhibit 11.

9              Please let me know when you see that

10   document.

11             All right.  What is this document?

12       A.    Once the remediation had started, or putting

13   back the house, we did walk-throughs almost every

14   single day, and these were things that we brought to

15   the contractor's attention.

16       Q.    So these are items that had not been done yet

17   that you --

18       A.    Exactly.

19       Q.    -- wanted to get done?

20       A.    Exactly.  Yes.

21       Q.    In looking through this punch list from

22   May 2012, it looks like there's checkmarks or marks

23   next to the items and items circled.

24             Do you see that?
```

Case 2:09-md-02047-EEF-MBN Document 23836-78 Filed 11/10/19 Page 971 of 1680
Confidential - Subject to further confidentiality Review
1449

```
 1       A.   Yes.

 2       Q.   Okay.  What do those circles or checkmarks

 3   indicate to you looking through this list?

 4       A.   The checkmarks for what was done, maybe

 5   through the first or second -- by the time we did the

 6   first or second walk-through.

 7            The circles are the ones that still needed to

 8   be done.  That's what it was.

 9       Q.   To your knowledge, were all of the items

10   completed by the time that Polkow and subcontractors

11   were done working on your home?

12       A.   Yes.

13       Q.   And I imagine you made sure that they were

14   all done; is that right?

15       A.   Yes.

16       Q.   Going to the next page, there appears to be

17   an image -- illustrated image of a kitchen.  Can you

18   tell me a little bit more about this exhibit, if you

19   know what it is?

20       A.   Yes.

21       Q.   And what is it?

22       A.   This was a drawing that a very good friend of

23   ours did for us who was in the kitchen cabinet

24   business in Naples.  And he came up and he took all
```

```
 1    the measurements even though he wasn't going to do it

 2    because we were using the other contractor.  He did

 3    this for us.

 4          And this is what I presented to the cabinet

 5    people to say this is how I want my kitchen to look.

 6    Q.   Was the attempt to make it look like it had

 7    looked before the home had to be -- you know, all the

 8    cabinets had to be taken out of the home and the

 9    drywall had to be taken out of the home?

10    A.   No.  I wanted it to look different because I

11    didn't want a reminder of what it looked like before.

12    Q.   Okay.  Would you say this was an upgrade on

13    what you had had previously or about similar to

14    finishings to your kitchen before the remediation?

15    A.   Similar.

16    Q.   Was there any part of it that you thought was

17    upgraded or nicer than what you had had before?

18    A.   Yes.

19    Q.   What was that?

20    A.   The middle island.

21    Q.   And what was upgraded about that?

22    A.   It was cut down to be cabinet height.

23    Q.   And previously the island that you had was

24    not cut down to the size?
```

Case 2:09-md-02047-EEF-MBN Document 23826-78 Filed 11/10/19 Page 973 of 1680
Case 2:09-md-02047-EEF-MBN Document 21841-5 Filed 11/19/18 Page 114 of 168 PageID #:
1451

```
 1        A.    No.  It was raised.

 2        Q.    Was there anything else that was upgraded or

 3    better in your view about the new kitchen?

 4        A.    The appliances.

 5        Q.    How were the appliances upgraded or improved?

 6        A.    Since I had gone through two different

 7    Whirlpool and GE and they both failed, I researched

 8    to find out what were better appliances, and so

 9    that's what I went with.

10        Q.    Do you know what brands you ended up buying

11    for those appliances?

12        A.    Thermador.

13        Q.    So you bought Thermador for the refrigerator?

14        A.    Yes.

15        Q.    And for the stove?

16        A.    Yes.

17        Q.    And the dishwasher?

18        A.    Yes.

19        Q.    And were there any other appliances that were

20    Thermador?

21        A.    The hood.

22        Q.    The hood over the oven?

23        A.    Yes.

24              And the microwave.
```

Case 2:09-md-02047-EEF-MBN Document 23368-78 Filed 11/10/19 Page 974 of 1680

Case 2:09-md-02047-EEF-MBN Document 23368-78 Filed 11/10/19 Page 114 of 168 PageID #
Confidential - Subject to Further Confidentiality Review
1452

```
1       Q.    Excuse me?

2       A.    It is a microwave oven warming drawer.  It's

3    called an appliances tower.

4       Q.    And that's a Thermador brand?

5       A.    Yes.

6       Q.    Turning to the following pages, are these

7    also illustrations that your friend put together to

8    be able to show the cabinetry that you wanted for the

9    kitchen?

10      A.    Yes.

11      Q.    And were they able to meet the specifications

12   of these illustrations when they put your kitchen

13   together?

14      A.    Somewhat.

15      Q.    Was there any way where it didn't meet the

16   specifications or didn't look like the way you had

17   hoped?

18      A.    The quality of the cabinets.

19      Q.    What was wrong with the quality of the

20   cabinets?

21      A.    I'm not pleased with the finish.  I have had

22   them come back to touch up some finishings on them.

23      Q.    Since they touched it up, are you satisfied

24   with it?
```

1    A.    Yes.

2    Q.    Looking to the third to last page of this

3    exhibit, there's an invoice from M & G Best Service.

4    A.    Yes.

5    Q.    Do you see that?

6    A.    Yes.

7    Q.    This appears to be an invoice for the kitchen

8    vanity and laundry room cabinets, it appears; is that

9    right?

10   A.    That's correct.

11   Q.    And it looks like the total amount that is

12   charged on the invoice is $7,450; is that correct?

13   A.    No.  This is not correct.

14   Q.    There's a total amount at the top that says

15   $17,000 for the project.

16   A.    Correct.

17   Q.    But then at the bottom of the invoice it says

18   a total of $7,450.

19         Do you see that?

20   A.    Yes.

21   Q.    Is that because part of it was paid

22   previously, and this was a different amount that was

23   still left over?

24   A.    Because we paid the subcontractor directly.

```
1       Q.    Okay.  So you paid the total $17,000 for the

2    kitchen as well as the other items on this list in

3    total, but you paid the subcontractor a lesser amount

4    of that --

5       A.    Yes.

6       Q.    -- directly?

7       A.    Yes.

8       Q.    I'd like to turn your attention to the last

9    page of this document.

10           This appears to be an invoice from Gulf Stone

11   Construction?

12      A.    Yes.

13      Q.    There's an item at the top for demo and

14   install new master bathroom porcelain tile floor.

15           Do you see that?

16      A.    Yes.

17      Q.    Did the tile floor in the master bathroom get

18   replaced?

19      A.    Yes.

20      Q.    Okay.  So previously we talked about how the

21   tile floors remained in the house, but it sounds like

22   at least in the master bathroom, they were removed.

23           Is that correct?

24      A.    Yes.
```

```
 1        Q.   Do you know why the master bathroom tile

 2   floor were removed from the house and replaced?

 3        A.   Yes.

 4        Q.   Why was that?

 5        A.   Because there had been a very large soaker

 6   tub in the corner, and when that was taken out, there

 7   was no tile and you could not match the existing

 8   tile.

 9        Q.   So that tile needed to be replaced or added

10   in that room?

11        A.   It was all replaced.

12        Q.   What other items were replaced or removed in

13   the master bathroom to your knowledge?

14        A.   The tub.  That's not on here.  It's a

15   separate invoice.  But the tub, the cabinets, the

16   shower door, of course the tile in the -- within the

17   shower, the light fixtures, the plumbing fixtures,

18   all of that was replaced.  But this is just

19   installing new tile and tiling the shower.

20        Q.   Are you happy with your master bathroom now?

21        A.   Yes.

22             May I go back?

23        Q.   Of course.

24        A.   It's for -- this is for the master bathroom
```

Case 2:09-md-02047-EEF-MBN Document 23365-78 Filed 01/10/19 Page 978 of 1680
confidential – Subject to further confidentiality Review
1456

1    and the guest bathroom.  It's both.

2        Q.   And were similar things done to the guest

3    bathroom as far as the items that were removed and

4    replaced?

5        A.   Yes.

6        Q.   And did the tile floor in the guest bathroom

7    also have been to remove or was that only because of

8    the clawfoot tub or the soaking tub that was in the

9    other bathroom?

10       A.   The soaking tub was in the master bathroom,

11   and the tile was not replaced in the guest bathroom

12   because we removed a tub in there and put in just a

13   walk-in shower.

14            MR. LAWSON:  We can go off the record.

15            (Recess from 3:28 until 3:46 p.m.)

16   BY MR. LAWSON:

17       Q.   Welcome back, Mrs. Gody.

18            I wanted to turn your attention back to

19   Exhibit 8, which is alternative living expenses that

20   we were discussing earlier.

21            About 14 pages near the back of it, there's a

22   list of upgrades for the home in Elizabeth,

23   Pennsylvania, that I wanted to discuss with you.

24            And I'll give you a moment to find it.  And I

Case 2:09-md-02047-EEF-MBN Document 23863-78 Filed 11/18/19 Page 979 of 1680
Case 2:09-md-02047-EEF-JCW Document 13 Filed 01/18/19 Page 120 of 168 PageID #:
1457
Confidential - Subject to further confidentiality review

1      apologize for the lack of numbering in there.

2            The page I'm referring to looks like this.

3            It should be behind the travel expenses, so I

4      think it's further back.  Yes, it should be after the

5      travel expenses.

6      A.   A lot of receipts.

7      Q.   Yes.  I see that.

8            You're very close.

9      A.   Okay.

10     Q.   There we are.

11           Can you tell me what this document is?

12     A.   It's a list of all the upgrades for

13     178 Grouse Drive, Elizabeth, Pennsylvania.

14     Q.   Are these items, the upgrades for that home

15     in Pennsylvania, part of the ALE, or alternative

16     living expenses, that you are seeking in this

17     litigation?  The $68,000 approximately that you are

18     seeking in this litigation?

19     A.   No.

20     Q.   Turning to the next page after that list,

21     there's what I believe might be mortgage payments for

22     the home in Pennsylvania; is that correct?

23     A.   Correct.

24     Q.   And if you go across the next six or so

```
 1    pages, there are additional statements showing

 2    mortgage payments from 2010, 2011, and 2012; is that

 3    right?

 4         A.   Correct.

 5         Q.   And are those meant to show the mortgage

 6    payments that you paid during the time you lived in

 7    the home in Pennsylvania from 2011 to 2012?

 8         A.   Yes.

 9         Q.   And your mortgage was around $1,270, it looks

10    like, at least --

11         A.   And $0.23.

12         Q.   -- in 2010 --

13              And $0.23, excuse me.

14              Is that right?

15         A.   Yes.

16         Q.   And was that consistent across the time that

17    you lived there from 2010 to 2012 that the amount

18    was 1,270.23?

19         A.   Yes.

20         Q.   If you turn to the next page following the

21    statements of these mortgage payments, there's a

22    Wells Fargo bank report.  It looks like it's taken

23    from the website -- from Wells Fargo's website.

24              Can you tell me what this document is?
```

```
 1      A.   This is the bank statements from Wells Fargo

 2   showing the mortgages, the utilities for the time

 3   period for the 26 months that we were at the home in

 4   Pennsylvania.

 5      Q.   And if you look at the first page, the title

 6   of the report appears to be PA or Pennsylvania House

 7   Payments --

 8      A.   Yes.

 9      Q.   -- August 1st, 2010, through July 1st, 2013.

10           Did I read that correctly?

11      A.   Yes.

12      Q.   And at the top of that first page, you see

13   first one is Cannonsburg, Gene.

14           Do you see that item?

15      A.   Yes.

16      Q.   Is that Gene Cannonsburg?  Is that what that

17   is?

18      A.   No.

19      Q.   Okay.  What is that?

20      A.   That happens to be a -- it's Cannonsburg

21   Cabinetry, but I -- I can't tell you exactly what

22   that is.

23      Q.   Would that item be part of the your ALE

24   damages?
```

```
1        A.   No, no.

2        Q.   Going down, there appear to be a series of

3   items for Comcast.

4        A.   Yes.

5        Q.   Can you tell me what those items are?

6        A.   Those items are for telephone and Internet

7   services.

8        Q.   Did you continue to pay for telephone and

9   Internet services at your home here in Florida at the

10  time you had moved out of the home?

11       A.   Yes.

12       Q.   And why did you do that?

13       A.   Up until the time it was remediated.

14       Q.   Right.

15            So you had moved out of the home, and you

16  continued to pay for phone and Internet services

17  until the time it was remediated?  Is that right?

18       A.   I don't recall that.

19       Q.   Okay.  But you did pay for those services in

20  Pennsylvania during that time where you lived in

21  Pennsylvania, correct?

22       A.   Yes.  And you can see they are all

23  documented.  It says:  PA house.

24       Q.   You don't recall whether you paid for those
```

```
 1    same services, Internet and phone, in Florida during

 2    the time you didn't live in the home?

 3         A.   Yes.  I had to pay for the cable because it's

 4    part of the HOA, and we had to continue to pay that

 5    the entire time we were out of the house.

 6         Q.   Okay.  So the cable was part of the

 7    homeowner's association agreement?

 8         A.   Yes, yes.

 9         Q.   And is that the same for the phone service as

10    well?

11         A.   No.

12         Q.   Okay.  So the phone service was not required?

13         A.   No.

14         Q.   But do you know if you did pay that during

15    that time in Florida?

16         A.   No, we -- we had no phone service in Florida.

17         Q.   Understood.

18              Next there is a series of items for custom

19    turf.

20              Do you see those?

21         A.   Yes.

22         Q.   Are those payments for landscaping services

23    in Pennsylvania?

24         A.   Yes.
```

1    Q.    Was that monthly service?

2    A.    Yes.

3    Q.    Did you continue to have landscaping services

4    paid for in Florida during the time that you were

5    moved out of the home?

6    A.    Yes, through our HOA.

7    Q.    The ERNS cutting edge items that are below

8    the custom turf item of the second page of this Wells

9    Fargo invoice, do you see those?

10   A.    Yes.

11   Q.    What are those?

12   A.    Those are for grass cutting while we were in

13   Pennsylvania.

14   Q.    Okay.  So like the custom turf ones above?

15   Or is that different,  the grass-cutting versus

16   landscaping?

17   A.    They were two different companies that

18   provided two different services.

19   Q.    All right.  And at different times?

20   A.    At different times, yes.

21   Q.    Understood.

22         Moving down to the next items, it says

23   Guardian Home.  Is that related to the security

24   system in the home?

```
 1         A.    Yes.

 2         Q.    Are those amounts paid for through the

 3    monitoring service?

 4         A.    Yes.

 5         Q.    There's additional items on the third page of

 6    the Wells Fargo statement for Nature Scape.

 7               Do you see those?

 8         A.    Yes.

 9         Q.    And what are those?

10         A.    Landscaping.

11         Q.    So the landscaping costs and the

12    grass-cutting costs are all part of your ALE damages

13    that you are seeking in this lawsuit?

14         A.    No.

15         Q.    Okay.  Are you seeking the Comcast items that

16    we discussed earlier in this lawsuit as alternative

17    living expenses?

18         A.    Yes.

19         Q.    And for the trash bills and house electrical

20    bills that were paid on Page 4 of this Wells Fargo

21    statement, are you seeking those items?

22         A.    Yes.

23         Q.    I would imagine that you continued to pay for

24    some electrical bills in Florida while you were moved
```

```
 1    out of the house; is that right?

 2         A.   Yes.

 3         Q.   Did those bills reduce during the time that

 4    you were moved out of the home in Florida?

 5         A.   Yes.

 6         Q.   Do you remember about how much it was a month

 7    to pay for the electricity in Florida while you were

 8    moved out of the home?

 9         A.   When we moved out in 2010, it was just

10    like -- the house was just like we were coming back

11    the next day.  So we had the air-conditioning on,

12    pool pump running, and those electric bills were

13    paid.

14              And then when we had the house remediated or

15    everything taken out of the house, the electric bill

16    dropped because the only thing we had to pay for was

17    the electric on for the pool pump.  That was the only

18    thing that was on.

19         Q.   You kept the pool pump running during that

20    time?

21         A.   Yes.

22         Q.   For the 26 months that you were gone?

23         A.   Yes.

24         Q.   Did you ever consider draining the pool
```

Case 2:09-md-02047-EEF-MBN Document 23862-78 Filed 11/19/19 Page 987 of 1680
Case 2:09-md-02047-EEF-MBN Document 13866-1 Filed 01/19/12 Page 188 of 340 #
Confidential - Subject to Further Confidentiality Review
1465

```
 1    during that time?

 2        A.    No.  It could have collapsed.

 3        Q.    When you look down to the fifth page,

 4    beginning -- at the end of the fourth page, into the

 5    fifth page, on the Wells Fargo statement, there's a

 6    series of items that say Pennsylvania House Sewage.

 7        A.    Yes.

 8        Q.    Are you seeking those items in your

 9    alternative living expenses damages in this lawsuit?

10        A.    Yes.

11        Q.    And are those for the sewage bills that you

12    received from the City or County in Pennsylvania

13    where you lived?

14        A.    Yes.

15        Q.    Going down further, there's items listed as

16    Pennsylvania House Water.

17              Do you see those items on Page 5?

18        A.    Yes.

19        Q.    Are those items ones that you are seeking

20    damages for the alternative living expenses in this

21    lawsuit?

22        A.    Yes.

23        Q.    And if you look down to the final items on

24    the page, there's a series of gas bills, it appears,
```

Case 2:09-md-02047-EEF-MBN Document 23365-78 Filed 01/19/19 Page 988 of 1680
Case 2:09-md-02047-EEF-MBN Document 23365-78 Filed 01/19/19 Page 988 of 1680
Confidential - Subject to Further Confidentiality Review
1466

1   that were paid?

2        A.   Yes.

3        Q.   Are you seeking those items in this lawsuit?

4        A.   Yes.

5        Q.   Did you continue to pay for water and gas

6   bills in Florida during the time that you were moved

7   up to Pennsylvania?

8        A.   Yes.  It was only water.

9        Q.   You only --

10       A.   We didn't have gas.

11       Q.   You only paid for water?

12       A.   We didn't have gas.

13       Q.   Did your water bills reduce during the time

14   you were -- was it the same because you were

15   continuing to use the pool?

16       A.   They reduced.  However, we had a significant

17   water bill for when they did the remediation and

18   power washed the interior of the house.

19       Q.   Do you remember how significant it was?

20       A.   A lot more than what we had normally paid.

21       Q.   Hundreds of dollars?

22       A.   Yes.

23       Q.   Was it thousands of dollars?

24       A.   No.

Case 2:09-md-02047-EEF-MBN Document 23866-78 Filed 11/10/19 Page 989 of 1680
Case 2:09-md-02047-MBN Document 23863-78 Filed 01/18/19 Page 130 of 188 PageID #
1467
confidential - Subject to Further Confidentiality Review

 1        Q.    Okay.  You can set that aside.

 2              (Defendants' Exhibit 12 was marked for

 3        identification.)

 4    BY MR. LAWSON:

 5        Q.    I've handed you a document that's been marked

 6    as Exhibit 12.

 7              When you have had a chance to review it, can

 8    you let me know what this document is?

 9        A.    The first five pages are copies of checks

10    paid to Polkow Construction that I received from

11    Wells Fargo.  However, there are two that are not

12    there because of the date they did -- weren't able to

13    capture them.

14        Q.    Because the date was too far in the past?

15        A.    Too far in the past, yes.

16        Q.    Would those have been maybe sometime in 2011?

17        A.    Yes.

18              The rest of the documents are actually

19    statements -- bank statements that I went through and

20    highlighted all of my mortgage payments for the home

21    in Florida while we were out of the house -- our

22    HOAs, our insurance that we still continued to pay on

23    the house, Comcast, as I mentioned that we had to

24    continue to pay, the electric, pool service for

Case 2:09-md-02047-EEF-MBN Document 23868-78 Filed 11/18/19 Page 990 of 1680
Confidential - Subject to further Confidentiality Review
1468

```
1    26 months, the HOA was for our local Tiberio.  We

2    paid Town Center dues, and we paid master HOA dues,

3    and we also had to pay club dues while we were gone.

4    And they are all highlighted in this document.

5        Q.   Are those the only types of expenses that are

6    highlighted in these Wells Fargo statements that I

7    just handed you?

8        A.   To the best of my knowledge, yes.

9        Q.   And are those all expenses that you paid

10   before you moved out of the home but continued to pay

11   afterward?

12       A.   Yes.

13       Q.   So all of them were something that you paid

14   from 2007 through 2010 when you actually lived in the

15   home in Florida; is that right?

16       A.   Yes.

17       Q.   And you paid those expenses or similar ones

18   when you moved back in in 2012, correct?

19       A.   Yes.  These documents only reflect the time

20   from when we left until we returned.

21       Q.   And are you seeking these highlighted

22   expenses in your alternative living expense damages

23   that you are seeking in this lawsuit?

24       A.   No.
```

```
 1        Q.    To your knowledge, are you seeking these

 2   expenses in any form of damages in this lawsuit?

 3              And I'm referring specifically to the Wells

 4   Fargo statement when I ask that, not the checks at

 5   the beginning.

 6        A.    Yeah.

 7              THE WITNESS:  Can we take a break?  Can I

 8        have a break?

 9              MR. LAWSON:  That's fine.

10              (Recess from 4:02 until 4:06 p.m.)

11   BY MR. LAWSON:

12        Q.    Ms. Gody, have you had the opportunity to be

13   able to go through this Wells Fargo report to be able

14   to determine if there are any items in here that you

15   are seeking in your damages in this lawsuit?

16        A.    Yes.  I continued --

17              MR. ALBANIS:  I was just going to object to

18        the form of the question.

19              But you may answer if you can.

20              THE WITNESS:  Okay.

21              I continued to pay the mortgage on the house

22        in Florida while I was also paying a mortgage for

23        my alternative living expense.  And that's what's

24        highlighted here, the expenses that I had to
```

Case 2:09-md-02047-EEF-MBN Document 23368-78 Filed 11/10/19 Page 992 of 1680
Confidential - Subject to further Confidentiality Review
1470

```
 1          carry on the house in Florida even though it was

 2          unlivable.

 3              And then it was totally remediated -- or, I

 4          mean, empty for all that time -- but I still paid

 5          all the same expenses.

 6     BY MR. LAWSON:

 7          Q.   So like we discussed earlier, you are

 8     seeking, for alternative living expenses, your

 9     mortgage payments for the home in Pennsylvania?

10          A.   Yes.

11          Q.   Correct?

12          A.   Yes.

13          Q.   Is it correct that you are not seeking your

14     mortgage payments for your home in Florida which you

15     would have been paying anyway if your home did not

16     have an issue with Chinese drywall?

17          A.   Yes.

18          Q.   And those issues for Florida are reflected in

19     the highlighted items in the Wells Fargo report in

20     this exhibit; is that right?

21          A.   Yes.

22          Q.   But there are the checks at the front of it

23     that relate to payments to Polkow or subcontractors,

24     it appears, related to your remediation of your home
```

```
 1    in Florida?

 2        A.    Yes.

 3        Q.    And you are seeking damages for those

 4    expenses for the remediation; is that right?

 5        A.    Yes.

 6              MR. ALBANIS:  Object in light of

 7        Judge Cooke's November 16, 2018, order and the

 8        plaintiffs' position that that will be handled on

 9        the remediation track.

10              But you may answer, Ms. Gody, if you can.

11              THE WITNESS:  Could you repeat the question?

12    BY MR. LAWSON:

13        Q.    Yeah.

14              Ms. Gody, are you seeking damages for the

15    payments that you made to Polkow and other

16    subcontractors for the remediation of your home in

17    this lawsuit?

18        A.    Yes.

19              MR. ALBANIS:  Same objection.

20              (Defendants' Exhibit 13 was marked for

21    identification.)

22    BY MR. LAWSON:

23        Q.    I have handed you a document that has been

24    marked as Exhibit 13.
```

```
 1              When you have had a chance to review it, can

 2    you let me know what this document is, if you've seen

 3    it before?

 4        A.   Okay.

 5        Q.   I would like to turn your attention to the

 6    first page of this exhibit.  It's a letter of

 7    completion from the City of Fort Myers.

 8              Do you see the one that I'm referring to?

 9        A.   Yes.

10        Q.   And it's dated August 10, 2012; is that

11    correct?

12        A.   Yes.

13        Q.   And it relates to a job address of

14    10842 Tiberio Drive, which is your residence; is that

15    right?

16        A.   Yes.

17        Q.   What is this document?

18        A.   I believe this is closing out the permit that

19    Polkow Construction filed for.

20        Q.   This was notifying you that the City of Fort

21    Myers had found that your remediation had been

22    completed, per the plans and specifications that you

23    had requested; is that right?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 23365-78 Filed 11/10/19 Page 995 of 1680
Case 2:09-md-02047-EEF-MBN Document 23365-78 Filed 11/10/19 Page 135 of 188 PageID #:
1473

```
1        Q.    In fact, it says in the letter:  This letter

2   serves as an official notice that all interim

3   inspections and a final inspection were conducted on

4   the property referenced above.

5            These inspections confirm that work performed

6   by the above-named contractor was accomplished in

7   accordance with plans and specifications on file in

8   this office.

9            Did I read that correctly?

10       A.    Yes.

11       Q.    And that was how you also felt about the

12  remediation, that it was done to the plans and

13  specifications that you had requested; is that right?

14       A.    Yes.

15            MR. ALBANIS:  Object to the form.

16            But you may answer, Ms. Gody, if you can.

17  BY MR. LAWSON:

18       Q.    Was that a yes to my question?

19       A.    Would you please repeat the question.

20       Q.    Sure.

21            You also felt that the remediation was

22  completed to the plans and specifications that you

23  had requested at the beginning of the project; isn't

24  that right?
```

```
 1          MR. ALBANIS:  Same objection.

 2          THE WITNESS:  No.

 3    BY MR. LAWSON:

 4      Q.   And why is that?

 5      A.   Because the contractor didn't complete some

 6    of the things, like replacing the damaged tile, the

 7    tile to the wall, or the framing for the cabinet.

 8      Q.   Did you ever attempt to have those items

 9    completed?

10      A.   With the contractor?

11      Q.   Yes.

12      A.   Yes.

13      Q.   And what happened when you requested that?

14      A.   It wasn't necessary was the answer.

15      Q.   They said it was not necessary?

16      A.   Yes, yes.

17      Q.   Did they tell you that it wasn't necessary

18    under Judge Fallon's protocol?

19      A.   No -- wait.  Let me just say to the best of

20    my recollection, when I asked that question, he said

21    it's not necessary.

22      Q.   Did you ever attempt to have anyone other

23    than Polkow or its subcontractors complete these

24    items, the removing of the tile floor or the cabinet
```

```
 1    framing?

 2         A.    Just the tile floor in the bathroom.

 3         Q.    You had the tile floor in the bathroom

 4    removed?

 5         A.    Yes.

 6         Q.    But the other tile floor you did not pay

 7    anyone or ask anyone else to remove that?

 8         A.    No, I did not.

 9         Q.    Why not?

10         A.    I don't recall.

11         Q.    Did you ever get a quote for those items to

12    be completed?

13         A.    No.

14         Q.    Were you satisfied with the state of your

15    home when you moved back into it?

16         A.    Yes.

17         Q.    And you'd agree that the City of Fort Myers

18    did send you a letter of completion for the

19    remediation project around August of 2012 that we're

20    looking at here, correct?

21         A.    Yes.

22         Q.    Turning to the next page, do you recognize

23    this document, this owner disclosure affidavit?

24              MR. ALBANIS:  I'll object to the form.
```

```
1              But you may answer, Ms. Gody, if you can.

2              It appears that the owner disclosure is a

3       seven-page document.

4              MR. LAWSON:  That's correct.

5   BY MR. LAWSON:

6       Q.   Going pages 1 through 7 of this document, do

7   you recognize it?

8       A.   Yes.

9       Q.   And to your knowledge, what is it?

10      A.   It's an affidavit provided by Polkow

11  Construction that shows what they had replaced.

12      Q.   If you look to the second page of this

13  document, in the middle of it, there's an item titled

14  "Bathroom Flooring."

15             Do you see that?

16      A.   Yes.

17      Q.   And circled there is the word "replaced."

18             Is that right?

19      A.   Yes.

20      Q.   So Polkow noted that the bathroom flooring

21  was replaced in the home?

22      A.   Yes.

23      Q.   And if you look back to the first page, it

24  also has a line at the bottom titled, "Kitchen
```

```
 1    Cabinets," and it notes that those were replaced as

 2    well, correct?

 3         A.   Correct.

 4         Q.   And there's also a space for a homeowner's

 5    signature on the seventh page of this document,

 6    correct?

 7         A.   Yes.

 8         Q.   And your signature is on that page; is that

 9    right?

10         A.   Yes.

11         Q.   And it looks like it's dated August 20th,

12    2012, correct?

13         A.   Correct.

14         Q.   And you were verifying with your signature

15    that the information in this affidavit was true and

16    correct to the best of your knowledge; is that right?

17         A.   Yes.

18         Q.   The next item appears to be a letter from you

19    to the City of Fort Myers related to a water bill

20    over $200.

21         A.   Yes.

22         Q.   Was that the same water bill that we

23    discussed earlier?

24         A.   Yes.
```

```
 1        Q.    And did you receive an adjustment for that

 2   high water bill?

 3        A.    Yes.

 4        Q.    Going to the next page, the City of Fort

 5   Myers utilities department letter to you.

 6              Is this related to that high water bill?

 7        A.    Yes.

 8        Q.    Looking to the Wells Fargo advisors document

 9   that is on the next page, can you explain what this

10   is?

11        A.    This is the account that we used to remediate

12   the house.  It was my husband's entire IRA money.

13              And I know you have all heard the expression

14   the gift that keeps on giving.  Well, this toxic

15   Chinese drywall situation has.  We had to use my

16   husband's IRA money to repair the house, and when we

17   did that, there's consequences by using IRA money.

18   It's taxed at a higher rate.

19              So I in turn, had to hire a special CPA at a

20   cost of $950 who was familiar with safe harbor

21   exemptions to prepare my taxes that year, because of

22   the year that we remediated the house and paid out

23   the $159,000 and it showed that we had additional

24   income because of this, my Medicare premiums went up
```

```
 1    for two years.
 2            So, as I said, it just keeps on giving.
 3            There were consequences to all of this.
 4       Q.   To your knowledge, are you seeking the
 5    increases of your Medicare premiums in your damages
 6    in this lawsuit?
 7       A.   No.
 8       Q.   Are you seeking the amount -- the $950 that
 9    you had to pay with a CPA to assist with your taxes
10    in this lawsuit?
11       A.   Yes.
12       Q.   Are you seeking any monies from -- related to
13    other fees or expenses related to removing money from
14    your husband's IRA to be able to pay for the
15    remediation?
16            MR. ALBANIS:  Object to the form.
17            But you may answer.
18            THE WITNESS:  I don't recall.
19    BY MR. LAWSON:
20       Q.   How much money did your husband have to
21    remove from his IRA to pay for the remediation?
22       A.   I don't recall the total figure.  It's -- we
23    can add it up, because these are the distributions
24    that were made.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1002 of 1680
Confidential - Subject to further confidentiality Review
1480

```
 1        Q.    Do you recall if you used any other money,

 2   perhaps from a savings account or a checking account,

 3   to be able to pay for the remediation of your home?

 4           MR. ALBANIS:  Object to the form.

 5           But you may answer.

 6           THE WITNESS:  We also used money from a line

 7      of credit.

 8   BY MR. LAWSON:

 9        Q.    How much money did you receive in that line

10   of credit?

11        A.    I don't recall at this time.

12        Q.    Have you submitted any statements related to

13   your payments from that line of credit?

14        A.    No.

15        Q.    Has the debt related to the payments from

16   that line of credit been repaid at this time?

17        A.    Yes.

18        Q.    Was it more than $10,000?

19        A.    Yes.

20        Q.    Was it more than $20,000?

21        A.    That, I don't recall.

22        Q.    Do you know if you would be able to find the

23   invoices or statements related to payments from that

24   line of credit if you looked today?
```

```
1       A.   No.  It was closed out.

2       Q.   Do you know when it was closed out?

3       A.   I don't recall right now.

4       Q.   Was it through Wells Fargo?

5       A.   Yes.

6       Q.   I'd like to turn your attention to the

7   residential central air-conditioning rebates

8   certificate that is after the IRA statements that we

9   just discussed.

10           Do you see that document?

11      A.   Yes.

12      Q.   What is this?

13      A.   This is from Certified Heating and Cooling

14  that they presented showing what the Florida Power

15  rebate amount was, and they used that to reduce the

16  cost of the new air-conditioning system that was put

17  in the house.

18      Q.   So this was for the new air-conditioning

19  system?

20      A.   Yes, yes.

21      Q.   And it says there's an installation date of

22  September 4th, 2012.

23      A.   Yes.

24      Q.   And you paid for this?
```

```
1       A.   This is the date that they presented this to

2    me.  The air-conditioning was installed before

3    September 20th.

4       Q.   But you ultimately paid for the new

5    air-conditioning unit in your home?

6       A.   Yes, yes.

7       Q.   In the pages that follow, there are

8    additional invoices from Certified Heating and

9    Cooling that state "paid" on them.  Are these related

10   to the HVAC system or the air-conditioning unit that

11   was put in the home in Florida after you remediated

12   the home?

13      A.   Yes.

14      Q.   Do you know ultimately how much in taxes that

15   you had to pay on IRA distributions that you

16   conducted to be able to get the money to pay for the

17   remediation?

18      A.   Because we used IRA money and if we would

19   have just done a regular tax return, our penalties

20   would have been $17,000 in additional taxes, and that

21   is why I hired a special CPA to -- who was familiar

22   with the safe harbor exemption which the IRA gave us

23   for two years, which was to deduct 10 percent and

24   then we could expense -- or we could charge off
```

```
1    75 percent of what the repairs were.  That reduced

2    our bill by 75 percent.

3         Q.   Okay.  Do you know ultimately how much after

4    that reduction of 75 percent the increase in your

5    taxes was during that year, to your knowledge?

6         A.   I have it, but to my knowledge, I don't know.

7         Q.   Do you know if that amount is part of the

8    damages that you are seeking in this lawsuit?

9         A.   No.

10         (Defendants' Exhibit 14 was marked for

11    identification.)

12         THE WITNESS:  We're finished with this

13    document?

14         MR. LAWSON:  Yes, we're finished with that

15    document, and you can set it aside.

16    BY MR. LAWSON:

17         Q.   I have handed you --

18         A.   Excuse me.  May I make a comment before we go

19    on to the next exhibit, please --

20         Q.   Okay.

21         A.   -- that was part of this?

22         As I have previously stated about how

23    traumatic this whole situation has been, there is a

24    letter in here that was received from ABF Drywall.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1006 of 1680
confidential - Subject to further confidentiality Review
1484

1    The president came to our house and threatened my

2    husband with bodily harm because he said we had not

3    paid to have the drywall installed in the house.

4         It was a very upsetting situation, and it

5    turned out that it had been paid but Mr. Fernandez's

6    wife who did the bookkeeping did not apply it to the

7    correct house.  So we had to be subjected to somebody

8    coming into our house, using foul language, and

9    threatening my husband with bodily harm.

10        So there are many stories that go along with

11   this whole situation.

12   Q.   And that letter from Mr. Fernandez was from

13   May 16th, 2012; is that right?

14   A.   Yes.

15   Q.   And that was related to the drywall that was

16   installed -- the new drywall that was installed in

17   your house after the remediation?

18   A.   Yes.

19        MR. VERRIER:  And that letter was in

20   Exhibit 13?

21        MR. LAWSON:  In Exhibit 13, that's correct.

22        MR. VERRIER:  Thank you.

23   BY MR. LAWSON:

24   Q.   I would like to turn your attention now to

Case 2:09-md-02047-EEF-MBN Document 23863-78 Filed 11/19/19 Page 1007 of 1680
confidential – Subject to further confidentiality Review
1485

```
 1    Exhibit 14, which has just been handed to you.

 2          Looking at the first page of this document,

 3    do you recognize it?

 4        A.   Yes.

 5        Q.   What is this?

 6        A.   I prepared these payments made for

 7    remediation.

 8        Q.   Are these payments that you paid to Polkow

 9    Construction or other subcontractors for the

10    remediation?

11        A.   Yes.

12        Q.   And these payments go from June of 2011

13    through May of 2012?

14        A.   Yes.

15        Q.   Do you know if this is all the payments that

16    were made to Polkow or subcontractors related to the

17    remediation?

18        A.   To the best of my knowledge.

19        Q.   Earlier we discussed a number that was around

20    $159,000 for the cost of the remediation of your

21    property in Florida.  What is -- what makes up the

22    difference between the $99,321 and the $159,000

23    figure that you're seeking for remediation -- or that

24    you noted as the costs of remediation in the
```

Case 2:09-md-02047-EEF-MBN  Document 23363-78  Filed 03/11/19  Page 1008 of 1680
confidential -- Subject to further confidentiality Review
1486

```
 1      documents in this case?

 2          MR. ALBANIS:  Object to the form.  Obviously,

 3      Ms. Gody has a well documented file.  We have

 4      produced all nonprivileged documents that

 5      Ms. Gody has provided to my firm.  They have all

 6      been uploaded to the BrownGreer portal.  And

 7      Ms. Gody testified to what her remediation

 8      damages were, even though she is being deposed

 9      today and has been named a priority claimant in

10      the nonremediation track of this litigation.

11          I suspect that you would be hard-pressed to

12      find any individuals that would be able to

13      clearly identify what additional expenses would

14      have been paid when you have such a

15      well-documented file.

16          So I will instruct my client that she may

17      answer the question if she can.  I just don't

18      know if anybody would actually be able to answer

19      that question.

20          MR. LAWSON:  Your objection is noted.

21          However, I think the witness can answer if

22      she knows of the difference of about $60,000 that

23      we are talking about here.  I want to understand

24      if there are additional payments that aren't on
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1009 of 1680
confidential ~ Subject to further confidentiality review
1487

```
 1        here or where that additional $60,000 was paid or

 2        what it went to.

 3             THE WITNESS:  If you look at the receipts --

 4        and that is an Excel spreadsheet that I did, and

 5        it documents every single check and every single

 6        purchase that was put on to a credit card.  And

 7        that's the difference.

 8             And if you go through the receipts for

 9        appliances, lighting, faucets, sinks, blinds,

10        granite, tile, and all the renovations, you will

11        see.

12   BY MR. LAWSON:

13        Q.   Thank you.

14             The next item is a letter from January 13th,

15   2012, from you to Polkow Construction.

16             Do you see that letter?

17        A.   Yes.

18        Q.   This letter is notifying him of an enclosed

19   check -- excuse me, Kevin of an enclosed check for

20   $7,000 to be applied to the agreed-upon costs of

21   $22,615 for the second phase of completing your

22   house; is that right?

23        A.   Yes.

24        Q.   And then on the next page, there's a similar
```

```
 1     letter or note to Kevin from you and your husband

 2     from February 8th, 2012, about another enclosed check

 3     for $7,000; is that right?

 4         A.   Yes.

 5         Q.   If you turn to the next page, there's a list

 6     that says "Receipts for" -- and then there's a list

 7     of various items, including appliances, lighting,

 8     faucets, sinks, blinds, granite, tile, and master

 9     bath renovations.

10          And there's a note at the bottom that says

11     total -- never mind.  Excuse that.  That's a note on

12     mine. You can scratch that.

13          Are the -- in the images that follow in the

14     pages, are those the receipts that are listed on that

15     list on the page that we just discussed for

16     appliances, lighting, and other items?

17         A.   Yes.

18         Q.   And are these expenses that you paid directly

19     or that were paid by Polkow for those items?

20          MR. ALBANIS:  Object to the form.

21          But you may answer if you know the answer,

22     Ms. Gody.

23          THE WITNESS:  If you would like to go through

24     them, I can tell you.
```

Case 2:09-md-02047-EEF-MBN Document 23863-78 Filed 11/19/19 Page 1011 of 1680
confidential - Subject to Further confidentiality Review
1489

```
1    BY MR. LAWSON:

2        Q.   Well, let me ask you this --

3        A.   If you would look at my Excel spreadsheet,

4    you will see the majority of all of these things on

5    here are what I paid directly.

6        Q.   For any of the items that are listed for

7    these receipts -- appliances, sinks, blinds, granite,

8    tile, and master bath renovations -- can you think of

9    anything in those categories that you thought of as

10   an upgrade over what you previously had in your home

11   when you purchased it?

12       A.   I'll say one thing:  The sinks that were put

13   in were substandard considering that I had had Kohler

14   sinking before.  So that was not an upgrade.

15            I don't know what you would consider an

16   upgrade.

17       Q.   I guess my question is if you consider it an

18   upgrade.  But if there isn't --

19       A.   No.

20       Q.   -- you can tell me that as well.

21            No?

22       A.   No.

23       Q.   Are these items that are listed in these

24   invoices included in the $159,000 that you are
```

```
 1    seeking for remediation damages in this lawsuit?

 2         A.   Yes.

 3         Q.   Turning past the receipts and invoices --

 4              MR. ALBANIS:  I'm going to object to the form

 5         of that last question.  I don't believe that that

 6         is an accurate characterization of Ms. Gody's

 7         prior testimony.

 8    BY MR. LAWSON:

 9         Q.   Ms. Gody, are these receipts and invoices

10    that we are discussing a part of the $159,000 that

11    you claim to have paid for the remediation of your

12    home to have it remediated?

13         A.   Yes.

14         Q.   Turning past the receipts and invoices for

15    those items, there's a page a little bit further into

16    this that says receipts for furniture, bedding,

17    paint, action door repair, powder room mirror.

18         A.   I have that.

19         Q.   Turning to the next page, there is an invoice

20    from Comcast as well as an installation agreement on

21    the page that follows.

22              If you know, what are these documents?

23         A.   This was to reinstall Internet service in the

24    house.
```

Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 11/19/19 Page 1013 of 1680
confidential - Subject to further confidentiality Review
1491

```
1       Q.   Are these receipts for furniture items

2   bedding items that you had to replace inside of the

3   home when you left the home?

4       A.   Yes.

5       Q.   Does this also include repainting the

6   interior of the home when it says "paint"?

7       A.   Yes.

8       Q.   And if you look a little bit into the

9   receipts, there's receipts for color wheel of paint?

10      A.   Yes.

11      Q.   And are those the paint expenses that -- and

12  receipts that are referred to on that list at the

13  front?

14      A.   Yes.

15      Q.   And was that paint for the interior of the

16  house?

17      A.   Yes.

18      Q.   The exterior of the house didn't need to be

19  repainted; is that right?

20      A.   Correct.

21      Q.   Are all of these receipts items that are

22  included in the $159,000 in remediation costs that

23  you have claimed in this lawsuit?

24      A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 23863-78 Filed 11/19/19 Page 1014 of 1680
confidential - Subject to further confidentiality review
1492

1    Q.   You can set that aside when you're ready to.

2         (Defendants' Exhibit 15 was marked for

3    identification.)

4    BY MR. LAWSON:

5    Q.   I have handed you a document that has been

6    marked as Exhibit 15.

7         Do you recognize this document?

8    A.   Yes.

9    Q.   And what is it?

10   A.   It's an Excel spreadsheet that I prepared.

11   Q.   Is this the same Excel spreadsheet of

12   remediation expenses that you were referring to

13   before?

14   A.   Yes.

15   Q.   And does this spreadsheet contain all of the

16   remediation costs of the $159,000 that you have

17   listed as your remediation costs for repairing your

18   home?

19   A.   Yes.  It matches up to all these receipts.

20   Q.   Are there any items that you would want to

21   add to that or remove from it to make it more

22   accurate, or is that an accurate reflection of your

23   costs?

24   A.   That is than accurate reflection of my costs.

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1015 of 1680
Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 01/01/01 Page 1560 of 1680 Page #
1493

```
 1      Q.   When did you create this list?

 2      A.   As the remediation process was being done,

 3   because I wanted to make sure that I captured

 4   everything.

 5      Q.   To your knowledge, have you produced any

 6   invoices and/or receipts for the items listed on this

 7   spreadsheet to your attorney?

 8      A.   Yes.

 9      Q.   Are you aware of any other invoices or

10   receipts for the items listed on the spreadsheet that

11   you haven't produced?

12      A.   No.

13           (Defendants' Exhibit 16 was marked for

14   identification.)

15   BY MR. LAWSON:

16      Q.   I have handed you a document that's been

17   marked as Exhibit 16.

18           Do you recognize this document?

19      A.   Yes.

20      Q.   What is it?

21      A.   It is an invoice From Intuitive Environmental

22   Solutions by Dan Reed, who was the environmental

23   engineer that oversaw the removal of the toxic

24   Chinese drywall.
```

```
1        Q.    And what is this invoice for?

2        A.    For his services and for the preparation of

3   the evidence box.

4        Q.    It says "preservation sampling."

5              Is that the evidence box that you are

6   discussing?

7        A.    Yes.

8        Q.    To your knowledge, did someone collect

9   samples of the drywall that was removed from your

10  home?

11       A.    Yes.

12       Q.    And was that Intuitive Environmental

13  Solutions?

14       A.    Yes.

15       Q.    Do you know how many samples they collected?

16       A.    Not to my knowledge, no.

17       Q.    Do you know if the samples of drywall were of

18  different markings that were found inside of the

19  house?

20       A.    Not to my knowledge.

21       Q.    Do you know if the samples show the markings

22  that are on the drywall?

23       A.    Yes, or he wouldn't have put them in the

24  evidence box.
```

Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 11/19/19 Page 1017 of 1680
confidential - Subject to further confidentiality Review
1495

```
 1        Q.   And the samples have been transferred over to
 2   your attorney; is that right?
 3        A.   Correct.
 4        Q.   And your attorney has had possession of them?
 5        A.   Yes.
 6        Q.   Do you know if there are any samples of end
 7   tape that were on the drywall that were collected?
 8             MR. ALBANIS:  Let me just interject here.
 9             Counsel, as you know, your colleagues
10        inspected Ms. Gody's evidence box or evidence
11        bin, I should say.  I don't know how you expect
12        Ms. Gody to know what's in there.  Your
13        colleagues know what's in there.  They inspected
14        it, and they took pictures of it.
15             MR. LAWSON:  My question is a little bit
16        different than that since Ms. Gody was around and
17        had personal knowledge of the remediation.  I'm
18        just asking about her knowledge of what was
19        collected if she knows it.  I understand what you
20        now have in your possession, but I have her here
21        today so I need to understand what she knows and
22        what she doesn't know.
23             We did have the opportunity to review that
24        evidence, and we appreciate that.  And I just
```

```
 1        want to be able to understand what she knows

 2        about it as well.

 3             MR. ALBANIS:  I'm sure she would represent to

 4        you that the evidence bin has not been altered in

 5        any way since it was opened last week.

 6             MR. LAWSON:  Well, I will ask her that.  And

 7        I understand that you're feeding that position to

 8        her, but let's have her answer my questions and

 9        then we can go from there.

10             MR. ALBANIS:  That's fine.

11    BY MR. LAWSON:

12        Q.   Did you witness any of the samples of drywall

13    or samples of end tape being collected by the people

14    who conducted your remediation or Intuitive

15    Environmental Solutions?

16        A.   Yes.  I saw Dan Reed put a lot of things in a

17    pile.  I do not know which ones he selected out of

18    that pile.

19        Q.   Did you see someone taking photos of the back

20    of drywall boards when they were removed from the

21    home?

22        A.   Yes.  Dan Reed.

23        Q.   And have you ever seen a floor plan that was

24    drafted of the house showing where different drywall
```

```
 1    boards were removed from the house?

 2        A.   Yes.  It's in my environmental report from

 3    Dan Reed.

 4            (Defendants' Exhibit 17 was marked for

 5    identification.)

 6            THE WITNESS:  Before we proceed with this, I

 7        need to make a text back to my professional who

 8        is staying with my husband to let her know we are

 9        still continuing and I will be awhile longer.

10            MR. LAWSON:  Okay.

11            THE WITNESS:  Because I just --

12            MR. ALBANIS:  Any idea how much longer you

13        will be, Matt?

14            MR. LAWSON:  I don't think it will be -- it

15        will be in the next hour that I will be done,

16        probably less than that.

17            THE WITNESS:  I just need to give her an

18        idea, because --

19            MR. ALBANIS:  Take a quick break.

20            MR. LAWSON:  Let's go off the record.

21            (Recess from 4:46 until 4:53 p.m.)

22    BY MR. LAWSON:

23        Q.   Ms. Gody, you have been handed a document

24    that's been marked as Exhibit 17, which appears to be
```

Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 11/19/19 Page 1020 of 1680
confidential - Subject to further Confidentiality Review
1498

```
1    a report from Intuitive Environmental Solutions from

2    July 8, 2011.

3         Do you see that?

4    A.   Yes.

5    Q.   And this relates to the items that were

6    preserved by Mr. Reed.  I believe it was --

7    A.   Yes.

8    Q.   -- during the remediation of your home; is

9    that right?

10   A.   Yes.

11   Q.   This also contains a floor plan of your home

12   showing where different types of drywall were removed

13   from the property.

14   A.   Yes.

15   Q.   Is that right?

16        And that's on Page 5 of the report, correct?

17   A.   Yes.

18   Q.   And there are also photos that were taken

19   during the remediation of the property or the removal

20   of drywall from the property, correct?

21   A.   Yes.

22   Q.   Looking at Page 7, in the bottom left corner,

23   do you see the drywall marking that says "Drywall"?

24   A.   Yes.
```

```
1    Q.   And do you see how the "Y" in that image on

2    drywall is a little bit larger than the rest of the

3    letters, or a little bit more pronounced?

4    A.   Yes.

5    Q.   Have you ever seen that marking before, that

6    particular marking on drywall?

7    A.   No.

8         MR. ALBANIS:  I'm going to object to the

9    form.

10        But you can answer, Ms. Gody, if you can.

11   BY MR. LAWSON:

12   Q.   You have not seen that particular marking on

13   drywall before?

14   A.   No.

15   Q.   To your knowledge, did Mr. Reed follow any

16   protocols or orders that were required of him by the

17   specifications that you had laid out for the people

18   who worked on the remediation in your home?

19        MR. ALBANIS:  Object to the form.

20        But you may answer him, Ms. Gody, if you can.

21        THE WITNESS:  Mr. Reed had the experience

22        because he had done other houses in our

23        neighborhood, and he had a copy of the protocol

24        with him.
```

Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 11/19/19 Page 1022 of 1680
confidential - Subject to further confidentiality Review
1500

 1    BY MR. LAWSON:

 2        Q.   And to your knowledge, he followed that

 3    protocol; is that right?

 4        A.   Yes.  To the best of my knowledge, yes.

 5             (Defendants' Exhibit 18 was marked for

 6    identification.)

 7    BY MR. LAWSON:

 8        Q.   Ms. Gody, I have handed you a document that

 9    has been marked as Exhibit 18.  This appears to be an

10    Intuitive Environmental Solutions report from

11    August 31, 2011.

12             Do you see that?

13        A.   Yes.

14        Q.   And from what I can tell, this is a final

15    report that you received from Mr. Reed related to his

16    work at your home; is that correct?

17             MR. ALBANIS:  Object to the form.

18             But you may answer.

19             THE WITNESS:  This is not the final report I

20        received from Mr. Reed.

21    BY MR. LAWSON:

22        Q.   Okay.  This is the report that you did

23    receive in August 31, 2011; is that right?

24        A.   Correct.

```
 1        Q.   If you turn to the second page of the

 2   document, there's a paragraph that begins "During the

 3   preservation sampling."

 4             Do you see that?

 5        A.   Yes.

 6        Q.   The second sentence in that paragraph states:

 7   The overall remediation included the removal of all

 8   of the drywall, both defective and suspect

 9   nondefective, wood trim, wood interior doors,

10   cabinetry, porous floorings, insulation, electrical

11   components and wiring, vapor barriers, air duct work,

12   air handler, mirrors, and various other building

13   components inside of the home.

14             Did I read that correctly?

15        A.   Yes.

16        Q.   After -- and it goes on to state:  After the

17   completion of the remedial efforts, all that was

18   remaining was the shell of the former residence,

19   including the concrete slab, concrete block exterior

20   walls, metal and wood framing, PVC plumbing, exterior

21   doors, windows, and plywood roof sheaving.

22             Did I read that correctly?

23        A.   Yes.

24        Q.   Is that your understanding of the remediation
```

1   work that was performed on your home?

2       A.   Yes.

3       Q.   I would like to turn your attention to the

4   fifth page of this report.

5            There's a section that begins with "The

6   following conclusions are made specifically regarding

7   the tainted and corrosive drywall."

8            Do you see that?

9       A.   Yes.

10      Q.   Looking through that section, this is where

11  Mr. Reed discusses the state of the home after the

12  remediation had occurred; is that right?

13      A.   Yes.

14      Q.   He begins by saying:  In the checklist, all

15  of the tainted and corrosive and nontainted and

16  corrosive drywall and associated wall covers were

17  removed from the Gody residence.

18           Did I read that correctly?

19      A.   Yes.

20      Q.   It said then in the next checklist item it

21  states:  All of the gross debris and particulate

22  matter generated as a result of the remediation of

23  the tainted and corrosive drywall inside of the home

24  has been removed, and all of the horizontal and

```
1    vertical surfaces were HEPA vacuumed and power

2    washed/cleaned.

3            Did I read that correctly?

4    A.    Yes.

5    Q.    The next checklist item states:  No residual

6    sulfur-like odors were detected by olfactory sensing

7    inside of the home during the final post-remediation

8    investigation.

9            Did I read that correctly?

10   A.    Yes.

11   Q.    And then it goes on to state:  The quality

12   assurance post remediation, clearance, and

13   verification composite sample that was conducted for

14   this investigation was nondetect by laboratory

15   analysis for the three specific chemical anolytes --

16   hydrogen sulfide, carbon sulfide, and carbon

17   disulfide -- that are related to the off-gassing of

18   tainted and corrosive drywall.

19           Do you see that?

20   A.    Yes.

21   Q.    It also states that the overall remediation

22   and pressure washing treatment of the residence was

23   effective and efficient.

24           Do you see that?
```

Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 04/11/19 Page 1026 of 1680
Confidential - Subject to further Confidentiality Review
1504

```
 1        A.   Yes.

 2        Q.   Is it your understanding that this section of

 3   the report that Mr. Reed is saying that the drywall

 4   remediation effort was successful in removing any

 5   gasses or particulate matter from the Chinese

 6   drywall?

 7        A.   Yes.

 8             MR. ALBANIS:  Object to the form.  Ms. Gody

 9        is not an engineer, a chemist, or a drywall

10        expert by any means.  The report says what it

11        says.

12   BY MR. LAWSON:

13        Q.   Ms. Gody, you have said that when you moved

14   back into the home, you no longer noticed an odor

15   inside of the home; is that right?

16        A.   Correct.

17        Q.   And you didn't have any of the physical

18   ailments that you had when you were in the home?

19        A.   Correct.

20        Q.   You waited an additional time to make sure

21   there was no remnant of the Chinese drywall in home;

22   is that right?

23        A.   Yes.

24        Q.   When you moved back in, in the year since,
```

1  you have been satisfied that there is no remnant of

2  the Chinese drywall in your home; is that correct?

3      A.   To the best of my knowledge.  I hope so.

4      Q.   Ms. Gody, you said earlier that you sold your

5  home in Pennsylvania at some time; is that right?

6      A.   Yes.

7      Q.   Do you remember when you sold it?

8      A.   In 2014.

9      Q.   Do you remember how much you sold it for?

10     A.   $255,000.

11     Q.   And do you remember how much you paid for the

12  home originally?

13     A.   Yeah.  300 and -- I'll give you the exact

14  number.  The base price of the house was 254 plus all

15  of the flooring and -- the base price was 254, but

16  then there was the decisions that we have already

17  gone over.

18     Q.   But as we discussed earlier, you were not

19  seeking the amount that you paid for the Pennsylvania

20  home as part of your damages in this lawsuit,

21  correct?

22          MR. ALBANIS:  Object to the form.

23          But you may answer, Ms. Gody.

24          THE WITNESS:  Only the alternative living

```
1          expenses for the 26 months that I resided there.

2               (Defendants' Exhibit 19 was marked for

3     identification.)

4     BY MR. LAWSON:

5          Q.   I have handed you a document that's been

6     marked as Exhibit 19, Supplemental Plaintiff Profile

7     Form.

8               Do you recognize this document?

9          A.   Yes.

10          Q.   Were you involved with the creation of this

11     document?

12          A.   Did I type it?  No.

13          Q.   Did you help answer the questions inside of

14     this document?

15          A.   Yes.

16          Q.   And when you signed this document, as you can

17     see on the final page of it, your signature, was your

18     statement that all the information was true and

19     correct to the best of your knowledge; is that right?

20          A.   Correct.

21          Q.   Under penalty of perjury; is that right?

22          A.   Yes.

23          Q.   And you signed this document around March 7th

24     of 2018; correct?
```

1    A.   Yes.

2    Q.   Looking to Section 5 under Page 4 of the

3    document, there's a section -- Section 5 that is

4    titled "Already Remediated Property."

5         Do you see that?

6    A.   Yes.

7    Q.   At the top there's a question that states:

8    Has the property been partially or completely

9    remediated?

10        Do you see that?

11   A.   Yes.

12   Q.   And you stated completely remediated?

13   A.   Yes.

14   Q.   Was that true at the time that you signed

15   this document?

16   A.   To the best of my knowledge at that time.

17   Q.   Has anything changed about the remediation

18   that you received at your home since March of 2018?

19   A.   After reviewing the findings from the Germano

20   case and realizing that we did not replace the

21   damaged tile or the tile that was up against the

22   drywall or the framing for the cabinet, I consider

23   that then partly remediated.  And I --

24   Q.   When did you review the Germano order that

```
 1    you are discussing?

 2         A.   I don't recall.

 3         Q.   Was it in the last month?

 4         A.   I don't recall.

 5         Q.   When you reviewed the order, did you contact

 6    your attorney?

 7         A.   Yes.  I asked a question.

 8         Q.   Do you know when you changed your statement

 9    from completely remediated to partially remediated on

10    this form?

11         A.   I don't recall.  There's been so many

12    documents.

13         Q.   Are you aware of any orders that have been

14    issued by Judge Cooke in the Southern District of

15    Miami related to the Chinese drywall litigation?

16              MR. ALBANIS:  Object to the form.

17              Obviously, she hired Morgan & Morgan to

18         represent her in this case, and she's not an

19         attorney.

20              MR. LAWSON:  If she's looked at it, she can

21         answer the question.

22    BY MR. LAWSON:

23         Q.   Have you looked at or reviewed any orders by

24    Judge Cooke in the Southern District of Florida?
```

```
 1            MR. ALBANIS:  Same objection.

 2            THE WITNESS:  I don't recall.  I don't

 3       recall.

 4            (Defendants' Exhibit 20 was marked for

 5       identification.)

 6  BY MR. LAWSON:

 7       Q.   I have handed you a document that has been

 8  marked as Exhibit 20.  This is a First Amended

 9  Supplemental Plaintiff Profile Form.

10            Do you recognize this document?

11       A.   Yes.

12       Q.   Have you seen it before?

13       A.   These documents all look alike.  Yes.

14       Q.   Looking to the seventh page of this document,

15  there's a field on it that says date signed.

16            Do you see that?

17       A.   Yes.

18       Q.   It says November 19th, 2018?

19       A.   Yes.

20       Q.   There is no signature next to that item; is

21  that correct?

22       A.   Correct.

23       Q.   And to your knowledge, have you ever signed a

24  verification for this particular First Amended
```

```
 1   Supplemental Plaintiff Profile Form?

 2       A.   I don't recall.

 3       Q.   Do you remember if you met with your lawyer

 4   in the weeks that preceded this November 19th, 2018,

 5   submission of this First Amended Supplemental

 6   Plaintiff Profile Form?

 7       A.   Yes.

 8       Q.   Do you remember when you met with him?

 9       A.   I do not remember the exact date.

10       Q.   But did you have an in-person meeting?

11       A.   Yes.

12       Q.   And did you discuss this First Amended

13   Supplemental Plaintiff Profile Form?

14            MR. ALBANIS:  Objection.

15            I'm going to instruct my client not to

16       answer.  That's protected by the attorney-client

17       privilege.

18   BY MR. LAWSON:

19       Q.   Did you sign -- or excuse me, did you review

20   this form in the weeks prior to it being submitted?

21            MR. ALBANIS:  Object to the form.

22            But you may answer if you can, Ms. Gody.

23            THE WITNESS:  I don't recall.

24   ///
```

```
 1    BY MR. LAWSON:

 2        Q.   Did you personally change the answer in

 3    Section 5 on Page 4 to state that your property was

 4    partially remediated?

 5             MR. ALBANIS:  Object to the form.

 6             But you may answer if you can, Ms. Gody.

 7             THE WITNESS:  I don't recall.

 8             MR. LAWSON:  We can go off the record.

 9             (Recess from 5:10 until 5:13 p.m.)

10    BY MR. LAWSON:

11        Q.   Ms. Gody, what inspired you to read the

12    Germano order when you read it?

13             MR. ALBANIS:  I'm going to object to that.

14             That's protected by the attorney/client

15             privilege, and I'll instruct my client not to

16             answer.

17    BY MR. LAWSON:

18        Q.   Do you recall when you read it?

19        A.   I don't recall.

20        Q.   Did anyone prompt you or instruct you to

21    change your answer to the first question in Section 5

22    about whether your home was partially or completely

23    remediated?

24             MR. ALBANIS:  Objection.  Don't answer that.
```

Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 11/19/19 Page 1034 of 1680
confidential – Subject to further confidentiality Review
1512

```
 1      That is protected by the attorney/client

 2      privilege.

 3            Counsel, that's directly related to the

 4      strategy of this case between client and

 5      attorney, and I'm sure you can appreciate that

 6      any questions related to strategy are privileged.

 7      Those sorts of communications are privileged, and

 8      I will instruct Ms. Gody to not answer that

 9      question.

10         MR. LAWSON:  That just confirms that it was

11      instructed by you, and that was all that I was

12      curious about.

13         MR. ALBANIS:  No, it doesn't.  No, it

14      doesn't, but you can deduct from that statement

15      whatever you want.

16         MR. POYER:  Respectfully, doesn't the fact of

17      a change of from completely remediated to

18      partially remediated, that goes to not to

19      strategy but the actual facts of the case,

20      doesn't it?

21         MR. ALBANIS:  Oh, it certainly goes to the

22      actual facts of the case, and Ms. Gody has

23      testified there are certain portions of the home,

24      mainly the tiles, that were not remediated
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1035 of 1680
Confidential - Subject to further confidentiality Review
1513

```
1        pursuant to the Germano order.

2             MR. VERRIER:  Whether you want to call it

3        strategies, facts, whatever you want to call it,

4        clearly those questions are directed towards

5        communications that were had with counsel and

6        client, and that's clearly protected.

7             MR. POYER:  I mean, I don't --

8    BY MR. LAWSON:

9        Q.   Did someone other than your lawyer instruct

10   you to change the answer to whether the property was

11   partially or completed remediated?

12            MR. ALBANIS:  Same objection.  Don't answer

13       that.

14            MR. VERRIER:  Misstates her testimony and

15       certainly assumes facts not in evidence.

16            MR. LAWSON:  I have no further questions at

17       this time.

18            MR. POYER:  Beijing New Building Materials

19       has no questions.

20                    CROSS-EXAMINATION

21   BY MR. ALBANIS:

22       Q.   Ms. Gody, I would like to ask you to look at

23   Exhibits 2, 7 -- I'm sorry, pull out Exhibits 2, 3,

24   7, 17, 19, and 20.
```

```
 1    A.   Can we start over?

 2    Q.   Two, three --

 3    A.   Okay.  Wait one second.  Here's 3 and 2.

 4         And?

 5         Two, three.

 6    Q.   Seven, 17, 19, and 20.

 7         Early in the deposition, you discussed an

 8   environmental report.  I would just want to confirm

 9   that when you were referring to an environmental

10   report, you were referring to reports prepared by

11   Intuitive Environmental Solutions; is that correct?

12    A.   Correct.

13    Q.   And the main representative from the

14   Intuitive Environmental Solutions that you were

15   dealing with, what was his name?

16    A.   Dan Reed.

17    Q.   Was Dan Reed present for the removal of the

18   original drywall that was in this home?

19    A.   Yes.  For three days.

20    Q.   He was present for the tear-down?

21    A.   Yes.

22    Q.   Looking at Exhibit 17, the fifth page of what

23   appears to be the 40-page Intuitive Environmental

24   Solutions report.
```

```
1     A.   Yes.

2     Q.   Is that a floor plan of your home -- or a

3  rough floor plan, I should say?

4     A.   Yes.  Yes, it is.

5     Q.   Does this floor plan identify the different

6  brands of drywall that were identified in your home

7  by Dan Reed?

8     A.   Yes.

9     Q.   Do you have any reason to believe that this

10 is an inaccurate representation of the brands of

11 drywall that were removed from your home?

12    A.   No.

13    Q.   Leave that out for a second.

14         Let's pick up Exhibit Number 2.

15         Exhibit Number 2 appears to be your Amended

16 Plaintiff Profile Form from the Multiple District

17 Litigation.

18         Do you agree with that?

19    A.   Yes.

20    Q.   Okay.  Does your signature page -- does your

21 signature appear on Page 5 of Exhibit Number 2?

22    A.   Yes.

23    Q.   Okay.  Would you please turn to Page 2 of

24 Exhibit Number 2, Section 5.
```

```
 1      A.   Yes.

 2      Q.   Mr. Lawson earlier in the deposition asked

 3   you to review Exhibit 2 and asked whether you wanted

 4   to correct or amend any of the information that was

 5   in Exhibit Number 2, and you identified adding an

 6   inspection to the list of inspections that had

 7   occurred.  And that list is on Page 4.

 8      A.   Yes.

 9      Q.   But you did not mention any changes to the --

10   to Section 5 of the form, which is on Page 2, which

11   identifies the drywall manufacturers.

12           MR. LAWSON:  Object to the form.  Leading.

13   BY MR. ALBANIS:

14      Q.   Are there any changes to Section 5 that you

15   would now like to make since your home has been

16   remediated and all the defective drywall has been

17   removed from the home?

18           MR. LAWSON:  Objection to form.  Leading.

19   BY MR. ALBANIS:

20      Q.   Let me ask it a different way.

21      A.   Yes.

22      Q.   Look at Exhibit 17, the IES Report Intuitive

23   Environmental Solutions report.

24      A.   Yes.
```

```
1        Q.   Dan Reed has identified on Page 5 of that

2   report --

3        A.   Yes.

4        Q.   -- Taishan, U.S. Gypsum, and Georgia-Pacific

5   DensShield drywall.

6             Do you see that?

7        A.   Yes.

8        Q.   Do you have any reason to believe that that's

9   an inaccurate composition of the drywall that was

10  originally in your home?

11       A.   No.

12       Q.   Okay.  So now let's look back at Exhibit 2,

13  the Plaintiff profile form, Section 5.

14            What drywall manufacturers would you identify

15  in Exhibit 2, Section 5, if you were to fill out a

16  new plaintiff profile form today?

17            MR. LAWSON:  Object to the form.

18            MR. POYER:  Object to the form.

19            THE WITNESS:  I would put Taishan, United

20        States Gypsum, and Georgia-Pacific.

21  BY MR. ALBANIS:

22       Q.   Thank you, Ms. Gody.

23       A.   I would not include Knauf.

24       Q.   Thank you.
```

Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 11/19/19 Page 1040 of 1680
Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 01/09/19 Page 180 of 189 Page#
1518

```
 1              Was a representative from Kross Inspectors

 2      present during the tear-down in the old drywall in

 3      the home?

 4         A.   No.

 5         Q.   Was Kross Inspectors affiliated with

 6      Intuitive Environmental Solutions, to your knowledge?

 7         A.   Not to my knowledge.

 8         Q.   When Kross Inspectors conducted its

 9      inspection of your home, your home was not being

10      remediated, correct?

11         A.   Correct.

12         Q.   Over the course of this litigation -- strike

13      that.

14              How long have you been one of my clients,

15      Ms. Gody?

16         A.   It seems like forever.  Since 2009, I believe

17      it was.  2009, I believe.

18         Q.   From 2009 through the present, has my office

19      sent a number of different profile forms and other

20      documents related to this litigation to you for your

21      review?

22         A.   Absolutely.

23         Q.   And each time that we have sent one of those

24      profile forms and other documents to you that related
```

Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 11/19/19 Page 1041 of 1680
Case 2:09-md-02047-MBN Document 11-3 Filed 01/04/11 Page 182 of 184 PageID#
1519

confidential – Subject to further confidentiality review

```
 1    the your case for your review, have you reviewed

 2    them?

 3        A.   Yes.

 4        Q.   And each time that you have reviewed a

 5    profile form, have you provided approval to our

 6    office before we have filed it on your behalf?

 7        A.   You have presented me with the document --

 8        Q.   Correct.

 9        A.   -- and then I either signed it or

10    electronically signed it and sent it back with my

11    approval on it.

12             Is that the question?

13        Q.   Yes.

14             Did you do that?

15        A.   Yes.

16        Q.   And each time that you would do that, you

17    would authorize us to file a profile form on your

18    behalf?

19        A.   Yes.

20             MR. ALBANIS:  Nothing else.  Thanks.

21             THE WITNESS:  Okay.

22             MR. LAWSON:  I have nothing further.

23             MR. POYER:  No questions.

24             (Whereupon, the deposition concluded at
```

1    5:23 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 04/19/19 Page 1043 of 1680
confidential - Subject to further confidentiality Review
1521

```
 1                   C E R T I F I C A T E

 2

 3           I, KELLY J. LAWTON, Registered Professional

 4      Reporter, Licensed Court Reporter, and Certified

 5      Court Reporter, do hereby certify that, pursuant to

 6      notice, the deposition of CANDACE GODY was duly taken

 7      on December 12, 2018, at 11:33 a.m. before me.

 8           The said CANDACE GODY was duly sworn by me,

 9      through an interpreter, according to law to tell the

10      truth, the whole truth and nothing but the truth and

11      thereupon did testify as set forth in the above

12      transcript of testimony.  The testimony was taken

13      down stenographically by me.  I do further certify

14      that the above deposition is full, complete, and a

15      true record of all the testimony given by the said

16      witness.

17

18      _____

19           KELLY J. LAWTON, RPR, LCR, CCR

20

21           (The foregoing certification of this

22      transcript does not apply to any reproduction of the

23      same by any means, unless under the direct control

24      and/or supervision of the certifying reporter.)
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5   and make any necessary corrections.  You should state

 6   the reason in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 05/11/19 Page 1045 of 1680
Case 2:09-md-02047-EEF-JCW Document 23863-78 Filed 01/09/11 Page 186 of 188 PageID #: 1523
confidential - Subject to further confidentiality review

```
 1              - - - - - -

 2            E R R A T A

 3              - - - - - -

 4   PAGE   LINE   CHANGE

 5   ____   ____   _____

 6     REASON: _____

 7   ____   ____   _____

 8     REASON: _____

 9   ____   ____   _____

10     REASON: _____

11   ____   ____   _____

12     REASON: _____

13   ____   ____   _____

14     REASON: _____

15   ____   ____   _____

16     REASON: _____

17   ____   ____   _____

18     REASON: _____

19   ____   ____   _____

20     REASON: _____

21   ____   ____   _____

22     REASON: _____

23   ____   ____   _____

24     REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 23863-78 Filed 11/19/19 Page 1046 of 1680
Case 2:09-md-02047-MSD-RJK Document 123365-78 Filed 01/09/11 Page 187 of 188 Page#
1524
confidential - Subject to further confidentiality Review

```
  1                    ACKNOWLEDGMENT OF DEPONENT

  2

  3           I, CANDACE GODY, do hereby acknowledge that I

  4      have read the foregoing pages, 1 to 187, and that the

  5      same is a correct transcription of the answers given

  6      by me to the questions therein propounded, except for

  7      the corrections or changes in form or substance, if

  8      any, noted in the attached Errata Sheet.

  9

 10

 11      _____        _____

 12      CANDACE GODY                                        DATE

 13

 14

 15

 16

 17      Subscribed and sworn to before me this

 18      _____ day of _____, 20___.

 19      My Commission expires: _____

 20

 21      _____

         Notary Public

 22

 23

 24
```

Case 2:09-md-02047-EEF-MBN Document 23363-78 Filed 11/19/19 Page 1047 of 1680
Case 2:09-md-02047-EEF-JCW Document 23363-78 Filed 11/04/11 Page 188 of 188 PageID#
1525
confidential - subject to further confidentiality review

```
 1                        LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____    _____

 4      _____   _____    _____

 5      _____   _____    _____

 6      _____   _____    _____

 7      _____   _____    _____

 8      _____   _____    _____

 9      _____   _____    _____

10      _____   _____    _____

11      _____   _____    _____

12      _____   _____    _____

13      _____   _____    _____

14      _____   _____    _____

15      _____   _____    _____

16      _____   _____    _____

17      _____   _____    _____

18      _____   _____    _____

19      _____   _____    _____

20      _____   _____    _____

21      _____   _____    _____

22      _____   _____    _____

23      _____   _____    _____

24      _____   _____    _____
```

# JOINT APPENDIX TAB # 40

Case 1:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1049 of 1680
Case 1:11-cv-22408-MGC Document 148-3 Filed 01/18/11 Page 2 of 83 PageID#327
Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2              Case No. 1:11-CV-22408-MGC
 3    -------------------------------§
      EDUARDO AND CARMEN AMORIN et    §
 4    al., individually, and on behalf §
      of all others similarly         §
 5    situated,                       §
                                      §
 6       Plaintiffs,                  §
                                      §
 7    vs.                             §
                                      §
 8    TAISHAN GYPSUM CO., LTD. F/K/A   §
      SHANDONG THAIHE DONGXIN CO.,     §
 9    LTD.; TAIAN TAISHAN PLASTERBOARD §
      CO., LTD., et al,                §
10                                     §
         Defendants.                   §
11    ------------------------------- §
                CONFIDENTIAL - SUBJECT TO FURTHER
12                  CONFIDENTIALITY REVIEW
13                        - - -
14              FRIDAY, DECEMBER 7, 2018
15                        - - -
16
17        Deposition of VICKI FOSTER, held at Morgan &
          Morgan, 12800 University Drive, Suite 600, Fort
18        Myers, Florida, commencing at 7:44 a.m., on the
          above date, before Kelly J. Lawton, Registered
19        Professional Reporter, Licensed Court Reporter,
          and Certified Court Reporter.
20
                          - - -
21
                GOLKOW LITIGATION SERVICES
22        877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
23
24
```

Case 1:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1050 of 1680
Case 1:19-cv-00397-MSD-RJK Document 143-36 Filed 11/18/11 Page 3 of 83 PageID# 928
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff

 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff
10
11    ALSTON & BIRD, LLP
      BY:  ALIYYA Z. HAQUE, ESQUIRE
12    BY:  PATRICK H. HILL, ESQUIRE
      BY:  BOYKIN LUCAS, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    aliyya.haque@alston.com
      patrick.hill@alston.com
16    boykin.lucas@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.
18
      ORRICK, HERRINGTON & SUTCLIFFE, LLP
19    BY:  MARC R. SHAPIRO, ESQUIRE
      51 West 52nd Street
20    New York, New York 10019
      (212) 506-3546
21    mrshapiro@orrick.com
      Representing BNBM PLC
22

23

24
```

```
 1    APPEARANCES:

 2       ORRICK, HERRINGTON & SUTCLIFFE, LLP

         BY:  DAN GUERRA, ESQUIRE

 3       The Orrick Building

         405 Howard Street

 4       San Francisco, California 94105

         (415) 773-5545

 5       dguerra@orrick.com

         Representing BNBM PLC

 6

 7    ALSO PRESENT:

 8       William Foster

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1052 of 1680
Case 1:14-cv-00932-MSD-TJK Document 143-1 Filed 03/16/16 Page 5 of 83 PageID# 3930
Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

                      I N D E X

 2                        - - -

 3    Testimony of:  VICKI FOSTER

 4        DIRECT EXAMINATION BY MS. HAQUE................  6

 5

 6                    E X H I B I T S

 7                (Attached to Transcript)

 8    DEFENDANTS'                                        PAGE

 9    Exhibit 1    Special Warranty Deed                  12

10    Exhibit 2    Barceloi Floor Plan                    17

11    Exhibit 3    WCI Property Address                   19

12    Exhibit 4    Allied Home Inspections Report         46

13    Exhibit 5    Tainted & Corrosive Chinese            49
                   Drywall "Evidence Sample

14                 Preservation" Investigation -
                   Intuitive Environmental Solutions

15
      Exhibit 6    Polkow Construction, Inc. Chinese      63

16                 Drywall Remediation Proposal

17    Exhibit 7    Check Copies                           72

18    Exhibit 8    Alternative Living Addresses and      107
                   Leases

19
      Exhibit 9    Purchases Invoices/Receipts           107

20
      Exhibit 10   Complete Remediation Checklist for    109

21                 Affected Properties

22    Exhibit 11   Receipts/Costs                        110

23    Exhibit 12   Lee County Property Appraiser -       134
                   Online Parcel Inquiry - Property

24                 Data
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1053 of 1680
Case 1:11-cv-00332-WSD-TJK Document 71-43 Filed 07/16/11 Page 6 of 183 PageID# 931
Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S

 2   DEFENDANTS'                                  PAGE

 3   Exhibit 13   Plaintiff Profile Form -        147
                  Residential Properties
 4
     Exhibit 14   Plaintiff Profile Form -        151
 5                Residential Properties

 6   Exhibit 15   Supplemental Plaintiff Profile  153
                  Form
 7
     Exhibit 16   First Amended Supplemental      155
 8                Plaintiff Profile Form

 9   Exhibit 17   Second Amended Supplemental     157
                  Plaintiff Profile Form
10
     Exhibit 18   Third Supplemental Plaintiff    162
11                Profile Form

12   Exhibit 19   Fourth Amended Supplemental     164
                  Plaintiff Profile Form
13
     Exhibit 20   Itemized Replacement Costs      172
14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1054 of 1680
Case 1:cv-00032-MSD-RJK Document 141-3 Filed 01/16/14 Page 1 of 183 PageID# 932
Confidential - Subject to Further Confidentiality Review

```
 1                         - - -

 2              THE COURT REPORTER:  Ma'am, would you please

 3         raise your right hand.

 4              Do you swear or affirm that the testimony

 5         you're about to give will be the truth, the whole

 6         truth, and nothing but the truth?

 7              THE WITNESS:  Yes.

 8              VICKI FOSTER, called as a witness by the

 9    Defendants, having been first duly sworn, testified

10    as follows:

11                    DIRECT EXAMINATION

12    BY MS. HAQUE:

13         Q.   Can you please state your name for the

14    record?

15         A.   Vicki D. Foster.

16         Q.   My name is Aliyya Haque, and I am one of the

17    attorneys on behalf of the one of the defendants,

18    Taishan Gypsum.  We're going to be asking you today

19    about some questions pertaining to your claims in

20    this lawsuit.

21              Have you ever been deposed before?

22         A.   Yes.

23         Q.   Okay.  So I'm going to then run through some

24    very quick ground rules just to refresh your
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1055 of 1680
Case 1:14-cv-00329-WSD-RJK Document 14-43 Filed 07/16/14 Page 8 of 33 PageID# 933
Confidential - Subject to Further Confidentiality Review

```
 1    recollection.

 2            As you know, the court reporter is taking

 3    down all of your testimony, and she's just sworn you

 4    in.

 5            So do you understand that you must tell the

 6    truth as if you are testifying in court and the judge

 7    is sitting in the room?

 8       A.   Yes.

 9       Q.   If you could please speak slowly for the

10    court reporter so that she can take down all of the

11    information, and I'll try to remember that as well.

12            Please make sure that you respond with verbal

13    responses, and don't nod or shake your head, because

14    the court reporter does need to take down a verbal

15    response.

16            Also, if you don't understand my question,

17    please let me know.  Otherwise, I'll assume if you

18    answer that you understand my question.

19            We'll try to take a break every hour or so.

20    But if you need to take a break at any time, please

21    let me know.  I only ask that if I have a question

22    pending that you go ahead and finish responding to

23    the question, and then we can go ahead and take the

24    break.
```

Confidential - Subject to Further Confidentiality Review

```
 1              Are you taking any medications this morning

 2    that will impair your ability to understand my

 3    questions or answer fully and truthfully?

 4        A.   No.

 5        Q.   Did you meet with your attorney to prepare

 6    for this deposition?

 7        A.   I spoke with my attorney and did meet with

 8    him.

 9        Q.   When -- did you meet more than once?

10        A.   Yes.

11        Q.   When were those meetings?

12        A.   I had one this week on Wednesday, I believe.

13        Q.   And for how long, approximately, did you all

14    meet?

15        A.   Less than an hour.

16        Q.   And the time before this week?

17        A.   I'm not sure how long it was.  It wasn't very

18    long.

19        Q.   Who was present at the meetings?

20        A.   Pete and I and my husband.

21        Q.   Did you speak with anyone else other than

22    your lawyer about this deposition?

23        A.   I did talk with my neighbor, Candy Gody, and

24    Jan Leeson, which is a neighbor as well.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-78  Filed 11/19/19  Page 1057 of 1680
Case 2:09-md-02047-EEF-MBN  Document 22363-78  Filed 11/19/19  Page 1057 of 1680
Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And what did you talk about?

 2        A.    With Candy, we just talked about how long

 3   it's been since we've been going through this with

 4   Chinese drywall.  And with Jan Leeson, we've spoke

 5   about my house as well.

 6        Q.    Did you review any documents to prepare for

 7   this deposition this morning?

 8        A.    Yes, I did.

 9        Q.    What documents did you review?

10        A.    I read the interrogatories.  I also looked at

11   all the pictures of my Chinese drywall personal

12   belongings.

13        Q.    Okay.

14        A.    And that's about it.

15        Q.    Did you bring any other documents with you to

16   the deposition this morning?

17        A.    Yes, I did.

18        Q.    Do you have those documents with you?

19        A.    Yes, I do.

20        Q.    Can we go ahead and take a look at these?

21        A.    (Handing.)

22        Q.    Do you intend to produce these to us today?

23   Are these -- and these are relevant to the topic of

24   Chinese drywall in this litigation?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes, it is relative.

 2             MS. HAQUE:  Then maybe we can make some

 3        copies and go through them a little bit later.

 4             Thank you.

 5   BY MS. HAQUE:

 6        Q.   Did you do anything else to prepare for this

 7   deposition?

 8        A.   No.

 9        Q.   Okay.  Mrs. Foster, where are you employed?

10        A.   I'm not employed.

11        Q.   Where were you previously employed?

12        A.   I was an employee of Ford Motor Company and

13   Freightliner.  I used to be a store manager.

14        Q.   And approximately how long did you work for

15   Ford Motor Company?

16        A.   I can't remember the dates.  I'm sorry.  It's

17   been a long time ago.

18        Q.   And how long ago, approximately, did you

19   retire?

20        A.   I can't recall the exact date.

21        Q.   Okay.  Are you married?

22        A.   Yes.

23        Q.   To whom?

24        A.   My husband, William Paul Foster.
```

```
1      Q.   And do you have any children?

2      A.   Yes.  I have two.  And I have a stepson.

3      Q.   And do you -- can you tell me their names and

4    ages, please?

5      A.   Zachary is my husband's son, and he's -- I

6    can't remember how old he is now.  And my daughter,

7    she'll be 41 next month.  And my son is approximately

8    45.

9      Q.   Sure.

10          And how long have you and your husband been

11   married?

12     A.   Approximately 21 years.

13     Q.   Have you ever been involved in a lawsuit

14   before this one?

15     A.   Yes.

16     Q.   What were the details of that lawsuit?

17     A.   It was a work-injury claim.

18     Q.   Have you participated in a class-action

19   lawsuit before?

20     A.   No.

21     Q.   Okay.  I'm going to switch gears and now

22   talk -- ask you some questions related to the

23   property at issue in this case.

24          What is the address of the property that you
```

Confidential - Subject to Further Confidentiality Review

```
1    allege has been damaged by Chinese drywall?

2         A.   10814 Fortina Drive, Fort Myers, Florida

3    33913.

4         Q.   And do you currently own that property?

5         A.   Yes.

6         Q.   When did you buy the property?

7         A.   We closed on our property in 2007, March.

8         Q.   And did you build it, or did you buy a

9    pre-existing home?

10        A.   We bought it pre-existing.

11        Q.   And from whom did you buy the home?

12        A.   WCI Bay Colony.

13        Q.   Are there any other owners for this

14   property --

15        A.   No.

16        Q.   -- at 10814 Fortina?

17        A.   No.

18        Q.   The property is just under you and your

19   husband's name?

20        A.   Yes.

21        Q.   All right.  I'm going to introduce what has

22   been premarked as Exhibit 1.

23             (Defendants' Exhibit 1 was marked for

24   identification.)
```

```
 1    BY MS. HAQUE:

 2        Q.   Mrs. Foster, do you recognize this document?

 3        A.   Yes.

 4        Q.   And please take a moment, if you need to

 5    review it.

 6        A.   Yes.

 7        Q.   What is this document?

 8        A.   It's a warranty deed.

 9        Q.   Is this the deed for the property to which

10    you are claiming damages in this lawsuit?

11        A.   Correct.

12        Q.   And whose names appear on this deed?

13        A.   My husband and my name.

14        Q.   When was this house -- do you know when this

15    property was originally built?

16        A.   2006.

17        Q.   And you can go ahead and set that down.

18             And how much did you pay for the home?

19        A.   It was approximately 430,000.

20        Q.   Was that purchase financed through a bank or

21    another lender?

22        A.   It was financed.

23        Q.   And was there a mortgage on the property?

24        A.   Correct.
```

Confidential - Subject to Further Confidentiality Review

```
1        Q.    And do you -- can you recall the details of

2   the mortgage, for example, how long?  Fixed term?

3        A.    I believe it was a 30-year loan.

4        Q.    Do you know how much you currently owe, if

5   anything, on the property today?

6        A.    We don't owe anything on the property.

7        Q.    Have you always lived at the property since

8   you purchased it?

9        A.    No.

10        Q.    And we'll go through a little bit later the

11   details of the different places in which you've

12   lived.

13              Do you live at the property today?

14        A.    Yes.

15        Q.    How many people have resided in the property

16   at 10814 Fortina while you have lived there?

17        A.    Two.

18        Q.    And who are they?

19        A.    Myself and my husband.

20        Q.    Have your children at any point or your

21   husband's children lived in the property with you?

22        A.    They have visited; only since we remediated.

23        Q.    Have you ever charged rent for anyone to live

24   in the property?
```

```
1        A.    No.

2        Q.    Have you renovated or made any improvements

3   on the property since you have owned it?

4        A.    We remediated the property.

5        Q.    Other than the remediation, have you ever

6   made any improvements such as a pool or a deck or a

7   new shed or anything to the property?

8        A.    No.

9        Q.    Did you -- do you own or did you own ever any

10  other properties or homes?

11       A.    Yes.

12       Q.    Could you go ahead and list those, as well as

13  the addresses?

14       A.    All of the houses that we have owned in the

15  past?

16       Q.    Correct.  To the extent of your memory.

17       A.    Okay.  We still own a condo in Colonial

18  Country Club, to this day.  We owned a home in

19  Kentucky, Deer Point Place.  We had a home in Ohio

20  previously.

21       Q.    I'll go ahead and stop you there.

22             Let's go back to the home in Ohio.  Do you

23  recall approximately the dates in which you lived in

24  this home?
```

```
1        A.   No, I don't.

2        Q.   What about the home in Kentucky?

3        A.   I don't know the exact dates either.

4        Q.   How about the condo that's here in -- is it

5    here in Fort Myers?

6        A.   Yes.

7        Q.   Do you recall the dates of your ownership of

8    the condo?

9        A.   I don't recall the date that we bought the

10   home.

11       Q.   Okay.

12       A.   But we did buy that property before we bought

13   the house in Fortina.

14       Q.   Okay.  So it was sometime prior to 2006 --

15   2007, I mean?

16       A.   Yes, it was.

17       Q.   Okay.  Do you know approximately the square

18   footage at your home at 10814 Fortina?

19       A.   It's approximately 1800 under air.

20       Q.   And how do you know that?

21       A.   It's on our documents.

22       Q.   Have you ever personally measured the square

23   footage of your home?

24       A.   No.
```

```
1        Q.    Have you ever had someone come to your home

2    to assess the square footage?

3        A.    No.

4        Q.    How many bedrooms are in the house at

5    10814 Fortina?

6        A.    Two.

7        Q.    And how many bathrooms are in that property?

8        A.    Two.

9        Q.    Have there been any changes to the square

10   footage since the property was built?

11       A.    No.

12       Q.    Okay.  I'm going to introduce what's going to

13   be marked as Exhibit 2.

14             (Defendants' Exhibit 2 was marked for

15   identification.)

16   BY MS. HAQUE:

17       Q.    Do you recognize this document?

18       A.    Yes.

19       Q.    What is this document?

20       A.    It is a layout of our property.

21       Q.    And is this the exact layout?  Have any

22   changes to your eye -- do you notice any other

23   deviations from this layout?

24       A.    No.
```

```
1         Q.    And do you see at the bottom in the left-hand
2    corner there's some numbers?
3         A.    Yes.
4         Q.    Is this the approximate square footage of
5    your home?
6         A.    Correct.
7         Q.    And is there any reason to doubt the accuracy
8    of these numbers?
9         A.    No.
10        Q.    All right.  You can go ahead and set that
11   down.
12              Okay.  I'm going to go on now to switch
13   topics to ask about some of the claims in this case
14   pertaining to the Chinese drywall specifically.
15        A.    Okay.
16        Q.    When do you believe that Chinese drywall was
17   installed in your house at 10814 Fortina?
18        A.    It was installed before we bought the home.
19        Q.    So you believe that the drywall was installed
20   during the original construction of the home in 2006?
21        A.    Correct.
22        Q.    Do you know who was in charge of the building
23   of the home back in 2006?
24        A.    WCI.
```

```
 1        Q.   And do you know who was paying them for the

 2   work?  Did you all contribute to the build of the

 3   house?

 4        A.   No.

 5        Q.   Do you know who on the builder's side

 6   purchased the Chinese drywall?

 7        A.   No.

 8        Q.   Do you know from which supplier the builder

 9   acquired the drywall for your house?

10        A.   From what I understand, it was Banner.

11        Q.   And how do you know that Banner was the

12   supplier of the drywall?

13        A.   In conversations with different people.

14        Q.   So I'm going to show you what's been marked

15   Exhibit 3.

16             (Defendants' Exhibit 3 was marked for

17   identification.)

18   BY MS. HAQUE:

19        Q.   And please go ahead and take a look at that,

20   and then I want to direction your attention

21   specifically -- well, let me first ask you:  Have you

22   ever seen this document before?

23        A.   No.

24        Q.   This was a -- this was a document that we
```

```
1    received from your attorneys.  Do you recall ever

2    talking about the Banner Supply within -- with your

3    husband or anyone else in terms of preparing -- not

4    your attorneys, but your husband or anyone else in

5    terms of collecting and preparing documents to be

6    submitted for this litigation?

7         A.   Would you repeat that question?

8         Q.   Sure.  I'm sorry.

9              This is one of the documents that we received

10   from your attorneys as being produced by you for this

11   litigation.  Do you recall discussing with your

12   husband or anyone else who's not an attorney

13   regarding the Banner Supply?

14        A.   I've had in the past -- I've had

15   conversations with people about Banner when we were

16   trying to find out who was the installer of the

17   drywall or the supplier.  This document --

18        Q.   So I'll just direct your attention to -- and

19   if there's any question that you think your husband

20   might be better suited to answer, please let me know.

21        A.   Okay.

22        Q.   Because I wouldn't -- I don't want -- well, I

23   want to not sort of ask you something if someone else

24   might be in a better place to answer that question.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/30/19 Page 1069 of 1680
Case 2:11-cv-00377-MSD-RJK Document 140 Filed 01/18/13 Page 23 of 153 PageID# 547
Confidential - Subject to Further Confidentiality Review

```
 1        A.    My husband may be better to answer this.

 2        Q.    But I do want to bring your attention to Page

 3   Number 5.

 4        A.    Can I say one thing?

 5        Q.    Yeah.  Go ahead.  Please.

 6        A.    I may have seen this.  I don't totally recall

 7   seeing it.  But I may even have this on my computer;

 8   but I've been having problems with it.  So I may or

 9   may not.  I'm not a hundred percent sure.

10        Q.    That's okay.

11              If we turn to Page 5, and you'll see -- well,

12   let me just tell you this.  Would you -- this is a

13   document that purportedly is from Banner Supply that

14   lists the status of drywall in various homes.  Would

15   you -- would you be okay with that representation?

16        A.    Sure.

17        Q.    If you go -- so if you turn to Page 7, there

18   is a box at the very top of the page, and I'm just

19   going to read it for the record and it says:  This is

20   Banner's best effort to confirm delivery.  This

21   spreadsheet was created as an accommodation of

22   plaintiffs.  Plaintiffs and all parties already had

23   access to the same Banner underlying documents and

24   are invited to verify and do their own analysis on
```

```
 1    confirming delivery.  It is not always possible to

 2    conclusively determine whether a delivery was made by

 3    Banner.

 4          If you turn to Page 5 -- and I believe your

 5    property is listed under Item No. 74?

 6    A.   Yes, it is.

 7    Q.   And if you look all the way across this

 8    document, what is -- what is written in the very last

 9    column?

10    A.   "Cannot confirm."

11    Q.   So it appears that Banner can't independently

12    confirm that they did supply the drywall.  Is that

13    your understanding of this document?

14          MR. ALBANIS:  I'm going to object to the

15       form.

16          You can answer.

17          THE WITNESS:  It does say "cannot confirm."

18       However, it was my understanding that they did

19       install the drywall in all of WCI's homes in

20       Pelican Preserve.

21    BY MS. HAQUE:

22    Q.   Did you discuss drywall supply with WCI at

23    any point either before or after you discovered the

24    presence of drywall?
```

```
 1        A.    I contacted WCI four times since I lived --

 2   in the beginning living in the home, up until 2009,

 3   and four times they told me my house was not built

 4   with Chinese drywall.

 5        Q.    And did they ever say that Banner was the one

 6   that supplied the drywall?

 7        A.    No.  They would not give me any information.

 8        Q.    Okay.  Did you ever see the drywall at any

 9   point during the -- either photos or physical drywall

10   before it was installed in the home?

11        A.    No.

12        Q.    Did you ever personally see any markings on

13   the drywall?

14        A.    Before I --

15        Q.    At any point.

16        A.    Did I personally, even during --

17        Q.    Yeah.  Let me rephrase.

18              Did you ever see any markings on the drywall

19   prior to installation?

20        A.    No.

21        Q.    Did you ever see any markings on the drywall

22   during the remediation process?

23        A.    I saw markings on the back of the walls even

24   before the remediation.
```

Confidential - Subject to Further Confidentiality Review

```
1       Q.    Do you recall specifically what any of those

2    markings were or said?

3       A.    I don't recall exactly what it said.  But I

4    have pictures that I personally took.

5       Q.    Are those the pictures that you submitted to

6    your attorneys --

7       A.    Yes.

8       Q.    -- to send to us?

9             Do you know if all of the drywall in your

10   home was made in China, or only select boards?

11      A.    From my understanding, there's a certain

12   amount of Taishan drywall in my house.

13      Q.    Do you -- do you know who manufactured the

14   Chinese drywall in your home?

15      A.    Taishan.

16      Q.    And how do you know that?

17      A.    I know that from the markings on the drywall

18   and from the documents that I've seen.  It's Taishan

19   product.

20      Q.    And how did you come to learn about the --

21   which markings signified which company?

22      A.    I looked on the Internet to find information

23   and talked with other people.

24      Q.    Do you recall what sites that you looked up
```

Confidential - Subject to Further Confidentiality Review

```
 1    for that information?

 2         A.    No.   I just Googled it.

 3         Q.    Okay.

 4         A.    And also when the home was inspected, they

 5    told me it was Taishan.

 6         Q.    Okay.  And we'll talk about your inspections

 7    a little bit later.

 8               Did anyone inform you at any point that they

 9    were installing drywall made in China in the house

10    before it was installed at any point?

11         A.    No.

12         Q.    Did -- did any builder or anyone in the

13    construction project every confirm later after you

14    had already moved into the home that drywall made in

15    China was installed?

16         A.    No.

17         Q.    Did anyone ever make any guarantees to you

18    about the products they used in your house?

19         A.    WCI guaranteed that it was a -- that it

20    was -- the whole house was a good product.

21         Q.    Did they ever make any guarantees about where

22    they sourced the various products to make the home?

23         A.    No.

24         Q.    There was -- was there ever any written
```

```
 1    guarantees or written list of this is what went into

 2    the property at 10814 Fortina?

 3         A.   When we bought the home, we received a -- a

 4    whole book on our house.  Honestly, I did not go

 5    through all of it, because I trusted them and . . .

 6         Q.   Would you happen to still have that within

 7    your possessions, the book that you received from

 8    WCI?

 9         A.   I could look at it -- I mean, I could try to

10    find it.

11         Q.   That would be great.  Thank you.  And we'll

12    talk to your attorneys regarding that.

13              Where was the Chinese drywall installed

14    within your house?  Do you recall?

15         A.   I don't know exactly.  But it was throughout

16    the whole home.

17         Q.   Do you know what the total cost was of the

18    drywall installation?

19         A.   No.

20         Q.   And would you -- and do you know if any other

21    work was done at the same time as the drywall

22    installation such as HVAC, air-conditioning, anything

23    like that?

24         A.   No.
```

```
 1        Q.    Do you know if there was any American-made

 2   domestic drywall used in your home?

 3        A.    I believe there is some.

 4        Q.    Do you know if there was drywall meant --

 5   used in your home that came from other countries, not

 6   the U.S. or China?

 7        A.    No.

 8        Q.    What caused you to first suspect that there

 9   was Chinese drywall in your home?

10        A.    Shortly after moving in the home in 2007,

11   March of 2007, it wasn't long after I was in there, I

12   started not feeling well.  I started having -- and

13   these symptoms kept progressing.  I had migraines, I

14   had nosebleeds, I had fatigue, I was nauseous.  I had

15   stomach problems; in fact, I lost over 30-some pounds

16   before I moved out of the home.  I had a rash.  I

17   became depressed.  My eyes were burning.  I had

18   numerous symptoms.

19        Q.    So there were physical symptoms that alerted

20   you to a possible presence of Chinese drywall?

21        A.    And -- I'm sorry.

22              In the beginning, when I started having these

23   symptoms, I had no idea what was happening to me.  At

24   one point, I developed vertigo.  And at that time I
```

 1   was having a repair on the refrigerator, and when I

 2   got up, the whole room started spinning.  And I knew

 3   that my health was failing for whatever reason.  So I

 4   went to the doctor.  And I had been going to the

 5   doctor previously, of course, and they couldn't

 6   find -- I had sinus infections; I was always sick --

 7   and he suggested that it might be environmental.  And

 8   he's the one that suggested I have the house

 9   inspected for Chinese drywall.

10      Q.   Let me ask you a couple of follow-up

11   questions on that.

12           How soon, approximately, after you moved in

13   in 2007 did you start experiencing some of these

14   physical symptoms?

15      A.   I would say within the first -- at least

16   within the first month.

17      Q.   And how soon thereafter did you go to the

18   physician to talk about your symptoms?

19      A.   I don't know the exact date that I went to

20   the physician.  I had been going previously, but I do

21   know it was in February of 2009 when I strongly

22   suggested we had Chinese drywall.  Plus I saw WCI --

23   and I don't know the exact dates -- but they started

24   remediating some houses across the street from us.

```
 1    And when I saw the dumpsters there, I started

 2    inquiring, and they -- we were all told it was --

 3    they were remediating them because the houses hadn't

 4    sold, and there was mold and mildew in the house.

 5        Q.   Was February 2009 the first time you heard of

 6    anything related to any effects related to Chinese

 7    drywall?

 8            MR. ALBANIS:  Object to the form.

 9            THE WITNESS:  I -- honestly, I don't know

10        when I started hearing about Chinese drywall.  I

11        had never heard of it before, and to -- I never

12        thought that I would be one of the people that

13        would have it.

14    BY MS. HAQUE:

15        Q.   Do you recall when you started seeing WCI

16    remediate the houses across the street who you spoke

17    to who told you were remediated based off the fact

18    that these houses couldn't sell and there was mold

19    and mildew?

20        A.   I talked with -- because I was having

21    problems with my own house -- some of the workmen

22    that would come out -- in fact, we had to have -- my

23    house was still under warranty, and I noticed pitting

24    in the faucets.  I was having air-conditioning
```

```
 1    problems.  I was having -- we had these medicine

 2    cabinets in the house; they were starting to corrode.

 3    And the mirrors were pitting.  And WCI replaced

 4    those.  They had to -- in fact, they had to give me a

 5    new refrigerator within -- I don't know the exact

 6    same time frame.  But then the new refrigerator

 7    started failing.

 8            There was numerous things happening in the

 9    house.  But I don't know when I started hearing about

10    Chinese drywall.

11        Q.    Okay.  Just to clarify, because you are

12    claiming various categories of damages, are you going

13    to be claiming any damages related to personal injury

14    or health problems in this lawsuit?

15        A.    No, I am not.  However, I did sustain a lot

16    of health issues.

17        Q.    Understood.

18            Let me walk you back from 2007, because I

19    know you mentioned a lot of issues that you noticed

20    with the home.

21            So correct me if I'm wrong, but in 2007, you

22    started experiencing health problems.  Then what was

23    the next thing you noticed in the home?

24            MR. ALBANIS:  Object to the form.
```

```
1              THE WITNESS:  I can't give you an exact

2         timeline, because I don't recall, because it's

3         been so many years ago.  I was having repairs --

4         the house was still under warranty.  I was having

5         repairs.  I noticed some pitting in the mirrors,

6         probably one of the first things.  And then the

7         faucets; I noticed some pitting there.  We also

8         had trouble with our tile that was down, which

9         WCI replaced all of the tile in our home.  And

10        they said that the underlayment was bad, and

11        that's why the tile starting bulking up.

12   BY MS. HAQUE:

13        Q.   Did they attribute the problems with the tile

14   to Chinese drywall, the presence of Chinese drywall?

15        A.   WCI did not.

16        Q.   Has anyone after that point attributed the

17   issues with the tile to Chinese drywall?

18        A.   Not that I'm aware of.

19        Q.   Do you recall the duration of the warranty

20   that you had with WCI?

21        A.   I believe our warranty was a one-year

22   warranty, and I think on some things it was a

23   two-year warranty.

24        Q.   Is it fair to say approximately between 2007
```

```
 1    and 2009 you started noticing these issues with the

 2    pitting of the bathroom fixtures and the issues with

 3    the tile?

 4         A.   Yes.

 5         Q.   Was the tile on the floor of the bathroom, or

 6    was it within the shower or any other part?  Do you

 7    recall?

 8         A.   It was on the flooring throughout the home.

 9         Q.   Okay.  I'm just going to ask you now about

10    some various categories of types of things within the

11    house.

12              Did you notice any metal corrosion within the

13    home?

14         A.   Yes.

15         Q.   Can you describe that for me?

16         A.   In our home, I had a lot of brass; I had a

17    lot of silver.  I noticed that it was turning black.

18    The mirrors in my home were starting to pit; I

19    noticed that.  There were numerous things that I

20    noticed, but I can't recall all of them.

21         Q.   Were any electrical systems or appliances in

22    your home affected or stopped working?

23         A.   Yes.  My computers.  I had a gentleman come

24    out, because my computer wasn't working, and it was
```

```
 1    relatively new.  They replaced the mother board

 2    several times.  The printer went out.  The telephones

 3    went out.  My washer must have corroded on the

 4    inside, and it started turning some of my clothes

 5    black.  My refrigerator failed and several other

 6    appliances.

 7        Q.   Do you attribute the problems with the metal

 8    corrosion that you saw in the house, as well as the

 9    issues with the appliances, to the presence of

10    Chinese drywall?

11        A.   Absolutely.

12        Q.   How -- how do you attribute -- or, I should

13    say:  How did you learn that these were attributable

14    to Chinese drywall?

15            MR. ALBANIS:  Object to the form.

16            THE WITNESS:  I learned it through watching

17        the news.  I -- when I suspected it, I Googled it

18        to find out -- try to find out more information.

19    BY MS. HAQUE:

20        Q.   The issues with the appliances and the metal

21    corrosion, can we get just a ballpark time frame?

22    Was that initially when you moved in?  Was that a

23    couple years later?  Do you recall at all the time

24    frame?
```

```
 1      A.   I cannot give you a time frame specifically.
 2   Like I said, I was very ill at the time.
 3      Q.   And how -- I'm sorry.  Go ahead.
 4      A.   No, that's okay.
 5      Q.   And how long were these issues persisting?
 6   Was it so that an appliance was not working, you got
 7   it fixed, and that was the end of it?  Was it
 8   ongoing?  Can you describe how long these problems
 9   were persisting?
10           MR. ALBANIS:  Object to the form.
11           THE WITNESS:  The problems continued to get
12       more and more.  I had a sewing machine, and it
13       went out.
14   BY MS. HAQUE:
15      Q.   Did any inspector or electrician tell you
16   that any of these problems with the metal corrosion,
17   the appliances were related to Chinese drywall?
18      A.   No.
19      Q.   Did you see any blackened electrical wires in
20   your home?
21      A.   Yes, I did.
22      Q.   Can you describe where you saw them?
23      A.   When I suspected that I had Chinese drywall,
24   I did some investigation myself.  And I opened up the
```

```
 1    receptacles in several rooms and they were black.

 2        Q.   Was that back in 2009 or 2010, approximately?

 3        A.   No.  It would have been before 2009, because

 4    that's when I heavily suspected --

 5        Q.   Before --

 6        A.   -- that we had it.

 7        Q.   Did you ever have any problems with your

 8    air-conditioning?

 9        A.   Yes.

10        Q.   Can you describe those problems and

11    approximately when they started?

12        A.   I don't know the exact date, but I contacted

13    WCI because our house was still under warranty, and

14    they inspected it.  And the cell had gone out in the

15    air conditioner.

16        Q.   Given the warranty, it's safe to say it could

17    have been 2008, 2009?

18        A.   I'm not exactly sure.

19        Q.   Was there ever an odor in your home?

20        A.   Yes.

21        Q.   Can you describe where and the extent of the

22    odor?

23        A.   The odor was enormous, and the odor, it was

24    like -- it started having a life of its own.  It kept
```

Case 2:09-md-02047-EEF-MBN Document 22363-79 Filed 11/19/19 Page 1084 of 1680
Case 2:11-cv-00377-MSD-RJK Document 40 Filed 01/18/19 Page 37 of 53 PageID# 562
Confidential - Subject to Further Confidentiality Review

```
 1    getting worse and worse.  And it was throughout the

 2    whole home.

 3         Q.    What did it smell like?

 4         A.    Like sulfur.

 5         Q.    Was it worse in certain areas than others?

 6         A.    I don't recall.

 7         Q.    Do you recall where you noticed the odor the

 8    most, in which part of the home?

 9         A.    I don't recall.

10         Q.    Do you recall when you first started noticing

11    the odor?  Was it closer to 2009?  Was it pretty

12    quickly after you moved in in 2007?

13         A.    Actually, before we even closed on the home,

14    I did a walk-through with the real estate agent that

15    we bought the home through, and when we first opened

16    up the door and walked in, I asked him what that odor

17    was, and he told me it was a new house smell.

18         Q.    And did -- at any point thereafter, did you

19    follow up with anyone or WCI about the odor

20    specifically?

21         A.    Not in the beginning, no.

22         Q.    When was the first time you spoke to someone

23    about the odor?

24         A.    I believe it was in 2009.  I contacted WCI.
```

```
1    I'm pretty sure it was in February of 2009, because I

2    asked them if they would -- well, that's when I asked

3    them if our home was built with Chinese drywall.

4        Q.   Did the odor ever change over time?  Did it

5    get stronger?  Did it lessen?

6        A.   No.  It got stronger.

7        Q.   And was it more prevalent during the day?  At

8    night?  If you recall.

9        A.   It was ongoing, every day.

10       Q.   And I think you talked about this a little

11   bit, but prior to that time in 2009, did you ever

12   hear about Chinese drywall on the news, on TV, with

13   your friends?

14       A.   I didn't know what Chinese drywall was, and I

15   didn't think that it would be happening to us.  I may

16   or may not have seen it on the television.  But when

17   we first bought the house, and I even smelled that

18   odor, they -- it was a model home.  And they had

19   furniture in there, and I thought maybe it could have

20   been their furniture.  I didn't know what the odor

21   was.

22            I do know that they had the air-conditioning

23   on very low, so it was quite cool in there, and I

24   don't like it cool; I turn the thermostat up.  Well,
```

```
 1    the odor progressed.

 2            But even when I first started seeing things

 3    on television, no one in my neighborhood talked about

 4    Chinese drywall.  I would see it on the television,

 5    thinking, well, that's not happening to me.  And I

 6    guess I was in denial.  I didn't want it to be us.

 7    But as I kept seeing things on television and seeing

 8    things that they were saying that it causes, then I

 9    started realizing, it was going to be us.

10       Q.   Do you want to take a break?  Are you -- do

11    you want to proceed, keep going?

12       A.   No.  We'll go.

13       Q.   Okay.  You had mentioned earlier that you

14    noticed that some of the electrical wiring

15    receptacles were black.  Do you recall which part

16    specifically was black?

17       A.    It was the wiring.  I -- I'm not an

18    electrician, so I don't know.  It was -- the wiring

19    was totally black.

20       Q.   Okay.  What did you do after you suspected

21    that your house had Chinese drywall?

22       A.    I cried.  I was so sick, and then I

23    realized -- and I had all these tests being done.  I

24    developed asthma -- I realized that I lived in that
```

```
 1    house all that time.  This was our home.  This was
 2    our sanctuary.  This is where we wanted to retire and
 3    be together for the rest of your lives and enjoy life
 4    after working all of our life, and that was taken
 5    away from us.
 6            For ten years, he's been gone.  I was alone
 7    doing all this stuff.  And, yes, he would come home,
 8    and he would visit.  But that wasn't enough.  I had
 9    to go through all this myself, plus not feeling well.
10            And I also had a dog living with me in that
11    house, and she was ill all the time, throwing up.
12            It's been a nightmare.
13        Q.  So after that, what -- did you -- did you
14    start talking to the builder?  Can you walk me
15    through maybe the next month or so?
16        A.  I started talking to the customer
17    representative that I had been dealing with, because
18    I had other issues still in the house.  Even up until
19    2009, I was still dealing with WCI issues.
20            And the one thing that I remember the most is
21    we had trouble with the cabinets.  And in talking
22    with her and trying to get -- and the
23    air-conditioning.  And they were coming out and we
24    were having trouble getting some cabinet doors and so
```

```
 1    forth.  And I asked her if our house could possibly

 2    be built with Chinese drywall, that the odor was

 3    horrible in there.  And then she kind of put me off,

 4    and I didn't know why she told me our house was built

 5    with American-made drywall.

 6            She -- she said but if I had even more

 7    concerns -- after talking with her and saying she was

 8    going to get somebody out there to look, she didn't

 9    for a long time.  And then she said if I had concerns

10    about Chinese drywall, that I needed to contact

11    customer service, which I did, and they never called

12    me back.  And I kept calling and calling until

13    someone said that they could not talk to me about

14    Chinese drywall.

15       Q.   Can I ask you a couple follow-up questions on

16    that?

17            So the WCI customer representative

18    affirmatively stated to you the home was made

19    completely with U.S. drywall?

20       A.   Customer service did not tell me that our

21    house was made -- a -- well, Jennifer Polkow told me

22    our house was made with American drywall, that there

23    was no Chinese drywall.  Four times they told me.

24    They told me one time in writing, and I don't
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1089 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 423 of 1133 PageID# 567
Confidential - Subject to Further Confidentiality Review

1    remember if I have that document or not.

2        Q.   Is it possible for you to just -- because you

3    are double-checking on some of the other documents,

4    that -- the initial builder book from WCI.  Is it

5    possible to see if you have that document as well?

6        A.   Yes, I will check.

7        Q.   That would be great.

8             I'm sorry, who is Jennifer Polkow?

9        A.   She worked for WCI.

10       Q.   Okay.

11       A.   She was the person -- the liaison that I went

12   through with any problems that I had with the house.

13       Q.   And so from the time you first made that call

14   to when somebody said, I can't talk to you about

15   Chinese drywall, was that days?  Weeks?  Was it more

16   than a month?

17       A.   I don't recall.

18       Q.   Okay.  After that, what happened?

19       A.   After --

20       Q.   After you heard from the representatives

21   saying, "I can't talk to you about Chinese drywall,"

22   where were the next steps?

23             MR. ALBANIS:  Object to the form.

24             THE WITNESS:  First off, I knew I was on my

```
 1        own, that I needed to do -- I needed to research

 2        it.  And I knew after the doctor told me that I

 3        needed to have my house inspected that I would

 4        have the house inspected, in which I did.

 5   BY MS. HAQUE:

 6        Q.   When did you first speak with an attorney

 7   about Chinese drywall?

 8        A.   It's been, I think, almost ten years now.

 9        Q.   Do you know approximately how long it was

10   between first talking to an attorney and when the

11   lawsuit was filed?

12        A.   No, I don't.

13        Q.   Have you ever had your house inspected for

14   Chinese drywall?

15        A.   Yes.

16        Q.   Who -- how many times have you had your house

17   inspected?

18        A.   A total of three times.

19        Q.   Who performed the first inspection?

20        A.   Radon and Mold Professionals, I believe is

21   the name.

22        Q.   We did not receive a copy of the report of

23   the inspection from Radon and Mold.  Can you also add

24   that to the list of documents that you look for to
```

```
1    see if they provided a report?

2         A.   I will.

3         Q.   Thank you.

4              Who paid for the inspection?

5         A.   I did.

6         Q.   Do you know approximately how much you paid

7    for the inspection?

8         A.   No, I don't.

9         Q.   Were you at home when that inspection was

10   performed?

11        A.   Yes.

12        Q.   Did you talk to the inspector?

13        A.   Yes.

14        Q.   What did you all talk about?

15        A.   I don't exactly know exactly what we talked

16   about.  I'm sure I was asking questions about if the

17   symptoms in my house was an indicator of having

18   Chinese drywall.

19        Q.   Do you recall the findings of the home -- of

20   that specific inspection with Radon and Mold?

21        A.   I don't know exactly what it says.  I'd have

22   to look at the report.

23        Q.   Did they confirm the presence of Chinese

24   drywall in the home?
```

```
1        A.    I believe so.

2        Q.    And what did you do at that time after

3   learning about the -- about the confirmation of

4   Chinese drywall?

5        A.    I guess my anxiety level went up.  I was

6   depressed about it.  I cried.  I -- I talked to a

7   friend of mine about it, in which a friend of mine,

8   in turn, called the golf professional where we lived,

9   which is a WCI employee, and which he called me, and

10  he offered to put me up in a hotel.  And -- and my

11  question about going into a hotel was, how long am I

12  going to have to live in a hotel?  So I didn't go.

13  But then I did find out later he couldn't discuss

14  Chinese drywall with me anymore -- or, because he was

15  reprimanded.

16            I was the first one in Pelican Preserve to

17  find out that their home was built with Chinese

18  drywall, and which, in turn, I notified our

19  residents' alliance because I wanted people to know

20  if they were living in that.  And they contacted --

21  they actually sent a letter throughout Pelican

22  Preserve notifying people that the Chinese drywall is

23  in our neighborhood, to alert them.

24       Q.    When was the last time you spoke with someone
```

```
 1    at WCI?  Was it 2009 or so?

 2         A.    I would -- I'm not exactly -- the date.

 3         Q.    The inspection that you had next was with

 4    Allied Home Inspectors.  Is that right?

 5         A.    I'm not sure.

 6         Q.    The date -- and I'll show you the inspection

 7    in one moment.  The date on the inspection is

 8    November 2009.

 9         A.    Correct.

10         Q.    So can we -- is it fair to say that the

11    inspection with Radon and Mold happened prior to

12    November 2009?

13         A.    I had my house inspected three times.  The

14    first person that came out -- and I don't remember

15    the name, and I'm not sure if that's Radon and Mold,

16    because I'm getting a little confused with the names.

17    But the first -- the first testing of my house was a

18    gentleman came out, and he had some type of machine

19    that he did with the walls.  And he suspected Chinese

20    drywall in my home because the Strontium levels were

21    high.  That was the first inspection.

22              And then I had the Radon and Mold inspected

23    after that, because I needed -- I needed verification

24    that I really had it in my home.
```

```
 1              And then Allied was in November of 2000.

 2        Q.    I'm going to show you now this report, which

 3    is Exhibit Number 3 -- no, 4.  Sorry.

 4              (Defendants' Exhibit 4 was marked for

 5    identification.)

 6    BY MS. HAQUE:

 7        Q.    Do you recognize this document?

 8        A.    Yes.

 9        Q.    Have you ever seen it before?

10        A.    Yes.

11        Q.    Whose names are on this inspection report?

12        A.    My husband and mine.

13        Q.    And do you see the date of the report in

14    the --

15        A.    Yes.

16        Q.    And what was the date?

17        A.    November 14th, '09.

18        Q.    Do you recall this particular inspection?

19        A.    Yes.

20        Q.    Do you -- were you present in the home during

21    this inspection?

22        A.    Yes.

23        Q.    Did you also speak with the inspector at

24    the -- during this inspection?
```

```
 1        A.   I'm sure I did.

 2        Q.   Do you recall the findings from this

 3   inspection?

 4        A.   There was confirmation that we had Chinese

 5   drywall.

 6        Q.   Do you recall if Allied took any samples of

 7   drywall during this inspection?

 8        A.   Yes, they did.

 9        Q.   And do you know what happened with those

10   samples?

11        A.   We boxed them up, and we had them.

12        Q.   And are those the samples that you sent to

13   your attorney?

14        A.   Yes.

15        Q.   Did Allied tell you where in the house they

16   found Chinese drywall?

17        A.   I'm sure they did.

18        Q.   Did they give you a percentage of the house

19   that was approximately constructed with Chinese

20   drywall?

21        A.   Approximately 40 percent.

22        Q.   And were the findings of this report

23   consistent with what you had seen yourself?

24        A.   Yes.
```

```
 1        Q.    Did you learn anything new about the home
 2   from this report?
 3        A.    I learned the approximate amount of drywall
 4   in my home.
 5        Q.    Did Allied talk to you about the different
 6   markings that were on the drywall?
 7        A.    They may have, but I did not retain that
 8   information.
 9        Q.    Did they -- did they tell you that there were
10   also U.S. or domestic sources of drywall in the home?
11        A.    I believe so.
12        Q.    Okay.  You can go ahead and set that aside.
13              This report -- I'm sorry, I made you put it
14   down prematurely.
15              This report is about three pages or so.  Do
16   you know if Allied provided a larger report with more
17   details?
18        A.    I'm not a hundred percent sure.
19        Q.    When you're looking for the other documents,
20   do you mind adding that to the list to go ahead and
21   confirm?  And we'll give you a list at the end of the
22   day so you can remember what we've talked about.
23   That would be helpful.
24        A.    Can I say one thing?
```

```
1          Q.   Yes, please.

2          A.   I'm not a hundred percent sure that they took

3     samples.  I know they took pictures.

4          Q.   Okay.

5          A.   As I'm looking at this, I'm trying to recall.

6     I'm not a hundred percent sure.  I know one of the

7     companies did.  And it -- it probably was this one.

8     I'm sure -- I'm sure . . .

9          Q.   Why don't we go ahead and look at the next

10    report.

11         A.   Okay.

12         Q.   I think that may clarify some issues.

13         A.   Okay.

14         Q.   We'll show you what's been marked as

15    Exhibit 5.

16              (Defendants' Exhibit 5 was marked for

17    identification.)

18    BY MS. HAQUE:

19         Q.   Do you recall seeing -- ever seeing this

20    document?

21         A.   Yes.

22         Q.   What is this document?

23         A.   This is the Tainted & Corrosive Chinese

24    Drywall Evidence Sample Preservation.
```

```
1       Q.    And who was the inspector that performed this

2   inspection?

3       A.    Intuitive Environmental Solutions.

4       Q.    And the date on this document is May 2012?

5       A.    Correct.

6       Q.    Do you recall being home during this

7   inspection?

8       A.    Yes.

9       Q.    And did you also speak with the inspector

10  during this inspection?

11      A.    Yes.

12      Q.    Do you recall the topics that you discussed

13  during the inspection?

14      A.    Chinese drywall.

15      Q.    And what did you learn from this inspection?

16      A.    I learned of where the Chinese drywall was in

17  my home.  He went over it.  This is when they took

18  the samples, if I'm not mistaken.

19      Q.    Yes.

20            Let's turn to the second page -- or, I'm

21  sorry, it's double-sided.  But, yes, this page right

22  there.

23            Were these the samples of drywall that were

24  taken from your home?
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/18/19 Page 1099 of 1680
Case 2:11-cv-00377-MSD-RJK Document 140 Filed 01/08/19 Page 52 of 83 PageID# 4577
Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    If you look in the third column, it says

3   Sample Type.

4        A.    Yes.

5        Q.    To your knowledge, are these the different

6   companies that supplied drywall to your home?

7        A.    Yes.

8              MR. ALBANIS:  Object to the form.

9              THE WITNESS:  If it's on this report, then I

10       have to trust that these are accurate.

11  BY MS. HAQUE:

12       Q.    Do you know if any of these companies listed

13  are U.S. or domestic sources of drywall?

14       A.    I can assume, but I wouldn't be a hundred

15  percent accurate.  I would think Georgia Pacific

16  would be American.

17       Q.    Can you turn to -- the page numbers on this

18  document, it's going to be Page 4.  Yes.

19             Can you tell me what your -- what this --

20  what this page is representing?

21       A.    It's representing where the different types

22  of drywall in my home are located in my home.

23       Q.    And the colors respond to the different

24  sources of drywall.  Is that your understanding?
```

```
1        A.   Yes.

2        Q.   Is this your understanding of where -- it

3   looks like what is labeled as "Taishan drywall" is in

4   red.  Is this your understanding of where the Chinese

5   drywall was located in your home where you see these

6   red markings?

7        A.   Yes.

8        Q.   So to your knowledge, there was no Chinese

9   drywall in the garage or the laundry room or it looks

10  like some closets.  Is that consistent with your

11  memory?

12       A.   I would assume this is accurate.

13       Q.   Okay.  And if you turn the page, just to

14  confirm, these were photos that the inspector took.

15  Did you also take photos during this inspection or

16  any of the inspections?

17       A.   I do have some pictures.

18       Q.   And were those -- I'm sorry.  Let me do that

19  step-wise.

20            Did you take any photos during the first

21  Radon and Mold inspection?

22       A.   While he was doing the inspection, I don't

23  believe I did.

24       Q.   What about during the second inspection with
```

Confidential - Subject to Further Confidentiality Review

```
 1    Allied Home, do you recall taking any photos during

 2    the inspection?

 3         A.   Not that I recall.

 4         Q.   And what about during this third inspection

 5    in May 2012, do you recall taking any photos?

 6         A.   That's this one?

 7         Q.   No.  I'm sorry.  That's the one you're

 8    looking at.

 9         A.   This one?  Yes.  This is when they were doing

10    the demolition of my home, and I did take pictures.

11         Q.   And these are the photos that you gave to

12    your attorney?

13         A.   I gave my lawyers pictures of everything.

14         Q.   Okay.  And are the findings of this report

15    consistent with what you -- what you have learned

16    about the different effects in your home?

17         A.   Yes.

18         Q.   Did you learn anything new from this

19    inspection that took place about two and a half years

20    after the initial inspection?

21         A.   I learned that I had a lot more in my house

22    that I wanted to admit or believe.

23         Q.   And I believe this is the report that said

24    approximately 40 percent of the home was constructed
```

1  with Chinese drywall.  Is that consistent with your

2  memory?

3      A.   Yes.

4          MS. HAQUE:  I think we can go ahead and take

5      a five- to ten-minute break right now before we

6      switch topics.

7          (Recess from 8:40 until 8:49 a.m.)

8  BY MS. HAQUE:

9      Q.   I want to ask you some questions now about

10 your neighborhood.

11         Can you -- the name is Pelican Preserve?

12     A.   Yes.

13     Q.   Can you tell me a little bit about the

14 neighborhood?  Is it a new subdivision?  When did it

15 come along?

16     A.   From my understanding, it was developed in

17 early 2000.  I'm not exactly sure on the dates.  It's

18 like a resort community.  It's beautiful.  It's got a

19 golf course; we have 27 holes.  We have a town

20 center, we have tennis courts, pickle ball.  And they

21 have a pool up there, a recreation center.  They have

22 all kind of amenities.  It's a beautiful place to

23 live.

24     Q.   What is the town center?  Are those shops or

Confidential - Subject to Further Confidentiality Review

```
1     stores?

2         A.   No.  There's a restaurant, a couple

3     restaurants; a pool, outdoor pool, indoor pool;

4     walking track; gym; they have a movie theater.

5         Q.   Do you recall or know the average home price

6     in that neighborhood?

7         A.   No, I don't.

8         Q.   But you paid approximately, you said, a

9     little over 400,000 for your home?

10        A.   Approximately 430,000.

11        Q.   Okay.  I'm going to next ask you some

12    questions about the remediation process.

13             Is Chinese drywall still in your home?

14        A.   No.

15             MR. ALBANIS:  I'll assert a rolling objection

16        to all the questions regarding remediation,

17        because these depositions are being taken

18        pursuant to the nonremediation damages track of

19        Judge Cook's November 16, 2018, order.  And Judge

20        Cook, of course, adopted all of Judge Fallon's

21        previous rulings from the multidistrict

22        litigation, including his ruling regarding

23        remediation damages.

24             Having said all that, again, that is a
```

```
 1          rolling objection related to all remediation

 2          damages questions.  I will allow the witness to

 3          answer the questions.

 4              MS. HAQUE:  Okay.  Noted.

 5              And I'll just also say for the record that we

 6          believe these questions pertain to the overall

 7          issue of damages in the case.

 8     BY MS. HAQUE:

 9          Q.   Do you want me to repeat the question?

10          A.   Yes.

11          Q.   Is Chinese drywall still in your -- in place

12     in your home?

13          A.   No.

14          Q.   When I use the word "remediate," I'm

15     referring to the process of removing and replacing

16     the drywall.  Is that an okay definition to use?

17          A.   Yes.

18          Q.   Tell me about the removal of drywall from

19     your home.

20          A.   The removal of the drywall was when all

21     these -- when that inspection and they took the

22     samples and preservation.  They removed all the

23     drywall, doors, practically everything in my home.

24     They left the tile; the tile was still remaining.
```

```
1    The center island in the kitchen, they left.

2        Q.   When did you decide to remediate the home?

3        A.   That choice was made because I was so sick in

4    the home, I had to get out.  Not only was I concerned

5    about my immediate health, but I was also, after

6    learning what I had learned about Chinese drywall, I

7    was -- I was afraid of the long-term effects.  And I

8    knew that I could not stay in that home.  So I moved

9    out.

10       Q.   And do you recall the dates of the

11   remediation process?

12       A.   The total remediation process was April of

13   2012; we contracted someone.  And it look until June

14   of 2013 to fully -- to get the house remediated.

15       Q.   And would it be fair to say you made the

16   decision sometime in March of 2012 to remediate the

17   home?

18       A.   My husband and I -- my husband had to go back

19   to work, because we were -- we were floundering.

20   Because we moved out of the house and we had -- I

21   had -- we have a condo that we had rented out, and

22   because I was so sick, we knew I had to get out.  So

23   when his contract was up, the renter's contract was

24   up, we decided that I would move in there.  We would
```

Case 2:09-md-02047-EEF-MBN Document 22363-79 Filed 11/19/19 Page 106 of 1680
Case 2:11-cv-00377-MSD-RJK Document 40 Filed 11/18/15 Page 59 of 33 PageID# 584
Confidential - Subject to Further Confidentiality Review

```
1    move in there.  And tried -- even though we knew the

2    expenses were going to be higher, we knew we had no

3    alternative but to get out.  So we moved in there.

4            And then as more money is going out, we

5    decided -- well, our neighbor down the street had

6    Knauf in his home, and he had remediated his house.

7    He had it on the market and he couldn't sell it.  So

8    he approached me as a solution to our problems,

9    because we were concerned about our furniture staying

10   in there, because I took very -- I took hardly

11   nothing with me when I went in the condo, because I

12   didn't know what these gasses would do to our

13   personal property.

14           So he approached me about renting his house,

15   that he would offer us a lower price, if we wanted to

16   rent his house, that that way we would be close to

17   our Chinese drywall house.  Because Knauf had -- when

18   he tried to sell his house and couldn't and that's

19   why he offered it up to us.  So we decided if we

20   could -- if we could move into his house and rent our

21   condo back out, at least we would have that income.

22   We wouldn't have to pay for the condo as well, even

23   though we knew we were going to have to rent from

24   him.  But it enabled us to try to save our furniture
```

Confidential - Subject to Further Confidentiality Review

1    by going in there.

2          Then with my husband working, we could try to

3    save up money to try to remediate the house.  And

4    that's why it took so long for us to decide to

5    remediate.

6    Q.   The furniture, did you store the furniture in

7    between?  Did you put it in storage, or was it

8    sitting in the house from about 2009 to 2012?

9    A.   We got a quote on how much it would cost us

10   to move our furniture out, and it was an -- in my

11   opinion an astronomical amount, which would be just

12   thrown away.  So we decided to leave everything in

13   the house.  And then when we rented Jack Walsh's

14   house, our neighbor, we knew by doing that, that we

15   could move the majority of all the stuff ourselves,

16   which was really not a smart move because it took a

17   toll on our bodies as well trying to move.

18         I don't know if you have seen the pictures of

19   our home, but we had a lot of furniture, a lot of

20   personal items.  And we knew if we could get -- we

21   dollied it.  My husband and I dollied.  Only one

22   piece of furniture did we get help with.  We dollied

23   every piece of furniture down there or put it in the

24   car or carried on our backs or used the golf cart to

Confidential - Subject to Further Confidentiality Review

```
1    even get it down there.  And we put everything in

2    Jack Walsh's garage and we cleaned it and off-gassed

3    it.

4             And this process took months.  We put

5    papers -- all of our financial documents were sitting

6    not only on the lanai at his house, but in the condo

7    because periodically, I'd have to have personal

8    documents.  I'd have to go back to the Chinese

9    drywall house and put them on the lanai at the condo

10   to try to off-gass it to where I could even tolerate

11   the odor again.

12       Q.   So did you -- so you experienced the odor

13   with -- on the personal property even after it was

14   taken outside of the home?

15       A.   Absolutely.

16       Q.   And how -- and it was just as strong?  Did it

17   lessen being taken out of that atmosphere?

18       A.   A lot of items took a lot longer than others.

19   And some items -- like, we lad a leather couch.  That

20   leather couch still remained -- the odor was still

21   there.  It wasn't as prevalent as it was previously,

22   of course.  But it -- we had to leave the garage door

23   open all day and all night.  I mean, it was

24   humiliating and embarrassing to have to do this at
```

```
 1    our age.

 2         Q.   Can I ask you about the home that you rented

 3    from Jack Walsh?  Was he having issues selling it

 4    just because this was during the recession at the

 5    same time that this was happening?

 6         A.   The conversations that I had with him, he

 7    told me that people -- once they found out -- because

 8    you have to disclose that.  Once he disclosed that he

 9    had Chinese drywall that had -- that he had

10    remediated it, people didn't want to buy it.

11         Q.   Do you recall approximately what the quote

12    was from moving all the furniture out of the home?

13         A.   Oh, for moving and storage?

14         Q.   Yes.

15         A.   And that was only for three months, I

16    believe, they said in that contract.  I think it was

17    like $10,000.

18         Q.   $10,000?

19              And that was for them to pick it up and just

20    store it as well?

21         A.   For three months.  And then it would -- it

22    would accumulate over time, more money to keep it

23    stored.  And then we would have to pay for it to come

24    back into our home, and we didn't know how long we
```

```
 1    were going to be out of the house.

 2         Q.   Who performed the remediation of your home?

 3         A.   Polkow Construction.

 4         Q.   How did you go about choosing that company

 5    for the remediation?

 6         A.   We learned his name from the neighbor down

 7    the street, that he had remediated his home as well.

 8         Q.   Is there any relationship between

 9    Jennifer Polkow and Polkow Construction?

10         A.   Actually, there is.  They were married

11    before.  They were divorced.

12         Q.   Is there any relationship between WCI and

13    Polkow Construction anymore during this remediation

14    process?

15         A.   Repeat the question.

16         Q.   Was there any relationship between WCI and

17    Polkow Construction?

18              MR. ALBANIS:  Object to the form.

19              THE WITNESS:  Not that I'm aware of.

20    BY MS. HAQUE:

21         Q.   And was all the original drywall taken out of

22    the home and replaced?

23         A.   Yes.

24         Q.   Did you consider any other contractors to
```

Confidential - Subject to Further Confidentiality Review

```
 1    perform the remediation work?

 2         A.   Yes.

 3         Q.   Did you get competing quotes beforehand?

 4         A.   Yes.

 5         Q.   And what factors did you consider in picking

 6    who did the remediation?

 7         A.   Cost.

 8         Q.   I am going to show you what we're going to

 9    premark Exhibit -- are we on 7?

10              MR. LUCAS:  6.

11              MS. HAQUE:  6.

12              (Defendants' Exhibit 6 was marked for

13    identification.)

14    BY MS. HAQUE:

15         Q.   Do you recognize this document?

16         A.   Yes.

17         Q.   Is this your name on the document?

18         A.   Yes.

19         Q.   Do you happen to have a signed version of

20    this?

21         A.   No.  I looked for one.  I can't find it.

22         Q.   Okay.  What is this document?

23         A.   It is our contract for the remediation.

24         Q.   And what is the total -- is it listed on
```

Case 2:09-md-02045-EEF-MBN Document 22363-79 Filed 11/18/19 Page 112 of 1680
Case 2:09-md-02047-EEF-MBN Document 22363-79 Filed 11/18/19 Page 65 of 83 PageID #: 590
Confidential - Subject to Further Confidentiality Review

```
 1        here -- the total price?  Yes.

 2                I'm sorry.  If you turn to the second page,

 3        they list the total price for the remediation as

 4        $117,531.

 5            A.    Correct.

 6            Q.    Is that the price that you paid for the

 7        remediation?

 8            A.    We actually paid more.

 9            Q.    And what is the reason for why you paid more?

10            A.    Well, it says on this "contract subject to

11        change," so materials maybe cost more; just other

12        things that happened that we -- as we went along cost

13        more money.

14            Q.    Did you -- did Polkow ever give you a revised

15        term sheet, essentially, showing you the total price

16        at the end?

17            A.    No.

18            Q.    Was Polkow the lowest cost of the bids that

19        you received?

20            A.    Yes.

21            Q.    Do you have to have any of the other -- did

22        you keep any of the other bids from the other

23        construction companies?

24            A.    I don't believe so.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  What conversations did you have with

 2    Polkow before they performed the remediation?

 3        A.    Well, we discussed the scope of the work,

 4    paint colors, flooring, just the typical remediation.

 5        Q.    Did you have any conversations during the

 6    remediation process of any changes or things that

 7    they found?

 8        A.    As far as the home?

 9        Q.    Correct.

10        A.    Yeah.  We had conversations of changes, yes.

11        Q.    And do you recall what those were?

12        A.    I did not want the cabinets.  I wanted

13    different cabinets in my home.

14        Q.    And did they agree to include that in the

15    cost they initially provided you?

16        A.    The cabinets were included, yes.

17        Q.    Did you have any conversations after the

18    remediation with them about anything?

19        A.    After he was completely done with the

20    remediation, I never wanted to see him again.  And

21    still don't.

22        Q.    And why do you say that?

23        A.    Because he took too long.  He was

24    disorganized.  We couldn't get him out there to get
```

```
1    the work done.  It took forever.  We moved back into

2    our home in November of 2012.  Our house was not near

3    being completed.  We -- I lived there under

4    construction until June of 2013, trying to get them

5    back out there to make all the other repairs.

6         Q.   When you moved back into the home in

7    November 2012, what percent of the house had been

8    completed at that time in terms of the remediation?

9         A.   I can't tell you a definitive amount.  I just

10   know that it was livable enough to stop renting my

11   neighbor's house, that I could get our furniture back

12   in there and that they could work around it.

13           Now, there was still painting to be done.  I

14   believe there was woodworking repairs.  The spare

15   bathroom was not completed.  Our bedroom was

16   completed enough that we could live in it.  And the

17   living area and the kitchen had the appliances in.

18        Q.   Who determined what work needed to be done

19   for the remediation?

20        A.   My husband and I discussed it with Polkow.

21        Q.   Okay.  In terms of from when you moved in in

22   November 2012 to June 2013, was it a steady

23   construction process in terms of they would come in

24   every week and do a little bit, or was there a period
```

Confidential - Subject to Further Confidentiality Review

```
 1    of time when nothing happened and then they just

 2    completed it towards the end?

 3         A.   From what I recall, it was a constant

 4    process.  They were in and out all the time.  They

 5    may come for an hour and then say that they're going

 6    to go to lunch or whatever, and then I wouldn't see

 7    them.  It was a constant, almost daily thing going

 8    on.

 9         Q.   Were they willing to give you any type of

10    discount or reduction in price due to the extremely

11    lengthy process?

12         A.   No.

13         Q.   I want to ask you a couple questions about

14    specifically what was done during the remediation to

15    the best of your recollection.

16              Do you recall how much drywall total was

17    removed?

18         A.   No.

19         Q.   And just to confirm, all of the original

20    drywall from the 2006 build was taken out?

21         A.   Yes.

22         Q.   Do you know where the replacement drywall was

23    sourced from that's now in your home?

24         A.   There's a picture that was taken of the
```

```
 1    drywall.

 2        Q.   And to your belief, all of the drywall that

 3    was replaced in the home comes from domestic or U.S.

 4    sources?

 5        A.   Yes.

 6        Q.   And as part of the agreement with Polkow,

 7    only domestic drywall was to be used?

 8        A.   I just verified with Polkow that I wanted

 9    U.S.-manufactured drywall.

10        Q.   If you could pick up Exhibit 6 as well.  If

11    you turn to Page 3, one of the bullet points says --

12    it's in bold -- "only domestic drywall will be used."

13            And that's consistent with what happened

14    during the remediation process --

15        A.   Yes.

16        Q.   -- to your best belief?

17        A.   Yes.

18        Q.   Okay.  Were the ceilings removed in the home?

19        A.   Yes.

20        Q.   And they were replaced?

21        A.   Yes.

22        Q.   Was there any carpeting in the home?

23        A.   Yes.

24        Q.   Was all the carpeting removed and replaced?
```

```
 1        A.    The carpeting was removed, but I wanted

 2   hardwood floors put down, so we paid for that out of

 3   pocket.

 4        Q.    Do you recall how much you paid out of pocket

 5   for the hardwood?

 6        A.    No.

 7        Q.    Do you recall which rooms received the

 8   hardwood floors that previously had the carpeting?

 9        A.    Two bedrooms.

10        Q.    Were any cabinets removed?

11        A.    Yes.

12        Q.    Where were the cabinets removed?

13        A.    In the kitchen and the two bathrooms and the

14   laundry room.

15        Q.    Were they replaced with the same cabinets, or

16   did you get new cabinets?

17        A.    I got new cabinets.

18        Q.    Okay.  Was the wiring of the home removed and

19   replaced?

20        A.    Yes.

21        Q.    Were any appliances removed and replaced?

22        A.    All the appliances were removed and replaced.

23        Q.    And we'll talk about some specifics a little

24   bit later on.
```

Confidential - Subject to Further Confidentiality Review

```
1            Were any original appliances put back into

2    the house?

3       A.   No.

4       Q.   Was anything removed from the bathrooms in

5    terms -- or, let me ask it this way.  Was any of the

6    plumbing removed?

7       A.   The plumbing was removed.  In the kitchen

8    island, that plumbing wasn't removed.

9       Q.   So the island kitchen has the same plumbing

10   as the original build?

11      A.   Yes.  As far as I know.

12      Q.   Did anyone tell you that the kitchen plumbing

13   in the island needed to be replaced?

14      A.   No.

15      Q.   Were any of the bathroom fixtures removed or

16   replaced?

17      A.   All the fixtures were removed.

18      Q.   What about the original toilets or bathtubs?

19   Were those removed and replaced?

20      A.   We bought all new toilets.

21      Q.   Okay.  What about the shower or bathtubs?

22      A.   The bathtub in the hall -- actually, both of

23   them were removed.

24      Q.   What about the tiling in the home?  Did you
```

```
 1    have tile in both the kitchen and the bathrooms?

 2         A.   I have tile throughout my whole home except

 3    for the original rooms that had the carpet.

 4         Q.   Was the tile all removed and replaced?

 5         A.   No.  The tile is still there.  And it's

 6    damaged in several places.

 7         Q.   How did the damage occur?

 8         A.   Because they didn't protect my flooring.

 9         Q.   And this -- by "them," you mean the Polkow

10    Construction?

11         A.   Yes.

12         Q.   Were any other areas of your home damaged by

13    the remediation process?

14         A.   I had some valances in my -- I had some

15    expensive valances that were special made through

16    Penney's, and I really wanted to put them back up

17    after the remediation.  Unfortunately, we were only

18    able to save the one valance in the family area.

19         Q.   Okay.  In terms of the appliances, was it --

20    who told you that all of the appliances needed to be

21    removed and replaced -- or replaced?

22         A.   I wanted all new appliances.  I didn't want

23    to go through what I had already gone through with

24    the other ones.
```

```
 1        Q.    Did Polkow Construction give you any

 2   recommendations of what need to be removed or

 3   replaced?

 4        A.    He suggested as well that they should be

 5   replaced.

 6        Q.    Okay.  I'm going to show you now what has

 7   been marked as Exhibit 7.

 8             (Defendants' Exhibit 7 was marked for

 9   identification.)

10   BY MS. HAQUE:

11        Q.    Do you recognize this set of documents?

12        A.    Yes, I do.

13        Q.    What are these documents?

14        A.    These are expenses that we had for the

15   remediation.

16        Q.    And are -- is this your signature or your

17   handwriting on these --

18        A.    Yes.

19        Q.    -- these checks?

20             Now, I know there's a lot of them.  But to

21   your recollection, do all of these checks pertain

22   specifically to the remediation?

23        A.    Yes.

24        Q.    And it looks like these were made out to --
```

```
1    is it Lauren Polkow?

2        A.   Kevin.

3        Q.   Kevin, sorry.  Kevin Polkow.

4             And if you go to the second page, Number 513,

5    it looks like this was made out to Intuitive

6    Environmental.

7             Is this the inspection company?

8        A.   Yes.

9        Q.   And this was the cost of the inspection and

10   the report from May 2012, to your recollection?

11       A.   I believe so.

12       Q.   Okay.  Some of these, it's just sort of hard

13   to make out.  If you look on the -- I guess it is

14   page -- the back of Page 2, Check Number 518.

15       A.   Can I say just one thing?

16       Q.   Yeah.  Go ahead.

17       A.   On this check here, of course it doesn't show

18   the date; I'd have to look at my records --

19       Q.   I'm sorry, is that Check 513, for the record?

20       A.   Yes, yes.

21       Q.   Okay.

22       A.   I know it relates to the drywall, but I'm not

23   exactly sure when I wrote this check, because I

24   think -- I'm not a hundred percent sure, I think I
```

Confidential - Subject to Further confidentiality Review

```
 1    gave him two checks.

 2         Q.    Do you happen to have clearer copies, by

 3    chance, of any of these?

 4         A.    Unfortunately, I tried to get them from the

 5    bank, and they won't -- they don't go back that far.

 6         Q.    No problem.

 7               Could you take a look for me -- at Check

 8    Number 518.  It's hard to make out.  Do you -- do you

 9    know, by chance?

10         A.    I can't -- I could look at mine at home.

11         Q.    That would be great.  We'll make a note of

12    that.

13               And check number -- I'm sorry, go ahead.

14               Check Number 519, do you recall what PMC is?

15         A.    Yes.  That is the gentleman that installed

16    the drywall.

17         Q.    Okay.

18         A.    We paid him personally.

19         Q.    And that was a separate individual from

20    Kevin Polkow?

21         A.    He worked with Kevin, and he asked for us to

22    pay him directly.

23         Q.    Okay.  Presumably Checks 523 and 528 are

24    Kevin Polkow?
```

Confidential - Subject to Further confidentiality Review

```
 1        A.   Yes.

 2        Q.   Okay.  Check Number 529, Dennis Reynolds?

 3        A.   Yes.  He was an electrician that worked on

 4   the outlets in the kitchen.

 5        Q.   Okay.  And he also wanted separate payment?

 6        A.   Yes.

 7        Q.   And Check Number 532 is Golf Stone --

 8        A.   Yes.

 9        Q.   -- Construction, maybe?

10        A.   Construction.

11        Q.   And did they provide materials for the home?

12        A.   Yes.

13        Q.   Was it the countertops?

14        A.   I'm not a hundred percent sure, but I think

15   so.

16        Q.   Okay.  Check Number 538 on the next page, it

17   looks like it's made out to -- is that total or Todd?

18        A.   Todd.  He worked for Kevin, and he asked me

19   to pay him.

20        Q.   Okay.  539 is Masters Touch?

21        A.   Masters Touch.  That is when -- before we

22   moved back into the home -- or, we may even was in

23   there at that time; I'm not a hundred percent sure --

24   that we asked because of all the construction, we
```

```
1    asked them to clean the tile floor.

2         Q.   547 at the bottom, can you make that out?

3         A.   No, I can't.

4         Q.   How about 569 on the next page?  Is that --

5    in the memo is that copper work?  I'm not sure.

6         A.   I -- I'm not a hundred percent sure.  I guess

7    I wrote two checks over -- I don't know.  Something

8    construction.  It might be Gulf Stone Construction.

9         Q.   Okay.  And then just the last one on the back

10   of this page, Number 576?

11        A.   I'll check into that, too.

12        Q.   That would be great.  Thank you.

13             Was the HVAC system replaced?

14        A.   Yes.

15        Q.   Was that done through Polkow, or was there a

16   separate contractor?

17        A.   It was actually done through Certified

18   Heating and Air-Conditioning.

19        Q.   Okay.

20        A.   Through Kevin Polkow.

21        Q.   Was that a related company, or did he find

22   that construction company?

23        A.   He found them.  And I use them today.

24        Q.   Oh, you are still using them?
```

```
 1      A.   I'm still using them.

 2      Q.   Was any -- okay.  Who paid for the

 3   remediation?

 4      A.   My husband and I did.

 5      Q.   Did you receive any money from anyone else

 6   for the remediation?

 7      A.   My mother gave us some money.

 8      Q.   Approximately how much?  Do you recall?

 9      A.   I don't know exactly.

10      Q.   Was it a significant portion or just a small

11   portion?

12      A.   A small portion to help us out and get us

13   through this tragedy.

14      Q.   And where does your mother live?

15      A.   She now lives around the corner from me in

16   Pelican Preserve.

17      Q.   In the same neighborhood?

18      A.   Yes.

19      Q.   When you had your home remediated, did you

20   assign to anyone else your right to bring claims?

21      A.   No.

22      Q.   And since November 2012, have you lived in

23   the home at 10814 Fortina?

24      A.   Yes.
```

1    Q.   Oh, I'm sorry.  I forgot to ask:  Back when

2    you said the HVAC work was done, I think you have a

3    note in some of the documents we received that you

4    could not find any receipts for the air-conditioning

5    remediation -- or, I'm sorry, the repair work that

6    was done with the air-conditioning.  Have you located

7    any additional receipts?

8    A.   Are you talking before the remediation?

9    Q.   Correct.

10   A.   At one point, what -- I had heard about this

11   company called Home Tech, and I contracted with them

12   to make repairs on our home.  Some repairs, we made

13   after our contract was up with them, but I got that

14   contract with them even before I even suspected --

15   or, I had suspicions -- well, I had suspicions that I

16   had Chinese drywall.  But in the beginning, I didn't

17   know what Chinese drywall was.  But when I -- as the

18   years progressed and I looked back, then I know now

19   that it was indicators of Chinese drywall.

20        But to answer your question, I had Home Tech,

21   and they made a lot of repairs to our house, after

22   our warranty was up.

23   Q.   How long, do you recall, that you had an A/C

24   warranty from WMI?

```
1       A.    WCI.

2       Q.    WCI, I'm sorry.

3       A.    That's okay.

4             I'm not sure the exact.  But I know I had a

5    one-year warranty, and I believe I had a two-year

6    warranty, like, on the air-conditioning or -- I'm not

7    exactly sure.

8       Q.    So maybe it's safe to say that Home Tech

9    operated on the air-conditioning from 2008 to 2009

10   period of time?

11      A.    Well, they did other repair work in there.

12   They repaired our refrigerator several times.  The

13   washer, they looked at that to see why my clothes

14   were getting all this junk on it.  I can't remember

15   everything that they did.

16      Q.    But you're not able to -- you weren't able to

17   find any receipts from them regarding the repair

18   work?

19      A.    No.

20      Q.    Okay.  Let's talk about some of the

21   appliances that you removed and then replaced.

22            How did you go about choosing what new

23   appliances that you put back into the home?

24      A.    I looked online to see what appliances were
```

1    out there and what companies and what were the

2    top-rated, that they backed -- that the company

3    backed their product.  And then in talking with

4    Polkow, Kevin, he suggested that I go to this Raymond

5    Supply Company, that they would give me a discounted

6    rate for appliances through his company.  And that's

7    what we did.

8        Q.   And do you recall which appliances

9    specifically you got from this discount supply

10   company?

11       A.   Thermador.

12       Q.   Thermador?

13            So just the refrigerator and freezer?

14       A.   Refrigerator, stove, microwave is an

15   all-in-one unit; and dishwasher; and a -- like, a

16   little refrigerator that goes in there.

17       Q.   So you did the online research and picked

18   what brands you wanted based on sort of the cutting

19   edge, what you thought was the best version of that,

20   and then you spoke with the discount supply company

21   for the specific brands, or did --

22            MR. ALBANIS:  Objection to the form.  I think

23       you mischaracterized what the witness said.

24   ///

Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. HAQUE:

 2        Q.   Can you explain the step-by-step -- the

 3    process by which you chose the appliances and worked

 4    with Discount Supply?

 5        A.   Once I went in there, he showed me what

 6    appliances he had in there, and then we chose the

 7    ones that we felt best suited our needs.

 8        Q.   And he was able to give you a discount off

 9    the list price?

10        A.   Yes.

11        Q.   And did you research these appliances and

12    brands independently?

13        A.   No.  Actually, I talked with my neighbor

14    about them, Candy Gody, because she was going --

15    actually, she started remediating her house before I

16    did.

17        Q.   And what did she suggest?

18        A.   Thermador.

19        Q.   And did she also suggest the other brands

20    such as the dishwasher, et cetera?

21        A.   The dishwasher she like -- at that time she

22    liked Bosch better.  I just wanted to just buy the

23    appliances and get them ordered and get them in.

24        Q.   What about the hardwood floors and the
```

```
 1    carpeting?  Who did you -- what are the steps by

 2    which you chose those?

 3         A.   Well, I knew I didn't want to put carpeting

 4    back in there, even though that was an upgraded

 5    carpet.  And the reason it was an upgraded carpet is

 6    because of -- we had problems in the house, and the

 7    carpet in the bedroom got molded because there was a

 8    leak in the -- in the laundry room, which came into

 9    that bedroom.

10         So we just -- I knew I didn't want -- in

11    Florida, I don't think carpet is needed.  I wanted

12    something that was easier to maintain.  So in

13    speaking with Kevin about that, he suggested that I

14    go to the Hadinger Flooring Company.  And I worked

15    with a girl, I believe her first name was Spring, and

16    she helped me in picking out hardwood flooring.

17         Q.   You talked about a leak a little bit earlier.

18    When did the leak occur in the laundry room?

19         A.   It was two weeks after I got in the house.

20         Q.   So still approximately November 2012?

21         A.   No.  No, no.  That leak had nothing to do

22    with the remediation.  It had to do with WCI.  It was

23    a leak in the laundry room that came under the floor

24    into the spare bedroom.
```

```
 1      Q.   Got it.

 2           Did WCI say that they were going to

 3   replace --

 4      A.   Yeah.  They replaced it.  Yeah.  They took

 5   care of all the repairs.

 6      Q.   Got it.

 7           What about the tile in the -- you said the

 8   tile was not replaced yet?

 9      A.   No, it was not.

10      Q.   What about the bathroom fixtures and the new

11   toilets and the new tub, how did you go about

12   selecting those?

13      A.   Well, my husband and I went up to Home Depot

14   and picked out the toilets that we wanted, and Kevin

15   picked them up, put them in.

16      Q.   What about the valances and any home

17   furnishings?  Did you remove and replace those?

18      A.   A lot of our personal property went in the

19   trash.  There was things that we -- I did not want

20   back in my home.  Like, I had a kitchen area set that

21   also -- I had bar stools that matched the kitchen

22   set, and I had -- because it's a great room, and all

23   of it is together.  And I had two end tables -- they

24   were all Hooker furniture -- with a coffee table,
```

```
 1    which had metal on it.  Well, all of that was trashed

 2    because it turned black, and the finish was coming

 3    off of it.

 4        Q.   And we'll talk about personal property, I

 5    think, a little bit later.  Because you are very

 6    organized and you gave us a listing.  So we'll go

 7    through that a little bit later on in the deposition.

 8            Can you describe your reaction to the

 9    remediation after you moved in?

10        A.   My home wasn't finished, so my reaction

11    wasn't of -- I mean, I wasn't the most happiest

12    person in the world, because I'm still dealing with

13    it.

14        Q.   How did you feel when the remediation was

15    completed in June of 2013?

16        A.   I was glad that the remediation was -- I was

17    finally not going to have to deal with Kevin Polkow

18    anymore.  I was disappointed that the tile was

19    damaged.  And he tried to epoxy where he put -- he

20    tried to epoxy it, but it's one of the first things I

21    see when I walk in the front door.

22        Q.   Did he make any promises or guarantees that

23    we would fix and/or replace the tile?

24        A.   No.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Were -- did you smell any odors following the

 2   remediation?

 3        A.    No.

 4        Q.    Did you experience --

 5        A.    Can I take that back?

 6        Q.    Yes.

 7        A.    Actually, I did smell some odor from our

 8   leather couch, because it had not off-gassed

 9   completely.

10        Q.    And where is your leather couch currently?

11        A.    That leather couch is in the garbage.

12        Q.    And how quickly did you dispose of the

13   leather couch?  Do you recall?

14        A.    I don't know the exact date.  But we did buy

15   a new leather couch a year or two years ago.  I don't

16   remember.

17        Q.    Okay.  Did you experience any issues with the

18   appliances after the remediation was completed in

19   June of 2013?

20        A.    No.

21        Q.    Did you notice any corrosion or pitting

22   post-completion of the remediation in June of 2013?

23        A.    No.  Except for the furniture that we still

24   have.  On the bedroom suite, you can see on our
```

```
1    mirror it's still pitted.  And other furnishings --

2    the damaged furniture that we still have, you can see

3    the damages to it.

4         Q.   Were you pleased with the remediation?

5         A.   I'm satisfied.

6         Q.   Did the remediation bring your house back to

7    as good as it was before you suspected or encountered

8    any Chinese drywall?

9              MR. ALBANIS:  Object to the form.

10             THE WITNESS:  Would you repeat the question?

11             MS. HAQUE:  Sure.

12   BY MS. HAQUE:

13        Q.   Did the remediation bring your house back to

14   as good as it had been when you first moved in?

15             MR. ALBANIS:  Same objection.

16   BY MS. HAQUE:

17        Q.   And before you encountered Chinese drywall?

18             MR. ALBANIS:  Same objection.

19             THE WITNESS:  I don't think I'm qualified to

20        actually answer that question.

21   BY MS. HAQUE:

22        Q.   Was there anything you wished that had been

23   done in the remediation that wasn't?

24        A.   I wish all the tile had been taken out and
```

```
 1   removed.

 2        Q.   Anything else you wished the remediation had

 3   accomplished?

 4        A.   I wished they had taken out that center

 5   island completely and put all new in.  I wish I

 6   didn't put that valance that's on the -- that I loved

 7   in the beginning, I wish that wasn't even up there

 8   anymore.

 9        Q.   Did you take the opportunity to make any

10   other renovations or upgrades while the remediation

11   was being done?

12        A.   We redesigned the kitchen.

13        Q.   Can you talk about that?

14        A.   We just moved the cabinets around and put the

15   refrigerator on one wall and the stove on the other

16   wall so it would be more convenient.

17        Q.   Did it involve any construction work to be --

18   to the breaking down walls or in reconfiguration --

19   in reconfiguring the kitchen?

20        A.   There was a walkway going into the dining

21   area.  We just had them go across and put a cabinet

22   on the bottom.

23        Q.   Were any other renovations or upgrades done

24   to the home during the remediation process?
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1136 of 1680
Case 2:11-cv-00377-MSD-RJK Document 40-3 Filed 01/18/13 Page 39 of 53 PageID# 4614
Confidential - Subject to Further Confidentiality Review

```
 1        A.   In the master bedroom, we had that tub taken

 2   out, and we just put the shower -- a bigger shower

 3   in.

 4        Q.   So in the master bathroom --

 5        A.   Yes.

 6        Q.   -- originally there was just a tub?

 7        A.   There was a tub and a real small closet -- I

 8   mean, not closet -- it was a shower.  So we took that

 9   shower and moved it on the other side and just put a

10   cabinet around there.

11        Q.   Do you know if they had to reconfigure the

12   plumbing in the master bathroom to accomplish that?

13        A.   Yes.  But they could tie right into the sink,

14   is what they did, from my understanding.

15        Q.   Did they have to reconfigure any of the

16   wiring in either the kitchen remodel or the master

17   bathroom remodel?

18        A.   Not that I'm aware of.

19        Q.   Any other upgrades or renovations, do you

20   recall?

21        A.   No.

22        Q.   We've examined samples of drywall that were

23   collected from your home in counsel's office the

24   other day.  Do you recall who collected those samples
```

```
1    of the drywall that was removed?

2         A.   Say that again.

3         Q.   Sure.

4              So we examined samples of drywall from your

5    home in counsel's office the other day.  Do you

6    recall who took out those samples?

7         A.   It's -- it's in one of these.  It's

8    Intuitive.

9         Q.   To your -- and presumably, those samples were

10   collected during that inspection back in May of 2012?

11             MR. ALBANIS:  Object to the form.

12   BY MS. HAQUE:

13        Q.   Do you know when -- let me rephrase.

14             Do you know when the samples were taken?

15        A.   It would have been May of 2012, because

16   that's when we started remediation.  I was there.  He

17   took all those samples in my presence.

18        Q.   Were those all the samples that were

19   collected, or do you have more samples?

20        A.   That's all that I know of.

21        Q.   And you said you -- did someone also take

22   photos of the back of the drywall boards that were

23   removed from the home?

24        A.   I took pictures.  I'm sure Allied took --
```

```
 1    well, I know Allied took pictures.  Intuitive took

 2    pictures.

 3        Q.   In the drywall boards that were removed, all

 4    of those individuals you listed took photos, to your

 5    knowledge?

 6        A.   As far as I know.

 7        Q.   Okay.  And do you know if those photos show

 8    the markings that were on the drywall?

 9        A.   It's my understanding they do.

10        Q.   Did someone draft a floor plan of the house

11    that showed where the drywall boards were removed?

12        A.   Yes.

13        Q.   Is that the same floor plan we looked at in

14    the Intuitive inspection report?

15        A.   Yes.

16        Q.   Have you seen any other floor plan other than

17    the one that was in that report?

18        A.   No.  Not to my knowledge, no.

19        Q.   Do you know if the inspectors have any photos

20    that have not been disclosed?

21        A.   Not to my knowledge.

22        Q.   And you have disclosed all of your photos

23    that you took personally to your attorneys?

24        A.   Yes, I have.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1139 of 1680
Case 2:11-cv-00377-MSD-RJK Document 140 Filed 03/18/19 Page 92 of 133 PageID# 4617
Confidential - Subject to Further Confidentiality Review

```
 1              MS. HAQUE:  Do you want to take a five-minute
 2         quick break right now?  Because we're going to
 3         switch topics and go into the personal property.
 4              THE WITNESS:  I'm okay.
 5              MR. ALBANIS:  Or do you want to keep going?
 6              THE WITNESS:  I'm okay.
 7              MR. GUERRA:  I think we should take a
 8         five-minute break.
 9              MS. HAQUE:  Okay.  We'll just take a quick,
10         not 15, a five-minute break and consult with my
11         colleagues here.
12              (Recess from 9:35 until 9:40 a.m.)
13    BY MS. HAQUE:
14         Q.   Mrs. Foster, just a couple more questions on
15    the remediation before we go on into another topic.
16              Have you experienced any medical issues since
17    the remediation was completed in June of 2013?
18         A.   I have -- I do some have medical issues, but
19    nothing like I had before.
20         Q.   Are they the same types or categories of
21    medical issues that you experienced before?
22         A.   In comparison, I don't have any health issues
23    compared to what I had before.
24         Q.   Can we take a look at -- this was Exhibit 6,
```

```
1    which is going to be -- there we go.

2         A.   Okay.

3         Q.   Could you flip with me to the last page,

4    please.  And could you read for me the disclaimer

5    under the signature?

6         A.   "The above work meets the requirements for

7    the protocol provided by the 2009 Florida Coalition

8    of Chinese Drywall.  Polkow Construction makes no

9    representations, warranties, or guarantees as to the

10   accuracy or the completeness of any information

11   contained in this protocol or the compliance with any

12   applicable statutes, laws, rules, or regulations."

13        Q.   To your knowledge, did Polkow comply with the

14   requirements of the protocol of the 2009 Florida

15   Coalition of Chinese Drywall?

16        A.   Absolutely.

17        Q.   With respect to the work that Polkow did, I

18   believe you've indicated that they used smaller

19   drywall boards such as that there is a gap?

20        A.   Repeat that question.

21        Q.   Sure.

22             Okay.  Well, let me go ahead and show you --

23        A.   You're referencing --

24        Q.   If you can answer, go ahead.
```

```
 1        A.   I can answer that.

 2             Because that's the original tile, there -- in

 3    some areas in the house, there are gaps.  Like, for

 4    instance, when they put the American drop board up --

 5    like, for instance, this is the tile.  When they put

 6    the drywall up, there might be a larger gap at the

 7    bottom where they had to put more grout in there to

 8    make, you know, a seam look more appropriately.

 9             And that's -- and then because of that, we

10    even had to -- I had Kevin install the baseboard, get

11    a larger baseboard that would -- you know, help mask

12    that and cover that up.  Some areas it worked; in

13    some areas it didn't.

14        Q.   And that gap is attributable to the Polkow's

15    construction process and the type of drywall they

16    chose to put in the house?

17        A.   From my understanding --

18             MR. ALBANIS:  Objection.  Objection to the

19        form.

20             Go ahead.

21             THE WITNESS:  From my understanding, it's not

22        because of the American drywall.  It's because of

23        the Chinese drywall depth was larger than the

24        American drywall.  That was my understanding.
```

```
 1     BY MS. HAQUE:

 2         Q.   And was it -- who explained that to you?  Do

 3     you recall?

 4         A.   Kevin.  Because I questioned him on it.

 5         Q.   And he explained that that was the issue with

 6     the depth?

 7         A.   Yes.

 8         Q.   You spoke a little bit earlier about the

 9     process you went through to choose new appliances.

10     How did the new appliances compare with the existing

11     appliances?

12         A.   They worked.

13         Q.   Can you explain a little bit more about the

14     replaced ones?  What -- what were the -- let me

15     rephrase.

16              What were the types and brands of the

17     original appliances, if you recall?  For example,

18     the -- let's take it piece by piece.

19              Do you recall the brand and type of your

20     original refrigerator from 2007?

21         A.   I believe they were Whirlpool products.

22         Q.   Did the original refrigerator experience --

23     did you experience problems with the original

24     refrigerator as soon as you moved in?
```

```
 1      A.   No.

 2      Q.   Was the new Thermador refrigerator that you

 3   have, other than working, was it a better appliance

 4   than the Whirlpool, in your opinion?

 5      A.   First off I had the Whirlpool appliances.

 6   The first refrigerator that I had when I first moved

 7   into the home, it failed.  And I don't know the exact

 8   date that it failed.  But WCI brought me a new

 9   refrigerator.  Then I started experiencing

10   problems -- this is all before I knew I had Chinese

11   drywall.

12           So I had these problems with the original.

13   Then they gave me a new one.  Then I started having

14   problems with that.  Had problems with the microwave,

15   the dishwasher, the washer.

16           I didn't want Whirlpool products.  I mean, I

17   was done with Whirlpool.

18      Q.   To your knowledge, were the majority of your

19   appliances Whirlpool?

20      A.   I believe so.

21      Q.   And in your opinion, is Whirlpool not as good

22   a brand as the brands that you currently have in your

23   house?

24      A.   Previously, I always liked Whirlpool.  I had
```

```
1    them in my previous homes.  The reason why we chose

2    the Thermador, going with that company, is because he

3    gave us a discount through buying all the appliances

4    through him, and then plus I got the construction

5    discount.  That's why we bought those appliances.

6         Q.   Okay.  In terms of the dishwasher and the

7    washing machines as well, in your opinion, were those

8    brands also superior or better than the Whirlpool?

9         A.   I can't honestly say that they're better.

10   But they all -- I mean, the kitchen appliances are

11   all in -- I mean, I wanted them all to look nice in

12   the kitchen.  But they're not -- it's not a Thermador

13   washing machine.  It's -- I forgot -- I believe that

14   was a Whirlpool.

15        Q.   Do you recall different characteristics of

16   the washing machine?  For example, was it front-load

17   versus top, for the previous?

18        A.   I can't remember now.

19        Q.   And your current one?

20        A.   My current one is a front loader.

21        Q.   Did you have any new appliances that were put

22   in that you did not previously have in the home?

23        A.   Oh, did I put any -- would you repeat the

24   question.
```

```
1     Q.   Sure.

2          Did you have any appliances put in the home

3     that you did not previously have?

4     A.   Yes.  That little beverage center.  I had him

5     put that in.

6     Q.   Okay.  Other than the beverage center, were

7     there any new appliances that were put in?

8     A.   Not that I recall.

9     Q.   Do you recall if the Thermador refrigerator

10    was more expensive than the Whirlpool refrigerator?

11    A.   I'm sure it was.

12    Q.   Okay.  Was the original refrigerator a

13    built-in refrigerator or was it a standalone

14    refrigerator?

15    A.   No.  It was a counter-depth.

16    Q.   A counter-depth?  Okay.

17         And was the Thermador a built-in refrigerator

18    or a counter-depth refrigerator?

19    A.   I'm not sure if they call that counter-depth

20    or not.

21    Q.   Okay.  But it -- but it's built into the

22    wall?

23    A.   It's -- yes.  It fits in there.

24    Q.   Okay.  Do you recall the brand of your
```

```
1    current washer and dryer?

2        A.   LG.

3        Q.   LG?

4             Do you know if LG is more expensive than

5    Whirlpool or the same price?

6        A.   I have no idea.

7        Q.   How about the Bosch dishwasher?  Do you

8    recall if the Bosch dishwasher was the same price or

9    more expensive than the Whirlpool dishwasher?

10       A.   I believe it's more expensive.

11       Q.   Okay.  I'm going to next ask you some

12   questions related to the alternative living expenses

13   damages that you've claimed in this lawsuit.

14            How long did you live in the house at

15   10814 Fortina after you suspected that the house

16   contained Chinese drywall?

17       A.   Even though I suspected it previously than

18   February 2009, I tried to get answers from WCI;

19   wasn't getting anywhere.  Then I had the house

20   inspected.  WCI -- and I don't know the time from

21   this, but -- and I don't know -- I don't recall all

22   the details, but I do know that WCI contacted -- at

23   some point in time, I was told that WCI was going to

24   make us whole.  This is before the bankruptcy.
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1147 of 1680
confidential - Subject to further confidentiality review
1625

```
 1            So we had hoped that WCI would take care of

 2    us.  And -- but then I was getting sicker all the

 3    time, and I -- and I really had a fear that -- I

 4    didn't know what the long-term effects would be.  So

 5    and then once I had the house inspected, I knew for

 6    certain that we had the Chinese drywall, and I knew

 7    we were going to have to leave.

 8            So I moved out in October of 2009, lived in

 9    our condo for about approximately two years.  And

10    then once we -- my husband and I decided that the

11    best thing for us to do is rent the house down the

12    street from our neighbor, rent our condo out, and

13    then make arrangements to remediate the house.

14        Q.   Okay.  Let me go back to something you said.

15            You said that you first suspected Chinese

16    drywall prior to February of 2009 when you had the

17    doctor's visit.  Do you recall -- I know it was a

18    long time ago, but do you think it was 2008 when you

19    first suspected, or maybe January 2009 when you first

20    suspected?

21        A.   I have -- I can't recall.

22        Q.   Okay.  Did anyone else live with you in the

23    house during the time after you suspected there was

24    Chinese drywall?
```

```
1        A.   My husband lived there for a time, and then,

2   of course, he had to go back to work.

3        Q.   So you moved out of the house in -- at

4   10814 Fortina in October -- yeah, October of 2009.

5   Did anyone tell you you needed to move out?

6        A.   I know that I needed to move out for my own

7   well-being and for my health.

8        Q.   And that was the primary reason for you to

9   move out at that time?

10       A.   Absolutely.

11       Q.   Did you attempt to remove any drywall from

12  your house before you moved out?

13       A.   No, I didn't attempt to move any drywall out.

14       Q.   What options did you consider at that point

15  in selecting where to move next?

16       A.   We had no -- as far as I'm concerned, we had

17  no choice.  Even though our condo was rented, even

18  though we knew we were going to lose the loss of

19  rent, we figured it would be better to go into our

20  own condo rather than rent another house when we

21  didn't know how long we would have to rent that house

22  for.

23       Q.   And you lived out of your house from

24  approximately October 2009 to November of 2012?
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1149 of 1680
confidential – Subject to further confidentiality Review
1627

```
 1       A.   Uh-huh.

 2       Q.   Do you recall how much total money you

 3  spent -- you believe you spent for alternative living

 4  expenses?

 5       A.   Approximately 190,000.

 6       Q.   And let's break that down step by step.

 7            Let's first talk about the alternative living

 8  expenses related to your condo, and that's at

 9  10137 Colonial Country Club, Unit 1106?

10       A.   Uh-huh.

11       Q.   How -- your -- how much do you recall are you

12  claiming in alternative living expenses related to

13  that condo?

14       A.   Approximately 60 -- 60,000.

15       Q.   And I believe the number you put is close to

16  that.  It's $58,706 and some change.

17            I have -- I have what we have premarked as

18  Exhibit 8.

19            (Defendants' Exhibit 8 was marked for

20  identification.)

21  BY MS. HAQUE:

22       Q.   Do you recognize this document?

23       A.   Yes.

24       Q.   Did you put together this document?
```

```
 1                MR. ALBANIS:  Object to the form.

 2     BY MS. HAQUE:

 3          Q.   Or I should say who -- let's look at the

 4     first page of the document.

 5          A.   Okay.

 6          Q.   Who drafted this first page?

 7          A.   I did.

 8          Q.   And let's flip to the second page.  Do you

 9     recognize this next set of pages?

10          A.   Yes.

11          Q.   What is this document?

12          A.   This is our lease agreement with our prior

13     renter.

14          Q.   And does your signature appear on this

15     document?

16          A.   Yes.

17          Q.   And approximately how much did you charge

18     your -- your renter per month to live in this condo?

19          A.   Are we talking about the first --

20          Q.   Yes.  Correct.

21          A.   850.

22          Q.   Okay.  And that's $850 per month?

23          A.   Per month.

24          Q.   Now, in terms of the almost $60,000 that
```

Confidential -- Subject To Further Confidentiality Review

```
1    you're claiming with respect to this condo, what

2    other numbers are factored into that amount?

3         A.   It's the cost for the mortgage payment, the

4    cost for the association dues in Colonial, electric,

5    cable, Internet.

6         Q.   Would you have to pay the mortgage payments

7    to the condo regardless of whether you lived in the

8    condo?

9         A.   Yes.

10        Q.   What about the condo association fees, would

11   you have to pay those regardless of whether you lived

12   in the condo?

13        A.   Yes.

14        Q.   And the insurance payments?

15        A.   Yes.

16        Q.   And the yearly taxes?

17        A.   Yes.

18        Q.   So those four categories, you would have to

19   pay no matter if you lived -- no matter where you

20   lived.  Is that -- is that fair to say?

21        A.   If I have it rented out, I wouldn't accrue

22   all this payment.  The rent would help pay for all

23   these expenses.

24        Q.   So you're unable to rent this condo for a
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1152 of 1680
confidential -- Subject to further confidentiality Review
1630

```
 1   total of 22 months.  Is that accurate?

 2        A.   I lived in that condo.  I couldn't rent it if

 3   I'm living in it.  I had no place else to go.

 4        Q.   So --

 5        A.   I couldn't live in my Chinese drywall house.

 6        Q.   So at $850 per month for 22 months, that's a

 7   total of $18,700 that you were unable to collect from

 8   a renter, approximately?

 9        A.   I don't know the exact -- well, I don't know

10   the exact -- how much it was for the year for renting

11   it.

12        Q.   Okay.  You also are claiming an amount of

13   $27,406.92 to move into the condo.  Do you recall

14   what -- what is going into that number to account for

15   the moving costs?

16        A.   Well, first off, when I moved into the condo,

17   I took very little with me.  I took enough personal

18   possessions just to even get in there.  I had -- that

19   condo was rented with his furniture.  And once I told

20   him that I was going to be moving in there and that I

21   couldn't rent it out again, I asked him if he was

22   going to -- what he was going to do with his

23   furniture, and he said he was going to take it back

24   to his home.  And I said, if you -- because I was --
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1153 of 1680#
Case 2:09-md-02047-MSD-RJK Document 164 Filed 01/31/14 Page 106 of 183 PageID#
confidential -- Subject to further confidentiality Review
1631

1   first off, I was sick.  I didn't feel like going

2   shopping.  So I asked him if I could buy some of his

3   furniture, and that's what I did.  That goes into it.

4        The other costs are maintaining that home

5   ourself.

6   Q.   Do you recall how much you paid him for the

7   furniture, your renter?

8   A.   I don't know the exact amount.

9   Q.   Do you have any receipts regarding to --

10  regarding the maintenance of the condo while you were

11  there?

12       I don't think we saw any in the stack.

13  A.   I'm -- I'm thinking that I gave all that

14  information to my attorney, all the receipts and

15  documents, but I'm not a hundred percent sure on that

16  either.

17       MR. ALBANIS:  And we've withheld no documents

18       that Mrs. Foster gave us.

19       MS. HAQUE:  Sure.  Understood.

20  BY MS. HAQUE:

21  Q.   Is it possible for you to just add that to

22  the list, just to confirm that you don't have any

23  receipts related to the maintenance of the condo?

24  A.   (Nodding head.)

```
 1      Q.   Great.

 2           We believe we do have receipts for the

 3      furniture you bought from the tenant, and it's

 4      approximately $2,500.  Does that sound --

 5      A.   That sound about right.

 6      Q.   -- about right?

 7      A.   Uh-huh.

 8      Q.   Do you recall the types of payments you paid

 9      with respect to the remainder, about $25,000, in

10      maintenance costs?

11      A.   Is that -- are you referring to the condo?

12      Q.   To the condo, yes.

13      A.   I'm not a hundred percent sure, but I would

14      think it would probably be the association fees, the

15      taxes, the insurance, any of the fees that we pay.

16      Q.   So the mortgage payments, condo association

17      fees, insurance, and yearly taxes approximately would

18      have gone into the 27,000 number?

19      A.   I'm sure it would have.

20      Q.   Okay.  And you are claiming approximately

21      $89,000 to move out of the house.  Can you provide us

22      with a breakdown to the best of your recollection of

23      that and if you have any associated receipts?

24      A.   89,000 for?
```

```
1        Q.   For the moving out of the condo.

2             MR. ALBANIS:  I'm going to object to the

3        form.

4   BY MS. HAQUE:

5        Q.   And we can actually show you a document.

6             MR. ALBANIS:  That would help.

7             MS. HAQUE:  One second.  I just want to put

8        the -- so you see the document with the

9        furniture.

10            It'll just take a second.

11  BY MS. HAQUE:

12       Q.   All right.  I'm showing you what has been

13  marked as Exhibit 9.

14            (Defendants' Exhibit 9 was marked for

15  identification.)

16  BY MS. HAQUE:

17       Q.   I don't need you to -- why don't you take a

18  second just to familiarize yourself with that.  It's

19  a lot of documents.  And I want to focus your

20  attention, when you finish, on the back of Page 1.

21       A.   Would it be better to go through the pages

22  and --

23       Q.   Sure.

24            Why don't we just turn to the back of this
```

Confidential - Subject to Further Confidentiality Review

```
 1    page first.

 2         A.   Okay.  Sure.

 3         Q.   Do you recognize this document?

 4         A.   Yes.

 5         Q.   Is that your signature at the bottom of this

 6    document?

 7         A.   Yes.

 8         Q.   Can you describe for us what this document

 9    is?

10         A.   This is where I bought my tenant's furniture

11    so I could live there temporarily.

12         Q.   And how much did you pay to purchase the

13    furniture?

14         A.   2,500.

15         Q.   And that 2,500 is included in your move-in

16    costs that you're claiming of approximately 27,000,

17    correct?

18         A.   That's including.

19         Q.   Okay.

20         A.   But this is just one example of many other

21    things that I needed after I moved in.

22         Q.   If you flip to the first page, do you know

23    if -- if any of these items were purchased for the

24    condo?
```

```
 1        A.    No.  This is actually for the Fortina

 2   address.

 3        Q.    Okay.

 4        A.    Examples of costs.

 5        Q.    Okay.  Let's set this aside, because we'll go

 6   through your personal effects a little bit later.

 7              But what I do want to show you is another

 8   document -- oh, actually, one moment.

 9              So there's another document in here --

10   unfortunately, there are no page numbers but -- you

11   can set that aside.  I'm sorry.

12              You kept a lot of paperwork, so we're just

13   going through a lot of it.

14              And I'm going to show you what's been

15   marked as -- we're on Exhibit 10, I believe.

16              (Defendants' Exhibit 10 was marked for

17   identification.)

18   BY MS. HAQUE:

19        Q.    And I want to hold this page open for you, if

20   you want to just stick a finger there.

21              Do you recognize this document?

22        A.    I do recognize it.

23        Q.    It's Page 84.  Unfortunately, there are no

24   page numbers, so you might have to take a second and
```

```
1    flip through that.

2           Do you remember that document?

3    A.    Are you talking about this one?

4    Q.    Correct.

5    A.    Yes.

6    Q.    What is that document?

7    A.    It's actually when my husband and I moved out

8    of the -- my neighbor's house, Jack Walsh's house,

9    and moved back into our house.

10   Q.    Okay.  And -- go ahead.

11   A.    And we moved -- first -- my husband and I

12   moved everything that we possibly could this time,

13   because we learned our lesson the first time in

14   moving all of our stuff.  We contracted with them to

15   move only our heavy furniture, and we moved all the

16   other stuff ourself.

17   Q.    Did you also use this company to move into

18   the condo -- or, to move anything into the condo?

19   A.    No.  I took very little with me.  It all fit

20   in the car.

21   Q.    Okay.  You can set that document aside.

22           All right.  I'm going to show you what's been

23   marked as Exhibit 11.

24           (Defendants' Exhibit 11 was marked for
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1159 of 1680
confidential - Subject to Further confidentiality Review
1637

```
 1    identification.)

 2    BY MS. HAQUE:

 3         Q.   Do you recognize this document?

 4         A.   Yes.

 5         Q.   Who drafted the first page?

 6         A.   I'm not a hundred percent sure, but I believe

 7    my husband and I both worked on this.

 8         Q.   Okay.  Can I bring your attention down to the

 9    column that says Receipts.  All the way at the bottom

10    of the column, can you read that line for me, please?

11         A.   $89,429.47.

12         Q.   And that pertains to costs related to "moving

13    out of our house," correct?

14         A.   Correct.

15         Q.   And by "our house," you're referring to the

16    10814 Fortina Drive?

17         A.   Correct.

18         Q.   Can you discuss what numbers went -- or, what

19    values went into calculate the $89,000 and if you

20    have any receipts related to them?

21              MR. ALBANIS:  Object to the form.

22              But you can answer, if you can.

23              THE WITNESS:  So would you repeat the

24    question?
```

```
 1              MS. HAQUE:  Sure.

 2    BY MS. HAQUE:

 3       Q.   Can you tell us how you calculated this

 4    $89,429.47 amount?

 5       A.   First off, this is -- the amount is due from

 6    October 2009 until we moved back into our remediated

 7    Chinese drywall house in November 2012.  It has the

 8    list of the electric that we had to pay, Sebastian

 9    Pool Maintenance, repairs of the golf cart, water

10    bills, Comcast cable and phone.

11       Q.   Can I ask you, did -- if you added all of

12    these items in the column above, is that how you got

13    to the $89,000 number?  Do you know?

14       A.   Actually, I would have to spend some time to

15    go over it to even -- because this was done a long

16    time ago also.  So I'm not -- I would have to

17    reconfigure it to, you know . . .

18              MR. ALBANIS:  And probably use a calculator.

19              MS. HAQUE:  Sure.

20    BY MS. HAQUE:

21       Q.   And have you, to your knowledge, provided all

22    of the receipts related to the move out of the home?

23       A.   Yes, I have.

24              MR. ALBANIS:  Object to the form.
```

```
 1              THE WITNESS:  As far as I know.

 2    BY MS. HAQUE:

 3         Q.   All right.  You can go ahead and set that

 4    down.

 5              And can you tell me when you lived -- from

 6    what month and what year to what month and what year

 7    you lived in the condo at Colonial Country Club?

 8         A.   Actually, it's on here.  It's on one of these

 9    documents I just saw.  I moved out of the Chinese

10    drywall house in October of 2009.  I lived there a

11    little over two years in the condo.  And then we

12    rented Jack Walsh's house just over a year.

13         Q.   So you moved out in approximately July of

14    2011, out of the condo?

15         A.   I believe so, yes.

16         Q.   Okay.  And then you lived at the address at

17    10828 Tiberio Drive?

18         A.   Correct.

19         Q.   Is that correct?

20              From July 2011 to approximately

21    November 2012?

22         A.   Correct.

23         Q.   Is that right?

24              Okay.  And then you moved back to your
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1162 of 1680
confidential -- Subject to Further Confidentiality Review
1640

```
 1    remediated home in November of 2012?

 2        A.   Our partially remediated home, because it

 3    wasn't even completed.

 4        Q.   Okay.  So let's turn back to Exhibit 11, I

 5    believe this was.

 6             So we just quickly did the math on this, and

 7    from the first page where it says "rental costs at

 8    10828 Tiberio Drive," all the way down through

 9    "Comcast cable and phone at rental houses," we came

10    up with a number that is greater than the 89,000.

11             So I guess my question is:  Do you recall

12    what the 89,000 is and whether any of these items

13    you're including in the 89,000?

14             MR. ALBANIS:  Object to the form.

15             But you can answer, if you can.

16             THE WITNESS:  You may have to ask my husband

17        that question.

18             MS. HAQUE:  Okay.

19             THE WITNESS:  I'm not looking at it.  It's

20        been a very, very long time.

21             MS. HAQUE:  Okay.  We will -- we'll do that,

22        sure.

23    BY MS. HAQUE:

24        Q.   A couple questions unrelated to the move-out
```

```
 1    process.

 2          Did you cancel the cable at the 10814 Fortina

 3    address when you left in 2009?

 4    A.    Yes.

 5    Q.    One second.

 6          Okay.  If you turn with me to -- it's going

 7    to be page -- Page 11.  And at the top of the page --

 8    yes, I believe that's the right page.

 9          Did you have monthly payments of cable while

10    you lived in the condo at Colonial Country Club?

11    A.    Uh-huh.

12    Q.    If you look at the bottom of the page,

13    there's some entries for quarterly cable.

14    A.    What that is, is in our association, they

15    only give you basic cable.  So when I moved into the

16    condo, I had Comcast come out, and I got Internet and

17    more TV channels.

18    Q.    Okay.  So these quarterly cable charges are

19    the basic package?

20    A.    Just the basic.

21    Q.    And did you receive any Internet through the

22    condo association?

23    A.    No.  At that time they did not, no.

24    Q.    Okay.  So the monthly payments for Comcast,
```

```
1    which are on, I believe, the second page of this

2    document --

3              MR. GUERRA:  Can we go off the record?

4              MS. HAQUE:  Yeah.  Can we go off the record

5         for just one moment.

6              (Discussion off the record.)

7    BY MS. HAQUE:

8         Q.   So just to confirm, these monthly Comcast

9    bills on the second page relate to the additional

10   upgraded additional channels plus the Internet that

11   you received in the condo beyond the quarterly cable

12   fees?

13        A.   Yeah.  I mean, it wasn't that big of an

14   upgrade, but it was -- it gave me Internet; no movie

15   channels or anything like that.

16        Q.   Okay.  And then if you flip back over to the

17   first page, I think we've figured out how the 89,000

18   came together.

19        A.   Good.

20        Q.   But I'll ask your husband, but I just want to

21   ask you as well to see if it jogs your memory.

22             It looks like, if you look at the bottom,

23   total cost to rent from Jack Walsh, the total cost

24   incurred while not being able to rent -- so that's
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1165 of 1680#
Confidential - Subject to further confidentiality review
1643

1    total cost to rent from Jack Walsh, $18,756.99; the

2    total cost incurred while not being able to rent,

3    $58,706.77.

4         And then at the very bottom, you'll see two

5    entries right above the 89,000:  It's total expenses

6    at Chinese drywall house, $7,853.54; and then Comcast

7    cable and phone at rental houses, $4,112.17.

8         And that totals to $89,429.47.

9         Does that sound accurate to you as the way

10   you came up with that number on move-out?

11   A.   Once again, I would have to go back and

12   physically do it myself.

13   Q.   Okay.  Another -- on this first page, you

14   have an entry at the top.  It says:  Costs for

15   storing house furnishings during remediation

16   $10,041.36.  Do you have any receipts related to that

17   transaction?

18   A.   Actually, we've already discussed that.  That

19   was in -- if we had used this company to move out our

20   Chinese drywall possessions and store it, and they

21   were only going to -- I think that price included

22   three months, and then we would have to keep paying

23   additional.  And we didn't know how long it would be

24   in there, and that's why -- one of the reasons why we

```
1    decided to rent Jack Walsh's house.

2        Q.   But that -- but you never ended up actually

3    going through with the quote?

4        A.   Right.

5        Q.   Understood.  Okay.

6             You also have listed pool expenses.  Can you

7    talk about what the pool expenses are related to?

8        A.   Prior to having to move out of our house, the

9    Chinese drywall house, we did the pool service

10   ourself.  And so, therefore, we're not living there,

11   so I had to hire someone to clean the pool.  And then

12   we -- of course, you have breakdown of the equipment.

13   And, in fact, we just replaced something just

14   recently that I don't even think we even put in here,

15   now that we we're talking about the pool.

16       Q.   What about the water bills and the electric

17   bills?  Did you turn off the water at the

18   10814 Fortina?

19       A.   No.

20       Q.   And what was your rationale for -- or, why

21   didn't you turn off the water?

22       A.   Well, first off, that's a yes and no.  I

23   would turn it off when I wasn't there, and then when

24   I would go back over there, I still ran water through
```

```
 1    the piping and flushed the toilets, because the odor

 2    and stuff.  And of course, I had to fill the pool up

 3    during the winter months.  So I always turned the

 4    water off when I leave the house.

 5        Q.   Approximately how often did you visit the

 6    home and go through this process of checking the

 7    water and flushing the water system when you --

 8    between 2009 and when you moved back in 2012?

 9        A.   Unfortunately, I was over there on a constant

10    basis because I was trying -- like I said before,

11    even -- I had to go back over there and get our

12    financial documents, different things, and I would

13    take it over to the condo and off-gass it, along with

14    even clothing or shoes, trying what I could put in

15    that condo to clean, which wasn't much.

16        Q.   Would you say it was a weekly basis?  A

17    monthly --

18        A.   I was there weekly.

19        Q.   Okay.  What about the electricity in the

20    home?

21        A.   It was left on.

22        Q.   Did you have natural gas in the home?

23        A.   No.

24        Q.   Do you -- did you -- what about the golf cart
```

```
 1    and other vehicles?  What did you do with those?

 2        A.    Well, the golf cart, we kept having problems

 3    with it, with the wiring; not just the golf cart, but

 4    the golf cart charger.  We had it repaired several

 5    times.  There was corrosion underneath it.  We

 6    actually did replace our golf cart.

 7              And what was the other part of the question?

 8        Q.    Any other vehicles that you had.

 9        A.    Oh.  And the other vehicle, of course, my

10    husband was gone, so I had a vehicle there, and I

11    ended up getting rid of that because I was having so

12    many troubles with it.

13        Q.    Let's take that step by step.

14              Let's talk about the vehicles that you owned

15    other than the golf cart.  What -- what did you

16    drive?

17        A.    It was a little Ford -- I believe it was

18    called Escort, a small car.

19        Q.    When did you first purchase that vehicle?

20        A.    I'm not exactly sure, but it was probably

21    somewhere -- I don't know -- I believe maybe 2007 or

22    2008.

23        Q.    And when did you first notice that there were

24    problems related to the Ford Escort?
```

```
 1        A.   I can't -- it's been so long ago, I can't

 2   remember.

 3        Q.   How long did you have that car?

 4        A.   I had that car, it progressively getting

 5   worse, and then I bought a new vehicle in -- it was

 6   after we moved -- I think it was after we moved in

 7   the house -- 2013, '14.  I think it's a 2014 vehicle.

 8        Q.   Okay.  Where did you keep the car while you

 9   lived in the 10814 Fortina?

10        A.   In the garage.

11        Q.   Did you ever keep it outside the home?

12        A.   Very seldom.

13        Q.   I think we looked at the floor plan earlier

14   today, and it stated that there was no Chinese

15   drywall in the garage.

16             Did you experience any issues with the car

17   that you attribute to Chinese drywall?

18        A.   Absolutely.

19        Q.   And what were those issues?

20        A.   Oh, well, first off, whenever you would open

21   up the garage, you could still smell Chinese drywall

22   in my house.

23             I know that diagram says there wasn't any in

24   there, but I had problems with the vehicle.  I don't
```

```
 1    think -- I'm -- I don't even think there's anything

 2    in here about our vehicle, except for the golf cart.

 3        Q.   Did -- do you know if the car was bought

 4    used, the Ford Escort?

 5        A.   No.

 6        Q.   It was bought new?

 7        A.   Uh-huh.

 8        Q.   Do you believe that there was Chinese drywall

 9    in your garage?

10        A.   I have -- I don't know.

11        Q.   Do you have any receipts, to your

12    recollection, of issues with the car, either car

13    maintenance --

14        A.   I believe I threw all that away when I got

15    rid of the car.

16        Q.   Okay.  Do you have any receipts for the pool

17    maintenance, that we talked about a little bit

18    earlier, while you were not living in the home?

19        A.   I don't know that I have any.  If I've

20    written it down on here, except for the -- no -- I

21    don't know that I have them, but I can certainly

22    look.

23        Q.   Great.  That would be -- that would be very

24    helpful.
```

```
 1              Did you pay for the Comcast cable and

 2    Internet at all the homes in which you lived, the

 3    10814 Fortina, the condo, as well as Jack Walsh's

 4    home?

 5         A.   Yes.

 6         Q.   But were they all paid simultaneously?  Did

 7    you pay for the Comcast in the home at 10814 Fortina

 8    at the same time as --

 9         A.   No.  I only had those services when I was

10    living in this home.  When I wasn't living there

11    anymore, they were cancelled -- or, transferred to

12    the next address.

13         Q.   Okay.  Let's talk about the golf cart.

14              Oh, I'm sorry.  Did you have any other cars

15    that you kept in the garage or that you kept at the

16    house at 10814 Fortina?

17         A.   My husband had a car, but it was not kept in

18    the garage.  Just my car.

19         Q.   Were there any problems with your husband's

20    car, to your recollection?

21         A.   No.

22         Q.   Let's talk about the golf cart.

23              Where was the golf cart kept in the home?

24         A.   In the garage.
```

```
 1        Q.    Do you -- and can you tell me again about the

 2    problems that you experienced with the golf cart?

 3        A.    We had problems with the --

 4        Q.    Please continue.

 5        A.    We had problems with -- I'm not exactly sure,

 6    because I'm not a mechanic.  I just know the golf

 7    cart wouldn't go.  So I would call somebody out.

 8    They would come out.  They replaced some things

 9    underneath where the batteries were.  We replaced the

10    batteries.  The charger itself went out, and we had

11    to buy a brand new charger.  And -- and it's those

12    things.

13        Q.    Okay.  This document, if you can flip to

14    Page 12 and 13 -- actually, it's going to be Page 6,

15    because this is double-sided.  It's this document

16    that says Receiving Record.

17        A.    Oh, that is for the golf cart.

18        Q.    This is for the golf cart?

19        A.    Uh-huh.

20        Q.    Do you recall how much the total was?

21        A.    It looks like it's 182.72, perhaps.

22        Q.    Okay.  And do you know exactly -- was this

23    for the service or was it for parts?

24        A.    Service -- it says service call and repair.
```

```
1        Q.    Okay.  Okay.  And then the next page.  Can

2    you say what these documents are?

3        A.    Oh, actually, the first one is we bought golf

4    cart batteries at -- someone said Costco had good

5    batteries for golf carts and they were cheaper, so we

6    bought -- the 399.95 is for batteries.

7        Q.    And then the second receipt?  It looks like

8    it's June 2012.

9        A.    Yes.  So the next year, we had to buy, I

10   guess, one of the -- it looks like one of the

11   batteries went out; we had to buy another one.  And

12   then I guess those are parts for the cart.  I don't

13   know.

14       Q.    So the total amount is $681, just to confirm,

15   which is on the first page.

16             Yeah.  The repairs for the golf cart all the

17   way at bottom, $681.  And those are those receipts?

18       A.    I assume so.

19       Q.    And just to confirm, the golf cart was kept

20   in the garage?

21       A.    Correct.

22       Q.    Did you keep it anywhere else in the house?

23       A.    No.

24       Q.    Or, not the house, but the property?
```

```
 1        A.    No.

 2        Q.    So it was never kept outside of the property?

 3        A.    No.

 4        Q.    And it is your belief that the problems with

 5   the golf cart were due to Chinese drywall?

 6        A.    Absolutely.

 7        Q.    And you do believe that there was potentially

 8   Chinese drywall in the garage as a result?

 9        A.    I think it's quite possible.  But I don't

10   know that to be true a hundred percent.

11        Q.    Let's turn back to what's been marked as --

12   oh, just a quick clarifying question.  Where did you

13   keep the golf cart while you were outside of the home

14   from 2009 to 2012?

15        A.    We kept it in the Chinese drywall house until

16   we moved into Jack's house, and we brought it down

17   there.  But we used it -- to clarify that, actually,

18   I'm not a hundred percent sure we kept it in Jack's

19   garage or not.  We used it to haul things back and

20   forth.  And we were storing furniture in Jack's

21   garage trying to off-gass it.  So I can't

22   specifically say we stored it in his garage.  I don't

23   remember.

24        Q.    But you -- it's safe to say that you were
```

1    using the golf cart continuously from when you moved

2    out in 2009 until you moved back into the house in

3    November of 2012?

4        A.   I can't say that we used it continuously,

5    because we used -- I mean, there's very little you

6    can put on a golf cart.

7        Q.   Right.

8        A.   Like the ladder, a tall ladder, we were able

9    to strap it.  We didn't use it continuously because

10   we used mainly our vehicles, and it was easier for us

11   to put things on a dolly and just wheel it down the

12   street five houses down.  And that's -- for the most

13   part, we used our muscles to do all that.

14       Q.   Do you know approximately how long it takes

15   for one golf cart battery to exhaust?

16       A.   No, I don't.

17       Q.   In the two receipts that you have in front of

18   you, it looks like you bought a total of six golf

19   cart batteries from 2011 to 2012.  Do you know if all

20   of those batteries were used?

21       A.   Absolutely.  This other receipt, I think one

22   of -- I'm not sure, but one of the batteries could

23   have went dead and not the other, but I'm not a

24   hundred percent sure.  I don't know.

```
 1        Q.    Okay.  So one thing that we haven't talked

 2   about yet is the -- is -- in detail is the Jack Walsh

 3   home.  So can I turn your attention back to the

 4   leasing document, which is exhibit -- yeah, it's -- I

 5   think it's this -- Exhibit 8.

 6              So when did you vacate the Colonial Country

 7   Club condo?

 8        A.    We moved into Jack Walsh's house July 13th.

 9        Q.    And was there a renter that went into the

10   condo at that time?  Did you get a renter?

11        A.    I did get a renter.

12        Q.    Do you recall if that renter started

13   immediately upon your move-out?

14        A.    No, they did not.  From what I recall, of

15   course, I had to advertise it, and I did advertise

16   it.  And I wanted, because I bought that furniture

17   from Jack, I was hoping I could get a renter that

18   wanted something with furniture in it.  But

19   unfortunately, that didn't work out.  I had to rent

20   it unfurnished again, and all that furniture was

21   donated.

22        Q.    You donated it to Goodwill or another

23   organization?

24        A.    Uh-huh.
```

```
1      Q.   Did you try to sell the furniture at any

2    point?

3      A.   I did advertise it, but I didn't get

4    anything.  And then -- and I don't remember the exact

5    date that I started renting it out again.  But after

6    I -- after I figured out that we couldn't get it

7    rented with furniture in there, I had to dispose of

8    the furniture once I got a renter.  So I left it

9    advertised -- and not really advertised -- word of

10   mouth.  I think I went on Craigslist to try to sell

11   it.

12     Q.   Were any items -- I'm sorry.  I didn't mean

13   to cut you off.

14     A.   That's okay.  No, you're fine.

15     Q.   Were any items sold at all from the

16   Craigslist listing?  Do you recall?

17     A.   Not that I recall.

18     Q.   And when you say you advertised for the

19   renter, where did you advertise?  Was that also

20   Craigslist?

21     A.   Let me think.  I put a bulletin -- I put a

22   little card up at the town center.  Our town center

23   has a bulletin board for things for sale and so

24   forth.  So I put a card there.  And then there's a
```

1    website in Colonial that you can advertise if you've

2    got a rental place or you are selling your place, and

3    I put it on there.

4        Q.   Okay.  Did you apply or receive a tax

5    deduction for the furniture items that you donated?

6        A.   I'm sure I did.

7        Q.   Do you know approximately for how much it

8    was?

9        A.   I don't remember.

10       Q.   Did you have to pay to post on the bulletin

11   boards at your neighborhood or in the condo

12   association for a renter?

13       A.   No.

14       Q.   Okay.  So let's talk about the home at

15   Tiberio place -- or, Jack Walsh's home.  Can you say

16   again when -- from when and when you rented?  It

17   was -- and I think we can flip to the next page.

18       A.   Okay.  Next page.

19            Are we talking about -- oh, moving into?

20       Q.   Correct.

21            First can I confirm that there's a typo on

22   this page, that it says in the second paragraph:

23   Vicki and Paul Foster, the dwelling located at

24   10828 Fortina Drive?

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1179 of 1680
confidential -- Subject to further confidentiality Review
1657

```
1      A.   Well, since we were -- that is our -- that is

2   our home; Fortina Drive is our home.  That is our

3   Chinese drywall address, that we still owned that

4   home.  So even though it says the dwelling --

5      Q.   Oh, this is, I think, the leasing with

6   Jack Walsh's home.

7      A.   Oh.

8      Q.   I believe the correct address should be

9   10828 Tiberio?

10      A.   Yes.  I was confused reading it.  I was like,

11   how can that be?

12      Q.   Just want to make it clear for the record.

13      A.   Yes.  Thank you.

14      Q.   And this lease says the term shall begin

15   July -- and 15th is crossed out and it's written

16   13th --

17      A.   Yes.

18      Q.   -- 2011 and end at midnight on July 12th --

19   because 14th is crossed out -- 2012.

20           Does this correspond to the time you spent

21   inside this dwelling?

22      A.   Actually, we lived there longer, because our

23   house took so long to remediate.  And we didn't move

24   into our remediated home until November of 2012.
```

```
1      Q.   Were the extra months that you stayed in this
2   home at 10828 Tiberio Drive the same as in this
3   initial contract that you signed?
4      A.   Yes.
5           MS. HAQUE:  Okay.  All right.  Can we go off
6       the record for one second.
7            (Discussion off the record.)
8   BY MS. HAQUE:
9      Q.   Mrs. Foster, are you claiming any additional
10  damages that correspond to alternative living
11  expenses?  I know we are going to speak with your
12  husband about some that pertain specifically to him.
13  But to your knowledge, are there any other categories
14  of damages that you're claiming, just alternative
15  living expenses that we haven't talked about today?
16     A.   So we're claiming alternative living.  We're
17  claiming diminutive value of our home, damage to our
18  personal property, remediation, and any punitive
19  damages that would be . . .
20     Q.   In terms of the category of alternative
21  living expenses, are there any subcategories of just
22  alternative living expenses, that we haven't talked
23  about today?
24     A.   Well, in the alternative living, we've talked
```

```
 1    about the expenses that we incurred in our own home,

 2    the condo, Jack Walsh's house.  We haven't talked

 3    about the expenses that we had due to my husband

 4    having to go back to work for -- to help pay for all

 5    of this.

 6         Q.   Is it better if I ask your husband those

 7    questions directly?

 8         A.   It would be.

 9         Q.   Okay.  I will -- I will save that questioning

10    for your husband's deposition.

11         A.   Thank you.

12         Q.   Okay.  I'm going to switch topics now and

13    just get a little more clarity on some of the

14    financial arrangements with respect to the

15    10814 Fortina Drive.

16              You said that there's no longer a mortgage on

17    the property.  Is that right?

18         A.   That's correct.

19         Q.   Was there originally a mortgage on the

20    property?

21         A.   Yes.  Yes, there was.

22         Q.   Do you recall the terms of the mortgage?  Was

23    it a 30-year, a five-year ARM?

24         A.   I'm not a hundred percent -- I believe it's a
```

```
 1    30-year.

 2        Q.   Okay.  Do you recall how much per month you

 3    made on the mortgage payments?

 4        A.   I'm not exactly sure, but I'm sure I've given

 5    all those documents.

 6        Q.   Okay.  Do you know how much equity you have

 7    in the property?

 8        A.   Today?

 9        Q.   Yes.

10        A.   Today we have all of it, because we don't

11    have a mortgage on it anymore.

12        Q.   Do you have -- are there any -- just to

13    confirm for the record, any liens or any loans

14    secured by the property?

15        A.   No.

16        Q.   What is the current value of your property?

17        A.   I'm not a hundred percent sure.

18        Q.   We have -- we have what we are going to mark

19    as Exhibit 12, I believe.

20            (Defendants' Exhibit 12 was marked for

21    identification.)

22    BY MS. HAQUE:

23        Q.   Can you take a second to look at this

24    document.
```

Case 2:09-md-02047-EEF-MBN  Document 22863-78  Filed 11/19/19  Page 1183 of 1680
confidential - Subject to further confidentiality Review
1661

```
1              Have you ever seen this document before?

2       A.    I'm not a hundred percent sure.

3       Q.    I'm going to ask you a couple questions to

4    see if you recognize it.

5              Do you recall -- do you see the name that's

6    listed on this document?

7       A.    Yes.

8       Q.    And that's your name and the name of your

9    husband?

10      A.    Correct.

11      Q.    And is that your current address?

12      A.    Yes.

13      Q.    And this is a document that is from the Lee

14   County Property Appraiser.

15             And do you live in Lee County?

16      A.    Yes.

17      Q.    So this appears to be an appraisal for your

18   home.  Is that -- is that fair to say?

19             MR. ALBANIS:  Object to the form.

20             THE WITNESS:  Honestly, I don't think this

21        would be an appraisal of our home.

22   BY MS. HAQUE:

23      Q.    At the bottom of the page, do you see a sale

24   price?  Is that the price for which you purchased the
```

```
 1    home?

 2        A.    Yes.

 3        Q.    And then right above that, you will see some

 4    values.

 5        A.    Yes.

 6        Q.    And it says -- gives you a value for the

 7    assessment at $278,608?

 8        A.    Yes.

 9        Q.    Would you have any reason to dispute that

10    value?

11              MR. ALBANIS:  Object to the form.

12              THE WITNESS:  I don't fully understand this.

13        So they are saying the value of our home is worth

14        278,000?

15    BY MS. HAQUE:

16        Q.    It appears that that's an appraiser from

17    2018, a tax appraiser?

18        A.    Well, it's very disappointing to me.

19        Q.    Have you ever done an independent appraisal

20    of your property?

21        A.    No.  We have not done one personally.

22        Q.    Have you ever had a property assessed in any

23    other manner in terms of the value?

24        A.    We had -- we got a second -- not a second
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1185 of 1680
confidential -- Subject to further confidentiality Review
1663

```
 1    mortgage -- we refinanced at one point to try to get

 2    our payments lower, and I don't know if they did an

 3    assessment or not.

 4         Q.   Do you recall when you first refinanced the

 5    property?

 6         A.   It was during -- through all the Chinese

 7    drywall.  I don't know the exact date.  I know it had

 8    to be -- it was before remediation started.

 9         Q.   So prior to 2012?

10         A.   Yes.

11         Q.   Do you know if any -- do you know what banks

12    were involved?

13         A.   Wells Fargo.

14         Q.   And do you know if they requested or do you

15    remember if they required an appraisal to be done?

16         A.   I don't know.

17         Q.   Have you attempted -- you can go ahead and

18    set that down.

19              Oh, and just to confirm, I'm sorry --

20         A.   Oh, that's okay.

21         Q.   This document gives a -- if you look in the

22    middle of the page, a total living area of the square

23    footage.  It's listed as 1,823 square foot.

24              Is that consistent with your recollection of
```

```
 1    the square footage of the home?

 2         A.   Yes.

 3         Q.   Okay.  You can go ahead and set that down.

 4              Have you ever attempted to sell or lease your

 5    property since Chinese drywall was installed in the

 6    home?

 7         A.   (Shaking head.)

 8              MR. ALBANIS:  You need to give a verbal

 9         response.

10              THE WITNESS:  I said no.

11              MR. ALBANIS:  Okay.

12              MS. HAQUE:  I heard you.

13              MR. ALBANIS:  It didn't appear on the

14         realtime.

15    BY MS. HAQUE:

16         Q.   Mrs. Foster, you are also claiming loss of

17    use and enjoyment damages.

18         A.   Yes.

19         Q.   Is that correct?

20         A.   Uh-huh.

21         Q.   So I'm going to ask you a couple of questions

22    related to that.

23              How has the presence of Chinese drywall

24    limited the use of your property?  And you can --
```

```
1    please answer at your convenience.

2            MR. ALBANIS:  Object to the form.

3            THE WITNESS:  Living in that nightmare will

4        never be forgotten.  It disrupted our whole life.

5        I couldn't bring my children in there.  I

6        couldn't bring my grandchildren there.  I

7        couldn't bring in our elderly mothers.  I was

8        sick.  My husband got sick.  It was living in a

9        hell-ish nightmare.  It consumed us.  The house

10       took on its own life.

11           Until you live through that, you can't even

12       imagine.  We couldn't live in it.  There was no

13       way to sell it.  Filing bankruptcy is not in our

14       standards of living.  We are upstanding citizens.

15       We pay our debt.  We make a promise to someone,

16       we fulfill it; we have every intention of

17       fulfilling it.

18           It destroyed -- it destroyed -- even now

19       living in it, even after it's remediated, I'm

20       glad it's over; I like the community that I live

21       in.

22           But when I walk through my house, I will

23       think about something that I had that went in the

24       garbage.  I was a person -- collected.  I had a
```

```
1          lot of Asian furniture in there that had the gold
2          inlay in it.  All that turned black; that's in
3          the garbage.  I was sick all the time.  It was a
4          nightmare.  That's how it impacted our life.
5     BY MS. HAQUE:
6          Q.   What -- a follow-up to that.
7               What were some of the things that you could
8     no longer do in the home because of Chinese drywall?
9          A.   I love to play golf, but I became so ill, I
10    didn't even want to play golf.  I was tired all the
11    time.  I -- I didn't have the initiative to even get
12    up, and even if I did attempt it, I came home
13    exhausted and laid on the couch.  I couldn't
14    function.
15              Plus -- and I will never forget this
16    either -- I was invited from some of the neighbors to
17    go up to Destinations, which is a restaurant there in
18    our community, and there was probably about eight to
19    ten, 12 people going.  And I'll never forget, I was
20    sitting at a long table and I sat down and a
21    gentleman came over and he says to me, oh, I'm not
22    going to sit beside her.  She has Chinese drywall.
23    Just smell her clothes.
24              Do you know how embarrassing and humiliating
```

```
1    that is?  And I had, after the fact, after the fact

2    of that, after all of that was over, the remediation

3    was behind us, people would talk.  And they would

4    tell me, Vicki, I'm sorry, but you wreaked of that

5    odor.  I had friends that, you know, wouldn't come to

6    the house.

7         I couldn't -- we could not live and enjoy

8    that home at all.

9    Q.   You mentioned that you were playing golf.

10   Did you belong to the country club in the

11   neighborhood?

12   A.   Yes.

13   Q.   So were you still paying dues while you were

14   unable to play golf?

15   A.   We paid dues and we weren't able to enjoy the

16   golf course.  My husband is gone working.  He's never

17   there.  And we had all of those expenses that we had

18   to continue to pay and couldn't use it.

19   Q.   Do you recall approximately how much in those

20   dues?

21   A.   (Shaking head.)

22   Q.   What about were you still able to use any of

23   the other facilities that you -- did you pay dues to

24   any other facilities --
```

```
1       A.   Yes.  The town center dues.  We had town
2   center dues, association, we had CDD that we pay for.
3   We have our -- well, I said tiberial dues -- town
4   center dues, association, all kinds of assessments
5   and stuff in there.  We had to pay for all of that.
6       Q.   And do you have a ballpark figure?  Was it a
7   couple hundred?  A couple thousand dollars a month?
8       A.   Oh, it's thousands.
9       Q.   Per month?
10      A.   I don't know the exact amount, but I know --
11  it's thousands.
12      Q.   Okay.  How much total money are you seeking
13  in this lawsuit with respect to the loss of use and
14  enjoyment damages?
15      A.   350,000.
16      Q.   And is that amount based on all of the things
17  you just told me?
18      A.   No, it's not.
19      Q.   Can you tell me what that amount is based on?
20      A.   It's based on the evidence that we have
21  produced to our attorneys, and it's based on the
22  judgment that -- of the Judge Fallon judicial case
23  with Germano.
24      Q.   So you are basing that number on
```

```
 1    Judge Fallon's prior -- decision in the prior?

 2            MR. ALBANIS:  Object to the form.

 3            THE WITNESS:  Not completely.  I'm sure

 4       that's an individual basis.  That would be for a

 5       judge.

 6    BY MS. HAQUE:

 7       Q.   You mentioned that part of that is the

 8    evidence that you provided to your attorneys.  Is --

 9    what categories?  Can you be a little bit more

10    specific, what categories of evidence is that based

11    on?

12       A.   Well, the fact that we couldn't enjoy our

13    home.  We couldn't have people come stay, not our

14    children, our grandchildren, our family, our friends.

15    We couldn't enjoy the facilities that we had.  My

16    husband has been gone from me for years trying to

17    support us.  It's based on all of that and all the

18    evidence that we have and presented.

19       Q.   And is -- is that -- I'm sorry.  I should

20    have clarified that.

21            Is that documentary document in terms of

22    receipts, or what specifically is that evidence that

23    you're claiming?

24            MR. ALBANIS:  Object to the form.
```

```
 1              You may have to explain what "documentary

 2       evidence" is.

 3              MS. HAQUE:  Sure.

 4    BY MS. HAQUE:

 5       Q.   So are you basing that off specific

 6    documents, like the receipts we looked at earlier, or

 7    what are you basing that $350,000 on when you say

 8    "evidence"?

 9       A.   Well --

10              MR. ALBANIS:  Object to the form.

11              THE WITNESS:  All the evidence that I have --

12       all the documents and evidence that I have given

13       my attorney, pictures of everything that we have,

14       basing it on the Germano case, and . . .

15              MS. HAQUE:  Why don't we go ahead and maybe

16       take a ten-minute break.

17              THE WITNESS:  Thank you.

18              MS. HAQUE:  Yeah.  We've been going for

19       almost two hours right now.

20              (Recess from 10:54 until 11:06 p.m.)

21    BY MS. HAQUE:

22       Q.   Mrs. Foster, just a couple clean-up questions

23    from some of the last sections we talked about.

24              When you moved into the condo at Colonial
```

```
1     Country Club back in 2009, did your health problems

2     start to dissipate?

3         A.   I still had some issues, but I did not have

4     all the sinus infections that I had before.  But it

5     took awhile to get to that stage.  I didn't feel -- I

6     gradually started feeling stronger.  So the health

7     did improve.

8         Q.   Did anything prevent you, when you moved into

9     the condo, from having, for example, family and

10    friends over to the condo?

11        A.   Are you asking if I had -- no, I could have

12    family into the condo, and I did.

13        Q.   And how about the home at 10828 Tiberio

14    Drive?  Was there anything that prevented you from

15    basically living a normal life, having family and

16    friends over?

17        A.   Absolutely.  We used it as a storage unit.  I

18    I'd literally -- we had the kitchen area livable, a

19    little family room across from the kitchen, and

20    two -- one bedroom that we lived in.  When we first

21    moved in there, we used all the other remaining

22    square footage of the home, including the garage to

23    store furniture.  I mean, we had boxes to the ceiling

24    in there.
```

```
1         Q.   So you weren't able to have family and

2    friends over because the living area was used as

3    storage?

4         A.   We could --

5              MR. ALBANIS:  Object to the form.

6              THE WITNESS:  We could have family over

7         there, but the problem was, unfortunately, it

8         took longer to -- for the odors to dissipate in a

9         lot of the stuff.  In fact, at one point, my

10        mother came to visit, and she told me she would

11        not be back, because it smelled.

12   BY MS. HAQUE:

13        Q.   And that was at the 10828 Tiberio.

14             So you were able to have folks over at the

15   condo from 2009 to about 2011.

16             And then when you moved to the home at

17   Tiberio Drive, that's when you were only allowed to

18   have -- you were only able to have a certain number

19   of family over?

20        A.   Well, it was embarrassing to have people in

21   there.  I mean, it's not like you could do any

22   entertaining.

23             The condo was livable, and it was a safe

24   place to live, but it wasn't -- I mean, it's not
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1195 of 1680
Case 2:09-md-02047-MSD-RJK Document 114 Filed 01/08/11 Page 149 of 193 PageID#
1673
Confidential -- Subject to Further Confidentiality Review

1    going to hold a lot of people.  If people wanted to

2    visit, they were welcome to come in, and I encouraged

3    them to come, and my grandchildren came.

4        Q.   Was the home at 10828 Tiberio Drive roughly

5    the same size as your home at 10814 Fortina?

6        A.   It's a little bit -- it's a different model,

7    different floor plans, a little bit bigger.

8        Q.   Okay.  All right.  I think we're going to go

9    ahead and change topics.

10        Do you remember filling out various forms

11    with your attorneys called profile forms?

12        A.   Yes.

13        Q.   Okay.  I'm going to put in front of you

14    what's been premarked as Exhibit 13.

15        (Defendants' Exhibit 13 was marked for

16    identification.)

17    BY MS. HAQUE:

18        Q.   Here.  Let me go ahead and put in front of

19    you what's been premarked as Exhibit 13.

20        And I will give counsel my copy.

21        Do you recognize this document, Mrs. Foster?

22        A.   Yes.

23        Q.   What is this document?

24        A.   It is the United States District Court

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1196 of 1680
Case 2:13-cv-00047-MSD-RJK Document 124-9 Filed 01/13/14 Page 149 of 193 PageID#
1674
Confidential - Subject to Further Confidentiality Review

1    Plaintiff Profile Form.

2        Q.   Okay.  Is your signature on this document?

3        A.   Yes.

4        Q.   And do you understand that your signature was

5    a verification that the form was true and correct?

6        A.   Yes.

7        Q.   Does the information you provided in this

8    form back in -- it looks like this was filled in

9    2009?

10       A.   Correct.

11       Q.   Does this still look correct to you?  And

12   please take a moment to refresh your recollection on

13   it.

14           MR. ALBANIS:  While Mrs. Foster is looking at

15       the document, I'm just going to go ahead and

16       insert an objection to the extent that there were

17       numerous versions and amendments to the Plaintiff

18       Profile Forms that were submitted in this case,

19       and I do not know offhand if this is the most

20       recent Plaintiff's Profile Form that was

21       submitted on the Fosters' behalf.

22           MS. HAQUE:  We will go through all the

23       Supplemental Plaintiff's Profile Forms and give

24       Mrs. Foster an opportunity to respond to each

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 05/09/20 Page 197 of 1680
confidential - Subject to further confidentiality Review
1675

```
 1        one.

 2            MR. ALBANIS:  And I don't mean what is called

 3        the Supplemental Plaintiff's Profile Form in this

 4        case.  I mean the original version of the

 5        Plaintiff's Profile Form, which was used in the

 6        multidistrict litigation.

 7            MR. GUERRA:  Are you objecting to say that

 8        this is not what she submitted, or are you

 9        objecting that this is not the most recent one?

10            MR. ALBANIS:  No, no.  I'm not saying that

11        this is not something that she submitted.  She

12        did submit this and -- well, we submitted it on

13        her behalf.  What I do not know is if this is the

14        most recent Plaintiff's Profile Form that was

15        submitted in the multidistrict litigation.

16        That's what I do not know.

17     BY MS. HAQUE:

18        Q.   Mrs. Foster, let me just ask you:  Do you

19     recall if you filled out another Plaintiff's Profile

20     Form, or is this the most recent one, to your

21     recollection, that you filled out?

22        A.   I believe I have a new one.

23        Q.   Do you have a new Plaintiff's Profile Form?

24     This is -- I just want to clarify the comment from
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1198 of 1680
confidential -- Subject to Further Confidentiality Review
1676

```
1    your counsel, if you recall if there's a more recent

2    version of this first or original verified

3    Plaintiff's Profile Form?

4         A.    I have instructed my attorney -- Pete has

5    been my attorney for almost ten years, and I have

6    told him that he -- you know, he -- he can, on my

7    behalf, represent me.  So I don't know for sure if --

8    if I've filled out a new one, but -- I mean, this was

9    in October 2009.  I'm sure there -- there's been one

10   filled out since then.

11        Q.    Do any of the items filled out appear

12   incorrect to you, just by looking at it right now?

13        A.    Well, on this first page, I noticed where it

14   says "is above your primary residence," that should

15   say "yes."  Even though we were living in Colonial at

16   that time, the mailing address is correct, but

17   it's -- Fortina Drive is our primary residence.

18        Q.    Anything else on this first page appear

19   incorrect to you?

20        A.    It appears to be correct.

21        Q.    Okay.  Can you turn with me to the second

22   page with me, please.

23        A.    Oh.

24        Q.    Go ahead.  I'm sorry?
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1199 of 1680
Case 2:09-md-02047-EEF-MBN Document 14361-78 Filed 01/13/11 Page 152 of 193 PageID #:
confidential -- Subject to further confidentiality Review
1677

```
 1        A.    Where is says "are you claiming personal

 2    injuries," we are not.

 3        Q.    Okay.  Could you please take a moment to just

 4    look through this page and see if anything jumps out

 5    to you as being incorrect?

 6        A.    Sure.

 7              Can I just say --

 8        Q.    Sure.

 9        A.    I'm sure, I mean, this was in October of

10    2009.  I know I've filled out earlier ones than this.

11        Q.    Oh, you have?

12        A.    I'm sure that I have.  I mean -- and I

13    don't --

14        Q.    And let me put another document in front of

15    you, because we did have a question about the dates.

16              I have what we're going to mark as

17    Exhibit 14.

18              (Defendants' Exhibit 14 was marked for

19    identification.)

20    BY MS. HAQUE:

21        Q.    And it looks like another Plaintiff's Profile

22    Form.  Can you flip with me to the signature page.

23              It looks like this is the -- this was done at

24    the same time as the first -- as Exhibit 13 that we
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1200 of 1680
confidential - Subject to further confidentiality Review
1678

```
 1    looked at, if you look at both exhibit pages

 2    side-by-side -- signature pages side-by-side.

 3        A.    Are we on the correct page?

 4        Q.    No.  I'm sorry.  It's going to be the

 5    signature page, which is Page 3 on both.

 6              They look to be dated for the same date of

 7    October 6, 2009.  Do you know which came first, or

 8    were these both signed simultaneously?

 9        A.    Well, were there changes made on the -- this

10    one?

11              There are changes made.  So this one would

12    have came after this one.

13        Q.    So Exhibit 14 would have come after

14    Exhibit 13?

15        A.    Probably.  I mean, I couldn't swear to it.

16              But I noticed on that first page there's a

17    typo stating that our Chinese drywall house was not

18    our primary residence; but it is.  And then on this

19    one that you just handed me, it says that it is our

20    primary residence.

21        Q.    Okay.  So -- but given that they are both

22    signed on the same date, you don't remember -- you

23    don't remember the circumstances that led to both of

24    these being signed on the same date?
```

```
1              MR. ALBANIS:  Object to the form.

2              THE WITNESS:  Perhaps I saw that there were

3         corrections that needed to be made.

4    BY MS. HAQUE:

5         Q.   Okay.  We can set that aside.

6              Let me put in front of you what's been marked

7    as Exhibit 15.

8              (Defendants' Exhibit 15 was marked for

9    identification.)

10   BY MS. HAQUE:

11        Q.   Do you recognize this document?

12        A.   Yes.

13        Q.   Do you remember providing information for

14   this form sometime this year?

15        A.   Yes.

16        Q.   Is your signature on this document?

17        A.   No, it's not.

18        Q.   Do you recall signing -- do you recall a

19   reason for why you didn't sign this document?

20        A.   Because it's probably -- I gave my

21   attorney --

22        Q.   Actually, can you flip to the back page.  I'm

23   sorry.

24        A.   Oh, it is signed.
```

```
1    Q.    Is that your signature?

2    A.    Yes.

3    Q.    You understand that your signature was a

4    verification that the form was true and correct?

5    A.    Correct.

6    Q.    And do you -- can you say the date on which

7    you signed this document?

8    A.    March 16, 2018.

9    Q.    Are you aware of changing some of the answers

10   on this document and subsequent forms?

11   A.    You mean after this form?

12   Q.    After this form.

13   A.    Well, it depends on what --

14         MR. ALBANIS:  Object to the form.

15   A.    -- what you are asking.  I'd have to --

16   Q.    Just generally, do you recall making any

17   revisions to this form?

18   A.    Yes.

19   Q.    And I'll go -- just from your recollection,

20   do you remember the types of changes that were made?

21         MR. ALBANIS:  Object to the form.

22         THE WITNESS:  I know this amount down here is

23     not accurate, the 77,000, that is not accurate.

24   ///
```

```
1   BY MS. HAQUE:

2       Q.   Okay.  Anything else, just from your

3   recollection?

4       A.   I'd have to read all of it.

5       Q.   Okay.  Why don't we go ahead and just take it

6   step by step.

7            I'm going to show you what has been marked

8   Exhibit 16.

9            (Defendants' Exhibit 16 was marked for

10  identification.)

11           THE WITNESS:  Are we finished with that one?

12           MS. HAQUE:  Why don't you keep it.  What

13      we'll do is side-by-side, and then we can go on

14      to the next.

15  BY MS. HAQUE:

16      Q.   Can you please take a look at Exhibit 16.

17           Do you recognize that document?

18      A.   Yes.

19      Q.   And did you sign Exhibit 16, this document?

20      A.   No.

21      Q.   Okay.  Do you recall providing answers,

22  though, for this document, Exhibit 16?

23      A.   Yes.

24      Q.   When I looked at both the Supplemental and
```

```
1    First Amended Supplemental Plaintiff's Profile Form,

2    it appears that in Exhibit 16 there was an additional

3    $775 payment from WCI that you added to the First

4    Amended Supplemental Form.  And that's located on

5    Page 5.

6        A.   Yes.

7        Q.   To your recollection, was that the only

8    change that was made from this -- these two

9    documents?

10       A.   The same amounts on here?  I'd have to read

11   all of it to -- to confirm that.

12       Q.   Yeah.  Why don't you just go ahead and just

13   take 30 seconds and see if you can confirm.

14            MR. ALBANIS:  Take as much a time as you

15       need.

16   BY MS. HAQUE:

17       Q.   Yeah.  I'm sorry.  Take as much time as you

18   need.

19       A.   Well, you know, the eyes aren't as good as

20   they used to be.

21            So I have to compare both of them?

22       Q.   Yeah.  Just see if anything else -- any other

23   changes.

24       A.   I went through briefly.  I don't see any
```

```
 1    other changes.

 2        Q.   Okay.  The only two changes were that, just

 3    to confirm, you added -- or, the $775 payment from

 4    WCI?

 5        A.   Uh-huh.

 6        Q.   And then the First Supplemental Plaintiff's

 7    Profile Form is just not signed?

 8        A.   Oh, of course.

 9        Q.   Okay.  You can go ahead and put away

10    Exhibit 15.

11        A.   Okay.

12        Q.   And please hang on to Exhibit 16.

13             And let me show you what has been premarked

14    as Exhibit 17.

15             (Defendants' Exhibit 17 was marked for

16    identification.)

17    BY MS. HAQUE:

18        Q.   Do you recognize this document?

19        A.   Yes.

20        Q.   Can you check to see if this document has

21    been signed?

22        A.   It's not signed.

23        Q.   Okay.  Let me bring your attention to Page 4

24    of both documents.
```

```
 1       A.   Okay.

 2       Q.   Section 5, it says:  Already remediated

 3   property.

 4            The question under that heading is:  Has the

 5   property been partially or completely remediated?

 6       A.   I'm lost.

 7       Q.   Oh, I'm sorry.

 8       A.   That's okay.

 9       Q.   Section 5 --

10       A.   Oh, here.

11       Q.   Yes.  Sorry about that.

12       A.   Sorry.  Wrong page.

13            Am I supposed to look at this one or that

14   one?

15       Q.   Let's look at Exhibit Number 16 first.

16       A.   Okay.

17       Q.   Under Section 5, Already Remediated Property,

18   the first --

19       A.   Oh, I already know about -- oh, I'm sorry.

20       Q.   Well, let me get my question out first, and

21   then we can talk about it.

22            The question is:  Has the property been

23   partially or completely remediated?

24            And in Exhibit 16 you have written
```

```
1    "completely remediated."

2         And then in Exhibit 17, you have changed that

3    response to "partially remediated."

4         So why did you change that response?

5    A.   I had Pete change that because my house was

6    not fully remediated.  I still have all the original

7    tiles, damages and all, from the remediation.  I have

8    the cornice board that I was luckily able to use one

9    of them.  The other ones had to go in the trash.  And

10   now even after going through all of this, I feel like

11   putting that one in the trash so I don't have to look

12   at it.

13        I have a center island in the kitchen that

14   still has the PVC pipe was -- stayed in there.  Plus

15   I had bought a lot -- not a lot -- I bought many

16   expensive lighting fixtures to put in that house, and

17   I couldn't part with them.  So we took them down, and

18   we took them into Jack's house, and we -- all the

19   little intricate details, we cleaned it, off-gassed

20   it.  I even bought -- and you'll see in your

21   documents where I bought repair parts for those

22   fixtures to try to save them.  They're --

23   Q.   Is there a reason for why you had listed

24   "complete remediation" in the first document?  Was
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1208 of 1680
confidential – Subject to Further Confidentiality Review
1686

1     that just a mistake?

2           MR. ALBANIS:  Object to the form.

3           THE WITNESS:  It was a mistake.

4     BY MS. HAQUE:

5       Q.  Okay.  I don't think we talked about the

6     cornice board.  Can you explain what the problems

7     were with the cornice board?

8       A.  Well, actually, we did discuss it --

9       Q.  Oh, we did?

10      A.  -- today.  We did, but I'll --

11      Q.  Please continue.

12      A.  Yeah.  In our family room, which it has a

13     triple sliding glass door, and then there's two

14     windows in the kitchen, which is, like, a roundabout.

15     Anyway, there's two, you know -- and then in the

16     dining room, there were two windows.  And I had

17     JC Penney's come out and contract with me to make

18     these cornice boards, because I didn't want curtains

19     up.  I just wanted the decorative cornice boards to

20     coordinate with the house.

21      Q.  Okay.

22      A.  So originally, I wanted all of them put back,

23     and they took them down.  But, you know, they just

24     can't care about them, and they tore them.  I was

```
 1    able to get ahold of the one that goes over the

 2    glass, sliding glass doors, and we did put that one

 3    back up.

 4         Q.   And that is Polkow Construction that damaged

 5    them?

 6         A.   Correct.

 7         Q.   Did Kevin Polkow or anyone associated with

 8    his company say that they would reimburse you or pay

 9    to fix the cornice boards?

10         A.   No.

11         Q.   You also mentioned the light fixtures.  What

12    were the light fixtures that you just described made

13    out of?

14         A.   They are metal, and they have crystals on

15    them, and they have different globes.  And they're

16    huge.

17         Q.   Were these light fixtures damaged by Polkow

18    in any way?

19         A.   There was some damages to them, not much; and

20    I was able to order repair parts.

21         Q.   And what kind of metal were the fixtures?  Do

22    you recall?

23         A.   I'm not sure exactly what the metal is.

24         Q.   Okay.
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1210 of 1680
Case 2:09-md-02047-EEF-MBN Document 14961-1 Filed 01/31/11 Page 169 of 763 Page #
1688

```
 1      A.    But they had the glass globes on them and

 2   then the crystals.

 3      Q.    Okay.  Did you tell Polkow that both the

 4   cornice board and the metal fixtures were already --

 5   were damaged by the remediation process?

 6      A.    Well, it wasn't major damage to the lighting

 7   fixtures.  It was some -- because when you take --

 8   because of the crystals that hang down, unless you

 9   have something to put them in, they're subject to

10   damage.  And even trying to clean them, while we were

11   cleaning them and trying to get -- anyway . . .

12      Q.    Do you know if Polkow is insured?

13      A.    I have no idea.

14      Q.    Okay.

15      A.    I'm sure he was in the beginning.  I believe

16   we have that, that he was licensed and insured.

17      Q.    Was the -- and just to confirm, you said the

18   tile was also damaged during the remediation?

19      A.    Uh-huh.  Yes.

20      Q.    Okay.  I think we can go ahead and pull

21   out -- you can set aside Exhibit Number 16.

22            And this is what we've premarked as

23   Exhibit 18.

24            (Defendants' Exhibit 18 was marked for
```

```
1    identification.)

2    BY MS. HAQUE:

3        Q.    Mrs. Foster, do you recognize Exhibit 18?

4        A.    Yes.

5        Q.    Could you check to see if that document is

6    signed?

7        A.    No.

8        Q.    Okay.  But your name does appear on that

9    document?

10       A.    Yes.

11       Q.    Okay.  Can I bring your attention to Page 5

12   of the document, under Section 6, Prior Payments.

13   And could you first look at the same section in

14   Exhibit 17 for me, please.

15       A.    Okay.

16       Q.    If you look under the Prior Payments, the

17   source is GBI holdback payment?

18       A.    Correct.

19       Q.    There's a difference between the Second

20   Amended Supplemental Plaintiff's Profile Form amount

21   and the third amount.  It looks like in the second

22   it's $1,339.99, and in the third, it's listed as

23   $4,773.26.

24             Do you know if you received an additional
```

```
 1     check for the GBI holdback payment?

 2         A.   No.  That was only one check, from what I

 3     recall.

 4         Q.   Okay.  So was the $1,339.99 just a mistake?

 5         A.   I believe so.

 6         Q.   Okay.  Then I'm going to show you what I

 7     believe is premarked as Exhibit 19.

 8              And you can go ahead and put away Exhibit 17.

 9              (Defendants' Exhibit 19 was marked for

10     identification.)

11     BY MS. HAQUE:

12         Q.   Mrs. Foster, do you recognize Exhibit 19?

13         A.   Yes.

14         Q.   And does your name appear on that document,

15     on Exhibit 19?

16         A.   Yes.

17         Q.   And then for the record, can you read the

18     title of Exhibit 19?

19         A.   Supplemental Plaintiff's Profile Form.

20         Q.   I'm sorry.  The title right --

21         A.   Oh.  Fourth Amended Supplemental Plaintiff's

22     Profile Form.

23         Q.   And has that document been signed?

24         A.   No.
```

```
 1        Q.    Okay.  Let me bring your attention to Page 5

 2   again under Section 7, Other Damages.

 3        A.    Right.

 4        Q.    So it looks like there was a change from the

 5   Third Supplemental Plaintiff's Profile Form of

 6   $77,463.76 to $190,000 -- 197,027.01.

 7              Can you explain the reason for this change

 8   between the two forms?

 9        A.    Yes.  Because I contacted Pete and told him

10   that that amount was incorrect on this form and asked

11   him to please change it.

12        Q.    Okay.  And I believe that was the only change

13   that was made.  And this was made very recently?

14        A.    Yes.

15        Q.    Do you recall any other changes being made?

16        A.    Not that I recall at this moment.

17        Q.    Okay.  And is it your testimony that all of

18   the answers in this Fourth Amended Supplemental

19   Plaintiff's Profile Form are true and correct?

20        A.    I better look over it.

21        Q.    Okay.  Take your time.

22        A.    It's accurate.

23        Q.    Okay.  And let me just ask:  When there was

24   the $77,463.76 amount for alternative living
```

```
 1   expenses, do you recall what that was -- where that

 2   number came from?

 3           MR. ALBANIS:  Can you just refer her to the

 4       document that you're --

 5           MS. HAQUE:  Yes.

 6   BY MS. HAGUE:

 7       Q.   Let's go to Exhibit Number 18.

 8       A.   Okay.

 9       Q.   And can you turn to Page 5.

10       A.   Okay.

11       Q.   And do you see the number that's at the very

12   bottom of the page?

13       A.   Right.

14       Q.   Do you recall where that number came from?

15       A.   Actually, I don't know exactly where that

16   came from.  I just know when I saw that, I knew that

17   was an inaccurate amount.

18       Q.   Okay.  And the -- and let's turn now to

19   Exhibit 19, the bottom of Page 5, the same question.

20       A.   Right.

21       Q.   What is that number based on?

22       A.   That is based on our alternative living

23   expenses.

24       Q.   Okay.
```

```
 1      A.   Which 90,000 of that is to maintain our home

 2   that we couldn't live in because of Chinese drywall.

 3   It's also approximately -- approximately 90,000 and

 4   then approximately 60,000 for living in the condo,

 5   approximately 20,000 for living in Jack Walsh's

 6   house, and the remaining of the balance is just a

 7   portion of the expenses that my husband had and we

 8   had with him going back to work all these years.

 9      Q.   Okay.  Do you seek to recover from Polkow any

10   damages?

11      A.   No.

12      Q.   Have you tried to recover any from Polkow

13   Construction prior -- previously?

14           MR. ALBANIS:  Object to the form.

15           THE WITNESS:  In the beginning before he

16       finished our house, we may have talked with him,

17       but I have no -- I don't want to talk to Kevin at

18       all.

19   BY MS. HAQUE:

20      Q.   Just some clean-up on -- on the Polkow

21   Construction.

22           Do you recall where the tile was damaged

23   exactly?

24      A.   There's a -- a chip in the master bathroom in
```

```
1    the middle of the floor.  There's also a chip --

2    several areas in our family living room.

3         Q.   And to confirm, how is the tile damaged

4    exactly?

5         A.   I don't know.  I just noticed it after they

6    got everything out, and they were off-gassing it.

7         Q.   And by "them," it's Polkow Construction?

8         A.   Correct.

9              MR. VERRIER:  I'm just going to object,

10             because I think under Judge Fallon's findings of

11             facts concluded with law in the Germano, tile

12             replacement was one of the items that was listed

13             as kind of common reparable items, so . . .

14             MS. HAQUE:  And objection noted.  And these

15             questions just go to the overall calculation of

16             damages.

17   BY MS. HAQUE:

18        Q.   Do you have any photos showing the damaged

19   tiles?

20        A.   No.  I haven't taken any pictures.

21        Q.   Okay.  All right.  We can move on to a

22   related topic.

23             If you look at Exhibit 19, can you turn with

24   me to Page 5, and the heading is Section 6, Prior
```

```
 1    Payments.

 2           You have listed here three different sources

 3    of payments?

 4        A.    Correct.

 5        Q.    Are these all the payments that you have

 6    received in relation to Chinese drywall?

 7        A.    Those are all the payments that I recall,

 8    yes.

 9        Q.    Do you recall when you received -- let's

10    start with the first one, CDW Settlement Program?

11        A.    I don't remember.

12        Q.    Do you recall when you received the WCI

13    settlement?

14        A.    No.

15        Q.    Or do you recall when you received the GBI

16    holdback payment?

17        A.    No.

18        Q.    Do you have any documents related to these

19    three payments?

20           MR. ALBANIS:  Objection.  We produced the

21        checks.  They are on the portal.

22           MS. HAQUE:  Okay.  That's fine.  Thanks,

23        Pete.

24    ///
```

BY MS. HAQUE:

1
2    Q.   What have you done with these three payments?
3  Have they been deposited into your account?
4    A.   They paid bills is what they did.  They
5  helped us sustain our -- until we could get in a
6  position to remediate our house.  I mean, they went
7  for debt.
8    Q.   So these three bill amounts went towards your
9  living expenses and debt that you have accumulated;
10  is that right?
11    A.   Absolutely.
12    Q.   Did any of the money amounts that you
13  received in these payments go towards the home or
14  anything specifically related to the home at
15  10814 Fortina?
16       MR. ALBANIS:  Object to the form.
17       THE WITNESS:  Would you repeat the question?
18       MS. HAQUE:  Sure.  Sorry.
19  BY MS. HAQUE:
20    Q.   The payments that you received from these
21  three settlements, do you remember or recall using
22  them specifically for anything related to the
23  10814 Fortina home, be it repairs or otherwise?
24    A.   Any money that -- that we have coming in to

```
 1        our household would go towards paying our mortgage,

 2        any repairs in the house.  I mean, we're struggling

 3        to stay alive and not go into bankruptcy.  So any

 4        payment that we would get went in to help us survive.

 5               My husband and I have never had a vacation.

 6        We've never done anything.  We've never gone

 7        anywhere.  I have been in this house for all these

 8        years suffering from all of this.  He's been gone.

 9               So any money that we got, thank the Lord,

10        went into just trying to survive and -- and sustain

11        our house.

12          Q.    You can go ahead and put that document away.

13               Do you need to take a break?

14          A.    No.

15          Q.    Okay.  A couple of questions just related to

16        your claims in the lawsuit.

17               Do you know if you are the sole owner of the

18        claim for all the damages that you are seeking in the

19        lawsuit?

20          A.    We are.

21               MR. ALBANIS:  Object to the form.

22        BY MS. HAQUE:

23          Q.    Do you know if there's anyone else other than

24        you or your husband who might be making a claim for
```

```
 1    the property for which you are seeking damages?

 2        A.   No.

 3        Q.   Okay.

 4             MS. HAQUE:  Can we go off the record for one

 5        second.

 6                  (Discussion off the record.)

 7    BY MS. HAQUE:

 8        Q.   I'm going to show you what has been premarked

 9    as Exhibit 20.

10             (Defendants' Exhibit 20 was marked for

11    identification.)

12    BY MS. HAQUE:

13        Q.   Do you recognize this document?

14        A.   Yes, I do.

15        Q.   Did you draft this document?

16        A.   Yes.

17        Q.   And can you briefly describe what this

18    document is?

19        A.   These are replacement costs for some of the

20    things in our Chinese drywall house.

21        Q.   Does --

22        A.   That was on the first page.

23             Okay.  What was your question?

24        Q.   Oh, can you briefly describe what this
```

```
 1    document is?

 2        A.    Okay.  The first page is replacement costs,

 3    some items that we replaced that were damaged.  On

 4    the second page has our appliances on there, and then

 5    there's some miscellaneous personal items:  Garden

 6    sprayers, there's furnishings, several items that we

 7    replaced.

 8            And then on the back pages are items that we

 9    discarded.

10        Q.    Okay.  Let's start with the first page.

11            We talked earlier about the HVAC, and this

12    document says:  Repairs were made several times, but

13    I could not find the receipts.

14        A.    Correct.

15        Q.    And then it says:  Receipts could be on file

16    at Morgan & Morgan.

17            Is that referring to the receipts for the

18    rest of the items listed in the document, or was that

19    referring to the HVAC?

20        A.    I believe I gave them some receipts, but I'm

21    not a hundred percent sure.

22        Q.    Receipts -- receipts for the HVAC or --

23        A.    Oh, no, no, no.  I don't have those.  I know

24    I don't have those.  Sorry.
```

```
 1    Q.   Okay.  No problem.

 2         Let's talk about some of the items you have

 3    listed on the first page.

 4         This first page are the electronics that

 5    you've replaced; is that right?

 6    A.   Well, it says -- oh, it's a wall mount for

 7    the television.  I had to buy -- when we remediated

 8    our house, I had to have a new wall mount to put the

 9    TV back on the wall.  So that's what that is.

10    Q.   Are these new products that you did not

11    originally have, or did these replace items that you

12    had to discard?

13    A.   These are replacement items.

14    Q.   Okay.  Let's talk about -- you had mentioned

15    the wall mount for the television.  Did you

16    previously have another wall mount?

17    A.   Yes.

18    Q.   When was that item originally purchased, the

19    original wall mount?

20    A.   I don't know.

21    Q.   Okay.  When did it stop working?

22    A.   The wall mount?

23    Q.   Correct.

24    A.   When we -- when they remediated the house,
```

```
 1    that went in the garbage.  They didn't save it.

 2         Q.   Was the wall mount under a warranty?

 3         A.   No.

 4         Q.   When, approximately -- I'm sorry, the date of

 5    the bill in the first column --

 6         A.   Yes.

 7         Q.   -- does that correspond to when you purchased

 8    the replacement item?

 9         A.   Yes.

10         Q.   So for the wall mount, you purchased it in

11    October of 2012 --

12         A.   Correct.

13         Q.   -- prior to moving back into your remediated

14    home?

15         A.   Correct.

16         Q.   The broken wall mount from the initial set of

17    items, did you keep that in any place or preserve it?

18         A.   The original wall mount?

19         Q.   The original wall mount.

20         A.   I'm sure that went in the garbage.

21         Q.   And the garbage you're referring to is during

22    the remediation?

23         A.   Correct.

24         Q.   Did you take a photograph of the original
```

```
1    wall mount?

2        A.   No.  But I have pictures of everything in my

3    house.  But you're not going to be able to see the

4    wall mount.

5        Q.   Do you mean -- the pictures that you took,

6    are they of -- when did you take the photos?

7        A.   When did I take them?  2009, I believe.  But

8    I'm not a hundred percent on the date.

9        Q.   Okay.  Do you know if the wall mount was --

10   do you remember if the wall mount was damaged prior

11   to the remediation, or was it damaged during the

12   remediation?

13       A.   From what I recall, it was corroded.

14       Q.   The wall mount was corroded?

15       A.   Yes.

16       Q.   Okay.

17            MS. HAQUE:  Can we go off the record for one

18       moment.

19            (Discussion off the record.)

20            MS. HAQUE:  I'm requesting counsel for

21       Mrs. Foster, if we can have access to the Chinese

22       drywall samples in order to measure the depth of

23       the samples.  That was one that -- one thing that

24       was not done prior to the examination.
```

```
 1            MR. ALBANIS:  We -- and in response to that,

 2      we did give you access earlier this week, I

 3      believe, pursuant to PG01J, which is operating --

 4      which is under effect in the MDL now.  There's no

 5      requirement to give additional access.

 6            Having said that, we will consider your

 7      request and let you know.

 8            MS. HAQUE:  I have no further questions for

 9      today.  We reserve the right to reopen the

10      deposition pending our discussions with

11      plaintiff's counsel on additional lines of

12      questioning.

13            I ask my colleagues if they have any

14      questions.

15            MR. SHAPIRO:  I think we're all set.

16            MS. HAQUE:  We can go off the record.

17            (Whereupon, the deposition concluded at

18      12:00 p.m.)

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1226 of 1680#
Case 2:09-md-02047-MSD-RJK Document 114 Filed 01/31/11 Page 179 of 183 PageID#
1704
Confidential - Subject to Further Confidentiality Review

```
 1                  C E R T I F I C A T E

 2

 3           I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that, pursuant to

 6    notice, the deposition of VICKI FOSTER was duly taken

 7    on December 7, 2018, at 7:44 a.m. before me.

 8           The said VICKI FOSTER was duly sworn by me

 9    according to law to tell the truth, the whole truth

10    and nothing but the truth and thereupon did testify

11    as set forth in the above transcript of testimony.

12    The testimony was taken down stenographically by me.

13    I do further certify that the above deposition is

14    full, complete, and a true record of all the

15    testimony given by the said witness.

16

17           _____

18           KELLY J. LAWTON, RPR, LCR, CCR

19

20           (The foregoing certification of this

21    transcript does not apply to any reproduction of the

22    same by any means, unless under the direct control

23    and/or supervision of the certifying reporter.)

24
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully

 5    and make any necessary corrections.  You should state

 6    the reason in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12           It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty

14    (30) days of receipt of the deposition transcript by

15    you.  If you fail to do so, the deposition transcript

16    may be deemed to be accurate and may be used in

17    court.

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22863-78 Filed 11/19/19 Page 1228 of 1680#
confidential - Subject to further confidentiality Review
1706

```
1                      - - - - - -

2                    E R R A T A

3                      - - - - - -

4    PAGE    LINE    CHANGE

5    _____   _____   _____

6      REASON: _____

7    _____   _____   _____

8      REASON: _____

9    _____   _____   _____

10     REASON: _____

11   _____   _____   _____

12     REASON: _____

13   _____   _____   _____

14     REASON: _____

15   _____   _____   _____

16     REASON: _____

17   _____   _____   _____

18     REASON: _____

19   _____   _____   _____

20     REASON: _____

21   _____   _____   _____

22     REASON: _____

23   _____   _____   _____

24     REASON: _____
```

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3            I, VICKI FOSTER, do hereby acknowledge that I

 4     have read the foregoing pages, 1 to 182, and that the

 5     same is a correct transcription of the answers given

 6     by me to the questions therein propounded, except for

 7     the corrections or changes in form or substance, if

 8     any, noted in the attached Errata Sheet.

 9

10

11     _____      _____

12     VICKI FOSTER                                      DATE

13

14

15

16

17     Subscribed and sworn to before me this

18     ____ day of _____, 20___.

19     My Commission expires: _____

20

21     _____

       Notary Public

22

23

24
```

```
 1                          LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____    _____

 4      _____   _____    _____

 5      _____   _____    _____

 6      _____   _____    _____

 7      _____   _____    _____

 8      _____   _____    _____

 9      _____   _____    _____

10      _____   _____    _____

11      _____   _____    _____

12      _____   _____    _____

13      _____   _____    _____

14      _____   _____    _____

15      _____   _____    _____

16      _____   _____    _____

17      _____   _____    _____

18      _____   _____    _____

19      _____   _____    _____

20      _____   _____    _____

21      _____   _____    _____

22      _____   _____    _____

23      _____   _____    _____

24      _____   _____    _____
```

# JOINT APPENDIX TAB # 41

Confidential - Subject to Further Confidentiality Review

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                     Case No. 1:11-CV-22408-MGC
 3        -------------------------------§
          EDUARDO AND CARMEN AMORIN et     §
 4        al., individually, and on behalf §
          of all others similarly          §
 5        situated,                         §
                                            §
 6            Plaintiffs,                   §
                                            §
 7        vs.                               §
                                            §
 8        TAISHAN GYPSUM CO., LTD. F/K/A    §
          SHANDONG THAIHE DONGXIN CO.,      §
 9        LTD.; TAIAN TAISHAN PLASTERBOARD §
          CO., LTD., et al,                 §
10                                          §
              Defendants.                   §
11        ------------------------------- §
           - - -
12
                                     - - -
13
                       WEDNESDAY, DECEMBER 19, 2018
14
                                     - - -
15
                   Confidential - Subject to Further
16                       Confidentiality Review
17                              - - -
18            Deposition of JEOVANY NUNEZ, held at JG Firm,
          1855 Griffin Road, Suite C-470, Dania, Florida,
19        commencing at 7:37 a.m., on the above date,
          before Kelly J. Lawton, Registered Professional
20        Reporter, Licensed Court Reporter, and Certified
          Court Reporter.
21
                                     - - -
22
                      GOLKOW LITIGATION SERVICES
23              877.370.3377 ph | 917.591.5672 fax
                          deps@golkow.com
24
```

```
 1    APPEARANCES:

 2       ALLISON GRANT, P.A.
         BY:  ALLISON GRANT, ESQUIRE
 3       14 S.E. 4th Street
         Boca Raton, Florida 33432
 4       (561) 994-9646
         agrant@allisongrantpa.com
 5       Representing Plaintiff
 6
         BARON & BUDD, P.C.
 7       BY:  HOLLY WERKEMA, ESQUIRE
         3102 Oak Lawn Avenue, Suite 1100
 8       Dallas, Texas 75219
         (214) 521-3605
 9       hwerkema@baronbudd.com
         Representing Plaintiff
10
11       LEVIN, SEDRAN & BERMAN, LLP
         BY:  KEITH J. VERRIER, ESQUIRE
12       510 Walnut Street, Suite 500
         Philadelphia, Pennsylvania 19106
13       (215) 592-1500
         kverrier@lfsblaw.com
14       Representing Plaintiff
15
         ALSTON & BIRD, LLP
16       BY:  MICHAEL J. BARRY, ESQUIRE
         BY:  SARAH O'DONOHUE, ESQUIRE
17       BY:  ASHTON G. CARPENTER, ESQUIRE
         One Atlantic Center
18       1201 West Peachtree Street
         Atlanta, Georgia 30309
19       (404) 881-7000
         mike.barry@alston.com
20       sarah.odonohue@alston.com
         ashton.carpenter@alston.com
21       Representing Taishan Gypsum Co., Ltd. and Tai'an
         Taishan Plasterboard, Co., Ltd.
22

23

24
```

```
 1    APPEARANCES:

 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP
          BY:  DAN GUERRA, ESQUIRE
 3        The Orrick Building
          405 Howard Street
 4        San Francisco, California 94105
          (415) 773-5545
 5        dguerra@orrick.com
          Representing BNBM PLC
 6

 7        ABALLI MILNE KALIL, P.A.
          BY:  JOSHUA D. POYER, ESQUIRE
 8        2250 SunTrust International Center
          One Southeast Third Avenue
 9        Miami, Florida 33131
          (305) 373-6600
10        jpoyer@alalli.com
          Representing BNBM PLC
11

12

13    ALSO PRESENT:

14        Monica Alba-Nunez

15

16

17

18

19

20

21

22

23

24
```

```
 1                         - - -
                        I N D E X
 2                         - - -
 3   Testimony of:  JEOVANY NUNEZ
 4       DIRECT EXAMINATION BY MR. BARRY...............  7
 5       CROSS-EXAMINATION BY MR. GUERRA............... 116
 6
 7                   E X H I B I T S
 8               (Attached to Transcript)
 9   DEFENDANTS'                                     PAGE
10   Exhibit 1   Purchase Agreement for Shoma Homes   19
                 Splendido, a Condominium
11
     Exhibit 2   Warranty Deed                        20
12
     Exhibit 3   Declaration of Correctness of Square 27
13               Footage on Chinese Drywall Client(s)
                 Property for Remediation Damages
14
     Exhibit 4   Miami-Dade County Property           28
15               Information Report
16   Exhibit 5   Subcontract Agreement                30
17   Exhibit 6   Oscar Air Conditioning, Inc.         34
                 Invoices
18
     Exhibit 7   Photographs - Air-Conditioning Unit  38
19
     Exhibit 8   Photographs - Bathroom Faucet Piping 42
20
     Exhibit 9   Chinese Drywall Screening, LLC       49
21               March 26, 2010 Report
22   Exhibit 10  December 22, 2011 Letter from Baron   56
                 & Budd, P.C.  to JP Morgan Chase and
23               Fannie Mae
24
```

Case 1:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 6 of 15
Case 1:16-cv-00312-MSD-RJK Document 141-1 Filed 01/16/18 Page 6 of 125 PageID# 14
Confidential - Subject to Further Confidentiality Review

```
 1                       E X H I B I T S

 2    DEFENDANTS'                                              PAGE

 3    Exhibit 11   2012 to 2013 Residential Lease for          73
                   Apartment or Unit in Multi-Family
 4                 Rental Housing (other than a Duplex)
                   Including a Mobile Home,
 5                 Condominium, or Cooperative

 6    Exhibit 12   2014 to 2015 Residential Lease for          74
                   Apartment or Unit in Multi-Family
 7                 Rental Housing (other than a Duplex)
                   Including a Mobile Home,
 8                 Condominium, or Cooperative

 9    Exhibit 13   2016 to 2017 Residential Lease for          74
                   Apartment or Unit in Multi-Family
10                 Rental Housing (other than a Duplex)
                   Including a Mobile Home,
11                 Condominium, or Cooperative

12    Exhibit 14   Bank of America Bank Statements             77

13    Exhibit 15   Chase Mortgage Loan Payment History         85

14    Exhibit 16   First Mortgage                              89

15    Exhibit 17   Second Mortgage                             89

16    Exhibit 18   June 14, 2010 E-mail from Jeovany           94
                   Nunez to Steve Bronzy - Subject:
17                 Acct:  5304359424

18    Exhibit 19   January 5, 2010 E-mail from PNMAC -         97
                   Subject:  Online Draft

19

      Exhibit 20   February 2, 2014 E-mail from PNMAC -        98
20                 Subject:  Online Draft

21    Exhibit 21   In Rem Final Judgment of Foreclosure        99

22    Exhibit 22   Certificate of Sale                        103

23    Exhibit 23   First Amended Supplemental Plaintiff       104
                   Profile Form

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2    DEFENDANTS'                                        PAGE

 3    Exhibit 24  Move For Less Quote                    108

 4    Exhibit 25  Plaintiff Jeovany Nunez's Response     109

                  to Defendants' Interrogatories

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                         - - -

 2            THE COURT REPORTER:  Sir, would you please

 3       raise your right hand.

 4            Do you swear or affirm that the testimony

 5       you're about to give will be the truth, the whole

 6       truth, and nothing but the truth?

 7            THE WITNESS:  Yes.

 8            JEOVANY NUNEZ, called as a witness by the

 9   Defendants, having been first duly sworn, testified

10   as follows:

11                    DIRECT EXAMINATION

12   BY MR. BARRY:

13       Q.   Mr. Nunez, we met before.  My name is

14   Michael Barry.  I represent Taishan Gypsum with my

15   colleagues, Sarah O'Donohue and Ashton Carpenter.

16            MR. BARRY:  Do we want to have everyone say

17       their name for the record?  Why don't we do that.

18            MR. GUERRA:  I'm Dan Guerra with Orrick,

19       Herrington & Sutcliffe.  We represent the

20       defendant in this matter, Beijing New Building

21       Materials, Pubic Limited Company.

22            MR. POYER:  Josh Poyer with Aballi, Milne,

23       Kalil; and I also represent Beijing New Building

24       Materials, PLC.
```

Confidential - Subject to Further Confidentiality Review

```
 1            MR. VERRIER:  Keith Verrier from Levin,

 2       Sedran & Berman in Philadelphia here on behalf of

 3       the plaintiffs.

 4            MS. GRANT:  And Allison Grant on behalf of

 5       Allison Grant, P.A., on behalf of the plaintiffs.

 6            THE WITNESS:  I'm Jeovany Nunez, and

 7       unfortunately, my house has Chinese drywall.

 8  BY MR. BARRY:

 9       Q.   Well, we appreciate you being here,

10  Mr. Nunez -- I know this is not an easy process --

11  and appreciate your time and energy.

12            And, you know, I'm going to go through a

13  little bit of background on the deposition.  And you

14  have probably heard all of this from your lawyer, but

15  I'm going to repeat it.

16            The first thing I will emphasize on all of

17  this is, you know, while we're sitting here taking a

18  deposition, all these people in the room, if you ever

19  need a break, if you have need a moment, you let me

20  know.  Don't hesitate to let me know.  The only thing

21  I ask is if there is a question on the table, just

22  let me finish it, answer the question, and then

23  you're welcome to take a break whenever you need to.

24            A few rules of the road, just more for the
```

```
 1    court reporter than anybody.  When I'm asking a

 2    question, please don't start answering it before I

 3    finish.  It's not like a normal conversation.  We're

 4    trying to make sure she can take everything down.

 5           I'm probably going to slip up and ask a

 6    question while you're already making an answer, so

 7    I'm going to do that too; so don't worry if you do

 8    it, too.  I'll probably remind you, you will probably

 9    remind me, or your lawyer will more likely remind me.

10           Make sure all your responses are verbal, say

11    "yes," "no," even if you are nodding your head.  And

12    just make sure that everything we're doing is

13    something that she can write down on the record.

14           So have you ever done a deposition before?

15    A.    No.

16    Q.    So have you ever watched a deposition?

17    A.    No.

18    Q.    And do you understand that everything that is

19    going on in this deposition is sworn and under oath

20    and can -- and it's taken as truth as if you are

21    testifying in court?

22    A.    Yes.

23    Q.    Are you taking any medications that will

24    impair your ability to understand my questions and to
```

```
1     answer the questions truthfully?

2         A.   No.

3         Q.   How did you prepare for this deposition?

4         A.   Speaking to my attorneys.

5         Q.   Now, I'm not asking for the content of those

6     conversations.  How many times did you meet with your

7     attorneys?

8         A.   Once.

9         Q.   Once?  For how long?

10        A.   About three hours.

11        Q.   Did you review any documents?

12        A.   Yes.

13        Q.   What documents did you review?

14        A.   It was a good amount of documents that, you

15    know, I have already provided to her.

16        Q.   And those are all documents that have been

17    produced to us?

18        A.   Yes.

19        Q.   And if I were going through these documents

20    and you saw them, I could probably -- I could ask

21    you, you know, you -- did you -- have you reviewed

22    this document before, and you would be able to

23    answer?

24        A.   For the most part.
```

Confidential - Subject to Further confidentiality Review

```
 1        Q.   Okay.  Was anyone else present at these

 2   meetings with your lawyer?

 3        A.   Yes.  My wife and Holly, which she stepped

 4   out, the other attorney.

 5        Q.   And did you meet separately without your wife

 6   at all?

 7        A.   No.

 8        Q.   Did you speak outside of the presence of

 9   counsel with your wife about this deposition?

10        A.   Briefly.

11        Q.   Have you spoken to anyone else about it?

12        A.   No.

13        Q.   You didn't speak to any of your friends

14   saying I'm going to do to a deposition?

15        A.   No.

16        Q.   Did you speak to your boss?

17        A.   No.  I happen to be off today.

18        Q.   It's always convenient.

19             Did you do anything else to prepare for this

20   deposition?

21        A.   No.

22        Q.   Now, I'm just going to ask some background

23   questions about you.

24             Where are you employed?
```

```
 1       A.    I work for the Department of Homeland

 2    Security, TSA.

 3       Q.    And how long have you worked there?

 4       A.    14 years.

 5       Q.    Wow.  What do you do there?

 6       A.    I am an expert transportation security

 7    officer.

 8       Q.    And what does that job entail?

 9       A.    Basically I work in the department that we

10    mitigate insider threats throughout the airport in

11    any entrance or any back way that an employee would

12    have access to.

13       Q.    And which airport do you work at?

14       A.    Miami International Airport.

15       Q.    And for the 14 years that you've worked

16    there, has been your role the entire time?

17       A.    No.  I've had other positions there.  When I

18    first started just as a screening officer and moving

19    up into leadership and then ultimately, where I'm at

20    now.

21       Q.    So you have worked your way up the totem

22    pole?

23       A.    Sure.

24       Q.    Right.
```

```
 1              What is your work schedule generally like?

 2       A.    I work from 4 in the morning until 12:30 in

 3   the afternoon.

 4       Q.    Okay.  And how many days a week?

 5       A.    Two days off, usually during the week.

 6       Q.    Okay.  And you said you are married, right?

 7       A.    Yes.

 8       Q.    What is your wife's name?

 9       A.    Monica Alba-Nunez.

10       Q.    And she is also a claimant in this case,

11   correct?

12       A.    Through marriage, but all of the paperwork

13   and all that, it's when I -- I purchase the home

14   prior to getting married.

15       Q.    Okay.  And how long -- and how long have you

16   been married?

17       A.    Since 2010.

18       Q.    Okay.  And were you -- how long were you with

19   your wife before you got married?

20       A.    Good question.

21       Q.    We won't let her review this part of the

22   transcript.

23       A.    2006.  So four years.

24       Q.    And do you have any children?
```

 1     A.   Yes.

 2     Q.   Are the children with your wife?

 3     A.   I have two stepdaughters and then a son that

 4  we have together, yes.

 5     Q.   Okay.  And how old are your children?

 6     A.   Kaila, she's the eldest, she's 21; Madison,

 7  18; and Ethan, 6.

 8     Q.   And so you said stepdaughters.  Are they from

 9  a previous marriage of your wife's?

10     A.   Yes.

11     Q.   Okay.  Have you ever been involved in a

12  lawsuit before this lawsuit?

13     A.   No.

14     Q.   You have never been a plaintiff, never been a

15  defendant, no one's ever sued you?

16     A.   The only thing, I guess, would be a part of,

17  like, a global settlement, which I guess would be the

18  same --

19          MS. GRANT:  This litigation.

20  BY MR. BARRY:

21     Q.   So everything related to Chinese drywall?

22     A.   Sure.  Right.  Right, right, right.

23     Q.   And so that's the only time you have ever

24  participated in a class-action lawsuit or anything

```
 1    like that?

 2         A.   Other than maybe, like, you know how you get

 3    those credit cards ones or --

 4         Q.   Yeah.  You are a part of the class.

 5         A.   Right, right.

 6         Q.   Your name is not front and center?

 7         A.   Right, right.

 8         Q.   Now, what is the address of the property that

 9    you are saying has been damaged by Chinese drywall?

10         A.   Okay.  It's been some time since I have been

11    there, but if I recall correctly, it's 8049 West

12    36th Avenue, Unit 4, Hialeah, Florida 33015 [sic].

13         Q.   Do you currently own that property?

14         A.   At the moment, no.

15         Q.   When did you buy that property?

16         A.   We closed in 2007.

17         Q.   Okay.  And who did you buy it from?

18         A.   Shoma Homes.

19         Q.   Okay.  And how much did you pay for the

20    house?

21         A.   Ballpark, 269,000 and some change.

22         Q.   And I'll put documents in front you that help

23    you remember the exact number.  So ballpark is

24    perfectly fine for right now.
```

```
 1              Do you remember whether you purchased that

 2    through a bank, or did you use a lender -- or,

 3    another type of lender of some sort?

 4         A.   At the moment, I don't recall.  It would

 5    probably be in the documents.

 6         Q.   Okay.  Do you remember if you took a mortgage

 7    on that property?

 8         A.   As far as taking a loan out for the purchase

 9    of the home?  Yes.

10         Q.   Do you remember if you took one mortgage or

11    two mortgages?

12         A.   It was divided into two.

13         Q.   Okay.  And why did you divide them into two?

14         A.   Not -- that was something the bank just

15    worked out.  I'm not a hundred percent sure why they

16    chose to do that.

17         Q.   So it wasn't something that you specifically

18    asked to do --

19         A.   No, I did not.  Right.  It must have been

20    something that they just worked out rate-wise, I'm

21    assuming.

22         Q.   Do you remember if anyone else, while you had

23    ownership of the property, had a lien on the

24    property, any type of tax lien or a business loan or
```

```
 1    any other type of encumbrance?

 2         A.   I don't recall.  No.

 3         Q.   Do you own any other properties or houses?

 4         A.   No.

 5         Q.   And from the time you bought the house in

 6    2007 until the time you no longer owned the house,

 7    were you always living there?

 8         A.   Yes.

 9         Q.   So you lived at that house the whole period

10    of time?

11         A.   There was a portion of time that it was

12    probably empty.

13         Q.   Okay.  What was that portion of time?

14         A.   Probably the first -- we closed 2007, so

15    maybe the first few months.

16         Q.   And now, I think I'm missing an important

17    question.  When did you leave the house?

18         A.   It was the end of 2011 when we finally

19    decided to move.

20         Q.   And what happened?  Did you sell the house

21    then?

22         A.   No.

23         Q.   So what was going on at the house from 2011

24    until today?
```

```
 1      A.   At that point, the house was vacant, closed.

 2   We were trying to work things out, you know, with the

 3   attorneys, as far as this process and with the

 4   mortgage holder, while we leased somewhere else due

 5   to just health reasons and, you know, obvious issues

 6   with our electronics and the piping in the walls and

 7   the fumes and the smell, things of that nature.  By

 8   that point, we were already aware of, you know, how

 9   big of an issue Chinese drywall was, and just for our

10   sake, we decided to move.

11      Q.   So from 2011 on, were you still in ownership

12   of the house?

13      A.   Yes.

14      Q.   Okay.  And when did your ownership of the

15   house cease?

16      A.   It would have been the last -- we're in 2018,

17   so August of 2017.

18      Q.   And what happened that --

19      A.   Foreclosure.

20      Q.   Foreclosure?

21           I'm going to show you a few documents, if you

22   don't mind.

23           Now, Mr. Nunez, I'm not going to take too

24   long on these documents.  And the way I'm going to do
```

1    this, I'm going to show it to your counsel first so

2    that she can review it and make sure she's okay with

3    it coming in.  I don't think there should be any

4    problems with these, but . . .

5         (Defendants' Exhibit 1 was marked for

6    identification.)

7         MR. BARRY:  Now, I'm going to enter this as

8      Exhibit 1 to the deposition.

9    BY MR. BARRY:

10     Q.   Mr. Nunez, do you know what this document is?

11          And please take the time to review it, if you

12   would like to.

13     A.   From what I'm reading, it's the purchase

14   agreement.

15     Q.   And was this the purchase agreement when you

16   bought the house in 2007?  Or, it says 2005 here.

17     A.   Well, the home was preconstruction, so that's

18   our -- this is just a contract between myself and the

19   builder, because it wasn't finally built until 2006

20   and we closed 2007.

21     Q.   Okay.  Explain that to me.  So you were --

22   you had entered into a purchase agreement before the

23   house was completed.  Is that right?

24     A.   From what it looks like, yes.  Yeah.  Because

1    you had to set the property aside, pick your

2    location, what model you wanted.

3         Q.   Now, since you signed up -- you entered into

4    the purchase agreement in 2005.  When did you -- do

5    you recall when you ended up entering the house?

6         A.   I would say -- I'm just going back, it's

7    2007 -- ten, 11 years ago.

8         Q.   Of course.

9         A.   I think prior to closing, I think they had us

10   do, like, a walk-through, due to the fact that the

11   house was preconstruction, so to point out any issues

12   or anything wrong with the construction.  So I would

13   say right before we closed.

14        Q.   And do you remember when closing was?

15        A.   It was January 2007, if I'm not mistaken.

16        Q.   And I'm going to hand you this.  So this will

17   help you remember.

18             MR. BARRY:  And that can be Exhibit 2.

19             (Defendants' Exhibit 2 was marked for

20   identification.)

21   BY MR. BARRY:

22        Q.   And so does this warranty deed confirm that

23   you closed in January 2007?

24        A.   Yes, it does.

```
 1        Q.   With all the ridiculous language that's at

 2   the top.

 3             So between 2005 and 2007, was your house

 4   being constructed by --

 5        A.   Shoma.

 6        Q.   -- Shoma?

 7        A.   Yes.

 8        Q.   And so Shoma was the entity that was building

 9   your house --

10        A.   Correct.

11        Q.   -- that you had contracted with?

12             Were you at all involved with that

13   construction?

14        A.   No.

15        Q.   So you didn't have any input?

16        A.   None.

17        Q.   Were you allowed to comment on whether there

18   was hardwood floors put in the house or anything like

19   that?

20        A.   When we set the property aside, when we chose

21   the model; you know, if you wanted to do any upgrades

22   and things like that, of course, you can pick the

23   colors or whatever the case was.  But it was pretty

24   standard.  I didn't do any upgrades.
```

```
1       Q.   So the builder would have let you do upgrades

2   if you wanted to, but you decided not to?

3       A.   Right.  I didn't go that route.  But I'm

4   assuming, yeah, they would have let you upgrade the

5   kitchen and things like that.

6       Q.   Mr. Nunez, do you have any experience in

7   construction?  Have you ever --

8       A.   No.

9       Q.   -- worked building houses, or do you know

10  anyone who builds houses?

11           Are you handy?

12      A.   Actually not.

13      Q.   Did you do a walk-through of the house before

14  closing?

15      A.   Yes.

16      Q.   And did you observe any defects when you were

17  walking through the house?

18      A.   I don't recall.  It wouldn't have been

19  anything massive; you know, maybe a scratch, you

20  know, on a floorboard or a scratch on the wall,

21  something minimal.

22      Q.   Did you observe any odor?  Did you smell

23  anything?

24      A.   I don't recall, like, anything that -- at the
```

```
1    moment other than that, you know, I probably would

2    have associated to new construction.

3         Q.   Okay.  So there was nothing out of the

4    ordinary in your mind?

5         A.   At that moment that I recall.

6         Q.   When you were living in the house, was anyone

7    else living in the house with you?

8         A.   Yes.  Eventually my wife, you know, once we

9    decided to move in together.

10        Q.   Were any of your kids living in the house?

11   And I apologize, I forgot their names.

12        A.   That's okay; that's fine.  Yes.  My

13   stepdaughters eventually.  You know, when we decided

14   to move in together, yes, they were living here.

15        Q.   And, Mr. Nunez, do you mind -- sorry, just

16   for the record, do you mind mentioning your

17   daughters' names and what cities they live in.

18        A.   Sure.

19        Q.   Including your stepdaughters.

20        A.   Yeah.  So it's Kaila.

21             Do you need the last name as well?

22        Q.   Yes.

23        A.   Kaila Fives; currently she lives in Orlando

24   because she goes to USF.
```

```
 1        Q.    Okay.  Congratulations to her.

 2        A.    And then Madison Fives; she lives in Miami,

 3    Florida.

 4        Q.    And I don't think I need your son's name.

 5              And are any of those individuals making a

 6    claim, too?  Are your stepdaughters making any claim?

 7              Did they ever live in the house?

 8        A.    Yes, they lived in the home.

 9        Q.    Have you ever charged rent to anyone to stay

10    there?  So when you left the house in 2011, was --

11    did you ever rent it out to anybody?

12        A.    There was a period of time that someone

13    reached out to me as far as -- they noticed the home

14    was empty -- if they can store some property and some

15    of their items in there.  I explained to them why,

16    you know, being that I was leasing and also

17    attempting to pay the mortgage -- because our goal

18    was to initially keep the home, hopefully get it

19    fixed, whatever the case may be.  But, you know, we

20    don't necessarily know how it would turn out at that

21    point.  Yeah, I let someone store some items in

22    there, and it ended up being -- and ended up

23    squatting for some time.

24        Q.    When you let them store items, did you charge
```

```
 1    them rent for storing those items?

 2        A.    Yes, I did.

 3        Q.    How much rent did you ask them --

 4        A.    Off the top of my head, I don't remember.  It

 5    just was, like, a few hundred dollars.

 6        Q.    Do you have any records of the rent you

 7    charged them?

 8              Did they pay you in cash?  Did they pay you

 9    in check?

10        A.    It was in cash.

11        Q.    Did you deposit that cash in the bank or --

12        A.    No.  It was minimal.

13        Q.    So there's no record of that transaction?

14        A.    I would have to look in documents, which I

15    have given everything to them.

16        Q.    What -- total -- total amount, how much do

17    you think they paid you?

18        A.    Overall?

19        Q.    Yeah.

20        A.    In the increments of payments?

21        Q.    Yeah.  Either one.

22        A.    Right.  I would just -- I would guess, you

23    know, for the time being it was maybe, I don't know,

24    at the most maybe a couple thousand dollars.
```

Confidential - Subject to Further confidentiality Review

```
 1        Q.   Do you know what that person's name is who

 2   was --

 3        A.   I don't recall their full name.

 4        Q.   Do you -- on the break, could you figure out

 5   what their name is?

 6        A.   I can attempt.

 7        Q.   Perfect.

 8             Do you know if any of the items they stored

 9   were damaged at all?

10        A.   No.  I was never informed of that.

11        Q.   Do you know what they were storing there?

12        A.   No.

13        Q.   When you owned the property, did you make any

14   improvements to it?

15        A.   No.

16        Q.   Did -- okay.  So let's just talk a little bit

17   about the actual parameters of the house.

18        A.   Sorry?

19        Q.   The parameters of the house, design.

20             Do you know the square footage of the house?

21        A.   It's in the documents I have given over to

22   them.  I can ballpark it, maybe 1350 square feet.

23        Q.   It looks pretty close.

24             Did -- how do you know that number?
```

```
 1      A.   Based off what information I had from Shoma.

 2      Q.   Did you ever do any kind of independent

 3   measure --

 4      A.   No.

 5      Q.   -- where you measured the square feet?

 6           How many bedrooms were in the house?

 7      A.   Three.

 8      Q.   How many bathrooms?

 9      A.   Two and a half.

10      Q.   And do you know if there were any changes to

11   the square footage?  Was there any additions made to

12   it?

13      A.   No.

14           MR. BARRY:  Now I'm going to introduce this

15      as Exhibit Number 3, which is the Declaration of

16      Correctness of Square Footage on Chinese Drywall

17      Client(s) Property for Remediation Damages.

18           (Defendants' Exhibit 3 was marked for

19      identification.)

20   BY MR. BARRY:

21      Q.   Do you recognize this document, maybe

22   vaguely?

23      A.   Vaguely, yes.

24      Q.   And do you understand what this document is?
```

Case 2:09-md-02045-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1259 of 1680
Case 2:11-cv-00312-MSD-RJK Document 42 Filed 01/18/19 Page 29 of 254 PageID# 737
Confidential - Subject to Further Confidentiality Review

```
 1              MS. GRANT:  I'm going to object to form.

 2         He's not an attorney.

 3    BY MR. BARRY:

 4         Q.   Okay.  What is your understanding of this

 5    document?

 6         A.   From what it seems like, it's just verifying,

 7    I guess, the square footage, address.

 8         Q.   And what is the square footage listed on this

 9    declaration?

10         A.   From what I see here on the actual

11    declaration, it's 1356 square feet.

12         Q.   And is this signed by you, or is this signed

13    by your attorney?

14         A.   It's signed by my attorney.

15         Q.   And do you have any knowledge of why your

16    attorney would have an incorrect number there?

17    A.   No.

18              MS. GRANT:  Object to form.  It's not what he

19         said.

20              MR. BARRY:  I mean, I'm asking whether -- we

21         can establish it through something else.  No

22         problem.

23              So I'm going to introduce Exhibit 4.

24              (Defendants' Exhibit 4 was marked for
```

```
 1    identification.)

 2    BY MR. BARRY:

 3         Q.   Have you ever seen this document before?

 4         A.   Yes.  It seems like it's, like, one of the

 5    online county records.

 6         Q.   And does this document pertain to the address

 7    of the -- your former home?

 8         A.   Yes.

 9         Q.   And what is the square footage listed on this

10    document?

11         A.   Let's see.  It is -- adjusted -- it says:

12    Adjusted square footage 1356 square feet.

13         Q.   And is that consistent with what you believed

14    the square footage of your home was?

15         A.   Yes.

16         Q.   Do you have any reason to believe that's

17    incorrect?

18         A.   No.

19         Q.   Okay.  So when do you believe that Chinese

20    drywall was installed in your house?

21         A.   During the building process, I would assume

22    in 2006, 2005.

23         Q.   Do you know who installed that drywall in

24    your house?
```

```
 1        A.    It would be in the documents.

 2        Q.    Do you know if it was Shoma?

 3        A.    Well, they were the builder.  I'm not sure

 4   who they contracted to do the work.

 5        Q.    Who -- do you know who purchased the Chinese

 6   drywall?  Was it the --

 7        A.    It would be in the documents.

 8        Q.    Okay.

 9              MR. BARRY:  For the court reporter, I'm going

10        to forget what number I'm on regularly.

11              I'm going to introduce this as Exhibit 5.

12              (Defendants' Exhibit 5 was marked for

13   identification.)

14   BY MR. BARRY:

15        Q.    Do you recognize this document?  It's listed

16   Subcontract Agreement.

17        A.    Not necessarily.  Those are not my initials

18   on there.

19        Q.    Are you aware this is a document that was

20   produced to us by your -- in this litigation?

21        A.    Yes.  I've seen as far as, like, some of this

22   information, but I don't -- I've seen so many

23   documents.  I have provided everything to them, and

24   they -- we've seen everything together.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/10/19 Page 1262 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42-3 Filed 01/18/19 Page 320 of 254 PageID# 6740
Confidential - Subject to Further Confidentiality Review

```
 1      Q.   So this agreement is between who?

 2           MS. GRANT:  Counsel, I'm going to object.

 3      Mr. Nunez has testified he doesn't know if he's

 4      seen this or not.  I mean, he can read the

 5      document --

 6           MR. BARRY:  Yeah.  That would be great.  He

 7      can read the document.

 8           MS. GRANT:  He has no personal knowledge.

 9           MR. BARRY:  Understand.

10           MS. GRANT:  And certainly, there are

11      documents that are uploaded that are generated

12      from counsel and some other sources that don't

13      necessary come from the client, and I trust that

14      you understand that.

15           MR. BARRY:  I completely understand that.

16           I stipulate for the record that Mr. Nunez

17      does not know this document and did not generate

18      this document.

19           MS. GRANT:  Thank you.

20           MR. BARRY:  He did produce it in this

21      litigation.

22           THE WITNESS:  So do you want me to read

23      through it?

24           MR. BARRY:  Yeah.
```

```
1    BY MR. BARRY:

2        Q.   If you can tell me who this contract is

3    between.

4             And that first line --

5        A.   Right.  As I'm skimming through it, it

6    seems -- it's saying that the contract was between

7    Shoma Homes and Ramos --

8        Q.   Mercado Enterprises, Inc.

9        A.   -- Martinez, architect.

10       Q.   Do you know who Mercado Enterprises, Inc.,

11   is?

12       A.   No.

13       Q.   So you have never heard of them?

14       A.   No.  I'm assuming somebody that, you know,

15   was part of the building process.

16       Q.   Do you have any understanding that they were

17   part of the -- or, installed -- or, subcontracted to

18   install drywall?

19       A.   I don't know.

20       Q.   Okay.  So how did you come to know that there

21   was Chinese drywall in your house?

22       A.   Well, I had multiple issues with the A/C

23   coils.  And the odor at first, you know, I wasn't

24   sure why.  But after some time, I noticed, you know,
```

Confidential - Subject to Further Confidentiality Review

```
 1     some of the neighbors were having the same issue.  I

 2     spoke to a neighbor that informed me that we actually

 3     had Chinese drywall throughout the complex.  It was

 4     built -- I guess that Shoma, whatever, worked out and

 5     started the building process.  And then he referred

 6     me over to the attorneys, which then at that point

 7     sent over an inspection team, and they -- that's when

 8     we were able to pinpoint and figure out that there

 9     was drywall -- Chinese drywall, sorry, in the home.

10          Q.   Do you remember who that neighbor was?

11          A.   I don't remember his name.  I know he was the

12     neighbor to the right of me.

13          Q.   And so you are saying that neighbor referred

14     you over to your attorney now, or to a different

15     attorney?

16          A.   It would be the group of attorneys that I

17     have been working with.

18          Q.   Okay.  And do you roughly when that was?

19          A.   Jeez.  No, I don't.

20          Q.   Was it 2008, 2009?

21          A.   I can't give an exact date.

22          Q.   Can you give a -- was it sooner than 2007?

23          A.   No.  It would have been --

24          Q.   Or before 2007?
```

```
1      A.   --  I would say -- no, it wasn't before 2007.

2   It was probably, like, late 2009 or '10; again,

3   ballparking.  I don't recall the exact date.

4      Q.   When you started noticing the difficulty with

5   the air conditioner, did you get it fix?

6      A.   Yes.  Multiple times.  They actually ended up

7   replacing the coils.  Which that was a new home; a

8   new A/C unit should last you at least six, seven

9   years.  And that wasn't even the case.  After -- we

10  had to replace the coils multiple times.  They were

11  blackened out completely.

12     Q.   So -- and you said "multiple times."  How

13  many times do you think that is?

14     A.   Jeez.  Well, Allison would have all the

15  receipts I have from the A/C company.  But I would

16  say more than three or four times.

17     Q.   So someone that's been lucky enough not to

18  watch depositions, this is the fun delay part where

19  we're trying to find everything.

20          (Defendants' Exhibit 6 was marked for

21  identification.)

22          MR. BARRY:  And this is Exhibit 6.

23  BY MR. BARRY:

24     Q.   Do you recognize these documents?
```

Confidential - Subject to Further Confidentiality Review

```
1      A.   Yes.

2           MR. BARRY:  I tried to pass all three this

3      time.

4           MR. VERRIER:  It's a good move.

5  BY MR. BARRY:

6      Q.   And so do you recognize these documents?

7      A.   Yes, I do.

8      Q.   What are they?

9      A.   They are the invoices for Oscar Air.  They

10  were the company that would service the air and, you

11  know, at times replace the coil.

12     Q.   So let's go through these.

13          How many times do we have?  I see June 2010

14  on the first one.

15     A.   Okay.

16     Q.   Okay.  So what's the date on the first one?

17     A.   June 29th, 2010.

18     Q.   And what was the service they were doing

19  here?

20     A.   It says replacing the -- I guess it's A/C

21  handler coil.

22     Q.   And for $300.  Is that what that says there?

23     A.   Yeah.

24     Q.   Do you know if this was before or after you
```

```
1    learned of Chinese drywall in your home?

2         A.   This would have been after.

3         Q.   It would have been after?

4         A.   Yeah.

5         Q.   Let's look at the next one here, which is

6    2009.

7         A.   Okay.

8         Q.   And this is another air conditioner repair

9    for the amount of $300.

10        A.   Okay.

11        Q.   Do you know if this was before or after you

12   learned of Chinese drywall in your house?

13        A.   This would have been before that we knew.

14        Q.   Okay.  Now, I can represent for the record,

15   and I'm happy to -- how many more are here?  How many

16   more invoices do we have here?

17        A.   There's a total of three more, so four in

18   total.

19        Q.   And are both of the other -- are the other

20   invoices after the 2010 date when you said that you

21   knew Chinese drywall was in the house?

22        A.   One was 2010, one was 2011.  So that would be

23   after.

24        Q.   And do you know if there are any other
```

```
 1     invoices for air-conditioning?

 2          A.   Not to my knowledge.

 3          Q.   And have you asked for -- do you believe that

 4     these are amounts owed by Taishan for damages you

 5     have suffered from Chinese drywall?

 6          A.   Yeah.  Yes.

 7          Q.   So these are included in the amount that you

 8     have requested?

 9          A.   Yes.

10          Q.   Did you do any other work on the house as a

11     result of Chinese drywall?

12          A.   No.  Not as labor-extensive as this.

13          MS. GRANT:  Counsel, I just wanted to clarify

14     something.  When you said "work," do you mean

15     repairs?

16          MR. BARRY:  Repair work.  Yeah.

17          MS. GRANT:  I apologize.

18          MR. BARRY:  No, that's a great clarification.

19          And my colleague, Sarah is going -- is

20     clarifying one thing, and I don't have the

21     documents here, but you produced two additional

22     invoices yesterday for the air-conditioning.

23     Does that sound correct?

24          MS. GRANT:  Actually, my co-counsel, Holly,
```

```
 1      is handling --

 2            MR. BARRY:  Holly.  Okay.

 3            MS. GRANT:  So I apologize.  I don't --

 4            MR. BARRY:  I just want to make sure that's

 5      clear on the record that there are potentially

 6      two other ones --

 7            THE WITNESS:  Right.  I gave them everything.

 8            MR. BARRY:  -- like I was trying to stick you

 9      into four when there's six out there.

10            THE WITNESS:  Yeah.  I turned in all

11      documents I have over to them.

12            MR. BARRY:  No, absolutely.  I just want to

13      be clear.

14   BY MR. BARRY:

15      Q.   Now, I'm going to provide you a few photos.

16   I'm going to first start with these, and I'm just

17   going to give them to you as a group.

18            MR. BARRY:  And this will be Exhibit 7.

19      Because I'm making more of a mess for myself over

20      here.

21            (Defendants' Exhibit 7 was marked for

22      identification.)

23   BY MR. BARRY:

24      Q.   Have you seen these photos before?
```

```
 1       A.    Yes.

 2       Q.    And what are they of?

 3       A.    They're of the A/C coil.  The first one was a

 4    comparison from the A/C coil that was in the unit,

 5    and the one to the right would be a new coil that's

 6    going to be installed.

 7       Q.    Okay.  And what's -- and now, help me out.

 8    What's the damage here?

 9       A.    Okay.  So the reason the coils had to be

10    replaced, according to the technicians, Oscar Air,

11    what they explained to me, because the A/C unit was

12    not cooling the home.  Once the -- all the piping

13    inside the coil were corroded, at that point the

14    freon, I guess, would leak out, and would not work

15    correctly and cool down the home, which is how we

16    started to notice there was an issue with the A/C.

17            We called at first.  They came and replaced

18    it.  Okay.  It could have been that it was bad, you

19    know.  It happens, right?  But when it started

20    happening often and once we understood the process

21    and how the coil works and why -- all of a sudden

22    it's being defective so quickly when it's something

23    that's supposed to last six to seven years.  That's

24    when we put together, obviously, it was not working
```

```
 1    properly.  And they explained to us was, was that

 2    corrosion was happening.  At that point we knew why,

 3    of course.

 4         Q.   Were you the one who noticed the damage

 5    initially, or was it the Oscar Air Conditioning?

 6         A.   Well, like I said, the home was not cooling.

 7    I called over the company that installed the

 8    air-conditioning unit, I guess, for the builder, and

 9    they were the ones that came out.

10         Q.   And when was that?  When was the first?

11    2009?  I think that's the earliest --

12         A.   Right.

13         Q.   -- invoice we see here.

14         A.   I think so.

15         Q.   And do you know when these photos were taken?

16         A.   Specifically, no.  There might be a date on,

17    you know, the jpeg file.

18         Q.   Okay.

19         A.   But, yeah, I don't know.

20         Q.   So you would represent that whatever the date

21    on the jpeg is probably correct?

22         A.   Right.  I would assume.

23         Q.   Do you know who took these photos?

24         A.   Yes.  These here, I did.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1272 of 1680
Case 2:11-cv-00377-MSD-RJK Document 11-42 Filed 01/18/13 Page 42 of 254 PageID# 750
Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  So you took these photos?

2      A.    Yes.

3      Q.    When the A/C tech came out to repair the air

4   conditioner, did the A/C tech tell you about Chinese

5   drywall?

6      A.    No.

7      Q.    Did the A/C tech explain why they thought the

8   wires were corroding -- or, the pipes were corroding?

9      A.    No.  Earlier on, they didn't know why it was

10   happening.  You know, they were just replacing the

11   coil.

12      Q.    Where was the A/C unit located in the house?

13      A.    It was under the stairs in a closet.

14      Q.    Under -- so it was within the house.  It

15   wasn't in a garage or anything like that?

16      A.    No, no.  It was inside.  It was, like, in the

17   center of the home between the stairs, the kitchen,

18   and, like, a laundry closet.

19      Q.    And did you only have one A/C unit?

20      A.    Yes.

21      Q.    And do you recall if there was a warranty on

22   the A/C unit?

23      A.    No.

24      Q.    You don't remember?

```
1        A.   Not specifically, like, a date or how long.

2        Q.   Do you remember applying under the warranty

3    when you got the repairs?  Did you say, so the

4    warranty company should be paying for the repairs?

5        A.   No.  Oscar Air, they replaced -- I'm going

6    off what I recall.  I believe Oscar Air replaced one

7    under warranty, I guess, from the -- you know, from

8    the manufacturer, wherever they got the units from.

9    And then after that is when we had to pay out every

10   time the coil had to be replaced.  Like I said, it

11   was happening so often throughout the complex that I

12   would assume the company itself had to put an end to

13   it.

14       Q.   And so just generally, the effects of the

15   issues with the air-conditioning is it would -- you

16   would not -- you wouldn't have cold air coming

17   through; you wouldn't have --

18       A.   Right.  That's how we -- that's how first

19   noticed there was something wrong with the unit, or,

20   you know, the air-conditioning itself.  We called

21   them over, and they came and, you know, did the work.

22       Q.   Now, I'm going to hand you another set of

23   photos.

24            (Defendants' Exhibit 8 was marked for
```

**Confidential - Subject to Further Confidentiality Review**

```
 1    identification.)

 2            MR. BARRY:  This is Exhibit 7, right?

 3            THE COURT REPORTER:  8.

 4            MR. BARRY:  8.  I'm so bad about that.

 5    BY MR. BARRY:

 6       Q.   Now, what are these photos of?

 7       A.   These photos are of piping under, like,

 8    facets in the bathroom.  This one here is a -- of

 9    a -- like, a waterspout controller from one of the

10    bathrooms.

11       Q.   Did you take these photos, too?

12       A.   Yes.

13       Q.   Do you remember when you took these photos?

14       A.   No.

15       Q.   And did you ever have a plumber come out to

16    repair these?

17       A.   No.  I don't recall having a plumber coming

18    out.

19       Q.   Did you have any issues related to it, or is

20    this just visible damage?

21       A.   Well, the visible damage on the second

22    picture, if you notice where the handle is -- or, the

23    spout, you see the bottom black.  There's, like, a

24    little tray there.  That, you know, was on the
```

1    faucet, on the -- you know, the sink, like, the

2    porcelain part, and there was, like, an adhesive.

3    All that came off and that was loose.  Therefore, I

4    decided, you know, to try to replace it.  And then

5    once we removed it, you know, you can see from the

6    pictures there, all that was corroded.

7        Q.   Did you replace it yourself?

8        A.   This one, yes.

9        Q.   Are there any receipts for when you purchased

10    to replace it?

11        A.   No.  Home Depot.  You know, just -- it was

12    just, like, a basic faucet.

13        Q.   Are you asking for damages related to the

14    damage to the sink in this litigation?

15        A.   Well, anything -- I would have to defer to

16    Allison on that.  She has all that information as far

17    as what we are asking for, and she would have any

18    documents or receipts that I have that I gave to

19    them.

20        Q.   But you're unaware of any receipts

21    specifically --

22        A.   Specifically to this one, I cannot pinpoint,

23    you know, no.

24        Q.   Okay.  Now, you said -- so how did you become

Case 2:09-md-02047-EEF-MBN  Document 22363-79  Filed 11/19/19  Page 1276 of 1680
Case 2:11-cv-00377-MSD-RJK  Document 44  Filed 01/18/19  Page 46 of 254 PageID# 754
Confidential - Subject to Further Confidentiality Review

```
 1   aware of -- that there was Chinese drywall in your

 2   house?

 3        A.   Once we had --

 4        Q.   You said a neighbor, of course.

 5        A.   Right.  That's what we were told.  Once we

 6   started the process, the inspector came out, and

 7   that's when they officially told us yes.

 8        Q.   Now, when the inspector came out, where did

 9   they say the drywall -- the Chinese drywall was

10   installed in the house?

11        A.   They didn't specifically say.  They took

12   random samples, made a bunch of holes in the

13   property, actually.

14        Q.   Did you look at any of that Chinese drywall?

15        A.   I would see portions and things that they

16   would show me.  From what I remember, they took that.

17   And there's pictures and stuff in the report that you

18   guys have.

19        Q.   Was there any odor in your home at the time?

20        A.   Yes.

21        Q.   What did it smell like?

22        A.   Like a sulfur, like a rotten egg, you know,

23   that type of smell.

24        Q.   Was that different from the initial
```

1    construction smell you smelled in 2007?

2         A.   No.

3         Q.   It was not different?

4         A.   It was the same.

5         Q.   So when you walked in the home in 2007, it

6    smelled exactly like it did when you found out --

7         A.   Right.

8         Q.   -- it was Chinese drywall?

9         A.   That I just correlated with new construction.

10   I figured it was adhesive, drywall, you know, all the

11   supplies that they used.

12        Q.   So the smell never was different from when

13   you did your walk-through?

14        A.   No.

15        Q.   Did it ever get worse?

16        A.   Over time, a little more of it, yeah.

17        Q.   Was it worse in certain parts of the house?

18        A.   I don't recall if, you know, a specific area

19   was stronger than others.  You know, it was just so

20   strong as soon as you'd come in, it'd hit you, you

21   know, overall.  So I don't remember pinpointing,

22   like, say, the kitchen wall is just stronger than,

23   you know, the rest of the home, no.

24        Q.   Was there a certain type of -- time of day

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1278 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 48 of 54 PageID# 756
Confidential - Subject to Further Confidentiality Review

```
 1    where it was worse?

 2         A.    Not that I can recall.

 3         Q.    Was there a weather -- type of weather when

 4    it was worse?

 5         A.    Not that I can recall, no.

 6         Q.    Any type of year that it was -- time of year

 7    it was worse?

 8         A.    No.

 9         Q.    Did it ever lessen?

10         A.    No.

11         Q.    Did any visitors to your house notice the

12    odor?

13         A.    Yes.  Which was kind of embarrassing.

14         Q.    What did they say?

15         A.    Oh, what's that smell?  I'm, like, oh, I'm

16    not sure.  I don't know.  You know, it's a new home.

17    You know, we were trying to figure out what it was.

18    You know, once we knew, then, obviously, I can just

19    explain, oh, from what I've been told, it seems like

20    it's this.

21              But over the years, yeah, I multiple

22    complaints.  You know, family comes over.  My

23    sister-in-law had a newborn, and you know, she

24    noticed, you know, once she came over.  And
```

```
1    coincidentally, she happened to mention that to her
2    pediatrician -- and at that point we kind of had an
3    idea of what was going on -- and he actually told her
4    not to bring the child anymore, which was obviously
5    upsetting for my wife being that she can't have her
6    niece over.
7            But, yeah, I had tons of complaints.  You
8    know, I had people -- I remember joking with, like,
9    friends or family that would come over, put plug-ins
10   everywhere, you know, open your windows, you know,
11   things of that nature, you know.
12       Q.   Now, when was it that you realized that the
13   odor was something more than just new construction
14   smell?
15       A.   I guess when it wouldn't go away.
16       Q.   Would that be after a month?  After a year?
17       A.   I would say so.  Probably after a few months
18   of being there that it just wouldn't go away.  You
19   know, you're just here at the house --
20            MR. BARRY:  Hold on one second.
21            Do you want to take a few minutes?
22            MS. GRANT:  Yeah.  Can we go off the record
23       just for one second so I can --
24            MR. BARRY:  It might be a good stopping
```

```
 1        point, if you want to just take a break.

 2             MS. GRANT:  Okay.  Sure.  Thank you.

 3             (Recess from 8:19 until 8:38 a.m.)

 4   BY MR. BARRY:

 5      Q.   So I'm going to give you a document here, and

 6   if you want to take a look at it.  And I'll represent

 7   to you it's the inspection report.

 8             MR. BARRY:  I think this is Exhibit 9.

 9             (Defendants' Exhibit 9 was marked for

10   identification.)

11   BY MR. BARRY:

12      Q.   If you don't mind taking a look through it.

13             Mr. Nunez, what is your understanding of this

14   document?

15      A.   This was produced after they did the

16   inspection, and it was pointing out where there was

17   corrosion on items such as the A/C unit and the

18   outlets.

19      Q.   And who performed this inspection?

20      A.   This company, Chinese Drywall Screening, LLC.

21      Q.   How soon after you learned that Chinese

22   drywall was in your house did you obtain -- did you

23   retain Chinese Drywall Screening to do the

24   inspection?
```

```
 1              MS. GRANT:  Object to form.

 2              I don't think that's what he testified.

 3              Can you restate it?

 4    BY MR. BARRY:

 5        Q.   How long after you learned that -- well, I'll

 6    restate it.  I'll ask it a different way.

 7              How long after you learned that Chinese

 8    drywall was in the house was the -- was the

 9    inspection performed?

10        A.   Soon after.  I mean, you know, I was informed

11    that some of the property in the complex had it, and

12    obviously, I wouldn't be able to confirm it until

13    they did the report.  And I reached out to the

14    attorneys, and then we got this.

15        Q.   And I think the question your attorney was

16    objecting to was:  Was it your attorney or you who

17    retained Chinese Drywall Screening to do an

18    inspection?

19              MS. GRANT:  No.

20              MR. BARRY:  No?

21              MS. GRANT:  That's not what I was objecting

22        to.

23              MR. BARRY:  Okay.

24              THE WITNESS:  Well, I reached over to them,
```

Confidential - Subject to Further Confidentiality Review

```
 1        you know, we started the process, and part of the

 2        process was getting the property screened to

 3        confirm, you know, know if, you know, it does

 4        have -- to confirm that there is drywall before

 5        we can keep moving forward.

 6   BY MR. BARRY:

 7        Q.   Who paid for this inspection?

 8        A.   I would assume it was the company --

 9        Q.   The company --

10        A.   -- that did the drywall screening, you know,

11   who gave me and my attorneys the inspection report.

12        Q.   Did you pay for the inspection?

13        A.   I don't recall.

14        Q.   So you did not pay -- you don't remember if

15   you paid Chinese Drywall Screening?

16        A.   No.

17        Q.   So do you know if your attorneys paid Chinese

18   Drywall Screening?

19        A.   I would assume they did.

20        Q.   Were you at home when the inspection was

21   performed?

22        A.   Yes.

23        Q.   Did you talk with the inspector?

24        A.   Briefly.  Just, you know, some subtleties,
```

1   but nothing specifically about the drywall itself.

2      Q.   Did you walk through with the inspector while

3   they were performing the inspection?

4      A.   Briefly.  You know, I wasn't right behind

5   them.  You know, just throughout the house.

6      Q.   Was the inspector showing you the drywall

7   during the inspection?

8      A.   No.  He was just kind of doing his work,

9   which was just opening a bunch of holes throughout

10  the property, looking through appliances, stuff like

11  that, taking pictures.

12     Q.   Have you done any other inspections of the

13  drywall since that date?

14     A.   No.

15     Q.   Has any drywall been removed from your house?

16     A.   I wouldn't know.  I no longer have possession

17  of --

18     Q.   Up until 2017, had any drywall been removed

19  from your house?

20     A.   No.  Not that I recall.

21     Q.   And did -- do you know if this inspector

22  determined the percentage of your house was

23  constructed with Chinese drywall?

24     A.   No.  Not that I'm aware of.  He didn't tell

Confidential - Subject to Further Confidentiality Review

```
 1   me anything.

 2       Q.    Did the inspector remove any -- or, did

 3   anyone remove any electrical receptacles from the

 4   house after the inspection?

 5       A.    Remove?  No.  Not that I'm aware of.  I mean,

 6   they obviously -- you can see from the pictures they

 7   took them out, took pictures, put them back in.  But,

 8   like, specifically remove them and take them out of

 9   the property, no.

10       Q.    Did anyone remove any A/C coils?

11       A.    Yes.  Every time they were replaced, they

12   would take the old ones and put a -- you know, put

13   the new system in.

14       Q.    Now, if you can turn to the seventh page.

15            I'm sorry.  One more question on that.  For

16   these A/C coils, when they were removed, were they

17   retained?

18       A.    As far as --

19       Q.    Preserved.

20       A.    -- if I kept them?

21       Q.    Yeah.

22       A.    No.  The -- Oscar Air would take them.

23       Q.    So they didn't reserve them?  To your

24   knowledge, they --
```

```
1        A.   To my knowledge.  I don't know what they did

2   with them, no.

3        Q.   Okay.

4        A.   Yeah.

5        Q.   Now, do you recognize this -- what is shown

6   here on the seventh here page?

7        A.   It's a picture, I'm assuming, that the

8   inspector took of inside, you know, the holes and

9   stuff they made throughout the property.

10       Q.   Do you know what is written on that drywall

11  there, drywall board?

12       A.   I can read.  It says Knauf, Knauf.

13       Q.   Do you know who Knauf is?

14       A.   I know they're a drywall manufacturer.

15       Q.   Do you understand that there was a settlement

16  with Knauf?

17            MS. GRANT:  I'm going to object to form.

18       He's not an attorney.

19            THE WITNESS:  I wouldn't know.

20  BY MR. BARRY:

21       Q.   Is that your understanding?

22       A.   I would have the defer to Allison.

23       Q.   So you have no personal knowledge of a

24  settlement with Knauf?
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1286 of 1680
Case 2:11-cv-00377-MSD-RJK Document 44 Filed 01/18/13 Page 56 of 254 PageID# 764
Confidential - Subject to Further Confidentiality Review

```
 1        A.    With them specifically?

 2        Q.    Yes.

 3              MS. GRANT:  Wait.  Object.

 4              Counsel, I'll note -- object -- just for the

 5        record, I'm sure you know, this is not the same

 6        Knauf that is part of the settlement.

 7              MR. BARRY:  Okay.

 8              MS. GRANT:  This is a different type of

 9        drywall.

10              MR. BARRY:  Okay.

11    BY MR. BARRY:

12        Q.    Were you of any understanding that there was

13    Knauf drywall in your house?

14        A.    After I saw the report.

15              MS. GRANT:  Again, I'm just going to object.

16        Object to the form.

17              Can you give the full name of Knauf?  Because

18        there's several different entities.

19              MR. BARRY:  Okay.  Let's see.  We're going to

20        come back to that in a second.

21    BY MR. BARRY:

22        Q.    So did you ever try to remediate any of the

23    drywall?  Did you ever try to take it out of the

24    house and repair it and put in new drywall?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.

 2        Q.   Why didn't you do that?

 3        A.   Cost-wise.  I mean, you have to repair --

 4   you'd have to go down to the studs, remove all the

 5   drywall and replace the drywall.  It just was so

 6   expensive.  I mean, there's no way I could have

 7   afforded to have done it.

 8        Q.   Did you ever have anyone assess the cost it

 9   would be to remediate?

10        A.   No.  Not, like, a report or a professional,

11   per se, to come and measure and tell me, no.

12             MR. BARRY:  Here you are.

13             (Defendants' Exhibit 10 was marked for

14   identification.)

15   BY MR. BARRY:

16        Q.   Do you recognize this letter?

17        A.   I mean, vaguely.  I mean, something that, you

18   know, the attorneys put together, you know, with my

19   authorization as far as explaining, I guess, from --

20   what process would be taken in order to fix the

21   property.

22        Q.   And so who sent this letter?

23        A.   Baron & Budd.

24        Q.   And on that first paragraph it says "at the
```

 1    request of Mr. and Mr. Nunez."

 2          So is this a letter that you authorized your

 3    attorneys to send?

 4       A.   Yes.

 5       Q.   And if we look at that fourth paragraph

 6    there, do you mind reading that to me?

 7       A.   Sure.

 8          "The cost of remediation is usually

 9    calculated in dollars per square foot.  At the

10    present time, it is expected the cost to radiate is

11    between $45 to $50 per square foot." [Sic]

12          Is that good?

13       Q.   And so it would be -- I think we said that

14    your house has 1,356 square feet, right?

15       A.   Uh-huh.

16       Q.   Doing my poor lawyer math, would that be

17    about $60,000 for remediation?

18          MS. GRANT:  I'm going to object to the form,

19       actually, as a rolling objection anything

20       relating to remediation.

21          Obviously, we have another part of this case

22       dealing with the remediation formula, and

23       remediation questions here are not relevant.

24          MR. BARRY:  That's fine.

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1289 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 59 of 254 PageID# 767
Confidential - Subject to Further Confidentiality Review

```
 1            MS. GRANT:  Notwithstanding -- you may

 2       answer, if you know.

 3            MR. BARRY:  And your rolling objection is

 4       recognized for the record.

 5            MS. GRANT:  Thank you.

 6            THE WITNESS:  I'm sorry.  Can you repeat the

 7       question?

 8  BY MR. BARRY:

 9       Q.   So $45 per square foot times 1356 is about

10  $67,000.  Is that right?  Some better lawyer math --

11            MR. VERRIER:  Object to form.

12            MR. BARRY:  If you want to do the math.

13            MS. GRANT:  And I'm going to object to the

14       form again.  You're asking him to do math, not --

15       you have not asked him what it costs to

16       remediate; you're simply asking him, to clarify,

17       to do math.  Is that correct?

18            MR. BARRY:  I'm asking what the cost is in

19       this letter.  It says it's 45 to 50.  He has read

20       that on the record.  And so we're asking the cost

21       to remediate that is listed in this letter, times

22       the square foot, which is what is listed in this

23       letter.

24            MR. VERRIER:  Maybe we can just give him a
```

```
 1        calculator.

 2             MR. BARRY:  If you have one present --

 3             MR. VERRIER:  You can use my phone.

 4             MR. BARRY:  Well, I just made a

 5        representation based on --

 6             MR. VERRIER:  Yeah.  I think if you want to

 7        say a rough --

 8             MR. BARRY:  I said roughly 67,000.

 9             MS. GRANT:  And just to clarify the record,

10        the calculation he's performing is per this

11        letter.  He is not testifying --

12             MR. BARRY:  Correct.

13             MS. GRANT:  -- it actually costs to

14        remediate.

15             MR. BARRY:  Correct.

16             THE WITNESS:  So do you want me to calculate

17        that for you?

18             MR. BARRY:  Yeah.  That would be great.

19             THE WITNESS:  So do you want me to go with 45

20        or the 50?

21             MR. BARRY:  Either one.  You choose which

22        one.

23             THE WITNESS:  Times 1356?

24             MR. BARRY:  Yeah.  Square feet.
```

```
 1              THE WITNESS:  It would be $67,800.

 2    BY MR. BARRY:

 3        Q.   And so at this time in 2011, do you know how

 4    your lawyers came to the conclusion that remediation

 5    would be about $45 to $50 per square foot?

 6              MS. GRANT:  Object to the form.

 7              Actually, don't understand that.  That's

 8         attorney/client.

 9    BY MR. BARRY:

10        Q.   Do you know that separate from how your

11    attorneys -- from the acknowledgement that your

12    attorneys provided to you?  Did an inspector provide

13    you that information?

14        A.   No.

15        Q.   So you have no other knowledge of how 45 to

16    $50 per square foot was put on this letter?

17        A.   I trust that they would -- you know, got the

18    information that it's something that's viable.

19        Q.   Did you ever ask anyone to quote how much it

20    would cost to remediate the property?

21        A.   No.  Myself, no.

22        Q.   So do you have any knowledge of what the

23    actual cost to remediate the property would be?

24        A.   No.
```

```
 1      Q.    And did you ever have any knowledge of that?

 2      A.    No.

 3      Q.    So you are no longer in possession of the

 4   house, correct?

 5      A.    Correct.

 6      Q.    So can you remediate the property now?

 7      A.    I wouldn't be able to now.  I fix can't -- I

 8   didn't have access to the property.  I no longer own

 9   it.

10      Q.    Perfect.

11      A.    I would have at the point, if I still owned

12   the property, and I would have gotten remediation and

13   funds, I would have definitely, yes, attempted with

14   the funds, if they were enough to fix the home, yeah.

15   We wanted to stay there.

16      Q.    Did someone collect any samples of the

17   drywall that was removed from the house?

18      A.    Over than the inspection, no.

19      Q.    Do you know how many samples were collected?

20      A.    Off the top of my head, no.

21      Q.    Do you know if there were any samples from

22   the drywall of different markings found in the house?

23      A.    No.

24      Q.    Do the samples show the markings on the
```

Confidential - Subject to Further Confidentiality Review

```
 1    drywall?

 2         A.   I wouldn't know.

 3         Q.   How much knowledge do you have of the

 4    samples?

 5         A.   Not much, to be honest with you.  I just let

 6    him come in, do his job, take pictures, send the

 7    report out, and I just --

 8         Q.   I won't go through all that with you.

 9         A.   Right.  Yeah.  I don't know, honestly.

10         Q.   Did you file any homeowner's insurance policy

11    claims for the damages in the house?

12         A.   No.

13         Q.   Did you have homeowner's insurance?  Did you

14    have homeowner's insurance during the time period?

15         A.   Just, I guess, to the exterior, whatever the

16    association required.

17         Q.   So you didn't have any interior --

18         A.   Interior, no.

19         Q.   Why didn't you have homeowner's insurance?

20         A.   It's something we never decided to have.

21         Q.   So has there been any damage to personal

22    property in your house?

23         A.   Yeah.  Electronic items, things of that

24    nature.  Obviously the coils, the piping, you know,
```

```
 1    the handles, like, in the bathroom, stuff like that.

 2         Q.   Do you still have possession of those

 3    personal items that have been damaged?

 4         A.   No, no.

 5         Q.   Okay.  So has the presence of Chinese drywall

 6    limited the use of the property?

 7         A.   Definitely.  We couldn't live in it.

 8         Q.   And how did it happen?  How did it limit the

 9    use of the property?

10         A.   I'm sorry?

11         Q.   How did it limit the use of your property?

12         A.   It was just not pleasant to be in there.  So,

13    you know, being -- you know, the emission of the

14    smell.  You know, once we knew officially that there

15    was Chinese drywall in there and it potentially could

16    harm you, we would try to not be at home as long

17    as -- of course, you have to be home.  But I mean,

18    just in general, you know, we would make it a point

19    to try to be out as much time as we could, you know,

20    out of the home in the park or just out, you know,

21    have dinner, which, obviously, incurs costs, you

22    know, as obviously, we all know, easier to -- cheaper

23    to make dinner at home.

24              But is that what you're kind of referring to?
```

1    Q.   Uh-huh.

2    A.   Yeah.

3    Q.   Are you seeking any money payment in this

4    lawsuit because of those limitations?

5    A.   All that would be set up, I'm assuming, by

6    whatever it is that we're asking for.

7    Q.   So you don't have a personal understanding --

8    A.   No.

9    Q.   -- of what the money damages you're asking in

10   that, for --

11        MS. GRANT:  And, Counsel, to clarify, you've

12        asked him for limited use of the property.  Are

13        you including loss of enjoyment, too?

14        MR. BARRY:  Yes.

15        MS. GRANT:  Okay.  So I don't think that was

16        clear to my client.

17        MR. BARRY:  I apologize.

18   BY MR. BARRY:

19   Q.   Are you asking for money damages for loss of

20   use and enjoyment?

21   A.   Yeah, definitely.

22        Just to kind of elaborate, you know,

23   things -- like we spoke earlier, I work for

24   Department of Homeland Security.  And one of the

```
 1    things that we constantly do is, like, background

 2    checks and things like that.  At some point I had to

 3    explain why my home, as far as, like, the status of

 4    the mortgage payment was behind, was because -- I had

 5    to bring in these documents, I had to explain to them

 6    Chinese drywall, and things of that nature.  And it

 7    kind of hindered security clearances that I had,

 8    approval for.  In addition to, let's say, like,

 9    credit cards:  Credit cards got denied; other cards

10    weren't renewed once they were expired because of the

11    mortgage affecting my credit.  Car loans, you know,

12    higher interest rate, things of that nature.

13        Q.   And when did -- when did that start?  When

14    you start having credit issues related to Chinese

15    drywall?

16        A.   Once I just could no longer pay the lease and

17    the mortgage at the same time.  You know, we tried as

18    much was we could as long as possible, but at one

19    point, we just couldn't.  And then that, obviously,

20    started reporting on my credit.  Therefore, you know,

21    domino effect, you know, for everything else, like I

22    explained to you as far as for work, and, you know,

23    just credit issues and things of that nature.

24        Q.   Did you have any issues paying the mortgage
```

Confidential - Subject to Further Confidentiality Review

```
 1   before you moved out of the property?

 2        A.   No.  Not at all.

 3        Q.   What monetary amount do you associate with

 4   that loss of use and enjoyment?

 5        A.   Without, like, alternative living expenses,

 6   you mean?

 7        Q.   Yeah.  Just the loss of use and enjoyment.

 8        A.   I mean, that's something we've kind of

 9   quantified, and they've, you know, added that in the

10   documents and stuff.

11        Q.   So out of -- off the top of your head right

12   now, you don't have an understanding of what that

13   amount is?

14        A.   I mean, I can give you what I would like.

15   You know, because, obviously, going through all that,

16   you know, not having -- not being able to have events

17   at home, have family over.  I mean, you can't put a

18   price on something like that.

19             Do you understand what I mean?

20        Q.   Yes.

21             Did you suffer any type of personal injury or

22   medical conditions as a result of the Chinese

23   drywall -- or, what you believe to be a result of

24   Chinese drywall?
```

```
 1        A.    I mean, as we all know, you know, there is a
 2    hard time necessarily proving any, like,
 3    scientific/medical evidence.  But, yeah, I would feel
 4    lethargic; I was tired often.  You know, at some
 5    point, like, I was -- you know, I'd consider, like,
 6    you know, am I depressed?  You know, it's just -- I
 7    just felt very, like, gloomy; you know, just very
 8    exhausted often.
 9            And then my wife, she's asthmatic, and, you
10    know, she had issues with her breathing.  My younger
11    stepdaughter had nosebleeds.  We'd seek medical
12    attention.  But, you know, at that point, I'm still
13    so -- I'm sure until today no one could necessarily
14    correlate, you know, Chinese drywall with specific
15    health issues.
16        Q.    And did you understand that this lawsuit does
17    not involve any claims for personal injury or medical
18    conditions?
19        A.    Yes.
20        Q.    So how long did you live in your house after
21    you suspected that the house contained Chinese
22    drywall?
23        A.    Until the end of 2011.
24        Q.    And who else lived in the house with you
```

```
 1    during that time period?

 2         A.   My wife and the kids.

 3         Q.   And how many of your kids?

 4         A.   At that point it was just the two girls.

 5         Q.   So the oldest girls -- or, just -- the

 6    newborn wasn't born yet?

 7         A.   No.  He was born after we moved.

 8         Q.   Do you remember the date in which you moved

 9    out of your house, roughly?

10         A.   Roughly, yeah.  It was the end of

11    December 2011.

12         Q.   And why exactly did you move out of the

13    house?

14         A.   Due to the damages, the evident issues with

15    the coil.  We just figured health-wise, you know, if

16    it's doing that to metal copper, you know, what is it

17    doing to our insides?  So we were just concerned

18    about our health, and, you know, of course the rest

19    of the items that we still had in damage.

20         Q.   Was there anything that specifically was a

21    breaking point for you that inspired you to leave the

22    house?

23         A.   My wife and I, for a good amount of time, we

24    were trying to conceive, and it just wasn't
```

```
 1    happening.  And we brought it up to, you know, our

 2    doctors and things of that nature.  And, you know, we

 3    told them that we had this drywall; you know, we

 4    suspected that could be an issue.  And, you know,

 5    they had suggested, you know, maybe it is.  You know,

 6    because we did all sorts of labs and things like

 7    that, and things, you know, were fine.  They just

 8    couldn't see why, another reason.

 9            And we moved at the end of 2011.  My son was

10    born in October 2010 -- I mean, I'm sorry, 2012.  You

11    know, I can't obviously correlate the two.  But do

12    the math, nine months, we moved in January -- that

13    whole time that we weren't in the house.  And,

14    actually, he was born a little earlier.  He should

15    have been born in November, so . . .

16        Q.    Now you're making me do the math.

17        A.    Take out your calculator.  Work that out.

18        Q.    No, no.  I know I'm not good at math.

19            And did your doctor tell you you needed to

20    move out of the house?

21        A.    No.  It's, you know, just his opinion,

22    suggestion.

23        Q.    But he didn't say move out of the house?

24        A.    Right.  He couldn't tell me that.
```

```
 1        Q.    Did anyone else tell you to move out of the

 2    house?

 3        A.    Just in general when you talk to people and

 4    you explain to them your situation.  Everybody's

 5    like, dude, what are you doing there?  Get out of

 6    there.  You're going to die.  You know, like, in that

 7    sense, but . . .

 8        Q.    Did you -- how did you decide where to live

 9    when you moved out of your house?

10        A.    We were just looking for somewhere far away

11    from where we lived, just to get away from there.  We

12    didn't even want to drive by there just because it

13    was, you know, such a pain, you know, the heartache

14    and the work and all the damage.  We just looked for

15    a neighborhood that appealed to us that was, you

16    know, nice for, you know, our standards.  And we

17    chose to go that route.

18        Q.    So I'm not that familiar with this area.

19        A.    Okay.

20        Q.    How far away from where you were previously

21    living did you move?

22        A.    You mean mileage-wise or time?

23        Q.    However you decide to gauge it.

24        A.    It's, like, a 15-, 20-minute drive.
```

```
 1        Q.   So it would be fair to say that you moved to

 2   a completely new neighborhood?

 3        A.   Yes.

 4        Q.   Were there any other reasons why you decided

 5   to move out of that neighborhood?

 6        A.   Out that specific neighborhood?

 7        Q.   Uh-huh.

 8        A.   No.  It was just because of the drywall.

 9        Q.   Was the new neighborhood you were living in,

10   did it have a better school district?

11        A.   No, not necessarily.  I think they both had

12   pretty good elementary schools and middle schools.

13        Q.   Did your kids have to change schools?

14        A.   No.

15        Q.   So they stayed at the same school once you

16   moved?

17        A.   Uh-huh.

18        Q.   And was it a further commute for you to work

19   or a closer commute for you?

20        A.   They're both about the same.  They're both

21   about the same distance from the airport.

22        Q.   Did you consider moving in with family?

23        A.   No.

24        Q.   Did you consider any other type of living
```

```
1    situation:  Moving in with friends, anything like
2    that?
3         A.   No, no, no.  It's such a burden on someone,
4    you know, and on us.  I didn't want to go through
5    that.
6         Q.   How many months did you live outside of the
7    house?
8         A.   Meaning?
9         Q.   Like, so let's actually take that a different
10   way.
11             What time period -- when you moved out of the
12   house in 2011 --
13        A.   Yes.
14        Q.   -- how long did you live in the rental
15   property?
16        A.   Until today.
17        Q.   So you're still living --
18        A.   We are still in that same location.
19        Q.   And are you claiming damages for that entire
20   time period?  So from December 2011 when you moved
21   out of the house, I assume you're paying -- well, let
22   me take a step back.
23        A.   Right, right.
24        Q.   How much are you paying for rent on the
```

```
 1    property?

 2        A.    Currently?  We're paying --

 3              THE WITNESS:  750, babe?

 4        A.    -- yeah, 1750.

 5              MR. BARRY:  Show that the witness had to

 6        ask -- phone a friend.

 7              THE WITNESS:  Yeah.  She's the one that makes

 8        the payment.  I just give her the money.

 9              MS. GRANT:  And if you don't know, please say

10        you don't know.

11              MR. VERRIER:  She will get her chance.

12              MR. BARRY:  I'm going to give you documents

13        that will help with it.

14              THE WITNESS:  Yeah.  Thanks.

15              MR. BARRY:  If your counsel does not object,

16        I'm going to give all three of the leases at the

17        same time.

18              MS. GRANT:  That's perfectly fine.

19              MR. BARRY:  And we can do Exhibit 11.

20              (Defendants' Exhibit 11 was marked for

21        identification.)

22              MR. BARRY:  Exhibit 12, which is -- so

23        Exhibit 11 is the lease from 2012 to 2013.

24              Exhibit 12 is going to be the lease from 2014
```

Confidential - Subject to Further Confidentiality Review

```
 1        to 2015.

 2               (Defendants' Exhibit 12 was marked for

 3        identification.)

 4               THE WITNESS:  Okay.

 5               MR. BARRY:  And then Exhibit 13 is going to

 6        be the lease from 2016 to 2017.

 7               THE WITNESS:  Okay.

 8               (Defendants' Exhibit 13 was marked for

 9        identification.)

10        BY MR. BARRY:

11          Q.   So for the lease that is 2012 to 2013, is

12        this -- do you recognize this document?

13          A.   Yes.

14          Q.   Is this a document that you signed?

15          A.   Yes.

16          Q.   Do you mind letting me know what the lease

17        term is on this?

18          A.   Yes.  For this time frame it was 1450.

19          Q.   I apologize.  Lease term, it's the length of

20        the lease.

21          A.   Oh, I'm sorry.  24 months.

22          Q.   So January 1, 2012, to December 31, 2013.

23               Do you see that on Page 2?

24          A.   Uh-huh.
```

```
 1        Q.   Do you -- and so how much was the lease?  How

 2   much did you have to pay per month?

 3        A.   For that time frame it was 1450.

 4        Q.   Okay.  And did -- did this lease last the

 5   entire 24-months?  Did you breach it?  Did --

 6        A.   No.

 7        Q.   -- the landlord breach it?

 8        A.   No.

 9        Q.   And are you asking for damages for the entire

10   1450 a month for 24 months?

11        A.   Yes.

12        Q.   I'm not making you do math on that.

13        A.   Right, right.  Yes, yes.

14        Q.   Then let's look at 2014 to 2015.

15        A.   Okay.

16        Q.   And what's the lease term here?

17        A.   It's also 24 months.

18        Q.   Okay.  And what is the amount of rent?

19        A.   1500.

20        Q.   So did you breach any of that agreement?

21        A.   No.

22        Q.   Did you breach that agreement at all?  Did

23   the landlord breach that agreement?

24        A.   No.
```

```
 1        Q.    Do you know if you made all the payments on

 2   the rent?

 3        A.    Yes.

 4        Q.    And now let's look at 2016 through 2017.

 5        A.    Okay.

 6        Q.    And what is the lease term here?

 7        A.    It's also 24 months.

 8        Q.    And what is the total rent -- or, the amount

 9   of rent payment that you need to make per month?

10        A.    1600.

11        Q.    So it increases by an extra hundred from the

12   time --

13        A.    From the previous one, yes.

14        Q.    And are you -- was this lease breached at all

15   by you or the landlord?

16        A.    No.

17        Q.    Do you know if you have made all payments on

18   this lease to date?

19        A.    We have, yes.

20        Q.    Now, do you have -- have you produced

21   evidence of all of the -- of making all of these rent

22   payments?

23        A.    Yeah.

24              THE WITNESS:  The bank statements, Allison.
```

```
 1            MS. GRANT:  I would have to look.

 2            THE WITNESS:  Yeah, I would have to -- I want

 3       to say bank statements.

 4            MR. BARRY:  I will provide to you -- this is

 5       going to be a fun part.  So I've got your bank

 6       statements that have been produced to us.

 7            THE WITNESS:  Perfect.

 8            (Defendants' Exhibit 14 was marked for

 9    identification.)

10    BY MR. BARRY:

11       Q.   So, Mr. Nunez, I'm going to -- do you

12    recognize these documents generally?

13       A.   Yes.

14       Q.   And if there's anything in here that's stray,

15    let me know.

16            And what are these documents?

17       A.   Checking, bank statements.

18       Q.   Whose name are they in?

19       A.   Monica.

20       Q.   But you would consider these as much part of

21    your own financials as much as hers?

22       A.   Yes.

23       Q.   I'm going to ask you to go through here, and

24    if you don't mind, just looking through the dates and
```

```
 1    reading them off to me of what bank statements we

 2    have here.  And I'm going to note it down.

 3         A.   Okay.  So the first one is here from

 4    October 23rd, 2015 to November 19th, 2015.

 5         Q.   Okay.  So we've got October 2015,

 6    November 2015.

 7              Let's go to the next one.  I apologize these

 8    are not on pages, so it's hard to find it.

 9         A.   Right.  So you want me to read -- I'm going

10    to give you the next set of dates.

11         Q.   Yeah.  That would be great --

12         A.   Yeah.  November -- do you need the actual

13    dates --

14         Q.   Yeah.

15         A.   -- or date and month?

16         Q.   You can just give me the month.

17         A.   Okay.

18         Q.   That works.

19         A.   -- 2015 to December 2015.

20         Q.   Perfect.

21         A.   Then we have December 2015 to January 2016;

22    January 2016, February 2016.

23         Q.   Okay.

24         A.   February 2016, March 2016; and then
```

```
 1    March 2016, April 2016; April 2016 to May 2016;

 2    May 2016 to June 2016; June 2016 to July 2016;

 3    July 2016 to August of 2016; August of 2016 to

 4    September of 2016; September of 2016 to October of

 5    2016; October of 2016 to November of 2016; November

 6    of 2016 to December of 2016; December of 2016 to

 7    January of 2017; January of 2017 to February of 2017;

 8    February of 2017 to March of 2017; March of 2017 to

 9    April 2017; April of 2017 to May of 2017; May of 2017

10    to June 2017; June of 2017 to July of 2017; July of

11    2017 to August of 2017; August of 2017 to September

12    of 2017.

13         Q.   So if my calculation is correct -- is that

14    the completion of the pile?

15         A.   Yeah.  That's the end of the documents.

16         Q.   So my -- if my calculation is correct, we

17    have bank statements from October 2015 to August of

18    2017, right?

19         A.   Yeah.

20         Q.   Am I right about that?  Yes.

21              September 2017.  So October 2015 to

22    September 2017.

23              The lease began -- your first lease was in

24    2013, correct?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    Uh-huh.

 2        Q.    Do you have any records -- do you have any

 3    records of lease payments before October of 2015?

 4        A.    Some documents weren't available online

 5    through Bank of America, and I was not able to get

 6    anything -- like, basically I downloaded anything

 7    that was available online that I could retrieve.

 8        Q.    Do you know of any alternative evidence

 9    that's been produced in this litigation by you that

10    would show that your lease payments began before

11    October 2015 or that you were paying those lease

12    payments before October 2015?

13        A.    Just the lease agreements.

14        Q.    But nothing that shows that you actually paid

15    those amounts?

16        A.    Yeah, all the documents I was able to

17    download I've handed over to them.  So whatever

18    documents I guess you would have.

19        Q.    Do you know if your landlord keeps records of

20    payments?

21        A.    I wouldn't know.

22        Q.    Have you asked your landlord for those

23    records?

24        A.    No.
```

```
 1        Q.    Are you -- so we've gone up until 2017.

 2              What happened in August 2017?  When was your

 3    house foreclosed on?

 4        A.    Oh, yeah, August of 2017, yes.

 5        Q.    So are we -- is your understanding of why we

 6    have bank records only through August of --

 7    August/September 2017 because you were no longer

 8    paying both the mortgage --

 9        A.    Right.

10        Q.    -- and the lease at the same time?

11        A.    Can you restate that for me?  I'm sorry.

12        Q.    So you were foreclosed on in 2017?

13        A.    Correct.

14        Q.    So you were no longer paying on the mortgage

15    after --

16        A.    Right.  For some time.

17        Q.    And I have bank records here showing that you

18    made lease payments between October 2015 and

19    August 2017.

20        A.    Correct.

21        Q.    Is your understanding of why there are no

22    bank records after --

23        A.    Whatever date.

24        Q.    -- September of 2017 because you were no
```

```
1    longer paying both for the mortgage and for the lease

2    payments?

3        A.   The mortgage, I had stopped paying in 2014.

4        Q.   So are you claiming damages for lease

5    payments that occurred after August 2017?

6        A.   As far as after the foreclosure?

7        Q.   Yes.

8        A.   Whatever documents I had given them, they

9    have put together.  I'm not sure what they have set

10   up.

11       Q.   What it be your -- what's your understanding

12   of why you're claiming damages for the lease

13   payments?

14            MS. GRANT:  Objection.

15   BY MR. BARRY:

16       Q.   What is your understanding?

17            MS. GRANT:  Asked and answered.

18            And -- I'm sorry, go ahead.

19            MR. BARRY:  I'm not sure I've heard the

20       answer to it.

21            MS. GRANT:  Okay.

22            MR. BARRY:  So if you don't mind --

23            MS. GRANT:  He deferred to counsel.

24            MR. BARRY:  Well, it's a different question.
```

Case 2:09-md-02047-EEF-MBN  Document 22363-79  Filed 11/19/19  Page 1314 of 1680
Case 2:11-cv-00377-MSD-RJK  Document 142  Filed 01/18/19  Page 84 of 125  PageID# 792
Confidential - Subject to Further Confidentiality Review

```
 1              MS. GRANT:  Okay.  I'm sorry then.

 2  BY MR. BARRY:

 3      Q.   What is your understanding of why you are

 4  claiming damages for the lease payments?

 5      A.   Alternative living expenses.

 6      Q.   And what is your understanding of what it

 7  means, "alternative living expenses"?

 8      A.   Basically, me having to move out of my home

 9  and pay these lease payments for, what, six, seven

10  years we've been living there, rather than living at

11  my home due to the fact that we had to move because

12  of the damages of the drywall.

13      Q.   And is it your understanding that you're

14  still entitled to damages once those -- you're

15  still -- while you're no longer obligated to make any

16  mortgage payments?

17      A.   Sorry.  Can you --

18      Q.   It was a horrible question.  I just asked

19  that terribly.

20      A.   Right.  It's okay.

21      Q.   No.  And truly, this is another example.  If

22  you don't understand what I'm saying --

23      A.   Right.  I don't.

24      Q.   -- you are more than welcome to stop me and
```

```
 1      say, Mike, you asked a terrible question.

 2             While you were -- is it your understanding

 3      that you are seeking damages for lease payments

 4      occurring after August 2017?

 5      A.    Okay.  I would have to refer --

 6      Q.    So you don't have a personal understanding?

 7      A.    No.  I don't have an actual breakdown or

 8      understanding of how and what they're going, you

 9      know, as far as, like, what they're asking for as far

10      as, like, a breakdown of up until when, I don't --

11      Q.    You're personally unaware?

12      A.    I'm personally not aware, no.

13      Q.    Let's see.

14             So -- was Bank of America your bank before

15      October 2015?

16      A.    Yes.

17      Q.    Okay.  Did you use any other bank to make

18      payments on this lease, do you know?

19      A.    No, no, no.

20      Q.    If you could give me just one second.

21             Mr. Nunez, earlier you represented that you

22      had two mortgages on the house, correct?

23      A.    Yes.

24      Q.    I'm going to hand you a document which I'll
```

```
 1    represent is the payment history.

 2            (Defendants' Exhibit 15 was marked for

 3    identification.)

 4    BY MR. BARRY:

 5        Q.   Do you recognize this document?

 6            MR. BARRY:  And sorry, what exhibit is this?

 7        This is Exhibit 14?

 8            MR. VERRIER:  15.

 9            THE WITNESS:  Yes, I recognize it.

10    BY MR. BARRY:

11        Q.   And if you don't mind taking a look through

12    it, just familiarizing yourself.

13        A.   Sure.

14        Q.   And you said at some point you ended up not

15    being able to pay on the mortgage anymore.  Can you

16    pinpoint that for me?

17        A.   Throughout this statement here on Chase's

18    invoices?

19        Q.   Yes.

20        A.   Let's see.

21        Q.   If you believe that would accurately

22    represent.

23        A.   Well, here it goes from 2007 -- '8, yeah, '8

24    to 2010.  So payments were all made during that time
```

```
 1    frame.

 2        Q.   Now, did you make any payments after that

 3    time frame, do you know?  Would that be about the

 4    time you stopped paying on the house?

 5        A.   I'm trying to think.  There was the two loans

 6    with Chase.  I was able to work out a forbearance due

 7    to the litigation process; so at some point that

 8    kicked in.  It's when that was over that they can no

 9    longer establish forbearance for -- you know,

10    whatever reason, they didn't approve it.  That's when

11    I stopped paying it, which that's not on here.

12        Q.   So sometime after --

13        A.   Yeah.  It was sometime after the date that's

14    here.

15        Q.   So sometime after the forbearance you were

16    stopped -- you weren't able to pay on --

17        A.   Right.

18        Q.   Which would also line up with the time when

19    you were living in another location.

20        A.   Yeah.  By that time, yes.

21        Q.   Were there any other financial difficulties

22    you were going through during that time period?

23        A.   No.

24        Q.   Did you -- did you or your wife have any loss
```

Case 2:09-md-02047-EEF-MBN Document 22363-79 Filed 11/19/19 Page 1318 of 1680
Case 2:11-cv-00377-MSD-RJK Document 44 Filed 01/18/19 Page 28 of 251 PageID# 796

Confidential - Subject to Further Confidentiality Review

```
1    of employment?

2         A.    No.

3         Q.    Did you -- so you said you asked for a

4    forbearance?

5         A.    Correct.

6         Q.    Do you remember what the terms of that

7    forbearance were?

8         A.    It was -- actually, it was very annoying

9    process, because they would only grant it sometimes

10   for a few months; sometimes it would be, you know,

11   three months.  Sometimes it would be more extensive;

12   you know, they give you a year or nine months,

13   whatever.  So it was kind of like each re-issuance of

14   it was different than the last.  But for the most

15   part it was -- you know, at that time frame, you

16   know, we forbear your payments due to the fact that

17   you are in litigation and trying to deal with this

18   problem.

19        Q.    When did the forbearance period end?  Do you

20   remember?

21        A.    Exactly?  No, I don't.

22        Q.    Did you have any type of accidents or medical

23   conditions during this time period that might have

24   been creating extra costs?
```

```
 1       A.   No.

 2       Q.   Were you -- did any of your members of your

 3   family have medical conditions or extra costs that

 4   would have added --

 5       A.   Just additional, you know, hospital or doctor

 6   visits due to, like, my wife's asthma, or like I

 7   referred you earlier, the nosebleeds, things of that

 8   nature.

 9            MR. BARRY:  And let's -- do you mind if we

10       take a quick break?  There's one thing I want to

11       clarify.

12            Is that okay with you?

13            THE WITNESS:  Yeah.

14            (Recess from 9:21 until 9:36 a.m.)

15   BY MR. BARRY:

16       Q.   Okay.  I'm going to walk through these

17   quickly.

18       A.   Sure.

19       Q.   Are we good?

20            I'm going to hand you, and if your counsel's

21   okay with it, two documents at a time.

22            MR. BARRY:  We're at 19, Exhibit 19?

23            THE COURT REPORTER:  16.

24            MR. BARRY:  16.  Gosh, I'm bad at that.
```

```
1    BY MR. BARRY:

2       Q.   I'll represent to you this is your first

3    mortgage.

4            (Defendants' Exhibit 16 was marked for

5    identification.)

6    BY MR. BARRY:

7       Q.   And what is what I understand to be your

8    second mortgage.

9            (Defendants' Exhibit 17 was marked for

10   identification.)

11   BY MR. BARRY:

12      Q.   And if you could just take a look through it.

13      A.   Sure.

14      Q.   Familiarize yourself with it.

15           On the first mortgage, do you see a total

16   contract sales price?

17      A.   Yes.

18      Q.   And do you recognize that as the price that

19   you paid for the house?

20      A.   Yes.

21      Q.   Okay.  Do you see the amount of this first

22   mortgage, the amount of money on the first mortgage?

23      A.   The 269?

24      Q.   How much the mortgage was, how much total you
```

Confidential - Subject to Further Confidentiality Review

```
1      have to pay.

2          A.   Right.  The 269,000.

3          Q.   Yes.

4          A.   Is that what you are referring to?  Uh-huh.

5          Q.   So if you turn to page -- if you keep turning

6      through here, you are going to see a document that

7      looks like this.  It says Mortgage.  And I'm going to

8      find the exact number -- it's the eighth page.  It's

9      just this document that says Mortgage.

10         A.   I think on mine it's -- yeah, it's before

11     that.  It's, like, the second or third page on mine.

12              MS. GRANT:  Counsel, also, if I may?

13              MR. BARRY:  Yeah.

14              MS. GRANT:  There's a note that I believe --

15         the promissory note that comes before that --

16         that is the page that Mr. Nunez is on.  The

17         mortgage is two pages later.

18              MR. BARRY:  Oh, got it.

19              MR. VERRIER:  We're still on Exhibit 16,

20         right?

21              MR. BARRY:  Excuse me?

22              MR. VERRIER:  Exhibit 16 we're looking at?

23              MR. BARRY:  Exhibit 16, yes.

24              MS. GRANT:  Oh, we're on the wrong one.
```

```
1              MR. BARRY:  We're looking at the mortgage

2         here, the note and mortgage.

3              THE WITNESS:  Oh, okay.  Sorry.  I was

4         looking at 17.  I'm on 16 now.

5              So you said Page 8?

6              MR. BARRY:  Yes.  So Page 8.

7    BY MR. BARRY:

8         Q.   And do you see in Paragraph D a note where it

9    says "note"?

10        A.   So we're on this where it says "mortgage"?

11        Q.   Yes.

12        A.   Okay.

13        Q.   Do you see Paragraph D where it says "note"?

14        A.   Yes.

15        Q.   What is the total amount of the note?

16        A.   It says $215,992.

17        Q.   And is that what you understand to be the

18   amount of your mortgage when you entered into it on

19   the first mortgages?

20        A.   On the first one.

21        Q.   Okay.  So if you look at Exhibit 18 -- is

22   that right?  17.

23        A.   17.

24        Q.   You've got me confused there.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1323 of 1680
Case 2:11-cv-00377-MSD-RJK Document 142 Filed 01/18/19 Page 93 of 125 PageID# 4301
Confidential - Subject to Further Confidentiality Review

```
 1              Let me count out what page this is.

 2              So do you recognize this document?

 3       A.    Yes.

 4       Q.    And what is this?

 5       A.    This would be for the second mortgage.

 6       Q.    So let's turn to the -- I want to make sure

 7  I'm right on the record -- the sixth page, which is

 8  the document that says Mortgage.

 9       A.    Yes.

10       Q.    And do you see the first whereas clause?

11       A.    Yes.

12       Q.    Where it says "the principal sum"?

13       A.    Uh-huh.

14       Q.    And how much is listed there?

15       A.    $26,999.

16       Q.    And do you understand that to be the amount

17  of the mortgage on your second mortgage?

18       A.    Correct.

19       Q.    Do you know if your mortgages -- either of

20  these two mortgages are paid off?

21       A.    No.

22       Q.    Do you still make any payments on this

23  mortgage?

24       A.    No.  On neither one.
```

```
 1        Q.   And why is that?

 2        A.   At the moment I currently don't own the

 3   property anymore.

 4        Q.   So the foreclosure took care of the mortgage?

 5        A.   Took care of -- right.

 6        Q.   The bank no longer asks for any payment on

 7   it?  They're not trying to collect anymore amounts on

 8   it?

 9        A.   No.

10        Q.   So I'm going to hand you a document.  This

11   was one of the documents that we received yesterday,

12   so I only have one copy of it.  I'm going to hand it

13   to you, and you can read through it.

14             MR. BARRY:  For everybody on the record, this

15        is an e-mail that is sent from Mr. Nunez to

16        Steve Bronzy at Chase.  And it is:  "We last

17        spoke about a month ago when you informed me

18        about the good news of our forbearance going

19        through."

20             It starts there.

21             THE WITNESS:  Okay.

22             MR. BARRY:  And so this is a June 14th, 2010,

23        e-mail.  Subject:  Account 5304359424.

24             And I hope counsel will indulge me with
```

Confidential - Subject to Further Confidentiality Review

1        testifying a little bit there.

2            And let's mark that as Exhibit 18.

3            (Defendants' Exhibit 18 was marked for

4    identification.)

5    BY MR. BARRY:

6        Q.   Mr. Nunez, do you mind telling me what this

7    document is?

8        A.   Kind of skimming it through quickly, but from

9    what I gather is at that point I guess Steve was the

10   contact as far as setting up the forbearance with

11   Chase, and it must have been that at that point they

12   must have extended the forbearance or granted me the

13   forbearance.

14       Q.   So your first forbearance period was in 2010.

15   Is that your understanding?

16       A.   From what I recall.

17       Q.   Do you ever remember making any payments on

18   your mortgage after 2010?

19       A.   In between the forbearances, I probably did

20   not.  If I did, maybe in between, like, forbearance

21   or up until they approved the next one, if I could

22   have afforded it at a time.  And I don't recall, to

23   be honest with you.

24           MS. GRANT:  I'm sorry to interrupt, Counsel.

```
1              Are we on the first mortgage or the second
2       mortgage?
3              MR. BARRY:  Firth mortgage.
4              MS. GRANT:  Because I mixed them up, too.  I
5       just want to make sure.
6              MR. BARRY:  Yes.  That's the first mortgage.
7              MS. GRANT:  And when we refer to the first
8       mortgage, that's your Chase?
9              THE WITNESS:  That's with Chase.
10             MS. GRANT:  Thank you.  If we can --
11             MR. BARRY:  The Chase mortgage.
12             MS. GRANT:  That will help me as well.
13             MR. BARRY:  A hundred percent.
14      BY MR. BARRY:
15        Q.   Now, on this document -- or, sorry, earlier
16      in the deposition we talked a little bit about when
17      you were unable to pay on your mortgage anymore, and
18      you said it was when you were paying your lease
19      payments and paying for the mortgage on the house at
20      the same time.  Is that correct?
21        A.   Yes.
22        Q.   But what -- and maybe I have my timeline out
23      of whack here.
24             You didn't start making lease payments until
```

```
 1      the end of 2011.  Is that correct?
 2          A.   Right.  It started 2012.
 3          Q.   But you -- early 2012 --
 4          A.   Right.
 5          Q.   -- late 2011?
 6          A.   January 2012, yeah.
 7          Q.   But you asked for a forbearance and stopped
 8      paying on your mortgage in June of 2010, correct?
 9          A.   Right.  Well, in the sense of stopping, as
10      far as I stopped making payments because of the
11      agreement I had with the forbearance.  I was still
12      paying PNMAC.  I was still paying the association,
13      yes.
14          Q.   Okay.  So -- but you weren't paying your
15      first mortgage, correct?
16          A.   Right.  Because Chase had agreed to stop, you
17      know, while litigation was going through, hoping, you
18      know, it would be quicker.
19          Q.   So would it be accurate to say that you
20      stopped making payments on your first mortgage before
21      you entered into the lease?
22          A.   Due to the forbearance, yes.
23          Q.   Correct.
24          A.   Yes.
```

1    Q.    What is PNMAC?

2    A.    PNMAC is the other lender that had the

3    smaller loan --

4    Q.    The second mortgage?

5    A.    -- the 25,000 or 26,000 mortgage.

6    Q.    And you were making payments to PNMAC during

7    this time period?

8    A.    Yes, I was.

9    Q.    When did you stop making payments from PNMAC?

10   A.    From what I recall, 2014.

11   Q.    Okay.  I'm going to show you a document which

12   is --

13         Was the PNMAC mortgage paid off?

14   A.    No.

15   Q.    No.

16         I'm going to show you two documents, if your

17   counsel is okay with it.  The first is an e-mail from

18   2010, as -- regarding your PNMAC mortgage.

19   A.    Okay.

20         (Defendants' Exhibit 19 was marked for

21   identification.)

22   BY MR. BARRY:

23   Q.    The second is another e-mail from 2014.  It

24   is also regarding your PNMAC mortgage, which we

1    understand to be your second mortgage.

2         (Defendants' Exhibit 20 was marked for

3    identification.)

4    BY MR. BARRY:

5         Q.   Now, what are these e-mails?

6         A.   From what I can see, they're just

7    confirmation e-mails of the payments that I made to

8    the bank.

9         Q.   Do you have any other records of payments

10   made for -- on your second mortgage?

11        A.   No.  All that I have, I turned in already.

12        Q.   Do you have any understanding if there were

13   any other payments made on your second mortgage?

14        A.   After this date?

15        Q.   Well, between 2010 and 2014 --

16        A.   Oh, yeah, yeah, yeah.

17        Q.   -- there were other payments?

18        A.   Yes.  In between.  I just --

19        Q.   We just don't have records?

20        A.   Right, right.  I don't have them.

21        Q.   Okay.  So your representation is that you

22   made mortgages on that PNMAC mortgage during that

23   time period, but we -- you have not produced records

24   that establish that?

```
 1      A.   Yes.

 2      Q.   Were you -- did you ever try to get a

 3   forbearance from PNMAC?

 4      A.   I don't recall if I was able to reach

 5   somebody.  I think I maybe brought it up, but I don't

 6   think anything came of it, to be honest with you.  I

 7   guess it was such a small amount maybe they -- you

 8   know, it was more in their -- you know, the ball was

 9   in their court.  You know, I don't think they

10   necessarily did much for it.

11      Q.   Now, let's just talk a little bit about --

12           I'm going to give you the -- what is entitled

13   the In Rem Final Judgment of Foreclosure.

14      A.   Okay.

15           (Defendants' Exhibit 21 was marked for

16   identification.)

17   BY MR. BARRY:

18      Q.   And have you seen this document before?

19      A.   Yes.

20      Q.   And if you turn to the second page of this

21   document, how much principal is due on the note on

22   which they are foreclosing?

23      A.   It's $209,371.52.

24      Q.   Okay.  Now, when you purchased the property,
```

```
 1    it was purchased for $269,000.  Are you claiming any

 2    damages resulting from the foreclosure?

 3        A.    I would have to defer.

 4        Q.    To counsel?

 5        A.    To counsel, yeah.

 6        Q.    If you could look back on your first

 7    mortgage, this document here.

 8        A.    Okay.

 9        Q.    I think it's Exhibit 16.

10              Now, the principal that was owed on the

11    initial first mortgage was $215,000, correct?

12        A.    Uh-huh.  Yes.

13        Q.    And then when it was foreclosed, the

14    principal was $209,000?

15        A.    Yes.

16        Q.    So between 2007 and 2017, does that show just

17    a reduction from $215,992 to $209,000?

18        A.    For principal.

19        Q.    Yes.

20              So were you -- would it be fair to say that

21    you didn't pay but $6,000 on principal --

22        A.    On principal.

23        Q.    -- for the life of the loan?

24        A.    Yes.  On principal alone.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1332 of 1680
Case 2:09-md-02047-MSD-RJK Document 114 Filed 01/18/11 Page 102 of 123 PageID#
1810

```
1        Q.    And from your perspective, when you -- the

2    house was sold in foreclosure, did you lose money

3    based on the purchase price of the house?

4        A.    Yes, I did.

5        Q.    What is your understanding of that diminution

6    in the value in the house?

7        A.    Can you restate that?

8        Q.    From the purchase price based on when it was

9    foreclosed on --

10       A.    Right.  The 269,000 --

11       Q.    Yes.

12       A.    -- to --

13       Q.    The 209,000 that was paid for in the

14   foreclosure?

15            MS. GRANT:  And I'm going to object.

16       Mr. Nunez is not an expert; he's not an

17       appraiser.

18            MR. BARRY:  I stipulate.  He's not.

19            MS. GRANT:  Certainly.

20            But you can answer, if you know.

21            THE WITNESS:  I mean, just from my

22       understanding, it would be obviously the balance

23       from whatever payments I was -- you know, were

24       made in that time frame.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1333 of 1680
Confidential - Subject to further Confidentiality Review
1811

```
 1    BY MR. BARRY:

 2         Q.   Did you believe your house was worth more at

 3    the home?

 4         A.   I honestly don't know as far as, you know,

 5    the market value for property and things like that.

 6         Q.   Did you ever try to sell your house?

 7         A.   No.

 8         Q.   So you never contacted a real estate agent

 9    and tried to see if you could sell the house?

10         A.   No.

11         Q.   Why not?

12         A.   Because we were happy living there.  We had

13    no intention of moving.

14         Q.   But you had moved out of the house after

15    2012.

16         A.   I'm sorry.  Oh, right, after, yes.  I thought

17    you meant overall.

18         Q.   Yes.

19         A.   No, no.  After the fact, after the drywall

20    and once we moved, is that what you are referring to?

21         Q.   Yes.

22         A.   I'm sorry.

23         Q.   No, I apologize for not being clear.

24         A.   No, no.
```

```
 1              We were just kind of waiting to see what was

 2      going to happen with the litigation process, like,

 3      you know, whether, you know, it was going to get

 4      remediated, if we were going to be to fix the

 5      property.  You know, we -- we really didn't know.  So

 6      we didn't have . . .

 7          Q.   I'm going give you what is Exhibit 22.

 8              (Defendants' Exhibit 22 was marked for

 9      identification.)

10      BY MR. BARRY:

11          Q.   Mr. Nunez, do you know what this document is?

12          A.   It's a Certificate of Sale by, I guess, the

13      lender once I foreclosed.

14          Q.   And what is the amount of the sale price

15      here?

16          A.   It says here $180,000.

17          Q.   And you originally purchased the property for

18      $269,000.

19          A.   Correct.

20          Q.   Correct?  Give or take a dollar or two.

21          A.   Sure.  Yeah.

22          Q.   Are you claiming that the difference between

23      your purchase price and the purchase price on the

24      foreclosure as damages?
```

```
 1              MS. GRANT:  And, again, I'm going to

 2         reiterate the same objection in terms of

 3         Mr. Nunez's expertise.

 4    BY MR. BARRY:

 5         Q.   Is it your understanding that you are

 6    claiming the damages between the purchase price you

 7    made in 2007 and then the foreclosure price?

 8         A.   I would have to defer to counsel.

 9         Q.   So you do not have a personal understanding?

10         A.   No.

11         Q.   I am going to pass to you what is the First

12    Amended Supplemental Plaintiff production -- or,

13    Profile Form.

14              MR. BARRY:  And I will represent to the Court

15         that I believe it has not been verified yet.

16              (Defendants' Exhibit 23 was marked for

17    identification.)

18    BY MR. BARRY:

19         Q.   And let's both look through this a couple

20    times.

21              Take your time.  Let me know when you're done

22    looking through it.

23         A.   Okay.

24         Q.   Do you recognize this document, Mr. Nunez?
```

```
 1        A.    Yes.

 2        Q.    And what is it?

 3        A.    It is the plaintiff form that was filled out.

 4        Q.    Did you fill this document out?

 5        A.    My attorneys did.

 6        Q.    Did you review it before it was produced, do

 7   you know?

 8        A.    No.

 9        Q.    Have you reviewed this document before?

10        A.    Yes.

11              MR. BARRY:  Do you want to stipulate for the

12        record that it was probably reviewed before it

13        was produced or --

14              MS. GRANT:  Yes.

15              MR. BARRY:  I think that might have been not

16        clear.  I think you may have answered that

17        differently than you might have wanted to.

18              THE WITNESS:  Oh, okay.

19   BY MR. BARRY:

20        Q.    Did you review this document before your

21   attorney produced it to the opposing counsel, us?

22        A.    Have I reviewed it before they --

23        Q.    Yes.

24        A.    Yes.
```

1    Q.   When you looked through it just a second ago,

2    did you see any information that is inaccurate?

3    A.   Not to my knowledge.

4    Q.   Let's see.  So if you turn to Page 5 --

5    A.   Okay.

6    Q.   -- there's Section 6, and it says Prior

7    Payments.

8         Did you receive any payments from -- it says

9    you received a payment of $4,547.04 from GBI

10   Settlements, correct?

11   A.   Yes.  Correct.

12   Q.   What is your understanding of what that

13   payment was?

14   A.   I'm not a hundred percent sure as far as -- I

15   know it was a combination of different organizations

16   after there was a settlement that was for all of us

17   that were involved in the drywall.  But I don't know

18   the specifics.  I would have the defer.

19   Q.   Did you apply for anything?  Did you

20   personally apply for the settlement to receive that

21   money?

22   A.   I would have to defer to counsel.

23   Q.   So you have no understanding of that?

24   A.   No.  I don't know how this was quantified and

```
 1    how exactly we fell into the parameters of that

 2    settlement, no.

 3         Q.   Did you ever apply for any other settlements?

 4    Do you know of any other settlements that you are

 5    applying for?  Were you ever denied any settlement?

 6         A.   Not that I'm aware.

 7         Q.   It's not something that is within your

 8    personal knowledge?

 9         A.   No, no.

10         Q.   That would be something that you would defer

11    to counsel?

12              I don't want to put words in your mouth,

13    but . . .  Is that correct?

14         A.   Yes.

15         Q.   On the next page, it says that -- actually,

16    sorry.  Let me take you back -- stay on the page we

17    were on.  I apologize.

18         A.   No problem.

19         Q.   The bottom here it says if you -- could you

20    read the bottom section to me?

21         A.   Sure.

22              "If you incurred alternative expenses as a

23    result of Chinese drywall, identify the total moving

24    costs and/or alternative living expenses you
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1339 of 1680
Case 2:09-md-02047-MSD-RJK Document 142-1 Filed 01/09/11 Page 109 of 129 PageID#
1817
Confidential - Subject To Further Confidentiality Review

1    incurred."

2         For a total of $73,000 even.

3    Q.   Do you know how you came to that amount?

4    A.   Yeah.  Adding up lease payments, moving

5    expenses, things of that nature.

6    Q.   Do you know what time period of lease

7    payments you are including in that 73,000?

8    A.   I would have to defer to counsel.

9    Q.   So I'm going to hand you a document.

10         And keep that exhibit handy.  We're going to

11   come back to it in just a second.

12   A.   Sure.

13         (Defendants' Exhibit 24 was marked for

14   identification.)

15   BY MR. BARRY:

16   Q.   So how much of moving expenses were there on

17   this --

18         What is this document?

19   A.   It is an invoice for moving -- actually, this

20   ended up being the quote.  Now that I look at it, I

21   recall I couldn't find the final invoice, which ended

22   up being more, unfortunately.  But I can't produce

23   it.

24   Q.   Do you know how much more it was?

```
 1        A.    I would guess -- I don't have an exact

 2   amount -- but it ended up being about -- close to a

 3   thousand dollars.  It was 800 and something, 900 and

 4   change.  I don't recall.

 5        Q.    Did you ask Move For Less for an invoice, or

 6   did you call them and see if they still have an

 7   invoice available from that time period?

 8        A.    No.  This was a long time ago.

 9        Q.    So you have not --

10        A.    I'm not sure if they are around, to be honest

11   with you.

12        Q.    So you have no evidence of the final number?

13        A.    No.  Right.

14        Q.    Just your recollection --

15        A.    Unfortunately.

16        Q.    -- it was higher?

17        A.    Right.  All I have is this.

18        Q.    Now, I'm going to provide to you your

19   interrogatory responses.  And I have your

20   verification here.

21             MR. BARRY:  Can we just stipulate for the

22        record that they're verified?

23             MS. GRANT:  Of course.

24             (Defendants' Exhibit 25 was marked for
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1341 of 1680#
Case 2:09-md-02047-MSD-RJK Document 1141-13 Filed 01/09/11 Page 110 of 123 PageID#
1819
Confidential - Subject to Further Confidentiality Review

```
 1   identification.)

 2   BY MR. BARRY:

 3       Q.   Now, if you want to review these.

 4            You are welcome to review this, but I'm

 5   really going to be asking only about a couple here.

 6       A.   Okay.

 7       Q.   So you if look at your response to

 8   Interrogatory Number 2.

 9       A.   Okay.

10       Q.   If you don't mind just reading through that a

11   little bit closer, I think that will probably get

12   us -- I'm sorry, for Number 1, my apologies.

13            So here you said your moving expense is $700.

14   Is that what you were saying is the higher value, the

15   amount?

16            And that's the -- do you mind saying it

17   audibly for the record?

18       A.   Oh, yeah.  Sorry.  So I think that $700 is

19   most likely what -- you know, I estimated at the

20   time, that we didn't have -- you know, off of that

21   one quote invoice.

22       Q.   And above where you say the alternative

23   living expenses are $107,560, is that the amount that

24   you experienced from paying the rent payments?
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1342 of 1680
confidential - Subject to Further confidentiality Review
1820

```
 1       A.   Correct.

 2       Q.   Now, if we look back at, I think it's

 3   Exhibit 22, which is the -- your plaintiff form.

 4            MS. GRANT:  I apologize, Counsel.  Your last

 5       question was is that the amount -- you were

 6       asking about alternative living, and then you

 7       asked him was that the amount of rent.  Just to

 8       clarify, alternative living expenses can include

 9       things other than rent.

10            MR. BARRY:  Right.  Rent and other things.

11       So I apologize.

12            MS. GRANT:  I don't want it to be confusing.

13            MR. BARRY:  To clarify -- I'll re-ask the

14       question.

15            MS. GRANT:  Thank you.

16   BY MR. BARRY:

17       Q.   It was lease payments and other expenses that

18   you said earlier --

19       A.   Right.

20       Q.   -- minus the moving expenses which --

21       A.   Yes.

22       Q.   On your Supplemental Plaintiff Profile Form,

23   if you look back at that.

24       A.   Yes.  21 -- no.
```

```
 1         Q.    I think it's 21 or 22.  It looks like this.

 2               MR. VERRIER:  23.

 3               MR. BARRY:  I think you've got it in your

 4         left hand.

 5               THE WITNESS:  Oh, sorry.

 6               MR. BARRY:  One more down.

 7               MS. GRANT:  It's this one.

 8               THE WITNESS:  Gotcha.

 9               MR. VERRIER:  Is he looking at 23?

10               MR. BARRY:  23, yeah.

11               THE WITNESS:  23.

12    BY MR. BARRY:

13         Q.    Now, back on Page 5 where it says the amount

14    of alternative living expenses you incurred.

15         A.    Okay.

16         Q.    It says $73,000.  Correct?

17         A.    Correct.

18         Q.    Over here on the interrogatories, you said

19    107,560 plus the moving expenses of $700.

20         A.    Sure.

21         Q.    What explains that discrepancy?

22         A.    I would have to defer to counsel.

23         Q.    So you have no understanding why in one place

24    it's, you know, 30,000 more than the other place?
```

```
 1              MS. GRANT:  Asked and answered.

 2   BY MR. BARRY:

 3       Q.   You have no personal understanding of it?

 4       A.   No.

 5       Q.   What would be -- could you think of any other

 6   alternative living expenses other than rent, other

 7   than moving expenses, other than any repair costs,

 8   that would also be included?

 9       A.   No.

10       Q.   So you can't think of anything?

11       A.   No.  I can't think of anything else that

12   would.

13       Q.   If you turn to the next page.

14       A.   On the same plaintiff form?

15       Q.   Yeah.

16            You see that -- if you don't mind reading

17   from the second paragraph of the top of the page.

18       A.   Okay.  On Page 6, correct?

19       Q.   Yes.

20       A.   So "if you experienced any loss," is that

21   what you are referring to?

22       Q.   Uh-huh.

23       A.   "If you experienced any loss of use and/or

24   loss of enjoyment of the property as a result of
```

```
 1    Chinese drywall, identify the total amount of such

 2    loss.

 3              To an estimated amount of 250,000 or however

 4    to be determined at trial."

 5        Q.   I know your lawyer has added the "to be

 6    determined at trial," but what is your understanding

 7    of how that $250,000 was calculated?

 8        A.   I would have to defer to counsel.

 9        Q.   So you have no personal understanding?

10        A.   No.

11        Q.   So let's look back at your interrogatories.

12    We have a couple other explanations here --

13        A.   Okay.

14        Q.   -- for damages.  So let's start -- we've

15    already talked about moving expenses.

16        A.   Correct.

17        Q.   The next one down is loss of equity and

18    foreclosure damages.

19              Do you know what those damages are?

20        A.   No.

21        Q.   You don't know what those damages are; you

22    have no personal knowledge?

23        A.   No.  No personal knowledge.

24        Q.   Do you know what would evidence those?
```

```
 1        A.   No.

 2        Q.   Damage to credit, do you know what those

 3   damages are?

 4        A.   Other than what I've mentioned to you earlier

 5   as far as, like, higher interest rates, credit

 6   denials, credit scores going down.

 7        Q.   Have you tried to quantify that?

 8        A.   No.

 9        Q.   Have you thought about hiring an expert to

10   try to quantify the amount of damage to credit?

11             MS. GRANT:  I'm going to object to that.

12        Attorney/client privilege.

13             MR. BARRY:  Understood.

14             MS. GRANT:  Don't answer.

15             MR. BARRY:  Understood.

16   BY MR. BARRY:

17        Q.   And we've already talked about the other

18   economic damages, which, you know, we didn't add up

19   all those receipts together but we assume --

20        A.   Right.

21        Q.   -- near 1211.

22             Are there any other types of damages that are

23   not listed here that we don't know about?  Are there

24   any other types of damages that you are claiming?
```

```
1      A.   Not to my knowledge.

2           MR. BARRY:  Let's take a quick break.

3           (Recess from 10:10 until 10:21 a.m.)

4           MR. BARRY:  Mr. Nunez, I have some good news.

5      You're not going to have to hear my voice

6      anymore.  I may have a question or two of

7      follow-up, but Mr. Guerra is going to ask a few

8      questions of you.

9           THE WITNESS:  Okay.

10          MR. BARRY:  I probably won't have anything

11     more to ask after that, but I reserve that right.

12                    CROSS-EXAMINATION

13  BY MR. GUERRA:

14     Q.   Good morning, Mr. Nunez.

15     A.   Good morning.  How are you?

16     Q.   Good.  How are you?

17     A.   I'm fine, thank you.

18     Q.   Just a couple questions to clear a few things

19  up.

20          You said you received several forbearances on

21  your first mortgage.  Do you know approximately when

22  they started and when they ended?

23     A.   Unfortunately, no.  I don't have the exact

24  dates.
```

```
 1        Q.    Okay.  Do you know when Chase started the
 2   foreclosure procedure on your house?
 3        A.    I don't have an exact date.
 4        Q.    Can you ballpark it?
 5        A.    No.  I mean, it would be once they didn't
 6   re-up the forbearance.  And then, you know, they
 7   contacted me that they were not going to re-up, you
 8   know, the payments would begin as normal.  You know,
 9   I informed them that I couldn't make the payments due
10   to the fact of the drywall, and I was already living
11   at our current location.  But I don't have
12   anything --
13        Q.    Would that be something we should ask your
14   wife?
15        A.    Maybe she can recall.
16        Q.    Okay.  And then you mentioned earlier that
17   you didn't consider selling your house.  Why didn't
18   you consider selling it?  Was there a particular
19   reason?
20        A.    We wanted to stay there.  We liked it.  We
21   liked the area.  It was spacious.  It was near the
22   highways.  We had no problem living there.  We wanted
23   to fix it, if, you know, the option became available.
24        Q.    Once the foreclosure process had started, did
```

```
1     you ever consider selling at that point?

2        A.   No.  At that point I just dealt with the

3     banks.  I never listed or thought of listing the

4     property or anything like that.  I mean, it -- it had

5     Chinese drywall.  I'm not going to gain anything from

6     that.  You know, I just was working out something

7     with the bank.

8        Q.   Okay.  And then one last question.

9        A.   Sure.

10       Q.   Aside from you and your wife, do you know of

11    anyone else that would have a claim related to

12    Chinese drywall for your property?

13       A.   No.  I mean, other than, like, for example

14    the claim that we currently have?

15       Q.   Correct.

16       A.   Like, another person?

17       Q.   Yes.

18       A.   No.

19            MR. GUERRA:  No further questions.

20            MR. BARRY:  We appreciate your time,

21    Mr. Nunez.  Unless your counsel has any

22    follow-up . . .

23            MS. GRANT:  No.  None.  Thank you.

24            MR. BARRY:  Appreciate your time.  Thank you
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1350 of 1680
Case 2:19-cv-00874-MSD-RJK Document 124-3 Filed 01/03/24 Page 120 of 125 PageID#
1828
Confidential - Subject to Further Confidentiality Review

```
1        for sitting with us.  I know this is not a fun
2        experience, and we appreciate your patience.
3               (Whereupon, the deposition concluded at
4     10:24 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1351 of 1680
Case 2:09-md-02047-MBN Document 11-41 Filed 01/01/11 Page 120 of 123 Page #
1829

Confidential - Subject to Further Confidentiality Review

```
  1                 C E R T I F I C A T E

  2

  3            I, KELLY J. LAWTON, Registered Professional

  4     Reporter, Licensed Court Reporter, and Certified

  5     Court Reporter, do hereby certify that, pursuant to

  6     notice, the deposition of JEOVANY NUNEZ was duly

  7     taken on December 19, 2018, at 7:37 a.m. before me.

  8            The said JEOVANY NUNEZ was duly sworn by

  9     me according to law to tell the truth, the whole

 10     truth and nothing but the truth and thereupon did

 11     testify as set forth in the above transcript of

 12     testimony.  The testimony was taken down

 13     stenographically by me.  I do further certify that

 14     the above deposition is full, complete, and a true

 15     record of all the testimony given by the said

 16     witness.

 17

 18     _____

 19            KELLY J. LAWTON, RPR, LCR, CCR

 20

 21            (The foregoing certification of this

 22     transcript does not apply to any reproduction of the

 23     same by any means, unless under the direct control

 24     and/or supervision of the certifying reporter.)
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1352 of 1680
Case 2:11-cv-00377-MSD-RJK Document 114 Filed 01/04/11 Page 121 of 123 PageID#
1830
Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5    and make any necessary corrections.  You should state

 6    the reason in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty

14    (30) days of receipt of the deposition transcript by

15    you.  If you fail to do so, the deposition transcript

16    may be deemed to be accurate and may be used in

17    court.

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1358 of 1680 #
Case 2:09-md-02047-EEF-MBN Document 14431-1 Filed 01/03/11 Page 125 of 125 PageID #
1831

Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6       REASON: _____

 7    _____   _____   _____

 8       REASON: _____

 9    _____   _____   _____

10       REASON: _____

11    _____   _____   _____

12       REASON: _____

13    _____   _____   _____

14       REASON: _____

15    _____   _____   _____

16       REASON: _____

17    _____   _____   _____

18       REASON: _____

19    _____   _____   _____

20       REASON: _____

21    _____   _____   _____

22       REASON: _____

23    _____   _____   _____

24       REASON: _____
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1354 of 1680
confidential - Subject to Further Confidentiality Review
1832

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3            I, JEOVANY NUNEZ, do hereby acknowledge that

 4     I have read the foregoing pages, 1 to 124, and that

 5     the same is a correct transcription of the answers

 6     given by me to the questions therein propounded,

 7     except for the corrections or changes in form or

 8     substance, if any, noted in the attached Errata

 9     Sheet.

10

11

12     _____     _____

13     JEOVANY NUNEZ                                      DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20____.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1355 of 1680 #
1833
confidential - subject to further confidentiality review

```
1                        LAWYER'S NOTES

2      PAGE    LINE

3      _____   _____   _____

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____
```

# JOINT APPENDIX TAB # 42

Confidential - Subject to Further Confidentiality Review

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                  Case No. 1:11-CV-22408-MGC
 3    -------------------------------§
      EDUARDO AND CARMEN AMORIN et    §
 4    al., individually, and on behalf §
      of all others similarly         §
 5    situated,                       §
                                      §
 6       Plaintiffs,                  §
                                      §
 7    vs.                             §
                                      §
 8    TAISHAN GYPSUM CO., LTD. F/K/A   §
      SHANDONG THAIHE DONGXIN CO.,     §
 9    LTD.; TAIAN TAISHAN PLASTERBOARD §
      CO., LTD., et al,               §
10                                    §
         Defendants.                  §
11    ------------------------------- §
       - - -
12
                                      - - -
13
                    THURSDAY, DECEMBER 13, 2018
14
                                      - - -
15
                 Confidential - Subject to Further
16                    Confidentiality Review
17                           - - -
18          Deposition of ANDREW FELDKAMP, held at Morgan
        & Morgan, 12800 University Drive, Suite 600,
19      Fort Myers, Florida, commencing at 8:08 a.m., on
        the above date, before Kelly J. Lawton,
20      Registered Professional Reporter, Licensed Court
        Reporter, and Certified Court Reporter.
21                           - - -
22
                    GOLKOW LITIGATION SERVICES
23          877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
24
```

Case 1:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1358 of 1680
Case 1:13-cv-00037-MSD-TJK Document 12 Filed 01/16/19 Page 3 of 64 PageID# 836
Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2    MORGAN & MORGAN
      BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3    12800 University Drive, Suite 600
      Fort Myers, Florida 33907
 4    (239) 433-6880
      palbanis@forthepeople.com
 5    Representing Plaintiff

 6
      LEVIN, SEDRAN & BERMAN, LLP
 7    BY:  KEITH J. VERRIER, ESQUIRE
      510 Walnut Street, Suite 500
 8    Philadelphia, Pennsylvania 19106
      (215) 592-1500
 9    kverrier@lfsblaw.com
      Representing Plaintiff

10
11    ALSTON & BIRD, LLP
      BY:  MATTHEW D. LAWSON, ESQUIRE
12    BY:  METHAWEE MANUPIPATPONG, ESQUIRE
      BY:  LARA TUMEH, ESQUIRE
13    One Atlantic Center
      1201 West Peachtree Street
14    Atlanta, Georgia 30309
      (404) 881-7000
15    matt.lawson@alston.com
      mae.manupipatpong@alston.com
16    lara.tumeh@alston.com
      Representing Taishan Gypsum Co., Ltd. and Tai'an
17    Taishan Plasterboard, Co., Ltd.

18
      GORDON, ARATA, MONTGOMERY, BARNETT
19    BY:  ALEX B. ROTHENBERG, ESQUIRE
      201 St. Charles Avenue, 40th Floor
20    New Orleans, Louisiana 70170
      (504) 582-1111
21    arothenberg@gamb.law
      Representing BNBM PLC

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2        ORRICK, HERRINGTON & SUTCLIFFE, LLP

          BY:  HARRY J. MOREN, ESQUIRE

 3        The Orrick Building

          405 Howard Street

 4        San Francisco, California 94105

          (415) 773-5619

 5        hmoren@orrick.com

          Representing BNBM PLC

 6

 7    ALSO PRESENT:

 8        Dawn Feldkamp

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                        - - -
                      I N D E X
 2                        - - -
 3   Testimony of:  ANDREW FELDKAMP
 4       DIRECT EXAMINATION BY MR. LAWSON...............  6
 5
 6
 7                  E X H I B I T S
 8               (Attached to Transcript)
 9   DEFENDANTS'                                      PAGE
10   Exhibit 1     "As Is" Contract for Sale and       19
                   Purchase
11
     Exhibit 2     Lee County Property Appraiser -     23
12                 Online Parcel Inquiry - Property
                   Data
13
     Exhibit 3     Plaintiff Profile Form -            28
14                 Residential Properties - Bates
                   Numbered Feldkamp,D0001 to
15                 Feldkamp,D0023
16   Exhibit 4     Comprehensive Building Consultants  52
                   Confidential Chinese Drywall
17                 Inspection Report
18   Exhibit 5     Important Taishan Notice -          58
                   Supplemental Submission of
19                 Evidence Demonstrating Class
                   Membership and the Existence of
20                 Class Damages for the Taishan
                   Trial Scheduled on April 28, 2015
21
     Exhibit 6     Priority Claimant Andrew            69
22                 Feldkamp's First Amended Answers
                   to Interrogatories
23
     Exhibit 7     Air-Conditioning Invoices           72
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1361 of 1680
Case 1:19-cv-00322-MSD-RJK Document 71-42 Filed 07/18/19 Page 6 of 164 PageID# 3639
Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2   DEFENDANTS'                                        PAGE

 3   Exhibit 8     First Amended Supplemental            76
                   Plaintiff Profile Form
 4

     Exhibit 9     Suncoast Credit Union                 85
 5                 September 21, 2018 Letter and
                   Check Copies
 6

     Exhibit 10    Uniform Borrower Assistance          105
 7

     Exhibit 11    Notice of Lis Pendens                133
 8

     Exhibit 12    Final Judgment of Foreclosure        135
 9

     Exhibit 13    United States Bankruptcy Court       145
10                 Middle District of Florida
                   Voluntary Petition
11

     Exhibit 14    Chapter 13 Standing Trustee's        150
12                 Final Report and Account

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                        - - -

 2             THE COURT REPORTER:  Sir, would you please

 3        raise your right hand.

 4             Do you swear or affirm that the testimony

 5        you're about to give will be the truth, the whole

 6        truth, and nothing but the truth?

 7             THE WITNESS:  I do.

 8             ANDREW FELDKAMP, called as a witness by the

 9     Defendants, having been first duly sworn, testified

10     as follows:

11                  DIRECT EXAMINATION

12     BY MR. LAWSON:

13        Q.   Good morning.

14        A.   Good morning.

15        Q.   Could you please state your name for the

16     record?

17        A.   Andrew Feldkamp.

18        Q.   Mr. Feldkamp, my name is Matt Lawson, and I'm

19     an attorney for Taishan Gypsum Company, Limited.  I

20     want to thank you for coming in today.  I wanted to

21     ask you some questions today about the documents that

22     you've produced through your attorneys and your

23     experience of living in your home that you have

24     claimed to be affected by Chinese drywall in this
```

1    lawsuit.

2            But before we get started, I wanted to go

3    over a few kind of rules of the road of this

4    deposition.

5            First, just a second ago you were sworn in,

6    and I wanted to know if you understood that that

7    meant that you needed to tell the truth today during

8    today's deposition?

9        A.   Yes.

10       Q.   And do you think you will be able to do that?

11       A.   Yes.

12       Q.   Are you taking any medications or anything

13   that would make it difficult for you to be able to

14   give clear and complete and truthful answers today?

15       A.   No.

16       Q.   Now, as you can tell, we're having everything

17   transcribed by a court reporter, and that means that

18   we need to kind of talk in a different way than we

19   normally would.  We're going to do our best to try to

20   talk slowly and to pause between my questions and

21   your answers.  And that will allow her to be able to

22   transcribe everything that we're saying.

23            Now, if at any point you need clarification

24   on a question that I have asked you, just please let

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1364 of 1680
Case 1:14-cv-00392-MSD-TJK Document 71-42 Filed 01/18/19 Page 9 of 84 PageID# 3842
Confidential - Subject to Further Confidentiality Review

 1    me know, and I can rephrase it.  If you need a break

 2    at any point, please just let me know.

 3           And as we're going through everything today,

 4    just please let me know if there's any point where

 5    something is confusing to you, and I'll be happy to

 6    try to clarify.

 7           Now, before today, did you meet with your

 8    lawyer to prepare for this deposition?

 9        A.   Yes.

10        Q.   And how often did you meet?

11        A.   Just once.

12        Q.   Okay.  And how long did you meet for?

13        A.   A couple of hours.

14        Q.   And did you review documents while you met?

15        A.   Yes.

16        Q.   Did you do anything else to prepare for the

17    deposition?

18        A.   Just went over the documents.

19        Q.   Okay.  Have you ever been deposed before?

20        A.   No.

21        Q.   I wanted to also flag for you that at points

22    during today's deposition, your attorney,

23    Mr. Albanis, may object to a question that I have.

24    Now, unless he instructs you not to answer the

Case 2:09-md-02043-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1365 of 1680
Case 2:11-cv-00372-MSD-RJK Document 142 Filed 01/18/19 Page 1061 of 1443
Confidential - Subject to Further Confidentiality Review

```
1     question, then I would ask you to let him complete

2     his objection, and then take a second and then you

3     can answer my question afterward, unless he instructs

4     you not to.  Okay?

5          A.   Okay.

6          Q.   And then the last thing for today is that

7     when we're having everything transcribed, you need to

8     give verbal answers to things.  Nodding won't show up

9     on the transcript; it won't reflect whether you are

10    saying yes or no.  So make sure, as best you can, to

11    be able to give a verbal answer, yeses, noes, so that

12    it's clear what your answer was to the question.

13              Does that make sense?

14         A.   Understood.

15         Q.   Mr. Feldkamp, where are you employed?

16         A.   T-Mobile.

17         Q.   How long have you worked there?

18         A.   Almost eight years.

19         Q.   And what is your job title?

20         A.   Retail store manager.

21         Q.   And what are your job duties as a retail

22    store manager?

23         A.   How much do you want me to list?

24         Q.   Well, just give me the general idea of what
```

Confidential - Subject to Further confidentiality Review

```
 1     you do.

 2          A.   It's a retail job, and I am in charge of the

 3     staff and operations of the single store.

 4          Q.   About how many employees do you have at the

 5     store?

 6          A.   Five.

 7          Q.   And where is the store located at?

 8          A.   Gulf Coast Town Center in Fort Myers.

 9          Q.   Okay.  Are you married?

10          A.   Yes.

11          Q.   And who are you married to?

12          A.   Dawn Feldkamp.

13          Q.   And how long have you been married?

14          A.   Eight years.

15          Q.   Sorry.  I keep doing this, and I really

16     shouldn't ask that question to someone who is sitting

17     in front of their wife under oath.  So I'm sorry.

18               Do you have any children?

19          A.   No.

20          Q.   And have you ever been involved in a lawsuit

21     before this one?

22          A.   Aside from this Chinese drywall lawsuit?

23          Q.   Yes.

24          A.   No.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Have you participated in any kind of

 2   class-action lawsuit before?

 3      A.    Just this one.

 4      Q.    Now, what is that address of the property

 5   that you allege has been damaged by Chinese drywall

 6   in this lawsuit?

 7      A.    5237 Butte Street, Lehigh Acres, Florida

 8   33971.

 9      Q.    How many bedrooms did that home have when you

10   lived in it?

11      A.    Three.

12      Q.    And how many bathrooms?

13      A.    Two.

14      Q.    Do you know when the home was originally

15   built?

16      A.    2006.

17      Q.    And do you know who it was built by?

18      A.    The Majkowski brothers.

19      Q.    When did you buy the property?

20      A.    2008, in August.

21      Q.    Do you if anyone owned the property before

22   you?

23      A.    I don't know.

24      Q.    Do you know who you bought the property from?
```

```
 1        A.   It was from a bank.  I don't remember the

 2   name.

 3        Q.   Do you know if your purchase was in a short

 4   sale or a foreclosure sale?

 5        A.   It specifically was not.

 6        Q.   Okay.  Why do you say it specifically was

 7   not?

 8        A.   In the MLS listing it said not a short sale,

 9   one of the first things.

10        Q.   Okay.  So it was -- to your knowledge, it was

11   owned by a bank, the home?

12        A.   Correct.

13        Q.   And you purchased it from that bank?

14        A.   Yes.

15        Q.   And you don't know if anyone lived in the

16   house before you?

17        A.   I don't know.

18        Q.   Okay.  When you moved into the house, did you

19   ever feel like someone had lived in it before?

20        A.   When I moved in, it was like new.

21        Q.   How much did you pay for the house when you

22   bought it?

23        A.   125,000.

24        Q.   And was that purchase financed through a
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/18/19 Page 1369 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/12 Page 14 of 64 PageID# 847
Confidential - Subject to Further Confidentiality Review

```
 1    bank?

 2         A.   Excuse me.  Yes.

 3         Q.   You had a mortgage on the property?

 4         A.   Yes.

 5         Q.   What was the term of that mortgage?  How long

 6    was the mortgage for?

 7         A.   I don't remember.

 8         Q.   Was there any down payment on the home when

 9    you purchased it?

10         A.   Yes.

11         Q.   How much was that?

12         A.   I don't remember.

13         Q.   Did you own or do you own today any other

14    properties or homes?

15         A.   No.

16         Q.   Do you -- where do you live currently?

17         A.   The address?

18         Q.   Yes.

19         A.   5543 Billings Street, Lehigh Acres, 33971.

20         Q.   And have you lived there since you moved out

21    of the home on Butte Street?

22         A.   Yes.

23         Q.   And do you rent that home?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1370 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 156 of 464 PageID# 848
Confidential - Subject to Further Confidentiality Review

1      Q.    So what years did you live at the home at

2    Butte Street?

3      A.    From 2008 until 2012.

4      Q.    And how many people lived in the home while

5    you lived there from 2008 to 2012?

6      A.    My wife and I.

7      Q.    No one else?

8      A.    That's it.

9      Q.    Have you ever -- did you ever, while you

10   owned that home, rent it out to anyone or anything

11   like that?

12     A.    No.

13     Q.    Did you ever renovate or make any

14   improvements to the home or the structure of the home

15   during the time that you lived at it?

16           MR. ALBANIS:  Object to the form.

17           But you may answer, if you know,

18     Mr. Feldkamp.

19           THE WITNESS:  Just landscaping.

20   BY MR. LAWSON:

21     Q.    What landscaping did you add to the home?

22     A.    Additional trees in the front yard, general

23   mulching, improvements all around.

24     Q.    And those are the only improvements to the

```
1     property that you made while you lived there for

2     those four years or so?

3         A.   Yes.

4              MR. ALBANIS:  Object to the form.

5              You can answer.

6     BY MR. LAWSON:

7         Q.   And that was yes to my question?

8         A.   Yes.

9         Q.   Did you do any work that added to the square

10    footage of the home during the time that you lived

11    there?

12        A.   No.

13        Q.   And did you ever remove any drywall from the

14    home while you lived inside of the home?

15        A.   Can you rephrase that?

16        Q.   Yeah.

17             Did you ever take any drywall boards or

18    sheetrock boards out of the home, out of the walls of

19    the home during the period from 2008 to 2012 that you

20    lived there?

21        A.   I removed --

22             MR. ALBANIS:  Object to the form.

23             But you may answer.

24             THE WITNESS:  I removed them from the wall,
```

```
 1          but they did not leave the property.

 2     BY MR. LAWSON:

 3          Q.   Okay.  When did you remove them from the

 4     wall?

 5          A.   I don't remember.

 6          Q.   All right.  How many did you take out, do you

 7     think?

 8          A.   One from each primary wall.

 9          Q.   Okay.  And when you say "one from each

10     primary wall," do you mean one from each wall in the

11     different rooms in the house?

12          A.   Each large wall in each room.

13          Q.   So you took one drywall board out of each

14     large wall in each room in the home?

15          A.   Correct.

16          Q.   And what was the reason that you did that?

17          A.   It was requested by my lawyer for pictures of

18     the back of the board.

19          Q.   Okay.  How did you decide where to remove the

20     boards from the wall?

21          A.   The largest section I could get.

22          Q.   And did you take out the entire drywall board

23     when you removed it or just a section of it?

24          A.   A section.
```

```
1       Q.   And what section did you target along the

2    board to remove?

3            MR. ALBANIS:  Object to the form.

4            But you may answer, if you know.

5            THE WITNESS:  The easiest, you know,

6       height-level.

7    BY MR. LAWSON:

8       Q.   So maybe a lower height on the board, not

9    above your head, but below it?

10      A.   The top was probably -- the top was around

11   six feet.

12      Q.   Okay.

13      A.   And bottom would have been around four feet.

14      Q.   Did you take photos of those boards when you

15   removed them?

16      A.   Yes.

17      Q.   And you gave them to your lawyer?

18      A.   They have been provided to the lawyer.

19      Q.   Did you ever consider removing all of the

20   Chinese drywall boards from the walls of your home?

21      A.   No.

22      Q.   Why not?

23      A.   It was not requested.

24      Q.   Did you ever consider doing that to remove
```

Confidential - Subject to Further Confidentiality Review

```
 1    the Chinese drywall from your home, even if it wasn't

 2    requested?

 3              MR. ALBANIS:  Object to the form.

 4              But you may answer, if you know.

 5              THE WITNESS:  I don't understand the

 6        question.

 7    BY MR. LAWSON:

 8        Q.   Did you ever think about removing or paying

 9    someone to have removed all of the Chinese drywall

10    from your home while you lived there?

11        A.   I couldn't afford that.

12        Q.   Did you ever get a quote of how much it would

13    cost to have the Chinese drywall removed from your

14    home?

15        A.   I don't remember.

16        Q.   Did you know anyone else with Chinese drywall

17    in their homes while you lived at Butte Street?

18        A.   No.

19        Q.   You didn't have any neighbors who told you

20    they had Chinese drywall?

21        A.   We informed our neighbor that we had it, but

22    that's all the further that we've ever discussed it

23    with anybody.

24        Q.   So you never heard any of your neighbors say
```

```
 1    that they had a similar issue?

 2         A.   Nobody came to us telling us.

 3              (Defendants' Exhibit 1 was marked for

 4    identification.)

 5    BY MR. LAWSON:

 6         Q.   I have handed you a document that's been

 7    marked as Exhibit 1.  And I'll give you a second to

 8    review it.

 9              Do you recognize this document, Mr. Feldkamp?

10         A.   Yes.

11         Q.   And what is it?

12         A.   It's the contract for sale and purchase.

13         Q.   And this is the contract for sale and

14    purchase of the home at Butte Street.  Is that right?

15         A.   Yes.

16         Q.   This is when you and your wife purchased the

17    home in 2008.  Is that correct?

18         A.   Yes.

19         Q.   And what date, according to this document,

20    did you purchase the home on?

21         A.   August 4th, 2008.

22         Q.   And did you move in soon after that?

23         A.   Yes.

24         Q.   I'm sorry.  I'll just make sure to finish my
```

```
 1    questions, just so we don't talk over each other.

 2          Did you move in soon after your purchase of

 3    the home in August of 2008?

 4    A.   Yes.

 5    Q.   Now, at the top of this document it states

 6    that this is an as-is contract for sale and purchase.

 7          Do you see that?

 8    A.   Yes.

 9    Q.   What is your understanding of what that

10    means?

11    A.   I didn't know that there was any other way to

12    purchase a house.  I assumed that that was the only

13    way to purchase a house.  I had -- had this been any

14    different, Chinese drywall, defective drywall was not

15    even being looked for when I purchased the house.

16    Q.   So to go back to my question though:  What

17    does, to your understanding, what does it mean to buy

18    something as-is now that you know what this is, if

19    you do?

20          MR. ALBANIS:  Object to the form.

21          But you can answer.

22          THE WITNESS:  That it doesn't have

23          manufacturer's defects, but the material that

24          it's made of is nontoxic.
```

```
1    BY MR. LAWSON:

2        Q.   Okay.  So when you purchased this home, did

3    you know that the home had Chinese drywall in the

4    home?

5        A.   No.

6        Q.   Did you know that there were any potential

7    defects in the construction of the home?

8        A.   No.

9        Q.   Did you understand that when you were buying

10   it you were taking it as the home was and were not

11   being given any guarantees as to the quality of the

12   construction of the home?

13           MR. ALBANIS:  Object to the form.

14           But you may answer.

15           THE WITNESS:  I -- can you repeat that?

16           MR. LAWSON:  Yeah.  Let me rephrase that.

17   BY MR. LAWSON:

18       Q.   When you bought the home, did the bank that

19   you bought it from make any guarantees to you about

20   the quality of the construction of the home?

21           MR. ALBANIS:  Object to the form.

22           THE WITNESS:  Only in the listing.

23   BY MR. LAWSON:

24       Q.   What did they say in the listing?
```

Case 2:09-md-02047-EEF-MBN Document 22363-79 Filed 11/19/19 Page 1378 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 23 of 64 PageID# 856
Confidential - Subject to Further Confidentiality Review

```
1      A.   The house was like new.

2      Q.   Did you inspect the home before you purchased

3    it?

4      A.   No.

5      Q.   Did you go into the home before you purchased

6    it?

7      A.   Yes.

8      Q.   Okay.  When you went into the home, did you

9    notice any issues in the home?

10     A.   No.

11     Q.   Did you notice any smells --

12     A.   Yes.

13     Q.   -- inside the home?

14     A.   Sorry.

15     Q.   What smell did you notice when you went into

16   the home?

17     A.   What I would have described it as was stale

18   house smell, something that hadn't been lived in for

19   a length of time.

20     Q.   Did you ask about that smell?

21     A.   The realtor stated the same thing, that it

22   should go away.

23          Once we were living in the house for any

24   length of time, we didn't smell it.  If you were
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/18/19 Page 1379 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 24 of 54 PageID# 857
Confidential - Subject to Further Confidentiality Review

```
 1    there for any length of time, you stopped smelling

 2    it.

 3         Q.   So when you lived in the house, you couldn't

 4    detect that smell anymore?

 5         A.   No.

 6         Q.   Did you notice any other issues with the home

 7    when you visited it before you purchased it?

 8         A.   It was perfect.

 9         Q.   You liked the home?

10         A.   I loved the home.

11              (Defendants' Exhibit 2 was marked for

12    identification.)

13              THE WITNESS:  Do I keep collecting these?

14              MR. LAWSON:  Yes.  If you can keep those

15         documents in front of you.

16    BY MR. LAWSON:

17         Q.   Mr. Feldkamp, I have handed you a document

18    that's been marked as Exhibit 2.  I represent to you

19    this is a Lee County Property Appraiser Online Parcel

20    Inquiry.  It appears to be from 2015.

21              Do you see that at the top of the document?

22         A.   Yes.

23         Q.   Have you ever seen a document like this

24    before?
```

1      A.    Yes.

2      Q.    And when have you seen it?

3      A.    On their website.

4      Q.    And is it your understanding that this is a

5   public record from Lee County?

6      A.    Yes.

7      Q.    And looking at the address for the site

8   address in the top left corner of the document, what

9   is the address that this records relates to?

10     A.    5237 Butte Street, Lehigh Acres, Florida

11  33971.

12     Q.    And is that the home that we've been

13  discussing that you own?

14     A.    Yes.

15     Q.    Looking at this document, looking to the

16  section that states Attributes on the right side, do

17  you see that?

18     A.    Yes.

19     Q.    Underneath that, there is a section called

20  Total Living Area.

21           Do you see that section?

22     A.    Yes.

23     Q.    And that states 1874; 1,874, do you see that?

24     A.    Yes.

```
1        Q.    Is it your understanding that that is the
2    total living area, square footage of the home,
3    according to Lee County?
4        A.    The under air.
5        Q.    Yes.  The under air square footage of the
6    home is 1,874 square feet.  Is that right?
7        A.    Yes.
8        Q.    Do you have any reason to doubt that number?
9        A.    No.
10       Q.    I'd like to turn your attention to the second
11   page of this document, specifically to the section
12   called Sales/Transactions.
13            Do you see that?
14       A.    Yes.
15       Q.    If you look into this table of sales and
16   transactions, there's an item from March 15th, 2005.
17            Do you see that?
18       A.    Yes.
19       Q.    And specifically, that lists a -- that item
20   lists a sales price on March 15th, 2005, of $37,000.
21            Do you see that?
22       A.    Yes.
23       Q.    Now, that was before you purchased the home,
24   correct?
```

```
 1        A.    Yes.

 2        Q.    And then if you look to the item above from

 3   June 7th, 2006, do you see that?

 4        A.    Yes.

 5        Q.    And there's a sales price of $300,600.

 6              Do you see that?

 7        A.    Yes.

 8        Q.    Now, earlier you said that the home was built

 9   in 2006.  Is that right?

10        A.    Correct.

11        Q.    And this Lee County property record appears

12   to show a sales transaction record in 2006 for a

13   little over $300,000.  Is that right?

14        A.    Yes.

15        Q.    However, when you purchased the home in the

16   item above in August 4th, 2008, the sales price was

17   around $125,000.  Is that right?

18        A.    Yes.

19        Q.    Were you aware that the home was selling for

20   significantly less than it had previously sold for

21   when you purchased it?

22        A.    The entire economy and market had taken a

23   steep decline, and that was the average selling price

24   among houses that were similar.
```

1    Q.   Did your realtor tell you that when you

2    purchased the home?

3    A.   Yes.

4    Q.   And, again, you do not know who purchased the

5    home back in 2006 for $300,000.  Is that right?

6    A.   No.

7    Q.   Turning your attention to what is the fourth

8    page of this document, there's a building footprint

9    that is shown on the right side of the page.

10        Do you see that?

11   A.   Yes.

12   Q.   Does that look like the footprint or layout

13   of the home?

14   A.   Yes.

15   Q.   And, again, above it, you can see there's a

16   section called Heated/Under Air and then Area Square

17   Footage on the right side.

18        Do you see that?

19   A.   Yes.

20   Q.   And again, that lists 1,874 square feet.  Is

21   that correct?

22   A.   Yes.

23   Q.   Turning your attention back to the first page

24   of the document under Attributes, there's a section

Confidential - Subject to Further confidentiality Review

```
 1     that is called First Year Building on Tax Roll.

 2            Do you see that?

 3     A.   Yes.

 4     Q.   And according to that line, it shows 2006 is

 5     the first year that this property was on the tax roll

 6     on the county.  Is that correct?

 7     A.   Yes.

 8     Q.   And that was the same year that, to your

 9     understanding, the home was built.  Is that right?

10     A.   Yes.

11     Q.   You can set that aside.

12            (Defendants' Exhibit 3 was marked for

13     identification.)

14     BY MR. LAWSON:

15     Q.   Mr. Feldkamp, I have handed you a document

16     that's been marked as Exhibit 3.

17            Do you recognize this document?

18     A.   Yes.

19     Q.   Have you seen it before?

20     A.   Yes.

21     Q.   And this is a Plaintiff's Profile Form for

22     your claim in the Chinese manufactured drywall

23     products liability litigation lawsuit.  Is that

24     right?
```

1     A.   Yes.

2     Q.   If you turn to the fourth page of this

3   exhibit marked as Feldkamp,D0004, your signature is

4   on that page.  Is that correct?

5     A.   Yes.

6     Q.   And your wife's signature as well?

7     A.   Yes.

8     Q.   And it appears that you signed it on

9   June 25th of 2012.  Is that correct?

10    A.   Yes.

11    Q.   Now, your signature, as you can see there

12  under that Section 12, was your promise under penalty

13  of perjury that the information contained in this

14  form was true and correct to the best of your

15  knowledge.  Is that right?

16    A.   Yes.

17    Q.   And was this information true and correct at

18  the time that you signed this document?

19    A.   Yes.

20         MR. ALBANIS:  Object to the form.

21         But you may answer, if you know.

22         THE WITNESS:  Yes.

23  BY MR. LAWSON:

24    Q.   And looking through this document today, do

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1386 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 31 of 64 PageID# 864
Confidential - Subject to Further Confidentiality Review

```
1    you see any information that you would change now

2    with the information that you have compared to when

3    you signed this in 2012?

4         A.   No.

5         Q.   No?

6         A.   No.

7         Q.   Looking at the first page of this document,

8    in Section 1 where it states Property Information,

9    your name and your wife's name are listed as the

10   property owners.  Is that right?

11        A.   Yes.

12        Q.   And that address of affected property is

13   listed as 5237 Butte Street.  Is that right?

14        A.   Yes.

15        Q.   And that is the home that we've been

16   discussing so far today, correct?

17        A.   Yes.

18        Q.   And it's listed that your wife was the person

19   who completed this form, correct?

20        A.   Yes.

21        Q.   Did you review it as well before you signed

22   it?

23        A.   Yes.

24        Q.   And it shows that your mailing address is the
```

Confidential - Subject to Further Confidentiality Review

```
1    home on Billings Street.  Correct?

2         A.   Correct.

3         Q.   So at that time that you had signed this in

4    2012, you had moved into the home on Billings Street,

5    correct?

6         A.   Yes.

7         Q.   In fact, if you look down to Section 3, where

8    it says Claimant Information, there's a section in

9    that table that's listed as Dates Occupied.

10             Do you see that?

11        A.   Yes.

12        Q.   And it says that you moved into the home on

13   Butte Street in August of 2008.  Is that right?

14        A.   Yes.

15        Q.   And that was also when you purchased the

16   home, when we just looked at that as-is sales

17   contract, correct?

18        A.   Yes.

19        Q.   And you left the home in May 2012?

20        A.   Yes.

21        Q.   Is that right?

22             And you never moved back into the home after

23   that date in May 2012?

24        A.   No.
```

```
 1      Q.   Did anyone live in the home after May 2012

 2   until the time that it was sold?

 3      A.   No.

 4      Q.   Did you visit the home during that time from

 5   May 2012 until the home was sold?

 6      A.   Yes.

 7      Q.   Why did you visit the home during that time?

 8      A.   To make sure that it wasn't vandalized.

 9      Q.   How often would you go back to it?

10      A.   At first every couple weeks and then once a

11   month and then less and less.

12      Q.   When you removed the drywall boards from the

13   home, was that prior to moving out, or after you had

14   moved out of the home, if you can remember?

15      A.   Prior to.

16      Q.   If you look up to Section 2 on the right side

17   of this document on the first page, it asks for

18   insurance information.

19           Do you see that?

20      A.   Yes.

21      Q.   And it asks for homeowner's or renter's

22   insurer for the home, and that's listed as Prepared

23   Insurance Company.  Is that correct?

24      A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1389 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42-1 Filed 01/18/19 Page 340 of 464 PageID# 867
Confidential - Subject to Further Confidentiality Review

1      Q.    That was the homeowner's policy that you had

2    on the Butte Street home while you lived there?

3      A.    Yes.

4      Q.    Is that the only homeowner's insurance that

5    you had while you lived in the Butte Street home?

6      A.    Yes.

7      Q.    If you look to the fifth page of this

8    document, it's marked as Feldkamp,D0005, there is

9    premium invoice for Prepared Insurance, it appears,

10   that is submitted to you and your wife at Butte

11   Street.

12         Do you see that?

13     A.    Yes.

14     Q.    And what is this document?

15     A.    A bill.

16     Q.    Is this a bill for your homeowner's

17   insurance?

18     A.    Yes.

19     Q.    And it appears to be a bill that was due on

20   May 16th of 2012.  Is that correct?

21     A.    Yes.

22     Q.    And that was around the time that you moved

23   out of the home?

24     A.    Yes.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And your premium that was due at that time
 2   was $1,756.  Is that correct?
 3        A.   Yes.
 4        Q.   Was that a normal monthly amount that was due
 5   for the premiums on your homeowner's insurance, or
 6   did that include multiple months of premiums in that
 7   amount due?
 8        A.   Multiple months.
 9        Q.   Okay.  Had you stopped paying your
10   homeowner's insurance at that time in May 2012?
11        A.   My bank paid everything for me.
12        Q.   Okay.  So the bank paid the homeowner's
13   insurance on the home during the time that you lived
14   in it?
15        A.   Correct.
16        Q.   Do you know if the bank had stopped paying,
17   or did they do it in quarterly or --
18        A.   I don't know.
19        Q.   You don't know if they did it in quarterly
20   payments or --
21        A.   I don't know.
22        Q.   Going back to the fourth page of this
23   document where your signature line was, it states in
24   a handwritten note in the middle of the page:  We did
```

Confidential - Subject to Further Confidentiality Review

```
1    not have -- have to --

2        A.   Have the home built.

3        Q.   -- have the home built and do not have

4    installation information.

5             Is that right?

6        A.   Yes.

7        Q.   And that's referring to Section 10 that asks

8    for the drywall installer.  Is that right?

9        A.   Yes.

10       Q.   And that's left blank on this form, correct?

11       A.   Yes.

12       Q.   And that means that you did not know who

13   installed the drywall because you did not have the

14   home built yourselves; you bought it two years after

15   it was built, correct?

16            MR. ALBANIS:  Object to the form.

17            But you may answer, if you know.

18            THE WITNESS:  Correct.

19   BY MR. LAWSON:

20       Q.   And as you mentioned before, in Section 9,

21   the home builder is the Majkowski Construction Inc.,

22   is that right, the brothers that you mentioned

23   before?

24       A.   Yes.
```

```
1         Q.   Okay.  Had you -- were you familiar with them

2    or their work at the time that you bought the home?

3         A.   No.

4         Q.   Okay.  Are you -- do you know anything about

5    them now?

6         A.   No.

7         Q.   Have you ever met anybody from that company?

8         A.   No.

9         Q.   And have you ever talked with any of them

10   before?

11        A.   No.

12        Q.   See that the section for Drywall Supplier is

13   also blank.  Is that correct?

14        A.   Yes.

15        Q.   And do you know who supplied the drywall that

16   was installed into your home?

17        A.   No.

18        Q.   Looking to the upper left-hand corner of this

19   fourth page, you list the approximate square footage

20   of the home as 2900 square feet.

21             Do you see that?

22        A.   Yes.

23        Q.   But as we discussed earlier, the under air

24   square footage was significantly less than that.  Is
```

```
 1    that right?

 2         A.    That doesn't specify under air.

 3         Q.    That's right.  This may be total square

 4    footage, not under air square footage.  Is that

 5    right?

 6         A.    Yes.

 7         Q.    And as we mentioned before, the Lee County

 8    property appraisal showed the square footage to be

 9    around 1800 square feet for under air square footage,

10    is that right?

11         A.    Correct.  Around 1900.

12         Q.    Around 1900.  Okay.

13               Did you ever file a homeowner's insurance

14    claim for the issues that you had in your home with

15    Chinese drywall?

16         A.    Yes.

17         Q.    What was the result of that homeowner's

18    insurance claim?

19         A.    Denied.

20         Q.    Did you file multiple claims?

21         A.    I don't remember.

22         Q.    Did you file an appeal when they denied your

23    claim?

24         A.    I don't remember.
```

```
1        Q.   Do you remember what they told you when they
2    denied the claim?
3        A.   I don't remember.
4        Q.   Did you continue to be covered by the
5    insurance after your claim was denied, or did they
6    cancel your policy?
7        A.   They did not cancel the policy.
8        Q.   Did you continue to have insurance with
9    Prepared Insurance Company for the Butte Street home
10   until you sold the home -- or until the home was
11   sold?
12       A.   Yes.
13       Q.   I would like to turn your attention to the
14   ninth page of this document.  It's marked as
15   Feldkamp,D0009.  And unless you are familiar with
16   this document immediately from looking at it, I'll
17   give you a chance to look at it.  It's a letter from
18   Morgan & Morgan to the Majkowski Construction, Inc.
19       A.   Okay.
20       Q.   Are you familiar with this letter?
21       A.   Yes.
22       Q.   And what is it?
23       A.   It's the notice from our lawyer to the
24   builder that the -- that they can repair the house
```

```
 1    for us.
 2         Q.   It was requesting that the builder repair the
 3    home?
 4         A.   Yes.
 5         Q.   Is that right?
 6              Do you know what, if anything, resulted from
 7    this letter being sent to the builder with this
 8    request?
 9         A.   I don't know.
10         Q.   Did they repair your home?
11         A.   No.
12         Q.   You can set this aside.
13              When do you believe that the Chinese drywall
14    was installed in your house?
15         A.   When the house was built.
16         Q.   And how do you know that?
17         A.   I don't.
18         Q.   Do you know who purchased the Chinese drywall
19    that was installed in your home?
20         A.   No.
21         Q.   When did you first suspect that you had
22    Chinese drywall inside of your home on Butte Street?
23         A.   2012.
24         Q.   So from 2008 when you moved into the home
```

```
1     until 2012, you did not suspect that you had Chinese

2     drywall inside of your home for those four years or

3     so?

4         A.    I feel I was in denial about some of the

5     writing on the wall.

6         Q.    What do you mean by that?

7         A.    I didn't want to believe that the house that

8     I purchased had such a major issue.  I hadn't heard

9     of it until the middle of owning it, and I just

10    didn't want to believe that something like that was

11    happening to me.

12        Q.    When you said that you hadn't heard of it

13    until the middle of owning it, when did you first

14    hear about Chinese drywall?

15        A.    2009, 2010, when the news started reporting

16    on others having the issue.

17        Q.    And what did you remember hearing about

18    Chinese drywall when you heard about it first in 2009

19    or 2010?

20        A.    Electrical failures and air-conditioning.

21        Q.    Anything else?

22        A.    To start with, no.

23        Q.    Were you having electrical issues or

24    air-conditioning failure in 2009 and 2010?
```

```
 1        A.    Air-conditioning, yes.  Electrical, no.

 2        Q.    When did you first have an air-conditioning

 3    failure or issue in your home?

 4        A.    Midway through 2008.

 5        Q.    So you moved into the home --

 6        A.    So --

 7        Q.    -- in August of 2008?

 8        A.    -- a couple months after moving in.

 9        Q.    Okay.  What happened with your

10    air-conditioning at that time?

11        A.    He put freon in the unit, and the unit worked

12    fine.

13        Q.    So the air-conditioning was not working at

14    all or wasn't working that well?  What was the

15    problem that caused you to bring someone in to try to

16    repair it?

17        A.    It wasn't fully cooling.

18        Q.    Okay.  And who did you call to help fix it?

19        A.    Larry's A/C Repair.

20        Q.    Okay.  And was the air-conditioning under

21    warranty at that time?

22        A.    No.

23        Q.    So you paid for the repair to it?

24        A.    Yes.
```

```
1        Q.    And he put freon back into the system.  Is
2    that right?
3        A.    From what I understand.
4        Q.    And did he tell you anything else about what
5    was wrong with the air-conditioning unit?
6        A.    No.
7        Q.    After that repair, how long was it before you
8    had any other issues with the air-conditioning?
9        A.    I don't remember the exact dates.
10       Q.    But you did have more issues with it after
11   that?
12       A.    Yes.
13       Q.    Can you remember what kinds of repairs you
14   needed to have done to the air-conditioning system
15   when it had issues again?
16       A.    At one point we had the evaporator coil
17   replaced, multiple times we had freon put back into
18   it because of a freon leak that he couldn't identify,
19   and the final time was a separate company came out
20   and again the evaporator coil was defective, and that
21   is the A/C person that told us to look into the
22   bigger issue.
23       Q.    And by "the bigger issue," do you mean
24   Chinese drywall?
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1399 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/12 Page 44 of 164 PageID# 877
Confidential - Subject to Further Confidentiality Review

```
1        A.    The defective drywall.

2        Q.    And would that have been around 2012?

3        A.    Yes.

4        Q.    And that's when you said that you suspected

5   that you did have Chinese drywall.  Is that right?

6        A.    Yes.

7        Q.    When you said before that you were in denial

8   about it, were there any other issues that were

9   occurring in your home that, looking back, you think

10  were related to Chinese drywall before 2012 other

11  than the air-conditioning?

12       A.    Yes.

13       Q.    What is that?

14       A.    Corrosion on fixtures.

15       Q.    Okay.  Where was that corrosion occurring?

16       A.    Near water.  And I assumed it was from the

17  terrible water in the area.  We're on a well.

18       Q.    Okay.  So you had corrosion, I'm guessing,

19  on, like, bathroom fixtures.  Is that right?

20       A.    Yes.

21       Q.    And you assumed because it was near water

22  that the water in the area from the well was causing

23  the corrosion?

24       A.    Yes.
```

1    Q.   But now you suspect that it was the Chinese

2    drywall?

3    A.   Yes.

4    Q.   And what items in the home were experiencing

5    corrosion that you can remember?

6    A.   Faucets, chrome fixtures, mirrors.  Mirrors

7    were at the very end of the time that we were there.

8    Q.   Was that largely in the bathrooms then that

9    the corrosion was occurring?

10   A.   Almost exclusively.

11   Q.   Okay.  Do you remember anywhere other than in

12   the bathrooms that you saw corrosion?

13   A.   I don't remember.

14   Q.   Did you have any issues -- and I think you

15   might have said this already -- but did you have any

16   issues with the electrical system in the home?

17   A.   Not that I put together at the time.

18   Q.   Okay.  But looking back now, were there any

19   issues with the electrical system?

20   A.   No.

21   Q.   Can you think of any other issues that you

22   had in the home that you now suspect were related to

23   Chinese drywall other than the corrosion and the

24   air-conditioning issues that we've discussed?

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/18/19 Page 1401 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/13/10 Page 46 of 64 PageID# 879

Confidential - Subject to Further Confidentiality Review

```
 1       A.   To the home itself --

 2       Q.   Yes?

 3       A.   -- or bodily.

 4       Q.   To the home itself first.

 5       A.   No.

 6       Q.   When you just mentioned bodily issues, what

 7   bodily issues do you associate with Chinese drywall?

 8       A.   I'm an asthmatic and it definitely

 9   exacerbated my asthmatic systems with breathing and

10   coughing.  I also ended up with nose -- like, dry

11   nose and bloody noses.

12       Q.   Did you experience -- you said that it

13   exacerbated based your asthmatic condition.  What

14   kind of issues with asthma did you have before you

15   lived in the home?

16       A.   Chronic asthma.

17       Q.   And what kind of symptoms do you experience

18   as a result of chronic asthma?

19       A.   Occasional tightness of breath.

20       Q.   Do you take any medication for that?

21       A.   Yes.

22       Q.   And what do you take?

23       A.   Albuterol.

24       Q.   Is that as-needed or something that you take
```

```
 1    on a regular interval?

 2        A.   It's rescue.

 3        Q.   When you were living in the home, did you

 4    need to take the medication more often?

 5        A.   Yes.

 6        Q.   Okay.  And did you have any other physical

 7    symptoms other than the exacerbation of your

 8    asthmatic condition?

 9        A.   Bloody nose.

10        Q.   When did you have bloody noses?

11        A.   Throughout.

12        Q.   When you mean "throughout," did you have them

13    weekly?

14        A.   No.

15        Q.   Monthly?

16        A.   Monthly.

17        Q.   Maybe once a month?

18        A.   Maybe once a month.

19        Q.   And would you wake up in the morning and have

20    a bloody nose?  When would it often occur?

21        A.   When I'd wake up in the morning and clear my

22    nose, blow my nose in the morning, there would be

23    blood.

24        Q.   Did the home seem especially dry?
```

```
 1        A.    Yes.

 2        Q.    And did you ever install humidifiers or

 3   anything like that to attempt to alleviate that

 4   condition?

 5        A.    Yes.

 6        Q.    Yes?

 7        A.    Yes.

 8        Q.    Did that help?

 9        A.    Yes.

10        Q.    And did you not have bloody noses after

11   installing the humidifiers in your bedroom?

12        A.    It could still happen occasionally.

13        Q.    Did you ever go to a doctor to discuss the

14   health conditions that you now associate with Chinese

15   drywall?

16        A.    Can you rephrase that?

17        Q.    Yeah.

18              Did you ever go to a doctor to talk about

19   the -- your asthma that you thought was getting worse

20   or the nosebleeds that you just discussed?

21        A.    I specifically mentioned those same exact

22   things to my primary care doctor.

23        Q.    Okay.  And did that doctor tell you anything

24   how about that might relate to the environmental
```

Case 2:09-md-02047-EEF-MBN Document 22363-79 Filed 11/19/19 Page 1404 of 1680
Case 2:11-cv-00377-MSD-RJK Document 142 Filed 01/18/19 Page 49 of 64 PageID# 882
Confidential - Subject to Further Confidentiality Review

```
 1    conditions in your home?

 2         A.    No.

 3         Q.    Were -- have you ever been told that Chinese

 4    drywall is the reason that you were experiencing

 5    nosebleeds or that your asthma had worsened by a

 6    doctor or anyone else?

 7         A.    My doctor said that there was no studies out

 8    there to show one way or another.

 9         Q.    And to your knowledge, you are not seeking

10    bodily injury or bodily harm damages in this lawsuit.

11    Is that right?

12         A.    Correct.

13         Q.    We talked a little bit about the stale house

14    smell that you said that you noticed when you came to

15    visit the home before you purchased it, correct?

16         A.    Correct.

17         Q.    And you said earlier that you did not notice

18    it once you began to regularly live in the home when

19    you lived there day-to-day.  Is that right?

20         A.    Correct.

21         Q.    Did people who visited the home tell you that

22    they noticed a smell in the home?

23         A.    No one brought it up to us.

24         Q.    Okay.  Afterward, did anyone tell you that,
```

Case 2:09-md-02047-EEF-MBN Document 22363-79 Filed 11/19/19 Page 1405 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 50 of 54 PageID# 883
Confidential - Subject to Further Confidentiality Review

```
 1    after you had moved out of the home?

 2         A.   I don't remember.

 3         Q.   Do you think that the house smelled any

 4    different than any other house, having lived in it,

 5    looking back?

 6              MR. ALBANIS:  Object to the form.

 7              But you may answer, if you know.

 8    BY MR. LAWSON:

 9         Q.   Do you think that the house smelled different

10    because of Chinese drywall?

11              MR. ALBANIS:  Same objection.

12              THE WITNESS:  Once I lived in it?

13              MR. LAWSON:  Yes.

14              THE WITNESS:  No.

15    BY MR. LAWSON:

16         Q.   Were there any issues other than the ones

17    that we've discussed that you experienced from living

18    in the home that you believe were connected to

19    Chinese drywall?

20              MR. ALBANIS:  Object to the form.

21              But you may answer.

22              THE WITNESS:  I guess the biggest issues

23         would be that I was forced into bankruptcy and,

24         you know, foreclosed on the house that I wanted
```

```
 1      to live in.

 2   BY MR. LAWSON:

 3      Q.   Why do you believe that you were forced into

 4   bankruptcy and having the home foreclosed because of

 5   Chinese drywall?

 6      A.   I reached out to everybody I could

 7   potentially ask for help.  We asked for additional

 8   loans from the bank and were denied.  We asked for

 9   help from the insurance company.  We asked for any

10   which way out, but I couldn't afford to live

11   somewhere else.  I couldn't mentally be in a house

12   that was toxic health-wise, mentally, and I couldn't

13   afford on top of all of that to do anything about

14   fixing it.

15      Q.   How did you decide to move out of the home?

16   What was the decision-making process that you went

17   through?

18      A.   We contacted a lawyer to assist us with --

19   with talking with Fifth Third about the mortgage and

20   about the house itself.

21      Q.   And Fifth Third Bank owned the mortgage on

22   the home.  Is that right?

23      A.   Yes.

24      Q.   When did you first contact an attorney
```

```
 1    related to the issues with your home?

 2        A.   2012.

 3        Q.   And was that before or after you suspected

 4    that there was Chinese drywall in your home?

 5        A.   After.

 6        Q.   Did you have your home inspected in 2012?

 7        A.   Yes.

 8        Q.   And was that before or after you had hired an

 9    attorney in this case -- excuse me, before you had

10    contacted an attorney?

11        A.   I don't remember.

12        Q.   Did you pay for the inspection?

13        A.   Yes.

14        Q.   When you suspected that there was Chinese

15    drywall in your home, did you ever attempt to go try

16    to see if there were any markings on the drywall

17    boards at that time in 2012 that were associated with

18    Chinese drywall?

19        A.   Yes.

20        Q.   How did you do that?

21        A.   We cut large chunks out of the wall.

22        Q.   Is that what we discussed earlier where you

23    cut boards out of the house?

24        A.   Yes.
```

1     Q.   Did you do that before or after you contacted

2   an attorney about the issues with your home?

3     A.   I don't remember.

4     (Defendants' Exhibit 4 was marked for

5   identification.)

6   BY MR. LAWSON:

7     Q.   I have handed you a document that's been

8   marked as Exhibit 4.

9     Do you recognize this document?

10     A.   Yes.

11     Q.   What is it?

12     A.   The inspection itself for the house on Butte

13   Street.

14     Q.   And is this the drywall inspection that you

15   just said that you paid for?

16     A.   Yes.

17     Q.   And when did this inspection occur?

18     A.   March 17th, 2012.

19     Q.   And is that the same time where you believed

20   that for the first time that you had Chinese drywall

21   in your home?

22     A.   Yes.

23     Q.   Before this, you -- you said that you were in

24   denial about that, but this confirmed it for you. Is

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/18/19 Page 1409 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 54 of 64 PageID# 887
Confidential - Subject to Further Confidentiality Review

```
1    that right?

2         A.    Yes.

3         Q.    And do you recall that led up to you hiring

4    this company to inspect your home, how you found

5    them?

6         A.    Can you rephrase the question?

7         Q.    Do you remember how you found this company to

8    inspect your home or who referred them to you?

9         A.    One of my wife's co-workers has a husband

10   that is in the building industry who referred us to

11   this company.

12        Q.    Before you had it confirmed for you that

13   there was Chinese drywall in your home, did you enjoy

14   living in your home?

15        A.    Yes.

16        Q.    Was there anything that you could not do in

17   your home that you wished you would be able to do

18   when you lived in it from 2008 to 2012?

19        A.    We used to take a lot of pride in doing the

20   landscaping and just having our house available.  We

21   bought a bigger -- we bought this house specifically

22   because the living room was large, and we liked

23   having parties.  Once all this stuff started to

24   happen, we really felt embarrassed about having
```

1    anybody over because, you know, like, I don't know if

2    they already knew and they weren't telling us or if

3    we were just that ignorant about the situation, but

4    we just kind of broke down altogether.  We couldn't

5    have our friends over.

6         Q.   What was the reason that you felt like you

7    couldn't have your friends over?  What did you think

8    that they would think when they came over to your

9    house?

10        A.   I thought, you know, if they knew anything

11   about it, that they might feel they were going to get

12   sick by being there.  I was just embarrassed

13   altogether that I was ignorant to this fact for so

14   long.  I was sad that -- you know, I don't know what

15   it could or was or is doing to my body, to my

16   animals, to my wife.

17        Q.   And did you feel this way before this

18   inspection?  Because earlier you were telling me that

19   you were in denial about it being Chinese drywall

20   before the inspection, correct?

21        A.   All those feelings went along with the

22   denial.

23        Q.   Okay.  So while you felt like you were in

24   denial about it being Chinese drywall, you also felt

Case 2:09-md-02047-EEF-MBN Document 22363-79 Filed 11/19/19 Page 1411 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42-2 Filed 01/18/19 Page 56 of 64 PageID# 889
Confidential - Subject to Further Confidentiality Review

1    like you didn't want to have people over to the house

2    during that time.  Is that right?

3         A.   All the little things around the house were

4    starting to change.

5         Q.   Like that?

6         A.   Like the corrosion on the sinks and faucets.

7    It looked like we didn't take care of our house.

8         Q.   Okay.  And that made you embarrassed to have

9    people over because of the corrosion?

10        A.   Yeah.

11        Q.   Were there any other things that -- other

12   than having people over to your house that you

13   couldn't do that you wanted to do while you were

14   living in the home from 2008 to 2012?

15        A.   I wanted to continue to live in the house

16   and, you know, that was the house that we were going

17   to live in, you know, pay off.  That was our first

18   house.  We were really young when we bought it, and,

19   you know, just -- I guess -- I guess our dreams were

20   there, because that's what we missed out on, where

21   we're still behind where we were when we were in our

22   20s and, you know, still years away from being able

23   to put ourselves back to that spot.

24        Q.   Looking at this inspection, do you remember

Confidential - Subject to Further Confidentiality Review

```
 1    being present in the home during the inspection?

 2         A.   No.

 3         Q.   Were you -- was your wife there during the

 4    inspection?

 5         A.   I don't remember.

 6         Q.   You don't remember answering any questions

 7    from the inspector while they inspected the home?

 8         A.   I don't remember.

 9         Q.   And have you looked at this report before?

10         A.   Yes.

11         Q.   I would like to turn your attention to the

12    seventh page of the inspection report.  And looking

13    through the photos that begin on the seventh page and

14    continue on to the next two pages, can you identify

15    that these are pictures that are taken inside of the

16    home on Butte Street?  Do any of them appear to you

17    to be obviously taken inside of your house?

18         A.   Yes.

19         Q.   Okay.  What do you recognize in the photos?

20         A.   The first pictures are the garage with the

21    air conditioner.  The purple picture is the dining

22    room.  I don't know where the white walls are

23    necessarily.  But those are all electric outlets from

24    the house.  Under the toilets, and in both the guest
```

Confidential - Subject to Further Confidentiality Review

```
 1    and the master bedroom, the fixtures from the guest

 2    room.

 3         Q.   You'd agree with me looking through these

 4    photos that the inspector did not include any photos

 5    of drywall boards in this report.  Is that right?

 6         A.   Yes.

 7         Q.   And to your knowledge, did that inspector cut

 8    any holes in the wall?

 9         A.   He took core samples.

10         Q.   He took core samples of drywall.  Is that

11    right?

12              Is that right that he took core samples of

13    drywall?

14         A.   Yes.

15         Q.   Do you know if those drywall samples were

16    tested?

17         A.   I don't know.

18         Q.   Do you remember ever receiving a drywall

19    testing report that told you that there was Chinese

20    drywall in your home?

21         A.   I don't remember.

22         Q.   Did you ever have any other inspections other

23    than this one performed on your home?

24         A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1414 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 59 of 64 PageID# 802
Confidential - Subject to Further Confidentiality Review

```
1      Q.    This is the only inspection?

2      A.    Yes.

3      Q.    Do you remember how much you paid for that

4   inspection?

5      A.    I don't.

6      Q.    You can set that aside.

7            (Defendants' Exhibit 5 was marked for

8   identification.)

9   BY MR. LAWSON:

10     Q.    You have been handed a document that's been

11  marked as Exhibit 5.  It's titled Important Taishan

12  Notice Must Be Completed By April 15, 2015.

13           Do you see that on the first page?

14     A.    Yes.

15     Q.    If you turn to the second page under

16  Property 1, the address 5237 Butte Street in Lehigh

17  Acres is listed.  Is that right?

18     A.    Yes.

19     Q.    And that is the home that we've been

20  discussing, your home that you lived in from 2008

21  through 2012, correct?

22     A.    Yes.

23     Q.    If you turn to the fourth page of the

24  document, your signature is on that page.  Is that
```

Case 2:09-md-02047-EEF-MBN Document 22363-79 Filed 11/19/19 Page 1415 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 60 of 64 PageID# 803
Confidential - Subject to Further Confidentiality Review

```
 1    right?

 2         A.    Yes.

 3         Q.    As well as your wife's signature?

 4         A.    Yes.

 5         Q.    And it appears that you both signed this on

 6    April 9th of 2015, correct?

 7         A.    Yes.

 8         Q.    Now, if you look to the pages that follow

 9    your signature, there's a series of photographs that

10    occur throughout the back of this exhibit.  I wanted

11    to ask you about these photos.

12               On the first page of photographs, you can see

13    two images that appear to be of drywall boards.

14               Who took these photographs?

15         A.    Myself and my father.

16         Q.    Okay.  Do you remember when you took them?

17         A.    No.

18         Q.    And was this when you, as you mentioned

19    earlier, removed large sections of drywall board from

20    primary walls in the home?

21         A.    Yes.

22         Q.    And at that time you took photographs of the

23    boards that you removed from the home.  Is that

24    right?
```

```
 1        A.    Yes.

 2        Q.    And what happened to those drywall boards

 3   after you removed them from the walls?

 4        A.    They were put into the garage.

 5        Q.    And did they stay in the garage for the time

 6   that you still owned the home?

 7        A.    Yes.

 8        Q.    Are these the only photos that were ever

 9   taken of those drywall boards?

10        A.    Yes.

11        Q.    What happened to these drywall boards after

12   the home was sold?

13        A.    I don't know.

14        Q.    Did you take possession of them?

15        A.    No.

16        Q.    Did -- to your knowledge, did your attorney

17   take possession of them?

18        A.    No.

19        Q.    Do you recall where the drywall that is shown

20   in these images on the first page and the second page

21   was found in the home, the first and second page of

22   photographs?

23        A.    Not specifically based on the picture.

24        Q.    Were the drywall boards marked?  Did you
```

Confidential - Subject to Further Confidentiality Review

```
 1    write on them, for example, where they had been taken

 2    from the home?

 3         A.    I don't remember.

 4         Q.    Did you create a floor plan or chart showing

 5    where the drywall boards had been taken out of the

 6    home, out of the walls?

 7         A.    No.

 8         Q.    And do you recall if there was more drywall

 9    board with the marking of any of these particular

10    foremarkings that we're seeing here, or did you find

11    one of each in the walls?

12              MR. ALBANIS:  Object to the form.

13              But you may answer it.

14              THE WITNESS:  I don't remember.

15    BY MR. LAWSON:

16         Q.    Did you pull these four boards out of the

17    wall, or were there more boards than these four?

18         A.    There were more boards.

19         Q.    And are those shown on the images that follow

20    in these photographs on the third and fourth pages of

21    photos?

22         A.    Some of them.

23         Q.    Do you remember how many boards you took out

24    of the wall?
```

```
 1        A.   I don't remember.

 2        Q.   Do you remember how many walls that you

 3   pulled boards from?

 4        A.   I don't remember.

 5        Q.   Did you collect any samples of this drywall

 6   that you gave to your attorney?

 7        A.   No.

 8        Q.   Did you cut out smaller sections of it and

 9   give it to your attorney?

10        A.   I don't remember.

11        Q.   Did you cut out smaller sections at all, or

12   did they just stay in the large boards that you cut

13   out of the wall?

14        A.   I don't remember.

15        Q.   Do you have any other photos in your

16   possession that you took on the day that you were

17   working to remove the boards from the walls?

18        A.   I have given everything I have to my

19   attorney.

20             MR. LAWSON:  We can go off the record.

21             (Recess from 9:11 until 9:19 a.m.)

22   BY MR. LAWSON:

23        Q.   Welcome back, Mr. Feldkamp.

24        A.   Thank you.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1419 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42-3 Filed 01/18/19 Page 64 of 64 PageID# 897
Confidential - Subject to Further Confidentiality Review

1     Q.   I would like to go back to Exhibit 6 that we

2   were just looking at, the inspection photos -- excuse

3   me, the photos that you took that are at the back of

4   that --

5     A.   The back?

6     Q.   Yeah.  The photos that you took of the back

7   of that Taishan --

8          MR. ALBANIS:  It's --

9          THE WITNESS:  I don't have Exhibit 6.

10  BY MR. LAWSON:

11    Q.   Exhibit 5.  I'm sorry.

12         MR. ALBANIS:  Thank you.

13  BY MR. LAWSON:

14    Q.   Exhibit 5 that we were looking at that has

15  the photos at the back of it that you said that you

16  took when you removed sections of drywall from your

17  home.

18         Looking at those drywall photos that are in

19  front of you, there are a few different types of

20  drywall markings that are shown.  Is that right?

21    A.   Yes.

22    Q.   One of the drywall markings that is shown is

23  GridMarX.  Do you see that; it says MarX that you can

24  see upside down on the second page of photographs?

```
 1        A.   Yes.

 2        Q.   And then there's also something that says

 3   National Gypsum on the bottom of that second page of

 4   photographs.  Is that right?

 5        A.   Yes.

 6        Q.   And then if you look onto the first page of

 7   photos -- it's upside down -- but there's something

 8   that says 4 feet x 12 feet x 1/2 on the bottom of the

 9   page.

10             Do you see that?

11        A.   Yes.

12        Q.   And then there's another drywall marking that

13   says 02309330321 at the bottom -- or, excuse me, at

14   the top of the first page of photos.

15             Do you see that?

16        A.   Yes.

17        Q.   So to your recollection, were there any other

18   types of drywall markings that you saw inside the

19   home other than those four when you pulled sections

20   of the drywall out?

21        A.   I don't remember.

22        Q.   And do you remember if one of them was more

23   common than the other when you pulled out different

24   sections of the walls?
```

Case 2:09-md-02047-EEF-MBN Document 22363-79 Filed 11/19/19 Page 1421 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42-3 Filed 01/18/13 Page 66 of 164 PageID# 1399
Confidential - Subject to Further Confidentiality Review

```
1      A.   I don't remember.

2      Q.   But you --

3           MR. ALBANIS:  For the record, there are a

4      couple more pictures attached to Exhibit 5 with

5      photos of drywall.

6           MR. LAWSON:  That's right.

7  BY MR. LAWSON:

8      Q.   And if you look to the next two pages, we

9  have on the last page an image that also contains

10  that image of 02309330321, the same marking that we

11  had discussed on the first page.

12     A.   That's the first --

13     Q.   It does appear to be the same image, doesn't

14  it?

15     A.   Yes.

16     Q.   And then there's an image that appears to

17  show the 4 feet x 12 feet marking, but just at a

18  distance.

19          Do you agree with that on that third page

20  that that appears to be that marking?

21     A.   Yes.

22     Q.   Okay.  So in total it appears four different

23  types of drywall markings that are shown across the

24  six photographs of drywall that are on Exhibit 5,
```

```
 1    correct?

 2         A.   Yes.

 3         Q.   All right.  I'd like to turn your attention

 4    back to Exhibit 3, the Plaintiff's Profile Form that

 5    we were looking at a little bit earlier, specifically

 6    looking at the second page of that document, which is

 7    marked as Feldkamp,D0002.  If you could look at

 8    Section 5.

 9              Under Section 5, it's titled Drywall

10    Information.  Do you see that?

11         A.   Yes.

12         Q.   And specifically there's a column that says

13    Markings on Drywall.  And the only item that is

14    listed is 4 feet x 12 feet x 1/2 inch.  Is that

15    right?

16         A.   Yes.

17         Q.   But you'd agree from what we just looked at

18    in the photographs that you took from the drywall

19    boards that you pulled out of the walls, there were

20    other drywall markings that were on the drywall in

21    your home, correct?

22         A.   Yes.

23         Q.   And if you look next to the 4 feet x 12 feet

24    cell, there is a cell and a column called Location in
```

```
 1     Home, and for that marking it states "throughout."

 2             Do you see that?

 3     A.   Yes.

 4     Q.   Now, do you know whether that 4 feet x

 5     12 feet x 1/2 inch marking drywall was throughout the

 6     home?

 7     A.   I don't know.

 8     Q.   When you pulled drywall boards out of the

 9     home, did you find that marking on boards throughout

10     the home?

11     A.   In multiple places I did.

12     Q.   Where did you find it?

13     A.   I don't remember.

14     Q.   But you don't recall whether you found it in

15     every wall of the home?

16     A.   I don't remember.

17     Q.   But you would agree that you found other

18     drywall markings on the boards in the home, correct?

19     A.   Yes.

20     Q.   Do you know who made the judgment that the --

21     that drywall marking was found throughout the home?

22     A.   The lawyer.

23     Q.   Your lawyer?

24     A.   Yes.
```

```
 1        Q.   Okay.  You would agree that there was not an
 2   inspection done to determine whether any particular
 3   drywall marking was found in all of the walls of the
 4   home, correct?
 5             MR. ALBANIS:  Object to the form.
 6             But you may answer.
 7             THE WITNESS:  Can you restate that?
 8   BY MR. LAWSON:
 9        Q.   The drywall inspection report that we looked
10   at didn't show any images of drywall in the home.  Is
11   that right?
12        A.   Correct.
13        Q.   As far as we know, you are the only person
14   who has looked to determine what drywall markings
15   were on the boards in the home, correct?
16        A.   Yes.
17        Q.   And when you looked, you found more than one
18   type of marking on the drywall in the home, correct?
19        A.   Yes.
20        Q.   Do you know whether there might have been
21   other types of drywall markings inside of the home
22   other than the ones that you found on the day that
23   you were pulling sections out of the wall?
24        A.   I don't remember.
```

```
 1        Q.    Because you didn't look at every single board

 2    in the home, correct?

 3        A.    Correct.

 4        Q.    You didn't pull them all out of the walls?

 5        A.    No.

 6        Q.    You pulled a section out of each primary

 7    wall, right?

 8        A.    I pulled a section out of each large wall in

 9    the house.

10        Q.    Right.

11              And when you did that, there were sections of

12    drywall that were left untouched, correct?

13        A.    Yes.

14        Q.    And as we established before, there were no

15    other inspections that were performed in the home

16    other than the one that we looked at in the report

17    earlier?

18        A.    Correct.

19        Q.    Okay.  You can set that -- those exhibits

20    aside.

21              (Defendants' Exhibit 6 was marked for

22    identification.)

23    BY MR. LAWSON:

24        Q.    Mr. Feldkamp, you have now actually been
```

```
 1    handed Exhibit 6.  This is a document that is titled

 2    Priority Claimant Andrew Feldkamp's First Amended

 3    Answers to Interrogatories.

 4              Do you see that on the first page?

 5              It will be underlined and bolded in the

 6    center of the page.

 7        A.    Yes.

 8        Q.    And I apologize, those legal documents are a

 9    little difficult to read sometimes.

10              Do you see that title there?

11        A.    Yes.

12        Q.    Have you seen this document before?

13        A.    Yes.

14        Q.    And when have you seen it before?

15        A.    It was provided to me by my lawyer.

16        Q.    Okay.  Did you review it?

17        A.    Yes.

18        Q.    And did you agree with the statements that

19    were made in it?

20        A.    Yes.

21        Q.    Are they true and correct to your knowledge?

22        A.    Yes.

23              MR. LAWSON:  And I don't believe at this

24        point that we've received a verification for
```

```
1         these interrogatories.  We would ask for one, if

2         one can be provided, and that will be produced to

3         us as soon as you can.

4              MR. ALBANIS:  We will ask the Feldkamps to

5         sign during a break during today's deposition and

6         get those uploaded.

7              MR. LAWSON:  Thank you.

8    BY MR. LAWSON:

9         Q.   I would like to turn your attention to the

10   first page of this document, specifically the first

11   question and answer that are on that page.

12             The first question or interrogatory asks you

13   to:  Identify all types of damages that you seek in

14   this lawsuit and to specify the amounts sought for

15   each category.

16             Do you see that?

17        A.   Yes.

18        Q.   Specifically I would like to point you to

19   your answer where you discuss personal property

20   losses.

21             You state that you have -- you are seeking

22   personal property losses of at least $969.50.

23             Do you see that?

24        A.   Yes.
```

```
 1        Q.   Do you know what those $969.50 relate to,

 2   what kinds of personal property losses you are

 3   seeking damages for that money?

 4        A.   I don't remember.

 5        Q.   Okay.

 6             (Defendants' Exhibit 7 was marked for

 7   identification.)

 8   BY MR. LAWSON:

 9        Q.   You have been handed a document that's been

10   marked as Exhibit 7.  Give you a moment to review it.

11             Have you had a chance to look through it?

12        A.   Yes.

13        Q.   Have you seen these invoices before?

14        A.   Yes.

15        Q.   Can you tell me about them?

16        A.   They are from the air-conditioning people

17   that we have had out at the house.

18        Q.   Okay.  Earlier we were talking about the

19   issues that you had with your air-conditioning system

20   while you lived in the home on Butte Street, correct?

21        A.   Yes.

22        Q.   And you said that you had them come out

23   multiple times to be able to perform service on your

24   air-conditioning because it was not cooling down the
```

1    house as well as it -- as you expected it to,

2    correct?

3         A.   Correct.

4         Q.   And these show, it appears, five different

5    services -- kinds of service that were performed --

6    at least five different invoices that were issued to

7    you for air-conditioning service.  Is that right?

8         A.   Yes.

9         Q.   And looking through these documents, I will

10   represent to you that it appears that they add up to

11   the $969.50 that you are requesting for personal

12   property losses.

13        Does that sound accurate to you, that this

14   would be the personal property losses that you are

15   seeking in this lawsuit?

16        A.   Yes.

17        Q.   Now, I notice that on the invoices on the

18   second, third, fourth, and fifth page there is an

19   item in the lower left corner that shows that the

20   amount on the invoice was paid and it contains a

21   number.

22        Do you see that?

23        A.   Yes.

24        Q.   And there appears to be a check number there.

```
 1      Is that what that number is?

 2           A.   Yes.

 3           Q.   And it's your testimony that you did pay

 4      these amounts, and it appears that you paid with a

 5      check to be able to pay for them.  Is that right?

 6           A.   Yes.

 7           Q.   For the first invoice, it states a total

 8      balance of $189.50 in the bottom right corner.

 9                Do you see that?

10           A.   Yes.

11           Q.   And can you let me know, is there anywhere on

12      this invoice that you can see where this particular

13      item was paid?

14           A.   No.

15           Q.   Okay.  And it specifically says

16      Payment/Credits in the bottom right corner $0.  Is

17      that right?

18           A.   Yes.

19           Q.   Do you have any recollection of paying this

20      invoice?

21           A.   I don't remember.

22           Q.   And to your knowledge, have you produced all

23      of the receipts that you have for the

24      air-conditioning services that are shown across this
```

```
 1    exhibit?

 2        A.   Everything I have I have provided to my

 3    lawyer.

 4        Q.   Do you know if you have any proof of payment

 5    for this particular invoice other than the invoice

 6    itself stating a balance of $189.50?

 7        A.   I have provided everything I have.

 8        Q.   When you left the home, was the

 9    air-conditioning unit working?

10        A.   I don't remember.

11        Q.   Do you know when the last service was

12    performed on the air conditioner?

13        A.   So the last service was when the air

14    conditioner guy came out and it was the coil again,

15    and he told us to look into defective drywall.  There

16    is no invoice for that because he, out of the

17    goodness of his heart, said that he couldn't take any

18    money from us.

19        Q.   It looks like the latest in time invoice that

20    we have is on the fourth page; it's the August 25th,

21    2011, service that you received, as far as I can

22    tell.  But you believe that there was one after that

23    where you were not charged anything.  Is that right?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1432 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 77 of 164 PageID# 910
Confidential - Subject to Further Confidentiality Review

```
1         Q.    And do you have any sense of when that

2    occurred?  Sometime after August 25th, 2011; is that

3    right?

4         A.    The first part of 2012.

5         Q.    Because you had the inspection in March of

6    2012.  Isn't that right?

7         A.    This was what led us to do that.

8         Q.    Okay.  So that final service probably

9    occurred sometime before March of 2012?

10        A.    Correct.

11        Q.    You can set that aside.

12              (Defendants' Exhibit 8 was marked for

13    identification.)

14   BY MR. LAWSON:

15        Q.    I have handed you a document that's been

16   marked as Exhibit 8.  It's titled First Amended

17   Supplemental Plaintiff's Profile Form.

18              Do you recognize this document?

19        A.    Yes.

20        Q.    And when have you seen it before?

21        A.    When it was provided to me by my lawyer.

22        Q.    Did you review this document when it was

23   provided to you?

24        A.    Yes.
```

```
1      Q.   Looking to the last page, Page 7, of this
2    Supplemental Plaintiff Profile Form, there is date
3    signed field that is marked as December 5th, 2018.
4           Do you see that?
5      A.   Yes.
6      Q.   And was that around the time that you
7    reviewed this document?
8      A.   Yes.
9      Q.   Now, there's a claimant's signature here that
10   is blank.
11          Do you see that?
12     A.   Yes.
13     Q.   Do you remember signing this document around
14   December 5th, 2018?
15     A.   We reviewed it with our lawyer and gave him
16   approval to submit it on our behalf.
17     Q.   Okay.  So you didn't sign anything at that
18   time when you reviewed it?
19     A.   No.
20     Q.   I'd like to turn your attention to the sixth
21   page, going one page back of this document,
22   specifically to the question where it states:  If you
23   experienced any loss of use and/or loss of enjoyment
24   of the property as a result of Chinese drywall,
```

```
1    identify the total amount of such loss.

2         Do you see that?

3    A.   Yes.

4    Q.   And the amount that you have listed here on

5    this form is $450,000.  Is that right?

6    A.   Yes.

7    Q.   How did you come to determine that you are --

8    that the amount of your loss for loss of use of

9    enjoyment of the property is $450,000?

10        MR. ALBANIS:  Object to form.

11        But you may answer.

12        THE WITNESS:  From the best of my knowledge,

13        that comes from a judgment.  A judge has created

14        a formula in which that that's correct number.

15        But to me, there's no such number that's really

16        going to make this right.  I'm behind seven years

17        on my life.  I would love to still be living in

18        that house, regardless of today's numbers.

19   BY MR. LAWSON:

20   Q.   I have heard you say a few times how much you

21   loved the house, you know, that you wish you were

22   still in it, that you didn't -- that you didn't want

23   to move out.  Why did you move out of the house?

24   A.   The Chinese drywall and the effects it was
```

1  potentially going to have on my health and my life.

2      Q.   So you were in it four years.  And did you

3  enjoy living in the house during that time for those

4  four years?

5      A.   For most of it.

6      Q.   For most of it?

7           When did you stop enjoying it?

8      A.   When it was confirmed that we had a major

9  issue in the house.

10     Q.   So when you knew that it was Chinese drywall,

11 you no longer enjoyed living in the house?

12     A.   We -- yes.

13     Q.   So that was from March 2012 when you had the

14 inspection report, until May 2012 when you moved out

15 of the house.  Is that right?

16     A.   Yes.

17     Q.   And that was the period where you no longer

18 enjoyed living it in because you knew you had Chinese

19 drywall.  Is that correct?

20     A.   We -- not only did we not enjoy living in it,

21 we were unable to live in it, and we, for much longer

22 than that, wished that we continued to live there and

23 had all of the opportunity to stay in that house.  We

24 asked multiple times from multiple people to help us

```
 1    to try to stay in the house.

 2         Q.   Did someone tell you that you could not live

 3    in the house anymore?

 4         A.   It was a health risk, from what I understood.

 5         Q.   Did a doctor tell you that it was a health

 6    risk to stay in the house?

 7         A.   No.

 8         Q.   What made you think that it was a health risk

 9    to stay in the house?

10         A.   Fear.

11         Q.   You were afraid of what it could -- what the

12    health risks could be related to the Chinese drywall?

13         A.   Yes.

14         Q.   But no one confirmed for you that you needed

15    to move out of the house.  Is that right?

16              MR. ALBANIS:  Object to the form.

17              But you may answer.

18              THE WITNESS:  The house itself had holes in

19         it and was continuing to deteriorate around us.

20         It was a situation that I wasn't going to risk my

21         health, my wife's health regardless of proof at

22         that point.

23    BY MR. LAWSON:

24         Q.   When you said that it had holes in it, are
```

```
 1    you referring to the corrosion?

 2         A.   I'm referring to the holes that we put in the

 3    wall.

 4         Q.   The holes that you -- that you put in the

 5    wall when you cut the sections of the drywall out?

 6         A.   Correct.

 7         Q.   So you think that happened before you moved

 8    out of the house.  Is that right?

 9         A.   What happened?

10         Q.   That you removed sections of the drywall

11    before you moved out?

12         A.   Yes.

13         Q.   Do you think that probably happened around

14    2012, before you moved out or --

15         A.   I don't remember.

16         Q.   I'd like to take you back to Exhibit 8 --

17    excuse me, no.

18              I would like to take you back to Exhibit 6,

19    which is your First Amended Answers to

20    Interrogatories.

21              And to go back to the same answer that we

22    were looking at earlier related to the damages that

23    you are seeking in this lawsuit, you state on that

24    first page:  We seek alternative living expenses from
```

```
 1    April 2012 through September 2015 of at least

 2    $37,989.

 3             Do you see that?

 4       A.   Yes.

 5       Q.   What does "alternative living expenses" mean

 6    to you?

 7       A.   A place to live that wasn't the house on

 8    Butte Street.

 9       Q.   So we were just talking about how you felt

10    when you decided that you needed to move out of your

11    home.  What did you do when you decided that you

12    needed to leave?  Did you look for another place to

13    live?

14       A.   Yes.

15       Q.   And where did you look?

16       A.   In the local area.

17       Q.   So you wanted to stay close to where you were

18    living already.  Is that right?

19       A.   Yes.

20       Q.   That's because you still needed to be able to

21    go to your job, correct?

22       A.   Yes.

23       Q.   And where did you end up finding a place to

24    live?
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1439 of 1680
Case 2:11-cv-00377-MSD-RJK Document 142 Filed 01/18/19 Page 84 of 64 PageID# 917
Confidential - Subject to Further Confidentiality Review

1      A.   Within the same subdivision, a few miles

2    away.

3      Q.   You said a little bit earlier that you sought

4    the help of others to be able to stay in your home.

5    Is that right?

6      A.   Yes.

7      Q.   Who did you seek help from?

8      A.   The bank that held our mortgage, the initial

9    builders, and the bank that sold us the house, as

10   well as the insurance company.

11     Q.   Looking to this answer to this interrogatory,

12   you say that you are seeking alternative living

13   expenses from April 2012 through September 2015.

14          Earlier we discussed that you moved out of

15   your home in May 2012.  Do you know why you are

16   seeking expenses beginning in April of that year?

17     A.   I believe that that's when the first check

18   was written.  I know that's when the first check was

19   written.

20     Q.   And when you say "the first check," do you

21   mean the first check for the home that you rented?

22     A.   For the rental home.

23     Q.   You began renting the home in April of 2012;

24   is that right?

```
1        A.    Yes.

2        Q.    And you continued to rent it through the time

3   in September 2015 that your home on Butte Street was

4   sold.  Is that right?

5        A.    We still live in the same place.

6        Q.    That's right.

7              But you are seeking damages for alternative

8   living expenses from when you first started paying

9   for the rental in April 2012 through September 2015

10  when your home on Butte Street was sold, correct?

11       A.    Yes.

12       Q.    Now, during those months from April 2012

13  through September 2015, how many of those months were

14  you also paying your mortgage payment at the same

15  time?

16       A.    One.

17       Q.    So you paid your mortgage payment in April of

18  2012.  Is that right?

19       A.    Yes.

20       Q.    And then you did not pay it in May of 2012?

21       A.    Correct.

22       Q.    And you did not continue -- continue to not

23  pay the mortgage payment for the Butte Street home

24  through September 2015, correct?
```

Case 2:09-md-02047-EEF-MBN   Document 22363-78   Filed 11/19/19   Page 1441 of 1680
Case 2:09-md-02047-EEF-MBN   Document 22363-78   Filed 11/18/19   Page 86 of 164   Page ID #:30019
Confidential - Subject to Further Confidentiality Review

1      A.    Correct.

2      Q.    How much less was your rental -- your rent

3  per month at the Billings Street home compared to

4  your mortgage payment at Butte Street?

5      A.    I don't remember.

6      Q.    Do you remember how much a month you were

7  paying for your rental and -- from April 2012 through

8  September 2015 per month?

9      A.    900.

10      Q.    But you don't remember how much your mortgage

11  payment was?

12      A.    I don't remember.  It was auto-drafted.

13      Q.    Do you think it was more than $900?

14      A.    Yes.

15      Q.    So after that first month where you were

16  paying both at the same time, you were paying less

17  for your living expenses than you had been

18  previously.  Isn't that right?

19      A.    Yes.

20      Q.    And you continued to pay less through this

21  period from April 2012 through September 2015,

22  correct?

23      A.    Yes.

24          (Defendants' Exhibit 9 was marked for

```
 1    identification.)

 2    BY MR. LAWSON:

 3         Q.   You have been handed a document that's been

 4    marked as Exhibit 9.

 5              Do you recognize this document?

 6         A.   Yes.

 7         Q.   What is it?

 8         A.   A copy of the checks for rent on the house on

 9    Billings.

10         Q.   To your knowledge, are there any other checks

11    or invoices for different things inside of this

12    exhibit?

13         A.   No.

14         Q.   So these are all the payments that you made

15    for the rental on Billings from the period of

16    April 2012 through September 2015?

17         A.   Yes.

18         Q.   And does this encompass, these payments, all

19    of the money that you are seeking for alternative

20    living expenses in this lawsuit?

21         A.   Yes.

22         Q.   So -- and that totals to $37,000 -- $37,989.

23    Is that right?

24         A.   Yes.
```

1    Q.    So looking to the first page -- excuse me,

2    the first page of checks, the second page of the

3    exhibit, there's a check that is dated August 29th,

4    2016.

5          Do you see that?

6    A.    Yes.

7    Q.    Now, that is after the time period that you

8    have listed in your interrogatory response, correct;

9    that only went until September of 2015?

10   A.    Yes.

11   Q.    So there are some additional checks in here

12   outside of that time period, correct?

13   A.    Yes.

14   Q.    If you look to the next page, there's one

15   from July 28, 2016; the page that follows is June 27,

16   2016; and it continues to go back through 2016 as you

17   flip through the pages, correct?

18   A.    Yes.

19   Q.    But you are not seeking money in damages in

20   this lawsuit for alternative living expenses for that

21   time period in 2016, correct?

22   A.    Correct.

23   Q.    Only the time period between when you moved

24   into the rental and when your home sold in September

1    of 2015?

2         A.   Yes.

3         Q.   And if you go back to the final page of this

4    exhibit, it shows a check that is dated April 13th,

5    2012.

6              Do you see that?

7         A.   Yes.

8         Q.   And that appears to be a check for an

9    application fee and deposit based on the note in the

10   lower left corner of this exhibit -- excuse me, of

11   this check?

12        A.   Yes.

13        Q.   And if you turn to the page that proceeds

14   that, there's a check on April 26, 2012, for $1,500?

15        A.   Yes.

16        Q.   And that, according to the note on that

17   check, is for the first and last month's rent.  Is

18   that correct?

19        A.   Yes.

20        Q.   If you look to the page before that, there is

21   a deposit -- excuse, a check for a deposit of $450

22   that was signed on April 26, 2012, correct?

23        A.   Yes.

24        Q.   And if you go back to the page before that,

```
 1     there's a check for $564 to Premier Realty Solutions,

 2     it looks like, for blinds.  Can you explain what

 3     that's for?

 4          A.   That's for rent, and we purchased blinds and

 5     they took it off of the rent.

 6          Q.   Okay.  So you purchased these items, and then

 7     you were given a credit by them --

 8          A.   Correct.

 9          Q.   -- for it?

10               So this is not an expense that you are

11     seeking in this lawsuit?

12          A.   This is rent --

13          Q.   Okay.

14          A.   -- minus the price of the blinds.

15          Q.   I understand now.

16               So your $900 rent was deducted for the price

17     of the blinds --

18          A.   Correct.

19          Q.   -- that you added to the rental.  They paid

20     you by reducing your rent amount by -- to $564 from

21     900.  Is that right?

22          A.   For that month, yes.

23          Q.   I understand.

24               And that in the checks that follow from 2012
```

Case 2:09-md-02047-EEF-MBN Document 22363-79 Filed 11/19/19 Page 1446 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 91 of 64 PageID# 924
Confidential - Subject to Further Confidentiality Review

```
 1    going backward in the exhibit, you can see that they

 2    are for $900?

 3        A.   Yes.

 4        Q.   Is that right?

 5             And the $900 amount was consistent throughout

 6    this time period from 2012 through 2015?

 7        A.   For the entire time period, yes.

 8        Q.   Okay.  And you were able to make all of your

 9    payments for rent during that time?

10        A.   Yes.

11        Q.   And are you aware of any other checks or

12    receipts that reflect your alternative living

13    expenses from that period from April 2012 through

14    September 2015 that you are seeking damages for in

15    this lawsuit?

16        A.   I have provided everything.

17        Q.   And does this exhibit reflect all of those

18    checks or invoices?

19        A.   Yes.

20        Q.   You would agree with me that you did not ever

21    remove all of the drywall from the walls inside of

22    your home, right; we discussed that earlier?

23        A.   Yes.

24        Q.   And you said earlier as well that you did not
```

```
 1    ever get a quote for how much it would cost for

 2    someone to remove all of the drywall from the home?

 3         A.    Correct.

 4         Q.    Did you ever consider doing that?

 5         A.    Yes.

 6         Q.    Why did you not do it?

 7         A.    The costs that I saw on the Internet were

 8    prohibitive, and I did not have any -- the means to

 9    do so without financial help.

10         Q.    And if you wanted to remediate or repair the

11    home now, would you be able to do that?

12         A.    I no longer own the home.

13         Q.    Right.

14               So to your knowledge, has anyone removed the

15    Chinese drywall from the home?

16         A.    I don't know.

17         Q.    Have you ever been back to the home since it

18    was sold?

19         A.    Can you rephrase that?

20         Q.    Have you been back to the home on Butte

21    Street since it sold in 2015?

22         A.    I have been on the street, but not inside the

23    house.

24         Q.    Do you know anyone who has owned the home
```

```
 1    since?

 2         A.    No.

 3         Q.    And do you have any reason to believe that

 4    the home has been remediated or repaired from the

 5    Chinese drywall in it since you sold the house?

 6         A.    I have no knowledge of that.

 7         Q.    Now, it's correct that the home went through

 8    a foreclosure.  Isn't that right?

 9         A.    Yes.

10         Q.    And when did that occur?  Was it 2015?

11         A.    The final?

12         Q.    Yes.  The final foreclosure --

13         A.    It was September 2015.

14         Q.    September 2015.

15               Your mortgage lender was Fifth Third Bank.

16    Is that correct?

17         A.    Correct.

18         Q.    And you paid your mortgage from when you

19    moved into the home in 2008 until the last month,

20    which we just discussed, of April 2012.  Is that

21    right?

22         A.    Correct.

23         Q.    You never missed any payments during that

24    time?
```

Case 2:09-md-02045-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1449 of 1680
Case 2:11-cv-00872-MSD-RJK Document 42 Filed 01/18/19 Page 94 of 64 PageID# 927
Confidential - Subject to Further Confidentiality Review

```
1      A.    No missed payments.

2      Q.    What made you stop paying your mortgage in

3    May of 2012?

4      A.    We had a lawyer for that specific reason

5    advise us to stop paying because Fifth Third would

6    not talk to us in any means prior to missed payment.

7      Q.    And you wanted to seek relief from Fifth

8    Third Bank from your mortgage and your payments, is

9    that right; and you wanted to be able to speak with

10   them about receiving some kind of relief or help from

11   them on having to pay the mortgage payments on your

12   Butte Street home?

13     A.    Yes.  Either relief or help in additional

14   loan amounts.

15     Q.    Do you know if you sought a forbearance on

16   making payments on the mortgage?

17     A.    I'm unfamiliar with that term.

18     Q.    Do you know if you sought from Fifth Third

19   Bank to not have to pay them for the mortgage for

20   some period of time, a year or some period of time?

21   Do you know if you did that?

22     A.    I don't remember.

23     Q.    Okay.  Did you -- do you know if you sought

24   from Fifth Third Bank to reduce the amount of your
```

```
 1    payments?

 2         A.   I don't remember.

 3         Q.   Did you ever explore the idea of trying to

 4    sell the home?

 5         A.   We sought mediation with Fifth Third, and

 6    short sale had been mentioned and was listed.

 7         Q.   The home was listed for short sale at some

 8    time?

 9         A.   For a short period of time.

10         Q.   Okay.  And what was the result of that?  Did

11    the home sell at short sale?

12         A.   No.

13         Q.   Do you know what period of time it was listed

14    for short sale?

15         A.   I don't remember.

16         Q.   Did you ever consider from 2008 through 2012

17    of selling your home?

18         A.   No.

19         Q.   Why is that?

20         A.   That's where we were going to live for the

21    foreseeable future for us.

22         Q.   After you moved out, did you ever talk to a

23    realtor about listing the home?

24         A.   Yes.
```

```
 1        Q.    What happened with that?

 2        A.    That was our attempt at a short sale from the

 3   same listing agent that found us our rental property.

 4        Q.    Did you make any other attempts other than

 5   that short sale to list the home or discuss listing

 6   the home for sale?

 7        A.    No.

 8        Q.    How did you decide that you would not be able

 9   to pay your mortgage and pay for the rental each

10   month?

11        A.    I didn't make enough money to do that.

12        Q.    You budgeted and determined you wouldn't have

13   enough to be able to do both?

14        A.    Correct.

15        Q.    But when you stopped paying your mortgage,

16   you were able to afford paying for the rental?  Is

17   that right?

18        A.    Yes.

19        Q.    And you were able to make your bills

20   otherwise, other than paying the mortgage, once you

21   stopped paying the mortgage.  Is that right?

22        A.    Correct.

23        Q.    What adverse effects did you have as a result

24   of stopping paying your mortgage on your finances?
```

```
1    Were there any adverse effects to your finances or

2    your credit as a result of not being able to pay your

3    mortgage?

4        A.   My credit was damaged by this long-term.  I

5    was also eventually put into a position where the

6    only way we could see out was through bankruptcy.  I

7    had no other previous debts or other debts that were

8    reflecting on my credit other than the house itself.

9    And long-term my credit is still affected:  I still

10   can't buy a house; I still have a couple years on

11   that; and the bankruptcy itself took several years of

12   time.

13       Q.   Do you know what your credit score was or any

14   of the credit scores that are available to you from

15   different bureaus before the foreclosure?

16       A.   I don't remember.

17       Q.   Okay.  Do you know what it is now?

18       A.   700s.

19       Q.   And you said that you still have a couple of

20   years left on that, I think is what you said a second

21   ago, to not be able to buy a house?

22       A.   Yes.

23       Q.   What did you mean by that?

24       A.   We finished our bankruptcy early because we
```

```
1    had only a student loan on the file for that left;

2    everything else had been paid.  And we have

3    approached Suncoast Credit Union, and they said it

4    will be two years after your bankruptcy has been

5    removed before they will even consider us for a new

6    mortgage.

7         Q.   Have you spoken with anyone other than

8    Suncoast Credit Union about that --

9         A.   No.

10        Q.   -- about a mortgage?

11        A.   No.

12        Q.   Whose student loans are you talking about

13   when you say that there's student loan debt?  Is that

14   yours or your wife's?

15        A.   Mine.

16        Q.   Yours?

17             And what was that student loan for?  What

18   education were you receiving when you took on that

19   student loan?

20        A.   Master's degree.

21        Q.   Okay.  A master's degree in what?

22        A.   Internet marketing.

23        Q.   Where did you get that degree from or pursue

24   that degree from?
```

```
1      A.   Full Sail University.

2      Q.   Did you receive a degree?

3      A.   Yes.

4      Q.   And when did you do that?  What year?

5      A.   I don't remember.

6      Q.   Was it before you bought the house?

7      A.   No.  No.

8      Q.   Okay.  Was it while you were living in the

9    house that you were going to school?

10     A.   I was in school during the time that we lived

11   in the house and after we had moved out.

12     Q.   Okay.  So you received your degree probably

13   sometime after 2012?

14     A.   Yes.

15     Q.   Do you remember how much debt you took on

16   through that student loan?

17     A.   I don't remember.

18     Q.   Do you remember when you started going to

19   school?  Would it have been -- it would have been

20   sometime, you were saying, between 2008 and 2012 when

21   you were living in the home on Butte Street?

22     A.   I would say summer of 2010.

23     Q.   Did you have any other student loan debt

24   before the student loan debt associated with that
```

```
 1    master's degree?

 2         A.    No.

 3         Q.    Had you ever taken on a loan before that

 4    student loan in your life?

 5         A.    The mortgage and my car.  That's it.

 6         Q.    What car loan did you have?

 7         A.    When?

 8         Q.    Let's see.  What was the first car loan that

 9    you had?

10         A.    It would be my wife's Corolla, Toyota

11    Corolla.

12         Q.    Do you remember when you bought that car?

13         A.    No.

14         Q.    Do you know what year the car is?

15         A.    No.

16         Q.    And what's the second car loan that you took

17    out?

18         A.    My wife's Prius.

19         Q.    Do you remember when you bought that car?

20         A.    After we sold the first one.

21         Q.    Okay.  And so you sold the first one to buy

22    the second one.  Is that right?

23         A.    Traded in, correct.

24         Q.    Traded it in.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1456 of 1680
confidential - Subject to further confidentiality Review
1934

```
 1              And did you have the Corolla at the time that

 2    you lived at the Butte Street home?

 3         A.   Yes.

 4         Q.   Okay.  Did you have the Corolla when you

 5    moved into the Billings Street home?

 6         A.   No.

 7         Q.   Did you have the Prius when you were in the

 8    Billings Street home?

 9         A.   No, no.

10         Q.   Okay.  Did you have the Prius during the time

11    that you were in the Butte Street home?

12         A.   Yes.

13         Q.   Okay.  So what was the next car after the

14    Prius?

15         A.   The Camry.

16         Q.   Okay.  And when did you buy the Camry?

17         A.   Just prior to filing bankruptcy.

18         Q.   So would that have been in 2015?

19         A.   Yes.

20         Q.   Or maybe 2014, somewhere around there?

21         A.   Yes.

22         Q.   Do you have any other car loans or have had

23    any other car loans in the last decade or so?

24         A.   My Veloster Hyundai.
```

```
1      Q.    Do you remember when you got that?

2      A.    That was after we moved into the Billings but

3  before the bankruptcy.

4      Q.    And did you have a car before that?

5      A.    Yes.  But it was not on a loan.

6      Q.    Okay.  Have you always had only two cars in

7  your family between you and your wife?

8      A.    I have a third vehicle.

9      Q.    Okay.  Is that the car that was not on a

10 loan?

11     A.    Yes.

12     Q.    All right.  And you have had that car for how

13 many years?

14     A.    2004.

15     Q.    Does that car still work?

16     A.    Yes.

17     Q.    Was there a reason that you wanted to get an

18 additional car beyond that one?

19     A.    More of reason to not get rid of that one.

20 It's my grandfather's car, and it's very sentimental

21 to me.

22     Q.    Got it.

23           So you want to hold on to that car for

24 sentimental value, but you also wanted to have a
```

```
 1   newer one?  Is that right?

 2       A.   Yeah.  The car was not a fuel-efficient

 3   vehicle, and I needed something that was going to be

 4   fuel-efficient.

 5       Q.   How far do you drive for your commute to

 6   work?

 7       A.   Now or then?

 8       Q.   Now.

 9       A.   Now, about ten miles.

10       Q.   Okay.  And in the past when you were living

11   at Butte Street?

12       A.   About 45 miles each direction.

13       Q.   Okay.  And is that why you felt you needed a

14   fuel-efficient car --

15       A.   Yes.

16       Q.   -- because of that commute?

17       A.   Yes.

18       Q.   Do you feel the same need now that you have

19   been living at Billings Street and you are ten

20   minutes away?  Do you feel like you still do long

21   drives?

22       A.   I still do long drives occasionally for work.

23       Q.   And when is that?

24       A.   Twice a month to Tampa.
```

1    Q.    Okay.  Is that going to, like, corporate

2    headquarters or something like that?

3    A.    Yes.

4    Q.    All right.  Before we get into this document,

5    I wanted to ask you about something that you said

6    earlier about your credit.

7         How, other than not being able to buy a home,

8    has the effect on your credit impacted your life?

9    A.    I've also not been able to take advantage of

10   any credit card programs that we have historically.

11   We would purchase most of our Christmas gifts with

12   points from using credit cards, and just the ability

13   to have an emergency credit card has disappeared

14   altogether.

15   Q.    When you have -- have you applied for credit

16   cards since filing for bankruptcy or since when you

17   stopped paying your mortgage?

18   A.    After the bankruptcy was expunged was the

19   first time we applied for new credit cards, because

20   we weren't allowed to have any credit cards or

21   additional debt during the term of the bankruptcy.

22   Q.    And do you now have credit cards?

23   A.    We have one.

24   Q.    Okay.  Have there been any other effects from

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1460 of 1680
Case 2:09-md-02047-MSD-RJK Document 14-4 Filed 01/13/11 Page 105 of 164 PageID#
1938
confidential -- Subject to further confidentiality Review

```
 1    your credit being in the state that it was in after

 2    defaulting on your mortgage and the bankruptcy?

 3             MR. ALBANIS:  Object to the form.

 4             But you may answer.

 5             THE WITNESS:  We feel that we can't apply to

 6        live anywhere else other than the place that we

 7        got into before the bankruptcy and foreclosure

 8        started, so we have been at the same place, even

 9        if it isn't our dream house.

10    BY MR. LAWSON:

11        Q.   Have you enjoyed living at the home at

12    Billings Street?

13        A.   It's okay.

14        Q.   What don't you like about it?

15        A.   It's small.  It doesn't have a yard.  That's

16    the size of the property that we lived in before.  It

17    doesn't necessarily lend itself to having additional

18    people there beyond the couple of us.

19        Q.   I forgot to ask this before:  Do you have any

20    pets?

21        A.   Yes.

22        Q.   Did you have pets during the time that you

23    were living at Butte Street?

24        A.   Yes.
```

1    Q.   What pets?

2    A.   Two cats.

3    Q.   Did you notice anything different about the

4    cats or their health during the time that you were

5    living in the Butte Street home?

6    A.   Not at the time, but one of the cats has

7    recently being diagnosed by long-term respiratory

8    issues, and I don't know if it's related or not.

9    Q.   How old is that cat?

10   A.   Seven.

11   Q.   So you would have gotten that cat -- or

12   potentially around the last year or so that you lived

13   at the Butte Street home?

14   A.   That sounds correct.

15   Q.   What about the other cat?  How old is that

16   cat?

17   A.   Ten.

18   Q.   Okay.  So you would have had that cat during

19   most of the time that you lived at Butte Street?

20        (Defendants' Exhibit 10 was marked for

21   identification.)

22   BY MR. LAWSON:

23   Q.   All right.  I would like to turn your

24   attention to the exhibit that I have handed you.

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1462 of 1680
Confidential - Subject to further confidentiality review
1940

```
 1    This is Exhibit 10.  It's, on the front of the page,

 2    titled Uniform Borrower Assistance.

 3           Do you see that?

 4    A.    Yes.

 5    Q.    Do you recognize this document?

 6    A.    Yes.

 7    Q.    What is it?

 8    A.    It's a request for help from Fifth Third.

 9    Q.    Okay.  You mentioned earlier that you had

10    requested help from Fifth Third after you had stopped

11    paying for your mortgage.  Is that right?

12    A.    Yes.

13    Q.    And this is a form that you filled out

14    requesting help or assistance from Fifth Third?

15    A.    Yes.

16    Q.    And that is your name as a co-borrower on the

17    first page on the right side.  Is that right?

18    A.    Yes.

19    Q.    On the second page of this document, there's

20    a section called Hardship Affidavit.

21           Do you see that?  It's in the middle of the

22    page on the second page.

23    A.    Yes.

24    Q.    And that is listed as -- requests a written
```

1    explanation with this request describing the specific

2    nature of your hardship.  Is that right?

3         A.    Yes.

4         Q.    And you checked or your wife checked

5    "long-term or permanent hardship greater than

6    12 months."  Is that right?

7         A.    Yes.

8         Q.    And below -- or, excuse me, above that it

9    states:  "I am requesting review of my current

10   financial situation to determine whether I qualify

11   for temporary or permanent mortgage relief options.

12   Date hardship began is" -- and it's filled in to say

13   "March 17th, 2012."

14         Do you see that?

15         A.    Yes.

16         Q.    Is that your understanding of when the

17   hardship began, when you had the inspection that said

18   that there was Chinese drywall in your home?

19         A.    Yes.

20         Q.    And not before that, correct?  Just at the

21   time that you had Chinese drywall confirmed in your

22   home, the hardship began?

23         A.    That's my understanding.

24         Q.    Let's turn to the fourth page of this

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1464 of 1680
confidential - Subject to further confidentiality review
1942

```
 1    document, and it's listed as Page 9 at the bottom of

 2    it.  At the top of it it says, Number of People in

 3    Household and it's marked "two."

 4           Do you see that page?

 5    A.    Yes.

 6    Q.    There's a table here of income -- Monthly

 7    Income, excuse me, Monthly Household Expenses and

 8    Debt, and Household Assets.

 9           Do you see that table?

10    A.    Yes.

11    Q.    And it lists the monthly gross wages at the

12    time that you filled out this form as $4700.  Is that

13    right?

14    A.    Yes.

15    Q.    Now, is that a combination of your income and

16    your wife's income?

17    A.    Yes.

18    Q.    And those are your gross wages at that -- at

19    the time that you filled out this form?

20    A.    Yes.

21    Q.    Now, do you know when you filled out this

22    form?

23    A.    I don't remember.

24    Q.    If you look to the page that's marked at the
```

1    bottom as Page 12, do you see your signature on that

2    page?

3        A.    Yes.

4        Q.    And do you see that it looks like you signed

5    it on December 8th, 2013?

6        A.    Yes.

7        Q.    Okay.  So at that point you had been out of

8    your home on Butte Street for a little less than two

9    years; is that right?  A little over a year, about a

10   year and a half or a little bit more than that; is

11   that right?

12       A.    Yes.

13       Q.    Do you believe that it was around then in

14   December 2013 that you would have filled out all of

15   this and signed it?

16       A.    Yes.

17       Q.    All right.  So back in 2013 at the end of

18   that year, your monthly gross wages combined with

19   your wife was about $4700, correct?

20       A.    Yes.

21       Q.    And here you list in the second column

22   different monthly household expenses or debts; is

23   that right?

24       A.    Yes.

```
1       Q.    And the first one says First Mortgage

2   Payment.

3             Do you see that?

4       A.    Yes.

5       Q.    And that's listed as $1100.

6             Did I read that correctly?

7       A.    Yet.

8       Q.    So that reflects the amount that you are

9   paying per month for your mortgage on the Butte

10  Street home.  Is that correct?

11      A.    Correct.

12      Q.    So your mortgage payment with Fifth Third for

13  the Butte Street home was about $1100?

14      A.    Yes.

15      Q.    And that was per month?

16      A.    Yes.

17      Q.    But at this time in 2013 you were no longer

18  paying that, correct?

19      A.    Correct.

20      Q.    However, in the second line it lists a second

21  mortgage payment, but that appears to be written over

22  by something that says "rent."  And next to that item

23  it lists the amount of rent as $900.

24            Do you see that?
```

```
 1        A.    Yes.

 2        Q.    So that's the amount that you are paying for

 3   rent for the Billings Street home, correct?

 4        A.    Yes.

 5        Q.    And we just went through a bunch of checks

 6   showing that $900 amount per month that you were

 7   paying for Billings Street?

 8        A.    Yes.

 9        Q.    It also shows renter's insurance on the next

10   line, is that right, for $31 a month?

11        A.    Yes.

12        Q.    Do you know if you were still continuing to

13   pay your homeowner's insurance at the Butte Street

14   home during that time?

15        A.    Fifth Third took care of all that for us.

16        Q.    That's right.  You said before that Fifth

17   Third Bank paid for the homeowner's insurance as part

18   of your mortgage payments.  Is that right?

19        A.    Correct.

20        Q.    There's also an item listed here for a car

21   payment or lease of $675.  Is that right?

22        A.    Yes.

23        Q.    And what is that car payment for?  Is that

24   just one car or multiple cars?
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1468 of 1680
confidential - Subject to further confidentiality Review
1946

```
1        A.    It was for multiple cars, but I don't

2    remember which vehicles.

3        Q.    Okay.  So this would have been in 2013.

4              Do you know if your wife had the Corolla

5    or --

6        A.    It would have been my Veloster and her

7    Corolla.

8        Q.    Okay.  So do you think that's the combined

9    amount across those two car payments, for $675?

10       A.    Yes.

11       Q.    Do you know if you would have been paying a

12   similar amount for your cars in the years prior to

13   that when you -- when your wife had her Prius, or at

14   that time did you not have your car when you lived at

15   Butte Street?

16       A.    At that time I didn't have my car, but she

17   paid more for the Prius.

18       Q.    Okay.  So the Prius cost more than what she

19   was paying for the Corolla, but did it cost more than

20   the $675 combined?

21       A.    I don't remember.

22       Q.    All right.  Do you know if it was a similar

23   amount to that $675?

24       A.    I don't remember.
```

```
 1        Q.   All right.  And you also have listed here
 2   $301 a month for auto insurance.
 3             Now, is that across the three vehicles that
 4   you owned?  Do you know?
 5        A.   I don't remember.
 6        Q.   Do you have a sense of -- scratch that.
 7             Have you paid for auto insurance on the older
 8   vehicle that you own that was your grandfather's
 9   vehicle throughout the length of time that you have
10   owned it?
11        A.   Yes.
12        Q.   And you have monthly food expenses listed as
13   a thousand dollars here as well.  Is that right?
14        A.   Yes.
15        Q.   There's also medical co-pays and monthly
16   expenses of $80 that are listed here.  Is that right?
17        A.   Yes.
18        Q.   And do you know what those monthly expenses
19   for medical were?  Are those prescription medicines?
20        A.   Primarily prescription medicines and regular
21   doctor's visits.
22        Q.   Okay.  And you mentioned that you take an
23   inhaler.  Is that right?
24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1470 of 1680
confidential -- Subject to Further confidentiality Review
1948

```
 1      Q.   There's water, sewer, utilities, and

 2   telephone, correct, that's listed for $300?

 3      A.   Yes.

 4      Q.   Now, do you know if that is across both the

 5   Butte Street property and the Billings Street

 6   property?

 7      A.   There is no water sewer in Lehigh Acres.

 8      Q.   Right.  You were on a well.

 9      A.   We were on a well.  So the utilities would be

10   for only the Billings, and the telephone would be

11   cellular, which is the same.

12      Q.   So you also have an item here for student

13   loans, and that shows an amount of $300.  Is that

14   right?

15      A.   Yes.

16      Q.   And that is the student loan payment for the

17   loan that you got for your master's degree, correct?

18      A.   Yes.

19      Q.   So you were paying $300 a month at this time

20   in 2013 for your student loans?

21      A.   Yes.  That would have been just after I

22   completed my coursework.

23      Q.   Okay.  So you had just started to pay for the

24   student loans at that time?
```

```
 1        A.    Yes.

 2        Q.    And do you know if that amount changed over

 3    time in the years that followed from 2013 from that

 4    $300 a month amount?

 5        A.    I don't know.

 6        Q.    So you wouldn't have been paying the student

 7    loan at the time that you stopped paying your

 8    mortgage in May of 2012.  Is that right?

 9        A.    Correct.

10        Q.    That wouldn't have been a part of your

11    monthly expenses?

12        A.    Not at the time of when we stopped paying the

13    mortgage.

14        Q.    Right.

15              So here, looking at this form, your total

16    gross listed is listed at $4700.  Is that right?

17        A.    Yes.

18        Q.    And your total household expenses and

19    payments is listed as $4,787, which is about $87 more

20    than what your total gross wages is, correct?

21        A.    Yes.

22        Q.    And there's also a Household Assets portion

23    of this table on the right-most column.

24              Do you see that?
```

```
 1        A.   Yes.

 2        Q.   And that lists $775 in your checking

 3   accounts.  Is that right?

 4        A.   Yes.

 5        Q.   And $1,045 in your savings account, correct?

 6        A.   Yes.

 7        Q.   So you gave all this information on this

 8   form, and you were requesting assistance from Fifth

 9   Third Bank, correct?

10        A.   Yes.

11        Q.   And do you remember what the result of that

12   request for assistance was?

13        A.   We didn't get assistance.

14        Q.   Do you remember when you were told that you

15   were not going to be receiving assistance from Fifth

16   Third Bank?

17        A.   I don't remember.

18        Q.   All right.  I would like to turn your

19   attention to the next page after this form, and it's

20   a hardship letter that is listed here on the page

21   that follows the borrower assistance form that we

22   just looked at.

23             Can you tell me what this letter is?

24        A.   It's us reaching out to Fifth Third telling
```

```
1    our exact circumstances and asking for their

2    assistance in any way possible to continue to live in

3    the house and to pay the mortgage as intended.

4        Q.   The next page shows another form, a form

5    1126, a Borrower Financial Information Form.

6            Do you see that?

7        A.   Yes.

8        Q.   And there's a Freddy Mac logo on the upper

9    left-hand side.

10           Do you see that?

11       A.   Yes.

12       Q.   What is this document?

13       A.   The Borrower Financial Information.

14       Q.   Do you know why you filled out this form?

15       A.   I don't remember.

16       Q.   Your name is on this form, correct?

17       A.   Yes.

18       Q.   Along with your wife's name?

19           Is that right, your wife's name is on this as

20   well?

21       A.   Yes.

22       Q.   At the -- on the first page of this Borrower

23   Financial Information Forms there's a field that is

24   called Involuntary Inability to Pay in the middle of
```

```
 1    the page.

 2           Do you see that?  It's in all caps in the

 3    center.

 4       A.   Yes.

 5       Q.   If you look down to the last line in that

 6    field, it says:  I want to, colon.  And then the box

 7    is checked for "sell the property."

 8           Do you see that?

 9       A.   Yes.

10       Q.   And if you look to the next page, the

11    document is signed at the bottom by both you and your

12    wife.  Is that right?

13       A.   Yes.

14       Q.   And this appears to be filled out on

15    December 8th of 2013.  Is that correct?

16       A.   Yes.

17       Q.   So at that time you expressed that you wanted

18    to sell the property.  Is that correct?

19       A.   Yes.

20       Q.   And you said that the attempt that you made

21    to do that was to speak to a realtor about a short

22    sale.  Is that right?

23       A.   Yes.

24       Q.   And that it was listed for short sale for
```

```
 1      some period of time?

 2          A.    Yes.

 3          Q.    But it did not sell, correct?

 4          A.    Correct.

 5          Q.    If you look at that second page of this form,

 6      there's again a table that shows monthly income and

 7      monthly expenses.

 8                Do you see that?

 9          A.    Yes.

10          Q.    And it's broken out across both your wife's

11      information and your information, correct?

12          A.    Yes.

13          Q.    And it shows your employer as T-Mobile for

14      two years.  Is that right?

15          A.    Yes.

16          Q.    And your wife's employer, is that Harris

17      Dermatology?

18          A.    Correct.

19          Q.    And she worked there for seven years.  Is

20      that right?

21          A.    Yes.

22          Q.    What does your wife do or what did she do at

23      Harris Dermatology?

24          A.    It's the medical field, so she's done a lot
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1476 of 1680
confidential - Subject to further confidentiality Review
1954

```
 1    of things there.

 2         Q.   Okay.  Does she still work there today?

 3         A.   Yes.

 4         Q.   Now, this was filled out around the same time

 5    as the previous form that we looked at, the Borrower

 6    Assistance Form; both of them were in December of

 7    2013, I believe, correct?

 8         A.   Yes.

 9         Q.   This form has some -- excuse me, this table

10    that we were just looking at in the Freddie Mac form

11    has some additional information related to assets

12    that I wanted to ask you about; specifically, there's

13    a 401k that is listed for $38,000.

14              Do you see that?

15         A.   Yes.

16         Q.   And was that your 401k, or whose name was

17    that 401k in?

18         A.   I don't know.

19         Q.   Okay.  But at this time in 2013 it had

20    $38,000 in it, according to this form?

21         A.   Yes.  There's only one time that 401k is

22    listed.

23         Q.   Yes.

24              Looking down, there's a car that is listed as
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1477 of 1680
confidential - Subject to further confidentiality Review
1955

```
1      an asset for $2,000.  Do you see that in the bottom

2      right corner of the table?

3         A.   Yes.

4         Q.   Is that your older car that you have?

5         A.   Yes.

6         Q.   And I keep referring to it that way, but what

7      kind of car is it?

8         A.   Firebird.

9         Q.   It's a Pontiac Firebird?

10        A.   Correct.

11        Q.   And you put the estimated value of it at

12     $2,000.  Is that right?

13        A.   Yes.

14        Q.   Do you still own that car?

15        A.   Yes.

16        Q.   Did you continue to pay property taxes at the

17     home at Butte Street after you moved out of the home?

18        A.   Everything was set up with Fifth Third to

19     auto-draft.

20        Q.   All right.  So both the property taxes and

21     the homeowner's insurance were paid through Fifth

22     Third Bank through your mortgage payments.  Is that

23     right?

24        A.   Correct.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1478 of 1680
Case 2:09-md-02047-EEF-MBN Document 14421-1 Filed 01/18/21 Page 129 of 164 Page#
confidential - Subject to further confidentiality review
1956

1    Q.    Did you have any changes to your salary or

2    wages during the period of time from when you moved

3    out of the house through the time that you filed for

4    bankruptcy in 2015?  So from 2012 through 2015, was

5    there any changes in your salary or wages in your job

6    at T-Mobile?

7           MR. ALBANIS:  Object to the form.

8           But you may answer.

9           THE WITNESS:  I didn't work for T-Mobile when

10     we left the house.

11   BY MR. LAWSON:

12   Q.    That's right.  You started working at

13   T-Mobile around 2013.  Is that right?

14   A.    Yes.

15   Q.    Because at the time that you filled out this

16   form in 2013, it said that you had been there for two

17   years, correct?

18   A.    Correct.

19   Q.    So, actually, you would have been there in

20   2011.  I'm sorry.  I'm doing my math wrong.

21          You would have been there -- according to

22   this, you would have been at T-Mobile for two years

23   as of the time you filled out in December of 2013.

24   Would that be correct?

```
1        A.    I started at T-Mobile in August of 2012.

2        Q.    Okay.  And where did you work before T-Mobile

3    when you came there in 2012?

4        A.    Burger King.

5        Q.    Burger King.  And how long were you there?

6        A.    About a year.

7        Q.    And did you have a job before that?

8        A.    Yes.

9        Q.    And where was that?

10       A.    Circuit City.

11       Q.    Okay.  And how long were you at Circuit City?

12       A.    Almost two years.

13       Q.    Okay.  And when did you start working at

14   Circuit City, if you can remember?

15       A.    I don't remember.  I can count backwards.

16       Q.    So during the time that you lived in the home

17   at Butte Street, what jobs did you have during that

18   period of time?

19       A.    I primarily worked for Circuit City, and then

20   they went out of business.  And that left me

21   unemployed for a length of time in which time we

22   continued to pay the mortgage, didn't miss any

23   payments, and then I got a job at Burger King.

24       Q.    Do you remember about when that was?
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1480 of 1680
Case 2:09-md-02047-MSR-RJN Document 1141 Filed 01/04/11 Page 125 of 164 Page #:
1958
confidential - Subject to further confidentiality Review

1      A.    Between 2008 and 2010.

2      Q.    Okay.  So it was during the time that you

3    lived at Butte Street between 2008 and 2010.  Your

4    wife was consistently employed during that period of

5    time.  Is that right?

6      A.    Yes.

7      Q.    And how were you able to continue to pay your

8    mortgage payments while you were in search of a job?

9      A.    Primarily based on her income, but

10    additionally, I was receiving unemployment because

11    the company went out of business, so I wasn't denied.

12    And that was during an economic downturn, so they

13    continued to extend my benefits because of the lack

14    of jobs available.

15      Q.    So you worked at Burger King for about how

16    long?

17      A.    A little over a year.

18      Q.    A little over a year.

19            And then you got the job at T-Mobile?

20      A.    My grandparents were murdered, and I took a

21    few months away to deal with that.  And when I went

22    back to Burger King, I couldn't walk in the building

23    without crying and just the memory of getting the

24    phone call in that building and having to deal with

1   that in the moment didn't allow me to continue

2   working there.  So I sought out another job that was

3   underneath my current position as a manager and

4   worked a part-time job with T-Mobile, because that

5   was about all I could handle monthly.

6       Q.   I'm sorry that you lost your grandparents

7   like that.

8       A.   Thank you.

9       Q.   So you started a part-time job at T-Mobile

10  but eventually became retail store manager?

11      A.   Store manager.

12      Q.   And about when did that happen when you

13  became retail store manager?

14      A.   March 2013, I would say.

15      Q.   Okay.  So it was --

16      A.   About six months after I started.

17      Q.   -- after the time that you had moved out of

18  the Butte Street home but before you had -- but

19  before these forms were filled out in December of

20  2013 that you started working --  that you got the

21  job as a retail store manager at T-Mobile, correct?

22      A.   I believe that's correct.

23      Q.   All right.  So during the period of time that

24  you were living at Butte Street, you had a few

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1482 of 1680
confidential – Subject to further confidentiality Review
1960

```
 1    different jobs.  The period of time where you were

 2    working part time at T-Mobile, was that while you

 3    were still living at Butte Street?

 4         A.   No.  I was at Billings Street by then.

 5         Q.   Okay.  So that would have been after March --

 6    excuse me, that could have been after May of 2012.

 7    And the period of time that you were working at

 8    Burger King would have been while you were at Butte

 9    Street still, correct?

10         A.   My time at Burger King would have ended

11    around June of 2012.

12         Q.   Okay.  And that was around the time same that

13    you stopped paying your mortgage as well, right?

14    That was May of 2012?

15         A.   That was a couple months after, yes.

16         Q.   Yes.

17              And do you know when you started part time at

18    T-Mobile?

19         A.   August 2012.

20         Q.   Okay.  So later that summer.

21              But there was obviously a lot of transition

22    going on in your employment in that period in 2012,

23    correct?

24         A.   There was one job different; not a lot.
```

```
1       Q.    Well, you went from working at Burger King

2    to -- was there a period where you were not employed,

3    and then you were working part time at T-Mobile?

4       A.    For a about a month.

5       Q.    About a month?

6             If you go back a little bit further into this

7    document, you begin to see some T-Mobile statements,

8    earnings statements.

9             Do you see what I'm looking at?

10      A.    Yes.

11      Q.    All right.  Are these earnings statements

12   from your job at T-Mobile?

13      A.    Yes.

14      Q.    And it looks like on the first page of

15   T-Mobile earnings statements they are from November

16   of 2013.  Is that right?

17      A.    Yes.

18      Q.    And looking at this form, it looks like your

19   gross pay from T-Mobile during that period of time

20   from the period beginning of November 10th, 2013, to

21   November 23rd, 2013, was $2,731.23.

22            Does that look correct?

23      A.    Yes.  That includes commissionable pay.

24      Q.    Okay.  What do you mean by "commissionable
```

```
1    pay"?  Do you receive commission at your job?

2         A.   A portion is salaried and a portion is bonus.

3         Q.   Okay.  And then there's an amount that was

4    deposited to your account of $2,030.43 on this first

5    earnings statement, correct?

6         A.   Yes.

7         Q.   Now, does the amount of commission that you

8    receive vary greatly from month to month?

9         A.   It can.

10        Q.   What's the largest amount of commission that

11   you have received in a month, if you know?

12        A.   I don't know the largest.

13        Q.   What range does it usually vary from?

14        A.   It can vary by about $1,200.

15        Q.   Okay.  So what is an average or normal month

16   of commission that you receive from your job?

17        A.   That would be average, the first one there;

18   the 2700 would be average.

19        Q.   The 2700 in gross pay would be average?

20        A.   Yes.

21        Q.   All right.  If you go past those T-Mobile

22   earnings statements, there appears to be earnings

23   statements for your wife's job at Harris Dermatology.

24             Do you see those?
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1485 of 1680
confidential -- Subject to further confidentiality Review
1963

```
1       A.    Yes.

2       Q.    And these appear to be earnings statements

3   from that same month in November 2013?

4       A.    Yes.

5       Q.    And that -- these appear to show gross

6   earnings -- excuse me, gross pay during that time of

7   $1,328.64.

8             Do you see that?

9       A.    Yes.

10      Q.    Do you know if your wife's earnings and pay

11  have -- or, excuse me, that they varied a lot during

12  that time period around 2012 and 2013, or were they

13  relatively stable?

14      A.    Relatively stable.

15      Q.    Has she earned about that much money per

16  paycheck month to month during the time that she's

17  worked there, or has it changed over time?

18      A.    It's been fairly similar the whole time.

19      Q.    Would you say that you're making -- that you

20  started to make more money once you worked as a

21  T-Mobile retail store manager than you had in the

22  previous positions in the previous jobs that you had?

23      A.    I made more money at Burger King.

24      Q.    You made more money at Burger King than at
```

1    T-Mobile?

2        A.    Yes.

3        Q.    What was your job at Burger King?

4        A.    Store manager.

5        Q.    Okay.

6        A.    General manager.  That's what it said.

7        Q.    So your pay reduced from the time that you

8    left your job at Burger King and worked at T-Mobile.

9    Is the that right?

10       A.    Yes.

11       Q.    You received less per month?

12       A.    Yes.

13       Q.    Do you know about how much less per month you

14   would often receive?

15       A.    A couple hundred dollars.  Not a lot.

16       Q.    The last page of this document -- excuse me,

17   the second to last page of this document appears to

18   be a Comcast receipt.

19             Do you see that?

20       A.    Yes.

21       Q.    And the total amount due on that is $79.08,

22   and it's from November 7th of 2013.

23             Do you see that on the page?

24       A.    Yes.

```
 1        Q.    Is this for your TV and Internet at the home

 2   at Billings Street?

 3        A.    Yes.

 4        Q.    And you'd agree with me that you are not

 5   pursuing your Comcast bills or any utility bills from

 6   the Billings Street home as alternative living

 7   expenses in this lawsuit, correct?

 8        A.    No.

 9              MR. ALBANIS:  Object to the form.

10              But you may answer.

11              THE WITNESS:  No.

12   BY MR. LAWSON:

13        Q.    All right.  You can set that aside.

14              MR. LAWSON:  We can go off the record.

15              (Recess from 10:30 until 10:53 a.m.)

16   BY MR. LAWSON:

17        Q.    Welcome back, Mr. Feldkamp.

18              I wanted to ask you a little bit more about

19   what was going on in your life around the time that

20   you moved out of the Butte Street home and moved into

21   the Billings Street home.

22              During that time, did you or your wife have

23   any major or unexpected medical bills that you were

24   paying?
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1488 of 1680
confidential - Subject to Further Confidentiality Review
1966

```
1        A.   I don't remember.

2        Q.   Can you think of any time where you had large

3   or unexpected medical bills that you had to pay or

4   that your wife had to pay?

5        A.   No.

6        Q.   Do you remember if the amount that you were

7   paying for your mortgage changed at all around 2012

8   when you stopped paying for your mortgage payment?

9        A.   I don't remember.

10       Q.   Did you make any investments of any kind in

11  2012 around the time that you stopped paying your

12  mortgage?

13       A.   No.

14       Q.   And can you think any other debts that you

15  had besides your student loans and your mortgage

16  around that time in 2012?

17       A.   Just the vehicle.

18       Q.   The car loan, right?

19            Anything other than that?

20       A.   No.

21            MR. ALBANIS:  For the record, the Feldkamps

22       filed for bankruptcy, as you well know.  Their

23       bankruptcy filings are a matter of public record,

24       which you could easily pull.
```

```
 1              MR. LAWSON:  Absolutely.  And we will review

 2         those.

 3              (Defendants' Exhibit 11 was marked for

 4         identification.)

 5    BY MR. LAWSON:

 6         Q.   I have handed you a document that's been

 7    marked as Exhibit 11.

 8              Have you seen this document before?

 9         A.   Yes.

10         Q.   Do you know what it is?

11         A.   It's a lis pendens, but I don't remember what

12    that term means.

13         Q.   This was Fifth Third Bank filing this notice

14    with the court seeking to foreclose on the mortgage

15    on your home an Butte Street, correct?

16              MR. ALBANIS:  Object to the form.

17         Mr. Feldkamp is not an attorney, and this is a

18         legal document.

19              But you may answer, if you know.

20              THE WITNESS:  I don't know.

21    BY MR. LAWSON:

22         Q.   If you look to the first sentence on the

23    first paragraph in this document, it says:  Notice is

24    hereby given that an action has been instituted by
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1490 of 1680
confidential -- Subject to further confidentiality Review
1968

1   the above-named plaintiff seeking to foreclose on a

2   mortgage encumbering the following-described property

3   in the county indicated in the below description, to

4   wit.

5           Do you see that?

6   A.   Yes.

7   Q.   And if you look below the description of the

8   property, it says that it's also known as 5237 Butte

9   Street, Lehigh Acres, Florida.  Is that right?

10  A.   Yes.

11  Q.   So would you agree that this was a notice

12  that Fifth Third was seeking to foreclose on the

13  mortgage on your property?

14  A.   Yes.

15  Q.   And that occurred around September 21st of

16  2012.  Is that right?

17  A.   It says 18th.

18  Q.   I'm sorry.  I was looking at the file date.

19  You are correct.

20          On the date that is below with the signature

21  it says September 18th, 2012.  Isn't that right?

22  A.   Yes.

23  Q.   So that would have been about four months

24  after you had stopped paying the mortgage on the

```
1    home.  Is that right?

2         A.   Yes.

3         Q.   And we just looked at your request for

4    borrower's assistance for the home with Fifth Third

5    from December of 2013 a little bit ago, right?

6         A.   Yes.

7         Q.   So you continued to have a discussion with

8    Fifth Third Bank about getting assistance for

9    repayment of your loan into 2013, correct?

10        A.   Yes.

11        Q.   And it's your recollection that the home did

12   not go into foreclosure until 2015, correct?

13        A.   Can you restate that?

14        Q.   The home was not sold in the foreclosure sale

15   until 2015.  Isn't that right?

16        A.   Correct.

17        Q.   You can set that aside.

18             (Defendants' Exhibit 12 was marked for

19   identification.)

20   BY MR. LAWSON:

21        Q.   You have been handed a document that has been

22   marked as Exhibit 12.

23             And have you ever seen this document before?

24        A.   Yes.
```

```
1       Q.   This is marked as a Final Judgment of

2   Foreclosure, and it appears to have been filed on

3   July 24th, 2015.

4            Do you see that on the first page?

5       A.   Yes.

6       Q.   What is your understanding of what this

7   document is?

8            MR. ALBANIS:  Object to the form.

9            But you may answer if you know, Mr. Feldkamp.

10           THE WITNESS:  It's the total amount that is

11       being foreclosed on from Fifth Third.

12   BY MR. LAWSON:

13       Q.   In the second paragraph on the first page of

14   this document it says Amounts Due and Owing, and it

15   states that:  Plaintiff, Fifth Third Mortgage Company

16   is due a principal of $118,705.34.

17           Do you see that?

18       A.   Yes.

19       Q.   It also lists some accrued interest from a

20   period of August 2008 through July of 2015.  Correct?

21       A.   Yes.

22       Q.   And that amount of accrued interest is

23   $26,708.80.  Is that right?

24       A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1482 of 1680
Case 2:09-md-02047-MBN Document 1141-3 Filed 01/03/14 Page 139 of 184 PageID #: 1971
confidential -- Subject to further confidentiality Review

```
 1        Q.   Now, along with some other taxes, fees, and

 2    insurance, the subtotal that is shown on the second

 3    page of the document appears to be $154,351.44.  Is

 4    that right?

 5        A.   Yes.

 6        Q.   And then the grand total after some

 7    additional costs that is listed on this document is

 8    $167,749.33.  Correct?

 9        A.   Yes.

10        Q.   So it's your understanding that this is the

11    amount that was owed to Fifth Third Bank at the time

12    of this filing in July 24th, 2015?

13        A.   Yes.

14        Q.   I'd like to turn your attention to the third

15    page of the document.  It's actually marked as Page 4

16    within -- at the bottom right corner.  There's a

17    Paragraph Number 5 that's marked as Sale of Property.

18             It states:  If the grand total sum with

19    interest at the rate described in Paragraph 3 and all

20    costs accrued subsequent to this judgment are not

21    paid, the clerk of this court shall sell the property

22    at electronic sale on September 24th, 2015, at 9 a.m.

23    to the highest bidder for cash.

24             Do you see that?
```

```
1        A.   Yes.

2        Q.   Now, is it your understanding that the house

3   did sell in a foreclosure sale around that date of

4   September 24th, 2015?

5        A.   Yes.

6        Q.   Do you know how much it sold for?

7        A.   I do not.

8        Q.   All right.  I'd like to go back to Exhibit 8

9   that we looked at a little bit earlier; specifically,

10  I'd like to turn your attention to Page 4 in

11  Exhibit 8.

12            At the top of this page there's a question --

13  or, excuse me, there's a line that states:  If the

14  property was the subject of a foreclosure or short

15  sale, identify the following.

16            And it asks if it's a foreclosure or short

17  sale and it says "foreclosure."

18            Do you see that?

19       A.   Yes.

20       Q.   And the lender's name is listed as Fifth

21  Third Bank on the next line.

22            Do you see that?

23       A.   Yes.

24       Q.   The original loan or mortgage amount is
```

1    listed at $125,000.  Correct?

2         A.   Correct.

3         Q.   And if you look down a little bit further,

4    the date of the foreclosure is listed as

5    September 24th, 2016, correct?

6         A.   It's listed that, but that's the incorrect

7    date.

8         Q.   Right.

9              That was actually September 24th, 2015.

10        A.   Correct.

11        Q.   Isn't that right?

12             And that's the date that we see on the

13   Exhibit 12 that we were just looking at, of

14   September 24th, 2015, when the sale was supposed to

15   occur.  Is that right?

16        A.   Yes.

17        Q.   And then if you look at the price that is

18   listed, it's listed as a short sale price.  But I

19   want to ask you:  This amount of $102,700 is the

20   foreclosure sale price.  Is that right?

21        A.   Yes.

22        Q.   So the home, at foreclosure, sold for around

23   23,000 less -- 22,000 and a little bit of change less

24   than what you purchased it for originally in 2008.

```
 1    Is that right?

 2        A.    Yes.

 3        Q.    Did you ever have anyone appraise the home

 4    while you lived in it, the home on Butte Street?

 5        A.    The only appraisal that was done was done by

 6    Fifth Third when we started the mortgage.

 7        Q.    Okay.  So you didn't pay for anyone to do an

 8    appraisal after that?

 9        A.    No.

10        Q.    How much -- did you know that the home

11    would -- did a realtor or anyone else tell you how

12    much you might be able to sell the home for at any

13    time when you owned it?

14        A.    No.

15        Q.    When you discussed a short sale, do you

16    remember how much the home was listed for?

17        A.    No.

18        Q.    After the home was sold at a foreclosure

19    sale, did Fifth Third Bank contact you and request

20    any additional money from you for the amount less

21    from the amount that you owed to them?

22        A.    No.

23        Q.    And why is that?

24        A.    I don't know.
```

1    Q.   You never received any correspondence from

2    them asking for you to pay the amount left over

3    between the amount you owed and the amount they were

4    able to sell the house for in foreclosure?

5    A.   All documentation was being provided to our

6    lawyer by Fifth Third at that point.

7    Q.   But you aren't aware of them seeking

8    additional money from you since the foreclosure sale?

9    A.   No.

10   Q.   Do you know what damages you are seeking for

11   the foreclosure of your property in this lawsuit?

12        MR. ALBANIS:  Object to the form.

13        But you may answer, if you can, Mr. Feldkamp.

14        THE WITNESS:  I'm seeking compensation for

15        rent, as well as for loss of use and enjoyment of

16        the property.

17   BY MR. LAWSON:

18   Q.   Okay.  Beyond those two items, which we have

19   discussed already, the rent that you paid for

20   alternative living expenses and the loss of use and

21   enjoyment of the property of Butte Street, is there

22   any additional money that -- or costs that you are

23   seeking reimbursement for related to the foreclosure

24   specifically?

```
 1              MR. ALBANIS:  Object to the form.

 2              But you may answer, if you can.

 3              THE WITNESS:  From what I understand, the

 4         judgment has a formula that, because we're the

 5         one that discovered the Chinese drywall and were

 6         living in the house at the time, that we are

 7         entitled to remediation costs as well.

 8    BY MR. LAWSON:

 9         Q.   Okay.  Now, with remediation, we discussed

10    earlier that you did not remediate or fix the home

11    removing the Chinese drywall, correct?

12         A.   Correct.

13              MR. ALBANIS:  Object to the form.

14              But you may answer.

15              THE WITNESS:  Had I had the finances to do

16         so, I would have liked to have.

17    BY MR. LAWSON:

18         Q.   But ultimately you did not pay anyone to do

19    that or perform the work yourself, correct?

20              MR. ALBANIS:  Object to the form.

21              THE WITNESS:  No.

22    BY MR. LAWSON:

23         Q.   So you don't have any receipts or invoices

24    showing the amounts that you paid to remediate the
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1489 of 1680
confidential - Subject to further confidentiality Review
1977

1     home.  Is that right?

2         A.    No.

3         Q.    And if you wanted to remediate the home

4     today, you don't own the home any longer, correct?

5              MR. ALBANIS:  Object to the form.

6              And let me state a lengthier objection, which

7         I have previously stated during the depositions

8         this week, since it appears as though you may be

9         delving into remediation damages at this time.

10             I would like to insert a rolling objection to

11        any and all questions related to remediation

12        damages.  As you well know, Judge Cooke put the

13        Amorin case in Florida on two tracks:  Number

14        one, the remediation track and number two, the

15        nonremediation track.

16             Furthermore, Judge Cooke on November 16,

17        2018, entered her order setting those two tracks

18        and adopting all of Judge Fallon's previous

19        rulings in the multidistrict litigation,

20        including his ruling where he stated that

21        previous homeowners who discovered the defective

22        Chinese drywall in their homes should be entitled

23        to remediation damages.

24             Mr. and Mrs. Feldkamp are presented to you

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1500 of 1680
confidential - Subject to further confidentiality Review
1978

```
 1        today as priority claimants on the nonremediation

 2        track.  Therefore, they are here to answer

 3        questions about their nonremediation damages.

 4        They are not here to discuss their remediation

 5        damages.  Those will be dealt with by the special

 6        master and Judge Cooke separately on the

 7        remediation track.

 8            Having said all that, we will allow you to

 9        ask the questions that you would like to ask.

10        But that is a rolling objection to any and all

11        questions related to the remediation of the home

12        and remediation damages as it relates to the

13        Butte property.

14   BY MR. LAWSON:

15        Q.   After the foreclosure had been entered and

16   the foreclosure sale had occurred, you did not pay

17   any additional amounts of money to Fifth Third Bank

18   after that time; did you?

19        A.   No.

20        Q.   Did you pay any additional amounts for the

21   Butte Street home after the property was sold?

22        A.   No.

23        Q.   Around 2015 you filed for bankruptcy,

24   correct?
```

```
 1        A.    Correct.

 2        Q.    Do you know what bankruptcy chapter you filed

 3    under when you filed for bankruptcy?

 4        A.    I don't remember.

 5        Q.    What led you to filing for bankruptcy?

 6        A.    The fact that our home had Chinese drywall,

 7    and we felt that we had no other option.

 8        Q.    So this occurred before the foreclosure sale

 9    had occurred in September of 2015, correct, that you

10    filed for bankruptcy?

11        A.    I don't remember.

12              (Defendants' Exhibit 13 was marked for

13    identification.)

14    BY MR. LAWSON:

15        Q.    You have been handed a document that has been

16    marked as Exhibit 13.  It is a United States

17    Bankruptcy Court of the Middle District of Florida

18    Voluntary Petition for Bankruptcy.

19              Do you see that?

20        A.    Yes.

21        Q.    And the name of the debtor at the top of the

22    document is you, Andrew Feldkamp, correct?

23        A.    Correct.

24        Q.    Along with your wife, Dawn Feldkamp.  Is that
```

1    right?

2        A.    Yes.

3        Q.    If you look at the file date at the top of

4    this page, it appears to have been filed on

5    January 8th of 2015.

6              Do you see that?

7        A.    Yes.

8        Q.    Does that sound about right that you would

9    have filed for bankruptcy initially around January of

10   2015?

11       A.    I don't understand the difference between

12   filing and having it actually be official.

13       Q.    Well, this voluntary petition appears to have

14   been filed around January 8th of 2015.  Is that

15   right?

16       A.    Yes.

17       Q.    Around that time, were there any debts or

18   amounts of money that you were finding yourself

19   unable to pay month to month?

20       A.    The mortgage.

21       Q.    Okay.  And you had not been paying the

22   mortgage since May of 2012.  Is that right?

23       A.    Yes.

24       Q.    And so at this time it had been almost three

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1503 of 1680
confidential - Subject to further confidentiality Review
1981

1    years since you had paid the mortgage at the Butte

2    Street home, correct?

3        A.    Yes.

4        Q.    Do you know why you sought relief through

5    bankruptcy at that time in 2015 and filed this

6    voluntary petition?

7        A.    The potential debt that we would have from

8    the house.

9        Q.    You still owed money to Fifth Third Bank at

10   this time in January of 2015, correct?

11       A.    Yes.

12       Q.    The foreclosure sale had not yet occurred,

13   correct?

14       A.    Correct.

15       Q.    And you still had an amount that we just saw

16   around $167,000 at the time that Fifth Third filed

17   that court filing that they said that you owed to

18   them, correct?

19       A.    Yes.

20       Q.    And that included the principal on the

21   mortgage, as well as interest and other costs,

22   correct?

23       A.    Yes.

24       Q.    So it's your testimony that you filed for

```
 1    bankruptcy to be able to help get relief from that

 2    amount of money that you owed from Fifth Third Bank?

 3        A.   Yes.

 4        Q.   Were there any other debts that you were

 5    seeking to get relief from at that time?

 6        A.   No.

 7        Q.   Were you able to pay your bills month to

 8    month at the time other than your mortgage, that you

 9    filed for this -- filed this voluntary petition in

10    January of 2015?

11        A.   Yes.

12        Q.   Would you say that your financial state was

13    better or worse than it had been in 2012 when you had

14    stopped paying your mortgage payments?

15             MR. ALBANIS:  Object to the form.

16             But you may answer, if you know.

17             THE WITNESS:  Worse.  Because we had

18        additional attorneys' fees that we were out for

19        both working with the foreclosure and potential

20        bankruptcy.

21    BY MR. LAWSON:

22        Q.   So you were paying attorneys in the

23    foreclosure case and also for this bankruptcy that

24    you had filed, correct?
```

```
 1      A.   Yes.

 2      Q.   And that was money that you were paying that

 3   you had not been paying back in 2012, correct?

 4      A.   Correct.

 5      Q.   I would like to turn your attention to the

 6   fourth page of this voluntary petition.  It's a

 7   summary of schedules.

 8           Do you see that?

 9      A.   Yes.

10      Q.   And this lists Schedules A through J, and it

11   has different assets and liabilities that are listed

12   in the table.

13           Do you see that?

14      A.   Yes.

15      Q.   And it lists your real property assets as

16   well as personal property assets in the column in the

17   left, correct?

18      A.   Yes.

19      Q.   And those total to $194,362.71.  Is that

20   right?

21      A.   Yes.

22      Q.   And then your liabilities total to an amount

23   of 222,816.93.  Is that right?

24      A.   Yes.
```

```
1       Q.   So your liabilities were greater than your

2   assets, according to this summary of schedules.  Is

3   that right?

4       A.   Yes.

5       Q.   And that amount included the real property

6   that you owned at that time in the Butte Street

7   property, correct?

8       A.   Yes.

9       Q.   That's the $97,905 in assets that are listed

10  under Schedule A of real property?

11      A.   Yes.

12           (Defendants' Exhibit 14 was marked for

13  identification.)

14  BY MR. LAWSON:

15      Q.   I have handed you a document that has been

16  marked as Exhibit 14.  It's titled Chapter 13

17  Standing Trustee's Final Report and Account.

18           Do you see that?

19      A.   Yes.

20      Q.   Do you see that in the first line it states

21  that the case was filed on January 8th of 2015.  Is

22  that right?

23      A.   Yes.

24      Q.   And then it goes on to state that your -- the
```

1    plan for the bankruptcy was confirmed on

2    September 15th of 2015, correct?

3        A.    Yes.

4        Q.    And it also states that there was a

5    modification of the plan on June 25th of 2018.  Is

6    that right?

7        A.    Yes.

8        Q.    And this filing occurred, if you look at the

9    top of the page, around September 26th of 2018.  Is

10   that right?

11       A.    Yes.

12       Q.    And is it your understanding that around that

13   time, earlier this year, your bankruptcy case was

14   finalized?

15            MR. ALBANIS:  Object to the form.

16            But you may answer, if you can, Mr. Feldkamp.

17            THE WITNESS:  Yes.

18   BY MR. LAWSON:

19       Q.    And what does that mean to you, that your

20   bankruptcy case has been finalized or terminated?

21       A.    I can begin to reestablish my credit and take

22   on additional debts, if the creditor would allow me.

23       Q.    What limitations did you have while your

24   bankruptcy case was pending over the last three

```
 1    years?  Financially what were your limitations that

 2    were created by that bankruptcy filing?

 3         A.   We were unable to take on any kind of

 4    additional debt by rule of the bankruptcy, as well as

 5    we could not own any real property in our name.  We

 6    were not able to refinance anything or get an

 7    additional or new car loan, if need be.

 8         Q.   And what kind of relief did the bankruptcy

 9    give you?  Were there any debts that you no longer

10    have to pay?

11         A.   There was nothing that was forgiven.

12         Q.   Okay.  No debts were forgiven as a result of

13    this bankruptcy; is that right?

14         A.   The only thing that was part of the

15    bankruptcy at any point was my student loan.

16         Q.   Okay.  And you're continuing to pay your

17    student loan debt?

18         A.   Yes.

19         Q.   And do you know how much you pay a month for

20    that?

21         A.   I don't.

22         Q.   Okay.  Is than auto-debit from your account?

23         A.   Yes.

24         Q.   All right.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1509 of 1680
confidential - Subject to Further Confidentiality Review
1987

```
 1        A.    It was originally part of the bankruptcy, and

 2    the trustee in the case was the one that disbursed

 3    those payments.

 4        Q.    As a result of this bankruptcy, were any

 5    debts discharged from Fifth Third Bank?

 6        A.    They were given the opportunity to make claim

 7    and never became part of our bankruptcy.

 8        Q.    Okay.  So Fifth Third did not make a claim in

 9    your bankruptcy for the amount that was still owed to

10    them after the foreclosure sale, correct?

11        A.    Correct.

12        Q.    So that was tens of thousands of dollars that

13    Fifth Third Bank could have pursued but did not.  Is

14    that right?

15        A.    They did not pursue them.

16        Q.    And now you do not owe them that money.  Is

17    that your understanding?

18        A.    From what I understand.

19        Q.    I wanted to ask you:  What costs or damages

20    are you seeking in this lawsuit related to your

21    bankruptcy?  Can you think of any?

22        A.    I don't know.

23        Q.    Are there any receipts or invoices related to

24    your bankruptcy that you have provided to your
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1540 of 1680
confidential - Subject to Further confidentiality Review
1988

```
 1    attorney that are associated with damages for that

 2    bankruptcy?

 3            MR. ALBANIS:  Object to the form.

 4            All documents that the Feldkamps have given

 5        to us, we have produced to the defendants.

 6            But you may answer, if you can.

 7            THE WITNESS:  I'm not claiming to get repaid

 8        for the bankruptcy lawyer, no.

 9    BY MR. LAWSON:

10        Q.   So from when you filed the voluntary petition

11    back in 2015 to now in 2018, would you say that your

12    financial situation is better or worse as a result of

13    having gone through bankruptcy?

14        A.   Worse.

15        Q.   Why is that?

16        A.   Because it damaged my credit history and

17    didn't allow me to gain any equity in any facet

18    whatsoever.

19        Q.   Do you wish that you wouldn't have gone

20    through bankruptcy?

21        A.   I don't have an opinion in my own head about

22    that.

23        Q.   But you think that it's made your financial

24    situation worse?
```

```
 1        A.   Yes.

 2        Q.   I'd like to turn your attention back to the

 3   first page of this exhibit.  Under Item 10, there's

 4   an amount of unsecured claims discharged without full

 5   payment for $14,518.46.

 6             Do you see that?

 7        A.   Yes.

 8        Q.   Do you know what that amount that was

 9   discharged without full payment was?

10        A.   No.

11        Q.   Okay.  So there was some unsecured debt that

12   was discharged as a result of your bankruptcy.  Is

13   that right?

14        A.   I don't know.

15        Q.   Have you received any money from settlements

16   in Chinese drywall litigation since you hired a

17   lawyer for your Chinese drywall claims?

18        A.   Yes.

19        Q.   Do you know how much money you have received?

20        A.   Two checks:  One was for about $5800, and one

21   was for about $700.

22        Q.   And you received those around 2014 and

23   another one around 2018.  Is that right?

24        A.   That does not sound right.
```

```
 1        Q.    Okay.  Let's go back to Exhibit 8;

 2   specifically look at Page 5, under Section 6, Prior

 3   Payments.

 4        Do you see that?

 5        A.    Yes.

 6        Q.    There's a Banner Supply settlement where the

 7   amount of payment received by you was $5,844.96.  Is

 8   that right?

 9        A.    Yes.

10        Q.    And then there was a GBI holdback payment for

11   $711.97.  Does that sound right?

12        A.    Yes.

13        Q.    Do you think you've received any other money

14   through settlement or any other payments related to

15   your Chinese drywall claims other than those two

16   checks?

17        A.    No.

18             MR. LAWSON:  Okay.  We can go off the record.

19             (Recess from 11:22 until 11:32 a.m.)

20   BY MR. LAWSON:

21        Q.    Mr. Feldkamp, I would like to go back to the

22   First Amended Interrogatory Responses that we looked

23   at earlier.  That is Exhibit Number 6.

24             And on the first page of that document we
```

```
1    have been looking at your answer to the first

2    interrogatory today.  Specifically, I wanted to ask

3    you about a couple of the types of damages that are

4    listed in that interrogatory.

5           You list that you are seeking damages for

6    lost equity in that answer.

7           Do you have a sense of what damages you are

8    seeking for lost equity in this lawsuit?

9           MR. ALBANIS:  Object to the form.

10          Loss of equity damages will be subject to

11      expert testimony.

12          But you may answer, if you know.

13          THE WITNESS:  I don't know.

14   BY MR. LAWSON:

15      Q.   And the same question for diminution in

16   value.  Do you know what values you are seeking for

17   that type of damage?

18          MR. ALBANIS:  Same objection.

19          But you can answer, if you know.

20          THE WITNESS:  I don't know.

21          MR. LAWSON:  Thank you for your testimony

22      today, Mr. Feldkamp.  I have no further questions

23      at this time.

24          THE WITNESS:  Thank you.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1514 of 1680
confidential – Subject to Further Confidentiality Review
1992

1          MR. MOREN:  BNBM has no questions.

2          MR. ALBANIS:  Give us a second, Keith and I.

3          MR. LAWSON:  We can go off the record.

4          (Recess from 11:33 until 11:33 a.m.)

5          MR. ALBANIS:  We have no questions.  And we

6     reserve signature, please.

7          (Whereupon, the deposition concluded at

8     11:38 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    C E R T I F I C A T E

 2

 3            I, KELLY J. LAWTON, Registered Professional

 4      Reporter, Licensed Court Reporter, and Certified

 5      Court Reporter, do hereby certify that, pursuant to

 6      notice, the deposition of ANDREW FELDKAMP was duly

 7      taken on December 13, 2018, at 8:08 a.m. before me.

 8            The said ANDREW FELDKAMP was duly sworn by

 9      me, through an interpreter, according to law to tell

10      the truth, the whole truth and nothing but the truth

11      and thereupon did testify as set forth in the above

12      transcript of testimony.  The testimony was taken

13      down stenographically by me.  I do further certify

14      that the above deposition is full, complete, and a

15      true record of all the testimony given by the said

16      witness.

17

18      _____

19            KELLY J. LAWTON, RPR, LCR, CCR

20

21            (The foregoing certification of this

22      transcript does not apply to any reproduction of the

23      same by any means, unless under the direct control

24      and/or supervision of the certifying reporter.)
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1546 of 1680
Confidential - Subject to further confidentiality Review
1994

```
1                    INSTRUCTIONS TO WITNESS

2

3

4          Please read your deposition over carefully

5    and make any necessary corrections.  You should state

6    the reason in the appropriate space on the errata

7    sheet for any corrections that are made.

8

9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12         It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

```
 1                    - - - - - -

 2                  E R R A T A

 3                    - - - - - -

 4    PAGE   LINE   CHANGE

 5    ____   ____   _____

 6      REASON: _____

 7    ____   ____   _____

 8      REASON: _____

 9    ____   ____   _____

10      REASON: _____

11    ____   ____   _____

12      REASON: _____

13    ____   ____   _____

14      REASON: _____

15    ____   ____   _____

16      REASON: _____

17    ____   ____   _____

18      REASON: _____

19    ____   ____   _____

20      REASON: _____

21    ____   ____   _____

22      REASON: _____

23    ____   ____   _____

24      REASON: _____
```

Confidential - Subject to Further Confidentiality Review

```
1                    ACKNOWLEDGMENT OF DEPONENT

2

3            I, ANDREW FELDKAMP, do hereby acknowledge

4      that I have read the foregoing pages, 1 to 163, and

5      that the same is a correct transcription of the

6      answers given by me to the questions therein

7      propounded, except for the corrections or changes in

8      form or substance, if any, noted in the attached

9      Errata Sheet.

10

11

12      _____        _____

13      ANDREW FELDKAMP                                    DATE

14

15

16

17

18      Subscribed and sworn to before me this

19      _____ day of _____, 20____.

20      My Commission expires: _____

21

22      _____

        Notary Public

23

24
```

```
 1                           LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____   _____

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____
```

# JOINT APPENDIX TAB # 43

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1521 of 1680
Case 1:11-cv-22408-MGC Document 143-3 Filed 07/18/01 Page 2 of 41 PageID# 3999
Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                 Case No. 1:11-CV-22408-MGC
 3      -------------------------------§
        EDUARDO AND CARMEN AMORIN et    §
 4      al., individually, and on behalf §
        of all others similarly         §
 5      situated,                        §
                                         §
 6          Plaintiffs,                  §
                                         §
 7      vs.                              §
                                         §
 8      TAISHAN GYPSUM CO., LTD. F/K/A   §
        SHANDONG THAIHE DONGXIN CO.,     §
 9      LTD.; TAIAN TAISHAN PLASTERBOARD §
        CO., LTD., et al,                §
10                                       §
            Defendants.                  §
11      ------------------------------- §
         - - -
12
                                    - - -
13
                        FRIDAY, DECEMBER 14, 2018
14
                                    - - -
15
                    Confidential - Subject to Further
16                       Confidentiality Review
17                             - - -
18            Deposition of DAILYN MARTINEZ, held at
          Morgan & Morgan, 12800 University Drive,
19        Suite 600, Fort Myers, Florida, commencing at
          7:45 a.m., on the above date, before
20        Kelly J. Lawton, Registered Professional
          Reporter, Licensed Court Reporter, and Certified
21        Court Reporter.
22                             - - -
23             GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1522 of 1680
Case 1:19-cv-00397-JJM-LDA Document 143-4 Filed 07/18/19 Page 3 of 861 PageID #:5000
confidential - Subject to Further confidentially Review

```
 1   APPEARANCES:
 2   MORGAN & MORGAN
     BY:  PANAGIOTIS "PETE" V. ALBANIS, ESQUIRE
 3   12800 University Drive, Suite 600
     Fort Myers, Florida 33907
 4   (239) 433-6880
     palbanis@forthepeople.com
 5   Representing Plaintiff
 6
     LEVIN, SEDRAN & BERMAN, LLP
 7   BY:  KEITH J. VERRIER, ESQUIRE
     510 Walnut Street, Suite 500
 8   Philadelphia, Pennsylvania 19106
     (215) 592-1500
 9   kverrier@lfsblaw.com
     Representing Plaintiff
10
11   ALSTON & BIRD, LLP
     BY:  MATTHEW D. LAWSON, ESQUIRE
12   BY:  METHAWEE MANUPIPATPONG, ESQUIRE
     BY:  LARA TUMEH, ESQUIRE
13   One Atlantic Center
     1201 West Peachtree Street
14   Atlanta, Georgia 30309
     (404) 881-7000
15   matt.lawson@alston.com
     mae.manupipatpong@alston.com
16   lara.tumeh@alston.com
     Representing Taishan Gypsum Co., Ltd. and Tai'an
17   Taishan Plasterboard, Co., Ltd.
18
     GORDON, ARATA, MONTGOMERY, BARNETT
19   BY:  ALEX B. ROTHENBERG, ESQUIRE
     201 St. Charles Avenue, 40th Floor
20   New Orleans, Louisiana 70170
     (504) 582-1111
21   arothenberg@gamb.law
     Representing BNBM PLC
22
23
24
```

```
 1   APPEARANCES:

 2       ORRICK, HERRINGTON & SUTCLIFFE, LLP

         BY:  HARRY J. MOREN, ESQUIRE

 3       The Orrick Building

         405 Howard Street

 4       San Francisco, California 94105

         (415) 773-5619

 5       hmoren@orrick.com

         Representing BNBM PLC

 6

 7   ALSO PRESENT:

 8       Myriam Sauchuk, Spanish Interpreter

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1524 of 1680
Case 1:cv-00392-MSD-TJK Document 143-11 Filed 01/16/11 Page 9 of 61 PageID 2002
Confidential - Subject to Further Confidentiality Review

```
 1                            - - -

                           I N D E X

 2                            - - -

 3   Testimony of:  DAILYN MARTINEZ

 4        DIRECT EXAMINATION BY MR. LAWSON...............   7

 5        CROSS-EXAMINATION BY MR. MOREN................  82

 6        DIRECT EXAMINATION (Continued) BY MR. LAWSON...  83

 7        RECROSS-EXAMINATION BY MR. MOREN.............. 147

 8        CROSS-EXAMINATION BY MR. ALBANIS.............. 149

 9

10

11                     E X H I B I T S

12                (Attached to Transcript)

13   DEFENDANTS'                                        PAGE

14   Exhibit 1   Lee County Property Appraiser -         24
                 Online Parcel Inquiry - Property
15               Data

16   Exhibit 2   Plaintiff Profile Form -               29
                 Residential Properties - Bates
17               Numbered MartinezD00001 to
                 MartinezD00013

18
     Exhibit 3   Erickson's Drying Systems - Chinese    46
19               Drywall Inspection

20   Exhibit 4   Chinese Drywall Screening, LLC         65
                 Report

21
     Exhibit 5   Priority Claimant Dailyn Martinez's    74
22               First Amended Answers to
                 Interrogatories

23
     Exhibit 6   Kawasaki Security Agreement, Buyers    78
24               Order, and Photographs
```

```
 1                    E X H I B I T S
 2   PLAINTIFF'S                                    PAGE
 3   Exhibit 7    AG Mechanical, Inc. HVAC Service    83
                  Order Invoice and Receipt
 4
     Exhibit 8    Water Medic of Cape Coral, Inc.     87
 5                Invoices
 6   Exhibit 9    Miscellaneous Claim Form Worksheet  91
                  and Receipts
 7
     Exhibit 10   Chinese Drywall Settlement Program  94
 8                Check Copies
 9   Exhibit 11   D.E. Foeller Sales, Inc. Invoice -  110
                  RV
10
     Exhibit 12   2011 Northeast 17th Place Rental   120
11                Receipts
12   Exhibit 13   First Amended Supplemental         125
                  Plaintiff Profile Form
13
     Exhibit 14   Chinese Drywall Experts, LLC       132
14                Contract Quote
15   Exhibit 15   Gabisa Construction, Inc. Estimates 138
16
17
     PLAINTIFF'S                                    PAGE
18
     Exhibit 1    Photographs                        150
19
20
21
22
23
24
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1526 of 1680
Case 1:15-cv-00392-MSD-RJK Document 143-1 Filed 01/16/19 Page 5 of 61 PageID# 2004
Confidential - Subject to Further Confidentiality Review

```
 1                         - - -

 2              THE COURT REPORTER:  Would you please raise

 3       your right hand.

 4              Do you solemnly swear or affirm that you will

 5       well and truly translate from English to Spanish

 6       and Spanish to English the questions asked and

 7       the answers given to the best of your knowledge

 8       and ability?

 9              THE INTERPRETER:  I do.

10              THE COURT REPORTER:  Would you have her raise

11       her right hand, please.

12              Do you swear or affirm that the testimony

13       you're about to give will be the truth, the whole

14       truth, and nothing but the truth?

15              THE WITNESS:  I do.

16              MR. ALBANIS:  By agreement of the parties,

17       because Ms. Martinez's English is very good, we

18       will allow Ms. Martinez to answer questions in

19       English to the extent that she understands the

20       questions that are being asked.  And if she

21       answers in English, we are operating under the

22       assumption that she understands the question and

23       she understands her answer.

24              If she needs the translator's help with
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1527 of 1680
Case 2:09-md-02047-MSD-JJK Document 143-3 Filed 01/16/01 Page 8 of 961 PageID #205
Confidential - Subject to Further Confidentiality Review

```
 1       certain areas of questioning, she will ask for

 2       help from the translator, who is present.

 3            MR. LAWSON:  That's my understanding.

 4            And we will also have it noted on the

 5       transcript where the translator is assisting,

 6       just to make that clear in the record that we're

 7       making today.

 8            MR. ALBANIS:  Very good.

 9            DAILYN MARTINEZ, called as a witness by the

10  Defendants, having been first duly sworn, testified

11  as follows:

12                    DIRECT EXAMINATION

13  BY MR. LAWSON:

14       Q.   Could you please state your name for the

15  court reporter?

16       A.   Dailyn Martinez.

17       Q.   Thank you for coming in today, Ms. Martinez.

18  We appreciate your time.  My name is Matt Lawson; I'm

19  an attorney for Taishan Gypsum Company, Limited.  I

20  had some questions today about your home and the

21  damages that you are seeking in this lawsuit.

22            I wanted to ask first:  Have you ever been in

23  a deposition like this before?

24       A.   No.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1528 of 1680
Case 1:11-cv-00377-MSD-TJK Document 143-3 Filed 07/18/11 Page 9 of 61 PageID# 2006
Confidential - Subject to Further Confidentiality Review

```
1        Q.   Have you ever been involved in a lawsuit

2    before?

3        A.   No.

4        Q.   Now, do you understand that a moment ago you

5    were sworn in to tell the truth during today's

6    deposition?

7        A.   Yes.

8        Q.   And can you think of any reason why you

9    won't -- will not be able to tell the truth today

10   during this deposition?

11       A.   (Translated through interpreter.)  No.  Only

12   the truth.

13       Q.   And do you understand that the court reporter

14   here is writing out everything that we say,

15   transcribing it for us today?

16       A.   Yes.

17       Q.   Now, because she is writing everything down

18   that we say, it's very important that we take our

19   time and pause between my questions and your answers

20   so she has an opportunity to be able to write

21   everything down that we're saying and so we don't

22   talk over each other.

23            Do you understand that?

24       A.   Yes.
```

```
 1        Q.   It's also important that any answers that you

 2   give, you give verbally instead of nodding, because

 3   she needs to be able to write down what you say.  If

 4   you nod, she can't say whether you are saying yes or

 5   no to the answers to my questions.

 6        A.   Okay.

 7        Q.   If any of my questions don't seem clear, you

 8   can ask me to rephrase it.  I'm happy to ask it in a

 9   different way.

10        A.   Okay.

11        Q.   And you may at points hear objections from

12   your attorney.  If he's objecting, let him finish and

13   complete his objection.  If he instructs you not to

14   answer, then you do not need to answer.  But if he

15   does not instruct you not to answer, then I would ask

16   that you answer my question to the best of your

17   ability, okay?

18        A.   Okay.

19        Q.   If you need to take a break at any point,

20   please let me know.  We can take a break at any time.

21   Just tell me, I need to take a break.

22        A.   Okay.

23        Q.   Did you meet with your lawyer prior to today

24   to prepare for this deposition?
```

```
 1        A.    Last month and this Monday.

 2        Q.    And about for how long did you meet during

 3   those meetings, how many hours?

 4        A.    A couple hours.

 5        Q.    Each time about a couple hours?

 6        A.    Yes.

 7        Q.    Did you review any documents?

 8        A.    Yes.

 9        Q.    And do you remember about how many documents

10   you looked at?

11        A.    So many.

12        Q.    And were all of those documents documents

13   that you had given to your lawyer before and -- for

14   this lawsuit?

15              THE INTERPRETER:  I'm sorry.  Can you repeat

16        the question?

17   BY MR. LAWSON:

18        Q.    Were all the documents that you reviewed

19   documents that you had given to your lawyer before?

20        A.    Yes.

21        Q.    And do you believe that you have given your

22   lawyer all of the documents that you have in your

23   possession that you think relate to your lawsuit in

24   this case?
```

```
 1        A.    Yes.

 2        Q.    Ms. Martinez, where are you employed?

 3        A.    I clean houses.

 4        Q.    About how many houses do you clean regularly?

 5        A.    In a day?

 6        Q.    I guess in a month, how many would you say

 7   that you work on?

 8        A.    About 20 houses in a month.

 9        Q.    About how many days a week do you work?

10        A.    Monday to Friday.

11        Q.    Are you going to be working later on this

12   afternoon?

13        A.    (Nodding head.)

14        Q.    And is that the reason we need to stop around

15   noon or so today?

16        A.    Yes.

17        Q.    And I'm sorry.  A second ago when I asked you

18   if you were going to be working later on this

19   afternoon, you nodded but you were saying yes, is

20   that right, that you are working later this

21   afternoon?

22        A.    Yes.

23        Q.    And I only ask that again just because, as we

24   said before, we need to make sure that all of your
```

```
1    answers are verbal, that you say them out loud.

2            Do you understand that?

3    A.   Yes.

4    Q.   Thank you.

5            It takes a little getting used do.  It's a

6    strange way to talk, being on the record like this.

7            Are you married?

8    A.   Yes.

9    Q.   And how long have you been married?

10   A.   24 years.

11   Q.   And do you have any children?

12   A.   Yes.

13   Q.   How many?

14   A.   One.

15   Q.   And how old is your child?

16   A.   20 years old.

17   Q.   What is the address of your home that you

18   allege was damaged by Chinese drywall?

19   A.   1624 Northwest 37th Avenue, Cape Coral,

20   Florida 33993.

21   Q.   And do you still own that home today?

22   A.   Yes.

23   Q.   How long have you owned that home?

24   A.   I bought the home in September 2008; 16
```

```
 1    September 2008.

 2         Q.   So you have owned it for a little over ten

 3    years?

 4         A.   Yes.

 5         Q.   And have you owned it during that entire ten

 6    years?

 7         A.   Yes.

 8         Q.   And who owns it other than you, if anyone?

 9    Does your husband also own the home?

10         A.   No.

11         Q.   You are the sole owner of the home?

12         A.   Yes.

13         Q.   How many bedrooms are in the home?

14         A.   Three.

15         Q.   And how many bathrooms?

16         A.   Two.

17         Q.   Has that changed at any time since you have

18    owned the home?

19         A.   No.

20         Q.   Have you ever done any work to change the

21    size of the home?

22         A.   No.

23         Q.   And can you think of any improvements or

24    additions that you have made to the inside of the
```

```
 1    home other than decorations since you have lived

 2    there?

 3         A.   (Translated through interpreter.)  Change the

 4    air-conditioning, which broke.  Change the dryer,

 5    change the washer, the kitchen, the microwave, the

 6    water heater, the televisions.

 7         Q.   So you have had to replace a number of

 8    appliances and electronic devices inside of the home?

 9         A.   Yes.

10         Q.   And when did you begin to have to replace or

11    repair appliances and electronic devices in the home?

12         A.   (Translated through interpreter.)  In the

13    last nine years.  I can't remember the dates.  But

14    throughout all these years things have been breaking

15    down, and I have been repairing them.

16         Q.   In this last year in 2018, have you had to

17    repair or replace any electronics or appliances in

18    your home?

19         A.   (Translated through interpreter.)  I can't

20    remember.  I think in 2017, I bought the refrigerator

21    and the stove and the microwave.

22         Q.   Do you think that you've submitted to your

23    lawyer all of the receipts and proof of payment for

24    the items that you have replaced or repaired over the
```

```
1    last decade?

2         A.    Yes.

3         Q.    And you can't think of any other ones that

4    you haven't given to your lawyer?

5         A.    No.

6         Q.    Where do you live today?

7         A.    Where I live?

8         Q.    Yes.  Do you live in --

9         A.    In that house.

10        Q.    -- you live in the house that we just

11   discussed?

12        A.    Yes.

13        Q.    In the last decade, how many years have you

14   lived in the home, as opposed to somewhere else?

15        A.    (Translated through interpreter.)  In 2010, I

16   bought an RV, and I put it behind the house.  And we

17   lived for two years in that RV.  In 2012, we moved to

18   another house.  And from 2012 to 2013, we lived in

19   two different houses.  In 2013, we returned, and from

20   then, we continue living in that house until today.

21        Q.    Do you remember how much you paid for your

22   house when you bought it?

23        A.    165.

24        Q.    And you said earlier that you bought it in
```

Confidential - Subject to Further Confidentiality Review

```
 1   2008?

 2       A.   2008.

 3       Q.   Do you remember when the house was built

 4   before you bought it?

 5       A.   2005.

 6       Q.   And between 2005 and when you bought the

 7   house in 2008, do you know if anyone else lived in

 8   the house?

 9       A.   I don't know.

10       Q.   Did any of your neighbors ever tell you that

11   someone had lived in the house before you?

12       A.   Nobody tell me anything.

13       Q.   Do you -- have you ever received mail to your

14   house with someone else's name on it but your

15   address?

16       A.   No.

17       Q.   Do you remember who you bought the house

18   from?

19       A.   Foreclosure, the bank.

20       Q.   So the home -- you purchased the home in a

21   foreclosure sale?

22       A.   Yes.

23       Q.   Did you have an opportunity to go into the

24   house and look at it before you bought it?
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1537 of 1680
Case 2:11-cv-00377-MSD-RJK Document 142 Filed 01/18/19 Page 180 of 561 PageID# 2015
Confidential - Subject to Further Confidentiality Review

1    A.   Yes.

2    Q.   And what did you think of the house when you

3    went into it and looked in it before you bought it?

4    A.   The house, it was beautiful.  I like it.

5    That's why I buy.

6    Q.   Did you notice any issues with the house or

7    problems with the house that you did not like when

8    you looked at it before you bought it?

9    A.   I look some, like, faucets and things like

10   that, they're corrosion, but I thought maybe it's

11   because the house was built in 2005 and I buy in

12   2008, maybe they're -- you know, I need to change.

13   So that's no big deal.  So that's what we do, you

14   know.  When we bought the house, we changed the

15   faucets and things like that, and we thought we

16   resolved the problem, you know.  We looked at

17   and . . .

18   Q.   So you noticed that there was corrosion on

19   the faucets?

20   A.   Yes.

21   Q.   Did you see corrosion anywhere else on the

22   house when you looked at it before you bought it?

23   A.   No.

24   Q.   Just on the faucets?

```
1        A.    Just on the faucets.

2        Q.    And when you moved in, you replaced the

3   faucets?

4        A.    Yes.

5        Q.    And did that corrosion come back on those

6   faucets?

7        A.    Yes.

8        Q.    And did you notice corrosion anywhere else in

9   the house after that?

10       A.    Yes.

11       Q.    Where?

12       A.    In the air condition, in the outlets for the

13  lights; that's where we found that.

14       Q.    Did you have any issues with the electricity

15  working in the house?

16       A.    No.

17       Q.    All the lights worked?

18       A.    Yes.

19       Q.    But you had issues with the air-conditioning

20  unit.  Is that right?

21       A.    Yeah.  After . . .

22       Q.    After you bought the house?

23       A.    Uh-huh.

24       Q.    When did you first have an issue with the
```

```
 1    air-conditioning?

 2         A.    I don't remember.

 3         Q.    When you did have an issue with the

 4    air-conditioning, what happened with the

 5    air-conditioning?

 6         A.    It don't cool the house and it freezing the

 7    coil.

 8         Q.    The coil?

 9         A.    The coil.

10         Q.    And at that time when you had those problems

11    with the air-conditioning, you called someone to fix

12    it?

13         A.    Yes.

14         Q.    Other than you, your husband, and your child,

15    has anyone else lived in the home since you bought it

16    in 2008?

17         A.    No.

18         Q.    During the time you were not living in the

19    home, did anyone else live in the home?

20         A.    No.

21         Q.    Have you ever attempted or someone that you

22    have hired attempted to pull the Chinese drywall out

23    of the house or take it out?

24         A.    No.
```

```
 1        Q.   Have you gotten a quote from anyone about how
 2   much it would cost to remove the Chinese drywall from
 3   your house?
 4        A.   Yes.
 5        Q.   How many times have you done that?
 6        A.   Two.
 7        Q.   When was the first time, if you remember?
 8        A.   2012.
 9        Q.   And to your knowledge, when was the second
10   time that you got a quote for someone to remove the
11   Chinese drywall from the house?
12        A.   Yesterday.  This morning I brought.
13        Q.   You did it this morning?
14        A.   Uh-huh.
15        Q.   How did you do it this morning?  Did you call
16   them?
17        A.   I call them, he come and then he send me the
18   estimate this morning.
19        Q.   Okay.  You received the estimate this
20   morning?
21        A.   Yes.
22        Q.   And when did you -- when did they come to
23   your house to look at it to assess how much it would
24   cost to pull the drywall out of the house?
```

Confidential - Subject to Further Confidentiality Review

```
1        A.   For second time?

2        Q.   Yeah.  For the second time this month.

3        A.   Last week.

4        Q.   All right.  They came out to your house last

5   week for about how long to look at the house?

6        A.   A couple hours.

7        Q.   And do you remember what they did when they

8   came over for those couple hours, what they looked

9   at?

10       A.   He looked everything.

11       Q.   Did you call this company to get the quote,

12  or did your lawyer?

13       A.   I called.

14       Q.   And why did you get another quote after

15  getting a quote back in 2012?

16       A.   Because the 2012 is long time ago, and

17  assuming it needs to update another estimate for now,

18  since everything's changed for the price and stuff

19  there's going to be now.

20       Q.   Do you think that the work that needs to be

21  done today in 2018 is any different than what would

22  have needed to be done to your home back in 2012?

23            MR. ALBANIS:  Object to the form.

24            But you may answer, if you can.
```

```
 1              THE WITNESS:  (Through the interpreter.)  Can

 2         you ask me the question again?

 3              MR. LAWSON:  Sure.

 4    BY MR. LAWSON:

 5         Q.   Do you think the work that they need to do to

 6    fix your home is different today in 2018 than the

 7    work they would have needed to do back in 2012?

 8              MR. ALBANIS:  Same -- same objection.

 9              But you may answer, if you can.

10              THE WITNESS:  (Translated through

11         interpreter.)  No.  I don't want to answer.  I

12         don't know anything about that work.

13    BY MR. LAWSON:

14         Q.   But you thought that the cost of the work

15    might be different in 2018 than it was back in 2012,

16    since six years have passed.  Is that right?

17         A.   Yeah.  That's what I thought.

18         Q.   And that's why you got a second quote?

19         A.   Uh-huh.

20         Q.   And that's a yes?

21         A.   Yes.

22              MR. ALBANIS:  You have to say "yes" or

23         "no" --

24              THE WITNESS:  Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1543 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 24 of 61 PageID# 1021

Confidential - Subject to Further Confidentiality Review

```
 1              MR. ALBANIS:  -- as opposed to "uh-huh" or

 2         "uh-uh."

 3              MR. LAWSON:  You are doing very well.  I'm

 4         sorry about our rules that we have to follow

 5         here.

 6              THE WITNESS:  Okay.  No problem.

 7    BY MR. LAWSON:

 8         Q.   Do you believe that you have enough money to

 9    be able to pay for the remediation of your home or

10    fixing your home from Chinese drywall at this time?

11         A.   No.

12              MR. ALBANIS:  Object to the form.

13              But you may answer.

14              THE WITNESS:  No.

15    BY MR. LAWSON:

16         Q.   If you remember from receiving the quote this

17    morning, how much money did the most recent quote

18    from this month tell you it would cost to remediate

19    or fix your home?

20         A.   179-9 something.

21         Q.   We'll look at that quote later on, but I

22    just -- I didn't know if you remembered from talking

23    with them earlier today?

24         A.   Yeah.
```

```
 1              (Plaintiff's Exhibit 1 was marked for

 2      identification.)

 3      BY MR. LAWSON:

 4          Q.   Ms. Martinez, you have been handed a document

 5      that's been marked as Exhibit 1.  This is a Lee

 6      County Property Appraiser Online Parcel Inquiry.

 7              Do you see that at the top of the page?

 8          A.   Yes.

 9          Q.   And if you have any trouble reading the --

10      what I'm pointing to or pointing out on this page,

11      please just let us know.

12              I wanted to ask first if you see your name at

13      the top of this document where it says Owner of

14      Record?

15          A.   Yes.

16          Q.   And you are the owner of the property at

17      1624 Northwest 37th Avenue in Cape Coral, Florida,

18      correct?

19          A.   Yes.

20          Q.   And that's your address there under Site

21      Address.  Is that right?

22          A.   Yes.

23          Q.   And that's a picture of your house, correct?

24          A.   Yes.
```

```
 1        Q.    Have you seen a document like this before, a
 2   Lee County property record like this?
 3        A.    Yes.
 4        Q.    I'd like to turn your attention down to the
 5   box that says Current Working Values, just below the
 6   box that we were looking at a moment ago.
 7              Do you see that?
 8        A.    Yes.
 9        Q.    If you look down in that box, there's an item
10   that says Total Living Area, and it lists total
11   living area as 2,259.
12              Do you see that?
13        A.    Yes.
14        Q.    And would you say that it's accurate that
15   that reflects 2,259 square feet of total living area
16   in your home?
17        A.    Yes.
18        Q.    And do you have any reason to doubt that that
19   number of 2,259 square feet is accurate?
20        A.    No.
21        Q.    So that number sounds about right --
22        A.    Yes.
23        Q.    -- for the total living area of your home?
24        A.    It's right.
```

```
1       Q.   I'd like to turn your attention to the third

2   page of this document.  At the top right corner it

3   says Page 3 of 5.  And there's a box on that page

4   that says Sales/Transactions.

5            Do you see that?

6       A.   No.

7       Q.   Okay.  In the middle of the page it says at

8   the top in big letters, Sales/Transactions in the

9   middle.

10      A.   Yes.

11      Q.   Do you see that there?

12      A.   Yes.

13      Q.   And if you look on that table or list,

14  there's a series of numbers and dates of sales prices

15  and dates.  And I wanted to point out the sales --

16  excuse me, the date of November 28th, 2005.

17           Do you see that there?  There's a sales price

18  of $119,000 next to it, and it's from November 28th,

19  2005.

20      A.   Yes.

21      Q.   And you said before that you thought that the

22  home was built around 2005.  Is that right?

23      A.   Yes.

24      Q.   And this record shows a sale of the property
```

```
 1    for $119,000 around November 28th of 2005.

 2              Do you see that?

 3    A.   Yes.

 4    Q.   And then if you look above that, there's

 5    another sale that shows on September 16th of 2008.

 6              Do you see that?  It's 9/16/2008.

 7    A.   Yes.

 8    Q.   And that is for $165,000.

 9    A.   Yes.

10    Q.   And is that when you bought the house?

11    A.   Yes.

12    Q.   Okay.  And to your knowledge, the house has

13    never been sold after you bought it.  You have never

14    sold the house, correct?

15    A.   Never.

16    Q.   Have you ever put the house up for sale at

17    any time since you bought it?

18    A.   Never.

19    Q.   Have you thought about selling the house

20    since you bought it?

21    A.   No.

22    Q.   Do you own any other properties other than

23    your house?

24    A.   No.
```

```
1        Q.    If you look below to Building and

2    Construction Permit Data, it's the next box below

3    Sales and Transactions, there's a few items from

4    2008, 2010, and 2015 about building a fence on the

5    property.

6            Do you see that, or that a permit was given

7    for building a fence?

8        A.    Yes.

9        Q.    Did you build a fence on the property?

10       A.    Yes.

11       Q.    Okay.  When did you do that?

12       A.    The first one is September 18, 2008, and the

13   last one is in November 25, 2015.

14       Q.    Did you build a new fence, or did you repair

15   an old fence?  What happened with the fence?

16       A.    The last one I build the new one, because the

17   older one broke.

18       Q.    When do you believe that Chinese drywall was

19   installed in your house?

20       A.    (Translated through interpreter.)  When the

21   house was built.

22       Q.    Has anyone ever told you that before, that

23   the drywall from China was installed when the house

24   was built?
```

```
 1       A.   No.

 2       Q.   But you assumed that that's when it was put

 3   into the house, correct?

 4       A.   Yes.

 5       Q.   Do you know who built your house?

 6       A.   United Builder.  That's the company.

 7       Q.   You can set aside that other document.

 8            (Defendants' Exhibit 2 was marked for

 9   identification.)

10   BY MR. LAWSON:

11       Q.   And you have been handed a document that's

12   been marked as Exhibit 2.

13            Do you recognize this document?  Do you think

14   you have seen it before?

15       A.   Yes.

16       Q.   And what is it, if you know?

17       A.   (Translated through interpreter.)  I don't

18   know what it is.  But I know I have seen this.

19       Q.   Okay.  If you look at the top of the page,

20   it's titled Plaintiff Profile Form - Residential

21   Properties.  And if you look down to Section 1, which

22   is titled Property Information, the name of the

23   property owner is Dailyn Martinez.

24            And that's you, correct?
```

1     A.   Yes.

2     Q.   And that is your address listed below that,

3   1624 Northwest 37th Avenue.  Is that right?

4     A.   Yes.

5     Q.   And if you flip back to the fourth page of

6   this document -- it's marked as MartinezD00004 -- is

7   that your signature on that page?

8     A.   Yes.

9     Q.   And the date that appears that you signed

10  this was December 8th of 2009.  Is that right?

11    A.   Yes.

12    Q.   And according to this document, when you

13  signed this, you were stating under penalty of

14  perjury that the contents of this form were true or

15  correct to the best of your knowledge.

16         Is that your understanding?

17    A.   Yes.

18    Q.   Do you remember reviewing this form before

19  you signed it back in 2009?

20    A.   (Translated through interpreter.)  I didn't

21  understand.

22    Q.   Did you look at this form before you signed

23  this page on Page 4?

24    A.   Yes.

```
1      Q.   And looking at it today -- scratch that.

2           I wanted to ask you about Section 2.  It says

3      Insurance Information.  That's on the first page of

4      the document, and it's marked as MartinezD00001.

5      It's on the right-hand side.  And it asks for the

6      homeowner or renter's insurer for the home.

7           And it looks like you have listed Northern

8      Capital Insurance Company.

9           Do you see that there?

10     A.   Yes.

11     Q.   Was Northern Capital Insurance Company the

12     company that you had your homeowner's insurance with

13     back in 2009?

14     A.   Yes.

15     Q.   And do you still have your homeowner's

16     insurance with that company today?

17     A.   No.

18     Q.   Okay.  Who do you have as your homeowner's

19     insurance company now, if you remember?

20     A.   I don't remember.

21     Q.   Do you remember if you ever filed an

22     insurance claim with Northern Capital Insurance for

23     the damage to your home from Chinese drywall?

24     A.   No.
```

```
1        Q.    You did not file a claim?

2        A.    No.  I don't file a claim.

3        Q.    Do you know -- did you ever consider or think

4    about filing a claim?

5        A.    No.

6        Q.    Why is that?

7        A.    Because they're not going to pay me for any

8    Chinese drywall.

9        Q.    And why do you think they wouldn't have paid

10   you?

11       A.    It's nothing to do with insurance.

12       Q.    Did someone tell you that, or that is what

13   you thought?

14       A.    No.  That's what I thought.

15       Q.    If you look down to Section 3, it's called

16   Claimant Information.  It lists three different

17   people that live in the home; it appears to be you,

18   your husband, and your son.  Is this right?

19       A.    Yes.

20       Q.    And it said that you all moved in at the same

21   date on September 6th of 2008.  Is that right?

22       A.    Yeah.

23       Q.    And there is no date that is entered for when

24   you left the house, because this is before you left
```

```
 1    the house to live in the RV.  Is that right?

 2         A.   (Translated through interpreter.)  I don't

 3    understand the question.

 4         Q.   When we looked at the date that you signed

 5    this, it was in 2009, right?

 6         A.   (Translated through interpreter.)  Yes.

 7         Q.   And at that time in 2009, you were still

 8    living in your house, right?

 9         A.   (Translated through interpreter.)  Yes.

10         Q.   You didn't move out until 2010?

11         A.   (Translated through interpreter.)  I moved

12    to -- I moved in 2010 into the RV in that -- in the

13    house.

14         Q.   And the RV was parked outside of the house.

15    Is that right?

16         A.   In the back to the house.

17         Q.   But at the time that you filled out this

18    form, did you know that you had Chinese drywall in

19    your house?

20         A.   Yes.

21         Q.   And how did you know that?

22         A.   I've been sick, I've been -- find all those

23    corrosion, the Erickson inspection come in 2009 and

24    do the inspection and all the pictures and all that
```

Confidential - Subject to Further Confidentiality Review

```
 1    stuff and confirm I have Chinese drywall.

 2        Q.   Were you at the house when Erickson's did the

 3    inspection of your home in 2009?

 4        A.   Yes.

 5        Q.   And do you remember what they did while they

 6    were in your house?

 7        A.   So many pictures, so many holes in the wall,

 8    so many things they -- they've been doing.

 9        Q.   If you look to the second page of this

10    document, it's marked as MartinezD0002.  At the top

11    it lists inspection information, and you entered that

12    Erickson's Drying Systems performed an inspection on

13    your house.

14            Do you see that at the top?  It says

15    Erickson's Drying Systems?

16        A.   Yes.

17        Q.   Is that the same Erickson's that you were

18    just telling me about --

19        A.   Yes.

20        Q.   -- that did an inspection?

21            And it looks like you said that the

22    inspection happened on October 20th, 2009.

23            Do you see that?

24        A.   Yes.
```

```
 1        Q.    Does that sound right?

 2        A.    Yes.

 3        Q.    If you look below that, there's a section

 4   called Drywall Information, and it lists drywall

 5   manufacturers.

 6              Do you see that?

 7        A.    Yes.

 8        Q.    And the first drywall manufacturer that's

 9   listed is Knauf, it's K-n-a-u-f.

10              Do you see that?

11        A.    Yes.

12        Q.    And it said that there are markings on

13   drywall from Knauf-Tianjin.

14              Do you see that listed?

15        A.    Yes.

16        Q.    And it says that they're in the attic and the

17   pocket doors in the -- under the column that says

18   Location in Home.

19              Do you see that?

20        A.    Yes.

21        Q.    And also for markings on drywall, there's a

22   marking that is listed as "4 feet x by 12 feet x 1/2

23   inch" and it says "drywall" and then it says

24   "051303056094."
```

1          Do you see that?

2     A.   Yes.

3     Q.   And it says the location in the home for that

4   drywall marking is pocket doors.

5          Do you see that there?

6     A.   Yes.

7     Q.   Have you ever seen those drywall markings,

8   either of those that are listed -- or, any of those

9   that are listed, excuse me, in your house?  Have you

10  seen them?

11         MR. ALBANIS:  Object to the form.

12         And I will further state that, Counsel, you

13     have copies of the Erickson's inspection report,

14     as well as subsequent inspection reports, after

15     2009 from this particular property.

16         MR. LAWSON:  Yes.  And we'll get there.  I

17     want to ask her about this.

18  BY MR. LAWSON:

19    Q.   You've seen those markings inside of your

20  house before?

21    A.   Those rounds --

22         (Translated through interpreter.)  The round

23  things that they did in the wall?

24    Q.   They cut out round samples of drywall

```
 1    markings from the walls in your house.  Is that

 2    right?

 3        A.   Yes.

 4        Q.   And when I say "they," Erickson's Drying

 5    Systems cut out round sections of drywall.  Is that

 6    right?

 7        A.   Yes.

 8        Q.   And did those round sections show drywall

 9    markings on them?

10        A.   Yes.

11        Q.   And do you believe they show the markings

12    that are listed on this form that we just read?

13        A.   Yes.

14        Q.   You said a second ago that United Home

15    Builders built your home.  Is that right?

16        A.   Yes.

17        Q.   How do you know that?

18        A.   I have papers at home.

19        Q.   You have papers that show that they built the

20    house?

21        A.   Yes.

22        Q.   Have you ever talked with anyone at United

23    Home Builders before?

24        A.   No.
```

```
 1        Q.   Have you ever asked United Home Builders or

 2    has your attorney asked United Home Builders to

 3    repair your home?

 4             MR. ALBANIS:  I'm going to object to the form

 5        of that question.

 6             Ms. Martinez retained counsel in 2009 to

 7        represent her in this matter, and her attorney,

 8        in 2009, sent the requisite Section 558 notice to

 9        United Home Builders, which is attached to the

10        Plaintiff Profile Form.  Per her agreement at the

11        time with her counsel at the time, that was her

12        counsel's role, and her counsel fulfilled it.

13             Ms. Martinez is not an attorney.  She would

14        not have any information beyond what is attached

15        to this document about the notice that was sent

16        to the builder.

17    BY MR. LAWSON:

18        Q.   Ms. Martinez, going back to my question:  Do

19    you know whether you or an attorney that you have

20    hired has ever asked United Home Builders to repair

21    your home?

22        A.   (Translated through interpreter.)  I think

23    they were contacted, but I think they went into

24    bankruptcy.
```

```
 1         Q.    I'd like you to turn to Page 8 of this

 2   document.  It's marked as MartinezD0008 -- excuse me,

 3   MartinezD00008, and also to the ninth page as well --

 4   and excuse me, it's the eighth through 11th page

 5   where this letter is.  But we can focus first on the

 6   eighth page.

 7         This appears to be a letter from December 9,

 8   2009, from a Webb & Scarmozzino law firm to United

 9   Home Builders.

10         Do you see that?

11         A.    Yes.

12         Q.    And is that the law firm that you hired to

13   contact United Home Builders?

14         A.    Yes.

15         Q.    Do you know at -- if United Home Builders

16   ever offered to repair your home?

17         A.    They never do anything, because they went

18   bankruptcy.  They're not . . .

19         Q.    So they never repaired your home or attempted

20   to repair it?

21         A.    Never.

22         Q.    Turning to the 12th page of this document

23   marked as MartinezD00012, it's the first page after

24   this letter, does this look like an image of your
```

Confidential - Subject to Further Confidentiality Review

```
 1    home and the floor plan or footprint of your home?

 2        A.    Yes.

 3        Q.    And looking to the 13th page, there's a

 4    warranty deed.

 5              Do you see that?

 6        A.    Yes.

 7        Q.    Now, this appears to be a warranty deed from

 8    April 2nd, 2010.

 9              Do you see that?

10        A.    Yes.

11        Q.    And it's a warranty deed between a

12    Robert Pike and Jill Pike and you.  Is that right?

13        A.    Yes.

14        Q.    What is this deed for?

15        A.    (Translated through interpreter.)  This is

16    from when I bought the house.

17        Q.    You bought the house in 2008.  Isn't that

18    right?

19        A.    Yes.

20        Q.    And this deed says that it's from 2010.

21              Do you see that at the top?

22        A.    Oh, wait a second.  This is for the extra lot

23    that I bought in the back to the house --

24        Q.    Okay.
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    -- for $7,000, yes.

 2        Q.    So you purchased additional land, another lot

 3    that was behind your house?

 4        A.    Yes.

 5        Q.    Okay.  And you purchased it from

 6    Mr. and Mrs. Pike.  Is that right?

 7        A.    Yes.

 8        Q.    All right.  And you did that around 2010?

 9        A.    Yes.

10        Q.    Okay.  You can set that document aside.

11              A little bit earlier you said that you

12    thought you might have Chinese drywall because of the

13    corrosion that you were seeing in the house, correct?

14              MR. ALBANIS:  Object to the form.  It

15         mischaracterizes Ms. Martinez's testimony.

16              But you may answer, if you can.

17              THE INTERPRETER:  Do you want me to translate

18         the question and your objection?

19              MR. ALBANIS:  I think that would be best.

20              THE WITNESS:  (Translated through

21         interpreter.)  No.  I didn't think that it was

22         Chinese drywall when I saw that, because I didn't

23         know.  I -- I saw something strange, but I didn't

24         refer it -- relate it with Chinese drywall.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. LAWSON:

 2        Q.   When did you first hear about Chinese

 3    drywall?

 4        A.   (Translated through interpreter.)  When

 5    Erickson's came and did the inspection.  That's when

 6    I found out about Chinese drywall.

 7        Q.   Had you heard about other people having

 8    Chinese drywall in their homes before Erickson's did

 9    the inspection in your home?

10        A.   No.

11        Q.   You had never heard of Chinese drywall before

12    Erickson's told you that you had it?

13        A.   Never.

14        Q.   Why did you have Erickson's come to your

15    house?

16        A.   Because the attorney send them.

17        Q.   So you had hired an attorney already before

18    you knew that you had Chinese drywall.  Is that

19    right?

20        A.   Yes.

21        Q.   And why did you want to hire an attorney at

22    that time?

23        A.   Because I don't know where I do -- I don't

24    know what I'm -- just do anything about that.
```

```
 1        Q.    What problems were you having in your house
 2    that made you want to go hire an attorney?
 3        A.    Too many problems.  The more problems is the
 4    health problem.  We don't feel good.  We start
 5    getting headache.  We start bleeding by the nose.  We
 6    have respiratory problems.  We have all kinds of
 7    problems that we don't even know, you know, how to --
 8    how do we deal with that?
 9        Q.    And because of those health issues that you
10    were having, that's why you hired an attorney?
11        A.    To try to do what -- to see what they can do.
12        Q.    Back when you bought the house, did you ask
13    the bank or whoever was selling the house about the
14    corrosion that you saw in the house?
15        A.    (Translated through interpreter.)  The bank?
16    No.
17        Q.    Did you ask a realtor or anyone who was
18    showing you the house about the corrosion?
19        A.    (Translated through interpreter.)  I asked
20    the woman who sold me the house who is a friend of
21    me.  She's a realtor.  And she told me she didn't
22    know anything.
23        Q.    Did you have an inspection done of the house
24    before you bought it?
```

```
1       A.   No.

2       Q.   Why not?

3       A.   (Translated through interpreter.)  Because

4    nothing was known about Chinese drywall at that time.

5       Q.   Did you notice any kind of smell or unusual

6    odor inside of the house when you visited it before

7    you purchased it?

8       A.   Yes.

9       Q.   What was that smell?

10       A.   Like, when your house is closed and no air

11    condition and things, like, get inside to your nose,

12    the -- you have, like, a --

13            (Translated through interpreter.)  Like a

14    strange smell.

15       Q.   Did you ask about that smell with the woman

16    who was showing you the house?

17       A.   No.  Because I thought the house was empty

18    and there be no air condition, nothing in the house,

19    and I thought maybe, you know, it's because nobody

20    live in the house.  So that's that kind of smell.

21       Q.   Did that smell continue to be in the house

22    after you moved in and turned on the

23    air-conditioning?

24       A.   Yes.
```

```
1        Q.   And did it continue -- does it continue to be

2    in the house today?

3        A.   Yes.

4        Q.   Has it ever changed at all and gotten better

5    or worse?

6        A.   It's better.  Don't smell too much when the

7    air condition is on.  And -- but when I open the

8    windows or turn off the air condition, because it

9    broke, it get worse.

10       Q.   Is it worse in any part of the house compared

11   to the other parts of the house?

12       A.   No.

13       Q.   It's the same?

14       A.   The same.

15       Q.   Can you smell it when you're in the garage of

16   the house?

17       A.   Yes.  Not much when you open the garage.

18       Q.   You said earlier that the company that built

19   your house, United Home Builders, had gone bankrupt.

20   Is that right?

21       A.   Yes.

22       Q.   Do you know if they went bankrupt around the

23   time that you bought the house, or do you know when

24   that occurred?
```

```
 1              MR. ALBANIS:  Object to the form.

 2              But you may answer, if you know,

 3         Ms. Martinez.

 4              THE WITNESS:  I don't know.

 5    BY MR. LAWSON:

 6         Q.   You said that you bought the house in a

 7    foreclosure sale.  Is that right?

 8         A.   Yes.

 9         Q.   Do you know if United Home Builders owned the

10    home before you owned the home?

11         A.   I don't know.

12              (Defendants' Exhibit 3 was marked for

13    identification.)

14    BY MR. LAWSON:

15         Q.   You have been handed a document that's been

16    marked as Exhibit 3.

17              Do you recognize this document?

18         A.   Yes.

19         Q.   And what is it?

20         A.   It's the Erickson's inspection they do in my

21    house.

22         Q.   And this is the inspection that was performed

23    on October 20th, 2009.  Is that right?

24         A.   Yes.
```

```
 1        Q.    And when this inspection was performed, that

 2    was the first time that you knew that you had Chinese

 3    drywall.  Is that right?

 4        A.    Yes.

 5        Q.    Earlier you told me about corrosion and

 6    health issues and problems with your air-conditioning

 7    that you were dealing with, as well as a smell inside

 8    of the house, correct?

 9        A.    Yes.

10        Q.    Were you dealing with all of those issues

11    before this inspection happened in October of 2009?

12        A.    Yes.

13        Q.    Were there any other issues or problems that

14    you had in your house that you think are related to

15    Chinese drywall other than the ones that we just

16    talked about?

17             MR. ALBANIS:  Object to the form.

18             But you may answer, if you know,

19        Ms. Martinez.

20             Are you talking about back in 2009, or are

21        you talking through the present?

22             MR. LAWSON:  Let's first talk before 2009.

23        That's fair.

24    ///
```

1   BY MR. LAWSON:

2       Q.   Did you have any other problems other than

3   the ones that we just listed before this inspection

4   in 2009?

5            MR. ALBANIS:  Object to the form.

6            But you may answer, Ms. Martinez.

7            THE WITNESS:  Not that I remember.

8   BY MR. LAWSON:

9       Q.   Can you think of any different problems that

10  you had with your home or living in your home because

11  of Chinese drywall after this inspection?

12           MR. ALBANIS:  Object to the form, because of

13      the -- because it's unclear if you are limiting

14      it -- if you are limiting your question to a

15      particular time period.

16  BY MR. LAWSON:

17      Q.   And to clarify, Ms. Martinez, I'm asking

18  about the period after this inspection from 2009

19  until today.

20      A.   (Translated through interpreter.)  The thing

21  is, I don't understand the question.

22      Q.   Are you having the same issues with your home

23  related to corrosion, health issues, air-conditioning

24  problems that -- and the smell in the home from 2009

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1569 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 50 of 61 PageID# 2047
Confidential - Subject to Further Confidentiality Review

```
1    until today that you were having before this

2    inspection?

3              MR. ALBANIS:  Object to the form.

4              But you may answer, Ms. Martinez.

5              THE WITNESS:  Yes.

6    BY MR. LAWSON:

7        Q.    Did you have the health issues that you

8    discussed during the time that you lived outside of

9    your home in the RV or in the rental homes that you

10   brought up before?

11       A.    No.

12       Q.    But now that you have moved back into the

13   home, are you having those same issues?

14       A.    Yes.

15       Q.    Has the corrosion issue changed at all today,

16   in 2018?

17       A.    No.

18       Q.    And let's look at this inspection report.

19             You said earlier that you were at your house

20   when this inspection was occurring, correct?

21       A.    Yes.

22       Q.    And if you turn to the second, third, and

23   fourth pages of this document, there's a series of

24   photographs.
```

```
1              Do you see those?

2       A.    Yes.

3       Q.    Looking at these photos, can you tell that

4   they were taken at your home?

5       A.    Yes.

6       Q.    And on the first page of photographs,

7   specifically, that is an image of the address of your

8   home and the exterior of your home, right?

9       A.    Yes.

10      Q.    The images on the first page of photographs

11  of the faucet on the right side, that is the

12  corrosion on the faucet that you were talking about

13  earlier, correct?

14      A.    Yes.

15      Q.    And you recall the inspector cutting out

16  samples of drywall from your house during this

17  inspection?

18      A.    Yes.

19      Q.    Are those the same samples that you brought

20  with you here today?

21      A.    Yes.

22      Q.    When you had another inspection of your home

23  later on, did they also cut out samples from the

24  wall?
```

```
 1      A.   No.

 2           MR. ALBANIS:  Well, it may help to refer her

 3      to the inspection that you are referring to.

 4           MR. LAWSON:  And we will get there.  I just

 5      want to understand her recollection.

 6  BY MR. LAWSON:

 7      Q.   As a result of this inspection, what did the

 8  inspector tell you about your home after they had

 9  done the inspection?

10      A.   That I have Chinese drywall Knauf.

11      Q.   That you had Knauf Chinese drywall?

12      A.   Yes.

13      Q.   And are those the images that you can see on

14  the third -- or, the second page of pictures in the

15  upper right corner?

16           Do you see that picture of Knauf drywall?

17      A.   Yes.

18      Q.   And then there's also some additional ones in

19  the third page of photographs on the left-hand side.

20           Are those what you are referring to?

21      A.   Yes.

22           MR. ALBANIS:  So for the record, the pictures

23      of the Knauf drywall are on Page 3, 4, 6, 7, 8 of

24      Exhibit 3.
```

```
 1    BY MR. LAWSON:

 2       Q.   Going back to the first page of this report,

 3    there's a chart that discusses different items in the

 4    home, and one of them is personal property.  It's the

 5    second to last item on the chart.

 6            Do you see that?

 7       A.   Yes.

 8       Q.   And it says that "no personal items presented

 9    for observation."

10            Do you see that?

11       A.   Yes.

12       Q.   Do you recall if you showed the inspector any

13    personal property items in your home that you felt

14    had been damaged by Chinese drywall?

15       A.   (Translated through interpreter.)  I can't

16    remember.  This was in 2009.

17       Q.   Do you believe that you have personal items

18    that have been damaged by Chinese drywall?

19       A.   Yes.

20       Q.   What kind of items are -- do you think have

21    been damaged by Chinese drywall in your house?

22       A.   (Translated through interpreter.)

23    Everything.  The stove, the microwave, the

24    refrigerator, the washer, the dryer, the
```

1     air-conditioning, the water heater, the cameras, the

2     televisions, the electric -- the electric pot, the

3     coffee maker, the watch stopped, all of the jewelry

4     that are not gold turned black.  The motorcycle, my

5     husband's motorcycle, all of that is metal, corroded.

6     Thousands of things.

7         Q.  It sounds like the metal or electrical items

8     in the house are the ones that you think have been

9     damaged by Chinese drywall?

10        MR. ALBANIS:  Object to the form.  That

11       mischaracterizes Ms. Martinez's testimony.

12          And I'll state further that we have submitted

13       and produced extensive documentation regarding

14       Ms. Martinez's personal property damage.  This

15       deposition is not a memory test, and she should

16       be referred to that extensive documentation if

17       you are going to ask her about such questions.

18        MR. LAWSON:  Pete, I appreciate that.  But

19       the speaking objections are just trying to inform

20       her of that.  And I'm asking her about her

21       recollection, which while not a memory test, is

22       the reason that we have her here instead of just

23       looking at documents.

24        So I am going to ask her questions, and I

Confidential - Subject to Further Confidentiality Review

```
1        would appreciate it if we don't try to instruct

2        the witness by referring to speaking objections.

3              MR. ALBANIS:  It is not an instruction at

4        all.  I am not coaching the witness.  I'm merely

5        stating a fact that we have produced extensive

6        documentation regarding Ms. Martinez's personal

7        property damage in this case.

8              THE WITNESS:  (Translated through

9        interpreter.)  What did he say?

10             MR. LAWSON:  You can translate it back for

11       her, if you want.

12             Pete, do you want that to be translated for

13       her?

14             MR. ALBANIS:  I think that would be best.

15             MR. LAWSON:  I would also note for the record

16       that for the first time, I believe just the other

17       day, we received a number, I think it was

18       yesterday, of $59,532.65 for personal property

19       damages that we had not known until the day

20       before this deposition.

21             So I think it is perfectly proper to be

22       asking today if there are any additional items in

23       asking for Ms. Martinez's recollection, because

24       it appears to be a moving target and changing on
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1575 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/01 Page 56 of 61 PageID# 053
Confidential - Subject to Further confidentiality Review

 1          the eve of the deposition.

 2              So we will inquire fully, and we will be

 3          asking questions about both the documentation

 4          that we have just received and the numbers that

 5          we have just received and her recollection of

 6          what items she is seeking damages for in this

 7          case.

 8              MR. ALBANIS:  And, Counsel, as you know, we

 9          have an obligation per Rule 26 of the Federal

10          Rules of Civil Procedure to amend our discovery

11          responses if we obtain new information or

12          documentation from our client, and we have

13          provided all of the supporting documentation that

14          supports the $59,000 and change number that you

15          just referenced.

16              MR. MOREN:  I would like to add for the

17          record in view of BNBM that this information was

18          just dumped on us on the eve of the deposition

19          and may not have been proper time for us to

20          review.  If counsel is not fully able to explore

21          these questions at this deposition, we may need

22          to continue at a later date.

23              MR. ALBANIS:  Understood.

24              MR. LAWSON:  Let's go off the record.

```
 1              (Recess from 8:51 until 9:04 a.m.)

 2          MR. ALBANIS:  As I just told you, Matt,

 3      during the break, I had an opportunity to check

 4      with my staff, and I just want to confirm for the

 5      record that what I believed before, which is that

 6      I think it's an unfair characterization to

 7      suggest that we "dumped," to use your word,

 8      Mr. Moren, this new information on you on the eve

 9      of the deposition, we actually produced the

10      following documents on the following dates that

11      support the personal property damages claim:

12      Document Number 150392 was produced on

13      October 13, 2013; Document Number 150393 was

14      produced on October 13, 2013; Document Number

15      136599 was produced on January 30th, 2015;

16      Document Number 365817 was produced on

17      November 30th, 2018; and Document Number 365944

18      was produced on December 4, 2018.

19          MR. LAWSON:  And I would like to clarify for

20      the record that my objection was to the latest

21      interrogatories that we received yesterday

22      evening for Ms. Martinez, which for the first

23      time listed the amount of personal property

24      damages that were actually being pursued by her
```

1    in this lawsuit.

2         As Mr. Albanis just explained, some of the

3    documentation that has been given for personal

4    property dated back to 2013, and there have been

5    claims submitted for that personal property --

6    some of it from 2013 -- in other settlements for

7    other lawsuits in this multidistrict litigation

8    that originated back in 2009.

9         So we received clarification on what was

10   being pursued in this lawsuit for the first time

11   yesterday evening, and want to get clarification

12   on that today, which is why I was asking

13   Ms. Martinez to her recollection which personal

14   property items she believes has been damaged in

15   her house so we can get that clarified and

16   explained in this deposition.

17        MR. ALBANIS:  And in response to that, I will

18   just say that we produced over the course of the

19   past five years numerous documents supporting the

20   $59,000 number.  The receipts that we previously

21   produced, which I identified earlier, support

22   that $59,000 number.

23        I would also point out that the defendants'

24   written discovery requests requested new

```
 1        information that had not already been produced,

 2        and as plaintiffs, we were operating with the

 3        understanding that documents that had previously

 4        been uploaded to the BrownGreer portal did not

 5        need to be uploaded again.

 6            MR. LAWSON:  We are of the understanding that

 7        all the documents in the BrownGreer portal were

 8        part of the case file as well.  However, it is

 9        not always clear which particular items are being

10        pursued in this action, as opposed to prior

11        actions, since that portal relates to other

12        lawsuits, other settlement programs.  And that is

13        the case here, where there is a claim form from

14        Ms. Martinez for the receipts from 2013 that you

15        have just listed, and there are also a series of

16        disbursements to Ms. Martinez that are in the

17        record showing payment for similar amounts to

18        those receipts.

19            And it was unclear to us until last evening

20        that Ms. Martinez is pursuing those same amounts

21        for those same receipts again against Taishan and

22        other defendants, as opposed to when she pursued

23        them from other defendants in this litigation.

24            MR. ALBANIS:  While she did previously submit
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1579 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/08/14 Page 60 of 61 PageID# 2057
Confidential - Subject to Further Confidentiality Review

1    receipts in regards to the Chinese drywall -- in

2    regard to the various Chinese drywall

3    settlements, she was not compensated in full at

4    the time when she received her compensation from

5    the Chinese drywall settlements for those claims.

6        And I'm sure that that's something that you

7    will get into, Matt, over time, and all of that

8    is fair game.  And those checks, of course, have

9    you produced to you.

10       MR. VERRIER:  And I would just add that I

11   object to using the phrase "previous action" she

12   submitted the claim.  There's one Chinese drywall

13   action.  Various settlements that are -- have

14   taken place, you know, may have been -- you know,

15   sought damage caused by the Chinese drywall and

16   gotten some partial compensation does not

17   foreclose her opportunity to get full

18   compensation for those damages.

19       MR. LAWSON:  And I think that is a

20   misstatement of the nature of this litigation.

21   There are hundreds of actions that have been

22   filed into the multidistrict litigation that

23   exists in the Eastern District of Louisiana, and

24   there have been multiple claims filed by

Case 2:09-md-02047-EEF-MBN   Document 22363-79   Filed 11/19/19   Page 1580 of 1680
Case 2:11-cv-00377-MSD-RJK   Document 42   Filed 01/18/19   Page 61 of 61   PageID# 2058
Confidential - Subject to Further Confidentiality Review

```
 1      different claimants into different actions

 2      against different defendants that do not relate

 3      to this particular lawsuit that we are dealing

 4      with in the Southern District of Florida now.

 5          And that is clear from Ms. Martinez's claim

 6      file on the BrownGreer online portal that she

 7      pursued other amounts of money from other

 8      defendants in the different actions that are in

 9      this multidistrict litigation.

10          MR. ALBANIS:  But there's no dispute that she

11      has not been compensated in full for her damages

12      in our view, number one.

13          And I think what Keith was getting at earlier

14      is that the Amorin complaint in the Southern

15      District of Florida and the Chinese drywall

16      multidistrict litigation that was proceeding and

17      continues to proceed in the Eastern District of

18      Louisiana are all under the umbrella of the

19      Chinese drywall litigation.

20          MR. LAWSON:  That's correct.  And we can

21      agree on that.

22          MR. MOREN:  I'll also point out then that

23      you, Keith, said that Ms. Martinez has received

24      partial compensation, and yet in the
```

```
1        interrogatory responses that she submitted last

2        night, she's seeking full compensation for all

3        these damages, which is double-dipping into --

4        with respect to the partial compensation that you

5        acknowledge and agreed.

6            I would also like to make a request for

7        signed responses to these interrogatories.

8            MR. ALBANIS:  We will provide verifications

9        to you as well.

10           MR. VERRIER:  And I would like -- I don't

11       believe you accurately characterized what I said.

12       I was referring to Mr. Lawson's statements

13       regarding the amount of money received in the --

14       that's indicated on the Plaintiff's Supplemental

15       Plaintiff Profile Form that he's about to get

16       into, as he noted; and that to the extent that

17       that's compensation for some damages, personal

18       property that she claimed, it's certainly not, as

19       Mr. Albanis has pointed out, full compensation

20       for damages in that regard, so . . .

21           MR. ALBANIS:  And we disagree with your

22       characterization --

23           MR. MOREN:  Well, I may have misunderstood

24       what you said, Keith.  And I'm certainly not
```

```
1          going to ask you to testify as to what

2          Ms. Martinez wrote in her --

3               MR. VERRIER:  And I would have to go back and

4          read the transcript.  Maybe I misspoke.  But I

5          think we both understand what we are saying now.

6               MR. LAWSON:  All right.  We have all talked

7          enough.  We are going to explore this issue

8          further to be able to see what damages for

9          personal property that Ms. Martinez is pursuing

10         in this lawsuit, and we will go through those

11         receipts and other compensation that she's

12         received.  And we would reserve the right to

13         pursue that line of inquiry in this deposition

14         and will pursue it.

15              MR. ALBANIS:  Great.

16              THE WITNESS:  (Through the interpreter.)  I

17         want to tell him something.  I have heard

18         everything that you have said, because you, the

19         interpreter, have explained it to me.

20              Tell him there's no money in the world

21         that -- the nine years that I have passed that my

22         family and I have suffered because of all of this

23         problem.  I'm a Cuban.  I came in a boat, in a

24         raft three days in the water with the -- with --
```

```
1          MR. ROTHENBERG:  Sharks.

2          THE WITNESS: (Through the interpreter.)  --

3     sharks next to me in order to arrive at this

4     country, this powerful country.  I have worked

5     very hard.  I bought my house, the American

6     dream, and look what's happened to us.

7     Everything for money.  Nine years.  Would anybody

8     believe that this would happen in this country?

9     Illnesses, many, many problems that you can't

10    even imagine.  That's what I wanted to tell you.

11         MR. LAWSON:  And, Ms. Martinez, I want you to

12    understand how much I appreciate you coming in

13    today and explaining all of that, and I

14    understand how difficult it must be to go through

15    all of this again.  But I want to give you this

16    opportunity to be able to have the -- to explain

17    to everyone what you have gone through, what you

18    have experienced, and what you believe has been

19    damaged or harmed in your life as a result of the

20    claims that you made in this lawsuit.

21         THE WITNESS:  And I really appreciate you

22    guys listen to me, because I'm waiting for nine

23    years to tell everybody or somebody like

24    Louisiana or -- I asked Pete, can I go to
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1584 of 1680
Case 2:11-cv-00377-MSD-RJK Document 42 Filed 01/18/19 Page 65 of 161 PageID# 2062

Confidential - Subject to Further Confidentiality Review

```
 1      Louisiana to talk to the people?  Can I -- listen

 2      to me?  Because nobody understand, because you

 3      are not -- live in the house like that.  When you

 4      don't know, when you don't pass in your --

 5          (Translated through interpreter.)  You don't

 6      live it in your own flesh, what is happening, you

 7      can imagine it, but you don't know.

 8          MR. LAWSON:  Well, I want you to know that we

 9      really want you to have the opportunity to be

10      able to fully explain everything today, and we'll

11      make sure to take the time to give you that

12      chance.

13          And if it's okay, unless you need a break, I

14      just want to keep moving forward because I know

15      you also have a limited amount of time here with

16      us today, and I want to give you the chance to be

17      able to talk through everything.

18          THE WITNESS:  Yeah, it's okay.  We can

19      continue.

20          MR. LAWSON:  Thank you.

21          MR. MOREN:  For the record, BNBM moves to

22      strike.

23          MR. ALBANIS:  Strike what?

24          MR. MOREN:  The discourse as not responsive
```

```
 1       to counsel's question.
 2            MR. ALBANIS:  We object to that.  We disagree
 3       that it's not responsive to the question.  And
 4       that's something that you can raise with the
 5       Court.
 6            MR. MOREN:  Just need to get the objection on
 7       the record, Pete.
 8            (Defendants' Exhibit 4 was marked for
 9   identification.)
10   BY MR. LAWSON:
11       Q.   Ms. Martinez, you have been handed a document
12   that's been marked as Exhibit 4.  This appears to be
13   a report from Chinese Drywall Screening from
14   March 21st, 2012.
15            Does that look correct to you?
16       A.   Yes.
17       Q.   Have you seen this document before?
18       A.   Yes.
19       Q.   And what is it?
20       A.   It's another inspection.  And this one,
21   that's the ones cut the little things; the other
22   ones, they're not doing.  But it's too many things,
23   too many papers, and too many years.  But this one, I
24   remember now the ones who do those, those samples
```

```
 1    that I have.

 2         Q.   So during this inspection, they cut circle

 3    samples --

 4         A.   Yes.

 5         Q.   -- of drywall from the walls in your house?

 6         A.   Yes.

 7         Q.   Is that right?

 8              And those are the circle samples that you

 9    brought in a bag with you here today?

10         A.   Yes.

11         Q.   I wanted to ask, it looks like there's five

12    or so of them in there, four or five, and I -- is

13    that all of the samples that were taken, or did you

14    have more of them at your home, or did the inspectors

15    keep them?  Do you know where the others are?

16              MR. ALBANIS:  Object to the form.

17              But you may answer.

18              THE WITNESS:  That's what they give to me.

19              MR. LAWSON:  Okay.

20              THE WITNESS:  That's why I keep it.

21    BY MR. LAWSON:

22         Q.   They gave you those samples?

23         A.   Yes.

24         Q.   And those are the ones you brought here
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1587 of 1680
Case 2:11-cv-00377-MSD-RJK Document 43 Filed 01/18/19 Page 68 of 161 PageID# 2065
Confidential - Subject to Further Confidentiality Review

```
 1    today?

 2         A.   Yes.

 3         Q.   All right.  Looking at this report, this

 4    inspection was taken around March 21st of 2012.  Is

 5    that right?

 6         A.   Yes.

 7         Q.   And were you at the home when the inspection

 8    took place?

 9         A.   Yes.

10         Q.   What do you remember about the inspection

11    that day?

12         A.   I remember they cut those walls.  They take

13    some pictures.  They write numbers on the back,

14    letters.  I'm sure maybe more things, but I don't

15    remember.

16         Q.   Do you remember them asking you any questions

17    during the inspection?

18         A.   No.

19         Q.   Do you remember how many people did the

20    inspection?

21         A.   No.

22         Q.   Do you remember how long they were there?

23         A.   A long time.

24         Q.   Hours?
```

```
1       A.    Hours.

2       Q.    And were you told that they were going to

3   test any of the samples of drywall that they took

4   from your house?

5       A.    I don't remember.

6       Q.    Do you ever remember seeing a report showing

7   that they had tested samples of drywall in your house

8   to see if it was Chinese drywall?

9       A.    I don't remember.

10      Q.    I'd like to turn your attention to the fifth

11  page of this report.  It's a photo array, like the

12  ones that we saw in the previous report, and there's

13  an image of what I believe is your house on the

14  outside.

15            Do you see that page?

16      A.    Yes.

17      Q.    Is it correct to say that that is your house

18  that's shown in the image there?

19      A.    Yes.

20      Q.    And that's the third photo on this page,

21  correct, the picture of the exterior of your house?

22      A.    Yes.

23      Q.    And then there are some photos of drywall

24  markings also on this first page of photos, correct?
```

```
 1        A.   Yes.

 2        Q.   And it appears that one of the drywall

 3   markings that's shown in the bottom left-hand corner,

 4   the fifth photo on this page, has a marking that

 5   reads 4 feet x 12, and then there's an F and an E

 6   that you can see in the image.

 7             Do you see that?

 8        A.   No.

 9        Q.   Okay.  In the bottom left-hand corner --

10        A.   Oh, yes.  I see.

11        Q.   And it says "garage ceiling" on a Post-it

12   note that's on that image?

13        A.   Yes.

14        Q.   And that's a Post-it that's shown in the

15   photograph, not actually a Post-it note on the page.

16             Have you seen that drywall marking inside of

17   your house at any time?

18        A.   Yes.

19        Q.   Where have you seen it?

20        A.   In the garage.

21        Q.   If you look in the upper right-hand corner of

22   that page, there's a picture of a drywall board that

23   has a drywall marking that says the word "drywall."

24   Do you see that, in the upper right on the page, the
```

1    second photograph on the page on the --

2        A.    Yes.

3        Q.    And do you see how the drywall marking just

4    says "drywall"?

5        A.    Yes.

6        Q.    Do you know how the Y is a little bit taller

7    than the other letters on the page?

8        A.    (Translated through interpreter.)  Is it this

9    one?

10       Q.    Yeah.  In the upper right-hand corner.  Yes,

11   that is the one that I'm referring to.

12             Do you see how the Y is a little bit taller

13   than the other letters on the page, that it sticks up

14   a little bit?

15       A.    Yes.

16       Q.    And that's the marking that you have seen

17   inside of the garage in your home?

18       A.    Yes.

19       Q.    Turning to the next page of photographs,

20   there are some images on the right-hand side of the

21   page.

22             Do you know what the images on the right side

23   of the page are of?

24       A.    (Translated through interpreter.)  Which one

```
 1    are you talking about?

 2        Q.   There are three pictures going down the right

 3    side of the page.  Do you know what those are

 4    pictures of?

 5        A.   (Translated through interpreter.)  These are

 6    the photos of the air conditioner.

 7        Q.   And to your knowledge, do they show corrosion

 8    on the air conditioner coils?

 9        A.   Yes.

10        Q.   I'd like to turn you to the pictures that are

11    on the sixth page of photos.  There are images on

12    this sixth page and also on the seventh page of this,

13    circular samples that were cut out of your walls that

14    we discussed earlier.

15             So if you can turn to the page with those

16    images, yes, of the circular samples.

17             Are these the circular samples that were cut

18    out of the walls in your home --

19        A.   Yes.

20        Q.   -- that we were talking about earlier?

21        A.   Yes.

22        Q.   And you brought some of those samples with

23    you here today.  Is that right?

24        A.   Yes.
```

```
1        Q.    And it appears that the inspector wrote on

2    the samples.  Do you see that, that they wrote

3    something on the samples?

4        A.    Yes.

5        Q.    And it looks like on one of them they wrote

6    "MB-1."  Do you see that on the first circular sample

7    image on the seventh page of the document?  It looks

8    like it was taken --

9        A.    Yes.

10       Q.    -- in the upper right-hand corner?

11             And that might be MB-2.  It's hard to be able

12   to tell.

13             But do you believe that that was taken from

14   the master bedroom or the master bathroom?

15       A.    Yes.  It could be.

16             MR. ALBANIS:  Matt, just a second.  I think a

17        moment ago you said the seventh page of the

18        document.  Just so the record is clear, I don't

19        think it's actually on the seventh page.

20             MR. LAWSON:  I'm sorry.  And let me make sure

21        of which page of photos that we're talking about

22        here.  I believe it's on the sixth page of

23        photos, excuse me.  And that's in the upper

24        right-hand corner of the sixth page of photos
```

```
1          there's a sample that appears that it has an

2          "MB-1" written on it; also an "M" below that.

3              MR. ALBANIS:  Okay.  So the sixth page of

4          photos would be the tenth page of the document.

5              MR. LAWSON:  That's correct.

6    BY MR. LAWSON:

7       Q.   Ms. Martinez, if you can turn to the last

8    page of the report.  There's a picture at the top of

9    that last page that is of a Knauf drywall board.

10           Do you see that?

11      A.   Yes.

12      Q.   And that's that same marking that we saw on

13   the previous inspection report that was a Knauf

14   marking.  Is that right?

15      A.   Yes.

16      Q.   And to your knowledge, you don't know if the

17   drywall boards and samples that were taken by the

18   inspector were ever tested?

19      A.   (Translated through interpreter.)  Yes.

20   Tests have been done.

21      Q.   When were tests done on the drywall samples?

22      A.   (Translated through interpreter.)  I don't

23   know the date.

24      Q.   How do you know that tests were done?
```

```
1       A.    (Translated through interpreter.)  Because

2    that was the result of the inspection.

3       Q.    The result of the inspection was that the

4    inspector told you that you had Chinese drywall in

5    your home, correct?

6       A.    Yes.

7       Q.    And do you know if the inspector ever gave

8    you another report other than this one?

9       A.    No.

10       Q.    And do you remember ever receiving a report

11    about tests that were done on the samples of the

12    drywall?

13       A.    (Translated through interpreter.)  I don't

14    remember.  It's a lot of paperwork.

15       Q.    You can set that report aside.

16            (Defendants' Exhibit 5 was marked for

17    identification.)

18    BY MR. LAWSON:

19       Q.    Ms. Martinez, you have been handed a document

20    that's been marked as Exhibit 5.

21            Have you seen this document before?

22       A.    Yes.

23       Q.    And to your knowledge, what is this document?

24       A.    (Translated through interpreter.)  This is --
```

 1    this is all I have given to my attorney, my property;

 2    everything that's been written here is what I have

 3    said; the RV when I bought it, everything that's

 4    happened.

 5        Q.   So I would represent to you that these are a

 6    series of questions or interrogatories that Taishan

 7    Gypsum Company, Limited and other defendants have

 8    served on you and your attorney and asked you to

 9    answer, and it appears that this document also

10    includes your answers to those questions.

11             Is that your understanding of what this

12    document is?

13        A.   Yes.

14        Q.   Looking to the first question that was asked

15    of you on the first page, it's number one; it states:

16    Identify all types of damages that you seek in this

17    lawsuit and specify amounts sought for each category.

18             Do you see that?

19        A.   Yes.

20        Q.   And specifically, within your answer, you

21    said that you are seeking personal property damage of

22    at least $59,532.65.

23             Do you see that?

24        A.   Yes.

```
1       Q.   We're going to get into some of the receipts

2    that you have submitted for personal property damage

3    in this case.  But I wanted to understand it today,

4    if that number is your best understanding of the

5    number that you are seeking for personal property

6    damages in this case?

7            MR. ALBANIS:  Object to the form.  And I

8        think it mischaracterizes what the document says.

9            But you may answer, if you know,

10       Ms. Martinez.

11   BY MR. LAWSON:

12       Q.   Let me actually rephrase the question.

13           Is it your understanding that you are seeking

14   at least $59,532.65 for personal property damages in

15   this lawsuit?

16       A.   (Translated through interpreter.)  To today's

17   date, yes.

18       Q.   Are you aware of any additional personal

19   property damages that are not part of that $59,532.65

20   that you are seeking in this lawsuit?

21           MR. ALBANIS:  Object to form.

22           THE WITNESS:  (Translated through

23       interpreter.)  Explain it to me again.

24   ///
```

```
 1   BY MR. LAWSON:

 2        Q.   Let me ask it in a different way.

 3             Have you submitted all of the receipts or

 4   proof of payment to your attorney for the personal

 5   property damages that you are seeking in this

 6   lawsuit?

 7        A.   (Translated through interpreter.)  To today's

 8   date, yes.

 9        Q.   And when you say "to today's date," do you

10   believe that there may be more receipts in the future

11   for future purchases or other items that are damaged

12   that you may seek in this lawsuit?

13        A.   (Translated through interpreter.)  It depends

14   on if this is resolved, because things continue to

15   be -- get broken if I don't repair the house.

16        Q.   But as of today's date, you believe you have

17   submitted all of the receipts and proof of payment

18   for the personal property damage that you have

19   suffered so far?

20             MR. ALBANIS:  Object to the form.

21             But you may answer, Ms. Martinez, if you

22        know.

23             THE WITNESS:  Yes.

24   ///
```

```
1    BY MR. LAWSON:

2         Q.   You can set that document aside.

3              (Defendants' Exhibit 6 was marked for

4    identification.)

5    BY MR. LAWSON:

6         Q.   You have been handed a document that's been

7    marked as Exhibit 6.

8              Do you recognize this document?

9         A.   Yes.

10        Q.   And what is it?

11        A.   (Translated through interpreter.)  This is

12   the contract when we bought the motorcycle.

13        Q.   And whose motorcycle is this?

14        A.   My husband's.

15        Q.   And did you purchase this motorcycle around

16   May of 2003?

17        A.   Yes.

18        Q.   Did you pay for it in cash when you purchased

19   it?

20        A.   No.

21        Q.   Did you have a payment plan to pay for the

22   motorcycle?

23        A.   Yes.

24        Q.   Do you remember when the motorcycle had been
```

```
 1   fully paid for?

 2       A.   (Through the interpreter.)  I don't remember.

 3       Q.   But as of today, has the motorcycle been

 4   fully paid for?

 5       A.   (Translated through interpreter.)  Yes.

 6       Q.   I'd like to turn your attention to the fourth

 7   page of this exhibit.  There's a photo of what

 8   appears to be a Kawasaki motorcycle.

 9            Do you see that photo?

10       A.   Yes.

11       Q.   And then there's another photo of the

12   motorcycle or of a motorcycle on the next page.

13            Do you see that?

14       A.   Yes.

15       Q.   And then it continues on to the pages that

16   follow to show three more images of a motorcycle.  Is

17   that right?

18       A.   Yes.

19       Q.   Are all of these pictures photos of the same

20   motorcycle?

21       A.   Yes.  The same motorcycle.

22       Q.   And these are all your husband's motorcycles.

23   Is that right?

24       A.   Yes.
```

```
1        Q.    Do you remember when these photos were taken?

2        A.    I don't remember.

3        Q.    What do these photos show on the motorcycle?

4        A.    (Translated through interpreter.)  All the

5    corrosion that it had -- it has in different places.

6        Q.    Does the motorcycle look like this today, the

7    same way that it looks in these photographs?

8        A.    (Translated through interpreter.)  The

9    motorcycle looks worse.

10        Q.    How does it look worse?

11        A.    (Translated through interpreter.)  Because we

12    sold it, and the man, he has it, it's still bad.

13    It's in conditions -- apart from the fact that it's

14    from 2013, it has many years -- 2003.

15        Q.    Do you know when you sold -- or, your husband

16    sold this motorcycle to someone else?

17        A.    (Translated through interpreter.)  I don't

18    remember.

19        Q.    Was it this year?

20        A.    (Translated through interpreter.)  I know

21    that it wasn't this year.

22        Q.    Was it after you had moved back into your

23    house?

24        A.    (Translated through interpreter.)  Yes.  Much
```

```
1    later.
2         Q.   So maybe in the last three years?
3         A.   (Translated through interpreter.)  Possible.
4         Q.   Do you know how much the motorcycle was sold
5    for?
6         A.   No.
7         Q.   And at this time, the motorcycle is around
8    15 years old.  Is that right?
9         A.   (Translated through interpreter.)  2003 to
10   2008 -- I'm sorry, correction, 2018.  Probably more
11   than --
12        Q.   Around 15 years?
13        A.   Around 15 years.
14        Q.   Did your husband buy a new motorcycle after
15   selling this one?
16        A.   No.
17        Q.   Was the motorcycle stored in the garage in
18   your home for a period of time?
19        A.   All the time.
20        Q.   So from when you moved in the house in 2008
21   until he sold it, was the motorcycle always stored in
22   the garage in your home?
23        A.   Always.
24        Q.   Did you ever consider storing it somewhere
```

Case 2:09-md-02045-EEF-MBN  Document 22363-78  Filed 11/19/19  Page 1602 of 1680
Case 2:11-cv-00372-MSD-RJK  Document 42  Filed 01/18/19  Page 33 of 61  PageID# 2080
Confidential - Subject to Further Confidentiality Review

```
1    other than in the garage?

2        A.   No.

3        Q.   Why not?

4        A.   (Through the interpreter.)  I don't have

5    another place in the house.  Where am I going to put

6    it, in the living room?  No.  Just in the garage

7    where things are stored.

8        Q.   Did you ever attempt to have someone repair

9    or -- or to repair the corrosion that was on the

10   motorcycle?

11       A.   No.

12       Q.   Did the motorcycle continue to work for the

13   length of the time that your husband owned it?

14       A.   (Translated through interpreter.)  Yes.

15       Q.   And he was able to drive it?

16       A.   Yes.

17            MR. MOREN:  Matt, are you all done with this

18       document?

19            MR. LAWSON:  I am.

20            MR. MOREN:  I have one follow-up question on

21       it.

22                     CROSS-EXAMINATION

23   BY MR. MOREN:

24       Q.   How much in damages are you seeking with
```

```
1    respect to the motorcycle?

2           MR. ALBANIS:  Object to the form.

3           But you may answer, Ms. Martinez, if you

4       know.

5           THE WITNESS:  (Translated through

6       interpreter.)  I don't know.

7           (Defendants' Exhibit 7 was marked for

8    identification.)

9                DIRECT EXAMINATION (Continued)

10   BY MR. LAWSON:

11      Q.   I have handed you a document that's been

12   marked as Exhibit 7.

13           Do you recognize this document?

14      A.   Yes.

15      Q.   What is it?

16      A.   It's a receipt for one of the times the air

17   condition broke.

18      Q.   And what about the back page, the second page

19   of the document?  What is that?

20      A.   This is a receipt when I buy the other air

21   condition.

22      Q.   You bought a new air-conditioning unit?

23      A.   Yes.

24      Q.   And it appears to show an air conditioner
```

```
 1    system and an air handler were purchased, on the left

 2    side of the document.

 3             Does that look right?

 4        A.   Yes.

 5        Q.   Do you know when you did this?

 6        A.   I think two years ago.

 7        Q.   And why do you think it was two years ago?

 8        A.   I'm guessing.  But I think it's two years

 9    ago.

10        Q.   And is it correct that you paid $4,100?

11        A.   Yes.

12        Q.   And does it say "paid" at the bottom

13    right-hand corner of that invoice?

14        A.   Yes.

15        Q.   Do you remember how you paid for it?

16        A.   Cash.

17        Q.   So on the first page, that's a different

18    air-conditioning payment, that receipt?

19        A.   Yes.

20        Q.   And it's a payment from 2012.  Is that right?

21        A.   Yes.

22        Q.   And how much money was it for?

23        A.   1,700.

24        Q.   And do you remember what you paid for at that
```

Confidential - Subject to Further Confidentiality Review

```
 1   time?

 2        A.   Do you say cash --

 3        Q.   I'm sorry.

 4             Do you remember what you were paying them for

 5   when you paid them the $1,700 for air-conditioning?

 6   Was it replacing something?  Was it for service?

 7        A.   Yes, replacing.

 8        Q.   What were you replacing?

 9        A.   Stuff outside, I remember; the big unit.

10        Q.   Replacing the outside air-conditioning unit?

11        A.   Yeah.

12        Q.   And you paid $1,700 for that?

13        A.   Yes.

14        Q.   Is that right?

15             Is it your understanding that you are seeking

16   compensation for both the $1,700 payment and this

17   $4,100 payment in your personal property damages in

18   this lawsuit?

19        A.   Yes.  I paid for.

20        Q.   And going back to the motorcycle that we just

21   discussed, when you included that invoice or receipt

22   for the payment of the motorcycle, were you seeking

23   compensation for the amount that you and your husband

24   paid for the motorcycle?
```

```
 1        A.   I don't think it's fair the whole amount,

 2   because it's old; but at least something.  But I

 3   don't know.

 4        Q.   But you do agree that your husband or you

 5   sold that motorcycle at some point, right?

 6        A.   Yes.

 7        Q.   But you don't know how much it was for?

 8        A.   No.

 9        Q.   All right.  You can set both of those -- oh,

10   excuse me.

11             Oh, I wanted to ask you, because we have seen

12   this on some documents.  If you look to the HVAC

13   service order invoice that's on the second page of

14   that document where it says "bill to," your name is

15   listed as Diaz.  Is that your name before you were

16   married?

17        A.   Yes -- no.

18        Q.   No?

19        A.   I'm sorry.  This is my -- when I'm married,

20   and the other ones when I'm not married.  So they --

21   we got some documents, Diaz, other ones Martinez.

22   But it's the same person.

23        Q.   Both are you?

24        A.   Both of me.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1607 of 1680
Case 2:11-cv-00377-MSD-RJK Document 143 Filed 01/18/19 Page 88 of 161 PageID# 2085
Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Thank you.

2          All right.  You can set that aside.

3          (Defendants' Exhibit 8 was marked for

4    identification.)

5    BY MR. LAWSON:

6    Q.    You have been handed a document that's been

7    marked as Exhibit 8.

8          Do you recognize this document?

9    A.    Yes.

10   Q.    What is it?

11   A.    It's a company for -- Water Medic -- whole

12   house reverse osmosis that I have at home.  They have

13   couple times, they have to come and repair.

14   Q.    And is this related to the pool at your home?

15   A.    No.  I don't have a pool.

16   Q.    What is this related to?

17   A.    For the water that I -- I don't have a city

18   water.  I have --

19   Q.    Well water?

20   A.    Well water.

21   Q.    Okay.  And there was an issue with the well

22   at your home?

23   A.    No.  The well -- I have a system.  They're --

24   because you can either use the well -- the home is

1    really bad water.  So this water, this is a filter

2    that we have to cook and things, you know, to use the

3    water, to be able to use the water.

4        Q.   Okay.  So this was service that was performed

5    by Water Medic on the filtration system?

6        A.   Yes.

7        Q.   It looks like a bubbler and a membrane for

8    the system that connects to your well?

9        A.   Yes.

10       Q.   And this service, it appears, was performed

11   in 2018.  So earlier this year?

12       A.   Yes.

13       Q.   And these are two different service times,

14   right?  There's a June 5th, 2018, and a

15   September 11th, 2018?

16       A.   Yes.

17       Q.   And what issues were you having with the

18   water system in your house?

19       A.   There's -- one day come home and no water.

20   So we had called, and they have to change membranes

21   and different kinds of things they have to change to

22   get it to work again and the water come back home.

23       Q.   How do you believe that this issue was

24   connected to the Chinese drywall in your home?

```
1      A.   Because they have to fix couple things.
2  They're corrosion, too, so . . .
3      Q.   Were parts of the system that they were
4  repairing corroded?
5      A.   Yes.
6      Q.   And they told you that, or could you see it?
7      A.   I can see.
8      Q.   Okay.  You saw corrosion on the system, and
9  they replaced the parts that were corroded?
10     A.   Yes.
11     Q.   It looks like for the first service there's
12 an amount that was paid.  It might be $260.  Is that
13 what you see at the bottom of the first invoice?
14     A.   Yes.
15     Q.   And you paid that amount to them?
16     A.   Yes.
17     Q.   Do you see anywhere on this invoice where it
18 says that the invoice was paid?
19     A.   I don't see in here they say it's paid, but I
20 know I pay --
21     Q.   Did you pay --
22     A.   -- because I pay it myself.
23     Q.   Excuse me.  I'm sorry.
24          Did you pay in cash or with a check?
```

```
 1       A.    Cash.

 2       Q.    And for the second invoice from September of

 3    2018, that appears to be for $660.  Did you pay with

 4    cash or check?

 5       A.    Yes, cash.

 6       Q.    But you believe that you paid it?

 7       A.    Yes, I paid.

 8       Q.    Do you see how on the item, the second item,

 9    the second invoice the words "no charge to you" are

10    circled?

11       A.    This circle here?

12       Q.    Uh-huh.

13       A.    Yeah, I see it.

14       Q.    Was that an indication that they did not

15    charge you for this service?

16       A.    Yeah.  They charged me.  They're -- nobody do

17    nothing for free, so . . .

18       Q.    So this was not covered by warranty when they

19    did this second service in September of 2018?

20       A.    No.

21       Q.    You had to pay the $660?

22       A.    Yes.

23       Q.    Okay.  Do you have a receipt for either of

24    these services other than these invoices?
```

```
 1        A.   No.  I have this -- the originals at home.

 2    So I give to them, and then they get copies.

 3        Q.   Okay.  And you see how both of these have a

 4    line for a signature in the bottom left corner.  That

 5    line says:  I hereby acknowledge the satisfactory

 6    completion of the above work.

 7             Do you see that?

 8        A.   Yes.

 9        Q.   Neither of those have your signature.  Is

10    that right?

11        A.   Yes.

12        Q.   So in this lawsuit, you are seeking

13    compensation for both of these payments, the $660

14    payment and the $260 payment.  Is that right?

15        A.   Yes.

16        Q.   You can set that aside.

17             (Defendants' Exhibit 9 was marked for

18    identification.)

19    BY MR. LAWSON:

20        Q.   Ms. Martinez, you have been handed a document

21    that's been marked as Exhibit 9.  At the top of it

22    it's titled Miscellaneous Claim Form Worksheet.

23             Do you see that?

24        A.   Yes.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Do you recognize this document?

 2      A.   Yes.

 3      Q.   What is it?

 4      A.   It is all the stuff that are broke and what I

 5  buy and the dates and what it is.  I do myself.

 6      Q.   So you filled out this form yourself?

 7      A.   Yes.

 8      Q.   Do you remember what this form was for, why

 9  you filled it out?

10      A.   Because it's a claim for the stuff that are

11  being broke and then we have to have it in file all

12  that stuff to -- so I remember all the stuff, because

13  it's been a lot of years, and then you can have

14  everything in your mind.

15      Q.   Did you fill this out so that you could

16  request that someone compensate you for the property

17  that you listed here that was damaged?

18      A.   Yes.

19      Q.   And to your knowledge, did you receive

20  payments for this damaged property?

21      A.   I receive some money, but not enough for the

22  whole entire stuff that be broke, for the other

23  name -- or Banner or something.

24      Q.   So you received some amount of money for the
```

```
 1    property that you listed here, right?

 2         A.   Yes.

 3         Q.   But you are saying it's not enough to cover

 4    all the things that have been damaged?

 5         A.   No, it's not.

 6         Q.   And looking at the dates on here, it appears

 7    that the latest dates that I can see are in 2013.

 8    Does that look right to you, looking through this

 9    document?

10         A.   Yes.

11         Q.   So do you think you filled this out around

12    2013?

13         A.   Probably.

14         Q.   Looking at the second page, there's a

15    signature line that is not filled in.

16              Do you see that?

17         A.   Yes.

18         Q.   Do you know if you ever signed this document?

19         A.   Well, if I don't see my signature here,

20    probably I don't sign this one.  I don't know.

21         Q.   And this Miscellaneous Claim Form Worksheet

22    has different categories of property that it asked

23    you about.  Is that right?  There's HVAC,

24    electronics, appliance, outside/garage, personal
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1614 of 1680
Case 2:11-cv-00377-MSD-RJK Document 43 Filed 01/18/19 Page 95 of 161 PageID# 992
Confidential - Subject to Further Confidentiality Review

```
1    items, furnishings, and other.  Is that right?

2        A.   Yes.

3        Q.   And you've listed all different kinds of

4    items on this list and put dates next to it.  Is that

5    right?

6        A.   Yes.

7        Q.   And those dates are when the item stopped

8    working.  Is that right?

9        A.   Some stuff they're stopped working.  Some

10   stuff they're broke.  Some stuff they have to buy

11   again.  That's all kinds of different situations in

12   here.

13       Q.   Are the dates when you purchased a

14   replacement for those items?

15       A.   I don't remember.  We have too many receipts

16   here that you can see it, and I don't remember.

17            (Defendants' Exhibit 10 was marked for

18   identification.)

19            THE WITNESS:  There's too many papers.

20   BY MR. LAWSON:

21       Q.   You have been handed a document that has been

22   marked as Exhibit 10.

23            Do you recognize this document?

24       A.   Yes.
```

```
 1      Q.   What is it?

 2      A.   The checks they send me for the Chinese

 3   Drywall Settlement Program.  So that's what got

 4   received.

 5      Q.   So after you submitted your claim form, you

 6   received money from the Chinese Drywall Settlement

 7   Program?

 8      A.   Yes.

 9      Q.   And these are the checks that you have

10   received from the Chinese Drywall Settlement Program.

11   Is that right?

12      A.   Yes.

13      Q.   And without asking you to add them up, do you

14   know about how much money that you have received from

15   the Chinese Drywall Settlement Program?

16      A.   About 33,000; around that.

17      Q.   And is it your understanding that the money

18   that you have received is compensating you for the

19   receipts and the payments that you made for the items

20   that we just went through on that miscellaneous claim

21   form?

22           MR. ALBANIS:  Object to the form.

23           And I'll further state that there were

24      numerous settlements within the Chinese Drywall
```

Confidential - Subject to Further Confidentiality Review

```
 1        Settlement Program.  Ms. Martinez provided

 2        documentation to my firm to make claims into the

 3        Chinese Drywall Settlement Program that we had a

 4        good-faith basis to make.

 5             The settlement administrator reviewed the

 6        claims and either granted the claim or marked the

 7        claim as deficient.  If the claim was marked as

 8        deficient, we were given an opportunity to

 9        provide additional documentation, and then the

10        settlement administrator made a determination as

11        to the claim and the value of it, if any.

12             I'm just mentioning this because I don't know

13        that Ms. Martinez would fully understand the

14        process for submitting the claims and for their

15        review and payment.

16             Having said all that, Ms. Martinez, you may

17        answer, if you understand the question.

18             THE INTERPRETER:  Can you ask the question

19        again?

20             MR. LAWSON:  Sure.

21   BY MR. LAWSON:

22        Q.   The amounts of money that you received from

23   the Chinese Drywall Settlement Program, those checks,

24   is it your understanding that you were being
```

Case 2:09-md-02047-EEF-MBN  Document 22363-78  Filed 11/19/19  Page 1617 of 1680
Case 2:09-md-02047-MSD-RJK  Document 42  Filed 01/18/19  Page 98 of 161  PageID# 2095
Confidential - Subject to Further Confidentiality Review

1    compensated for the payments and receipts that you

2    submitted in the miscellaneous claim form that we

3    were just looking at that listed all of those

4    different items?

5         MR. ALBANIS:  Same objection.

6         THE WITNESS:  (Translated through

7         interpreter.)  I don't really know how they

8         handle that.  I just know that it wasn't enough

9         from all the receipts that I sent.

10   BY MR. LAWSON:

11        Q.   And the receipts that you sent are in

12   Exhibit 9 that we just looked at, that miscellaneous

13   claim form.

14        MR. ALBANIS:  Object to the form.

15        But you may answer.

16        THE WITNESS:  (Translated through

17        interpreter.)  Yes.  They are receipts.

18   BY MR. LAWSON:

19        Q.   And the receipts that are behind the

20   miscellaneous claim form in Exhibit 9 are the

21   receipts for purchases that you made for the items

22   that are listed on the form.  Is that right?

23        A.   (Translated through interpreter.)  There are

24   receipts that are included here.  There are other

```
 1    receipts that are not, because it was not asked.

 2         Q.   And who did not ask for those receipts?

 3         A.   (Translated through interpreter.)  Here, in

 4    this.

 5         Q.   So are there items on this miscellaneous

 6    claim form where you do not have a receipt that is

 7    part of this Exhibit 9?

 8         A.   (Translated through interpreter.)  Yes.  You

 9    didn't understand me.

10              You didn't understand me.  The receipts are

11    here.  It's just that they are not -- it's not being

12    asked for here.

13         Q.   The form doesn't ask for the receipts.  Is

14    that what you are saying?

15         A.   (Translated through interpreter.)  Exactly.

16    Yes.

17         Q.   All right.  So when you look at the top of

18    the page, it says:  Please check all that apply and

19    provide the bill or invoice and proof of payment for

20    each expense you wish to claim.

21              Do you see that?

22         A.   Yes.

23         Q.   So it asks for bills or invoices and proof of

24    payment for each expense that you want to claim on
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1619 of 1680
confidential - Subject to Further confidentiality Review
2097

1    this form.  Is that right?

2         A.   Yes.

3         Q.   So you then listed all of these items on the

4    form, right?

5         A.   I did list and circle what they ask me here,

6    and I provide the receipt for stuff in the back.

7         Q.   Right.

8              So you listed items that you wanted to claim

9    on this form, and then you provided the receipts for

10   those items, right?

11        A.   Yes.

12        Q.   And so the items that are listed on here have

13   receipts for them in the pages that follow, right?

14        A.   Yes.

15        Q.   And as a result of filing this form, you

16   received, you said, around $33,000 or so through the

17   Chinese Drywall Settlement Program?

18        A.   Around that, yes.

19        Q.   And you believe that that is not enough money

20   to compensate you for these items that are listed

21   here?

22        A.   Yes.

23        Q.   And is it your understanding that the

24   receipts that are listed in Exhibit 9, if you added

```
1    them up to what you paid for, they would be more than

2    $33,000?

3    A.   Yes.

4    Q.   If they were less than $33,000, would you

5    agree that you had been fully compensated for these

6    items?

7         MR. ALBANIS:  Object to the form.

8         And I'll further state, as I indicated

9         earlier, there were numerous claims that were

10        made on Ms. Martinez's behalf in the Chinese

11        Drywall Settlement Program.  It was not just

12        related to the miscellaneous claim form which

13        would encompass the personal property damage that

14        you are currently discussing with the witness.

15        MR. LAWSON:  And I would like to put on the

16        record that this process would be much easier if

17        we could have both an accounting of which

18        particular items and receipts that Ms. Martinez

19        is pursuing in the $59,532.65 that she is

20        seeking, at least that amount in this lawsuit, as

21        well as which items she has been compensated for

22        previously.  But unfortunately, we don't have

23        that in the case file, and we're doing our best

24        to be able to sort that out with her today during
```

```
1        the deposition.

2            MR. ALBANIS:  Understood.

3            And if I can just state further, Matt, we've

4        encountered a similar issue in the -- in Vicki

5        and Paul Foster's priority claimants' deposition,

6        and your colleague, Aliyya Haque, and I are

7        working on a spreadsheet as well as some

8        further -- potentially further discovery

9        questions that Taishan intends to propound on us

10       to address this very issue or a similar issue.

11       So that may be something that we may want to

12       consider in this case.

13           MR. LAWSON:  Great.  Thank you.  And, yeah,

14       that's something that we can discuss after the

15       deposition.

16           I'm not sure if there's a question currently

17       that is being framed to you, so let me ask a new

18       one.

19           MR. VERRIER:  Is this a good time to take a

20       break?

21           MR. LAWSON:  That's fine.  Let's take a

22       break.  Yeah.

23           We can go off the record.

24           (Recess from 10:09 until 10:31 a.m.)
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1622 of 1680
confidential -- Subject to further confidentiality review
2100

```
 1    BY MR. LAWSON:

 2        Q.   Welcome back.

 3             I think before we were looking at Exhibit 9,

 4    which is this miscellaneous claim form.  If you can

 5    pull that back out.  It's the form that you filled

 6    out with different items and dates on it.

 7             We've gone over how there are receipts for

 8    the items that you have listed on this form a little

 9    bit earlier, right?

10        A.   Yes.

11        Q.   Do you know if there are any photographs of

12    the damage to these items that you submitted or that

13    you have in your possession?

14        A.   We have the pictures for the air condition

15    and the motorcycle.  Other than that, I don't think

16    we have more pictures.

17        Q.   Are the -- excuse me.  Is the motorcycle --

18    I'm sorry.  Go ahead.

19        A.   The faucets, we have the pictures for the

20    faucets and . . .

21        Q.   You mentioned the motorcycle.  Is the

22    motorcycle listed on this form anywhere?  I don't

23    know if I saw that.

24        A.   Yes.
```

```
1      Q.   Oh, I do see it.

2      A.   When they say "other," when they say "other."

3      Q.   Yes.  You listed the motorcycle under

4    "other."  I see that.

5           And that was the motorcycle that we looked at

6    earlier in the photographs and the receipt -- or,

7    invoice that you had --

8      A.   Yes.

9      Q.   -- that we discussed.  I believe that was

10   Exhibit 6 that we looked at a little bit earlier.

11     A.   Yes.

12     Q.   Can you -- do you see any items on this

13   miscellaneous claim form that you attempted to repair

14   first before you replaced them?

15     A.   The camera, I replace it, send them.  And

16   they bring me back another one, but the other ones

17   broke, too.  So that one, I'm trying to repair.

18          The microwave, I repair, too.  The washer and

19   dryer.  The TVs.  I don't see here -- I don't know if

20   I put in here the air condition, but I definitely --

21     Q.   It looks like --

22     A.   -- the refrigerator twice.  The A/C coils.

23   See, that's in here.

24     Q.   HVAC is its own section.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1624 of 1680
Case 2:09-md-02047-EEF-MBN Document 14436-8 Filed 01/13/13 Page 105 of 161 PageID#
Confidential - Subject to Further Confidentiality Review
2102

| 1 | A. Yeah. |
| 2 | Q. And that refers to the air-conditioning? |
| 3 | A. Yes. |
| 4 | Faucets. |

```
 1        A.   Yeah.

 2        Q.   And that refers to the air-conditioning?

 3        A.   Yes.

 4             Faucets.

 5        Q.   All of those items you tried to repair before

 6   you replaced them?

 7        A.   Yes.

 8        Q.   But you ultimately did replace all of them?

 9        A.   Yes.

10        Q.   And that is what is reflected on this form,

11   all of the items that you have replaced over time?

12        A.   Yes.

13        Q.   What happened with the cell phones that are

14   listed under Electronics?

15        A.   Cell phones?

16        Q.   Yeah.  And maybe I'm wrong, but on the left

17   side of the page it says "cell" and then there are

18   dates.  Does that refer to cell phones?

19        A.   Yes.

20        Q.   What happened with those?

21        A.   They're -- start doing some lines and it

22   broke.

23        Q.   So they just stopped working?

24        A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1625 of 1680
confidential – Subject to further confidentiality Review
2103

```
1       Q.   And was that around 2013?

2       A.   Yes.

3       Q.   So lines started to appear on the screen, and

4  then the cell phone stopped working entirely?

5       A.   Yes.

6       Q.   And then you bought a new cell phone?

7       A.   Yes.

8       Q.   Has your cell phone continued to work since

9  you replaced the cell phones around 2013?

10      A.   It broke and I buy another one, but I always

11  getting replaced and send other ones.

12      Q.   You have replaced it again since --

13      A.   Yes.

14      Q.   Did you have the same issue happen when you

15  had to replace another cell phone?

16      A.   Different things, like the --

17           (Translated through interpreter.)  Like the

18  speaker.

19           -- speakers don't work in other ones.  So

20  different things.

21      Q.   Different issues with cell phones?

22      A.   Yes.

23      Q.   Different things have broken in them?

24      A.   Yes.
```

1    Q.   And you think that those are related to

2    Chinese drywall?

3    A.   Yes.

4    Q.   Would you say that for all of the items that

5    are listed on here you believe that they were broken

6    or damaged by Chinese drywall?

7    A.   Yes.

8    Q.   And is that based on you taking them in for

9    repairs and being told that they were damaged by

10   Chinese drywall or your opinion that they were

11   damaged by Chinese drywall?

12        MR. ALBANIS:  Object to the form.

13        But you may answer, if you know,

14   Ms. Martinez.

15        THE WITNESS:  They really don't know how --

16   what that means, but they -- looks weird.  So

17   when I explain house have Chinese drywall, that's

18   why, you know.  There's something weird.

19   BY MR. LAWSON:

20   Q.   So when you've taken these items to be

21   replaced or had someone look at them, they think that

22   the damage to them is odd or weird?

23   A.   Yes.

24   Q.   And then you explain that you have Chinese

1    drywall, and they say that that might be why they are

2    damaged?

3        A.   Yes.

4        Q.   Let's go back to Exhibit 5, which we looked

5    at earlier, which is your answers to interrogatories.

6             We talked a little bit earlier about the at

7    least $59,532.65 that you are seeking in personal

8    property damages.

9             Do you remember that?

10       A.   Yes.

11       Q.   And we've now just looked at receipts and

12   claims that you have previously made for different

13   personal property items.  Is that right?

14       A.   Yes.

15       Q.   Are you aware of any other receipts for

16   personal property items that you have submitted to

17   your lawyer other than the ones that we have looked

18   at today?

19            MR. ALBANIS:  Object to the form.

20            But you may answer, if you know,

21       Ms. Martinez.

22            THE WITNESS:  (Translated through

23       interpreter.)  I don't know if all the receipts I

24       gave them are here.

```
 1    BY MR. LAWSON:

 2        Q.   Can you think of anything that you have not

 3    seen a receipt for or anything that was not listed on

 4    the claim form that we just looked at that you have

 5    submitted a receipt to your attorney for?

 6             MR. ALBANIS:  Same objection.

 7             But you may answer, Ms. Martinez.

 8             THE WITNESS:  (Translated through

 9        interpreter.)  I don't know.

10    BY MR. LAWSON:

11        Q.   If you did encounter additional receipts or

12    invoices for personal property items that you believe

13    were damaged by Chinese drywall, would you submit

14    them to your attorney?

15        A.   Yes.

16        Q.   All right.  I would like to look at the same

17    answer that you gave on the first page of this First

18    Amended Interrogatories, where you say:  We seek

19    alternative living expenses from November 2010

20    through June 2013 of at least $12,199.

21             Do you see that?

22        A.   Yes.

23        Q.   What is your understanding of what

24    "alternative living expenses" means?
```

```
 1              MR. ALBANIS:  Object to the form.

 2              But you may answer, Ms. Martinez, if you

 3         know.

 4              THE WITNESS:  (Translated through

 5         interpreter.)  The RV is here, which I bought.

 6         The rent for all the houses when I left.

 7    BY MR. LAWSON:

 8         Q.   And that is the amount of money that you're

 9    seeking for alternative living expenses in that

10    $12,199?

11              MR. ALBANIS:  Object to the form.

12              But you may answer, Ms. Martinez.

13              THE WITNESS:  (Translated through

14         interpreter.)  To tell you the truth, I don't

15         really know how this was worked out.  What I know

16         is -- I know that what's in here is what I have

17         paid with my money.

18    BY MR. LAWSON:

19         Q.   And you said a little bit ago that you think

20    that this includes the RV that you purchased, that

21    you lived in, as well as the rent that you paid in

22    the rental properties that you mentioned earlier.  Is

23    that right?

24         A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1680 of 1680
confidential -- Subject to further confidentiality Review
2108

```
1        Q.   And that's for the period of time from

2   November '10 -- 2010, excuse me, through June 2013.

3   Is that right?

4        A.   Yes.

5            (Defendants' Exhibit 11 was marked for

6   identification.)

7   BY MR. LAWSON:

8        Q.   Ms. Martinez, you have been handed a document

9   that's been marked as Exhibit 11.

10           Do you recognize this document?

11       A.   Yes.

12       Q.   What is it?

13       A.   It's when I bought the RV.

14       Q.   Now, the tables have been turned and now I'm

15  at a disadvantage because a lot of this agreement is

16  written in Spanish.  But this appears to be a bill of

17  sale for the purchase of the RV that you were just

18  discussing.  Is that right?

19       A.   Yes.

20       Q.   And it looks like that you purchased it

21  around November of 2010?

22       A.   Yes.

23       Q.   Is that correct?

24           And just a moment ago we were talking about
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1681 of 1680
confidential – Subject to further confidentiality review
2109

```
1     that you are seeking alternative living expenses from

2     November of 2010 until, I believe, June of 2013.  Is

3     that right?

4         A.   Yes.

5         Q.   So you began living in the RV that you

6     purchased here around the time that you purchased it

7     in November of 2012?

8         A.   Yes.

9         Q.   Is that right?

10             And looking at this, is it correct that you

11    purchased the RV for $4,399?

12        A.   Yes.

13        Q.   And I may be missing it, but I just wanted to

14    know:  Is there any section of this bill of sale

15    where it shows that you paid for the RV and that that

16    amount of money, that $4,399 was paid?

17             Is that the line below the total where it

18    says --

19        A.   Yes.

20        Q.   -- the amount that you have paid?

21        A.   In Spanish.

22        Q.   Yes.

23        A.   (Through the interpreter.)  Balanced to be

24    financed, amount zero.  Because we paid for it.
```

```
1        Q.    And did you pay for the RV in cash?

2        A.    Yes.

3        Q.    And is this part of that amount in

4   alternative living expenses, this $4,399 that you are

5   seeking in this lawsuit?

6        A.    Yes.

7        Q.    So after you purchased this RV, did you start

8   living in it immediately?

9        A.    Yes.

10       Q.    And that would have occurred sometime around

11  November 16th of 2010.  Is that right?

12       A.    Yes.

13       Q.    And was the RV parked behind your house?

14       A.    Yes.  Behind my house.

15       Q.    And how long did you live in the RV after you

16  started to live in it?

17       A.    For two years, to 2012.

18       Q.    How did you decide that you wanted -- that

19  you needed to live in the RV instead of living in

20  your home?

21       A.    Because it's too much headache, too much

22  respiratory problems.  My son started getting worse

23  all the time.  And we decide to do something to try

24  to -- at least a nighttime -- we can breathe better,
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1633 of 1680
confidential - Subject to Further Confidentiality Review
2111

```
1    you know.  So that's why we decide to buy the RV and

2    put it in the back to try to live in the RV, sleep in

3    the RV, and come back home, take a shower, cook, and

4    go back to the RV.

5        Q.   So you would sleep in the RV at night.  Is

6    that right?

7        A.   Yes.

8        Q.   And your husband, your son, and you would all

9    sleep there?

10       A.   Yes.

11       Q.   And what else would you do in the RV, as

12   opposed to in your house?

13       A.   That's it.

14       Q.   Just sleep?

15       A.   Just sleep.

16       Q.   Okay.  So when you were cooking, you did that

17   inside of the house?

18       A.   Yes.

19       Q.   And when you -- you showered inside of the

20   house, as you said?

21       A.   Yes.

22       Q.   And you used the rest of the house to do

23   laundry.  Is that right?

24       A.   Yes.
```

```
 1       Q.    Did you keep your clothes inside of the house

 2    still?

 3       A.    Some are in the RV and some are in the house.

 4       Q.    Did you eat inside of the house?

 5       A.    No.

 6       Q.    Did you eat in the RV?

 7       A.    In the lanai.

 8       Q.    Okay.  So out on the lanai is where you --

 9       A.    Yes.

10       Q.    -- you would eat?

11       A.    We trying to get out of the house as much as

12    we can.

13       Q.    Can you think of anything else that you did

14    in the house during that time that you lived in the

15    RV, any other tasks that you performed or things that

16    you did in there?

17       A.    No.

18       Q.    Did you have people over to your house during

19    that time that you lived in the house before you

20    moved into the RV?

21       A.    (Translated through interpreter.)  My mother,

22    my sister, they would come often.

23       Q.    And did you ever have any issues inviting

24    them over?  Did they complain about being in the
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1635 of 1680
confidential -- Subject to Further confidentiality Review
2113

```
 1    house?

 2              MR. ALBANIS:  Object to the form.

 3              But you may answer, Ms. Martinez.

 4              THE WITNESS:  (Translated through

 5         interpreter.)  They didn't want to come

 6         afterwards.  They didn't want to come.  They

 7         would get sick.  They would get headaches.  My

 8         mother has lupus, so she didn't want to be inside

 9         the toxic.

10    BY MR. LAWSON:

11         Q.   So when you said they didn't want to come

12    afterwards, do you mean after you found out that you

13    had Chinese drywall in your house?

14         A.   Yes.

15         Q.   And then they didn't want to come over?

16         A.   Yes.

17         Q.   But they did before that?

18         A.   Yes.

19         Q.   Did they have any issues with the house

20    before you knew that there was Chinese drywall in it?

21         A.   They do, but they don't know what's going on,

22    what's the problems.  Like, people have a headache,

23    oh, I have a headache, you know, but . . .

24         Q.   Since you moved back into the house, do you
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1686 of 1680
confidential - Subject to further confidentiality Review
2114

```
1    have family members over or friends?

2        A.   No.

3        Q.   And for the same reasons?

4        A.   They prefer me to go to their house because

5    they won't come.

6        Q.   A little bit earlier we were looking at a

7    warranty deed where you bought an additional lot

8    behind your house.  Was that related to having the RV

9    behind your house?

10       A.   Yes.

11       Q.   Okay.  Did you buy that lot so you would have

12   room to put the RV there?

13       A.   Yes.  Otherwise, I don't have -- and then I

14   have a lot of problems with the city, either way,

15   with the City of Cape Coral.

16            MR. ALBANIS:  With the City of Cape Coral.

17   BY MR. LAWSON:

18       Q.   Do you remember how much you paid for the lot

19   behind the house?

20       A.   7,000.

21       Q.   $7,000?

22            And that was also in 2010 when you purchased

23   the RV.  Is that right?

24       A.   Yes.
```

```
 1        Q.   Do you still own that lot today?

 2        A.   Yes.

 3        Q.   What does your husband do for work?

 4        A.   He's driving dump trucks, 18 wheels before.

 5   And then dirt --

 6             (Translated through interpreter.)  Dirt

 7   trucks.

 8        Q.   Do you still have the RV that you purchased

 9   in 2010?

10        A.   No.

11        Q.   Did you sell it?

12        A.   Yes.

13        Q.   Do you remember when you sold it?

14        A.   No.

15        Q.   Do you remember who you sold it to?

16        A.   No.

17        Q.   Do you remember how much you sold it for?

18        A.   I think $2,000, something like that.

19        Q.   $2,000?

20        A.   Yeah.

21        Q.   Somewhere around there?

22        A.   Yes.

23        Q.   Do you know if you have any records of that

24   sale, like, of how much you sold it for, a piece of
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1688 of 1680
confidential -- Subject to further confidentiality Review
2116

```
 1    paper that shows that?

 2         A.   I don't know if I have a record.  I don't

 3    know.

 4         Q.   Why did you sell the RV?

 5         A.   Because I don't live in the RV anymore.

 6         Q.   So you sold it after you moved into one of

 7    the rentals or after you moved back into the house?

 8         A.   After I go to the rentals, I sell it.

 9         Q.   So maybe around 2012 or 2013?

10         A.   Probably 2013, probably, yes.  The Cape Coral

11    City give me a lot of hard time and give me a couple

12    years only for stay.  It's not legal to have RV in a

13    residential, so they want me to -- charge me a

14    thousand dollars a day for have it there.

15         Q.   So they gave you a couple years where you did

16    not have to pay that fine, but then they wanted you

17    to start paying to have to have the RV in the back of

18    your house?

19         A.   Or get rid of that, in back to the house.

20         Q.   And is that why you decided to rent a new

21    place to live?

22         A.   Not really.  I wanted renting another place,

23    because my son, he's growing up, and it was very

24    uncomfortable, the RV, very, very uncomfortable.  I
```

1    have pictures where he's sleeping in that bed.  Like,

2    he don't even stay in that bed.  So he has to sleep

3    like this.  And my husband and I, we can't sleep

4    together; we have to sleep in a bunk bed, one in --

5    and every time that I get up, I hit my head with that

6    other bed in the top.  And it's very uncomfortable.

7    So that's why we decide to -- we have to do

8    something.  He -- every time he ask me for, Mom, can

9    we stay when we sleep in a better situation?  So

10   that's why we decide to -- to rent in another house.

11        Q.   A few minutes ago you said that you bought

12   the lot behind your house for around $7,000.  Is that

13   right?

14        A.   Yes.

15        Q.   Have you ever had that lot appraised for what

16   its value is today?

17        A.   No.

18        Q.   Do you know if you are seeking that $7,000 in

19   your damages in this lawsuit?

20        A.   I don't think so.  I don't think I've put it

21   in there, in those papers.  No.

22             MR. ALBANIS:  I can't answer your questions

23        for you.  I'm sorry.

24             THE WITNESS:  No.  I'm sure not.  I'm sure

```
 1      not.

 2             (Defendants' Exhibit 12 was marked for

 3      identification.)

 4      BY MR. LAWSON:

 5         Q.   You have been handed a document that's been

 6      marked as Exhibit 12.

 7             Do you recognize this document?

 8         A.   Yes.

 9         Q.   What is it?

10         A.   That's a receipt when I buy -- rent places

11      from Melissa Mickey and Mike.

12         Q.   So this is a rental that you had in 2013?

13         A.   Uh-huh.

14         Q.   And there's also receipts for amounts paid in

15      rent for 2012 as well.  Is that right?

16         A.   Yes.

17         Q.   So does this cover the period of time where

18      you were not living in the RV but you were also not

19      living in your home; you were in rental properties?

20      Is that right?

21         A.   Yes.

22         Q.   And it looks like there are about 13

23      different checks in here each for $600.  Is that

24      right?
```

Confidential -- Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Is it -- does it sound about right to say

 3   that you were living in rental properties for around

 4   13 months during this time?

 5        A.   Yes.

 6        Q.   And these amounts that you paid in rent are

 7   part of what you are seeking for alternative living

 8   expenses in this lawsuit.  Is that right?

 9        A.   Yes.

10        Q.   For the period of time from November 2010 to

11   June 2013, correct?

12        A.   Yes.

13        Q.   And it looks like you started living in

14   rental properties around June of 2012.  Is that

15   right?

16        A.   Yes.

17        Q.   And that you continued to live in them until

18   March of -- excuse me, June of 2013?

19        A.   Yes.

20        Q.   Are you aware of any other receipts or

21   amounts of money that you are seeking for alternative

22   living expenses other than the RV and the rent checks

23   that we just reviewed?

24        A.   (Translated through interpreter.)  Not that I
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1642 of 1680
confidential - Subject to Further Confidentiality Review
2120

1    know of.

2        Q.   And I represent to you that -- and I think I

3    have done this math correctly -- that the checks, as

4    well as the $4,399 for the RV, appear to add up to

5    the $12,199 that you listed in your answer to the

6    interrogatories as the amount that you are seeking.

7        A.   Yes.

8        Q.   Why did you decide to move back into your

9    house in June of 2013?

10       A.   Because we can't afford to pay -- continue to

11   pay the mortgage at the house, and we have to pay the

12   rent for those people.  We have to pay electricity in

13   the house; we everybody to pay electricity in our

14   home.  We have to pay everything in both houses.  We

15   can't afford to pay everything at that time.  My

16   husband, he don't got too much job when everything

17   went down.  So everything is when -- like, every

18   time's good times.  So we have to decide to go back.

19   We can't afford to pay both things.  So we have to go

20   back home.  We can't rent in that anymore.

21       Q.   What has your experience been like living in

22   your home since you've moved back?

23       A.   (Translated through interpreter.)  The house

24   is worse.  We can't have a normal life.  My son as a

```
1    grownup, he can't bring any friends to his house.

2          I'm sorry.

3    Q.    No.  Take your time, please.

4    A.    This is very hard for me.

5    Q.    I understand.

6    A.    (Translated through interpreter.)  We've been

7    sick many times.  My husband has sleep apnea.  He has

8    to sleep with a machine.

9          I have a picture in my phone so if you want

10   to look, how he have to sleep.  And I have to have a

11   couple things where respiratory problems, because I

12   have.  So it's been very bad situation when we come

13   back home.

14   Q.    You said that the house is worse since you

15   came back.  Is that right?

16   A.    Yes.

17   Q.    How is it worse?

18   A.    The stuff still broken.  One day we see the

19   TV, and explode, the TV, in front of us.  Other day,

20   we went to the garage, and we see the white smoke,

21   and we look; the water heater is burnt.  We have to

22   shut off all those -- the fuse box.

23         Things like that.  That's how we -- we don't

24   even know every day what we can get.  We afraid one
```

```
 1    day everything's burnt.

 2           I was cooking, and the cable with the stove

 3    burn.  We have to put tape on it until we can buy a

 4    new stove.

 5           That's -- that's how we do all the time.  We

 6    don't even know the next day what's going to come,

 7    what we're going to do.  What's going to happen.

 8    That's how we live.

 9       Q.   You said a moment ago that you have to take

10    something for respiratory issues?

11       A.   Yes.

12       Q.   Is that an inhaler?

13       A.   Yes.

14       Q.   And are you diagnosed --

15       A.   Two different ones.

16       Q.   I'm sorry.

17           Two different inhalers?

18       A.   Yes.

19       Q.   And you were diagnosed with a respiratory

20    condition by a doctor?

21       A.   Yes.

22       Q.   Do you know what condition that is?

23       A.   Well, I have so many papers with the doctors

24    at home.  I give it to Pete.  So many papers that
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1645 of 1680
confidential – Subject to further confidentiality Review
2123

1    I -- that I have.  That's what they say, respiratory

2    problems.

3        Q.   And have you had those problems throughout

4    the time that you have lived in the house?

5        A.   Yes.

6        Q.   Have they gotten better or worse over time?

7        A.   When I get out of the house for that year, I

8    doing better.  When I have to live in the RV, come

9    back and forth, come back and forth, about -- we

10   doing better when I get out of the house.

11            MR. ALBANIS:  Let's go off the record for a

12        second.

13            (Recess from 11:04 until 11:19 a.m.)

14            (Defendants' Exhibit 13 was marked for

15   identification.)

16   BY MR. LAWSON:

17       Q.   Welcome back, Ms. Martinez.

18            During the break, you were handed a document

19   that was marked as Exhibit 13.

20            Do you see that?

21       A.   Yes.

22       Q.   And what is this document, if you know?

23       A.   (Translated through interpreter.)  This is a

24   document which has all my information, when I bought

```
 1    the house, different questions I've been asked.

 2        Q.   If you look at the first page of the

 3    document, it appears to be titled at the top as a

 4    First Amended Supplemental Plaintiff Profile Form.

 5            Do you see that?

 6        A.   Yes.

 7        Q.   And if you turn to the last page of the

 8    document, you can see that there is a signature page.

 9            Do you see that?

10        A.   Yes.

11        Q.   And it has a date signed field that's filled

12    in as December 4th, 2018.

13            Do you see that?

14        A.   Yes.

15        Q.   And that your name is listed below there,

16    along with the address of your home.  Is that right?

17        A.   Yes.

18        Q.   Now, you did not sign this particular form

19    that we are looking at today; did you?

20        A.   No.

21        Q.   And do you know if you have signed a form

22    that looked like this before, a Supplemental

23    Plaintiff Profile Form?

24        A.   I don't remember.
```

```
1       Q.   Okay.  I'd like to turn your attention to the

2   sixth page of this document.  At the top of it

3   there's a question that asks -- and I'll let you get

4   there.

5            It asks:  If you experienced any loss of use

6   and/or loss of enjoyment of the property as a result

7   of Chinese drywall, identify the total amount of such

8   loss.

9            And below that you answered:  $550,000.

10           Do you see that?

11      A.   Yes.

12      Q.   Is that -- can you tell me why you answered

13  that you experienced a loss of $550,000 for loss of

14  use and/or loss of enjoyment of your property?

15      A.   (Through the interpreter.)  According to what

16  Judge Fallon said, the formula.

17      Q.   So that amount is based on a formula from a

18  Judge Fallon.  Is that right?

19      A.   Yes.

20      Q.   And is that your understanding, that you are

21  seeking that amount of money for loss of use and/or

22  loss of enjoyment of your home?

23           MR. ALBANIS:  Object to the form.

24           But you may answer, Ms. Martinez --
```

```
1            THE WITNESS:  Yes.

2            MR. ALBANIS:  -- if you know.

3   BY MR. LAWSON:

4       Q.   We've discussed a lot of different ways where

5   you have had issues with your home or problems living

6   in your home.  Can you think of any other issues or

7   problems that have interfered with your use or

8   enjoyment of your home that we haven't talked about

9   today?

10      A.   (Through the interpreter.)  Apart from all

11  the problems we've had, the things that worry me the

12  most are the health problems.  Right now I got

13  diagnosed with fibromyalgia because of all the amount

14  of large stress I've had for all these years.  My

15  dream home is not worth it, anything at all.  What

16  else?  What -- what's -- what more worse than that

17  could happen?

18      Q.   The fibromyalgia that you just mentioned, was

19  that diagnosed by a doctor?

20      A.   Yes.

21      Q.   When was that diagnosed?

22      A.   Two weeks ago.

23      Q.   Were you told that it was the result of

24  stress that you now have fibromyalgia?
```

1     A.    Yes.

2     Q.    And you believe that stress is from Chinese

3   drywall in your home.  Is that right?

4     A.    Well, yes.  It's part of that.  Life is a

5   stress, but if you have to deal with all the stuff,

6   it's been worse.

7     Q.    And you said that your dream home is worth

8   very little now or nothing.  Is that what you said?

9     A.    Yes.

10     Q.    Do you know how much your home is worth now?

11     A.    Well, according to the City, $22,000,

12   something like that.

13     Q.    Have you had the home appraised by anyone in

14   the last few years?

15     A.    Every year they send me, by the City, when

16   you pay taxes, and that's where they discuss how much

17   it cost, the house, by the City.

18     Q.    Anyone other than the City?

19     A.    No.

20     Q.    Have you ever listed the house for sale?

21     A.    Never.

22     Q.    How much do you think your home was worth

23   before -- or, when you purchased it?

24     A.    I buy for one sixty-five.  I think that's the

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1650 of 1680
Case 2:09-md-02047-MSD-RJK Document 1141 Filed 01/04/11 Page 130 of 161 PageID#
2128
Confidential -- Subject to Further Confidentiality Review

```
 1    right cost of the house.

 2         Q.   Do you think that's what -- knowing that the

 3    house now has Chinese drywall in it, do you think

 4    that the house was worth $165,000 when you brought

 5    it?

 6         A.   No.

 7              MR. ALBANIS:  Object to the form.

 8              But you may answer.

 9              THE WITNESS:  No.

10    BY MR. LAWSON:

11         Q.   You think the house was worth less than

12    $165,000 when you bought it?

13         A.   Yes.

14              MR. ALBANIS:  Object to the form.

15              But you may answer, if you know,

16         Ms. Martinez.

17              THE WITNESS:  (Translated through

18         interpreter.)  When I bought the house, I didn't

19         know that it had Chinese drywall, and I thought I

20         was buying a very good house at a good price.

21    BY MR. LAWSON:

22         Q.   If you would have known that it had Chinese

23    drywall, would you have paid less for it?

24              MR. ALBANIS:  Same objection.
```

```
 1              But you may answer.

 2              THE WITNESS:  (Translated through

 3         interpreter.)  Yes.  I probably would have paid a

 4         lot less.

 5    BY MR. LAWSON:

 6         Q.   And that amount that you just mentioned, that

 7    the City has said is the value of your home, around

 8    $22,000, I believe is what you said, is that about

 9    what you would pay for the house if you would have

10    known that it had Chinese drywall?

11              MR. ALBANIS:  Object to the form.

12              But you may answer, Ms. Martinez, if you

13         know.

14              THE WITNESS:  Probably, yes.

15    BY MR. LAWSON:

16         Q.   You've continued to pay your mortgage

17    payments ever since you bought the house, correct?

18         A.   Yes.

19         Q.   Do you know how much you have paid into the

20    principal of your mortgage since you started making

21    payments on the house?

22         A.   I think it was 600-something I pay in

23    interest.  Principal, 100-something, I believe.  I'm

24    not sure.
```

Case 2:09-md-02047-EEF-MBN Document 11463-1 Filed 11/24/11 Page 135 of 161 PageID#

```
 1              MR. ALBANIS:  Matt, just for the record, we

 2        have produced mortgage documents that show the

 3        principal payments and I believe also show what

 4        the original amount of the mortgage was, meaning

 5        the total amount that was financed.

 6              MR. LAWSON:  I think that's right.

 7        (Defendants' Exhibit 14 was marked for

 8    identification.)

 9    BY MR. LAWSON:

10        Q.   I have handed you a document that's been

11    marked as Exhibit 14.

12             Do you recognize this document?

13        A.   Yes.

14        Q.   What is it?

15        A.   It's a contractor.  They give me an estimate

16    in 2012 for remediate and reconstruction quote to do

17    my house.

18        Q.   Earlier this morning you were telling me that

19    you had received a quote for the reconstruction or

20    remediation of your home back in 2012.  Is that this

21    quote?

22        A.   No.

23        Q.   Oh, is that a different one from 2012?

24        A.   It's a different one.
```

```
1          Q.   Okay.  So you had one from 2018, just the

2    other week, is that right, that you received a quote?

3          A.   Yes.

4          Q.   And then there's this one, which is from

5    2012.  Is that right?

6          A.   Yes.

7          Q.   And is there a third one beyond that?

8          A.   No.  There's only two.

9          Q.   Okay.  So this is the quote that you received

10   in 2012?

11         A.   Yes.

12         Q.   And the quote was from a contractor named

13   Chinese Drywall Experts, LLC.  Is that right?

14         A.   Yes.

15         Q.   And did you contact them back in 2012 to give

16   you a quote on what the remediation and

17   reconstruction of your home would cost?

18              MR. ALBANIS:  And, Matt, I'm just going to

19         assert the same objection I've asserted all week

20         regarding remediation damages; it's a rolling

21         objection.

22              As you know, it is the plaintiff's position

23         that Ms. Martinez has been named as a priority

24         claimant for nonremediation damages.  Remediation
```

1        damages in the Amorin class-action litigation,

2        which is before Judge Cooke, are to be addressed

3        on a separate track in the litigation by the

4        special master and then subsequently by

5        Judge Cooke, as the judge laid out in her

6        November 16, 2018, order.

7             Having said all that, we will, of course,

8        allow you to ask questions regarding the

9        remediation damages and the documents that relate

10       to that.

11   BY MR. LAWSON:

12       Q.   Ms. Martinez, this -- did you contact Chinese

13   Drywall Experts, LLC to come out and give you a quote

14   on the remediation and reconstruction of your home?

15       A.   Give me this quote?

16       Q.   Yes.

17       A.   Yes.

18       Q.   You called them?

19       A.   They come and they give me this quote.

20       Q.   Okay.  Did you want to get this quote because

21   you wanted to know how much it would cost to fix your

22   home?

23       A.   Yes.

24       Q.   And did you give them any instructions on

```
1    what you wanted them to give you a quote for?

2         A.   No.  They know what they're doing.

3    They're -- that's their job, so they're -- they know

4    what they have to deal with Chinese drywall, and

5    that's why all this stuff very clear, what they have

6    to do, they mark in here.  So I don't have to tell

7    them anything.  They know what they're doing.

8         Q.   So you asked them to give you a quote because

9    they had experience fixing homes with Chinese

10   drywall.  Is that right?

11        A.   Yes.

12        Q.   And it was your understanding that they knew

13   how to remediate and reconstruct a home that had

14   Chinese drywall in it, right?

15        A.   Yes.

16        Q.   And you thought they would do a good job?

17        A.   Yes.

18        Q.   How much did they quote you for -- to

19   remediate and reconstruct your home?

20        A.   129,684; subtotal 133,184.

21        Q.   And it looks like they included some

22   potential reconstruction credits that reduce that

23   amount of the $129,684 that you listed.  Is that

24   right?
```

```
1        A.    Yes.

2        Q.    I would like to turn your attention to

3   Page 12 of this document.

4              If you look on Page 12, there's a table that

5   lists options.  Do you see that?  There's an Option

6   Number 5001 and an Option Number 5002.

7        A.    Yes.

8        Q.    Do you see how under Option 5001 it says:

9   "Add on 240" and it says "SSQ to back of home."

10             Is that referring to adding on 240 square

11   feet to the back of the home?

12       A.    I don't remember.

13       Q.    Do you remember asking them to add square

14   footage to the back of your home as part of this

15   quote?

16       A.    I don't remember.

17       Q.    And for Option 5002, it also lists as an

18   option to "remove and replace 2,283 SQ of tile."

19             Do you see that?

20       A.    Yes.

21       Q.    And do you think that refers to removing and

22   replacing 2,283 squares of tile or square feet of

23   tile?

24       A.    I don't remember.  It is there, but I don't
```

1    remember.

2        Q.    But those are listed as options for this

3    project.  Is that right?

4        A.    Yes.

5        Q.    And the total amount of a price for those

6    options is listed here as $31,000.  Is that right?

7        A.    Yes.

8        Q.    Let's go back to Page 3 that we were looking

9    at with the total amount of the quote.

10            If you look to the chart on Page 3 where

11   they're listing out the total price for this quote,

12   Options is listed as $31,000.  Is that right?

13       A.    Yes.

14       Q.    And that's the same number that we just

15   looked at for the two options that were on Page 12?

16       A.    Yes.

17       Q.    So that total of $129,684 includes $31,000

18   for the two optional items that we just talked about,

19   right?

20       A.    Yes.

21            MR. ALBANIS:  Object to the form.

22            But you may answer.

23   BY MR. LAWSON:

24       Q.    Without those two options, the total quote

```
1    would have been $31,000 less.  Isn't that right?

2              MR. ALBANIS:  Object to the form.

3              But you may answer.

4              THE WITNESS:  Yes.

5    BY MR. LAWSON:

6         Q.   And you don't recall if you asked Chinese

7    Drywall Experts to either add on 240 square feet to

8    your home or remove and replace the tile in the home;

9    do you?

10             MR. ALBANIS:  Object to the form.

11             THE WITNESS:  I don't remember.

12   BY MR. LAWSON:

13        Q.   But they did list those options on this

14   quote.  Isn't that right?

15        A.   Yes.

16        Q.   And you ultimately did not pay Chinese

17   Drywall Experts to perform this work.  Is that right?

18        A.   (Translated through interpreter.)  Correct.

19        Q.   Is that because of the cost that they were

20   asking for?

21        A.   Yes.

22        Q.   It was too much money?

23        A.   Yes.  I don't have the money to pay.

24             (Defendants' Exhibit 15 was marked for
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1659 of 1680
confidential – Subject to further confidentiality Review
2137

```
 1    identification.)

 2    BY MR. LAWSON:

 3        Q.   I have handed you a document that's been

 4    marked as Exhibit 15.

 5             Do you recognize this document?

 6        A.   Yes.

 7        Q.   And is this the quote for remediation and

 8    reconstruction of your home that you received this

 9    month?

10        A.   Yes.

11        Q.   Specifically, did you receive this quote, I

12    believe you said, this morning.  Is that right?

13        A.   Yes.

14        Q.   And you said that -- earlier that you had

15    sought out this quote because it had been some six

16    years since you had received the previous quote.  Is

17    that right?

18        A.   Yes.

19        Q.   And you wanted to see what it would cost in

20    2018 to be able to repair and reconstruct your home?

21        A.   Yes.

22        Q.   Do you know if Chinese Drywall Experts still

23    exists and -- excuse me, if they still exist?  Do you

24    know if that company still exists?
```

```
1        A.   No.

2        Q.   Did you think about calling them to get a new

3   quote?

4        A.   I don't know.

5        Q.   Do you know why you called this company to

6   get a new quote?

7        A.   I want to get different companies to see

8   how -- how -- how they work with estimates.

9        Q.   Now, looking at this estimate, this is from a

10  Gabisa Construction, Inc.  Do you know how that's

11  pronounced?

12       A.   Gabisa.

13       Q.   Gabisa?

14            Have you ever worked with them before?

15       A.   No.

16       Q.   And how did you find them to ask them to give

17  you a quote?

18       A.   A friend of mine give me this company.

19       Q.   And do you think you are going to ask for

20  quotes from any other companies?

21       A.   I can do.

22       Q.   Do you think you would want to see what

23  Chinese Drywall Experts would quote your house for

24  remediation and reconstruction for?
```

```
 1              MR. ALBANIS:  Object to the form.

 2              But you may answer, if you know,

 3          Ms. Martinez.

 4              THE WITNESS:  Yeah.  Why not?

 5   BY MR. LAWSON:

 6      Q.   Do you have friends who work for Gabisa

 7   Construction?

 8      A.   Friends?  No.

 9      Q.   But someone you know knows people at Gabisa

10   Construction?

11      A.   Yes.

12      Q.   Do you know if Gabisa Construction has ever

13   remediated and reconstructed a home with Chinese

14   drywall?

15      A.   That's what they do.

16      Q.   Do they do any other kind or work or only

17   work with Chinese drywall homes?

18              MR. ALBANIS:  Object to the form.

19              But you may answer.

20              THE WITNESS:  I don't know.

21   BY MR. LAWSON:

22      Q.   But you were told that they have remediated

23   and reconstructed homes with Chinese drywall before?

24      A.   Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1662 of 1680
confidential - Subject to further confidentiality Review
2140

```
 1        Q.    And looking at this form, Gabisa Construction

 2    quoted you a total of $179,520 for the remediation

 3    and reconstruction of your home.  Is that right?

 4        A.    Yes.

 5        Q.    And you would agree that is significantly

 6    more than what Chinese Drywall Experts quoted you

 7    for.  Is that right?

 8        A.    Yes.

 9        Q.    Did you ask Gabisa Construction why the cost

10    was more than what you had been quoted in 2012?

11        A.    No.

12        Q.    Do you remember a little bit earlier when we

13    were looking at the square footage that Lee County

14    listed for the living area in your home on that Lee

15    County property record that we looked at earlier?

16        A.    Yes.

17        Q.    And that was Exhibit 1, right?

18        A.    Yes.

19        Q.    And it listed the total square footage of the

20    living area as 2,259 square feet.  Isn't that right?

21        A.    Yes.

22        Q.    Looking back at this Gabisa Construction

23    quote that you received, if you look into the

24    description of the work listed on the first page of
```

1    that quote, it states:  House area where drywall

2    needs to be replaced, 3,264 SF.

3         Do you see that?

4    A.   Yes.

5    Q.   And is it your understanding that this quote

6    is to replace drywall in a house area of 3,264 square

7    feet?

8         MR. ALBANIS:  Object to the form.

9         But you may answer, Ms. Martinez, if you

10        know.

11        THE WITNESS:  In this, that's what I thought

12        he got this number.  In here is the total living

13        area; but in here, I thought he include the

14        garage, like, it is not included in here because

15        they here say total living area.  The garage is

16        not living area, but it have Chinese drywall,

17        too.  I think it's 500-something, the garage.

18        It's three-car garage.

19        So I'm guessing that's how he got those

20        numbers.  I don't adding those numbers together,

21        so I don't know -- so that's what I'm guessing,

22        he had this.

23   BY MR. LAWSON:

24   Q.   So this Gabisa Construction quote is for not

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1664 of 1680
confidential -- Subject to further confidentiality review
2142

```
1    just the total living area of the home to be

2    remediated and reconstructed but also for around a

3    thousand additional square feet to be remediated and

4    reconstructed.  Is that right?

5        A.   Yeah.  He -- I believe he account that --

6    what have Chinese drywall, too, the garage.

7        Q.   Does this quote also ask Gabisa Construction

8    to add additional square footage to the back of your

9    house?

10       A.   No.  I don't see any -- any square footage

11   extra.

12       Q.   To your knowledge, does this quote ask for

13   Gabisa Construction to remove the tile from the

14   house?

15            MR. ALBANIS:  I'm going to object to the

16       form.

17            But you can answer, if you know,

18       Ms. Martinez.

19            THE WITNESS:  No.  They're not asking for

20       tile.  All carpet flooring -- yeah, they do.

21       Yes.

22   BY MR. LAWSON:

23       Q.   And where does it say that?

24       A.   Where?
```

Confidential - Subject to Further Confidentiality Review

1    Q.   Yes.

2    A.   All carpet flooring will be removed and

3   replaced new.  Contractor, we remove and replace

4   window sills.  Oh, they're talking about window

5   sills.

6    Q.   So the quote says that they'll remove any

7   carpentry there.  Is that right?

8    A.   Yes.  Carpet flooring.

9    Q.   Well, I think it's saying "carpentry," right?

10  That's the word, "carpentry"?

11       And then in quotes it says:  Interior door,

12  door handles, baseboard, crown moldings, medicine

13  cabinets, mirrors, and install new.

14   A.   Yes.

15   Q.   So this appears to be referring to doors,

16  baseboards, crown moldings, cabinets, things like

17  that.  Is that right?

18   A.   Yes.

19   Q.   Do you have tile flooring in your home?

20   A.   Yes.

21   Q.   And you'd agree with me that you don't see

22  anywhere in this quote where it says that it's

23  removing the tile flooring.  Is that right?

24   A.   Yes.

```
1         Q.   When you spoke with Gabisa Construction, did

2    they tell you that they would be performing this

3    remediation based on any kind of protocol?  Did they

4    use that word "protocol" at any time?

5              MR. ALBANIS:  Object to the form.

6              But you may answer, Ms. Martinez.

7              THE WITNESS:  (Translated through

8         interpreter.)  What does "protocol" mean?

9    BY MR. LAWSON:

10        Q.   Did they tell you that they would follow any

11   particular plan for how a home should be remediated

12   and reconstructed based on a court order?

13             MR. ALBANIS:  Object to the form.

14             But you may answer, Ms. Martinez.

15             THE WITNESS:  They tell me about codes by the

16        City, inspections, permits, all that stuff they

17        require to do when they do the remediation.

18        That's how they tell me.

19   BY MR. LAWSON:

20        Q.   All right.  Did they tell you that there were

21   any other rules or plans that they were going to

22   follow other than the City codes?

23             MR. ALBANIS:  Object to the form.

24             But you may answer, if you know,
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1667 of 1680
confidential - Subject to further confidentiality Review
2145

```
 1     Ms. Martinez.

 2          THE WITNESS:  I don't know.  Say provide City

 3     permits and all that stuff.  There needs to be

 4     required to be legally how do they do it, because

 5     that's their job.  They know what they're doing.

 6  BY MR. LAWSON:

 7     Q.   Do you plan to have Gabisa Construction

 8  remediate and reconstruct your home?

 9     A.   I don't know.

10          MR. LAWSON:  We can go off the record.

11          (Recess from 11:50 until 11:55 a.m.)

12          MR. LAWSON:  Ms. Martinez, thank you for your

13     time today.  I have no further questions at this

14     time.

15          MR. MOREN:  Ms. Martinez, I just have a few

16     quick questions for you.  Hopefully it won't take

17     up much more of your time.

18                    RECROSS-EXAMINATION

19  BY MR. MOREN:

20     Q.   First, when you purchased your house in 2008,

21  the purchase price was 165,000, right?

22     A.   Yes.

23     Q.   And how much -- did you take out a loan from

24  the bank to help pay for that?
```

```
 1        A.    I pay $50,000.  And the rest, I make payments

 2   every month.

 3        Q.    Thank you.

 4              Just one more question.  If you can go back

 5   to Exhibit Number 5.  And please turn to Page 2.

 6              I just want to confirm with you the street

 7   addresses of the two homes that you rented, because I

 8   think there may be a discrepancy.

 9              So in your answer to Question Number 2, it

10   states that the street address of the first home is

11   1718 Southwest 12th Terrace.  Is that accurate?

12        A.    Yes.

13        Q.    And the second home it states the street

14   address is 2011 Northeast, or NE, 18th Place.  Is

15   that correct?

16        A.    Yes.

17        Q.    Okay.  I just want to verify, because I saw

18   elsewhere.  If you can pull out Exhibit 12, please.

19              So on the first page, the address on the

20   first receipt is 2011 Northeast -- it says NE --

21   17th Place.  Is that correct?

22        A.    Yes.

23        Q.    So do you think that one of these addresses

24   is a mistake, between the 17th Place or the
```

Confidential - Subject to Further Confidentiality Review

1    18th Place?

2        A.   Yes.  This one is mistake.  It's 18th Place.

3        Q.   18th Place?

4        A.   Yes.

5        Q.   Is the correct street?

6        A.   Yes.

7        Q.   Thank you.

8        MR. MOREN:  That's all I have.

9        MR. ALBANIS:  Nothing else?

10                CROSS-EXAMINATION

11   BY MR. ALBANIS:

12        Q.   Ms. Martinez, I just have a few follow-up

13   questions.

14        Could you please take out Exhibit 13, the

15   First Amended Supplemental Plaintiff Profile Form.

16        A.   Yes.

17        Q.   Did you authorize my office to file this form

18   on your behalf?

19        A.   Yes.

20        Q.   Before you authorized my office to file this

21   form, did you have an opportunity to review the form?

22        A.   Yes.

23        Q.   Did you agree with all of the information

24   that was provided on the form?

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1670 of 1680
confidential - Subject to Further Confidentiality Review
2148

1    A.    Yes.

2    Q.    Thank you.

3          Earlier when Mr. Lawson was asking you

4    questions about living in the RV, you mentioned some

5    pictures that you had.  Do you remember that?

6    A.    Yes.

7          MR. ALBANIS:  We'll mark this as Plaintiff's

8          Exhibit Number 1, please.

9          (Plaintiff's Exhibit 1 was marked for

10    identification.)

11    BY MR. ALBANIS:

12    Q.    Would you please take a moment to flip

13    through these photographs, and let me know after

14    you've looked at all of them.

15          Have you had a chance to look at all the

16    photographs, Ms. Martinez?

17    A.    Yes.

18    Q.    Are these the photographs that you were

19    referencing earlier when you told Mr. Lawson that you

20    had pictures of the time period that you were living

21    in the RV?

22    A.    Yes.

23    Q.    Let's focus on the first page.

24          Is that the RV that we see behind the fence?

```
 1        A.    Yes.

 2        Q.    And it appears as though there are two homes

 3   in this picture.  Which home is the Chinese drywall

 4   house in this picture?  Is it the home on the left,

 5   which is -- appears to be a yellow color, or is it

 6   the home on the right, which appears to be a brighter

 7   color?

 8        A.    The house in -- your right.

 9        Q.    The house behind the trees?

10        A.    Yes.  Here.

11        Q.    Okay.  Let's turn to the second picture.

12   What is this picture of, Ms. Martinez?

13        A.    That's my son.  He is sleeping in that bed

14   like he can't sleep in that bed.

15        Q.    Is that a picture from the inside of the RV?

16        A.    Yes.

17        Q.    Let's go to the next picture, Ms. Martinez,

18   on Page 3 of the document.

19              What is this picture of?

20        A.    That's his room in the house.

21        Q.    It appears as though he has a Frankenstein

22   pillow on his bed.  Is that true?

23        A.    Yes.

24        Q.    Let's go to the next picture, Ms. Martinez.
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1672 of 1680
confidential – Subject to Further confidentiality Review
2150

```
 1              On the fourth page of the document, what is

 2     this picture of, Ms. Martinez?

 3         A.    That's my husband in my bed, the bunk bed.

 4     We have to sleep separate:  One in the top, one in

 5     the bottom.

 6         Q.    Was this picture taken from inside the RV?

 7         A.    Yes.

 8         Q.    Who slept on top and who slept on the bottom?

 9         A.    I slept in here, and he slept in the --

10         Q.    You slept on the bottom?

11         A.    Yes.

12         Q.    And he slept on the top bunk?

13         A.    Yes.

14         Q.    Thank you.

15              And then the fifth picture, Ms. Martinez,

16     flip to that.  Is that a picture of the RV in your

17     yard?

18         A.    Yes.

19         Q.    Okay.  And then the sixth picture,

20     Ms. Martinez, what is that a picture of?

21         A.    That's my bed.

22         Q.    That's your bed inside your home?

23         A.    Yes.

24         Q.    Does your home still have Chinese drywall in
```

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1673 of 1680
confidential -- Subject to further confidentiality Review
2151

1   it?

2       A.    Yes.

3       Q.    Is it your position that you are continuing

4   to be damaged by the Chinese drywall in your home?

5       A.    Yes.

6       Q.    Will those damages continue in your -- will

7   those damages continue until the house is fixed?

8       A.    Yes.

9           MR. ALBANIS:   We have nothing else.

10          MR. LAWSON:   Before we conclude, I just

11          wanted to put on the record that we have received

12          a lot of documentation in the last 48 and

13          24 hours, including some additional documents

14          this morning.   We have done our best to be able

15          to review and analyze those documents and to be

16          able to discuss them with Ms. Martinez here.

17              But given the nature of those productions and

18          that we just received them and we had to analyze

19          some of them as early as this morning, we would

20          like to keep the deposition record open, pending

21          our review to make sure that there aren't any

22          additional questions.   And we will confer with

23          Mr. Albanis and plaintiff's counsel to be able to

24          determine if there is a need for any additional

Case 2:09-md-02047-EEF-MBN Document 22363-78 Filed 11/19/19 Page 1674 of 1680
confidential - Subject to further confidentiality Review
2152

1      sessions of this deposition before it concludes.

2           But with that, I see that we have reached the

3      time limit that we had for today's deposition,

4      and we do not have any further questions at this

5      time.

6           MR. ALBANIS:  We will reserve signature.

7           MR. MOREN:  For the reasons that Mr. Lawson

8      stated, BNBM would also like to keep the

9      deposition open.

10           MR. VERRIER:  I just want to add on the

11      record that obviously with the judge's kind of

12      tight deadlines, we'll be following up if you

13      think that this is one you want to keep open.  So

14      we will try to have it completed by January 14th;

15      we're all going to be in Florida, and we can try

16      and figure out a time to do that.

17           So we would just ask that if you get a sense

18      you're going to want to redepose or have

19      additional time, just let us know with as much

20      notice as possible so that we can orchestrate the

21      scheduling of it.

22           MR. LAWSON:  We will.

23           THE WITNESS:  Can I say something?

24           MR. ALBANIS:  Let's go off the record.

1                    (Whereupon, the deposition concluded at

2        12:06 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review
2154

```
 1                    C E R T I F I C A T E

 2

 3           I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that, pursuant to

 6    notice, the deposition of DAILYN MARTINEZ was duly

 7    taken on December 14, 2018, at 7:45 a.m. before me.

 8           The said DAILYN MARTINEZ was duly sworn by

 9    me, through an interpreter, according to law to tell

10    the truth, the whole truth and nothing but the truth

11    and thereupon did testify as set forth in the above

12    transcript of testimony.  The testimony was taken

13    down stenographically by me.  I do further certify

14    that the above deposition is full, complete, and a

15    true record of all the testimony given by the said

16    witness.

17

18           _____

19           KELLY J. LAWTON, RPR, LCR, CCR

20

21           (The foregoing certification of this

22    transcript does not apply to any reproduction of the

23    same by any means, unless under the direct control

24    and/or supervision of the certifying reporter.)
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5   and make any necessary corrections.  You should state

 6   the reason in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

```
 1                      - - - - - -

 2                    E R R A T A

 3                      - - - - - -

 4    PAGE    LINE    CHANGE

 5    ____    ____    _____

 6      REASON: _____

 7    ____    ____    _____

 8      REASON: _____

 9    ____    ____    _____

10      REASON: _____

11    ____    ____    _____

12      REASON: _____

13    ____    ____    _____

14      REASON: _____

15    ____    ____    _____

16      REASON: _____

17    ____    ____    _____

18      REASON: _____

19    ____    ____    _____

20      REASON: _____

21    ____    ____    _____

22      REASON: _____

23    ____    ____    _____

24      REASON: _____
```

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, DAILYN MARTINEZ, do hereby acknowledge

 4     that I have read the foregoing pages, 1 to 160, and

 5     that the same is a correct transcription of the

 6     answers given by me to the questions therein

 7     propounded, except for the corrections or changes in

 8     form or substance, if any, noted in the attached

 9     Errata Sheet.

10

11

12     _____    _____

13     DAILYN MARTINEZ                               DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20___.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24
```

```
 1                          LAWYER'S NOTES

 2      PAGE     LINE

 3      _____    _____    _____

 4      _____    _____    _____

 5      _____    _____    _____

 6      _____    _____    _____

 7      _____    _____    _____

 8      _____    _____    _____

 9      _____    _____    _____

10      _____    _____    _____

11      _____    _____    _____

12      _____    _____    _____

13      _____    _____    _____

14      _____    _____    _____

15      _____    _____    _____

16      _____    _____    _____

17      _____    _____    _____

18      _____    _____    _____

19      _____    _____    _____

20      _____    _____    _____

21      _____    _____    _____

22      _____    _____    _____

23      _____    _____    _____

24      _____    _____    _____
```