UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


In Re: CHINESE-MANUFACTURED  MDL 2047
DRYWALL PRODUCTS LIABILITY
LITIGATION
                              SECTION "L"
This document relates to:
                              JUDGE ELDON
                              FALLON
Elizabeth Bennett, et al
versus Gebr. Knauf, et al
                              MAGISTRATE:
                              JOSEPH
                              WILKINSON, JR.
Case No. 14-cv-2722



         Deposition of NATHAN JUNIUS,

4 Thrush Street, New Orleans, Louisiana

70122, taken at the Law Offices of Fishman

Haygood, LLP, 201 St. Charles Avenue, 46th

Floor, New Orleans, Louisiana 70170, on

Thursday, the 30th day of May, 2019.



REPORTED BY:

MICHELINE COSSE' BURAS, CCR, RPR
Certified Court Reporter

EXHIBIT
B

1      A.   I don't believe -- I got in a car

2    accident, some guy hit me probably four

3    weeks ago so that may be something.

4         **Q.   Yeah.**

5      A.   But I don't recall anything, other

6    than this.

7         **Q.   So have you done depositions in**

8    the context of the expert work?

9      A.   Correct.

10        **Q.   Okay.  Have you ever actually**

11   testified in trial?

12     A.   Have not.

13        **Q.   Did you ever get excluded from**

14   testifying in trial?

15     A.   Have not.

16        **Q.   All right.  So when I'm talking**

17   about the house, I'm talking about --

18   what's the address?  6537 Marshall Foch; is

19   that correct?

20     A.   Correct.

21        **Q.   And you currently live in 4 Thrush**

22   Street; right?

23     A.   Yes, sir.

24        **Q.   And that's where you moved when**

25   you sold the Marshall Foch house in 2015;

1      right?

2          A.   I think I sold it in '16 --

3          **Q.   Sorry.  Yeah.**

4          A.   -- but we moved in '15.

5          **Q.   You moved in '15, right.  And**

6      you've been in the Thrush Street house ever

7      since?

8          A.   Correct.

9          **Q.   All right.  So you purchased the**

10     house 6537 in February of 2006; right?

11         A.   Correct.

12         **Q.   And you bought it for 245,000?**

13         A.   Correct.

14         **Q.   And it had just been flooded in**

15     Katrina; right?

16         A.   Correct.

17         **Q.   How many feet did that house get,**

18     do you think?

19         A.   Five, six feet.

20         **Q.   Five or six?**

21         A.   (Witness nods head affirmatively.)

22         **Q.   So did you have the gut the second**

23     story?

24         A.   No.

25         **Q.   So you completely gutted the first**

1    Q.  And that's when, I assume, you

2    bought the Thrush Street house in October?

3    A.  We built it.

4    Q.  Y'all built it, okay.

5    A.  So we --

6    Q.  Y'all finished building it, you

7    moved in, and then started the process of

8    selling Marshall Foch; is that right?

9    A.  I think the Marshall Foch Street

10   house was on the market for the last few

11   months leading up to the move out.

12   Q.  Okay.  And you went under contract

13   in November -- on November 15th, 2015 with

14   the Theards; is that right?

15   A.  Correct.

16   Q.  And that was a purchase agreement

17   for 550,000; right?

18   A.  Correct.

19   Q.  When you went under contract with

20   the Theards, you didn't know about the

21   Chinese drywall at that point; right?

22   A.  Correct.

23   Q.  Just explain to me, what happened

24   with the Theard deal and why did that not

25   progress to closing.

1          A.  So they had their inspector come

2     in and tell us about -- come in to do the

3     inspection and said we think you may have

4     Chinese drywall.  And I ended up talking to

5     him directly, he's an attorney.  And he

6     said, well, what do you want to do?  And I

7     said, well, I want to get another person

8     whose a real expert on this to see if we

9     really do have it.  And then so we got the

10    other guy and then I think at that point in

11    time we canceled the contract.

12         Q.  **The Theards wanted to back out of**

13    **it?**

14         A.  Correct.

15         Q.  **Why did they want to back out of**

16    **it?**

17         A.  I think it was his wife didn't

18    want it or they have young kids or

19    something, I don't know.

20         Q.  **Did you know the Theards**

21    **personally?**

22         A.  I kind of -- I think he was a

23    couple years younger than me in school.  I

24    don't really know them, but, you know,

25    lived in the same area.

1        Q.  So you, basically, buy houses and

2   then rent them out?

3        A.  We guy vacant lots and then build

4   a house on it and rent it out.

5        Q.  And how many projects has C&J done

6   over the years since 2008?

7        A.  Over 60.

8        Q.  Oh, wow.  And so when was Ben

9   Chauffe involved in C&J?

10       A.  So he was on the original -- when

11   we set it, that was the C&J.  And then at

12   some point he got out.  The company wasn't

13   doing anything.  The idea was to do -- to

14   bid on actual work.

15       Q.  So in the C&J, C stands for

16   Chauffe and J stands for Junius?

17       A.  Correct.

18       Q.  What year do you think he got out?

19       A.  I don't know.

20       Q.  In 2016 when you were renovating

21   the Marshall Foch house, was he involved in

22   C&J at that point?

23       A.  No.  I don't believe.

24       Q.  How do you know -- how did you

25   know Ben?

1          A.   Just a guy in the area, a guy I
2     knew.
3          Q.   **Like high school?**
4          A.   I didn't go to high school with
5     him.  We had mutual friends.
6          Q.   **Okay.  You've known him for a long**
7     **time?**
8          A.   When did I meet him?  Probably
9     2000, around 2000 or so, maybe after
10    2000.
11         Q.   **And what does he do for a living?**
12         A.   He does insurance.
13         Q.   **Why did you partner up with him**
14    **for C&J?**
15         A.   He was going to get out of the
16    insurance business and kind of run the
17    day-to-day of C&J and then it just didn't
18    pan out.
19         Q.   **But y'all split on good terms?**
20         A.   Yeah.
21         Q.   **Does he have an interest at all in**
22    **C&J --**
23         A.   No.
24         Q.   **-- or any of the properties?**
25         A.   No.  Nothing.  So C&J doesn't

1    actually own any of the properties.  I own

2    all the properties myself.  He has no

3    interest in my -- you know, in my

4    properties that are in some of my different

5    LLCs.  We are partner in a piece of

6    property together in St. Bernard but --

7         **Q.  Right now?**

8         A.  Correct.

9         **Q.  Do you have any other partnerships**

10   deals with him?

11        A.  We have -- we have St. Bernard and

12   then we have -- I think it's two or three,

13   there's about five of us in a rental

14   property, in two or three rental

15   properties.  I don't know exactly.  If I

16   could look at my phone, I could tell you.

17        **Q.  Yeah.  You could look.**

18        A.  I think that's it.  I don't know

19   of anything else that we have together, but

20   so we have three doubles, two vacant

21   properties, and then -- and these are with

22   other people -- and then we're in a piece

23   of property in Fort Beauregard.  It's like

24   a fishing camp property.

25        **Q.  Okay.  Are y'all in that in a**

1          fishing club together?

2               A.  It's a third, a third, a third.

3          It's three of us.

4               **Q.  So y'all see each other personally**

5          fishing, anything like that?

6               A.  We have -- it's vacant land.  We

7          have nothing on it.  We have hopes to build

8          something on it one day.

9               **Q.  Yeah.  That's a nice area.  All**

10         right.  Let's see.

11              MR. DOYLE:

12                   Off the record.

13              (Off the record.)

14         EXAMINATION BY MR. THIBODEAUX:

15              **Q.  And we'll go through these**

16         documents a little bit later.  But you

17         got -- before you ultimately sold the house

18         and went to the closing in July of 2016,

19         there's an appraisal that comes in May of

20         2016 and an update to that comes in July of

21         2016.  The May '16 appraisal was for

22         595,000.  But your sale price in July of

23         2016 was for 416,500; correct?

24              A.  Is the appraisal in here?  I don't

25         what the appraisal amount was.

1          Q.  This is --

2          MR. DOYLE:

3               It may be attached.

4          THE WITNESS:

5               All right.  So the appraisal

6          was for 595.  Okay.  On July 15th

7          of '16.

8     EXAMINATION BY MR. THIBODEAUX:

9          Q.  Right.  And the sale price was

10    416,500; right?  The Purchase Agreement is

11    somewhere in there?

12         A.  Yeah.  I believe that's about

13    right.

14         Q.  So my question generally is, you

15    know, when you have an appraisal for 595,

16    why did you sell it for 416,500?

17         A.  I don't know exactly all the

18    details of how we got to the price.  I

19    don't know.  I don't know how we got to

20    that.  I think we were under contract for

21    550 for the guy that fell through --

22         Q.  Right.

23         A.  -- when we found out we had the

24    Chinese drywall.  And I don't know how we

25    got to the exact number, I can't recall.

1      **Q.  So it looks to me what happened**

2      just from looking at the documents today,

3      the 416,500 sale price was, basically,

4      discounted because of the renovation that

5      was going on and he was going to pay,

6      meaning Theard -- not Theard, what's his

7      name?  Chauffe was going to pay for at

8      least some amount of the renovations that

9      was going on.

10          MR. DOYLE:

11              Object to the form.

12     EXAMINATION BY MR. THIBODEAUX:

13          **Q.  Is that generally what the**

14     relationship was, what the deal was?

15          A.  I think there was a couple of

16     things that he was going to pay for that,

17     you know, that they were going to handle as

18     the new owner of the house, different from

19     what we were going to pay for it.  But I

20     don't -- I don't know of any other -- you

21     know, I can't remember any other kind of

22     arrangement that we had.

23          **Q.  Okay.  Maybe when we go through**

24     the documents and some of the invoices that

25     will trigger some memory.

1              A.   Right.

2          Q.   Okay.   You would agree with me

3      though when you and your wife moved out in

4      October of 2015 and moved into the Thrush

5      Street house, y'all were doing that

6      regardless of the Chinese drywall and the

7      Marshall Foch house; right?

8              MR. DOYLE:

9                  Object to the form.   You can

10                 answer.

11             THE WITNESS:

12                 Yeah.   We were building a

13                 house and then we were moving out.

14     EXAMINATION BY MR. THIBODEAUX:

15         Q.   So any costs associated with

16     moving out of the Marshall Foch house and

17     the Thrush Street house, that's unrelated

18     to the Chinese drywall and the Marshall

19     Foch house; right?

20             A.   Yeah.   We were already planned to

21     move out in October.

22         Q.   And because you didn't even know

23     that you had had Chinese drywall in the

24     home until you moved out in October of

25     2016 -- 2015 the Chinese drywall didn't

1       prevent you from doing anything in the

2        Marshall Foch house when you actually lived

3        there; is that right?

4               MR. DOYLE:

5                   Object to the form.  You can

6               answer.

7               THE WITNESS:

8                   Did it prevent me from doing

9               anything?

10              MR. THIBODEAUX:

11                  Yeah.

12              THE WITNESS:

13                  From selling it.

14      EXAMINATION BY MR. THIBODEAUX:

15          **Q.  Yeah.  Okay.  Other than selling**

16      it though, I mean, and that deal falling

17      through with the Theards, it didn't prevent

18      you from using the house in any way?

19          A.  No.  I don't know.

20              MR. DOYLE:

21                  Object to the form.  You can

22              answer.

23      EXAMINATION BY MR. THIBODEAUX:

24          **Q.  What was the answer?**

25          A.  I don't know.  You know we used

1    the house, you know, yeah.  I don't know.

2         Q.  **I mean, you never said before you**

3    moved out to you or your wife we can't do

4    X, Y, Z because of Chinese drywall, because

5    you didn't know that you had Chinese

6    drywall; right?

7         A.  Well, when we sold the house, I

8    was looking to get about 2 to 300,000 out

9    of the house.  So we were not able to pay

10   for things in our new house.

11        Q.  **Yeah.  I mean, separate and apart**

12   from the sale falling through.

13        A.  Well, we were banking on the sale

14   happening when we were building our house

15   and that fell apart.  And so we moved into

16   a house that wasn't furnished or, you know,

17   that I could barely pay the note on the

18   thing.

19        Q.  **Right.  So again --**

20        A.  Yeah.  It impacted the hell out of

21   me.

22        Q.  **I'm talking about --**

23        A.  And I got to hear about it from my

24   wife too.

25        Q.  **I'm sure.**

1          A.   And that wasn't a fun time.

2          Q.   I'm sure.   I guess what I'm just

3     trying to do is draw a line between that

4     process when you were trying to sell the

5     house in November of 2015 and the problems

6     you were having with that and prior to the

7     thank.   The Chinese drywall problem you had

8     didn't start until November of 2015 when

9     you found out about it; right?

10          A.   As far as I know, correct.

11          Q.   All right.   So you after the deal

12     fell through in November of 2015 and you

13     got the inspection confirming that you had

14     Chinese drywall just kind of explain to me

15     generally what was C&J General Contractors

16     role moving forward in the remediation of

17     the Chinese drywall?

18          A.   So we were the general contractor

19     and hired the subs to do the Sheetrock,

20     painting, you know, whatever else work that

21     we did.

22          Q.   Okay.   And those are all subs I'm

23     sure you used on your other projects as

24     well?

25          A.   Correct.

1      Q.   What process did you follow to

2    remediate the Chinese drywall?

3      A.   The Healthy Home Solutions guy

4    went through and I can't remember

5    everything, but he did some inspections I

6    remember we got.  He came through and we

7    had to remove every piece of dust.  I don't

8    know, there was some kind of Federal

9    guideline that was from the prior cases of

10   how to handle the thing.  And I hired him

11   and he, basically, had to clear us before

12   we could even do anything after --

13     Q.   Okay.

14     A.   -- the removal.

15     Q.   Okay.  And so that was a piece

16   of -- I guess, let me back up.  There was a

17   remediation piece to what y'all were doing

18   to get rid of the Chinese drywall and get

19   it to where you could sell it without

20   having to worry about the Chinese drywall

21   part; is that right?

22     A.   Correct.

23     Q.   And then there was also kind of a

24   renovation piece that went with it --

25     A.   Correct.

1     **Q.   -- to improve the house above and**
2     **beyond what the Chinese drywall work was;**
3     **is that right?**
4          A.   Uh-huh.
5          **Q.   What was Ben's role in that**
6     **renovation part in improving the home?**
7          A.   So I didn't want to put a house
8     back together to my taste and then try to
9     sell it.  And so they were a potential
10    buyer and so we went -- unless I had some
11    big objection to what they wanted to do --
12    but they went and picked out -- I said, all
13    right, you know, go pick out whatever, you
14    know, finish on the Sheetrock, the
15    painting, the trim work, you know, all that
16    kind of stuff.
17         **Q.   Uh-huh.**
18         A.   Unless I had any real objection to
19    something really crazy because if I had to
20    sell it later, it's mine, I still have to
21    sell it, but knowing that they wanted to
22    buy the house.  So they would go and pick
23    out flooring and stuff like that.
24               MR. THIBODEAUX:
25                    Okay.  Do you want to take a

1        A.  Right.  Okay.

2        **Q.  All right.  So let's start back on**

3  the first page.  All right.  Name of

4  Claimant down at the bottom and it's got

5  your name.  Your wife's not included.  And

6  that's because she never had a property

7  interest in the Marshall Foch property; is

8  that right?

9        A.  I guess, yeah, you know.

10        **Q.  Let's go to Page 2.  All right.**

11  If you look in the middle it's got

12  questions when did you acquire the property

13  and when was the Chinese drywall installed.

14  You've got dates of February 1st, 2006 and

15  June 1st, 2006.  Those dates are accurate

16  as far as you know?

17        A.  Pretty close, yeah.

18        **Q.  Did you fill out this Supplemental**

19  Plaintiff Profile Form yourself?

20        A.  I don't know if I typed it or hand

21  wrote it and y'all typed it or whatever,

22  but I may have typed it.  I don't know.  I

23  have to go look at my sent e-mails to know

24  exactly.

25        **Q.  Okay.**

1      main part of the house on the first floor,

2      the kitchen, the den, the dining.  That

3      all -- that all remained intact --

4      **Q.  Okay.**

5      A.  -- in there.

6      **Q.  All right.  This one has got bill**

7      to Ben Chauffe.  Did Ben pay this invoice

8      directly?

9      A.  I don't believe.  But he was

10     picking out the flooring that they wanted.

11     So he would go and he would send it to him,

12     and then he'd send everything to me.

13     **Q.  For any of the renovation**

14     invoices, did Ben pay directly?

15     A.  He may have used his credit card

16     on a couple like miscellaneous items or

17     something, but I don't know.  We can look

18     at it and see in the documents to see

19     what -- if he paid anything or, you know,

20     whatever he paid or didn't pay.

21     **Q.  Okay.**

22     A.  But, no, I believe I paid every --

23     mostly everything because he couldn't

24     afford it.

25     **Q.  Oh, yeah.**

1      A.  He needed the loan from the bank

2  and that was the problem was he needed the

3  loan from the bank.  The bank wouldn't lend

4  to an unfinished house.  So the bank needed

5  to have a finished house before they would

6  give him the phone.  And he needed the

7  money for the deposit on the house.

8      **Q.  Okay.**

9      A.  So I would have let him handle the

10  whole thing and buy it from me undone, but

11  he couldn't -- the bank wouldn't lend on a

12  vacant unfinished house.  So I funded -- I,

13  basically, funded this, you know, the whole

14  renovation.

15      **Q.  I guess it goes back to the**

16  question I had earlier though because you

17  end up with the appraisal, which I think is

18  of the finished home --

19      A.  Uh-huh.

20      **Q.  -- or assuming it's going to be**

21  the finished home, which is 595, I think.

22  But your sale price is still 415 or

23  whatever?

24      A.  So I had this house sold a year

25  before, before I had a real estate agent

1        Would you just confirm that those are the

2        two appraisals you referenced in the Fact

3        Sheet?

4             A.  All right.  I'm not seeing the

5        earlier appraisal.

6             **Q.  It's actually after.**

7             A.  Okay.

8             **Q.  It's right after all the**

9   documentation from the first one.  The

10      first, if you look at this, the first one

11      is about this thick.

12             A.  Okay.  Yeah.

13             **Q.  There it is there.**

14             A.  Okay.  March of 2009.  Yes.

15      Okay.

16             **Q.  All right.  So the May 16, 2016**

17      appraisal that's attached, that's the one

18      that's got the appraisal for 595,000; is

19      that right?

20             A.  Yes.

21             **Q.  If look at the bottom of Page 3 of**

22      this document it's got manufacturer/seller

23      of the drywall.  Do you see that?  I'm

24      sorry.  I'm back to the  --

25             A.  The first appraisal?