1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  CHINESE-MANUFACTURED  *        09-MD-2047
             DRYWALL PRODUCTS        *
5            LIABILITY LITIGATION    *        Section L
                                     *
6    Relates to:  Guilfort Dieuvil  *        August 20, 2019
             13-CV-609               *
7                                    *
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

8

9                    PROCEEDINGS BEFORE THE
10                  HONORABLE ELDON E. FALLON
                 UNITED STATES DISTRICT JUDGE
11

12   Appearances:

13

14   For the Plaintiffs:         Herman Herman & Katz, LLC
                                  BY:  RUSS M. HERMAN, ESQ.
15                                     STEPHEN J. HERMAN, ESQ.
                                  820 O'Keefe Avenue
16                                New Orleans, Louisiana 70113

17   For the Knauf               Fishman Haygood, LLP
     Defendants:                 BY:  KERRY J. MILLER, ESQ.
18                               201 St. Charles Avenue, Suite 4600
                                 New Orleans, Louisiana 70170
19

20   Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
                                 500 Poydras Street, HB-275
21                               New Orleans, Louisiana 70130
                                 (504) 589-7778
22

23

24   Proceedings recorded by mechanical stenography using
     computer-aided transcription software.
25

<u>**PROCEEDINGS**</u>

**(August 20, 2019)**

**THE COURT:**  Be seated, please.  Good morning, ladies and gentlemen.

Call the case, Dean.

**THE DEPUTY CLERK:**  MDL 2047*, In re Chinese-Manufactured Drywall Products Liability Litigation*, regarding Civil Action 13-609, Guilfort Dieuvil.

**THE COURT:**  Counsel make their appearance for the record, please.

**MR. STEVE HERMAN:**  Good morning, Your Honor.  Steve Herman for Mr. Dieuvil.

**MR. MILLER:**  Good morning, Judge Fallon.  Kerry Miller for Knauf.

**THE COURT:**  Let me make some comments to put this matter in perspective.

This matter grows out of the Chinese drywall litigation.  The genesis of that litigation began around 2004.  From 2004 to 2006, both a housing boom and unfortunately hurricanes brought about a situation where we had a shortage of construction material, including drywall.  As a result, drywall manufactured in China was brought into the United States and used to construct as well as refurbish homes and other buildings in the coastal areas of our country, particularly the Gulf Coast, including New Orleans, Louisiana, all the way to

1  Florida, and all the way up the east coast of Virginia.

2          Sometime after the drywall was installed,

3  homeowners began to complain of foul-smelling odors, corrosion,

4  blackening of metal surfaces, objects, and the breaking down of

5  various appliances and electrical material in the homes.

6          The homeowners began filing suits in various

7  state and federal courts against the home builders, developers,

8  installers, realtors, brokers, suppliers, importers, and

9  various other people, including the manufacturers of the

10  Chinese drywall.  The matter was made into an MDL and

11  transferred to this Court and we began handling the matter.

12          The Chinese drywall was largely manufactured by

13  two groups, the Knauf entities and Taishan entities.  The Knauf

14  entities had a wholly owned Chinese subsidiary.  The Knauf

15  entities are German-based international manufacturers of

16  building products, including drywall, whose Chinese subsidiary,

17  Knauf Plasterboard (Tianjin) -- KPT we know it as -- advertised

18  and sold drywall in the United States.

19          The matter proceeded and on December 20, 2011,

20  after extensive discovery and several bellwether trials,

21  seeking to avoid the effort and expense of future litigation,

22  the parties, the Knauf defendants and the PSC, entered into

23  settlement discussions, and they were able to construct a

24  settlement of this MDL 2047.

25          The settlement included both unremediated homes

as well as self-remediated homes.  Under the settlement
agreement, owners who had self-remediated affected properties
were able to seek benefits to resolve their remediation claims
and expenses connected therewith, but they also had to follow a
protocol.  Pursuant to the protocol, owners of already
remediated homes were required to produce evidence -- such as
photographs, videos, samples, and other material -- showing the
extent, the nature, and the type of drywall that was used.

            The present matter before the Court involves a
self-remediated property which allegedly contained Knauf
Chinese drywall.  In the mid 2000s, I think it was, Mr. Dieuvil
learned that the property might contain this defective
Chinese-manufactured drywall.  In 2013 Mr. Dieuvil submitted a
plaintiff profile form to the Knauf defendant pursuant to the
Knauf class action settlement.

            Knauf initially denied the claim.  However, in
2015 the parties entered into an agreement whereby Mr. Dieuvil
would recover to the extent he could present evidence preserved
in accordance with this Court's pretrial order -- I think it
was 1B -- which sets forth the protocol for the preservation of
the various items of evidence.

            After inspection of Mr. Dieuvil's property in
2015, Knauf again denied the claim, and the issue was submitted
to a special master the Court appointed, Mr. Dan Balhoff, for
his consideration.

On November 22, 2017, the special master issued
a report finding in favor of Knauf and against Mr. Dieuvil.  In
his report the special master reasoned that the denial of
Mr. Dieuvil's claim was appropriate because he felt that
Mr. Dieuvil did not present evidence in compliance with the
Court's pretrial order.  The special master further reasoned
that such failure to preserve the evidence and present the
evidence pursuant to the pretrial order would prejudice Knauf's
ability to present a defense since only, of course, Mr. Dieuvil
had access to the property.

Mr. Dieuvil, acting *pro se*, filed an objection
to the special master's report on December 21, 2017.  I
received the objection.  I noted that it was *pro se*, and so I
contacted plaintiff liaison counsel and ordered plaintiff
liaison counsel to review the objection, confer with all the
necessary parties, and make a recommendation regarding any
further proceedings.

Plaintiff liaison counsel contacted Mr. Dieuvil,
as the Court requested, in September of 2018 and began an
intensive and extensive review of the evidence submitted to
him, including photographs, samples of drywall, blueprints
showing inspections, documents regarding evidence retention,
and so forth.

On February 8, 2018, plaintiff liaison counsel
advised the Court that after having completed a thorough

1  investigation of Mr. Dieuvil's material and documentation, he

2  strongly recommended that the Court consider calling a hearing

3  on Mr. Dieuvil's request for an appeal from the special

4  master's report.

5       This matter has been set for hearing today to

6  hear from the parties.  I will now hear from the plaintiffs.

7       **MR. STEVE HERMAN:**  Thank you, Your Honor.  I provided

8  a copy of the PowerPoint to Ms. Poucher and ask permission to

9  approach.

10       **THE COURT:**  Yes.

11       **MR. STEVE HERMAN:**  So, Your Honor, it's undisputed, I

12  think, that there was Knauf drywall in the home.  I also think

13  it's undisputed that when the drywall was removed by the

14  builder in 2010 in order to start remediating the home -- the

15  process was never finished, but all of the drywall was removed

16  back in 2010.  There were samples of the Knauf drywall that

17  were preserved as well as a lot of other samples and

18  photographs and other things that we are going to go over, so

19  that's undisputed.  Nevertheless, under the special master's

20  order, the plaintiff is denied any and all compensation based

21  on this supposed failure to comply with the requirements of the

22  PTO.

23       Now, it's unclear to me in what specific

24  respects did the samples and photographs preserved not comply

25  with the PTO.  That's not really set forth that I have seen by

10:12

1  Knauf, and it certainly wasn't set forth by the special master.

2  There is also a question in my mind as to what extent would

3  this order have even applied to somebody that wasn't in the

4  litigation back in 2010.

5       I understand there's a contract, and we will

6  talk about that.  Just under ordinary circumstances,

7  Mr. Dieuvil I don't think was even anticipating litigation at

8  that time.  His builder said, "We are going to go ahead and fix

9  your property," so I think he was hoping to get the matter

10  resolved without ever having to sue anyone.  Nevertheless, this

11  information was preserved.

12       **THE COURT:**  He bought the property and then

13  discovered the drywall?  Is that basically it?

14       **MR. STEVE HERMAN:**  Correct.  I don't remember if he

15  discovered it and then inquired or if he got a letter from the

16  builder that said, "We think you might have a problem."  I

17  don't remember off the top of my head.

18       The builder came.  They did an inspection.  They

19  said, "Yeah, we confirmed that there's drywall."  In fact, they

20  even confirmed it was Knauf drywall, and they offered to

21  remediate.

22       So basically what we have here is tantamount to

23  a dismissal of his claim due to alleged spoliation, and under

24  the case law that's a drastic and Draconian remedy of last

25  resort.  It generally requires egregious and willful conduct on

10:14

1    the part of the plaintiff, generally requires substantial

2    prejudice to the defendant, and it's not applied when a less

3    drastic remedy is available.

4              Your Honor might remember that you decided a

5    case a few years ago that's cited here where you declined to

6    impose any sanctions, much less dismissal.  You wouldn't apply

7    any sanction in the case of the spoliation, which was a clear

8    spoliation, in the absence of bad faith.  We certainly don't

9    have bad faith here.

10             The builder in this case verified that Knauf

11   drywall did exist in the home and was removed back in 2010.

12   Knauf itself admits in the filing with this Court that there

13   were five installed KPT boards and six detached KPT boards

14   presented in accordance with the PTO.  Knauf admits that.

15             Here's just a few photographs of some of the

16   Knauf samples that were preserved.  Your Honor may recall we

17   had a hearing a few months ago and we had boxes and boxes of

18   samples.  We didn't bring that back into court, but these

19   samples are still preserved to this today.  I think under the

20   PTO they were supposed to preserve two samples.  In fact,

21   there's 11 Knauf samples that were preserved.

22             In addition to that, the builder also preserved

23   samples of domestic drywall.  This is just a couple that we are

24   showing you here, but there's several more.  Here's another one

25   of a different domestic drywall sample that was preserved.

10:15

1               In addition, the builder preserved a bunch of

2   unmarked drywall cutouts.  There's probably 20 or 30 unmarked

3   drywall cutouts that are preserved.  They are all marked, who

4   took them out.  They are bagged.  They are dated, where they

5   came from.  All of this is maintained by the builder on a

6   series of floor plans that were submitted as part of the

7   objection.  I'm going to show a little blowup later, but you

8   can see what drywall was found in the home.  There's a little

9   legend and what rooms that it came from.  So all of this was

10  documented, maintained, preserved in 2010.

11             When there was an AirQuest environmental

12  inspection report, there were photographs of the HVAC system

13  before it was removed, and that's what was required under the

14  PTO.  The builder also preserved plumbing components.  In

15  addition, the builder preserved electrical components.  I've

16  only shown you three here, but there's about 15 pages of

17  photographs of electrical components, boxes of electrical

18  components that were all preserved and electrical wires that

19  were preserved.

20             So just under the general common law state duty

21  to preserve evidence in anticipation of litigation, Mr. Dieuvil

22  clearly satisfied that requirement.

23        **THE COURT:**  Did he have an attorney at the time,

24  early on?

25        **MR. STEVE HERMAN:**  I don't believe he did.  I think

10:16

1  the builder is the one that undertook to do all these

2  preservation efforts, probably because the builder was going to

3  try to get their money back from Knauf.  But in any event, it

4  was all preserved and is preserved to this day.

5          So what Knauf relies on is this Jimmy Doyle

6  settlement term sheet, which indicated that everything was

7  going to be done in strict compliance with PTO 1B.  Just a

8  couple of notes about this settlement term sheet.

9          First of all, it was presented as a package deal

10 to Mr. Doyle with other clients.  There's no evidence that the

11 plaintiff individually authorized or approved this agreement,

12 and it's not signed by the actual party.  It's only signed by

13 Mr. Doyle.  Here's the first page of it, and it shows that the

14 terms are only enforceable as a package deal.  Then when you

15 look at the signature page, when they are talking about

16 Mr. Dieuvil, it says Knauf and Doyle agree that his claim will

17 go forward, and then it's signed by Mr. Doyle on behalf of the

18 Doyle clients.  It's not signed by the plaintiff.

19         In any event, okay, let's assume that there is

20 some agreement of strict compliance with PTO 1B.  That begs the

21 question as of when.  Knauf admits that the drywall was all

22 removed in September to December of 2010.  There's no evidence

23 or any suggestion that any of those samples were not maintained

24 from that point forward.

25         There's no evidence or suggestion that there was

10:18

1    any spoliation in violation of the order after the plaintiff

2    became a party to the litigation in 2013.  There's certainly no

3    evidence or suggestion of any spoliation in violation of the

4    order after this agreement was signed by Mr. Doyle in 2015.

5              There's no prejudice to Knauf.  There's no

6    finding by the special master of substantial prejudice, which

7    is what's required by the case law.  I would submit that the

8    finding of prejudice is not very well-founded.

9              There's samples of the Knauf drywall.  There's

10   samples of the domestic drywall.  There's samples of the

11   unmarked board.  There's photos and samples of the HVAC,

12   plumbing, and electrical wiring.  There's an AirQuest

13   inspection report.  If this had gone to litigation, Knauf

14   certainly could have questioned, subpoenaed documents from, and

15   deposed the builder and its employees about what they did when

16   they originally built the property and what they found during

17   the remediation process.  So there were other ways in which

18   Knauf could have confirmed the presence of other drywall, if

19   any.

20             When you are talking about prejudice, if we go

21   back to this floor plan that I showed previously, the builder

22   meticulously noted every single type of drywall that was found

23   in the home.  This is the second floor that I have blown up.

24   On the left side is what was found on the first floor.  So

25   Knauf was clearly on notice as to every type of board that was

10:19    1    found in the home.

2                    In addition, after this dispute arose, the

3    plaintiff said, "Well, if you can't tell enough from the

4    photographs, come over and look at the actual samples

5    themselves.  We have the samples sitting over here," and Knauf

6    declined to do that.

7                    And then there's no bad faith.  There's no

8    finding by the special master of bad faith.  There's no

9    evidence or suggestion of any egregious or any type of even

10   negligent conduct by the plaintiff himself, much less willful

11   spoliation or bad faith.

12                   I'm happy to answer any questions that the Court

13   might have.

14           **THE COURT:**  I'll give you an opportunity to respond.

15   Let's hear from the defendant.

16           **MR. STEVE HERMAN:**  Thank you very much, Your Honor.

17           **THE COURT:**  Thank you.

18           **MR. MILLER:**  Thank you, Steve.

19                   Thank you, Judge Fallon.  Kerry Miller again on

20   behalf of Knauf.

21                   Judge, just a couple of responses to your

22   remarks, and then I will address Mr. Herman's comments about

23   prejudice.  I think those are the key issues here today.

24                   In your introductory remarks about the case,

25   Your Honor, you correctly identified under the Knauf class

10:20

1    action settlement agreement there were basically two buckets of

2    claim type.  One was for homes to be remediated by the program

3    contractor, typically Moss, the other bucket being the already

4    remediated home bucket.  The typical case would involve the

5    homeowner hiring his own contractor, preserving all the

6    evidence -- that is, the drywall that came out, the drywall

7    that went in -- and all of the expenses incurred in renovating

8    the home.  That would be submitted to us in a binder and then

9    analyzed.

10           The fundamental problem with Mr. Dieuvil's claim

11   is it didn't fit into either bucket, as it came to us, neatly.

12   As Mr. Herman mentioned -- and I think you also did in your

13   introductory remarks -- this claim started out with Mr. Dieuvil

14   dealing with his builder, GL Homes.  He signed a repair

15   agreement with his builder.  As Your Honor will recall, in the

16   early days of your MDL the builders loomed large.  They were

17   having their own repair programs, doing their own repairs.

18   Mr. Dieuvil's builder was one of those companies, GL Homes.

19           It started the repairs on Mr. Dieuvil's home in

20   2010.  It removed all the drywall.  It removed all the

21   insulation.  It removed all the wiring.  It was in the process

22   of reinstalling wiring and insulation when Mr. Dieuvil said, "I

23   want new metal studs in my home."  The home builder said,

24   "Metal studs aren't part of the protocol.  There's no problem

25   with your metal studs."  Mr. Dieuvil and the home builder got

10:22

1    into a dispute over metal studs.

2              At some point the home builder -- I think right

3    around December of 2010 -- said, "Look.  We will replace your

4    metal studs, we will redo the electrical we just redid, and we

5    will redo the insulation we just redid for $25,000."  A deal

6    was never consummated.  Mr. Dieuvil never agreed to pay them

7    $25,000 to go back and remove the metal studs that weren't

8    impacted and to reinsulate and rewire the home.  So the house

9    sits partially remediated beginning in 2010.  I think it's the

10   same condition it's in today.

11             The home comes into the Knauf settlement.  He

12   makes various claims.  He actually made a claim against Banner

13   and recovered money because he was able to prove his drywall

14   came from Banner.

15             The problem on the Knauf side was the home was

16   not already remediated in the typical sense because he had not

17   incurred any expenses.  He didn't hire the contractor.  He

18   didn't possess the samples.  He didn't have the binder.  He

19   didn't have the invoices.

20             **THE COURT:**  Who hired the contractor?

21             **MR. MILLER:**  It was his own contractor, like

22   Mr. Herman said, doing the repair program.

23             **THE COURT:**  He didn't pay him or anything?

24             **MR. MILLER:**  No.  No.  They were doing this under

25   their warranty program in the early days of Chinese drywall as

1   you will recall.

2            So it wasn't a classic already remediated home

3   in terms of the settlement agreement proof requirements.  They

4   weren't there.  It was also not a remediated home or a home to

5   be under the remediation program because it was already

6   partially remediated, and there was no ability for Knauf to do

7   the kind of inspections -- the initial inspection, the

8   confirmatory inspection -- all the things that were built into

9   the settlement agreement to qualify a home for remediation.  So

10   it was sort of in no-man's-land.

11            Lots of claims were submitted.  I think he was

12   in *pro se* status.  My understanding of his representation

13   status is when he is dealing with GL he is unrepresented.

14   There are emails to the effect, Your Honor, at the time that he

15   evicted GL in 2010 that he was represented by Colson Hicks, by

16   Ervin Gonzalez.  I don't know how long that lasted.

17            Then he makes claims in the Knauf class action

18   settlement.  I think he is *pro se* again.  BrownGreer has

19   difficulty classifying his claim because it didn't fit in

20   either bucket.  He then retains Mr. Doyle.  Knauf and Mr. Doyle

21   do a deal on various claims that he had back in 2010.

22            We knew some of the history of the claim because

23   of just dealing with BrownGreer.  We would get calls from Jake

24   and others at BrownGreer, "We are not sure what to do with

25   this.  It doesn't fit.  There's no inspection.  It's not an

10:25

1    already remediated home.

2              So in the deal that we struck with his lawyer at

3    the time, 2015, Mr. Doyle, the agreement that was reached was

4    strict compliance with PTO 1B because we knew this house was

5    different.  Knauf was never going to be able to have the

6    ability to go into a home that had not been remediated and

7    deploy the Court-approved inspection protocol.  And that's why

8    strict compliance with PTO 1B was required in 2015, as

9    Mr. Dieuvil was now represented and his claim was going to be

10   resubmitted and reprocessed by BrownGreer.

11             Mr. Herman said, "Well, how are you prejudiced?

12   There's a lot of stuff: a lot of pictures, a lot of ziplock

13   bags with drywall, a lot of electrical components."

14             I'm going to refer to our mutual friend,

15   Arnie Levin.  He would always say in the early days of Chinese

16   drywall -- and, in fact, quite recently we saw the good news of

17   a preliminary approval motion filed today -- the world tilted

18   to Knauf.  It didn't tilt to Taishan for reasons that we are

19   all aware.  The world tilted to Knauf.  What I meant by that

20   was homeowners, builders, people in the trade, if they had this

21   unfortunate situation, they wanted to have Knauf drywall and

22   not Taishan.

23             Well, we knew that in 2009 when one of the first

24   substantive pretrial orders confected was Pretrial Order 1B.

25   We knew that there would be an unbiased way -- because we saw

1   plenty of them in the early days -- to do inspections and to

2   selectively find Knauf drywall, and the Taishan or other

3   Chinese drywall would just be unlabeled or unknown.  It

4   depended on how the inspection was done.

5             That's why, to get to the central point of

6   Mr. Balhoff's finding that Knauf was prejudiced in the

7   assessment of this claim, you look to the strict language of

8   PTO 1B entered October 9, 2009.  It says in order to comply

9   with PTO 1B, a claimant must "photograph the back side of each

10  Chinese drywall board immediately after it is removed on-site

11  and document on a floor plan, building diagram, or other

12  similar form of documentation the location of each full or

13  partial Chinese drywall board removed from the property and its

14  photograph.  Photographs of the wall sections should be taken

15  so that any markings on the back side of the drywall sections

16  are most clearly visible in the photographs."

17            You may remember, Steve may remember, as we

18  refresh our recollections, we worked on this protocol for

19  months.  Knauf had a representative.  The PSC had a

20  representative.  The builders had a representative.  We all had

21  statisticians in building sciences to help us with this

22  protocol; the reason being, Your Honor, in a home the size of

23  Mr. Dieuvil's, it would typically encompass about 560 sheets of

24  drywall.

25            Drywall is laid out -- they come in 4x8 or 4x12

10:28

1    sheets.  It's laid horizontally.  This is not a good room

2    because it's wood paneling, but in a regular room, depending on

3    what size it is -- if you had 12-foot ceilings, that would be

4    an easy one because you would have three sheets, 4x8, 4x8, 4x8.

5    If your room was 16-foot long, you would have 4x8, 4x8, 4x8,

6    4x8, 4x8, 4x8.  In a perfect setting, of course.  You would

7    have doors and windows and cutouts and things of that nature.

8                So the idea would be -- the requirement of

9    PTO 1B is you would basically photograph the house, document

10   the house like a jigsaw puzzle.  You would take the boards off

11   where they were, flip them around, take a photograph so you

12   knew exactly how they were installed.

13               We don't have that in this case.  We will never

14   know whether or not Mr. Dieuvil's house contained five KPT

15   boards, Taishan boards, other Chinese boards, black market

16   boards --

17         **THE COURT:**  Doesn't he have the pictures, though, of

18   all the material plus the plan, where it's supposed be?

19         **MR. MILLER:**  Yes, but that plan and those pictures,

20   all of which Mr. Balhoff had, does not strictly comply with

21   PTO 1B because it's not the back side of a jigsaw puzzle.

22               The flip side of PTO 1B, Your Honor -- I mean,

23   look, this settlement was very rule-specific.  Knauf followed

24   the rules.  Mr. Dieuvil didn't, and he didn't because he kicked

25   GL out in 2010.  That was a bad decision.  Knauf shouldn't have

to pay for that bad decision.  Had he just let GL finish the home, the home would have been finished a long time ago and he would have been living there.  It's been proven over time there's nothing wrong with the studs.  But that decision was made, and it set this claim on a completely different course than any other case.  That's why strict compliance is needed.

The information submitted by Mr. Dieuvil to the special master and to Your Honor does not comply strictly with PTO 1B.  It doesn't comply with the letter of PTO 1B.  It does prejudice Knauf because Knauf will never know the composition of the 560 boards in the home.

If you look at the operative language of PTO 1B in terms of what the relief is, it says the failure to preserve evidence as required by law will result in a disallowance or reduction in the amount of the claim if the failure has been prejudicial to determination of the claim, and that's what Mr. Balhoff found, Your Honor.

**THE COURT:**  I hear you.  It just seems to me we have a person here who has been *pro se*.  He has collected the material, or somebody collected it for him, the builder.  It's imposing.  It's not nothing.  He has not only the material, but he has plans showing where the material was and how much of it was there.

You're right it doesn't cross every "T" and dot every "I," but if he gets there another way -- I don't know.

10:32

1  What are we talking about here from the standpoint of amounts?

2  What are we dealing with?  Do we have any idea?

3        MR. MILLER:  Well, Your Honor, that sort of is the

4  issue.  Our secondary issue that we are not here to talk about

5  today --

6        THE COURT:  I understand.

7        MR. MILLER:  -- and if we go back, we will have to

8  talk about mitigation.  It's a big house.  It was halfway

9  remediated, but it's been sitting like that since 2010.  I'm

10  happy to have some discussions with Mr. Herman after this.

11        THE COURT:  Yes.  I really would like you-all -- this

12  is what appears to me.  It appears to me there's no question

13  that the protocol, every "T" wasn't crossed, every "I" wasn't

14  dotted.  It also seems to me that the information developed is

15  information that the protocol would give.  As they say, there

16  are several routes to the kingdom of truth; who is to say what

17  is the shortest.  It seems to me that they both go to the same

18  place.  There's one that's a little longer and the other one is

19  a little shorter.

20              I would like to know what we are talking about.

21  If you-all can get together and see what it is and see whether

22  or not we can resolve this matter, I think -- the fellow has

23  done about as much as he can do.  If we can figure out how much

24  drywall is in there or what we do with this situation --

25              It seems to me, Kerry, we have a situation here

10:34

1  where a fellow is *pro se*.  I think he is in the settlement.  I

2  don't think he can file a lawsuit at this point.

3          **MR. MILLER:**  No, I think that's right.

4          **THE COURT:**  I think he is inside the settlement.

5          **MR. MILLER:**  He made a settlement claim.  He already

6  recovered his Banner settlement claim, so I don't think there's

7  any doubt about that.

8          **THE COURT:**  I don't have any question about that.

9          **MR. MILLER:**  The issue is compliance with the

10  settlement rules and regulations.

11          **THE COURT:**  Yes.  The question is whether the

12  material developed gives enough information that we can resolve

13  this thing fairly and appropriately.

14          **MR. MILLER:**  No, that's right, Your Honor.  It not as

15  if he doesn't have information.  To quote you, there are short

16  roads and long roads to the kingdom of truth.  Our problem is

17  he didn't quite get there.

18          **THE COURT:**  Well, yes, I know your situation.  You

19  say he didn't.  It seems to me he has a lot of material.  It's

20  not like he didn't do anything.  If the fellow didn't do

21  anything and just he has word of mouth, "There was drywall in

22  there and I saw it," that's one thing.  He not only has the

23  pictures, but he has material to look at.

24          **MR. MILLER:**  Well, he has some material, and that's

25  what the issue is, Your Honor.  We didn't put him in this

situation.

        **THE COURT:**  No, I understand.  You didn't.  Here we have a *pro se* fellow who made a bad decision by firing his person, but I don't know whether that's necessarily problematic if we can get through this.  I'll give you-all two weeks to talk about it and, if not, then I will rule on it.

        **MR. MILLER:**  Okay.  Thank you, Judge.

        **THE COURT:**  Let's see if we can resolve this.

        Russ, get involved in this.

        **MR. RUSS HERMAN:**  May it please the Court.  I just want to answer Your Honor's inquiry.

        We, in due diligence, once we were assigned this, got Xactimate and Mr. Velez involved to make sure what was the square footage, etc.  We have prepared a proffer.  We will provide that proffer to Mr. Miller because we felt it was inappropriate at this point to deal with the findings.

        Your Honor had originally asked before, I'll call it, the first hearing, "What are we dealing with?"  It's at least, according to the proffer -- which can be contested, argued about, mediated, whatever -- in excess of $500,000.  So no matter how you cut it, it's a substantial loss in terms of pure remediation.  I just want to answer the question.

        **MR. MILLER:**  As we shift there -- and, look, I like these guys.  We'll get together over lunch and we'll see if we can figure it out.

 1          **MR. RUSS HERMAN:**  It takes two of us to deal with

 2   you, Kerry.

 3          **THE COURT:**  We have to understand that this is not

 4   the usual case, Mr. Dieuvil.  So there's some way you are going

 5   to have to be understanding, too, in this situation.  It's not

 6   100 percent recovery in a case like this, and you have to deal

 7   with that.

 8          **MR. MILLER:**  That's all I was going to say,

 9   Your Honor.  I appreciate those comments.  I have seen Russ'

10   proffer and I have looked at it.  It's a one-up house in 2019.

11   Doing this as part of a program in 2010 would have yielded a

12   much lower number.  Again, we didn't kick the home builder out.

13          **THE COURT:**  Yes, I understand.

14              I agree with that sentiment, Mr. Dieuvil.  You

15   have to understand that in a settlement situation -- and I

16   would hope that this would be able to be resolved.  In a

17   settlement situation, generally speaking, a good settlement is

18   when nobody is satisfied.  It's just the way it is.

19              So don't feel that you are going to get

20   something in a settlement that makes you very, very happy

21   walking away.  It generally doesn't work that way.  I'm sure

22   they are not going to be satisfied either.

23              Maybe we have an opportunity here to deal with

24   it.  I think that the plaintiff would prevail in this

25   situation.  It's a question of how much.  In this room, you

10:38

1    folks are probably the world experts in Chinese drywall.  We

2    have been doing this now almost 10 years.

3            **MR. MILLER:**  Quite the dubious distinction we all

4    share.

5            **MR. STEVE HERMAN:**  It's not what we set out to do.

6            **THE COURT:**  Thank you very much.  I appreciate the

7    comments, both of you-all.

8            **MR. RUSS HERMAN:**  Can I make one professional comment

9    for the record?

10           **THE COURT:**  Yes.

11           **MR. RUSS HERMAN:**  We have no doubt about the

12   integrity and the ability of the special master.  It is not an

13   issue.  We have no doubt about the great competency and

14   integrity of Kerry Miller and Dan Dysart.

15               The only reason I'm making that is there may be

16   some references in the record in which they were criticized.  I

17   want to make it clear that the special master did his job.  He

18   has integrity.  He is familiar with the case.  And, of course,

19   Kerry Miller and Dan Dysart for Knauf have been in the case for

20   nine years and resolved most it.

21           **THE COURT:**  Thank you.  The Court appreciates it.

22   The Court will stand in recess.

23               (Proceedings adjourned.)

24                           * * *

25

1                    **<u>CERTIFICATE</u>**

2              I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, certify that the foregoing is a true and correct

5    transcript, to the best of my ability and understanding, from

6    the record of proceedings in the above-entitled matter.

7

8

9                                    */s/ Toni Doyle Tusa*
                                     Toni Doyle Tusa, CCR, FCRR
10                                   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25