# EXHIBIT 11

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA

**EDUARDO AND CARMEN AMORIN**, *et al.*, **individually, and on behalf of all others similarly situated,**

        **Plaintiffs,**

        **v.**

**TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD.,** *et al.*,

        **Defendants.**

**Case No. 1:11-CV-22408-MGC**

---

### PLAINTIFFS' RESPONSE TO DEFENDANTS' TRIAL PLAN PROPOSAL

Defendants are quick to improperly place blame on the MDL proceedings for the "many unfortunate twists and turns" this decade-old litigation has taken and for the current state of affairs.[1] But these twists and turns are the result of the Defendants' conduct, as aptly crystallized by the MDL Court:

> [T]he problem that I am faced with is that we've been doing this for nine years now. Every step of the way the defendant has resisted looking at the case. I mean, we've had jurisdictional issues and a bunch of other things. It just is apparent -- it appears to me, or at least it's a strong argument, that the whole approach is just delay. Delay because people die, delay because they lose their homes, delay because they're frustrated and giving up. And it's a method, and I am not talking about counsel, but it's just -- I don't know how much more I can give you to look at from the standpoint of bellwethers. I mean, we've discovered this case now for nine years. Even going to China to take depositions. And I think everybody knows the facts of this case pretty well, and it just seems to me that we're just – we're finding ourselves in, you know, a Dickens kind of Bleak House where we just keep discovering and keep moving the case at glacial speed, and pretty soon the glacier melts and you don't have

---

[1] *See* Defendants' Trial Plan Proposal [ECF No. 53] at 1.

> anything. And that concerns me. I am trying to figure a
> way of just bringing this to a head and getting rid of the
> case.[2]

In Defendants' words, "how the MDL court conducted things was no way to run a railroad."[3] Using Defendants' railroad analogy, that train has left the station: Defendants are in default; their motions to vacate the defaults have been denied multiple times; their motion to decertify the *Amorin* class was denied; and their motions for interlocutory appeal of the MDL Court's Class Damages Order and class certification rulings were also denied. Liability has been established against Defendants.[4] The only thing left to determine are Plaintiffs' damages. The problem with Defendants' plan is that the time for "traditional adjudication mechanisms" – *i.e.*, full-blown discovery, bellwether trials, and an assessment of the cost of litigation and claim values – has passed.

With regard to damages, the MDL Court has not yet entered an order detailing the plan for resolution of the Louisiana cases, but Judge Fallon recently signaled the Court's position: "With regard to the property damage cases, I would intend to appoint a master to utilize the formula that has been established in a number of cases, and to verify the square footage, verify the present ownership, verify the location, address, things of that sort, and then we'll simply apply the formula and come up with

---

[2] *See* Transcript of MDL Proceedings dated 8/15/2018 (attached hereto as Exhibit "A") at 24:2-20 (emphasis added).

[3] Defendants' Trial Plan Proposal at 1. Ironically, although Defendants contend that "[t]he historical causes of that derailment are now not relevant to this Court," they devote eight pages of their Trial Plan to a recitation of the "Background" of these proceedings, which really is a rewrite of history.

[4] *See* 8/15/2018 Transcript (Exhibit "A" hereto) at 5:5-10 (Judge Fallon: "with regard to "the *Amorin* cases, I've tried a number of those and liability in my opinion has been established in those cases. There have been two appeals, two different groups of appellate judges affirmed the cases, no cert has been asked for, so it's final. In the *Amorin* cases, therefore, liability has been established.").

2

a figure for the property damage. Those cases, it seems to me, are just administratively dealt with. I don't see the necessity for any trials in those cases, I think it's just I'll be issuing judgments in that fashion."[5]

It warrants repeating that Defendants actively participated in the evidentiary hearing that determined the measure of remediation damages for the *Amorin* Class Members. They proffered experts and presented argument in support of their position and they challenged Plaintiffs' evidence, but were unsuccessful. Not satisfied with the end result, Defendants want yet another opportunity to challenge in this Court everything already determined in the MDL, including default against BNBM, causation and defect, composition of the *Amorin* class, and the application of a damages formula, as if the past nine-plus years magically could be erased.

If past conduct is any indication, Defendants are not sincere in their claim that an initial set of randomized trials will enable them to have a "deeper appreciation" of the value of Plaintiffs' claims, which may then lead to a global settlement. Defendants already had numerous opportunities and sufficient evidence to evaluate these claims if they wanted to. They engaged in a variety of different mediation sessions in the MDL and were granted a stay of proceedings for almost a year to pursue settlement, which never came to fruition. As Judge Fallon indicated during oral argument on the parties' proposals for resolution of the Louisiana cases, after Counsel for BNBM reiterated that "it's counterproductive in terms of moving towards a resolution for the defendants to be put in the position where they think this court is in some way rolling over their rights, that will merely harden positions and make it more difficult to get to where we need to be"[6]: "I've given up on settlement. I don't think settlement is feasible."[7]

---

[5] *Id.* at 5:20-6:3.

[6] *Id.* at 23:21-25.

[7] *Id.* at 24:21-22.

For these reasons, the Court should reject Defendants' Trial Plan, which will only add additional delay and motion practice to proceedings that have already taken on too many "twists and turns." The Plaintiffs deserve justice. They are entitled to be compensated for the damages they sustained from Defendants' Chinese Drywall, without having to relitigate settled issues.

Accordingly, the Plaintiffs' Plan for Resolution [ECF No. 52] should be adopted. There is nothing wrong with "pick[ing] up where the MDL court left off."[8] Plaintiffs' remediation damages should be calculated and Plaintiffs' other property damages should be assessed by a Special Master. The personal injury claims and punitive damages that remain should be set for trial.

As to Defendants' due process argument, the MDL Court carefully and fairly administered these judicial proceedings in accordance with governing law since 2009, granting Defendants due process every step of the way. From the outset, the MDL Court encouraged all Defendants who were served in the litigation to enter their appearance in order to avoid being defaulted.[9]

Due to Defendants' misleading characterization of the MDL proceedings, a brief history is required, as it is indicative of Defendants' litigation posture and strategy to delay and deny justice to Plaintiffs. Defendants do not come to the Southern District of Florida with clean hands. Unbeknownst to the MDL Court back in the

---

[8] Defendants' Trial Plan at 1. Indeed, continuing on the path already set forth in the MDL for resolution of global case-wide issues like the assessment of remediation damages would serve the purpose of coordinating and consolidating pretrial Chinese Drywall proceedings in the MDL in the first place pursuant to 28 U.S.C. § 1407. *See In re Bisphenol–A (BPA) Polycarbonate Plastic Prod. Liab. Litig.*, 276 F.R.D. 336, 339 (W.D. Mo. 2011) ("The purpose of an MDL is to foster efficiency by having a single judge address and decide issues that will apply to all (or at least a significant number of) the transferred cases."); H.R. Rep. No. 90-1130, at 1 (1967), reprinted in 1968 U.S.C.C.A.N. 1898, 1901 (stating that the purpose of establishing MDLs is to "assure the uniform and expeditious treatment" of the included cases).

[9] *See* Transcript of MDL Proceedings dated 8/11/2009 (attached hereto as Exhibit "B") at 10:21-11:7.

beginning of the litigation, these Defendants had no intention of answering any Chinese Drywall complaints. Upon the advice of their American and Chinese attorneys, Taishan Gypsum and BNBM crafted a plan to avoid paying for any damages caused by Chinese Drywall. Their strategy was to refuse service of complaints properly served on them under The Hague Convention, and in the event service was perfected, to ignore the complaints and allow default judgments to be entered.[10]

When faced with having to pay a $2.6 million default judgment in *Germano*, however, Taishan entered a limited appearance in 2010 to challenge jurisdiction and attempt to vacate the defaults. At that time, Taishan admitted "it was served with the Complaint in *Germano*, but claim[ed] it did not respond because it did not understand the significance of it and it was ignorant of the U.S. legal system."[11] Taishan also claimed that "once it learned of and understood the Default Judgment against it, it expeditiously took measures to appear and participate in the litigation."[12]

Taishan's claims of ignorance and innocence were not true, as we have since learned through documentary proof. Taishan and BNBM knowingly allowed the defaults to be entered and they took a calculated risk that any judgments obtained here would be unenforceable in China where all of their assets are located. In fact, even

---

[10] As planned, even though Plaintiffs perfected service on Taishan under The Hague on May 8, 2009 (before the MDL was formed) in *The Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115, and on August 3, 2009 in *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687, Taishan failed to answer the complaints and was defaulted. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 832 (E.D. La. 2012), *aff'd*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014). Similarly, Taishan's parent, BNBM, attempted to avoid service of process on multiple occasions, but nonetheless was properly served with complaints and notice of this litigation, but failed to respond and was defaulted. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2018 WL 279629, *7 (E.D. La. Jan. 2, 2018) ("these entities have refused to accept service at various points in this history of this litigation," but they "received notice of this action and had sufficient time to present their defense—but they did not.").

[11] *Chinese Drywall*, 894 F. Supp. 2d at 863.

[12] *Id.*

before the MDL was formed, after Taishan was served in the *Mitchell* case, Taishan
told its leaders at CNBM Group that it was "inclined not to respond to the lawsuit."[13]

Then, on May 28, 2010, BNBM made a public announcement that "it had been
served with notice of the allegations against the company concerning defects in its
Chinese Drywall, but rather than respond to the lawsuits, '[t]he Company and Taishan
Gypsum w[ould] continue to keep an eye on the progress of the incident, and address
and handle the same with due prudence, so as to be responsible to investors, consumers
and the industry.'"[14] Eventually, Plaintiffs were able to uncover evidence that
Defendants' game plan "to reject the service of legal process" was devised with help
from their American attorneys.[15] Defendants explained (and tried to justify) this
approach to their shareholders as follows:

> Although the US lawyers of BNBM and Taishan
> Gypsum estimate that the damages that might be
> imposed in the US court's default judgments for the
> gypsum board cases might be very large, since <u>the major
> assets of the Company, BNBM and Taishan Gypsum are
> all located in China</u>, according to the US and Chinese
> lawyers whom BNBM and Taishan Gypsum have
> respectively consulted, <u>there is no convention or treaty on
> mutual recognition and enforcement of judgments
> between China and the US such that the possibility of the
> US judgments being enforced in China is very low</u>.

---

[13] *See* "Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan
Gypsum Company Limited" dated 5/11/2009 (attached hereto as Exhibit "C").

[14] *See Chinese Drywall*, 2018 WL 279629 at *7, *citing* BNBM Announcement No. 2010-009 in
Relation to Event about Gypsum Board in US dated 5/28/2010 ("So far as is known to the
Company, the aggregate number of this kind of complaints [referring to gypsum board of
BNBM] is approximately 3,000."); *see also* BNBM 2010 Annual Report at 36, 38 & 143; BNBM
2011 Annual Report at 39 & 108; BNBM 2012 Annual Report at 36; BNBM 2013 Annual
Report at 35, 95 & 96; BNBM 2014 Annual Report at 37; BNBM Announcement dated
2/13/2015 ("Since 2010, BNBM has engaged one US well-known law firm for legal
consultation services in relation to the gypsum board litigation in the US.").

[15] *See* Memorandum re: "The Course of Events on Hiring Foreign Law Firms for the Gypsum
Board Litigation in the United States—Brief Version of the Related Meetings" ("Course of
Events Memo – Brief Version") (attached hereto as Exhibit "D") at 3-4.

> Therefore, based on information currently available to the Company, the Company believes that the <u>US courts' judgments will not result in significant economic loss to the Group and will not have material adverse impact on the Group's production and operation</u>.[16]

Thus, any claim on Defendants' part that they were ever unaware or uninformed of the potential consequences of failing to appear in the litigation is untenable.

Moreover, Defendants' willingness to "participate" in these proceedings is questionable at best. Taishan entered the MDL in 2010, but solely to contest jurisdiction and attempt to vacate the defaults entered against it. After unsuccessfully challenging the MDL Court's findings that jurisdiction over Taishan was proper under Louisiana, Florida, and Virginia law, and that there were no grounds to vacate the defaults,[17] Taishan abruptly fled the jurisdiction and went back to China. The company refused to participate any further. As Judge Fallon pointed out: "They lost the appeal, and then they decided that they were going to walk away from the court because they didn't get their way. They're going to take their ball and go home, so to speak."[18] Defendants' blatant disregard for the decorum and rules of the Court resulted in a <u>civil and criminal contempt</u> order against Taishan and an injunction prohibiting Taishan and its affiliates from doing any business in the U.S. until Taishan complied with the Court's orders.[19]

---

[16] *See, e.g.*, CNBM Voluntary Announcement on Development of Gypsum Board Litigation in the US dated 7/18/2014 (emphasis added) (attached hereto as Exhibit "E").

[17] *Chinese Drywall*, 894 F. Supp. 2d 819, *aff'd*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

[18] *See* Transcript of MDL Proceedings dated 1/22/2015 (attached hereto as Exhibit "F") at 20:14-17.

[19] *See* Contempt Order and Injunction imposing penalties on Taishan and awarding attorneys' fees to Plaintiffs for Defendants' refusal to appear in open court for a judgment debtor examination [MDL Rec. Doc. 17869] (attached hereto as Exhibit "G"). The MDL Court further ruled that in the event Taishan and/or its affiliates violated the injunction, significant penalties would be assessed – 25% of the profits earned by Taishan or its affiliates for the year of the violation. *Id*. at 3. Despite the reprimands of the MDL Court and the threat of further

These sanctions were not the only sanctions imposed on Taishan in this litigation, as it turns out. On January 8, 2016, the MDL Court found that Taishan committed numerous discovery abuses, including "protracted withholding of relevant evidence."[20] Taishan "conceded its failure to relay [to the Plaintiffs] [a key witness] Mr. Peng's whereabouts and produce documents from his computer in a timely manner," which caused an eight-month delay and forced the Plaintiffs to seek Court intervention.[21]

Not surprisingly, "[i]t was only after the Court certified the *Amorin* class and scheduled a hearing on class remediation damages that [BNBM and BNBM's parent, CNBM] decided to appear in the MDL in 2015—almost six years after suits were filed against them—to challenge Plaintiffs' evidence of damages, class certification, and the Court's jurisdiction over them."[22] At the same time, Taishan returned to the proceedings. Unfortunately, ever since then, these Defendants have tried to relitigate every ruling made in the MDL during the years they sat on the sidelines and refused to participate in the normal course.[23]

If the parties can agree on one thing, it's the fact that this case has gone on for too long. But the cause of the protracted proceedings is not any misguided effort by the MDL Court as Defendants allege. Rather, the cause is rooted in the "delay tactics [that] have permeated every aspect of Defendants' litigation strategy: from their initial

---

sanctions for violations of the injunction, the PSC uncovered substantial evidence that numerous affiliates of Taishan, namely entities owned and/or controlled by CNBM Group, CNBM, BNBM Group, and BNBM, continued to conduct business in the U.S. during the period of contempt. *See* Transcript of MDL Proceedings dated 3/2/2017 concerning Plaintiffs' Motion to Enforce the Contempt Order and Injunction [MDL Rec. Doc. 21710] (attached hereto as Exhibit "H") at 32:19-82:13.

[20] *See* Findings of Facts and Conclusions of Law from Evidentiary Hearing dated 11/17/2017, [MDL Rec. Doc. 19959] (attached hereto as Exhibit "I") at 14.

[21] *Id*. at 17.

[22] *Chinese Drywall*, 2018 WL 279629 at *7 (emphasis added).

[23] *Id.*

failure to appear to their now perpetual motions to re-litigate settled matters."[24] As Judge Fallon aptly noted earlier this year:

> [T]his case involving the Chinese Entities has only made glacial progress. Th[e] MDL was consolidated in 2009. [BNBM and CNBM] did not make an appearance until 2015. And now, in 2018, [they] are asking this Court to go back to square one.
>
> Meanwhile, plaintiffs here—thousands of them—are still without remedy after installing defective Chinese drywalls and suffering from them. Additionally, Plaintiffs have expended significant time and money in this litigation. Any further delays would undeniably prejudice the plaintiffs.[25]

Having deliberately delayed the adjudication of Plaintiffs' claims for such an extended period of time and having willfully allowed default judgments to be entered against them, Defendants are in no position to argue on remand that this Court should start over "using traditional mass-tort adjudication mechanisms."[26] As Defendants have described their plan, it "provides for non-bifurcated complete discovery followed by an initial set of trials," which purportedly "are designed to foster settlement by enabling the parties to meaningfully gauge the cost of litigation and global claim values."[27] Again, that train has left the station.

---

[24] *Id.* at *9.

[25] *Id.* at *10.

[26] Defendants' Trial Plan at 2.

[27] *Id.* at 9.

Dated: September 14, 2018

Respectfully submitted,

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Southern District of Florida by using the CM/ECF System, which will send a notice of electronic filing on this 14th day of September, 2018.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

# EXHIBIT "A"

09:06:07

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2

 3       *************************************************************

 4       IN RE:  CHINESE-MANUFACTURED        Docket No. 09-MD-2047
         DRYWALL PRODUCTS LIABILITY          New Orleans, Louisiana
 5                                           Wednesday, August 15, 2018

 6
         *************************************************************
 7
                      TRANSCRIPT OF MOTION PROCEEDINGS
 8          HEARD BEFORE THE HONORABLE ELDON E. FALLON
                      UNITED STATES DISTRICT JUDGE
 9

10       APPEARANCES:

11       FOR THE PLAINTIFF STEERING
         COMMITTEE:                          LEVIN, FISHBEIN, SEDRAN & BERMAN
12                                           BY:  ARNOLD LEVIN, ESQ.
                                             510 Walnut Street, Suite 500
13                                           Philadelphia, PA 19106

14

15       FOR THE TAISHAN DEFENDANTS:         ALSTON & BIRD
                                             BY:  CHRISTINA H. EIKHOFF, ESQ.
16                                           One Atlantic Center
                                             1201 West Peachtree St.
17                                           Suite 4900
                                             Atlanta, GA 30309-3424
18

19

20       FOR CNBM AND BNBM ENTITIES:         ORRICK
                                             BY:  JAMES STENGEL, ESQ.
21                                           51 West 52nd St.
                                             New York, NY 10019-6142

22

23                                           PHELPS DUNBAR
                                             BY:  HARRY ROSENBERG, ESQ.
24                                           365 Canal St., Suite 2000
                                             New Orleans, LA 70130

25
```

1

2    Official Court Reporter:          Karen A. Ibos, CCR, RPR, CRR
                                       500 Poydras Street, Room HB-406
3                                      New Orleans, Louisiana 70130
                                       (504) 589-7776
4

5

6      Proceedings recorded by mechanical stenography, transcript
     produced by computer.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              (WEDNESDAY, AUGUST 15, 2018)

 3                  (MOTION PROCEEDINGS)

 4
```

09:13:44  5      (OPEN COURT.)

09:13:44  6           THE COURT:  Be seated, please.  Good morning, ladies and

09:13:46  7      gentlemen.  Call the case, please.

09:13:47  8           THE DEPUTY CLERK:  MDL-2047, *in re:  Chinese Manufactured*

09:13:52  9      *Drywall Products Liability Litigation*.

09:13:53 10           THE COURT:  Counsel make their appearance for the record,

09:13:55 11      please.

09:13:55 12           MR. LEVIN:  Arnold Levin for the Plaintiff Steering

09:13:59 13      Committee, sir.

09:14:00 14           MS. EIKOFF:  Christy Eikhoff for Taishan.

09:14:03 15           THE COURT:  Let me say a word or two about the matter

09:14:03 16      first --  I'm sorry.

09:14:07 17           MR. STENGEL:  Jim Stengel for CNBM and BNBM.

09:14:09 18           THE COURT:  Anybody else?  Okay.  And we have a number of

09:14:13 19      other lawyers in the case.

09:14:19 20           We're here today to discuss the trial plan in the Taishan

09:14:23 21      cases.  As we all know, we've been dealing with this Chinese

09:14:32 22      drywall case, as we term it, for about nine years now, and a large

09:14:40 23      part of the case is over involving Knauf, but the Taishan, et al,

09:14:49 24      cases have not been able to be resolved.  So I am convinced that

09:14:55 25      after a number -- a lot of discovery that the parties conducted and

09:15:03  1   a number of trials, both with and without a jury, that I've done

09:15:11  2   about as best as I can to give the attorneys an opportunity to look

09:15:15  3   at the case, to decide whether or not there's some way of globally

09:15:21  4   resolving the case, some method, some approach, something done.

09:15:28  5   But that hasn't worked.

09:15:29  6        So now it comes time to send the cases back, those that I

09:15:35  7   can send back, and those cases that are involving Louisiana

09:15:42  8   products, Louisiana houses, structures, to try the cases.  And so

09:15:51  9   that's where we are now.

09:15:53  10       I sent back a number of cases to Florida, I'll be sending

09:15:58  11  a number of cases back to Virginia so that those judges can begin

09:16:02  12  the process of resolving the cases by trials.  And I'll do that now

09:16:08  13  in Louisiana.

09:16:10  14       We've got two class action cases that we're dealing with:

09:16:21  15  One is the *Amorin* and the other is the *Brooke* cases.  They're both

09:16:26  16  together involving Louisiana products.  The Louisiana houses total

09:16:33  17  about 919.  We need to, as I mentioned to the parties a moment ago,

09:16:41  18  as I see it, at least at the outset -- and I shared this with them

09:16:47  19  because it's been my experience that in these cases the reason that

09:16:52  20  they can get resolved is that the lawyers involved in these types

09:16:57  21  of cases are really the best of the best.  It's just the way it is.

09:17:05  22  And this case is no exception.

09:17:09  23       And so I find that it's helpful to tap into that

09:17:13  24  experience, that knowledge, that ability in trying to come up with

09:17:21  25  plans to resolve the cases.  And so I always discuss these with the

09:17:27  1    attorneys and invite them to respond.

09:17:30  2         The way I see it, at least at the outset in any event,

09:17:35  3    and this is not in stone, it's in pencil, but I see that they're

09:17:41  4    the two areas:  The *Amorin* cases and the *Brooke* cases.

09:17:45  5         Now, the *Amorin* cases, I've tried a number of those and

09:17:50  6    liability in my opinion has been established in those cases.  There

09:17:57  7    have been two appeals, two different groups of appellate judges

09:18:05  8    affirmed the cases, no cert has been asked for, so it's final.

09:18:14  9         In the *Amorin* cases, therefore, liability has been

09:18:17 10    established.

09:18:18 11         The *Brooke* liability has not been established.  Most of

09:18:22 12    the *Brooke* cases really involve Florida properties, and that will

09:18:28 13    be dealt with by Judge Cook in that area.

09:18:32 14         But the *Amorin* cases is where my focus is going to be

09:18:36 15    primarily, and we first have to separate the *Amorin* docket from

09:18:44 16    those cases that are simply -- are just strict property damage

09:18:49 17    cases.  There are a large number of them that are property damage

09:18:53 18    cases.  There are also in there a number of property damage plus

09:19:00 19    personal injury cases.  We may have to separate those out.

09:19:05 20         With regard to the property damage cases, I would intend

09:19:10 21    to appoint a master to utilize the formula that has been

09:19:18 22    established in a number of cases, and to verify the square footage,

09:19:27 23    verify the present ownership, verify the location, address, things

09:19:34 24    of that sort, and then we'll simply apply the formula and come up

09:19:42 25    with a figure for the property damage.  Those cases, it seems to

09:19:48 1   me, are just administratively dealt with.  I don't see the

09:19:53 2   necessity for any trials in those cases, I think it's just I'll be

09:20:01 3   issuing judgments in that fashion.

09:20:03 4           With regard to the property plus personal injury, I think

09:20:07 5   that's a different grouping; and with personal injury, it seems to

09:20:13 6   me that jury trials need to be had for the jury to determine

09:20:19 7   personal injury.

09:20:20 8           Now, unlike the bellwether cases where I am trying to

09:20:27 9   give the lawyers an opportunity to view the case in the real world

09:20:32 10  setting of trials, I think that bellwethers work best if it's one

09:20:39 11  case at a time because that's closer to the real world.  It's a

09:20:43 12  bellwether case, it's not total real world, but you're getting a

09:20:46 13  jury, you're getting a case, one case, you're seeing how your

09:20:52 14  witnesses do, you're seeing how much it costs, you're seeing the

09:20:54 15  logistics of the trial.  It's best handled, in my opinion, one case

09:20:59 16  at a time.

09:21:00 17          But at this stage I am not -- no longer interested in

09:21:05 18  bellwether cases.  I am interested in resolution of cases.  So in

09:21:12 19  that area, I think multiple cases can be handled to the jury.  I

09:21:17 20  would like to start with maybe three cases and then work up to

09:21:20 21  maybe ten cases at a time so that we can finish with these cases.

09:21:32 22  And we'll be dealing with a jury who will set the damages, the

09:21:37 23  injuries and damages.

09:21:41 24          The challenging part is with regard to the property

09:21:45 25  aspect of those cases.  It seems to me that there's no need for the

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 20 of 258
Case 2:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2016 Page 8 of 37

7

09:21:51  1   jury to deal with property damage because we can deal with that

09:21:54  2   administratively.  So if that's the case, then do we do them

09:22:02  3   both -- those cases both at the same time and get the property

09:22:05  4   damage aspect with the personal injury damages and then I join

09:22:14  5   those together for a judgment?  I don't think it's appropriate to

09:22:19  6   have two judgments in every case, so it would be one judgment, but

09:22:24  7   I would use the property damage formula to figure the property

09:22:28  8   damage and then the jury response for the personal injury.

09:22:40  9        That's kind of what I envision based upon, you know,

09:22:45 10   dealing with this case for a long period of time, and also

09:22:49 11   reviewing the various briefs, which were very helpful to me, from

09:22:54 12   both sides.  But I shared that a moment ago with the attorneys for

09:22:59 13   both sides, and I would be interested in their responses and any

09:23:05 14   other comments that they might have.

09:23:06 15        Let me hear from the plaintiffs first.

09:23:09 16        MR. LEVIN:  Good morning, your Honor.  Arnold Levin.

09:23:16 17        We basically are very comfortable with what your Honor

09:23:19 18   has stated.  And as such, I probably should sit down.

09:23:26 19        But there are several issues that were briefed by the

09:23:32 20   defendants.  I think we've covered -- you've covered them at least

09:23:38 21   by what you've told us, but I would like to reserve my time in

09:23:41 22   rebuttal to deal with their arguments of due process, if they're

09:23:45 23   still going to make it; the jury trial demand, if they're still

09:23:48 24   going to make it; the nature of the default judgments, if they're

09:23:54 25   still going to make it.  And I think I can be very brief at that

09:24:00  1    time, five or ten minutes; and if your Honor will give me leave,

09:24:03  2    I'll sit down.

09:24:05  3             THE COURT:  Okay.  Fine.  Christy.

09:24:08  4             We've talked also about the question of discovery, and

09:24:15  5    there's no question in my mind that the defendants need some

09:24:19  6    discovery in the personal injury aspects of the case.  They haven't

09:24:24  7    had anything, they, I assume, haven't received any recent reports.

09:24:30  8    So the discovery aspect of those cases needs to be done, so I

09:24:34  9    recognize that.  I would like to see if we can expedite it, but

09:24:40  10   discovery needs have to be satisfied.

09:24:42  11            MS. EIKOFF:  Sure, your Honor.  Christy Eikhoff on behalf

09:24:47  12   of Taishan.  Jim Stengel is going to be making a separate argument

09:24:52  13   on behalf of his clients BNBM and CNBM.  And as the Court knows,

09:24:57  14   those parties are differently situated from Taishan.

09:25:00  15            THE COURT:  Right.

09:25:01  16            MS. EIKOFF:  We recognize, as the Court has said, that

09:25:02  17   the defaults have been upheld by the circuit court and that Taishan

09:25:05  18   is in default, so we are in a different situation from those other

09:25:09  19   entities.

09:25:10  20            Your Honor, I would -- I am going to slightly rearrange

09:25:15  21   the order that I was planning to cover things today because I want

09:25:19  22   to make sure I get clarification and share with the Court our

09:25:25  23   perspective of the categories of damages.

09:25:27  24            THE COURT:  Sure.

09:25:28  25            MS. EIKOFF:  The Court has referred to property damage

Case 2:09-md-02047-EEF-MBN Document 22380-4 Filed 12/02/19 Page 22 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 10 of 37

9

09:25:32  1  this morning versus personal injury damage.  Those are not the

09:25:36  2  distinctions that we have been using, and even, frankly, that the

09:25:39  3  PSC has been using in the course of this litigation.  The more

09:25:45  4  relevant distinction, your Honor, between categories of damages in

09:25:50  5  this case so far has been within the umbrella of property damage,

09:25:53  6  the distinction between remediation damages and non-remediation

09:25:57  7  damages.

09:25:58  8         Non-remediation damages covers other categories of

09:26:03  9  damages that could still be considered property damage, but -- and

09:26:09  10  are not "personal injury damages."  It includes personal injuries,

09:26:13  11  alternative living expenses, loss of use and enjoyment, appliances,

09:26:20  12  foreclosure, bankruptcy, short sale.  There's a whole laundry list.

09:26:27  13         The distinction between remediation and non-remediation

09:26:31  14  is important because this Court certified a class for remediation

09:26:35  15  damages only, and this Court has also identified a formula that can

09:26:44  16  be used for current owners only for remediation damages only.  And

09:26:57  17  I will get into why even that isn't quite as simple as it sounds.

09:27:03  18         But at this point, your Honor, the current owner

09:27:06  19  remediation damages is actually a very small aspect of this case

09:27:12  20  now, because in the original claimants and plaintiffs that came to

09:27:19  21  the court, many have sold the properties so they're former owners

09:27:23  22  now, and many have already remediated their properties and so

09:27:26  23  they're outside of the class.  The majority of this case, of the

09:27:30  24  claimants in this case, your Honor, at this point are outside of

09:27:33  25  the class.

09:27:33  1      And so that is the basis for the plan that we have

09:27:40  2  proposed, and I would like to go ahead and skip to the first slide.

09:27:44  3  I'm sure the Court is familiar with Occam's razor, which is the

09:27:49  4  principle that the simplest solution tends to be the right one.

09:27:52  5  And here, Taishan has submitted the simplest plan, but it's the

09:27:56  6  right plan because it is the most efficient.  And we'll show you,

09:28:02  7  it's not delay, it's not inefficient, it actually gets to judgment

09:28:07  8  quickly, well under a year.  It follows Fifth Circuit law and it

09:28:11  9  follows constitutional law.

09:28:12  10      And, your Honor, we need to point out the violations of

09:28:15  11  both Fifth Circuit and Constitution law that we think are embedded

09:28:19  12  in the plan that has been submitted by the PSC.

09:28:29  13      Our plan is quick.  We're saying that within 37 days of

09:28:35  14  when the Court enters its order, we will have priority claimants

09:28:38  15  selected, 24 priority claimants.  That will be enough for us to

09:28:42  16  really understand all of the variations.  Our proposal is that

09:28:47  17  those 24 be selected based on categories of the product ID that

09:28:52  18  they have, and it will also include former owners and also include

09:28:56  19  perhaps bankruptcy, short sale.  We will try to get a good variety

09:29:01  20  of the issues that we're dealing with.

09:29:04  21      Discovery would be complete 60 days after that.  If we

09:29:08  22  need experts -- I don't think either party has decided whether or

09:29:11  23  not they will need experts -- but if we need experts, that entire

09:29:15  24  expert discovery process - depositions, reports, rebuttal - all of

09:29:20  25  that would take 120 days.  And then we're into pretrial briefing

09:29:24  1    within 75 days after that.

09:29:25  2          So what we're looking for is we would be ready for the

09:29:29  3    first trial on damages in six to ten months.  That is an efficient

09:29:33  4    plan.  And it's more efficient than the PSC's plan and it makes

09:29:37  5    more sense because, as the Court has recognized, as the PSC has

09:29:41  6    recognized, we need to take depositions of everybody anyway because

09:29:47  7    everybody has non-remediation damages.  There are no claimants in

09:29:55  8    this case that have claimed only remediation damages and nothing

09:29:58  9    else.  They're asking for, on top of their remediation damages,

09:30:03 10    they want their loss of use and enjoyment, they want their

09:30:06 11    alternative living expenses, they want a whole host of other

09:30:09 12    things.

09:30:10 13          And I'll note, your Honor, that very, very few of the

09:30:12 14    claimants in these cases have alleged personal injury.  Personal

09:30:17 15    injury is a minuscule part of this case, if any part of this case

09:30:22 16    at all.  It's really about all property damage but the remediation

09:30:26 17    versus the non-remediation damages.

09:30:29 18          THE COURT:  Would you propose liability trials also?

09:30:32 19          MS. EIKOFF:  No.  No, your Honor.  Because, again,

09:30:34 20    Taishan, we know we're in default.  So what we're saying is that --

09:30:38 21    these damages, your Honor, are not liquidated.  When you have

09:30:41 22    unliquidated damages, even a defaulted defendant, it is entitled to

09:30:46 23    defend against that and the plaintiff has to prove the damages.

09:30:49 24          And so we're saying, let's do a short expedited discovery

09:30:55 25    period for everybody, for all categories of damages.  So just to

09:30:59  1    illustrate kind of the bizarreness of the PSC's plan, under their

09:31:06  2    plan we're deposing everybody, we're deposing 800 claimants, we're

09:31:10  3    deposing them all -- which, by the way, I don't think it's possible

09:31:14  4    in the amount of time that they've proposed, but that's what

09:31:17  5    they're proposing.

09:31:18  6             We propose we depose everybody.  But in those depositions

09:31:21  7    we can ask about them about certain of their property damages, but

09:31:25  8    we can't ask them about other property damages unless we get leave

09:31:28  9    of court, and that just doesn't make sense.  If people are going to

09:31:30 10    be deposed, let's ask about all of their damages.  If there are

09:31:34 11    going to be trials, let's try all of their damages together.  So

09:31:37 12    that's why we have proposed the priority claimants.

09:31:40 13             We've got a single track for all damages, it all gets

09:31:42 14    done in six to ten months, and it's more efficient than their plan

09:31:48 15    because we're going to be taking these depositions anyway.  We

09:31:51 16    might as well be asking them all of the questions that we have.

09:31:54 17             And to be clear, there are contested issues on even

09:31:58 18    remediation damages.  It sounds easy to say, well, there's a

09:32:02 19    formula and there's square foot, but there's a lot of questions

09:32:07 20    about whether they ever had Taishan drywall in their property and

09:32:12 21    whether they have changed the size of their house and where it was

09:32:16 22    and where the drywall came from.  So there are questions that we

09:32:21 23    have that make it more complex than just simply applying a formula.

09:32:25 24             But, your Honor, just to go to the next slide.

09:32:29 25             THE COURT:  Would you propose one trial at a time or

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/03/19 Page 26 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 14 of 37

13

09:32:32  1   multiple trials?

09:32:34  2           MS. EIKOFF:  So, your Honor, our proposal actually does

09:32:36  3   not directly address that question, but we have proposed 24

09:32:39  4   priority claimants.  I know that our client would be open to

09:32:44  5   grouping some of those if it makes sense to group some of those,

09:32:48  6   your Honor.

09:32:49  7           But one thing that is important to know about the

09:32:52  8   remediation damages, I just was saying that there's a lot of

09:32:56  9   contested issues there.  Well, the Fifth Circuit and Louisiana law

09:32:59 10   actually prohibits the application of the formula to a claimant who

09:33:04 11   has already remediated.  And we've got -- we cited it in our

09:33:10 12   briefs, we've got it here in the PowerPoint, that using an estimate

09:33:17 13   for property damage where the property has already been repaired is

09:33:22 14   improper because you need to look at the repairs.

09:33:24 15           Now, the PSC has often said, and it's a point well taken,

09:33:29 16   well, you know, people may not have done a good job because they

09:33:32 17   were doing the best they could with the resources they had.  That

09:33:35 18   is well and we get that but that is an assumption.  And in the

09:33:39 19   court of law, we can't just assume that they didn't do a good job.

09:33:43 20   We need to see what they actually did.  And if it wasn't a good job

09:33:47 21   and if the receipts show that they are entitled to more, then

09:33:52 22   that's how it would be litigated.  But we can't just assume that

09:33:57 23   everyone did an improper job and should get the formula anyway,

09:34:00 24   especially when you have binding law that says it's improper to use

09:34:04 25   an estimate when the damages have already been incurred.

Case 2:09-md-02047-EEF-MBN Document 22880-4 Filed 12/03/19 Page 27 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 15 of 37

14

09:34:10  1        Also, the PSC's plan says, well, we want to get judgment

09:34:15  2   on remediation damages, so we want Cal Mayo to work with the

09:34:18  3   spreadsheet; and then once he applies the formula and does the

09:34:21  4   math, then it's going to spit out a number.  And they've already

09:34:24  5   said they want that number to be more than half of a billion

09:34:29  6   dollars.  Well, that's not -- even if that were allowed -- and

09:34:32  7   we'll get into why we think that that violates the due process of

09:34:36  8   the defendants.  Even if that were allowed, they can't do anything

09:34:39  9   with it because it won't be a judgment.  The Fifth Circuit law

09:34:46 10   black letter says you can't collect or appeal anything that's a

09:34:50 11   judgment if it doesn't include all of the categories of damages.

09:34:55 12   So we think, again, that's another reason why their process is more

09:35:00 13   complex, more convoluted, and it doesn't gain anything.

09:35:04 14        The PSC -- we cited these in our brief.  The PCS's

09:35:08 15   response did not address these cases at all, so we see this as

09:35:14 16   undisputed.

09:35:15 17        Next please.

09:35:16 18        Finally, your Honor, constitutional due process.  The

09:35:21 19   plaintiff -- there are twin principles that are mutually

09:35:23 20   reinforceable in due process, and these principles apply to us even

09:35:27 21   in default.  The plaintiffs still have the burden of proof and the

09:35:31 22   defendants have a right to mount a defense.  That doesn't go away

09:35:35 23   under Rule 55, the Supreme Court has said that.  The PSC's plan

09:35:40 24   seeks to shift the burden to us to tell Cal Mayo why the drywall is

09:35:48 25   not Taishan.  So they say it's Taishan and then we have to prove

Case 2:09-md-02047-EEF-MBN Document 22880-4 Filed 12/02/19 Page 28 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 16 of 37

15

09:35:51 1    that it's not, that's improper.  The process that they say that we

09:35:57 2    need to go through has the Special Master making decisions on

09:36:03 3    categories, so they just say -- he just says any drywall that has a

09:36:08 4    made in China mark is Taishan or isn't Taishan.  Well, if you look

09:36:12 5    at what has been submitted for proof, there are dozens of

09:36:15 6    variations of drywall that say made in China.

09:36:20 7          And there are also dozens of variation of the quality of

09:36:24 8    proof.  Some claimants have a full inspection report with clear

09:36:28 9    pictures from every room, and some claimants have a single, blurry

09:36:33 10   photograph.  And they're saying that the special master would just

09:36:37 11   treat them the same.  Wouldn't even look at them.  Literally

09:36:41 12   wouldn't even look at it.  Would just decide, oh, well, if it says

09:36:44 13   made in China, it either is Taishan or it isn't Taishan.  That

09:36:49 14   violates our due process, your Honor.

09:36:51 15         And by saying that we can't dispose -- they're saying we

09:36:54 16   aren't allowed to depose anyone about their product ID, we can't

09:36:57 17   ask them any questions, so the single blurry photograph, the

09:37:01 18   example I gave, we can't ask the plaintiff:  "Well, where did this

09:37:04 19   picture come from?  What room was it taken in?  Who took it?"

09:37:10 20         And then, what's also very problematic about this is that

09:37:13 21   the PSC is seeking to expand the class definition.  And so if you

09:37:19 22   look at their plan, they say, "We have a formula.  We love it.  We

09:37:22 23   want it to apply not just to current owners," which is what the

09:37:25 24   class is defined, "we also want it to apply to people who have

09:37:29 25   already remediated," which we say violates Fifth Circuit law,

because it does, "we also want to apply it to former owners, even though it's outside of the class.  We also want to apply it to new owners.  Oh, and by the way, we also want to apply it in *Brooke*, a case where liability has not even been established yet.  So let's go ahead and work into our plan that we're going to be applying it to *Brooke* as well."  That violates our due process, your Honor, and it should not be permitted.

Finally, speaking of *Brooke* because we were accused of ignoring it, we have not ignored it.  So here is what we propose on *Brooke*.  It is improper to weave *Brooke* into the *Amorin* process.  This Court has already acknowledged that and we appreciate that.  There has been no default in *Brooke* as the Court has acknowledged.  There is no class.  So this idea of let's just go ahead and apply the formula in *Brooke* in the next two months or something is simply not permissible.

In fact, I just want to point out how far they're going with *Brooke*.  They have in the first 45 days in their schedule, they're going to submit motions for sanctions against us for our conduct in other cases.  We've got to recognize *Brooke* for what it is, which is a different case and a new case.  It is a case that has the vast majority of its claimants in Florida, so we think Florida should be the center of gravity for *Brooke*.

Your Honor has not remanded *Brooke* yet.  We think *Brooke* should be remanded.  And when it is remanded, then we think that the timetable for the hundred odd *Brooke* claimants in Louisiana

Case 2:09-md-02047-EEF-MBN Document 22880-4 Filed 12/02/19 Page 30 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 18 of 37

17

09:39:19 1  should mirror the timetable that is established by the Florida

09:39:23 2  court for the 800 plus *Brooke* claimants.

09:39:26 3          And then what we're going to advocate for in Florida is

09:39:30 4  that *Brooke*, the new case, needs to be trifurcated into three

09:39:34 5  threshold issues:  First, we need to look at statute of limitations

09:39:38 6  because the *Brooke* claims were filed so late in the game, years and

09:39:44 7  years after this litigation was underway; then we'll look at class

09:39:48 8  certification to see whether it can become a class; and then if it

09:39:53 9  is a class or isn't a class, we'll address issues of liability

09:39:57 10  which are available in that case because it is not presumed that

09:40:00 11  the drywall is defective, they have to prove it.

09:40:05 12          So, your Honor, I am happy to answer any questions for

09:40:08 13  the Court.

09:40:09 14          THE COURT:  No, that's fine.  Let me hear from Jim.

09:40:25 15          MR. STANGEL:  If you'll indulge us for a moment, your

09:40:30 16  Honor, we need to switch over some technology.

09:40:33 17          THE COURT:  Sure.

09:40:43 18          MR. STENGEL:  Your Honor, Jim Stengel for CNBM and BNBM.

09:40:47 19          I hesitate to enter into what happened before we appeared

09:40:52 20  in this litigation because there is an extensive prior procedural

09:40:56 21  record.  But one point that I am not sure I agree with your Honor

09:40:59 22  is we haven't had bellwethers in this case.  There were Virginia

09:41:04 23  properties tried in the *Germano* proceedings years ago, we have not

09:41:08 24  been involved in any such proceeding.  We have been through a

09:41:11 25  substantial amount of litigation before your Honor, obviously, but

Case 2:09-md-02047-EEF-MBN Document 22380-4 Filed 12/02/19 Page 31 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 19 of 37

18

09:41:14 1    there aren't bellwethers.

09:41:17 2            Your Honor observed early on that this is a case that

09:41:34 3    should settle and you probably have the personnel in the courtroom

09:41:37 4    to do that.  We agree with that.  But at the outset, I will say I

09:41:44 5    am responding to your Honor's description of a proposal this

09:41:47 6    morning, as well as the PSC.  I think what your Honor proposes,

09:41:51 7    while efficient in some ways, does further violence to due process

09:41:56 8    rights of the defendants.  And to do that to further skew that

09:42:00 9    value, to tilt the playing field in our perspective, from my

09:42:05 10   clients' perspective, is further away from what we would view as

09:42:09 11   balanced is a mistake, and I think it will complicate the process

09:42:12 12   of resolving these matters.

09:42:14 13           Now, we've made a slightly different proposal from

09:42:17 14   Taishan in terms of how to proceed, but in large measure, I won't

09:42:21 15   repeat what Ms. Eikhoff said because we largely agree in approach.

09:42:25 16   We do think we need discovery on alternate living expenses and

09:42:29 17   property damages that are components that we as the defendants know

09:42:32 18   nothing about.  We also believe the supplemental profile form,

09:42:37 19   although useful, is tantamount to interrogatory answers, it's not

09:42:45 20   the be all and end all of discovery, even as to their mediation

09:42:46 21   damage component.

09:42:46 22           So there's more work that needs to be done, and we think

09:42:50 23   our process is -- the Taishan and CNBM and BNBM proposals provide

09:42:53 24   the Court with a working structure to push these cases towards

09:42:58 25   resolution, and I'm afraid what the PSC has proposed and what your

09:43:03  1    Honor proposes takes us, frankly, further away from where we need

09:43:08  2    to be.

09:43:08  3         Now, specifically from the context of BNBM and CNBM.  And

09:43:13  4    I -- Mark, let's skip the description of the PSC plan because I

09:43:20  5    think we're dealing with something slightly different now.

09:43:24  6         The fact that Taishan is in default even if we were

09:43:28  7    proceeding under Rule 55 does not end the discovery rights of the

09:43:32  8    defendants - defendants being Taishan, BNBM and CNBM.  The PSC

09:43:40  9    tends to view this through the lens of:  We have liability, we have

09:43:44 10    a spreadsheet process, we're finished.  But as your Honor knows,

09:43:48 11    we've seen nothing on alternative living expenses, loss of use and

09:43:51 12    enjoyment, and there are a myriad of other issues embedded in the

09:43:55 13    damage determination that have to be addressed.

09:43:58 14         Next slide, Mark.  And the other sort of failing, I

09:44:04 15    think, from the PCS's approach -- and I want to make sure your

09:44:08 16    Honor doesn't fall into this trap as well -- as the Federal Rules

09:44:10 17    of Evidence apply with full force and default proceeding and we

09:44:13 18    can't shortcut this no matter how tempting it is in the name of

09:44:18 19    efficiency to do that.

09:44:19 20         So here we're going to have to have some form of

09:44:22 21    proceeding where there's real evidence and the burdens are in the

09:44:26 22    right place.

09:44:27 23         And here is one of our primary objections -- and your

09:44:31 24    Honor did not specifically address this point, but it's certainly

09:44:34 25    deeply embedded in the PSC's approach.  There is in effect, through

Case 2:09-md-02047-EEF-MBN Document 22880-4 Filed 12/02/19 Page 33 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 23 of 37

20

09:44:38  1    Cal Mayo's process or otherwise, an inversion of the burdens of

09:44:43  2    proofs, and there's no legal basis to do that.

09:44:46  3          The plaintiffs still bear the burden of proving their

09:44:49  4    claims, even under a default situation.  So nothing we do should

09:44:53  5    shorthand that, and again, why I think Taishan and CNBM and BNBM

09:44:59  6    moved in the direction of a more limited number of trials is the

09:45:04  7    idea that the trials themselves are going to have to be more

09:45:06  8    extensive proceedings than I'm afraid your Honor and the PSC may be

09:45:11  9    contemplating.

09:45:11 10          And now I am going to turn to the specific situation of

09:45:18 11    BNBM and CNBM, because your Honor has made statements about the

09:45:20 12    fact that there really aren't issues as to liability for us because

09:45:25 13    we're alter egos with Taishan.  Frankly, your Honor, I don't

09:45:28 14    believe that's sustainable.  This is a chart from your Honor's

09:45:32 15    findings of fact and conclusions of law.  You'll see in Louisiana,

09:45:37 16    *Amorin* only CNBM is in default; and that's not a default judgment,

09:45:41 17    that's a preliminary default.  Neither of the BNBM entities are in

09:45:47 18    default.  And that has legal significance in how we proceed here.

09:45:51 19          I don't think there's any basis to proceed on an

09:45:53 20    imputation basis to give the default to the BNBM entities for the

09:45:58 21    following reasons:  If it's BNBM to BNBM -- or excuse me, Taishan

09:46:05 22    to BNBM, your Honor ruled only that you found there was under, as

09:46:12 23    to Louisiana cases, SBE would apply but your Honor specifically in

09:46:19 24    your opinion limited that finding to jurisdictional purposes.

09:46:22 25    That's a fact reservation of some substantial significance here as

09:46:31 1   there are temporal components as to when the attribution theory can

09:46:35 2   apply.  So within the case, there is no basis to say because

09:46:39 3   Taishan is in default, we don't dispute that fact, BNBM and BNBM,

09:46:44 4   PLC should be also in default, or CNBM company for that matter.

09:46:48 5        They take another approach to say, no, no, no, it's not

09:46:52 6   an imputation theory, it's a matter of collateral estoppel or claim

09:46:57 7   preclusion.  Doesn't work either because the matter of black letter

09:47:01 8   law that the only preclusive aspects are matters that were actually

09:47:06 9   litigated and the black letter law is defaults to not create a

09:47:10 10  preclusive effect.

09:47:12 11       So we're left with parties with a substantial interest,

09:47:14 12  which are remote to the processes your Honor has noted, to

09:47:17 13  manufacturing, sales, any aspect to the actual production of

09:47:20 14  drywall.  But what the PSC would do is substantially truncate our

09:47:26 15  rights in the interest of making sure there are assets available.

09:47:31 16       Now, this also implicates some procedural rights.  And

09:47:36 17  our view is the B and C entity that's in this case are entitled to

09:47:44 18  try this matter before a jury.  We may ultimately elect not to do

09:47:48 19  that, but it's our right and one of the limitations we think on

09:47:50 20  shorthand approaches to trying these cases.  Certainly to mass

09:47:56 21  consolidations or the spreadsheet process is we think we retain

09:48:00 22  these rights.

09:48:00 23       And there are two grounds for that:  One, because we

09:48:05 24  think that are not taken from us.

09:48:08 25       The other is Rule 38 and this is -- there are obviously

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/02/19 Page 35 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 23 of 37

22

09:48:12  1   courts that have come out both ways on this issue.  But the premise

09:48:15  2   is that once a party has elected, Rule 38 doesn't allow them to

09:48:19  3   unilaterally withdraw their demand for a jury.  And there are cases

09:48:24  4   in a default setting that say that's still the case.  So we

09:48:29  5   think -- and it may be a complication that's not welcome by the PSC

09:48:31  6   or, in fact, the Court, we have to design a program that maintains

09:48:35  7   the jury trial rights of CNBM and BNBM.

09:48:40  8         This gets us to who we choose, and I think this is

09:48:43  9   implicated in your Honor's proposal as well as the PSC's --

09:48:54 10         THE COURT:  I'm sorry.

09:48:55 11         MR. STENGEL:  Thank you, your Honor.

09:48:57 12         There is no reason, frankly, and this gets to my initial

09:49:00 13   point that I think we still need a bellwether process and that will

09:49:04 14   hopefully herd the cats into some form of resolution here.  But it

09:49:08 15   would be counterproductive under either the PSC's proposal or your

09:49:13 16   Honor's proposal to have a skewed, non-random distribution of cases

09:49:18 17   to be tried, because we all as experienced counsel will take

09:49:23 18   signals from the outcome of trials.  We're not irrational.  But to

09:49:29 19   the extent one party or the other is allowed to sort of tilt the

09:49:34 20   balance in favor of their best cases, it means you're getting

09:49:37 21   nothing but noise out of the process.  And I don't think it's on

09:49:41 22   the table at this point, although I hesitate given I don't think

09:49:45 23   *Germano* was intended to be preclusive and it became that through

09:49:48 24   the damage formula.  Obviously *Chevron* makes it absolutely clear

09:49:54 25   there can be no preclusive effect of bellwethers, or even initial

09:49:58  1    trials if we're going to try all of these things in short order.

09:50:02  2        *Brooke*, Ms. Eikhoff addressed.  *Brooke* is a fresh start.

09:50:11  3    We may not like it, but it's a late filed case.  There are no

09:50:13  4    defaults.  Liability is still fully at issue.  And we agree that

09:50:15  5    since the center of gravity in the *Brooke* litigation is in Florida,

09:50:20  6    and she may not welcome this, but *Brooke* is largely Judge Cook's

09:50:25  7    problem.  But we ought not get too wrapped up with the Louisiana

09:50:28  8    *Brooke* claimants here.  But I just want to make clear that we did,

09:50:31  9    in fact respond to the PSC on that point.

09:50:34 10        THE COURT:  Okay.

09:50:35 11        MR. STENGEL:  In closing, your Honor, we think Taishan

09:50:37 12    and CNBM and BNBM have made rational proposals.  They are clearly

09:50:44 13    aggressive in terms of how quickly we would move through a

09:50:49 14    discovery process and get to bellwether trials.  And granted,

09:50:52 15    there's a central premise there, which is different from your

09:50:55 16    Honor's, that bellwethers still would have some utility in this

09:50:58 17    litigation.  But that is our belief and we don't see any way that

09:51:02 18    we can proceed with either the PSC's proposal, or in fairness your

09:51:06 19    Honor's, without doing substantial violence to the due process

09:51:09 20    rights of the defendants.

09:51:11 21        And to reiterate, it's counterproductive in terms of

09:51:16 22    moving towards a resolution for the defendants to be put in the

09:51:19 23    position where they think this court is in some way rolling over

09:51:22 24    their rights, that will merely harden positions and make it more

09:51:27 25    difficult to get to where we need to be.

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/02/19 Page 37 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2018 Page 25 of 37

24

09:51:29  1          So unless there are any questions.

09:51:31  2          THE COURT:  No.  Just the problem that I am faced with is

09:51:33  3    that we've been doing this for nine years now.  Every step of the

09:51:38  4    way the defendant has resisted looking at the case.  I mean, we've

09:51:48  5    had jurisdictional issues and a bunch of other things.  It just is

09:51:59  6    apparent -- it appears to me, or at least it's a strong argument,

09:52:03  7    that the whole approach is just delay.  Delay because people die,

09:52:10  8    delay because they lose their homes, delay because they're

09:52:16  9    frustrated and giving up.  And it's a method, and I am not talking

09:52:23  10   about counsel, but it's just -- I don't know how much more I can

09:52:30  11   give you to look at from the standpoint of bellwethers.

09:52:36  12          I mean, we've discovered this case now for nine years.

09:52:40  13   Even going to China to take depositions.  And I think everybody

09:52:45  14   knows the facts of this case pretty well, and it just seems to me

09:52:53  15   that we're just -- we're finding ourselves in, you know, a Dickens

09:53:03  16   kind of Bleak House where we just keep discovering and keep moving

09:53:11  17   the case at glacial speed, and pretty soon the glacier melts and

09:53:18  18   you don't have anything.  And that concerns me.  I am trying to

09:53:22  19   figure a way of just bringing this to a head and getting rid of the

09:53:28  20   case.

09:53:28  21          Not settlement.  I've given up on settlement.  I don't

09:53:31  22   think settlement is feasible, and if I have to be the one to

09:53:36  23   approve it, I am probably not going to approve it.  So we need

09:53:40  24   trials in these cases, and I just need to get either my colleagues

09:53:46  25   in state court, particularly those that have issues of punitive

09:53:50  1    damages and things of that sort, they've got to get on with their

09:53:54  2    thing and I've got to get on with mine.  I just don't see starting

09:53:59  3    bellwethers again.  I mean, you know, we just --

09:54:03  4         It's nine years out at this time.  It's nine years.  And

09:54:08  5    I hear you and I understand your argument and it's not without

09:54:15  6    sincerity and it's certainly not without citations, but that's the

09:54:21  7    pickle that I am in dealing with the case.

09:54:23  8         MR. STENGEL:  Well, your Honor, but as a practical

09:54:25  9    matter, and we tried to address this -- and I am not going to

09:54:28 10    address what happened before we got involved in the litigation

09:54:31 11    because I simply don't know.  But if you take the span of the case

09:54:36 12    since the parties re-entered and re-engaged, it's been a little

09:54:41 13    slow, but we've largely been engaged, other than times where with

09:54:46 14    everyone's consent we stopped because we thought we had something

09:54:50 15    positive by way of resolution, so we lost time.  No one's fault but

09:54:55 16    it happened.

09:54:56 17         But, your Honor, our fundamental point is that it doesn't

09:55:02 18    behoove anyone's interest, certainly not the claimants -- and I am

09:55:06 19    not attempting to wrap myself in the interest of the claimants

09:55:10 20    here, obviously I represent a defendant.  But if something goes

09:55:13 21    forward, if a defective trial process is unleashed, we've already

09:55:17 22    got a matter before the Fifth Circuit, your Honor has heard me in

09:55:22 23    particular on the due process issues that we think are already

09:55:26 24    implicated with the damage model, with class certification, with

09:55:28 25    contempt, et cetera.

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/02/19 Page 39 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 27 of 37

26

09:55:31  1          There are a broad buffet of issues here, most of them

09:55:35  2   worthy of consideration by this circuit.  We go forward with the

09:55:38  3   PSC plan or indeed with what your Honor has outlined -- granted in

09:55:44  4   outline form, not with precision -- I think we are buying greater

09:55:49  5   delay because I think the end result -- and I understand your

09:55:57  6   Honor's pessimism about settlement.  And I can't represent to you

09:56:01  7   that fortune will smile and we'll become reasonable and settle this

09:56:04  8   thing in X days.  I wish I could.  It should.  But it hasn't

09:56:07  9   happened yet for a variety of reasons.

09:56:09  10         But I don't think it's because some sinister orientation

09:56:13  11  towards delay on the part of my clients.  I think our behavior both

09:56:17  12  in resolution discussions and in litigation has been contrary to

09:56:21  13  that.  But I think your Honor should give due consideration to the

09:56:24  14  fact that our paths here diverge fairly substantially, but the real

09:56:32  15  risk is we unleash unlimited war, we're trying ten cases at a time

09:56:38  16  in what I would guess is probably under Rule 42 an improper

09:56:43  17  consolidation.  But we will, I will virtually guarantee your Honor,

09:56:46  18  end up on that in the Fifth Circuit at some point.

09:56:49  19         It will be a long time coming because we don't think

09:56:53  20  54(b) allows a partial damages judgment.  And we could spend

09:56:57  21  another two or three years -- and again, your Honor, I am trying to

09:57:00  22  be very careful, this is not a lawyer threatening your Honor --

09:57:04  23         THE COURT:  No, I understand that.

09:57:05  24         MR. STENGEL:  -- this is just an effort to make an

09:57:08  25  objective assessment of what's likely to happen.  We could be here

Case 2:09-cv-02047-EEF-MBN Document 22380-4 Filed 12/03/19 Page 40 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 28 of 37

27

09:57:10  1  for sometime even under your Honor's notion.  If we're going to try

09:57:14  2  every case, 900 cases, unless we throw due process just completely

09:57:18  3  out the window, and even with the employment of all the district

09:57:24  4  judges here, who I believe have other things to do, we're going to

09:57:26  5  be here for years.  And we don't want to do that with the idea that

09:57:30  6  all it's going to do is arm the parties with what they think are

09:57:34  7  unlimited set of grounds for appeal.

09:57:36  8        So I think our proposals, and there is a leap of faith

09:57:39  9  for your Honor here, I admit that, that rationality will begin to

09:57:44 10  intrude and the parties will be pushed closer together.  But we at

09:57:48 11  least, I think, posit an exit strategy within some reasonable

09:57:54 12  amount of time.  And my perception of reasonable may be different

09:58:00 13  from your Honor's because I haven't lived through all nine and a

09:58:03 14  half or ten years.

09:58:04 15        THE COURT:  All right.  Thank you.

09:58:04 16        MR. STENGEL:  But that's where we're trying to go, your

09:58:04 17  Honor.

09:58:05 18        THE COURT:  I appreciate it.  Thank you very much.  Let

09:58:07 19  me hear from the plaintiffs.

09:58:12 20        MR. LEVIN:  Well, I wasn't going to mention the aborted

09:58:17 21  settlement, so I won't, whose at fault.  But, your Honor, you put

09:58:22 22  your finger right on what the problem was.  After counsel and the

09:58:26 23  Court invested so much time in this case over nine years, we're now

09:58:36 24  at square one.  Francis Scott Key had one song.  The defendants

09:58:40 25  have one position:  Delay.

09:58:48  1          Your Honor, they won two percent of the cases.  There's

09:58:53  2    no settlement.  There's no talk of settlement.  There's no want of

09:58:57  3    settlement on their part.  It would take 31.9 years to conclude

09:59:02  4    this.

09:59:03  5          This is not what an MDL is about.  An MDL at least was

09:59:11  6    established to get results in mass torts, whether they be

09:59:17  7    antitrust, securities, or mass torts.  And I invite your Honor to

09:59:21  8    look at the *PPA* case of the Ninth Circuit, 460 F.3d 1217.  "For all

09:59:38  9    its work, multidistrict litigation assumes cooperation by counsel

09:59:42 10    and macro-, rather than micro-, judicial management."  Why?

09:59:48 11    Because the Court's business and Counsel's business is to resolve

09:59:53 12    things.  And there's no resolution here.

10:00:00 13          Mr. Stengel says he's new to the process.  He wasn't here

10:00:04 14    when we began.  Your Honor, Orrick, his law firm, was here before I

10:00:14 15    was here in this case.  They were in China, they were in China

10:00:21 16    advising these defendants that they couldn't collect -- that we

10:00:26 17    couldn't collect judgments in the United States.  They were in

10:00:29 18    China advising these defendants that they didn't have to appear.

10:00:35 19    They are the fault of nine years.

10:00:50 20          This case can be resolved in a proper fashion with a

10:00:57 21    Special Master.  If it's a non-jury trial -- case, and I'll get to

10:01:03 22    why it should be a non-jury case -- the plaintiffs can make a prima

10:01:12 23    facie case before the Special Master with regard to move in/move

10:01:16 24    out, foreclosure, short sales.

10:01:19 25          God did we hear a story yesterday on foreclosures and

Case 2:09-md-02047-EEF-MBN Document 22880-4 Filed 12/03/19 Page 42 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 30 of 37

29

10:01:23  1   what a beautiful, personal injury, mental anguish case there would

10:01:30  2   be for what that fella went through that spoke to this court

10:01:35  3   yesterday.

10:01:36  4        The Special Master can make recommendations and then an

10:01:42  5   Article III judge can deal with the recommendations that the

10:01:46  6   Special Master makes.  If people want to resolve matters, they know

10:01:53  7   how to do it.  Some of us have been doing this for over 50 years.

10:02:08  8   Now --

10:02:08  9        THE COURT:  How would you propose to handle it?

10:02:11 10        MR. LEVIN:  I would propose putting *Brooke* aside, and I

10:02:15 11   don't believe that we should just let *Brooke* go to Florida for

10:02:19 12   resolution because your Honor has been involved in the liability

10:02:23 13   aspects of this case.  If the *Brooke* case is tried here and

10:02:27 14   processed here, there is an awful lot of knowledge that the Court

10:02:31 15   has that we don't have to re-invent the wheel in Florida.

10:02:38 16        I would propose that we use your plan, your Honor:  Have

10:02:43 17   a Special Master appointed; that we not have to redo the class

10:02:50 18   hearings; the remediation decision that your Honor wrote; that

10:02:58 19   square footage, ownership, and product ID be established before the

10:03:04 20   special master; and that we give a Special Master a plan with

10:03:10 21   regard to the non-pure remediation aspects; and that we present our

10:03:15 22   evidence, create our prima facie case, and let the Special Master

10:03:20 23   make recommendations.  Perhaps the best thing to do is to meet with

10:03:25 24   that Special Master collectively and provide a plan of the Special

10:03:30 25   Master for your court to view.

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/02/19 Page 43 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 31 of 37

30

10:03:33  1          But we are not going to try all of these cases for

10:03:36  2     31 years.  And to pick out 24 cases and start right now after nine

10:03:43  3     years is just not proper.

10:03:45  4          THE COURT:  How do you deal with their constitutional

10:03:47  5     argument?

10:03:48  6          MR. LEVIN:  Well, let me tell you how we deal with the

10:03:51  7     constitutional argument, your Honor.

10:03:53  8          First of all, the Fifth Circuit has said in *Dierschke v.*

10:03:59  9     *O'Cheskey,* 975 F.2d 181, that there is no due process in a default

10:04:06 10     judgment, you don't have it.

10:04:08 11          How do we deal with the jury trial?  Rule 38 does not

10:04:14 12     come into play here.  Usually you get a default judgment, the

10:04:20 13     plaintiff has demanded a jury trial and he wants a jury trial in

10:04:24 14     default and that's how it goes up.  But there is a Northern

10:04:31 15     District of Texas case, Flexible Innovations v. IDEA Max, 2013

10:04:46 16     Westlaw 12126232.  I can't get used to those cites, your Honor, I'm

10:04:55 17     too old.  And in a Rule -- under Rule 55 you do not need the jury

10:05:02 18     trial.

10:05:05 19          As to the multiple defaults, every defendant has been

10:05:11 20     defaulted in this case in at least one of the *Amorin* cases, and the

10:05:16 21     *Amorin* cases are all the same in three different jurisdictions

10:05:21 22     because of the personal jurisprudence involved.  And they were all

10:05:28 23     before your Honor, we were dealing with them altogether.  It was an

10:05:32 24     MDL, and, your Honor, you know, has so indicated in your damage

10:05:36 25     opinion.  So I don't see a problem there.

Case 2:09-md-02047-EEF-MBN Document 22880-4 Filed 12/03/19 Page 44 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 32 of 37

31

10:05:41  1          The problems that are here are created problems for delay

10:05:48  2  so that all -- because the defendants are playing the long game.

10:05:53  3  In the end, we'll all be dead.  Some of us chronologically we'll be

10:06:02  4  dead sooner than others, but eventually the entire client base will

10:06:07  5  be dead.

10:06:11  6          And for CNBM and BNBM who are single business

10:06:16  7  enterprises, alter egos, to come in here right now and say they

10:06:20  8  know nothing about this case, they have been in this case forever.

10:06:25  9  They have been formulating the plan as to how to defend this case

10:06:33 10  forever.  They were in China before they were in the United States

10:06:37 11  and before these cases were commenced, or at least when the first

10:06:42 12  complaint landed in China.  And for the defendants to say when they

10:06:48 13  came in here that they didn't understand American law when they had

10:06:51 14  American lawyers telling them what the American law was, only shows

10:06:55 15  that there is only one thing that they're interested in, and that's

10:07:00 16  delay.

10:07:01 17          Your Honor, give us a chance.  We'll take the chance with

10:07:05 18  regard to their due process arguments for the Chinese defendants.

10:07:09 19  We'll take the chance with regard to their argument that they know

10:07:12 20  want a jury trial.  We'll take the chance with the fact that there

10:07:15 21  is no -- that the defaults are inappropriate.  We'll take all of

10:07:19 22  those things because after nine years, we've got to do something

10:07:25 23  and we shouldn't -- I learned a long time ago that if you play the

10:07:32 24  game by other people's rules, you're apt to lose because they wrote

10:07:38 25  the rules.  And I think it's time not to play by the defendants'

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/03/19 Page 45 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 33 of 37

32

10:07:43  1    rules.  And your Honor, you know, we'll be guided by what you have

10:07:48  2    to say.

10:07:49  3          THE COURT:  Let me ask you one question.  The class they

10:07:52  4    say include -- does not include all owners, it just includes the

10:07:57  5    present owners.

10:07:59  6          MR. LEVIN:  It just included current owners at the time,

10:08:01  7    yes.  But you can take your findings and apply them to everybody

10:08:05  8    else.  Now, there may be --

10:08:06  9          I would suggest that there are issues here, there's

10:08:08 10    always issues.  But like in pharmaceutical cases, you have a

10:08:15 11    science day.  Perhaps we have a motions day and the plaintiffs do

10:08:20 12    their motions, defendants do their motions, and we take them one at

10:08:24 13    a time over a day or two and resolve them all before your Honor.

10:08:28 14          THE COURT:  Okay.

10:08:30 15          MS. EIKOFF:  May I respond?

10:08:31 16          THE COURT:  Yes.  Sure.

10:08:39 17          MS. EIKOFF:  Your Honor, I just want to respond to a

10:08:41 18    couple of the things that Mr. Levin said.

10:08:44 19          I was surprised to hear him say that the Fifth Circuit

10:08:48 20    has held that due process doesn't apply to a defaulted defendant.

10:08:53 21    That is not the law.  I will cite to you a case *Frame v. SH, Inc.*,

10:09:01 22    967 F.2d 134 (VERBATIM), that says that discretion granted to

10:09:08 23    judges for damages adjudication under Rule 55 is bounded at its

10:09:13 24    outer limits by constitutional due process concerns.  That is

10:09:17 25    citing a Supreme Court case called *Hovey v. Elliott* from 1897.

10:09:23  1   I've gotten to know that case.  It was one of the first cases that

10:09:26  2   I read when we were engaged in this matter in 2015.  Alston & Bird

10:09:34  3   was never involved in the cases before that.

10:09:40  4        In that case, the argument that was being made by the

10:09:44  5   adverse party was that a party that was in contempt and that was in

10:09:48  6   default was entitled to no constitutional rights.  I thought that

10:09:51  7   was an interesting case based on where I was coming from and where

10:09:57  8   our client was at the time.

10:09:59  9        And that case holds, Supreme Court, in no uncertain terms

10:10:04 10   that the Constitution applies and whether a party is in default and

10:10:08 11   whether a party is in contempt, they are still allowed to defend

10:10:13 12   themselves against the imposition of damages, and that is the basis

10:10:16 13   of the due process issues that we've raised today.

10:10:19 14        I want to respond, also, to this allegation that our end

10:10:25 15   game is delay or driven by delay, all we want to do is delay, and

10:10:31 16   that our plan is for delay.  As I put up on the screen earlier and

10:10:36 17   we have in the packet, under the plan that we propose, they would

10:10:40 18   get to an appealable, collectable judgment through a trial, through

10:10:46 19   the first trial in less than a year, in six to ten months.

10:10:54 20        They say that their plan is so much faster.  Well, their

10:10:59 21   plan has changed today, because the plan that they submitted did

10:11:02 22   not have Cal Mayo doing all of the trials on all of the issues.

10:11:06 23   They've shifted to that because it's convenient for them.  Their

10:11:10 24   plan was for every single claimant, all 800 to 900 of them to be

10:11:16 25   deposed on non-remediation damages only and to have discovery on

10:11:22  1   non-remediation damages only and then for all of them to be tried.

10:11:27  2   Our plan is actually faster.  Our plan makes more sense.

10:11:31  3            And I will close on this note.  They say in their brief

10:11:34  4   that their plan is ambitious.  It's ambitious because it's

10:11:38  5   unbounded by constitutional principles.  It's also unbounded by

10:11:43  6   realistic principles.  And so I would ask that if the court does

10:11:49  7   consider their plan, they have a long list of things that they say

10:11:52  8   that the parties need to do in the first 15 days, it includes

10:11:58  9   extensive briefing, it includes obligations on both parties.  Of

10:12:04 10   course we would ask the Court to reject their entire plan; but if

10:12:08 11   it does accept their plan, we would ask that the first 15-day mark

10:12:12 12   be shifted to 30 just so that the parties can more realistically

10:12:16 13   get things done, your Honor.

10:12:17 14            THE COURT:  All right.  Thank you very much.

10:12:20 15            MR. STENGEL:  Your Honor.

10:12:22 16            THE COURT:  You want to respond, Jim?

10:12:24 17            MR. STENGEL:  And I won't respond to the ad hominem

10:12:28 18   attacks.  I think I was fairly precise in saying we hadn't been

10:12:30 19   involved here before your Honor, which was totally accurate.

10:12:34 20            I think two things are instructive there.  One was this

10:12:39 21   sort of on the fly expansion of what Cal Mayo would consider, to

10:12:42 22   include, apparently, claims that we have all, both sides conceded

10:12:46 23   had to be discovered and litigated.  That and the sort of fascicle

10:12:52 24   restructuring of what the class covers and does not, I think

10:12:55 25   bespeaks of a fairly substantial indifference to error here.

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/03/19 Page 48 of 258
Case 1:11-cv-22408-MGC Document 64-1 Entered on FLSD Docket 09/14/2012 Page 36 of 37

35

|          |    |                                                                         |
|----------|----|-------------------------------------------------------------------------|
| 10:13:01 | 1  | Procedural error matters and our clients do have rights                 |
| 10:13:04 | 2  | and we're here to assert those rights and will continue to do so.       |
| 10:13:07 | 3  | And to the extent the PSC wants to take the position of, well, you      |
| 10:13:11 | 4  | know, close is good enough.  It's not.  And that gets us exactly in     |
| 10:13:15 | 5  | the adverse end game I outlined of we go through substantial            |
| 10:13:21 | 6  | efforts here, we spend a lot of your time and our time and our          |
| 10:13:26 | 7  | clients' time, and we end up with an indefensible outcome in the        |
| 10:13:31 | 8  | circuit.  That serves no one's interest.  Thank you, your Honor.        |
| 10:13:34 | 9  | THE COURT:  Okay.  I got it.                                            |
| 10:13:34 | 10 | MR. LEVIN:  Your Honor, 30 seconds?                                     |
| 10:13:38 | 11 | THE COURT:  Sure.  Go ahead.                                            |
| 10:13:41 | 12 | MR. LEVIN:  Yes, we did expand what Cal Mayo would be                   |
| 10:13:45 | 13 | doing, and the reason we did that is we were listening to your          |
| 10:13:49 | 14 | Honor and made the adjustment based on what we heard the Court say.     |
| 10:13:54 | 15 | THE COURT:  Okay.  Harry.                                               |
| 10:13:55 | 16 | MR. ROSENBERG:  Not substantively.  But when we were in                 |
| 10:13:59 | 17 | chambers this morning with your Honor, you suggested that it might      |
| 10:14:02 | 18 | serve the Court to submit briefs after this hearing, your Honor,        |
| 10:14:07 | 19 | because there are a number of issues that have been raised almost       |
| 10:14:11 | 20 | for the first time, and we would respectfully ask the Court to          |
| 10:14:15 | 21 | afford at least the parties ten business days to do so.                 |
| 10:14:19 | 22 | THE COURT:  Let's do it in five days, so I'll let you do                |
| 10:14:22 | 23 | it.                                                                     |
| 10:14:22 | 24 | MR. LEVIN:  If they can do five days, we would like five                |
| 10:14:25 | 25 | days to reply.                                                          |

Case 2:09-md-02047-EEF-MBN   Document 22880-4   Filed 12/02/19   Page 49 of 258
Case 1:11-cv-22408-MGC   Document 64-1   Entered on FLSD Docket 09/14/2012   Page 37 of 37

36

| | | |
|---|---|---|
| 10:14:26 | 1 | MR. ROSENBURG:  I expected it would be simultaneous, your |
| 10:14:30 | 2 | Honor.  Mr. Levin -- |
| 10:14:30 | 3 | MR. LEVIN:  I don't know what the issues are. |
| 10:14:32 | 4 | MR. ROSENBERG:  Well, he heard all of the issue.  I don't |
| 10:14:34 | 5 | want to argue the case, but Mr. Levin was pretty articulate.  He |
| 10:14:39 | 6 | can raise the issues like we can, and we'll do it simultaneously. |
| 10:14:42 | 7 | THE COURT:  Yes, I agree, simultaneously.  Let's do it in |
| 10:14:44 | 8 | five days.  The court will stand in recess.  Thank you. |
| 10:14:47 | 9 | MR. ROSENBERG:  Thank you, your Honor. |
| 10:14:48 | 10 | THE DEPUTY CLERK:  All rise. |
| 10:14:50 | 11 | (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.) |
| | 12 | |
| | 13 | * * * * * * |
| | 14 | |
| | 15 | REPORTER'S CERTIFICATE |
| | 16 | |
| | 17 | I, Karen A. Ibos, CCR, Official Court Reporter, United |
| | 18 | States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the |
| | 19 | proceedings in the above-entitled and numbered matter. |
| | 20 | |
| | 21 | ____/s/ Karen A. Ibos_____<br>Karen A. Ibos, CCR, RPR, CRR, RMR |
| | 22 | Official Court Reporter |
| | 23 | |
| | 24 | |
| | 25 | |

# EXHIBIT "B"

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 51 of 258
Case 2:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2016 Page 2 of 26

1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
  ************************************************************

  IN RE:  CHINESE-MANUFACTURED          Docket No. 09-MD-2047
  DRYWALL PRODUCTS LIABILITY            New Orleans, Louisiana
                                        Tuesday, August 11, 2009


  ************************************************************


            TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
            HEARD BEFORE THE HONORABLE ELDON E. FALLON
                  UNITED STATES DISTRICT JUDGE



  APPEARANCES:

  FOR THE PLAINTIFF:            HERMAN, HERMAN, KATZ & COTLAR
                               BY:  RUSS M. HERMAN, ESQ.
                               820 O'Keefe Avenue
                               New Orleans, LA 70130


  FOR THE DEFENDANT:            FRILOT L.L.C.
                               BY:  KERRY J. MILER, ESQ.
                               Energy Centre - Suite 3700
                               1100 Poydras Street
                               New Orleans, LA 70163-3700


  Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR
                               500 Poydras Street, Room HB-406
                               New Orleans, Louisiana 70130
                               (504) 589-7776



    Proceedings recorded by mechanical stenography, transcript
  produced by computer.
```

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 52 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2016 Page 3 of 26

2

<u>P R O C E E D I N G S</u>

(TUESDAY, AUGUST 22, 2009)

(STATUS CONFERENCE PROCEEDINGS)

09:02:34  THE COURT:  Be seated, please.  Good morning, ladies and gentlemen.  Call the case, please.

09:02:38  THE DEPUTY CLERK:  MDL No. 2047, <u>in re:  Chinese Manufactured Drywall Products</u>.

09:02:44  THE COURT:  Liaison counsel make their appearance for the record, please.

09:02:47  MR. HERMAN:  Good morning, Judge Fallon, Russ Herman for plaintiffs in MDL 2047.

09:02:53  MR. MILLER:  Kerry Miller for defendants, your Honor.

09:02:55  THE COURT:  I am pleased to advise that we have several judges on the line:  Judge Joseph Farina from Miami, Eleventh Judicial District; Judge Robert Rosenberg from Fort Lauderdale, Seventeenth Judicial District; and Judge Glenn Kelly, West Palm Beach, Fifteenth Judicial District.

09:03:15  Gentlemen, I appreciate your being with us today.  I am going to look forward to working with you as a team, and hopefully together we can work on this matter.

09:03:26  I met with liaison counsel to talk about the agenda.  I'll take them in the order as it's given.

09:03:38  First, Pretrial Orders.

09:03:39  MR. HERMAN:  May it please the court, good morning, your

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 53 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2016 Page 4 of 26

3

09:03:42  1  Honor, and good morning your Honors.

09:03:43  2      With respect to the status conference this morning, Item

09:03:50  3  No. 2, Property Inspections, we've had numerous meetings with

09:03:57  4  defense counsel.  We're in progress, we expect to provide to the

09:04:05  5  court for review no later than Thursday of this week an agreed to

09:04:13  6  protocol for inspection and to get it to the five or six companies

09:04:19  7  that were interviewed mutually by plaintiffs and defendants on

09:04:23  8  Friday and ask them to please expedite their review and get back to

09:04:29  9  us.

09:04:30  10     We plan to agree on a discrete number of initial

09:04:36  11  inspections that will move rapidly, probably between 30 and 50 with

09:04:43  12  your Honor's approval.  And then look at whether the protocol is

09:04:48  13  working and whether the company that's been contracted is doing the

09:04:52  14  job.  We will make sure that the company mutually selected or

09:04:58  15  companies mutually selected are available to meet with your Honor

09:05:03  16  on accord with your schedule before the inspections begin.

09:05:06  17     MR. MILLER:  Your Honor, I think that's all correct.

09:05:09  18  With respect to the inspection companies, just a few more details

09:05:13  19  on what Mr. Herman had to say.

09:05:16  20     THE COURT:  Speak into the mike so the judges can hear

09:05:19  21  you.

09:05:20  22     MR. MILLER:  I think the parties jointly believe that the

09:05:21  23  inspection company needs to be court approved so whereby the

09:05:24  24  parties may make suggestions to the court.  Ultimately the

09:05:28  25  inspection company needs to be court approved and we anticipate

09:05:34 1    inserting the name of the inspection company into the pretrial

09:05:34 2    order that's going to govern the inspections.

09:05:35 3         THE COURT:  I've had several meetings with the parties on

09:05:40 4    this issue.  My feeling is at this point I think all would profit

09:05:45 5    by understanding the identification of the issues and the parties

09:05:50 6    involved.  I think we need a threshold inspection protocol to

09:05:55 7    determine whether or not the property in question contains Chinese

09:06:00 8    manufactured drywall; secondly, the name of the manufacturer,

09:06:07 9    distributor and installer of that particular drywall; third, the

09:06:12 10   nature and extent, if any, of the impact on the surrounding

09:06:18 11   property.  And that's the thrust of this initial inspection.

09:06:22 12        I need a protocol by the end of this week.  I will, of

09:06:26 13   course, forward it to the state judges for their inspection and

09:06:30 14   input.  And also when you give me the names of the inspectors, I'll

09:06:36 15   also send it to my colleagues in state court for their input.

09:06:41 16        I think this case is going to profit from understanding

09:06:46 17   and getting our hands around as quickly as possible what we're

09:06:51 18   dealing with.  We need to know whether or not a particular property

09:06:58 19   has within it Chinese manufactured drywall.  And if so, the extent

09:07:03 20   of that drywall.  It seems that this drywall has also been sold

09:07:09 21   together with non-Chinese drywall.  So not all homes that have some

09:07:16 22   Chinese drywall, have all of the drywall is Chinese manufactured.

09:07:22 23   We need to know that, we need to know how much is involved, we need

09:07:27 24   to know who manufactured it, we need to know who distributed it, we

09:07:30 25   need to know who installed it, and also we need to know at least

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 55 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2016 Page 5 of 26

5

visually the nature and extent of the collateral damage.

So once that is ascertained, and I would hope that that could be ascertained within 30 or 60 days, I am looking for an initial read of 25, 30 homes, take a look at the protocol, you may have to tweak it at that time, and then let's step it out to 1,500, 2,000 homes throughout the country. And then from that group, both the federal court, as well as the state courts may find it advisable to select some cases and try those particular cases. At least that's my thought presently.

In addition, I asked counsel to get together and give to us a plaintiff and defendant profile form. The traditional method, as all of us know, is to draft a large set of interrogatories and serve those interrogatories and wait for 30 days and then you get them back and you deal with them back and forth. We don't have that time in this particular case, so we have to shortcut that and deal with profile forms instead of detailed sets of interrogatories. Doesn't mean that you can't file interrogatories later, it simply means that there's some information that you need now and we can't wait 30 and 60 days to get that information. So I've instructed counsel to get together and prepare profile forms.

Let me hear from the parties on the progress of those profile forms.

MR. HERMAN: May it please the court, your Honor, we've had a number of meetings. We expect to have more meetings as soon as this status conference is concluded and to send a representative

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 56 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2016 Page 57 of 26

6

09:09:24  1  from plaintiffs and whomever liaison counsel for defense selects

09:09:30  2  with a profile forms for you to review.  And if your Honor is

09:09:34  3  satisfied with them to enter an order.

09:09:36  4      We have one issue outstanding, we expect that we're going

09:09:39  5  to resolve it very shortly as soon as this is concluded.  We're

09:09:45  6  well aware your Honor is in trial, and so we will try not to

09:09:49  7  interrupt your Honor while you're conducting other business.

09:09:52  8      I will say this, there was some dispute as to who was

09:09:56  9  going to pay, how they were going to pay.  The PSC, Plaintiffs

09:10:03  10  Steering Committee met last night, and we met with some of our

09:10:06  11  cochairs, we are going to pay the initial cost of the 25

09:10:10  12  inspections.  That does not mean that we are not going to seek

09:10:13  13  reimbursement at some point, it doesn't mean that we agree for the

09:10:16  14  next thousand that we're going to pay.  But in order to get this

09:10:20  15  show on the road, the plaintiffs are going to pick up the costs of

09:10:24  16  the inspections, whatever they are.

09:10:26  17      THE COURT:  Okay.  With regard to the profile forms, let

09:10:28  18  me have those by the end of the week in final form.  So I'll put

09:10:32  19  that out in an order and we can distribute the profile forms and

09:10:35  20  we'll get them back as quickly as possible.

09:10:38  21      MR. MILLER:  Judge, Kerry Miller on behalf of the

09:10:40  22  defendants.  On the issue of the profile forms, just one

09:10:42  23  supplemental point to what Mr. Herman had to say.

09:10:45  24      I think we are close to finalizing those documents, I

09:10:48  25  have every confidence in the world they will be finalized in the

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 57 of 258
Case 1:11-cv-22408-MGC Document 04-2 Entered on FLSD Docket 09/14/2016 Page 58 of 26

7

09:10:56  1    next day or so.  I think in the course of our discussions yesterday

09:10:56  2    there was an agreement that once they are finalized, submitted to

09:10:57  3    the court for entry, that as part of the court's order authorizing

09:11:03  4    the issuance of those profile forms that the return date would be

09:11:06  5    15 days.

09:11:07  6            THE COURT:  Right.

09:11:08  7            MR. MILLER:  Because we are going to try to move this

09:11:10  8    fast, get those profile forms answered quickly.  We understand from

09:11:13  9    plaintiffs and defendants who come in subsequent to that it's going

09:11:16 10    to be a rolling production.  But for the group that's here right

09:11:19 11    now, 15 days is what we're looking for to get the responses in.

09:11:22 12            THE COURT:  And that dovetails in with the inspections

09:11:25 13    because I think the profile forms will help you understand from the

09:11:29 14    defendant's standpoint what the complaints are so you will be able

09:11:33 15    to at least be aware of those when you do the inspections.

09:11:35 16            MR. MILLER:  In terms of what the court identified as the

09:11:38 17    main issues for the thrust of discovery, the one, the two, and the

09:11:43 18    three, it's the profile forms and the inspections together in

09:11:45 19    agreement that's hopefully going to answer those questions.

09:11:48 20            THE COURT:  I think that's right.  Also while you're

09:11:50 21    doing the inspections you're going to come across some property,

09:11:53 22    obviously, and some samples will be taken.  The issue of what to do

09:11:57 23    with those samples is the next item on the agenda, the Preservation

09:12:01 24    Order.  This type of material you need to talk to the people to

09:12:05 25    find out how you store it.  You can't stick it in a plastic bag,

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 58 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2016 Page 59 of 26

8

09:12:10  1    you can't put it in your pocket and expect that the chain of

09:12:14  2    custody will be maintained.

09:12:17  3            So we need to deal with a preservation order and get that

09:12:25  4    to me so I can send it to the state judges and hopefully that same

09:12:30  5    chain of custody will satisfy their requirements as it will for the

09:12:35  6    federal requirements.

09:12:36  7            You won't have to go back in and take other samples, the

09:12:40  8    samples will be valid samples -- I am not saying you have to test

09:12:44  9    them now, that may come later, but the samples will be validly

09:12:48 10    taken, validly stored, and then able to be tested at another time.

09:12:55 11    But the chain of custody is what I am focussing on with the

09:12:58 12    preservation order.  Anything on that?

09:13:03 13            MR. HERMAN:  We've exchanged three different versions of

09:13:05 14    a preservation order and we're continuing to work on it, your

09:13:08 15    Honor.  We'll have an order to you certainly before inspections

09:13:12 16    begin.

09:13:14 17            THE COURT:  All right.

09:13:14 18            MR. HERMAN:  Your Honor, the next issue I believe on your

09:13:19 19    Honor's agenda is No. 5 which would be State Court Trial Settings.

09:13:30 20            THE COURT:  Yes, right.  Anything on that from either the

09:13:30 21    plaintiffs or defendants?

09:13:30 22            MR. HERMAN:  From plaintiffs we will attempt to track

09:13:32 23    removals and remands, your Honor, and I believe the defendants will

09:13:36 24    advise, as is customary, at each status conference the trial

09:13:42 25    settings in state and federal court, as well as motions that are

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/02/19 Page 59 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 10 of 26

9

09:13:48 1    pending.

09:13:50 2          And, your Honor, as I understand it, your Honor is

09:13:53 3    considering a period of time in which no motions will either be

09:14:01 4    filed or heard.

09:14:07 5          THE COURT:  Two points on that.  The reason that I need

09:14:09 6    to know about the state court settings is so that I am not

09:14:15 7    inconsistent with their settings.  I don't want to set a trial on a

09:14:19 8    date that they have a trial set, so I want to be conscious of that.

09:14:24 9    And if they have something coming up, I need to know it so I don't

09:14:27 10   get in the way of it.  That's the reason for that.

09:14:30 11         With respect to motions, my thinking with motions is that

09:14:34 12   we've got to stop everything, the motions initially, just to get a

09:14:42 13   handle on it.  In this case we've got several thousand of claims

09:14:48 14   that we know about and maybe many thousands more.  We can't have

09:14:55 15   thousands of motions being filed with people having to respond to

09:15:01 16   the motions within a certain period of time or have their rights

09:15:05 17   prejudiced.  So I am going to be issuing an order freezing motions

09:15:12 18   and then I am going to instruct the parties to get together a list

09:15:16 19   of motions for me, prioritize the motions, and then I'll set a

09:15:21 20   briefing schedule on those motions.

09:15:23 21         I need them to direct their attention on the key motions

09:15:27 22   as opposed to being all over the place.  So we're going to get to

09:15:35 23   the motions and we're going to get to them expeditiously, but I

09:15:39 24   need to focus on the key motions first rather than motions that can

09:15:46 25   wait for a week or two.

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/03/19 Page 60 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 11 of 26

10

09:15:48  1      The State/Federal Coordination.  My thinking there is

09:15:54  2   that I talked to liaison counsel for both sides, lead counsel for

09:15:58  3   both sides to suggest to them that they could get together for me

09:16:04  4   some names of individuals who are involved in the state court

09:16:07  5   proceedings and give me some input on a committee to appoint for

09:16:19  6   state court liaison purposes, and I'd like the committee to feel

09:16:24  7   free to come to every meeting, at least their chairs if not the

09:16:29  8   whole committee, the state court liaison committee, and I want to

09:16:35  9   hear from them as to what their needs are, what their problems are,

09:16:40 10   that we can deal with them from the federal vantage point.  So I

09:16:44 11   will be hearing from counsel before the next meeting on that, on

09:16:52 12   that issue.

09:16:55 13      THE COURT:  Discovery Issues is the next item.

09:16:57 14      MR. HERMAN:  Your Honor, with respect to coordination, we

09:17:03 15   understand that there are a number of defense counsel that have

09:17:05 16   signed up and haven't entered an appearance, and plaintiffs would

09:17:10 17   not object to, if they are required to enter an appearance, would

09:17:14 18   not object to your Honor considering that they don't have to file

09:17:18 19   responsive pleadings at this point but at least we would know which

09:17:24 20   party is represented by whom.

09:17:26 21      THE COURT:  I am going to have to act on that, folks.  My

09:17:33 22   problem is is that I need to know who is in the litigation, and

09:17:41 23   from that standpoint the people who have been sued and who have

09:17:46 24   been served, those individuals have to make some appearance.  And

09:17:52 25   if they don't make the appearance, I am going to instruct the

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/06/19 Page 61 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 12 of 26

11

09:17:58   1    plaintiffs who have sued them to file with me a motion for default

09:18:02   2    judgment and I will have to act on that.

09:18:05   3            So I need to have some appearance by those individuals,

09:18:11   4    and I need that done before the next meeting, either file a motion

09:18:18   5    for default, I'm talking about individuals who are defendants who

09:18:23   6    have been served who have not answered yet.  It's time at least for

09:18:31   7    them to make an appearance.

09:18:34   8            Any matters on Discovery Issues?

09:18:36   9            MR. MILLER:  Your Honor, on that very point, on making

09:18:38  10    the appearance by all defendants who have been served in the

09:18:41  11    various MDL cases.  Just as a point of reference, in Pre-Trial

09:18:46  12    Order No. 1 entered by your Honor back in July, section 8 is titled

09:18:50  13    Extension and Stay, and that's what provides, at least at this

09:18:54  14    point an unlimited extension of time to even file a notice of

09:18:59  15    appearance.  So that would be the section that needs to be modified

09:19:02  16    and get the parties who have been served at least file an

09:19:06  17    appearance in the litigation so we know who they are.

09:19:08  18            As we work on these discovery issues and progress on

09:19:11  19    profile forms and inspection sheets, if you're in the case, the

09:19:13  20    parties jointly think, at least at this point, you need to get

09:19:16  21    those profile forms, you need to be involved in the inspections,

09:19:19  22    and you need to move forward.  So we think it's critical that that

09:19:23  23    paragraph get modified.

09:19:24  24            THE COURT:  I just modified it, I verbally modified it.

09:19:27  25    It will go into my minute entry, that's already been done two

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/02/19 Page 62 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 13 of 26

12

09:19:35  1    minutes ago.

09:19:35  2            MR. HERMAN:  May it please the court, with the next item

09:19:35  3    on your agenda, Item No. 7, Discovery Issues, we are drafting,

09:19:43  4    plaintiffs are drafting a master set of discovery and we should be

09:19:50  5    ready to file that within the next two weeks.

09:19:52  6            We will be filing within the next two weeks a motion and

09:19:57  7    brief for the conduct of early 30(b)(6) depositions.  And we will

09:20:07  8    give defendant liaison counsel a copy of any discovery we intend to

09:20:13  9    initiate before it's filed so that we can meet and confer, and

09:20:20 10    hopefully, your Honor, by the time we meet next in a status

09:20:24 11    conference, that issue will either be ripe for your Honor's

09:20:28 12    consideration or it will be resolved.

09:20:31 13            THE COURT:  Let me comment on that.  On both sides from

09:20:35 14    discovery, before you file discovery, I need you to file it with

09:20:38 15    each other or send it to each other in draft form and meet and

09:20:42 16    confer on it.  You don't have to agree, but at least you ought to

09:20:47 17    meet and confer on it.  And then after you've met and conferred,

09:20:50 18    put it in final form and send it to the court.  That's not going to

09:20:54 19    delay it because I don't want you to meet and confer and get

09:20:58 20    together in a week or two.  When you send it in draft form, meet

09:21:03 21    within an hour or two and talk about it and then file it with the

09:21:07 22    court.

09:21:08 23            But meet and confer before you file discovery matters

09:21:11 24    with the court so that I'll know that whatever the disagreement is

09:21:17 25    you've at least tried to resolve it first.

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/02/19 Page 63 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 14 of 26

13

09:21:21  1          Next item is the FOIA Issues.

09:21:26  2          MR. HERMAN:  Your Honor, I apologize, I've made an error

09:21:29  3     in connection with the status report.  It should have included your

09:21:33  4     Honor's web site, www.laed.uscourts.gov/drywall/drywall.htm.  Let

09:21:53  5     me repeat it, www.laed.uscourts.gov/drywall/drywall.htm, which then

09:22:03  6     would allow any interested party to access your conferences and

09:22:10  7     your rulings.

09:22:11  8          THE COURT:  Right.  And a shortcut is the

09:22:13  9     www.laed.uscourts.gov.  When you pull the court's web site for the

09:22:20 10     Eastern District, you'll see on the left-hand side a number of

09:22:23 11     buttons and click on the Drywall button and I'll come up that way,

09:22:27 12     too.

09:22:29 13          In that connection, I'll post everything on there for

09:22:32 14     everyone who is interested in this litigation, whether it's

09:22:37 15     litigants or lawyers or anyone else public, they have access to it.

09:22:48 16     You can keep in touch with it, I have current events on it, I have

09:22:48 17     all of the orders, all of my opinions will be posted on it.  Even

09:22:52 18     the transcripts from these hearings in due course will be posted on

09:22:59 19     that website.

09:23:09 20          MR. HERMAN:  Your Honor, under the Freedom of Information

09:23:11 21     Act, plaintiffs have filed a number of requests to various

09:23:15 22     governmental agencies, both federal and state, and will be filing

09:23:19 23     more.  We have not had a problem in terms of return at this

09:23:27 24     juncture.  In the event we do have a problem, we will report to the

09:23:34 25     court by the next status conference and if necessary ask the court

Case 1:11-cv-22408-MGC   Document 64-2   Entered on FLSD Docket 09/14/2012   Page 15 of 26
Case 2:09-md-02047-EEF-MBN   Document 23880-4   Filed 12/03/19   Page 64 of 258

14

09:23:40   1    to assist in having FOIA returns.

09:23:45   2          THE COURT:  Both sides have a right to have that.  If you

09:23:48   3    don't get cooperation, let me know and I'll issue the appropriate

09:23:52   4    order for the person to come down here and tell us why.

09:23:58   5          MR. MILLER:  Your Honor, while on the topic, Russ, if you

09:24:01   6    wouldn't mind sharing with me a copy of the FOIA requests that have

09:24:05   7    been issued.

09:24:05   8          MR. HERMAN:  I don't see any problem with sharing FOIA

09:24:08   9    requests.  And we would like any of the defense also to provide us

09:24:16  10    copies of their FOIA requests; and we're also willing to exchange

09:24:20  11    the materials that we receive, I think we can work cooperatively to

09:24:25  12    have that process accelerated.

09:24:27  13          MR. MILLER:  Sounds good from our end, your Honor.

09:24:30  14          THE COURT:  Okay.  Next item is Trial Settings in Federal

09:24:32  15    Court.

09:24:35  16          What my thinking is on that is that after the next

09:24:39  17    meeting, I am going to look to you all to give me each ten cases

09:24:45  18    that you're focussing on, and those ten cases will be cases that

09:24:53  19    will form the initial pool from which we'll try the cases.  I will

09:24:57  20    give you an opportunity to conduct some discovery, some pertinent

09:25:04  21    case specific discovery on those ten cases, and then I'll ask you

09:25:07  22    to come up with five from each side.  From the five I'll give each

09:25:13  23    side an opportunity to veto two selections.

09:25:19  24          We'll come up with three each, that will be six, we will

09:25:22  25    try to try five cases, we will have one as a swing in the event one

Case 2:09-md-02047-EEF-MBN Document 22880-4 Filed 12/02/19 Page 65 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 16 of 26

15

09:25:27  1  folds.  And I hope to start those cases the beginning of next year,

09:25:32  2  January so that will give you four months or so to get ready for

09:25:39  3  them and we'll have an opportunity to look at the cases.

09:25:43  4       All of us who have been doing this for awhile know that

09:25:46  5  you can think about a case, you can plan a case, you can visualize

09:25:55  6  a case, but until you put a case on, you don't know what that case

09:25:56  7  is about, just the way it works.  From those bellwether trials

09:26:02  8  you'll find out how much it costs to try the case, what's involved

09:26:06  9  in the trial of the case, how the juries respond to those cases,

09:26:13 10  and it'll give you some input, hopefully, that will give you an

09:26:17 11  opportunity to look at this case from a global standpoint.

09:26:21 12       But that's my current thinking.  But I will meet with the

09:26:23 13  parties to discuss it with them before taking any action.  And I

09:26:29 14  will also coordinate as much as I can with the state courts so that

09:26:35 15  I get their consent and cooperation also.  Yes.

09:26:41 16       MR. MILLER:  Judge, if I may on that point of trial

09:26:43 17  settings.  That's why the defendants think the discovery moving

09:26:48 18  forward needs to be focused two things:  No. 1, the selection of

09:26:51 19  the bellwether plaintiffs.  The plaintiffs are at an advantage,

09:26:54 20  they know their clients better than we do.  That's why the profile

09:26:58 21  forms and the inspections need to go forward so the defendants have

09:27:01 22  the ability to evaluate the cases and select their ten.

09:27:03 23       So that's why we think discovery needs to be focused

09:27:05 24  that.  And of course once the 20 cases are selected, there can be

09:27:09 25  more intense discovery on those cases.

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/02/19 Page 66 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 17 of 26

16

09:27:11 1    THE COURT:  That's correct.  And I agree with that.

09:27:14 2    With the ten cases, too, I ask that counsel in good faith

09:27:18 3  try to select cases that are across the spectrum.  I mean, it

09:27:23 4  doesn't make any sense to take the same case and try that ten times

09:27:27 5  or five times, it doesn't make any sense to do that.  So I am going

09:27:31 6  to look to you for some guidance and some suggestions as to how we

09:27:34 7  get a sampling of what we're dealing with.

09:27:37 8    MR. HERMAN:  Your Honor, there is, as natural, to have

09:27:43 9  some disagreement between sides in a case.  We think that the

09:27:46 10  defendants know a lot more about our clients than we know, having

09:27:51 11  conducted somewhere between 400 and 800 inspections directly with

09:27:56 12  clients in Florida and elsewhere.  Notwithstanding that, if we are

09:28:02 13  to really have a spectrum of cases, then we need expedited 30(b)(6)

09:28:09 14  depositions in-depth to determine which suppliers, which members of

09:28:15 15  the distribution chain are going to be involved in those eventual

09:28:20 16  five or six cases that are going to be tried.

09:28:22 17    So we have a disagreement as to what the limit would be

09:28:26 18  in 30(b)(6), we'll try and work it out.  We have to provide the

09:28:36 19  usual list of subjects, but I note for your Honor and the other

09:28:37 20  judges, we do have a disagreement on this issue.

09:28:39 21    THE COURT:  All right.  Okay.  Next item is Filings in

09:28:44 22  the MDL.

09:28:46 23    MR. HERMAN:  Your Honor, there have been intense

09:28:49 24  discussions which have become even more intense in the last three

09:28:53 25  days.  It would be premature for me to speak other than to say that

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/02/19 Page 67 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 18 of 26

17

09:29:04  1    folks on both sides are encouraged that there may be, with the

09:29:07  2    consent of their clients, a waiver of service under some

09:29:13  3    circumstances with a reservation of certain defenses and direct

09:29:18  4    filing in the MDL with a reservation as to venue and other

09:29:25  5    defenses.  And hopefully that will happen because that will allow

09:29:29  6    us, both sides, a better opportunity in the MDL to explore the

09:29:38  7    issues.

09:29:40  8             THE COURT:  Anything from the defendants on that?

09:29:43  9             MR. MILLER:  I think Russ's recitation is right.  There

09:29:47 10    are certain defendants I think right now that are amenable to

09:29:50 11    direct filing in the MDL while others may not be, but are

09:29:54 12    evaluating the issue.

09:29:55 13             With respect to service, again, the same.  I think there

09:29:55 14    are certain defendants, particularly domestic defendants that are

09:29:58 15    capable of accepting service.  I know some of the foreign

09:30:01 16    defendants are considering the issue.  We hope to be back with your

09:30:04 17    Honor at the next conference on it.

09:30:05 18             THE COURT:  It's important that we get everybody in as

09:30:08 19    quickly as we can, because the train is leaving, folks, and you're

09:30:12 20    not going to be able to catch up to it.  So the MDL is going to get

09:30:16 21    it eventually, you might as well shortcut it.  It's going to take

09:30:21 22    about two months to get from filed in a state through the process

09:30:25 23    to this MDL.  If you can detour and come in initially reserving

09:30:31 24    your rights, I don't expect anybody to give up any rights, but

09:30:36 25    reserving your rights for all of the defenses, all of the

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/02/19 Page 68 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 19 of 26

18

09:30:44  1  applicable laws, and where you're going to try the case, things of

09:30:49  2  that sort and any problem with it.  But I think it's to everybody's

09:30:54  3  advantage that you get into this if you're going to go with the MDL

09:30:59  4  that you get in as quickly as possible.

09:31:01  5         Tolling Agreements/Suspension of Prescription.

09:31:08  6         MR. HERMAN:  We have no agreement as to tolling in

09:31:10  7  Louisiana.  Of course, what we are entertaining doing is filing a

09:31:16  8  large complaint with all plaintiffs in alphabetical order in

09:31:23  9  federal court and asking the court to put it on the suspense

09:31:26 10  docket, either directly or by class action.

09:31:29 11         As to Tolling Agreements, there is no agreement on

09:31:31 12  tolling at this point.

09:31:32 13         With respect to class actions, your Honor, the PSC has

09:31:43 14  requested consent from defendants for a waiver of local Rule 23B

09:31:44 15  requiring motions to be filed moving for certification as required

09:31:51 16  by that rule.

09:31:54 17         THE COURT:  All right.  Anything on that?

09:31:56 18         MR. MILLER:  Yeah, I think there's consent on defendants

09:31:58 19  to go ahead and waive that local rule.

09:32:02 20         THE COURT:  I will grant that.  I am not going to be

09:32:05 21  dealing with certifications within a short period of time like that

09:32:08 22  in a case like this.

09:32:11 23         MR. HERMAN:  May it please the court, on Motions in the

09:32:13 24  MDL, there is an application for the homebuilders.  I might note

09:32:20 25  that the only attorney older than Arnold Levin in the courtroom is

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/02/19 Page 69 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 20 of 26

19

09:32:26  1    subject to that motion.

09:32:28  2            MR. LEVIN:  Phil, welcome to our court.

09:32:33  3            MR. WITTMANN:  I am hiding back here, Judge.

09:32:35  4            THE COURT:  We can't see you, Phil, so you must be in it

09:32:41  5    some way.

09:32:42  6            I got that application and I am going to grant that.  And

09:32:45  7    I look to the committee to give me some suggestions as to lead

09:32:49  8    counsel.

09:32:53  9            MR. HERMAN:  We will be pleased to work with whomever is

09:33:02 10    chosen and directed by your Honor.

09:33:05 11            THE COURT:  Anything more on motions?  I think we've

09:33:09 12    talked about that earlier.

09:33:12 13            MR. MILLER:  I think so, your Honor.  The idea is that a

09:33:13 14    list is going to be submitted jointly by Friday on motions we think

09:33:17 15    can be prioritized and handled either with little discovery or with

09:33:20 16    discrete amounts of discovery.

09:33:22 17            THE COURT:  That's fine.  Insurance Issues.

09:33:24 18            MR. HERMAN:  There are no current issues other than, I

09:33:27 19    believe, there is one dec action, I will ask lead counsel for

09:33:31 20    plaintiffs.

09:33:33 21            MR. LEVIN:  There are two dec actions in Virginia, your

09:33:40 22    Honor, and one has been noted as a tag along, the other will be

09:33:43 23    noted as a tag along.  There is one homeowners suit against AIG in

09:33:52 24    the Middle District of Florida, that will be tagged along today.

09:33:59 25            MR. HERMAN:  Your Honor --

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/03/19 Page 70 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 21 of 26

20

09:34:00 1          MR. MILLER:  On the point of insurance issues, it is my

09:34:05 2 belief and understanding that that question is part of the defense

09:34:09 3 profile forms, identification of insurers.

09:34:12 4          THE COURT:  I think it is.

09:34:13 5          MR. MILLER:  And if it is, as we all think that it is,

09:34:18 6 that would all be answered within 15 days.  I would hope that if

09:34:21 7 there's going to be actions filed against those insurers if they're

09:34:24 8 filed after that 15-day period because, as you put it out, the

09:34:27 9 train is leaving the station.

09:34:28 10          MR. HERMAN:  The plaintiffs will withhold filing any

09:34:30 11 insurer amendments to complaints or new complaints until after the

09:34:36 12 15 days and we've met and conferred.  Its plaintiffs' intention to

09:34:48 13 chart policies and different types of policies of various parties,

09:34:48 14 that's another reason we feel we need 30(b)(6), because of the

09:34:52 15 chain of distribution they have different types of policies issued

09:34:57 16 by different insurers with different clauses.

09:35:00 17          So we will be happy to refrain from filing any direct

09:35:07 18 actions against insurers or amendments against insurers until the

09:35:11 19 15 days have passed and we've met and conferred.

09:35:15 20          THE COURT:  Also with regard to depositions.  I've done

09:35:18 21 this in another case or two, there is an opportunity to do

09:35:25 22 depositions online.  There's some outside providers that afford

09:35:31 23 that service.

09:35:33 24          In the cases that I've used it on, you log on with your

09:35:38 25 social security number, it's prearranged, the depositions are taken

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/03/19 Page 71 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 22 of 26

21

09:35:42  1    online; that is to say, two people, one from the plaintiff, one

09:35:47  2    from the defendant or other parties appear, one individual has a

09:35:54  3    lap top, the other asks the questions.  People who want to

09:35:59  4    participate in the deposition participate by pulling it up on their

09:36:07  5    computer.  On the right-hand side of the screen is the running

09:36:09  6    transcript, on the left-hand side is voice and image.  The

09:36:12  7    plaintiffs have their chat rooms, defendants have their chat rooms,

09:36:16  8    the Chinese wall separates them.  You can communicate back and

09:36:21  9    forth.  If Hawaii has something or New York has something or

09:36:23 10    someone else has something, you can communicate that way, and it

09:36:28 11    comes up and you click on, you click on the screen next to the

09:36:32 12    questioner.

09:36:34 13         At the appropriate time he elbows him and says New

09:36:37 14    Orleans wants this, Miami wants this, and so forth and you do it

09:36:42 15    that way.

09:36:43 16         With this number of people, it works.  It's economical.

09:36:48 17    It's good because the experts can monitor the depositions.  If you

09:36:53 18    give me a heads up on a particular deposition that you anticipate

09:36:57 19    some difficulty with, I log on and I'll make my rulings immediately

09:37:01 20    so that you can continue on.

09:37:04 21         It's worked before and I notice it to you because you can

09:37:11 22    take a look at it and if you want all or some of the depositions

09:37:16 23    taken in that fashion you can do so.

09:37:20 24         MR. HERMAN:  With great respect, your Honor, from the

09:37:23 25    plaintiffs standpoint we prefer an iron curtain to a Chinese wall.

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/02/19 Page 72 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 23 of 26

22

09:37:28  1          MR. MILLER:  Well, just as long as it's not Chinese

09:37:32  2   drywall, right?

09:37:34  3          THE COURT:  As long as it's not Chinese drywall,

09:37:37  4   manufactured drywall.  Okay.

09:37:39  5          The next item is Service of Pleadings Electronically.

09:37:42  6          MR. HERMAN:  Yes, your Honor, and LexisNexis has a

09:37:51  7   training session scheduled for today.  At what time?

09:37:52  8          THE DEPUTY CLERK:  Noon.

09:37:53  9          MR. HERMAN:  At noon.

09:37:53 10          THE COURT:  And segue into that, the importance in a case

09:37:57 11   of this sort, the importance of transparency and in disseminating

09:38:02 12   information, we talked about transparency with the website, the

09:38:06 13   method of disseminating information is done through an outside

09:38:10 14   provider LexisNexis.  They will be keyed in to the court and they

09:38:15 15   will be served with the documents that the liaison counsel are

09:38:20 16   served with.  Instead of liaison counsel having to sending the

09:38:26 17   documents to 1,500 or 2,000 lawyers, LexisNexis can do that and it

09:38:33 18   will be done electronically with e-mail.

09:38:36 19          And as soon as the document is filed, they will get a

09:38:40 20   copy and they will be able to upload it and then distribute it

09:38:45 21   immediately.  So you will get the filings within about 20 minutes

09:38:50 22   after it's filed so you will know what's happening.

09:38:52 23          MR. MILLER:  Your Honor, on that point.  LexisNexis is

09:38:55 24   also going to conduct a training session tomorrow morning at nine

09:38:58 25   at my office.  So if it's more convenient for folks to do it then,

Case 2:09-md-02047-EEF-MBN Document 22880-14 Filed 12/03/19 Page 73 of 258
Case 1:11-cv-22408-MGC Document 64-2 Entered on FLSD Docket 09/14/2012 Page 24 of 26

23

09:39:02  1   if they're staying over, nine o'clock tomorrow.

09:39:04  2           THE COURT:  We have a session here in court at 12

09:39:07  3   o'clock, I understand we've got about 100 people who are going to

09:39:11  4   be attending.  So if you're interested, you can attend.

09:39:15  5           THE DEPUTY CLERK:  It's on the second floor, Judge,

09:39:16  6   courtroom 227.

09:39:18  7           THE COURT:  I am in trial myself, starting in a couple of

09:39:22  8   minutes, so it won't be in this courtroom, it will be on the second

09:39:26  9   floor.

09:39:28 10           Anything on the Master Complaint?

09:39:30 11           MR. HERMAN:  Not at this time, your Honor.

09:39:33 12           THE COURT:  Anything from the defendants on that?

09:39:34 13           MR. MILLER:  No, your Honor.

09:39:35 14           THE COURT:  The next status conference, I think it would

09:39:38 15   be helpful if we had one in a shorter period of time, September the

09:39:44 16   3rd, Thursday, September the 3rd at 8:30 for the liaison counsel

09:39:50 17   and lead counsel, and then at nine o'clock in open court.

09:39:59 18           Again, I appreciate the attendance of the judges from

09:40:02 19   state court, they do me an honor by attending today; and hopefully

09:40:08 20   one day they can sit with me on the bench and we'll deal with the

09:40:13 21   Frye hearings, the Daubert hearings that we have.

09:40:17 22           One last comment about the PSC.  I have asked the PSC to

09:40:25 23   be conscious of individual lawyers who are not on the PSC who wish

09:40:28 24   to perform work on this particular case under the direction of the

09:40:34 25   PSC.  There's room for everyone who wants to work, whether you're

09:40:45  1    on the PSC or not on the PSC.  I know there are extremely talented

09:40:45  2    lawyers, and if you're willing to work and interested in working, I

09:40:49  3    assure you there will be a spot for you.

09:40:52  4          MR. HERMAN:  Your Honor, in accord with your Honor's

09:40:55  5    direction, every lawyer that has submitted an application either to

09:41:00  6    serve on the PSC or a committee who has a filed case and commits to

09:41:06  7    file cases in the MDL will be appointed as of seven o'clock P.M.

09:41:15  8    this evening to a committee.  And in some cases, those that have

09:41:22  9    been very active and have indicated, even though they're not on the

09:41:26 10    PSC, they will be cochairs or chairs of various subcommittees.  We

09:41:33 11    will provide your Honor the list after we get confirmation back

09:41:38 12    that they choose to serve and they're willing to serve under the

09:41:42 13    guidelines set forth.

09:41:43 14          But I assure your Honor, it will be open participation,

09:41:49 15    but only by those who intend to participate fully in the activities

09:41:53 16    of the MDL.  We've had a number of applications from folks that

09:41:57 17    have no filed cases in federal court, so they should file if they

09:42:03 18    want to participate.

09:42:04 19          THE COURT:  Fine.  I know we have several hundred people

09:42:06 20    here.  If there's anything anyone else wishes to bring up to the

09:42:10 21    court I have it in open court for that reason, not only to inform

09:42:14 22    you but also to give you a forum if you have something to say.

09:42:19 23          Hearing none, thank you very much, I look forward to

09:42:22 24    seeing you on September 3rd.

09:42:23 25          THE DEPUTY CLERK:  Everyone rise.

09:42:25  1          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

09:42:25  2

       3                    *  *  *  *  *  *

       4

       5                   REPORTER'S CERTIFICATE

       6

       7     I, Karen A. Ibos, CCR, Official Court Reporter, United States

       8   District Court, Eastern District of Louisiana, do hereby certify

       9   that the foregoing is a true and correct transcript, to the best of

      10   my ability and understanding, from the record of the proceedings in

      11   the above-entitled and numbered matter.

      12

      13

      14                    _____

      15                    Karen A. Ibos, CCR, RPR, CRR

      16                    Official Court Reporter

      17

      18

      19

      20

      21

      22

      23

      24

      25

# EXHIBIT "C"

Translation of TG-0208428-0208430

TG-0208428

**Informational Report on the Class Actions Brought by the U.S. Parties Against Taishan Gypsum Company Limited**

Respectful Chief Song, Chief Cao:

On the class action on quality defects of gypsum boards brought by the Mitchell Company in the U.S. and the individuals in the states of Florida, Mississippi, Louisiana, Alabama, Georgia, and Texas (abbreviated as the U.S. plaintiffs), Taishan Gypsum Company Limited (abbreviated as Taishan Company) received the civil action subpoenas and complaints from the U.S. federal district court in the Northern District of Florida on May 8, 2009. A written report on the facts of the case and the relevant information are hereby submitted to each leader so that the leaders can understand the facts of the case and give relevant instructions.

I. Brief Introduction of the Case Facts

On March 6, 2009, the U.S, plaintiffs brought lawsuits against the German Knauf Group, Knauf Plasterboard (Tianjin) Co., Ltd., Taishan Company, Interior Exterior Building Supply L.P. (U.S. Company), Rightway Drywall Co., Ltd. (U.S. Company). The factual allegations and grounds of complaints by the U.S. plaintiffs are summarized as follows: 1) the U.S. plaintiffs purchased and used the gypsum boards sold by Interior Exterior Building Supply L.P. and Rightway Drywall Co., Ltd., and the gypsum boards distributed by the two companies came from Knauf and Taishan Company; 2) The quality defects of the gypsum boards were mainly seen in: A. a very high level of sulfur used in the gypsum boards makes them unfit for its intended purpose; B. the chemical reactions between the gypsum boards and metal caused other metals to corrode; C. the cause of the problems related to the heater, ventilation, and air conditioning systems found in some households in the states of Alabama and Florida were related to the use of gypsum boards; 3) the scope of compensation demanded by the U.S. plaintiffs are: A. fixing or replacing the affected houses; B. other economic losses incurred by the U.S. plaintiffs as a result of fixing or replacing the houses; C. the unlawful gains or profits made by

PENG: Exhibit 825

MTD Exhibit #3

the Defendants from selling the gypsum boards shall be owned to the U.S. plaintiffs; D. the attorney's fees for the U.S. plaintiffs, etc. Analyzed from the scope of jurisdiction of the court that accepted the case, the amount of damages claimed by the U.S. plaintiffs should gravely surpass 5 million U.S. dollars in this case.

II. The Information on the Gypsum Boards Exported to the U.S. by Taishan Company

From 2005 to 2008, Taishan Company exported a total of 6656748.44 square meters of gypsum boards to the U.S., among them,

**TG-0208429**

822037.37 square meters of gypsum boards were directly exported to the U.S. under the name of Shandong Taihe Dongxin Company Limited (Taishan Gypsum Company Limited); 5834711.07 square meters of gypsum boards were exported under the name of Tai'an Taishan Plasterboard Company Limited through domestic import and export companies.

Categorized by dates, 446520.0 square meters were exported to the U.S. in 2005, 5952556.63 square meters were exported in 2006, 240763.584 square meters were exported in 2007, 16908.224 square meters were exported in 2008. Later on, under the influence of various factors such as the plunging price of U.S. building materials, the appreciation of Renminbi, the increase in ocean shipping cost, and the increase in domestic manufacturing costs, the export of gypsum boards faced increasing number of restrictions, and the volume of export business fell by a large margin, after August 2007, the orders for exporting gypsum boards to the U.S. almost completely halted.

When exporting gypsum boards to the U.S., the customers mainly ordered the goods through field inspection, ordering by samples, and field supervision. When signing contracts, the quality requirements for the gypsum boards mainly included the requirements on weight, size, and packaging. Our company strictly

followed the demands of the customers and the requirements in the contracts when producing, delivering, and shipping the gypsum boards. During actual business operation, all gypsum boards exported to the U.S. followed the demands of the customers in conducting either neutral packaging labeling or labeling the company name and brand of the customer's own company, neither the "Taishan" brand nor the company's name was indicated.

During the course of business and in the after-sales follow-ups, we have never received any quality objections or bad feedbacks from the customers. The customers stated that they had to stop the gypsum board import business due to the influence of various market factors such as demand and price.

III. The Deeper-Level Background and Cause of the U.S. Plaintiffs' Action

To summarize the relevant articles and comments on the various websites, the basic opinion is: during the 4 years of sharp real estate price increase and after the 2005 Hurricane Katrina disaster, the U.S. imported about 227 million tons of gypsum boards from China. With regard to the gypsum boards' quality defect, why was it not raised sooner or later, but a flourish of propaganda came out right after the eruption of the U.S. economic crisis, when the real estate market was plunging, what is the intention? I'm afraid this is the background and cause for blaming the quality of Chinese gypsum boards.

IV. The Measures and Reasons Adopted by Taishan Company to Prepare for the Lawsuit

After analysis, Taishan Company believes that this lawsuit is relatively complicated, and it plans not to respond, but when necessary, it will provide documents that are beneficial to Taishan Company to the court that accepted the case, the reasons are as follows: 1)

**TG-0208430**

The authoritative testing and inspection agencies in our country did not detect any quality defect pointed out in the written complaint of the U.S. plaintiffs about the gypsum boards exported to the U.S.; 2) the gypsum boards produced by Taishan

Company does not have any quality defect, and they were all produced according to the standards prescribed by the U.S. customers, and since the date of delivery till now no quality complaints by the relevant customers was ever received; 3) responding to the lawsuit would incur a large amount of attorney's fees and traveling fees; 4) the most important reason is that there is no judicial treaty signed between China and the U.S. on mutual recognition and enforcement of court judgements, and Taishan Company does not have assets within the continental U.S., even if the lawsuit was lost, the U.S. court cannot enforce Taishan's assets in China. 5) Taishan Company noticed that this time the quality of the gypsum boards did not involve personal injury like the skin rashes, nose bleeds, diseases of the respiratory system, etc. as reported before.

Summarizing the reasons above, Taishan Company is inclined not to respond to the lawsuit, but when necessary it will adopt methods such as mailing the evidence that is beneficial to Taishan Company to the U.S. court and having the government departments interfere, so as to eliminate and reduce some negative impact.

Please instruct and approve whether the information above is appropriate.

Regards,

Taishan Gypsum Company Limited

May 11, 2009

Mentioned the situation report of group lawsuit to Taishan gypsum and other companies about US

Respect Song Zong, Cao Zong:
Individuals in American Mitcher Corporation and Florida, Mississippi, Louisiana, Alabama, Georgia and Texas (i.e. American plaintiffs) because of the group charge that the gypsum board quality flaw filed, the Taishan gypsum joint-stock company (i.e. Taishan Corporation) received the civil action subpoena and petition of American federation court of appeal Florida north district delivery in May 8, 2009. Presently makes case's case and form to fellow leaders written report, so that fellow leaders find out case, and gives the related instruction.

Case synopsis

On March 6, 2009, the American plaintiffs may bear the lucky group, to be possible to bear the lucky gypsum board to Germany (Tianjin) joint-stock company, Taishan Corporation and building inside and outside finishing material supply limited partnership companies (American Corporation), to come Turvey to do the wall plate limited company (American Corporation) to file the charge. The American plaintiffs proposed that the lawsuit fact and reason summary are: (The American plaintiffs have purchased and have used inside and outside the building the finishing material supply limited partnership company and come Turvey to do the gypsum board that the wall plate company sells on commission, but the gypsum board that two companies sell on commission from may bear the lucky and Taishan Corporation; The quality flaw that (gypsum board has mainly displays in: Material sulfur content that A and gypsum board use is very high, not suitable anticipated use; B, gypsum board and metal has the chemical reaction, causes other metal corrosions; C, has the problem and use gypsum board in Alabama and Florida certain houses' warm air well ventilated air-conditioning systems related; (The American plaintiffs scope that requests to compensate mainly have: The A repair or the replacement come under the influence the house; Other economic losses that the B American plaintiffs suffer because of repair replacement house; The C defendant sells the gypsum board illegal gains or profit belongs to the American plaintiffs; The attorney expense of D American plaintiff and so on. According to accepting the jurisdiction scope situation in case court analyzes, the compensation request amount of above-mentioned plan American plaintiff should be higher than 5 million US dollars by far.
Second, Taishan Corporation exports the American gypsum board the situation.
2005 - 2008 Taishan Corporation exports the American gypsum board total 6656748.44 square meters, takes the Shandong Taihe Dongxin limited liability company (Taishan gypsum limited liability company) name direct export the American quantity as 822037.37 square meters; Exports 5834711.07 square meters through the domestic import-export company by Tai'an Taishan paper surface gypsum board limited company name.

Divided in 2005 to export the American 446520.0 square meters according to the date, in 2006 exported 5952556.63 square meters, in 2007 exports 240763.584 square meters, in 2008 will export 16908.224 square meters. Latter was declined, Renminbi revaluation by the American building materials price and marine transportation cost enhancement and home manufacture cost enhancement and other factor influences, the restriction that the gypsum board export receives are also getting more and more, the export business volume descends largely, after August, 2007, exports US's gypsum board order form almost to stop completely.

When exporting the American gypsum board, customer mainly takes the scene to inspect and look at a sample the order and inspector general as the main order way. When signs the contract the quality requirement to gypsum board mainly includes to the weight, size and packing makes the request, our company strict produces and ships out the gypsum board according to the customer request and contract provision. In the real business, all exports US's gypsum board to press the customer to request to carry on the neutral packing indication perhaps labelling customer own corporate name and brand, has not labelled "Taishan" brand or corporate name.

When the service carries on the process and post-sale track, we have not received customer any quality objection and bad feedback. The customers said can only stop the gypsum board import business by the demand, price and other market factor influences.

American plaintiff lawsuit deep level background and reason.
Synthesizes threads and commentaries in various big websites, the basic viewpoint thinks: 4 year and in 2005 that US

rises after the floor rate Katrina hurricane wind-caused disaster, imported about 227 million tons gypsum board from China. Regarding the gypsum board quality flaw, why early did not say that late did not say, erupts after the American economic crisis, the real estate being at a low ebb time carries on hypes wantonly, is what mind. Perhaps this is accuses Chinese gypsum board quality the background and reason.

Taishan Corporation to the case the measure and reason that prepares to take.

Taishan Corporation after analysis thinks that this case is quite complex, planned does not answer a charge, when necessity was sued the court to provide to the US to the Taishan Corporation advantageous material, the reason is as follows: (The authorities in our country examine the authorities in organization and US examine the department not to examine to export US's gypsum board to have the quality flaw that in the American plaintiff petition pointed out; The gypsum board that (Taishan Corporation produces does not have the quality flaw, and presses the standard production that the American customers provide, has not received the quality suit of related customer from the date of delivery; (Answers a charge must pay large amount attorney and business travel expense; (4) the most essential reason lies between China and US does not have the sign to acknowledge, the judicial agreement of execution court decision mutually, and Taishan Corporation does not have the property in the US territory, even if really lost the lawsuit, American Court is unable to carry out Taishan Corporation in China's property. (5) Taishan Corporation notes this gypsum board quality not to involve to the harm of person, like before the creation person who reported presents the skin rash, the class nosebleed and respiratory disorder and so on.
Synthesizes the above reason, Taishan Corporation favors the procedure that does not answer a charge, when necessity should accept to the American Court sending helps Taishan Corporation's evidence and through authority negotiation and other procedures, eliminates and reduces some negative influences.
The above situation does not know to work as otherwise, please do make written comments.

I herewith offer Taishan gypsum limited liability company

On May 11, 2009 PAGE

--- Summary Information ---
1: 1200 PID_TITLE: Filed the group charge the situation to report PID_SUBJECT to Taishan gypsum and other companies about US:
PID_AUTHOR: aa PID_KEYWORDS:
PID_COMMENTS:
PID_TEMPLATE: Normal.wpt PID_LASTAUTHOR:
PID_REVNUMBER:
PID_EDITTIME: Sat Dec 30 08:00: 00 CST 1899 PID_CREATE_DTM: Mon May 11 16:51: 47 CST 2009
PID_LASTSAVE_DTM: Sat Dec 30 08:00: 00 CST 1899 PID_LASTPRINTED: Sat Dec 30 08:00: 00 CST 1899
PID_PAGECOUNT: 0 PID_WORDCOUNT: 0 PID_CHARCOUNT: 0 PID_APPNAME:
PID_SECURITY: 0

--- Document Summary Information ---
PID_CODEPAGE: 1200 PID_COMPANY:
PID_CATEGORY:
PID_MANAGER:
PID_PARCOUNT: 0 PID_LINECOUNT: 0 17: 0 PID_PRESFORMAT:
PID_BYTECOUNT: 0 PID_SLIDECOUNT: 0 PID_NOTECOUNT: 0 PID_HIDDENCOUNT: 0
PID_MMCLIPCOUNT: 0 PID_SCALE: false PID_LINKSDIRTY: false 1: 1200 KSOProductBuildVer: 2052-6.3.0.1705

## 关于美国方面对泰山石膏等公司提起集团诉讼的情况汇报

尊敬的宋总、曹总：

美国米切尔公司及佛罗里达州、密西西比州、路易斯安那州、阿拉巴马州、佐治亚州、德克萨斯州的个人（简称美国原告)因石膏板质量缺陷提起的集团诉讼，泰山石膏股份公司（简称泰山公司）已于 2009 年 5 月 8 日收到了美国联邦地区法院佛罗里达州北部管区送达的民事诉讼传票及诉状。现将案件的案情及相关情况向各位领导做出书面汇报，以便各位领导了解案件情况，并给予相关指示。

一、案情简介

2009 年 3 月 6 日，美国原告对德国可耐福集团、可耐福石膏板（天津）股份公司、泰山公司、建筑物内外装修材料供应有限合伙公司（美国公司）、来特威干墙板有限公司（美国公司）提起诉讼。美国原告提出诉讼的事实及理由概括为：①美国原告购买并使用了建筑物内外装修材料供应有限合伙公司及来特威干墙板公司经销的石膏板，而两公司经销的石膏板来自可耐福及泰山公司；②石膏板存在的质量缺陷主要表现在：A、石膏板采用的材料硫含量很高，不适合预期用途；B、石膏板与金属发生化学反应，导致其他金属腐蚀；C、在阿拉巴马州和佛罗里达州某些住宅的暖气通风空调系统出现问题与使用石膏板有关；③美国原告要求赔偿的范围主要有：A 修理或更换受到影响的房屋；B 美国原告因修理更换房屋而遭受的其他经济损失；C 被告出售石膏板的非法所得或盈利归美国原告所有；D 美国原告的律师费用等。根据受理案件法院的管辖权范围情况来分析，该案美国原告的赔偿请求数额应远远高于 500 万美元。

二、泰山公司出口到美国石膏板的情况。

2005 年—2008 年泰山公司出口美国石膏板共计 6656748.44 平米，其中以山东泰和东新股份有限公司（泰山石膏股份有限公司）名

TG-0208428

义直接出口美国数量为 822037.37 平米；以泰安市泰山纸面石膏板有限公司名义通过国内进出口公司出口 5834711.07 平米。

按日期划分 2005 年出口美国 446520.0 平米，2006 年出口 5952556.63 平米，2007 年出口 240763.584 平米，2008 年出口 16908.224 平米。后受美国建材价格走低、人民币升值、海运成本提高、国内制造成本提高等因素影响，石膏板出口受到的制约也越来越多，出口业务量大幅降落，2007 年 8 月以后出口美国的石膏板订单几乎全部停止。

在出口美国石膏板时，客户主要以现场考察、看样订货、现场监督为主要订货方式。签订合同时对石膏板的质量要求主要包括对重量、尺寸、包装作出要求，我公司严格按照客户要求和合同规定生产、发运石膏板。在实际业务中，所有出口到美国的石膏板均按客户要求进行中性包装标示或是标注客户自己的公司名称、品牌，均未标注"泰山"品牌或公司名称。

在业务进行过程及售后跟踪时，我们未收到客户任何质量异议和不良反馈。客户表示受需求、价格等市场因素影响只能停止石膏板进口业务。

三、美国原告方诉讼的深层次背景及原因。

综合各大网站上的相关文章及评论，基本的观点认为：美国在楼价急升的 4 年间及 2005 年卡特里娜飓风灾后，从中国进口了大约 2.27 亿吨石膏板。对于石膏板的质量缺陷，为何早不说，晚不说，偏偏在美国经济危机爆发后、房地产处于低潮期进行大肆炒作，是何居心。恐怕这是指责中国石膏板质量的背景及原因。

四、泰山公司对案件准备采取的措施及理由。

泰山公司经分析后认为本案比较复杂，打算不去应诉，但必要时向美国受诉法院提供对泰山公司有利的材料，理由如下：①我国的权

TG-0208429

威检测机构及美国的权威检测部门没有检测出出口到美国的石膏板存在美国原告诉状中指出的质量缺陷；②泰山公司生产的石膏板不存在质量缺陷，且均按美国客户提供的标准生产，自交货之日至今未收到相关客户的质量投诉；③应诉需支付巨额的律师及差旅费用；④最关键的原因在于中国与美国之间没有签订相互承认、执行法院判决的司法协定，且泰山公司在美国本土没有财产，即使真是输了官司，美国法院也无法执行泰山公司在中国的财产。⑤泰山公司注意到此次石膏板质量没有涉及到对人身的损害，如以前报道的造成人身上出现皮疹、流鼻血和呼吸系统疾病等。

综合以上原因，泰山公司倾向于不去应诉的做法，但必要时应采纳向美国法院寄送有利于泰山公司的证据及通过政府部门交涉等做法，来消除和减少一些负面影响。

以上情况不知当否，请批示。

此致

泰山石膏股份有限公司

2009 年 5 月 11 日

3

TG-0208430

# EXHIBIT "D"

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 87 of 258

Translation of BNBMPLC-E-0059967-59977

<u>BNBMPLC-E-0059967</u>

## The Course of Events on Hiring Law Firms for the Gypsum Board Litigation in the United States

### I. The Course of Events on Hiring Foreign Law Firms

Background: Since the end of 2008, some homeowners, construction companies, and other companies in the United States have brought lawsuits against multiple Chinese gypsum board manufacturing enterprises in some federal courts and state courts of the United States. Beijing New Building Materials Public Limited Company (abbreviated below as "BNBM PLC") and Taishan Gypsum Company Limited (abbreviated below as "Taishan Gypsum") are listed as defendants in some cases.

### Stage one: Hiring Foreign Law Firms to Issue Legal Opinions

1. After BNBM PLC and Taishan Gypsum were listed as defendants in some of the gypsum board lawsuits in the United States, BNBM PLC responded actively. According to the advice of Chungang Dong, Esq. from Beijing Jingtian & Gongcheng Law Firm (abbreviated below as "Jingtian & Gongcheng"), the Company's legal counsel, he suggested that BNBMPLC should officially appoint a U.S. law firm to provide an official legal opinion to serve as the basis for the official decision. After obtaining information on foreign law firms through various channels, BNBM PLC sent invitation letters to three preliminarily-determined law firms and one U.S. attorney. Among them, three law firms replied.

2. BNBM PLC and its subsidiary Taishan Gypsum discussed the gypsum board lawsuits in the United States, in which BNBM PLC and Taishan Gypsum were involved, with the three candidate law firms on September 10th, 2009 and September 15th, 2009, respectively. The three candidate law firms were Lovells International Law Firm[1] (abbreviated below as "Lovells"), Orrick, Herrington & Sutcliffe LLP (abbreviated below as "Orrick"), and K&L Gates LLP (abbreviated

---

[1] It should be Hogan Lovells. Hogan & Hartson LLP and Lovells merged in May 2010 to become Hogan Lovells. The

MTD Exhibit #186

SONG: Exhibit 331

below as "K&L Gates"). The three candidate law firms each provided the special information they had and their suggestions on the gypsum board litigation in the United States. The minutes of this meeting were provided by Chungang Dong, Esq. at Jingtian & Gongcheng.

**BNBMPLC-E-0059968**

3. On September 22nd, 2009, BNBM PLC and Taishan Gypsum continued the discussion about the candidate law firms for the gypsum board litigation in the United States, and the topic of the discussion was about *Hiring Attorneys for the "Toxic Drywall Event" and Responding to the Default Judgment.* Candidate law firms, Lovells and Orrick, provided the special information each of them had and their suggestions at this meeting.

This meeting solicited the opinions of Tongchun Jia and Gang Zhao at Taishan Gypsum on hiring attorneys. Tongchun Jia's opinions were: 1) according to the instructions of leaders, necessary and limited response to the litigation can be given; 2) at the same time, he thought that Taishan Gypsum was involved in a relatively large number of lawsuits and could not manage the responses to the lawsuits, and that the fees could be very high. He agreed to respond to the hearing on September 24th, and to make further judgments based on the situations after the response; 3) he agreed with the suggestion put forward by Yu Chen at BNBM PLC that the two companies appoint law firms separately and bear the fees on their own.

Gang Zhao's opinion was: for hiring law firms, he suggested to hire one firm, and he was inclined to hire Orrick, because: 1) Orrick paid close attention to the case; 2) there was no problem with their level of professionalism; 3) under the premise that there was no significant difference of the levels of professionalism among the U.S. law firms, Orrick had better attitudes.

4. On October 12th, 2009, the Legal Department of BNBM PLC issued the *Report on Hiring Foreign Lawyers for the Gypsum Board Litigation in the United States*, and reported relevant matters about hiring foreign law firms to provide legal opinions, and etc. This document gives a brief introduction of the three candidate foreign law firms; and, after considering the price offers and comprehensively

analyzing the advantages of the three law firms, BNBM PLC preliminarily decided to have Lovells answer its questions of concern, collect information, provide suggestions and strategies, and issue legal opinions letters.

The price offers of the three law firms are as follows:

K&L Gates: USD 98,500

**BNBMPLC-E-0059969**

Orrick: USD 75,000

Lovells: USD 60,000

**Stage two: Taishan Gypsum retained the law firm**

5. On April 8th, 2010, the time in the United State, Judge Eldon Fallon, a federal district judge in New Orleans, United States, issued an order in the lawsuit of the plaintiffs about the quality issues of the gypsum boards, and ruled that Taishan Gypsum Company Limited (abbreviated as "Taishan Gypsum") pay a sum of USD 2.6 million as the damages to 7 U.S. families. In the teleconference held on April 12th, 2010, BNBM PLC analyzed and discussed with Lovells in depth about the gypsum board litigation in the United States. Daozheng Chen, Esq. from Lovells made a preliminary analysis and judgment on the order.



7. In the teleconference on June 9th, 2010, CNBM Group, CNBM Co., Ltd., and BNBM PLC discussed the agency agreement; Hogan Lovells briefly introduced its thoughts on the litigation.

8. On June 10th, 2010, according to the results from the discussions on June 3rd and June 9th, Taishan Gypsum and Hogan Lovells signed the agency agreement. It was officially determined that Hogan Lovells would be the law firm to represent Taishan Gypsum in the gypsum board litigation in the United States in which Taishan Gypsum has been involved.

**BNBMPLC-E-0059970**

**Stage three: BNBM PLC retained the law firm**

9. To follow up with the gypsum board litigation in the United States, BNBM PLC considered whether to retain a law firm to provide legal advise. On July 28th, 2010, Attorney Chungang Dong from Jingtian & Gongcheng sent an email on the matter of hiring the law firm by BNBM PLC. In the email, he offered his own suggestions on how to proceed with hiring the law firm while BNBM PLC is following up with the gypsum board litigation in the United States.

According to the suggestions of Attorney Chungang Dong, the Legal Department of BNBM PLC issued the *Second Report on Hiring U.S. Attorneys* on August 12th, 2010, and submitted it together with the *Report on Hiring Foreign Attorneys for the Gypsum Board Litigation in the United States* issued on July 10th, 2010 to the Company's leaders for review. On September 17th, 2010, BNBM PLC signed the confirmation letter for the agency with Orrick, and it was confirmed that BNBM PLC retained Orrick as the legal consultant for the gypsum board litigation in the United States.

**BNBMPLC-E-0059971**

II.    Related Meetings and Contents of Discussions

| **Time of meeting: September 10, 2009 / September 15, 2009** |
| --- |

| Topic of meeting: U.S. Litigation Involving BNBM Group and Taishan Gypsum |
|---|
| **Attendees:** BNBM PLC:  Yu Chen, Zheng Tao, Ziqiang Bian; Taishan Gypsum:  Gang Zhao; Shandong Taishan Lantian Law Firm:  Guangbin Liang, Esq. ; Jing Tian & Gong Cheng:  Chungang Dong, Esq. |

**The following matters mainly involve facts, and the information and opinions provided by various foreign firms are either identical or similar;**

I.   The existing lawsuits on the quality issues of gypsum boards are being heard in the U.S. federal courts and state courts respectively, totaling to more than 1000 cases, of which, the 127 cases accepted by federal courts are being handled as the multidistrict litigation ("MDL") by the federal court in the state of Louisiana. The judge hearing the case is Eldon E. Fallon.

II.   There are additionally hundreds of cases (the specific number is increasing with time) filed in the courts of 26 states, the majority of which are in the state of Florida and the state of Louisiana. There is the possibility that the cases within each state could be heard in consolidation. Therefore, even if all cases were heard in consolidation, there are at least 27 consolidated cases.

III. 

IV.   Among all the Chinese enterprises listed as defendants, only the Chinese subsidiaries of KNAUF hired attorneys to participate in the litigation procedure. They have already filed the motion to dismiss, and raised the objection to jurisdiction.

V.

VI.   Judge Fallon already issued a warning to Taishan Gypsum. If Taishan Gypsum did not respond to the litigation before September 24, 2009, the judge will hold a hearing on September 24, 2009, and issue a default judgment against Taishan Gypsum.



BNBMPLC-E-0059972



| Special Information and Suggestions Provided at the Meeting by the Law Firms and the Opinions of the Company's Legal Consultant | |
| --- | --- |
| Lovells: Daozheng Chen, Gaston Fermandez, Ye Yuan | |



Orrick:   Xiang Wang,
Raymond G. Mullady,
Fang Fu

| | |
|---|---|
| | |
| K&L Gates   Yujing Shu, Xianjin Tian, Miao Li, David Klaber, Eric Stone | I. Except for the juridical process, the CSPA and the EPA in the United States also conducted investigations on this case, but there has not been any conclusion as of now. The above agencies have also conducted cooperation with the relevant departments of the Chinese government, and will appoint a delegation group to China in October to conduct joint investigation with the AQSIQ[2] in China.<br><br>II. The CSPA in the U.S. demanded that the construction companies shall take mitigation measures such as to fix, replace, or issue refunds to the homeowners' houses involved. Therefore, these construction companies are simultaneously facing pressures from three parties: the homeowners, the court, and the government. For the losses resulted from the above mitigations measures, the construction companies |

**BNBMPLC-E-0059973**

| | |
|---|---|
| | will also ask for indemnities from the manufacturers. |

---

[2] General Administration of Quality Supervision, Inspection and Quarantine of the People's Republic of China

| | |
|---|---|
| | ███████████████████████████ |
| Jingtian & Gongcheng: Chungang Dong | I. Lovells quoted USD 50,000 for issuing legal opinions about, but not limited to, the five questions consulted. Orrick quoted USD 75,000 (no additional charge for giving legal advice if the firm is retained to handle a case). K&L Gates quoted USD 98,500.<br><br>II. **The main advantage** of Lovells lies in the direct and rich experience possessed by the attorneys at its Chinese offices with regard to U.S. litigations, which allows it to complete the main work in their Chinese office. In addition, Lovells is the highest ranked and most renowned foreign law firm internationally out of the three.<br><br>III. **The main advantage of Orrick** lies in its striking passion and focus on this case. Also, its attorneys stationed in the U.S. also have good channels of communication with the plaintiffs' attorneys.<br><br>IV. **The main advantage of K&L Gates** lies in the fact that this firm has many offices located at the southern states of the U.S. where the lawsuits are congregated. This provides a convenient geographical condition for investigating the situation and communicating with the courts in the United States. Additionally, two of their foreign attorneys have abundant experience in product liability. |

| |
|---|
| **Time of the Meeting: September 22, 2009 (Live meeting + telephone conference)** |
| **Topic of the Meeting: Hiring Attorneys for the "Toxic Drywall Event" and the Response to the Default Judgement** |
| Attendees: BNBM PLC: Yu Chen, Zheng Tao; Taishan Gypsum: Tongchun Jia, Gang Zhao |
| **Main Contents of the Meeting:** |

I. The information acquired from the law firms includes, but is not limited to, 1) the current situation of the case, 2) suggestions from the attorneys, 3) whether response to the hearing proceeding means the acceptance of jurisdiction of the U.S. courts, whether it entails mandatory participation in the subsequent litigation?

II. Solicited opinions from Tongchun Jia and Gang Zhao of Taishan Gypsum about matters on hiring the law firm and responding to the hearing on September 24th.

**Special Information and Suggestions Provided by the Law Firms During the Meeting**

| Lovells: Daozheng Chen |  |
| --- | --- |
| Orrick: Xiang Wang | |

| | |
|---|---|
| | ████████████████████████████████████ |
| K&L Gates: Xianjin Tian | None |
| Notes of this Stage | On October 12, 2009, the Legal Department of BNBM PLC issued the *Report on Hiring Foreign Lawyers for the Gypsum Board Litigation in the United States,* |

BNBMPLC-E-0059974

| | |
|---|---|
| | and it was preliminarily decided to have Lovells answer those questions of concern from BNBM PLC, collect information, provide suggestions and strategies, and issue legal opinion letters. |

**Time of the Meeting:** April 12, 2010 (Telephone Conference)

**Main Contents of the Meeting: Preliminary Introduction and Judgement on the Gypsum Board Litigation in the United States**

**Attendees:** BNBM: Yu Chen, Zhucai Chen; Jingtian & Gongcheng: Chungang Dong; Hogan Lovells: Daozheng Chen

**Main Contents of the Meeting:** On April 8, 2010, U.S. time, Eldon Fallon, a federal district court judge in New Orleans, U.S.A., issued an order in the lawsuit of the plaintiffs about the quality issues of gypsum boards. Taishan Gypsum Limited Company (abbreviated as "Taishan Gypsum") was ordered to pay a sum of USD 2,600,000 to 7 families in the United States in compensatory damages. Based on the progress of the case, (the meeting) made preliminary analysis and judgement on the case.

**Judgements and Suggestions Provided by Lovells and the Company's Legal Counsel**

| | |
|---|---|
| Lovells:<br><br>Daozheng | ████████████████████████████████████ |

| Chen |  |
|---|---|
| Jingtian & Gongcheng: | |

Chungang
Dong



**BNBMPLC-E-0059975**



| **Time of the meeting**: June 3rd, 2010 (teleconference) |
|---|
| **Topic of the Meeting: the Strategy for Responding to the Gypsum Board Litigation in the United States** |

**Attendees**: CNBM Group: Jian Zhang; BNBM PLC: Bing Wang; Taishan Gypsum: Tongchun Jia; Jingtian & Gongcheng: Chungang Dong; and Lovells: Daozheng Chen

**Summary of the meeting:**

I. Mr. Knauf visited Zhiping Song, chairman of the board of directors, and hoped that CNBM Group could offer a helping hand to them in responding to the United States drywall event. The situations that Knauf reported were that the Knauf Company had done some work and that, for the construction companies, for the moment it did not explore the truth of the matter, nor did it divide up liabilities. They cooperated to fix the issue of home renovation, but the small homeowners who did their own decorations were waiting for the result of the litigation. Knauf was worried that their assets would be enforced in the United States. Knauf has 3 factories in the United States, and the main market is in the heat insulating materials. The plaintiffs have formed an attorney team of more than 100 people. Among them, a leadership body of 5 people has been established to negotiate with the defendants about the compensation. The goal of the team of plaintiffs' attorneys is to work hard to have the court make a judgment on 1-2 cases first and set a precedent for the ruling and settlement negotiations of other recent cases. For the judgment made against Knauf, the Knauf Company has appealed, hoping to delay the time and to reduce the amount of compensation.

Chairman Song agreed that CNBM Group should organize the response to the litigation, but the purposes of the response are: 1. for the images of Chinese products and Chinese enterprises; 2. for the friendship with Mr. Knauf of more than 30 years. Reluctant to see the Knauf Company fighting alone; 3. insisting on the position that our products do not have any problems. We should consider the situations as we deal with the litigation. The Company may ask the Knauf Company to help recommend attorneys for us and delay the effectiveness of the judgment.

II. [redacted]

III. [redacted]

---

[3] Fourth? typo

BNBMPLC-E-0059976

| | |
|---|---|
| ████████████████████████████ | |
| **Time of the meeting**: June 3rd, 2010 (teleconference) | |
| **Topic of the meeting: the strategy for responding to the United States gypsum board litigation** | |
| **Attendees**: CNBM Group: Chief (Jianglin) Cao and Jian Zhang; CNBM Co., Ltd.: Zhangli Chang; BNBM PLC: Yu Chen; Taishan Gypsum: Tongchun Jia; and Jingtian & Gongcheng: Chungang Dong | |
| **Summary of the meeting:**<br><br>Abstract I: Introduction of the Lovells firm and its strengths after the merger, including Attorney Daozheng Chen, Attorney Weining Yang, the advantages are large scale and strong strengths, the attorneys in Shanghai and Beijing representative offices have strong capabilities, and are convenient in communications and exchanges.<br><br>Abstract II: The statistics from the Supreme Court showed that there are a total of 81 subpoenas that were served, involving 48 enterprises.<br><br>Abstract III:  | |





**Translation of BNBMPLC-E-0059977**





# EXHIBIT "E"

*Hong Kong Exchanges and Clearing Limited and The Stock Exchange of Hong Kong Limited take no responsibility for the contents of this announcement, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement.*



## CNBM

# China National Building Material Company Limited*

# 中 國 建 材 股 份 有 限 公 司

*(a joint stock limited company incorporated in the People's Republic of China with limited liability)*

(Stock Code: 3323)

**VOLUNTARY ANNOUNCEMENT**

**DEVELOPMENT OF GYPSUM BOARD LITIGATION IN THE US**

On 18 July 2014, China National Building Material Company Limited*（中國建材股份有限公司）(the "**Company**", the Company and its subsidiaries, together, "the **Group**")) was notified by Beijing New Building Material Public Limited Company* (北新集團建材股份有限公司) ("**BNBM**"), a 52.4% held subsidiary of the Company, that the motions made by Taishan Gypsum Company Limited* (泰山石膏股份有限公司) ("**Taishan Gypsum**"), a 65% held subsidiary of BNBM, in respect of some of the gypsum board litigation cases in the United States of America (the "**US**") to vacate the default judgment and the preliminary entry of the default order and to dismiss legal action on the ground that the US courts did not have personal jurisdiction had been dismissed. As Taishan Gypsum does not agree that the US courts have jurisdiction and objects to the substantive disputes being heard by a court without jurisdiction, it has, after due and careful consideration, decided not to continue to participate in any of the gypsum board litigation brought against Taishan Gypsum in the US courts.

T: 6/2/15-6/4/15
**Exhibit 27**

CONTEMPT
**Exhibit 3**

— 1 —

CNBMCO00000001

Since 2009, various gypsum board cases against a number of enterprises including at least dozens of Chinese gypsum board manufacturers have been brought by, among others, a number of homeowners and construction companies in the US, and the amounts involved will be determined by the US courts after the hearings. Since 2010, Taishan Gypsum has engaged one US well-known law firm to act on its behalf in the gypsum board litigation in the US. Before Taishan Gypsum responded to any legal action, a US district court had made a default judgment against Taishan Gypsum in one of the cases involving the owners of seven properties in the sum of US$2,758,356.52 with interest accruing from May 2010. Currently, the US courts have only made substantive ruling on merits in respect of the above one case. BNBM has been listed as one of the defendants in various gypsum board litigation cases in the US. Although the Company has neither produced nor exported any gypsum boards, it has also been listed as a one of the defendants in various gypsum board litigation cases in the US. Both the Company and BNBM have not participated in any gypsum board litigation in the US. Each of the Company, BNBM and Taishan Gypsum expects that the US courts may begin to make substantive default judgments on merits against them in the near future.

At present, it is unable to ascertain the number of plaintiffs and properties involved in the US gypsum board cases and it is also difficult to accurately predict the possible rulings. Although the US lawyers of BNBM and Taishan Gypsum estimate that the damages that might be imposed in the US court's default judgments for the gypsum board cases might be very large, since the major assets of the Company, BNBM and Taishan Gypsum are all located in China, according to the US and Chinese lawyers whom BNBM and Taishan Gypsum had respectively consulted, the possibility of the US judgments being enforced in China is very low. Therefore, based on information currently available to the Company, the Company believes that the US courts' judgments will not result in significant economic loss to the Group and will not have material adverse impact on the Group's production and operation.

This announcement is made on a voluntary basis and not required specifically under Part XIVA of the Securities and Futures Ordinance (Cap. 571 of the Laws of Hong Kong) (the "SFO") or the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited (the "**Listing Rules**").

CNBMCO00000002

## 1. INTRODUCTION

References are made to the overseas regulatory announcement of the Company dated 30 May 2010 in respect of an announcement released by BNBM, a 52.4% held subsidiary of the Company, relating to the gypsum board incident in the US and the information on the stage of development of the gypsum board cases in the US in the 2013 annual report of the Company. On 18 July 2014, the Company was notified by BNBM, that the motions made by Taishan Gypsum, a 65% held subsidiary of BNBM, in respect of some of the gypsum board litigation cases in the US to vacate the default judgment and the preliminary entry of the default order and to dismiss legal action on the ground that the US courts did not have personal jurisdiction had been dismissed. As Taishan Gypsum does not agree that the US courts have jurisdiction and objects to the substantive disputes being heard by a court without jurisdiction, it has, after due and careful consideration, decided not to continue to participate in any of the gypsum board litigation brought against Taishan Gypsum in the US courts.

## 2. THE STATUS OF THE GYPSUM BOARD CASES IN THE US

Since 2009, various gypsum board cases against a number of enterprises including at least dozens of Chinese gypsum board manufacturers have been brought by, among others, a number of homeowners and construction companies in the US, and the amounts involved will be determined by the US courts after the hearings. Since 2010, Taishan Gypsum has engaged one US well-known law firm to act on its behalf in the gypsum board Litigation in the US. Before Taishan Gypsum responded to any legal action, a US district court had made a default judgment against Taishan Gypsum in one of the cases involving the owners of seven properties in the sum of US$2,758,356.52 with interest accruing from May 2010. Taishan Gypsum had filed motions to vacate the default judgments and the pre-liminary entry of the default orders and to dismiss legal action on the ground that the US courts did not have personal jurisdiction, but some of the motions had been dismissed by the US courts. Currently, apart from the above one case, the US courts have not made any substantive ruling on merits in respect of the gypsum board cases. According to a notice from Taishan Gypsum's US lawyers, the US courts would successively organise the substantive hearing on merits of various cases in the next stage of the proceedings.

CNBMCO00000003

Taishan Gypsum has always been of the view that the US courts have no jurisdiction on the actions brought by the plaintiffs and that if the plaintiffs want to make any claims against Taishan Gypsum, they should bring and resolve their legal actions in the competent courts in China which have jurisdiction over Taishan Gypsum. However, after the expensive and lengthy hearings, the motions made by Taishan Gypsum disputing the jurisdiction of the US courts had been dismissed by the US courts. Taishan Gypsum is deeply disappointed about, and does not agree to, such rulings. Although Taishan Gypsum firmly believes, as supported by relevant scientific research, that the products of Taishan Gypsum are safe and up to standard, Taishan Gypsum does not agree to the substantive dispute being heard by a court without jurisdiction. Thus, Taishan Gypsum has, after due and careful consideration, decided not to continue to participate in any of the gypsum board Litigation in the US brought against Taishan Gypsum in the US courts.

BNBM has been listed as one of the defendants in various gypsum board litigation cases in the US. Although the Company has neither produced nor exported any gypsum boards, it has also been listed as one of the defendants in various gypsum board litigation cases in the US. Both the Company and BNBM have not participated in any gypsum board litigation in the US. Each of the Company, BNBM and Taishan Gypsum expects that the US courts may begin to make substantive default judgments on merits against them in the near future.

If the plaintiffs in the gypsum board litigation in the US bring any action against the Company, BNBM and Taishan Gypsum in the competent courts in China with jurisdiction, the Company, BNBM and Taishan Gypsum will actively respond in accordance with law.

— 4 —

CNBMCO00000004

## 3. IMPACT OF THE US GYPSUM BOARD LITIGATION

According to information provided by the US lawyers of BNBM and Taishan Gypsum, during the course of the gypsum board litigation in the US, a large number of plaintiffs are gradually joining the proceedings, and there are situations where cases are being merged. At present, it is unable to ascertain the number of plaintiffs and properties involved in the cases, and it is also difficult to accurately predict the possible rulings. Although the US lawyers of BNBM and Taishan Gypsum estimate that the damages that might be imposed in the US court's default judgments for the gypsum board cases might be very large, since the major assets of the Company, BNBM and Taishan Gypsum are all located in China, according to the US and Chinese lawyers whom BNBM and Taishan Gypsum have respectively consulted, there is no convention or treaty on mutual recognition and enforcement of judgments between China and the US such that the possibility of the US judgments being enforced in China is very low. Therefore, based on information currently available to the Company, the Company believes that the US courts' judgments will not result in significant economic loss to the Group and will not have material adverse impact on the Group's production and operation.

## 4. QUALITY OF THE GROUP'S GYPSUM BOARD PRODUCTS

Gypsum board is one of the important building and decorative materials. Compared to traditional building materials, it has the advantages of fire-proofing, sound-proofing, energy saving and cost efficiency, and is globally recognised as a green, safe and environmentally friendly new type of building material. Currently it is widely used in developed countries and regions such as the US and Europe.

The Company, BNBM and Taishan Gypsum have consistently been emphasising the importance of product quality. BNBM and Taishan Gypsum have introduced and established a series of measures, such as ISO9001 Quality Management System, ISO14001 Environment Management System, GB/T28001 Occupational Health and Safety Management System, ISO10012 Management System and Environmental Label Safeguarding Measures. In addition, their gypsum board products have obtained relevant international quality accreditations, including the US's UL ac-creditation and the United Kingdom's BS accreditation.

CNBMCO00000005

After the occurrence of the gypsum board incidents in the US, the Chinese government has attached high importance to it. During the period from May 2009 to June 2010, the relevant Chinese governmental authorities organised two national specific gypsum board inspections the scope of which covered the gypsum boards produced by BNBM and Taishan Gypsum (the Company has not produced any gypsum boards). The inspection results indicated that all inspected samples of gypsum boards produced by BNBM and Taishan Gypsum complied with the quality standards and no quality defects had been identified.

This announcement is made on a voluntary basis and not required specifically under Part XIVA of the SFO or the Listing Rules.

By order of the Board

**China National Building Material Company Limited**

**Chang Zhangli**

*Secretary of the Board*

Beijing, the PRC

18 July 2014

*As at the date of this announcement, the board of directors of the Company comprises Mr. Song Zhiping, Mr. Cao Jianglin, Mr. Peng Shou, Mr. Cui Xingtai and Mr. Chang Zhangli, as executive directors, Mr. Guo Chaomin, Mr. Huang Anzhong and Ms. Cui Lijun, as non-executive directors, and Mr. Qiao Longde, Mr. Li Decheng, Mr. Ma Zhongzhi, Mr. Shin Fang and Mr. Wu Liansheng, as independent non-executive directors.*

\*   *For identification only*

CNBMCO00000006

# EXHIBIT "F"

```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3

 4    IN RE: CHINESE-MANUFACTURED      )
      DRYWALL PRODUCTS LIABILITY       )
 5    LITIGATION                       )
                                       ) MDL 2047 "L"
 6                                     ) NEW ORLEANS, LOUISIANA
                                       ) THURSDAY, JANUARY 22, 2015
 7                                     ) 9:00 A.M.
      THIS DOCUMENT RELATES TO:        )
 8                                     )
      ALL CASES                        )
 9                                     )
                                       )
10    ******************************

11

12

13          TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

14        HEARD BEFORE THE HONORABLE ELDON E. FALLON

15                  UNITED STATES DISTRICT JUDGE

16

17

      OFFICIAL COURT REPORTER:       SUSAN A. ZIELIE, RMR, FCRR
18                                   EASTERN DISTRICT OF LOUISIANA
                                     500 POYDRAS STREET, ROOM B406
19                                   NEW ORLEANS, LA 70130
                                     susan_zielie@laed.uscourts.gov
20                                   504.589.7781

21

22

23    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
      PRODUCED BY COMPUTER AIDED TRANSCRIPTION.
24

25
```

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 116 of 258
Case 2:11-cv-22408-MCE Document 64-6 Entered on FLSD Docket 09/14/2018 Page 3 of 37

2

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS'
      STEERING COMMITTEE:              HERMAN HERMAN KATZ
 3                                     BY:  LEONARD DAVIS, ESQUIRE
                                       820 O'KEEFE AVENUE
 4                                     NEW ORLEANS, LA 70113

 5                                     LEVIN, FISHBEIN, SEDRAN & BERMAN
                                       BY:  ARNOLD LEVIN, ESQUIRE
 6                                     510 WALNUT STREET, SUITE 500
                                       PHILADELPHIA, PA 19106
 7
      THE PLAINTIFFS:                  DANIEL BECNEL, ESQUIRE
 8                                     425 W. AIRLINE HIGHWAY
                                       SUITE B
 9                                     LAPLACE, LA 70086

10    FOR THE STATE/FEDERAL
      COORDINATION COMMITTEE:          BARRIOS, KINGSDORF & CASTEIX
11                                     BY:  DAWN BARRIOS, ESQUIRE
                                       701 POYDRAS STREET, SUITE 3600
12                                     NEW ORLEANS, LA 70139

13    PRO SE CURATOR:                  ROBERT MURRAY JOHNSTON, ESQ.
                                       LAW OFFICES OF
14                                       ROBERT M. JOHNSTON, LLC
                                       400 POYDRAS STREET
15                                     SUITE 2450
                                       NEW ORLEANS LA 70130
16
      DEFENDANT KNAUF:                 Frilot, LLC
17                                     BY:  KERRY J. MILLER, ESQUIRE
                                       ENERGY CENTRE
18                                     1100 POYDRAS STREET
                                       SUITE 3700
19                                     NEW ORLEANS, LA 70163

20    FOR HOME BUILDERS:               STONE PIGMAN
                                       BY:  DOROTHY H. WIMBERLY, ESQ.
21                                     546 Carondelet Street
                                       New Orleans LA 70130
22                                     504.593.0849
                                       dwimberly@stonepigman.com
23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 118 of 258
Case 1:11-cv-22408-MGC Document 84-6 Entered on FLSD Docket 09/14/2018 Page 5 of 37

4

|   |   |   |
|---|---|---|
| 1 | NEW ORLEANS, LOUISIANA; THURSDAY, JANUARY 22, 2015 | 08:55AM |
| 2 | 9:00 A.M. | 08:55AM |
| 3 | THE COURT:  Be seated, please.  Good morning, call the | 08:59AM |
| 4 | case. | 09:00AM |
| 5 | CASE MANAGER:  In re:  2047 in re:  Chinese | 09:00AM |
| 6 | Manufactured Drywall Products Liability litigation. | 09:00AM |
| 7 | THE COURT:  This is our monthly status conference in | 09:00AM |
| 8 | this matter.  I'm hear from liaison counsel. | 09:01AM |
| 9 | MR. LEVIN:  Good morning, Your Honor.  Arnold Levin, | 09:01AM |
| 10 | substituting for Russ Herman, who is the plaintiff's liaison. | 09:01AM |
| 11 | MR. MILLER:  Good morning, Your Honor.  Kerry Miller on | 09:01AM |
| 12 | behalf of Knauf and the defense steering committee. | 09:01AM |
| 13 | THE COURT:  I met with lead and liaison counsel moment | 09:01AM |
| 14 | ago to discuss the agenda. | 09:01AM |
| 15 | We don't have any motions necessarily on the | 09:01AM |
| 16 | agenda but I'll take it on the order. | 09:01AM |
| 17 | Do we have anything on Pretrial Orders? | 09:01AM |
| 18 | MR. LEVIN:  No, sir.  But BrownGreer will issue a | 09:01AM |
| 19 | report to the Court today that speaks to the money that's | 09:01AM |
| 20 | flowing to the clients. | 09:01AM |
| 21 | THE COURT:  Anything on State Court Trial Settings? | 09:01AM |
| 22 | MS. BARRIOS:  Your Honor, the three cases that are | 09:01AM |
| 23 | listed in the joint report on page five are pending now in | 09:01AM |
| 24 | Virginia, and we have hopes that they'll be able to be resolved | 09:01AM |
| 25 | by Mr. Serpe. | 09:01AM |

```
 1                    But I'd like to just jump head and talk about the    09:01AM

 2    Virginia class action settlements.  Garretson Group did not come    09:02AM

 3    today.  They asked me to make a very simple report.                 09:02AM

 4                    The other loss fund deadline is over.  They are      09:02AM

 5    now reviewing all the claim forms.  They are in the process of      09:02AM

 6    preparing the deficiency notices, which should go out by the end    09:02AM

 7    of the month.  They've been in very close contact with Jake         09:02AM

 8    Woody at BrownGreer, particularly with regard to your last order    09:02AM

 9    on the other loss funds and the payouts.  And they're talking       09:02AM

10    about all issues with regard to it, particularly the                09:02AM

11    Medicare-Medicaid injury with regard to the bodily injury           09:02AM

12    payments.                                                           09:02AM

13                    Thank you.                                          09:02AM

14          MR. LEVIN:  That's a segue for one thing on the               09:02AM

15    Virginia settlements.  Not necessarily the Virginia settlement,     09:02AM

16    but Mr. Serpe is explaining to the Taishan plaintiffs on a          09:02AM

17    one-to-one basis, answering calls and effectively steering them     09:02AM

18    to make decisions with regard to the class certification order      09:02AM

19    of this Court with regard to Taishan and the assessment of          09:03AM

20    damages hearing which will take place during the February           09:03AM

21    pretrial conference, sir.                                           09:03AM

22          THE COURT:  All right.  That case seems to be going           09:03AM

23    well.  I appreciate the help that the judge is giving to it.        09:03AM

24    She and I have worked closely on this matter and she's been a       09:03AM

25    great help to us in this proceeding.                               09:03AM
```

Case 2:09-md-02047-EEF-MBN  Document 22380-14  Filed 12/02/19  Page 129 of 258
Case 1:11-cv-22408-MGC  Document 64-6  Entered on FLSD Docket 09/14/2018  Page 8 of 37

6

| | | |
|---|---|---|
| 1 | While we are on that, Jake, give me a report on | 09:03AM |
| 2 | what's happening with regard to the money. | 09:03AM |
| 3 | MR. WOODY:  Good morning, Your Honor.  My name is Jake | 09:03AM |
| 4 | Woody, from BrownGreer.  I'm here to give the monthly status | 09:03AM |
| 5 | report for the Chinese Drywall settlement program. | 09:03AM |
| 6 | I'll start very briefly, just as I always do, with | 09:03AM |
| 7 | our total number of claims to set the stage. | 09:03AM |
| 8 | Total submitted claims is 22,491.  Of those, we | 09:04AM |
| 9 | reviewed 19,726.  We're complete with all claim types other than | 09:04AM |
| 10 | miscellaneous claims.  We're actively reviewing those claims and | 09:04AM |
| 11 | should be done with those in short order. | 09:04AM |
| 12 | Our largest claim type, as you know, is our Global | 09:04AM |
| 13 | Banner IN/EX repair and relocation claims.  Those are | 09:04AM |
| 14 | settlements for a pro rata share of three different settlements, | 09:04AM |
| 15 | the Global settlement, the Banner settlement and the IN/EX | 09:04AM |
| 16 | settlement.  We had just under 10,000 eligible claims in this | 09:04AM |
| 17 | category, 9,983.  We've denied 1,674 largely for insufficient | 09:04AM |
| 18 | documentation or because the claimants submitted a claim that | 09:04AM |
| 19 | they had previously assigned to another claim. | 09:04AM |
| 20 | THE COURT:  So the denied doesn't mean that they're not | 09:04AM |
| 21 | going to get some money but they're going to get it from another | 09:04AM |
| 22 | fund? | 09:04AM |
| 23 | MR. WOODY:  They are denied for this claim type, but | 09:04AM |
| 24 | they could potentially receive claim from other loss fund or for | 09:04AM |
| 25 | other loss claim. | 09:05AM |

1   These numbers change month to month largely    09:05AM

2   because we have claimants withdrawing claims.    09:05AM

3   We're at the stage in this claim type where we are    09:05AM

4   essentially reconciling duplicate claims.  We're only authorized    09:05AM

5   to make payment per property.  The claims that haven't been paid    09:05AM

6   are largely claims where we have that issue.  As we work through    09:05AM

7   them, claimants generally withdraw them.  We see duplicate    09:05AM

8   claims in many cases for spouses who submitted two claims out an    09:05AM

9   abundance of caution and also where we have competing claims    09:05AM

10  where one claimant has received an assignment and the other    09:05AM

11  assigned the claim.  We're reconciling those, and largely are    09:05AM

12  able to do that on our own.    09:05AM

13  We began issuing payments on GBI claims on    09:05AM

14  September 12th of last year.  So far, we've issued 11,770    09:05AM

15  checks.  The number of checks is larger than the number of    09:05AM

16  claimants because many claimants are eligible for payment from    09:05AM

17  multiple settlements.  So they would receive two checks for one    09:06AM

18  claim.  So far, we have distributed just over $54.8 million.    09:06AM

19  That's an increase of 1.7 million from the last status    09:06AM

20  conference.    09:06AM

21  We make payments every day.  The number fluctuates    09:06AM

22  as we're able to reconcile these duplicate claimant issues.  We    09:06AM

23  also require a W-9 and a verification of claims from claimants    09:06AM

24  before we make payment.  As we receive those, we put them in    09:06AM

25  line for payment and issue checks.    09:06AM

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 122 of 258
Case 2:11-cv-22408-MGC Document 84-6 Entered on FLSD Docket 09/14/2018 Page 58 of 37

8

1       Both of those forms are available on our website.    09:06AM

2    I'll give the address at the end of this presentation.    09:06AM

3       We have $21.3 million left to distribute.  As I    09:06AM

4    mentioned, we continue to make payments every day and this    09:06AM

5    process is largely stable and we're not seeing any problems with    09:06AM

6    it.    09:06AM

7       The claims that are not Global, Banner, IN-EX    09:06AM

8    claims, we refer to as Other Loss Claims, and these fit in a    09:06AM

9    variety of categories.  Our four main Other Loss claims    09:07AM

10   are bodily injury; foreclosure and short sale; lost rent, use    09:07AM

11   and sales; and pre-remediation alternative living expenses,    09:07AM

12   which we abbreviate as PRALE here.    09:07AM

13       We have just over 4,000 claims in these four claim    09:07AM

14   types; 428, to be exactly.  Of those 2,527 are eligible.  44 are    09:07AM

15   incomplete.  As I always mention, the incompleteness number    09:07AM

16   changes every month.  Last month, it was 100.  The month before,    09:07AM

17   I think it was 200.  So you can see the progress we're making in    09:07AM

18   reconciling those and moving them from either incomplete to    09:07AM

19   eligible if they satisfy the document requirements or denying    09:07AM

20   them for failure to submit those documents.    09:07AM

21       Because of the low number of incomplete claims,    09:07AM

22   we're able to work with the parties and the Court to draft and    09:07AM

23   submit PTO-29, which allow us to begin making payments on    09:07AM

24   eligible Other Loss claims.    09:07AM

25       The Court entered this order on December 23rd.    09:07AM

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 123 of 258
Case 1:11-cv-22408-MGC Document 82-6 Entered on FLSD Docket 09/14/2018 Page 10 of 37

9

1    We've received a lot of questions, and I'd like to just go          09:08AM

2    through some of the high points of PTO-29.                          09:08AM

3            PTO-29 allow us to make what we call resolution            09:08AM

4    offers on eligible Other Loss claims of varying amounts.  For       09:08AM

5    bodily injury, it's up to $1,000.  For closure short sale           09:08AM

6    claims, it's up to $10,000.  For loss use or sales, it's up to      09:08AM

7    $10,000.  For lost rent, it's three times the verified monthly      09:08AM

8    rent for rental property.  For PRALE claims, it's $14,400.  It's    09:08AM

9    up to $14,400.  And miscellaneous tenant losses are up to          09:08AM

10   $2,500.                                                             09:08AM

11           These amounts are essentially modified pro rata            09:08AM

12   share of the amount available for Other Loss claims, which is       09:08AM

13   $37.7 millin.  It's not a straight pro rata or distribution         09:08AM

14   because each claim has a different value.  But within each claim    09:08AM

15   type, it is a pro rata number.  That's where we got those          09:08AM

16   numbers from and that's how we're proceeding.                      09:09AM

17           We will issue eligibility notices and have begun           09:09AM

18   issuing eligibility notices on Other Loss claims that list the      09:09AM

19   resolution offer.                                                   09:09AM

20           I should also mention, before I move on, that the          09:09AM

21   up to -- this is an up to number.  So, if we review the claim      09:09AM

22   and determine that the verified losses are less than the numbers    09:09AM

23   that I mentioned, we make the lower offer.                          09:09AM

24           And whatever the offer is will be in the                   09:09AM

25   eligibility notice.  We'll issue these through our standard         09:09AM

| | |
|---|---|
| 1 | notice process. | 09:09AM |
| 2 | The notices contain instructions on how to | 09:09AM |
| 3 | proceed.  Claimants have two options after receiving an | 09:09AM |
| 4 | eligibility notice.  They can accept offer and receive payment. | 09:09AM |
| 5 | Or they can, if they feel the offer is insufficient, request | 09:09AM |
| 6 | what we call a special master award.  Those claims, if you | 09:09AM |
| 7 | request that Special Master Award, those claims would be routed | 09:09AM |
| 8 | to the special master who will review them independently of us | 09:09AM |
| 9 | and make a determination. | 09:09AM |
| 10 | Claimants who do not take any action within thirty | 09:10AM |
| 11 | days will be deemed to have accepted the offer; and, if all | 09:10AM |
| 12 | payment documents are present, we'll make payment to them.  So, | 09:10AM |
| 13 | if you take no action, you will lose the chance to request the | 09:10AM |
| 14 | Special Master Award but you will receive the resolution offer. | 09:10AM |
| 15 | If the claimant requests a Special Master Award, | 09:10AM |
| 16 | the offer can change.  It can go up, it can go down or it can | 09:10AM |
| 17 | stay the same. | 09:10AM |
| 18 | What happens when a claimant requests this is yet | 09:10AM |
| 19 | to be determined.  There's a number of variables at issue.  The | 09:10AM |
| 20 | special master, as I mentioned, will do a review independent of | 09:10AM |
| 21 | ours and come up with a determination. | 09:10AM |
| 22 | If a claimant accepts the resolution offer, we | 09:10AM |
| 23 | will make payment rapidly.  Generally, within seven days of the | 09:10AM |
| 24 | acceptance.  Assuming, of course, that the W-9 verification of | 09:10AM |
| 25 | the claims form are present. | 09:10AM |

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 125 of 258
Case 1:11-cv-22408-MGC Document 82-6 Entered on FLSD Docket 09/14/2018 Page 12 of 37

11

| | | |
|---|---|---|
| 1 | If you already submitted those documents in | 09:10AM |
| 2 | support of another claim, of a GBI claim, you do not need to | 09:10AM |
| 3 | submit them again.  We only need these documents once per claim. | 09:10AM |
| 4 | If a claimant wishes to request a Special Master | 09:11AM |
| 5 | Award, you cannot submit an additional documents.  The time to | 09:11AM |
| 6 | submit supporting documents has passed, along with the claims | 09:11AM |
| 7 | deadline.  You can, however -- and we prefer that you submit | 09:11AM |
| 8 | something that tells us where in your claim what we should look | 09:11AM |
| 9 | at:  A list of itemized expenses that you think support your | 09:11AM |
| 10 | request and you can refer to documents you've already admitted | 09:11AM |
| 11 | to us.  That will help streamline the special master review and | 09:11AM |
| 12 | speed up the process. | 09:11AM |
| 13 | Finally, we have received a lot of questions about | 09:11AM |
| 14 | the timeline associated with that special master.  We anticipate | 09:11AM |
| 15 | having the vast majority of all eligibility notices on Other | 09:11AM |
| 16 | Loss claims issued by the first week of February.  That will | 09:11AM |
| 17 | start the thirty-day clock on all the claims.  We will not be | 09:11AM |
| 18 | able to grant deadline extensions for those claims. | 09:11AM |
| 19 | So the deadline for almost all the Other Loss | 09:11AM |
| 20 | claims should expire some time in the first week of March.  Once | 09:11AM |
| 21 | we have a good idea of how many people want a special master | 09:12AM |
| 22 | review and how many want to be paid, we'll be able to make a | 09:12AM |
| 23 | better evaluation of how long it will take.  However, because | 09:12AM |
| 24 | all of the claim documents are already in because we've reviewed | 09:12AM |
| 25 | all the claims, it will not take as long as the claim process. | 09:12AM |

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 126 of 258
Case 2:11-cv-22408-MGC Document 82-6 Entered on FLSD Docket 09/14/2018 Page 13 of 37

12

| | |
|---|---|
| 1 | It will be a shorter process. | 09:12AM |
| 2 | THE COURT: All right. We'll have some indication by | 09:12AM |
| 3 | next meeting, I would think. | 09:12AM |
| 4 | MR. WOODY: I think so. | 09:12AM |
| 5 | As I mentioned, have begun issuing eligible | 09:12AM |
| 6 | notices on these claims. So far, we've issued just over a | 09:12AM |
| 7 | thousand on three different claim types. We've issued all the | 09:12AM |
| 8 | eligibility notices for bodily injury and foreclosure and short | 09:12AM |
| 9 | sale claims and we've issued 200 notices on PRALE claims. And | 09:12AM |
| 10 | we'll continue to issue notices, as I mentioned, on all of the | 09:12AM |
| 11 | remaining PRALE claims as well as the lost rent, use and sales | 09:12AM |
| 12 | claims. | 09:12AM |
| 13 | So we've issued just over 1,000. We've received | 09:12AM |
| 14 | responses on 176 claims. 159 offers have been accepted. | 09:12AM |
| 15 | Seventeen have requested the special master review, which puts | 09:13AM |
| 16 | our acceptance rate at ninety percent. | 09:13AM |
| 17 | And we've also begun issuing payment on Other Loss | 09:13AM |
| 18 | claims. We began earlier this week. We've paid forty-three | 09:13AM |
| 19 | claims and disbursed $393,800. We'll continue make payments on | 09:13AM |
| 20 | accepted claims, and should have payment out pretty quickly | 09:13AM |
| 21 | within the date of acceptance and resolve as many of these | 09:13AM |
| 22 | claims as we can. | 09:13AM |
| 23 | Finally, our contact information, the best place | 09:13AM |
| 24 | to obtain the W-9 verification form I mentioned are on our | 09:13AM |
| 25 | website at www3.BrownGreer.com/drywall. If you need to email | 09:13AM |

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 127 of 258
Case 1:11-cv-22408-MGC Document 82-6 Entered on FLSD Docket 09/14/2016 Page 14 of 37

13

1    us, you can do it at CDWquestions@BrownGreer.  And you can call      09:13AM

2    us at 866-866-1729.                                                 09:13AM

3              THE COURT:  Thank you.                                    09:13AM

4              The next item is Omnibus Class Actions.  Anything         09:13AM

5    on that?                                                            09:14AM

6              MR. LEVIN:  Just one personal thing.                      09:14AM

7              The PSC has listened to the BrownGreer report each        09:14AM

8    and every month, and I just want BrownGreer to know how            09:14AM

9    appreciative we have of the work they are doing and the manner      09:14AM

10   in which they're doing the work.                                    09:14AM

11             THE COURT:  Yes.  They've done a good job, and I          09:14AM

12   appreciate that also.                                               09:14AM

13             MR. LEVIN:  With regard to the Class Action Complaints,   09:14AM

14   the Omnibus, there's just one aspect of the complaints that's       09:14AM

15   outstanding.  We have a complaint against SASAC in China right      09:14AM

16   now.  And, if SASAC behaves as CMBM behaved and BMBM behaved in     09:14AM

17   the past and doesn't enter an appearance and come in here, for      09:14AM

18   whatever reasons, but appear in these proceedings, at that          09:14AM

19   point, in about six weeks, we're prepared to take a default         09:14AM

20   judgment against SASAC.  And then we will pursue assessment of a    09:15AM

21   class action as we pursued against CMBM and BMBM an assessment      09:15AM

22   of damages against SASAC, which is the umbrella corporation that    09:15AM

23   has a lot of interests in the United States.                        09:15AM

24             THE COURT:  How about Class Action, the last item?        09:15AM

25             MR. LEVIN:  That would be it, sir.                        09:15AM

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 128 of 258
Case 2:11-cv-22408-MGC EDocument 82-6 Entered on FLSD Docket 09/14/2018 Page 15 of 37

14

| | | |
|---|---|---|
| 1 | THE COURT:  The next item is Fee Expense. | 09:15AM |
| 2 | MR. LEVIN:  There's nothing new on that. | 09:15AM |
| 3 | THE COURT:  In connection with that, I have received | 09:15AM |
| 4 | from Danny Becnel letters showing copies to you and to Arnold. | 09:15AM |
| 5 | Danny, you want to flesh that out for me, the | 09:15AM |
| 6 | issue here on Sean Payton. | 09:15AM |
| 7 | MR. BECNEL:  Judge, as you know, Sean was living across | 09:15AM |
| 8 | the lake in the Super Bowl year, in Mandeville, in a rather | 09:16AM |
| 9 | expensive home.  He and his wife, the minute it was finished, | 09:16AM |
| 10 | had to move out.  He then had to live in the Saint's training | 09:16AM |
| 11 | camp for the whole season, and his wife wound up having to get | 09:16AM |
| 12 | another house.  So she moved.  The Chinese drywall case really | 09:16AM |
| 13 | resulted in the dissolution of their marriage. | 09:16AM |
| 14 | And he approached me.  As you know, I represent | 09:16AM |
| 15 | many of the Saints:  Mickey Loomis, the general manager, Drew | 09:16AM |
| 16 | Brees and many of the team members. | 09:16AM |
| 17 | And so I handled that case by myself.  I | 09:16AM |
| 18 | negotiated the settlement by myself.  And I don't mind if all | 09:16AM |
| 19 | the other cases I have with the plaintiff's committee gets a | 09:16AM |
| 20 | fee.  But this case was purely me.  And I could have settled it | 09:16AM |
| 21 | probably a week after they were notified that I had Sean Payton. | 09:17AM |
| 22 | In any event, I'd like to get paid on it.  And | 09:17AM |
| 23 | it's been, I think I said -- I only got in at 1 o'clock so I | 09:17AM |
| 24 | didn't even have time to get my file this morning from Kansas | 09:17AM |
| 25 | City.  But I'd like to get paid on it. | 09:17AM |

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 129 of 258
Case 2:11-cv-22408-MGC-EEF Document 82-6 Entered on FLSD Docket 09/14/2018 Page 18 of 37

15

```
 1              THE COURT:  All right.                            09:17AM

 2         MR. BECNEL:  And I don't think the PSC has a claim     09:17AM

 3    against those funds.                                        09:17AM

 4              I did the inspections myself.  In fact, it was    09:17AM

 5    inspected five different times.  Because it was kind of the 09:17AM

 6    poster child of how do you find what's wrong with the Chinese 09:17AM

 7    drywall case.                                               09:17AM

 8         THE COURT:  Well, you know, in this case, I guess the  09:17AM

 9    beauty of it is so forth, from the standpoint of the litigants 09:17AM

10    themselves, is that the defendant, the settlements call for the 09:17AM

11    defendant paying the attorney fees.                         09:17AM

12              Let me hear from Arnold.                          09:18AM

13         MR. LEVIN:  I will not hold it against Danny Becnel and 09:18AM

14    Sean Payton that they've had their way with the Philadelphia 09:18AM

15    Eagles for some time now.                                   09:18AM

16              Getting to the merits of Mr. Becnel's request.   09:18AM

17    The fee committee has conducted extensive interviews with every 09:18AM

18    plaintiff's counsel that is seeking a common benefit fee, and 09:18AM

19    the fee committee has taken all of that under advisement.  And I 09:18AM

20    can assure Mr. Becnel that those issues are being discussed by 09:18AM

21    the fee committee.                                          09:18AM

22              There will be a report, and he will be able to   09:18AM

23    review that report and take whatever action.                09:18AM

24              I might add that, at the interview, the situation 09:18AM

25    with Sean Payton was not mentioned by Mr. Becnel.  However, the 09:18AM
```

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 130 of 258
Case 2:11-cv-22408-MGC Document 62-6 Entered on FLSD Docket 09/14/2018 Page 17 of 37

16

| | | |
|---|---|---|
| 1 | fee committee is available -- is aware of his representation of | 09:18AM |
| 2 | the lead plaintiff in the omnibus complaint, and we will treat | 09:19AM |
| 3 | him the way we treat everybody as to when a common benefit fee, | 09:19AM |
| 4 | how it advanced the litigation.  And also there's a segment of | 09:19AM |
| 5 | the fee for the individual attorneys on their retainer | 09:19AM |
| 6 | agreements.  And that is being actively pursued and is a very | 09:19AM |
| 7 | prolix and complex process, and Mr. Becnel will be treated as | 09:19AM |
| 8 | everybody else is.  And he will have -- there will be a report, | 09:19AM |
| 9 | the Court will see the report.  Danny Becnel could object to the | 09:19AM |
| 10 | report, he could deal with it afterwards if he doesn't like what | 09:19AM |
| 11 | the fee committee has done with regard to his particular claim. | 09:19AM |
| 12 | But I can assure Danny that:  We know who he is, | 09:19AM |
| 13 | we know who Sean Payton is, we know what this litigation is and | 09:19AM |
| 14 | we will afford him due process. | 09:19AM |
| 15 | THE COURT:  Okay. | 09:20AM |
| 16 | MR. BECNEL:  Your Honor, let me just reply to that. | 09:20AM |
| 17 | As you know, I got Sean Payton and the Saints to | 09:20AM |
| 18 | do a commercial.  I paid the fee for sending to the advertising | 09:20AM |
| 19 | counsel with the bar association, and it had all kinds of | 09:20AM |
| 20 | commotion with it.  And we got a lot of cases as a result of the | 09:20AM |
| 21 | public service announcement he made on Chinese Drywall. | 09:20AM |
| 22 | The case was -- he and my first client, | 09:20AM |
| 23 | Dr. Parent, the dentist, that's the first two cases.  She's a | 09:20AM |
| 24 | Taishan case, he was a Knauf case. | 09:20AM |
| 25 | And, you know, I just don't think I should have to | 09:20AM |

1   wait, especially with my health situation periodically.  I don't   09:20AM

2   want to be here with my estate having to deal with something   09:20AM

3   that I should have been paid on and could have been paid on   09:20AM

4   directly, right off the bat.   09:21AM

5           THE COURT:  The interesting thing in this particular   09:21AM

6   case is that usually, as everybody knows, the fee comes from the   09:21AM

7   litigants.  The litigants work out some arrangement with their   09:21AM

8   attorney.  They hire the attorney, they agree to pay the   09:21AM

9   attorney a fee.  Then the case comes to MDL.  The MDL sets an   09:21AM

10  amount for common benefit fee.  That common benefit generally   09:21AM

11  comes from the attorney's fee portion, not in addition to the   09:21AM

12  claimant.   09:21AM

13          But, in this particular case, the interesting   09:21AM

14  thing was that the concept of the settlement was that the   09:21AM

15  claimants got their homes fixed, 100 percent of their homes   09:21AM

16  fixed; and, in addition to that, the defendants paid a fee.  So   09:21AM

17  the claimants didn't have to pay anything.  They got everything   09:21AM

18  done for them and plus their attorney fees.  So it's a little   09:22AM

19  different in this situation.   09:22AM

20          But I hear your comments, and nobody's going to   09:22AM

21  get any fee until I approve the fees.  So I'm going to give   09:22AM

22  everybody an opportunity express themselves, and I certainly   09:22AM

23  will take all of that into consideration.  Including a   09:22AM

24  fast-track type situation.  There are some people who may have   09:22AM

25  some issues, health and otherwise, that need to be dealt with,   09:22AM

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 132 of 258
Case 2:11-cv-22408-MGC Document 84-6 Entered on FLSD Docket 09/14/2018 Page 19 of 37

18

1    and I'm conscious of that.  Thanks for bringing it to my                    09:22AM

2    attention.                                                                 09:22AM

3                    How about the Remediation Program, anything,                09:22AM

4    Kerry?                                                                      09:22AM

5              MR. MILLER:  Good morning, again, Your Honor.  Kerry             09:22AM

6    Miller.                                                                     09:22AM

7                    Nothing really new to report, Your Honor.  The             09:22AM

8    remediation program is into I think the last inning of the game.           09:22AM

9    Moss is complete with ninety-plus percent of the homes.  They're           09:23AM

10   trying to do their last shift, including the last group of pro             09:23AM

11   se homes we talked about last time, get those started this                 09:23AM

12   spring, so that everything's done this year, Your Honor.                    09:23AM

13             THE COURT:  Yes.                                                  09:23AM

14                   As everyone knows, with the Remediation Program,           09:23AM

15   as I mentioned several times, in this particular case, rather              09:23AM

16   than wait for the case to get over the defendants have                     09:23AM

17   undertaken the remediation program which even predated the                 09:23AM

18   settlement of the case.  And, so far, they've been able to                 09:23AM

19   remediate several thousand homes, which has worked out well.               09:23AM

20                   How about the IN\EX, Banner, Knauf settlement?             09:23AM

21             MR. LEVIN:  Nothing with regard to that.                         09:23AM

22             THE COURT:  Anything on Shared Costs?                            09:23AM

23             MR. LEVIN:  Nothing, sir.                                        09:23AM

24             THE COURT:  What about Taishan defendants?                       09:23AM

25             MR. LEVIN:  Well, if we're in the ninth inning with             09:23AM

| | |
|---|---|
| 1 | regard to the Knauf remediation program, we're in the first | 09:24AM |
| 2 | inning or perhaps just batting practice with regard to Taishan. | 09:24AM |
| 3 | We are pursuing assets. We are pursuing | 09:24AM |
| 4 | litigation in Portland, Oregon. We have determined that Taishan | 09:24AM |
| 5 | affiliates have brought suit in Portland, Oregon and have | 09:24AM |
| 6 | utilized our court system, our federal court system, to pursue | 09:24AM |
| 7 | their commercial needs, where they have ignored us in the | 09:24AM |
| 8 | Eastern District of Louisiana and created another great wall | 09:24AM |
| 9 | between us and China. | 09:24AM |
| 10 | THE COURT: Is there any money in that? | 09:24AM |
| 11 | MR. LEVIN: There's $50,000 for attorneys fees in the | 09:24AM |
| 12 | case that was settled. We're not interested in hurting the | 09:24AM |
| 13 | attorneys that have handled the case there for the $50,000. | 09:24AM |
| 14 | But what we are interested in is finding out what | 09:24AM |
| 15 | their ongoing business is. It seems that they are purchasing | 09:24AM |
| 16 | timber in the Northwest because of this a shortage of timber in | 09:24AM |
| 17 | China. Just like we had a shortage of drywall and purchased | 09:25AM |
| 18 | from China drywall. | 09:25AM |
| 19 | We have not seen the settlement agreement. We've | 09:25AM |
| 20 | been precluded so far from seeing the settlement agreement. But | 09:25AM |
| 21 | we think the settlement agreement contains clauses with ongoing | 09:25AM |
| 22 | activities between the parties to the settlement. That's just | 09:25AM |
| 23 | one aspect of it. | 09:25AM |
| 24 | Once we perfect service on SASAC, and either they | 09:25AM |
| 25 | come in and defend or we get a default judgment against SASAC, | 09:25AM |

Case 2:09-md-02047-EEF-MBN  Document 22380-14  Filed 12/02/19  Page 134 of 258
Case 1:11-cv-22408-MGC-EBD  Document 82-6  Entered on FLSD Docket 09/14/2018  Page 25 of 37

20

1  that umbrella corporation has petroleum, banking and other                    09:25AM

2  interests around the world, including in the United States.                   09:25AM

3            And we just want to assure those poor unfortunates                  09:25AM

4  that didn't have Knauf board, so that their homes could be                    09:25AM

5  remediated, and had Taishan board, that eventually we are going               09:25AM

6  to make them whole.  But, unfortunately, in the process, many of              09:26AM

7  them have had foreclosures and gone bankrupt.                                 09:26AM

8        THE COURT:  As we know, the board that we're talking                    09:26AM

9  about was manufactured by basically two entities, one Knauf and               09:26AM

10  the other Taishan entities.                                                  09:26AM

11            After discovery in trial, the Knauf entities                       09:26AM

12  settled the case.  The Taishan entities did not.  They resisted              09:26AM

13  service, and then they resisted appearance.  And, eventually,                09:26AM

14  they showed up in court participating in an appeal.  They lost               09:26AM

15  the appeal, and then they decided that they were going to walk               09:26AM

16  away from the court because they didn't get their way.  They're              09:26AM

17  going to take their ball and go home, so to speak.                           09:26AM

18            And, as a result, I gave them an opportunity to                    09:26AM

19  explain why they did that.  They refused to participate in the               09:27AM

20  proceedings, so I found them in content of court.  And, in                   09:27AM

21  addition to fining them, I provided that a percentage of any                 09:27AM

22  fees or profits that they earned in this country, by either them             09:27AM

23  or any of their affiliates, would be seized by the Court.                    09:27AM

24            So I would direct counsel to determine whether or                  09:27AM

25  not there's any assets of that company, and I'll issue a seizure             09:27AM

| | | |
|---|---|---|
| 1 | order wherever they happen to be in the United States.  Because | 09:27AM |
| 2 | I do sit, as an MDL judge, I sit as a district judge in every | 09:27AM |
| 3 | district in the United States.  So let me know if there's any | 09:27AM |
| 4 | assets, and I will seize them. | 09:27AM |
| 5 | MR. BECNEL:  May it please the Court, I want to give | 09:27AM |
| 6 | the Court some additional information on Chinese assets. | 09:27AM |
| 7 | About five weeks ago, six weeks, Cargill and then | 09:28AM |
| 8 | ADM filed suit in St. John Parish in our court system for money | 09:28AM |
| 9 | against Syngenta, which produced genetically engineered corn. | 09:28AM |
| 10 | There is a separate MDL which we had a hearing on yesterday in | 09:28AM |
| 11 | Kansas. | 09:28AM |
| 12 | But they, Chinese, refused to accept it. | 09:28AM |
| 13 | Although, they already paid those companies.  And so the corn is | 09:28AM |
| 14 | all coming back, which has been paid for by China. | 09:28AM |
| 15 | And I think we would have the ability -- -as the | 09:28AM |
| 16 | Court knows, the major grain exports come from Reserve, | 09:28AM |
| 17 | Louisiana, with all of the grain elevators there.  And we may be | 09:28AM |
| 18 | able to seize those grain.  You know, it could be sold here in | 09:29AM |
| 19 | the US for cattle feed and other things.  But it's something | 09:29AM |
| 20 | else that the Chinese sent back, that we may have an ability to | 09:29AM |
| 21 | get those assets. | 09:29AM |
| 22 | THE COURT:  Okay.  Well, if there's some assets, any | 09:29AM |
| 23 | kind of assets from those companies or the affiliates of those | 09:29AM |
| 24 | companies, I will act on it.  Because I do owe the system the | 09:29AM |
| 25 | duty to effect my orders, and I ordered them to do that.  They | 09:29AM |

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 136 of 258
Case 2:11-cv-22408-MGC Document 84-6 Entered on FLSD Docket 09/14/2018 Page 23 of 37

22

| | |
|---|---|
| 1 | violated it. I held them in contempt. So I'll stand behind | 09:29AM |
| 2 | that. | 09:29AM |
| 3 | MR. DAVIS: Your Honor, we'll prepare the appropriate | 09:29AM |
| 4 | papers for the Court. | 09:29AM |
| 5 | But we'll ask Mr. Becnel or anyone else that has | 09:29AM |
| 6 | information, if they could get it to us and they could provide | 09:29AM |
| 7 | us the links to CMDM or BMDM or whoever it is so that we can | 09:29AM |
| 8 | make those links. | 09:29AM |
| 9 | THE COURT: Let's make sure it's an affiliate or the | 09:29AM |
| 10 | company itself. Because I don't want to wrongfully seize | 09:30AM |
| 11 | anything. But I will seize matters or material. | 09:30AM |
| 12 | MR. LEVIN: Your Honor, we would request that madam | 09:30AM |
| 13 | court reporter give us on an expedited basis, which we'll pay | 09:30AM |
| 14 | for obviously, the transcript of these proceedings. Because I | 09:30AM |
| 15 | think this becomes very relevant for the judiciary in Portland, | 09:30AM |
| 16 | Oregon to see. | 09:30AM |
| 17 | MR. BECNEL: In addition to that, Judge, there's an MDL | 09:30AM |
| 18 | judge on that very case. And, yesterday, at the hearing, both | 09:30AM |
| 19 | ADM and Cargill says they didn't want to be in the MDL; they | 09:30AM |
| 20 | want it to come back. Because almost all of the grain that goes | 09:30AM |
| 21 | to China is shipped through Reserve. | 09:30AM |
| 22 | MR. DAVIS: If you'll got us that link, Danny, so we | 09:30AM |
| 23 | can make the connection, that that will be helpful. Thank you. | 09:30AM |
| 24 | THE COURT: Venture Supply, anything on Venture Supply? | 09:30AM |
| 25 | MR. LEVIN: No, sir. Just that the Virginia settlement | 09:30AM |

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 137 of 258
Case 1:11-cv-22408-MGC Document 84-6 Entered on FLSD Docket 09/14/2016 Page 24 of 37

23

| | |
|---|---|
| 1 | is just between Your Honor, Judge Wall, Mr. Serpe and Dewan and | 09:30AM |
| 2 | others that have been working with them, is being run very | 09:31AM |
| 3 | effectively. | 09:31AM |
| 4 | THE COURT:  Okay. * | 09:31AM |
| 5 | Plaintiff and Defendant Profile, Fact Forms, | 09:31AM |
| 6 | anything? | 09:31AM |
| 7 | MR. LEVIN:  Nothing, sir. | 09:31AM |
| 8 | THE COURT:  Nothing on Frequently Asked Questions. | 09:31AM |
| 9 | No pro se claimants? | 09:31AM |
| 10 | MR. LEVIN:  Mr. Johnston has informed me that he | 09:31AM |
| 11 | needn't come here -- | 09:31AM |
| 12 | THE COURT:  He is here. | 09:31AM |
| 13 | MR. JOHNSTON:  It's been so interesting that I decided | 09:31AM |
| 14 | to stay. | 09:31AM |
| 15 | Let me make a brief comment for the Court. | 09:31AM |
| 16 | Since the November 25th status conference, I have | 09:31AM |
| 17 | worked certainly very, very well with counsel for Knauf and | 09:31AM |
| 18 | staff.  My office has provided every document, every piece of | 09:31AM |
| 19 | paper for every one of the group that I've called the late Knauf | 09:31AM |
| 20 | claimants, which we're all aware of, that we ended up being | 09:31AM |
| 21 | informed by Kerry Miller at the last status that remediation was | 09:32AM |
| 22 | going to be accomplished.  And I think it is going very, very | 09:32AM |
| 23 | well.  And I just want to notify the Court that we've had | 09:32AM |
| 24 | back-and-forth, but there's never been a negative moment since | 09:32AM |
| 25 | the last status conference.  And we'll continue try to help | 09:32AM |

Case 2:09-md-02047-EEF-MBN  Document 22380-14  Filed 12/02/19  Page 138 of 258
Case 1:11-cv-22408-MGC  Document 82-6  Entered on FLSD Docket 09/14/2016  Page 25 of 37

24

| | |
|---|---|
| 1 | these last group of people to get what they want, which is of | 09:32AM |
| 2 | course to have the remediation of their properties. | 09:32AM |
| 3 | THE COURT:  Okay.  I appreciate your work on it. | 09:32AM |
| 4 | As you all know, we had a number of pro se | 09:32AM |
| 5 | claimants.  They haven't hired attorneys.  They don't wish to | 09:32AM |
| 6 | hire an attorney.  And so I appointed Bob Johnston to help them | 09:32AM |
| 7 | navigate through this system.  He's been talking to them.  As a | 09:32AM |
| 8 | result of his efforts and efforts of Knauf, these individuals | 09:32AM |
| 9 | have been taken care of.  So I appreciate your work. | 09:32AM |
| 10 | MR. LEVIN:  Your Honor, I apologize to Bob.  Because he | 09:33AM |
| 11 | had told me before this hearing that he couldn't be here for the | 09:33AM |
| 12 | complete hearing; he had a personal situation.  And I didn't | 09:33AM |
| 13 | think he was in the courtroom when I started off. | 09:33AM |
| 14 | THE COURT:  All right. | 09:33AM |
| 15 | Anything on -- | 09:33AM |
| 16 | MR. JOHNSTON:  Did you hear what I said?  It was so | 09:33AM |
| 17 | interesting that I just had to stay. | 09:33AM |
| 18 | THE COURT:  Okay. | 09:33AM |
| 19 | Physical Evidence. | 09:33AM |
| 20 | MR. LEVIN:  Mr. Davis will respond to that. | 09:33AM |
| 21 | MR. DAVIS:  Yes, Your Honor. | 09:33AM |
| 22 | In light of your comments earlier, prior status | 09:33AM |
| 23 | conferences, we've met -- | 09:33AM |
| 24 | THE COURT:  This is the issue in the Physical Evidence. | 09:33AM |
| 25 | In this some type situation, the exposure to the board has | 09:33AM |

Case 2:09-md-02047-EEF-MBN  Document 22380-14  Filed 12/02/19  Page 139 of 258
Case 1:11-cv-22408-MGC  Document 62-6  Entered on FLSD Docket 09/14/2016  Page 20 of 37

25

1   created physical problems with a lot of appliances, particularly          09:33AM

2   with the copper-fit appliances.  It has some negative effect              09:33AM

3   object those appliances.  Well, those appliances and a lot of             09:33AM

4   other board had to be stored.  And you can imagine, there may be          09:33AM

5   hundreds or thousands of refrigerators and things of that sort.           09:34AM

6   The issue now is what do we do with it?  It's not really fair             09:34AM

7   for the defendants to be required to continue to pay rent for             09:34AM

8   these warehouses that I required them to keep the material in.            09:34AM

9          So we have to recognize, however, the case is not               09:34AM

10  over and some proof may be needed.                                        09:34AM

11         So it seems to me that it's legitimate and                      09:34AM

12  appropriate for the defendants or liaison counsel and defendants         09:34AM

13  to file a motion with the Court to find some other way.  And             09:34AM

14  what we would do is take pictures of it, take samples of it,             09:34AM

15  take video of it and have individuals look at it so that they            09:34AM

16  can be able to testify.                                                   09:34AM

17         The reason I suggest the motion is that so there's              09:34AM

18  no spoliation issue that's raised by a defendant later on saying         09:34AM

19  that you intentionally and maliciously destroyed this material           09:35AM

20  so that evidence should be used against you.  I don't see it             09:35AM

21  that way.  It's a practicality.                                          09:35AM

22         So file the motion and I'll authorize another way               09:35AM

23  of preserving that evidence.                                             09:35AM

24       MR. DAVIS:  Thank you, Your Honor.                                09:35AM

25         And, in light of that, we've also had discussions              09:35AM

```
 1    with Ms. Bass and Ms. Wimberly of the Home Builders committee to        09:35AM

 2    try to reach some type of proposal that we will present to the          09:35AM

 3    Court.                                                                  09:35AM

 4              We appreciate that, Your Honor.                               09:35AM

 5         THE COURT:  Okay.                                                  09:35AM

 6              Anything from BASS?  From the builder, Moss?  Any             09:35AM

 7    problems?                                                               09:35AM

 8              I always ask the Moss representative to be here.              09:35AM

 9    In case any litigants or lawyers have any issues, they can take         09:35AM

10    it up directly with the remediation program manager, who is in         09:35AM

11    charge of all of this.                                                 09:36AM

12         MR. MILLER:  Your Honor, Kerry Miller again.                      09:36AM

13              Phil Adams from Moss is here, as he has been for             09:36AM

14    the last twenty or so status conferences.  Maybe more, I can          09:36AM

15    remember.  And, if there are any issues, this presents a nice         09:36AM

16    forum form discussion.                                                 09:36AM

17              But what we've seen, Your Honor, is the                      09:36AM

18    remediation program has certainly peaked and is on the down           09:36AM

19    swing.  We don't have nearly the issues we used to.                   09:36AM

20              But, to the extent they do exist, Mr. Adams is              09:36AM

21    here and certainly available to address them while in New             09:36AM

22    Orleans.                                                               09:36AM

23         THE COURT:  Yes.  The people who are interested in               09:36AM

24    remediating their homes have access to professional                   09:36AM

25    well-thought-of, well documented national group that's been          09:36AM
```

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 141 of 258
Case 1:11-cv-22408-MGC Document 64-6 Entered on FLSD Docket 09/14/2018 Page 28 of 37

27

| | |
|---|---|
| 1 | doing this. | 09:36AM |
| 2 | And, because of the numbers that they've worked | 09:36AM |
| 3 | on, they're able to have not only the quality but also some | 09:37AM |
| 4 | break for the numbers of cases that they're handling, and | 09:37AM |
| 5 | they're able to do it and do it efficiently.  While this has | 09:37AM |
| 6 | been going on.  So individuals have applied for this program. | 09:37AM |
| 7 | And, as in all remediation or as in all building programs, | 09:37AM |
| 8 | sometimes things don't work out.  And so Moss has been able to | 09:37AM |
| 9 | be at these meetings; and, any problems that people have had, | 09:37AM |
| 10 | they've been able to bring them up at these meetings and they've | 09:37AM |
| 11 | been able to get attention immediately for it. | 09:37AM |
| 12 | So I think the program has worked very well, and I | 09:37AM |
| 13 | appreciate the cooperation of the parties in doing it. | 09:37AM |
| 14 | MR. LEVIN:  Your Honor, lead and liaison counsel have | 09:37AM |
| 15 | monitored what's going on with the remediation.  There's emails | 09:37AM |
| 16 | every day confirming various problems and the resolution of | 09:37AM |
| 17 | various problems.  And we can say that, with the undertaking | 09:38AM |
| 18 | that Knauf has made through Kerry and what Moss has done, that | 09:38AM |
| 19 | we only wish that the Taishan defendants behaved in the manner | 09:38AM |
| 20 | in which Knauf, their counsel and Moss have behaved to the | 09:38AM |
| 21 | clients that we represent. | 09:38AM |
| 22 | THE COURT:  All right. | 09:38AM |
| 23 | Any other items on the agenda? | 09:38AM |
| 24 | The Louisiana Attorney General, anything from the | 09:38AM |
| 25 | attorney general? | 09:38AM |

| | | |
|---|---|---|
| 1 | The representative says no. | 09:38AM |
| 2 | The next meeting is February the 12th; and, | 09:38AM |
| 3 | following that, it's March the 26th. March 26th. | 09:38AM |
| 4 | MR. MILLER: Your Honor, one thing before we break. | 09:38AM |
| 5 | On the issue of Already Remediated Homes, that was | 09:38AM |
| 6 | right before the Louisiana Attorney General. | 09:38AM |
| 7 | Your Honor, Sean Payton was the actually first ARA | 09:38AM |
| 8 | that settled this part of that component of the class action | 09:38AM |
| 9 | settlement. That was a protocol I had worked out with Mr. Davis | 09:38AM |
| 10 | in terms of documentation and putting books together and so on | 09:39AM |
| 11 | and so forth. | 09:39AM |
| 12 | On that, Your Honor, we've settled about 260 of | 09:39AM |
| 13 | those. We have about 150 left. The 260 we've settled were the | 09:39AM |
| 14 | cases that had the best documentation, such as Mr. Payton's home | 09:39AM |
| 15 | and others like that, where the attorneys kept and the clients | 09:39AM |
| 16 | kept very good records of what went on. | 09:39AM |
| 17 | For the 150 that are left, maybe some fall in that | 09:39AM |
| 18 | category. But the others, at least to us, appear to have some | 09:39AM |
| 19 | evidentiary issues and so are more difficult to resolve. | 09:39AM |
| 20 | What we want to do, Your Honor is perhaps set up | 09:39AM |
| 21 | mediations, perhaps set up face-to-face meetings with counsel | 09:39AM |
| 22 | and their clients on these issues to try and wrap these up this | 09:39AM |
| 23 | year while we wrap up the other aspects of the program. | 09:39AM |
| 24 | THE COURT: That's a good idea. | 09:39AM |
| 25 | What's the total number? Some thousands? | 09:39AM |

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 143 of 258
Case 1:11-cv-22408-MGC Document 82-6 Entered on FLSD Docket 09/14/2018 Page 30 of 37

29

```
 1          MR. MILLER:  No.  Already remediated homes?  About 410.    09:39AM
 2   So we've gotten about 260 done with about 150 left to go.         09:39AM
 3          THE COURT:  All right.                                     09:40AM
 4          MR. MILLER:  Your Honor, on that score, I've recently      09:40AM
 5   switched firms.  I know that they were looking for some contact   09:40AM
 6   information in terms of getting additional information in on       09:40AM
 7   these already remediated homes that are unsettled or setting      09:40AM
 8   mediation, things of that nature.  I provided Duncan, your law    09:40AM
 9   clerk, with my new email address.  That will be available on the  09:40AM
10   Court's website.  And certainly me and the staff that I have at   09:40AM
11   my new firm will be very attentive to this issue moving forward   09:40AM
12   at this point.                                                    09:40AM
13          THE COURT:  Good luck to you at the new firm.  I know      09:40AM
14   you'll do a good job for them.                                    09:40AM
15              Court will stand in recess.  Thank you.                09:40AM
16              (9:38 a.m., proceedings recessed.)                     09:40AM
17                                                                     09:41AM
18
19                       CERTIFICATE
20
21          I, Susan A. Zielie, Official Court Reporter, do hereby
22   certify that the foregoing transcript is correct.
23
24                       /S/ SUSAN A. ZIELIE, FCRR
25                       _____
                              Susan A. Zielie, FCRR
```

## $

**$1,000** [1] - 9:5
**$10,000** [2] - 9:6, 9:7
**$14,400** [1] - 9:8, 9:9
**$2,500** [1] - 9:10
**$393,800** [1] - 12:19
**$50,000** [2] - 19:11, 19:13

## /

**/S** [1] - 29:24

## 1

**1** [1] - 14:23
**1,000** [1] - 12:13
**1,674** [1] - 6:17
**1.7** [1] - 7:19
**10,000** [1] - 6:16
**100** [2] - 8:16, 17:15
**11,770** [1] - 7:14
**1100** [1] - 2:18
**12th** [2] - 7:14, 28:2
**150** [3] - 28:13, 28:17, 29:2
**159** [1] - 12:14
**176** [1] - 12:14
**19,726** [1] - 6:9
**19106** [1] - 2:6

## 2

**2,527** [1] - 8:14
**200** [2] - 8:17, 12:9
**2015** [2] - 1:6, 4:1
**2047** [2] - 1:5, 4:5
**21.3** [1] - 8:3
**22** [2] - 1:6, 4:1
**22,491** [1] - 6:8
**23rd** [1] - 8:25
**2450** [1] - 2:15
**25th** [1] - 23:16
**260** [3] - 28:12, 28:13, 29:2
**26th** [2] - 28:3

## 3

**3600** [1] - 2:11
**37.7** [1] - 9:13
**3700** [1] - 2:18

## 4

**4,000** [1] - 8:13
**400** [1] - 2:14
**410** [1] - 29:1
**425** [1] - 2:8

## 428

**428** [1] - 8:14
**44** [1] - 8:14

## 5

**500** [2] - 1:18, 2:6
**504.589.7781** [1] - 1:20
**504.593.0849** [1] - 2:22
**510** [1] - 2:6
**54.8** [1] - 7:18
**546** [1] - 2:21

## 7

**70086** [1] - 2:9
**701** [1] - 2:11
**70113** [1] - 2:4
**70130** [3] - 1:19, 2:15, 2:21
**70139** [1] - 2:12
**70163** [1] - 2:19

## 8

**820** [1] - 2:3
**866-866-1729** [1] - 13:2

## 9

**9,983** [1] - 6:17
**9:00** [2] - 1:7, 4:2
**9:38** [1] - 29:16

## A

**A.M** [1] - 1:7, 4:2
**a.m** [1] - 29:16
**abbreviate** [1] - 8:12
**ability** [2] - 21:15, 21:20
**able** [15] - 4:24, 7:12, 7:22, 8:22, 11:18, 11:22, 15:22, 18:18, 21:18, 25:16, 27:3, 27:5, 27:8, 27:10, 27:11
**abundance** [1] - 7:9
**accept** [2] - 10:4, 21:12
**acceptance** [3] - 10:24, 12:16, 12:21
**accepted** [3] - 10:11, 12:14, 12:20
**accepts** [1] - 10:22
**access** [1] - 26:24
**accomplished** [1] - 23:22
**act** [1] - 21:24
**Action** [2] - 13:13, 13:24
**action** [6] - 5:2, 10:10, 10:13, 13:21, 15:23, 28:8
**Actions** [1] - 13:4
**actively** [2] - 6:10, 16:6
**activities** [1] - 19:22
**Adams** [2] - 26:13, 26:20
**add** [1] - 15:24
**addition** [4] - 17:11, 17:16, 20:21, 22:17
**additional** [3] - 11:5, 21:6, 29:6
**address** [3] - 8:2, 26:21, 29:9
**ADM** [2] - 21:8, 22:19
**admitted** [1] - 11:10
**advanced** [1] - 16:4
**advertising** [1] - 16:18
**advisement** [1] - 15:19
**affiliate** [1] - 22:9
**affiliates** [3] - 19:5, 20:23, 21:23
**afford** [1] - 16:14
**afterwards** [1] - 16:10
**agenda** [3] - 4:14, 4:16, 27:23
**ago** [2] - 4:14, 21:7
**agree** [1] - 17:8
**agreement** [3] - 19:19, 19:20, 19:21
**agreements** [1] - 16:6
**AIDED** [1] - 1:23
**AIRLINE** [1] - 2:8
**ALL** [1] - 1:8
**allow** [2] - 8:23, 9:3
**almost** [2] - 11:19, 22:20
**alternative** [1] - 8:11
**amount** [2] - 9:12, 17:10
**amounts** [2] - 9:4, 9:11
**announcement** [1] - 16:21
**answering** [1] - 5:17
**anticipate** [1] - 11:14
**apologize** [1] - 24:10
**appeal** [2] - 20:14, 20:15
**appear** [2] - 13:18, 28:18
**appearance** [2] - 13:17, 20:13
**APPEARANCES** [1] - 2:1
**appliances** [4] - 25:1, 25:2, 25:3
**applied** [1] - 27:6
**appointed** [1] - 24:6
**appreciate** [6] - 5:23, 13:12, 24:3, 24:9, 26:4, 27:13
**appreciative** [1] - 13:9
**approached** [1] - 14:14
**appropriate** [2] - 22:3, 25:12
**approve** [1] - 17:21
**ARA** [1] - 28:7
**Arnold** [3] - 4:9, 14:4, 15:12
**ARNOLD** [1] - 2:5
**arrangement** [1] - 17:7
**aspect** [2] - 13:14, 19:23
**aspects** [1] - 28:23
**assessment** [3] - 5:19, 13:20, 13:21
**assets** [7] - 19:3, 20:25, 21:4, 21:6, 21:21, 21:22, 21:23
**assigned** [2] - 6:19, 7:11
**assignment** [1] - 7:10
**associated** [1] - 11:14
**association** [1] - 16:19
**assuming** [1] - 10:24
**assure** [3] - 15:20, 16:12, 20:3
**attention** [2] - 18:2, 27:11
**attentive** [1] - 29:11
**Attorney** [2] - 27:24, 28:6
**attorney** [7] - 15:11, 17:8, 17:9, 17:18, 24:6, 27:25
**attorney's** [1] - 17:11
**attorneys** [5] - 16:7, 19:11, 19:13, 24:5, 28:15
**authorize** [1] - 25:22
**authorized** [1] - 7:4
**available** [5] - 8:1, 9:12, 16:1, 26:21, 29:9
**AVENUE** [1] - 2:3
**award** [1] - 10:6
**Award** [4] - 10:7, 10:14, 10:15, 11:5
**aware** [2] - 16:1, 23:20

## B

**B406** [1] - 1:18
**back-and-forth** [1] - 23:24
**ball** [1] - 20:17
**banking** [1] - 20:1
**bankrupt** [1] - 20:7
**Banner** [4] - 6:13, 6:15, 8:7, 18:20
**bar** [1] - 16:19
**BARRIOS** [3] - 2:10, 2:11, 4:22
**basis** [2] - 5:17, 22:13
**BASS** [1] - 26:6
**Bass** [1] - 26:1
**bat** [1] - 17:4
**batting** [1] - 19:2
**beauty** [1] - 15:9
**Becnel** [7] - 14:4, 15:13, 15:20, 15:25, 16:7, 16:9, 22:5
**BECNEL** [6] - 2:7, 14:7, 15:2, 16:16, 21:5, 22:17
**Becnel's** [1] - 15:16
**becomes** [1] - 22:15
**BEFORE** [1] - 1:14
**began** [2] - 7:13, 12:18
**begin** [1] - 8:23
**begun** [3] - 9:17, 12:5, 12:17
**behalf** [1] - 4:12
**behaved** [4] - 13:16, 27:19, 27:20
**behaves** [1] - 13:16
**behind** [1] - 22:1
**benefit** [4] - 15:18, 16:3, 17:10
**BERMAN** [1] - 2:5
**best** [2] - 12:23, 28:14
**better** [1] - 11:23
**between** [4] - 19:9, 19:22, 23:1
**BMBM** [2] - 13:16, 13:21
**BMDM** [1] - 22:7
**board** [5] - 20:4, 20:5, 20:8, 24:25, 25:4
**Bob** [2] - 24:6, 24:10
**bodily** [4] - 5:11, 8:10, 9:5, 12:8
**books** [1] - 28:10
**Bowl** [1] - 14:8
**break** [2] - 27:4, 28:4
**Brees** [1] - 14:16
**brief** [1] - 23:15
**briefly** [1] - 6:6

**bring** [1] - 27:10
**bringing** [1] - 18:1
**brought** [1] - 19:5
**BrownGreer** [5] -
   4:18, 5:8, 6:4, 13:7,
   13:8
**builder** [1] - 26:6
**BUILDERS** [1] - 2:20
**Builders** [1] - 26:1
**building** [1] - 27:7
**business** [1] - 19:15
**BY** [7] - 1:23, 1:23,
   2:3, 2:5, 2:11, 2:17,
   2:20

## C

**camp** [1] - 14:11
**cannot** [1] - 11:5
**care** [1] - 24:9
**Cargill** [2] - 21:7,
   22:19
**Carondelet** [1] - 2:21
**case** [22] - 4:4, 5:22,
   14:12, 14:17, 14:20,
   15:7, 15:8, 16:22,
   16:24, 17:6, 17:9,
   17:13, 18:15, 18:16,
   18:18, 19:12, 19:13,
   20:12, 22:18, 25:9,
   26:9
**CASE** [1] - 4:5
**CASES** [1] - 1:8
**cases** [7] - 4:22, 7:8,
   14:19, 16:20, 16:23,
   27:4, 28:14
**CASTEIX** [1] - 2:10
**categories** [1] - 8:9
**category** [2] - 6:17,
   28:18
**cattle** [1] - 21:19
**caution** [1] - 7:9
**CDWquestions@**
   **BrownGreer** [1] -
   13:1
**CENTRE** [1] - 2:17
**certainly** [5] - 17:22,
   23:17, 26:18, 26:21,
   29:10
**CERTIFICATE** [1] -
   29:19
**certification** [1] - 5:18
**certify** [1] - 29:22
**chance** [1] - 10:13
**change** [2] - 7:1,
   10:16
**changes** [1] - 8:16
**charge** [1] - 26:11
**checks** [4] - 7:15,
   7:17, 7:25

**child** [1] - 15:6
**China** [6] - 13:15,
   19:9, 19:17, 19:18,
   21:14, 22:21
**Chinese** [4] - 4:5, 6:5,
   14:12, 15:6, 16:21,
   21:6, 21:12, 21:20
**CHINESE** [1] - 1:4
**CHINESE-**
**MANUFACTURED**
   [1] - 1:4
**City** [1] - 14:25
**claim** [24] - 5:5, 6:9,
   6:12, 6:18, 6:19,
   6:23, 6:24, 6:25, 7:3,
   7:11, 7:18, 8:13,
   9:14, 9:21, 11:2,
   11:3, 11:8, 11:24,
   11:25, 12:7, 15:2,
   16:11
**claimant** [7] - 7:10,
   7:22, 10:15, 10:18,
   10:22, 11:4, 17:12
**claimants** [13] - 6:18,
   7:2, 7:7, 7:16, 7:23,
   10:3, 10:10, 17:15,
   17:17, 23:9, 23:20,
   24:5
**Claims** [1] - 8:8
**claims** [45] - 6:7, 6:8,
   6:10, 6:13, 6:16, 7:2,
   7:4, 7:5, 7:6, 7:8,
   7:9, 7:13, 7:23, 8:7,
   8:8, 8:9, 8:13, 8:21,
   8:24, 9:4, 9:6, 9:8,
   9:12, 9:18, 10:6,
   10:7, 10:25, 11:6,
   11:16, 11:17, 11:18,
   11:20, 11:25, 12:6,
   12:9, 12:11, 12:12,
   12:14, 12:18, 12:19,
   12:20, 12:22
**class** [4] - 5:2, 5:18,
   13:21, 28:8
**Class** [3] - 13:4,
   13:13, 13:24
**clauses** [1] - 19:21
**clerk** [1] - 29:9
**client** [1] - 16:22
**clients** [4] - 4:20,
   27:21, 28:15, 28:22
**clock** [1] - 11:17
**close** [1] - 5:7
**closely** [1] - 5:24
**closure** [1] - 9:5
**CMBM** [2] - 13:16,
   13:21
**CMDM** [1] - 22:7
**coming** [1] - 21:14
**comment** [1] - 23:15

**comments** [2] - 17:20,
   24:22
**commercial** [2] -
   16:18, 19:7
**committee** [8] - 4:12,
   14:19, 15:17, 15:19,
   15:21, 16:1, 16:11,
   26:1
**COMMITTEE** [2] - 2:2,
   2:10
**common** [4] - 15:18,
   16:3, 17:10
**commotion** [1] - 16:20
**companies** [3] -
   21:13, 21:23, 21:24
**company** [2] - 20:25,
   22:10
**competing** [1] - 7:9
**complaint** [2] - 13:15,
   16:2
**Complaints** [1] -
   13:13
**complaints** [1] - 13:14
**complete** [3] - 6:9,
   18:9, 24:12
**complex** [1] - 16:7
**component** [1] - 28:8
**COMPUTER** [1] - 1:23
**concept** [1] - 17:14
**conducted** [1] - 15:17
**CONFERENCE** [1] -
   1:13
**conference** [5] - 4:7,
   5:21, 7:20, 23:16,
   23:25
**conferences** [2] -
   24:23, 26:14
**confirming** [1] - 27:16
**connection** [2] - 14:3,
   22:23
**conscious** [1] - 18:1
**consideration** [1] -
   17:23
**contact** [3] - 5:7,
   12:23, 29:5
**contain** [1] - 10:2
**contains** [1] - 19:21
**contempt** [1] - 22:1
**content** [1] - 20:20
**continue** [5] - 8:4,
   12:10, 12:19, 23:25,
   25:7
**cooperation** [1] -
   27:13
**COORDINATION** [1] -
   2:10
**copies** [1] - 14:4
**copper** [1] - 25:2
**copper-fit** [1] - 25:2
**corn** [2] - 21:9, 21:13

**corporation** [2] -
   13:22, 20:1
**correct** [1] - 29:22
**Costs** [1] - 18:22
**counsel** [10] - 4:8,
   4:13, 15:18, 16:19,
   20:24, 23:17, 25:12,
   27:14, 27:20, 28:21
**country** [1] - 20:22
**course** [2] - 10:24,
   24:2
**court** [8] - 19:6, 20:14,
   20:16, 20:20, 21:8,
   22:13, 29:15
**Court** [16] - 4:19, 4:21,
   5:19, 8:22, 8:25,
   16:9, 20:23, 21:5,
   21:6, 21:16, 22:4,
   23:15, 23:23, 25:13,
   26:3, 29:21
**COURT** [39] - 1:1,
   1:17, 4:3, 4:7, 4:13,
   4:21, 5:22, 6:20,
   12:2, 13:3, 13:11,
   13:24, 14:1, 14:3,
   15:1, 15:8, 16:15,
   17:5, 18:13, 18:22,
   18:24, 19:10, 20:8,
   21:22, 22:9, 22:24,
   23:4, 23:8, 23:12,
   24:3, 24:14, 24:18,
   24:24, 26:5, 26:23,
   27:22, 28:24, 29:3,
   29:13
**Court's** [1] - 29:10
**courtroom** [1] - 24:13
**created** [2] - 19:8,
   25:1
**CURATOR** [1] - 2:13

## D

**damages** [2] - 5:20,
   13:22
**DANIEL** [1] - 2:7
**Danny** [6] - 14:4, 14:5,
   15:13, 16:9, 16:12,
   22:22
**date** [1] - 12:21
**DAVIS** [5] - 2:3, 22:3,
   22:22, 24:21, 25:24
**Davis** [2] - 24:20, 28:9
**DAWN** [2] - 1:17
**days** [2] - 10:11, 10:23
**deadline** [4] - 5:4,
   11:7, 11:18, 11:19
**deal** [2] - 16:10, 17:2
**dealt** [1] - 17:25
**December** [1] - 8:25
**decided** [2] - 20:15,

   23:13
**decisions** [1] - 5:18
**deemed** [1] - 10:11
**default** [2] - 13:19,
   19:25
**defend** [1] - 19:25
**defendant** [3] - 15:10,
   15:11, 25:18
**DEFENDANT** [1] -
   2:16
**Defendant** [1] - 23:5
**defendants** [7] -
   17:16, 18:16, 18:24,
   25:7, 25:12, 27:19
**defense** [1] - 4:12
**deficiency** [1] - 5:6
**denied** [3] - 6:17,
   6:20, 6:23
**dentist** [1] - 16:23
**denying** [1] - 8:19
**destroyed** [1] - 25:19
**determination** [2] -
   10:9, 10:21
**determine** [2] - 9:22,
   20:24
**determined** [2] -
   10:19, 19:4
**Dewan** [1] - 23:1
**different** [5] - 6:14,
   9:14, 12:7, 15:5,
   17:19
**difficult** [1] - 28:19
**direct** [1] - 20:24
**directly** [2] - 17:4,
   26:10
**disbursed** [1] - 12:19
**discovery** [1] - 20:11
**discuss** [1] - 4:14
**discussed** [1] - 15:20
**discussion** [1] - 26:16
**discussions** [1] -
   25:25
**dissolution** [1] - 14:13
**distribute** [1] - 8:3
**distributed** [1] - 7:18
**distribution** [1] - 9:13
**District** [1] - 19:8
**DISTRICT** [4] - 1:1,
   1:2, 1:15, 1:18
**district** [2] - 21:2, 21:3
**document** [2] - 8:19,
   23:18
**DOCUMENT** [1] - 1:7
**documentation** [3] -
   6:18, 28:10, 28:14
**documented** [1] -
   26:25
**documents** [8] - 8:20,
   10:12, 11:1, 11:3,
   11:5, 11:6, 11:10,

11:24
**done** [7] - 6:11, 13:11, 16:11, 17:18, 18:12, 27:18, 29:2
**DOROTHY** [1] - 2:20
**down** [2] - 10:16, 26:18
**Dr** [1] - 16:23
**draft** [1] - 8:22
**Drew** [1] - 14:15
**Drywall** [3] - 4:6, 6:5, 16:21
**DRYWALL** [1] - 1:4
**drywall** [4] - 14:12, 15:7, 19:17, 19:18
**due** [1] - 16:14
**Duncan** [1] - 29:8
**duplicate** [3] - 7:4, 7:7, 7:22
**during** [1] - 5:20
**duty** [1] - 21:25
**dwimberly@ stonepigman.com** [1] - 2:22

**E**

**Eagles** [1] - 15:15
**earned** [1] - 20:22
**Eastern** [1] - 19:8
**EASTERN** [2] - 1:2, 1:18
**effect** [2] - 21:25, 25:2
**effectively** [2] - 5:17, 23:3
**efficiently** [1] - 27:5
**efforts** [1] - 24:8
**either** [3] - 8:14, 19:24, 20:22
**ELDON** [1] - 1:14
**elevators** [1] - 21:17
**eligibility** [6] - 9:17, 9:18, 9:25, 10:4, 11:15, 12:8
**eligible** [7] - 6:16, 7:16, 8:14, 8:19, 8:24, 9:4, 12:5
**email** [2] - 12:25, 29:9
**emails** [1] - 27:15
**end** [2] - 5:6, 8:2
**ended** [1] - 23:20
**ENERGY** [1] - 2:17
**engineered** [1] - 21:9
**enter** [1] - 13:17
**entered** [1] - 8:25
**entities** [4] - 20:9, 20:10, 20:11, 20:12
**especially** [1] - 17:1
**ESQ** [2] - 2:13, 2:20
**ESQUIRE** [5] - 2:3,

2:5, 2:7, 2:11, 2:17
**essentially** [2] - 7:4, 9:11
**estate** [1] - 17:2
**evaluation** [1] - 11:23
**event** [1] - 14:22
**eventually** [2] - 20:5, 20:13
**Evidence** [2] - 24:19, 24:24
**evidence** [2] - 25:20, 25:23
**evidentiary** [1] - 28:19
**EX** [1] - 8:7
**exactly** [1] - 8:14
**exist** [1] - 26:20
**expedited** [1] - 22:13
**Expense** [1] - 14:1
**expenses** [2] - 8:11, 11:9
**expensive** [1] - 14:9
**expire** [1] - 11:20
**explain** [1] - 20:19
**explaining** [1] - 5:16
**exports** [1] - 21:16
**exposure** [1] - 24:25
**express** [1] - 17:22
**extensions** [1] - 11:18
**extensive** [1] - 15:17
**extent** [1] - 26:20

**F**

**face** [1] - 28:21
**face-to-face** [1] - 28:21
**fact** [1] - 15:4
**Fact** [1] - 23:5
**failure** [1] - 8:20
**fair** [1] - 25:6
**fall** [1] - 28:17
**FALLON** [1] - 1:14
**far** [5] - 7:14, 7:18, 12:6, 18:18, 19:20
**fast** [1] - 17:24
**fast-track** [1] - 17:24
**FCRR** [3] - 1:17, 29:24, 29:25
**February** [3] - 5:20, 11:16, 28:2
**federal** [1] - 19:6
**fee** [16] - 14:20, 15:17, 15:18, 15:19, 15:21, 16:1, 16:3, 16:5, 16:11, 16:18, 17:6, 17:9, 17:10, 17:11, 17:16, 17:21
**Fee** [1] - 14:1
**feed** [1] - 21:19
**fees** [5] - 15:11, 17:18,

17:21, 19:11, 20:22
**file** [3] - 14:24, 25:13, 25:22
**filed** [1] - 21:8
**finally** [2] - 11:13, 12:23
**fining** [1] - 20:21
**finished** [1] - 14:9
**firm** [2] - 29:11, 29:13
**firms** [1] - 29:5
**first** [6] - 11:16, 11:20, 16:22, 16:23, 19:1, 28:7
**FISHBEIN** [1] - 2:5
**fit** [2] - 8:8, 25:2
**five** [3] - 4:23, 15:5, 21:7
**fixed** [2] - 17:15, 17:16
**flesh** [1] - 14:5
**flowing** [1] - 4:20
**fluctuates** [1] - 7:21
**following** [1] - 28:3
**FOR** [3] - 2:2, 2:10, 2:20
**foreclosure** [2] - 8:10, 12:8
**foreclosures** [1] - 20:7
**foregoing** [1] - 29:22
**form** [3] - 10:25, 12:24, 26:16
**forms** [2] - 5:5, 8:1
**Forms** [1] - 23:5
**forth** [3] - 15:9, 23:24, 28:11
**forty** [1] - 12:18
**forty-three** [1] - 12:18
**forum** [1] - 26:16
**forward** [1] - 29:11
**four** [2] - 8:9, 8:13
**Frequently** [1] - 23:8
**Frilot** [1] - 2:16
**fund** [3] - 5:4, 6:22, 6:24
**funds** [2] - 5:9, 15:3

**G**

**game** [1] - 18:8
**Garretson** [1] - 5:2
**GBI** [2] - 7:13, 11:2
**general** [2] - 14:15, 27:25
**General** [2] - 27:24, 28:6
**generally** [3] - 7:7, 10:23, 17:10
**genetically** [1] - 21:9
**Global** [3] - 6:12, 6:15, 8:7
**grain** [4] - 21:16,

21:17, 21:18, 22:20
**grant** [1] - 11:18
**great** [2] - 5:25, 19:8
**group** [4] - 18:10, 23:19, 24:1, 26:25
**Group** [1] - 5:2
**guess** [1] - 15:8

**H**

**handled** [2] - 14:17, 19:13
**handling** [1] - 27:4
**head** [1] - 5:1
**health** [2] - 17:1, 17:25
**hear** [4] - 4:8, 15:12, 17:20, 24:16
**HEARD** [1] - 1:14
**hearing** [5] - 5:20, 21:10, 22:18, 24:11, 24:12
**held** [1] - 22:1
**help** [5] - 5:23, 5:25, 11:11, 23:25, 24:6
**helpful** [1] - 22:23
**hereby** [1] - 29:21
**HERMAN** [1] - 2:2
**Herman** [1] - 4:10
**high** [1] - 9:2
**HIGHWAY** [1] - 2:8
**hire** [2] - 17:8, 24:6
**hired** [1] - 24:5
**hold** [1] - 15:13
**HOME** [1] - 2:20
**Home** [1] - 26:1
**home** [3] - 14:9, 20:17, 28:14
**homes** [9] - 17:15, 18:9, 18:11, 18:19, 20:4, 26:24, 29:1, 29:7
**Homes** [1] - 28:5
**Honor** [23] - 4:9, 4:11, 4:22, 6:3, 16:16, 18:5, 18:7, 18:12, 22:3, 22:12, 23:1, 24:10, 24:21, 25:24, 26:4, 26:12, 26:17, 27:14, 28:4, 28:7, 28:12, 28:20, 29:4
**HONORABLE** [1] - 1:14
**hopes** [1] - 4:24
**house** [1] - 14:12
**hundreds** [1] - 25:5
**hurting** [1] - 19:12

**I**

**idea** [1] - 11:21, 28:24
**ignored** [1] - 19:7
**imagine** [1] - 25:4
**immediately** [1] - 27:11
**IN** [2] - 1:4, 8:7
**IN-EX** [1] - 8:7
**IN/EX** [2] - 6:13, 6:15
**IN\EX** [1] - 18:20
**including** [3] - 17:23, 18:10, 20:2
**incomplete** [3] - 8:15, 8:18, 8:21
**incompleteness** [1] - 8:15
**increase** [1] - 7:19
**independent** [1] - 10:20
**independently** [1] - 10:8
**indication** [1] - 12:2
**individual** [1] - 16:5
**individuals** [3] - 24:8, 25:15, 27:6
**information** [5] - 12:23, 21:6, 22:6, 29:6
**informed** [2] - 23:10, 23:21
**injury** [5] - 5:11, 8:10, 9:5, 12:8
**inning** [3] - 18:8, 18:25, 19:2
**inspected** [1] - 15:5
**inspections** [1] - 15:4
**instructions** [1] - 10:2
**insufficient** [2] - 6:17, 10:5
**intentionally** [1] - 25:19
**interested** [3] - 19:12, 19:14, 26:23
**interesting** [4] - 17:5, 17:13, 23:13, 24:17
**interests** [1] - 13:23, 20:2
**interview** [1] - 15:24
**interviews** [1] - 15:17
**issue** [14] - 4:18, 7:6, 7:25, 9:17, 9:25, 10:19, 12:10, 14:6, 20:25, 24:24, 25:6, 25:18, 28:5, 29:11
**issued** [6] - 7:14, 11:16, 12:6, 12:7, 12:9, 12:13
**issues** [9] - 5:10, 7:22, 15:20, 17:25, 26:9,

26:15, 26:19, 28:19,
28:22
**issuing** [4] - 7:13,
9:18, 12:5, 12:17
**item** [3] - 13:4, 13:24,
14:1
**itemized** [1] - 11:9
**items** [1] - 27:23
**itself** [1] - 22:10

### J

**Jake** [3] - 5:7, 6:1, 6:3
**JANUARY** [2] - 1:6,
4:1
**job** [2] - 13:11, 29:14
**john** [1] - 21:8
**JOHNSTON** [4] - 2:13,
2:14, 23:13, 24:16
**Johnston** [2] - 23:10,
24:6
**joint** [1] - 4:23
**Judge** [2] - 22:17,
23:1
**judge** [5] - 5:23, 14:7,
21:2, 22:18
**JUDGE** [1] - 1:15
**judgment** [2] - 13:20,
19:25
**judiciary** [1] - 22:15
**jump** [1] - 5:1

### K

**Kansas** [2] - 14:24,
21:11
**KATZ** [1] - 2:2
**keep** [1] - 25:8
**kept** [2] - 28:15, 28:16
**Kerry** [6] - 4:11, 18:4,
18:5, 23:21, 26:12,
27:18
**KERRY** [1] - 2:17
**kind** [2] - 15:5, 21:23
**kinds** [1] - 16:19
**KINGSDORF** [1] -
2:10
**Knauf** [12] - 4:12,
16:24, 18:20, 19:1,
20:4, 20:9, 20:11,
23:17, 23:19, 24:8,
27:18, 27:20
**KNAUF** [1] - 2:16
**knows** [3] - 17:6,
18:14, 21:16

### L

**LA** [7] - 1:19, 2:4, 2:9,
2:12, 2:15, 2:19,

2:21
**lake** [1] - 14:8
**LAPLACE** [1] - 2:9
**largely** [5] - 6:17, 7:1,
7:6, 7:11, 8:5
**larger** [1] - 7:15
**largest** [1] - 6:12
**last** [13] - 5:8, 7:14,
7:19, 8:16, 13:24,
18:8, 18:10, 18:11,
23:21, 23:25, 24:1,
26:14
**late** [1] - 23:19
**law** [1] - 29:8
**LAW** [1] - 2:13
**lawyers** [1] - 26:9
**lead** [3] - 4:13, 16:2,
27:14
**least** [1] - 28:18
**left** [4] - 8:3, 28:13,
28:17, 29:2
**legitimate** [1] - 25:11
**LEONARD** [1] - 2:3
**less** [1] - 9:22
**letters** [1] - 14:4
**LEVIN** [21] - 2:5, 2:5,
4:9, 4:18, 5:14, 13:6,
13:13, 13:25, 14:2,
15:13, 18:21, 18:23,
18:25, 19:11, 22:12,
22:25, 23:7, 23:10,
24:10, 24:20, 27:14
**Levin** [1] - 4:9
**LIABILITY** [1] - 1:4
**Liability** [1] - 4:6
**liaison** [5] - 4:8, 4:10,
4:13, 25:12, 27:14
**light** [2] - 24:22, 25:25
**line** [1] - 7:25
**link** [1] - 22:22
**links** [2] - 22:7, 22:8
**list** [2] - 9:18, 11:9
**listed** [1] - 4:23
**listened** [1] - 13:7
**litigants** [4] - 15:9,
17:7, 26:9
**litigation** [4] - 4:6,
16:4, 16:13, 19:4
**LITIGATION** [1] - 1:5
**live** [1] - 14:10
**living** [2] - 8:11, 14:7
**LLC** [2] - 2:14, 2:16
**look** [2] - 11:8, 25:15
**looking** [1] - 29:5
**Loomis** [1] - 14:15
**lose** [1] - 10:13
**Loss** [9] - 8:8, 8:9,
8:24, 9:4, 9:12, 9:18,
11:16, 11:19, 12:17

**loss** [5] - 5:4, 5:9,
6:24, 6:25, 9:6
**losses** [2] - 9:9, 9:22
**lost** [4] - 8:10, 9:7,
12:11, 20:14
**Louisiana** [3] - 19:8,
21:17, 27:24, 28:6
**LOUISIANA** [4] - 1:2,
1:6, 1:18, 4:1
**low** [1] - 8:21
**lower** [1] - 9:23
**luck** [1] - 29:13

### M

**madam** [1] - 22:12
**main** [1] - 8:9
**major** [1] - 21:16
**majority** [1] - 11:15
**maliciously** [1] - 25:19
**manager** [2] - 14:15,
26:10
**MANAGER** [1] - 4:5
**Mandeville** [1] - 14:8
**manner** [2] - 13:9,
27:19
**MANUFACTURED** [1]
- 1:4
**manufactured** [1] -
20:9
**Manufactured** [1] - 4:6
**March** [3] - 11:20, 28:3
**marriage** [1] - 14:13
**master** [7] - 10:6,
10:8, 10:20, 11:11,
11:14, 11:21, 12:15
**Master** [1] - 10:7,
10:14, 10:15, 11:4
**material** [3] - 22:11,
25:8, 25:19
**matter** [2] - 4:8, 5:24
**matters** [1] - 22:11
**MDL** [6] - 17:9, 21:2,
21:10, 22:17, 22:19
**mDL** [1] - 1:5
**mean** [1] - 6:20
**MECHANICAL** [1] -
1:23
**mediation** [1] - 29:8
**mediations** [1] - 28:21
**Medicaid** [1] - 5:11
**Medicare** [1] - 5:11
**Medicare-Medicaid**
- 5:11
**meeting** [2] - 12:3,
28:2
**meetings** [3] - 27:9,
27:10, 28:21
**members** [1] - 14:16
**mention** [2] - 8:15,

9:20
**mentioned** [8] - 8:4,
9:23, 10:20, 12:5,
12:10, 12:24, 15:25,
18:15
**merits** [1] - 15:16
**met** [2] - 4:13, 24:23
**Mickey** [1] - 14:15
**might** [1] - 15:24
**MILLER** [7] - 2:17,
4:11, 18:5, 26:12,
28:4, 29:1, 29:4
**Miller** [4] - 4:11, 18:6,
23:21, 26:12
**millin** [1] - 9:13
**million** [3] - 7:18,
7:19, 8:3
**mind** [1] - 14:18
**minute** [1] - 14:9
**miscellaneous** [2] -
6:10, 9:9
**modified** [1] - 9:11
**moment** [2] - 4:13,
23:24
**money** [5] - 4:19, 6:2,
6:21, 19:10, 21:8
**monitored** [1] - 27:15
**month** [5] - 5:7, 7:1,
8:16, 13:8
**monthly** [3] - 4:7, 6:4,
9:7
**morning** [6] - 4:3, 4:9,
4:11, 6:3, 14:24,
18:5
**Moss** [7] - 18:9, 26:6,
26:8, 26:13, 27:8,
27:18, 27:20
**motion** [3] - 25:13,
25:17, 25:22
**motions** [1] - 4:15
**move** [2] - 9:20, 14:10
**moved** [1] - 14:12
**moving** [2] - 8:18,
29:11
**MR** [39] - 4:9, 4:11,
4:18, 5:14, 6:3, 6:23,
12:4, 13:6, 13:13,
13:25, 14:2, 14:7,
15:2, 15:13, 16:16,
18:5, 18:21, 18:23,
18:25, 19:11, 21:5,
22:3, 22:12, 22:17,
22:22, 22:25, 23:7,
23:10, 23:13, 24:10,
24:16, 24:20, 24:21,
25:24, 26:12, 27:14,
28:4, 29:1, 29:4
**MS** [1] - 4:22
**multiple** [1] - 7:17
**MURRAY** [1] - 2:13

### N

**name** [1] - 6:3
**national** [1] - 26:25
**nature** [1] - 29:8
**navigate** [1] - 24:7
**nearly** [1] - 26:19
**necessarily** [2] - 4:15,
5:15
**need** [4] - 11:2, 11:3,
12:25, 17:25
**needed** [1] - 25:10
**needn't** [1] - 23:11
**needs** [1] - 19:7
**negative** [2] - 23:24,
25:2
**negotiated** [1] - 14:18
**never** [1] - 23:24
**New** [2] - 2:21, 26:21
**new** [5] - 14:2, 18:7,
29:9, 29:11, 29:13
**NEW** [1] - 1:6, 1:19,
2:4, 2:12, 2:15, 2:19,
4:1
**next** [4] - 12:3, 13:4,
14:1, 28:2
**nice** [1] - 26:15
**ninety** [2] - 12:16, 18:9
**ninety-plus** [1] - 18:9
**ninth** [1] - 18:25
**nobody's** [1] - 17:20
**Northwest** [1] - 19:16
**nothing** [6] - 14:2,
18:7, 18:21, 18:23,
23:7, 23:8
**notice** [3] - 9:25, 10:1,
10:4
**notices** [9] - 5:6, 9:17,
9:18, 10:2, 11:15,
12:6, 12:8, 12:9,
12:10
**notified** [1] - 14:21
**notify** [1] - 23:23
**November** [1] - 23:16
**number** [11] - 6:7,
7:15, 7:21, 8:15,
8:21, 9:15, 9:21,
10:19, 24:4, 28:25
**numbers** [5] - 7:1,
9:16, 9:22, 27:2,
27:4

### O

**o'clock** [1] - 14:23
**O'KEEFE** [1] - 2:3
**object** [2] - 16:9, 25:3
**obtain** [1] - 12:24
**obviously** [1] - 22:14
**OF** [4] - 1:2, 1:13,

1:18, 2:13
**offer** [9] - 9:19, 9:23, 9:24, 10:4, 10:5, 10:11, 10:14, 10:16, 10:22
**offers** [2] - 9:4, 12:14
**office** [1] - 23:18
**OFFICES** [1] - 2:13
**Official** [1] - 29:21
**OFFICIAL** [1] - 1:17
**Omnibus** [2] - 13:4, 13:14
**omnibus** [1] - 16:2
**once** [3] - 11:3, 11:20, 19:24
**one** [11] - 5:14, 5:17, 7:10, 7:17, 13:6, 13:14, 19:23, 20:9, 23:19, 28:4
**one-to-one** [1] - 5:17
**ongoing** [2] - 19:15, 19:21
**opportunity** [2] - 17:22, 20:18
**options** [1] - 10:3
**order** [6] - 4:16, 5:8, 5:18, 6:11, 8:25, 21:1
**ordered** [1] - 21:25
**Orders** [1] - 4:17
**orders** [1] - 21:25
**Oregon** [3] - 19:4, 19:5, 22:16
**ORLEANS** [7] - 1:6, 1:19, 2:4, 2:12, 2:15, 2:19, 4:1
**Orleans** [2] - 2:21, 26:22
**otherwise** [1] - 17:25
**outstanding** [1] - 13:15
**owe** [1] - 21:24
**own** [1] - 7:12

## P

**PA** [1] - 2:6
**page** [1] - 4:23
**paid** [11] - 7:5, 11:22, 12:18, 14:22, 14:25, 16:18, 17:3, 17:16, 21:13, 21:14
**paper** [1] - 23:19
**papers** [1] - 22:4
**parent** [1] - 16:23
**Parish** [1] - 21:8
**part** [1] - 28:8
**participate** [1] - 20:19
**participating** [1] - 20:14

**particular** [4] - 16:11, 17:5, 17:13, 18:15
**particularly** [3] - 5:8, 5:10, 25:1
**parties** [3] - 8:22, 19:22, 27:13
**passed** [1] - 11:6
**past** [1] - 13:17
**pay** [4] - 17:8, 17:17, 22:13, 25:7
**paying** [1] - 15:11
**payment** [10] - 7:5, 7:16, 7:24, 7:25, 10:4, 10:12, 10:23, 12:17, 12:20
**payments** [6] - 5:12, 7:13, 7:21, 8:4, 8:23, 12:19
**payouts** [1] - 5:9
**Payton** [7] - 14:6, 14:21, 15:14, 15:25, 16:13, 16:17, 28:7
**Payton's** [1] - 28:14
**peaked** [1] - 26:18
**pending** [1] - 4:23
**people** [5] - 11:21, 17:24, 24:1, 26:23, 27:9
**per** [2] - 7:5, 11:3
**percent** [3] - 12:16, 17:15, 18:9
**percentage** [1] - 20:21
**perfect** [1] - 19:24
**perhaps** [3] - 19:2, 28:20, 28:21
**periodically** [1] - 17:1
**personal** [2] - 13:6, 24:12
**petroleum** [1] - 20:1
**Phil** [1] - 26:13
**Philadelphia** [1] - 15:14
**PHILADELPHIA** [1] - 2:6
**physical** [2] - 24:19, 25:1
**Physical** [1] - 24:24
**pictures** [1] - 25:14
**piece** [1] - 23:18
**PIGMAN** [1] - 2:20
**place** [2] - 5:20, 12:23
**plaintiff** [2] - 16:2, 23:5
**plaintiff's** [3] - 4:10, 14:19, 15:18
**plaintiffs** [1] - 5:16
**PLAINTIFFS** [1] - 2:7
**PLAINTIFFS'** [1] - 2:2
**plus** [2] - 17:18, 18:9
**point** [2] - 13:19,

29:12
**points** [1] - 9:2
**poor** [1] - 20:3
**portion** [1] - 17:11
**Portland** [3] - 19:4, 19:5, 22:15
**poster** [1] - 15:6
**potentially** [1] - 6:24
**POYDRAS** [4] - 1:18, 2:11, 2:14, 2:18
**practicality** [1] - 25:21
**practice** [1] - 19:2
**PRALE** [4] - 8:12, 9:8, 12:9, 12:11
**pre** [1] - 8:11
**pre-remediation** [1] - 8:11
**precluded** [1] - 19:20
**predated** [1] - 18:17
**prefer** [1] - 11:7
**prepare** [1] - 22:3
**prepared** [1] - 13:19
**preparing** [1] - 5:6
**present** [3] - 10:12, 10:25, 26:2
**presentation** [1] - 8:21
**presents** [1] - 26:15
**preserving** [1] - 25:23
**pretrial** [1] - 5:21
**Pretrial** [1] - 4:17
**pretty** [1] - 12:20
**previously** [1] - 6:19
**PRO** [1] - 2:13
**pro** [7] - 6:14, 9:11, 9:13, 9:15, 18:10, 23:9, 24:4
**problems** [6] - 8:5, 25:1, 26:7, 27:9, 27:16, 27:17
**proceed** [1] - 10:3
**proceeding** [2] - 5:25, 9:16
**proceedings** [4] - 13:18, 20:20, 22:14, 29:16
**PROCEEDINGS** [2] - 1:13, 1:23
**process** [9] - 5:5, 8:5, 10:1, 11:12, 11:25, 12:1, 16:7, 16:14, 20:6
**produced** [1] - 21:9
**PRODUCED** [1] - 1:23
**Products** [1] - 4:6
**PRODUCTS** [1] - 1:4
**professional** [1] - 26:24
**Profile** [1] - 23:5
**profits** [1] - 20:22

**program** [9] - 6:5, 18:8, 18:17, 19:1, 26:10, 26:18, 27:6, 27:12, 28:23
**Program** [2] - 18:3, 18:14
**programs** [1] - 27:7
**progress** [1] - 8:17
**prolix** [1] - 16:7
**proof** [1] - 25:10
**properties** [1] - 24:2
**property** [2] - 7:5, 9:8
**proposal** [1] - 26:2
**protocol** [1] - 28:9
**provide** [1] - 22:6
**provided** [3] - 20:21, 23:18, 29:8
**PSC** [2] - 13:7, 15:2
**PTO-29** [3] - 8:23, 9:2, 9:3
**public** [1] - 16:21
**purchased** [1] - 19:17
**purchasing** [1] - 19:15
**purely** [1] - 14:20
**pursue** [2] - 13:20, 19:6
**pursued** [2] - 13:21, 16:6
**pursuing** [2] - 19:3
**put** [1] - 7:24
**puts** [1] - 12:15
**putting** [1] - 28:10

## Q

**quality** [1] - 27:3
**Questions** [1] - 23:8
**questions** [2] - 9:1, 11:13
**quickly** [1] - 12:20

## R

**raised** [1] - 25:18
**rapidly** [1] - 10:23
**rata** [4] - 6:14, 9:11, 9:13, 9:15
**rate** [1] - 12:16
**rather** [2] - 14:8, 18:15
**re** [2] - 4:5
**RE** [1] - 1:4
**reach** [1] - 26:2
**really** [3] - 14:12, 18:7, 25:6
**reason** [1] - 25:17
**reasons** [1] - 13:18
**receive** [5] - 6:24, 7:17, 7:24, 10:4, 10:14
**received** [5] - 7:10,

9:1, 11:13, 12:13, 14:3
**receiving** [1] - 10:3
**recently** [1] - 29:4
**recess** [1] - 29:15
**recessed** [1] - 29:16
**recognize** [1] - 25:9
**reconcile** [1] - 7:22
**reconciling** [3] - 7:4, 7:11, 8:18
**RECORDED** [1] - 1:23
**records** [1] - 28:16
**refer** [2] - 8:8, 11:10
**refrigerators** [1] - 25:5
**refused** [2] - 20:19, 21:12
**regard** [9] - 5:8, 5:10, 5:11, 5:18, 5:19, 6:2, 13:13, 16:11, 18:21, 19:1, 19:2
**RELATES** [1] - 1:7
**relevant** [1] - 22:15
**relocation** [1] - 6:13
**remaining** [1] - 12:11
**remediate** [1] - 18:19
**Remediated** [1] - 28:5
**remediated** [3] - 20:5, 29:1, 29:7
**remediating** [1] - 26:24
**Remediation** [2] - 18:3, 18:14
**remediation** [10] - 8:11, 18:8, 18:17, 19:1, 23:21, 24:2, 26:10, 26:18, 27:7, 27:15
**remember** [1] - 26:15
**rent** [5] - 8:10, 9:7, 9:8, 12:11, 25:7
**rental** [1] - 9:8
**repair** [1] - 6:13
**reply** [1] - 16:16
**report** [12] - 4:19, 4:23, 5:3, 6:1, 6:5, 13:7, 15:22, 15:23, 16:8, 16:9, 16:10, 18:7
**REPORTER** [1] - 1:17
**reporter** [1] - 22:13
**Reporter** [1] - 29:21
**represent** [2] - 14:14, 27:21
**representation** [1] - 16:1
**representative** [2] - 26:8, 28:1
**request** [7] - 10:5, 10:7, 10:13, 11:4, 11:10, 15:16, 22:12

**requested** [1] - 12:15
**requests** [2] - 10:15, 10:18
**require** [1] - 7:23
**required** [2] - 25:7, 25:8
**requirements** [1] - 8:19
**Reserve** [2] - 21:16, 22:21
**resisted** [2] - 20:12, 20:13
**resolution** [5] - 9:3, 9:19, 10:14, 10:22, 27:16
**resolve** [2] - 12:21, 28:19
**resolved** [1] - 4:24
**respond** [1] - 24:20
**responses** [1] - 12:14
**result** [3] - 16:20, 20:18, 24:8
**resulted** [1] - 14:13
**retainer** [1] - 16:5
**review** [7] - 9:21, 10:8, 10:20, 11:11, 11:22, 12:15, 15:23
**reviewed** [2] - 6:9, 11:24
**reviewing** [2] - 5:5, 6:10
**RMR** [1] - 1:17
**ROBERT** [2] - 2:13, 2:14
**ROOM** [1] - 1:18
**routed** [1] - 10:7
**run** [1] - 23:2
**Russ** [1] - 4:10

**S**

**Saint's** [1] - 14:10
**Saints** [2] - 14:15, 16:17
**sale** [3] - 8:10, 9:5, 12:9
**sales** [3] - 8:11, 9:6, 12:11
**samples** [1] - 25:14
**SASAC** [6] - 13:15, 13:16, 13:20, 13:22, 19:24, 19:25
**satisfy** [1] - 8:19
**score** [1] - 29:4
**SE** [1] - 2:13
**se** [3] - 18:11, 23:9, 24:4
**Sean** [8] - 14:6, 14:7, 14:21, 15:14, 15:25, 16:13, 16:17, 28:7

**season** [1] - 14:11
**seated** [1] - 4:3
**SEDRAN** [1] - 2:5
**see** [5] - 7:7, 8:17, 16:9, 22:16, 25:20
**seeing** [2] - 8:5, 19:20
**seeking** [1] - 15:18
**segment** [1] - 16:4
**segue** [1] - 5:14
**seize** [4] - 21:4, 21:18, 22:10, 22:11
**seized** [1] - 20:23
**seizure** [1] - 20:25
**sending** [1] - 16:18
**sent** [1] - 21:20
**separate** [1] - 21:10
**September** [1] - 7:14
**Serpe** [3] - 4:25, 5:16, 23:1
**service** [3] - 16:21, 19:24, 20:13
**set** [3] - 6:7, 28:20, 28:21
**sets** [1] - 17:9
**setting** [1] - 29:7
**Settings** [1] - 4:21
**settled** [6] - 14:20, 19:12, 20:12, 28:8, 28:12, 28:13
**settlement** [15] - 5:15, 6:5, 6:15, 6:16, 14:18, 17:14, 18:18, 18:20, 19:19, 19:20, 19:21, 19:22, 22:25, 28:9
**settlements** [6] - 5:2, 5:15, 6:14, 7:17, 15:10
**seven** [1] - 10:23
**seventeen** [1] - 12:15
**several** [2] - 18:15, 18:19
**share** [2] - 6:14, 9:12
**Shared** [1] - 18:22
**shift** [1] - 18:10
**shipped** [1] - 22:21
**short** [4] - 6:11, 8:10, 9:5, 12:8
**shortage** [2] - 19:16, 19:17
**shorter** [1] - 12:1
**showed** [1] - 20:14
**showing** [1] - 14:4
**simple** [1] - 5:3
**sit** [2] - 21:2
**situation** [6] - 15:24, 17:1, 17:19, 17:24, 24:12, 24:25
**six** [2] - 13:19, 21:7

**sold** [1] - 21:18
**sometimes** [1] - 27:8
**sort** [1] - 25:5
**speaks** [1] - 4:19
**special** [7] - 10:6, 10:8, 10:20, 11:11, 11:14, 11:21, 12:15
**Special** [4] - 10:7, 10:14, 10:15, 11:4
**speed** [1] - 11:12
**spoliation** [1] - 25:18
**spouses** [1] - 7:8
**spring** [1] - 18:12
**St** [1] - 21:8
**stable** [1] - 8:5
**staff** [2] - 23:18, 29:10
**stage** [2] - 6:7, 7:3
**stand** [2] - 22:1, 29:15
**standard** [1] - 9:25
**standpoint** [1] - 15:9
**start** [2] - 6:6, 11:17
**started** [2] - 18:11, 24:13
**State** [1] - 4:21
**STATE/FEDERAL** [1] - 2:10
**STATES** [2] - 1:1, 1:15
**States** [4] - 13:23, 20:2, 21:1, 21:3
**status** [8] - 4:7, 6:4, 7:19, 23:16, 23:21, 23:25, 24:22, 26:14
**STATUS** [1] - 1:13
**stay** [3] - 10:17, 23:14, 24:17
**STEERING** [1] - 2:2
**steering** [2] - 4:12, 5:17
**STENOGRAPHY** [1] - 1:23
**STONE** [1] - 2:20
**stored** [1] - 25:4
**straight** [1] - 9:13
**streamline** [1] - 11:11
**STREET** [5] - 1:18, 2:6, 2:11, 2:14, 2:18
**Street** [1] - 2:21
**submit** [6] - 8:20, 8:23, 11:3, 11:5, 11:6, 11:7
**submitted** [4] - 6:8, 6:18, 7:8, 11:1
**substituting** [1] - 4:10
**suggest** [1] - 25:17
**suit** [2] - 19:5, 21:8
**SUITE** [5] - 2:6, 2:8, 2:11, 2:15, 2:18
**Super** [1] - 14:8
**Supply** [2] - 22:24

**support** [2] - 11:2, 11:9
**supporting** [1] - 11:6
**Susan** [2] - 29:21, 29:25
**SUSAN** [2] - 1:17, 29:24
**susan_zielie@laed.uscourts.gov** [1] - 1:19
**swing** [1] - 26:19
**switched** [1] - 29:5
**Syngenta** [1] - 21:9
**system** [5] - 19:6, 21:8, 21:24, 24:7

**T**

**Taishan** [10] - 5:16, 5:19, 16:24, 18:24, 19:2, 19:4, 20:5, 20:10, 20:12, 27:19
**team** [1] - 14:16
**tenant** [1] - 9:9
**terms** [2] - 28:10, 29:6
**testify** [1] - 25:16
**THE** [40] - 1:14, 2:2, 2:10, 4:3, 4:7, 4:13, 4:21, 5:22, 6:20, 12:2, 13:3, 13:11, 13:24, 14:1, 14:3, 15:1, 15:8, 16:15, 17:5, 18:13, 18:22, 18:24, 19:10, 20:8, 21:22, 22:9, 22:24, 23:4, 23:8, 23:12, 24:3, 24:14, 24:18, 24:24, 26:5, 26:23, 27:22, 28:24, 29:3, 29:13
**themselves** [2] - 15:10, 17:22
**they've** [7] - 5:7, 13:11, 15:14, 18:18, 27:2, 27:10
**thirty** [2] - 10:10, 11:17
**thirty-day** [1] - 11:17
**thousand** [2] - 12:7, 18:19
**thousands** [2] - 25:5, 28:25
**three** [5] - 4:22, 6:14, 9:7, 12:7, 12:18
**THURSDAY** [2] - 1:6, 4:1
**timber** [2] - 19:16
**timeline** [1] - 11:14
**TO** [1] - 1:7
**today** [2] - 4:19, 5:3

**together** [1] - 28:10
**total** [3] - 6:7, 6:8, 28:25
**track** [1] - 17:24
**training** [1] - 14:10
**transcript** [2] - 22:14, 29:22
**TRANSCRIPT** [2] - 1:13, 1:23
**TRANSCRIPTION** [1] - 1:23
**treat** [2] - 16:2, 16:3
**treated** [1] - 16:7
**Trial** [1] - 4:21
**trial** [1] - 20:11
**try** [3] - 23:25, 26:2, 28:22
**trying** [1] - 18:10
**twenty** [1] - 26:14
**two** [5] - 7:8, 7:17, 10:3, 16:23, 20:9
**type** [6] - 6:12, 6:23, 7:3, 9:15, 17:24, 24:25, 26:2
**types** [3] - 6:9, 8:14, 12:7

**U**

**umbrella** [2] - 13:22, 20:1
**under** [2] - 6:16, 15:19
**undertaken** [1] - 18:17
**undertaking** [1] - 27:17
**unfortunately** [1] - 20:6
**unfortunates** [1] - 20:3
**United** [4] - 13:23, 20:2, 21:1, 21:3
**UNITED** [2] - 1:1, 1:15
**unsettled** [1] - 29:7
**up** [19] - 9:5, 9:6, 9:9, 9:21, 10:16, 10:21, 11:12, 14:11, 20:14, 23:20, 26:10, 27:10, 28:20, 28:21, 28:22, 28:23
**US** [1] - 21:19
**utilized** [1] - 19:6

**V**

**value** [1] - 9:14
**variables** [1] - 10:19
**variety** [1] - 8:9
**various** [2] - 27:16, 27:17
**varying** [1] - 9:4

**vast** [1] - 11:15
**Venture** [2] - 22:24
**verification** [3] - 7:23, 10:24, 12:24
**verified** [2] - 9:7, 9:22
**video** [1] - 25:15
**violated** [1] - 22:1
**Virginia** [5] - 4:24, 5:2, 5:15, 22:25

## W

**W-9** [3] - 7:23, 10:24, 12:24
**wait** [2] - 17:1, 18:16
**walk** [1] - 20:15
**wall** [1] - 19:8
**Wall** [1] - 23:1
**WALNUT** [1] - 2:6
**warehouses** [1] - 25:8
**website** [3] - 8:1, 12:25, 29:10
**week** [4] - 11:16, 11:20, 12:18, 14:21
**weeks** [3] - 13:19, 21:7
**well-thought-of** [1] - 26:25
**whole** [2] - 14:11, 20:6
**wife** [2] - 14:9, 14:11
**Wimberly** [1] - 26:1
**WIMBERLY** [1] - 2:20
**wish** [2] - 24:5, 27:19
**wishes** [1] - 11:4
**withdraw** [1] - 7:7
**withdrawing** [1] - 7:2
**Woody** [2] - 5:8, 6:4
**WOODY** [3] - 6:3, 6:23, 12:4
**world** [1] - 20:2
**wound** [1] - 14:11
**wrap** [2] - 28:22, 28:23
**wrongfully** [1] - 22:10
**www3.BrownGreer. com/drywall** [1] - 12:25

## Y

**year** [4] - 7:14, 14:8, 18:12, 28:23
**yesterday** [2] - 21:10, 22:18

## Z

**Zielie** [2] - 29:21, 29:25
**ZIELIE** [2] - 1:17, 29:24

OFFICIAL TRANSCRIPT
SUSAN A. ZIELIE, CRR, RMR, FCRR
OFFICIAL COURT REPORTER

# EXHIBIT "G"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | : | MDL NO. 2047 |
| IN RE: CHINESE MANUFACTURED DRYWALL | : | |
| PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
| | : | |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE WILKINSON |
| .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. | : | |

**THIS DOCUMENT RELATES TO:** *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Case No. 2:09-cv-6687 (E.D. La.)**

## ORDER

From 2005 to 2008, a housing boom coincided with the destruction caused by Hurricanes Katrina and Rita to sharply increase the demand for construction materials in the Gulf South and East Coast. In response, Chinese companies manufactured, and sold to homeowners throughout the United States, considerable quantities of gypsum wallboard which came to be known as "Chinese drywall." Homeowners experienced problems with the drywall. Specifically, the drywall emits various sulfide gases, damages structural mechanical and plumbing systems of the home, and damages other appliances in the home. The affected parties sued the entities involved in the manufacturing, importing, and installing the Chinese drywall. The cases multiplied and the Judicial Panel on Multidistrict Litigation ("MDL"), declared the matter an MDL and transferred the cases to this Court. After a period of discovery, it became clear that there were two principal manufacturers, (1) the Knauf Entities, and (2) the Taishan Entities. There are four cases in particular in which Taishan Entities have been served (via international means at the Hague, costing at least $100,000 per service of process). These four cases are *Germano*, *Mitchel*, *Gross*, and *Wiltz*. The matters were set to trial and default judgments were entered. In the instant case, *Germano*, Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd ("Taishan") is the

Defendant. Taishan refused to participate in any of these proceedings.

The day before the expiration of the window for appeal, Taishan appeared and appealed to the Fifth Circuit Court of Appeals, arguing – for the first time – that this Court lacked personal jurisdiction. The matters were remanded to this Court for further discovery on the jurisdictional issue. After a period of discovery, this issue was briefed and argued. In due course, this Court rendered an opinion finding it had jurisdiction over the Defendant Taishan. The Defendant appealed the Court's judgment. Ultimately, two separate Fifth Circuit panels affirmed this Court's exercise of jurisdiction over Taishan. In *Germano*, the time for seeking writs to the Supreme Court has passed, so such judgment has become final and enforceable. In order to execute the judgment, Plaintiffs moved for a Judgment Debtor Examination. The Court ordered Taishan to appear in open court on the morning of July 17, 2014 for a Judgment Debtor Examination (Rec. Doc. 17774).

Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination. Taishan, in fact, has *refused* to appear in open court for the Examination. As stated by counsel for Taishan, both in open court and in a brief (Rec. Doc. 17846), Taishan has received notice of the Examination and has refused to appear or otherwise participate in the proceedings.

As a consequence of Taishan's refusal to appear at this Judgement Debtor Examination, in direct, willful violation of this Court's June 20, 2014 order, the Court holds Taishan in contempt of court, both criminally and civilly. This refusal to appear is a direct contemptuous act occurring in open court after actual notice of the proceedings. Such disobedience of the Court's order harms both the many other parties in this case and the decorum of the Court. Due to the "affront to the Court's dignity [that] is [] widely observed," it is necessary to summarily punish

Taishan's contempt. *Pounders v. Watson*, 521 (U.S. 982, 988-89) (1997); Fed. Rule Crim. Pro. 42(b).

    In punishing Taishan's contempt, the Court "has broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process." *Test Masters Educational Servs. v. Singh*, 428 F.3d 559 (5th Cir. 2005). In this massive suit, the harm from Taishan's noncompliance is high and requires strong sanctions to coerce compliance and restore integrity to these proceedings. *Lamar Financial Corp. v. Adams*, 918 F.2d 564, 567 (5th Cir. 1990) (setting forth four factors by which the Court assesses an appropriate contempt sanction); *see Manhattan Industries v. Sweater Bee, Ltd.*, 885 F.2d 1, 6 (2d Cir. 1989) (affirming the propriety of an award of unjust enrichment contempt sanctions aligned with the contemptor's profits to punish the wrongdoing). Accordingly,

    **IT IS ORDERED** that Taishan pay **$15,000** in attorneys' fees to Plaintiffs' counsel.

    **IT IS FURTHER ORDERED** that Taishan pay **$40,000** as a penalty for contempt.

    **IT IS FURTHER ORDERED** that Taishan, and any of its affiliates or subsidiaries, is hereby **ENJOINED** from conducting any business in the United States until or unless it participates in this judicial process. If Taishan violates this injunction, it must pay a further penalty of **25%** of the profits earned by the company or its affillates who violate the order, for the year of the violation.

    **IT IS FURTHER ORDERED** that the clerk of court forward this contempt order to the U.S. Secretary of Commerce, the Chair of the U.S. Senate Committee on Commerce**,** Science, and Transportation, and the U.S. Attorney General, so that these officials are aware of the seriousness of the situation, and for any appropriate action they may see fit.

New Orleans, Louisiana this 17th day of July, 2014.

UNITED STATES DISTRICT JUDGE

CC:   Secretary Penny Pritzker
      U.S. Department of Commerce
      1401 Constitution Ave., NW
      Washington, DC 20230

      U.S. Senator Jay Rockefeller
      Chair of U.S. Senate Committee on Commerce, Science, and Transportation
      Russell Senate Building, Room 254
      2 Constitution Ave., NE
      Washington, DC 20002

      U.S. Attorney General Eric Holder
      U.S. Department of Justice
      950 Pennsylvania Ave., NW
      Washington, DC 20530-0001

# EXHIBIT "H"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*********************************************************************

IN RE:  CHINESE-MANUFACTURED          *     Docket No. 09-MDL-2047
DRYWALL PRODUCTS LIABILITY            *
LITIGATION                            *
                                      *     March 2, 2017
                                      *
                                      *
Relates to all cases                  *     Section "L"
                                      *

*********************************************************************


REPORTER'S OFFICIAL TRANSCRIPT OF THE
ORAL MOTIONS HEARING REGARDING

RECORD DOCUMENT 20627, CNBM ENTITIES' MOTION TO DECERTIFY CLASS

AND

RECORD DOCUMENT 18302, MOTION OF PLAINTIFF-INTERVENORS AND
THE PSC FOR AN EXPEDITED HEARING TO ENFORCE THE COURT'S JULY 17,
2014 CONTEMPT ORDER AND INJUNCTION.


BEFORE THE HONORABLE ELDON E. FALLON,
UNITED STATES DISTRICT JUDGE.


REPORTED BY:        Mary Thompson, RMR, FCRR
                    500 Poydras Street, Box B275
                    New Orleans, Louisiana  70130
                    (504)589-7783
                    mary_v_thompson@laed.uscourts.gov


**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/03/19 Page 159 of 258
Case 1:Case 2:09md:06804·D·7-ECF·MBN·19 ·Document 22310·L·Filed 08/20/19·4·Page 2·Page 3 of 83

2

**APPEARANCES:**

For the Plaintiffs:                    Herman, Herman & Katz
                                       BY:  RUSS HERMAN
                                       LEONARD DAVIS
                                       820 O'Keefe Avenue
                                       New Orleans, LA  70113

                                       Levin, Fishbein, Sedran & Berman
                                       BY:  ARNOLD LEVIN
                                            SANDRA L. DUGGAN
                                       510 Walnut Street, Ste. 500
                                       Philadelphia, PA  19106


For the Defendants:                    Baker Donelson Bearman
                                       Caldwell & Berkowitz
                                       BY:  KERRY J. MILLER
                                       201 St. Charles Avenue
                                       Ste. 2400
                                       New Orleans, LA  70112


                                       Orrick, Herrington & Sutcliffe
                                       BY:  JAMES L. STENGEL
                                       51 West 52nd Street
                                       New York, NY 10019

                                       Alston & Bird
                                       BY: CHRISTY EIKHOFF
                                           MICHAEL P. KENNY
                                       1201 West Peachtree Street
                                       Atlanta, Georgia  29028


                                       Dentons US
                                       BY: MICHAEL H. BARR
                                           RICHARD L. FENTON
                                       1221 Avenue of the Americas
                                       New York, NY 10020

**OFFICIAL TRANSCRIPT**

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT:  Okay.  We have two motions set.  One, the motion to decertify and the other motion involving the penalties.

First the motion to decertify.  Each side has 30 minutes.

Just by way of background, after some six cases were tried, default trials, and the confirmation of default, which took about a week, the Court issued judgments in those six cases. And following that, on July 23rd of 2014, the plaintiffs filed their omnibus motion for class certification pursuant to 23(b)(3).

Although the question of liability had been established by multiple default judgments, the Court felt and explained that even though -- even when factual allegations are established by default, Rule 23 imposes an independent duty on the Court to determine, by order, that the requirements of Rule 23 would be satisfied regardless of the defendants' admissions.  Thus, the Court performed what we felt was a rigorous analysis to determine whether or not 23 had been satisfied.  After some time, I felt that the plaintiffs established 23 numerosity, commonality, typicality, and adequacy of representation.  The Court determined also that the plaintiffs had met 23(b)(3) requirements of predominance and superiority.  In particular, I felt that the liability and causation had already been determined, but the only

09:06:50
09:07:23
09:07:46
09:08:15
09:08:45

**OFFICIAL TRANSCRIPT**

1    remaining issue was damages.

2         And I felt that some formulaic approach would work in

3    this particular case recognizing that the census of the

4    litigation was -- and I'm not sure why, but the census seemed to

09:09:13    5    be that the type of house was pretty similar, 80, 90 percent of

6    the homes.  Maybe it's because they were the subdivisions that

7    were being built at the time or some remediation after storms,

8    but the houses, with some outliers, seemed to be the same type

9    and construction of house.  And so I looked at the formulaic

09:09:44    10    approach as the best way of handling it other than having 3,000

11    or 4,000 individual trials in the various areas; I felt that

12    certification was proper in this particular matter.

13         CNBM has now filed a motion to decertify the class

14    arguing that predominance is not satisfied in this particular

09:10:16    15    case.  They have favored me with extensive briefing.  I received

16    also responses from the plaintiffs.  We're here today to argue

17    that particular matter.

18         I'll hear from the parties.

19         MR. KENNY:  Michael Kenny on behalf of the Taishan

09:10:35    20    defendants.

21         May it please the Court:

22         Good morning, Your Honor.  I want to pick up -- the

23    point of my remarks this morning will be to focus principally on

24    predominance and superiority.  This morning I want to address the

09:10:50    25    factual and trial plan reasons why the class that you certified

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/03/19 Page 161 of 258
Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/03/19 Page 5 of 83

5

09:11:12

09:11:31

09:11:52

09:12:15

09:12:33

 1   back in September of 2014 must now be decertified.

 2          In the various briefings by the defendants, we have

 3   provided Your Honor with an exhaustive list of United States

 4   Supreme Court cases and Fifth Circuit cases that are on point and

 5   provide Your Honor with all of the legal reasons why the case

 6   should be decertified.  But for this morning, I want to focus on

 7   the factual reasons and the trial plan reasons that have

 8   developed since Your Honor certified the class to demonstrate why

 9   the class must now be decertified.

10          Your Honor, the bottom line is pretty simple.  There is

11   no common issue that will predominate over all of the individual

12   issues in this case.  There is no class mechanism that is

13   superior to the agreed-upon need for individualized inquiry for

14   the manifold damages that these plaintiffs are seeking.  Indeed,

15   Your Honor simply needs to read the PSC's trial plans to show

16   that they are blueprints for a series of mini-trials for all of

17   the class plaintiffs over all issues.

18          As Your Honor knows, the defining attribute of a class

19   action is adjudication by representation.  There will be no

20   adjudication by representation over any of the damages in this

21   case.  And that's why, at this stage of the proceedings, it is

22   manifestly clear that there is no substitute for individual

23   trials.

24          THE COURT:  When you say individual trials, we've got

25   about 26 states.  We have about 3,000 or 4,000 claims.  You would

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/03/19 Page 162 of 258
Case 2:09-md-02047-EEF-MBN Document 20719-1 Filed 08/02/17 Page 6 of 83

6

09:12:52
09:13:03
09:13:25
09:13:43
09:14:07

1  assume that 4,000 juries would be empaneled to try each of these

2  cases in the same area, same issues?  We're talking about

3  property damage here only.

4          MR. KENNY:  Well, we're not, Your Honor.

5          THE COURT:  Well, the class certification is a --

6          MR. KENNY:  And I will go through, but there are at

7  least ten different types of damages that these plaintiffs are

8  claiming.

9          They're claiming, for example, remediation damages.

10 Well, what do we now know in this case?  We now know that in the

11 class that currently exists, at least a third of them are former

12 owners.  Okay?  There will be no common proof -- no common

13 proof -- for an entire class for all of the damages.  That's

14 game, set, match right there, Your Honor, under *Bell Atlantic* and

15 Fifth Circuit precedent.

16          What else do we know in this case?

17          We know, because the plaintiffs keep telling us, that

18 every single plaintiff in this class is a, quote, named plaintiff

19 and active litigant in the case.  That's exactly what the

20 situation was in the *Robertson v Monsanto* case, a Fifth Circuit

21 case, where the Fifth Circuit said when the plaintiffs are all

22 named and known, and, at least with regard to Taishan, liability

23 has been established, there is no need, as a matter of law, for a

24 class.  That's game, set, match, Your Honor.

25          What do we also know?

**OFFICIAL TRANSCRIPT**

1       We know that in this case, since the Court certified

2  the class, what did the plaintiffs do?  They immediately filed a

3  motion for class damages, as Your Honor is well aware.  And in

4  that motion they said there are three types of damages that are

*09:14:26*  5  susceptible to (b)(3) certification:  Remediation, loss of use

6  and enjoyment, and alternative living expenses.

7       Since that motion was filed back in 2014, and up to the

8  point at which the Court had the June 9th hearing, what happened?

9       They drew down alternative living expenses as a class

*09:14:51*  10  for class damages.  They drew down loss of use and enjoyment as

11  class damages.  They didn't forfeit those damages.  Indeed, as of

12  today, they are making claims for those types of damages.  Their

13  own admission is those types of damages must be individually

14  adjudicated.  There is no common proof for those damages.

*09:15:13*  15       There's a whole laundry list of other damages that they

16  put back into the case.  Your Honor will recall the September 8,

17  2015, letter that they sent you where they walked back, even from

18  the position they took in the June 9, 2015, hearing, where they

19  said, We want an aggregate sum to be awarded.

*09:15:36*  20       By September 8th, after they saw what happened with

21  their expert witness, they retreated.  They said, We're not even

22  asking for an aggregate sum.  We know that we have to have

23  individualized inquiry on product ID, ownership, proper square

24  footage.  Those issues -- they are maintaining today that there

*09:15:59*  25  is a single -- only one -- common issue with regard to damages in

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22380-16 Filed 12/03/19 Page 164 of 258
Case 1:Case 2:09-md-02047-EEF-JCW Document 20191 Filed 08/04/14 Page 8 of 83

8

1  the case, and that is remediation.

2          But even that requires individualized inquiry.  There

3  is no proof -- the Fifth Circuit in *Bell Atlantic* says game, set

4  match.  If you can't have a trial with common proof that will be

09:16:22  5  applied to all of the absent class members, there is no

6  predominance, there is no superiority.  That's what we have here,

7  Your Honor.

8          THE COURT:  Well, what would you recommend?  Individual

9  trials on 3,000 cases dealing with property damage?  That's your

09:16:39  10  answer?

11          MR. KENNY:  That is our answer at this point because

12  that is the only alternative.

13          THE COURT:  Uh-huh.

14          MR. KENNY:  And it's not my answer, it's not the

09:16:48  15  defendant's answer, it's the plaintiffs' position.  The

16  plaintiffs' are the ones -- they control this case in the sense

17  of the damages that they're asking for.  They're the ones asking

18  for remediation damages, alternative living expenses, loss of use

19  and enjoyment.  They're the ones asking for property -- other

09:17:07  20  kinds of property damages.  Personal property damages; damages

21  associated with short sales, foreclosures, bankruptcies.  They've

22  even suggested that maybe there's some personal injury claims

23  that are in the case.

24          They have a class where a third of which consists of

09:17:22  25  former owners.  They say that they have to be tried

**OFFICIAL TRANSCRIPT**

1  independently.

2       And Your Honor will recall from *Castano*, the driving

3  force in a class action, as Your Honor knows, is the negative

4  value suit.  And here, each one of these -- I don't know how many

09:17:41  5  there are anymore.  Let's just say approximately 3,000.  Maybe

6  it's 2,000.  We think it's under 2,000.  But they all -- almost

7  all of them already have lawyers.  Almost all of them have

8  claims, to read what they keep submitting to Your Honor, of more

9  than $100,000.  Many of them, multiples of $100,000.  They have

09:18:07  10  every financial incentive in the world to pursue the case.

11       THE COURT:  See, the thing that just -- I can't

12  understand how it's helpful, either to the system or to any of

13  the parties, to have 3,000 juries decide whether or not the

14  Chinese -- how much damages the Chinese company should pay.

09:18:35  15  That's doesn't make sense to me.

16       MR. KENNY:  And some of the district courts in the

17  Fifth Circuit, whether the *Corley* case, the *Crutchfield* case, the

18  *Castano* case -- all of the district court judges struggled with

19  that same kind of issue.  And there's this felt need to be

09:18:53  20  expedient.  How can we just make this shorter and simpler than it

21  possibly is already?  But that's the nature of mass torts.

22  That's the nature of mass torts.

23       THE COURT:  But isn't that the movement, though?  The

24  movement, even across the country now -- particularly we see with

09:19:10  25  the *Tyson Food* that the Supreme Court is beginning to look at

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22396-14 Filed 12/02/19 Page 166 of 258
Case 2:09-md-02047-EEF-MBN Document 22396-14 Filed 12/02/19 Page 10 of 83

10

1    some method of dealing with this, because the paradigm of

2    litigation in the United States has really changed from the

3    independent, individual trial to multiple trials.  We have to

4    come up with some solution to deal with multiple trials where you

09:19:31   5    have thousands of people dealing with really similar issues.  If

6    you say they're not the same, similar issues.

7              If you can carve out even the property damage, which is

8    the largest part of this particular case, and come up with some

9    method that's good for everybody, including the system, that

09:19:50   10   seems to me to be a sensible way of dealing with it.

11             MR. KENNY:  That possibly is, but that's not the law,

12   Your Honor, and Your Honor knows it.  I mean, Your Honor knows

13   what Fifth Circuit law is in mass torts.  Your Honor knows

14   *Corley*, *Crutchfield, Bell Atlantic, Chevron*.  I mean, the list --

09:20:07   15   there's a reason why these plaintiffs can't cite a single

16   analogous case, because there are none, and why we can cite 15 to

17   20 U.S. Supreme Court and Fifth Circuit cases in the mass tort

18   context, where you have these individualized nature of damages,

19   where Rule 23 doesn't apply.

09:20:30   20             Thank you.

21             THE COURT:  Okay.  Thank you so much.  I'll hear from

22   the others.

23             MR. LEVINE:  I think I've got three against me,

24   Your Honor.

09:20:41   25             THE COURT:  Okay.

**OFFICIAL TRANSCRIPT**

09:21:04

1        MR. FENTON:  Good morning, Your Honor.  Rick Fenton on

2   behalf of BNBM PLC and BNBM Group.

3        Your Honor, I'd sort of like to pick up where Mr. Kenny

4   left off, and I'm going to put aside what I was prepared to say

5   for a moment and just address the issue that Your Honor raised

6   about 3,000 individual trials.

7        I was national counsel for Allstate during

8   Hurricane Katrina.  We had, for Allstate, 7500 individual

9   homeowner cases alone, most of which were in this court.  There

10  were many other carriers.  There were, as Your Honor probably is

11  very familiar with, tens of thousands of individual homeowner

12  claims.  And Judge Duval ruled -- and I think his ruling was

13  correct -- in the *In Re: Katrina* cases that none of those were

14  susceptible to class treatment because of the individualized

15  nature of homeowner damages.

16       And the same is really true here.  This Court got

17  through it; the cases were tried.  Many were settled.  But

18  sometimes that's just what you've got to do.  And, quite frankly,

19  given the number of cases we were dealing with in that scenario,

20  the notion of 3,000 cases among 29 states I don't find at all a

21  daunting proposition.

22       THE COURT:  Yes.  But you know how we dealt with those

23  cases.  We created a mini-MDL in this particular court and we

24  dealt with them that way.  And the cases were bundled, and by and

25  large most of them were resolved in a bundled fashion.  We didn't

09:21:28
09:21:49
09:22:14
09:22:34

**OFFICIAL TRANSCRIPT**

1  have to do the individual trials.

2      MR. FENTON:  Well, actually, there were a number of

3  individual trials, Your Honor.  And at the end of the day, that's

4  what it came down to.  Fortunately a lot of those cases were

09:22:50  5  settled, and that may or may not happen here.

6      But the problem we've got, as Mr. Kenny said, is the

7  individual variations here.  And the fact is that the formula

8  that was put forward by Mr. Wright and Mr. Inglis just doesn't

9  work.  And I know Your Honor would love to have a formula that

09:23:19  10  worked.  Quite frankly, it would make life easier for all of us.

11  But the formula that they've put forward, you don't have to be an

12  expert to know that if you have two houses with identical floor

13  space but one has 8-foot ceilings and one has 12-foot ceilings,

14  there's going to be 50 percent more drywall remediation in the

09:23:40  15  house with the 12-foot ceilings.

16      THE COURT:  But couldn't you do that administratively?

17      I mean, couldn't you have that examined

18  administratively and simply not necessarily -- just indicate

19  administratively how many square feet you're dealing with in any

09:23:57  20  particular area?

21      MR. FENTON:  If that were the only variable,

22  Your Honor, perhaps, but it's not.  There's finish.  There's

23  internal wall configurations.  There's the number of plumbing

24  fixtures.  There's location.  Quite frankly, the location of a

09:24:11  25  property makes a big difference in terms of accessibility as to

**OFFICIAL TRANSCRIPT**

1    how you're going to remediate.

2         And that's why, when we had the damages hearing back in

3    June of 2015, Mr. Pogorilich indicated, from the construction

4    perspective, why the formula doesn't work because of all these

09:24:31   5    individual variations.  Dr. Marais from the statistical

6    perspective basically said, Look, these numbers are all over the

7    lot.  He compared it to the Knauf settlement.  And in any given

8    case, the numbers were wildly inaccurate, both on the plus side

9    and on the minus side.  And when you looked at it in the

09:24:50   10   aggregate, taking Knauf as a benchmark, it overstated the damages

11   by over 30 percent.

12        So when you look at it on a theoretical basis or on an

13   empirical basis, the formula just doesn't work here.  And I know

14   that, you know, we wish it did, but it doesn't.

09:25:10   15        Your Honor, I do want to cover a couple of points that

16   are specific to the BNBM companies.

17        The first is -- and this has been briefed and argued

18   endlessly and I don't plan to repeat it here, but the first is

19   that there's no jurisdiction over the BNBM companies.  That

09:25:32   20   motion is before Your Honor.

21        But for purposes of the Court's class certification

22   order in 2014, the Court found the jurisdictional hook, and

23   really the class certification hook, through these requests to

24   admit that had been served on Taishan.  And I am going to use

09:25:52   25   Taishan, not in the very broad sense that the PSC uses it, which

**OFFICIAL TRANSCRIPT**

14

1    is to rope in all the Chinese defendants, but in the narrow sense

2    of the Taishan company that is a defendant here.

3           And we know from the Fifth Circuit's decision in

4    *Briseno* that it -- the Court was really sort of led into error

09:26:20
5    using the requests to admit to bind the BNBM companies and the

6    CNBM companies.  And as a matter of fact, if you go through the

7    Court's class certification decision, I think it's Paragraphs 30

8    through 47, that's basically a recitation of the request to admit

9    and form the foundation for the class certification decision.

09:26:48
10          And not only were those admissions not binding, Your

11   Honor, but in light of what we've seen in the jurisdictional

12   motions now with respect to the way that these companies operate,

13   their ownership structure, the separate management, the separate

14   facilities, we know that many of those requests to admit, if not

09:27:07
15   all of them, are not accurate.  They do not comport with facts.

16          So I think it has to be reexamined from that

17   perspective as well as the jurisdictional perspective.

18          The other thing I'd like to point out, Your Honor,

19   again specifically as to the BNBM companies, is that the BNBM

09:27:25
20   companies are not foreclosed by any defaults from litigating

21   individual issues of liability or causation.

22          A principal premise of the PSC's theory for class-wide

23   relief is its contention that those issues are foreclosed because

24   of defaults.

09:27:46
25          First of all, defaults have no meaning if there is no

**OFFICIAL TRANSCRIPT**

1    jurisdiction.  And for this purpose, let me separate my clients

2    for a moment.  There's absolutely no evidence in this record that

3    BNBM Group manufactured or sold drywall to anyone during the

4    relevant period or had any U.S. transactions at all.  There were

09:28:09  5    simply no contacts, let alone minimum contacts, that serve as a

6    basis for personal jurisdiction over BNBM Group.

7           With respect to BNBM PLC, Your Honor -- and, again, as

8    detailed in the jurisdictional motions, there were some sales of

9    drywall that were initiated and completed in China.  Those

09:28:32  10   transactions do not give rise to U.S. contacts because they were

11   centered in China.  But even if one were to assume, contrary to

12   fact, that some of those transactions could give rise to minimum

13   contacts, there's absolutely no evidence that any BNBM Dragon

14   brand drywall ended up in any jurisdiction other than Florida.

09:28:58  15   Therefore, Florida is the only conceivable jurisdiction that even

16   arguably could exercise jurisdiction over BNBM.

17           Now, let's --

18           THE COURT:  But doesn't that give me the jurisdiction,

19   then, as the MDL judge?  I mean, I'm looking at Florida.  I have

09:29:16  20   the Florida cases.  You dealt in Florida.

21           MR. FENTON:  You do, Your Honor.  And I think I'm about

22   to address exactly Your Honor's point.

23           If you look at the cases that were certified for class

24   damages, they did include cases that had been filed in Florida.

09:29:34  25   But if you then eliminate the cases where the BNBM entities are

**OFFICIAL TRANSCRIPT**

1 not parties, you're left with five cases. You're left with
2 Gross, which was filed here; Wiltz, which was filed here; and the
3 three Amorin cases, one of which was filed in Florida.

4 The problem is that neither BNBM Group nor BNBM PLC
5 were defaulted in the Florida case. That's the only case that
6 conceivably could have had jurisdiction over BNBM PLC when it was
7 filed and where it was filed, but there has been no default
8 entered in that case. So as to the Florida properties where
9 there is some BNBM drywall, there is no default.

10 And issues of causation and liability as to BNBM are
11 alive and well. In that regard, Your Honor, there is absolutely
12 no class-wide evidence that's been presented that could
13 conceivably prove a product defect as to BNBM drywall. The only
14 evidence in the record is the report of the Consumer Products
15 Safety Commission that said that Dragon Brand Beijing New
16 Building Materials Company's 2006 drywall had low or no
17 detectable emissions of hydrogen sulfide. So it is a different
18 product than what is alleged to be dealt with by Taishan. A
19 defect cannot be proved on a class-wide basis, and it requires an
20 individual determination.

21 The other thing that I think is telling here,
22 Your Honor, is that when we look at those Florida properties,
23 there are less than 70 so there's a real numerosity issue with
24 respect to BNBM that you do not have with respect to Taishan.
25 And that's another reason that I think BNBM stands in a somewhat

09:29:59
09:30:25
09:30:52
09:31:19
09:31:39

**OFFICIAL TRANSCRIPT**

1  different posture, although I agree with Mr. Kenny as to the

2  impropriety of class proceeding.

3  　　　　THE COURT:  But aren't you conflating some of the

4  issues there?  If I have jurisdiction over BNBM because of their

09:32:01  5  sales, it doesn't matter whether it was Dragon or anything else,

6  I have jurisdiction over them for everything.  I mean, it's just

7  not that.  If they do business in the state, it gives me

8  jurisdiction over them.  And if they have some relationship or

9  there's the same commonality of ownership with Taishan, then

09:32:25  10  they -- that may be different.  Isn't it --

11  　　　　MR. FENTON:  I don't think so, Your Honor.  And with

12  all due respect, I think you have to keep the cases separate.

13  Just because it's an MDL proceeding doesn't mean that the cases

14  are merged.  They do retain their independent identity.

09:32:41  15  　　　　The only class proceeding where there could conceivably

16  be jurisdiction over BNBM PLC is the proceeding that was

17  initiated in Florida, because that's the only one that even

18  arguably -- and we don't think it meets the test there, but

19  that's the one that arguably would have jurisdiction over these

09:33:02  20  Florida properties.  And there's been no default --

21  　　　　THE COURT:  And you said that the jurisdiction is

22  restricted to Dragon board?

23  　　　　MR. FENTON:  As to BNBM, Your Honor, based on, again,

24  the jurisdictional motions -- and I don't want to go into all of

09:33:19  25  that.  But the only other way that BNBM gets roped into these

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 174 of 258
Case 2:09-md-02047-EEF-MBN Document 20175-1 Filed 03/23/16 Page 18 of 83

18

1  proceedings is if the alter-ego theories still have viability,

2  and for all the reasons that we have briefed, it doesn't.

3          Let me just, in concluding, Your Honor, pick up on

4  another point that Mr. Kenny raised, and that has to do with the

09:33:38  5  PSC's trial plan.  And I think this really illustrates the

6  problem that we have here.

7          We took the PSC's trial plan and we tried to map out

8  what this case would look like if that trial plan were followed.

9  The only class or mass part of this -- whatever it is, is

09:34:12  10  highlighted in yellow up at the upper left-hand corner, and that

11  is the application of the remediation formula for current owners

12  on Exhibit 79.  That would not include former owners on

13  Exhibit 79, which I think is roughly a third of the class.  And

14  for both categories, whether it's current owners or former

09:34:36  15  owners, it then devolves into a whole series of individual

16  trials, individual determinations.  They want Bellwether No. 1.

17  They want Bellwether No. 2.  Then there's a whole bunch of

18  non-class proceedings in Florida on the Omni 20 complaint.  It is

19  a mess, Judge.

09:35:02  20          But to say the common issues predominate in the case as

21  a whole, which is the test in the Fifth Circuit, when what we're

22  left with at this stage of the game is a little slice where the

23  remediation formula is being applied, I think cannot reasonably

24  be said, and one really needs to question what the tiny bit of

09:35:30  25  class proceeding here really adds if there's going to be a bunch

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 175 of 258
Case 2:09-cv-02047-EEF-MBN Document 21641-61 Filed 08/20/18 Page 19 Page 220 of 83

19

1  of individual questions on damages.

2          And the other thing I will point out in that regard,

3  Judge -- and then I'll conclude my remarks -- is that in order to

4  even get there, you've got to make shortcuts.

09:35:47
5          What is the shortcut?  The shortcut is the application

6  of the formula that provides estimated damages in place of actual

7  proof of damages.  Most of the properties at this stage of the

8  game have been remediated, some to the full degree, some perhaps

9  partially, but even that raises individual questions.  And I

09:36:13
10 think the law that we've cited in the briefs is very clear that

11 where actual cost data is available, courts may not use estimates

12 to measure damages.  And that is particularly true in a class

13 proceeding, Your Honor, where *Tyson Foods* is also quite clear

14 that you cannot make shortcuts in substantive proof requirements

09:36:42
15 in order to accommodate the class procedure.

16          But that is precisely what is happening here.  If you

17 had an individual damage case and a homeowner was sitting there

18 and they had receipts and Mr. Inglis took the stand to say, I'm

19 going to estimate damages, I think one of the first questions out

09:37:07
20 of Your Honor's mouth would be, Well, why don't we look at the

21 actual receipts and see what the actual cost was?  Why do I need

22 Mr. Inglis to estimate it?

23          Well, it's no different in a class proceeding, but

24 that's exactly the kind of proof shortcut that needs to be

09:37:23
25 utilized if a class proceeding is going to go forward here, all

**OFFICIAL TRANSCRIPT**

09:37:39

09:38:12

09:38:30

09:38:48

09:39:01

1  of which ties into Mr. Kenny's point that, for better or worse,

2  Judge, on the facts of this case and on the procedural posture we

3  find ourselves in, we can't just do it.

4         Thank you very much.

5         THE COURT:  Thank you.

6         MR. STENGEL:  Good morning, Your Honor.  Jim Stengel

7  from Orrik Herrington for the CNBM entities.

8         I'd like to try and address, in the first instance,

9  your question about the practical impact of this, because it's a

10  decision the Court will have to make.  I think it's unavoidable

11  given the deficiencies of this class as currently certified, the

12  change in positions made be the PSC, and the fact that I think at

13  the time there was an underappreciation of things that would

14  impact the ability to resolve issues on a class-wide basis like

15  variations in state law which are significant and substantial.

16         But there is a growing body of experience outside the

17  class context.  I am morally certain that Judge Parker was fairly

18  upset when the Fifth Circuit said "no" in *Cimino*.  As you know

19  here, he put together a very complicated statistical methodology

20  to try and estimate the value of asbestos claims, albeit personal

21  injury claims which are a different species generally not viewed

22  as amenable to class treatment.

23         But when you actually do, as I think the briefing

24  illustrates here, look at the variation of these claims, you are

25  going to see that there's so many moving parts with this, there's

**OFFICIAL TRANSCRIPT**

1 so little commonality.  There's no basis to proceed on a
2 class-wide basis to resolve this.
3 And there's a general interest in resolving this case,
4 Your Honor.  We've tried for years --
5 THE COURT:  You know, you mention asbestos.  Asbestos
6 now is in the 25th year -- 25 years for asbestos.  The litigants
7 have all gone bankrupt.  The lawyers are the only ones who are
8 making any hay out of the cases now.  Do you want to keep the
9 Chinese companies in for 25 years?  That's a hard row to hoe.
10 MR. STENGEL:  In fairness, asbestos was sold
11 commercially in the United States for over 100 years.  You have
12 literally millions of claimants as opposed to a relatively small
13 group of claimants in this case.  And I'm not unsympathetic to
14 the fact that we have 3,000 people whose claims need to be
15 resolved one way or the other.
16 So I think you're talking about a different model.  To
17 go back to asbestos, if you look at what Judge Robreno did to
18 clean up the MDL mess in asbestos, it's a model that where
19 there's a will, there's a way.  And my bottom line point here,
20 Your Honor, is we, frankly, because of the existence of the
21 certified class, have not joined issue with the PSC, or any other
22 plaintiff lawyers, on how we'd resolve these cases outside of the
23 class context.
24 And I know Your Honor is involved in the Xarelto
25 litigation.  We have a situation where we have putative

09:39:14
09:39:40
09:39:55
09:40:07
09:40:19

**OFFICIAL TRANSCRIPT**

1   bellwethers Hernandez and Germano.  They don't fit the definition

2   of bellwether that any case in the Fifth Circuit would recognize.

3   They're not statistically valid, they weren't selected properly,

4   et cetera.  But I think it's probably a mistake to assume that

5   they would mechanistically require 3,000 cases to be tried to

6   verdict.  We don't know what we can do because we've never

7   discussed this in an orderly way with the plaintiffs.  We've

8   never had a Rule 16 conference to talk about a non-class

9   approach.

10              I don't know where we'd land.  But I think we, as

11   officers of the court and lawyers with clients, would try and

12   find a happy medium that would honor the due process rights of

13   the defendants, be consistent with the Rules Enabling Act.  All

14   the deficiencies of the class certified right now, which is not

15   legally permissible, I think we could work around, but we simply

16   don't know because we haven't had that opportunity.

17              With that, Your Honor, thank you.

18              THE COURT:  Thank you very much.

19              Let me hear from the plaintiffs.

20              MR. LEVIN:  Mr. Kenny said "game, set, match."  Where I

21   come from, the certification in this case is a slam dunk.  Much

22   of what you heard today dealt with jurisdiction.  Those motions

23   are before you.  We can't overlook that BNBM is here on an

24   alter-ego theory, a single-business enterprise theory, and they

25   have been defaulted in them.

**OFFICIAL TRANSCRIPT**

1        Last I heard about *Castano* and the asbestos cases --

2 and it probably wasn't mentioned, but it was *Amchem*.  This is not

3 *Castano*.  It's not *Amchem*.  It's not 25 years of asbestos.  It's

4 not a sprawling class.  There are no futures.  Every class member

09:42:34 5 knows that they're in this litigation, knows why they're in this

6 litigation, and made a decision to be in this litigation.  So you

7 don't have that type of situation.

8        I've also heard about "Allstate knows how to do it."

9 Well, I haven't handled an Allstate case in 40 years, but for the

09:42:56 10 first 15 years of my practice there was Allstate everywhere.  And

11 they said, "You're in good hands with Allstate," and my clients

12 are not in good hands with the theories that are promulgated by

13 the defendants in this litigation.

14        Let's look at this chart.  I just want to cover the

09:43:21 15 three things on top.

16        Current owners, remediation damages.  That's the bulk

17 of the claims in this case.  That's what predominates.  Sure,

18 there are other damages that could be handled as pick-up in our

19 trial plan, but that is the bulk of the damages.

09:43:43 20        Former owners we've removed because there is an issue

21 there, but we believe the former owners are entitled to the same

22 damages as the present owners.  The reason why they're former

23 owners is while Knauf was here with Moss remediating claims, our

24 clients were losing their homes, were in short sales, were in

09:44:12 25 foreclosures, were in bankruptcies, all at the hands of these

**OFFICIAL TRANSCRIPT**

1    defendants who chose to stay in China; come to the United States

2    and leave the United States with the blessing of CNBM who voted

3    11 to nothing to tell them to leave.  So while they slept in

4    China, we were litigating here.

09:44:37    5         THE COURT:  I'm sure they will hear that in every case

6    they're dealing with, but they say that you don't have any common

7    issues in this particular matter to justify a class action.  They

8    say location, type of construction, and most of the properties

9    have already been remediated; therefore, there's no --

09:45:01   10         MR. LEVIN:  Our expert has gone through an analysis

11   using ZIP Codes to account for locality.  We've used square

12   footage to account for the size of the home.  And we've used

13   RSMeans, which Your Honor approved of in similar litigation, and

14   in *CertainTeed* in the Eastern District of Pennsylvania

09:45:26   15   Judge O'Neill used.  So we have a formulaic approach to proving

16   damages on remediation.  It's arithmetic.  It is not "e" equals

17   "mc" squared.  And that was used, I believe, by Your Honor in

18   *Turner*, and in *Harrell*, in *Hernandez*.  That's in this

19   jurisdiction.

09:45:50   20         But we've gone even further.  We've used those

21   approaches in Florida in state court with Judge Farina in *Siefert*

22   and in *Harrell,* which is a certified class of homeowners.  Judge

23   Hall has used them in Virginia.

24         This case is not on an open slate.  In fact, we had

09:46:11   25   *Daubert* hearings in *Germano*.  Your Honor has had three or four

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 181 of 258
Case 2:09-md-02047-EEF-MBN Document 23179-1 Filed 04/01/21 Page 25 of 83

25

1   decisions.  On jurisdiction we've gone to the Fifth Circuit

2   twice.  And I'm not going to deal with the jurisdiction motions,

3   because Your Honor brought it up with alter ego and business

4   enterprise where BNBM says, We only have Dragon board in 65

09:46:34   5   homes.  We have a default judgment against each of the defendants

6   in some jurisdiction.

7          The cases that they cite are anti-trust cases with

8   regression analysis saying you can't prove it in a formulaic

9   method, but we've done it here.  We've done it in *Germano*.  We've

09:46:58   10  done it in *Hernandez*.  We've done it in *Siefert* in Florida.

11  We've done it in *Campbell* here in this courtroom.

12         THE COURT:  Well, how do you anticipate determining the

13  square footage in a particular case?  You know and I know that if

14  a 1400-square-foot or 1500-square-foot house has three rooms as

09:47:27   15  opposed to six rooms, the six-room house, even though it's

16  1500 square feet on a plan, it's going to consume more drywall

17  than the other.  How do you deal with that?

18         MR. LEVIN:  We deal with it because we deal with

19  practicalities.  We go around the perimeter, and you take the

09:47:49   20  walls and you measure the heights of walls and get your square

21  footage.  I mean, every contractor that has to give an estimate

22  for a home takes a look at the home and determines the square

23  footage.  And we have that.  They can come out and examine the

24  home if they want to.

09:48:05   25         But that still doesn't preclude, in the first instance,

**OFFICIAL TRANSCRIPT**

current owners on Exhibit 79 getting their damages based on their
ZIP Code, their square footage, and the cost-per-square-foot for
remediation.

If you want to solve problems, you can solve problems.
But if you avoid the problems for seven and a half years and then
come into court, after the case has been certified, after you
chose not to participate in the case, and say, We want to
decertify the Class seven and a half years later, Your Honor,
there is no -- the brief is replete with it, but there's no issue
with any of the provisions of Rule 23 that have changed since
your certification order -- not one -- other than some owners
have lost their homes because they couldn't afford to be in an
apartment and pay the mortgage or buy another home and pay the
mortgage.

And when we get to former owners, we'll talk about
estoppel, too, because it's their conduct that has caused this
disaster here.  And it continues to cause a disaster.  It's
disruptive.  There are individuals next door to other individuals
who had their homes remediated by Knauf but not the Chinese
Taishan entities.  They've held back.

THE COURT:  How about the argument that most properties
have already been remediated?  How do you deal with that?

MR. LEVIN:  Well, if they'd been remediated properly,
then they are a remediated home, they get their money.  But if
they have to go to Handy Andy and get it done for $15,000 as they

**OFFICIAL TRANSCRIPT**

1  would like to do it, no, that's not adequate damages.

2      We've already found what has to be done and what proper

3  remediation is.  It's stripping the homes down to the studs and

4  replacing electrical and air conditioning and everything.

09:50:10  5  They're entitled to those damages.

6      Because they chose not to come into court for seven and

7  a half years should not enure to their benefit.

8      THE COURT:  Let me ask you:  How do you deal with a

9  situation -- let's assume it's already remediated and the person

09:50:26  10  spent $70,000 remediating the home and the formula would bring

11  $60,000.  They've already spent 70- but the formula would bring

12  60-.

13      MR. LEVIN:  The pinball machine tilts, they pay 70,000.

14  They pay the maximum.

09:50:46  15      Your Honor, they talk about multiple state laws.  In

16  90 percent of these classes, the class members are in three

17  states, not 26; Florida, Virginia, and here in Louisiana.  And

18  each of those states recognize the cause of action that we've

19  proceeded on.

09:51:17  20      I think I've taken enough time, Your Honor.  I know I

21  didn't use 30 minutes, but I don't want to give them any of my

22  time.

23      THE COURT:  Okay.

24      (Conferring.)

09:51:28  25      MR. LEVIN:  Well, as Russ -- as Mr. Herman just said,

**OFFICIAL TRANSCRIPT**

1    3,000 homes have not been remediated.

2              THE COURT:  Okay.  All right.

3              MR. KENNY:  Very briefly, Your Honor.  Just look at the

4    trial plan.  Here is what *Bell Atlantic* -- I'm going to quote it.

5    339 F3d 302.  This is Fifth Circuit.

6              (As read):  The Fifth Circuit has repeatedly held that

7    where the fact of damages cannot be established for every class

8    member through common proof to the class, then it defeats

9    23(b)(3).

10             All you have to do is look at their own trial plan.

11   They are not even pretending that they can come in with common

12   proof through a class representative and prove all of these

13   damages.  They are not contending that they can have a class

14   representative come in with common proof and prove, for current

15   owners, remediation.

16             Just stay there for a minute, Your Honor.  What do they

17   need to do?  They need to first figure out product ID.  The only

18   way to do that is to go through their list one by one by one.

19   You have to figure out the square footage, as Your Honor has put

20   his finger right on that.  And what was Mr. Levin's response?

21   "Well, then come look at our houses."

22             Well, that's precisely their burden.  And you have to

23   do it house by house by house.  There is no shortcut.  You have

24   to figure out -- they say in their class they have former owners.

25   That's a third of their class.  They're not even pretending to

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22396-14 Filed 12/02/19 Page 185 of 258
Case 2:09-md-02047-EEF-MBN Document 20185-4 Filed 03/12/18 Page 29 of 83

29

1  use the remediation formula to figure out the remediation damages

2  even for those people.

3  THE COURT:  Can't you do the square-footage analysis

4  administratively as opposed to judicially?  I mean, can't you

09:53:21  5  have a special master just measure the houses and figure it out

6  that way as opposed to having a trial to determine the square

7  footage when it's already there?

8  MR. KENNY:  No, Your Honor, for a couple of reasons.

9  One, as Mr. Fenton pointed out, and as Your Honor --

09:53:41  10  well, you were at, obviously, the June 9th hearing.  The formula

11  doesn't work.  It starts with faulty data and proceeds to a

12  mechanistic way that ignores all of the variations throughout the

13  various states.

14  But even if you're in the same ZIP Code, House A and

09:54:03  15  House B right next to each other, as Mr. Pogorilich showed

16  Your Honor with his demonstrative, you've got to go in and figure

17  out fit and finish.

18  Mr. Inglis, when he was on the stand, admitted that

19  even with his formula some people get more, some people get less

09:54:22  20  than what they should get.  That's just fundamentally in

21  violation of due process, Your Honor.

22  THE COURT:  All right.  Okay.

23  MR. HERMAN:  Your Honor, may I say something?  It will

24  take two minutes.

09:54:34  25  THE COURT:  Okay.

**OFFICIAL TRANSCRIPT**

1    MR. HERMAN:  The old shell game is you move the pea

2  from shell to shell and you try to guess.  There's no guesswork

3  here.  There are a thousand Chinese-manufactured drywall homes in

4  Louisiana that have never been remediated.  RSMeans and ZIP Codes

09:54:58   5  determine what the value is per square foot.

6        Those thousand claims -- and I'm just using them as an

7  example -- have submitted, through required orders of this Court,

8  their square footage.  They have had inspectors inspect their

9  properties for ID, and it is merely a mathematical formula.  And

09:55:23  10  if the defendants want to challenge, in a class cert hearing, the

11  methodology as to square footage, well, they'll have to go in and

12  do what we did, hire inspectors, go house by house, measure and

13  measure.  But that does not defeat a formulaic mathematical

14  certification.

09:55:46  15        And I suppose what I object to on behalf of the

16  approximately 3,000 unremediated homes, including those by

17  Habitat for Humanity and Catholic Charities, is we've got

18  defendants that have hidden evidence, that have hidden witnesses,

19  and that have tested every sort of way to delay this case.

09:56:14  20        And I point out, Your Honor, that it was necessary, and

21  I understand it, for the Court to hold a period of time for there

22  to be discussions, and there were discussions in several

23  different states over multiple months that resulted in,

24  unfortunately, no resolutions whatsoever.

09:56:41  25        THE COURT:  Right.

**OFFICIAL TRANSCRIPT**

```
 1          MR. HERMAN:  But at the same time, this matter now is
 2   seven years out.  The folks have done what they're supposed to
 3   do, fill out forms, certify as to what their square footage is --
 4          THE COURT:  Okay.
 5          MR. HERMAN:  -- had inspections.  They're waiting.
 6          Now, we're not talking about remediations here in the
 7   remediation sense, we're talking about monetary value to
 8   remediate.
 9          THE COURT:  All right.  I understand.
10          MR. HERMAN:  I believe that can certainly be done.
11          THE COURT:  I understand.
12          I'll give you time.  Do you want to rebut anything he
13   says, anybody?
14          MR. KENNY:  No, Your Honor.
15          MR. FENTON:  Very briefly, Your Honor.
16          The Germano and the Castano cases, Your Honor, are very
17   clear that you can't just keep carving away pieces of the case to
18   try and narrow it down to a class proceeding.
19          That's exactly what the PSC has done here.  And while
20   they may try to minimize the other components of damages, they
21   aren't so minimal.  There are substantial claims.  And Your Honor
22   entered significant judgments for ALE, for loss of use, for
23   personal property damages.
24          In the Germano case, these are not inconsequential or
25   incidental damages, these are major damage components.  And the
```

09:56:58
09:57:11
09:57:21
09:57:40
09:58:02

**OFFICIAL TRANSCRIPT**

1  PSC itself, in a motion that it filed back in November, asked for

2  individual trials on both class and non-class claims.  There's

3  really no way to avoid it.

4  And when my friend Mr. Levin says to the Court, Well,

09:58:24

5  you got to inspect each house and, gee, if they overestimate or

6  underestimate, the defendant should pay the maximum, I don't know

7  where that rule of law comes from, Judge.  It certainly doesn't

8  come from Rule 23.  And I think that really exemplifies some of

9  the problems here.

09:58:45

10  THE COURT:  Okay.  Thank you very much.  I appreciate

11  all the arguments counsel made.

12  Let's go to the next motion, the contempt enforcement.

13  MR. HERMAN:  May we have a five-minute recess?

14  THE COURT:  Sure.  Take a five-minute recess.

09:59:02

15  (A recess was taken.)

16  **AFTER THE RECESS**

17  (Call to order of the court.)

18  THE COURT:  Be seated, please.

19  We're talking about the second motion.  But before the

10:05:47

20  second motion, let me think about the first one, too, with you.

21  It seems to me that this case is in a posture that is

22  different than a lot of other cases.  In a lot of other cases

23  that I've dealt with over the years, there's a period of time

24  where a defendant can be liable.  I mean, there's such a thing

10:06:19

25  called prescription in this country, as everybody knows, or

**OFFICIAL TRANSCRIPT**

1    statute of limitations as we sometimes say in Louisiana.

2         This case is different in the sense that you're going

3    to find some people 20 years down the road that get ready to sell

4    their property -- they've never known that Chinese drywall was in

10:06:41    5    it.  They get ready to sell their property and somebody says, I

6    want an inspection.  The inspection turns up Chinese drywall.

7    That's the first indication that they've ever had that there was

8    a problem in the case -- in their property.  So there's a

9    provision in most law -- most state laws, as we all know, with

10:07:02    10   products, particularly where you discover something for the first

11   time.  So here we are 20 years down the road and there are cases

12   that are coming up involving Chinese drywall and the defendants

13   are back in the suit.

14        A mechanism for resolving that problem is a class

10:07:25    15   action where the -- those who are in are in; those who are out

16   are gone.  And that's another vehicle that was, I think, viable.

17   Class certification is helpful to many people in this -- both

18   sides of the "v" as we say.  But it is what it is.

19        Let's go to the second motion.

10:07:50    20        This has to do with contempt.  The cases, as we know,

21   awhile back were tried early on.  But before they were tried,

22   service was made appropriately, at least in some instances, and

23   no answer was filed.  When I got the cases, I tried my best to

24   get the word out to the defendants that it was time to answer.  I

10:08:22    25   gave them a long period of time to answer and then I instructed

**OFFICIAL TRANSCRIPT**

1   the plaintiffs to take a default because a year or so had gone by

2   without answering.

3           They took a default, and again I put the word out

4   through counsel that something had to be done.  Nothing was done

5   so the plaintiffs filed the necessary motion for a

6   judgment-debtor rule.  That was served and the defendants didn't

7   answer the judgment-debtor rule.

8           I felt I had no alternative but to hold them in

9   contempt of court, something I don't do.  This may be the first

10  time that I've done it over the years, the 20-some-odd years that

11  I've been here.  I take it seriously.  I had no alternative but

12  to hold them in contempt.

13          I provided something like $15,000 in attorneys' fees

14  and $40,000 in penalties, as I recall, but I also said that they

15  would be enjoined from doing business in the United States until

16  they purged themselves of contempt.  And I said they or their

17  associates or other entities attached to them.

18          They eventually came back in and paid the amount, but

19  there was about a six-month period there that it was potential

20  for them to have -- to owe 25 percent of the earnings for that

21  period of time, either they or their other entities, and the

22  plaintiffs conducted some discovery on it.

23          But we're here today to deal with contempt enforcement.

24  I'll hear from the parties.

25          MS. DUGGAN:  Good morning.  Sandra Duggan for the

10:08:47

10:09:12

10:09:35

10:10:08

10:10:31

**OFFICIAL TRANSCRIPT**

1 plaintiffs.

2         May it please the Court:

3         The Taishan defendants and their parent companies, BNBM

4 and CNBM, have made it clear that they do not subscribe to our

5 system of justice.  When the problems arose concerning the

6 drywall that they manufactured in China and shipped to the

7 United States, when the complaints started coming in, they made a

8 strategic decision simply to ignore the lawsuits.  They decided

9 not to respond to thousands of claims filed against them in this

10 country.

11         Why would they do that?

12         Well, they've told us:  This Court does not have

13 jurisdiction over them.  There is no U.S. treaty with China, a

14 mutual recognition, and enforcement of judgments, and Taishan has

15 no assets here.  Therefore, according to the defendants, the

16 possibility of U.S. judgments being enforced in China is very

17 low.

18         Based on these principles, Taishan, with approval and

19 direction from CNBM, decided early on that it would be far less

20 expensive to avoid the litigation altogether than respond fairly

21 to the claims of thousands of homeowners.

22         That mindset that our courts cannot tell them what to

23 do, that plaintiffs have no recourse against them because they

24 are Chinese companies with no assets here, that they do not have

25 any obligation at all to respond to our citizens' complaints --

**OFFICIAL TRANSCRIPT**

1  that mindset is what led us here today.

2         It is not surprising, then, that the CNBM and BNBM

3  entities and Taishan have repeatedly shown disrespect for the

4  Court and for Your Honor's rulings.  They've done everything

10:12:09  5  possible in their ability to avoid having to pay judgments to

6  American citizens, and the plaintiffs have faced innumerable

7  obstacles trying to get these recalcitrant companies to do the

8  right thing.

9         On July 17, 2014, this Court held Taishan in contempt

10:12:27  10  civilly and criminally for its refusal to appear in open court.

11  Taishan did not act alone.  Its parent companies controlled,

12  aided, and abetted Taishan's decision to fire their counsel and

13  withdraw from the case in direct and blatant disobedience of the

14  Court's order.

10:12:46  15         An integral part of the contempt order included an

16  injunction.  Taishan and its affiliates and subsidiaries were

17  prohibited from doing any business in the United States unless or

18  until Taishan participated in these proceedings.  It was

19  necessary, the Court said, to coerce Taishan to return to this

10:13:06  20  Court to pay the valid judgment against it and to answer the

21  claims of thousands of additional victims.

22         The Court held the contempt order alone would not stop

23  Taishan from continuing to disregard the orders of the Court.  We

24  have learned, unfortunately, that even with this injunction,

10:13:24  25  Taishan and its affiliates, including many of the CNBM and BNBM

**OFFICIAL TRANSCRIPT**

1  entities, disregarded and violated the Court's injunction.

2  We are here today seeking to enforce the penalties

3  imposed for violations of that injunction, and we've been here a

4  very long time.  This MDL began on June 15, 2009, and

10:13:45  5  unfortunately, after almost eight years, approximately 3,000

6  plaintiffs with Chinese drywall in their homes are still awaiting

7  redress.  It's not for lack of effort on the part of the

8  plaintiff steering committee or this Court.  The reason that the

9  plaintiffs have not been compensated is because the manufacturers

10:14:06  10  have refused to pay the damages they caused, and this is in stark

11  contrast to the Knauf manufacturing defendants.

12  Taishan Gypsum and its controlling parents have a long

13  history of disrespecting this Court and our judicial process in

14  this case.

10:14:22  15  First, they refused to participate even though they

16  were served under the Hague Convention.

17  Second, they waited for the *Germano* default judgment to

18  be entered before they came in to challenge jurisdiction.

19  And when they did come in to the litigation, they were

10:14:38  20  not forthright.  They claimed falsely that they only made two

21  shipments of drywall to Virginia and two to Louisiana, but they

22  had no idea where that drywall ended up.  These defendants knew

23  all along that they purposefully shipped more than 70 million

24  square feet of drywall to customers in the United States.

10:14:55  25  Third, Taishan repeatedly abused the discovery process.

**OFFICIAL TRANSCRIPT**

1    They exaggerated during depositions, they refused to properly

2    produce documents, and in November of 2011 they threatened to

3    withdraw from the litigation.  Their dilatory tactics required

4    the Court to personally travel to Hong Kong for a second round of

5    depositions.

6         Fourth, after two separate panels from the

7    Fifth Circuit upheld Your Honor's ruling that TG and TTP are, in

8    fact, subject to the jurisdiction of this Court, these defendants

9    orchestrated a plan to unilaterally withdraw from the litigation

10   and refused to appear, and this was in direct violation of the

11   Court's order requiring Taishan to appear.

12        Fifth, after the Court held Taishan in contempt and

13   enjoined the companies from doing business in the United States,

14   they repeatedly violated the injunction with no regard for any

15   consequences.

16        And finally, even after they violated the injunction

17   and the Court ordered expedited discovery regarding the

18   violations, Taishan continued to engage in abusive discovery, and

19   that resulted in an additional sanctions order.  The enforcement

20   of that order is still pending before the Court and will be heard

21   next month.

22        So in furtherance of their plan to deny relief to the

23   plaintiffs, these defendants have repeatedly demonstrated they

24   have little or no regard for the Court's jurisdiction and the

25   laws of this country.  They've shown little or no interest in

**OFFICIAL TRANSCRIPT**

1    resolving the plaintiffs' claims.

2         Back in 2009 when Taishan abstained from participating,
3    BNBM and CNBM were involved.  They monitored the litigation and
4    they controlled the events that transpired.

5         On April 21, 2009, and on May 15, 2009, before the MDL
6    was even formed, Taishan's biggest competitor, Knauf, wrote to
7    the head of CNBM Group about these lawsuits and encouraged CNBM
8    and BNBM to take effective measures to respond to the U.S.
9    consumer lawsuits as soon as possible.

10        And then on May 11, 2009, Taishan Gypsum prepared a
11   report for the leaders of CNBM Group, Chief Song and Chief Sal,
12   so the leaders can understand the facts of the case and give
13   relevant instructions.  This report reveals their intent to deny
14   relief to the plaintiffs and ignore and disrespect this Court's
15   jurisdiction.

16        The reported admits large quantities of drywall shipped
17   to the United States from 2005 to 2008, more than 70 million
18   square feet.  The report admits that drywall is subject to
19   complaints from customers, and Taishan tells CNBM Group it is not
20   inclined to respond to the lawsuit because that would incur large
21   amounts of attorneys' fees; and since there's no judicial treaty
22   between China and the U.S., even if the lawsuit is lost, the U.S.
23   court cannot enforce Taishan's assets in China.

24        So instead of responding to those suits, Taishan tells
25   CNBM, When necessary, Taishan will mail evidence that is

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/09/18 Page 40 of 83

1  beneficial to Taishan to the U.S. court, and Taishan asked CNBM
2  Group for instructions and approval as to whether such inaction
3  is appropriate.

4         In accordance with this plan, they did allow default
5  judgments to be entered, and a year later, in May of 2010,
6  Your Honor entered the default judgment in *Germano* for
7  $2.7 million.

8         On June 3rd, 2010, a few weeks later, CNBM Group, the
9  entity all the way at the top, had two important telephone
10  conferences with the leaders of BNBM and Taishan about the
11  strategy for responding to gypsum board litigation in the U.S.

12        And the chairman of CNBM Group, of BNBM Group, and of
13  CNBM, Chairman Song, agreed that CNBM Group should organize the
14  response to the litigation.  They discussed hiring Hogan Lovells
15  to represent Taishan.  And on the last day to appeal the *Germano*
16  judgment, Taishan did come in represented by Hogan Lovells but
17  solely to contest jurisdiction.

18        For the following two years, from 2010 to 2012, CNBM
19  Group continued to control the tortured proceedings that were
20  designed to delay and deny relief to the plaintiffs.

21        There were numerous depositions in the United States.
22  We had to go to Hong Kong twice.  There were motions to compel.
23  There were -- Taishan also did not produce a number of the
24  documents that we now have that didn't come to us until 2015.
25  And finally, after two years, there was briefing on four separate

10:18:22
10:18:40
10:19:02
10:19:22
10:19:44

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 197 of 258
Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 197 of 258

41

1    motions to dismiss for lack of jurisdiction.

2              We were successful on those motions, but rather than

3    pay the judgment, they appealed to the Fifth Circuit.  And after

4    four appeals to the Fifth Circuit, finally -- finally -- on

10:20:02  5    January 28, 2014, the Fifth Circuit affirmed jurisdiction over

6    Taishan in the *Germano* case.

7              And from that moment, CNBM and BNBM orchestrated a plan

8    for Taishan to avoid having to pay that judgment.  Right away

9    they started strategizing on how to exit the litigation.

10:20:23  10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████████████

13             On May 20, 2014, the Fifth Circuit affirmed

14   Your Honor's ruling in *Gross*, *Wiltz,* and *Mitchell,* so the

10:20:39  15   plaintiffs were thinking that finally they could execute on the

16   judgment in *Germano*.  That's after five years of litigation.

17             So on June 20, 2014, Your Honor ordered Taishan to

18   appear in this courtroom for a judgment-debtor examination, and

19   there's no question that CNBM and BNBM were involved in and

10:21:00  20   controlled Taishan's refusal to appear for that hearing.

21             Taishan's chairman, Mr. Jia Tongchun, he testified that

22   he was summoned to a CNBM Group meeting, he thinks he was asked

23   to go there by BNBM, to report on the status of the litigation.

24   That was extraordinary.  Mr. Jia does not normally attend CNBM

10:21:23  25   Group meetings.

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 198 of 258
Case 2:09-cv-06504-EEF-MBN Document 131-1 Filed 09/20/18 Page 42 of 83

42

1 ████████████████████████████████████████

2 ██████████████████████████████████████████

3 ████████████████████████    ███████████████

4 ███████████████████████████

10:21:39   5        On July 7, 2014, Mr. Dong told Hogan Lovells,  ██████

6 ████████████████████████████████████████████

7 █████████████████████████

8          And then on July 11th, six days before the contempt of

9 court, two events occurred.  CNBM Group's board of directors

10:22:05  10 unanimously approved the decision for Taishan not to continue to

11 participate in any of the gypsum board litigation brought against

12 Taishan in the U.S. courts.  And on that same day, CNBM Group

13 issued orders to its subsidiaries to ensure that their assets and

14 funds would be out of the court's reach.  They told their

10:22:24  15 subsidiaries, Don't put your money in New York banks and don't

16 you use company e-mails when doing business overseas; rather, use

17 your personal e-mail accounts.

18          As we all know, on July 17, 2014, Taishan was a

19 no-show, and the Court issued its contempt order.  That order was

10:22:43  20 very clear and very precise; it was not vague.

21          Now, the defendants over in China were well-aware of

22 this order, because the very next day, on July 18, 2014, both

23 CNBM and BNBM issued public announcements.  They said that TG,

24 after due and careful consideration, decided not to continue to

10:23:06  25 participate.  So they admit that they unilaterally decided not to

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22396-14 Filed 12/02/19 Page 199 of 258
Case 2:09-cv-06504-EEF-MBN Document 391-1 Filed 02/20/14 Page 43 of 44

43

1    abide by the Court's order.

2         On August 5, 2014, Taishan's counsel purposefully sent

3    an e-mail to the leadership of CNBM and BNBM, to Chairman Jia and

4    to Peng, and he said, ████████████████████████████████

10:23:27

5    ████████████████████████████████████████████████

6    ████████████████████████

7         Now, the defendants also contemplated what Your Honor

8    meant by "affiliates."

9         On August 12th, 2014, Taishan's counsel wrote, ██

10:23:45

10   ██████████████████████████████  ████████████████

11   ████████████████████████████████████

12   █████████████████████████████████████

13   ██████

14        And on August 20, 2014, CNBM and BNBM issued another

10:24:04

15   announcement.  They admit and they tell everyone that the U.S.

16   District Court held Taishan in contempt of court ordering it to

17   pay certain amounts of penalty and the plaintiffs' attorneys'

18   fees and enjoining Taishan Gypsum and its affiliates or

19   subsidiaries from conducting any business in the United States.

10:24:24

20        Unfortunately, after Your Honor entered the contempt

21   order, we've learned that despite their awareness and their

22   understanding of the contempt order and injunction, CNBM and BNBM

23   took no steps to comply -- none.  Chairman Jia from Taishan did

24   ask an assistant to notify the company subsidiaries about the

10:24:49

25   injunction, but that notification occurred seven months after the

**OFFICIAL TRANSCRIPT**

1   date of the contempt order.

2          At great expense and time, the plaintiffs noticed

3   dozens of third-party depositions here in the United States in an

4   attempt to uncover what the violations were, if any, during the

10:25:11   5   period of contempt. And we have learned, and it's set forth in

6   our brief in great detail, that there were dozens and dozens of

7   the violations of the Court's order.

8          Now, they are set forth with exhibits in the brief. We

9   have invoices, contracts, wire transfers. This is just a summary

10:25:29   10   chart that shows what was going on during the period of contempt

11   from July 17, 2014, until March of 2015.

12          But just a brief summary, Your Honor.

13          These companies were purchasing lumber in the

14   northwest, in Oregon and Washington, to export to China.

10:25:46   15          They were involved in litigation in Oregon. And they

16   settled that litigation, and part of the settlement involved

17   transfers of payments to them.

18          Some of these entities initiated litigation. They used

19   our judicial system as plaintiffs in an attempt to recoup

10:26:03   20   millions of dollars in the state of Texas in federal court for

21   fees from the sale of wood flooring products. When the judge in

22   Texas found out about Your Honor's order, he halted that

23   litigation.

24          BNBM Group acted as a clearing agent for the purchase

10:26:17   25   of lumber to be exported to China.

**OFFICIAL TRANSCRIPT**

```
 1        They funded United Suntech here in the United States --

 2   that's one of the CNBM entities -- and sold goods in the U.S.

 3        They operate an e-commerce site that's similar to

 4   Alibaba -- it's called okorder.com -- in an attempt to increase

 5   their sales.

 6        And we know from prior briefing and discovery in the

 7   Taishan jurisdictional motions that alibaba.com did find

 8   customers to buy their products.  All of these -- many of these

 9   affiliates maintained storefronts on alibaba.com during this

10   period.

11        They also did business with a company called Sunpin to

12   manufacture solar panels for Walmart grocery stores.  The

13   contract is for 1100 stores.

14        They have an ongoing relationship with the New Jersey

15   Institute of Technology.  In fact, there's a laboratory at the

16   university and it's called the CNBM Laboratory.  They develop

17   photovoltaic technology there.  They also send their executives

18   for training there.  And this is what led, we believe, to their

19   ability to get these solar panel contracts.

20        And the list goes on and on.  As I said, it's set forth

21   in our brief.  There are numerous individual invoices and

22   receipts.  There's summary charts.  It's all there.

23        Now, why did they violate the order?  Why would they do

24   that?

25        Because, according to them -- and this is a quote from
```

**OFFICIAL TRANSCRIPT**

10:26:36
10:26:53
10:27:08
10:27:25
10:27:40

1 one of their announcements:  The major assets of the companies

2 CNBM, BNBM, and Taishan Gypsum are all located in China.  The

3 possibility of U.S. judgments being enforced in China is very

4 low.

10:27:56

5          So what do we do?  Where do we go from here?

6          There's no doubt that Your Honor had the authority to

7 hold Taishan in contempt of court.  Almost 200 years ago in 1821

8 the Supreme Court in *Anderson v Dunn*, 19 US 204, held:  Courts of

9 justice are universally acknowledged to be vested by their very

10:28:18

10 creation with power to impose silence, respect, and decorum in

11 their presence and submission to their lawful mandates.

12          The Court's orders are not optional.  This is not a

13 so-called court, this is a real court.  Your Honor issues real

14 orders.  And these orders have to be followed or people get hurt.

10:28:40

15 Our system of justice is damaged.  The parties to a litigation

16 cannot simply comply with the orders that they like and ignore

17 the ones they don't like.

18          Look what happened here.  Taishan and TTP, they didn't

19 like the order affirming jurisdiction over them.  But rather than

10:28:54

20 seeking *certiori* from the Supreme Court, they fired their counsel

21 and they unilaterally withdrew from the litigation.  There's no

22 doubt under these circumstances that the Court has broad power to

23 hold them in contempt.

24          The Supreme Court also said -- this is a case from

10:29:12

25 1911, *Gompers v Bucks Stove & Range Co.*:  If a party can make

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 203 of 258
Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 4 Page 48 of 83

47

1  himself a judge of the validity of orders which had been issued,
2  and by his own act of disobedience set them aside, then are the
3  courts impotent, and what the Constitution now fittingly calls
4  the judicial power of the United States would be a mere mockery.

10:29:35  5         Your Honor's injunction has nationwide application.
6  The Fifth Circuit made that clear in *Waffenschmidt v Mackay*.  The
7  Court cannot only bind parties, but non-parties to its orders.
8  Because if a party could violate an injunction by getting a
9  non-party to do the act, then what import would it have?

10:29:57  10        The defendants say:  Well, we don't have enough due
11  process here.  This was a criminal injunction, it wasn't -- a
12  criminal contempt, it wasn't a civil contempt.  And in *Gompers*
13  the Supreme Court said:  Contempts are neither wholly civil nor
14  altogether criminal.  And this Court held Taishan in contempt
10:30:14  15  civilly and criminally.

16        Now, the *Bagwell* case from the Supreme Court in 1994
17  clarified that civil contempt sanctions, or those penalties
18  designed to compel future compliance with a court order, are
19  considered to be coercive and avoidable through obedience.  And
10:30:34  20  that's exactly what happened here.  Your Honor said that you
21  wanted to coerce Taishan to come back to the case and that's why
22  the injunction was put in place.  It's a civil penalty.  And
23  Taishan could and did purge itself of contempt.  That happened.
24  That's why the injunction and the contempt period has an end
10:30:53  25  point.

**OFFICIAL TRANSCRIPT**

1          Now, they also say that the order was not clear, they

2     were unsure of it, but that's not a tenable argument.  They did

3     not come to this Court, when the contempt order was entered in

4     July of 2014, and ask for clarification.  They didn't do that.

10:31:11  5     In other cases, that's what occurs.  They didn't do that.  They

6     waited an entire year before they filed that motion.  And that

7     motion has already been denied.  Their appeal from that motion

8     was sent back from the Fifth Circuit.  So it's just not a tenable

9     argument.

10:31:25  10         They say:  What is an affiliate?

11          These are the affiliates that we're talking about

12    (indicating).  These are the ones -- there probably are more, but

13    these are the ones that we've found violations and that's why

14    we're focusing on them.  I can't think of a more apt definition

10:31:41  15    that satisfies the definition of an affiliate.  Black's Law

16    Dictionary says:  It's a corporation that is related to another

17    corporation by shareholdings or other means of control; a

18    subsidiary, a parent, or a sibling corporation.  That's exactly

19    what we have here.

10:31:56  20         And we give numerous examples in our briefs of where

21    they, themselves, use the word "affiliate."  But there's a letter

22    from the Ministry of Foreign Affairs of the PRC that's talking

23    about this case, and the letter says:  Several U.S. plaintiffs

24    instituted a lawsuit in the U.S. against SASAC, CNBM Group, and

10:32:13  25    five of its affiliates.  They know what "affiliates" means,

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22396-14 Filed 12/02/19 Page 205 of 258
Case 2:09-md-02047-EEF-MBN Document 22380-1 Filed 12/02/19 Page 49 of 83

49

1    there's no doubt.

2          So we submit that no one, no matter their position or

3    title, not even the President of the United States, is above the

4    law.  See *United States v Nixon*, 418 US 683.

10:32:31

5          Your Honor's valid contempt order and injunction was

6    not advisory.  If there are no consequences to their violations

7    of that injunction, there will be no incentive to follow the

8    Court's orders.

9          We don't know how much the penalty should be,

10:32:44

10   Your Honor.  We've asked for the earnings and profits information

11   from these companies multiple times.  There's an outstanding

12   motion to compel discovery, and that will be heard next month.

13   So we ask that the Court find that the defendants violated the

14   injunction and set a hearing to determine the amount of the

10:33:02

15   penalty.

16          And to just put some human perspective on this, sadly,

17   by the time that Taishan purged itself of contempt and paid the

18   *Germano* judgment and fines, many of the *Germano* intervenors, the

19   Germano Seven as we refer to them, had lost their homes through

10:33:18

20   foreclosure or bankruptcy.  They simply were unable to pay their

21   mortgages and at the same time pay for alternative housing for

22   themselves.

23          And meanwhile Michelle Germano, the named plaintiff,

24   who was not an intervening claimant in the *Germano* bellwether

10:33:38

25   trial, is still waiting for compensation.  She recently submitted

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22396-14 Filed 12/02/19 Page 206 of 258
Case 2:09-cv-06024-EEF-MBN Document 91-1 Filed 04/20/18 Page 50 Page 51 of 83

50

1  a declaration in this case.  She had to move out of her home in

2  2009 because of the Chinese drywall.  Her savings were depleted

3  because she had to pay her mortgage.  Her homeowners association

4  sued her for back dues that were owing on her toxic home and

10:33:59  5  ultimately she was forced to declare bankruptcy.  She's now

6  living in a rented home in Norfolk, Virginia.  She's waiting for

7  redress.

8          Will Michelle Germano and the thousands of other

9  homeowners and plaintiffs with claims against Taishan, BNBM, and

10:34:14  10  CNBM receive justice from these proceedings?  We submit,

11  Your Honor, that the time is now for you to consider that.

12          Thank you.

13          THE COURT:  Thank you.

14          Let me hear from the defendants.

10:34:29  15          MR. STENGEL:  Good morning again, Your Honor.  Two

16  quick housekeeping matters.  The defendants have divided the time

17  so I'll be followed for lawyers Dentons and Alston.  I'm taking

18  the lead on opposing the contempt.

19          The other item, we distributed the PowerPoint I intend

10:35:00  20  to use.  Obviously I'm reacting to their argument.  There are

21  matters in there that I won't use.

22          But something we did do for the convenience of the

23  Court, and probably, more particularly, a new clerk, is we did

24  argue many of these items in August of 2015, and I have included

10:35:12  25  our PowerPoint from that hearing.  On the reading of the

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22396-14 Filed 12/09/19 Page 207 of 258
Case 18-31274-MBK Doc 9-1 Filed 06/20/18 Page 51 of 83

51

1    transcript of that proceeding, I realized it was largely
2    meaningless if you didn't have access to the graphics we used.
3              THE COURT:  Okay.
4              MR. STENGEL:  So with that, Your Honor, what I intend
10:35:23
5    to address are really two or three major points.
6              The first is this issue of civil versus criminal, which
7    we discussed almost two years ago.  It is very important in terms
8    of how the Court assesses the priority of the process given the
9    defendants.
10:35:39
10             The second issue really goes to -- and the PSC has
11   cited both Rule 65 and Rule 37 as a rule basis for the exercise
12   of jurisdiction by the Court over the alleged contemnors, and I
13   want to look at those rules in greater detail.
14             I also want to revisit the issue that Ms. Duggan
10:35:57
15   raised, which is the notion of ambiguity and the terms of the
16   order.  And while we think there are a variety of places which
17   are open for debate, our primary lines of attack relate to the
18   meaning of "affiliate" in the application of this case and this
19   context and what "doing business" means similarly in this
10:36:16
20   context.
21             Finally, I offered, when we were here in August of
22   2015, a solution to the problem that has been created by the
23   legal deficiencies of the contempt order and the efforts by the
24   PSC to enforce that order in the way that they've done it.
10:36:31
25             I think the presentation you heard gives very stark

**OFFICIAL TRANSCRIPT**

1    demonstration of the need to put the whole contempt exercise

2    behind us.  I understand, although I was not here, the irritation

3    and the anger that was suffered by the Court and the PSC in that

4    time period when Taishan chose not to appear, but we are years

10:36:52    5    past that.  The defendants have been here; we've litigated, I

6    think, in good faith.  We've attempted to help the Court resolve

7    this matter.  And what has now happened is we've had a

8    continuation of a contempt process which should have ended, and

9    in our position did end, with the return of Taishan to the

10:37:07    10    litigation.  It purged itself of contempt.

11    But to get to that end point, you have to read the

12    order in a particular way, which again we suggested in August of

13    '15.  By leaving that open I think you see the problem of that,

14    of an unbounded effort by the PSC to pursue business that had

10:37:26    15    nothing to do with what I was suspect was the Court's ultimate

16    intention with the contempt order itself.

17    But let me turn to the first issue of civil versus

18    criminal contempt.

19    I'll say at the outset much of what Ms. Duggan said I

10:37:41    20    think proved our point.  Typically when a court acts to protect

21    its prerogatives, controlling the behavior of people in front of

22    it on a punitive basis, that typically falls into the criminal

23    contempt category.  This Court is aware of that.  Plaintiffs

24    cited the *Bagwell* case as the controlling Supreme Court authority

10:38:08    25    on this civil versus criminal contempt issue.  We think the way

**OFFICIAL TRANSCRIPT**

1  particularly the PSC has interpreted this order, we are

2  squarely -- as it relates to the 25 percent of profits penalty,

3  squarely in the area and the law of criminal contempt, which has

4  a number of implications for how this litigation goes forward.

10:38:30
5           In brief, we're entitled to a full range of due process

6  rights that are appropriate for criminal prosecution; the PSC,

7  because of its interest in the outcome of the litigation, is

8  disabled -- disqualified from proceeding as a prosecuting counsel

9  here; and the class doesn't receive penalties, those are paid to

10:38:50
10  the Court.

11          Next slide, please.

12          Now, I'm not going to reargue jurisdiction.  Those

13  matters are pending before Your Honor.  You've heard us fully on

14  that.

10:39:00
15          For purposes of whether we violated the order -- "we"

16  meaning for this purpose the CNBM entities -- we have focused

17  primarily on the contempt order entered by this Court in July of

18  2014.  What happened before then may have been an irritant, it

19  may have angered the Court and the parties, but it's not an

10:39:20
20  injunction that had binding effect on the CNBM entities.  So

21  we're going to focus on the court's order, not what happened

22  before it.

23          And with respect to the PSC, as Your Honor knows from

24  prior discussions of this matter, we think they do a fair amount

10:39:34
25  of violence to the decision-making process by Taishan not to

**OFFICIAL TRANSCRIPT**

1   appear, and the decision of CNBM Group to respect that decision

2   is a long way from the allegations -- the bald assertions of

3   control.

4          And we'll get to this in greater detail when we look at

10:39:53   5   the order itself.  There is a zone -- and the *Waffenschmidt* case

6   probably outlines this -- where courts have some flexibility to

7   bring in non-parties.  We are well beyond any acceptable scope of

8   the law right now.

9          Next slide, please.

10:40:04   10          Now, I'm not going to belabor the fact that the Court

11   has called this criminal contempt.  That was clear.  That was the

12   intention of the Court at the time.  We think it is clear today.

13          Next slide, please.

14          I would also note that the Court cited Criminal Rule of

10:40:22   15   Procedure 42.  There's no real debate that at the outset there

16   was a criminal element to this order.

17          Now, ironically -- and I'm not sure I fully understand

18   what Footnote 7 in the PSC opposition to class decertification

19   was intended to say, but they are still taking on the mantle of

10:40:40   20   their rights to make sure that the defendants comply with

21   criminal law.  That, I think with the comments from Ms. Duggan

22   here, suggest that the PSC is still, at best, undecided as to

23   whether this is criminal versus civil, and probably would

24   acknowledge that it's largely criminal.  And probably also

10:40:57   25   acknowledge that when you have a mixed civil versus criminal

**OFFICIAL TRANSCRIPT**

1  situation, you default to treatment as a criminal contempt.

2       Next slide, please.

3       Now, these are definitions.  *Lamar Finance* is the

4  source of the authority for the fact that when you've got a mixed

5  question of civil and criminal law, you default to the procedural

6  protections that are appropriate for a criminal proceeding.

7       And the backward-looking and unconditional is one of

8  the sort of functional definitions of how you get to is it

9  coercive civil or is it criminal.  And that's a point of some

10 confusion here which I think we can allay.  And I think the PSC

11 has already helped with this.

12       Next slide.

13       Now, this is the Court's order, the document that we

14 think we are here for.  And I think there's some interesting

15 parallels here.

16       The PSC has acknowledged that the $40,000 payment was a

17 penalty.  That was criminal in nature.  It was a fixed amount.

18       Interestingly, the 25-percent-of-profit charge is also

19 deemed a penalty in the four corners of the injunction, which

20 gives further credence to the fact that it was, and was intended

21 to be, criminal in the future.

22       Next slide, please.

23       Now, why this is important.  Ms. Duggan had a slide

24 purporting to show all the activity in the United States by

25 various -- and I'm going to say "related parties," not to fall

**OFFICIAL TRANSCRIPT**

```
 1    into the "affiliated" trap.  But Your Honor will notice that some

 2    of that conduct started as soon as 2001.  And if you go to the

 3    brief that the PSC filed to revivify their contempt efforts --

 4    and these numbers will not be precise because under each category

 5    there are numerous entities and numerous transactions captured,

 6    but of the 21 categories of activity, 14 of those relate to

 7    preexisting business activity.

 8              And why is that significant?

 9              It's highly significant here because of the way that

10    the injunction is formulated.

11              Can we go back to the injunction.

12              There's no warning track with this injunction.  The

13    minute it was entered, this was affective as against the Taishan

14    defendants.  And the way this operates, and it's indeed a large

15    part of the claim being made by the PSC, is that it wasn't only a

16    perspective decision to engage in business that was covered by

17    this injunction, but you can tell by the numerous situations

18    where they're claiming that the injunction applies and should

19    give rise to a penalty, it applied to all the existing activity

20    of their broad definition of affiliates.

21              So this was instantaneous.  The moment this injunction

22    was entered, in the PSC's construction of the order all of this

23    activity would give rise -- would trigger the

24    25-percent-of-profits penalty.

25              That means that there was no ability to purge.  And
```

**OFFICIAL TRANSCRIPT**

1  remember the amount of damage claimed, the penalty claimed, is
2  25 percent of the profits of each of those entities alleged to
3  have been engaged in contumacious behavior in the United States.
4  That penalty couldn't be purged.  In their own terms, it was
5  fixed.

6          So that takes you squarely into the teachings of
7  *Bagwell* where the Court reacted to a perspective list of fines to
8  be imposed on a union and said:  Well, yes, in some cases
9  perspective fines would be coercive civil penalties.

10         But in this context, given that there was no way for
11  the alleged contemnor to -- and this is to misapply the
12  imprisonment analogy to damages.  The contemnors didn't have the
13  keys to their cells.  They couldn't purge.  According to the
14  PSC's own position, these penalties were fixed and in place.

15         Go forward now.

16         So where are we in terms of how the order as written
17  and read by the PSC applies?

18         We're in a situation where we don't believe these are
19  properly affiliates.  We don't believe they are properly doing
20  business under the terms of the order.  But to the extent there's
21  ambiguity about those terms, they make the order defective under
22  Rule 65.

23         Next slide, please.

24         This puts us in a place where we are entitled and have
25  been entitled throughout this process to the full range of due

**OFFICIAL TRANSCRIPT**

1    process rights that would be available to criminal defendants.

2            Functionally the most important aspect of this, and

3    maybe the most troubling, is the PSC is disqualified from

4    operation.  They shouldn't have been involved in this.

5            Next one.

6            We are also entitled -- and this gets to -- and we will

7    discuss it when we get to Rule 65 in a little greater detail.

8    We're still in a world of relying on findings of fact and

9    conclusions of law this Court entered long ago in terms of the

10   control.

11           We're still in a world -- and I'm not going to repeat

12   all the jurisdiction arguments.  There are multi-layers of

13   subsidiaries here.  There are shareholdings that go up and down.

14   You're going up the line through a sovereign entity and back

15   down.

16           But as we'll talk about, when we're talking about

17   aiding and abetting, the limited window that the Fifth Circuit

18   has recognized where a non-party can be subject to contempt

19   remedies, they require specificity.

20           And here you've got a convergence of an evidentiary

21   burden.  A presumption of innocence, which would operate, as

22   Your Honor recognized, as the Bancec presumption in the foreign

23   sovereign immunities context, coupled with evidence beyond a

24   reasonable doubt.  And as to most of the control issues that are

25   relevant for this issue, particularly as it relates to the CNBM

**OFFICIAL TRANSCRIPT**

1  entities, there aren't even allegations sufficient to make the

2  case, let alone proof at this level.  And then a right to a jury

3  trial.

4           So this Court, in our view, having determined that this

5  is a criminal contempt, is not in a position to decide by summary

6  adjudication what the plaintiffs have asked for in this motion.

7           Next slide.

8           THE COURT:  Do you think I should have a jury trial

9  involving CNBM or BNBM to determine whether or not you're in

10 contempt?

11          MR. STENGEL:  First of all, you can't do it with these

12 lawyers, Your Honor.  You'd have to have new counsel.  And I

13 think --

14          THE COURT:  Is that what you want?  You want a jury

15 trial?

16          MR. STENGEL:  No, Your Honor.

17          We have two grounds to object.  We think this is fatal

18 to the current process.  But as I'll deal with in the remainder

19 of this argument, we think to start over with independent counsel

20 or the U.S. Attorney would be an act of futility.  We strongly

21 suspect that a disinterested prosecuting counsel would look at

22 this record and say it doesn't fall within what the Court was

23 intending to reach -- although the fact that we're all arguing

24 about what the Court was intending to reach for the injunction is

25 a problem in and of itself and probably a fatal legal defect.

**OFFICIAL TRANSCRIPT**

1    But let's cover the other problems.

2    THE COURT:  I'm just trying to figure out.  You want me

3    to appointment an independent counsel to proceed against you?

4    MR. STENGEL:  No, Your Honor.  What we want you to do

10:48:09    5    is to say -- and maybe I'll just get to the end point here and

6    try and be helpful to the Court.

7    You know, the order -- and I say this trying very hard

8    not to offend the Court.  I think the order was -- reads like it

9    was written with some degree of anger.  This Court had been

10:48:28    10    disrespected, and there was a long history of irritations before

11    then.  So it may not have been drawn with the precision that it

12    required.

13    THE COURT:  Well, that's -- you know, I understand your

14    feeling and I don't take offense when you say that.  You're a

10:48:45    15    good lawyer and I appreciate your views.

16    I just felt that I told them to appear; they didn't

17    appear.  After a lot of cajoling and trying to get them to come,

18    they didn't appear, and so I held them in contempt.  And I did

19    the $15,000 and $40,000.  And then I said, Don't do business in

10:49:13    20    the United States.

21    And then I said, Well, what happens if they do do

22    business in the United States?  And that's when I put on there,

23    If you do business in the United States, you or your affiliates,

24    you're going to have to then put up 25 percent.

10:49:32    25    I was hoping they wouldn't do business in the

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22396-14 Filed 12/02/19 Page 217 of 258
Case 2:09-cv-06072-EEF-MBN Document 3 Filed 01/01/14 Page 61 Page 252 of 83

61

 1   United States.  And I was hoping that they would say, Okay, we're

 2   in now.  But, you know -- and notwithstanding that, it didn't

 3   work.

 4            MR. STENGEL:  Well, Your Honor, to engage in further

 5   speculation of what might have happened -- and I think what

 6   you're seeing is ambiguities in the injunction provided a window

 7   through which the PSC could charge and make this something very

 8   different than I think it was intended.

 9            If you read "affiliates" in a conventional way, that

10   might have gotten you one level of relationship.  It would have

11   been subsidiaries, obviously.  It might have been one level up.

12            But you hadn't intended, I don't believe -- and if you

13   did, I think it's a clear deficiency of the order -- for there to

14   be this endless daisy chain of interest.  And it can't have been

15   the Court's -- I mean, let's put it in the context of the

16   *Waffenschmidt* case.

17            There there was a bank and some individuals who helped

18   an individual who was under a TRO to retain funds because of a

19   fraudulent securities transaction.  The bank, interestingly, was

20   absolved because it was merely negligent and hadn't intended to

21   violate the order.  Two Mississippi residents -- I may be getting

22   the states wrong, but it involved Texas and Mississippi -- were

23   clearly employed by the debtor contemnor to try and get assets

24   out of the control of the court.

25            THE COURT:  Sure.

10:49:46
10:50:01
10:50:16
10:50:31
10:50:46

**OFFICIAL TRANSCRIPT**

1      MR. STENGEL:  And there the Court did say:  The

2  language is there; we could apply contempt to non-parties over

3  whom we don't have jurisdiction.  But the Court then went on to

4  say:  I have two bases to assert jurisdiction over them.  One is

10:51:00    5  respect for the court itself.  The other is to apply conventional

6  *International Shoe* evaluation standards.

7          So in that case -- but that gets to my point about what

8  could have been done with a more carefully crafted -- I mean, let

9  me put it in a very concrete way.  If after you entered the

10:51:16   10  injunctions, if Taishan had said:  Boy, we've got six shiploads

11  of bad drywall we'd really like to get to the United States, but

12  we have an injunction, we can't do it.  Well, let me call my

13  friends at BNBM and say, Hey guys, can you do this under your

14  name and ship it to the United States?  And they said, Fine.

10:51:33   15  That would be exactly the kind of aiding and abetting of contempt

16  and evasion of your order that I think the law allows.

17          What the law doesn't allow, though -- and when I got to

18  the point about assertions here, I think you'll hear from

19  Taishan -- and I have to be mindful of time because I know there

10:51:52   20  are people anxious to talk behind me.  But I don't think there's

21  any assertion that Taishan did any business.  There is no

22  assertion that any of the other entities did anything to aid and

23  abet a Taishan violation of the injunction.

24          So we don't have a *Waffenschmidt* situation here.  We

10:52:12   25  don't have a clear situation where there's an injunction and a

**OFFICIAL TRANSCRIPT**

1   third party helps the object of an injunction violate it.

2          Nor are there any indications that Taishan had anything

3   to do with any of that long list of activities, many of which

4   were preexisting.  And that's where they get to the point of the

5   dual ambiguities here.

6          And we've briefed this so I'm going to try and be brief

7   because I feel the pressure behind me.  Other counsel want to

8   speak.

9          You know, the "affiliates" issue is very difficult in

10  this context, because the PSC -- and we have a slide that I know

11  you're familiar with -- has come up with wildly different numbers

12  of affiliates.  They have gone up and down.  They've defined them

13  differently.  They are now including SASAC.  And, you know,

14  there's no logical stopping point.  I mean, if you're allowed to

15  chain ownership or control or influence, you should have the

16  Peoples Republic of China here.  You should go to the other

17  state-owned enterprises.  There's no limiting device in this

18  other than to say we give you one level of ownership and we give

19  you a tangible and substantial relationship with a violation of

20  the injunction.

21         We don't have that here, and that's why "affiliates" as

22  applied in this order is ambiguous.

23         Similarly, "doing business," think of what the PSC

24  definition entails.  How was a CNBM-related entity supposed to

25  know that it had to stop a cooperative investment relationship

10:52:32
10:52:42
10:53:00
10:53:20
10:53:36

**OFFICIAL TRANSCRIPT**

1  with New Jersey Technical Institute having to do with solar

2  power?  It had nothing to do with drywall.  It had nothing to do

3  with Taishan.  It had nothing to do with the litigation in this

4  court.  It was a longstanding business relationship with a public

5  interest involved.  What reasonable person would have read the

6  order -- and here we had the PSC citing a Chinese non-lawyer

7  asking what he thought "affiliates" meant.

8       So we have an order, just to conclude, that has

9  procedural deficiencies because the wrong lawyers have been

10  persuing remedies which are unavailable to them.  I think that's

11  given a lot of the impetus for this process.  We spent a

12  tremendous amount -- literally millions of dollars responding to

13  discovery solely on the contempt issue.  And we've had this

14  dogged pursuit of contempt remedies, and it's, frankly, been a

15  frolic and detour and not in the interest -- particularly from

16  our perspective, whatever is at issue here, we don't think there

17  will be profits between the businesses properly measured.  But

18  even if they were, they would go to the court and not to the

19  class.

20       So you have the waste of time there.  You have the

21  ambiguities inherent in the injunction.  And what we need to do,

22  Your Honor -- and I'll repeat the suggestion I made in August of

23  2015.  The order has a disjunctive.  It's "until or unless

24  Taishan returns to this litigation."  You can read the order

25  literally as suggesting that Taishan could, in fact, purge --

10:53:52
10:54:12
10:54:29
10:54:43
10:55:03

**OFFICIAL TRANSCRIPT**

1    different from my interpretation and the PSC's interpretation,

2    that Taishan could actually purge this fixed and attached damage

3    amount by returning to litigation, which they did.

4            And I think the Court will appreciate that while there

10:55:22    5    have been bumps in the road, counsel for the defendants have

6    worked very hard to make sure we're always viewed as acting in

7    good faith.  We've tried to make this litigation work for the

8    Court and the PSC.  I think we've done a reasonably good job.

9            But that reading ends the default -- excuse me, the

10:55:40    10    contempt process.  We're finished.  There are no trials.  There's

11    no need to reach out further to counsel.  It's over.  The Court

12    got what it wanted.  It penalized Taishan, presumably the $40,000

13    in fees.  It made it come back here.

14            The alternative path is knowing there's a tract.

10:55:57    15    Because, as Your Honor knows, once we get into the thicket of

16    criminal versus civil, and whether we've gotten appropriate due

17    process rights, we have all sorts of issues which would be

18    fascinating to the people across the walkway.  We have procedures

19    that would have to be followed to get to a point where we could

10:56:12    20    even have a decision on what damage amount is appropriate.  Those

21    take time from the Court, which I don't think the Court has

22    available.  It would be a diversion for counsel on both sides.

23    It would be a substantial additional expense.  And to what end?

24            Nothing good will come of that path.  We're at a point

10:56:29    25    in time for this Court to say contempt has served its appropriate

**OFFICIAL TRANSCRIPT**

1  purpose.  The order as reasonably interpreted is over, and we

2  shouldn't be engaged in this process.

3          Thank you, Your Honor.

4          THE COURT:  Thank you.

10:56:49

5          MR. BARR:  I want to thank the Court for its courtesy

6  to let me address the Court in this chariot here rather than

7  standing up at the podium.

8          By the way, I would never put any pressure on

9  Mr. Stengel to finish because we are fully supportive of all the

10:57:02

10 positions that he expressed.

11         Indeed, what I would like to focus on, Your Honor, is

12 whether this particular contempt order can be enforced against my

13 clients, BNBM PLC and BNBM Group.  And I think I would like to

14 basically draw down from the positions that Mr. Stengel

10:57:24

15 explicated here to talk about the particular facts that I think

16 are very relevant.

17         First of all, Your Honor, there is no question here

18 that this contempt order related to the *Germano* case and *Germano*

19 case alone.  The order itself says, "This document relates to

10:57:43

20 *Germano v Taishan Gypsum*."

21         With respect to the *Germano* case, what's critical here

22 is that neither BNBM PLC nor BNBM Group were named as defendants

23 in that case.  They were never served with any form of process in

24 that case.  There are no judgments, defaults or otherwise,

10:58:04

25 entered against either BNBM PLC or BNBM Group in that case.

**OFFICIAL TRANSCRIPT**

1          Your Honor, even if they had been named in that case,
2   this Court would have lacked jurisdiction over them.

3          First of all, *Germano* was a Virginia case at its
4   inception, and this Court -- excuse me, neither BNBM PLC nor
5   Group had the minimum contacts with the state of Virginia to
6   establish long-arm jurisdiction and nor could any of Taishan's
7   contacts be imputed to BNBM under an alter-ego theory,
8   particularly because no such theory was pled in *Germano*.  So
9   we're talking about a particular case in a particular
10  jurisdiction, and it's highly relevant what entities were parties
11  to that case.

12         Go to next one.

13         Your Honor --

14         Nope, next one please.

15         Next couple.

16         Your Honor, when we talk about there being no minimum
17  contacts with the BNBM entities with the state of Virginia, this
18  is a slide -- or a portion of a slide that we had presented to
19  the Court during the jurisdictional argument.  There were
20  literally 30,000 profile forms, give or take a few, that were
21  examined.  There is not a single profile form that identifies any
22  claims that there were any defects in BNBM drywall in any home
23  from any Virginia resident.  So under those circumstances, it
24  would be impossible to find long-arm jurisdiction.

25         And of course Your Honor has fully seen everything that

10:58:28
10:58:46
10:58:56
10:59:12
10:59:33

**OFFICIAL TRANSCRIPT**

1   we've presented on the jurisdiction motion itself with respect to

2   the alter-ego issues.

3         So let's focus particularly on what occurred in *Germano*

4   with respect to the order that the Court ultimately entered.

*10:59:50*

5        *The Germano* plaintiffs filed the judgment-debtor

6   examination, a motion to examine.  What did the motion seek?  It

7   sought an order compelling the in-court examination of Taishan

8   and Taishan's books and records.  There is no reference and no

9   attempt to seek an appearance from either of the BNBM entities.

*11:00:07*

10        The motion that was made does not mention any

11   affiliates of Taishan.  The motion did not seek relief from any

12   entity other than Taishan.  And certainly the motion did not seek

13   contempt sanctions against any entity other than Taishan.

14        The order itself was addressed to Taishan alone.  The

*11:00:25*

15   order that Your Honor issued for the appearance at the judgment-

16   debtor examination imposed no requirements on any other entity,

17   neither the BNBM entities nor any of the CNBM entities.

18        And the order did not give anyone notice that they

19   could be held in contempt if Taishan failed to appear.

*11:00:44*

20        Your Honor, Mr. Stengel addressed at great length the

21   legalities and the unconstitutionality of the application of a

22   criminal sanction order against these parties.  I, again wanting

23   to stay strictly focused on the facts as they pertain to the BNBM

24   entities, want to talk about whether or not the BNBM entities

*11:01:06*

25   received due process -- the appropriate due process protection.

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22396-14 Filed 12/02/19 Page 225 of 258
Case 2:09-cv-06524-EEF-MBN Document 671-1 Filed 02/01/19 Page 69 of 83

69

1    They were not given notice of the contempt hearing.

2    They were not given notice that they could be punished

3    for Taishan's non-appearance at the examination.

4    They had no opportunities to present witnesses at that

5    time.

6    The presumption of innocence that Mr. Stengel

7    addressed.

8    The requirement to prove beyond a reasonable doubt the

9    non-interested prosecutor.

10    The jury trial.

11    What's relevant, Your Honor, is not what happened, as

12    Ms. Duggan recited, all the history prior to the entry of that

13    order, or what has happened in discovery subsequent to the order.

14    What's important is what was before the Court at the time the

15    Court entered that order in that particular case.

16    And, respectfully, at that point in time -- because

17    it's only that point in time that's relevant -- BNBM PLC and

18    BNBM Group received none of the due process protections that are

19    retired with respect to any criminal sanctions.

20    THE COURT:  If they knew of it, though -- do they need

21    a notice if they know it and are kept advised of it?

22    MR. BARR:  No, Your Honor.  They would not be subject

23    to an order unless they were told by this Court, before the Court

24    entered the order, what penalties that they could be subject to.

25    They do not cite a single case in that kind of

**OFFICIAL TRANSCRIPT**

1  circumstance where all of those due process protections were not

2  afforded before the order was entered.

3  Your Honor, respectfully, the Court's first findings

4  with respect to the identity of affiliates came in the Court's

5  class certification order which post-dates that contempt.  So,

6  then, if you don't have, at the time the order was entered, the

7  necessary due process protections afforded, respectfully it

8  cannot be enforced against the other parties.

9  And what may occur subsequent to this litigation, as

10 the Court learned more and proceeded with the case, is not

11 sufficient to effectively retroactively make an order clear that

12 was not clear at the time.

13 THE COURT:  I understand that argument.  But there

14 seems to me that there's two provisions of the contempt order.

15 One is the $15,000 and the $40,000 and pay the judgment of

16 $2 million.  The order doesn't direct CNBM to do that, it directs

17 Taishan to do that.

18 But in the future -- it says don't do business in the

19 future.  And if you do business in the future, you have to come

20 up with 25 percent of it.

21 If BNBM or CNBM, whatever it is, knew about that.

22 I'm not talking about the $40,000 and $15,000 and

23 $2 million.  That was something they didn't know about perhaps.

24 MR. BARR:  Your Honor, they did not --

25 THE COURT:  I'm not saying that.

**OFFICIAL TRANSCRIPT**

1    MR. BARR: I'm sorry, Your Honor.

2    THE COURT: But the plaintiffs are focused on the

3 25 percent in the future, and they say that BNBM knew that.

4    MR. BARR: Your Honor, the question is what procedural

11:04:08 5 protections were afforded to the BNBM entities and the CNBM

6 entities before Your Honor entered that order. That's the

7 critical thing here in terms of the ability of the Court to

8 enforce the order against my clients and against Mr. Stengel's

9 clients.

11:04:26 10    THE COURT: Okay.

11    MR. BARR: The fact that you may learn about an

12 order -- the fact that you may see something and yet have not had

13 an opportunity before its entry to challenge it and to see

14 whether it's appropriate to do the things that they have

11:04:40 15 attempted to do subsequently, that's the critical issue here.

16    Your Honor, I'd like to turn very briefly -- because I

17 know Ms. Eikhoff is now pushing behind me for me to get off the

18 stage here. I want to speak specifically about the issue of

19 whether BNBM PLC or BNBM Group in any respect, even on its face,

11:04:59 20 arguably violated the order. And the answer is a very simple

21 they did not.

22    There is not a single fact, a single document, a single

23 argument that they have made with respect to BNBM PLC that

24 BNBM PLC did any business in the United States during the period

11:05:16 25 of the contempt order. There's absolutely zero facts in the

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22396-14 Filed 12/02/19 Page 228 of 258
Case 2:09-md-02047-EEF-MBN Document 23771-1 Filed 03/20/24 Page 72 Page 73 of 83

72

1    record to that effect.

2         And after all, when we were talking, as Mr. Stengel

3    talked, about the issue about far-flung related entities, yes,

4    BNBM PLC was a partial owner, a roughly two-thirds owner, of

5    Taishan at that point in time.  It was its direct parent at that

6    point in time.  But they did absolutely no business in the

7    United States during the contempt period; a critical factor here

8    as Your Honor decides how to approach this overall situation.

9         Furthermore, there is no evidence in the record that

10   BNBM Group did business in the United States during the contempt

11   period.

12        And, again, the plaintiffs put up a chart showing all

13   the various different corporations.  You'll notice that

14   BNBM Group was way up in kind of the upper left-hand corner on

15   that chart describing the various corporate relationships.

16        Critically, BNBM Group does not own, did not own, has

17   never owned a single share -- or at least during the period of

18   this case, a single piece of Taishan.  They had absolutely zero

19   ownership in that entity.

20        Furthermore, BNBM Group's only involvement in the U.S.

21   during that period of time, and all the documents that they have

22   tried to present in that regard with respect to certain lumber

23   transactions, was that they acted as an import agent in China for

24   some timber transactions.  Their role was to, in China, issue

25   letters of credit.  They were not a purchaser of timber.  They

**OFFICIAL TRANSCRIPT**

 1   were not a transacting party with respect to that.  Their role

 2   was to issue letters of credit in China from Chinese banks for

 3   Chinese customers who imported timber to China.

 4         BNBM Group, during the contempt period, did not sell

 5   any products into the United States; did not export any lumber

 6   out of the U.S. for its own use; did not solicit business in the

 7   United States; did not negotiate or communicate at all with the

 8   timber companies; did not receive any compensation from the

 9   timber companies; nor was it able to control, once those letters

10   of credit were issued, the drawdowns on those letters of credit.

11   And the facts, as we've presented in our brief, is that with

12   respect to virtually all of those takedowns of the letters of

13   credit, the letters of credit were issued long before the

14   contempt order.

15         Your Honor, there is significant authority from the

16   Supreme Court on down indicating that playing that kind of role,

17   with respect to the export of goods from the United States, does

18   not constitute doing business in the United States.  We've

19   presented those cases in our brief.  I won't reiterate them here.

20   But it's pretty clear -- when you have Justice Brandeis stating

21   that purchases and related trips, standing alone, are not a

22   sufficient basis for a state's assertion of jurisdiction, the law

23   is really pretty clear in that regard.

24         Finally, Your Honor, I'd like to just address just very

25   briefly -- and I can go through each of these, but you have these

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22380-14 Filed 12/02/19 Page 230 of 258
Case 2:09-cv-06690-EEF-MBN Document 30-14 Filed 06/20/18 Page 74 of 83

74

1   in the PowerPoint that you can take a look at.

2          The plaintiffs took the depositions of each and every

3   one of the timber companies that were part of these transactions.

4   And I think if we just look at Baillie Lumber as being one

5   representative example of those, it's hard to be more clear than

6   to say, "I would say we didn't have any dealings with BNBM," and

7   "...I would not have recognized them as a customer or somebody

8   that we actually do business with."

9          Your Honor, those kinds of statements are replete

10  throughout the depositions that were taken of those witnesses.

11  They did not view themselves as transacting business with BNBM

12  because BNBM had the very limited role that I described before.

13         Unless Your Honor has any further questions, I pass the

14  baton here to Ms. Eikhoff.

15         THE COURT:  Okay.

16         MS. EIKHOFF:  Your Honor, I realize that collectively

17  we have gone a bit over the allotted time.

18         THE COURT:  That's all right.

19         MS. EIKHOFF:  May I have five minutes, Your Honor?

20         THE COURT:  Sure.

21         MR. BARR:  That was Mr. Stengel's fault, not mine.

22         THE COURT:  That's fine.  Go ahead.

23         MS. EIKHOFF: Your Honor, Christy Eikhoff on behalf of

24  Taishan.

25         Taishan is in a slightly different boat than the other

11:08:36
11:08:55
11:09:12
11:09:27
11:09:48

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22396-14 Filed 12/09/19 Page 231 of 258
Case 2:09-cv-02047-EEF-MBN Document 20184-1 Filed 04/03/19 Page 75 of 83

75

1   parties that have addressed the Court this morning because
2   Taishan is named in the contempt order, and, in fact, is squarely
3   at the center of the contempt order at issue.  But even so, the
4   profits penalty of the contempt order cannot be enforced against
5   Taishan and the PSC's motion to enforce the contempt order must
6   be denied.
7        And, Your Honor, there are three reasons and I will get
8   to them quite briefly.
9        One moment, please.
10                      (A pause in the proceedings.)
11       MS. EIKHOFF:  The first reason is that the
12  private-party prosecution by an interested party in the case has
13  been unlawful under a long and unbroken line of Supreme Court and
14  Fifth Circuit cases.
15       And, Your Honor, Ms. Duggan, in her remarks, directed
16  the Court to the *Bagwell* case and also to the *Gompers* case, and
17  if there were two decisions from the Supreme Court that we would
18  love the Court to review, those would be the two cases.
19       *Bagwell* controls.  It is legally directly on point on
20  this question of when is a fine for violation of an injunction
21  over many months civil, when it is criminal.  The Court looked at
22  the objective criteria and said that this backward-looking
23  investigation of fines that incurred for behavior out of court
24  over several months that an injunction was in place was criminal;
25  and as such, the prosecution by the interested party has been

11:10:11
11:10:32
11:10:55
11:11:16
11:11:42

**OFFICIAL TRANSCRIPT**

1   unlawful.

2          And the cases cited here are from the Fifth Circuit and

3   from the U.S. Supreme Court.  There's no question that the

4   conflict of interest precludes the investigation and prosecution

11:12:04   5   that is taking place.

6          Your Honor, just as an illustration, my esteemed sister

7   of the bar, Ms. Duggan, started her remarks emphasizing the

8   disrespect for the Court, disrespect for Your Honor's rulings,

9   disrespect for our judicial process.  That's how she started.

11:12:25  10   But she ended her presentation with -- by relaying a story about

11   one of the clients that they represent and how her interests have

12   been allegedly harmed.  That is a perfect illustration of the

13   conflict that you have when an interested party prosecutes a

14   criminal contempt matter, and that is why it is not allowed.  It

11:12:51  15   is disqualifying and any contempt judgments by precedent must

16   be -- will be reversed and cannot stand.

17          THE COURT:  So you're suggesting that I should appoint

18   private counsel, too?

19          MS. EIKHOFF:  I am not suggesting that, Your Honor,

11:13:06  20   because I share in Mr. Stengel's response to that question, which

21   was that the purposes of the contempt order, to coerce Taishan

22   back into this litigation, were accomplished.  We've been back in

23   this litigation for over two years now, and, in fact, the

24   investigation and prosecution of this criminal contempt has

11:13:32  25   lasted almost four times as long as the contempt period itself.

**OFFICIAL TRANSCRIPT**

1   It should have ended when we came back.

2        The first three papers that we filed with this Court in
3   February of 2015 suggested that.  We moved to lift the contempt
4   order, we responded to their motion to enforce the contempt
5   order, and we responded to their motion to preclude our
6   participation in the contempt order, and in each of those we
7   said, It's finished; we're back.  And so that is the right result
8   here.

9        And the Court -- the same power that the Court has --
10  the same inherent contempt power that it has to initiate
11  contempt, it has to exercise a termination of contempt
12  proceedings, and that's what we think should happen.

13       THE COURT:  Okay.

14       MS. EIKHOFF:  But not only is Taishan not liable for
15  any contempt because the prosecution has violated Taishan's due
16  process, but also Taishan did not violate the injunction.

17       Your Honor said earlier from the bench that you hoped
18  that Taishan wouldn't violate it.  Well, those hopes have come to
19  fruition because Taishan didn't.  The PSC has not made any
20  serious allegation that Taishan did.

21       THE COURT:  No, I don't think that that's an issue,
22  frankly.  Taishan eventually came back in.  They paid the money.
23  They paid the judgment.  They paid the attorneys' fees.  They
24  paid the $40,000.  And they tell me that they haven't done
25  business.  I assume that that's right.  Nobody says that they

11:13:52
11:14:08
11:14:24
11:14:49
11:15:05

**OFFICIAL TRANSCRIPT**

1    have.

2              The issue really is whether or not they did it through

3    another means.  That's the issue.

4              But you don't have any problem with it.  I mean,

5    Taishan did what they had to do.

6              MS. EIKHOFF:  The only thing that the PSC has pointed

7    to for Taishan is that Taishan had postings on a website that is

8    available throughout the entire world via the Worldwide Web.

9    That is not doing business as a matter of law.

10             But you're right, they have not alleged any

11   transactions because no transactions occurred.

12             And, to follow up on what Mr. Stengel said earlier, any

13   of the transactions that they are alleging have nothing to do

14   with drywall.

15             Taishan is a manufacturer of drywall in the Shandong

16   Province of China, and they are talking about solar panels and,

17   you know, cooperatives with the New Jersey Institute of

18   Technology.  These are things that Taishan had nothing to do

19   with.  And the PSC has not alleged that they had anything to do

20   with it, that they benefited from it in any way or influenced it

21   in any way.

22             THE COURT:  Okay.

23             MS. EIKHOFF:  The third point, and my final point that

24   I wanted to make, Your Honor, is that the PSC's motion asked for

25   attorneys' fees.  This is their phrase and not ours.  They want

**OFFICIAL TRANSCRIPT**

1  their attorneys' fees for the efforts they've made in pursuit of

2  enforcement of the contempt order and injunction.

3         That is a prosecutor's statement and it's not allowed.

4  It's not allowed.  It has been an unconstitutional process, and

*11:16:41*  5  certainly the subject of an unconstitutional process should not

6  have to pay for that process, particularly when it didn't --

7  there were no violations found.

8         Setting aside the constitutional issues, which are not

9  easily moved, but even if you do, just as a pure legal basis,

*11:17:00*  10  there's no legal basis for fee-shifting here.  This is a

11  nationwide injunction.  Under the American rule, the parties bear

12  their own costs.  There's no statutory provision for fee-

13  shifting.  There's no contractual basis for fee-shifting here.

14  So there's simply no mechanism to say that this comes somehow

*11:17:21*  15  back to Taishan to pay for a process that they objected to from

16  the get-go and that others objected to over the course of many

17  months.

18         The last point on the slide, Your Honor, is that this

19  is not a Rule 37 discovery sanction.  We saw that in the reply

*11:17:40*  20  brief.  Obviously when Taishan came back in February of 2015, hat

21  in hand, we paid the fines.  We paid the $40,000 fine.  We paid

22  attorneys' fees to the PSC for the failure to appear for the

23  judgment-debtor examination.  And then we went one step further

24  and paid the entire *Germano* judgment in full with interest.  And

*11:18:05*  25  when that was paid, that ended post-judgment discovery in

**OFFICIAL TRANSCRIPT**

1    *Germano.*

2            So the discovery period is closed and over, and that is

3    when the PSC's investigation of criminal contempt began.  So

4    there's no overlap between the two to say that this is a Rule 37

5    sanction, because it's not.

6            Unless the Court has any questions --

7            THE COURT:  No, I understand.

8            MS. EIKHOFF:  Thank you.

9            THE COURT:  Okay.  Anything in response?

10           MS. DUGGAN:  Yes, Your Honor.

11           Now that these defendants are facing penalties for

12   violating the Court's injunction, they're pleading with the Court

13   and saying that we should not engage in that exercise; it would

14   be a waste of time and a waste of judicial resources.  The PSC

15   was not on a frolic of its own.  The Court ordered us and ordered

16   the defendants to engage in this discovery, and we did exactly

17   what the Court ordered.

18           The Fifth Circuit in the *Waffenschmidt* case made it

19   clear that a Court may assert jurisdiction over persons who, with

20   knowledge of the Court's orders, actively aid and abet an

21   enjoined party.  They don't have to be parties to the case.

22           So there was nothing preventing this Court from seeking

23   future action on the part of Taishan.  CNBM says, Well, that was

24   Taishan that could purge, we couldn't purge for Taishan, but CNBM

25   was controlling Taishan all along.

11:18:23

11:18:30

11:18:47

11:19:05

11:19:26

**OFFICIAL TRANSCRIPT**

Case 2:09-md-02047-EEF-MBN Document 22396-14 Filed 12/02/19 Page 237 of 258
Case 2:09-md-02047-EEF-MBN Document 22380-1 Filed 06/20/19 Page 8 Page 252 of 83

81

1   They talked about a daisy wheel.  These companies are

2   all related.  They're all affiliates.

3   And the due process that they're talking about is

4   what's occurring here.  They are getting their due process.  This

5   is a civil contempt hearing.  They can respond as they've done.

6   They can file briefs which they've done.  This is not a criminal

7   contempt against them.  That is not what this is about.

8   And in the *Bagwell* case, the distinguishing fact from

9   this case is that the penalty there was fixed.  The Court noted

10  the difference between fixing a penalty versus a dollar amount

11  per day of violation.  Well, here the passage of time and doing

12  business in the United States is what will determine what the

13  penalty is.  It was not fixed amount, and that's the difference.

14  And there was nothing inappropriate or illegal or

15  against the law for the Court to issue this injunction and to

16  assign penalties for those violations, and we leave it to the

17  Court's sound discretion as to what happens to that money.

18  THE COURT:  Okay.  Thank you very much, both of you

19  all -- both sides.  I've learned a lot from your briefs.

20  Let me say, we've been here now for a long time and I

21  think it's fair to say that it's not the fault of any of the

22  attorneys in the court.

23  This case had two aspects to it.  One aspect was the

24  Knauf drywall and the other aspect was the Taishan drywall, and a

25  lot of effort was placed on the Knauf drywall.  And the Taishan

11:19:42
11:20:04
11:20:21
11:20:41
11:21:03

**OFFICIAL TRANSCRIPT**

1  drywall hit some road bumps on jurisdiction and other things, and

2  the lawyers of both sides have been diligently preparing that

3  sort of thing.

4        With some of the penalties or some of the other things

*11:21:20*  5  that we've talked about, I have not ruled because the parties

6  have asked me to hold up until this period of time, they wanted

7  to at least explore some other avenues; but it's clear that those

8  avenues haven't borne fruit so I'll be issuing my orders very

9  shortly and you can take them from there.  I suspect either the

*11:21:45*  10  Fifth Circuit or the Supreme Court might be involved in this

11  particular matter, but that's for another day.

12        Okay.  Thank you very much.  The Court will stand in

13  recess.

14                 (Proceedings adjourned.)

15

16                * * * *

17               **CERTIFICATE**

18

19      **I hereby certify this 6th day of March, 2017, that the**

20  **foregoing is, to the best of my ability and understanding, a true**

21  **and correct transcript of the proceedings in the above-entitled**

22  **matter.**

23

24                    */s/ Mary V. Thompson*

25                      Official Court Reporter

**OFFICIAL TRANSCRIPT**

# EXHIBIT "I"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL | : | MDL NO. 2047 |
| PRODUCTS LIABILITY LITIGATION | : | SECTION L |
|  | : |  |
|  | : | JUDGE FALLON |
|  | : | MAGISTRATE JUDGE |
| .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. : | | WILKINSON |

**THIS DOCUMENT RELATES TO:** ALL CASES

<u>**FINDINGS OF FACTS AND CONCLUSIONS OF LAW FROM THE
NOVEMBER 17, 2015 EVIDENTIARY HEARING**</u>

## I.    INTRODUCTION

In the course of discovery regarding alter ego relationships between and among Taishan

Gypsum Co., Ltd. ("TG") and its wholly-owned subsidiary and alter ego Taian Taishan

Plasterboard Co., Ltd. ("TTP") (collectively, "Taishan") and its parent companies and whether

any of Taishan's affiliates or subsidiaries violated the injunction prong of the Court's July 17,

2014 Contempt Order, it came to the Court's attention that Taishan may have endeavored to keep

from discovery the computers and electronic mail of its former employee, Mr. Peng Wenlong

("Mr. Peng") and preclude further testimony by Mr. Peng in this litigation.  Accordingly, on

September 18, 2015, the Court directed that an evidentiary hearing take place to determine

whether Taishan's actions amounted to spoliation, contempt, and/or required adverse inferences

relating to allegations that:

> (1) Taishan knew of and refused or intentionally failed to disclose the current
> (i.e., post-employment) business relationships with and the locations or
> whereabouts of Mr. Peng; and
> (2) Taishan knew that Mr. Peng had documents and/or computer-stored
> information but denied knowing the same or intentionally failed to disclose it
> and did not take proper measures to protect or collect these documents and/or
> computer-stored information. (R. Doc. 19657)

1

(R. Doc. 19657). The Court has now received the parties' argument and evidence and issues the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### a. Taishan's Initial Appearance and the Subsequent Default Judgment

1.  Upon receipt of the June 15, 2009 transfer order from the Judicial Panel for Multidistrict Litigation, this Court promptly issued Pretrial Order No. 1, on June 16, 2009, and posted it on the Court's official website. *See* R. Doc. 2. Paragraph 14 of PTO 1 made clear the duty of each party and each counsel in the consolidated proceedings to preserve documents and, it further specified the potential consequences for the breach of this duty: "All parties and their counsel are reminded of their duty to preserve evidence that may be relevant to this action…Failure to comply may lead to dismissal of claims, striking of defenses, imposition of adverse inferences or other dire consequences."

2.  The first perfected service on Taishan in this litigation was on May 8, 2009 in *Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115. *Mitchell* was originally filed on March 6, 2009 in the U.S. District Court for the Northern District of Florida. *See* (R. Doc. 1-1, Case No. 09-4115).

3.  On May 1, 2009, *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687 was filed in the U.S. District Court for the Eastern District of Virginia as a Virginia class action against Taishan by the owners of homes located in Virginia which were alleged to contain Taishan-manufactured Chinese drywall. *See* (R. Docs. 1-1, 1-2, Case No. 09-6678). On August 3, 2009, Taishan was served in that matter pursuant to the Hague Convention. *See* (R. Doc. 1-7, Case No. 09-6687). *Germano* was then transferred to the U.S. District Court

for the Eastern District of Louisiana and consolidated with this MDL litigation on October 13, 2009. Thereafter, the class was expanded to a nationwide class. *See* (R. Doc. 470).

4.     Taishan failed to timely answer the complaints or otherwise enter an appearance in *Mitchell* and *Germano*, although it had been properly served in both matters. (R. Doc. 52). As a result, the Court after encouraging a response and allowing extensive delay finally entered preliminary defaults against Taishan in *Germano* and *Mitchell*. (R. Docs. 277, 487); *see In re Chinese Manufactured Drywall Products Liab. Litig.*, 894 F. Supp. 2d 819, 832 (E.D. La 2012) *aff'd*, 742 F.3d 576 (5th Cir. 2014) and 753 F.3d 521 (5th Cir. 2014).

5.     After affording Taishan more than a reasonable amount of time to answer or enter an appearance, the Court moved forward with an evidentiary hearing under FRCP 55, in order to monetize the claims of 14 intervening plaintiffs in *Germano* as a predicate for entry of a default judgment. (R. Docs. 502, 1223, 1258, 2380). Following this hearing on February 19 and 20, 2010, the Court issued detailed Findings of Fact & Conclusions of Law. (R. Doc. 2380). On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of the intervening plaintiffs, in the amount of $2,609,129.99. (R. Doc. 3031). On June 10, 2010, the last day to timely do so, Taishan filed a Notice of Appeal of the Default Judgment in *Germano*. (R. Doc. 3670). On this same day, Taishan also entered its appearance in *Germano* and *Mitchell*. (R. Doc. 3668).

6.     After Taishan entered its appearance in the MDL through its then-counsel Hogan Lovells LLP ("Hogan Lovells"), it immediately sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction, as well as on procedural grounds. (R. Docs. 5436, 5583).

3

7.    The Court of Appeal recognized that Taishan's motion for the first time raised jurisdictional issues which were not raised or addressed by the district court. The Court of Appeal thus remanded the case to the district court to address the jurisdictional issue.

8.    Formal personal jurisdiction discovery of Taishan began in October 2010. *See* (R. Docs. 5839, 5840). Discovery included the production of both written and electronic documents, as well as the depositions of Taishan's corporate representatives. This discovery required close supervision by the Court. The first Taishan depositions were held in Hong Kong on April 4-8, 2011. *See* (R. Docs. 8296, 8297). Upon return to the United States, several motions were filed seeking to schedule a second round of Taishan depositions as a result of problems during the depositions. The Court, after reviewing the transcripts from the depositions, concluded that the "depositions were ineffective." (R. Doc. 9107). Accordingly, the Court ordered the parties to move forward with further written discovery and to schedule a second round of Taishan depositions, but with knowledgeable and prepared witnesses, a single translator, and Court supervision. *See id.*

9.    The Court scheduled the second round of Taishan depositions for the week of January 9, 2012 in Hong Kong. Counsel for the interested parties and Judge Fallon traveled to Hong Kong for these depositions. On June 29, 2012, after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions to dismiss. The Court coordinated its hearing with Judge Joseph Farina of the 11th Judicial Circuit of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

10.    Subsequently, on September 4, 2012, this Court determined that is had jurisdiction over TG and its alter ego TTP and denied the motions to vacate and dismiss.

Taishan appealed the decision of this Court. However, the rulings of this Court were affirmed by the Court of Appeals for the Fifth Circuit. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

11.     Taishan filed no petition for *writ of certiorari*, and the judgment in *Germano* became final and enforceable. In order to execute the judgment, Plaintiffs moved for a Judgment Debtor Examination. On June 20, 2014, the Court ordered Taishan to appear in open court on the morning of July 17, 2014 for the Judgment Debtor Examination. (R. Doc. 17774).

12.     Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination. Accordingly, on July 17, 2014, the Court entered an Order holding Taishan in contempt and assessing penalties, fees, and enjoining Taishan or its affiliates or alter egos from doing business in the United States until it purged itself of its contempt. (R. Doc. 17869). The Contempt Order further provided that if Taishan violated the injunction, it must pay a further penalty of 25% of the profits earned by the company or its affiliates who violate the order. *Id.*

### b. Taishan's Return to the Litigation and the Contempt Track

13.     On February 17, 2015, Taishan returned to the litigation with the appearance of new counsel, Alston & Bird LLP ("Alston Bird").

14.     On February 20, 2015, the Plaintiffs' Steering Committee (the "PSC)") sought to continue its discovery of Taishan, issuing a 30(b)(6) deposition notice and seeking production of documents regarding, *inter alia*, Taishan's assets in the United States and entities affiliated with Taishan in an effort to determine if they or any affiliated entities did business in the United States in violation of the injunction. (R. Doc. 18369).

15.     On March 17, 2015, the Court ordered BNBM, BNBM Group, CNBM, CNBM Group, and Taishan to participate in an expedited discovery track related to the issue of whether Taishan or any of its affiliates or alter egos violated the Court's injunction by doing business in the United States during the period it was in contempt of Court.

16.     On March 19, 2015, the PSC served Taishan with a 30(b)(6) Notice of Deposition and expedited document requests related to violations of the Contempt Order (R. Doc. 17869) and alter-ego relationships among Taishan, BNBM, BNBM Group, CNBM, and CNBM Group.  (R. Doc. 18500).  The PSC also sought the deposition of Mr. Peng.  (R. Doc. 18502).

17.     On April 6, 2015, Taishan's counsel and the PSC engaged in a meet-and-confer-conference where Taishan's counsel informed the PSC of its intention to investigate the status of Mr. Peng's files and his current whereabouts.  (PSC Exhibit 30).

18.     On April 24, 2015, Mr. Herman of the PSC reported to the Court that little progress had been made and the PSC still had not been made aware of Mr. Peng's whereabouts or the location of his files.  (PSC Exhibit 70, pp. 10:10-13, 11:18-21, 13:21-14:1).

19.     On April 28, 2015, Taishan filed a discovery status report stating that Mr. Che Gang ("Mr. Che") would serve as Taishan's 30(b)(6) witness and that Mr. Peng had left Taishan's employment in the Spring of 2014.  (R. Doc. 18765).

20.     In an email to counsel for Taishan dated May 18, 2015, Mr. Herman of the PSC again inquired about Mr. Peng's files: "Have you located the e-files and other custodial files of Jia Tongchun and Wenlong Peng? When may we expect production?" (PSC Exhibit 44).

In that email, the PSC further requested that Taishan "concentrate efforts on the custodial files of Che Gang, Peng, Jia…" *Id.*

21.     Beginning on June 2, 2015, the PSC moved forward with the examination of Taishan's corporate designee, Mr. Che.  (PSC Exhibit 44).

22.     At the June 2, 2015 30(b)(6) deposition, Mr. Che testified that Mr. Peng had formally left Taishan's employment but had continued to assist Taishan with the U.S. Drywall litigation until that function was transitioned to Mr. Che.  (PSC Exhibit 85, 6/2/15 Deposition of Che Gang ("Che Depo."), 49:3-21).  While Mr. Che claimed to not know where Mr. Peng worked, he had been in telephone contact with Mr. Peng in preparation for and leading up to his deposition as the corporate representative for Taishan.  He stated he believed Mr. Peng lived in Taian City and provided Mr. Peng's phone number.  Che Depo., 6/2-4/2015, pp. 29:8-11, 49:3-21, 105:20-21, 106:1-107:19, 108:3-12, 150:3-13, 206:10-19.

23.     There were several topics about which Mr. Che was not fully able to testify, such as details about the refusal of Taishan to appear at the Judgment Debtor Hearing.  *See id.* 264:2-23. For such topics, he indicated that Mr. Peng was the person from Taishan who could have best answered these questions.  *Id.* 265:15-22.

**c.  Discovery Related to Mr. Peng**

24.     From April 2015 through August 2015, Taishan and the PSC engaged in numerous meet-and-confer sessions on discovery-related issues, including the location of Mr. Peng's custodial files and his whereabouts.  (Taishan Supplemental Exhibits 3-24).

25.     Following a discovery-related meet-and-confer on August 28, 2015, and as evidenced by an email from the PSC to counsel for Taishan dated August 31, 2015, the PSC

was under the impression that Mr. Peng's laptop was unsearchable and/or incapable of providing responsive documents.  (PSC Exhibit 16).

26.     On August 31, 2015, Taishan produced a declaration from Chairman Jia, which stated that Mr. Peng had been the Manager of TG's Foreign Trade Department and Chairman Jia had "tasked Mr. Peng with the responsibility of monitoring the developments in the lawsuit, working with TG's counsel, and coordinating TG's involvement" in the litigation. (PSC Exhibit 12, ¶ 4).  When Mr. Peng left Taishan in March 2014, Chairman Jia asked that he continue as "a special consultant continuing in the role that he served while an active employee," which he did "on-and-off as needed for several months, including in TG's decision to retain new counsel and resume participation in the U.S. lawsuits."  *Id*. at ¶ 5, 6. Because of his continued assistance as a consultant, Mr. Peng and Taishan "entered into a more formal consulting agreement for his services for which he received a onetime lump sum payment."  *Id.* at ¶ 6.

27.     Despite Mr. Peng's continuing role as a consultant, Chairman Jia also stated, under penalty of perjury that "Mr. Peng voluntarily left the employment of TG in March 2014, to pursue another career at a company unrelated to TG, TTP, and to my knowledge, [and the knowledge of] any of the Defendants in this action, including any BNBM or CNBM entity" and Mr. Peng "never told me the name of the company where he currently works, nor has he told anyone at TG to my knowledge."  *Id.* at ¶ 3.  Chairman Jia, like Mr. Che, did offer a phone number, but said that Mr. Peng was no longer cooperating.  *Id.* at ¶ 7.

28.     On September 12, 2015, Taishan located Mr. Peng's desktop computer.  Taishan was unsuccessfully in locating Mr. Peng's work computer in April and May of 2015 but

ultimately located the computer in September, after Chairman Jia learned of the issue and insisted that the computer be found. (Taishan Supplement Exhibit 1).

29.     On September 13, 2015, the PSC emailed the Court with copies to opposing counsel alleging that a PSC-retained private investigator had discovered information about Mr. Peng's whereabouts and current employment. The PSC's email to the Court with copies to opposing counsel alleged spoliation and other discovery misconduct and averred that such misconduct may require the Court to impose sanctions. (PSC Exhibit 37).

30.     On September 16, 2015, on the eve of its continued deposition, Taishan provided the PSC with two new documents: a Declaration of Jia Tongchun for Clarification and Supplementation and an "Employment Agreement" with Mr. Peng from February 2015.

31.     The "Employment Agreement," dated February 2, 2015 (more than 11 months after Mr. Peng left Taishan but continued to consult with on an "as needed" basis), provided that "[b]ased on Mr. Peng's full understanding of the Taishan Chinese drywall litigations in U.S., [Taishan] hires [Mr. Peng] to be the consultant for these cases" for the sum of 50,000 Yuan plus expenses. (PSC Exhibit 46).

32.     In his new declaration, Chairman Jia "clarifies" some points he made in his prior declaration. (PSC Exhibit 11). First, while he had claimed that he was not told where Mr. Peng worked, he did in fact know the entire time that Mr. Peng worked at Shenyang Taishi Rock Wool Co., Ltd. ("Shenyang") which is a wholly-owned subsidiary of Taishi Rock Wool Co. Ltd. ("Taishi"). *Id.* at ¶ 4. While he claimed that Mr. Peng was at a company "unrelated" to Taishan or any of the other Defendants, in fact, Taishi was owned by Shandong Taihe Building Material Co., Ltd., which owns 92 percent of Taishi and 14 percent of Taishan, and is itself owned by Chairman Jia and his family. *Id.* at ¶ 4 ("I and my family are one of 503

9

individual shareholders or Shandong Taihe Building Material Co., Ltd.). Notwithstanding the foregoing, Chairman Jia says that he held a "sincere belief that Sheyang is unrelated to any Defendant in this action" and he insisted that his prior declaration was "technically correct", but acknowledged that "it gave the misimpression that I personally did not know where Mr. Peng currently works, when in fact I do and I did know." *Id.* at ¶ 6.

33.     On September 17 and 18, 2015, the PSC deposed Chairman Jia in Hong Kong. As is pertinent to Mr. Peng's whereabouts, Chairman Jia testified that:

    a.  He knew at all times where Mr. Peng worked. (PSC Exhibits 92 and 93, 2015 Jia Deposition ("Jia Depo."), pp. 109:14-110:17, 110:19-11:18).

    b.  Mr. Peng is Executive Director of Taishi. *Id.*, pp. 110:19-111:18.

    c.  Chairman Jia's wife is Chairman of the Board at Taishi. *Id.*, p. 171:12-13.

    d.  Chairman Jia first learned about Mr. Peng's employment at Taishi from his nephew who is, among other things, the legal representative of Shenyang. *Id.*, p. 171:10-11.

34.     As is pertinent to Mr. Peng's computer, Chairman Jia testified that Mr. Peng continued to use his computer as a litigation consultant and it contains some of the information he kept about the litigation. *Id.*, pp. 45:13-19, 86:14-18.

35.     The day after Taishan's 30(b)(6) deposition concluded, Taishan provided Mr. Peng's home address to the PSC. (PSC Exhibit 32).

36.     On September 17, 2015, the Court ordered an evidentiary hearing on issues of spoliation, contempt, adverse inferences and possible penalties related to the discovery and disclosure of information related to Mr. Peng. After the discovery of Mr. Peng's desktop

computer on September 12, the Court ordered Taishan to refrain from changing, deleting or modifying any aspect of the computer or its hard drive. (R. Doc. 19526).

37.     At an October 13, 2015 status conference, the Court ordered Taishan to produce from Mr. Peng's custodial files all non-privileged documents regardless of relevance to the contempt track or other issues in the litigation. The Court directed Taishan to produce the documents to the PSC on a rolling basis and to produce a privilege log.

38.     From October 16, 2015, through November 4, 2015, Taishan produced on a rolling basis over 84,000 documents from Mr. Peng's custodial files. The number of pages produced was more than 383,000. (PSC Exhibit 50). Taishan also provided a privilege log describing 3,150 items. (Taishan Supplemental Exhibit 1 and Taishan Exhibit 6).

### d.   The Deposition of Mr. Peng

39.     Mr. Peng who purportedly had previously refused to cooperate now agreed to voluntarily make himself available for a deposition.

40.     Mr. Peng voluntarily traveled from China to appear for two and half days of deposition testimony in New York City from November 12, 2015 through November 14, 2015. (PSC Supplemental Exhibit 145, 2015 Peng Depo. ("Peng Depo.")). During his deposition, he testified to the following:

   a.   He confirmed he consulted with Taishan for, and assisted Mr. Che with, matters related to the litigation. *Id.*, pp. 173:20-174:8, 195:6-196:4.

   b.   He used his personal computer and desktop for Taishan business, including his work on the litigation. *Id.* pp. 203:18-204:1, 204:15-205:12, 206:2-207:9.

   c.   All the documents relating to the litigation are electronic and were on his computers and emails. *Id.*, p. 223:13-23.

d.  He was told in 2010 to preserve documents for the litigation. *Id.*, p. 226:4-15.

e.  He left his desktop at Taishan when he last left his office in February 2014, but took his laptop with him. *Id.*, pp. 219:12-17, 240:21-241:5, 242:18-243:9, 277:13, 278:9-13.

f.  He continued to serve as the litigation consultant with Taishan into 2015 when he gradually began to hand these responsibilities over to Mr. Che. *Id.*, p. 231:19-232:2.

g.  He continued to use his laptop for business, including emails related to Taishan and the litigation, even after he left Taishan. *Id.*, pp. 204:15-205:12, 206:2-207:9, 209:10-13, 209:22-24, 211:6-15, 291:17-291:3.

h.  He used a special email address when communicating on behalf of Taishan about the litigation and stopped using it in March 2015. *Id.*, pp. 334:24-335:2, 336:8-11, 336:25-337:10, 337:17-338:6, 339:3-13.

i.  He turned over his laptop, the only one he ever used for Taishan business, to Mr. Che in October 2015. *Id.*, pp. 334:15-335:13.

j.  He was not consulted about the Chain of Custody declaration that had been produced by Taishan and signed by Mr. Che. *Id.*, p. 351:16-22.

k.  He willingly testified when Chairman Jia requested him to do so. *Id.*, pp. 172:24-173:9.

41.  Because of this factual scenario, a hearing was set for November 17, 2015 to determine whether Taishan's actions amounted to spoliation, contempt and/or required adverse inferences and, if so, to determine the appropriate consequences regarding those actions.

### e. The November 17, 2015 Hearing

42.     On November 9, 2015, Taishan produced the Chain of Custody Statement of Che Gang, which outlines the chain of custody of Mr. Peng's desktop computer. The statement states that Taishan unsuccessfully attempted to locate Mr. Peng's work computer in April and May of 2015 and eventually located the computer on September 12, 2015. On September 25, 2015, after the 30(b)(6) depositions had concluded, Taishan learned that Mr. Peng had a laptop. On September 29, 2015, discovery vendor Grant Thorton imaged Mr. Peng's desktop computer hard drive and searched three of Mr. Peng's email addresses. On October 8, 2015, Mr. Peng tendered his laptop to Mr. Che, and the vendor imaged that laptop. On that date, each of three imaged drives were sealed into containers in the vendor's possession in China. On October 27, 2015, two additional emails for Mr. Peng are identified and searched. (PSC Exhibit 105).

43.     Prior to the November 17, 2015 evidentiary hearing, the Parties agreed to disclosure deadlines but could not agree on the scope of the hearing. At the October 21 status conference, the PSC proposed a broad scope. The Court rejected the PSC's proposal in favor of a more limited scope focused on Taishan's discovery conduct since Taishan's return to the litigation in February 2015. (R. Doc. 19656).

44.     The Court directed that an evidentiary hearing take place to address issues of spoliation, contempt, and/or adverse inferences relating to allegations that:

a. Taishan knew of and refused or intentionally failed to disclose the current (i.e., post-employment) business relationships with and the locations or whereabouts of Mr. Peng; and

13

b. Taishan knew that Mr. Peng had documents and/or computer-stored information but denied knowing the same or intentionally failed to disclose it and did not take proper measures to protect or collect these documents and/or computer-stored information. (R. Doc. 19657)

45.     The evidentiary hearing was held on November 17, 2015.  Opening statements were made by counsel for the PSC and Taishan and exhibits were offered and admitted by both sides, subject to objections lodged with the Court.  (R. Doc. 19752).  Closing arguments were heard on December 15, 2015.

## III.    CONCLUSIONS OF LAW

46.     The Court finds, as a matter of law, that Taishan engaged in discovery abuses. Specifically, Taishan's protracted withholding of relevant evidence, as more fully described below, is sanctionable under Rule 37 of the Federal Rules of Civil Procedure and through this Court's inherent powers to issue discovery sanctions.

47.     When considering discovery abuses, the court must consider the suitability of remedies based on defendants' conduct.  *See Coane v. Ferrara Pan Camdy Co.*, 898 F.2d 1030 (5th Cir. 1990).  The court's remedies must be just and related to the conduct of the defendants.  *Insurance Corp. of Ireland v. Campagnie Des Bauxites de Guinee*, 456 U.S. 694, 707 (1984).  Thus, the issue before the Court is the type and nature of the appropriate remedies.

### a.  **The PSC Has Not Proven Spoliation**

48.     This Court's Pretrial Order No. 1, entered on June 16, 2009, required all parties to "take reasonable steps to preserve all documents, data and tangible things containing information potentially relevant to the subject matter of this litigation."  (R. Doc. 2)

49.     The Court finds insufficient evidence of intentional failure to preserve evidence under PTO 1 to justify a finding of spoliation.  The PSC has failed to prove that Taishan destroyed, lost, or altered evidence relevant to potential violations of the injunction or the relationship between Taishan, BNBM, and CNBM during the contempt period.  *See Williams v. Briggs Co.*, 62 F.3d 703, 708 (5th Cir. 1995) (no finding of spoliation where "the evidence in issue was not destroyed or lost" and plaintiff offered no evidence to suggest defendant did anything to alter the condition of the evidence in issue).

50.     The PSC does not claim that any relevant Taishan evidence is missing, or that Taishan destroyed any relevant evidence.

51.     The Court does not find evidence that Taishan intentionally violated PTO 1 or the general duty of preservation.

52.     Taishan's corporate representative, Mr. Che, pursuant to the PSC's request, provided a chain of custody affidavit regarding Mr. Peng's two computers.  Mr. Peng's desktop computer, which was Taishan's property, was preserved and eventually imaged. Notably, the desktop was misplaced for a period of time but Taishan ultimately located it and produced documents on the device to the PSC.  Mr. Peng also delivered his personal laptop to Taishan, which produced the documents on that device to the PSC.  Taishan also obtained emails from multiple web-based email accounts belonging to Mr. Peng.

53.     In the absence of proof of missing evidence, the Court will not impose any adverse inferences.  *See Williams*, 62 F.3d at 708.

54.     Notwithstanding the fact that the evidence does not support a finding of spoliation to justify imposing adverse inferences, the evidence is sufficient to support of finding of discovery abuses warranting sanctions.

15

**b. The PSC Has Proven Intentional Delay in Responding to the Contempt Track Discovery Warranting Sanctions**

55.     When issuing discovery sanctions, Courts consider pleadings, motions, papers, and prior discovery orders to determine whether defendants' conduct warrants providing remedies to the opposing party.  Often it is necessary to consider orders entered by the court and motions filed by the parties requesting and compelling discovery to make findings regarding whether a party committed any discovery abuses.  The court may consider promises made by counsel when considering discovery abuses.  *Metropolitan Life Ins. Co. v. Camman*, No. 88 C 5549, 1989 WL 153558, at * 4 (N.D. Ill. November 7, 1989) (violation of an order found where party failed to deliver documents it promised it would produce).

56.     The court should apply its review of evidence even-handedly, but is not bound by the rules of evidence.  *See Jensen v. Phillips Screw Company*, 546 F.3d 59, n.5 (1st Cir. 2008) ("We do not suggest that the rules of evidence necessarily apply to fact finding in the context of sanctions.  That is not the case.")  Thus, the court should consider based on its judgment whether the evidence is reliable and its opinions will not be disturbed unless it abuses its discretion.  *See Moore v. CITGO Refining and Chemicals Co., LP*, 735 F.3d 309 (5th Cir. 2013).

57.     Rule 37 provides that a district court may impose sanctions for a party's failure to comply with discovery orders.  Fed.R.Civ.P. 37(b)(2)(A).

58.     An award of sanctions under Rule 37(b)(2)(A) must be both "just" and "fair", meaning that the conduct is sanctionable and that the sanction is appropriate to the wrong. *See Insurance Corp. of Ireland v. Compagnie des Bauxites*, 456 U.S. 694, 707 (1982).

59.     Additionally, an award of fees and expenses must be made in addition to sanctions under Rule 37(b)(2)(A).  Rule 37(b)(2)(C) provides that "the court must order the

disobedient party, the attorney advising the party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

60.    Taishan has conceded its failure to relay Mr. Peng's whereabouts and produce documents from his computer in a timely manner.  There is no justification for this failure. Chairman Jia admitted that he knew where Mr. Peng worked and Taishan has produced no evidence to justify the delay in locating Mr. Peng's computers.

61.    Ultimately, there was a delay of approximately eight months between the March 2015 request for Mr. Peng's documents and deposition and the October 16 initial production of Mr. Peng's documents and Mr. Peng's November 2015 deposition.

62.    Taishan should be made accountable for those costs and expenses attributable to its unjustified eight-month delay in complying with discovery requests.  Such expenses will relate to the time the PSC spent briefing the instant issue, expenses related to both the delay and eventual deposition of Mr. Peng, and such other expenses as may be relevant to the tasks forced upon the PSC by Taishan's delay in complying with the discovery orders of this Court.  The PSC shall submit to the Court within (30) days of the entry of this order, to serve on Taishan and produce to the Court the expenses it believes were incurred as a result of Taishan's delay from March 19, 2015 through Mr. Peng's November 2015 deposition.

63.    Having conceded that Rule 37 is applicable, Taishan claims that there is no prejudice to justify further sanctions.  However, this is not the standard under Rule 37.  Even if a party eventually cures a violation of Rule 37, such as by a late production of withheld evidence, they are still subject to sanction.  *Chilcutt v. United States*, 4 F.3d 1313, 1319 (5th Cir. 1993) (affirming the trial court's finding that discovery sanctions were warranted where

17

the Government had disadvantaged the plaintiffs by producing the documents on the eve of trial and by causing the plaintiffs' counsel to devote a great amount of time, not to preparing for trial, but to dealing with the Government's discovery abuses).

64.     The question turns to what is "just and fair" for a party that has answered orders and discovery with evasiveness, possible outright lies, and delay.  Any sanctions need have some relationship to the claim at issue.  Accordingly, Courts have typically considered the striking of factual defenses or adverse inferences related to the information that a party has kept from discovery.  As the information at issue in the present proceeding was eventually produced to the PSC, neither the striking of factual defenses nor the finding of adverse inferences is warranted.

65.     However, the culpability evidenced in this case is clear.  According to Chairman Jia's Declaration for Clarification, Taishan acted in bad faith in keeping the whereabouts of Mr. Peng concealed.  Additionally, Taishan offered no evidence as to why two prior searches for Mr. Peng's computer revealed nothing whereas mere insistence by Chairman Jia that the computer be found in September 2015 proved fruitful.

66.     Accordingly, **IT IS ORDERED** that

   a.  All documents produced from Mr. Peng's computers and emails since October 2016 be accurately (non-machine) translated into English by Taishan and at Taishan's cost.

   b.  Taishan pay all litigation costs and fees to the PSC that are related to the discovery delay by Taishan from March 19, 2015 through Mr. Peng's deposition, the amount of which will be determined based on records to be submitted to the Court by the PSC.

    c.   Taishan pay $40,000 as a discovery penalty, which is equivalent to $5,000 per month for the eight-month delay attributable to Taishan in keeping the whereabouts of Mr. Peng concealed and in failing to produce Mr. Peng's ESI documents in a timely manner.

67.   **IT IS FURTHER ORDERED** that Taishan's Motion to Quash Plaintiffs' Subpoena for Production of Items Related to Peng Wenlong (R. Doc. 19733) and Taishan's Motion to Exclude Plaintiffs' Proposed Exhibits and Irrelevant Depositions Designations for the November 17, 2015 Hearing (R. Doc. 19731) are **DISMISSED** as **MOOT**.

New Orleans, Louisiana, this 8th day of January, 2016.

UNITED STATES DISTRICT JUDGE