# EXHIBIT 24—part 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

**EDUARDO AND CARMEN AMORIN,** *et al.*, **individually, and on behalf of all others similarly situated,**

     **Plaintiffs,**

       **v.**

**TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD., et al.,**

     **Defendants.**

**Case No. 1:11-CV-22408-MGC**

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE OPINIONS OF ANTHONY GRAZIANO, MAI, CRE

The Taishan Defendants, collectively BNBM PLC, Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd. ("Defendants"), seek to exclude the expert testimony of Plaintiffs' real estate appraiser, Anthony Graziano, MAI, CRE ("Mr. Graziano"), who has offered opinions on the damages for (1) post-remediation diminution in value of the Priority Claimants' homes due to stigma, and (2) alternative living expenses during remediation. The Court should deny Defendants' motion because Mr. Graziano's opinions are based on sound methodology and recognized real estate appraisal practices, and the arguments raised in Defendants' motion go to the weight, and not the admissibility, of his testimony.

## I.   <u>INTRODUCTION</u>

Plaintiffs have been clear throughout this litigation that they intend seek stigma damages due to the Chinese drywall contamination of their homes whether it be pre or post-remediation. Plaintiffs' expert witness, Mr. Ryan Greenblatt, a licensed real estate agent, has opined within a reasonable degree of probability as a realtor that if Plaintiffs attempt to sell their homes, remediated or unremediated, they will be required to disclose that their home had Chinese drywall. In other words, Mr. Greenblatt is providing causation testimony for

Plaintiffs' stigma damages. <u>This opinion has gone unchallenged by Defendants</u>.[1]  Mr. Graziano, on the other hand, is providing the amount of stigma suffered, 10% of the value of the home at this time.

A brief explanation of Florida law will assist the Court in understanding the importance of the legal significance of Mr. Greenblatt's and Mr. Graziano's opinions. Mr. Greenblatt's opinion is consistent with the Florida Supreme Court's decision in the landmark case of *Johnson v. Davis*, 480 So. 2d 625, 629 (Fla. 1985), that a seller of residential property must disclose those facts materially affecting the value of the property which are not readily observable and not known to a buyer.  *Bisque Associates of Fla., Inc. v. Towers of Quayside No. 2 Condominium Association, Inc.,* 639 So. 2d 997, 999 (Fla. 3d DCA 1994).  Mr. Greenblatt's opinion is also consistent with the Florida Association of Realtors' ("FARBAR")[2] form contracts for disclosures of material defects.[3]  On the FAR forms, the presence of defective Chinese drywall in a home at any time must be disclosed in a home sale even if repaired or remediated.  *Id.*  Defendants' rebuttal expert, Mr. Cohen, agrees that when a home that has or had Chinese drywall is sold, the Chinese drywall must be disclosed.[4] On the FARBAR form, Chinese drywall is included with other hazardous materials such as asbestos, formaldehyde and radon. *Id.*

Plaintiffs' recovery of diminution in value for their home is permitted in Florida when the damages are permanent, due to the required disclosure under *Johnson v. Davis*.  *Bisque,* 639 So. 2d at 999.  *Bisque* is on point.  In *Bisque* a unit owner in a condominium sued the condominium association for breach of contract for plumbing problems that caused backups and spillovers.  The unit owner sought damages for lost rental income and diminution in value.  The unit owner sought damages for diminution in value because of "Bisque's legal

---

[1] Defendants have challenged Mr. Greenblatt's opinion only on the quantum of stigma. *See* ECF. No. 247.

[2] The forms are a product of collaboration between the Florida Association of Realtors ("FAR") and the Florida Bar, accordingly, FARBAR.

[3] FARBAR form contract, attached as Exhibit A.

[4] Cohen Deposition Transcript at 49:12-18, attached as Exhibit B.

obligation to tell potential renters or purchasers about the plumbing problems." *Id.* at 998. At trial, the trial court granted a motion in limine to exclude evidence of diminution in value. The appellate court reversed the trial court finding that under *Johnson v. Davis,* the seller has a duty to disclose the defect and that it was error not to allow the unit owner's expert to testify regarding a potential buyer's reluctance to pay full market prices for a unit that had plumbing problems. *Id.* at 999. The appellate court held that in light of the evidence regarding the potentially permanent diminution in value, the trial judge was incorrect to exclude the testimony relating to the permanence of the injury, and that a new trial on damages was necessary. *Id.*

*Bisque* is a remarkable case, because even though it was a breach of contract claim, diminution in value was found to be an issue for the jury, and tort type damages were permissible. Importantly, the Third District Court of Appeals found that, "The objective of compensatory damages is to make the injured party whole to the extent that it is possible to measure the injury sustained in terms of money." *Id.* at 999 (citing *Mercury Motors Express, Inc. v. Smith,* 393 So. 2d 545 (Fla. 1981)). Here, Plaintiffs merely seek the consequential damages from the defective Chinese drywall. There can be no dispute under *Johnson v. Davis* that Plaintiffs must disclose that they had defective Chinese drywall in their home. *Bisque* instructs that the issue of how much the diminution in value will be is properly before the jury.

Evidence regarding diminution in value due to market forces and potential buyer fear is permissible in a similar context for condemnation actions. *Finkelstein v. Dept. of Transp.,* 656 So. 2d 921, 925 (Fla. 1995) (recognizing that where factual basis through evidence of comparable values shows diminution, the matter is for a jury to decide); *Florida Power & Light Co. v. Jennings,* 518 So. 2d 895 (Fla. 1987). In *Jennings,* the Florida Supreme Court held that "The public's 'fear' as a factor which may be relevant to the issue of just compensation may be utilized as a basis for an expert's valuation opinion <u>regardless of whether this fear is objectively reasonable</u>." *Jennings,* 518 So. 2d at 895 (emphasis added). Plaintiffs proffer that their real estate agent and appraiser expert witnesses will testify regarding public fear and

3

perception of the property for purposes of valuing diminution in value. Such testimony is permissible under *Bisque* and the Florida Supreme Court's rulings in *Finkelstein* and *Jennings*.

## II.    GRAZIANO'S METHODOLOGY AND OPINIONS

At the request of counsel for Plaintiffs, Mr. Graziano, the senior managing director of the Miami office of Integra Realty Resources and the Chairman of the Board of Integra Realty Resources, prepared a study entitled, "Market Analysis of the Post-Remediation Impact of Chinese Drywall on Residential Property Values in Florida" (the "Report"), with an effective date of February 15, 2019, covering the period 2009 through 2018.[5] The scope of Mr. Graziano's study and his methodology are described in detail in his Report. In it, he describes how Integra maintains a historic archive of reports from the Consumer Product Safety Commission, Florida Board of Realtor and National Homebuilder Association alerts, and correspondence with Integra professionals on CDW dating back to 2009 to 2010.[6] As a part of its work on this matter, Integra updated three (3) binders and reviewed additional public literature to familiarize themselves with the timeline of the problems with Chinese drywall.[7] Integra undertook research to determine if there were published studies related to valuation of homes with Chinese drywall and found none.[8]

Over a period of eight weeks, Mr. Graziano and his staff engaged local appraisers in the geographic region of Priority Claimants' homes with substantial residential appraisal experience to assist in the inspection and appraisal of the hypothetical unimpaired values of the twenty Priority Claimant properties covering various dates of value from 2012 to the effective date of the Report.[9] As a part of this work, Integra interfaced with the residential

---

[5] Market Analysis of the Post-Remediation Impact of Chinese Drywall on Residential Property Values in Florida, February 15, 2019, attached as Exhibit C. (This document was Exhibit 1 to Mr. Graziano's deposition transcript).

[6] Ex. C at 11.

[7] *Id.*

[8] *Id.*

[9] *Id.* The word "unimpaired" is used in Graziano's Report and his deposition to describe properties that were not affected and never had Chinese Drywall installed.

appraisers, conducted telephone interviews of realtors via a written confirmation script, and actively participated in the data gathering and analysis of the Priority Claimant properties.[10]

Under Mr. Graziano's direction, Integra also conducted research through the various local Multiple Listing Services (MLS) to identify properties that were sold, which had been built with Chinese drywall (both remediated and unremediated). Integra narrowed the search and focused on the remediated properties. Mr. Graziano employed a paired case analysis using twenty case studies, which represented a cross-section of the Florida residential market.[11] In these studies, control sales (sales of properties where the control sale had been remediated of Chinese drywall and disclosed during market exposure) were compared to 3-4 comparables that were unimpaired.[12]

Mr. Graziano's Report specifies the recognized methodology he applied to gather the data and reach his conclusions. The methods employed included: 1) Paired Sales Analysis; 2) Impaired Sales Comparables; 3) Market Resistance Estimation; 4) Sale-Resale Analysis; 5) Case Study Analysis; and 6) Market Interview and Surveys.[13] His process conformed to the process described by the leading Real Estate Damages treatise, Randall Bell, Ph.D., MAI, REAL ESTATE DAMAGES, APPLIED ECONOMICS AND DETRIMENTAL CONDITIONS at 8 (3d ed. 2016), which provides as follows:

- Use Multiple Research sources (constructionism) and rely upon [an expert's] general experience (Action)
- Demonstrate or acquire geographic competency (ethnography)
- Conduct a literature review and comply with USPAP (hermeneutics)
- Use sale or lease comparables, vacancy rates, expenses, and capitalization rates (empirical research)
- Use adjustment grids or other means to compare and contrast the data (comparative research)
- Have discussions with property owners or managers (testimony); verify the market data with parties involved or survey participants within the market

---

[10] Id.
[11] Id. at 14.
[12] Id. at 13.
[13] Id. at 10.

(phenomenology) and ultimately produce findings that are logical, innate, testable, and repeatable (rationalism).[14]

As discussed, *supra*, Mr. Graziano used multiple research sources, conducted an extensive literature review, used sale comparables, conducted comparative research, and conducted surveys of realtors in accordance with Dr. Bell's approach. Furthermore, during his deposition, Dr. Bell testified that literature reviews, surveys, paired sales, and sale-resale analyses – the methods employed by Mr. Graziano in reaching his conclusions - are all conventional approaches to determining market resistance.[15]

Based on his application of the foregoing methodologies and the overwhelming amount of data he compiled in case studies, appraisal of the Priority Claimant properties, and interviews with real estate brokers, Mr. Graziano was able to opine that the Priority Claimants suffered a ten percent (10%) diminution of the value in their homes resulting from the stigma effect of Chinese drywall. Mr. Graziano concluded that, "informed by the knowledge and literature regarding the appraisal problem which was readily known in the market, and continues to be readily known, after consideration and extensive market participant interviews and analysis of the 20 case studies, Integra concludes there is a post-remediation value diminution estimate of 10% of unimpaired value for properties with remediated Chinese Drywall where subsequent proper disclosure is made available to the market."[16] The Report included the results of the case studies he performed, and Defendants were provided with specific individual reports relating to each of the Priority Claimants.[17]

---

[14] Dr. Bell was retained as an expert by the Plaintiffs in this litigation.
[15] Bell Deposition Transcript at 60:20-61:4, attached as Exhibit D. During a conversation with Mr. Graziano concerning his approach to the question of market resistance in this case, Dr. Bell told Mr. Graziano that these four methodologies are conventional and that "we use them all the time, lots of people do." Exhibit D at 54:17-55:12.
[16] Ex. C. at 25.
[17] Twenty Priority Claimant-specific reports, attached as Exhibit E. (These documents were Exhibit 2 to Graziano's deposition transcript.)

Defendants took Mr. Graziano's deposition on March 18 and 19, 2019.[18] After he submitted his Report, and before his deposition, Mr. Graziano studied the data and his Report again and made several updates. He created an updated Priority Claimant List dated March 17, 2019.[19] Mr. Graziano also created a Post-Discovery submission, which supplied the MLS data that was researched on the sales of the Priority Claimant homes.[20] To create this Post-Discovery submission, he reviewed each of the Priority Claimant binders and asked his staff to determine whether any of those properties sold after the date of value. Mr. Graziano then searched for comparable sales – paired sales that were not impaired – and tested them against the subsequent sales.[21] In addition, he created an errata sheet correcting some duplicates of the comparables in his study.[22] All of Mr. Graziano's updates and revisions (Exhibits D through F) were provided to counsel for Defendants at his deposition. The revisions he made did not change his opinion as set out in his Report.[23]

In the present Motion, Defendants seek to exclude Mr. Graziano's opinion testimony for various reasons. Because all of their arguments for exclusion go to the weight of Mr. Graziano's testimony, and not its admissibility, this Court should deny Defendants' Motion, as discussed below.

## III.   **ARGUMENT**

### A.   **The Legal Standard Under *Daubert* Applicable to Technical Experts**

Plaintiffs incorporate by reference, as if fully set forth herein, the section in Plaintiffs' Response in Opposition to Defendants' Joint Motion to Preclude the Proposed testimony and

---

[18] Transcript of Deposition of Anthony Graziano, attached as Exhibit F.
[19] Updated Priority Claimant List, attached as Exhibit G. (This document was Exhibit 3 to Graziano's deposition transcript.)
[20] Post-Discovery submission, attached as Exhibit H. (This document was Exhibit 4 to Graziano's deposition.)
[21] Ex. H; Graziano Depo. at 51:4-23.
[22] Errata Sheet, attached as Exhibit I. (This document was Exhibit 5 to Graziano's deposition transcript.)
[23] Graziano Depo. at 52:21-23 ("I think [the updated Priority Claimant List – Exhibit G herein] largely reflects similar results as what we found, and so, no, [it] does not, at this time, change my opinion.")

Strike the Expert Report of Plaintiffs' Expert Michael Elkin addressing the Legal Standard under *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993), in its entirety. Plaintiffs add that, as a general rule, objections to the inadequacy of a study go to the weight of the evidence. *See Rosenfeld v. Oceania Cruises, Inc.,* 654 F.3d 1190, 1193 (11th Cir. 2011) ("in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.") (citations omitted)); *Quiet Technology DC–8*, 326 F.3d 1333, 1346 (11th Cir. 2003) (quoting *Bazemore v. Friday,* 478 U.S. 385, 400 (1986) (challenges to the inclusiveness of expert's analysis '"will affect the analysis' probativeness, not its admissibility'"). "[W]eaknesses in the factual basis of an expert witness' opinion...bear on the weight of the evidence rather than on its admissibility." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993); *see also Coquina Investments v. Rothstein*, No. 10-60786-CIV, 2011 WL 4949191 at *8 (S.D. Fla. Oct. 18, 2011) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.") (citation omitted); *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490-CIV, 2011 WL 2295269 at *7 (S.D. Fla. June 8, 2011)("Defendants' challenges to [the expert's] conclusions and the facts she relied on, go to their weight rather than their admissibility."); *Ostroski v. United States*, No. 06-80327-CIV, 2007 WL 9701868 at *2 (S.D. Fla. Aug. 23, 2007) ("Any claimed weakness in the factual basis for [expert's] conclusion...goes at best to weight and credibility, and can certainly be explored on cross examination.").

**B.    Mr. Graziano's Opinions Regarding Post-Remediation Stigma Sustained by the Priority Claimants Are the Product of Sound Methodology, Are Reliably Applied, and Defendants' Arguments Attack the Persuasiveness of his Opinions, Not their Admissibility.**

Defendants argue that Mr. Graziano's opinions are "unreliable" and based solely on his "*ipse dixit.*"[24] They first claim that there is a "disconnect" or "analytical gap" between the

---

[24] ECF 246 at 5.

data Mr. Graziano compiled and his opinion that Priority Claimants have sustained a ten percent (10%) stigma discount, because none of the Priority Claimants "actually experienced" the discount. Second, they complain that there are various errors in the Report. Third, they argue that Mr. Graziano's opinions are unreliable because the data compiled for Mr. Graziano's case studies ends in August 2016 and, they claim, surveys of local real estate brokers were used inappropriately to bridge the gap between August 2016 and February 2019. All of Defendants' arguments go to the weight of his testimony at trial, which can be challenged by rigorous cross-examination at that time. However, none of them bear on the admissibility of Mr. Graziano's opinions.

### 1. There Is No "Analytical Gap" Between the Data and Mr. Graziano's Opinions.

Mr. Graziano's opinions are the result of his application of accepted methodologies and intense study of relevant data, as outlined in his Report. In his Case Study, the data showed post-remediation impacts ranging from zero to thirty percent.[25] In reaching his conclusion, he arrayed the results by price segmentation and geography, and there was no systematic difference between price segmentation by date or by county.[26] There were some properties in which the impact was 25 or 30 percent, but in seeking what he considered to be a fair estimate, he considered both low and high impacts.[27] Mr. Graziano assigned a ten percent diminution rate based on seven of the twenty Priority Claimants' homes having sustained a greater impact than twenty percent; three having suffered less than five percent (or zero), and all others falling somewhere in the middle.[28] Mr. Graziano reached his conclusions based on the data and his "practice and experience in assign[ing] values, both for adjustment and analytical purposes, based on looking at an array of data, reaching a conclusion, and applying that conclusion to other factors."[29] That, he testified, is "a normal

---

[25] Graziano Depo. at 76:17-19.
[26] Id. at 76:25-77:20.
[27] Id. at 77:17-78:1.
[28] Id. at 80:6-81:10.
[29] Id. at 81:11-21.

9

part of [his] practice."[30]  *See Maiz v. Virani*, 253 F. 3d 641, 669 (11th Cir. 2001) ("there is no question that an expert may still properly base his testimony on 'professional study or personal experience.'").

Defendants claim that Mr. Graziano "could not articulate" his opinion that Priority Claimants experienced a ten percent stigma discount.[31]  In fact, he articulated it quite well. As he stated, the purchase prices of the Priority Claimants' homes incorporated the buyer's expectation that they would, on resale, suffer damage.  The stigma is therefore embedded in the price.[32]  As for the property owners who still hold their homes, they would experience the same damage were they to put the property on the market today.[33]  Mr. Graziano explained that a person who sells his home before remediation also incurs a post-remediation discount, because the stigma is baked into the overall loss.  *It does not run with the Priority Claimants' property for eternity, instead, it is incurred only upon the initial sale, because the buyer has counted the discount in the purchase price.*[34]  The former owners among the Priority Claimants experienced post-remediation stigma that is embedded within their damages.  That damage is cumulative because it is embedded in all of the costs to cure elements and the expectations that a buyer would have discounted.[35]

Defendants argue that none of the Priority Claimants actually experienced ten percent post-remediation stigma, and Mr. Graziano's opinion is therefore mere *ipse dixit*.  They neglect to mention that some Priority Claimants who sold their homes suffered a much greater impact than ten percent.  As shown in Exhibits 3 and 4, eleven of the 20 Priority Claimants have either sold or lost their homes.  In Exhibits 3 and 4, Mr. Graziano compared the sales prices of the Priority Claimant homes to the closest comparable he could find.  For those eleven Priority Claimants, he found that all of the homes sold for less than the comparables:

---

[30] *Id.* at 81:21.
[31] ECF 246 at 6.
[32] Graziano Depo. at 29:12-19.
[33] *Id.* at 29:20-30:2.
[34] *Id.* at 33:8-36:9.
[35] *Id.* at 57:2-22.

Miranda (2.5 percent); Michael and Robin Rosen (inconclusive because the difference was 1.9 million for the sale vs. 1.3 million for the remediated property, and the complexity of the home did not rise to the level of assigning all of the impact to Chinese drywall; Kevin Rosen (7 percent); Etter (0 percent because he could not confirm disclosure of CDW); O'Brien (7.5 percent – no indication of disclosure); Avery (8.5 percent); Walls (limited data because he could not identify any comparables); Feldkamp (15 to 20 percent); Lalwani (19 percent); Marin (8.5 percent); Deeg (1 percent).[36]  Thus, the sales of the Feldkamp, Lalwani, and O'Brien (for the 2014 sale) homes showed at least a 10 percent diminution.  To the extent there was a comparable available and disclosure was confirmed, *all* of the Priority Claimant homes that sold reflected a stigma discount, with the rate of most approaching or far in excess of 10 percent.

Defendants argue, erroneously, that the Etter home, which is the only Priority Claimant home to sell post-remediation, disproves Mr. Graziano's study because it sold for $1.58 million, which was the same as Mr. Graziano's appraisal.  First, as Mr. Graziano noted in his report and in his deposition, a newly remediated home might sell at a premium compared to a comparable home with a 5 to 10-year interior, but that is masking the diminution because the remediation includes renovation of wiring, appliances, and not just ripping out drywall.[37]  And in his Case Study Analysis, Mr. Graziano states that "[s]ome 'damage' may be masked by the restoration when in fact, the property is still damaged relative to newer peers, but the market accepts a 5%-15% discount (due to perception/impairment) in

---

[36] Ex. G.

[37] Graziano Depo. at 148:21-25 ("I think if you look at the photographs in the Etters' home, this is a very, very nice home on Jupiter Inlet with some very unique features and probably not many perfectly analogous replacement properties…"); *Id.* at 242:3-243:16 ("So I agree with you in some cases because the remediation remedy is to renovate the home, that actually is probably masking the post-remediation discount more than it otherwise would because some people look at it and say, 'Well, I'm going to buy a 2006 home and it's got a brand-new interior, a brand-new kitchen, brand-new everything, you know, I'm going to pay more for that than a home that's, you know, ten years old that's never been renovated.' That's -- that's part of the -- I think that's part of the bias I think to the benefit of the defendants.").

exchange for new bathrooms, kitchen and completely remodeled drywall and fresh paint."[38]
Second, it appears that the buyers of the Etter home were not aware of the prior existence of
Chinese drywall due to lack of disclosure.[39]  The sale price of the Etter home, therefore, does
not disprove Mr. Graziano's opinion that homes selling post-remediation are sold at a 10
percent stigma discount.

Defendants claim that Mr. Graziano "refuses to believe" that a remediated home
could sell for more than comparable homes with worn interiors.  (ECF 246, p. 4.)  Not so.
Indeed, he addressed this several times during his deposition.[40]  Vast improvements to the
home, beyond the removal of drywall (as in the Etters' case), mask the diminution in value
caused by the prior existence of Chinese drywall in the home.[41]  And there is always the
possibility of a "magic buyer," who will offer a premium despite the prior existence of Chinese
drywall.[42]  And there is a logical explanation that Defendants refuse to grasp, as to why he
assigned a "zero" to such homes in his Case Study:  simply put, no buyer would pay a
premium for a remediated home *because* of the prior presence of Chinese drywall.[43]

For these reasons, Defendants' arguments that Mr. Graziano's opinions are *ipse dixit*
due to a disconnect between the data and his opinions should be rejected.  They are free to

---

[38] Ex. C at 21.
[39] Ex. E, Etter Report at 7 (PDF at 272 of 989).
[40] Graziano Depo. at 73:4-12; 243:2-244:16; 246:5-247:4 (discussing the concept of "masking").
[41] *Id.*
[42] *Id.* at 74:13-23 ("And you may just find a magic buyer. I mean, there are instances where you find the one buyer that doesn't have a big problem with it and doesn't necessarily have an impact. But what you're betting on if you don't assess any -- if you don't assess any impact whatsoever, what you're betting on is that all of the Priority Claimants and all of the people within this class of impairment would all find magic buyers. And I find that not to -- not to be credible.").
[43] *Id.* at 99:14-100:1 (… "if the home did sell higher than what I considered to be the correlated unimpaired value, then I did that math, and it may have reflected a negative indication.  But I certainly don't believe that anyone was paying a premium as a result of the prior existence of drywall, so I correlated that – I showed that as zero."); *Id.* at 105:4-10 ("Q. You put zero percent instead of negative 29 percent, correct?  A. Correct.  But again, it's not my position that anything could be negative because that would imply that somebody is paying a premium for Chinese drywall and I don't think that the data demonstrates that.").

cross-examine him on any of these issues; however, his opinions are reliable and meet the requirements for admissibility.

### 2. The Errors in Mr. Graziano's Report Were Retracted and Do Not Alter his Opinion.

Defendants complain that Mr. Graziano "acknowledged multiple errors" in his Report and that the highest stigma effect he claimed to find resulted from inadvertently comparing an unremediated home to homes that never had Chinese drywall; when he corrected it, there was basically no difference between the remediated home and the comparables. (ECF 246, p. 6.) This is a reference to the chart at page 20 of his Report reflecting a sale price in the Broward 10 data of $390,000 where the post-remediation sale price was actually $755,000, a mistake that Mr. Graziano raised during his deposition.[44] Even after the correction, however, only five out of the twenty case studies showed less than a five percent impact.[45] Mr. Graziano acknowledged mistakes in his Report and created an errata sheet at his deposition to correct them.[46]

Mistakes in a report do not render the report or opinion inadmissible – especially when the expert retracts or corrects the mistakes, which Mr. Graziano did in this case. In *Crowley v. Chait*, 322 F. Supp. 2d 530, 553 (D.N.J. 2004), against the defendants' argument that the underwriting experts' reports were so riddled with error that the expert had to either retract or correct their opinions when confronted with these errors by the defendant, the court rejected the contention that these inaccuracies rendered the reports unreliable as to require exclusion. To the contrary, the court held:

> *Daubert* does not require that an expert's testimony be excluded simply because he admitted and corrected his own mistakes or retracted his false statements. In fact, one of the very purposes of a Daubert hearing, discussed above, is to give experts a chance to explain and even correct errors that they made in their reports. *** There is no stigma attached to such error correction, nor should there be. If anything, it strengthens the quality of the expert report.

---

[44] *Id.* at 82:18-20; 84:18-85:9.
[45] *Id.* at 85:23-86:7; 108:22-109:2.
[46] Ex. I.

13

In the end, the court in *Crowley* recognized that "an expert's testimony need not be flawless for it to be reliable and admissible," and refused to exclude the expert opinion, preferring instead that it be subject to cross-examination. Here, Mr. Graziano provided counsel for Defendants with Exhibits D through F, which updated and corrected mistakes in his original Report. These revisions, if anything, strengthened the quality of his Report. They did not alter his opinion that the Priority Claimants have suffered a 10 percent post-remediation diminution in the value of their homes.

### 3. Mr. Graziano's Use of Contingent Valuation Surveys of Realtors Is a Recognized Methodology, and Was Not Used to "Bridge the Gap" Between 2016 and 2019.

One of Defendants' chief complaints is that the data Mr. Graziano used ends in 2016 and that he did not study the data for the period from August 2016 to February 2019, yet they ignore Mr. Graziano's explanation for this. The case study analysis demonstrates that the impacts were relatively consistent from 2009 to 2016, and there was no reason to believe that those impacts did not continue to exist in 2017 and 2018. There was no systematic declination in the impacts as a result of time or geography. As such, the studies continued to hold true as of February 2019.[47] Also, he and his staff were unable to locate any remediated control sales disclosed within the MLS listing as having Chinese drywall within the period from August 8, 2016 through February 15, 2019.[48]

As Mr. Graziano testified, the data studied from 2009 to 2016 – a seven year period – indicated that the damage continued to persist for that period. Mr. Graziano was therefore able to extend the time frame to 2019, because the data indicated that time was not a factor.[49] Thus, Defendants' complaint that Mr. Graziano "switched analytical techniques mid-stream" when he conducted his contingent valuation survey of realtors is simply false. Mr. Graziano

---

[47] Graziano Depo. at 63:3-24.
[48] *Id.* at 64:15-23.
[49] *Id.* at 165:21-166:9.

specifically denied that the survey was the only method he used for the period from August 2016 to February 2019.  He explained that his "study of the data from the 2009 to 2016 time frame indicated that time was not a variable in the estimate, that there was no systematic grouping or declination of the diminution over time, and [he] applied that in the subsequent period."[50] Defendants may certainly cross-examine Mr. Graziano about this during trial, but it is not a basis upon which to exclude his testimony.

Likewise, in their argument that the survey results showed that half of the realtors surveyed said they were not impacted, Defendants fail to mention Mr. Graziano's testimony that of the realtors who said there was no impact, most of them qualified their statements to state that there would have to be an inspection report and clean remediation.[51]  On the other hand, fifty percent of the realtors surveyed stated that post-remediation stigma "absolutely" exists.[52] Defendants claim that Mr. Graziano "abandoned" his own work by stating that the survey was not statistically validated, but this too is false.  Mr. Graziano explained that his survey was never intended to be statistically validated; it was based on the realtors that they could reach, and was used *in conjunction with* the case study sales they were studying.[53]  While Defendants are correct that Mr. Graziano agreed that "continuation valuation is generally a less reliable and less accurate indicator of value" than market data,[54] they erroneously depict the surveys as his stand-alone methodology.  Furthermore, Mr. Graziano noted that he has specialized expertise in the design of such surveys based on his knowledge, training, and experience in conducting such surveys, and it was not used as the sole method, but was a "tertiary approach."[55] Defendants' challenges to the surveys may be taken up on cross-examination.

---

[50] *Id.* at 165:6-20.
[51] *Id.* at 208:15-24.
[52] *Id.* at 209:23-25.
[53] *Id.* at 212:23-213:2.
[54] *Id.* at 162:1-166:13
[55] *Id.* at 164:24-165:5.

15

## C.     Mr. Graziano's Opinions on the Stigma Damages Sustained by the Priority Claimants Comport with Florida Law.

There is no basis for Defendants' argument that Florida law precludes the stigma damages outlined in Mr. Graziano's opinion.  Defendants assert that Mr. Graziano's opinion is inadmissible because in Florida, damages awarded should be equal to and precisely commensurate with the injury sustained, and Plaintiffs cannot recover more than was "actually inflicted."  For this, they cite *MCI WorldCom Network Servs. v. Mastec, Inc.*, 995 So.2d 221, 224 (Fla. 2008), wherein the Florida Supreme Court denied a plaintiff's request for loss of use damages because it was not the appropriate measure of damages when there had been no such damages incurred.    MCI, however, is inapposite.   There, MCI sought loss-of-use damages against a company when the company damaged one of MCI's underground fiber-optic cables. 995 So. 2d at 222-23. However, MCI did not suffer a disruption in its service because it was able to redirect telecommunications traffic to other cables in its system. *Id.* The Florida Supreme Court, while answering a certified question from the Eleventh Circuit Court of Appeals, held that MCI could not recover loss-of-use damages because there was no actual loss of use or rental of replacement cable, nor interruption of service to MCI's customers. *Id.* at 229.

Here, by contrast, the Priority Claimants suffered an actual loss.  Mr. Graziano applied the ten percent diminution rate as of the effective date of value to each of the Priority Claimants' property and translated it into a dollar range.  The damage is imposed as of the effective date of value.[56]  If a Priority Claimant still owns the property and sells it three years from now, he or she has already suffered the 10 percent loss in value.  The diminution of value is what they could sell the house for on the effective date, so it affects their current equity status; it affects the value of their home as of that date.[57]  As Mr. Graziano explained, to say there is no damage is like saying that having $100,000 in your bank account is the same as

---

[56] Graziano Depo. at 343:23-17.
[57] *Id.* at 344:25-346:17.

having $90,000. "The fact that [a person did not need] the money or didn't go to spend the money at that particular time doesn't negate the fact that there is $10,000 less in [the person's] bank account. Real estate is an asset, so if the asset value goes down, you've suffered the damage."[58] The "damages are real."[59] "Their asset value is impaired and therefore they have suffered that damage as of the effective date."[60]

In addition, Defendants' reliance upon *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172 (11th Cir. 2002) is misplaced. There, the plaintiff sued Imperial Sterling Ltd (ISL) for breach of a contract to pay a commission for sale of real estate. The jury awarded future profit damages to the plaintiff, based on evidence that certain properties would be sold after trial but before Brough's contract would have expired. The Eleventh Circuit held that "the jury's award of $ 2,585,000 for 'future commissions on other Florida properties' was based on speculation that ISL would sell its property," and was, therefore, impermissible because "it was unclear at the time of the trial whether ISL would have sold its Florida property before November 1, 2002, when [the plaintiff's] contract expired." *Id.* at 1177.

The limits of *Brough* were addressed in *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1215-16 (11th Cir. 2006), wherein the Eleventh Circuit rejected its application. In *Reichhold*, a window manufacturer sued its resin supplier after the resin proved to be defective. The defendant argued that the manufacturer's expert improperly calculated lost profit damages by including in his calculations customers who stopped doing business with Glasslam for reasons unrelated to the non-conforming resin, customers who continued to purchase from Glasslam despite having resin problems, and customers who never experienced a problem with the resin. *Id.* at 1210. The *Reichhold* court distinguished *Brough* because the plaintiff's entire case in *Brough* "depended on proving how a single company would behave in the future based on that company's actions in the past. Glasslam's case included testimony about a large group of consumers' actual purchasing decisions for three years, and

---

[58] *Id.* at 346:25-347:19.
[59] *Id.* at 347:20-23.
[60] *Id.* at 347:6-8.

extrapolating that trend forward. A far larger sample size means Glasslam's projection, unlike the plaintiff's in *Brough*, is not susceptible to the randomness of an individual company's whim." *Reichhold*, 454 F.3d at 1216. Likewise, here, Mr. Graziano did not rely on one sale to reach his conclusions. He conducted an in-depth paired-sales study of twenty subject properties and comparables, conducted interviews of relevant brokers, and followed sound methodology in forming his opinion.

In support of their argument that the current owners among the Priority Claimants cannot obtain ten percent stigma damages, Defendants rely on *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1250-51 (11th Cir. 2018), wherein a homeowner filed suit against a fertilizer company located three miles from her home for contamination of her home. In *Williams*, the Eleventh Circuit held that the homeowner's lay testimony that her home was rendered valueless as a result of the contamination was properly excluded because it was speculative. The Court reasoned that a home that is contaminated is not necessarily valueless; indeed, the plaintiff testified from her own knowledge that homes in her neighborhood, including one on the same block as hers, had recently been sold. This directly refuted her contention that the value of her home was zero. Thus, despite the general rule that homeowners may testify as to the value of their homes, Ms. Williams' testimony was inadmissible because it would not have been based on personal knowledge. *Id.* at 1251. In the instant case, by contrast, Mr. Graziano, an appraisal expert, has provided his expert opinion, based on sound methodology, that the value of homes containing Chinese drywall sustain a *reduction* in value post-remediation as a result of stigma. The results of his study confirm that such homes sell at a discount because of the previous presence of the drywall. *Williams*, therefore, does not support Defendants' position that Florida law disallows such damages for current owners.

Notably, in the district court's opinion in *Williams v. Mosaic Fertilizer, LLC*, No. 8:14-cv-1748-MSS-MAP, 2017 WL 5307920, at *3 (M.D. Fla. Jan. 12, 2017), the court observed that Florida recognizes that "[a] discovery of contamination can stigmatize property." *Id.* (quoting *Finkelstein v. Dep't of Transp.*, 656 So. 2d 921, 925 (Fla. 1995)). But, "[a]n opinion as

to a decrease in value cannot be a mere surmise that because property is contaminated, it logically follows that the value of the property is decreased. *There must be a factual basis through evidence of sales of comparable contaminated property upon which to base a determination that contamination has decreased the value of the property*." *Id.* (quoting *Finkelstein*, 626 So.2d at 925 (emphasis in *Williams*). In their Memorandum, Defendants attempt to confine *Finkelstein* to the realm of eminent domain, but its application in *Williams* demonstrates that it applies in tort cases as well.[61] What this reveals is that Defendants' assertion that a plaintiff must attempt to sell his or her home to recover stigma damages under Florida law is not true. It was not the fact that the plaintiff in *Williams* was a current owner of the house that rendered her lay opinion speculative, as Defendants suggest. If the plaintiff in *Williams* had obtained expert testimony showing that sales of comparable contaminated property were discounted by stigma related to the contamination – as Plaintiffs have done in this case – her stigma evidence would not have been deemed speculative.

Accordingly, Defendants' arguments notwithstanding, Florida law does not require the claimants to try to sell their homes in order to recover post-remediation stigma damages and such damages are available to them as current owners. Mr. Graziano's studies and testimony have provided the reasonable certainty that post-remediation stigma damages exists for these claimants. The damages are not dependent on a party "taking an action that is unclear he will take," which was the court's concern in *Brough*, because the damages have already been incurred. Thus, Defendants' argument that current owners cannot obtain 10 percent stigma damages they have not actually experienced and may never experience has no basis in Florida law. Their argument that Mr. Graziano's testimony should be excluded because it does not comport with Florida law should therefore be rejected.

---

[61]In their Motion for Summary Judgment, Defendants concede that stigma damages are "certainly recognized in Florida." ECF 245 at 12.

**D.   All of Defendants' Complaints as to Mr. Graziano's Opinions on Alternative Living Costs Go to the Weight, not the Admissibility, ff the Opinions.**

In forming his opinion on the issue of Alternative Living Costs, Mr. Graziano testified that he identified a number of homes that sold impaired, were subsequently remediated, and resold. The time frame of his opinions represents the approximate time frame that someone would need to move out of the home, put it back into remediated condition, to then sell it remediated.[62] That time frame represents a loss of utilization of the property. He estimated the time frame that they would have to be out of the home and the rental rate for the home to represent a proxy for the economic loss associated with being out of the home, plus the cost of packing up and moving during remediation and moving back in.[63] This, he testified, is the type of damage he has calculated in the past outside of the Chinese drywall context as an appraiser, and he is qualified to say how long a particular class of construction should take.[64]

The issues raised by Defendants with respect to Mr. Graziano's opinions on alternative living expenses are not questions of admissibility. He has provided his opinion, based on his professional experience, as to the time it takes to remediate the properties and what substitute housing during remediation will cost. Defendants have failed to demonstrate that his opinions as to Alternative Living Costs are not reliable, and the Court should therefore refuse to exclude his testimony on this issue.

**IV.   CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court DENY the Motion to Exclude Opinions of Anthony Graziano.

---

[62] Graziano Depo. at 39:11-20.
[63] *Id.* at 40:3-8; 262:12-21.
[64] *Id.* at 263:9-265:13.

Dated: May 13, 2019.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL  33134-2351
Telephone:  (305) 476-7400
Facsimile:  (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of this document was served via email on May 13, 2019 on all counsel and/or parties of record as indicated in the service email.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

22

**SERVICE LIST**

Arnold Levin, Esq.
Sandra Duggan, Esq.
Frederick S. Longer, Esq.
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500
*Attorneys for Plaintiffs*

Dawn Barrios, Esq.
Emma Kingsdorf Schwab, Esq.
BARRIOS, KINGSDORF & CASTEIX,
LLP
701 Poydras Street, Suite 3650
New Orleans, Louisiana 70139,
504-524-3300
*Attorneys for Plaintiffs*

Leonard A. Davis, Esq.
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue,
New Orleans, Louisiana 70113,
PH: (504) 581-4892
*Attorneys for Plaintiffs*

Pearl Anna Robertson, Esq.
IRPINO, AVIN, HAWKINS, LLP
2216 Magazine Street
New Orleans, LA 70130
504-525-1500
*Attorneys for Plaintiffs*

James V. Doyle, Esq.
DOYLE LAW FIRM, PC
2100 Southbridge Pkwy., Suite 650
Birmingham, AL 35209
Tele: 205-533-9500 Fax: 844-638-5812
Jim.Doyle@DoyleFirm.com
*Attorney for Plaintiffs*

Jay P. Dinan
FL Bar No.: 876593
Email: jdinan@yourlawyer.com
Parker Waichman LLP
27300 Riverview Center Boulevard, Suite
103
Bonita Springs, Florida 34134
Office: 239.390.1000
Fax: 239.390.0055
*Counsel for Parker Waichman LLP Plaintiffs*

Jimmy Faircloth, Esq.
Faircloth, Melton, & Sobel
Gras Town Plaza,
412 N. 4th Street, Suite 230
Baton Rouge, LA 70802,
(225) 343-9535
*Attorney for Plaintiffs*

Scott A. George, Esq.
Jeffrey S. Grand, Esq.
Christopher Seeger, Esq.
Seeger Weiss LLP
1515 Market Street, Suite 1380
Philadelphia, PA 19102,
(215) 564-2300
*Attorney for Plaintiffs*

Jeffrey A. Breit, Esq.
BREIT CANTOR GRANA BUCKNER,
PLLC
600 22nd Street, Suite 402
Virginia Beach, VA 23451
757-622-6000
*Attorney for Plaintiffs*

Richard S. Lewis, Esq.
Hausfeld LLP,
1700 K Street, NW., Ste. 650
Washington, DC 20006
(202) 540-7200
*Attorney for Plaintiffs*

Richard J. Serpe, Esq.
LAW OFFICES OF RICHARD J.
SERPE, PC
580 E. MAIN STREET, SUITE 310
Norfolk, Virginia 23510
757-233-0009
*Attorney for Plaintiffs*

David Venderbush, Esq.
Michael P. Kenney, Esq.
Kristine McAlister Brown, Esq.
Christina Hull Eikhoff, Esq.
Bernard Taylor, Esq.
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
PH 404-881-7000 Fax: 404-881-7777
kristy.brown@alston.com

*Attorney for Defendant Taishan Gypsum Co.
Ltd, & Tai'an Taishan Plasterboard Co.,*

Craig P. Kalil, Esq.
Aballi Milne Kalil, PA
2250 Suntrust International Center
One Southeast Third Avenue
Miami, Florida 33131
Tel: 305-373-6600
Tel: 305-372-5924
Fax: 305-373-7929
*Attorneys for BNBM PLC*

Eric Matthew Hairston, Esq.
Andrew K. Davidson, Esq.
L. Christopher Vejnoska, Esq.
James L. Stengel, Esq.
Orrick, Herrington & Sutcliffe, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700

*Attorneys for Beijing News Building Materials
Public*

# EXHIBIT A

## Seller's Property Disclosure – Residential



**Notice to Licensee and seller:** Only the **Seller** should fill out this form.

**Notice to Seller:** Florida law[1] requires a **Seller** of a home to disclose to the **Buyer** all known facts that materially affect the value of the property being sold and that are not readily observable or known by the **Buyer**. This disclosure form is designed to help you comply with the law. However, this disclosure form may not address every significant issue that is unique to the Property. You should think about what you would want to know if you were buying the Property today; and if you need more space for additional information, comments, or explanations, check the Paragraph 12 checkbox and attach an addendum.

**Notice to Buyer:** The following representations are made by **Seller** and **not** by any real estate licensee. This disclosure is not a guaranty or warranty of any kind. It is not a substitute for any inspections, warranties, or professional advice you may wish to obtain. It is not a substitute for your own personal judgment and common sense. The following information is based only upon **Seller's** actual knowledge of the Property's condition. **Sellers** can disclose only what they actually know. **Seller** may not know about all material or significant items. You should have an independent, professional home inspection to verify the condition of the Property and determine the cost of repairs, if any. This disclosure is not a contract and is not intended to be a part of any contract for sale and purchase.

**Seller** makes the following disclosure regarding the property described as: _____

_____ (the "Property")

The Property is ☐owner occupied ☐tenant occupied ☐unoccupied (If unoccupied, how long has it been since **Seller** occupied the Property? _____

|   |     | Yes | No | Don't Know |
|---|-----|-----|----|-----------|
| **1.** | **Structures; Systems; Appliances** | | | |
| | **(a)** Are the structures including ceilings; walls; doors; windows; foundation; and pool, hot tub, and spa, if any, structurally sound and free of leaks? | ☐ | ☐ | ☐ |
| | **(b)** Is seawall, if any, and dockage, if any, structurally sound? | ☐ | ☐ | ☐ |
| | **(c)** Are existing major appliances and heating, cooling, mechanical, electrical, security, and sprinkler systems, in working condition, i.e., operating in the manner in which the item was designed to operate? | ☐ | ☐ | ☐ |
| | **(d)** Does the Property have aluminum wiring other than the primary service line? | ☐ | ☐ | ☐ |
| | **(e)** Are any of the appliances leased? If yes, which ones: _____ | ☐ | ☐ | ☐ |
| | **(f)** If any answer to questions 1(a) - 1(c) is no, please explain: _____ | | | |

|   |     | Yes | No | Don't Know |
|---|-----|-----|----|-----------|
| **2.** | **Termites; Other Wood-Destroying Organisms; Pests** | | | |
| | **(a)** Are termites; other wood-destroying organisms, including fungi; or pests present on the Property or has the Property had any structural damage by them? | ☐ | ☐ | ☐ |
| | **(b)** Has the Property been treated for termites; other wood-destroying organisms, including fungi; or pests? | ☐ | ☐ | ☐ |
| | **(c)** If any answer to questions 2(a) - 2(b) is yes, please explain: _____ | | | |

|   |     | Yes | No | Don't Know |
|---|-----|-----|----|-----------|
| **3.** | **Water Intrusion; Drainage; Flooding** | | | |
| | **(a)** Has past or present water intrusion affected the Property? | ☐ | ☐ | ☐ |
| | **(b)** Have past or present drainage or flooding problems affected the Property? | ☐ | ☐ | ☐ |
| | **(c)** Is any of the Property located in a special flood hazard area? | ☐ | ☐ | ☐ |
| | **(d)** Is any of the Property located seaward of the coastal construction control line? | ☐ | ☐ | ☐ |
| | **(e)** Does your lender require flood insurance? | ☐ | ☐ | ☐ |
| | **(f)** Do you have an elevation certificate? If yes, please attach a copy. | ☐ | ☐ | ☐ |
| | **(g)** If any answer to questions 3(a) - 3(d) is yes, please explain: _____ | | | |

_____

[1] *Johnson v. Davis*, 480 So.2d 625 (Fla. 1985).

**Seller** (_____) (_____) and **Buyer** (_____) (_____) acknowledge receipt of a copy of this page, which is Page 1 of 5.

SPDR-2    Rev 9/16



EXHIBIT 501
4    3/4/19
Greenblatt

|  | Yes | No | Don't Know |
|---|---|---|---|

**4. Plumbing**

(a) What is your drinking water source? ☐ public ☐ private ☐ well ☐ other

(b) Have you ever had a problem with the quality, supply, or flow of potable water?    ☐ ☐ ☐

(c) Do you have a water treatment system?    ☐ ☐ ☐
If yes, is it ☐ owned ☐ leased?

(d) Do you have a ☐ sewer or ☐ septic system? If septic system, describe the location of each system: _____

(e) Are any septic tanks, drain fields, or wells that are not currently being used located on the Property?    ☐ ☐ ☐

(f) Have there been any plumbing leaks since you have owned the Property?    ☐ ☐ ☐

(g) Are any polybutylene pipes on the Property?    ☐ ☐ ☐

(h) If any answer to questions 4(b), 4(c), and 4(e) - 4(g) is yes, please explain:

_____

**5. Roof and Roof-Related Items**

(a) To your knowledge, is the roof structurally sound and free of leaks?    ☐ ☐ ☐

(b) The age of the roof is _____ years OR date installed _____

(c) Has the roof ever leaked during your ownership?    ☐ ☐ ☐

(d) To your knowledge, has there been any repair, restoration, replacement (indicate full or partial) or other work undertaken on the roof?    ☐ ☐ ☐
If yes, please explain: _____

(e) Are you aware of any defects to the roof, fascia, soffits, flashings or any other component of the roof system?    ☐ ☐ ☐
If yes, please explain: _____

_____

**6. Pools; Hot Tubs; Spas**

**Note:** Florida law requires swimming pools, hot tubs, and spas that received a certificate of completion on or after October 1, 2000, to have at least one safety feature as specified by Section 515.27, Florida Statutes.

(a) If the Property has a swimming pool, hot tub, or spa that received a certificate of completion on or after October 1, 2000, indicate the existing safety feature(s): ☐ enclosure that meets the pool barrier requirements ☐ approved safety pool cover ☐ required door and window exit alarms ☐ required door locks ☐ none

(b) Has an in-ground pool on the Property been demolished and/or filled?    ☐ ☐ ☐

**7. Sinkholes**

**Note:** When an insurance claim for sinkhole damage has been made by the **Seller** and paid by the insurer, Section 627.7073(2)(c), Florida Statutes, requires the **Seller** to disclose to the **Buyer** that a claim was paid and whether or not the full amount paid was used to repair the sinkhole damage.

(a) Does past or present settling, soil movement, or sinkhole(s) affect the Property or adjacent properties?    ☐ ☐ ☐

(b) Has any insurance claim for sinkhole damage been made?    ☐ ☐ ☐
If yes, was the claim paid? ☐ yes ☐ no If the claim was paid, were all the proceeds used to repair the damage? ☐ yes ☐ no

(c) If any answer to questions 7(a) - 7(b) is yes, please explain:

_____

|  | **Yes** | **No** | **Don't Know** |
|---|---|---|---|

**8. Homeowners' Association Restrictions; Boundaries; Access Roads**

(a) Is membership in a homeowner's association mandatory or do any covenants, conditions or restrictions (CCRs) affect the Property? (CCRs include deed restrictions, restrictive covenants and declaration of covenants.)
**Notice to Buyer:** If yes, you should read the association's official records and/or the CCRs before making an offer to purchase. These documents contain information on significant matters, such as recurring dues or fees; special assessments; capital contributions, penalties; and architectural, building, landscaping, leasing, parking, pet, resale, vehicle and other types of restrictions. ☐ ☐ ☐

(b) Are there any proposed changes to any of the restrictions? ☐ ☐ ☐

(c) Are any driveways, walls, fences, or other features shared with adjoining landowners? ☐ ☐ ☐

(d) Are there any encroachments on the Property or any encroachments by the Property's improvements on other lands? ☐ ☐ ☐

(e) Are there boundary line disputes or easements affecting the Property? ☐ ☐ ☐

(f) Are you aware of any existing, pending or proposed legal or administrative action affecting homeowner's association common areas (such as clubhouse, pools, tennis courts or other areas)? ☐ ☐ ☐

(g) Have any subsurface rights, as defined by Section 689.29(3)(b), Florida Statutes, been severed from the Property? ☐ ☐ ☐
If yes, is there a right of entry? ☐ yes ☐ no

(h) Are access roads ☐ private ☐ public? If private, describe the terms and conditions of the maintenance agreement: _____
_____

(i) If any answer to questions 8(a) - 8(g) is yes, please explain: _____
_____

**9. Environmental**

(a) Was the Property built before 1978? ☐ ☐ ☐
If yes, please see Lead-Based Paint Disclosure.

(b) Does anything exist on the Property that may be considered an environmental hazard, including but not limited to, lead-based paint; asbestos; mold; urea formaldehyde; radon gas; methamphetamine contamination; defective drywall; fuel, propane, or chemical storage tanks (active or abandoned); or contaminated soil or water? ☐ ☐ ☐

(c) Has there been any damage, clean up, or repair to the Property due to any of the substances or materials listed in subsection (b) above? ☐ ☐ ☐

(d) Are any mangroves, archeological sites, or other environmentally sensitive areas located on the Property? ☐ ☐ ☐

(e) If any answer to questions 9(b) - 9(d) is yes, please explain: _____
_____

**10. Governmental, Claims and Litigation**

(a) Are there any existing, pending or proposed legal or administrative claims affecting the Property? ☐ ☐ ☐

(b) Are you aware of any existing or proposed municipal or county special assessments affecting the Property? ☐ ☐ ☐

(c) Are you aware of the Property ever having been, or is it currently, subject to litigation or claim, including but not limited to, defective building products, construction defects and/or title problems? ☐ ☐ ☐

(d) Have you ever had any claims filed against your homeowner's Insurance policy? ☐ ☐ ☐

(e) Are there any zoning violations or nonconforming uses? ☐ ☐ ☐

(f) Are there any zoning restrictions affecting improvements or replacement of the Property? ☐ ☐ ☐

(g) Do any zoning, land use or administrative regulations conflict with the existing use of the Property? ☐ ☐ ☐

(h) Do any restrictions other than association or flood area requirements, affect improvements or replacement of the Property? ☐ ☐ ☐

(i) Are any improvements, located below the base flood elevation? ☐ ☐ ☐

(j) Have any improvements been constructed in violation of applicable local flood guidelines? ☐ ☐ ☐

(k) Have any improvements to the Property, whether by you or by others, been constructed in violation of building codes or without necessary permits? ☐ ☐ ☐

(l) Are there any active permits on the Property that have not been closed by a final inspection? ☐ ☐ ☐

(m) Is there any violation or non-compliance regarding any unrecorded liens; code enforcement violations; or governmental, building, environmental and safety codes, restrictions or requirements? ☐ ☐ ☐

(n) If any answer to questions 10(a) - 10(m) is yes, please explain: _____
_____

**11. Foreign Investment in Real Property Tax Act ("FIRPTA")**
    (a) Is the **Seller** subject to FIRPTA withholding per Section 1445 of the Internal Revenue Code? ☐ ☐ ☐
       **If yes, Buyer and Seller should seek legal and tax advice regarding compliance.**

**12.** ☐ **(If checked) Other Matters; Additional Comments** The attached addendum contains additional information, explanation, or comments.

**Seller** represents that the information provided on this form and any attachments is accurate and complete to the best of **Seller's** knowledge on the date signed by **Seller**. **Seller** authorizes listing broker to provide this disclosure statement to real estate licensees and prospective **buyers** of the Property. **Seller** understands and agrees that **Seller** will promptly notify **Buyer** in writing if any information set forth in this disclosure statement becomes inaccurate or incorrect.

Seller: _____ / _____ Date: _____
         (signature)              (print)

Seller: _____ / _____ Date: _____
         (signature)              (print)

**Buyer** acknowledges that **Buyer** has read, understands, and has received a copy of this disclosure statement.

Buyer: _____ / _____ Date: _____
         (signature)              (print)

Buyer: _____ / _____ Date: _____
         (signature)              (print)

©2016 Florida Realtors®

**Seller's Update**

**Instructions to Seller:** If the information set forth in this disclosure statement becomes inaccurate or incorrect, you must promptly notify **Buyer**. Please review the questions and your answers. Use the space below to make corrections and provide additional information, if necessary. Then acknowledge that the information is accurate as of date signed below.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Seller** represents that the information provided on this form and any attachments is accurate and complete to the best of **Seller's** knowledge on the date signed by **Seller**.

**Seller:** _____ / _____   Date: _____
                     (signature)                              (print)

**Seller:** _____ / _____   Date: _____
                     (signature)                              (print)

**Buyer** acknowledges that **Buyer** has read, understands, and has received a copy of this revised disclosure statement.

**Buyer:** _____ / _____   Date: _____
                     (signature)                              (print)

**Buyer:** _____ / _____   Date: _____
                     (signature)                              (print)

**Seller** (_____) (_____) and **Buyer** (_____) (_____) acknowledge receipt of a copy of this page, which is Page 5 of 5.
SPDR-2   Rev 9/16                                                           ©2016 Florida Realtors®

# EXHIBIT B

Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF FLORIDA
 2
      ----------------------------:
 3   EDUARDO AND CARMEN AMORIN,    :
     et al., individually, and on :
 4   behalf of all others         :
     similarly situated,          :
 5                                 :
          Plaintiffs,              :
 6                                 :
     v.                            : Case No. 1:11-CV-22408-MGC
 7                                 :
     TAISHAN GYPSUM CO., LTD,      :
 8   f/k/a SHANDONG TAIHE DONGXIN :
     CO., LTD.; TAIAN TAISHAN      :
 9   PLASTERBOARD CO., LTD.,       :
     et al.,                       :
10                                 :
          Defendants.              :
11   ----------------------------:
12
13                      - - -
14            Wednesday, April 17, 2019
15                      - - -
16
                  ** CONFIDENTIAL **
17
         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
18
                        - - -
19
           Videotaped deposition of DAVID J. COHEN, held
20      at Boca Raton Conference Center, 301 Northeast 51st
        Street, Suite 1240, Boca Raton, Florida 33431,
21      commencing at 1:10 p.m., on the above date, before
        Joan L. Pitt, Registered Merit Reporter, Certified
22      Realtime Reporter, Florida Professional Reporter
23                      - - -
24            GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
25                 deps@golkow.com
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 34 of 796
Case 1:11-cv-22408-MGC Document 24 Entered on FLSD Docket 05/13/2011 Page 3 of 121

Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2        COLSON HICKS EIDSON
          BY:   PATRICK S. MONTOYA, ESQUIRE
 3             NATALIE M. RICO, ESQUIRE
          255 Alhambra Circle, Penthouse
 4        Coral Gables, Florida 33134
          Phone:  (305) 476-7400
 5        patrick@colson.com
          natalie@colson.com
 6        Representing Plaintiffs
 7
          ABALLI MILNE KALIL
 8        BY:   JOSHUA D. POYER, ESQUIRE
               MICHEL AYUB, ESQUIRE
 9        1 Southeast 3rd Avenue, Suite 2250
          Miami, Florida 33131
10        Phone:  (305) 373-6600
          jpoyer@aballi.com
11        mayub@aballi.com
          Representing Defendant Beijing New Building
12        Materials PLC
13
          ALSTON & BIRD LLP
14        BY:   STEVEN R. CAMPBELL, ESQUIRE
          90 Park Avenue, 15th Floor
15        New York, New York 10016-1387
          Phone:  (212) 210-9400
16        steven.campbell@alston.com
          Representing Defendants Taishan Gypsum Co., Ltd,
17        and Taian Taishan Plasterboard Co., Ltd.
18
          ALSTON & BIRD LLP
19        BY:   SARAH O'DONOHUE, ESQUIRE
          1201 West Peachtree Street
20        Atlanta, Georgia 30309-3424
          Phone:  (404) 881-7000
21        sarah.odonohue@alston.com
          Representing Defendants Taishan Gypsum Co., Ltd,
22        and Taian Taishan Plasterboard Co., Ltd.
23
24    ALSO PRESENT:
25        Danielle DeSantis, Videographer
```

Confidential - Subject to Further Confidentiality Review

```
1                          - - -

2                    I N D E X

3                          - - -

4

5   Testimony of:  DAVID J. COHEN                      Page

6
```

```
7    DIRECT EXAMINATION BY MS. RICO                      6

8    CROSS-EXAMINATION BY MR. CAMPBELL                 112

9    REDIRECT-EXAMINATION BY MS. RICO                  113
```

```
10

11                    E X H I B I T S

12              (Attached to transcript)
```

```
13  DAVID J. COHEN DEPOSITION EXHIBITS                 PAGE

14  Exhibit 1   CV of David J. Cohen                    14

15  Exhibit 2   Report of David J. Cohen dated          20

16              3/21/2019

17  Exhibit 3   REOBroker.com Member Profile            29

18  Exhibit 4   Invoice No. 26506 dated 4/5/2019        42

19  Exhibit 5   Listing of Supplemental Production      64

20  Exhibit 6   Florida Claimants List                 83

21  Exhibit 7   MLS Listing - 1690 Renaissance          85

22              Commons Boulevard, Boynton Beach, FL

23  Exhibit 8   MLS Reports and Tax Record - 9447       87

24              Satinleaf Place, Parkland, FL 33076

25
```

Confidential – Subject to further confidentiality Review

```
 1   Exhibit 9    MLS Reports - 8232 Emerald Avenue,      89
 2                Parkland, FL 33076
 3   Exhibit 10   Asset Manager Property Inspection        97
 4                Report - 422 Belle Grove Lane, West
 5                Palm Beach, FL 33411
 6   Exhibit 11   Photographs - 422 Belle Grove Lane,      97
 7                Royal Palm Beach, FL 33411
 8   Exhibit 12   Settlement Statement - 8232 Emerald      98
 9                Avenue, Parkland, FL 33076
10   Exhibit 13   Settlement Statement - 422 Belle        100
11                Grove Lane, Royal Palm Beach, FL
12                33411
13   Exhibit 14   HUD-1 Settlement Statement - 9447       101
14                Satinleaf Place, Parkland, FL 33076
15   Exhibit 15   HUD Property Inspection Report - 422    102
16                Belle Grove Lane, Royal Palm Beach,
17                FL 33411
18   Exhibit 16   Property Appraiser Tax Report - 9447    103
19                Satinleaf Place, Parkland, FL
20   Exhibit 17   Closing Documents - 9447 Satinleaf      103
21                Place, Parkland, FL 33076
22   Exhibit 18   Blog Article entitled What Things       110
23                Should You Disclose When Selling a
24                Home?
25
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 37 of 796
Case 1:14-cv-09148-JFK Document 24 Filed 10/04/19 Page 9 of 123
Confidential - Subject to Further Confidentiality Review
121

```
 1                        -  -  -

 2              THE VIDEOGRAPHER:  We are now on the record.

 3         My name is Danielle DeSantis.  I'm a videographer

 4         for Golkow Litigation Services.  Today's date is

 5         April 17, 2019, and the time is 1:10 p.m.

 6              This video deposition is being held in Boca

 7         Raton, Florida, in the matter of Eduardo and Carmen

 8         Amorin, et al., vs. Taishan Gypsum Co. Ltd., et al.,

 9         for the United States District Court for the

10         Southern District of Florida.

11              The deponent is David Cohen.

12              Will counsel please identify themselves.

13              MS. RICO:  Natalie Rico and Patrick Montoya on

14         behalf of the plaintiffs.

15              MR. CAMPBELL:  Steven Campbell, from

16         Alston & Bird, on behalf of Defendant Taishan

17         Gypsum.

18              MS. O'DONOHUE:  Sarah O'Donohue, from

19         Alston & Bird, also on behalf of Taishan.

20              MR. POYER:  Joshua Poyer, of Aballi Milne

21         Kalil, on behalf of Beijing New Building Materials.

22              MR. AYUB:  Michel Ayub, of Aballi Milne Kalil,

23         on behalf of Beijing New Building Materials PLC.

24              THE VIDEOGRAPHER:  The court reporter is Joan

25         Pitt and will now swear in the witness.
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 38 of 796
Case 1:01-cv-12257-PBS Document 21 Filed 06/14/05 Docket 05/13/2019 Page 2 of 121

Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT REPORTER:  Raise your right hand,
 2       please.  Do you swear or affirm the testimony you
 3       give will be the truth, the whole truth, and nothing
 4       but the truth?
 5              THE WITNESS:  Yes.
 6              THE COURT REPORTER:  Thank you.
 7              DAVID J. COHEN, called as a witness by the
 8   Plaintiffs, having been first duly sworn, testified as
 9   follows:
10                     DIRECT EXAMINATION
11   BY MS. RICO:
12       Q.   Good afternoon, Mr. Cohen.
13       A.   Good afternoon.
14       Q.   As I said, I'm Natalie Rico.  We'll be asking
15   you a couple questions today.  We will try to keep it as
16   brief as humanly possible.
17       A.   Thank you.
18       Q.   But I make no promises.
19       A.   No problem.
20       Q.   Could you state your full name for the record,
21   please?
22       A.   David Cohen.
23       Q.   And what is your professional address?
24       A.   240 West Palmetto Park Road, Suite 300, Boca
25   Raton, Florida 33432.
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 39 of 796
Case 11-cv-01244-MRGF Document 42-1 Filed 06/13/2019 Page 8 of
Confidential - Subject to Further Confidentiality Review
121

 1      Q.    And what company is located at that address?

 2      A.    GSIG LLC, and we also have a d/b/a GSIG Select.

 3   GSIG Select.

 4      Q.    Okay.  And so it's the same company, it's

 5   just --

 6      A.    Correct.

 7      Q.    Okay.  Thank you.  I was going to get into that

 8   later.

 9            Could you please walk us real quickly through

10   your educational background?

11      A.    I have an associate's degree in networking

12   technology and I have a real estate license and real

13   estate brokerage license.

14      Q.    And where is your associate's degree from?

15      A.    From Asheville-Buncombe Technical Community

16   College in North Carolina.

17      Q.    And what year did you receive that in?

18      A.    2003.

19      Q.    Okay.  And you mentioned you have your real

20   estate license?

21      A.    Correct.

22      Q.    In what year did you obtain your real estate

23   license?

24      A.    2006, I believe.

25      Q.    And that's in the state of Florida?

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 40 of 796
Case 1:14-cv-09148-MBN Document 2 Attachment 3 Docket 05/13/2014 Page 8 of
121

Confidential – Subject to Further Confidentiality Review

1        A.    Correct.

2        Q.    And you also have your broker's license;

3   correct?

4        A.    Yes.

5        Q.    In what year did you receive your broker's

6   license?

7        A.    If I remember correctly, 2007.

8        Q.    And that's also in the state of Florida?

9        A.    Correct.

10        Q.    Do you have a license to practice real estate

11   in any other state?

12        A.    No.

13        Q.    And I saw somewhere, please correct me if I'm

14   wrong, that you are a Certified Distressed Property

15   Expert; is that right?

16        A.    Yes.

17        Q.    And where did you obtain that certification?

18        A.    It was a -- at one of the REO conferences that

19   I attended.

20        Q.    What is an REO conference?

21        A.    It's a real estate-owned conference, so it's a

22   conference where real estate professionals who have some

23   interest in bank-owned properties and acquiring those

24   type of clients.

25        Q.    Okay.  And they were offering a Certified

1    Distressed Property Expert certification at one of those

2    conferences; is that right?

3        A.   Yeah, there was a lot of different

4    certifications I attended at different conferences

5    with -- that one could have been through NRBA [sic],

6    which is the National Association of Real Estate

7    Brokers, in Vegas.  It could have been.  I'm not

8    100 percent sure.

9        Q.   I believe it was from the Charfen Institute.

10   Does that sound right?

11       A.   Charfen?  Okay.

12       Q.   What is the Charfen Institute?

13       A.   If I remember correctly, it was a company that

14   provided certifications.  At that time I was just

15   getting certifications to deal with the industry as

16   it -- as it was heading to foreclosures.  There was a

17   lot of -- the housing crisis happened in 2007/2008 and

18   there was a lot of foreclosures, so I was just following

19   where the industry was going.  At that time, if you --

20   if you didn't pick up foreclosures, then you weren't

21   getting as much business.

22       Q.   Okay.  And that's the reason that you proceeded

23   with these various certifications?

24       A.   For credibility.

25       Q.   For credibility.  Okay.  What do you mean when

1    you say "credibility"?

2        A.    Well, when you have a certification, it helps

3    you with your credibility.

4        Q.    Okay.  Credibility with respect to work in

5    that --

6        A.    Potential clients.

7        Q.    -- particular market area?

8        A.    Correct.

9        Q.    Okay.  And just going back quickly to the

10   Certified Distressed Property Expert, that

11   certification, what is your definition of a distressed

12   property?

13       A.    Just to clarify, it was a very small

14   certification.  It wasn't a big deal.  There was a lot

15   of different certifications that I got similar to those.

16       Q.    Okay.  Thank you for that.

17       A.    Okay.

18       Q.    Just quickly, what is your definition of a

19   distressed property?

20       A.    Distressed property?  It has to do with a

21   seller that needs to sell that -- somebody who's not

22   going to live in a property.  So banks sometimes will

23   sell properties because they need to get them off their

24   books and they're going to continue -- they're going to

25   eventually sell.  It's not like a traditional seller who

```
 1    will take the property off the market if they don't get

 2    the price they want.  The banks have to sell.

 3        Q.   Okay.  So you mentioned that you've obtained a

 4    number of other certifications.  What other

 5    certifications did you obtain?

 6        A.   I don't remember the names at this point.  It

 7    was a lot of different companies offering

 8    certifications.  Early in my -- my career around when I

 9    decided to pursue some of these foreclosures, I just

10    pursued whatever certification I could in order to help

11    give me credibility with -- with the clients.

12        Q.   Okay.  So did you -- for the certification that

13    we were discussing, did you take any classes to obtain

14    that certification, if you remember?

15        A.   I know that I took classes for most of my

16    certifications.

17        Q.   Okay.  How long?

18        A.   Some of them were at the desk on the Internet,

19    and many of them were in class.  So it just -- that one

20    doesn't stand out specifically.  There was numerous

21    certifications I obtained, and not just for the

22    distressed property, but just general real estate

23    through the Realtor Association of Palm Beach County.

24    So I've had various different classes to further my

25    career.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Okay.  How long do the classes typically last?
 2  Are they a day?  Are they a couple months?
 3      A.   It varies.  It varies from just online to
 4  multiday classes.  So I've done three-day classes in
 5  Vegas, I've done different classes in Dallas, classes
 6  here in Palm Beach County.
 7      Q.   Okay.  And do they require an exam at the
 8  termination of the class, or does it vary?
 9      A.   Most of them do have an exam.
10      Q.   Okay.  And the different companies that you
11  mention that offer these classes, are they accredited
12  colleges?
13      A.   It varies.  I don't know that any were
14  accredited colleges, but there are different companies
15  that offer the classes.  Some from the association.
16  Some are private companies.
17      Q.   Okay.  Are these certifications sanctioned by
18  the Florida Association of Realtors?
19           MR. CAMPBELL:  Object to the form.  Answer if
20      you --
21  BY MS. RICO:
22      Q.   To the extent you know, obviously.
23      A.   Some of them.
24      Q.   Okay.  Which ones, if you remember?
25      A.   I don't recall.
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 45 of 796
Case 1:16-cv-01439-WEG Document 12 entered on SUbject to Docket 11/04/18 Page 4 of
Confidential - Subject to Further Confidentiality Review
121

```
 1        Q.    Okay.  Now, aside from your real estate and

 2   broker's licenses and the various certifications we've

 3   alluded to, do you have any other certifications or

 4   licenses?

 5        A.    None that come to mind.

 6        Q.    Okay.  Are you as a real estate agent and a

 7   broker required to take continuing education classes?

 8        A.    Yes.

 9        Q.    Tell me about those requirements.

10        A.    Every two years we're required to take a

11   14-hour continuing education class to maintain our

12   license.

13        Q.    And are you up-to-date with that?

14        A.    Yes.

15        Q.    Have you over the extent of your career ever

16   had a professional complaint filed against you?

17        A.    No.

18        Q.    Now, you mentioned, I believe, the Palm Beach

19   Association of Realtors earlier?

20        A.    Yes.

21        Q.    Is that the association that you are a direct

22   member of or --

23        A.    So I'm a member of the Realtors Association of

24   the Palm Beaches, that's my Realtor membership, and then

25   I have MLS memberships with Greater Fort Lauderdale,
```

Confidential - Subject to Further Confidentiality Review

```
 1    South Broward, and Miami for MLS marketing data.

 2        Q.   I'm sorry.  You said Fort Lauderdale, South

 3    Broward, and Miami?

 4        A.   Yeah.  Greater Fort Lauderdale.  Realtor

 5    Association of the Palm Beaches and Greater Fort

 6    Lauderdale merged.

 7        Q.   I'd like to speak quickly about your employment

 8    history, and to ease that I'm going to give you a copy

 9    of your CV that we'll mark as Exhibit 1.

10        A.   Thank you.

11             (Cohen Exhibit No. 1 was marked for

12    identification.)

13    BY MS. RICO:

14        Q.   So you are -- so you are currently employed by

15    GSIG LLC; is that right?

16        A.   Correct.

17        Q.   And what is your position with that

18    organization?

19        A.   The owner.

20        Q.   And you founded -- this is a brokerage firm; is

21    that right?

22        A.   Correct.

23        Q.   And you founded that firm; is that right?

24        A.   Yes.

25        Q.   That was when?  In 2006?
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 47 of 796
Case 1:16-cv-40436-NG-1 Document 2 entered on FLSD Docket 08/17/2014 Page 6 of
121
Confidential - Subject to Further Confidentiality Review

1      A.    2006 or maybe late 2005.  Somewhere around

2   there.

3      Q.    Okay.  And prior to that, you were at -- how do

4   you say it?  LTEP?  LTEP?

5      A.    No, that's just an entity that I own that I had

6   a few small trial investments in.  There's really

7   nothing to it.

8      Q.    And would those be real estate investments?

9      A.    Just failed investments pretty much, so...

10     Q.    Okay.  Were any of the investments that were

11  kind of under the purview of that company involving

12  Chinese drywall at all?

13     A.    No.

14     Q.    Okay.  And then, so prior to GSIG, you were at

15  RE/MAX; is that right?

16     A.    Correct.

17     Q.    Okay.  And you were a sales associate there for

18  about two years?

19     A.    Yeah, I don't recall when I started in 2006 and

20  when I finished in 2008, but roughly one and a half, two

21  years.

22     Q.    And I'm going to ask you about some other

23  corporations that I do not see on this CV, just for

24  clarity.

25            So you're the founding member of GSIG, and you

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 48 of 796
Case 1:14-cv-04948-WFG Confidential — Subject to Further Confidentiality Review
121

1    said that its d/b/a is GSIG Select; is that right?

2       A.   Correct.

3       Q.   Okay.  And you're the CEO of that organization;

4    is that right?

5       A.   GSIG LLC and GSIG Select, correct.

6       Q.   Okay.  What is Foreclosure Rescue LLC?

7       A.   That's a failed entity that we never ended that

8    we had set up, and I think we changed the name to LTEP.

9    So that should be LTEP, if I remember correctly.

10      Q.   So those are the same company, just with a

11   changed name?

12      A.   Yeah.  We -- I had created a lot of entities

13   throughout the years and we had a lot of ideas and

14   spinoff ideas that just never took off.  So I keep

15   paying for the registrations thinking that one day maybe

16   I'll use the entity for something, and I already had a

17   bank account associated with it, and so I pay the fees

18   and it's there, but I don't really do anything with them

19   and...

20      Q.   Okay.  And when you said "we" set up

21   Foreclosure Rescue LLC, who is "we"?

22      A.   My bookkeeper helps me set up the entities.  I

23   mean, I'm not setting up entities now, but I have in the

24   past, and she helped me with it.

25      Q.   And what is her name?

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 49 of 796
Case 1:16-cv-04043-AKH Document 1 Entered Electronically 11/20/17 Page 8 of 121
Confidential - Subject to Further Confidentiality Review

1      A.    Sabrina Santucho.  And my brother and I had

2    different ideas for things, but...

3      Q.    What is your brother's name?

4      A.    Jared Cohen.

5      Q.    And what was -- what was the purpose of

6    Foreclosure Rescue LLC?  What was the idea?

7      A.    I think we wanted to start a preservation

8    company to do property preservations, and then as we

9    continued with our real estate business we realized it

10   was a conflict of interest so we didn't pursue that

11   business.

12     Q.    And I am not in your industry, so could you

13   tell me, when you say "property preservation," what does

14   that mean?

15     A.    Preservation is to preserve a property from

16   further deterioration.  So if you have a leaky roof or

17   if you have anything that would -- that left untreated

18   would continue to degradate the property, that needs to

19   be taken care of, and so that's what preservation is.

20          So if there's a hole in the roof and you have

21   water intrusion, that needs to be resolved, versus a

22   renovation, which is fixing something that doesn't --

23   that's not time-sensitive.  So preservation is dealing

24   with time-sensitive issues that need to be repaired.

25     Q.    Okay.  And you mentioned earlier that you

 1   thought that that concept was a conflict of interest

 2   with what you were doing.  How so?

 3       A.   Because if a client, a bank, asks me to do

 4   preservations on a property, I can't use my own company

 5   to do that, because then there would be -- that would be

 6   a conflict of interest if I were to use my own company.

 7   If I was the custodian of that asset managing that

 8   asset, I need to hire a third party company to do that

 9   work, not my own company.

10       Q.   I see.

11       A.   So we just put all our eggs in the asset

12   management basket.

13       Q.   And what do you mean by "asset management"?

14       A.   Managing the assets and disposing the assets

15   for our clients.  So selling the properties and focusing

16   on that instead of focusing on doing the preservation

17   work.  So we worked with other companies to do the

18   preservation work.

19       Q.   Okay.  And what about a company named -- I'm

20   probably going to butcher this -- Gruchini, Inc.?

21       A.   Oh, Gershuni is just another entity, and

22   basically what that is there for is I have licensed real

23   estate agents who are not members of the Realtor board,

24   and they don't want to pay board dues, so the way to

25   deal with that is we have another entity that does not

 1    have -- it's not a member of the Realtor board.  And so

 2    if we have real estate agents that are licensed agents

 3    but not members of the Realtor Association, then they

 4    join that company.

 5         Because I do have people who have real estate

 6    licenses that don't want to pay these dues because it's

 7    not a full-time job for them, so they're -- they're

 8    just -- they have their real estate license, maybe

 9    they're a CPA or they have some other line of work and

10    they want to hang their license somewhere, they'll do it

11    with that entity of mine.

12    Q.   When you say they're not a member of the board,

13    do you mean the Palm Beach Realtors Association you

14    mentioned earlier?

15    A.   Yeah, that would be the primary one for our

16    area, but any -- they're not a member of any real estate

17    board and they don't want to pay the dues associated

18    with that.

19    Q.   And so what, effectively, does this company do

20    for them if they're not paying?

21    A.   It allows them to hold their license and

22    continue to practice real estate, because as a real

23    estate sales associate you have to have your license

24    with a real estate brokerage, and so it gives them a

25    brokerage to hang their license so they can still

```
 1   practice.

 2           (Cohen Exhibit No. 2 was marked for

 3   identification.)

 4   BY MS. RICO:

 5       Q.   Okay.  I'm going to mark as Exhibit 2 your

 6   expert report in this case.

 7       A.   Thank you.

 8       Q.   You're welcome.  And if you would please turn

 9   to page 1, the first paragraph.

10       A.   Do you want me to read it?

11       Q.   Please.

12       A.   Okay.  "My name is David J. Cohen.  I'm a

13   Florida licensed real estate broker.  I have over a

14   decade of experience in the South Florida real

15   estate -- residential real estate market.  In 2006, I

16   founded GSIG LLC, a real estate brokerage firm based in

17   Boca Raton that focuses on representing buyers and

18   sellers of residential properties located in Palm Beach,

19   Broward, and Miami-Dade counties.  GSIG has sold over

20   4,000 homes in Florida, and I have been the agent of

21   record for over 2,500 sales.  I've represented a wide

22   range of clients - from individuals to corporations and

23   government entities including Fannie Mae, Freddie Mac,

24   Bank of America, Chase Bank, and all three HUD M&M

25   contractors servicing 2A (the southeast region of the
```

Confidential — Subject to Further Confidentiality Review

1    United States).  My professional biography is attached

2    as Exhibit 1."

3        Q.    Thank you.  So in that paragraph you mentioned

4    that you've represented a wide range of clients, from

5    individuals to corporations and government entities,

6    including Fannie Mae, Freddie Mac, Bank of America,

7    Chase Bank, and all three HUD M&M contracting

8    services -- servicing 2A, the southeast region of the

9    United States.

10            What kind of work have you done for Fannie Mae?

11       A.    I sold properties for Fannie Mae.  I helped

12   oversee renovations and repairs.  I helped manage

13   vendors.  I helped negotiate offers.  I helped market

14   the properties.  I helped negotiate offers.  I think I

15   mentioned that.  That pretty much sums it up.

16       Q.    And how many sales have you been the agent for

17   for Fannie Mae?  Guesstimate.

18       A.    Probably something in the vicinity of 600

19   homes.

20       Q.    Okay.  And these would -- these would qualify

21   as REO sales; is that right?

22       A.    Real estate-owned properties, correct.

23       Q.    Okay.  And just, I think you explained it

24   before, please explain again what that is.

25       A.    Real estate-owned properties?

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 54 of 796
Case 1:11-cv-04054-MGC Document 2 entered on FLSD Docket 09/13/2019 Page 23 of 121
Confidential - Subject to Further Confidentiality Review

 1      Q.   Yes.

 2      A.   They're corporate-owned properties, so the

 3   previous occupant is not -- no longer living in the

 4   property.  So it's -- it's basically a foreclosure from

 5   a mortgage, typically, and now the lender who lent out

 6   money to the borrower now has a home that they -- that's

 7   not their business and they need to dispose of that home

 8   to make good for their investors.  So it's property

 9   that's taken back on bad loans.

10      Q.   Okay.  And is this typically done after a

11   failed foreclosure auction?  Or how does --

12      A.   Typically in a foreclosure auction, if the debt

13   is greater than the value of the property, it will not

14   sell at auction, and so then the lender will end up with

15   the property.

16      Q.   Okay.

17      A.   And they're not in the business of holding on

18   to properties, so then one of the dispositions is hiring

19   an agent to dispose of the property or to sell it.

20      Q.   And then you would serve, as you mentioned

21   before, as the custodian of that property; is that

22   right?

23      A.   We were doing traditional real estate

24   activities, but then in addition we were visiting the

25   property, maintaining the property.  We were the eyes

```
 1    and ears for the bank, because they had never lived in

 2    the property, they weren't there.  So we did additional

 3    activities outside of the scope of a traditional real

 4    estate agent.

 5         Q.   And those would include overseeing renovations

 6    and repairs and things of that nature?

 7         A.   Correct.  Overseeing renovations, repairs,

 8    visiting the property on a regular basis.

 9         Q.   Okay.  You also mention in that first paragraph

10    Freddie Mac.  What kind of work have you done for

11    Freddie Mac?  Similar?

12         A.   Pretty much the exact same work.

13         Q.   And what -- how many sales or transactions do

14    you think that you performed for Freddie Mac?

15              MR. CAMPBELL:  Object to the form.  You can

16         answer.

17              THE WITNESS:  It's hard for me to say.  I would

18         have to pull a report, but it's in the three digits,

19         so...

20    BY MS. RICO:

21         Q.   So a guesstimate would be?  I'm not holding you

22    to it.

23         A.   400.  Guesstimate.  It could -- give or take

24    200, I don't know.

25         Q.   And, quickly, what -- what is Fannie Mae?
```

```
 1        A.    They're the -- it's a company that insures

 2    mortgages, so they buy mortgages on the secondary

 3    market, and it's a government-sponsored entity, so it's

 4    not -- technically, it's a private company, but they

 5    insure mortgages.

 6        Q.    And what about Freddie Mac?

 7        A.    Same thing.

 8        Q.    Now, you also said you served as an agent and

 9    conducted transactions for Bank of America; is that

10    right?

11        A.    Correct, through -- through their various

12    outsourcing companies.

13        Q.    And what --

14        A.    And I believe directly as well, so...

15              They act as a servicer for the original lender.

16    So lenders would be pension funds, and so then they

17    service those pension funds, and part of their servicing

18    agreement they're responsible for disposing or selling

19    REO properties from bad loans.

20        Q.    Okay.

21        A.    And so what they would do, they would hire

22    agents directly or an outsourcing company, who then

23    would hire us.

24        Q.    Okay.  And how many transactions did you work

25    on for Bank of America?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   I don't recall.

 2      Q.   Guesstimate?  Best guess.

 3      A.   It would just be a pure guess.  It was probably

 4  not in the triple digits, but in the double digits.

 5      Q.   Okay.  I'm not going to hold you to it if you

 6  don't remember.

 7      A.   And can I clarify something?

 8      Q.   Yes.

 9      A.   So we've worked with over 130 different

10  outsourcing companies, so there's a lot of ones that are

11  not mentioned on there.  Wilshire Credit Corporation was

12  a big company that we worked for and we sold a lot of

13  properties for, and they were sold out to IBM, who --

14  you know, so there's a lot of companies that we worked

15  for that are not listed on that.

16      Q.   Okay.  What was that last one?  Wilshire?

17      A.   Wilshire Credit Corporation.

18      Q.   And these are also REOs, these sales?

19      A.   They're all similar companies.

20      Q.   Okay.  And continuing down the list, how about

21  Chase Bank?

22      A.   I couldn't tell you the numbers for Chase

23  either.

24      Q.   That's --

25      A.   Because I worked directly with Chase, but then
```

Confidential - Subject to Further Confidentiality Review

 1    they had numerous outsourcing companies, so it's really

 2    difficult.  When I work with my client, it's my client

 3    and we don't always even know who the underlying

 4    servicer is.

 5        Q.   Not a problem.  I'm not asking you to guess if

 6    you really -- I mean, if you have no memory at all, so

 7    don't worry about that.

 8             Then later you referred to HUD M&M contractors

 9    servicing 2A, which you explain is the southeast region

10    of the United States.  What is HUD M&M contractors?

11    What is that referring to?

12        A.   It's FHA foreclosures.  So they're all the bad

13    loans.  The collateral for the loans that went bad for

14    FHA loans end up with HUD, and then HUD breaks up the

15    country into regions.  It's either four or five regions.

16    And 2A is Florida, Georgia, South Carolina, Louisiana.

17    It's the southeast region of the United States.

18             And they had 12 M&M contractors throughout the

19    country, and three of them handled 2A.  So we were

20    fortunate enough, after making application and with our

21    resume, to be able to work with all three M&M

22    contractors.

23        Q.   And how many transactions, if you remember, did

24    you have with them?

25             MR. CAMPBELL:  Objection to form.

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 59 of 796
Confidential - Subject to further Confidentiality Review
121

```
 1          THE WITNESS:  I don't recall, but it was

 2      definitely in the triple digits, so I don't --

 3      somewhere around Freddie Mac's volume.  I think

 4      Fannie Mae was probably our largest client and then

 5      HUD was maybe our second largest client.

 6  BY MS. RICO:

 7      Q.   Okay.  So of the 2,500 sales you reference in

 8  the first paragraph where you've been the agent, roughly

 9  how many were REO sales for these types of companies?

10          MR. CAMPBELL:  Objection to form.  Just "over

11      200" -- "2,500" is what it says.  I just want to

12      make sure that we're clear on the number.

13          MS. RICO:  Over 2,500.  Well, actually, no.

14          Yes, you're right.  I'm sorry.

15  BY MS. RICO:

16      Q.   Go ahead.

17      A.   Could you state the question again?

18          MR. CAMPBELL:  Do you know the question?  I'm

19      sorry.  Do you know the question?  You can have her

20      read it back or you can ask it.

21          MS. RICO:  No, that's fine, she can read it

22      back.

23          (The question was read by the reporter.)

24  BY MS. RICO:

25      Q.   And just to clarify, of the over 2,500 sales
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 60 of 796
Case 1:11-cv-01408-WCG Document 21 Entered on FLSD Docket 11/20/19 Page 29 of 121
Confidential - Subject to Further Confidentiality Review

 1    where you've been the agent.

 2        A.    How many were REO?

 3        Q.    How many were REO?

 4        A.    I couldn't attribute a specific number to that.

 5        Q.    But would you say that those types of sales are

 6    your company's specialty?

 7        A.    For a time earlier in the career.  Maybe around

 8    2013, for a time we had, but we had a lot of agents.  I

 9    had 60 agents.  We've had hundreds of agents work for

10    us.  I had a sales manager.  We did trainings.  And our

11    agents worked with buyers and we represented buyers.

12    Traditional real estate.  And we also represented

13    traditional sellers.

14        Q.    But what would be --

15        A.    We did have -- we did have a niche and we were

16    good at REO, but we also did traditional, and it helped

17    us with our traditional.

18        Q.    And how did it help you with your traditional

19    sales?

20        A.    Just being involved in many transactions and

21    seeing all the different things that can go wrong and

22    that can go right and just understanding the real estate

23    process.

24        Q.    And what would you say is your company's mix

25    percentage-wise between this type of work and

```
 1    traditional sales?

 2              MR. CAMPBELL:  Objection.  You're talking about

 3         the during the life of the company or during a

 4         specific time period?

 5    BY MS. RICO:

 6         Q.   The life of the company.

 7         A.   So I would say about 50/50, because we're very

 8    focused on traditional real estate now.  It was just a

 9    sign of the times.  It's not something I wanted to do,

10    but it was where the market was at the time, and the

11    market's not at that point right now.

12         Q.   Okay.  And you were saying that your focus

13    right now is -- is more traditional real estate.  Since

14    when?

15         A.   Since -- I would say it's been since, probably,

16    2014.  It's always been something we've tried to pivot

17    towards, because we always knew that markets are

18    cyclical, they're changing, and so we adjust with the

19    times.  So it's been something that we've -- lead

20    generation, advertising, sales training too.

21              (Cohen Exhibit No. 3 was marked for

22    identification.)

23    BY MS. RICO:

24         Q.   Okay.  I am going to show you what we will mark

25    as Exhibit 3.
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 62 of 796
Case 1:16-cv-14860-WGC Document 21 entered on USA Docket 03/11/2019 Page 61 of
Confidential - Subject to Further Confidentiality Review
121

 1            This appears to be, and please correct me if

 2   I'm wrong, a member profile on a website REOBroker.com;

 3   is that right?

 4       A.   That's correct.

 5       Q.   Are you familiar with this website?

 6       A.   I am.

 7       Q.   What is this website?

 8       A.   REOBroker.com is a -- it is a company that is

 9   owned by a Realtor.  I believe, if this is the company

10   that I remember, it's a Realtor in Huntington Beach,

11   California, who does REOs.  And my brother signed us up

12   for this a few years ago just to put our name out there,

13   but, yeah.

14       Q.   And does -- does this website require a

15   membership of any kind?

16       A.   Yes, it does.

17       Q.   And are the members -- do the members control

18   their profiles?

19       A.   The members are supposed to be able to control

20   their profiles.  I wasn't able to control this profile,

21   because my brother's no longer working for my company

22   and he was the one who signed us up.  So I actually did

23   get a call recently from the owner following up with me,

24   and I told him to please cancel, so...

25       Q.   Okay.  Would your brother have checked with you

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 63 of 796
Case 1:11-cv-22408-WJZ Document 21 entered on FLSD Docket 11/14/2019 Page 62 of 121

Confidential - Subject to Further Confidentiality Review

```
 1   before putting certain information --

 2        A.   Yeah, he checked with me.

 3        Q.   Okay.

 4             MR. CAMPBELL:  Let her finish the question.

 5             THE WITNESS:  Sorry.  I didn't mean to jump.

 6   BY MS. RICO:

 7        Q.   I'm sorry.  Before --

 8        A.   I apologize.

 9        Q.   No, no, that's fine.

10             Before putting certain information on a profile

11   for your company?

12        A.   My guess is he probably copied something, some

13   old sales copy that we had.

14        Q.   Okay.  Let's look at the second page briefly.

15   There's a section here that says "more information."

16             The section states:  "The GSIG team has proven

17   to be a top performer in managing and selling

18   residential REOs in southern Florida.  Our office was

19   opened in 2006 and designed specifically for listing

20   bank and investor-owned homes.  Since that time we have

21   sold over 2,500 properties."

22             Did I read that correctly?

23             MR. CAMPBELL:  Objection to form.

24             MR. POYER:  Object to the form.

25             THE WITNESS:  Yes.
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 64 of 796
Case 4:11-cv-01049-WCG Document 2 entered on FLSD Docket 11/28/19 Page 63 of
121
Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. RICO:

 2       Q.   And is that an accurate statement?

 3       A.   Can you repeat the statement specifically?

 4       Q.   It says here that GSIG was opened and designed

 5   specifically for listing bank and investor-owned sales;

 6   is that right?

 7       A.   That's what it says on here.

 8       Q.   Is that an accurate statement?

 9       A.   We -- when we're marketing to corporate

10   clients, that's what we're mentioning, but that's why I

11   created the separate entity called GSIG Select that

12   focuses on individuals.  And we started doing that in

13   2014.  We started to change some of that focus to have a

14   separate entity.

15           So I made my brother the broker of GSIG Select

16   while I stayed the broker of GSIG REO, is what we called

17   it.  And so my sales manager -- and we actually had two

18   signs on our doors, and my sales manager, we were doing

19   CRMs and training and hiring agents and training them

20   how to do lead generation through GSIG Select while GSIG

21   REO stayed an REO company.

22       Q.   Okay.  My -- my understanding from earlier was

23   that the two GSIG companies, one was the d/b/a of

24   another.  Is there a third company?

25       A.   There is -- I created an entity, and then my
```

1    bookkeeper said, you know, it's easier to just keep it

2    as a d/b/a.  So the entity, I don't know if it still

3    exists, but we operate GSIG Select as a d/b/a under GSIG

4    LLC just for accounting purposes.

5        Q.    Okay.  Thank you for clarifying.

6              Okay.  The paragraph we were looking at

7    continues, and it says:  "With our carefully developed

8    system and the combined years of experience among our

9    team, we are able to manage and sell your property in

10   any situation while exceeding expectations."

11             Did I read that right?

12       A.    Yes.

13       Q.    What do you mean by "our carefully developed

14   system"?

15       A.    We developed systems to automate processes and

16   just be very efficient in -- in what we did.  So I had

17   developed position agreements.  I had staff that was

18   hired for specific positions that did specific tasks so

19   that we were -- so we ran smooth and we had a good

20   operation, we provided good service.

21       Q.    Then it goes on to say:  "We believe a great

22   deal of our success comes from our sales tactic.  When

23   we prepare and list your asset, we make it a goal that a

24   potential buyer is unable to differentiate our

25   bank-owned listings to a privately owned home."

```
1              Did I read that correctly?

2       A.   Yes.

3       Q.   Why is that important?

4              MR. CAMPBELL:  Objection to form.

5              MR. POYER:  Join.

6   BY MS. RICO:

7       Q.   I'm sorry.  The statement where you say you're

8   able to -- you make it so "a potential buyer is unable

9   to differentiate our bank-owned listings to a privately

10  owned home," what is the importance of your being able

11  to do that?

12             MR. CAMPBELL:  Same objection.

13             MR. POYER:  Objection.  Same objection.

14             MS. RICO:  What's the basis for the objection?

15             MR. CAMPBELL:  The assumption, the fact that

16      it's an important distinction.

17  BY MS. RICO:

18      Q.   Is there -- is that distinction important, that

19  you are able to make it so that a potential buyer can't

20  differentiate a bank-owned listing from a privately

21  owned home?

22      A.   For a time in the early REO market a lot of

23  homes were -- bank-owned homes -- were poorly managed,

24  so they would have no electricity on and they were in,

25  typically, generally speaking, in not as good condition
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 67 of 796
Case 1:14-cv-09148-JFK Document 21 Entered on FLSD Docket 01/14/2019 Page 36 of 121
Confidential — Subject to Further Confidentiality Review

1    as a privately owned home, though there are many, many

2    exceptions.  So with the help of our clients, the goal

3    was to make sure that the homes had electricity, running

4    water, were clean.  And over time the industry became

5    better about doing that.

6        Q.   Okay.  I'm going to move on from this document

7    and just ask you quickly, have you ever served as an

8    expert witness before?

9        A.   No, never.

10       Q.   This is your first time?

11       A.   It is my first time.

12       Q.   When were you retained in this case?

13       A.   I believe in February, if I remember correctly,

14   but I'll be honest, I don't recall the exact date.

15   Perhaps March.

16       Q.   Do you have an executed retainer agreement for

17   your work in this case?

18       A.   It's not executed.  My -- from my

19   understanding, there's just some translation issues, but

20   it will -- but I have been paid 60 percent of one of my

21   invoices, so...

22       Q.   And, I'm sorry, what do you mean by

23   "translation issues"?

24       A.   The defendant is a Chinese company, so they

25   have to translate the documents, so...

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 68 of 796
Case 1:16-cv-04964-WFK Document 21 Entered on FLSD Docket 11/14/19 Page 37 of 121
Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  And so there's not currently an executed

2    agreement; is that right?

3    A.   That's correct, but I have been paid 60 percent

4    of one of my invoices, so...

5    Q.   Okay.

6         MS. RICO:  Whenever the translation issues are

7         sorted, we'd ask -- we haven't seen a retainer

8         agreement, so to the extent that there is one, we'd

9         like a copy.

10   BY MS. RICO:

11   Q.   Do you know if you were retained prior to

12   February 8?  Do you have any recollection?

13   A.   I don't believe that I was.

14   Q.   Okay.  And by whom were you retained?

15   A.   By the defendants.

16   Q.   Is it your understanding that there are

17   multiple defendants in this case?

18   A.   Taishan and BNBM, as far as I understand.

19   Q.   And were you retained by both?

20   A.   Yes.

21   Q.   Who contacted you initially?

22   A.   Sarah contacted me initially.

23   Q.   And do you know, roughly, when this was?

24   A.   If -- if I remember, I think it was Sarah.  It

25   could have been Caroline.  I'm not 100 percent sure, but

```
 1    Alston & Bird.

 2        Q.   Okay.  And was it a phone call?  Was it an

 3    e-mail?

 4        A.   It was a phone call asking me my opinion of

 5    remediated Chinese drywall homes, and I gave my opinion

 6    unknowing anything about the case.

 7        Q.   Okay.  And this was a call that you had with --

 8    you're certain this is a call you had with Alston &

 9    Bird?

10        A.   I'm not 100 percent certain, but I would say 90

11    percent sure.

12        Q.   Do you recall that you received a phone call

13    serving real estate agents regarding Chinese drywall

14    back in February?

15            MR. POYER:  Object to the form.

16            MR. CAMPBELL:  Join.

17            THE WITNESS:  I was contacted by Graziano's

18        office asking me if I had been -- what my opinion

19        was on Chinese drywall homes, remediated Chinese

20        drywall homes.

21    BY MS. RICO:

22        Q.   And to the best of your recollection, was that

23    prior to or after your conversation with Sarah?

24        A.   Prior to.

25        Q.   Prior to.  So at the time you received the call
```

1  from Graziano's office, you had not been retained in

2  this case?

3      A.  Correct.

4      Q.  Okay.  And can you walk me through what you

5  remember about your initial conversation with Sarah?

6      A.  I don't recall the specifics of the

7  conversation.

8      Q.  But she did ask you about your opinion

9  regarding --

10      A.  From what I recall, she asked my opinion, I

11  gave my opinion, and then I was sometime, either on that

12  conversation or a subsequent conversation, made aware of

13  the case and asked to be retained for services, or asked

14  what my -- yeah.

15      Q.  And what did you tell Sarah your opinion was at

16  that time?

17      A.  I told her my opinion was that there is no

18  reduction in value due to remediated Chinese drywall

19  homes.

20      Q.  And it's your opinion that there is never a

21  reduction in value of -- of a remediated Chinese drywall

22  home?

23      A.  I think that it's specific to the buyers and

24  the sellers.  So there are some buyers that would

25  potentially -- there's some buyers that would want to

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 71 of 796
Case 1:11-cv-40089-WGY Document 2 Entered on FLSD Docket 08/13/2013 Page 90 of 121
Confidential — Subject to Further Confidentiality Review

1    pay less for a Chinese drywall remediated home, but

2    there's also buyers that would pay more for a remediated

3    home because it has new interiors versus aged interiors

4    of other houses in the community.

5        Q.    So the fact that there is an updated effective

6    date of the interior of a home may raise the price?

7        A.    Correct, depending on the buyer.

8        Q.    And that would also be true of a home that

9    didn't previously contain Chinese drywall that was

10   renovated; correct?

11       A.    Correct.

12       Q.    Who else did you speak to regarding your

13   initial retention in this case?

14           MR. CAMPBELL:  Object to form.

15           THE WITNESS:  I spoke to Steven and some of the

16       other attorneys in the case.

17   BY MS. RICO:

18       Q.    And what did you speak to them about?

19       A.    I don't recall the specifics of the

20   conversation.

21           MR. CAMPBELL:  Just a reminder, David, that

22       anything that we discussed with you in terms of

23       facts or that you relied on for your report is --

24       you have to talk about that, but anything else about

25       case strategy, to the extent that we did, is

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 72 of 796
Case 1:11-cv-01084-WCG Document 21 entered on FLSD Docket 08/13/2012 Page 71 of 121
Confidential — Subject to Further Confidentiality Review

```
 1           privileged --

 2               THE WITNESS:  Okay.

 3               MR. CAMPBELL:  -- and would like for you to

 4           keep that privileged.

 5               THE WITNESS:  Yeah, it was just them asking me

 6           my opinion of remediated homes and my experience in

 7           the industry and would I be willing to be deposed

 8           and be an expert witness.

 9   BY MS. RICO:

10           Q.  And you obviously said yes?

11           A.  Yeah, I obviously said yes.

12           Q.  And regarding your billing in this case, you

13   are charging $600 per hour?

14           A.  Correct.

15           Q.  Have you ever charged $600 per hour for work

16   before?

17           A.  I don't charge on an hourly rate.  I work off

18   commission, so...

19           Q.  So you've never previously been paid $600 an

20   hour for any type of work?

21           A.  No, but I -- you know, I sell real estate and I

22   make large commissions on my sales or small commissions

23   and lots of commissions, so...

24           Q.  What's the last job you had where you were paid

25   by the hour?
```

```
 1     A.   Probably a skin care company many years ago.

 2     Q.   A skin care company?

 3     A.   My uncle owns a skin care company.

 4     Q.   Okay.  Do you remember what your hourly rate

 5   was?

 6     A.   Yeah, I do.  It was a lot less than I was

 7   making in real estate, that's for sure.

 8     Q.   I'm sure.  What was it, if you don't mind my

 9   asking?

10     A.   I don't recall exactly, but it was a lot less

11   than I was making in real estate.

12     Q.   A lot less than $600 an hour?

13     A.   Yeah.  The reason why I charged -- I actually

14   asked for more, and it's because this is not the kind of

15   work that I like to do.  I like to work with clients.  I

16   like to work with my buyers and my sellers.  I like to

17   show property.  I just put a $2.5 million property under

18   contract in Boca Bridges.

19          And it's my time.  My name is valuable.  I

20   don't get enough time with my family, and if I'm going

21   to do something I don't like to do, it's not really my

22   line of work, then, you know, that's what I'm going to

23   charge for it.  So, otherwise, I'll just -- and it's

24   also time away from my business.  So my customers, if I

25   work with them, eventually I'll close a property with
```

Confidential - Subject to Further Confidentiality Review

```
 1   them, and when I'm not available it's possible that

 2   they'll go work with another agent because I don't pick

 3   up the phone or I'm not attending to their needs.  And

 4   this has been very time-consuming, so...

 5        Q.   What are we up to?  I'm going to mark -- 4.

 6             (Cohen Exhibit No. 4 was marked for

 7   identification.)

 8   BY MS. RICO:

 9        Q.   Is this your invoice for the work you've done

10   in this case so far?

11        A.   Yes.

12        Q.   Is this your only invoice so far, or are there

13   others?

14        A.   There will be another invoice.  One more

15   invoice.

16        Q.   I would assume that that would include today?

17        A.   Yeah.  Correct.

18        Q.   And so this invoice is dated April 5, 2019; is

19   that right?

20        A.   That's correct.

21        Q.   And it includes -- if we look on the second

22   page, it includes your time from March 12, 2019, through

23   March 21, 2019; is that right?

24        A.   Correct.

25        Q.   Does looking at this invoice refresh your
```

1  memory in terms of when you were retained in this case?

2      A.   It's possible I was retained in March.  Yeah.

3  Probably in March.

4      Q.   Seems likely.

5      A.   Yeah.

6      Q.   You started working on the case, or at least

7  you started billing on the case March 12 --

8      A.   Yeah.

9      Q.   -- 2019; right?

10      A.   Yeah, I don't think I billed for our initial

11  conversation, so...

12      Q.   Do you recall if your initial conversation was

13  well before the 12th or right around the 12th?

14      A.   I don't.  I definitely have it somewhere, so...

15      Q.   And so, as we said, this bill is through

16  March 21, 2019.

17          MR. CAMPBELL:  Objection.  Form.

18  BY MS. RICO:

19      Q.   March 21, 2019, is the date of your expert

20  report; is that right?

21      A.   The date -- well, I worked on the report

22  throughout.  I worked on the report on the 19th.

23      Q.   Do we have it handy?

24          MR. CAMPBELL:  Listen to her question.

25          ///

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 76 of 796
Case 1:14-cv-04048-WSD Document 1 entered on FLSD Docket 03/13/2015 Page 45 of
121

Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. RICO:

 2       Q.   I'm sorry.

 3       A.   Sorry.

 4       Q.   It sounded more complicated than I intended it

 5   to.  Your expert report has a date on it.  It is dated

 6   March 21; is that right?

 7       A.   Oh, got it.

 8       Q.   You can look at it, of course.

 9            MR. CAMPBELL:  That's Exhibit 2, David, yeah.

10            THE WITNESS:  Yeah.  Yeah, that's correct.

11   BY MS. RICO:

12       Q.   Okay.  And so this is the work through the date

13   that your report was submitted; correct?

14            MR. CAMPBELL:  Objection.  Form.

15            THE WITNESS:  Correct.

16   BY MS. RICO:

17       Q.   And the invoice reflects a total of 39.87

18   hours; is that right?

19       A.   Yes.

20       Q.   At a rate of $600 per hour; that's right?

21       A.   That's correct.

22       Q.   Totaling $23,922; correct?

23       A.   That's correct.

24       Q.   I just want to walk you through the different

25   tasks that you've identified on this invoice and have
```

1  you explain to me what they are.

2          So we'll start with the first one, 3/12/2019.

3  Could you explain to me what this first task was?

4      A.   It was cross-referencing my homes that -- that

5  I had sold during the time frames that Chinese drywall

6  was an issue with homes of -- in the case.

7      Q.   And when you say "homes in the case," which

8  homes do you mean?

9      A.   I sent them over -- so I sent my homes over to

10  Sarah so that she could cross-reference them to see if

11  there was any homes that I had sold that had been

12  previously remediated.

13      Q.   And were there any?

14      A.   There were some homes that I had that had

15  active Chinese drywall, but none that were remediated.

16      Q.   And just to be clear, you said, "There were

17  some homes that I had that had active Chinese drywall,

18  but none that were remediated."

19          The homes that you had that had active Chinese

20  drywall, is that in reference to homes that you sold?

21      A.   There was a home in Parkland that we had that

22  had Chinese drywall.  We received multiple offers for

23  it.  It went under contract, I believe 70 to 90 days

24  after we put it on the market.  And if I remember

25  correctly, there was some title issues.  It sat off the

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 78 of 796
Case 1:11-cv-22408-MGC Document 1 entered on FLSD Docket 06/13/2013 Page 47 of 121
Confidential -- Subject to Further Confidentiality Review

```
 1   market for maybe a year.  It was under contract, and
 2   then the client ended up moving it to another agent, so
 3   we didn't officially sell it.
 4        Q.   And who was the client in that case?
 5        A.   Don't quote me on this, but it was --
 6   potentially -- IAS, potentially.  I can't remember.
 7             MR. CAMPBELL:  You don't have to guess if you
 8        don't know, unless she asks you to.
 9             THE WITNESS:  Okay.  I'm not going to guess.  I
10        don't know.
11   BY MS. RICO:
12        Q.   And was this sale an REO?
13        A.   Yes.
14        Q.   And was the drywall, the presence of Chinese
15   drywall, disclosed as part of the sale?
16        A.   Yes.
17        Q.   I don't believe that you referenced this sale
18   in your report.  Did you?
19        A.   I don't believe that I did, no.  I -- actually,
20   I know I did not reference that sale.
21        Q.   And why is that?
22        A.   It was not remediated.
23        Q.   Was it your decision to omit transactions of
24   nonremediated homes from your report?
25             MR. CAMPBELL:  Objection to form.
```

```
 1              THE WITNESS:  Yes.

 2   BY MS. RICO:

 3       Q.   And why did you make that decision?

 4              MR. CAMPBELL:  Same objection.

 5              THE WITNESS:  I didn't feel it was relevant.

 6   BY MS. RICO:

 7       Q.   Why not?

 8       A.   Because I was asked to give my professional

 9   opinion on Graziano and Greenblatt's reports, and they

10   discussed remediated homes.

11       Q.   Were you given a list of the 20 priority

12   claimants in this case?

13       A.   Yes.

14       Q.   And are you aware that some of those homes are

15   not remediated?

16       A.   Yeah, I suppose -- yeah, I guess some of them I

17   was aware, yeah.

18       Q.   And did counsel tell you about the

19   circumstances of each of the priority claimants?

20       A.   No.

21       Q.   Let's look at the second entry on your invoice.

22   I'll represent that it's the same as the one above.

23   "Research what homes I have sold that had Chinese

24   drywall."

25              Is that task -- was that a continuation of the
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 80 of 796
Case 1:16-cv-04849-WHP Document 21 entered on FLSD Docket 12/13/2019 Page 80 of 121

Confidential - Subject to Further Confidentiality Review

1    same task that's listed above it?

2        A.   Yes.

3        Q.   Okay.  How about the third one down?  You said:

4    "Talked with Caroline, search for selling side

5    transactions."

6             What -- what were you doing here?

7        A.   I was looking to see if there was transactions

8    I could identify that had remediated homes from the

9    selling side.  And the selling side in real estate is a

10   little confusing.  It means representing the buyer.

11   It's the listing side represents the seller.  So I was

12   looking for those transactions.

13       Q.   Did you identify any?

14       A.   No, none that were -- that were obvious.

15       Q.   Okay.  And how about the third one down?

16   "Talking with Sarah 1.16 hours."

17            MR. CAMPBELL:  Objection to form.  It's the

18       fourth.

19   BY MS. RICO:

20       Q.   I'm sorry.  The fourth one down.

21       A.   I was speaking to Sarah.

22       Q.   What about, outside of anything privileged?

23       A.   It's -- I can't remember.  I spoke to her many

24   times.

25       Q.   I know the feeling.

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 81 of 796
Case 1:11-cv-22408-MGC Document 21 entered on FLSD Docket 08/15/2019 Page 50 of 121
Confidential - Subject to Further Confidentiality Review

```
 1              How about -- how about the following one?  "FAR

 2    legal hotline and list of sold properties."

 3         A.   I contacted the Florida Legal Hotline to

 4    inquire if it -- if it was required to disclose that a

 5    home had been remediated with Chinese drywall.

 6         Q.   And what did they tell you?

 7         A.   They actually said that it was not required to

 8    disclose that a home had been remediated with Chinese

 9    drywall, which I realize is a little bit different

10    than -- I asked them about Chinese drywall specifically.

11    I didn't say the word "defective," so maybe that --

12         Q.   And in your practice as a professional broker,

13    would you disclose that a home previously had Chinese

14    drywall and was remediated?

15         A.   Yes.

16         Q.   And why is that?

17         A.   Because it's a requirement on the seller's

18    disclosure.

19         Q.   This next line down, 3/18/2019, "working on

20    report," what were you doing here, to the extent it's

21    not self-explanatory?

22         A.   I believe that the 18th was the date that I

23    began working on my report.

24         Q.   And what work were you doing on your report?

25         A.   Drafting my opinions of Graziano's and
```

```
 1    Greenblatt's report.

 2         Q.   Okay.  And let's just keep going down.  Next,

 3    "research homes I have sold to Chinese drywall"?

 4         A.   Correct.

 5         Q.   3/18?  What were you doing there?

 6         A.   Just looking into the home that I did have with

 7    Chinese drywall.

 8         Q.   And which home was that?

 9         A.   I can't remember the address, but it was in

10    Parkland.

11         Q.   Is this the same home that you referenced

12    earlier that --

13         A.   Yes.

14         Q.   -- did not sell?

15         A.   Yes, but was under contract within 70 to 90

16    days.

17         Q.   Yes, it was under contract and --

18         A.   There were some title issues.  And it,

19    unfortunately, happens with foreclosures a lot.  So you

20    get a buyer excited, the bank's excited, they go under

21    contract, and then there's a cloud on title, and then

22    it's another year, and typically the buyers will walk at

23    that point.  And then after -- the banks need to

24    reassign the agent after a certain amount of time, so

25    even though it's not our fault, they'll reassign it.
```

 1      Q.   Yeah.  And that happens with foreclosures

 2  because it's a distressed property; right?

 3      A.   What happens with foreclosures?

 4      Q.   Title issues sometimes happen because it's a

 5  distressed property?

 6      A.   Well, they happen because there's disputes on

 7  the title or that they can't identify the correct

 8  records to find out who correctly owns the property.  So

 9  from -- there's various reasons.  That's not the only

10  reason.

11      Q.   What other reasons?

12      A.   It's -- it's really a title agent thing.  It's

13  not my expertise, so...

14      Q.   Okay.  But it is more common with foreclosures?

15      A.   To have title issues?

16      Q.   Yes.

17      A.   I would say, generally speaking, that's --

18  yeah, that's an accurate statement.

19      Q.   That would be because they're not arm's length

20  sales?

21          MR. CAMPBELL:  Objection to form.  To the

22      extent you understand the --

23          MR. POYER:  Join.

24          THE WITNESS:  They're arm's length

25      transactions.

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 84 of 796
Case 1:11-cv-22408-MGC Document 21 entered on FLSD Docket 11/14/2011 Page 53 of 121
Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. RICO:

 2         Q.   Okay.  Could we move -- I lost track now.  I

 3    think we're at 3/18.  "Review documents and speaking

 4    with Sarah."  What work were you doing there?

 5         A.   I don't recall.

 6         Q.   You don't recall what documents you were

 7    reviewing?

 8         A.   We reviewed a lot of documents together, so

 9    they're just my notes that I took as I started the

10    activity to make sure that I was billing for the time.

11         Q.   Okay.  Did you take notes during any of your

12    conversations with counsel?

13         A.   No.

14         Q.   No?

15         A.   Everything was just what I had on my report.

16         Q.   Okay.  So you never took any notes while you

17    spoke to them?

18         A.   No.

19         Q.   Got a good memory.

20              Next one down.  You've got two entries on 3/19

21    that say "reviewing properties we had with Chinese

22    drywall."  Are those tasks pertaining to that same

23    property we discussed in Parkland or other properties?

24         A.   It could have been also researching other

25    properties, but that could have been that property.  I
```

1    honestly don't recall.  We --

2           MR. CAMPBELL:  Don't guess if you don't know,

3       unless she asks you to.

4           THE WITNESS:  No, I don't recall.

5    BY MS. RICO:

6       Q.   I will say, just for the record, I'm never

7    asking you to guess unless I --

8       A.   Okay.

9       Q.   Earlier on I said guesstimate, but I really

10   don't want you to make things up so that your counsel

11   doesn't have to keep saying that.

12      A.   Yeah.

13      Q.   So if you don't know, you can simply say you

14   don't know.

15      A.   Yeah, I mean, I take -- I look at these notes

16   and, you know, at the time that's the first thing, when

17   I started the activity, just to give the task, but what

18   happened is I was working on multiple things at once and

19   I was trying to organize the task for a specific thing,

20   but it's difficult for me to remember the specifics.  So

21   I apologize.

22      Q.   No, that's perfectly all right.  That happens.

23   We're all busy people.

24      A.   And the reason why I --

25           MR. CAMPBELL:  Let her ask the question, David.

```
 1              THE WITNESS:  Okay.  Sorry.

 2   BY MS. RICO:

 3       Q.   No, perfectly all right.

 4            The next one down, you say "researching 8232

 5   Emerald Avenue."  Why were you researching this

 6   property, if you remember?

 7       A.   I believe, if I'm not mistaken, it was a

 8   property that was asked -- that I was asked about but

 9   did not have Chinese drywall and I thought maybe did.

10   I -- but I'll be honest.  I don't recall.

11       Q.   Okay.

12       A.   There was a lot of addresses and a lot of

13   different properties that we were looking at.  But that

14   could have been -- that could have been my property with

15   Chinese drywall.  One of the two.

16       Q.   One of the two, you said?

17       A.   One of the two.  It's either the property that

18   I thought had Chinese drywall and I was investigating if

19   it did because it was in Parkland in an -- in an area

20   that had had Chinese drywall, or it was the property

21   that I had with Chinese drywall.  I don't recall the

22   address.

23       Q.   Okay.  And to be clear, there was only one

24   property that you dealt with that had Chinese drywall?

25       A.   My -- dealt with in my career?
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 87 of 796
Case 1:16-cv-04540-WFK Document 21 entered on FLSD Docket 08/13/2019 Page 56 of 121
Confidential - Subject to Further Confidentiality Review

 1      Q.   Yes, that you've confirmed.

 2      A.   I believe there were more, but if -- confirmed,

 3   yes.  I'm pretty sure we had more than one property that

 4   had Chinese drywall, but that was the one that I was

 5   able to confirm.

 6      Q.   Okay.  And then the next one down, 3/19, "phone

 7   meeting with attorneys," do you recall what this meeting

 8   was about?

 9      A.   I do not recall the conversation.

10      Q.   Okay.  And then 3/19 you've got two entries

11   following that that say "working on report."  Do you

12   recall specifically what you were working on?

13      A.   This exhibit right here.  This report.

14      Q.   Okay.  And you were drafting that report at the

15   time?

16      A.   Correct.

17      Q.   You've never written a Rule 26 report before;

18   is that right?

19           MR. POYER:  Object to the form.

20           THE WITNESS:  That's correct.

21   BY MS. RICO:

22      Q.   Did you receive guidance on what to include in

23   your report?

24           MR. CAMPBELL:  Object to the form.

25           MR. POYER:  Join.

```
 1              THE WITNESS:  I wrote my report based on my
 2       opinions, so they -- there was -- I had sent it in
 3       and there was some proofreading done to make it --
 4       to clean it up, because I'm not the best writer, but
 5       I was just -- it's all my opinions and just better
 6       worded, more to the point.
 7  BY MS. RICO:
 8       Q.   I was more asking about -- Rule 26 reports have
 9  requirements.  Did you receive guidance regarding those
10  requirements?
11       A.   No, I did not.
12       Q.   Okay.
13       A.   Not that I recall.  Not that I recall.  It's
14  possible.
15       Q.   Now we're looking here at 3/19/2019.  "Reading
16  Greenblatt report."  Is that the first time that you'd
17  seen Mr. Greenblatt's report, on the 19th?
18       A.   No.
19       Q.   No?  When did you first see that report?
20       A.   Sometime around the 18th.  Well, I guess it --
21  it's possible it could have been, but...
22       Q.   Okay.
23       A.   It -- I think I received it and I started
24  reading it maybe around the 18th when I started working
25  on the report.
```

```
1       Q.   Okay.  I'm going to try to go throughout the

2   rest quickly, because they're very similar.  So "reading

3   Greenblatt deposition," I'll assume that that's what it

4   says it was?

5       A.   Yes.

6       Q.   You were reviewing Mr. Greenblatt's deposition?

7       A.   Yeah.

8       Q.   And is that the first time you'd seen it?

9       A.   No.

10      Q.   Did you make any notes on Mr. Greenblatt's

11  report or deposition as you were reviewing them?

12      A.   You know, I read everything on the computer, so

13  it's a PDF.

14      Q.   Did you make any notes on the PDF?

15      A.   Not that I recall.  I mean, I don't know.

16      Q.   Okay.  To the extent that you did create any

17  working notes on any of these documents, we would ask

18  that they be produced.

19      A.   They've all been provided.

20      Q.   Okay.  They've all been provided to counsel?

21      A.   Correct.

22           MS. RICO:  Do you know if everything's been

23      provided to us?

24           MR. CAMPBELL:  Anything that was responsive

25      that's not work product privilege, yeah.
```

```
 1              MS. RICO:  Well, anything he relied upon

 2         wouldn't be privileged, so everything that he relied

 3         upon in --

 4              MR. CAMPBELL:  Absolutely.

 5              MS. RICO:  Okay.

 6              MR. CAMPBELL:  And just to -- if this makes it

 7         clear, I don't recall ever seeing anything that had

 8         notes, whether it be handwritten or on the computer.

 9              MS. RICO:  That is helpful.

10              MR. CAMPBELL:  If we did have that, we would

11         have produced it, unless the notes contained work

12         product privilege, but I don't recall seeing

13         anything.

14              MS. RICO:  Okay.

15    BY MS. RICO:

16         Q.   And then let's skip down to 3/21.  "Revised

17    resume."  What were you doing there?

18         A.   Just working on my resume that -- this exhibit

19    right here.

20         Q.   Just making it current, up-to-date?

21         A.   Yeah.  I mean, we had a big marketing packet

22    and most of it didn't pertain to what was required,

23    so...

24         Q.   Okay.  And then let's jump down to the last

25    one.  3/21/2019.  "Reading revised report."  Is that a
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 91 of 796
Case 1:11-cv-22408-MGC Document 21 Entered on FLSD Docket 11/14/2011 Page 60 of 121
Confidential — Subject to Further Confidentiality Review

 1    revised report you received from counsel?

 2        A.   It's my -- my last revision, and they did make

 3    some -- helped me make some edits on it.

 4             MS. RICO:  Okay.  I think we can actually take

 5        a quick break.

 6             MR. CAMPBELL:  Whatever you want.

 7             MS. RICO:  Five, 10 minutes.

 8             MR. CAMPBELL:  Sure.

 9             THE VIDEOGRAPHER:  2:21 p.m.  Off the record.

10             (Recess from 2:21 p.m. until 2:34 p.m.)

11             THE VIDEOGRAPHER:  2:34 p.m.  Back on the

12        record.

13    BY MS. RICO:

14        Q.   Before we took that last break we had discussed

15    properties -- I'm sorry -- sales or transactions that

16    you had confirmed containing Chinese drywall.  Do you

17    remember that?

18        A.   Yes.

19        Q.   And you said that you had confirmed one

20    property that had contained Chinese drywall; is that

21    right?

22        A.   That -- that's what I said, yeah.

23        Q.   Yes.  How did you confirm that that property

24    had Chinese drywall?

25        A.   I pulled my list of properties and I had sorted

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 92 of 796
Case 1:11-cv-22408-MGC Document 21 entered on FLSD Docket 11/18/11 Page 61 of
121
Confidential - Subject to Further Confidentiality Review

1    them by date, and then through the ones that were during

2    that time frame.  I also had to add in dates because

3    some of my date fields weren't filled.  So I had to go

4    and research some of these properties to find out what

5    dates they sold, and then I started looking into

6    properties that I had sold in Parkland around those

7    dates.

8         Q.   And why did you look in Parkland specifically?

9         A.   Because I was aware of homes in Parkland that

10   had Chinese drywall.

11        Q.   And how did you confirm that, once you looked

12   through this list, that this one property had Chinese

13   drywall?

14        A.   We had it on the MLS and then in my notes.

15        Q.   When you say "we had it on the MLS," you mean

16   you identified on the MLS that that property contained

17   Chinese drywall; is that right?

18        A.   My printout -- my printout of the MLS sheet

19   showed that we had mentioned it had Chinese drywall.

20        Q.   And with regard to other transactions that you

21   researched, you did not find any others that contained

22   Chinese drywall?

23        A.   Not out of my -- I think I did find a few, but

24   I can't remember correctly if I didn't list them because

25   they were either a rental or they didn't sell or we had

1    it as an assignment but we never ended up selling it.

2         So when I say "assignment," I mean the bank

3    would give us a property assignment and we do work.  We

4    do work on that property.  Occupancy reports,

5    preservation items, updates, and deal -- we deal with

6    all these issues prior to listing it, and then sometimes

7    we don't end up getting the property for various

8    reasons.  They'll either reassign it or they'll find out

9    that there's an issue with the foreclosure and they'll

10   reassign it.

11        So I was aware of Chinese drywall and I was

12   aware that I had properties there.  This is the only one

13   that I properly identified that we put under contract.

14        Q.   Let's --

15        A.   Do you mind if I add?

16        Q.   I'm sorry.  Did you have something else to add?

17        A.   Yeah, I did.  It's not easy to identify from my

18   system, out of 2,500 properties, properties that had

19   Chinese drywall.  So it's an imperfect search.  It's not

20   like I had a field where I could just pull it up and say

21   "Chinese drywall."  You know, I can search for bedrooms,

22   bathrooms, and whatnot, but there was no easy way to

23   identify, out of 2500 properties, which ones had Chinese

24   drywall.

25        Q.   We were discussing your invoice earlier.  And

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 94 of 796
Case 1:11-cv-01048-WCG Document 224 entered on FLSD Docket 09/13/2019 Page 63 of 121
Confidential - Subject to Further Confidentiality Review

 1  the invoice ran through March 21.  Have you done any

 2  additional work between March 21 and today?

 3          MR. CAMPBELL:  Objection to form just to the

 4      extent that the invoice is dated April 5.  The last

 5      entry is from March 21.  You can answer the

 6      question.

 7          THE WITNESS:  Yeah, I did additional work.  I

 8      did -- I met with counsel and -- that's the only

 9      thing I recall right now.

10  BY MS. RICO:

11      Q.  And how many times did you meet with counsel?

12      A.  At least two times, if I -- two times, if I

13  remember correctly.

14      Q.  Was that in person?

15      A.  Yes.

16      Q.  When was that?

17      A.  One was yesterday, and the other one, sometime

18  after the 21st.

19      Q.  And why was that?

20      A.  In preparation of the deposition.  I've never

21  done this before, so...

22      Q.  It's a little daunting; right?

23      A.  It is.

24      Q.  Approximately how many hours did you meet with

25  counsel?  And let's limit it to the first time.

```
 1      A.    The first time?  Seven hours.

 2      Q.    And how about the second time?

 3      A.    Four hours.

 4      Q.    And who --

 5      A.    Four and a half.  Sorry.

 6      Q.    Four and a half.  And who did you meet with the

 7   first time?

 8      A.    Sorry.  Three and a half.  Somewhere around

 9   there.

10      Q.    Somewhere between three and --

11      A.    Yeah.  Anyway.

12      Q.    -- four hours?

13      A.    I apologize.

14      Q.    Okay.  And who did you meet with the first

15   time?

16      A.    I met with all of the attorneys that you see

17   here.

18      Q.    And the second time?  Same?

19      A.    Same.

20      Q.    And what did you review, if anything, to

21   prepare for today?

22      A.    I reviewed everything in my invoice.  So I

23   reviewed the Graziano report, the Greenblatt report, and

24   my report.

25      Q.    Did you review anything new at all?
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 96 of 796
Case 1:11-cv-01408-WEG-1 Document 21 entered on FLSD Docket 11/14/2019 Page 65 of 121
Confidential -- Subject to Further Confidentiality Review

```
 1    A.   No.

 2    Q.   Is your expert work in this case complete?

 3    A.   After this deposition, and then if there's a

 4  trial, I'll be present at the trial.

 5    Q.   And are your opinions, as you sit here today,

 6  are they final as contained in your report?

 7    A.   I would say so, yes.

 8    Q.   I'll mark this as Exhibit 5.

 9         (Cohen Exhibit No. 5 was marked for

10  identification.)

11  BY MS. RICO:

12    Q.   We received supplemental production on your

13  behalf from your counsel on March 15, 2009.  I'm going

14  to represent to you that this is a printout of the

15  transfer system that Alston & Bird uses to produce

16  documents and it lists the titles of the various

17  documents that -- that were produced.

18         I'd like to go through them and have you tell

19  me what they are to the best of your recollection.

20         MS. RICO:  We also do have the physical

21    documents if he needs to look at them.

22  BY MS. RICO:

23    Q.   So could you just go through, please, and tell

24  me what you believe each document to be?

25         MR. CAMPBELL:  Objection just to the extent
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 97 of 796
Case 2:14-cv-04046-EEF-MBN Document 29-1 Filed 05/13/2019 Page 66 of 121
Confidential - Subject to Further Confidentiality Review

 1      that we prepared the --

 2          MS. RICO:  Did you change the titles?

 3          MR. CAMPBELL:  Well -- well, let me just -- I

 4      don't know how this was put together, because I

 5      didn't do it, but I think someone from our office is

 6      the one who put the named -- the folder, if you

 7      will.  I don't know what the system is or how this

 8      is done, but I do not believe that he named the

 9      folders.

10          MS. RICO:  Okay.

11          MR. CAMPBELL:  So to the extent he may not know

12      what a folder is because he was not involved in the

13      folder.

14          MS. RICO:  Right.  I'll represent these are not

15      folders.  They're all individual files.

16          MR. CAMPBELL:  Okay.

17          MS. RICO:  I don't know if he produced them to

18      you that way or if you've altered them, so to the

19      extent that they've been altered by your office and

20      you don't know, that's fine, just let me know that

21      you don't know.

22          MR. CAMPBELL:  Okay, fair enough.

23  BY MS. RICO:

24      Q.  But aside from all of that, just if you could

25  take a look and let me know what these various documents

1    are.

2        A.    I can't tell you what the documents are without

3    looking at them.

4        Q.    Okay.    I was trying to avoid you having to look

5    at all of them.

6        A.    Yeah.    Sorry.

7        Q.    But looks like we -- we are not going to avoid

8    that, which is fine.

9        A.    I mean, it's --

10       Q.    Do you recognize the titles for any of these

11   documents?

12       A.    Deposition of Ryan Greenblatt, that's .msg, so

13   I'm assuming it's an e-mail.    There's an executed

14   contract.    First sale MLS?

15       Q.    Do you recall what that contract was?    I can

16   show it to you, but --

17       A.    Yeah, I have to look at it.

18       Q.    Okay.    No problem.    If you could just look

19   through the list and to the extent that we can expedite

20   and you can let me know if you know what any of these

21   are.    If not, that's fine.

22       A.    Florida Claimants, I would assume that's a list

23   of the claimants.    Graziano Reports, I assume that's

24   an -- I don't know if that's -- Graziano Reports, if

25   that said PDF, I would assume it's the report, but since

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 99 of 796
Case 1:14-cv-14049-WGY Document 1-1 entered on FLSD Docket 11/18/19 Page 68 of
121

Confidential — Subject to Further Confidentiality Review

```
 1   it's an e-mail, I don't know.  I don't know what's in

 2   there.  HUD, I'm assuming it's a settlement statement.

 3          And these -- we -- out of our properties, we

 4   would have a folder for every single property, and so

 5   some of these might have been pulled from one of those

 6   folders for one of our properties.

 7          HUD is a settlement statement, I assume.  HUD

 8   Report could have been a HUD -- a HUD M&M report maybe.

 9          MR. CAMPBELL:  Just to the extent there's any

10       confusion, I'm sorry, I don't want to, but I just

11       want to make sure that we're on the same page here.

12       This would include documents that we gave you,

13       not -- these aren't simply just things you gave us.

14       So I don't want you to make a wrong assumption here.

15          THE WITNESS:  Got it.

16          MR. CAMPBELL:  This is everything that's

17       responsive to their document request.

18          THE WITNESS:  Yeah.  Yeah.

19   BY MS. RICO:

20       Q.   I think that it's -- we'll be better served to

21   look at the specific documents.

22          MR. CAMPBELL:  Sure.  It's probably easier.

23   BY MS. RICO:

24       Q.   It was intended to expedite, not confuse,

25   but...
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 100 of 796
Case 2:09-md-02047-EEF-MBN Document 22141-... Filed ... Page 100 of 121
Confidential - Subject to Further Confidentiality Review

```
 1    A.   Sorry.

 2    Q.   No, that's not on you at all.  So we'll just

 3  put this one aside for now.

 4         Who developed your scope of work in this case?

 5         MR. CAMPBELL:  Objection to form.

 6         MR. POYER:  Same objection.

 7         THE WITNESS:  Scope?

 8  BY MS. RICO:

 9    Q.   What was your scope of work or your assignment

10  in this case?

11    A.   To elaborate on my opinion of remediated homes.

12    Q.   Okay.

13    A.   And how -- and how it affected or did not

14  affect values.

15    Q.   And did anyone give you any input on that

16  scope?

17    A.   The opinions are my own.

18         MR. CAMPBELL:  You can refer to your report if

19         you want to, if that would help you.

20         THE WITNESS:  Yeah.  So I was asked to give my

21         opinion on Mr. Greenblatt's report and

22         Mr. Graziano's report.  Specifically, Mr. Greenblatt

23         was stating that there is a pervasive stigma

24         associated with remediated homes and then

25         Mr. Graziano's report saying that there's -- well, I
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 101 of 796 of
Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 100 of
Confidential — Subject to Further Confidentiality Review
121

```
 1          guess Mr. Greenblatt was saying that there's a
 2          pervasive stigma that drastically reduces value.
 3          Mr. Graziano was stating that there should be a
 4          10 percent diminution in value across the board.
 5               And based on my professional experience,
 6          there -- it's -- that's not true for residential
 7          real estate that homes -- either one of those
 8          statements is true, based on my professional
 9          opinion.
10    BY MS. RICO:
11          Q.   What assumptions, if any, did you make in
12    preparing your report?
13          A.   Assumptions.  I made the assumption -- I don't
14    know if I made any assumptions.  I just talked about my
15    experience.  So, in my experience, so on remediated
16    homes, they will often sell for a greater value than an
17    unremediated home that has aged interiors.
18               So, I mean, if I -- if there was some pervasive
19    stigma in the market, I'd be aware of it.  I'm in the
20    real estate market, and we talk, we talk to buyers,
21    sellers, and other agents, so...
22          Q.   When you say --  I'm sorry.
23               MR. CAMPBELL:  You can finish if you have more,
24          but if not, you should answer the next question.
25               THE WITNESS:  Yeah, go ahead.  Go ahead.  I'm
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 102 of 796
Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 102 of 796
121

Confidential - Subject to Further Confidentiality Review

```
 1        sorry.

 2   BY MS. RICO:

 3        Q.   When you say, "in your experience selling

 4   remediated homes," what do you mean by that?

 5        A.   So I've overseen numerous renovations and

 6   remediations for mold and for polybutylene pipes.  And

 7   mold has serious health effects.  And I've seen homes

 8   that -- that you had to sign disclosures just to enter

 9   and, once remediated, the remediation companies are

10   wearing suits and masks.  And they'll -- they'll take

11   the drywall off.  They tape off the entryways.  They

12   treat the studs.  They clean the air.  They test the

13   air.  And then they'll continue testing until they have

14   a clear test, and then they'll put back the drywall and

15   the home is -- looks like new.

16             And, in my experience, buyers are concerned

17   with the present condition and not the previous

18   condition.  They care about the home in -- in its

19   existing condition.  So oftentimes -- I mean, it's very

20   rare that I'll see a home not get more than -- a greater

21   price than homes in the community because they have --

22   because it's new, it's renovated.

23        Q.   So your experience that you reference selling

24   remediated homes pertains to homes remediated for other

25   conditions; right?
```

    1    A.   For other conditions, correct.

    2    Q.   Not Chinese drywall?

    3    A.   It's very, very similar.  They're taking the --

    4   it's actually -- you know, mold is, I would argue, a far

    5   greater concern than Chinese drywall.  There's health

    6   effects that come with mold.  And I've seen homes in

    7   absolutely deplorable conditions, horrible conditions,

    8   that have been fixed up brand-new and sold for much

    9   higher values than other homes in the community that

   10   never had problems.

   11    Q.   But you've had more experience remediating

   12   homes with mold than Chinese drywall; right?

   13    A.   That's correct.

   14    Q.   And you only confirmed one Chinese drywall

   15   sale; is that right?

   16    A.   Correct.

   17    Q.   Did you rely on data from any other source when

   18   formulating your opinions?

   19    A.   My sources.

   20    Q.   Which sources were those?

   21    A.   My transactions, my customers.  The homes that

   22   I've remediated and my own personal experience.  I had

   23   polybutylene pipes that burst and we had to take our

   24   drywall down to the studs and leave the house when my

   25   son was born, and it was a five-month process.  And we

```
 1    replumbed the entire house.  We had a lot of mold

 2    because of it and we had to put -- take the AC out, take

 3    everything out, and then we replaced the entire kitchen.

 4    We rebuilt the house and it's -- it's much more

 5    beautiful than it was before.  So -- and I have no

 6    problem living in it even though I know it previously

 7    had mold.  It doesn't presently, so...

 8        Q.   And that was in your personal home?

 9        A.   In my personal home.

10        Q.   That must have been stressful.

11        A.   Yeah.

12        Q.   Are you aware that the defendants have retained

13    other experts in this case?

14        A.   Yes.

15        Q.   Do you know who they are?

16        A.   No.

17        Q.   Have you spoken with any of them?

18        A.   No.

19        Q.   I'd like to take a moment to discuss the

20    concept of -- we've kind of been on this line -- the

21    concept of environmental risks and their impacts on real

22    estate.

23             Would you agree that environmental risks like

24    radon, asbestos, mold could impact real estate?

25        A.   Yes.
```

```
 1      Q.   There's a number of different impacts that that

 2   could include.  Would you agree it includes the ability

 3   and opportunity to sell the property?

 4           MR. POYER:  Object to the form.

 5           MR. CAMPBELL:  Join.

 6   BY MS. RICO:

 7      Q.   Assuming that a property contained some kind of

 8   environmental hazard like the ones I've just mentioned,

 9   would that affect the homeowner's ability and

10   opportunity to sell that property?

11      A.   It would -- it depends on the market value.  So

12   it would -- those issues you mentioned, if there was

13   existing mold, could affect the value of the property

14   and require the homeowner to sell at a lower price.

15      Q.   And that would include limiting the number and

16   type of potential buyers; right?

17      A.   I've sold some very ugly homes with all the

18   issues you mentioned and had multiple offers above

19   asking price.  It just depends on the market and the

20   list price.  It depends on a lot of factors.  Just

21   every -- every home is different.  Every buyer is

22   different.  Every seller is different.  So there's

23   really a multitude of factors that goes into a

24   transaction that affects the value.

25      Q.   But it could --
```

```
1        A.    Correct.

2        Q.    -- limit the number and type of potential

3   buyers?

4        A.    Could?  I mean, it depends on the list price.

5   It depends on so many different factors.  So I've had

6   beautiful homes that sat on the market that were perfect

7   and they just were not a price that the market was happy

8   with, or they were not in an area that the market was

9   happy with, or it was a bad timing, you know, it was off

10  season so everyone went back home.

11        So it's a multitude of factors that affect the

12  value, but it's -- mold is not going to help the value

13  of a home.

14        Q.    Could it limit the marketing time?

15        A.    Not if it was priced right.

16        Q.    Meaning?

17        A.    Meaning if I -- if I price a home based on

18  its -- the true value, and if I -- and I do a lot of

19  values, so I've done thousands and thousands of broker

20  price opinions, which are -- they're not appraisals,

21  because I'm not a licensed appraisal -- appraiser, but

22  they're similar.  We have to pull comparables.  We have

23  to make adjustments.  And so I'll pull comparable

24  properties and make adjustments and determine a list

25  price, and if I'm accurate with that list price, the
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 107 of 796
Case 2:14-cv-02046-MBC Document 271-1 Filed 09/18/15 Docket 05/13/2015 Page 96 of
121

Confidential - Subject to Further Confidentiality Review

```
 1    house is going to sell.  If I'm off for greater or for

 2    less, then -- then it -- it will either sit on the

 3    market or I'll have multiple offers.

 4        Q.   So you said it wouldn't necessarily limit the

 5    marketing time if it was priced right.  Does that mean

 6    that the price would be reduced to reflect the condition

 7    of the home?

 8        A.   If there was mold in a house versus a house

 9    that did not have mold, all things being equal, which is

10    impossible, because no two houses are equal, but all

11    things being equal, in a -- in a vacuum, then the house

12    that had mold would be priced -- there would be a lower

13    value for that home than the one that did not have mold.

14        Q.   And could the presence of an environmental risk

15    like mold affect the availability in terms of financing

16    for that home?

17        A.   If there was active mold?  That could affect,

18    yes.

19             MR. CAMPBELL:  Just to be clear, you're asking

20        about houses that actively have mold?

21             MS. RICO:  Yes.

22             MR. CAMPBELL:  Okay.

23             MS. RICO:  At the moment, yes.

24    BY MS. RICO:

25        Q.   Meaning that people might be unable to
```

 1    refinance or obtain modifications due to that condition

 2    in the home; is that right?

 3         A.   It's possible during the appraisal, though I

 4    have seen houses that have had financing that had mold

 5    as well.  So it depends on the extent of the mold and it

 6    depends on the lender and their underwriting policies.

 7         Q.   And to be clear, I was not saying that it -- I

 8    was not suggesting that it always does.  I was asking if

 9    it could.

10         A.   It could, yes.

11         Q.   And the presence of a condition like this could

12    also lead to a discounted rate, right, which, I mean,

13    we've already discussed?

14         A.   Discounted rate?  Yeah.

15         Q.   A discounted value to the home.

16         A.   Okay.

17         Q.   Because a buyer might want a discount because

18    of this condition in the home; right?

19         A.   I'm not aware of anyone who wants mold, so...

20         Q.   Touche.

21              Would you please tell me, what -- what is your

22    definition or understanding of stigma?

23         A.   Stigma.  Negativity.

24         Q.   So a negative perception of a property?

25         A.   Well, I don't think of properties when I think

Confidential -- Subject to Further Confidentiality Review

```
 1   of stigma.  I just think of -- the word "stigma" is

 2   something negative.  I guess attachment, maybe.

 3       Q.   Okay.  And would that be a negative -- speaking

 4   about property specifically --

 5       A.   Okay.

 6       Q.   -- how would you qualify stigma?

 7       A.   It's not a term that I've used in real estate.

 8   It's not a term that I see a lot.  I saw it a lot in

 9   this case, but it's not something that I've really seen.

10       Q.   Why do you think that is?

11            MR. CAMPBELL:  Objection.  Form.

12            THE WITNESS:  I think that it's because every

13       homeowner is different and they all have different

14       things that they look for, and a lot of my investors

15       are looking for properties that have problems so

16       that they can renovate them and resell them.  So

17       every property has a price.  It's something that

18       we've always said in our -- in our business.

19   BY MS. RICO:

20       Q.   And when you say a lot of your investors are

21   looking for properties that have problems, who are you

22   referring to?

23       A.   Buyers, investors that I work with, they're

24   looking for properties that they can fix up and resell.

25   So they add their sweat equity and get paid for
```

1    delivering a fixed-up, renovated, remediated home, and

2    they get paid for their effort, so...

3        Q.   Are you referring to the concept of flipping a

4    property?

5        A.   Yeah, exactly.  Uh-huh.  Yeah.

6        Q.   So are many of your clients investors

7    interested in flipping properties?

8            MR. CAMPBELL:  Objection to form.

9            THE WITNESS:  Yes, some of them are.  I work

10           with a lot of owner occupants.  So primarily owner

11           occupants.  Investors are -- can be a little bit

12           more challenging.

13   BY MS. RICO:

14       Q.   And what -- what percentage of your clients are

15   investors of that kind?

16       A.   It fluctuates throughout the history, but if

17   you were to say now, maybe 35 percent, maybe.  Roughly.

18   Very rough.

19       Q.   And earlier in your career?

20       A.   It depends on the year, so it's harder for me

21   to say, but it was anywhere between 30 and 50 percent or

22   30 and 70 percent in either direction, so...

23       Q.   Okay.  Returning to the concept of stigma,

24   you'd agree with me that there are some people who will

25   never buy a home containing Chinese drywall; right?

Confidential - Subject to further confidentiality Review

```
 1      A.   Yes, but --

 2      Q.   And there are some people who would never buy a

 3  home that previously contained Chinese drywall; isn't

 4  that right?

 5      A.   I would say that there are some people that

 6  would never buy a home that previously contained Chinese

 7  drywall.  I would also say that there's some people who

 8  would never buy a home that has a pool or any other

 9  factor.  Buyers are very, very specific.  Even husbands

10  and wives can't agree on what they're looking for.  So

11  it's very, very individualistic.

12           And I would also say that there are homeowners

13  that would prefer to buy a remediated home, because then

14  they can say for certainty that there are no -- there is

15  no Chinese drywall in it versus another home built

16  around the same time that they're not sure about.

17      Q.   But back to the original question, some people

18  would never buy a home that previously contained Chinese

19  drywall; right?

20           MR. CAMPBELL:  Objection.  Asked and answered.

21           MR. POYER:  Join.

22  BY MS. RICO:

23      Q.   You can answer.

24      A.   There may be some people that would never -- I

25  would say Greenblatt would probably never buy a home
```

1   that had been previously remediated.

2       Q.   I would say that you're right.

3            And you don't know how many people feel that

4   way, do you?

5       A.   I have no idea, but it would -- I would

6   assume -- based on my experience, it's probably not a

7   large number, and they would probably defer to their --

8   yeah.  I would say the number is equally as likely that

9   there would be people who would want to buy a Chinese

10  drywall home.  A remediated home.  Not a Chinese drywall

11  home, but a remediated home.

12      Q.   Now, when you say "remediated home," you mean

13  remediated of any condition?

14      A.   Any condition or Chinese drywall.  It's the

15  same.

16      Q.   So, to be clear, remediated of any condition,

17  including Chinese drywall?

18      A.   I mean, let's say specifically for Chinese

19  drywall.  I think that it would be equal that -- equal

20  amount of people that would prefer to buy a house that

21  had been remediated because they can definitively say

22  there is no more Chinese drywall in this home, whereas

23  in the same community you can't definitively say that if

24  there's a house built right next door.  I suppose you

25  could if you had the correct testing, but...

```
 1      Q.   So if I'm understanding you clearly, you're
 2  saying that people would prefer to buy a home that was
 3  remediated, previously had Chinese drywall and
 4  remediated, as opposed to a home that currently contains
 5  Chinese drywall?
 6          MR. CAMPBELL:  Objection.  Form.
 7      Mischaracterizes testimony.
 8          THE WITNESS:  I'm saying that there are equal
 9      amount of people that would not want to buy a
10      remediated Chinese drywall home as there are people
11      who would want to buy it because it was remediated
12      with Chinese drywall, because they can -- there's a
13      couple reasons why a buyer would want to buy a home
14      that had been remediated that previously contained
15      Chinese drywall.
16          Number one is the interiors are going to be
17      renovated and they're going to be newer relative to
18      other homes in that community.  Over -- over time,
19      paint loses its color, scuff marks go on the wall,
20      and things start to look aged even in a short time
21      frame.  So a remediated home is going to have all
22      new drywall and new paint and it's going to look
23      nicer, look newer relative to other aged homes in
24      the community.
25          And the other reason why people would want to
```

```
 1        buy a remediated Chinese drywall home is because
 2        they can definitively say every piece of Chinese
 3        drywall has been replaced, have been torn down to
 4        the studs, and we don't have to worry about there
 5        being one rogue or, you know, a couple rooms that
 6        have rogue Chinese drywall in it that we -- that we
 7        couldn't test for, because it's got to be difficult.
 8        I don't know what goes into it, but I assume it's
 9        very difficult to test for Chinese drywall, I mean,
10        every single drywall in the home to make sure that
11        every single piece of drywall is -- is not correct.
12   BY MS. RICO:
13        Q.   And to be clear, you've never overseen the
14   remediation of a Chinese drywall home, have you?
15        A.   That is correct.
16        Q.   And your experience pertaining to Chinese
17   drywall is in reference to the one Chinese drywall sale
18   that you confirmed; right?
19        A.   I've had experience with Chinese drywall.  That
20   was the one confirmed property that I could identify,
21   but I -- can -- may I add something?
22        Q.   Of course.
23        A.   I don't see any environmental impact as unique.
24   There's asbestos.  There's lead-based paint.  There's
25   mold.  They're all unique when they exist, but once
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 115 of 796
Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 114 of 121

Confidential – Subject to Further Confidentiality Review

 1    remediated, it's a new home.  That's the way I look at

 2    it, is that the problem has been remediated and

 3    repaired.  So I look -- I look at homes not as a

 4    stagnant thing but a living, breathing, changing thing.

 5            I've had -- I've sold a home that was built by

 6    Addison Mizner and it was burnt and it was very rough

 7    and it -- in Old Floresta, and it had been from 1920s

 8    and it was remediated and renovated to its previous

 9    glory and it's a beautiful home afterwards.

10            So just as you can take an empty piece of land

11    and build a home, you can take an existing home and make

12    changes to it.

13      Q.    The home that you were just referring to, did

14    you oversee the remediation work of that home?

15      A.    No.  I sold it to an investor, who renovated

16    it.

17            MS. RICO:  Could I actually take a five-minute

18       break?  I want to go over the documents you guys

19       produced, but I'd like to just organize them first

20       so that we don't --

21            THE VIDEOGRAPHER:  3:10 p.m.  Going off the

22       record.

23            (Recess from 3:10?p.m. until 3:27 p.m.)

24            THE VIDEOGRAPHER:  3:27 p.m.  Back on record.

25            (Cohen Exhibit No. 6 was marked for

Confidential - Subject to Further Confidentiality Review

```
 1    identification.)

 2    BY MS. RICO:

 3        Q.   Mr. Cohen, earlier we discussed some

 4    supplemental production that we received from counsel on

 5    March 15.  I'm going to hand you what I've marked as

 6    Exhibit No. 6.

 7             As we received it, this was titled Florida

 8    Claimants List.  What is this document?

 9             MR. CAMPBELL:  Objection to form.

10    BY MS. RICO:

11        Q.   Do you recognize this document?

12        A.   I'm guessing it's either the list of plaintiffs

13    or -- yeah, I'm guessing this is a list of the

14    plaintiffs' homes.

15        Q.   And is that a reference to the list you

16    mentioned earlier that you used to search your

17    transactions?

18        A.   I have my own list of properties, so I just got

19    out my CRM and then I pulled my own report of properties

20    and I sent them to Sarah.  And maybe -- I don't know if

21    at some point she sent these to me or if these were just

22    part of her files.

23        Q.   But you didn't rely on this list in preparing

24    your report?

25        A.   No.
```

1    Q.   Okay.  So this may be a list that was provided

2    to you by counsel of Florida claimants?

3    A.   I know that I sent my list to Sarah and then

4    she cross-referenced it with this list.  So at some

5    point she may have sent it back to me, but I -- I don't

6    know if this -- these documents, if they're in an FTP

7    server.  I don't recall looking into these.

8    Q.   Okay.  We also received a series of MLS

9    listings.  Many of them were different dates but the

10   same property, so I'm going to do this as a composite

11   exhibit per property.  Let me have a second.

12   A.   No problem.  Take your time.

13        MR. CAMPBELL:  7?

14        MS. RICO:  7.

15        (Cohen Exhibit No. 7 was marked for

16   identification.)

17   BY MS. RICO:

18   Q.   Mr. Cohen, could you tell -- could you tell me

19   what these are?

20        MR. CAMPBELL:  Objection to form.

21        THE WITNESS:  This is an MLS listing.  They're

22   MLS listings.

23   BY MS. RICO:

24   Q.   Did you pull this MLS listing in conjunction

25   with your work on this report, or, rather, in this case?

```
 1      A.   This is a property rental that I did that I had

 2   cross-referenced with Sarah, and it had -- I believe at

 3   some point it had Chinese drywall, though I don't

 4   believe I was aware of it in two thousand and -- I

 5   listed it in 2007 when I was with RE/MAX.

 6      Q.   And the property is 1690 Renaissance Commons

 7   Boulevard 1418?

 8      A.   Correct.

 9      Q.   In what year did you list this property?

10      A.   2007.

11      Q.   Is that the only time that you listed this

12   property?

13      A.   Yes.

14      Q.   It was a rental property?

15      A.   Yes.

16      Q.   And what about the second page?  Did you -- did

17   you pull the history for this property?  Is that what

18   you did?

19      A.   Yes.

20      Q.   And why did you do that?

21      A.   Because it was a property that I had been

22   involved with at one time.

23      Q.   That you believed had Chinese drywall?

24      A.   Yes.

25      Q.   But you never listed this property for sale?
```

```
 1      A.   Correct.

 2      Q.   You never sold this property?

 3      A.   Correct.

 4      Q.   And you were never involved in the remediation

 5   of this property?

 6      A.   Correct.

 7      Q.   Did you rely on the information in these MLS

 8   reports when preparing your report?

 9      A.   No.

10      Q.   Thank you.

11           (Cohen Exhibit No. 8 was marked for

12   identification.)

13   BY MS. RICO:

14      Q.   I'm going to mark the next series of MLS as

15   Composite Exhibit 8.

16           Are these also MLS reports that you pulled in

17   conjunction with your work in this case?

18      A.   The first one is an MLS report, the second one

19   is the tax record from this CRS power tool, and then the

20   next one is an MLS report, and then the next one's an

21   MLS report.

22      Q.   And these are all for the property at 9447 --

23      A.   Satinleaf.

24      Q.   -- Satinleaf Place?

25      A.   Yeah.
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 120 of 796
Case 2:14-cv-02722-NGG Document 31-5 Docketed 12/01/2014 Page 89 of
121
Confidential - Subject to Further Confidentiality Review

 1      Q.   And why did you pull these MLS reports and the

 2   tax records?

 3      A.   I don't recall my exact reasoning.  I believe I

 4   was asked about this --

 5           MR. CAMPBELL:  Don't guess if you don't know.

 6           THE WITNESS:  Okay.  I don't recall my exact --

 7      exact reasoning.

 8   BY MS. RICO:

 9      Q.   So is it safe to say you didn't rely on --

10      A.   Correct, I did not.

11      Q.   -- these reports and the tax information in

12   compiling your report?

13      A.   Correct.

14      Q.   Thank you.

15           MR. CAMPBELL:  We were on 8?

16           MS. RICO:  That was 8, yes.

17           THE WITNESS:  Let me put these in order so I

18      can --

19           MR. CAMPBELL:  I can do that for you if you

20      want to cross-reference, if that makes it easier.

21           THE WITNESS:  There's 6 over there.

22           MR. CAMPBELL:  It may be easier to have your

23      report out --

24           THE WITNESS:  Yeah.

25           MR. CAMPBELL:  -- but the others I can get for

Confidential - Subject to Further Confidentiality Review

1       you.

2             THE WITNESS:  Thank you.

3             (Cohen Exhibit No. 9 was marked for

4       identification.)

5   BY MS. RICO:

6       Q.   And I'm going to show you another set of MLS

7   reports for 8232 Emerald Avenue in Parkland.

8       A.   Thank you.

9       Q.   Are these also MLS reports that you pulled in

10  conjunction with your work in this case?

11      A.   Yes.

12            MR. CAMPBELL:  For the record, you're referring

13      to Exhibit 9?

14            MS. RICO:  Yes.  I'm sorry.  Composite

15      Exhibit 9.

16  BY MS. RICO:

17      Q.   And why did you pull these reports?

18      A.   Because it had Chinese drywall and I had listed

19  it.

20      Q.   How did you identify this property as having

21  Chinese drywall?

22      A.   I first saw it in the notes section of my CRM

23  from my field service vendors, and then I noticed it on

24  the MLS.  Let me see --

25      Q.   Is this --

```
 1          MR. CAMPBELL:  Take time to read it if you need

 2     to.

 3          THE WITNESS:  Yeah.  You know what?  I just --

 4     it was in my notes section, and then -- hold on.

 5     Let me look at these.  I could be confusing this

 6     with another property, because when it -- I could be

 7     confusing this with another property.

 8  BY MS. RICO:

 9     Q.   Take your time and look at it.

10     A.   We may have had an addendum that was attached

11  to the MLS, I don't recall, but I -- I guess my memory

12  is not serving me correctly, but I thought that we had

13  mentioned it had Chinese drywall at some point.

14     Q.   If you look at the first page down there where

15  it says "public remarks" --

16     A.   Yes.

17     Q.   -- that may be helpful.  You want to read that

18  to us?

19     A.   This is not my listing, MLS listing, but it

20  says:  "Parkland foreclosure.  Once sold for over 1

21  million.  Needs Chinese drywall remedy.  Has marble

22  floors, huge open kitchen with granite counters and

23  island, tray ceilings, enormous master suite, Roman tub,

24  tile roof, central vacuum, and more upgrades.  Cash

25  only."
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 123 of 796
Case 1:16-cv-25195-MGC Document 21 Entered on FLSD Docket 12/07/2017 Page 92 of
121

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And so that was in reference to the first page,

 2   which is a listing in 2009; is that right?

 3        A.    Two thousand -- this one was listed in 2010.

 4        Q.    2010.  And your listing was when?

 5        A.    This is -- see this is an incomplete -- this is

 6   a public listing.  It's not the private listing.  So

 7   it's not showing me all the details that I need.

 8        Q.    What is the difference between a public listing

 9   and a private listing?

10        A.    A public listing removes certain information

11   from the public's view.  And I don't see the list date

12   on this public listing here.

13        Q.    What type of information does it remove?

14        A.    It removes the listing agent's information.

15   And then I don't recall all the information that it

16   removes.  But it should have a list date, so that's

17   probably one of the fields that's removed.  It also

18   depends on the MLS that we're using, if we're using

19   Miami or Regional, and this one looks like it's -- R.

20   This is Regional Association of Palm Beaches, so...

21        Q.    But the second page does reflect your listing;

22   correct?

23        A.    Yes, it does.  I'm just trying to find the

24   dates on here.  I don't know if you see any dates that

25   I'm missing.  If I had my CRM in front of me, I could
```

1    tell you the definitive date that we listed it.  I have

2    a lot of information.

3        Q.   And could you read for us what it lists under

4    the public remarks section for your listing?

5        A.   "5 bedroom 3 bathroom single story in highly

6    desirable Parkland Golf and Country Club.  Recently

7    remodeled.  Marble and tile floors only.  Impact windows

8    and doors.  New dual zone AC with ultraviolet filter

9    system.  Large backyard."

10       Q.   Do you recall at this time if the listing

11   disclosed the presence of or the previous presence of

12   Chinese drywall?

13       A.   It's not on the MLS, but there -- there are

14   attachments that we include on the MLS.  It could have

15   been on those attachments.  If it was a foreclosure,

16   which this one was, we won't have a seller's disclosure,

17   because they -- the seller doesn't have any information

18   about the home, because the sellers --

19       Q.   Because foreclosures --  I'm sorry, go ahead.

20       A.   With a foreclosure, the sellers never occupy

21   the home, so they don't know anything about the home.

22   I'm their eyes and ears.  And I'm not a professional

23   inspector and I'm -- I'm not able to give my own opinion

24   on what things are going on in the home other than

25   what's in my purview as a real estate agent.

1          So if I see an obvious remediation issue, I'll

2    let them know, but if it's not obvious, then there's --

3    I'm not going to -- I'm not asked to pay for inspections

4    to do that.

5         Q.   So with a foreclosure or an REO, the seller

6    indemnifies themselves; right?

7               MR. CAMPBELL:  Objection to form.

8               MR. POYER:  Object to the form.

9               THE WITNESS:  Yeah, I don't know if indemnify

10        is the word.  The seller is reliant on my

11        information.  I'm the -- because they've never

12        visited the property, I'm their eyes and ears, so...

13    BY MS. RICO:

14        Q.   But they sell the property as is?

15        A.   Correct.  And people, when buying an REO,

16    generally will have an expectation of a home that has

17    some potential liabilities associated with it.

18        Q.   And those liabilities are not always disclosed?

19               MR. CAMPBELL:  Objection to form.

20               MR. POYER:  Same.

21               THE WITNESS:  Anything that the seller is aware

22        of or I'm aware of I disclose.

23    BY MS. RICO:

24        Q.   To the extent that you're aware?

25        A.   If I'm not aware of it, I can't disclose it,

1    so...

2        Q.   Did you rely on these MLS reports in creating

3    your report?

4        A.   My report is just based on my professional

5    experience, so I did not rely on this -- these exhibits.

6        Q.   Okay.

7             MS. RICO:  Yeah, I'm sorry for the confusion,

8        but I'm going to add these to the exhibit that you

9        just looked at because it's the same -- it's the

10       same property.

11            MR. CAMPBELL:  And you're handing us, just for

12       the record, a stack of more --

13            MS. RICO:  MLS.

14            MR. CAMPBELL:  -- MLS's?

15            MS. RICO:  Right.

16   BY MS. RICO:

17       Q.   And it was 8232 Emerald Avenue in Parkland,

18   which is the property we were just discussing; is that

19   right?

20       A.   Let me just double-check, but I would assume

21   that's correct.

22            Yes.

23       Q.   Let's stack them all together just for --

24       A.   Oh, okay.

25       Q.   -- when we clip them.

Confidential - Subject to further confidentiality review

1    A.   Oh, got it.

2    Q.   Let's clip those all together as the same

3  exhibit for the court reporter.

4    A.   Yeah, I can do that.  Okay, so this is

5  Exhibit 9.  I'll put them together, but if it's all

6  right with you, I'd like to just review these.

7    Q.   Yes, please review the new ones I gave you.

8    A.   Okay.  So put it in the front because it had

9  the exhibit sticker?

10    Q.   Uh-huh.  That's perfect.

11    A.   All right.

12         MR. CAMPBELL:  David, there's no question

13         pending.  You can obviously review it, but --

14         MS. RICO:  I'm going to have him review it, and

15         I was just going to ask if his statement that he

16         didn't rely on these is still true.

17         THE WITNESS:  Yeah, I would say it's still

18         true.

19  BY MS. RICO:

20    Q.   Okay.  Thank you.

21    A.   So for the record, one of these listings does

22  have Chinese drywall, or we do mention that it does have

23  Chinese drywall.

24    Q.   And which page is that?

25    A.   This -- and this was -- well, these aren't

Confidential - Subject to further Confidentiality Review

```
 1   page-numbered, so --

 2        Q.   I'm sorry.  Which -- which date?

 3        A.   It was listed January 6, 2010, and on the

 4   listing it says:  "Property has Chinese drywall."  And

 5   I -- I don't recall the specifics, so it is possible

 6   that my inspector found out that it had Chinese drywall

 7   and notified our seller.

 8        Q.   Are you referring to the document that has a

 9   time stamp on the bottom that says 9:32 a.m.?

10        A.   11:56 a.m.

11        Q.   Okay.  11:56 a.m.  okay.  And it's dated

12   2/11/2010 on the bottom?

13        A.   Correct.

14        Q.   And this was your listing?

15        A.   Correct.  So the original listing did not

16   mention Chinese drywall, and then at some point we

17   updated it.  That's what it appears, based on the

18   timestamps.

19        Q.   Then did you rely on these documents when

20   preparing your report?

21        A.   To the extent that it affected my original

22   opinion, no.

23        Q.   Okay.  Thank you.

24             I'm going to do another composite exhibit,

25   because these are the same property and they appear to
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 129 of 796
Case 1:14-cv-21142-MGC Document 224-1 Entered on FLSD Docket 05/13/2015 Page 98 of
121

Confidential - Subject to Further Confidentiality Review

```
 1   be the same document.  So Composite Exhibit 10.

 2             (Cohen Exhibit No. 10 was marked for

 3   identification.)

 4   BY MS. RICO:

 5      Q.   What -- do you recognize these documents?

 6      A.   It looks like an HUD initial inspection report.

 7      Q.   And did you pull these HUD initial inspection

 8   reports in conjunction with your work in this case?

 9      A.   It -- it was a document that we would have had

10   in our file for this particular property.  And I don't

11   recall why this property was pulled.  I would assume

12   that it had -- I don't -- I don't recall why it was

13   pulled.

14      Q.   Is it safe to say that you didn't rely on these

15   documents when preparing your report in this case?

16      A.   Correct.

17      Q.   Okay.

18             (Cohen Exhibit No. 11 was marked for

19   identification.)

20   BY MS. RICO:

21      Q.   I'm going to show you what we'll mark as

22   Composite Exhibit 11.  If you look at the address, it's

23   422 Belle Grove Lane, Royal Palm Beach, Florida, which

24   is the same address as the HUD initial inspection

25   reports that we were just reviewing.  What are -- do you
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 130 of 796
Case 2:14-cv-02722-NGG Document 21 Amended FSP Docket 48 11/20/18 Page 99 of
121
Confidential - Subject to Further Confidentiality Review

```
1    recognize these documents?

2        A.   They're mine.  I recognize they're -- yeah, I

3    recognize them.

4        Q.   And what are they?

5        A.   Reports that HUD required us to send them.

6    Inspection reports, photos.

7        Q.   And why are these reports required?

8        A.   Because we're the eyes and ears for our seller.

9        Q.   So this would have been another REO sale?

10       A.   This was an FHA foreclosure for HUD.

11       Q.   Okay.  And do you know why you pulled these in

12   your work for this case?

13       A.   I don't recall why this property was

14   specifically pulled.

15       Q.   So is it safe to say that you didn't rely on

16   these documents when --

17       A.   Yes.

18       Q.   -- creating your report?  Thank you.

19            MS. RICO:  I'm going to put this just so I

20       don't cover anything.

21            (Cohen Exhibit No. 12 was marked for

22   identification.)

23   BY MS. RICO:

24       Q.   I'm going to show you what we'll mark as

25   Exhibit 12.  Do you recognize this document?
```

```
 1      A.    It's a settlement statement for Emerald Avenue.

 2      Q.    And did you pull this document in conjunction

 3   with your work in this case?

 4      A.    Yes, because this was the property that I had

 5   that was under contract for that had Chinese drywall.

 6      Q.    So this is the property in Parkland that we

 7   discussed earlier --

 8      A.    Yes.

 9      Q.    -- that there were title issues?  It went to

10   contract, there were title issues?

11      A.    It was a --

12            MR. CAMPBELL:  Let her finish.  Sorry.

13            THE WITNESS:  Sorry.

14            MR. CAMPBELL:  Just for the record.

15   BY MS. RICO:

16      Q.    I lost my train of thought.

17            This is the property we were discussing

18   earlier?

19      A.    Yes.

20      Q.    The one property you confirmed with Chinese

21   drywall?

22      A.    Yes.

23      Q.    Okay.  And did you rely on this document when

24   creating your report?

25      A.    No.  My opinions were regardless of these
```

```
1    reports.

2        Q.   Okay.

3        A.   Documents.

4        Q.   And this HUD statement would be for -- would

5    reflect when the sale was under -- when the property was

6    under contract; is that right?

7        A.   It was close to closing, and then I suspect

8    there were title issues is why it didn't close.

9        Q.   So this HUD statement was prepared for the

10   closing of that property, or in anticipation?

11       A.   Correct.

12       Q.   Okay.  Thank you.

13       A.   It was extensions.

14       Q.   What do you mean, "extensions"?

15       A.   Extensions to the close date.

16       Q.   Okay.

17            (Cohen Exhibit No. 13 was marked for

18   identification.)

19   BY MS. RICO:

20       Q.   Exhibit 13.  Do you recognize this document?

21       A.   This is a settlement statement.

22       Q.   And this is a settlement statement for?

23       A.   Belle Grove.

24       Q.   422 Belle Grove.  And you testified earlier

25   that you couldn't -- you couldn't recall why you had
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 133 of 796
Case 1:14-cv-02494-MSK-KLM Document 241 Entered on FLSD Docket 08/15/2011 Page 902 of
121

Confidential - Subject to further Confidentiality Review

```
1    pulled this particular property?

2         A.   Correct.

3         Q.   So is it safe to assume that you did not rely

4    on this document in preparation of your report?

5         A.   Yes.

6         Q.   Thank you.

7              (Cohen Exhibit No. 14 was marked for

8    identification.)

9    BY MS. RICO:

10        Q.   Exhibit 14.  Same question.  Do you recognize

11   this document?

12        A.   Satinleaf settlement statement.

13        Q.   And did you pull this document in conjunction

14   with your work in this case?

15        A.   Yes.

16        Q.   Do you recall why?

17        A.   I don't recall why I pulled this particular

18   document, no.

19        Q.   Do you know if this property had Chinese

20   drywall?

21        A.   I don't believe that it did.

22        Q.   So is it safe to say you didn't rely on this

23   document --

24        A.   Yes.

25        Q.   -- in preparation of your report?
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 134 of 796
Case 1:11-cv-22408-MGC Document 204 Entered on FLSD Docket 03/15/2013 Page 103 of 121
Confidential - Subject to further confidentiality review

```
 1      A.   Yes.

 2           MR. POYER:  Could we take two minutes, and,

 3      Madam Court Reporter, can you fill out some more

 4      tags for us?  Thank you.

 5           THE VIDEOGRAPHER:  3:55 p.m.  Going off the

 6      record.

 7           (Recess from 3:55?p.m. until 3:59?p.m.)

 8           THE VIDEOGRAPHER:  3:59 p.m.  Back on the

 9      record.

10           (Cohen Exhibit No. 15 was marked for

11      identification.)

12      BY MS. RICO:

13      Q.   Okay.  I'm going to show you what we've marked

14      as Exhibit 15.  Do you recognize this document?

15      A.   It's a HUD Property Inspection Report.

16      Q.   And it is for the property we were discussing

17      earlier, 422 Belle Grove Lane?

18      A.   Yes.

19      Q.   And if I recall, you said earlier that you --

20      you're not sure why you pulled this property in

21      conjunction with your work in this case?

22      A.   That's correct.

23      Q.   So it's safe to say you didn't rely on this

24      document in preparing your report?

25      A.   Yes.
```

```
 1        Q.    Thank you.

 2              (Cohen Exhibit No. 16 was marked for

 3    identification.)

 4    BY MS. RICO:

 5        Q.    I'll show you what we've marked as Exhibit 16.

 6    Do you recognize this document?

 7        A.    This is a tax record report for Satinleaf.

 8        Q.    And did you pull this document in conjunction

 9    with your work in this case?

10        A.    Yes.

11        Q.    Do you recall why?

12        A.    No.

13        Q.    Is it safe to say you didn't rely on this

14    document in preparing your report?

15        A.    Yes.

16        Q.    Thank you.

17              (Cohen Exhibit No. 17 was marked for

18    identification.)

19    BY MS. RICO:

20        Q.    I'll show you what we've marked as Exhibit 17.

21    Do you recognize this document?

22        A.    It looks like a very large settlement statement

23    and -- give me a minute.

24        Q.    Uh-huh.  Take your time.

25        A.    Okay.  It looks like a, yeah, settlement
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 136 of 796
Case 1:14-cv-22484-MGC Document 23-1 Entered on FLSD Docket 08/15/2014 Page 105 of
121
Confidential - Subject to further Confidentiality Review

 1   statement.  It's just --

 2       Q.   If you look at the -- they're not numbered, but

 3   if you look at the sixth page in, Settlement Agreement

 4   and Release is the title on the page?

 5       A.   Yeah.  Yeah.

 6       Q.   Are you there?

 7       A.   Yeah, I'm looking at it right now.

 8       Q.   It looks like this pertains to the property at

 9   9447 Satinleaf Place, Parkland; is that right?

10       A.   Yes.  Yes.

11       Q.   Do you know why you pulled this document in

12   conjunction with your work in this case?

13       A.   It was in the file with all the rest of the

14   documents.

15       Q.   But you don't recall why you pulled this

16   particular property?

17       A.   No.  I just threw it in there with the rest of

18   the documents.  I don't know why I pulled this property.

19       Q.   Okay.  Is it safe to say you didn't rely on

20   this document when preparing your report?

21       A.   Yes, that's safe to say.

22       Q.   Okay.  Thanks.

23            Aside from the documents that we were just

24   reviewing, are there any documents that you can recall

25   that you did rely on when preparing your report that we

Confidential - Subject to Further Confidentiality Review

1    have not discussed today?

2        A.    There's no documents that I used to rely --

3    that I relied on for my report.

4        Q.    Your report is only based on your experience?

5        A.    Correct.

6        Q.    Okay.  Thank you.

7        A.    None that I recall.

8        Q.    You mentioned earlier, you're not a certified

9    appraiser, are you?

10       A.    I'm not a certified appraiser.

11       Q.    And you don't hold yourself out to be an expert

12   in that field, do you?

13       A.    As an appraiser?  No.

14       Q.    And you have no training as an appraiser?

15       A.    My job depended on accuracy of values for list

16   prices and we valued -- we came up with an estimated

17   value, a broker price opinion for every single property

18   we listed, every -- at least for the listing, and then

19   generally every few months, as long as it hadn't sold,

20   and then we would also do broker price opinions,

21   fee-based opinions, for $50.  So we've done multiples of

22   opinions of value past the number of properties we've

23   sold.  So it would be, potentially, 10,000 broker price

24   opinions.  So we -- we are not certified appraisers

25   and -- but I would say I do have experience valuing

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 138 of 796 of
121
Confidential – Subject to further confidentiality review

1    properties.

2        Q.   But that falls within your experience as a real

3    estate broker; right?

4        A.   Not as a -- I do not have an appraisal license

5    and I'm not governed under the appraisal guidelines.

6        Q.   So you don't follow the Uniform Standards of

7    Professional Appraisal Practice; right?

8        A.   Correct.  Or I don't know if there are some of

9    those that are involved with licensed real estate law,

10   but I'm not a licensed appraiser.

11            May I add something?

12       Q.   Of course.

13       A.   So generally our clients would get an appraisal

14   done on the houses that we sold, so they would compare

15   our value to the appraised value and -- and use that for

16   the list price, for determining their list price, so...

17       Q.   How would they use that?  They would compare

18   the two, is that what you mean?

19       A.   Yeah, and sometimes ours were more accurate

20   than the appraisals.

21       Q.   How so?

22       A.   Because it sold closer to the price that we

23   estimated it.

24       Q.   But you only know that if the property sold?

25   Or when the property sold, rather?

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 139 of 796
Confidential – Subject to further Confidentiality Review
121

```
 1        A.    Yes.  Or also when it went under contract,

 2   generally speaking, it would sell for the price it went

 3   under contract.

 4           MS. RICO:  I'm almost done.  Could we take a

 5       two-minute break so I can just look through?

 6           THE VIDEOGRAPHER:  4:08 p.m.  Going off the

 7       record.

 8           (Recess from 4:08?p.m. until 4:17 p.m.)

 9           THE VIDEOGRAPHER:  4:17 p.m.  Back on record.

10   BY MS. RICO:

11        Q.    Throughout the day today we've been discussing

12   the one confirmed Chinese drywall transaction that you

13   had.  Do we have your entire file for that property?

14        A.    Yes.

15           MS. RICO:  Counsel, you provided it to us?

16           MR. CAMPBELL:  (Nodding head.)

17           MS. RICO:  Okay.

18   BY MS. RICO:

19        Q.    Additionally, did you go through your e-mails

20   and files and search for anything referencing Chinese

21   drywall?

22        A.    I went through my CRM, which has all my

23   properties in it and all the files associated to those

24   properties.

25        Q.    How about e-mails with investors or former
```

```
1   clients?

2       A.   E-mails with investors?

3       Q.   With any of your clients, discussing Chinese

4   drywall, did you do a search for that?

5       A.   I don't recall doing a search of my e-mails.  I

6   have 13 years worth of e-mails and a lot of e-mails, so

7   it's just --

8       Q.   Could you please conduct a search like that

9   and, to the extent that you find anything, produce it

10  through your counsel?

11      A.   I can search my e-mail.

12           MR. CAMPBELL:  Yeah, I mean, if we have an --

13           MS. RICO:  Obviously subject to any review,

14      right.

15           MR. CAMPBELL:  Yeah, objection.

16           MS. RICO:  Subject to your review.

17           MR. CAMPBELL:  Well, and just if it's going to

18      be an undue burden on him, then we may have that

19      objection in addition to any privilege or

20      confidential information.  But we have to talk to

21      him about what it would entail to do that, so just

22      reserving all rights.

23           MS. RICO:  That's -- that's fine, but to the --

24           MR. POYER:  The same.

25           MS. RICO:  That's fine.  No, of course.
```

```
1   BY MS. RICO:

2       Q.   But to the extent that you could, because it

3   does go to your expertise and any work that you've done

4   pertaining to Chinese drywall.

5           MR. CAMPBELL:  And I guess, just for the

6       record, I don't believe you asked -- I don't think

7       that those documents or that search that you've

8       asked for him to do is responsive to any of the

9       document requests that were issued, just for the

10      record.  You may have a disagreement on that,

11      but --

12          MS. RICO:  I would have to look.

13          MR. MONTOYA:  I think we're mirroring what was

14      done with Greenblatt, that's all.  I think y'all

15      asked that at the conclusion of his depo or sometime

16      during it, and we just would ask for the same, and

17      that's what we're saying.  And I understand you've

18      got -- you may have objections to it, but that's

19      what we're requesting.

20          MR. CAMPBELL:  And his may be different

21      requests too.  We used different ones.

22  BY MS. RICO:

23      Q.   We'll -- we'll go through this later, but --

24      A.   Okay, no problem.

25      Q.   -- for your purposes, you can do whatever they
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 142 of 796 1 of
121
Confidential - Subject to further confidentiality Review

1   tell you to do --

2       A.   Okay.

3       Q.   -- and we'll hash it out later.

4            Have you ever read the book Real Estate Damages

5   by Randall Bell, Dr. Randall Bell?

6       A.   I have not.

7       Q.   Have you ever read any -- Hank, I think, is his

8   first name -- any articles by Mr. Rodaway?

9            MR. MONTOYA:  Richard, I think.

10      Q.   Richard.

11      A.   I have not.

12           (Cohen Exhibit No. 18 was marked for

13   identification.)

14  BY MS. RICO:

15      Q.   I'm going to show you what we'll -- what I've

16  marked as Exhibit 18.  Do you recognize this document?

17      A.   This looks like it is part of my blog, and my

18  blog is -- it has content on it that's created by a

19  third party for marketing purposes.  The company's name

20  is Ylopo.

21      Q.   What -- could you spell that for us, please?

22      A.   Y-l-o-p-o.  And they provide me -- they do

23  marketing for my company and they do my website and they

24  do content creation.  So they -- they create content in

25  order to help -- it's general content that they use in

 1   order to help with credibility and lead generation.  And

 2   it's used by a lot of different real estate agents, so

 3   it's not unique copy to me.  It's copy that a lot of

 4   agents are using.  Customers of Ylopo.

 5       Q.   Okay.  And this blog post is titled What Things

 6   Should You Disclose When Selling a Home?; is that right?

 7       A.   That's correct.

 8       Q.   And it appeared on your company's blog on

 9   May 29, 2018; is that right?

10       A.   I -- yeah, I guess so.  Yep, it looks like it.

11       Q.   And I would assume you approve all content

12   before it goes up on your company's website; is that

13   right?

14       A.   There is content on my website that has been

15   used by a lot of other realtors in my -- in the

16   community that uses Ylopo, and so there's a level of

17   trust with the content.  And there's a lot of past

18   content.  So I only joined Ylopo maybe four months ago,

19   so I haven't gone retroactively to read all of the

20   content that they created that spans years.  I have not

21   reviewed all of that content.

22       Q.   But any content on your company's blog is a

23   reflection of your company; right?

24           MR. CAMPBELL:  Objection to form.

25           MR. POYER:  Object to the form.

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 144 of 796
Case 1:14-cv-22048-MGC Document 124 Entered on FLSD Docket 03/15/2016 Page 113 of 121
Confidential – Subject to Further Confidentiality Review

 1            THE WITNESS:  So I trust this company, and when

 2       you're a business owner -- in my experience as a

 3       business owner, I -- I can't -- there's certain

 4       things I have to outsource, and I have outsourced

 5       the marketing of my website and certain content to

 6       them.  And I trust the company, they're very

 7       credible, and so I do not review all the content

 8       that they create for the blogs.

 9  BY MS. RICO:

10       Q.  Do you stand behind the content that's on your

11  blog?

12            MR. CAMPBELL:  Objection.  Form.

13            THE WITNESS:  I would say yes, I would stand

14       behind the content.

15            MS. RICO:  That's it.  I have no more

16       questions.  Thank you.

17                      CROSS-EXAMINATION

18  BY MR. CAMPBELL:

19       Q.  I just have one redirect, if that's okay.  Let

20  me see which exhibit it was.

21            MR. CAMPBELL:  Do you recall which one the

22       invoice was?

23            MS. RICO:  I think it was 4.  4 or 5.

24            MR. CAMPBELL:  Okay.

25            ///

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 145 of 796
Case 1:11-cv-22408-MGC Document 223-1 Entered on FLSD Docket 08/15/2011 Page 94 of
121

Confidential - Subject to further confidentiality Review

```
1    BY MR. CAMPBELL:

2        Q.   Yea, here it is.  4.  Can you pull out

3    Exhibit 4, David?

4        A.   Yes.

5        Q.   You discussed this earlier.  I'm going to draw

6    your attention to the entry that says "FAR legal

7    hotline."  Do you see that?

8        A.   Yes.

9        Q.   Okay.  Can you explain the best you can

10   remember exactly what occurred during that telephone

11   call that you discussed earlier?

12       A.   I called to find out if there was a legal

13   requirement to disclose that a home had been remediated

14   that previously had Chinese drywall, and I was told that

15   there's no requirement to disclose, if it was properly

16   remediated, that it had previously had Chinese drywall.

17       Q.   And what is FAR Legal Hotline?

18       A.   It's the Florida Association of Realtors Legal

19   Hotline, and it's available to real estate agents.  And

20   it's paid for out of our board dues.  There are

21   attorneys on there.  I don't know -- yeah, that's it.

22            MR. CAMPBELL:  That's all.

23                     REDIRECT-EXAMINATION

24   BY MS. RICO:

25       Q.   I have one more question.
```

```
 1              When you called the FAR Legal Hotline, did you

 2   get a reference number for your call?

 3       A.   I did not get a reference number for the call.

 4       Q.   Did you take any notes from your call?

 5       A.   It's possible.  It's possible.  It's possible

 6   that I took notes.  I would have to check.

 7       Q.   Would you please check for us?  And to the

 8   extent that you have them, we'd ask that you produce

 9   them.

10       A.   Yes.

11       Q.   And do you recall who you talked to?

12       A.   I don't recall who I spoke to, but it might be

13   in -- if I took notes -- I know where to check if I took

14   notes, so, yeah.

15       Q.   Okay.  Well, we'd just ask that you check on

16   that.

17              But you did testify earlier that, as a

18   professional, you would disclose that a home was

19   remediated that previously contained Chinese drywall;

20   right?

21       A.   So the seller's disclosure, if required, has to

22   be filled out truthfully, and in the seller's disclosure

23   it does ask if there is drywall that had been previously

24   remediated.  So I would answer that fairly -- well, the

25   truth is my seller -- I will tell my seller to answer
```

```
 1    the seller's disclosure truthfully and fairly.  And it's

 2    their form to fill out, not mine.  I'm not allowed to

 3    fill out that form.

 4          MS. RICO:  Okay.  I have no further questions.

 5       Thank you.

 6          THE VIDEOGRAPHER:  4:27 p.m.  Going off the

 7       record.  This marks the end of the deposition.

 8          (Whereupon, the deposition concluded at

 9    4:27 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2

 3         I, JOAN L. PITT, Registered Merit Reporter,

 4    Certified Realtime Reporter, and Florida Professional

 5    Reporter, do hereby certify that, pursuant to notice,

 6    the deposition of DAVID J. COHEN was duly taken on

 7    April 17, 2019, at 1:10 p.m., before me.

 8          The said DAVID J. COHEN was duly sworn by me

 9    according to law to tell the truth, the whole truth, and

10    nothing but the truth, and thereupon did testify as set

11    forth in the above transcript of testimony.  The

12    testimony was taken down stenographically by me.  I do

13    further certify that the above deposition is full,

14    complete, and a true record of all the testimony given

15    by the said witness.

16

17         _____

18           JOAN L. PITT, RMR, CRR, FPR

19

20         (The foregoing certification of this transcript

21    does not apply to any reproduction of the same by any

22    means, unless under the direct control and/or

23    supervision of the certifying reporter.)

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22380-39 Filed 12/03/19 Page 149 of 796
Case 1:14-cv-22483-MGC Document 234 Entered on FLSD Docket 05/15/2017 Page 118 of
121

Confidential - Subject to further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully and

 5   make any necessary corrections.  You should state the

 6   reason in the appropriate space on the errata sheet for

 7   any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty (30)

14   days of receipt of the deposition transcript by you.  If

15   you fail to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to further confidentiality review

```
 1                      - - - - - -

 2                     E  R  R  A  T  A

 3                      - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6      REASON:  _____

 7    _____   _____   _____

 8      REASON:  _____

 9    _____   _____   _____

10      REASON:  _____

11    _____   _____   _____

12      REASON:  _____

13    _____   _____   _____

14      REASON:  _____

15    _____   _____   _____

16      REASON:  _____

17    _____   _____   _____

18      REASON:  _____

19    _____   _____   _____

20      REASON:  _____

21    _____   _____   _____

22      REASON:  _____

23    _____   _____   _____

24      REASON:  _____

25
```

```
 1                 ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4    acknowledge that I have read the foregoing pages,

 5    1 - 120, and that the same is a correct transcription of

 6    the answers given by me to the questions therein

 7    propounded, except for the corrections or changes in

 8    form or substance, if any, noted in the attached Errata

 9    Sheet.

10

11

12    _____      _____

13    DAVID J. COHEN                DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    ____ day of _____, 20___.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24

25
```

Confidential - Subject to further confidentiality Review

```
 1                          LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____   _____

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```

# EXHIBIT C

**Integra Realty Resources**
Miami/Palm Beach

## Market Analysis of the Post-Remediation Impact of Chinese Drywall On Residential Property Values in Florida

**Prepared For:**
Colsen Hicks Eidson and related parties to Amorin v. Taishan Gypsum Co. Ltd. et al
United States District Court – Southern District of Florida
Case No. 11-22408 – Civ - COOKE

**Effective Date of the Study:**
February 15, 2019

Covering the period 2009 - 2018

**Report Format:**
Consulting Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275



| | In Miami | In Orlando | In Naples/Sarasota |
|---|---|---|---|
| **Integra Realty Resources** | Dadeland Centre | The Magnolia Building | Horseshoe Professional Park |
| Miami | 9155 South Dadeland Blvd. | 326 N. Magnolia Ave. | 2770 Horseshoe Drive S. |
| Orlando | Suite 1208 | | Suite 3 |
| Southwest Florida | Miami, FL 33156 | Orlando, FL 32801 | Naples, FL 34104 |
| | (305) 670-0001 | (407) 843-3377 | (239)-643-6888 |
| www.irr.com | | | |

February 15, 2019

Patrick Montoya, Esq.
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134`

SUBJECT:     Detrimental Conditions Analysis
             Market Analysis of Post Remediation Impacts relating to Chinese Drywall
             Case No 11-22408-Civ-COOKE
             United States District Court Southern District of Florida in the matter of
             Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
             similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taishan Dongxin Co. Ltd., et al
             IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach ("Integra") submits the following report in anticipation of providing expert testimony in the above captioned matter before the United States District Court – Southern District of Florida.

This report outlines the premise of our research, the relevant literature and theory with respect to real property value diminution, and sets forth of our material findings with respect to Integra's study of post-remediation value impacts on residential property values in Florida. Integra's research includes additional source material contained within our workfile to arrive at these expert conclusions.

The report is intended to comply with the Uniform Standards of Professional Appraisal Practice (USPAP) and methods of research relevant to our industry and documented by industry professionals and are deemed reliable within the degree of certainty accepted in the practice of real estate appraisal.

The material findings will form the basis of expert witness testimony in the above referenced case.

On Residential Property Values in Florida



Case 2:09-md-02047-EEF-MBN Document 22280-28 Filed 12/02/19 Page 157 of 796
Case 1:11-cv-22408-MGC Document 279-3 Entered on FLSD Docket 03/13/2019 Page 9 of 54

Identification of Subject(s)                                                                 2

## Identification of Subject(s)

The intended application of the relevant findings is for the 20 priority claimant damage analyses delivered under separate cover. Integra has prepared individual appraisal reports demonstrating the unimpaired values of those homes on relevant dates as instructed by Plaintiff's counsel. Those appraisal reports reference findings within this report to provide an independent opinion of relevant post-remediation damages suffered by Claimants as of those effective dates.

This detrimental conditions report and findings are considered applicable to the Florida cases remanded by Judge Fallon from the United States District Court for the Eastern District of Louisiana with respect to the Florida cases only.

This analysis does not consider the costs to cure the defects as Plaintiffs are proceeding on a separate track for those damages apart from this expert's scope of work.

## Effective Date

The effective date of the study covers the time period December 1, 2009 through August 8, 2016 based upon the relevant case study evidence developed in this matter. Our interview methods extend this date through a current (February 2019) date and support our conclusion that the case study evidence is relevant from December 1, 2009 through February 15, 2019.

## Intended Use and User

The intended use of the study is to provide material conclusions with respect to value diminution of real property residential values after defective Chinese Drywall and related remediation is completed.

The Plaintiffs, their related experts and counsel, and the Court are considered intended users of the report. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report. Specifically, the scope of the report relates to residential property values in Florida and using the study outside of the State of Florida may not be appropriate without supplementing additional research.

## Material Statement of Findings

Pursuant to Rule 26(A)(2)(B) of the Federal Rules of Civil Procedure, a complete statement of all opinions I will express, including the basis and reasons for them, is set forth below. I have rendered my opinions based on my experience, knowledge and training as a real estate appraiser and based on the research conducted in this study under methods and practices typically undertaken by my peers. All opinions are based upon a reasonable degree of certainty one would expect from a practitioner of real estate appraisal and damage analysis experts.

The value impact of residential homes with in-place defective Chinese Drywall are known to be worth materially less than the value of homes unimpaired (to wit: never affected by the presence of defective drywall in the construction or renovation of the home). This report does not address value diminution with respect to homes with in-place defective drywall, but rather analyzes the economic impact (damage) on homes post-remediation only.



The method for assessing value diminution as set forth by industry peers is best expressed and consolidated into uniform peer methodology in the Appraisal Institute text "Real Estate Damages, Applied Economics and Detrimental Conditions", Third Edition by Randall Bell, MAI.

We incorporate by reference the Bell Damage Matrix, and have structured the research framework associated with my conclusions around the recommended relevant methods outlined by Bell.

The scope of this study does not address the <u>cost of assessment</u> of the Class VI detrimental condition[1], <u>or the cost to cure</u>.  These items are being handled separate from my analysis.  This study specifically addresses the magnitude of probable economic damages (expressed as a percentage of unimpaired value) that likely persists, and which apply to Florida residential properties, following a full and complete drywall remediation process and certification by the contractor responsible for remediation.

The value of homes that had defective drywall and were subsequently remediated were generally found to have lower values than similarly situated homes that never had defective drywall.  Our findings incorporate the results of (20) case studies developed over the time period 2009 – 2019 across (7) counties in Florida.

A review of the published appraisal and general real estate literature found no published case studies of the post-remediation effect on value of defective Chinese Drywall, and there is a lack of published literature on studies of defective drywall pre or post-remediation.  After post-remediation, nevertheless, the application of the research framework applied herein is considered a reliable methodology to evaluate these matters.

Our development of the Contingent Valuation Method through Type I Market Surveys with brokers and salespersons in the market areas associated with the control and comparable unimpaired sales revealed mixed impressions of post-remediation impacts.  However, the interview process also informed our correlation of why the impacts are not uniformly measurable or distributed, and assisted in our final correlation of likely post-remediation impact.

Integra's final finding with respect to post-remediation value diminution is as follows:

- The analysis of the (20) case studies demonstrates a wide range of value impacts to properties that have completed a defective drywall remediation from zero to 30%.

- The ability to fairly measure the value diminution requires a careful assessment of the unimpaired values, and, in most cases, we have developed the case studies (and impact assessments) in a range in order to mitigate the influence of normal market differences due to differing physical factors.  These results form a lower and upper boundary of impact which in some cases is quite large (a/k/a "the spread").

---

[1] Bell defines and classifies the typology of various Detrimental Conditions (DC), and construction defects are classified as Class VI DC's.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 159 of 796
Case 1:11-cv-22408-MGC Document 279-3 Entered on FLSD Docket 05/13/2019 Page 76 of 54

Material Statement of Findings                                                                    4

- The majority of the case studies (11 of 20) indicated measurable post-remediation diminution of at least 5% on the lower boundary.

- The majority of the case studies (13 of 20) indicated upper boundary impacts greater than 10%, with many (10 of 20) at 20% or higher.

- The mean and median of all case studies demonstrate a lower boundary median/mean at 7% /-11% respectively, and an upper boundary median\mean at 20% / 19%, respectively.

- The case studies were confirmed with primary parties to the greatest extent possible, both the control sales with remediated drywall, and comparable sales used to model the unimpaired pairing.

- Integra analyzed the case studies on various issues potentially affecting the magnitude or potentially systematic analysis of the value diminution including geography, price segmentation, and date of value.  No systematic patterns emerged.

- Integra's conclusion of 10% value diminution post-remediation considers the potential variation in market adjustments and also considers that properties with less diminution may have suffered extended marketing times, may not have disclosed prior conditions, or may indicate less diminution because they found "the right buyer" who preferred a completely remodeled home, and suffered the risks of future disclosure (or intended not to disclose in the future).

- On the other hand, the 10% conclusion may understate the value diminution that some homes suffer when there are a high number of unaffected competitive properties listed for sale, or when the buyer/broker pool is more cautious resulting from prior bias or experience regarding Chinese drywall, or where there may be less confidence in the efficacy and/or proofs of the remedial action taken.

- For purposes of developing and applying a uniform damage analysis that withstands minor variations in the market's pricing behavior across time, geography and price segmentation, and which is both a fair and reasonable professional effort to measure the damage to both Plaintiff and Defendant, it is my expert opinion that the 10% estimate strikes a reasonable balance between the preponderance of the data analyzed, and the potential error rate of property and market variations.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 160 of 796
Case 1:11-cv-22408-MGC Document 279-3 Entered on FLSD Docket 05/13/2019 Page 8 of 54

Definition of the Appraisal Problem                                                              5

## Definition of the Appraisal Problem

"As of October 15, 2010, The Consumer Product Safety Commission (CSPC) received 3,650 reports concerning problem drywall across 38 states, the District of Columbia, Puerto Rico, and American Somoa…Two states, Florida and Louisiana account for more than 75% of all complaints…"[2] The reported problems commenced following major homebuilder use of Chinese Drywall following a supply shortage of typical drywall suppliers in 2006.

The CSPC maintained monthly reports on this evolving problem dating back to early 2009.  By 2010, the CSPC was conducting indoor air studies and distributing guidance on potential remedial actions.

The National Association of Homebuilders (NAHB) reported in May 2010 that initial imports dated back to 2000-2001, but by 2004-2007 these imports increased rapidly following escalating demand from Gulf Coast hurricane recovery efforts and general building demand.  The NAHB, a lobbying association for major public and private homebuilders, was issuing guidance to homebuilders on various legislative actions, insurance and risk assessment, and remediation guidance.

The Florida Association of Realtors (FAR) issued a White Paper identifying the problem, and guiding Realtors to disclose known conditions and educate themselves.  In conjunction with this White Paper, FAR developed a "Chinese Drywall Addendum for Purchase" contract addendum to specifically address the disclosure.

County Assessor offices began compiling lists of homes confirmed as having Chinese Drywall, and systematically offering 50% - 100% reductions in the building assessments for homes with confirmed defective drywall.

News articles describing the problem and addressing the myriad problems for homebuilders and homeowners alike propagated throughout statewide media outlets.

By middle to late 2010, a search of internet sources and various public agency websites confirmed that the problem was identified, and although the magnitude had not been fully quantified, market participants were aware of the potential problems with Chinese Drywall.

The appraisal problem examined herein is to estimate whether the knowledge of market participants, including Realtors, homebuilders, homeowners and the general public affected the price setting of homes with prior existence of Chinese Drywall if disclosed.  The disclosure of a known defect, which could materially affect the value of property, triggers the need for an affirmative disclosure of its presence.

I understand from Plaintiff's counsel that the prescribed standards and scope of a "complete" remediation of a Chinese Drywall property are identified in Judge Fallon's April 8, 2010 Findings of Facts @ Conclusions of Law in connection with Germano, et al, v. Taishan Gypsom Co. LTD, et al.

---

[2] Consumer Product Safety Commission, "Study of the Possible Effect of Problem Drywall Presence on Foreclosures – A report to Congress" dated July 17, 2012, page 4.  See Addendum for full report and data compiled by CPSC.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 161 of 796
Case 1:11-cv-22408-MGC Document 279-3 Entered on FLSD Docket 05/13/2019 Page 9 of 54

Definition of the Appraisal Problem                                                          6

Compounding the complexity of remediation, the timing of the discovery and assessment phase occurred during the depths of the Great Recession[3], so capital availability for homeowners was more limited, and banking foreclosures were at historic highs. Residential real estate values had declined, and access to lending channels (and home equity) was constrained.

The breadth of public experience with the negative effects of Chinese Drywall and the required disclosure on the existence of the problem conspired to raise more public awareness of this defective material. The detrimental condition, once identified through broad public knowledge, commences to affect peoples' perception on value and risk.

The specific valuation problem addressed in this report is not the cost to cure or discount to market value for an unremediated property , but rather the market resistance following a complete remediation (with disclosure) that sellers are likely to experience.

---

[3] https://www.investopedia.com/terms/g/great-recession.asp; The Great Recession is a term that represents the sharp decline in economic activity during the late 2000s, which is considered the most significant downturn since the Great Depression. The term "Great Recession" applies to both the U.S. recession, officially lasting from December 2007 to June 2009, and the ensuing global recession in 2009.



Case 2:09-md-02047-EEF-MBN   Document 22380-38   Filed 12/02/19   Page 162 of 796
Case 1:11-cv-22408-MGC   Document 273-8   Entered on FLSD Docket 05/13/2019   Page 90 of
54

Foundational Theory on Value Diminution                                          7

## Foundational Theory on Value Diminution

The foundational theory on value diminution within the appraisal community has been developing since the early 1970's and 1980's[4]. In the early 1990's, Randall Bell, PhD., MAI commenced aggregating prior research and codifying a uniform framework that started as an Appraisal Institute seminar.  This early research culminated into the current Third Edition (2016) of the Appraisal Institute textbook "Real Estate Damages" authored by Dr. Bell.

It would not be an understatement to say that no one has advanced the knowledge base and framework of the analysis of detrimental property conditions and their effect on value more than Dr. Randall Bell.

Following years of study including input from many academic and industry professionals, and over multiple textbook editions, interim article and study publications, and exposure of the detrimental condition theory in the private and public sector practices and courts, the definitive framework for describing and quantifying detrimental conditions is now well established within the definitive textbook on the subject matter.   The classification of the types of detrimental conditions is even known as "the Bell Chart."

The Detrimental Conditions Matrix describes three definitive areas giving rise to value discounts relating to the Cost, Use, and Risk factors during three stages (time periods); 1) Assessment Stage; 2) Repair Stage; and 3) an On-Going Stage post remediation.[5]

This framework posits that in each of these nine quadrants, overall values could be affected depending upon the specific factors and case facts surrounding the specific type of detrimental condition (DC).

The DC matrix is a continuum of costs, use, and risk factors that combined affect real property value and give rise to cumulative value discounts versus an unimpaired value.

The DC Model (and damage continuum) is graphically represented by Dr. Bell as follows:

---

[4] Early publication indexes of articles as contained within the Appraisal Institute's LUM Library date back to 1990, but Integra maintains historic copies of Appraisal Journals back to 1985.  The first article on the "Effects of Violent Crimes on Residential Property Values", Sheila Little was published in July 1988.  Real Property practice includes many comparative value premises dating back to the original codification of appraisal texts in the 1950's, but collective and comprehensive published research began in earnest in the early 1990's.  Real Estate Damages provides a collective index of research and published papers dating back to 1972.

[5] The text clearly describes how these stages are not always sequential, and during repair a property owner with a DC may have to return for new assessments, or once proceeding to remediate the problem (thereby in an on-going phase) may have to return for additional repairs.  This is beyond the scope of this study.  For this class of detrimental condition, it is only the "risk" of possibly having to return to a prior stage that gives rise to market resistance.  For a properly remediated Chinese Drywall home where all copper and plumbing, electrical, and HVAC systems have been replaced, and 100% of the drywall in the house has been removed, we consider it somewhat unlikely to revert into prior stages once remediation is completed.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 163 of 796
Case 1:11-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 21 of 54

Foundational Theory on Value Diminution                                                                          8



This expert report incorporates the Appraisal Institute textbook <u>Real Estate Damages</u>, Third Edition (2016) by Randall Bell, PhD., MAI by reference.

The subject of this damage analysis concerns itself at the point above of "D", with the assumption that Property Damage Claims for remediation cost, risk and project incentive are being accounted for separately by Judge Cooke's Trial Plan.

The focus of this report is from D to E, reflective of the costs immediately preceding final repairs (interruption /loss of use during repair) which has been estimated by using the rental rate of the property as a proxy for the temporary loss of use during remediation, and the Points E to F, the "Market Resistance" phase post-remediation where the property owner must disclose the prior detrimental condition, and suffer any potential loss in value (versus a property that never experienced the DC).



On Residential Property Values in Florida

Case 1:09-md-02047-EEF-MBN  Document 22380-28  Filed 12/02/19  Page 164 of 796
Case 1:11-cv-22408-MGC  Document 273-3  Entered on FLSD Docket 05/13/2019  Page 12 of 54

Foundational Theory on Value Diminution                                                     9

**Table 1**  **The DC Matrix**

| Cost | Assessment | Repair | Ongoing |
|---|---|---|---|
| | • Cost to assess & responsibility<br>• Engineering<br>• Phase I, II, III studies | • Repair costs & responsibility<br>• Repairs<br>• Remediation<br>• Contingencies | • Ongoing costs & responsibility<br>• Operations & maintenance (O&M)<br>• Monitoring |
| Use | • All loss of utility while assessed<br>• Disruptions<br>• Safety concerns<br>• Use restrictions | • All loss of utility while assessed<br>• Income loss<br>• Expense increase<br>• Use restrictions | • Ongoing disruptions<br>• Material alterations to highest & best use |
| Risk | • Uncertainty factor<br>• Discount, if any, where extent of damage is unknown | • Project incentive<br>• Financial incentive or risk, if any, during repairs | • Market resistance<br>• Residual discount, if any, due to a historical situation |

We do not expect there to be any costs in the On-going phase post remediation, although part of the market resistance arises because of the unknown risk of future disruptions and potential costs.

In the instant case with defective Chinese Drywall, and in many Class VI construction defects cases, the physical defects (DC's) are curable. The market resistance arises because of buyers' fear that future disclosure of a prior problem will scare future buyers. Some buyers just have a natural resistance to taking on problems, which although cured, are not guaranteed as cured.

**Definition of Market Resistance:** The risk, if any, associated with the ongoing stage of a detrimental conditions analysis. Market resistance includes the reluctance on the part of the real estate market to buy a property that has historically been damaged or tainted. Sometimes called *stigma.*[6]

**Detrimental Condition:** Any issue or condition that may cause a diminution in value to real estate.[7]

**Diminution in Value:** the lost value of real estate before (as if impaired) and after (or upon the discovery of) a detrimental condition.

Applicable valuation methodologies for measuring valuation diminution associated with detrimental conditions are outlined in the Bell textbook. Cost Approach methods are not relevant in the instant case because the costs of repair are being handled separately from this expert's analysis. The cost of moving is quantified herein as a damage since this is a cost reasonably expected to be incurred by an owner who suffers a full home remediation.

---

[6] Bell, Randall. Real Estate Damages Third Edition, *Appraisal Institute,* Chicago:2016, pg. 462
[7] *Ibid., pg. 458*



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 165 of 796
Case 1:11-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 23 of 54

Foundational Theory on Value Diminution                                                10

Similarly, Income Approach methods are not applied since the residential properties studied are not
traditionally traded on their income potential. However, the use of market rent as a proxy for
occupancy costs is a "replacement approach" that considers the economic impact of rent as a proxy
for use\occupancy value. This is considered and applied.

This report applies various methods as outlined within the Sales Comparison Approach to Detrimental
Conditions. These methods include:

- Paired Sales Analysis
- Impaired Sales Comparables
- Market Resistance Estimation
- Sale-Resale Analysis
- Neighborhood Studies
- Proximity Studies
- Case Study Analysis
- Statistical Studies using Inferential Statistics, Linear Regression, or Multiple Regression
- Market Interview and Surveys

This report applies all of the above sales comparison methods with the exception of Linear and
Multiple Regression, and Neighborhood and Proximity Studies, all of which are generally more suitable
for studying a fixed-point detrimental condition (the impact of nuclear disaster, or a landfill) on
surrounding properties where the fixed variable (location) can be arrayed against multiple variables
(distance, time, price, and physical and economic differences).

The sale-resale method is considered within the individual reports by analyzing the Priority Claimants
sales history against the findings within this report. This is not individually tested within this Report,
but has been considered.

The process followed within this report conforms to the process described in Dr. Bell's Real Estate
Damages text at page 8:

- Use Multiple Research sources (constructionism) and rely upon [an experts] general
  experience (Action)
- Demonstrate or acquire geographic competency (ethnography)
- Conduct a literature review and comply with USPAP (hermeneutics)
- Use sale or lease comparables, vacancy rates, expenses, and capitalization rates (empirical
  research)
- Use adjustment grids or other means to compare and contrast the data (comparative
  research)
- Have discussions with property owners or managers (testimony); verify the market data with
  parties involved or survey participants within the market (phenomenology) and ultimately
  produce findings that are logical, innate, testable, and repeatable (rationalism)

The scope, activities, analysis and findings conform to the above process.



Case 2:09-md-02047-EEF-MBN Document 22380-38 Filed 12/02/19 Page 166 of 796
Case 1:11-cv-22408-MGC Document 279-3 Entered on FLSD Docket 05/13/2015 Page 24 of 54

Scope of Study and Methods                                                                    11

## Scope of Study and Methods

As part of the scope of this report, and the related individual damage analyses, Integra professionals undertook an extensive review of published literature on defective drywall (a/k/a "Chinese Drywall") referring to the manufacture, import, and installation of drywall originally manufactured in China.

Integra Miami maintains a historic archive of reports from the Consumer Product Safety Commission (CPSC), Florida Board of Realtor and National Homebuilder Association alerts, various correspondence with Integra professionals on the matter of Chinese Drywall dating back to 2009-2010 timeframe contemporaneous with the discovery and study of the initial effects of Chinese Drywall.

In conjunction with this assignment, we updated these (3) data binders and reviewed additional public literature to familiarize ourselves with the timeline of the problems, the emerging report and study of the problems, and the reactions of the business community, realtors, legislators, homebuilders (to wit "market participants") over the time period 2009 – present.

We also undertook research to determine if studies related to valuation were published, and found none.  We also researched and\or refamiliarized ourselves with writings on stigma and detrimental conditions generally, including reviewing excerpts and portions of the Real Estate Damages, and other related detrimental condition writings.

Over a period of 8 weeks, we engaged local appraisers with substantial residential appraisal experience to assist in the inspection and appraisal of the unimpaired values (hypothetical) of the twenty Priority Claimant properties covering various dates of value from 2012 – present.  As part of this process, we interfaced with the residential appraisers, conducted telephone interviews and actively participated in the data gathering and analysis of the Claimant properties.

We developed a confirmation script, and proceeded to research through the various local Multiple Listing Services (MLS) to identify properties which had sold with Chinese Drywall (both remediated and unremediated).  From among over 50 case studies, we narrowed our search and focused on the remediated properties and developed case studies to quantify whether any diminution in value was apparent.

As part of the case study and paired sales development, the Integra team conducted and collected dozens of in-person interviews with listing and selling Realtors™ involved or with primary knowledge of homes that sold with Chinese Drywall, or post remediation of Chinese Drywall.  The results of these surveys were then analyzed, and specific comments were arrayed and analyzed to assess market participant reactions to the presence (or prior existence) of Chinese Drywall, and its impact on marketing and price of residential homes.

This material was fully analyzed and condensed into this report, and into various workfile documents evidencing our study, and supporting the process which lead to the development of conclusions contained herein.  Following this scope are the results of our study.

It is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni, Juan Gamio and Paul L. Jones of IRR-Miami/Palm Beach made contributions to this study consisting of conducting research on the subject and transactions involving comparable properties, performing interviews, researching



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 167 of 796
Case 1:11-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 15 of 54

Review of Literature                                                                    12

literature, and development of research for all case studies under the direct supervision of Anthony M. Graziano, MAI, CRE.

## Review of Literature

Bell, Randall PhD., MAI <u>Real Estate Damages</u> (Third Edition) *Appraisal Institute* Chicago: 2016

"Chinese Drywall Facts and Fears" – Powerpoint Presentation dated June 24, 2009; <u>www.assetadvisorsandmanagers.com</u>

Consumer Product Safety Commission "Study of the Possible Effects of Problem Drywall Presence on Foreclosures – A Report to Congress", <u>www.cpsc.gov/s3fs-public/StudyofthePossibleEffectofProblemDrywallPresenceonForeclosures.pdf dated July 12</u>, 2012; Accessed January 23, 2019.

Kinnard, William N. "How North American Appraisers Value Contaminated Property and Associated Stigma", The Appraisal Journal, July, 1999

Kirkpatrick, John A. "Construction Defects and Stigma" Mealy's Construction Defects, July 2003

Mundy, Bill PhD., MAI "Stigma and Value" The Appraisal Journal, January 1992.

Patchin, Peter J. "Contaminated Properties – Stigma Revisited", The Appraisal Journal, April 1991

Patchin, Peter J. "Valuation of Contaminated Properties", The Appraisal Journal, January 1988

Various materials and documents comprised of Integra historic research specifically on Chinese Drywall; source material includes timestamped material downloaded from various government and industry sources proximate the 2009 – 2012 timeframe. This material is referred to as "Integra Research Binder Volumes I – III."

## Case Study Analysis

The following presents an analysis of the paired case studies developed in conjunction with this assignment. The 20 case studies represent a cross-section of pairings with control sales (sales of properties where the control sale had been remediated and disclosed during market exposure) which was then compared to 3-4 comparables that were not affected and never had defective drywall.

The presentation and analysis of the data and results will follow the process by which we collected and analyzed the data, and the resulting conclusions.

### Process of Development and Selection

Over the period January 20, 2019 – February 14, 2019, Integra developed over 40 case study files for properties in both a remediated and unremediated state as of the date of the control sale.



Case 2:09-md-02047-EEF-MBN Document 22380-38 Filed 12/02/19 Page 168 of 796
Case 1:17-cv-22405-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 16 of 54

Case Study Analysis                                                                 13

The Integra team started with an understanding that a well-structured study would demonstrate a range in control sales that varied by A) date of sale; B) varying geographies generally representative of the distribution of affected drywall properties; C) various price segments to test whether different price ranged homes were affected differently.

These initial case studies collected included remediated and unremediated homes since the selection process was focused on a mass search of the various Multiple Listing Service (MLS) records searching for key word terms "Chinese Drywall" and variations. From these 50+ case studies, we then confirmed by direct contact with the listing or selling agent whether the control sales were remediated. If unavailable, we relied upon the disclosures in the MLS.

From these data sets, we then arrayed 27 sales which Integra reasonably confirmed were sales of homes post-remediation (the focus of the study). The Integra team then mapped these sales and identified relevant comparable sales from within the MLS to create paired analysis on each of the 27 control sale sets. Primary residential comparative factors were considered including building size, # BR, # Baths; Lot Size; Condition; and date of sale.

Over a 2- week period commencing on or about January 25, 2019, the team then followed a confirmation script to confirm all control sales and interview the listing broker. We repeated the same process for all of the comparable sales. Each listing was printed including photos when available of all relevant sales. Market data from Zillow/Trulia on sales trends in the market during the relevant timeframe was also collected and considered to understand the pricing trends during the relevant timeframe.

The team then confirmed as many control and comparable sales as possible, and recorded notes for each sale regarding the arms-length nature, confirming the control sale had been remediated and was disclosed at the time of sale, and that all comparable sales never had defective drywall issues.

From this initial set of 27, there were (7) case studies that were eliminated from further consideration. Three (3) of the (7) were eliminated because we confirmed the control sale was not remediated or had no confirmation of the existence of defective drywall. One case study was eliminated because the area had known sinkhole issues, and comparables may have been affected by a different detrimental condition; and three (3) case studies were eliminated due to insufficient comparable sales within close proximity or physical similarity to the control sale.

The balance of the (20) case studies were confirmed with the brokers, and notes on the control sale and comparables were recorded. These interviews also form the basis of our Market Participant Interviews analyzed separately.

Under my direction, Integra then developed adjustments for each of the comparable sales using typical adjustment processes used in residential appraisal to adjust for the major factors considered in pricing residential properties. The listing photographs were used to evaluate the overall condition, effective age, and level of finishes at the time of listing.

From the unaffected comparables, we then correlated to a range of indicated value that the control sale "should have" sold for if unaffected by the prior existence of defective drywall, as disclosed. This



Case 2:09-md-02047-EEF-MBN   Document 22380-38   Filed 12/02/19   Page 169 of 796
Case 1:11-cv-22408-MGC   Document 279-8   Entered on FLSD Docket 05/13/2019   Page 27 of 54

Case Study Analysis                                                                    14

concluded range in value considers a lower and upper boundary established by the adjusted comparables, and a reasonable correlation of the range the control sale should have sold within.  This range was then compared to the actual price, and a range in post-remediation damages was reflected per case study.

The result of each case study was then arrayed on a master sheet, and the meta data and correlated data was then analyzed.

**Meta-Data**

Meta Data is the set of data that describes and gives information about other data.  The 20 case studies represent a cross section of the Florida residential market.  A 2010 article in the Sarasota Herald Tribune (Dec 14, 2010) outlined the reported drywall cases at that time from assessment records.  The distribution of reported defective drywall cases based upon this article is compared to the geographic distribution of our case studies as follows:

|              |      | % Cases by County | Integra Case Study % | Integra Case Study # |
|--------------|------|-------------------|----------------------|----------------------|
| Lee          | 1518 | 30%               | 0%                   | 0                    |
| Palm Beach   | 747  | 15%               | 10%                  | 2                    |
| Broward      | 607  | 12%               | 24%                  | 5                    |
| Hillsborough | 515  | 10%               | 19%                  | 4                    |
| Miami Dade   | 294  | 6%                | 14%                  | 3                    |
| Collier      | 264  | 5%                | 0%                   | 0                    |
| Charlotte    | 254  | 5%                | 19%                  | 4                    |
| St. Lucie    | 240  | 5%                | 5%                   | 1                    |
| Indian River | 132  | 3%                | 0%                   | 0                    |
| Pinellas     | 106  | 2%                | 0%                   | 0                    |
| Sarasota     | 93   | 2%                | 0%                   | 0                    |
| Martin       | 88   | 2%                | 5%                   | 1                    |
| Pasco        | 59   | 1%                | 0%                   | 0                    |
| Polk         | 33   | 1%                | 5%                   | 1                    |
| **Base TOTAL** | 5137 |                 |                      | 21                   |

*Source:  Larson, Jeff and Sapien Jouquin - Sarasota Herald Tribune Dec 14, 2010*

Integra intentionally omitted Lee County from the data set because this represented the highest prevalence of defective drywall in the entire State of Florida. A substantial number of news articles and published surveys on the problem focus on Lee County as "ground zero" of the Chinese Drywall problem.  This area being hardest hit by the detrimental condition could create bias with Realtors and market participants, and identifying clean "unimpaired sales" was deemed significantly more complex without full confirmation.  This elimination was performed to prevent bias that might skew the results in favor of the Plaintiff.  Whatever impacts are measured, we would expect the impacts in Lee County to be equivalent or more severe than the balance of the state.

Generally, the case studies represent an otherwise similar proportion relative to the reported cases in 2010.

Part of the study design was to also control for the dates of sale and price segmentations, so it was considered significant to have a few counties with multiple case studies to allow for analysis on other factors where geography was held consistent.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 170 of 796
Case 1:11-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 18 of 54

Case Study Analysis                                                                                                    15

The date of sale was considered, and the following distribution is reflected among the 20 case studies:

| Year | Count |
|------|-------|
| 2010 | 3 |
| 2011 | 1 |
| 2012 | 2 |
| 2013 | 7 |
| 2014 | 1 |
| 2015 | 2 |
| 2016 | 3 |
| 2017 | 1 |
|      | 20 |

The case study price segmentation is shown as follows:

| Range | Count |
|-------|-------|
| <$150K | 3.00 |
| $150K - $300K | 9.00 |
| $300K - $750K | 2.00 |
| > $750K | 6.00 |
|       | 20.00 |

Notably, the price segmentation is heavily skewed towards case studies that developed in the $750,000+ range. This over-weighting of the >$750K price segment resulted because five (5) of the (7) case studies excluded from final development fell within other price ranges.

The median sales prices in Florida through the study period is shown as follows:



Case 1:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 171 of 796
Case 1:11-cv-22408-MGC   Document 279-8   Entered on FLSD Docket 05/13/2019   Page 19 of 54

Case Study Analysis                                                                                16



Source:  Zillow.com

Twelve (60%) of the 20 case studies fall within the median home price averages.  Therefore, we consider the distribution of the case studies representative of the price segmentation generally dominant in the market.



Case Study Analysis                                                           17

The following page provides an index listing of the case studies cross-referenced in our workfile by Case Study # and Address.

**Summary of Case Study Control Sales**
Source: IRR-Miami | File # 123-2017-0275

| IRR Case Study # | Control Subject | County | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Year Built |
|---|---|---|---|---|---|---|---|---|---|
| Broward 1 | 6985 Long Leaf Dr, Parkland | Broward | Remediated | $ 1,056,000 | 5/10/2012 | 6,581 | 7 | 5 | 2007 |
| Broward 10 | 6935 Long Leaf Dr, Parkland | Broward | Remediated | $ 590,000 | 4/1/2010 | 4,100 | 5 | 4.1 | 2007 |
| Broward 2 | 6289 Emerald Ave, Parkland | Broward | Remediated | $ 855,000 | 5/20/2013 | 4,744 | 6 | 4.1 | 2006 |
| Broward 3 | 6339 NW 120th Dr, Coral Springs | Broward | Remediated | $ 814,000 | 10/30/2013 | 3,850 | 5 | 4 | 2002 |
| Broward 5 | 9677 Cinnamon ct, Parkland | Broward | Remediated | $ 585,000 | 8/26/2013 | 3,531 | 4 | 3 | 2006 |
| FM 20 | 1358 RICHMAR ST, NORTH PORT, FL 34288 | Charlotte County | Remediated | $ 110,000 | 4/22/2010 | 1,851 | 3 | 2 | 2006 |
| FM 21 | 5428 SHAGBARK CT, NORTH PORT, FL 34287 | Charlotte County | Remediated | $ 115,000 | 3/22/2010 | 1,477 | 3 | 2 | 2006 |
| FM 22 | 4698 GLOBE TER, NORTH PORT, FL 34286 | Charlotte County | Remediated | $ 148,000 | 11/12/2013 | 1,914 | 3 | 2 | 2007 |
| FM 23 | 4637 ANTIOCH ST, NORTH PORT, FL 34288 | Charlotte County | Remediated | $ 159,650 | 10/8/2014 | 1,728 | 3 | 2 | 2005 |
| Hialeah 2 | 8051 W 36th Ave Unit 5, Hialeah | Miami-Dade | Remediated | $ 235,000 | 11/22/2017 | 1,356 | 3 | 3 | 2006 |
| Miami Dade 1 | 363 NE 30 Av, Homestead | Miami-Dade | Remediated | $ 276,500 | 2/6/2017 | 2,733 | 3 | 3 | 2006 |
| Miami-Dade 2 | 372 NE 36 TE, Homestead | Miami-Dade | Remediated | $ 210,000 | 7/6/2015 | 2,549 | 4 | 3 | 2006 |
| PB Boca 1 | 9407 Bridgebrook Dr, Boca Raton, FL 33496 | Palm Beach | Remediated | $ 1,200,000 | 7/9/2013 | 5,209 | 5 | 5 | 2006 |
| PB Boca 2 | 17830 Monte Vista Dr, Boca Raton, FL 33496 | Palm Beach | Remediated | $ 940,000 | 6/29/2012 | 4,674 | 5 | 5 | 2006 |
| PSL # 6 | 569 NW Ashton Way, Port St. Lucie, FL 34983 | St. Lucie | Remediated | $ 228,500 | 2/20/2013 | 2,564 | 4 | 3 | 2006 |
| Stuart 1 | 520 SW Akron Ave, Stuart | Martin | Remediated | $ 332,500 | 3/9/2016 | 2,730 | 3 | 3.1 | 2005 |
| Tampa 12 | 1211 E. Giddens Avenue, Tampa, FL 33603 | Hillsborough | Remediated | $ 179,000 | 9/19/2016 | 1,562 | 3 | 2 | 2007 |
| Tampa 25 | 416 VINE CLIFF ST, RUSKIN, FL 33570 | Hillsborough | Remediated | $ 104,000 | 3/8/2011 | 1,930 | 4 | 2 | 2007 |
| Tampa 26 | 11618 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | Hillsborough | Remediated | $ 115,000 | 2/11/2013 | 1,446 | 3 | 2 | 2006 |
| Tampa 27 | 11511 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | Hillsborough | Remediated | $ 120,000 | 3/16/2012 | 1,766 | 4 | 3 | 2006 |
| | | | Average | $ 374,482 | | 2,712 | 3.84 | 3.02 | 2006 |
| | | | Median | $ 228,500 | | 2,549 | 4.00 | 3.00 | 2006 |

On Residential Property Values in Florida

irr.

Case 2:09-md-02047-EEF-MBN Document 22380-38 Filed 12/02/19 Page 173 of 796
Case 1:11-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 21 of 54

Case Study Analysis                                                                 18

The case study analysis worksheets are included within the Appendix.  Backup notes and research is collated in our research binders indexed by IRR Case Study #.

The results of the low-end estimate of impact and high-end estimate of impact are shown.  We first present the data sorted by "Highest Impact" reflecting the upper boundary of value diminution based on the correlated unimpaired prediction.

**Summary of Case Study Control Sales**
Source: IRR-Miami | File # 123-2017-0275

| IRR Case Study # | Control Subject | County | Price | Date of Sale | Sale Year | Price Segment | Low Impact | High Impact | Spread | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| FM 23 | 4657 ANTIOCH ST, NORTH PORT, FL 34288 | Charlotte County | $ 159,630 | 10/4/2014 | 2014 | $150 - $300K | 0% | 0% | 0% | No material adjustment |
| Broward 3 | 6359 NW 120th Dr, Coral Springs | Broward | $ 814,000 | 10/30/2015 | 2015 | >$750K | 0% | 3% | 3% | |
| PSL #6 | 303 NW Ashton Way, Port St. Lucie, FL 34983 | St. Lucie | $ 228,500 | 2/20/2013 | 2013 | $150 - $300K | 0% | 3% | 3% | Homes sold within range - need to confirm w/ listing agent the "guarantee" |
| Tampa 27 | 11511 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | Hillsborough | $ 120,000 | 3/16/2012 | 2012 | <$150K | 0% | 7% | 7% | 60 DOM versus comps (2 - 13 days) |
| Hialeah 2 | 8051 W 34th Ave Unit 3, Hialeah | Miami-Dade | $ 253,000 | 11/22/2017 | 2017 | $150 - $300K | 0% | 7% | 7% | Selling Broker did not disclose; prior history on listing |
| Broward 5 | 9677 Cinnamon ct, Parkland | Broward | $ 585,000 | 9/26/2013 | 2013 | $500K - $750K | 0% | 9% | 9% | Newly renovated 2007 home; no apparent discount. With disclosure and remediation cert |
| Miami Dade 1 | 365 NE 30 Av, Homestead | Miami-Dade | $ 276,500 | 2/6/2017 | 2016 | $150 - $300K | 2% | 12% | 10% | Extended Marketing Time |
| Miami-Dade 2 | 372 NE 36 TE, Homestead | Miami-Dade | $ 210,000 | 7/6/2015 | 2015 | $150K - $300K | 13% | 13% | 0% | Have prior sale; not paired unremediated |
| Tampa 26 | 11618 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | Hillsborough | $ 115,000 | 2/11/2013 | 2013 | <$150K | 0% | 13% | 13% | 60 DOM versus comps (2 - 13 days) |
| Tampa 22 | 1211 E. Giddeon Avenue, Tampa, FL 33603 | Hillsborough | $ 170,000 | 9/19/2016 | 2016 | $150 - $300K | 5% | 20% | 17% | 11 months on market, versus comps 40-90 days |
| PB Boca 1 | 5807 Bridgebrook Dr, Boca Raton, FL 33496 | Palm Beach | $ 1,200,000 | 7/9/2013 | 2013 | >$750,000 | 8% | 20% | 12% | |
| FM 20 | 1350 RICHMAR ST, NORTH PORT, FL 34288 | Charlotte County | $ 110,000 | 4/22/2010 | 2010 | $150 - $300K | 0% | 21% | 21% | |
| FM 22 | 4659 GLOBE TER, NORTH PORT, FL 34286 | Charlotte County | $ 148,000 | 11/12/2013 | 2013 | $150 - $300K | 13% | 23% | 10% | |
| FM 21 | 8289 Emerald Ave, Parkland | Broward | $ 855,000 | 5/20/2013 | 2013 | >$750K | 0% | 20% | 17% | Remediated by BRS in under 3 months |
| PB Boca 2 | 5428 SHADIBARK CT, NORTH PORT, FL 34287 | Charlotte County | $ 115,000 | 5/22/2010 | 2010 | $150 - $500K | 25% | 25% | 2% | |
| PB Boca 2 | 17850 Monte Vista Dr, Boca Raton, FL 33496 | Palm Beach | $ 940,000 | 6/29/2012 | 2012 | >$750,000 | 22% | 20% | 6% | |
| Stuart 1 | 520 SW Akron Ave, Stuart | Martin | $ 332,500 | 3/9/2016 | 2016 | $300K - $750K | 26% | 28% | 2% | Drywall Reportedly 90%; No guarantee- Seller motivated |
| Tampa 25 | 416 VINE CLIFF ST, RUSKIN, FL 33570 | Hillsborough | $ 104,000 | 3/19/2013 | 2013 | <$150K | 21% | 30% | 9% | Remediation @ KB Homes; 102 DOM versus 30-45 |
| Broward 1 | 6985 Long Leaf Dr, Parkland | Broward | $ 1,056,000 | 5/16/2012 | 2012 | >$750K | 24% | 30% | 6% | Control home sold in 22 days; may have been influenced by list-discount |
| Broward 10 | 6935 Long Leaf Dr, Parkland | Broward | $ 390,000 | 4/1/2010 | 2010 | >$750K | 44% | 50% | 2% | -48% on Unremediated; Back to Back Control Sale |

Of the 20 case studies, there were (3) that showed no demonstrable discount at the upper or lower boundary.  The "spread" indicates that the comparable data was sufficiently similar to correlate to a single point value.

Case Study Tampa27 showed 60 days on market versus the (4) comparables ranging from 2-13 days on market.  So, while the price achieved was comparable to the peers, it took on average 6x longer to achieve that price.  This also occurred in Tampa26 with a 0% lower boundary, reflecting the same subdivision, year and price point as Tampa 27; therefore, two of the case studies with no lower boundary impact revealed a demonstrable market time difference to achieve the market price.

PSL#6 was noted that the drywall remediation was "guaranteed."  We were unable to confirm with the agent what "guarantees" were provided, but whether this guarantee was perception or reality, it may have influenced the buyer and hence influenced the 0% impact.

Overall, of the 20 case studies, there were only (3) that were "no value diminution" by review of the upper and lower boundary.  Three (3) of the 20 sales (15%) suggest that post-remediation, there is no impact other than an extended marketing time.  Ignoring the upper boundary, this could be extended to (7) sales of 20 (35%).

The other 65% - 85% of the case studies strongly suggest that there is post-remediation value diminution present.  Integra then analyzed this based on date of sale, geography by county, and price segmentation.



Case 1:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 174 of 796
Case 1:11-cv-22408-MGC   Document 279-3   Entered on FLSD Docket 05/13/2019   Page 22 of 54
Case Study Analysis                                                                                      19

An array of the same data set <u>sorted by date</u> is shown below.

| IRR Case Study # | Control Subject | County | Price | Date of Sale | Sale Year | Price Segment | Low Impact | High Impact | Spread | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| FM 21 | 5428 SHAGBARK CT, NORTH PORT, FL 34287 | Charlotte County | $ 115,000 | 3/22/2010 | 2010 | $150 – $300K | 23% | 25% | 2% | |
| Broward 10 | 6593 Long Leaf Dr, Parkland | Broward | $ 390,000 | 4/1/2010 | 2010 | >$750K | 46% | 50% | 2% | -48% on Unremediated; Back to Back Control |
| FM 20 | 1350 RICHMAR ST, NORTH PORT, FL 34288 | Charlotte County | $ 110,000 | 4/22/2010 | 2010 | $150 – $300K | 0% | 21% | 21% | |
| Tampa 25 | 416 VINE CLIFF ST, RUSKIN, FL 33570 | Hillsborough | $ 104,000 | 3/8/2011 | 2011 | <$150K | 21% | 30% | 9% | Remediation @ K8 Homes; 102 DOM versus 30 |
| Tampa 27 | 11511 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | Hillsborough | $ 120,000 | 3/16/2012 | 2012 | <$150K | 0% | 7% | 7% | 90 DOM versus comps (12 - 13 days) |
| Broward 1 | 6985 Long Leaf Dr, Parkland | Broward | $ 1,056,000 | 5/10/2012 | 2012 | >$750K | 24% | 30% | 6% | Control home sold in 22 days; may have been influenced by list-discount |
| PB Boca 2 | 17830 Monte Vista Dr, Boca Raton, FL 35496 | Palm Beach | $ 940,000 | 6/29/2012 | 2012 | >$750,000 | 22% | 28% | 6% | |
| Tampa 26 | 11618 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | Hillsborough | $ 115,000 | 2/11/2013 | 2013 | <$150K | 0% | 13% | 13% | 60 DOM versus comps (12 - 13 days) |
| PSL #6 | 305 NW Ashton Way, Port St. Lucie, FL 34983 | St. Lucie | $ 228,500 | 2/20/2013 | 2013 | $150 – $300K | 0% | 3% | 3% | |
| Broward 2 | 8209 Emerald Ave, Coral Springs | Broward | $ 855,000 | 5/20/2013 | 2013 | >$750K | 8% | 25% | 17% | Remediated by BRS in under 3 months |
| PB Boca 1 | 9407 Bridgebrook Dr, Boca Raton, FL 35496 | Palm Beach | $ 1,200,000 | 7/9/2013 | 2013 | >$750,000 | 8% | 20% | 12% | |
| Broward 5 | 9677 Cinnamon ct, Parkland | Broward | $ 585,000 | 8/26/2013 | 2013 | $350K - $750K | 0% | 9% | 9% | Newly renovated 2007 home; not apparent |
| FM 22 | 4698 GLOBE TER, NORTH PORT, FL 34286 | Charlotte County | $ 148,000 | 11/12/2013 | 2013 | $150 – $300K | 3% | 23% | 20% | |
| FM 23 | 4637 ANTIOCH ST, NORTH PORT, FL 34288 | Charlotte County | $ 159,630 | 10/8/2014 | 2014 | $150 – $300K | 0% | 0% | 0% | No material adjustment |
| Miami Dade 2 | 372 NE 36 TE, Homestead | Miami-Dade | $ 210,000 | 7/6/2015 | 2015 | $150K - $300K | 13% | 13% | 0% | Have prior sale; not paired unremediated |
| Broward 3 | 6539 NW 120th Dr, Coral Springs | Broward | $ 814,000 | 10/30/2015 | 2015 | >$750K | 0% | 3% | 3% | |
| Stuart 1 | 520 SW Akron Ave, Stuart | Martin | $ 332,500 | 3/9/2016 | 2016 | $300K - $750K | 26% | 28% | 2% | Drywall Reportedly 90%; No guarentee- Seller motivated |
| Tampa 12 | 1211 E. Giddens Avenue, Tampa, FL 33603 | Hillsborough | $ 179,000 | 5/19/2016 | 2016 | $150K - $300K | 3% | 20% | 17% | 11 months on market, versus comps 40-90 days |
| Miami Dade 1 | 363 NE 30 Av, Homestead | Miami-Dade | $ 276,500 | 2/6/2017 | 2016 | $150K - $300K | 2% | 12% | 10% | Extended Marketing Time |
| Hialeah 2 | 8651 W 36th Ave Unit 3, Hialeah | Miami-Dade | $ 233,000 | 11/22/2017 | 2017 | $150 – $300K | 3% | 7% | 2% | Selling Broker did not disclose; prior history on listing |

Notably, some of the upper boundary highest impacts occur in the earliest years, which is suggestive that post remediation damages may be declining as the market becomes more sophisticated and understands the remediation process.  However, there still remains indications as late as 2015 – 2016 of upper limit impacts in the 20%+ range.  There is no systematic decline in damage impacts by date.

As array of the same data set <u>sorted by geography (county)</u> is shown below:

| IRR Case Study # | Control Subject | County | Price | Date of Sale | Sale Year | Price Segment | Low Impact | High Impact | Spread | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| Broward 10 | 6593 Long Leaf Dr, Parkland | Broward | $ 390,000 | 4/1/2010 | 2010 | >$750K | 46% | 50% | 2% | -48% on Unremediated; Back to Back Control |
| Broward 1 | 6985 Long Leaf Dr, Parkland | Broward | $ 1,056,000 | 5/10/2012 | 2012 | >$750K | 24% | 30% | 6% | Control home sold in 22 days; may have been influenced by list-discount |
| Broward 2 | 8209 Emerald Ave, Coral Springs | Broward | $ 855,000 | 5/20/2013 | 2013 | >$750K | 8% | 25% | 17% | Remediated by BRS in under 3 months |
| Broward 5 | 9677 Cinnamon ct, Parkland | Broward | $ 585,000 | 8/26/2013 | 2013 | $350K - $750K | 0% | 9% | 9% | Newly renovated 2007 home; not apparent |
| Broward 3 | 6539 NW 120th Dr, Coral Springs | Broward | $ 814,000 | 10/30/2015 | 2015 | >$750K | 0% | 3% | 3% | |
| FM 21 | 5428 SHAGBARK CT, NORTH PORT, FL 34287 | Charlotte County | $ 115,000 | 3/22/2010 | 2010 | $150 – $300K | 23% | 25% | 2% | |
| FM 20 | 1350 RICHMAR ST, NORTH PORT, FL 34288 | Charlotte County | $ 110,000 | 4/22/2010 | 2010 | $150 – $300K | 0% | 21% | 21% | |
| FM 22 | 4698 GLOBE TER, NORTH PORT, FL 34286 | Charlotte County | $ 148,000 | 11/12/2013 | 2013 | $150 – $300K | 3% | 23% | 20% | |
| FM 23 | 4637 ANTIOCH ST, NORTH PORT, FL 34288 | Charlotte County | $ 159,630 | 10/8/2014 | 2014 | $150 – $300K | 0% | 0% | 0% | No material adjustment |
| Tampa 25 | 416 VINE CLIFF ST, RUSKIN, FL 33570 | Hillsborough | $ 104,000 | 3/8/2011 | 2011 | <$150K | 21% | 30% | 9% | Remediation @ K8 Homes; 102 DOM versus 30-45 |
| Tampa 27 | 11511 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | Hillsborough | $ 120,000 | 3/16/2012 | 2012 | <$150K | 0% | 7% | 7% | 90 DOM versus comps (12 - 13 days) |
| Tampa 26 | 11618 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | Hillsborough | $ 115,000 | 2/11/2013 | 2013 | <$150K | 0% | 13% | 13% | 60 DOM versus comps (12 - 13 days) |
| Tampa 12 | 1211 E. Giddens Avenue, Tampa, FL 33603 | Hillsborough | $ 179,000 | 5/19/2016 | 2016 | $150K - $300K | 3% | 20% | 17% | 11 months on market, versus comps 40-90 days |
| Stuart 1 | 520 SW Akron Ave, Stuart | Martin | $ 332,500 | 3/9/2016 | 2016 | $300K - $750K | 26% | 28% | 2% | Drywall Reportedly 90%; No guarentee- Seller motivated |
| Miami Dade 2 | 372 NE 36 TE, Homestead | Miami-Dade | $ 210,000 | 7/6/2015 | 2015 | $150K - $300K | 13% | 13% | 0% | Have prior sale; not paired unremediated |
| Miami Dade 1 | 363 NE 30 Av, Homestead | Miami-Dade | $ 276,500 | 2/6/2017 | 2016 | $150K - $300K | 2% | 12% | 10% | Extended Marketing Time |
| Hialeah 2 | 8651 W 36th Ave Unit 3, Hialeah | Miami-Dade | $ 233,000 | 11/22/2017 | 2017 | $150 – $300K | 3% | 7% | 2% | Selling Broker did not disclose; prior history on listing |
| PB Boca 2 | 17830 Monte Vista Dr, Boca Raton, FL 35496 | Palm Beach | $ 940,000 | 6/29/2012 | 2012 | >$750,000 | 22% | 28% | 6% | |
| PB Boca 1 | 9407 Bridgebrook Dr, Boca Raton, FL 35496 | Palm Beach | $ 1,200,000 | 7/9/2013 | 2013 | >$750,000 | 8% | 20% | 12% | |
| PSL #6 | 305 NW Ashton Way, Port St. Lucie, FL 34983 | St. Lucie | $ 228,500 | 2/20/2013 | 2013 | $150 – $300K | 0% | 3% | 3% | Homes sold within range - need to confirm w/ listing agent the "guarentee" |

The Broward County case studies were about 60/40 on significant impacts of 20% or more, notably most in the higher price segments.

Charlotte County had 75% of the study results with 20%+impacts.

Hillsborough County was 30/70, with 3 of the 4 case studies having lower boundary impacts of zero – 3%.  All three of these sales had demonstrably inferior marketing times for the control sales.



Case 2:09-md-02047-EEF-MBN Document 22380-38 Filed 12/02/19 Page 175 of 796
Case 1:11-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 23 of 54

Case Study Analysis                                                                                      20

Miami-Dade County 2/3rds of the cases showing 13%+/- diminution.

With only one study in Martin, and St. Lucie – Martin show significant impacts (26% - 27%) and St. Lucie no impact.

The two Palm Beach studies had significant impacts in the upper boundaries in excess of 25% diminution, both on homes over $750,000.

While not conclusive, the groupings by county generally showed prominent impacts in Broward, Palm Beach, Charlotte, and Miami-Dade consistent with the prevalence of cases in those counties.

As array of the same data set sorted by price segmentation is shown below:

**Summary of Case Study Control Sales**
**Source: IRR-Miami | File # 123-2017-0275**

| IRR Case Study # | Control Subject | County | Sale Year | Price Segment | Low Impact | High Impact |
|---|---|---|---|---|---|---|
| Tampa 25 | 416 VINE CLIFF ST, RUSKIN, FL 33570 | Hillsborough | 2011 | <$150K | 21% | 30% |
| Tampa 27 | 11511 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | Hillsborough | 2013 | <$150K | 0% | 7% |
| Tampa 26 | 11618 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | Hillsborough | 2013 | <$150K | 0% | 13% |
| FM 21 | 5428 SHAGBARK CT, NORTH PORT, FL 34287 | Charlotte County | 2010 | $150 - $300K | 23% | 25% |
| FM 20 | 1358 RICHMAR ST, NORTH PORT, FL 34288 | Charlotte County | 2010 | $150 - $300K | 0% | 21% |
| FM 22 | 4698 GLOBE TER, NORTH PORT, FL 34286 | Charlotte County | 2013 | $150 - $300K | 13% | 23% |
| FM 23 | 4637 ANTIOCH ST, NORTH PORT, FL 34288 | Charlotte County | 2014 | $150 - $300K | 0% | 0% |
| Tampa 12 | 1211 E. Giddons Avenue, Tampa, FL 33603 | Hillsborough | 2016 | $150 - $300K | 3% | 20% |
| Hialeah 2 | 8031 W 36th Ave Unit 5, Hialeah | Miami-Dade | 2017 | $150 - $300K | 5% | 7% |
| PSL # 6 | 505 NW Ashton Way, Port St. Lucie, FL 34983 | St. Lucie | 2013 | $150 - $300K | 0% | 5% |
| Miami-Dade 2 | 572 NE 36 TE, Homestead | Miami-Dade | 2015 | $150K - $300K | 13% | 13% |
| Miami Dade 1 | 363 NE 30 Av, Homestead | Miami-Dade | 2016 | $150K - $300K | 2% | 12% |
| Stuart 1 | 520 SW Akron Ave, Stuart | Martin | 2016 | $300K - $750K | 26% | 28% |
| Broward 5 | 9677 Cinnamon ct, Parkland | Broward | 2013 | $350K - $750K | 0% | 9% |
| PB Boca 2 | 17830 Monte Vista Dr. Boca Raton, FL 33496 | Palm Beach | 2012 | >$750K | 22% | 28% |
| PB Boca 1 | 9407 Bridgebrook Dr. Boca Raton, FL 33496 | Palm Beach | 2013 | >$750K | 8% | 20% |
| Broward 10 | 6935 Long Leaf Dr, Parkland | Broward | 2010 | >$750K | 48% | 50% |
| Broward 1 | 6985 Long Leaf Dr, Parkland | Broward | 2012 | >$750K | 24% | 30% |
| Broward 2 | 8289 Emerald Ave, Parkland | Broward | 2013 | >$750K | 8% | 25% |
| Broward 3 | 6339 NW 120th Dr, Coral Springs | Broward | 2015 | >$750K | 0% | 3% |

There was no systematic patterns on price segmentation. Each price segment had examples of neutral case studies where nominal impacts were shown, but each segment also contained a greater number of case studies with lower and upper bound limits at 20%+.

The last array shows the case studies sorted by the spread between the lower and upper boundaries of impact. This method of testing underscores how the "tightness" of the unimpaired adjustment.

Integra then compared the median and mean of the impacts upper and lower boundaries to identify the average and median impacts across geography, price segmentation, date of sale. Integra segregated three classes of mean and median across A) All sales; B) only sales with spreads of 1% of more; and C) only sales with 1% - 8% spreads (essentially eliminating the outer boundaries of zero and high indications that were not "tight")

On Residential Property Values in Florida



Case 1:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 176 of 796
Case 1:14-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 24 of 54
Case Study Analysis                                                                 21

**Summary of Case Study Control Sales**
**Source: IRR-Miami | File # 123-2017-0275**

| IRR Case Study # | Control Subject | County | Sale Year | Price Segment | Low Impact | High Impact | Spread | Notes |
|---|---|---|---|---|---|---|---|---|
| FM23 | 4637 ANTIOCH ST, NORTH PORT, FL 34288 | Charlotte County | 2014 | $150 - $300K | 0% | 0% | 0% | No material adjustment |
| Miami-Dade 2 | 372 NE 36 TE, Homestead | Miami-Dade | 2015 | $150K - $300K | 13% | 13% | 0% | Have prior sale; not peaked unremediated |
| FM 21 | 5428 SHAGBARK CT, NORTH PORT, FL 34287 | Charlotte County | 2010 | $150 - $300K | 23% | 25% | 2% | Selling Broker did not disclose; prior history |
| Hialeah 2 | 8031 W 36th Ave Unit 3, Hialeah | Miami-Dade | 2017 | $150 - $300K | 5% | 7% | 2% | |
| Broward 10 | 6935 Long Leaf Dr, Parkland | Broward | 2010 | >$750K | 48% | 50% | 2% | -48% on Unremediated; Back to Back Control Sale |
| Stuart 1 | 520 SW Akron Ave, Stuart | Martin | 2016 | $360K - $750K | 26% | 28% | 2% | Drywall Reportedly 90%; No guarantee- Seller |
| Broward 3 | 6359 NW 120th Dr, Coral Springs | Broward | 2015 | >$750K | 0% | 3% | 3% | |
| PSL # 6 | 503 NW Ashton Way, Port St. Lucie, FL 34983 | St. Lucie | 2013 | $150 - $300K | 0% | 5% | 5% | Homes sold within range - need to confirm w/ |
| Broward 1 | 6985 Long Leaf Dr, Parkland | Broward | 2012 | >$750K | 24% | 30% | 6% | Control home sold in 22 days; may have been |
| PB Boca 2 | 17830 Monte Vista Dr. Boca Raton, FL 33496 | Palm Beach | 2013 | >$750K | 22% | 28% | 6% | |
| Tampa 27 | 11511 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | Hillsborough | 2013 | <$150K | 0% | 7% | 7% | 60 DOM versus comps (2 - 13 days) |
| Tampa 25 | 416 VINE CLIFF ST, RUSKIN, FL 33570 | Hillsborough | 2011 | <$150K | 21% | 30% | 9% | Remediation @ KB Homes; 102 DOM versus 30- |
| Broward 5 | 9677 Cinnamon ct, Parkland | Broward | 2013 | $350K - $750K | 0% | 9% | 9% | Newly renovated 2007 home; no apparent discount. With disclosure and remediation |
| Miami Dade 1 | 363 NE 30 Av, Homestead | Miami-Dade | 2016 | $150K - $300K | 2% | 12% | 10% | Extended Marketing Time |
| FM 22 | 4698 GLOBE TER, NORTH PORT, FL 34286 | Charlotte County | 2013 | $150 - $300K | 13% | 23% | 10% | |
| PB Boca 1 | 9407 Bridgebrook Dr. Boca Raton, FL 33496 | Palm Beach | 2013 | >$750K | 8% | 20% | 12% | |
| Tampa 26 | 13618 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | Hillsborough | 2013 | <$150K | 0% | 13% | 13% | |
| Broward 2 | 8289 Emerald Ave, Parkland | Broward | 2013 | >$750K | 8% | 25% | 17% | Remediated by BRS in under 3 months |
| Tampa 12 | 1211 E. Giddons Avenue, Tampa, FL 33603 | Hillsborough | 2016 | $150 - $300K | 3% | 20% | 17% | 11 months on market, versus comps 40-90 |
| FM 20 | 1358 RICHMAR ST, NORTH PORT, FL 34288 | Charlotte County | 2010 | $150 - $300K | 0% | 21% | 21% | |

| | Median Lower | Median Upper |
|---|---|---|
| ALL | 7% | 20% |
| ALL Non-Zero HIGH | 7% | 21% |
| Spread 1% - 13% | 8% | 20% |
| | Mean Lower | Mean Upper |
| ALL | 11% | 19% |
| ALL Non-Zero HIGH | 11% | 20% |
| Spread 1% - 13% | 13% | 19% |

**Conclusion:**

In evaluating the case study results and reconciling to a post-remediation value diminution as a percentage of unimpaired value, Integra has considered all material factors within the various segregations of the data.

Using simple averages or medians across a population where n=20 is not unreliable, but it does not recognize that the derivation of the spreads is based on a comparative analysis that contains imputed variability on property condition and effective age. There is also the inherent bias that remediated homes have been "restored", so comparing homes built in 2006 (unimpaired) with a home built in 2006 but renovated in 2011, is inherently prejudicial to under-estimating the damage. Some "damage" may be masked by the restoration when in fact, the property is still damaged relative to newer peers, but the market accepts a 5%-15% discount (due to perception/impairment) in exchange for new bathrooms, kitchen and completely remodeled drywall and fresh paint.

In almost all of the price ranges, new kitchens and bathrooms that are worth 10% - 15% of the home's value can skew the measurement of a potential damage in the same range. And still, 50% of the case studies have an upper and/or a lower-upper damage estimate of 20% of greater.

Alternatively, appraisals (or adjusted paired sales analyses in the instant case) are sensitive to the magnitude of net adjustments unless the comparables are extremely homogeneous. Price variations



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 177 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 25 of 54

Case Study Analysis                                                                                          22

of 5%+/- would be considered within the normal variation of the market with or without detrimental conditions.[8]

Considering these factors, I consider the data well reconciled toward the lower end of the mean/median range, and conclude that over the time period in question, among the Florida residential market and within all price segmentations, a 10% value diminution reflects the most probable market-based adjustment against unimpaired value for post-remediation value diminution.

I would expect these value diminution impacts to decline over time after numerous resales of the same property where no adverse conditions persist.  The 10% diminution may understate the impacts on larger properties where owners have more choice and are less tolerant of risks, but this is offset by the multiplier effect of larger price variation in higher-priced, more customized homes.

In the case study examples where the marketing time was extended, a 10% price discount is certainly sufficient to accelerate ordinary marketing times.

**Based on the case studies analyzed and presented, and considering the myriad factors that could affect the reliability of higher or lower estimates, I conclude there exists a post-remediation value diminution of 10%.**  This assumes disclosure of the detrimental condition, and provision of a certificate of completion from a recognized and qualified contractor.

Where a contractor (or homebuilder) provides a multi-year warranty, the measurement of this diminution may result in a lower conclusion.  However, this is merely shifting the impact (and risk) to a different party, it does not eliminate the risk, it only eliminates the measurement of the risk discount.

---

[8] 11 of the 20 case studies demonstrated a correlated "spread" of 5% or less; and 15 of the 20 had a correlated spread of 6% or less.

On Residential Property Values in Florida



Case 2:09-md-02047-EEF-MBN   Document 22380-38   Filed 12/02/19   Page 178 of 796
Case 1:11-cv-22408-MGC   Document 279-8   Entered on FLSD Docket 05/13/2019   Page 26 of 54

Market Participant Interviews                                                    23

## Market Participant Interviews

Included within the Addendum of this report is a cross-referenced list of all interviews conducted as part of the case study interview confirmation process. This included interviews with listing and selling brokers involved in control sale or comparable sales transactions, and having experience and/or knowledge as market participants.

Integra then reviewed the confirmation and interviews with market participants, who were not advised on which side of the case we were working, only that we were engaged to analyze the impact of Chinese Drywall.

The Integra team asked interviewees as a percentage of price, how the presence of Chinese Drywall affects the market value. The design of the question elicited respondents to discuss percentage impacts, if any and to determine whether the interviewee would make a distinction between remediated and unremediated homes.

This response array does not classify the number of respondents that declined to go on record for the survey, or those who responded "Don't know".

Among the 45 responses, 13 responses were classified as "unclear" whether the respondent meant pre-remediation or post remediation. Many of these responses tended to a 30% - 40% discount, and given the results of our case studies and other inquiries, this appears to represent an opinion pre-remediation. Since this was not explicit, we classified these as "unclear".

14 of the 45 responses (31%+-) indicated that post remediation, there would not be any value impact. Some of these statements were qualified to say certificates were needed, no value impact of contractor was known and reputable, etc. Some of these respondents also quoted the 40% +/- discount range, and clearly delineated this was for properties pre-remediation, corroborating Integra's classification of the unclear comments at 40%+/-.

18 of the 45 (40%) responses indicated clearly that there would be some market resistance even after remedial actions were completed. Only one respondent qualified the impact at 5%, others indicated it would extend marketing time, it would limit buyers, some buyers don't want anything to do with prior defects. Respondents chose their own words to describe "tainted, stigmatized, negative, etc."

Excluding the "qualified" comments, most of which indicated that buyers have a problem but not isolating for the remediated conditions we are studying herein, Integra was identified 32 relevant comments, 56% of which were negative indicating post-remediation impacts, and 44% of which indicate no post-remediation impacts.

The results of the survey are shown on the following page, groups by respondents who provided clear designation that remediated homes would see price impacts (noted as PR – "Post Remediation Negative); agents who responded post-remediation there would be no impact (PR + - Post Remediation Positive); and UC (comment was unclear whether the respondent was talking about post or pre-remediation).



Case 1:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 179 of 796
Case 1:17-cv-22421-MGC Document 273-3 Entered on FLSD Docket 05/13/2019 Page 27 of 54

Market Participant Interviews     24

**Integra Realty Resources**

Controlled Pairing Interview Comments

| Market | Property Reference | Property Address | City | Interviewer | Interviewee | Phone # | Interview Date | Interviewee Comment | Category |
|---|---|---|---|---|---|---|---|---|---|
| Tampa | T12-C1 | 1413 E. Commanche Ave | Tampa | Paul Jones | Rae Catanese | 813-784-7744 | 2/11/2019 | "Always a negative." | PR - - |
| Palm Beach-Boca | PB-S | 17830 Monte Vista Dr | Boca Raton | Juan Gamio | Wendy Jensen | 561-706-7502 | 2/8/2019 | "Yes, some people would never buy a property with past history of Chinese drywall." | PR - - |
| Palm Beach-Boca | PB2-C1 | 17782 Cedena Dr | Boca Raton | Juan Gamio | Lorna Swartz | 561-735-9820 | 2/8/2019 | "Absolutely, but don't hear about those since 5 years ago." | PR - - |
| Palm Beach-Boca | PB2-C3 | 9604 Bridgebrook Dr | Boca Raton | Juan Gamio | Myrta Gonzalez | 561-706-6037 | 2/8/2019 | "Yes, many buyers don't want anything with those properties." | PR - - |
| Palm Beach-Boca | PB1-C1 | 9468 Grand Estates | Boca Raton | Juan Gamio | Jill Golden | 561-613-3507 | 2/8/2019 | "Completely." "A lot" "In today's market, even if 100% remediated, they are considered 'older homes.'" | PR - - |
| Palm Beach-Boca | PB1-C2 | 9391 Bridgebrook Dr | Boca Raton | Juan Gamio | Bryce Gaines | 561-289-7777 | 2/8/2019 | "Substantive, can't tell how much. Even remediated, many buyers would not touch it." | PR - - |
| Palm Beach-Boca | PB1-C3 | 9411 Grand Estates Way | Boca Raton | Juan Gamio | Alex Curcio | 561-702-3587 | 2/8/2019 | "Yes" | PR - - |
| Broward | B4-C2 | 11953 NW 66 Ct | Parkland | Paul Jones | Shellee Gold-Peterson | 954-614-0055 | 2/9/2019 | "Not seeing difference. I have certain buyers who do not want tainted properties." | PR - - |
| Broward | B3-C4 | 12757 NW 68 Dr | Parkland | Joe Melloni | David Carlton | 954-903-8114 | 2/8/2019 | "Even afterward, yes, a remediated home's value was impacted." | PR - - |
| Broward | B1-C4 | 6725 NW 122 Ave | Parkland | Joe Melloni | Robert Auerbach | 954-547-3600 | 2/8/2019 | "Yes, of course." | PR - - |
| Broward | B2-S | 8289 Emerald Ave | Parkland | Joe Melloni | Lea Plotkin | 954-802-8451 | 2/9/2019 | "Tainted, some clients simply wouldn't touch it." | PR - - |
| Broward | B2-C2 | 10055 Bay Leaf Ct | Parkland | Joe Melloni | Bette Abrams | 954-303-5185 | 2/9/2019 | "Yes, the stigma remained and I believe even after remediation it impacted the value you could get. Some people would just stay away." | PR - - |
| Broward | B2-C3 | 7086 Spyglass Ave | Parkland | Joe Melloni | Brent Mechler | 954-410-6056 | 2/9/2019 | "There was a stigma, deals fell through, people either stayed away or trusted in the repairs." | PR - - |
| Broward | B5-C2 | 6968 Spyglass Ave | Parkland | Joe Melloni | Joy Fischer | 954-256-0646 | 2/8/2019 | "Buyers now - Toll Brothers 10 year guarantee, resale value was good. Remediation Experts - yes, would affect resale." | PR - - |
| Broward | B10-S2 | 6935 Longleaf Dr | Parkland | Paul Jones | 0 | 0 954-753-2000 | 2/8/2019 | "Little bit of stigma still - 5%." | PR - - |
| Broward | B10-C4 | 6013 NW 91 Ave | Parkland | Joe Melloni | Hap Pomerantz | 954-341-4444 | 2/9/2019 | "Limits the market." | PR - - |
| Broward | B2-C4 | 9860 Bay Leaf Ct | Parkland | Joe Melloni | Ed Poirier | Email | 2/12/2019 | "Chinese drywall had a huge impact on homes that were remediated sell for less than homes that never had the issue. Some buyers refuse to see remediated homes and nobody wants one with drywall in it unless prior is significantly reduced." | PR - - |
| Tampa | T12-S | 1211 E. Giddens Ave | Tampa | Paul Jones | Rich Guagliardo | 813-244-7424 | 2/11/2019 | "It stigmatizes the houses; took a long time to find a buyer okay with the prior existence of Chinese drywall." | PR - - |
| Stuart Cay | SC1-C2 | 536 SW Akron Ave | Stuart Cay | Paul Jones | Maria Gan | 561-414-1642 | 2/9/2019 | "After remediation, no - recent sales are at market; market is doing great." | PR - + |
| Miami-Dade | MD-C4 | 919 NE 35 Ave | Homestead | Paul Jones | Jose Tavares | 305-984-7468 | 2/7/2019 | Not seeing any difference at this time. | PR - + |
| Broward | B3-S | 6339 NW 12 Dr | Coral Springs | Joe Melloni | Beth Laggan | 954-444-5143 | 2/8/2019 | "After remediation, no. Must be a reputable company." | PR - + |
| Broward | B5-C1 | 7848 NW 112 Way | Parkland | Joe Melloni | Joseph Fiorello | 954-646-4611 | 2/9/2019 | "Devistated the market, but in my opinion, once remediated, absolutely not - good as new." | PR - + |
| Broward | B5-C1 | 7066 Spyglass Ave | Parkland | Joe Melloni | Darcy Silver | 954-234-5206 | 2/8/2019 | "No, overall not much." | PR - + |
| Broward | B5-C4 | 9447 Satinleaf Pl | Parkland | Joe Melloni | David Cohen | 561-271-3103 | 2/8/2019 | "At remediation - market value." | PR - + |
| Miami-Dade | MD3-S | 385 NE 36 Ter | Homestead | Paul Jones | Louis Melara | 305-281-9472 | 2/7/2019 | "If remediated, not a factor." | PR - + |
| Miami-Dade | MD3-C1 | 555 SE 30 Dr | Homestead | Paul Jones | David Cirinna | 786-390-6324 | 2/7/2019 | Yes if unremediated | PR - + |
| Miami-Dade | MD3-C4 | 215 NE 36 Ter | Homestead | Paul Jones | Natalia Betancur | 786-512-1116 | 2/7/2019 | "Back then, if remediated, not impacted. Had to have the certificate." | PR - + |
| Miami-Dade | MD4-C2 | 380 NE 32 Ter | Homestead | Paul Jones | Fernando Martinez | 305-216-3620 | 2/7/2019 | "Homes that were remediated were able to sell at market." | PR - + |
| Miami-Dade | MD1-C3 | 180 NE 26 Ave | Homestead | Paul Jones | Serafin Sanchez | 305-244-7373 | 2/7/2019 | "Unremediated homes, yes; remediated homes, no." Unremediated homes - 40% below market; no discount for remediated homes. | PR - + |
| Miami-Dade | MD2-C4 | 730 SE 28 Lane | Homestead | Paul Jones | Kim Green | 305-219-2665 | 2/7/2019 | "If not remediated, 40% +- discount. If remediated, no impact on current pricing. Some buyers do walk away." | PR - + |
| Tampa | T24-S | 12115 Rockford St | Spring Hill | Paul Jones | Sheree Landreth | 727-919-3713 | 2/11/2019 | "Being sold at market." | PR - + |
| Tampa | T24-C2 | 5243 Roble Ave | Spring Hill | Paul Jones | Joshua Miller | 352-201-2557 | 2/11/2019 | "Yes, significantly; have to do gut-renovation. Once remediated, not a factor." | PR - + |
| Fort Myers | FM22-C2 | 3682 Parade Ter | North Port | Yule Georgieva | Sandra Winkler | 941-223-4436 | 2/9/2019 | "Yes, because remediation needs to be done." | Qualified |
| Fort Myers | FM22-C6 | 4566 Appleton Ter | North Port | Yule Georgieva | Vicki Painter | 941-4129 | 2/9/2019 | "Huge impact" | Qualified |
| Fort Myers | FM20-C2 | 5644 Cissus Ave | North Port | Yule Georgieva | Ed Moser | 941-320-2680 | 2/9/2019 | "Obviously yes we had to remediate all sources of Chinese Drywall." | Qualified |
| Fort Myers | FM20-C4 | 1898 Andy Rd | North Port | Yule Georgieva | Dick Miller | 941-375-5000 | 2/9/2019 | Recommend home inspection to our buyers "Chinese" | Qualified |
| Fort Myers | FM21-S | 5428 Shagbark Ct | North Port | Yule Georgieva | Randy McLendon | 941-375-5000 | 2/8/2019 | "Absolutely, this drywall was a frustrating experience." | Qualified |
| Stuart Cay | SC1-S | 520 SW Akron Ave | Stuart Cay | Paul Jones | Debra Manuel | 561-252-1353 | 2/9/2019 | Property was originally listed for $559,000; reduced to $375,000 once Chinese Drywall was discovered. | Qualified |
| Palm Beach-Boca | PB2-C4 | 17846 Cadena Dr | Boca Raton | Juan Gamio | Claire Sheres | 561-414-4146 | 2/8/2019 | "Huge: $2 million worth; $500,000 sold." | Qualified |
| Broward | B5-S | 9677 Cinnamon Ct | Parkland | Joe Melloni | Hap Pomerantz | 954-341-4444 | 2/8/2019 | "Salability; wouldn't touch; limits market" | Qualified |
| Miami-Dade | MD4-C1 | 3767 NE 10 Ct | Homestead | Paul Jones | Michelle Hoo | 786-367-7705 | 2/7/2019 | "Controlled by HFA remediated- price was impacted 30-40% market discount if not properly documented." | Qualified |
| Miami-Dade Hialeah | MDH2-S | 8031 W. 36 Ave #5 | Hialeah | Juan Gamio | Gulenka Buergo | 305-776-0296 | 2/11/2019 | "Big, important, 40% maybe" | Qualified |
| Miami-Dade Hialeah | MDH2-C1 | 10762 NW 87 Ct | Hialeah | Juan Gamio | Daniel Vera | 786-972-4883 | 2/11/2019 | "Of course, usually in distressed homes you see it. If $250k worth; single family it will sell for $170k, 32% discount. Worst the mold; health hazard." | Qualified |
| Miami-Dade Hialeah | MDH2-C2 | 10762 NW 87 Ct | Hialeah | Juan Gamio | Yasmiina La Paz | 305-788-3520 | 2/11/2019 | "More than 40% I think - nobody wants them." | Qualified |
| Miami-Dade Hialeah | MDH2-C5 | 8547 NW 140 Ter | Hialeah | Juan Gamio | Luis Dominguez | 305-962-9592 | 2/11/2019 | "I sold some in that area, significant reduction - 30% in my opinon." | Qualified |

On Residential Property Values in Florida



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 180 of 796
Case 1:11-cv-22408-MGC   Document 279-8   Entered on FLSD Docket 05/13/2013   Page 28 of 54

Market Participant Interviews                                                          25

Integra professionals conducted 78 interviews, with 45 responses regarding the potential effects of presence and disclosure.

The conclusions drawn from the interview process is that the majority of respondents offered an opinion on post and pre-remediation impacts, and very clearly all respondents who offered an opinion said pre-remediation impacts were evident in the market, and most (> 50%) of Realtors believe there is post-remediation impacts directly related to value\price, inclusive of extended market times (which can sometimes be cured by price reductions), or direct price reductions and loss of buyers.

## Final Conclusions:

Informed by the knowledge and literature regarding the appraisal problem which was readily known in the market, and continues to be readily known, after consideration and extensive market participant interviews and analysis of the 20 case studies, Integra concludes there is a post-remediation value diminution estimate of 10% of unimpaired value for properties with remediated Chinese Drywall where subsequent proper disclosure is made available to the market.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 181 of 796
Case 1:11-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 29 of 54

Certification                                                                           26

## Certification

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the properties or subject matter that is the subject of this report and no personal interest with respect to the parties involved.

4. I have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. I have no bias with respect to any of the real estate, direct or indirect, that may be the subject of this report, or to the parties involved with this assignment.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the plaintiffs, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this Report.

8. My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. I did not make a personal inspection of the real estate referenced in this report. This does not affect the reliability of the results given the methods and reconciled conclusions contained herein.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. I have experience in evaluating detrimental conditions and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, I have completed the continuing education program for Designated Members of the Appraisal Institute.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 182 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 90 of 54

Certification                                                                    27



Anthony M. Graziano, MAI, CRESenior Managing
Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 183 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2015 Page 91 of 54

Addenda

# Addenda



## Integra Realty Resources
**Market / Pairing: Broward 1**
**Value Adjustment Conclusions**

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: Condition | Broward 1 Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6985 Long Leaf Dr, Parkland | Parkland Golf | Remediated | $ 1,056,000 | 5/10/2012 | 6,381 | 7 | 5 | 1/2 - < 3/4 AC | Good | 2007 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 7023 Lost Garden Ter Parkland | Parkland Golf | Unimpaired | $ 1,375,000 | 3/26/2012 | 6,336 | 5 | 5.1 | 1/4 - < 1/2 AC | Good | 2008 | | |
| VALUE ADJUSTMENTS | | | | | | 25,000 | (10,000) | | | | $15,000 | $ 1,390,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 6725 NW 122nd Ave Parkland | Heron Bay East | Unimpaired | $ 2,200,000 | 7/11/2012 | 6,559 | 5 | 5.2 | 1/4 - < 1/2 AC | Good | 2008 | | |
| VALUE ADJUSTMENTS | | | | | (27,000) | 25,000 | (20,000) | | | | -$22,000 | $ 2,178,000 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 6244 NW 120th Dr Coral Springs | c Falls/Heron E | Unimpaired | $ 1,600,000 | 8/14/2012 | 6,149 | 6 | 6.2 | 1/2 - < 3/4 AC | Good | 2007 | | |
| VALUE ADJUSTMENTS | | | | | 20,000 | 10,000 | | | | | $30,000 | $ 1,630,000 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 7620 Marblehead Ln Parkland | Cypress Head | Unimpaired | $ 1,225,000 | 5/15/2012 | 6,261 | 6 | 5.1 | 3/4 - < 1 AC | Good | 1997 | | |
| VALUE ADJUSTMENTS | | | | | 10,000 | 10,000 | (10,000) | | | | 150,000 | $135,000 | $ 1,360,000 |

| | Average | High | Low | Concluded Value Range High | Low | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $1,639,500 | $2,178,000 | $1,360,000 | $1,500,000 | $1,385,000 | 29.6% | 23.8% |

**NOTES:**

## Integra Realty Resources

**Market / Pairing: Broward 2**
**Value Adjustment Conclusions**

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: / Condition | Broward 2 / Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8289 Emerald Ave, Parkland | Parkland Golf | Remediated | $ 855,000 | 5/20/2013 | 4,744 | 6 | 4.5 | 1/2 - <3/4 AC | Good | 2006 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 7848 NW 112th Way, Parkland | Greenbriar/Heron | Unimpaired | $ 785,000 | 4/1/2013 | 4,710 | 6 | 5 | 1/2 - <3/4 AC | Average | 2006 | | |
| VALUE ADJUSTMENTS | | | | | | | | (10,000) | 150,000 | | $140,000 | $ 925,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 10055 Bay Leaf Ct, Parkland | Parkland Golf & C | Unimpaired | $ 1,125,000 | 8/20/2013 | 4,811 | 6 | 5 | 1/4 - <1/2 AC | Good | 2007 | | |
| VALUE ADJUSTMENTS | | | | | | | | (10,000) | 25,000 | | $15,000 | $ 1,140,000 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 7086 Spyglass Ave, Parkland | Parkland Golf & C | Unimpaired | $ 675,000 | 7/30/2013 | 4,800 | 5 | 3.5 | <1/4 AC | Good | 2006 | | |
| VALUE ADJUSTMENTS | | | | | | 10,000 | 10,000 | 35,000 | | | $55,000 | $ 730,000 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 9860 Bay Leaf Ct, Parkland | Parkland Golf & C | Unimpaired | $ 1,142,000 | 12/17/2013 | 4,388 | 6 | 5 | 1/4 - <1/2 AC | Good | 2007 | | |
| VALUE ADJUSTMENTS | | | (70,000) | | 50,000 | | | (10,000) | 25,000 | | -$5,000 | $ 1,137,000 |

| | Average | High | Low | Concluded Value Range High | Low | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $983,000 | $1,140,000 | $730,000 | $1,140,000 | $925,000 | 25.0% | 7.6% |

**NOTES:**     Comp 3 not considered; Had prior partial Chinese drywall problem not remediated (see confirmation notes).

**Integra Realty Resources**
Market / Pairing: Broward 3
Value Adjustment Conclusions

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: Condition | Broward 3 Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6339 NW 120th Dr, Coral Springs | Heron Bay 2 | Remediated | $ 814,000 | 10/30/2015 | 3,850 | 5 | 4 | 1/4 - <1/2 AC | Good | 2002 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 12735 NW 67th Dr, Parkland | Estates of Heron B | Unimpaired | $ 795,000 | 9/9/2015 | 3,935 | 5 | 4.1 | <1/4 AC | Average | 2002 | | |
| VALUE ADJUSTMENTS | | | | | | | | | 50,000 | | $50,000 | $ 845,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 11325 NW 83 Way, Parkland | Heron Bay North | Unimpaired | $ 835,885 | 2/17/2016 | 3,558 | 5 | 4 | AC Oversized / C | New | 2016 | | |
| VALUE ADJUSTMENTS | | | | (33,000) | 35,000 | | | | | | $2,000 | $ 837,885 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 7183 NW 123rd Ave, Parkland | Heron Bay | Unimpaired | $ 775,000 | 3/14/2016 | 3,818 | 5 | 4.1 | 1/4 - <1/2 AC | Average | 2004 | | |
| VALUE ADJUSTMENTS | | | | (31,000) | | | | | 50,000 | | $19,000 | $ 794,000 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 12757 NW 68 Dr, Parkland | Heron Bay | Unimpaired | $ 720,000 | 10/5/2015 | 3,764 | 5 | 4 | 1/4 - <1/2 AC | Good | 2001 | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | $0 | $ 720,000 |

| | Average | High | Low | | Concluded Value Range High | Low | | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $799,221 | $845,000 | $720,000 | | $840,000 | $800,000 | | 3.1% | -1.8% |

**NOTES:**   Prenominal price $200 / sf; Adjustment for area @ $120 / sf (60%)

**Integra Realty Resources**

**Market / Pairing: Broward 5**

Value Adjustment Conclusions

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Condition | Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Market Area: | Broward 5 | | |
| 9677 Cinnamon ct, Parkland | Parkland Golf & CC | Remediated | $ 585,000 | 8/26/2013 | 3,331 | 4 | 3 | <1/4 AC | Good | 2006 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 7066 Spyglass Ave, Parkland | Parkland Golf & CC | Remediated | $ 630,000 | 12/3/2013 | 3,520 | 4 | 3 | <1/4 AC | Good | 2006 | | |
| VALUE ADJUSTMENTS | | | | | (20,000) | | | | | | -$20,000 | $ 610,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 6986 Spyglass Ave, Parkland | Parkland Golf & CC | Unimpaired | $ 580,000 | 10/28/2013 | 3,689 | 5 | 3 | 1/4 - < 1/2 AC | Good | 2006 | | |
| VALUE ADJUSTMENTS | | | | | (25,800) | (10,000) | | | | | -$35,800 | $ 544,200 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 10110 Camolla St, Parkland | Parkland Golf & CC | Unimpaired | $ 603,313 | 1/31/2013 | 2,952 | 4 | 3 | <1/4 AC | New | 2012 | | |
| VALUE ADJUSTMENTS | | | | | 40,000 | | | | | | $40,000 | $ 643,313 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 9447 Satinleaf Pl, Parkland | Parkland Golf & CC | Unimpaired | $ 500,000 | 11/27/2013 | 3,015 | 4 | 3 | <1/4 AC | Average | 2005 | | |
| VALUE ADJUSTMENTS | | | | | 31,600 | | | | | | $131,600 | $ 631,600 |

| | Average | High | Low | Concluded Value Range | | Percent (%) Value Dimunition | |
| | | | | High | Low | High | Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $607,278 | $643,313 | $544,200 | $640,000 | $550,000 | 8.6% | 0.0% |

**NOTES:**       See Broward 2 - Comp 3 partially remediated sold @ $675,000

**Integra Realty Resources**

**Market / Pairing: Broward 10**

**Value Adjustment Conclusions**

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: Condition | Broward 10 Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6935 Long Leaf Dr, Parkland | Parkland Golf & CC | Impaired | $ 390,000 | 4/1/2010 | 4,100 | 5 | 4.5 | 1/2 - < 3/4 AC | Good | 2007 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 7003 Lost Garden Te, Parkland | Parkland Golf & CC | Unimpaired | $ 849,000 | 3/4/2010 | 4,227 | 5 | 4.5 | < 1/4 AC | New* | 2008 | | |
| VALUE ADJUSTMENTS | | $50,000 | | | | | $5,000 | | | | $55,000 | $ 904,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 7003 Lost Garden Te, Parkland | Parkland Golf & CC | Unimpaired | $ 849,000 | 3/4/2010 | 4,227 | 5 | 4.5 | < 1/4 AC | New* | 2008 | | |
| VALUE ADJUSTMENTS | | -$50,000 | | | | | $5,000 | | | | -$45,000 | $ 804,000 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 10925 NW 71st Ct, Parkland | Parkland Isles | Unimpaired | $ 495,000 | 9/15/2010 | 4,056 | 5 | 4 | < 1/4 AC | New* | 2004 | | |
| VALUE ADJUSTMENTS | | | | | | | | (10,000) | | | -$10,000 | $ 485,000 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 6013 NW 91st Ave, Parkland | Grand Cypress | Unimpaired | $ 800,000 | 7/8/2010 | 3,926 | 6 | 4.5 | 1/4 - < 1/2 AC | Average | 2002 | | |
| VALUE ADJUSTMENTS | | $50,000 | | | | | $10,000 | | | | $60,000 | $ 860,000 |
| Unimpaired Comp 5 | | | | | | | | | | | | |
| 6747 NW 110th Wy, Parkland | Parkland Isles | Unimpaired | $ 640,000 | 8/13/2010 | 4,100 | 5 | 4.5 | 1/4 - < 1/2 AC | Average | 2000 | | |
| VALUE ADJUSTMENTS | | $50,000 | | | | | $10,000 | | | | $60,000 | $ 700,000 |

| | Average | High | Low | | Concluded Value Range High | Low | | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $731,000 | $904,000 | $485,000 | | $775,000 | $755,000 | | 49.7% | 48.3% |

**NOTES:**   Subject sold on 9/13/2010 for $755,000 remediated.

**Integra Realty Resources**
Market / Pairing: Miami 1
Value Adjustment Conclusions

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Condition (Market Area: Miami 1) | Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 363 NE 30 Av, Homestead | Carmens Place | Remediated | $ 276,500 | 2/6/2017 | 2,733 | 3 | 3 | 6,000 | Good | 2006 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 109 NE 26 Ave. Homestead, FL 33033 | CAPRI AT OASIS | Unimpaired | $ 282,000 | 5/9/2017 | 2,696 | 4 | 3 | 6,527 | Good | 2014 | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | $0 | $ 282,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 2631 NE 2nd. Dr. Homestead, FL 33033 | CAPRI AT OASIS | Unimpaired | $ 265,000 | 9/23/2016 | 2,093 | 4 | 3 | 5,330 | Good | 2013 | | |
| VALUE ADJUSTMENTS | | | | | 18,000 | | | | | | $18,000 | $ 283,000 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 180 NE 26th Ave. Homestead, FL 33033 | CAPRI AT OASIS | Unimpaired | $ 334,900 | 4/21/2017 | 2,550 | 5 | 3 | 5,933 | Good | 2013 | | |
| VALUE ADJUSTMENTS | | | | | 5,000 | (25,000) | | | | | -$20,000 | $ 314,900 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 730 SE 28th Ln. Homestead, FL 33033 | KEYS-GATE NO 3 | Unimpaired | $ 240,000 | 10/14/2016 | 2,126 | 2 | 2 | 7,050 | Good | 2001 | | |
| VALUE ADJUSTMENTS | | | | | 17,000 | 15,000 | 10,000 | | | | $42,000 | $ 282,000 |

| | Average | High | Low | | Concluded Value Range High | Low | | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $290,475 | $314,900 | $282,000 | | $315,000 | $282,000 | | 12.2% | 2.0% |

**NOTES:**  SF Adjustment $28/SF

## Integra Realty Resources
**Market / Pairing: Miami Dade 2**
**Value Adjustment Conclusions**

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Condition | Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Market Area: | Miami Dade 2 | | |
| 372 NE 36 TE, Homestead | Bali at Oasis | Remediated | $ 210,000 | 7/6/2015 | 2,549 | 4 | 3 | - | Average | 2006 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 375 NE 35th Ave. Homestead, FL 33033 | BALI AT OASIS | Unimpaired | $ 228,000 | 7/29/2015 | 2,258 | 5 | 3 | 3,600 | Average | 2006 | | |
| VALUE ADJUSTMENTS | | | | | 20,000 | (10,000) | | | | | $10,000 | $ 238,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 380 NE 31st. Ter. Homestead, FL 33033 | BIMINI AT THE OASIS | Unimpaired | $ 191,300 | 4/9/2015 | 1,906 | 4 | 2 | 4,212 | Average | 2007 | | |
| VALUE ADJUSTMENTS | | | | | 35,000 | | 10,000 | | | | $45,000 | $ 236,300 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 3488 NE 1st St. Homestead, FL 33033 | ANTIGUA AT OASIS | Unimpaired | $ 210,000 | 4/23/2015 | 2,250 | 3 | 2 | 6,657 | Average | 2008 | | |
| VALUE ADJUSTMENTS | | | | | | 10,000 | 10,000 | (5,000) | | | $15,000 | $ 225,000 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 919 NE 35 Ave. Homestead, FL 33033 | ESTATES AT MENDICINO | Unimpaired | $ 230,000 | 7/9/2015 | 2,237 | 4 | 2 | 6,000 | Average | 2004 | | |
| VALUE ADJUSTMENTS | | | | | 15,000 | | 10,000 | (5,000) | | | $20,000 | $ 250,000 |

| | Average | High | Low | | Concluded Value Range | | | Percent (%) Value Diminution | |
| | | | | | High | Low | | High | Low |
|---|---|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $237,325 | $250,000 | $225,000 | | $240,000 | $240,000 | | 12.5% | 12.5% |

**NOTES:**

## Integra Realty Resources
**Market / Pairing: Hialeah 2**
**Value Adjustment Conclusions**

| | | | | | | | | | Market Area: | Hialeah 2 | Net | Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Condition | Year Built | Adjustments | Sales Price |
| 8031 W 36th Ave Unit 5 | Splendido | Remediated | $ 233,000 | 11/22/2017 | 1,356 | 3 | 3 | 1,356 | New | 2006 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 10762 NW 87th Ct Unit 10762 | Gardengate II | Unimpaired | $ 237,000 | 3/29/2017 | 1,384 | 3 | 2 | 1,384 | New | 2002 | | |
| VALUE ADJUSTMENTS | | | | | | | | 10,000 | | | $10,000 | $ 247,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 10762 NW 87th Ct Unit 10762 | Gardengate II | Unimpaired | $ 240,000 | 11/29/2017 | 1,384 | 3 | 2 | 1,384 | New | 2002 | | |
| VALUE ADJUSTMENTS | | | | | | | | 10,000 | | | $10,000 | $ 250,000 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 8545 NW 140th St. Unit 1101 | Villa Vizcaya | Unimpaired | $ 247,000 | 8/3/2017 | 1,450 | 3 | 2.5 | 1,450 | Average | 2002 | | |
| VALUE ADJUSTMENTS | | | | | (10,000) | | | 5,000 | | | -$5,000 | $ 242,000 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 8444 NW 141 St. Ter. Unit 3904 | Villa Vizcaya | Unimpaired | $ 225,000 | 8/25/2016 | 1,351 | 3 | 3 | 1,351 | Average | 2002 | | |
| VALUE ADJUSTMENTS | | | | | 18,000 | | | | | | $18,000 | $ 243,000 |
| Unimpaired Comp 5 | | | | | | | | | | | | |
| 8547 NW 140th Ter. Unit 703 | Villa Vizcaya | Unimpaired | $ 245,000 | 2/3/2017 | 1,351 | 3 | 3 | 1,351 | Average | 2002 | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | $0 | $ 245,000 |

| | Average | High | Low | Concluded Value Range High | Low | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $245,500 | $250,000 | $242,000 | $250,000 | $245,000 | 6.8% | 4.9% |

**NOTES:**          $165 price/60/=$100/SF for size

**Integra Realty Resources**
Market / Pairing: Palm Beach Boca 1
Value Adjustment Conclusions

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: Condition | PB Boca 1 Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9407 Bridgebrook Dr. Boca Raton, FL 33496 | The Oaks | Remediated | $ 1,200,000 | 7/9/2013 | 5,209 | 5 | 5 | 10,125 | Average | 2006 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 9468 Grand Estates Way, Boca Raton, FL 33496 | The Oaks/Grand Estates | 0 | $ 1,642,000 | 4/9/2013 | 5,940 | 5 | 5.5 | 7,585 | 0 | 2004 | | |
| VALUE ADJUSTMENTS | | | | | (115,000) | | (10,000) | 10,000 | | | -$115,000 | $ 1,527,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 9391 Bridgebrook Dr. Boca Raton, FL 33496 | The Oaks | 0 | $ 1,720,000 | 5/30/2013 | 6,317 | 6 | 6.5 | 7,692 | 0 | 2006 | | |
| VALUE ADJUSTMENTS | | | | | (140,000) | (20,000) | (25,000) | 10,000 | | | -$175,000 | $ 1,545,000 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 9411 Grand Estates Way, Boca Raton, FL 33496 | The Oaks/Grand Estates | 0 | $ 1,598,000 | 12/5/2013 | 6,531 | 6 | 7.5 | 8,020 | 0 | 2005 | | |
| VALUE ADJUSTMENTS | | | | | (140,000) | (20,000) | (35,000) | 10,000 | | | -$185,000 | $ 1,413,000 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 9327 Grand Estates Way Boca Raton, FL 33496 | The Oaks | 0 | $ 1,140,000 | 8/2/2013 | 4,519 | 4 | 4.5 | 5,861 | 0 | 2005 | | |
| VALUE ADJUSTMENTS | | | | | 100,000 | 20,000 | 10,000 | 35,000 | | | $165,000 | $ 1,305,000 |

| | Average | High | Low | Concluded Value Range High | Low | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $1,447,500 | $1,545,000 | $1,305,000 | $1,500,000 | $1,300,000 | 20.0% | 7.7% |

**NOTES:**

$275 / sf overall on adjustment
Sizze adjustment at $165 psf (60% of typical)

## Integra Realty Resources

**Market / Pairing: Palm Beach Boca 2**
Value Adjustment Conclusions

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: Condition | PB Boca 2 Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17830 Monte Vista Dr.  Boca Raton, FL 33496 | Oaks At Boca Raton | Remediated | $  940,000 | 6/29/2012 | 4,674 | 5 | 5 | 6,132 | Average | 2006 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 17782 Cadena Dr. Boca Raton, FL 33496 | Oaks At Boca Raton | 0 | $  1,250,000 | 5/3/2012 | 4,975 | 5 | 5 | 6,151 | 0 | 2010 | | |
| VALUE ADJUSTMENTS | | | | | (40,000) | | | | | | -$40,000 | $  1,210,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 9328 Grand Estates Way, Boca Raton, FL 33496 | Oaks At Boca Raton | 0 | $  1,450,000 | 6/20/2012 | 4,523 | 4 | 4.5 | 5,865 | 0 | 2005 | | |
| VALUE ADJUSTMENTS | | | | | | 20,000 | 5,000 | | | | $25,000 | $  1,475,000 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 9604 Bridgebrook Dr.  Boca Raton, FL 33496 | Oaks At Boca Raton | 0 | $  1,050,000 | 6/26/2012 | 4,358 | 4 | 4.5 | 5,324 | 0 | 2006 | | |
| VALUE ADJUSTMENTS | | | | | 15,000 | 20,000 | 5,000 | | | | $40,000 | $  1,090,000 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 17846 Cadena Dr. Boca Raton, FL 33496 | Oaks At Boca Raton | 0 | $  1,425,000 | 12/21/2012 | 5,653 | 6 | 6 | 7,204 | 0 | 0 | | |
| VALUE ADJUSTMENTS | | | | | (100,000) | (10,000) | (10,000) | (20,000) | | | -$140,000 | $  1,285,000 |

| | Average | High | Low | Concluded Value Range High | Low | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $1,265,000 | $1,475,000 | $1,090,000 | $1,300,000 | $1,200,000 | 27.7% | 21.7% |

**NOTES:**

## Integra Realty Resources

**Market / Pairing: Port St. Lucie 6**

**Value Adjustment Conclusions**

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: | Condition | Port St. Lucie 6 Age at time of sale | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 503 NW Ashton Way, Port St. Lucie, FL 34983 | St James Golf Club Pod D | Remediated | $ 228,500 | 2/20/2013 | 2,564 | 4 | 3 | 1/4 - < 1/2 AC | | Average | 2006 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | | |
| 451 Dover Court, PSL | St James Golf Club Pod D | Unimpaired | $ 215,000 | 3/8/2013 | 2,672 | 4 | 3 | < 1/4 AC | | Average | 2006 | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | | $0 | $ 215,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | | |
| 507 NW Dover Ct, PSL | St James Golf Club Pod D | Unimpaired | $ 240,000 | 2/28/2013 | 2,672 | 4 | 3 | < 1/4 AC | | Average | 2008 | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | (20,000) | -$20,000 | $ 220,000 |
| Unimpaired Comp 3 | | | | | | | | | | | | | |
| 480 NW Dover Ct, PSL | St James Golf Club Pod D | Unimpaired | $ 220,000 | 4/30/2013 | 2,672 | 4 | 3 | < 1/4 AC | | Average | 2005 | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | | $0 | $ 220,000 |
| Unimpaired Comp 4 | | | | | | | | | | | | | |
| 408 Sheffield Cir, PSL | St James Golf Club Pod D | Unimpaired | $ 231,500 | 6/17/2013 | 2,519 | 4 | 2 | < 1/4 AC | | Average | 2005 | | |
| VALUE ADJUSTMENTS | | | | | | | | 7,500 | | | | $7,500 | $ 239,000 |

| | Average | High | Low | | Concluded Value Range High | Low | | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $223,500 | $239,000 | $215,000 | | $239,000 | $228,500 | | 4.4% | 0.0% |

**NOTES:**

**Integra Realty Resources**
**Market / Pairing: Stuart 1**
**Value Adjustment Conclusions**

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: Condition | Stuart 1 Age at time of sale | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 520 SW Akron Ave, Stewart | Stuart Cay | Remediated | $332,500 | 3/9/2016 | 2,750 | 3 | 3.5 | < 1/4 AC | Average | 2005 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| 508 SW California Ave, Stuart | Stuart Cay | Unimpaired | 420000 | 42479 | 2750 | 4 | 3 | 0 | Average | 2005 | | |
| VALUE ADJUSTMENTS | | | | | | (10,000) | | | 40,000 | | $30,000 | $ 450,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 536 SW Akron Ave | Stuart Cay | Unimpaired | $510,000 | 5/5/2016 | 2,421 | 3 | 3.5 | < 1/4 AC | Good | 2006 | | |
| VALUE ADJUSTMENTS | | | | | | | | | (50,000) | | -$50,000 | $ 460,000 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 524 SW Akron Ave | Stuart Cay | Unimpaired | $449,900 | 4/9/2015 | 2,421 | 3 | 3.5 | <1/4 AC | Average | 2006 | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | $0 | $ 449,900 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | $0 | $ - |

| | Average | High | Low | | Concluded Value Range High | Low | | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $453,300 | $460,000 | $449,900 | | $460,000 | $450,000 | | 27.7% | 26.1% |

**NOTES:**          Subject sold with REO conditions.

## Integra Realty Resources

**Market / Pairing: Tampa 12**

**Value Adjustment Conclusions**

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: Condition | Tampa 12 Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1211 E GIDDENS AVE, TAMPA, FL 33603 | MCDAVIDS EAST SEMINOLE REV | Remediated | $ 179,000 | 9/19/2016 | 1,562 | 3 | 2 | 1,947 | Good | 2007 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 1413 E COMANCHE AVE, TAMPA, FL 33604 | HAMPTON TERRACE | Unimpaired | $ 291,000 | 5/16/2016 | 1,493 | 3 | 2 | 1,786 | New | 2016 | | |
| VALUE ADJUSTMENTS | | | | | 6,900 | | | | (75,000) | | -$68,100 | $ 222,900 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 931 E MCBERRY ST, TAMPA, FL 33603 | MC CLUNG BERRY SUB 2 | Unimpaired | $ 320,000 | 9/9/2016 | 1,944 | 3 | 2 | 2,118 | Good | 2005 | | |
| VALUE ADJUSTMENTS | | | | | (38,200) | | | | (97,200) | | -$135,400 | $ 184,600 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 1608 E POWHATAN AVE, TAMPA, FL 33610 | TRIPOLI PLACE | Unimpaired | $ 268,000 | 8/16/2016 | 1,615 | 3 | 2 | 1,989 | Good | 2004 | | |
| VALUE ADJUSTMENTS | | | | | | | | | (80,750) | | -$80,750 | $ 187,250 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 1208 E CLIFTON ST, TAMPA, FL 33604 | ALTA VISTA | Unimpaired | $ 353,500 | 7/8/2016 | 1,757 | 3 | 2 | 2,550 | Good | 2003 | | |
| VALUE ADJUSTMENTS | | | | | (19,500) | | | | (87,850) | | -$107,350 | $ 246,150 |

| | Average | High | Low | Concluded Value Range High | Low | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $210,225 | $246,150 | $184,600 | $225,000 | $185,000 | 20.4% | 3.2% |

**NOTES:** All comps in significantly better finishes. Est. +$50/SF for condition

**Integra Realty Resources**
**Market / Pairing: Tampa 25**
Value Adjustment Conclusions

| | | | | | | | | | Market Area: | Tampa 25 | Net | Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Condition | Year Built | Adjustments | Sales Price |
| 416 VINE CLIFF ST, RUSKIN, FL 33570 | BLACKSTONE AT BAY PARK | Remediated | $  104,000 | 3/8/2011 | 1,930 | 4 | 2 | 2,688 | Good | 2007 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 1821 ATLANTIC DR, RUSKIN, FL 33570 | WELLINGTON NORTH AT BAY PARK | Unimpaired | $  149,990 | 11/30/2011 | 1,752 | 4 | 2 | 1,725 | New | 2011 | | |
| VALUE ADJUSTMENTS | | | | | -15000 | 8,500 | | 5,000 | | | -$1,500 | $  148,490 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 1865 ATLANTIC DR, RUSKIN, FL 33570 | WELLINGTON NORTH AT BAY PARK | Unimpaired | $  157,990 | 10/26/2011 | 2,044 | 4 | 2.1 | 2,044 | New | 2011 | | |
| VALUE ADJUSTMENTS | | | | | -15000 | (5,700) | | (5,000) | | | -$25,700 | $  132,290 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 529 LAGUNA MILL DR, RUSKIN, FL 33570 | WELLINGTON NORTH | Unimpaired | $  140,440 | 11/18/2011 | 1,573 | 4 | 2 | 1,573 | New | 2011 | | |
| VALUE ADJUSTMENTS | | | | | -15000 | 18,000 | | 8,000 | | | $11,000 | $  151,440 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 523 LAGUNA MILL DR, RUSKIN, FL 33570 | WELLINGTON NORTH | Unimpaired | $  149,990 | 8/31/2011 | 1,752 | 4 | 2 | 1,752 | New | 2011 | | |
| VALUE ADJUSTMENTS | | | | | -15000 | 8,500 | | 5,000 | | | -$1,100 | $  148,890 |

| | Average | High | Low | Concluded Value Range High | Low | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $145,278 | $151,440 | $132,290 | $149,000 | $132,000 | 30.2% | 21.2% |

**NOTES:**   Control Sale Remediation done by KB Homes
$51/ of adj per day

**Integra Realty Resources**
Market / Pairing: Tampa 26
Value Adjustment Conclusions

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: Tampa 26 Condition | Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11618 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | RIVERCREST PH 2 PARCEL O AND R | Remediated | $ 115,000 | 2/11/2013 | 1,446 | 3 | 2 | 2,037 | Good | 2006 | | |
| Unimpaired Comp 1 | | | | | | | | | Lakeview | | | |
| 11014 LAUREL BROOK CT, RIVERVIEW, FL 33569 | RIVERCREST PH 1A | Unimpaired | $ 125,000 | 7/26/2013 | 1,520 | 3 | 2 | 2,182 | Good | 2002 | | |
| VALUE ADJUSTMENTS | | | | | -6300.00 | (3,700) | | | | | -$10,000 | $ 115,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 11517 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | RIVERCREST | Unimpaired | $ 138,000 | 4/9/2013 | 1,550 | 3 | 2 | 2,130 | Good | 2006 | | |
| VALUE ADJUSTMENTS | | | | | -6250.00 | (3,700) | | | | | -$9,950 | $ 128,050 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 11120 RUNNING PINE DR, RIVERVIEW, FL 33569 | MOSS LANDING PH 1 | Unimpaired | $ 195,000 | 7/30/2013 | 1,605 | 3 | 2 | 2,206 | Very Good | 2006 | | |
| VALUE ADJUSTMENTS | | | | | -10000.00 | (12,450) | | | | | -$62,450 | $ 132,550 |

| | Average | High | Low | Concluded Value Range High | Low | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $125,200 | $132,550 | $115,000 | $132,550 | $115,000 | 13.2% | 0.0% |

NOTES:     0% - 13% without adjustment for subject lake view

## Integra Realty Resources

**Market / Pairing: Tampa 27**
**Value Adjustment Conclusions**

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: Condition | Tampa 27 Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11511 HAMMOCKS GLADE DR, RIVERVIEW, FL 33569 | RIVERCREST PH 2 PARCEL O AND R | Remediated | $ 120,000 | 3/16/2012 | 1,766 | 4 | 3 | 2,639 | Good | 2006 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 10926 HOLLY CONE DR, RIVERVIEW, FL 33569 | RIVERCREST | Unimpaired | $ 120,000 | 1/19/2012 | 1,838 | 4 | 2 | 2,419 | Good | 2004 | | |
| VALUE ADJUSTMENTS | | | | | | | | 10,000 | | | $10,000 | $ 130,000 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 11409 COCONUT ISLAND DR, RIVERVIEW, FL 33569 | RIVERCREST | Unimpaired | $ 121,000 | 6/15/2011 | 1,748 | 4 | 2 | 2,329 | Good | 2005 | | |
| VALUE ADJUSTMENTS | | | | | | | | 10,000 | | | $10,000 | $ 131,000 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 11308 CRESTLAKE VILLAGE DR, RIVERVIEW, FL 33569 | LAKESIDE TRACT | Unimpaired | $ 126,000 | 4/27/2012 | 2,730 | 4 | 2.1 | 2,884 | Good | 2004 | | |
| VALUE ADJUSTMENTS | | | | | | | | (38,560) | | | 5,000 | -$33,560 | $ 92,440 |

|  | Average | High | Low | Concluded Value Range High | Low | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $117,813 | $131,000 | $92,440 | $130,000 | $93,000 | 7.7% | -29.0% |

**NOTES:**

$40/SF for Size
Certificate provided to seller
No impact indicated

## Integra Realty Resources

**Market / Pairing: Fort Myers 20**
**Value Adjustment Conclusions**

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: Condition | Fort Myers 20 Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1350 RICHMAR ST, NORTH PORT, FL 34288 | PORT CHARLOTTE 49 | Remediate | $ 110,000 | 4/22/2010 | 1,851 | 3 | 2 | 2,508 | Good | 2006 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 1260 BOSWELL ST, NORTH PORT, FL 34288 | PORT CHARLOTTE | 0 | $ 139,900 | 3/26/2010 | 1,682 | 3 | 2 | 2,457 | Good | 2005 | | |
| VALUE ADJUSTMENTS | | | | | 10,000 | | | | (10,000) | | $0 | $ 139,900 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 3644 CISSUS AVE, NORTH PORT, FL 34288 | PORT CHARLOTTE 24 | 0 | $ 149,900 | 8/5/2010 | 1,849 | 3 | 2 | 2,594 | Good | 2007 | | |
| VALUE ADJUSTMENTS | | | | | | | | | (10,000) | | -$10,000 | $ 139,900 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 1508 JAGUST RD S, NORTH PORT, FL 34288 | PORT CHARLOTTE | might be remediated | $ 124,000 | 8/23/2010 | 1,788 | 3 | 2 | 2,433 | Good | 2005 | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | $0 | $ 124,000 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 1059 ANDY RD, NORTH PORT, FL 34288 | SAN MATEO | 0 | $ 150,000 | 1/29/2010 | 1,830 | 3 | 2 | 2,615 | Good | 2006 | | |
| VALUE ADJUSTMENTS | | | | | -10000 | | | | | | -$10,000 | $ 140,000 |

| | Average | High | Low | Concluded Value Range High | Low | Percent (%) Value Diminution High | Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $135,950 | $140,000 | $124,000 | $140,000 | $110,000 | 21.4% | 0.0% |

**NOTES:**

## Integra Realty Resources
**Market / Pairing: Fort Myers 21**
**Value Adjustment Conclusions**

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Market Area: Fort Myers 21 Condition | Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5428 SHAGBARK CT, NORTH PORT, FL 34287 | VILLAS OF SABAL TRACE PH 2 | Remediated | $ 115,000 | 3/22/2010 | 1,477 | 3 | 2 | 2,053 | Good | 2006 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 3729 FAIRWAY DR, NORTH PORT, FL 34287 | VILLAS SABAL TRACE | 0 | $ 148,500 | 2/10/2010 | 1,477 | 3 | 2 | 2,053 | Good | 2006 | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | $0 | $ 148,500 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 5976 IBIS CT, NORTH PORT, FL 34287 | VILLAS OF SABAL TRACE | 0 | $ 153,000 | 3/26/2010 | 1,477 | 3 | 2 | 2,053 | Good | 2006 | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | $0 | $ 153,000 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 3813 FAIRWAY DR, NORTH PORT, FL 34287 | VILLAS OF SABAL TRAC | 0 | $ 154,000 | 2/19/2010 | 1,477 | 3 | 2 | 2,050 | Good | 2006 | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | $0 | $ 154,000 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 5697 WHISPERING OAKS DR, NORTH PORT, FL 34287 | HERON CREEK | 0 | $ 190,000 | 8/5/2010 | 1,767 | 3 | 2 | 2,488 | Good | 2004 | | |
| VALUE ADJUSTMENTS | | | | | | | | | | | $0 | $ 190,000 |

| | Average | High | Low | Concluded Value Range High | Concluded Value Range Low | Percent (%) Value Diminution High | Percent (%) Value Diminution Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $161,375 | $190,000 | $148,500 | $154,000 | $150,000 | 25.3% | 23.3% |

**NOTES:** 2010 Ft. Myers post-remediation with letter from Lennar.

**Integra Realty Resources**

**Market / Pairing: Fort Myers 22**

Value Adjustment Conclusions

| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Condition | Market Area: Fort Myers 22 Year Built | Net Adjustments | Adjusted Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4698 GLOBE TER, NORTH PORT, FL 34286 | PORT CHARLOTTE 6 | Remediated | $ 148,000 | 11/12/2013 | 1,914 | 3 | 2 | 2,603 | Good | 2007 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| 4160 MARCELLA TER, NORTH PORT, FL 34286 | PORT CHARLOTTE | REO | $ 167,000 | 8/15/2013 | 1,845 | 3 | 2 | 2,595 | Good | 2006 | $25,000 | $ 192,000 |
| VALUE ADJUSTMENTS | | $25,000 | | | | | | | | | | |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 3682 PARADE TER, NORTH PORT, FL 34286 | PORT CHARLOTTE | 0 | $ 169,900 | 10/11/2013 | 1,981 | 3 | 2 | 2,663 | Good | 2004 | $0 | $ 169,900 |
| VALUE ADJUSTMENTS | | | | | | | | | | | | |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 2539 CARTWRIGHT LN, NORTH PORT, FL 34286 | PORT CHARLOTTE | 0 | $ 195,000 | 7/22/2013 | 2,247 | 3 | 2.1 | 3,016 | Good | 2007 | -$1,500 | $ 193,500 |
| VALUE ADJUSTMENTS | | | | | (16,500) | | | | 15,000 | | | |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 4566 APPLETON TER, NORTH PORT, FL 34286 | PORT CHARLOTTE | 0 | $ 219,500 | 11/8/2013 | 2,206 | 3 | 2 | 2,954 | Good | 2006 | -$26,500 | $ 193,000 |
| VALUE ADJUSTMENTS | | | | | (16,500) | | | | (10,000) | | | |

| Comparable Adjusted Sales Price | Average $187,100 | High $193,500 | Low $169,900 | Concluded Value Range High $193,000 | Low $170,000 | Percent (%) Value Diminution High 23.3% | Low 12.9% |
|---|---|---|---|---|---|---|---|

**NOTES:**     Subject control sold 5/15/2013 for $75,000; on 11/12/2013 for %148000 Drywall discussed in listing; contractor did renovation.  Prior sale in 2005 @ $375,000.

## Integra Realty Resources

**Market / Pairing: Fort Myers 23**
**Value Adjustment Conclusions**

| | | | | | | | | | Market Area: Fort Myers 23 | | Net | Adjusted |
| Control Subject | Subdivision | Impaired Status | Price | Date of Sale | Size, SF | Bedrooms | Bathrooms | Lot Size, SF | Condition | Year Built | Adjustments | Sales Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4637 ANTIOCH ST, NORTH PORT, FL 34288 | PORT CHARLOTTE SUB 12 | Remediated | $ 159,650 | 10/8/2014 | 1,728 | 3 | 2 | 2,545 | Good | 2005 | | |
| Unimpaired Comp 1 | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| 4792 MIDLAND ST, NORTH PORT, FL 34288 | PORT CHARLOTTE | 0 | $ 134,900 | 2/6/2014 | 2,040 | 3 | 2 | 2,534 | Fair | 2002 | | |
| VALUE ADJUSTMENTS | | | | | (14,000) | | | | 25,000 | | $11,000 | $ 145,900 |
| Unimpaired Comp 2 | | | | | | | | | | | | |
| 2837 ESCAMBIA, NORTH PORT, FL 34288 | NORTH PORT | 0 | $ 149,900 | 12/17/2014 | 1,400 | 3 | 2 | 1,400 | New | 2014 | | |
| VALUE ADJUSTMENTS | | | | | 15,000 | | | | | | $15,000 | $ 164,900 |
| Unimpaired Comp 3 | | | | | | | | | | | | |
| 2980 SILAS AVE, NORTH PORT, FL 34288 | PORT CHARLOTTE | 0 | $ 151,000 | 6/7/2014 | 1,798 | 3 | 2 | 2,623 | Poor | 2004 | | |
| VALUE ADJUSTMENTS | | | | | | | | | 10,000 | | $10,000 | $ 161,000 |
| Unimpaired Comp 4 | | | | | | | | | | | | |
| 4086 BILLINGHAM LN, NORTH PORT, FL 34288 | PORT CHARLOTTE | 0 | $ 165,000 | 6/25/2014 | 2,194 | 3 | 2 | 2,878 | Good | 2005 | | |
| VALUE ADJUSTMENTS | | | | | (21,000) | | | | | | $21,000 | $ 144,000 |

| | Average | High | Low | Concluded Value Range | | Percent (%) Value Diminution | |
| | | | | High | Low | High | Low |
|---|---|---|---|---|---|---|---|
| Comparable Adjusted Sales Price | $153,950 | $164,900 | $144,000 | $159,000 | $144,000 | -0.4% | -10.9% |

**NOTES:**

**Integra Realty Resources**

Controlled Pairing Interview Comments

| Market | Property Reference | Property Address | City | Interviewer | Interviewee | Phone # | Interview Date | Interviewee Comment | Category |
|---|---|---|---|---|---|---|---|---|---|
| Tampa | T12-C1 | 1413 E. Commanche Ave | Tampa | Paul Jones | Rae Catanese | 813-784-7744 | 2/11/2019 | "Always a negative." | PR -- |
| Palm Beach-Boca | P8-S | 17830 Monte Vista Dr | Boca Raton | Juan Gamio | Wendy Jensen | 561-706-7502 | 2/8/2019 | "Yes, some people would never buy a property with past history of Chinese drywall." | PR - - |
| Palm Beach-Boca | PB2-C1 | 17782 Cedena Dr | Boca Raton | Juan Gamio | Lorna Swartz | 561-735-9820 | 2/8/2019 | "Absolutely, but don't hear about trhose since 5 years ago." | PR - - |
| Palm Beach-Boca | PB2-C3 | 9604 Bridgebrook Dr | Boca Raton | Juan Gamio | Myrta Gonzalez | 561-706-6037 | 2/8/2019 | "Yes, many buyers don't want anything with those properties." | PR - - |
| Palm Beach-Boca | PB1-C1 | 9468 Grand Estates | Boca Raton | Juan Gamio | Jill Golden | 561-613-3507 | 2/8/2019 | "Completely." "A lot" "In today's market, even if 100% remediated, they are considered 'older homes.'" | PR - - |
| Palm Beach-Boca | PB1-C2 | 9391 Bridgebrook Dr | Boca Raton | Juan Gamio | Bruce Gaines | 561-289-7777 | 2/8/2019 | "Substantive, can't tell how much.  Even remediated, many buyers would not touch it." | PR - - |
| Palm Beach-Boca | PB1-C3 | 9411 Grand Estates Way | Boca Raton | Juan Gamio | Alex Curcio | 561-702-3587 | 2/8/2019 | "Yes" | PR - - |
| Broward | B4-C2 | 11953 NW 66 Ct | Parkland | Paul Jones | Shellee Gold-Peterson | 954-614-0055 | 2/9/2019 | "Not seeing difference.  I have certain buyers who do not want tainted properties." | PR - - |
| Broward | B3-C4 | 12757 NW 68 Dr | Parkland | Joe Melloni | David Carlton | 954-903-8114 | 2/8/2019 | "Even afterward, yes, a remediated home's value was impacted." | PR - - |
| Broward | B1-C2 | 6725 NW 122 Ave | Parkland | Joe Melloni | Robert Auerbach | 954-547-3600 | 2/8/2019 | "Yes, of course." | PR - - |
| Broward | B2-S | 8289 Emerald Ave | Parkland | Joe Melloni | Lea Plotkin | 954-802-8451 | 2/9/2019 | "Tainted, some clients simply wouldn't touch it." | PR - - |
| Broward | B2-C2 | 10055 Bay Leaf Ct | Parkland | Joe Melloni | Bette Abrams | 954-303-5185 | 2/9/2019 | "Yes, the stigma remained and I believe even after remediation it impacted the value you could get.  Some people would just stay away." | PR - - |
| Broward | B2-C3 | 7086 Spyglass Ave | Parkland | Joe Melloni | Brent Mechler | 954-410-6056 | 2/9/2019 | "There was a stigma, deals fell through, people either stayed away or trusted in the repairs." | PR - - |
| Broward | B5-C2 | 6968 Spyglass Ave | Parkland | Joe Melloni | Joy Fischer | 954-254-0646 | 2/8/2019 | "Buyers now - Toll Brothers 10 year guarantee, resale value was good. Remediation Experts - yes, would affect resale." | PR - - |
| Broward | B10-S2 | 6935 Longleaf Dr | Parkland | Paul Jones | | 0  954-753-2000 | 2/8/2019 | "Little bit of stigma still - 5%." | PR - - |
| Broward | B10-C4 | 6013 NW 91 Ave | Parkland | Joe Melloni | Hap Pomerantz | 954-341-4444 | 2/9/2019 | "Limits the market." | PR - - |
| Broward | B2-C4 | 9860 Bay Leaf Ct | Parkland | Joe Melloni | Ed Poirier | Email | 2/12/2019 | "Chinese drywall had a huge impact and homes that were remediated sell for less than homes that never had the issue.  Some buyers refuse to see remediated homes and nobody wants one with drywall in it unless price is significantly reduced." | PR - - |
| Tampa | T12-S | 1211 E. Giddens Ave | Tampa | Paul Jones | Rich Guagliardo | 813-244-7424 | 2/11/2019 | "It stigmatizes the houses; took a long time to find a buyer okay with the prior existence of Chinese drywall." | PR - - |
| Stuart Cay | SC1-C2 | 536 SW Akron Rd | Stuart Cay | Paul Jones | Maria Gain | 561-414-1642 | 2/9/2019 | "After remediation, no - recent sales are at market; market is doing great." | PR - + |
| Miami-Dade | MD-C4 | 919 NE 35 Ave | Homestead | Paul Jones | Jose Tavares | 305-984-7468 | 2/7/2019 | Not seeing any difference at this time. | PR - + |
| Broward | B3-S | 6339 NW 12 Dr | Coral Springs | Joe Melloni | Beth Laggan | 954-444-5143 | 2/8/2019 | "After remediation, no.  Must be a reputable company.  10- | PR - + |
| Broward | B2-C1 | 7848 NW 112 Way | Parkland | Joe Melloni | Joseph Fiorello | 954-646-4611 | 2/9/2019 | "Devistated the market, but in my opinion, once remediated, absolutely not - good as new." | PR - + |
| Broward | B5-C1 | 7066 Spyglass Ave | Parkland | Joe Melloni | Darcy Silver | 954-234-5206 | 2/8/2019 | "No, overall not much." | PR - + |

| Broward | B5-C4 | 9447 Satinleaf Pl | Parkland | Joe Melloni | David Cohen | 561-271-3103 | 2/8/2019 | "At remediation - market value." | PR - + |
|---|---|---|---|---|---|---|---|---|---|
| Miami-Dade | MD3-S | 385 NE 36 Ter | Homestead | Paul Jones | Louis Melara | 305-281-9472 | 2/7/2019 | "If remediated, not a factor." | PR - + |
| Miami-Dade | MD3-Cl | 555 SE 30 Dr | Homestead | Paul Jones | David Cirinna | 786-390-6324 | 2/7/2019 | Yes if unremediated | PR - + |
| Miami-Dade | MD3-C4 | 215 NE 36 Ter | Homestead | Paul Jones | Natalia Betancur | 786-512-1116 | 2/7/2019 | "Back then, if remediated, not impacted. Had to have the certificate." | PR - + |
| Miami-Dade | MD4-C2 | 380 NE 31 Ter | Homestead | Paul Jones | Fernando Martinez | 305-216-3620 | 2/7/2019 | "Homes that were remediated were able to sell at market." | PR - + |
| Miami-Dade | MD1-C3 | 180 NE 26 Ave | Homestead | Paul Jones | Serafin Sanchez | 305-244-7373 | 2/7/2019 | "Unremediated homes, yes; remediated homes, no." Unremediated homes - 40% below market; no discount for remediated homes. | PR - + |
| Miami-Dade | MD1-C4 | 730 SE 28 Lane | Homestead | Paul Jones | Kim Green | 305-219-2665 | 2/7/2019 | "If not remediated, 40% +- discount. If remediated, no impact on current pricing. Some buyers do walk away." | PR - + |
| Tampa | T24-S | 12115 Rockford St | Spring Hill | Paul Jones | Sheree Landreth | 727-919-3713 | 2/11/2019 | "Being sold at market." | PR - + |
| Tampa | T24-C2 | 5243 Roble Ave | Spring Hill | Paul Jones | Joshua Miller | 352-201-2557 | 2/11/2019 | "Yes, significantly; have to do gut-renovation. Once remediated, not a factor." | PR - + |
| Fort Myers | FM22-C2 | 3682 Parade Ter | North Port | Yule Georgieva | Sandra Winkler | 941-223-4436 | 2/9/2019 | "Yes, because remediation needs to be done." | Qualified |
| Fort Myers | FM22-C4 | 4566 Appleton Ter | North Port | Yule Georgieva | Vicki Painter | 941-4129 | 2/9/2019 | "Huge Impact" | Qualified |
| Fort Myers | FM20-C2 | 5644 Cissus Ave | North Port | Yule Georgieva | Ed Moser | 941-320-2680 | 2/9/2019 | "Obviously yes we had to remediate all sources of Chinese Drywall." | Qualified |
| Fort Myers | FM20-C4 | 1898 Andy Rd | North Port | Yule Georgieva | Dick Miller | 941-375-5000 | 2/9/2019 | Recommend home inspection to our buyers "Chinese | Qualified |
| Fort Myers | FM2-S | 5428 Shagbark Ct | North Port | Yule Georgieva | Randy McLendon | 941-473-7750 | 2/8/2019 | "Absolutely, this drywall was a terrifying experience. | Qualified |
| Stuart Cay | SC1-S | 520 SW Akron Ave | Stuart Cay | Paul Jones | Debra Manuel | 561-252-1353 | 2/9/2019 | Property was originally listed for $559,000; reduced to $375,000 once Chinese Drywall was discovered. | Qualified |
| Palm Beach-Boca | PB2-C4 | 17846 Cadena Dr | Boca Raton | Juan Gamio | Claire Sheres | 561-414-4146 | 2/8/2019 | "Huge: $2 million worth; $500,000 sold." | Qualified |
| Broward | B5-S | 9677 Cinnamon Ct | Parkland | Joe Melloni | Hap Pomerantz | 954-341-4444 | 2/8/2019 | "Salability; wouldn't touch; limits market" | Qualified |
| Miami-Dade | MD4-C1 | 3767 NE 10 Ct | Homestead | Paul Jones | Michelle Hoo | 786-367-7705 | 2/7/2019 | "Controlled by HFA remediated- price was impacted 30-40% market discount if not properly documented." | Qualified |
| Miami-Dade Hialeah | MDH2-S | 8031 W. 36 Ave #5 | Hialeah | Juan Gamio | Gulenka Buergo | 305-776-0296 | 2/11/2019 | "Big, important, 40% maybe" | Qualified |
| Miami-Dade Hialeah | MDH2-C1 | 10762 NW 87 Ct | Hialeah | Juan Gamio | Daniel Vera | 786-972-4883 | 2/11/2019 | "Of course, usually in distressed homes you see it. If $250k worth; single family it will sell for $170k, 32% discount. Worst the mold; health hazard." | Qualified |
| Miami-Dade Hialeah | MDH2-C2 | 10762 NW 87 Ct | Hialeah | Juan Gamio | Yasmiina La Paz | 305-788-3520 | 2/11/2019 | "More than 40% I think - nobody wants them." | Qualified |
| Miami-Dade Hialeah | MDH2-CS | 8547 NW 140 Ter | Hialeah | Juan Gamio | Luis Dominguez | 305-962-9592 | 2/11/2019 | "I sold some in that area, significant reduction - 30% in my opinon." | Qualified |

**Intergra Realty Resources**
Control Pairing Interview Statistics

| Market | Subject # | R=Remediated I=Impaired | Subject | | Comparable 1 | | Comparable 2 | | Comparable 3 | | Comparable 4 | | Comparable 5 | | Subject 2 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Interview | Comment | Interview | Comment | Interview | Comment | Interview | Comment | Interview | Comment | Interview | Comment | Interview | Comment |
| Fort Myers | 20 | R | LM | | Y | NC | Y | CN | LM | | Y | CN | | | | |
| Fort Myers | 22 | R | N | | N | | Y | C | N | | Y | CN | | | | |
| Fort Myers | 21 | R | Y | CN | Y | NC | Y | NC | Y | NO | Y | NO | | | | |
| Stuart Cay | 1 | R | Y | NO | LM | | Y | C | LM | | NAP | | | | | |
| Port St. Lucie | 7 | R | LM | | Y | NO | LM | | LM | | LM | | | | | |
| Miami-Dade | 2 | R | LM/E | | Y | NC | Y | NO | Y | NO | Y | C | | | | |
| Palm Beach-Boca | 2 | R | Y | CN | Y | CN | Y | NC | Y | CN | Y | CN | | | | |
| Palm Beach-Boca | 1 | R | N1 | NC | Y | CN | Y | NC | Y | CN | Y1 | CN | | | | |
| Broward | 4 | NAP | Y | NC | Y | NC | Y | CN | LM/T | | Y | NC | | | | |
| Broward | 3 | R | Y | CN | LM/E | | LM | | Y | NC | Y | CN | | | | |
| Broward | 1 | R | N2 | | LM/T | | Y | C | N3 | | Y2 | | | | | |
| Broward | 2 | R | Y | CN | Y | CN | LM | | Y | CN | | | | | | |
| Broward | 5 | R | Y | CN | Y | C | Y | CN | LM | | Y | C | | | | |
| Miami-Dade | 3 | I | Y | C | Y | C | Y | NO | Y | NO | Y | CN | | | | |
| Tampa | 5 | I | Y | NO | LM | | LM | | N3 | | NAP | | | | | |
| Broward | 10 | I | Y | NO | Y | NC | Y | CN | LM | | Y | C | | | Y | CN |
| Tampa | 8 | I | Y | NO | LM | | LM | | LM | | LM | | | | | |
| Tampa | 25 | R | Y2 | NO | Y2 | | Y2 | | LM | | LM | | | | | |
| Tampa | 26 | R | Y | NO | Y | NO | LM | | LM/E | | LM/E | | | | | |
| Miami-Dade | 4 | R | LM | | Y | CN | Y | C | Y | NC | LM | | | | | |
| Miami-Dade | 1 | R | LM | | LM | | Y | NO | Y | CN | Y | CN | | | | |
| | | | | | | | | | | | | | | | | |
| Miami-Dade Hialeah | 2 | R | Y | CN | Y | CN | Y | C | Y | NO | LM | | Y | CN | Y | NC |
| Tampa | 12 | R | Y | CN | Y | C | Y | NO | LM | | Y | NC | | | | |
| Tampa | 27 | R | Y | C | LM | | LM | | LM | | | | | | | |
| Fort Myers | 23 | R | Y | NC | Y | NC | N3 | | LM | | | | | | | |
| Tampa | 24 | R | Y | C | N4 | | Y | C | N4 | | Y | NC | | | | |

78

**LEGEND**

N1 Agent ( Ryan Greenblatt) said he was retained for a class action lawsuit on CDW. Declined to answer
N2 Agent no longer with company
N3 Agent declined to cooperate/would not confirm/did not remember
N4 Did not call - had repaired sinkhole.
Y1 Agent (Mark Nestler) did not recall transation; referred to public records
Y2 Agent confirmed no CDW; could not confirm sales price or date
C Comment neutral
NC No Comment
NO No Opinion
CN Comment Negative (shows impact)
LM Left Message
LM/T Left Message/ Sent Text
LM/E Left Message/ Sent Email

# EXHIBIT D

```
 1               UNITED STATES DISTRICT COURT

                 SOUTHERN DISTRICT OF FLORIDA

 2                Case No. 1:11-CV-22408-MCG

 3

 4    EDUARDO AND CARMEN AMORIN, et al.

      individually and on behalf of others

 5    similarly situated,

 6                    Plaintiffs,

      v.

 7

      TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG

 8    TAIHE DONGXIN, LTD.; TAI'AN TAISHAN

      PLASTERBOARD CO., LTD., et al.

 9

                      Defendants.

10    -----------------------------/

11           CONFIDENTIAL - SUBJECT TO FURTHER

                    PROTECTIVE REVIEW

12                      - - -

13                 MARCH 14, 2019

14                      - - -

15          Videotaped deposition of RANDALL BELL, Ph.D.,

16    MBA, MAI, held in the offices of Orrick, Herrington &

17    Sutcliffe, LLP, 2050 Main Street, Suite 1100, Irvine,

18    California, commencing at 9:08 A.M., on the above date

19    before Pamela Cotten, CSR, RDR, Certified Realtime

20    Reporter, Certificate No. 4497.

21                      - - -

22           GOLKOW LITIGATION SERVICES

             877.370.3377 ph | 917.591.5672 fax

23                 deps@golkow.com

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 209 of 796
Case 1:11-cv-22408-MGC Document 214 Entered on FLSD Docket 05/13/2015 Page 8 of
122

Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S:

 2

 3   For the Plaintiffs:

 4          BREIT CANTOR GRANA BUCKNER
            BY:  JEFFREY A. BREIT, ESQ.
 5          Towne Pavillion Center II
            600 22nd Street, Suite 402
 6          Virginia Beach, Virginia  23451
            855.212.8200
 7          jeffrey@breitcantor.com

 8          LEVIN, SEDRAN & BERMAN
            BY:  FREDERICK S. LONGER, ESQ.
 9          510 Walnut Street, Suite 500
            Philadelphia, Pennsylvania  19106-3697
10          215.592.1500
            flonger@lfsblaw.com

11

12   For the Defendant Beijing New Building Materials, PLC:

13          ORRICK, HERRINGTON & SUTCLIFFE, LLP
            BY:  HARRY J. MOREN, ESQ.
14          The Orrick Building
            405 Howard Street
15          San Francisco, California  94105-2669
            415.203.1291
16          hmoren@orrick.com

17          GORDON ARATA MONTGOMERY BARNETT
            BY:  DONNA PHILLIPS CURRAULT, ESQ.
18          201 St. Charles Avenue, 40th Floor
            New Orleans, Louisiana  70170-4000
19          504.582.1111
            dcurrault@gamb.law

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S (Continued):

 2

 3    For the Defendant Taishan Gypsum Company:

 4            ALSTON & BIRD LLP
              BY:  STEVEN R. CAMPBELL, ESQ.
 5            90 Park Avenue, 15th Floor
              New York, New York  10016-1387
 6            212.210.9400
              steven.campbell@alston.com
 7

              ALSTON & BIRD LLP
 8            BY:  AARON BLOCK, ESQ.
              1201 West Peachtree Street
 9            Atlanta, Georgia  30309-3424
              404.881.7000
10            aaron.block@alston.com

11

12    ALSO PRESENT:

13            JIM LOPEZ, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 211 of 796
Case 1:11-cv-22408-MGC Document 224-1 Entered on FLSD Docket 05/13/2019 Page 5 of
122
Confidential - Subject to Further Confidentiality Review

```
 1                    I N D E X

 2

 3  Witness:  RANDALL BELL, Ph.D., MBA, MAI

 4  Examination:                                    Page

 5      BY MR. CAMPBELL    -----------------------     7

 6      BY MS. CURRAULT    -----------------------   112

 7

 8

 9

10                   E X H I B I T S

11  Deposition          Description              Page

12  Exhibit 1      Notice of Videotaped            10
                   Deposition of Randall Bell
13
    Exhibit 2      2/15/19 Expert Witness          14
14                 Report of Randall Bell,
                   Ph.D., MBA, MAI
15
    Exhibit 3      3/12/19 Email Subject:          17
16                 Amorin, et al., v. Taishan,
                   et al., Case No.
17                 1:11-cv-22408-MGC; Randall
                   Bell Expert Report
18
    Exhibit 4      Curriculum Vitae of Randall     30
19                 Bell, Ph.D., MBA, MAI

20  Exhibit 5      Randall Bell, Ph.D., MAI -      32
                   Summary of Testimony
21                 Experience

22  Exhibit 6      Chinese Drywall Literature      35
                   Review (work in progress)
23                 (Landmark File:  103-1-19)

24  Exhibit 7      Chinese Drywall Media Review    42
                   (work in progress) (Landmark
25                 File:  103-1-19)
```

Confidential - Subject to Further Confidentiality Review

```
  1                    E X H I B I T S

                         (Continued)

  2

  3    Deposition           Description              Page

  4    Exhibit 8       Chinese Drywall Media           46

                       Summary Metadata, One Page

  5

       Exhibit 9       Declaration of Glen Randall     97

  6                    Bell, Ph.D., MBA, MAI In the

                       Matter of the Complaint of

  7                    Bertucci Contracting Co.,

                       LLC, etc.

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 213 of 796
Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 213 of 796
Confidential - Subject to Further Confidentiality Review
122

```
 1              IRVINE, CALIFORNIA - THURSDAY, MARCH 14, 2019

 2                          9:08 A.M.

 3         VIDEO OPERATOR LOPEZ:  We are now on the record.

 4    My name is Jim Lopez.  I'm a videographer for Golkow

 5    Litigation Services.  Today's date is March 14th, 2019,

 6    and the time is approximately 9:08 A.M.

 7              This video deposition is being held in Irvine,

 8    California, in the matter of In Re Chinese Manufactured

 9    Drywall Products Liability Litigation, MDL Number 2047,

10    for the United States District Court, Eastern District

11    of Louisiana.

12              The deponent is Randall Bell.  Counsel will be

13    noted on the stenographic record.

14              Will counsel please identify themselves.

15         MR. CAMPBELL:  Steven Campbell, Alston & Bird,

16    representing defendant Taishan Gypsum.

17         MR. BLOCK:  Aaron Block from Alston & Bird for

18    Taishan.

19         MS. CURRAULT:  Donna Currault from Gordon Arata

20    representing BNBM.

21         MR. MOREN:  Harry Moren from Orrick representing

22    BNBM.

23         MR. BREIT:  Jeffrey Breit representing Plaintiffs'

24    Steering Committee.

25         MR. LONGER:  And Fred Longer is here representing
```

Confidential - Subject to Further Confidentiality Review

```
 1   the plaintiffs as well.

 2       VIDEO OPERATOR LOPEZ:  The court reporter is Pam

 3   Cotten, and she will now swear in the witness.

 4

 5               RANDALL BELL, Ph.D., MBA, MAI,

 6   called as a witness, and having been first duly sworn by

 7   the Certified Shorthand Reporter, was examined and

 8   testified as follows:

 9

10                       EXAMINATION

11   BY MR. CAMPBELL:

12       Q    Good morning, Dr. Bell.

13       A    Good morning, Mr. Campbell.

14       Q    I represent defendant Taishan Gypsum.

15       A    Uh-huh.

16       Q    You understand that you are under oath just

17   like you were testifying in a court of law?

18       A    Yes.

19       Q    You further understand you are subject to

20   civil, possibly criminal penalties, if you falsely

21   testify today?

22       A    Right.

23       Q    Any reason you can't fully and truthfully give

24   answers today?

25       A    No.
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 215 of 796
Case 2:14-cv-02404-MCF Document 218-1 filed 06/28/15 Docket 1339115 Page 1 of
122
Confidential — Subject to Further Confidentiality Review

```
 1    Q    You aren't on any medications of any sort?

 2    A    I am, but that would not impede me.

 3    Q    You have had your deposition taken before; is

 4  that correct?

 5    A    Yes.

 6    Q    I'll spare you the windup because I know

 7  you're used to this.

 8         Have you ever had your deposition taken in a

 9  Chinese drywall case?

10    A    Not that I recall.

11    Q    Have you ever submitted an expert report in a

12  federal case before?

13    A    Yes.

14    Q    How many?

15    A    I don't know.  Several.

16    Q    Have you ever had an expert report or expert

17  testimony excluded or limited by a court?

18    A    Well, Daubert challenges, no.  I mean,

19  sometimes judges will dismiss a comparable or

20  something, but I have never been excluded as a witness.

21    Q    What do you mean sometimes judges will dismiss

22  a comparable?

23    A    Well, for example, you go to court and they

24  take part of your testimony and they see it comparable

25  for some reason, a comparable sale that they don't
```

```
 1    like, and they will exclude it, something like that.

 2         Q    How many times have you had a comparable

 3    included in an expert report that a judge has excluded

 4    or dismissed?

 5         A    I can think of one time, but maybe there were

 6    others.  I don't know.  It is a minor thing.

 7         Q    When -- the one time that you can think of

 8    when a judge excluded one of your comparables, when was

 9    that?

10         A    It was over ten years ago.  I don't know --

11    don't recall anything more specific than that.

12         Q    You don't recall the judge?

13         A    No.

14         Q    The court?

15         A    It was Superior Court, State of California.

16         Q    Do you remember the case?

17         A    No.

18         Q    Are you familiar with the requirement

19    governing expert reports in the Federal Rules --

20    Federal Rule 26 of the Federal Rules of Civil

21    Procedure?

22         A    Yes.

23         Q    What is your understanding of what Rule 26

24    requires for expert reports?

25         A    My general understanding is that all your
```

```
 1    opinions need to be laid out within the report.  You

 2    need to have your -- a summary of your testimony

 3    experience and a summary of your billing rate, and

 4    that's the essence of it.

 5        MR. CAMPBELL:  Mark this as Exhibit 1.

 6            (The document referenced below was

 7        marked Deposition Exhibit 1 for

 8        identification and is appended hereto.)

 9    BY MR. CAMPBELL:

10        Q    Dr. Bell, I'm handing you Exhibit 1 which is a

11    notice of videotaped deposition of Randall Bell.

12            Have you seen this before?

13        A    Yes.

14        Q    Please turn to page 5 of the notice.

15        A    Sure.

16        Q    It is Exhibit A, which is a list of requested

17    documents.  Do you see that?

18        A    Yes.

19        Q    And if you turn to page 6 under the section

20    "Documents requested," there are nine document

21    requests.

22            Do you see that, sir?

23        A    Yes.

24        Q    When did you first see this notice?

25        A    I think yesterday or Monday.
```

```
 1      Q     And did you review the document request to see
 2   if you had any responsive documents?
 3      A     Yes.
 4      Q     Okay.  And did you collect all the documents
 5   that were responsive to each of the requests?
 6      A     Yes.
 7      Q     And did you give those documents to counsel in
 8   this case?
 9      A     I mostly did.  I didn't have my notes from
10   home, so I brought those this morning.  I took notes
11   yesterday.  I brought those.
12            And also I -- in an abundance of caution, I
13   don't really think I need to do this, but just to be
14   sure, I brought the standard assumptions and
15   certification to go with it, and I think that is
16   everything.
17      Q     Okay.  And so you were just pointing out
18   documents that are in a binder that you brought with
19   you today; is that correct?
20      A     Right.
21      Q     What is the -- is there a title on the binder?
22      A     Yes.  There's a title, Chinese Drywall.
23      Q     And when was that binder compiled?
24      A     It was compiled over the last couple weeks,
25   and, like I said, I just added things to it this
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 219 of 796
Confidential - Subject to further confidentiality review
122

```
1    morning.

2        Q     Okay.  Do you know when you first started

3    compiling that binder, sir?

4        A     I didn't compile it.  Tara Harder did some

5    literature review work for me, and she started

6    compiling it a couple weeks ago.

7        Q     Who is Tara Harder?

8        A     She is one of our researchers at my office.

9        Q     You said that she started doing some research

10   for you a couple weeks ago; is that correct?

11       A     Right.

12       Q     So that would be approximately March 1st?

13       A     I don't know the date.

14       Q     Okay.  After February 15th?

15       A     It would have been -- no, I think it was

16   before February 15th, actually.

17       Q     So then it would have been closer to four

18   weeks ago?

19       A     When I say a couple weeks, I mean -- I'm not

20   sure, but it was before -- it was before the report.

21   I -- she compiled the literature before that.

22       Q     All right.  I'll tell you what, we will get

23   back to that.  We will take -- we will make a copy of

24   that binder during a break and we will get back to

25   that.
```

```
 1              Did you bring anything else with you today,

 2    sir?

 3       A    I brought a copy of my book, Real Estate

 4    Damages, and I brought an index -- a search index of

 5    documents related to the literature review.

 6              I think -- my understanding is all the

 7    literature and the media and so forth has been

 8    produced, but that's -- and then I brought the depo

 9    notice and I think everything else we have talked about

10    or you have.

11       Q    Why is it your understanding that all of these

12    documents with the exception of, I believe you said of

13    your notes, have been produced?

14       A    Well, I sent the -- we sent the literature and

15    the media to the attorneys, and, of course, the report

16    they had some time ago.

17       Q    When did you send the literature and the media

18    to the attorneys?

19       A    I don't -- I don't know when the literature

20    was sent.  Tara sent that.  The media she inadvertently

21    did not send, and when I found out yesterday I asked

22    her to immediately send it to the attorneys yesterday.

23       Q    Which attorneys did Tara send the literature

24    and the media to?

25       A    I'd have to ask her, but I think she sent it
```

Confidential - Subject to Further Confidentiality Review

1     to Fred Longer.

2         MR. CAMPBELL:  Please mark this Exhibit 2.

3             (The document referenced below was

4         marked Deposition Exhibit 2 for

5         identification and is appended hereto.)

6   BY MR. CAMPBELL:

7     Q    Dr. Bell, I'm handing you Exhibit 2, which is

8   a copy of a document entitled --

9         MR. BREIT:  Just so your record and you're

10  clarified, Fred did not get it.  We believe it was sent

11  to Natalie in Miami.  Fred Longer did not get it, but

12  he didn't know where it went.

13  BY MR. CAMPBELL:

14    Q    Handing you what has been marked as Exhibit 2,

15  Dr. Bell.  It is a document entitled Expert Witness

16  Report of Randall Bell, Ph.D., MBA, MAI, February 15,

17  2019.

18         Do you recognize this document, Dr. Bell?

19    A    Yes.

20    Q    Is Exhibit 2 the expert report you submitted

21  in this case?

22    A    It is without the exhibits, yes.

23    Q    When you say "without the exhibits," what are

24  you referring to, sir?

25    A    Well, it says Attachments A, B, and C --

Confidential - Subject to Further Confidentiality Review

1   documents and other information collected, my CV, my

2   five-year record of testimony -- and then also I

3   brought a certification and limiting conditions.

4       Q     All right.  Let me just take this one by one.

5             When you say that this is a copy of the expert

6   report that you submitted in this case without the

7   exhibits, what you are referring to are the three

8   attachments listed on page i of your expert report; is

9   that correct, sir?

10      A     That's partially correct.  Plus the

11  certification and the limiting conditions I want to add

12  to it.

13      Q     You -- you want to add something to your

14  expert report; is that correct, sir?

15      A     Right.

16      Q     All right.  And what is it again that you want

17  to add to your report?

18      A     The certification and limiting conditions.

19      Q     What are the certifications and limiting

20  conditions?

21      A     They are standard attachments, and I don't

22  know that they are even needed, but in an abundance of

23  caution, I brought them here today.  I don't think they

24  are needed, but I have them.

25      Q     When you say "they are standard attachments,"

```
 1    what do you mean by being standard attachments?

 2        A    In the appraisal profession -- I have not

 3    conducted an appraisal.  I have no opinions of value

 4    today.  So it didn't even occur to me to add the

 5    limiting conditions and certification, which are

 6    required when you do render an opinion of value.

 7             As I say, I don't think they are necessary,

 8    but out of an abundance of caution, even though I have

 9    not done an appraisal report, I brought those with me

10    and want to make them part of the record.

11        Q    So if you were to amend your report, you would

12    add an Attachment D, which would be the certification

13    and limiting conditions.  Is that fair to say?

14        A    Yes.  Again, I just want to make it clear, I

15    don't know that they are even necessary, but it is

16    just, again, out of an abundance of caution.

17        Q    Does Exhibit 2 contain all of your opinions

18    that you intend to give in this case?

19        A    Yes.

20        Q    Are there any opinions you expect to give in

21    this case that are not contained in Exhibit 2?

22        A    Generally, no.  I mean, if I'm asked

23    something, which I presume I will be, I'm happy to

24    answer the question, but this is the essence of my

25    opinions.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q    Okay.

 2      MR. CAMPBELL:  Mark this as Exhibit 3.

 3           (The document referenced below was

 4      marked Deposition Exhibit 3 for

 5      identification and is appended hereto.)

 6      MR. CAMPBELL:  Dr. Bell, I'll hand this to you, but

 7      this is really for Jeffrey.

 8           This is just to preserve my client's

 9      reservations and objections.  As we previously have

10      notified plaintiffs' counsel in writing, Dr. Bell's

11      report is insufficient under Rule 26(a)(2)(B) in Judge

12      Cooke's order, ECF112 at page 9.  By taking Dr. Bell's

13      deposition today, defendants do not waive their

14      objections to Dr. Bell's report.

15      BY MR. CAMPBELL:

16      Q    Dr. Bell, just to clarify, you will not be

17      rendering opinions with regard to issues of liability

18      in this case.  Isn't that correct, sir?

19      A    Yes.  Yes, it is.

20      Q    And you will not be rendering opinions

21      relating to the priority claimant's specific damages or

22      Anthony Graziano's conclusions; correct?

23      A    That's correct.

24      Q    Did anyone assist you in preparing your

25      report, Dr. Bell?
```

```
 1      A    Tara Harder did some literature review for me.

 2   That's essentially it.

 3      Q    Who is Tara Harder?

 4      A    As I said earlier, she is a researcher that

 5   works for my firm.

 6      Q    And your firm is what, sir?

 7      A    Landmark Research Group, LLC.

 8      Q    And you said that Tara Harder did research for

 9   you; is that correct, sir?

10      A    Yes.

11      Q    What specific research did Ms. Harder do for

12   you with respect to preparing your report?

13      A    I asked her to do a literature review to see

14   what articles had been written about Chinese drywall,

15   it had been a while since I had looked into the topic,

16   and also media -- not comprehensive media, but just

17   general recent media or relevant media on Chinese

18   drywall.

19      Q    How do you spell Ms. Harder's name?

20      A    T-a-r-a H-a-r-d-e-r.

21      Q    When you say you asked Ms. Harder to do a

22   literature review because it had been a while since you

23   had looked into the topic of Chinese drywall, when was

24   the last time you looked into the topic of Chinese

25   drywall?
```

```
 1      A     It has been well over five years, maybe

 2    longer.

 3      Q     And what was the occasion in which you had

 4    previously looked into Chinese drywall?

 5      A     I was retained on a Chinese drywall case

 6    several years ago.  I believe I flew out to Florida and

 7    looked at some homes, and then I think the case

 8    settled.  That's my best recollection.

 9      Q     Do you recall the name of the case that you

10    were retained in that was a Chinese drywall case in

11    Florida?

12      A     No.

13      Q     Do you recall who retained you?

14      A     No.

15      Q     You don't recall who hired you?

16      A     It was years ago.  I don't remember.

17      Q     Approximately how many years ago?

18      A     It was over five years ago.

19      Q     Do you recall how much you got paid in that

20    case?

21      A     No.

22      Q     Did you submit any expert reports in that

23    case?

24      A     Not that I recall.

25      Q     Did you provide testimony in that case?
```

```
 1       A    I don't think so.  Not that I can recall.

 2       Q    Were you hired by the plaintiffs or the

 3  defendants in that case?

 4       A    I think I was hired by the defendants.

 5       Q    And you don't recall the name of the

 6  defendant?

 7       A    No.

 8       Q    Was it a company called Knauf?

 9       A    I don't recall.

10       Q    What about Banner Supply?

11       A    Don't recall.

12       Q    Do you recall what the company's -- nature of

13  the company's business?

14       A    No.  I -- my best recollection is for the

15  defense, and beyond that, I don't recall any of the

16  parties.

17       Q    Do you recall the work that you did in the

18  case?

19       A    I've just told you.  I went there, looked at

20  some homes that they were in the middle of destructive

21  testing, and the case settled soon after that.  I

22  didn't really get into writing a report.  Issuing a

23  report, depositions, testimony, I don't recall doing

24  any of that.

25       Q    If you had written a report, would that be in
```

Confidential - Subject to Further Confidentiality Review

```
1     your files?

2         A    I don't know.  Old reports get purged, so --

3     and I think it was well over five years ago.  So I -- I

4     don't know.

5         Q    Do you recall any conclusions that you reached

6     in that case?

7         A    I never reached any conclusions.

8         Q    You didn't perform any appraisal in that case?

9         A    Not that I recall.

10        Q    What was the scope of your engagement in that

11    case?

12        A    Well, my best memory is that I was just

13    retained as an expert witness, and I flew out to -- I'm

14    pretty sure it was Florida, and my expectation was like

15    any case that I get into it and do the research and do

16    an analysis and ultimately produce a report, but it

17    didn't get to that point.

18        Q    Getting back to the work that Ms. Harder did

19    in this case with respect to preparing your report,

20    fair to say that she did not perform a comprehensive

21    review of media and literature with respect to Chinese

22    drywall?

23        A    I think that's fair to say.

24        Q    Approximately how much time did Ms. Harder

25    spend on performing a literature review?
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 229 of 796
Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed ESI Docket 12/04/19 Page 83 of 122
Confidential — Subject to Further Confidentiality Review

```
 1      A    A couple or a few days.  I don't know exactly.

 2      Q    And how much time, approximately, did

 3   Ms. Harder spend on conducting a media review?

 4      A    That would probably be included in the few-day

 5   estimate that I just gave you.

 6      Q    Will you please turn to page 2 of your expert

 7   report.

 8      A    Sure.

 9      Q    At the bottom, is that your signature?

10      A    That's a typed-in signature.

11      Q    I'm sorry?

12      A    It's -- I mean, I haven't actually physically

13   signed it with my hand, but that's the symbol for a

14   signature.

15      Q    And did you type the "/S/Randall Bell" in the

16   signature block -- signature line at the bottom of

17   page 2 of your expert report, sir?

18      A    I don't know that I typed it.  It was typed,

19   and I agreed to it.

20      Q    Who typed it?

21      A    I couldn't tell you.

22      Q    Well, then how do you know you agreed to it if

23   you don't know who typed it, sir?

24      A    Because I reviewed the document after it was

25   typed and agreed to it.
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 230 of 796
Case 2:14-cv-02722-NGG Document 34-4 Filed 09/18/15 Page 231 of 796
Confidential - Subject to Further Confidentiality Review
122

```
1      Q    When did you review the document, sir?

2      A    It was mid -- I think it was mid-February.

3      Q    Do you recall exactly when you read the

4  document?

5      A    No.

6      Q    Do you know whether or not you read the

7  document before it was submitted in this case?

8      A    I did read the document before it was

9  submitted.

10     Q    Did you read -- did you read the document more

11  than one time before it was submitted in this case?

12     A    I read parts of it more than one time.  I

13  don't know that I read the whole thing more than twice

14  or more than one time.

15     Q    Have you ever had someone else sign your name

16  to an expert report that you have submitted in any case

17  that you can recall?

18     MR. BREIT:  I'm going to object to the form of the

19  question.  There's a suggestion that someone else

20  signed this form.

21  BY MR. CAMPBELL:

22     Q    You can answer.

23     A    Yeah, sometimes I'm traveling or sometimes

24  there's a deadline, and I authorize that it is okay to

25  put my electronic signature, or sometimes they do this,
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 231 of 796
Case 2:14-cv-02722-NGG-MDG Document 234-4 Filed 04/01/19 Page 235 of 122
confidential - Subject to further confidentiality Review

```
 1   but I've done that before.

 2       Q    Okay.  So you have an electronic signature;

 3   correct, sir?

 4       A    I have a -- it is like a picture of my

 5   signature.

 6       Q    Right.  Why didn't you use that in this case?

 7       A    I don't recall exactly why.  I think there was

 8   a time issue and I was traveling or something, but I

 9   sent the report.  It had this, and I agreed to it.

10       Q    Which case was it where you had someone sign

11   your name with the /S/ to an expert report?

12       A    Oh, I don't know offhand.  Sometimes I sign it

13   and it is scanned.  Sometimes we just add an electronic

14   picture.  Sometimes this is done.  I can't tell you

15   what happened when.

16       Q    Are you certain that you have submitted an

17   expert report with an /S/ in another case?

18       A    Usually it is the picture of the signature.  I

19   can't be certain without looking over everything.

20       Q    It is possible this is the first time that you

21   have ever submitted an expert report with an /S/; is

22   that correct, sir?

23       A    Either way is possible.  It's possible it is

24   or isn't.  It is less usual, but I wouldn't exclude it

25   as never happening.  I'm not sure.
```

1    Q    Who wrote your report, Dr. Bell?

2    A    Who wrote the report?

3    Q    Yes, sir.

4    A    Well, the -- I don't know, honest -- I went

5    over the issues and -- with -- I believe it was Patrick

6    Montoya, excuse me, and someone at his office prepared

7    this.  And I reviewed it, and it was fine, and it was

8    submitted.

9    Q    When did you go over the issues with Patrick

10   Montoya?

11   A    It was in some point in February.

12   Q    Do you recall exactly when?

13   A    No, I don't.

14   Q    What were the issues that you went over with

15   Mr. Montoya?

16   A    This is all right here.  The background, my

17   qualifications, I gave my CV, and the opinions and

18   fees.  That's all information I gave him.

19   Q    Is it my understanding -- is my understanding

20   correct that you were unable to sign this report or

21   write this report because you were flying and there

22   were timing issues?

23   A    I think that mischaracterizes what I -- where

24   I'm coming from.  I talked to them -- they asked these

25   questions about background, qualifications, and

1   opinions and fees in a conversation.  Someone at their

2   office typed this up, and they sent it to me to see if

3   this correctly represented my -- my position and my

4   opinions and other information.

5         I read it.  Some parts I read more than once,

6   and it was fine, and I said it was okay to submit as my

7   report.

8     Q    Are you certain that you read this report and

9   gave your approval to submit it with an electronic

10  signature that someone else put into the report before

11  it was actually submitted in this case?

12    A    You would have to ask them when they submitted

13  it.  But I -- with the exception of that, I'm certain I

14  gave them the information, they gave it to me, I read

15  it, and I said it was okay.

16    Q    Is there any way you could go back in your

17  records and figure out when you had the phone call or

18  conversation with Mr. Montoya giving him approval to

19  sign your name and submit this report?

20    A    I'm not sure if there is or not.  I could try,

21  but I couldn't tell you one way or the other.

22    Q    When you were speaking with Mr. Montoya, were

23  you doing that over the phone, I imagine?

24    A    I have only spoken to him over the phone, yes.

25    Q    How many times have you spoken with

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 234 of 796
Case 2:14-cv-02722-MGC Document 24-4 Entered on FLSD Docket 11/26/14 Page 28 of
122
Confidential - Subject to Further Confidentiality Review

```
1    Mr. Montoya?

2       A    Two or three, four times.  I'm not sure.

3       Q    Was it on your work phone or on your cell

4    phone?

5       A    I don't know.

6       Q    You don't know?

7       A    Well, it could have been my home office phone.

8    It could have been my work phone.  It could have been

9    my cell phone.  I'm not sure.

10      Q    Okay.  Did you call him or did he call you in

11   this conversation?

12      A    Well, you said "this conversation."  I think

13   this was more than one conversation.  And I couldn't

14   tell you.

15      Q    Just to make sure that I understand correctly,

16   you don't recall when you first read your report?

17      MR. BREIT:  I'm going to object to the form of the

18   question.  Are you talking about the report that was

19   sent to him to approve, or are you talking about some

20   other portion of it?  Why don't we clarify the time,

21   date, and what exact object you are talking about.

22   BY MR. CAMPBELL:

23      Q    Do you understand my question?

24      A    I think I do.  I don't recall the exact time.

25   It was a few weeks ago.  I -- that's about the best I
```

1    can do from memory.

2        Q    And what was the occasion in which you first

3    reviewed your report?

4        A    They sent -- I gave them the information they

5    asked for.  They said -- in my mind -- and apparently I

6    was mistaken, in my mind they were putting together a

7    declaration or -- but, regardless, it doesn't matter.

8            They sent this document to me, and it

9    reflected exactly what I had told them and it reflected

10   my opinions, and I said it was fine.  It was -- it was

11   good.

12       Q    And when you say they sent you "this," you are

13   holding up --

14       A    Exhibit 2.

15       Q    -- Exhibit 2?  Right.

16           Did the report that they sent you the first

17   time you read it include any attachments or exhibits?

18       A    I don't -- I don't think -- I had sent them my

19   CV.  I don't recall that I looked at it again.

20   Statement of my testimony, I just remember asking my

21   assistant to send that to them.  And the documents that

22   I considered, I had sent to them.  I think when I got

23   this document, it was just -- just the four pages.

24       Q    I'll represent to you, sir, that when we

25   received your report on February 15th, we were not

1    provided Attachment A or Attachment C.

2         Do you know why your report was missing

3    Attachment A and Attachment C when we received it on

4    February 15th?

5    A    I couldn't tell you.  All I know is when I was

6    asked for it, I provided it.

7    Q    Do you recall when you were asked for the

8    attachments to your report?

9    A    I don't recall.

10   Q    Okay.  Is it possible that you were asked for

11   the attachments to your report after your report was

12   submitted on February 15th?

13   A    Well, I mean, anything is possible.  I

14   don't -- the short answer is I don't recall.  When I

15   was asked for these things, I immediately provided them

16   or asked someone in my office to provide them.

17   Q    We are just talking about what occurred over

18   the last few weeks.

19   A    Right.

20   Q    Correct?

21   A    Right.

22   Q    I mean, you don't have any memory of when you

23   provided any of these documents?

24   A    Since then I've probably been to probably four

25   different states, so, I'm sorry, I don't have an exact

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 237 of 796
Case 1:09-md-02047-EEF-MBN Document 22314 Entered on FLSD Docket 11/26/19 Page 91 of
122
Confidential - Subject to Further Confidentiality Review

```
 1    memory of what happened on what day.

 2        MR. CAMPBELL:  Please mark this as Exhibit 4.

 3            (The document referenced below was

 4        marked Deposition Exhibit 4 for

 5        identification and is appended hereto.)

 6    BY MR. CAMPBELL:

 7        Q    Dr. Bell, I'm handing you what has been marked

 8    as Exhibit 4.  Do you recognize this document?

 9        A    Yes.  Is my CV.

10        Q    Is this an accurate and current version of

11    your CV, sir?

12        A    Looks like it.

13        Q    Will you please turn to page i of your expert

14    report.  Is Exhibit 4 Attachment B to your report in

15    this case, sir?

16        A    Yes.

17        Q    Please turn to page 5 of your expert report.

18        A    They are not numbered, but --

19        Q    I'm sorry, excuse me, paragraph 5 of your

20    expert report.

21        A    Oh, sorry.

22        Q    Starts on page 1, goes over to page 2.

23        A    Okay.  Right.

24        Q    On page 1, the first sentence references an

25    Exhibit B.  Do you see that, sir?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A    Yes.

 2      Q    Is Exhibit 4 the same document as what is

 3   being referenced as Exhibit B in paragraph 5 of your

 4   expert report?

 5      A    Yes.

 6      Q    Okay.  So Attachment B and Exhibit B are the

 7   same thing?

 8      A    Yes.

 9      Q    Is there a reason why on page i you refer to

10   this document as Attachment B but then in paragraph 5

11   you refer to it as Exhibit B?

12      A    It is synonymous.  I don't think there's any

13   special reason.

14      Q    You mentioned earlier that it was your initial

15   understanding that you would be submitting a

16   declaration in this case, not an expert report.  Is

17   that correct, sir?

18      A    That's what I was thinking.  It was

19   inconsequential to me one way or the other.  They had

20   the same information.

21      Q    What's the difference between a declaration

22   and an expert report?

23      A    Well, I've -- you are the attorney, I'm not,

24   but the -- a declaration can be one and the same as a

25   declaration [sic].  Sometimes I've taken expert reports
```

```
 1   and the attorneys put it into a declaration format.  So

 2   there may not be really any other -- real difference

 3   other than they are formatting for litigation.

 4          But sometimes a declaration is more informal

 5   and just has a -- more of a statement rather than a

 6   report.  It just depends.

 7      Q    And would you have preferred to have a

 8   declaration in this case, given that you are not giving

 9   an appraisal in this case, sir?

10      A    I don't know that I have a preference one --

11   one way or the other.  It is -- I think it is pretty

12   much inconsequential since I am not rendering any kind

13   of appraisal.

14      MR. CAMPBELL:  Exhibit 5.

15          (The document referenced below was

16      marked Deposition Exhibit 5 for

17      identification and is appended hereto.)

18   BY MR. CAMPBELL:

19      Q    Dr. Bell, I'm handing you what is marked as

20   Exhibit 5.  Do you recognize this document?

21      A    Yes.

22      Q    What is this document, sir?

23      A    This is my -- summary of my testimony

24   experience.

25      Q    Is this a complete and accurate list of your
```

1    testimony experience over the past five years?

2       A    As far as I know.

3       Q    Will you please turn to page i of your expert

4    report, sir?

5       A    Sure.

6       Q    Is this Exhibit 5 -- strike that.

7            Is Exhibit 5 Attachment C to your expert

8    report?

9       A    Yes.

10      Q    Okay.  Will you please turn to paragraph 5 of

11   your expert report.  The top of page 2 in paragraph 5

12   there's a reference to an Exhibit C.  Do you see that,

13   sir?

14      A    Yes.

15      Q    Is Attachment C the same thing as Exhibit C?

16      A    Yes.

17      Q    Do you know why Attachment C to your expert

18   report was not produced until 8:57 P.M. on February 26,

19   11 days after your report was due?

20      A    No.  You would have to ask the attorneys.

21   Whenever I was asked for something, as I said earlier,

22   we got things over there.

23      Q    Okay.  Do you know when you were asked for

24   Exhibit C to your expert report?

25      A    No.

Confidential - Subject to Further Confidentiality Review

1     Q     Okay.

2     A     I don't know.

3     Q     Is it possible that you were asked for

4   Exhibit C after your report was submitted?

5     A     Again, anything is possible, but the short

6   answer is I don't know.

7     Q     Do you have a specific memory of being asked

8   for Exhibit C before February 15th, sir?

9     A     I don't have a specific memory one way or the

10  other.

11    Q     Please turn to page i of your expert report.

12  Do you see that there is an Attachment A listed, which

13  is documents and other information considered?

14    A     Right.

15    Q     Right.  Would you please turn to paragraph 3

16  of your expert report on page 1.

17    A     Okay.

18    Q     Will you read paragraph 3, please.

19    A     "In rendering opinions, I relied

20        on my expertise, documents, and other

21        information provided by counsel as

22        described throughout this report and the

23        attached exhibits.  A listing of the

24        documents and information I considered

25        is contained in Exhibit A to this

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 242 of 796
Case 2:14-cv-06601-NG-JO Document 44 Entered on FLSD Docket 12/19/2014 Page 296 of 122
Confidential - Subject to Further Confidentiality Review

```
 1        report."

 2        Q    What are the, quote-unquote, "attached

 3   exhibits"?

 4        A    I think that would be everything in the

 5   binders that I brought.  The literature and the media

 6   and -- as well as my notes.

 7        Q    So Exhibit A referenced in paragraph 3 of your

 8   report, Attachment A and the attached exhibits are all

 9   referring to the same thing.  Is that your

10   understanding, sir?

11        A    The attachments and exhibits are synonymous,

12   yes.  A, B, and C.

13        Q    Okay.  What documents and other

14   information -- strike that.

15             (The document referenced below was

16        marked Deposition Exhibit 6 for

17        identification and is appended hereto.)

18   BY MR. CAMPBELL:

19        Q    Dr. Bell, I'm just handing you Exhibit 6 --

20   let's just take a step back real quick.

21             You are telling -- are you telling me that

22   Attachment A to your expert report is this binder

23   that's in front of you that you brought with you today,

24   sir?

25        A    These are the actual articles referenced in
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 243 of 796
Case 2:09-md-02047-EEF-MBN Document 21641-38 Filed 08/13/18 Page 37 of 122
Confidential - Subject to Further Confidentiality Review

 1    Exhibit 6.

 2         Q    Okay.  So what is Exhibit 6 that I just handed

 3    you, sir?

 4         A    Exhibit 6 is a summary of the literature

 5    review.

 6         Q    Okay.  And so is -- just to make sure I

 7    understand correctly, is Attachment A to your expert

 8    report the literature review that we have marked as

 9    Exhibit 6 to this deposition?

10         A    Yes.

11         Q    Okay.

12         A    If I heard your question right.  Maybe I

13    should listen to it again, I'm not sure.

14         MR. CAMPBELL:  Read it back, please.

15             (Record read as follows:

16             "Question:  Okay.  And so is --

17         just to make sure I understand

18         correctly, is Attachment A to your

19         expert report the literature review that

20         we have marked as Exhibit 6 to this

21         deposition?")

22         THE WITNESS:  Yes.  However, as I mentioned

23    earlier, yesterday when I became aware that we had some

24    media in the file that hadn't been sent, we sent that

25    over as well.  And I brought that with me today.

BY MR. CAMPBELL:

1    Q   Okay.  So what is Attachment A to your expert report, sir?

A   Attachment A is Exhibit 6, and also there's some literature -- I'm happy to give this to you -- excuse me, not literature.

Q   It is all right.  You can keep it in your binder.

A   Okay.  But it is media reports about Chinese drywall.

Q   So is Attachment A two separate documents?

A   Yes.

Q   Let's stick with the first document, which is Exhibit 6.

A   Sure.

Q   Who prepared this document, Exhibit 6, which is titled "Chinese Drywall Literature Review (Work in Progress)"?

A   Tara Harder.

Q   When did Ms. Harder prepare Exhibit 6?

A   It was sometime in February.

Q   Do you know whether Ms. Harder prepared Exhibit 6 before February 15th?

A   I know she certainly got into it.  If she finished or not, you would have to ask her, by

```
 1   February 15th specifically.

 2       Q    Did you review all of the articles listed in

 3   Exhibit 6 prior to signing your expert report in this

 4   case?

 5       A    I believe so.  I had read most of these

 6   articles before because I keep up to speed on -- on the

 7   literature.

 8            And whether I went over them again with this

 9   case specifically, I think so.  I'm not certain.  I've

10   been looking at it as recently as this morning, so --

11   so I can't be much more specific than that.

12       Q    Do you know why Exhibit 6 was not produced

13   until 2:16 P.M. on March 11, 24 days after your report

14   was due?

15       A    You would have to ask the attorneys.  I don't

16   know.

17       Q    Do you know when you or Ms. Harder gave

18   Exhibit 6 to the attorneys in this case?

19       A    No.  I would have to ask her.

20       Q    Would she have sent Exhibit 6 to the attorneys

21   in this case without you having directed her to do so?

22       A    There's nothing that precludes her from

23   sending something that a client requests without me

24   okaying it, so it is quite possible that she did.

25       Q    Would it be -- well, strike that.
```

```
 1            Do you know how long after you received a
 2    request for Exhibit 6 that you gave Exhibit 6 to the
 3    attorney requesting it?
 4       A    Well, your question presupposes I gave it to
 5    the attorneys.  I didn't.  Tara Harder did.
 6       Q    Okay.  So approximately the lag time between
 7    when the request was made to your firm, Ms. Harder, and
 8    when it was provided to the attorneys?
 9       A    No, I don't know.
10       Q    At the top of Exhibit 6 in the title there is
11    a parenthetical inside.  It states "work in progress."
12    Do you see that, sir?
13       A    Yes.
14       Q    What does that mean?
15       A    That's a standard statement we put in
16    things -- in litigation, particularly where -- this is
17    the list that we have so far.  There's nothing that
18    says we might become aware of something additional in
19    the future, but this is what we have so far.
20       Q    Are you -- you or Ms. Harder or anyone else
21    that is working with you on this case presently
22    conducting literature-review research at this time?
23       A    No.  Well, yes, on lots of other cases, but
24    not on this case.
25       Q    That's what I mean.
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 247 of 796
Case 2:14-cv-02722-NGG Document 204-4 Filed 12/04/19 Docket 1:18-cv-14201 Page 81 of 122
Confidential - Subject to Further Confidentiality Review

```
 1        A    Yeah.  But in doing work on other cases, it

 2   may come up -- an article might come up that is

 3   relevant to this we weren't aware of, we might add it

 4   to it, you know, if we become aware of something in the

 5   future.

 6        Q    Okay.  I'm just trying to understand what's --

 7   what your expert report is in this case.  And so

 8   Exhibit 6 is part of your expert report; is that

 9   correct, sir?

10        MR. BREIT:  I'm going to object to the form of the

11   question and ask you to reread it again.

12   BY MR. CAMPBELL:

13        Q    Hold on.  Do you understand that question?

14        MR. BREIT:  I'm going to object to it and ask that

15   it be read again so I understand it.

16             So would you please read it back to me, Court

17   Reporter.

18        MR. CAMPBELL:  You have it in front of you, Jim.

19        MR. BREIT:  I would like to have it read to me.

20        THE REPORTER:  I want to make sure I'm reading back

21   the right question.

22             (Record read as follows:

23             "Question:  Are you -- you or

24        Ms. Harder or anyone else that is

25        working with you on this case presently
```

Confidential - Subject to Further Confidentiality Review

```
 1        conducting literature-review research at

 2        this time?")

 3        MR. CAMPBELL:  It's after that.

 4           (Record read as follows:

 5           "Question:  I'm just trying to

 6        understand what your expert report is in

 7        this case.  So Exhibit 6 is part of your

 8        expert report; is that correct, sir?")

 9        MR. BREIT:  Object to the question.

10  BY MR. CAMPBELL:

11      Q    Do you understand the question?

12        MR. BREIT:  Form of the question.  It is a compound

13  question, and I'm going to ask you to rephrase it so

14  that it makes sense to me.

15        MR. CAMPBELL:  Stand on the question.

16  BY MR. CAMPBELL:

17      Q    You can answer it.

18        MR. BREIT:  If you don't understand it or want it

19  broken down, feel free to ask for it to be broken down.

20        THE WITNESS:  Well, my understanding is the essence

21  of the question is what constitutes my expert report.

22        MR. CAMPBELL:  Can you read back the question?

23        THE WITNESS:  Okay.

24           (Record read as follows:

25           "Question:  I'm just trying to
```

```
 1        understand what your expert report is in

 2        this case.  So Exhibit 6 is part of your

 3        expert report; is that correct, sir?")

 4        THE WITNESS:  Oh.  Exhibit 6, yes, is part of my

 5   expert report.  Sorry, I didn't understand your

 6   question.

 7   BY MR. CAMPBELL:

 8        Q    Pretty simple question.

 9             So I just want to make sure that we understand

10   what is part of your expert report.  Okay?  That's why

11   we are asking these questions and if anything in your

12   expert report is going to change.

13             So the next question is Exhibit 6, which is

14   part of your expert report, in its final form?

15        A    I have no -- I'm certainly not working on it

16   now.  I haven't directed anybody else to do that.  So I

17   think it's -- I think the short answer is, yes, it is

18   final, but with the understanding that there may be

19   additional information I'm given in the future, as with

20   any litigation case.

21             (The document referenced below was

22        marked Deposition Exhibit 7 for

23        identification and is appended hereto.)

24   BY MR. CAMPBELL:

25        Q    Dr. Bell, I'm handing you what has been marked
```

```
 1    at Exhibit 7.  It's entitled "Chinese Drywall Media

 2    Review (Work in Progress)."

 3          Do you recognize this document?

 4    A     Yes, this is the document I referred to a few

 5    minutes ago.

 6    Q     Okay.  And just to make sure that we are

 7    clear, Exhibit 6 and Exhibit 7 are the two documents

 8    that constitute Attachment A and Exhibit A to your

 9    expert report; is that correct?

10    A     Yes.

11    Q     Okay.  And who prepared this document?

12    A     Ms. Harder.

13    Q     Do you know when Ms. Harder prepared this

14    document?

15    A     I'd have to ask her, but she worked on it in

16    mid-February, and she told me about the fact she hadn't

17    sent it yesterday, but I had seen it some time ago, two

18    weeks ago, couple weeks ago.

19    Q     When you saw it a couple weeks ago, was it in

20    the form that it is now?

21    A     I remember -- I don't remember this -- this is

22    our standard format.  So whether I explicitly saw this,

23    I remember the articles.

24    Q     Were the same articles in the report -- strike

25    that.
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 251 of 796
Case 2:09-md-02047-MBN Document 22380-28 Filed 12/02/19 Page 251 of 796
Confidential - Subject to Further Confidentiality Review
122

```
 1                   When you first saw Exhibit 7 --

 2         A    Uh-huh.

 3         Q    -- were the same articles in the version that

 4    you saw as -- that are in it right now?

 5         A    I think so.  I can check.

 6              Yes, this is the only version I've ever seen.

 7         Q    And I'll represent to you, Dr. Bell, that we

 8    did not receive a copy of Exhibit 7 until last night.

 9    I believe you said that was because Ms. Harder had not

10    emailed that to counsel until yesterday; is that

11    correct?

12         A    Right.  We were -- I was talking to Mrs. --

13    Ms. Harder yesterday, and she suddenly said, "Oh, I

14    forgot to send this to the attorneys."  I said, "Well,

15    send it to them immediately," and she did.

16         Q    How did it come up in conversation that she

17    had not sent the media review?

18         A    She just -- just as I said, we were just

19    looking over the articles in the binder getting ready

20    for today, and she made that comment.  I had assumed it

21    had been sent, and I said, "Well, that's -- then send

22    it immediately."

23         Q    Who is Jason Borras, B-o-r-r-a-s?

24         A    Jason Borras is a researcher that used to work

25    for me.
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 252 of 796 of
Case 2:09-md-02047-EEF-MBN Document 21641-30 Filed 12/09/18 Page 286 of
122
Confidential - Subject to Further Confidentiality Review

```
 1      Q     When did Mr. Borras work for you?

 2      A     It would have been last year.

 3      Q     Okay.  2018?

 4      A     That sounds right.

 5      Q     Do you recall when you hired Mr. Borras?

 6      A     Not exactly.  He worked for me and he worked

 7   for some other -- some of my colleagues, and that

 8   was -- one of my colleagues.

 9      Q     Do you recall when Mr. Borras stopped working

10   for you?

11      A     Sometime last year, I'm pretty sure.  I could

12   check.

13      Q     And do you recall when Exhibit 7 was first

14   created?

15      A     When Exhibit 7 was first created?

16      Q     Correct.

17      A     I couldn't tell you.  We maintain literature

18   reviews, and then we update literature reviews from

19   time to time.  When it began, could have been with this

20   case or it could have been editions from prior cases.

21   I just don't know.

22      Q     Okay.  But you have only worked on one other

23   Chinese drywall case; is that correct?

24      A     That I can think of, yeah.

25      Q     In the last five years, you only worked on one
```

1    other one that you can think of?

2        A    That misstates my testimony.  I said it was

3    over five years ago.

4        Q    Okay.

5             (The document referenced below was

6        marked Deposition Exhibit 8 for

7        identification and is appended hereto.)

8    BY MR. CAMPBELL:

9        Q    I'm handing you what's been marked as

10   Exhibit 8, Dr. Bell.  It is metadata for the document

11   that's entitled Chinese Drywall Media Review, which is

12   Exhibit 7.

13       A    Right.

14       Q    Do you see that on the right column there are

15   dates listed, one is a created date and it states

16   April 7th, 2017?

17            Do you see that, sir?

18       A    Right.

19       Q    Do you have any reason -- or do you understand

20   why this document would have been created on April 7th,

21   2017?

22       A    The short answer is I don't recall, but the --

23   there's a couple scenarios.  One is we could have -- it

24   could have been a template on other literature review

25   that Jason started or that we may have done something

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 254 of 796
Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 254 of 796
Confidential - Subject to Further Confidentiality Review
122

 1    similar to Chinese drywall, so we are looking at

 2    Chinese drywall, but I don't recall doing a Chinese

 3    drywall in 2017.

 4        Q    Okay.  And Mr. Borras is listed as the person

 5    who was the author of this document.  Do you see that?

 6        A    Right.

 7        Q    Okay.  And just to confirm, Mr. Borras has not

 8    worked on this case with you; is that correct?

 9        A    Not at all.

10        Q    Okay.

11        A    That's correct.

12        Q    What documents or materials did you rely upon

13    in preparing your report?

14        A    The literature and the media was basically

15    just to refresh my memory on Chinese drywall, but,

16    frankly, it doesn't -- I didn't really rely upon them

17    because I have my opinions about methodologies

18    completely separate and apart from the media

19    literature.

20            So I didn't rely on those, but I was informed

21    of them because I just wanted to be conversant in the

22    generalities of -- of the issues.

23            But what I relied upon basically was a phone

24    conversation with -- with the attorney and the

25    appraiser.  The appraiser is Anthony --

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 255 of 796
Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 89 of 122
Confidential - Subject to Further Confidentiality Review

```
1        MR. BREIT:  Graziano.

2        THE WITNESS:  Graziano.  Excuse me.  And he told me

3    what he had done in terms of methodologies, and I

4    relied upon what he told me and interfaced with what I

5    already know about methodology from having read the

6    book and so forth.  That's the essence of what I relied

7    on.  And didn't rely on any kind of market data or

8    anything like that because I didn't do an appraisal.

9    BY MR. CAMPBELL:

10       Q    Was there just one phone call that you had

11   with the attorney and Mr. Graziano?

12       A    I can recall one for sure.  It might have been

13   another one or two, but I think there was just one.

14       Q    Did you ever speak to Mr. Graziano without an

15   attorney on the phone?

16       A    I believe he called me before that

17   conversation.  I might be confused with the attorney

18   calling me, but I think I had a phone call before that

19   asking if I, you know, was willing to testify as to

20   methodologies in this case, and I said sure, I know the

21   methodologies.

22       Q    When was the phone call that you received from

23   Mr. Graziano asking if you would testify regarding

24   methodologies in the case?

25       A    Well, I -- again, your -- your question
```

Confidential - Subject to Further Confidentiality Review

1   misstates my testimony because I didn't say -- I wasn't

2   sure who it was.

3       Q    Okay.

4       A    But I had a conversation before the

5   conversation with the two of them together asking about

6   my availability to testify on methodology.

7       Q    When was that conversation?

8       A    It was a week or two or three before the

9   conversation we had in February.

10      Q    When you say the -- "it was a week or two

11  before the conversation we had in February," are you

12  referring to the conversation that you had with counsel

13  and Mr. Graziano regarding the methodologies that he

14  had used in this case?

15      A    I had a conversation -- I don't know exactly

16  when.  I had a conversation with Mr. Graziano and the

17  attorneys somewhere in February, mid or early February.

18  Beyond that, I don't know.

19           Prior to that I got a conversation from

20  somebody asking if I was just generally available to

21  testify about methodology, and then that -- from that

22  first conversation came the conversation with everybody

23  on the line.

24      Q    Who else was on the line?

25      A    I wrote down -- in addition to Anthony

```
 1    Graziano and Patrick Montoya, I wrote down Natalie and

 2    Sandra Duggan.  I don't know if they were on the

 3    conversation or their names just came up.

 4         Q    And you are looking at handwritten notes right

 5    now; is that correct, sir?

 6         A    Right.

 7         Q    Okay.  And is there a date on those

 8    handwritten notes?

 9         A    I didn't write a date down.

10         Q    Had you ever heard of Mr. Graziano before you

11    first heard his name in the context of this case?

12         A    I -- yes, I had heard of him.

13         Q    When did you first hear of Mr. Graziano?

14         A    I might have met him, but I don't recall.

15    I've taught a seminar for the Appraisal Institute for

16    decades, coast to coast and around the world, and I've

17    met thousands of people, but I remember his name.  And

18    I may have very well met him.

19         Q    But you don't recall specifically having met

20    him?

21         A    No.

22         Q    Did you review any of Mr. Graziano's expert

23    reports before agreeing that you could serve as an

24    expert in this case?

25         A    No.  I've never seen his report.  I've never
```

 1    reviewed a report or anything like that.

 2         Q    So you never read any of his reports prior to

 3    this case?

 4         A    If I have, I sure don't remember.  I don't --

 5    not that I recall.

 6         Q    And you haven't read any of his reports in

 7    this case?

 8         A    That's correct.

 9         Q    In the phone call that you had with

10    Mr. Graziano where there was another attorney on the

11    line, who was that attorney?

12         A    That was Patrick --

13         Q    Natalie --

14         A    -- Montoya.

15         Q    Okay.  And Natalie may have been on that call

16    too, you said?

17         A    Natalie -- I wrote the names Natalie and

18    Sandra Duggan.  I'm not saying they were on the call.

19    Their names came up.  I don't know.

20         Q    Sure.  Approximately how long was that phone

21    call?

22         A    Oh, I'd estimate about 45 minutes or so.

23         Q    Do you recall any specific statements that

24    were made during that call?

25         A    I don't recall much of the specifics.  I can

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 259 of 796
Confidential - Subject to further Confidentiality Review
122

```
 1    tell you generally what I recall.

 2        Q    Please.

 3        A    Well, they said they -- when I say "they," the

 4    attorneys said that they were working on litigation

 5    involving Chinese drywall.  They asked me if I had

 6    worked on Chinese drywall.  I told them essentially

 7    what I just told you a little bit ago, that I had, but

 8    it had been a long time.  They asked me if I ever

 9    issued a report, and I told them exactly what I told

10    you.  I said I don't think I did.  My recollection is I

11    didn't.

12            They said that this was in federal court and

13    they needed a Rule 26 report.  I'm kind of looking at

14    my notes.  They told me that they wanted me to just

15    talk about methodology.  Normally I get a phone call

16    like this, I'm asked to review a report.  I said, so

17    I'm not being asked to review a report?  And they said

18    that's correct.  And so I said, okay, that's fine.

19            Then they asked about what kind of approaches

20    could be taken in a Chinese drywall case, and we

21    discussed a number of methodologies.  They are in my

22    notes here.  We discussed sale/resale, case studies,

23    cost to cure, paired sales, surveys, literature

24    reviews.  We talked about costs, use, and risk, which

25    is the fundamentals of the methodologies.
```

```
 1            And then I recall that Mr. Graziano mentioned

 2   he had done a sales/resale, paired sales, a survey, and

 3   a literature review.  And I asked if he had done a mass

 4   appraisal technique, simple regression or multiple

 5   regression, or if he had done days on market.  There

 6   are other approaches, they are in the book.  And he

 7   told me he focused on those four approaches.

 8            And I was asked are those approaches used

 9   within the real estate profession, and I said yes,

10   they -- indeed they are.  In fact, I may have written

11   about them in my book, but these approaches have been

12   around a long time.

13            And what else did we talk about?  We talked

14   about that the litigation was going on in Florida and I

15   think Virginia, if I remember right.  I could be wrong

16   about that.  We talked about where the cases were going

17   on.

18            I asked if -- who the opposing expert was.

19   They didn't know.

20            And I have some notes here about partial

21   remediation, where sometimes people clean up part of

22   the house, not all of it.  The sulfur smell.  I wrote

23   down ten-year remodel and ten-year-old.  I don't know

24   why I wrote that down.  I don't recall that part of the

25   conversation.
```

```
 1                 And pitting and the oxide, I wrote down that.

 2                 And I recall talking about how Chinese drywall

 3      causes corrosion of the copper, the electrical in the

 4      air conditioning most -- most commonly.  And they

 5      said -- I think they said that that had happened in

 6      these cases, if I recall right.

 7                 You have asked a broad question, but I'm

 8      telling you everything that comes to mind.

 9           Q    That's great.  Thank you.

10           A    That's -- maybe other things will come to

11      mind, but that's about what I can recall.

12           Q    If they do, just let me know.

13           A    I will.

14           Q    So you talked about methodologies during this

15      call; is that correct?

16           A    Yes, sir.

17           Q    And were you initially asked during the call

18      what methodologies would be appropriate to conduct a

19      damages analysis?

20           A    Something along those lines, yeah.

21           Q    And you, then, gave a list of appropriate

22      methodologies to use in a case like this to determine

23      whether or not there is stigma damages associated with

24      the property?

25           A    It was more the other way around.  It was --
```

```
 1    it was more Mr. Graziano mentioning what he had done

 2    and asking if those were -- if those were acceptable

 3    conventional methodologies.

 4         Q    What do you recall Mr. Graziano saying

 5    specifically with respect to what he had done?

 6         A    Well, I just -- I mean, I'm happy to tell you

 7    again, but he told me that he had used -- employed

 8    these four methodologies.

 9         Q    Okay.

10         A    And asked me if those were conventional

11    methodologies.  And I said, yes, we use them all the

12    time, lots of people do.

13         Q    Did Mr. Graziano tell you what he meant when

14    he was using those terms, the methodology terms?

15         A    It is interesting you ask that, because one

16    thing he said, he said he did case studies.  And I

17    said, yeah, we use a lot of case studies, but how --

18    when he went in to explain what he meant by case

19    studies, it really broke down to sale/resale, paired

20    sale.  He had done -- he called them case studies, but

21    they really broke down to sale/resale and -- and paired

22    sales.

23         Q    So he had misused the terminology; is that

24    fair to say?

25         A    I don't think that's fair to say.  I think
```

```
 1    "case studies" is a broader term.  I don't think it is
 2    a misuse of the term.  Sale/resale and paired sale is a
 3    little more specific.
 4        Q    What was it that he told you that made you
 5    realize that he was not talking about case studies,
 6    that he was talking about sale/resale and paired sales
 7    analysis?
 8        A    Well, you could -- I don't have an argument
 9    with calling them case studies.  It is just that case
10    studies take a lot -- there's a lot of approaches to
11    case studies.  There's not a misuse of the term there.
12             But when I asked him the specifics, it really
13    broke down into the applications of these two
14    approaches.
15        Q    What specifics did you ask him?
16        A    Well, I -- he said, "I did case studies."  And
17    I said, "Okay.  We do case studies, but tell me more
18    about them."  And as he described what he was doing,
19    they looked to be more sale/resale and paired sales.
20        Q    And what did he tell you specifically that
21    made it appear to be sale/resale and paired sales?
22        A    He had compared properties that were -- that
23    had Chinese drywall issues with otherwise similar
24    properties without Chinese drywall issues.  That's
25    paired sales.  There's language to that effect.
```

1    Q    Did he tell you how many properties he had

2    compared?

3    A    If he did, I don't recall.  It sounded like he

4    went through a fair amount of data.

5    Q    What makes you say that?

6    A    Well, he was talking about a number of case

7    studies and a number of paired sales, but how many, I

8    couldn't tell you.  I've never seen the report.

9    Q    Okay.  Did you ask to see the report?

10   A    No.  They told me they wanted me to just talk

11   about methodology.

12   Q    What do you mean by sale/resale?

13   A    Sale/resale is where you look at a sale of a

14   property and then that same property resells again.

15   So -- so you have a house that's sold, and then, for

16   example, there's a landslide and the house sells after

17   the landslide, and from the sale before and after the

18   landslide there are calculations you can make to see

19   what effect that landslide had on the property value.

20   Q    Because you haven't read Mr. Graziano's

21   report, fair to say you are not able to comment on

22   whether he applied any methodology properly?

23   A    That's fair.  I don't know whether he did or

24   didn't.

25   Q    Aside from the one phone call that you can

 1    remember that lasted approximately 45 minutes that

 2    Mr. Graziano was on and some folks from -- that were

 3    attorneys, do you recall any other conversation that

 4    you had with Mr. Graziano?

 5        A    Well, I mentioned that someone called me

 6    before that, which might have been Mr. Graziano.  I'm

 7    leaning to think it was, but I could be mistaken.  It

 8    was just a quick call.  Other than that, I don't recall

 9    any other conversations.

10        Q    Anything else you remember about that phone

11    call that you had with Mr. Graziano that you have not

12    discussed today?

13        A    Just that I was a little bit -- I think I was

14    a little repetitive.  I'm just talking about

15    methodology.  Right?  I just want to make it clear.

16    I'm just talking about methodology.  I show up all the

17    time at seminars and courses and keynote speeches

18    talking about methodology.  I'm happy to talk about

19    methodology.

20             I just want to make sure I was hearing that

21    straight, that there wasn't an expectation to get into

22    anybody's analysis.  And they said, no, there's no

23    assignment here beyond just talking about methodology.

24        Q    Fair to say that the scope of your assignment

25    was quite narrow?

1     A    It was probably one of the most narrow, if not

2    the most narrow, I have ever had in my career, which

3    was fine with me because I know that information

4    already.

5     Q    Was it your understanding at the time that you

6    talked with Mr. Graziano that he had already done his

7    work in this case, or was he in the middle of doing

8    work in the case?

9     A    I didn't really ask that, but my -- I could be

10   wrong, but my sense was he was done with it.

11    Q    Did he tell you what his conclusions were in

12   this case?

13    A    He told me that he found post-remediation

14   stigma, what we call market resistance, what I call

15   market resistance.  I don't recall any numbers, if he

16   even shared any numbers.  And he asked me something

17   along the lines of, "What do you think it would be?"

18   And I told him I have no idea.  I haven't done the

19   analysis.

20    Q    And there may not be any if you did the

21   analysis; correct?

22    A    That's fair.  Whether there is or isn't and if

23   there is, how much, I have no idea.

24    Q    Did Mr. Graziano say anything during that call

25   that gave you any concern or pause about the

```
 1    methodologies that he used or the way that he applied

 2    the methodologies?

 3        A    The short answer is there was nothing that

 4    gave me any pause.  He didn't say anything sketchy or

 5    unethical or he didn't say anything that struck me as

 6    incompetent.  I say that because -- to answer your

 7    question, but, again, I haven't seen the analysis.

 8        Q    Fair.

 9        A    But nothing -- there were no red flags.

10        Q    Were you asked any questions that you couldn't

11    answer during that call?

12        A    I think I handled them all okay.

13        Q    Did you ask any questions that were not

14    answered during that call?

15        A    No.  Everything was answered.  Again, there

16    was just kind of that surprise factor, such a simple

17    and narrow lane to drive in.  Normally I'm asked to do

18    very broad, large-scale assignments, but that was fine

19    with me.

20        Q    Did anybody explain to you why you were asked

21    to do such a narrow scope of work in this case?

22        A    Just that they -- the only conversations along

23    those lines were along the lines of we just want an

24    independent source, someone that wrote the book, to

25    tell the court that literature reviews and surveys and
```

Confidential — Subject to further Confidentiality Review

```
 1   paired sales and sale/resale are all conventional

 2   approaches.  You would have to ask them why that's

 3   important to the case, but I feel very comfortable

 4   saying that those are standard approaches.

 5        Q    Have you met with or talked to any other

 6   experts in this case?

 7        A    No.  I don't think so.  In fact, I can say for

 8   sure I haven't.

 9        Q    Have you met with or talked to any witnesses

10   in this case?

11        A    No.

12        Q    Have you spoken to anyone about this case

13   other than the attorneys at Colson Hicks or counsel

14   that's here today or other plaintiffs' attorneys?

15        A    I think that sums it up.

16        Q    Did you do anything else to prepare your

17   report?

18        A    I think I laid it out pretty -- already,

19   everything I've done.

20        Q    Can you briefly describe your educational

21   background, sir?

22        A    Sure.  I grew up here in Orange County.  I

23   went to Troy High, and then I went to Cal State

24   Fullerton and ended up graduating in finance and

25   accounting from BYU.  Then I earned an MBA degree from
```

Confidential - Subject to Further Confidentiality Review

1    UCLA, and then I went to Fielding in Santa Barbara and

2    earned a Ph.D.

3         Q    What is -- looking at your -- it's Exhibit 4,

4    this is your CV?

5         A    Uh-huh.

6         Q    Under the Education section, professional

7    studies?

8         A    Right.  Uh-huh.

9         Q    It says, "Appraisal Institute - MAI."  What is

10   that, sir?

11        A    MAI is to appraising what a CPA is to

12   accounting is the way I think of it.

13        Q    And do you need to have an MAI to be qualified

14   to determine whether or not there is diminution damages

15   or diminution in value of a property?

16        A    No.  You don't need -- you don't have to, no.

17        Q    You also have on your CV UCLA Extension

18   Certificate in Real Estate?

19        A    Right.

20        Q    What is UCLA extension?

21        A    Well, after my bachelor's degree, I got

22   interested in real estate, so I took a bunch -- I was

23   living in West L.A., and they had some great classes up

24   there in the extension program, and so I took a bunch

25   of classes.

Confidential - Subject to Further Confidentiality Review

```
 1      Q     What is a certificate in real estate?

 2      A     I don't think it -- it is not a degree.  It is

 3   an extension program.  It's just kind of like for a --

 4   the way I think of it, it's -- it is not academic.  It

 5   is very hands-on practical real estate information.

 6      Q     And what was the purpose of getting a Ph.D.

 7   from Fielding Graduate University?

 8      A     Well, I wanted to get in -- I wanted a

 9   research degree and I find research really interesting,

10   and I wanted to become more proficient at it, so I got

11   a research degree, which was kind of a blend between

12   sociology and economics, somewhat the people behind the

13   statistics and the statistics themselves.

14      Q     And was this an online program?

15      A     No.  You had to take classes at Fielding, and

16   then like any class, some of the classes you do with

17   Skype or Zoom or -- I don't think we had Zoom then.  We

18   had classes, but, no, it wasn't online.

19      Q     Turning back to Exhibit 4, which is your CV,

20   under Licenses and Memberships, where are the licenses

21   here, sir?

22      A     Oh.  What are -- you want me to just go down

23   and tell you what the license is?

24      Q     Yeah.  Well, I'm just trying to understand

25   which one is the license.  Is -- certified general real
```

```
1    estate appraiser, is that a license?

2        A    That's a license.

3        Q    Okay.  What is certified general real estate

4    appraiser?

5        A    That's the license under the federal

6    guidelines now.  It is a state -- it's a state license.

7        Q    Which state are you licensed in?

8        A    I'm licensed in many states, but I think this

9    particular number refers to my California license.

10       Q    Okay.  So you have other states that you are

11   licensed as a general -- certified general real estate

12   appraiser?

13       A    Yes.

14       Q    Where are the other states where you are

15   licensed?

16       A    It has been a while since I looked, but

17   numerous states.  Nevada.  I have been in Hawaii.

18   Whether I'm current there or not, I don't know.  New

19   York.  I'd have to look.  There's numerous states.

20       Q    Is there any reason why you don't list all the

21   states where you are licensed on your CV?

22       A    The only reason is that they -- there's kind

23   of an ebb and flow.  It is a fluid thing because

24   sometimes I get a case in a state and I get the

25   license.  Sometimes I work in an area where you don't
```

```
 1    need a license.  Like right now I'm doing a case in

 2    Canada, and they don't have licenses.

 3          So it just depends.  Trying to keep my CV up

 4    to date with what licenses I don't need anymore and

 5    what new license I have is just not important to me.

 6       Q    Okay.  Would you please turn to page 2 of your

 7    CV.

 8       A    Sure.

 9       Q    Under the section Book Author, you see that

10    there are ten books listed there?

11       A    Right.

12       Q    Is this a complete and accurate list of the

13    books that you have authored?

14       A    Let's see.  Well, Real Estate Damages is --

15    the first and second editions are not listed here.  The

16    short answer is, yes, this is complete, as far as I can

17    remember, of the -- oh, I wrote a book called Bottom

18    Line Results, and then I changed the title to Rich

19    Habits, and I changed the title again to Me We Do Be,

20    and then it took off.  But it is all essentially the

21    same book.

22          I think there is another one called

23    Strategy 360, but it all kind of evolved to become Me

24    We Do Be.

25       Q    Okay.  So Rich Habits, Rich Lives, The Four
```

1    Cornerstones of All Great Pursuits which was published

2    by Leadership Institute Press January 1, 2016, that is

3    the same book as Me We Do Be, The Four Cornerstones of

4    Success which was published by the Leadership Institute

5    Press?

6        A    It is the same book.

7        Q    Okay.  And Bottom Line Results, The Ten

8    Strategies for Achievement, that is the same book as

9    well?

10       A    I changed -- it is essentially the same book,

11   from what I remember.  I was -- I was trying to get

12   this book right, and it took a few attempts before I

13   got it right.  And that was one of the attempts.

14       Q    Okay.  And Strategy 360, Ten Steps to Creating

15   a Complete Game Plan for Business and Life, published

16   by Owners Manual Press March 1, 2009, is that also the

17   same book as Me We Do Be?

18       A    They are all attempts at getting it right,

19   yes.

20       Q    Is there any reason why you didn't list all of

21   the different versions of this book?

22       A    Not particularly other than they were kind of

23   works in process to get to what I wanted, which was Me

24   We Do Be.

25       Q    But you can actually go online and purchase

 1   all the books --

 2       A    I don't think they are in print.  I know -- in

 3   fact, they are not in print anymore.  You might be able

 4   to buy a used version.

 5       Q    Fair to say that these books that we have just

 6   discussed that all kind of led up to Me We Do Be

 7   concern self-help profession, if you will?

 8       A    That's fair.  I do a lot of volunteer work, so

 9   that's where the books mainly go, with the jail and

10   prison and homeless shelters where I do a lot of

11   volunteer work.  I'm trying to help these people get

12   back on their feet.

13       Q    It appears, based on the Google research I did

14   on you and YouTube, that you do a lot of speaking in

15   promoting these books and talking about the lessons in

16   these books.  Is that fair to say?

17       A    Yeah.  I -- like I say, I'm kind of pushing

18   retirement age, and I want to have an active

19   semi-retirement or retirement with volunteer work.  I

20   really enjoy -- in fact, I just gave a lecture two days

21   ago at Cal State Fullerton to kids, you know, starting

22   their careers.  I enjoy that kind of thing.

23       Q    Over the last couple years, what percentage of

24   your professional time has been spent doing the

25   self-help side of your profession versus the appraisal

Confidential - Subject to Further Confidentiality Review

```
 1    side of your profession?

 2        A    It's -- I look at it kind of -- it is more

 3    than a hobby because I'm pretty passionate about it,

 4    but it is more evenings and weekends.  I work full-time

 5    at Landmark.

 6        Q    Okay.  And not to tread over trodden trail,

 7    but just to make sure that I understand, so I apologize

 8    I'm going to ask you the same questions, I just want to

 9    get some dates right if we can get those.

10        A    Sure.

11        Q    When were you first approached about serving

12    as an expert in this case?

13        A    Again, I don't know, but it could have been --

14    I don't think it was before January.  I think it was

15    probably -- probably sometime in January.

16        Q    And you don't recall -- well, strike that.

17             I don't think I've asked this question:  Who

18    first contacted you about working on this case?

19        A    Well, I mentioned a call before with everybody

20    on the line, and I think it was Tony Graziano, but I'm

21    not certain.  And I think it was in either late January

22    or early February.

23        Q    Well, assuming that first call was with

24    Mr. Graziano, do you recall Mr. Graziano explaining to

25    you why he wanted you to testify about methodologies
```

1    that he had used in the case?

2         MR. BREIT:  I'm going to object to the

3    characterization of the question.  I believe the first

4    call was would you be available.  Then there was a

5    second call.

6         THE WITNESS:  Yeah.  I think that's essentially

7    right.  The first call was just about availability.

8         MR. CAMPBELL:  Okay.

9         THE WITNESS:  It wasn't really getting into any

10   substantive issues.

11   BY MR. CAMPBELL:

12       Q    Approximately how long was that first call?

13       A    Very short.

14       Q    Okay.  Like, a minute?

15       A    Well, I don't know if it was that short, but

16   it was basically, "We have a case involving Chinese

17   drywall, would you be available to consult on that,"

18   and I said I'd be happy to discuss it, and then a phone

19   call was set up to discuss it.

20       Q    There was no discussion about the scope of

21   your assignment?

22       A    No, not -- no.  It was just basically more

23   along the lines of availability.

24       Q    Did you agree during that first call to serve

25   as an expert in this case or as a consultant in this

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 277 of 796
Case 2:14-cv-02722-NGG Document 234-4 Filed 03/18/19 Docket 03/18/2019 Page 91 of
122

confidential - Subject to further confidentiality Review

1   case?

2        A    I agreed to discuss it.  I didn't agree to --

3        Q    How many hours have you spent working on this

4   case, Dr. Bell?

5        A    I spent about a day in total looking at the

6   articles again.

7        Q    And when did you spend the day looking at

8   articles?

9        A    It was the last month.  What days, I couldn't

10  tell you.

11       Q    Okay.  Fair to say that you didn't spend more

12  than a few minutes preparing your report in this case?

13       A    I wouldn't say a few minutes.  I read it -- I

14  mean, it was -- I mean, I could read it and time it,

15  but it was pretty short, but it was over a few minutes.

16       Q    Aside from reading it, did you do anything

17  else to prepare your report in this case?

18       MR. BREIT:  Other than what he has already

19  testified to.

20       THE WITNESS:  Yeah.  I've already mentioned --

21       MR. CAMPBELL:  No more speaking objections, please.

22       MR. BREIT:  I think I'm allowed to say what a

23  mischaracterization of a question is, and I will

24  continue --

25       MR. CAMPBELL:  You can object to the form, that's

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 278 of 796
Confidential — Subject to further confidentiality Review
122

 1    fine.

 2        MR. BREIT:  And I'll continue to object and make

 3    sure I clarify what the objection is --

 4    BY MR. CAMPBELL:

 5        Q    Do you understand the question, Dr. Bell?

 6        MR. BREIT:  Let me finish my comments, please.

 7            I want you to be able to ask a clear question

 8    with a clear answer.  I will continue to object and

 9    explain to you so if you want to correct your question,

10    you are free to do.  Otherwise I will not shut up.

11        MR. CAMPBELL:  Well, I never told you to shut up.

12            Will you read back the question for Dr. Bell,

13    please.

14            (Record read as follows:

15            "Question:  Aside from reading it,

16            did you do anything else to prepare your

17            report in this case?")

18        THE WITNESS:  Yeah.  I think that kind of

19    mischaracterizes things.  As I said earlier, I -- the

20    four things that we discussed -- we discussed on the

21    phone to go into it, which were background,

22    qualifications, my fees, and then the important thing

23    was the summary of expert opinions.  That was all

24    discussed.  And, as I said earlier, that was all typed

25    up and I reviewed it.  I didn't make any changes.  It

```
 1   was fine the way it was.

 2          And I think that a little better explains the

 3   process of the report rather than simply reading it.

 4   BY MR. CAMPBELL:

 5     Q    Fair to say that you spent less than an hour

 6   preparing your report in this case?

 7     A    It was a short amount of time.  Whether it was

 8   an hour or slightly more or less, I couldn't tell you.

 9     Q    How many invoices have you submitted for your

10   work in this case?

11     A    I don't know.  I'd have to ask my bookkeeper.

12     Q    Okay.  Do you know the total amount that you

13   have invoiced in this case?

14     A    No.  It is not a lot.

15     Q    You were paid a 10,000-dollar retainer; is

16   that correct?

17     A    Right.

18     Q    And you are being paid $575 for an hour for

19   non-testimonial work; is that correct?

20     A    Right.

21     Q    And $675 an hour for testimony like today?

22     A    Right.

23     Q    Do you know the names of the priority

24   claimant -- priority plaintiffs in this case?

25     A    Do I know the names?
```

```
 1        Q    Correct.

 2        A    No, I don't.

 3        Q    Did you prepare for your deposition today?

 4        A    Yes.

 5        Q    What did you do to prepare?

 6        A    Well, I pretty much discussed it already, but

 7   I talked to Tara yesterday.  I found my notes from

 8   home.  I reread my report, and that's essentially it.

 9        Q    Let's turn to your report, Dr. Bell.

10        A    Okay.

11        Q    Paragraph 1 of your report, does that

12   accurately state your assignment in this case?

13        A    Yes.

14        Q    Were you ever asked to perform any work in

15   this case that you declined to perform?

16        A    No.

17        Q    Let's look at paragraph 2 of your report,

18   Dr. Bell.

19        A    Sure.

20        Q    Is there a reason why you did not include

21   Mr. Graziano's full name?

22        A    No.  No -- the short answer is no.

23        Q    Why did you not explain to Mr. Graziano what

24   is in your report, sir?

25        A    I thought it was self-evident to all the
```

 1     parties, but the case is unclear, we're talking about

 2     Mr. Graziano, Anthony Graziano, who did do an expert

 3     report, which I have not seen.

 4          Q    And you are not offering any opinions about

 5     Mr. Graziano's expert reports or conclusions in this

 6     case; correct?

 7          A    Correct.  And I've said it before, I'll say it

 8     again, I've not seen it, I have not reviewed it, I have

 9     no opinions about it one way or the other.

10          Q    Do you have any concerns or reservations about

11     your opinions in this case in the limited scope of your

12     assignment in this case?

13          A    Well, I've kind of expressed it is unusual to

14     have such a narrow scope, but I'm not concerned about

15     it.  I'm happy to talk about methodologies.

16          Q    Let's turn to page 2 of your expert report.

17     Section III is titled "Summary of Expert Opinions, Work

18     Performed and Basis for those Opinions."

19               Do you see that, sir?

20          A    Sure.

21          Q    And Section III of your report is comprised of

22     four paragraphs, which are paragraphs 6, 7, 8, and 9.

23               Do you see that, sir?

24          A    Right.

25          Q    Okay.  Fair to say that paragraph 6 of your

1    report is not an opinion?

2        A    That's fair.  It is more a foundational

3    statement for my opinions, yeah.

4        Q    Is there a reason why you incorporated your

5    book, Real Estate Damages, Third Edition, into this

6    report?

7        A    Well, yes.  I think it is self-evident.  I'm

8    the author of the book.  A lot of people use the book.

9    And my understanding is that I'm happy to talk about

10   the methodologies within the book and refer to the book

11   perhaps in response to questions you or somebody else

12   poses to me.

13       Q    Is the entire book relevant to your opinions

14   in this case?

15       A    No, but -- but the book does have the

16   methodologies explained.

17       Q    Okay.  Which chapters or pages of your book

18   are relevant to your opinions in this case?

19       A    Well, Chapter 1 would be relevant to any case.

20   And then probably Chapter 8, Environmental Issues, and

21   probably Chapter 6 with Construction Defect.  Those

22   would be the primary chapters.

23       Q    Is there a reason why you didn't incorporate

24   any of your other books into this report?

25       A    Well, I wrote a pocket book -- a couple pocket

 1   books on real estate, but whatever is relevant in there

 2   would be in Real Estate Damages already.  The other

 3   books are really not on topic.  Real Estate Damages is

 4   the -- I think best kind of establishes the

 5   methodologies for -- for these kinds of cases.

 6       Q    Let's look at paragraph 7 of your expert

 7   report.

 8       A    Sure.

 9       Q    Will you please read paragraph 7 into the

10   record?

11       A    Sure.

12            "It is my understanding that, in

13       calculating diminution in value for

14       priority claimants, Mr. Graziano used

15       four methodologies:  A literature

16       review, paired sales analysis, scripted

17       survey method, and a sale/resale

18       analysis.  These are all appropriate

19       methodologies as outlined in my book

20       Real Estate Damages, Third Edition."

21       Q    And the basis of your understanding of the

22   methodologies that Mr. Graziano used, is that the

23   telephone conversation that you had in which you spoke

24   to Mr. Graziano?

25       A    Yes.  That's the methodologies he told me he

Confidential -- Subject to Further Confidentiality Review

```
 1   used.

 2       Q    But you are not sure if he used them because

 3   you haven't read the report; correct?

 4       A    I have not read the report.  He told me that

 5   he used those approaches.

 6       Q    But you have not confirmed that he used those

 7   approaches, correct?

 8       A    Other than him telling me on a phone

 9   conversation, I have -- that's my only basis for

10   understanding he used them.

11       Q    Let's look at paragraph 8, please.

12       A    Sure.

13       Q    Fair to say that paragraph 8 is not an

14   opinion?

15       A    I don't know if that's fair or not.  I'm -- if

16   asked questions about what generally causes stigma or

17   diminution of value in the marketplace, I'm happy to

18   answer those questions.  And whether they are my

19   opinions or they are just established appraisal

20   approaches and appraisal methodologies, I guess we

21   could get into a discussion on semantics, but I'm happy

22   to talk about that topic and speak to that topic.

23       Q    Okay.  So what specifically is the opinion

24   that is in paragraph 8 of your report?

25       A    Well, just general information about what --
```

Confidential - Subject to Further Confidentiality Review

1   what risk is, what market resistance is, what causes

2   it, what mitigates it, those types of things.

3       Q   Okay.  You don't talk about risk in the report

4   in paragraph 8.

5       A   I don't use the word "risk," but risk is

6   synonymous with stigma.  In fact, risk is the proper

7   term.  Stigma is more of a kind of a slang term.  It's

8   within USPAP, and they are synonymous.

9       Q   Is there a reason why you use the term

10  "stigma" instead of "risk" in your report if stigma is

11  the slang term and risk is the proper term?

12      A   Probably because stigma is used more commonly.

13  People are more familiar with the term stigma.

14      Q   Let's look at paragraph 9 of your report.

15  Fair to say that paragraph 9 is not an opinion, sir?

16      A   That's kind of one of those -- I don't know

17  that I can say that's not an opinion.  I -- my

18  opinions -- my position is that they are indeed

19  expressed with some reasonable degree of probability.

20  And I have been designated as an expert many times in

21  this field, so it kind of speaks for itself there, I

22  think.

23      Q   What does -- what does a reasonable degree of

24  probability mean?

25      A   Well, I don't know the legal semantics of it,

 1    but the way I think of it is the opinions I have would

 2    represent certainly my opinions as the author of this

 3    book and certainly a position that they reflect the

 4    appraisal profession and certainly more likely than not

 5    in terms of what I would express.

 6        Q    Have you ever used the phrase "reasonable

 7    degree of probability" in any of your other expert

 8    reports?

 9        A    May have.  I don't know.  I've written a lot

10    of reports.

11        Q    You don't know?

12        A    Reasonable -- I may very well have.  We do a

13    lot of statistical things.  That terminology comes up

14    all the time.

15        Q    All right.  I just want to get clear on

16    several other subjects you have no opinion on just to

17    make sure that there's no misunderstanding here.

18        A    Sure.

19        Q    You are not offering an opinion on quality of

20    information that Mr. Graziano used in preparing his

21    expert reports in this case?

22        A    Correct.

23        Q    And you are not offering an opinion on

24    quantity of information that Mr. Graziano used in

25    preparing his expert reports in this case?

Confidential - Subject to Further Confidentiality Review

```
1      A    Correct.

2      Q    And you are not offering an opinion as to

3  whether Mr. Graziano properly applied any methodology

4  in preparing his expert reports in this case?

5      A    Correct.

6      Q    And you are not offering an opinion as to

7  whether there are any stigma damages associated with

8  any of the 20 priority plaintiffs' properties in this

9  case?

10     A    I don't know one way or the other, that's

11 correct.

12     Q    So you are not offering an opinion?

13     A    Right.

14     MR. CAMPBELL:  Is it okay with you to take a break?

15 We can keep powering through, but we may try to pare it

16 down a little bit.  So now is a good time to take a

17 break.

18     THE WITNESS:  Works for me, if it works for you.

19     MR. CAMPBELL:  It works for me.

20     THE WITNESS:  Sure.

21     MR. CAMPBELL:  Let's do that.

22     VIDEO OPERATOR LOPEZ:  We are now going off the

23 record.  The time is approximately 10:47 A.M.

24          (Recess taken.)

25     VIDEO OPERATOR LOPEZ:  With the approval of
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 288 of 796
Case 2:14-cv-02722-MCE-DB Document 224-4 Filed 01/30/19 in TXSD Page 82 of
122
Confidential – Subject to Further Confidentiality Review

1    counsel, back on the record.  The time is approximately

2    11:06 A.M.  This marks the beginning of Recording

3    Media 2.

4    BY MR. CAMPBELL:

5         Q    Dr. Bell, I wanted to ask you about the four

6    methodologies that you understand Mr. Graziano used in

7    his expert reports in this case.

8              Just briefly, what is a literature review?

9         A    Literature review is where you go -- typically

10   what appraisers do is we go to the Lum Library, which

11   is maintained by the Appraisal Institute.  Or you could

12   go to academic searches, NexisLexis [sic] or Google

13   Academics, and you put in key words.  For example, in

14   this case you would put in probably "Chinese drywall,"

15   and up come all the articles that have been written on

16   the topic.  And you review the literature and you see

17   what your colleagues in the field have been researching

18   and writing about in the field.

19        Q    Okay.  And paired sales analysis?

20        A    Paired sales, in a nutshell, is to -- the

21   simple example I give as an instructor for the

22   Appraisal Institute is you have got house A and house

23   B, and house A is just like house B except house A has

24   a pool, and they both sell.  And you look at house A

25   sold for $300,000 and house B sold for 275,000.  So the

1    difference is attributable to the pool.  It is a way to

2    isolate out pools or any distinctive characteristic.

3        Q    Is that the same thing as a contingent

4    evaluation?

5        A    No.  Contingent evaluation is another term

6    given for surveys.  Surveys and contingent evaluations

7    are synonymous.

8        Q    Okay.  What's a survey?

9        A    A survey -- in the appraisal profession we

10   verify our sales, or we attempt to.  We call the

11   broker, the agent or the property owner, the seller.

12   We call a party to the sale and say, did this sale take

13   place?  What was -- I have the sales price is this, is

14   that correct?  I understand the house was -- had these

15   characteristics or the property, if it's a shopping

16   center, whatever.

17        And that's standard within the appraisal

18   profession.  A survey is kind of a step beyond where

19   you call and ask the opinions of buyers and sellers or

20   brokers or agents, and you document their answers.

21        And that can be done in -- there's different

22   kinds of surveys it breaks down in the book.  But you

23   can have them scripted or unscripted.  Typically

24   scripted is better because then everybody knows what

25   was asked and in what order it was asked and can see if

1  those questions were fair or unfair or leaning in some

2  way or another.

3         Then it breaks down even further into you are

4  interviewing people that had that condition itself,

5  people that have heard about it or just people -- just

6  generally what would you do if this happened to you,

7  but it hasn't happened to you.  So there's different

8  categories.

9         But that is -- those are the basics of a

10 survey.

11     Q    So is a scripted survey method one of the

12 categories of surveys?

13     A    Yes.  There's scripted and unscripted.  And I

14 think a verification would be more of an unscripted

15 survey or an unscripted conversation.  Scripted are a

16 little more formal and the questions are actually

17 written out.

18     Q    And then is a contingent evaluation a scripted

19 or unscripted survey?

20     A    Usually the term "contingent evaluation" is --

21 leans more -- I don't know that there's a definitive

22 rule on that, but the way I think of it is a contingent

23 evaluation is more a scripted survey.

24     Q    And what is a sale/resale analysis?

25     A    Yeah.  You asked that earlier today where I

 1    gave the example of a landslide.  You have a house that

 2    showed, and then there's a landslide, and then the same

 3    house resells after the landslide.  And you can look at

 4    the two sales prices and figure out what was done in

 5    terms of repairs, if indeed repairs were done, and

 6    adjustments for the market trends and calculate what

 7    that effect -- calculate in that example what the

 8    effect of the landslide was.

 9        Q    Fair to say that surveys should not be a

10    substitute for methods involving market data?

11        A    That's a pretty -- I generally agree with

12    that.  The preferential type of data is transactional

13    data where there's been an actual sale.

14             I've been doing this type of work with

15    distressed or damaged properties since 1986, so I've

16    come across a handful of cases where they were just so

17    unique, I could not -- and nobody could find actual

18    transactional data, so we would use surveys.

19             But to rely only on surveys is not recommended

20    unless there's one of these extreme situations.  But to

21    do surveys in conjunction with other approaches is done

22    all the time.

23        Q    But if you had a choice where you do have

24    available market data, would it be inappropriate to use

25    a survey to update, revise, or replace a scripted --

Confidential - Subject to Further Confidentiality Review

```
 1    excuse me, a paired sales analysis or a sale/resale

 2    analysis?

 3        A    I'm not familiar with a case where -- speaking

 4    for myself -- where I have let a survey replace -- I

 5    think that was your word, replace a paired sales or

 6    some kind of transactional type of data.

 7             In my mind, surveys are usually more of a

 8    support or a -- just another direction of looking at

 9    things to confirm or reconfirm that everything adds up

10    properly.

11        Q    What about using surveys to update a paired

12    sales analysis?

13        A    I'm not exactly sure what you mean by update.

14    But, again, surveys are usually supportive, have more

15    of a supportive role.  In a handful of cases they are

16    given a primary role.  They are more of a secondary

17    role.  Generally speaking.

18        Q    Can you please turn to page 323 of your Real

19    Estate Damages, Third Edition book.

20        A    Sure.

21             I'm there.

22        Q    Let me get there too.  One second, sir.

23             If you look at the end of the third full

24    paragraph, you write that:

25             "The effect of a detrimental
```

Confidential - Subject to further confidentiality Review

```
 1        condition cannot be generalized and is

 2        unique to a particular market and the

 3        facts of a particular property at a

 4        specific date and value."

 5             Do you see that?

 6        A    Yes.

 7        Q    Does that mean that real estate

 8   damages -- strike that.

 9             Does that mean that a real estate damages

10   appraisal should be done on a property-specific basis?

11        A    Well, if your question implies that you can do

12   a mass appraisal technique, I wouldn't agree with that.

13   There's -- there's enormous sections of USPAP -- I'm

14   presuming you know what USPAP is all about?

15        Q    No.

16        A    Oh, okay.  Let me back up.

17             To answer that question, there's a document

18   called USPAP, U-S-P-A-P, and it stands for Uniform

19   Standards of Professional Appraisal Practice.  Those

20   are the federal regulations we have to comply with.

21             And enormous portions of that document have to

22   do with mass appraisal techniques, for example, in a

23   class-action lawsuit, which make it clear that it is --

24   it is okay, given the right approach and circumstances,

25   to appraise on a mass basis.
```

Confidential - Subject to further confidentiality review

```
 1              So part of your question kind of triggered

 2     that -- the position that you don't have to go property

 3     by property necessarily.  You can do things on a mass

 4     basis.

 5         Q    Correct me if I'm wrong, Dr. Bell, I believe

 6     earlier you testified that during your call with

 7     Mr. Graziano, and the others that were on the call,

 8     that you mentioned that there were other methodologies

 9     out that were appropriate to use, one of which was a

10     mass appraisal; is that correct?

11         A    Well, I think -- I think my position could be

12     appropriate to use.  I don't know -- I don't know

13     anything about this case, really.

14         Q    Right.

15         A    But it could be.  There's a number of other

16     approaches, and some of those could be appropriate or

17     not, depending on the case.

18         Q    And so I guess what my question is -- more

19     specifically is, is mass appraisal a different type of

20     methodology than the four that you understand

21     Mr. Graziano used in this case?

22         A    I don't know that I would characterize it that

23     way because the -- the paired sale approach can be

24     determined for a number of properties and then applied

25     in some cases across -- across a larger number of
```

Confidential - Subject to Further Confidentiality Review

```
 1   properties.

 2         For example, if I do a number of paired sales

 3   to determine the contributing value of a pool to a

 4   house is $25,000 or 25- to $30,000 per property, in

 5   some situations I might be able to apply that across

 6   the entire tract or the entire neighborhood, even

 7   though I haven't looked at every single instance of

 8   that happening.

 9         So applications of the case studies, paired

10   sales approaches, sale/resale, can be applied on a mass

11   scale in the right circumstances, but not in all

12   circumstances.

13   Q    When you say "in the right circumstances," you

14   are talking about when you are looking at different

15   properties in the same tract or the same neighborhood;

16   is that correct?

17   A    Or across a homogeneous, you know, area.

18   There's -- for example, here in Southern California, I

19   presume you know, a lot of people know, that we have

20   some areas that are very vast tract areas.  They may

21   not be the same neighborhood, but the homes for some

22   distance are very homogenous.  They're -- they are

23   mass-produced tract homes.  So you might go beyond the

24   neighborhood.

25         But when you make those comparisons, we are
```

Confidential - Subject to Further Confidentiality Review

1    talking about homogeneous neighbor -- or homogeneous

2    areas or regions.  It just depends.  It depends on the

3    case.

4            Some cases are very, very diverse where I've

5    seen some -- frankly, some shacks in the same region to

6    mansions on the water.  In those cases, you wouldn't --

7    the contributing value of a pool to the small,

8    run-down, tear-down home may not be the same as to a

9    mansion.

10           So you have to inspect the areas.  You have

11   to -- you have to use common sense and compare an apple

12   to an apple.

13       Q   I'm just trying to get an understanding where

14   there would be a brighter line.  Could you do a mass

15   appraisal across different counties?

16       A   Oh, yeah.  I mean, we are doing -- it is no

17   secret we are doing mass appraisals right now for -- in

18   Houston, we are doing several right now in the Houston

19   flood, which is -- you know, when we say mass, it is a

20   massive area, and we are doing, you know, vast areas.

21           I was just working on a case that's in three

22   different cities.  Yeah, you can do mass appraisals

23   across city or county lines.

24       Q   Would it be -- could you do that -- strike

25   that.

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 297 of 796
Case 2:09-md-02047-EEF-MBN Document 2134 Entered on FLSD Docket 12/01/19 Page 91 of
122
Confidential - Subject to further Confidentiality Review

1          Could you do a, quote-unquote, "mass

2    appraisal" across county lines when the way that you

3    are doing the mass appraisal is a paired sales analysis

4    as opposed to some other way that you could do a mass

5    appraisal?

6     A    It is conceivable.  I don't think there's

7    anything that precludes that.  It is less of a question

8    of the county lines or the zip code lines or we use

9    census tract lines.  There's all kinds of lines that

10   delineate areas.

11          It is more a question of homo -- if it is a

12   homogenous, meaning similar, property type, the way we

13   typically do it we look at the median home income or

14   the median home price, but the areas we are comparing

15   it to have a similar median home price, but they may be

16   some great distance away, but -- and it is also

17   important to go there and drive the area and visually

18   inspect them to see if they look the same, if they have

19   the same features and amenities and are otherwise

20   similar.

21          So -- but there's nothing that says you can't

22   cross county or -- lines or anything like that.  It is

23   done all the time.

24     Q    So the determining factor on whether or not

25   you can do a paired sales analysis for a mass appraisal

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 298 of 796
Case 2:14-cv-02722-MLCF-DEK Document 34-3 Filed 04/10/15 Page 92 of
122

Confidential - Subject to Further Confidentiality Review

1   depends on whether or not the properties at issue had

2   the same median price; is that correct?

3       A    Well, I don't want to pigeon-hole into that

4   being the one singular defining characteristic, but it

5   is important that -- what I'm trying to convey is that

6   it is important that we are talking about homogenous

7   areas.

8           You know, to do a paired sales of a -- of a

9   run-down, tear-down property and apply those results to

10  the mansions could be inappropriate.  You have to look

11  at the data and make sure you are comparing, as I say,

12  apples to apples.

13      Q    Could you give me a little more detail what

14  you mean by homogeneous areas in this context?

15      A    Sure.  I think I've already used up my best

16  example, which was a case -- it was actually

17  coincidentally in Florida where -- where somebody had

18  done a mass appraisal technique, and he was trying to

19  lump into one regression analysis not just residential

20  but government buildings, schools, churches,

21  synagogues, city halls, auto-repair facilities,

22  industrial, hotels, all into one regression, which was

23  absurd, and applying a mass appraisal technique with

24  diverse property types.

25          So to further clarify where I'm coming from, I

 1    think most people would agree that if you're doing

 2    paired sales for residential, those are only good for

 3    residential.  You wouldn't take those approaches and

 4    apply them to office buildings or hotels or shopping

 5    centers.  So we are talking property type.

 6            And then sticking -- and then just assuming

 7    you are dealing just with residential, that we are

 8    talking about properties that are generally similar.

 9    The term is comparable, not identical, but it is

10    comparable.  They are similar.  And it is important to

11    compare the property to other comparable properties.

12            And if you have got a, you know, house here in

13    Irvine where things are very homogeneous, things are

14    very master-planned, right where we happen to be right

15    now, I don't know that I would take those results and

16    then go down to Laguna Beach where everything is built

17    in the 19 -- I don't want to say everything, but lots

18    of properties are built in the 1930s and are very

19    diverse and very custom.  And you have got the water

20    amenity, which has enormous effects on value.  And then

21    take the results here and apply them to Bellaire or

22    Beverly Hills or Holmby Hills, which aren't far from

23    here, which are mansions.  You want to stay within the

24    same general characteristics.

25            And there's also issues of suburban, rural,

 1    and urban.  If you are looking at things in an urban

 2    market, you want to be -- I'm not saying you can't, but

 3    you want to be careful before you apply those results

 4    to an urban or -- if you are looking at suburban, you

 5    know, before you apply it to urban, you have just got

 6    to look at the characteristics and make sure that you

 7    are using comparable data.

 8        Q    Have you ever seen a detrimental condition

 9    impact the value of property in the exact same

10    percentage across different real estate markets, across

11    different property types during different periods of

12    time?

13        A    That's an interesting question.  I mean, the

14    short answer is no.

15            But that being said, there's always a margin

16    of error.  With any -- with any study, any statistical

17    study, any study you read in the newspaper, there's

18    going to be a margin of error, you know, plus or minus

19    3 percent or plus or minus 5 percent.  So getting the

20    exact same number out of everything, the markets are

21    not that efficient, and that would be an unrealistic

22    expectation.

23            So, again, the short answer is no.  I would

24    expect some range and some flexibility, that's just

25    normal.

Confidential - Subject to Further Confidentiality Review

```
 1       Q     What range and flexibility would you think

 2  would be normal?

 3       A     It just depends because with, for example,

 4  airport noise, those -- those numbers are

 5  extraordinarily well researched and extraordinarily

 6  precise.  I say that and I'm going to have to retract

 7  it because -- I retract it in part because we now have

 8  this new next-gen airline thing, and that's revamping

 9  all the, you know, decades of literature and studies

10  done on it.  It is a game changer.

11             But that is, of all detrimental conditions,

12  probably the singular most researched.  And you get

13  more precise numbers.  Something that's more unusual,

14  you are going to have more flexibility.  So there's no

15  one size fits all for the margin of error.

16       Q     Chapter 12 of your book --

17       A     Uh-huh.

18       Q     -- Real Estate Damages, Third Edition, you

19  have a section on the scientific method; is that

20  correct?

21       A     Uh-huh.

22       Q     What role does the scientific method play in

23  an appraiser's expert report analyzing real estate

24  damages?

25       A     Well, I made a discovery that -- it was
```

1   actually when I was getting my Ph.D. that the

2   scientific method has these five steps, and I found a

3   book on economics and the scientific method, and it

4   correlated and reconciled almost perfectly with the

5   five approaches that appraisers are supposed to use.

6           And so I actually wrote an article on it, I

7   put it in the book as well, that what we are doing does

8   reconcile ideally with the scientific method, meaning

9   that we do things in a -- in a process that, done

10  correctly, can be replicated by others, and if others

11  do it properly, they will get similar results.  That's

12  the essence of that -- of that chapter.

13      Q    And you have criticized other appraisers'

14  expert reports for failing to test their results as

15  required by the scientific method; correct?

16      A    I've criticized lots of reports, and that can

17  be one of the reasons, yes.

18      Q    And you have specifically criticized reports

19  for failing to test the results as required by the

20  scientific method; correct?

21      A    I would -- I'm not sure what you are referring

22  to, but that could be one of the criticisms I had, yes.

23      Q    Okay.  And you think that's a valid criticism?

24      A    It can be, sure.

25      Q    On page 321 of your book --

Confidential - Subject to further Confidentiality Review

```
 1       A     Uh-huh.

 2       Q     -- on the second paragraph you write:

 3             "To be valid, a measurement process

 4       should have discriminant and convergent

 5       validity."

 6       A     Uh-huh.

 7       Q     Do you see that, sir?

 8       A     Yeah.

 9       Q     What does that mean?

10       A     I have to read it.  I wrote it, but I have got

11   to get it in context here.

12       Q     Sure.

13       A     Yeah, I mean, this is basically saying that

14   when you are putting data into your analysis,

15   discriminant means -- bring it to real estate.  It

16   would be like the color of the house.  The house is

17   pink or yellow or blue, that would be kind of

18   discriminant.  It doesn't really matter much.  It is

19   not going to really show up on the value of the price.

20             Convergent means the data is converging and

21   telling you the same story over and over again, like

22   the pool example, where pools contribute so much to the

23   value.  That's the essence of what that is saying.

24       Q     Can you give me an example where an analysis

25   or expert report done by an appraiser would not satisfy
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 304 of 796
Case 2:14-cv-02722-NGG Document 224-4 Entered on FLSD Docket 05/13/2019 Page 98 of
122

Confidential - Subject to Further Confidentiality Review

```
 1   the requirement to have discriminant data -- or

 2   results, rather?

 3       A    Would not satisfy that?

 4       Q    Right.

 5       A    Well, like, for example, I think the big one

 6   is square footage.  I mean, how big is the house.

 7   That's going to be -- I'm sorry, your question was on

 8   discriminant or convergent?

 9       Q    Discriminant validity within the context of

10   the results of a --

11       A    Right.

12       Q    -- analysis or expert report.

13       A    Well, discriminants are kind of the variables

14   that don't matter much.  So ignoring a discriminant

15   variable doesn't -- isn't going to have much

16   consequence.  It is more the convergent, the ones that

17   do come together and converge to tell you something.

18           So to ignore discriminant variable is kind of

19   like saying I never put in my report what color the

20   houses were, but the -- the issue is it doesn't really

21   matter.  It is not -- it is not real relevant.

22       MR. CAMPBELL:  Please mark this as Exhibit

23   Number 9.

24           (The document referenced below was

25       marked Deposition Exhibit 9 for
```

```
 1         identification and is appended hereto.)

 2    BY MR. CAMPBELL:

 3         Q    I'm handing you Exhibit 9, which is a

 4    declaration and expert report that you gave in the

 5    matter of the Complaint of Bertucci Contracting

 6    Company, LLC, as owner of the M/V Sharon Gale.

 7              Do you recognize this document?

 8         A    I do recognize the document.  I'm just trying

 9    to remember what property this was, get it back in my

10    head.

11         Q    Take your time.  And while you are doing that,

12    since we are kind of nearing the end here, do you mind

13    if we take your binder and make a copy of it so you can

14    leave with it?

15         A    Sure.

16         Q    I mean, just so you know, whatever we have

17    already that's in there, we are not going to copy --

18         A    Sure.

19         Q    -- just whatever we don't have.

20         A    Whatever you want to do with it.  It's all

21    yours.

22              Okay.

23         Q    Is there anything else that you brought with

24    you other than the two binders that I just gave to

25    Aaron?
```

```
1       A    No, sir.  Not -- not relevant to the case.

2       Q    Okay.  So you do recognize the document?

3       A    I do.  Just for some reason, I want to

4    remember which -- I know John Kilpatrick's work.

5       Q    So on page 4 of your expert report, which is

6    Exhibit A to your declaration, you provide a summary of

7    your expert report.

8            Do you see that?

9       A    Yes.

10       Q    Okay.  And on page 6, step 4, scientific

11    method as you have laid it out is to test the

12    hypothesis.

13            Do you see that?

14       A    Yes.

15       Q    And part D of your summary of the expert

16    report in the matter of the Complaint of Bertucci

17    Contracting Company, you state:

18            "The scientific method requires

19       that results be tested.  Yet Kilpatrick

20       failed to identify a single property

21       that actually incurs the 30 percent loss

22       his study predicts."

23       A    Right.

24       Q    Do you see that, sir?

25       A    Right.
```

1    Q    And Kilpatrick is the appraiser that was hired

2    by the plaintiffs in that case?

3    A    That's right, yeah.

4    Q    Fair to say that an appraiser's result is not

5    scientifically valid if the result does not occur in

6    any of the properties that are the subject of the

7    appraiser's report?

8    THE WITNESS:  Can you read that one back again,

9    please.  I'm sorry, Miss.

10       (Record read as follows:

11       "Question:  Fair to say that an

12       appraiser's result is not scientifically

13       valid if the result does not occur in

14       any of the properties that are the

15       subject of the appraiser's report?")

16    THE WITNESS:  The -- that's a -- that's an

17    interesting question.  The answer is if you measure a

18    diminution of value, in an informed market you would

19    expect to see those -- those consequences or that

20    diminution of value repeat itself throughout the

21    market.  Excuse me.

22       But that's not always the case because, for

23    example, the market might not be informed.  For

24    example, you know, I did some homes that were built on

25    a -- unknowingly they were built on a landfill, and

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 308 of 796
Case 1:14-cv-22069-MGC Document 224 Entered on FLSD Docket 08/15/2019 Page 302 of 122

Confidential - Subject to Further Confidentiality Review

1    there was methane coming into the homes.  Well, if you

2    look at the sales of the homes, the sales all looked

3    normal because the market was uninformed.  They had no

4    idea they were buying homes on this methane-prone

5    landfill.

6         So when the market is informed, you would

7    expect to see things as your study reflects, reflected

8    within the market data.

9         But that's -- I'm hedging a little bit because

10   the market has got to be informed.

11       MR. CAMPBELL:  Okay.

12       THE WITNESS:  And there may be other issues, but

13   generally speaking, you would expect to see the

14   discounts, if there are discounts, replicated

15   throughout the market.

16   BY MR. CAMPBELL:

17       Q    So assuming that you have an informed market,

18   fair to say that an appraiser's result is not

19   scientifically valid if the result does not occur in

20   any of the properties that are the subject of the

21   appraiser's report?

22       A    Generally, that's correct.  This report -- I

23   still am trying to remember which case this was.  The

24   context -- if my memory is right, and I would have to

25   read this again, this is a case where John Kilpatrick

```
1    had some case studies and applied, I believe, a

2    30 percent discount across all these properties, and

3    yet not one of those properties actually incurred a

4    30 percent discount or any discount.  And the market

5    was very well informed about the whole incident.  It

6    was a class action lawsuit.  There's articles and

7    literature.  It wasn't a matter of being misinformed.

8    And in that case, my criticisms very much do stand in

9    this case.

10          So the short answer is, yes, you need to pull

11   data from the market.  The market needs to be informed.

12   If it is not informed, you need to pull data from a

13   market that is informed.  And where the market is

14   informed, you should see a replication of that data

15   within the marketplace.  That's part of the scientific

16   method.

17      Q    Right.  And so like in this Bertucci case

18   where an appraiser comes up with an amount for

19   diminution in value or a stigma, you would expect to

20   see that -- that amount actually occur in one of the

21   subject properties; correct?

22      A    Yes.  In this case, yes, because the -- from

23   my recollection, I think this was a construction dust

24   case --

25      Q    Right.
```

```
 1       A       -- if my memory is right, after Hurricane

 2    Katrina, and the market was very informed.  The dust

 3    was airborne and -- from the construction going on

 4    nearby when they reconstructed the I-10, and yet he

 5    didn't pull any data from that market, which makes no

 6    sense.

 7       Q    Let's look at part E on page 6 of your expert

 8    report in the Bertucci case.

 9       A    I'm sorry, which page are you on?

10       Q    Page 6, part E.

11       A    Okay.

12       Q    You state:

13            "Scientifically valid studies must

14       reconcile and validate one another, yet

15       Kilpatrick's test results of

16       1.8 percent, 30 percent, 58 percent, are

17       enormously divergent."

18            Do you see that?

19       A    Yeah.

20       Q    Explain to me what you mean there.

21       A    As I said earlier, you expect a range, and --

22    you know, plus or minus 3 percent or plus or minus

23    5 percent or even larger, depending on what the case

24    is.  But here, he has got literally 1 percent to

25    58 percent.  And I've seen lots of good, credible
```

Confidential - Subject to further Confidentiality Review

1  studies, and usually the range is, you know, narrower

2  than that.

3      Q    What is the typical range?

4      A    There's no typical range, but that's wildly

5  divergent, I mean, 1 percent to 58 percent.

6      Q    What about 30 to 58 percent, is that wildly

7  divergent?

8      A    No, that doesn't sound that -- I mean, this

9  is -- I can do the math of 1 to 58.  That's 58X, you

10  know, divergency.  30 to 58 is under 2X, so that might

11  apply in some cases.  But this strikes me as pretty

12  wildly divergent.

13      Q    I notice in this expert report in the Bertucci

14  Contracting case and others I've read of your expert

15  reports, you typically have a section where you are

16  citing a lot of different articles and books by

17  appraisers in the field.

18      A    Uh-huh.

19      Q    Is that typically something you do in your

20  expert reports?

21      A    Typically, not always, but yes.

22      Q    I want to ask you about a few of -- a few

23  articles and authors.  Who is Thomas O. Jackson?

24      A    Tom Jackson is a Ph.D. MAI.  He is in Texas.

25  He taught at Texas A & M.  I co-wrote an article with

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 312 of 796
Case 1:21-cv-22084-MGC Document 22-1 Entered on FLSD Docket 08/15/2021 Page 106 of
122
Confidential - Subject to further confidentiality review

1    him.  He is retired now, I understand, but he's a

2    well-respected expert in the field.

3        Q    Okay.  Someone that you respect?

4        A    I respect him, sure.

5        Q    Who is Christine Matthews?

6        A    She wrote an article, I'm pretty sure, but I

7    don't remember what offhand.  I don't know that I know

8    her.

9        Q    Is Ms. Matthews someone that's well respected

10   in the field like Mr. Jackson?

11       A    She might be the research associate that works

12   for Tom Jackson, I'm not sure.  But I don't know that I

13   know her.

14       Q    Okay.  Who is Michael V. Sanders?

15       A    Mike Sanders is a colleague of mine.  We were

16   partners for 15 years.  They still -- we still work

17   together to this day.

18       Q    Is Mr. Sanders someone who is well respected

19   in the field like Mr. Jackson?

20       A    Yes I respect Mike Sanders a lot.  Sure.

21       Q    Who is Richard J. Roddewig?

22       A    Dick Roddewig, he is out of Chicago.  He has

23   taught courses through the Appraisal Institute.

24       Q    Is he someone that's well respected in the

25   field like Mr. Jackson and Mr. Sanders?

```
 1      A    Well, Tom Jackson's work I haven't had issues

 2   with.  Mike Sanders' work I haven't had issues with.  I

 3   have had issues with Dick Roddewig's quality of work.

 4      Q    What were those issues?

 5      A    I saw a report he did in Hawaii where he

 6   didn't -- he had a bunch of market data in the addenda,

 7   but it wasn't identified, it wasn't dated, it wasn't --

 8   there's no addresses, there's -- and it was -- I wasn't

 9   buying it, bottom line.

10           I wasn't involved in the case, but someone

11   showed it to me, and I agree with whoever showed it to

12   me that it was -- it was not credible, from what I saw.

13      Q    Is Mr. Roddewig someone that you respect?

14      A    I've met him a couple times, I like him.  I've

15   only seen his work a couple times, and I think the

16   couple times, it wasn't -- it sure wasn't up to my

17   standards, I can tell you that.

18      Q    But you have cited a number of his articles?

19      A    He has written some good articles, yeah.

20      Q    Who is Albert R. Wilson?

21      A    Al Wilson is out of Colorado, I believe.  He

22   is not an MAI, but he has written quite a bit on the

23   topic of real estate damages and environmental issues.

24      Q    Is Mr. Wilson someone that is well respected

25   in the field like Mr. Jackson?
```

```
 1       A    Well, unlike Mr. Roddewig, I have not seen Al

 2    Wilson's work.  I've read his articles, and I've spoken

 3    to him many times.  And from what -- I haven't read

 4    anything he has published that I disagree with that I

 5    can think of.  He's written some good -- he wrote a

 6    book, too, and some articles, and they look good to me.

 7       Q    So is Mr. Wilson someone whose opinion you

 8    respect?

 9       A    I haven't seen his opinions expressed in work,

10    so I couldn't say one way or the other.  I could say

11    that he has written some very intelligent articles, and

12    I like his work, too.

13       Q    Can you turn to, I believe it is Exhibit

14    Number 1, Deposition Exhibit Number 1, which is the

15    depo notice.

16       A    Sure.

17       Q    I'm trying to find my copy.  Please turn to

18    page 6 where the document requests are listed.

19       A    Sure.

20       Q    Okay.  Let's look at Document Request

21    Number 1.  All documents and data you reviewed,

22    considered, or relied upon in forming your opinions in

23    this matter.

24            Do you see that?

25       A    Yes.
```

```
 1      Q    Okay.  Have you given to counsel or brought

 2   with you today all the documents, data that you

 3   reviewed, considered, or relied upon in forming your

 4   opinions in this matter?

 5      A    Yes.

 6      Q    Document Request Number 2 is your entire file

 7   relating to the properties of the Florida Priority

 8   Claimants.

 9           Do you have any responsive documents to this

10   question?  Have you submitted your file?

11      A    I've submitted everything I got.

12      Q    Everything.  Everything you have done in this

13   case you have submitted?

14      A    Right.

15      Q    Every document you have reviewed or relied on

16   in connection with this case you have submitted?

17      A    Right.

18      Q    And all your notes you have submitted?

19      A    Uh-huh.

20      Q    What about all documents and data you have

21   reviewed, considered, or relied upon while serving as

22   an expert witness in any matters related to Chinese or

23   defective drywalls?

24      A    I've submitted everything related to my work

25   in this case.  I worked on that case years ago --
```

```
 1      Q    Right.

 2      A    -- which I didn't rely on.  I haven't seen it.

 3   I don't know if I even still have it.

 4      Q    Have you searched for documents and data

 5   related to your prior case, your prior Chinese drywall

 6   case?

 7      A    No.

 8      Q    Will you do that?

 9      A    If my -- if my clients ask me to.  I haven't

10   been asked to.

11      Q    We asked you in this document request.

12      A    Yeah, I -- the short answer is no, simply --

13   and I don't mean that disrespectfully, but I would have

14   to get permission from the clients.  Even if I have the

15   documents, I just can't take a client's documents and

16   supply them to people that ask for them.

17      Q    Will you ask your client for permission to be

18   able to submit the documents and data that are

19   requested in Document Request Number 4?

20      A    I will if my clients ask me to, but otherwise

21   I won't.

22      Q    Okay.  And when you say if your clients ask

23   you, you are referring to the attorneys in this case?

24      A    Right.

25      Q    Do you have any documents responsive to
```

```
 1    Document Request Number 5?

 2         A     Yeah, I have no opinions of any value, so I

 3    don't have any -- I don't have any studies or surveys

 4    or reports of any kind.  So I haven't been responsive,

 5    but I don't have anything to give.

 6         Q     What about Document Request Number 6, do you

 7    have any articles that are responsive to Number 6?

 8         A     If I've mentioned -- if I've written about

 9    Chinese drywall, it was just in passing.  I have not

10    written an article on Chinese drywall.  Actually, I

11    think that's an article to be written, but I haven't

12    written it.

13         Q     What about Number 7, do you have any emails or

14    other written correspondence which identify facts,

15    data, or assumptions provided to you that you relied

16    upon or considered in forming your opinions in this

17    case?

18         A     The only thing I have there is the two pages

19    of notes which -- which are being copied right now.  I

20    don't have anything else.

21         Q     Okay.  What about engagement letters,

22    retention letters, or other documents relating to your

23    compensation in connection with your study or review of

24    materials?

25         A     My -- of course, my clients have my engagement
```

Case 2:09-md-02047-EEF-MBN Document 22380-39 Filed 12/03/19 Page 318 of 796
Case 1:11-cv-22408-MGC Document 231 Entered on FLSD Docket 05/15/2012 Page 92 of
122
Confidential – Subject to Further Confidentiality Review

 1   letter and other documents, and it has all been

 2   supplied to them.

 3       Q    What about the last one, Number 9, all written

 4   correspondence of Anthony Graziano or any individual

 5   assisting Mr. Graziano relating to Chinese drywall or

 6   Mr. Graziano's reports in this case, any responsive

 7   documents to that request?

 8       A    There's been no written correspondence, just a

 9   phone conversation.

10       Q    One, possibly two conversations with

11   Mr. Graziano; is that correct?

12       A    You know, he -- I'm glad you -- he called me

13   up later after that conversation.  There was nothing

14   new or substantive to talk about.  But I've talked to

15   him at least twice.  Once with the -- that

16   conversation, that main conversation that he called,

17   and I think I -- I think I called him back

18   inadvertently because I was referring -- I had been

19   traveling, and I was referring to an old message where

20   I had already talked to him.  But I called him, he

21   picked up, and we chatted for a minute.

22       Q    Do you recall what you chatted about?

23       A    Nothing that we haven't already discussed and

24   nothing substantive.  It was kind of like -- it was

25   kind of like, whoops, I called you on accident, that

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 319 of 796
Confidential - Subject to further Confidentiality Review
122

1    kind of conversation.

2        Q    Well, let's take one final break just to make

3    sure we have everything, but I may be done.  Counsel

4    representing another defendant in this case may have

5    questions for you or may not.  We will do a five-minute

6    break and reconvene, if that's okay.

7        A    Sounds good.

8        VIDEO OPERATOR LOPEZ:  With the approval of

9    counsel, going off the record.  The time is

10   approximately 11:52 A.M.

11           (Recess taken.)

12       VIDEO OPERATOR LOPEZ:  With the approval of

13   counsel, back on the record.  The time is approximately

14   11:59 A.M.  This marks the beginning of Recording

15   Media 3.

16

17                    EXAMINATION

18   BY MS. CURRAULT:

19       Q    Dr. Bell, again, I'm Donna Currault.  I

20   represent one of the defendants in this case, BNBM.

21   And I've listened to all the testimony, so I'm not

22   going to replow any old ground.  I just have a couple

23   of follow-up clarification questions for you.

24       A    Sure.  Okay.

25       Q    Okay.  So with regard to the request for

```
 1    production of documents, there was a request regarding

 2    engagement letters and communications and documents

 3    exchanged with counsel.  You indicated you have sent

 4    that to your client.

 5              Is that something that you have produced that

 6    was included in the binder you just delivered or not?

 7         A    No.  But I can get it or -- it has already

 8    been sent.

 9         Q    Okay.

10         A    But I can resend it.

11         Q    Right.  Could you please send that to us?

12         MS. CURRAULT:  Or, Counsel, if you would forward it

13    to us, we did ask for all of those documents, and that

14    would include the engagement letter.

15    BY MS. CURRAULT:

16         Q    So if you could please send that to us, either

17    through counsel or you can send it as instructed in the

18    deposition notice.

19         A    Okay.

20         Q    Okay.  Secondly, I wanted to ask you about

21    invoices.  Have you assimilated -- have you issued any

22    invoices in this case?

23         A    I think I was asked that earlier, and I would

24    have to ask my bookkeeper.  I don't -- I don't know.  I

25    just fly and run and write stuff and hand it all off to
```

Confidential - Subject to Further Confidentiality Review

```
 1    the bookkeeper.

 2         Q    Do you customarily issue invoices on a monthly

 3    basis?

 4         A    Yes.  And they have not -- as far as I know, I

 5    don't know that they have even issued for February yet

 6    because I've been gone.  And they just -- I just got my

 7    hours in, like, yesterday, so.

 8         Q    When you say you got your hours in, do you

 9    keep contemporaneous time records of your hours and how

10    much you work on particular client matters?

11         A    Yes.

12         Q    Okay.  Then I'm also going to ask that when

13    you provide us with the engagement letter that was

14    requested in the notice, could you also include your

15    time records and your invoices in this matter?

16         A    Sure.

17         MR. BREIT:  We are going to do whatever is

18    necessary under the subpoena, and we will comply with

19    what is necessary.

20         MS. CURRAULT:  Okay.  Thank you.

21    BY MS. CURRAULT:

22         Q    On Exhibit 4 of your CV you list your

23    licensures, and I think earlier you mentioned you were

24    licensed in various states, and I think you mentioned

25    Nevada and New York.
```

Confidential - Subject to Further Confidentiality Review

```
 1              Are you licensed in Florida?

 2      A    I -- the short answer is, excuse me, I'm not

 3   sure.  Florida, I think, is a state -- I've done

 4   several cases in Florida, and I think they are a state

 5   that don't actually issue licenses or temporary

 6   licenses unless -- they have a rule there -- unless it

 7   is for at a federally related transaction, meaning a

 8   bank loan, they won't even give you a license.

 9              Other states, for example, Illinois will.  I

10   happen to know.

11              So the short answer is I don't think I have a

12   license in Florida, and I don't think for what they --

13   the way their rules work, that I'm -- that anybody

14   needs a license.

15              And thirdly, because I'm rendering no opinions

16   of value, I don't need a license.

17      Q    Right.  Okay.

18      A    That's a long answer to a short question.

19      Q    Sure.  No, I just -- since you didn't list

20   them all specifically, I was just wondering about these

21   particular states.

22              What about Louisiana, are you licensed in

23   Louisiana?

24      A    I have been in the past.  I would have to

25   check to see if I am now.
```

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/03/19 Page 323 of 796 7 of
122
Confidential - Subject to further confidentiality review

```
1    Q    Okay.  And how about Virginia?

2    A    Virginia, I don't think I am.

3    Q    Okay.  Have you ever seen any report or

4    analysis or study on diminution in value or stigma with

5    regard to property that either has or had Chinese

6    drywall?

7    A    Not that I can recall, which -- which

8    surprises me because Chinese drywall is a pretty big

9    deal in parts of the country.

10        But the Lum Library didn't show studies, and I

11   never -- I don't recall ever doing a report on it.  And

12   I don't think I've seen anybody else's report.  I

13   certainly haven't in this case.

14        So I guess that's a long way of saying no, I

15   don't think so.

16   MS. CURRAULT:  Okay.  Those are all the questions I

17   have.

18   MR. CAMPBELL:  I have nothing further.

19   MS. CURRAULT:  Okay.  Pass the witness.

20   MR. BREIT:  You have the right to read this

21   deposition, you know, and you can sign it if you wish

22   or you can waive the signature.  It is totally up to

23   you.

24   THE WITNESS:  Okay.

25   VIDEO OPERATOR LOPEZ:  With the approval of --
```

```
 1        MR. BREIT:  Which do you wish to do, read and sign

 2   or waive?

 3        THE WITNESS:  I will read and sign.

 4        VIDEO OPERATOR LOPEZ:  Now with the approval of

 5   counsel, this concludes today's video deposition.  The

 6   time is approximately 12:03 P.M.  We are now off the

 7   record.

 8             (The deposition was concluded at 12:03 P.M.)

 9

10                     --ooOoo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to further Confidentiality Review

```
 1

 2

 3                        CERTIFICATE

 4                            OF

 5            CERTIFIED SHORTHAND REPORTER

 6

 7            The undersigned Certified Shorthand Reporter of
      the State of California does hereby certify:

 8            That the foregoing proceeding was taken before
      me at the time and place therein set forth, at which

 9    time the witness was duly sworn by me;
              That the testimony of the witness and all

10    objections made at the time of the examination were
      recorded stenographically by me and were thereafter

11    transcribed, said transcript being a true and correct
      copy of my shorthand notes thereof;

12            That the dismantling of the original transcript
      will void the reporter's certificate.

13

14            In witness thereof, I have subscribed my name

15    this date:_____.

16

17

18                          _____

19                          PAMELA COTTEN, CSR, RDR
                            Certificate No. 4497

20                          Certified Realtime Reporter

21

22

23            (The foregoing certification of
         this transcript does not apply to any

24         reproduction of the same by any means,
           unless under the direct control and/or

25         supervision of the certifying reporter.)
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3            Please read your deposition over carefully and

 4    make any necessary corrections.  You should state the

 5    reason in the appropriate space on the errata sheet for

 6    any corrections that are made.

 7            After doing so, please sign the errata sheet

 8    and date it.

 9            You are signing same subject to the changes you

10    have noted on the errata sheet, which will be attached

11    to your deposition.

12            It is imperative that you return the

13    original errata sheet to the deposing attorney within

14    thirty (30) days of receipt of the deposition transcript

15    by you.  If you fail to do so, the deposition transcript

16    may be deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/18 Page 327 of 796
Case 2:14-cv-02484-MCE-DB Document 221-1 Entered on FLSD Docket 08/15/2019 Page 321 of 122
Confidential - Subject to further confidentiality review

```
 1                  - - - - - -

 2                E  R  R  A  T  A

 3                  - - - - - -

 4   PAGE   LINE    CHANGE

 5   _____  _____   _____

 6      REASON:     _____

 7   _____  _____   _____

 8      REASON:     _____

 9   _____  _____   _____

10      REASON:     _____

11   _____  _____   _____

12      REASON:     _____

13   _____  _____   _____

14      REASON:     _____

15   _____  _____   _____

16      REASON:     _____

17   _____  _____   _____

18      REASON:     _____

19   _____  _____   _____

20      REASON:     _____

21   _____  _____   _____

22      REASON:     _____

23   _____  _____   _____

24      REASON:     _____

25
```

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3         I,_____, do hereby

 4    certify that I have read the foregoing pages, and that

 5    the same is a correct transcription of the answers given

 6    by me to the questions therein propounded, except for

 7    the corrections or changes in form or substance, if any,

 8    noted in the attached Errata Sheet.

 9

10

11    _____

12    RANDALL BELL, Ph.D., MBA, MAI           DATE

13

14    Subscribed and sworn to

      before me this

15

       _____day of_____,20___.

16

      My commission expires:_____

17

18    _____

      Notary Public

19

20

21

22

23

24

25
```

# EXHIBIT E

**Integra Realty Resources**
**Miami/Palm Beach**

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Miranda, Jose and Adela**
Market Value - "As Remediated"
8890 SW 229th St.
Miami, Miami-Dade County, Florida 33190
Client Reference: 1

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
November 16, 2017

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**Miranda, Jose and Adela**
8890 SW 229th St.
Miami, Florida

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 332 of 796
Case 1:11-cv-22408-MGC Document 278-3 Entered on FLSD Docket 05/13/2019 Page 4 of 989

Identification of Subject                                                                                    3

February 10, 2019

Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

SUBJECT:        Market Value - "As Remediated"
                Case No 11-22408-Civ-COOKE
                United States District Court Southern District of Florida in the matter of
                Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
                similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
                Priority Claimant Case at:
                Miranda, Jose and Adela
                8890 SW 229th St.
                Miami, Miami-Dade County, Florida 33190
                Client Reference: 1
                IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the
referenced property as of the effective date assuming all remediation was completed by an
appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It
presents summary discussions of the data, reasoning, and analysis that were used in the appraisal
process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

## Identification of Subject

The subject of this report is a single-family home configured with 3 bedroom and 2.1 baths with 1,988
SF under air-conditioning.  The subject property was built in 2006 and is located on a 2,337 SF site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages,
collectively "the damages" as of the effective date of the appraisal, November 16, 2017. The damage
estimate assumes the defective drywall remediation was completed and does not consider the cost to
cure. The date of the report is February 10, 2019. The appraisal is valid only as of the stated effective
date or dates.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 333 of 796
Case 1:11-cv-22408-MGC Document 273-5 Entered on FLSD Docket 05/13/2019 Page 5 of 989

Intended Use and User                                                              4

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
| --- | --- |
| Sale Date (Most Recent) | January 1, 2007 |
| Seller | Pride Homes of Lakes by the Bay |
| Buyer | Miranda, Jose and Adela |
| Sale Price | $302,790 |
| Recording Instrument Number | 25312-0889 |
| Disposition Details | Original Sale from homebuilder |

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

The following transfers occurred subsequent to our effective date of value, November 16, 2017

- May 3, 2018 a Certificate of Title was issued on May 03, 2018 in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida reflecting a consideration of $208,200. Plaintiff was Wells Fargo Bank, NA, Defendant was Jose F. Miranda et al, Buyer was Pier 18 Developments LLC.

- October 2, 2018 a Warranty Deed was recorded reflecting a consideration of $306,500. Grantor was Pier 18 Developments, LLC (grantor) and Aldo Amoretti, Gilda Francheska Mattei Haddock (grantees).

  The property was listed for sale in the Realtors MLS system with an asking price of $315,000 August 8, 2018, with a status change to Pending Sale on September 4, 2018 and Closed Sale on October 17, 2018.

  A representative of the listing office confirmed the Chinese Drywall had been completely remediated, however the MLS listing makes no mention of prior existence of Chinese Drywall at the property.

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

Miranda, Jose and Adela



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 334 of 796
Case 1:14-cv-22408-MGC Document 273-5 Entered on FLSD Docket 05/13/2019 Page 6 of 989

Definition of Market Value                                                                    5

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

## Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value.  Instead, it identifies a value opinion as being effective at some specific prior date.  Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation.  Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

## Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 335 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 7 of 989

Scope of Work                                                                                                    6

## Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation. The result of that study are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida." The results of that study are incorporated by reference herein.

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation. As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction. Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation. These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property. This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections. Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available. In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis. However, the damage analysis only represents a portion of the overall damages because we were specifically requested to exclude the consideration of the costs to cure. This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to as a "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.

Miranda, Jose and Adela



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 336 of 796
Case 1:14-cv-22408-MGC Document 273-3 Entered on FLSD Docket 05/13/2019 Page 8 of 989

Highest and Best Use                                                                                          7

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report.  The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach.  The valuations consider the only relevant approach for residential valuation, the sales comparison analysis.  The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis.  Additionally, this approach directly considered the prices of alternative properties having similar utility.

### Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant.  The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

### Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report.  This value us hypothetical since it assumes that defective drywall had never been present at the subject property.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 337 of 796
Case 1:11-cv-22408-MGC Document 273-5 Entered on FLSD Docket 05/13/2019 Page 9 of 989

Conclusion of Value                                                                                    8

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue. This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date. This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation. Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total. This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value. These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home. Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered. Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF          4 months

$150,000 - $750,000 home up to 4,000 SF          6 months

$750,000+ home up over 4,000 SF          9 months

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 338 of 796
Case 1:11-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 90 of 989

Conclusion of Value                                                                                   9

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

**Conclusions of Damage**

| | | | |
|---|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $265,000 | |
| Market Impairment Discount (As if Remediated) | | 10% | |
| Post Impairment Damage ($) | | $26,500 | |
| **Hypothetical Value As IF Remediated** | | | **$238,500** |
| Post Remediation Damages as of Effective Date | | | **$26,500** |
| Loss of Use: | | | |
| Rental Rate ($/Month) | **$1,900** | | |
| Moving & Storage Costs | | $3,000 | |
| Loss of Use Subject (# Months) | 4x | $7,600 | |
| Subject Total | | | **$10,600** |
| **Post Remediation Damage** | | | **$37,100** |

Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

Property records reflect a foreclosure of the subject on May 3, 2018 for $208,200, and a subsequent sale October 2, 2018 for $306,500 (see page 4 for details on both). The MLS listing related to the October 2018 sale makes no mention of the property having previously contained Chinese Drywall, and no mention of any significant renovation or remediation.

Miranda, Jose and Adela



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 339 of 796
Case 1:11-cv-22408-MGC   Document 279-5   Entered on FLSD Docket 05/13/2019   Page 91 of 989
Certification                                                                    10

## Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Carlos Fong has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Case 2:09-md-02047-EEF-MBN  Document 22380-38  Filed 12/02/19  Page 340 of 796
Case 1:14-cv-22409-MGC  Document 279-8  Entered on FLSD Docket 05/13/2019  Page 12 of 989

Assumptions and Limiting Conditions                                    11

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2. There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3. There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4. The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5. The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1. An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2. The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4. No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5. Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6. We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 341 of 796
Case 1:14-cv-22401-MGC Document 273-9 Entered on FLSD Docket 05/13/2019 Page 13 of 989

Assumptions and Limiting Conditions                                                    12

7.  No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.  We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.  The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during



Case 1:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 342 of 796
Case 1:14-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 14 of 989

Assumptions and Limiting Conditions                                                    13

the period covered by our analysis will vary from our estimates, and the variations may be material.

18. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19. The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20. No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21. The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23. The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged



Case 1:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 343 of 796
Case 1:17-cv-22405-MGC Document 273-3 Entered on FLSD Docket 05/13/2019 Page 15 of 989

Assumptions and Limiting Conditions                                    14

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25.  Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26.  The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27.  All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 344 of 796
Case 1:11-cv-22408-MGC Document 279-5 Entered on FLSD Docket 05/13/2019 Page 16 of 989

Addenda

# **Addenda**



| Borrower | Jose & Adele Miranda | | | | File No. | VALU-18-12-1464 |
|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | |
| City | Miami | County | Dade | State | FL | Zip Code | 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | |

## TABLE OF CONTENTS



USPAP Identification Addendum ........................................................................................................ 1
Exterior-Only ...................................................................................................................................... 2
Single Family Comparable Rent Schedule ......................................................................................... 8
General Text Addendum ..................................................................................................................... 9
Subject Photos ................................................................................................................................... 12
Comparable Photos 1-3 ...................................................................................................................... 13
Rental Photos 1-3 ............................................................................................................................... 14
Assessor Map ..................................................................................................................................... 15
Location Map ...................................................................................................................................... 16
Subject Aerial Map ............................................................................................................................. 17
Assessor Data ..................................................................................................................................... 18
MLS Listing Sheet .............................................................................................................................. 19
MLS Listing History ........................................................................................................................... 20
License ............................................................................................................................................... 21

USPAP ADDENDUM

| Borrower | Jose & Adele Miranda | | | | | |
|----------|---------------------|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | |
| City | Miami | County | Dade | State | FL | Zip Code 33190 |
| Lender | Integra Realty Resources (IRR) - Miami | | | | | |

File No. VALU-18-12-1464

This report was prepared under the following USPAP reporting option:

☒ Appraisal Report    This report was prepared in accordance with USPAP Standards Rule 2-2(a).

☐ Restricted Appraisal Report    This report was prepared in accordance with USPAP Standards Rule 2-2(b).

**Reasonable Exposure Time**

My opinion of a reasonable exposure time for the subject property at the market value stated in this report is: 30-90 DAYS

EXPOSURE TIME: estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

USPAP 2018-19 Comment: Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market

**Additional Certifications**

I certify that, to the best of my knowledge and belief:

☒ I have NOT performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

☐ I HAVE performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

**Additional Comments**

APPRAISER COMPETENCY

An appraiser must determine, prior to accepting an assignment, that he or she can perform the assignment competently. Competency requires:

1. the ability to properly identify the problem to be addressed; and
2. the knowledge and experience to complete the assignment competently; and
3. recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.

I am competent to perform this assignment based on my state appraiser license and familiarity with this type of property in the subject market

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations

**APPRAISER:**

Signature: *Carlos Fong*
Name: Carlos Fong
Date Signed: 02/10/2019
State Certification #: RD 6782
or State License #:
State: FL
Expiration Date of Certification or License: 11/30/2020
Effective Date of Appraisal: 11/16/2017

**SUPERVISORY APPRAISER: (only if required)**

Signature:
Name:
Date Signed:
State Certification #:
or State License #:
State:
Expiration Date of Certification or License:
Supervisory Appraiser Inspection of Subject Property:
☐ Did Not    ☐ Exterior-only from Street    ☐ Interior and Exterior

# Exterior-Only Inspection Residential Appraisal Report

VALU-18-12-1464
File # VALU-18-12-1464

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

## SUBJECT

| | | |
|---|---|---|
| Property Address 8890 SW 229th St | City Miami | State FL Zip Code 33190 |
| Borrower Jose & Adele Miranda | Owner of Public Record Aldo Amoretti & Gilda Francheska Mattei | County Dade |
| Legal Description TRELLIS AT BAYSHOREPB 164-047 T-22257LOT 2 BLK 8LOT SIZE 2337 SQ FTFAU 36 6016000 0023COC 25312-0889 01 2007 1 | | |
| Assessor's Parcel # 36-60-16-017-0390 | Tax Year 2017 | R.E. Taxes $ 2,482 |
| Neighborhood Name Trellis at Bayshore | Map Reference 33124 | Census Tract 0106.17 |

Occupant ☒ Owner ☐ Tenant ☐ Vacant  Special Assessments $ 0  ☒ PUD  HOA $ 74  ☐ per year ☒ per month
Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)
Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Litigation
Lender/Client Integra Realty Resources (IRR) - Miami  Address
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No
Report data source(s) used, offering price(s), and date(s). The subject property has not been offered for sale in the last 12 months per MLS.

## CONTRACT

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $  Date of Contract  Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s)
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No
If Yes, report the total dollar amount and describe the items to be paid.

## NEIGHBORHOOD

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | Property Values ☐ Increasing ☒ Stable ☐ Declining | | | PRICE $ (000) | AGE (yrs) | One-Unit | 80 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | 121 Low | 5 | 2-4 Unit | % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | Marketing Time ☒ Under 3 mths ☐ 3-6 mths ☐ Over 6 mths | | | 299 High | 15 | Multi-Family | 10 % |
| Neighborhood Boundaries The subject is bound to the north by SW 216th St, to the west by SW 97th | | | | | 205 Pred. | 10 | Commercial | 10 % |
| Ave, to the east by SW 87th Ave and to the south by SW 232nd St. | | | | | | | Other | % |

Neighborhood Description There are no apparent factors that should affect the subject's marketability. The subject has access to all necessary supporting facilities including schools, shopping, recreation and employment centers.

Market Conditions (including support for the above conclusions) See Attached Addendum

## SITE

| | | | |
|---|---|---|---|
| Dimensions Per Dade County Assessor | Area 2,337 sf | Shape Rectangular | View Preserves |
| Specific Zoning Classification SR | Zoning Description Single Family Residential District | | |

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)
Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe

| Utilities Public Other (describe) | Public Other (describe) | Off-site Improvements – Type | Public Private |
|---|---|---|---|
| Electricity ☒ | Water ☒ | Street Asphalt | ☒ |
| Gas ☒ | Sanitary Sewer ☒ | Alley None | |

FEMA Special Flood Hazard Area ☒ Yes ☐ No  FEMA Flood Zone AE  FEMA Map # 12086C0612L  FEMA Map Date 9/11/2009
Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe
No observed or known adverse influences to market value were noted.

## IMPROVEMENTS

Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☒ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner
☐ Other (describe)  Data Source for Gross Living Area Assessor

| General Description | General Description | Heating/Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | ☒ FWA ☐ HWBB | Fireplace(s) # 0 ☐ None | ☒ None |
| # of Stories 2 | ☐ Full Basement ☐ Finished | ☐ Radiant | Woodstove(s) # 0 | ☐ Driveway # of Cars 2 |
| Type ☐ Det. ☒ Att. ☐ S-Det./End Unit | ☐ Partial Basement ☐ Finished | ☐ Other Elec. | ☒ Patio/Deck | Driveway Surface Pavers |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls CBS | Fuel | ☒ Porch Porch | ☒ Garage # of Cars 2 |
| Design (Style) Traditional | Roof Surface Barrel | ☐ Central Air Conditioning | Pool None | ☐ Carport # of Cars 0 |
| Year Built 2006 | Gutters & Downspouts None | ☐ Individual | ☒ Fence Wd | ☐ Attached ☐ Detached |
| Effective Age (Yrs) 8 | Window Type Single Hung | ☐ Other | ☐ Other | ☐ Built-in |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☐ Disposal ☒ Microwave ☐ Washer/Dryer ☐ Other (describe)
Finished area above grade contains: 6 Rooms 3 Bedrooms 2.1 Bath(s) 1,988 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.) None

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.). The subject was noted in average condition upon exterior inspection.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No
If Yes, describe.
There are no apparent external or functional inadequacies noted or reported at time of inspection. Physical depreciation is calculated by the modified age life method.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe.
The construction quality is typical for the area.

# Exterior–Only Inspection Residential Appraisal Report

VALU-18-12-1464
File # VALU-18-12-1464

| | | | |
|---|---|---|---|
| There are | 1 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 329,000 | to $ 329,000 . |
| There are | 14 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 190,000 | to $ 299,000 . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 8890 SW 229th St Cutler Bay, FL 33190 | 8870 SW 229th St Cutler Bay, FL 33190 | 8928 SW 228th Ln Cutler Bay, FL 33190 | 8977 SW 227th Ter Cutler Bay, FL 33190 |
| Proximity to Subject | | 0.07 miles E | 0.09 miles W | 0.18 miles NW |
| Sale Price | $ | $ 269,000 | $ 260,000 | $ 260,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 135.31 sq.ft. | $ 130.78 sq.ft. | $ 130.78 sq.ft. |
| Data Source(s) | | SEF #A10191445;DOM 121 | SEF #A10200442;DOM 24 | SEF #A10223042;DOM 35 |
| Verification Source(s) | | Assessor, Realist | Assessor, Realist | Assessor, Realist |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION +(-) $ Adjustment | DESCRIPTION +(-) $ Adjustment | DESCRIPTION +(-) $ Adjustment |
| Sales or Financing | | ArmLth | ArmLth | ArmLth |
| Concessions | | Conv;0 | Cash;0 | Conv;0 |
| Date of Sale/Time | | s06/17;c04/17 | s02/17;c01/17 | s04/17;c03/17 |
| Location | Residential | Residential | Residential | Residential |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Site | 2337 sf | 2337 sf | 2337 sf | 2337 sf |
| View | Preserves | Preserves | Preserves | Residential +5,000 |
| Design (Style) | Traditional | Traditional | Traditional | Traditional |
| Quality of Construction | Average | Average | Average | Average |
| Actual Age | 8 | 11 | 10 | 10 |
| Condition | Average | Average | Average | Average |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | Total Bdrms. Baths | Total Bdrms. Baths |
| Room Count | 6 3 2.1 | 6 3 2.1 | 6 3 2.1 | 6 3 2.1 |
| Gross Living Area | 1,988 sq.ft. | 1,988 sq.ft. | 1,988 sq.ft. | 1,988 sq.ft. |
| Basement & Finished | No Basement | No Basement | No Basement | No Basement |
| Rooms Below Grade | None | None | None | None |
| Functional Utility | Average | Average | Average | Average |
| Heating/Cooling | EFA/CAC | EFA/CAC | EFA/CAC | EFA/CAC |
| Energy Efficient Items | None | None | None | None |
| Garage/Carport | 2-Car Garage | 2-Car Garage | 2-Car Garage | 2-Car Garage |
| Porch/Patio/Deck | Patio/Porch | Patio/Porch | Patio/Porch | Patio/Porch |
| Net Adjustment (Total) | | ☐ + ☐ - $ | ☐ + ☐ - $ | ☒ + ☐ - $ 5,000 |
| Adjusted Sale Price of Comparables | | Net Adj. 0.0 % Gross Adj. 0.0 % $ 269,000 | Net Adj. 0.0 % Gross Adj. 0.0 % $ 260,000 | Net Adj. 1.9 % Gross Adj. 1.9 % $ 265,000 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) MIAMI MLS, Miami-Dade County Records, and Realist
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s) MIAMI MLS, Miami-Dade County Records, and Realist
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist |
| Effective Date of Data Source(s) | 11/16/2017 | 11/16/2017 | 11/16/2017 | 11/16/2017 |

Analysis of prior sale or transfer history of the subject property and comparable sales 8928 SW 228th Ln has no 12-month prior transfer history. 8977 SW 227th Ter has no 12-month prior transfer history. 8870 SW 229th St has no 12-month prior transfer history.

Summary of Sales Comparison Approach See Attached Addendum.

Indicated Value by Sales Comparison Approach $ 265,000

| | | | |
|---|---|---|---|
| Indicated Value by: Sales Comparison Approach $ 265,000 | Cost Approach (if developed) $ | Income Approach (if developed) $ | |

see attached addendum.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: No special conditions are noted.

Personal property is not included in this valuation.
Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 265,000 , as of 11/16/2017 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 2055 March 2005      Page 2 of 6      Fannie Mae Form 2055 March 2005

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1464
File # VALU-18-12-1464

PLEASE ATTACHED ADDENDUM FOR FURTHER INFORMATION

**ADDITIONAL COMMENTS**

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)   Site value is estimated and/or supported by the sales comparison approach whenever data is available, otherwise extraction method is used.

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | =$ | 20,000 |
|---|---|---|---|---|
| Source of cost data   N/A | DWELLING   1,988 Sq.Ft. @ $ | | =$ | |
| Quality rating from cost service   N/A   Effective date of cost data   N/A | Sq.Ft. @ $ | | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | =$ | |
| The cost approach was not applied as the area is fully built up and there | Garage/Carport   Sq.Ft. @ $ | | =$ | |
| is no vacant land available, except where an existing house will be torn | Total Estimate of Cost-New | | =$ | |
| down.  Although the Cost Approach could be considered an applicable | Less   Physical | Functional | External | |
| approach to value, it is not typically relied upon by market participants | Depreciation | | =$( | ) |
| for one to four family properties. | Depreciated Cost of Improvements | | =$ | |
| | "As-is" Value of Site Improvements | | =$ | |
| Estimated Remaining Economic Life (HUD and VA only)   52 Years | **INDICATED VALUE BY COST APPROACH** | | **= $** | |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $   1,900   X Gross Rent Multiplier   = $ | Indicated Value by Income Approach |
|---|---|

Summary of Income Approach (including support for market rent and GRM)   The income approach is not applicable to this report as homes in the area are typically owner occupied.

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?   ☐ Yes   ☒ No   Unit type(s)   ☐ Detached   ☒ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?   ☐ Yes   ☐ No   If Yes, date of conversion

Does the project contain any multi-dwelling units?   ☐ Yes   ☐ No   Data Source(s)

Are the units, common elements, and recreation facilities complete?   ☐ Yes   ☐ No   If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?   ☐ Yes   ☐ No   If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

**Exterior-Only Inspection Residential Appraisal Report**   VALU-18-12-1464
File # VALU-18-12-1464

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK:   The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE:   The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER:   The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE:   The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:   The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1464
File # VALU-18-12-1464

APPRAISER'S CERTIFICATION:    The  Appraiser  certifies  and  agrees  that:

1. I  have,  at  a  minimum,  developed  and  reported  this  appraisal  in  accordance  with  the  scope  of  work  requirements  stated  in  this  appraisal  report.

2. I  performed  a  visual  inspection  of  the  exterior  areas  of  the  subject  property  from  at  least  the  street.  I  reported  the  condition  of  the  improvements  in  factual,  specific  terms.  I  identified  and  reported  the  physical  deficiencies  that  could  affect  the  livability,  soundness,  or  structural  integrity  of  the  property.

3. I  performed  this  appraisal  in  accordance  with  the  requirements  of  the  Uniform  Standards  of  Professional  Appraisal  Practice  that  were  adopted  and  promulgated  by  the  Appraisal  Standards  Board  of  The  Appraisal  Foundation  and  that  were  in  place  at  the  time  this  appraisal  report  was  prepared.

4. I  developed  my  opinion  of  the  market  value  of  the  real  property  that  is  the  subject  of  this  report  based  on  the  sales  comparison  approach  to  value.  I  have  adequate  comparable  market  data  to  develop  a  reliable  sales  comparison  approach  for  this  appraisal  assignment.  I  further  certify  that  I  considered  the  cost  and  income  approaches  to  value  but  did  not  develop  them,  unless  otherwise  indicated  in  this  report.

5. I  researched,  verified,  analyzed,  and  reported  on  any  current  agreement  for  sale  for  the  subject  property,  any  offering  for  sale  of  the  subject  property  in  the  twelve  months  prior  to  the  effective  date  of  this  appraisal,  and  the  prior  sales  of  the  subject  property  for  a  minimum  of  three  years  prior  to  the  effective  date  of  this  appraisal,  unless  otherwise  indicated  in  this  report.

6. I  researched,  verified,  analyzed,  and  reported  on  the  prior  sales  of  the  comparable  sales  for  a  minimum  of  one  year  prior  to  the  date  of  sale  of  the  comparable  sale,  unless  otherwise  indicated  in  this  report.

7. I  selected  and  used  comparable  sales  that  are  locationally,  physically,  and  functionally  the  most  similar  to  the  subject  property.

8. I  have  not  used  comparable  sales  that  were  the  result  of  combining  a  land  sale  with  the  contract  purchase  price  of  a  home  that  has  been  built  or  will  be  built  on  the  land.

9. I  have  reported  adjustments  to  the  comparable  sales  that  reflect  the  market's  reaction  to  the  differences  between  the  subject  property  and  the  comparable  sales.

10. I  verified,  from  a  disinterested  source,  all  information  in  this  report  that  was  provided  by  parties  who  have  a  financial  interest  in  the  sale  or  financing  of  the  subject  property.

11. I  have  knowledge  and  experience  in  appraising  this  type  of  property  in  this  market  area.

12. I  am  aware  of,  and  have  access  to,  the  necessary  and  appropriate  public  and  private  data  sources,  such  as  multiple  listing  services,  tax  assessment  records,  public  land  records  and  other  such  data  sources  for  the  area  in  which  the  property  is  located.

13. I  obtained  the  information,  estimates,  and  opinions  furnished  by  other  parties  and  expressed  in  this  appraisal  report  from  reliable  sources  that  I  believe  to  be  true  and  correct.

14. I  have  taken  into  consideration  the  factors  that  have  an  impact  on  value  with  respect  to  the  subject  neighborhood,  subject  property,  and  the  proximity  of  the  subject  property  to  adverse  influences  in  the  development  of  my  opinion  of  market  value.  I  have  noted  in  this  appraisal  report  any  adverse  conditions  (such  as,  but  not  limited  to,  needed  repairs,  deterioration,  the  presence  of  hazardous  wastes,  toxic  substances,  adverse  environmental  conditions,  etc.)  observed  during  the  inspection  of  the  subject  property  or  that  I  became  aware  of  during  the  research  involved  in  performing  this  appraisal.  I  have  considered  these  adverse  conditions  in  my  analysis  of  the  property  value,  and  have  reported  on  the  effect  of  the  conditions  on  the  value  and  marketability  of  the  subject  property.

15. I  have  not  knowingly  withheld  any  significant  information  from  this  appraisal  report  and,  to  the  best  of  my  knowledge,  all  statements  and  information  in  this  appraisal  report  are  true  and  correct.

16. I  stated  in  this  appraisal  report  my  own  personal,  unbiased,  and  professional  analysis,  opinions,  and  conclusions,  which  are  subject  only  to  the  assumptions  and  limiting  conditions  in  this  appraisal  report.

17. I  have  no  present  or  prospective  interest  in  the  property  that  is  the  subject  of  this  report,  and  I  have  no  present  or  prospective  personal  interest  or  bias  with  respect  to  the  participants  in  the  transaction.  I  did  not  base,  either  partially  or  completely,  my  analysis  and/or  opinion  of  market  value  in  this  appraisal  report  on  the  race,  color,  religion,  sex,  age,  marital  status,  handicap,  familial  status,  or  national  origin  of  either  the  prospective  owners  or  occupants  of  the  subject  property  or  of  the  present  owners  or  occupants  of  the  properties  in  the  vicinity  of  the  subject  property  or  on  any  other  basis  prohibited  by  law.

18. My  employment  and/or  compensation  for  performing  this  appraisal  or  any  future  or  anticipated  appraisals  was  not  conditioned  on  any  agreement  or  understanding,  written  or  otherwise,  that  I  would  report  (or  present  analysis  supporting)  a  predetermined  specific  value,  a  predetermined  minimum  value,  a  range  or  direction  in  value,  a  value  that  favors  the  cause  of  any  party,  or  the  attainment  of  a  specific  result  or  occurrence  of  a  specific  subsequent  event  (such  as  approval  of  a  pending  mortgage  loan  application).

19. I  personally  prepared  all  conclusions  and  opinions  about  the  real  estate  that  were  set  forth  in  this  appraisal  report.  If  I  relied  on  significant  real  property  appraisal  assistance  from  any  individual  or  individuals  in  the  performance  of  this  appraisal  or  the  preparation  of  this  appraisal  report,  I  have  named  such  individual(s)  and  disclosed  the  specific  tasks  performed  in  this  appraisal  report.  I  certify  that  any  individual  so  named  is  qualified  to  perform  the  tasks.  I  have  not  authorized  anyone  to  make  a  change  to  any  item  in  this  appraisal  report;  therefore,  any  change  made  to  this  appraisal  is  unauthorized  and  I  will  take  no  responsibility  for  it.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1464
File # VALU-18-12-1464

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION:    The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature *Carlos Fong* | Signature |
| Name  Carlos Fong | Name |
| Company Name  Valucentric LLC | Company Name |
| Company Address  7908 Montecito Pl, Delray Beach, FL 33446 | Company Address |
| Telephone Number  (844) 825-8236 | Telephone Number |
| Email Address  info@valucentric.com | Email Address |
| Date of Signature and Report  02/10/2019 | Date of Signature |
| Effective Date of Appraisal  11/16/2017 | State Certification # |
| State Certification #  RD 6782 | or State License # |
| or State License # | State |
| or Other (describe)                            State # | Expiration Date of Certification or License |
| State  FL | |
| Expiration Date of Certification or License  11/30/2020 | SUBJECT PROPERTY |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did not inspect exterior of subject property |
| 8890 SW 229th St | ☐ Did inspect exterior of subject property from street |
| Miami, FL 33190 | Date of Inspection |
| APPRAISED VALUE OF SUBJECT PROPERTY $       265,000 | COMPARABLE SALES |
| LENDER/CLIENT | ☐ Did not inspect exterior of comparable sales from street |
| Name | ☐ Did inspect exterior of comparable sales from street |
| Company Name  Integra Realty Resources (IRR) - Miami | Date of Inspection |
| Company Address | |
| Email Address | |

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

# SINGLE FAMILY COMPARABLE RENT SCHEDULE

VALU-18-12-1464
File # VALU-18-12-1464

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property. Adjustments should be made only for items of significant difference between the comparables and the subject property.

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 8890 SW 229th St Cutler Bay, FL 33190 | 8908 SW 229th St Cutler Bay, FL 33190 | | 8952 SW 228th Ln Cutler Bay, FL 33190 | | 8939 SW 228th Ln Cutler Bay, FL 33190 | |
| Proximity to Subject | | 0.05 miles W | | 0.13 miles W | | 0.12 miles NW | |
| Date Lease Begins | | 10/17 | | 07/17 | | 11/16 | |
| Date Lease Expires | | Unk | | Unk | | Unk | |
| Monthly Rental | If Currently Rented: $ | $ 1,900 | | $ 1,975 | | $ 1,850 | |
| Less: Utilities | $ | $ | | $ | | $ | |
| Furniture | | | | | | | |
| Adjusted Monthly Rent | $ | $ 1,900 | | $ 1,975 | | $ 1,850 | |
| Data Source | MLS,Inspection Assessor,Realist | MLS #A10351387 Assessor, Realist | | MLS #A10308550 Assessor, Realist | | MLS #A10184013 Assessor, Realist | |
| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Rent Concessions | | | | | | | |
| Location/View | Residential Preserves | Residential Preserves | | Residential Preserves | | Residential Residential | |
| Design and Appeal | Traditional | Traditional | | Traditional | | Traditional | |
| Age/Condition | 8 Average | 10 Average | | 10 Average | | 10 Average | |
| Above Grade Room Count | Total: 6  Bdrms: 3  Baths 2.1 | Total: 6  Bdrms: 3  Baths 2.1 | | Total: 6  Bdrms: 3  Baths 2.1 | | Total: 6  Bdrms: 3  Baths 2.1 | |
| Gross Living Area | 1,988 Sq. Ft. | 1,988 Sq. Ft. | | 1,988 Sq. Ft. | | 1,988 Sq. Ft. | |
| Other (e.g., basement, etc.) | No Basement None | No Basement None | | No Basement None | | No Basement None | |
| Other: | | | | | | | |
| Net Adj. (total) | | ☐ +  ☐ −  $ 0 | | ☐ +  ☐ −  $ 0 | | ☐ +  ☐ −  $ 0 | |
| Indicated Monthly Market Rent | | $ 1,900 | | $ 1,975 | | $ 1,850 | |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)  Rentals of comparable style dwellings ranged from $1,800 to $1,900.

Final Reconciliation of Market Rent:   All rentals were taken into the final consideration.  The opinion of market rent is $1,900

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF  11/16/2017   TO BE $  1,900

| Appraiser(s) SIGNATURE *Carlos Fong* | Review Appraiser SIGNATURE |
|---|---|
| NAME  Carlos Fong | (If applicable)  NAME |
| Certified Residential Appraiser | |
| Date Property Inspected  11/16/2017   Report Signed  02/10/2019 | Date Property Inspected          Report Signed |
| License or Certification #  RD 6782   State  FL | License or Certification #          State |
| Expiration Date of License or Certification  11/30/2020 | Expiration Date of License or Certification |
| | Review Appraiser  ☐ Did  ☐ Did Not  Inspect Subject Property |

Freddie Mac Form 1000 (8/88)   Fannie Mae Form 1007 (8/88)

Form 1007 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Supplemental Addendum

File No. VALU-18-12-1464

| Borrower | Jose & Adele Miranda | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | | |
| City | Miami | County | Dade | | State | FL | Zip Code | 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | | |

**PURPOSE OF APPRAISAL REPORT**

The purpose of this appraisal is to estimate the market value of the subject property as defined herein. The function of the appraisal is to assist the above-named Lender/Client, its successors and/or assigns, in evaluating the subject property for lending purposes. This is a federally regulated transaction. Additional supporting data can be found in our appraiser work file.

It is assumed that the title to this property is good and marketable. No title search has been made, nor have we attempted to determine ownership of the property. The value estimate is given without regard to any questions of title, boundaries, or encroachments. It is assumed that all assessments are paid. We assume the property to be free and clear of liens and encumbrances except as noted.

The legal description, if included herein, should be verified by legal counsel before being relied upon or used in any conveyance or other document.

We are not familiar with any engineering studies made to determine the bearing capacity of the land. Improvements in the area appear to be structurally sound. It is therefore assumed that soil and subsoil conditions are stable unless specifically outlined in this report.

Any exhibits in the report are intended to assist the reader in visualizing the property and its surroundings. The drawings are not intended as surveys and no responsibility is assumed for their cartographic accuracy. Drawings are not intended to be exact in size, scale or detail.

Areas and dimensions of the property were physically measured. If data is furnished by the principal or from plot plans or surveys furnished by the principal, or from public records, we assume it to be reasonably accurate. In the absence of current surveys, land areas may be based upon representations made by the owner's agents or the client. No attempt has been made to render an opinion or determine the status of easements that may exist. No responsibility is assumed for discrepancies that may become evident from a licensed survey of the property.

The value estimate involves only the real estate and all normal building equipment if any improvements are involved. No consideration was given to personal property, (or special equipment), unless stated.

It is assumed that the property is subject to lawful, competent and informed ownership and management unless noted.

Information in this report concerning market data was obtained from buyers, sellers, brokers, attorneys, trade publications or public records. To the extent possible, this information was examined for accuracy and is believed to be reliable. Dimensions, areas or data obtained from others is believed correct; however, no guarantee is made.

Any information, in whatever form, furnished by others is believed to b e reliable; however, no responsibility is assumed for accuracy.

The separate allocations between land and improvements, if applicable, represents our judgment only under the existing utilization of the property. A re-evaluation should be made if the improvements are removed or substantially altered, and the land utilized for another purpose.

All information and comments concerning the location, neighborhood trends, construction quality and costs, loss in value from whatever cause, condition, rents, or any other data for the property appraised herein, represents the estimates and opinions of the appraiser formed after an examination and study of the property.

Any valuation analysis of the income stream has been predicted upon financing conditions as specified herein, which we have reason to believe are currently available for this property. Financing terms and conditions other than those indicated may alter the final value conclusions.

The appraiser is not required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless arrangements have been made previously thereto. If the appraiser (s) is subpoenaed pursuant to court order, the client will be required to compensate said appraiser(s) for his/her time at his/her regular hourly rates, plus expenses.

All opinions, as to values stated, are presented as the appraiser's considered opinion based on the information set forth in the report and his experience. We assume no responsibility for changes in market conditions or for the inability of the client or any other party to achieve their desired results based upon the appraised value. Further, some of the assumptions made can be subject to variation depending upon evolving events. We realize some assumptions may never occur and unanticipated events or circumstances may occur. Therefore, actual results achieved during the projection period may vary from those in this report.

The appraisal assignment was not based on developing or reporting predetermined results, or a requested minimum valuation, a specific valuation, or the approval of a loan.

Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of: USPAP Uniform Standards of Professional Appraisal Practice, and SPP-AI Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute; and, except as noted in the Scope of Appraisal, in conformity with specific implementation rules of the following agencies:

FIRREA Title XI of the Financial Institutions Reform, Recovery and Enforcement Act and section 5(b) of the Bank Company Holding Act; FRB – Federal Reserve Board; RTC-Resolution Trust Corporation; OTS-Office of Thrift Supervision; FDIC – Federal Deposit Insurance Corporation; OTC – Office of the Comptroller; NCUA – National Credit Union Association.

**THE APPRAISER HAS PREPARED THIS APPRAISAL IN FULL COMPLIANCE WITH THE APPRAISAL INDEPENDENCE REQUIREMENTS AND HAS NOT PERFORMED, PARTICIPATED IN, OR BEEN ASSOCIATED WITH ANY ACTIVITY IN VIOLATION OF AIR.**

**AT THE REQUEST OF THE CLIENT, THIS APPRAISAL REPORT HAS BEEN PREPARED IN COMPLIANCE WITH THE**

**Supplemental Addendum**

File No. VALU-18-12-1464

| Borrower | Jose & Adele Miranda | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | | |
| City | Miami | County | Dade | State | FL | Zip Code | 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | | |

**UNIFORM APPRAISAL DATASET (UAD) FROM FANNIE MAE AND FREDDIE MAC. THE UAD REQUIRES THE APPRAISER TO USE STANDARDIZED RESPONSES THAT INCLUDE SPECIFIC FORMATS, DEFINITIONS, ABBREVIATIONS, AND ACRONYMS.**

We do not authorize the out-of-context quoting from or partial reprinting of this appraisal report. Further, neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser nor the name of the firm which he is connected, shall be reproduced, published, or disseminated to the public through advertising media, public relations media, news media, or another public means of communication, without the prior written consent of the appraiser signing this report.

Adobe's Distiller software or equivalent may be utilized by appraiser to transmit this encrypted PDF-formatted appraisal. At a minimum, the software contains the following security measure:

- identifies transmission error during the transmission process, and confirms date, time and quantity of data submitted by appraiser and the date, time and quantity of data received by the Client, and/or its assigns and
- secures data from editing by means of a password, hardware device, or other means that remains in the sole control of the transmitting appraiser.

**THIRTY SIX MONTH LISTING HISTORY**

We are not aware of any prior listings pertaining to the subject property in the past three years as researched through the local Multiple Listing Service.

**NEIGHBORHOOD MARKET CONDITIONS**

No discounts, buy downs or other concessions were noted. Current 30 year fixed rate financing at 4.5 - 5.5% and 0-2 points.

Stricter Lending Standards and the availability of Mortgage Capital may affect the average sales prices in the area, however, given the market data analyzed by the appraiser, there are no fiscal or economic trends expected to occur that would significantly impact the relatively stable market currently experienced in this neighborhood.

Neighborhood conditions can be found in detail in the attached 1004MC form.

**SITE COMMENTS**

This site is very typical of the neighborhood in terms of size, topography, view and general appeal. It provides a suitable setting for the improvements and is consistent with market expectations in this price range. Statements regarding zoning compliance are intended only in the most general sense. Zoning and building ordinances vary significantly from one municipality to another and can be extremely detailed. The scope of this assignment does not include a comparison of every potentially significant characteristic of the subject property's site and improvements relative to zoning and building ordinances. Unless otherwise noted, standard utility and right-of-way easements are insignificant to value. However, a current locational or boundary survey or title report may reveal encroachments, easements, zoning violations or other matters of interest that could warrant modification of the appraised value.

**COMMENTS REGARDING HIGHEST AND BEST USE**

In compliance with USPAP the following is included in the appraisal;
•         The current use of the real estate as of the date of value is Residential as described in the improvements section of this appraisal.

•         The use of the real estate reflected in this appraisal is as currently improved

•         The rationale and support for the opinion of highest and best use developed for this assignment is as per below:
Highest and Best Use is defined as "The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property-specific with respect to the user and timing of the use-that is adequately supported and results in the highest present value"
Source: Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Appraisal Institute, 2010).
The highest and best use analysis is a critical step in the valuation process. The comparable properties incorporated into the appraisal are directly affected by the highest and best use analysis. The analysis is based on the use that a hypothetical purchaser would make of the property based on the four tests cited above:
•         Legally Permissible
•         Physically Possible
•         Financially Feasible
•         Maximally Productive

After consideration of the above criteria it has been determined that the current improvements continue to contribute to the total market value of the property and the return from a new improvement would not currently offset the cost of demolishing the existing improvements and constructing a new one. Therefore, the highest and best use is as improved.

**COMMENTS ON SALES COMPARISON APPROACH**

All comparables provided strong support. The most weight, and opinion of value fell on comparables 1, and 2, for requiring zero adjustments.

Comparables were adjusted for their differences in views. No gross living area adjustments were warranted as all comparable dwellings were within 100 square feet of the subject property. No age adjustments were warranted as all comparables were noted in similar overall condition.

**Supplemental Addendum**

File No. VALU-18-12-1464

| Borrower | Jose & Adele Miranda | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | |
| City | Miami | County | Dade | State | FL | Zip Code 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | |

It should be noted that the estimated value of the subject exceeds the predominate value in the subject neighborhood. This will not have a negative effect on the marketability of the subject property. The subject property is in no way an over improvement for the market area.

ALL ADJUSTMENTS WERE DERIVED FROM THE SUBJECT MARKET AND THE APPRAISERS EXPERTISE IN THE MARKET PLACE.

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations.

All comparables are located within the subject's neighborhood boundaries. No geographic boundaries were crossed.

**RECONCILIATION**

The sales comparison approach was considered most applicable for the subject property because a typical buyer or seller would most readily understand and apply this approach. The income approach was not considered applicable due to the fact that the majority of housing stock in the area is owner occupied and not typically used for investment property. The cost approach was not completed due the subjectivity in estimating depreciation and because the typical buyer does not base price points on the cost approach. The quality of available data utilized in the Sales comparison Approach was considered adequate.

**EXTERIOR INSPECTION ADDENDA**

The appraiser has been requested to perform an appraisal based on an exterior only inspection and not to disturb the occupants by entering the building. The physical characteristics used to develop this appraisal are based on the assessment records of Dade County, Florida and on the multiple listing service. The subject property was observed from the public street as of the effective date of the appraisal. On the basis of the observed conditions, the assessment records and multiple listing service information appear to be accurate. For the purposes of this appraisal, it is assumed that the interior condition of the subject property is consistent with the exterior conditions as observed and that the information concerning the interior condition as provided by the assessor's records and the multiple listing service is accurate.

**PHYSICAL DEFICIENCIES OR ADVERSE CONDITIONS**

Unless otherwise stated in this report, the existence of hazardous material and/or electromagnetic emission, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no such knowledge of the existence of such materials on or in the subject property, or in the properties of the subject neighborhood. The appraiser is not qualified to detect such substances. The presence of such substances as asbestos, urea formaldehyde foam insulation, radon, mold, or other potentially hazardous material may affect the value of the property. The value estimate expressed is predicated on the assumption that there is no such material in or on the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required discovering them. The customer is urged to retain an expert in this field.

Dwellings built prior to 1978 may contain lead-based paint.

**MOLD**

The appraiser is not a home or environmental inspector. The appraiser provides an opinion of value. The appraisal does not guarantee that the property is free of defects or environmental problems. The appraiser performs an inspection of visible and accessible areas only. Mold may be present in areas the appraiser cannot see. A professional home inspection or environmental inspection is recommended.

**CONCLUSION**

This is an Appraisal Report which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for an Appraisal Report. As such, it presents only minimal discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's file. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein. The appraiser is not responsible for unauthorized use of this report.

**Subject Photo Page**

| Borrower | Jose & Adele Miranda | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | |
| City | Miami | County | Dade | State | FL | Zip Code 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | |



**Subject Front**

| | |
|---|---|
| 8890 SW 229th St | |
| Sales Price | |
| Gross Living Area | 1,988 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Preserves |
| Site | 2337 sf |
| Quality | Average |
| Age | 8 |

**Subject Rear**



**Subject Street**

## Comparable Photo Page

| Borrower | Jose & Adele Miranda | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | | |
| City | Miami | County | Dade | State | FL | Zip Code | 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | | |



### Comparable 1

| | |
|---|---|
| 8870 SW 229th St | |
| Prox. to Subject | 0.07 miles E |
| Sales Price | 269,000 |
| Gross Living Area | 1,988 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Preserves |
| Site | 2337 sf |
| Quality | Average |
| Age | 11 |



### Comparable 2

| | |
|---|---|
| 8928 SW 228th Ln | |
| Prox. to Subject | 0.09 miles W |
| Sales Price | 260,000 |
| Gross Living Area | 1,988 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Preserves |
| Site | 2337 sf |
| Quality | Average |
| Age | 10 |



### Comparable 3

| | |
|---|---|
| 8977 SW 227th Ter | |
| Prox. to Subject | 0.18 miles NW |
| Sales Price | 260,000 |
| Gross Living Area | 1,988 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Residential |
| Site | 2337 sf |
| Quality | Average |
| Age | 10 |

## Rental Photo Page

| Borrower | Jose & Adele Miranda | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | |
| City | Miami | County | Dade | State | FL | Zip Code 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | |



### Rental 1

8908 SW 229th St

| | |
|---|---|
| Proximity to Subject | 0.05 miles W |
| Adj. Monthly Rent | 1,900 |
| Gross Living Area | 1,988 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Preserves |
| Condition | Average |
| Age/Year Built | 10 |



### Rental 2

8952 SW 228th Ln

| | |
|---|---|
| Proximity to Subject | 0.13 miles W |
| Adj. Monthly Rent | 1,975 |
| Gross Living Area | 1,988 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Preserves |
| Condition | Average |
| Age/Year Built | 10 |



### Rental 3

8939 SW 228th Ln

| | |
|---|---|
| Proximity to Subject | 0.12 miles NW |
| Adj. Monthly Rent | 1,850 |
| Gross Living Area | 1,988 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Residential |
| Condition | Average |
| Age/Year Built | 10 |



**Assessor Map**

| Borrower | Jose & Adele Miranda | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | | |
| City | Miami | County | Dade | State | FL | Zip Code | 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | | |



## Location Map

| Borrower | Jose & Adele Miranda | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | | |
| City | Miami | County | Dade | State | FL | Zip Code | 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | | |



**Subject Aerial Map**

| Borrower | Jose & Adele Miranda | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | | |
| City | Miami | County | Dade | | State | FL | Zip Code | 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | | |



SUBJECT
8890 SW 229th St
Miami, FL 33190

## Assessor Data

| Borrower | Jose & Adele Miranda | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | | |
| City | Miami | | County | Dade | | State | FL | Zip Code | 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | | |



1/2/2019       Property Search Application - Miami-Dade County

# OFFICE OF THE PROPERTY APPRAISER

## Summary Report

Generated On : 1/2/2019

### Property Information

| | |
|---|---|
| Folio: | 36-6016-017-0390 |
| Property Address: | 8890 SW 229 ST<br>Cutler Bay, FL 33190-1959 |
| Owner | ALDO AMORETTI<br>GILDA FRANCHESKA MATTEI<br>HADDOCK |
| Mailing Address | 8890 SW 229 ST<br>CUTLER BAY, FL 33190 USA |
| PA Primary Zone | 0100 SINGLE FAMILY - GENERAL |
| Primary Land Use | 0410 RESIDENTIAL - TOTAL VALUE<br>: TOWNHOUSE |
| Beds / Baths / Half | 3 / 2 / 1 |
| Floors | 2 |
| Living Units | 1 |
| Actual Area | 2,575 Sq.Ft |
| Living Area | 1,988 Sq.Ft |
| Adjusted Area | 1,988 Sq.Ft |
| Lot Size | 2,337 Sq.Ft |
| Year Built | 2006 |

### Assessment Information

| Year | 2018 | 2017 | 2016 |
|---|---|---|---|
| Land Value | $0 | $0 | $0 |
| Building Value | $0 | $0 | $0 |
| XF Value | $0 | $0 | $0 |
| Market Value | $23,370 | $23,370 | $23,370 |
| Assessed Value | $23,370 | $23,370 | $23,370 |

### Benefits Information

| Benefit | Type | 2018 | 2017 | 2016 |
|---|---|---|---|---|
| Homestead | Exemption | $23,370 | $23,370 | $23,370 |
| Second Homestead | Exemption | $0 | $0 | $0 |

Note: Not all benefits are applicable to all Taxable Values (i.e. County, School Board, City, Regional).

### Short Legal Description

| |
|---|
| TRELLIS AT BAYSHORE |
| PB 164-047 T-22057 |
| LOT 2 BLK 8 |
| LOT SIZE 2337 SQ FT |
| FAU 36 6016 000 0023 |

### Taxable Value Information

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| **County** | | | |
| Exemption Value | $23,370 | $23,370 | $23,370 |
| Taxable Value | $0 | $0 | $0 |
| **School Board** | | | |
| Exemption Value | $23,370 | $23,370 | $23,370 |
| Taxable Value | $0 | $0 | $0 |
| **City** | | | |
| Exemption Value | $23,370 | $23,370 | $23,370 |
| Taxable Value | $0 | $0 | $0 |
| **Regional** | | | |
| Exemption Value | $23,370 | $23,370 | $23,370 |
| Taxable Value | $0 | $0 | $0 |

### Sales Information

| Previous Sale | Price | OR Book-Page | Qualification Description |
|---|---|---|---|
| 10/02/2018 | $306,500 | 31197-3536 | Qual by exam of deed |
| 05/17/2016 | $208,200 | 30982-4149 | Federal, state or local government agency |
| 01/01/2007 | $302,790 | 25312-0889 | Sales which are qualified |

The Office of the Property Appraiser is continually editing and updating the tax roll. This website may not reflect the most current information on record. The Property Appraiser and Miami-Dade County assumes no liability, see full disclaimer and User Agreement at http://www.miamidade.gov/info/disclaimer.asp

Version:

**MLS Listing Sheet**

| Borrower | Jose & Adele Miranda | | | | |
|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | |
| City | Miami | County | Dade | State FL | Zip Code 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | |

1/2/2019         Matrix

🏠 Listing

**Single Family**
8890 SW 229th St
CUTLER BAY, FL 33190-1959

| | | | |
|---|---|---|---|
| ML#: | A10517799 | List Price: | $315,000 |
| Rng Price: | | Sold Price: | $306,500 |
| LLP: | | Status: | Closed Sale |
| Short Sale: | No | REO: | No |
| Listing Brkr: | LKSR01 /LuckyStart Realty, LLC | | |
| County: | Miami-Dade County | | |
| Area: | 60 | Auction: | No |
| Geo Area: | | | |
| Legal: | ✗TRELLIS AT BAYSHORE PB 164-047 T-22057 LOT 2 BLK 8 LOT SIZE 2337 SQ FT FAU 36 6016 000 0023 COC 25312-0889 01 2007 1 | | |
| Furnished: | | | |
| Bedrooms: | 3 | Baths: | 2/1 |
| Convert Bed: | | | |
| SqFt (Liv): | ✗1,988 | Tot SqFt: | ✗2,575 |
| SqFt (Adj): | ✗1,988 | | |
| Bld Ar/Src: | | | |
| Year Built: | 2006/New Construction | | |
| Virtual Tour: | Click Here | | |

**Location Information**

| | | | | | |
|---|---|---|---|---|---|
| Folio#: | ✗3660160170390 | Parcel #: | 0390 | Model Name: | |
| Municipal Code: | 36 | Town/Range: | 60 | Section: | 16 |
| Subdivision #: | 17 | Map Coord: | | Zoning: | ✗0100 |
| Subdivision: | ✗TRELLIS AT BAYSHORE | Development: | | | |
| Elementary: | | Middle: | | | |
| High: | | | | | |
| Neighborhood: | | | | | |

**General Information**

| | | | | | |
|---|---|---|---|---|---|
| Type Property: | Single | Front Exposure: | North East | HOPA: | No HOPA |
| For Lease: | | For Lease MLS#: | | SS Addend: | |
| Boat Services: | | | | | |
| Style: | R30-No Pool/No Water | | | | |
| Garage: | 2 | | | Carport: | |
| Lot SF: | ✗2,337 | Appr Lot Size: | | | |
| Parking Desc: | Covered Parking | | | | |
| Parking Restr: | | | | | |
| Lot Desc: | Less Than 1/4 Acre Lot | | | | |
| Waterfront: | No | | | | |
| Water Access: | | | | | |
| Water Frontage: | | View: | Other View | | |
| Pool Dim: | | Spa: | | | |
| Pool: | No | | | | |
| Design/Desc: | Attached/Two Story | | | | |
| Construction: | Concrete Block Construction | | | | |
| Roof Desc: | Barrel Roof | | | | |
| Floor: | Tile Floors, Wood Floors | | | | |

**Remarks**

| | |
|---|---|
| Remarks: | Great Property with Large master bedroom. Huge closet spaces. Nice private backyard for entertaining and your pets. Close to top schools. Short drive to the Marina. Listed as a three bedroom , and one den that can be used as a forth bedroom, two and a half bathrooms, Upgraded kitchen with quartz counter top, all new SS appliances, new washer and dryer, updated vanities , lots of room and light. Do not let this one pass you by. |

Driving Directions:

| | |
|---|---|
| Broker Remarks: | Please submit offer and required docs to BOTH jfernandez@luckystarthomes.com & nl@lyacon.com with DU. |

**Rooms**

| | |
|---|---|
| Bedroom Desc: | Master Bedroom Upstairs, Other |
| Master Bath: | |
| Addition Rooms: | Den/Library/Office |
| Dining Desc: | |
| ADA Compliant: | |

**Additional Information**

| | | | |
|---|---|---|---|
| Pets: | Yes | Cable: | |
| Pet Rstr: | Restrictions Or Possible Restrictions | | |
| Guest House: | | | |
| # Ceiling Fans: | | | |
| Interior Feat: | First Floor Entry, Walk-In Closets | | |

https://sef.mlsmatrix.com/Matrix/Printing/PrintOptions.aspx?c=AAEAAAD*****AQAAAAAAARAQAAAFQAAAAGAgAAAAQzMzYyBgMAAAABMwY…    1/3

**MLS Listing History**

| Borrower | Jose & Adele Miranda | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | | |
| City | Miami | County | Dade | State | FL | Zip Code | 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | | |

Property History

RE1/             8890 SW 229th St           L - $315,000
A10517799 - Closed Sale     Cutler Bay, FL 33190-1959      C - $306,500

MLS#:   A10517799      8890 SW 229th St        Single Family

| Price | Chg Type | Chg Info | Eff Date | Agent ID | Office ID | DOM |
|---|---|---|---|---|---|---|
| $306,500 | CS | ($306,500) | 10/17/2018 | 3398270 | LKSR01 | 22 |
| $315,000 | PS | A -> PS | 09/04/2018 | 3398270 | LKSR01 | 22 |
| $315,000 | BOM | T -> A | 08/13/2018 | 3398270 | LKSR01 | 0 |
| $315,000 | T | A -> T | 08/08/2018 | 3398270 | LKSR01 | 0 |
| $315,000 | NEW | ACTV -> $315,000 | 08/08/2018 | 3398270 | LKSR01 | 0 |

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 366 of 796
Case 1:14-cv-22408-MGC Document 27-9 Entered on FLSD Docket 05/13/2019 Page 98 of
License

| Borrower | Jose & Adele Miranda | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8890 SW 229th St | | | | | | |
| City | Miami | County | Dade | | State | FL | Zip Code | 33190 |
| Lender/Client | Integra Realty Resources (IRR) - Miami | | | | | | |



RICK SCOTT, GOVERNOR                    JONATHAN ZACHEM, SECRETARY



### STATE OF FLORIDA
### DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

### FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED RESIDENTIAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## FONG, CARLOS RAFAEL

10601 S.W. 124 ROAD.
MIAMI            FL 33186

**LICENSE NUMBER: RD6782**

**EXPIRATION DATE:  NOVEMBER 30, 2020**

Always verify licenses online at MyFloridaLicense.com



Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment



amgraziano@irr.com    -    305.670.0001 x320

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com

### Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida



**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Caribbean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Carribean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 11/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Saranzzi, Faith Ann Safaranzi, Proverbium Hldg, LLC, USA & George Albright | NeJame, La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | C8 Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

M. Quals: Graziano: Trial Lists

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL.

| RETENTION DATE | ON BEHALF | TRI FILE # | COURT/CASE NO. # | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008893I-CA-01 | Aaron Stauber & Aviva Stauber V. BH 33, LLC | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | Southern District of Florida | John Campos | Retrospective (2004-2008) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Igor Gert V. Yacht Club at Portofino Condo Association | Miami-Dade County | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Ocean Bank V. Lindback, Monroe County | Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24694 CA 06 | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Sariff and Course Drive Investments, LLC | 11th Judicial Circuit Dade County, Florida | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (retrospective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0194 | 13-010822 CACE 02 | Amalia I. Irlanda-Rivera V. Riviera Diagnostic Center, Inc., Oknay Rivero & Yudit Rivero | 13th Judicial Circuit Broward County, Florida | Amalia I. Irlanda-Rivera | Rent default judgment and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FL534 (Pending) | Roehm Title Resources Claim | Palm Beach County | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined title defects not identified by Title Insurance Company |
| 4/2014 | Plaintiff | 123-2014-0117 | 4:14-CV-01077 (Pending) | USA V. GSA-VA St. Louis Property, LLC | USA District Court for the Eastern District of Missouri Eastern Division (Hon. Carlos A. Rodriguez) | Bryan Cave LLP | Condemnation defect a possessory interest for a term. Retained as consulting/rebuttal expert |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Euforia Club | Miami-Dade County | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition S.R.-7 | Broward County | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | West Airport Plaza Business Park, LLC | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | Counsel for the Debtor, Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23922-CA 09 | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | 11th Judicial Circuit Dade County, Florida | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Plaintiff | 123-2013-0126 | CACE 08857624 (14) | Bayview Loan Servicing, LLC v. Kayhan Soodjani; Muhammad Mahmoodi; et al | 17th Judicial Circuit Broward County, Florida (Hon. Carlos A. Rodriguez) | Bayview Servicing, represented by Tabas, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency Judgment on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV - Rosenbaum | United States of America v. G.K.K. etal | US District Court - Southern District of Florida (Hon. Rosenbaum) | Richard Duvall, Holland and Knight and Jeffrey Nieman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 02/2013 | Plaintiff | 123-2011-0870 | 09-05650 CA 04 | Zenaida Gomez v. City of Pinecrest | 11th Judicial Circuit Dade County, Florida (Hon. Beth Bloom) | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence |
| 1/2013 | Plaintiff | 123-2011-0016 | 12-60950-CIV | Q Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | US Federal Court - Southern District of Florida | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 1/2012 | Plaintiff | 123-2010-0129 | Pending | 2011 and 2012 Ad Valorem Tax Protest | 11th Judicial Circuit Dade County, Florida | Ken Wurtenberger, Esq., Koeppenn & Oslund Ferguson | Tax protest of commercial condominium. |
| 10/19/2012 | Plaintiff | 123-2010-0111 | 2011-1107 CA-23 | Renegade at Hialeah Blvd v. Dynatech Engineering | 17th Judicial Circuit Broward County, Florida (Hon. Stanford Blake) | Daniel Levin, Esq., Cole, Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from expired lease modification. |
| 10/12/2012 | Defendant | 123-2012-0109 | 11-30189 CA21 | Yaffa Yakubov vs. Bayview at Fisher Island No.3 | 11th Judicial Circuit Dade County, Florida | Craig Minko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal; economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal |
| 8/20/2012 | Plaintiff | 123-2010-0012 | CA-02180 CA-25 | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egozi, etal | 11th Judicial Circuit Dade County, Florida | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012 |
| 8/15/2012 | Disclosed Dual Expert | 123-2012-0072 | | Vazquez v. Vazquez Matrimonial Matter | Matrimonial Mediation | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) marital assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Illinois, Bahamas |
| 7/2012 | Plaintiff | 109-2011-0172 | Pending: 2003-2014 | BASF, Inc. successor Ciba Geigy Inc. vs. Township of Toms River | Tax Court of New Jersey (Hon. Patrick DeAlemeida) | Phil Genuario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010-0172 | ATL-L-4451-08 | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Superior Court of New Jersey, Law Division, Atlantic County | Jay Rhatican, Connell Foley on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands; deprivation of all reasonable investment backed expectations |
| 07/2011 | Defendant | 109-2010-0199 | MER-L-3034-08 | 460 Mercer Street, LLP and Bruckener Southern, LLC vs. Hightstown | Superior Court of New Jersey, Mercer County | Ansell Zaro Grimm & Aaron, P.C. Husam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept.-Justice File 90-11-3-3800-1 | United States v. Atlantic Wood Industries, Inc. | Federal District Court of Virginia | U.S. Department of Justice | Damages in environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Westrust/HPC Mortgage Fund vs. City of Atlantic City | Tax Court of New Jersey | Cole, Schotz, Meisel, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |



**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/1/2009 | Secured Creditor | 109-2009-0439 | | Erickson Building | US Bankruptcy Court - Southern District of Texas | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 9/2/2009 | Plaintiff | 109-2009-3035-001 | 3035-001 | Bay Head Yacht Club vs. Ocean County Tax Board | Tax Court of New Jersey | John Doyle, Carlucco, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 109-2008-0123 | INA (DEFS Pending) | Mirage Atlantic City (MAC) vs. City of Atlantic City | Tax Court of New Jersey | Hank Rovitsart, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 8/6/2008 | Defendant | 109-2008-0202 XXX | L-2424-05 | The City of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Superior Court of New Jersey Law Division, Middlesex County | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | 109-2008-345 | C.A. No. OCN L-3361-06 | Oldbourne Associates, Melbourne Associates VI, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co. JAC, Property Management etal and Eckerd Corporation | Superior Court of New Jersey, Law Division Ocean County | Francis X. Manning, Esq, Strodley Ronon Stevens & Young & Michael Camboli, Esq, Partridge Snow and Hahn both on behalf of | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 109-2008-0125- | N/A | Toms River Township vs. Gilsa Geigy Corporation | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpenteli] | Mark Troncone, Esq, In-house Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | 109-2007-211 | L-008635-06 | Kyle Mosteller vs. Galla Neeman | Superior Court of New Jersey, Law Division Middlesex County | Frank Canuso, Esq, Hoogland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Plaintiff | 109-2007-0134 | 3:07-CV-2322 | Silver Lakes Inc. vs. Township of Freehold Inc. | Superior Court of New Jersey, Chancery Division Monmouth County | Christopher Hanlon, Esq, Hanlon and Niehman | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee |
| 6/2007 | Plaintiff | 109-2007-0173 | | Laurelwood Homes, LLC vs. United States Department of Navy | Federal District Court of Virginia | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 109-2006-0192 | CAM L - 9731-05 | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Superior Court of New Jersey, Chancery Division, Camden County | Brett Last, Esq, O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 8/6/2006 | Defendant | 109-2006-0257 | | County Line & Browers Bridge, Jackson Township | | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 2/2/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Carl Brooks vs. K. Hovanian | Ocean Superior Court, Ocean County Courthouse | Ronan, Tuzzio & Giannone, Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner, and the subject developer K. Hovranian @ Sea Oaks |
| 10/2005 | Defendant | 109-2005-0315 | OCN-L-1810-5 | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility of the state of New Jersey vs. AC1 Manahawkin, LLC family and Armstrong | Superior Court of New Jersey, Law Division Ocean County | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and tower by Atlantic City Electric |
| 6/2005 | Defendant | 109-2005-0214 | MON L-2609-05 | Township of Howell vs. George Harms Construction Co., Inc. etal | Superior Court of New Jersey Law Division Monmouth County | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 8/2003 | Defendant | 109-2003-0282 | | Giuffre vs. Giuffre | Superior Court of New Jersey Chancery Division, Family Part, Monmouth County | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 7/2003 | Plaintiff | 109-2003-0203 | OCN-C-78-03 | West, etal vs. Pompaino, etal | Superior Court of New Jersey, Chancery Division, Ocean County | Stephen E. Smith, Esq. | To develop an opinion of the diminution in value due to a loss of useable land area |
| 6/2003 | Plaintiff | 109-2003-0106 | OCN-C-316-02 | Eugene M. Lord vs. Donald W. Rinaldo | Superior Court of New Jersey Law Division, Ocean County | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate of the property |
| 4/2003 | Plaintiff | 109-2003-0128 | FM-15-468-03-C | Vincent Urbank vs. Lisa Urbank | Superior Court of New Jersey, Chancery Division, Family Part Ocean County | Marianna Portorerio, Esq. | Litigation-Matrimonial |
| 2/2002 | Plaintiff | 109-2002-0055 | | Shenandoah Mobile Home Park | | Winckel's Manx Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 4/2001 | Claimant | 109-2001-0169 | NJ-2624-00 | DeForest John Ely and Kimberle A. Ely, h/w | Superior Court of New Jersey, Chancery Division, Middlesex County | First American Title Insurance Co. Jack Milks | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 3/3/1999 | Plaintiff | 109-1999-0062 | | Georgetown Apartments | US Bankruptcy Court - District of Newark | Emmes & Co. Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | LKW 257-3186 | FM-15-1465-94 | Lisa Franklin, etal vs. Donald Franklin, etal | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1984 | Creditor | HUD-XX | | Hudson Marina Association vs. Emmes & Co. | US Bankruptcy Court - District of Newark | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium condominium |



M. Quals: Graziano, Trial Lists

**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Nunez, Jeovany**
Hypothetical Market Value "As If" Remediated
8049 W 36th Ave, Unit 4
Hialeah, Miami-Dade County, Florida 33018
Client Reference: 2

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
August 22, 2017

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**Nunez, Jeovany**
8049 W 36th Ave, Unit 4
Hialeah, Florida



| Integra Realty Resources | In Miami | In Orlando | In Naples/Sarasota |
|---|---|---|---|
| Miami | Dadeland Centre | The Magnolia Building | Horseshoe Professional Park |
| Orlando | 9155 South Dadeland Blvd. | 326 N. Magnolia Ave. | 2770 Horseshoe Drive S. |
| Southwest Florida | Suite 1208 | | Suite 3 |
| | Miami, FL 33156 | Orlando, FL 32801 | Naples, FL 34104 |
| www.irr.com | (305) 670-0001 | (407) 843-3377 | (239)-643-6888 |

February 10, 2019 (Amended February 26, 2019)

Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

SUBJECT:      Hypothetical Market Value "As If" Remediated
Case No 11-22408-Civ-COOKE
United States District Court Southern District of Florida in the matter of
Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
Priority Claimant Case at:
Nunez, Jeovany
8049 W 36th Ave, Unit 4
Hialeah, Miami-Dade County, Florida 33018
Client Reference: 2
IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the referenced property as of the effective date assuming all remediation was completed by an appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It presents summary discussions of the data, reasoning, and analysis that were used in the appraisal process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 2:09-md-02047-EEF-MBN Document 22380-38 Filed 12/02/19 Page 375 of 796
Case 1:11-cv-22408-MGC Document 273-9 Entered on FLSD Docket 05/13/2019 Page 47 of 989
Identification of Subject 2

## Identification of Subject

The subject of this report is a residential condominium home configured with 3 bedroom and 2.5 baths with 1,356 SF under air-conditioning. The subject property was built in 2006 and is located in the Shoma Homes Splendido Condominium neighborhood.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, August 22, 2017. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is February 10, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
| --- | --- |
| Sale Date (Most Recent) | January 1, 2007 |
| Seller | Shoma Homes Splendido |
| Buyer | Nunez, Jeovany |
| Sale Price | $269,990 |
| Recording Instrument Number | 25295-2421 |
| Disposition Details | Original Sale from homebuilder |

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

The property was foreclosed on in July 2017, which is just prior to our effective date of value. No listing or sale was found subsequent to the foreclosure or effective value date. The interrogatories indicate that the Chinese Drywall had not been remediated at the time of foreclosure.

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:



Case 2:09-md-02047-EEF-MBN   Document 22380-38   Filed 12/02/19   Page 376 of 796
Case 1:11-cv-22408-MGC   Document 279-8   Entered on FLSD Docket 05/13/2019   Page 48 of 989

Definition of Retrospective Value Opinion                                                    3

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

## Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value.  Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation.  Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

## Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

## Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation.  The result of that study are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida."  The results of that study are incorporated by reference herein.



In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation.  As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction.  Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation.  These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property.  This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections.  Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available.  In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis.  However, the damage analysis only represents a <u>portion of the overall damages</u> because we were specifically requested to exclude the consideration of the costs to cure.  This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to a "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report.  The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local



Case 1:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 378 of 796
Case 1:14-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 50 of 989

Highest and Best Use                                                                    5

knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach.  The valuations consider the only relevant approach for residential valuation, the sales comparison analysis.  The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis.  Additionally, this approach directly considered the prices of alternative properties having similar utility.

### Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant.  The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

### Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report.  This value us hypothetical since it assumes that defective drywall had never been present at the subject property.

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue.  This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date.  This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

Nunez, Jeovany



Conclusion of Value                                                                                    6

_____

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation.  Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total.  This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value.  These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home.  Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered.  Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF              4 months

$150,000 - $750,000 home up to 4,000 SF        6 months

$750,000+ home up over 4,000 SF                9 months

_____

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).

Nunez, Jeovany



The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

| Conclusions of Damage | | | |
|---|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $200,000 | |
| Market Impairment Discount (As if Remediated) | | 10% | |
| Post Impairment Damage ($) | | $20,000 | |
| **Hypothetical Value As IF Remediated** | | | **$180,000** |
| Post Remediation Damages as of Effective Date | | | **$20,000** |
| Loss of Use: | | | |
| Rental Rate ($/Month) | **$1,850** | | |
| Moving & Storage Costs | | $3,000 | |
| Loss of Use Subject (# Months) | 4x | $7,400 | |
| Subject Total | | | $10,400 |
| **Post Remediation Damage** | | | **$30,400** |

Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

Nunez, Jeovany



Case 1:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 381 of 796
Case 1:11-cv-22408-MGC   Document 279-5   Entered on FLSD Docket 05/13/2019   Page 93 of 989

Certification                                                                                                    8

## Certification

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Carlos Fong has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Case 2:09-md-02047-EEF-MBN Document 22380-38 Filed 12/02/19 Page 382 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 84 of 989

Assumptions and Limiting Conditions                                                                    9

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1.  The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2.  There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3.  There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4.  The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5.  The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6.  The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1.  An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2.  The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3.  No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4.  No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5.  Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6.  We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.

Nunez, Jeovany



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 383 of 796
Case 1:11-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 95 of 989

Assumptions and Limiting Conditions                                                                    10

7.  No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.  We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.  The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during



Case 2:09-md-02047-EEF-MBN Document 22380-38 Filed 12/02/19 Page 384 of 796
Case 1:14-cv-22409-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 96 of 989

Assumptions and Limiting Conditions                                                    11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19. The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20. No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21. The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23. The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged

Nunez, Jeovany



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 385 of 796
Case 1:11-cv-22408-MGC   Document 273-9   Entered on FLSD Docket 05/13/2019   Page 9 of 989

Assumptions and Limiting Conditions                                               12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25.  Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26.  The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27.  All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

Nunez, Jeovany



# **Addenda**



| Borrower | Jeovany & Monica Nunez | | | File No. | VALU-18-12-1465 |
|---|---|---|---|---|---|
| Property Address | 8049 W 36th Ave | | | | |
| City | Hialeah | County | Dade | State FL | Zip Code 33018 |
| Lender/Client | Integra Realty Resources (IRR) | | | | |

## TABLE OF CONTENTS



USPAP Identification Addendum ................................................................................................ 1
Exterior-Only Condo .................................................................................................................. 2
Additional Comparables 4-6 ...................................................................................................... 8
Single Family Comparable Rent Schedule ................................................................................ 9
General Text Addendum ............................................................................................................ 10
Subject Photos .......................................................................................................................... 13
Comparable Photos 1-3 ............................................................................................................ 14
Comparable Photos 4-6 ............................................................................................................ 15
Rental Photos 1-3 ..................................................................................................................... 16
Subject Aerial Map .................................................................................................................... 17
Location Map .............................................................................................................................. 18
Assessor Data ........................................................................................................................... 19
Tax Information .......................................................................................................................... 20
License ....................................................................................................................................... 21

# USPAP ADDENDUM

| | |
|---|---|
| Borrower | Jeovany & Monica Nunez |
| Property Address | 8049 W 36th Ave |
| City | Hialeah | County Dade | State FL | Zip Code 33018 |
| Lender | Integra Realty Resources (IRR) |

File No. VALU-18-12-1465
VALU-18-12-1465

This report was prepared under the following USPAP reporting option:

☒ Appraisal Report          This report was prepared in accordance with USPAP Standards Rule 2-2(a).

☐ Restricted Appraisal Report      This report was prepared in accordance with USPAP Standards Rule 2-2(b).

**Reasonable Exposure Time**
My opinion of a reasonable exposure time for the subject property at the market value stated in this report is: _____
EXPOSURE TIME: estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

USPAP 2018-19 Comment: Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market

**Additional Certifications**
I certify that, to the best of my knowledge and belief:

☒ I have NOT performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

☐ I HAVE performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

**Additional Comments**

APPRAISER COMPETENCY

An appraiser must determine, prior to accepting an assignment, that he or she can perform the assignment competently. Competency requires:

1. the ability to properly identify the problem to be addressed; and
2. the knowledge and experience to complete the assignment competently; and
3. recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.

I am competent to perform this assignment based on my state appraiser license and familiarity with this type of property in the subject market

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations

**APPRAISER:** *Carlos Fong*

Signature:
Name: Carlos Fong
Date Signed: 02/10/2019
State Certification #: RD 6782
or State License #:
State: FL
Expiration Date of Certification or License: 11/30/2020
Effective Date of Appraisal: 08/22/2017

**SUPERVISORY APPRAISER: (only if required)**

Signature:
Name:
Date Signed:
State Certification #:
or State License #:
State:
Expiration Date of Certification or License:
Supervisory Appraiser Inspection of Subject Property:
☐ Did Not    ☐ Exterior-only from Street    ☐ Interior and Exterior

**Exterior–Only Inspection Individual Condominium Unit Appraisal Report**

VALU-18-12-1465
File # VALU-18-12-1465

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

Freddie Mac Form 466 March 2005      Page 1 of 6      Fannie Mae Form 1075 March 2005

Form 1075 - "TOTAL" appraisal software by a la mode, inc. – 1-800-ALAMODE

### SUBJECT

| Field | Value |
|---|---|
| Property Address | 8049 W 36th Ave   Unit # 4   City Hialeah   State FL   Zip Code 33018 |
| Borrower | Jeovany & Monica Nunez   Owner of Public Record Jeovany & Monica Nunez   County Dade |
| Legal Description | SHOMA HOMES SPLENDIDO CONDOUNIT 60 BLDG 11UNDIV 1/219INT IN COMMON ELEMENTSOFF REC 24177-2205COC 25295-2421 01 20 |
| Assessor's Parcel # | 04-2028-106-0600   Tax Year 2017   R.E. Taxes $ 2,562 |
| Project Name | Shoma Homes Splendido Condo   Phase #   Map Reference 33124   Census Tract 0126.00 |
| Occupant | ☒ Owner ☐ Tenant ☐ Vacant   Special Assessments $ 0   HOA $ 175 ☐ per year ☒ per month |
| Property Rights Appraised | ☒ Fee Simple ☐ Leasehold ☐ Other (describe) |
| Assignment Type | ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Litigation |
| Lender/Client | Integra Realty Resources (IRR)   Address 9155 South Dadeland Boulevard, Miami, FL 33156 |

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No
Report data source(s) used, offering price(s), and date(s).   The subject has not listed or sold for the past 12 months per MIAMI MLS.

### CONTRACT

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $   Date of Contract   Is the property seller the owner of public record? ☐ Yes ☐ No   Data Source(s)
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No
If Yes, report the total dollar amount and describe the items to be paid.

### NEIGHBORHOOD

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | Condominium Unit Housing Trends | Condominium Housing | Present Land Use % |
|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☐ Increasing ☒ Stable ☐ Declining | PRICE / AGE | One-Unit 85 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | $ (000) / (yrs) | 2-4 Unit 5 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | 139 Low 0 | Multi-Family 5 % |
| Neighborhood Boundaries The subject is bound to the north by Florida's Tpke, to the west by N | | 345 High 40 | Commercial 5 % |
| Okeechobee Rd, to the south by Hialeah Gardens Blvd and to the south by N Okeechobee Rd. | | 288 Pred. 15 | Other % |

Neighborhood Description   There are no apparent factors that should affect the subject's marketability. The subject has access to all necessary supporting facilities including schools, shopping, recreation and employment centers.

Market Conditions (including support for the above conclusions)   See Attached Addendum

### PROJECT SITE

Topography Typical   Size Typical   Density Typical   View N;Res;
Specific Zoning Classification R-3-2   Zoning Description Residential (Medium Density)
Zoning Compliance ☒ Legal ☐ Legal Nonconforming – Do the zoning regulations permit rebuilding to current density? ☐ Yes ☐ No
☐ No Zoning ☐ Illegal (describe)
Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No   If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | ☒ | ☐ |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley None | | |

FEMA Special Flood Hazard Area ☒ Yes ☐ No   FEMA Flood Zone AH   FEMA Map # 12086C0113L   FEMA Map Date 9/11/2009
Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No   If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No   If Yes, describe
No observed or known adverse influences to market value were noted.

### PROJECT INFORMATION

Data source(s) for project information   Management
Project Description ☐ Detached ☒ Row or Townhouse ☐ Garden ☐ Mid-Rise ☐ High-Rise ☐ Other (describe)

| General Description | | Subject Phase | If Project Completed | If Project Incomplete |
|---|---|---|---|---|
| # of Stories 2 | Exterior Walls CBS | # of Units 200 | # of Phases 200 | # of Planned Phases |
| # of Elevators 0 | Roof Surface Barrel | # of Units Completed 200 | # of Units 200 | # of Planned Units |
| ☒ Existing ☐ Proposed | Total # Parking 200 | # of Units For Sale 0 | # of Units for Sale 0 | # of Units for Sale |
| ☐ Under Construction | Ratio (spaces/units) 1/1 | # of Units Sold 200 | # of Units Sold 200 | # of Units Sold |
| Year Built 2006 | Type Ext | # of Units Rented 100 | # of Units Rented 100 | # of Units Rented |
| Effective Age 8 | Guest Parking Street | # of Owner Occupied Units 100 | # of Owner Occupied Units 100 | # of Owner Occupied Units |

Project Primary Occupancy ☒ Principle Residence ☐ Second Home or Recreational ☐ Tenant
Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☒ No
Management Group – ☐ Homeowners' Association ☐ Developer ☒ Management Agent - Provide name of management company.

Does any single entity (the same individual, investor group, corporation, etc.) own more than 10% of the total units in the project? ☐ Yes ☒ No   If Yes, Describe

Was the project created by the conversion of existing building(s) into a condominium? ☐ Yes ☒ No   If Yes, describe the original use and date of conversion.

Are the units, common elements, and recreation facilities complete (including any planned rehabilitation for a condominium conversion)? ☒ Yes ☐ No   If No, describe

Is there any commercial space in the project? ☐ Yes ☒ No   If Yes, describe and indicate the overall percentage of the commercial space.

**Exterior–Only Inspection Individual Condominium Unit Appraisal Report**

VALU-18-12-1465
File # VALU-18-12-1465

## PROJECT INFORMATION

Describe the condition of the project and quality of construction    The project displayed an average level of condition, appeal, and unit mix compared to the other similar developments.

Describe the common elements and recreational facilities.    Water, common insurance, exterior maintenance.

Are any common elements leased to or by the Homeowners' Association?    ☐ Yes  ☒ No  If Yes, describe the rental terms and options.

Is the project subject to a ground rent?    ☐ Yes  ☒ No  If Yes, $    per year (describe terms and conditions)

Are the parking facilities adequate for the project size and type?    ☒ Yes  ☐ No  If No, describe and comment on the effect on value and marketability.

## PROJECT ANALYSIS

I ☐ did  ☒ did not analyze the condominium project budget for the current year. Explain the results of the analysis of the budget (adequacy of fees, reserves, etc.), or why the analysis was not performed.    Neither a copy of the condominium documents nor a budget was provided to the appraiser. The appraiser assumes that there was no information which would be detrimental to the marketability of the project.

Are there any other fees (other than regular HOA charges) for the use of the project facilities?    ☐ Yes  ☒ No  If Yes, report the charges and describe.

Compared to other competitive projects of similar quality and design, the subject unit charge appears    ☐ High  ☒ Average  ☐ Low  If High or Low, describe

Are there any special or unusual characteristics of the project (based on the condominium documents, HOA meetings, or other information) known to the appraiser?    ☐ Yes  ☒ No  If Yes, describe and explain the effect on value and marketability.

Unit Charge $ 175    per month X 12 = $ 2,100.00    per year  Annual assessment charge per year per square foot of gross living area = $  1.55

Utilities included in the unit monthly assessment  ☐ None  ☐ Heat  ☐ Air Conditioning  ☐ Electricity  ☐ Gas  ☒ Water  ☒ Sewer  ☐ Cable  ☐ Other

Source(s) used for physical characteristics of property  ☐ Previous Appraisal Files  ☒ MLS  ☒ Assessment and Tax Records  ☐ Prior Inspection  ☐ Property Owner
☐ Other (describe)    Data Source for Gross Living Area    Assessor

| General Description | Amenities | Appliances | Car Storage |
|---|---|---|---|
| Floor # 1/2 | Fireplace(s) # 0 | ☒ Refrigerator | ☐ None |
| # of Levels 1 | ☐ WoodStove(s) # 0 | ☒ Range/Oven | ☐ Garage  ☐ Covered  ☐ Open |
| Heating Type Elec.  Fuel Elec. | ☒ Deck/Patio  Patio | ☐ Disp  ☒ Microwave | # of Cars 1 |
| ☒ Central AC  ☐ Individual AC | ☒ Porch/Balcony  Entry | ☒ Dishwasher | ☐ Assigned  ☐ Owned |
| ☐ Other (describe) | ☐ Other | ☒ Washer/Dryer | Parking Space # N/A |

## UNIT IMPROVEMENTS

Finished area **above** grade contains:    6 Rooms    3 Bedrooms    2.1 Bath(s)    1,356 Square Feet of Gross Living Area Above Grade

Are the heating and cooling for the individual units separately metered?    ☒ Yes  ☐ No  If No, describe and comment on compatibility to other projects in the market area.

Additional features (special energy efficient items, etc.)    None

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).    The subject was noted in average condition upon exterior inspection.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?    ☐ Yes  ☒ No  If Yes, describe
There are no apparent external or functional inadequacies noted or reported at time of inspection. Physical depreciation is calculated by the modified age life method.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?    ☒ Yes  ☐ No  If No, describe
The construction quality is typical for the area.

## PRIOR SALE HISTORY

I ☒ did  ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research  ☐ did  ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s)    MIAMI MLS, Miami-Dade County Records, and Realist
My research  ☒ did  ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s)    MIAMI MLS, Miami-Dade County Records, and Realist

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | 03/01/2016 | 09/20/2016 |
| Price of Prior Sale/Transfer | | | 146,500 | 121,300 |
| Data Source(s) | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist |
| Effective Date of Data Source(s) | 08/22/2017 | 08/22/2017 | 08/22/2017 | 08/22/2017 |

Analysis of prior sale or transfer history of the subject property and comparable sales.    8043 W 36th Ave Unit 6 has no 12-month prior transfer history. 8025 W 36th Ave Unit 2 transferred on 03/01/2016 for $146,500 (Special Warranty Deed - Doc #29981-4036). 8123 W 36th Ave Unit 1 transferred on 09/20/2016 for $121,300 (Certificate Of Title (FI) - Doc #30236-4586).

**Exterior–Only Inspection Individual Condominium Unit Appraisal Report**

VALU-18-12-1465
File # VALU-18-12-1465

| | | | | |
|---|---|---|---|---|
| There are | 35 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ | 175,000 | to $ 395,000 . |
| There are | 23 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | 139,000 | to $ 345,000 . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address and | 8049 W 36th Ave Apt 4 | 8043 W 36th Ave | | 8025 W 36th Ave | | 8123 W 36th Ave | |
| Unit # | Hialeah, FL 33018 | Hialeah, FL 33018 | | Hialeah, FL 33018 | | Hialeah, FL 33018 | |
| Project Name and | 1 | Shoma Homes Splendido Co | Shoma Homes Splendido Condo | Shoma Homes Splendido Condo | | Shoma Homes Splendido Condo | |
| Phase | 1 | 1 | | 1 | | 1 | |
| Proximity to Subject | | 0.09 miles SW | | 0.10 miles SW | | 0.06 miles SW | |
| Sale Price | $ | | 235,000 | | 220,000 | $ | 187,900 |
| Sale Price/Gross Liv. Area | $ sq. ft. | $ 160.52 sq. ft. | | $ 161.76 sq. ft. | | $ 138.06 sq. ft. | |
| Data Source(s) | | SEF #A10215462;DOM 9 | | SEF #A10185832;DOM 9 | | SEF #A10176504;DOM 14 | |
| Verification Source(s) | | Assessor, Realist | | Assessor, Realist | | Assessor, Realist | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | REO | |
| Concessions | | FHA;0 | | Conv;103 | | Conv;0 | |
| Date of Sale/Time | | s03/17;c02/17 | | s01/17;c12/16 | | s01/17;c11/16 | |
| Location | Residential | Residential | | Residential | | Residential | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| HOA Mo. Assessment | 175 | 175 | | 175 | | 170 | |
| Common Elements | Typical for | Typical for | | Typical for | | Typical for | |
| and Rec. Facilities | Similar Projects | Similar Projects | | Similar Projects | | Similar Projects | |
| Floor Location | 1/2 | 1/2 | | 1/2 | | 1/2 | |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | Townhouse | Townhouse | | Townhouse | | Townhouse | |
| Quality of Construction | Average | Average | | Average | | Average | |
| Actual Age | 11 | 13 | | 13 | | 13 | |
| Condition | Average | Good | -10,000 | Good | -10,000 | Average | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 6  3  2.1 | 7  4  3.0 | -5,000 | 6  3  2.0 | +5,000 | 6  3  2.0 | +5,000 |
| Gross Living Area | 1,356 sq. ft. | 1,464 sq. ft. | -4,300 | 1,360 sq. ft. | | 1,361 sq. ft. | |
| Basement & Finished | No Basement | No Basement | | No Basement | | No Basement | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | EFA/CAC | EFA/CAC | | EFA/CAC | | EFA/CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 1 Open Space | 1 Open Space | | 1 Open Space | | 1 Open Space | |
| Porch/Patio/Deck | Patio | Patio | | Patio | | Patio | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - $ | -19,300 | ☐ + ☒ - $ | -5,000 | ☒ + ☐ - $ | 5,000 |
| Adjusted Sale Price | | Net Adj. 8.2 % | | Net Adj. 2.3 % | | Net Adj. 2.7 % | |
| of Comparables | | Gross Adj. 8.2 % $ | 215,700 | Gross Adj. 6.8 % $ | 215,000 | Gross Adj. 2.7 % $ | 192,900 |

Summary of Sales Comparison Approach    See Attached Addendum

**SALES COMPARISON APPROACH** (vertical label)

Indicated Value by Sales Comparison Approach $ 200,000

**INCOME APPROACH TO VALUE (not required by Fannie Mae)**

| | | | |
|---|---|---|---|
| Estimated Monthly Market Rent $ | 1,850 | X Gross Rent Multiplier = $ | Indicated Value by Income Approach |

Summary of Income Approach (including support for market rent and GRM)    N/A

**INCOME** (vertical label)

| Indicated Value by: Sales Comparison Approach $ | 200,000 | Income Approach (if developed) $ |
|---|---|---|

see attached addendum.

**RECONCILIATION** (vertical label)

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: No special conditions are noted.

Personal property is not included in this valuation.

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 200,000 , as of 08/22/2017 , which is the date of the exterior inspection and the effective date of this appraisal.

**Exterior-Only Inspection Individual Condominium Unit Appraisal Report**

VALU-18-12-1465
File # VALU-18-12-1465

This report form is designed to report an appraisal of a unit in a condominium project or a condominium unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK:   The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect and analyze the condominium project, (3) inspect the neighborhood, (4) inspect each of the comparable sales from at least the street, (5) research, verify, and analyze data from reliable public and/or private sources, and (6) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE:   The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER:   The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE:   The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:   The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**Exterior-Only Inspection Individual Condominium Unit Appraisal Report**

VALU-18-12-1465
File # VALU-18-12-1465

APPRAISER'S CERTIFICATION:    The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I have performed a visual inspection of the exterior areas of the subject property from at least the street. I have reported the condition of the improvements in factual, specific terms. I have identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

**Exterior–Only Inspection Individual Condominium Unit Appraisal Report**

VALU-18-12-1465
File # VALU-18-12-1465

21.  The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22.  I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23.  The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25.  Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION:      The Supervisory Appraiser certifies and agrees that:

1.  I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2.  I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3.  The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4.  This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report   was   prepared.

5.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature *Carlos Fong* | Signature |
| Name  Carlos Fong | Name |
| Company Name  Valucentric LLC | Company Name |
| Company Address  7908 Montecito Pl, Delray Beach, FL 33446 | Company Address |
| Telephone Number  (844) 825-8236 | Telephone Number |
| Email Address  info@valucentric.com | Email Address |
| Date of Signature and Report  02/10/2019 | Date of Signature |
| Effective Date of Appraisal  08/22/2017 | State Certification # |
| State Certification #  RD 6782 | or State License # |
| or State License # | State |
| or Other | Expiration Date of Certification or License |
| State  FL | |
| Expiration Date of Certification or License  11/30/2020 | SUBJECT PROPERTY |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 8049 W 36th Ave, # 4 | Date of Inspection |
| 4, Hialeah, FL 33018 | |
| APPRAISED VALUE OF SUBJECT PROPERTY $  200,000 | COMPARABLE SALES |
| LENDER/CLIENT | |
| Name | ☐ Did not inspect exterior of comparable sales from street |
| Company Name  Integra Realty Resources (IRR) | ☐ Did inspect exterior of comparable sales from street |
| Company Address  9155 South Dadeland Boulevard, Miami, FL 33156 | Date of Inspection |
| Email Address | |

Form 1075 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Exterior–Only Inspection Individual Condominium Unit Appraisal Report

VALU-18-12-1465
File # VALU-18-12-1465

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address and | 8049 W 36th Ave Apt 4 | 3574 W 88th Ter | | | | | |
| Unit # | Hialeah, FL 33018 | Hialeah, FL 33018 | | | | | |
| Project Name and | Shoma Homes Splendido Co | Aragon At Lennar | | | | | |
| Phase | 1 | | | | | | |
| Proximity to Subject | | 0.43 miles N | | | | | |
| Sale Price | $ | | $ 270,000 | | $ | | $ |
| Sale Price/Gross Liv. Area | $ sq. ft. | $ 189.87 sq. ft. | | $ sq. ft. | | $ sq. ft. | |
| Data Source(s) | | SEF #A10216716;DOM 106 | | | | | |
| Verification Source(s) | | Assessor, Realist | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | | | | |
| Concessions | | VA;0 | | | | | |
| Date of Sale/Time | | s07/17;c05/17 | | | | | |
| Location | Residential | Residential | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| HOA Mo. Assessment | 175 | 165 | 0 | | | | |
| Common Elements | Typical for | Typical for | | | | | |
| and Rec. Facilities | Similar Projects | Similar Projects | | | | | |
| Floor Location | 1/2 | 1/2 | | | | | |
| View | Residential | Residential | | | | | |
| Design (Style) | Townhouse | Townhouse | | | | | |
| Quality of Construction | Average | Average | | | | | |
| Actual Age | 11 | 5 | | | | | |
| Condition | Average | Good | -10,000 | | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 6 3 2.1 | 6 2 2.1 | | | | | |
| Gross Living Area | 1,356 sq. ft. | 1,422 sq. ft. | | sq. ft. | | sq. ft. | |
| Basement & Finished | No Basement | No Basement | | | | | |
| Rooms Below Grade | None | None | | | | | |
| Functional Utility | Average | Average | | | | | |
| Heating/Cooling | EFA/CAC | EFA/CAC | | | | | |
| Energy Efficient Items | None | None | | | | | |
| Garage/Carport | 1 Open Space | 1 Open Space | | | | | |
| Porch/Patio/Deck | Patio | Patio | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -10,000 | ☐ + ☐ - | $ | ☐ + ☐ - | $ |
| Adjusted Sale Price | | Net Adj. 3.7 % | | Net Adj. 0.0 % | | Net Adj. 0.0 % | |
| of Comparables | | Gross Adj. 3.7 % | $ 260,000 | Gross Adj. 0.0 % | $ 0 | Gross Adj. 0.0 % | $ |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | MLS, Assessor, Realist | MLS, Assessor, Realist | | |
| Effective Date of Data Source(s) | 08/22/2017 | 08/22/2017 | | |

Analysis of prior sale or transfer history of the subject property and comparable sales    3574 W 88th Ter has no 12-month prior transfer history.

Analysis/Comments

Freddie Mac Form 466 March 2005

Fannie Mae Form 1075 March 2005

Form 1075.(AC) - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

# SINGLE FAMILY COMPARABLE RENT SCHEDULE

VALU-18-12-1465
File # VALU-18-12-1465

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property. Adjustments should be made only for items of significant difference between the comparables and the subject property.

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 8049 W 36th Ave Apt 4 Hialeah, FL 33018 | 8153 W 36th Ave Apt 3 Hialeah, FL 33018 | | 8123 W 36th Ave Apt 1 Hialeah, FL 33018 | | 8141 W 36th Ave Apt 4 Hialeah, FL 33018 | |
| Proximity to Subject | | 0.05 miles W | | 0.06 miles SW | | 0.05 miles W | |
| Date Lease Begins | | 09/16 | | 03/17 | | 05/17 | |
| Date Lease Expires | | Unk | | Unk | | Unk | |
| Monthy Rental | If Currently Rented: $ | $ 1,850 | | $ 1,900 | | $ 1,850 | |
| Less: Utilities | $ | $ | | $ | | $ | |
| Furniture | | | | | | | |
| Adjusted Monthly Rent | $ | $ 1,850 | | $ 1,900 | | $ 1,850 | |
| Data Source | MLS,Inspection Assessor,Realist | MLS #A10148474 Assessor, Realist | | MLS #A10242914 Assessor, Realist | | MLS # Assessor, Realist | |
| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Rent Concessions | | | | | | | |
| Location/View | Residential Residential | Residential Residential | | Residential Residential | | Residential Residential | |
| Design and Appeal | Townhouse | Townhouse | | Townhouse | | Townhouse | |
| Age/Condition | 11 Average | 11 Average | | 11 Average | | 11 Average | |
| Above Grade Room Count | Total : Bdrms : Baths 6 : 3 : 2.1 | Total : Bdrms : Baths 6 : 3 : 2.1 | | Total : Bdrms : Baths 6 : 3 : 2.1 | | Total : Bdrms : Baths 6 : 3 : 2.1 | |
| Gross Living Area | 1,356 Sq. Ft. | 1,360 Sq. Ft. | | 1,361 Sq. Ft. | | 1,356 Sq. Ft. | |
| Other (e.g., basement, etc.) | No Basement None | No Basement None | | No Basement None | | No Basement None | |
| Other: | | | | | | | |
| Net Adj. (total) | | ☐ + ☐ − $ | 0 | ☐ + ☐ − $ | 0 | ☐ + ☐ − $ | 0 |
| Indicated Monthly Market Rent | | $ 1,850 | | $ 1,900 | | $ 1,850 | |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)  Rentals of comparable style dwellings ranged from $1,500 to $1,900.

Final Reconciliation of Market Rent:   All rentals were taken into the final consideration. The opinion of market rent is $1,850

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF   08/22/2017   TO BE $   1,850

| | | | |
|---|---|---|---|
| Appraiser(s) SIGNATURE *Carlos Fong* | | Review Appraiser SIGNATURE | |
| NAME Carlos Fong | | (If applicable) NAME | |
| Certified Residential Appraiser | | | |
| Date Property Inspected 08/22/2017 | Report Signed 02/10/2019 | Date Property Inspected | Report Signed |
| License or Certification # RD 6782 | State FL | License or Certification # | State |
| Expiration Date of License or Certification 11/30/2020 | | Expiration Date of License or Certification | |
| | | Review Appraiser ☐ Did ☐ Did Not | Inspect Subject Property |

Freddie Mac Form 1000 (8/88)

Form 1007 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Fannie Mae Form 1007 (8/88)

### Supplemental Addendum

File No. VALU-18-12-1465

| Borrower | Jeovany & Monica Nunez | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8049 W 36th Ave | | | | | | |
| City | Hialeah | County | Dade | State | FL | Zip Code | 33018 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

**PURPOSE OF APPRAISAL REPORT**

The purpose of this appraisal is to estimate the market value of the subject property as defined herein.  The function of the appraisal is to assist the above-named Lender/Client, its successors and/or assigns, in evaluating the subject property for lending purposes.  This is a federally regulated transaction.  Additional supporting data can be found in our appraiser work file.

It is assumed that the title to this property is good and marketable.  No title search has been made, nor have we attempted to determine ownership of the property.  The value estimate is given without regard to any questions of title, boundaries, or encroachments.  It is assumed that all assessments are paid.  We assume the property to be free and clear of liens and encumbrances except as noted.

The legal description, if included herein, should be verified by legal counsel before being relied upon or used in any conveyance or other document.

We are not familiar with any engineering studies made to determine the bearing capacity of the land.  Improvements in the area appear to be structurally sound.  It is therefore assumed that soil and subsoil conditions are stable unless specifically outlined in this report.

Any exhibits in the report are intended to assist the reader in visualizing the property and its surroundings.  The drawings are not intended as surveys and no responsibility is assumed for their cartographic accuracy.  Drawings are not intended to be exact in size, scale or detail.

Areas and dimensions of the property were physically measured.  If data is furnished by the principal or from plot plans or surveys furnished by the principal, or from public records, we assume it to be reasonably accurate.  In the absence of current surveys, land areas may be based upon representations made by the owner's agents or the client.  No attempt has been made to render an opinion or determine the status of easements that may exist.  No responsibility is assumed for discrepancies that may become evident from a licensed survey of the property.

The value estimate involves only the real estate and all normal building equipment if any improvements are involved.  No consideration was given to personal property, (or special equipment), unless stated.

It is assumed that the property is subject to lawful, competent and informed ownership and management unless noted.

Information in this report concerning market data was obtained from buyers, sellers, brokers, attorneys, trade publications or public records.  To the extent possible, this information was examined for accuracy and is believed to be reliable.  Dimensions, areas or data obtained from others is believed correct; however, no guarantee is made.

Any information, in whatever form, furnished by others is believed to b e reliable; however, no responsibility is assumed for accuracy.

The separate allocations between land and improvements, if applicable, represents our judgment only under the existing utilization of the property.  A re-evaluation should be made if the improvements are removed or substantially altered, and the land utilized for another purpose.

All information and comments concerning the location, neighborhood trends, construction quality and costs, loss in value from whatever cause, condition, rents, or any other data for the property appraised herein, represents the estimates and opinions of the appraiser formed after an examination and study of the property.

Any valuation analysis of the income stream has been predicted upon financing conditions as specified herein, which we have reason to believe are currently available for this property.  Financing terms and conditions other than those indicated may alter the final value conclusions.

The appraiser is not required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless arrangements have been made previously thereto.  If the appraiser (s) is subpoenaed pursuant to court order, the client will be required to compensate said appraiser(s) for his/her time at his/her regular hourly rates, plus expenses.

All opinions, as to values stated, are presented as the appraiser's considered opinion based on the information set forth in the report and his experience.  We assume no responsibility for changes in market conditions or for the inability of the client or any other party to achieve their desired results based upon the appraised value.  Further, some of the assumptions made can be subject to variation depending upon evolving events.  We realize some assumptions may never occur and unanticipated events or circumstances may occur.  Therefore, actual results achieved during the projection period may vary from those in this report.

The appraisal assignment was not based on developing or reporting predetermined results, or a requested minimum valuation, a specific valuation, or the approval of a loan.

Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of:  USPAP Uniform Standards of Professional Appraisal Practice, and SPP-AI Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute; and, except as noted in the Scope of Appraisal, in conformity with specific implementation rules of the following agencies:

FIRREA Title XI of the Financial Institutions Reform, Recovery and Enforcement Act and section 5(b) of the Bank Company Holding Act;  FRB – Federal Reserve Board; RTC-Resolution Trust Corporation; OTS-Office of Thrift Supervision; FDIC – Federal Deposit Insurance Corporation; OTC – Office of the Comptroller; NCUA – National Credit Union Association.

**THE APPRAISER HAS PREPARED THIS APPRAISAL IN FULL COMPLIANCE WITH THE APPRAISAL INDEPENDENCE REQUIREMENTS AND HAS NOT PERFORMED, PARTICIPATED IN, OR BEEN ASSOCIATED WITH ANY ACTIVITY IN VIOLATION OF AIR.**

**AT THE REQUEST OF THE CLIENT, THIS APPRAISAL REPORT HAS BEEN PREPARED IN COMPLIANCE WITH THE**

## Supplemental Addendum

File No. VALU-18-12-1465

| Borrower | Jeovany & Monica Nunez | | | | |
|---|---|---|---|---|---|
| Property Address | 8049 W 36th Ave | | | | |
| City | Hialeah | County | Dade | State | FL | Zip Code | 33018 |
| Lender/Client | Integra Realty Resources (IRR) | | | | |

**UNIFORM APPRAISAL DATASET (UAD) FROM FANNIE MAE AND FREDDIE MAC. THE UAD REQUIRES THE APPRAISER TO USE STANDARDIZED RESPONSES THAT INCLUDE SPECIFIC FORMATS, DEFINITIONS, ABBREVIATIONS, AND ACRONYMS.**

We do not authorize the out-of-context quoting from or partial reprinting of this appraisal report. Further, neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser nor the name of the firm which he is connected, shall be reproduced, published, or disseminated to the public through advertising media, public relations media, news media, or another public means of communication, without the prior written consent of the appraiser signing this report.

Adobe's Distiller software or equivalent may be utilized by appraiser to transmit this encrypted PDF-formatted appraisal. At a minimum, the software contains the following security measure:

- identifies transmission error during the transmission process, and confirms date, time and quantity of data submitted by appraiser and the date, time and quantity of data received by the Client, and/or its assigns and
- secures data from editing by means of a password, hardware device, or other means that remains in the sole control of the transmitting appraiser.

**THIRTY SIX MONTH LISTING HISTORY**

We are not aware of any prior listings pertaining to the subject property in the past three years as researched through the local Multiple Listing Service.

**NEIGHBORHOOD MARKET CONDITIONS**

No discounts, buy downs or other concessions were noted. Current 30 year fixed rate financing at 4.5 - 5.5% and 0-2 points.

Stricter Lending Standards and the availability of Mortgage Capital may affect the average sales prices in the area, however, given the market data analyzed by the appraiser, there are no fiscal or economic trends expected to occur that would significantly impact the relatively stable market currently experienced in this neighborhood.

Neighborhood conditions can be found in detail in the attached 1004MC form.

**SITE COMMENTS**

This site is very typical of the neighborhood in terms of size, topography, view and general appeal. It provides a suitable setting for the improvements and is consistent with market expectations in this price range. Statements regarding zoning compliance are intended only in the most general sense. Zoning and building ordinances vary significantly from one municipality to another and can be extremely detailed. The scope of this assignment does not include a comparison of every potentially significant characteristic of the subject property's site and improvements relative to zoning and building ordinances. Unless otherwise noted, standard utility and right-of-way easements are insignificant to value. However, a current locational or boundary survey or title report may reveal encroachments, easements, zoning violations or other matters of interest that could warrant modification of the appraised value.

**COMMENTS REGARDING HIGHEST AND BEST USE**

In compliance with USPAP the following is included in the appraisal;
•         The current use of the real estate as of the date of value is Residential as described in the improvements section of this appraisal.

•         The use of the real estate reflected in this appraisal is as currently improved

•         The rationale and support for the opinion of highest and best use developed for this assignment is as per below:
Highest and Best Use is defined as "The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property-specific with respect to the user and timing of the use-that is adequately supported and results in the highest present value"
Source: Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Appraisal Institute, 2010).
The highest and best use analysis is a critical step in the valuation process. The comparable properties incorporated into the appraisal are directly affected by the highest and best use analysis. The analysis is based on the use that a hypothetical purchaser would make of the property based on the four tests cited above:
•         Legally Permissible
•         Physically Possible
•         Financially Feasible
•         Maximally Productive
Although the current use is considered in the analysis, it is not always the highest and best use based on the four tests.
The analysis involves determining if a typical purchaser would:
•         Utilize the current improvements on the site as they currently exist
•         Make modification to the current improvements
•         Raze or demolish  the current improvements because they no longer have sufficiently contribute to value or until the return from the new improvements would more than offset the cost of demolishing the existing improvements and construction of new ones.

Since the property appraised is owned under the condominium form of ownership, the land is an element common to all units in the owner's association. The subject's fractional interest in the land is not a marketable entity unto itself; it does not have independent market value. Accordingly, the highest and best use of just the subject's interest in the land is to remain part of a larger parcel that has more usefulness.

Case 1:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 399 of 796
Case 1:19-cv-22440-MGC   Document 2-9   Entered on FLSD Docket 05/13/2019   Page 71 of
080

**Supplemental Addendum**                                           File No. VALU-18-12-1465

| Borrower | Jeovany & Monica Nunez | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 8049 W 36th Ave | | | | | |
| City | Hialeah | County | Dade | State | FL | Zip Code 33018 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |

### COMMENTS ON SALES COMPARISON APPROACH

All comparables provided strong support.  The most weight, and opinion of value fell on comparables 1 through 3, for being in the subjects project.  The opinion fell near the lower end of the adjusted range, due to the condition.

Comparables were adjusted for their differences in overall condition, bathroom count, gross living area.  Gross living area adjustments were made at $40 per square foot.  Comparables within 100 square feet of the subject property did not warrant an adjustment.  Comparables 1, 2, and 4 received negative condition adjustments.  This was based off of interior MLS Photos, and descriptions.

ALL ADJUSTMENTS WERE DERIVED FROM THE SUBJECT MARKET AND THE APPRAISERS EXPERTISE IN THE MARKET PLACE.

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations.

All comparables are located within the subject's neighborhood boundaries.  No geographic boundaries were crossed.

THE ESTIMATED VALUE OF THE SUBJECT IS BELOW THE PREDOMINATE VALUE IN THE SUBJECT NEIGHBORHOOD. THIS WILL NOT HAVE A NEGATIVE EFFECT ON THE MARKETABILITY OF THE SUBJECT. THE SUBJECT PROPERTY IS NOT AN UNDER  IMPROVEMENT FOR THE AREA.

### RECONCILIATION

The sales comparison approach was considered most applicable for the subject property because a typical buyer or seller would most readily understand and apply this approach.  The income approach was not considered applicable due to the fact that the majority of housing stock in the area is owner occupied and not typically used for investment property.  The cost approach is not applicable for condominium ownership dwellings.  The quality of available data utilized in the Sales comparison Approach was considered adequate.

### EXTERIOR INSPECTION ADDENDA

The appraiser has been requested to perform an appraisal based on an exterior only inspection and not to disturb the occupants by entering the building.  The physical characteristics used to develop this appraisal are based on the assessment records of Dade County, Florida and on the multiple listing service.  The subject property was observed from the public street as of the effective date of the appraisal.  On the basis of the observed conditions, the assessment records and multiple listing service information appear to be accurate.  For the purposes of this appraisal, it is assumed that the interior condition of the subject property is consistent with the exterior conditions as observed and that the information concerning the interior condition as provided by the assessor's records and the multiple listing service is accurate.

### PHYSICAL DEFICIENCIES OR ADVERSE CONDITIONS

Unless otherwise stated in this report, the existence of hazardous material and/or electromagnetic emission, which may or may not be present on the property, was not observed by the appraiser.  The appraiser has no such knowledge of the existence of such materials on or in the subject property, or in the properties of the subject neighborhood.  The appraiser is not qualified to detect such substances.  The presence of such substances as asbestos, urea formaldehyde foam insulation, radon, mold, or other potentially hazardous material may affect the value of the property.  The value estimate expressed is predicated on the assumption that there is no such material in or on the property that would cause a loss in value.  No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required discovering them.  The customer is urged to retain an expert in this field.

Dwellings built prior to 1978 may contain lead-based paint.

### MOLD

The appraiser is not a home or environmental inspector.  The appraiser provides an opinion of value.  The appraisal does not guarantee that the property is free of defects or environmental problems.  The appraiser performs an inspection of visible and accessible areas only.  Mold may be present in areas the appraiser cannot see.  A professional home inspection or environmental inspection is recommended.

### CONCLUSION

This is an Appraisal Report which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for an Appraisal Report.  As such, it presents only minimal discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value.  Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's file.  The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein.  The appraiser is not responsible for unauthorized use of this report.

## Subject Photo Page

| Borrower | Jeovany & Monica Nunez | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8049 W 36th Ave | | | | | | |
| City | Hialeah | County | Dade | State | FL | Zip Code | 33018 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



### Subject Front

8049 W 36th Ave Apt 4
Sales Price
Gross Living Area   1,356
Total Rooms   6
Total Bedrooms   3
Total Bathrooms   2.1
Location   Residential
View   Residential
Site
Quality   Average
Age   11

### Subject Rear

### Subject Street



## Comparable Photo Page

| Borrower | Jeovany & Monica Nunez | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 8049 W 36th Ave | | | | | |
| City | Hialeah | County | Dade | State | FL | Zip Code 33018 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



### Comparable 1

| | |
|---|---|
| 8043 W 36th Ave | |
| Prox. to Subject | 0.09 miles SW |
| Sales Price | 235,000 |
| Gross Living Area | 1,464 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.0 |
| Location | Residential |
| View | Residential |
| Site | |
| Quality | Average |
| Age | 13 |



### Comparable 2

| | |
|---|---|
| 8025 W 36th Ave | |
| Prox. to Subject | 0.10 miles SW |
| Sales Price | 220,000 |
| Gross Living Area | 1,360 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.0 |
| Location | Residential |
| View | Residential |
| Site | |
| Quality | Average |
| Age | 13 |



### Comparable 3

| | |
|---|---|
| 8123 W 36th Ave | |
| Prox. to Subject | 0.06 miles SW |
| Sales Price | 187,900 |
| Gross Living Area | 1,361 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.0 |
| Location | Residential |
| View | Residential |
| Site | |
| Quality | Average |
| Age | 13 |

**Comparable Photo Page**

| Borrower | Jeovany & Monica Nunez | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8049 W 36th Ave | | | | | | |
| City | Hialeah | County | Dade | | State | FL | Zip Code | 33018 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



### Comparable 4

3574 W 88th Ter

| | |
|---|---|
| Prox. to Subject | 0.43 miles N |
| Sales Price | 270,000 |
| Gross Living Area | 1,422 |
| Total Rooms | 6 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Residential |
| Site | |
| Quality | Average |
| Age | 5 |

### Comparable 5

| | |
|---|---|
| Prox. to Subject | |
| Sales Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sales Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

## Rental Photo Page

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower | Jeovany & Monica Nunez | | | | | |
| Property Address | 8049 W 36th Ave | | | | | |
| City | Hialeah | County | Dade | State | FL | Zip Code 33018 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



### Rental 1

8153 W 36th Ave Apt 3

| | |
|---|---|
| Proximity to Subject | 0.05 miles W |
| Adj. Monthly Rent | 1,850 |
| Gross Living Area | 1,360 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Residential |
| Condition | Average |
| Age/Year Built | 11 |



### Rental 2

8123 W 36th Ave Apt 1

| | |
|---|---|
| Proximity to Subject | 0.06 miles SW |
| Adj. Monthly Rent | 1,900 |
| Gross Living Area | 1,361 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Residential |
| Condition | Average |
| Age/Year Built | 11 |



### Rental 3

8141 W 36th Ave Apt 4

| | |
|---|---|
| Proximity to Subject | 0.05 miles W |
| Adj. Monthly Rent | 1,850 |
| Gross Living Area | 1,356 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Residential |
| Condition | Average |
| Age/Year Built | 11 |

## Subject Aerial Map

| Borrower | Jeovany & Monica Nunez | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8049 W 36th Ave | | | | | | |
| City | Hialeah | County | Dade | | State | FL | Zip Code | 33018 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



SUBJECT
8049 W 36th Ave # 4
Hialeah, FL 33018

**Location Map**

| Borrower | Jeovany & Monica Nunez | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8049 W 36th Ave | | | | | | |
| City | Hialeah | County | Dade | State | FL | Zip Code | 33018 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



## Assessor Data

| | |
|---|---|
| Borrower | Jeovany & Monica Nunez |
| Property Address | 8049 W 36th Ave |
| City | Hialeah |
| County | Dade |
| State | FL |
| Zip Code | 33018 |
| Lender/Client | Integra Realty Resources (IRR) |

1/3/2019      Property Search Application - Miami-Dade County

# OFFICE OF THE PROPERTY APPRAISER

## Summary Report

Generated On : 1/3/2019

### Property Information

| | |
|---|---|
| Folio: | 04-2028-106-0600 |
| Property Address: | 8049 W 36 AVE   UNIT: 4<br>Hialeah, FL  33018-1753 |
| Owner | FEDERAL NATIONAL MORTGAGE ASSN |
| Mailing Address | PO BOX 650043<br>DALLAS, TX 75265 USA |
| PA Primary Zone | 4300 MULTI-FAMILY - 2 STORY |
| Primary Land Use | 0407 RESIDENTIAL – TOTAL VALUE : CONDOMINIUM - RESIDENTIAL |
| Beds / Baths / Half | 3 / 2 / 1 |
| Floors | 0 |
| Living Units | 1 |
| Actual Area | Sq.Ft |
| Living Area | 1,356 Sq.Ft |
| Adjusted Area | 1,356 Sq.Ft |
| Lot Size | 0 Sq.Ft |
| Year Built | 2006 |



### Assessment Information

| Year | 2018 | 2017 | 2016 |
|---|---|---|---|
| Land Value | $0 | $0 | $0 |
| Building Value | $0 | $0 | $0 |
| XF Value | $0 | $0 | $0 |
| Market Value | $185,075 | $174,599 | $135,348 |
| Assessed Value | $185,075 | $110,083 | $100,076 |

### Benefits Information

| Benefit | Type | 2018 | 2017 | 2016 |
|---|---|---|---|---|
| Non-Homestead Cap | Assessment Reduction | | $64,516 | $35,272 |

Note: Not all benefits are applicable to all Taxable Values (i.e. County, School Board, City, Regional).

### Short Legal Description

| |
|---|
| SHOMA HOMES SPLENDIDO CONDO |
| UNIT 60 BLDG 11 |
| UNDIV 1/219 |
| INT IN COMMON ELEMENTS |
| OFF REC 24177-2205 |

### Taxable Value Information

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| **County** | | | |
| Exemption Value | $0 | $0 | $0 |
| Taxable Value | $185,075 | $110,083 | $100,076 |
| **School Board** | | | |
| Exemption Value | $0 | $0 | $0 |
| Taxable Value | $185,075 | $174,599 | $135,348 |
| **City** | | | |
| Exemption Value | $0 | $0 | $0 |
| Taxable Value | $185,075 | $110,083 | $100,076 |
| **Regional** | | | |
| Exemption Value | $0 | $0 | $0 |
| Taxable Value | $185,075 | $110,083 | $100,076 |

### Sales Information

| Previous Sale | Price | OR Book-Page | Qualification Description |
|---|---|---|---|
| 09/18/2017 | $0 | 30697-4488 | Federal, state or local government agency |
| 01/01/2007 | $269,990 | 25295-2421 | Sales which are qualified |

The Office of the Property Appraiser is continually editing and updating the tax roll. This website may not reflect the most current information on record. The Property Appraiser and Miami-Dade County assumes no liability, see full disclaimer and User Agreement at http://www.miamidade.gov/info/disclaimer.asp

Version:

## Tax Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower | Jeovany & Monica Nunez | | | | | | |
| Property Address | 8049 W 36th Ave | | | | | | |
| City | Hialeah | | County | Dade | | State FL | Zip Code 33018 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



1/3/2019          Southeast Florida MLS - Miami-Dade County Tax Report - 8049 W 36TH AVE APT 4, HIALEAH, FL 33018-1754

### Southeast Florida MLS - IMAPP
Miami-Dade County Tax Report - 8049 W 36TH AVE APT 4, HIALEAH, FL 33018-1754

#### PROPERTY INFORMATION

**PID #** 04-2028-106-0600
**Property Type:** Multi-Unit
**Property Address:**
8049 W 36TH AVE APT 4
HIALEAH, FL 33018-1754
**Current Owner:**
FEDERAL NATIONAL MORTGAGE ASSN
**Tax Mailing Address:**
PO BOX 650043
DALLAS, TX 75265-0043
**Use Code:** 04 / CONDO
**Total Land Area:**
0 acres / 0 sf
**Land Areas:**
1. RESIDENTIAL - TOTAL VALUE :
CONDOMINIUM - RESIDENTIAL (0407)
**Zoning:** 4300/MULTI-FAMILY - 2
STORY
**Waterfront:** Yes - LAKE/POND
**Subdivision:**
SHOMA SPLENDIDO CONDO
**Census Tract/Block:** 012600 / 2003
**Twn:** 52 / **Rng:** 40 / **Sec:** 28
**Block:** / Lot:
**Latitude:** 25.896556
**Longitude:** -80.355291
**Legal Description:**
SHOMA HOMES SPLENDIDO CONDO UNIT 60
BLDG 11 UNDIV 1/219 INT IN COMMON
ELEMENTS OFF REC 24177-2205 COC 25295-2421
01 2007 1

Foreclosures

#### VALUE INFORMATION

| | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Building Value: | $0 | $0 | $0 | $0 | $0 |
| Land Value: | $0 | $0 | $0 | $0 | $0 |
| Just Market Value: | $29,364 | $112,790 | $135,348 | $174,599 | $185,075 |
| Percent Change: | - n/a - | 284.11% | 20% | 29% | 6% |
| Total Assessed Value: | $29,364 | $90,979 | $100,076 | $110,083 | $185,075 |
| Homestead Exemption: | NO | NO | NO | NO | NO |
| Total Exemptions: | $0 | $0 | $0 | $0 | $0 |
| Taxable Value: | $29,364 | $90,979 | $100,076 | $110,083 | $185,075 |
| Total Tax Amount: | $596.41 | $1,978.12 | $2,215.07 | $2,561.74 | $3,504.07 |

**Taxing District(s):** 0400 - HIALEAH

Link To County Tax Collector

#### SALES INFORMATION

| | | | | | | |
|---|---|---|---|---|---|---|
| Deed Type: | CERTIFICATE OF TRANSFER | | | Price: | $180,000 | Qualifiers: U1 |
| Sale Date: | 09/18/2017 | Recorded Date: | 09/28/2017 | Document # | Bk 30697/Pg 4488 | |
| Grantor: | JEOVANY NUNEZ | | | Grantee: | FEDERAL NATIONAL MORTGAGE ASSN | |
| Deed Type: | WARRANTY DEED | | | Price: | $269,990 | Qualifiers: Q2 |
| Sale Date: | 01/12/2007 | Recorded Date: | 01/22/2007 | Document # | Bk 25295/Pg 2421 | |
| Grantor: | Not Available | | | Grantee: | Not Available | |
| Mortgage Amount: | $26,999 | Instrument Date: | 01/12/2007 | Document # | 2007R0000069990 | |
| Terms: | 6.05%/180 M | Attributes: | Traditional Loan, Original, Warranty Deed | | | |
| Lender: | CONTINENTAL TRUST MORTGAGE CORP | | | Borrower: | NUNEZ JEOVANY | |
| Mortgage Amount: | $215,992 | Instrument Date: | 01/12/2007 | Document # | 2007R0069990 | |
| Terms: | 360 M | Attributes: | Other Subordinate Loan, Original, Stand Alone Mortgage | | | |
| Lender: | CONTINENTAL TRUST MORTGAGE CORP | | | Borrower: | NUNEZ JEOVANY | |

**Qualifier Flags:** Q=Qualified, U=Unqualified, O=Other (see note), M=Multiple, P=Partial, V=Vacant, I=Improved
[1] UNQUALIFIED - FORECLOSURE OR THIRD PARTY INTERVENTION , [2] QUALIFIED

http://sef.imapp.com/ilinks/property?upin=US120860420281060600          1/2

Case 1:09-md-02047-EEF-MBN Document 22380-38 Filed 12/02/19 Page 408 of 796
Case 1:14-cv-22403-MGC Document 273-5 Entered on FLSD Docket 05/13/2019 Page 80 of
License

| Borrower | Jeovany & Monica Nunez | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 8049 W 36th Ave | | | | | | |
| City | Hialeah | County | Dade | | State | FL | Zip Code | 33018 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



RICK SCOTT, GOVERNOR

JONATHAN ZACHEM, SECRETARY



## STATE OF FLORIDA
## DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

### FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED RESIDENTIAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## FONG, CARLOS RAFAEL

10601 S.W. 124 ROAD.
MIAMI            FL 33186

LICENSE NUMBER: RD6782

EXPIRATION DATE: NOVEMBER 30, 2020

Always verify licenses online at MyFloridaLicense.com



Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment



amgraziano@irr.com    -    305.670.0001 x320

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com

## Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida



amgraziano@irr.com    -    305.670.0001 x320

**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Caribbean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Caribbean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 11/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Saranzzi, Fatih Ann Safaranzzi, Proverbaim Hidg, LLC, USA & George Albright | NeJame, La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | CB Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

M. Qualls: Graziano: Trial Lists

| RETENTION DATE | ON BEHALF OF | TRI FILE # | COURT/CASE NO. # | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008930-CA-01 | Aaron Stauber & Aviva Stauber V. BH33, LLC | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | Southern District of Florida | John Camps | Retrospective (2004-2008) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Igor Gelr V. Yacht Club at Portofino Condo Association | Miami-Dade County | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Ocean Bank V. Lindback, Monroe County | Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24994 CA 06 | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Sariff and Course Drive Investments, LLC | 11th Judicial Circuit Dade County, Florida | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (retrospective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0164 | 13-01822 CACE 02 | Amalia I. Irianda-Rivera V. Rivera Diagnostic Center, Inc., Oknay Rivera & Yudit Rivero | 17th Judicial Circuit Broward County, Florida | Amalia I. Irlanda-Rivera | Rent default judgment and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FL534 (Pending) | Roehm Title Resources Claim | Palm Beach County | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined title defect not identified by Title Insurance Company |
| 4/2014 | Plaintiff | 123-2014-0117 | 4:14-CV-01077 (Pending) | USA V. GSA-VA St. Louis Property, LLC | USA District Court for the Eastern District of Missouri Eastern Division | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Euforia Club | Miami-Dade County | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition S.R.7 | Broward County | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | West Airport Plaza Business Park, LLC | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | Counsel for the Debtor, Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23822-CA 09 | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | 11th Judicial Circuit Dade County, Florida | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Plaintiff | 123-2013-0126 | CACE 08857624 (14) | Bayview Loan Servicing, LLC v. Kayhan Soodjani, Muhammad Mahmoodi, et al | 17th Judicial Circuit Broward County, Florida (Hon. Carlos A. Rodriguez) | Bayview Servicing, represented by Tabais, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency judgment on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV-Rosenbaum | United States of America v. G.K.K. etal | US District Court - Southern District of Florida (Hon. Rosenbaum) | Richard Duvall, Holland and Knight and Jeffrey Neiman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 2/2013 | Defendant | 123-2011-0670 | 09-05650 CA 04 | Zenaida Gomez v. City of Pinecrest | 11th Judicial Circuit Dade County, Florida (Hon. Beth Bloom) | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence |
| 1/2013 | Plaintiff | 123-2013-0016 | 12-60950-CIV | Q Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | US Federal Court - Southern District of Florida | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 11/2012 | Plaintiff | 123-2013-0012 | Pending | | 11th Judicial Circuit Dade County, Florida | Ken Wurtenberger, Esq. | Tax protest of commercial condominium. |
| 10/19/2012 | Defendant | 123-2012-0111 | 2011-1107 CA-23 | Renegade at Hialeah Blvd v. Dynatech Engineering | 17th Judicial Circuit Dade County, Florida (Hon. Stanford Blake) | Daniel Levin, Esq., Cole, Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from prepaid lease modification. |
| 10/12/2012 | Defendant | 123-2012-0109 | 11-30189 CA21 | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | 11th Judicial Circuit Dade County, Florida | Craig Mirko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal; economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal |
| 8/20/2012 | Plaintiff | 123-2012-0012 | CA-02180 CA-25 | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egoz, etal | 11th Judicial Circuit Dade County, Florida | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012. |
| 8/15/2012 | Disclosed Dual Expert | 123-2012-0072 | | Vazquez v. Vazquez Matrimonial Matter | Matrimonial Mediation | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) marital assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Illinois Bahamas. |
| 7/2012 | Plaintiff | 109-2011- | Pending; 2003-2014 | BASF Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Tax Court of New Jersey (Hon. Patrick DeAlemida) | Phil Genuario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010-0172 | ATL-L-4461-08 | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Superior Court of New Jersey, Law Division Atlantic County | Jay Rhatican, Connell Foley on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations |
| 7/2011 | Defendant | 109-2010-0199 | MER-L-3034-08 | 460 Mercer Street, LLP and Bruckener Southern, LLC vs. Hightstown | Superior Court of New Jersey Mercer County | Anell Zarro Grimm & Aaron, P.C. Husam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5800-1 | United States vs. Atlantic Wood Industries, Inc. | Federal District Court of Virginia | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Westrust/HPC Mortgage Fund vs. City of Atlantic City | Tax Court of New Jersey | Cole, Schotz, Meisel, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |



Anthony M. Graziano, MAI, CRE, FRICS
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2009 | Secured Creditor | 109-2009-0439 | | Erickson Building | US Bankruptcy Court - Southern District of Texas | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 09/2009 | Plaintiff | 3035-001 | | Bay Head Yacht Club vs. Ocean County Tax Board | Tax Court of New Jersey | John Doyle, Carluccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 109-2008-0123 | INA (DEFS Pending) | Mirage Atlantic City (MAC) vs. City of Atlantic City | Tax Court of New Jersey | Hank Rovillard, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 08/2008 | Defendant | 109-2008-0252 | L-2424-05 | The City of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Superior Court of New Jersey Law Division, Middlesex County | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | 109-2008-345 | C.A. No. OCNL-3361-06 | Osbourne Associates, Melbourne Associates VI, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co, JAC Property Management etal and Eckert Corporation | Superior Court of New Jersey, Law Division Ocean County | Francis X. Manning, Esq. Stradley Ronon Stevens & Young & Michael Canitioli, Esq. Partridge Snow and Hahn, both on behalf of | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 109-2008-0125 | N/A | Toms River Township vs. Citta Geigy Corporation | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpenteli] | Mark Troncone, Esq., In-House Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | 109-2007-211 | L-0008-35-06 | Kyle Mosteller vs. Galia Neeman | Superior Court of New Jersey, Law Division Middlesex County | Frank Caruso, Esq, Hoagland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Plaintiff | 109-2007-0134 | 3:07-CV-2322 | Silver Lakes Inc. vs. Township of Freehold Inc. | Superior Court of New Jersey, Chancery Division Monmouth County | Christopher Hanlon, Esq. Hanlon and Neman | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee |
| 06/2007 | Plaintiff | 109-2007-0173 | | Laurelwood Homes, LLC vs. United States Department of Navy | Federal District Court of Virginia | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 109-2006-0192 | CAM - L - 9731-05 | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Superior Court of New Jersey, Law Division, Camden County | Brett Last, Esq. O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 08/2006 | Defendant | 109-2006-0257 | | County Line & Browns Bridge, Jackson Township | | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 02/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Carl Brooks vs. K. Hovanian | Ocean Superior Court, Ocean County Courthouse | Ronan, Tuzzio & Giannone   Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner and the subject developer K. Hovnanian @ Sea Oaks |
| 10/2005 | Defendant | 109-2005-0315 | OCN-L-1810-5 | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility of the state of New Jersey vs. AC1 Manahawkin, LLC family and/or Armstrong | Superior Court of New Jersey, Law Division Ocean County | Flaster/Greenberg, PC,   David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and towers by Atlantic City Electric |
| 06/2005 | Defendant | 109-2005-0214 | MON-L-2609-05 | Township of Howell vs. George Harms Construction Co., Inc. etal | Superior Court of New Jersey Law Division, Monmouth County | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 08/2003 | Defendant | 109-2003-0282 | | Giuffre vs. Giuffre | Superior Court of New Jersey Chancery Division, Family Part, Monmouth County | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 07/2003 | Defendant | 109-2003-0203 | OCN-C-78-03 | West, etal vs. Pompano, etal | Superior Court of New Jersey, Chancery Division, Ocean County | Stephen E. Smith, Esq | To develop an opinion of the diminution in value due to a loss of useable land area |
| 06/2003 | Plaintiff | 109-2003-0192 | OCN-C-316-02 | Eugene M. Lord vs. Donald W. Rinaldo | Superior Court of New Jersey Law Division, Ocean County | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate of the property |
| 04/2003 | Plaintiff | 109-2003-0128 | FM-15-468-03-C | Vincent Urbank vs. Lisa Urbank | Superior Court of New Jersey, Chancery Division, Family Part Ocean County | Marianna Pontoriero, Esq. | Litigation-Matrimonial |
| 02/2002 | Plaintiff | 109-2002-0055 | | Shenandoah Mobile Home Park | | Windels Marx Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 04/2001 | Claimant | 109-2001-0169 | NJ-2624-00 | DeForest John Ely and Kimberle A. Ely, h/w | Superior Court of New Jersey, Chancery Division Middlesex County | First American Title Insurance Co. Jack Milks | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 03/1999 | Defendant | 109-1999-0062 | | Georgetown Apartments | US Bankruptcy Court - District of Newark | Emmes & Co., Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD |
| 12/1997 | Defendant | LKW 257-3186 | FM-15-1465-94 | Lisa Franklin, etal vs. Donald Franklin, etal | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP   Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1984 | Creditor | HUD-XX | | Hudson Marina Association vs. Emmes & Co. | US Bankruptcy Court - District of Newark | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium condo |



M. Quelis: Graziano: Trial Lists

**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Rosen, Kevin and Stacey**
Hypothetical Market Value "As If" Remediated
17830 Monte Vista Drive
Boca Raton, Palm Beach County, Florida 33496
Client Reference: 3

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
December 23, 2009

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**Rosen, Kevin and Stacey**
17830 Monte Vista Drive
Boca Raton, Florida



| Integra Realty Resources | In Miami | In Orlando | In Naples/Sarasota |
|---|---|---|---|
| Miami | Dadeland Centre | The Magnolia Building | Horseshoe Professional Park |
| Orlando | 9155 South Dadeland Blvd. | 326 N. Magnolia Ave. | 2770 Horseshoe Drive S. |
| Southwest Florida | Suite 1208 | | Suite 3 |
| | Miami, FL 33156 | Orlando, FL 32801 | Naples, FL 34104 |
| www.irr.com | (305) 670-0001 | (407) 843-3377 | (239)-643-6888 |

February 13, 2019

Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

SUBJECT:      Hypothetical Market Value "As If" Remediated
Case No 11-22408-Civ-COOKE
United States District Court Southern District of Florida in the matter of
Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
Priority Claimant Case at:
Rosen, Kevin and Stacey
17830 Monte Vista Drive
Boca Raton, Palm Beach County, Florida 33496
Client Reference: 3
IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr.Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the
referenced property as of the effective date assuming all remediation was completed by an
appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It
presents summary discussions of the data, reasoning, and analysis that were used in the appraisal
process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 2:09-md-02047-EEF-MBN   Document 22380-38   Filed 12/02/19   Page 417 of 796
Case 1:11-cv-22408-MGC   Document 273-8   Entered on FLSD Docket 05/13/2019   Page 89 of 989

Identification of Subject                                                                        2

## Identification of Subject

The subject of this report is a single-family mediterranean style home configured with 5- bedroom and 5- full baths, 2- half baths with 4,674 SF under air-conditioning.  The subject property was built in 2006 and is located on a 13,068 SF site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, December 23, 2009. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is February 13, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users.  Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
| --- | --- |
| Sale Date (Most Recent) | August 7, 2006 |
| Seller | Albanese Popkin The Oaks Development LLC |
| Buyer | Rosen, Kevin & Stacey |
| Sale Price | $1,050,000 |
| Recording Instrument Number | 20060463683 |
| Disposition Details | This was the original sale from the developer |

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

Subsequent to this sale the property had the following transfers:

- September 14, 2009 the property was listed for sale in the Realtors MLS system for $839,000, with a status change to Pending Sale December 7, 2009 and Closed December 23, 2009 at $501,000. The listing specified the house was in need of remediation of Chinese's Drywall. The discount to our unimpair4ed value as of 2009 was nearly 51%.

- December 30, 2011 the property was listed for sale in the Realtors MLS system for $999,000, with a status change to Pending Sale February 27, 2012 and Closed Sale June 29, 2012 for $940,000. The listing disclosed the home previously contained Chinese Drywall which had been remediated.  Integras Dec 2012 appraisal unimpaired ($1,015,000) compared to the post-remediation closed price ($940,000) reflects a 7% diminution w/o accounting for 2.5-years of property appreciation between 12-2009 and 06-2012.



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 418 of 796
Case 1:11-cv-22408-MGC   Document 273-8   Entered on FLSD Docket 05/13/2019   Page 90 of 989

Pending Transactions                                                                        3

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

## Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value.  Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation.  Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

(*Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org*)

## Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions

Rosen, Kevin and Stacey



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 419 of 796
Case 1:11-cv-22408-MGC   Document 279-9   Entered on FLSD Docket 05/13/2019   Page 91 of 989

Scope of Work                                                                            4

external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

(*Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org*)

## Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation. The result of that study are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida." The results of that study are incorporated by reference herein.

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation. As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction. Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation. These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property. This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections. Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available. In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis. However, the damage analysis only represents a portion of the overall damages because we were specifically requested to exclude the consideration of the costs to cure.

Rosen, Kevin and Stacey



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 420 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 92 of 989

Highest and Best Use                                                                   5

This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to a "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report. The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach. The valuations consider the only relevant approach for residential valuation, the sales comparison analysis. The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis. Additionally, this approach directly considered the prices of alternative properties having similar utility.

## Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant. The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

Rosen, Kevin and Stacey



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 421 of 796
Case 1:11-cv-22408-MGC   Document 273-9   Entered on FLSD Docket 05/13/2019   Page 93 of
989

Conclusion of Value                                                                      6

## Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report.  This value us hypothetical since it assumes that defective drywall had never been present at the subject property.

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue.  This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date.  This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation.  Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total.  This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value.  These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home.  Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered.  Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF               4 months

$150,000 - $750,000 home up to 4,000 SF         6 months

$750,000+ home up over 4,000 SF                 9 months

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).

Rosen, Kevin and Stacey



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 422 of 796
Case 1:11-cv-22408-MGC   Document 279-8   Entered on FLSD Docket 05/13/2019   Page 94 of 989

Conclusion of Value                                                                7

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

| Conclusions of Damage | | | |
|---|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $1,015,000 | |
| Market Impairment Discount (As if Remediated) | | 10% | |
| Post Impairment Damage ($) | | $101,500 | |
| **Hypothetical Value As IF Remediated** | | | **$913,500** |
| Post Remediation Damages as of Effective Date | | | **$101,500** |
| Loss of Use: | | | |
| Rental Rate ($/Month) | **$8,000** | | |
| Moving & Storage Costs | | $3,000 | |
| Loss of Use Subject (# Months) | 9x | $72,000 | |
| Subject Total | | | **$75,000** |
| **Post Remediation Damage** | | | **$176,500** |
| Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work. | | | |

December 30, 2011 the property was listed for sale in the Realtors MLS system for $999,000, with a status change to Pending Sale February 27, 2012 and Closed Sale June 29, 2012 for $940,000. The listing disclosed the home previously contained Chinese Drywall which had been remediated.  Integras Dec 2012 appraisal unimpaired ($1,015,000) compared to the post-remediation closed price ($940,000) reflects a 7% diminution w/o accounting for 2.5-years of property appreciation between 12-2009 and 06-2012.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 423 of 796
Case 1:11-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2019 Page 95 of 989

Certification          8

## Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Carlos Fong has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Case 2:09-md-02047-EEF-MBN Document 22380-38 Filed 12/02/19 Page 424 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 05/13/2019 Page 96 of 989
Assumptions and Limiting Conditions                                                                9

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1.  The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2.  There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3.  There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4.  The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5.  The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6.  The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1.  An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2.  The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3.  No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4.  No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5.  Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6.  We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.



Case 2:09-md-02047-EEF-MBN   Document 22380-38   Filed 12/02/19   Page 425 of 796
Case 1:11-cv-22408-MGC   Document 279-8   Entered on FLSD Docket 05/13/2019   Page 97 of 989

Assumptions and Limiting Conditions                                                    10

7.   No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.   We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.   The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10.  Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11.  Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12.  Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13.  If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14.  Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15.  The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16.  The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17.  The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during



Case 2:09-md-02047-EEF-MBN   Document 22380-38   Filed 12/02/19   Page 426 of 796
Case 1:14-cv-22403-MGC   Document 273-8   Entered on FLSD Docket 05/13/2019   Page 98 of 989

Assumptions and Limiting Conditions                                           11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19. The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20. No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21. The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23. The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 427 of 796
Case 1:11-cv-22408-MGC   Document 273-8   Entered on FLSD Docket 05/13/2019   Page 99 of 989

Assumptions and Limiting Conditions                                                    12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25. Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26. The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27. All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

Rosen, Kevin and Stacey



# Addenda



| Borrower | Kevin & Stacey Rosen | | | File No. | VALU-18-12-1468 | |
|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |

## TABLE OF CONTENTS



USPAP Identification Addendum ............................................................................................................. 1
Exterior-Only ............................................................................................................................................. 2
Single Family Comparable Rent Schedule ............................................................................................. 8
General Text Addendum .......................................................................................................................... 9
Subject Photos .......................................................................................................................................... 12
Comparable Photos 1-3 ........................................................................................................................... 13
Rental Photos 1-3 ..................................................................................................................................... 14
Assessor Map ........................................................................................................................................... 15
Subject Aerial Map ................................................................................................................................... 16
Location Map ............................................................................................................................................. 17
Assessor Data ........................................................................................................................................... 18
MLS Listing Sheet ..................................................................................................................................... 19
MLS Listing History ................................................................................................................................... 20
Tax Information .......................................................................................................................................... 21
License ....................................................................................................................................................... 22

## USPAP ADDENDUM

| Borrower | Kevin & Stacey Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code 33496 |
| Lender | Integra Realty Resources (IRR) | | | | | | |

This report was prepared under the following USPAP reporting option:

☒ Appraisal Report     This report was prepared in accordance with USPAP Standards Rule 2-2(a).

☐ Restricted Appraisal Report     This report was prepared in accordance with USPAP Standards Rule 2-2(b).

**Reasonable Exposure Time**

My opinion of a reasonable exposure time for the subject property at the market value stated in this report is: 90-180 DAYS

EXPOSURE TIME: estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

USPAP 2018-19 Comment: Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market

**Additional Certifications**

I certify that, to the best of my knowledge and belief:

☒ I have NOT performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

☐ I HAVE performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

**Additional Comments**

APPRAISER COMPETENCY

An appraiser must determine, prior to accepting an assignment, that he or she can perform the assignment competently. Competency requires:

1. the ability to properly identify the problem to be addressed; and
2. the knowledge and experience to complete the assignment competently; and
3. recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.

I am competent to perform this assignment based on my state appraiser license and familiarity with this type of property in the subject market

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations

| **APPRAISER:** | **SUPERVISORY APPRAISER: (only if required)** |
|---|---|
| Signature: *Carlos Fong* | Signature: |
| Name: Carlos Fong | Name: |
| Date Signed: 02/13/2019 | Date Signed: |
| State Certification #: RD 6782 | State Certification #: |
| or State License #: | or State License #: |
| State: FL | State: |
| Expiration Date of Certification or License: 11/30/2020 | Expiration Date of Certification or License: |
| Effective Date of Appraisal: 12/23/2009 | Supervisory Appraiser Inspection of Subject Property: |
| | ☐ Did Not  ☐ Exterior-only from Street  ☐ Interior and Exterior |

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1468
File # VALU-18-12-1468

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | |
|---|---|---|---|
| Property Address 17830 Monte Vista Dr | City Boca Raton | State FL | Zip Code 33496 |

Borrower Kevin & Stacey Rosen  Owner of Public Record Kevin & Stacey Rosen  County Palm Beach

Legal Description OAKS AT BOCA RATON PL 6 LT 30 BLK G1

Assessor's Parcel # 00-42-46-31-07-007-0300  Tax Year 2017  R.E. Taxes $ 14,008

Neighborhood Name Oaks at Boca Raton  Map Reference 48424  Census Tract 0077.43

Occupant ☒ Owner ☐ Tenant ☐ Vacant  Special Assessments $ 0  ☐ PUD  HOA $ 0 ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Litigation

Lender/Client Integra Realty Resources (IRR)  Address 9155 South Dadeland Boulevard, Miami, FL 33156

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☒ Yes ☐ No

Report data source(s) used, offering price(s), and date(s). DOM 84;See attached listing history

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $   Date of Contract   Is the property seller the owner of public record? ☐ Yes ☐ No Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | Property Values ☐ Increasing ☒ Stable ☐ Declining | | PRICE $(000) | AGE (yrs) | One-Unit | 90 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | 266 Low | 0 | 2-4 Unit | % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | 2,575 High | 40 | Multi-Family | 5 % |
| | | | | 1,413 Pred. | 25 | Commercial | 5 % |

Neighborhood Boundaries The subject is bound to the north by Gulf Stream, to the west by FL Route 441, Other %

to the east by Lyons Rd and to the south by Clint Moore Rd.

Neighborhood Description There are no apparent factors that should affect the subject's marketability. The subject has access to all necessary
supporting facilities including schools, shopping, recreation and employment centers.

Market Conditions (including support for the above conclusions) See Attached Addendum

| | | | |
|---|---|---|---|
| Dimensions Per Palm Beach County Assr | Area 13,068 sf | Shape Irregular | View N;Res; |

Specific Zoning Classification AGR-PUD  Zoning Description Agricultural Reserve PUD (00-Unincorporated)

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley None | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone X  FEMA Map # 12099C0965F  FEMA Map Date 10/5/2017

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe

No observed or known adverse influences to market value were noted.

Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☒ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner
☐ Other (describe)  Data Source for Gross Living Area Assessor

| General Description | General Description | Heating/Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☐ Concrete Slab ☐ Crawl Space | ☒ FWA ☐ HWBB | Fireplace(s) # 0 ☐ None | ☐ None |
| # of Stories 2 | ☐ Full Basement ☐ Finished | ☐ Radiant | Woodstove(s) # 0 ☒ Driveway # of Cars 3 |
| Type ☒ Det. ☐ Att. ☐ S-Det/End Unit | ☐ Partial Basement ☐ Finished | ☐ Other | ☒ Patio/Deck Patio Driveway Surface Pavers |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls CBS | Fuel Gas/Elec. | ☒ Porch Entry ☐ Garage # of Cars 3 |
| Design (Style) Mediterranean | Roof Surface S-Tile | ☒ Central Air Conditioning | ☐ Pool Pool ☐ Carport # of Cars |
| Year Built 2006 | Gutters & Downspouts Alum | ☐ Individual | ☒ Fence Fence ☒ Attached ☐ Detached |
| Effective Age (Yrs) 3 | Window Type Pic./SH | ☐ Other | ☐ Built-in |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☒ Washer/Dryer ☐ Other (describe)

Finished area above grade contains: 9 Rooms 5 Bedrooms 5.2 Bath(s) 4,674 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.) None

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.) Upon visual inspection of the
neighborhood the property was located in a gated community where public access was restricted. We therefore assume the subject is in
average condition relative to our observations of the general condition of the neighborhood.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No
If Yes, describe.

There are no apparent external or functional inadequacies noted or reported at time of inspection. Physical depreciation is calculated by the
modified age life method.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe.

The construction quality is typical for the area.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Exterior-Only Inspection Residential Appraisal Report

VALU-18-12-1468
File # VALU-18-12-1468

There are 26 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 875,000 to $ 3,750,000 .

There are 11 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 1,015,000 to $ 2,575,000 .

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 17830 Monte Vista Dr | 17800 Key Vista Way | | 9684 Bridgebrook Dr | | 9068 Redonda Dr | |
| | Boca Raton, FL 33496 | Boca Raton, FL 33496 | | Boca Raton, FL 33496 | | Boca Raton, FL 33496 | |
| Proximity to Subject | | 0.32 miles W | | 0.49 miles W | | 0.21 miles E | |
| Sale Price | $ | | $ 1,015,000 | | $ 1,200,000 | | $ 1,300,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 182.59 sq.ft. | | $ 205.62 sq.ft. | | $ 228.95 sq.ft. | |
| Data Source(s) | | SEF #R3047057;DOM 51 | | SEF #R2996463;DOM 81 | | SEF #R3001359;DOM 31 | |
| Verification Source(s) | | Assessor, Realist | | Assessor, Realist | | Assessor, Realist | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Arms Length | | Arms Length | | Arms Length | |
| Concessions | | Cash;0 | | Conv;0 | | Cash;0 | |
| Date of Sale/Time | | s10/09;c10/09 | | s06/09;c05/09 | | s05/09;c03/09 | |
| Location | Residential | Residential | | Residential | | Residential | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 13068 sf | 12632 sf | 0 | 11761 sf | 0 | 17873 sf | -24,025 |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | Mediterranean | Mediterranean | | Mediterranean | | Mediterranean | |
| Quality of Construction | Good | Good | | Good | | Good | |
| Actual Age | 3 | 2 | | 3 | | 0 | |
| Condition | Good | Good | | Good | | New | -100,000 |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 9 5 5.2 | 9 5 5.1 | +10,000 | 9 5 5.1 | +10,000 | 9 5 5.1 | +10,000 |
| Gross Living Area | 4,674 sq.ft. | 5,559 sq.ft. | -88,500 | 5,836 sq.ft. | -116,200 | 5,678 sq.ft. | -100,400 |
| Basement & Finished | No Basement | No Basement | | No Basement | | No Basement | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | EFA/CAC | EFA/CAC | | EFA/CAC | | EFA/CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 3-Car Garage | 3-Car Garage | | 3-Car Garage | | 3-Car Garage | |
| Porch/Patio/Deck | Blcs/Pto/Porch | Blcs/Pto/Porch | | Blcs/Pto/Porch | | Blcs/Pto/Porch | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -78,500 | ☐ + ☒ - | $ -106,200 | ☐ + ☒ - | $ -214,425 |
| Adjusted Sale Price | | Net Adj. 7.7 % | | Net Adj. 8.9 % | | Net Adj. 16.5 % | |
| of Comparables | | Gross Adj. 9.7 % | $ 936,500 | Gross Adj. 10.5 % | $ 1,093,800 | Gross Adj. 18.0 % | $ 1,085,575 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data Source(s) MIAMI MLS, Palm Beach County Records, and Realist

My research ☒ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data Source(s) MIAMI MLS, Palm Beach County Records, and Realist

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | 10/14/2009 | 05/06/2009 | |
| Price of Prior Sale/Transfer | | 0 | 0 | |
| Data Source(s) | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist |
| Effective Date of Data Source(s) | 12/23/2009 | 12/23/2009 | 12/23/2009 | 12/23/2009 |

Analysis of prior sale or transfer history of the subject property and comparable sales Per public record, the Subject sold on 03/29/2018 for $835,000 from

Michael & Valerie Z Buckstein to Ronald Y & Gail Marsh (Warranty Deed #29747-1454) and is an arms length sale. The Subject sold on

12/23/2009 for $501,000 from Kevin & Stacey Rosen to Florida Campbell R/E Holdings (Warranty Deed #23622-870) and is an arms length sale.

The Subject transferred on 04/30/2009 for $0 from Oakes at Boca Raton Venture to Albanese-Popkin The Oaks Dev G (Special Warranty Deed

#23215-208). The Subject sold on 02/06/2008 for $2,112,569 from Kenco of the Oaks/Boca Raton to Aerocav Ltd (Special Warranty Deed

#22435-370) and is an arms length sale.

Summary of Sales Comparison Approach See Attached Addendum

Indicated Value by Sales Comparison Approach $ 1,015,000

**Indicated Value by: Sales Comparison Approach $** 1,015,000 **Cost Approach (if developed) $** **Income Approach (if developed) $**

The cost approach is not applicable. Insufficient data is available to compute the income approach. Thus the Sales Comparison Approach is

most readily reflects active buyers / sellers.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: No special conditions are noted.

Personal property is not included in this valuation.

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is

$ 1,015,000 , as of 12/23/2009 , which is the date of inspection and the effective date of this appraisal.

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1468
File # VALU-18-12-1468

| ADDITIONAL COMMENTS |
|---|
| PLEASE ATTACHED ADDENDUM FOR FURTHER INFORMATION |

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)  Site value is estimated and/or supported by the sales comparison approach whenever data is available, otherwise extraction method is used.

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | ............................................. =$ | 150,000 |
|---|---|---|---|
| Source of cost data  N/A | DWELLING  4,674 Sq.Ft. @ $ | ........ =$ | |
| Quality rating from cost service  N/A  Effective date of cost data  N/A | Sq.Ft. @ $ | ........ =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | =$ | |
| The cost approach was not applied as the area is fully built up and there | Garage/Carport  Sq.Ft. @ $ | ........ =$ | |
| is no vacant land available, except where an existing house will be torn | Total Estimate of Cost-New | ........ =$ | |
| down. In addition, physical depreciation is often difficult to estimate for | Less  Physical  Functional  External | | |
| homes over 5 years of age. Although the Cost Approach could be | Depreciation | =$( | ) |
| considered an applicable approach to value, it is not typically relied | Depreciated Cost of Improvements | ............................................. =$ | |
| upon by market participants for one to four family properties. | "As-is" Value of Site Improvements | ............................................. =$ | |
| Estimated Remaining Economic Life (HUD and VA only)  57 Years | INDICATED VALUE BY COST APPROACH | ............................................. = $ | |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $  8,000  X Gross Rent Multiplier  8,000  = $ | Indicated Value by Income Approach |
|---|---|

Summary of Income Approach (including support for market rent and GRM)  The income approach is not applicable to this report as homes in the area are typically owner occupied.

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No  Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion

Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source(s)

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1468
File # VALU-18-12-1468

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

---

Freddie Mac Form 2055 March 2005      Page 4 of 6      Fannie Mae Form 2055 March 2005

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1468
File # VALU-18-12-1468

APPRAISER'S CERTIFICATION:    The  Appraiser  certifies  and  agrees  that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this  appraisal  report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness,  or  structural  integrity  of  the  property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the  time  this  appraisal  report  was  prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them,  unless  otherwise  indicated  in  this  report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to  the  date  of  sale  of  the  comparable  sale,  unless  otherwise  indicated  in  this  report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property  and  the  comparable  sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the  sale  or  financing  of  the  subject  property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable  sources  that  I  believe  to  be  true  and  correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability  of  the  subject  property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements  and  information  in  this  appraisal  report  are  true  and  correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are  subject  only  to  the  assumptions  and  limiting  conditions  in  this  appraisal  report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage  loan  application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility  for  it.

### Exterior-Only Inspection Residential Appraisal Report

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION:    The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature  *Carlos Fong* | Signature |
| Name  Carlos Fong | Name |
| Company Name  Valucentric LLC | Company Name |
| Company Address  7908 Montecito Pl, Delray Beach, FL 33446 | Company Address |
| Telephone Number  (844) 825-8236 | Telephone Number |
| Email Address  info@valucentric.com | Email Address |
| Date of Signature and Report  02/13/2019 | Date of Signature |
| Effective Date of Appraisal  12/23/2009 | State Certification # |
| State Certification #  RD 6782 | or State License # |
| or State License # | State |
| or Other (describe)                         State # | Expiration Date of Certification or License |
| State  FL | |
| Expiration Date of Certification or License  11/30/2020 | SUBJECT PROPERTY |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did not inspect exterior of subject property |
| 17830 Monte Vista Dr | ☐ Did inspect exterior of subject property from street |
| Boca Raton, FL 33496 | Date of Inspection |
| APPRAISED VALUE OF SUBJECT PROPERTY $   1,015,000 | |
| LENDER/CLIENT | COMPARABLE SALES |
| Name | ☐ Did not inspect exterior of comparable sales from street |
| Company Name  Integra Realty Resources (IRR) | ☐ Did inspect exterior of comparable sales from street |
| Company Address  9155 South Dadeland Boulevard, Miami, FL 33156 | Date of Inspection |
| Email Address | |

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

# SINGLE FAMILY COMPARABLE RENT SCHEDULE

VALU-18-12-1468
File # VALU-18-12-1468

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property.  Adjustments should be made only for items of significant difference between the comparables and the subject property.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 17830 Monte Vista Dr  Boca Raton, FL 33496 | 17554 Middlebrook Way  Boca Raton, FL 33496 | 17690 Middlebrook Way  Boca Raton, FL 33496 | 17979 Lake Azure Way  Boca Raton, FL 33496 |
| Proximity to Subject | | 0.52 miles W | 0.44 miles NW | 0.22 miles SW |
| Date Lease Begins  Date Lease Expires | | 02/08  Unk | 05/09  Unk | 11/07  Unk |
| Monthly Rental | If Currently  Rented: $ | $       10,000 | $       8,500 | $       8,000 |
| Less: Utilities  Furniture | $ | $ | $ | $ |
| Adjusted  Monthly Rent | $ | $       10,000 | $       8,500 | $       8,000 |
| Data Source | MLS,Inspection  Assessor,Realist | MLS #R2899264  Assessor, Realist | MLS #R3005050  Assessor, Realist | MLS #R2873477  Assessor, Realist |

| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
|---|---|---|---|---|---|---|---|
| Rent  Concessions | | | | | | | |
| Location/View | Residential  Residential | Residential  Residential | | Residential  Residential | | Residential  Residential | |
| Design and Appeal | Mediterranean | Mediterranean | | Mediterranean | | Mediterranean | |
| Age/Condition | 3  Good | 7  Good | | 5  Good | | 3  Good | |
| Above Grade  Room Count  Gross Living Area | Total Bdrms Baths  9 5 5.2  4,674 Sq. Ft. | Total Bdrms Baths  9 5 5.2  4,882 Sq. Ft. | | Total Bdrms Baths  10 5 6.2  4,986 Sq. Ft. | | Total Bdrms Baths  9 5 4.2  4,661 Sq. Ft. | |
| Other (e.g., basement, etc.) | No Basement  None | No Basement  None | | No Basement  None | | No Basement  None | |
| Other: | | | | | | | |
| Net Adj. (total) | | □+ □− $ | 0 | □+ □− $ | 0 | □+ □− $ | 0 |
| Indicated Monthly  Market Rent | | $       10,000 | | $       8,500 | | $       8,000 | |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)   Rentals of comparable style dwellings ranged from $8,000 to $10,000.

Final Reconciliation of Market Rent:      All rentals were taken into the final consideration.  The opinion of market rent is $8,000

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF                 12/23/2009          TO BE $           8,000

Appraiser(s)  SIGNATURE   *Carlos Fong*                Review Appraiser   SIGNATURE
NAME   Carlos Fong                                (If applicable)  NAME
Certified Residential Appraiser
Date Property Inspected   12/23/2009   Report Signed   02/13/2019          Date Property Inspected          Report Signed
License or Certification #   RD 6782   State   FL          License or Certification #          State
Expiration Date of License or Certification   11/30/2020          Expiration Date of License or Certification
                                                  Review Appraiser   □ Did   □ Did Not   Inspect Subject Property

Freddie Mac Form 1000  (8/88)                                          Fannie Mae Form 1007  (8/88)

Supplemental Addendum

File No. VALU-18-12-1468

| Borrower | Kevin & Stacey Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

**PURPOSE OF APPRAISAL REPORT**

The purpose of this appraisal is to estimate the market value of the subject property as defined herein. The function of the appraisal is to assist the above-named Lender/Client, its successors and/or assigns, in evaluating the subject property for lending purposes. This is a federally regulated transaction. Additional supporting data can be found in our appraiser work file.

It is assumed that the title to this property is good and marketable. No title search has been made, nor have we attempted to determine ownership of the property. The value estimate is given without regard to any questions of title, boundaries, or encroachments. It is assumed that all assessments are paid. We assume the property to be free and clear of liens and encumbrances except as noted.

The legal description, if included herein, should be verified by legal counsel before being relied upon or used in any conveyance or other document.

We are not familiar with any engineering studies made to determine the bearing capacity of the land. Improvements in the area appear to be structurally sound. It is therefore assumed that soil and subsoil conditions are stable unless specifically outlined in this report.

Any exhibits in the report are intended to assist the reader in visualizing the property and its surroundings. The drawings are not intended as surveys and no responsibility is assumed for their cartographic accuracy. Drawings are not intended to be exact in size, scale or detail.

Areas and dimensions of the property were physically measured. If data is furnished by the principal or from plot plans or surveys furnished by the principal, or from public records, we assume it to be reasonably accurate. In the absence of current surveys, land areas may be based upon representations made by the owner's agents or the client. No attempt has been made to render an opinion or determine the status of easements that may exist. No responsibility is assumed for discrepancies that may become evident from a licensed survey of the property.

The value estimate involves only the real estate and all normal building equipment if any improvements are involved. No consideration was given to personal property, (or special equipment), unless stated.

It is assumed that the property is subject to lawful, competent and informed ownership and management unless noted.

Information in this report concerning market data was obtained from buyers, sellers, brokers, attorneys, trade publications or public records. To the extent possible, this information was examined for accuracy and is believed to be reliable. Dimensions, areas or data obtained from others is believed correct; however, no guarantee is made.

Any information, in whatever form, furnished by others is believed to be reliable; however, no responsibility is assumed for accuracy.

The separate allocations between land and improvements, if applicable, represents our judgment only under the existing utilization of the property. A re-evaluation should be made if the improvements are removed or substantially altered, and the land utilized for another purpose.

All information and comments concerning the location, neighborhood trends, construction quality and costs, loss in value from whatever cause, condition, rents, or any other data for the property appraised herein, represents the estimates and opinions of the appraiser formed after an examination and study of the property.

Any valuation analysis of the income stream has been predicted upon financing conditions as specified herein, which we have reason to believe are currently available for this property. Financing terms and conditions other than those indicated may alter the final value conclusions.

The appraiser is not required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless arrangements have been made previously thereto. If the appraiser (s) is subpoenaed pursuant to court order, the client will be required to compensate said appraiser(s) for his/her time at his/her regular hourly rates, plus expenses.

All opinions, as to values stated, are presented as the appraiser's considered opinion based on the information set forth in the report and his experience. We assume no responsibility for changes in market conditions or for the inability of the client or any other party to achieve their desired results based upon the appraised value. Further, some of the assumptions made can be subject to variation depending upon evolving events. We realize some assumptions may never occur and unanticipated events or circumstances may occur. Therefore, actual results achieved during the projection period may vary from those in this report.

The appraisal assignment was not based on developing or reporting predetermined results, or a requested minimum valuation, a specific valuation, or the approval of a loan.

Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of: USPAP Uniform Standards of Professional Appraisal Practice, and SPP-AI Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute; and, except as noted in the Scope of Appraisal, in conformity with specific implementation rules of the following agencies:

FIRREA Title XI of the Financial Institutions Reform, Recovery and Enforcement Act and section 5(b) of the Bank Company Holding Act; FRB – Federal Reserve Board; RTC-Resolution Trust Corporation; OTS-Office of Thrift Supervision; FDIC – Federal Deposit Insurance Corporation; OTC – Office of the Comptroller; NCUA – National Credit Union Association.

**THE APPRAISER HAS PREPARED THIS APPRAISAL IN FULL COMPLIANCE WITH THE APPRAISAL INDEPENDENCE REQUIREMENTS AND HAS NOT PERFORMED, PARTICIPATED IN, OR BEEN ASSOCIATED WITH ANY ACTIVITY IN VIOLATION OF AIR.**

**AT THE REQUEST OF THE CLIENT, THIS APPRAISAL REPORT HAS BEEN PREPARED IN COMPLIANCE WITH THE**

# Supplemental Addendum

File No. VALU-18-12-1468

| Borrower | Kevin & Stacey Rosen | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |

**UNIFORM APPRAISAL DATASET (UAD) FROM FANNIE MAE AND FREDDIE MAC. THE UAD REQUIRES THE APPRAISER TO USE STANDARDIZED RESPONSES THAT INCLUDE SPECIFIC FORMATS, DEFINITIONS, ABBREVIATIONS, AND ACRONYMS.**

We do not authorize the out-of-context quoting from or partial reprinting of this appraisal report. Further, neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser nor the name of the firm which he is connected, shall be reproduced, published, or disseminated to the public through advertising media, public relations media, news media, or another public means of communication, without the prior written consent of the appraiser signing this report.

Adobe's Distiller software or equivalent may be utilized by appraiser to transmit this encrypted PDF-formatted appraisal. At a minimum, the software contains the following security measure:

- identifies transmission error during the transmission process, and confirms date, time and quantity of data submitted by appraiser and the date, time and quantity of data received by the Client, and/or its assigns and
- secures data from editing by means of a password, hardware device, or other means that remains in the sole control of the transmitting appraiser.

**THIRTY SIX MONTH LISTING HISTORY**

We are not aware of any prior listings pertaining to the subject property in the past three years as researched through the local Multiple Listing Service.

**NEIGHBORHOOD MARKET CONDITIONS**

No discounts, buy downs or other concessions were noted. Current 30 year fixed rate financing at 4.5 - 5.5% and 0-2 points.

Stricter Lending Standards and the availability of Mortgage Capital may affect the average sales prices in the area, however, given the market data analyzed by the appraiser, there are no fiscal or economic trends expected to occur that would significantly impact the relatively stable market currently experienced in this neighborhood.

Neighborhood conditions can be found in detail in the attached 1004MC form.

**1004 MARKET CONDITIONS COMMENTS**

Market Conditions Addendum Criteria included XXXXXXXXXXX.

***In the past three months, there were XXX dwellings sold with a median sales price of $XXXXXX. In the previous four to six months, there were XXX dwellings sold with a median sales price of $XXX,XXX. In the prior 7-12 months the median price was $XXX,XXX and XX units sold. This data supports stable values in the market.***

This report is provided "as is" for information purposes only and DynaConnections expressly disclaims any warranties regarding accuracy or completeness. DynaConnections makes no representation or warranties about
the legality or propriety of the use of this report for any purpose, including for purposes related to appraisals. DynaConnections disclaims any warranties of merchantability, fitness for a particular purpose, or warranties
based on course of dealing or usage in trade.

**SITE COMMENTS**

This site is very typical of the neighborhood in terms of size, topography, view and general appeal. It provides a suitable setting for the improvements and is consistent with market expectations in this price range. Statements regarding zoning compliance are intended only in the most general sense. Zoning and building ordinances vary significantly from one municipality to another and can be extremely detailed. The scope of this assignment does not include a comparison of every potentially significant characteristic of the subject property's site and improvements relative to zoning and building ordinances. Unless otherwise noted, standard utility and right-of-way easements are insignificant to value. However, a current locational or boundary survey or title report may reveal encroachments, easements, zoning violations or other matters of interest that could warrant modification of the appraised value.

**COMMENTS REGARDING HIGHEST AND BEST USE**

In compliance with USPAP the following is included in the appraisal;
•         The current use of the real estate as of the date of value is Residential as described in the improvements section of this appraisal.

•         The use of the real estate reflected in this appraisal is as currently improved

•         The rationale and support for the opinion of highest and best use developed for this assignment is as per below:
Highest and Best Use is defined as "The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property-specific with respect to the user and timing of the use-that is adequately supported and results in the highest present value"
Source: Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Appraisal Institute, 2010).
The highest and best use analysis is a critical step in the valuation process. The comparable properties incorporated into the appraisal are directly affected by the highest and best use analysis. The analysis is based on the use that a hypothetical purchaser would make of the property based on the four tests cited above:
•         Legally Permissible
•         Physically Possible
•         Financially Feasible
•         Maximally Productive

**Supplemental Addendum**

File No. VALU-18-12-1468

| Borrower | Kevin & Stacey Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

After consideration of the above criteria it has been determined that the current improvements continue to contribute to the total market value of the property and the return from a new improvement would not currently offset the cost of demolishing the existing improvements and constructing a new one. Therefore, the highest and best use is as improved.

**COMMENTS ON SALES COMPARISON APPROACH**

All comparables proivded strong support. The most weight, and opinion of value fell on comparables 1, and 2, for being the most recent sales. The opinion fell near the lower end of the unadjusted range, due to the GLA.

Comparables were adjusted for their differences in lot square footages, overall condition, above grade bathroom count, and gross living area. Gross living area adjustments were made at $100 per square foot. Comparables within 100 square feet of the subject property did not warrant an adjustment. Lot adjustments were made at $5 per square foot. No lot size adjustments were warranted for lot size differences within 20% of the subject lot size as no market data exists to support an adjustment. Comparable 3 received a negative condition adjustment, for being brand new construction.

The remaining adjustments are indicated on the sales comparison grid.

**RECONCILIATION**

The sales comparison approach was considered most applicable for the subject property because a typical buyer or seller would most readily understand and apply this approach. The income approach was not considered applicable due to the fact that the majority of housing stock in the area is owner occupied and not typically used for investment property. The cost approach was not completed due to the subjectivity in estimating depreciation and because the typical buyer does not base price points on the cost approach. The quality of available data utilized in the Sales comparison Approach was considered adequate.

**EXTERIOR INSPECTION ADDENDA**

The appraiser has been requested to perform an appraisal based on an exterior only inspection and not to disturb the occupants by entering the building. The physical characteristics used to develop this appraisal are based on the assessment records of Palm Beach County, Florida and on the multiple listing service. The subject property was observed from the public street as of the effective date of the appraisal. On the basis of the observed conditions, the assessment records and multiple listing service information appear to be accurate. For the purposes of this appraisal, it is assumed that the interior condition of the subject property is consistent with the exterior conditions as observed and that the information concerning the interior condition as provided by the assessor's records and the multiple listing service is accurate.

**PHYSICAL DEFICIENCIES OR ADVERSE CONDITIONS**

Unless otherwise stated in this report, the existence of hazardous material and/or electromagnetic emission, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no such knowledge of the existence of such materials on or in the subject property, or in the properties of the subject neighborhood. The appraiser is not qualified to detect such substances. The presence of such substances as asbestos, urea formaldehyde foam insulation, radon, mold, or other potentially hazardous material may affect the value of the property. The value estimate expressed is predicated on the assumption that there is no such material in or on the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required discovering them. The customer is urged to retain an expert in this field.

Dwellings built prior to 1978 may contain lead-based paint.

**MOLD**

The appraiser is not a home or environmental inspector. The appraiser provides an opinion of value. The appraisal does not guarantee that the property is free of defects or environmental problems. The appraiser performs an inspection of visible and accessible areas only. Mold may be present in areas the appraiser cannot see. A professional home inspection or environmental inspection is recommended.

**CONCLUSION**

This is an Appraisal Report which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for an Appraisal Report. As such, it presents only minimal discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's file. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein. The appraiser is not responsible for unauthorized use of this report.

## Subject Photo Page

| Borrower | Kevin & Stacey Rosen | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



**Subject Front**

17830 Monte Vista Dr

Sales Price

Gross Living Area    4,674
Total Rooms    9
Total Bedrooms    5
Total Bathrooms    5.2
Location    Residential
View    Residential
Site    13068 sf
Quality    Good
Age    3



**Subject Rear**



**Subject Street**

## Comparable Photo Page

| Borrower | Kevin & Stacey Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



### Comparable 1

| | |
|---|---|
| 17800 Key Vista Way | |
| Prox. to Subject | 0.32 miles W |
| Sales Price | 1,015,000 |
| Gross Living Area | 5,559 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Residential |
| Site | 12632 sf |
| Quality | Good |
| Age | 2 |



### Comparable 2

| | |
|---|---|
| 9684 Bridgebrook Dr | |
| Prox. to Subject | 0.49 miles W |
| Sales Price | 1,200,000 |
| Gross Living Area | 5,836 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Residential |
| Site | 11761 sf |
| Quality | Good |
| Age | 3 |



### Comparable 3

| | |
|---|---|
| 9068 Redonda Dr | |
| Prox. to Subject | 0.21 miles E |
| Sales Price | 1,300,000 |
| Gross Living Area | 5,678 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Residential |
| Site | 17873 sf |
| Quality | Good |
| Age | 0 |

## Rental Photo Page

| Borrower | Kevin & Stacey Rosen | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



### Rental 1

| | |
|---|---|
| 17554 Middlebrook Way | |
| Proximity to Subject | 0.52 miles W |
| Adj. Monthly Rent | 10,000 |
| Gross Living Area | 4,882 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.2 |
| Location | Residential |
| View | Residential |
| Condition | Good |
| Age/Year Built | 7 |



### Rental 2

| | |
|---|---|
| 17690 Middlebrook Way | |
| Proximity to Subject | 0.44 miles NW |
| Adj. Monthly Rent | 8,500 |
| Gross Living Area | 4,986 |
| Total Rooms | 10 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | Residential |
| View | Residential |
| Condition | Good |
| Age/Year Built | 5 |



### Rental 3

| | |
|---|---|
| 17979 Lake Azure Way | |
| Proximity to Subject | 0.22 miles SW |
| Adj. Monthly Rent | 8,000 |
| Gross Living Area | 4,661 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.2 |
| Location | Residential |
| View | Residential |
| Condition | Good |
| Age/Year Built | 3 |

**Assessor Map**

| Borrower | Kevin & Stacey Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



**Subject Aerial Map**

| Borrower | Kevin & Stacey Rosen | | | | |
|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | |



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 446 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 918 of
960

## Location Map

| Borrower | Kevin & Stacey Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



**Assessor Data**

| Borrower | Kevin & Stacey Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



### Property Detail

| | | | |
|---|---|---|---|
| Parcel Control Number: | 00-42-46-31-07-007-0300 | Location Address: | 17830 MONTE VISTA DR |
| Owners: | MARSH GAIL ,MARSH RONALD Y | | |
| Mailing Address: | 17830 MONTE VISTA DR,BOCA RATON FL 33496 1054 | | |
| Last Sale: | MAR-2018 | Book/Page#: | 29747 / 1454 | Price: | $835,000 |
| Property Use Code: | 0100 - SINGLE FAMILY | Zoning: | AGR-PUD - Agricultural Reserve PUD ( 00-UNINCORPORATED ) |
| Legal Description: | OAKS AT BOCA RATON PL 6 LT 30 BLK G1 | Total SF: | 6132 | Acres | 0.30 |

### 2018 Values (Current)

| | |
|---|---|
| Improvement Value | $726,517 |
| Land Value | $140,333 |
| Total Market Value | $866,850 |
| Assessed Value | $837,202 |
| Exemption Amount | $50,000 |
| Taxable Value | $787,202 |
| All values are as of January 1st each year. | |

### 2018 Taxes

| | |
|---|---|
| Ad Valorem | $13,712 |
| Non Ad Valorem | $394 |
| Total Tax | $14,106 |

### 2019 Qualified Exemptions

Homestead
Additional Homestead

**Applicants**

MARSH GAIL
MARSH RONALD Y &

### Building Footprint (Building 1 )

### Subarea and Square Footage (Building 1 )

| Description | Area Sq. Footage |
|---|---|
| BAS Base Area | 2978 |
| BLC Balcony | 32 |
| BLC Balcony | 88 |
| FGR Finished Garage | 285 |
| FGR Finished Garage | 506 |
| FOP Finished Open Porch | 128 |
| FOP Finished Open Porch | 241 |
| FUS Finished Upper Story | 1696 |
| NVA No Value Area | 178 |
| Total Square Footage : | 6132 |
| Total Area Under Air : | 4674 |

### Extra Features

| Description | Unit |
|---|---|
| Pool - In-Ground | 1 |

Unit may represent the perimeter, square footage, linear footage, total number of other measurement.

### Structural Details (Building 1 )

| No | Description | |
|---|---|---|
| 1. | Exterior Wall 1 | CB STUCCO |
| 2. | Year Built | 2006 |
| 3. | Air Condition Desc. | HTG & AC |
| 4. | Heat Type | FORCED AIR DUCT |
| 5. | Heat Fuel | ELECTRIC |
| 6. | Bed Rooms | 4 |
| 7. | Full Baths | 2 |
| 8. | Half Baths | |
| 9. | Roof Structure | WOOD TRUSS |
| 10. | Roof Cover | CONC. TILE |
| 11. | Interior Wall 1 | DRYWALL |
| 12. | Floor Type 1 | MARBLE |
| 13. | Floor Type 2 | CARPETING |
| 14. | Stories | 2 |

### MAP

Dorothy Jacks, CFA, AAS  PALM BEACH COUNTY PROPERTY APPRAISER  www.pbcgov.org/PAPA                1/3/2019

Owner: MARSH GAIL , MARSH RONALD Y  PCN: 00424631070070300        1 of 1

**MLS Listing Sheet**

| Borrower | Kevin & Stacey Rosen | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



1/3/2019                                                                         Matrix

🏠 **Listing**

**Single Family**
17830 Monte Vista Dr #
BOCA RATON, 33496

| | | | |
|---|---|---|---|
| ML#: | R3050040 | List Price: | $599,000 |
| Rng Price: | | Sold Price: | $501,000 |
| LLP: | | Status: | Closed Sale |
| Short Sale: | No | REO: | |
| Listing Brkr: | FLL608114 /Lang Realty | | |
| County: | Palm Beach County | | |
| Area: | 4750 | | |
| Geo Area: | Palm Beach 4750; 4760; 4770; 4780; 4860; 4870; 488 | | |
| Legal: | Oaks At Boca Raton 06 Lot:30 Blk:G1 Lot SqFt:13068 Frontage: Depth: | | |
| Furnished: | | | |
| Bedrooms: | 5 | Baths: | 5/2 |
| Convert Bed: | | | |
| SqFt (Liv): | 4,604 | Tot SqFt: | 4,604 |
| SqFt (Adj): | | | |
| Bld Ar/Src: | | | |
| Year Built: | 2006/New Construction | | |
| Virtual Tour: | Click Here | | |

**Location Information**

| | | | |
|---|---|---|---|
| Folio#: | 00424631070070300 | Parcel #: | |
| Municipal Code: | | Town/Range: | Model Name: Monte Verde |
| Subdivision #: | | Map Coord: | Section: |
| Subdivision: | The Oaks | Development: The Oaks | Zoning: Agr-Pud |
| Elementary: | | Middle: | |
| High: | | | |
| Neighborhood: | | | |

**General Information**

| | | | | |
|---|---|---|---|---|
| Type Property: | Single | Front Exposure: South West | HOPA: | |
| For Lease: | | For Lease MLS#: | SS Addend: | |
| Boat Services: | | | | |
| Style: | R33-WF/Pool/No Ocean Access | | | |
| Garage: | 3 | | Carport: | |
| Lot SF: | | Appr Lot Size: .3 | | |
| Parking Desc: | | | | |
| Parking Restr: | | | | |
| Lot Desc: | | | | |
| Waterfront: | Yes/Lake Front | | | |
| Water Access: | | | | |
| Water Frontage: | | View: Water View | | |
| Pool Dim: | X | Spa: | | |
| Pool: | Yes/Below Ground Pool, Heated | | | |
| Design/Desc: | | | | |
| Construction: | CBS Construction | | | |
| Roof Desc: | | | | |
| Floor: | Marble Floors, Wood Floors | | | |

**Remarks**

Remarks: NOT A SHORT SALE.NO WAITING. NO MONKEY BUSINESS.Beautiful corner lot totally upgraded Monte Verde model 5 bedrooms plus loft.Upgraded everything.gorgeous pool patio.Impact Glass,whole house nat/gas generator.!!Chinese Drywall and needs remediation!! This home has Chinese Drywall. Take advantage of this opportunity. Remediate and live in The Oaks for a fraction of building new... NOT A SHORT SALE

Driving Directions: Clint Moore Rd. between Lyons and 441. Entry on north side of Clint Moore.

Broker Remarks: NOT A SHORT SALE.WHY WASTE YOUR TIME WITH A SHORT SALE GOING NOWHERE WHEN YOU CAN MAKE A DEAL ON THIS HOME.NO MONKEY BUSINESS.Please qualify buyer bef

**Rooms**

| Room | Dim | Room | Dim | Room | Dim |
|---|---|---|---|---|---|
| Kitchen | 15X15 | LivingRoom | 19X19 | MasterBedroom | 16X19 |

| | |
|---|---|
| Bedroom Desc: | |
| Master Bath: | Bidet, Dual Sinks, Whirlpool/Spa |
| Addition Rooms: | Family Room, Loft |
| Dining Desc: | |
| ADA Compliant: | |

| | | | |
|---|---|---|---|
| Pets: | Yes | Cable: | Yes |
| Pet Rstr: | | | |
| Guest House: | | | |

https://sef.mlsmatrix.com/Matrix/Printing/PrintOptions.aspx?c=AAEAAAD*****AQAAAAAAAARAQAAAFQAAAAGAgAAAAAQyODA4BgMAAAABNAY...     1/4

## MLS Listing History

| Borrower | Kevin & Stacey Rosen | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | | | |
| City | Boca Raton | | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | | |

**MLS#:** R3050040    17830 Monte Vista Dr #      Single Family

No Picture Available

| Price | Chg Type | Chg Info | Eff Date | Agent ID | Office ID | DOM |
|---|---|---|---|---|---|---|
| $501,000 | CS | ($501,000) | 12/23/2009 | FLL6061521 | FLL608114 | |
| $599,000 | PS | A -> PS | 12/07/2009 | FLL6061521 | FLL608114 | |
| $599,000 | DECR | $699,000 -> $599,000 | 11/04/2009 | FLL6061521 | FLL608114 | |
| $699,000 | DECR | $789,000 -> $699,000 | 10/08/2009 | FLL6061521 | FLL608114 | |
| $789,000 | DECR | $839,000 -> $789,000 | 10/06/2009 | FLL6061521 | FLL608114 | |
| $839,000 | NEW | ACTV -> $839,000 | 09/14/2009 | FLL6061521 | FLL608114 | |

## Tax Information

| Borrower | Kevin & Stacey Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



**License**

| Borrower | Kevin & Stacey Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17830 Monte Vista Dr | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

 RICK SCOTT, GOVERNOR

JONATHAN ZACHEM, SECRETARY



### STATE OF FLORIDA
### DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

### FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED RESIDENTIAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## FONG, CARLOS RAFAEL

10601 S.W. 124 ROAD.
MIAMI          FL 33186

**LICENSE NUMBER: RD6782**

**EXPIRATION DATE:  NOVEMBER 30, 2020**

Always verify licenses online at MyFloridaLicense.com



Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
Miami/Palm Beach

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment



amgraziano@irr.com    -    305.670.0001 x320

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com

## Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida



**Anthony M. Graziano, MAI, CRE, FRICS**
PROFFERED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03094CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Caribbean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Caribbean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 1/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Saranzci, Faith Ann Safaruzi, Proverbium Hldg, LLC, USA & George Albright | NeJame, La Foy, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | C8 Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

M. Quals: Graziano: Trial Lists

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF OF | TRI FILE # | COURT/CASE NO. # | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008930-CA-01 | Aaron Stauber & Aviva Stauber V. BH 93, LLC | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22364 UU | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | Southern District of Florida | John Camps | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Igor Gen V. Yacht Club at Portofino Condo Association | Miami-Dade County | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of... |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Ocean Bank V. Lindback, Monroe County | Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24694 CA 04 | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Serieff and Coursel Drive Investments, LLC | 11th Judicial Circuit Dade County, Florida | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (respective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0194 | 13-01822 CACE 02 | Amalia I. Irlanda-Rivera V. Rivera Diagnostic Center, Inc., Okrap Rivera & Yudit Rivero | 13th Judicial Circuit Broward County, Florida | Amalia I. Irlanda-Rivera | Rent default judgment and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FLX34 (Pending) | Roehm Title Resources Claim | Palm Beach County | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined title defects not identified by Title Insurance Company |
| 4/2014 | Plaintiff | 123-2014-0117 | 4:14-CV-01077 (Pending) | USA V. GSA-VA St. Louis Property, LLC | USA District Court for the Eastern District of Missouri Eastern Division | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Euforia Club | Miami-Dade County | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition S.R.7 | Broward County | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | West Airport Plaza Business Park, LLC | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | Counsel for the Debtor, Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23922-CA 09 | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | 11th Judicial Circuit Dade County, Florida | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Defendant | 123-2013-0126 | CACE 08857624 (14) | Bayview Loan Servicing, LLC v. Kayhan Soodjani; Muhammad Mahmoodi; et al | 17th Judicial Circuit Broward County, Florida (Hon. Carlos A. Rodriguez) | Bayview Servicing, represented by Tabais, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency Damages on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV - Rosenbaum | United States of America v. G.K.K, et al | US District Court - Southern District of Florida (Hon. Rosenbaum) | Richard Duvall, Holland and Knight and Jeffrey Neiman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 2/2013 | Defendant | 123-2011-0670 | 09-05650 CA 04 | Zenaida Gomez v. City of Pinecrest | 11th Judicial Circuit Dade County, Florida | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence |
| 7/2013 | Defendant | 123-2013-0016 | 12-60950-CIV | US Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | US Federal Court - Southern District of Florida | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 1/2012 | Plaintiff | 123-2013-0129 | Pending | 2011 and 2012 Ad Valorem Tax Protest | 11th Judicial Circuit Dade County, Florida | Ken Wurtenberger, Esq. Kozelchuk Oxbrow Fergenson | Tax protest of commercial condominium. |
| 10/19/2012 | Plaintiff | 123-2013-0111 | 2011-1107 CA-23 | Renegade at Hialeah Blvd v. Dynatech Engineering | 11th Judicial Circuit Dade County, Florida (Hon. Patrick DeAlemeida) | Daniel Levin, Esq., Cole Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from prepaid lease modification. |
| 10/12/2012 | Defendant | 123-2012-0109 | 11-30189 CA21 | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | 11th Judicial Circuit Dade County, Florida | Craig Mirko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal; economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal |
| 8/20/2012 | Plaintiff | 123-2012-0012 | CA-02160 CA-25 | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egozi, etal | 11th Judicial Circuit Dade County, Florida | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012. |
| 8/15/2012 | Disclosed Dual Expert | 123-2012-0072 | | Vazquez v. Vazquez Matrimonial Matter | Matrimonial Mediation | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) marital assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Illinois, Bahamas |
| 7/2012 | Plaintiff | 109-2011-0172 | Pending: 2003-2014 | BASF Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Tax Court of New Jersey (Hon. Patrick DeAlemeida) | Phil Genuario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010-0172 | ATL-L-4451-08 | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Superior Court of New Jersey, Law Division Atlantic County | Jay Rhatican, Connell Foley on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations |
| 7/2011 | Defendant | 109-2010-0199 | MER-L-3034-08 | 460 Mercer Street, LLP and Bruckener Southern, LLC vs. Hightstown | Superior Court of New Jersey Mercer County | Anad Zarro Grimm & Aaron, P.C. Husam Chater | Litigation Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept.-Justice File 90-11-3-5801 | United States vs. Atlantic Wood Industries, Inc. | Federal District Court of Virginia | U.S. Department of Justice | Damage/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Westrust/HPC Mortgage Fund vs. City of Atlantic City | Tax Court of New Jersey | Cole, Schotz, Meisel, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |



M. Qualis: Graziano: Trial Lists

Anthony M. Graziano, MAI, CRE, FRICS
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF OF | IRR FILE # | COURT CASE NO | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2009 | Secured Creditor | 109-2009-0439 | | Erickson Building | US Bankruptcy Court - Southern District of Texas | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 09/2009 | Plaintiff | 109-2009-0123 | 3035-601 | Bay Head Yacht Club vs. Ocean County Tax Board | Tax Court of New Jersey | John Doyle, Carluccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 109-2008-XXX | INA (DEFS Pending) | Mirage Atlantic City (MAC) vs. City of Atlantic City | Tax Court of New Jersey | Hank Rovillard, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 08/2008 | Defendant | 109-2008-0252 | L-2424-05 | The City of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Superior Court of New Jersey Law Division, Middlesex County | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | 109-2008-345 | C.A. No. OCNL-3361-06 | Osbourne Associates, Melbourne Associates VI, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co., JAC Property Management etal and Eckerd Corporation | Superior Court of New Jersey, Law Division Ocean County | Francis X. Manning, Esq. Stradley Ronon Stevens & Young & Michael Canitoli, Esq. Partridge Snow & Hahn, both on behalf of | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 109-2008-0125- | N/A | Toms River Township vs. Ciba Geigy Corporation | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpenteli] | Mark Troncone, Esq., In-house Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | 109-2007-211 | L-000635-06 | Kyle Mosteller vs. Gaila Neeman | Superior Court of New Jersey, Law Division Middlesex County | Frank Caruso, Esq. Hoagland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Plaintiff | 109-2007-0134 | 3:07-CV-2322 | Silver Lakes Inc. vs. Township of Freehold Inc. | Superior Court of New Jersey, Chancery Division Monmouth County | Christopher Hanlon, Esq. Hanlon and Niemann | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee |
| 06/2007 | Plaintiff | 109-2007-0173 | | Laurelwood Homes, LLC vs. United States Department of Navy | Federal District Court of Virginia | William A. Shook Esq. | Leasehold interest in the property; breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 109-2006-0192 | CAM - L - 9731-05 | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Superior Court of New Jersey, Law Division, Camden County | Brett Last, Esq. O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 08/2006 | Defendant | 109-2006-0257 | | County Line & Browers Bridge, Jackson Township | Superior Court of New Jersey, Chancery Division, Ocean County | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 02/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Carl Brooks vs. K. Hovanian | Ocean Superior Court, Ocean County Courthouse | Ronan, Tuzzio & Giannone Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner, and the subject developer K. Hovanian @ Sea Oaks |
| 10/2005 | Defendant | 109-2005-0315 | OCN-L-1810-5 | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility of the state of New Jersey vs. AC1 Mainatawin, LLC family and Armstrong | Superior Court of New Jersey, Law Division Ocean County | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and tower by Atlantic City Electric |
| 09/2005 | Defendant | 109-2005-0214 | MON-L-2609-05 | Township of Howell vs. George Harms Construction Co., Inc. etal | Superior Court of New Jersey, Law Division Monmouth County | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 08/2003 | Defendant | 109-2003-0282 | | Giuffre vs. Giuffre | Superior Court of New Jersey Chancery Division, Family Part, Monmouth County | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the property for purposes of equitable distribution of marital assets |
| 07/2003 | Defendant | 109-2003-0203 | OCN-C-79-03 | West, etal vs. Pompaino, etal | Superior Court of New Jersey, Chancery Division, Ocean County | Stephen E. Smith, Esq. | To develop an opinion of the diminution in value due to a loss of useable land area |
| 06/2003 | Plaintiff | 109-2003-0149 | OCN-C-316-02 | Eugene M. Lord vs. Donald W. Rinaldo | Superior Court of New Jersey Law Division, Ocean County | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate of the property |
| 04/2003 | Plaintiff | 109-2003-0128 | FM-15-468-03-C | Vincent Urbank vs. Lisa Urbank | Superior Court of New Jersey, Chancery Division, Family Part Ocean County | Marianna Pontoriero, Esq. | Litigation-Matrimonial |
| 02/2002 | Plaintiff | 109-2002-0055 | | Shenandoah Mobile Home Park | | Winokis Mann, Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 04/2001 | Claimant | 109-2001-0169 | NJ-2624-00 | DeForest John Ely and Kimberle A. Ely, h/w | Superior Court of New Jersey, Chancery Division Middlesex County | First American Title Insurance Co. Jack Milks | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 03/1999 | Secured Creditors | 109-1999-0062 | | Georgetown Apartments | US Bankruptcy Court - District of Newark | Emmes & Co. Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | LKW-257-3186 | FM-15-1465-94 | Lisa Franklin, etal vs. Donald Franklin, etal | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1984 | Creditor | HUD-XX | | Hudson Marina Association vs. Emmes & Co. | US Bankruptcy Court - District of Newark | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium condition |

**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Wites, Marc & Jennifer**
Market Value - "As Remediated"
17625 Middlebrook Way
Boca Raton, Palm Beach County, Florida 33496
Client Reference: 4

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
January 1, 2019

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**Wites, Marc & Jennifer**
17625 Middlebrook Way
Boca Raton, Florida



Integra Realty Resources
Miami
Orlando
Southwest Florida

www.irr.com

In Miami
Dadeland Centre
9155 South Dadeland Blvd.
Suite 1208
Miami, FL 33156
(305) 670-0001

In Orlando
The Magnolia Building
326 N. Magnolia Ave.

Orlando, FL 32801
(407) 843-3377

In Naples/Sarasota
Horseshoe Professional Park
2770 Horseshoe Drive S.
Suite 3
Naples, FL 34104
(239)-643-6888

January 15, 2019


Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134


SUBJECT:        Market Value - "As Remediated"
                Case No 11-22408-Civ-COOKE
                United States District Court Southern District of Florida in the matter of
                Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
                similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
                Priority Claimant Case at:
                Wites, Marc & Jennifer
                17625 Middlebrook Way
                Boca Raton, Palm Beach County, Florida 33496
                Client Reference: 4
                IRR - Miami/Palm Beach File No. 123-2018-0275


Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the
referenced property as of the effective date assuming all remediation was completed by an
appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It
presents summary discussions of the data, reasoning, and analysis that were used in the appraisal
process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 460 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 182 of 989

Identification of Subject                                                                                    2

## Identification of Subject

The subject of this report is a single-family Mediterranean style home configured with 6 bedroom and 5.5 baths with 5,935 SF under air-conditioning. The subject property was built in 2006 and is located on a 10302 SF site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, January 1, 2019. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is January 15, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
| --- | --- |
| Sale Date (Most Recent) | June 8, 2007 |
| Seller | Pech, Jeffrey & Bari |
| Buyer | Wites, Marc & Jennifer |
| Sale Price | $1,600,000 |
| Recording Instrument Number | 20070292703 |
| Disposition Details | Both buyer & seller were unaware of defective drywall issue at TOS |

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

Wites, Marc & Jennifer



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 461 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 183 of 989

Definition of Retrospective Value Opinion                                                    3

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

## Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value.  Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation.  Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

(*Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org*)

## Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

(*Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org*)

## Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation.  The result of that study are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida."  The results of that study are incorporated by reference herein.

Wites, Marc & Jennifer



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 462 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/13/2019 Page 184 of 989

Scope of Work                                                                                                                        4

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation.  As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction.  Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation.  These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property.  This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections.  Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available.  In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis.  However, the damage analysis only represents a <u>portion of the overall damages</u> because we were specifically requested to exclude the consideration of the costs to cure.  This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to a "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report.  The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 463 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 185 of 989

Highest and Best Use                                                                 5

knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach. The valuations consider the only relevant approach for residential valuation, the sales comparison analysis. The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis. Additionally, this approach directly considered the prices of alternative properties having similar utility.

## Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant. The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

## Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report. This value us hypothetical since it assumes that defective drywall had never been present at the subject property.

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue. This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date. This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

Wites, Marc & Jennifer



The homeowner would also have to incur moving /storage costs twice, once before and once after remediation.  Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total.  This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value.  These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home.  Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered.  Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF               4 months

$150,000 - $750,000 home up to 4,000 SF         6 months

$750,000+ home up over 4,000 SF                 9 months

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).

Wites, Marc & Jennifer



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 465 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 187 of 989

Conclusion of Value                                                                      7

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

**Conclusions of Damage**

| | | | |
|---|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $1,500,000 | |
| Market Impairment Discount (As if Remediated) | | 10% | |
| Post Impairment Damage ($) | | $150,000 | |
| **Hypothetical Value As IF Remediated** | | **$1,350,000** | |
| **Post Remediation Damages as of Effective Date** | | **$150,000** | |
| Loss of Use: | | | |
| Rental Rate ($/Month) | **$8,250** | | |
| Moving & Storage Costs | | $3,000 | |
| Loss of Use Subject (# Months) | 9x | $74,250 | |
| Subject Total | | | **$77,250** |
| **Post Remediation Damage** | | | **$227,250** |

Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

The property owner reportedly remediated the home and continues to own the home. Therefore, the above damages relate to the home's current impairment assuming disclosure of prior detrimental condition in any future listings.

Wites, Marc & Jennifer



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 466 of 796
Case 1:11-cv-22408-MGC Document 273-3 Entered on FLSD Docket 08/15/2019 Page 188 of 989
Certification                                                                                            8

## Certification

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Carlos Fong has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 467 of 796
Case 1:11-cv-22408-MGC Document 273-9 Entered on FLSD Docket 08/15/2019 Page 189 of 989

Assumptions and Limiting Conditions                                                    9

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1.  The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2.  There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3.  There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4.  The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5.  The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6.  The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1.  An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2.  The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3.  No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4.  No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5.  Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6.  We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 468 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 140 of 989

Assumptions and Limiting Conditions                                                    10

7.    No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.    We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.    The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10.    Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11.    Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12.    Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13.    If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14.    Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15.    The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16.    The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17.    The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during

Wites, Marc & Jennifer



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 469 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 941 of
989

Assumptions and Limiting Conditions                                            11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18.    The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19.    The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20.    No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21.    The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22.    Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23.    The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24.    It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 470 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2017 Page 142 of 989

Assumptions and Limiting Conditions                                                                12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25.   Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26.   The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27.   All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

Wites, Marc & Jennifer



Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/02/19 Page 471 of 796
Case 1:11-cv-22408-MGC Document 273-5 Entered on FLSD Docket 08/15/2019 Page 143 of 989

Addenda

# Addenda



| Borrower | Marc & Jennifer Wites | | | | File No. | VALU-18-12-1469 |
|---|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |

## TABLE OF CONTENTS



USPAP Identification Addendum ........................................................................................................................ 1
Exterior-Only ............................................................................................................................................... 2
Additional Comparables 4-6 .......................................................................................................................... 8
Single Family Comparable Rent Schedule ....................................................................................................... 9
General Text Addendum ................................................................................................................................. 10
Subject Photos .............................................................................................................................................. 13
Comparable Photos 1-3 ................................................................................................................................. 14
Comparable Photos 4-6 ................................................................................................................................. 15
Rental Photos 1-3 ......................................................................................................................................... 16
Assessor Map ............................................................................................................................................... 17
Location Map ................................................................................................................................................ 18
Subject Aerial Map ....................................................................................................................................... 19
Assessor Data ............................................................................................................................................... 20
Tax Information ............................................................................................................................................ 21
License ......................................................................................................................................................... 22

## USPAP ADDENDUM

| Borrower | Marc & Jennifer Wites | | | | |
|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | |
| City | Boca Raton | County | Palm Beach | State FL | Zip Code 33496 |
| Lender | Integra Realty Resources (IRR) | | | | |

File No. VALU-18-12-1469

This report was prepared under the following USPAP reporting option:

☒ Appraisal Report      This report was prepared in accordance with USPAP Standards Rule 2-2(a).

☐ Restricted Appraisal Report      This report was prepared in accordance with USPAP Standards Rule 2-2(b).

**Reasonable Exposure Time**
My opinion of a reasonable exposure time for the subject property at the market value stated in this report is: 90-180 DAYS
EXPOSURE TIME: estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

USPAP 2018-19 Comment: Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market

**Additional Certifications**
I certify that, to the best of my knowledge and belief:

☒ I have NOT performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

☐ I HAVE performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no  personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

**Additional Comments**

APPRAISER COMPETENCY

An appraiser must determine, prior to accepting an assignment, that he or she can perform the assignment competently.  Competency requires:

1. the ability to properly identify the problem to be addressed; and
2. the knowledge and experience to complete the assignment competently; and
3. recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.

I am competent to perform this assignment based on my state appraiser license and familiarity with this type of property in the subject market

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations

**APPRAISER:**        *Carlos Fong*

Signature:
Name: Carlos Fong
Date Signed: 01/15/2019
State Certification #: RD 6782
or State License #:
State: FL
Expiration Date of Certification or License: 11/30/2020
Effective Date of Appraisal: 01/01/2019

**SUPERVISORY APPRAISER: (only if required)**

Signature:
Name:
Date Signed:
State Certification #:
or State License #:
State:
Expiration Date of Certification or License:
Supervisory Appraiser Inspection of Subject Property:
☐ Did Not    ☐ Exterior-only from Street    ☐ Interior and Exterior

## Exterior-Only Inspection Residential Appraisal Report

VALU-18-12-1469
File # VALU-18-12-1469

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| SUBJECT | | | | | |
|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | City | Boca Raton | State FL | Zip Code 33496 |
| Borrower | Marc & Jennifer Wites | Owner of Public Record | Marc & Jennifer Wites | County | Palm Beach |
| Legal Description | FOX HILL ESTATES OF BOCA RATON LT 114 | | | | |
| Assessor's Parcel # 00-42-46-31-01-000-1140 | | Tax Year 2017 | | R.E. Taxes $ 16,950 | |
| Neighborhood Name Fox Hill Estates of Boca Raton | | Map Reference 48424 | | Census Tract 0077.43 | |
| Occupant ☒ Owner ☐ Tenant ☐ Vacant | Special Assessments $ 0 | | ☐ PUD | HOA $ 0 | ☐ per year ☐ per month |
| Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe) | | | | | |
| Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Litigation | | | | | |
| Lender/Client Integra Realty Resources (IRR) | Address 9155 South Dadeland Boulevard, Miami, FL 33156 | | | | |
| Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? | | | | ☐ Yes ☒ No | |
| Report data source(s), offering price(s), and date(s). The subject has not listed or sold for the past 12 months per MIAMI MLS. | | | | | |

| CONTRACT | | | |
|---|---|---|---|
| I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. | | | |
| Contract Price $ | Date of Contract | Is the property seller the owner of public record? ☐ Yes ☐ No Data Source(s) | |
| Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No | | | |
| If Yes, report the total dollar amount and describe the items to be paid. | | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| NEIGHBORHOOD | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Neighborhood Characteristics** | | **One-Unit Housing Trends** | | | **One-Unit Housing** | | **Present Land Use %** | |
| Location | ☐ Urban ☒ Suburban ☐ Rural | Property Values | ☐ Increasing ☒ Stable ☐ Declining | | PRICE $ (000) | AGE (yrs) | One-Unit | 90 % |
| Built-Up | ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply | ☐ Shortage ☐ In Balance ☒ Over Supply | | 79 Low | 0 | 2-4 Unit | % |
| Growth | ☐ Rapid ☒ Stable ☐ Slow | Marketing Time | ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | 2,100 High | 40 | Multi-Family | 5 % |
| Neighborhood Boundaries The subject is bound to the north by Gulf Stream, to the west by FL Route 441, | | | | | 347 Pred. | 25 | Commercial | 5 % |
| to the east by Lyons Rd and to the south by Clint Moore Rd. | | | | | | | Other | 5 % |

Neighborhood Description There are no apparent factors that should affect the subject's marketability. The subject has access to all necessary supporting facilities including schools, shopping, recreation and employment centers.

Market Conditions (including support for the above conclusions) There is a slight oversupply of active listings. This will lead to higher marketing times, however, will not adversely effect the subject.

| SITE | | | | | | |
|---|---|---|---|---|---|---|
| Dimensions Per Palm Beach County Assr | | Area 10,302 sf | Shape Rectangular | View N;Res; | | |
| Specific Zoning Classification AGR-PUD | | Zoning Description Agricultural Reserve PUD (00-Unincorporated) | | | | |
| Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe) | | | | | | |
| Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe | | | | | | |
| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | | Public | Private |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street | Asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley | None | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No FEMA Flood Zone X FEMA Map # 12099C0965F FEMA Map Date 10/05/2017

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe

No observed or known adverse influences to market value were noted. Subject backs up to a plant farm/nursery, external obsolescence was not noted.

Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☒ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner
☐ Other (describe) Data Source for Gross Living Area Sefimapp

| IMPROVEMENTS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **General Description** | | **General Description** | | **Heating/Cooling** | | **Amenities** | | **Car Storage** | |
| Units ☒ One ☐ One with Accessory Unit | | ☐ Concrete Slab ☐ Crawl Space | | ☒ FWA ☐ HWBB | | Fireplace(s) # 0 | | ☐ None | |
| # of Stories 2 | | ☐ Full Basement ☐ Finished | | ☐ Radiant | | Woodstove(s) # 0 | | ☒ Driveway # of Cars 3 | |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | ☐ Partial Basement ☐ Finished | | ☐ Other | | ☒ Patio/Deck Patio | | Driveway Surface Pavers | |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Exterior Walls CBS | | Fuel Gas/Elec. | | ☒ Porch Entry | | ☒ Garage # of Cars 3 | |
| Design (Style) Mediterranean | | Roof Surface S-Tile | | ☒ Central Air Conditioning | | ☒ Pool Pool | | ☐ Carport # of Cars 0 | |
| Year Built 2006 | | Gutters & Downspouts Gutters | | ☐ Individual | | ☒ Fence Fence | | ☒ Attached ☐ Detached | |
| Effective Age (Yrs) 10 | | Window Type Sliders | | ☐ Other | | Other None | | ☐ Built-in | |
| Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☒ Washer/Dryer ☐ Other (describe) | | | | | | | | | |
| Finished area above grade contains: | 10 Rooms | 6 Bedrooms | 5.1 Bath(s) | 5,935 Square Feet of Gross Living Area Above Grade | | | | | |

Additional features (special energy efficient items, etc.). None

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.). C2;The subject was noted in average condition upon inspection. Subject is located in a gated community and access was not granted.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe.

There are no apparent external or functional inadequacies noted or reported at time of inspection. Physical depreciation is calculated by the modified age life method.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe.
The construction quality is typical for the area.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Exterior–Only Inspection Residential Appraisal Report

VALU-18-12-1469
File # VALU-18-12-1469

| | | | |
|---|---|---|---|
| There are | 25 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 899,000 to $ 9,490,000 . |
| There are | 18 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 920,000 to $ 2,100,000 . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 17625 Middlebrook Way | 17837 Key Vista Way | | 17768 Vecino Way | | 9398 Grand Estates Way | |
| | Boca Raton, FL 33496 | Boca Raton, FL 33496 | | Boca Raton, FL 33496 | | Boca Raton, FL 33496 | |
| Proximity to Subject | | 0.31 miles SE | | 0.71 miles SE | | 0.34 miles E | |
| Sale Price | $ | $ | 1,500,000 | $ | 1,600,000 | $ | 1,562,500 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 262.79 sq.ft. | | $ 251.37 sq.ft. | | $ 235.92 sq.ft. | |
| Data Source(s) | | SEF #R10417012;DOM 42 | | SEF #R10447451;DOM 75 | | SEF #R10420998;DOM 137 | |
| Verification Source(s) | | Assessor, Realist | | Assessor, Realist | | Assessor, Realist | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Cash;0 | | Cash;0 | | Cash;0 | |
| Date of Sale/Time | | s06/18;c05/18 | | s10/18;c09/18 | | s09/18;c08/18 | |
| Location | Residential | Residential | 0 | Residential | | Residential | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 10302 sf | 11326 sf | | 11269 sf | | 19589 sf | -46,435 |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | Mediterranean | Mediterranean | | Mediterranean | | Mediterranean | |
| Quality of Construction | Good | Good | | Good | | Good | |
| Actual Age | 13 | 13 | | 8 | 0 | 13 | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 10 6 5.1 | 9 5 5.1 | 0 | 10 5 6.2 | -30,000 | 10 5 6.2 | -30,000 |
| Gross Living Area | 5,935 sq.ft. | 5,708 sq.ft. | | 6,365 sq.ft. | | 6,623 sq.ft. | -68,800 |
| Basement & Finished | No Basement | No Basement | | No Basement | | No Basement | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | EFA/CAC | EFA/CAC | | EFA/CAC | | EFA/CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 3-Car Garage | 3-Car Garage | | 3-Car Garage | | 4-Car Garage | -20,000 |
| Porch/Patio/Deck | Porch/Patio | Blcs/Pto/Porch | 0 | Blcs/Pto/Porch | 0 | Blcs/Pto/Porch | 0 |
| Other | Pool | Pool | | Pool | | Pool | |
| Net Adjustment (Total) | | + - $ | 0 | + ☒ - $ | -30,000 | + ☒ - $ | -165,235 |
| Adjusted Sale Price | | Net Adj. 0.0 % | | Net Adj. 1.9 % | | Net Adj. 10.6 % | |
| of Comparables | | Gross Adj. 0.0 % $ | 1,500,000 | Gross Adj. 1.9 % $ | 1,570,000 | Gross Adj. 10.6 % $ | 1,397,265 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) MIAMI MLS, Palm Beach County Records, and Realist
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s) MIAMI MLS, Palm Beach County Records, and Realist
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist |
| Effective Date of Data Source(s) | 01/01/2019 | 01/01/2019 | 01/01/2019 | 01/01/2019 |

Analysis of prior sale or transfer history of the subject property and comparable sales Per public record, the Subject has not sold or transferred in the past 36 months.

Summary of Sales Comparison Approach See Attached Addendum

Indicated Value by Sales Comparison Approach $ 1,500,000

Indicated Value by: Sales Comparison Approach $ 1,500,000 Cost Approach (if developed) $ Income Approach (if developed) $

see attached addendum.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: No special conditions are noted.

Personal property is not included in this valuation.
Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 1,500,000 , as of 01/01/2019 , which is the date of inspection and the effective date of this appraisal.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1469
File # VALU-18-12-1469

| | |
|---|---|
| ADDITIONAL COMMENTS | PLEASE ATTACHED ADDENDUM FOR FURTHER INFORMATION |

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value) **Site value is estimated and/or supported by the sales comparison approach whenever data is available, otherwise extraction method is used.**

| COST APPROACH | | | | | | |
|---|---|---|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | | OPINION OF SITE VALUE | | | =$ | 150,000 |
| Source of cost data  N/A | | DWELLING | 5,935 Sq.Ft. @ $ | | =$ | |
| Quality rating from cost service  N/A  Effective date of cost data  N/A | | | 0 Sq.Ft. @ $ | | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | | | =$ | |
| The cost approach was not applied as the area is fully built up and there | | Garage/Carport | Sq.Ft. @ $ | | =$ | |
| is no vacant land available, except where an existing house will be torn | | Total Estimate of Cost-New | | | =$ | |
| down.  In addition, physical depreciation is often difficult to estimate for | | Less  Physical | Functional | External | | |
| homes over 5 years of age.  Although the Cost Approach could be | | Depreciation | | | =$( | ) |
| considered an applicable approach to value, it is not typically relied | | Depreciated Cost of Improvements | | | =$ | |
| upon by market participants for one to four family properties. | | "As-is" Value of Site Improvements | | | =$ | |
| Estimated Remaining Economic Life (HUD and VA only) | 50 Years | INDICATED VALUE BY COST APPROACH | | | = $ | |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| INCOME | | | | |
|---|---|---|---|---|
| Estimated Monthly Market Rent $ | 8,250 | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
| Summary of Income Approach (including support for market rent and GRM)  **The income approach is not applicable to this report as homes in the area are typically owner occupied.** | | | | |

### PROJECT INFORMATION FOR PUDs (if applicable)

| PUD INFORMATION | |
|---|---|
| Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No  Unit type(s) ☐ Detached ☐ Attached | |
| Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit. | |
| Legal Name of Project | |
| Total number of phases  Total number of units  Total number of units sold | |
| Total number of units rented  Total number of units for sale  Data source(s) | |
| Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion | |
| Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source(s) | |
| Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion. | |
| Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options. | |
| Describe common elements and recreational facilities. | |

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1469
File # VALU-18-12-1469

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK:   The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE:   The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER:   The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE:   The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:   The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

VALU-18-12-1469
File # VALU-18-12-1469

**Exterior-Only Inspection Residential Appraisal Report**

APPRAISER'S CERTIFICATION:    The  Appraiser  certifies  and  agrees  that:

1.  I  have,  at  a  minimum,  developed  and  reported  this  appraisal  in  accordance  with  the  scope  of  work  requirements  stated  in this  appraisal  report.

2.  I  performed  a  visual  inspection  of  the  exterior  areas  of  the  subject  property  from  at  least  the  street.  I  reported  the  condition of  the  improvements  in  factual,  specific  terms.  I  identified  and  reported  the  physical  deficiencies  that  could  affect  the  livability, soundness,  or  structural  integrity  of  the  property.

3.  I  performed  this  appraisal  in  accordance  with  the  requirements  of  the  Uniform  Standards  of  Professional  Appraisal Practice  that  were  adopted  and  promulgated  by  the  Appraisal  Standards  Board  of  The  Appraisal  Foundation  and  that  were  in place  at  the  time  this  appraisal  report  was  prepared.

4.  I  developed  my  opinion  of  the  market  value  of  the  real  property  that  is  the  subject  of  this  report  based  on  the  sales comparison  approach  to  value.  I  have  adequate  comparable  market  data  to  develop  a  reliable  sales  comparison  approach for  this  appraisal  assignment.  I  further  certify  that  I  considered  the  cost  and  income  approaches  to  value  but  did  not  develop them,  unless  otherwise  indicated  in  this  report.

5.  I  researched,  verified,  analyzed,  and  reported  on  any  current  agreement  for  sale  for  the  subject  property,  any  offering  for sale  of  the  subject  property  in  the  twelve  months  prior  to  the  effective  date  of  this  appraisal,  and  the  prior  sales  of  the  subject property  for  a  minimum  of  three  years  prior  to  the  effective  date  of  this  appraisal,  unless  otherwise  indicated  in  this  report.

6.  I  researched,  verified,  analyzed,  and  reported  on  the  prior  sales  of  the  comparable  sales  for  a  minimum  of  one  year  prior to  the  date  of  sale  of  the  comparable  sale,  unless  otherwise  indicated  in  this  report.

7.  I  selected  and  used  comparable  sales  that  are  locationally,  physically,  and  functionally  the  most  similar  to  the  subject  property.

8.  I  have  not  used  comparable  sales  that  were  the  result  of  combining  a  land  sale  with  the  contract  purchase  price  of  a  home  that has  been  built  or  will  be  built  on  the  land.

9.  I  have  reported  adjustments  to  the  comparable  sales  that  reflect  the  market's  reaction  to  the  differences  between  the  subject property  and  the  comparable  sales.

10.  I  verified,  from  a  disinterested  source,  all  information  in  this  report  that  was  provided  by  parties  who  have  a  financial  interest  in the  sale  or  financing  of  the  subject  property.

11.  I  have  knowledge  and  experience  in  appraising  this  type  of  property  in  this  market  area.

12.  I  am  aware  of,  and  have  access  to,  the  necessary  and  appropriate  public  and  private  data  sources,  such  as  multiple  listing services,  tax  assessment  records,  public  land  records  and  other  such  data  sources  for  the  area  in  which  the  property  is  located.

13.  I  obtained  the  information,  estimates,  and  opinions  furnished  by  other  parties  and  expressed  in  this  appraisal  report  from reliable  sources  that  I  believe  to  be  true  and  correct.

14.  I  have  taken  into  consideration  the  factors  that  have  an  impact  on  value  with  respect  to  the  subject  neighborhood,  subject property,  and  the  proximity  of  the  subject  property  to  adverse  influences  in  the  development  of  my  opinion  of  market  value.  I have  noted  in  this  appraisal  report  any  adverse  conditions  (such  as,  but  not  limited  to,  needed  repairs,  deterioration,  the presence  of  hazardous  wastes,  toxic  substances,  adverse  environmental  conditions,  etc.)  observed  during  the  inspection  of  the subject  property  or  that  I  became  aware  of  during  the  research  involved  in  performing  this  appraisal.  I  have  considered  these adverse  conditions  in  my  analysis  of  the  property  value,  and  have  reported  on  the  effect  of  the  conditions  on  the  value  and marketability  of  the  subject  property.

15.  I  have  not  knowingly  withheld  any  significant  information  from  this  appraisal  report  and,  to  the  best  of  my  knowledge,  all statements  and  information  in  this  appraisal  report  are  true  and  correct.

16.  I  stated  in  this  appraisal  report  my  own  personal,  unbiased,  and  professional  analysis,  opinions,  and  conclusions,  which are  subject  only  to  the  assumptions  and  limiting  conditions  in  this  appraisal  report.

17.  I  have  no  present  or  prospective  interest  in  the  property  that  is  the  subject  of  this  report,  and  I  have  no  present  or prospective  personal  interest  or  bias  with  respect  to  the  participants  in  the  transaction.  I  did  not  base,  either  partially  or completely,  my  analysis  and/or  opinion  of  market  value  in  this  appraisal  report  on  the  race,  color,  religion,  sex,  age,  marital status,  handicap,  familial  status,  or  national  origin  of  either  the  prospective  owners  or  occupants  of  the  subject  property  or  of  the present  owners  or  occupants  of  the  properties  in  the  vicinity  of  the  subject  property  or  on  any  other  basis  prohibited  by  law.

18.  My  employment  and/or  compensation  for  performing  this  appraisal  or  any  future  or  anticipated  appraisals  was  not conditioned  on  any  agreement  or  understanding,  written  or  otherwise,  that  I  would  report  (or  present  analysis  supporting)  a predetermined  specific  value,  a  predetermined  minimum  value,  a  range  or  direction  in  value,  a  value  that  favors  the  cause  of any  party,  or  the  attainment  of  a  specific  result  or  occurrence  of  a  specific  subsequent  event  (such  as  approval  of  a  pending mortgage  loan  application).

19.  I  personally  prepared  all  conclusions  and  opinions  about  the  real  estate  that  were  set  forth  in  this  appraisal  report.  If  I relied  on  significant  real  property  appraisal  assistance  from  any  individual  or  individuals  in  the  performance  of  this  appraisal or  the  preparation  of  this  appraisal  report,  I  have  named  such  individual(s)  and  disclosed  the  specific  tasks  performed  in  this appraisal  report.  I  certify  that  any  individual  so  named  is  qualified  to  perform  the  tasks.  I  have  not  authorized  anyone  to  make a  change  to  any  item  in  this  appraisal  report;  therefore,  any  change  made  to  this  appraisal  is  unauthorized  and  I  will  take  no responsibility  for  it.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1469
File # VALU-18-12-1469

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature *Carlos Fong* | Signature |
| Name  Carlos Fong | Name |
| Company Name  Valucentric LLC | Company Name |
| Company Address  7908 Montecito Pl, Delray Beach, FL 33446 | Company Address |
| Telephone Number  (844) 825-8236 | Telephone Number |
| Email Address  info@valucentric.com | Email Address |
| Date of Signature and Report  01/15/2019 | Date of Signature |
| Effective Date of Appraisal  01/01/2019 | State Certification # |
| State Certification #  RD 6782 | or State License # |
| or State License # | State |
| or Other (describe)  State #  | Expiration Date of Certification or License |
| State  FL | |
| Expiration Date of Certification or License  11/30/2020 | SUBJECT PROPERTY |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did not inspect exterior of subject property |
| 17625 Middlebrook Way | ☐ Did inspect exterior of subject property from street |
| Boca Raton, FL 33496 | Date of Inspection |
| APPRAISED VALUE OF SUBJECT PROPERTY $  1,500,000 | |
| LENDER/CLIENT | COMPARABLE SALES |
| Name  Integra Realty Resources (IRR) | ☐ Did not inspect exterior of comparable sales from street |
| Company Name  Integra Realty Resources (IRR) | ☐ Did inspect exterior of comparable sales from street |
| Company Address  9155 South Dadeland Boulevard, Miami, FL 33156 | Date of Inspection |
| Email Address | |

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Exterior-Only Inspection Residential Appraisal Report

VALU-18-12-1469
File # VALU-18-12-1469

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 17625 Middlebrook Way | 9439 Grand Estates Way | | 9509 Grand Estates Way | | | |
| | Boca Raton, FL 33496 | Boca Raton, FL 33496 | | Boca Raton, FL 33496 | | | |
| Proximity to Subject | | 0.32 miles E | | 0.24 miles E | | | |
| Sale Price | $ | $ 1,512,500 | | $ 1,480,000 | | $ | |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 231.59 sq.ft. | | $ 249.16 sq.ft. | | $ sq.ft. | |
| Data Source(s) | | SEF #R10390472;DOM 45 | | SEF #R10438257;DOM 40 | | | |
| Verification Source(s) | | Assessor, Realist | | Assessor, Realist | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | + (-) Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | | |
| Concessions | | Cash;0 | | Conv;0 | | | |
| Date of Sale/Time | | s03/18;c02/18 | | s08/18;c07/18 | | | |
| Location | Residential | Residential | | Residential | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | | |
| Site | 10302 sf | 14745 sf | -22,215 | 16705 sf | -32,015 | | |
| View | Residential | Residential | | Residential | | | |
| Design (Style) | Mediterranean | Mediterranean | | Mediterranean | | | |
| Quality of Construction | Good | Good | | Good | | | |
| Actual Age | 13 | 13 | | 13 | | | |
| Condition | Good | Average | +150,000 | Good | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 10 6 5.1 | 11 6 7.2 | -50,000 | 10 5 5.1 | 0 | | |
| Gross Living Area | 5,935 sq.ft. | 6,531 sq.ft. | -59,600 | 5,940 sq.ft. | | sq.ft. | |
| Basement & Finished | No Basement | No Basement | | No Basement | | | |
| Rooms Below Grade | None | None | | None | | | |
| Functional Utility | Average | Average | | Average | | | |
| Heating/Cooling | EFA/CAC | EFA/CAC | | EFA/CAC | | | |
| Energy Efficient Items | None | None | | None | | | |
| Garage/Carport | 3-Car Garage | 4-Car Garage | -20,000 | 3-Car Garage | | | |
| Porch/Patio/Deck | Porch/Patio | Blcs/Pto/Porch | 0 | Blcs/Pto/Porch | 0 | | |
| Other | Pool | Pool | | Pool | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - $ | -1,815 | ☐ + ☒ - $ | -32,015 | ☐ + ☐ - $ | |
| Adjusted Sale Price | | Net Adj. 0.1 % | | Net Adj. 2.2 % | | Net Adj. 0.0 % | |
| of Comparables | | Gross Adj. 20.0 % $ | 1,510,685 | Gross Adj. 2.2 % $ | 1,447,985 | Gross Adj. 0.0 % $ | |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist | |
| Effective Date of Data Source(s) | 01/01/2019 | 01/01/2019 | 01/01/2019 | |

Analysis of prior sale or transfer history of the subject property and comparable sales   9398 Grand Estates Way has no 12-month prior transfer history. 9439
Grand Estates Way has no 12-month prior transfer history. 9509 Grand Estates Way has no 12-month prior transfer history.

Analysis/Comments

Freddie Mac Form 2055 March 2005

Fannie Mae Form 2055 March 2005

Form 2055.(AC) - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## SINGLE FAMILY COMPARABLE RENT SCHEDULE

VALU-18-12-1469
File # VALU-18-12-1469

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property. Adjustments should be made only for items of significant difference between the comparables and the subject property.

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 17625 Middlebrook Way<br>Boca Raton, FL 33496 | 17637 Circle Pond Ct<br>Boca Raton, FL 33496 | | 17642 Middlebrook Way<br>Boca Raton, FL 33496 | | 17697 Middlebrook Way<br>Boca Raton, FL 33496 | |
| Proximity to Subject | | 0.13 miles W | | 0.04 miles SE | | 0.13 miles E | |
| Date Lease Begins | | 04/17 | | 05/17 | | 08/17 | |
| Date Lease Expires | | Unk | | Unk | | Unk | |
| Monthly Rental | If Currently<br>Rented: $ | $         8,500 | | $         8,500 | | $         8,000 | |
| Less: Utilities<br>Furniture | $ | $ | | $ | | $ | |
| Adjusted<br>Monthly Rent | $ | $         8,500 | | $         8,500 | | $         8,000 | |
| Data Source | MLS,Inspection<br>Assessor,Realist | MLS #R10319032<br>Assessor, Realist | | MLS #R10317508<br>Assessor, Realist | | MLS #R10363320<br>Assessor, Realist | |
| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Rent<br>Concessions | | | | | | | |
| Location/View | Residential<br>Residential | N;Res;<br>N;Res; | | N;Res;<br>N;Res; | | N;Res;<br>N;Res; | |
| Design and Appeal | Mediterranean | DT2;Mediterranean | | DT2;Mediterranean | | DT2;Mediterranean | |
| Age/Condition | 13<br>Good | 13<br>C2 | | 16<br>C2 | | 14<br>C2 | |
| Above Grade<br>Room Count | Total Bdrms Baths<br>10   6   5.1 | Total Bdrms Baths<br>11   6   6.2 | | Total Bdrms Baths<br>10   6   6.1 | | Total Bdrms Baths<br>9   5   5.1 | |
| Gross Living Area | 5,935 Sq. Ft. | 6,538 Sq. Ft. | | 5,188 Sq. Ft. | | 5,511 Sq. Ft. | |
| Other (e.g., basement,<br>etc.) | No Basement<br>None | 0sf | | 0sf | | 0sf | |
| Other: | | | | | | | |
| Net Adj. (total) | | + − $ | 0 | + − $ | 0 | + − $ | 0 |
| Indicated Monthly<br>Market Rent | | $         8,500 | | $         8,500 | | $         8,000 | |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)    Rentals of comparable style dwellings ranged from $8,000 to $8,500.

Final Reconciliation of Market Rent:    All rentals were taken into the final consideration. The opinion of market rent is $8,250

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF     01/01/2019     TO BE $     8,250

Appraiser(s) SIGNATURE     *Carlos Fong*                    Review Appraiser  SIGNATURE
NAME  Carlos Fong                                           (If applicable)  NAME
Certified Residential Appraiser
Date Property Inspected  01/01/2019   Report Signed  01/15/2019      Date Property Inspected           Report Signed
License or Certification #  RD 6782    State  FL                     License or Certification #                    State
Expiration Date of License or Certification  11/30/2020              Expiration Date of License or Certification
                                                                    Review Appraiser  ☐ Did  ☐ Did Not  Inspect Subject Property

Freddie Mac Form 1000  (8/88)                                                           Fannie Mae Form 1007  (8/88)

Form 1007 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Supplemental Addendum**

File No. VALU-18-12-1469

| Borrower | Marc & Jennifer Wites | | | | | | | |
|----------|----------------------|--|--|--|--|--|--|--|
| Property Address | 17625 Middlebrook Way | | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | | |

**PURPOSE OF APPRAISAL REPORT**

The purpose of this appraisal is to estimate the market value of the subject property as defined herein. The function of the appraisal is to assist the above-named Lender/Client, its successors and/or assigns, in evaluating the subject property for lending purposes. This is a federally regulated transaction. Additional supporting data can be found in our appraiser work file.

It is assumed that the title to this property is good and marketable. No title search has been made, nor have we attempted to determine ownership of the property. The value estimate is given without regard to any questions of title, boundaries, or encroachments. It is assumed that all assessments are paid. We assume the property to be free and clear of liens and encumbrances except as noted.

The legal description, if included herein, should be verified by legal counsel before being relied upon or used in any conveyance or other document.

We are not familiar with any engineering studies made to determine the bearing capacity of the land. Improvements in the area appear to be structurally sound. It is therefore assumed that soil and subsoil conditions are stable unless specifically outlined in this report.

Any exhibits in the report are intended to assist the reader in visualizing the property and its surroundings. The drawings are not intended as surveys and no responsibility is assumed for their cartographic accuracy. Drawings are not intended to be exact in size, scale or detail.

Areas and dimensions of the property were physically measured. If data is furnished by the principal or from plot plans or surveys furnished by the principal, or from public records, we assume it to be reasonably accurate. In the absence of current surveys, land areas may be based upon representations made by the owner's agents or the client. No attempt has been made to render an opinion or determine the status of easements that may exist. No responsibility is assumed for discrepancies that may become evident from a licensed survey of the premises.

The value estimate involves only the real estate and all normal building equipment if any improvements are involved. No consideration was given to personal property, (or special equipment), unless stated.

It is assumed that the property is subject to lawful, competent and informed ownership and management unless noted.

Information in this report concerning market data was obtained from buyers, sellers, brokers, attorneys, trade publications or public records. To the extent possible, this information was examined for accuracy and is believed to be reliable. Dimensions, areas or data obtained from others is believed correct; however, no guarantee is made.

Any information, in whatever form, furnished by others is believed to b e reliable; however, no responsibility is assumed for accuracy.

The separate allocations between land and improvements, if applicable, represents our judgment only under the existing utilization of the property. A re-evaluation should be made if the improvements are removed or substantially altered, and the land utilized for another purpose.

All information and comments concerning the location, neighborhood trends, construction quality and costs, loss in value from whatever cause, condition, rents, or any other data for the property appraised herein, represents the estimates and opinions of the appraiser formed after an examination and study of the property.

Any valuation analysis of the income stream has been predicted upon financing conditions as specified herein, which we have reason to believe are currently available for this property. Financing terms and conditions other than those indicated may alter the final value conclusions.

The appraiser is not required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless arrangements have been made previously thereto. If the appraiser (s) is subpoenaed pursuant to court order, the client will be required to compensate said appraiser(s) for his/her time at his/her regular hourly rates, plus expenses.

All opinions, as to values stated, are presented as the appraiser's considered opinion based on the information set forth in the report and his experience. We assume no responsibility for changes in market conditions or for the inability of the client or any other party to achieve their desired results based upon the appraised value. Further, some of the assumptions made can be subject to variation depending upon evolving events. We realize some assumptions may never occur and unanticipated events or circumstances may occur. Therefore, actual results achieved during the projection period may vary from those in this report.

The appraisal assignment was not based on developing or reporting predetermined results, or a requested minimum valuation, a specific valuation, or the approval of a loan.

Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of:  USPAP Uniform Standards of Professional Appraisal Practice, and SPP-AI Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute; and, except as noted in the Scope of Appraisal, in conformity with specific implementation rules of the following agencies:

FIRREA Title XI of the Financial Institutions Reform, Recovery and Enforcement Act and section 5(b) of the Bank Company Holding Act;  FRB – Federal Reserve Board; RTC-Resolution Trust Corporation; OTS-Office of Thrift Supervision; FDIC – Federal Deposit Insurance Corporation; OTC – Office of the Comptroller; NCUA – National Credit Union Association.

**THE APPRAISER HAS PREPARED THIS APPRAISAL IN FULL COMPLIANCE WITH THE APPRAISAL INDEPENDENCE REQUIREMENTS AND HAS NOT PERFORMED, PARTICIPATED IN, OR BEEN ASSOCIATED WITH ANY ACTIVITY IN VIOLATION OF AIR.**

**AT THE REQUEST OF THE CLIENT, THIS APPRAISAL REPORT HAS BEEN PREPARED IN COMPLIANCE WITH THE**

**Supplemental Addendum**

File No. VALU-18-12-1469

| Borrower | Marc & Jennifer Wites | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |

**UNIFORM APPRAISAL DATASET (UAD) FROM FANNIE MAE AND FREDDIE MAC. THE UAD REQUIRES THE APPRAISER TO USE STANDARDIZED RESPONSES THAT INCLUDE SPECIFIC FORMATS, DEFINITIONS, ABBREVIATIONS, AND ACRONYMS.**

We do not authorize the out-of-context quoting from or partial reprinting of this appraisal report.  Further, neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser nor the name of the firm which he is connected, shall be reproduced, published, or disseminated to the public through advertising media, public relations media, news media, or another public means of communication, without the prior written consent of the appraiser signing this report.

Adobe's Distiller software or equivalent may be utilized by appraiser to transmit this encrypted PDF-formatted appraisal.  At a minimum, the software contains the following security measure:

- identifies transmission error during the transmission process, and confirms date, time and quantity of data submitted by appraiser and the date, time and quantity of data received by the Client, and/or its assigns and
- secures data from editing by means of a password, hardware device, or other means that remains in the sole control of the transmitting appraiser.

**THIRTY SIX MONTH LISTING HISTORY**

We are not aware of any prior listings pertaining to the subject property in the past three years as researched through the local Multiple Listing Service.

**NEIGHBORHOOD MARKET CONDITIONS**

No discounts, buy downs or other concessions were noted.  Current 30 year fixed rate financing at 4.5 - 5.5% and 0-2 points.

Stricter Lending Standards and the availability of Mortgage Capital may affect the average sales prices in the area, however, given the market data analyzed by the appraiser, there are no fiscal or economic trends expected to occur that would significantly impact the relatively stable market currently experienced in this neighborhood.

Neighborhood conditions can be found in detail in the attached 1004MC form.

**SITE COMMENTS**

This site is very typical of the neighborhood in terms of size, topography, view and general appeal.  It provides a suitable setting for the improvements and is consistent with market expectations in this price range.  Statements regarding zoning compliance are intended only in the most general sense.  Zoning and building ordinances vary significantly from one municipality to another and can be extremely detailed.  The scope of this assignment does not include a comparison of every potentially significant characteristic of the subject property's site and improvements relative to zoning and building ordinances.  Unless otherwise noted, standard utility and right-of-way easements are insignificant to value.  However, a current locational or boundary survey or title report may reveal encroachments, easements, zoning violations or other matters of interest that could warrant modification of the appraised value.

**COMMENTS REGARDING HIGHEST AND BEST USE**

In compliance with USPAP the following is included in the appraisal;
•	The current use of the real estate as of the date of value is Residential as described in the improvements section of this appraisal.

•	The use of the real estate reflected in this appraisal is as currently improved

•	The rationale and support for the opinion of highest and best use developed for this assignment is as per below:
Highest and Best Use is defined as "The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property-specific with respect to the user and timing of the use-that is adequately supported and results in the highest present value"
Source: Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Appraisal Institute, 2010).
The highest and best use analysis is a critical step in the valuation process.  The comparable properties incorporated into the appraisal are directly affected by the highest and best use analysis. The analysis is based on the use that a hypothetical purchaser would make of the property based on the four tests cited above:
•	Legally Permissible
•	Physically Possible
•	Financially Feasible
•	Maximally Productive

After consideration of the above criteria it has been determined that the current improvements continue to contribute to the total market value of the property and the return from a new improvement would not currently offset the cost of demolishing the existing improvements and constructing a new one.   Therefore, the highest and best use is as improved.

**COMMENTS ON SALES COMPARISON APPROACH**

All comparables provided strong support.  The most weight, and opinion of value fell on comparable 1, for requiring zero adjustments.

Comparables were adjusted for their differences in lot square footages, overall condition, above grade bathroom count, gross living area, and parking.  Gross living area adjustments were made at $100 per square foot.  Comparables within 10% of the subject property did not warrant an adjustment.  Lot adjustments were made at $5 per square foot.  No lot size adjustments were warranted for lot size differences within 30% of the subject lot size as no market data exists to support an adjustment.

**Supplemental Addendum**

File No. VALU-18-12-1469

| Borrower | Marc & Jennifer Wites | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

The remaining adjustments are indicated on the sales comparison grid.

ALL ADJUSTMENTS WERE DERIVED FROM THE SUBJECT MARKET AND THE APPRAISERS EXPERTISE IN THE MARKET PLACE.

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations.

All comparables are located within the subject's neighborhood boundaries. No geographic boundaries were crossed.

It should be noted that the estimated value of the subject exceeds the predominate value in the subject neighborhood. This will not have a negative effect on the marketability of the subject property. The subject property is in no way an over improvement for the market area.

**RECONCILIATION**

The sales comparison approach was considered most applicable for the subject property because a typical buyer or seller would most readily understand and apply this approach. The income approach was not considered applicable due to the fact that the majority of housing stock in the area is owner occupied and not typically used for investment property. The cost approach was not completed due to the age of the subject and the subjectivity in estimating depreciation and because the typical buyer does not base price points on the cost approach. The quality of available data utilized in the Sales comparison Approach was considered adequate.

**EXTERIOR INSPECTION ADDENDA**

The appraiser has been requested to perform an appraisal based on an exterior only inspection and not to disturb the occupants by entering the building. The physical characteristics used to develop this appraisal are based on the assessment records of Palm Beach County, Florida and on the multiple listing service. The subject property was observed from the public street as of the effective date of the appraisal. On the basis of the observed conditions, the assessment records and multiple listing service information appear to be accurate. For the purposes of this appraisal, it is assumed that the interior condition of the subject property is consistent with the exterior conditions as observed and that the information concerning the interior condition as provided by the assessor's records and the multiple listing service is accurate.

**PHYSICAL DEFICIENCIES OR ADVERSE CONDITIONS**

Unless otherwise stated in this report, the existence of hazardous material and/or electromagnetic emission, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no such knowledge of the existence of such materials on or in the subject property, or in the properties of the subject neighborhood. The appraiser is not qualified to detect such substances. The presence of such substances as asbestos, urea formaldehyde foam insulation, radon, mold, or other potentially hazardous material may affect the value of the property. The value estimate expressed is predicated on the assumption that there is no such material in or on the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required discovering them. The customer is urged to retain an expert in this field.

Dwellings built prior to 1978 may contain lead-based paint.

**MOLD**

The appraiser is not a home or environmental inspector. The appraiser provides an opinion of value. The appraisal does not guarantee that the property is free of defects or environmental problems. The appraiser performs an inspection of visible and accessible areas only. Mold may be present in areas the appraiser cannot see. A professional home inspection or environmental inspection is recommended.

**CONCLUSION**

This is an Appraisal Report which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for an Appraisal Report. As such, it presents only minimal discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's file. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein. The appraiser is not responsible for unauthorized use of this report.

## Subject Photo Page

| Borrower | Marc & Jennifer Wites | | | | |
|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | |



**Subject Front**

| | |
|---|---|
| 17625 Middlebrook Way | |
| Sales Price | |
| Gross Living Area | 5,935 |
| Total Rooms | 10 |
| Total Bedrooms | 6 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Residential |
| Site | 10302 sf |
| Quality | Good |
| Age | 13 |



**Subject Rear**



**Subject Street**

## Comparable Photo Page

| Borrower | Marc & Jennifer Wites | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



### Comparable 1
17837 Key Vista Way
| | |
|---|---|
| Prox. to Subject | 0.31 miles SE |
| Sales Price | 1,500,000 |
| Gross Living Area | 5,708 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Residential |
| Site | 11326 sf |
| Quality | Good |
| Age | 13 |



### Comparable 2
17768 Vecino Way
| | |
|---|---|
| Prox. to Subject | 0.71 miles SE |
| Sales Price | 1,600,000 |
| Gross Living Area | 6,365 |
| Total Rooms | 10 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | Residential |
| View | Residential |
| Site | 11269 sf |
| Quality | Good |
| Age | 8 |



### Comparable 3
9398 Grand Estates Way
| | |
|---|---|
| Prox. to Subject | 0.34 miles E |
| Sales Price | 1,562,500 |
| Gross Living Area | 6,623 |
| Total Rooms | 10 |
| Total Bedrooms | 5 |
| Total Bathrooms | 6.2 |
| Location | Residential |
| View | Residential |
| Site | 19589 sf |
| Quality | Good |
| Age | 13 |

**Comparable Photo Page**

| Borrower | Marc & Jennifer Wites | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



### Comparable 4

9439 Grand Estates Way

| | |
|---|---|
| Prox. to Subject | 0.32 miles E |
| Sales Price | 1,512,500 |
| Gross Living Area | 6,531 |
| Total Rooms | 11 |
| Total Bedrooms | 6 |
| Total Bathrooms | 7.2 |
| Location | Residential |
| View | Residential |
| Site | 14745 sf |
| Quality | Good |
| Age | 13 |



### Comparable 5

9509 Grand Estates Way

| | |
|---|---|
| Prox. to Subject | 0.24 miles E |
| Sales Price | 1,480,000 |
| Gross Living Area | 5,940 |
| Total Rooms | 10 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Residential |
| Site | 16705 sf |
| Quality | Good |
| Age | 13 |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sales Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

# Rental Photo Page

| Borrower | Marc & Jennifer Wites | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



### Rental 1

17637 Circle Pond Ct

| | |
|---|---|
| Proximity to Subject | 0.13 miles W |
| Adj. Monthly Rent | 8,500 |
| Gross Living Area | 6,538 |
| Total Rooms | 11 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | N;Res; |
| View | N;Res; |
| Condition | C2 |
| Age/Year Built | 13 |



### Rental 2

17642 Middlebrook Way

| | |
|---|---|
| Proximity to Subject | 0.04 miles SE |
| Adj. Monthly Rent | 8,500 |
| Gross Living Area | 5,188 |
| Total Rooms | 10 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.1 |
| Location | N;Res; |
| View | N;Res; |
| Condition | C2 |
| Age/Year Built | 16 |



### Rental 3

17697 Middlebrook Way

| | |
|---|---|
| Proximity to Subject | 0.13 miles E |
| Adj. Monthly Rent | 8,000 |
| Gross Living Area | 5,511 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.1 |
| Location | N;Res; |
| View | N;Res; |
| Condition | C2 |
| Age/Year Built | 14 |

**Assessor Map**

| Borrower | Marc & Jennifer Wites | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



## Location Map

| Borrower | Marc & Jennifer Wites | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



## Subject Aerial Map

| Borrower | Marc & Jennifer Wites | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



## Assessor Data

| Borrower | Marc & Jennifer Wites | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

# Tax Information

| Borrower | Marc & Jennifer Wites | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

---

1/3/2019    Southeast Florida MLS - Palm Beach County Tax Report - 17625 MIDDLEBROOK WAY, BOCA RATON, FL 33496-1021



**Southeast Florida MLS - IMAPP**
Palm Beach County Tax Report - 17625 MIDDLEBROOK WAY, BOCA RATON, FL 33496-1021

## PROPERTY INFORMATION

**PID #** 00-42-46-31-01-000-1140
**Property Type:** Residential
**Property Address:**
17625 MIDDLEBROOK WAY
BOCA RATON, FL 33496-1021
**Current Owner:**
MARC WITES
JENNIFER WITES
**Tax Mailing Address:**
17625 MIDDLEBROOK WAY
BOCA RATON, FL 33496-1021
**Phone Number:**
( ) 470-6098
(see phone use disclaimer below)

**Use Code:** 01 / SINGLE FAMILY
RESIDENTIAL
**Total Land Area:**
0.2365 acres / 10,303 sf
**Land Areas:**
1. SFR (0100)
**Zoning:** AGR-PUD/AGRICULTURAL
RESERVE PLANNED UNIT
DEVELOPMENT DISTRICT
**Frontage:** 76 ft
**Waterfront:** No
**Subdivision:**
FOX HILL ESTATES OF BOCA RATON
**Census Tract/Block:** 007743 / 1004
**Twn:** 46S / **Rng:** 42E / **Sec:** 31
**Block:** 000 / **Lot:** 1140
**Latitude:** 26.415792
**Longitude:** -80.199045
**Legal Description:**
FOX HILL ESTATES OF BOCA RATON LT 114



Residential Commercial
Agricultural Industrial
Government Other
Water Condo

Active    Sold    Pending    Withdrawn    Expired

Foreclosures

## VALUE INFORMATION

| | | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| **Improved Value:** | | $927,871 | $1,007,479 | $883,413 | $872,706 | $903,692 |
| | Land Value: | $180,000 | $135,000 | $141,750 | $155,925 | $140,333 |
| | Just Market Value: | $1,107,871 | $1,142,479 | $1,025,163 | $1,028,631 | $1,044,025 |
| | Percent Change: | - n/a - | 3.12% | -10.27% | 0.34% | 1.5% |
| | Total Assessed Value: | $953,397 | $961,024 | $967,751 | $988,074 | $988,074 |
| | Homestead Exemption: | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| | Total Exemptions: | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| | Taxable Value: | $903,397 | $911,024 | $917,751 | $938,074 | $958,824 |
| | Ad Valorem Taxes: | $17,174.27 | $17,127.09 | $16,678.74 | $16,585.80 | $16,665.85 |
| | Non-Ad Valorem Taxes: | $361.00 | $357.00 | $360.50 | $364.00 | $393.50 |
| | Total Tax Amount: | $17,535.27 | $17,484.09 | $17,039.24 | $16,949.80 | $17,059.35 |

**Taxing District(s):** 00355 - UNINCORPORATED COUNTY(355)
**\*Non-Ad Valorem** SOLID WASTE AUTHORITY OF PBC ($316.00) LAKE WORTH DRAINAGE DISTRICT MAINT ($48.00)
**Levies:**

Link To County Tax Collector

http://sef.imapp.com/ilinks/property?upin=US120990004246310100001140    1/2

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 494 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 166 of 1899
License

| Borrower | Marc & Jennifer Wites | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 17625 Middlebrook Way | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



RICK SCOTT, GOVERNOR

JONATHAN ZACHEM, SECRETARY



## STATE OF FLORIDA
## DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

### FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED RESIDENTIAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## FONG, CARLOS RAFAEL

10601 S.W. 124 ROAD.
MIAMI          FL 33186

LICENSE NUMBER: RD6782

EXPIRATION DATE: NOVEMBER 30, 2020

Always verify licenses online at MyFloridaLicense.com



Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment

amgraziano@irr.com    -    305.670.0001 x320



# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com

## Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida



**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Caribbean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Carribean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 1/1/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Saranzzi, Fatih Ann Safaranzi, Proverbium Hldg, LLC, USA & George Albright | NeJame, La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | C8 Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF OF | TRI FILE # | COURT CASE NO. # | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008936-CA-01 | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Aaron Stauber & Aviva Stauber V. BH 33, LLC | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Southern District of Florida | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | John Camps | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Miami-Dade County | Igor Gel V. Yacht Club at Portofino Condo Association | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Monroe County | Ocean Bank V. Lindback, Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24994 CA 04 | 11th Judicial Circuit Dade County, Florida | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Sarriff and Course Drive Investments, LLC | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (retrospective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0194 | 13-010822 CACE 02 | 17th Judicial Circuit Broward County, Florida | Amalia I. Irianda-Rivera V. Rivera Diagnostic Center, Inc., Oknay Rivera & Yudit Rivero | Amalia I. Irianda-Rivera | Rent default judgment and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FL534 (Pending) | 17th Judicial Circuit Broward County, Florida | Roehm Title Resources Claim | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined risk-defects not identified by Title Insurance Company |
| 4/2014 | Defendant | 123-2014-0117 | 4:14-CV-01077 (Pending) | USA District Court for the Eastern District of Missouri Eastern Division | USA V. GSA-VA St. Louis Property, LLC | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Miami-Dade County | Eufonia Club | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | | Broward County | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition S.R.7 | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | West Airport Plaza Business Park, LLC | Counsel for the Debtor, Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23922-CA 09 | 11th Judicial Circuit Dade County, Florida | American Educational Enterprises LLC v. The Board of Trustees of the Internal Improvement Trust Fund | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Plaintiff | 123-2013-0126 | CACE 08057624 (14) | 17th Judicial Circuit Broward County, Florida (Hon. Carlos A. Rodriguez) | Bayview Loan Servicing, LLC v. Kayhan Soodjani; Muhammad Mahmoodi; et al | Bayview Servicing, represented by Tabaks, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency Judgment on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV - Rosenbaum | US District Court - Southern District of Florida (Hon. Rosenbaum) | United States of America v. G.K.K. etal | Richard Duvall, Holland and Knight and Jeffrey Neman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 2/2013 | Defendant | 123-2011-0670 | 09-05650 CA 04 | 11th Judicial Circuit Dade County, Florida (Hon. Beth Bloom) | Zenaida Gomez v. City of Pinecrest | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence |
| 7/2013 | Defendant | 123-2013-0016 | 12-60950-CIV | US Federal Court - Southern District of Florida | G Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 11/2012 | Plaintiff | 123-2012-0129 | Pending | 11th Judicial Circuit Dade County, Florida | USS Federal Court v. Ad Valorem Tax Protest | Ken Wurtenberger, Esq., Hinshaw Culbertson, P.A. | Tax protest of commercial condominium. |
| 10/19/2012 | Plaintiff | 123-2012-0111 | 2011-1107 CA - 23 | 17th Judicial Circuit Broward County, Florida (Hon. Patrick Stanford Blake) | Renegade at Hialeah Blvd v. Dynatech Engineering | Daniel Levin, Esq., Cole Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from injured lease modification. |
| 10/12/2012 | Defendant | 123-2012-0109 | 11-30189 CA21 | 11th Judicial Circuit Dade County, Florida | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | Craig Mirko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal; economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal |
| 8/20/2012 | Plaintiff | 123-2012-0012 | CA-02180 CA-25 | 11th Judicial Circuit Dade County, Florida | 7935 NBV, LLC v. Harbour East Development LTD, Miami Egoz, etal | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012 |
| 8/15/2012 | Disclosed Dual Expert | 123-2012-0072 | | Matrimonial Mediation | Vazquez v. Vazquez Matrimonial Matter | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) marital assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Illinois, Bahamas |
| 7/2012 | Plaintiff | 109-2011 | Pending: 2003-2014 | Tax Court of New Jersey (Hon. Patrick DeAhemida) | BASF Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Phil Genuario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010-0172 | ATL-L-4451-08 | Superior Court of New Jersey, Law Division Atlantic County | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Jay Rhatican, Connell Foley on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations |
| 7/2011 | Defendant | 109-2010-0199 | MERR-L3034-08 | Superior Court of New Jersey Mercer County | 480 Mercer Street, LLP and Bruckener Southern, LLC vs. Hightstown | Arcell Zarro Grimm & Aaron, P.C. Hussam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Tax Court of New Jersey | Westrust/HPC Mortgage Fund vs. City of Atlantic City | Cole, Schotz, Meisel, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |

M. Qualis: Graziano; Trial Lists

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 11/2009 | Secured Creditor | 109-2009-0439 | | Erickson Building | US Bankruptcy Court - Southern District of Texas | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 09/2009 | Plaintiff | 109-2009-0123 | 3035-001 | Bay Head Yacht Club vs. Ocean County Tax Board | Tax Court of New Jersey | John Doyle, Carlucci, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 109-2008-XXX | INA (DEFS Pending) | Mirage Atlantic City (MAC) vs. City of Atlantic City | Superior Court of New Jersey | Hank Rovitkarf, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 08/2008 | Defendant | 109-2008-0252 | L-2424-05 | The City of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Superior Court of New Jersey Law Division, Middlesex County | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | 109-2008-345 | C.A. No. OCNL-3361-06 | Osbourne Associates, Melbourne Associates VII, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co., JAC Property Management etal and Eckert Corporation | Superior Court of New Jersey, Law Division Ocean County | Francis X. Manning, Esq. Standley Ronon Stevens & Young & Michael Carrigol, Esq. Partridge Snow and Hahn, both on behalf of | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 109-2008-0125- | N/A | Toms River Township vs. Citta Geigy Corporation | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpentelli] | Mark Troncone, Esq., In-House Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site |
| 11/2007 | Defendant | 109-2007-211 | L-0008/35-06 | Kyle Mosteiller vs. Galia Neeman | Superior Court of New Jersey, Law Division | Frank Canuso, Esq. Hoagland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Plaintiff | 109-2007-0134 | 3:07-CV-2322 | Silver Lakes Inc. vs. Township of Freehold Inc. | Superior Court of New Jersey, Chancery Division Monmouth County | Christopher Hanlon, Esq. Hanlon and Niemann | Challenge to validity of Rent Control Ordinance as applied to property rights for Licensee to Lessee |
| 06/2007 | Plaintiff | 109-2007-0173 | | Laurelwood Homes, LLC vs. United States Department of Navy | Federal District Court of Virginia | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 109-2006-0192 | CAM - L - 9731-05 | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Superior Court of New Jersey, Law Division, Camden County | Brett Last, Esq., O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 08/2006 | Defendant | 109-2006-0257 | | County Line & Browers Bridge, Jackson Township | Superior Court of New Jersey, Law Division | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 02/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Carl Brooks vs. K. Hovanian | Ocean Superior Court, Ocean County Courthouse | Ronan, Tuzzio & Giannone   Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner and the subject developer K. Hovnanian @ Sea Oaks |
| 10/2005 | Defendant | 109-2005-0315 | OCNL-1810-5 | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility of the state of New Jersey vs. AC1 Manahawkin, LLC formerly and/or Armstrong | Superior Court of New Jersey, Chancery Division Ocean County | Flaster/Greenberg, PC,   David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and tower by Atlantic City Electric |
| 06/2005 | Defendant | 109-2005-0214 | MON-L-2609-05 | Township of Howell vs. George Harms Construction Co., Inc. etal | Superior Court of New Jersey, Law Division Monmouth County | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 08/2003 | Defendant | 109-2003-0282 | FM-15-1465-94 | Giuffre vs. Giuffre | Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of two properties for purposes of equitable distribution of marital assets |
| 07/2003 | Defendant | 109-2003-0203 | OCN-C-78-03 | West, etal vs. Pompaino, etal | Superior Court of New Jersey, Chancery Division, Ocean County | Stephen E. Smith, Esq. | To develop an opinion of the diminution in value due to a loss of useable land area |
| 06/2003 | Plaintiff | 109-2003-0124 | OCN-C-316-02 | Eugene M. Lord vs. Donald W. Rinaldo | Superior Court of New Jersey, Law Division | Lombardi & Lombard Scott Telson | To develop an opinion of the market value of the fee simple estate of the property |
| 04/2003 | Plaintiff | 109-2003-0128 | FM-15-468-03-C | Vincent Urbank vs. Lisa Urbank | Superior Court of New Jersey, Chancery Division, Family Part Ocean County | Marianna Pontoriero, Esq. | Litigation-Matrimonial |
| 02/2002 | Plaintiff | 109-2002-0055 | | Shenandoah Mobile Home Park | | Winckels Marx Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 04/2001 | Claimant | 109-2001-0169 | NJ-2824-00 | DeForest John Ely and Kimberle A. Ely, h/w | Superior Court of New Jersey, Chancery Division Middlesex County | First American Title Insurance Co. Jack Mikis | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 03/1999 | Defendant | 109-1999-0062 | | Georgetown Apartments | | Emmes & Co. Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the fee simple, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | LKW 257-3186 | FM-15-1465-94 | Lisa Franklin, etal vs. Donald Franklin, etal | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP   Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1984 | Creditor | HUD-XX | | Hudson Marina Association vs. Emmes & Co. | US Bankruptcy Court - District of Newark | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium condo |



**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Griffin, David & Diane**
Hypothetical Market Value "As If" Remediated
9801 Cobblestone Lakes Ct
Boynton Beach, Palm Beach County, Florida 33472
Client Reference: 5

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
May 1, 2010

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**Griffin, David & Diane**
9801 Cobblestone Lakes Ct
Boynton Beach, Florida



| Integra Realty Resources | In Miami | In Orlando | In Naples/Sarasota |
|---|---|---|---|
| Miami | Dadeland Centre | The Magnolia Building | Horseshoe Professional Park |
| Orlando | 9155 South Dadeland Blvd. | 326 N. Magnolia Ave. | 2770 Horseshoe Drive S. |
| Southwest Florida | Suite 1208 | | Suite 3 |
| | Miami, FL 33156 | Orlando, FL 32801 | Naples, FL 34104 |
| www.irr.com | (305) 670-0001 | (407) 843-3377 | (239)-643-6888 |

February 7, 2019

Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

SUBJECT:     Hypothetical Market Value "As If" Remediated
             Case No 11-22408-Civ-COOKE
             United States District Court Southern District of Florida in the matter of
             Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
             similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
             Priority Claimant Case at:
             Griffin, David & Diane
             9801 Cobblestone Lakes Ct
             Boynton Beach, Palm Beach County, Florida 33472
             Client Reference: 5
             IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the
referenced property as of the effective date assuming all remediation was completed by an
appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It
presents summary discussions of the data, reasoning, and analysis that were used in the appraisal
process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 503 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 975 of 989

Identification of Subject                                                                           2

## Identification of Subject

The subject of this report is a single-family Mediterranean style home configured with 5 bedroom and 4 baths with 3,670 SF under air-conditioning. The subject property was built in 2006 and is located on an 8,712 SF site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, May 1, 2010. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is February 7, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
| --- | --- |
| Sale Date (Most Recent) | October 5, 2006 |
| Seller | Northstar Holdings at B & A, LLC |
| Buyer | Griffin, David D. & Diane |
| Sale Price | $731,544 |
| Recording Instrument Number | 20060576393 |
| Disposition Details | Original purchase of home from developer |

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

Subsequent the effective date of value the property was listed for sale October 08, 2009 with an asking price of $275,000, with a status change to Pending Sale July 8, 2010 and Closed Sale July 27, 2010 at $240,000. The Realtors MLS listing states the home was in need of remediation of Chinese Drywall.

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

Griffin, David & Diane



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 504 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 976 of 989

Definition of Retrospective Value Opinion                                                    3

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

### Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value.  Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation.  Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

### Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

### Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 505 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 177 of 989

Scope of Work                                                                                              4

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation. The result of that study are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida." The results of that study are incorporated by reference herein.

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation. As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction. Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation. These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property. This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections. Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available. In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis. However, the damage analysis only represents a <u>portion of the overall damages</u> because we were specifically requested to exclude the consideration of the costs to cure. This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to as "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.



Case 2:09-md-02047-EEF-MBN  Document 22380-28  Filed 12/03/19  Page 506 of 796
Case 1:11-cv-22408-MGC  Document 273-8  Entered on FLSD Docket 09/15/2015  Page 178 of 989

Highest and Best Use                                                                                    5

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report. The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach. The valuations consider the only relevant approach for residential valuation, the sales comparison analysis. The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis. Additionally, this approach directly considered the prices of alternative properties having similar utility.

### Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant. The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

### Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report. This value us hypothetical since it assumes that defective drywall had never been present at the subject property.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 507 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 179 of 989

Conclusion of Value                                                                              6

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue. This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date. This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation. Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total. This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value. These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home. Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered. Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF          4 months

$150,000 - $750,000 home up to 4,000 SF          6 months

$750,000+ home up over 4,000 SF          9 months

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).



Case 2:09-md-02047-EEF-MBN  Document 22380-28  Filed 12/02/19  Page 509 of 796
Case 1:11-cv-22408-MGC  Document 273-8  Entered on FLSD Docket 09/15/2015  Page 180 of 989

Conclusion of Value                                                                        7

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

| Conclusions of Damage | | | |
|---|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $380,000 | |
| Market Impairment Discount (As if Remediated) | | 10% | |
| Post Impairment Damage ($) | | $38,000 | |
| **Hypothetical Value As IF Remediated** | | | **$342,000** |
| Post Remediation Damages as of Effective Date | | | **$38,000** |
| Loss of Use: | | | |
| Rental Rate ($/Month) | **$2,650** | | |
| Moving & Storage Costs | | $3,000 | |
| Loss of Use Subject (# Months) | 6x | $15,900 | |
| Subject Total | | | **$18,900** |
| **Post Remediation Damage** | | | **$56,900** |

Note:  Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

Subsequent the effective date of value the property was listed for sale October 08, 2009 with an asking price of $275,000, with a status change to Pending Sale July 8, 2010 and Closed Sale July 27, 2010 at $240,000. The Realtors MLS listing states the home was in need of remediation of Chinese Drywall. The sale price reflects a discount greater than estimated in the above conclusions of damage because the property sold un-remediated at a 37% discount to unimpaired value. Cost to cure damages are being separately examined by the Court's special master.

Griffin, David & Diane



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 509 of 796
Case 1:11-cv-22408-MGC   Document 273-8   Entered on FLSD Docket 08/15/2019   Page 181 of 989

Certification                                                                                      8

## Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Carlos Fong has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 510 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 182 of 989
Assumptions and Limiting Conditions 9

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2. There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3. There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4. The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5. The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1. An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2. The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4. No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5. Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6. We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.



7. No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8. We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9. The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during

Griffin, David & Diane



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 512 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2015 Page 184 of 989

Assumptions and Limiting Conditions                                                                                    11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18.   The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19.   The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20.   No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21.   The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22.   Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23.   The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24.   It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 513 of 796
Case 1:11-cv-22408-MGC Document 273-9 Entered on FLSD Docket 09/15/2015 Page 185 of 989
Assumptions and Limiting Conditions                                                      12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25.  Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26.  The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27.  All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.



# Addenda



| Borrower | David & Diane Griffin | | | File No. | VALU-18-12-1470 | |
|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |

## TABLE OF CONTENTS



| | |
|---|---|
| Supplemental Addendum | 1 |
| USPAP Identification Addendum | 2 |
| Exterior-Only | 3 |
| Single Family Comparable Rent Schedule | 9 |
| General Text Addendum | 10 |
| Subject Photos | 13 |
| Comparable Photos 1-3 | 14 |
| Rental Photos 1-3 | 15 |
| Assessor Map | 16 |
| Location Map | 17 |
| Subject Aerial Map | 18 |
| Assessor Data | 19 |
| MLS Listing Sheet | 20 |
| MLS Listing History | 21 |
| Tax Information | 22 |
| License | 23 |

**Supplemental Addendum**

| Borrower | David & Diane Griffin | | | | | | | File No. VALU-18-12-1470 |
|---|---|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | | | |
| City | Boynton Beach | | County | Palm Beach | | State | FL | Zip Code 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | | |

ADDITIONAL COMMENTS(02/07/2019)

On 2/7/2019 the appraiser removed comparable 1 from the analysis due to being a non arms length short sale. Based on the removal of comparable 1 the appraiser has amended the final opinion of market value to $380,000 with comparable 2 receiving the most weight for requiring no adjustments and for being the most recent sale.

## USPAP ADDENDUM

| Borrower | David & Diane Griffin | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code 33472 |
| Lender | Integra Realty Resources (IRR) | | | | | |

This report was prepared under the following USPAP reporting option:

☒ Appraisal Report           This report was prepared in accordance with USPAP Standards Rule 2-2(a).

☐ Restricted Appraisal Report      This report was prepared in accordance with USPAP Standards Rule 2-2(b).

**Reasonable Exposure Time**

My opinion of a reasonable exposure time for the subject property at the market value stated in this report is:    30-90 DAYS

EXPOSURE TIME: estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

USPAP 2018-19 Comment: Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market

**Additional Certifications**

I certify that, to the best of my knowledge and belief:

☒ I have NOT performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

☐ I HAVE performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

**Additional Comments**

APPRAISER COMPETENCY

An appraiser must determine, prior to accepting an assignment, that he or she can perform the assignment competently. Competency requires:

1. the ability to properly identify the problem to be addressed; and
2. the knowledge and experience to complete the assignment competently; and
3. recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.

I am competent to perform this assignment based on my state appraiser license and familiarity with this type of property in the subject market

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations

**APPRAISER:**                                           **SUPERVISORY APPRAISER:** (only if required)

*Carlos Fong*

| | | | |
|---|---|---|---|
| Signature: | | Signature: | |
| Name: | Carlos Fong | Name: | |
| Date Signed: | 02/13/2019 | Date Signed: | |
| State Certification #: | RD 6782 | State Certification #: | |
| or State License #: | | or State License #: | |
| State: | FL | State: | |
| Expiration Date of Certification or License: | 11/30/2020 | Expiration Date of Certification or License: | |
| Effective Date of Appraisal: | 05/01/2010 | Supervisory Appraiser Inspection of Subject Property: | |
| | | ☐ Did Not ☐ Exterior-only from Street ☐ Interior and Exterior | |

# Exterior-Only Inspection Residential Appraisal Report

VALU-18-12-1470
File # VALU-18-12-1470

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

## SUBJECT

| | |
|---|---|
| Property Address | 9801 Cobblestone Ct  City Boynton Beach  State FL  Zip Code 33472 |
| Borrower David & Diane Griffin  Owner of Public Record David & Diane Griffin  County Palm Beach |
| Legal Description COUNTRYSIDE MEADOWS LT 120 BLK 2 |
| Assessor's Parcel # 00-42-45-20-05-002-1200  Tax Year 2017  R.E. Taxes $ 6,044 |
| Neighborhood Name Countryside Meadows  Map Reference 48424  Census Tract 0077.13 |
| Occupant ☒ Owner ☐ Tenant ☐ Vacant  Special Assessments $ 0  ☐ PUD  HOA $ 0  ☐ per year ☐ per month |
| Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe) |
| Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Litigation |
| Lender/Client Integra Realty Resources (IRR)  Address 9155 South Dadeland Boulevard, Miami, FL 33156 |
| Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☒ Yes ☐ No |
| Report data source(s) used, offering price(s), and date(s). DOM 292;The Subject was offered for sale on 10/08/2009 for $275,000 per the MIAMI MLS #R3056547, and closed on 07/27/2010 for $240,000. |

## CONTRACT

| | |
|---|---|
| I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. |
| Contract Price $  Date of Contract  Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s) |
| Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No |
| If Yes, report the total dollar amount and describe the items to be paid. |

## NEIGHBORHOOD

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | One-Unit Housing | | Present Land Use % |
|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☐ Increasing ☒ Stable ☐ Declining | PRICE $ (000) | AGE (yrs) | One-Unit 90 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | 175 Low 0 | | 2-4 Unit % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | 520 High 50 | | Multi-Family 5 % |
| Neighborhood Boundaries The subject is bound to the north by Hypoluxo Rd, to the west by FL Route | | 285 Pred. 10 | | Commercial 5 % |
| 441, to the east by Florida's Tpke and to the south by Boynton Beach Blvd. | | | | Other % |

Neighborhood Description There are no apparent factors that should affect the subject's marketability.  The subject has access to all necessary supporting facilities including schools, shopping, recreation and employment centers.

Market Conditions (including support for the above conclusions)  See Attached Addendum

## SITE

| | |
|---|---|
| Dimensions See Assessor Map  Area 8,712 sf  Shape Irregular  View B;Wtr; |
| Specific Zoning Classification AGR-PUD  Zoning Description Agricultural Reserve PUD (00-Unincorporated) |
| Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe) |
| Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe |

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley None | | |

| | |
|---|---|
| FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone X  FEMA Map # 12099C0770F  FEMA Map Date 10/5/2017 |
| Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe |
| Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe |
| No observed or known adverse influences to market value were noted. |

## IMPROVEMENTS

| | |
|---|---|
| Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☐ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner |
| ☐ Other (describe)  Data Source for Gross Living Area Assessor |

| General Description | General Description | Heating/Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☐ Concrete Slab ☐ Crawl Space | ☐ FWA ☐ HWBB | Fireplace(s) # 0 ☐ None | ☒ None |
| # of Stories 2 | ☐ Full Basement ☐ Finished | ☐ Radiant | Woodstove(s) # 0 | ☐ Driveway # of Cars 2 |
| Type ☒ Det. ☐ Att. ☐ S-Det/End Unit | ☐ Partial Basement ☐ Finished | ☐ Other  Fuel Elec. | ☒ Patio/Deck Patio | Driveway Surface pavers |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls CBS | ☒ Central Air Conditioning | ☒ Porch Porch | ☐ Garage # of Cars 2 |
| Design (Style) Mediterranean | Roof Surface S-Tile | ☐ Individual | ☐ Pool None | ☐ Carport # of Cars 0 |
| Year Built 2006 | Gutters & Downspouts None | ☐ Other | ☒ Fence Iron | ☐ Attached ☐ Detached |
| Effective Age (Yrs) 3 | Window Type Single Hung | | ☐ Other | ☐ Built-in |
| Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☐ Disposal ☐ Microwave ☐ Washer/Dryer ☐ Other (describe) |
| Finished area above grade contains: 9 Rooms 5 Bedrooms 4.0 Bath(s)  3,670 Square Feet of Gross Living Area Above Grade |
| Additional features (special energy efficient items, etc.) None |

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.)  Upon visual inspection of the neighborhood the property was located in a gated community where public access was restricted. We therefore assume the subject is in average condition relative to our observations of the general condition of the neighborhood.

| | |
|---|---|
| Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No |
| If Yes, describe. |

There are no apparent external or functional inadequacies noted or reported at time of inspection.  Physical depreciation is calculated by the modified age life method.

| | |
|---|---|
| Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe. |

The construction quality is typical for the area.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Exterior-Only Inspection Residential Appraisal Report

VALU-18-12-1470
File # VALU-18-12-1470

| | | |
|---|---|---|
| There are | 9 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 435,000 to $ 620,000 . |
| There are | 21 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 175,000 to $ 520,000 . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 9801 Cobblestone Lakes Ct Boynton Beach, FL 33472 | 10148 Cobblestone Creek Dr Boynton Beach, FL 33472 | | 10164 Cobblestone Creek Dr Boynton Beach, FL 33472 | | 10116 Cobblestone Creek Dr Boynton Beach, FL 33472 | |
| Proximity to Subject | | 0.06 miles NW | | 0.06 miles NW | | 0.08 miles N | |
| Sale Price | $ | | $ 420,000 | | $ 380,000 | | $ 320,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 114.97 sq.ft. | | $ 104.02 sq.ft. | | $ 94.23 sq.ft. | |
| Data Source(s) | | SEF #R2889162;DOM 409 | | SEF #R2889163;DOM 578 | | SEF #R2889160;DOM 498 | |
| Verification Source(s) | | Assessor, Realist | | Assessor, Realist | | Assessor, Realist | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Conv;0 | | Cash;0 | | Conv;0 | |
| Date of Sale/Time | | s05/09;c03/09 | | s09/09;c08/09 | | s06/09;c05/09 | |
| Location | Residential | Residential | | Residential | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 8712 sf | 7205 sf | 0 | 7309 sf | | 6617 sf | |
| View | Water | Water | | Water | | N;Res; | |
| Design (Style) | Mediterranean | Mediterranean | | Mediterranean | | Mediterranean | |
| Quality of Construction | Stucco | Stucco | | Stucco | | Stucco | |
| Actual Age | 4 | 4 | | 4 | | 4 | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 9 5 4.0 | 9 5 4.0 | | 9 5 4.0 | | 9 4 3.0 | +10,000 |
| Gross Living Area | 3,670 sq.ft. | 3,653 sq.ft. | | 3,653 sq.ft. | | 3,396 sq.ft. | +11,000 |
| Basement & Finished | No Basement | No Basement | | No Basement | | No Basement | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | EFA/CAC | EFA/CAC | | EFA/CAC | | EFA/CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 2-Car Garage | 2ga2dw | | 2ga2dw | | 3ga3dw | |
| Porch/Patio/Deck | Patio,Porch | Patio,Porch | | Patio,Porch | | Patio,Porch | |
| Net Adjustment (Total) | | ☐ + ☐ - | $ | ☐ + ☐ - | $ | ☒ + ☐ - | $ 21,000 |
| Adjusted Sale Price | | Net Adj. 0.0 % | | Net Adj. 0.0 % | | Net Adj. 6.6 % | |
| of Comparables | | Gross Adj. 0.0 % $ | 420,000 | Gross Adj. 0.0 % $ | 380,000 | Gross Adj. 6.6 % $ | 341,000 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) MIAMI MLS, Palm Beach County Records, and Realist
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s) MIAMI MLS, Palm Beach County Records, and Realist
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist |
| Effective Date of Data Source(s) | 05/01/2010 | 05/01/2010 | 05/01/2010 | 05/01/2010 |

Analysis of prior sale or transfer history of the subject property and comparable sales Per public record, the Subject has not sold or transferred in the past 36 months.

Summary of Sales Comparison Approach See Attached Addendum

Indicated Value by Sales Comparison Approach $ 380,000

Indicated Value by: Sales Comparison Approach $ 380,000 Cost Approach (if developed) $ Income Approach (if developed) $

see attached addendum.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: No special conditions are noted.
Personal property is not included in this valuation.
Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 380,000 , as of 05/01/2010 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 2055 March 2005 Page 2 of 6 Fannie Mae Form 2055 March 2005

**Exterior–Only Inspection Residential Appraisal Report**

VALU-18-12-1470
File # VALU-18-12-1470

| | |
|---|---|
| **ADDITIONAL COMMENTS** | PLEASE ATTACHED ADDENDUM FOR FURTHER INFORMATION |

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    Site value is estimated and/or supported by the sales comparison approach whenever data is available, otherwise extraction method is used.

| | | | | | |
|---|---|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | | | OPINION OF SITE VALUE | ........................... =$ | 25,000 |
| Source of cost data   N/A | | | DWELLING | 3,670 Sq.Ft. @ $ ........ =$ | |
| Quality rating from cost service   N/A   Effective date of cost data   N/A | | | | Sq.Ft. @ $ ........ =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | | ........ =$ | |
| The cost approach was not applied as the area is fully built up and there | | | Garage/Carport | Sq.Ft. @ $ ........ =$ | |
| is no vacant land available, except where an existing house will be torn | | | Total Estimate of Cost-New | ........ =$ | |
| down. Although the Cost Approach could be considered an applicable | | | Less   Physical | Functional | External |
| approach to value, it is not typically relied upon by market participants | | | Depreciation | | =$( ) |
| for one to four family properties. | | | Depreciated Cost of Improvements | ........................... =$ | |
| | | | "As-is" Value of Site Improvements | ........................... =$ | |
| Estimated Remaining Economic Life (HUD and VA only)   57 Years | | | **INDICATED VALUE BY COST APPROACH** | ........................... = $ | |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| | | | |
|---|---|---|---|
| Estimated Monthly Market Rent $   2,650   X Gross Rent Multiplier | = $ | | Indicated Value by Income Approach |

Summary of Income Approach (including support for market rent and GRM)    The income approach is not applicable to this report as homes in the area are typically owner occupied.

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No   Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| | | |
|---|---|---|
| Total number of phases | Total number of units | Total number of units sold |
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No   If Yes, date of conversion

Does the project contain any multi-dwelling units? ☐ Yes ☐ No   Data Source(s)

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No   If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No   If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

VALU-18-12-1470
File # VALU-18-12-1470

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1470
File # VALU-18-12-1470

APPRAISER'S CERTIFICATION: The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1470
File # VALU-18-12-1470

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION:    The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature *Carlos Fong* | Signature |
| Name  Carlos Fong | Name |
| Company Name  Valucentric LLC | Company Name |
| Company Address  7908 Montecito Pl, Delray Beach, FL 33446 | Company Address |
| Telephone Number  (844) 825-8236 | Telephone Number |
| Email Address  info@valucentric.com | Email Address |
| Date of Signature and Report  02/13/2019 | Date of Signature |
| Effective Date of Appraisal  05/01/2010 | State Certification # |
| State Certification #  RD 6782 | or State License # |
| or State License # | State |
| or Other (describe)  State # | Expiration Date of Certification or License |
| State  FL | |
| Expiration Date of Certification or License  11/30/2020 | SUBJECT PROPERTY |
| ADDRESS OF PROPERTY APPRAISED | |
| 9801 Cobblestone Lakes Ct | ☐ Did not inspect exterior of subject property |
| Boynton Beach, FL 33472 | ☐ Did inspect exterior of subject property from street |
| | Date of Inspection |
| APPRAISED VALUE OF SUBJECT PROPERTY $  380,000 | |
| LENDER/CLIENT | COMPARABLE SALES |
| Name | |
| Company Name  Integra Realty Resources (IRR) | ☐ Did not inspect exterior of comparable sales from street |
| Company Address  9155 South Dadeland Boulevard, Miami, FL | ☐ Did inspect exterior of comparable sales from street |
| 33156 | Date of Inspection |
| Email Address | |

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

# SINGLE FAMILY COMPARABLE RENT SCHEDULE

VALU-18-12-1470
File # VALU-18-12-1470

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property. Adjustments should be made only for items of significant difference between the comparables and the subject property.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 9801 Cobblestone Lakes Ct Boynton Beach, FL 33472 | 10148 Cobblestone Creek Dr Boynton Beach, FL 33472 | 9962 Equus Cir Boynton Beach, FL 33472 | 9246 Equus Cir Boynton Beach, FL 33472 |
| Proximity to Subject | | 0.06 miles NW | 0.95 miles NW | 0.79 miles NW |
| Date Lease Begins | | 04/10 | 11/09 | 05/09 |
| Date Lease Expires | | Unk | Unk | Unk |
| Monthly Rental | If Currently Rented: $ | $ 2,650 | $ 3,000 | $ 3,500 |
| Less: Utilities Furniture | $ | $ | $ | $ |
| Adjusted Monthly Rent | $ | $ 2,650 | $ 3,000 | $ 3,500 |
| Data Source | MLS,Inspection Assessor,Realist | MLS #R3080995 Assessor, Realist | MLS #R3053795 Assessor, Realist | MLS #R3013459 Assessor, Realist |

| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
|---|---|---|---|---|---|---|---|
| Rent Concessions | | | | | | | |
| Location/View | Residential Water | Residential Water | | Residential Residential | | Residential Residential | |
| Design and Appeal | Mediterranean | Mediterranean | | Mediterranean | | Mediterranean | |
| Age/Condition | 4 Good | 3 Good | | 6 Good | | 3 Good | |
| Above Grade Room Count | Total Bdrms Baths 9 5 4.0 | Total Bdrms Baths 9 5 4.0 | | Total Bdrms Baths 9 4 5.1 | | Total Bdrms Baths 9 4 5.1 | |
| Gross Living Area | 3,670 Sq. Ft. | 3,653 Sq. Ft. | | 4,403 Sq. Ft. | | 4,588 Sq. Ft. | |
| Other (e.g., basement, etc.) | No Basement None | No Basement None | | No Basement None | | No Basement None | |
| Other: | | | | | | | |
| Net Adj. (total) | | + − $ | 0 | + − $ | 0 | + − $ | 0 |
| Indicated Monthly Market Rent | | $ 2,650 | | $ 3,000 | | $ 3,500 | |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)  Rentals of comparable style dwellings ranged from $2,650 to $3,500.

Final Reconciliation of Market Rent:    All rentals were taken into the final consideration.  The opinion of market rent is $2,650

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF    05/01/2010    TO BE $    2,650

| | | |
|---|---|---|
| Appraiser(s) SIGNATURE *Carlos Fong* | Review Appraiser SIGNATURE | |
| NAME  Carlos Fong | (If applicable)  NAME | |
| Certified Residential Appraiser | | |
| Date Property Inspected  05/01/2010    Report Signed  02/13/2019 | Date Property Inspected | Report Signed |
| License or Certification #  RD 6782    State  FL | License or Certification # | State |
| Expiration Date of License or Certification  11/30/2020 | Expiration Date of License or Certification | |
| | Review Appraiser ☐ Did ☐ Did Not  Inspect Subject Property | |

Freddie Mac Form 1000 (8/88)

Form 1007 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Fannie Mae Form 1007 (8/88)

# Supplemental Addendum

File No. VALU-18-12-1470

| Borrower | David & Diane Griffin | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | | |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

**PURPOSE OF APPRAISAL REPORT**

The purpose of this appraisal is to estimate the market value of the subject property as defined herein. The function of the appraisal is to assist the above-named Lender/Client, its successors and/or assigns, in evaluating the subject property for lending purposes. This is a federally regulated transaction. Additional supporting data can be found in our appraiser work file.

It is assumed that the title to this property is good and marketable. No title search has been made, nor have we attempted to determine ownership of the property. The value estimate is given without regard to any questions of title, boundaries, or encroachments. It is assumed that all assessments are paid. We assume the property to be free and clear of liens and encumbrances except as noted.

The legal description, if included herein, should be verified by legal counsel before being relied upon or used in any conveyance or other document.

We are not familiar with any engineering studies made to determine the bearing capacity of the land. Improvements in the area appear to be structurally sound. It is therefore assumed that soil and subsoil conditions are stable unless specifically outlined in this report.

Any exhibits in the report are intended to assist the reader in visualizing the property and its surroundings. The drawings are not intended as surveys and no responsibility is assumed for their cartographic accuracy. Drawings are not intended to be exact in size, scale or detail.

Areas and dimensions of the property were physically measured. If data is furnished by the principal or from plot plans or surveys furnished by the principal, or from public records, we assume it to be reasonably accurate. In the absence of current surveys, land areas may be based upon representations made by the owner's agents or the client. No attempt has been made to render an opinion or determine the status of easements that may exist. No responsibility is assumed for discrepancies that may become evident from a licensed survey of the premises.

The value estimate involves only the real estate and all normal building equipment if any improvements are involved. No consideration was given to personal property, (or special equipment), unless stated.

It is assumed that the property is subject to lawful, competent and informed ownership and management unless noted.

Information in this report concerning market data was obtained from buyers, sellers, brokers, attorneys, trade publications or public records. To the extent possible, this information was examined for accuracy and is believed to be reliable. Dimensions, areas or data obtained from others is believed correct; however, no guarantee is made.

Any information, in whatever form, furnished by others is believed to b e reliable; however, no responsibility is assumed for accuracy.

The separate allocations between land and improvements, if applicable, represents our judgment only under the existing utilization of the property. A re-evaluation should be made if the improvements are removed or substantially altered, and the land utilized for another purpose.

All information and comments concerning the location, neighborhood trends, construction quality and costs, loss in value from whatever cause, condition, rents, or any other data for the property appraised herein, represents the estimates and opinions of the appraiser formed after an examination and study of the property.

Any valuation analysis of the income stream has been predicted upon financing conditions as specified herein, which we have reason to believe are currently available for this property. Financing terms and conditions other than those indicated may alter the final value conclusions.

The appraiser is not required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless arrangements have been made previously thereto. If the appraiser (s) is subpoenaed pursuant to court order, the client will be required to compensate said appraiser(s) for his/her time at his/her regular hourly rates, plus expenses.

All opinions, as to values stated, are presented as the appraiser's considered opinion based on the information set forth in the report and his experience. We assume no responsibility for changes in market conditions or for the inability of the client or any other party to achieve their desired results based upon the appraised value. Further, some of the assumptions made can be subject to variation depending upon evolving events. We realize some assumptions may never occur and unanticipated events or circumstances may occur. Therefore, actual results achieved during the projection period may vary from those in this report.

The appraisal assignment was not based on developing or reporting predetermined results, or a requested minimum valuation, a specific valuation, or the approval of a loan.

Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of: USPAP Uniform Standards of Professional Appraisal Practice, and SPP-AI Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute; and, except as noted in the Scope of Appraisal, in conformity with specific implementation rules of the following agencies:

FIRREA Title XI of the Financial Institutions Reform, Recovery and Enforcement Act and section 5(b) of the Bank Company Holding Act; FRB – Federal Reserve Board; RTC-Resolution Trust Corporation; OTS-Office of Thrift Supervision; FDIC – Federal Deposit Insurance Corporation; OTC – Office of the Comptroller; NCUA – National Credit Union Association.

**THE APPRAISER HAS PREPARED THIS APPRAISAL IN FULL COMPLIANCE WITH THE APPRAISAL INDEPENDENCE REQUIREMENTS AND HAS NOT PERFORMED, PARTICIPATED IN, OR BEEN ASSOCIATED WITH ANY ACTIVITY IN VIOLATION OF AIR.**

**AT THE REQUEST OF THE CLIENT, THIS APPRAISAL REPORT HAS BEEN PREPARED IN COMPLIANCE WITH THE**

**Supplemental Addendum**

File No. VALU-18-12-1470

| Borrower | David & Diane Griffin | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | | |
| City | Boynton Beach | County | Palm Beach | | State | FL | Zip Code 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

**UNIFORM APPRAISAL DATASET (UAD) FROM FANNIE MAE AND FREDDIE MAC. THE UAD REQUIRES THE APPRAISER TO USE STANDARDIZED RESPONSES THAT INCLUDE SPECIFIC FORMATS, DEFINITIONS, ABBREVIATIONS, AND ACRONYMS.**

We do not authorize the out-of-context quoting from or partial reprinting of this appraisal report. Further, neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser nor the name of the firm which he is connected, shall be reproduced, published, or disseminated to the public through advertising media, public relations media, news media, or another public means of communication, without the prior written consent of the appraiser signing this report.

Adobe's Distiller software or equivalent may be utilized by appraiser to transmit this encrypted PDF-formatted appraisal. At a minimum, the software contains the following security measure:

- identifies transmission error during the transmission process, and confirms date, time and quantity of data submitted by appraiser and the date, time and quantity of data received by the Client, and/or its assigns and
- secures data from editing by means of a password, hardware device, or other means that remains in the sole control of the transmitting appraiser.

**THIRTY SIX MONTH LISTING HISTORY**

We are not aware of any prior listings pertaining to the subject property in the past three years as researched through the local Multiple Listing Service.

**NEIGHBORHOOD MARKET CONDITIONS**

No discounts, buy downs or other concessions were noted. Current 30 year fixed rate financing at 4.5 - 5.5% and 0-2 points.

Stricter Lending Standards and the availability of Mortgage Capital may affect the average sales prices in the area, however, given the market data analyzed by the appraiser, there are no fiscal or economic trends expected to occur that would significantly impact the relatively stable market currently experienced in this neighborhood.

Neighborhood conditions can be found in detail in the attached 1004MC form.

**SITE COMMENTS**

This site is very typical of the neighborhood in terms of size, topography, view and general appeal. It provides a suitable setting for the improvements and is consistent with market expectations in this price range. Statements regarding zoning compliance are intended only in the most general sense. Zoning and building ordinances vary significantly from one municipality to another and can be extremely detailed. The scope of this assignment does not include a comparison of every potentially significant characteristic of the subject property's site and improvements relative to zoning and building ordinances. Unless otherwise noted, standard utility and right-of-way easements are insignificant to value. However, a current locational or boundary survey or title report may reveal encroachments, easements, zoning violations or other matters of interest that could warrant modification of the appraised value.

**COMMENTS REGARDING HIGHEST AND BEST USE**

In compliance with USPAP the following is included in the appraisal;
•        The current use of the real estate as of the date of value is Residential as described in the improvements section of this appraisal.

•        The use of the real estate reflected in this appraisal is as currently improved

•        The rationale and support for the opinion of highest and best use developed for this assignment is as per below:
Highest and Best Use is defined as "The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property-specific with respect to the user and timing of the use-that is adequately supported and results in the highest present value"
Source: Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Appraisal Institute, 2010).
The highest and best use analysis is a critical step in the valuation process. The comparable properties incorporated into the appraisal are directly affected by the highest and best use analysis. The analysis is based on the use that a hypothetical purchaser would make of the property based on the four tests cited above:
•        Legally Permissible
•        Physically Possible
•        Financially Feasible
•        Maximally Productive

After consideration of the above criteria it has been determined that the current improvements continue to contribute to the total market value of the property and the return from a new improvement would not currently offset the cost of demolishing the existing improvements and constructing a new one. Therefore, the highest and best use is as improved.

**COMMENTS ON SALES COMPARISON APPROACH**

All comparables provided strong support. The most weight, and opinion of value fell on comparable 2 for being the most recent sale and for requiring not adjustments.

Comparables were adjusted for their differences in above grade bathroom count, and gross living area. Gross living area adjustments were made at $40 per square foot. Comparables within 100 square feet of the subject property did not warrant an adjustment.

The remaining adjustments are indicated in the sales comparison grid.

## Supplemental Addendum

File No. VALU-18-12-1470

| Borrower | David & Diane Griffin | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | | |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

ALL ADJUSTMENTS WERE DERIVED FROM THE SUBJECT MARKET AND THE APPRAISERS EXPERTISE IN THE MARKET PLACE.

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations.

All comparables are located within the subject's neighborhood boundaries.  No geographic boundaries were crossed.

It should be noted that the estimated value of the subject exceeds the predominate value in the subject neighborhood.  This will not have a negative effect on the marketability of the subject property.  The subject property is in no way an over improvement for the market area.

**RECONCILIATION**

The sales comparison approach was considered most applicable for the subject property because a typical buyer or seller would most readily understand and apply this approach.  The income approach was not considered applicable due to the fact that the majority of housing stock in the area is owner occupied and not typically used for investment property.  The cost approach was not completed due to the subjectivity in estimating depreciation and because the typical buyer does not base price points on the cost approach.  The quality of available data utilized in the Sales comparison Approach was considered adequate.

**EXTERIOR INSPECTION ADDENDA**

The appraiser has been requested to perform an appraisal based on an exterior only inspection and not to disturb the occupants by entering the building.  The physical characteristics used to develop this appraisal are based on the assessment records of Palm Beach County, Florida and on the multiple listing service.  The subject property was observed from the public street as of the effective date of the appraisal.  On the basis of the observed conditions, the assessment records and multiple listing service information appear to be accurate.  For the purposes of this appraisal, it is assumed that the interior condition of the subject property is consistent with the exterior conditions as observed and that the information concerning the interior condition as provided by the assessor's records and the multiple listing service is accurate.

**PHYSICAL DEFICIENCIES OR ADVERSE CONDITIONS**

Unless otherwise stated in this report, the existence of hazardous material and/or electromagnetic emission, which may or may not be present on the property, was not observed by the appraiser.  The appraiser has no such knowledge of the existence of such materials on or in the subject property, or in the properties of the subject neighborhood.  The appraiser is not qualified to detect such substances.  The presence of such substances as asbestos, urea formaldehyde foam insulation, radon, mold, or other potentially hazardous material may affect the value of the property.  The value estimate expressed is predicated on the assumption that there is no such material in or on the property that would cause a loss in value.  No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required discovering them.  The customer is urged to retain an expert in this field.

Dwellings built prior to 1978 may contain lead-based paint.

**MOLD**

The appraiser is not a home or environmental inspector.  The appraiser provides an opinion of value.  The appraisal does not guarantee that the property is free of defects or environmental problems.  The appraiser performs an inspection of visible and accessible areas only.  Mold may be present in areas the appraiser cannot see.  A professional home inspection or environmental inspection is recommended.

**CONCLUSION**

This is an Appraisal Report which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for an Appraisal Report.  As such, it presents only minimal discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value.  Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's file.  The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein.  The appraiser is not responsible for unauthorized use of this report.

## Subject Photo Page

| Borrower | David & Diane Griffin | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | | |
| City | Boynton Beach | County | Palm Beach | | State | FL | Zip Code 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



### Subject Front

9801 Cobblestone Lakes Ct
Sales Price
Gross Living Area    3,670
Total Rooms          9
Total Bedrooms       5
Total Bathrooms      4.0
Location             Residential
View                 Water
Site                 8712 sf
Quality              Stucco
Age                  4



### Subject Rear



### Subject Street

## Comparable Photo Page

| Borrower | David & Diane Griffin | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



### Comparable 1

10148 Cobblestone Creek Dr
| | |
|---|---|
| Prox. to Subject | 0.06 miles NW |
| Sales Price | 420,000 |
| Gross Living Area | 3,653 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.0 |
| Location | Residential |
| View | Water |
| Site | 7205 sf |
| Quality | Stucco |
| Age | 4 |



### Comparable 2

10164 Cobblestone Creek Dr
| | |
|---|---|
| Prox. to Subject | 0.06 miles NW |
| Sales Price | 380,000 |
| Gross Living Area | 3,653 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.0 |
| Location | Residential |
| View | Water |
| Site | 7309 sf |
| Quality | Stucco |
| Age | 4 |



### Comparable 3

10116 Cobblestone Creek Dr
| | |
|---|---|
| Prox. to Subject | 0.08 miles N |
| Sales Price | 320,000 |
| Gross Living Area | 3,396 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.0 |
| Location | N;Res; |
| View | N;Res; |
| Site | 6617 sf |
| Quality | Stucco |
| Age | 4 |

# Rental Photo Page

| Borrower | David & Diane Griffin | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



### Rental 1

10148 Cobblestone Creek Dr
| | |
|---|---|
| Proximity to Subject | 0.06 miles NW |
| Adj. Monthly Rent | 2,650 |
| Gross Living Area | 3,653 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.0 |
| Location | Residential |
| View | Water |
| Condition | Good |
| Age/Year Built | 3 |



### Rental 2

9962 Equus Cir
| | |
|---|---|
| Proximity to Subject | 0.95 miles NW |
| Adj. Monthly Rent | 3,000 |
| Gross Living Area | 4,403 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Residential |
| Condition | Good |
| Age/Year Built | 6 |

### Rental 3

9246 Equus Cir
| | |
|---|---|
| Proximity to Subject | 0.79 miles NW |
| Adj. Monthly Rent | 3,500 |
| Gross Living Area | 4,588 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Residential |
| Condition | Good |
| Age/Year Built | 3 |

**Assessor Map**

| Borrower | David & Diane Griffin | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | | |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



**Location Map**

| Borrower | David & Diane Griffin | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



## Subject Aerial Map

| Borrower | David & Diane Griffin | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | | |
| City | Boynton Beach | County | Palm Beach | | State | FL | Zip Code | 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



**Assessor Data**

| Borrower | David & Diane Griffin | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | | |
| City | Boynton Beach | County | Palm Beach | | State | FL | Zip Code 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



**MLS Listing Sheet**

| Borrower | David & Diane Griffin | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | | |
| City | Boynton Beach | County | Palm Beach | | State | FL | Zip Code | 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



1/3/2019     Matrix

🏠 Listing

**Single Family**
9801 Cobblestone Lakes Ct #
BOYNTON BEACH, 33472

| | | | |
|---|---|---|---|
| ML#: | R3056547 | List Price: | $275,000 |
| Rng Price: | | Sold Price: | $240,000 |
| LLP: | | Status: | Closed Sale |
| Short Sale: | Yes | REO: | |
| Listing Brkr: | FLL404289 /Corcoran Group Palm Beach | | |
| County: | Palm Beach County | | |
| Area: | 4710 | | Auction: |
| Geo Area: | Palm Beach 4710; 4720; 4820; 4830 | | |
| Legal: | Countryside Meadows Lot:120 Blk:2 | | |
| Furnished: | | | |
| Bedrooms: | 5 | Baths: | 4/0 |
| Convert Bed: | | | |
| SqFt (Liv): | 3,364 | Tot SqFt: | 3,364 |
| SqFt (Adj): | | | |
| Bld Ar/Src: | | | |
| Year Built: | 2006/New Construction | | |
| Virtual Tour: | Click Here | | |

**Location Information**

| | | | | | |
|---|---|---|---|---|---|
| Folio#: | 00424520050021200 | Parcel #: | | Model Name: | Fairfax |
| Municipal Code: | | Town/Range: | | Section: | |
| Subdivision #: | | Map Coord: | | Zoning: | Resident |
| Subdivision: | Cobblestone Creek | Development: | Cobblestone Creek | | |
| Elementary: | | Middle: | | | |
| High: | | | | | |
| Neighborhood: | | | | | |

**General Information**

| | | | | | |
|---|---|---|---|---|---|
| Type Property: | Single | Front Exposure: | South East | HOPA: | |
| For Lease: | | For Lease MLS#: | | SS Addend: | |
| Boat Services: | | | | | |
| Style: | R32-WF/No Ocean Access | | | | |
| Garage: | 2/Attached | | | Carport: | 0 |
| Lot SF: | | Appr Lot Size: | 35X120X106X120 | | |
| Parking Desc: | | | | | |
| Parking Restr: | | | | | |
| Lot Desc: | Less Than 1/4 Acre Lot, Cul-De-Sac Lot | | | | |
| Waterfront: | Yes/Lake Front | | | | |
| Water Access: | | | | | |
| Water Frontage: | 100 | View: | Water View | | |
| Pool Dim: | X | Spa: | | | |
| Pool: | No | | | | |
| Design/Desc: | | | | | |
| Construction: | | | | | |
| Roof Desc: | Curved/S-Tile Roof | | | | |
| Floor: | Carpeted Floors, Marble Floors, Wood Floors | | | | |

**Remarks**

Remarks: **This home has Chinese Drywall and will need an estimated $80k in repairs.** Fairfax model with all upgrades. Premier exterior, marble floors, extra bath, plus much, much more. This lot is a large waterfront location on cul-de-sac. Expansive water vi ews from almost every room. Gated community. Beautiful clubhouse with state of the art fitness center. Resort style community pool and children's aqua park and playground. Conve nient to shopping, entertainment, parks, schools, transportation & business.

Driving Directions: BOYNTON BEACH BLVD TO N IN LYONS, 1ST R AT GATE, GO R TO 2ND LEFT

Broker Remarks: Property has Chinese Drywall.

**Rooms**

| Room | Dim | Room | Dim | Room | Dim |
|---|---|---|---|---|---|
| SecondBedroom | 12X11 | ThirdBedroom | 13X12 | FourthBedroom | 13X12 |
| FifthBedroom | 13X12 | Den | 11X9 | DiningRoom | 18X12 |
| FamilyRoom | 17X17 | Kitchen | 12X17 | LivingRoom | 16X14 |
| MasterBedroom | 14X20 | PatioBalcony | 15X9 | | |

| | |
|---|---|
| Bedroom Desc: | |
| Master Bath: | Dual Sinks |
| Addition Rooms: | Den/Library/Office, Family Room, Great Room |
| Dining Desc: | Eat-In Kitchen |
| ADA Compliant: | |

**Additional Information**

https://sef.mlsmatrix.com/Matrix/Printing/PrintOptions.aspx?c=AAEAAAD*****AQAAAAAAAAARAQAAAFQAAAAGAgAAAAQ3MjlyBgMAAAABMwYE...    1/3

**MLS Listing History**

| Borrower | David & Diane Griffin | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | | |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

MLS#: R3056547    9801 Cobblestone Lakes Ct #    Single Family

No Picture Available

| Price | Chg Type | Chg Info | Eff Date | Agent ID | Office ID | DOM |
|---|---|---|---|---|---|---|
| $240,000 | CS | ($240,000) | 07/27/2010 | FLL6308348 | FLL404289 | |
| $275,000 | PS | AC -> PS | 07/08/2010 | FLL6308348 | FLL404289 | |
| $275,000 | AC | A -> AC | 10/13/2009 | FLL6308348 | FLL404289 | |
| $275,000 | NEW | ACTV -> $275,000 | 10/08/2009 | FLL6308348 | FLL404289 | |

## Tax Information

| Borrower | David & Diane Griffin | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | | |
| City | Boynton Beach | County | Palm Beach | State | FL | Zip Code | 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 538 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 210 of
License

| Borrower | David & Diane Griffin | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 9801 Cobblestone Lakes Ct | | | | | | |
| City | Boynton Beach | County | Palm Beach | | State | FL | Zip Code | 33472 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |


RICK SCOTT, GOVERNOR

JONATHAN ZACHEM, SECRETARY



## STATE OF FLORIDA
## DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

### FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED RESIDENTIAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## FONG, CARLOS RAFAEL

10601 S.W. 124 ROAD.
MIAMI            FL 33186

**LICENSE NUMBER: RD6782**

**EXPIRATION DATE: NOVEMBER 30, 2020**

Always verify licenses online at MyFloridaLicense.com



Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
Miami/Palm Beach

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment



amgraziano@irr.com    -    305.670.0001 x320

# Anthony M. Graziano, MAI, CRE

### Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com



amgraziano@irr.com    -    305.670.0001 x320

**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Ray Benson & Maria Helena V. QBE Insurance Corporation | Miami-Dade County, FL | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | Manuel Soltero V. Adorno & Yoss, LLP | 11th Judicial Circuit Miami-Dade, FL | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Rainmaker Development V. A&F Bahamas, etal | Caribbean Islands | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Carribean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 11/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | CSX Transportation, Inc. V. Moshen Saranzzi, Faith Ann Safaranzi, Proverbium Hldg, LLC, USA & George Albright | Marion County, FL | NeJame, La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Ft. Lauderdale-Hollywood Int'l Airport Expansion | Broward County, FL | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | C8 Entertainment, LLC V. South Beach Ocean Parcel | Miami-Dade County, FL | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | United States vs. Atlantic Wood Industries, Inc. | Federal District Court of Virginia | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF OF | TRI COURT/CASE FILE # | COURT/CASE NO. # | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008930-CA-01 | 11th Judicial Circuit Court, Florida (Hon. Peter R. Lopez) | Aaron Stauber & Aviva Stauber V. BH 33, LLC | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Southern District of Florida | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | John Campos | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Miami-Dade County | Igor Gelr V. Yacht Club at Portofino Condo Association | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Monroe County | Ocean Bank V. Lindsack, Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24994 CA 06 | 11th Judicial Circuit Court, Florida | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Sariff and Course Drive Investments, LLC | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (respective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0164 | 13-01822 CACE 02 | 17th Judicial Circuit Broward County, Florida | Amalia I. Irlanda-Rivera V. Rivera Diagnostic Center, Inc., Oknay Rivera & Yudit Rivero | Amalia I. Irlanda-Rivera | Rent default judgment and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FLL534 (Pending) | Palm Beach County | Roehm Title Resources Claim | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined title defects not identified by Title Insurance Company |
| 4/2014 | Plaintiff | 123-2014-0117 | 4:14-CV-01077 (Pending) | USA District Court for the Eastern District of Missouri Eastern Division | USA V. GSA-VA St. Louis Property, LLC | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Miami-Dade County | Eufloria Club | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | Pending | Broward County | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition S.R. 7 | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | West Airport Plaza Business Park, LLC | Counsel for the Debtor, Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23822-CA 09 | 11th Judicial Circuit Court, Florida | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Plaintiff | 123-2013-0126 | CACE 0805762A (14) | 17th Judicial Circuit Broward County, Florida (Hon. Carlos A. Rodriguez) | Bayview Loan Servicing, LLC v. Kayhan Soodjani; Muhammad Mahmoodi, et al | Bayview Servicing, represented by Tabass, Freedman and Soloff; Stanzy Soloff, Esq. | Deficiency Judgment on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV-Rosenbaum | US District Court - Southern District of Florida (Hon. Rosenbaum) | United States of America v. G.K.K. etal | Richard Duvall, Holland and Knight and Jeffrey Neiman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 2/2013 | Plaintiff | 123-2011-0670 | 09-05650 CA 04 | 11th Judicial Circuit Court, Florida (Hon. Beth Bloom) | Zenaida Gomez v. City of Pinecrest | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence |
| 1/2013 | Defendant | 123-2013-0016 | 12-60930-CIV | 11th Judicial Circuit Court, Florida | US Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud |
| 11/2012 | Plaintiff | 123-2012-0128 | Pending | 11th Judicial Circuit Court, Florida | 2011 and 2012 Ad Valorem Tax Protest | Ken Wurtenberger, Esq., Kopelowitz, Ostrow Ferguson | Tax protest of commercial condominium. |
| 10/19/2012 | Plaintiff | 123-2012-0111 | 2011-1107 CA-23 | 17th Judicial Circuit Broward County, Florida (Hon. Patrick DeAhrenida) | Renegade at Hialeah Blvd v. Dynatech Engineering | Daniel Levin, Esq., Cole Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from unpaid lease modification. |
| 10/12/2012 | Defendant | 123-2012-0109 | 11-30189 CA21 | 11th Judicial Circuit Court, Florida | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | Craig Minko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal; economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal |
| 8/20/2012 | Plaintiff | 123-2010-0012 | CA-(2160) CA-25 | 11th Judicial Circuit Court, Florida | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egozi, etal | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012 |
| 8/15/2012 | Disclosed Dual Expert | 123-2012-0072 | | Matrimonial Mediation | Vazquez v. Vazquez Matrimonial Matter | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) marital assets comprised of office, retail, single and multi-family units in FL, TN, NC and Illinois, Bahamas |
| 7/2012 | Plaintiff | 109-2011-0199 | Pending: 2003-2014 | Tax Court of New Jersey (Hon. Patrick DeArencida) | BASF Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Phil Genuario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010-0172 | ATL-L-4451-08 | Superior Court of New Jersey, Law Division Atlantic County | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Jay Rhatican, Connell Foloey on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations |
| 7/2011 | Defendant | 109-2010-0199 | MERL-3034-08 | Superior Court of New Jersey Mercer County | 460 Mercer Street, LLP and Bruckener Southern, LLC vs. Hightstown | Aneel Zaro Grimm & Aaron, P.C. Husam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-580-1 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damage/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Tax Court of New Jersey | Westruah/RPC Mortgage Fund vs. City of Atlantic City | Cole, Schotz, Meisel, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

M. Quals: Graziano; Trial Lists

| RETENTION DATE | ON BEHALF OF | IRR FILE # | COURT CASE NO | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/1/2009 | Secured Creditor | 109-2009-0439 | | Erickson Building | US Bankruptcy Court - Southern District of Texas | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 09/2009 | Plaintiff | 109-2009-0123 | 3035-001 | Bay Head Yacht Club vs. Ocean County Tax Board | Tax Court of New Jersey | John Doyle, Carluccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 109-2008-XXX | INA (DEPS Pending) | Mirage Atlantic City (MAC) vs. City of Atlantic City | Superior Court of New Jersey | Hank Rovifiard, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 08/2008 | Defendant | 109-2008-0252 | L-2424-05 | The City of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Superior Court of New Jersey Law Division, Middlesex County | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | 109-2008-345 | C.A. No. OCNL-3361-06 | Osbourne Associates, Melbourne Associates VI, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co., JAC Property Management etal and Eckerd Corporation | Superior Court of New Jersey, Law Division Ocean County | Francis X. Manning, Esq, Stradley Ronon Stevens & Young & Michael Camboli, Esq, Partridge Snow and Hahn, both on behalf of | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 109-2008-0125- | N/A | Toms River Township vs. Citta Geigy Corporation | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpentelli] | Mark Troncone, Esq., In-house Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | 109-2007-211 | L-008635-06 | Kyle Mosteller vs. Galis Neeman | Superior Court of New Jersey, Law Division Middlesex County | Frank Canuso, Esq, Hoagland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between lush properties |
| 6/2007 | Plaintiff | 109-2007-0134 | 3:07-CV-2322 | Silver Lakes Inc. vs. Township of Freehold Inc. | Superior Court of New Jersey, Chancery Division Monmouth County | Christopher Hanlon, Esq, Hanlon and Niemann | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee |
| 06/2007 | Plaintiff | 109-2007-0173 | | Laurelwood Homes, LLC vs. United States Department of Navy | Federal District Court of Virginia | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 109-2006-0192 | CAM - L - 9731-05 | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Superior Court of New Jersey, Law Division, Camden County | Brett Last, Esq, O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 08/2006 | Defendant | 109-2006-0257 | | County Line & Browns Bridge, Jackson Township | Superior Court of New Jersey, Law Division | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 02/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Carl Brooks vs. K. Hovanian | Ocean Superior Court, Ocean County Courthouse | Ronan, Tuzzio & Giannone, Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner and the subject developer K. Hovnanian @ Sea Oaks |
| 10/2005 | Defendant | 109-2005-0315 | OCN-L-1810-5 | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility of the state of New Jersey vs. AC1 Manahawkin, LLC family and/or Armstrong | Superior Court of New Jersey, Law Division Ocean County | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and towers by Atlantic City Electric |
| 06/2005 | Defendant | 109-2005-0214 | MON-L-2609-05 | Township of Howell vs. George Harms Construction Co., Inc. etal | Superior Court of New Jersey, Law Division Monmouth County | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 09/2003 | Defendant | 109-2003-0282 | | Giuffre vs. Giuffre | Superior Court of New Jersey Chancery Division, Family Part, Monmouth County | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 07/2003 | Defendant | 109-2003-0203 | OCN-C-78-03 | West, etal vs. Pompaino, etal | Superior Court of New Jersey Chancery Division, Ocean County | Stephen E. Smith, Esq | To develop an opinion of the diminution in value due to a loss of useable land area |
| 06/2003 | Plaintiff | 109-2003-0128 | OCN-C-316-02 | Eugene M. Lord vs. Donald W. Rinaldo | Superior Court of New Jersey Law Division, | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate in the property |
| 04/2003 | Plaintiff | 109-2003-0128 | FM-15-468-03-C | Vincent Urbank vs. Lisa Urbank | Superior Court of New Jersey, Chancery Division, Family Part Ocean County | Marianna Pontoriero, Esq. | Litigation-Matrimonial |
| 02/2002 | Plaintiff | 109-2002-0055 | | Shenandoah Mobile Home Park | | Winokto Mani Lanni & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 04/2001 | Claimant | 109-2001-0169 | NJ-2624-00 | DeForest John Ely and Kimberle A. Ely, h/w | Superior Court of New Jersey, Chancery Division Middlesex County | First American Title Insurance Co. Jack Milks | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 03/1999 | Plaintiff | 109-1999-0062 | | Georgetown Apartments | US Bankruptcy Court - District of Newark | Emmes & Co. Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | LKW-257-3186 | FM-15-1465-94 | Lisa Franklin, etal vs. Donald Franklin, etal | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP - Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1984 | Creditor | HUD-XX | | Hudson Marina Association vs. Emmes & Co. | US Bankruptcy Court - District of Newark | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium complex |

**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Rosen, Michael & Robyn**
Hypothetical Market Value "As If" Remediated
17538 Middlebrook Way
Boca Raton, Palm Beach County, Florida 33496
Client Reference: 6

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
August 1, 2009

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**Rosen, Michael & Robyn**
17538 Middlebrook Way
Boca Raton, Florida



| Integra Realty Resources | In Miami | In Orlando | In Naples/Sarasota |
|---|---|---|---|
| Miami | Dadeland Centre | The Magnolia Building | Horseshoe Professional Park |
| Orlando | 9155 South Dadeland Blvd. | 326 N. Magnolia Ave. | 2770 Horseshoe Drive S. |
| Southwest Florida | Suite 1208 | | Suite 3 |
| | Miami, FL 33156 | Orlando, FL 32801 | Naples, FL 34104 |
| www.irr.com | (305) 670-0001 | (407) 843-3377 | (239)-643-6888 |

February 12, 2019

Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

SUBJECT:  Hypothetical Market Value "As If" Remediated
Case No 11-22408-Civ-COOKE
United States District Court Southern District of Florida in the matter of
Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
Priority Claimant Case at:
Rosen, Michael & Robyn
17538 Middlebrook Way
Boca Raton, Palm Beach County, Florida 33496
Client Reference: 6
IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the
referenced property as of the effective date assuming all remediation was completed by an
appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It
presents summary discussions of the data, reasoning, and analysis that were used in the appraisal
process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 547 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2015 Page 219 of 989

Identification of Subject                                                                          2

## Identification of Subject

The subject of this report is a single-family ranch style home configured with 5 bedroom and 5.5 baths with 5,935 SF under air-conditioning. The subject property was built in 2006 and is located on a 10,393 SF site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, August 1, 2009. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is February 12, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
| --- | --- |
| Sale Date (Most Recent) | November 6, 2006 |
| Seller | Albanese-Popkin The Oaks Development Group |
| Buyer | Rosen, Michael & Robyn |
| Sale Price | $1,600,000 |
| Recording Instrument Number | 21066 / 01743 |
| Disposition Details | Original Sale from homebuilder |

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

On December 4, 2009, the subject was sold for $876,000 after being on the market for 334 days (MLS #R2983257). Per the MLS, the property was originally listed for $1,949,000 on December 16, 2008. The listing price was reduced to $1,848,000 on July 10, 2009. The sales price represented a 44.9% discount to the original listing price and a 54.8% discount to the most recent sale.

On March 3, 2016, the subject property was listed for sale for $1,795,000 (MLS #R10213453) and sold for $1,499,656 after 84 days on market. It was put under contract on May 26, 2016 – 74 days before the closing. The broker indicated that the property had been "totally remastered by award-winning Brenner Architecture Group…"

Rosen, Michael & Robyn



Case 1:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 548 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 220 of 989

Pending Transactions                                                                                    3

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

The property was listed for sale with an asking price of $1,599,900 on November 27, 2018 (MLS #10483913). Per the MLS, it has been put under contract at the listing price.

### Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

## Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

## Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 549 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 221 of 989

Scope of Work                                                                                                          4

physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

(*Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org*)

## Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation. The result of that study are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida." The results of that study are incorporated by reference herein.

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation. As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction. Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation. These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property. This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections. Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available. In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis. However, the damage analysis only represents a <u>portion of the overall</u>

Rosen, Michael & Robyn



Case 2:09-md-02047-EEF-MBN  Document 22380-28  Filed 12/02/19  Page 550 of 796
Case 1:11-cv-22408-MGC  Document 273-8  Entered on FLSD Docket 08/15/2019  Page 222 of 989

Highest and Best Use                                                                        5

damages because we were specifically requested to exclude the consideration of the costs to cure. This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to as a "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report.  The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach.  The valuations consider the only relevant approach for residential valuation, the sales comparison analysis.  The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis.  Additionally, this approach directly considered the prices of alternative properties having similar utility.

### Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant.  The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 551 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2015 Page 223 of 989

Conclusion of Value                                                                  6

## Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report.  This value us hypothetical since it assumes that defective drywall had never been present at the subject property.

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue.  This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date.  This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation.  Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total.  This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value.  These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home.  Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered.  Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF            4 months

$150,000 - $750,000 home up to 4,000 SF      6 months

$750,000+ home up over 4,000 SF              9 months

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).

Rosen, Michael & Robyn                                                  

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

| Conclusions of Damage | | | |
|---|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $1,725,000 | |
| Market Impairment Discount (As if Remediated) | | 10% | |
| Post Impairment Damage ($) | | $172,500 | |
| **Hypothetical Value As IF Remediated** | | **$1,552,500** | |
| Post Remediation Damages as of Effective Date | | **$172,500** | |
| Loss of Use: | | | |
| Rental Rate ($/Month) | **$10,000** | | |
| Moving & Storage Costs | | $3,000 | |
| Loss of Use Subject (# Months) | 9x | $90,000 | |
| Subject Total | | | **$93,000** |
| **Post Remediation Damage** | | | **$265,500** |

Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

On December 4, 2009, the subject was sold for $876,000 after being on the market for 334 days (MLS #R2983257). Per the MLS, the property was originally listed for $1,949,000 on December 16, 2008. The listing price was reduced to $1,848,000 on July 10, 2009. The sales price represented a 44.9% discount to the original listing price and a 54.8% discount to the most recent sale. Compared to the August 2009 unimpaired value estimate by Integra ($1,725,000), this resale (4 months later) reflects a 50.8% value dimunition.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 553 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 225 of 989
Certification                                                                                          8

## Certification

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Carlos Fong has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 554 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 226 of 989

Assumptions and Limiting Conditions                                                                9

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2. There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3. There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4. The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5. The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1. An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2. The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4. No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5. Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6. We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 555 of 796
Case 1:11-cv-22408-MGC Document 273-9 Entered on FLSD Docket 09/15/2015 Page 227 of 989

Assumptions and Limiting Conditions                                                    10

7.  No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.  We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.  The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 556 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 228 of 989

Assumptions and Limiting Conditions                                                    11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18.    The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19.    The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20.    No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21.    The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22.    Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23.    The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24.    It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 557 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2015 Page 229 of 989

Assumptions and Limiting Conditions                                                    12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25. Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26. The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27. All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

Rosen, Michael & Robyn



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 558 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 280 of 989

Addenda

# Addenda



## Supplemental Addendum

| | | | | File No. VALU-18-12-1471 |
|---|---|---|---|---|
| Borrower | Michael & Robyn Rosen | | | |
| Property Address | 17538 Middlebrook Way | | | |
| City | Boca Raton | County Palm Beach | State FL | Zip Code 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | |

02/12/2019

On this date above, the appraiser added comparables 5, 6, and 7 to the final analysis.  These sales were provided to the appraiser in order to include more recent sales.  After analyzing, and adjusting for the more recent sales, the appraiser has amended the opinion of value from $1,900,000 to $1,725,000, with more emphasis and weight placed on the more recent sales.

Signature _Carlos Fong_

| | | | |
|---|---|---|---|
| Signature | | Signature | |
| Name Carlos Fong | | Name | |
| Date Signed 02/12/2019 | | Date Signed | |
| State Certification # RD 6782 | State FL | State Certification # | State |
| Or State License # | State | Or State License # | State |

Form TADD2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

| Borrower | Michael & Robyn Rosen | | | File No. | VALU-18-12-1471 |
|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | |

## TABLE OF CONTENTS



Supplemental Addendum w/sig block ................................................................ 1
USPAP Identification Addendum .................................................................... 2
Exterior-Only ................................................................................... 3
Additional Comparables 4-6 ...................................................................... 9
Additional Comparables 7-9 ...................................................................... 10
Single Family Comparable Rent Schedule .......................................................... 11
General Text Addendum ........................................................................... 12
Subject Photos .................................................................................. 15
Comparable Photos 1-3 ........................................................................... 16
Comparable Photos 4-6 ........................................................................... 17
Comparable Photos 7-9 ........................................................................... 18
Rental Photos 1-3 ............................................................................... 19
Assessor Map .................................................................................... 20
Location Map .................................................................................... 21
Subject Aerial Map .............................................................................. 22
Assessor Data ................................................................................... 23
MLS Listing Sheet ............................................................................... 24
MLS Listing History ............................................................................. 25
Tax Information ................................................................................. 26
License ......................................................................................... 27

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 561 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 283 of
989

# USPAP ADDENDUM

| Borrower | Michael & Robyn Rosen | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code 33496 |
| Lender | Integra Realty Resources (IRR) | | | | | |

**This report was prepared under the following USPAP reporting option:**

☒ Appraisal Report       This report was prepared in accordance with USPAP Standards Rule 2-2(a).

☐ Restricted Appraisal Report       This report was prepared in accordance with USPAP Standards Rule 2-2(b).

**Reasonable Exposure Time**

My opinion of a reasonable exposure time for the subject property at the market value stated in this report is:    90-180 DAYS

EXPOSURE TIME: estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

USPAP 2018-19 Comment: Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market

**Additional Certifications**

I certify that, to the best of my knowledge and belief:

☒ I have NOT performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

☐ I HAVE performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no  personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

**Additional Comments**

APPRAISER COMPETENCY

An appraiser must determine, prior to accepting an assignment, that he or she can perform the assignment competently.  Competency requires:

1. the ability to properly identify the problem to be addressed; and
2. the knowledge and experience to complete the assignment competently; and
3. recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.

I am competent to perform this assignment based on my state appraiser license and familiarity with this type of property in the subject market

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations

| **APPRAISER:** | **SUPERVISORY APPRAISER: (only if required)** |
|---|---|
| Signature: *Carlos Fong* | Signature: |
| Name: Carlos Fong | Name: |
| Date Signed: 02/12/2019 | Date Signed: |
| State Certification #: RD 6782 | State Certification #: |
| or State License #: | or State License #: |
| State: FL | State: |
| Expiration Date of Certification or License: 11/30/2020 | Expiration Date of Certification or License: |
| Effective Date of Appraisal: 08/01/2009 | Supervisory Appraiser Inspection of Subject Property: |
| | ☐ Did Not   ☐ Exterior-only from Street   ☐ Interior and Exterior |

## Exterior-Only Inspection Residential Appraisal Report

VALU-18-12-1471
File # VALU-18-12-1471

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

SUBJECT

| | | |
|---|---|---|
| Property Address | 17538 Middlebrook Way | City Boca Raton | State FL | Zip Code 33496 |

Borrower Michael & Robyn Rosen     Owner of Public Record Michael & Robyn Rosen     County Palm Beach

Legal Description FOX HILL ESTATES OF BOCA RATON LT 148

Assessor's Parcel # 00-42-46-31-01-000-1480    Tax Year 2017    R.E. Taxes $ 18,700

Neighborhood Name Fox Hill Estates of Boca Raton    Map Reference 48424    Census Tract 0077.43

Occupant ☒ Owner ☐ Tenant ☐ Vacant    Special Assessments $ 0    ☐ PUD   HOA $ 0   ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Litigation

Lender/Client Integra Realty Resources (IRR)    Address 9155 South Dadeland Boulevard, Miami, FL 33156

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☒ Yes ☐ No

Report data source(s) used, offering price(s), and date(s). DOM 334;The Subject was offered for sale on 12/16/2008 for $1,949,000 per the MIAMI MLS #R2983257, and closed on 12/04/2009 for $876,000.

CONTRACT

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $    Date of Contract    Is the property seller the owner of public record? ☐ Yes ☐ No   Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

NEIGHBORHOOD

| Neighborhood Characteristics | | One-Unit Housing Trends | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☐ Increasing ☒ Stable ☐ Declining | PRICE $ (000) | AGE (yrs) | One-Unit | 90 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | 3,098 High 40 | | 2-4 Unit | % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | 92 Low 0 | | Multi-Family | 5 % |
| | | | | Commercial | 5 % |
| | | 360 Pred. 25 | | Other | % |

Neighborhood Boundaries The subject is bound to the north by Gulf Stream, to the west by FL Route 441, to the east by Lyons Rd and to the south by Clint Moore Rd.

Neighborhood Description There are no apparent factors that should affect the subject's marketability.  The subject has access to all necessary supporting facilities including schools, shopping, recreation and employment centers.

Market Conditions (including support for the above conclusions) There is a slight oversupply of active listings.  This will lead to higher marketing times, however, will not adversely effect the subject.

SITE

Dimensions Per Palm Beach County Assr    Area 10,393 sf    Shape Rectangular    View N;Wtr;

Specific Zoning Classification AGR-PUD    Zoning Description Agricultural Reserve PUD (00-Unincorporated)

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No   If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley None | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No   FEMA Flood Zone X   FEMA Map # 12099C0965F   FEMA Map Date 10/5/2017

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No   If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No   If Yes, describe

No observed or known adverse influences to market value were noted.

IMPROVEMENTS

Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☒ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner
☐ Other (describe)    Data Source for Gross Living Area Sefimapp

| General Description | General Description | Heating/Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | ☒ FWA ☐ HWBB | Fireplace(s) # 0 ☐ None | ☐ None |
| # of Stories 2 | ☐ Full Basement ☐ Finished | ☐ Radiant | Woodstove(s) # 0 ☒ Driveway # of Cars 3 | |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | ☐ Partial Basement ☐ Finished | ☐ Other | ☒ Patio/Deck Patio | Driveway Surface Pavers |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls CBS | Fuel Gas/Elec | ☒ Porch Porch | ☒ Garage # of Cars 3 |
| Design (Style) Mediterranean | Roof Surface S-Tile | ☒ Central Air Conditioning | ☒ Pool Pool | ☐ Carport # of Cars 0 |
| Year Built 2006 | Gutters & Downspouts Gutters | ☐ Individual | ☒ Fence Fence | ☒ Attached ☐ Detached |
| Effective Age (Yrs) 3 | Window Type Pic./Sliders | ☐ Other | ☐ Built-in | |
| Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☒ Washer/Dryer ☐ Other (describe) | | | | |

Finished area above grade contains: 9 Rooms 5 Bedrooms 5.1 Bath(s) 5,935 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). None

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.). C2;The subject was noted in average condition upon inspection. Subject is located in a gated community and access was not granted.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No
If Yes, describe.

There are no apparent external or functional inadequacies noted or reported at time of inspection.  Physical depreciation is calculated by the modified age life method.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No   If No, describe.
The construction quality is typical for the area.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

# Exterior–Only Inspection Residential Appraisal Report

VALU-18-12-1471
File # VALU-18-12-1471

| | | | |
|---|---|---|---|
| There are | 28 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 899,000 to $ 9,490,000 . |
| There are | 14 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 1,290,000 to $ 3,097,500 . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 17538 Middlebrook Way | 9391 Bridgebrook Dr | | 17807 Cadena Dr | | 17690 Lomond Ct | |
| | Boca Raton, FL 33496 | Boca Raton, FL 33496 | | Boca Raton, FL 33496 | | Boca Raton, FL 33496 | |
| Proximity to Subject | | 0.32 miles E | | 0.75 miles E | | 0.21 miles E | |
| Sale Price | $ | | $ 2,010,000 | | $ 1,950,000 | | $ 1,910,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 321.29 sq.ft. | | $ 336.09 sq.ft. | | $ 282.80 sq.ft. | |
| Data Source(s) | | SEF #R2885821;DOM 49 | | SEF #R2607252;DOM 62 | | SEF #R2818416;DOM 315 | |
| Verification Source(s) | | Assessor, Realist | | Assessor, Realist | | Assessor, Realist | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Conv;0 | | Cash;0 | | Cash;0 | |
| Date of Sale/Time | | s03/08;c02/08 | | s07/07;c03/06 | | s07/08;c04/08 | |
| Location | Residential | Residential | | Residential | | Residential | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 10393 sf | 10019 sf | | 9165 sf | | 13939 sf | -17,730 |
| View | Water | Water | | Water | | Water | |
| Design (Style) | Mediterranean | Mediterranean | | Mediterranean | | Mediterranean | |
| Quality of Construction | Good | Good | | Good | | Good | |
| Actual Age | 3 | 3 | | 3 | | 4 | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 9   5   5.1 | 10   6   7.1 | -40,000 | 9   5   5.1 | | 10   6   5.2 | -10,000 |
| Gross Living Area | 5,935 sq.ft. | 6,256 sq.ft. | | 5,802 sq.ft. | | 6,754 sq.ft. | -81,900 |
| Basement & Finished | No Basement | No Basement | | No Basement | | No Basement | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | EFA/CAC | EFA/CAC | | EFA/CAC | | EFA/CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 3-Car Garage | 3-Car Garage | | 3-Car Garage | | 3-Car Garage | |
| Porch/Patio/Deck | Porch/Patio | Porch/Patio | | Porch/Patio | | Porch/Patio | |
| Net Adjustment (Total) | | ☐ +   ☒ -  $ | -40,000 | ☐ +   ☐ -  $ | | ☐ +   ☒ -  $ | -109,630 |
| Adjusted Sale Price | | Net Adj. 2.0 % | | Net Adj. 0.0 % | | Net Adj. 5.7 % | |
| of Comparables | | Gross Adj. 2.0 % $ | 1,970,000 | Gross Adj. 0.0 % $ | 1,950,000 | Gross Adj. 5.7 % $ | 1,800,370 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   MIAMI MLS, Palm Beach County Records, and Realist
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   MIAMI MLS, Palm Beach County Records, and Realist
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 04/30/2009 | | | |
| Price of Prior Sale/Transfer | 0 | | | |
| Data Source(s) | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist |
| Effective Date of Data Source(s) | 08/01/2009 | 08/01/2009 | 08/01/2009 | 08/01/2009 |

Analysis of prior sale or transfer history of the subject property and comparable sales   Per public record, the Subject transferred on 04/30/2009 for $0 from
Oaks At Boca Raton Venture to Albanese-Popkin Th Oaks Dev Group (Special Warranty Deed #23215-208).

Summary of Sales Comparison Approach      See Attached Addendum.

Indicated Value by Sales Comparison Approach $   1,725,000

Indicated Value by: Sales Comparison Approach $   1,725,000   Cost Approach (if developed) $   Income Approach (if developed) $
see attached addendum.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  No special conditions are noted.

Personal property is not included in this valuation.
Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$   1,725,000   , as of   08/01/2009   , which is the date of inspection and the effective date of this appraisal.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1471
File # VALU-18-12-1471

PLEASE ATTACHED ADDENDUM FOR FURTHER INFORMATION

**ADDITIONAL COMMENTS**

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    Site value is estimated and/or supported by the

sales comparison approach whenever data is available, otherwise extraction method is used.

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | =$ 150,000 |
|---|---|---|
| Source of cost data    N/A | DWELLING    5,935 Sq.Ft. @ $ | =$ |
| Quality rating from cost service    N/A    Effective date of cost data    N/A | 0 Sq.Ft. @ $ | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | =$ |
| The cost approach was not applied as the area is fully built up and there | Garage/Carport    Sq.Ft. @ $ | =$ |
| is no vacant land available, except where an existing house will be torn | Total Estimate of Cost-New | =$ |
| down.  Although the Cost Approach could be considered an applicable | Less    Physical    Functional    External | |
| approach to value, it is not typically relied upon by market participants | Depreciation | =$( ) |
| for one to four family properties. | Depreciated Cost of Improvements | =$ |
| | "As-is" Value of Site Improvements | =$ |
| Estimated Remaining Economic Life (HUD and VA only)    57 Years | INDICATED VALUE BY COST APPROACH | =$ |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $    10,000    X Gross Rent Multiplier    = $ | Indicated Value by Income Approach |
|---|---|

Summary of Income Approach (including support for market rent and GRM)    The income approach is not applicable to this report as homes in the area are

typically owner occupied.

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No    Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion

Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source(s)

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1471
File # VALU-18-12-1471

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1471
File # VALU-18-12-1471

APPRAISER'S CERTIFICATION:    The  Appraiser  certifies  and  agrees  that:

1.  I  have,  at  a  minimum,  developed  and  reported  this  appraisal  in  accordance  with  the  scope  of  work  requirements  stated  in
this  appraisal  report.

2.  I  performed  a  visual  inspection  of  the  exterior  areas  of  the  subject  property  from  at  least  the  street.  I  reported  the  condition
of  the  improvements  in  factual,  specific  terms.  I  identified  and  reported  the  physical  deficiencies  that  could  affect  the  livability,
soundness,  or  structural  integrity  of  the  property.

3.  I  performed  this  appraisal  in  accordance  with  the  requirements  of  the  Uniform  Standards  of  Professional  Appraisal
Practice  that  were  adopted  and  promulgated  by  the  Appraisal  Standards  Board  of  The  Appraisal  Foundation  and  that  were  in
place  at  the  time  this  appraisal  report  was  prepared.

4.  I  developed  my  opinion  of  the  market  value  of  the  real  property  that  is  the  subject  of  this  report  based  on  the  sales
comparison  approach  to  value.  I  have  adequate  comparable  market  data  to  develop  a  reliable  sales  comparison  approach
for  this  appraisal  assignment.  I  further  certify  that  I  considered  the  cost  and  income  approaches  to  value  but  did  not  develop
them,  unless  otherwise  indicated  in  this  report.

5.  I  researched,  verified,  analyzed,  and  reported  on  any  current  agreement  for  sale  for  the  subject  property,  any  offering  for
sale  of  the  subject  property  in  the  twelve  months  prior  to  the  effective  date  of  this  appraisal,  and  the  prior  sales  of  the  subject
property  for  a  minimum  of  three  years  prior  to  the  effective  date  of  this  appraisal,  unless  otherwise  indicated  in  this  report.

6.  I  researched,  verified,  analyzed,  and  reported  on  the  prior  sales  of  the  comparable  sales  for  a  minimum  of  one  year  prior
to  the  date  of  sale  of  the  comparable  sale,  unless  otherwise  indicated  in  this  report.

7.  I  selected  and  used  comparable  sales  that  are  locationally,  physically,  and  functionally  the  most  similar  to  the  subject  property.

8.  I  have  not  used  comparable  sales  that  were  the  result  of  combining  a  land  sale  with  the  contract  purchase  price  of  a  home  that
has  been  built  or  will  be  built  on  the  land.

9.  I  have  reported  adjustments  to  the  comparable  sales  that  reflect  the  market's  reaction  to  the  differences  between  the  subject
property  and  the  comparable  sales.

10.  I  verified,  from  a  disinterested  source,  all  information  in  this  report  that  was  provided  by  parties  who  have  a  financial  interest  in
the  sale  or  financing  of  the  subject  property.

11.  I  have  knowledge  and  experience  in  appraising  this  type  of  property  in  this  market  area.

12.  I  am  aware  of,  and  have  access  to,  the  necessary  and  appropriate  public  and  private  data  sources,  such  as  multiple  listing
services,  tax  assessment  records,  public  land  records  and  other  such  data  sources  for  the  area  in  which  the  property  is  located.

13.  I  obtained  the  information,  estimates,  and  opinions  furnished  by  other  parties  and  expressed  in  this  appraisal  report  from
reliable  sources  that  I  believe  to  be  true  and  correct.

14.  I  have  taken  into  consideration  the  factors  that  have  an  impact  on  value  with  respect  to  the  subject  neighborhood,  subject
property,  and  the  proximity  of  the  subject  property  to  adverse  influences  in  the  development  of  my  opinion  of  market  value.  I
have  noted  in  this  appraisal  report  any  adverse  conditions  (such  as,  but  not  limited  to,  needed  repairs,  deterioration,  the
presence  of  hazardous  wastes,  toxic  substances,  adverse  environmental  conditions,  etc.)  observed  during  the  inspection  of  the
subject  property  or  that  I  became  aware  of  during  the  research  involved  in  performing  this  appraisal.  I  have  considered  these
adverse  conditions  in  my  analysis  of  the  property  value,  and  have  reported  on  the  effect  of  the  conditions  on  the  value  and
marketability  of  the  subject  property.

15.  I  have  not  knowingly  withheld  any  significant  information  from  this  appraisal  report  and,  to  the  best  of  my  knowledge,  all
statements  and  information  in  this  appraisal  report  are  true  and  correct.

16.  I  stated  in  this  appraisal  report  my  own  personal,  unbiased,  and  professional  analysis,  opinions,  and  conclusions,  which
are  subject  only  to  the  assumptions  and  limiting  conditions  in  this  appraisal  report.

17.  I  have  no  present  or  prospective  interest  in  the  property  that  is  the  subject  of  this  report,  and  I  have  no  present  or
prospective  personal  interest  or  bias  with  respect  to  the  participants  in  the  transaction.  I  did  not  base,  either  partially  or
completely,  my  analysis  and/or  opinion  of  market  value  in  this  appraisal  report  on  the  race,  color,  religion,  sex,  age,  marital
status,  handicap,  familial  status,  or  national  origin  of  either  the  prospective  owners  or  occupants  of  the  subject  property  or  of  the
present  owners  or  occupants  of  the  properties  in  the  vicinity  of  the  subject  property  or  on  any  other  basis  prohibited  by  law.

18.  My  employment  and/or  compensation  for  performing  this  appraisal  or  any  future  or  anticipated  appraisals  was  not
conditioned  on  any  agreement  or  understanding,  written  or  otherwise,  that  I  would  report  (or  present  analysis  supporting)  a
predetermined  specific  value,  a  predetermined  minimum  value,  a  range  or  direction  in  value,  a  value  that  favors  the  cause  of
any  party,  or  the  attainment  of  a  specific  result  or  occurrence  of  a  specific  subsequent  event  (such  as  approval  of  a  pending
mortgage  loan  application).

19.  I  personally  prepared  all  conclusions  and  opinions  about  the  real  estate  that  were  set  forth  in  this  appraisal  report.  If  I
relied  on  significant  real  property  appraisal  assistance  from  any  individual  or  individuals  in  the  performance  of  this  appraisal
or  the  preparation  of  this  appraisal  report,  I  have  named  such  individual(s)  and  disclosed  the  specific  tasks  performed  in  this
appraisal  report.  I  certify  that  any  individual  so  named  is  qualified  to  perform  the  tasks.  I  have  not  authorized  anyone  to  make
a  change  to  any  item  in  this  appraisal  report;  therefore,  any  change  made  to  this  appraisal  is  unauthorized  and  I  will  take  no
responsibility  for  it.

# Exterior-Only Inspection Residential Appraisal Report

VALU-18-12-1471
File # VALU-18-12-1471

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION:     The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report     was     prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature *Carlos Fong* | Signature |
| Name  Carlos Fong | Name |
| Company Name  Valucentric LLC | Company Name |
| Company Address  7908 Montecito Pl, Delray Beach, FL 33446 | Company Address |
| Telephone Number  (844) 825-8236 | Telephone Number |
| Email Address  info@valucentric.com | Email Address |
| Date of Signature and Report  02/12/2019 | Date of Signature |
| Effective Date of Appraisal  08/01/2009 | State Certification # |
| State Certification #  RD 6782 | or State License # |
| or State License # | State |
| or Other (describe)                  State # | Expiration Date of Certification or License |
| State  FL | |
| Expiration Date of Certification or License  11/30/2020 | SUBJECT PROPERTY |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did not inspect exterior of subject property |
| 17538 Middlebrook Way | ☐ Did inspect exterior of subject property from street |
| Boca Raton, FL 33496 | Date of Inspection |
| APPRAISED VALUE OF SUBJECT PROPERTY $  1,725,000 | |
| LENDER/CLIENT | COMPARABLE SALES |
| Name | ☐ Did not inspect exterior of comparable sales from street |
| Company Name  Integra Realty Resources (IRR) | ☐ Did inspect exterior of comparable sales from street |
| Company Address  9155 South Dadeland Boulevard, Miami, FL 33156 | Date of Inspection |
| Email Address | |

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1471
File # VALU-18-12-1471

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 17538 Middlebrook Way | 17897 Monte Vista Dr | | 9115 Redonda Dr | | 17776 Vecino Way | |
| | Boca Raton, FL 33496 | Boca Raton, FL 33496 | | Boca Raton, FL 33496 | | Boca Raton, FL 33496 | |
| Proximity to Subject | | 0.59 miles SE | | 0.63 miles E | | 0.69 miles E | |
| Sale Price | $ | $ | 1,888,213 | $ | 1,775,000 | $ | 1,860,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 308.03 sq.ft. | | $ 272.57 sq.ft. | | $ 276.33 sq.ft. | |
| Data Source(s) | | SEF #R2635967;DOM 134 | | SEF #R2811246; DOM 610 | | SEF #R3013996;DOM 17 | |
| Verification Source(s) | | Assessor, Realist | | Assessor, Realist | | Assessor, Realist | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Cash;0 | | Cash;0 | | Cash;0 | |
| Date of Sale/Time | | s09/07;c06/06 | | s02/09;c01/09 | | s05/09;c05/09 | |
| Location | Residential | Residential | | Residential | | Residential | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 10393 sf | 10454 sf | | 11275 sf | | 18687 sf | -41,470 |
| View | Water | Residential | 0 | Water | | Water | |
| Design (Style) | Mediterranean | Mediterranean | | Mediterranean | | Mediterranean | |
| Quality of Construction | Good | Good | | Good | | Good | |
| Actual Age | 3 | 3 | | 1 | | 0 | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 9 5 5.1 | 10 6 6.2 | -30,000 | 10 5 7.2 | -50,000 | 10 6 6.1 | -20,000 |
| Gross Living Area | 5,935 sq.ft. | 6,130 sq.ft. | | 6,512 sq.ft. | | 6,731 sq.ft. | -79,600 |
| Basement & Finished | No Basement | No Basement | | No Basement | | No Basement | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | EFA/CAC | EFA/CAC | | EFA/CAC | | EFA/CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 3-Car Garage | 3-Car Garage | | 3-Car Garage | | 3-Car Garage | |
| Porch/Patio/Deck | Porch/Patio | Porch/Patio | | Porch/Patio | | Porch/Patio | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - $ | -30,000 | ☐ + ☒ - $ | -50,000 | ☐ + ☒ - $ | -141,070 |
| Adjusted Sale Price | | Net Adj. 1.6 % | | Net Adj. 2.8 % | | Net Adj. 7.6 % | |
| of Comparables | | Gross Adj. 1.6 % $ | 1,858,213 | Gross Adj. 2.8 % $ | 1,725,000 | Gross Adj. 7.6 % $ | 1,718,930 |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 04/30/2009 | | | 05/06/2009 |
| Price of Prior Sale/Transfer | 0 | | | 0 |
| Data Source(s) | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist |
| Effective Date of Data Source(s) | 08/01/2009 | 08/01/2009 | 08/01/2009 | 08/01/2009 |

Analysis of prior sale or transfer history of the subject property and comparable sales    17602 Middle Lake Dr has no 12-month prior transfer history. 17777
Key Vista Way has no 12-month prior transfer history.

Analysis/Comments

Freddie Mac Form 2055 March 2005

Fannie Mae Form 2055 March 2005

## Exterior-Only Inspection Residential Appraisal Report

VALU-18-12-1471
File # VALU-18-12-1471

| FEATURE | SUBJECT | COMPARABLE SALE # 7 | | COMPARABLE SALE # 8 | | COMPARABLE SALE # 9 | |
|---|---|---|---|---|---|---|---|
| Address | 17538 Middlebrook Way | 9107 Redonda Dr | | | | | |
| | Boca Raton, FL 33496 | Boca Raton, FL 33496 | | | | | |
| Proximity to Subject | | 0.64 miles E | | | | | |
| Sale Price | $ | | $ 1,839,200 | | $ | | $ |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 270.83 sq.ft. | | $ sq.ft. | | $ sq.ft. | |
| Data Source(s) | | SEF #R2780361; DOM 760 | | | | | |
| Verification Source(s) | | Assessor, Realist | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | | | | |
| Concessions | | Conv;0 | | | | | |
| Date of Sale/Time | | c05/09;c03/09 | | | | | |
| Location | Residential | Residential | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | 10393 sf | 11275 | | | | | |
| View | Water | Water | | | | | |
| Design (Style) | Mediterranean | Mediterranean | | | | | |
| Quality of Construction | Good | Good | | | | | |
| Actual Age | 3 | 1 | | | | | |
| Condition | Good | Good | | | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 9 5 5.1 | 10 6 7.2 | -50,000 | | | | |
| Gross Living Area | 5,935 sq.ft. | 6,791 sq.ft. | -85,600 | sq.ft. | | sq.ft. | |
| Basement & Finished | No Basement | No Basement | | | | | |
| Rooms Below Grade | None | None | | | | | |
| Functional Utility | Average | Average | | | | | |
| Heating/Cooling | EFA/CAC | EFA/CAC | | | | | |
| Energy Efficient Items | None | None | | | | | |
| Garage/Carport | 3-Car Garage | 3-Car Garage | | | | | |
| Porch/Patio/Deck | Porch/Patio | Porch/Patio | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -135,600 | ☐ + ☐ - | $ | ☐ + ☐ - | $ |
| Adjusted Sale Price | | Net Adj. 7.4 % | | Net Adj. 0.0 % | | Net Adj. 0.0 % | |
| of Comparables | | Gross Adj. 7.4 % $ 1,703,600 | | Gross Adj. 0.0 % $ 0 | | Gross Adj. 0.0 % $ |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 7 | COMPARABLE SALE # 8 | COMPARABLE SALE # 9 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 04/30/2009 | | | |
| Price of Prior Sale/Transfer | 0 | | | |
| Data Source(s) | MLS, Assessor, Realist | MLS, Assessor, Realist | | |
| Effective Date of Data Source(s) | 08/01/2009 | 08/01/2009 | | |

Analysis of prior sale or transfer history of the subject property and comparable sales

Analysis/Comments

*(vertical labels along left margin: SALES COMPARISON APPROACH, SALE HISTORY, ANALYSIS / COMMENTS)*

Freddie Mac Form 2055 March 2005

Fannie Mae Form 2055 March 2005

Form 2055.(AC) - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

### SINGLE FAMILY COMPARABLE RENT SCHEDULE

VALU-18-12-1471
File # VALU-18-12-1471

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property.  Adjustments should be made only for items of significant difference between the comparables and the subject property.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 17538 Middlebrook Way Boca Raton, FL 33496 | 17570 Middlebrook Way Boca Raton, FL 33496 | 17979 Lake Azure Way Boca Raton, FL 33496 | 17827 Lake Azure Way Boca Raton, FL 33496 |
| Proximity to Subject | | 0.06 miles N | 0.44 miles SE | 0.45 miles SE |
| Date Lease Begins | | 02/08 | 11/07 | 04/07 |
| Date Lease Expires | | Unk | Unk | Unk |
| Monthly Rental | If Currently Rented: $ | $  12,000 | $  8,000 | $  8,000 |
| Less: Utilities | $ | $ | $ | $ |
| Furniture | | | | |
| Adjusted Monthly Rent | $ | $  12,000 | $  8,000 | $  8,000 |
| Data Source | MLS,Inspection Assessor,Realist | MLS #R2899248 Assessor, Realist | MLS #R2873477 Assessor, Realist | MLS #R2799568 Assessor, Realist |

| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(–)$ Adjust. | DESCRIPTION | +(–)$ Adjust. | DESCRIPTION | +(–)$ Adjust. |
|---|---|---|---|---|---|---|---|
| Rent Concessions | | | | | | | |
| Location/View | Residential Water | Residential Water | | Residential Water | | Residential Water | |
| Design and Appeal | Mediterranean | Mediterranean | | Mediterranean | | Mediterranean | |
| Age/Condition | 3 Good | 7 Good | | 3 Good | | 3 Good | |
| Above Grade | Total : Bdrms : Baths | Total : Bdrms : Baths | | Total : Bdrms : Baths | | Total : Bdrms : Baths | |
| Room Count | 9 : 5 : 5.1 | 9 : 5 : 5.1 | | 9 : 5 : 4.2 | | 9 : 5 : 4.2 | |
| Gross Living Area | 5,935 Sq. Ft. | 5,511 Sq. Ft. | | 4,661 Sq. Ft. | | 4,661 Sq. Ft. | |
| Other (e.g., basement, etc.) | No Basement None | No Basement None | | No Basement None | | No Basement None | |
| Other: | | | | | | | |
| Net Adj. (total) | | ☐ + ☐ – $ | 0 | ☐ + ☐ – $ | 0 | ☐ + ☐ – $ | 0 |
| Indicated Monthly Market Rent | | $  12,000 | | $  8,000 | | $  8,000 | |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments.  (Rent concessions should be adjusted to the market, not to the subject property.)  Rentals of comparable style dwellings ranged from $8,000 to $12,000.

Final Reconciliation of Market Rent:   All rentals were taken into the final consideration.  The opinion of market rent is $10,000

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF   08/01/2009   TO BE $   10,000

Appraiser(s) SIGNATURE  *Carlos Fong*          Review Appraiser SIGNATURE
NAME  Carlos Fong                             (If applicable)  NAME
Certified Residential Appraiser
Date Property Inspected  08/01/2009  Report Signed  02/12/2019      Date Property Inspected          Report Signed
License or Certification #  RD 6782  State  FL                      License or Certification #          State
Expiration Date of License or Certification  11/30/2020             Expiration Date of License or Certification
                                                                    Review Appraiser  ☐ Did  ☐ Did Not  Inspect Subject Property

Freddie Mac Form 1000  (8/88)                                       Fannie Mae Form 1007  (8/88)

Form 1007 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Supplemental Addendum

File No. VALU-18-12-1471

| Borrower | Michael & Robyn Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

**PURPOSE OF APPRAISAL REPORT**

The purpose of this appraisal is to estimate the market value of the subject property as defined herein. The function of the appraisal is to assist the above-named Lender/Client, its successors and/or assigns, in evaluating the subject property for lending purposes. This is a federally regulated transaction. Additional supporting data can be found in our appraiser work file.

It is assumed that the title to this property is good and marketable. No title search has been made, nor have we attempted to determine ownership of the property. The value estimate is given without regard to any questions of title, boundaries, or encroachments. It is assumed that all assessments are paid. We assume the property to be free and clear of liens and encumbrances except as noted.

The legal description, if included herein, should be verified by legal counsel before being relied upon or used in any conveyance or other document.

We are not familiar with any engineering studies made to determine the bearing capacity of the land. Improvements in the area appear to be structurally sound. It is therefore assumed that soil and subsoil conditions are stable unless specifically outlined in this report.

Any exhibits in the report are intended to assist the reader in visualizing the property and its surroundings. The drawings are not intended as surveys and no responsibility is assumed for their cartographic accuracy. Drawings are not intended to be exact in size, scale or detail.

Areas and dimensions of the property were physically measured. If data is furnished by the principal or from plot plans or surveys furnished by the principal, or from public records, we assume it to be reasonably accurate. In the absence of current surveys, land areas may be based upon representations made by the owner's agents or the client. No attempt has been made to render an opinion or determine the status of easements that may exist. No responsibility is assumed for discrepancies that may become evident from a licensed survey of the property.

The value estimate involves only the real estate and all normal building equipment if any improvements are involved. No consideration was given to personal property, (or special equipment), unless stated.

It is assumed that the property is subject to lawful, competent and informed ownership and management unless noted.

Information in this report concerning market data was obtained from buyers, sellers, brokers, attorneys, trade publications or public records. To the extent possible, this information was examined for accuracy and is believed to be reliable. Dimensions, areas or data obtained from others is believed correct; however, no guarantee is made.

Any information, in whatever form, furnished by others is believed to be reliable; however, no responsibility is assumed for accuracy.

The separate allocations between land and improvements, if applicable, represents our judgment only under the existing utilization of the property. A re-evaluation should be made if the improvements are removed or substantially altered, and the land utilized for another purpose.

All information and comments concerning the location, neighborhood trends, construction quality and costs, loss in value from whatever cause, condition, rents, or any other data for the property appraised herein, represents the estimates and opinions of the appraiser formed after an examination and study of the property.

Any valuation analysis of the income stream has been predicted upon financing conditions as specified herein, which we have reason to believe are currently available for this property. Financing terms and conditions other than those indicated may alter the final value conclusions.

The appraiser is not required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless arrangements have been made previously thereto. If the appraiser (s) is subpoenaed pursuant to court order, the client will be required to compensate said appraiser(s) for his/her time at his/her regular hourly rates, plus expenses.

All opinions, as to values stated, are presented as the appraiser's considered opinion based on the information set forth in the report and his experience. We assume no responsibility for changes in market conditions or for the inability of the client or any other party to achieve their desired results based upon the appraised value. Further, some of the assumptions made can be subject to variation depending upon evolving events. We realize some assumptions may never occur and unanticipated events or circumstances may occur. Therefore, actual results achieved during the projection period may vary from those in this report.

The appraisal assignment was not based on developing or reporting predetermined results, or a requested minimum valuation, a specific valuation, or the approval of a loan.

Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of: USPAP Uniform Standards of Professional Appraisal Practice, and SPP-AI Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute; and, except as noted in the Scope of Appraisal, in conformity with specific implementation rules of the following agencies:

FIRREA Title XI of the Financial Institutions Reform, Recovery and Enforcement Act and section 5(b) of the Bank Company Holding Act; FRB – Federal Reserve Board; RTC-Resolution Trust Corporation; OTS-Office of Thrift Supervision; FDIC – Federal Deposit Insurance Corporation; OTC – Office of the Comptroller; NCUA – National Credit Union Association.

**THE APPRAISER HAS PREPARED THIS APPRAISAL IN FULL COMPLIANCE WITH THE APPRAISAL INDEPENDENCE REQUIREMENTS AND HAS NOT PERFORMED, PARTICIPATED IN, OR BEEN ASSOCIATED WITH ANY ACTIVITY IN VIOLATION OF AIR.**

**AT THE REQUEST OF THE CLIENT, THIS APPRAISAL REPORT HAS BEEN PREPARED IN COMPLIANCE WITH THE**

**Supplemental Addendum**

File No. VALU-18-12-1471

| Borrower | Michael & Robyn Rosen | | | | |
|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | |
| City | Boca Raton | County | Palm Beach | State FL | Zip Code 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | |

**UNIFORM APPRAISAL DATASET (UAD) FROM FANNIE MAE AND FREDDIE MAC. THE UAD REQUIRES THE APPRAISER TO USE STANDARDIZED RESPONSES THAT INCLUDE SPECIFIC FORMATS, DEFINITIONS, ABBREVIATIONS, AND ACRONYMS.**

We do not authorize the out-of-context quoting from or partial reprinting of this appraisal report. Further, neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser nor the name of the firm which he is connected, shall be reproduced, published, or disseminated to the public through advertising media, public relations media, news media, or another public means of communication, without the prior written consent of the appraiser signing this report.

Adobe's Distiller software or equivalent may be utilized by appraiser to transmit this encrypted PDF-formatted appraisal. At a minimum, the software contains the following security measure:

- identifies transmission error during the transmission process, and confirms date, time and quantity of data submitted by appraiser and the date, time and quantity of data received by the Client, and/or its assigns and
- secures data from editing by means of a password, hardware device, or other means that remains in the sole control of the transmitting appraiser.

**THIRTY SIX MONTH LISTING HISTORY**

We are not aware of any prior listings pertaining to the subject property in the past three years as researched through the local Multiple Listing Service.

**NEIGHBORHOOD MARKET CONDITIONS**

No discounts, buy downs or other concessions were noted. Current 30 year fixed rate financing at 4.5 - 5.5% and 0-2 points.

Stricter Lending Standards and the availability of Mortgage Capital may affect the average sales prices in the area, however, given the market data analyzed by the appraiser, there are no fiscal or economic trends expected to occur that would significantly impact the relatively stable market currently experienced in this neighborhood.

Neighborhood conditions can be found in detail in the attached 1004MC form.

**SITE COMMENTS**

This site is very typical of the neighborhood in terms of size, topography, view and general appeal. It provides a suitable setting for the improvements and is consistent with market expectations in this price range. Statements regarding zoning compliance are intended only in the most general sense. Zoning and building ordinances vary significantly from one municipality to another and can be extremely detailed. The scope of this assignment does not include a comparison of every potentially significant characteristic of the subject property's site and improvements relative to zoning and building ordinances. Unless otherwise noted, standard utility and right-of-way easements are insignificant to value. However, a current locational or boundary survey or title report may reveal encroachments, easements, zoning violations or other matters of interest that could warrant modification of the appraised value.

**COMMENTS REGARDING HIGHEST AND BEST USE**

In compliance with USPAP the following is included in the appraisal;
•        The current use of the real estate as of the date of value is Residential as described in the improvements section of this appraisal.

•        The use of the real estate reflected in this appraisal is as currently improved

•        The rationale and support for the opinion of highest and best use developed for this assignment is as per below:
Highest and Best Use is defined as "The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property-specific with respect to the user and timing of the use-that is adequately supported and results in the highest present value"
Source: Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Appraisal Institute, 2010).
The highest and best use analysis is a critical step in the valuation process. The comparable properties incorporated into the appraisal are directly affected by the highest and best use analysis. The analysis is based on the use that a hypothetical purchaser would make of the property based on the four tests cited above:
•        Legally Permissible
•        Physically Possible
•        Financially Feasible
•        Maximally Productive

After consideration of the above criteria it has been determined that the current improvements continue to contribute to the total market value of the property and the return from a new improvement would not currently offset the cost of demolishing the existing improvements and constructing a new one. Therefore, the highest and best use is as improved.

**COMMENTS ON SALES COMPARISON APPROACH**

All comparables provided strong support. The most weight, and opinion of value fell on comparables 1, and 2, for requiring the lowest gross adjustments.

Comparables were adjusted for their differences in lot square footages, above grade bathroom count, and gross living area. Gross living area adjustments were made at $100 per square foot. Comparables within 10% of the subject property did not warrant an adjustment.

The remaining adjustments are indicated on the sales comparison grid.

## Supplemental Addendum

File No. VALU-18-12-1471

| Borrower | Michael & Robyn Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

ALL ADJUSTMENTS WERE DERIVED FROM THE SUBJECT MARKET AND THE APPRAISERS EXPERTISE IN THE MARKET PLACE.

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations.

All comparables are located within the subject's neighborhood boundaries. No geographic boundaries were crossed.

It should be noted that the estimated value of the subject exceeds the predominate value in the subject neighborhood. This will not have a negative effect on the marketability of the subject property. The subject property is in no way an over improvement for the market area.

**RECONCILIATION**

The sales comparison approach was considered most applicable for the subject property because a typical buyer or seller would most readily understand and apply this approach. The income approach was not considered applicable due to the fact that the majority of housing stock in the area is owner occupied and not typically used for investment property. The cost approach was not completed due to the subjectivity in estimating depreciation and because the typical buyer does not base price points on the cost approach. The quality of available data utilized in the Sales comparison Approach was considered adequate.

**EXTERIOR INSPECTION ADDENDA**

The appraiser has been requested to perform an appraisal based on an exterior only inspection and not to disturb the occupants by entering the building. The physical characteristics used to develop this appraisal are based on the assessment records of Palm Beach County, Florida and on the multiple listing service. The subject property was observed from the public street as of the effective date of the appraisal. On the basis of the observed conditions, the assessment records and multiple listing service information appear to be accurate. For the purposes of this appraisal, it is assumed that the interior condition of the subject property is consistent with the exterior conditions as observed and that the information concerning the interior condition as provided by the assessor's records and the multiple listing service is accurate.

**PHYSICAL DEFICIENCIES OR ADVERSE CONDITIONS**

Unless otherwise stated in this report, the existence of hazardous material and/or electromagnetic emission, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no such knowledge of the existence of such materials on or in the subject property, or in the properties of the subject neighborhood. The appraiser is not qualified to detect such substances. The presence of such substances as asbestos, urea formaldehyde foam insulation, radon, mold, or other potentially hazardous material may affect the value of the property. The value estimate expressed is predicated on the assumption that there is no such material in or on the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required discovering them. The customer is urged to retain an expert in this field.

Dwellings built prior to 1978 may contain lead-based paint.

**MOLD**

The appraiser is not a home or environmental inspector. The appraiser provides an opinion of value. The appraisal does not guarantee that the property is free of defects or environmental problems. The appraiser performs an inspection of visible and accessible areas only. Mold may be present in areas the appraiser cannot see. A professional home inspection or environmental inspection is recommended.

**CONCLUSION**

This is an Appraisal Report which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for an Appraisal Report. As such, it presents only minimal discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's file. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein. The appraiser is not responsible for unauthorized use of this report.

## Subject Photo Page

| Borrower | Michael & Robyn Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



**Subject Front**

17538 Middlebrook Way

| | |
|---|---|
| Sales Price | |
| Gross Living Area | 5,935 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Water |
| Site | 10393 sf |
| Quality | Good |
| Age | 3 |



**Subject Rear**



**Subject Street**

## Comparable Photo Page

| Borrower | Michael & Robyn Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



### Comparable 1
9391 Bridgebrook Dr

| | |
|---|---|
| Prox. to Subject | 0.32 miles E |
| Sales Price | 2,010,000 |
| Gross Living Area | 6,256 |
| Total Rooms | 10 |
| Total Bedrooms | 6 |
| Total Bathrooms | 7.1 |
| Location | Residential |
| View | Water |
| Site | 10019 sf |
| Quality | Good |
| Age | 3 |



### Comparable 2
17807 Cadena Dr

| | |
|---|---|
| Prox. to Subject | 0.75 miles E |
| Sales Price | 1,950,000 |
| Gross Living Area | 5,802 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Water |
| Site | 9165 sf |
| Quality | Good |
| Age | 3 |



### Comparable 3
17690 Lomond Ct

| | |
|---|---|
| Prox. to Subject | 0.21 miles E |
| Sales Price | 1,910,000 |
| Gross Living Area | 6,754 |
| Total Rooms | 10 |
| Total Bedrooms | 6 |
| Total Bathrooms | 5.2 |
| Location | Residential |
| View | Water |
| Site | 13939 sf |
| Quality | Good |
| Age | 4 |

**Comparable Photo Page**

| Borrower | Michael & Robyn Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



### Comparable 4

17897 Monte Vista Dr

| | |
|---|---|
| Prox. to Subject | 0.59 miles SE |
| Sales Price | 1,888,213 |
| Gross Living Area | 6,130 |
| Total Rooms | 10 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | Residential |
| View | Residential |
| Site | 10454 sf |
| Quality | Good |
| Age | 3 |



### Comparable 5

9115 Redonda Dr

| | |
|---|---|
| Prox. to Subject | 0.63 miles E |
| Sales Price | 1,775,000 |
| Gross Living Area | 6,512 |
| Total Rooms | 10 |
| Total Bedrooms | 5 |
| Total Bathrooms | 7.2 |
| Location | Residential |
| View | Water |
| Site | 11275 sf |
| Quality | Good |
| Age | 1 |



### Comparable 6

17776 Vecino Way

| | |
|---|---|
| Prox. to Subject | 0.69 miles E |
| Sales Price | 1,860,000 |
| Gross Living Area | 6,731 |
| Total Rooms | 10 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.1 |
| Location | Residential |
| View | Water |
| Site | 18687 sf |
| Quality | Good |
| Age | 0 |

## Comparable Photo Page

| Borrower | Michael & Robyn Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



**Comparable 7**

| | |
|---|---|
| | 9107 Redonda Dr |
| Prox. to Subject | 0.64 miles E |
| Sale Price | 1,839,200 |
| Gross Living Area | 6,791 |
| Total Rooms | 10 |
| Total Bedrooms | 6 |
| Total Bathrooms | 7.2 |
| Location | Residential |
| View | Water |
| Site | 11275 |
| Quality | Good |
| Age | 1 |

**Comparable 8**

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

**Comparable 9**

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

# Rental Photo Page

| Borrower | Michael & Robyn Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



### Rental 1

17570 Middlebrook Way

| | |
|---|---|
| Proximity to Subject | 0.06 miles N |
| Adj. Monthly Rent | 12,000 |
| Gross Living Area | 5,511 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Water |
| Condition | Good |
| Age/Year Built | 7 |



### Rental 2

17979 Lake Azure Way

| | |
|---|---|
| Proximity to Subject | 0.44 miles SE |
| Adj. Monthly Rent | 8,000 |
| Gross Living Area | 4,661 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.2 |
| Location | Residential |
| View | Water |
| Condition | Good |
| Age/Year Built | 3 |



### Rental 3

17827 Lake Azure Way

| | |
|---|---|
| Proximity to Subject | 0.45 miles SE |
| Adj. Monthly Rent | 8,000 |
| Gross Living Area | 4,661 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.2 |
| Location | Residential |
| View | Water |
| Condition | Good |
| Age/Year Built | 3 |

**Assessor Map**

| Borrower | Michael & Robyn Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 580 of 796

## Location Map

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower | Michael & Robyn Rosen | | | | | |
| Property Address | 17538 Middlebrook Way | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



## Subject Aerial Map

| Borrower | Michael & Robyn Rosen | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



## Assessor Data

| Borrower | Michael & Robyn Rosen | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | | |



## MLS Listing Sheet

| | |
|---|---|
| Borrower | Michael & Robyn Rosen |
| Property Address | 17538 Middlebrook Way |
| City | Boca Raton |
| Lender/Client | Integra Realty Resources (IRR) |

County: Palm Beach  State: FL  Zip Code: 33496

---

1/3/2019      Matrix

### Listing

No Picture Available

**Single Family**
17538 Middlebrook Wy
BOCA RATON, 33496

| | | | |
|---|---|---|---|
| ML#: | R2983257 | List Price: | $1,848,000 |
| Rng Price: | | Sold Price: | $876,000 |
| LLP: | | Status: | Closed Sale |
| Short Sale: | No | REO: | No |
| Listing Brkr: | FLL606632 /Berkshire Hathaway Florida Realty | | |
| County: | Palm Beach County | | |
| Area: | 4750 | | Auction: |
| Geo Area: | Palm Beach 4750; 4760; 4770; 4780; 4860; 4870; 488 | | |
| Legal: | Fox Hill Estates Boca Raton Lot:148 Blk: Lot SqFt:10454 | | |
| | Frontage: Depth: | | |
| Furnished: | | | |
| Bedrooms: | 6 | Baths: | 5 |
| Convert Bed: | | | |
| SqFt (Liv): | 5,961 | Tot SqFt: | 5,961 |
| SqFt (Adj): | | | |
| Bld Ar/Src: | | | |
| Year Built: | 2006 | | |
| Virtual Tour: | Click Here | | |

### Location Information

| | | | |
|---|---|---|---|
| Folio#: | 00424631010001480 | Parcel #: | Model Name: MONTECITO |
| Municipal Code: | | Town/Range: | Section: |
| Subdivision #: | | Map Coord: | Zoning: RES |
| Subdivision: | the oaks | Development: THE OAKS | |
| Elementary: | | | |
| High: | | | |
| Neighborhood: | | | |

### General Information

| | | | | | |
|---|---|---|---|---|---|
| Type Property: | Single | Front Exposure: | West | HOPA: | No HOPA |
| For Lease: | | For Lease MLS#: | | SS Addend: | |
| Boat Services: | | | | | |
| Style: | R33-WF/Pool/No Ocean Access | | | | |
| Garage: | 3/Attached | | | Carport: | |
| Lot SF: | | Appr Lot Size: | .24 | | |
| Parking Desc: | | | | | |
| Parking Restr: | | | | | |
| Lot Desc: | Less Than 1/4 Acre Lot | | | | |
| Waterfront: | Yes | | | | |
| Water Access: | | | | | |
| Water Frontage: | | View: | Pool Area View, Water View | | |
| Pool Dim: | 33 X | Spa: | | | |
| Pool: | Yes | | | | |
| Design/Desc: | | | | | |
| Construction: | CBS Construction | | | | |
| Roof Desc: | Curved/S-Tile Roof | | | | |
| Floor: | Carpeted Floors, Marble Floors, Wood Floors | | | | |

### Remarks

| | |
|---|---|
| Remarks: | PROFESSIONALLY DECORATOR-FINISHED HOME DESIGNED FOR THE MOST DISCRIMINATING BUYER*FROM THE MOMENT YOU WALK INTO THIS LUXURY ESTATE THE ATTENTION TO DETAIL IS OBVIOUS*CUSTOME-SELECTED STONE, FABRICS AND MILLWORK BLEND TOGETHER IN PERFECT HARMONY TO CREATE AN ULTRA BRIGHT COSMOPOLITAN AMBIANCE*THIS HOME IS NOT A HEAVY, DARK, MEDITERRANEAN DUNGEON*THIS HOME IS SLEEK, OPEN AND BRIGHT*THE WELL PLANNED ARCHITECTURAL DESIGN ALLOWS FOR 6 BEDROOMS, 5 BATHS, OFFICE AND BILLIARD ROOM*ABUNDANT CLOSET SPACE AND A THRE |

Driving Directions: clintmoore rd. to entr. on north side. 2nd left to middlebrook on right

Broker Remarks:

### Rooms

| Room | Dim | Room | Dim | Room | Dim |
|---|---|---|---|---|---|
| SecondBedroom | 15X13 | ThirdBedroom | 13X16 | FourthBedroom | 15X12 |
| FifthBedroom | 14X12 | Den | 15X15 | DiningRoom | 16X12 |
| FamilyRoom | 21X19 | Kitchen | 15X15 | LivingRoom | 28X19 |
| MasterBedroom | 19X15 | | | | |

| | |
|---|---|
| Bedroom Desc: | |
| Master Bath: | Bidet, Dual Sinks |
| Addition Rooms: | Attic, Family Room, Loft, Storage Room |
| Dining Desc: | Breakfast Area |
| ADA Compliant: | |

### Additional Information

## MLS Listing History

| Borrower | Michael & Robyn Rosen | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | | |

**MLS#:** R2983257     17538 Middlebrook Wy       Single Family

No Picture Available

| Price | Chg Type | Chg Info | Eff Date | Agent ID | Office ID | DOM |
|---|---|---|---|---|---|---|
| $876,000 | CS | ($876,000) | 12/04/2009 | FLL6065432 | FLL606632 | |
| $1,848,000 | X | AC -> X | 12/01/2009 | FLL6065432 | FLL606632 | |
| $1,848,000 | AC | A -> AC | 11/19/2009 | FLL6065432 | FLL606632 | |
| $1,848,000 | DECR | $1,849,000 -> $1,848,000 | 07/10/2009 | FLL6065432 | FLL606632 | |
| $1,849,000 | DECR | $1,949,000 -> $1,849,000 | 06/03/2009 | FLL6065432 | FLL606632 | |
| $1,949,000 | NEW | ACTV -> $1,949,000 | 12/16/2008 | FLL6065432 | FLL606632 | |

# Tax Information

| Borrower | Michael & Robyn Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

---

1/3/2019     Southeast Florida MLS - Palm Beach County Tax Report - 17538 MIDDLEBROOK WAY, BOCA RATON, FL 33496-1022

 **Southeast Florida MLS - IMAPP**
Palm Beach County Tax Report - 17538 MIDDLEBROOK WAY, BOCA RATON, FL 33496-1022

## PROPERTY INFORMATION

**PID #** 00-42-46-31-01-000-1480
**Property Type:** Residential
**Property Address:**
17538 MIDDLEBROOK WAY
BOCA RATON, FL 33496-1022
**Current Owner:**
ANNA KIM
PHILLIP KIM
**Tax Mailing Address:**
17538 MIDDLEBROOK WAY
BOCA RATON, FL 33496-1022

**Use Code:** 01 / SINGLE FAMILY
RESIDENTIAL
**Total Land Area:**
0.2385 acres / 10,387 sf
**Land Areas:**
1. SFR WATER (0130)
**Zoning:** AGR-PUD/AGRICULTURAL
RESERVE PLANNED UNIT
DEVELOPMENT DISTRICT
**Frontage:** 78 ft
**Waterfront:** No
**Subdivision:**
FOX HILL ESTATES OF BOCA RATON
**Census Tract/Block:** 007743 / 1004
**Twn:** 46S / **Rng:** 42E / **Sec:** 31
**Block:** 000 / **Lot:** 1480
**Latitude:** 26.413661
**Longitude:** -80.199415
**Legal Description:**
FOX HILL ESTATES OF BOCA RATON LT 148



Residential | Agricultural | Government | Water
Commercial | Industrial | Other | Condo
Active | Sold | Pending | Withdrawn | Expired

Foreclosures

## VALUE INFORMATION

| | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Improved Value:** | $934,751 | $1,013,775 | $889,756 | $878,637 | $903,101 |
| Land Value: | $200,000 | $190,000 | $199,500 | $209,475 | $230,423 |
| Just Market Value: | $1,134,751 | $1,203,775 | $1,089,256 | $1,088,112 | $1,133,524 |
| Percent Change: | - n/a - | 6.08% | -9.51% | -0.11% | 4.17% |
| Total Assessed Value: | $844,699 | $851,457 | $857,417 | $1,088,112 | $1,088,112 |
| Homestead Exemption: | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Total Exemptions: | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Taxable Value: | $794,699 | $801,457 | $807,417 | $1,038,112 | $1,060,962 |
| Ad Valorem Taxes: | $15,130.67 | $15,089.85 | $14,694.84 | $18,336.49 | $18,423.65 |
| Non-Ad Valorem Taxes: | $361.00 | $357.00 | $360.50 | $364.00 | $393.50 |
| Total Tax Amount: | $15,491.67 | $15,446.85 | $15,055.34 | $18,700.49 | $18,817.15 |

**Taxing District(s):** 00355 - UNINCORPORATED COUNTY(355)
**\*Non-Ad Valorem** SOLID WASTE AUTHORITY OF PBC ($316.00) LAKE WORTH DRAINAGE DISTRICT MAINT ($48.00)
**Levies:**

Link To County Tax Collector

http://sef.imapp.com/links/property?upin=US1209900424631010001480     1/2

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 586 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 258 of 699
License

| Borrower | Michael & Robyn Rosen | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 17538 Middlebrook Way | | | | | | |
| City | Boca Raton | County | Palm Beach | | State | FL | Zip Code | 33496 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

 RICK SCOTT, GOVERNOR

JONATHAN ZACHEM, SECRETARY



## STATE OF FLORIDA
## DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

### FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED RESIDENTIAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## FONG, CARLOS RAFAEL

10601 S.W. 124 ROAD.
MIAMI          FL 33186

**LICENSE NUMBER: RD6782**

EXPIRATION DATE:  NOVEMBER 30, 2020

Always verify licenses online at MyFloridaLicense.com



Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
Miami/Palm Beach

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:   Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment

amgraziano@irr.com    -    305.670.0001 x320



# Anthony M. Graziano, MAI, CRE

### Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com



amgraziano@irr.com    -    305.670.0001 x320



**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2/2015 | Defendant | 123-2015-0037 | 14-CV-22384 LJU | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2/014 | Plaintiff | 123-2014-0030 | Settled | Caribbean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Carribean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 11/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Saranzzi, Faith Ann Safarazzi, Proverbum Hldg, LLC, USA & George Albright | NeJame, La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | CB Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | TRI FILE # | COURT/CASE NO. # | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008938-CA-01 | Aaron Stauber & Aviva Stauber V. BH 33, LLC | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22364 UU | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | Southern District of Florida | John Campo | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Igor Gel V. Yacht Club at Portofino Condo Association | Miami-Dade County | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Ocean Bank V. Lindback, Monroe County | Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24994 CA 06 | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Sardiff and Course Drive Investments, LLC | 11th Judicial Circuit Dade County, Florida | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (retrospective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0194 | 13-010822 CACE 02 | Amalia I. Irianda-Rivera V. Rivera Diagnostic Center, Inc., Oknay Rivera & Yudit Rivero | 17th Judicial Circuit Broward County, Florida | Amalia I. Irianda-Rivera | Rent default judgment and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FL534 (Pending) | Roehm Title Resources Claim | Palm Beach County | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined title defects not identified by Title Insurance Company |
| 4/2014 | Plaintiff | 123-2014-0117 | 4:14-CV-01077 (Pending) | USA V. GSA-VA St. Louis Property, LLC | USA District Court for the Eastern District of Missouri Eastern Division | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Euforia Club | Miami-Dade County | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition SR-7 | Broward County | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | West Airport Plaza Business Park, LLC | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | Counsel for the Debtor, Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23922-CA 09 | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | 17th Judicial Circuit Broward County, Florida | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Plaintiff | 123-2013-0126 | CACE 08057624 (14) | Bayview Loan Servicing, LLC v. Kayhan Soodjani; Muhammad Mahmoodi, et al | 17th Judicial Circuit Broward County, Florida (Hon. Carlos A. Rodriguez) | Bayview Servicing, represented by Tabaas, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency judgment on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV-Rosenbaum | United States of America v. G.K.K. etal | US District Court - Southern District of Florida (Hon. Rosenbaum) | Richard Duvall, Holland and Knight and Jeffrey Neiman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 2/2013 | Defendant | 123-2011-0670 | 09-05650 CA 04 | Zenaida Gomez v. City of Pinecrest | 11th Judicial Circuit Dade County, Florida | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence |
| 1/2013 | Defendant | 123-2013-0016 | 12-60950-CIV | G Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | US Federal Court - Southern District of Florida | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud |
| 11/2012 | Plaintiff | 123-2012-0129 | Pending | Alayon, USA Federal Court, Tax Protest | 11th Judicial Circuit Dade County, Florida | Ken Wuenberger, Esq., Kozeiswitz Oxblow Ferguson | Tax protest of commercial condominium. |
| 10/19/2012 | Plaintiff | 123-2012-0111 | 2011-1107 CA-23 | Renegade at Hialeah Blvd v. Dynatech Engineering | 17th Judicial Circuit Dade County, Florida (Hon. Patrick DeAlemeida) | Daniel Levin, Esq., Cole, Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from prepaid lease modification. |
| 10/12/2012 | Defendant | 123-2012-0109 | 11-30189 CA21 | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | 11th Judicial Circuit Dade County, Florida | Craig Minko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal; economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal |
| 8/20/2012 | Plaintiff | 123-2012-0012 | CA-02160 CA-25 | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egozi, etal | 11th Judicial Circuit Dade County, Florida | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2011 |
| 8/15/2012 | Disclosed Dual Expert | 123-2012-0072 | | Vazquez v. Vazquez Matrimonial Matter | Matrimonial Mediation | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a dual-appointed third party expert to both parties to appraise (2) martial assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Illinois, Bahamas |
| 7/2012 | Plaintiff | 109-2011- | Pending; 2003-2014 | BASF Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Tax Court of New Jersey (Hon. Patrick DeAlemeida) | Phil Genuario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010-0172 | ATL-L-4451-08 | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Superior Court of New Jersey, Law Division Atlantic County | Jay Rhatican, Connell Foley on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectation |
| 07/2011 | Defendant | 109-2010-0199 | MER-L-3034-08 | 460 Mercer Street, LLP and Bruckener Southern, LLC vs. Hightstown | Superior Court of New Jersey Mercer County | Aneel Zaro Grimm & Aaron, P.C. Husam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | United States vs. Atlantic Wood Industries, Inc. | Federal District Court of Virginia | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Wextrust/HPC Mortgage Fund vs. City of Atlantic City | Tax Court of New Jersey | Cole, Schotz, Meisel, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |



M. Qualls: Graziano, Trial Lists

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF OF | IRR FILE # | COURT CASE NO | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/1/2009 | Secured Creditor | 1109-2009-0439 | 3035-001 | Erickson Building | US Bankruptcy Court - Southern District of Texas | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 9/0/2009 | Plaintiff | 1109-2009-0123 | INA (DEFS Pending) | Bay Head Yacht Club vs. Ocean County Tax Board | Tax Court of New Jersey | John Doyle, Cariuccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 1109-2008-XXX | | Mirage Atlantic City (MAC) vs. City of Atlantic City | Tax Court of New Jersey | Hank Rovillard, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 8/2008 | Defendant | 1109-2008-0252 | L-2424-05 | The City of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Superior Court of New Jersey Law Division, Middlesex County | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | 1109-2008-345 | C.A. No. OCNL-3361-06 | Osbourne Associates, Melbourne Associates VII, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co, JAC Property Management etal and Eckerd Corporation | Superior Court of New Jersey, Law Division, Ocean County | Francis X. Manning, Esq, Straubly, Ronon Stevens & Young & Michael Canfioli, Esq, Partridge Snow and Hahn, both on behalf of... | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 1109-2008-0125 | N/A | Toms River Township vs. Citta Geigy Corporation | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpenteli] | Mark Troncone, Esq., In-House Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | 1109-2007-211 | L-002635-06 | Kyle Mosteller vs. Galla Neeman | Superior Court of New Jersey, Law Division, Middlesex County | Frank Caruso, Esq, Hoogland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Plaintiff | 1109-2007-0134 | 3:07-CV-2322 | Silver Lakes Inc. vs. Township of Freehold Inc. | Superior Court of New Jersey, Chancery Division Monmouth County | Christopher Hanlon, Esq, Hanlon and Niemann | Challenge to validity of Rent Control Ordinance as applied to apartment property rights from Lessee to Lessee |
| 6/2007 | Plaintiff | 1109-2007-0173 | | Laurelwood Homes, LLC vs. United States Department of Navy | Federal District Court of Virginia | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 1109-2006-0192 | CAM - L - 9731-05 | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Superior Court of New Jersey, Law Division, Camden County | Brett Last, Esq, O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 8/2006 | Defendant | 1109-2006-0257 | | County Line & Browns Bridge, Jackson Township | Superior Court of New Jersey, Law Division | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 2/2006 | Defendant | 1109-2006-0044 | OCNL-2482-04 | Carl Brooks vs. K. Hovanian | Ocean Superior Court, Ocean County Courthouse | Ronan, Tuzzio & Giannone Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner and the subject developer K. Hovnanian @ Sea Oaks |
| 10/2005 | Defendant | 1109-2005-0315 | OCNL-1810-5 | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility of the state of New Jersey vs. AC1 Manahawkin, LLC/family and/or Armstrong | Superior Court of New Jersey, Law Division Ocean County | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and towers by Atlantic City Electric |
| 6/2005 | Defendant | 1109-2005-0214 | MONL-2609-05 | Township of Howell vs. George Harms Construction Co., Inc. etal | Superior Court of New Jersey, Law Division, Monmouth County | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 9/2003 | Defendant | 1109-2003-0282 | | Giuffre vs. Giuffre | Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 7/2003 | Defendant | 1109-2003-0203 | OCN-C-78-03 | West, etal vs. Pompaino, etal | Superior Court of New Jersey, Chancery Division, Ocean County | Stephen E. Smith, Esq. | To develop an opinion of the diminution in value due to a loss of useable land area |
| 6/2003 | Plaintiff | 1109-2003-0163 | OCN-C-316-02 | Eugene M. Lord vs. Donald W. Rinaldo | Superior Court of New Jersey Law Division, Ocean County | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate of the property |
| 4/2003 | Plaintiff | 1109-2003-0128 | FM-15-468-03-C | Vincent Urbank vs. Lisa Urbank | Superior Court of New Jersey, Chancery Division, Family Part Ocean County | Marianna Pontoriero, Esq. | Litigation-Matrimonial |
| 2/2002 | Plaintiff | 1109-2002-0055 | | Shenandoah Mobile Home Park | | Winokfa Marx Laine & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 4/2001 | Claimant | 1092-001-0169 | NJ-2624-00 | DeForest John Ely and Kimberle A. Ely, h/w | Superior Court, New Jersey, Chancery Division Middlesex County | First American Title Insurance Co. Jack Milks | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 3/1999 | Secured Creditors | 1091-1999-0062 | | Georgetown Apartments | US Bankruptcy Court - District of Newark | Emmes & Co., Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | LKW-257-3186 | FM-15-1465-94 | Lisa Franklin, etal vs. Donald Franklin, etal | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1984 | Creditor | HUD-XX | | Hudson Marina Association vs. Emmes & Co. | US Bankruptcy Court - District of Newark | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium complex |

**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Etter, Steven & Cathy**
Market Value - "As Remediated"
18894 SE Jupiter Inlet Way
Tequesta, Martin County, Florida 33469
Client Reference: 7

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
September 28, 2016

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275

**Etter, Steven & Cathy**
18894 SE Jupiter Inlet Way
Tequesta, Florida



| | | | |
|---|---|---|---|
| **Integra Realty Resources** | In Miami | In Orlando | In Naples/Sarasota |
| Miami | Dadeland Centre | The Magnolia Building | Horseshoe Professional Park |
| Orlando | 9155 South Dadeland Blvd. | 326 N. Magnolia Ave. | 2770 Horseshoe Drive S. |
| Southwest Florida | Suite 1208 | | Suite 3 |
| | Miami, FL 33156 | Orlando, FL 32801 | Naples, FL 34104 |
| www.irr.com | (305) 670-0001 | (407) 843-3377 | (239)-643-6888 |

February 7, 2019

Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

SUBJECT:     Market Value - "As Remediated"
             Case No 11-22408-Civ-COOKE
             United States District Court Southern District of Florida in the matter of
             Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
             similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
             Priority Claimant Case at:
             Etter, Steven & Cathy
             18894 SE Jupiter Inlet Way
             Tequesta, Martin County, Florida 33469
             Client Reference: 7
             IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the
referenced property as of the effective date assuming all remediation was completed by an
appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It
presents summary discussions of the data, reasoning, and analysis that were used in the appraisal
process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 595 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 267 of 989

Identification of Subject                                                                                    2

## Identification of Subject

The subject of this report is a single-family Mediterranean style home configured with 3 bedroom and 3 full baths, 2 half baths with 4,597 SF under air-conditioning. The subject property was built in 2006 and is located on a 9,104 SF site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, September 28, 2016. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is February 7, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
| --- | --- |
| Sale Date (Most Recent) | December 8, 2004 |
| Seller | EMERALD HARBOUR OF JUPITER INC |
| Buyer | Etter, Steven M & Cathy L |
| Sale Price | $600,000 |
| Recording Instrument Number | 1798714 |
| Disposition Details | Original purchase of land from the developer |

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

Per the Evidence Preservation Report by Chinese Drywall Screening LLC, the house was remediated on December 17, 2012.

On September 29, 2016, the subject was sold for $1,580,000 after 88 days on market (DOM). The listing did not disclose the prior presence of Chinese drywall. The original listing price was $1,795,000. The sales price was 88% of the listing price. Based upon Integra's unimpaired value, there was 0% discount. However, this is not probative since the sale did not disclose prior drywall remediation.

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

Etter, Steven & Cathy



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 596 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 268 of 989

Definition of Market Value                                                                    3

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

## Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value.  Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation.  Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

(*Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org*)

## Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

(*Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org*)



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 597 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/13/2019 Page 269 of 989
Scope of Work                                                                    4

## Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation. The result of that study are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida." The results of that study are incorporated by reference herein.

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation. As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction. Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation. These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property. This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections. Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available. In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis. However, the damage analysis only represents a <u>portion of the overall damages</u> because we were specifically requested to exclude the consideration of the costs to cure. This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to as "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.

Etter, Steven & Cathy



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 598 of 796
Case 1:11-cv-22408-MGC Document 273-9 Entered on FLSD Docket 09/15/2015 Page 270 of 989

Highest and Best Use                                                                              5

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report.  The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach.  The valuations consider the only relevant approach for residential valuation, the sales comparison analysis.  The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis.  Additionally, this approach directly considered the prices of alternative properties having similar utility.

### Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant.  The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

### Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report.  This value us hypothetical since it assumes that defective drywall had never been present at the subject property.

Etter, Steven & Cathy



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 599 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 271 of 989

Conclusion of Value                                                                                      6

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue. This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date. This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation. Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total. This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value. These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home. Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered. Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF            4 months

$150,000 - $750,000 home up to 4,000 SF      6 months

$750,000+ home up over 4,000 SF              9 months

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).



Etter, Steven & Cathy

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

| Conclusions of Damage | | | |
|---|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $1,580,000 | |
| Market Impairment Discount (As if Remediated) | | 10% | |
| Post Impairment Damage ($) | | $158,000 | |
| **Hypothetical Value As IF Remediated** | | **$1,422,000** | |
| Post Remediation Damages as of Effective Date | | **$158,000** | |
| Loss of Use: | | | |
| Rental Rate ($/Month) | **$6,200** | | |
| Moving & Storage Costs | | $3,000 | |
| Loss of Use Subject (# Months) | 9x | $55,800 | |
| Subject Total | | | **$58,800** |
| **Post Remediation Damage** | | | **$216,800** |

Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

On September 29, 2016, the subject was sold for $1,580,000 after 88 days on market (DOM). The listing did not disclose the prior presence of Chinese drywall. The original listing price was $1,795,000. The sales price was 88% of the listing price. Based upon Integra's unimpaired value, there was 0% discount. However, this is not probative since the sale did not disclose prior drywall remediation.

The Court will be left to decide whether the value diminution damages apply because the claimant did not disclose the prior remediation, but achieved a price "as if unimpaired." In instant case, the sellers did not appear to suffer the value diminution estimated above, but have incurred future potential risk/potential liability through non-disclosure.

Etter, Steven & Cathy



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 601 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 273 of 989

Certification                                                                                              8

## Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Carlos Fong has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 602 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 274 of 989

Assumptions and Limiting Conditions                                                                9

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1.  The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2.  There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3.  There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4.  The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5.  The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6.  The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1.  An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2.  The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3.  No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4.  No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5.  Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6.  We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/03/19   Page 603 of 796
Case 1:11-cv-22408-MGC   Document 273-8   Entered on FLSD Docket 08/15/2019   Page 275 of 989

Assumptions and Limiting Conditions                                                                 10

7.  No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.  We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.  The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during

Etter, Steven & Cathy



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 604 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 276 of 989

Assumptions and Limiting Conditions                                          11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19. The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20. No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21. The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23. The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 605 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 277 of 989

Assumptions and Limiting Conditions                                                        12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25.  Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26.  The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27.  All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

Etter, Steven & Cathy



# Addenda



| Borrower | Cathy & Steven Etter | | | File No. | VALU-18-12-1472 |
| Property Address | 18894 SE Jupiter Inlet Way | | | | |
| City | Tequesta | County | Martin | State | FL | Zip Code | 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | |

### TABLE OF CONTENTS



Supplemental Addendum .................................................................................................................... 1
USPAP Identification Addendum ........................................................................................................ 2
Exterior-Only ..................................................................................................................................... 3
General Text Addendum .................................................................................................................... 9
Single Family Comparable Rent Schedule ........................................................................................ 12
Subject Photos .................................................................................................................................. 13
Comparable Photos 1-3 .................................................................................................................... 14
Rental Photos 1-3 .............................................................................................................................. 15
Assessor Map ................................................................................................................................... 16
Location Map ..................................................................................................................................... 17
Subject Aerial Map ............................................................................................................................ 18
Assessor Data ................................................................................................................................... 19
MLS Listing Sheet ............................................................................................................................. 20
MLS Listing History ........................................................................................................................... 21
Tax Information .................................................................................................................................. 22
License .............................................................................................................................................. 23

**Supplemental Addendum**

File No. VALU-18-12-1472

| Borrower | Cathy & Steven Etter | | | | | | |
|----------|----------------------|--|--|--|--|--|--|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | | |
| City | Tequesta | County | Martin | | State | FL | Zip Code | 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

ADDITIONAL COMMENTS(02/07/2019)

It should be noted that the subject along with comparables 1 and 2 have both a private inground pool and a private boat dock. Comparable 3 has a private inground pool, but no boat dock which required a positive adjustment. The subject property has 3 full bathrooms and 2 half baths which was considered equal to the 4 full bathrooms of comparable 3. No additional adjustments were warranted.

USPAP ADDENDUM

File No. VALU-18-12-1472

| Borrower | Cathy & Steven Etter | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | |
| City | Tequesta | County | Martin | State | FL | Zip Code 33469 |
| Lender | Integra Realty Resources (IRR) | | | | | |

**This report was prepared under the following USPAP reporting option:**

☒ Appraisal Report      This report was prepared in accordance with USPAP Standards Rule 2-2(a).

☐ Restricted Appraisal Report      This report was prepared in accordance with USPAP Standards Rule 2-2(b).

**Reasonable Exposure Time**

My opinion of a reasonable exposure time for the subject property at the market value stated in this report is:    30-90 DAYS

EXPOSURE TIME: estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

USPAP 2018-19 Comment: Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market

**Additional Certifications**

I certify that, to the best of my knowledge and belief:

☒ I have NOT performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

☐ I HAVE performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

**Additional Comments**

APPRAISER COMPETENCY

An appraiser must determine, prior to accepting an assignment, that he or she can perform the assignment competently. Competency requires:

1. the ability to properly identify the problem to be addressed; and
2. the knowledge and experience to complete the assignment competently; and
3. recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.

I am competent to perform this assignment based on my state appraiser license and familiarity with this type of property in the subject market

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations

**APPRAISER:**      *Carlos Fong*      **SUPERVISORY APPRAISER: (only if required)**

| | | | |
|---|---|---|---|
| Signature: | | Signature: | |
| Name: | Carlos Fong | Name: | |
| Date Signed: | 02/07/2019 | Date Signed: | |
| State Certification #: | RD 6782 | State Certification #: | |
| or State License #: | | or State License #: | |
| State: | FL | State: | |
| Expiration Date of Certification or License: | 11/30/2020 | Expiration Date of Certification or License: | |
| Effective Date of Appraisal: | 09/28/2016 | Supervisory Appraiser Inspection of Subject Property: | |
| | | ☐ Did Not   ☐ Exterior-only from Street   ☐ Interior and Exterior | |

# Exterior–Only Inspection Residential Appraisal Report

VALU-18-12-1472
File # VALU-18-12-1472

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

## SUBJECT

| | |
|---|---|
| Property Address | 18894 SE Jupiter Inlet Way   City Tequesta   State FL   Zip Code 33469 |
| Borrower Cathy & Steven Etter | Owner of Public Record   Daniel W & Jessica L Corns   County Martin |
| Legal Description | LOT 4 EMERALD HARBOUR (PB 15 PG 75) |

Assessor's Parcel #   19-40-43-002-000-00040-0   Tax Year 2016   R.E. Taxes $ 11,605

Neighborhood Name   Emerald Harbour   Map Reference 38940   Census Tract 0015.00

Occupant ☒ Owner ☐ Tenant ☐ Vacant   Special Assessments $ 0   ☒ PUD   HOA $ 400   ☐ per year ☒ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Litigation

Lender/Client   Integra Realty Resources (IRR)   Address 9155 South Dadeland Boulevard, Miami, FL 33156

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☒ Yes ☐ No

Report data source(s) used, offering price(s), and date(s).   DOM 88;The Subject was offered for sale on 05/31/2016 for $1,795,000 per the MIAMI MLS #R10240297, and closed on 09/28/2016 for $1,580,000.

## CONTRACT

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $   Date of Contract   Is the property seller the owner of public record? ☐ Yes ☐ No Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No
If Yes, report the total dollar amount and describe the items to be paid.

## NEIGHBORHOOD

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | Property Values ☐ Increasing ☒ Stable ☐ Declining | | PRICE $ (000) | AGE (yrs) | One-Unit | 90 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | Demand/Supply ☐ Shortage ☐ In Balance ☒ Over Supply | | | | 2-4 Unit | % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | 161 Low | 0 | Multi-Family | 5 % |
| Neighborhood Boundaries | The subject is bound to the north by County Line Rd, to the west by | | | | 5,495 High | 75 | Commercial | 5 % |
| | Loxahatchee River, to the east by Atlantic Ocean and to the south by Loxahatchee River. | | | | 460 Pred. | 30 | Other | % |

Neighborhood Description   There are no apparent factors that should affect the subject's marketability. The subject has access to all necessary supporting facilities including schools, shopping, recreation and employment centers.

Market Conditions (including support for the above conclusions)   There is a slight oversupply of active listings. This will lead to higher marketing times, however, will not adversely effect the subject.

## SITE

Dimensions Per Martin County Assr   Area 9,104 sf   Shape Irregular   View N;Res;

Specific Zoning Classification WRC   Zoning Description Waterfront Resort Commercial District

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | | Public | Private |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street | Asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley | None | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No   FEMA Flood Zone X   FEMA Map # 12085C0527G   FEMA Map Date 3/16/2015

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe

No observed or known adverse influences to market value were noted.

## IMPROVEMENTS

Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☒ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner ☐ Other (describe)

Data Source for Gross Living Area   Sefimapp

| General Description | General Description | Heating/Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | ☒ FWA ☐ HWBB | Fireplace(s) # 0 ☐ None | ☐ None |
| # of Stories 2 | ☐ Full Basement ☐ Finished | ☐ Radiant | Woodstove(s) # 0 ☒ Driveway # of Cars 6 | |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | ☐ Partial Basement ☐ Finished | ☐ Other Fuel | ☒ Patio/Deck Patio   Driveway Surface Pavers | |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls CBS | Gas/Elec. | ☒ Porch Porch   ☒ Garage # of Cars 3 | |
| Design (Style) Mediterranean | Roof Surface S-Tile | ☒ Central Air Conditioning | ☒ Pool Pool   ☐ Carport # of Cars | |
| Year Built 2006 | Gutters & Downspouts Gutters | ☐ Individual | ☒ Fence Fence   ☒ Attached ☐ Detached | |
| Effective Age (Yrs) 8 | Window Type SH | ☐ Other | ☐ Built-in | |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☐ Disposal ☒ Microwave ☒ Washer/Dryer ☐ Other (describe)

Finished area above grade contains:   7 Rooms   3 Bedrooms   3.2 Bath(s)   4,597 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).   None

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.).   The subject was noted in good condition upon inspection. Subject is located in a gated community and access was not granted.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No
If Yes, describe.

There are no apparent external or functional inadequacies noted or reported at time of inspection. Physical depreciation is calculated by the modified age life method.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe.
The construction quality is typical for the area.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

# Exterior–Only Inspection Residential Appraisal Report

File # VALU-18-12-1472
VALU-18-12-1472

| | | | | |
|---|---|---|---|---|
| There are | 20 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 987,000 to $ 5,250,000 . |
| There are | 17 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 696,888 to $ 5,495,000 . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 18894 SE Jupiter Inlet Way | 25 Saddleback Rd | | 10482 SE Banyan Way | | 11992 SE Tiffany Way | |
| | Tequesta, FL 33469 | Tequesta, FL 33469 | | Tequesta, FL 33469 | | Tequesta, FL 33469 | |
| Proximity to Subject | | 1.62 miles W | | 1.62 miles W | | 1.38 miles N | |
| Sale Price | $ | | $ 1,800,000 | | $ 1,700,000 | | $ 1,375,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 345.56 sq.ft. | | $ 354.46 sq.ft. | | $ 317.41 sq.ft. | |
| Data Source(s) | | MLS #R10195226; DOM 7 | | MLS #R10189312; DOM 10 | | MLS #R10130142; DOM 153 | |
| Verification Source(s) | | Assessor, Realist | | Assessor, Realist | | Assessor, Realist | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Arms Length | | Arms Length | | Arms Length | |
| Concessions | | Cash;0 | | Conv;0 | | Conv;0 | |
| Date of Sale/Time | | c01/16;s03/16 | | c12/15;s01/16 | | c09/15;s10/15 | |
| Location | Residential | Res/WaterFrnt | -90,000 | Residential | | Residential | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 9,104 sf | 16248 sf | -21,432 | 19733 sf | -31,887 | 15464 sf | -19,080 |
| View | Residential | Res/Water | -54,000 | Residential | | Residential | |
| Design (Style) | Mediterranean | Contemp | | Mediterranean | | Mediterranean | |
| Quality of Construction | Good | Good | | Good | | Good | |
| Actual Age | 13.8 | 32 | | 12 | 0 | 24 | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 7 3 3.2 | 9 5 3.1 | +10,000 | 8 4 4.1 | -10,000 | 9 5 4.0 | 0 |
| Gross Living Area | 4,597 sq.ft. | 5,209 sq.ft. | -61,200 | 4,796 sq.ft. | -19,900 | 4,332 sq.ft. | +26,500 |
| Basement & Finished | No Basement | No Basement | | No Basement | | No Basement | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | EFA/CAC | EFA/CAC | | EFA/CAC | | EFA/CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 3-Car Garage | 3-Car Garage | | 2-Car Garage | +10,000 | 2-Car Garage | +10,000 |
| Porch/Patio/Deck | Porch,Patio | Deck/Porch | | Porch,Patio | | Patios/Deck | 0 |
| Other | Pool/Boat Dock | Pool/Boat Dock | | Pool/Boat Dock | | Pool | +50,000 |
| Net Adjustment (Total) | | ☐ + ☒ - $ | -216,632 | ☐ + ☒ - $ | -51,787 | ☒ + ☐ - $ | 67,420 |
| Adjusted Sale Price | | Net Adj. 12.0 % | | Net Adj. 3.0 % | | Net Adj. 4.9 % | |
| of Comparables | | Gross Adj. 13.1 % $ | 1,583,368 | Gross Adj. 4.2 % $ | 1,648,213 | Gross Adj. 7.7 % $ | 1,442,420 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) MIAMI MLS, Martin County Records, and Realist
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s) MIAMI MLS, Martin County Records, and Realist
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 09/28/2016 | | | |
| Price of Prior Sale/Transfer | 1,580,000 | | | |
| Data Source(s) | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist | MLS, Assessor, Realist |
| Effective Date of Data Source(s) | 09/28/2016 | 09/28/2016 | 09/28/2016 | 09/28/2016 |

Analysis of prior sale or transfer history of the subject property and comparable sales Per public record, the Subject sold on 09/28/2016 for $1,580,000 from
Steven M & Cathy L Etter to Daniel W & Jessica L Corns (Warranty Deed #2881-2968).

Summary of Sales Comparison Approach See Attached Addendum.

Indicated Value by Sales Comparison Approach $ 1,580,000

Indicated Value by: Sales Comparison Approach $ 1,580,000 Cost Approach (if developed) $ Income Approach (if developed) $

see attached addendum.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: No special conditions are noted.

Personal property is not included in this valuation.
Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 1,580,000 , as of 09/28/2016 , which is the date of inspection and the effective date of this appraisal.

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1472
File # VALU-18-12-1472

PLEASE ATTACHED ADDENDUM FOR FURTHER INFORMATION

**ADDITIONAL COMMENTS**

---

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)      Site value is estimated and/or supported by the sales comparison approach whenever data is available, otherwise extraction method is used.

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | =$ | 300,000 |
|---|---|---|---|
| Source of cost data      N/A | DWELLING     4,597  Sq.Ft. @ $ | =$ | |
| Quality rating from cost service     N/A      Effective date of cost data     N/A | Sq.Ft. @ $ | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | =$ | |
| The cost approach was not applied as the area is fully built up and there | Garage/Carport     Sq.Ft. @ $ | =$ | |
| is no vacant land available, except where an existing house will be torn | Total Estimate of Cost-New | =$ | |
| down.  In addition, physical depreciation is often difficult to estimate for | Less     Physical     Functional     External | | |
| homes over 5 years of age.  Although the Cost Approach could be | Depreciation | =$( | ) |
| considered an applicable approach to value, it is not typically relied | Depreciated Cost of Improvements | =$ | |
| upon by market participants for one to four family properties. | "As-is" Value of Site Improvements | =$ | |
| Estimated Remaining Economic Life (HUD and VA only)     52  Years | INDICATED VALUE BY COST APPROACH | = $ | |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $   6,200   X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
|---|---|---|

Summary of Income Approach (including support for market rent and GRM)      The income approach is not applicable to this report as homes in the area are typically owner occupied.

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?     ☐ Yes   ☒ No     Unit type(s)   ☒ Detached   ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?     ☐ Yes     ☐ No  If Yes, date of conversion

Does the project contain any multi-dwelling units?     ☐ Yes   ☐ No   Data Source(s)

Are the units, common elements, and recreation facilities complete?     ☐ Yes     ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?     ☐ Yes     ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

---

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1472
File # VALU-18-12-1472

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1472
File # VALU-18-12-1472

APPRAISER'S CERTIFICATION:  The  Appraiser  certifies  and  agrees  that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this  appraisal  report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness,  or  structural  integrity  of  the  property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place  at  the  time  this  appraisal  report  was  prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them,  unless  otherwise  indicated  in  this  report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property  for  a  minimum  of  three  years  prior  to  the  effective  date  of  this  appraisal,  unless  otherwise  indicated  in  this  report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to  the  date  of  sale  of  the  comparable  sale,  unless  otherwise  indicated  in  this  report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has  been  built  or  will  be  built  on  the  land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property  and  the  comparable  sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the  sale  or  financing  of  the  subject  property.

11. I have  knowledge  and  experience  in  appraising  this  type  of  property  in  this  market  area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable  sources  that  I  believe  to  be  true  and  correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability  of  the  subject  property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements  and  information  in  this  appraisal  report  are  true  and  correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are  subject  only  to  the  assumptions  and  limiting  conditions  in  this  appraisal  report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage  loan  application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility  for  it.

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Exterior-Only Inspection Residential Appraisal Report**

VALU-18-12-1472
File # VALU-18-12-1472

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION:    The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature _Carlos Fong_ | Signature |
| Name  Carlos Fong | Name |
| Company Name  Valuecentric LLC | Company Name |
| Company Address  7908 Montecito Pl, Delray Beach, FL 33446 | Company Address |
| Telephone Number  (844) 825-8236 | Telephone Number |
| Email Address  info@valucentric.com | Email Address |
| Date of Signature and Report  02/07/2019 | Date of Signature |
| Effective Date of Appraisal  09/28/2016 | State Certification # |
| State Certification #  RD 6782 | or State License # |
| or State License # | State |
| or Other (describe)                                State # | Expiration Date of Certification or License |
| State  FL | |
| Expiration Date of Certification or License  11/30/2020 | SUBJECT PROPERTY |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did not inspect exterior of subject property |
| 18894 SE Jupiter Inlet Way | ☐ Did inspect exterior of subject property from street |
| Tequesta, FL 33469 | Date of Inspection |
| APPRAISED VALUE OF SUBJECT PROPERTY $        1,580,000 | |
| LENDER/CLIENT | COMPARABLE SALES |
| Name | ☐ Did not inspect exterior of comparable sales from street |
| Company Name  Integra Realty Resources (IRR) | ☐ Did inspect exterior of comparable sales from street |
| Company Address  9155 South Dadeland Boulevard, Miami, FL 33156 | Date of Inspection |
| Email Address | |

Form 2055 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Supplemental Addendum**

File No. VALU-18-12-1472

| Borrower | Cathy & Steven Etter | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | | |
| City | Tequesta | County | Martin | State | FL | Zip Code | 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

**PURPOSE OF APPRAISAL REPORT**

The purpose of this appraisal is to estimate the market value of the subject property as defined herein. The function of the appraisal is to assist the above-named Lender/Client, its successors and/or assigns, in evaluating the subject property for lending purposes. This is a federally regulated transaction. Additional supporting data can be found in our appraiser work file.

It is assumed that the title to this property is good and marketable. No title search has been made, nor have we attempted to determine ownership of the property. The value estimate is given without regard to any questions of title, boundaries, or encroachments. It is assumed that all assessments are paid. We assume the property to be free and clear of liens and encumbrances except as noted.

The legal description, if included herein, should be verified by legal counsel before being relied upon or used in any conveyance or other document.

We are not familiar with any engineering studies made to determine the bearing capacity of the land. Improvements in the area appear to be structurally sound. It is therefore assumed that soil and subsoil conditions are stable unless specifically outlined in this report.

Any exhibits in the report are intended to assist the reader in visualizing the property and its surroundings. The drawings are not intended as surveys and no responsibility is assumed for their cartographic accuracy. Drawings are not intended to be exact in size, scale or detail.

Areas and dimensions of the property were physically measured. If data is furnished by the principal or from plot plans or surveys furnished by the principal, or from public records, we assume it to be reasonably accurate. In the absence of current surveys, land areas may be based upon representations made by the owner's agents or the client. No attempt has been made to render an opinion or determine the status of easements that may exist. No responsibility is assumed for discrepancies that may become evident from a licensed survey of the property.

The value estimate involves only the real estate and all normal building equipment if any improvements are involved. No consideration was given to personal property, (or special equipment), unless stated.

It is assumed that the property is subject to lawful, competent and informed ownership and management unless noted.

Information in this report concerning market data was obtained from buyers, sellers, brokers, attorneys, trade publications or public records. To the extent possible, this information was examined for accuracy and is believed to be reliable. Dimensions, areas or data obtained from others is believed correct; however, no guarantee is made.

Any information, in whatever form, furnished by others is believed to b e reliable; however, no responsibility is assumed for accuracy.

The separate allocations between land and improvements, if applicable, represents our judgment only under the existing utilization of the property. A re-evaluation should be made if the improvements are removed or substantially altered, and the land utilized for another purpose.

All information and comments concerning the location, neighborhood trends, construction quality and costs, loss in value from whatever cause, condition, rents, or any other data for the property appraised herein, represents the estimates and opinions of the appraiser formed after an examination and study of the property.

Any valuation analysis of the income stream has been predicted upon financing conditions as specified herein, which we have reason to believe are currently available for this property. Financing terms and conditions other than those indicated may alter the final value conclusions.

The appraiser is not required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless arrangements have been made previously thereto. If the appraiser (s) is subpoenaed pursuant to court order, the client will be required to compensate said appraiser(s) for his/her time at his/her regular hourly rates, plus expenses.

All opinions, as to values stated, are presented as the appraiser's considered opinion based on the information set forth in the report and his experience. We assume no responsibility for changes in market conditions or for the inability of the client or any other party to achieve their desired results based upon the appraised value. Further, some of the assumptions made can be subject to variation depending upon evolving events. We realize some assumptions may never occur and unanticipated events or circumstances may occur. Therefore, actual results achieved during the projection period may vary from those in this report.

The appraisal assignment was not based on developing or reporting predetermined results, or a requested minimum valuation, a specific valuation, or the approval of a loan.

Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of: USPAP Uniform Standards of Professional Appraisal Practice, and SPP-AI Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute; and, except as noted in the Scope of Appraisal, in conformity with specific implementation rules of the following agencies:

FIRREA Title XI of the Financial Institutions Reform, Recovery and Enforcement Act and section 5(b) of the Bank Company Holding Act; FRB – Federal Reserve Board; RTC-Resolution Trust Corporation; OTS-Office of Thrift Supervision; FDIC – Federal Deposit Insurance Corporation; OTC – Office of the Comptroller; NCUA – National Credit Union Association.

**THE APPRAISER HAS PREPARED THIS APPRAISAL IN FULL COMPLIANCE WITH THE APPRAISAL INDEPENDENCE REQUIREMENTS AND HAS NOT PERFORMED, PARTICIPATED IN, OR BEEN ASSOCIATED WITH ANY ACTIVITY IN VIOLATION OF AIR.**

**AT THE REQUEST OF THE CLIENT, THIS APPRAISAL REPORT HAS BEEN PREPARED IN COMPLIANCE WITH THE**

## Supplemental Addendum

File No. VALU-18-12-1472

| Borrower | Cathy & Steven Etter | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | |
| City | Tequesta | County | Martin | State | FL | Zip Code 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |

**UNIFORM APPRAISAL DATASET (UAD) FROM FANNIE MAE AND FREDDIE MAC. THE UAD REQUIRES THE APPRAISER TO USE STANDARDIZED RESPONSES THAT INCLUDE SPECIFIC FORMATS, DEFINITIONS, ABBREVIATIONS, AND ACRONYMS.**

We do not authorize the out-of-context quoting from or partial reprinting of this appraisal report.  Further, neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser nor the name of the firm which he is connected, shall be reproduced, published, or disseminated to the public through advertising media, public relations media, news media, or another public means of communication, without the prior written consent of the appraiser signing this report.

Adobe's Distiller software or equivalent may be utilized by appraiser to transmit this encrypted PDF-formatted appraisal.  At a minimum, the software contains the following security measure:

- identifies transmission error during the transmission process, and confirms date, time and quantity of data submitted by appraiser and the date, time and quantity of data received by the Client, and/or its assigns and
- secures data from editing by means of a password, hardware device, or other means that remains in the sole control of the transmitting appraiser.

**THIRTY SIX MONTH LISTING HISTORY**

See attached listing history.

**NEIGHBORHOOD MARKET CONDITIONS**

No discounts, buy downs or other concessions were noted.  Current 30 year fixed rate financing at 4.5 - 5.5% and 0-2 points.

Stricter Lending Standards and the availability of Mortgage Capital may affect the average sales prices in the area, however, given the market data analyzed by the appraiser, there are no fiscal or economic trends expected to occur that would significantly impact the relatively stable market currently experienced in this neighborhood.

Neighborhood conditions can be found in detail in the attached 1004MC form.

**SITE COMMENTS**

This site is very typical of the neighborhood in terms of size, topography, view and general appeal.  It provides a suitable setting for the improvements and is consistent with market expectations in this price range.  Statements regarding zoning compliance are intended only in the most general sense.  Zoning and building ordinances vary significantly from one municipality to another and can be extremely detailed.  The scope of this assignment does not include a comparison of every potentially significant characteristic of the subject property's site and improvements relative to zoning and building ordinances.  Unless otherwise noted, standard utility and right-of-way easements are insignificant to value.  However, a current locational or boundary survey or title report may reveal encroachments, easements, zoning violations or other matters of interest that could warrant modification of the appraised value.

**COMMENTS REGARDING HIGHEST AND BEST USE**

In compliance with USPAP the following is included in the appraisal;
•        The current use of the real estate as of the date of value is Residential as described in the improvements section of this appraisal.

•        The use of the real estate reflected in this appraisal is as currently improved

•        The rationale and support for the opinion of highest and best use developed for this assignment is as per below:
Highest and Best Use is defined as "The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property-specific with respect to the user and timing of the use-that is adequately supported and results in the highest present value"
Source: Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Appraisal Institute, 2010).
The highest and best use analysis is a critical step in the valuation process. The comparable properties incorporated into the appraisal are directly affected by the highest and best use analysis. The analysis is based on the use that a hypothetical purchaser would make of the property based on the four tests cited above:
•        Legally Permissible
•        Physically Possible
•        Financially Feasible
•        Maximally Productive

After consideration of the above criteria it has been determined that the current improvements continue to contribute to the total market value of the property and the return from a new improvement would not currently offset the cost of demolishing the existing improvements and constructing a new one.   Therefore, the highest and best use is as improved.

**COMMENTS ON SALES COMPARISON APPROACH**

All comparables provided strong support.  The most weight, and opinion of value fell on comparable 1, for being the most recent sale.

*Due to the lack of comparable sales located within a 1 mile radius of the subject, it was necessary for the appraiser to expand the comparable search to a 2 mile radius of the subject in order to provide comparables more similar in condition, quality, lot size, and gross living area.  No location adjustments were warranted as all comparables are located within neighborhood boundaries.*

Comparables were adjusted for their differences in locations, lot square footages, views, bathroom count, gross living area,

**Supplemental Addendum**

File No. VALU-18-12-1472

| Borrower | Cathy & Steven Etter | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | |
| City | Tequesta | County | Martin | State | FL | Zip Code 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |

parking, and other features. Gross living area adjustments were made at $100 per square foot. Comparables within 100 square feet of the subject property did not warrant an adjustment. Lot adjustments were made at $3 per square foot. No bedroom count adjustments were warranted as this was demonstrated through the gross living area line item. Comparable 1 received a 5% negative location adjustment, and 3% negative view adjustment, for being a river front property. Comparable 3 received a positive boat dock adjustment.

ALL ADJUSTMENTS WERE DERIVED FROM THE SUBJECT MARKET AND THE APPRAISERS EXPERTISE IN THE MARKET PLACE.

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations.

All comparables are located within the subject's neighborhood boundaries. No geographic boundaries were crossed.

It should be noted that the estimated value of the subject exceeds the predominate value in the subject neighborhood. This will not have a negative effect on the marketability of the subject property. The subject property is in no way an over improvement for the market area.

### RECONCILIATION

The sales comparison approach was considered most applicable for the subject property because a typical buyer or seller would most readily understand and apply this approach. The income approach was not considered applicable due to the fact that the majority of housing stock in the area is owner occupied and not typically used for investment property. The cost approach was not completed due to the subjectivity in estimating depreciation and because the typical buyer does not base price points on the cost approach. The quality of available data utilized in the Sales comparison Approach was considered adequate.

### EXTERIOR INSPECTION ADDENDA

The appraiser has been requested to perform an appraisal based on an exterior only inspection and not to disturb the occupants by entering the building. The physical characteristics used to develop this appraisal are based on the assessment records of Palm Beach County, Florida and on the multiple listing service. The subject property was observed from the public street as of the effective date of the appraisal. On the basis of the observed conditions, the assessment records and multiple listing service information appear to be accurate. For the purposes of this appraisal, it is assumed that the interior condition of the subject property is consistent with the exterior conditions as observed and that the information concerning the interior condition as provided by the assessor's records and the multiple listing service is accurate.

### PHYSICAL DEFICIENCIES OR ADVERSE CONDITIONS

Unless otherwise stated in this report, the existence of hazardous material and/or electromagnetic emission, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no such knowledge of the existence of such materials on or in the subject property, or in the properties of the subject neighborhood. The appraiser is not qualified to detect such substances. The presence of such substances as asbestos, urea formaldehyde foam insulation, radon, mold, or other potentially hazardous material may affect the value of the property. The value estimate expressed is predicated on the assumption that there is no such material in or on the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required discovering them. The customer is urged to retain an expert in this field.

Dwellings built prior to 1978 may contain lead-based paint.

### MOLD

The appraiser is not a home or environmental inspector. The appraiser provides an opinion of value. The appraisal does not guarantee that the property is free of defects or environmental problems. The appraiser performs an inspection of visible and accessible areas only. Mold may be present in areas the appraiser cannot see. A professional home inspection or environmental inspection is recommended.

### CONCLUSION

This is an Appraisal Report which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for an Appraisal Report. As such, it presents only minimal discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's file. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein. The appraiser is not responsible for unauthorized use of this report.

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 619 of 796
Case 1:11-cv-22408-MGC Document 20 Entered on FLSD Docket 08/13/2019 Page 291 of
989

# SINGLE FAMILY COMPARABLE RENT SCHEDULE

File # VALU-18-12-1472
VALU-18-12-1472

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property.  Adjustments should be made only for items of significant difference between the comparables and the subject property.

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 18894 SE Jupiter Inlet Way Tequesta, FL 33469 | 18687 SE Tortuga Ct Tequesta, FL 33469 | | 9806 SE Landing Pl Tequesta, FL 33469 | | 18730 SE Lakeside Way Tequesta, FL 33469 | |
| Proximity to Subject | | 2.57 miles W | | 2.14 miles W | | 1.45 miles W | |
| Date Lease Begins Date Lease Expires | | 06/16 Unk | | 05/16 Unk | | 09/16 Unk | |
| Monthly Rental | If Currently Rented: $ | $ 6,500 | | $ 3,800 | | $ 3,300 | |
| Less: Utilities Furniture | $ | $ | | $ | | $ | |
| Adjusted Monthly Rent | $ | $ 6,500 | | $ 3,800 | | $ 3,300 | |
| Data Source | MLS,Inspection Assessor,Realist | MLS #R10200435 Assessor, Realist | | MLS #R10237449 Assessor, Realist | | MLS #R10250847 Assessor, Realist | |
| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Rent Concessions | | | | | | | |
| Location/View | Residential Residential | Residential Residential | | Residential Residential | | Residential Residential | |
| Design and Appeal | Mediterranean | Mediterranean | | Ranch | | Ranch | |
| Age/Condition | 13,8 Good | 3 Good | | 24 Average | | 17 Average | |
| Above Grade Room Count | Total \| Bdrms \| Baths 7 \| 3 \| 3.2 | Total \| Bdrms \| Baths 7 \| 4 \| 3.1 | | Total \| Bdrms \| Baths 10 \| 4 \| 4.0 | | Total \| Bdrms \| Baths 6 \| 3 \| 3.0 | |
| Gross Living Area | 4,597 Sq. Ft. | 3,653 Sq. Ft. | | 3,490 Sq. Ft. | | 2,900 Sq. Ft. | |
| Other (e.g., basement, etc.) | No Basement None | No Basement None | | No Basement None | | No Basement None | |
| Other: | | | | | | | |
| Net Adj. (total) | | ☐+ ☐− $ | 0 | ☐+ ☐− $ | 0 | ☐+ ☐− $ | 0 |
| Indicated Monthly Market Rent | | $ 6,500 | | $ 3,800 | | $ 3,300 | |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)   Rentals of comparable style dwellings ranged from $3,300 to $6,500.

Final Reconciliation of Market Rent:   All rentals were taken into the final consideration, however, fell near the higher end due to GLA, condition, and quality.  The opinion of market rent is $6,200

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF    09/28/2016    TO BE $    6,200

| Appraiser(s) SIGNATURE | *Carlos Fong* | Review Appraiser SIGNATURE | |
|---|---|---|---|
| NAME  Carlos Fong | | (If applicable)  NAME | |
| Certified Residential Appraiser | | | |
| Date Property Inspected  09/28/2016    Report Signed  02/07/2019 | | Date Property Inspected     Report Signed | |
| License or Certification #  RD 6782    State  FL | | License or Certification #     State | |
| Expiration Date of License or Certification  11/30/2020 | | Expiration Date of License or Certification | |
| | | Review Appraiser  ☐ Did  ☐ Did Not  Inspect Subject Property | |

Freddie Mac Form 1000  (8/88)                    Fannie Mae Form 1007  (8/88)

Form 1007 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Subject Photo Page

| Borrower | Cathy & Steven Etter | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | | |
| City | Tequesta | County | Martin | | State | FL | Zip Code | 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



### Subject Front

18894 SE Jupiter Inlet Way
Sales Price
Gross Living Area      4,597
Total Rooms            7
Total Bedrooms         3
Total Bathrooms        3.2
Location               Residential
View                   Residential
Site                   9,104 sf
Quality                Good
Age                    13,8



### Subject Rear



### Subject Street

## Comparable Photo Page

| Borrower | Cathy & Steven Etter | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | |
| City | Tequesta | County | Martin | State | FL | Zip Code 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | |



### Comparable 1

25 Saddleback Rd

| | |
|---|---|
| Prox. to Subject | 1.62 miles W |
| Sales Price | 1,800,000 |
| Gross Living Area | 5,209 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 3.1 |
| Location | Res/WaterFrnt |
| View | Res/Water |
| Site | 16248 sf |
| Quality | Good |
| Age | 32 |



### Comparable 2

10482 SE Banyan Way

| | |
|---|---|
| Prox. to Subject | 1.62 miles W |
| Sales Price | 1,700,000 |
| Gross Living Area | 4,796 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4.1 |
| Location | Residential |
| View | Residential |
| Site | 19733 sf |
| Quality | Good |
| Age | 12 |



### Comparable 3

11992 SE Tiffany Way

| | |
|---|---|
| Prox. to Subject | 1.38 miles N |
| Sales Price | 1,375,000 |
| Gross Living Area | 4,332 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.0 |
| Location | Residential |
| View | Residential |
| Site | 15464 sf |
| Quality | Good |
| Age | 24 |

## Rental Photo Page

| Borrower | Cathy & Steven Etter | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | | |
| City | Tequesta | County | Martin | | State | FL | Zip Code | 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



### Rental 1

18687 SE Tortuga Ct

| | |
|---|---|
| Proximity to Subject | 2.57 miles W |
| Adj. Monthly Rent | 6,500 |
| Gross Living Area | 3,653 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | Residential |
| View | Residential |
| Condition | Good |
| Age/Year Built | 3 |



### Rental 2

9806 SE Landing Pl

| | |
|---|---|
| Proximity to Subject | 2.14 miles W |
| Adj. Monthly Rent | 3,800 |
| Gross Living Area | 3,490 |
| Total Rooms | 10 |
| Total Bedrooms | 6 |
| Total Bathrooms | 4.0 |
| Location | Residential |
| View | Residential |
| Condition | Average |
| Age/Year Built | 24 |



### Rental 3

18730 SE Lakeside Way

| | |
|---|---|
| Proximity to Subject | 1.45 miles W |
| Adj. Monthly Rent | 3,300 |
| Gross Living Area | 2,900 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 3.0 |
| Location | Residential |
| View | Residential |
| Condition | Average |
| Age/Year Built | 17 |

**Assessor Map**

| Borrower | Cathy & Steven Etter | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | | |
| City | Tequesta | County | Martin | State | FL | Zip Code | 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



## Location Map

| Borrower | Cathy & Steven Etter | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | | |
| City | Tequesta | County | Martin | | State | FL | Zip Code | 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



## Subject Aerial Map

| Borrower | Cathy & Steven Etter | | | | |
|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | |
| City | Tequesta | County | Martin | State | FL | Zip Code | 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | |



**Assessor Data**

| Borrower | Cathy & Steven Etter | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | | |
| City | Tequesta | County | Martin | State | FL | Zip Code | 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

1/3/2019                                    Martin County, Florida - Laurel Kelly, C.F.A

## Martin County, Florida - Laurel Kelly, C.F.A

*generated on 1/3/2019 6:45:07 PM EST*

### Summary

| Parcel ID | Account # | Unit Address | Market Total Value | Website Updated |
|---|---|---|---|---|
| 19-40-43-002-000-00040-0 | 609075 | 18894 SE JUPITER INLET WAY, TEQUESTA | $1,225,860 | 12/29/2018 |

#### Owner Information

| | |
|---|---|
| Owner(Current) | CORNS DANIEL W CORNS JESSICA L |
| Owner/Mail Address | 18894 SE JUPITER INLET WAY<br>TEQUESTA FL 33469 |
| Sale Date | 9/28/2016 |
| Document Book/Page | 2881 2968 |
| Document No. | 2598381 |
| Sale Price | 1580000 |

#### Location/Description

| | | | |
|---|---|---|---|
| Account # | 609075 | Map Page No. | U-19 S1/2(R43E) |
| Tax District | 3003 | Legal Description | LOT 4 EMERALD HARBOUR (PB 15 PG 75) |
| Parcel Address | 18894 SE JUPITER INLET WAY, TEQUESTA | | |
| Acres | .2090 | | |

#### Parcel Type

| | |
|---|---|
| Use Code | 0100 Single Family |
| Neighborhood | 813035 Rllng,Indn,Emrld Hrbr,2000 |

#### Assessment Information

| | |
|---|---|
| Market Land Value | $400,000 |
| Market Improvement Value | $825,860 |
| Market Total Value | $1,225,860 |

http://fl-martin-appraiser.governmax.com/propertymax/GRM/tab_parcel_v1002_FLMartin.asp?PrintView=True&r_nm=tab%5Freport&t_wc=%7Cparceli...   1/1

## MLS Listing Sheet

| Borrower | Cathy & Steven Etter | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | | |
| City | Tequesta | County | Martin | State | FL | Zip Code | 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

1/3/2019       Matrix

🏠 Listing

**Single Family**
**18894 SE Jupiter Inlet Way**
TEQUESTA, FL 33469

| | | | |
|---|---|---|---|
| **MLS#:** | R10240297 | **List Price:** | $1,695,000 |
| **Rng Price:** | | **Sold Price:** | $1,580,000 |
| **LLP:** | | **Status:** | Closed Sale |
| **Short Sale:** | No | **REO:** | No |
| **Listing Brkr:** | FLL303248 /Water Pointe Realty Group | | |
| **County:** | Martin County | | |
| **Area:** | 5020 | **Auction:** | No |
| **Geo Area:** | Palm Beach 5020; 5030; 5060; 5080 | | |
| **Legal:** | LOT 4 EMERALD HARBOUR (PB 15 PG 75) | | |
| **Furnished:** | Unfurnished | | |
| **Bedrooms:** | 3 | **Baths:** | 3/2 |
| **Convert Bed:** | | | |
| **SqFt (Liv):** | 4,597 | **Tot SqFt:** | 6,124 |
| **SqFt (Adj):** | | | |
| **Bld Ar/Src:** | | | |
| **Year Built:** | 2006 | | |
| **Virtual Tour:** | Click Here | | |

### Location Information

| | | | | | |
|---|---|---|---|---|---|
| **Folio#:** | 194043002000000400 | **Parcel #:** | 1940 | **Model Name:** | |
| **Municipal Code:** | | **Town/Range:** | | **Section:** | |
| **Subdivision #:** | | **Map Coord:** | | **Zoning:** | RES |
| **Subdivision:** | Emerald Harbour | **Development:** | | | |
| **Elementary:** | | **Middle:** | | | |
| **High:** | | | | | |
| **Neighborhood:** | | | | | |

### General Information

| | | | | | |
|---|---|---|---|---|---|
| **Type Property:** | Single | **Front Exposure:** | East | **HOPA:** | No HOPA |
| **For Lease:** | | **For Lease MLS#:** | | **SS Addend:** | No |
| **Boat Services:** | Electric Available, Lift, Private Dock, Up to 30 Ft Boat, UP to 40 Ft Boat, Up to 50 Ft Boat, Water Available | | | | |
| **Style:** | R31-Pool Only | | | | |
| **Garage:** | 3/Attached | | | **Carport:** | |
| **Lot SF:** | 9,104 | **Appr Lot Size:** | < 1/4 Acre,Cul-De-Sac,Ea | | |
| **Parking Desc:** | Driveway | | | | |
| **Parking Restr:** | | | | | |
| **Lot Desc:** | Less Than 1/4 Acre Lot, Cul-De-Sac Lot, East Of US 1 | | | | |
| **Waterfront:** | No/Intracoastal Front, Ocean Access | | | | |
| **Water Access:** | | | | | |
| **Pool Dim:** | | **Spa:** | | | |
| **Pool:** | Yes/Heated | | | | |
| **Design/Desc:** | Garden Apartment/Mediterranean | | | | |
| **Construction:** | CBS Construction | | | | |
| **Roof Desc:** | Barrel Roof | | | | |
| **Floor:** | Carpeted Floors, Marble Floors, Wood Floors | | | | |

### Remarks

**Remarks:** Beautifully finished estate home situated in a small, gated Intracoastal community! The upscale, gourmet kitchen boasts high-end, Viking refrigerator/freezer, professional gas range and double oven, Miele dishwasher, wine cooler, appliance garage with slide-out shelf, Leed's custom cabinetry, large walk-in pantry and bar with ice machine. Interior features include Travertine & hardwood flooring throughout the home and carpeting in the 2nd & 3rd bedrooms, an elevator, hurricane impact glass (except in breakfast area), exquisite decorator touches throughout including crown molding, arched doorways & pillars, custom lighting & fixtures, Bose whole-house sound system & more! The inviting entry features a rotunda with custom medallion, faux painting and floor-to-ceiling windows that

**Driving Directions:** N. US One (SE Federal Hwy), 1/3 mi. north of County Line Rd. (Just north of the Waterfront Inn).

**Broker Remarks:** ***MARK IS OUT OF TOWN 8/24 – 9/4. DURING THIS TIME, PLEASE CALL JULIANNE JOHNSON, 561-762-0117 TO SHOW. All sizes and dimensions are approximate and not guaranteed.

### Rooms

| Room | Dim | Room | Dim | Room | Dim |
|---|---|---|---|---|---|
| MasterBedroom | 20x22 | SecondBedroom | 12x15 | ThirdBedroom | 14x16 |
| Den | 14x14 | DiningRoom | 15x15 | FamilyRoom | 22x18 |
| Kitchen | 16x17 | LivingRoom | 14x15 | | |

**Bedroom Desc:**
**Master Bath:**
**Addition Rooms:** Attic, Den/Library/Office, Family Room, Laundry, Media Room
**Dining Desc:** Breakfast Area, Formal Dining, Snack Bar/Counter
**ADA Compliant:**

### Additional Information

https://sef.mlsmatrix.com/Matrix/Printing/PrintOptions.aspx?c=AAEAAAD*****AQAAAAAAAARAQAAAFQAAAAGAgAAAAQ3MJjyBgMAAAABOQYE...    1/3

Case 2:09-md-02047-EEF-MBN   Document 22380-29   Filed 12/02/19   Page 628 of 796
Case 1:11-cv-22408-MGC   Document 273-9   Entered on FLSD Docket 08/15/2019   Page 500 of
989

## MLS Listing History

| Borrower | Cathy & Steven Etter | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | | |
| City | Tequesta | County | Martin | | State | FL | Zip Code | 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |

**MLS#:**  R10240297        18894 SE Jupiter Inlet Way                    Single Family

| Price | Chg Type | Chg Info | Eff Date | Agent ID | Office ID | DOM |
|---|---|---|---|---|---|---|
| $1,580,000 | CS | ($1,580,000) | 09/28/2016 | FLL3039725 | FLL303248 | 88 |
| $1,695,000 | AC | A -> AC | 08/27/2016 | FLL3039725 | FLL303248 | 88 |
| $1,695,000 | DECR | $1,795,000 -> $1,695,000 | 07/28/2016 | FLL3039725 | FLL303248 | 58 |
| $1,795,000 | NEW | ACTV -> $1,795,000 | 05/31/2016 | FLL3039725 | FLL303248 | 3 |

# Tax Information

| Borrower | Cathy & Steven Etter | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | | |
| City | Tequesta | County | Martin | State | FL | Zip Code | 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



1/3/2019      Southeast Florida MLS - Martin County Tax Report - 18894 SE JUPITER INLET WAY, TEQUESTA, FL 33469-1754

**Southeast Florida MLS - IMAPP**
Martin County Tax Report - 18894 SE JUPITER INLET WAY, TEQUESTA, FL 33469-1754

## PROPERTY INFORMATION

**PID #** 19-40-43-002-000-00040-0
**Property Type:** Residential
**Property Address:**
18894 SE JUPITER INLET WAY
TEQUESTA, FL 33469-1754
**Current Owner:**
DANIEL W CORNS
JESSICA L CORNS
**Tax Mailing Address:**
18894 SE JUPITER INLET WAY
TEQUESTA, FL 33469-1754
**Use Code:** 01 / SINGLE FAMILY
**Total Land Area:**
0.209 acres / 9,104 sf
**Land Areas:**
1. SINGLE FAMILY (0100)
**Waterfront:** No
**Subdivision:**
EMERALD HARBOUR
**Census Tract/Block:** 001500 / 2087
**Twn:** 40S / **Rng:** 43E / **Sec:** 19
**Block:** 000 / **Lot:** 00040
**Neighborhood:** INDIAN HILLS,
ROLLING HILLS (613030)
**Latitude:** 26.974719
**Longitude:** -80.088149
**Legal Description:**
LOT 4 EMERALD HARBOUR (PB 15 PG 75)

Residential | Agricultural | Government | Water
Commercial | Industrial | Other | Condos
Active | Sold | Pending | Withdrawn | Expired

Foreclosures

## VALUE INFORMATION

| | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Improved Value:** | $504,160 | $548,950 | $759,870 | $923,790 | $825,860 |
| Land Value: | $195,000 | $270,000 | $162,000 | $325,000 | $400,000 |
| Just Market Value: | $699,160 | $818,950 | $921,870 | $1,248,790 | $1,225,860 |
| Percent Change: | - n/a - | 17.13% | 12.57% | 35.46% | -1.84% |
| Total Assessed Value: | $258,683 | $704,753 | $709,687 | $1,248,790 | $1,098,794 |
| Total Exemptions: | $55,000 | $55,000 | $55,000 | $0 | $50,000 |
| Taxable Value: | $203,683 | $649,753 | $654,687 | $1,248,790 | $1,048,794 |
| Ad Valorem Taxes: | | | $11,300.86 | $21,052.22 | |
| Non-Ad Valorem Taxes: | | | $304.14 | $309.10 | |
| **Total Tax Amount:** | $11,493.30 | $11,679.04 | $11,605.00 | $21,361.32 | $18,912.26 |
| | | | | | Link To County Tax Collector |

## SALES INFORMATION

| Deed Type: | WARRANTY DEED | | | Price: | $1,580,000 | Qualifiers: | Q[1] |
|---|---|---|---|---|---|---|---|
| Sale Date: | 09/28/2016 | Recorded Date: | 09/29/2016 | Document # | Bk 2881/Pg 2968 | | |
| Grantor: | ETTER STEVEN M | | | Grantee: | CORNS DANIEL W | | |
| **Mortgage Amount:** | $1,264,000 | **Instrument Date:** | 09/28/2016 | **Document #** | 2598382 | | |
| **Terms:** | 3.43%/360 M | **Attributes:** | | Traditional Loan, Original, Warranty Deed | | | |
| **Lender:** | FIRSTCITY BANK OF COMMERCE | | | **Borrower:** | CORNS DANIEL W | | |
| Deed Type: | - n/a - | | | Price: | $600,000 | Qualifiers: | |
| Sale Date: | 12/13/2004 | Recorded Date: | | Document # | Bk 1963/Pg 364 | | |
| Grantor: | EMERALD HARBOUR OF JUPITER INC | | | Grantee: | Not Available | | |
| **Mortgage Amount:** | $81,000 | **Instrument Date:** | 07/28/2006 | **Document #** | 1952475 | | |
| **Terms:** | 360 M | **Attributes:** | | New Construction Loan, Original, Construction, Stand Alone Mortgage | | | |
| **Lender:** | SEACOAST NATIONAL BANK | | | **Borrower:** | ETTER STEVEN M | | |
| **Mortgage Amount:** | $1,172,000 | **Instrument Date:** | 12/08/2004 | **Document #** | Bk 1963/Pg 368 | | |
| **Terms:** | | **Attributes:** | | | | | |
| **Lender:** | | | | **Borrower:** | ETTER, STEVEN M & CATHY L | | |

Qualifier Flags: Q=Qualified, U=Unqualified, O=Other (see note), M=Multiple, P=Partial, V=Vacant, I=Improved
[1] QUALIFIED

http://sef.imapp.com/iiinks/property?upin=US12085194043002000000400      1/2

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 630 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 502 of
License

| Borrower | Cathy & Steven Etter | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 18894 SE Jupiter Inlet Way | | | | | | |
| City | Tequesta | County | Martin | | State | FL | Zip Code 33469 |
| Lender/Client | Integra Realty Resources (IRR) | | | | | | |



RICK SCOTT, GOVERNOR

JONATHAN ZACHEM, SECRETARY



### STATE OF FLORIDA
### DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

### FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED RESIDENTIAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## FONG, CARLOS RAFAEL

10601 S.W. 124 ROAD.
MIAMI        FL 33186

**LICENSE NUMBER: RD6782**

**EXPIRATION DATE: NOVEMBER 30, 2020**

Always verify licenses online at MyFloridaLicense.com



Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment



amgraziano@irr.com    -    305.670.0001 x320

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com

## Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida



amgraziano@irr.com    -    305.670.0001 x320

**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Caribbean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Carribean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 11/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Saranazi, Faith Ann Safarazi, Proveritum Hldg, LLC, USA & George Albright | NeJame, La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | CB Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL.

| RETENTION DATE | ON BEHALF OF | TRI FILE # | COURT/CASE NO. # | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008693-CA-01 | Aaron Stauber & Aviva Stauber V. BH 33, LLC | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22364 UU | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | Southern District of Florida | John Campis | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Igor Gel V. Yacht Club at Portofino Condo Association | Miami-Dade County | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Ocean Bank V. Lindback, Monroe County | Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24994 CA 06 | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Sariff and Course Drive Investments, LLC | 11th Judicial Circuit Dade County, Florida | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (respective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0194 | 13-016822 CACE 02 | Amalia I. Irianda-Rivera V. Rivera Diagnostic Center, Inc., Oknay Rivera & Yudit Rivero | 13th Judicial Circuit Broward County, Florida | Amalia I. Irianda-Rivera | Rent default judgment and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FLL534 (Pending) | Amalia I. Irianda-Rivera V. Roehm Title Resources Claim | Palm Beach County | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined title defects not identified by Title Insurance Company |
| 4/2014 | Plaintiff | 123-2014-0117 | 4:14-CV-01077 (Pending) | USA V. GSA-VA St. Louis Property, LLC | USA District Court for the Eastern District of Missouri Eastern Division | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Eufoia Club | Miami-Dade County | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition S5-R.7 | Broward County | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | West Airport Plaza Business Park, LLC | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | Counsel for the Debtor, Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23922-CA 09 | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | 11th Judicial Circuit Dade County, Florida | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Defendant | 123-2013-0126 | CACE 08057624 (14) | Bayview Loan Servicing, LLC v. Kayhan Soodjani; Muhammad Mahmoodi; et al | 17th Judicial Circuit Broward County, Florida (Hon. Carlos A. Rodriguez) | Bayview Servicing, represented by Tabas, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency judgment on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV - Rosenbaum | United States of America v. G.K.K, et al | US District Court - Southern District of Florida (Hon. Rosenbaum) | Richard Duvall, Holland and Knight and Jeffrey Neiman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 2/2013 | Defendant | 123-2011-0670 | 09-05650 CA 04 | Zenaida Gomez v. City of Pinecrest | 11th Judicial Circuit Dade County, Florida | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence |
| 7/2013 | Defendant | 123-2013-0016 | 12-60950-CIV | G Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc.; etal | US Federal Court - Southern District of Florida (Hon. Beth Bloom) | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 11/2012 | Plaintiff | 123-2012-0129 | Pending | 2011 and 2012 Ad Valorem Tax Protest | 11th Judicial Circuit Dade County, Florida | Ken Wurtenberger, Esq. Kaseowitz Oshrow Ferguson | Tax protest of commercial condominium. |
| 10/19/2012 | Plaintiff | 123-2012-0111 | 2011-1107 CA-23 | Renegade at Hialeah Blvd v. Dynatech Engineering | 11th Judicial Circuit Dade County, Florida (Hon. Patrick DeAbreola) | Daniel Levin, Esq. Cole, Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from unpaid lease modification. |
| 10/12/2012 | Plaintiff | 123-2012-0109 | 11-30189 CA21 | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | 11th Judicial Circuit Dade County, Florida | Craig Mirko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under contract; value of first refusal damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal |
| 8/20/2012 | Plaintiff | 123-2010-0012 | CA-02180 CA-25 | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egozi, etal | 11th Judicial Circuit Dade County, Florida | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami report in 2010 and 2012 |
| 8/15/2012 | Defendant | 123-2012-0072 | | Vazquez v. Vazquez Matrimonial Matter | Matrimonial Mediation | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) martial assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Illinois, Bahamas |
| 7/2012 | Plaintiff | 109-2011-0072 | Pending; 2003-2014 | BASF Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Tax Court of New Jersey (Hon. Patrick DeAbreola) | Phil Geruario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010-0172 | ATL-L-4481-08 | Scott Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Superior Court of New Jersey, Law Division Atlantic County | Jay Rhatican, Connell Foley on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations |
| 7/2011 | Defendant | 109-2010-0199 | MER-L-3034-08 | 480 Mercer Street, LLP and Bruckener Southern, LLC vs. Hightstown | Superior Court of New Jersey Mercer County | Aneil Zaro Grimm & Aaron, P.C., Husam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | United States vs. Atlantic Wood Industries, Inc. | Federal District Court of Virginia | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | WexHarm/HPC Mortgage Fund vs. City of Atlantic City | Tax Court of New Jersey | Cole, Schotz, Meisel, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF OF | IRR FILE # | COURT CASE NO | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/1/2009 | Secured Creditor | 109-2009-0439 | | Erickson Building | US Bankruptcy Court - Southern District of Texas | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 9/2/2009 | Plaintiff | 109-2009-0123 | 3035-001 | Bay Head Yacht Club vs. Ocean County Tax Board | Tax Court of New Jersey | John Doyle, Carluccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2/2008 | Plaintiff | 109-2009-XXX | INA (DEPS Pending) | Mirage Atlantic City (MAC) vs. City of Atlantic City | Tax Court of New Jersey | Hank Rovitkant, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 8/8/2008 | Defendant | 109-2008-0252 | L-2424-05 | The City of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Superior Court of New Jersey Law Division, Middlesex County | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2/2008 | Defendant | 109-2008-345 | C.A. No. OCNL-3361-06 | Osbourne Associates, Melbourne Associates VI, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co, JAC Property Management etal and Eckert Corporation | Superior Court of New Jersey, Law Division Ocean County | Francis X. Manning, Esq, Standley Ronon Stevens & Young & Michael Canfodi, Esq, Partridge Snow and Hahn, both on behalf of | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/1/2008 | Defendant | 109-2008-0125- | N/A | Toms River Township vs. Ciba Gelgy Corporation | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpentelli] | Mark Troncone, Esq., In-house Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2/2007 | Defendant | 109-2007-211 | L-0008-35-06 | Kyle Mosteller vs. Gaita Neeman | Superior Court of New Jersey, Law Division | Frank Canuso, Esq, Hoogland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2/2007 | Plaintiff | 109-2007-0134 | 3:07-CV-2322 | Silver Lakes Inc. vs. Township of Freehold Inc. | Superior Court of New Jersey, Chancery Division Monmouth County | Christopher Hanlon, Esq, Hanlon and Niemann | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee |
| 6/2/2007 | Plaintiff | 109-2007-0173 | | Laurelwood Homes, LLC vs. United States Department of Navy | Federal District Court of Virginia | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2/2006 | Defendant | 109-2006-0192 | CAM - L - 9731-05 | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Superior Court of New Jersey, Chancery Division, Camden County | Brett Last, Esq, O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 8/8/2006 | Defendant | 109-2006-0257 | | County Line & Brewers Bridge, Jackson Township | Superior Court of New Jersey, Law Division | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 2/2/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Carl Brooks vs. K. Hovanian | Ocean Superior Court, Ocean County Courthouse | Ronan, Tuzzio & Giannone  Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner and the subject developer K. Hovnanian @ Sea Oaks |
| 10/2/2005 | Defendant | 109-2005-0315 | OCN-L-1810-5 | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility in the state of New Jersey vs. ACI Manahawkin, LLC Family and/or Armstrong | Superior Court of New Jersey, Law Division Ocean County | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and towers by Atlantic City Electric |
| 6/2/2005 | Defendant | 109-2005-0214 | MON-L-2609-05 | Township of Howell vs. George Herms Construction Co., Inc. etal | Superior Court of New Jersey, Law Division Monmouth County | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 8/8/2003 | Defendant | 109-2003-0282 | | Giuffre vs. Giuffre | Superior Court of New Jersey Chancery Division, Family Part, Monmouth County | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 7/7/2003 | Defendant | 109-2003-0203 | OCN-C-78-03 | West, etal vs. Pompano, etal | Superior Court of New Jersey, Chancery Division, Ocean County | Stephen E. Smith, Esq. | To develop an opinion of the diminution in value due to a loss of useable land area |
| 6/2/2003 | Plaintiff | 109-2003-0130 | OCN-C-316-02 | Eugene M. Lord vs. Donald W. Rinaldo | Superior Court of New Jersey, Law Division, | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate in the property |
| 4/2/2003 | Plaintiff | 109-2003-0128 | FM-15-468-03-C | Vincent Urbank vs. Lisa Urbank | Superior Court of New Jersey, Chancery Division, Family Part Ocean County | Marianna Pontoriero, Esq. | Litigation-Matrimonial |
| 2/2/2002 | Plaintiff | 109-2002-0255 | | Shenandoah Mobile Home Park | | Windels Marx Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 4/2/2001 | Claimant | 109-2001-0169 | NJ-2624-00 | DeForest John Ely and Kimberle A. Ely, h/w | Superior Court of New Jersey, Chancery Division Middlesex County | First American Title Insurance Co, Jack Milks | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 3/3/1999 | Defendant | 109-1999-0062 | | Georgetown Apartments | US Bankruptcy Court - District of Newark | Emmes & Co, Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1/1997 | Defendant | LKW-257-3186 | FM-15-1465-94 | Lisa Franklin, etal vs. Donald Franklin, etal | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP  Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1984 | Creditor | HUD-XX | | Hudson Marina Association vs. Emmes & Co. | US Bankruptcy Court - District of Newark | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium complex |



**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Chatmon, Lillian**
Hypothetical Market Value "As If" Remediated
4151 Bismarck Palm Dr
Tampa, Hillsborough County, Florida 33610
Client Reference: 8

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
January 1, 2019

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**Chatmon, Lillian**
4151 Bismarck Palm Dr
Tampa, Florida

Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 638 of 796
Case 1:11-cv-22408-MGC   Document 273-8   Entered on FLSD Docket 08/15/2019   Page 910 of
989



| **Integra Realty Resources** | In Miami | In Orlando | In Naples/Sarasota |
| --- | --- | --- | --- |
| Miami | Dadeland Centre | The Magnolia Building | Horseshoe Professional Park |
| Orlando | 9155 South Dadeland Blvd. | 326 N. Magnolia Ave. | 2770 Horseshoe Drive S. |
| Southwest Florida | Suite 1208 | | Suite 3 |
| | Miami, FL 33156 | Orlando, FL 32801 | Naples, FL 34104 |
| www.irr.com | (305) 670-0001 | (407) 843-3377 | (239)-643-6888 |

January 21, 2019

Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

SUBJECT:     Hypothetical Market Value "As If" Remediated
             Case No 11-22408-Civ-COOKE
             United States District Court Southern District of Florida in the matter of
             Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
             similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
             Priority Claimant Case at:
             Chatmon, Lillian
             4151 Bismarck Palm Dr
             Tampa, Hillsborough County, Florida 33610
             Client Reference: 8
             IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the referenced property as of the effective date assuming all remediation was completed by an appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It presents summary discussions of the data, reasoning, and analysis that were used in the appraisal process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 639 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 911 of 989

Identification of Subject                                                                          2

## Identification of Subject

The subject of this report is a single-family home configured with 2 bedroom and 2.5 baths with 1,240 SF under air-conditioning.  The subject property was built in 2006 and is located on a 1,168 square foot site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, January 1, 2019. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is January 21, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users.  Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
| --- | --- |
| Sale Date (Most Recent) | March 30, 2007 |
| Seller | Rottlund Homes of Florida Inc |
| Buyer | Chatmon, Lillian |
| Sale Price | $169,900 |
| Recording Instrument Number | 17635-1068 |
| Disposition Details | Sale from the homebuilder |

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

Chatmon, Lillian



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 640 of 796
Case 1:11-cv-22408-MGC   Document 273-8   Entered on FLSD Docket 09/15/2019   Page 912 of 989

Definition of Retrospective Value Opinion                                    3

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

## Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value.  Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation.  Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

(*Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org*)

## Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

(*Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org*)

## Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation.  The result of that study are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida."  The results of that study are incorporated by reference herein.



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 641 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 913 of 989

Scope of Work                                                                                          4

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation.  As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction.  Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation.  These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property.  This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections.  Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available.  In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis.  However, the damage analysis only represents a <u>portion of the overall damages</u> because we were specifically requested to exclude the consideration of the costs to cure.  This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to a "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report.  The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local

Chatmon, Lillian



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 642 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 514 of 989

Highest and Best Use                                                                    5

knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach. The valuations consider the only relevant approach for residential valuation, the sales comparison analysis. The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis. Additionally, this approach directly considered the prices of alternative properties having similar utility.

## Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant. The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

## Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report. This value us hypothetical since it assumes that defective drywall had never been present at the subject property.

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue. This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date. This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

Chatmon, Lillian



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 643 of 796
Case 1:21-cv-22408-MGC Document 273-3 Entered on FLSD Docket 09/15/2019 Page 915 of 989

Conclusion of Value                                                                                    6

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation.  Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total.  This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value.  These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home.  Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered.  Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF                    4 months

$150,000 - $750,000 home up to 4,000 SF              6 months

$750,000+ home up over 4,000 SF                      9 months

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).

Chatmon, Lillian

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

**Conclusions of Damage**

| | | |
|---|---|---|
| Hypothetical Value (Unimpaired - Before) | $145,000 | |
| Market Impairment Discount (As if Remediated) | 10% | |
| Post Impairment Damage ($) | $14,500 | |
| **Hypothetical Value As IF Remediated** | | **$130,500** |
| Post Remediation Damages as of Effective Date | | **$14,500** |
| Loss of Use: | | |
| Rental Rate ($/Month) | $1,250 | |
| Moving & Storage Costs | | $3,000 |
| Loss of Use Subject (# Months) | 4x | $5,000 |
| Subject Total | | **$8,000** |
| **Post Remediation Damage** | | **$22,500** |

Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

As of the effective date of value, the home remains un-remediated. Additional cost to cure damages would apply. These are being handled by the Court's special master.

Chatmon, Lillian



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 645 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 917 of 989

Certification 8

## Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Rob Baird has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Chatmon, Lillian

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 646 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 918 of 989

Assumptions and Limiting Conditions                                                                          9

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1.  The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2.  There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3.  There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4.  The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5.  The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6.  The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1.  An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2.  The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3.  No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4.  No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5.  Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6.  We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.

Chatmon, Lillian



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 647 of 796
Case 1:11-cv-22408-MGC Document 273-9 Entered on FLSD Docket 08/15/2019 Page 919 of 989

Assumptions and Limiting Conditions                                                   10

7.   No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.   We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.   The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10.  Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11.  Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12.  Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13.  If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14.  Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15.  The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16.  The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17.  The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during

Chatmon, Lillian



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 648 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 920 of 989

Assumptions and Limiting Conditions                                                                11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19. The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20. No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21. The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23. The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged

Chatmon, Lillian



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/03/19   Page 649 of 796
Case 1:11-cv-22408-MGC   Document 273-8   Entered on FLSD Docket 08/15/2019   Page 321 of 989

Assumptions and Limiting Conditions                                                    12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25.   Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26.   The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27.   All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

Chatmon, Lillian



# Addenda



| Client | Integra Realty Resources | | | File No. | 18-12-1457a | |
|---|---|---|---|---|---|---|
| Property Address | 4151 Bismarck Palm Dr | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code 33610 |
| Client | Integra Realty Resources | | | | | |

## TABLE OF CONTENTS

Exterior-Only ........................................................................................................ 1
Additional Comparables 4-6 ............................................................................... 7
Additional Commentary Addendum ..................................................................... 8
Market Conditions Addendum to the Appraisal Report ....................................... 9
Additional Rentals 1-3 ......................................................................................... 10
Comparable Photos 1-3 ....................................................................................... 11
Comparable Photos 4-6 ....................................................................................... 12
Comparables Location Map ................................................................................. 13
Rent Comparables Photos ................................................................................... 14
Subject Photos Page 1 ........................................................................................ 15
Scope of Work ..................................................................................................... 16
Subject Aerial Photograph ................................................................................... 17
Flood Map ............................................................................................................ 18
Property Appraiser Page 1 ................................................................................... 19
Property Appraiser Page 2 ................................................................................... 20
License ................................................................................................................. 21
E & O ................................................................................................................... 22
USPAP Identification ........................................................................................... 23
Certifications & Limiting Conditions - Residential .............................................. 24
Supplemental Addendum ..................................................................................... 26
Supplemental Addendum ..................................................................................... 27
Supplemental Addendum ..................................................................................... 28
UAD Definitions Addendum ................................................................................. 29

Serial# 6CE6A285
esign.alamode.com/verify

# Exterior-Only Inspection Residential Appraisal Report

18-12-1457a
File # 18-12-1457a

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

## SUBJECT

| | | | |
|---|---|---|---|
| Property Address | 4151 Bismarck Palm Dr | City Tampa | State FL Zip Code 33610 |
| Borrower N/A | | Owner of Public Record Lillian E. Chatmon | County Hillsborough |

Legal Description TOWNHOMES AT SABAL POINTE LOT 3 BLOCK 26Folio No. 065456-1062

Assessor's Parcel # U-06-29-20-83E-000026-00003.0; 065456-1062  Tax Year 2018  R.E. Taxes $ 425

Neighborhood Name Sabal Park  Map Reference 45300  Census Tract 0121.03

Occupant ☐ Owner ☒ Tenant ☐ Vacant  Special Assessments $ 0  ☒ PUD  HOA $ 174  ☐ per year ☒ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Estimate market value for litigation

Lender/Client Integra Realty Resources  Address 9155 South Dadeland Blvd, #1208, Miami, FL 33156

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s). The subject property has not been listed for sale in the prior 12 months.

## CONTRACT

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ _____ Date of Contract _____ Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s) _____

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No
If Yes, report the total dollar amount and describe the items to be paid.

## NEIGHBORHOOD

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | Present Land Use % |
|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☒ Increasing ☐ Stable ☐ Declining | PRICE AGE | One-Unit 75 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | $ (000) (yrs) | 2-4 Unit 2 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☒ Under 3 mths ☐ 3-6 mths ☐ Over 6 mths | 50 Low 0 | Multi-Family 3 % |
| | | 500 High 100 | Commercial 20 % |
| | | 150 Pred. 55 | Other % |

Neighborhood Boundaries Interstate 4 to the north, Interstate 75 to the east, E. Broadway Avenue to the south, and Interstate 4 to the west.

Neighborhood Description The subject property is located approximately 7.50 miles northeast of Downtown Tampa, in the Sabal Park area. The area is desirable to the market for its proximity to the employment center of Sabal Park, transportation linkages (such as US Highway 301, Interstates 75 and 4, and Dr. Martin Luther King Jr. Boulevard), and recreational amenities such as the Florida State Fairgrounds. All support services are located in a three to five mile radius.

Market Conditions (including support for the above conclusions) Based on data from the S&P Corelogic Case-Shiller Tampa Home Price NSA Index, property values are increasing in the Tampa Bay area. Currently, prices are appreciating on an annual basis of 6.41%. The current cycle of appreciating prices began in 2012. Please see the 1004MC for additional market conditions (time) data.

## SITE

Dimensions 16'x73'  Area 1,168 sf  Shape Rectangular  View B;Woods;

Specific Zoning Classification PD  Zoning Description Planned Development

Zoning Compliance ☐ Legal ☒ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe The Highest and Best Use as Improved is a continuation of the townhouse use.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | ☒ | |
| Gas | | None | Sanitary Sewer | ☒ | | Alley None | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone X  FEMA Map # 12057C0380J  FEMA Map Date 09/27/2013

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No  If Yes, describe
No observed or known adverse influences to market value were noted. The subject property backs to a greenspace (common area) which is a benefit.

## IMPROVEMENTS

Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☐ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner
☐ Other (describe)  Data Source for Gross Living Area Public records

| General Description | General Description | Heating/Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | ☐ FWA ☐ HWBB | Fireplace(s) # 0 | ☐ None |
| # of Stories 2.00 | ☐ Full Basement ☐ Finished | ☐ Radiant | Woodstove(s) # 0 | ☒ Driveway # of Cars 1 |
| Type ☐ Det. ☒ Att. ☐ S-Det./End Unit | ☐ Partial Basement ☐ Finished | ☒ Other Central | ☒ Patio/Deck None | Driveway Surface Concrete |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls Stucco/Avg | Fuel Electric | ☒ Porch Screen | ☐ Garage # of Cars |
| Design (Style) Townhouse | Roof Surface Shingles/Avg | ☒ Central Air Conditioning | ☐ Pool None | ☐ Carport # of Cars 0 |
| Year Built 2006 | Gutters & Downspouts Alum/Avg | ☐ Individual | ☐ Fence None | ☐ Attached ☐ Detached |
| Effective Age (Yrs) 13 | Window Type Sliding/Avg | ☐ Other | ☐ Other None | ☐ Built-in |
| Appliances ☒ Refrigerator ☒ Range/Oven | ☒ Dishwasher ☒ Disposal ☐ Microwave | ☐ Washer/Dryer | | |

Finished area above grade contains: 6 Rooms  2 Bedrooms  2.1 Bath(s)  1,240 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). Entry porch, screen porch, wood cabinets, and sliding glass doors.

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.). C3;An interior inspection of the subject property was not performed by the appraiser. I have depended on the public records and information provided by the client for a description of the improvements. Please see the Extraordinary Assumption under the Scope of Work.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☒ Yes ☐ No
If Yes, describe.
The subject property has Chinese Drywall. The opinion of value is based on Hypothetical Condition found in the Scope of Work.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe.
The functional utility, style, condition, use, quality of construction quality are typical for the area.

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 6CE6A285
esign.alamode.com/verify

# Exterior-Only Inspection Residential Appraisal Report

18-12-1457a
File # 18-12-1457a

| There are | 14 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ | 139,999 | to $ | 223,320 |

| There are | 76 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | 64,900 | to $ | 217,250 |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 4151 Bismarck Palm Dr Tampa, FL 33610 | 4044 Bismarck Palm Dr Tampa, FL 33610 | | 4211 Fan Palm Way Tampa, FL 33610 | | 9812 Fan Palm Way Tampa, FL 33610 | |
| Proximity to Subject | | 0.11 miles SW | | 0.02 miles NE | | 0.08 miles N | |
| Sale Price | $ | | $ 167,500 | | $ 142,000 | | $ 168,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 99.00 sq.ft. | | $ 114.52 sq.ft. | | $ 99.29 sq.ft. | |
| Data Source(s) | | MLS No. T3128630;DOM 20 | | MLS No. T3112433;DOM 8 | | MLS No. T3100986;DOM 4 | |
| Verification Source(s) | | Public Records | | Public Records | | Public Records | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | REO | | ArmLth | |
| Concessions | | Conv;0 | | Conv;0 | | FHA;3500 | -3,500 |
| Date of Sale/Time | | s11/18;c09/18 | 0 | s07/18;c06/18 | +3,000 | s06/18;c04/18 | +4,000 |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 1,168 sf | 1,533 sf | 0 | 1,168 sf | | 1,533 sf | 0 |
| View | B;Woods; | B;Wtr; | 0 | B;Woods; | | N;Res; | +1,500 |
| Design (Style) | AT2.00;Townho | AT2.00;Townho | | AT2.00;Townho | | AT2.00;Townho | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 13 | 8 | 0 | 12 | 0 | 12 | 0 |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 6 2 2.1 | 7 3 2.1 | -1,000 | 6 2 2.1 | | 7 3 2.1 | -1,000 |
| Gross Living Area | 1,240 sq.ft. | 1,692 sq.ft. | -22,600 | 1,240 sq.ft. | | 1,692 sq.ft. | -22,600 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Typical | Typical | | Typical | | Typical | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Typical | Typical | | Typical | | Typical | |
| Garage/Carport | 1ga1dw | 2ga2dw | -2,500 | 1ga1dw | | 2ga2dw | -2,500 |
| Porch/Patio/Deck | Screen porch | Screen porch | | Screen porch | | Screen porch | |
| Net Adjustment (Total) | | + ☒ - $ | -26,100 | ☒ + - $ | 3,000 | + ☒ - $ | -24,100 |
| Adjusted Sale Price | | Net Adj. 15.6 % | | Net Adj. 2.1 % | | Net Adj. 14.3 % | |
| of Comparables | | Gross Adj. 15.6 % $ | 141,400 | Gross Adj. 2.1 % $ | 145,000 | Gross Adj. 20.9 % $ | 143,900 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)    Public records and CoreLogic
My research ☒ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)    Public Records and CoreLogic
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | 04/23/2018 | |
| Price of Prior Sale/Transfer | | | $100 | |
| Data Source(s) | Corelogic | Corelogic | Corelogic | Corelogic |
| Effective Date of Data Source(s) | 01/01/2019 | 01/01/2019 | 01/01/2019 | 01/01/2019 |

Analysis of prior sale or transfer history of the subject property and comparable sales No prior sales of the subject, Comparables 1 or 2 in the last three years.
The subject property is located in a townhouse development known as Townhomes at Sabal Pointe. Over the prior 12 months, there have been ten sales in this development. The sale prices ranged from $115,764 to $168,000. The comparable at the low end of the range was sold at an auction. The room count adjustment is a net adjustment considering the number of bedrooms and bathrooms. If warranted, bedrooms were adjusted $1,000, half baths $1,500 and bathrooms $3,000. Comparable No. 3 sold with seller concessions thus a downward adjustment was warranted. The adjustment was $1.00 on the $1.00. Market conditions (time) adjustments were warranted for the older transactions.
Summary of Sales Comparison Approach    he comparable sales have been analyzed in chronological order from the most current to the oldest sale.  A 0 in the adjustment column indicates that there were differences between the subject and the comparable , however, the market would not recognize an adjustment.  The comparable sales range from $99.00 to $114.52 per sq. ft. This includes the site, site improvements, bathrooms, kitchen, garage, etc.  The living area adjustment reflects only living area size differences.  It would be reasonable for the living area adjustment to be less than the price per square foot paid for the entire comparable.  A living area adjustment of $50 per sq. ft. was made to reflect differences in the living area size. The balance of the adjustments were based on their contributory value.In the final reconciliation of the Sales Comparison Approach, all of the comparables were given approximate equal weight.

Indicated Value by Sales Comparison Approach $    145,000

| Indicated Value by: Sales Comparison Approach $ 145,000 | Cost Approach (if developed) $ | Income Approach (if developed) $ |

The subject is a townhouse. Typically, the market will rely on the Sales Comparison Approach.  Sufficient market data was available to develop a reasonable and credible opinion of value.  The Cost Approach is not applicable for an individual townhouse unit in a townhouse development. The Income Approach would not be considered by the market.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☒ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  No personal property has been included in this valuation.

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 145,000 , as of 01/01/2019 , which is the date of inspection and the effective date of this appraisal.

Serial# 6CE6A285
esign.alamode.com/verify

## Exterior–Only Inspection Residential Appraisal Report

18-12-1457a
File # 18-12-1457a

ADDITIONAL COMMENTS

I have considered relevant competitive listings/contract offerings in performing this appraisal and any trend indicated by that data is supported by the listing/offering information included in this report. The Hillsborough County Property Appraiser uses a Parcel Id No. and a Folio No. to identify properties.  On page 1 of the form, I have provided both numbers.  The commercial land use in the neighborhood is situated on the major roads.  This does not adversely affect the subject.

**Predominant Value**
The subject's indicated value is below the indicated predominant value in the area but falls within the value range and is not an under-improvement.  This does not adversely affect the marketability of the subject.

**Highest and Best Use**
The Highest and Best Use as Vacant is not applicable for a single townhome in a townhouse development because the approach would have to included common areas that are not part of the subject.  The Highest and Best Use as Improved is a continuation of the current use.

---

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)        The Cost Approach is not applicable for an individual townhome in a townhouse development because the approach would have to include common areas that are not included in the scope of this assignment.

| | | |
|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE .................................................. =$ | |
| Source of cost data | DWELLING                          Sq.Ft. @ $ .............. =$ | |
| Quality rating from cost service          Effective date of cost data | Sq.Ft. @ $ .............. =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | .............. =$ | |
| | Garage/Carport              Sq.Ft. @ $ .............. =$ | |
| | Total Estimate of Cost-New .............. =$ | |
| | Less        Physical    Functional    External | |
| | Depreciation =$(                    ) | |
| | Depreciated Cost of Improvements .................................................. =$ | |
| | "As-is" Value of Site Improvements .................................................. =$ | |
| Estimated Remaining Economic Life (HUD and VA only)    52  Years | INDICATED VALUE BY COST APPROACH .................................................. = $ | |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

Estimated Monthly Market Rent $                    X  Gross Rent Multiplier                    = $                    Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes  ☒ No    Unit type(s)  ☐ Detached  ☒ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

Total number of phases                    Total number of units                    Total number of units sold

Total number of units rented                    Total number of units for sale                    Data source(s)

Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes  ☐ No  If Yes, date of conversion

Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source(s)

Are the units, common elements, and recreation facilities complete?  ☐ Yes  ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes  ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.    Pool, ingress/egress, and green space.

Serial# 6CE6A285
esign.alamode.com/verify

**Exterior-Only Inspection Residential Appraisal Report**

18-12-1457a
File # 18-12-1457a

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Serial# 6CE6A285
esign.alamode.com/verify

**Exterior-Only Inspection Residential Appraisal Report**

APPRAISER'S CERTIFICATION:   The   Appraiser   certifies   and   agrees   that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this   appraisal   report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness,   or   structural   integrity   of   the   property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place   at   the   time   this   appraisal   report   was   prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them,   unless   otherwise   indicated   in   this   report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property   for   a   minimum   of   three   years   prior   to   the   effective   date   of   this   appraisal,   unless   otherwise   indicated   in   this   report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to   the   date   of   sale   of   the   comparable   sale,   unless   otherwise   indicated   in   this   report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has   been   built   or   will   be   built   on   the   land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property   and   the   comparable   sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the   sale   or   financing   of   the   subject   property.

11. I   have   knowledge   and   experience   in   appraising   this   type   of   property   in   this   market   area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable   sources   that   I   believe   to   be   true   and   correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability   of   the   subject   property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements   and   information   in   this   appraisal   report   are   true   and   correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are   subject   only   to   the   assumptions   and   limiting   conditions   in   this   appraisal   report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage   loan   application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility   for   it.

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 6CE6A285
esign.alamode.com/verify

**Exterior-Only Inspection Residential Appraisal Report**

18-12-1457a
File # 18-12-1457a

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION:     The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name   Robert K. Baird | Name |
| Company Name   Valucentric, LLC | Company Name |
| Company Address   4590 Ulmerton Road, #204 | Company Address |
|   Clearwater, FL 33762 | |
| Telephone Number   813-252-1140 | Telephone Number |
| Email Address   info@valucentric.com | Email Address |
| Date of Signature and Report   01/21/2019 | Date of Signature |
| Effective Date of Appraisal   01/01/2019 | State Certification # |
| State Certification #   Cert Gen RZ2497 | or State License # |
| or State License # | State |
| or Other (describe)   State # | Expiration Date of Certification or License |
| State   FL | |
| Expiration Date of Certification or License   11/30/2020 | SUBJECT PROPERTY |
| | ☐ Did not inspect exterior of subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 4151 Bismarck Palm Dr | Date of Inspection |
| Tampa, FL 33610 | |
| APPRAISED VALUE OF SUBJECT PROPERTY $   145,000 | COMPARABLE SALES |
| LENDER/CLIENT | |
| Name   No AMC | ☐ Did not inspect exterior of comparable sales from street |
| Company Name   Integra Realty Resources | ☐ Did inspect exterior of comparable sales from street |
| Company Address   9155 South Dadeland Blvd, #1208, Miami, FL | Date of Inspection |
|   33156 | |
| Email Address | |

Freddie Mac Form 2055 March 2005                    UAD Version 9/2011        Page 6 of 6                                      2055 March 2005

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 6CE6A285
esign.alamode.com/verify

## Exterior-Only Inspection Residential Appraisal Report

18-12-1457a
File # 18-12-1457a

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 4151 Bismarck Palm Dr Tampa, FL 33610 | 4222 Bismarck Palm Dr Tampa, FL 33610 | | | | | |
| Proximity to Subject | | 0.05 miles NW | | | | | |
| Sale Price | $ | | $ 136,000 | | $ | | $ |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 109.68 sq.ft. | | $ sq.ft. | | $ sq.ft. | |
| Data Source(s) | | MLS No. T2912513;DOM 15 | | | | | |
| Verification Source(s) | | Public Records | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | ArmLth FHA;0 | | | | | |
| Date of Sale/Time | | s05/18;c11/17 | +4,000 | | | | |
| Location | N;Res; | N;Res; | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | 1,168 sf | 1,168 sf | | | | | |
| View | B;Woods; | B;Woods; | | | | | |
| Design (Style) | AT2.00;Townho | AT2.00;Townho | | | | | |
| Quality of Construction | Q3 | Q3 | | | | | |
| Actual Age | 13 | 12 | 0 | | | | |
| Condition | C3 | C3 | | | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 6 2 2.1 | 6 2 2.1 | | | | | |
| Gross Living Area | 1,240 sq.ft. | 1,240 sq.ft. | | sq.ft. | | sq.ft. | |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | | | | |
| Functional Utility | Typical | Typical | | | | | |
| Heating/Cooling | Central | Central | | | | | |
| Energy Efficient Items | Typical | Typical | | | | | |
| Garage/Carport | 1ga1dw | 1ga1dw | | | | | |
| Porch/Patio/Deck | Screen porch | Screen porch | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 4,000 | ☐ + ☐ - | $ | ☐ + ☐ - | $ |
| Adjusted Sale Price of Comparables | | Net Adj. 2.9 % Gross Adj. 2.9 % | $ 140,000 | Net Adj. % Gross Adj. % | $ | Net Adj. % Gross Adj. % | $ |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | 04/28/2016 | | |
| Price of Prior Sale/Transfer | | $111,500 | | |
| Data Source(s) | Corelogic | Corelogic | | |
| Effective Date of Data Source(s) | 01/01/2019 | 01/01/2019 | | |

Analysis of prior sale or transfer history of the subject property and comparable sales    No prior sales of the subject in the last three years.

Analysis/Comments

Freddie Mac Form 2055 March 2005 | UAD Version 9/2011 | Fannie Mae Form 2055 March 2005

Form 2055UAD.(AC) - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 6CE6A285
esign.alamode.com/verify

## Additional Commentary Addendum

File No. 18-12-1457a

| Client | Integra Realty Resources | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4151 Bismarck Palm Dr | | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33610 |
| Client | Integra Realty Resources | | | | | | |

• **SALES COMPARISON ANALYSIS - Comparable #1 Size varies from subject by more than 25%. (Var = 36.45%)**

• **SALES COMPARISON ANALYSIS - Comparable #1 Age varies from subject by more than 30%. (Var = -38.46%)**

• **SALES COMPARISON ANALYSIS - Comparable #1 Largest Adjustment exceeds 10% of Comp Sale Price.**

• **SALES COMPARISON ANALYSIS - Comparable #1 Net Adjustment exceeds 15% of Comp Sale Price.**

• **SALES COMPARISON ANALYSIS - Comparable #3 Size varies from subject by more than 25%. (Var = 36.45%)**

• **SALES COMPARISON ANALYSIS - Comparable #3 Largest Adjustment exceeds 10% of Comp Sale Price.**

**The above does not affect the credibility of the Sales Comparison Approach.**

**Market Conditions Addendum to the Appraisal Report**

File No. 18-12-1457a
18-12-1457a

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| Property Address | 4151 Bismarck Palm Dr | City | Tampa | State | FL | ZIP Code | 33610 |
|---|---|---|---|---|---|---|---|
| Borrower | N/A | | | | | | |

**Instructions:** The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

**MARKET RESEARCH & ANALYSIS**

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 36 | 18 | 22 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Absorption Rate (Total Sales/Months) | 6 | 6 | 7.33 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Total # of Comparable Active Listings | 3 | 21 | 14 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 0.5 | 3.5 | 1.91 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
| Median Comparable Sale Price | $142,000 | $152,450 | $151,500 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | 31 | 11 | 31 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Median Comparable List Price | $189,750 | $172,620 | $172,620 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Median Comparable Listings Days on Market | 67 | 34 | 126 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Median Sale Price as % of List Price | 98.18 | 97.72 | 98.40 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | ☐ Yes | ☒ No | | ☐ Declining | ☐ Stable | ☒ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.). The MFR MLS indicates there were 76 closed sales during the past 12 months and 28 of those sales contained seller concessions which is 37% of the total transactions in this market area. Prior Months 7-12: 36 Sales; 9 with concessions; 25% of sales for this period. 4-6: 18 Sales; 9 with concessions; 50% of sales for this period. 0-3: 22 Sales; 10 with concessions; 45% of sales for this period. The concessions ranged between $300 and $14,000. The median concession amount is $4,425.

Are foreclosure sales (REO sales) a factor in the market? ☐ Yes ☒ No If yes, explain (including the trends in listings and sales of foreclosed properties).
The MFR MLS indicates there were 76 closed sales during the past 12 months and 6 of those sales were either foreclosures or short sales which is 8% of the total transactions in this market area. Prior Months 7-12: 36 Sales; 3 foreclosures or short sales; 8% of sales for this period. 4-6: 18 Sales; 2 foreclosures or short sales; 11% of sales for this period. 0-3: 22 Sales; 1 foreclosure or short sales; 5% of sales for this period.

Cite data sources for above information. The MFR MLS was the data source used to complete the Market Conditions Addendum.

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.
According to the S&P Corelogic Case-Shiller price index for the Tampa Bay area (as of October 2018 and published December 2018) the median home price in October 2017 was $200,410 and it increased 6.41% to $213,260 by October 2018. Over the prior year prices have appreciated 0.53% per month. Furthermore, they indicated that home prices have appreciated 58.06%, since October 2010. So this index indicates that overall homes prices are appreciating in the Tampa Bay area. Considering all of the market data, on page 1 of the form I have indicated increasing property values. As of December 2018 the 30-year fixed interest rate was 4.75 and the 15-year fixed rate was 4.83%. In November 2018, Fannie Mae's Home Purchase Sentiment Index increased slightly by 0.5 points to 86.2. The increase can be attributed primarily to an increase in the net share of Americans who reported significantly higher income, which hit a new survey high after jumping 5 percentage points. According to NAR, existing home sales nationally increased 1.9% in November 2018.

**CONDO/CO-OP PROJECTS**

If the subject is a unit in a condominium or cooperative project , complete the following:   Project Name:

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab.Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project? ☐ Yes ☐ No If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

🔒 esign.alamode.com/verify    Serial:6CE6A285

**APPRAISER**

| Signature | | Signature | |
|---|---|---|---|
| Appraiser Name | Robert K. Bandy | Supervisory Appraiser Name | |
| Company Name | Valucentric, LLC | Company Name | |
| Company Address | 4590 Ulmerton Road, #204, Clearwater, FL 33762 | Company Address | |
| State License/Certification # | Cert Gen RZ2497 State FL | State License/Certification # | State |
| Email Address | info@valucentric.com | Email Address | |

Freddie Mac Form 71    March 2009                Page 1 of 1                Fannie Mae Form 1004MC    March 2009

Serial# 6CE6A285
esign.alamode.com/verify

Form 1004MC2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## SINGLE FAMILY COMPARABLE RENT SCHEDULE

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property. Adjustments should be made only for items of significant difference between the comparables and the subject property.

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 4151 Bismarck Palm Dr Tampa, FL 33610 | 9811 Blue Palm Way Tampa, FL 33610 | | 4107 Key Thatch Dr Tampa, FL 33610 | | 4241 Key Thatch Dr Tampa, FL 33610 | |
| Proximity to Subject | | 0.14 miles S | | 0.12 miles SE | | 0.06 miles NE | |
| Date Lease Begins Date Lease Expires | | 8/2018 7/2019 | | 7/2018 6/2019 | | 7/2018 6/2019 | |
| Monthy Rental | If Currently Rented: $ | $ 1,325 | | $ 1,250 | | $ 1,195 | |
| Less: Utilities Furniture | $ | $ 0 0 | | $ 0 0 | | $ 0 0 | |
| Adjusted Monthly Rent | | $ 1,325 | | $ 1,250 | | $ 1,195 | |
| Data Source | Inspection Public records | MLS T3125877 Public records | | MLS T3110075 Public records | | MLS T3113790 Public records | |
| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Rent Concessions | | None | | None | | None | |
| Location/View | N;Res; B;Woods; | Average Greenspace | | Average Greenspace | | Average Greenspace | |
| Design and Appeal | AT2.00;Townhou | Townhouse | | Townhouse | | Townhouse | |
| Age/Condition | 13 C3 | 13 Average | | 13 Average | | 13 Below Average | +50 |
| Above Grade Room Count | Total Bdrms Baths 6 2 2.1 | Total Bdrms Baths 7 3 2.1 | -25 | Total Bdrms Baths 6 2 2.1 | | Total Bdrms Baths 6 2 2.1 | |
| Gross Living Area | 1,240 Sq. Ft. | 1,692 Sq. Ft. | -25 | 1,240 Sq. Ft. | | 1,240 Sq. Ft. | |
| Other (e.g., basement, etc.) | | 0sf | | 0sf | | 0sf | |
| Other: | 1-garage | 2-garage | -25 | 1-garage | | 1-garage | |
| Net Adj. (total) | | ☐ + ☒ − $ | -75 | ☐ + ☐ − $ | | ☒ + ☐ − $ | 50 |
| Indicated Monthly Market Rent | | $ 1,250 | | $ 1,250 | | $ 1,245 | |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)    All of the rent comparables are located in the same development as the subject. The analysis include a superior comparable (No. 1) and two similar models as the subject.

Final Reconciliation of Market Rent:    After adjustments, the comparables range from $1,245 to $1,250 per month. Overall, a reasonable rent estimate would be $1,250 per month.

🔒 esign.alamode.com/verify    Serial:6CE6A285

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF    01/01/2019    TO BE $ 1,250

Appraiser(s) SIGNATURE

NAME  Robert K. Baird

Review Appraiser SIGNATURE (If applicable)

NAME

Freddie Mac Form 1000  (8/88) [Y2K]                    Fannie Mae Form 1007  (8/88)

Robert Baird

Form 2055UAD.(AR) - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 6CE6A285
esign.alamode.com/verify

**Comparable Photo Page**

| Client | Integra Realty Resources | | | | |
|---|---|---|---|---|---|
| Property Address | 4151 Bismarck Palm Dr | | | | |
| City | Tampa | County Hillsborough | State FL | Zip Code 33610 | |
| Client | Integra Realty Resources | | | | |



**Comparable 1**

4044 Bismarck Palm Dr
| | |
|---|---|
| Prox. to Subject | 0.11 miles SW |
| Sale Price | 167,500 |
| Gross Living Area | 1,692 |
| Total Rooms | 7 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | N;Res; |
| View | B;Wtr; |
| Site | 1,533 sf |
| Quality | Q3 |
| Age | 8 |



**Comparable 2**

4211 Bismarck Palm Dr
| | |
|---|---|
| Prox. to Subject | 0.02 miles NE |
| Sale Price | 142,000 |
| Gross Living Area | 1,240 |
| Total Rooms | 6 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2.1 |
| Location | N;Res; |
| View | B;Woods; |
| Site | 1,168 sf |
| Quality | Q3 |
| Age | 12 |



**Comparable 3**

9812 Fan Palm Way
| | |
|---|---|
| Prox. to Subject | 0.08 miles N |
| Sale Price | 168,000 |
| Gross Living Area | 1,692 |
| Total Rooms | 7 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 1,533 sf |
| Quality | Q3 |
| Age | 12 |

Serial# 6CE6A285
esign.alamode.com/verify

## Comparable Photo Page

| Client | Integra Realty Resources | | | | | |
|--------|--------------------------|---|---|---|---|---|
| Property Address | 4151 Bismarck Palm Dr | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33610 |
| Client | Integra Realty Resources | | | | | |



### Comparable 4

| | |
|---|---|
| 4222 Bismarck Palm Dr | |
| Prox. to Subject | 0.05 miles NW |
| Sale Price | 136,000 |
| Gross Living Area | 1,240 |
| Total Rooms | 6 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2.1 |
| Location | N;Res; |
| View | B;Woods; |
| Site | 1,168 sf |
| Quality | Q3 |
| Age | 12 |



### Comparable 5

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |



Serial# 6CE6A285
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-29 Filed 12/02/19 Page 664 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/13/2019 Page 386 of
513

**Comparables Location Map**

| Client | Integra Realty Resources | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4151 Bismarck Palm Dr | | | | | | |
| City | Tampa | County | Hillsborough | | State | FL | Zip Code | 33610 |
| Client | Integra Realty Resources | | | | | | |



## Rent Comparables Photos

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Client | Integra Realty Resources | | | | | | |
| Property Address | 4151 Bismarck Palm Dr | | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33610 |
| Client | Integra Realty Resources | | | | | | |



**Rent Comparable 1**

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



**Rent Comparable 2**

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



**Rent Comparable 3**

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



Serial# 6CE6A285
esign.alamode.com/verify

## Subject Photo Page

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 4151 Bismarck Palm Dr | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33610 |
| Client | Integra Realty Resources | | | | | |



**Subject Front**

4151 Bismarck Palm Dr
Sales Price
Gross Living Area   1,240
Total Rooms   6
Total Bedrooms   2
Total Bathrooms   2.1
Location   N;Res;
View   B;Woods;
Site   1,168 sf
Quality   Q3
Age   13



**Subject Rear**



**Subject Street**

Serial# 6CE6A285
esign.alamode.com/verify

| Client | Integra Realty Resources | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4151 Bismarck Palm Dr | | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33610 |
| Client | Integra Realty Resources | | | | | | |

The scope of work applied to this specific appraisal assignment is summarized below.

In the preparation of this report, the appraisal problem was identified; that being the client, intended use, intended users, type and definition of value opinion, effective date of the opinion and conclusion, subject of the assignment and relevant characteristics about that subject, and the assignment conditions. A solution to the appraisal problem (scope of work) was planned, and then implemented so as to arrive at a credible result. The appraiser(s) of this report have the knowledge and experience to complete the assignment competently.

The scope of work applied in this assignment is summarized as:

Viewed the general neighborhood of the subject property.
Inspected the exterior of the subject property from the street.
Gathered information about relevant characteristics of the property.
Noted the characteristics of the property relevant to this assignment.
Analyzed the highest and best use of the property to come to a conclusion.
Market data researched included market trends, rent comparables, and comparable improved sales.
Comparables were researched from varied sources which included the appraisal firm's own database, the public records, and national data services.
Analyzed the data collected and applied it to the Sales Comparison approach to value.
The client has requested a rental analysis, however, an Income Approach was not developed.

The scope of work did not include the following:
I was unable to inspect the interior of the improvements.

The subject property comprises a townhouse. As such the Cost Approach is not applicable because it would have to include common areas that are outside the scope of the assignment.

The client has requested a rent analysis. However, townhomes are typically not purchased for their anticipated income stream. Thus, the market does not consider the Income Approach applicable.

**Extraordinary Assumption**

Per USPAP 2018-2019 - An extraordinary assumption is defined as: "as assignment-specific assumption as of the effective date regarding uncertain information used in the analysis which, if found to be false, could alter the appraiser's opinions or conclusions".

I have only inspected the subject property from the street and have not performed a thorough interior and exterior inspection. The opinion of value is based on the subject property being in average condition as of the effective date.

**Hypothetical Condition**

Per USPAP 2018-2019 - A hypothetical condition is defined as: "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.2"

The opinion of value is based on the Hypothetical Condition the value of the subject property is not affected by any detrimental conditions including Chinese drywall.

Serial# 6CE6A285
esign.alamode.com/verify

**Subject Aerial Photograph**



Serial# 6CE6A285
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 669 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2013 Page 341 of
989
Flood Map



Serial# 6CE6A285
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 670 of 796
Case 1:31-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2017 Page 342 of
Property Appraiser Page 1



**Bob Henriquez**
**Hillsborough County Property Appraiser**

https://www.hcpafl.org/
15th Floor County Ctr.
601 E. Kennedy Blvd, Tampa, Florida 33602-4932
Ph: (813) 272-6100

## Folio: 065456-1062



### Owner Information

| | |
|---|---|
| Owner Name | CHATMON LILLIAN E |
| Mailing Address | 4151 BISMARCK PALM DR<br>TAMPA, FL 33610-9038 |
| Site Address | 4151 BISMARCK PALM DR, TAMPA |
| PIN | U-06-29-20-83E-000026-00003.0 |
| Folio | 065456-1062 |
| Prior PIN | U-06-29-20-ZZZ-000002-39680.0 |
| Prior Folio | 065350-0000 |
| Tax District | U - UNINCORPORATED |
| Property Use | 0106 TOWNHOUSE/VILLA |
| Plat Book/Page | 104/53 |
| Neighborhood | 218002.00 | By-Pass Canal Area W of I-75 & E of 301 |
| Subdivision | 83E | TOWNHOMES AT SABAL POINTE |

### Value Summary

| Taxing District | Market Value | Assessed Value | Exemptions | Taxable Value |
|---|---|---|---|---|
| County | $10,661 | $8,818 | $0 | $8,818 |
| Public Schools | $10,661 | $10,661 | $0 | $10,661 |
| Municipal | $10,661 | $8,818 | $0 | $8,818 |
| Other Districts | $10,661 | $8,818 | $0 | $8,818 |

Note: This section shows Market Value, Assessed Value, Exemptions, and Taxable Value for taxing districts. Because of changes in Florida Law, it is possible to have different assessed and taxable values on the same property. For example, the additional $25,000 Homestead Exemption and the non-homestead CAP do not apply to public schools, and the Low Income Senior Exemption only applies to countywide and certain municipal millages.

### Sales Information

| Book | Page | Month | Year | Type Inst | Qualified or Unqualified | Vacant or Improved | Price |
|---|---|---|---|---|---|---|---|
| 17635 | 1068 | 03 | 2007 | WD | Qualified | Improved | $169,900 |
| 17300 | 0097 | 12 | 2006 | WD | Unqualified | Improved | $173,400 |
| 14386 | 1658 | 11 | 2004 | WD | Unqualified | Vacant | $140,300 |

**Page 1 - 1/1/2019 7:58:58 PM**

Serial# 6CE6A285
esign.alamode.com/verify

**Property Appraiser Page 2**

## Building Information

### Building 1

| | |
|---|---|
| **Type** | 24  | TOWNHOUSE |
| **Year Built** | 2006 |



### Building 1 Construction Details

| Element | Code | Construction Detail |
|---|---|---|
| Class | C | Masonry or Concrete Frame |
| Exterior Wall | 7 | Masonry Frm: Stucco |
| Exterior Wall | 6 | Wd/Mtl Frm: Stucco |
| Roof Structure | 3 | Gable or Hip |
| Roof Cover | 3 | Asphalt/Comp. Shingle |
| Interior Walls | 5 | Drywall |
| Interior Flooring | 8 | Carpet |
| Interior Flooring | 7 | Tile |
| Heat/AC | 2 | Central |
| Condition | 3 | Average |
| Bathrooms | 2.5 | |
| Bedrooms | 2.0 | |
| Stories | 2.0 | |
| Units | 1.0 | |



### Building 1 subarea

| Area Type | Gross Area | Heated Area | Depreciated Value |
|---|---|---|---|
| FOP | 112 | | $133 |
| FUS | 112 | 112 | $481 |
| TWO | 1,104 | 1,104 | $4,992 |
| FOP | 24 | | $29 |
| FUS | 24 | 24 | $105 |
| FGR | 276 | | $657 |
| **Totals** | **1,652** | **1,240** | **$6,397** |

## Extra Features

| OB/XF Code | Description | Building | Year On Roll | Length | Width | Units | Value |
|---|---|---|---|---|---|---|---|
| 0400 | SCREEN ENCLOSURE | 1 | 2007 | 0 | 0 | 144.00 | $449 |

## Land Information - Total Acreage: 0.03

| Use Code | Description | Zone | Front | Depth | Land Type | Total Land Units | Land Value |
|---|---|---|---|---|---|---|---|
| 0040 | CONDO/TOWNHOUSE | PD | 0.0 | 0.0 | UT | UNITS | 1.00 | $100 |

## Legal Description

TOWNHOMES AT SABAL POINTE LOT 3 BLOCK 26

**Page 2 - 1/1/2019 7:58:58 PM**

Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 673 of 796
Case 1:11-cv-22408-MGC   Document 273-8   Entered on FLSD Docket 09/15/2015   Page 544 of 606
License


RICK SCOTT, GOVERNOR

JONATHAN ZACHEM, SECRETARY



## STATE OF FLORIDA
## DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

### FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED GENERAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## BAIRD, ROBERT KEITH

1423 S HOWARD AVE
TAMPA          FL 33606

LICENSE NUMBER: RZ2497

EXPIRATION DATE: NOVEMBER 30, 2020

Always verify licenses online at MyFloridaLicense.com



Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

Serial# 6CE6A285
esign.alamode.com/verify



**LIA Administrators & Insurance Services**

August 28, 2018

RE:     Aspen Specialty Insurance Company
        (A.M. Best Rated A (Excellent), Financial Size Class XV.
        Policy # LR0092M18 Customer ID: 600284

For Clients of
VALUCENTRIC, LLC
1003 Mt. Hermon Road, Suite 201
Salisbury, MD 21804

The purpose of this letter is to advise you of the professional liability (E&O) insurance coverage of VALUCENTRIC, LLC and staff appraisers performing work on its behalf.

VALUCENTRIC, LLC is the named insured under the professional liability insurance policy identified above. This policy provides the following coverage, subject to its terms and conditions:

| Limit of Liability (Each Claim/Aggregate) | Deductible | Effective Date | Expiration Date |
|---|---|---|---|
| $1,000,000/$2,000,000 | $10,000 | 09/19/2018 | 09/19/2019 |

Under the policy, any appraiser who "is, was, or hereafter becomes" a staff appraiser or other employee/contractor for VALUCENTRIC, LLC is also an insured under the policy while acting on behalf of VALUCENTRIC, LLC. The definition of insured includes the following staff appraisers of VALUCENTRIC, LLC:

(Sample)

If you have any questions concerning the insurance coverage arranged by our company, please feel free to contact me directly.

Sincerely,

*Susan Lomeli*

Susan Lomeli
LIA Administrators & Insurance Services
800.334.0652 Ext.139
Susan@Liability.com

Post Office Box 1319, Santa Barbara, CA 93102-1319 ▪ 1600 Anacapa St., Santa Barbara, CA 93101
Tel: (805) 963-6624  (800) 334-0652 ▪ Fax: (805) 957-0652 ▪ Web: www.liability.com

Serial# 6CE6A285
esign.alamode.com/verify

| Client | Integra Realty Resources | | | | File No. 18-12-1457a |
|---|---|---|---|---|---|
| Property Address | 4151 Bismarck Palm Dr | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33610 |
| Client | Integra Realty Resources | | | | |

## APPRAISAL AND REPORT IDENTIFICATION

This Report is one of the following types:

[X] Appraisal Report  (A written report prepared under Standards Rule  2-2(a) , pursuant to the Scope of Work, as disclosed elsewhere in this report.)

[ ] Restricted Appraisal Report  (A written report prepared under Standards Rule  2-2(b) , pursuant to the Scope of Work, as disclosed elsewhere in this report, restricted to the stated intended use by the specified client or intended user.)

## Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:
- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no  personal interest with respect to the parties involved.
- Unless otherwise indicated, I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

## Reasonable Exposure Time  (USPAP defines Exposure Time as the estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.)

My Opinion of Reasonable Exposure Time for the subject property at the market value stated in this report is:  3 to 6 months

## Comments on Appraisal and Report Identification

Note any USPAP-related issues requiring disclosure and any state mandated requirements:

In the past three years, from the date of this report, we have not performed an appraisal or any other services for the subject.

I certify, as the appraiser, that I have completed all aspects of this valuation, including reconciling my opinion of value, free of influence from the client, client's representatives, borrower, or any other party to the transaction.

As of the date of this report, I, (Robert K. Baird) have completed the Standards and Ethics Education Requirement of the Appraisal Institute for associate members.

GEOGRAPHIC COMPETENCE - In accordance with Certification 11, the appraiser further attest to my competence for the market area that is the subject of this report.  The location of the subject property is within an area regularly serviced within my appraisal practice and I utilize the MRED MLS, Realist and other data sources specific to this market area.

APPRAISER COMPETENCY

An appraiser must determine, prior to accepting the assignment, that he or she can perform the assignment competently.  Competency requires:

1. The ability to properly identify the problem to be addressed; and

2. The knowledge and experience to complete the assignment competently; and

3. Recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.

I am competent to perform this assignment based on my state appraiser license and familiarity with this type of property in the subject market.

I performed this appraisal in ac[...] esign.alamode.com/verify    Serial# 6CE6A285  [...]m, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations

| APPRAISER: | SUPERVISORY or CO-APPRAISER (if applicable): |
|---|---|
| Signature: | Signature: |
| Name:  Robert K. Baird | Name: |
| 4590 Ulmerton Rd #201 Clearwater, FL 33762 | |
| State Certification #:  Cert Gen RZ2497 | State Certification #: |
| or State License #: | or State License #: |
| State:  FL   Expiration Date of Certification or License:  11/30/2020 | State:   Expiration Date of Certification or License: |
| Date of Signature and Report:  01/21/2019 | Date of Signature: |
| Effective Date of Appraisal:  01/01/2019 | |
| Inspection of Subject:  [ ] None  [ ] Interior and Exterior  [X] Exterior-Only | Inspection of Subject:  [ ] None  [ ] Inter[...]  [ ] Exterior-Only |
| Date of Inspection (if applicable):  01/01/2019 | Date of Inspection (if applicable): |

Serial# 6CE6A285
esign.alamode.com/verify

Form ID14E - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

File No. 18-12-1457a | Page # 24 of 31

| Client: | Integra Realty Resources | Client File #: | 18-12-1457 |
|---|---|---|---|
| Subject Property: | 4151 Bismarck Palm Dr, Tampa, FL 33610 | Appraisal File #: | 18-12-1457a |

## STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal is subject to the following assumptions and limiting conditions:

- This report is prepared using forms developed and copyrighted by the Appraisal Institute. However, the content, analyses, and opinions set forth in this report are the sole product of the appraiser. The Appraisal Institute is not liable for any of the content, analyses, or opinions set forth herein.

- No responsibility is assumed for matters legal in character or nature. No opinion is rendered as to title, which is assumed to be good and marketable. All existing liens, encumbrances, and assessments have been disregarded, unless otherwise noted, and the property is appraised as though free and clear, having responsible ownership and competent management.

- I have examined the property described herein exclusively for the purposes of identification and description of the real property. The objective of our data collection is to develop an opinion of the highest and best use of the subject property and make meaningful comparisons in the valuation of the property. The appraiser's observations and reporting of the subject improvements are for the appraisal process and valuation purposes only and should not be considered as a warranty of any component of the property. This appraisal assumes (unless otherwise specifically stated) that the subject is structurally sound and all components are in working condition.

- I will not be required to give testimony or appear in court because of having made an appraisal of the property in question, unless specific arrangements to do so have been made in advance, or as otherwise required by law.

- I have noted in this appraisal report any significant adverse conditions (such as needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) discovered during the data collection process in performing the appraisal. Unless otherwise stated in this appraisal report, I have no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and have assumed that there are no such conditions and make no guarantees or warranties, express or implied. I will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because I am not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable public and/or private sources that I believe to be true and correct.

- I will not disclose the contents of this appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice, and/or applicable federal, state or local laws.

- The Client is the party or parties who engage an appraiser (by employment contract) in a specific assignment. A party receiving a copy of this report from the client does not, as a consequence, become a party to the appraiser-client relationship. Any person who receives a copy of this appraisal report as a consequence of disclosure requirements that apply to an appraiser's client, does not become an intended user of this report unless the client specifically identified them at the time of the assignment. The appraiser's written consent and approval must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

- If this valuation conclusion is subject to satisfactory completion, repairs, or alterations, it is assumed that the improvements will be completed competently and without significant deviation.

## VALUE DEFINITION

| ☒ Market Value Definition (below) | ☐ Alternate Value Definition (attached) |
|---|---|

MARKET VALUE is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;

2. both parties are well informed or well advised and acting in what they consider their own best interests;

3. a reasonable time is allowed for exposure in the open market;

4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Source: The Dictionary of Real Estate Appraisal, 5th ed., Appraisal Institute

* NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute plays no role in completing the form responsibility for the data, analysis or any other work product provided by the individual appraiser(s).

AI Reports® AI-900.04 Certification, Assumptions and Limiting Conditions      © Appraisal Institute 2013, All Rights Reserved      January 2013

Form AI9004 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 6CE6A285
esign.alamode.com/verify

| Client: | Integra Realty Resources | Client File #: | 18-12-1457 |
| Subject Property: | 4151 Bismarck Palm Dr, Tampa, FL 33610 | Appraisal File #: | 18-12-1457a |

## APPRAISER CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analysis, opinions, and conclusions are limited only by the report assumptions and limiting conditions, and are my personal, unbiased professional analysis, opinions, and conclusions.

- I have no present (unless specified below) or prospective interest in the property that is the subject of this report, and I have no (unless specified below) personal interest with respect to the parties involved.

- I have no bias with respect to any property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon the developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

- Individuals who have provided significant real property appraisal assistance are named below. The specific tasks performed by those named are outlined in the Scope of Work section of this report.

☒ None    ☐ Name(s)    N/A

As previously identified in the Scope of Work section of this report, the signer(s) of this report certify to the inspection of the property that is the subject of this report as follows:

Property inspected by Appraiser          ☐ Yes    ☐ No

Property inspected by Co-Appraiser       ☐ Yes    ☐ No

- Services provided, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment:    ☒ None    ☐ Specify services provided:

## ADDITIONAL CERTIFICATION FOR APPRAISAL INSTITUTE MEMBERS, CANDIDATES AND PRACTICING AFFILIATES

Appraisal Institute Designated Member, Candidate for Designation, or Practicing Affiliate Certify:

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- I am a Candidate for Designation in the Appraisal Institute.
  As of the date of this report, I have completed the Standard and Ethics Education Requirements for Candidates of the Appraisal Institute.

- 

esign.alamode.com/verify    Serial: 6CE6A285

## APPRAISERS SIGNATURES

| APPRAISER: | | CO-APPRAISER: | |
| Signature | | Signature | |
| Name | Robert K. Baird | Name | |
| Report Date | 01/21/2019 | Report Date | |
| Trainee ☐  Licensed ☐  Certified Residential ☒  Certified General ☐ | | Trainee ☐  Licensed ☐  Certified Residential ☐  Certified General ☐ | |
| License # | Cert Gen RZ2497    State FL | License # | State |
| Expiration Date | 11/30/2020 | Expiration Date | |

* NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute plays no role in completing the form responsibility for the data, analysis or any other work product provided by the individual appraiser(s).
AI Reports® AI-900.04 Certification, Assumptions and Limiting Conditions          © Appraisal Institute 2013, All Rights Reserved          January 2013

Serial# 6CE6A285
esign.alamode.com/verify

Form AI9004 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Supplemental Addendum**

File No. 18-12-1457a

| Client | Integra Realty Resources | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4151 Bismarck Palm Dr | | | | | | |
| City | Tampa | County | Hillsborough | | State | FL | Zip Code | 33610 |
| Client | Integra Realty Resources | | | | | | |

**PURPOSE OF THE APPRAISAL REPORT**

The purpose of this appraisal report is to estimate the market value of the subject property as defined herein. The use of the appraisal is to assist the above-named lender/client, its successors and/or assigns, in evaluating the subject property for lending purposes. This is a federally regulated transaction. Additional supporting data can be found in the appraiser's work file.

It is assumed that the title to this property is good and marketable. No title search has been made, nor have we attempted to determine ownership of the property. The value estimate is given without regard to any questions of title, boundaries, or encroachments. It is assumed that all assessments are paid. We assume the property to be free and clear of liens and encumbrances except as noted.

We are not familiar with any engineering studies made to determine the bearing capacity of the land. Improvements in the area appear to be structurally sound. It is therefore assumed that soil and subsoil conditions are stable unless specifically outlined in this report.

Any exhibits in the report are intended to assist the reader in visualizing the property and its surroundings. The drawings are not intended as surveys and no responsibility is assumed for their cartographic accuracy. Drawings are not intended to be exact in size, scale or detail.

Areas and dimensions of the property were physically measured. If data is furnished by the principal or from plot plans or surveys furnished by the principal, or from public records, we assume it to be reasonably accurate. In the absence of current surveys, land areas may be based upon representations made by the owner's agents or the client. No attempt has been made to render an opinion or determine the status of easements that may exist. No responsibility is assumed for discrepancies that may become evident from a licensed survey of the property.

The value estimate involves only the real estate and all normal building equipment if any improvements are involved. Unless otherwise indicated, the opinion of value arrived at in this appraisal report is for the real estate only and DOES NOT INCLUDE ANY PERSONAL PROPERTY OF ANY KIND. Above ground pools or non-attached items such as freestanding appliances and window treatments are some examples of personal property. The inclusion of personal property in the sale of real estate is common. Although only the real estate is valued in this report, including typical personal property in a sale does not limit the marketability of a house.

The separate allocations between land and improvements, if applicable, represent our judgment only under the existing utilization of the property. A re-evaluation should be made if the improvements are removed or substantially altered, and the land utilized for another purpose.

All information and comments concerning the location, neighborhood trends, construction quality and costs, loss in value from whatever cause, condition, rents, or any other data for the property appraised herein, represents the estimates and opinions of the appraiser formed after an examination of the subject property.

All opinions, as to values stated, are presented as the appraiser's considered opinion based on the information set forth in the report and his experience. We assume no responsibility for changes in market conditions or for the inability of the client or any other party to achieve their desired results based upon the appraised value. Further, some of the assumptions made can be subject to variation depending upon evolving events. We realize some assumptions may never occur and unanticipated events or circumstances may occur. Therefore, actual results achieved during the projection period may vary from those in this report.

The appraisal report was not based on developing or reporting predetermined results, or a requested minimum valuation, a specific valuation, or the approval of a loan.

Our analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of: USPAP – Uniform Standards of Professional Appraisal Practice.

*THE APPRAISER HAS PREPARED THIS APPRAISAL IN FULL COMPLIANCE WITH THE APPRAISER INDEPENDENCE REQUIREMENTS AND HAS NOT PERFORMED, PARTICIPATED IN, OR BEEN ASSOCIATED WITH ANY ACTIVITY IN VIOLATION OF AIR.*

At the request of the client, this appraisal has been prepared in compliance with the Uniform Appraisal Dataset (UAD) from Fannie Mae and Freddie Mac. The UAD requires the appraiser to use standardized responses that include specific formats, definitions, abbreviations, and acronyms. The UAD standard requires property information for the subject and comparables that may be difficult to verify in the normal course of business. The appraiser relies on MLS data, public records data, property owner and realtor verification when available. However, when those collective sources cannot provide precise information, estimates and assumptions are made to comply with the UAD requirements. Should information become available that was not known during the original appraisal due diligence, it could impact the appraisal. The UAD data standard also requires the use of whole numbers in certain data fields. The appraiser was required to round certain numeric entries in order to comply with the UAD data standard.

We do not authorize the out of context quoting or partial reprinting of this appraisal report. Further, neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser nor the name of the firm which he/she is connected, shall be reproduced, published, or disseminated to the public through advertising media, public relations media, news media, or another public means of communication, without the prior written consent of the appraiser signing the report.

Serial# 6CE6A285
esign.alamode.com/verify

## Supplemental Addendum

File No. 18-12-1457a

| Client | Integra Realty Resources | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4151 Bismarck Palm Dr | | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33610 |
| Client | Integra Realty Resources | | | | | | |

**APPRAISAL DATA**

Appraisal reports are technical documents addressed to the specific needs of clients.  In most cases, appraisals are made for mortgage companies and / or banks whose use for this report may be wholly different than that of the casual reader.  Therefore, the reader should understand that this was made with a limited amount of data and limited ability to verify certain information.  Information was verified when possible through public records, multiple listing services, real estate agents and exterior inspection.  This includes verifications that the comparables are actually closed sales and the transactions are arms-length.  No verification technique is one hundred percent accurate but the appraiser has relied upon information as reported and recorded unless better sources prevail.

From time to time, the indicated sizes of comparables shown in the available sources such as MLS services listing sheets or assessor appears to be incorrect based on the appraisers professional experience.  If the size used in the MLS sheets does not correlate with other known data, the appraiser will estimate the size of comparables.  These include assessor's sheets, physical inspection and use of interior room measurements along with a multiplier to depict size based on exterior measurements.  The deviation of comparable size from published sizes only indicates an attempt at higher accuracy in the final report.  However, there are many times that the exact size and features found in comparables cannot be confirmed except by any exterior inspection from the street.  We have used three or more comparables in this report to eliminate the limited data associated with any single comparable.

Information regarding the comparable sales has been obtained from public sources and listing agencies.  If any significant discrepancies are revealed, the right to amend this report is reserved.

**CONDITION OF MATERIALS**

The appraisal report requires the appraiser to note the condition of materials of several components of the subject property.  The appraiser makes no representations, guarantees or warranties (express or implied), regarding the materials, their fitness, quality, condition or remaining economic life.  An appraiser is NOT QUALIFIED OR TRAINED to discover/disclose hidden defects in material or workmanship.  The lender/client should utilize or at least consider the services of a professional licensed home inspector to evaluate same if concerned about the condition of materials of the subject property.

**ENVIRONMENTAL**

The opinion of value reported in this appraisal report is predicated on the belief that there are no adverse conditions that would affect the livability, soundness, or structural integrity of the property, unless noted in the appraisal report.  Adverse conditions include but are not limited to the following:  Needed repairs, deterioration, the presence of hazardous wastes, toxic substances, and other adverse environmental conditions.  Neither the appraiser(s), nor the appraisal firm and the associate's staff have the expertise required to discover any environmental hazards, toxic substances or infestation concerning the subject property.  The appraiser is not an expert in the field of environmental hazards and this report is not to be considered as an environmental assessment of the property.  The appraiser does not make any representations, guarantees, or warranties, express or implied, that the property is free of defects or environmental problems including but not limited to the following:

**INFESTATION** – The appraiser has no expertise in the field of insect, termites or pest infestation.  We are not qualified to detect the presence of these or any other unfavorable infestations.  We have not specifically inspected the subject property to determine the presence of any infestation.  No effort was made to dismantle or probe the structure to observe enclosed, encased, or otherwise concealed evidence of infestation.  Infestation may be present in areas the appraiser cannot see.

**LEAD BASE PAINT** – A residential dwelling that was built prior to 1978 may present exposure to lead based paint that may place young children at risk of developing lead poisoning.  The appraiser is not qualified to determine if lead based paint is present or if it poses any risk or hazard to its inhabitants.

**MECHANICAL SYSTEMS** – The appraiser is NOT A HOME INSPECTOR, ELECTRICIAN, OR PLUMBER.  Mechanical systems, including but not limited to plumbing, electrical, HVAC, appliances, septic systems and wells, have not been tested by the appraiser to determine their fitness of condition.  If an electrical capacity has been noted in the appraisal report, it has been taken from the electrical service panel within the subject property or provided by another source including but not limited to, the owner, the blueprints, specifications, contractors, or other sources believed to be reliable.  The appraiser will not be responsible for the condition, alterations, defects, or other unapparent modifications related to the mechanical systems of the subject property.

**MOLD** – The appraiser is not qualified to determine if mold is present in the property and if present, the appraiser is not qualified to determine the cause of the mold, the type of mold, or whether it poses any risk or hazard to the inhabitants.

**SEASONAL CONDITIONS** – There are instances when portions of the exterior of the property are obscured or not readily observable due to weather related conditions.  In those instances, the appraiser(s) has relied upon a source(s) familiar with the property to cite the material and the condition of those improvements.

**PROPERTY INSPECTION**

A "complete visual inspection" includes a walking tour of the property, interior and exterior and viewing all readily observable items; observing the floor plan and layout; identifying relevant amenities, evaluating conformity of the subject with the neighborhood; observing general conditions; assessing functional utility; measuring the house or utilizing other data and information to calculate the living area, and noting any renovations or remodeling that may have been done to the property.  A "complete visual inspection" does not include observing or



Serial# 6CE6A285
esign.alamode.com/verify

## Supplemental Addendum

File No. 18-12-1457a

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 4151 Bismark Palm Dr | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33610 |
| Client | Integra Realty Resources | | | | | |

viewing any portion of the property not readily accessible from a walking tour include full access to attics and/or crawl spaces; activation or operation of all mechanicals, electrical, or plumbing equipment or fixtures; any observation or viewing of the roof surface other than that which is readily viewable from ground level; or activation or testing of any water system of sewage or septic tank; walking the entire home site if the size and/or topography do not readily allow.  THE APPRAISER IS NOT A QUALIFIED HOME INSPECTOR OR ENGINEER AND DOES NOT REPRESENT THOSE SERVICES.  THIS APPRAISAL IS NOT A WARRANTY AGAINST ANY DEFECT OF THE IMPROVEMENTS.

**SITE COMMENTS**

The site is very typical of the neighborhood in terms of size, topography, view and general appeal.  It provides a suitable setting for the improvements and is consistent with market expectations in this price range.  While no readily apparent adverse site conditions or external factors were noted, many site-related issues are beyond the scope of this assignment.  Statements regarding zoning compliances are intended only in the most general sense.  Zoning and building ordinances vary significantly from one municipality to another and can be extremely detailed.  The scope of this assignment does not include a comparison of every potentially significant characteristics of the subject property's site and improvements relative to zoning and building ordinances.  Unless otherwise noted, standard utility and right of way easements are insignificant to value.  However, a current locational or boundary survey or title report may reveal significant encroachments, easements, zoning violations or other matters of interest that could warrant modifications of the appraised value.

**LEGAL DESCRIPTION**

F.I.R.R.E.A. regulations require the appraiser to attempt to provide a legal description as part of the appraisal.  If the legal description is provided, the appraiser has assumed it is correct.  The legal description should be verified through legal documentation.

**MARKET CONDITIONS**

Trends in real estate are directly related to historic, economic, demographic, and political forces within a market area.  Events occurring nationally, regionally and locally can significantly impact the success of all types of real estate development.  Macroeconomic conditions, such as interest rates, inflation, job security, industrial productivity, and stability in the stock market, shape consumer confidence and business investment activity.  Regional and local indicators do not always mirror national trends.  As a result, the economic conditions on a regional and local level have the most significant impact on real estate markets and must be analyzed separately.  Diversity and stability in employment, job growth, business expansion and the profile of the available labor force all impact the economic stability of a region.  Consumer demographics in the local market, such a population growth, household statistics, age/family characteristics and income levels, specifically impact the type of real estate development that can be sustained, the amount of development supported, prices/rents, absorption of space and the amenities required.

1004 MC Instructions state:  "Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property".

"Subject Specific" parameters are often utilized, but by doing this, it will yield a smaller number of sales, too low to be considered statistically significant, it is then the appraiser's parameters may be expanded to include areas outside of the subject's immediate market neighborhood but still within the surrounding area to produce a statistically credible amount of data to achieve results in which support the appraiser's trend conclusions & not miss-lead the reader with an inadequate amount of statistical data.

**ADDITIONAL SALES COMPARABLE COMMENTS**

The comparables utilized were considered the best available to derive subject's valuation.  Appropriate market adjustments were made for dissimilarities in all comps.  Square footage where obtained from the assessor's office.  Where assessor records were unavailable or appeared inaccurate, square footages were obtained from a multiplier derived from the market. The appraiser uses a variety of data services such as public and private online databases which include assessor's records, county recorder, FEMA Flood Maps, county websites, local zoning maps and/or phone confirmations by the appropriate zoning authorities, local MLS information, or any other reliable sources considered typical for the market area.  All sources are considered to be reliable sources of data.  When discrepancies in the information are found, the appraiser will use the source(s) that is believed to be the most reliable in the appraisal report.  The appraiser will report only the data pertinent to the valuation process.  When applicable, the data presented in the Sales Comparison Approach has been verified by more than one source unless otherwise noted.

THE UAD REQUIRES THAT COMPARABLE SALES BASEMENT AREA AND FINISHED AREA ARE INCLUDED IN THE SALES GRID.  IT SHOULD BE NOTED THAT THE BASEMENT SQUARE FOOTAGE AND BASEMENT FINISHED SQUARE FOOTAGE HAVE BEEN ESTIMATED.  THIS DATA IS NOT AVAILABLE THROUGH MRED MLS OR PUBLIC ASSESSOR RECORDS.

The appraiser attempted to obtain an adequate amount of information in the normal course of business regarding the subject and comparable properties. Some of the standardized responses required by the UAD, especially those in which the appraiser has not had the opportunity to verify personally or measure, could mistakenly imply greater precision and reliability in the data than is factually correct or typical in the normal course of business. Examples include condition and quality ratings as well as comparable sales and listing data. Not every element of the subject property was viewable (list if necessary) and comparable property data was generally obtained from third-party sources (list sources). Consequently, this information should be considered an "estimate" unless otherwise noted by the appraiser.

Serial# 6CE6A285
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 680 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 352 of 989

File No.   18-12-1457a
18-12-1457a

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Condition Ratings and Definitions

C1
The improvements have been recently constructed and have not been previously occupied. The entire structure and all components are new and the dwelling features no physical depreciation.

Note: Newly constructed improvements that feature recycled or previously used materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100 percent new foundation and the recycled materials and the recycled components have been rehabilitated/remanufactured into like-new condition. Improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (that is, newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).

C2
The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category are either almost new or have been recently completely renovated and are similar in condition to new construction.

Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.

C3
The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.

C4
The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.

C5
The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.

C6
The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.

Quality Ratings and Definitions

Q1
Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2
Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 681 of 796
Case 1:11-cv-22408-MGC Document 273-1 Entered on FLSD Docket 08/15/2013 Page 353 of
339

UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Quality Ratings and Definitions (continued)

Q3

Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4

Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5

Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6

Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure

Definitions of Not Updated, Updated, and Remodeled

Not Updated

Little or no updating or modernization. This description includes, but is not limited to, new homes.

Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

Updated

The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.

An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled

Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion.

A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

Explanation of Bathroom Count

Three-quarter baths are counted as a full bath in all cases. Quarter baths (baths that feature only a toilet) are not included in the bathroom count. The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.

Example:
3.2 indicates three full baths and two half baths.

Serial# 6CE6A285
esign.alamode.com/verify

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM

(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Abbreviations Used in Data Standardization Text

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| A | Adverse | Location & View |
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| AT | Attached Structure | Design (Style) |
| B | Beneficial | Location & View |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| BsyRd | Busy Road | Location |
| c | Contracted Date | Date of Sale/Time |
| Cash | Cash | Sale or Financing Concessions |
| Comm | Commercial Influence | Location |
| Conv | Conventional | Sale or Financing Concessions |
| cp | Carport | Garage/Carport |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| cv | Covered | Garage/Carport |
| DOM | Days On Market | Data Sources |
| DT | Detached Structure | Design (Style) |
| dw | Driveway | Garage/Carport |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| g | Garage | Garage/Carport |
| ga | Attached Garage | Garage/Carport |
| gbi | Built-in Garage | Garage/Carport |
| gd | Detached Garage | Garage/Carport |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| GR | Garden | Design (Style) |
| HR | High Rise | Design (Style) |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Ind | Industrial | Location & View |
| Listing | Listing | Sale or Financing Concessions |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| MR | Mid-rise | Design (Style) |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| o | Other | Basement & Finished Rooms Below Grade |
| O | Other | Design (Style) |
| op | Open | Garage/Carport |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA - Rural Housing | Sale or Financing Concessions |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| RT | Row or Townhouse | Design (Style) |
| s | Settlement Date | Date of Sale/Time |
| SD | Semi-detached Structure | Design (Style) |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area, Site |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| Woods | Woods View | View |
| Wtr | Water View | View |
| WtrFr | Water Frontage | Location |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

UAD Version 9/2011 (Updated 1/2014)

Serial# 6CEE6A285
esign.alamode.com/verify

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
Miami/Palm Beach

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment



amgraziano@irr.com    -    305.670.0001 x320

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com

### Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida



amgraziano@irr.com    -    305.670.0001 x320



**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Carribean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Carribean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 11/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Saranazi, Fatih Ann Safaniazi, Proveltbahn Hidg, LLC, USA & George Albright | NeJame, La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | CB Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF OF | TRI FILE # | COURT/CASE NO. # | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-00893/CA-01 | Aaron Stauber & Aviva Stauber V. BH 33, LLC | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22364 UU | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | Southern District of Florida | John Campo | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Igor Gen V. Yacht Club at Portofino Condo Association | Miami-Dade County | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Ocean Bank V. Lindback, Monroe County | Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24694 CA 06 | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Saritff and Course Drive Investments, LLC | 11th Judicial Circuit Dade County, Florida | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (respective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0194 | 13-018822 CACE 02 | Amalia I. Inarda-Rivera V. Rivera Diagnostic Center, Inc., Olexay Rivera & Yudit Rivero | 13th Judicial Circuit Broward County, Florida | Amalia I. Iñarda-Rivera | Rent default judgment and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FL534 (Pending) | Roehm Title Resources Claim | Palm Beach County | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined title defects not identified by Title Insurance Company |
| 4/2014 | Defendant | 123-2014-0117 | 4:14-CV-01077 (Pending) | USA V. GSA-VA St. Louis Property, LLC | USA District Court for the Eastern District of Missouri Eastern Division | Bryan Cave LLP | Condemnation defect of a possessory interest for a term. Retained as consulting/rebuttal expert |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Euforia Club | Miami-Dade County | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental value of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0099 | | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition SR-7 | Broward County | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | West Airport Plaza Business Park, LLC | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | Counsel for the Debtor, Michael D. Seese, Esq. | Fairness Opinion and market value opinion in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23922-CA 09 | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | 11th Judicial Circuit Dade County, Florida | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Plaintiff | 123-2013-0126 | CACE 08057824 (14) | Bayview Loan Servicing, LLC v. Kayhan Soodjani; Muhammad Mahmoodi; et al | 17th Judicial Circuit Broward County, Florida (Hon. Carlos A. Rodriguez) | Bayview Servicing, represented by Tabaras, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency Damages on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV - Rosenbaum | United States of America v. G.K.K. etal | US District Court - Southern District of Florida (Hon. Rosenbaum) | Richard Duvall, Holland and Knight and Jeffrey Neiman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building, condemnation of a possessory interest (leasehold) |
| 2/2013 | Defendant | 123-2011-0670 | 09-05850 CA 04 | Zenaida Gomez v. City of Pinecrest | 11th Judicial Circuit Dade County, Florida (Hon. Beth Bloom) | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence |
| 1/2013 | Defendant | 123-2013-0016 | 12-60950-CIV - CA-23 | Q Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | US Federal Court - Southern District of Florida | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 11/2012 | Plaintiff | 123-2010-0130 | Pending | US Federal Court, USA Property Tax Protest | 11th Judicial Circuit Dade County, Florida | Ken Wurtenberger, Esq., Kozeworski Oxbrow Ferguson | Tax protest of commercial condominium. |
| 10/19/2012 | Defendant | 123-2012-0111 | 2011-1107 CA-23 | Renegade at Hialeah Blvd v. Dynatech Engineering | 11th Judicial Circuit Dade County, Florida (Hon. Patrick DeAbrenida) | Daniel Levin, Esq., Cole, Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from prepaid lease modification. |
| 10/12/2012 | Plaintiff | 123-2012-0109 | 11-30189 CA21 | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | 11th Judicial Circuit Dade County, Florida (Hon. Stanford Blake) | Craig Minko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal, economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal |
| 8/20/2012 | Plaintiff | 123-2010-0012 | CA-02180 CA-25 | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egozi, etal | 11th Judicial Circuit Dade County, Florida | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012. |
| 8/15/2012 | Disclosed Dual Expert | 123-2012-0072 | | Vazquez v. Vazquez Matrimonial Matter | Matrimonial Mediation | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) marital assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Illinois, Bahamas |
| 7/2012 | Plaintiff | 109-2011 Pending: 2003-2014 | | BASF Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Tax Court of New Jersey (Hon. Patrick DeAbrenida) | Phil Genuario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010-0172 | ATL-L-4451-08 | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Superior Court of New Jersey, Law Division Atlantic County | Jay Rhatican, Connell Foley on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations |
| 07/2011 | Defendant | 109-2010-0199 | MERL-3034-08 | 480 Mercer Street, LLP and Bruckener Southern, LLC vs. Hightstown | Superior Court of New Jersey Mercer County | Ansell Zaro Grimm & Aaron, P.C. Husam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5601 | United States vs. Atlantic Wood Industries, Inc. | Federal District Court of Virginia | U.S. Department of Justice | Damage/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Wextrust/HPC Mortgage Fund vs. City of Atlantic City | Tax Court of New Jersey | Cole, Schotz, Meisel, Forman & Leonard P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |



**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF OF | IRR FILE # | COURT CASE NO | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2009 | Secured Creditor | 109-2009-0439 | | Erickson Building | US Bankruptcy Court - Southern District of Texas | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 09/2009 | Plaintiff | 109-2009-0123 | 3035-001 | Bay Head Yacht Club vs. Ocean County Tax Board | Tax Court of New Jersey | John Doyle, Carluccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 109-2009-XXX | INA /DEPS Pending) | Mirage Atlantic City (MAC) vs. City of Atlantic City | Tax Court of New Jersey | Hank Rovithari, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 08/2008 | Defendant | 109-2008-0252 | L-2424-05 | The City of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Superior Court of New Jersey Law Division, Middlesex County | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | 109-2008-345 | C.A. No. OCNL-3361-06 | Osbourne Associates Melbourne Associates VI, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co. JAC Property Management etal and Eckert Corporation | Superior Court of New Jersey, Law Division Ocean County | Francis X. Manning, Esq. Stradley Ronon Stevens & Young & Michael Camboli, Esq. Partridge Snow & Hahn, both on behalf of | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 109-2008-0125- | N/A | Toms River Township vs. Gba Geigy Corporation | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpentelli] | Mark Troncone, Esq., In-house Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | 109-2007-211 | L-009035-06 | Kyle Mosteller vs. Gaila Neerman | Superior Court of New Jersey, Law Division Middlesex County | Frank Canuso, Esq, Hoagland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Plaintiff | 109-2007-0134 | 3:07-CV-2322 | Silver Lakes Inc. vs. Township of Freehold Inc. | Superior Court of New Jersey, Chancery Division Monmouth County | Christopher Hanlon, Esq, Hanlon and Niemann | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee. |
| 06/2007 | Plaintiff | 109-2007-0173 | | Laurelwood Homes, LLC vs. United States Department of Navy | Federal District Court of Virginia | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 109-2006-0192 | CAM - L - 9731-05 | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Superior Court of New Jersey, Law Division, Camden County | Brett Last., Esq. O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 08/2006 | Defendant | 109-2006-0257 | | County Line & Browns Bridge, Jackson Township | | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 02/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Carl Brooks vs. K. Hovanian | Ocean Superior Court, Ocean County Courthouse | Ronan, Tuzzio & Giannone, Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner and the subject developer K. Hovnanian @ Sea Oaks |
| 10/2005 | Defendant | 109-2005-0315 | OCN-L-1810-5 | Atlantic City Electric Company d/b/a Conectiv Power Delivery, a regulated public utility of the state of New Jersey vs. AC1 Marakhamin, LLC family and Armstrong | Superior Court of New Jersey, Law Division Ocean County | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and tower by Atlantic City Electric |
| 09/2005 | Defendant | 109-2005-0214 | MON-L-2609-05 | Township of Howell vs. George Harms Construction Co. Inc. etal | Superior Court of New Jersey, Law Division Monmouth County | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 08/2003 | Defendant | 109-2003-0282 | | Giuffre vs. Giuffre | Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 07/2003 | Defendant | 109-2003-0203 | OCN-C-79-03 | West, etal vs. Pompano, etal | Superior Court of New Jersey, Chancery Division, Ocean County | Stephen E. Smith, Esq | To develop an opinion of the diminution in value due to a loss of useable land area |
| 06/2003 | Plaintiff | 109-2003-0191 | OCN-C-316-02 | Eugene M. Lord vs. Donald W. Rinaldo | Superior Court of New Jersey, Law Division, Ocean County | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate of the property |
| 04/2003 | Plaintiff | 109-2003-0128 | FM-15-468-03-C | Vincent Urbank vs. Lisa Urbank | Superior Court of New Jersey, Chancery Division, Family Part Ocean County | Marianna Pontoriero, Esq. | Litigation-Matrimonial |
| 02/2002 | Plaintiff | 109-2002-0056 | | Shenandoah Mobile Home Park | | Windels Marx Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 04/2001 | Claimant | 109-2001-0169 | NJ-2624-00 | DelForest John Ely and Kimberle A. Ely, h/w | Superior Court of New Jersey, Chancery Division Middlesex County | First American Title Insurance Co. Jack Milks | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 03/1999 | Secured Creditors | 109-1999-0062 | | Georgetown Apartments | US Bankruptcy Court - District of Newark | Emmes & Co. Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | LKW-257-3186 | FM-15-1465-94 | Lisa Franklin, etal vs. Donald Franklin, etal | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1984 | Creditor | HUD-XX | | Hudson Marina Association vs. Emmes & Co. | US Bankruptcy Court - District of Newark | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium condition |



**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Hernandez, Bertha**
Market Value - "As Remediated"
3516 N. Perry Ave
Tanpa, Hillsborough County, Florida 33603
Client Reference: 9

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
January 21, 2019

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**Hernandez, Bertha**
3516 N. Perry Ave
Tanpa, Florida



| Integra Realty Resources | In Miami | In Orlando | In Naples/Sarasota |
|---|---|---|---|
| Miami | Dadeland Centre | The Magnolia Building | Horseshoe Professional Park |
| Orlando | 9155 South Dadeland Blvd. | 326 N. Magnolia Ave. | 2770 Horseshoe Drive S. |
| Southwest Florida | Suite 1208 | | Suite 3 |
| | Miami, FL 33156 | Orlando, FL 32801 | Naples, FL 34104 |
| www.irr.com | (305) 670-0001 | (407) 843-3377 | (239)-643-6888 |

January 22, 2019

Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

SUBJECT:      Market Value - "As Remediated"
              Case No 11-22408-Civ-COOKE
              United States District Court Southern District of Florida in the matter of
              Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
              similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
              Priority Claimant Case at:
              Hernandez, Bertha
              3516 N. Perry Ave
              Tanpa, Hillsborough County, Florida 33603
              Client Reference: 9
              IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the referenced property as of the effective date assuming all remediation was completed by an appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It presents summary discussions of the data, reasoning, and analysis that were used in the appraisal process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 691 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 563 of 989
Identification of Subject                                                                                      2

## Identification of Subject

The subject of this report is a single-family home configured with 4 bedroom and 2.5 baths with 3,578 SF under air-conditioning. The subject property was built in 2006 and is located on a 12,000 square foot site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, January 21, 2019. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is January 22, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
| --- | --- |
| Sale Date (Most Recent) | March 6, 1996 |
| Seller | Morgan, Jody L. et al |
| Buyer | Hernandez, Bertha |
| Sale Price | $125,000 |
| Recording Instrument Number | 8068-1608 |
| Disposition Details | This was the acquisition of land |

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

Hernandez, Bertha



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 692 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 364 of 989

Definition of Retrospective Value Opinion                                      3

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

## Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

(*Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org*)

## Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

(*Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org*)

## Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation. The result of that study are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida." The results of that study are incorporated by reference herein.

Hernandez, Bertha



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 693 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket/09/13/2019 Page 365 of 989

Scope of Work                                                                          4

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation.  As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction.  Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation.  These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property.  This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections.  Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available.  In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis.  However, the damage analysis only represents a <u>portion of the overall damages</u> because we were specifically requested to exclude the consideration of the costs to cure.  This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to a "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report.  The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 694 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 366 of 989

Highest and Best Use                                                                                                    5

knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach. The valuations consider the only relevant approach for residential valuation, the sales comparison analysis. The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis. Additionally, this approach directly considered the prices of alternative properties having similar utility.

## Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant. The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

## Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report. This value us hypothetical since it assumes that defective drywall had never been present at the subject property.

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue. This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date. This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

Hernandez, Bertha



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 695 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 367 of 989

Conclusion of Value                                                                                    6

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation.  Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total.  This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value.  These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home.  Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered.  Therefore, we apply the following timeframes based on the subject's size and price range:

< $150,000 Home up to 2,000+/- SF                  4 months

$150,000 - $750,000 home up to 4,000 SF           6 months

$750,000+ home up over 4,000 SF                    9 months

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).

Hernandez, Bertha



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 696 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 968 of 989

Conclusion of Value                                                                                                    7

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

**Conclusions of Damage**

| | | | |
|---|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $1,065,000 | |
| Market Impairment Discount (As if Remediated) | | 10% | |
| Post Impairment Damage ($) | | $106,500 | |
| **Hypothetical Value As IF Remediated** | | | **$958,500** |
| Post Remediation Damages as of Effective Date | | | **$106,500** |
| Loss of Use: | | | |
| Rental Rate ($/Month) | **$3,600** | | |
| Moving & Storage Costs | | $3,000 | |
| Loss of Use Subject (# Months) | 9x | $32,400 | |
| Subject Total | | | **$35,400** |
| **Post Remediation Damage** | | | **$141,900** |

Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

The home was remediated by the current owner and cost to cure damages apply in addition to the damages estimated above.

Hernandez, Bertha



Case 1:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 697 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 969 of 989

Certification                                                                                                           8

## Certification

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Rob Baird has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Hernandez, Bertha

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 698 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 370 of 989

Assumptions and Limiting Conditions                                                    9

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1.   The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2.   There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3.   There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4.   The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5.   The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6.   The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1.   An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2.   The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3.   No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4.   No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5.   Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6.   We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.

Hernandez, Bertha



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 699 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 371 of 989

Assumptions and Limiting Conditions                                                           10

7.  No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.  We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.  The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during

Hernandez, Bertha



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 700 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2013 Page 572 of 989

Assumptions and Limiting Conditions                                                                11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19. The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20. No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21. The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23. The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged

Hernandez, Bertha



Case 1:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 701 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 973 of 989

Assumptions and Limiting Conditions                                          12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25.  Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26.  The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27.  All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

Hernandez, Bertha



# Addenda



| Client | Integra Realty Resources | | | File No. | 18-12-1459 | |
|---|---|---|---|---|---|---|
| Property Address | 3516 N Perry Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33603 |
| Client | Integra Realty Resources | | | | | |

## TABLE OF CONTENTS

Exterior-Only ........................................................................................................ 1
Additional Commentary Addendum ............................................................................ 7
Comparable Photos 1-3 .......................................................................................... 8
Comparable Photos 4-6 .......................................................................................... 9
Rent Comparable Photos 1-3 .................................................................................. 10
Comparable Sales Map ........................................................................................... 11
Subject Photos Page 1 ........................................................................................... 12
Market Conditions Addendum to the Appraisal Report .................................................. 13
Single Family Comparable Rent Schedule .................................................................. 14
Scope of Work ...................................................................................................... 15
Subject Aerial Photograph ...................................................................................... 16
Subject Flood Map ................................................................................................ 17
Property Appraiser Page 1 ...................................................................................... 18
Property Appraiser Page 2 ...................................................................................... 19
License ............................................................................................................... 20
E & O ................................................................................................................. 21
USPAP Identification .............................................................................................. 22
Certifications & Limiting Conditions - Residential ........................................................ 23
UAD Definitions Addendum ..................................................................................... 25
Supplemental Addendum ........................................................................................ 28
Supplemental Addendum ........................................................................................ 29
Supplemental Addendum ........................................................................................ 30

Serial# 17AE706A
esign.alamode.com/verify

# Exterior-Only Inspection Residential Appraisal Report

18-12-1459
File # 18-12-1459

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

## SUBJECT

| | |
|---|---|
| Property Address | 3516 N Perry Ave | City Tampa | State FL | Zip Code 33603 |

Borrower N/A   Owner of Public Record Bertha L Hernandez   County Hillsborough

Legal Description Riverside North Lot 18 And Water Lot 18 And Closed River Blvd Lying Between Lot 18 And Water Lot 18 Block 22

Assessor's Parcel # 167032-0100; A-11-29-18-4HA-000022-00018.0   Tax Year 2018   R.E. Taxes $ 6,934

Neighborhood Name Riverside North   Map Reference 11-29-18   Census Tract 28.00

Occupant ☒ Owner ☐ Tenant ☐ Vacant   Special Assessments $ 0   ☐ PUD   HOA $ 0 ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Estimate market value for litigation

Lender/Client Integra Realty Resources   Address 9155 South Dadeland Blvd, #1208, Miami, FL 33156

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s). The subject property has not been listed for sale in the prior 12 months.

## CONTRACT

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $   Date of Contract   Is the property seller the owner of public record? ☐ Yes ☐ No   Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No
If Yes, report the total dollar amount and describe the items to be paid.

## NEIGHBORHOOD

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | Present Land Use % |
|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☒ Increasing ☐ Stable ☐ Declining | PRICE ($ 000) / AGE (yrs) | One-Unit 75 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | 2-4 Unit 2 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☒ Under 3 mths ☐ 3-6 mths ☐ Over 6 mths | Low 0 Low 0 | Multi-Family 3 % |
| Neighborhood Boundaries Dr Martin Luther King Jr. Boulevard to the north, N. Boulevard to the east, | | 1,200 High 100 | Commercial 20 % |
| Columbus Drive to the south, and the Hillsborough River to the west. | | 200 Pred. 60 | Other % |

Neighborhood Description The subject is located approximately two miles north of Downtown Tampa, in an area known as Riverside Heights. This is one of the rural neighborhoods in Tampa with bungalow style homes that were constructed in the early 1900's. This area is desirable to the market due to its central location, restaurants, proximity to linkages, and bungalow style homes. All support services are located in a three mile radius.

Market Conditions (including support for the above conclusions) Based on data from the S&P Corelogic Case-Shiller Tampa Home Price NSA Index, property values are increasing in the Tampa Bay area. Currently, prices are appreciating on an annual basis of 6.86%. The current cycle of appreciating prices began in 2012. Please see the 1004MC for additional market conditions (time) data.

## SITE

Dimensions 60'x200'   Area 12000 sf   Shape Rectangular   View B;Wtr;

Specific Zoning Classification RS-60   Zoning Description Residential Single Family

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No   If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | None | Alley None | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No   FEMA Flood Zone X   FEMA Map # 12057 C0351H   FEMA Map Date 08/28/2008

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No   If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No   If Yes, describe

No observed or known adverse influences to market value were noted. The subject site backs to the Hillsborough River which is a benefit to the subject.

## IMPROVEMENTS

Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☐ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner
☐ Other (describe)   Data Source for Gross Living Area Prior appraisal

| General Description | General Description | Heating/Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | ☐ FWA ☐ HWBB | ☐ None | ☐ None |
| # of Stories 2.00 | ☐ Full Basement ☐ Finished | ☐ Radiant | Fireplace(s) # 0 | ☒ Driveway # of Cars 2 |
| Type ☒ Det. ☐ Att. ☐ S-Det/End Unit | ☐ Partial Basement ☐ Finished | ☒ Other Central | Woodstove(s) # 0 | Driveway Surface Pavers |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls Stucco/Avg | Fuel Electric | ☐ Patio/Deck Open | ☐ Garage # of Cars |
| Design (Style) Contemporary | Roof Surface Tile/Average | ☒ Central Air Conditioning | ☒ Porch Open | ☐ Carport # of Cars 0 |
| Year Built 2006 | Gutters & Downspouts Alum/Avg | ☐ Individual | ☐ Pool Open | ☐ Attached ☐ Detached |
| Effective Age (Yrs) 13 | Window Type Awn/Avg | ☐ Other | ☐ Fence Vinyl | |
| Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☐ Disposal ☐ Microwave | | | ☒ Balcony Other | ☐ Built-in |
| | | | ☐ Washer/Dryer ☐ Other (describe) | |

Finished area above grade contains: 8 Rooms 2.1 Bath(s) 3,578 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.) Entry porch, ceiling fans, balcony, generator, wood cabinets, crown molding, insulated windows, and Travertine floors.

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.) C3;An interior inspection of the subject property was not performed by the appraiser. I have depended on the public records and information provided by the client for a description of the improvements. Please see the Extraordinary Assumption under the Scope of Work.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No
If Yes, describe.

No observed or known adverse influences to market value were noted.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No   If No, describe.

The functional utility, style, condition, use, quality of construction quality are typical for the area.

| | | | |
|---|---|---|---|
| Freddie Mac Form 2055 March 2005 | UAD Version 9/2011 | Page 1 of 6 | Fannie Mae Form 2055 March 2005 |

**Exterior-Only Inspection Residential Appraisal Report**

18-12-1459
File # 18-12-1459

| | | | |
|---|---|---|---|
| There are | 15 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 509,900 to $ 1,200,000 | |
| There are | 17 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 510,000 to $ 1,200,000 | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 3516 N Perry Ave Tampa, FL 33603 | 1021 W Henry Ave Tampa, FL 33604 | 3916 1/2 N Ridge Ave Tampa, FL 33603 | 9425 Oak St Riverview, FL 33578 |
| Proximity to Subject | | 3.81 miles NE | 0.27 miles NE | 10.18 miles SE |
| Sale Price | $ | $ 1,179,000 | $ 840,000 | $ 915,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 240.17 sq.ft. | $ 264.73 sq.ft. | $ 330.32 sq.ft. |
| Data Source(s) | | T3141351;DOM 4 | T2939449;DOM 33 | T2926565;DOM 56 |
| Verification Source(s) | | Public Records | Public Records | Public Records |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Sales or Financing Concessions | | ArmLth Cash;0 | | ArmLth Conv;25500 | -13,000 | ArmLth Conv;0 | |
| Date of Sale/Time | | s12/18;c11/18 | 0 | s08/18;c05/18 | 0 | s01/18;c12/17 | +55,000 |
| Location | N;Res; | N;Res; | +59,000 | A;BsvRd; | +84,000 | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 12000 sf | 21080 sf | 0 | 11642 sf | 0 | 10645 sf | 0 |
| View | B;Wtr; | B;Wtr; | | B;Wtr; | | B;Wtr; | |
| Design (Style) | DT2.00;Contem | DT2.00;Contem | | DT2.00;Contem | | DT2.00;Contem | |
| Quality of Construction | Q2 | Q2 | | Q3 | +50,000 | Q2 | |
| Actual Age | 13 | 21 | +2,000 | 1 | -3,000 | 4 | -2,500 |
| Condition | C3 | C3 | | C1 | -50,000 | C2 | -36,000 |
| Above Grade | Total 8 Bdrms. 4 Baths 2.1 | Total 8 Bdrms. 4 Baths 3.0 | -1,500 | Total 8 Bdrms. 4 Baths 4.0 | -3,000 | Total 7 Bdrms. 3 Baths 2.0 | +2,500 |
| Room Count | | | | | | | |
| Gross Living Area | 3,578 sq.ft. | 4,909 sq.ft. | -66,600 | 3,173 sq.ft. | +20,300 | 2,770 sq.ft. | +40,400 |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 2ga2dw | 4ga4dw | -10,000 | 2ga2dw | | 2ga2dw | |
| Porch/Patio/Deck | Open porch | Open porch | | Open porch | | Screen porch | -2,500 |
| Pool/Spa | Open pool | Open pool | | None | +20,000 | Screen pool | -5,000 |
| Net Adjustment (Total) | | + X - $ | -17,100 | X + - $ | 105,300 | X + - $ | 51,900 |
| Adjusted Sale Price of Comparables | | Net Adj. 1.5 % Gross Adj. 11.8 % $ | 1,161,900 | Net Adj. 12.5 % Gross Adj. 29.0 % $ | 945,300 | Net Adj. 5.7 % Gross Adj. 15.7 % $ | 966,900 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) Public records
My research ☒ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s) Public records
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | 11/7/2016 | | 10/18/2016 |
| Price of Prior Sale/Transfer | | $650,000 | | $370,000 |
| Data Source(s) | Corelogic | Corelogic | Corelogic | Corelogic |
| Effective Date of Data Source(s) | 01/22/2019 | 01/22/2019 | 01/22/2019 | 01/22/2019 |

Analysis of prior sale or transfer history of the subject property and comparable sales   No prior sales of the subject and Comparable 2 in the last three years.
The subject and Comparables Nos. 1 and 2 are located on the Hillsborough River. Comparable No. 3 is located on the Alafia River. Comparable No.
2 was adjusted downward for seller concessions. The adjustment was $0.50 on the $1.00. Comparable No. 1 was adjusted for having an inferior
location. Comparable No. 2 was adjusted upward for having a view of overpass for Dr. ML King, Jr. Blvd. The room count adjustment is a net
adjustment considering the number of bedrooms and bathrooms. If warranted, bedrooms were adjusted $1,000, half baths $1,500 and bathrooms
$3,000. The quality of construction adjustment reflects differences in the quality of construction.
Summary of Sales Comparison Approach   A 0 in the adjustment column indicates that there were differences between the comparable ,
however, the market would not recognize an adjustment. The comparable sales were sold from $240.17 to $330.32 per square foot. This includes
the site, site improvements, bathrooms, kitchen, garage, etc. The living area adjustment reflects only living area size differences. It would be
reasonable for the living area adjustment to be less than the price per square foot paid for the entire comparable. A living area adjustment of $75
was made to reflect differences in the living area size. The balance of the adjustments were based on their contributory value. In the final
reconciliation of the Sales Comparison Approach, all of the comparables were given approximate equal weight.

Indicated Value by Sales Comparison Approach $   1,065,000

| Indicated Value by: Sales Comparison Approach $   1,065,000 | Cost Approach (if developed) $ | Income Approach (if developed) $ |
|---|---|---|

The subject is a single family residence. Typically, the market will rely on the Sales Comparison Approach. Sufficient market data was available to
develop a reasonable and credible opinion of value. The Cost Approach is not necessary to develop a credible indication of value. The Income
Approach would not be considered by the market.
This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☒ subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: No personal property has been
included in this valuation.
Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report
is $ 1,065,000 , as of   01/21/2019 , which is the date of inspection and the effective date of this appraisal.

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 17AE706A
esign.alamode.com/verify

## Exterior−Only Inspection Residential Appraisal Report

18-12-1459
File # 18-12-1459

I have considered relevant competitive listings/contract offerings in performing this appraisal and any trend indicated by that data is supported by the listing/offering information included in this report. The Hillsborough County Property Appraiser uses a Parcel Id No. and a Folio No. to identify properties. On page 1 of the form, I have provided both numbers. The commercial land in the neighborhood is situated on the major roads. This does not adversely affect the subject.

**Above Predominant Value**

It is noted that the subject's appraised valuation exceeds the predominant value for the neighborhood. Please remember that the predominant value for the subject's neighborhood includes all homes and all sales, just not similar homes like the subject, or similar comparable sales to the subject. On Page 1 of this report, Fannie Mae is requesting the predominant value for all homes in the subject's neighborhood, which can be confusing and at times misleading, especially in a very diverse area of existing, older and smaller homes combined with larger, new construction homes, such as the subject's neighborhood is comprised of at this time.   This does not affect the marketability of the subject.

**Highest and Best Use**

As If Vacant

Legally Permissible - As previously reported, the subject's current zoning allows for residential use. Commercial, industrial and other uses are not permitted under the current zoning classification. A residential use is legally permissible.

Physically Possible - The site is typical in size, terrain; shape and has sufficient access and is adequately served by utilities. There are no known physical characteristics that would adversely affect the site to support any legally permissible development. The current improvements provide additional support for development on the site as a residential property.

Financially Feasible - The current improvements continue to contribute to the overall value of the property in excess of the site value and therefore, utilization of the current improvements is financially feasible.

Maximally Productive - The use that conforms to neighborhood trends, is consistent with existing land uses and produces the highest price or value is typically the highest and best use. The sales comparison approach will indicate that single family properties that are similar to the subject have been purchased to be utilized by owners and tenants and none of the comparable sales have been converted to an alternative use. These sales indicate that the maximally productive use of the property is consistent with the existing single family use.

**As Improved**

The site is improved with a single family home that was constructed in 2005.  The improvements appear to have been updated and maintained over the years. The Highest and Best Use as Improved is a continuation of the single family use

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)   The improvements were built in 2006.  Due to the age of the improvements, the Cost Approach would have an abundant physical depreciation estimate which would weaken the reliability of the approach.  Therefore, the Cost Approach would not be considered by the market.

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | ......................................... =$ |
|---|---|---|
| Source of cost data | DWELLING | Sq.Ft. @ $ ........ =$ |
| Quality rating from cost service     Effective date of cost data | | Sq.Ft. @ $ ........ =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | ......................... =$ |
| | Garage/Carport           Sq.Ft. @ $ | ........ =$ |
| | Total Estimate of Cost-New | ......... =$ |
| | Less      Physical    Functional    External | |
| | Depreciation | =$( ) |
| | Depreciated Cost of Improvements | ................ =$ |
| | "As-is" Value of Site Improvements | ......................... =$ |
| Estimated Remaining Economic Life (HUD and VA only)        52 Years | INDICATED VALUE BY COST APPROACH | ............................. = $ |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $   3,600   X Gross Rent Multiplier     = $   Indicated Value by Income Approach |
|---|

Summary of Income Approach (including support for market rent and GRM)

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes  ☐ No   Unit type(s)  ☐ Detached  ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes  ☐ No  If Yes, date of conversion

Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source(s)

Are the units, common elements, and recreation facilities complete?  ☐ Yes  ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes  ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Serial# 17AE706A
esign.alamode.com/verify

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Exterior-Only Inspection Residential Appraisal Report**

18-12-1459
File # 18-12-1459

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Serial# 17AE706A
esign.alamode.com/verify

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Exterior-Only Inspection Residential Appraisal Report**

18-12-1459
File # 18-12-1459

APPRAISER'S CERTIFICATION:    The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

Serial# 17AE706A
esign.alamode.com/verify

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Exterior-Only Inspection Residential Appraisal Report**

18-12-1459
File # 18-12-1459

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION:     The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Robert K. Baird | Name |
| Company Name  Valucentric; LLC | Company Name |
| Company Address  4590 Ulmerton Road, #204 | Company Address |
| Clearwater, FL 33762 | |
| Telephone Number  813-252-1140 | Telephone Number |
| Email Address  info@valucentric.com | Email Address |
| Date of Signature and Report  01/22/2019 | Date of Signature |
| Effective Date of Appraisal  01/21/2019 | State Certification # |
| State Certification #  Cert Gen RZ2497 | or State License # |
| or State License # | State |
| or Other (describe)               State # | Expiration Date of Certification or License |
| State  FL | |
| Expiration Date of Certification or License   11/30/2020 | SUBJECT PROPERTY |

ADDRESS OF PROPERTY APPRAISED

3516 N Perry Ave
Tampa, FL 33603

APPRAISED VALUE OF SUBJECT PROPERTY $          1,065,000

LENDER/CLIENT

Name  No AMC
Company Name  Integra Realty Resources
Company Address  9155 South Dadeland Blvd, #1208, Miami, FL 33156
Email Address

SUBJECT PROPERTY

☐ Did not inspect exterior of subject property
☐ Did inspect exterior of subject property from street
Date of Inspection

COMPARABLE SALES

☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
Date of Inspection

Serial# 17AE706A
esign.alamode.com/verify

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Additional Commentary Addendum

File No. 18-12-1459

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 3516 N Perry Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33603 |
| Client | Integra Realty Resources | | | | | |

• **SALES COMPARISON ANALYSIS - Comparable #1 Size varies from subject by more than 25%. (Var = 37.2%)**

• **SALES COMPARISON ANALYSIS - Comparable #1 Age varies from subject by more than 30%. (Var = 61.54%)**

• **SALES COMPARISON ANALYSIS - Comparable #2 Age varies from subject by more than 30%. (Var = -92.31%)**

• **SALES COMPARISON ANALYSIS - Comparable #2 Gross Adjustment exceeds 25% of Comp Sale Price.**

• **SALES COMPARISON ANALYSIS - Comparable #3 Age varies from subject by more than 30%. (Var = -69.23%)**

**The above does not affect the credibility of the Sales Comparison Approach.**

## Comparable Photo Page

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 3516 N Perry Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code 33603 |
| Client | Integra Realty Resources | | | | | |



### Comparable 1

| | |
|---|---|
| 1021 W Henry Ave | |
| Prox. to Subject | 3.81 miles NE |
| Sale Price | 1,179,000 |
| Gross Living Area | 4,909 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.0 |
| Location | N;Res; |
| View | B;Wtr; |
| Site | 21080 sf |
| Quality | Q2 |
| Age | 21 |



### Comparable 2

| | |
|---|---|
| 3916 1/2 N Ridge Ave | |
| Prox. to Subject | 0.27 miles NE |
| Sale Price | 840,000 |
| Gross Living Area | 3,173 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4.0 |
| Location | A;BsyRd; |
| View | B;Wtr; |
| Site | 11642 sf |
| Quality | Q3 |
| Age | 1 |



### Comparable 3

| | |
|---|---|
| 9425 Oak St | |
| Prox. to Subject | 10.18 miles SE |
| Sale Price | 915,000 |
| Gross Living Area | 2,770 |
| Total Rooms | 7 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.0 |
| Location | N;Res; |
| View | B;Wtr; |
| Site | 10645 sf |
| Quality | Q2 |
| Age | 4 |

Photo is from the MLS people were outside during the inspection

Serial# 17AE706A
esign.alamode.com/verify

## Comparable Photo Page

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 3516 N Perry Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code 33603 |
| Client | Integra Realty Resources | | | | | |



**Comparable 4**

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



**Comparable 5**

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

**Comparable 6**

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

Serial# 17AE706A
esign.alamode.com/verify

## Rent Comparable Photos 1-3

| Client | Integra Realty Resources | | | | |
|---|---|---|---|---|---|
| Property Address | 3516 N Perry Ave | | | | |
| City | Tampa | County Hillsborough | | State FL | Zip Code 33603 |
| Client | Integra Realty Resources | | | | |



### Rent Comparable 1

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



### Rent Comparable 2

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



### Rent Comparable 3

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

Serial# 17AE706A
esign.alamode.com/verify

## Comparable Sales Map

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 3516 N Perry Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33603 |
| Client | Integra Realty Resources | | | | | |



Serial# 17AE706A
esign.alamode.com/verify

## Subject Photo Page

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 3516 N Perry Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code 33603 |
| Client | Integra Realty Resources | | | | | |



**Subject Front**

3516 N Perry Ave
Sales Price
Gross Living Area 3,578
Total Rooms 8
Total Bedrooms 4
Total Bathrooms 2.1
Location N;Res;
View B;Wtr;
Site 12000 sf
Quality Q2
Age 13



**Subject Front**



**Subject Street**

Serial# 17AE706A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 716 of 796
Case 2:11-cv-22408-MCE Document 272 Entered on FLSD Docket 08/13/2013 Page 588 of
18-12-1459

# Market Conditions Addendum to the Appraisal Report

File No. 18-12-1459

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| Property Address | 3516 N Perry Ave | City | Tampa | State | FL | ZIP Code | 33603 |
|---|---|---|---|---|---|---|---|
| Borrower | N/A | | | | | | |

**Instructions:** The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 5 | 7 | 5 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | 0.83 | 2.33 | 1.67 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Total # of Comparable Active Listings | 23 | 20 | 15 | ☒ Declining | ☐ Stable | ☐ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 27.6 | 8.57 | 9 | ☒ Declining | ☐ Stable | ☐ Increasing |

| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Median Comparable Sale Price | $649,000 | $600,000 | $807,000 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | 13 | 47 | 77 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Median Comparable List Price | $690,000 | $732,450 | $650,000 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Median Comparable Listings Days on Market | 96 | 146 | 212 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Median Sale Price as % of List Price | 98.92 | 97.27 | 95.22 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | ☒ Yes | ☐ No | | ☐ Declining | ☐ Stable | ☒ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.). The MFR MLS indicates there were 17 closed sales during the past 12 months and 4 of those sales contained seller concessions which is 24% of the total transactions in this market area. Prior Months 7-12: 5 Sales; 0 with concessions; 0% of sales for this period. 4-6: 7 Sales; 2 with concessions; 29% of sales for this period. 0-3: 5 Sales; 2 with concessions; 40% of sales for this period. The concessions ranged between $2,000 and $25,500. The median concession amount is $8,125.

Are foreclosure sales (REO sales) a factor in the market? ☐ Yes ☒ No   If yes, explain (including the trends in listings and sales of foreclosed properties).
The data used in the grid above does not indicate there were any REO/Short sales or other distressed properties associated with the reported transactions. However, this is not a mandatory reporting field for agents and there may be some distressed properties that were not reported. It is beyond the scope of this assignment to confirm each sale used in the Market Conditions Report.

Cite data sources for above information.    The MFR MLS was the data source used to complete the Market Conditions Addendum.

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.
According to the S&P Corelogic Case-Shiller price index for the Tampa Bay area (as of October 2018 and published December 2018) the median home price in October 2017 was $200,410 and it increased 6.41% to $213,260 by October 2018. Over the prior year prices have increased 0.53% per month. Furthermore, they indicated that home prices have appreciated 58.06%, since October 2010. So this index indicates that overall homes prices are appreciating in the Tampa Bay area. Considering all of the market data, on page 1 of the form I have indicated increasing property values.  As of December 2018 the 30-year fixed interest rate was 4.75 and the 15-year fixed was 4.83%. In November 2018, Fannie Mae's Home Purchase Sentiment Index increased slightly by 0.5 points to 86.2. The increase can be attributed primarily to an increase in the net share of Americans who reported significantly higher income, which hit a new survey high after jumping 5 percentage points. According to NAR, existing home sales nationally increased 1.9% in November 2018.

**If the subject is a unit in a condominium or cooperative project , complete the following:**    Project Name:

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab.Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project? ☐ Yes ☐ No   If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

esign.alamode.com/verify    Serial:17AE706A

| Signature | | Signature | |
|---|---|---|---|
| Appraiser Name | Robert K. Bandy | Supervisory Appraiser Name | |
| Company Name | Valucentric, LLC | Company Name | |
| Company Address | 4590 Ulmerton Road, #201, Clearwater, FL 33762 | Company Address | |
| State License/Certification # | Cert Gen RZ2497    State   FL | State License/Certification # | State |
| Email Address | info@valucentric.com | Email Address | |

| Freddie Mac Form 71   March 2009 | Page 1 of 1 | Fannie Mae Form 1004MC   March 2009 |
|---|---|---|

Form 1004MC2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE
Serial# 17AE706A
esign.alamode.com/verify

**SINGLE FAMILY COMPARABLE RENT SCHEDULE**

18-12-1459
File # 18-12-1459

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property. Adjustments should be made only for items of significant difference between the comparables and the subject property.

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 3516 N Perry Ave Tampa, FL 33603 | 4824 N River Blvd Tampa, FL 33603 | | 13310 Waterford Run Dr Riverview, FL 33569 | | 11949 Riverhills Dr Tampa, FL 33617 | |
| Proximity to Subject | | 1.17 miles NE | | 15.10 miles SE | | 8.38 miles NE | |
| Date Lease Begins | | 4/2018 | | 8/2018 | | 3/2018 | |
| Date Lease Expires | | 3/2019 | | 7/2019 | | 2/2019 | |
| Monthly Rental | If Currently Rented: $ | $ 4,000 | | $ 3,500 | | $ 2,700 | |
| Less: Utilities | $ | $ 0 | | $ 0 | | $ 0 | |
| Furniture | | 0 | | 0 | | 0 | |
| Adjusted Monthly Rent | $ | $ 4,000 | | $ 3,500 | | $ 2,700 | |
| Data Source | Inspection Public records | MLS T2912237 Public records | | MLS T3115186 Public records | | MLS T2923302 Public records | |
| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Rent Concessions | | None | | None | | None | |
| Location/View | N;Res; B;Wtr; | N;Res; B;Wtr; | | N;Res; B;Wtr; | | N;Res; B;Wtr; | |
| Design and Appeal | DT2.00;Contemp | DT2.00;Contemp | | DT2.00;Contemp | | DT2.00;Contemp | |
| Age/Condition | 13 C3 | 15 C3 | | 15 C3 | | 14 C3 | |
| Above Grade Room Count | Total\|Bdrms\|Baths 8 \| 4 \| 2.1 | Total\|Bdrms\|Baths 7 \| 3 \| 3.1 | -25 | Total\|Bdrms\|Baths 8 \| 4 \| 4 | -25 | Total\|Bdrms\|Baths 7 \| 3 \| 3.1 | -25 |
| Gross Living Area | 3,578 Sq. Ft. | 2,396 Sq. Ft. | +300 | 4,755 Sq. Ft. | -300 | 2,700 Sq. Ft. | |
| Other (e.g., basement, etc.) | 0sf | 0sf | | 0sf | | 0sf | |
| Other: | 2-garage | 6-garage | -200 | 3-garage | -50 | 2-garage | |
| Net Adj. (total) | | ☒ + ☐ − $ | 75 | ☐ + ☒ − $ | -375 | ☐ + ☒ − $ | -25 |
| Indicated Monthly Market Rent | | Net 1.9 % Gross 13.1 % $ | 4,075 | Net 10.7 % Gross 10.7 % $ | 3,125 | Net 0.9 % Gross 0.9 % $ | 2,675 |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)   All of the rent comparables are located in riverfront locations. The rent comparables indicate an adjusted range from $2,675/month to $4,075/month. Properties along the river vary greatly. However, due to the subject's central location and living area size it should have a value to the high end of the range or $3,600 per month.

Final Reconciliation of Market Rent:   A reasonable and credible lease rate is $3,600 per month.

🔒 esign.alamode.com/verify    Serial:17AE706A

I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF _____ 01/21/2019 _____ TO BE $ _____ 3,600

| Appraiser:  SIGNATURE | | Review Appraiser  SIGNATURE | |
| NAME  Robert K. Baird | | (if applicable)  NAME | |
| 4590 Ulmerton Rd #201 Clearwater, FL 33762 | | | |
| Date Property Inspected  01/21/2019  Report Signed  01/22/2019 | | Date Property Inspected  _____  Report Signed  _____ | |
| License or Certification #  Cert Gen RZ2497  State  FL | | License or Certification #  _____  State  _____ | |
| Expiration Date of License or Certification  11/30/2020 | | Expiration Date of License or Certification  _____ | |
| | | Review Appraiser  ☐ Did  ☐ Did Not  Inspect Subject Property | |

Freddie Mac Form 1000 (8/88)

Form 1007 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Fannie Mae Form 1007 (8/88)

Serial# 17AE706A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN   Document 23380-28 Filed 12/03/19   Page 390 of 989

**Scope of Work**

File No. 18-12-1459

| Client | Integra Realty Resources | | | | | |
|--------|--------------------------|--|--|--|--|--|
| Property Address | 3516 N Perry Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code 33603 |
| Client | Integra Realty Resources | | | | | |

The scope of work applied to this specific appraisal assignment is summarized below.

In the preparation of this report, the appraisal problem was identified; that being the client, intended use, intended users, type and definition of value opinion, effective date of the opinion and conclusion, subject of the assignment and relevant characteristics about that subject, and the assignment conditions. A solution to the appraisal problem (scope of work) was planned, and then implemented in so as to arrive at a credible result. The appraiser(s) of this report have the knowledge and experience to complete the assignment competently.

The scope of work applied in this assignment is summarized as:

Viewed the general neighborhood of the subject property.
Inspected the exterior of the subject property from the street.
Gathered information about relevant characteristics of the property.
Noted the characteristics of the property relevant to this assignment.
Analyzed the highest and best use of the property to come to a conclusion.
Market data researched included market trends, rent comparables, and comparable improved sales.
Comparables were researched from varied sources which included the appraisal firm's own database, the public records, and national data services.
Analyzed the data collected and applied it to the Sales Comparison approach to value.
The client has requested a rental analysis, however, an Income Approach was not developed.

The scope of work did not include the following:
I was unable to inspect the interior of the improvements.

The subject property comprises a single family home that was built in 2006. Due to the age of the improvements, the Cost Approach would have an abundant depreciation which weakens the reliability of the approach. Therefore, the Cost Approach was not applicable.

The client has requested a rent analysis. However, single family homes are typically not purchased for their anticipated income stream. Thus, the market does not consider the Income Approach applicable.

Extraordinary Assumption

Per USPAP 2018-2019 - An extraordinary assumption is defined as: "as assignment-specific assumption as of the effective date regarding uncertain information used in the analysis which, if found to be false, could alter the appraiser's opinions or conclusions".

I have only inspected the subject property from the street and have not performed a thorough interior and exterior inspection. The opinion of value is based on the subject property being in average condition as of the effective date.

The opinion of value assumes the improvements are in average condition.

Hypothetical Condition

Per USPAP 2018-2019 - A hypothetical condition is defined as: "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.2"

The opinion of value is based on the Hypothetical Condition the value of the subject property is not affected by any detrimental conditions including Chinese drywall.

Serial# 17AE706A
esign.alamode.com/verify

**Subject Aerial Photograph**



Serial# 17AE706A
esign.alamode.com/verify

**Subject Flood Map**



Serial# 17AE706A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 721 of 796
Case 1:11-cv-22408-MGC Document 270-8 Entered on FLSD Docket 08/13/2015 Page 593 of
Property Appraiser Page 1



**Bob Henriquez**
**Hillsborough County Property Appraiser**

https://www.hcpafl.org/
15th Floor County Ctr.
601 E. Kennedy Blvd, Tampa, Florida 33602-4932
Ph: (813) 272-6100

## Folio: 167032-0100



### Owner Information

| | |
|---|---|
| Owner Name | HERNANDEZ BERTHA L |
| Mailing Address | 3516 N PERRY AVE<br>TAMPA, FL 33603-5242 |
| Site Address | 3516 N PERRY AVE, TAMPA |
| PIN | A-11-29-18-4HA-000022-00018.0 |
| Folio | 167032-0100 |
| Prior PIN | |
| Prior Folio | 167032-0000 |
| Tax District | TA - TAMPA |
| Property Use | 0100 SINGLE FAMILY R |
| Plat Book/Page | 1/134 |
| Neighborhood | 204006.00 | Tampa Hts Area, N of Columbus to River |
| Subdivision | 4HA | RIVERSIDE NORTH |

### Value Summary

| Taxing District | Market Value | Assessed Value | Exemptions | Taxable Value |
|---|---|---|---|---|
| County | $758,578 | $371,336 | $50,000 | $321,336 |
| Public Schools | $758,578 | $371,336 | $25,000 | $346,336 |
| Municipal | $758,578 | $371,336 | $50,000 | $321,336 |
| Other Districts | $758,578 | $371,336 | $50,000 | $321,336 |

Note: This section shows Market Value, Assessed Value, Exemptions, and Taxable Value for taxing districts. Because of changes in Florida Law, it is possible to have different assessed and taxable values on the same property. For example, the additional $25,000 Homestead Exemption and the non-homestead CAP do not apply to public schools, and the Low Income Senior Exemption only applies to countywide and certain municipal millages.

### Sales Information

| Book | Page | Month | Year | Type Inst | Qualified or Unqualified | Vacant or Improved | Price |
|---|---|---|---|---|---|---|---|
| 8068 | 1608 | 02 | 1996 | WD | Qualified | Improved | $125,000 |
| 7779 | 1000 | 06 | 1995 | WD | Qualified | Improved | $115,000 |
| 5360 | 0886 | 03 | 1988 | WD | Qualified | | $82,500 |

Page 1 - 1/1/2019 7:45:36 PM

Serial# 17AE706A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 722 of 796
Case 1:11-cv-22408-MGC Document 273 Entered on FLSD Docket/08/15/2013 Page 594 of
Property Appraiser Page 2

## Building Information

### Building 1

| | |
|---|---|
| Type | 01 | SINGLE FAMILY |
| Year Built | 2006 |



### Building 1 Construction Details

| Element | Code | Construction Detail |
|---|---|---|
| Class | C | Masonry or Concrete Frame |
| Exterior Wall | 7 | Masonry Frm: Stucco |
| Exterior Wall | 6 | Wd/Mtl Frm: Stucco |
| Roof Structure | 3 | Gable or Hip |
| Roof Cover | 6 | Tile |
| Interior Walls | 5 | Drywall |
| Interior Flooring | 8 | Carpet |
| Interior Flooring | 7 | Tile |
| Heat/AC | 2 | Central |
| Architectural Style | 10 | Contemporary Multi-Story |
| Condition | 3 | Average |
| Bedrooms | 3.0 | |
| Bathrooms | 3.5 | |
| Stories | 2.0 | |
| Units | 1.0 | |



### Building 1 subarea

| Area Type | Gross Area | Heated Area | Depreciated Value |
|---|---|---|---|
| SFB | 121 | 121 | $13,593 |
| FOP | 432 | | $15,134 |
| BAS | 2,422 | 2,422 | $339,395 |
| FOP | 63 | | $2,242 |
| FGR | 543 | | $38,115 |
| FOP | 230 | | $8,128 |
| ADD | | | $0 |
| BAL | 567 | | $11,911 |
| FOP | 398 | | $14,013 |
| FUS | 1,070 | 1,070 | $134,845 |
| Totals | 5,846 | 3,613 | $577,476 |

## Extra Features

| OB/XF Code | Description | Building | Year On Roll | Length | Width | Units | Value |
|---|---|---|---|---|---|---|---|
| 0350 | POOL 01 NO ENCL | 1 | 2003 | 0 | 0 | 1.00 | $22,490 |
| 0190 | DOCK WOOD | 1 | 2003 | 0 | 0 | 300.00 | $2,805 |
| 0245 | BOATPORT | 1 | 2003 | 24 | 12 | 288.00 | $2,189 |
| 0850 | ELEVATOR | 1 | 2008 | 0 | 0 | 1.00 | $17,117 |

## Land Information - Total Acreage: 0.28

| Use Code | Description | Zone | Front | Depth | Land Type | Total Land Units | Land Value |
|---|---|---|---|---|---|---|---|
| 05HK | Hillsborough River Class 18 | RS-60 | 60.00 | 200.00 | FF | FRONT FEET | 60.00 | $130,800 |
| 993I | Acreage Class 3 | RS-60 | 0.0 | 0.0 | AC | ACREAGE | 0.15 | $5,700 |

## Legal Description

RIVERSIDE NORTH LOT 18 AND WATER LOT 18 AND CLOSED RIVER BLVD LYING BETWEEN LOT 18 AND WATER LOT 18 BLOCK 22

**Page 2 - 1/1/2019 7:45:36 PM**

**License**


RICK SCOTT, GOVERNOR                    JONATHAN ZACHEM, SECRETARY



### STATE OF FLORIDA
### DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

### FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED GENERAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## BAIRD, ROBERT KEITH

1423 S HOWARD AVE
TAMPA          FL 33606

LICENSE NUMBER: RZ2497

**EXPIRATION DATE: NOVEMBER 30, 2020**

Always verify licenses online at MyFloridaLicense.com



Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

Form SCNLGL - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 17AE706A
esign.alamode.com/verify



**LIA Administrators & Insurance Services**

August 28, 2018

RE:   Aspen Specialty Insurance Company
      (A.M. Best Rated A (Excellent), Financial Size Class XV.
      Policy # LR0092M18 Customer ID: 600284

For Clients of
VALUCENTRIC, LLC
1003 Mt. Hermon Road, Suite 201
Salisbury, MD 21804

The purpose of this letter is to advise you of the professional liability (E&O) insurance coverage of VALUCENTRIC, LLC and staff appraisers performing work on its behalf.

VALUCENTRIC, LLC is the named insured under the professional liability insurance policy identified above. This policy provides the following coverage, subject to its terms and conditions:

| Limit of Liability (Each Claim/Aggregate) | Deductible | Effective Date | Expiration Date |
|---|---|---|---|
| $1,000,000/$2,000,000 | $10,000 | 09/19/2018 | 09/19/2019 |

Under the policy, any appraiser who "is, was, or hereafter becomes" a staff appraiser or other employee/contractor for VALUCENTRIC, LLC is also an insured under the policy while acting on behalf of VALUCENTRIC, LLC.  The definition of insured includes the following staff appraisers of VALUCENTRIC, LLC:

(Sample)

If you have any questions concerning the insurance coverage arranged by our company, please feel free to contact me directly.

Sincerely,

*Susan Lomeli*

Susan Lomeli
LIA Administrators & Insurance Services
800.334.0652 Ext.139
Susan@Liability.com

Post Office Box 1319, Santa Barbara, CA 93102-1319 ■ 1600 Anacapa St., Santa Barbara, CA 93101
Tel (805) 963-6624  (800) 334-0652 ■ Fax (805) 957-0652 ■ Web www.liability.com

Serial# 17AE706A
esign.alamode.com/verify

| Client | Integra Realty Resources | | | | File No. 18-12-1459 |
|---|---|---|---|---|---|
| Property Address | 3516 N Perry Ave | | | | |
| City | Tampa | County | Hillsborough | State FL | Zip Code 33603 |
| Client | Integra Realty Resources | | | | |

## APPRAISAL AND REPORT IDENTIFICATION

This Report is one of the following types:

☒ Appraisal Report (A written report prepared under Standards Rule 2-2(a) , pursuant to the Scope of Work, as disclosed elsewhere in this report.)

☐ Restricted Appraisal Report (A written report prepared under Standards Rule 2-2(b) , pursuant to the Scope of Work, as disclosed elsewhere in this report, restricted to the stated intended use by the specified client or intended user.)

### Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:
- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no  personal interest with respect to the parties involved.
- Unless otherwise indicated, I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

### Reasonable Exposure Time (USPAP defines Exposure Time as the estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.)

My Opinion of Reasonable Exposure Time for the subject property at the market value stated in this report is:        3 to 6 months

### Comments on Appraisal and Report Identification

Note any USPAP-related issues requiring disclosure and any state mandated requirements:

In the past three years, from the date of this report, we have not performed an appraisal or any other services for the subject.

I certify, as the appraiser, that I have completed all aspects of this valuation, including reconciling my opinion of value, free of influence from the client, client's representatives, borrower, or any other party to the transaction.

As of the date of this report, I, (Robert K. Baird) have completed the Standards and Ethics Education Requirement of the Appraisal Institute for associate members.

GEOGRAPHIC COMPETENCE - In accordance with Certification 11, the appraiser further attest to the competence in the market area that is the subject of this report.  The location of the subject property is within an area regularly serviced within my appraisal practice and I utilize the MRED MLS, Realist and other data sources specific to this market area.

APPRAISER COMPETENCY

An appraiser must determine, prior to accepting the assignment, that he or she can perform the assignment competently.  Competency requires:

1. The ability to properly identify the problem to be addressed; and

2. The knowledge and experience to complete the assignment competently; and

3. Recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.

I am competent to perform this assignment based on my state appraiser license and familiarity with this type of property in the subject market.

I performed this appraisal in accordance with the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.) and any implementing regulations

esign.alamode.com/verify       Serial:17AE706A

| APPRAISER: | SUPERVISORY or CO-APPRAISER (if applicable): |
|---|---|
| Signature: | Signature: |
| Name: Robert K. Baird | Name: |
| 4590 Ulmerton Rd #201 Clearwater, FL 33762 | |
| State Certification #: Cert Gen RZ2497 | State Certification #: |
| or State License #: | or State License #: |
| State: FL Expiration Date of Certification or License: 11/30/2020 | State: Expiration Date of Certification or License: |
| Date of Signature and Report: 01/22/2019 | Date of Signature: |
| Effective Date of Appraisal: 01/21/2019 | |
| Inspection of Subject: ☐ None ☒ Interior and Exterior ☐ Exterior-Only | Inspection of Subject: ☐ None ☐ Interior and Exterior ☐ Exterior-Only |
| Date of Inspection (if applicable): 01/17/2019 | Date of Inspection (if applicable): |

Serial# 17AE706A
esign.alamode.com/verify
Form ID14E - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

File No. 18-12-1459 | Page # 23 of 30

| Client: | Integra Realty Resources | Client File #: | 18-12-1459 |
| Subject Property: | 3516 N Perry Ave, Tampa, FL 33603 | Appraisal File #: | 18-12-1459 |

## STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal is subject to the following assumptions and limiting conditions:

- This report is prepared using forms developed and copyrighted by the Appraisal Institute. However, the content, analyses, and opinions set forth in this report are the sole product of the appraiser. The Appraisal Institute is not liable for any of the content, analyses, or opinions set forth herein.

- No responsibility is assumed for matters legal in character or nature. No opinion is rendered as to title, which is assumed to be good and marketable. All existing liens, encumbrances, and assessments have been disregarded, unless otherwise noted, and the property is appraised as though free and clear, having responsible ownership and competent management.

- I have examined the property described herein exclusively for the purposes of identification and description of the real property. The objective of our data collection is to develop an opinion of the highest and best use of the subject property and make meaningful comparisons in the valuation of the property. The appraiser's observations and reporting of the subject improvements are for the appraisal process and valuation purposes only and should not be considered as a warranty of any component of the property. This appraisal assumes (unless otherwise specifically stated) that the subject is structurally sound and all components are in working condition.

- I will not be required to give testimony or appear in court because of having made an appraisal of the property in question, unless specific arrangements to do so have been made in advance, or as otherwise required by law.

- I have noted in this appraisal report any significant adverse conditions (such as needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) discovered during the data collection process in performing the appraisal. Unless otherwise stated in this appraisal report, I have no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and have assumed that there are no such conditions and make no guarantees or warranties, express or implied. I will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because I am not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable public and/or private sources that I believe to be true and correct.

- I will not disclose the contents of this appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice, and/or applicable federal, state or local laws.

- The Client is the party or parties who engage an appraiser (by employment contract) in a specific assignment. A party receiving a copy of this report from the client does not, as a consequence, become a party to the appraiser-client relationship. Any person who receives a copy of this appraisal report as a consequence of disclosure requirements that apply to an appraiser's client, does not become an intended user of this report unless the client specifically identified them at the time of the assignment. The appraiser's written consent and approval must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

- If this valuation conclusion is subject to satisfactory completion, repairs, or alterations, it is assumed that the improvements will be completed competently and without significant deviation.

## VALUE DEFINITION

| ☒ Market Value Definition (below) | ☐ Alternate Value Definition (attached) |

MARKET VALUE is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;

2. both parties are well informed or well advised and acting in what they consider their own best interests;

3. a reasonable time is allowed for exposure in the open market;

4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Source: The Dictionary of Real Estate Appraisal, 5th ed., Appraisal Institute

* NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute plays no role in completing the form, responsibility for the data, analysis or any other work product provided by the individual appraiser(s).
AI Reports® AI-900.04 Certification, Assumptions and Limiting Conditions          © Appraisal Institute 2013, All Rights Reserved          January 2013

Serial# 17AE706A
esign.alamode.com/verify

Form AI9004 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

| Client: | Integra Realty Resources | Client File #: | 18-12-1459 |
|---|---|---|---|
| Subject Property: | 3516 N Perry Ave, Tampa, FL 33603 | Appraisal File #: | 18-12-1459 |

## APPRAISER CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analysis, opinions, and conclusions are limited only by the report assumptions and limiting conditions, and are my personal, unbiased professional analysis, opinions, and conclusions.
- I have no present (unless specified below) or prospective interest in the property that is the subject of this report, and I have no (unless specified below) personal interest with respect to the parties involved.
- I have no bias with respect to any property that is the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon the developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
- Individuals who have provided significant real property appraisal assistance are named below. The specific tasks performed by those named are outlined in the Scope of Work section of this report.

☒ None   ☐ Name(s)   N/A

As previously identified in the Scope of Work section of this report, the signer(s) of this report certify to the inspection of the property that is the subject of this report as follows:

Property inspected by Appraiser          ☒ Yes   ☐ No

Property inspected by Co-Appraiser      ☐ Yes   ☐ No

- Services provided, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment:      ☒ None   ☐ Specify services provided:

## ADDITIONAL CERTIFICATION FOR APPRAISAL INSTITUTE MEMBERS, CANDIDATES AND PRACTICING AFFILIATES

Appraisal Institute Designated Member, Candidate for Designation, or Practicing Affiliate Certify:

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- I am a Candidate for Designation in the Appraisal Institute.
  As of the date of this report, I have completed the Standard and
  Ethics Education Requirements for Candidates of the Appraisal
  Institute.

esign.alamode.com/verify   Serial# 17AE706A

## APPRAISERS SIGNATURES

| APPRAISER: | | CO-APPRAISER: | |
|---|---|---|---|
| Signature | | Signature | |
| Name | Robert K. Baird | Name | |
| Report Date | 01/22/2019 | Report Date | |
| Trainee ☐  Licensed ☐  Certified Residential ☐  Certified General ☒ | | Trainee ☐  Licensed ☐  Certified Residential ☐  Certified General ☐ | |
| License # | Cert Gen RZ2497    State  FL | License # | State |
| Expiration Date | 11/30/2020 | Expiration Date | |

* NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute plays no role in completing the form responsibility for the data, analysis or any other work product provided by the individual appraiser(s).

AI Reports® AI-900.04 Certification, Assumptions and Limiting Conditions          © Appraisal Institute 2013, All Rights Reserved          January 2013

Serial# 17AE706A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 728 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/13/2013 Page 400 of 989

File No.    18-12-1459
18-12-1459

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Condition Ratings and Definitions

C1

The improvements have been recently constructed and have not been previously occupied. The entire structure and all components are new and the dwelling features no physical depreciation.

Note: Newly constructed improvements that feature recycled or previously used materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100 percent new foundation and the recycled materials and the recycled components have been rehabilitated/remanufactured into like-new condition. Improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (that is, newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).

C2

The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category are either almost new or have been recently completely renovated and are similar in condition to new construction.

Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.

C3

The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.

C4

The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.

C5

The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.

C6

The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.


Quality Ratings and Definitions

Q1

Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2

Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Serial# 17AE706A
esign.alamode.com/verify

UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Quality Ratings and Definitions (continued)

Q3

Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4

Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5

Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6

Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure

Definitions of Not Updated, Updated, and Remodeled

Not Updated

Little or no updating or modernization. This description includes, but is not limited to, new homes.

Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

Updated

The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.

An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled

Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion.

A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

Explanation of Bathroom Count

Three-quarter baths are counted as a full bath in all cases. Quarter baths (baths that feature only a toilet) are not included in the bathroom count. The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.

Example:
3.2 indicates three full baths and two half baths.

Serial# 17AE706A
esign.alamode.com/verify

UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM

(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Abbreviations Used in Data Standardization Text

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| A | Adverse | Location & View |
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| AT | Attached Structure | Design (Style) |
| B | Beneficial | Location & View |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| BsyRd | Busy Road | Location |
| c | Contracted Date | Date of Sale/Time |
| Cash | Cash | Sale or Financing Concessions |
| Comm | Commercial Influence | Location |
| Conv | Conventional | Sale or Financing Concessions |
| cp | Carport | Garage/Carport |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| cv | Covered | Garage/Carport |
| DOM | Days On Market | Data Sources |
| DT | Detached Structure | Design (Style) |
| dw | Driveway | Garage/Carport |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| g | Garage | Garage/Carport |
| ga | Attached Garage | Garage/Carport |
| gbi | Built-in Garage | Garage/Carport |
| gd | Detached Garage | Garage/Carport |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| GR | Garden | Design (Style) |
| HR | High Rise | Design (Style) |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Ind | Industrial | Location & View |
| Listing | Listing | Sale or Financing Concessions |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| MR | Mid-rise | Design (Style) |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| o | Other | Basement & Finished Rooms Below Grade |
| O | Other | Design (Style) |
| op | Open | Garage/Carport |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA - Rural Housing | Sale or Financing Concessions |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| RT | Row or Townhouse | Design (Style) |
| s | Settlement Date | Date of Sale/Time |
| SD | Semi-detached Structure | Design (Style) |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area, Site |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| Woods | Woods View | View |
| Wtr | Water View | View |
| WtrFr | Water Frontage | Location |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| HBU | Highest and Best Use | Page 1 |
| MLS No. | Multiple Listing Service Number | Page 2 |
| Avg | Average | Page 1 |
| Cpt | Carpet | Page 1 |
| Tl | Tile | Page 1 |
| Vnyl | Vinyl | Page 1 |

**Supplemental Addendum**

File No. 18-12-1459

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 3516 N Perry Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33603 |
| Client | Integra Realty Resources | | | | | |

**PURPOSE OF THE APPRAISAL REPORT**

The purpose of this appraisal report is to estimate the market value of the subject property as defined herein. The use of the appraisal is to assist the above-named lender/client, its successors and/or assigns, in evaluating the subject property for lending purposes. This is a federally regulated transaction. Additional supporting data can be found in the appraiser's work file.

It is assumed that the title to this property is good and marketable. No title search has been made, nor have we attempted to determine ownership of the property. The value estimate is given without regard to any questions of title, boundaries, or encroachments. It is assumed that all assessments are paid. We assume the property to be free and clear of liens and encumbrances except as noted.

We are not familiar with any engineering studies made to determine the bearing capacity of the land. Improvements in the area appear to be structurally sound. It is therefore assumed that soil and subsoil conditions are stable unless specifically outlined in this report.

Any exhibits in the report are intended to assist the reader in visualizing the property and its surroundings. The drawings are not intended as surveys and no responsibility is assumed for their cartographic accuracy. Drawings are not intended to be exact in size, scale or detail.

Areas and dimensions of the property were physically measured. If data is furnished by the principal or from plot plans or surveys furnished by the principal, or from public records, we assume it to be reasonably accurate. In the absence of current surveys, land areas may be based upon representations made by the owner's agents or the client. No attempt has been made to render an opinion or determine the status of easements that may exist. No responsibility is assumed for discrepancies that may become evident from a licensed survey of the property.

The value estimate involves only the real estate and all normal building equipment if any improvements are involved. Unless otherwise indicated, the opinion of value arrived at in this appraisal report is for the real estate only and DOES NOT INCLUDE ANY PERSONAL PROPERTY OF ANY KIND. Above ground pools or non-attached items such as freestanding appliances and window treatments are some examples of personal property. The inclusion of personal property in the sale of real estate is common. Although only the real estate is valued in this report, including typical personal property in a sale does not limit the marketability of a house.

The separate allocations between land and improvements, if applicable, represent our judgment only under the existing utilization of the property. A re-evaluation should be made if the improvements are removed or substantially altered, and the land utilized for another purpose.

All information and comments concerning the location, neighborhood trends, construction quality and costs, loss in value from whatever cause, condition, rents, or any other data for the property appraised herein, represents the estimates and opinions of the appraiser formed after an examination of the subject property.

All opinions, as to values stated, are presented as the appraiser's considered opinion based on the information set forth in the report and his experience. We assume no responsibility for changes in market conditions or for the inability of the client or any other party to achieve their desired results based upon the appraised value. Further, some of the assumptions made can be subject to variation depending upon evolving events. We realize some assumptions may never occur and unanticipated events or circumstances may occur. Therefore, actual results achieved during the projection period may vary from those in this report.

The appraisal report was not based on developing or reporting predetermined results, or a requested minimum valuation, a specific valuation, or the approval of a loan.

Our analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of: USPAP – Uniform Standards of Professional Appraisal Practice.

***THE APPRAISER HAS PREPARED THIS APPRAISAL IN FULL COMPLIANCE WITH THE APPRAISER INDEPENDENCE REQUIREMENTS AND HAS NOT PERFORMED, PARTICIPATED IN, OR BEEN ASSOCIATED WITH ANY ACTIVITY IN VIOLATION OF AIR.***

At the request of the client, this appraisal has been prepared in compliance with the Uniform Appraisal Dataset (UAD) from Fannie Mae and Freddie Mac. The UAD requires the appraiser to use standardized responses that include specific formats, definitions, abbreviations, and acronyms. The UAD standard requires property information for the subject and comparables that may be difficult to verify in the normal course of business. The appraiser relies on MLS data, public records data, property owner and realtor verification when available. However, when those collective sources cannot provide precise information, estimates and assumptions are made to comply with the UAD requirements. Should information become available that was not known during the original appraisal due diligence, it could impact the appraisal. The UAD data standard also requires the use of whole numbers in certain data fields. The appraiser was required to round certain numeric entries in order to comply with the UAD data standard.

We do not authorize the out of context quoting or partial reprinting of this appraisal report. Further, neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser nor the name of the firm which he/she is connected, shall be reproduced, published, or disseminated to the public through advertising media, public relations media, news media, or another public means of communication, without the prior written consent of the appraiser signing the report.

Serial# 17AE706A
esign.alamode.com/verify

## Supplemental Addendum

File No. 18-12-1459

| Client | Integra Realty Resources | | | | | |
|--------|--------------------------|--|--|--|--|--|
| Property Address | 3516 N Perry Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33603 |
| Client | Integra Realty Resources | | | | | |

### APPRAISAL DATA

Appraisal reports are technical documents addressed to the specific needs of clients. In most cases, appraisals are made for mortgage companies and/or banks whose use for this report may be wholly different than that of the casual reader. Therefore, the reader should understand that this was made with a limited amount of data and limited ability to verify certain information. Information was verified when possible through public records, multiple listing services, real estate agents and exterior inspection. This includes verifications that the comparables are actually closed sales and the transactions are arms-length. No verification technique is one hundred percent accurate but the appraiser has relied upon information as reported and recorded unless better sources prevail.

From time to time, the indicated sizes of comparables shown in the available sources such as MLS services listing sheets or assessor appears to be incorrect based on the appraisers professional experience. If the size used in the MLS sheets does not correlate with other known data, the appraiser will estimate the size of comparables. These include assessor's sheets, physical inspection and use of interior room measurements along with a multiplier to depict size based on exterior measurements. The deviation of comparable size from published sizes only indicates an attempt at higher accuracy in the final report. However, there are many times that the exact size and features found in comparables cannot be confirmed except by any exterior inspection from the street. We have used three or more comparables in this report to eliminate the limited data associated with any single comparable.

Information regarding the comparable sales has been obtained from public sources and listing agencies. If any significant discrepancies are revealed, the right to amend this report is reserved.

### CONDITION OF MATERIALS

The appraisal report requires the appraiser to note the condition of materials of several components of the subject property. The appraiser makes no representations, guarantees or warranties (express or implied), regarding the materials, their fitness, quality, condition or remaining economic life. An appraiser is NOT QUALIFIED OR TRAINED to discover/disclose hidden defects in material or workmanship. The lender/client should utilize or at least consider the services of a professional licensed home inspector to evaluate same if concerned about the condition of materials of the subject property.

### ENVIRONMENTAL

The opinion of value reported in this appraisal report is predicated on the belief that there are no adverse conditions that would affect the livability, soundness, or structural integrity of the property, unless noted in the appraisal report. Adverse conditions include but are not limited to the following: Needed repairs, deterioration, the presence of hazardous wastes, toxic substances, and other adverse environmental conditions. Neither the appraiser(s), nor the appraisal firm and the associate's staff have the expertise required to discover any environmental hazards, toxic substances or infestation concerning the subject property. The appraiser is not an expert in the field of environmental hazards and this report is not to be considered as an environmental assessment of the property. The appraiser does not make any representations, guarantees, or warranties, express or implied, that the property is free of defects or environmental problems including but not limited to the following:

**INFESTATION** – The appraiser has no expertise in the field of insect, termites or pest infestation. We are not qualified to detect the presence of these or any other unfavorable infestations. We have not specifically inspected the subject property to determine the presence of any infestation. No effort was made to dismantle or probe the structure to observe enclosed, encased, or otherwise concealed evidence of infestation. Infestation may be present in areas the appraiser cannot see.

**LEAD BASE PAINT** – A residential dwelling that was built prior to 1978 may present exposure to lead based paint that may place young children at risk of developing lead poisoning. The appraiser is not qualified to determine if lead based paint is present or if it poses any risk or hazard to its inhabitants.

**MECHANICAL SYSTEMS** – The appraiser is NOT A HOME INSPECTOR, ELECTRICIAN, OR PLUMBER. Mechanical systems, including but not limited to plumbing, electrical, HVAC, appliances, septic systems and wells, have not been tested by the appraiser to determine their fitness of condition. If an electrical capacity has been noted in the appraisal report, it has been taken from the electrical service panel within the subject property or provided by another source including but not limited to, the owner, the blueprints, specifications, contractors, or other sources believed to be reliable. The appraiser will not be responsible for the condition, alterations, defects, or other unapparent modifications related to the mechanical systems of the subject property.

**MOLD** – The appraiser is not qualified to determine if mold is present in the property and if present, the appraiser is not qualified to determine the cause of the mold, the type of mold, or whether it poses any risk or hazard to the inhabitants.

**SEASONAL CONDITIONS** – There are instances when portions of the exterior of the property are obscured or not readily observable due to weather related conditions. In those instances, the appraiser(s) has relied upon a source(s) familiar with the property to cite the material and the condition of those improvements.

### PROPERTY INSPECTION

A "complete visual inspection" includes a walking tour of the property, interior and exterior and viewing all readily observable items; observing the floor plan and layout; identifying relevant amenities, evaluating conformity of the subject with the neighborhood; observing general conditions; assessing functional utility; measuring the house or utilizing other data and information to calculate the living area, and noting any renovations or remodeling that may have been done to the property. A "complete visual inspection" does not include observing or

Serial# 17AE706A
esign.alamode.com/verify

**Supplemental Addendum**

File No. 18-12-1459

| Client | Integra Realty Resources | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 3516 N Perry Ave | | | | | | |
| City | Tampa | County | Hillsborough | | State | FL | Zip Code | 33603 |
| Client | Integra Realty Resources | | | | | | |

viewing any portion of the property not readily accessible from a walking tour include full access to attics and/or crawl spaces; activation or operation of all mechanicals, electrical, or plumbing equipment or fixtures; any observation or viewing of the roof surface other than that which is readily viewable from ground level; or activation or testing of any water system of sewage or septic tank; walking the entire home site if the size and/or topography do not readily allow.  THE APPRAISER IS NOT A QUALIFIED HOME INSPECTOR OR ENGINEER AND DOES NOT REPRESENT THOSE SERVICES.  THIS APPRAISAL IS NOT A WARRANTY AGAINST ANY DEFECT OF THE IMPROVEMENTS.

**SITE COMMENTS**

The site is very typical of the neighborhood in terms of size, topography, view and general appeal.  It provides a suitable setting for the improvements and is consistent with market expectations in this price range.  While no readily apparent adverse site conditions or external factors were noted, many site-related issues are beyond the scope of this assignment.  Statements regarding zoning compliances are intended only in the most general sense.  Zoning and building ordinances vary significantly from one municipality to another and can be extremely detailed.  The scope of this assignment does not include a comparison of every potentially significant characteristics of the subject property's site and improvements relative to zoning and building ordinances.  Unless otherwise noted, standard utility and right of way easements are insignificant to value.  However, a current locational or boundary survey or title report may reveal encroachments, easements, zoning violations or other matters of interest that could warrant modifications of the appraised value.

**LEGAL DESCRIPTION**

F.I.R.R.E.A. regulations require the appraiser to attempt to provide a legal description as part of the appraisal.  If the legal description is provided, the appraiser has assumed it is correct.  The legal description should be verified through legal documentation.

**MARKET CONDITIONS**

Trends in real estate are directly related to historic, economic, demographic, and political forces within a market area.  Events occurring nationally, regionally and locally can significantly impact the success of all types of real estate development.  Macroeconomic conditions, such as interest rates, inflation, job security, industrial productivity, and stability in the stock market, shape consumer confidence and business investment activity.  Regional and local indicators do not always mirror national trends.  As a result, the economic conditions on a regional and local level have the most significant impact on real estate markets and must be analyzed separately.  Diversity and stability in employment, job growth, business expansion and the profile of the available labor force all impact the economic stability of a region.  Consumer demographics in the local market, such a population growth, household statistics, age/family characteristics and income levels, specifically impact the type of real estate development that can be sustained, the amount of development supported, prices/rents, absorption of space and the amenities required.

1004 MC Instructions state:  "Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property".

"Subject Specific" parameters are often utilized, but by doing this, it will yield a smaller number of sales, too low to be considered statistically significant, it is then the appraiser's parameters may be expanded to include areas outside of the subject's immediate market neighborhood but still within the surrounding area to produce a statistically credible amount of data to achieve results in which support the appraiser's trend conclusions & not miss-lead the reader with an inadequate amount of statistical data.

**ADDITIONAL SALES COMPARABLE COMMENTS**

The comparables utilized were considered the best available to derive subject's valuation.  Appropriate market adjustments were made for dissimilarities in all comps.  Square footage where obtained from the assessor's office.  Where assessor records were unavailable or appeared inaccurate, square footages were obtained from a multiplier derived from the market. The appraiser uses a variety of data services such as public and private online databases which include assessor's records, county recorder, FEMA Flood Maps, county websites, local zoning maps and/or phone confirmations by the appropriate zoning authorities, local MLS information, or any other reliable sources considered typical for the market area.  All sources are considered to be reliable sources of data.  When discrepancies in the information are found, the appraiser will use the source(s) that is believed to be the most reliable in the appraisal report.  The appraiser will report only the data pertinent to the valuation process.  When applicable, the data presented in the Sales Comparison Approach has been verified by more than one source unless otherwise noted.

THE UAD REQUIRES THAT COMPARABLE SALES BASEMENT AREA AND FINISHED AREA ARE INCLUDED IN THE SALES GRID.  IT SHOULD BE NOTED THAT THE BASEMENT SQUARE FOOTAGE AND BASEMENT FINISHED SQUARE FOOTAGE HAVE BEEN ESTIMATED.  THIS DATA IS NOT AVAILABLE THROUGH MRED MLS OR PUBLIC ASSESSOR RECORDS.

The appraiser attempted to obtain an adequate amount of information in the normal course of business regarding the subject and comparable properties.  Some of the standardized responses required by the UAD, especially those in which the appraiser has not had the opportunity to verify personally or measure, could mistakenly imply greater precision and reliability in the data than is factually correct or typical in the normal course of business.  Examples include condition and quality ratings as well as comparable sales and listing data.  Not every element of the subject property was viewable (list if necessary) and comparable property data was generally obtained from third-party sources (list sources).  Consequently, this information should be considered an "estimate" unless otherwise noted by the appraiser.

Serial# 17AE706A
esign.alamode.com/verify

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

## Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

## Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable - Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 - February 2001
Lifetime Member: National Eagle Scout Association (NESA)

## Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

## Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment



amgraziano@irr.com    -    305.670.0001 x320

# Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com

## Qualified Before Courts & Administrative Bodies

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court - Chancery Division
NJ Superior Court - Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida



amgraziano@irr.com  -  305.670.0001 x320

**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Miami-Dade County, FL | Ray Benson & Maria Helena V. QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Caribbean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Caribbean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 11/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Saranazi, Faith Ann Safarazi, Proverbium Hldg, LLC, USA & George Albright | NeJame, La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | CB Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-5801 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | TRI FILE # | COURT/CASE NO. # | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008930-CA-01 | Aaron Stauber & Aviva Stauber V. BH 33, LLC | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | Southern District of Florida | John Camps | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Igor Ger V. Yacht Club at Portofino Condo Association | Miami-Dade County | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Plaintiff | 123-2014-0226 | 08-CA-408-P | Ocean Bank V. Lindback, Monroe County | Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24994 CA 08 | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Sarriff and Course Drive Investments, LLC | 11th Judicial Circuit Dade County, Florida | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (retrospective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2014-0194 | 13-010822 CACE 02 | Amalia I. Irianda-Rivera V. Rivera Diagnostic Center, Inc., Okray, Rivera & Yudit Rivero | 13-Judicial Circuit Broward County, Florida | Amalia I. Irianda-Rivera | Rent default judgment and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FLL534 (Pending) | Amalia I. Irianda-Rivera V. Rivera Diagnostic Center, Inc... Roehm Title Resources Claim | 17th Judicial Circuit Broward County, Florida | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined title defects not identified by Title Insurance Company |
| 4/2014 | Plaintiff | 123-2014-0117 | 4:14-CV-01077 (Pending) | USA V. GSA-VA St. Louis Property, LLC | USA District Court for the Eastern District of Missouri Eastern Division | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Eufonia Club | Miami-Dade County | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition S.R. 7 | Broward County | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | West Airport Plaza Business Park, LLC | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | Counsel for the Debtor, Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23922-CA 09 | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | 11th Judicial Circuit Dade County, Florida | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property |
| 7/2013 | Defendant | 123-2013-0126 | CACE 08857824 (14) | Bayview Loan Servicing, LLC v. Kayhan Soodjani; Muhammad Mahmoodi; et al | 17th Judicial Circuit Broward County, Florida (Hon. Carlos A. Rodriguez) | Bayview Servicing, represented by Tabais, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency Judgment on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561 CIV - Rosenbaum | United States of America v. G.K.K, etal | US District Court - Southern District of Florida (Hon. Rosenbaum) | Richard Duvall, Holland and Knight and Jeffrey Neiman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 02/2013 | Defendant | 123-2011-0670 | 09-05650 CA 04 | Zenaida Gomez v. City of Pinecrest | 11th Judicial Circuit Dade County, Florida (Hon. Beth Bloom) | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence |
| 1/2013 | Plaintiff | 123-2013-0016 | 12-60950-CIV | Q Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | US Federal Court - Southern District of Florida | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 1/2012 | Plaintiff | 123-2012-0128 | Pending | 2011 and 2012 Ad Valorem Tax Protest | 11th Judicial Circuit Dade County, Florida | Ken Wunterberger, Esq. Kopelowitz Ostrow Ferguson | Tax protest of commercial condominium. |
| 10/19/2012 | Plaintiff | 123-2012-0111 | 2011-1107 CA-23 | Renegade at Hialeah Blvd v. Dynatech Engineering | 11th Judicial Circuit Dade County, Florida (Hon. Stanford Blake) | Daniel Levin, Esq., Cole, Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from unpaid lease modification. |
| 10/12/2012 | Plaintiff | 123-2012-0109 | 11-30189 CA21 | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | 11th Judicial Circuit Dade County, Florida | Craig Minko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal; economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal |
| 8/20/2012 | Plaintiff | 123-2012-0012 | CA-(2180) CA-25 | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egozi, etal | 11th Judicial Circuit Dade County, Florida | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012 |
| 8/15/2012 | Disclosed Dual Expert | 123-2012-0072 | | Vazquez v. Vazquez Matrimonial Matter | Matrimonial Mediation | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) marital assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Illinois, Bahamas |
| 7/2012 | Plaintiff | 109-2011 Pending 0120 | | BASF, Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Tax Court of New Jersey (Hon. Patrick DeAlemeida) | Phil Geruario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010 ATL-L-4481-08 0172 | | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Superior Court of New Jersey, Law Division Atlantic County | Jay Rhatican, Connell Foley on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations |
| 07/2011 | Defendant | 109-2010 MERL-L3034-08 0199 | | 460 Mercer Street, LLP and Bruckener Southern, LLC vs. Hightstown | Superior Court of New Jersey Mercer County | Aneel Zarin Grimm & Aaron, P.C. Hussam Chater | Litigation-Dispute Resolution - Hightown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept.-Justice File 90-11-3-5801 | United States vs. Atlantic Wood Industries, Inc. | Federal District Court of Virginia | U.S. Department of Justice | Damage/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Westrust/HPC Mortgage Fund vs. City of Atlantic City | Tax Court of New Jersey | Cole, Schotz, Meisel, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |

**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF OF | IRR FILE # | COURT CASE NO | CASE NAME | COURT / VENUE | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2009 | Secured Creditor | 109-2009-0439 | | Erickson Building | US Bankruptcy Court - Southern District of Texas | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 09/2009 | Plaintiff | 109-2009-0123 | 3035-001 | Bay Head Yacht Club vs. Ocean County Tax Board | Tax Court of New Jersey | John Doyle, Carluccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 109-2008-XXX | INA (DEPS Pending) | Mirage Atlantic City (MAC) vs. City of Atlantic City | Tax Court of New Jersey | Hank Rovitsant, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 08/2008 | Defendant | 109-2008-0252 | L-2424-05 | The City of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Superior Court of New Jersey Law Division, Middlesex County | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | 109-2008-345 | C.A. No. OCNL-3361-06 | Osbourne Associates, Melbourne Associates VI, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co, JAC Property Management etal and Eckert Corporation | Superior Court of New Jersey, Law Division Ocean County | Francis X. Manning, Esq, Stradley Ronon Stevens & Young & Michael Canitoli, Esq, Partridge Snow and Hahn, both on behalf of | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 109-2008-0125 | N/A | Toms River Township vs. Gba Geigy Corporation | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpentelli] | Mark Troncone, Esq., In-house Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | 109-2007-211 | L-003635-06 | Kyle Mosteller vs. Gaila Neeman | Superior Court of New Jersey, Law Division Middlesex County | Frank Caruso, Esq, Hoagland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Plaintiff | 109-2007-0134 | 3:07-CV-2322 | Silver Lakes Inc. vs. Township of Freehold Inc. | Superior Court of New Jersey, Chancery Division Monmouth County | Christopher Hanlon, Esq, Hanlon and Niemann | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee |
| 06/2007 | Plaintiff | 109-2007-0173 | | Laurelwood Homes, LLC vs. United States Department of Navy | Federal District Court of Virginia | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 109-2006-0192 | CAM - L - 9731-05 | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Superior Court of New Jersey, Law Division, Camden County | Brett Last , Esq, O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 08/2006 | Defendant | 109-2006-0257 | | County Line & Browns Bridge, Jackson Township | | Levin, Shea, Pfeffer, PA, Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 02/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Carl Brooks vs. K. Hovanian | Ocean Superior Court, Ocean County Courthouse | Ronan, Tuzzio & Giannone , Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner and the subject developer K. Hovnanian @ Sea Oaks |
| 10/2005 | Defendant | 109-2005-0315 | OCN-L-1810-5 | Atlantic City Electric Company (b/a Conectiv Power Delivery, a regulated public utility in the state of New Jersey vs. ACI Manahawkin, LLC family and / or | Superior Court of New Jersey, Law Division Ocean County | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and towers by Atlantic City Electric |
| 06/2005 | Defendant | 109-2005-0214 | MON-L-2609-05 | Township of Howell vs. George Harms Construction Co, Inc. etal | Superior Court of New Jersey Law Division Monmouth County | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 09/2003 | Defendant | 109-2003-0282 | | Giuffre vs. Giuffre | Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 07/2003 | Defendant | 109-2003-0203 | OCN-C-79-03 | West, etal vs. Pompano, etal | Superior Court of New Jersey, Chancery Division, Ocean County | Stephen E. Smith, Esq | To develop an opinion of the diminution in value due to a loss of useable land area |
| 06/2003 | Plaintiff | 109-2003-0128 | OCN-C-316-02 | Eugene M. Lord vs. Donald W. Rinaldo | Superior Court of New Jersey Law Division, Ocean County | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate of the property |
| 04/2003 | Plaintiff | 109-2003-0128 | FM-15-468-03-C | Vincent Urbank vs. Lisa Urbank | Superior Court of New Jersey, Chancery Division, Family Part Ocean County | Marianna Pontoriero, Esq. | Litigation-Matrimonial |
| 02/2002 | Plaintiff | 109-2002-0055 | | Shenandoah Mobile Home Park | | Winokrs Marx Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 04/2001 | Claimant | 109-2001-0169 | NJ-2624-00 | DeForest John Ely and Kimberle A. Ely, h/w | Superior Court of New Jersey, Chancery Division Middlesex County | First American Title Insurance Co. Jack Milkis | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 03/1999 | Defendant | 109-1999-0062 | | Georgetown Apartments | US Bankruptcy Court. - District of Newark | Emmes & Co., Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | LKW 257-3186 | FM-15-1465-94 | Lisa Franklin, etal vs. Donald Franklin, etal | Superior Court of New Jersey, Chancery Division, Family Part, Ocean County | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1984 | Creditor | HUD-XX | | Hudson Marina Association vs. Emmes & Co. | US Bankruptcy Court. - District of Newark | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium condo |



**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**O'Brien, Kelly & Lori**
Hypothetical Market Value "As If" Remediated
3120 W. Wallcraft Ave
Tampa, Hillsborough County, Florida 33611
Client Reference: 10

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
February 17, 2012

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**O'Brien, Kelly & Lori**
3120 W. Wallcraft Ave
Tampa, Florida



**Integra Realty Resources**
Miami
Orlando
Southwest Florida

www.irr.com

In Miami
Dadeland Centre
9155 South Dadeland Blvd.
Suite 1208
Miami, FL 33156
(305) 670-0001

In Orlando
The Magnolia Building
326 N. Magnolia Ave.

Orlando, FL 32801
(407) 843-3377

In Naples/Sarasota
Horseshoe Professional Park
2770 Horseshoe Drive S.
Suite 3
Naples, FL 34104
(239)-643-6888

January 22, 2019

Patrick S. Montoya
Partner
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134

SUBJECT:      Hypothetical Market Value "As If" Remediated
                 Case No 11-22408-Civ-COOKE
                 United States District Court Southern District of Florida in the matter of
                 Eduardo and Carmen Amorin, et al. individually and on behalf of others situated
                 similarly v. Taishan Gypsum Co., LTD., f/k/a Shandong Taiche Dongxin Co. Ltd., et al
                 Priority Claimant Case at:
                 O'Brien, Kelly & Lori
                 3120 W. Wallcraft Ave
                 Tampa, Hillsborough County, Florida 33611
                 Client Reference: 10
                 IRR - Miami/Palm Beach File No. 123-2018-0275

Dear Mr. Montoya:

Integra Realty Resources – Miami/Palm Beach submits the following damage estimate in the referenced property as of the effective date assuming all remediation was completed by an appropriate contractor with experience and credentials in remediating defective drywall.

The report is intended to comply the Uniform Standards of Professional Appraisal Practice (USPAP). It presents summary discussions of the data, reasoning, and analysis that were used in the appraisal process to develop the opinions. Additional information is contained within our workfile.

The findings will form the basis of expert witness testimony in the above referenced case.

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 742 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 94 of 989

Identification of Subject                                                                        2

## Identification of Subject

The subject of this report is a single-family home configured with 4 bedroom and 3 baths with 3,300 SF under air-conditioning. The subject property was built in 2007 and is located on a 7,250 square foot site.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the diminution in value and related damages, collectively "the damages" as of the effective date of the appraisal, February 17, 2012. The damage estimate assumes the defective drywall remediation was completed and does not consider the cost to cure. The date of the report is January 22, 2019. The appraisal is valid only as of the stated effective date or dates.

## Intended Use and User

The intended use of the appraisal is for litigation purposes. The client, Colson Hicks Eidson and related co-counsel, Plaintiff and the Court are the intended users. Integra Realty Resources – Miami/Palm Beach is not responsible for unauthorized use of this report.

## Most Recent Sale History

The most recent closed sale of the subject is summarized as follows:

| Most Recent Subject Sale (Closed) | |
| --- | --- |
| Sale Date (Most Recent) | February 17, 2012 |
| Seller | O'Brien, Kelly & Lori |
| Buyer | John Merrill Investments Inc |
| Sale Price | $340,000 |
| Recording Instrument Number | 2012059185 |
| Disposition Details | Property sold as is with Chinese Drywall unremediated, buyer purchased home with intent to renovate and resell. Buyer resold the home 6 months later for $542,000. |

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

## Pending Transactions

The subject was under contract which is reflected in the table above. There were no other pending transactions.

## Definition of Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and

O'Brien, Kelly & Lori



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 743 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/13/2013 Page 415 of 989

Definition of Retrospective Value Opinion                                        3

assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(12 C.F.R. Part 34.42(g); 55 Federal Register 54696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992, 59 Federal Register 29499, June 7, 1994)*

## Definition of Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgements, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g. "retrospective market value opinion".

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

## Definition of Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)

2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of date used in an analysis. (USPAP, 2016-2017 ed.)

*(Source: The Dictionary of Real Estate Appraisal – 6th Edition; Appraisal Institute, 200 W. Madison, Suite 1500, Chicago, IL 60606, www.appraisalinstitute.org)*

## Scope of Work

Integra was retained as an expert in the captioned matter of this report to address potential damages related to the subject property, specifically excluding the costs to cure.

Integra was retained to estimate any post remediation damages, and conducted a separate study to determine whether damages persist following defective drywall remediation. The result of that study



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 744 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 416 of 989

Scope of Work                                                                    4

are outlined within Integra's report entitled "Market Analysis of the Post Remediation Impact of Chinese Drywall on Residential Property Values in Florida." The results of that study are incorporated by reference herein.

In addition, our damage model was requested to include a rental value analysis of the Priority Claimant residence, and a determination of the relevant economic damage associated with having to vacate the home for a period of time (and secure alternate living arrangements) during the remediation. As of the effective date, the claimant would have suffered the damages.

Integra established individual case files on each Priority Claimant residence, and retained professional assistance from qualified residential appraisers in each jurisdiction. Integra managed the process of these retrospective appraisals, interfaced with the residential appraisers, and reviewed the form appraisals completed on each assignment including review of the comparables, adjustments, and form narrative to establish the market value of the residence unimpaired as of the effective date.

Integra professionals reviewed various materials exchanged as part of this case and considered materials that were relevant to the market valuation. These materials were downloaded from the attorney's dropbox and are retained within our workfile.

Integra's participation in and review of the final appraised values results in a conclusion of the market value of the home defined as "Hypothetical Market Value" assuming defective drywall had never been identified within the subject property. This forms the basis of the unimpaired market value as of the effective date.

All properties and comparables were inspected by the local residential appraisers without the benefit of interior inspections. Adjustments for condition and age at the time of sale are based upon photographs contained within the various MLS databases, paired analysis from amongst the comparables, and for the subject, were based on photos, if available. In the event a property had not been remediated as of the effective date, we assume average condition for the property in the market as of the effective date.

The damage analysis expressed within this report follows the peer teachings and market accepted processes for damage analysis. However, the damage analysis only represents a <u>portion of the overall damages</u> because we were specifically requested to exclude the consideration of the costs to cure. This represents a relevant component of damage in this case for property that factually have not been remediated.

Integra's role was strictly to identify post remediation value damage (sometime referred to a "stigma") and estimate the relevant rental value and moving costs as a proxy for the temporary loss of use during remediation.

## Significant Appraisal Assistance

In addition to Anthony M. Graziano, MAI ,CRE, principal, it is acknowledged that Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones of IRR-Miami/Palm Beach were involved in the assignment consisting of conducting research on the subject and transactions involving comparable



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 745 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 417 of 989

Highest and Best Use                                                                5

properties, performing appraisal analyses and assisting in report writing, under the supervision of the persons signing the report. The local residential appraisers are also named as providing significant assistance, including exterior inspection of the properties and comparables, application of their local knowledge in adjusting and estimating the unimpaired value, and developing the form report valuations incorporated herein.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach. The valuations consider the only relevant approach for residential valuation, the sales comparison analysis. The cost and income approach are not considered relevant.

The sales comparison approach is the most applicable valuation method since there is an active market for similar properties, and sufficient sales data is available for analysis. Additionally, this approach directly considered the prices of alternative properties having similar utility.

### Highest and Best Use

The highest and best use of the subject as if vacant for development of a single-family home which is physically possible, legally permissible as per zoning, financially feasible and maximally productive.

The highest and best use of the subject as improved is for continued use as a single-family home with no other use that could reasonably be expected to provide a higher value to the land as if vacant. The improvements contribute to the over all value to a greater extent than the land value alone, and therefore, continued use as improved concluded to be maximally productive and the highest and best use of the property.

### Conclusion of Value

The Hypothetical market value appraisal as of the effective date, reflective of a traditional form appraisal, is contained within the Addenda of this report. This value us hypothetical since it assumes that defective drywall had never been present at the subject property.

Against this value, we then apply the Post Impairment Discount as a percentage of unimpaired value as developed within the Integra report studying this issue. This represents a compensable damage resulting from the prior existence of defective drywall in the home as of the effective date.

In addition, each appraisal (unimpaired) reflects a rental value analysis as of the effective date. This rental value analysis concludes to the equivalent market rent for the home (unimpaired) and reflects a



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 746 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 418 of 989

Conclusion of Value                                                                                    6

proxy for the probable actual costs the homeowner would experience by having to move-out of the primary residence during remediation.

The homeowner would also have to incur moving /storage costs twice, once before and once after remediation.  Professional packing, moving and storage for an average home is estimated at $1,500 per move, or $3,000 in total.  This amount is added to the loss of use estimate as an additional damage.

This loss of use calculation does not consider the costs of alternative housing or other tangible costs potentially incurred for damages suffered between the date of discovery and the date of value.  These damages, if applicable, are being estimated by a separate expert (Elkins et al). To the extent Elkins posits costs which are duplicative or actual costs that are greater or less, some minor adjustments to Integra's damage model may be required.

The timeframe for remediation (months of actual loss) could vary depending upon the permitting process in the specific community, the availability of labor, and the size of the home.  Integra reviewed a number of transactions that were remediated by investors and found the typical timeframe between purchase of an unremediated home and listing[1] of the home post-remediation to be 3-6 months.

Larger more expansive homes would be expected to take longer to remediate since more materials are required, and in higher-priced homes, supplies would typically be custom-ordered.  Therefore, we apply the following timeframes based on the subject's size and price range:

| | |
|---|---|
| < $150,000 Home up to 2,000+/- SF | 4 months |
| $150,000 - $750,000 home up to 4,000 SF | 6 months |
| $750,000+ home up over 4,000 SF | 9 months |

---

[1] The "listing date" is most relevant since a homeowner conducting their own remediation can move back in once the home is ready for sale (ie- coinciding with a final certificate of occupancy).

O'Brien, Kelly & Lori



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 747 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2013 Page 419 of 989

Conclusion of Value                                                                                        7

The following shows our final estimate of damages as of the effective date, and assuming costs to cure (i.e. – to conduct the remediation) have been expended.

**Conclusions of Damage**

| | | | |
|---|---|---|---|
| Hypothetical Value (Unimpaired - Before) | | $565,000 | |
| Market Impairment Discount (As if Remediated) | | 10% | |
| Post Impairment Damage ($) | | $56,500 | |
| **Hypothetical Value As IF Remediated** | | | $508,500 |
| **Post Remediation Damages as of Effective Date** | | | **$56,500** |
| Loss of Use: | | | |
| Rental Rate ($/Month) | $3,300 | | |
| Moving & Storage Costs | | $3,000 | |
| Loss of Use Subject (# Months) | 6x | $19,800 | |
| Subject Total | | | $22,800 |
| **Post Remediation Damage** | | | **$79,300** |

Note: Does not consider "cost to cure". Assumes remediation was completed by qualified contractor who warranties the work.

The subject sold in Feb. 2012 to an investor, who remediated and flipped the property in July 2012 this offers reasonable evidence of the loss of use evidence. The flip to a new buyer post remediation reflects a 4% discount versus the Integra 2012 unimpaired estimate, assuming no value appreciation between Feb. 2012 and July 2012.

O'Brien, Kelly & Lori



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 748 of 796
Case 1:14-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2019 Page 420 of 989
Certification                                                                                    8

## Certification

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Anthony M. Graziano, MAI, CRE did not make a personal inspection of the property that is the subject of this report. Rob Baird has personally inspected the subject.

12. Significant real property appraisal assistance was provided by Peter G. Kayworth, Yuliya Georgieva, Joseph Melloni and Paul L. Jones. Additionally, real estate assistance was provided by various Valucentric employees and subcontractors, including: John Barcelo, Angela Barcelo, Fred Stites, Carlos Fong, Sarah D. Wilson and Rob Baird.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Anthony M. Graziano, MAI, CRE, has completed the continuing education program for Designated Members of the Appraisal Institute.

Anthony M. Graziano, MAI, CRE
Senior Managing Director - Miami
State-Certified General RE Appraiser
FL Certificate # RZ#3510

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 749 of 796
Case 1:11-cv-22408-MGC Document 273-3 Entered on FLSD Docket 09/15/2014 Page 421 of 989

Assumptions and Limiting Conditions                                                    9

## Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, <u>except as otherwise noted in the report</u>:

1.   The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2.   There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3.   There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4.   The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5.   The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6.   The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1.   An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2.   The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3.   No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4.   No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5.   Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6.   We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.



Case 2:09-md-02047-EEF-MBN   Document 22380-28   Filed 12/02/19   Page 750 of 796
Case 1:11-cv-22408-MGC   Document 273-8   Entered on FLSD Docket 08/15/2013   Page 422 of 989

Assumptions and Limiting Conditions                                                    10

7.  No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.  We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.  The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 751 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 423 of 989

Assumptions and Limiting Conditions                                           11

the period covered by our analysis will vary from our estimates, and the variations may be material.

18. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19. The appraisal report is prepared for the exclusive benefit of the Client, its subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20. No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. Integra Realty Resources – Miami/Palm Beach, Integra Realty Resources, Inc., Integra Strategic Ventures, Inc. and/or any of their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21. The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. We are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. Integra Realty Resources – Miami/Palm Beach is not a building or environmental inspector. Integra Miami/Palm Beach does not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23. The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. It is expressly acknowledged that in any action which may be brought against any of the Integra Parties, arising out of, relating to, or in any way pertaining to this engagement, the appraisal reports, and/or any other related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further acknowledged



Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/03/19 Page 752 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 424 of 989

Assumptions and Limiting Conditions                                                                    12

that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the appraisal report unless the appraisal was fraudulent or prepared with intentional misconduct. Finally, it is acknowledged that the fees charged herein are in reliance upon the foregoing limitations of liability.

25.  Integra Realty Resources – Miami/Palm Beach, an independently owned and operated company, has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26.  The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27.  All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.



| Client | Integra Realty Resources | | | File No. | Valu-18-12-1460 |
|--------|--------------------------|--|--|----------|------------------|
| Property Address | 3120 W Wallcraft Ave | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33611 |
| Client | Integra Realty Resources | | | | |

## TABLE OF CONTENTS

Exterior-Only .................................................................................................................. 1
Additional Commentary Addendum ........................................................................... 7
Additional Comparables 4-6 ....................................................................................... 8
Comparable Photos 1-3 ............................................................................................... 9
Comparable Photos 4-6 ............................................................................................... 10
Rent Comparables Photos 1-3 .................................................................................... 11
Single Family Comparable Rent Schedule ................................................................ 12
Comparable Sales Map ................................................................................................ 13
Subject Photos Page 1 ................................................................................................. 14
Scope of Work .............................................................................................................. 15
Subject Aerial Photograph .......................................................................................... 16
Plat Map ........................................................................................................................ 17
Flood Map ..................................................................................................................... 18
Property Appraiser Page 1 .......................................................................................... 19
Property Appraiser Page 2 .......................................................................................... 20
MLS Page 1 Feb 2012 Marketing ................................................................................ 21
MLS Page 2 Feb 2012 Marketing ................................................................................ 22
MLS Page 1 June 2012 Marketing .............................................................................. 23
MLS Page 2 June 2012 Marketing .............................................................................. 24
License .......................................................................................................................... 25
E & O ............................................................................................................................. 26
USPAP Identification .................................................................................................... 27
Certifications & Limiting Conditions - Residential ................................................... 28
UAD Definitions Addendum ........................................................................................ 30
Supplemental Addendum ............................................................................................ 33
Supplemental Addendum ............................................................................................ 34
Supplemental Addendum ............................................................................................ 35

Serial# 24BAE67A
esign.alamode.com/verify

# Exterior–Only Inspection Residential Appraisal Report

Valu-18-12-1460
File # Valu-18-12-1460

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | |
|---|---|
| Property Address 3120 W Wallcraft Ave | City Tampa  State FL  Zip Code 33611 |
| Borrower N/A | Owner of Public Record Kelly & Lori O' Brien  County Hillsborough |
| Legal Description West Bay Bluff W 1/2 Lot 7 Block 2 | |

Assessor's Parcel # 127850-0100; A-03-30-18-3VR-000002-00007.2  Tax Year 2011  R.E. Taxes $ 1,139
Neighborhood Name West Bay Bluff/South Tampa  Map Reference S-03, T-30, R-18  Census Tract 0067.00
Occupant ☒ Owner ☐ Tenant ☐ Vacant  Special Assessments $ 0  ☐ PUD  HOA $ 0 ☐ per year ☐ per month
Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)
Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Estimate market value for litigation
Lender/Client Integra Realty Resources  Address 9155 South Dadeland Boulevard, #1208Miami, FL 33156
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☒ Yes ☐ No
Report data source(s) used, offering price(s), and date(s). DOM 64;The Subject was offered for sale on 11/18/2011 for $375,000 per the MFRMLS
#T2495704, and is now under contract.

**CONTRACT**

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. The contract price is based on a single family business that has Chinese drywall and requires repairs.

Contract Price $ 340,000  Date of Contract 12/02/2011  Is the property seller the owner of public record? ☒ Yes ☐ No  Data Source(s) Public records
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☒ No
If Yes, report the total dollar amount and describe the items to be paid. $0;;

Note: Race and the racial composition of the neighborhood are not appraisal factors.

**NEIGHBORHOOD**

| Neighborhood Characteristics | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☒ Increasing ☐ Stable ☐ Declining | | | PRICE | AGE | One-Unit | 75 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | $ (000) | (yrs) | 2-4 Unit | 2 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | | 100 Low | 0 | Multi-Family | 3 % |
| Neighborhood Boundaries W. Kennedy Boulevard to the north, Hillsborough Bay to the east, MacDill Air | | | | 1,700 High | 100 | Commercial | 20 % |
| Force base to the south, and Old Tampa Bay to the west. | | | | 235 Pred. | 50 | Other | % |

Neighborhood Description The subject is located in an area known as South Tampa. This is desirable to the market because of its proximity to the two major employment centers of Hillsborough County which area Downtown Tampa and the Westshore Business District. The area also has good proximity to retail, entertainment, access to transportation linkages, and Tampa International Airport. All support services are located in a 1 to 3 mile radius.
Market Conditions (including support for the above conclusions). The market conditions are appreciating.

**SITE**

Dimensions 50'x145'  Area 7250 sf  Shape Rectangular  View N;Res;
Specific Zoning Classification RS-50  Zoning Description Residential Single Family
Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)
Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | | Public | Private |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | None | Alley None | | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone X  FEMA Map # 12057C0363H  FEMA Map Date 08/28/2008
Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No  If Yes, describe
No observed or known adverse influences to market value were noted.

**IMPROVEMENTS**

Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☐ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner
☐ Other (describe)  Data Source for Gross Living Area Public records

| General Description | | General Description | | Heating/Cooling | | Amenities | | Car Storage | |
|---|---|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☒ Concrete Slab ☐ Crawl Space | | ☐ FWA ☐ HWBB | | ☐ None | | ☐ None | |
| # of Stories 2.00 | | ☐ Full Basement ☐ Finished | | ☐ Radiant | | Woodstove(s) # 0 | | ☒ Driveway # of Cars 2 | |
| Type ☒ Det. ☐ Att. ☐ S-Det/End Unit | | ☐ Partial Basement ☐ Finished | | ☒ Other Central | | ☒ Patio/Deck None | | Driveway Surface Concrete | |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls Stucco/Avg | | Fuel Electric | | ☒ Porch Porch | | ☐ Garage # of Cars | |
| Design (Style) Contemporary | Roof Surface Shingles/Avg | | ☒ Central Air Conditioning | | ☒ Pool None | | ☐ Carport # of Cars 0 | |
| Year Built 2007 | Gutters & Downspouts Alum/Avg | | ☐ Individual | | ☒ Fence Wood | | ☐ Attached ☐ Detached | |
| Effective Age (Yrs) 5 | Window Type Sliding/New | | ☐ Other | | ☒ Other (describe) None | | ☐ Built-in | |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☒ Washer/Dryer ☒ Other (describe) Gas Water Heater
Finished area above grade contains: 8 Rooms  3.0 Bedrooms  3.0 Bath(s)  3,300 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.) Entry porch, sprinkler system, French door, and crown molding.

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.) C3;An interior inspection of the subject property was not performed by the appraiser. I have depended on the public records and information provided by the client for a description of the improvements. Please see the Extraordinary Assumption under the Scope of Work.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No
If Yes, describe.
No observed or known adverse influences to market value were noted.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe
The functional utility, style, condition, use, quality of construction quality are typical for the area.

Freddie Mac Form 2055 March 2005  UAD Version 9/2011  Page 1 of 6  2055 March 2005

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 24BAE67A
esign.alamode.com/verify

**Exterior-Only Inspection Residential Appraisal Report**

Valu-18-12-1460
File # Valu-18-12-1460

| | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| There are | 0 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 0 | to $ 0 | . |
| There are | 24 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 515,000 | to $ 690,000 | . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 3120 W Wallcraft Ave Tampa, FL 33611 | 3101 W Fair Oaks Ave Tampa, FL 33611 | | 3108 W Fair Oaks Ave Tampa, FL 33611 | | 3312 W Villa Rosa St Tampa, FL 33611 | |
| Proximity to Subject | | 0.22 miles SE | | 0.23 miles SE | | 0.60 miles SW | |
| Sale Price | $ 340,000 | $ 655,000 | | $ 605,000 | | $ 529,000 | |
| Sale Price/Gross Liv. Area | $ 103.03 sq.ft. | $ 179.40 sq.ft. | | $ 218.57 sq.ft. | | $ 175.86 sq.ft. | |
| Data Source(s) | | U7524183;DOM 145 | | T2488938;DOM 44 | | T2495101;DOM 6 | |
| Verification Source(s) | | Public Records | | Public Records | | Public Records | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Conv;0 | | Conv;9000 | | Cash;0 | |
| Date of Sale/Time | | s01/12;c12/11 | 0 | s12/11;c11/11 | 0 | s11/12;c11/11 | 0 |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 7250 sf | 10260 sf | 0 | 7200 sf | 0 | 5250 sf | 0 |
| View | N;Res; | A;CtyStr; | +10,000 | N;Res; | | N;Res; | |
| Design (Style) | DT2.00;Contem | DT2.00;Contem | | DT2.00;Contem | | DT2.00;Contem | |
| Quality of Construction | Q3 | Q2 | -50,000 | Q2 | -25,000 | Q3 | |
| Actual Age | 5 | 16 | +5,500 | 26 | +10,500 | 12 | +1,750 |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 8 4 3.0 | 8 4 3.1 | -1,500 | 8 4 3.1 | -1,500 | 8 4 3.1 | -1,500 |
| Gross Living Area | 3,300 sq.ft. | 3,651 sq.ft. | -17,600 | 2,768 sq.ft. | +26,600 | 3,008 sq.ft. | +14,600 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 2ga2dw | 2ga2dw | | 2ga2dw | | 2ga2dw | |
| Porch/Patio/Deck | Open porch | Open porch | | Open porch | | Open porch | |
| Pool/Spa | None | Open pool | -20,000 | None | | None | |
| Net Adjustment (Total) | | ☐ + ☒ - $ | -73,600 | ☒ + ☐ - $ | 10,600 | ☒ + ☐ - $ | 14,850 |
| Adjusted Sale Price | | Net Adj. 11.2 % | | Net Adj. 1.8 % | | Net Adj. 2.8 % | |
| of Comparables | | Gross Adj. 16.0 % $ | 581,400 | Gross Adj. 10.5 % $ | 615,600 | Gross Adj. 3.4 % $ | 543,850 |

I ☐☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) Public records
My research ☒ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 02/17/2012 | | | 08/31/2009 |
| Price of Prior Sale/Transfer | $340,000 | | | $500,000 |
| Data Source(s) | Corelogic | Corelogic | Corelogic | Corelogic |
| Effective Date of Data Source(s) | 01/22/2019 | 01/22/2019 | 01/22/2019 | 01/22/2019 |

Analysis of prior sale or transfer history of the subject property and comparable sales    The February 2012 transaction is from Kelly O'Brien to John Merrill Investments, Inc. Since I am preparing a retrospective appraisal, I am also aware of the following transactions for the subject property. John Merrill Investments, Inc. to Katie MacGillivary for $542,000 on July 24, 2012. The sale is recorded in OR BK 21275/506. From the February 2012 sale to the July 2012 sale, the Chinese Drywall was repaired. Please see the attached MLS. No prior sales of Comparables 1, 2, or 3 in the last three years. The room count adjustment is a net adjustment considering the number of bedrooms and bathrooms. If warranted, bedrooms were adjusted $1,000, half baths $1,500 and bathrooms $3,000. The quality of construction adjustment reflects differences in the quality of construction.

Summary of Sales Comparison Approach    The comparable sales have been analyzed in chronological order from the most current to the oldest date.  A 0 in the adjustment column indicates that there were differences between the subject and the comparable , however, the market would not recognize an adjustment.  The comparable sales sold from $155.47 to $218.57 per square foot. It would be reasonable for the living area adjustment to be less than the price per square foot paid for the entire comparable. A living area adjustment of $50 was made to reflect differences in the living area size. Comparable No. 1 was adjusted upward for view because it sides to S. MacDill Avenue.  In the final reconciliation of the Sales Comparison Approach, Comparables Nos. 3 and 4 were given the most weight because they had the lowest gross net adjustments.

Indicated Value by Sales Comparison Approach $ 565,000

| Indicated Value by: Sales Comparison Approach $ 565,000 | Cost Approach (if developed) $ | Income Approach (if developed) $ |
|---|---|---|

The subject is a single family residence.  Typically, the market will rely on the Sales Comparison Approach.  Sufficient market data was available to develop a reasonable and credible opinion of value.  The Cost Approach is not necessary to develop a credible indication of value.  The Income Approach would not be considered by the market.

This appraisal is made ☒ "as is",  ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed,  ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☒ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  No personal property has been included in this valuation.

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 565,000 , as of 02/17/2012 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 2055 March 2005          UAD Version 9/2011          Page 2 of 6          Fannie Mae Form 2055 March 2005

Serial# 24BAE67A
esign.alamode.com/verify

# Exterior-Only Inspection Residential Appraisal Report

Valu-18-12-1460
File # Valu-18-12-1460

Freddie Mac Form 2055 March 2005          UAD Version 9/2011          Page 3 of 6          Fannie Mae Form 2055 March 2005

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 24BAE67A
esign.alamode.com/verify

**ADDITIONAL COMMENTS**

I have considered relevant competitive listings/contract offerings in performing this appraisal and any trend indicated by that data is supported by the listing/offering information included in this report. The Hillsborough County Property Appraiser uses a Parcel Id No. and a Folio No. to identify properties. On page 1 of the form, I have provided both numbers. The commercial land in the neighborhood is situated on the major roads. This does not adversely affect the subject.

Above Predominant Value

It is noted that the subject's appraised valuation exceeds the predominant value for the neighborhood. Please remember that the predominant value for the subject's neighborhood includes all homes and all sales, just not similar homes like the subject, or similar comparable sales to the subject. On Page 1 of this report, Fannie Mae is requesting the predominant value for all homes in the subject's neighborhood, which can be confusing and at times misleading, especially in a very diverse area of existing, older and smaller homes combined with larger, new construction homes, such as the subject's neighborhood is comprised of at this time.  This does not affect the marketability of the subject.

Highest and Best Use

As If Vacant

Legally Permissible - As previously reported, the subject's current zoning allows for residential use. Commercial, industrial and other uses are not permitted under the current zoning classification. A residential use is legally permissible.

Physically Possible - The site is typical in size, terrain; shape and has sufficient access and is adequately served by utilities. There are no known physical characteristics that would adversely affect the site to support any legally permissible development. The current improvements provide additional support for development on the site as a residential property.

Financially Feasible - The current improvements continue to contribute to the overall value of the property in excess of the site value and therefore, utilization of the current improvements is financially feasible.

Maximally Productive - The use that conforms to neighborhood trends, is consistent with existing land uses and produces the highest price or value is typically the highest and best use. The sales comparison approach will indicate that single family properties that are similar to the subject have been purchased to be utilized by owners and tenants and none of the comparable sales have been converted to an alternative use. These sales indicate that the maximally productive use of the property is consistent with the existing single family use.

As Improved

The site is improved with a single family home that was constructed in 2007.  The improvements appear to have been updated and maintained over the years. The Highest and Best Use as Improved is a continuation of the single family use.

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    The improvements were built in 2007.  Due to the age of the improvements, the Cost Approach would have an abundant physical depreciation estimate which would weaken the reliability of the approach.  Therefore, the Cost Approach would not be considered by the market.

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | =$ |
|---|---|---|
| Source of cost data | DWELLING | Sq.Ft. @ $ | =$ |
| Quality rating from cost service          Effective date of cost data | | Sq.Ft. @ $ | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | =$ |
| | Garage/Carport          Sq.Ft. @ $ | =$ |
| | Total Estimate of Cost-New | =$ |
| | Less          Physical | Functional | External | |
| | Depreciation | =$( ) |
| | Depreciated Cost of Improvements | =$ |
| | "As-is" Value of Site Improvements | =$ |
| Estimated Remaining Economic Life (HUD and VA only)          60   Years | INDICATED VALUE BY COST APPROACH | = $ |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

Estimated Monthly Market Rent $ _____          X Gross Rent Multiplier _____ = $ _____          Indicated Value by Income Approach _____

Summary of Income Approach (including support for market rent and GRM)

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No    Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion

Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source(s)

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

**Exterior-Only Inspection Residential Appraisal Report**

Valu-18-12-1460
File # Valu-18-12-1460

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Serial# 24BAE67A
esign.alamode.com/verify

Form 2055UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Exterior-Only Inspection Residential Appraisal Report**

Valu-18-12-1460
File # Valu-18-12-1460

APPRAISER'S CERTIFICATION:    The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

**Exterior-Only Inspection Residential Appraisal Report**

Valu-18-12-1460
File # Valu-18-12-1460

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION:    The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Robert K. Baird | Name |
| Company Name  Valucentric, LLC | Company Name |
| Company Address  4590 Ulmerton Road, #204 | Company Address |
| Clearwater, FL 33762 | |
| Telephone Number  813-252-1140 | Telephone Number |
| Email Address  info@valucentric.com | Email Address |
| Date of Signature and Report  01/22/2019 | Date of Signature |
| Effective Date of Appraisal  02/17/2012 | State Certification # |
| State Certification #  Cert Gen RZ2497 | or State License # |
| or State License # | State |
| or Other (describe)  State # | Expiration Date of Certification or License |
| State  FL | |
| Expiration Date of Certification or License  11/30/2020 | SUBJECT PROPERTY |

ADDRESS OF PROPERTY APPRAISED

3120 W Wallcraft Ave

Tampa, FL 33611

APPRAISED VALUE OF SUBJECT PROPERTY $          565,000

LENDER/CLIENT

Name  No AMC

Company Name  Integra Realty Resources

Company Address  9155 South Dadeland Boulevard, #1208

Miami, FL 33156

Email Address

SUBJECT PROPERTY

☐ Did not inspect exterior of subject property
☐ Did inspect exterior of subject property from street
Date of Inspection

COMPARABLE SALES

☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
Date of Inspection

Serial# 24BAE67A
esign.alamode.com/verify

# Additional Commentary Addendum

File No. Valu-18-12-1460

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 3120 W Wallcraft Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33611 |
| Client | Integra Realty Resources | | | | | |

**• SALES COMPARISON ANALYSIS - Comparable #1 Age varies from subject by more than 30%. (Var = 220%)**

**• SALES COMPARISON ANALYSIS - Comparable #1 Price/SF varies from subject by more than 25%. (Var = 74.12%)**

**• SALES COMPARISON ANALYSIS - Comparable #2 Age varies from subject by more than 30%. (Var = 420%)**

**• SALES COMPARISON ANALYSIS - Comparable #2 Price/SF varies from subject by more than 25%. (Var = 112.14%)**

**• SALES COMPARISON ANALYSIS - Comparable #3 Age varies from subject by more than 30%. (Var = 140%)**

**• SALES COMPARISON ANALYSIS - Comparable #3 Price/SF varies from subject by more than 25%. (Var = 70.69%)**

**• SALES COMPARISON ANALYSIS - Comparable #4 Age varies from subject by more than 30%. (Var = 180%)**

**• SALES COMPARISON ANALYSIS - Comparable #4 Price/SF varies from subject by more than 25%. (Var = 79.58%)**

**• SALES COMPARISON ANALYSIS - Comparable #5 Age varies from subject by more than 30%. (Var = 180%)**

**• SALES COMPARISON ANALYSIS - Comparable #5 Price/SF varies from subject by more than 25%. (Var = 73.6%)**

**• SALES COMPARISON ANALYSIS - Comparable #6 Age varies from subject by more than 30%. (Var = 280%)**

**• SALES COMPARISON ANALYSIS - Comparable #6 Price/SF varies from subject by more than 25%. (Var = 50.9%)**

**The above does not affect the credibility of the Sales Comparison Approach.**

Serial# 24BAE67A
alamode.com/verify

## Exterior-Only Inspection Residential Appraisal Report

Valu-18-12-1460
File # Valu-18-12-1460

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 3120 W Wallcraft Ave | 3108 W Knights Ave | | 3110 W Knights Ave | | 3801 S Kenwood Ave | |
| | Tampa, FL 33611 | Tampa, FL 33611 | | Tampa, FL 33611 | | Tampa, FL 33611 | |
| Proximity to Subject | | 0.08 miles NE | | 0.07 miles NE | | 0.34 miles NW | |
| Sale Price | $ 340,000 | | $ 615,000 | | $ 655,000 | | $ 625,000 |
| Sale Price/Gross Liv. Area | $ 103.03 sq.ft. | $ 185.02 sq.ft. | | $ 178.86 sq.ft. | | $ 155.47 sq.ft. | |
| Data Source(s) | | T2482449;DOM 18 | | T2490824;DOM 12 | | T2460281;DOM 116 | |
| Verification Source(s) | | Public Records | | Public Records | | Public Records | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Conv;0 | | Conv;0 | | Conv;0 | |
| Date of Sale/Time | | s10/11;c08/11 | 0 | s09/11;c09/11 | 0 | s08/11;c06/11 | 0 |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 7250 sf | 8100 sf | 0 | 8100 sf | 0 | 7200 sf | 0 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT2.00;Contem | DT2.00;Contem | | DT2.00;Contem | | DT2.00;Contem | |
| Quality of Construction | Q3 | Q2 | -25,000 | Q2 | -50,000 | Q3 | -25,000 |
| Actual Age | 5 | 14 | +2,250 | 14 | +2,250 | 19 | +3,500 |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 8 4 3.0 | 8 4 3.1 | -1,500 | 8 4 4.1 | -4,500 | 8 4 3.1 | -1,500 |
| Gross Living Area | 3,300 sq.ft. | 3,324 sq.ft. | -1,200 | 3,662 sq.ft. | -18,100 | 4,020 sq.ft. | -36,000 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 2ga2dw | 2ga2dw | | 2ga2dw | | 2ga2dw | |
| Porch/Patio/Deck | Open porch | Open porch | | Open porch | | Screen porch | -2,000 |
| Pool/Spa | None | None | | Open pool | -20,000 | Screen pool | -25,000 |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -25,450 | ☐ + ☒ - | $ -90,350 | ☐ + ☒ - | $ -86,000 |
| Adjusted Sale Price | | Net Adj. 4.1 % | | Net Adj. 13.8 % | | Net Adj. 13.8 % | |
| of Comparables | | Gross Adj. 4.9 % | $ 589,550 | Gross Adj. 14.5 % | $ 564,650 | Gross Adj. 14.9 % | $ 539,000 |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 02/17/2012 | | | |
| Price of Prior Sale/Transfer | $340,000 | | | |
| Data Source(s) | Corelogic | Corelogic | Corelogic | Corelogic |
| Effective Date of Data Source(s) | 01/22/2019 | 01/22/2019 | 01/22/2019 | 01/22/2019 |

Analysis of prior sale or transfer history of the subject property and comparable sales    No prior sales of Comparables 4, 5, or 6 in the last three years.

Analysis/Comments

Freddie Mac Form 2055 March 2005                UAD Version 9/2011                Fannie Mae Form 2055 March 2005

Form 2055UAD.(AC) - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 24BAE67A
esign.alamode.com/verify

## Comparable Photo Page

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 3120 W Wallcraft Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code  33611 |
| Client | Integra Realty Resources | | | | | |



**Comparable 1**

3101 W Fair Oaks Ave

| | |
|---|---|
| Prox. to Subject | 0.22 miles SE |
| Sale Price | 655,000 |
| Gross Living Area | 3,651 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | N;Res; |
| View | A;CtyStr; |
| Site | 10260 sf |
| Quality | Q2 |
| Age | 16 |

Due retrospective nature of the assignment all comps photos are from the MLS because they were taken at the time of the sale



**Comparable 2**

3108 W Fair Oaks Ave

| | |
|---|---|
| Prox. to Subject | 0.23 miles SE |
| Sale Price | 605,000 |
| Gross Living Area | 2,768 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 7200 sf |
| Quality | Q2 |
| Age | 26 |



**Comparable 3**

3312 W Villa Rosa St

| | |
|---|---|
| Prox. to Subject | 0.60 miles SW |
| Sale Price | 529,000 |
| Gross Living Area | 3,008 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 5250 sf |
| Quality | Q3 |
| Age | 12 |

Serial# 24BAE67A
esign.alamode.com/verify

## Comparable Photo Page

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 3120 W Wallcraft Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code  33611 |
| Client | Integra Realty Resources | | | | | |



### Comparable 4

3108 W Knights Ave

| | |
|---|---|
| Prox. to Subject | 0.08 miles NE |
| Sale Price | 615,000 |
| Gross Living Area | 3,324 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 8100 sf |
| Quality | Q2 |
| Age | 14 |



### Comparable 5

3110 W Knights Ave

| | |
|---|---|
| Prox. to Subject | 0.07 miles NE |
| Sale Price | 655,000 |
| Gross Living Area | 3,662 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 8100 sf |
| Quality | Q2 |
| Age | 14 |



### Comparable 6

3801 S Kenwood Ave

| | |
|---|---|
| Prox. to Subject | 0.34 miles NW |
| Sale Price | 625,000 |
| Gross Living Area | 4,020 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 7200 sf |
| Quality | Q3 |
| Age | 19 |



Serial# 24BAE67A
esign.alamode.com/verify

## Rent Comparables Photos 1-3

| Client | Integra Realty Resources | | | | |
|---|---|---|---|---|---|
| Property Address | 3120 W Wallcraft Ave | | | | |
| City | Tampa | County | Hillsborough | State  FL | Zip Code  33611 |
| Client | Integra Realty Resources | | | | |



**Rent Comparable 1**

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



**Rent Comparable 2**

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



**Rent Comparable 3**

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



Serial# 24BAE67A
esign.alamode.com/verify

Valu-18-12-1460

File # Valu-18-12-1460

# SINGLE FAMILY COMPARABLE RENT SCHEDULE

This form is intended to provide the appraiser with a familiar format to estimate the market rent of the subject property. Adjustments should be made only for items of significant difference between the comparables and the subject property.

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 3120 W Wallcraft Ave<br>Tampa, FL 33611 | 3804 S Lynwood Ave<br>Tampa, FL 33611 | | 2924 Bayshore Vista Dr<br>Tampa, FL 33611 | | 3301 W Fielder St<br>Tampa, FL 33611 | |
| Proximity to Subject | | 0.31 miles NW | | 2.47 miles S | | 0.49 miles SW | |
| Date Lease Begins | | 12/2011 | | 7/2011 | | 2/2011 | |
| Date Lease Expires | | 11/2012 | | 6/2012 | | 2/2012 | |
| Monthly Rental | If Currently<br>Rented: $ | $       3,500 | | $       3,450 | | $       3,200 | |
| Less: Utilities | $ | $       0 | | $ | | $ | |
| Furniture | | 0 | | | | | |
| Adjusted<br>Monthly Rent | $ | $       3,500 | | $       3,450 | | $       3,200 | |
| Data Source | Inspection<br>Public records | MLS T2490150<br>Public records | | MLS T2470331<br>Public records | | MLS T2453302<br>Public records | |
| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Rent<br>Concessions | | None | | None | | None | |
| Location/View | N;Res;<br>N;Res; | N;Res;<br>N;Res; | | N;Res;<br>N;Res; | | N;Res;<br>N;Res; | |
| Design and Appeal | DT2.00;Contemp | DT2.00;Contem | | DT2.00;Contemp | | DT2.00;Contemp | |
| Age/Condition | 5<br>C3 | 3<br>C3 | | 13<br>C3 | | 7<br>C3 | |
| Above Grade | Total : Bdrms : Baths | Total : Bdrms : Baths | | Total : Bdrms : Baths | | Total : Bdrms : Baths | |
| Room Count | 8 : 4 : 3.0 | 8 : 4 : 4 | -50 | 8 : 4 : 3.1 | | 8 : 4 : 4 | -50 |
| Gross Living Area | 3,300 Sq. Ft. | 3,648 Sq. Ft. | -50 | 3,440 Sq. Ft. | -25 | 3,132 Sq. Ft. | +25 |
| Other (e.g., basement,<br>etc.) | 0sf | 0sf | | 0sf | | | |
| Other: | 2-garage | 3-garage | -50 | 2-garage | | 2-garage | |
| Net Adj. (total) | | ☐ + ☒ − $ | -150 | ☐ + ☒ − $ | -25 | ☐ + ☒ − $ | -25 |
| Indicated Monthly<br>Market Rent | | Net 4.3 %<br>Gross 4.3 % $ | 3,350 | Net 0.7 %<br>Gross 0.7 % $ | 3,425 | Net 0.8 %<br>Gross 2.3 % $ | 3,175 |

Comments on market data, including the range of rents for single family properties, an estimate of vacancy for single family rental properties, the general trend of rents and vacancy, and support for the above adjustments. (Rent concessions should be adjusted to the market, not to the subject property.)     All of the rent comparables are located in South Tampa. The rent comparables indicate an adjusted range from $3,175/month to $3,425/month.

Final Reconciliation of Market Rent:     A reasonable and credible lease rate is $3,300 per month.

🔒 esign.alamode.com/verify     Serial:24BAE67A

**I (WE) ESTIMATE THE MONTHLY MARKET RENT OF THE SUBJECT AS OF** _____ 02/17/2012 _____ TO BE $ _____

| Appraiser: SIGNATURE | Review Appraiser SIGNATURE |
|---|---|
| NAME   Robert K. Baird | (If applicable)   NAME |
| 4590 Ulmerton Rd #201 Clearwater, FL 33762 | |
| Date Property Inspected  02/17/2012   Report Signed  01/22/2019 | Date Property Inspected _____   Report Signed _____ |
| License or Certification #   Cert Gen RZ2497   State   FL | License or Certification # _____   State _____ |
| Expiration Date of License or Certification   11/30/2020 | Expiration Date of License or Certification _____ |
| | Review Appraiser ☐ Did  ☐ Did Not  Inspect Subject Property |

Freddie Mac Form 1000  (8/88)

Form 1007 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Fannie Mae Form 1007  (8/88)

Serial# 24BAE67A<br>esign.alamode.com/verify

## Comparable Sales Map

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 3120 W Wallcraft Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code 33611 |
| Client | Integra Realty Resources | | | | | |



Serial# 24BAE67A
esign.alamode.com/verify

## Subject Photo Page

| Client | Integra Realty Resources | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 3120 W Wallcraft Ave | | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33611 |
| Client | Integra Realty Resources | | | | | | |



**Subject Front**

3120 W Wallcraft Ave
| | |
|---|---|
| Sales Price | 340,000 |
| Gross Living Area | 3,300 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.0 |
| Location | N;Res; |
| View | N;Res; |
| Site | 7250 sf |
| Quality | Q3 |
| Age | 5 |



**Subject Front**



**Subject Street**



Serial# 24BAE67A
esign.alamode.com/verify

**Scope of Work**

| Client | Integra Realty Resources | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 3120 W Wallcraft Ave | | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33611 |
| Client | Integra Realty Resources | | | | | | |

File No. Valu-18-12-1460

The scope of work applied to this specific appraisal assignment is summarized below.

In the preparation of this report, the appraisal problem was identified; that being the client, intended use, intended users, type and definition of value opinion, effective date of the opinion and conclusion, subject of the assignment and relevant characteristics about that subject, and the assignment conditions. A solution to the appraisal problem (scope of work) was planned, and then implemented in so as to arrive at a credible result. The appraiser(s) of this report have the knowledge and experience to complete the assignment competently.

The scope of work applied in this assignment is summarized as:

Viewed the general neighborhood of the subject property.
Inspected the exterior of the subject property from the street.
Gathered information about relevant characteristics of the property.
Noted the characteristics of the property relevant to this assignment.
Analyzed the highest and best use of the property to come to a conclusion.
Market data researched included market trends, rent comparables, and comparable improved sales.
Comparables were researched from varied sources which included the appraisal firm's own database, the public records, and national data services.
Analyzed the data collected and applied it to the Sales Comparison approach to value.
The client has requested a rental analysis, however, an Income Approach was not developed.

The scope of work did not include the following:
I was unable to inspect the interior of the improvements.

The subject property comprises a single family home that was built in 2007. Due to the age of the improvements, the Cost Approach would have an abundant depreciation which weakens the reliability of the approach. Therefore, the Cost Approach was not applicable.

The client has requested a rent analysis. However, single family homes are typically not purchased for their anticipated income stream. Thus, the market does not consider the Income Approach applicable.

Extraordinary Assumption

Per USPAP 2018-2019 - An extraordinary assumption is defined as: "as assignment-specific assumption as of the effective date regarding uncertain information used in the analysis which, if found to be false, could alter the appraiser's opinions or conclusions".

I have only inspected the subject property from the street and have not performed a thorough interior and exterior inspection. The opinion of value is based on the subject property being in average condition as of the effective date.

The opinion of value assumes the improvements are in average condition.

Hypothetical Condition

Per USPAP 2018-2019 - A hypothetical condition is defined as: "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.2"

The opinion of value is based on the Hypothetical Condition the value of the subject property is not affected by any detrimental conditions including Chinese drywall.

Serial# 24BAE67A
esign.alamode.com/verify

## Subject Aerial Photograph



Serial# 24BAE67A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 770 of 796
Case 1:11-cv-22408-MGC Document 273 Entered on FLSD Docket 08/15/2013 Page 242 of 395

**Plat Map**



Serial# 24BAE67A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 771 of 796
Case 1:31-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 143 of
980

**Flood Map**



Serial# 24BAE67A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 772 of 796
Case 1:31-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2015 Page 244 of
Property Appraiser Page 1



**Bob Henriquez**
**Hillsborough County Property Appraiser**

https://www.hcpafl.org/
15th Floor County Ctr.
601 E. Kennedy Blvd, Tampa, Florida 33602-4932
Ph: (813) 272-6100

## Folio: 127850-0100



### Owner Information

| | |
|---|---|
| Owner Name | ALVAREZ DAVID M |
| | ALVAREZ NICOLE L |
| Mailing Address | 3120 W WALLCRAFT AVE |
| | TAMPA, FL 33611-1943 |
| Site Address | 3120 W WALLCRAFT AVE, TAMPA |
| PIN | A-03-30-18-3VR-000002-00007.2 |
| Folio | 127850-0100 |
| Prior PIN | A-03-30-18-3VR-000002-00007.1 |
| Prior Folio | 127850-0000 |
| Tax District | TA - TAMPA |
| Property Use | 0100 SINGLE FAMILY R |
| Plat Book/Page | 5/56 |
| Neighborhood | 203003.00 | NW MacDill North of Dorchester |
| Subdivision | 3VR | WEST BAY BLUFF |

### Value Summary

| Taxing District | Market Value | Assessed Value | Exemptions | Taxable Value |
|---|---|---|---|---|
| County | $719,381 | $691,873 | $50,000 | $641,873 |
| Public Schools | $719,381 | $691,873 | $25,000 | $666,873 |
| Municipal | $719,381 | $691,873 | $50,000 | $641,873 |
| Other Districts | $719,381 | $691,873 | $50,000 | $641,873 |

Note: This section shows Market Value, Assessed Value, Exemptions, and Taxable Value for taxing districts. Because of changes in Florida Law, it is possible to have different assessed and taxable values on the same property. For example, the additional $25,000 Homestead Exemption and the non-homestead CAP do not apply to public schools, and the Low Income Senior Exemption only applies to countywide and certain municipal millages.

### Sales Information

| Book | Page | Month | Year | Type Inst | Qualified or Unqualified | Vacant or Improved | Price |
|---|---|---|---|---|---|---|---|
| 25001 | 0300 | 06 | 2017 | WD | Qualified | Improved | $749,900 |
| 21275 | 0506 | 07 | 2012 | WD | Qualified | Improved | $542,000 |
| 20965 | 0406 | 02 | 2012 | WD | Unqualified | Improved | $340,000 |
| 13945 | 0205 | 06 | 2004 | WD | Qualified | Vacant | $185,000 |
| 11381 | 1049 | 01 | 2002 | WD | Unqualified | Vacant | $70,000 |

Page 1 - 1/1/2019 8:08:48 PM

Serial# 24BAE67A
esign.alamode.com/verify

Case 1:21-cv-22409-MGC Document 22380-28 Filed 12/02/19 Page 773 of 796
Case 1:21-cv-22409-MGC Document 273-8 Entered on FLSD Docket 09/15/2015 Page 145 of
Property Appraiser Page 2

## Building Information

### Building 1

| | |
|---|---|
| Type | 01 \| SINGLE FAMILY |
| Year Built | 2007 |

### Building 1 Construction Details

| Element | Code | Construction Detail |
|---|---|---|
| Class | C | Masonry or Concrete Frame |
| Exterior Wall | 7 | Masonry Frm: Stucco |
| Exterior Wall | 6 | Wd/Mtl Frm: Stucco |
| Roof Structure | 3 | Gable or Hip |
| Roof Cover | 3 | Asphalt/Comp. Shingle |
| Interior Walls | 5 | Drywall |
| Interior Flooring | 8 | Carpet |
| Interior Flooring | 5 | Wood |
| Heat/AC | 2 | Central |
| Architectural Style | 18 | Updated Contemporary Multi-Story |
| Condition | 4 | Good |
| Bedrooms | 4.0 | |
| Bathrooms | 3.0 | |
| Stories | 2.0 | |
| Units | 1.0 | |




### Building 1 subarea

| Area Type | Gross Area | Heated Area | Depreciated Value |
|---|---|---|---|
| BAS | 1,548 | 1,548 | $203,841 |
| FUS | 1,548 | 1,548 | $183,430 |
| FOP | 320 | | $10,534 |
| FGR | 180 | | $11,851 |
| FUS | 180 | 180 | $21,332 |
| FGR | 240 | | $15,802 |
| FOP | 104 | | $3,424 |
| FOP | 24 | | $790 |
| FUS | 24 | 24 | $2,897 |
| Totals | 4,168 | 3,300 | $453,901 |

## Extra Features

| OB/XF Code | Description | Building | Year On Roll | Length | Width | Units | Value |
|---|---|---|---|---|---|---|---|
| 0380 | SPA 01 | 1 | 2015 | 0 | 0 | 1.00 | $6,720 |
| 0351 | POOL 01 SCREENED | 1 | 2015 | 0 | 0 | 1.00 | $31,762 |

## Land Information - Total Acreage: 0.17

| Use Code | Description | Zone | Front | Depth | Land Type | Total Land Units | Land Value |
|---|---|---|---|---|---|---|---|
| REU1 | Res SF Class 31.00 | RS-50 | 50.00 | 145.00 | SE \| SF LOTS W/ EFF SIZE | 7,250.00 | $226,998 |

## Legal Description

WEST BAY BLUFF W 1/2 LOT 7 BLOCK 2

Form SCNLGL - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

Serial# 24BAE67A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 774 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/13/2015 Page 146 of 182
MLS Page 1 Feb 2012 Marketing

1/22/2019 Matrix

| T2495704 | 3120 W WALLCRAFT AVE, TAMPA, FL 33611 |
|---|---|



**County:** Hillsborough

**Subdiv:** WEST BAY BLUFF
**Beds:** 4
**Baths:** 3/0
**Pool:** None
**Property Style:** Single Family Residence
**Lot Features:** Sidewalks, Street Paved
**Total Acreage:** Up to 10,889 Sq. Ft.
**Garage:** Yes **Attch:** Yes **Spcs:** 2
**Garage/Parking Features:**
**LP/SqFt:** $113.64

**Home Warranty Y/N:**No
**New Construction:** No
**Flood Zone Code:**

**Status:** Sold
**List Date:**11/18/2011
**List Price:** $375,000
**Year Built:** 2007
**Special Sale:** None
**ADOM:** 64
**CDOM:** 64

**Pets:**
**Carport: Spcs:**

**Heated Area:**3,300 SqFt
**Total Area:** 4,168 SqFt

**Sold Date:** 02/17/2012
**Sold Price:**$340,000
**SP / SqFt:**$103.03

ACTIVE WITH CONTRACT. Custom 4 Bedroom, 3 Baths, Formal Living and Dining Rooms, Delightful Kitchen Overlooks Family Room, Upstairs Loft/Bonus Room. Charming Front and Rear Covered Porches. Beautiful Wood Floors!Plant High School District. Home has Chinese Drywall and is being sold AS-IS.

### Land, Site, and Tax Information

**Legal Desc:** WEST BAY BLUFF W 1/2 LOT 7 BLOCK 2
**SE/TP/RG:** 03-30-18
**Subdivision #:** 3VR
**Tax ID:** A-03-30-18-3VR-000002-00007.2
**Taxes:** $1,272
**Homestead:** Yes

**Ownership:** Fee Simple
**SW Subd Condo#:**
**Flood Zone:**
**Floors in Unit/Home:** Two
**Book/Page:** 0005/0056
**Total # of Floors:**
**Land Lease Fee:**
**Lot Dimensions:** 50.0X145.0

**Zoning:** RS-50
**Future Land Use:** 0136
**Zoning Comp:**
**Tax Year:** 2010

**CDD:** No **Annual CDD Fee:**
**Complex/Comm Name:**
**SW Subd Name:** Not Applicable
**Flood Zone Date:**
**Floor #:**
**Census Block:**
**Bldg Name/#:**
**Total Units:**
**Lot Size Acres:** 0.17

**Block/Parcel:** 000002
**Front Exposure:**
**Lot #:** 000072
**Other Exemptions:**
**Mill Rate:** 21.4500

**Flood Zone Panel:**
**Planned Unit Dev:**
**Census Tract:**

**Lot Size SqFt:** 7,248

### Interior Information

**A/C:** Central Air
**Heat/Fuel:** Heat Pump, Natural Gas
**Utilities:** BB/HS Internet Available, Cable Available, Electricity Connected, Fire Hydrant, Gas, Sprinkler Meter, Street Lights
**Sewer:** Public Sewer
**Water:** Public
**Fireplace:** No
**Heated Area Source:** Public Records

**Appliances Incl:** Dishwasher, Disposal, Gas Water Heater, Microwave, Oven, Range, Range Hood, Water Filter Owned, Water Softener Owned
**Flooring Covering:** Carpet, Wood
**Interior Feat:** Attic, Ceiling Fans(s), Crown Molding, Eating Space In Kitchen, Kitchen/Family Room Combo, Solid Surface Counters, Stone Counters, Tray Ceiling(s), Walk-In Closet(s)

| Room Type | Level | Dimen | Flooring | Features |
|---|---|---|---|---|
| Bedroom 2 | | 14x12 | | |
| Bedroom 3 | | 14x11 | | |
| Bedroom 4 | | 14x11 | | |
| Bonus Room | | 13x13 | | |
| Dining Room | | 14x13 | | |
| Family Room | | 17x18 | | |
| Kitchen | | 16x11 | | Closet Pantry, Island |
| Living Room | | 12x9 | | |
| Master Bathroom | | | | Tub with Separate Shower Stall |
| Master Bedroom | | 20x35 | | |

### Exterior Information

**Ext Construction:** Block, Stucco, Wood Frame
**Roof:** Shingle
**Property Description:**
**Ext Features:** French Doors, Fenced, Irrigation System, Rain Gutters
**Pool:** None
**Pool Features:**
**Patio And Porch Features:** Covered, Deck, Patio, Porch
**Foundation:** Slab
**Garage/Parking Features:**

**Garage Dim:**
**Architectural Style:**Custom

**Pool Dimensions:**
**Spa:**

### Community Information

| **HOA / Comm Assn:** No | **HOA Fee:** | **HOA Pmt Sched:** | **Mo Maint$(add HOA):** |
|---|---|---|---|

### Realtor Information

**List Agent:** KAREN GAJDOSZ
**List Agent E-mail:** kgajdosz@yahoo.com
**List Agent 2:** ASHLEY GAJDOSZ
**List Agent 2 Email:** agajdosz@ymail.com
**Sales Team:** GAJDOSZ TEAM

**List Agent ID:** 261505145
**List Agent Fax:** 813-960-4443
**List Agent 2 ID:** 261544618

**List Agent Direct:** 813-766-1171
**List Agent Cell:** 813-766-1171
**List Agent 2 Phone:** 813-300-7002

**Call Center #:**

https://mfr.mlsmatrix.com/Matrix/Printing/PrintPreview.aspx?c=AAEAAAD*****AQAAAAAAAARAQAAAFQAAAAGAgAAAAQ1MzM4BgMAAAABMwY... 1/2

Serial# 24BAE67A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 775 of 796
Case 8:11-cv-22004-MCE Document 273-8 Entered on FLSD Docket 08/15/2015 Page 247 of 302
MLS Page 2 Feb 2012 Marketing

1/22/2019                             Matrix

**List Office:** KELLER WILLIAMS TAMPA PROP.
**Original Price:** $375,000
**List Date:** 11/18/2011
**Representation:** Seller Not Represented
**Owner:**
**Financing Avail:** Cash

**Contract Status:** Inspections
**Contract:** 12/02/2011
**Selling Agent:** KAREN GAJDOSZ          **SP/SqFt:** $103
**Sold Date:** 02/17/2012
**Terms:** Cash
**Sold Remarks:**
**Single Agent:** 3%-$380
**Realtor Info:** Sold As-Is
**Confidential Info:**

**List Office Fax:** 813-960-4443

**Listing Service Type:** Full Service
**Owner Phone:**
**Association/Manager Name:**
**Association/Manager Phone:**
**Days to Cont:** 14

**Sell Office:** KELLER WILLIAMS TAMPA PROP.
**Sold Price:** $340,000
**Seller Credit:** $0

**Non-Rep:** 3%-$380

**List Office ID:** 771620
**List Office Phone:** 813-264-7754
**LP/SqFt:** $113.64

**Listing Type:** Exclusive Right To Sell

**Exp Clsg Date:** 01/31/2012

**Days to Closed:** 91
**SP/LP Ratio:** 91

**Trans Broker:** 3%-$380

**Showing Instructions:** 24 Hour Notice, Appointment Only, Call Listing Agent, Occupied
**Driving Directions:** From Bay to Bay, South on MacDill, right on Wallcraft to home.
**Realtor Remarks:** Please Call or Text Karen Gajdosz at 766-1171 for showing request. No Lockbox. Please give as much notice as possible for showings. Home has Chinese Drywall and is being Sold As-Is. Please note: Property Taxes are based on the Chinese Drywall Program.

Copyright - 2019 - MFRMLS, Inc. Information deemed reliable but not guaranteed. Parties are advised to verify. **Digital Millennium Copyright Act Take-Down Notice**

https://mfr.mlsmatrix.com/Matrix/Printing/PrintPreview.aspx?c=AAEAAAD*****AQAAAAAAAARAQAAAFQAAAAGAgAAAAQ1MzM4BgMAAAABMwY...    2/2

Serial# 24BAE67A
esign.alamode.com/verify

Case 1:21-cv-22440-MGC Document 270 Entered on FLSD Docket 09/13/2019 Page 248 of
Case 2:09-cv-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 776 of 796
MLS Page 1 June 2012 Marketing

| 1/22/2019 | Matrix |
|---|---|

## T2521038    3120 W WALLCRAFT AVE, TAMPA, FL 33611



**County:** Hillsborough
**Subdiv:** WEST BAY BLUFF
**Beds:** 4
**Baths:** 3/0
**Pool:** None
**Property Style:** Single Family Residence
**Lot Features:** In City Limits, Key Lot, Sidewalks, Street Paved
**Total Acreage:** Up to 10,889 Sq. Ft.
**Garage:** Yes  **Attch:** Yes  **Spcs:** 2
**Garage/Parking Features:** Garage Door Opener, Oversized
**LP/SqFt:** $181.52

**Home Warranty Y/N:** Yes
**New Construction:** No
**Flood Zone Code:**

**Status:** Sold
**Backups Requested:** Yes
**List Date:** 06/01/2012
**List Price:** $599,000
**Year Built:** 2007
**Special Date:** None
**ADOM:** 59
**CDOM:** 59
**Pets:**
**Carport: Spcs:**
**Heated Area:** 3,300 SqFt
**Total Area:** 4,168 SqFt

**Sold Date:** 07/30/2012
**Sold Price:** $542,000
**SP / SqFt:** $164.24

Active with Contract. Seller accepting backup contracts. STUNNING CUSTOM HOME located in the Plant High District and within walking distance to Bayshore Blvd, Shops and Eateries! Covered front porch and rich wood door will welcome you into this home with amenities galore including gleaming hardwood floors, Crown molding, 8 ft doors and loads of windows throughout for GREAT NATURAL LIGHT. Fabulous floor plan includes first floor Formal Living Room, Bedroom with walk-in closet and pocket door to Full Bath with shower, Dining Room and generous size Family Room and Kitchen. Love to cook...this kitchen has it all starting with 42" raised panel cabinets with crown caps, under cabinet lighting, granite counter tops, island breakfast bar, stainless appliances including 6 burner gas cooktop, wall oven and convection microwave. The family room is pre-wired for surround sound and overlooks the covered back patio through Dual French Doors. Upstairs you will find a loft/bonus room, two spacious secondary bedrooms with walk-in closets, hall bathroom and laundry room with cabinets and sink. The private Master retreat is accented with trayed recessed lighting and large walk-in closet. The Master Bath has dual sinks with granite countertops, soaking tub and frameless glass step in shower. Enjoy the Florida evenings sitting on the swing on the covered porch overlooking the private fenced backyard that is perfect for entertaining friends and family.

### Land, Site, and Tax Information

**Legal Desc:** WEST BAY BLUFF W 1/2 LOT 7 BLOCK 2
**SE/TP/RG:** 03-30-18
**Subdivision #:** 3VR
**Tax ID:** A-03-30-18-3VR-000002-00007.2
**Taxes:** $1,174
**Homestead:** No

**Ownership:** Fee Simple
**SW Subd Condo#:**
**Flood Zone:**
**Floors in Unit/Home:** Two
**Book/Page:** 0005/0056
**Total # of Floors:**
**Land Lease Fee:**
**Lot Dimensions:** 50.0X145.0

**Zoning:** RS-50
**Future Land Use:** 0135
**Zoning Comp:**
**Tax Year:** 2011

**CDD:** No **Annual CDD Fee:**
**Complex/Comm Name:**
**SW Subd Name:** Not Applicable
**Flood Zone Date:**
**Floor #:**
**Census Block:**
**Bldg Name/#:**
**Total Units:**
**Lot Size Acres:** 0.17

**Block/Parcel:** 000002
**Front Exposure:**
**Lot #:** 000072
**Other Exemptions:**
**Mill Rate:** 21.5900

**Flood Zone Panel:**
**Planned Unit Dev:**
**Census Tract:**

**Lot Size SqFt:** 7,248

### Interior Information

**A/C:** Central Air
**Heat/Fuel:** Central, Electric, Propane
**Utilities:** BB/HS Internet Available, Cable Available, Electricity Connected, Gas, Public, Sprinkler Meter
**Sewer:** Public Sewer
**Water:** Public
**Fireplace:** No
**Heated Area Source:** Public Records

**Appliances Incl:** Dishwasher, Disposal, Gas Water Heater, Microwave, Range, Range Hood, Refrigerator, Water Softener Owned
**Flooring Covering:** Carpet, Ceramic Tile, Wood
**Interior Feat:** Ceiling Fans(s), Crown Molding, Eating Space In Kitchen, Split Bedroom, Stone Counters, Tray Ceiling(s), Walk-In Closet(s)

| Room Type | Level | Dimen | Flooring | Features |
|---|---|---|---|---|
| Bedroom 2 | | 10x15 | | |
| Bedroom 3 | | 13x15 | | |
| Bedroom 4 | | 13x15 | | |
| Bonus Room | | 13x14 | | |
| Dining Room | | 13x16 | | |
| Family Room | | 18x20 | | |
| Kitchen | | 12x18 | | Closet Pantry, Island, Pantry |
| Living Room | | 12x15 | | |
| Master Bathroom | | | | Dual Sinks, Garden Bath, Tub with Separate Shower Stall |
| Master Bedroom | | 18x19 | | |

### Exterior Information

**Ext Construction:** Block, Stucco, Wood Frame
**Roof:** Shingle
**Property Description:**
**Ext Features:** French Doors, Fenced, Irrigation System, Rain Gutters
**Pool:** None
**Pool Features:**
**Patio And Porch Features:** Covered, Deck, Patio, Porch
**Foundation:** Slab

**Garage Dim:**
**Architectural Style:** Custom
**Pool Dimensions:**
**Spa:**

https://mfr.mlsmatrix.com/Matrix/Printing/PrintOptions.aspx?c=AAEAAAD*****AQAAAAAAAAARAQAAAFQAAAAGAgAAAAQ1MzM4BgMAAAABNAY...    1/2

Serial# 24BAE67A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 777 of 796
Case 1:11-cv-22408-MGC Document 273-1 Entered on FLSD Docket 08/15/2019 Page 249 of
MLS Page 2 June 2012 Marketing

1/22/2019 Matrix

**Garage/Parking Features:** Garage Door Opener, Oversized

| Community Information | | |
|---|---|---|
| HOA / Comm Assn: No | HOA Fee: | Mo Maints(add HOA): |
| Elementary School: | Middle School: | High School: Plant City-HB |

| Realtor Information | | |
|---|---|---|
| List Agent: KAREN GAJDOSZ | List Agent ID: 261505145 | List Agent Direct: 813-766-1171 |
| List Agent E-mail: kgajdosz@yahoo.com | List Agent Fax: 813-960-4443 | List Agent Cell: 813-766-1171 |
| List Agent 2: ASHLEY GAJDOSZ | List Agent 2 ID: 261544618 | List Agent 2 Phone: 813-300-7002 |
| List Agent 2 Email: agajdosz@ymail.com | | |
| Sales Team: GAJDOSZ TEAM | | Call Center #: 888-998-9005 |
| List Office: KELLER WILLIAMS TAMPA PROP. | | List Office ID: 771620 |
| Original Price: $629,900 | List Office Fax: 813-960-4443 | List Office Phone: 813-264-7754 |
| List Date: 06/01/2012 | | LP/SqFt: $181.52 |
| Previous Price: $629,900 | Price Change: 06/08/2012 | Expiration Date: |
| Representation: Seller Represented | Listing Service Type: Full Service | |
| Owner: JOHN MERRILL INVESTMENTS INC | Owner Phone: | Listing Type: Exclusive Right To Sell |
| Financing Avail: Cash, Conventional | Association/Manager Name: | |
| | Association/Manager Phone: | |
| Contract Status: | Days to Cont: 26 | Exp Clsg Date: 07/31/2012 |
| Contract: 06/27/2012 | | |
| Selling Agent: ASHLEY GAJDOSZ | Sell Office: KELLER WILLIAMS TAMPA PROP. | |
| Sold Date: 07/30/2012        SP/SqFt: $164 | Sold Price: $542,000 | Days to Closed: 59 |
| Terms: Conventional | Seller Credit: $0 | SP/LP Ratio: 90 |
| Sold Remarks: | | |
| Single Agent: 3%-$300 | Non-Rep: 3%-$300 | Trans Broker: 3%-$300 |
| Realtor Info: Home Warranty, Sold As-Is | | |
| Confidential Info: | | |

**Showing Instructions:** Appointment Only, Call Before Showing, Contact Call Center, Lock Box Coded, Lock Box Electronic
**Driving Directions:** From Gandy, South on Macdill to West on Wallcraft
**Realtor Remarks:** Call Centralized Showings at 1-888-998-9005 for all appointments. Seller providing 1 Year Home Warranty for Buyer! SELLER HAS NOT OCCUPIED THE PROPERTY. Drywall has been remediated and engineering report is available.

Copyright - 2019 - MFRMLS, Inc. Information deemed reliable but not guaranteed. Parties are advised to verify. Digital Millennium Copyright Act Take-Down Notice

Serial# 24BAE67A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 778 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2015 Page 450 of
License



RICK SCOTT, GOVERNOR

JONATHAN ZACHEM, SECRETARY


Florida
dbpr

## STATE OF FLORIDA
### DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

### FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED GENERAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

## BAIRD, ROBERT KEITH
1423 S HOWARD AVE
TAMPA          FL 33606

LICENSE NUMBER: RZ2497

EXPIRATION DATE: NOVEMBER 30, 2020

Always verify licenses online at MyFloridaLicense.com



Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

Serial# 24BAE67A
esign.alamode.com/verify



## LIA Administrators & Insurance Services

August 28, 2018

RE:   Aspen Specialty Insurance Company
      (A.M. Best Rated A (Excellent), Financial Size Class XV.
      Policy # LR0092M18 Customer ID: 600284

For Clients of
VALUCENTRIC, LLC
1003 Mt. Hermon Road, Suite 201
Salisbury, MD 21804

The purpose of this letter is to advise you of the professional liability (E&O) insurance coverage of VALUCENTRIC, LLC and staff appraisers performing work on its behalf.

VALUCENTRIC, LLC is the named insured under the professional liability insurance policy identified above. This policy provides the following coverage, subject to its terms and conditions:

| Limit of Liability (Each Claim/Aggregate) | Deductible | Effective Date | Expiration Date |
|---|---|---|---|
| $1,000,000/$2,000,000 | $10,000 | 09/19/2018 | 09/19/2019 |

Under the policy, any appraiser who "is, was, or hereafter becomes" a staff appraiser or other employee/contractor for VALUCENTRIC, LLC is also an insured under the policy while acting on behalf of VALUCENTRIC, LLC. The definition of insured includes the following staff appraisers of VALUCENTRIC, LLC:

(Sample)

If you have any questions concerning the insurance coverage arranged by our company, please feel free to contact me directly.

Sincerely,

*Susan Lomeli*

Susan Lomeli
LIA Administrators & Insurance Services
800.334.0652 Ext.139
Susan@Liability.com

Post Office Box 1319, Santa Barbara, CA 93102-1319 ■ 1600 Anacapa St., Santa Barbara, CA 93101
Tel (805) 963-6624 (800) 334-0652 ■ Fax (805) 962-0652 ■ Web www.liability.com

Serial# 24BAE67A
esign.alamode.com/verify

| Client | Integra Realty Resources | | | | File No. Valu-18-12-1460 |
|---|---|---|---|---|---|
| Property Address | 3120 W Wallcraft Ave | | | | |
| City | Tampa | County | Hillsborough | State FL | Zip Code 33611 |
| Client | Integra Realty Resources | | | | |

## APPRAISAL AND REPORT IDENTIFICATION

This Report is one of the following types:

☒ Appraisal Report (A written report prepared under Standards Rule 2-2(a), pursuant to the Scope of Work, as disclosed elsewhere in this report.)

☐ Restricted Appraisal Report (A written report prepared under Standards Rule 2-2(b), pursuant to the Scope of Work, as disclosed elsewhere in this report, restricted to the stated intended use by the specified client or intended user.)

## Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:
- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
- Unless otherwise indicated, I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

## Reasonable Exposure Time (USPAP defines Exposure Time as the estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.)

My Opinion of Reasonable Exposure Time for the subject property at the market value stated in this report is:    3 to 6 months

## Comments on Appraisal and Report Identification

Note any USPAP-related issues requiring disclosure and any state mandated requirements:

In the past three years, from the date of this report, we have not performed an appraisal or any other services for the subject.

I certify, as the appraiser, that I have completed all aspects of this valuation, including reconciling my opinion of value, free of influence from the client, client's representatives, borrower, or any other party to the transaction.

As of the date of this report, I, (Robert K. Baird) have completed the Standards and Ethics Education Requirement of the Appraisal Institute for associate members.

GEOGRAPHIC COMPETENCE - In accordance with Certification 11, the appraiser further attest to my competence for the market area that is the subject of this report. The location of the subject property is within an area regularly serviced within my appraisal practice and I utilize the MRED MLS, Realist and other data sources specific to this market area.

APPRAISER COMPETENCY

An appraiser must determine, prior to accepting the assignment, that he or she can perform the assignment competently. Competency requires:

1. The ability to properly identify the problem to be addressed; and

2. The knowledge and experience to complete the assignment competently; and

3. Recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.

I am competent to perform this assignment based on my state appraiser license and familiarity with this type of property in the subject market.

I performed this appraisal in ac[...] esign.alamode.com/verify    Serial# 24BAE67A [...]m, Recovery and Enforcement Act of 1989, (12 U.S.C.3331 et seq.), and any implementing regulations

| APPRAISER: | SUPERVISORY or CO-APPRAISER (if applicable): |
|---|---|
| Signature: | Signature: |
| Name: Robert K. Baird | Name: |
| 4590 Ulmerton Rd #201 Clearwater, FL 33762 | |
| State Certification #: Cert Gen RZ2497 | State Certification #: |
| or State License #: | or State License #: |
| State: FL    Expiration Date of Certification or License: 11/30/2020 | State:    Expiration Date of Certification or License: |
| Date of Signature and Report: 01/22/2019 | Date of Signature: |
| Effective Date of Appraisal: 02/17/2012 | |
| Inspection of Subject: ☐ None ☐ Interior and Exterior ☒ Exterior-Only | Inspection of Subject: ☐ None ☐ Inter[...] ☐ Exterior-Only |
| Date of Inspection (if applicable): 1/17/2019 | Date of Inspection (if applicable): |

Serial# 24BAE67A
esign.alamode.com/verify

Form ID14E - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

| Client: | Integra Realty Resources | Client File #: | Valu-18-12-1460 |
|---|---|---|---|
| Subject Property: | 3120 W Wallcraft Ave, Tampa, FL 33611 | Appraisal File #: | Valu-18-12-1460 |

## STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal is subject to the following assumptions and limiting conditions:

- This report is prepared using forms developed and copyrighted by the Appraisal Institute. However, the content, analyses, and opinions set forth in this report are the sole product of the appraiser. The Appraisal Institute is not liable for any of the content, analyses, or opinions set forth herein.

- No responsibility is assumed for matters legal in character or nature. No opinion is rendered as to title, which is assumed to be good and marketable. All existing liens, encumbrances, and assessments have been disregarded, unless otherwise noted, and the property is appraised as though free and clear, having responsible ownership and competent management.

- I have examined the property described herein exclusively for the purposes of identification and description of the real property. The objective of our data collection is to develop an opinion of the highest and best use of the subject property and make meaningful comparisons in the valuation of the property. The appraiser's observations and reporting of the subject improvements are for the appraisal process and valuation purposes only and should not be considered as a warranty of any component of the property. This appraisal assumes (unless otherwise specifically stated) that the subject is structurally sound and all components are in working condition.

- I will not be required to give testimony or appear in court because of having made an appraisal of the property in question, unless specific arrangements to do so have been made in advance, or as otherwise required by law.

- I have noted in this appraisal report any significant adverse conditions (such as needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) discovered during the data collection process in performing the appraisal. Unless otherwise stated in this appraisal report, I have no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and have assumed that there are no such conditions and make no guarantees or warranties, express or implied. I will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because I am not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable public and/or private sources that I believe to be true and correct.

- I will not disclose the contents of this appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice, and/or applicable federal, state or local laws.

- The Client is the party or parties who engage an appraiser (by employment contract) in a specific assignment. A party receiving a copy of this report from the client does not, as a consequence, become a party to the appraiser-client relationship. Any person who receives a copy of this appraisal report as a consequence of disclosure requirements that apply to an appraiser's client, does not become an intended user of this report unless the client specifically identified them at the time of the assignment. The appraiser's written consent and approval must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

- If this valuation conclusion is subject to satisfactory completion, repairs, or alterations, it is assumed that the improvements will be completed competently and without significant deviation.

## VALUE DEFINITION

| ☒ Market Value Definition (below) | ☐ Alternate Value Definition (attached) |
|---|---|

MARKET VALUE is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;

2. both parties are well informed or well advised and acting in what they consider their own best interests;

3. a reasonable time is allowed for exposure in the open market;

4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Source: The Dictionary of Real Estate Appraisal, 5th ed., Appraisal Institute

* NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute plays no role in completing the form responsibility for the data, analysis or any other work product provided by the individual appraiser(s).

Serial# 24BAE67A
esign.alamode.com/verify

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 782 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2019 Page 454 of 989

File No. Valu-18-12-1460 | Page # 29 of 35

| Client: | Integra Realty Resources | Client File #: | Valu-18-12-1460 |
|---|---|---|---|
| Subject Property: | 3120 W Wallcraft Ave, Tampa, FL 33611 | Appraisal File #: | Valu-18-12-1460 |

## APPRAISER CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analysis, opinions, and conclusions are limited only by the report assumptions and limiting conditions, and are my personal, unbiased professional analysis, opinions, and conclusions.

- I have no present (unless specified below) or prospective interest in the property that is the subject of this report, and I have no (unless specified below) personal interest with respect to the parties involved.

- I have no bias with respect to any property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon the developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

- Individuals who have provided significant real property appraisal assistance are named below. The specific tasks performed by those named are outlined in the Scope of Work section of this report.

☒ None    ☐ Name(s)    N/A

As previously identified in the Scope of Work section of this report, the signer(s) of this report certify to the inspection of the property that is the subject of this report as follows:

Property inspected by Appraiser          ☒ Yes    ☐ No

Property inspected by Co-Appraiser      ☐ Yes    ☐ No

- Services provided, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment:    ☒ None    ☐ Specify services provided:

## ADDITIONAL CERTIFICATION FOR APPRAISAL INSTITUTE MEMBERS, CANDIDATES AND PRACTICING AFFILIATES

Appraisal Institute Designated Member, Candidate for Designation, or Practicing Affiliate Certify:

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- I am a Candidate for Designation in the Appraisal Institute.
  As of the date of this report, I have completed the Standard and
  Ethics Education Requirements for Candidates of the Appraisal
  Institute.

  esign.alamode.com/verify    Serial:24BAE67A

- 

## APPRAISERS SIGNATURES

| APPRAISER: | CO-APPRAISER: |
|---|---|
| Signature | Signature |
| Name   Robert K. Baird | Name |
| Report Date   01/22/2019 | Report Date |
| Trainee ☐   Licensed ☐   Certified Residential ☒   Certified General ☐ | Trainee ☐   Licensed ☐   Certified Residential ☐   Certified General ☐ |
| License #   Cert Gen RZ2497       State   FL | License #       State |
| Expiration Date   11/30/2020 | Expiration Date |

* NOTICE:   The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute plays no role in completing the form, has no responsibility for the data, analysis or any other work product provided by the individual appraiser(s).

AI Reports® AI-900.04 Certification, Assumptions and Limiting Conditions        © Appraisal Institute 2013, All Rights Reserved        January 2013

Serial# 24BAE67A
esign.alamode.com/verify

Form AI9004 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

File No.    Valu-18-12-1460

Valu-18-12-1460

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM

(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Condition Ratings and Definitions

C1

The improvements have been recently constructed and have not been previously occupied. The entire structure and all components are new and the dwelling features no physical depreciation.

Note: Newly constructed improvements that feature recycled or previously used materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100 percent new foundation and the recycled materials and the recycled components have been rehabilitated/remanufactured into like-new condition. Improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (that is, newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).

C2

The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category are either almost new or have been recently completely renovated and are similar in condition to new construction.

Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.

C3

The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.

C4

The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.

C5

The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.

C6

The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.

Quality Ratings and Definitions

Q1

Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2

Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Serial# 24BAE67A
esign.alamode.com/verify

UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Quality Ratings and Definitions (continued)

Q3

Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4

Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5

Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6

Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure

Definitions of Not Updated, Updated, and Remodeled

Not Updated

Little or no updating or modernization. This description includes, but is not limited to, new homes.

Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

Updated

The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.

An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled

Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion.

A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

Explanation of Bathroom Count

Three-quarter baths are counted as a full bath in all cases.  Quarter baths (baths that feature only a toilet) are not included in the bathroom count.  The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.

Example:
3.2 indicates three full baths and two half baths.

Serial#24BAE67A
esign.alamode.com/verify

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Abbreviations Used in Data Standardization Text

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| A | Adverse | Location & View |
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| AT | Attached Structure | Design (Style) |
| B | Beneficial | Location & View |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| BsyRd | Busy Road | Location |
| c | Contracted Date | Date of Sale/Time |
| Cash | Cash | Sale or Financing Concessions |
| Comm | Commercial Influence | Location |
| Conv | Conventional | Sale or Financing Concessions |
| cp | Carport | Garage/Carport |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| cv | Covered | Garage/Carport |
| DOM | Days On Market | Data Sources |
| DT | Detached Structure | Design (Style) |
| dw | Driveway | Garage/Carport |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| g | Garage | Garage/Carport |
| ga | Attached Garage | Garage/Carport |
| gbi | Built-in Garage | Garage/Carport |
| gd | Detached Garage | Garage/Carport |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| GR | Garden | Design (Style) |
| HR | High Rise | Design (Style) |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Ind | Industrial | Location & View |
| Listing | Listing | Sale or Financing Concessions |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| MR | Mid-rise | Design (Style) |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| o | Other | Basement & Finished Rooms Below Grade |
| O | Other | Design (Style) |
| op | Open | Garage/Carport |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA - Rural Housing | Sale or Financing Concessions |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| RT | Row or Townhouse | Design (Style) |
| s | Settlement Date | Date of Sale/Time |
| SD | Semi-detached Structure | Design (Style) |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area, Site |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| Woods | Woods View | View |
| Wtr | Water View | View |
| WtrFr | Water Frontage | Location |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| HBU | Highest and Best Use | Page 1 |
| MLS No. | Multiple Listing Service Number | Page 2 |
| Avg | Average | Page 1 |
| Cpt | Carpet | Page 1 |
| Tl | Tile | Page 1 |
| Vnyl | Vinyl | Page 1 |

Serial# 24BAE67A
esign.alamode.com/verify

File No. Valu-18-12-1460

| Client | Integra Realty Resources | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 3120 W Wallcraft Ave | | | | | | |
| City | Tampa | County | Hillsborough | | State | FL | Zip Code | 33611 |
| Client | Integra Realty Resources | | | | | | |

**PURPOSE OF THE APPRAISAL REPORT**

The purpose of this appraisal report is to estimate the market value of the subject property as defined herein. The use of the appraisal is to assist the above-named lender/client, its successors and/or assigns, in evaluating the subject property for lending purposes. This is a federally regulated transaction. Additional supporting data can be found in the appraiser's work file.

It is assumed that the title to this property is good and marketable. No title search has been made, nor have we attempted to determine ownership of the property. The value estimate is given without regard to any questions of title, boundaries, or encroachments. It is assumed that all assessments are paid. We assume the property to be free and clear of liens and encumbrances except as noted.

We are not familiar with any engineering studies made to determine the bearing capacity of the land. Improvements in the area appear to be structurally sound. It is therefore assumed that soil and subsoil conditions are stable unless specifically outlined in this report.

Any exhibits in the report are intended to assist the reader in visualizing the property and its surroundings. The drawings are not intended as surveys and no responsibility is assumed for their cartographic accuracy. Drawings are not intended to be exact in size, scale or detail.

Areas and dimensions of the property were physically measured. If data is furnished by the principal or from plot plans or surveys furnished by the principal, or from public records, we assume it to be reasonably accurate. In the absence of current surveys, land areas may be based upon representations made by the owner's agents or the client. No attempt has been made to render an opinion or determine the status of easements that may exist. No responsibility is assumed for discrepancies that may become evident from a licensed survey of the property.

The value estimate involves only the real estate and all normal building equipment if any improvements are involved. Unless otherwise indicated, the opinion of value arrived at in this appraisal report is for the real estate only and DOES NOT INCLUDE ANY PERSONAL PROPERTY OF ANY KIND. Above ground pools or non-attached items such as freestanding appliances and window treatments are some examples of personal property. The inclusion of personal property in the sale of real estate is common. Although only the real estate is valued in this report, including typical personal property in a sale does not limit the marketability of a house.

The separate allocations between land and improvements, if applicable, represent our judgment only under the existing utilization of the property. A re-evaluation should be made if the improvements are removed or substantially altered, and the land utilized for another purpose.

All information and comments concerning the location, neighborhood trends, construction quality and costs, loss in value from whatever cause, condition, rents, or any other data for the property appraised herein, represents the estimates and opinions of the appraiser formed after an examination of the subject property.

All opinions, as to values stated, are presented as the appraiser's considered opinion based on the information set forth in the report and his experience. We assume no responsibility for changes in market conditions or for the inability of the client or any other party to achieve their desired results based upon the appraised value. Further, some of the assumptions made can be subject to variation depending upon evolving events. We realize some assumptions may never occur and unanticipated events or circumstances may occur. Therefore, actual results achieved during the projection period may vary from those in this report.

The appraisal report was not based on developing or reporting predetermined results, or a requested minimum valuation, a specific valuation, or the approval of a loan.

Our analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of: USPAP – Uniform Standards of Professional Appraisal Practice.

***THE APPRAISER HAS PREPARED THIS APPRAISAL IN FULL COMPLIANCE WITH THE APPRAISER INDEPENDENCE REQUIREMENTS AND HAS NOT PERFORMED, PARTICIPATED IN, OR BEEN ASSOCIATED WITH ANY ACTIVITY IN VIOLATION OF AIR.***

At the request of the client, this appraisal has been prepared in compliance with the Uniform Appraisal Dataset (UAD) from Fannie Mae and Freddie Mac. The UAD requires the appraiser to use standardized responses that include specific formats, definitions, abbreviations, and acronyms. The UAD standard requires property information for the subject and comparables that may be difficult to verify in the normal course of business. The appraiser relies on MLS data, public records data, property owner and realtor verification when available. However, when those collective sources cannot provide precise information, estimates and assumptions are made to comply with the UAD requirements. Should information become available that was not known during the original appraisal due diligence, it could impact the appraisal. The UAD data standard also requires the use of whole numbers in certain data fields. The appraiser was required to round certain numeric entries in order to comply with the UAD data standard.

We do not authorize the out of context quoting or partial reprinting of this appraisal report. Further, neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser nor the name of the firm which he/she is connected, shall be reproduced, published, or disseminated to the public through advertising media, public relations media, news media, or another public means of communication, without the prior written consent of the appraiser signing the report.

Serial# 24BAE67A
esign.alamode.com/verify

### Supplemental Addendum

File No. Valu-18-12-1460

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 3120 W Wallcraft Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code | 33611 |
| Client | Integra Realty Resources | | | | | |

**APPRAISAL DATA**

Appraisal reports are technical documents addressed to the specific needs of clients. In most cases, appraisals are made for mortgage companies and/or banks whose use for this report may be wholly different than that of the casual reader. Therefore, the reader should understand that this was made with a limited amount of data and limited ability to verify certain information. Information was verified when possible through public records, multiple listing services, real estate agents and exterior inspection. This includes verifications that the comparables are actually closed sales and the transactions are arms-length. No verification technique is one hundred percent accurate but the appraiser has relied upon information as reported and recorded unless better sources prevail.

From time to time, the indicated sizes of comparables shown in the available sources such as MLS services listing sheets or assessor appears to be incorrect based on the appraisers professional experience. If the size used in the MLS sheets does not correlate with other known data, the appraiser will estimate the size of comparables. These include assessor's sheets, physical inspection and use of interior room measurements along with a multiplier to depict size based on exterior measurements. The deviation of comparable size from published sizes only indicates an attempt at higher accuracy in the final report. However, there are many times that the exact size and features found in comparables cannot be confirmed except by any exterior inspection from the street. We have used three or more comparables in this report to eliminate the limited data associated with any single comparable.

Information regarding the comparable sales has been obtained from public sources and listing agencies. If any significant discrepancies are revealed, the right to amend this report is reserved.

**CONDITION OF MATERIALS**

The appraisal report requires the appraiser to note the condition of materials of several components of the subject property. The appraiser makes no representations, guarantees or warranties (express or implied), regarding the materials, their fitness, quality, condition or remaining economic life. An appraiser is NOT QUALIFIED OR TRAINED to discover/disclose hidden defects in material or workmanship. The lender/client should utilize or at least consider the services of a professional licensed home inspector to evaluate same if concerned about the condition of materials of the subject property.

**ENVIRONMENTAL**

The opinion of value reported in this appraisal report is predicated on the belief that there are no adverse conditions that would affect the livability, soundness, or structural integrity of the property, unless noted in the appraisal report. Adverse conditions include but are not limited to the following: Needed repairs, deterioration, the presence of hazardous wastes, toxic substances, and other adverse environmental conditions. Neither the appraiser(s), nor the appraisal firm and the associate's staff have the expertise required to discover any environmental hazards, toxic substances or infestation concerning the subject property. The appraiser is not an expert in the field of environmental hazards and this report is not to be considered as an environmental assessment of the property. The appraiser does not make any representations, guarantees, or warranties, express or implied, that the property is free of defects or environmental problems including but not limited to the following:

**INFESTATION** – The appraiser has no expertise in the field of insect, termites or pest infestation. We are not qualified to detect the presence of these or any other unfavorable infestations. We have not specifically inspected the subject property to determine the presence of any infestation. No effort was made to dismantle or probe the structure to observe enclosed, encased, or otherwise concealed evidence of infestation. Infestation may be present in areas the appraiser cannot see.

**LEAD BASE PAINT** – A residential dwelling that was built prior to 1978 may present exposure to lead based paint that may place young children at risk of developing lead poisoning. The appraiser is not qualified to determine if lead based paint is present or if it poses any risk or hazard to its inhabitants.

**MECHANICAL SYSTEMS** – The appraiser is NOT A HOME INSPECTOR, ELECTRICIAN, OR PLUMBER. Mechanical systems, including but not limited to plumbing, electrical, HVAC, appliances, septic systems and wells, have not been tested by the appraiser to determine their fitness of condition. If an electrical capacity has been noted in the appraisal report, it has been taken from the electrical service panel within the subject property or provided by another source including but not limited to, the owner, the blueprints, specifications, contractors, or other sources believed to be reliable. The appraiser will not be responsible for the condition, alterations, defects, or other unapparent modifications related to the mechanical systems of the subject property.

**MOLD** – The appraiser is not qualified to determine if mold is present in the property and if present, the appraiser is not qualified to determine the cause of the mold, the type of mold, or whether it poses any risk or hazard to the inhabitants.

**SEASONAL CONDITIONS** – There are instances when portions of the exterior of the property are obscured or not readily observable due to weather related conditions. In those instances, the appraiser(s) has relied upon a source(s) familiar with the property to cite the material and the condition of those improvements.

**PROPERTY INSPECTION**

A "complete visual inspection" includes a walking tour of the property, interior and exterior and viewing all readily observable items; observing the floor plan and layout; identifying relevant amenities, evaluating conformity of the subject with the neighborhood; observing general conditions; assessing functional utility; measuring the house or utilizing other data and information to calculate the living area, and noting any renovations or remodeling that may have been done to the property. A "complete visual inspection" does not include observing or



Serial# 24BAE67A
esign.alamode.com/verify

## Supplemental Addendum

File No. Valu-18-12-1460

| Client | Integra Realty Resources | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 3120 W Wallcraft Ave | | | | | |
| City | Tampa | County | Hillsborough | State | FL | Zip Code 33611 |
| Client | Integra Realty Resources | | | | | |

viewing any portion of the property not readily accessible from a walking tour include full access to attics and/or crawl spaces; activation or operation of all mechanicals, electrical, or plumbing equipment or fixtures; any observation or viewing of the roof surface other than that which is readily viewable from ground level; or activation or testing of any water system of sewage or septic tank; walking the entire home site if the size and/or topography do not readily allow.  THE APPRAISER IS NOT A QUALIFIED HOME INSPECTOR OR ENGINEER AND DOES NOT REPRESENT THOSE SERVICES.  THIS APPRAISAL IS NOT A WARRANTY AGAINST ANY DEFECT OF THE IMPROVEMENTS.

**SITE COMMENTS**

The site is very typical of the neighborhood in terms of size, topography, view and general appeal.  It provides a suitable setting for the improvements and is consistent with market expectations in this price range.  While no readily apparent adverse site conditions or external factors were noted, many site-related issues are beyond the scope of this assignment.  Statements regarding zoning compliances are intended only in the most general sense.  Zoning and building ordinances vary significantly from one municipality to another and can be extremely detailed.  The scope of this assignment does not include a comparison of every potentially significant characteristics of the subject property's site and improvements relative to zoning and building ordinances.  Unless otherwise noted, standard utility and right of way easements are insignificant to value.  However, a current locational or boundary survey or title report may reveal encroachments, easements, zoning violations or other matters of interest that could warrant modifications of the appraised value.

**LEGAL DESCRIPTION**

F.I.R.R.E.A. regulations require the appraiser to attempt to provide a legal description as part of the appraisal.  If the legal description is provided, the appraiser has assumed it is correct.  The legal description should be verified through legal documentation.

**MARKET CONDITIONS**

Trends in real estate are directly related to historic, economic, demographic, and political forces within a market area.  Events occurring nationally, regionally and locally can significantly impact the success of all types of real estate development.  Macroeconomic conditions, such as interest rates, inflation, job security, industrial productivity, and stability in the stock market, shape consumer confidence and business investment activity.  Regional and local indicators do not always mirror national trends.  As a result, the economic conditions on a regional and local level have the most significant impact on real estate markets and must be analyzed separately.  Diversity and stability in employment, job growth, business expansion and the profile of the available labor force all impact the economic stability of a region.  Consumer demographics in the local market, such a population growth, household statistics, age/family characteristics and income levels, specifically impact the type of real estate development that can be sustained, the amount of development supported, prices/rents, absorption of space and the amenities required.

1004 MC Instructions state:  "Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property".

"Subject Specific" parameters are often utilized, but by doing this, it will yield a smaller number of sales, too low to be considered statistically significant, it is then the appraiser's parameters may be expanded to include areas outside of the subject's immediate market neighborhood but still within the surrounding area to produce a statistically credible amount of data to achieve results in which support the appraiser's trend conclusions & not miss-lead the reader with an inadequate amount of statistical data.

**ADDITIONAL SALES COMPARABLE COMMENTS**

The comparables utilized were considered the best available to derive subject's valuation.  Appropriate market adjustments were made for dissimilarities in all comps.  Square footage where obtained from the assessor's office.  Where assessor records were unavailable or appeared inaccurate, square footages were obtained from a multiplier derived from the market. The appraiser uses a variety of data services such as public and private online databases which include assessor's records, county recorder, FEMA Flood Maps, county websites, local zoning maps and/or phone confirmations by the appropriate zoning authorities, local MLS information, or any other reliable sources considered typical for the market area.  All sources are considered to be reliable sources of data.  When discrepancies in the information are found, the appraiser will use the source(s) that is believed to be the most reliable in the appraisal report.  The appraiser will report only the data pertinent to the valuation process.  When applicable, the data presented in the Sales Comparison Approach has been verified by more than one source unless otherwise noted.

THE UAD REQUIRES THAT COMPARABLE SALES BASEMENT AREA AND FINISHED AREA ARE INCLUDED IN THE SALES GRID.  IT SHOULD BE NOTED THAT THE BASEMENT SQUARE FOOTAGE AND BASEMENT FINISHED SQUARE FOOTAGE HAVE BEEN ESTIMATED.  THIS DATA IS NOT AVAILABLE THROUGH MRED MLS OR PUBLIC ASSESSOR RECORDS.

The appraiser attempted to obtain an adequate amount of information in the normal course of business regarding the subject and comparable properties.  Some of the standardized responses required by the UAD, especially those in which the appraiser has not had the opportunity to verify personally or measure, could mistakenly imply greater precision and reliability in the data than is factually correct or typical in the normal course of business.  Examples include condition and quality ratings as well as comparable sales and listing data.  Not every element of the subject property was viewable (list if necessary) and comparable property data was generally obtained from third-party sources (list sources).  Consequently, this information should be considered an "estimate" unless otherwise noted by the appraiser.

Case 2:09-md-02047-EEF-MBN Document 22380-28 Filed 12/02/19 Page 789 of 796
Case 1:11-cv-22408-MGC Document 273-8 Entered on FLSD Docket 08/15/2013 Page 461 of 989

Addenda

## Anthony M. Graziano, MAI, CRE

**Integra Realty Resources**
**Miami/Palm Beach**

Dadeland Centre
9155 S. Dadeland Boulevard
Suite 1208
Miami, FL 33156

T 305.670.0001
F 305.670.2276

irr.com

### Experience

Senior Managing Director of Integra Realty Resources – Miami/Palm Beach.

Mr. Graziano has actively counseled and advised clients on the sale, leasing, valuation, management, and development of commercial real estate assets throughout the northeast and southeast U.S. since 1992.

Mr. Graziano's professional perspective is a blend of his experience and educational background which includes formal training in architecture, urban planning, macro and micro economics, real estate finance, institutional asset management, and land development. His market experience in sales, leasing, management, and valuation disciplines combine to bring practical real world answers to complex planning and development projects. He has been actively involved as a consultant and/or member of a consultant team on various major redevelopment and land use projects for public and private clients over the past 25+ years.

Mr. Graziano has specialized in consulting and valuation assignments for corporate and private clients on a wide array of complex issues related to estate and condemnation matters, title defects, environmental contamination/damages, air rights, partial and fractional interests, contract disputes, and mediation/arbitration disputes. Mr. Graziano's experience in these matters provides a comprehensive framework for effective strategic real estate consulting.

### Professional Activities & Affiliations

Advisory Board Member: Urban Land Institute (ULI) South Florida / Caribbean
Advisory Board Member: University of Miami M+RED Program
Member: Economic Roundtable – Miami Beacon Council (2012-present)
Board of Director: Integra Realty Resources, Inc. (2011-2016)
Chairman of the Board:    Integra Realty Resources, Inc. (2016-present)
Director: South Florida Chapter of the Appraisal Institute (2014-2016)
Board Member: Builders Association of South Florida (BASF) (2014-2016)
Subject Matter Expert (SME): Appraisal Practice Board, Appraisal Foundation
Member: Appraisal Institute (MAI) (2008-Present)
Member: Counselors of Real Estate (CRE) (2007-Present)
National Association of Realtors (REALTOR)
Miami Association of REALTORS Industry Analyst of the Year (2016)
Former Fellow: Royal Institute of Chartered Surveyors (FRICS) (2007-2014)
AI Leadership Development Advisory Council, March 1998 – February 2001
Lifetime Member: National Eagle Scout Association (NESA)

### Licenses

Florida, State-Certified General Real Estate Appraiser, RZ3510
New Jersey, State-Certified General Real Estate Appraiser, RG001261

### Education

University of Miami, Coral Gables, Florida 1988-1992
Degree: Bachelor of Science in Land Development and Planning, School of Architecture

New York University Real Estate Institute, New York, New York 1993-1996
Degree: Master of Science in Real Estate Development and Investment

amgraziano@irr.com   ·   305.670.0001 x320





Addenda

---

## Anthony M. Graziano, MAI, CRE

**Qualified Before Courts & Administrative Bodies**

Qualified and accepted as an expert before:
US Bankruptcy Court (Newark, Southern District of Texas, Southern District of Florida)
US Federal District Court (Southern District of Florida)
FL Circuit Court (Miami-Dade, Broward, and Monroe Counties)
NJ State Tax Court
NJ Superior Court – Chancery Division
NJ Superior Court – Law Division
Various municipal planning and zoning boards throughout New Jersey and Florida
Various Taxing Authorities and Boards throughout New Jersey and Florida

**Integra Realty Resources**
**Miami/Palm Beach**

The Douglas Centre
2600 Douglas Road, Suite 801
Coral Gables, FL 33134

T 305.670.0001
F 305.670.2276

irr.com



amgraziano@irr.com  ·  305.670.0001 x320

---

O'Brien, Kelly & Lori





**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 6/2015 | Plaintiff | 123-2015-0170 | 15-008930-CA-01 | 11th Judicial Circuit Dade County, Florida (Hon. Peter R. Lopez) | Aaron Stauber & Aviva Stauber V. BH 93, LLC | Piedra & Associates, P.A. | Motion to dismiss Lis Pendens in an action to enforce contractual specific performance clause. |
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Southern District of Florida | Ray Benson & Maria Helena Campos V. QBE Insurance Corporation | John Camps | Retrospective (2004-2006) analysis of market value claims against insurance company related to property damage claims arising from Hurricane Wilma |
| 1/2014 | Plaintiff | 123-2015-0031 | Pending | Miami-Dade County | Igor Ger V. Yacht Club at Portofino Condo Association | Weil Quaranta McGovern, P.A. | Construction defect dispute related to water-intrusion and damage-detrimental conditions analysis of |
| 10/2014 | Defendant | 123-2014-0226 | 08-CA-408-P | Monroe County | Ocean Bank V. Lindback, Monroe County | Ocean Bank | Deficiency claim against borrower on real estate collateral in the Florida Keys (development site plus marine related improvements) |
| 10/2014 | Defendant | 123-2014-0215 | 11-24994 CA 06 | 11th Judicial Circuit Dade County, Florida | Palm-Aire Holdings V. JRGS Investments, LLC, Jorge Garcia-Saraff and Course Drive Investments, LLC | Cole, Scott & Kissane, P.A. | Partnership dispute over valuation issues proximal to a fractured condominium project (retrospective values), and operating agreement dispute |
| 7/2014 | Plaintiff | 123-2015-0164 | 13-018022 CACE 02 | 17th Judicial Circuit Broward County, Florida | Amalia I. Irlanda-Rivera V. Rivero Diagnostic Center, Inc., Osnay Rivero & Yudit Rivero | Amalia I. Irlanda-Rivera | Rent default judgement and market rental and damage analysis associated with lease default. |
| 10/2014 | Defendant | 123-2014-0159 | 2014FL534 (Pending) | Palm Beach County | Roehm Title Resources Claim | Title Resources Guaranty Company | Title insurance claim related to before and after damage/value diminution analysis based on defined title defects not identified by Title Insurance Company. |
| 4/2014 | Defendant | 123-2014-0117 | 4:14-CV-01077 (Pending) | USA District Court for the Eastern District of Missouri Eastern Division | USA V. GSA-VA St. Louis Property, LLC | Bryan Cave LLP | Condemnation of a possessory interest for a term. Retained as consulting/rebuttal expert. |
| 5/2014 | Defendant | 123-2014-0114 | Pending | Miami-Dade County | Euforia Club | Rennert Bogel Mandler & Rodriguez, P.A. | Rent dispute regarding forced relocation of a nightclub, and relevant market rental rate of replacement club space in Miami |
| 4/2014 | Plaintiff | 123-2014-0089 | Pending | Broward County | Pan American Holdings Corp. V. Florida DOT Right of Way (ROW) Acquisition S.R.-7 | Henry Wulf, Esq. | Condemnation for R.O.W. purposes including before and after damage analysis |
| 1/2014 | Debtor | 123-2014-005 | 13-25728-BKC-RAM | US Federal Bankruptcy - Southern District of Florida - Miami Division (Hon. R. Mark) | West Airport Palms Business Park, LLC | Counsel for the Debtor; Michael D. Seese, Esq. | Fairness Opinion and market value opinions in conjunction with Debtor's Plan for Reorganization |
| 8/2013 | Defendant | 123-2009-0016 | 02-23922-CA 09 | 11th Judicial Circuit Dade County, Florida | American Educational Enterprises, LLC v. The Board of Trustees of the Internal Improvement Trust Fund | Richard Alayon, Esq. - Alayon and Associates | Economic Damages case associated with an alleged misrepresentation or omission by seller of real property. |
| 7/2013 | Plaintiff | 123-2013-0126 | CACE 08057624 (14) | 17th Judicial Circuit Broward County, Florida [Hon. Carlos A. Rodriguez] | Bayview Loan Servicing, LLC v. Kayhan Soodjani; Muhammad Mahmoodi; et al | Bayview Servicing; represented by Tabass, Freedman and Soloff; Stacey Soloff, Esq. | Deficiency judgment on multi-family project (Dewey Street Apartments) |
| 3/2013 | Defendant | 123-2013-0105 | 11-23561-CIV - Rosenbaum | US District Court - Southern District of Florida (Hon. Rosenbaum) | United States of America v. G.K.K. etal | Richard Duvall, Holland and Knight and Jeffrey Neiman, Esq. | Condemnation claim on the 137,779 s.f. Miami Federal Bureau of Investigation (F.B.I.) building; condemnation of a possessory interest (leasehold) |
| 02/2013 | Defendant | 123-2011-0670 | 08-05850 CA 04 | 11th Judicial Circuit Dade County, Florida [Hon. Beth Bloom] | Zenaida Gomez v. City of Pinecrest | Cynthia A. Everett, Cynthia A. Everett, P.A. | Economic damage resulting from temporary taking (seizure) of private residence. |
| 1/2013 | Defendant | 123-2013-0016 | 12-60950-CIV | US Federal Court - Southern District of Florida | Q Lending, Inc., Equity Financial Group, Inc., and Equity Commercial Group, Inc. v. Travelers Companies, Inc. etal | Heidi Raschke, Butler Pappas etal | Value diminution resulting from alleged mortgage fraud. |
| 11/2012 | Plaintiff | 123-2012-0129 | Pending | 11th Judicial Circuit Dade County, Florida | 2011 and 2012 Ad Valorem Tax Protest | Ken Wurtenberger, Esq., Kopelowitz Ostrow Ferguson | Tax protest of commercial condominium. |
| 10/19/2012 | Defendant | 123-2011-0111 | 2011-1107 CA - 03 | 11th Judicial Circuit Dade County, Florida [Hon. Stanford Blake] | Renegade at Hialeah Blvd v. Dynatech Engineering | Daniel Levin, Esq., Cole, Scott, Kissane, P.A. | Economic Damages case, diminution in value resulting from ground lease modification. |
| 10/1/2012 | Defendant | 123-2012-0109 | 11-30189 CA21 | 11th Judicial Circuit Dade County, Florida | Yaffa Yakubov vs. Bayview at Fisher Island No 3 | Craig Minko, Esq., Cole Scott Kissane, P.A. | Market Value estimate of Fisher Island Condominium purchased under right of first refusal, economic damages claimed by Plaintiff due to contract dispute arising from association's exercise of right of first refusal. |
| 8/20/2012 | Plaintiff | 123-2010-0012 | CA-02180 CA-25 | 11th Judicial Circuit Dade County, Florida | 7935 NBV, LLC v. Harbour East Development LTD, Mario Egozi, etal | Jose Casal, Esq., Holland and Knight | Deficiency judgment on 32-unit fractured condominium, substitute expert following issuance of IRR-Miami reports in 2010 and 2012 |
| 8/15/2012 | Disclosed Dual-Expert | 123-2012-0072 | | Matrimonial Mediation | Vazquez v. Vazquez Matrimonial Matter | Colon and Mendoza and Robert Hertzberg, P.A. | Retained as a court-appointed third party expert to both parties to appraise (2) marital assets comprised of office, retail, single and multi-family units in FL, TN, NC, and Bimini, Bahamas |
| 7/2012 | Plaintiff | 109-2011-2014 | Pending; 2003-2014 | Superior Court of New Jersey [Hon. Patrick DeAlmeida] | BASF Inc., successor Ciba Geigy Inc. vs. Township of Toms River | Phil Genuario, Garippa, etal on behalf of BASF | Challenge to multi-year appeal of $80 Million+ land assessment on contaminated superfund site in Central New Jersey |
| 3/2012 | Plaintiff | 109-2010-0172 | ATL-L-4451-08 | Superior Court of New Jersey, Law Division Atlantic County | Scot Netherlands Inc. vs. State of New Jersey Department of Environmental Protection (NJDEP) | Jay Rhatican, Connell Foloey on behalf of Scot Netherlands, Inc. | Challenge to NJDEP permit denial to fill wetlands, deprivation of all reasonable investment backed expectations. |
| 07/2011 | Defendant | 109-2010-0199 | MER-L-3034-08 | Superior Court of New Jersey Mercer County | 480 Mercer Street, LLP and Brookner Southern, LLC vs. Hightstown | Ansell Zaro Grimm & Aaron, P.C. - Hussam Chater | Litigation-Dispute Resolution - Hightstown Zoning Challenge |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-580/1 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc. | U.S. Department of Justice | Damages/environmental condemnation dispute between United States Navy and responsible party (Atlantic Wood Industries) |
| 12/2009 | Plaintiff | 109-2009-0377 | | Tax Court of New Jersey | Wextrust/HPC Mortgage Fund vs. City of Atlantic City | Cole, Schotz; Meisei, Forman & Leonard, P.A. Carl Rizzo, Esq. | Tax Appeals - To develop an opinion of the market value of the fee simple interest in the property |



**Anthony M. Graziano, MAI, CRE, FRICS**
IDENTIFIED EXPERT WITNESS TESTIMONY AT DEPOSITION and/or TRIAL

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 11/2009 | Secured Creditor | 109-2009-0439 | | US Bankruptcy Court - Southern District of Texas | Erickson Building | Stuart Glick, Esq., Sills, Cummis & Gross | Market Value for Bankruptcy of 140,000 SF corporate campus in Bethesda, Maryland |
| 09/2009 | Plaintiff | 109-2009-0123 | 3035-001 | Tax Court of New Jersey | Bay Head Yacht Club vs. Ocean County Tax Board | John Doyle, Carluccio, Leone, Dimon, Doyle & Sacks, LLC | Tax Appeal for Bay Head Yacht Club |
| 12/2008 | Plaintiff | 109-2008-XXX | INA (DEPS Pending) | Tax Court of New Jersey | Mirage Atlantic City (MAC) vs. City of Atlantic City | Hank Rovillard, Esq. | Tax Appeal at State Tax Court on 15 acre casino site adjacent to Trump Marina |
| 08/2008 | Defendant | 109-2008-0252 | L-2424-05 | Superior Court of New Jersey Law Division, Middlesex County | The city of South Amboy vs. Lower Main Street Development, LLC & Amboy Aggregates Joint Venture | Bathgate, Wegenar, etal | Verified complaint in condemnation |
| 6/2008 | Defendant | 109-2008-345 | C.A. No. OCNL-3861-06 | Superior Court of New Jersey, Law Division Ocean County | Osbourne Associates, Melbourne Associates VI, LLC, Kingsway Realty Profit Share vs. Citta Enterprises Co, JAC Property Management etal and Eckerd Corporation | Francis X. Manning, Esq, Stradley Ronon Stevens & Young & Michael Gamboli, Esq, Partridge Snow and Hahn, both on behalf of | Dispute re: proper valuation of leasehold and sub-lessee's sandwich leasehold interest on damage claim for breach of agreement claim |
| 1/2008 | Defendant | 109-2008-0125- | N/A | American Arbitration Association [testimony at Arbitration conducted by Hon. Eugene Serpentell] | Toms River Township vs. Ciba Gegy Corporation | Mark Troncone, Esq., In-house Counsel to Township of Toms River | Arbitration of environmental damages claim, and counter-claim of appropriateness of zoning on 1,900 acre superfund site. |
| 11/2007 | Defendant | 109-2007-211 | L-003635-06 | Superior Court of New Jersey, Law Division Middlesex County | Kyle Mosteller vs. Gaila Neeman | Frank Caruso, Esq. Hoagland, Longo, Moran and Dunst | Damage claim due to loss of trees and screening between urban properties |
| 6/2007 | Defendant | 109-2007-0134 | 3:07-CV-2322 | Superior Court of New Jersey, Chancery Division Monmouth County | Silver Lakes Inc. vs. Township of Freehold Inc. | Christopher Hanlon, Esq, Hanlon and Nieman | Challenge to validity of Rent Control Ordinance as transfer of property rights from Lessor to Lessee |
| 06/2007 | Plaintiff | 109-2007-0173 | | Federal District Court of Virginia | Laurelwood Homes, LLC vs. United States Department of Navy | William A. Shook Esq. | Leasehold interest in the property, breach of lease claim on behalf of leasehold owner (Laurelwood) claiming breach of lease and damages |
| 12/2006 | Defendant | 109-2006-0192 | CAM - L - 9731-05 | Superior Court of New Jersey, Chancery Division, Camden County | Brandywine Operating Partnership, LP vs. UFCW Local 56 | Brett Last, Esq, O'Brien, Belland and Bushinsky | Estimate the value of damages to landlord on breach of above-market lease |
| 08/2006 | | 109-2006-0257 | | | County Line & Brewers Bridge, Jackson Township | Levin, Shea, Pfeffer, PA Steven Pfeffer | To develop an opinion of the hypothetical market value of the fee simple interest in the property |
| 02/2006 | Defendant | 109-2006-0044 | OCN-L-2482-04 | Ocean Superior Court, Ocean County Courthouse | Carl Brooks vs. K Hovanian | Ronan, Tuzzio & Giannone Linda Olsen | To estimate value diminution in the subject property as a result of various issues asserted by the property owner in conjunction with pending litigation between the property owner, and the subject developer K. Hovnanian @ Sea Oaks |
| 10/2005 | Defendant | 109-2005-0315 | OCN-L-1810-5 | Superior Court of New Jersey, Law Division Ocean County | Atlantic City Electric Company d/b/a Coneciiv Power Delivery, a regulated public utility of the state of New Jersey vs. AC I Manahawkin, LLC formly and/or Armstrong | Flaster/Greenberg, PC, David R. Oberlander, Esq. | Compensation for the taking of an easement for construction and maintenance of a 230kv transmission line and towers by Atlantic City Electric |
| 06/2005 | Defendant | 109-2005-0214 | MON-L-2609-05 | Superior Court of New Jersey Law Division: Monmouth County | Township of Howell vs. George Harms Construction Co., Inc. etal | Connell & Foley, LLP Kevin Coakley, Esq. | To develop an opinion of the market value of the fee simple estate of the property |
| 08/2003 | | 109-2003-0282 | | Superior Court of New Jersey Chancery Division, Family Part, Monmouth County | Giuffre vs. Giuffre | Louis & Wolf - Frank A. Louis | To develop an opinion of the market value of the Fee Simple estate of the properties for purposes of equitable distribution of marital assets |
| 07/2003 | Defendant | 109-2003-0203 | OCN-C-78-03 | Superior Court of New Jersey Chancery Division, Ocean County | West, etal vs. Pompanio, etal | Stephen E. Smith, Esq. | To develop an opinion of the diminution in value due to a loss of useable land area |
| 06/2003 | Plaintiff | 109-2003-0161 | OCN-C-316-02 | Superior Court of New Jersey Law Division, Ocean County | Eugene M. Lord vs. Donald W. Rinaldo | Lombardi & Lombardi Scott Telson | To develop an opinion of the market value of the fee simple estate of the property |
| 04/2003 | | 109-2003-0128 | FM-15-468-03-C | Superior Court of New Jersey Chancery Division, Family Part Ocean County | Vincent Urbank vs. Lisa Urbank | Marianna Pontoniero, Esq. | Litigation-Matrimonial |
| 02/2002 | Plaintiff | 109-2002-0055 | | | Shenandoah Mobile Home Park | Windels Marx Lane & Mittendorf, LLP - William Cagney | Inverse Condemnation - Rent Control Ordinance |
| 04/2001 | Claimant | 109-2001-0189 | NJ-2624-00 | Superior Court of New Jersey, Chancery Division, Middlesex County | DeForest John Ely and Kimberle A. Ely, h/w | First American Title Insurance Co. Jack Milkis | To derive an opinion of the fair compensation of the fee simple estate, subject to the temporary title encumbrance |
| 03/1999 | Secured Creditors | 109-1999-0062 | | US Bankruptcy Court - District of Newark | Georgetown Apartments | Emmes & Co. Andrew Schwarz | To estimate the market value of the Leased Fee Estate of the property, inclusive of 28 Apartment complexes through NY, NJ, PA, and MD. |
| 12/1997 | Defendant | LKW-257-3186 | FM-15-1465-94 | Superior Court of New Jersey Chancery Division, Family Part, Ocean County | Lisa Franklin, etal vs. Donald Franklin, etal | Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP Robert S. Underhill | Estimating the market value of the leased fee interest |
| 8/1994 | Creditor | HUD-XX | | US Bankruptcy Court - District of Newark | Hudson Marina Association vs. Emmes & Co. | | Bankruptcy Reorganization of 200+ slip failed marina/dockominium complex |

M: Quals: Graziano; Trial Lists



**Anthony M. Graziano, MAI, CRE, FRICS**

PREFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| 1/2015 | Defendant | 123-2015-0037 | 14-CV-22384 UU | Miami-Dade County, FL | Ray Benson & Maria Helena V, QBE Insurance Corporation | John A. Camp | Retrospective (2004-2006) analysis of market value claims against insurance company related to property |
| 9/2014 | Defendant | 123-2014-0194 | 13-03084CA 10 | 11th Judicial Circuit Miami-Dade, FL | Manuel Soltero V. Adorno & Yoss, LLP | Kaplan Zeena, LLP | Professional Liability suit against law firm and attorneys for malfeasance in litigation matter. |
| 2/2014 | Plaintiff | 123-2014-0030 | Settled | Carribean Islands | Rainmaker Development V. A&F Bahamas, etal | VLASAC & SHMARUK, LLC | Partnership Dispute between Joint Venture in Carribean development project (golf course, villas, and large-scale marina-commercial-retail development) |
| 11/2012 | Defendant | 123-2012-0140 | 42-2012-CA-001065 | Marion County, FL | CSX Transportation, Inc. V. Moshen Sararazi, Fatih Ann Safarazi, Proverbium Hldg, LLC, USA & George Albrigilt | NeJame. La Fay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A. | Condemnation of partial interest with damages |
| 7/2012 | Confidential | 123-2012-0076 | Confidential | Broward County, FL | Ft. Lauderdale-Hollywood Int'l Airport Expansion | White & Case, LLP | Value Diminution Study to assist public agency in good faith negotiations based on airport expansion. |
| 6/2012 | Defendant | 123-2012-0070 | 10-49616-CA-40 | Miami-Dade County, FL | CB Entertainment, LLC V. South Beach Ocean Parcel | Kubicki Draper, P.A. | Construction Damages claim |
| 12/2009 | Plaintiff | 109-2009-0443 | Dept. Justice File 90-11-3-580/1 | Federal District Court of Virginia | United States vs. Atlantic Wood Industries, Inc, | U.S. Department of Justice | Damages/environmental contamination dispute between United States Navy and responsible party (Atlantic Wood Industries) |

M: Quals: Graziano: Trial Lists



**Anthony M. Graziano, MAI, CRE, FRICS**
PROFERRED OR DISCLOSED EXPERT WITNESS REPORTS/SETTLEMENTS

| RETENTION DATE | ON BEHALF | IRR FILE # | COURT CASE NO. | COURT / VENUE | CASE NAME | RETAINED BY | TYPE OF CASE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

M: Quals: Graziano: Trial Lists

**Integra Realty Resources**
Miami/Palm Beach

**Appraisal Report & Post-Remediation Damage Related to Chinese Drywall**

**Avery, Janet**
Hypothetical Market Value "As If" Remediated
10671 Camarelle Cir.
Fort Myers, Lee County, Florida 33913
Client Reference: 11

**Prepared For:**
Colson Hicks Eidson

**Effective Date of the Appraisal:**
July 22, 2011

**Report Format:**
Appraisal Report

**IRR - Miami/Palm Beach**
File Number: 123-2018-0275





**Avery, Janet**
10671 Camarelle Cir.
Fort Myers, Florida