# EXHIBIT 26

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| EDUARDO AND CARMEN AMORIN, *et al.*, individually, and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD., *et al.*,<br><br>     Defendants. | Case No. 1:11-CV-22408-MGC |

**PLAINTIFFS' MOTION AND MEMORANDUM TO STRIKE THE EXPERT REPORT OF BEN NOLAN AS VIOLATIVE OF THIS COURT'S ORDER "ADOPTING *ALL* OF JUDGE FALLON'S FINDINGS OF FACTS AND LEGAL CONCLUSIONS"**

## INTRODUCTION

The expert report of Defendants' building expert, Ben Nolan, should be struck for three reasons. First, it should be struck because it violates this Court's order adopting all of Judge Fallon's Conclusions of Fact and Law. Specifically, it disagrees with the comprehensive remediation *Scope of Work* and the *Remediation Damages Formula* that Judge Fallon has repeatedly found is necessary, fair and reasonable to remediate Plaintiffs' homes and compensate Plaintiffs for their damages. In addition, the Court should strike the Nolan Report because it addresses remediation damages – a subject that is explicitly ordered to be addressed in a separate proceeding; not in these Priority Plaintiff non-remediation damages trials. Finally, the Nolan Report should also be struck under the doctrine of collateral estoppel, because the issues he address have been preclusively addressed in multiple prior rulings.

This Court already fully considered the Taishan Defendants' challenges to Plaintiffs' Remediation Scope of Work and Remediation Damages Formula, rejected these challenges, and instead adopted Judge Fallon's findings of fact and conclusions of law. ECF 112 at p. 2. The Nolan expert report and opinions seek to relitigate these issues; however Judge Fallon

has already found that the Remediation Damages Formula is fundamentally based on a "well-established evidence-based and field tested Scope of Work necessary to fully remediate a Chinese drywall property." FOFCOL, 2017 WL 1421627, 11 (37) (E.D. La.) (emphasis added) (hereinafter "2017 FOFCOL."). This Scope of Work contains ten specific elements that are set forth by Judge Fallon and supported by *both* "scientific and practical constructability evidence." 2017 FOFCOL at 7 ( 8); FOFCOL, 706 F. Supp. 2d. 655, 669-688 (E.D. La. 2010) (hereinafter "2010 FOFCOL"). In addition, Judge Fallon found that the Remediation Damages Formula itself is based on well-established estimation methods and is "reliable, fair, and reasonable " 2017 FOFCOL at 21 ( 81), 24. At the same time, Judge Fallon rejected individual inspections as a remediation damages methodology, characterizing such an approach as "costly (and wasteful)," and as an approach that would "most likely not lead to a more precise estimate " 2017 FOFCOL at 14 & n.1 ( 55), 24.

The expert report of Defense building expert, Ben Nolan, provides opinions on two topics: (a) "whether issues surrounding reactive drywall have been resolved," and (2) "remediation costs." Exhibit 1. These opinions fundamentally disagree with Judge Fallon's findings on both the Scope of Work, and the Remediation Damages Formula. The opinions set forth at page 1-2 and p. 13 of the Nolan report are not based on, or supported by, a "compelling showing of an intervening change in law or fact," as this Court requires for such matters to be reconsidered. ECF 112 at p. 3. Rather, as was the case in the prior briefing before this Court, Ben Nolan's opinions are just another attempt "to revisit the MDL's decisions because they disagree with Judge Fallon's conclusions." ECF 112 at p. 2

## ARGUMENT

**A. Defense Expert Nolan's Opinions on "Whether Issues Surrounding the Reactive Drywall Have Been Resolved" and "Remediation Costs" Violate this Court's Order Adopting All of Judge Fallon's Findings of Fact and Law.**

### 1. "Whether Issues Surrounding Reactive Drywall Have Been Resolved."

Judge Fallon has already resolved issues of liability and causation in this case, and this Court has adopted those findings.

Judge Fallon has found the following:

    1) Defendants' Chinese Drywall is defective. 2017 FOFCOL 2, 6.

    2) The scope of the necessary remediation to make the plaintiff whole is the specific 10 point Scope of Work starting with removal of all drywall, stripping the house to studs, and ending with a post-remediation independent inspection and certification. 2017 FOFCOL at   6, 7, 8.

    3) Given that the defectiveness and corrosive effect of Chinese drywall is well-established, defendants are in default    the only issue currently pending before the Court is the amount of damages. 2017 FOFCOL at 9.

Thus, all issues relating to Defense Expert Nolan's topic of "whether issues surrounding the reactive drywall have been resolved," are conclusively settled by Judge Fallon's Findings set forth above on the defective nature of Defendants' drywall and the necessity of the 10 point remediation. There can be no further dispute as to these issues and there is no possibility of expert opinion on these issues assisting the Court because Judge Fallon's Finding on the necessary remediation Scope of Work resolves the issues. Therefore, Defense expert Nolan's liability and causation opinions on these issues including:

    1) What a "sufficient remediation" is

    2) What "indicia of reactive drywall" is, and

    3) What accomplishes the "purpose of the MDL protocol,"

are precluded by Judge Fallon's Findings on the Scope of Work. (*See e.g.,* Ex. 1 at p. 2).

The *only acceptable* remediation Scope of Work is the one established by Judge Fallon and adopted by this Court, and Defense expert Nolan cannot relitigate these issues. These opinions of Mr. Nolan should be struck under the explicit language of this Court's Order, ECF 112 at p. 2-3. Furthermore, Mr. Nolan has not offered any compelling evidence of changed fact or law. He has cited no peer reviewed science, no building code, and no institutional remediation protocol from evidence dated after April 21, 2017 (the date of the 2017 FOFCOL) that contradicts Judge Fallon's Remediation Scope of Work.

Therefore, Mr. Nolan's opinions on "whether issues surrounding the reactive drywall have been resolved" summarized in his report at pages 1 and 13 (Ex. 1) should be struck.

## 2. "Remediation Costs"

Judge Fallon has already resolved the issue of "remediation costs" by finding that:

1) That the formula is based on well-established defined scope of work necessary to fully remediate a "Chinese drywall property" 2017 FOFCOL at 8, 11.

2) That the formula is "reliable, fair and reasonable " 2017 FOFCOL at 24.

3) That the alternative of individual inspections is "costly (and wasteful) and would not provide a more reliable result " 2017 FOFCOL at 11, 14 & n.1, 24, 25

4) That the 86/sq. ft Remediation Damages Formula cost, updated to "reflect current day building materials and labor costs" to 117.94 [1] is reliable, fair and reasonable. 2017 FOFCOL at 21, 24 & n.10.

Therefore, Defense expert Nolan's opinions on "remediation costs," including those that are not based on a complete and full remediation under Judge Fallon's 10 point Remediation Scope of Work, cannot assist the Court because the issue of "remediation costs" is resolved.

The proper measure of remediation damages is to be based on the current 117.94/sq. ft. RS Means national average, unless a complete and full remediation under Judge Fallon's 10 point Scope of Work has been done; and in that case the measure of remediation damages is the actual cost of the remediation.[2] Furthermore, Mr. Nolan has offered no compelling evidence of changed fact or law to contradict the reliability of the Remediation Damages Formula. Mr. Nolan has offered no authoritative evidence dated after 4/21/17 (the date of the FOFCOL) from RS Means or any other institution committed to publishing cost data on demolition or repair and remediation generally, or specific to Chinese drywall.

---

[1] The current 2019 national average remediation costs under the Remediation Damages Formula is 117.94/sq. ft and this is the basis of the measure of remediation damages in this case. See Declaration of Ron Wright (4/18/18), attached as Ex. 2.

[2] ECF 112, Attachment A, p. 6 & n.1. Mr. Nolan performed an inadequate comparison of the actual remediation done to Judge Fallon's 10 point remediation Scope of Work. He relied primarily on the "KPT 2012 Protocol," not the Fallon Protocol, and failed to systematically measure and document his findings on each of the 10 points of the Scope of Work. See Rebuttal Declaration of Ron Wright, PE (04/25/19) at p.6. (Exhibit 3.)

4

Therefore, the opinions of Mr. Nolan on remediation costs should be struck under the explicit language in this Court's Order on the "remediation formula" being the "appropriate amount of property damages."  ECF 112 at p. 3.

**B.  The Nolan Expert Report and Opinions Should Also be Struck Under this Court's Order Limiting the Priority Plaintiff Trials to Non-Remediation Damages, and Under the Doctrine of Collateral Estoppel.**

The Nolan expert report and opinions regarding "whether issues surrounding reactive drywall have been resolved" and "remediation costs" also should be struck under this Court's Order limiting the Priority Plaintiff trials to non-remediation damages.  ECF 112 at p. 8.  Mr. Nolan's report and opinions disagree with Judge Fallon's findings on the 10 point Scope of Work and the Remediation Damages Formula as the measure of remediation damages in this case.  These opinions relate exclusively to remediation damages.  Therefore, the opinions are not relevant and will not assist the Court.  Finally, Mr. Nolan's report and opinions should also be struck under the doctrine of collateral estoppel.  *Parklane Hosiery Co, Inc., v. Shore,* 439 U.S. 322, 330-31 (1979); *see also U.S. v. Davenport,* 484 F.3d 321, 326 (5th Cir. 2007).  Judge Fallon certified the class in 2014 and in so doing upheld the Scope of Work and the Remediation Damages Formula in a proceeding that cannot be relitigated, as set forth by Judge Fallon below.

> Under the *Parklane* standards, it is appropriate to give the Findings of Fact and Conclusions of Law a preclusive effect in this class proceeding.  The defendant has had a full opportunity to litigate, but chose not to respond to process.  FOFCOL at 5. It is also clear that the Court's findings on the scope and cost of remediation and property damages were "necessary to support a valid and final judgment on the merits." *Parklane,* 439 U.S. at 330–31. Furthermore, none of the *Parklane* factors which would justify a court's refusal to apply collateral estoppel is present on the *Germano* record. Therefore, under *Parklane* and *Plunk,* the Court holds that the Findings of Fact and Conclusions of Law (Rec.Doc.# 2380) are entitled to be given preclusive effect in this class proceeding.

*In re Chinese Manufactured Drywall Products Liability Litigation;* 2014 WL 4809520, 12 (E.D. La.) (footnote omitted).

CONCLUSION

For all the reasons stated above, the expert opinions of Defense expert Ben Nolan should be struck.

CERTIFICATION OF PRE-FILING CONFERENCE PURSUANT TO S.D. FLA. L.R. 7.1(A)(3)

Counsel for Plaintiffs has engaged in extensive discussions with Defendants in a good faith effort to resolve the issues raised in this motion and has been unable to do so.

Dated: August 29, 2019                    Respectfully submitted,


                                          /s/ Patrick S. Montoya, Esq.
                                          Patrick Shanan Montoya
                                          Fla. Bar No. 0524441
                                          Email: Patrick@colson.com
                                          Colson Hicks Eidson
                                          255 Alhambra Circle, PH
                                          Coral Gables, FL 33134-2351
                                          Telephone: (305) 476-7400
                                          Facsimile: (305) 476-7444
                                          *Interim Lead Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Southern District of Florida by using the CM/ECF System, which will send a notice of electronic filing on this 29th day of April, 2019.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 9 of 224
Case 1:11-cv-22408-MGC Document 244-1 Entered on FLSD Docket 04/25/2013 Page 1 of
185

# EXHIBIT 1

# Chinese Drywall Report

## *Amorin* Priority Claimants (S.D. Fla.)

**Prepared for:**
**Alston & Bird LLP and**
**Orrick, Herrington & Sutcliffe**
**March 21, 2019**



Prepared by:

Ben D. Nolan, III PE, PSP
Managing Director,
Berkeley Research Group, LLC
bnolan@thinkbrg.com
(850) 677-0541



## 1. Expert Background and Qualifications

I was retained by the law firm of Alston & Bird LLP and Orrick, Herrington & Sutcliffe LLP, defense counsel, in litigation matters pertaining to Chinese Drywall ("reactive drywall") remediation in residential homes.

I am a registered Professional Engineer in Florida, a licensed (but inactive) general and drywall contractor and construction auditor with forty years of experience in construction. I am an expert in construction defects and have investigated and served as an expert witness in scores of construction defect related disputes over the past 26 years.

My experience with Chinese Drywall began in 2008, when I was engaged by investors and developers to identify Chinese Drywall in their properties, to develop a sufficient remediation protocol for individual residences, for large condominium buildings with hundreds of individual residences, and for large-scale mass remediation of entire developments. During these assignments, I developed an expert level of knowledge and experience in identifying Chinese Drywall and the requirements for sufficient Chinese Drywall remediation. I have also reviewed the MDL protocol for remediation articulated in the Germano Findings of Fact and Conclusions of Law (MDL Rec. 2380) (the "MDL protocol") as well as the formula for remediation costs set forth in Findings of Fact and Conclusions of Law (MDL Rec. 20741) (the "MDL formula").

I inspected seven homes owned by the following Priority Claimants: Hernandez, Nguyen, Foster, Wites, Gody, Chatmon, and Martinez. I also reviewed materials for Priority Claimants who no longer own the subject properties. In this assignment, my tasks are to inspect the current condition of Plaintiff's residences, take photographs and videos during my inspections, study the documents in the record, and provide my opinions regarding the remediation costs estimated or incurred, and determine whether the issues surrounding the reactive drywall have been resolved by the remediation protocol implemented.


## 2. Summary of Expert Opinions

It is my opinion, to a reasonable degree of certainty, that:

(1) The following Priority Claimant residences have been remediated and currently exhibit no indicia of reactive drywall: Hernandez, Nguyen, Foster, Wites, and Gody. Those residences do not need to incur material additional remediation expenses as the issues surrounding reactive drywall have been resolved.

(2) The "MDL Formula" remediation results can be substantially higher than the actual remediation costs.

(3) The actual construction costs the Etters incurred appear to be substantially higher than those reasonably necessary to remediate their property.



## 3.  Inspection and Analysis of Priority Claimant Properties

### 3.1.  Tracy Nguyen and Mai Tuyen – 103 SE 16th Place, Cape Coral, Florida 33990

On January 18, 2019, I inspected 103 SE 16th Place, Cape Coral, FL 33904, a single story three bedroom, two and a half bathroom structure with an attached garage. It is my opinion that this residence has been sufficiently remediated and exhibits no indicia of reactive drywall and does not need to incur any additional expense**.** The purpose of the MDL protocol has been satisfied and there is no indication of a need for further remediation or expense to achieve a sufficient remediation.  I observed and photographed selected electrical switch wires and the air conditioning unit label. All of the photos I took were of the post-remediation current condition of the residence. There were no indicia of reactive drywall.

Plaintiff contracted with J. & A. Stucco and Drywall and with Alex Fite for Air Conditioning.[1] The J. & A. Stucco scope of demolition, repairs and restoration are detailed therein.  The J & A. Stucco scope was consistent with the MDL Protocol objective, and my inspection confirms that, several years after the remediation, there are no present indicia of reactive drywall.

The J & A Stucco and Drywall Agreement stated the amount $43,000 to remove and replace 100% of the drywall, with options for Electrical $9,000, Plumbing $3,500 and Wall Tile $6,000, totaling $61,500. Fite's contract for air conditioning and ductwork repair totaled $6,595.  Plaintiff notes the kitchen cabinets and counter were not removed.[2]  This is acceptable under the remediation protocol when the cabinets do not need to be removed to access drywall behind the cabinets.  This was the condition at this residence. This does not mean that the home was not substantively remediated, and, if it is necessary to replace these items, the cost would be minor and would not require paying for or undergoing another remediation.  I added up the checks and bank statements included in the expenses exhibit and found documentation of $48,500 or $13,000 less than the J&A contract amount. The expenses for Fite matched the contract.  The Third Amended Supplement PPF states remediation costs were $75,000.  Section V. states that the residence was Partially Remediated.  Section V also states that remediation was completed in May 2015.  The discrepancy between the status of Partially Remediated and Completed Remediation is not explained.

The incurred remediation expenses of $48,500 are substantially lower than the MDL Formula result of 2,293 SF x .80 x $109.85/SF = $201,508.84.

**Selected Photographs.** I took the following photographs on January 18, 2019.  I also made a video of my walk through, which is in my files.

---

[1] Nguyen Exhibit #11
[2] Nguyen Deposition page 86, lines 9-14

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/02/19 Page 13 of 224
Case 1:11-cv-22408-MGC Document 244-1 Entered on FLSD Docket 04/29/2013 Page 5 of
185











The documents I relied on are listed at Attachment 3.



### 3.2. William and Vicki Foster – 10814 Fortina Drive, Fort Myers, Florida 33913

On January 18, 2019, between 9am and 11am, I inspected 10814 Fortina Drive, Ft. Myers, FL 33913 a single story two bedroom with den, two-bathroom structure with an attached garage. It is my opinion that this residence has been sufficiently remediated and exhibits no indicia of reactive drywall and does not need to incur any additional expense. The purpose of the MDL protocol has been satisfied and there is no indication of a need for further remediation or expense to achieve a sufficient remediation. The contractor's price was $117,531 and the claimed actual cost was $127,572.36, which are substantially lower than the MDL Formula result of 1,823 SF x .80 x $109.85 = $160,205.24.

Plaintiff contracted with Polkow Construction Inc., Fort Myers, FL to remediate the property, based on its October 19, 2011 proposal.[3] The scope of demolition, repairs and restoration are detailed therein. The scope was consistent with the purpose of the MDL Protocol. The Agreement stated the amount $117,531 to remove and replace 100% of the drywall. Remediation took place 4/22/2012 – 6/13/2013.[4] Plaintiff's Fourth Amended Supplemental Plaintiff Profile Form lists the remediation costs at $127,572.36 and indicated the residence was Partially Remediated, without explaining what parts were not fully remediated yet.

I did not detect any indicia of remaining work to be remediated. I understand that the Plaintiff claims that some floor tile was damaged, but not repaired, during the remediation. Whether that is so, replacing that floor tile would be a minor expense and would not require undergoing (or paying for) an entirely new remediation.

I observed and photographed selected electrical switch wires and the air conditioner label, which were in normal condition, with no indicia of reactive drywall.

**Selected Photographs.** The following are the photographs taken. I also videotaped a walk-through of the residence, which is in my records.

---

[3] Foster Exhibit # 6
[4] Foster Exhibit 15, page 4









The documents I relied on are listed at Attachment 3.

### 3.3.  Anthony and Candace Gody – 10842 Tiberio Drive, Fort Myers, Florida 33913

On January 18, 2019, I inspected 10842 Tiberio Drive, Ft. Myers, FL 33913, a single story three bedroom, two and a half bathrooms structure with an attached garage.  It is my opinion that this residence has been sufficiently remediated and exhibits no indicia of reactive drywall and does not need to incur any additional expense. The purpose of the MDL protocol has been satisfied and



there is no indication of a need for further remediation or expense to achieve a sufficient remediation.

Plaintiff contracted with Polkow Construction Inc., Fort Myers, FL to remediate the property based on its April 5, 2011 proposal.[5] The scope of demolition, repairs and restoration are detailed therein. The scope is consistent with the purpose of the MDL Protocol. The Agreement stated the amount $99,081 to remove and replace 100% of the drywall. The Agreement was revised and dated June 28, 2011 with a revised total of $108,717.[6] Remediation took place 7/1/2011 – 8/31/2011.[7] The Fourth Supplement PPF stated that remediation costs were $159,517. At Section V, it is stated that the residence was Partially Remediated and that it remediation was completed in August 2012. These contradictions, i.e. the actual completion date in 2011 or 2012 and whether the residence is partially remediated or completely remediated, are not explained. The incurred remediation costs of $159,517 are substantially lower than the MDL Formula result of 2,246 SF x .80 x $109.85/SF = $197,378.48.

The documents I relied on in forming my opinions are listed in Attachment 3.

### 3.4. Lillian Chatmon – 4151 Bismarck Palm Drive, Tampa, Florida 33610

On November 29, 2018, between 9am and 1pm, I inspected 4151 Bismarck Palm Drive in Tampa, FL, an un-remediated two-story townhouse residence. It was stated that this residence was vacated and has been unoccupied for approximately 9 years. The electricity was on and the air conditioner was working. The water had been turned off. I did not smell sulfur upon entry. I observed indicia of reactive drywall at the entry foyer, toilet room near kitchen, under the stairwell and on the banker's wall at the top of the stairs. I did not observe obvious evidence in the upstairs area except at the top of the stairs. The air conditioner coils appear to be faintly tarnished, which appears to be consistent with some degree of exposure to the effects of reactive drywall. Plaintiff testified that the original air conditioning coils were replaced in 2008 (see deposition page 30). Photographs were taken to show the tarnish on the copper electrical wires near the location of the reactive drywall. I did not observe indicia of reactive drywall in other areas of the house, as the electrical wires in the other rooms were not tarnished. I did not see the typical pitting of faucets and shower heads at any location.

Plaintiff's inspector's (Kross) report and my observations are generally consistent in that there are indicia of reactive drywall located near the kitchen, entry foyer, and up the stairs. Neither Kross nor I confirmed reactive drywall in other areas of the home. It may be that approximately 1/3 to less than ½ of the drywall is reactive and merits remediation.

I understand that remediation was scheduled to occur subsequent to my inspection. I have reviewed a remediation contract from Staten Homes, dated 10-2-2018, in the amount of $63,420, with

---

[5] Gody Exhibit #10
[6] Martinez Exhibit #11
[7] Martinez Exhibit #19



optional additions in the amount of $21,000. The actual remediation costs are substantially lower than the MDL Formula result of 1,240 SF x .83 x $109.85/SF = $113,057.62.

The documents I relied on in forming my opinions are listed in Attachment 3.

### 3.5. Dailyn Martinez – 1624 NW 37th Avenue, Cape Coral, Florida 33993

On January 18, 2019, I inspected 1624 NW 37th Avenue, Cape Coral, FL 33904, a single story three bedroom, two-bathroom structure with an attached garage.

At that time, the property had not been entirely remediated, although some drywall had been removed.

Plaintiffs received a quotation dated March 19, 2012 from contractor Chinese Drywall Experts I, LLC to remediate and restore the property for $102,184. With other improvement options, i.e. to build a 240 SF addition to the back of the house and to remove and replace 2,283 SF of tile, the contractor's price totaled $129,684.[8] The estimate of $102,184 is substantially lower than the MDL Formula result of 2,259 SF x .80 x $109.85/SF = $198,520.92.

The documents I relied on in forming my opinions are listed in Attachment 3.

### 3.6. Marc and Jennifer Wites – 17625 Middlebrook Way, Boca Raton, Florida 33496

On January 14, 2019, I inspected 17625 Middlebrook Way, Boca Raton, FL 33496, a two story five bedroom, 5 ½ bathrooms custom home with an attached garage. I observed and photographed selected electrical switch wires and the air conditioner coils and label. It is my opinion that this residence has been sufficiently remediated and exhibits no indicia of reactive drywall and does not need to incur any additional expense.

Plaintiff contracted with B4 & After General Contractors, Lighthouse Point, FL for a base contract of $241,050. Plaintiff retained EE&G, Miami Lakes, FL to provide inspections during remediation for $3,550. The claimed actual construction cost is $297,266, which is substantially lower than the MDL Formula result of 5,961 SF x .82 x $109.85/SF = $536,949. The claimed construction cost includes temporary rental and living expenses, which are not normally included in the construction costs.

**Selected Photographs.** The following are the photographs taken. I also videotaped a walk-through of the residence, which is in my records.

---

[8] Etter Exhibit #14









**Ongoing Kitchen Renovations**



**Master Bath**



The documents I relied on in forming my opinions are listed in Attachment 3.

### 3.7.  Steven and Cathy Etter – 18894 SE Jupiter Inlet Way, Tequesta, Florida 33469

I reviewed a variety of materials for this property, but did not inspect the residence as the Etters no longer own it. The Etters retained Chinese Drywall Screening LLC, 411 SW Silver Palm Cover, Port St. Lucie, FL 34986 ["CDS"] to inspect and report on the property at 1624 NW 37th Avenue, Cape Coral, FL18894 SE Jupiter Inlet Drive, Tequesta, FL 33469.

**Pre-demolition Photographs**. See CDS Report for Images included below:[9]






---

[9] Etter Exhibit #12



The two images below are of the residence interiors, which I obtained at https://www.realtor.com/realestateandhomes-detail/18894-SE-Jupiter-Inlet-Way_Tequesta_FL_33469_M67245-57188#photo50.  The reason I selected these images is that they demonstrate expensive floor and ceiling finishes.







Based on my review of the documents in the record, it is my opinion, to a reasonable degree of certainty, that:

(1) this residence has been sufficiently remediated and exhibits no indicia of reactive drywall;

(2) No further work or expense is needed as the Chinese Drywall issues have been resolved;

(3) The Etters incurred remediation expenses that substantially exceeded the original construction costs. The original cost of the new construction of the entire house was $197.25/SF. The Etters' remediation contractor's cost of $998,450 or $227.49/SF is markedly higher. The high end interiors appear to contribute to the higher cost. The Etters' claimed incurred costs are substantially higher than those resulting from the MDL Formula of 4,389 SF x .82 x $109.85/SF = $395,347.95.

The documents I relied on in forming my opinions are in Attachment 3.

### 3.8.  John and Bertha "Betty" Hernandez – 3516 N. Perry Avenue, Tampa, Florida 33603

On January 11, 2019, I inspected 3516 N. Perry Ave., Tampa, FL 33603 a two story four bedroom, 3 ½ bathrooms[10] structure with an attached garage. It is my opinion that this residence has been sufficiently remediated and exhibits no indicia of reactive drywall and does not need to incur any additional remediation expense. I observed and photographed selected electrical switch wires and the air conditioning labels. There are no indicia of reactive drywall. The purpose of the MDL protocol has been satisfied and there is no indication of a need for further remediation or expense to achieve a sufficient remediation.

The incurred remediation expenses of $406,923 are substantially higher than the MDL Formula result of 3,613 SF x .83 x $109.85/SF = $329,417.08, but the testimony suggests that the claimants made upgrades or unrelated changes during the remediation, such as replacing pool bathroom stucco and reformatting the kitchen.[11]

**Selected Photographs.** The following are the photographs that I took on January 18, 2019 after the remediation was complete. These photographs illustrate that the property has been completely remediated.

---

[10] B. Hernandez Deposition, Page 32, lines 3-8
[11] B. Hernandez Deposition, Page 71.

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 22 of 224
Case 1:11-cv-22408-MGC Document 244-1 Entered on FLSD Docket 04/29/2013 Page 14 of
185













The documents I relied upon in forming my opinions are in Attachment 3.

## 4. **Disclosures to Comply with the Federal Rules of Procedure**

### 4.1. **Complete Statement of Opinions:**

Based on my study of the documents in the record, it is my opinion that the Hernandez, Nguyen, Foster, Wites and Gody residences have been substantially remediated following a protocol that included a select number of steps defined by the MDL protocol and exhibit no further indicia of reactive drywall. The purpose of the remediation has been satisfied and there is no indication of a need for further remediation or expense to achieve a sufficient remediation.

The Chatmon and Martinez residences have not been remediated but the contractor's price proposal for the remediation is significantly less than the MDL Formula result would provide and the scope of work included in those proposals should reasonably be expected to achieve the objective of the remediation protocol, which is to remove the reactive drywall.

- The facts and data I considered in forming my opinions are listed in Attachment 3, and include the following types of documents, among others:
- The Indicia Reports for each residence.
- The pre-construction and during construction photographs and other reports contemporaneously produced during those time periods.
- Various reports from inspection firms and contractors certifying compliance with selected steps in the MDL protocol.
- Plaintiff's exhibits documenting remediation costs, actual square footage, and the year that effects of reactive drywall were first observed, among other facts.
- My observations and documentation during inspections of the residences.

The facts and data considered in forming my opinions are from reading and considering all the documents in the records provided to me by counsel and comparison of the contractor's remediation costs with the MDL formula calculation, RSMeans cost adjustment factor for location, and my own experience building and renovating homes.

### 4.2. **Exhibits That Will be Used to Summarize or Support my Opinions:**

Exhibits include this report and selected documents from the record.

### 4.3. **Expert's Qualifications:**

My current CV is attached which includes a list of all publications authored in the previous 10 years.



### 4.4. Expert's Trial Testimony in Previous Four Years:

A list of my trial testimony in the previous four years is included in my CV, attached.

### 4.5. Expert's Compensation:

My compensation is $450 per hour. Rates for staff that support my work are less and vary by individual as set annually by my employer. I have no financial interest in the outcome of this litigation.

Respectfully submitted,


Ben D. Nolan, III PE
Florida Professional Engineer
License #66997
Certificate of Authorization #29650

```
 1              IN THE UNITED STATES DISTRICT COURT

             FOR THE SOUTHERN DISTRICT OF FLORIDA

 2

 3              Case No. 1:11-CV-22408-MGC

 4    _____

 5    EDUARDO and CARMEN AMORIN, et al.,

      individually and on behalf of all

 6    others similarly situated,

 7              Plaintiffs,

 8         vs.

 9    TAISHAN GYPSUM CO., LTD. f/k/a

      SHANDONG TAIHE DONGXIN CO., LTD.;

10    TAIAN TAISHAN PLASTERBOARD CO., LTD., et al.,

11              Defendants.

      _____

12

13              ******* CONFIDENTIAL *******

          SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

14

15

16

                   VIDEOTAPED DEPOSITION OF

17                 BEN D. NOLAN, III, PE, PSP

18

                      Atlanta, Georgia

19

20              Wednesday, April 10, 2019

21

22

23

24

25         Court Reporter:  Michelle M. Boudreaux, RPR
```

1

2

3

4

5

6                          April 10, 2019

7                          9:05 a.m.

8

9

10          Videotaped deposition of

11      BEN D. NOLAN, III, PE, PSP, held at the

12      offices of Alston & Bird LLP, One Atlantic

13      Center, 1201 West Peachtree Street, Suite

14      4900, Atlanta, Georgia, pursuant to Agreement

15      before Michelle M. Boudreaux, a Registered

16      Professional Reporter in the State of

17      Georgia.

18

19

20

21

22

23

24

25

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 27 of 224
Case 1:11-cv-04009-CT Document 444-1 Entered on FLSD Docket 11/14/2013 Page 4 of 185
Confidential - Subject to Further Confidentiality Review

```
 1                APPEARANCES OF COUNSEL
 2
 3   On behalf of the Plaintiffs:
 4        RICHARD J. SERPE, Esq.
          Law Offices of Richard J. Serpe, PC
 5        580 East Main Street
          Suite 310
 6        Norfolk, Virginia 23510
          757.233.0009
 7        rserpe@serpefirm.com
 8        NATALIE M. RICO, Esq.
          Colson Hicks Eidson
 9        255 Alhambra Circle, Penthouse
          Coral Gables, Florida 33134
10        305.476.7400
          natalie@colson.com
11
          PETE V. ALBANIS, Esq.
12        Morgan & Morgan
          One University Park
13        12800 University Drive
          Suite 600
14        Fort Myers, Florida 33907
          239.433.6880
15        palbanis@forthepeople.com
16
     On behalf of Defendants Taishan Gypsum Co., Ltd. and
17   Taian Taishan Plasterboard Co., Ltd.:
18        AARON K. BLOCK, Esq.
          SARAH O'DONOHUE, Esq.
19        BERNARD TAYLOR, SR., Esq.
          Alston & Bird LLP
20        One Atlantic Center
          1201 West Peachtree Street
21        Suite 4900
          Atlanta, Georgia 30309-3424
22        404.881.7000
          aaron.block@alston.com
23        sarah.odonohue@alston.com
          bernard.taylor@alston.com
24
25   ///
```

Confidential - Subject to Further Confidentiality Review

```
 1              APPEARANCES OF COUNSEL (Cont'd)

 2

 3   On behalf of Defendants Taishan Gypsum Co., Ltd. and
     Taian Taishan Plasterboard Co., Ltd.:

 4

          STEVEN R. CAMPBELL, Esq.
 5        Alston & Bird LLP
          90 Park Avenue
 6        15th Floor
          New York, New York 10016-1387
 7        212.210.9400
          steven.campbell@alston.com

 8

 9   On behalf of Defendant BNBM PLC:

10        ALEX B. ROTHENBERG, Esq.
          Gordon Arata Montgomery Barnett
11        201 St. Charles Avenue
          40th Floor
12        New Orleans, Louisiana 70170-4000
          504.582.1111
13        arothenberg@gamb.law

14

     Videographer:  Josh Coleman
15

16

17

18

19

20

21

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 29 of 224
Case 1:14-cv-04049-ILG Document 244-1 Entered on FLSD Docket 12/13/2019 Page 31 of
185

Confidential - Subject to Further Confidentiality Review

```
 1                         INDEX

 2

 3                      EXAMINATIONS

 4     Examination by Mr. Serpe ..................... 7

 5     Examination by Mr. Block .................... 153

 6                         - - -

 7                       EXHIBITS

 8  Exhibit                                         Page

 9  Exhibit 1 ..................................... 8
       Expert report prepared by Ben D. Nolan, III,
10     PE, PSP, March 21, 2019

11  Exhibit 2 ..................................... 8
       Curriculum Vitae of Ben D. Nolan, III, PE,
12     PSP

13  Exhibit 3 ..................................... 78
       Photograph
14

    Exhibit 4 ..................................... 80
15     Drywall Inspection, Nguyen Home, January 18,
       2019
16

    Exhibit 5 ..................................... 104
17     Findings of Fact & Conclusions of Law Related
       to the June 9, 2015 Damages Hearing
18

    Exhibit 6 ..................................... 146
19     Gabisa Construction, Inc. Estimate, 12/5/2018
       (Martinez home)
20

    Exhibit 7 ..................................... 157
21     RSMeans Historical Cost Indexes

22

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 30 of 224
Case 1:11-cv-00400-MBN Document 244-1 entered on FLSD Docket 04/25/2019 Page 32 of
185

Confidential - Subject to Further Confidentiality Review

```
1              THE VIDEOGRAPHER:  We are now on the
2        record.  My name is Josh Coleman.  I'm the
3        videographer for Golkow Litigation Services.
4        Today's date is April 10th, 2019.  The time
5        is approximately 9:05 a.m.
6              This video deposition is being taken in
7        Atlanta, Georgia in the matter of Eduardo and
8        Carmen Amorin, et al., versus Taishan Gypsum
9        Company, et al., for the United States
10       District Court for the Southern District of
11       Florida.  The deponent is Ben Nolan.
12             Will counsel please identify themselves
13       for the record.
14             MR. SERPE:  Richard Serpe representing
15       plaintiffs.
16             MS. RICO:  Natalie Rico representing
17       plaintiffs.
18             MR. ALBANIS:  Pete Albanis representing
19       the plaintiffs.
20             MR. BLOCK:  Aaron Block representing
21       Taishan.
22             MS. O'DONOHUE:  Sarah O'Donohue
23       representing Taishan.
24             MR. ROTHENBERG:  Alex Rothenberg
25       representing BNBM.
```

```
 1              MR. CAMPBELL:  Steven Campbell,
 2         Taishan.
 3              MR. TAYLOR:  Bernard Taylor, Taishan.
 4              THE VIDEOGRAPHER:  And the court
 5         reporter is Michelle Boudreaux, who will now
 6         swear in the witness.
 7                   BEN D. NOLAN, III, PE, PSP,
 8    being first duly sworn, was examined and testified as
 9    follows:
10                        EXAMINATION
11    BY MR. SERPE:
12         Q    Mr. Nolan, would you state your full name and
13    professional address for the record?
14         A    Ben Davis Nolan, III, 1101 Gulf Breeze
15    Parkway, Building 7, Suite 3, in Gulf Breeze, Florida
16    32561.
17         Q    Could you give me an estimate on how many
18    depositions you have given in the past?
19         A    Over 80.
20         Q    So I'll dispense with some of the rules about
21    taking breaks, et cetera, because I know you're
22    familiar with those, but I'd like to ask you for a
23    couple of understandings.  Okay?  The first, will you
24    stop me if you don't understand one of my questions and
25    ask me to repeat or rephrase?
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 32 of 224
Case 1:16-cv-40057-WGY Document 241-1 Filed 08/27/18 Page 31 of 185
Confidential - Subject to Further Confidentiality Review

 1      A    Yes.

 2      Q    If you don't stop me and ask me to rephrase,

 3   would it be fair for me to assume that you understood

 4   my question and you're answering on that basis?

 5      A    Yes.

 6           MR. SERPE:  I'm going to hand you a copy

 7       of your report and ask the court reporter to

 8       mark it as Exhibit No. 1.

 9           (Exhibit 1 marked for identification.)

10      Q    (By Mr. Serpe)  Mr. Nolan, is that the one

11   and only report that you have authored in this matter?

12   Or stated another way, have you written anything else,

13   any other reports other than this one?

14      A    No.

15           MR. SERPE:  Let me also ask the court

16       reporter to mark Exhibit 2, your curriculum

17       vitae.

18           (Exhibit 2 marked for identification.)

19      Q    (By Mr. Serpe)  Is this your current

20   curriculum vitae?

21      A    Yes.

22      Q    Before digging into some of the substantive

23   opinions in your report, I'd like to ask you about your

24   experience with Chinese drywall in the past.

25           Will you give us a -- you mentioned in your

```
 1   background and qualifications section of your report

 2   some significant work with Chinese drywall in the past.

 3   Can you give us more details about that, the nature of

 4   your work, what you've done?

 5        A    Yes.  So just looking at the paragraph 3 on

 6   page 1 in my report, it gives an introduction that in

 7   2008 I was initially engaged by a group of investors

 8   who had purchased condominium buildings, entire

 9   buildings, with unsold units as an investment, and

10   their attorneys -- the investors were Cerberus Capital,

11   C-E-R-B-E-R-U-S, Cerberus Capital, a large private

12   equity fund, and their attorneys were Carlton Fields,

13   Cary Wright from Carlton Fields in Tampa.

14             And they retained me because they -- Cerberus

15   had purchased two towers in Aventura, Florida, the

16   Peninsula I and Peninsula II, which were, I think, 30

17   stories each.  And after the purchase, it had been

18   discovered that there was Chinese drywall in these

19   high-rises.

20             And so the attorneys needed some help

21   developing a protocol to remove the Chinese drywall and

22   also to help manage the residents who were in the

23   building -- or the buildings during the remediation.

24   And so I was engaged to do that, and I led that

25   engagement for several months, where I developed a
```

1    protocol, brought in the corrosion engineers, sent lab

2    samples -- or samples of drywall to the lab, determined

3    the content of the drywall in the building,

4    investigated how to go about remediating this since

5    there was no established protocol at the time, and

6    developed that protocol.

7            What was a couple of factors in this

8    particular project that weren't in the normal

9    residential house is in a high-rise you have a lot of

10   common utilities that run up through the building,

11   chase pipes and things, and getting access into those

12   chases was going to be really difficult.  That was a

13   complicating factor.

14           And then also the logistics of moving

15   residents in and out and moving things up and down

16   through an elevator without cross-contaminating the

17   building, et cetera.  And it was sort of an unknown

18   about Chinese drywall at the time of exactly what

19   needed to be done.

20           So I worked on that protocol with those

21   clients, came up with a construction cost estimate, a

22   remediation protocol, a project management plan, a work

23   plan, and the clients accepted that.  And then my role

24   came to an end when the client asked for insurance

25   coverage and it was denied.  And when the coverage was

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 35 of 224
Case 1:11-cv-22408-MGC Document 241 Entered on FLSD Docket 02/13/2015 Page 37 of
185
Confidential - Subject to Further Confidentiality Review

```
 1    denied, that's -- they didn't need my help anymore

 2    because it just came on how they're going to pay for

 3    it, and I think that ended the progress on the

 4    remediation.

 5             That was my first few months in dealing

 6    with -- I think there were maybe 400 units in those two

 7    towers, and then --

 8      Q      Forgive me, but did you say Cerbus,

 9    C-E-R-B-U-S?

10      A      C-E-R-B-E-R-U-S, Cerberus (pronunciation).

11      Q      Cerberus (pronunciation).  Thank you.

12      A      Right.

13             And then soon thereafter -- I have another

14    client in Birmingham, Drummond Company.  They're a

15    large residential developer.  They are a mining

16    company, and they reclaim their mines.  And when they

17    reclaim their mines, they build developments, golf

18    courses and cities and things, on these reclaimed

19    mines.

20             And they had discovered that they had Chinese

21    drywall in their really high-end homes in Birmingham

22    that they had developed.  So they asked me to come up

23    and do the same analysis up in Birmingham with their

24    lawyers.  And so I did, went through several of the

25    homes that they had built.  These were large custom
```

1    homes.  And they had Chinese drywall in them, and I

2    developed their remediation protocol and sort of a cost

3    estimate for what it would be.

4            And I gave that to them, and then they

5    proceeded to go ahead and remediate.  And since they

6    were a builder and they were building these houses

7    currently in the same neighborhood, they just used

8    their forces to go ahead and remove the Chinese

9    drywall, and that's how they did that.  So those were

10   several homes that I worked with with Drummond.

11           And then a year later or so, I was requested

12   to just be a consultant on some other Chinese drywall

13   matters where there weren't actually properties

14   involved.  It was more conceptual on how to go about

15   the protocol, and so I did that consulting too.

16   Q    Who's that with?

17           MR. BLOCK:  Actually, let me stop you

18        for a second, Richard.  I think there may be

19        a potential work product issue here.

20           And so if this is a matter, Ben, that

21        you didn't produce a report in litigation

22        for, I'm going to instruct him not to get

23        into this.  I think I know what it is and --

24           THE WITNESS:  That's correct, it was

25        just consulting.

Confidential - Subject to Further Confidentiality Review

```
1              MR. SERPE:  Can I know who it was for?

2        Q    (By Mr. Serpe)  Let me ask you -- I'll ask

3    the question.

4              MR. BLOCK:  Well, let -- if you give me

5         30 seconds with him, I think I can probably

6         clear it up.

7              MR. SERPE:  Sure.

8              MR. BLOCK:  Can we go off the record?

9              THE VIDEOGRAPHER:  We are now going off

10        the video record.  The time is currently 9:15

11        a.m.

12             (Off the record.)

13             THE VIDEOGRAPHER:  We are now back on

14        the video record.  The time is currently 9:16

15        a.m.

16        Q    (By Mr. Serpe)  Can you tell me who it was

17   you did the consulting work for?

18             MR. BLOCK:  And I'm just going to

19        interject here that we're going to assert a

20        work product objection.  I'll tell you that

21        the consulting was for Taishan.

22             MR. SERPE:  Okay.

23             MR. BLOCK:  And we can't get into it

24        other than that.

25        Q    (By Mr. Serpe)  The Birmingham
```

1    neighborhood -- I'm going to move sequentially

2    through -- what neighborhood in Birmingham?  Do you

3    remember any identifiers, name of the neighborhood, et

4    cetera?  What was the names of those places?

5         A    It's the one where Vulcan is, the -- on the

6    hill there.  It will come to me.

7         Q    Okay, if it comes to you, will you raise your

8    hand and say --

9         A    Yeah.

10        Q    Which reminds me, if at any time today you

11   realize that an answer you gave was incomplete or

12   inaccurate in any way, will you let me know and then we

13   can discuss that?

14        A    Yes.

15        Q    After the consulting work for Taishan, did

16   you have any additional involvement with respect to

17   Chinese drywall?

18        A    No.

19        Q    To your knowledge, did either of your -- or

20   any of your clients who you worked for prior to

21   consulting for Taishan and agreeing to serve as an

22   expert witness in this matter make claims against

23   Taishan in any litigation?

24        A    I don't know.

25        Q    Have you -- did you reach out to your -- the

1    firms with whom you had previously consulted to

2    determine whether there was any conflict in having

3    worked with them to design remediation protocols, et

4    cetera, and then work for potentially the company that

5    had supplied the drywall which had been installed in

6    their developments and buildings?

7              MR. BLOCK:  Objection, lack of

8         foundation.

9              THE WITNESS:  I don't recall.  That was

10        in 2009, and I was working at a different

11        consulting firm at the time.  I don't -- I

12        don't recall -- we typically do conflict

13        checks, but I don't remember the specifics.

14        Q    (By Mr. Serpe)  Do you know whether a

15   conflict check was done in this matter, before agreeing

16   to provide testimony for Taishan, with respect to the

17   plaintiffs in this litigation?

18        A    Yes.

19        Q    Was a list of all of the entities who have

20   brought claims against Taishan supplied to you so that

21   it could be run against your existing database of

22   clients that you have consulted with in the past?

23        A    No.

24        Q    So how was a conflict check done if you

25   didn't have a list of the people who were plaintiffs in

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 40 of 224
Case 11:11-cv-04049-WGY Document 244-1 entered on FLSD Docket 08/19/2019 Page 42 of
185
Confidential - Subject to Further Confidentiality Review

1    this case?

2        A    We have a standard conflict check process.

3    We were provided the parties to the litigation, and we

4    gave that to our conflict check department.  They ran

5    the conflict check, and it came back clear.

6            MR. BLOCK:  I'm going to -- sorry for

7            the late objection, but when you're saying

8            "these cases," are you talking about the 20

9            priority claimants in -- that we're currently

10           litigating, or do you mean all of the -- the

11           broader universe of plaintiffs in --

12           MR. SERPE:  Broader universe.

13           MR. BLOCK:  -- Florida or the litigation

14           generally?

15           MR. SERPE:  Yeah, broader universe of

16           plaintiffs.

17           MR. BLOCK:  Okay.  I'd have to know --

18           we've designated Ben as a testifying expert

19           in the 20 priority claimant cases, and his

20           report addresses eight of those claimants.

21           We haven't designated Ben as a testifying

22           expert in the balance of the litigation in

23           Florida or elsewhere.

24           MR. SERPE:  I understand that.  It may

25           be that there are former clients who would

```
 1          take a different position than you with

 2          respect to whether it's a conflict or not,

 3          and --

 4               MR. BLOCK:  Uh-huh.

 5               MR. SERPE:  -- I was just trying to

 6          determine whether anyone went through the

 7          total Amorin plaintiff list to determine

 8          whether any of those people are his former

 9          clients and --

10               MR. BLOCK:  Yeah, I just wanted the

11          record to be clear about Ben's role in

12          this -- in this litigation and how it relates

13          specifically to the 20 priority claimants

14          whose cases we're litigating now.

15               MR. SERPE:  Understood.

16               MR. BLOCK:  That's all.  I understand

17          where you're coming from.

18          Q    (By Mr. Serpe)  Would you tell me the

19     universe of materials that were provided to you to

20     consider?  So there's a couple of ways to tackle that.

21               Let's start with:  How was stuff provided to

22     you?  Was it done all in hard-copy paper, through

23     Dropbox or other file transfer links?  How did you

24     receive your materials that you reviewed in this case?

25          A    Electronically.
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 42 of 224
Case 1:11-cv-04401-MGC Document 41-1 Entered on FLSD Docket 04/24/2015 Page 44 of
Confidential - Subject to Further Confidentiality Review
185

```
1       Q    And, you know, as fantastically well

2  organized as my opposing counsel are, were there a

3  series of transmissions saying here's one, here's

4  another, or did you get everything all in one load and

5  nothing else has been delivered since then?

6       A    There were batches.

7       Q    And for the materials that were presented,

8  did -- did you create an index or other listing of

9  materials that were provided for your review?

10      A    Yes.

11      Q    And where is that list?

12      A    I believe it's Attachment 3 to my report.

13      Q    So Attachment 3 has, for example, some

14  exhibit numbers and they're -- some of them jump from 3

15  to 11 to 14 and so on.

16           Are those the ones that you're relying on for

17  your report as opposed to ones that were provided, or

18  were you literally only provided those numbered

19  exhibits, deposition exhibits, for example?

20      A    There would be other documents that I did not

21  rely on for some reason, so those are the former, which

22  are the ones I relied on.

23      Q    Uh-huh.

24      A    But we do have indexes of all the files that

25  we received.
```

1    Q    And so when these electronic transmissions

2    were received, were there other members of your team

3    that reviewed those transmissions and vetted them for

4    what was important versus not, or did you do all of

5    that work yourself?

6    A    I did most of the work on the initial reviews

7    when -- because I was the one making the document

8    requests, because when I would get a set of documents

9    in and I knew -- I knew what documents I was looking

10   for, and if there were documents that were not provided

11   to me, I would get a supplemental document request, and

12   the attorneys would then revert and send another batch

13   of documents in response to that.

14   Q    Uh-huh.

15   A    And then I would look through those to see if

16   it was what I wanted.  And the only other people that

17   supported me in this exercise were organizing the

18   documents, which is a task, you know, that there's a

19   lot of documents, so we have a method that we organize

20   our documents, and then the other was putting the

21   documents into the footnotes, right, so the ones that I

22   selected to go into the report.  But other than that,

23   it's my work.

24   Q    The -- when you say, "I know there were

25   documents I was looking for," what were those types or

```
 1    classes of documents that you were particularly

 2    interested in seeing here?

 3         A    Okay.  The initial indicia inspections, and

 4    there were often more than one that I found, and so I

 5    was looking for all of those.  I was looking for the

 6    proposals from builders for -- to do the remediation

 7    work for each property.  I was looking for the actual

 8    costs that the plaintiff incurred for the remediation

 9    work, if there -- if it had been remediated.

10         I was looking for the various inspections

11    that would have been done during the process and the

12    documentation and what -- to what extent the

13    remediation work had been documented by either

14    contractors or consultants, and that varied from file

15    to file, so I wanted to be thorough.

16         I looked for building permits for

17    remediation, the certificates of occupancy after that,

18    certificates of cleaning and clearing after the drywall

19    had been removed, certificates that the drywall that

20    had been replaced was nonreactive drywall.

21         Tax map information about the size of the

22    property.  Depositions, when they became available, and

23    the exhibits to the depositions.  Spreadsheets that are

24    from the plaintiff about the facts that the plaintiff

25    has in their spreadsheets.  The -- some of the judge's
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 45 of 224
Case 11:11-cv-04008-NGG Document 24-1 Filed Other Subject to 23,2015 Page 37 of 185
Confidential - Subject to Further Confidentiality Review

1    rulings in the other cases as a reference.

2           There might be some others, but that's a

3    fairly comprehensive list of the types of documents

4    that I was looking for.

5    Q    And those were made available for you on the

6    eight homes that are specifically identified in your

7    report?

8    A    There were initially more than eight, so I

9    have files, but at the end of the day, there were only

10   eight homes selected for me to include in the report.

11   Those are the ones that I either inspected or was asked

12   to review the file on, those eight.

13   Q    And how many more were -- how many more homes

14   were provided to you, materials for your review?

15   A    I think there were 20-something total.

16   Q    Uh-huh.  And how was the decision made to

17   include eight and not include 12?

18   A    My understanding is that these were

19   properties that the plaintiffs still owned and we could

20   have access to; or, in one case, the plaintiff had sold

21   the case -- sold the house, so I couldn't actually

22   inspect it.  It's the one that I couldn't inspect.  But

23   I believe the common denominator was the plaintiff

24   still owned the property.

25   Q    So tell me about the outlier.  Why was a case

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 46 of 224
Case 1:11-cv-00408-GJQ Doc #227-1 entered 04/04/12 23:19:15 Page 58 of 185
Confidential -- Subject to Further Confidentiality Review

1    selected when you couldn't get access to the home?

2        A    I don't know exactly.  I was just instructed

3    to include that case.

4        Q    And did you go through the same analytical

5    process for all 20 cases or only -- they gave you the

6    materials and then turned around and said, "But only

7    look at these eight"?

8        A    It's more the latter.  They gave me the

9    materials, and I gave a proposal to inspect all of

10   them.  And then some time went by, a few weeks, and I

11   was instructed, "You're not going to need to do all

12   those inspections; you're only going to need to do this

13   set of inspections."  And so I redid my plan to

14   schedule the inspections in each locality, and that's

15   what I did.

16       Q    So the -- but had the materials on all 20

17   already been provided and then subsequently the -- when

18   it became apparent that inspections were only available

19   on seven, that the number was dialed back on what they

20   wanted you to review from the 20 homes down to the

21   seven or eight homes?  Had you already had the

22   documents?

23       A    I had -- when I did the very first inspection

24   at Ms. Chatmon's house, the only document that I had,

25   that I recall having at that time, and I got it the

1   morning of the inspection, was their screening

2   inspection report, Chinese drywall screening report,

3   and so I was able to read that before I did the

4   inspection that morning.

5           And then I started getting more documents as

6   I started requesting them, because that's when I knew

7   what I would need.  And so once I got into it, I

8   started requesting more documents.  And I don't

9   remember when the number of inspections was limited,

10  but I did get an initial set of documents.

11          We have a file for each of the properties,

12  but -- but after that initial set of documents, I did

13  not request additional documents for any of those files

14  except for the eight.  So I focused my efforts on the

15  eight that I would be working on.

16      Q    Mr. Nolan, in addition to the information

17  about the homes, you mentioned also that there were --

18  see if I can work this.

19          (Discussion off the written record.)

20      Q    (By Mr. Serpe)  "Some of the judge's rulings

21  in the other cases that -- as a reference."

22          Let me ask you to expand upon that.  Did you

23  ask for those materials, or were those materials

24  provided?  What did you do with that stuff?

25      A    I asked for them.  I mean, over the years,

```
1     I've been generally interested in the progress of the

2     Chinese drywall matters, and because I had written some

3     protocols early on, when the first protocol came out, I

4     was interested to see what the judge had come up with,

5     and so I -- I was aware of that from years ago, and I

6     wanted to see that again, and I wanted anything else

7     that had come up in the meantime.  And so I requested

8     protocols and I got those, and so those are the

9     references I mainly wanted.

10         Q    So you received the one from years ago, 2010,

11    I think was the first one, but you also were provided

12    with a 2017 protocol from Judge Fallon in New Orleans

13    as well?

14         A    The other one, I believe, is 2012; the KPT

15    protocol is the one I'm referring to.  As far as a

16    2017, I'm not quite sure what you're referring to.  You

17    might have to give me some more information about

18    that --

19         Q    Okay.

20         A    -- see if I looked at that one.

21         Q    So if you look at your report, on page 1 --

22         A    Uh-huh.

23         Q    -- in the third paragraph that we're talking

24    about, there is a -- the last line talks about a

25    "Findings of Fact and Conclusions of Law.  It's got
```

```
 1    an -- "MDL Rec. 20741."  Do you see that line in your

 2    report?

 3        A    Yes.

 4        Q    If I represent to you that that document was

 5    released on April the 21st of 2017, would that -- would

 6    you have any reason to doubt that?

 7        A    No.

 8        Q    Okay.

 9        A    No.

10        Q    Other than the two references that you

11    specifically identified there, any other judicial

12    rulings or judicial reasons/findings that you were

13    provided with?

14        A    Yes.  There's probably six or so documents

15    that are in my file --

16        Q    Uh-huh.

17        A    -- that are the judges' rulings.

18        Q    And did you rely on those in formulating your

19    opinions?

20        A    No.

21        Q    Were you provided anything from Judge Cooke,

22    who is the federal judge overseeing the Florida federal

23    court cases that we're here about today?

24        A    If I was, I'm not aware of who signed it.  I

25    didn't pay very close attention to that, but I might
```

1   have been.

2       Q    Do you recall seeing an order from last year,

3   something that recent?

4       A    I'm not familiar with the dates on the

5   documents.  I would -- if I saw the document you're

6   referring to, I could tell you if I saw it or not.

7       Q    Mr. Nolan, on page 1, in the final paragraph

8   under "Background and Qualifications," you list your

9   mission or assignment with respect to this case,

10  beginning "In this assignment," about three lines into

11  the paragraph.  Do you see that?

12      A    Yes.

13      Q    Do you consider the sentence still to be an

14  accurate statement of what your assignment was, or has

15  it expanded in any way since the time you wrote the

16  report?

17      A    It's accurate.

18      Q    And let me kind of go through in sequence

19  your tasks here.  First is to inspect the current

20  condition of the plaintiff residences.  Tell me what

21  your method was for inspecting the residences.

22      A    It was -- there was two methods.  The first,

23  with Chatmon, was I scheduled the inspection and met

24  Pete Albanis there and some other attorneys on our side

25  and Ms. Chatmon and went into the property.  And I

```
 1   wanted at first to do the indicia inspection to see --

 2   since this property had not been remediated, to confirm

 3   what was in her indicia report that I was provided that

 4   morning.  And so I went into the kitchen area and the

 5   foyer and removed a light switch to see the exposed

 6   copper wire and took pictures of that.

 7           And then I went under the stairs and took

 8   pictures in the existing openings in the drywall where

 9   samples had been taken apparently by other people

10   and -- to try to inspect the back side of the drywall.

11   And with the camera that I had, I could not see the

12   back side of it.

13           I took a -- I cut a sample of drywall off the

14   common wall between the closet and the toilet room

15   there and exposed some names on the back of the drywall

16   and took pictures of that and labeled that sample that

17   I took, numbered it and labeled it, and had the

18   attorney that was with me assisting, him sign that

19   piece of drywall, and we bagged it up.  I brought bags

20   for the samples that I had planned on harvesting.

21           Then we went into the back part of the house

22   and took some more pictures.  I inspected the bathroom

23   fixtures for pitting and corrosion.  I tried to smell

24   for the presence of sulfur odor.  And then we went

25   upstairs, and I took -- I opened the coils in the
```

```
 1   air-conditioning and inspected the coils and took

 2   photographs of the coils and replaced that.

 3              Then I went in the bathrooms upstairs and

 4   looked for pitting, both the hallway bathroom and the

 5   master bath in the back.  I went in the front bedroom

 6   and removed an electrical outlet to inspect for tarnish

 7   on the wiring and photographed that.  I went in the

 8   closet that -- in that bedroom that adjoins the

 9   air-conditioning closet and took a sample from that

10   area, labeled it, bagged it, had the attorney sign the

11   back as a witness.

12              I went in the back bedroom and went in the

13   closet and took a sample and looked inside of the walls

14   for writing or the identification of the drywall.  I

15   removed an electric plug in that bedroom, inspecting

16   the wiring.  I looked in that bathroom.

17              And then I went in the hallway at the top of

18   the stairs and removed a sample on what I call the

19   banker's wall, there's a low wall, and found writing

20   and I took a picture of that, I took samples.

21              I did not go in the attic because I didn't

22   have a ladder to get up in the attic, which is another

23   place that I would typically want to look because you

24   can see the back side of the drywall.

25              I replaced everything, bagged up the samples,
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 53 of 224
Case 2:14-cv-06009-EEF-MBN Document 22380-34 Filed 12/03/19 Page 45 of 185

Confidential - Subject to Further Confidentiality Review
185

1    and that was -- the inspection was over.  We left.

2         Q    Since we spent some time on Chatmon, I think

3    what I'll do is just run with Chatmon for a while and

4    then circle back to some of the mission-driven stuff so

5    you'll understand where I'm heading now.  Let's just

6    knock out some stuff on Chatmon.

7              How many samples did you take from the

8    Chatmon home?

9         A    I believe it was seven.

10        Q    And your report doesn't provide an index of

11   those samples.  Do you have an index of them?

12        A    I believe we do.  I have the samples in

13   storage in my office.

14        Q    The -- has anything been done with the

15   samples?  Has anything been tested or checked?

16        A    No.

17        Q    So as we're sitting here today, you know, a

18   precise number of samples, whether it's seven or maybe

19   one or two less, I mean, you don't have a very clear

20   recollection about the number of samples that you took?

21        A    No, I think seven.

22        Q    Seven?

23        A    I think so.

24        Q    And did you take any steps to have those

25   materials tested, prepare a cost estimate or an invoice

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 54 of 224
Case 1:11-cv-01077-MBN Document 144-1 Filed 04/25/2013 Page 46 of 185
Confidential — Subject to Further Confidentiality Review

1    or analyze what it would cost to have those samples

2    checked?

3        A    Not yet.

4        Q    Of the seven samples, how many of them were

5    drywall versus some other type of media?

6        A    They're all drywall.

7        Q    Now, on the basis of that inspection, what

8    conclusions did you draw regarding the specific issues

9    that you were assigned to investigate on the Chatmon

10   home?

11       A    They're -- my conclusions are listed in the

12   Chatmon section of my report on page 2 and 3.

13       Q    And will you walk me through them?

14       A    Actually, it's not those pages.  I'm sorry.

15       Q    Six and seven?

16       A    Sorry.  Put my glasses on.

17            Yes, 6 and 7.

18            (Discussion off the written record.)

19       Q    (By Mr. Serpe)  Mr. Nolan, in the first

20   paragraph, you talk about, as part of your inspection,

21   three lines from the bottom, sir, "I did not observe

22   indicia of reactive drywall in other areas of the

23   house."  Would you explain what you mean by that?

24       A    Yes.  The typical indicia is the tarnished

25   electrical cover wiring exposed, the copper coils in

Confidential - Subject to Further Confidentiality Review

185

```
 1    the air-conditioning, the smell of sulfur, and the

 2    pitting of the faucets and fixtures and appliances.

 3              I did observe the indicia in the entry area

 4    by the kitchen, and I observed the indicia at the top

 5    of the stairs, and I observed -- on the copper coils,

 6    they were slightly tarnished.  "Faintly" is the word I

 7    used.  In the bedrooms, I did not observe indicia.  And

 8    in the bathrooms, I didn't see indicia.

 9         Q    And by "indicia," we're -- let me make sure I

10    understand you.  We're talking about the visible

11    corrosion on copper surfaces?

12         A    Well, there were four things.

13         Q    Okay.

14         A    Visible corrosion on copper surfaces,

15    including the coils and the electrical wiring --

16         Q    Uh-huh.

17         A    -- the smell, okay, and then the pitting on

18    silver and the chrome faucets and showerheads and

19    things like that.  So it's more than just copper.

20         Q    More than the copper.  Smell, pitting, and

21    the coils, but that's copper in the coils as well,

22    right?

23         A    Well, the pitting in the -- on the faucets

24    and sinks that you typically see and on the shutoff

25    valves and things like that that aren't copper.
```

1    Q    So would it be a fair statement that you

2    believe that the house has got some Chinese drywall and

3    some non-Chinese drywall?

4    A    Yes.

5    Q    And on the basis of that, in the second

6    paragraph, it was your analysis that, "It may be that

7    approximately one-third to less than half of the

8    drywall is reactive and merits remediation."

9         How did you arrive at that conclusion?

10   A    Based on the evidence that I detected at the

11   house when I was there.

12   Q    And on the basis of that, what remediation is

13   merited with respect to this house?

14        MR. BLOCK:  Objection.  Assumes facts

15        not in evidence because I believe the house

16        has been remediated at this point.

17   Q    (By Mr. Serpe)  The -- so at the time you

18   inspected this house, had it not been remediated?

19   A    That's correct.

20   Q    So my question is:  When you made the

21   statement, "It may be that approximately one-third to

22   less than half of the drywall is reactive and merits

23   remediation," what do you believe, at the time you

24   wrote this report, merited remediation in the house?

25   A    Well, it's generally been my advice and

1    opinions to remediate all the drywall.  I was simply

2    indicating that from the evidence available from my

3    inspection at that point in time, it appeared that

4    there was reactive drywall in one section of the house.

5    And that merited definitely "needs to come out," and

6    then the rest of the drywall would come out also, is

7    under -- is generally my advice.

8        Q    You say generally your advice.  Is it

9    sometimes your advice not to remove all drywall in a

10    mixed home, Chinese reactive and nonreactive drywall?

11        A    I -- I've been asked whether it's a good idea

12    to only remediate a part of the drywall or not, and

13    I've advised, for purposes to achieve the cleanliness

14    test, to go ahead and remove all the drywall.

15        I could imagine a scenario or have a

16    hypothetical where there might be a section of a

17    property that would not need it that had been somehow

18    proven by lab not to be contaminated, but I believe

19    that you need to clean the drywall out of the house,

20    and it's too difficult to identify all the Chinese

21    drywall without simply removing it all.

22        Q    So in that last sentence of the second

23    paragraph, when you say that approximately a third to

24    less than half of the drywall is reactive and merits

25    remediation, you're not suggesting that the rest of the

1  drywall in the home should not be removed and also

2  replaced?

3      A    I'm not making that suggestion one way or the

4  other.  Based on this, it's just a factual statement of

5  my opinion that this is what I found, and the facts say

6  this appears to be, you know, Chinese drywall.

7          I believe it would be up to Ms. Chatmon to

8  make the call on how much of the house she wanted to be

9  remediated or not.  She didn't ask me, and I didn't

10  advise on that.

11      Q    So -- but, really, it's just focusing on the

12  last two words, "merits remediation."

13          What are the criteria that you would use for

14  the determination of whether drywall in a home merits

15  remediation or does not merit remediation?

16      A    Just -- well, there's -- it depends.  If you

17  pass the indicia test where you've got three of

18  the four indicia, and then the protocol instructs to

19  come back and actually take the samples, like I took,

20  drywall samples, and to do the coupon testing and

21  corrosion testing to prove that there's Chinese

22  drywall, I would -- I would suggest those tests be

23  done.

24          And in a typical home, like just a typical

25  average house, I believe the recommendation would

Confidential – Subject to Further Confidentiality Review

```
 1    likely be to remediate back to the studs in the walls,

 2    like was generally done here.  It would be very

 3    straightforward.  If there were some evidence that

 4    indicated not to do that, I would -- I would consider

 5    that.

 6         Q    Your report mentions that you reviewed the

 7    Chatmon remediation contract?

 8         A    Yes.

 9         Q    And what was involved in your review?  What

10    were you looking for when you studied the remediation

11    contract for the home?

12         A    What it said.

13         Q    And what were you looking for to determine --

14    other than what the bottom-line number was, were you

15    looking at anything else as part of the proposal?

16         A    I looked at the whole thing.

17         Q    And what was -- what were the issues that you

18    were specifically looking for?

19         A    Whatever was in the contract.

20         Q    And did you have any -- did you conduct an

21    analysis with respect to whether you considered that

22    that contract, what it called for, would do an adequate

23    remediation or that, you know, some objective would be

24    achieved if the listing of that contract had actually

25    been done?  Did you look for adequacy of the Chatmon
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 60 of 224
Case 1:11-cv-01100-CB-M Document 244-1 Entered on FLSD Docket 11/09/2015 Page 52 of
185
Confidential - Subject to Further Confidentiality Review

1    contract, or did you just look at the number?

2        A    I read the whole contract.  And if my memory

3    is correct, the contractor was to remove all the

4    Chinese drywall and to replace the finishes in the home

5    again, and that would have been a complete remediation.

6        Q    So let's just assume hypothetically that the

7    contract said remove all drywall, replace all drywall

8    and finishes, would you explain what you mean by

9    restoring finishes or replacing finishes?

10       A    So in the Chatmon house, it had some tile

11   floor in the kitchen and maybe linoleum or something in

12   the bathroom.  The other was carpet throughout the

13   house.  And then typical drywall, walls and ceilings.

14           The -- so the scope of work for Chatmon would

15   be to remove the carpet, remove the drywall, the trim,

16   you know, the baseboards and things, to remove the

17   insulation, to remove the electrical wiring, to remove

18   the copper piping, to remove the appliances if they

19   were tarnished and failing, to switch out the

20   air-conditioning system and the ductwork.

21           And when all of that was done, the only thing

22   left inside the structure would be the perimeter walls,

23   windows and block walls, and the framing, the wood or

24   metal framing, for the building.  And then the building

25   would be cleaned.  And then everything that had been

1    removed would be put back, the wiring, the plumbing,

2    the insulation, the light -- I mean the low-voltage

3    wiring, the fire alarm system, et cetera, the

4    air-conditioners and ductwork, the light fixtures.  All

5    of that would go in, and then the insulation and the

6    drywall would go in, the trims would go back in, and

7    then be repainted and carpeted, and so it would be

8    restored to a like-kind condition.

9          In Ms. Chatmon's contract, if I remember

10   correctly, there were three additional items that

11   were -- appeared optional, and I think they totaled

12   $21,000, and that was a countertop and some tile.  I

13   can't remember the third.  Seemed like there were three

14   items that totaled $21,000 that were separate from the

15   basic remediation scope of work.

16         So that -- when I read that and it appeared

17   that that was what the contractor was going to do, that

18   seemed to be a full remediation scope to me.

19   Q    Now, that scope -- and when you say it seemed

20   to be a full remediation scope to you, did you utilize

21   any sort of a checklist or grading document to make

22   sure that various things were done, or were you reading

23   it over and getting a sense that it seemed to be a full

24   remediation to you?

25   A    Well, the most comprehensive protocol that I

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 62 of 224
Case 2:14-cv-02494-EEF-MBN Document 241 Filed 04/12/19 Page 62 of 224
Confidential – Subject to Further Confidentiality Review
185

1    refer to is the KPT format protocol, and so that is a

2    checklist and it's a step-by-step checklist.  And when

3    I evaluated these properties, I had that checklist as a

4    guide to look for documents that would prove that each

5    step of that protocol was done or not.

6            And then if it -- whether or not it was done,

7    was -- was the goal of the remediation achieved,

8    whether -- if they didn't follow all the steps, did

9    they still achieve a full remediation.  And in Chatmon,

10   it hadn't been done yet, so I don't know for sure, you

11   know, what they actually did, but it appeared the

12   contractor had a scope of work that, if he followed

13   that scope of work, it would achieve a full

14   remediation.

15       Q    So a couple of questions.  First, when you

16   say "the goal of remediation would be achieved," what

17   is the goal?

18       A    To remove the evidence of Chinese drywall.

19       Q    And is there anything other than your

20   professional judgment that you're relying on to

21   determine on a house-by-house basis whether or not the

22   evidence of Chinese drywall had been removed?

23       A    The documents in the record, I have to assume

24   they're factual.  And there -- in some of the files,

25   not Chatmon, there was evidence of in-construction

1    demolition work.  There were photographs.  There was

2    documentation, in some instances, of every sheet of

3    drywall that came out, and they had it identified

4    "drywall," et cetera.

5           So it was more of a factual conclusion and

6    not an opinion, necessarily.  I wasn't there, so I

7    can't tell you firsthand that they, in fact, did

8    everything they said they did, but it appeared that

9    they did a sufficient job to completely remediate the

10   house before they started closing up the walls.

11   Q    Let me circle back to a second part of your

12   answer where you talk about the KPT protocol.

13          Is the KPT protocol the document that you use

14   as the gold standard to determine whether or not

15   various aspects of remediation have or have not been

16   accomplished?

17   A    I've never called it a gold standard.  I

18   think it's thorough and it's comprehensive.

19   Q    And do you see it more as a guideline or

20   guidance document as opposed to a gold standard on

21   achieving a remediation?

22   A    My understanding, the judge issued it, and

23   therefore that's the way it was supposed to be done.

24   Q    Uh-huh.  And when you're talking about the

25   KPT protocol, are you, in your mind, referring to the

```
 1   first of the two documents that you listed on page 1 of

 2   your report?

 3        A    Probably.

 4        Q    Will you look at that reference there and...

 5        A    It could be.  I don't think that it's --

 6   that's Germano.  No, um -- I'd have to look at it.  I

 7   refer to it as the KPT protocol.  It might have been

 8   from the Knauf trials, and maybe it's Germano.  That

 9   could be it.

10        Q    And in the Germano document, which you listed

11   and have told us that you reviewed and relied on, Judge

12   Fallon, in fact, has a list of steps that must be done

13   in his opinion, judicial opinion, to achieve a full

14   remediation.  You're aware of that?

15        A    Yes.

16        Q    You reviewed that?

17        A    Yes.

18        Q    Did you prepare any sort of a checklist or

19   excerpt of the steps that Judge Fallon mandated as part

20   of a full remediation and then go through each of these

21   contracts to determine where there was variance or not

22   variance from Judge Fallon's protocol for remediating a

23   home?

24        A    I did have my checklist.  It's a -- in my

25   mind, because I have read the document and I know
```

1    generally the steps that I was looking for, which is

2    also what helped guide me to ask for additional

3    documentation once I started receiving the plaintiff

4    individual files.

5            I did not prepare a work product, like a

6    matrix, that said here's what the judge said and here's

7    what I found at each house, did they comply or not.

8    No, I did not do that matrix.

9        Q    And are you aware of any variances whatsoever

10   for the Chatmon quote, remediation quote, that were

11   different or, frankly, less intensive a remediation

12   than what Judge Fallon had ruled as part of the Germano

13   protocol, the findings of fact and conclusions of law

14   document that's referred to in your report?

15       A    Yes.

16       Q    And what were those variances where -- things

17   that were not done that had been mandated by Judge

18   Fallon?

19       A    The -- and I'm talking about the KPT

20   protocol, and I assume that's what you're talking about

21   with Judge Fallon.

22       Q    Well, I don't know what the -- what the KPT

23   protocol is.  If you've got a copy with you, I'm happy

24   to look at it.  The document that I'm referring to is

25   the one that's specifically listed in your expert

```
 1    report --
 2         A     Uh-huh.
 3         Q     -- that does, in fact, have a protocol.  If
 4    there's another document, I'm happy to look at it, and
 5    we can take a break and pull it up or --
 6         A     Fair enough.
 7               MR. BLOCK:  It should be in the
 8         materials that we produced to you-all with
 9         the -- with the report a couple -- on 3/21.
10               MR. SERPE:  The -- okay, so let's do
11         this.  On the next break coming up at
12         10:30 --
13               MR. BLOCK:  Yeah.
14               MR. SERPE:  -- we will pull that up and
15         see if we have additional questions.
16         Q     (By Mr. Serpe)  But let me ask you a very
17    precise question, then.  Are you aware of any variances
18    whatsoever for the Chatmon remediation quote, which you
19    reviewed, that would result in a less intensive
20    remediation than what Judge Fallon set forth in his
21    rulings in the Germano protocol, which are specifically
22    referenced on page 1 of your report?
23         A     No.
24         Q     As we're looking at this report, there are
25    some additional homes that have also been remediated, I
```

```
 1    guess eight in number, or six that were remediated and

 2    two with prospective.

 3              With respect to any of those eight homes, are

 4    you aware of any variance from the remediations that

 5    were either actually done or, like Chatmon, are spec'd

 6    to be done that are less intensive than the remediation

 7    protocol ruled on by Judge Fallon in the Germano

 8    document, which is referenced on page 1 of your report?

 9         A    That's a -- not the same question as before,

10    and the difference in the two questions is the word

11    "result."  And when you asked the first question, did

12    the remediation intensity or vary achieve the result,

13    right, did any variances cause it -- the word "result"

14    was in your question.  And my answer was I found that

15    none of the variances caused it not to achieve the

16    result.

17              So I believe the protocol that was followed

18    with the variances did achieve a full remediation.

19    That's the result that I'm referring to.  That's why I

20    answered no.

21              And it would be a different answer to your

22    second question because the word "result" isn't in

23    there yet.

24              (Discussion off the written record.)

25         Q    (By Mr. Serpe)  Let me see if I can break
```

1    down your last answer into two sections.

2         First, taking the word "result" out, are you

3    aware of any variance -- for any of the eight homes in

4    your report where the remediation that was either

5    actually accomplished or is to be accomplished under

6    the contracts you were provided, varied in any respect

7    from the level of intensity specified by Judge Fallon

8    in the Germano rulings, which are identified in your

9    report?

10   A    No.

11   Q    Second question:  When you say that the word

12   "result" was important to you in the initial question,

13   help me understand what you mean when you say that as

14   long as the results were the same, then it's still a

15   good remediation.  That's an imprecise question, but is

16   that where you were going with that, something like

17   that?

18   A    The -- there are two protocols, I believe,

19   that we're talking about here.  One is more of a

20   summary protocol that says in general, you know, these

21   are the things you must do, and that is remove the

22   drywall and the carpet and the appliances that have

23   silver, and it's straightforward in what is to be done.

24   And it only includes one test, and that's the cleaning

25   test after the drywall has been removed and the house

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 69 of 224
Case 2:14-cv-04640-EEF-MBN Document 44-1 Entered on FLSD Docket 11/18/19 Page 51 of
185
Confidential - Subject to Further Confidentiality Review

 1    has been cleaned and HEPA-vac'd and wiped down and

 2    dried out, that a CIH comes in and gives a certificate

 3    that it's clean.  That's included in both protocols.

 4         Q    This summary protocol that we're talking

 5    about -- I don't mean to --

 6         A    I think it's the Germano protocol you're

 7    talking about, and I'm referring to the KPT, which

 8    is --

 9         Q    And that's the other one?

10         A    Yes.  Very -- it's a very detailed

11    step-by-step protocol, the gold standard that you

12    referred to.  Okay?  It's very comprehensive.  Okay?

13         Q    So I want to make sure we're not

14    misunderstanding each other.  I never suggested, and if

15    I did, you misunderstood me, that some other document,

16    other than the document referenced in your report, is a

17    gold standard.  So if you understood me to say that,

18    let's erase that.

19         A    That's fine.

20         Q    To the extent you're referring to two

21    protocols, one is a summary protocol and one is a

22    highly detailed protocol, can you give me any

23    information where I could actually lay hands on them,

24    or what would I be looking for to find the summary

25    versus the more detailed protocol?  Any other names,

Case 2:09-cm-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 70 of 224
Case 2:16-cv-08492-L Document 244-1 Integrated Dispositions/21/19 Page 52 of
Confidential – Subject to Further Confidentiality Review
185

 1    dates, judges, places?  Where would I look to find

 2    these two protocols?

 3         A     In my file.

 4         Q     And as we're sitting here, can you tell me

 5    anything, without having to take a break and look at

 6    the file, where I could look right now to find these

 7    two protocols, the summary versus the intensive one?

 8         A     I find it by just looking for the date, which

 9    is in 2012, and it says KPT on there, is the first

10    initials in the file name.

11         Q     And that's the longer one?

12         A     Uh-huh, yes.

13         Q     2012 KPT?

14         A     I believe so, yeah.

15         Q     Okay.

16         A     Uh-huh.

17         Q     And then the other one, how do you look for

18    that one?

19         A     I believe it's one of these documents that's

20    referenced in my report.  So we can get them and put

21    them side by side, and I can show you exactly what I'm

22    talking about.

23         Q     And as between the two, you consider the 2012

24    KPT document to be the more relevant one that you use

25    as part of your analysis in the case?

```
 1       A    I didn't make a judgment if there's -- more

 2   relevant or not.  I'm aware of both, and as an engineer

 3   and reading the more detailed protocol, that's

 4   consistent with the protocols that I developed when I

 5   first got into this that I referred to.  It was a more

 6   detailed protocol.

 7            And in the houses that I inspected, under

 8   either protocol, it appears that the houses were

 9   cleaned, which is the result, you want a clean house,

10   before you put back, okay, the finishes.

11            In some of the files, there's no certificate

12   that it was cleaned.  That was required under the

13   protocol.  The drywall was put back; the wiring was put

14   back.  I went in the house.  It's been remediated.  If

15   the certificate is missing, I can't 100 percent verify

16   that someone certified that, which is one of the steps,

17   but I just have to assume that at some point an

18   inspector came by, someone came by and said it's okay

19   to close the wall.  I don't know.

20       Q    Which of these homes didn't have the

21   certificate?

22       A    We'd have to look at each of the files.  I

23   don't have it in my memory, but I did note that there

24   were not only missing certificates, but also incorrect

25   certificates.
```

1    Q    What would make a certificate incorrect?

2    A    So in Nguyen, the contractor who actually did

3    the work signed the verification certificate, and it

4    doesn't work that way.  What the certificate requires

5    is that the contractor give a certificate that he has

6    performed the work, right, and then an independent

7    engineer comes and verifies the certification.

8         In this case, on each of those certificates,

9    the contractor signed as if he were the engineer, and

10   that was not the intent of that certificate.

11   Q    It's kind of leaving the fox guarding the hen

12   house, then?

13   A    That's a good example or a good statement,

14   description of it.

15   Q    A minute ago, you emphasized that the house

16   was cleaned, that we got all the drywall out, wiped

17   out, whatever, and that house was clean.

18        Is that what you consider to be, really, the

19   ultimate objective that we're looking for as part of a

20   remediation?

21   A    Well, if you have gotten through the

22   predecessor steps, you've done your indicia report, you

23   have come to the conclusion that there's Chinese

24   drywall, then the result of the remediation would be to

25   remove all Chinese drywall, clean the house of all

```
 1    evidence of former Chinese drywall, and then rebuild

 2    the house.

 3             So I believe whether it's the ultimate goal,

 4    that -- that has to happen to make sure the house is

 5    clean before you put -- but I -- and I looked for that

 6    in each house.

 7       Q    Let me give you an example.  Let me ask you

 8    to assume that one of the judicial statements requires

 9    that all the lighting fixtures in the house be replaced

10    and that all the kitchen cabinets in the house need to

11    be replaced, not removed and reinstalled.

12             To the extent that a homeowner faced with a

13    remediation couldn't afford new cabinets and just

14    reused the cabinets that were there, despite the wear

15    and tear of the removal and reinstallation process,

16    would you still consider that remediation to have been

17    a full remediation because the objective of the

18    remediation program was met?

19             MR. BLOCK:  Object to the

20       characterization of the orders, which speak

21       for themselves.

22             MR. SERPE:  Okay.  Thank you.

23             MR. BLOCK:  And that's a hypothetical.

24             THE WITNESS:  Okay, so this is a

25       hypothetical, and the requirement in the
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 74 of 224
Case 1:16-cv-06784 Document 44-1 Confidential Confidentiality Review Page 16 of
185
Confidential – Subject to Further Confidentiality Review

1    order is to remove the cabinets because

2    there's drywall behind the cabinets, and it

3    assumes that the cabinets will be damaged in

4    the removal, and therefore it's more

5    efficient to simply demolish the cabinets and

6    replace them with new.  The predicate is that

7    there's drywall behind the cabinets.

8        In some of the houses, there's no

9    drywall behind the cabinets, and so those

10   cabinets were not removed.  There's no damage

11   to the cabinets themselves from the removal

12   process.  They were just left in place.

13       So the only reason that you would remove

14   them is to access the drywall behind them,

15   and where there's -- when that's not the

16   case, like in an island, you didn't have to

17   remove the cabinets.

18       So in that case, would it be a complete

19   remediation?  Yes, it would be a complete

20   remediation.  Did they remove the cabinets

21   and replace them?  No.  But is it a complete

22   remediation?  Yes.  Why?  Because in that

23   particular house, they did not have to remove

24   the cabinets.

25       Q    (By Mr. Serpe)  In a home where they did have

1    to remove the cabinets to get to the drywall behind --

2    I'm asking you again to assume that the protocol says

3    put new cabinets in -- if the family for whatever

4    reason decided to reuse those cabinets, would you

5    consider that nonetheless a full remediation because

6    the house was cleaned and the objectives, in your

7    opinion, of the remediation program had been followed?

8         A    If the family in your hypothetical could not

9    afford new cabinets, but they wanted to remove the

10   drywall, one, that means the cabinets themselves were

11   not contaminated, because they're going to reuse them

12   and they're not causing any harm or damage, right, and

13   that they were able to be removed and stored and then

14   replaced.  That would be what they would do if they

15   couldn't afford to do that.  Or if they like their

16   cabinets and they wanted those cabinets replaced.

17        And not a hypothetical is one of the houses,

18   that's exactly what they did; they saved some of the

19   cabinets and replaced them because they were custom and

20   they liked them, okay, and they removed them and stored

21   them and put them back.

22        So, you know, it would be unfortunate if the

23   cabinets were damaged removing them, and the family

24   couldn't afford to replace them, and then somehow they

25   had to get cabinets.  I mean, that would be a conundrum

1   that they would be in not to be able to put cabinets

2   back if they couldn't afford them.  So they have to be

3   very careful that -- in that decision, to try to

4   reinstall those cabinets, because likely you're going

5   to damage them in removing them.

6        Q    And so my question -- circling back to my

7   question, if, in what you just mentioned, the family

8   couldn't afford it, some damage was done, but they're

9   reinstalled for economic reasons, from your standpoint,

10  as an expert witness in this case, would you

11  nonetheless say that's still a full remediation because

12  the objective of a remediation program was achieved,

13  that the drywall was removed, the house was cleaned,

14  there's no more contamination, it's just unfortunate

15  that the cabinets were not restored to their

16  pre-drywall state?

17       A    I think the protocol is pretty clear that you

18  can replace your cabinets.  And so if the cabinets do

19  need to be replaced, when they can afford it, then they

20  should probably get cabinets.

21       Q    And as you were going through this report,

22  did you make any effort to determine whether or not

23  there was adherence or not adherence to the specific

24  requirements on scope of remediation as ordered by

25  Judge Fallon in the document on page 1 of your report?

1      A      Yes.

2      Q      And what was your conclusions?

3      A      Well, I mentioned one, that I was looking for

4  the clearance certifications, and I couldn't find them

5  in every case.

6          In some cases, there was extensive

7  documentation, so I was -- had to -- I noted that in my

8  analysis.  I didn't write it in my report, but I just

9  assumed that at some point the house was satisfied, as

10  far as being clean, and they restored the house.  So --

11  but I did evaluate that in each -- in each property.

12      Q      You mentioned earlier, with respect to

13  appliances, that one of the steps that you go through

14  is to determine if the appliances were tarnished and

15  failing, and then they would have to be replaced.  Do

16  you recall statement?

17      A      Generally, yes.

18      Q      And how does one go about inspecting an

19  appliance to determine whether it is tarnished and/or

20  failing and needs to be replaced?  What -- how did your

21  system work to do that, achieve that?

22      A      So generally, in the record, there's either

23  testimony or bills that appliances have been replaced,

24  that something failed and they had to get new ones, or

25  in the construction contract, there's allowances for

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 78 of 224
Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 79 of 224
Confidential - Subject to Further Confidentiality Review
185

1    new appliances, several thousand dollars for new

2    appliances.

3              In the event of an inspection where you have

4    access to the appliances, you would look for the

5    brazing in the silver, brazing because the silver

6    sulfide would be similar -- black tarnish.  Or in

7    interviewing the plaintiff, you know, "Have you had any

8    failures to your microwave," for example, and you hear,

9    "Yes, I've had problems with this, and this device quit

10   working."

11             So there's lots of -- a few areas of getting

12   evidence to see if they are not working or if the

13   silver connections are tarnished.

14   Q    So in a home that you were inspecting for

15   determining the scope of a remediation, if you looked

16   at the microwave and the refrigerator and you saw no

17   evidence whatsoever of any silver or copper tarnish,

18   the homeowner said they're working fine, the house has

19   got Chinese drywall and passed the test, three tests or

20   whatever, you were satisfied that there was Chinese

21   drywall in the house, would you consider it acceptable

22   to reuse an appliance that showed no evidence, in your

23   opinion, of visible corrosion and had no problems with

24   failure?

25   A    Let me make sure I understand your question.

```
 1    You're referring to two houses that have not been

 2    remediated, correct?

 3        Q    No.  I'm sorry.  That must have been a bad

 4    hypothetical.  I thought I was talking about one single

 5    house.

 6        A    Are you talking about a house that I

 7    inspected or just hypothetical?

 8        Q    A hypothetical house --

 9        A    Okay.

10        Q    -- all right?  Great.  So chalkboard

11    hypothetical house --

12        A    Okay.

13        Q    -- you've satisfied yourself that the indicia

14    of Chinese drywall is in the house --

15        A    Okay.

16        Q    -- you go into the house to inspect, you go

17    in the kitchen, you look at the refrigerator and you

18    look at the microwave, there's -- you can see no

19    evidence whatsoever of tarnish on any copper element or

20    silver element in the appliances, in those two

21    appliances.  The homeowner is there.  You ask them,

22    "Are these working okay?  Have you had any trouble?"

23    And they said, "They're working fine."

24            In your professional opinion or protocol for

25    considering the appropriate scope of remediation, is it
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 80 of 224
Case 2:14-cv-02722-EEF-MBN Document 24-1 Filed 04/21/17 Page 80 of
185
Confidential - Subject to Further Confidentiality Review

```
 1    acceptable to reuse those appliances?

 2         A    Well, it's two separate standards.  One is

 3    what the judge has allowed.  He's allowed for replacing

 4    the appliances, and I would allow that, you know, in an

 5    estimate for the appliances, a few thousand dollars for

 6    a refrigerator and a microwave or dishwasher, the kind

 7    of things that are in the kitchen.

 8             If the homeowner chose that -- they thought

 9    there was a more longer, useful life, that would be up

10    to them, but I would advise them that this tarnish,

11    there would be some corrosion scientists who would say

12    causes a lot of resistance in the electrical

13    conductivity of the panel boards, and that's a

14    potential fire hazard.

15             And so from a life safety standpoint, which

16    is one of my key emphases as an engineer, I would

17    caution them that it's a potential fire hazard.  So I

18    would not necessarily support the idea of reusing

19    appliances that had been electrically exposed in a

20    Chinese drywall environment.

21         Q    Would the same go for you with respect to

22    electrical switches and outlets, smoke alarms, those --

23    that sort of equipment that had been exposed?

24         A    If that's part of the protocol, I would agree

25    with that.
```

Confidential - Subject to Further Confidentiality Review

```
 1              MR. SERPE:  We're going to take a break

 2        at 10:30 as we discussed before.

 3              THE WITNESS:  Okay.

 4              MR. SERPE:  Off the record.

 5              THE VIDEOGRAPHER:  We are now going off

 6        the video record.  The time is currently

 7        10:28 a.m.  This is end of Media No. 1.

 8              (Recess taken.)

 9              THE VIDEOGRAPHER:  We are now back on

10        the video record with the beginning of Media

11        No. 2.  The time is currently 11:06 a.m.

12        Q    (By Mr. Serpe)  Mr. Nolan, before we get back

13   into substantive questions, I'd like to ask you about

14   the Peninsula I and Peninsula II clients that you

15   mentioned at the beginning of the deposition you had

16   done work for early on, 2008-2009 time frame.  Do you

17   recall those questions and answers?

18        A    Yes.

19              MR. BLOCK:  I'm just going to object

20        really quickly to the question.  I'm not sure

21        that the testimony was that Peninsula I and

22        Peninsula II were his clients.  I

23        understand -- I do recall the testimony that

24        he did work in relation to Peninsula I and

25        Peninsula II.  The record will reflect what
```

1    the testimony was.  I'm just noting that for

2    the record.

3        Q    (By Mr. Serpe)  The -- you did consulting

4    work with respect to properties which could be

5    identified by the names Peninsula I and Peninsula II

6    approximately 10 years ago?

7        A    Yes.

8        Q    And would the street address for those

9    developments be 3301 Northeast 183rd Street in

10   Aventura, Florida?

11       A    I don't recall the street address, but it was

12   in Aventura.

13       Q    And it was your understanding that you were

14   working for the individuals who owned Peninsula II at

15   that time?

16       A    I was working for a company called Cerberus,

17   and it might have been a subsidiary of Cerberus that

18   actually made the investment, but this investment

19   company had purchased the unsold units in the Peninsula

20   buildings.

21       Q    So the entity that you represented had

22   actually purchased the units?

23       A    The unsold -- previous -- there were some

24   that had been sold and occupied, and then the remainder

25   of the unsold and unoccupied units were purchased by

1    Cerberus, and that's who I was working for.

2        Q    By the entity that had purchased the unsold

3    units at Peninsula I and Peninsula II?

4        A    I believe it's both, yes.

5        Q    On the break, we conducted an investigation

6    with respect to Peninsula I and Peninsula II as

7    entities at the address that was just mentioned and

8    determined that the owners of the units have retained

9    the Plaintiff Steering Committee -- that's the group of

10   lawyers representing Chinese drywall victims

11   nationally -- to represent them in a case against

12   Taishan.

13          During the break, I mentioned to counsel for

14   Taishan that Peninsula II owners are going to take the

15   position that your having agreed to serve as an expert

16   witness for the manufacturer of the defective product

17   that had damaged their units generates a conflict of

18   interest for you and that they're not willing to waive

19   that conflict of interest.

20          Are you willing to continue your deposition

21   at this point despite the fact that an issue has been

22   raised as to whether or not you've got a conflict of

23   interest?

24          MR. BLOCK:  Let me just object.  I

25      appreciate the heads-up from Mr. Serpe about

```
1        this potential issue, which we're all just

2        learning about this morning.  I don't -- I

3        just -- before we answer sort of specifics

4        like that, can you guys confirm the claimant

5        that you're looking at as your client,

6        Peninsula II, because we looked on the MDL

7        website, the BrownGreer website, and we see

8        one property at 3301 Northeast 183rd Street

9        in Aventura, and it looks like it's Unit

10       1207, and I'm not sure who the owner is, but

11       is that the property you're talking about, or

12       is there some other -- let me ask you this

13       way:  I'm trying to understand who the

14       claimant is, the Peninsula II claimant is

15       that you-all are asserting believes there's a

16       conflict

17            MR. SERPE:  The claimant name is

18       Peninsula II Developers, Inc.

19            MR. BLOCK:  Peninsula II --

20            MR. SERPE:  And there are many, many

21       units.

22            MS. RICO:  And if it's helpful to you,

23       there was an intervention filed in Brooke on

24       their behalf that includes all the

25       properties.  It's an extensive list of
```

```
 1          properties.  I can't tell you exactly how

 2          many it is, but it was filed in August of

 3          2017.

 4               MR. BLOCK:  And is that -- are those

 5          cases still in MDL in New Orleans, or have

 6          they been remanded to --

 7               MS. RICO:  Brooke has been remanded.

 8               MR. BLOCK:  Yeah, okay.

 9               MS. RICO:  So these should have been

10          included in it.  I would need to check that

11          they're on the list, but I would assume that

12          they are.

13               MR. BLOCK:  This is not on the -- so we

14          should look on the -- where should we look to

15          find that?  Because it's not coming up that

16          way on the --

17               MS. RICO:  I can send you a copy of

18          the --

19               MR. BLOCK:  Yeah, yeah, yeah, yeah, that

20          would be good.

21               MR. SERPE:  Is there an ECF number here?

22               MS. RICO:  Yes.  8-1.

23               MR. SERPE:  8-1, way in the beginning.

24               MR. BLOCK:  Wow.

25               MS. RICO:  But I can send this to you.
```

```
1              MR. SERPE:  That was the Brooke
2        intervention, right?
3              MS. RICO:  Right, it was the Brooke
4        intervention.
5              MR. SERPE:  That was in the Brooke case,
6        the Brooke intervention, 8-1, but we'll send
7        you a copy of the intervention --
8              MR. BLOCK:  Okay.
9              MR. SERPE:  -- that identifies those
10       properties.
11             MR. BLOCK:  Okay.  Yeah, it's just not
12       coming up in the portal, but that's something
13       we can figure out offline.  I'm just noting
14       that there's some ambiguity on our side about
15       who the claimants are here.
16             MR. SERPE:  So where were we?  You were
17       stating information for the record.  Can I
18       get an answer to the question, or were you
19       instructing him not to answer, or where were
20       we at that point?
21             MR. BLOCK:  I'm not instructing him not
22       to answer.  I'm noting for the record that I
23       don't think that any of us has a full sense
24       of what the facts are regarding these -- the
25       prior representation and the status of the
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 87 of 224 of
Case 1:11-cv-03896-MGC Document 144-1 Entered on FLSD Docket 12/18/19 Page 87 of
Confidential - Subject to Further Confidentiality Review
185

```
1        Peninsula II claims.
2            And so I think it's a little bit
3        difficult to make a firm decision about --
4        for anyone to make a firm decision about
5        there being the existence of a conflict here.
6            I guess the way I see it is you
7        flagged -- the way I see it is you-all have
8        flagged a potential issue which needs to be
9        examined, but I don't think that any of us
10       has the facts -- well, speaking not for Ben,
11       but as the lawyer here, I don't think that I
12       have the facts necessary to understand the
13       issue yet, and I don't -- I can't speak for
14       you guys, but I'm not sure you-all do yet
15       either.
16           MR. SERPE:  So in our -- in our view,
17       when you, at the latest, got a draft report
18       from Mr. Nolan that identified that he had
19       done substantial work for Chinese drywall
20       remediation issues in Florida, that this
21       issue was patent, in addition to standard
22       conflict, and that there was an opportunity
23       to have checked against all existing
24       plaintiffs that had brought a claim against
25       Taishan in advance of today.  We didn't know
```

```
 1     who these people were and made inquiries, but
 2     no one said, oh, yes, that's -- we had that
 3     guy.
 4          MR. BLOCK:  Yeah.
 5          MR. SERPE:  So we're now just becoming
 6     aware of the conflict, and we want to be
 7     really clear that we're not waiving -- by
 8     asking questions, we're not waiving what we
 9     believe to be a clear conflict of interest
10     with you representing both sides of a
11     commercial dispute.
12          And you're right, we're getting more
13     information, but it's not really my call
14     whether or not Mr. Nolan is or is not willing
15     to continue to answer questions now that he
16     has been apprised of the fact that Peninsula
17     II current owners are not waiving their --
18     whatever rights they have to insist that he
19     not consult the entity that damaged the units
20     that they had hired him to investigate.
21          MR. BLOCK:  I understand that's your
22     position, and our position is we just need to
23     learn a lot more about the nature of the
24     issues here and who that -- what the status
25     of the clients are.
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 89 of 224
Case 1:11-cv-04408-MGC Document 244-1 entered on FLSD Docket 04/25/2016 Page 89 of 224
Confidential - Subject to Further Confidentiality Review
185

```
1              And, actually, I would note as well that

2        we designated Mr. Nolan in the -- in 20

3        specific cases of prior claimants.  I

4        understand your position that there are

5        implications of his testimony for the rest of

6        the litigation.  I'm not saying I agree with

7        that, but I understand what you're saying.

8              MR. SERPE:  Right, the -- let's go off

9        the record for a second.

10             THE VIDEOGRAPHER:  We are now going off

11       the video record.  The time is currently

12       11:15 a.m.

13             (Discussion off the written record.)

14             THE VIDEOGRAPHER:  We are now back on

15       the video record.  The time is currently

16       11:17 a.m.

17       Q    (By Mr. Serpe)  Mr. Nolan, are you willing to

18  continue to answer questions given the fact that the

19  current owners of Peninsula II are objecting to you

20  providing testimony at this time?

21       A    We have a corporate policy that I have to

22  adhere to, which is in the event that a conflict or

23  potential conflict arises, that I need to bring that to

24  the attention of my in-house counsel, and at this point

25  in time, I need to do that.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q      Thank you.

 2             MR. SERPE:  Counsel, it's acceptable to

 3      us to take a midday break now and see if we

 4      can't straighten this out during the lunch

 5      break, and we'll stay here in the building so

 6      that we can confirm.

 7             MR. BLOCK:  Thank you.

 8             THE VIDEOGRAPHER:  We are now going off

 9      the video record.  The time is currently

10      11:18 a.m.

11             (Lunch recess taken.)

12             THE VIDEOGRAPHER:  We are now back on

13      the video record.  The time is currently

14      12:38 p.m.

15      Q      (By Mr. Serpe)  Mr. Nolan, I understand that

16      during the break, you were able to speak with people in

17      your organization to determine whether, from your

18      standpoint, there's a conflict of not?

19      A      Correct.

20      Q      And what position are you and/or your company

21      taking with respect to conflict?

22      A      We're clear.  We have no conflict.

23      Q      And we are in the process of contacting our

24      client to make a determination from their standpoint,

25      but in the interest of saving time and not having to
```

```
 1   come back on another day, we're going to proceed with
 2   the questions now.
 3            Before the break, we were talking about a
 4   summary protocol and a longer or -- the word we used
 5   was "intensive" protocol.  And the intensive one, I
 6   believe you identified that when you look for it, it's
 7   got KPT 2012, is the file name that you look for when
 8   you search for it?
 9        A    Those are parts of the file name, yes.
10        Q    And do you, in your mind, when you're looking
11   to see whether a remediation has met the judicial
12   requirements from Judge Fallon, use the protocol that
13   you call KPT 2012, or are you using any other protocol
14   as well?
15        A    Yeah, so I use both because, to me, the
16   essential -- I think you called it ultimate goal, but
17   the key step is, one, to identify that there is Chinese
18   drywall, right, and both protocols include that.
19            The other step is that you've removed all the
20   Chinese drywall and the contaminants and the remnants
21   of it such that it's clean so that there will never be
22   another occasion or encounter with the effects of it.
23   Both protocols have that requirement.  So for those two
24   requirements, I'm fine with either one.
25        Q    So let me start by saying that it's my
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 92 of 224
Case 2:11-cv-04094-EEF-MBN Document 244-1 Filed 08/29/2019 Page 34 of 185
Confidential - Subject to Further Confidentiality Review

 1    obligation to do a good job for my client, to object

 2    and say I think you're being nonresponsive to my

 3    question when you insert into your answers things like

 4    "I think you called it the ultimate goal," and I'm just

 5    going to object and say I didn't call anything the

 6    ultimate goal.  I'm asking you whether you have an

 7    ultimate goal.

 8           So for that reason, I'm going to object to

 9    the way you're answering my questions when you refer

10    back to what you think I've said.  I really only want

11    to know your opinions.

12           When you say that both protocols require

13    inspection, removal, and cleaning, what's important to

14    you about those three things, in particular, happening

15    in a remediation protocol?

16    A    You would not remediate if there were not

17    Chinese drywall.  That's the first step.  You would

18    remove all of the contaminants, you know, the Chinese

19    drywall, and the damaged components in the house so

20    that the house, when it's built back, would be

21    contaminant-free, and you would do the cleaning to

22    assure that the house was contaminant-free.

23    Q    And you agree that those steps should be

24    taken in every home with reactive Chinese drywall?

25    A    Yes.

1    Q    In your mind, is -- after those things are

2    done, is there any variation between what you're

3    referring to as the KPT 2012 intensive protocol versus

4    the other protocol that you also reviewed?

5    A    Yes.

6    Q    And what are the differences between the KPT

7    2012 and the other protocol?

8    A    The one under the KPT protocol is that it

9    requires a certification that the drywall that was

10   replaced that is the new drywall is not reactive.

11   That's not required under the other protocol.

12   Q    Any others?

13   A    I think there's another certification at the

14   end to certify that it is complete in the more

15   definitive protocol.

16   Q    In what you're calling the KPT 2012?

17   A    Correct.

18   Q    There's another certification that everything

19   is complete?

20   A    At the end, yes.

21   Q    And that's not in the other protocol?

22   A    Not that I am aware of.

23   Q    Any other differences?

24   A    There may be.  I would need to have the two

25   documents side by side, and then it would be

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 94 of 224
Case 1:11-cv-22408-MGC Document 244-1 entered on FLSD Docket 11/21/2011 Page 46 of
185
Confidential - Subject to Further Confidentiality Review

```
 1    self-evident; but from my natural recollection, those

 2    are two that -- that's after the cleaning that I

 3    would -- can recall.

 4         Q    What about before the cleaning, any

 5    differences -- any other differences other than these

 6    two?

 7         A    That's where most of the differences are.

 8    There's quite a few requirements for identifying.

 9    There's a second -- once you've done the indicia

10    report, there's -- or indicia test and you've passed

11    that there's indications, there's a second test that

12    has to be done under that protocol.

13              Those are actually taking samples of drywall,

14    sending them to the lab, and getting the lab results

15    back.  Those are putting the copper coupons into the

16    residence and having them exposed to the interior

17    environment for 30 days and then sending those to the

18    lab and having the corrosion tested on those to confirm

19    that there is evidence of the reactive drywall.  Those

20    tests are required.

21              Then there are requirements for documenting

22    the drywall that's removed from the house as far as

23    what's the brand, how -- where was it, how much of it

24    was it, and there's actually reports like that in these

25    files.  That's not required under the other protocol,
```

1    the -- all the extensive documentation.

2         Q    So other than the differences that you've

3    given us so far with respect to additional testing of

4    drywall, coupons, documenting what's removed,

5    certifications at the end, any other differences

6    between these two protocols that you can identify?

7         A    Those are the ones that come to mind.  Like I

8    said earlier, I would put the two documents side by

9    side, and it would be self-evident for the rest if

10   there are some more.

11        Q    Have you ever put the documents side by side

12   and compared them to see if there are differences?

13        A    Yes.

14        Q    And did you make a written list of the

15   differences between them?

16        A    No.

17        Q    When you went through these homes to

18   determine whether the homes met the remediation

19   protocol standards, whatever that meant to you, did you

20   work off of the requirements from the KPT 2012 protocol

21   to make sure that those had been achieved?

22        A    I -- in fact, the Attachment 3 to my report,

23   the -- the attachments that are there were selected

24   generally because those are steps in the KPT protocol,

25   and I think if you -- if we found those attachments and

```
 1    lined them up with the steps, you would see which ones

 2    they match.  And there would be, in some regards, more

 3    information than would be required under the other

 4    protocol.

 5         Q    So is the answer to my question, yes, that

 6    you used the KPT 2012 protocol as a check against

 7    which -- what was in those reports?

 8         A    Not that alone.  I used both protocols, plus

 9    my own knowledge, to evaluate what was in the files and

10    see if a complete remediation had been accomplished.

11         Q    Now, as you analyzed these eight homes, did

12    you document instances where any of the eight homes had

13    some aspect of their remediation which deviated from

14    the -- either the KPT 2012 protocol or what we're

15    referring to as the other protocol?

16         A    Yes.

17         Q    And where is the documentation of the

18    variances between the remediation protocols and what

19    was actually done?

20         A    I understood your question to be a little

21    different from that.  I understood your question to be

22    variances from the KPT protocol.  Is it variances from

23    both in that you're looking for a written matrix of

24    some type that I prepared?  Because I did not prepare a

25    written matrix of the two protocols and then check
```

1    which protocols were fulfilled.

2              I evaluated the evidence that was in the

3    file.  The evidence in the file is in Attachment 3.

4    That would be the evidence that I would -- if there was

5    a need for a matrix or a checklist, those would be the

6    documents that would be evaluated on that checklist.

7         Q    I'd like to read back a question and answer

8    from just a minute ago and ask you if you need to

9    update your answer.

10             Question:  "Now, as you analyzed these eight

11   homes, did you document instances where any of the

12   eight homes had some aspect of their remediation which

13   deviated from either the KPT 2012 protocol or what

14   we're referring to as the other protocol?"

15             Your answer was:  "Correct."

16             And then I said,  "Where's that

17   documentation?"

18             So I was asking about variances from either.

19        A    Okay.  So my answer is still correct, and

20   yes, and the documentation are the photographs and the

21   videos that I took that are in the file.

22        Q    And have you written out in words "Here are

23   the departures from either the KPT protocol or the

24   other protocol or both" in a written document at any

25   time?

Confidential -- Subject to Further Confidentiality Review

```
 1       A    No.

 2       Q    The -- we had a conversation earlier about

 3   the Nguyen case.  I think the court reporter typed it

 4   as "Gwen," but it's N-G-U-Y-E-N.

 5       A    Correct.

 6       Q    And you mentioned that the builder had signed

 7   the certification form, which was not the way

 8   certifications are supposed to be done under either

 9   protocol.  Do you recall that testimony?

10       A    Yes.

11       Q    Now, let's look at your report on page 2.  Do

12   you see Section 3.1, Tracy Nguyen and Mai, M-A-I,

13   Nguyen -- Mai Tuyen, T-U-Y-E-N?

14       A    Yes.

15       Q    The -- you conducted an inspection of this

16   home, did you not?

17       A    Yes.

18       Q    And in that -- then on the basis of your

19   inspection and review of documentation in the case, you

20   concluded that it's your opinion that "...this

21   residence has been sufficiently remediated and exhibits

22   no indicia of reactive drywall and does not need to

23   incur any additional expense.  The purpose of the MDL

24   protocol has been satisfied and there's no indication

25   of a need for further remediation or expense to achieve
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 99 of 224
Case 1:11-cv-22408-MGC Document 244-1 entered on FLSD Docket 04/25/2012 Page 91 of 185
Confidential - Subject to Further Confidentiality Review

 1    a sufficient remediation."

 2            Mr. Nolan, do you want to correct that

 3    opinion today?

 4       A    No.

 5       Q    To the extent that no clearance testing was

 6    done at the end of this remediation, wouldn't you agree

 7    that the remediation deviated from the -- both

 8    protocols and failed to provide what was a

 9    court-required level of certainty?

10       A    I would --

11            MR. BLOCK:  Objection.  Assumes facts

12            not in evidence that there was no clearance

13            testing.

14            THE WITNESS:  Right.  I would agree that

15            there appears to be a deviation from the

16            procedures, so -- I believe that was your

17            question.  I would agree that there was a

18            deviation.  But when I inspected the

19            property, I found no further indicia of

20            Chinese drywall or evidence of it.

21            And from the other photographs of their

22            property and records in their file, it

23            appears to me that they did, in fact,

24            remediate back to the walls and the studs,

25            and I found no indicia that would lead me to

```
 1          say they did not complete the remediation.

 2          Q    (By Mr. Serpe)  So when you say, "The purpose

 3     of the MDL protocol has been satisfied and there's no

 4     indication of a need for further remediation or expense

 5     to achieve a sufficient remediation," are you now

 6     saying that in your professional opinion, you can

 7     dispense with testing of the home post remediation as

 8     long as, at some point in the future, somebody looks

 9     and doesn't see visible indicia of corrosion?

10          A    Well, I'm not sure about your question as far

11     as the "as long as someone in the future."  All I can

12     say is from my professional experience and opinion,

13     there was no further indicia these some several years

14     after the remediation had been accomplished, so -- and

15     given all the evidence that's available, even though

16     it's incomplete, in my opinion, the remediation was

17     sufficient.

18          Q    Other than your professional opinion, are you

19     aware of any judicial decision, published article,

20     recognized remediation protocol from another builder,

21     something from the Consumer Product Safety Commission,

22     anyone out there, who has made an announcement in

23     the -- say the last two or three years, that you can

24     dispense with post-remediation clearance testing and

25     still have a sufficient remediation?
```

```
 1        A     No.

 2        Q     In the Nguyen house, in this -- in your

 3   report, you discuss a specific aspect about the

 4   kitchen.  And you mentioned earlier that it's

 5   acceptable to not remove cabinets if there's no drywall

 6   behind the cabinet, and if you don't have to remove it,

 7   you just leave it in place.  Am I getting that correct

 8   on your opinion about the cabinets in the Nguyen house?

 9        A     That's part of what I said.  The other is

10   that the protocol allows for replacement of cabinets if

11   that's what the homeowner chooses.  If the homeowner,

12   for whatever reason, doesn't have to tear the cabinets

13   out to access drywall, then that's their decision.

14        Q     So -- and in here, you said "...when the

15   cabinets do not need to be removed to access the

16   drywall behind the cabinets" and "This was the

17   condition at this residence."  What you're saying is if

18   you don't have to remove the cabinets, they're not

19   going to get damaged; therefore, you don't have to

20   replace them, at least for the Nguyen house?  Is that a

21   fair statement?

22        A     Yes.

23        Q     What evidence do you have that there was no

24   drywall behind the cabinets?

25        A     I was in the house and I took pictures of it.
```

Confidential - Subject to Further Confidentiality Review

```
 1       Q      And you've done construction or building in

 2    the past, consulted with people that are involved in

 3    that in the state of Florida?

 4       A      In what?

 5       Q      Say residential construction.

 6       A      Yes.

 7       Q      You know the building code?

 8       A      Yes.

 9       Q      Did the building code require drywall before

10    cabinets are installed in a kitchen?

11       A      Not if it's in an island where there's no

12    wall.

13       Q      And if the -- was there -- in addition to an

14    island, were there cabinets mounted on the wall in the

15    Nguyen house?

16       A      I'd have to look back.  It's a -- there might

17    be, but I could look at the pictures.

18              (Discussion off the written record.)

19       Q      (By Mr. Serpe)  Let me hand you what I'm

20    going to mark as Exhibit 3.

21              (Exhibit 3 marked for identification.)

22       Q      (By Mr. Serpe)  Is that you in Exhibit 3?

23       A      Yes.

24       Q      And are you looking at cabinets that are

25    mounted to a wall?
```

1      A    Yes.

2      Q    And was there drywall behind that wall --

3      A    Yes.

4      Q    -- behind those cabinets?

5      A    Yes.

6      Q    And was that drywall left in place during

7   this remediation?

8      A    I don't know.  I'd have to look back at the

9   photographs in the file.

10      Q    Now, when you were there, you had the

11   opportunity to remove switches or plugs that were in

12   the kitchen to look behind them to see whether you

13   could see if, in fact, there was drywall or not on the

14   wall; you had that opportunity, didn't you?

15      A    Yes.

16      Q    And you had the opportunity to look to see

17   whether there was or wasn't corrosion on the wires in

18   the kitchen?

19      A    Yes.

20      Q    Did you look at any of the switches or

21   outlets in the kitchen?

22      A    Yes.  One just to the left of where I'm

23   standing.

24      Q    And was that in the kitchen or was that

25   outside the kitchen in the living space?

```
 1       A     Just this -- where I'm standing is in the
 2   kitchen, and there's more cabinets.  There's an island
 3   right here (indicating), and just to the left is a
 4   wall, and it was the first switch by the kitchen on the
 5   wall.
 6       Q     So let me hand you Exhibit 4, which is a
 7   collection of pictures from the -- from the inspection,
 8   from a videotape.
 9             (Exhibit 4 marked for identification.)
10       Q     (By Mr. Serpe)  And I'm going to circle back
11   to the beginning, but if you flip -- one, two, three,
12   four -- five pages in, I think you'll see at the top of
13   the picture, that there's a picture of you with a
14   screwdriver getting ready to take a light switch off?
15       A     Yes.
16       Q     And in the background, you can see the
17   kitchen, can't you?
18       A     Yes.
19       Q     So this wasn't really in the kitchen; this
20   was next to the kitchen?
21       A     You could describe it as next to the kitchen.
22   It's the first light switch as you come up to the
23   kitchen, and the kitchen is literally a foot away.
24       Q     So the -- there were no cabinets over where
25   you were standing here, right?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A    No.

 2        Q    So if we wanted to check to see if the

 3   cabinets had been removed or not removed and what the

 4   drywall looked like and what the wires looked like in

 5   the vicinity where the cabinets were hung, you could

 6   have taken a switch or a plug right there by the

 7   cabinets, couldn't you have?

 8        A    Yes.

 9        Q    And you didn't do that?

10        A    No.

11        Q    Now, on your inspection, let's talk about

12   what you -- what you actually did.

13             Your inspection took place on January 18th;

14   is that correct?

15        A    Yes.

16        Q    And the -- on the next page, we've got a

17   picture of the home.  Does that look like the home, the

18   Nguyen home that you inspected on January 18th?

19        A    Are you talking on Exhibit 4 now?

20        Q    Sorry.  Exhibit 4, yes.

21        A    Yes.

22        Q    And on the next page, you'll see that our

23   videographer has you walking into the building at 12:10

24   p.m.  Does that sound accurate?  Do you have any reason

25   to say it wasn't around 12:10 on that day?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A     No.

 2        Q     And the next page -- we have looked at the

 3   counter.  When you sat down at your computer to look at

 4   whatever files were there, you started at 12:11 and

 5   ended at 12:19.

 6              Now, I've got the video with me on a thumb

 7   drive, and we can pull it out and play the eight

 8   minutes later, but do you have any reason to dispute

 9   that you spent about eight minutes on the computer in

10   the house before you began doing anything else?

11        A     No.

12              MR. BLOCK:  Richard, for the record, so

13        I understand, this is -- these are stills

14        from a video --

15              MR. SERPE:  Yes.

16              MR. BLOCK:  -- that you-all took --

17              MR. SERPE:  Took, right.

18              MR. BLOCK:  -- of Mr. Nolan?  Okay.

19        Q     (By Mr. Serpe)  Next page, you checked one

20   outlet in the house, just a single outlet; is that

21   correct?

22        A     Yes.

23        Q     And it was the one that we just talked about

24   that was next to the kitchen, but not the wall with the

25   cabinets; is that correct?
```

```
 1        A     Correct.  Correct.

 2        Q     And that took about three minutes.  If you

 3   see, you started at 12:19, ended at 12:22.  Any reason

 4   to believe that it -- that it would have taken any

 5   longer or anything else was involved?

 6        A     No.

 7        Q     You took a video in the house.  You began at

 8   12:23; you ended at 12:28.  And that video, in fact,

 9   was produced in your reliance materials.  That took

10   five minutes.  Any reason to doubt that timing?

11        A     No.

12        Q     You departed the house at 12:30, 12:29:59,

13   12:30.  Elapsed time in the house, 20 minutes.  Does

14   that sound about right for your inspection of the

15   house?

16        A     Yes.

17        Q     During which you, other than videotaping,

18   spent a total of three minutes inspecting any aspect of

19   the house for evidence of corrosion; would that be a

20   fair statement?

21        A     I inspected for any indicia the entire time I

22   was in the house.

23        Q     And how would you see indicia of, say, copper

24   and silver corrosion visually while you were walking

25   through the house with a -- with an iPhone in your
```

```
 1    hand?

 2         A    So you're smelling for -- right?  That's one

 3    of the indicia.

 4         Q    Uh-huh.

 5         A    You're looking for corroded copper.  I took

 6    off one of the switches, which here it is, and I

 7    brought my drill so it would go quick, as opposed to

 8    the first one in Chatmon, which was a screwdriver.  So

 9    there was no evidence of corrosion there.

10         And I went in the garage where they had

11    replaced the air-conditioning system, and it was up in

12    the ceiling, so I couldn't take the covers off up in

13    the ceiling, but I saw the hot water heater in the

14    garage, and it had copper.  So it looked untarnished.

15    Okay?

16         And I walked around in the house to smell and

17    observe any -- for any other indicia.  I felt like that

18    was adequate given the information in the file about

19    the indicia report and the information about the

20    remediation that was done.

21         Q    Do you remember my question?

22         A    I think I answered your question.

23         Q    Do you remember what my question was?

24         A    Why don't you read it back.

25         Q    And how would you see indicia of copper and
```

Confidential – Subject to Further Confidentiality Review

1    silver corrosion visually while you're walking through

2    the house with an iPhone in your hand?  And how do you

3    do that?

4         A    Read my answer, please.

5         Q    Yeah, so you talked about smell.  That wasn't

6    silver or copper corrosion.  You talked about something

7    out in the garage, right?  Anything inside the house

8    that you were able to see that was silver or copper

9    during your entire time there?

10        A    All the bathroom fixtures, all the door

11   handles, all the cabinet knobs.  Nothing, no evidence.

12        Q    Uh-huh.  And those were copper and/or silver,

13   those items?

14        A    Those are typically pitted.  And the light

15   fixtures were visible.

16        Q    So let's return to the question of the

17   kitchen and your statement in your report that the

18   purposes of the remediation would be met in a house --

19   that the MDL protocol objective was met as long as

20   there was no drywall behind the cabinets.

21             What information do you have, if any, that

22   the wires that were on the wall with the cabinets did

23   or did not have corrosion?

24        A    I didn't look in every specific outlet.  I

25   looked in one, and I didn't find any.  I believe if we

1   look at the photographs of the property when it's being

2   remediated, you'll see that all of the wiring is

3   removed.  That's all I need to see.

4        Q    If that's all you need to see, why do you go

5   in the house at all?

6        A    Because I was asked to.

7        Q    And why were you asked to?

8        A    To look for indicia of further indications of

9   contamination.

10       Q    Which, based upon your review of the

11  photographic evidence and the other documents, you knew

12  didn't exist, so it was kind of a -- just an exercise

13  to go through the motions.  Would you say that's a fair

14  statement?

15       A    I don't think it was considered to be just an

16  exercise.  I think there was a specific purpose, and I

17  went there and I did the -- what I was supposed to do.

18       Q    What was the specific purpose?

19       A    To go inside the house -- the purpose is on

20  page 1 of my report:  Inspect the current condition of

21  the plaintiff's residence.  I did that for, what did

22  you figure, 20 minutes --

23       Q    Yes.

24       A    -- in the house.  I inspected the house for

25  20 minutes.  I went in every room, every closet, every

1    bathroom, the back porch, the foyer, all around the

2    house, in the garage, in the laundry room, every room.

3    So I did the first part:  Inspect the current

4    condition.  Take --

5         Q    And that took you five minutes to do that?

6         A    It -- perhaps, but I had the camera on the

7    whole time and taking pictures for 20 minutes, correct?

8         Q    No.  You were at the computer for eight

9    minutes of the 20.  So you weren't videotaping during

10   the computer time, right?

11        A    I think your idea of an inspection is perhaps

12   very narrow compared to my idea.  I was at the property

13   inspecting even when I had my computer on, because I

14   was looking at the files again, because I had already

15   looked at them, and I was refreshing, because I think I

16   had four inspections that day, and I wanted to make

17   sure that I was referring to the same file.

18            And I looked through it, and I was trying to

19   refresh if there was anything specific about that file

20   I wanted to see.  And when I had finished that, I went

21   and I started the other parts of the inspection.  So I

22   consider that part of the inspection, okay, whether you

23   do or not.

24            So the next part is take photographs, and you

25   have me taking photographs and videos, which I did

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 113 of 224 of
Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 113 of 224 of
Confidential - Subject to Further Confidentiality Review
185

```
1    during my inspections, study the documents in the

2    record -- you have a picture of me studying the

3    documents on my PC in her house -- and provide my

4    opinions about the remediation costs and determine

5    whether the issues surrounding reactive drywall have

6    been resolved by the remediation protocol implemented.

7    I did that.  It's in my report.  And I gave my opinion

8    of that.  I did -- that's why I went to that house.

9         Q    What aspects of the remediation that was done

10   on the Nguyen home, the actual remediation, deviated in

11   any respect from the protocols that you considered to

12   be the ones that the properties have to be checked

13   against?  What deviations were there for Nguyen?

14        A    Is there a chance I could look at the Nguyen

15   file, the documents in the Nguyen file?

16             MR. BLOCK:  We can pull up a copy if --

17             MR. SERPE:  The -- perfectly fair.

18        Let's do this.  By referencing your report or

19        recollection, can you tell us anything?  And

20        if not, by all means, let's take a look at

21        the file.

22             THE WITNESS:  Well, I'm already there.

23        I'm already there.  I want to see the file

24        because I'm referencing "The J&A Stucco scope

25        of demolition, repairs and restoration are
```

Confidential - Subject to Further Confidentiality Review

1          detailed therein."  I want to look at that.

2          Q    (By Mr. Serpe)  And as we're sitting here,

3     before you look at it, can you tell me any of the

4     variations from what they did versus the protocol?

5          A    You mean in his scope of work or at the --

6     after the job?  I'm -- I want to look at his scope of

7     work again, and then we'll work through this

8     remediation one step at a time to see which step did or

9     did not comply with the protocol.

10         Q    A minute ago, you said that on your computer,

11    you had the documents that you were provided regarding

12    the Nguyen house.

13         A    Correct.

14         Q    You had everything.  You had the construction

15    contract, indicia reports, contract, if the remediation

16    was done, what was done, spreadsheets.  You had the

17    full load available to you, didn't you?

18         A    Yes.

19         Q    And when you reviewed the documents, as you

20    just told us, to make sure that they were right there

21    in front of you, and you were in the house, at any

22    point, up to this second, did you systematically go

23    through and say what's missing in this house from what

24    was required by either of the protocols?

25         A    Yes.

1    Q    And did you write that information down

2    anywhere?

3    A    No.

4    Q    And as we're sitting here, on a

5    house-by-house basis, you can't remember what did or

6    did not deviate?

7    A    I -- we were talking about Nguyen, and you

8    were asking me very specific --

9    Q    Yes.

10   A    -- and I think to be any more clear to you, I

11   would like to put the documents in front of me and

12   describe to you what does or doesn't.  I don't want to

13   sit here from my natural recollection and miss

14   something.

15   Q    It's perfectly fair.  And allow me just to

16   ask the question one more way using that framework.

17        Your natural recollection, as we're sitting

18   here, doesn't contain what you would consider to be a

19   reliable or perfectly clear assessment of what wasn't

20   done in the Nguyen house that was required by the

21   protocols?  Is that a fair way of phrasing it?

22   A    No.

23   Q    Okay.  What was unfair about that?

24   A    I've already given you very specific examples

25   that show how it deviated from certain steps in the

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 115 of 224 7 of
Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 08/25/2011 Page 117 of
Confidential – Subject to Further Confidentiality Review
185

1    protocol, and now you're asking me the same question,

2    but broadening it to all steps of the protocol.

3        Q    So on very specific examples that you've

4    given me -- we've talked about the lack of clearance

5    testing that was a departure from the protocols.  That

6    was one, wasn't it?

7        A    Yes.

8        Q    Was there -- did we talk about anything else

9    that wasn't done that was required by the protocols for

10   the Nguyen house?

11       A    All the certifications that the contractor

12   signed incorrectly.

13       Q    Okay.  Anything else that was supposed to be

14   done according to the protocols that wasn't done for

15   Nguyen that you can think of as we're sitting here?

16       A    Not that I can remember.  That's why I would

17   say if you want further information, I would refer to

18   the file.

19       Q    We may circle back to the file, but in the

20   interest of just moving on, on what's in the report, I

21   want to move to the second house in your report, page

22   4, Foster.

23            In paragraph 3 point -- first paragraph, in

24   Section 3.2, with respect to the Foster home, you once

25   again stated that, "The purpose of the MDL protocol has

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 116 of 224
Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 116 of 224
Confidential - Subject to Further Confidentiality Review
185

1    been satisfied and there's no indication of a need for

2    further remediation or expense to achieve a sufficient

3    remediation."

4              What do you mean by "sufficient remediation"?

5        A    Complete.

6        Q    And what do you mean by "complete"?

7        A    No further contaminants in the house from

8    Chinese drywall.

9        Q    So that if the house no longer has

10   contaminants from Chinese drywall, that's a complete

11   remediation?

12       A    Yes.

13       Q    What information do you have with respect to

14   whether the remediation that was actually done on the

15   Foster home deviated in any way from the requirements

16   of any published protocol, KPT 2012 or otherwise?

17       A    I would have to see the file to look at the

18   attachments that I noted in Attachment 3 to be able to

19   answer that with any specifics.

20       Q    And can you tell us any of them today, any

21   departures?

22       A    Not that I recall.

23            (Discussion off the written record.)

24       Q    (By Mr. Serpe)  In Section 4 [sic] of the

25   report, you compared --

Confidential - Subject to Further Confidentiality Review

```
 1        A    Can I ask you what page you're on?

 2        Q    Four.

 3        A    Page 4?

 4        Q    Page 4, of Section 3.2.

 5        A    I got you.

 6        Q    In the first paragraph, you did a comparison

 7   between what you refer to as the claimed actual cost

 8   and the MDL formula results and described them as

 9   substantially lower.  Do you see where I'm referring

10   to?

11        A    Yes.

12        Q    And the price quote that you're referring to

13   as part of the data here on the remediation expense was

14   authored back in October of 2011; is that correct?

15        A    I would have to check the date on the

16   document.

17        Q    The first paragraph of -- first sentence of

18   the second paragraph, proposal, October 19, 2011.

19   First line, second paragraph.

20        A    I'm sorry.

21        Q    Okay.

22        A    Correct.

23        Q    So the Polcow Construction, Inc. was doing

24   bidding based upon what was then the prevailing market

25   conditions in Fort Myers in 2011.  Would that be your
```

```
 1   best estimate of the situation?

 2       A    It makes sense to me.

 3       Q    When you, in the first paragraph, talked

 4   about an MDL formula result and you had some

 5   mathematical equations, a multiplier of .8 and then a

 6   standard figure of $109.85, what year were those

 7   figures derived from?

 8       A    Those figures were provided to me in the

 9   Amorin spreadsheet, and Column K is the location

10   factor, and I believe it's for 2017, if I remember

11   correctly.

12       Q    So are you comparing an 2011 apple to a 2017

13   orange here?

14       A    That's possible.

15       Q    Let me ask you about the Wites property,

16   W-I-T-E-S, on page 7 of the report, Section 3.6.

17            Let me start with the same question:  What

18   can you tell me, from your report or your recollection,

19   were any deviations from what was actually done on the

20   Wite [sic] house, in terms of the remediation, compared

21   to what was required by Judge Fallon's protocol, KPT

22   2012, any other protocol that you considered important?

23       A    Well, I'm going to answer I'd like to see the

24   file to make sure that I'm answering completely and

25   accurately.  I can say that Mr. Wites, if that's how
```

1    you pronounce their name --

2        Q    It is.  I've been -- I had the same question.

3    It's pronounced Wites (pronunciation).

4        A    Okay.  They actually had a testing company

5    involved, which I've noted here, which is different

6    from other of the houses that we've talked about so

7    far.  At least this case, they did have some testing

8    done, which was one of the protocols.  So it's actually

9    not something they skipped, which I pointed out the

10   others did.

11           I would have to look at the documents in the

12   file to compare it to the matrix to identify any other

13   deviations.

14       Q    And would it be a fair statement, then, that

15   those deviations are -- were not laid out either in the

16   report or in -- that you can recall from your

17   recollection just sitting here today?

18           MR. BLOCK:  Objection.  Assumes there

19       were deviations, which is not the testimony.

20           MR. SERPE:  Fair enough.

21       Q    (By Mr. Serpe)  Would it be fair to say that

22   as we're sitting here, you don't recall if there were

23   any deviations from the protocols compared to what

24   Mr. Wites's remediation actually encompassed?

25       A    I do have some of the requirements in my mind

1    that I'm working through to see if I recall that those

2    steps were done.

3           For example, the KPT protocol requires you to

4    identify the drywall, and I know they had pictures of

5    some drywall being removed, but I don't recall seeing

6    extensive documentation of the individual sheets of the

7    drywall with markings, as I saw in other files.  And

8    that is a step in the KPT protocol that I would

9    double-check against the file here to see if he did

10   that or not.  That's the kind of thing that I would do

11   to give you an answer.

12   Q    Now, once again, you looked at the claimed

13   actual construction cost, and you compared it to the

14   MDL formula and concluded that they were substantially

15   lower.

16          What was important to you about the fact that

17   they were substantially lower?  What was -- why was --

18   why was that documented in your report?

19   A    Well, first, it's a fact.

20   Q    Okay.

21   A    And you have a similar fact pattern in the

22   other houses.  There are two where the claimed

23   remediation costs exceed the result of the formula.

24   And the other houses are lower, and some are much

25   lower.  So it's just a fact.

```
1        Q    And why was that fact important to you
2    sufficient that you documented it not only once, but in
3    each of the homes that you reviewed here?  Where -- how
4    did that come in to be part of your mission here?
5        A    I was asked to do it.
6        Q    And when you were asked to do it, was there
7    an explanation of why you were being asked to do it?
8             MR. BLOCK:  Objection.  It gets into
9         work product.
10            MR. SERPE:  Instructing him not to
11        answer?
12            MR. BLOCK:  That form of the question,
13        yeah.  I think -- it sounds like you're
14        asking what my thinking was for discussing
15        the point in his report.
16            MR. SERPE:  Fair enough.
17        Q    (By Mr. Serpe)  What was your understanding
18    on why you were being asked to do a mathematical
19    comparison, one number to another number, to determine
20    what was a bigger number and what was a smaller number?
21    What was -- what was the point of that?
22        A    To compare the two.
23        Q    And did you have any understanding on why
24    that comparison was being done?
25        A    To be able to state whether the actual cost
```

1   is lower, the same, or higher than the formula result.

2        Q    So to the extent that the actual cost was a

3   number that an accountant could add up on a spreadsheet

4   and put down on a piece of paper, and the formula is a

5   multiplication of square footage times an RSMeans

6   standard, again, a mathematical number, two

7   mathematical numbers, one is bigger, one is smaller,

8   why do we need an engineer to tell us that?  What is it

9   that your expertise does there that we can't do for

10  ourselves?

11       A    I can answer that question.  It's not been

12  part of my task in my scope of work, but I can answer

13  the question.

14       Q    So is it that you hold opinions that you have

15  not articulated here with respect to costs of

16  remediations in general?

17       A    These are just facts.  These aren't even

18  opinions; these are just facts.

19       Q    You're aware that Mr. Wites obtained more

20  than one quote before undertaking this remediation, are

21  you not?

22       A    Yes.

23       Q    In fact, those quotes were all provided to

24  you as part of the materials that were in the record

25  for you, weren't they?

1    A    Yes.

2    Q    And there was a quote that Mr. Wites obtained

3    from Distinct Design Build on April 26, 2010, and let

4    me just ask you to take my word for the fact that if

5    you looked at that document that's in the record, that

6    the amount of the quote was $452,614.42. Just assume

7    with me for a second that's the number. We can look.

8         Was it important to you that there was a

9    difference in quoted prices between contractors when

10   you considered the remediation costs that were actually

11   undertaken?

12   A    Yes.

13   Q    And what importance did you put on the quote

14   by Distinct Design Builders, which was $155,000 more

15   money? Did you do some comparison between the quotes?

16   What weight, if at all, did you put on the quote that

17   was obtained from Distinct Design Build?

18   A    I don't understand what you're asking about

19   weight.

20   Q    Did you consider that quote at all in

21   reaching your opinions in this case?

22   A    I considered it, yes.

23   Q    And what impact, if any, did it have on your

24   conclusions in this case?

25   A    None.

1      Q    Is the quote from Distinct Design Build more

2  or less adherent to the protocols that we've been

3  talking about than the actual construction contract

4  that was entered into with -- by the Wites family?

5           MR. BLOCK:  Objection.  Are you asking

6      him about the scope of the Distinct Design

7      Build -- is that the one you were referencing

8      a minute --

9           MR. SERPE:  Yes.

10          MR. BLOCK:  But I -- have you shown him

11     the scope?  I'm sorry, I may not understand

12     the question.

13         MR. SERPE:  He was -- he's testified it

14     was -- that those quotes were provided to him

15     and, you know -- so let me ask -- and that he

16     reviewed it and that he didn't put weight on

17     it.

18      Q    (By Mr. Serpe) So now my question is:  Which

19  of those quotes, Distinct Design Build or the one that

20  was actually entered into, is closer to the protocols?

21      A    That's the question now?

22      Q    Yes.

23      A    Which one is closer to the protocols?

24      Q    Which one is more adherent to the protocols,

25  the one that he paid for or the one that was done by

1    Distinct Design Build?

2        A    I think your question is vague in "adherent

3    to the protocols" because each of the quotes that he

4    got was bid off the same set of plans, and the prices

5    were different from the four or five bidders, and he

6    selected to negotiate the bid that he wanted to

7    negotiate.  The one that you referred to was the high

8    bid.  I don't -- I'm not aware and I don't recall that

9    there was any difference in the scope of work that they

10   were bidding on.

11       My impression from reading his file is

12   Mr. Wites approached the bidding carefully, and he did

13   a reasonable job in negotiating and getting competitive

14   bids from several bidders, and there was a high bidder,

15   as there usually is, so I'm not surprised by that, but

16   I don't believe it was because they included more work

17   than the other bidders.

18       Q    You don't believe it, but as we're sitting

19   here, you don't have any data for that, you don't have

20   a point-by-point comparison to see, for example,

21   whether Distinct Design Build was actually going to

22   replace the cabinets in the house as opposed to the one

23   that they settled on where they removed them and then

24   put them back in as best they could?

25       A    What I actually remember and -- is that there

1    were -- I'll give you an example, and it's not this

2    Distinct Design Build, but it is EE&G, which I put in

3    as $3,550. Do you see that?

4         Q    Yes.

5         A    Okay. EE&G's initial proposal to Mr. Wites

6    was $16,000. He negotiated the bare minimum services

7    that he needed to accomplish the complete remediation,

8    and he purchased that for 3,550 instead of what the

9    bidder wanted, which was 16,000, to do more work. So

10   he negotiated that. That's the same thing he did with

11   the other bidders for the construction work.

12        Q    And from having reviewed his deposition, you

13   recognize that he's an attorney and he aggressively

14   negotiated these items, cutting contracts down by more

15   than 16,000 to -- like 75 percent on the EE&G, right?

16   So he did an excellent job negotiating contracts down

17   to a bare minimum; is that a fair statement?

18        A    I said reasonable.

19        Q    Uh-huh. And in your experience, do most

20   homeowners in Florida that are negotiating with

21   builders go through a process where they get five

22   different quotes and negotiate as hard as Mr. Wites was

23   able to based upon his professional training and

24   disposition?

25        A    The ones that I advise do.

Confidential - Subject to Further Confidentiality Review

```
1      Q      And the ones that don't?

2      A      Get all -- every possible combination out

3   there.

4      Q      And combinations are on a continuum from low

5   to high, are they not?

6      A      Some are handshakes.

7      Q      Some are handshakes.  But in terms of things

8   like dollar per square foot, there's a continuum, isn't

9   there, some are less expensive and some are more?

10     A      Do you mean a bidder's price, some are less

11   expensive?

12     Q      What do you mean "bidder's price"?  The

13   quotes that you get from --

14     A      What are you referring to that's less and

15   what's more?

16     Q      The contract price to do the work varies from

17   contractor to contractor, even on the same home, same

18   scope of work.

19     A      I agree with that.

20     Q      So you would agree that there's a range of

21   expenses that you would anticipate seeing with respect

22   to the value of -- the cost of doing a remediation on a

23   home?

24     A      A range of bids from five bidders, yes, I

25   would -- I would not be surprised to see a range of
```

Confidential - Subject to Further Confidentiality Review

1    bids when there's five bidders.

2        Q    Mr. Nolan, we're at an hour.  I'm happy to

3    keep going, but I want to be sensitive to your comfort

4    as well, so at any time you want to take a break,

5    including now, just let us know and we'll --

6        A    Let's take a break, five minutes.

7        Q    Okay.

8        A    Thank you.

9             THE VIDEOGRAPHER:  We are now going off

10            the video record.  The time is currently 1:37

11            p.m.  This is the end of Media No. 2.

12            (Recess taken.)

13            THE VIDEOGRAPHER:  We are now back on

14            the video record with the beginning of Media

15            No. 3.  The time is currently 1:55 p.m.

16       Q    (By Mr. Serpe)  Mr. Nolan, I'm going to hand

17   you another exhibit -- I think we're up to No. 5 --

18   which I'll represent to you, while my co-counsel is

19   grabbing it, is the April 21st, 2017 document from

20   Judge Fallon that we identified from your first page by

21   that docket number -- the document number.

22            (Exhibit 5 marked for identification.)

23       Q    (By Mr. Serpe)  The -- so on page 1 of your

24   report, when you say you reviewed formula for

25   remediation costs set forth in MDL Record 20741, you'll

```
1    see 27041 [sic] here on the top is the document number.

2    Do you see it on page 1 of your report?

3         A    I do.

4         Q    Yeah, so there -- I want to ask you about

5    paragraph No. 10, which is on page 15.  And following

6    up on the discussion we had earlier about safety and

7    how important that is in any protocol that you're

8    reviewing, let me read paragraph 10 out loud, and then

9    I want to ask you if you agree or disagree with this

10   conclusion from Judge Fallon.

11            "It is both economical and practical to

12   remove all the wiring while the drywall is removed,

13   rather than removing only some of the wiring at the

14   time of the remediation and then risk later having to

15   tear down the drywall again in the event that

16   additional wiring exposed to the sulfur gases is harmed

17   or fails.  Additionally, the low-voltage wiring

18   supporting life and safety devices such as fire alarms

19   and smoke detectors should be removed and replaced

20   because of the low cost of replacement when compared

21   with the high risk of injury or death if these devices

22   are not functioning properly."

23            First, did I read that correctly?

24        A    Yes.

25        Q    And is there anything about Judge Fallon's
```

1    statement here that you disagree with?

2        A    No.

3        Q    I want to turn to -- back to your report and

4    look at the Etter home, which is on page 9.

5             Now, this was the home that you were not able

6    to inspect?

7        A    Yes.

8        Q    And -- but you did have all of the

9    documentation that you described earlier provided to

10   you with respect to this home?

11       A    Yes.

12       Q    And you also had Mr. Etter's deposition

13   transcript available for you?

14       A    Yes.

15       Q    When it comes to the question of whether the

16   Etter house was upgraded or not as part of this

17   remediation, I want to ask you some -- about some very

18   specific building parts and ask you if you have an

19   opinion one way or the other about them.

20       A    Okay.

21       Q    The -- what information do you have that the

22   cabana originally had a shower, and ultimately that was

23   left out to save money at the time of the remediation?

24       A    I don't recall that.

25       Q    What information do you have that there was a

```
1    fireplace in the family room, but the Etters decided

2    not to replace the fireplace after demolition and to

3    just put a plain wall up?

4         A    I don't remember that being specifically

5    listed.  It could be that that was in the plans that

6    they had, but that it wasn't apparent because it wasn't

7    something in the scope of work.

8         Q    Do you have an opinion in this case whether

9    the removal of the fireplace constituted a downgrade

10   versus an upgrade to the home as part of remediation?

11        A    I would have to know all of the changes that

12   were made because they might have decided to move it

13   somewhere else.  I don't know all the facts.  But

14   that's something that I know one of the other

15   plaintiffs did, was they changed parts of their house,

16   because I was able to detect that and they admitted it

17   to me.  So I wouldn't call it one way or the other,

18   based on the limited information I have.

19        Q    The -- is one family that admitted they made

20   a change the Hernandez family, about their kitchen?

21        A    The kitchen was one, but it was actually an

22   outside wall, where they had eliminated a window, they

23   closed a window off.

24        Q    And that was Hernandez?

25        A    Yes.
```

1    Q    So we'll come back to Hernandez in a minute,

2    but sticking on Etter, do you have an opinion as to

3    whether architectural details in the family room,

4    including two large archways and two niches that had

5    been framed into the wall of the family room, were

6    removed and replaced with plain wall to save money?  Do

7    you have an opinion on whether that happened or not on

8    the Etter home?

9    A    I don't think there's enough information in

10   the file to -- like those facts, I don't believe

11   they're in the file, like the -- if it's a fact that

12   they deleted something to save money, I don't -- I

13   don't recall that.

14   Q    Do you recall any facts about the elimination

15   of a morning kitchen in the master bedroom, elimination

16   of sink, fridge, cabinets, and putting a wall in only

17   in the master bedroom?

18   A    I remember something about a wall, that rings

19   a bell, changing a wall, but that it was described as a

20   preference, that "We didn't want it where it was and we

21   wanted it over here instead."

22   Q    Anything about a kitchen being eliminated

23   from the master bedroom suite?

24   A    I don't recall.

25   Q    Do you know whether or not appliances were

Confidential – Subject to Further Confidentiality Review

1    reused in the home rather than replacing them in an

2    effort to save money during this remediation?

3         A    I don't know what was done to save money, and

4    that's been part of the last few questions, and I will

5    just say I don't know how they made their decisions.

6    And whether the appliances were replaced would be a

7    matter of fact in the record, and if it's in the

8    record, I could look at that and see.

9              As I sit here right now, I do not recall the

10   specifics about the appliances in the Etter home, but

11   if they were in the budget, because I remember they had

12   extensive spreadsheets, and they weren't replaced, it

13   would be evident.

14        Q    So in the Etter report, though, you did

15   formulate an impression that high-end interiors

16   appeared to contribute to higher costs.

17             What data do you have for the interiors being

18   high end?

19        A    Well, the picture at the bottom of page 10.

20        Q    Uh-huh, and was the home -- did the home have

21   a less high-end interior before the remediation than

22   this?

23        A    I don't -- I don't know off the top of my

24   head.  I believe there are original construction

25   drawings in the file that would have those details on

1    it.  It appears to me that this -- and like I said, I

2    have to -- there's an incomplete set of information for

3    me to be able to know for sure, but I'm just

4    referencing here that this type of ceiling that's in

5    here, for example, and the custom cabinet work, the

6    only other home that had anything similar to this was

7    Mr. Wites, and it wasn't enough this extensive.

8         Q    So when it comes to what changes were made,

9    either upgrades or downgrades, on the Etter home during

10   the construction process, is it fair to say that you

11   don't have an opinion one way or the other on any

12   specific item, whether, in fact, it was an upgrade or a

13   downgrade, compared to what it was pre-remediation?

14        A    I tried to identify in each property just

15   that, whether there were upgrades, and some were very

16   specifically laid out as options and upgrades.  Just

17   like Ms. Chatmon that we talked about, there were

18   three, I believe, in her contract that were her

19   options.

20             In this particular file, there were several

21   pages of cost estimates that were updated by his

22   architect/builder, and I don't recall going -- actually

23   identifying the specific ones that somehow didn't get

24   replaced, like a zero budget or something.  So it's

25   difficult to tell from his records what was there

1    originally versus what was replaced.

2         And so -- so there's just an incomplete set

3    of facts, but I pulled these pictures off the internet

4    because I saw the drawings, and the drawings that he

5    had looked like that (indicating), and then when I went

6    on the internet to see the house, that's what it looks

7    like, is what was built.

8         Now, whether that was protected, I could go

9    back to the spreadsheets. And I remember looking at

10   the flooring, this marble floor with this pattern and

11   all. I hope he protected that, right, because flooring

12   is -- you can pull it out. I don't know if he, off the

13   top of my head, replaced that piece of the marble

14   flooring right there or not. It would be in the

15   records, but we could check that.

16   Q    So let's say he protected it, hypothetically,

17   right, rubber yoga mats, remediation done, lift up

18   mats, fine.

19        Would you correct your opinion or suggestion

20   on page 11 that high-end interiors appear to contribute

21   to the higher cost if they didn't replace them at all,

22   they just protected them during the -- during the

23   construction process?

24   A    No.

25   Q    How would a high-end floor that was covered

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 136 of 224
Case 2:09-md-02047-EEF-MBN Document 20688-19 Filed 04/25/2019 Page 112 of 185
Confidential - Subject to Further Confidentiality Review

1    with a yoga mat and not replaced increase the

2    remediation expense?

3        A    So the picture below explains it, which is

4    the ceiling, for example.  If that ceiling was --

5    that's what was in the house before the remediation and

6    if that ceiling was torn out, that's an expensive

7    ceiling to replace, and that would contribute to the

8    high-end finishes that were replaced.  If the floor

9    wasn't replaced, then that wouldn't contribute any to

10   the higher costs.

11       Q    Fair enough.  So if the floor wasn't

12   replaced, it doesn't contribute.  If the ceiling was

13   replaced, that's an expensive thing to do.

14            What information do you have that the house

15   had a ceiling like that or didn't have a ceiling like

16   that before this remediation?

17       A    I believe I have the drawings for his

18   original construction in the file.

19       Q    And was it like that, was it more elaborate,

20   was it less elaborate, just plain?  What was the house

21   before that?

22       A    I can't recall as I sit here right now, but I

23   could do that exercise.  And probably the way to see

24   exactly what they replaced is their cost spreadsheets,

25   and those were very detailed areas where they got lots

Confidential – Subject to Further Confidentiality Review

1    of prices and bids and bought a lot of items for the

2    house.

3        Q    So a home that has reactive Chinese drywall

4    that's built with exquisite finishes, very high-end

5    everything, 10-part crown molding, mahogany chair rail,

6    the whole works, the cost per square foot to remediate

7    that house is going to be significantly higher than a

8    house that's built with contractor-grade items;

9    wouldn't that be a fair statement?

10       A    Yes.

11       Q    So the Etters had a high-end home, or at

12   least they've got one now.  If you just assume for me

13   it was high end before, you would expect to see a

14   higher-than-average square-footage expense for that

15   house, wouldn't you?

16       A    Yes.

17       Q    Let's go to Hernandez on page 11.  The first

18   question I have for you on Hernandez is the source of

19   your number in the second paragraph of $406,923.  Where

20   did that come from?

21       A    From the project file.

22       Q    If I -- if I told you that his profile form

23   listed $381,784 and that that was also the number that

24   was arrived at by Elkin, the accountant that added up

25   the remediation expenses and published a report for the

```
 1   Hernandez house, 381,784, could you tell me whether
 2   381,784 is more reliable or whether your 406,923 number
 3   is more reliable?
 4       A    I would refer to the source document of the
 5   406,923 and see what it's comprised of and check what
 6   the CPA included in their damages number.  I've noted
 7   on several of these files that the personal profile
 8   form damages number is different --
 9       Q    Uh-huh.
10       A    -- from the documentation in the file.
11       Q    Right.
12       A    So I look at the documentation in the file.
13   I -- they claimed 406,923.
14       Q    So -- and I'm not trying to make this a
15   memory game or a trick contest.
16           MR. SERPE:  And, Counsel, maybe I'll
17       just ask at some point if you could
18       supplement.  We've got both the SPPF and
19       Elkin at 381, not 406.
20           MR. BLOCK:  What I'm looking at suggests
21       we have a basis for the $406,000 number, I
22       think in the plaintiff's -- Ms. Hernandez's
23       testimony, but we can --
24           MR. SERPE:  Let's come back to it.  It's
25       not really that important a point.
```

```
 1              MR. BLOCK:  Yeah.
 2              MR. SERPE:  I just wanted to make sure
 3         we were working on the same --
 4              MR. BLOCK:  Yeah.
 5              MR. SERPE:  -- math number.
 6              MR. BLOCK:  Yeah.
 7              MR. SERPE:  Okay.
 8         Q    (By Mr. Serpe)  Substantively, on Hernandez,
 9    you specifically commented on an upgrade made by the
10    Hernandez family and included the reformatting of the
11    kitchen on -- here on page 11, second paragraph.  Am I
12    reading that fairly in terms of your conclusions in
13    this case?
14         A    Yes.
15         Q    And what was the reformatting?  What was done
16    in the kitchen to upgrade it?
17         A    So the -- when Ms. -- I was at the property,
18    and Mr. and Mrs. Hernandez were there, and we had a
19    conversation, and they told me that when the builder
20    had built the house in 2005 and '6, the cabinets that
21    were in the kitchen were custom cabinets from Canada.
22    And when the cabinets were removed during the drywall
23    removal, the cabinets that were replaced were not the
24    same cabinets, they did not re-install them, and that
25    the builder had put in less expensive cabinets from
```

Case 2:09-md-02047-EEF-MBN Document 23380-34 Filed 12/03/19 Page 140 of 224
Case 1:14-cv-22074-WCL Document 194-1 Entered on FLSD Docket 08/25/2014 Page 32 of 185
Confidential – Subject to Further Confidentiality Review

 1    Home Depot, is what she said, I believe.

 2            So when that was done, then the size of the

 3    cabinets and the location of the cabinets and the

 4    island changed because the cabinet dimensions were

 5    different, and then -- they then scavenged some floor

 6    tiles to try to fill in the floor tiles.  So, you know,

 7    the kitchen was not the -- they didn't put back the

 8    same kitchen that they took out.

 9       Q    Now, is replacing custom cabinets with HQ

10    pre-fab cabinets an upgrade?

11       A    I wouldn't call that an upgrade, no.

12       Q    So in an effort to save money or, frankly,

13    they couldn't afford to replace custom cabinets, if

14    people go to HQ and do the best they can and then the

15    tile has to be reformatted and there's some expense

16    there, that's not a -- the tile work would not be an

17    upgrade either, would it?

18       A    No.  That's just working with the field

19    conditions.

20       Q    So when you say in your report that the

21    testimony suggests that upgrades or unrelated changes

22    during remediation, such as replacing the pool bathroom

23    stucco and reformatting the kitchen, contributed to the

24    higher than MDL formula costs, what did you mean if

25    these were downgrades and not upgrades?

Confidential - Subject to Further Confidentiality Review

```
 1        A     Well, you skipped over the stucco out in the

 2    pool room.

 3        Q     Good.  Let's talk about that.  How much

 4    stucco are we talking about?

 5        A     I don't know.

 6        Q     You couldn't tell me if it was 5 square feet

 7    or 50 square feet of stucco?

 8        A     I said I don't know.

 9        Q     And do you know whether the stucco removal

10    involved sanding down to drywall and applying a new

11    coat of stucco or what was involved in that portion of

12    the project?

13        A     I don't know.

14        Q     Do you know -- do you have a unit cost for

15    applying stucco to a pool bathroom wall, what that

16    costs per square foot or anything like that?

17        A     I have a general idea.

18        Q     And for, let's say, an average-sized

19    bathroom, if you were going to stucco it, can you give

20    me an idea of what you would expect in terms of a range

21    of expenses for putting stucco in it?

22        A     For an average bathroom to stucco the walls?

23        Q     Yeah.

24        A     I think the stucco guy would charge about

25    2500 bucks.
```

1      Q      So let's put that data point up there as an

2    assumed number, 2500.  Any other upgrades or changes

3    that the family wanted to do to their property that you

4    would say would have contributed to a substantially

5    higher than predicted outcome for this house?

6      A      Substantially higher than predicted?

7      Q      Than the MDL formula, your words,

8    substantially higher than the MDL formula, but the

9    testimony suggests that the claimants made upgrades or

10   unrelated changes during the remediation, such as

11   replacing pool bathroom stucco and reformatting the

12   kitchen.

13          Other than those two things we've talked

14   about, what else happened that would have contributed

15   to the increase in remediation expenses?

16     A      Okay.  The way your question is worded, I

17   take exception to that, one, I never represented that

18   the formula is indicative of anything, okay, and you

19   made a statement like that, so I'm not -- I didn't say

20   that, and I have not made a statement in my report that

21   the formula -- that that's the -- that's what the price

22   should be.

23          All I'm saying is the fact:  The formula

24   calculation result is this, their actual damages is

25   that, it's higher, substantially higher, and in the

Confidential - Subject to Further Confidentiality Review

1   house of Hernandez, they've admitted and identified

2   upgrades that they chose to make during the renovation.

3          One that I noted is in the picture on page

4   12, the top right corner, that exterior wall was

5   changed as part of it.  There used to be windows.  If

6   you look at the before pictures and the after pictures,

7   those windows that were on that wall are no longer

8   there.

9          And from the before pictures, I was trying to

10  identify other changes that were made that were owner

11  changes.  Another change is in the bathroom under the

12  stairs.  It used to be a closet and a bathroom, and

13  what they wanted to do was enlarge the bathroom so

14  there was more room in there, and they enlarged the

15  bathroom by 3 feet.  And to do that, they had to chop

16  out the floor and move the toilet, which, by the time

17  that you've done that, you're into the thousands of

18  dollars.  That was simply because they wanted it done

19  differently.

20          So those are two items that I was able to

21  detect that were owner preferences that would account

22  for a higher than replace in kind.

23          The other factor for this home is it was a

24  custom home.  It's not a tract home.  For example, in

25  the top right picture, you can see a large two-story

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 144 of 224
Case 2:11-cv-02349-MCE-JFM Document 244-1 Filed 08/25/2014 Page 146 of
185
Confidential - Subject to Further Confidentiality Review

1    area in the house, and that's a very high ceiling, with

2    walls and balconies around it and whatnot.  That is not

3    a house like Gody or Foster or Nguyen.  So the cost of

4    working in that situation will be higher than the cost

5    of working in a one-story house where everything can be

6    done not off ladders, et cetera.

7         So there are a series of factors that explain

8    the actual cost that the Hernandezes spent, and the

9    result is higher than the formula result.

10   Q    On the list of upgrades, you mentioned the

11   elimination of windows on the picture in -- page 12.

12   Are you talking about the top right picture?

13   A    Yes.

14   Q    So there were windows below it?

15   A    Yes, there were windows right where that --

16   those two cabinets are.

17   Q    And eliminating a window as opposed to

18   replacing a window increases the cost or decreases the

19   cost?

20   A    Well, you're not supposed -- in the protocol,

21   you're not required to do anything with the windows.

22   So whatever they did, block it in, remove the window,

23   waterproof it, stucco the outside, drywall the inside,

24   that would be all just their discretionary choice, not

25   required.

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 145 of 224
Case 1:14-cv-22494-MGC Document 94-1 Entered on FLSD Docket 04/25/2016 Page 147 of 185
Confidential - Subject to Further Confidentiality Review

1       Q       And have you -- let me start over.

2               Would it be a fair statement that for the

3       window elimination, the bathroom change -- am I leaving

4       anything else -- oh, the stucco outside on the pool --

5       anything else that would have increased construction

6       costs that you're aware of in this house?

7       A       Yes.  The master bathroom, which is not

8       photographed here, but it's in my other videos.  When

9       their home was renovated, the master bathroom had, I'm

10      going to say, custom cabinets and either granite or

11      marble countertops.  It was a green pattern, and this

12      was something that Ms. Hernandez had handpicked and had

13      done similar to her kitchen cabinets.

14              During the renovation, there were photographs

15      of those cabinets, those countertops, the soaking tub,

16      other fixtures and things that were in the master

17      bathroom that were in storage in the garage.  There's

18      pictures of it.  So when I look at the before and after

19      pictures, it had been reinstalled, right, and one of

20      the reasons that the judge has written that you

21      wouldn't reinstall something is it's more economical to

22      replace it with stuff new because you might damage what

23      you take out.  So, logically, to try to carefully

24      remove custom cabinets, store them, clean them,

25      carefully reinstall them so you don't mess them up or

Confidential – Subject to Further Confidentiality Review

1  break them is going to cost more than new cabinets.

2  And that's one thing they did, and it was their choice.

3      Q    Let me make sure I understand your last

4  sentence.  You believe that removing cabinets, storing

5  them, and carefully reinstalling them costs more than

6  simply replacing the cabinets?

7      A    That's what the judge says.

8      Q    Is that what you believe?

9      A    I haven't done an independent analysis, but

10  that's what the judge says.

11      Q    And you have no reason to -- you're not

12  offering an opinion that he's mistaken in that regard,

13  are you?

14      A    I haven't been asked to give that opinion.

15      Q    And because you haven't been asked and you

16  haven't thought about it, you haven't formed an opinion

17  that he's mistaken in that regard that you're prepared

18  to defend here today, have you?

19      A    I haven't been asked to give any opinions

20  about the judge's rulings.

21      Q    So on our list for Hernandez of things that

22  they did which would have driven the price up, I

23  understand that you believe we should add the increased

24  cost of reusing the things that were in the master

25  bathroom.

1          Anything else on your list of upgrades or

2     price increases that the Hernandezes undertook in their

3     home?

4          A     Top right picture, again, that chandelier

5     that you see hanging there -- see it --

6          Q     Yes.

7          A     -- that chandelier is mounted on a motor that

8     lowers it and raises it so it can be cleaned and

9     lightbulbs replaced.  That chandelier was taken down

10    and put in a crate and stored in a garage, and then

11    after the construction was done, it was replaced --

12         Q     Uh-huh.

13         A     -- reinstalled, I should say.  There's no

14    chandelier like that in Gody, in Foster, or in Nguyen,

15    and so -- and there are lights in the ceiling just like

16    there are in Foster and Gody and Nguyen and the other

17    houses.  So it would have cost -- and I don't remember

18    if I was told the number that the contractor charged

19    for that exercise, but that would have been an

20    additional cost that would have caused the final

21    construction cost to be higher than the other houses,

22    for example.

23         Q     Uh-huh.

24         A     That's another factor.

25               They also have, that's not photographed here,

1   an Elevette in this home, an elevator, and I didn't see

2   indications of repair work or whatnot, but that is

3   another upgrade that has to be considered for the

4   electronics and the wiring.

5           They also mentioned a -- Mr. Hernandez was

6   very proud of his music system in the house, and that

7   was a complete restoration in his home.  It was not

8   something you found in Gody or Foster or Nguyen.  It

9   was a -- apparently, he represented it was a high-end

10  system throughout the house that he replaced

11  completely, so that would have also added to the cost

12  over your house, normal house.

13      Q    Is the sound system included in the

14  remediation bills that you are quantifying here?

15      A    I'd have to check.

16      Q    You're not sure?

17      A    It came to my mind, so I just -- I don't

18  know.  I'd have to check.

19      Q    So you'd be quite right, if that was included

20  in the remediation expense, that would be something

21  that would be out of the ordinary for remediation and

22  would drive the price up.  But if it wasn't, then you

23  wouldn't consider that as having put upward pressure on

24  this remediation cost; would that be a fair statement?

25      A    I thought there was -- could you just ask me

1    the first question again?

2         Q    The sound system, if it wasn't part of the

3    remediation quote, you wouldn't consider it as having

4    put upward pressure on the remediation expenses

5    actually incurred by the Hernandezes, would you?

6         A    If the sound system was not included in their

7    damages claim, it would have no effect on their

8    damages.

9         Q    Sometimes you just ask a dumb question, and

10   by the time you answer it, you think "Why did I say

11   that out loud."  I mean, that's just so obvious.

12        So I want to switch from the things that you

13   look for that would put upward pressure on the

14   remediation expenses, and I want to talk about, in

15   fairness, things that the Hernandez family lost, things

16   that weren't as good for them afterwards, where they

17   didn't get back what they had before.

18        What information, if any, do you have that

19   there were aspects of their house that were downgraded

20   or damaged or not the same as what they had before the

21   remediation?

22        A    We mentioned the kitchen where they -- they

23   told me that the cabinets were less expensive, and I

24   believe their explanation was they couldn't get the

25   cabinets in time, the ones that they wanted, like the

1    replacement cabinets from Canada, and so -- and this

2    happens sometimes -- they got different cabinets.  That

3    would be one, I guess, what you described as downgrade,

4    so it's the kitchen cabinets.

5              No other downgrades come to my mind.  They

6    have a very nice home, well kept, and the upgrade would

7    be the air-conditioning system.  I do not believe that

8    the air-conditioning system that he had in the home

9    prior to the remediation was replaced in kind because

10   he explained it to me, when I was trying to remove the

11   covers for the coils, that he has severe allergies and

12   he put in a very high-end purity filtration system and

13   air-conditioning system, which I have pictures of, and

14   I was 15 or 20 minutes standing there in front of him

15   trying to get the covers off.

16             And so those would have been an upgrade over

17   what he previously had, it appears to me.  Now, I'm not

18   aware of any other downgrades that came to my

19   attention.

20       Q    You mentioned that because of the

21   reconfiguration of the kitchen to accommodate the HQ

22   cabinets, that tiles had to be replaced in the kitchen

23   floor.  Do you recall that?

24       A    Yes.

25       Q    And the tiles were harvested from another

```
1    area of the house, were they not?

2        A    Yes.

3        Q    And they tried to remove the tiles, then put

4    them in in a way where the tiles would blend into the

5    kitchen adequately; is that a fair statement?

6        A    Yes.

7        Q    And they didn't achieve a very attractive

8    result; wouldn't you agree with that?

9        A    I didn't see anything unattractive about it.

10   I was not critical of their home.  I saw where I --

11   they described to me where the tile work had been done.

12   I thought it looked pretty good.

13           They also took me over to the little bathroom

14   that they increased where they harvested or scavenged

15   the tile from, and she wasn't happy with the way that

16   the tile changed from this living area to the tile in

17   the bathroom because they were different kinds of tile,

18   and that's often the case.

19           And I offered to her, "Did you think about

20   putting a threshold in to separate the two visually,"

21   which is what most people do when you have a different

22   flooring material, and so I -- we were just there and I

23   asked her, because if it is -- visually bothered her --

24   it didn't bother me, but it's just an aesthetic touch

25   that they could have put a little white normal
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 152 of 224
Case 2:14-cv-02722-MSG Document 3-41 Filed 04/24/15 Page 45 of 185
Confidential - Subject to Further Confidentiality Review

 1    threshold across there, and it probably wouldn't bother

 2    her near as much.

 3        Q    So is it your testimony that you examined the

 4    tiles in this area sufficiently that you can offer an

 5    opinion that none of them are cracked or loose, or do

 6    you not have an opinion on that, on the adequacy of the

 7    reinstallation job?

 8        A    I don't recall any being loose.  I walked on

 9    it.  I stood on it.  I was right there with my computer

10    in the area where -- the tiles that were harvested from

11    the bathroom were put around this island, because this

12    island is not the same shape as the island that was

13    there before.  And my understanding is they had to

14    change the floor, so there'd be tile now where there

15    wasn't tile before, right, they had to change the

16    configuration of it.

17            There might be some cracks.  I usually

18    observe cracks if they're there.  I don't recall seeing

19    cracks, but that doesn't mean they're not there.

20        Q    And the tile that was brought in to replace

21    the tile that was harvested from the bathroom, you said

22    was a different type.

23            You would recognize, from your experience,

24    that it was an inferior grade of tile and one which

25    clearly did not match what was there before, wouldn't

Confidential - Subject to Further Confidentiality Review

1  you?

2     A    My impression, it was just a different color,

3  slightly different color.

4     Q    So in your view, the tile was -- other than

5  color, was an equivalent tile?

6     A    I'd have to look at my photographs to see.

7  They do have nice floor finishes, but there was nothing

8  unattractive about the finish in the bathroom, and I

9  don't know that I determined that it was inferior.  I

10 could take a second look at it, but I don't think I

11 know enough about it right now to say one way or the

12 other.

13    Q    Well, let me ask the question this way, see

14 if it refreshes your recollection:  The tile that was

15 harvested from the bathroom to move to the kitchen was

16 a marble tile, it was marble that was cut into squares

17 and dropped; am I right so far?

18    A    I believe that's marble.

19    Q    And when they went back to replace the tile

20 in the bathroom, they didn't use marble, they used some

21 sort of ceramic; would that be a fair statement?

22    A    That appears so.

23    Q    And in your experience, is marble an

24 equivalent price to a ceramic bathroom tile?

25    A    No, I would say marble was probably more

Confidential – Subject to Further Confidentiality Review

1    expensive, but remember what they did in the bathroom

2    was they demolished the closet next to it and expanded

3    the bathroom 3 feet back and moved the toilet back so

4    they would have more room in that bathroom, which would

5    then have had to replace the floor, generally, when you

6    jack out -- jackhammer the floor out for the potty.

7         Q    Why was the bathroom expanded?

8         A    What Mr. Hernandez explained was his closet

9    for the electronic gear was between the bathroom and

10   the Elevette, that there was a small closet space where

11   he had his electronics gear, and that it no longer was

12   there.

13        Q    And this space was contiguous to the kitchen,

14   was it not?

15        A    I would not call it contiguous.  I would say

16   it was under the stairs.

17        Q    Shared a wall?

18        A    What do you mean?

19        Q    When the kitchen was reconfigured to

20   accommodate different sized cabinets, they had to

21   change the exterior walls, the configuration of the

22   kitchen, didn't they?

23        A    The exterior walls of the kitchen?

24        Q    I'm sorry, the interior calls, the walls of

25   the kitchen.

```
 1       A    No.  I think the walls stayed in the same

 2  place, and they just hung the cabinets where the old

 3  walls were, unless I missed something.  I think the

 4  thing that changed was the island, so --

 5       Q    I didn't mean to cut you off.  I'm sorry.

 6       A    That's it.

 7       Q    So you're not basing your opinion at all on

 8  whether the cabinets would have forced a

 9  reconfiguration of the layout of the walls of the

10  kitchen?

11       A    Well, I did address earlier that they told me

12  that the walls were -- I mean, the cabinets were a

13  different size.

14       Q    Smaller?

15       A    I don't remember if there were more of them

16  that were smaller.  I don't recall the detail comparing

17  one to the other, the pre-remediation to these actual

18  ones that are photographed in the top left corner.  But

19  they were describing to me that the cabinets were

20  different from the ones they had before and they were a

21  different size.

22            I do not recall detecting that the walls that

23  the cabinets are mounted on were changed in any

24  substantive way.  Apparently, the island had a

25  different shape.  I think if you look at a before and
```

1    after of the island, you'll see the difference in the

2    shape.

3         Q    Let me switch to the last home for this

4    afternoon, Martinez, which is on page 7.

5              When you inspected the Martinez home, did you

6    see evidence of corrosion in the home?

7         A    Yes.

8         Q    Would it be a fair statement that you saw

9    it -- that you saw it at least in the kitchen and the

10   garage?

11        A    Yes.

12        Q    The drywall had been removed from the garage

13   when you inspected it?

14        A    Yes.

15        Q    And you saw corrosion on the copper grounding

16   wires that you inspected in the garage?

17        A    Yes.

18        Q    Did you see markings in the home on the

19   drywall that are consistent with reactive Chinese

20   drywall?

21        A    I haven't been asked to give an opinion about

22   the identification of the markings.  I took photographs

23   of them, and there were various markings from different

24   manufacturers that I photographed.

25        Q    And putting aside reactive versus

1    nonreactive, were there photographs that indicated to

2    you that the word "China" or something about China was

3    associated with any of the pictures you took?

4        A    Again, I haven't been asked to give an

5    opinion to identify that.  There -- my pictures are in

6    my file.  You can see the words for yourself.

7        Q    Now, the -- your report analyzes expenses

8    from a 2012 estimate prepared by Chinese Drywall

9    Experts I, LLC.

10           Do you see that on the third paragraph of

11   page 7?

12       A    Yes.

13       Q    And do you believe that the scope of work

14   that was included in the 2012 quotation from that

15   company for the Martinez family varied in any respect

16   from the remediation protocols that we've identified

17   either as KPT 2012 or the summary protocol?

18       A    Well, that's just a proposal.  I mean, it's

19   not anything to do with the protocol right now, and I

20   would have to see that proposal to see what they

21   included in it.

22       Q    In your third paragraph, you include a

23   sentence in which you compare the estimate to the MDL

24   formula.  Do you see that, the last sentence of your

25   third paragraph?

```
 1      A      Yes.

 2      Q      So is it true that you compared this estimate

 3   to an MDL formula for a very specific remediation

 4   protocol without determining whether the quote was for

 5   the items that are included in the remediation

 6   protocol?

 7      A      No.

 8      Q      Why not?

 9      A      That's not true.

10      Q      Why not?

11      A      Because I looked at the quote in the file,

12   and I said that to answer your question, I would need

13   to look at the quote.

14      Q      So if I understand you correctly, at the time

15   you looked at the quote, you were satisfied that the

16   quote did represent a reasonable MDL-specified

17   remediation, which is why you then did the comparison

18   of the quote to what the formula for that remediation

19   would cost?

20      A      No.  I just put the fact in there they had a

21   quote, and here's the formula, and the quote is lower.

22   I did not make any statement that this would be

23   sufficient for a complete remediation.  And if I had

24   the quote in front of me, which I've read before

25   because I read it when I was in the home -- it's the
```

1    first thing I did in every one of these houses.  I went

2    in and I set up my computer, I opened it up, and I

3    refreshed on those files that were in that folder in my

4    computer, and I read it at that time.

5         I do not recall, as I sit here right now,

6    exactly what it said, so I can't give you an opinion

7    that it would have been sufficient.  I can't answer

8    that question without that document.

9    Q    Let's go to page 13, "Complete Statement of

10   Opinions," second paragraph.  Let me read it into the

11   record, and then correct me if I've misread it.

12        "The Chatmon and Martinez residences have not

13   been remediated, but the contractor's price proposal

14   for the remediation is significantly less than the MDL

15   formula result would provide, and the scope of work

16   included in those proposals should reasonably be

17   expected to achieve the objective of the remediation

18   protocol, which is to remove the reactive drywall."

19   Did I read that correctly?

20   A    Yes.

21   Q    And when you say "reasonably expected to

22   achieve the objective of the remediation proposal,"

23   what do you mean?

24   A    The same thing we've said throughout the

25   questions that you asked me today, to remove the

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 160 of 224
Case 2:14-cv-02494-CJ Document 341 Entered on FLSD Docket 08/25/2011 Page 252 of
285
Confidential - Subject to Further Confidentiality Review

```
1    Chinese drywall and the effects of it and to restore

2    the house to a condition where there's no Chinese

3    drywall.

4        Q    If the quote that you reviewed for the

5    Martinez residence at the time you offered the opinion

6    that it -- that the proposal "should reasonably be

7    expected to achieve the objective of the remediation

8    protocol," did that quote vary in any significant

9    degree from the protocols that we've discussed as KPT

10   2012 or the other -- what you refer to as summary

11   protocol?

12       A    Same answer as probably the last three times

13   you asked me that exact same question.  You give me

14   their proposal, let's take a look at it, and I'll be

15   answer to your question.  Because in my recollection,

16   as I'm sitting here right now, I cannot answer that

17   factually.

18       Q    Would you have said that sentence if there

19   was any variation from the KPT 2012 or the summary

20   protocol?  Would you have said that sentence?

21       A    Well, the sentence says the proposals should,

22   not will, should reasonably be expected.  And that's

23   the purpose of the proposal; you should reasonably

24   expect it to do what you're hiring them to do to

25   achieve it.  So that's a very straightforward
```

1    statement.

2         Q    At any time prior to today, have you written

3    down on a piece of paper or typed on a computer a

4    specific comparison of any protocol with the Martinez

5    residence quote to document any variation between the

6    two?

7         A    I've not written that down.  I've

8    photographed it.  I observed it.  I see what they have

9    done and what remains to be done.  I read their

10   proposal and made the determination that the proposal

11   would -- should reasonably be expected to achieve the

12   remediation.  But did I write it down somewhere in a

13   matrix?  No, I didn't do any of them.

14        Q    I think that's the second time you used the

15   word "matrix," and I want to make sure I understand

16   what that is.

17             What -- when you say "matrix," what are you

18   referring to?

19        A    Spreadsheet.

20        Q    So a spreadsheet, for example, could have one

21   column for KPT 2012 requirements, other protocol

22   requirements, and then the home, yes/no, and you could

23   list each of the individual items and have a

24   spreadsheet, a matrix, as to whether it did or did not

25   meet the specific requirements of the protocol.

Confidential - Subject to Further Confidentiality Review

```
 1              Would that be a matrix?  Did I accurately
 2    describe that?
 3       A    Yeah.  It's a quick reference.  It could be
 4    demonstrative; you could look at in an instant and see
 5    which ones were done and which ones weren't done.
 6       Q    So that could be done for all of them
 7    collectively, or it could be done for an individual
 8    one, or there could simply be a note somewhere saying
 9    this was or wasn't done, but none of that has ever been
10    written down by you in any format?
11       A    No.
12       Q    Let me ask you to assume for a minute that
13    the 2012 quote says we're not going to replace the
14    cabinets, we're going to take them out, we're going to
15    put them back as best we can, that's what we're going
16    to do for you here, and that was a proposal.
17              Would you say that that proposal varied or
18    didn't vary from either the KPT 2012 or any other
19    protocol which you have reviewed?
20       A    Well, those particular cabinets are one of a
21    kind in that they have been destroyed by the
22    Martinezes, who have drilled holes all through the
23    cabinets.  No one explained to me why they drilled
24    holes in them, but it appears they're to ventilate,
25    because there's holes drilled throughout the house.
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 163 of 224
Case 2:14-cv-02722-MVL Document 241-1 Entered on FLSD Docket 08/25/2014 Page 455 of
185
Confidential - Subject to Further Confidentiality Review

```
 1    Around where the baseboard would be, they have holes

 2    that are the size of a drill bit, 1-inch holes,

 3    whatever.  I don't know how many, but over 100 holes.

 4            And the cabinets in the island and the

 5    cabinets in the kitchen, on the base cabinets, have

 6    holes in them.  I don't recall seeing the wall cabinets

 7    having holes, but I took the electrical outlet off of

 8    the sink, that's right there by the sink, and I

 9    commented, and I took pictures of it, that that was a

10    safety issue because it was so corroded, that that

11    could be a fire hazard.

12            I mean, that was -- of all of the electrical

13    switches and devices that I had seen, it was the worst.

14    And that was mounted to the cabinets, and underneath

15    the cabinets is the pipes for the sink.  They were

16    corroded.  So if the Martinezes took those cabinets out

17    and then replaced those cabinets, they would have

18    defective cabinets when they were reinstalled, that I

19    would not agree with their approach to do that --

20       Q    Uh-huh.

21       A    -- just because those cabinets are already --

22    at least the base cabinets, they're already worthless.

23    They should be thrown away when they take them out.

24       Q    Thank you for that.  I agree with you 100

25    percent.  I appreciate that answer.
```

Confidential - Subject to Further Confidentiality Review

```
 1              Let me ask you a hypothetical.  If, in 2012,
 2   when the first quote came out, the cabinets were the
 3   same as when they were first installed, no holes
 4   drilled, they were just as installed.  The contractor
 5   writes a quote and says, "You know what, we're not
 6   going to replace the cabinets."  Kind of a simple
 7   question:  Would you consider that variance to be a
 8   variance from the court-mandated remediation protocol
 9   by the -- what you refer to as KPT 2012 or any other
10   protocol that you've reviewed?
11        A    The cabinets in the protocols are allowed to
12   be removed and replaced.  The explanation is the
13   economics of trying to salvage them was -- in the
14   judge's ruling, that it's more economical just to
15   remove them and -- because they're going to be damaged
16   or whatever and just replace them with new.  But
17   there's also a provision that the cabinets aren't
18   necessarily -- they don't necessarily have to be
19   removed because they in themselves are not damaged.
20   They are simply in the way of the Chinese drywall.
21              And so if the homeowner decides to take out
22   the cabinets, store them, and then reinstall them, the
23   house will still have been remediated because the
24   cabinets themselves aren't damaged.  So that's the
25   latitude that the protocol gives, even though it does
```

1    provide for cabinets to be removed and new cabinets

2    installed.

3         Q     Which protocol gives latitude on cabinet

4    removal and replacement?

5         A     There's discussion about that.  So on page 14

6    of this document, 20741, there's a paragraph 5 that

7    identifies the impact of the corrosive environment.

8         Q     Yep.

9         A     And it lists the items that are impacted:

10   copper wiring, copper pipes, silver-based components in

11   the electronics, HVAC circuits, brazing on pipes, which

12   causes premature failure of electrical/mechanical

13   devices.  It does not mention cabinets as being

14   affected.  That's one place.

15         Another is at 8.  There's another list that

16   says that -- the building codes, the national builders,

17   the science of corrosion and practical experience --

18   "proper remediation of the Chinese drywall must include

19   all drywall, all electrical wiring, the entire HVAC

20   system, and many other items such as appliances,

21   carpet, cabinetry, trim work and flooring."

22         So now they have mentioned cabinetry, trim

23   work, and flooring.  And what we're going to read

24   ahead, we're going to find out where those have to be

25   removed simply because they're in the way, and the

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 166 of 224
Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 166 of 224

Confidential - Subject to Further Confidentiality Review
185

 1    assumption is that they're going to be damaged and it's

 2    going to cost more to replace them, but they themselves

 3    are not damaged by the Chinese drywall.

 4             They list carpeting, for example, as it's

 5    just not cost effective.  Hardwood flooring, again, to

 6    clean it, not cost effective.

 7             Thirteen, "It is more cost effective to

 8    replace cabinets, countertops, trim, crown molding,

 9    baseboards, bathroom fixtures, and insulation than

10    attempt exacting removal, storage and subsequent

11    reinstallation."

12             Now, it doesn't say those are damaged.  It

13    simply says it's less economical to reinstall them, is

14    what it says.  Okay?

15             So if the Martinezes wanted to salvage their

16    cabinets, take them out, and store them and replace

17    them, they could.  They would be entitled to the cost

18    of new cabinets, but they could reuse their cabinets

19    because they're not damaged.

20        Q    When you say they would be entitled to

21    recover the cost of the new cabinets, that's because of

22    the way that the protocols have been written?

23        A    That's true.

24        Q    In fact, as written in this protocol and

25    continues in additional areas, the protocol calls for

1    the replacement of all cabinets and doesn't provide a

2    formula for when they can and can't be -- doesn't

3    provide an optional matrix on how to save cabinets.

4    That's nowhere in here.  Is that a fair statement?

5         A    The commentary I've read so far to you, and I

6    could continue, is that it's economics.  It's a

7    decision that's not because the cabinets are damaged by

8    Chinese drywall.  It's simply the judge's

9    interpretation, based on the testimony and things he

10   considered, that it's more economically -- and I would

11   add in general, to add new cabinets instead of

12   replacing the old.

13            And here you have an example where a family

14   decided not to replace with new.  They just decided to

15   put back for whatever reason.

16        Q    Let me ask you to look at page 24 of the

17   document there in front of you, paragraph 37.  And if

18   you'll bear with me for a minute, I'm going to read the

19   paragraph, and with Counsel's -- unless Counsel prefers

20   it, I'm going to eliminate the citation marks just to

21   make it go a little fast.

22            "As this Court earlier determined and

23   Mr. Inglis confirms, there's a well-established and

24   defined scope of work necessary to fully remediate a

25   Chinese drywall property.  This well-established

 1    evidence-based and field-tested scope of work for

 2    remediating a Chinese drywall property requires that

 3    the interior of the home be stripped to the studs (with

 4    all wiring, plumbing, fixtures, cabinets, HVAC systems

 5    and insulation removed), cleaned by wet-wipe and HEPA

 6    vacuum, and examined and tested by an independent

 7    entity before the property is brought back to its

 8    originally intended condition.  This scope of work was

 9    established based on long-term observation of

10    properties with Chinese drywall (including sampling and

11    testing), scientific investigation of Chinese drywall

12    and the science of corrosion, practical construction

13    experience (particularly the experience of national

14    builders, and electric and building codes).  The scope

15    of work is the same regardless of the building type or

16    location of the property.  The only difference is the

17    square footage of the contaminated area of the

18    building."

19             First question, did I read that accurately?

20        A    Yes.

21        Q    Do you understand this paragraph to mandate,

22    as necessary, the removal of all cabinets for the

23    remediation that is mandated by this court order?

24        A    Yes.

25        Q    And you understand that Judge Fallon based it

```
1    not just on his own logic, but he listed a series of

2    six or seven different bodies of evidence that he

3    reviewed to draw his conclusion?  You see that he's

4    done that?

5         A    He listed the ones he listed, yes.

6         Q    Since April 21st of 2017, are you aware of

7    any court order, guidance document from a state agency

8    or a federal agency, a building -- national building

9    group, any organization whatsoever that has come out

10   with a protocol description that's less intensive than

11   what Judge Fallon has described here in 2017?

12        A    I think you've asked me that question a

13   couple of times and -- using the word "less intensive."

14   I answered it.  I'm not aware of any new protocols, but

15   I will point out something about what you read that is

16   consistent with my testimony, that it says you have to

17   take the cabinets out, right, the home be stripped to

18   the studs, and it lists taking the cabinets out, and

19   then it says clean it before it can be brought back to

20   the originally intended condition.

21             Your cabinets, we see, are not damaged by

22   Chinese drywall.  So you take them out, you clean the

23   house, and as you rebuild the house, you can put the

24   original cabinets back in the house as they were

25   originally intended.  This doesn't say anything more
```

1    than you have to take them out during the cleaning.

2    That's consistent with my testimony, and that's been

3    apparently what the Martinezes envisioned when they got

4    this proposal.

5         Q    Let me ask you to look at paragraph 13 on

6    page 16.  "Similarly, it is more cost effective to

7    replace cabinets, countertops, trim, crown molding,

8    baseboards, bathroom fixtures, and insulation than

9    attempt exacting removal, storage and subsequent

10   reinstallation."

11        That was Judge Fallon's ruling and

12   determination in April of 2017.  Did I read that

13   correctly?

14        A    Yes.

15        Q    Are you aware of any publication from any of

16   the entities I listed in the last question that have

17   come out and said, "Yeah, no, that's not right," that

18   something's new or different that has happened since

19   April of '17 where you don't have to replace

20   countertops, et cetera?

21        A    No, not a national publication, but on

22   individual homeowner bases, it's -- they can make that

23   determination themselves.

24             (Exhibit 6 marked for identification.)

25        Q    (By Mr. Serpe)  I'm going to hand you Exhibit

```
 1   6 and first ask you:  Have you ever seen Exhibit 6

 2   before?

 3        A    I don't believe so.

 4        Q    Exhibit 6 has already got a sticker on it

 5   that refers to Martinez Deposition Exhibit 15 from

 6   December 14th, 2018.

 7             Did you, to your knowledge, receive all of

 8   the exhibits that came with Mr. Martinez's

 9   deposition?

10        A    I believe I did.

11        Q    The -- I'd like to point your attention to

12   the date of this document, December 5th, 2018.

13        A    Uh-huh.

14        Q    Do you see that?

15        A    Yes.

16        Q    And then there's -- take -- I don't want

17   to -- don't feel rushed, but take the time you need,

18   but I think you'll see that there's a price quote

19   listed on this estimate of $179,526.

20        A    Okay.

21        Q    First of all, let me correct myself.  It's

22   Mrs. Martinez, not Mr. Martinez, whose deposition I'm

23   referring to.  So let me correct that and just ask you

24   the question again.

25             Do you believe you were -- that you received
```

1    a copy of Mrs. Martinez's deposition?

2        A    I believe I received copies of all

3    depositions.

4        Q    And deposition exhibits?

5        A    Yes, I believe so.

6        Q    And if I represent to you that Exhibit 15 to

7    the Martinez deposition was a -- was this price quote

8    from Gabisa, G-A-B-I-S-A, Construction Incorporated

9    from 2018, would you have any reason to doubt me in

10   that?

11       A    I would not doubt that this document exists.

12   I'm holding it.

13       Q    And to the extent that your report relied

14   upon a quote from 2012 for the Martinez family and

15   there was a subsequent quote in 2018, would you agree

16   with me that the 2018 quote would be more relevant for

17   current conditions or at least recently current

18   conditions in that market?

19       A    Let me just read this, see what it's all

20   about, because the first thing I noticed on here, it

21   says to reroof the house, and that's inconsistent with

22   what needs to happen.

23            If this is in the file, which I assume it's

24   going to be because we've got exhibits, then I missed

25   it somehow, and I would -- if this -- I mean, I have a

1    few specific questions about this that I would want to

2    check before I said, yes, this would give a full

3    remediation, because it doesn't talk about the garage,

4    which you asked me about.  And this 3,264 square feet,

5    let's see how many square feet are in this spreadsheet

6    for this house.

7            Yeah, so the formula has 2,259 square feet

8    for Martinez, and this quote is for 3,264 square feet.

9    I don't think that's the right number.  I think it's

10   a -- it's a thousand square feet more than the house.

11   That might be including the garage.  The garage does

12   need to be remediated because they put fence boards all

13   over the walls and ceilings, and that's a fire hazard,

14   which is what I told them about when I was there.

15           So I'm not sure that -- I mean, I am sure

16   that 2,259 square feet is the agreed square footage of

17   the house, so this quote is wrong in that regard.  I

18   have a picture of the air-conditioning unit, and it is

19   relatively new, I recall that, so it could be that

20   that's already done and doesn't need to be done.

21           This says, "Contractor will remove and repair

22   as needed the electrical system."  I'm not sure what

23   they're talking about repairing the electrical system

24   because there are no repairs for safety concerns.  It's

25   a complete removal.  It could be just wording that they

1    didn't need to include.

2              And in this one, they're going to remove and

3    replace the kitchen cabinets and the countertops, which

4    is what I've said they should do, and provide a city

5    permit.

6              Now, your question was:  Is there anything

7    about this scope that wouldn't fulfill the protocol?

8    Are any -- any variances in it?

9              This appears that it would achieve the

10   construction part of the protocol, but not the

11   inspection part of the protocol and cleaning.  That's

12   not included in this scope, but they would need to do

13   that as part of this process.

14       Q    Mr. Nolan, I thought I heard you say -- maybe

15   I just misunderstood it as you were beginning to

16   flip -- that the first thing that you saw there is that

17   they were talking about replacing the roof on the

18   house?

19       A    Yes.

20       Q    Where is that?

21       A    Okay, so if you look at the cover sheet --

22       Q    Yep.

23       A    -- you see the PO number?

24       Q    No.  Where?

25       A    Right here (indicating).

Confidential - Subject to Further Confidentiality Review

1     Q     Oh, yes.

2     A     See "Reroof"?

3     Q     Yes.

4     A     And you see the guy's signature -- email down

5  at the bottom?

6     Q     Yep.

7     A     You know what it says?  "Proedgeroofingswfl."

8     Q     Yeah.

9     A     To me, that means Pro Edge Roofings West

10  Florida.  So I don't know who Gabisa Construction is or

11  who this Ruben Garcia is, but before I would go much

12  further, I would make sure I didn't have a roofing

13  contractor trying to do a Chinese drywall job.

14     Q     Does that happen?

15     A     Illegally.

16     Q     Do illegal contractors get in there and do

17  remediations?

18     A     Yes, they do them illegally.

19     Q     And they do them for less money, which is how

20  they entice people into getting the business?

21     A     Not necessarily less money.  Sometimes it's

22  criminally more money.

23     Q     Your general experience?

24     A     I have some very specific experience with

25  construction fraud.

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 176 of 224
Case 2:14-cv-02722-MVL-DEK Document 234-1 Filed 04/15/2011 Page 26 of 185
Confidential - Subject to Further Confidentiality Review

```
1              MR. SERPE:  The court reporter --

2         videographer handed me a note that we're

3         literally at the end of this tape, so we're

4         going to go off the record at this point.

5              THE VIDEOGRAPHER:  We are now going off

6         the video record.  The time is currently 3:16

7         p.m.  This is the end of Media No. 3.

8              (Recess taken.)

9              THE VIDEOGRAPHER:  We are now back on

10        the video record with the beginning of Media

11        No. 4.  The time is currently 3:32 p.m.

12        Q    (By Mr. Serpe)  Mr. Nolan, have you, during

13   the break, had any additional revelation or discovery

14   about why the 2018 quote was not included in your

15   analysis of the Martinez home on page 7 of your report?

16   A    Other than it was produced to me, it was

17   confirmed that it was produced to me, and I must have

18   just missed it.

19             MR. SERPE:  I don't have any further

20        questions.  Thank you for your time today.

21             THE WITNESS:  Thank you.

22             MR. BLOCK:  Mr. Nolan, I have just a few

23        questions for you.

24   ///

25   ///
```

```
1                         EXAMINATION

2    BY MR. BLOCK:

3         Q    Can we stay with Exhibit 6, which you were

4    just discussing, which is the second estimate that

5    Ms. Martinez obtained, the one she obtained apparently

6    in 2018.  Do you have Exhibit 6 in front of you?

7         A    Yes.

8         Q    Okay.  On the first page, do you see a cost

9    per square foot that this contractor offered?

10        A    Yes.

11        Q    What is that cost per square foot?

12        A    $55.

13        Q    And do you understand that the plaintiffs'

14   theory is that the cost per square foot under the MDL

15   remediation formula is 109 dollars and change a square

16   foot?

17        A    Yes.

18        Q    On a dollar basis, is the actual estimate

19   that Ms. Martinez obtained in 2018 about half of the

20   MDL formula estimate square-foot-wise?

21        A    Well, the square footage is above what's the

22   house square footage.

23        Q    Uh-huh.

24        A    But the price per square foot is about half

25   of what the formula square foot price is.
```

Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 178 of 224
Case 2:09-md-02047-EEF-MBN Document 22380-34 Filed 12/03/19 Page 178 of 224
Confidential – Subject to Further Confidentiality Review
185

```
 1        Q     Right.  In other words --

 2            MS. RICO:  I want to object to the form,

 3        and I'm sorry it's a late objection, just to

 4        say that it's not our theory, it's the order

 5        entered by Judge Fallon that is the law of

 6        the case.

 7            MR. BLOCK:  We can --

 8            MS. RICO:  But go ahead.

 9            MR. BLOCK:  We can argue about what the

10        law is separately.

11        Q     (By Mr. Block)  But is 109 dollars and change

12     a square foot about two times $55 a square foot?

13            MR. SERPE:  Objection.  That's not an

14        expert opinion.  That's math.

15            MR. BLOCK:  That's Elkin.

16            MR. SERPE:  Yes.

17        Q     (By Mr. Block)  So, Mr. Nolan, the MDL

18     formula estimate is about twice the -- on a square foot

19     basis, the MDL formula estimate is about twice the cost

20     per square foot of this actual estimate that

21     Ms. Martinez obtained?

22            MR. SERPE:  Objection.  You're

23        misstating your own witness's testimony.

24        Q     (By Mr. Block)  Mr. Nolan, on a square

25     foot -- on a cost per square foot basis, dollars per
```

1    square foot, is the MDL formula figure of $109 a square

2    foot about twice the actual contractor estimate of $55

3    a square foot?

4            MR. SERPE:  Same objection.

5            THE WITNESS:  Yes.

6            MR. BLOCK:  Okay.  Thank you.

7            (Discussion off the written record.)

8       Q    (By Mr. Block)  Mr. Nolan, I'll ask you to

9    assume with me that Mrs. Martinez testified and

10   confirmed under oath that the square footage of her

11   house was 2,259 square feet.  Make that assumption with

12   me, okay?  If we multiply 2,259 by $55 a square foot --

13   do you have your phone with you?

14      A    2259?

15      Q    Uh-huh, times 55.

16      A    Okay.

17      Q    What's the answer?

18      A    $124,245.

19      Q    So if the actual square footage of

20   Ms. Martinez's home that needs to be remediated is

21   2,259 square feet instead of 3,264 square feet on

22   Exhibit 6, the estimate would be $124,245, correct?

23           MR. SERPE:  So let me object on four

24       different levels.  First, you're leading the

25       witness.  Second, you're assuming facts not

1    in evidence.  Third, you're doing a
2    mathematical calculation assuming variables
3    that have not been demonstrated to have
4    anything to do with reality.  Fourth, you're
5    ignoring the correction that he has made
6    already to you with respect to the square
7    footage variance.  Fifth, this opinion and
8    the fact for it is nowhere contained in his
9    report.
10         To the extent that your expert missed an
11    important data point and you want to now
12    amend his report well after the deadline to
13    start generating, on a direct examination
14    with leading questions, new opinions from
15    him, we're strongly objecting to that.
16         MR. BLOCK:  I will acknowledge that the
17    question was leading.  I disagree with the
18    rest of it, so I'll reask the question.
19    Q    (By Mr. Block)  Mr. Nolan, assume with me --
20         MR. BLOCK:  And I can -- we can get out
21    the testimony if y'all want to see a copy of
22    what your witness testified to.
23    Q    (By Mr. Block)  But assume with me, for
24    purposes of my hypothetical, that Mrs. Martinez
25    testified that it's accurate -- or she agreed that it's

```
 1    accurate that 2,259 square feet of total living area in

 2    her home is accurate.  Make that assumption with me,

 3    okay?

 4        A    Yes.

 5        Q    If that's true and the actual estimate that

 6    she got in 2018, Exhibit 6, is $55 a square foot, what

 7    would the estimate be?

 8             MR. SERPE:  Same objection.

 9             THE WITNESS:  $124,245.

10        Q    (By Mr. Block)  Okay.  Is 100,000 -- excuse

11    me.  Is $124,245 substantially lower than the MDL

12    formula result of 198,000 dollars and change?

13             MR. SERPE:  Object to the form.

14             THE WITNESS:  Yes.

15             MR. BLOCK:  Okay.

16        Q    (By Mr. Block)  All right, Mr. Nolan, I'm

17    going to show you what I'd like to mark as Exhibit 7.

18             `(Exhibit 7 marked for identification.)

19        Q    (By Mr. Block)  Do you have Exhibit 7 in

20    front of you, Mr. Nolan?

21        A    Yes.

22        Q    Okay.  Do you recognize Exhibit 7 as an

23    RSMeans Historical Cost Index?

24        A    Yes.

25        Q    And what is an RSMeans Historical Cost Index?
```

```
 1        A      It's a -- an index percentage.  You can
 2   compare a baseline year to any future year in the table
 3   to give you the additional cost to do the work in that
 4   future year.
 5        Q      Okay.  Is it possible to use an RSMeans
 6   Historical Cost Index to compare costs in one year to
 7   costs in a second year, adjusting for inflation?
 8        A      Yes.
 9        Q      Okay.  Is that standard in the construction
10   industry?
11        A      Yes.
12        Q      Okay.
13               All right, if you could grab your report,
14   sir, and your calculator on your iPhone.  Let's first
15   look at page 7 of your report, please, the section of
16   your report that deals with the Wites property.
17        A      Okay.
18        Q      Are you there?
19        A      Yes.
20        Q      Okay.  And on page 7 of your report, what do
21   you say the claimed actual construction cost is?
22        A      $297,266.
23        Q      Okay.  Will you assume with me that the Wites
24   completed the construction of their -- excuse me, the
25   remediation of their home in 2011?
```

1      A    Okay.

2      Q    All right.  Can you look at Exhibit 7 and

3   tell me what the -- well, actually, why don't we do

4   this before we go through the Wites.  Can you -- can

5   you explain the formula on the right where you make a

6   time adjustment using the Historical Cost Index?

7      A    Index for Year A divided by index for Year B

8   times the cost in Year B is the cost in Year A.

9      Q    Okay, so let's --

10         MR. SERPE:  Can I just confirm for the

11         record that you're asking your expert in

12         real time to derive new opinions on new

13         mathematical equations in the deposition?

14         MR. BLOCK:  I am responding to a door

15         that you opened.

16         MR. SERPE:  So the answer is yes?

17         MR. BLOCK:  I don't agree with your

18         characterization.

19      Q    (By Mr. Block)  So, Mr. Nolan, if you go back

20   to page 7 of your report, you told me that the Wites --

21   or you report that the Wites claimed an actual

22   construction cost of 297,000 dollars and change, right?

23      A    Yes.

24      Q    Okay.  And assume with me that the Wites

25   completed that construction in 2011.

```
 1        A    Okay.

 2        Q    Okay.  What is the Historical Cost Index

 3   factor for 2011?

 4             MR. SERPE:  Objection, vague, not

 5        specifying what area.  Is this a national

 6        number?  Is this a local number?  What are

 7        you doing here?

 8             MR. BLOCK:  This is the same number that

 9        Mr. Inglis used to go from $86 up to wherever

10        we are today, so it's -- it is a national

11        number, but if there's a problem in the

12        national number, you guys have a problem in

13        the national number.  We don't need to argue

14        here, but I'm just telling you.

15             MR. SERPE:  I want your hypothetical to

16        be complete.  In addition to the other

17        objections I've made, you haven't specified

18        whether this is a number for Florida or a

19        number for a national number?

20             MR. BLOCK:  No.

21        Q    (By Mr. Block)  Mr. Nolan, what is the

22   RSMeans Historical Cost Index for 2011?

23        A    191.2.

24        Q    Okay.  And what is the Historical Cost Index

25   for 2017?
```

1    A    213.6.

2    Q    All right.  So if we want to do the formula

3    from RSMeans, the Historical Cost Index, the formula on

4    the right side of the page, how would we write that

5    out, sir, for the Wites property?

6    A    For what year?

7    Q    Let's assume that Year A is 2017 because

8    that's the year that $109 a square foot is key to.

9    A    Very good.

10        So your numerator, Year A, would be 213.6.

11   Your denominator, Year B, is 2011, which is 191.2.

12   Times the cost in Year B, which in Year B is 2011, and

13   that is 109.85.

14   Q    Oh, sorry, I want --

15   A    Oh, I'm sorry, Year B, you're -- Year A is

16   2017?

17   Q    Yes, and we need to then --

18        MR. SERPE:  Do we need to swear you in

19        as the expert that explains how this formula

20        works here?  Can we -- can we get the court

21        reporter [sic] to switch the camera over to

22        you so you can explain to the judges in the

23        case which numbers go in which variable?

24        Because it's apparent your witness doesn't

25        know.

```
1              MR. BLOCK:  Object to that

2      characterization.

3              MR. SERPE:  I think anyone looking at

4      the video will know otherwise.

5              MR. BLOCK:  The video will speak for

6      itself.

7      Q    (By Mr. Block)  Mr. Nolan --

8      A    What you don't have in this information in my

9  report is the square foot cost in 2011 --

10     Q    Uh-huh.  I'd like to ask you to --

11     A    -- which is what the B would be.

12     Q    Right.

13          I'd like to ask you to convert the actual

14  construction cost that Mr. Wites and his wife incurred

15  as reflected in your report in 2011, I'd like to adjust

16  that, if we can, and you can tell me if we can, I'd

17  like to adjust that, using the RSMeans Historical Cost

18  Index, to 2017 dollars.  Can we do that?

19     A    Yes.

20     Q    Okay.  So how would we do that?

21     A    You would -- you've got to get the cost per

22  square foot, so you would take 297,266 divided by 5,961

23  square feet, and that would give you dollars per square

24  foot.

25     Q    Okay.  Can you do that for me, sir?
```

```
 1      A    Yes.
 2           MR. SERPE:  Aaron, to be a little less
 3      contentious, can I get a continuing
 4      objection?
 5           MR. BLOCK:  Oh, yeah.  You've got it.
 6           Do you want one too?
 7           MS. RICO:  No, no, no.  Could we have --
 8      I mean, his counts for me.  Could we possibly
 9      have the expert work that out and do it on a
10      paper so that we can enter it as an exhibit?
11           THE WITNESS:  Can I just speak the math
12      or -- I mean, I don't -- give me a piece of
13      paper, I'll do it.
14           MS. RICO:  Whatever you want.  I was
15      just saying.
16           THE WITNESS:  Okay, so 297,266 divided
17      by 5,961, the answer is 49.87.
18      Q    (By Mr. Block)  And what does 49.87 refer to?
19      A    That's dollars per square foot of cost.
20      Q    Okay.  And if we want to convert that
21   dollar -- and is that a 2011 dollar per square foot
22   cost?
23      A    Yes.
24      Q    Okay.  How would we convert that into a 2017
25   dollar per square foot cost?
```

```
1        A      So you take the A number, which is 2017, and
2    the factor is -- or the Historical Cost Index is 213.6.
3        Q      Uh-huh.
4        A      And you divide that by the index for 2011,
5    which is 191.2.
6        Q      Uh-huh.
7        A      And then you multiply that times the 49.86,
8    which is the square foot cost in 2011.  And that would
9    then give you the increased cost equivalent in 2017.
10       Q      Okay.  Could you do that math for us, sir?
11       A      Yes.
12       Q      Thank you.
13       A      So I've already got the 49.86 for the cost in
14   Year B.  I need to write it down.
15              The index for A for '17 is 213.6.  The index
16   for B is 211 -- is 2011, is 191.2.  That math result is
17   1.117.  1.117.  So that's the cost index.  Now we
18   multiply that times the cost in 2011, and the cost per
19   square foot in 2011 is $49.87 per square foot.  So
20   1.117 times 49.87 is $55.70.  $55.70 per square foot is
21   the equivalent cost in 2017 as adjusted by the
22   Historical Cost Index.
23       Q      Okay.  And can you convert that cost per
24   square foot in 2017 dollars to a total cost?
25       A      Yes.  And I'll use the same location factor
```

1    adjustment, which is .82.  So it's 5,961 square feet

2    times .82 as the location factor adjustment, times the

3    $55.70.  5961 times .82 times $55.70 is $272,262.71.

4        Q    Mr. Nolan, was it -- was it necessary to

5    adjust the -- by location factor again in that

6    calculation?

7        A    It is a variable that is compared on a

8    nationwide scale for this city specific.  So, yes, you

9    do that as part of the RSMeans calculation.

10       Q    When you performed this analysis using the

11   RSMeans Historical Cost Index, did the bottom line of

12   your opinion change?

13            MR. SERPE:  Object to the form.

14            THE WITNESS:  No.

15       Q    (By Mr. Block)  Why is that?

16       A    Because it's just the location factor

17   adjustment, and it's different for each city.

18       Q    Let me ask it a little bit differently.

19            When you used the RSMeans Historical Cost

20   Index to adjust the 2011 construction costs for

21   inflation, did the bottom line of your opinion about

22   the relationship between the actual construction costs

23   and the formula result change?

24       A    No.

25            MR. SERPE:  Object to the form.

```
 1              THE WITNESS:  No.
 2              MR. BLOCK:  Okay.
 3       Q     (By Mr. Block)  And why did that opinion not
 4  change?
 5       A     Because the formula number result is
 6  $536,949.  The Historical Cost Index result is
 7  $272,000.  It's roughly half of the formula results.
 8  So it's significantly lower, which is consistent with
 9  my report.
10       Q     Okay.  The analysis that you just did for the
11  Wites property, would it be possible to do that for the
12  other construction estimates that you discuss in your
13  report that are from years prior to 2011?  Strike that.
14  Let me -- let me ask a better question.
15              Would it be possible to update the other
16  construction costs in your report for inflation the
17  same way you just did for the Wites property?
18       A     I could do that for all of the properties
19  except for Martinez because it's a 2018 number and it
20  would not need to be adjusted.
21       Q     Would the process be the same to update the
22  other construction costs, other than Martinez, as what
23  you just used here for Mr. Wites?
24       A     Yes.
25              MR. SERPE:  Object to the form.
```

```
 1              THE WITNESS:  Yes.

 2              MR. BLOCK:  Okay.  I think those are all

 3         the questions I have.

 4              MR. SERPE:  Let's go off the record for

 5         just a minute.

 6              THE VIDEOGRAPHER:  We are now going off

 7         the video record.  The time is currently 3:50

 8         p.m.

 9              (Off the video record.)

10              MR. SERPE:  Counsel, we have no further

11         questions.

12              MR. BLOCK:  Thank you.  We will read and

13         sign.

14              (Deposition concluded at 3:53 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E .

 2

 3   STATE OF GEORGIA

 4   COUNTY OF COBB

 5

 6          I, MICHELLE M. BOUDREAUX, do hereby certify

 7   that BEN D. NOLAN, III, PE, PSP, the witness whose

 8   deposition is hereinbefore set forth, was duly sworn by

 9   me and that such deposition is a true record of the

10   testimony given by such witness.

11

12          I further certify that I am not related to

13   any of the parties to this action by blood or marriage

14   and that I am in no way interested in the outcome of

15   this matter.

16

17          IN WITNESS WHEREOF, I have hereunto set my

18   hand this 15th day of April 2019.

19

20          _____

             MICHELLE M. BOUDREAUX, RPR

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1              ERRATA SHEET FOR THE TRANSCRIPT OF:

 2    Case Name:  Amorin, et al. v. Taishan Gypsum, et al.

 3    Deposition Date:  April 10, 2019

 4    Deponent:  Ben D. Nolan, III, PE, PSP

 5

 6    Pg.  Ln.  Now Reads        Should Read        Reason

 7    ____ ____ _____     _____       _____

 8    ____ ____ _____     _____       _____

 9    ____ ____ _____     _____       _____

10    ____ ____ _____     _____       _____

11    ____ ____ _____     _____       _____

12    ____ ____ _____     _____       _____

13    ____ ____ _____     _____       _____

14    ____ ____ _____     _____       _____

15    ____ ____ _____     _____       _____

16    ____ ____ _____     _____       _____

17    ____ ____ _____     _____       _____

18    ____ ____ _____     _____       _____

19

20                             _____

                               Signature of Deponent

21

22

      SUBSCRIBED AND SWORN BEFORE ME

23    THIS _____ DAY OF _____ 20____.

24    _____

      (SIGNATURE OF NOTARY PUBLIC)

25    MY COMMISSION EXPIRES:_____
```

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

EDUARDO AND CARMEN AMORIN, *et al.*, **individually, and on behalf of all others similarly situated,**

      **Plaintiffs,**

v.

TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD., *et al.*,

      **Defendants.**

Case No. 1:11-CV-22408-MGC

## DECLARATION OF RONALD E. WRIGHT, P.E.

1.    I graduated with a Bachelor of Science in Civil Engineering and a Master of Business Administration degrees from the University of Toledo, Ohio. I am a Licensed Professional Engineer in the states of Ohio, North Carolina, South Carolina, Virginia, Maryland, Pennsylvania, New Jersey, Florida, Alabama, and Mississippi, and have expertise in property damage and remediation consulting. I have been involved in construction, remediation, and implementation of projects for over 39 years. I am currently a principal of the firm, Berman & Wright Architecture, Engineering & Planning, LLC ("Berman & Wright"), where I have performed forensic investigations and provided opinions regarding construction issues and building problems that included developing the scope of necessary repair and establishing the cost via quotes and estimates to make the repairs. I have formed opinions regarding these construction issues by employing standard techniques based on my technical education and training, hands-on field experience including investigations of hundreds of buildings, and the subsequent remediation needed to address building problems and storm damage. I have also conducted significant research

of publications and studies done by other forensic investigators and trade associations, and I have
reviewed national standards and industry guidelines. I have been retained in numerous matters to
provide expert opinions regarding building repair. I provided testimony and an expert report in
the 2010 Germano proceeding regarding the scope of work and cost of remediation and have
provided several reports for subsequent Chinese drywall proceedings in that court. My hourly rate
for services rendered on this matter is $275/hour (expert testimony during deposition and trial at
1.5 times rate). All opinions expressed herein are expressed to a reasonable degree of certainty
within my fields of expertise.

2.    I was requested to update the national average remediation cost based on the
Chinese drywall scope of work and remediation damages formula included in the Court's
FOFCOL from the Class Damages hearing in 2015. The national average remediation cost as
stated in the 2017 Order was $105.91/ square foot (including CIH costs) for the year 2015. The
updated 2019 national average remediation cost is $117.94/ square foot (including CIH costs). See
Exhibit 1.

3.    The remediation cost formula utilizes this figure ($117.94), along with the RS
Means localized (zip code) cost factor, and square footage of the building, to calculate the 2019
remediation cost for each Florida plaintiff, as shown in the spreadsheet prepared by Counsel and
attached as Exhibit 2.

4.      The remediation damages amount = *remediation and inspection and clearance cost* [cost per square foot -- i.e. $117.94] x adjustment by the applicable RS Means localized (zip code) cost factor x square feet of building].  Exhibit 2 shows the calculation for each Florida plaintiff.

I declare under the penalty of perjury that the foregoing is true and correct.

_Ronald E. Wright_                              _4/18/19_
Ronald E Wright, PE                         Date

Exhibits:
1   National Average Cost Index Adjustment
2   Plaintiffs' Remediation Damages Spreadsheet

**Cost Index and Location Factor Adjustment**
Calculated in 2019 for Amorin et. al v. Taishan
As of April 18, 2019

| | | |
|---|---|---|
| 1. National Average Cost with clearance testing in 2015 | $ | 105.91 |
| 2. Cost Index 2015 | | 206.2 |
| 3. Cost Index 2019* | | 229.6 |
| 4. Index 2019/ Index 2015 RS Means conversion from 2015 to 2019 dollars (line 3 divided by line 2) | | 111.35% |
| 5. Remediation cost and inspection and clearance fees in 2019 dollars (/sf, National Average Cost) (line 1 times line 4) | **$** | **117.94** |

\* - Historical Index from 2019 RS Means Cost Data as of 2019 1st Quarter (January 2019)



# Ronald E. Wright, PE
Principal

## PROFESSIONAL SUMMARY

Ron Wright has provided services to the construction industry since 1979. Mr. Wright's variety of experiences include Building Diagnostics, Design, Project Management, CPM scheduling, Claims Management, and Surety Contract Management. Mr. Wright is widely and highly regarded in the industry for his expertise in Building Diagnostics and has provided expert testimony in front of juries, arbitrators, judges, and mediators.

## PROFESSIONAL EXPERIENCE

**Wright Angle Consulting, PLLC**
Principal                                                                 2017 – Present

Mr. Wright actively participates in providing services to owners, design professionals, contractors, and other participants in the construction field. Services provided include but are not limited to defining design and construction deficiencies; completing construction code and technical analysis; determining and documenting causes of building deterioration in order to define corrections; and estimating costs of repairs.

**Berman & Wright, Architecture, Engineering & Planning, LLC (Formerly Buric)**
| | |
|---|---|
| Principal | 2011 – Present |
| Chief Operating Officer | 2007 – 2011 |
| Vice President of Building Diagnostics Services | 2005 – 2007 |
| Senior Vice President | 2004 – 2006 |
| Vice President | 2000 – 2004 |
| Senior Project Consultant | 1995 – 2000 |
| Project Consultant | 1989 – 1995 |

Mr. Wright actively participates in providing services to owners, design professionals, contractors, and other participants in the construction field. Services provided include defining design and construction deficiencies; completing construction code and technical analysis; determining and documenting causes of building deterioration in order to define corrections; estimating costs of repairs and managing projects through rehabilitation, inclusive of cost monitoring and controls; administering contracts; and scheduling.



**H. C. Rummage, Inc.**
Project Manager and Estimator                                          1987 – 1989

Mr. Wright worked in the capacities of Project Manager and Estimator constructing commercial and industrial projects for the general contractor. His responsibilities included initiating and developing contracts with Clients; developing project estimates and establishing contract amounts; performing project management duties including project schedules, developing and finalizing subcontracts and materials purchases; and closeout of projects. Additionally, for design-build projects, Mr. Wright developed project construction documents that included engineering design.

**Bench Mark Builders, Inc.**
Project Manager and Estimator                                          1984 – 1987

Mr. Wright worked in the roles of Project Manager and Estimator to construct commercial and industrial projects for a general contractor. Mr. Wright's responsibilities included initiating and developing contracts with Clients; developing project estimates and establishing contract amounts; performing project management duties including project schedules, developing and finalizing subcontracts and materials purchases, and closeout of projects. Additionally, for design-build projects, Mr. Wright developed project construction documents that included design engineering.

**Owens-Illinois Inc.**
Staff Engineer                                                        1979 - 1984

Mr. Wright work in the role of Staff Engineer by performing design engineering and by serving as owner's representative on construction projects for over twenty glass manufacturing plants. His duties included site reviews to establish construction needs, develop drawings and specifications for projects performed by contractors or in-house personnel, coordinate project work, develop cost estimates for budget purposes, meet with materials suppliers and manufacturers to evaluate products to be used within construction, and perform on-site management of project work during major glass plant renovations or new construction projects.

**EDUCATION**

University of Toledo                                                  Toledo, Ohio
Master of Business Administration                                     June 1984
Bachelor of Science in Civil Engineering                             June 1979



**PROFESSIONAL LICENSE**

Registered Professional Engineer

| | | |
|---|---|---|
| Ohio | License No. E-48776 | May 1984 |
| North Carolina | License No. 012130 | October 1984 |
| South Carolina | License No. 10583 | July 1985 |
| Virginia | License No. 036280 | June 2001 |
| Maryland | License No. 0029570 | March 2004 |
| New Jersey | License No. GE45073 | June 2004 |
| Mississippi | License No. 20672 | March 2012 |
| Alabama | License No. 32709-E | May 2012 |
| Florida | License No. 74971 | August 2012 |
| Pennsylvania | License No. 080264 | September 2012 |

**PROFESSIONAL MEMBERSHIPS**

American Architectural Manufacturers Association
American Society for Testing and Materials
International Code Council
Professional Engineers of North Carolina
American Society of Civil Engineers
Tau Beta Pi, Engineering Honorary Fraternity

**PROFESSIONAL PUBLICATION**

- Wright, Ron. "The Mold Challenge in Construction," Construction Claims Advisor, May 2005.

**PARTIAL LIST OF CURRENT PROJECTS**

| | |
|---|---|
| McDonald & Ratner Residences | Rincon, GA |
| Chrisley Residence | Stephens City, VA |
| Rialto-Capital Condominiums | Jersey City, NJ |
| The Plaza at Tenafly Condominiums | Tenafly, NJ |
| Four Seasons at Great Notch | Great Notch, NJ |



Ronald E. Wright, PE lectures on a variety of construction-related topics including Building Diagnostics. The following is a listing of seminars Mr. Wright has presented:

| LISTING OF SEMINARS PRESENTED | |
|---|---|
| **Date** | **Topic** |
| 2017 | WMC CAI "Defining Potential Problem Causes in your Building" Conference & Expo Presentation; Washington, D.C. |
| 2016 | Virginia CLE "Contract Documents Impacts to the Building Envelope" Seminar Presentation for 37th Annual Construction Law and Public Contracts; Charlottesville, Virginia |
| 2016 | Southeast Virginia CAI "Building Diagnostics Issues" Educational Presentations to Property Managers and Owners; Williamsburg and Virginia Beach, Virginia |
| 2012 | Senior Summit: Panelist for open forum Q & A; Manchester, New Jersey |
| 2010 | Associated Owners & Developers 14th Annual Construction Industry Conference "How Owners and Contractors can Control Project Risk" Seminar presentation for Dealing With Construction and Design Defects; Atlanta, Georgia |
| 2008 | Lorman Education Services "Condominium Construction Issues in North Carolina", Seminar Presentation for Building Diagnostics; Raleigh, North Carolina |
| 2005 | "Mealey's Construction Defect & Mold Litigation Conference", Panel member in presentation on "Hot Topics in Construction Defect Litigation - Defective Product Round-up"; Phoenix, Arizona' |
| 2004 | National Business Institute "Ohio Construction Defect and Mold Litigation" Seminar Presentation for Mold and Building Diagnostics; Cleveland, Ohio |
| 2004 | National Business Institute "Ohio Construction Defect and Mold Litigation" Seminar Presentation for Mold and Building Diagnostics; Akron, Ohio |
| 2004 | Lorman Education Services "Advances in Environmental Mold Issues" Fairfax County Government Seminar Presentation for Mold and Building Diagnostics; Fairfax, Virginia |
| 2004 | National Business Institute "Ohio Construction Defect and Mold Litigation" Seminar Presentation for Mold and Building Diagnostics; Cleveland, Ohio |
| 2003 | The "Contractor's Construction Superconference" Presentation for "What Owners Need to Know About Delay and Disruption Claims"; San Francisco, California |
| 2003 | Lorman Education Services "Advances in Environmental Mold Issues in Virginia" Seminar Presentation for Mold and Building Diagnostics; Arlington, Virginia |
| 2002 | North Carolina Academy of Trial Lawyers "Toxic Mold and Construction Defects" Seminar Presentation for Using the Forensic Engineer to Build the Case; Raleigh, North Carolina |
| 2002 | The "Contractor's Construction Superconference" Presentation for Mold and Building Problems Investigations; San Francisco, California |



| 2001 | Waterproofing Contractors Association, Inc. "Construction Pitfalls and Solutions" Seminar Presentation for Construction Pitfalls and Solutions; Pinehurst, North Carolina |
|------|------|
| 1999 | North Carolina Bar Foundation "Advanced Synthetic Stucco Update" Presentation for Overview of EIFS Issues; Cary, North Carolina |
| 1999 | NOVA SHOC Public Forum on EIFS Presentation as Panel Member for open discussion of EIFS; Fairfield County Civic Center, Virginia |
| 1998 | North Carolina Bar Foundation "Stucco Litigation" Seminar Presentation for Expert/Engineer's Perspective; Greensboro, North Carolina |
| 1996 | North and South Carolina Bar Foundation Annual Construction Law Section Meeting Presentation as Panel Member for Open Discussion of EIFS; Durham, North Carolina |
| 1996 | Homeowner Public Forum on EIFS Presentation for Investigation and Documentation of Problems with EIFS; Savannah, Georgia |



| SEMINARS ATTENDED | |
|---|---|
| **Date** | **Topic** |
| 2014 | Infrared Training Center Infrared Thermography Level I Certification Class Nashua, NH |
| 2014 | North Carolina Bar Foundation Annual Construction Law Section Meeting "Multi-Party Construction Cases: The Critical Path to Resolution" Pinehurst, North Carolina |
| 2013 | South and North Carolina Bar Foundation Law Section "Constructing the Trial of a Construction Defect Case" Asheville, North Carolina |
| 2013 | North Carolina Bar Foundation "Construction Law 2013: Practice Smarter, Not Harder!" Cary, North Carolina |
| 2012 | North Carolina Bar Foundation Annual Construction Law Section Annual Meeting "Navigating Changes and Building Practice Area Expertise" Concord, North Carolina |
| 2012 | 21st Century Building Exposition and Conference "Profiting in 2012 and Beyond" Charlotte, North Carolina |
| 2012 | 21st Century Building Exposition and Conference "Strategy Shift: Moving from Defense to Offense" Charlotte, North Carolina |
| 2012 | 21st Century Building Exposition and Conference "Misleading Proposals and How to Avoid Them" Charlotte, North Carolina |
| 2011 | South and North Carolina Bar Foundation Law Section Conference "A Gathering of Leaders from the Judiciary, the Legislature, the Industry and Bars" Wild Dunes, Isle of Palms, South Carolina |
| 2011 | 21st Century Building Exposition and Conference "Residential Code Update" Charlotte, North Carolina |
| 2011 | 21st Century Building Exposition and Conference "The 11 Hottest Marketing Commodities of 2011" Charlotte, North Carolina |
| 2010 | Waterproofing Contractor's Association Spring Conference Wilmington, North Carolina |
| 2010 | Reed Construction Data "Economic Recovery: Under Construction" Webinar |
| 2010 | North Carolina Bar Foundation Annual Construction Law Section Annual Meeting; Greensboro, North Carolina |
| 2009 | Reed Construction Data "Construction Activity Update" Webinar |
| 2009 | HB Litigation Conference "Chinese Drywall Litigation" Teleconference |
| 2009 | Reed Construction Data "Lessons in BIM Adoption" Webinar |
| 2009 | North and South Carolina Bar Foundation Law Section Meeting Asheville, North Carolina |



| SEMINARS ATTENDED | |
|---|---|
| **Date** | **Topic** |
| 2008 | North Carolina Bar Foundation Annual Construction Law Section meeting<br>Greensboro, North Carolina |
| 2007 | North and South Carolina Bar Foundation Construction Law Section Meeting<br>Isle of Palms, South Carolina |
| 2006 | "North Carolina Building Inspectors Association – Winter Code Seminar"<br>Boone, North Carolina |
| 2006 | North Carolina Bar Foundation Annual Construction Law Section Meeting<br>Greensboro, North Carolina |
| 2005 | North and South Carolina Bar Foundation Construction Law Section Meeting<br>Asheville, North Carolina |
| 2005 | ASCE  Structures Congress: Metropolis & Beyond<br>New York City, New York |
| 2002 | North Carolina Bar Foundation Annual Construction Law Section Meeting<br>Southern Pines, North Carolina |
| 2001 | ASTM Symposium on Performance of Exterior Building Walls<br>Phoenix, Arizona |
| 2001 | North and South Carolina Bar Foundation Construction Law Section Meeting<br>Asheville, North Carolina |
| 2001 | Professional Engineers of North Carolina "Changes to the Building Code and<br>Impacts on Construction"; Wilmington, North Carolina |
| 2000 | Training for Inspection of Hurricane Damaged Homes<br>Wilmington, North Carolina |
| 1999 | North and South Carolina Bar Foundation Construction Law Section Meeting<br>Charleston, South Carolina |
| 1998 | Patton – Boggs "Hot Legal Topics" Seminar<br>Research Triangle Park, North Carolina |
| 1998 | North Carolina Bar Foundation Annual Construction Law Section Meeting<br>Durham, North Carolina |
| 1998 | ASTM Symposium<br>Atlanta, George |
| 1997 | ASTM Symposium:  "EIFS: Innovations and Solutions to Industry<br>Challenges"; San Diego, California |
| 1997 | North and South Carolina Bar Foundation Construction Law Section Meeting<br>Asheville, North Carolina |
| 1996 | ASTM Symposium "Water Leakage Through Building Facades"<br>Orlando, Florida |
| 1996 | Green Building's Seminar<br>Wilmington, North Carolina |
| 1995 | North and South Carolina Bar Foundation Construction Law Section Meeting and<br>Seminar; Charleston, South Carolina |



| SEMINARS ATTENDED | |
|---|---|
| **Date** | **Topic** |
| Prior to 1995 | Brick Institute of America "Discussion of Sealant Joints" |
| Prior to 1995 | Owens-Corning Training "Field Investigations" |
| Prior to 1995 | Carlisle Roof Training "Field Investigations" |

**TESTIMONY EXPERIENCE**

**Trials**

· Deficiencies of design and cost estimate to complete construction of Stone Bay Plantation amenities (1997)
· Design and construction deficiencies and damages for Pepper Residence (1998)
· Construction deficiencies of beach access way for Hodge (1999)
· Cost estimate for replacement of McAlisters Restaurant destroyed by fire (2000)
· Investigation and analysis for building problems and water intrusion at Polk County Judicial Complex (2000)
· Design and construction deficiencies and damages for Maday Residence (2000)
· Design and construction deficiencies and damages for Stafford Residence (2001)
· Design and construction deficiencies and damages for Spy Glass at Bay Point condominiums (2001)
· Design and construction deficiencies and damages for Tucker Residence (2002)
· Design and construction deficiencies and damages for Farhoumand Residence (2002)
· Design and construction deficiencies and damages for Rasmussen Residence (2002)
· Design and construction deficiencies and damages for Columbine Place Townhomes (2002)
· Design and construction deficiencies and damages for Taft Residence (2003)
· Design and construction deficiencies and damages for Herman/Chancler Residence (2003)
· Design and construction deficiencies and damages for Calhoun Residence (2003)
· Design and construction deficiencies and damages for Shannon Residence (2004)
· Design and construction deficiencies and damages for Blackward Residence (2004)
· Construction deficiencies and repair costs for Davis Residence (2004)
· Construction deficiencies and damages for Davis Residence (2005)
· Construction deficiencies and damages for Daniel Residence (2006)
· Design and construction deficiencies and damages for the Marina Village Condominiums (2006)
· Design and construction deficiencies and damages for the Westbriar Condominiums (2006)
· Design and construction deficiencies and damages for the Ferranti Residence (2007)
· Design and construction deficiencies and damages for the Camelot Condominiums (2008)
· Design and construction deficiencies and damages for Garmon Residence (2008)
· Design and construction deficiencies and damages for the Hunters Creek Condominiums (2008)
· Design and construction deficiencies and damages for Meng Residence (2008)
· Remediation scope of work and damages to address defective Chinese drywall for the Germano Plaintiffs (2010)
· Design and construction deficiencies and damages for Renaissance on the Ocean Condominiums (2010)
· Design and construction deficiencies and damages for Quay 55 Apartments (2014)
· Design and construction deficiencies and damages for Port Liberte II (2014)
· Design and construction deficiencies and damages for Watson Residence (2014)



**Arbitrations**

- Assist with design and construction deficiencies presentation for Pavilion Towers apartment complex (1995)
- Improper installation of exterior finish system and damages for Nugent Residence (1997)
- Water intrusion and building problem issues for Soaring Eagle Hotel (1999,2000)
- Design and construction deficiencies and damages for Shaw Residence (2002)
- Design and construction deficiencies and damages for Singer Residence (2002)
- Design and construction deficiencies and damages for Ahern Residence (2002)
- Design and construction deficiencies and damages for Peter/Jay Residence (2002)
- Design and construction deficiencies and damages for Tolsdorf Residence (2003)
- Design and construction deficiencies and damages for Siegal Residence (2003)
- Design and construction deficiencies and damages for Olson/St. Ledger-Roty Residence (2005)
- Design and construction deficiencies and damages for the Oster Residence (2008)
- Design and construction deficiencies and damages for the Grove Landing Townhouses (2008)

**Mediations**

- Design and construction deficiencies and damages for Muse Residence (1995)
- Delay claim analysis and damages for Sun Oil Marcus Hook Refinery piling contractor (1996)
- Design and construction deficiencies and damages for Villa Capriani Condominiums (1997)
- Design and construction deficiencies and damages for Pembroke at Landfall Condominiums (1997)
- Design and construction deficiencies and damages for Lakeside Village Condominiums (1997)
- Design and construction deficiencies and damages for Lukowski Residence (1998)
- Design and construction deficiencies and damages for Brissette Residence (1998)
- Design and construction deficiencies and damages for Hovdesven Residence (1999)
- Design and construction deficiencies and damages for Williamson Residence (2000)
- Design and construction deficiencies and repairs for San Francisco State University student housing (2000)
- Design and construction deficiencies and damages for Van Volkenburg Residence (2001)
- Design and construction deficiencies and damages for Myrtle Grove Volunteer Fire Department (2001)
- Design and construction deficiencies and damages for Extended Stay America Hotel Site #877 (2002)
- Design and construction deficiencies and damages for Extended Stay America Hotel Site #6065 (2002)
- Design and construction deficiencies and damages for Extended Stay America Hotel Site #399 (2003)
- Design and construction deficiencies and damages for Villas at Harbor Island Condominiums (2005)
- Design and construction deficiencies and damages for the Prospect Ashley Condominiums (2006)
- Design and construction deficiencies for the Park Phillips Townhomes (2006)
- Construction deficiencies and damages for the Villas at Harbor Island Condominiums (2006)
- Design and construction deficiencies for the Amherst Mews Townhomes (2007)
- Design and construction deficiencies for the Renaissance on the Ocean Condominiums (2008)



- Construction deficiencies for the McKinney Residence (2008)
- Construction and design deficiencies for the Bryan Psychiatric Hospital (2010)
- Construction and design deficiencies for the Edgewater Condominiums (2011)

**Hearings**
- North Carolina Licensing Board for General Contractors for Code violations on construction of Daniel residence (2001)
- York County, Virginia Board of Appeals for code violations on use of Chinese Drywall (2010)
- Plenary hearing for insurance coverage issues concerning the Lakeside at North Haledon Condominiums (2013)

**Depositions**
- Design and construction deficiencies and damages for Barnwell Colony condominiums (1989)
- Design and construction deficiencies and damages for Pavilion Towers apartment complex (1992)
- Design and construction deficiencies and damages for Muse Residence (1994)
- Delay claim analysis and damages for Sun Oil Marcus Hook Refinery piling contractor (1996)
- Design and construction deficiencies and damages for Villa Capriani condominiums (1996)
- Design and construction deficiencies and damages for Regency Executive Plaza Office Condominiums (1997)
- Design and construction deficiencies and damages for Hallman Residence (1997)
- Design and construction deficiencies and damages for Means Residence (1998)
- Design and construction deficiencies and damages for Rose Residence (1998)
- Design and construction deficiencies and damages for Blackward Residence (1998)
- Design and construction deficiencies and damages for Pepper Residence (1998)
- Design and construction deficiencies and damages for Toscano Residence (1999)
- Design and construction deficiencies and damages for Pope Residence (1999)
- Design and construction deficiencies and damages for Austin Residence (1999)
- Design and construction deficiencies and damage for Atkinson et al. (1999)
- Design and construction deficiencies of Lincoln Windows for Coastal Window and Door Company (1999)
- Design and construction deficiencies of Molesworth Residence (1999)
- Design and construction deficiencies for Weyerhaeuser Residence (1999)
- Design deficiencies of EIFS for the North Carolina State EIFS Class Actions (1999).
- Design and construction deficiencies for Puryear Residence (1999)
- Design and construction deficiencies for Jones Residence (1999)
- Design and construction deficiencies for Gelfo Residence (1999)
- Issues of design, installation, and maintenance of LPP sewer system for Brinkman et al. (1999, 2000)
- Design and construction deficiencies for Tuluri Residence (1999)
- Design and construction deficiencies for Hannen and Graziano Residences (2000)
- Design and construction deficiencies for Hull Residence (2000)
- Design and construction deficiencies for Williamson Residence (2000)
- Design and construction deficiencies for Travis Residence (2000)
- Design and construction deficiencies for Eastport Development fence (2000)
- Design and construction deficiencies for Garrett Residence (2000)



- Design and construction deficiencies for Bissett Residence (2000)
- Design and construction deficiencies for Spencer Residence (2000)
- Design and construction deficiencies for Preston Falls Villas (2000)
- Design and construction deficiencies for Link/Potter and Maday Residences (2000)
- Design and construction deficiencies for Karnofsky Residence (2000)
- Design and construction deficiencies for Mignogna Residence (2000)
- Design and construction deficiencies for McGugan Residence (2000)
- Design and construction deficiencies for Gardner Residence (2000)
- Design and construction deficiencies for Alspaugh Residence (2000)
- Design and construction deficiencies for Gibson Residence (2000)
- Design and construction deficiencies for Allen Residence (2000, 2001)
- Design and construction deficiencies for Spy Glass at Bay Point condominiums (2000)
- Design and construction deficiencies for Berger and Anderson Residences (2000)
- Design and construction deficiencies for Wilmington Assisted Living Community (2001)
- Design and construction deficiencies for Moskowitz and Sanok Residences (2001)
- Design and construction deficiencies for Pizzurro Residence (2001)
- Design and construction deficiencies for Atkinson Residence (2001)
- Design and construction deficiencies for Moore Residence (2001)
- Design and construction deficiencies for Zimmerlein Residence (2001)
- Design and construction deficiencies for Club Villas townhomes (2001, 2002)
- Design and construction deficiencies for Combof Residence (2001)
- Design and construction deficiencies for Wilson Residence (2001)
- Design and construction deficiencies for Ramm Residence (2001)
- Design and construction deficiencies for Stafford Residence (2001)
- Design and construction deficiencies for Sergent/Thompson Residence (2001)
- Design and construction deficiencies for Shull Residence (2001)
- Design and construction deficiencies for Connolly Residence (2001)
- Design and construction deficiencies for Higgins Residence (2001)
- Design and construction deficiencies for Swain Residence (2001)
- Design and construction deficiencies for Jordan Residence (2001)
- Design and construction deficiencies for Foss Residence (2001)
- Design and construction deficiencies for Desjardins Residence (2001)
- Design and construction deficiencies for Tong/Huang Residence (2001)
- Design and construction deficiencies for Wynne Residence (2001)
- Design and construction deficiencies for Peppertree Residences (2001, 2002)
- Design and construction deficiencies for Steel Residence (2002)
- Design and construction deficiencies for Gergits Residence (2002)
- Design and construction deficiencies for Country Club of Landfall (2002)
- Design and construction deficiencies for Mix Residence (2002)
- Design and construction deficiencies for Ashton Townhomes (2002)
- Design and construction deficiencies for Fix Residence (2002)
- Design and construction deficiencies for Miller Residence (2002)
- Design and construction deficiencies for Geller Residence (2002)
- Design and construction deficiencies for Farhoumand Residence (2002)
- Design and construction deficiencies for Tucker Residence (2002)



- Design and construction deficiencies for Amin (Harry) Residence (2002)
- Design and construction deficiencies for Amin (Mike) Residence (2002)
- Design and construction deficiencies for Pendry Residence (2002)
- Design and construction deficiencies for Gibson Residence (2002)
- Design and construction deficiencies for McGuiness Residence (2002)
- Design and construction deficiencies for Cardamone Residence (2002)
- Design and construction deficiencies for Robbins Residence (2002)
- Design and construction deficiencies for Evans Residence (2002)
- Design and construction deficiencies for Sochko Residence (2002)
- Design and construction deficiencies for Wolff Residence (2002)
- Design and construction deficiencies for Johnson Residence (2002)
- Design and construction deficiencies for Kaufman Residence (2002)
- Design and construction deficiencies for Taylor Residence (2002)
- Design and construction deficiencies for Columbine Place Townhomes (2002)
- Design and construction deficiencies for Petrella Residence (2002)
- Design and construction deficiencies for Doremus Residence (2002, 2003)
- Design and construction deficiencies for Stoney Residence (2002, 2003)
- Design and construction deficiencies for McClure Residence (2002)
- Design and construction deficiencies for Goodall Residence (2002)
- Design and construction deficiencies for Peter/Jay Residence (2002)
- Design and construction deficiencies for Thomas Residence (2003)
- Design and construction deficiencies for Gavin Residence (2003)
- Design and construction deficiencies for Nazelrod Residence (2003)
- Design and construction deficiencies for Horne Residence (2003)
- Design and construction deficiencies for Lesner Point East condominiums (2003, 2004, 2005)
- Design and construction deficiencies for Taft Residence (2003)
- Design and construction deficiencies for Himes Residence (2003)
- Design and construction deficiencies for Shaw Residence (2003)
- Design and construction deficiencies for Tolsdorf Residence (2003)
- Design and construction deficiencies for Basumallik Residence (2003)
- Design and construction deficiencies for Extended Stay America Hotels #6065 and #877 (2003)
- Design and construction deficiencies for McDonalds Restaurants (North Carolina) (2003)
- Design and construction deficiencies for Butt/Priester Residence (2003)
- Design and construction deficiencies for Spinnaker Cove Condominiums (2003)
- Design and construction deficiencies for Skirzenski Residence (Finestone EIFS Class Action) (2003)
- Design and construction deficiencies for Schrader Residence (2003)
- Design and construction deficiencies for Sherwood Residence (2003)
- Design and construction deficiencies for Shank Residence (2003)
- Design and construction deficiencies for Rosthein Residence (2004)
- Design and construction deficiencies for Shannon Residence (2004)
- Design and construction deficiencies for Tran Residence (2004)
- Construction issues for Riley accident (2004)
- Design and construction deficiencies for Tanner Residence (2004)
- Design and construction deficiencies for Extended Stay America Hotel #831 (2004)
- Design and construction deficiencies for Ronan Residence (2004)
- Design and construction deficiencies for New Jersey Sto Class Action litigation (2004)



- Design and construction deficiencies for Lucas Residence (2004)
- Design and construction deficiencies for Stang Residence (2004)
- Design and construction deficiencies for Rogoff, Tenenbaum, and Tice Residences (2004)
- Design and construction deficiencies for Cutrone Residence (2004)
- Design and construction deficiencies for Full Cry Farms residences (Cole, Hickey-Fishbein, Police, Sander, Weber) (2004)
- Design and construction deficiencies for Scott Residence (2004)
- Repair scope and cost analysis and estimate for Davis Residence (2004)
- Design and construction deficiencies for Florio Residence (2004, 2005)
- Design and construction deficiencies for Galioto Residence (2004)
- Design and construction deficiencies for the Red Roof Inn (2004)
- Design and construction deficiencies for the Mulligan Residence (2004)
- Design and construction deficiencies for the Willard Residence (2004)
- Design and construction deficiencies for the Stokes Residence (2004)
- Design and construction deficiencies for the Erdogan Residence (2004)
- Design and construction deficiencies for the Liska Residence (2004)
- Design and construction deficiencies for the Villas at Harbor Island Condominiums (2004, 2005)
- Design and construction deficiencies for Extended Stay America Hotels #2504, #2528, #2530, and #2549 (2004)
- Design and construction deficiencies for the McMillin Residence (2004)
- Design and construction deficiencies for the Village of Carver Falls and Hollows at Greenville Apartments (2004)
- Design and construction deficiencies for the Noble Residence (2004)
- Design and construction deficiencies for the Rathnam Residence (2005)
- Design and construction deficiencies for the Cato Residence (2005)
- Design and construction deficiencies for the Watson Residence. (2005)
- Design and construction deficiencies for the Berean Baptist Church. (2005)
- Design and construction deficiencies for the Moore Residence (2005)
- Design and construction deficiencies for the Pocock Residence (2005)
- Design and construction deficiencies for Extended Stay America Hotels #522 and #561 (2005)
- Design and construction deficiencies for the Messner Residence (2005)
- Construction deficiencies for the McKinney Residence (2005)
- Design and construction deficiencies for the Zinn Residence (2005)
- Design and construction deficiencies for the Hale Residence (2005)
- Design and construction deficiencies for the Carter, Hatten, Krantz, Mehrotra, and Paige residences (2005, 2006)
- Design and construction deficiencies for the Dayton Place Condominiums (2005)
- Design and construction deficiencies for the Szczesny Residence (2006)
- Design and construction deficiencies for the Pierce Residence (2006)
- Design and construction deficiencies for the Kravecas Residence (2006)
- Design and construction deficiencies for the Avalos Residence (2006)
- Design and construction deficiencies for the Dean Residence (2006)
- Design and construction deficiencies for the Dial Residence (2006)
- Design and construction deficiencies for the Prospect Ashley Condominiums (2006)
- Design and construction deficiencies for the Burkhamer Residence (2006)
- Design and construction deficiencies for the Lightkeepers Village (2006)



- Design and construction deficiencies for the Venick Residence (2006)
- Design and construction deficiencies for the Chadbourn Commercial Building (2006)
- Design and construction deficiencies for the Seibert Residence (2006)
- Design and construction deficiencies for the Matturro and Strenkowski Residences (2006)
- Design and construction deficiencies for the Marina Village Condominiums (2006)
- Design and construction deficiencies for the Nardella Residence (2006)
- Design and construction deficiencies for the Juranich Residence (2006)
- Design and construction deficiencies for the Hunters Creek Condominiums (2006)
- Design and construction deficiencies and damages for the Tomasetta Residence (2006)
- Design and construction deficiencies and damages for the Hetrick and Northrop Residences (2006)
- Design and construction deficiencies for the Tulenko Residence (2006)
- Design and construction deficiencies for the Breezewood Condominiums (2006)
- Design and construction deficiencies for the Baum Residence (2007)
- Design and construction deficiencies for the Chang Residence (2007)
- Design and construction deficiencies for the Super 8 Motel (2007)
- Design and construction deficiencies for the Harbor Ridge Condominiums (2007)
- Design and construction deficiencies for the Greenberg Residence (2007)
- Standard of care for professionals on the Sunset Beach Development (2007)
- Design and construction deficiencies for the Marrone Residence (2007)
- Design and construction deficiencies for the Stith Residence (2007)
- Design and construction deficiencies for the Ward Residence (2007)
- Design and construction deficiencies for the Camelot Condominiums (2007)
- Design and construction deficiencies for the Kleinberg Residence (2007)
- Design and construction deficiencies for the Sea Dunes II (2007)
- Design and construction deficiencies for the Roberts Residence (2007)
- Design and construction deficiencies for the Ocean Sands Best Western Hotel (2007)
- Design and construction deficiencies and damages for the Amherst Mews Townhouses (2008)
- Design and construction deficiencies and damages for the Renaissance on the Ocean Condominiums (2008)
- Design and construction deficiencies and damages for the Millennium Building Condominiums (2008)
- Design and construction deficiencies and damages for the Sussek Residence (2008)
- Design and construction deficiencies and damages for the Meng Residence (2008)
- Design and construction deficiencies for the Bald Eagle Commons Condominiums (2008)
- Design and construction deficiencies for the Microtel Inn & Suites (2009)
- Design and construction deficiencies for the Linkside Village at the Country Club (2009)
- Design and construction deficiencies for the Fortner residence (2010)
- Remediation scope of work and damages to address defective Chinese drywall for the Germano Plaintiffs (2010)
- Design and construction deficiencies for the Sidney Lanier Middle School (2010)
- Design and construction deficiencies for Brooklyn House Condominiums (2011)
- Remediation scope of work and damages to address defective Chinese drywall for the Mayo, Tedder, and White residences (2011)
- Remediation scope of work and damages to address defective Chinese drywall for Class Representatives in Florida and Louisiana (2011)
- Design and construction deficiencies for the Port Liberte II condominiums (2011, 2014)



- Design and construction deficiencies for the KC Prime Restaurant (2011, 2012)
- Design and construction deficiencies for the Blanton Residence (2011)
- Design and construction deficiencies for the Hardiplank class action (Elliott, Gabrielson, and Kashima residences) (2011)
- Remediation and scope of work and damages to address defective Chinese drywall for the Bell residence (2012)
- Remediation and scope of work and damages to address water intrusion and mold for the Wayland Residence (2012)
- Remediation and scope of work and damages to address defective Chinese drywall for the Ard and McCully residences and Seminole Baptist Church (2012)
- Design and construction deficiencies for the Nemec Residence (2012)
- Design and construction deficiencies for the Broadfoot Residence (2012)
- Design and construction deficiencies for Lakeside at North Haledon Condominiums (2013, 2014)
- Remediation and scope of work and damages to address defective Chinese drywall for the Fincher Residence (2013)
- Remediation and scope of work and damages to address defective Chinese drywall for the 341 9th Street Condominiums (2013)
- Design and construction deficiencies for the Watson Residence (2013)
- Declaratory judgment for insurance coverage issues fore Lakeside at North Haledon Condominiums (2013)
- Design and construction deficiencies for the Ferris Residence (2013)
- Site drainage deficiencies for the Brantley Residence (2013)
- Construction deficiencies for the Quay 55 apartments (2014)
- Design and construction deficiencies for Seabright Condominiums (2015)
- Design and construction deficiencies for the Abee Residence (2015)
- Design and construction deficiencies for Edgewater Condominiums (2014, 2016)
- Design and construction deficiencies for Views at Hudson Pointe (2016)
- Remediation and scope of work to address sulfur damages to McDonald and Ratner Residences (2017)
- Site activities analysis for the Metuchen Sportsplex (2017)
- Project impacts and delays for the Garner Police Department Additions and Renovations (2017)
- Design and construction defects for Rialto-Capitol Condominiums (2018)
- Design and construction defects for Four Seasons at Great Notch Condominiums (2018)

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

**EDUARDO AND CARMEN AMORIN,** *et al.*,
**individually, and on behalf of all others
similarly situated,**

     **Plaintiffs,**

**v.**

**TAISHAN GYPSUM CO., LTD. f/k/a
SHANDONG TAIHE DONGXIN CO., LTD.;
TAIAN TAISHAN PLASTERBOARD CO.,
LTD.,** *et al.*,

     **Defendants.**

**Case No. 1:11-CV-22408-MGC**

## REBUTTAL REPORT OF RON WRIGHT, PE
## REGARDING BEN D. NOLAN, III PE REPORT

### INTRODUCTION

I was asked to review and provide a rebuttal to the report issued by Ben D. Nolan, III PE ("Nolan") dated March 21, 2019. The report by Nolan addressed litigation matters pertaining to Chinese drywall remediation in residential homes regarding the *Eduardo and Carmen Amorin et al. v. Taishan Gypsum Company, LTD. et al.* case. Following is my rebuttal report in response to some of the opinions and conclusions stated by Nolan within his report.

### SUMMARY OF EXPERT OPINIONS

1. Nolan utilized the incorrect scope of work or "protocol" for evaluating remediation of the homes which contained Chinese drywall.

2. Nolan performed inadequate and improper inspections of the homes that did not conform to Judge Fallon's 10 point remediation Scope of Work protocol (hereinafter "Judge Fallon Protocol"). He did not specifically review each of the 10 points. He did not systematically document compliance or noncompliance, rather he used assumptions and general impressions as a measure of compliance, which is not adequate.

3. Nolan could not accurately compare the actual remediation done to the Judge Fallon Protocol (and the costs) for several reasons including that he did not rely primarily on the Judge Fallon Protocol to guide his inspections, he did not document his findings or perform adequate investigations on each point to confirm or define the actual work performed, and he did not know or document the differences between the protocol he said he used which he called the "2012 KPT Protocol," and the Judge Fallon Protocol.

4. Nolan presented no new data, information, basis, conclusions, or opinions based on information that post-dated Judge Fallon's 2017 FOFCOL.

## OPINIONS

### 1. Nolan utilized the incorrect scope of work or "protocol" for evaluating remediation of the homes which contained Chinese drywall.

Nolan was not certain what Judge Fallon's Remediation Scope of Work Protocol was and instead he appears to have relied on a Knauf Settlement document.[1] Nolan stated he relied on a 2012 KPT remediation protocol. This document is not the Judge Fallon 10 point Protocol from the FOFCOL. If an expert intends to evaluate the sufficiency of a remediation on the basis of Judge Fallon's Protocol, he would have to rely on that protocol, not a different one, as Nolan did.

Nolan testified that he relied on the 2012 KPT protocol.:

> Q. *So you received the one from years ago, 2010, I think was the first one, but you also were provided with a 2017 protocol from Judge Fallon in New Orleans as well?*
> A. *The other one, I believe, is 2012; the KPT protocol is the one I'm referring to. As far as a 2017, I'm not quite sure what you're referring to. You might have to give me some information about that -*[2]

---

[1] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p. 41 lines 9-21.
[2] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p.24 lines 10-18.

**2. Nolan performed inadequate and improper inspections of the homes that did not conform to Judge Fallon's 10 point remediation Scope of Work protocol (hereinafter "Judge Fallon Protocol"). Nolan did not specifically review each of the 10 points. He did not systematically document compliance or noncompliance, rather he used assumptions and general impressions as a measure of compliance, which is not adequate.**

Judge Fallon did not qualify the scope of work with subjective language which provided choices or selective work that could be performed to achieve a proper remediation of a house. Instead, Judge Fallon provided a well-defined and specific set of tasks which needed to be performed to achieve the proper remediation of a house. As Judge Fallon indicated in his April 4, 2017 FOFCOL, the protocol has been confirmed through its application in remediation of thousands of homes.[3]

The language of the Judge Fallon Protocol defined the tasks objectively for what was necessary to be performed. The language did not include subjective terms or descriptors indicating choices as to the work to be performed nor did it include subjective descriptors of the tasks or the cumulative effect of the tasks. Nolan, however, included numerous subjective qualifiers to statements in his report which indicated only partial adherence to a protocol would suffice. This included words such as "satisfied", "sufficient", "sufficiently", "consistent", or "substantially". These qualifiers do not indicate that the protocol as established by Judge Fallon was fully met. The following excerpts from his report are examples of such qualifying words or statements Nolan applied to the protocol. Qualifier words are highlighted in yellow.

> *The purpose of the MDL protocol has been* ==*satisfied*== *and there is no indication of a need for further remediation or expense to achieve a* ==*sufficient*== *remediation.*[4] [Reiterated in multiple locations for the residences of Nguyen/Tuyen, Gody, and Hernandez, and in the summary of opinions.]*

> *The scope was* ==*consistent*== *with the purpose of the MDL protocol.*[5]

> *(1) this residence has been* ==*sufficiently*== *remediated and exhibits no indicia of reactive drywall.*[6]

---

[3] Findings of Fact & Conclusions of Law Case 2:09-md-02047-EEF-JCW Document 20741 Filed 04/21/17 p.14
[4] Chinese Drywall Report Prepared by Ben D. Nolan, III PE, PSP dated March 21, 2019 – p.2, pp.5-6, p.11, and p.13
[5] Chinese Drywall Report Prepared by Ben D. Nolan, III PE, PSP dated March 21, 2019 – p.6
[6] Chinese Drywall Report Prepared by Ben D. Nolan, III PE, PSP dated March 21, 2019 – p.11

> *Hernandez, Nguyen, Foster, Wites and Gody residences have been ==substantially== remediated following a protocol that included a select number of steps defined by the MDL protocol and exhibit no further indicia of reactive drywall.[7]*

When asked repeatedly to describe the remediation scope of work he relied on, he described it differently on several occasions and ultimately testified that he walked through the house looking for " three or four indicia" such as "smelling"[8] [for sulfur] and looking for corroded copper:

> *Q. During which you, other than videotaping, spent a total of three minutes inspecting any aspect of the house for evidence of corrosion; would that be a fair statement?*
> *A.  I inspected for any indicia the entire time I was in the house.*
>
> *Q. And how would you see indicia of, say, copper and silver corrosion visually while you were walking through the house with a – with an iPhone in your hand?*
> *A. So you're smelling for – right?  That's one of the indicia.*
>
> *Q. Uh-huh.*
> *A. You're looking for corroded copper.  I took off one of the switches, which here it is, and I brought my drill so it would go quick, as opposed to the first one in Chatmon, which was a screwdriver.  So there was no evidence of corrosion there.*
>
> *And I went in the garage where they had replaced the air-conditioning system, and it was up in the ceiling, so I couldn't take the covers off up in the ceiling, but I saw the hot water heater in the garage, and it had copper.  So it looked untarnished.  Okay?*
>
> *And I walked around in the house to smell and observe any – for any other indicia.  I felt like that was adequate given the information in the file about the indicia report and the information about the remediation that was done.[9]*

Nolan testified that he evaluated remediation compliance with the protocol based on recollection of the check list "in my mind:"

> *Q. Did you prepare any sort of a checklist of excerpt of the steps that Judge Fallon mandated as part of a full remediation and then go through each of these contracts to determine where there was variance or not variance from Judge Fallon's protocol for remediating a home?*

---

[7] Chinese Drywall Report Prepared by Ben D. Nolan, III PE, PSP dated March 21, 2019 – p.13
[8] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p. 34 lines 11-25, p. 35 lines 1-5.
[9] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p. 83 lines 17-25 and p. 84 lines 1-20.

> A. `I did have my checklist. It's a – in my mind, because I have read the document
> and I know generally the steps that I was looking for, which is also what helped
> guide me to ask for additional documentation once I started receiving the
> plaintiff individual files. I did not prepare a work product, like a matrix, that
> said here's what the judge said and here's what I found at each house, did they
> comply or not. No, I did not do that matrix.[10]

Nolan did not document his findings of compliance or non-compliance.

> Q. And have you written out in words "Here are the departures from either the
> KPT protocol or the other protocol or both" in a written document at any
> time?
> A. No.[11]

> Q. At any time prior to today, have you written down on a piece of paper or
> typed on a computer a specific comparison of any protocol with the
> Martinez residence quote to document any variation between the two?
> A. I've not written that down. I've photographed it. I observed it. I see what
> they have done and what remains to be done. I read their proposal and
> made the determination that the proposal would – should reasonably be
> expected to achieve the remediation. But did I write it down somewhere in
> a matrix? No, I didn't do any of them.[12]

In one instance where he determined a post-remediation inspection and certification was not done,
he simply "assumed" the remediation was complete and adequate – a blatant violation of the 10th
Point to Judge Fallon's Protocol:

> In some of the files, there's no certificate that it was cleaned. That was required
> under the protocol. The drywall was put back; the wiring was put back. I went in
> the house. It's been remediated. If the certificate is missing, I can't 100 percent
> verify that someone certified that, which is one of the steps, but I just have to assume
> that at some point an inspector came by, someone came by and said it's okay to
> close the wall. I don't know.[13]

---

[10] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p. 40 lines 18-25 and p. 41 lines 1-8.
[11] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p.72 lines 22-25 and p.74 line 1
[12] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p.137 lines 2-13
[13] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p. 47 lines 11-19.

3. **Nolan could not accurately compare the actual remediation done to the Judge Fallon Protocol (and the costs) for several reasons including that he did not rely primarily on the Judge Fallon Protocol to guide his inspections, he did not document his findings or perform adequate investigations on each point to confirm or define the actual work performed, and he did not know or document the differences between the protocol he said he used which he called the "2012 KPT Protocol," and the Judge Fallon Protocol.**

Nolan could not identify those differences between the KPT Settlement document he relied on and the Judge Fallon Protocol, particularly those related to the 10 items of remediation.

> *Q. And what are the differences between the KPT 2012 and the other protocol?*
> *A. The one under the KPT protocol is that it requires a certification that the drywall that was replaced that is the new drywall is not reactive. That's not required under the other protocol.*
>
> *Q. Any others?*
> *A. I think there's another certification at the end to certify that it is complete in the more definitive protocol.[14]*

The KPT 2012 protocol that Nolan used in fact varies from the protocol adopted by Judge Fallon in the following significant ways (variance to the Judge Fallon protocol is noted in the parenthesis following the KPT 2012 protocol variance indicated):

1. Limits only ½" drywall will be removed; other drywall board can stay (ALL drywall board within the residence is to be replaced)
2. Remove, store, and reinstall, if necessary, the following to remove drywall, otherwise leave these items in place and protect - hot water heaters, cabinets, countertops, doors, moldings and trim, sinks, toilets, bathtubs, shower enclosures, mirrors, lighting fixtures, ceiling fans, plumbing fixtures, exhaust grilles and diffusers, marble, granite, and other natural stone pieces, doors and attached hardware. If the items are contaminated, then remove and replace. (ALL items are to be removed and replaced)
3. HEPA vacuum if necessary (HEPA vacuuming is required)
4. Repair or replace non-porous insulation in direct contact with drywall as needed (ALL insulation is to be removed and replaced)
5. Remove and replace all carpeting, padding, laminate flooring; all other flooring to remain in place and be protected i.e. wood flooring remains (ALL wood and vinyl floorings to be removed and replaced)

---

[14] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p.69 lines 6-15

6. Remove and replace all affected plumbing components if discolored or pitted, inspect all other piping, fittings, and components – clean of any contaminants and, if functionally unaffected, leave in place. (ALL piping, fittings, and components in bathrooms are to be removed and replaced)

7. For appliances in homes with >3,500 sf, remove and replace, where performance or appearance is compromised (ALL appliances are to be removed and replaced)

8. Finish and paint all new drywall with primer and 2 coats of paint in one color (restore home to pre-remediation fit and finish – if wallpaper or other wall finishes were in place, replace in like kind).[15]

As can be seen, significant variances exist between the KPT 2012 protocol and the Judge Fallon Protocol. By applying the KPT 2012 protocol as the basis for his evaluation, Nolan cannot confirm that the actual scope of work performed at a Plaintiff house was remediated to the level required by the Judge Fallon Protocol. This does not allow for a proper evaluation of the cost information Nolan compares between the remediation costs he determined and the MDL Remediation Damages Formula pricing.

Nolan did not do adequate home investigation to evaluate the scope of remediation work performed to the Judge Fallon Protocol. To do so would have required much more time than he performed (20 minutes or less) and required knowing the actual protocol requirements.

> Q. *During which you, other than videotaping, spent a total of three minutes inspecting any aspect of the house for evidence of corrosion; would that be a fair statement?*
> A. *I inspected for any indicia the entire time I was in the house.*
>
> Q. *And how would you see indicia of, say, copper and silver corrosion visually while you were walking through the house with a – with an I-Phone in your hand?*
> A. *So you're smelling for – right? That's one of the indicia.*[16]
>
> Q. *What was the specific purpose?*
> A. *To go inside the house – the purpose is on page 1 of my report: Inspect the current condition of the plaintiff's residence. I did that for, what you figure, 20 minutes.*
> Q. *Yes.*

---

[15] Compare 2012 KPT Protocol (Ex. F) to 2017 FOFCOL, 2017 WL 141627, *6-*8 (E.D. La.) and 2010 FOFCOL, 706 F.Supp. 3d 655, 670-688 (E.D. La.).
[16] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p.83 lines 17-25 and p.84 lines 1-3

> *A. in the house. I inspected the house for 20 minutes. I went in every room, every closet, every bathroom, the back porch, the foyer, all around the house, in the garage, in the laundry room, every room. So I did the first part. Inspect the current condition. Take –*
>
> *Q. And that took you five minutes to do that?*
>
> *A. It – perhaps, but I had the camera on the whole time and taking pictures for 20 minutes, correct?[17]*

### 4. Nolan presented no new data, information, basis, conclusions, or opinions based on information that post-dated Judge Fallon's 2017 FOFCOL.

Nolan did not provide new information (post 2017 FOFCOL) from RSMeans, the American Society of Professional Estimators or any other remediation authority in disagreeing with the Judge Fallon Protocol. For example, Nolan testified that he was willing to assume post remediation inspection and certification occurred or was acceptable, even if there was no certificate in the file.[18] However, when Nolan was asked if since the 2017 FOFCOL, any authority had announced a standard that it was acceptable to ignore the post remediation inspection and certification requirement, he could not identify any such information. This further illustrates that Nolan did not carry out strict adherence to the Judge Fallon Protocol, in reaching his opinions.

> *Q. Other than your professional opinion, are you aware of any … anyone out there, who has made an announcement in the – say the last two or three years, that you can dispense with post-remediation clearance testing and still have a sufficient remediation?*
>
> *A. No.[19]*

---

[17] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p.86 lines 18-25 and p.87 lines 1-7
[18] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p.47 lines 11-19.
[19] Videotaped deposition of Ben D. Nolan, III PE, PSP on April 10, 2019 p.76 lines 18-25 and p.77 line 1

Opinions expressed within this report are based upon information provided to Berman & Wright to date. All opinions expressed in this report are stated to a reasonable degree of engineering certainty. Berman & Wright has no financial interest in the outcome of this proceeding except that the firm is compensated as an expert witness at a standard hourly rate and expense basis for time spent in connection with this matter. Berman & Wright reserves the right to supplement or modify opinions and content should additional information become available.

**BERMAN & WRIGHT ARCHITECTURE, ENGINEERING & PLANNING, LLC**

Ronald E. Wright, PE
Professional Engineer
Principal