# EXHIBIT 31 part 2

# EXHIBIT B11

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others
similarly situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG TAIHE
DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD
CO., LTD., et al.,

      Defendants.

_____/

## PLAINTIFF CASSANDRA MARIN'S RESPONSE TO DEFENDANTS' INTERROGATORIES

Pursuant to Fed. R. Civ. P. 26 and 33 and LR 26.1(e), and as required by Fed. R. Civ. P. 26(e),

Plaintiff Cassandra Marin hereby provides responses to Defendants Taishan Gypsum Company,

Ltd., Tai'an Taishan Plasterboard Company, Ltd., and BNBM PLC (collectively "Defendants")

interrogatories dated November 16, 2018.

## INTERROGATORIES

      1.      Identify all types of damages that you seek in this Lawsuit (e.g. alternative living

expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for

each category.

## PLAINTIFF'S RESPONSE TO INTERROGATORY #1:

Remediation Damages: In accordance with Judge Cooke's November 16, 2018 Order (Rec. Doc.

112), Remediation damages will be computed based on the "remediation formula" set forth in

Judge Fallon's Findings of Fact and Conclusions of Law Related to the June 9, 2015 Damages

hearing (MDL Rec. Doc. 20741).

Loss of Use and Enjoyment Damages:  Plaintiff seeks loss of use and enjoyment damages in an amount to be determined at trial.

Diminution in Value:  Plaintiff seeks damages for the diminution in value of the property in an amount to be determined at trial.

Punitive Damages:  Plaintiff seeks punitive damages in an amount to be determined at trial.

Plaintiff reserves the right to supplement this response prior to the close of fact discovery on January 14, 2019.

     2.    Did you ever vacate the Property because of Chinese Drywall?

        a.    If so, identify the dates and location of your alternative residence.

        b.    If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2:**

Plaintiff sold and vacated the Property in February of 2012.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2a:**

Not applicable, as Plaintiff no longer owned the property after it was vacated.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2b:**

Not applicable, as Plaintiff no longer owned the property after it was vacated.

     3.    Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

        a.    If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

        b.    If so, identify any physician and/or medical professional who has

diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

       c.      If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #3:**

Plaintiff is not pursuing a claim for bodily injury.

    4.    Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

       a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

       b.      If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

       c.      If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #4:**

Neither Plaintiff, nor any member of Plaintiff's household is pursuing a claim for bodily injury.

Dated:  November 30, 2018          Respectfully submitted,

                    /s/ Holly R. Werkema
                    Holly R. Werkema, Fla. Bar No. 71133
                    Russell W. Budd
                    BARON & BUDD, P.C.
                    3102 Oak Lawn Ave., Ste. 1100
                    Dallas, TX 75219
                    hwerkema@baronbudd.com
                    Phone: (214) 521-3605

Facsimile: (214) 520-1181

Allison Grant, Fla. Bar No. 858330
Allison Grant, P.A.
14 SE 4th St
Boca Raton, FL 33432-6111
agrant@allisongrantpa.com
Phone: 561-994-9646
Fax: 561-431-4627

*Attorneys for Plaintiff Cassandra Marin*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, November 30, 2018, I caused the foregoing Answers to

Defendants' Interrogatories to Priority Claimant Cassandra Marin to be served on the following

counsel via email and by uploading it to the Chinese Drywall MDL 2047 Portal:

Craig P. Kalil, Esquire
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue, Suite 2250
Miami, FL 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929
Email: ckalil@aballi.com

L. Christopher Vejnoska, Esquire
Eric Matthew Hairston, Esquire
Andrew Davidson, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA 94105
Telephone: (415) 773-5700
Email: cvejnoska@orrick.com
            ehairston@orrick.com
            adavidson@orrick.com

James L. Stengel, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Email: jstengel@orrick.com

*Attorneys for Beijing New Building Materials Public Limited Company*

Enjolique D. Aytch, Esquire
AKERMAN LLP
Las Olas Centre II – Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: enjolique.aytch@akerman.com

Bernard Taylor, Esquire
Michael P. Kenny, Esquire

Christina Hull Eikhoff, Esquire
David Venderbush, Esquire
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
       mike.kenny@alston.com
       christy.eikhoff@alston.com
       david.venderbush@alston.com

*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*


          /s/ Holly R. Werkema
          Holly R. Werkema

          *Attorney for Plaintiff Cassandra Marin*

# EXHIBIT B12

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:11-CV-22408-MGC**

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all
others similarly situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A
SHANDONG TAIHE DONGXIN CO., LTD.;
TAIAN TAISHAN PLASTERBOARD CO., LTD., et
al.,

      Defendants.

_____/

**PRIORITY CLAIMANT DAILYN MARTINEZ'S FIRST AMENDED ANSWERS**
**TO INTERROGATORIES**

      PURSUANT TO Fed. R. Civ. P. 26 and 33 and LR 26.1(g), Plaintiff, Dailyn
Martinez, through Plaintiff's undersigned attorney, hereby responds to Defendants Taishan
Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd. and BNBM PLC
(collectively "Defendants") Interrogatories as follows:

**FIRST AMENDED INTERROGATORIES**

      1.    Identify all types of damages that you seek in this Lawsuit (e.g. alternative
living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts
sought for each category.

      **ANSWER:**    We seek alternative living expenses from November 2010
through June 2013 of at least $12,199.00, personal property damage of at least
$59,532.65, lost equity, diminution in value, loss of use and enjoyment, punitive
damages, and pre-judgment interest. In addition, we seek remediation damages as
determined by the Court. The total amount of diminution in value, loss of use and
enjoyment, and punitive damages will be determined by the jury and pre-judgment
interest by the Court as a post-judgment ministerial matter.

1

2.  Did you ever vacate the Property because of Chinese Drywall?

   a.  If so, identify the dates and location of your alternative residence.

   b.  If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

   **ANSWER:**  Yes, my family and I vacated the Property because of the Chinese Drywall. My husband, young son, and I all suffered from respiratory problems, headaches, and sleeping problems while we were living in the home from late 2008 until November 2010. In November 2010, my family and I purchased a used RV for $4,399. We parked the used RV in our backyard where our Chinese Drywall home is located. We began to sleep in the RV at night time. We would only go inside the Chinese Drywall home to use the bathrooms and kitchen. We had this type of living arrangement until June 2012. By that time, my son Jeasiel who was born on July 11, 1998 had outgrown the RV and I was tired of seeing him sleep uncomfortably in the RV. Therefore, my husband and I rented a home at 1718 SW 12th Terrace, Cape Coral FL 33991 from June 2012 through December 2012 and then rented a home at 2011 NE 18th Place, Cape Coral, FL 33993 from January 2013 through June 2013.  In June 2013, my husband and I determined that we could not afford to make both our mortgage payments and to pay for rent. Therefore, we moved back to the Chinese Drywall home. We continued to make payments on our mortgage while residing in the alternative residences identified above.

3.  Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

   a.  If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

   b.  If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

   c.  If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

2

**ANSWER:**     While we do not intend to pursue bodily injury claims arising from Chinese Drywall, we did suffer from respiratory problems, headaches, eye irritation, fatigue, sore throats and insomnia among other symptoms while living in the Chinese Drywall Property. It was our fear of the long-term effects of living in the Chinese Drywall Property that caused us to leave the Property and find an alternative residence.

4.     Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

a.     If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

b.     If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

c.     If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

**ANSWER:**     While we are not pursuing bodily injury claims related to Chinese Drywall, we did suffer from respiratory problems, headaches, eye irritation, fatigue, sore throats and insomnia and other symptoms while living in the Chinese Drywall Property. It was our fear of the long-term effects of living in the Chinese Drywall Property that caused us to leave the Property and find an alternative residence.

5.     If you claim a diminution in value of the Property as a result of Chinese Drywall, identify the total amount of such diminution of value being claimed.

**ANSWER:**  I am claiming diminution in value damages in an amount to be determined at trial.

Respectfully submitted this 13th day of December, 2018.

/s/ Panagiotis V. Albanis
Panagiotis "Pete" V. Albanis
Morgan & Morgan – Complex Litigation
12800 University Drive Suite 600
Fort Myers, FL 33907

3

Tel:  239-433-6880
Fax:  239-433-6836
palbanis@forthepeople.com

*Attorney for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing **PRIORITY CLAIMANT DAILYN MARTINEZ'S ANSWERS TO DEFENDANTS INTERROGATORIES** has been served on the following counsel via email:

Enjoliqué D. Aytch, Esq.
AKERMAN LLP
Las Olas Centre II - Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, Florida 33301
Tel: 954-463-2700
Fax: 954-463-2224
enjolique.aytch@akerman.com

Bernard Taylor, Esq.
Michael P. Kenny, Esq.
Christina Hull Eikhoff, Esq.
David Venderbush, Esq.
ALSTON & BIRD LLP
1201 West Peachtree Street Atlanta, Georgia 30309
Tel: 404-881-7000
Fax: 404-881-7777
bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Attorneys for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

Craig P Kalil
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue Suite 2250
Miami, FL 33131
Tel: 305-373-6600
Fax: 305-373-7929
ckalil@aballi.com

L. Christopher Vejnoska
Eric Matthew Hairston
Andrew K. Davidson
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700
cvejnoska@orrick.com

James L. Stengel
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel: 212-506-5000
jstengel@orrick.com

*Counsel for BNBM PLC*

December 13, 2018

<u>/s/ Panagiotis V. Albanis</u>
Panagiotis "Pete" V. Albanis

6

## VERIFICATION

I hereby affirm, under the penalty of perjury, that the foregoing responses to Defendants' Supplement Interrogatories propounded on December 13, 2018 are based on my personal knowledge, and are true and correct to the best of my knowledge, information and belief.

Dated:  12/14/2018                          By: _____
                                                                  Dailyn Martinez

1

# EXHIBIT B13

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others
similarly situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG TAIHE
DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD
CO., LTD., et al.,

      Defendants.

_____/

## PLAINTIFF ADELA MIRANDA'S RESPONSE TO DEFENDANTS' INTERROGATORIES

Pursuant to Fed. R. Civ. P. 26 and 33 and LR 26.1(e), Plaintiff Adela Miranda hereby provides

responses to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company,

Ltd., and BNBM PLC (collectively "Defendants") interrogatories dated November 16, 2018.

## INTERROGATORIES

1.     Identify all types of damages that you seek in this Lawsuit (e.g. alternative living

expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for

each category.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #1:**

Remediation Damages:  In accordance with Judge Cooke's November 16, 2018 Order (Rec. Doc.

112), Remediation damages will be computed based on the "remediation formula" set forth in

Judge Fallon's Findings of Fact and Conclusions of Law Related to the June 9, 2015 Damages

hearing (MDL Rec. Doc. 20741).

Loss of Use and Enjoyment Damages:  Plaintiff seeks loss of use and enjoyment damages in an amount to be determined at trial.

Loss of Equity/Foreclosure Damages:  Plaintiff seeks damages for her loss of equity in the Property in an amount to be determined at trial.

Damage to Credit:  Plaintiff seeks damages for injury to her credit in an amount to be determined at trial.

Diminution in Value:  Plaintiff seeks damages for the diminution in value of the property in an amount to be determined at trial.

Other Economic Damages:  Plaintiff seeks other economic damages of $5,500.00 in attorneys' fees paid to J.P. Law Firm and Pila Law Group, LLC for foreclosure defense.

Punitive Damages:  Plaintiff seeks punitive damages in an amount to be determined at trial.

Plaintiff reserves the right to supplement this response prior to the close of fact discovery on January 14, 2019.

2.  Did you ever vacate the Property because of Chinese Drywall?

   a.  If so, identify the dates and location of your alternative residence.

   b.  If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2:**

Plaintiff vacated the property upon foreclosure by Wells Fargo Bank, N.A. on or about June 9, 2018.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2a:**

Not applicable, as Plaintiff no longer owned the property after it was vacated.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2b:**

Not applicable, as Plaintiff no longer owned the property after it was vacated.

      3.     Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

      a.     If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

      b.     If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

      c.     If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #3:**

Plaintiff is not pursuing a claim for bodily injury.

      4.     Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

      a.     If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

      b.     If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

      c.     If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #4:**

Neither Plaintiff, nor any member of Plaintiff's household is pursuing a claim for bodily injury.

5.      If you contend that a foreclosure occurred as a result of damage to your Property, identify any lenders or mortgagees that had a security interest on the Property at any time during your ownership (to the extent not already identified in the Supplemental Plaintiff Profile Form).

**PLAINTIFF'S RESPONSE TO INTERROGATORY #5:**

To the best of Plaintiff's recollection, Wells Fargo Bank, N.A. was the only lender with a security interest on the Property during the time of her ownership.

6.      If the Property was the subject of a foreclosure, identify the following (to the extent not already identified in the Supplemental Plaintiff Profile Form):

      a.      Lender's name;

      b.      Loan number;

      c.      Original loan/mortgage amount;

      d.      Date of the original loan/mortgage;

      e.      The amount owed on the loan/mortgage at the date of foreclosure;

      f.      Date of the foreclosure

**PLAINTIFF'S RESPONSE TO INTERROGATORY #6:**

    a.   Wells Fargo Bank, N.A.

    b.   Loan No. ███████

    c.   Original mortgage amount was $ 272,511.00

    d.   Mortgage was entered on January 22, 2007.

    e.   With interest and penalties, $338,606.06 was owed on the mortgage on the date of foreclosure.

    f.   Foreclosure sale took place on May 3, 2018.

Dated:  November 30, 2018    Respectfully submitted,


           /s/ Holly R. Werkema
           Holly R. Werkema, Fla. Bar No. 71133
           Russell W. Budd
           BARON & BUDD, P.C.
           3102 Oak Lawn Ave., Ste. 1100
           Dallas, TX 75219
           hwerkema@baronbudd.com
           Phone: (214) 521-3605
           Facsimile: (214) 520-1181

           Allison Grant, Fla. Bar No. 858330
           Allison Grant, P.A.
           14 SE 4th St
           Boca Raton, FL 33432-6111
           agrant@allisongrantpa.com
           Phone: 561-994-9646
           Fax: 561-431-4627

           *Attorneys for Plaintiff Adela Miranda*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, November 30, 2018, I caused the foregoing Answers to

Defendants' Interrogatories to Priority Claimant Adela Miranda be served on the following counsel

via email and by uploading the foregoing to the Chinese Drywall MDL 2047 Portal:

> Craig P. Kalil, Esquire
> ABALLI MILNE KALIL P.A.
> SunTrust International Center
> 1 SE 3rd Avenue, Suite 2250
> Miami, FL 33131
> Telephone: (305) 373-6600
> Facsimile: (305) 373-7929
> Email: ckalil@aballi.com
>
> L. Christopher Vejnoska, Esquire
> Eric Matthew Hairston, Esquire
> Andrew Davidson, Esquire
> ORRICK, HERRINGTON & SUTCLIFFE LLP
> The Orrick Building
> San Francisco, CA 94105
> Telephone: (415) 773-5700
> Email: cvejnoska@orrick.com
>       ehairston@orrick.com
>       adavidson@orrick.com
>
> James L. Stengel, Esquire
> ORRICK, HERRINGTON & SUTCLIFFE LLP
> 51 West 52nd Street
> New York, NY 10019
> Telephone: (212) 506-5000
> Email: jstengel@orrick.com
>
> *Attorneys for Beijing New Building Materials Public Limited Company*
>
> Enjolique D. Aytch, Esquire
> AKERMAN LLP
> Las Olas Centre II – Suite 1600
> 350 E. Las Olas Boulevard
> Ft. Lauderdale, FL 33301
> Telephone: (954) 463-2700
> Facsimile: (954) 463-2224
> Email: enjolique.aytch@akerman.com
>
> Bernard Taylor, Esquire
> Michael P. Kenny, Esquire

Christina Hull Eikhoff, Esquire
David Venderbush, Esquire
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
       mike.kenny@alston.com
       christy.eikhoff@alston.com
       david.venderbush@alston.com

*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

/s/ Holly R. Werkema
Holly R. Werkema

*Attorney for Plaintiff Adela Miranda*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others
similarly situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG TAIHE
DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD
CO., LTD., et al.,

      Defendants.

_____/

## PLAINTIFF JOSE MIRANDA'S RESPONSE TO DEFENDANTS' INTERROGATORIES

Pursuant to Fed. R. Civ. P. 26 and 33 and LR 26.1(e), Plaintiff Jose Miranda hereby provides responses to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd., and BNBM PLC (collectively "Defendants") interrogatories dated November 16, 2018.

## INTERROGATORIES

1.      Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #1:**

Remediation Damages:  In accordance with Judge Cooke's November 16, 2018 Order (Rec. Doc. 112), Remediation damages will be computed based on the "remediation formula" set forth in Judge Fallon's Findings of Fact and Conclusions of Law Related to the June 9, 2015 Damages hearing (MDL Rec. Doc. 20741).

Loss of Use and Enjoyment Damages:  Plaintiff seeks loss of use and enjoyment damages in an amount to be determined at trial.

Loss of Equity/Foreclosure Damages:  Plaintiff seeks damages for his loss of equity in the Property in an amount to be determined at trial.

Damage to Credit:  Plaintiff seeks damages for injury to his credit in an amount to be determined at trial.

Diminution in Value:  Plaintiff seeks damages for the diminution in value of the property in an amount to be determined at trial.

Other Economic Damages:  Plaintiff seeks other economic damages of $5,500.00 in attorneys' fees paid to J.P. Law Firm and Pila Law Group, LLC for foreclosure defense.

Punitive Damages:  Plaintiff seeks punitive damages in an amount to be determined at trial.

Plaintiff reserves the right to supplement this response prior to the close of fact discovery on January 14, 2019.

      2.      Did you ever vacate the Property because of Chinese Drywall?

           a.      If so, identify the dates and location of your alternative residence.

           b.      If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2:**

Plaintiff vacated the property upon foreclosure by Wells Fargo Bank, N.A. on or about June 9, 2018.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2a:**

Not applicable, as Plaintiff no longer owned the property after it was vacated.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2b:**

Not applicable, as Plaintiff no longer owned the property after it was vacated.

    3.      Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

        a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

        b.      If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

        c.      If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #3:**

Plaintiff is not pursuing a claim for bodily injury.

    4.      Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

        a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

        b.      If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

        c.      If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #4:**

Neither Plaintiff, nor any member of Plaintiff's household is pursuing a claim for bodily injury.

5.      If you contend that a foreclosure occurred as a result of damage to your Property, identify any lenders or mortgagees that had a security interest on the Property at any time during your ownership (to the extent not already identified in the Supplemental Plaintiff Profile Form).

**PLAINTIFF'S RESPONSE TO INTERROGATORY #5:**

To the best of Plaintiff's recollection, Wells Fargo Bank, N.A. was the only lender with a security interest on the Property during the time of his ownership.

6.      If the Property was the subject of a foreclosure, identify the following (to the extent not already identified in the Supplemental Plaintiff Profile Form):

      a.      Lender's name;

      b.      Loan number;

      c.      Original loan/mortgage amount;

      d.      Date of the original loan/mortgage;

      e.      The amount owed on the loan/mortgage at the date of foreclosure;

      f.      Date of the foreclosure

**PLAINTIFF'S RESPONSE TO INTERROGATORY #6:**

    a.  Wells Fargo Bank, N.A.

    b.  Loan No. ▮▮▮▮▮▮▮

    c.  Original mortgage amount was $ 272,511.00

    d.  Mortgage was entered on January 22, 2007.

    e.  With interest and penalties, $338,606.06 was owed on the mortgage on the date of foreclosure.

    f.  Foreclosure sale took place on May 3, 2018.

Dated:  November 30, 2018          Respectfully submitted,


/s/ Holly R. Werkema
Holly R. Werkema, Fla. Bar No. 71133
Russell W. Budd
BARON & BUDD, P.C.
3102 Oak Lawn Ave., Ste. 1100
Dallas, TX 75219
hwerkema@baronbudd.com
Phone: (214) 521-3605
Facsimile: (214) 520-1181

Allison Grant, Fla. Bar No. 858330
Allison Grant, P.A.
14 SE 4th St
Boca Raton, FL 33432-6111
agrant@allisongrantpa.com
Phone: 561-994-9646
Fax: 561-431-4627

*Attorneys for Plaintiff Jose Miranda*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, November 30, 2018, I caused the foregoing Answers to

Defendants' Interrogatories to Priority Claimant Jose Miranda be served on the following counsel

via email and by uploading the foregoing to the Chinese Drywall MDL 2047 Portal:

Craig P. Kalil, Esquire
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue, Suite 2250
Miami, FL 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929
Email: ckalil@aballi.com

L. Christopher Vejnoska, Esquire
Eric Matthew Hairston, Esquire
Andrew Davidson, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA 94105
Telephone: (415) 773-5700
Email: cvejnoska@orrick.com
       ehairston@orrick.com
       adavidson@orrick.com

James L. Stengel, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Email: jstengel@orrick.com

*Attorneys for Beijing New Building Materials Public Limited Company*

Enjolique D. Aytch, Esquire
AKERMAN LLP
Las Olas Centre II – Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: enjolique.aytch@akerman.com

Bernard Taylor, Esquire
Michael P. Kenny, Esquire

Christina Hull Eikhoff, Esquire
David Venderbush, Esquire
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
       mike.kenny@alston.com
       christy.eikhoff@alston.com
       david.venderbush@alston.com

*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

<u>/s/ Holly R. Werkema</u>
Holly R. Werkema

*Attorney for Plaintiff Jose Miranda*

# EXHIBIT B14

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all
others similarly situated,

     Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A
SHANDONG TAIHE DONGXIN CO., LTD.;
TAIAN TAISHAN PLASTERBOARD CO., LTD., et
al.,

     Defendants.

_____/

## PRIORITY CLAIMANT TRACY NGUYEN'S ANSWERS TO INTERROGATORIES

PURSUANT TO Fed. R. Civ. P. 26 and 33 and LR 26.1(g), Plaintiff, Tracy Nguyen, through Plaintiff's undersigned attorney, hereby responds to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd. and BNBM PLC (collectively "Defendants") Interrogatories as follows:

## INTERROGATORIES

1.     Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

     **ANSWER:**     I seek alternative living expenses from May 2010 through May 2015 of at least $100,042.00, personal property damage expenses of at least $463.05, lost equity, diminution in value, loss of use and enjoyment, punitive damages, and pre-judgment interest. In addition, I seek remediation damages as determined by the Court. The total amount of diminution in value, loss of use and enjoyment, and punitive damages will be determined by the jury and pre-judgment interest by the Court as a post-judgment ministerial matter.

2.      Did you ever vacate the Property because of Chinese Drywall?

     a.      If so, identify the dates and location of your alternative residence.

     b.      If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**ANSWER:**      Yes.  a. My children and I vacated the Property because of the Chinese Drywall. We suffered from migraine headaches, skin irritation, throat irritation and coughing, breathing difficulties, hair loss and loss of voice while we were living in the home from 12/13/2006 to 5/21/2010.  We moved into my mother's home at 925 SW Santa Barbara Place, Cape Coral, FL 33991 and lived there until 6/17/2011, when I purchased another home at 2100 SW Santa Barbara Place, Cape Coral, FL 33991 to live in with my children.   I moved back into my home at 103 SE 16th Place Cape Coral, FL 33990 when remediation was completed on 5/5/2015.  b. I continued to make payments on the mortgage throughout the time we were not living in the property to present.

3.      Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

     a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

     b.      If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

     c.      If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**ANSWER:**      While I do not intend to pursue bodily injury claims arising from Chinese Drywall, I did suffer from respiratory problems, migraine headaches, loss of hair and loss of voice while living in the Chinese Drywall Property. It was my fear of the long-term effects of living in the Chinese Drywall Property that caused us to leave the Property and find an alternative residence.

4.      Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

    a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

    b.      If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

    c.      If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

**ANSWER:**      While I do not intend to pursue bodily injury claims arising from Chinese Drywall, I did suffer from respiratory problems, migraine headaches, loss of hair and loss of voice while living in the Chinese Drywall Property. It was my fear of the long-term effects of living in the Chinese Drywall Property that caused us to leave the Property and find an alternative residence.

5.    If you claim a diminution in value of the Property as a result of Chinese Drywall, identify the total amount of such diminution of value being claimed.

**ANSWER:**      I am claiming diminution in value damages in an amount to be determined at trial.

This the 30th day of November 2018.

        /s/ Panagiotis V. Albanis
        Panagiotis "Pete" V. Albanis
        Morgan & Morgan – Complex Litigation
        12800 University Drive Suite 600
        Fort Myers, FL 33907
        Tel:   239-433-6880
        Fax:   239-433-6836
        palbanis@forthepeople.com

        *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **PRIORITY CLAIMANT TRACY NGUYEN'S ANSWERS TO DEFENDANTS INTERROGATORIES** has been served on the following counsel via email:

Enjoliqué D. Aytch, Esq.
AKERMAN LLP
Las Olas Centre II - Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, Florida 33301
Tel: 954-463-2700
Fax: 954-463-2224
enjolique.aytch@akerman.com

Bernard Taylor, Esq.
Michael P. Kenny, Esq.
Christina Hull Eikhoff, Esq.
David Venderbush, Esq.
ALSTON & BIRD LLP
1201 West Peachtree Street Atlanta, Georgia 30309
Tel: 404-881-7000
Fax: 404-881-7777
bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Attorneys for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

Craig P Kalil
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue Suite 2250
Miami, FL 33131
Tel: 305-373-6600
Fax: 305-373-7929
ckalil@aballi.com

L. Christopher Vejnoska
Eric Matthew Hairston
Andrew K. Davidson
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700
cvejnoska@orrick.com

James L. Stengel
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel: 212-506-5000
jstengel@orrick.com

*Counsel for BNBM PLC*

This 30th day of November, 2018.

/s/ Panagiotis V. Albanis
Panagiotis "Pete" V. Albanis

## VERIFICATION

     I hereby affirm, under the penalty of perjury, that the foregoing responses to Defendants' Interrogatories propounded on November 16, 2018 are based on my personal knowledge, and are true and correct to the best of my knowledge, information, and belief.

Dated: _11/30/2018_                    By: _____

                                              Tracy Nguyen

Case 1:11-cv-22408-MGC Document 270-15 Entered on FLSD Docket 05/13/2019 Page 1 of 17

# EXHIBIT B15

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others
similarly situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG TAIHE
DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD
CO., LTD., et al.,

      Defendants.

_____/

## PLAINTIFF MONICA NUNEZ'S RESPONSE TO DEFENDANTS' INTERROGATORIES

Pursuant to Fed. R. Civ. P. 26 and 33 and LR 26.1(e), Plaintiff Monica Nunez hereby provides

responses to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company,

Ltd., and BNBM PLC (collectively "Defendants"), interrogatories dated November 16, 2018.

## INTERROGATORIES

1.      Identify all types of damages that you seek in this Lawsuit (e.g. alternative living

expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for

each category.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #1:**

Remediation Damages:  In accordance with Judge Cooke's November 16, 2018 Order (Rec. Doc.

112), Remediation damages will be computed based on the "remediation formula" set forth in

Judge Fallon's Findings of Fact and Conclusions of Law Related to the June 9, 2015 Damages

hearing (MDL Rec. Doc. 20741).

Alternative Living Expense Damages:  To date, Plaintiff has identified and produced documentation

of alternative living expense damages of $107,560.00.

Moving Expense Damages: Plaintiff incurred and seeks damages for moving expenses of approximately $700.00.

Loss of Use and Enjoyment Damages: Plaintiff seeks loss of use and enjoyment damages in an amount to be determined at trial.

Loss of Equity/Foreclosure Damages: Plaintiff seeks damages for her loss of equity in the Property in an amount to be determined at trial.

Damage to Credit: Plaintiff seeks damages for injury to her credit in an amount to be determined at trial.

Diminution in Value: Plaintiff seeks damages for the diminution in value of the property in an amount to be determined at trial.

Other Economic Damages: Plaintiff seeks other economic damages for $1211.00 in air conditioning repair costs incurred as a result of the Chinese drywall.

Punitive Damages: Plaintiff seeks punitive damages in an amount to be determined at trial.

Plaintiff reserves the right to supplement this response prior to the close of fact discovery on January 14, 2019.

> 2. Did you ever vacate the Property because of Chinese Drywall?

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2:**

Yes.

> a. If so, identify the dates and location of your alternative residence.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2a:**

Due to health concerns, Plaintiff and her family vacated the Property on or around January 1, 2012 and did not reside in the Property again prior to the foreclosure in August of 2017. The address of the alternative residence is 20225 NE 34 Delvista Ct., Aventura, FL 33180.

      b.      If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2b:**

To the best of Plaintiff's recollection, she continued to make timely mortgage payments until around March of 2014. At that point, it became too financially burdensome on Plaintiff and her family to pay both rent for his family's housing and a mortgage on an unusable property.

      3.      Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

      a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

      b.      If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

      c.      If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #3:**

Plaintiff is not pursuing a claim for bodily injury.

      4.      Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

      a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

      b.     If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

      c.     If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #4:**

Neither Plaintiff, nor any member of Plaintiff's household is pursuing a claim for bodily injury.

      5.     If you contend that a foreclosure occurred as a result of damage to your Property, identify any lenders or mortgagees that had a security interest on the Property at any time during your ownership (to the extent not already identified in the Supplemental Plaintiff Profile Form).

**PLAINTIFF'S RESPONSE TO INTERROGATORY #5:**

To the best of Plaintiff's recollection, Continental Trust Mortgage was the original mortgage holder of both mortgages on the property. Plaintiff's first mortgage with Continental Trust Mortgage was later transferred to Chase, Seterus, Inc., and Federal National Mortgage Association (FNMA). Plaintiff's second mortgage with Continental Trust Mortgage was later transferred to PennyMac (PNMAC).

      6.     If the Property was the subject of a foreclosure, identify the following (to the extent not already identified in the Supplemental Plaintiff Profile Form):

      a.     Lender's name;

      b.     Loan number;

      c.     Original loan/mortgage amount;

      d.     Date of original loan/mortgage;

      e.     The amount owed on the loan/mortgage at the date of foreclosure;

      f.     Date of the foreclosure.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #6:**

a. Continental Trust Mortgage (later Chase, Seterus, Inc., FNMA, and PNMAC)

b. Continental Trust Mortgage Loan No.- █████████

    Chase Loan No.- ████████

    Seterus, Inc. Loan No.- ████████

    FNMA Loan No.- Plaintiff has been unable to obtain the FNMA loan number, but will

    supplement this response if and when the loan number is obtained.

    PNMAC Loan No.- ████████

c. Continental Trust First Mortgage Amount- $215,992.00

    Continental Trust Second Mortgage Amount- $26,999.00

d. Both mortgages were entered on January 12, 2007.

e. With interest and penalties, $328,015.37 was owed on the first mortgage at the date of

    foreclosure.

f. Foreclosure sale took place on August 22, 2017.


Dated:  November 30, 2018          Respectfully submitted,


                                 /s/ Holly R. Werkema
                                 Holly R. Werkema, Fla. Bar No. 71133
                                 Russell W. Budd
                                 BARON & BUDD, P.C.
                                 3102 Oak Lawn Ave., Ste. 1100
                                 Dallas, TX 75219
                                 hwerkema@baronbudd.com
                                 Phone: (214) 521-3605
                                 Facsimile: (214) 520-1181

                                 Allison Grant, Fla. Bar No. 858330
                                 Allison Grant, P.A.
                                 14 SE 4th St
                                 Boca Raton, FL 33432-6111
                                 agrant@allisongrantpa.com
                                 Phone: 561-994-9646

Fax: 561-431-4627

*Attorneys for Plaintiff Monica Nunez*

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that on this day, November 30, 2018, I caused the foregoing Answers to

Defendants' Interrogatories to Priority Plaintiff Monica Nunez be served on the following counsel

via email and by uploading the foregoing to the Chinese Drywall MDL 2047 Portal:

      Craig P. Kalil, Esquire
      ABALLI MILNE KALIL P.A.
      SunTrust International Center
      1 SE 3rd Avenue, Suite 2250
      Miami, FL 33131
      Telephone: (305) 373-6600
      Facsimile: (305) 373-7929
      Email: ckalil@aballi.com

      L. Christopher Vejnoska, Esquire
      Eric Matthew Hairston, Esquire
      Andrew Davidson, Esquire
      ORRICK, HERRINGTON & SUTCLIFFE LLP
      The Orrick Building
      San Francisco, CA  94105
      Telephone: (415) 773-5700
      Email: cvejnoska@orrick.com
            ehairston@orrick.com
            adavidson@orrick.com

      James L. Stengel, Esquire
      ORRICK, HERRINGTON & SUTCLIFFE LLP
      51 West 52nd Street
      New York, NY 10019
      Telephone: (212) 506-5000
      Email: jstengel@orrick.com

      *Attorneys for Beijing New Building Materials Public Limited Company*

      Enjolique D. Aytch, Esquire
      AKERMAN LLP
      Las Olas Centre II – Suite 1600
      350 E. Las Olas Boulevard
      Ft. Lauderdale, FL 33301
      Telephone: (954) 463-2700
      Facsimile: (954) 463-2224
      Email: enjolique.aytch@akerman.com

      Bernard Taylor, Esquire
      Michael P. Kenny, Esquire

Christina Hull Eikhoff, Esquire
David Venderbush, Esquire
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
      mike.kenny@alston.com
      christy.eikhoff@alston.com
      david.venderbush@alston.com

*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

                        /s/ Holly R. Werkema
                        Holly R. Werkema

                        *Attorney for Plaintiff Monica Nunez*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:11-CV-22408-MGC**

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others
similarly situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG TAIHE
DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD
CO., LTD., et al.,

      Defendants.

_____/

## PLAINTIFF JEOVANY NUNEZ'S RESPONSE TO DEFENDANTS' INTERROGATORIES

Pursuant to Fed. R. Civ. P. 26 and 33 and LR 26.1(e), Plaintiff Jeovany Nunez hereby provides

responses to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company,

Ltd., and BNBM PLC (collectively "Defendants"), interrogatories dated November 16, 2018.

## INTERROGATORIES

1.      Identify all types of damages that you seek in this Lawsuit (e.g. alternative living

expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for

each category.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #1:**

Remediation Damages:  In accordance with Judge Cooke's November 16, 2018 Order (Rec. Doc.

112), Remediation damages will be computed based on the "remediation formula" set forth in

Judge Fallon's Findings of Fact and Conclusions of Law Related to the June 9, 2015 Damages

hearing (MDL Rec. Doc. 20741).

Alternative Living Expense Damages:  To date, Plaintiff has identified and produced documentation

of alternative living expense damages of $107,560.00.

Moving Expense Damages:  Plaintiff incurred and seeks damages for moving expenses of approximately $700.00.

Loss of Use and Enjoyment Damages:  Plaintiff seeks loss of use and enjoyment damages in an amount to be determined at trial.

Loss of Equity/Foreclosure Damages:  Plaintiff seeks damages for his loss of equity in the Property in an amount to be determined at trial.

Damage to Credit:  Plaintiff seeks damages for injury to his credit in an amount to be determined at trial.

Diminution in Value:  Plaintiff seeks damages for the diminution in value of the property in an amount to be determined at trial.

Other Economic Damages:  Plaintiff seeks other economic damages for $1211.00 in air conditioning repair costs incurred as a result of the Chinese drywall.

Punitive Damages:  Plaintiff seeks punitive damages in an amount to be determined at trial.

Plaintiff reserves the right to supplement this response prior to the close of fact discovery on January 14, 2019.

  2. Did you ever vacate the Property because of Chinese Drywall?

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2:**

Yes.

  a. If so, identify the dates and location of your alternative residence.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2a:**

Due to health concerns, Plaintiff and his family vacated the Property on or around January 1, 2012 and did not reside in the Property again prior to the foreclosure in August of 2017.  The address of the alternative residence is 20225 NE 34 Delvista Ct., Aventura, FL 33180.

      b.     If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**PLAINTIFF'S RESPONSE TO INTERROGATORY #2b:**

To the best of Plaintiff's recollection, he continued to make timely mortgage payments until around March of 2014. At that point, it became too financially burdensome on Plaintiff and his family to pay both rent for his family's housing and a mortgage on an unusable property.

      3.     Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

      a.     If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

      b.     If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

      c.     If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #3:**

Plaintiff is not pursuing a claim for bodily injury.

      4.     Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

      a.     If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

        b.      If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

        c.      If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #4:**

Neither Plaintiff, nor any member of Plaintiff's household is pursuing a claim for bodily injury.

        5.      If you contend that a foreclosure occurred as a result of damage to your Property, identify any lenders or mortgagees that had a security interest on the Property at any time during your ownership (to the extent not already identified in the Supplemental Plaintiff Profile Form).

**PLAINTIFF'S RESPONSE TO INTERROGATORY #5:**

To the best of Plaintiff's recollection, Continental Trust Mortgage was the original mortgage holder of both mortgages on the property. Plaintiff's first mortgage with Continental Trust Mortgage was later transferred to Chase, Seterus, Inc., and Federal National Mortgage Association (FNMA). Plaintiff's second mortgage with Continental Trust Mortgage was later transferred to PennyMac (PNMAC).

        6.      If the Property was the subject of a foreclosure, identify the following (to the extent not already identified in the Supplemental Plaintiff Profile Form):

        a.      Lender's name;

        b.      Loan number;

        c.      Original loan/mortgage amount;

        d.      Date of original loan/mortgage;

        e.      The amount owed on the loan/mortgage at the date of foreclosure;

        f.      Date of the foreclosure.

**PLAINTIFF'S RESPONSE TO INTERROGATORY #6:**

a.  Continental Trust Mortgage (later Chase, Seterus, Inc., FNMA, and PNMAC)

b.  Continental Trust Mortgage Loan No.- 2505008021

    Chase Loan No.- ███████

    Seterus, Inc. Loan No.- ███████

    FNMA Loan No.- Plaintiff has been unable to obtain the FNMA loan number, but will

    supplement this response if and when the loan number is obtained.

    PNMAC Loan No.- ███████

c.  Continental Trust First Mortgage Amount- $215,992.00

    Continental Trust Second Mortgage Amount- $26,999.00

d.  Both mortgages were entered on January 12, 2007.

e.  With interest and penalties, $328,015.37 was owed on the first mortgage at the date of

    foreclosure.

f.  Foreclosure sale took place on August 22, 2017.


Dated:  November 30, 2018               Respectfully submitted,


                                    /s/ Holly R. Werkema
                                    Holly R. Werkema, Fla. Bar No. 71133
                                    Russell W. Budd
                                    BARON & BUDD, P.C.
                                    3102 Oak Lawn Ave., Ste. 1100
                                    Dallas, TX 75219
                                    hwerkema@baronbudd.com
                                    Phone: (214) 521-3605
                                    Facsimile: (214) 520-1181

                                    Allison Grant, Fla. Bar No. 858330
                                    Allison Grant, P.A.
                                      14 SE 4th St
                                    Boca Raton, FL 33432-6111
                                    agrant@allisongrantpa.com
                                    Phone: 561-994-9646

Fax: 561-431-4627

*Attorneys for Plaintiff Jeovany Nunez*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, November 30, 2018, I caused the foregoing Answers to

Defendants' Interrogatories to Priority Plaintiff Jeovany Nunez be served on the following counsel

via email and by uploading the foregoing to the Chinese Drywall MDL 2047 Portal:

Craig P. Kalil, Esquire
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue, Suite 2250
Miami, FL 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929
Email: ckalil@aballi.com

L. Christopher Vejnoska, Esquire
Eric Matthew Hairston, Esquire
Andrew Davidson, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA 94105
Telephone: (415) 773-5700
Email: cvejnoska@orrick.com
        ehairston@orrick.com
        adavidson@orrick.com

James L. Stengel, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Email: jstengel@orrick.com

*Attorneys for Beijing New Building Materials Public Limited Company*

Enjolique D. Aytch, Esquire
AKERMAN LLP
Las Olas Centre II – Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: enjolique.aytch@akerman.com

Bernard Taylor, Esquire
Michael P. Kenny, Esquire

7

Christina Hull Eikhoff, Esquire
David Venderbush, Esquire
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
      mike.kenny@alston.com
      christy.eikhoff@alston.com
      david.venderbush@alston.com

*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

 

/s/ Holly R. Werkema
Holly R. Werkema

*Attorney for Plaintiff Jeovany Nunez*

# EXHIBIT B16

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all
others similarly situated,

       Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A
SHANDONG TAIHE DONGXIN CO., LTD.;
TAIAN TAISHAN PLASTERBOARD CO., LTD., et
al.,

       Defendants.

_____/

## PRIORITY CLAIMANT KELLY O'BRIEN'S ANSWERS TO INTERROGATORIES

PURSUANT TO Fed. R. Civ. P. 26 and 33 and LR 26.1(g), Plaintiff, Kelly O'Brien, through Plaintiff's undersigned attorney, hereby responds to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd. and BNBM PLC (collectively "Defendants") Interrogatories as follows:

## INTERROGATORIES

1.     Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

**ANSWER:** I seek alternative living expenses of at least $7,941.28 (monthly mortgage payments on non-Chinese Drywall home of $467.58 for 16 months) at a minimum, air conditioning repair cost reimbursement of $6,100.25, damaged personal property of $3,492.16 (mattress replacement), lost equity, diminution in value, loss of use and enjoyment, punitive damages, and pre-judgment interest. In addition, I seek remediation damages as determined by the Court. The total amount of diminution in value, loss of use and enjoyment, and punitive damages

1

will be determined by the jury and pre-judgment interest by the Court as a post-judgment ministerial matter.

2.     Did you ever vacate the Property because of Chinese Drywall?

     a.     If so, identify the dates and location of your alternative residence.

     b.     If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**ANSWER:**     Yes, we vacated the Property because of Chinese Drywall.

<u>a.</u> The dates of alternative residence are November 2010 – May 2012 at address 3503 W McElroy Ave. Tampa, FL 33611.

<u>b.</u> Yes, we continued to make mortgage payment on the Property during the period of alternative residence.

3.     Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

     a.     If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

     b.     If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

     c.     If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**ANSWER:**     No, we do not intend to pursue bodily injury claims. However, while we were living in the home, we did suffer from respiratory problems and headaches and it was our fear of the long-term effects of living in the Chinese Drywall Property that caused us to sell the Property.

4.     Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

     a.     If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

     b.     If so, identify any physician and/or medical professional who has

diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

        c.      If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

    **ANSWER:**    While we did suffer from respiratory problems and headaches, we are not claiming bodily injury damages because of Chinese Drywall.

Respectfully submitted this 30th day of November, 2018.

           */s/ Panagiotis V. Albanis*
           Panagiotis "Pete" V. Albanis
           Morgan & Morgan – Complex Litigation
           12800 University Drive Suite 600
           Fort Myers, FL 33907
           Tel:   239-433-6880
           Fax:   239-433-6836
           palbanis@forthepeople.com

           *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **PRIORITY CLAIMANT KELLY O'BRIEN'S ANSWERS TO DEFENDANTS INTERROGATORIES** has been served on the following counsel via email:

Enjoliqué D. Aytch, Esq.
AKERMAN LLP
Las Olas Centre II - Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, Florida 33301
Tel: 954-463-2700
Fax: 954-463-2224
enjolique.aytch@akerman.com

Bernard Taylor, Esq.
Michael P. Kenny, Esq.
Christina Hull Eikhoff, Esq.
David Venderbush, Esq.
ALSTON & BIRD LLP
1201 West Peachtree Street Atlanta, Georgia 30309
Tel: 404-881-7000
Fax: 404-881-7777
bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Attorneys for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

Craig P Kalil
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue Suite 2250
Miami, FL 33131
Tel: 305-373-6600
Fax: 305-373-7929
ckalil@aballi.com

4

L. Christopher Vejnoska
Eric Matthew Hairston
Andrew K. Davidson
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700
cvejnoska@orrick.com

James L. Stengel
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel: 212-506-5000
jstengel@orrick.com

*Counsel for BNBM PLC*

November 30, 2018.

*/s/ Panagiotis V. Albanis*
Panagiotis "Pete" V. Albanis

## <u>VERIFICATION</u>

I hereby affirm, under the penalty of perjury, that the foregoing responses to Defendants' Interrogatories propounded on November 16, 2018 are based on my personal knowledge, and are true and correct to the best of my knowledge, information, and belief.

Dated: __11/30/2018__          By: _____
                                        Kelly O'Brien

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all
others similarly situated,

     Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A
SHANDONG TAIHE DONGXIN CO., LTD.;
TAIAN TAISHAN PLASTERBOARD CO., LTD., et
al.,

     Defendants.

_____/

## PRIORITY CLAIMANT LORI O'BRIEN'S ANSWERS TO INTERROGATORIES

PURSUANT TO Fed. R. Civ. P. 26 and 33 and LR 26.1(g), Plaintiff, Kelly O'Brien, through Plaintiff's undersigned attorney, hereby responds to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd. and BNBM PLC (collectively "Defendants") Interrogatories as follows:

## INTERROGATORIES

1.     Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

     **ANSWER:** I seek alternative living expenses of at least $7,941.28 (monthly mortgage payments on non-Chinese Drywall home of $467.58 for 16 months) at a minimum, air conditioning repair cost reimbursement of $6,100.25, damaged personal property of $3,492.16 (mattress replacement), lost equity, diminution in value, loss of use and enjoyment, punitive damages, and pre-judgment interest. In addition, I seek remediation damages as determined by the Court. The total amount of diminution in value, loss of use and enjoyment, and punitive damages will be determined by the jury and pre-judgment interest by the Court as a post-

judgment ministerial matter.

2.      Did you ever vacate the Property because of Chinese Drywall?

        a.      If so, identify the dates and location of your alternative residence.

        b.      If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**ANSWER:**      Yes, we vacated the Property because of Chinese Drywall.

<u>a.</u> The dates of alternative residence are November 2010 – May 2012 at address 3503 W McElroy Ave. Tampa, FL 33611.

<u>b.</u> Yes, we continued to make mortgage payment on the Property during the period of alternative residence.

3.      Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

        a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

        b.      If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

        c.      If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**ANSWER:**      No, we do not intend to pursue bodily injury claims. However, while we were living in the home, we did suffer from respiratory problems and headaches and it was our fear of the long-term effects of living in the Chinese Drywall Property that caused us to sell the Property.

4.      Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

        a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

        b.      If so, identify any physician and/or medical professional who has

diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

        c.     If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

**ANSWER:**    While we did suffer from respiratory problems and headaches, we are not claiming bodily injury damages because of Chinese Drywall.

Respectfully submitted this 30th day of November, 2018.

                        */s/ Panagiotis V. Albanis*
                        Panagiotis "Pete" V. Albanis
                        Morgan & Morgan – Complex Litigation
                        12800 University Drive Suite 600
                        Fort Myers, FL 33907
                        Tel:    239-433-6880
                        Fax:   239-433-6836
                        palbanis@forthepeople.com

                        *Attorney for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing **PRIORITY CLAIMANT LORI O'BRIEN'S ANSWERS TO DEFENDANTS INTERROGATORIES** has been served on the following counsel via email:

Enjoliqué D. Aytch, Esq.
AKERMAN LLP
Las Olas Centre II - Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, Florida 33301
Tel: 954-463-2700
Fax: 954-463-2224
enjolique.aytch@akerman.com

Bernard Taylor, Esq.
Michael P. Kenny, Esq.
Christina Hull Eikhoff, Esq.
David Venderbush, Esq.
ALSTON & BIRD LLP
1201 West Peachtree Street Atlanta, Georgia 30309
Tel: 404-881-7000
Fax: 404-881-7777
bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Attorneys for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

Craig P Kalil
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue Suite 2250
Miami, FL 33131
Tel: 305-373-6600
Fax: 305-373-7929
ckalil@aballi.com

4

L. Christopher Vejnoska
Eric Matthew Hairston
Andrew K. Davidson
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700
cvejnoska@orrick.com

James L. Stengel
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel: 212-506-5000
jstengel@orrick.com

*Counsel for BNBM PLC*

November 30, 2018.

/s/ Panagiotis V. Albanis
Panagiotis "Pete" V. Albanis

## VERIFICATION

I hereby affirm, under the penalty of perjury, that the foregoing responses to Defendants' Interrogatories propounded on November 16, 2018 are based on my personal knowledge, and are true and correct to the best of my knowledge, information, and belief.

Dated: __11/30/2018__                    By: _____

                                             Lori O'Brien

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others similarly
situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG
TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN
PLASTERBOARD CO., LTD., et al.,

      Defendants.

_____/

## CLAIMANT KEVIN ROSEN'S ANSWERS TO DEFENDANTS TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN PLASTERBOARD COMPANY, LTD'S AND BNBM PLC'S INTERROGATORIES

Pursuant to by Fed. R. Civ. P. 26 and 33 and LR 26.1(g) and as required by Fed. R. Civ.

P. 26(e), Claimant Kevin Rosen hereby serves answers to Defendants Taishan Gypsum

Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd., and BNBM PLC (collectively

"Defendants"), interrogatories propounded on November 16, 2018.

Dated: November 30, 2018

Respectfully submitted,

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

## CLAIMANT KEVIN ROSEN'S ANSWERS TO DEFENDANT TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN PLASTERBOARD COMPANY, LTD'S AND BNBM PLC'S INTERROGATORIES

1.      Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

**ANSWER:** We are seeking all compensatory damages, including, but not limited to personal property costs, alternative living expenses, lost equity (including down payment, mortgage payments, and capital improvements to the property), remediation damages as determined the Court, diminution in value, loss of use and enjoyment, punitive damages and pre-judgment interest. Please see attached chart reflecting liquidated damages for alternative living expenses and personal property. The amount of diminution in value and lost equity will be quantified by an expert. While our lost equity will be quantified by an expert, it includes, but is not limited to $792,293.84 ($105,000.00 (down payment at purchase) + $115,631.67 (capital improvements) + $105,000.00 (payment at permitting) + $698,353.76 (down payment at closing) + $27,300.00 (capital improvement/generator) + $25,050 (payments toward principal of mortgage) = $1,076,336.23 (Total Investment) − $284,042.39 (Net proceeds of sale). = $792,293.84. Loss of use and enjoyment damages and punitive damages will be determined by the jury. Pre-judgment interest will be determined by the Court as a post-judgment ministerial matter.

2.      Did you ever vacate the Property because of Chinese Drywall?

**ANSWER:** Yes. Our fear over potential bodily injuries, adverse health effects and the uninhabitable condition of the Property forced us to vacate our home to seek alternative housing.

   a.      If so, identify the dates and location of your alternative residence.



**ANSWER:** We leased from July 27, 2009 through December 23, 2009. The address of our alternative housing was 770 NE 37th Street, Boca Raton, FL.

b. If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**ANSWER:** Yes. I continued to make full and timely mortgage payments until the date I was able to sell the Property in an attempt to mitigate losses caused by the defective Chinese drywall.

3. Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

**ANSWER:** No, we are not pursuing bodily injury claims caused or aggravated by Chinese Drywall. However, it was our fear over potential bodily injuries and adverse health effects that led to our vacating our home and having to seek alternative housing. This, coupled with the anxiety of our losses and the diminished value of our home, led to a substantial amount of emotional distress and exacerbated our loss of use and enjoyment of our home.

a. If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

**ANSWER:** Not applicable.

b. If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

**ANSWER:** Not applicable.

c. If so, identify any physician and/or medical professional who has

3



treated you for any of the conditions you have identified.

**ANSWER:** Not applicable.

4.      Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

**ANSWER:** While we are not pursuing bodily injury claims caused or aggravated by Chinese Drywall, we did suffer a number of physical symptoms while living in the house, including shortness of breath, headaches, respiratory problems (i.e. infections), insomnia and dizziness. It was our fear over these symptoms, other potential bodily injuries and adverse health effects that led to our vacating our home and having to seek alternative housing. This, coupled with the anxiety of our losses and the diminished value of our home, led to a substantial amount of emotional distress and exacerbated our loss of use and enjoyment of our home.

a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

**ANSWER:** While we are not pursuing bodily injury claims caused or aggravated by Chinese Drywall, we did suffer a number of physical symptoms while living in the house, including shortness of breath, headaches, respiratory problems (i.e. infections), insomnia and dizziness. It was our fear over these symptoms, other potential bodily injuries and adverse health effects that led to our vacating our home and having to seek alternative housing. This, coupled with the anxiety of our losses and the diminished value of our home, led to a substantial amount of emotional distress and exacerbated our loss of use and enjoyment of our home.

b.      If so, identify any physician and/or medical professional who has

diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

        **ANSWER:** Not applicable.

      c.    If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

        **ANSWER:** Not applicable.

    5.    If you contend that a short sale occurred as a result of damage to your Property, identify any lenders or mortgagees that had a security interest on the Property at any time during your ownership (to the extent not already identified in the Supplemental Profile Form).

**ANSWER:** My Property was sold through a sale in mitigation as a result of damage to the Property. My Property was not sold through a short sale. At the time of my initial purchase, I had a mortgage with Wachovia Mortgage with a principal amount of $175,000.00. On April 10, 2008, I refinanced the Property. My mortgage balance of $172,415.31 was paid off and a new mortgage loan, with a principal amount of $200,000.00 was issued by Wachovia Mortgage.

    6.    If the Property was the subject of a short sale, identify the following (to the extent not already identified in the Supplemental Plaintiff Profile Form):

      a.    Lender's name;

        **ANSWER:** Wachovia Mortgage

      b.    Loan number;

        **ANSWER:** ███████

      c.    Original loan/mortgage amount;

        **ANSWER:** $175,000.00

      d.    Date of original loan/mortgage;



**ANSWER:** August 7, 2006

e.     The amount owed on the loan/mortgage at the date of short sale;

**ANSWER:** Not applicable. **The Property was not sold in a short sale, but through a sale in mitigation** as the result of damage to the Property caused by defective Chinese drywall. That said, the amount owed on the mortgage was $174,949.20 and was satisfied at the time of sale.

f.     Date of the short sale;

**ANSWER:** Not applicable. **The Property was not sold in a short sale, but through a sale in mitigation** as the result of damage to the Property caused by defective Chinese drywall. That said, the date of the Sale was December 23, 2009.

g.     Short sale price

**ANSWER:** Not applicable. **The Property was not sold in a short sale, but through a sale in mitigation** as the result of damage to the Property caused by defective Chinese drywall. That said, the sale price of the home was $501,000.00.

STATE OF _Florida_ )

)SS:

COUNTY OF _Palm Beach_ )

BEFORE ME, a Notary Public, duly authorized and administered to take oaths,

personally appeared _Kevin Rosen_ who is personally known to me or who has produced

_Florida Driver's License_ as identification and who did/did not take an oath, and says that the

following Answers to Interrogatories are true and correct to the best of his/her knowledge, and

that he/she has read the Answers to Interrogatories and knows the contents thereof.

SWORN TO AND SUBSCRIBED before me this _30_ day of _November_, 2018.

Notary Public:

sign _____

print _Priscila Maldonado_

PRISCILA MALDONADO
Notary Public, State of Florida
Commission# GG 259605
My comm. expires Sept. 18, 2022

State of _Florida_ at Large (Seal)

My Commission Expires _Sept 18, 2022_

7

## CERTIFICATE OF SERVICE

I hereby certify that on this day, November 30, 2018, I caused the foregoing Answers to

Defendants' First Set of Interrogatories to be served via email on the following:

Craig P. Kalil, Esquire
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue, Suite 2250
Miami, FL 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929
Email: ckalil@aballi.com

L. Christopher Vejnoska, Esquire
Eric Matthew Hairston, Esquire
Andrew Davidson, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA 94105
Telephone: (415) 773-5700
Email: cvejnoska@orrick.com
         ehairston@orrick.com
         adavidson@orrick.com

James L. Stengel, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Email: jstengel@orrick.com

*Attorneys for Beijing New Building Materials Public Limited Company*

Enjolique D. Aytch, Esquire
AKERMAN LLP
Las Olas Centre II – Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: enjolique.aytch@akerman.com

Bernard Taylor, Esquire
Michael P. Kenny, Esquire

Christina Hull Eikhoff, Esquire
David Venderbush, Esquire
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
     mike.kenny@alston.com
     christy.eikhoff@alston.com
     david.venderbush@alston.com

*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

This Document Prepared By and Return to:
Robert S. Forman, Esquire
Forman & Alimo, P. A.
2101 West Commercial Boulevard, Suite 2800
Fort Lauderdale, Florida 33309

Parcel ID Number: 00 42 46 31 07 007 0300

# Warranty Deed

This Indenture, Made this **23rd** day of **December** , **2009** A.D., **Between**
**Kevin Rosen and Stacey Rosen, husband and wife**

of the County of **Palm Beach** , State of **Florida** , grantors, and
**Florida Campbell Real Estate Holdings, Inc., a corporation existing**
**under the laws of the State of Florida**
whose address is: **5231 NE 33rd Avenue, Fort Lauderdale, FL 33308**

of the County of **Broward** , State of **Florida** , grantee.
**Witnesseth** that the GRANTORS, for and in consideration of the sum of
----------------------------------------**TEN DOLLARS ($10)**------------------------------------- DOLLARS,
and other good and valuable consideration to GRANTORS in hand paid by GRANTEE, the receipt whereof is hereby acknowledged, have
granted, bargained and sold to the said GRANTEE and GRANTEE'S heirs, successors and assigns forever, the following described land, situate,
lying and being in the County of **Palm Beach** State of **Florida** to wit:

Lot 30, Block G1 of OAKS AT BOCA RATON PLAT SIX, according to the
plat thereof, as recorded in Plat Book 103, Pages 57 thru 63,
inclusive, of the Public Records of Palm Beach County, Florida.

Subject to covenants, conditions, restrictions, reservations, limitations, easements, zoning
ordinances and other regulatory laws and ordinances affecting the land, if any, which are not
reimposed hereby, and taxes for the year 2010 and subsequent years.

and the grantors do hereby fully warrant the title to said land, and will defend the same against lawful claims of all persons whomsoever.
**In Witness Whereof,** the grantors have hereunto set their hands and seals the day and year first above written.
Signed, sealed and delivered in our presence:

Printed Name: Jean Seibold                          **Kevin Rosen**                          (Seal)
Witness                                             P.O. Address: 5625 NE Trieste Way, Boca Raton, FL 33487

Printed Name: VICTORIA LUCKETT                      **Stacey Rosen**                         (Seal)
Witness                                             P.O. Address 5625 NE Trieste Way, Boca Raton, FL 33487

STATE OF    **Florida**
COUNTY OF **Palm Beach**
The foregoing instrument was acknowledged before me this **21** day of **December** , **2009** by
**Kevin Rosen and Stacey Rosen, husband and wife**

who are personally known to me or who have produced their **Florida driver's license** as identification.

Printed Name:
Notary Public
My Commission Expires:

581005
Laser Generated by © Display Systems, Inc., 2009 (863) 763-5555 Form FLWD-1

KROSEN -000001



**A. Settlement Statement**

U.S. Department of Housing and Urban Development

OMB Approval No. 2502-0265

**B. Type of Loan**

1. ☐ FHA  2. ☐ FmHA  3. ☒ Conv. Unins.  6. File Number _____  7. Loan Number _____  8. Mortgage Insurance Case Number
4. ☐ VA  5. ☐ Conv. Ins.

**C.** NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. NAME OF BORROWER:** Florida Campbell Real Estate Holdings, Inc.

**ADDRESS OF BORROWER:** 5231 NE 33rd Avenue, Fort Lauderdale, FL 33308

**E. NAME OF SELLER:** Kevin Rosen and Stacey Rosen, husband and wife

**ADDRESS OF SELLER:** P.O. Box 810544

**F. NAME OF LENDER:** Boca Raton, FL 33481

**ADDRESS OF LENDER:**

**G. PROPERTY** 17830 Monte Vista Drive

**LOCATION:** Boca Raton, FL 33496

**H. SETTLEMENT AGENT:** FORMAN & ALTINO, P.A.

**PLACE OF SETTLEMENT:** 2101 W. COMMERCIAL BLVD., SUITE 2800, FT. LAUDERDALE FL 33309

**I. SETTLEMENT DATE:** 12/23/2009

2101 W. COMMERCIAL BLVD., SUITE 2800, FT. LAUDERDALE FL 33309

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100 GROSS AMOUNT DUE FROM BORROWER** | | **400 GROSS AMOUNT DUE TO SELLER** | |
| 101 Contract sales price | 501,000.00 | 401 Contract sales price | 501,000.00 |
| 102 Personal property | | 402 Personal property | |
| 103 Settlement charges to borrower (line 1400) | 2,232.46 | 403 | |
| 104 | | 404 | |
| 105 | | 405 | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106 City/town taxes | to | 406 City/town taxes | to |
| 107 County taxes | 12/23/2009 to 12/31/2009 | 411.90 | 407 County taxes | 12/23/2009 to 12/31/2009 | 411.90 |
| 108 Assessments | to | 408 Assessments | to |
| 109 Assessments | 12/23/2009 to 12/31/2009 | 172.39 | 409 Assessments | 12/23/2009 to 12/31/2009 | 172.39 |
| 110 | to | 410 | to |
| 111 | to | 411 | to |
| 112 | to | 412 | to |
| **120 GROSS AMOUNT DUE FROM BORROWER** ▶ | 503,816.75 | **420 GROSS AMOUNT DUE TO SELLER** ▶ | 501,584.29 |
| **200 AMOUNTS PAID BY OR IN BEHALF OF BORROWER** | | **500 REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201 Deposit or earnest money | 25,000.00 | 501 Excess deposit (see instructions) | |
| 202 Principal amount of new loan(s) | | 502 Settlement charges to seller(line 1400) | 42,592.70 |
| 203 Existing loan(s) taken subject to | | 503 Existing loan(s) taken subject to | |
| 204 | | 504 Payoff of first mortgage loan | 174,949.20 |
| | | Wachovia Mortgage | |
| 205 | | 505 Payoff of second mortgage loan | |
| 204 Principal amount of new loan(s) | | 506 | |
| 207 | | 507 | |
| 208 | | 508 | |
| 209 | | 509 | |
| 209a | | 509a | |
| 209b | | 509b | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210 City/town taxes | to | 510 City/town taxes | to |
| 211 County taxes | to | 511 County taxes | to |
| 212 Assessments | to | 512 Assessments | to |
| 213 | to | 513 | to |
| 214 | to | 514 | to |
| 215 | to | 515 | to |
| 216 | to | 516 | to |
| 217 | to | 517 | to |
| 218 | to | 518 | to |
| 219 | to | 519 | to |
| **220 TOTAL AMOUNTS PAID BY OR IN BEHALF OF BORROWER** ▶ | 25,000.00 | **520 TOTAL REDUCTIONS IN AMOUNT DUE SELLER** ▶ | 217,541.90 |
| **300 CASH AT SETTLEMENT FROM/TO BORROWER** | | **600 CASH AT SETTLEMENT TO/FROM SELLER** | |
| 301 Gross amount due from borrower (line 120) | 503,816.75 | 601 Gross amount due to seller (line 420) | 501,584.29 |
| 302 Less amounts paid by/for borrower (line 220) | 25,000.00 | 602 Less reductions in amount due seller (line 520) | 217,541.90 |
| **303 CASH** ☒ From ☐ To BORROWER ▶ | 478,816.75 | **603 CASH** ☒ To ☐ From SELLER ▶ | 284,042.39 |

SUBSTITUTE FORM 1099 Seller Statement: For information contained in Blocks E,G,H, and I on Line 401 and Buyers part of real estate (lines 406-411) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER INSTRUCTIONS: If this real estate was your principal residence, file Form 2119 for the year of sale, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 (and/or for Exchanges, Form 8824.)

You are required by law to provide (see line 111) with your correct taxpayer identification number. If you do not provide (see line 111) with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law, and may (failure of perjury, I certify that the number shown on this instrument is my correct taxpayer identification number.

SELLER'S SIGNATURE

KROSEN -000002

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SETTLEMENT STATEMENT

PAGE 2

| L. Settlement Charges | | Paid From Borrower's Funds At Settlement | Paid From Seller's Funds At Settlement |
|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COM. based on price 501,000.00 @ 6.00 % = 30,060.00 | | | |
| Division of Commission (line 700) as follows: | | | |
| 701. 15,030.00 | to Boca Executive Realty | | |
| 702. 15,030.00 | to Lang Realty | | |
| 703. Commission paid at Settlement | | | 30,060.00 |
| 704. Processing Fee | to Boca Executive Realty | 250.00 | |
| 800. Items Payable In Connection With Loan | | | |
| 801. Loan Origination Fee % to | | | |
| 802. Loan Discount % to | | | |
| 803. Appraisal Fee to | | | |
| 804. Credit Report to | | | |
| 805. Lender's Inspection Fee to | | | |
| 806. Mortgage Insurance Application Fee to | | | |
| 807. to | | | |
| 808. to | | | |
| 809. to | | | |
| 810. to | | | |
| 811. to | | | |
| 812. to | | | |
| 813. to | | | |
| 814. to | | | |
| 815. to | | | |
| 900. Items Required By Lender To Be Paid In Advance | | | |
| 901. Interest from to @ /day | | | |
| 902. Mortgage Insurance Premium for months to | | | |
| 903. Hazard Insurance Premium for years to | | | |
| 904. years to | | | |
| 905. years to | | | |
| 1000. Reserves Deposited With Lender | | | |
| 1001. Hazard insurance months@ per month | | | |
| 1002. Mortgage Insurance months@ per month | | | |
| 1003. City property taxes months@ per month | | | |
| 1004. County property taxes months@ per month | | | |
| 1005. Annual assessments months@ per month | | | |
| 1006. months@ per month | | | |
| 1007. months@ per month | | | |
| 1008. months@ per month | | | |
| 1009. months@ per month | | | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee to | | | |
| 1102. Abstract or title search to First American Title Ins./F & A, P.A. | | | 225.00 |
| 1103. Title examination to | | | |
| 1104. Title insurance binder to | | | |
| 1105. Document preparation to | | | |
| 1106. Notary fees to | | | |
| 1107. Attorney's fees to Forman & Altino, P.A. | | | 4,732.00 |
| (includes above item numbers ) | | | |
| 1108. Title insurance to First American Title Ins./F & A, P.A. | | | 2,680.00 |
| (includes above item numbers ) | | | |
| 1109. Lender's coverage: Risk Premium INS AMT: | | | |
| 1110. Owner's coverage: Risk Premium 2,680.00 INS AMT: 501,000.00 | | | |
| 1110a | | | |
| 1111. to | | | |
| 1112. to | | | |
| 1113. to | | | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording Fees: Deed $10.50; L-Mortgage(s) ; S-Mortgage(s) ; Releases $19.15 | | | 29.70 |
| 1202. City/county tax/stamps: Deed ; L-Mortgage(s) ; S-Mortgage(s) | | | |
| 1203. State tax/stamps: Deed $3,507.00; L-Mortgage(s) ; S-Mortgage(s) | | | 3,507.00 |
| 1204. | | | |
| 1205. | | | |
| 1300. Additional Settlement Charges | | | |
| 1301. Lien Search to A.S.A.P. Tax and Lien Search, Inc. | | | 250.00 |
| 1302. HOA Estoppel Letter - Continental Group to Relish, Forman & Altino, P.A. | | | 250.00 |
| 1303. Federal Express Payoff to Forman & Altino, P.A. | | | 125.00 |
| 1304. Fax/Phone/Photocopies to Forman & Altino, P.A. | | | 25.00 |
| 1305. Capital Contribution to The Oaks at Boca Raton Property | | | 25.00 |
| 1306. Attorney's Fee to Berman, Kean & Riguera | 1,982.46 | | 984.00 |
| 1307. to | | | |
| 1308. to | | | |
| 1309. to | | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | 2,232.46 | 42,892.70 |

I have carefully reviewed the HUD - 1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD - 1 Settlement Statement.

DATE 12/21/2009

By: _____ Borrower          _____ Seller
                                              Kevin Rosen

By: _____ Borrower          _____ Seller
                                              Stacey Rosen

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement.

_____ FORMAN & ALTINO, P.A.
Settlement Agent                              12/23/2009  Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

531005

KROSEN -000003

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SETTLEMENT STATEMENT
PAGE 2

| L. Settlement Charges | | | Paid From Borrower's Funds At Settlement | Paid From Seller's Funds At Settlement |
|---|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COM. based on price | 501,000.00 @ 6.00 % = 30,060.00 | | | |
| Division of Commission (line 700) as follows: | | | | |
| 701. 15,030.00 | | to Boca Executive Realty | | |
| 702. 15,030.00 | | to Lang Realty | | |
| 703. Commission paid at Settlement | | | | 30,060.00 |
| 704. Processing Fee | | to Boca Executive Realty | 250.00 | |
| 800. Items Payable In Connection With Loan | | | | |
| 801. Loan Origination Fee | % to | | | |
| 802. Loan Discount | % to | | | |
| 803. Appraisal Fee | | to | | |
| 804. Credit Report | | to | | |
| 805. Lender's Inspection Fee | | to | | |
| 806. Mortgage Insurance Application Fee | | to | | |
| 807. | | to | | |
| 808. | | to | | |
| 809. | | to | | |
| 810. | | to | | |
| 811. | | to | | |
| 812. | | to | | |
| 813. | | to | | |
| 814. | | to | | |
| 815. | | to | | |
| 900. Items Required By Lender To Be Paid In Advance | | | | |
| 901. Interest from | to @ /day | | | |
| 902. Mortgage Insurance Premium for | months to | | | |
| 903. Hazard Insurance Premium for | years to | | | |
| 904. | years to | | | |
| 905. | years to | | | |
| 1000. Reserves Deposited With Lender | | | | |
| 1001. Hazard insurance | months@ | per month | | |
| 1002. Mortgage insurance | months@ | per month | | |
| 1003. City property taxes | months@ | per month | | |
| 1004. County property taxes | months@ | per month | | |
| 1005. Annual assessments | months@ | per month | | |
| 1006. | months@ | per month | | |
| 1007. | months@ | per month | | |
| 1008. | months@ | per month | | |
| 1009. | months@ | per month | | |
| 1100. Title Charges | | | | |
| 1101. Settlement or closing fee | | to | | |
| 1102. Abstract or title search | | to First American Title Ins./F & A, P.A. | | 225.00 |
| 1103. Title examination | | to | | |
| 1104. Title insurance binder | | to | | |
| 1105. Document preparation | | to | | |
| 1106. Notary fees | | to | | |
| 1107. Attorney's fees | | to Forman & Altino, P. A. | | 4,712.00 |
| (includes above items numbers: | | | | |
| 1108. Title insurance | | to First American Title Ins./F & A, P.A. | | 2,580.00 |
| (includes above items numbers: | | | | |
| 1109. Lender's coverage: Risk Premium | INS AMT: | | | |
| 1110. Owner's coverage: Risk Premium 2,580.00 | INS AMT: 501,000.00 | | | |
| 1110a. | | | | |
| 1111. | | to | | |
| 1112. | | to | | |
| 1113. | | to | | |
| 1200. Government Recording and Transfer Charges | | | | |
| 1201. Recording Fees: Deed $10.60; I-Mortgage(s) ; S-Mortgage(s) ; Releases $19.10 | | | | 29.70 |
| 1202. City/county tax/stamps: Deed ; I-Mortgage(s) ; S-Mortgage(s) | | | | |
| 1203. State tax/stamps: Deed $3,507.00 ; I-Mortgage(s) ; S-Mortgage(s) | | | | 3,507.00 |
| 1204. | | | | |
| 1205. | | | | |
| 1300. Additional Settlement Charges | | | | |
| 1301. Lien Search | | to A.S.A.P. Tax and Lien Search, Inc. | | 250.00 |
| 1302. HOA Estoppel Letter - Continental Group | | to Reisch, Forman & Altino, P. A. | | 175.00 |
| 1303. Federal Express Payoff | | to Forman & Altino, P. A. | | 25.00 |
| 1304. Fax/Phone/Photocopies | | to Forman & Altino, P. A. | | 25.00 |
| 1305. Capital Contribution | | to The Oaks at Boca Raton Property | 1,982.46 | |
| 1306. Attorney's Fee | | to Berman, Kean & Riguera | | 984.00 |
| 1307. | | to | | |
| 1308. | | to | | |
| 1309. | | to | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | ▶ | 2,232.46 | 42,592.70 |

CERTIFICATION

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

DATE: 12/23/2009
Florida Ginghill Real Estate Holdings, Inc.

By: _Daniel Caru_ Borrower        Kevin Rosen _____ Seller
DANIEL S CARUSI

By: _____ Borrower        Stacey Rosen _____ Seller

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement.
FORMAN & ALTINO, P.A.

_____ Settlement Agent        12/23/2009 Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

SS1009

KROSEN -000004

# THE OAKS AT BOCA RATON
Agreement for Purchase and Sale

In this Agreement, the word BUYER refers to buyer or buyers who have signed this Agreement. The word SELLER means or refers to ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, whose address is 200 S. Rogers Circle, Suite D, Boca Raton, Florida 33487.

If the first letter of the word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or in the Community Documents (as defined in Paragraph 14 of this Agreement).

Buyer(s):  KEVIN ROSEN and STACEY ROSEN, his wife

Address:  6620 NW 25th Way     101 PLAZA REAL     APT # 313

City:  Boca Raton     County:  Palm Beach

State:  FL     Zip Code:  33431     33432

Home Phone:                     Cell Phone: (  )  Fax Phone: (  )

E-Mail Address:
Social Security Number(s):

Estimated Completion Date of Home (See Paragraph 7). Approximately 14 past from date of execution.

On-Site Salesperson:  Alan Goldberg

Cooperating Broker (See Paragraph 16-H not filled in, there is none):  Same Name Without Agent Sam  Hollowis

1.  PURCHASE AND SALE. Seller agrees to sell to, and Buyer agrees to purchase from Seller, the single family dwelling ("Home") and the "Lot" on which it is situated, as hereinafter described, for the price and on the terms and conditions now about to be set forth:

Lot #:  30     Block  G1     Model:  Monte Verde     Garage Orientation: As per Plat

A.  DESCRIPTION OF HOME AND PRICE.

Buyer agrees to buy the Home comprised of or to be constructed on Lot 30, Block G-1 ("Property") of The Oaks at Boca Raton, Plat Three, according to the Plat recorded in Plat Book _____ Page _____ Public Records of Palm Beach County, Florida, (the "Community") together with the rights and subject to the obligations applicable thereto as set forth in the Community Documents (hereinafter defined).

The "Total Purchase Price" for the Property is:     $  1,050,000.00

Base Price:     $  N/A

Options & Extras:     $  N/A

Total Purchase Price:     $  1,050,000.00     OR PAYMENT OPTION 2 ___X___ BELOW (CHECK ONE)

BUYER HEREBY SELECTS PAYMENT OPTION 1

PAYMENT OPTION 1

A.  Payment upon execution of Agreement     (10% of Total Purchase Price)     $

B.  Submission of application for building permit     (10% of Total Purchase Price)     $

C.  Completion of first floor slab     (10% of Total Purchase Price)     $

D.  First floor to be beam poured     (5% of Total Purchase Price)     $

E.  Roof trusses and interior framing     (5% of Total Purchase Price)     $

F.  Rough electric, plumbing A/C ducts and dry-in     (5% of Total Purchase Price)     $

G.  Roof Complete, stucco finish coat applied, windows installed     (5% of Total Purchase Price)     $

H.  Cabinets and trim installed     (10% of Total Purchase Price)     $

I.  Balance due at Closing     (10% of Total Purchase Price)     $

J.  Total Purchase Price     $

ROSEN 0365

KROSEN -000005

**PAYMENT OPTIONS**

| | | |
|---|---|---|
| A. Payment upon execution of Agreement | (32% of Total Purchase Price) | $ 153,600.00 |
| B. Submission of application for building permit | (10% of Total Purchase Price) | $ 105,000.00 |
| C. Balance of Total Purchase Price due at closing | (30% of Total Purchase Price) | $ 630,000.00 |
| D. Carrying charge due at closing | (2% of Total Purchase Price) | $ 70,000.00 |
| E. Total balance due at closing (line C plus line D) | | $ 651,600.00 |

Buyer shall make such payment in full and to close U.S. funds, within five (5) banking days from the date of Seller's request, time being of the essence for all such payments. If Buyer fails to tender the payment as required by this paragraph, then Buyer shall be deemed to be in default of this Agreement and Seller may declare any and all remedies Seller may have under this Agreement. If Seller elects to accept any such payment at a later date, Buyer shall pay to Seller, together with the additional deposit, a sum equal to interest at the highest lawful rate on the amount of the additional deposit from the date such payment was due to Seller to the date such payments was made to Seller.

All deposits and draw payments shall be made in native by check subject to collection. Seller reserves the right to increase the Purchase Price by 1% per month if construction of the improvements is not commenced within sixty (60) days after the effective date of this Agreement due to delay created or caused by Buyer.

Except where Buyer has selected Payment Option 1, Seller may borrow construction money from a lender to construct the improvements on the Property. Buyer agrees that any lender advancing construction funds will have a lien mortgage on the Property from the lien of the construction mortgage. This Agreement and the deposits will not give release the Property from the lien of the construction mortgage. Buyer agrees and the buyer's rights hereunder will be subordinate to those of any lender holding a mortgage, whether or not such a mortgage remains the advancement of construction funds, even if such mortgage is placed on the Property after the date of this Agreement.

**BUYER ALSO AGREES TO PAY ALL OTHER SUMS REQUIRED TO BE PAID BY BUYER IN THIS AGREEMENT.**

The balance due at closing must be paid by cashier's check in order transfer of funds traced at the United States Treasury only. All payments must be made in U.S. funds and all cashier's checks must be payable on a bank located in Palm Beach, Broward or Dade County, Florida, U.S.A.

**2. TITLE EVIDENCE.** Simultaneously with the Closing Notice provided for in Paragraph 15, Seller shall deliver to Buyer a title insurance commitment issued by a Florida licensed title insurer agreeing to issue to Buyer, upon recording of the deed, an owner's policy of title insurance (ALTA Form II) in the amount of the Total Purchase Price, insuring Buyer's title to the Property, subject only to the following permitted exceptions ("Permitted Exceptions"):

    A.   Liability for all taxes affecting the Property accruing the year Buyer receives title and continuing thereafter.

    B.   All laws and all restrictions, covenants, conditions, limitations, agreements, reservations and easements recorded in the Public Records of Palm Beach County, or otherwise established with respect to the Property (for example zoning restrictions, property use limitations and obligations easements (right-of-ways) plus restrictions, agreements relating to telephone lines, water and sewer lines and other utilities) provided however none of the foregoing shall render title unmarketable or prohibit use of the Property for residential purposes.

    C.   The restrictions, covenants, easements, terms and other provisions imposed by the documents contained or referred to in the Community Documents, as described in Paragraph 15 (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which are recorded by Seller now or at any time after the date of this Agreement in the Public Records of Palm Beach County, Florida, and as amendments to any of such documents.

    D.   Pending governmental liens for public improvements as of closing.

    E.   Any state of facts which any accurate survey of the Property would show.



ROSEN 0366

KROSEN -000006

F. Perpetual easement for encroachments now or hereinafter existing caused by the settlement or movement of improvements or caused by other inaccuracies in building or rebuilding.

G. Buyer's mortgage, if any.

H. All unrecorded printed exceptions contained in an ALTA Owner's title insurance policy customarily issued in Palm Beach County, Florida. Provided however, upon delivery by Seller of customary affidavits and delivery of a survey at closing, exceptions relating to parties in possession, mechanics liens, the "gap" and the survey will be deleted at Closing. Notwithstanding the foregoing, Buyer acknowledges that certain minor encroachments are routinely disclosed on a survey (such as an encroachment of a driveway over a utility easement) and Buyer agrees to accept an exception for minor encroachments shown on a survey).

Buyer shall have five (5) days from the date of receiving the title insurance commitment to examine it. If Buyer finds title unmarketable, Buyer shall, within five (5) days of receiving the title insurance commitment, notify Seller in writing specifying defaults. If defects render title unmarketable, Seller shall have one hundred twenty (120) days from receipt of notice within which to remove defects, failing which, Buyer shall have the option of (i) either accepting the title as it then is or (ii) demanding a refund of the deposit(s) paid and escrow paid her option and all applicable taxes which shall immediately be returned to Buyer, whereupon Buyer and Seller shall be deemed to have released each another of all further obligations under this Agreement. Seller will use reasonable efforts to remove title defects, but shall not be obligated to furnish more than expend any sum in excess of three percent (3%) of the Total Purchase Price. For purposes of this Agreement, title is defective only if matters are revealed which are not disclosed by or approved in that Agreement.

Unless Seller receives written notice from Buyer within five (5) days after the Effective Date of this Agreement or five (5) days prior to closing, whichever occurs first, Seller will direct the title agent and insurers referred to above to issue the title insurance commitment and relevant to above and a title insurance policy after Closing. In that event Buyer hereby delivers such notice, (i) Seller shall have no obligation to deliver or cause to be delivered to Buyer a title insurance commitment and title insurance policy, (ii) Buyer shall be responsible for obtaining and delivering a title commitment to Seller at its sole cost and five (5) days prior to Closing, (ii) Buyer shall be deemed to waive Buyer's right to make title and title-related objection and Buyer shall be deemed to accept title subject to the Permitted Exceptions and all other matters affecting title, (iii) Buyer shall be responsible to identify pay all costs and fees arising from or related to the title commitment, title policy and (or) Closing of the transaction described herein (iv) Seller shall have no obligation to provide Buyer with any prior owner's title insurance policy, base title, certificate of good standing, corporate resolution of Seller, assigned letters, etc. and (v) Buyer shall be responsible for all costs and expenses (including a Delayed Closing Charge) if Closing is delayed as a result of the foregoing.

3.    DEPOSITS.    SELLER HEREBY PROVIDES TO THE BUYER THE RIGHT TO HAVE DEPOSIT FUNDS (UP TO 10 PERCENT OF THE PURCHASE PRICE) IN AN INTEREST BEARING ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED IN WRITING BY THE BUYER.

If Buyer elects to have the deposit funds in an escrow account, Buyer will be obligated to pay to the Seller at the time of closing an interest charge calculated pursuant to the formula set forth below:

Seller may borrow money in an amount equal to the funds held in escrow for construction purposes only, in which case any interest which the Seller pays on such a loan for a period not to exceed 12 months shall be paid by the Buyer in the form of closing, but the Buyer shall be credited for any interest accrued on the escrow account.

We have read the foregoing language and we agree that our deposit be [____ required)/(_X_ waived) in 10% deposit of $160,000.00.

4.    CONSTRUCTION SPECIFICATIONS.    The Home will be constructed in substantial accordance with the plans and specifications kept in Seller's construction office ("Seller's Plans and Specifications"). Buyer acknowledges and agrees that as a widely observed construction industry practice the plans and specifications for any home or building to be changed and adjusted from time to time in order to accommodate ongoing "in the field" construction decisions. Buyer further agrees that these changes and adjustments are essential in order to permit all components of the home to be integrated into a well functioning and aesthetically pleasing product in an expeditious manner. Because of the foregoing, Buyer acknowledges that each change and agrees that it is reasonable and for Buyer's benefit to allow Seller the flexibility to make such changes in the Home provided that such changes do not materially or otherwise adversely affect the size or dimensions of the Home. The Home may be constructed in

ROSEN 0367

lot as a reverse of that shown on the plans, in any sales and promotional material or as the model(s) may have been constructed.

With out limiting Seller's general right to make changes referred to above, Buyer specifically agrees that changes in the location of utility (including, but not limited to electrical, television and telephone) headers and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes may be made. Buyer further agrees that Seller may "flip" the House to a position that is different from that of the Model and the Seller's Plans and Specifications.

Buyer agrees that all Change Orders for construction modifications must be submitted to Seller and approved by Seller. Buyer understands and agrees that Seller will not be obligated to accept any Change Orders after application for building permit is submitted. Notwithstanding Change Orders, if any, accepted by Seller subsequent to commencement of construction shall be at Seller's sole and absolute discretion and with such Change Order, the Closing Date may be extended. Payment for all costs set forth on all Change Orders shall be made by Buyer to Seller at the time each Change Order is accepted by Seller. Seller shall not be obligated to undertake any change pursuant to a Change Order until Buyer has made payment in full to Seller for all items in the Change Order.

Buyer acknowledges that in the course of construction of any building or other improvements, certain changes, deviations or omissions may be desirable or required by governmental authorities or job conditions. Any changes, deviations or omissions required by job conditions or governmental authorities are hereby authorized by Buyer. Any costs or expenses resulting from any change, deviation, addition or variation required by governmental authorities, seeking subsequent to the execution of this Agreement, shall be evidenced on a Change Order presented to the Seller to the Buyer, which shall be executed by the Buyer.

**5.  MATERIALS AND COLOR SELECTIONS.** Buyer agrees and acknowledges that certain wall coverings, decorations and furnishing in any model displayed to Buyer are for display purposes only and are not included as part of this Agreement. Further, Buyer understands and agrees that certain wall and are not included as part of this Agreement. Further, Buyer understands and agrees that certain wall other items (or where appropriate, upgraded versions of each item) which may be seen in the Model or in illustrations, are not included with the sale of the Buyer's Home. Buyer further understands and agrees that items of that nature will not be included in Buyer's Home unless specifically provided for in Seller's published list of standard items (if any) or in a Rider or Schedule to this Agreement signed by both Buyer and Seller.

In circumstances arise which warrant changes of suppliers, manufacturers, brand names or other items, Seller may substitute equipment, material, appliances, etc. which are of equal or better quality to that designated on Seller's Plans and Specifications. Buyer further understands and agrees that certain of the finishing items, such as tile, marble, carpets, cabinets, stone, brickwork, roof tile, paint finishes, wood, paints, stain and trim are subject to slight and color variations from those allowed in the model, if any, or in accordance with availability and changes by manufacturers from those allowed in the model, if any, or in accordance with availability and changes by manufacturers from those allowed in the model, if any, or (limitations or brochures or those indicated in the specifications or as shown in Seller's construction offices.

Buyer may select certain standard colors and/or materials in the Home. Buyer understands and agrees that Buyer must submit Buyer's selections to Seller in writing within ten (10) days of the date the list of selections is available to Buyer. If those selections are not delivered to Seller in writing within the ten day period noted above, then it is understood and agreed that the choices may be made by Seller in its sole discretion and be binding on Buyer. In that event, Seller's selections shall be binding upon Purchaser and shall not be a basis upon which Buyer may (i) fail or refuse to close this transaction as scheduled, (ii) make any claim against Seller or (iii) fail or refuse to make any payment when due, in full.

**6.  INSULATION.** Seller has advised Buyer by way of an Insulation Rider attached to this Agreement as required by the rules of the Federal Trade Commission, that it currently intends to install in the House the insulation disclosed in that Rider. The R-Value and other information shown are in the Rider as listed, only on the information given by the appropriate manufacturers (based on the type of insulation listed) and Buyer agrees that Seller is not responsible for the manufacturer's errors. All of the installation information is subject to Seller's general right, under Paragraph 4 of this Agreement, to make changes in Seller's Plans and Specifications, and to applicable limitations of Seller's liability in Buyer.

**7.  COMPLETION DATE.** Seller estimates that the Home will be substantially completed on or about the date indicated on the first page of this Agreement. Buyer acknowledges and agrees, however, that this estimate is given to Buyer for convenience only and is subject to change from time to time so that this estimate is given to Buyer for convenience only and is subject to change from time to time so that any means and without creating any liability of Seller. Seller does, however, agree to substantially complete construction of the House in the manner specified in this Agreement by a date no later than the

ROSEN 0368

(1) year and eleven (11) months from the date Buyer and Seller execute this Agreement, subject however, to delays caused by Buyer or acts of God, the unavailability of materials, strikes, other labor problems, governmental actions, or other events which would support a defense based upon impossibility of performance for reasons beyond Seller's control.

8.    **SUBSTANTIAL COMPLETION.** Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that item will be understood to be complete when the same is substantially complete in Seller's reasonable opinion. Notwithstanding the foregoing, however, the Home will not be considered complete or substantially complete by Seller for purposes of this Agreement unless Seller has obtained a Certificate of Occupancy (or its equivalent) from the proper governmental authority.

9.    **INSPECTION PRIOR TO CLOSING.** Except as provided herein, for reasons of safety and/or requirements under policies of insurance held by Seller, neither Buyer nor any agent of Buyer shall be permitted to enter the Lot or the Home until after Buyer has closed this Agreement and has taken possession of the Home, whereupon Buyer's rights shall be as set forth in the Community Documents. Buyer agrees to abide by such restriction and not to enter upon or interfere in any way with the construction of the Home or communicate with any of Seller's contractors, subcontractors, suppliers or workmen or interfere with any other improvements of the Community.

Prior to Closing and upon notice from Seller, Buyer or Buyer's designated representative shall inspect the Home with Seller and together with Seller compile a Punch List specifying any outstanding work required to conform the Home to this Agreement. Buyer's failure to perform Buyer's obligation hereunder shall not delay, postpone, or otherwise interfere with the Closing. Seller shall have a reasonable period of time to complete all work required under the Punch List in a workmanlike manner. The fact that Seller has to complete the work set forth under the Punch List shall not delay or postpone the Closing or Buyer's obligation to close and pay the balance of the Purchase Price or be grounds for a reduction of or credit against the Purchase Price or be grounds for the placing a portion of the Purchase Price in escrow pending completion of such items. The provisions of this paragraph shall survive the Closing.

The Property constitutes a part of the Community which may result in the construction or additional improvements by Seller. The Seller is not obligated however, for the construction or completion of any additional improvements of any other portion of the Community as a precondition to the obligation of Buyer to close after substantial completion of the Home by Seller.

10.   **CLOSING DATE.** Buyer will be given at least ten (10) days notice of the time and place of Closing, which shall be in Palm Beach County, Florida, at a location designated by Seller ("Closing Notice"). Seller is authorized to postpone the Closing for any reason and Buyer will close on the new date, time and place specified in a Notice of Postponement (so long as at least three (3) days notice of the new date, time and place are given). A change of time or place of Closing only (that is, not an involving a change of date) will not require any additional notice period. Any Notice of Closing, Postponement or Rescheduling must be given in writing. All of those notices to Buyer will be sent or directed to the address specified on the first page of this Agreement unless Seller has received written notice from Buyer of a change prior to the date the Closing Notice is given. Those notices (where there is a change of address) will be effective on the date mailed or placed for an express delivery system (for Federal Express). An Affidavit of one of Seller's employees or agents stating the Notice of Closing, Postponement or Rescheduling was mailed or placed with an express delivery system shall be presumed to establish that the Closing Notice was received.

If Seller agrees to a delay of Closing at the request of Buyer (which Seller is not obligated to do), Buyer will pay to Seller at the Closing (or in advance if so requested by Seller) a late closing charge equal to eighteen percent (18%) per annum on the Total Purchase Price of the Property computed from the originally scheduled Closing Date through the actual Closing Date.

**IF BUYER FAILS TO CLOSE AS REQUIRED BY THIS PARAGRAPH, BUYER WILL BE IN DEFAULT OF THIS AGREEMENT.**

11.   **CLOSING DOCUMENTS.** At Closing, Buyer will receive (i) a Special Warranty Deed to the Property, (ii) Seller's form of Owner's (No Lien) Affidavit, (iii) a copy of the Certificate of Occupancy or equivalent from the governmental agency having jurisdiction over the Home, and (iv) the FIRPTA Affidavit (collectively the "Closing Documents"). The Special Warranty Deed will be subject to (that is, contain exceptions for) all of the Permitted Exceptions described in Paragraph 3. When Buyer receives the Special Warranty Deed at Closing, Buyer will sign all papers reasonably necessary or appropriate to effectuate the intent of this Agreement.



5

ROSEN 0369

KROSEN -000009

At the same time Buyer receives the Closing Documents, Buyer agrees to pay the balance of the Total Purchase Price **and** any additional amounts Buyer owes under this Agreement. Buyer will not be entitled to take possession of the Property until all funds have been received by Seller in accordance with this Agreement.

12.  **CLOSING COSTS.** Buyer understands that, in addition to the Total Purchase Price for the Property Buyer must pay certain other fees at "closing costs" when Buyer accepts title at Closing. These include:

A.  A "closing charge" equal to one and one-half percent (1 ½%) of the Total Purchase Price (including charges for all options, extras, premiums now or hereafter contracted for) shall be paid to Seller. This charge will be used, in part, to pay for the cost of officially recording the deed, for documentary stamp taxes on the deed of conveyance and the premium, on the owner's title insurance policy (all of which costs will be disbursed by Seller on behalf of Buyer). The foregoing one and one-half percent (1 ½%) closing charge is based on the assumption that documentary stamp taxes on the Special Warranty Deed will be, at Closing, $.70/$100.00 and that the cost of title insurance will be based, at Closing, at the minimum rates promulgated by the Florida Insurance Commissioner in effect on the date of this Agreement. In the event of changes in either or both of the foregoing, appropriate additional charges (in case of increases) will be paid by Buyer at closing. In the event Buyer shall not wish to be furnished with an owner's title insurance policy by Seller, and Buyer so notifies the Seller in writing within seven (7) days of the date of execution of this Agreement, Buyer shall be credited at Closing with an amount equal to the minimum risk rate premium with full reissue credit for the owner's title insurance policy and Buyer shall be responsible for all title charges and title related charges (including but not limited to title search fees, title examination fees and title closing fees). Seller shall have no obligation to provide Buyer with any prior owner's title insurance policy, base title, certificate of good standing, computer print-out of Seller's attorneys policies, the like) Buyer not wish to be furnished with an owner's title insurance policy by Seller.

B.  The sum of Three Hundred Seventy-Five Dollars ($375.00) shall be paid to Seller by Buyer for a survey of the Property;

C.  The Property's prorata share of the assessments for The Oaks at Boca Raton Property Owners Association, Inc. (the "Association"), commencing the date of this Agreement;

D.  A contribution to the Capital Improvement Fund of the Association, equal to three (3) months of the Association's annual assessment for the Property. This contribution shall be collected and maintained in a separate account for the use and benefit of the Association. The Capital Improvement Fund of the Association shall be disbursed by the Board of Directors for the Association in accordance with the Association documents.

E.  A proportion of the Association's assessment for the Property for the quarter immediately following the quarter in which closing occurs;

F.  Loan fees, loan closing costs and all other related sums, including but not limited to, interest, points, attorneys' fees, recording fees, documentary stamps, intangible tax, credit report, abstracting, inspection fees and title insurance charged by Buyer's lender, (if any);

G.  Reimbursement for water and sewer tap-in fee in the amount of $4,450.00;

H.  Any utility or similar deposits attributable to the Property;

I.  Any late closing charges provided for elsewhere in this Agreement; and

J.  Real estate taxes and property owners assessments shall be prorated as of the date of this Agreement.

13.  **DEFAULT.** If Buyer defaults under this Agreement (beyond the expiration of any cure period, if applicable), all Buyer's rights under this Agreement will end and Buyer authorizes Seller to keep all deposits made or agreed to be made and other pre-closing advance payments (including,

ROSEN 0370

KROSEN -000010

without limitation, those on options, extras, upgrades and the like) Buyer had then made and all interest which was earned on them, all as agreed and liquidated damages and not as a penalty. The parties acknowledge that the extent and amount of actual damages is uncertain and as such the amounts provided for above are agreed and liquidated damages.

If Seller defaults under this Agreement, Buyer will give Seller notice of it and if Seller has not commenced appropriate action to cure the default within ten (10) days after such notice is given, Buyer will have the choice of either (i) receiving a refund of all deposits and prepayments for options, extras, upgrades and the like actually paid under this Agreement; (ii) specifically enforcing this Agreement; or (iii) any other remedy available to Buyer at law or in equity. When Buyer elects one of the remedies available to Buyer, Buyer will be deemed to have waived the other remedy provided that notwithstanding anything to the contrary contained herein, Buyer shall have whatever remedies, including specific performance and damages, in the event Seller fails to fulfill its obligations to deliver the Property within one (1) year and eleven (11) months as provided in Paragraph 7 of this Agreement.

14. ASSOCIATION; RECEIPT OF COMMUNITY DOCUMENTS. Upon taking title to the Property, Buyer shall automatically become a member of the Association described in the Community Documents (defined below). Buyer understands Buyer's membership will take effect at Closing. At that time, Buyer agrees to accept all liabilities and obligations of such membership.

Buyer acknowledges receipt from Seller, prior to Buyer's signing this Agreement, of copies of the following documents (the "Community Documents"):

A. Declaration of Covenants, Conditions and Restrictions for The Oaks at Boca Raton.

B. Articles of Incorporation and By-laws of the Association.

C. Rules and Regulations of the Association described in the Community Documents.

D. Operating Budget for the Association (which may be in estimated form).

Buyer acknowledges and agrees that the Community Documents permit The Oaks at Boca Raton Venture, L.P., developer of The Oaks at Boca Raton ("Developer"), or Seller, as the case may be, to make amendments to them and that any changes it makes to them prior to Closing (i) will not necessarily be addressed to Buyer (however, such amendments will be part of the Public Records of the County) and (ii) will not affect Buyer's obligation to perform any or all of the duties under this Agreement, unless such changes have a material adverse effect on the market value of the Property.

Buyer understands that the budget for the Association is not guaranteed. The budget is subject to change at any time and from time to time to reflect actual and projected expenditures. These changes may occur before or after Closing but will not affect any of Buyer's obligations under this Agreement (except as to remaining changes in Closing prorations). Buyer recognizes and agrees that Buyer's assessment may include expenses attributable to common areas which are not yet complete or under by Buyer.

15. USE OF THE REMAINING PROPERTY. As long as Seller, Developer or other builders own property in the Community, Seller, Developer or such other builders may keep sales certain offices and model homes in the Community (including in the common areas). Such persons also people may show homes, erect advertising signs and do whatever else is necessary and helpful for sales, leasing, or management. This use of such property must be reasonable and cannot unreasonably interfere with Buyer's use and enjoyment of the Property and of the common areas.

In addition to the foregoing, Seller, Developer and other builders and their affiliates, contractors, subcontractors, licensees or designees may conduct such blasting, construction, excavation, repair and other activities in or around the Community as are deemed necessary or appropriate in the sole discretion of the party conducting such activities. With out limiting the generality of the foregoing, and as a material inducement to Seller to enter into this Agreement, Buyer acknowledges and agrees:

SELLER, DEVELOPER AND/OR THE OTHER PARTIES IDENTIFIED ABOVE WILL BE CONDUCTING EXCAVATION, CONSTRUCTION AND OTHER ACTIVITIES (INCLUDING AROUND THE LOCATION) BOTH BEFORE AND AFTER BUYER CLOSES UNDER THIS AGREEMENT. BUYER RECOGNIZES THEIR RIGHTS TO DO SO AND WILL NOT OBJECT TO ANY OF THESE ACTIVITIES CONDUCTED AND/OR IN CONJUNCTION WITH SUCH ACTIVITIES. ANY OTHERS UNDER BUYER'S CONTROL TO ENTER ANY AREAS WHERE SUCH ACTIVITIES ARE BEING CONDUCTED (EVEN WHEN THEY HAVE TEMPORARILY CEASED). SUCH AS DURING NON-WORKING HOURS) AND (iii) HOLD SELLER OR DEVELOPER LIABLE OR SEEK SELLER OR DEVELOPER FOR ANY DAMAGE OR INJURY ARISING FROM OR CONNECTED WITH ANY OF THE ACTIVITIES DESCRIBED ABOVE.

14

ROSEN 0371

The provisions of this paragraph will not limit the generality or limit the generality in effect of any similar provision in any of the Community Documents and, without limiting, the generality of paragraph 27 of this Agreement, will continue to be effective after (survive) after (survive) Closing.

The provisions of this Paragraph 15 will survive Closing.

16. **SALES COMMISSIONS**: Seller shall pay the cooperating broker, if any, named on the first page of this Agreement. By signing this Agreement, Buyer is representing and warranting to Seller that Buyer has not consulted or dealt with any other broker, salesperson, agent or finder and that Buyer will indemnify and hold Seller harmless for and from any such person or company claiming otherwise, including commissions, attorney's fees and court costs.

The provisions of this Paragraph 16 shall survive Closing.

17. **NOTICES**: Except for the provisions set forth in Paragraph 30, whenever Buyer or Seller is required to notify the other, the notice must be in writing addressed to the address and both on page one of this Agreement and it must be sent by express mail, courier or certified mail, postage prepaid, with a return receipt requested.

A change of address notice is effective when it is received. All other written notices are effective on the day they are properly mailed or placed with an express courier, whether or not received.

18. **TRANSFER OR ASSIGNMENT**. Buyer has no right to assign, sell or transfer his interest in this Agreement without Seller's prior written consent, which Seller may withhold in its own discretion. Buyer covenants and agrees that prior to closing, Buyer shall not: (a) list or advertise the Property for sale with any broker, in any multiple listing service, in any classified or other advertisement, or otherwise (including, without limitation, "by owner"), and or (b) enter into any agreement (verbal or written) involving an assignment of Agreement or the right thereunder, or any agreement (verbal or written) for a transfer of title to the Property by any third party.

19. **OTHERS BOUND BY THIS AGREEMENT**. This Agreement will bind Buyer's heirs and personal representatives. If Buyer is a corporation or other business entity, this Agreement will bind any successor corporation or entity. [Buyer has received permission to assign or transfer Buyer's interest in this Agreement, this Agreement will bind anyone receiving Buyer's interest.

20. **PUBLIC RECORDS**. Buyer authorizes Seller to record the documents necessary to establish and perfect the Community and the portion of it in which the Property is located, all other documents Seller deems necessary or appropriate, and all amendments and supplements to them in the Public Records of the County.

21. **LITIGATION**. In any suit or other proceeding brought by either Buyer or Seller, the prevailing party will be entitled to recover reasonable attorneys' fees, reasonable costs and expenses actually incurred by the prevailing party in each suit or proceeding or on any appeal, and Buyer and Seller agree that venue for such litigation shall be in Palm Beach County, Florida.

22. **FLORIDA LAW**. This Agreement will be governed by the laws of the State of Florida.

23. **TIME OF THE ESSENCE**. The performance of all obligations on the precise times stated in this Agreement is of absolute importance and failure to perform any of them on time is a default, time being of the essence.

24. **RECORDING**. Neither this Agreement, nor any notice of memorandum hereof may be recorded among the Public Records and not recording shall constitute a default under this Agreement by the recording party.

25. **COMMUNITY**. The developer of the Community is The Oaks at Boca Raton Venture, L.P. Buyer acknowledges and agrees that Seller has not made any representations, warranties or guarantees whatsoever in connection with this Agreement as to the design, construction, completion, use, benefits or value of the Community of which the Property is a part. Buyer is purchasing the Property from Seller and expenditure of any direct or indirect benefits which that Seller may receive from having Buyer purchase property in the Community. Buyer has not (and will not) relied and any consideration to Seller for any such representation, warranty or guaranty and Buyer has neither received nor relied on any such representation, warranty or guaranty from Seller as to the design, construction, completion, use, benefits or value of the Community.

ROSEN 0372

KROSEN -000012

26. **RETURN OF COMMUNITY DOCUMENTS.** If this Agreement is cancelled for any reason, Buyer shall return to Seller all of the Community Documents Seller has delivered to Buyer in the same condition Buyer received them, reasonable wear and tear excepted. If Buyer fails to return them, Buyer will pay Seller $50.00 (which may be withheld from Buyer's deposit if Buyer is then entitled to a refund) to defray Seller's cost of preparation, printing and delivery.

27. **SURVIVAL.** The provisions and disclosures in this Agreement which are intended to have effect after Closing (but only those provisions and disclosures) will continue to be effective after (survive) Closing and delivery of the deed.

28. **INDUCEMENT.** Buyer acknowledges that the primary inducement for Buyer to purchase under this Agreement is the Property itself and not the Common Areas of the Community or any other part of it. Buyer also acknowledges that he was not induced to purchase the Property or sign this Agreement by any oral statement or oral representation made by Seller or Seller's agents.

29. **RADON GAS.** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit. Buyer acknowledges that Seller has made no geological or environmental test or survey of the Community. Seller makes no representations or warranty concerning geological or environmental matters including, but not limited to, radon gas. Seller specifically excludes such geological or environmental matters from any warranty given under this Agreement. If Buyer requires more information concerning these potential risks, additional information may be obtained from the U.S. Environmental Protection Agency and state and local authorities.

30. **RECEIPT OF DISCLOSURES.** Seller and his salesperson hereby disclose to Buyer that it is acting as the Real Estate Broker-Salesperson or Salesperson with respect to the purchase of the Property solely on behalf of Seller as an agent. Accordingly it acknowledges no duty of disclosure or representation to Buyer in this transaction. This disclosure is given in accordance with Section 475.25(l)(q), Florida Statutes and Rule 21V-10.033, Florida Administrative Code. Buyer acknowledges receipt of this disclosure, the disclosure summaries for the Community, the Agency Disclosure and Notice of the Closing Expenses prior to signing this Agreement.

31. **WATER LEVELS.** Buyer acknowledges that all lakes and canals (designated, referred to as "Lake Area" and collectively referred to as "Lake Area") within the Community are designed as water management areas and are not designed as aesthetic features. Permits from various regulatory agencies govern the control of water levels. Due to varying climatic conditions, environmental conditions of water use requirements, including without limitation, fluctuations in ground water elevation, periodic water use requirements, including, without limitation, and other causes of the control of Developer, Seller and the established by governmental authorities, and the control of Developer, Seller and the Association, the water levels in the Lake Areas, depending on conditions, will rise and fall as others so easily and on occasion the water levels may decline significantly and result in damage to the appearance of the Lake Areas. These water level fluctuations and changes in the appearance of the Lake Areas are considered normal occurrences. Buyer further understands and acknowledges that neither the Developer, Seller, nor the Association, have any responsibility over such water level fluctuations nor associated largesse of plant growth in the Lake Areas. Therefore, Buyer agrees to release and hold harmless Developer, Seller and the Association from and against any and all claims, demands, damages, costs and expenses of whatever nature or kind, including attorney's fees and costs, arising from or relating to any measure to the Lake Areas, including, without limitation, water level fluctuations, permitting, construction and maintenance thereof. Buyer shall not alter, modify, expand, or fill any Lake Area without the prior written approval of the Developer, Seller, the U.S. Army Corps of Engineers, and such other local, state and federal authorities as may have jurisdiction over such matters.

The provisions of this paragraph 31 shall survive closing and delivery of the deed to Buyer.

32. **SUBORDINATION.** Buyer acknowledges and agrees that all his rights hereunder are subordinate to the lien of any mortgage which now or shall hereafter encumber the subject property prior to Closing and to all amendments, modifications, renewals, consolidations and extensions thereof and all voluntary and involuntary future advances made thereunder. However, Seller agrees to cause any such mortgage to be discharged of record at the time of Closing.

33. **SEVERABILITY.** Should any part, clause, provision or condition of this Agreement be held by a court of competent jurisdiction to be invalid or inoperative, including but not limited to enforcement with 18 U.S.C. 1701a(d) of the Interstate Land Sales Full Disclosure Act ("Act"), the parties agree that such invalidity shall not affect any other part, clause, provision or condition and that the remainder of this Agreement shall be effective as though such void part, clause, provision or condition had never been inserted.

9

ROSEN 0373

had not been contained herein. Additionally, if the interpretation of a provision of this Agreement or a resolution within the Agreement could invalidate the Agreement pursuant to the Act, then this Agreement shall be modified accordingly so that the offending part, clause, provision or condition of this Agreement will either be deleted or modified so that the intent of this parties can be fulfilled and yet the offending provision is renewed.

**34.** **WAIVER OF JURY TRIAL.** Each party hereby knowingly, voluntarily, and intentionally waives the right to a trial by jury with respect to any litigation between the parties, including, but not limited to any and all cause or causes of action, defenses, counterclaims, cross-claims, third party claims, and interveners' claims, whether now existing or hereafter arising, and whether sounding in contract, tort, equity or otherwise. Regardless of the cause or causes of action, defenses or counterclaims alleged (including by any party, and regardless of whether such causes of action, defenses or counterclaims are alleged or the relief sought by any party, and regardless of whether such causes of action, defenses or counterclaims are alleged or the relief sought by any party in conjunction with this agreement or in the subject matter, out of any alleged conduct or course of conduct, dealing or course of dealing, statements (whether verbal or written), or otherwise. Any party hereto may file a copy of this agreement with any court as conclusive evidence of the consent of the parties hereto to the waiver of any right they may have to trial by jury.

**35.** **DAMAGE BEFORE COMPLETION.** If between the date of this Agreement and the Closing, the Property is damaged by fire or other casualty, the following shall apply:

A. Risk of loss to the improvements by fire or other casualty until the Closing is assumed by Seller. Seller shall have no obligation to repair or replace the improvements; provided, however, if Seller elects to repair or replace such loss or damage to the improvements, this Agreement shall continue in full force and effect and Buyer shall not have the right to rescind or receive a credit against the full force and effect and Buyer shall not have the right to rescind or receive a credit against the abatement in the Purchase Price. In such event Seller shall be entitled to a reasonable period of time within which to complete repair or replacement. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss or damage shall belong entirely to Seller.

B. If Seller notifies Buyer that it does not elect to repair or replace any such loss or damage, then this Agreement shall be deemed cancelled and of no further force or effect, and Seller shall refund to Buyer all deposits paid hereunder, whereupon the parties shall be released and discharged of all claims and obligations hereunder, except that if Buyer is then otherwise in default under this Agreement, Seller shall retain all such deposits as liquidated damages.

**36.** **LITTORAL ZONES/AQUATIC LAKE PLANTINGS.** In addition to the foregoing, the Buyer hereby stipulates and agrees that any and all conservation areas required by governmental authority to be located within the Community shall be dedicated as Common Areas and shall be the perpetual responsibility of the Association and may in no way be altered from the natural or permitted state. Activities prohibited within any and all conservation areas which may be required to be located within the Community, including, but are not limited to, construction or placing of buildings on or above the ground, dumping or placing of soil or other substances such as trash, removal or destruction of trees, shrubs or other vegetation (with the exception of "exotic" and/or "nuisance" vegetation, removal by excavation, dredging or removal of soil material), cleanup, or filling and any other activities detrimental to drainage, flood control, water conservation, erosion control or fish and wildlife habitat conservation or preservation.

Furthermore, the Palm Beach County Department of Environmental Resource Management ("DERM") requires that aquatic zone lake plantings to be installed and maintained in certain areas in the Community. These plantings may not be disturbed, trimmed, or removed by any other person other than the Association who must receive prior approval from DERM. The ongoing maintenance, care and perpetual obligation of such plantings shall remain the responsibility of the Association after the Developer's representatives resign from the Board of Directors. Any Member(s) of the Association or Buyer who damages the referenced plantings shall be solely responsible for the cost of repairing same, as well as any fines, costs, or other charges imposed by DERM or any other agency or governmental entity arising from such damage. All Buyers shall be deemed to have acknowledged and agreed that waters of, including but not limited to, any lakes or other bodies of water in or outside of the Community may be altered by the presence of such plantings.

All work pursuant to this Section and all expenses incurred or allowed to the Association pursuant to the Community Documents shall be paid for by the Association through assessments (either general or special) imposed in accordance herewith.

The provisions of Paragraph 36 shall survive closing.

- 29 -

ROSEN 0374

KROSEN -000014

37. **INTERLOCAL/SCHOOL AGREEMENT.** By receipt of a copy of the Community Documents and acceptance of a special warranty deed conveying a Lot or Lots to the respective Buyer, Buyer does hereby agree to join in and consent to any application, petition or agreement providing an interlocal/school agreement supported by Seller and which will benefit the Community as Seller's sole and reasonable discretion. Buyer additionally acknowledges that school boundaries are periodically change within Palm Beach County and Seller does not provide any warranty or guaranty to Buyer as to a child's attendance at a specific school for a specific period of time.

38. **ADDITIONAL LAND.** Currently, the Developer of The Oaks at Boca Raton has submitted plans to the County to add the approximate 118 +/- acres property to the east of The Oaks (Additional Land) to the Community. (the Developer finalizes the approvals for this Additional Land, then the following Land will be added as part of the Community: (i) the Community Documents will govern the Additional Land and the homes, common areas, and other improvements constructed thereon as part of the Community; (ii) the Pot, quality and Common areas serving the Community may be enlarged and/or modified with the homes in the Additional Land serving the same size rights as the homes in the existing Community; and (iii) the current planned entrance on Clint Moore Road may be relocated further to the east.

39. **WARRANTY/DISCLAIMER OF IMPLIED WARRANTIES.** Seller grants to Buyer a limited warranty, the form of which is available at Seller's office. Buyer acknowledges that as the time of execution of this Agreement, Seller has to reason to know of any particular purpose Buyer might have in purchasing the Home and Items of personal property sold pursuant to this Agreement other than normal residential use. Buyer further acknowledges that normal dwelling, complaints and characteristics of materials and construction, and any cracks appearing as a result thereof are as a result of settlement of, or, or on the Home shall not be deemed to be construction defects. Seller makes no other warranties with respect to the fitness, merchantability, habitability, intended uses, workmanship, construction or physical condition of either the Home, any fixtures or items of personal property sold pursuant to this Agreement or any other real or personal property conveyed hereby.

This limited warranty is expressly in lieu of any other warranties, express or implied, except for the limited warranty. Seller disclaims any and all implied warranties or merchantability and fitness as to the home, and all fixtures or items of personal property whatsoever conveyed hereby, whether arising from the custom, usage of trade, course of dealing, and law or otherwise. Seller shall not be liable for any defects in the work performed by third party contractors not hired by Seller, nor for any adverse impact to the Home, Property or Community caused thereby. Further, should Buyer elect to use a third party contractor that is a subcontractor of Seller, Buyer acknowledges that Seller makes no representations relative to the performance by such third party contractor. Seller will not be liable for damages or injury to any improvements Buyer makes to the Property, or the Buyer's personal property, or for any consequential damages including, but not limited to liability by reason the Home, inconvenience or loss of time, due to any defects.

The provisions of this Paragraph 39 will survive Closing.

40. **CASH TRANSACTION.** The transaction covered by this Agreement shall be on an all cash basis and shall not be subject to Buyer procuring financing.

41. **ENTIRE AGREEMENT.** This Agreement, together with the Addenda attached hereto, constitutes the entire Agreement for Purchase and Sale of the Property and once the Agreement is signed, the Agreement can only be amended in writing. ANY CURRENT OR PRIOR AGREEMENT, REPRESENTATIONS OR UNDERSTANDINGS AND ORAL STATEMENTS, INCLUDING BUT NOT LIMITED TO RENDERINGS OR REPRESENTATIVE CONTAINED IN SALES BROCHURES, ADVERTISING OR SALESMATERIALS AND ORAL STATEMENTS OF SALES REPRESENTATIVES, IF NOT EXPRESSED IN THIS AGREEMENT OR IN THE COMMUNITY DOCUMENTS, ARE VOID AND HAVE NO EFFECT. BUYER ACKNOWLEDGES AND AGREES THAT BUYER HAS NOT RELIED ON ANY SUCH ITEMS.

42. **SPECIAL CLAUSES.** The following attached Addenda are incorporated into and made a part of this Agreement:

Cameras Facilities Disclosure
Notice of Closing Costs
Homeowner Association Disclosure Addendum
Insulation Rider
Specification Rider
Swimming Pool Disclosure
Zoning Conditions Disclosure
Other: Planting Addendum

11

ROSEN 0375

BY SIGNING BELOW, BUYER AND SELLER AGREE TO BE BOUND BY ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT, INCLUDING THOSE PARAGRAPHS AS PRINTED ON THE REVERSE SIDES OF THE PAGES. BUYER IS ADVISED TO CAREFULLY REVIEW SUCH TERMS AND PROVISIONS AS WELL AS THE VARIOUS DISCLOSURES APPEARING IN THIS AGREEMENT.

NOTE: BEFORE BUYER SIGNS THIS AGREEMENT, BUYER SHOULD READ IT AND THE COMMUNITY DOCUMENTS CAREFULLY AND IS FREE TO CONSULT AN ATTORNEY OF BUYER'S CHOICE.

Witnesses

SELLER:

ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, by ALBANESE-POPKIN DEVELOPMENT GROUP, LLC, a Florida limited liability company, General Partner

By: _____
    Leonard J. Albanese, Manager

Date: 11.15.04

BUYER:

_____
Sidney Rosen

Date: 11-12-04

ROSEN 0376

KROSEN -000016

# COMMON FACILITIES DISCLOSURE

As required by Florida Law, the purchaser(s) of property in The Oaks of Boca Raton (the "Development") are advised that the following recreational or other facilities are available for use by the property owners in the Development:

A Community Building of approximately _____ 20,000 _____ square feet with swimming pool and tennis courts.

There will be charges for the use of the facilities listed above. The Declarant, the Association or other entity which owns and/or operates the facilities have the right to levy assessments which are used, in part, for the operation and upkeep of the facilities. Further, there may be other property (e.g., private roads, parks) in the Community and/or Development which is owned or operated by the Association.

By signing below, the purchaser(s) acknowledges receipt of this disclosure prior to the execution of a contract to purchase property in the Community and Development.

Purchaser: _____

Purchaser: _____
Stacey Rosen

Date: _____1-12-4_____

ROSEN 0377

KROSEN -000017

# THE OAKS OF BOCA RATON
## NOTICE OF CLOSING EXPENSES

Pursuant to the rules promulgated by the Department of Legal Affairs, Buyer is hereby warned that upon Closing, additional costs may be required to be paid by the Buyer in the form of closing costs, which may include the following:

1. The balance of the Purchase Price, plus any unpaid extras (i.e., Change Orders).

2. Prorated portion of the current real property taxes, benefit tax on said assessments as of the date of this Agreement.

3. A "closing charge" equal to one and one-half percent (1½ %) of the Purchase Price (including charges of all options, extras, premiums now or hereinafter contracted for) shall be paid to the Seller. This charge will be used, in part, to pay for the cost of officially recording the deed, for documentary stamp taxes on the deed of conveyance and the premium of the owner's title insurance policy.

4. A prorated portion of the Association assessments and a working capital contribution equal to three (3) months assessments for The Oaks at Boca Raton Property Owners Association, Inc.

5. Buyer's own hazard and liability insurance.

6. Attorney's fees for Buyer's attorney, if any.

7. Default interest, delayed closing charges or penalties.

8. A fee of $375.00 shall be paid to the Seller for a survey of the property.

In addition, if the Buyer obtains a mortgage, additional costs may be demanded from the Buyer by the lender.

ROSEN 0378

KROSEN -000018

## THE OAKS AT BOCA RATON
### PURCHASE AND SALE AGREEMENT
### HOMEOWNERS ASSOCIATION DISCLOSURE ADDENDUM

THIS ADDENDUM to The Oaks at Boca Raton Purchase and Sale Agreement (the "Agreement") made between Albanese-Popkin The Oaks Development Group, L.P., a Florida limited partnership, ("Seller") and KEVIN ROSEN AND STACEY ROSEN, His Wife, ("Buyer"), for the purchase of the property located at (Lot 50, O-1), is hereby entered into and made a part of said Agreement as if fully set forth herein.

### W I T N E S S E T H:

1. In the event of any conflict between the terms and provisions of this Addendum and any terms and provisions of the Agreement, the terms and provisions of this Addendum shall control. Capitalized terms which are employed in this Addendum without definition but which are defined in the Agreement shall have the same meaning in this Addendum as in the Agreement.

2. Association Membership.

(A) As a purchase of property in this Community, you ☒ will _____ will not be obligated to be a member of a Homeowners' Association ("Association").

(B) There have been or will be recorded restrictive covenants (the "Covenants") governing the use and occupancy of properties in this Community.

(C) You ☒ will _____ will not be obligated to pay assessments to the Association(s). You ☒ will _____ will not be obligated to pay Assessments to the respective municipality, county or special district. All Assessments are subject to periodic change.

(D) Your failure to pay Special Assessments or Assessment levied by a Mandatory Homeowners' Association could result in a lien on your property.

(E) There _____ is ☒ is not an obligation to pay rent or land use fees for recreational or other commonly used facilities as an obligation of membership in the Homeowners' Association. (If such obligation exists, then the amount of that current obligation is $600.12 per quarter.)

(F) The Covenants _____ can ☒ cannot be amended without the approval of the Association.

(G) The Statements contained in this disclosure form are only summary in nature, and, as a Prospective Purchaser, you should refer to the Covenants and the Association Governing Documents before purchasing property.

(H) These Documents are matters of Public Record and can be obtained from the Record Office in the County where the Property is located.

3. Buyer acknowledges that this Homeowner Association Disclosure Addendum was provided to Buyer prior to Buyer's execution of the Agreement.

BUYER:                                    SELLER:

ALBANESE-POPKIN THE OAKS
DEVELOPMENT GROUP, L.P., a Florida
limited partnership, by ALBANESE-
POPKIN DEVELOPMENT GROUP, LLC,
a Florida limited liability Company,
General Partner

_____                By: _____
Kevin Rosen                                Lorenzo X. Albanese, Manager

_____
Stacey Rosen

DATE EXECUTED BY BUYER:                 DATE EXECUTED BY SELLER:

_____ 1/12, 2004                        _____ 1/13 _____ 2004

25

ROSEN 0379

KROSEN -000019

## INSULATION DISCLOSURE

Seller presently intends to install insulation in the Property as follows:

1. Material: Fiberglass batts, fold backed paper

2. R-Value: R-30 / R-11 / R-11

3. Thickness: 9" / 4" / N/A
   Living / O/S / O/S

4. Locations: attic ceiling / frame walls / block walls (unless otherwise specified, insulation
   will not be installed in outside garage walls, garage ceilings or interior walls).

Pursuant to rules of the Federal Trade Commission, Seller reserves the right to change such
insulation by delivering written notice of the change to Purchaser.

_____
Kim Ingman

_____
Stacey Ivons

Date of Execution: (signature)

ROSEN 0380

# THE OAKS AT BOCA RATON
## DISCLOSURE
### Residential Swimming Pool Safety Act

Chapter 515, Florida Statutes, effective October 1, 2000, sets forth certain pool safety feature and disclosure requirements regarding drowning prevention and pool ownership.

All new residential swimming pools, spas, and hot tubs must be equipped with at least one pool safety feature as specified in the chapter, designed to deny, delay or detect unsupervised entry to a swimming pool, spa, or hot tub, in order to reduce drowning and near-drowning incidents.

The State of Florida Department of Health shall be responsible for producing its own or adopting a nationally recognized publication that provides the public with information on drowning prevention and the responsibilities of pool ownership and also for developing its own or adopting a nationally recognized drowning prevention education program for the public and for persons violating the pool safety requirements of the chapter. As of the date hereof, no publication has been prepared or adopted.

## DEFINITIONS.

The term:

"Approved safety pool cover" means a manually or power-operated safety pool cover that meets all of the performance standards of the American Society for Testing and Materials (ASTM) in compliance with standard F1346-91.

"Barrier" means a fence, dwelling wall, or nondwelling wall, or any combination thereof, which completely surrounds the swimming pool and obstructs access to the swimming pool, especially access from the residence or from the yard outside the barrier.

"Exit alarm" means a device that makes audible, continuous alarm sounds when any door or window which permits access from the residence to any pool area that is without an intervening enclosure is opened or opened an left ajar.

## RESIDENTIAL SWIMMING POOL SAFETY FEATURE OPTIONS AND PENALTIES.

In order to pass final inspection and receive a certificate of completion, a residential swimming pool must meet at least one of the following requirements relating to pool safety features:

(1) The pool must be isolated from access to a home by an enclosure that meets the pool barrier requirement of s. 515.29;

(2) The pool must be equipped with an approved safety pool cover;

(3) All doors and windows providing direct access from the home to the pool must be equipped with an exit alarm that has a minimum sound pressure rating of 85 dB A at 10 feet; or

(4) All doors providing direct access from the home to the pool must be equipped with a self-closing, self-latching device with a release mechanism placed no lower than 54 inches above the floor.

## RESIDENTIAL SWIMMING POOL BARRIER REQUIREMENTS.

A residential swimming pool barrier must have all of the following characteristics:

(1) The barrier must be at least 4 feet high on the outside.

(2) The barrier may not have any gaps, openings, indentations, protrusions, or structural

17



ROSEN 0381

components that could allow a young child to crawl under, squeeze through, or climb over the barrier.

(3) The barrier must be placed around the perimeter of the pool and must be separate from any fence, wall, or other enclosure surrounding the yard unless the fence, wall, or other enclosure or portion thereof is situated on the perimeter of the pool, is being used as part of the barrier, and meets the barrier requirements of this section.

(4) The barrier must be placed sufficiently away from the water's edge to prevent a young child or medically frail elderly person who may have managed to penetrate the barrier from inadvertently falling into the water.

Gates that provide access to swimming pools must open outward away from the pool and be self-closing and equipped with a self-latching locking device, the release mechanism of which must be located on the pool side of the gate and so placed that it cannot be reached by a young child over the top or through any opening or gap. A wall of a dwelling may serve as part of the barrier if it does not contain any door or window that opens to provide access to the swimming pool.

A barrier may not be located in a way that allows any permanent structure, equipment, or similar object to be used for climbing the barrier.

**DROWNING PREVENTION EDUCATION PROGRAM; PUBLIC INFORMATION PUBLICATION.**

The Department of Health shall develop a drowning prevention education program, which shall be made available to the public at the state and local levels and which shall be required as set forth in s. 515.27(2) for persons in violation of the pool safety requirements of this chapter. The Department may charge a fee, not to exceed $100, for attendance at such a program. The drowning prevention education program shall be funded using the proceeds, state funds appropriated for such purpose, and grants. The Department, in lieu of developing its own program, may adopt a nationally recognized drowning prevention education program to be approved for use in local safety education programs.

The Department shall also produce, for distribution to the public at no charge, a publication that provides information on drowning prevention and the responsibilities of pool ownership. The Department, in lieu of developing its own publication, may adopt a nationally recognized drowning prevention and responsibilities of pool ownership publication.

ROSEN 0382

KROSEN -000022

THE OAKS AT BOCA RATON

ZONING CONDITION DISCLOSURES

PORTIONS OF THE PROPERTY ARE IMMEDIATELY ADJACENT TO THE CLINT MOORE ANIMAL HOSPITAL, WHICH IS A VETERINARY CLINIC AND COMMERCIAL DOG KENNEL, AND WHICH HAS OUTDOOR DOG RUNS AND EXERCISE AREAS, WHICH ALONG OTHER THINGS COULD GENERATE NOISE. EACH OWNER ACKNOWLEDGES AND AGREES THAT THE USES OF THE CLINT MOORE ANIMAL HOSPITAL PREDATE THE DEVELOPMENT OF THE PROJECT AND THAT IN ACQUIRING THE RESPECTIVE LOT, BUYER HAS HAD AN OPPORTUNITY TO INSPECT THE CONDITIONS PRESENTED BY THE USES OF THE CLINT MOORE ANIMAL HOSPITAL AND KNOWINGLY AND VOLUNTARILY ACKNOWLEDGES AND ACCEPTS SUCH CONDITIONS, AND WAIVES, RELEASES, INDEMNIFIES AND HOLDS HARMLESS THE DEVELOPER, SELLER AND THE ASSOCIATION FROM ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, COSTS AND EXPENSES, INCLUDING BUT NOT LIMITED TO REASONABLE ATTORNEYS' FEES AND COSTS ARISING FROM OR RELATED TO SUCH CONDITIONS.

PORTIONS OF THE PROJECT ARE IMMEDIATELY ADJACENT AND NEAR CERTAIN AGRICULTURAL FACILITIES AND A FACING PLANT. THE ACTIVITIES OF THESE FACILITIES, AMONG OTHER THINGS MAY GENERATE NOISE, ODORS AND TRUCK TRAFFIC. OWNER ACKNOWLEDGES AND AGREES THAT THESE USES PREDATE THE PROJECT AND THAT, IN ACQUIRING ITS LOT, BUYER HAS HAD AN OPPORTUNITY TO INSPECT THE CONDITIONS PRESENTED THEREBY AND KNOWINGLY AND VOLUNTARILY ACKNOWLEDGES AND ACCEPTS SUCH CONDITIONS, AND WAIVES, RELEASES, INDEMNIFIES AND HOLDS HARMLESS THE DEVELOPER, SELLER, AND THE ASSOCIATION FROM ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, COSTS AND EXPENSES, INCLUDING BUT NOT LIMITED TO REASONABLE ATTORNEYS' FEES AND COSTS ARISING FROM OR RELATED TO SUCH CONDITIONS.

BUYER:

Kevin Rosen

Stacey Rosen

Date:

ROSEN 0383

KROSEN -000023

F:\Agent\Oaks\Add Bk G-1 Rosen

ADDENDUM "1"

TO THE AGREEMENT FOR SALE AND PURCHASE BY AND BETWEEN AT BANESS-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., (SELLER) AND KEVIN ROSEN AND STACEY ROSEN, HIS WIFE, (BUYER) FOR THE SALE AND PURCHASE OF LOT 20, G-1, THE OAKS AT BOCA RATON

IT IS HEREBY MUTUALLY AGREED UPON AS FOLLOWS:

1. Paragraph 4 of the above referenced Contract is hereby modified to provide that the Buyer may determine the orientation of the house on the lot and may portions same subject to all existing setbacks and governmental regulations including, but not limited to, municipal regulations affecting use of the property. In the event that any governmental or municipal agency requires the home to be oriented differently than shown on Exhibit "A", the Buyer shall be entitled to cancel this contract and receive a full refund.

2. Paragraph 7 of the above referenced Contract is hereby modified to provide that Seller estimates that a Certificate of Occupancy for the subject residence will be obtained within twelve months from the date of issuance of the building permit.

3. At closing Seller will provide to Buyer proof of the cost to be reimbursed by Buyer pursuant to paragraph 12(G) of the above referenced Contract, (water and sewer tap-in fee).

4. Buyer represents to Seller that Stacey Rosen (joint purchaser with her husband, Kevin Rosen) is a duly licensed and registered real estate broker in the State of Florida and that other than Seller's in house real estate brokerage company, is the only other real estate broker involved in this transaction. Seller agrees that in reliance of the foregoing Seller shall at closing cause to be issued to Buyer a credit in the amount of three (3%) percent of the Contract purchase price ($31,500) provided that at least thirty (30) days prior to closing Stacey Rosen delivers to Seller on her firm's stationary a letter indicating that she as real estate broker has agreed to waive her three (3%) percent real estate commission and have same applied as a credit to the Buyer at closing. Simultaneously with delivery of such written notice Stacey Rosen must deliver a copy of her real estate brokerage license showing that she is a licensed real estate broker in good standing in the State of Florida. The aforesaid credit shall appear on the Closing Statement.

5. Paragraph 35 of the above referenced Contract is modified to provide that if prior to completion of construction (issuance of the Certificate of Occupancy) the home is damaged to such a degree that Seller elects not to rebuild same then, in such event, the Buyer shall be entitled to receive a complete refund of all deposits paid to Seller along with any other additional sums which

ROSEN 0384

may have been paid by Buyer to Seller for any change orders or upgrades.

6. Seller agrees that Seller will provide Buyer with thirty (30) days advance notice prior to scheduling the closing date.

7. In the event there exists a conflict between the terms and provisions of this Addendum "1" and the terms and provisions of the Agreement for Purchase and Sale, then the terms and provisions of this Addendum "1" shall control and prevail. Except as modified herein, all terms and provisions of the above referenced Contract for Sale and Purchase shall remain in full force and effect.

8. The Seller shall provide the Buyer a discount of 15% toward future options, upgrades and subsequent work orders. This discount shall be indicated on each work order.

SELLER:
ALBANESE-POPKIN THE OAKS
DEVELOPMENT GROUP, L.P.
A Florida limited partnership

By: Albanese-Popkin Development Group, LLC
a Florida limited liability Company, General Partner

By: _____
Leonard A. Albanese
Manager

Date: 11-12-04

BUYER: _____
Karen Rosen

Date: 1-12-04

Sherry Rosen

ROSEN 0385

KROSEN -000025

# RESERVATION DEPOSIT AGREEMENT

THE OAKS AT BOCA RATON REALTY, INC. ("The Oaks") hereby acknowledges receipt of the sum of TEN THOUSAND DOLLARS (10,000) from _STACY + KEVIN ROSEN_
_5825 N.W. 42nd Wa___ _BocA llATon Fi. 33496_ (Purchaser) phone# ▉▉▉▉▉▉▉
This amount shall be held ... escrow as a Reservation Deposit for the purpose of reserving the following:

Lot # _30_    Published Home Price $ _990,000_
Village _OAKPOINTE_    _STATES_    Lot Premium    $ _90,000_
Mode_ Type _SAN M/_    _o_    Total    $ _1,080,000_
Blo__

Th_ Reservation shall ex_ ... 12 noon, on _11/5_ ___,2004, "Expiration Date", after which it shall become n_ ...d void and of no further force or effect. The above referenced lot will then be made avail_ ...or sale to other third parties. Upon the Expiration Date, or upon the sooner _ _rmination of t_ ...greement, the Reservation Deposit shall be refunded in full to Purcha__ without intere_ ...vithin fourteen (14) business days. If prior to the Expiration Date, Purchas__ nters into a P_ ...ase and Sale Agreement ("Contract"), the deposit shall be transferred to and becom__ ...portion of the required down payment stated in the Contract, and this Agreement will be term__ ...d. PLEASE MAKE CHECKS PAYABLE TO: THE OAKS AT BOCA RATON REAL_ ...INC.

This Reservation Depos__ ...greement may be canceled by Purchaser at anytime, prior to the Expiration Date, upon d_ ...ry to The Oaks of Purchaser's written request to terminate. At any time during this agreem__ ...the purchaser may request the return of the deposit for any reason, and seller may likewise r_ ...rn the deposit for any reason.

The Oaks at Boca Raton Realty, Inc., reserves the right to take back up reservations for the subject Lot, which reservation shall be subject to the priority of this reservation and any agreed upon extension thereto.

The Purchaser acknowledges that the sales staff at The Oaks represents the builders, exclusively as builders agent as outlined in the attached agency disclosures.

Purchaser shall be provided Oaks at Boca Raton Property Owners' Association documents upon the execution of a contract agreement.

This Reservation Deposit Agreement is solely a receipt for funds and does not constitute an agreement in any respect to sell the lot to Purchaser. In no event shall Purchaser have any lien upon, interest in or contractual rights to the lot by virtue hereof, nor may any notice or memorandum be placed in the public records of any county.

Agreed and Accepted:

The Oaks Representative _ALAN GOLDBERG_

Purchaser X _____    Purchaser X _S. Ros___

Date X _10-23-04_

2/23/04

ROSEN 0386

KROSEN -000026

# THE OAKS AT BOCA RATON

## PURCHASE AND SALE AGREEMENT
## HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE

*IF* THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.601, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE ("CONTRACT"), THIS CONTRACT IS V     BLE BY PURCHASER BY DELIVERING     SELLER OR SELLER'S AGEN     ITTEN NOTICE OF THE PURCHASER'S     TENTION TO CANCEL WITHIN     EE (3) CALENDAR DAYS AFTER RECEI     OF THE DISCLOSURE SU     RY OR PRIOR TO CLOSING, WHICHEVI     OCCURS FIRST, ANY PUR     TED WAIVER OF THIS VOIDABILITY RIC     T HAS NO EFFECT. PURCH     R'S RIGHT TO VOID THIS CONTRACT SH     LL TERMINATE AT     SING.

Purchaser should no     ecute a Contract until Purchaser has received      l read this disclosure.

Disclo    re Summary for The Oaks at Boca Raton ("Community"):

1.      s a purchaser of property in this community, you will be obli     ed to be a
     m mber of a homeowners' association ("Association").

2.      Th re are recorded restrictive covenants ("Covenants") govern     ; the use and
     oc upancy of all properties in this community.

3.     You will be obligated to pay assessments to the Association.      sessments may be
     subject to periodic change. The 2004 obligation is $422.91* p     month. There is
     an additional obligation of $133.00 per month at the Enclave a     the Enclave
     East, and an additional obligation of $15.00 per month at the Grand Estates. You
     will also be obligated to pay any special assessments imposed by the Association.
     Currently, th     e are no special assessments.

4.     You may be     ligated to pay special assessments to the respective municipality,
     county or spe     al district. All assessments are subject to periodic change.

5.     Your failure to pay special assessments or assessments levied by a mandatory
     homeowners' association could result in a lien on your property.

6.     There is no obligation to pay rent or land use fees for recreational or other
     commonly used facilities as an obligation of membership in the Association
     except for as part of fees set forth in paragraph 3 above.

7.     The developer may have the right to amend the restrictive covenants without the
     approval of the Association's membership or, approval of the parcel owners.

8.     The statements contained in this disclosure form are only summary in nature, and
     as a prospective purchaser, you should refer to the Covenants and the
     Associations' governing documents before purchasing property.

9.     These documents are matters of public record and can be obtained from the record
     office in the county where the property is located.

Purchaser acknowledges that this Homeowner's Association/Community
Disclosure was provided to Purchaser prior to executing the Contract.

Purchaser: X _____     Date: X  10-23-4

Purchaser: X _____     Date: X  10-23.04

* Based on 469 residences                                          10/01/04

ROSEN 0387

KROSEN -000027



ROSEN 0388

KROSEN -000028

THE OAKS PLAZA REAL (1-0)
Agreement for Purchase and Sale

In this Agreement, the word BUYER refers to buyer or buyers who have signed the Agreement. The word SELLER means or refers to **ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P.**, a Florida limited partnership, whose address is 1200 S. Rogers Circle, Suite 11, Boca Raton, Florida 33487.

If the first letter of the word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or in the Community Documents (as defined in Paragraph 14, of this Agreement).

Buyer(s): ____KEVIN ROSEN and STACEY ROSEN, His Wife____

Address: ____5825 N.W. 42nd Way   101 PLAZA REAL APT #313____
City: ____Boca Raton____   County: ____Palm Beach____

State: ____FL____   Zip Code: ____33496   33432____

Home Phone: [redacted]   Cell Phone: [redacted]   Fax Phone: ( )

E-Mail Address:____
Social Security Number(s): ____

Estimated Completion Date of Home (See Paragraph 7): Approximately 14 mos from date of execution___

On-Site Salesperson: ____Alan Goldberg____

Cooperating Broker (See Paragraph 16-If not filled in, there is none): Stacey Rosen, Hollywood Atlantic Realty - 954-240-6256

1. **PURCHASE AND SALE.** Seller agrees to sell to, and Buyer agrees to purchase from Seller, the single family dwelling ("Home") and the "Lot" on which it is situated, as hereinafter described, for the price and on the terms and conditions now about to be set forth:

Lot #: ____30____ Block ____G-1____ Model: ____Monte Verde____   Garage Orientation: As per Plan

A. DESCRIPTION OF HOME AND PARCEL

Buyer agrees to buy the Home constructed or to be constructed on Lot 30, Block G-1, ("Property") of The Oaks at Boca Raton, Plat Three, according to the Plat recorded in Plat Book ____, Page____, Public Records of Palm Beach County, Florida, (the "Community"), together with the rights and subject to the obligations applicable thereto as set forth in the Community Documents (hereinafter defined).

| | | |
|---|---|---|
| The "Total Purchase Price" for the Property is: | $ | 1,050,000.00 |
| Base Price: | $ | N/A |
| Options & Extras: | $ | N/A |
| Total Purchase Price: | $ | 1,050,000.00 |

BUYER HEREBY SELECTS PAYMENT OPTION 1 _____ OR PAYMENT OPTION 2 ____X____ BELOW: (CHECK ONE)

PAYMENT OPTION 1:

| | | |
|---|---|---|
| A. Payment upon execution of Agreement | (10% of Total Purchase Price) | $ _____ |
| B. Submission of application for building permit | (10% of Total Purchase Price) | $ _____ |
| C. Completion of first floor slab | (10% of Total Purchase Price) | $ _____ |
| D. First floor tie beam poured | (10% of Total Purchase Price) | $ _____ |
| E. Roof trusses and interior framing | (15% of Total Purchase Price) | $ _____ |
| F. Rough electric, plumbing A/C duct, roof dry-in | (15% of Total Purchase Price) | $ ____ |
| G. Roof Complete; stucco finish coat applied; windows installed | (10% of Total Purchase Price) | **ROSEN 0344**<br>$ _____ |
| H. Cabinets and trim installed | (10% of Total Purchase Price) | $ _____ |
| I. Balance due at Closing | (10% of Total Purchase Price) | $ _____ |
| J. Total Purchase Price | | $ _____ |

KROSEN -000029

**PAYMENT OPTION 2:**

| | | | |
|---|---|---|---|
| A. Payment upon execution of Agreement | (10% of Total Purchase Price) | $ | 105,000.00 |
| B. Submission of application for building permit | (10% of Total Purchase Price) | $ | 105,000.00 |
| C. Balance of Total Purchase Price due at closing | (80% of Total Purchase Price) | $ | 840,000.00 |
| D. Carrying charge due at closing | (2% of Total Purchase Price) | $ | 21,000.00 |
| E. Total balance due at closing (line C plus line D): | | $ | 861,000.00 |

Buyer shall make each payment in full and in clear U.S. funds, within five (5) banking days from the date of Seller's request, time being of the essence for all such payments. If Buyer fails to tender the payment as required by this paragraph, then Buyer shall be deemed to be in default of this Agreement and Seller may pursue any and all remedies Seller may have under this Agreement. If Seller elects to accept any such payment at a later date, Buyer shall pay to Seller, together with the additional deposit, a sum equal to interest at the highest lawful rate on the amount of the additional deposit from the date such payment was due to Seller to the date such payment was made to Seller.

All deposits and draw payments shall be made in cash or by check subject to collection. Seller reserves the right to increase the Purchase Price by 1% per month if construction of the improvements is not commenced within sixty (60) days after the effective date of this Agreement due to delay created or caused by Buyer.

Except where Buyer has selected Payment Option 1, Seller may borrow construction money from a lender to construct the improvements on the Property. Buyer agrees that any lender advancing construction funds will have a first mortgage on the Property until Closing. At that time, Seller may use all the closing proceeds to release the Property from the lien of the construction mortgage. This Agreement and the deposits will not give Buyer any lien or claim against the Property and the Buyer's rights hereunder will be subordinate to those of any lender holding a mortgage, whether or not such a mortgage secures the advancement of construction funds, even if such mortgage is placed on the Property after the date of this Agreement.

**BUYER ALSO AGREES TO PAY ALL OTHER SUMS REQUIRED TO BE PAID BY BUYER IN THIS AGREEMENT.**

The balance due at closing must be paid by cashier's check or wire transfer of funds cleared the United States Treasury, only. All payments must be made in U.S. Funds and all cashier's checks must be payable on a bank located in Palm Beach, Broward or Dade County, Florida, U.S.A.

2. **TITLE EVIDENCE**. Simultaneously with the Closing Notice provided for in Paragraph 10, Seller shall deliver to Buyer a title insurance commitment issued by a Florida licensed title insurer agreeing to issue to Buyer, upon recording of the deed, an owner's policy of title insurance (ALTA Form B) in the amount of the Total Purchase Price, insuring Buyer's title to the Property, subject only to the following permitted exceptions ("Permitted Exceptions").

    A.    Liability for all taxes affecting the Property starting the year Buyer receives title and continuing thereafter.

    B.    All laws and all restrictions, covenants, conditions, limitations, agreements, reservations and easements recorded in the Public Records of Palm Beach County, or otherwise established with respect to the Property; for example, zoning restrictions, property use limitations and obligations, easements (right-of-way), plat restrictions, agreements relating to telephone lines, water and sewer lines and other utilities, provided however, none of the foregoing shall render title unmarketable or prohibit use of the Property for residential purposes.

    C.    The restrictions, covenants, conditions, easements, terms and other provisions imposed by the documents contained or referred to in the Community Documents, as described in Paragraph 15 (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which are recorded by Seller now or at any time after the date of this Agreement in the Public Records of Palm Beach County, Florida, and as amendments to any of such documents.

    D.    Pending governmental liens for public improvements as of closing.

    E.    Any state of facts which any accurate survey of the Property would show.

ROSEN 0345

KROSEN -000030

F.  Perpetual easement for encroachments now or hereinafter existing caused by the settlement or movement of improvements or caused by minor inaccuracies in building or rebuilding.

G.  Buyer's mortgage, if any.

H.  All standard printed exceptions contained in an ALTA Owner's title insurance policy customarily issued in Palm Beach County, Florida. Provided however, upon delivery by Seller of customary affidavits and delivery of a survey at closing, exceptions relating to parties in possession, mechanic's liens, the "gap" and the survey will be deleted at closing. Notwithstanding the foregoing, Buyer acknowledges that certain minor encroachments are routinely disclosed on a survey (such as an encroachment of a driveway over a utility easement) and Buyer agrees to accept an exception for minor encroachments shown on a survey.

Buyer shall have five (5) days from the date of receiving the title insurance commitment to examine it. If Buyer finds title unmarketable, Buyer shall, within five (5) days of receiving the title insurance commitment, notify Seller in writing specifying details. If defects render title unmarketable, Seller shall have one hundred twenty (120) days from receipt of notice within which to remove defects, failing which, Buyer shall have the option of (i) either accepting the title as it then is or (ii) demanding a refund of the deposit(s) and monies paid for options and upgrades which shall immediately be returned to Buyer; whereupon Buyer and Seller shall be deemed to have released one another of all further obligations under this Agreement. Seller will use reasonable efforts to remove title defects, but shall not be obligated to institute suit nor expend any sums in excess of three percent (3%) of the Total Purchase Price. For purposes of this Agreement, title is defective only if matters are revealed which are not disclosed by or approved in this Agreement.

Unless Seller receives written notice from Buyer within five (5) days after the Effective Date of the Agreement or five (5) days prior to closing, whichever occurs first, Seller will direct the title agent and insurer referred to above to issue the title insurance commitment referred to above and a title insurance policy after Closing. In the event Buyer timely delivers such notice, (i) Seller shall have no obligation to deliver or cause to be delivered to Buyer a title insurance commitment and title insurance policy; (ii) Buyer shall be responsible for obtaining and delivering a title commitment to Seller a minimum of five (5) days prior to Closing (if Buyer shall be deemed to waive Buyer's right to make title and title related objections and Buyer shall be deemed to accept title subject to the Permitted Exceptions and all other matters affecting title); (iii) Buyer shall be responsible to directly pay all costs and fees arising from or related to the title commitment, title policy and the Closing of the transaction described herein; (iv) Seller shall have no obligation to provide Buyer with any prior owner's title insurance policy, base title, certificates of good standing, corporate resolution of Seller, estoppel letters, etc; and (v) Buyer shall be responsible for all costs and expenses (including a Delayed Closing Charge) if Closing is delayed as a result of the foregoing.

3.  **DEPOSITS**. SELLER HEREBY PROVIDES TO THE BUYER THE RIGHT TO HAVE DEPOSIT FUNDS (UP TO 1 PERCENT OF THE PURCHASE PRICE) IN AN INTEREST BEARING ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED IN WRITING BY THE BUYER.

If Buyer elects to have the deposit funds in an escrow account, Buyer will be obligated to pay to the Seller at the time of closing an interest charge calculated pursuant to the formula set forth below:

Seller may borrow money in an amount equal to the funds held in escrow for construction purposes only, in which case any interest which the Seller pays on such a loan for a period not to exceed 12 months shall be paid by the Buyer at the time of closing, but the Buyer shall be credited for any interest accrued on the escrow account.

We have read the foregoing language and we agree that an escrow is:( ____ required); (_X__ waived) on 10% deposit of $105,000.00

4.  **CONSTRUCTION SPECIFICATIONS**. The Home will be constructed in substantial accordance with the plans and specifications kept in Seller's construction office ("Seller's Plans and Specifications"). Buyer acknowledges and agrees that it is a widely observed construction industry practice for plans and specifications for any home or building to be changed and **adjusted** from time to time in order to accommodate on-going "in the field" construction factors. **Buyer** further agrees that these changes and adjustments are essential in order to permit all components of the Home to be integrated into a well functioning and aesthetically pleasing product in an expeditious manner. Because of the foregoing, Buyer acknowledges that such changes may occur and agrees that it is reasonable and for Buyer's benefit to allow Seller the flexibility to make such changes in the Home provided that such changes do not materially or adversely affect the size or dimensions of the Home. The Home may be constructed on the

3

lot as a reverse of that shown on the plans, on any sales and promotional material or as the model may have been constructed.

Without limiting Seller's general right to make the changes referred to above, Buyer specifically agrees that changes in the location of utility (including, but not limited to electrical, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes may be made. Buyer further agrees that Seller may "site" the Home in a position that is different from that of the Model and the Seller's Plans and Specifications.

Buyer agrees that all Change Orders for construction modifications must be submitted to Seller and approved by Seller. Buyer understands and agrees that Seller will not be obligated to accept any Change Orders after application for building permit is submitted. Non-structural Change Orders, if any, accepted by Seller subsequent to commencement of construction shall be at Seller's sole and absolute discretion and with such Change Order, the Closing Date may be extended. Payment for all costs set forth on all Change Orders shall be made by Buyer to Seller at the time each Change Order is accepted by Seller. Seller shall not be obligated to undertake any change pursuant to a Change Order until Buyer has made payment in full to Seller for all items on the Change Order.

Buyer acknowledges that in the course of construction of any building or other improvements, certain changes, deviations or omissions may be desirable or required by governmental authorities or job conditions. Any changes, deviations or omissions required by job conditions or governmental authorities are hereby authorized by Buyer. Any costs or expenses resulting from any change, deviation, addition or omission required by governmental authorities, arising subsequent to the execution of this Agreement, shall be evidenced on a Change Order presented by the Seller to the Buyer, which shall be executed by the Buyer.

5. **MATERIALS AND COLOR SELECTIONS**. Buyer agrees and acknowledges that certain wall coverings, decorations and furnishing in any model displayed to Buyer are for display purposes only and are not included as part of this Agreement. Further, Buyer understands and agrees that certain other items (or where appropriate, upgraded versions of such items) which may be seen in the Model or in illustrations, are not included with the sale of the Buyer's Home. Buyer further understands and agrees that items of this nature will not be included in Buyer's Home unless specifically provided for in Seller's published list of standard items (if any) or in a Rider or Schedule to this Agreement signed by both Buyer and Seller.

If circumstances arise which warrant changes of suppliers, manufacturers, brand names or other items, Seller may substitute equipment, material, appliances, etc. which are of equal or better quality to that designated on Seller's Plans and Specifications. Buyer further understands and agrees that certain of the finishing items, such as tile, marble, carpet, cabinets, stone, brickwork, roof tile, pool finishes, wood, paint, stain and mica are subject to size and color variations, grain and quality variations, and may vary in accordance with availability and changes by manufacturers from those shown in the model, if any, or illustrations or brochures or those included in the specifications or as shown in Seller's construction office.

Buyer may select certain standard colors and/or materials in the Home. Buyer understands and agrees that Buyer must submit Buyer's selections to Seller in writing within ten (10) days of the date the list of selections is made available to Buyer. If these selections are not delivered to Seller in writing within the time period stated above then it is understood and agreed that these choices may be made by Seller in its discretion and be binding on Buyer. In that event, Seller's selections shall be binding upon Purchaser and shall not be a basis upon which Buyer may: (i) fail or refuse to close this transaction as scheduled; (ii) make any claim against Seller or (iii) fail or refuse to make any payment when due, in full.

6. **INSULATION**. Seller has advised Buyer by way of an Insulation Rider attached to this Agreement as required by the rules of the Federal Trade Commission that it currently intends to install in the Home the insulation disclosed in that Rider. The R-Value and other information shown in the Rider is based solely on the information given by the applicable manufacturers (based on the thicknesses listed) and Buyer agrees that Seller is not responsible for the manufacturers' errors. All of the insulation information is subject to Seller's general right, under Paragraph 4 of this Agreement, to make changes in Seller's Plans and Specifications, and to applicable limitations of Seller's liability to Buyer.

7. **COMPLETION DATE**. Seller estimates that the Home will be substantially completed on or about the date indicated on the first page of this Agreement. Buyer acknowledges and agrees, however, that this estimate is given to Buyer for convenience only and is subject to change from time to time for any reason and without creating any liability of Seller. Seller does, however, agree to substantially complete construction of the Home in the manner specified in this Agreement by a date no later than one

4

KROSEN -000032

(1) year and eleven (11) months from the date Buyer and Seller execute this Agreement, subject however, to delays caused by Buyer or acts of God, the unavailability of materials, strikes, other labor problems, governmental orders, or other events which would support a defense based upon impossibility of performance for reasons beyond Seller's control.

8. **SUBSTANTIAL COMPLETION**. Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that item will be understood to be complete when the same is substantially complete in Seller's reasonable opinion. Notwithstanding the foregoing, however, the Home will not be considered complete or substantially complete by Seller for purposes of this Agreement unless Seller has obtained a Certificate of Occupancy (or its equivalent) from the proper governmental authority.

9. **INSPECTION PRIOR TO CLOSING**. Except as provided herein, for reasons of safety and/or requirements under policies of insurance held by Seller, neither Buyer nor any agent of Buyer shall be permitted to enter the Lot or the Home until after Buyer has closed this Agreement and has taken possession of the Home, whereupon Buyer's rights shall be as set forth in the Community Documents. Buyer agrees to abide by such

restriction and not to enter upon or interfere in any way with the construction of the Home or communicate with any of Seller's contractors, subcontractors, suppliers or workmen or interfere with any other improvements of the Community.

Prior to Closing and upon notice from Seller, Buyer or Buyer's designated representative shall inspect the Home with Seller and together with Seller compile a Punch List specifying any outstanding work required to conform the Home to this Agreement. Buyer's failure to perform Buyer's obligations hereunder shall not delay, postpone, or otherwise interfere with the Closing. Seller shall have a reasonable period of time to complete all work required under the Punch List in a workmanlike manner. The fact that Seller has to complete the work set forth under the Punch List shall not delay, or postpone the Closing, or Buyer's obligation to close and pay the balance of the Purchase Price, or be grounds for a reduction of or credit against the Purchase Price or be grounds for placing a portion of the Purchase Price in escrow pending completion of such items. The provisions of this paragraph shall survive the Closing.

The Property constitutes a part of the Community which may result in the construction of additional improvements by Seller. The Seller is not obligated, however, for the construction or completion of any additional improvements of any other portion of the Community as a pre-condition to the obligation of Buyer to close after substantial completion of the Home by Seller.

10. **CLOSING DATE**. Buyer will be given at least ten (10) days notice of the time and place of Closing, which shall be in Palm Beach County, Florida, at a location designated by Seller ("Closing Notice"). Seller is authorized to postpone the Closing for any reason and Buyer will close on the new date, time and place Seller specifies in a Notice of Postponement (as long as at least three (3) days' notice of the new date, time and place are given). A change of time or place of Closing only (that is, one not involving a change of date) will not require any additional notice period. Any Notice of Closing, Postponement or Rescheduling must be given in writing. All of these notices to Buyer will be sent or directed to the address specified on the first page of this Agreement unless Seller has received written notice from Buyer of a change prior to the date the Closing Notice is given. These notices (other than a change of address) will be effective on the date mailed or placed in an express delivery system (i.e. Federal Express). An Affidavit of one of Seller's employees or agents stating the Notice of Closing, Postponement or Rescheduling was mailed or placed with an express delivery system shall be presumed to establish that the Closing Notice was received.

If Seller agrees to a delay of Closing at the request of Buyer (which Seller is not obligated to do), Buyer will pay to Seller, at the Closing (or in advance if so required by Seller) a late closing charge equal to eighteen percent (18%) per annum on the Total Purchase Price for the Property, computed from the originally scheduled Closing Date through the actual Closing Date.

IF BUYER FAILS TO CLOSE AS REQUIRED BY THIS PARAGRAPH, BUYER WILL BE IN DEFAULT OF THIS AGREEMENT.

11. **CLOSING DOCUMENTS**. At Closing, Buyer will receive (i) a Special Warranty Deed to the Property, (ii) Seller's form of Owner's (No Lien) Affidavit, (iii) a copy of the Certificate of Occupancy or equivalent from the governmental agency having jurisdiction over the Home, and (iv) the *FIRPTA* Affidavit (collectively the "Closing Documents"). The Special Warranty Deed will be subject to (that is, contain exceptions for) all of the Permitted Exceptions described in Paragraph 2. When Buyer receives the Special Warranty Deed at Closing, Buyer will sign all papers reasonably necessary or appropriate to effectuate the intent of this Agreement.

5

KROSEN -000033

At the same time Buyer receives the Closing Documents, Buyer agrees to pay the balance of the Total Purchase Price and any additional amounts Buyer owes under this Agreement. Buyer will not be entitled to take possession of the Property until all funds have been received by Seller in accordance with this Agreement.

12.    **CLOSING COSTS.** Buyer understands that, in addition to the Total Purchase Price for the Property, Buyer must pay certain other fees or "closing costs" when Buyer accepts title at Closing. These include:

A.    A "closing charge" equal to one and one-half percent (1 ½%) of the Total Purchase Price (including charges for all options, extras, premiums now or hereafter contracted for) shall be paid to Seller. This charge will be used, in part, to pay for the cost of officially recording the deed, for documentary stamp taxes on the deed of conveyance and the premium on the owner's title insurance policy (all of which costs will be disbursed by Seller on behalf of Buyer). The foregoing one and one-half percent (1 ½%) closing charge is based on the assumption that documentary stamp taxes on the Special Warranty Deed will be, at Closing $.70/$100.00 and that the cost of title insurance will be based, at Closing, on the minimum rates promulgated by the Florida Insurance Commissioner in effect on the date of this Agreement. In the event of changes in either or both of the foregoing, appropriate additional charges (in case of increases) will be paid by Buyer at closing. In the event Buyer shall not wish to be furnished with an owner's title insurance policy by Seller, and Buyer so notifies the Seller in writing within seven (7) days of the date of execution of this Agreement, Buyer shall be credited at Closing with an amount equal to the minimum risk rate premium with full reissue credit for the owner's title insurance policy and Buyer shall be responsible for all title charges and title related charges including but not limited to title search fees, title examination fees and title closing fees. Seller shall have no obligation to provide Buyer with any prior owner's title insurance policy, base title, certificates of good standing, corporation resolution of Seller, estoppel letters, etc. should Buyer not wish to be furnished with an owner's title insurance policy by Seller.

B.    The sum of Three Hundred Seventy-five Dollars ($375.00) shall be paid to Seller by Buyer for a survey of the Property;

C.    The Property's prorata share of the assessments to The Oaks at Boca Raton Property Owners Association, Inc. (the "Association"), commencing the date of this Agreement;

D.    A contribution to the Capital Improvement Fund of the Association, equal to three (3) months of the Association's annual assessment for the Property. This contribution shall be collected and maintained in a separate account for the use and benefit of the Association. The Capital Improvement Fund of the Association shall be disbursed by the Board of Directors for the Association in accordance with the Association documents.

E.    A prepayment of the Association's assessment for the Property for the quarter immediately following the quarter in which closing occurs;

F.    Loan fees, loan closing costs and all other related sums, including but not limited to, interest, points, attorneys fees, recording fees, documentary stamps, intangible tax, credit report, abstracting, inspection fees and title insurance charged by Buyer's lender, if any;

G.    Reimbursement for water and sewer tap-in fee in the amount of $4,450.00.

H.    Any utility or similar deposits attributable to the Property;

I.    Any late closing charges provided for elsewhere in this Agreement; and

J.    Real estate taxes and property owners assessments shall be prorated as of the date of this Agreement.

13.    **DEFAULT.** If Buyer defaults under this Agreement (beyond the expiration of any notice period, if applicable), all Buyer's rights under this Agreement will end and Buyer authorizes Seller to keep all deposits made or agreed to be made and other pre-closing advance payments (including,

6

without limitation, those on options, extras, upgrades and the like) Buyer has then made and all interest which was earned on them, all as agreed and liquidated damages and not as a penalty. The parties acknowledge that the extent and amount of actual damages is uncertain and as such the amounts provided for above are agreed and liquidated damages.

If Seller defaults under this Agreement, Buyer will give Seller notice of it and if Seller has not commenced appropriate action to cure the default within ten (10) days after such notice is given, Buyer will have the choice of either (i) receiving a refund of all deposits and prepayments for options, extras, upgrades and the like actually paid under this Agreement; (ii) specifically enforcing this Agreement; or (iii) any other remedy available to Buyer in law or in equity. When Buyer elects one of the remedies available to Buyer, Buyer will be deemed to have waived the other one(s); provided that notwithstanding anything to the contrary contained herein, Buyer shall have whatever remedies, including specific performance and damages, in the event Seller fails to fulfill its obligations to deliver the Property within one (1) year and eleven (11) months as provided in Paragraph 7 of this Agreement.

14.    **ASSOCIATION; RECEIPT OF COMMUNITY DOCUMENTS.**  Upon taking title to the Property, Buyer shall automatically become a member of the Association described in the Community Documents (defined below). Buyer understands Buyer's membership will take effect at Closing. At that time, Buyer agrees to accept all liabilities and obligations of such membership.

Buyer acknowledges receipt from Seller, prior to Buyer's signing this Agreement, of copies of the following documents (the "Community Documents"):

    A.    Declaration of Covenants, Conditions and Restrictions for The Oaks at Boca Raton.

    B.    Articles of Incorporation and By-laws of the Association.

    C.    Rules and Regulations of the Association described in the Community Documents.

    D.    Operating Budget for the Association (which may be in estimated form).

Buyer acknowledges and agrees that the Community Documents permit The Oaks at Boca Raton Venture, L.P., developer of The Oaks at Boca Raton ("Developer"), or Seller, as the case may be, to make amendments to them and that any changes it makes prior to Closing (i) will not necessarily be delivered to Buyer (however, such amendments will be a part of the Public Records of the County) and (ii) will not affect Buyer's obligation to perform any or all of the duties under this Agreement, unless such changes have a material and adverse effect on the market value of the Property.

Buyer understands that the budget for the Association is not guaranteed. The budget is subject to change at any time and from time to time to reflect actual and projected expenditures. These changes may occur before or after Closing but will not affect any of Buyer's obligations under this Agreement (except as to resulting changes in Closing prorations). Buyer recognizes and agrees that Buyer's assessments may include expenses attributable to common areas which are not yet complete or usable by Buyer.

15.    **USE OF THE REMAINING PROPERTY.**  As long as Seller, Developer or other builders own property in the Community, Seller, Developer or such other builders may keep a sales center, offices and model homes in the Community (including on the common areas). Such persons' salespeople may show homes, erect advertising signs and do whatever else is necessary and helpful for sales, leasing or management. This use of such property must be reasonable, and cannot unreasonably interfere with Buyer's use and enjoyment of the Property and of the common areas.

In addition to the foregoing, Seller, Developer and other builders and their affiliates, contractors, subcontractors, licensees or designees may conduct such blasting, construction, excavation, repair and other activities in or around the Community as are deemed necessary or appropriate in the sole discretion of the party conducting such activities. Without limiting the generality of the foregoing, and as a material inducement to Seller to enter into this Agreement, Buyer acknowledges and agrees:

SELLER, DEVELOPER AND/OR THE OTHER PARTY DESCRIBED ABOVE WILL BE CONDUCTING EXCAVATION, CONSTRUCTION AND OTHER ACTIVITIES WITHIN OR AROUND THE COMMUNITY, BOTH BEFORE AND AFTER BUYER CLOSES UNDER THIS AGREEMENT. BUYER RECOGNIZES THEIR RIGHTS TO DO SO AND WILL NOT (i)DEEM ANY OF THESE ACTIVITIES TO BE NUISANCES OR NOXIOUS OR OFFENSIVE ACTIVITIES, (ii) ENTER, OR ALLOW ANY OTHERS UNDER BUYER'S CONTROL TO ENTER ANY AREAS WHERE SUCH ACTIVITIES ARE BEING CONDUCTED (EVEN WHEN THEY HAVE TEMPORARILY CEASED, SUCH AS DURING NON-WORKING HOURS) AND (iii) HOLD SELLER OR DEVELOPER LIABLE OR SUE SELLER OR DEVELOPER FOR ANY DAMAGE OR INJURY ARISING FROM OR CONNECTED WITH ANY OF THE ACTIVITIES DESCRIBED ABOVE.

7

The provisions of this paragraph will not limit the generality or effect of any similar provisions in any of the Community Documents and, without limiting the generality of paragraph 27 of this Agreement, will continue to be effective after (survive) Closing.

The provisions of this Paragraph 15 will survive Closing.

16.    **SALES COMMISSIONS**. Seller shall pay the cooperating broker, if any, named on the first page of this Agreement. By signing this Agreement, Buyer is representing and warranting to Seller that Buyer has not consulted or dealt with any other broker, salesperson, agent or finder and that Buyer will indemnify and hold Seller harmless for and from any such person or company claiming otherwise, including commissions, attorneys' fees and court costs.

The provisions of this Paragraph 16 shall survive Closing.

17.    **NOTICES**. Except for the provisions set forth in Paragraph 10, whenever Buyer or Seller is required to notify the other, the notice must be in writing addressed to the address set forth on page one of this Agreement and it must be sent by express mail, courier or certified mail, postage prepaid, with a return receipt requested.
A change of address notice is effective when it is received. All other written notices are effective on the day they are properly mailed or placed with an express courier, whether or not received.

18.    **TRANSFER OR ASSIGNMENT**. Buyer has no right to assign, sell or transfer his interest in this Agreement without Seller's prior written consent, which Seller may withhold in its own discretion. Buyer covenants and agrees that prior to closing, Buyer shall not: (a) list or advertise the Property for sale with any broker, in any multiple listing service, in any classified or other advertisement , or otherwise (including, without limitation, "by owner") , and/or (b) enter into any agreement (verbal or written) for an assignment of Agreement or the rights thereunder, or any agreement (verbal or written) for a transfer of title to the Property to any third party.

19.    **OTHERS BOUND BY THIS AGREEMENT**. This Agreement will bind Buyer's heirs and personal representatives. If Buyer is a corporation or other business entity, this Agreement will bind any successor corporation or entity. If Buyer has received permission to assign or transfer Buyer's interest in this Agreement, this Agreement will bind anyone receiving Buyer's interest.

20.    **PUBLIC RECORDS**. Buyer authorizes Seller to record the documents necessary to establish and operate the Community and the portion of it in which the Property is located, all other documents Seller deems necessary or appropriate, and all amendments and supplements to them in the Public Records of the County.

21.    **LITIGATION.** In any suit or other proceeding brought by either Buyer or Seller, the prevailing party will be entitled to recover reasonable attorneys' fees, reasonable costs and expenses actually incurred by the prevailing party in such suit or proceeding or in any appeal and Buyer and Seller agree that venue for such litigation shall be in Palm Beach County, Florida.

22.    **FLORIDA LAW**. This Agreement will be governed by the laws of the State of Florida.

23.    **TIME OF THE ESSENCE**. The performance of all obligations on the precise times stated in this Agreement is of absolute importance and failure to perform any of them on time is a default, time being of the essence.

24.    **RECORDING**. Neither this Agreement, nor any notice or memorandum hereof may be recorded among the Public Records and such recording shall constitute a default under this Agreement by the recording party.

25.    **COMMUNITY**. The developer of the Community is The Oaks at Boca Raton Venture, L.P. Buyer acknowledges and agrees that Seller has not made any representations, warranties or guarantees whatsoever in connection with this Agreement, as to the design, construction, completion, use, benefits or value of the Community of which the Property is a part. Buyer is purchasing the Property from Seller and regardless of any direct or indirect benefits which the **Seller** may receive from having Buyer purchase property in the Community, Buyer has not (and will not have) paid or given any consideration to Seller for any such representation, warranty or guaranty and Buyer has neither received nor relied on any such representation, warranty or guaranty from Seller as to the design, construction, completion, use, benefits or value of the Community.

8

ROSEN 0351
KROSEN -000036

26. **RETURN OF COMMUNITY DOCUMENTS**. If this Agreement is cancelled for any reason, Buyer will return to Seller all of the Community Documents Seller has delivered to Buyer in the same condition Buyer received them, reasonable wear and tear excepted. If Buyer fails to return them, Buyer will pay Seller $50.00 (which may be withheld from Buyer's deposits if Buyer is then entitled to a refund) to defray Seller's cost of preparation, printing and delivery.

27. **SURVIVAL**. The provisions and disclaimers in this Agreement which are intended to have effect after Closing (but only those provisions and disclaimers) will continue to be effective after (survive) Closing and delivery of the deed.

28. **INDUCEMENT**. Buyer acknowledges that the primary inducement for Buyer to purchase under this Agreement is the Property itself and not the Common Areas of the Community or any other part of it. Buyer also acknowledges that he was not induced to purchase the Property or sign this Agreement by any oral statement or oral representation made by Seller or Seller's agents.

29. **RADON GAS**. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit. Buyer acknowledges that Seller has made no geological or environmental test or surveys of the Community. Seller makes no representations or warranty concerning geological or environmental matters including, but not limited to, radon gas. Seller specifically excludes such geological or environmental matters from any warranties given under this Agreement. If Buyer requires more information concerning this potential risk, additional information may be obtained from the U.S. Environmental Protection Agency and state and local authorities.

30. **RECEIPT OF DISCLOSURES**. Seller and the salesperson hereby disclose to Buyer that it is acting as the Real Estate Broker-Salesperson or Salesperson with respect to the purchase of the Property solely on behalf of Seller as an agent. Accordingly, it undertakes no duty of disclosure, representation or otherwise to Buyer in this transaction. This disclosure is given in accordance with Section 475.25(I)(q), Florida Statutes and Rule 21V-10.033, Florida Administrative Code. Buyer acknowledges receipt of this disclosure, the disclosure summaries for the Community, the Agency Disclosure and Notice of the Closing Expenses prior to signing this Agreement.

31. **WATER LEVELS**. Buyer acknowledges that all lakes and canals (singularly, referred to as "Lake Area" and collectively referred to as "Lake Areas") within the Community are designed as water management areas and are not designed as aesthetic features. Permits from various regulatory agencies govern the control of water levels. Due to varying climatic conditions, environmental conditions of water use requirements, including, without limitation, fluctuations in ground water elevations, priorities established by governmental authorities, and other causes out of the control of Developer, Seller and the Association, the water levels in the Lake Areas, depending on conditions, will rise and fall as often as daily and on occasion the water level may decline significantly and result in changes to the appearance of the Lake Areas. These water level fluctuations and changes in the appearance of the Lake Areas are considered normal occurrences. Buyer further understands and acknowledges that neither the Developer, Seller, nor the Association, have control over such water level fluctuation nor associated impacts to plant growth in the Lake Areas. Therefore, Buyer agrees to release and hold harmless Developer, Seller and the Association from and against any and all claims, demands, damages, costs and expenses of whatever nature or kind, including attorneys' fees and costs, arising from or relating in any manner to the Lake Areas, including, without limitation, water level fluctuations, permitting, construction and maintenance thereof. Buyer shall not alter, modify, expand, or fill any Lake Area without the prior written approval of the Developer, Seller, the U.S. Army Corps of Engineers, and such other local, state and federal authorities as may have relevant jurisdiction over such matters.

The provisions of this paragraph 31 shall survive closing and delivery of the deed to Buyer.

32. **SUBORDINATION**. Buyer acknowledges and agrees that all his rights hereunder are subordinate to the lien of any mortgage which now or shall hereafter encumber the subject property prior to Closing and to all amendments, modifications, renewals, consolidations and extensions thereof, and all voluntary and involuntary future advances made thereunder. However, Seller agrees to cause any such mortgage to be discharged of record at the time of Closing.

33. **SEVERABILITY**. Should any part, clause, provision or condition of this Agreement be held by a court of competent jurisdiction to be void, invalid or inoperative, including *but not* limited to compliance with 15 U.S.C. 1702(a)(2) of the Interstate Land Sales Full Disclosure Act ("Act"), the parties agree that such invalidity shall not effect any other part, clause, provision or condition hereof, and that the remainder of this Agreement shall be effective as though such void part, clause, provision or condition

9

ROSEN 0352
KROSEN -000037

had not been contained herein. Additionally, if the interpretation of a provision of the Agreement or a condition within the Agreement could invalidate the Agreement pursuant to the Act, then this Agreement shall be modified accordingly so that the offending part, clause, provision or condition of the Agreement will either be deleted or modified so that the intent of the parties can be fulfilled and yet the offending provision is removed.

34.  **WAIVER OF JURY TRIAL.** Each party hereby knowingly, voluntarily, and intentionally waives the right to a trial by jury with respect to any litigation between the parties, including, but not limited to any and all cause or causes of action, defenses, counterclaims, crossclaims, third party claims, and intervenor's claims, whether now existing or hereafter arising and whether sounding in contract, tort, equity or otherwise, regardless of the cause or causes of action, defenses or counterclaims alleged or the relief sought by any party, and regardless of whether such causes or action, defenses or counterclaims alleged or the relief sought by any party, and regardless of whether such causes of action, defenses or counterclaims are based on, or arise out of, under or in connection with this agreement or its subject matter, out of any alleged conduct or course of conduct, dealing or course of dealing, statements (whether verbal or written), or otherwise. Any party hereto may file a copy of this agreement with any court as conclusive evidence of the consent of the parties hereto to the waiver of any right they may have to trial by jury.

35. **DAMAGE BEFORE COMPLETION.** If between the date of this Agreement and the Closing, the Property is damaged by fire or other casualty, the following shall apply:

A. Risk of loss to the improvements by fire or other casualty until the Closing is assumed by Seller. Seller shall have no obligation to repair or replace the improvements; provided, however, if Seller elects to repair or replace such loss or damage to the improvements, this Agreement shall continue in full force and effect and Buyer shall not have the right to reject title or receive a credit against or abatement in the Purchase Price. In such event Seller shall be entitled to a reasonable period of time within which to complete repairs or replacement. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss or damage shall belong entirely to Seller.

B. If Seller notifies Buyer that it does not elect to repair or replace any such loss or damage, then this Agreement shall be deemed cancelled and of no further force or effect, and Seller shall refund to Buyer all deposits made hereunder, whereupon the parties shall be released and discharged of all claims and obligations hereunder, except that if Buyer is then otherwise in default under this Agreement, Seller shall retain all such deposits as liquidated damages.

36.  **LITTORAL ZONES/AQUATIC LAKE PLANTINGS.** In addition to the foregoing, the Buyer hereby stipulates and agrees that any and all conservation areas required by governmental authority to be located within the Community shall be dedicated as Common Areas and shall be the perpetual responsibility of the Association and may in no way be altered from the natural or permitted state. Activities prohibited within any and all conservation areas which may be required to be located within the Community; including, but are not limited to, construction or placing of buildings on or above the ground; dumping or placing of soil or other substances such as trash; removal or destruction of trees, shrubs or other vegetation (with the exception of "exotic" and/or "nuisance" vegetation removal); excavation; dredging or removal of soil material; diking or fencing and any other activities detrimental to drainage, flood control, water conservation, erosion control or fish and wildlife habitat conservation or preservation.

Furthermore, the Palm Beach County Department of Environmental Resource Management ("DERM") requires littoral zone lake plantings to be installed and maintained in certain areas in the Community. These plantings may not be disturbed, trimmed or removed by any other persons other than the Association who must first receive approval from DERM. The ongoing maintenance, cost and perpetual obligation of such plantings shall remain the responsibility of the Association after the Developer's representatives resign from the Board of Directors. Any Member(s) of the Association or Buyer who damages the referenced plantings shall be solely responsible for the cost or repairing same, as well as any fines, costs, or other charges imposed by DERM or any other agency or governmental entity arising from such damage. All Buyers shall be deemed to have acknowledged and agreed that views of, including but not limited to, any lakes or other bodies of water in or outside of the Community may be altered by the presence of such plantings.

All work pursuant to this Section and all expenses incurred or allocated to the Association pursuant to the Community Documents shall be paid for by the Association through assessments (either general or special) imposed in accordance herewith.

The provisions of Paragraph 36 shall survive closing.

10

ROSEN 0363

KROSEN -000038

37.    **INTERLOCAL/SCHOOL AGREEMENT.** By receipt of a copy of the Community Documents and acceptance of a special warranty deed conveying a lot or lots to the respective Buyer, Buyer does hereby agree to join in and consent to any application, petition or agreement involving an interlocal/school agreement supported by Seller and which will benefit the Community in Seller's sole and reasonable discretion. Buyer additionally acknowledges that school boundaries periodically change within Palm Beach County and Seller does not provide any warranty or guaranty to Buyer as to a child's attendance at a specific school for a specific period of time.

38.    ADDITIONAL LAND. Currently, the Developer of The Oaks at Boca Raton has submitted plans to the County to add the approximate 118 +/- acres property to the east of The Oaks [Additional Land] to the Community. If the Developer finalizes the approvals for this Additional Land, then the following, among other changes not yet determined, may at the Developer's option, occur: (i) the Additional Land will be added as part of the Community; (ii) the Community Documents will govern the Additional Land and the homes, common areas, and other improvements constructed thereon as part of the Community, (iii) the Rec facility and common areas serving the Community may be enlarged and/or modified with the homes in the Additional Land having the same use rights as the homes in the existing Community; and (iv) the current planned entrance on Clint Moore Road may be relocated further to the east.

39.    **WARRANTY; DISCLAIMER OF IMPLIED WARRANTIES**, Seller grants to Buyer a limited warranty, the form of which is available at Seller's office. Buyer acknowledges that at the time of execution of this Agreement, Seller has no reason to know of any particular purpose Buyer might have in purchasing the Home and items of personal property sold pursuant to this Agreement other than normal residential use. Buyer further acknowledges that normal swelling, expansions and contractions of materials and construction, and any cracks appearing as a result thereof or as a result of settlement of, in, or on the Home shall not be deemed to be construction defects. Seller makes no other warranties with respect to the fitness, merchantability, habitability, intended use, workmanship, construction or physical condition of either the Home, any fixtures or items of personal property sold pursuant to this Agreement or any other real or personal property conveyed hereby.

This limited warranty is expressly in lieu of any other warranties express or implied, except for the limited warranty. Seller disclaims any and all implied warranties of merchantability and fitness as to the home, and all fixtures or items of personal property whatsoever conveyed hereby, whether arising from custom, usage of trade, course of dealing, case law or otherwise. Seller shall not be liable for any defects in the work performed by third party contractors not hired by Seller nor for any adverse impact to the Home, Property or Community caused thereby. Further, should Buyer elect to use a third party contractor that is a subcontractor of Seller, Buyer acknowledges that Seller makes no representations relative to the performance by such third party contractor. Seller will not be liable for damages or injury to any improvements Buyer makes to the Property, or the Buyer's personal property, or for any consequential damages including, but not limited to, inability to possess the Home, inconvenience, or loss of time, due to any defects.
The provisions of this Paragraph 39 will survive Closing.

40. **CASH TRANSACTION.** The transaction covered by this Agreement shall be on an all cash basis and shall not be subject to Buyer procuring financing.

41. **ENTIRE AGREEMENT.** This Agreement, together with the Addenda attached hereto, constitute the entire Agreement for Purchase and Sale of the Property and once the Agreement is signed, the Agreement can only be amended in writing. ANY CURRENT OR PRIOR AGREEMENT, REPRESENTATIONS, UNDERSTANDINGS AND ORAL STATEMENTS, INCLUDING BUT NOT LIMITED TO RENDERINGS OR REPRESENTATIONS CONTAINED IN SALES BROCHURES, ADVERTISING OR SALES MATERIALS AND ORAL STATEMENTS OF SALES REPRESENTATIVES, IF NOT EXPRESSED IN THIS AGREEMENT OR IN THE COMMUNITY DOCUMENTS, ARE VOID AND HAVE NO EFFECT. BUYER ACKNOWLEDGES AND AGREES THAT BUYER HAS NOT RELIED ON ANY SUCH ITEMS.

42. **SPECIAL CLAUSES.** The following attached Addenda are incorporated into and made a part of this Agreement:

                 Common Facilities Disclosure
                 Notice of Closing Costs
                 Homeowner Association **Disclosure Addendum**
                 Insulation Rider
                 Specifications Rider
                 Swimming Pool Disclosure
                 Zoning Conditions Disclosure
                 Other: Platting Addendum

11

ROSEN 0354

KROSEN -000039

BY SIGNING BELOW, BUYER AND SELLER AGREE TO BE BOUND BY ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT, INCLUDING THOSE PARAGRAPHS AS PRINTED ON THE REVERSE SIDES OF THE PAGES. BUYER IS ADVISED TO CAREFULLY REVIEW SUCH TERMS AND PROVISIONS AS WELL AS THE VARIOUS DISCLAIMERS APPEARING IN THIS AGREEMENT.

NOTE: BEFORE BUYER SIGNS THIS AGREEMENT, BUYER SHOULD READ IT AND THE COMMUNITY DOCUMENTS CAREFULLY AND IS FREE TO CONSULT AN ATTORNEY OF BUYER'S CHOICE.

Witnesses:                              SELLER:

                                        ALBANESE-POPKIN THE OAKS DEVELOPMENT
                                        GROUP, L.P., a Florida limited partnership, by
                                        ALBANESE-POPKIN DEVELOPMENT GROUP, LLC.,
                                        a Florida limited liability Company, General Partner

_____                 By:_____
                                             Leonard A. Albanese, Manager

_____                 Date:_____11-15-04_____

                                        BUYER:

_____                 _____
                                        Kevin Rosen

_____                 _____
                                        Stacey Rosen

                                        Date:____11-12-04_____

ROSEN 0355

KROSEN -000040

## COMMON FACILITIES DISCLOSURE

As required by Florida Law, the purchaser(s) of property in The Oaks of Boca Raton (the "Development") are advised that the following recreational or other facilities are available for use by the property owners in the Development.

A Community Building of approximately _____ 20,000 _____ square feet with swimming pool and tennis courts.

There will be charges for the use of the facilities listed above. The Declarant, the Association or other entity which owns and/or operates the facilities have the right to levy assessments which are used, in part, for the operation and upkeep of the facilities. Further, there may be other property (e.g., private roads, parks) in the Community and/or Development which is owned or operated by the Association.

By signing below, the purchaser(s) acknowledges receipt of this disclosure prior to the execution of a contract to purchase property in the Community and Development.

Purchaser: _____
            Kevin Rosen

Purchaser: _____
            Stacey Rosen

Date: _____ 11-12-04 _____

p:\wpdocs\facilitiesOaksatBocaRaton.wpd

13

ROSEN 0356

KROSEN -000041

## THE OAKS OF BOCA RATON
## NOTICE OF CLOSING EXPENSES

Pursuant to the rules promulgated by the Department of Legal Affairs, Buyer is hereby warned that upon Closing, additional costs may be required to be paid by the Buyer in the form of closing costs, which may include the following:

1.  The balance of the Purchase Price, plus any unpaid extras (i.e., Change Orders).

2.  Prorated portion of the current real property taxes, benefit taxes and assessments as of the date of this Agreement.

3.  A "closing charge" equal to one and one-half percent (1 ½ %) of the Purchase Price (including charges of all options, extras, premiums now or hereinafter contracted for) shall be paid to the Seller. This charge will be used, in part, to pay for the cost of officially recording the deed, for documentary stamp taxes on the deed of conveyance and the premium of the owner's title insurance policy.

4.  A prorated portion of the Associations assessments and a working capital contribution equal to three (3) months assessments for The Oaks at Boca Raton Property Owners Association, Inc.

5.  Buyer's own hazard and liability insurance.

6.  Attorney's fees for Buyer's attorney, if any.

7.  Default interest, delayed closing charges or penalties.

8.  A fee of $375.00 shall be paid to the Seller for a survey of the property.

In addition, if the Buyer obtains a mortgage, additional costs may be demanded from the Buyer by the lender.

c:\wpdocs\closingexp\OaksafBocaRaton

ROSEN 0357

KROSEN -000042

14

## THE OAKS AT BOCA RATON
## PURCHASE AND SALE AGREEMENT
## HOMEOWNER ASSOCIATION DISCLOSURE ADDENDUM

**THIS ADDENDUM** to The Oaks at Boca Raton Purchase and Sale Agreement (the "**Agreement**") made between Albanese-Popkin The Oaks Development Group, L.P., a Florida limited partnership, ("**Seller**"), and KEVIN ROSEN AND STACEY ROSEN, His Wife, ("**Buyer**"), for the purchase of the property located at (Lot 30, G-1), is hereby entered into and made a part of said Agreement as if fully set forth therein.

### WITNESSETH:

1.   In the event of any conflict between the terms and provisions of this Addendum and any terms and provisions of the Agreement, the terms and provisions of this Addendum shall control. Capitalized terms which are employed in this Addendum without definition but which are defined in the Agreement shall have the same meaning in this Addendum as in the Agreement.

2.   Association Memberships:

(A)   As a purchaser of property in this Community, you  X  will _____ will not be obligated to be a member of a Homeowners' Association ("Association").

(B)   There have been or will be recorded restrictive covenants (the "Covenants") governing the use and occupancy of properties in this Community.

(C)   You  X  will _____ will not be obligated to pay assessments to the Association. You  X  will _____ will not be obligated to pay Assessments to the respective municipality, county or special district. All Assessments are subject to periodic change.

(D)   Your failure to pay Special Assessments or Assessments levied by a Mandatory Homeowners' Association could result in a lien on your property.

(E)   There _____ is  X  is not an obligation to pay rent or land use fees for recreational or other commonly used facilities as an obligation of membership in the Homeowners' Association. (If such obligation exists, then the amount of the current obligation is $680.32 per quarter.)

(F)   The Covenants _____ can  X  cannot be amended without the approval of the Association Membership or, if no mandatory Association exists, parcel owners.

(G)   The Statements contained in this disclosure form are only summary in nature, and, as a Prospective Purchaser, you should refer to the Covenants and the Association Governing Documents before purchasing property.

(H)   These Documents are matters of Public Record and can be obtained from the Record Office in the County where the Property is located.

3.   Buyer acknowledges that this Homeowner Association Disclosure Addendum was provided to Buyer prior to Buyer's execution of the Agreement.

**BUYER:**

Kevin Rosen

Stacey Rosen

**SELLER:**

ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, by ALBANESE-POPKIN DEVELOPMENT GROUP, LLC., a Florida limited liability Company, General Partner

By:

Leonard A. Albanese, Manager

**DATE EXECUTED BY BUYER:**

_____ 1-12 , 2005

**DATE EXECUTED BY SELLER:**

_____ 11/15 , 2004

15

ROSEN 0358

KROSEN -000043

# INSULATION DISCLOSURE

Seller presently intends to install insulation in the Property as follows:

1. Material: __Fiberglass batts, foil-backed paper__

2. R-Value: __R-30  /  R-11    /  R-4.1__

3. Thickness: __9"  /    4"    /  N/A__
   Living   / O/S    / O/S

4. Location: __area ceilings/ frame walls / block walls__ (unless otherwise specified, insulation will not be installed in outside garage walls, garage ceilings or interior walls).

Pursuant to rules of the Federal Trade Commission, Seller reserves the right to change such insulation by delivering written notice of the changes to Purchaser.

Kevin Rosen

Stacey Rosen

Date of Execution: __1-12-04__

16

ROSEN 0359

KROSEN -000044

# THE OAKS AT BOCA RATON
## DISCLOSURE
### Residential Swimming Pool Safety Act

Chapter 515, Florida Statutes, effective October 1, 2000, sets forth certain pool safety feature and disclosure requirements regarding drowning prevention and pool ownership.

All new residential swimming pools, spas, and hot tubs must be equipped with at least one pool safety feature as specified in the chapter, designed to deny, delay or detect unsupervised entry to a swimming pool, spa, or hot tub, in order to reduce drowning and near-drowning incidents.

The State of Florida Department of Health shall be responsible for producing its own or adopting a nationally recognized publication that provides the public with information on drowning prevention and the responsibilities of pool ownership and also for developing its own or adopting a nationally recognized drowning prevention education program for the public and for persons violating the pool safety requirements of the chapter. As of the date hereof, no publication has been prepared or adopted.

## DEFINITIONS.

The term:

"Approved safety pool cover" means a manually or power-operated safety pool cover that meets all of the performance standards of the American Society for Testing and Materials (ASTM) in compliance with standard F1346-91.

"Barrier" means a fence, dwelling wall, or nondwelling wall, or any combination thereof, which completely surrounds the swimming pool and obstructs access to the swimming pool, especially access from the residence or from the yard outside the barrier.

"Exit alarm" means a device that makes audible, continuous alarm sounds when any door or window which permits access from the residence to any pool area that is without an intervening enclosure is opened or left ajar.

## RESIDENTIAL SWIMMING POOL SAFETY FEATURE OPTIONS AND PENALTIES.

In order to pass final inspection and receive a certificate of completion, a residential swimming pool must meet at least one of the following requirements relating to pool safety features:

(1)   The pool must be isolated from access to a home by an enclosure that meets the pool barrier requirements of s. 515.29;

(2)   The pool must be equipped with an approved safety pool cover;

(3)   All doors and windows providing direct access from the home to the pool must be equipped with an exit alarm that has a minimum sound pressure rating of 85 dB A at 10 feet; or

(4)   All doors providing direct access from the home to the pool must be equipped with a self-closing, self-latching device with a release mechanism placed no lower than 54 inches above the floor.

## RESIDENTIAL SWIMMING POOL BARRIER REQUIREMENTS.

A residential swimming pool barrier must have all of the following characteristics:

(1)   The barrier must be at least 4 feet high on the outside.

(2)   The barrier may not have any gaps, openings, indentations, protrusions, or structural

17

ROSEN 0360

KROSEN -000045

components that could allow a young child to crawl under, squeeze through, or climb over the barrier.

(3) The barrier must be placed around the perimeter of the pool and must be separate from any fence, wall, or other enclosure surrounding the yard unless the fence, wall, or other enclosure or portion thereof is situated on the perimeter of the pool, is being used as part of the barrier, and meets the barrier requirements of this section.

(4) The barrier must be placed sufficiently away from the water's edge to prevent a young child or medically frail elderly person who may have managed to penetrate the barrier from immediately falling into the water.

Gates that provide access to swimming pools must open outward away from the pool and be self-closing and equipped with a self-latching locking device, the release mechanism of which must be located on the pool side of the gate and so placed that it cannot be reached by a young child over the top or through any opening or gap. A wall of a dwelling may serve as part of the barrier if it does not contain any door or window that opens to provide access to the swimming pool.

Aa barrier may not be located in a way that allows any permanent structure, equipment, or similar object to be used for climbing the barrier.

## DROWNING PREVENTION EDUCATION PROGRAM; PUBLIC INFORMATION PUBLICATION.

The Department of Health shall develop a drowning prevention education program, which shall be made available to the public at the state and local levels and which shall be required as set forth in s. 515.27(2) for persons in violation of the pool safety requirements of this chapter. The Department may charge a fee, not to exceed $100, for attendance at such a program. The drowning prevention education program shall be funded using fee proceeds, state funds appropriated for such purpose, and grants. The Department, in lieu of developing its own program, may adopt a nationally recognized drowning prevention education program to be approved for use in local safety education programs.

The Department shall also produce, for distribution to the public at no charge, a publication that provides information on drowning prevention and the responsibilities of pool ownership. The Department, in lieu of developing is own publication, may adopt a nationally recognized drowning prevention and responsibilities of pool ownership publication.

c:\wpdocs\poolsafety.Oakszt Boc. aton.wpd

ROSEN 0361

KROSEN -000046

## THE OAKS AT BOCA RATON
## ZONING CONDITION DISCLOSURES

PORTIONS OF THE PROPERTY ARE IMMEDIATELY ADJACENT TO THE CLINT MOORE ANIMAL HOSPITAL, WHICH IS A VETERINARY CLINIC AND COMMERCIAL DOG KENNEL, AND WHICH HAS OUTDOOR DOG RUNS AND EXERCISE AREAS, WHICH AMONG OTHER THINGS COULD GENERATE NOISE. EACH OWNER ACKNOWLEDGES AND AGREES THAT THE USES OF THE CLINT MOORE ANIMAL HOSPITAL PREDATE THE DEVELOPMENT OF THE PROJECT AND THAT IN ACQUIRING THE RESPECTIVE LOT, BUYER HAS HAD AN OPPORTUNITY TO INSPECT THE CONDITIONS PRESENTED BY THE USES OF THE CLINT MOORE ANIMAL HOSPITAL AND KNOWINGLY AND VOLUNTARILY ACKNOWLEDGES AND ACCEPTS SUCH CONDITIONS, AND WAIVES, RELEASES, INDEMNIFIES AND HOLDS HARMLESS THE DEVELOPER, SELLER AND THE ASSOCIATION FROM ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, COSTS AND EXPENSES, INCLUDING BUT NOT LIMITED TO REASONABLE ATTORNEYS' FEES AND COSTS ARISING FROM OR RELATED TO SUCH CONDITIONS.

PORTIONS OF THE PROJECT ARE IMMEDIATELY ADJACENT AND NEAR CERTAIN AGRICULTURAL FACILITIES AND A PACKING PLANT, THE ACTIVITIES OF THESE FACILITIES, AMONG OTHER THINGS MAY GENERATE NOISE, ODORS AND TRUCK TRAFFIC. OWNER ACKNOWLEDGES AND AGREES THAT THESE USES PREDATE THE PROJECT AND THAT, IN ACQUIRING ITS LOT, BUYER HAS HAD AN OPPORTUNITY TO INSPECT THE CONDITIONS PRESENTED THEREBY AND KNOWINGLY AND VOLUNTARILY ACKNOWLEDGES AND ACCEPTS SUCH CONDITIONS, AND WAIVES, RELEASES, INDEMNIFIES AND HOLDS HARMLESS THE DEVELOPER, SELLER, AND THE ASSOCIATION FROM ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, COSTS AND EXPENSES, INCLUDING BUT NOT LIMITED TO REASONABLE ATTORNEYS' FEES AND COSTS ARISING FROM OR RELATED TO SUCH CONDITIONS.

BUYER: _____

Kevin Rosen _____

Stacey Rosen _____

Date: _1-12-04_ _____

c:\wpdocs\ zoningdis\Oaks at B       on.wpd

ROSEN 0362

KROSEN -000047

F:\Agree\Oaks\Add Lot 30, G-1 Rosen

<div align="center">

ADDENDUM "1"
TO THE AGREEMENT FOR SALE AND PURCHASE BY AND BETWEEN
ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., (SELLER) AND
KEVIN ROSEN AND STACEY ROSEN, HIS WIFE , (BUYER)
FOR THE SALE AND PURCHASE OF LOT 30, G-1, THE OAKS AT BOCA RATON

</div>

IT IS HEREBY MUTUALLY AGREED UPON AS FOLLOWS:

1.    Paragraph 4 of the above referenced Contract is hereby modified to provide that the Buyer may determine the orientation of the house on the lot and may position same subject to all existing setbacks and governmental regulations including, but not limited to, municipal regulations affecting use of the property. In the event that any governmental or municipal agency requires the home to be oriented differently than shown on Exhibit "A", the Buyer shall be entitled to cancel this contract and receive a full refund.

2.    Paragraph 7 of the above referenced Contract is hereby modified to provide that Seller estimates that a Certificate of Occupancy for the subject residence will be obtained within twelve months from the date of issuance of the building permit.

3.    At closing Seller will provide to Buyer proof of the cost to be reimbursed by Buyer pursuant to paragraph 12(G) of the above referenced Contract, (water and sewer tap-in fee).

4.    Buyer represents to Seller that Stacey Rosen (joint purchaser with her husband, Kevin Rosen) is a duly licensed and registered real estate broker in the State of Florida and that other than Seller's in house real estate brokerage company, is the only other real estate broker involved in this transaction. Seller agrees that in reliance of the foregoing Seller shall at closing cause to be issued to Buyer a credit in the amount of  three (3%) percent of the Contract purchase price ($31,500) provided that at least thirty (30) days prior to closing Stacey Rosen delivers to Seller on her firm's stationery a letter indicating that she as real estate broker has agreed to waive her three (3%) percent real estate commission and have same applied as a credit to the Buyer at closing. Simultaneously with delivery of such written notice Stacey Rosen must deliver a copy of her real estate brokerage license showing that she is a licensed real estate broker in good standing in the State of Florida. The aforesaid credit shall appear on the Closing Statement.

5.    Paragraph 35 of the above referenced Contract is modified to provide that if prior to completion of construction (issuance of the Certificate of Occupancy) the home is damaged to such a degree that Seller elects not to rebuild same then, in such event, the Buyer shall be entitled to receive a complete refund of all deposits paid to Seller along with any other additional sums which

ROSEN 0363

KROSEN -000048

may have been paid by Buyer to Seller for any change orders or upgrades.

6. Seller agrees that Seller will provide Buyer with thirty (30) days advance notice prior to scheduling the closing date.

7. In the event there exists a conflict between the terms and provisions of this Addendum "1" and the terms and provisions of the Agreement for Purchase and Sale, then the terms and provisions of this Addendum "1" shall control and prevail. Except as modified herein, all terms and provisions of the above referenced Contract for Sale and Purchase shall remain in full force and effect.

8. The Seller shall provide the Buyer a discount of 15% toward future options, upgrades and subsequent work orders. This discount shall be indicated on each work order.

SELLER:
ALBANESE-POPKIN THE OAKS
DEVELOPMENT GROUP, L.P.
A Florida limited partnership

By: Albanese-Popkin Development Group, LLC
a Florida limited liability Company, General Partner

By: _____
Leonard A. Albanese
Manager

Date: _11-12-04_

Date: _1-12-04_

BUYER:

_____
Kevin Rosen

_____
Stacey Rosen

2                    ROSEN 0364

KROSEN -000049

November 12, 2004

### PRELIMINARY CONSTRUCTION SPECIFICATIONS

**Lot# 30 G1 Rosen Residence**
THE MONTE VERDE
@
THE OAKS

**Two Story Residence:** 4 Bedrooms. 5 Full Baths plus 2 Half Baths, Foyer, Living room, Dining room, Family room, Kitchen, Breakfast room, Den, Utility room, Loft, two car garage and single car garage.

Total A/C Living Area      4,604 s.f.

#### FOUNDATION:

- Reinforced steel monolithic concrete slab with plastic moisture barrier.
- Interior bearing wall footings using 2500 PSI concrete.
- Termite treatment under slab.

#### EXTERIOR STRUCTURE:

- Structure meets hurricane requirements of Palm Beach County
- 2 story substantially masonry block construction.
- Reinforced masonry/concrete bond beams and columns utilizing 3000 PSI concrete.
- Engineered Southern Pine floor and roof trusses @ 24" on center.
- Spanish S Cement Tile Roof (Choice of standard color). 90# mineral surfaced, hot mopped membrane applied over 30# fiberglass felt, tin tagged to 5/8" CDX plywood sheathing.
- Galvanized metal at all flashings.
- Galvanized drip edge over 1" x 2" PT drip over 2" x 8" rough sawn Cedar.
- Light textured stucco on exterior walls w/ stucco soffits over wire lath.
- Raised stucco bands with smooth finish as per approved plans
- Stucco primed and painted with exterior grade latex paint with accent color on bands.
- One coat sealer and one coat exterior latex paint on exterior wood surfaces.

ROSEN 0339



STANDARD SPECIFICATIONS - The Oaks-Monte Verte
Page 2 of 5

11/12/04

## INTERIOR WALLS:

- Load bearing walls 2" x 6" wood studs @ 16" o.c., secured in accordance with code requirements to prevent uplift.
- Non-load bearing walls of 2" x 4" metal studs @ 24" o.c.
- 1" x 2" PT vertical furring strips @ 16" o.c. on concrete block walls.
- 1" x 4" PT window and door wraps on concrete block walls.
- 2" x 4" wood door bucks on all 8'0" swing type doors in metal stud wall openings.
- 1/2" sheetrock on walls and 5/8" sheetrock on ceilings.
- 1/2" moisture resistant wall board in all bath wet areas.
- One step coffer ceiling standard in Master Suite, Master Bath, Master Suite Vestibule, Powder room Vestibule
- Two step coffer ceiling in the Den/Guest Bedroom, Dining Room
- Box Beam coffer ceiling in Living room.
- Knockdown or Orange Peel finish on all walls and knockdown on ceilings.
- One (1) prime coat and one (1) finish coat of interior grade Flat latex paint on walls and ceilings. Choice of one (1) color.

## WINDOWS, DOORS and HARDWARE:

### *Note: Windows and Sliding Glass Doors will have direct mount steel storm panels to meet minimum hurricane requirements for Palm Beach County.

- PGT fixed windows. White or bronze aluminum frames with bronze tinted glass.
- PGT horizontal sliding windows. White or bronze aluminum frames, bronze tinted glass.
- PGT sliding glass doors. White or bronze aluminum frames, bronze tinted tempered glass.
- 8' solid core, paint grade wood (birch) front entrance doors. 1 ¾" thick, flush doors with applied moldings and heavy duty hinges.
- 8' solid core, paint grade garage to house door. 1 ¾" flush door w/ applied moldings.
- 8' solid core flush Masonite interior doors. 1 ¾" w/ applied moldings.
- Aluminum raised panel garage doors (non-insulated) with operator and opener.
- Choice of interior/exterior door hardware, see Builder's selection

## AIR CONDITIONING and INSULATION:

- Multi-Zone high efficiency Central Air Conditioning and electric heat strips
  - Equipment sized to meet loading and efficiency per code.
  - Programmable thermostats one per zone.
  - *Zoning efficiency and sizing of a/c system shall be per the mechanical engineer's calculations.*
- All walk-in closets air-conditioned.
- Exhaust venting in each bathroom.
- R-30 batt fiberglass ceiling insulation.
- R-11 fiberglass batt insulation in exterior wood framed walls
- R-4.1 foil insulation on all exterior concrete block walls.

ROSEN 0340

KROSEN -000051

STANDARD SPECIFICATIONS - The Oaks-Monte Verte
Page 3 of 5

11/12/04

## ELECTRICAL:

- Two (2) corner flood light outlets. Lights as per Builder's standard
- 300-400 Amp electrical service with circuit breaker panel, sized as needed.
- Copper wiring throughout.
- Decora series switches and receptacles (quantities and locations as required by code).
- Eight (8) paddle fan outlets. Fans by owner
- 74 Hi-Hat cans, includes standard bulb and white recessed trim with white or black baffle, $140 per each additional hi-hat.
- Four (4) exterior WP GFI receptacles.
- Two (2) stub outs for future landscape lighting. (See options for landscape lighting)
- Fluorescent lighting at garage and closets
- Exterior wall lighting as per Builder's selection and location.
- Interior decorative fixtures/fans supplied by owner
  One hour labor included for installation/bracing for each decorative fixture/fan.
- Pre-wiring for Six (6) category 5 telephones and Six (6) cable TV outlets.
- Eight (8) zone security system on all operable doors and windows includes two (2) control panels, motion detector, and door chime.
- Smoke detectors, as required by city code.
- Built in Central vacuum system including One (1) Nutone CV-450 main vacuum located in the garage. Standard five (5) piece cleaning kit with thirty feet (30')of hose.

## PLUMBING (All fixture quantities and layout per plan):

### MASTER BATHROOM: White or Biscuit

- Kohler #3384 San Raphael One Piece Water Closet with seat
- Polished brass water closet trip lever and supply kit
- Kohler #4854 San Tropez Bidet
- Kohler Revival #16132-4 polished brass Bidet Fitting and polished brass bidet supply kit
- Kohler #2210 under mount Caxton Lavs
- Kohler Revival #16102-4 polished brass Lav Faucets
- Kohler Revival #16115-4 polished brass Shower Fitting
- Biscuit shower drain cover and polished brass tub drain
- Kohler Revival #16119-4 polished brass deck mount Tub Faucet
- Jacuzzi Riva 6' Whirlpool tub with matching jets

### BATHROOMS: #3, #4, #5 and Guest - White

- Kohler #3422 Wellworth Two Piece Water Closet with seat
- Kohler #2905-4 Farmington drop-in Lav
- Kohler #12182 Fairfax chrome Lav Faucet
- Kohler #KT12014-4 Fairfax chrome pressure balance shower or Tub/Shower Fitting
- Polished chrome tub or shower drain cover
- Villager #K715/6 Tub (where applicable)

ROSEN 0341

STANDARD SPECIFICATIONS – The Oaks-Monte Verte                                    11/12/04
Page 4 of 5

## PLUMBING (cont'd):

### POWDER ROOM and Cabana: Biscuit
- Kohler #3384 San Raphael One Piece Water Closet with seat
- Polished brass trip lever and supply kit
- Kohler #2210 Caxton undermount Lav
- Kohler #16102-4 polished brass Lav Faucet

### KITCHEN:
- (1) Kohler #3355 Stainless Steel undermount Kitchen Sink
- (1) Kohler K15170 Pull Out Faucet
- (1) Badger V Disposal
- Connection to Ice Maker at refrigerator
- Dishwasher connection

### MISCELLANEOUS:
- One (1) "Energy Saver" 75 gallon gas water heater with recirculating system and pump
- Mustee #10 Drop-in Laundry tray with Briggs #115-L Faucet
- Washing machine outlet
- TWO (2) outside hose bibbs
- 1 ½" water service with 1 ½" backflow preventer.
- All waste lines to be PVC, all water lines to be copper.
- All hot lines under slab to be insulated with ½" armaflex.

## CABINETS and INTERIOR TRIM:
- Interior millwork to be paint grade throughout.
  - Casings: Victorian (3 ½")
  - Base: Victorian (5 ¼")
  - Door Moldings: M62A (3/4" x 1 ¾")
- All interior woodwork painted with one prime coat and one finish coat of oil based enamel. Choice of one (1) color.
- Cabinetry package provided to include the following:
  - Kitchen cabinets. Includes 42" uppers European Style Wood.
  - Powder Room Cabinet European Style Wood.
  - Secondary Bath cabinets and plywood subtops.
  - Utility Room cabinets with laminate tops.
- Granite Kitchen countertops with 1 ½" standard edges (see Builder's selection) and full 4"x4" tumbled marble backsplashes.
- Granite Powder Room top with 1 ½" standard edges (see Builder's selection) and 4" tile backsplash.
- Saturnia Marble Master Bath vanity tops with 1 ½" standard edge (see Builder's selection) with a 4" tumbled Marble Backsplash.
- Secondary Bath tops to be standard color 4" x 4" tumbled marble.
- Travertine marble window sills throughout.
- Wood ventilated shelving in master clothes (2 shelves)

Match Flooring

ROSEN 0342

KROSEN -000053

STANDARD SPECIFICATIONS – The Oaks-Monte Verte                                    11/12/04
Page 5 of 5

## CABINETS and INTERIOR TRIM cont:
- Vinyl clad shelving in all secondary clothes (2 shelves)
- Melamine shelving (5 shelves) in kitchen pantry
- Towel and toilet paper holders in all baths, as per Builder's selection

## APPLIANCES: white
- Kitchenaid #KSSS42QM 42" Refrigerator, Ice and Water plus Filter
- Kitchenaid #KEBC207K 30" Double Oven
- Kitchenaid #KGCS166GBL 36" Gas Cooktop
- Kitchenaid #KWVU265YBA 36" Slide Out Hood
- Kitchenaid #KUDI01ILBL Dishwasher
- General Electric #JEM31BFBB Microwave
- Kitchenaid #KAWS750LT Washer
- Kitchenaid #KGYS750LT Gas Dryer

## FLOORING:
- Master bath saturnia marble (18" x 18") laid straight includes: bath floors, shower walls and tub deck.
- Secondary bathrooms ceramic tile includes: 8"x 10" ceramic laid straight in tub area or shower walls to 8' above finish floor, 8"x 8" or equal laid straight on floor. See Builder's selection.
- Main floors Saturnia marble (18" x 18") laid in a straight pattern
- Carpeting allowances is $17.00/square yard, includes labor and material.
- 18" x 18" Saturnia on accessible balconies
- All marble is mud set installation

## ADDITIONAL ITEMS:
- Stairs shall be carpet (see allowance) over construction grade tread and riser, paint grade skirt board, oak cap and rail, iron balusters and oak newel. See Builder's selection.
- 1/4" clear plate glass mirror to the soffit/ceiling and full length of vanities in all baths.
- 76" Alumax Gold or Silver Anodized aluminum framed shower enclosures in all shower stalls, with clear glass.
- 76" frameless shower enclosure in Master Bath.
- Straight in driveway and service walk using standard interlocking brick pavers set in sand.
- Standard interlocking brick pavers at covered entry, patio(s) and at exterior doors
- Fully sodded lot with automatic sprinkler system on city water.
- Landscape Allowance of $12,500.00 including sod and street tree, Builder must install Landscape.
- Custom Oaks Mailbox                                        **ROSEN 0343**
- Aluminum gutters as required by plan
- 14' x 28' or 84 linear foot pool. One (1) light, 3' to 5' at deepest point, bullnose brick coping, one (1)1 h.p. pump and filter. Two rows of 3"x3" or one row of 6" water line tile per Builder's selection.
- Interlocking brick pavers set in sand on pool surface (800 sf allowance).
- Bronze aluminum rail fence with two (2) gates as per plan.

**The Seller shall provide the Buyer a discount of 15% toward future options, upgrades and subsequent work orders. This discount shall be indicated on each work order.**

KROSEN -000054

flexmls Web | Page 1 of 1

## Residential Full Report

**Address:** 17830 Monte Vista Drive Boca Raton, FL 33496    **MLS#:** RX-3050040    **St:** Closed    **List Price:** $599,000

| | |
|---|---|
| **Area:** 4750 | **Type:** Single Family Detached |
| **Geo Area:** PB04 | **Range Price:** |
| **County:** Palm Beach | **Original List Price:** 839,000 |
| **Parcel ID:** 00424631070070300 | **Lot Dimensions:** .3 |
| **Subdivision:** The Oaks | **Type:** Single Family Detached |
| **Development Name:** The Oaks | **Dock #:** |
| **Model Name:** Monte Verde | **Private Pool:** Yes |
| **Lot Dimensions:** .3 | **Garage Spaces:** 3 |
| **List Price Sqft:** 130.1 | **Membrshp Equity:** |
| **Waterfront:** Yes | |
| **Waterfrontage:** | |

**Legal Desc:** Oaks At Boca Raton 06 Lot:30 Blk:G1 Lot SqFt:13068 Frontage: Depth:
**Short Sale:** No    **Short Sale Add:** No    **REO:** No

| Master Bedroom | 16 X 19 | Living Room | 19 X 19 | Kitchen | 15 X 15 |
|---|---|---|---|---|---|

| | | | |
|---|---|---|---|
| **SqFt - Living:** 4,604 | **SqFt - Total:** 6,547 | **Guest Hse:** | **Yr Blt:** 2006 | **Pool Size:** |
| **BD:** 5 | **FB:** 5 | **Baths - Half:** 2 | **Yr Blt Des:** New | **Pets Allowed:** Yes |
| | **Year Built:** 2006 | **Front Exp:** SW | | |

| | | | |
|---|---|---|---|
| **Bldg #:** | **Governing Bodies:** HOA | **HOA Fee/Month:** 661 | **Serial #:** |
| **Total Floors/Stories:** 2 | **Land Lease:** | **Brand Name:** | **Tax Year:** 2008 |
| **Total Units in Bldg:** | **Recreation Lease:** | **Mobile Home Size:** | **Taxes:** 17,435 |
| **Ttl Units in Complex:** | **Min Days to Lease:** | **Decal #:** | **Special Assmnt:** No |
| **Unit Floor #:** | **Application Fee:** 100 | | |

| | | |
|---|---|---|
| **Design:** Mediterranean | **Waterfront:** Lake | **Restrict:** Other |
| **Construction:** CBS | **View:** Lake | **HOPA:** No Hopa |
| **Unit Desc:** | **Private Pool:** Heated; Inground | **Heating:** Central; Electric |
| **Flooring:** Marble; Wood Floor | **Security:** Gate - Manned | **Boat Services:** |
| **Furnished:** Unfinished | **Membership:** | **Guest House:** |
| **Dining Area:** | **Cooling:** Central; Electric | **Taxes:** County Only; Homestead |
| **Guest House:** | **Heating:** Central; Electric | **Terms Considered:** Cash Only |
| **Roof:** | **Utilities:** 3-Phase Electric; Cable; Gas | **Mobile Features:** |
| **Special Info:** Disclosure; Sold As-Is | **Natural; Public Sewer; Public Water** | **Cooling:** Central; Electric |

**Rooms:** Family; Loft
**Master Bedroom/Bath:** Bidet; Dual Sinks; Separate Shower; Separate Tub; Whirlpool Spa
**Dining Area:**
**Window Treatments:**
**Maintenance Fee Incl:**
**Equip/Appl Included:** Dishwasher; Dryer; Range - Electric; Refrigerator; Washer; Water Heater - Gas
**Private Pool:** Heated; Inground
**Parking:**
**Lot Description:**
**Subdiv. Amenities:** Basketball; Clubhouse; Exercise Room; Lobby; Pool; Tennis
**Exterior Features:**
**Interior Features:** Volume Ceiling; Walk-in Closet
**Showing Instructions:** Appointment Only; Call Listing Agent
**Directions:** Clint Moore Rd. between Lyons and 441. Entry on north side of Clint Moore.
**Public Remarks:** NOT A SHORT SALE.NO WAITING. NO MONKEY BUSINESS.Beautiful corner lot totally upgraded Monte Verde model 5 bedrooms plus loft.Upgraded everything.gorgeous pool patio.Impact Glass,whole house nat/gas generator.!!Chinese Drywall and needs remediation!! This home has Chinese Drywall. Take advantage of this opportunity. Remediate and live in The Oaks for a fraction of building new...NOT A SHORT SALE

| | | | |
|---|---|---|---|
| **Sold Price:** 501,000 | **Sold Price Sqft:** 108.82 | **Days On Market:** 84 | **Under Contract Date:** 12/07/2009 |
| **Sold Date:** 12/23/2009 | **Cumulative DOM:** 84 | **Terms of Sale:** Cash | |
| **Sell Office:** Boca Executive Realty, LLC 800192 | | **Sell Agent:** Wendy L Jensen 63063634 | |

| | | | | |
|---|---|---|---|---|
| **LO:** | 608114 | Lang Realty | 561-989-2100 | | |
| **LA:** | 60615215 | David Philip Greenblatt | 561-989-2100 | 561-989-2100 | homestoyou@aol.com |
| **Co-LO:** | 608114 | Lang Realty | 561-989-2100 | | |
| **Co-LM:** | 63016769 | Ryan Greenblatt | 561-989-2100 | 561-350-1850 | 561-350-1850 |
| **Comm/Buyer Agent:** 3% | **Comm/Non-Rep:** 3% | **Comm/Trans Brk:** 3% | **Bonus:** No | **LD:** 09/14/2009 |
| **Var/Dual Rate:** No | **List Type:** Ex Rt | **List Off Agency:** Single Agency | | **XD:** 12/31/2009 |

**Owner Name:** Kevin & Stacey Rosen    **Broker Only Remarks:** NOT A SHORT SALE.WHY WASTE YOUR TIME WITH A SHORT SALE GOING NOWHERE WHEN YOU CAN MAKE A DEAL ON THIS HOME.NO MONKEY BUSINESS.Please qualify buyer before showing.Chinese Drywall.

Information is deemed to be reliable, but is not guaranteed. © 2013 MLS and FBS.
Prepared by Ryan Greenblatt on Friday, July 05, 2013 9:07 AM
The information on this sheet has been made available by the MLS and may not be the listing of the provider.

KROSEN - 000055

CMA: Statistical Summary

## Price Analysis

### Summary of Closed Listings

| MLS # | Address | List Price | DOM | CDOM | Sold Date | Sold Price | Total Adjustments | Adjusted Price |
|---|---|---|---|---|---|---|---|---|
| RX-3066109 | 17606 Grand Este Way, Boca Raton FL | $2,499,000 | 47 | 47 | 12/31/2009 | $2,000,000 | | $2,000,000 |
| RX-2934509 | 17777 Key Vista Drive, Boca Raton FL | $1,895,000 | 374 | 374 | 06/30/2009 | $1,660,000 | | $1,660,000 |
| RX-2998983 | 9620 Bridgebrook Drive, Boca Raton FL | $1,495,000 | 306 | 306 | 12/22/2009 | $1,300,000 | - | $1,300,000 |
| FX-1011957 | 17633, Boca Raton FL | $1,285,000 | 94 | 94 | 10/30/2009 | $1,205,000 | - | $1,205,000 |

### Low, Average, Median, and High Comparisons

| | Closed | Overall |
|---|---|---|
| Low | $1,205,000 | $1,205,000 |
| Average | $1,541,250 | $1,541,250 |
| Median | $1,480,000 | $1,480,000 |
| High | $2,000,000 | $2,000,000 |

### Overall Market Analysis (Unadjusted)

| Status | # | List Vol. | Avg. List Price | Sold Vol. | Avg. Sold Price | Avg. Sale/List Price | Avg. SqFt - Living | Avg. List $/SqFt - Living | Avg. Sold $/SqFt - Living | Avg. Dom | Avg. CDOM |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Closed | 4 | 7,174,000 | 1,793,500 | 6,165,000 | 1,541,250 | 0.87 | 6,077 | 290.96 | 251.19 | 205 | 205 |
| Overall | 4 | 7,174,000 | 1,793,500 | 6,165,000 | 1,541,250 | 0.87 | 6,077 | 290.96 | 251.19 | 205 | 205 |

KROSEN - 000056

flexmls Web

## CMA: Comparable Properties

|  | RX-3066109 | RX-2998983 | RX-2934509 |
|---|---|---|---|
|  | 17606 Grand Este Way Boca Raton FL | 9620 Bridgebrook Drive Boca Raton FL | 17777 Key Vista Drive Boca Raton FL |
| List Price | $2,499,000 | $1,495,000 | $1,895,000 |
| Original List Price | $2,985,000 | $1,795,000 | $2,195,000 |
| Sold Price | $2,000,000 | $1,300,000 | $1,660,000 |
| Status | Sold | Sold | Sold |
| Status Date | 01/04/2010 | 01/11/2010 | 07/02/2009 |
| Days on Market | 47 | 306 | 374 |
| Cumulative Days on Market | 47 | 306 | 374 |
|  |  |  |  |
| Total Bedrooms | 6 | 6 | 6 |
| SqFt - Living | 6,817 | 5,511 | 6,579 |
| Lot Dimensions |  | .25 | .30 acres |
| Short Sale Addendum |  |  |  |
| Year Built | 2006 | 2006 | 2006 |
| Hardship Package |  |  |  |
| Short Sale | No | No | No |
| Price | $2,000,000 | $1,300,000 | $1,660,000 |

KROSEN - 000057

flexmls Web                                            Page 2 of 3

**CMA: Comparable Properties**

| | FX-1011957 | | |
|---|---|---|---|
| | 17633 Boca Raton FL | | |
| List Price | $1,285,000 | | |
| Original List Price | $1,285,000 | | |
| Sold Price | $1,205,000 | | |
| Status | Sold | | |
| Status Date | 10/30/2009 | | |
| Days on Market | 94 | | |
| Cumulative Days on Market | 94 | | |
| | | | |
| Total Bedrooms | 6 | | |
| SqFt - Living | 5,400 | | |
| Lot Dimensions | | | |
| Short Sale Addendum | | | |
| Year Built | 2006 | | |
| Hardship Package | | | |
| Short Sale | No | | |
| **Price** | $1,205,000 | | |

KROSEN - 000058

Case 9:09-cv-82408-MGC Document 290 Entered on FLSD Docket 05/13/2010 Page 65 of 459

# COUNTY OF PALM BEACH: NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

| PROPERTY CONTROL NUMBER | YEAR | CMC | ASSESSED VALUE | EXEMPTIONS | TAXABLE VALUE |
|---|---|---|---|---|---|
| 00-42-46-31-07-007-0300 | 2008 | 35 | 1,047,511 | 50,000 | 997,511 |

| EXEMPTIONS APPLIED TO THIS PROPERTY | LEGAL DESCRIPTION |
|---|---|
| HOMESTEAD HOMESTEAD/ADDL | OAKS AT BOCA RATON PL 6 LT 30 BLK G1 |

SEE REVERSE SIDE FOR MORE INFORMATION

| COLLECTOR NO. | ANNE M. GANNON, Tax Collector Palm Beach County |
|---|---|
| 2-245-173-00 | |

ROSEN KEVIN &
ROSEN STACEY
17830 MONTE VISTA DR
BOCA RATON FL 33496-1054

**READ REVERSE SIDE BEFORE CALLING** — **AD VALOREM TAXES** — **READ REVERSE SIDE BEFORE CALLING**

| TAXING AUTHORITY | TELEPHONE | EXT. | MILLAGE | TAX AMOUNT |
|---|---|---|---|---|
| COUNTY | 561 355-3996 | | 3.7811 | 3,771.69 |
| COUNTY DEBT | 561 355-3996 | | .1845 | 184.04 |
| FIRE/RESCUE MSTU | 561 355-3996 | | 2.9500 | 2,942.66 |
| LIBRARY | 561 355-3996 | | .4970 | 495.76 |
| LIBRARY DEBT SERVICE | 561 355-3996 | | .0457 | 45.59 |
| CHILDRENS SERVICES COUNCIL | 561 740-7000 | | .6009 | 599.40 |
| F.I.N.D. | 561 627-3386 | | .0345 | 34.41 |
| PBC HEALTH CARE DISTRICT | 561 659-1270 | | .9975 | 995.02 |
| SCHOOL LOCAL | 561 434-8837 | | 2.3530 | 2,405.97 |
| SCHOOL STATE | 561 434-8837 | | 4.8980 | 5,008.26 |
| SFWMD EVERGLADES CONST PROJECT | 561 686-8800 | | .0894 | 89.18 |
| SO FLA WATER MANAGEMENT DIST. | 561 686-8800 | | .2549 | 254.27 |
| SO FLA WATER MGMT - OKEE BASIN | 561 686-8800 | | .2797 | 279.00 |

**TOTAL AD VALOREM** 17,105.25

**READ REVERSE SIDE BEFORE CALLING** — **NON-AD VALOREM ASSESSMENTS** — **CODE: HA ACRES: .3000**

| LEVYING AUTHORITY | TELEPHONE | EXT. | RATE | AMOUNT |
|---|---|---|---|---|
| LAKE WORTH DRAINAGE DISTRICT MAINT | 561 819-5479 | | 38.00 | 38.00 |
| SOLID WASTE AUTHORITY | 561 697-2700 | | 292.00 | 292.00 |

**TOTAL NON-AD VALOREM** 330.00

**TOTAL AD VALOREM AND NON-AD VALOREM COMBINED** 17,435.25

## **** INFORMATIONAL NOTICE ****

# A TAX NOTICE WAS SENT TO YOUR ESCROW AGENT FOR PAYMENT:
## WACHOVIA MORTGAGE

** SEE REVERSE SIDE FOR INSTRUCTIONS AND INFORMATION **

# COUNTY OF PALM BEACH: NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

| PROPERTY CONTROL NUMBER | YEAR | MTG | COLLECTOR NO. |
|---|---|---|---|
| 00-42-46-31-07-007-0300 | 2008 | 42225 | 2-245-173-00 |

ROSEN KEVIN &
ROSEN STACEY
17830 MONTE VISTA DR
BOCA RATON FL 33496-1054

LEGAL DESCRIPTION
OAKS AT BOCA RATON PL 6 LT 30
BLK G1

07224517300001743525011001

# INFORMATIONAL NOTICE
PLEASE READ THE REVERSE SIDE

P.O. BOX 3353
WEST PALM BEACH, FL 33402-3353

KROSEN - 000059

| AMOUNT DUE WHEN POSTMARKED BY | | | | | |
|---|---|---|---|---|---|
| NOV 30, 2008 | DEC 31, 2008 | JAN 31, 2009 | FEB 28, 2009 | MARCH 31, 2009 | TAXES ARE DELINQUENT APRIL 1 |
| $16,737.84 | $16,912.19 | $17,086.55 | $17,260.90 | $17,435.25 | |

SEE REVERSE SIDE FOR INSTRUCTIONS AND INFORMATION



**GARY R. NIKOLITS, CFA**
PALM BEACH COUNTY PROPERTY APPRAISER
301 N. OLIVE AVENUE, 1ST FLOOR
WEST PALM BEACH, FL 33401
(561) 355-2866

**RETURN
SERVICE REQUESTED**

PRESORTED
FIRST-CLASS MAIL
AUTO
U.S. POSTAGE PAID
WEST PALM BCH. FL
PERMIT NO. 214

---

## 2009 HOMESTEAD RECEIPT

### PROPERTY CONTROL NUMBER

| CITY | RG. | TWP. | SEC. | SUBD. | BLOCK | LOT |
|------|-----|------|------|-------|-------|-----|
| 00 | 42 | 46 | 31 | 07 | 007 | 0300 |

This unique **PROPERTY CONTROL NUMBER (PCN)** is your key to appraisal and Tax Roll information. Always refer to this number when contacting the Property Appraiser, Tax Collector or Building Department. This Renewal applies **ONLY** to the owner(s) and property legally described on this receipt.

THE FOLLOWING QUALIFIED EXEMPTIONS FOR THIS TAX YEAR

HOMESTEAD

HAVE BEEN RENEWED FOR THE FOLLOWING PROPERTY

OAKS AT BOCA RATON PL 6

LT 30 BLK G1

ROSEN KEVIN &
ROSEN STACEY
17830 MONTE VISTA DR
BOCA RATON FL 33496 1054

000000121
J7320

SEE REVERSE SIDE FOR
IMPORTANT INFORMATION

KROSEN - 000060



Return To:
Wachovia Mortgage, FSB

1100 Corporate Center
DriveRaleigh, NC 27607

This document was prepared by:
Wachovia Mortgage, FSB

1100 Corporate Center
DriveRaleigh, NC 27607

------- [Space Above This Line For Recording Data] -------

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    April 10, 2008
together with all Riders to this document.
(B) "Borrower" is Kevin D Rosen and Stacey A Rosen, Husband And Wife

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is Wachovia Mortgage, FSB

241443

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS                Form 3010 1/01

 -6A(FL) (0005).03
Page 1 of 15
VMP Mortgage Solutions, Inc.



Lender is a Federal Savings Bank
organized and existing under the laws of United States of America
Lender's address is 1100 Corporate Center Drive, Raleigh, NC 27607

(E) "Note" means the promissory note signed by Borrower and dated    April 10, 2008
The Note states that Borrower owes Lender Two Hundred Thousand

Dollars

(U.S. $200,000.00         ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than     May 1, 2023
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

241443

VMP®-6A(FL) (0005).02                    Page 2 of 16                    Form 3010  1/01

KROSEN - 000062

Case 2:09-md-02047-EEF-MBN Document 22380-40 Filed 12/02/19 Page 140 of 251
Case 1:11-cv-22408-MGC Document 270-11 Entered on FLSD Docket 05/13/2015 Page 172 of
459

**(P)** "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the County                [Type of Recording Jurisdiction]
of   Palm Beach                                                                                  [Name of Recording Jurisdiction]:


**Lot 30, Block G1 of OAKS AT BOCA RATON PLAT SIX, according to the plat thereof, as recorded in Plat Book 103, Pages 57 thru 63, inclusive, of the Public Records of Palm Beach County, Florida.**


Parcel ID Number:                                                which currently has the address of
17830 Monte Vista Drive                                                                              [Street]
Boca Raton                                        [City], Florida  33496                [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
241443

VMP®  -6A(FL) (0009).02                    Page 3 of 15                                          Form 3010  1/01

KROSEN - 000063

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

241443

VMP® -6A(FL) (0005).02        Page 4 of 16        Form 3010  1/01

KROSEN - 000064

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

241443

VMP® -6A(FL) (0008).02                    Page 5 of 16          Initials          Form 3010  1/01

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

 -6A(FL) (0005).02

Page 6 of 18



Form 3010 1/01

KROSEN - 000066

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

 -6A(FL) (0005).02

Page 7 of 18



Form 3010 1/01

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.



VMP® -6A(FL) (0608).02                    Page 8 of 16                    Form 3010  1/01

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

 -6A(FL) (0005).02

Page 9 of 16



Form 3010  1/01

KROSEN - 000069

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of

VMP®-6A(FL) (0005).02                    Page 10 of 16                                    Form 3010  1/01

KROSEN - 000070

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers

 -6A(FL) (0006).02      Page 11 of 16       Form 3010  1/01

KROSEN - 000071

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the



-6A(FL) (0005).07                        Page 12 of 19                                Form 3010  1/01

KROSEN - 000072

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

 -6A(FL) (0008).01

Page 13 of 16



Form 3010 1/01

KROSEN - 000073

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Attorneys' Fees. As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. Jury Trial Waiver. The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

 -6A(FL) (0005).02

Page 14 of 16

 Form 3010  1/01

KROSEN - 000074

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____ (Seal)
                                    Kevin D Rosen           -Borrower

                                    17830 Monte Vista Dr Boca
                                    Raton, FL 33496          (Address)

_____          _____ (Seal)
                                    Stacey A Rosen          -Borrower

                                    17830 Monte Vista Dr Boca
                                    Raton, FL 33496          (Address)

_____ (Seal)   _____ (Seal)
                -Borrower                           -Borrower


                (Address)                           (Address)

_____ (Seal)   _____ (Seal)
                -Borrower                           -Borrower


                (Address)                           (Address)

_____ (Seal)   _____ (Seal)
                -Borrower                           -Borrower


                (Address)                           (Address)

VMP®-6A(FL) (0005).02          Page 15 of 16          Form 3010  1/01

KROSEN - 000075

STATE OF FLORIDA,                                        Broward    County ss:
The foregoing instrument was acknowledged before me this 10th day of April, 2008    by

    Kevin D. Rosen and Stacey A. Rosen, Husband and Wife

who is personally known to me or who has produced                                as identification.

    Notary Public

**Betty Russell Buffum**
Commission # DD424031
Expires June 30, 2009
Bonded Thru Fain - Insurance, Inc. 800-365-7019

VMP -6A(FL) (0205).02                    Page 10 of 15                    Form 3010  1/01

KROSEN - 000076

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 10th        day of
April, 2008                      , and is incorporated into and shall be
deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the
"Security Instrument") of the same date, given by the undersigned (the "Borrower") to
secure Borrower's Note to Wachovia Mortgage, FSB

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at: 17830 Monte Vista Drive, Boca Raton, FL 33496

(Property Address)
The Property includes, but is not limited to, a parcel of land improved with a dwelling,
together with other such parcels and certain common areas and facilities, as described in

(the "Declaration"). The Property is a part of a planned unit development known as
The Sanctuary

(Name of Planned Unit Development)
(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the
"Owners Association") and the uses, benefits and proceeds of Borrower's interest.
     PUD COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:
     A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners
Association; and (iii) any by-laws or other rules or regulations of the Owners Association.
Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the
Constituent Documents.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01
Wolters Kluwer Financial Services        Page 1 of 3        Initials: 
VMP®-7R (0411).01

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

VMP®-7R (0411).01          Page 2 of 3          Initials: ____          Form 3150 1/01

KROSEN - 000078

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
Kevin D Rosen                    -Borrower

_____ (Seal)
Stacey A Rosen                   -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

VMP®-7R (0411).01            Page 3 of 3            Form 3150 1/01

KROSEN - 000079

**Wachovia Mortgage, FSB**
Post Office Box 900001
Raleigh, North Carolina 27675-9000

1100 Corporate Center Drive
Raleigh, North Carolina 27607-5066

## WACHOVIA

KEVIN D ROSEN
STACEY A ROSEN
17830 MONTE VISTA DR
BOCA RATON, FL 33496

July 28, 2009

RE:    Wachovia Mortgage Loan Number:
       Property Address:                        17830  MONTE VISTA DRIVE
                                                BOCA RATON, FL 33496

Dear KEVIN D ROSEN and STACEY A ROSEN:

Wachovia Mortgage has recently received written correspondence regarding the above referenced mortgage
loan.  Please be advised a copy of this item has been forwarded to the Loss Mitigation Department for an
appropriate review and response.

If you should have any further questions, please feel free to call one of our Customer Service
Representatives at 866/642-8608 Monday through Friday between the hours of 8:30 AM and 5:30 PM ET.
We thank you for your business and look forward to serving you in the future.

Sincerely,

*Meagan Smith*

Meagan Smith
Customer Service Department

CS183L

**Kevin D. Rosen, Esq.**
**Attorney at Law**
17830 Monte Vista Drive
Boca Raton, Florida 33496
954-675-8098

**VIA FACSIMILE 866-260-3962 ONLY**

July 28, 2009

Wachovia Mortgage Corp., FSB
Attention: Research Department
P.O. Box 90001
Raleigh, NC 27615-9000

RE:   Loan ▓▓▓▓▓
        Property Address: 17830 Monte Vista Drive, Boca Raton, FL 33496

Dear Wachovia Mortgage Corp. Representative:

I am submitting this letter via facsimile pursuant to the telephone instruction of today from your Customer Service and Corporate departments. We are requesting a full mortgage suspension/abatement, including escrow of taxes and insurance, effective September 1, 2009 for a period of six months due to harmful Chinese drywall located in our home.

We recently discovered that we have Chinese drywall in our home built during 2005 - 2006. According to published reports, the defective Chinese drywall emits sulfur gas when exposed to moisture and corrodes copper wiring, causing electrical problems, and may be linked to various health problems. A visual inspection of the electrical outlets in our home, exposed copper wire and air conditioners shows corrosion, deterioration and coverage of a "black, sooty coating" as described, and depicted in photographs, on the website     for     the     Florida     Division     of     Health.     *See* http://www.doh.state.fl.us/environment/community/indoor-air/casedefinition.html

We have filed an insurance claim under our homeowners' insurance policy which to date has not resulted in financial relief. Furthermore, the federal government and the states have not established a protocol for remediation of Chinese drywall nor have they established a homeowner restitution fund.

Case 2:09-md-02047-EEF-MBN Document 22380-40 Filed 12/02/19 Page 159 of 459
Case 1:11-cv-22408-MGC Document 270-11 Entered on FLSD Docket 05/13/2015 Page 91 of
459

Wachovia Mortgage Corp., FSB
Attention: Research Department
July 28, 2009
Page 2

These extraordinary circumstances have created an imminent, substantial financial and
personal hardship. We are relocating our family to a rental property. However, we will
be without adequate financial resources to support two properties, both our home and a
rental.

It is imperative that Wachovia provide us with a six month mortgage
suspension/abatement, without adverse credit reporting. In the interim of the mortgage
abatement, we will continue to pursue a resolution of the problem.

It is not in Wachovia's interest for our loan to default and the house to move into
foreclosure.

I have attached a news article dated July 27, 2009 which confirms that banks, including
Wachovia, have suspended mortgage payments of homeowners suffering from Chinese
drywall. Please immediately approve a full suspension/abatement of our mortgage
payments effective September 1, 2009 for a period of six months.

Thank you for your prompt consideration.

Very truly yours,

Kevin D. Rosen

Lenders Help Florida Homeowners Affected by Chinese Drywall : HousingWire || financi... Page 1 of 2

Case 2:09-md-02047-EEF-MBN Document 22380-40 Filed 12/02/19 Page 160 of 251
Case 2:11-cv-22408-MGC Document 27-11 Entered on FLSD Docket 05/13/2019 Page 92 of 459



## HMP Loan Modifications

▼ Rules-based Waterfall Decisioning ▼ Contact Management
▼ Automated Document Generation ▼ Integrated Reporting    Click Here >>

BUZZPOST  EVENTS  JOBS  VIDEO  ABOUT  CONTACT        Search        GO

-ADVERTISEMENT-

Servicing/Default

## Lenders Help Florida Homeowners Affected by Chinese Drywall

by AUSTIN KILGORE
July 20, 2009 4:16 PM CST

Florida homeowners saddled with homes built with defective drywall from China received mortgage abatements from lenders wary of adding the defective and potentially dangerous homes to their inventories.

Florida lawyer Mike Ryan represents 160 home owners who live in eight south Florida residential communities developed by WCI Communities. He said he negotiated 90-day abatements — or mortgage payment suspensions — with his clients' lenders. Most of his clients have moved out of their homes and could not afford their mortgages now that they are forced to pay for temporary housing.

Ryan said he already has obtained mortgage abatements from a variety of lenders, including Wells Fargo, Bank of America, Countrywide, Wachovia, HSBC, Citi Mortgage and SunTrust for his clients.



That was in April, and Ryan said many banks are extending the abatements to six months.

According to multiple published reports, the defective Chinese-made drywall emits sulfur gas when exposed to moisture and allegedly corrodes copper wiring, causing electrical problems and may be linked to a various health problems experienced by homeowners and their families.

The imported drywall made its way into American homes during the building boom in the early-to-mid 2000s and when demand for materials went up after Hurricane Katrina.

Ryan said lenders understood it was in their best interest to give his clients some leeway on their mortgages while the problem was resolved, instead of foreclosing on the homes.

"The last thing these mortgage lenders would want is to have these homes put into foreclosure and eventually added into their inventory because then they would truly have a toxic asset," Ryan said.

He added lenders are also faced with the possibility that additional homes already in their real-estate-owned inventories could have been built with Chinese drywall.

Ryan's next task is recovering damages from WCI, which entered into bankruptcy protection nearly a year ago.

Under a restructuring proposal WCI submitted in bankruptcy court, WCI plans to exit Chapter 11 protection by Q309, with various debtors holding equity stakes in the reorganized builder.

Ryan said that plan includes a trust for his clients that would help pay for the damages, as well as provide a 3% equity stake. In addition, the homeowners would have the ability to file claims against WCI in court.

In a January Securities and Exchange Commission filing, WCI admitted it used the Chinese drywall in some homes built and sold before it filed for bankruptcy protection in August 2008. In the filing, WCI said it was investigating the claims and established an $1.1m reserve to fund air conditioner coil replacements, "which may or may not be related to the Chinese drywall."

Ryan said it will be difficult for his clients to see any of that money because their homes' warranties have all expired.



## ClearCapital

## Intelligent valuation solutions.

More info

GET YOUR HW FIX

Join nearly 10,000 bold subscribers who already get our daily email delivered to their inbox — it's free and a great way to ensure you don't miss something.

Enter your email address        GO

EVENTS

2009 Oct 04 -- 2009 Oct 05
IMN's 15th Annual ABS East
Hosted at the Fountainbleau Resort Miami Beach in Miami, FL, the theme of this year's event is "Navigating a Path to Recovery" and alludes to decisive actions by the government and industry leaders to set a course that will hopefully lead to a revived and robust US securitization market. For more information, visit www.imn.org.

2009 Oct 20 -- 2009 Oct 21
RMBS: Assessing Value and Risk
This two-day course in Washington, DC will equip market participants with the knowledge and skills to evaluate prime, Alt-A and subprime RMBS portfolios in order to assess their value and understand inherent risks. For more information, visit www.fitchratings.com.

2009 Nov 04 -- 2009 Nov 05
6th Annual P&P Conference
This annual event, hosted by Safeguard Properties, is one of a few events focused solely on property preservation and field services. The program generally covers both best practices and process improvements. For more information, visit www.safeguardproperties.com

2009 Dec 09 -- 2009 Dec 10
RMBS: Assessing Value and Risk
This two-day course in New York City will equip market participants with the knowledge and skills to evaluate prime, Alt-A and subprime RMBS portfolios in order to assess their value and understand inherent risks. For more information, visit www.fitchratings.com.



http://www.housingwire.com/2009/07/20/lenders-help-florida-homeowners-affected-by-ch...  7/27/2009

KROSEN - 000083



P. 1

* * * Communication Result Report ( Jul. 28. 2009 10:05AM ) * * *

1)
2)

Date/Time: Jul. 28. 2009 10:04AM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 2906 | Memory TX | 918662603962 | P. 3 | OK | |

Reason for error
E. 1) Hang up or line fail
E. 3) No answer
E. 5) Exceeded max. E-mail size
E. 2) Busy
E. 4) No facsimile connection

**Kevin D. Rosen, Esq.**
**Attorney at Law**
17830 Monte Vista Drive
Boca Raton, Florida 33496
954-675-8098

**VIA FACSIMILE 866-260-3962 ONLY**

July 28, 2009

Wachovia Mortgage Corp., FSB
Attention: Research Department
P.O. Box 90001
Raleigh, NC 27615-9000

RE: Loan [redacted]
Property Address: 17830 Monte Vista Drive, Boca Raton, FL 33496

Dear Wachovia Mortgage Corp. Representative:

I am submitting this letter via facsimile pursuant to the telephone instruction of today from your Customer Service and Corporate departments. We are requesting a full mortgage suspension/abatement, including escrow of taxes and insurance, effective September 1, 2009 for a period of six months due to harmful Chinese drywall located in our home.

We recently discovered that we have Chinese drywall in our home built during 2005 - 2006. According to published reports, the defective Chinese drywall emits sulfur gas when exposed to moisture and corrodes copper wiring, causing electrical problems, and may be linked to various health problems. A visual inspection of the electrical outlets in our home, exposed copper wire and air conditioners shows corrosion, deterioration and coverage of a "black, sooty coating" as described, and depicted in photographs, on the website for the Florida Division of Health. *See* http://www.doh.state.fl.us/environment/community/indoor-air/casedefinition.html

We have filed an insurance claim under our homeowners' insurance policy which to date has not resulted in financial relief. Furthermore, the federal government and the states have not established a protocol for remediation of Chinese drywall nor have they established a homeowner restitution fund.

[redacted]

Recording Requested By:
WACHOVIA MORTGAGE, FSB

When Recorded Return To:

Melanie Best
WACHOVIA MORTGAGE, FSB
1100 CORPORATE CENTER DRIVE
RALEIGH, NC 27607

## RELEASE OF MORTGAGE

WACHOVIA MORTGAGE CORPORATION (RELEASES 2005) #_____  Lender ID:602/0375110283  Palm Beach, Florida
**MERS #: 100013700039432743  VRU #: 1-888-679-6377**

KNOW ALL MEN BY THESE PRESENTS that MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS NOMINEE FOR WACHOVIA MORTGAGE CORPORATION, holder of a certain Mortgage, whose parties, dates and recording information are below, does hereby acknowledge that it has received full payment and satisfaction of the same, and in consideration thereof, does hereby cancel and discharge said Mortgage.

Original Mortgagor:  KEVIN D ROSEN HUSBAND AND WIFE STACEY A ROSEN HUSBAND AND WIFE
Original Mortgagee:  MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC AS NOMINEE FOR WACHOVIA MORTGAGE CORPORATION
Dated:  08/07/2006 Recorded:  08/09/2006  in Book/Reel/Liber: OR 20708 Page/Folio: 1005 as Instrument No.: 20060463684
in the County of Palm Beach State of Florida

Legal:  LOT 30 BLOCK G1 OAKS AT BOCA RATON PLAT SIX ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 103 PAGES 57 THRU 63 INCLUSIVE OF THE PUBLIC RECORDS OF PALM BEACH COUNTY FLORIDA.

Property Address: 17830 MONTE VISTA DRIVE, BOCA RATON, FL  33496

IN WITNESS WHEREOF, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS NOMINEE FOR WACHOVIA MORTGAGE CORPORATION by the officers duly authorized, has duly executed the foregoing instrument.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS NOMINEE FOR WACHOVIA MORTGAGE CORPORATION
On May 29th, 2008

By: _____
MARY HERNDON, Vice President

WITNESS                                          WITNESS

_____                          _____
GWEN HOOVER                                      SHARON MITCHELL

STATE OF Missouri
COUNTY OF Stone

ON May 29th, 2008, before me, M BEST, a Notary Public, in and for the County of Stone, State of Missouri, personally appeared MARY HERNDON, Vice President, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____
M BEST
Notary Expires: 09/21/2009  #05405772

| |
|---|
| M. BEST |
| Notary Public - Notary Seal |
| STATE OF MISSOURI |
| Stone County – Comm.#05405772 |
| My Commission Expires Sept. 21, 2009 |

(This area for notarial seal)

**Prepared By:  Melanie Best, RICHMOND MONROE GROUP PO BOX 458, KIMBERLING CITY, MO  65686 417-739-9412**

***KHWAVI*05/29/2008 08:36:37 AM* WAVI01WAVI00000000000000200109009* FLPALM* 000364327A FLSTATE_MORT_REL *MBB*MBBAMRC*

KROSEN - 000085

1100 CORPORATE CENTER DRIVE
NC 4, J3
Raleigh, NC 27607-5066

Tel 919 852-7330
Fax 919 852-7327

**WACHOVIA**

July 09, 2008

KEVIN D ROSEN
P.O. BOX 810544
BOCA RATON, FL 33481

Loan No. [redacted]          Lender Loan: [redacted]

Dear Sir / Madam,

Please find enclosed the final documents showing that the above referenced loan has been paid off. The release has been recorded and you may now have it for your records. Because it is recorded, it will now be available as a public record any time you enter into a real estate transaction involving your property.

If we had access to any other original documents (note, deed of trust or mortgage) we have included them as well. If they are not with this letter, they are not available to us, either because they have been returned to you in a prior mailing, or because they have been misplaced or lost.

If you have any questions, please call our office at 919 852-7330.

Sincerely,
WACHOVIA MORTGAGE, FSB

*Roscoe Brown*

KROSEN - 000086

THIS INSTRUMENT PREPARED BY:
RECORD & RETURN TO:
Carl E. Siegel, Esquire
Cross Country Title, Inc.
5355 Town Center Road, Suite 801
Boca Raton, Florida 33486

Property Control No.: 00-42-46-31-07-007-0300

CFN 20060463683
OR BK 20708 PG 1004
RECORDED 08/09/2006 10:36:21
Palm Beach County, Florida
AMT 1,050,000.00
Doc Stamp 7,350.00
Sharon R. Bock, CLERK & COMPTROLLER
Pg 1004; (1pg)

## SPECIAL WARRANTY DEED

THIS Warranty Deed, made this 1 day of August, 2006, between ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, by ALBANESE-POPKIN DEVELOPMENT GROUP, LLC, a Florida limited liability Company, General Partner having its principal place of business c/o Albanese-Popkin The Oaks Development Group, L.P. 1200 S. Rogers Circle #11, Boca Raton, Florida 33487 (hereinafter called the "Grantor") and KEVIN ROSEN and STACEY ROSEN, husband and wife, whose post office address is 17630 Monte Vista Drive, Boca Raton, Florida 33496, (hereinafter called "Grantee"):

WITNESSETH That the Grantor, for and in consideration of the sum of Ten Dollars U.S. Dollars ($10.00) lawful money of the United States of America, to it in hand paid by the Grantee, at or before the unsealing and delivery of these presents, the receipt of which is hereby acknowledged, has granted, bargained, sold, aliened, remised, released, conveyed and confirmed and by these presents does grant, bargain, sell, alien, remise, release, convey and confirm unto the Grantee and their heirs or successors and assigns forever, the following parcel of land, situate, lying and being in the County of Palm Beach, State of Florida, and more particularly described as follows:

Lot 30, Block G1, of OAKS AT BOCA RATON PLAT SIX, according to the Plat thereof, as recorded in Plat Book 103, Pages 57 thru 63, inclusive, of the Public Records of Palm Beach County, Florida.

SUBJECT TO: All restrictions, reservations, covenants and easements relating thereto; taxes and assessments for the year 2006 and years subsequent thereto; land use regulations and restrictions imposed by governmental authorities.

TO HAVE AND TO HOLD, the same in fee simple forever.

AND the Grantor does hereby covenant with the Grantee that it is lawfully seized of said land in fee simple; that it has good right and lawful authority to sell and convey said land; that it hereby fully warrants the title of said land and will defend the same against the lawful claims of all persons claiming by, through, or under the said Grantor.

"Grantor" and "Grantee" are used for singular or plural, as the context requires.

IN WITNESS WHEREOF, the Grantor has hereunto set Grantor's hand and seal the day and year first above written.

Signed, sealed and delivered
in the presence of:

ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, BY: ALBANESE-POPKIN DEVELOPMENT GROUP, LLC a Florida limited liability Company, General Partner

By: _____
Edward D. Popkin, Manager

_Beverly A. Donnelly_
BEVERLY A. DONNELLY
Printed Name:

_____
Melanie Kunkel
Printed Name:

STATE OF FLORIDA )
COUNTY OF PALM BEACH )

I hereby certify that on this 1 day of August, 2006 before me, an officer duly authorized in the State and County aforesaid to take acknowledgments, personally appeared, EDWARD D. POPKIN, as Manager of ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, LLC, a Florida limited partnership, BY: ALBANESE-POPKIN DEVELOPMENT GROUP, LLC, a Florida limited liability Company, General Partner named as Grantor in the foregoing deed, that he severally acknowledges executing the same in the presence of two subscribing witnesses freely and voluntarily under authority duly vested in him by said company and who is personally known to me and who did not take an oath.

_____
Notary Public

My Commission [SEAL]
MELANIE KUNKEL
MY COMMISSION # DD 450498
EXPIRES September 23, 2009

Printed Name: _____

Melanie~updowraense\lot30\rosen\sellerdeed

Book20708/Page1004                                    Page 1 of 1

KROSEN - 000087

THIS INSTRUMENT PREPARED BY:
RECORD & RETURN TO:
Carl E. Siegel, Esquire
Cross Country Title, Inc.
5355 Town Center Road, Suite 801
Boca Raton, Florida 33486

Property Control No. : 00-42-46-31-07-007-0300

CFN 20060463683
OR BK 20708 PG 1004
RECORDED 08/09/2006 10:36:21
Palm Beach County, Florida
AMT 1,050,000.00
Doc Stamp 7,350.00
Sharon R. Bock, CLERK & COMPTROLLER
Pg 1004; (1pg)

## SPECIAL WARRANTY DEED

THIS Warranty Deed, made this 1 day of August, 2006, between ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, by ALBANESE-POPKIN DEVELOPMENT GROUP, LLC, a Florida limited liability Company, General Partner having its principal place of business c/o Albanese-Popkin The Oaks Development Group, L.P. 1200 S. Rogers Circle #13, Boca Raton, Florida 33487 (hereinafter called the "Grantor") and KEVIN ROSEN and STACEY ROSEN, husband and wife, whose post office address is: 17680 Monte Vista Drive, Boca Raton, Florida 33496, (hereinafter called "Grantee");

WITNESSETH That the Grantor, for and in consideration of the sum of Ten Dollars U.S. Dollars ($10.00) lawful money of the United States of America, to it in hand paid by the Grantee, at or before the ensealing and delivery of these presents, the receipt of which is hereby acknowledged, has granted, bargained, sold, aliened, remised, released, conveyed and confirmed and by these presents does grant, bargain, sell, alien, remise, release, convey and confirm unto the Grantee and their heirs or successors and assigns forever, the following parcel of land, situate, lying and being in the County of Palm Beach, State of Florida, and more particularly described as follows:

Lot 30, Block G1 of OAKS AT BOCA RATON PLAT SIX, according to the Plat thereof, as recorded in Plat Book 103, Pages 57 thru 63, inclusive, of the Public Records of Palm Beach County, Florida.

SUBJECT TO: All restrictions, reservations, covenants and easements relating thereto, taxes and assessments for the year 2006 and years subsequent thereto; land use regulations and restrictions imposed by governmental authorities.

TO HAVE AND TO HOLD, the same in fee simple forever.

AND the Grantor does hereby covenant with the Grantee that it is lawfully seized of said land in fee simple; that it has good right and lawful authority to sell and convey said land; that it hereby fully warrants the title of said land and will defend the same against the lawful claims of all persons claiming by, through, or under the said Grantor.

"Grantor" and "Grantee" are used for singular or plural, as the context requires.

IN WITNESS WHEREOF, the Grantor has hereunto set Grantor's hand and seal the day and year first above written.

Signed, sealed and delivered
in the presence of:

ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP,
L.P., a Florida limited partnership, BY: ALBANESE-POPKIN
DEVELOPMENT GROUP, LLC a Florida limited liability
Company, General Partner

By: _____
Edward D. Popkin, Manager

*Beverly A. Donnelly*
BEVERLY A. DONNELLY
Printed Name:

*Melanie Kunkel*
Melanie Kunkel
Printed Name:

STATE OF FLORIDA
COUNTY OF PALM BEACH

I hereby certify that on this 1 day of August, 2006 before me, an officer duly authorized in the State and County aforesaid to take acknowledgments, personally appeared, EDWARD D. POPKIN, as Manager of ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, BY: ALBANESE-POPKIN DEVELOPMENT GROUP, LLC a Florida limited liability Company, General Partner named as Grantor in the foregoing deed, that he severally acknowledges executing the same in the present of two subscribing witnesses freely and voluntarily under authority duly vested in him by said company and who is personally known to me and who did not take an oath.

_____
Notary Public

My Commission [seal]
MELANIE KUNKEL
MY COMMISSION # DD 431408
EXPIRES September 30, 2009

Printed Name

_____

melanie-epdocs\taks\lot30g-rosen\seller\docs

Book20708/Page1004                              Page 1 of 1

KROSEN - 000088



THIS INSTRUMENT PREPARED BY:
RECORD & RETURN TO

Frank A. Barbieri, Jr., Esquire
Sachs Sax Caplan
6111 Broken Sound Parkway NW
Boca Raton, Florida 33487
Phone: (561)994-4499
4/28/09
Property Control No.: 00-42-46-31-09-000-1430
00-42-46-31-02-002-0030

CFN 20090151756
OR BK 23215 PG 0208
RECORDED 05/06/2009 13:19:27
Palm Beach County, Florida
AMT 10.00
Doc Stamp 0.70
Sharon R. Bock, CLERK & COMPTROLLER
Pgs 0208 - 210; (3pgs)

## SPECIAL WARRANTY DEED

THIS IS A CORRECTIVE SPECIAL WARRANTY DEED TO CORRECT THE NAME OF THE GRANTEE IN THOSE PRIOR SPECIAL WARRANTY DEEDS RECORDED IN OFFICIAL RECORD BOOK 18453, AT PAGE 970, AND OFFICIAL RECORD BOOK 19073 AT PAGE 548.

THIS Warranty Deed, is made this 3⁰ day of _April_ , 2009, between THE OAKS AT BOCA RATON VENTURE, L.P., a Florida limited partnership, formerly known as FOX HILL VENTURE, L.P., a Florida limited partnership, having its principal place of business c/o Kenco Communities, 1000 Clint Moore Road, Suite 110, Boca Raton, Florida 33487 (hereinafter called the "Grantor") and ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, a/k/a ALBANESE-POPKIN DEVELOPMENT GROUP, L.P., a Florida limited partnership, having its principal place of business at 1200 South Rogers Circle #11, Boca Raton, Florida 33487 (hereinafter called "Grantee")

WITNESSETH That the Grantor, for and in consideration of the sum of Ten Dollars U.S. Dollars ($10.00) lawful money of the United States of America, to it in hand paid by the Grantee, at or before the ensealing and delivery of these presents, the receipt of which is hereby acknowledged, has granted, bargained, sold, aliened, remised, released, conveyed and confirmed and by these presents does grant, bargain, sell, alien, remise, release, convey and confirm unto the Grantee and their heirs or successors and assigns forever, the following parcel of land, situate, lying and being in the County of Palm Beach, State of Florida, and more particularly described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

*Note to title examiners: The name "Albanese-Popkin Development Group L.P., a Florida limited partnership", was used as Grantee in the original Warranty Deed recorded in Official Records Book 18153, Page 970. No such company, however, ever existed under that name and the correct name of the Grantee should have been "Albanese-Popkin The Oaks Development Group, L.P., a Florida limited partnership, a/k/a Albanese-Popkin Development Group L.P., a Florida limited partnership".*

SUBJECT TO All restrictions, reservations, covenants and easements relating thereto, taxes and assessments for the year 2009 and years subsequent thereto; land use regulations and restrictions imposed by governmental authorities;

TO HAVE AND TO HOLD, the same in fee simple forever

AND the Grantor does hereby covenant with the Grantee that it is lawfully seized of said land in fee simple; that it has good right and lawful authority to sell and convey said land, that it hereby fully warrants the title of said land and will defend the same against the lawful claims of all persons claiming by, through, or under the said Grantor

"Grantor" and "Grantee" are used for singular or plural, as the context requires.

*[SIGNATURES BEGIN ON NEXT PAGE]*

Page -1-

Book23215/Page208                    Page 1 of 3

KROSEN - 000089

IN WITNESS WHEREOF, the Grantor has hereunto set Grantor's hand and seal the day and year first above written

Signed, sealed and delivered in the presence of

_(signature)_

Witness
Print Name _Beverly A Donnelly_

_(signature)_

Witness
Print Name _Carol A. Smith_

THE OAKS AT BOCA RATON VENTURE, L.P., a Florida limited partnership, formerly known as Fox Hill Venture, L.P., a Florida limited partnership

BY: THE OAKS AT BOCA RATON DEVELOPMENT, LLC, a Florida limited liability company, General Partner

By: _(signature)_ Mgr.

Edward D. Popkin, Manager

STATE OF FLORIDA )
COUNTY OF PALM BEACH )

I hereby certify that on this 30 day of _April_ , 2009 before me, an officer duly authorized in the State and County aforesaid to take acknowledgments, personally appeared, Edward D. Popkin, as Manager of THE OAKS AT BOCA RATON DEVELOPMENT, LLC, a Florida limited liability company, the General Partner of THE OAKS AT BOCA RATON VENTURE, L.P., a Florida limited partnership, formerly known as Fox Hill Venture, L.P., a Florida limited partnership, named as Grantor in the foregoing deed, that he acknowledges executing the same in the present of two subscribing witnesses freely and voluntarily under authority duly vested in him by said company and who is personally known to me and who did not take an oath.

_(notary seal)_
CAROL A. SMITH
Notary Public - State of Florida
My Commission Expires May 17, 2012
Commission # DD 174255
Bonded Through National Notary Assn.

_(signature)_
Notary Public

_Carol A. Smith_
Printed Name

My Commission Expires:

Page 2

Book23215/Page209                    Page 2 of 3

KROSEN - 000090

Exhibit "A"

Lots 314, 148 and 149 Block B1, FOX HILL ESTATES OF BOCA RATON, according to the plat thereof, as recorded in Plat Book 87, Pages 4 through 12 of the Public Records of Palm Beach County, Florida.

Lots 1, 5 and 19, Block B2, OAKS AT BOCA RATON PLAT ONE, according to the plat thereof, as recorded in Plat Book 95, Pages 16 through 22 of the Public Records of Palm Beach County, Florida.

Lot 2, Block C1, OAKS AT BOCA RATON PLAT TWO, according to the plat thereof, as recorded in Plat Book 98, Pages 196 through 198 of the Public Records of Palm Beach County, Florida.

Lots 25, 26, 28, 30, 33, 35, 36, 39 and 40, Block C2, OAKS AT BOCA RATON PLAT FOUR, according to the plat thereof, as recorded in Plat Book 99, Pages 180 through 181 of the Public Records of Palm Beach County, Florida.

Lots 3, 4, 6, 8, 11, 18, 22, 27, 29, 30, 32, 36, 39, 40, 42, 43, 48, 50, 52, 55, 56, 59, 62, 64, 65, and 68 Block D, OAKS AT BOCA RATON PLAT FIVE, according to the plat thereof, as recorded in Plat Book 100, Pages 76 through 83, of the Public Records of Palm Beach County, Florida.

Lots 2, 4, 5, 6, 10, 12, 15, 16, 17, 21, 24, 25, 26, 28, 29, 30, 32, 36, 37, 41, 43, 44, 46, 47, 50, 51, 54, 55, 57, 59, 60, 63, 65, 67, and 70, Block F, OAKS AT BOCA RATON PLAT EIGHT, as recorded in Plat Book 103, Pages 115 through 119, of the Public Records of Palm Beach County, Florida.

Lots 3, 5, 7, 9, 11, 12, 15, 16, 18, 20, 22, 24, 26, 27, and 30, Block G1, OAKS AT BOCA RATON PLAT SIX, according to the plat thereof, as recorded in Plat Book 103, Pages 57 through 63 of the Public Records of Palm Beach County, Florida.

Lots 1, 2, 3, 4, 6, 9, 11, 13, 15, 19, 22, 25, 27, 28, 29, 33, 35, 36, 37, 39, 42, 44, 46, 49, 51, 52, and 53, Block G2, OAKS AT BOCA RATON PLAT EIGHT, according to the plat thereof, as recorded in Plat Book 103, Pages 115 through 119, of the Public Records of Palm Beach County, Florida.

Book23215/Page210          Page 3 of 3

KROSEN - 000091

THIS INSTRUMENT PREPARED BY:
RECORD & RETURN TO:
Carl E. Siegel, Esquire
Siegel, Lipman, Dunay & Shepard, LLP / HK
5355 Town Center Road, Suite 801
Boca Raton, Florida 33486
Property Control Nos.
00-42-46-31-01-000-1430
00-42-46-31-03-000-0030

```
CFN 20050095925
OR BK 18153 PG 0970
RECORDED 02/17/2005 09:35:40
Palm Beach County, Florida
AMT 15,971,633.00
Doc Stamp 111,801.90
Sharon R. Bock, CLERK & COMPTROLLER
Pgs 0970 - 971; (2pgs)
```

```
CFN 20050508085
OR BK 19073 PG 0548
RECORDED 08/12/2005 11:28:44
Palm Beach County, Florida
Sharon R. Bock, CLERK & COMPTRO
Pgs 0548 - 549; (2pgs)
```

* THIS DEED IS BEING RE-RECORDED TO CORRECT THE NAME
OF THE GRANTEE TO: ALBANESE-POPKIN THE OAKS DEVELOPMENT
GROUP, L.P., a Florida
limited partnership      SPECIAL WARRANTY DEED

THIS Warranty Deed, made this 9 day of February, 2005, between THE OAKS AT BOCA RATON VENTURE, L.P., a Florida limited partnership, formerly known as FOX HILL VENTURE, L.P., a Florida limited partnership, having its principal place of business c/o Kenco Communities at 1000 Clint Moore Road, Suite 110, Boca Raton, FL 33487, (hereinafter called the "Grantor") and ALBANESE-POPKIN DEVELOPMENT GROUP L.P., a Florida limited partnership, having its principal place of business at 1200 S. Rogers Circle #11, Boca Raton, FL 33487 (hereinafter called "Grantee"),

WITNESSETH That the Grantor, for and in consideration of the sum of Ten Dollars U.S. Dollars ($10.00) lawful money of the United States of America, to it in hand paid by the Grantee, at or before the ensealing and delivery of these presents, the receipt of which is hereby acknowledged, has granted, bargained, sold, aliened, remised, released, conveyed and confirmed and by these presents does grant, bargain, sell, alien, remise, release, convey and confirm unto the Grantee and their heirs or successors and assigns forever, the following parcel of land, situate, lying and being in the County of Palm Beach, State of Florida, more particularly described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

SUBJECT TO: All restrictions, reservations, covenants and easements relating thereto; taxes and assessments for the year 2004 and years subsequent thereto; land use regulations and restrictions imposed by governmental authorities;

TO HAVE AND TO HOLD, the same in fee simple forever.

AND the Grantor does hereby covenant with the Grantee that it is lawfully seized of said land in fee simple; that it has good right and lawful authority to sell and convey said land; that it hereby fully warrants the title of said land and will defend the same against the lawful claims of all persons claiming by, through, or under the said Grantor.

"Grantor" and "Grantee" are used for singular or plural as the context requires.

IN WITNESS WHEREOF, the Grantor has hereunto set Grantor's hand and seal the day and year first above written.

Signed, sealed and delivered
in the presence of:

Chas E. Sisbel
Printed Name:

Melanie Kunkel
Printed Name:

THE OAKS AT BOCA RATON VENTURE L.P., a
Florida limited partnership, formerly known as
Fox Hill Venture, L.P., a Florida limited partnership

By:

Edward D. Popkin, Manager
of THE OAKS AT BOCA RATON DEVELOPMENT,
LLC, a Florida limited liability company, its
General Partner

STATE OF FLORIDA      )
COUNTY OF PALM BEACH  )

I hereby certify that on this 9 day of February, 2005, before me, an officer duly authorized in the State and County aforesaid to take acknowledgments, personally appeared, Edward D. Popkin, Manager of THE OAKS AT BOCA RATON DEVELOPMENT, LLC., a Florida limited liability company, as General Partner of THE OAKS AT BOCA RATON VENTURE, L.P., a Florida limited partnership, named as Grantor in the foregoing deed, that he severally acknowledges executing the same in the present of two subscribing witnesses freely and voluntarily under authority duly vested in him by said company and who is personally known to me and who did not take an oath.

Notary Public

My Commission Expires:

Printed Name:

Book19073/Page548                    Page 1 of 2

KROSEN - 000092

## Exhibit "A"

Lots 114, 148 and 149 Block B1, FOX HILL ESTATES OF BOCA RATON, according to the plat thereof, as recorded in Plat Book 87, Pages 4 through 12 of the Public Records of Palm Beach County, Florida.

Lots 1, 5 and 19, Block B2, OAKS AT BOCA RATON PLAT ONE, according to the plat thereof, as recorded in Plat Book 95, Pages 16 through 22 of the Public Records of Palm Beach County, Florida.

Lot 2, Block C1, OAKS AT BOCA RATON PLAT TWO, according to the plat thereof, as recorded in Plat Book 98, Pages 196 through 198 of the Public Records of Palm Beach County, Florida.

Lots 25, 26, 28, 30, 32, 35, 38, 39, and 40, Block C2, OAKS AT BOCA RATON PLAT FOUR, according to the plat thereof, as recorded in Plat Book 99, Pages 180 through 181 of the Public Records of Palm Beach County, Florida.

Lots 3, 4, 6, 8, 11, 18, 22, 27, 29, 30, 32, 36, 39, 40, 42, 43, 48, 50, 52, 55, 56, 59, 62, 64, 65, and 68 Block D, OAKS AT BOCA RATON PLAT FIVE, according to the plat thereof, as recorded in Plat Book 100, Pages 76 through 83 of the Public Records of Palm Beach County, Florida.

Lots 2, 4, 5, 6, 10, 12, 15, 16, 17, 21, 24, 25, 26, 28, 29, 30, 32, 36, 37, 41, 43, 44, 46, 47, 50, 51, 54, 55, 57, 59, 60, 63, 65, 67, and 70, Block F, OAKS AT BOCA RATON PLAT EIGHT, as recorded in Plat Book 103, Pages 115 through 119, of the Public Records of Palm Beach County, Florida.

Lots 3, 5, 7, 9, 11, 12, 15, 16, 18, 20, 22, 24, 26, 27, and 30, Block G1, OAKS AT BOCA RATON PLAT SIX, according to the plat thereof, as recorded in Plat Book 103, Pages 57 through 63 of the Public Records of Palm Beach County, Florida.

Lots 1, 2, 3, 4, 6, 9, 11, 13, 15, 19, 22, 25, 27, 28, 29, 33, 35, 36, 37, 39, 42, 44, 46, 49, 51, 52, and 53, Block G2, OAKS AT BOCA RATON PLAT EIGHT, according to the plat thereof, as recorded in Plat Book 103, Pages 115 through 119, of the Public Records of Palm Beach County, Florida.

Book19073/Page549

Page 2 of 2

KROSEN - 000093

**Uniform Residential Appraisal Report**     File #   06140241

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | |
|---|---|
| Property Address 17830 MONTE VISTA DRIVE | City BOCA RATON   State FL   Zip Code 33496 |
| Borrower ROSEN, KEVIN & STACEY | Owner of Public Record ALBANESE-POPKIN THE OAKS DEVELOPMENT LP County PALM BEACH |
| Legal Description OAKS AT BOCA RATON PL 6 LOT 30 BLK G1 | |
| | Tax Year 2006   R.E. Taxes $ 21,003.00 *est |
| Neighborhood Name THE OAKS AT BOCA RATON | Map Reference 46-42-31   Census Tract 79.05 |
| Occupant ☐ Owner ☐ Tenant ☒ Vacant   Special Assessments $ NONE | ☒ PUD   HOA $ 653.08   ☐ per year ☒ per month |
| Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe) | |
| Assignment Type ☒ Purchase Transaction ☐ Refinance Transaction ☐ Other (describe) | |
| Lender/Client WACHOVIA MORTGAGE CORP.   Address 6451 N FEDERAL HIGHWAY, STE 500, FT LAUDERDALE, FL 33308 | |

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☒ Yes ☐ No
Report data source(s) used, offering price(s), and date(s). THE SUBJECT IS CURRENTLY UNDER CONTRACT FOR $1,050,000 WITH THE DEVELOPER. THE SUBJECT PROPERTY HAS NOT BEEN LISTED IN THE MLS.

☒ I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. THE CONTRACT PROVIDED WAS REVIEWED.

Contract Price $ 1,050,000   Date of Contract 11/2004   Is the property seller the owner of public record? ☒ Yes ☐ No   Data Source(s) ISC/PUBLIC RECORDS
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☒ No
If Yes, report the total dollar amount and describe the items to be paid. THE CONTRACT PROVIDED DID NOT STATE ANY FINANCIAL ASSISTANCE TO BE PAID BY ANY PARTY ON BEHALF OF THE BORROWER.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | Present Land Use % |
|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☒ Increasing ☐ Stable ☐ Declining | PRICE $(000) / AGE (yrs) | One-Unit 100 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | 200± Low / NEW Low | 2-4 Unit % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | 2 MIL+ High / 1 | Multi-Family % / Commercial % |
| | | 1 MIL+/- Pred. NEW | Other % |

Neighborhood Boundaries THE SUBJECT NEIGHBORHOOD IS BOUNDED BY ATLANTIC AVE TO THE NORTH; LYONS RD TO THE EAST; CLINT MOORE RD TO THE SOUTH; SR 7 TO THE WEST.
Neighborhood Description THE SUBJECT IS LOCATED IN AN ESTABLISHED NEIGHBORHOOD. IT IS WITHIN CLOSE PROXIMITY TO COMMUNITY SERVICES INCLUDING SCHOOLS, TRANSPORTATION, PARKS, SHOPPING AND PLACES OF WORSHIP. EMPLOYMENT CENTERS ARE NEARBY. FIRE AND POLICE PROTECTION ARE ADEQUATE. NEIGHBORHOOD APPEAL IS POSITIVE.
Market Conditions (including support for the above conclusions) MARKET CONDITIONS IN THE AREA APPEAR TO BE STABLE TO INCREASING WHILE SUPPLY AND DEMAND REMAIN IN BALANCE. MARKET TIME IS TYPICALLY BETWEEN 3 TO 6 MONTHS. NO SPECIAL FINANCING FACTORS ARE EVIDENT IN THE AREA. MOST OF THE SALES ARE CLOSED WITH CONVENTIONAL FINANCING AND SPECIAL SALES CONCESSIONS ARE NOT EVIDENT ON MOST SALES.

| | |
|---|---|
| Dimensions N/A-PER PLAT - SUBJECT TO SURVEY | Area 13,068 SQFT   Shape IRREGULAR   View RESIDENTIAL/PARTIAL LAKE |
| Specific Zoning Classification PUD | Zoning Description PLANNED UNIT DEVELOPMENT |
| Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe) | |

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe. THE PRESENT USE OF THE SUBJECT IS THE HIGHEST AND BEST USE AS IMPROVED.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements — Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | FPL | Water | ☒ | MUNICIPALITY | Street ASPHALT | ☒ | |
| Gas | | | Sanitary Sewer | ☒ | MUNICIPALITY | Alley NONE | | |

FEMA Special Flood Hazard Area? ☐ Yes ☒ No   FEMA Flood Zone B   FEMA Map # 1201920215 A   FEMA Map Date 2/1/1979
Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe TYPICAL OF THE AREA.
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe THE APPRAISER DID NOT OBSERVE ANY KNOWN ADVERSE ENVIRONMENTAL CONDITIONS AT THE TIME OF INSPECTION. HOWEVER, THE APPRAISER IS NOT AN ENVIRONMENTAL EXPERT.

| General Description | Foundation | Exterior Description materials/condition | Interior materials/condition |
|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | Foundation Walls CONCRETE BLOCK/AVG | Floors MARBLE/WOOD/NEW |
| # of Stories 2 | ☐ Full Basement ☐ Partial Basement | Exterior Walls STUCCO/AVG | Walls DRYWALL/NEW |
| Type ☒ Det ☐ Att ☐ S-Det/End Unit | Basement Area NONE sq. ft. | Roof Surface BARREL/AVG | Trim/Finish WOOD/NEW |
| ☒ Existing ☐ Proposed ☐ Under Const. | Basement Finished NONE % | Gutters & Downspouts YES/AVG | Bath Floor MARBLE/TILE/NEW |
| Design (Style) 2-STORY | ☐ Outside Entry/Exit ☐ Sump Pump | Window Type CASEMENT/AVG | Bath Wainscot DRYWALL/NEW |
| Year Built 2006 | Evidence of ☐ Infestation | Storm Sash/Insulated IMPACT/AVG | Car Storage ☐ None |
| Effective Age (Yrs) 0 | ☐ Dampness ☐ Settlement | Screens NONE | ☒ Driveway # of Cars 3 |
| Attic ☐ None | Heating ☒ FWA ☐ HWBB ☐ Radiant | Amenities ☐ WoodStove(s) # | Driveway Surface BRICK PAVER |
| ☐ Drop Stair ☐ Stairs | ☐ Other   Fuel ELECTRIC | ☐ Fireplace(s) #   ☒ Fence METAL | ☒ Garage # of Cars 3 |
| ☐ Floor ☒ Scuttle | Cooling ☒ Central Air Conditioning | ☒ Patio/Deck COV'D ☒ Porch COV'D | ☐ Carport # of Cars |
| ☐ Finished ☐ Heated | ☐ Individual ☐ Other | ☒ Pool BLW GRND ☐ Other | ☐ Att. ☐ Det. ☒ Built-in |
| Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☒ Washer/Dryer ☐ Other (describe) | | | |
| Finished area above grade contains: 10 Rooms   3 Bedrooms   5F 2H Bath(s)   4,604 Square Feet of Gross Living Area Above Grade | | | |

Additional features (special energy efficient items, etc.) STANDARD ENERGY EFFICIENT ITEMS.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.) THE OVERALL CONDITION OF THE SUBJECT IS CONSIDERED AVERAGE FOR THE AREA. NO DEFERRED MAINTENANCE WAS NOTED. FLOOR PLAN APPEARS FUNCTIONAL AND CONSISTENT WITH AREA.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe THE APPRAISER DID NOT OBSERVE ANY PHYSICAL DEFICIENCIES OR ADVERSE CONDITIONS THAT WOULD AFFECT THE LIVABILITY, SOUNDNESS OR STRUCTURAL INTEGRITY OF THE SUBJECT PROPERTY.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe THE SUBJECT GENERALLY CONFORMS TO NEIGHBORHOOD STANDARDS IN STYLE, CONDITION, USE, CONSTRUCTION AND FUNCTIONAL UTILITY.

Freddie Mac Form 70 (March 2005)    This form was reproduced by United Systems Software Company (800) 969-4227 - Page 1 of 6    Fannie Mae Form 1004 (March 2005)

KROSEN - 000095

## Uniform Residential Appraisal Report

File # 06140241

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| There are __ 3 __ comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 1,691,059 | | | | to $ 2,763,772 | | | |
| There are __ N/A __ comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 0 | | | | to $ 0 | | | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 17830 MONTE VISTA DRIVE BOCA RATON, FL 33496 | 17745 LAKE AZURE WAY BOCA RATON, FL 33496 | | 17787 LAKE AZURE WAY BOCA RATON, FL 33496 | | 9604 BRIDGEBROOK DRIVE BOCA RATON, FL 33496 | |
| Proximity to Subject | | SAME COMMUNITY | | SAME COMMUNITY | | SAME COMMUNITY | |
| Sale Price | $ 1,050,000 | | $ 1,038,890 | | $ 1,163,782 | | $ 1,120,000 |
| Sale Price/Gross Liv. Area | $ 228.06 sq. ft. | $ 229.59 sq. ft. | | $ 264.26 sq. ft. | | $ 261.56 sq. ft. | |
| Data Source(s) | | ISC/PUBLIC RECORDS/SALES CENTER | | ISC/PUBLIC RECORDS/SALES CENTER | | ISC/PUBLIC RECORDS/SALES CENTER | |
| Verification Source(s) | | EXTERIOR OBSERVATION | | EXTERIOR OBSERVATION | | EXTERIOR OBSERVATION | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | CONV MTG NONE NOTED | | CONV MTG NONE NOTED | | CONV MTG NONE NOTED | |
| Date of Sale/Time | | 4/2006 | | 5/2006 | | 5/2006 | |
| Location | SUBURBAN | SUBURBAN | | SUBURBAN | | SUBURBAN | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 13,068 SQFT | 7,841 SQFT | 19,454 | 7,841 SQFT | 19,454 | 10,890 SQFT | NO ADJ |
| View | RESD/PARTIAL LAKE | RESIDENTIAL | 15,000 | RSTD/LAKE | -15,000 | RSFD/LAKE | -15,000 |
| Design (Style) | 2-STORY | 2-STORY | | 2-STORY | | 2-STORY | |
| Quality of Construction | CBS | CBS | | CBS | | CBS | |
| Actual Age | 2006 | 2006 | | 2006 | | 2006 | |
| Condition | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Above Grade | Total / Bdrms / Baths | Total / Bdrms / Baths | | Total / Bdrms / Baths | | Total / Bdrms / Baths | |
| Room Count | 10 / 5 / 5F 2H | 10 / 5 / 4F 2H | 8,000 | 10 / 5 / 4F 2H | INCL BLW | 10 / 4 / 4F 2H | INC BLW |
| Gross Living Area | 4,604 sq. ft. | 4,525 sq. ft. | | 4,404 sq. ft. | 13,000 | 4,282 sq. ft. | 20,930 |
| Basement & Finished Rooms Below Grade | NONE NONE | NONE NONE | | NONE NONE | | NONE NONE | |
| Functional Utility | ADEQUATE | ADEQUATE | | ADEQUATE | | ADEQUATE | |
| Heating/Cooling | CENTRAL | CENTRAL | | CENTRAL | | CENTRAL | |
| Energy Efficient Items | STANDARD | STANDARD | | STANDARD | | STANDARD | |
| Garage/Carport | 3 CAR GARAGE | 3 CAR GARAGE | | 3 CAR GARAGE | | 3 CAR GARAGE | |
| Porch/Patio/Deck | PORCH/PATIO | PORCH/PATIO | | PORCH/PATIO | | PORCH/PATIO | |
| IMPROVEMENTS | POOL | POOL | | POOL | | POOL | |
| Net Adjustment (Total) | | ☒ + ☐ − | $ 33,454 | ☒ + ☐ − | $ 8,454 | ☒ + ☐ − | $ 5,930 |
| Adjusted Sale Price of Comparables | | Net Adj. 3.22% Gross Adj. 3.22% | $ 1,072,344 | Net Adj. 0.73% Gross Adj. 3.30% | $ 1,172,236 | Net Adj. 0.53% Gross Adj. 3.21% | $ 1,125,930 |

☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain THE APPRAISER RESEARCHED THE SALE AND/OR TRANSFER HISTORY OF THE SUBJECT PROPERTY AND THE COMPARABLE SALES.

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) ISC/TAX RECORDS

My research ☐ did ☒ did not reveal any prior sales or transfers of the comparables sales for the year prior to the date of sale of the comparable sale.
Data Source(s) ISC/TAX RECORDS

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | NO PRIOR SALE WITHIN 3 YRS | NO PRIOR SALE WITHIN 3 YRS | NO PRIOR SALE WITHIN 3 YRS | NO PRIOR SALE WITHIN 3 YRS |
| Price of Prior Sale/Transfer | NEW CONSTRUCTION | DEVELOPER SALE | DEVELOPER SALE | DEVELOPER SALE |
| Data Source(s) | ISC/TAX/PUBLIC RECORDS | ISC/TAX/PUBLIC RECORDS | ISC/TAX/PUBLIC RECORDS | ISC/TAX/PUBLIC RECORDS |
| Effective Date of Data Source(s) | 7/17/2006 | 7/17/2006 | 7/17/2006 | 7/17/2006 |

Analysis of prior sale or transfer history of the subject property and comparable sales THE SUBJECT IS CURRENTLY UNDER CONTRACT FOR $1,050,000 WITH THE DEVELOPER. THE SUBJECT PROPERTY HAS NOT BEEN LISTED IN THE MLS.

Summary of Sales Comparison Approach THE SALES UTILIZED ARE LOCATED IN THE SUBJECT MARKET AREA AND ARE CONSIDERED TO BE RELIABLE INDICATORS OF MARKET VALUE. THE APPRAISER MADE AN EFFORT TO LOCATE AND UTILIZE RECENT SALES THAT BRACKET THE SUBJECT PROPERTY IN MOST ASPECTS. PER THE SALES CENTER, AT TIME OF INSPECTION THERE HAVE BEEN NO CLOSED SALES OF A MONTE VERDE MODEL. THE SALES UTILIZED ARE COMPARABLE TO THE SUBJECT IN TERMS OF LOCATION, ROOM COUNT, GROSS LIVING AREA AND DESIGN/APPEAL.

ALL THREE SALES ARE DEVELOPER SALES WITH NO PRIOR SALE.

THE SUBJECT PROPERTY WILL REQUIRE A FINAL INSPECTION ONCE COMPLETED.

Indicated Value by Sales Comparison Approach $ 1,100,000

Indicated Value by: Sales Comparison Approach $ 1,100,000      Cost Approach (if developed) $ 1,097,110      Income Approach (if developed) $ N/A

PRINCIPAL RELIANCE IS PLACED ON THE SALES COMPARISON APPROACH. THE COST APPROACH LENDS SUPPORT. THE INCOME APPROACH WAS NOT UTILIZED.

This appraisal is made ☐ "as is", ☒ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 1,100,000 , as of 7/17/2005 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 (March 2005)      This form was reproduced by United Systems Software Company (800) 969-8727 - Page 2 of 6      Fannie Mae Form 1004 (March 2005)

KROSEN - 000096

## Uniform Residential Appraisal Report

File # _____  06140241

ADDITIONAL COMMENTS:

AT TIME OF INSPECTION, THERE WAS ONLY ONE CLOSED SALE ON THE SUBJECT STREET (THE SANCTUARY). IN THE REVIEWER'S OPINION, THE CLOSED SALE WAS BY FAR SUPERIOR TO THE SUBJECT AND THEREFORE NOT UTILIZED.

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value) THE APPRAISER HAS ANALYZED AREA VACANT LAND VALUES AND HAS CONSIDERED THE ABSTRACTION METHOD IN DETERMINING THE SUBJECT PROPERTY SITE VALUE. MOST WEIGHT WAS PLACED ON THE ABSTRACTION METHOD DUE TO THE LACK OF RECENT VACANT LAND SALES IN THE NEIGHBORHOOD AREA.

| | | | |
|---|---|---|---|
| ESTIMATED [X] REPRODUCTION OR [ ] REPLACEMENT COST NEW | OPINION OF SITE VALUE | = $ | 300,000 |
| Source of cost data MARSHALL & SWIFT RESIDENTIAL COST HANDBOOK | Dwelling 4,604 Sq. Ft. @ $ 135.00 | = $ | 621,540 |
| Quality rating from cost service AVG Effective date of cost data 2006 | Sq. Ft. @ $ | = $ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | APPLIANCES/UPGRADES/EQUIPMENT/POOL | = $ | 100,000 |
| COST FIGURES DERIVED FROM MARSHALL & SWIFT'S RESIDENTIAL | Garage/Carport 778 Sq. Ft. @ $ 65.00 | = $ | 50,570 |
| HANDBOOK & LOCAL BUILDERS. SEE ATTACHED FLOOR PLAN. ESTIMATED | Total Estimate of Cost-New | = $ | 772,110 |
| TOTAL LIFE= 60 YEARS. ESTIMATED REMAINING ECONOMIC LIFE= 60 | Less Physical 0.00% Functional External | | |
| YEARS. LAND TO VALUE RATIO IS TYPICAL FOR THE AREA AND HAS NO | Depreciation 0 | = $ ( | 0) |
| ADVERSE AFFECT ON MARKET VALUE. | Depreciated Cost of Improvements | = $ | 772,110 |
| | "As-is" Value of Site Improvements | = $ | 25,000 |
| | | = $ | |
| Estimating Remaining Economic Life (HUD and VA only) Years | Indicated Value by Cost Approach | = $ | 1,097,110 |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| | | | |
|---|---|---|---|
| Estimated Monthly Market Rent $ N/A | X Gross Rent Multiplier N/A = $N/A | Indicated Value by Income Approach | |

Summary of Income Approach (including support for market rent and GRM) THE INCOME APPROACH WAS NOT UTILIZED IN THE APPRAISAL REPORT.

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? [X] Yes [ ] No Unit type(s) [X] Detached [ ] Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project _____

| Total number of phases _____ | Total number of units _____ | Total number of units sold _____ |
|---|---|---|
| Total number of units rented _____ | Total number of units for sale _____ | Data source(s) _____ |

Was the project created by the conversion of existing building(s) into a PUD? [ ] Yes [ ] No If Yes, date of conversion.

Does the project contain any multi-dwelling units? [ ] Yes [ ] No Data source(s) _____

Are the units, common elements, and recreational facilities complete? [ ] Yes [ ] No If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? [ ] Yes [ ] No If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Freddie Mac Form 70 (March 2005)     This form was reproduced by United Systems Software Company (800) 960-8737 · Page 3 of 6     Fannie Mae Form 1004 (March 2005)

KROSEN - 000097

Uniform Residential Appraisal Report    File #    06140241

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

KROSEN - 000098

Uniform Residential Appraisal Report | File # | 08140241

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change is made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Freddie Mac Form 70 (March 2005) | This form was reproduced by United Systems Software Company (800) 555-6727 - Page 5 of 8 | Fannie Mae Form 1004 (March 2005)

INVOICE



KROSEN - 000094

Uniform Residential Appraisal Report    File #    06140241

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION: The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of the Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

ACKNOWLEDGMENT IS GIVEN TO KARI RYMUT, RI-9950 IN THE PREPARATION OF THIS REPORT.
PLEASE NOTE THESE ELECTRONIC SIGNATURES ARE TRUE AND CERTIFIED SIGNATURES.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  MICHAEL FACENDO | Name |
| Company Name  FACENDO ASSOCIATES, INC | Company Name |
| Company Address  8950 CYPRESS ROAD, SUITE 206 | Company Address |
| PLANTATION, FL 33317 | |
| Telephone Number | Telephone Number |
| Email Address  INFO@FACENDO.COM | Email Address |
| Date of Signature and Report  7/18/2006 | Date of Signature |
| Effective Date of Appraisal  7/17/2006 | State Certification # |
| State Certification #  ST. CERT. RES. REA. | or State License # |
| or State License #  RD-2508 | State |
| or Other (describe)          State # | Expiration Date of Certification or License |
| State    FL | |
| Expiration Date of Certification or License  11/30/2006 | |

| ADDRESS OF PROPERTY APPRAISED | SUBJECT PROPERTY |
|---|---|
| 17830 MONTE VISTA DRIVE | ☐ Did not inspect subject property |
| BOCA RATON, FL 33496 | ☐ Did inspect exterior of subject property from street |
| | Date of Inspection |
| APPRAISED VALUE OF SUBJECT PROPERTY $  1,100,000 | ☐ Did inspect interior and exterior of subject property |
| | Date of Inspection |
| LENDER/CLIENT | |
| Name  L. | |
| Company Name  WACHOVIA MORTGAGE CORP. | COMPARABLE SALES |
| Company Address  6451 N FEDERAL HIGHWAY | ☐ Did not inspect exterior of comparable sales from street |
| STE 500, FT LAUDERDALE, FL 33308 | ☐ Did inspect exterior of comparable sales from street |
| Email Address | Date of Inspection |

Freddie Mac Form 70 (March 2006)    This form was reproduced by United Systems Software Company (850) 968-8727 - Page 6 of 6    Fannie Mae Form 1004 (March 2006)

KROSEN - 000100

SKETCH

| Borrower/Client | ROSEN, KEVIN & STACEY | | | | | |
|---|---|---|---|---|---|---|
| Address | 17810 MONTE VISTA DRIVE | | | | Unit No. | N/A |
| City | BOCA RATON | County | PALM BEACH | State | FL | Zip Code | 33496 |
| Lender/Client | WACHOVIA MORTGAGE CORP. | | | | | |



Designed by United Systems Software Company (800) 969-9771

KROSEN - 000101

SUBJECT PHOTOGRAPH ADDENDUM

| Borrower/Client | ROSEN, KEVIN & STACEY | | | | | | |
| Address | 17830 MONTE VISTA DRIVE | | | | | Unit No. | N/A |
| City | BOCA RATON | County | PALM BEACH | State | FL | Zip Code | 33496 |
| Lender/Client | WACHOVIA MORTGAGE CORP. | | | | | | |



Front View



Rear View



Street View

Designed by Uneed Systems Software Company (800) 969-8727

KROSEN - 000102

SUBJECT PHOTOGRAPH ADDENDUM

| | | | |
|---|---|---|---|
| Borrower/Client | ROSEN, KEVIN & STACEY | | |
| Address | 17830 MONTE VISTA DRIVE | Unit No. | N/A |
| City | BOCA RATON | County PALM BEACH | State FL | Zip Code 33496 |
| Lender/Client | WACHOVIA MORTGAGE CORP. | | |



Partial Lake View



Partial Lake View



Pool



Designed by United Systems Software Company (800) 969-8727

KROSEN - 000103

# COMPARABLE PHOTOGRAPH ADDENDUM

| Borrower/Client | ROSEN, KEVIN & STACEY | | | | | Unit No.: | N/A |
| Address | 17830 MONTE VISTA DRIVE | | | | | |
| City | BOCA RATON | County | PALM BEACH | State | FL | Zip Code | 33496 |
| Lender/Client | WACHOVIA MORTGAGE CORP. | | | | | |



**Sales Comparable 1**
Front View

| | |
|---|---|
| Address: | 17746 LAKE AZURE WAY |
| Prox. to Subject: | SAME COMMUNITY |
| Sales Price: $ | 1,038,890 |
| Gross Living Area: | 4,525 |
| Total Rooms: | 10 |
| Total Bedrooms: | 5 |
| Total Bathrooms: | 4F 2H |
| Location: | SUBURBAN |



**Sales Comparable 2**
Front View

| | |
|---|---|
| Address: | 17782 LAKE AZURE WAY |
| Prox. to Subject: | SAME COMMUNITY |
| Sales Price: $ | 1,163,782 |
| Gross Living Area: | 4,404 |
| Total Rooms: | 10 |
| Total Bedrooms: | 5 |
| Total Bathrooms: | 4F 2H |
| Location: | SUBURBAN |



**Sales Comparable 3**
Front View

| | |
|---|---|
| Address: | 9604 BRIDGEBROOK DRIVE |
| Prox. to Subject: | SAME COMMUNITY |
| Sales Price: $ | 1,120,000 |
| Gross Living Area: | 4,282 |
| Total Rooms: | 10 |
| Total Bedrooms: | 4 |
| Total Bathrooms: | 4F 2H |
| Location: | SUBURBAN |

Designed by United Systems Software Company (800) 969-8727

KROSEN - 000104

LOCATION MAP

| Borrower/Client | ROSEN, KEVIN & STACEY | | | | Unit No. | N/A |
|---|---|---|---|---|---|---|
| Address | 17830 MONTE VISTA DRIVE | | | | | |
| City | BOCA RATON | County | PALM BEACH | State FL | Zip Code | 33496 |
| Lender/Client | WACHOVIA MORTGAGE CORP. | | | | | |



Designed by United Systems Software Company (602) 969-8727

KROSEN - 000105

| A. | | OMB NO. 2502-0265 |
|---|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | B. TYPE OF LOAN: 1. ☐ FHA  2. ☐ FmHA  3. ☒ CONV. UNINS.  4. ☐ VA  5. ☐ CONV. INS. | |
| SETTLEMENT STATEMENT | 6. FILE NUMBER: | 7. LOAN NUMBER: |
| | 8. MORTGAGE INS. CASE NUMBER: | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.
1.0  3/86  (LGT30GROSEN.PFGR.OT30GROSEN18)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| Kevin Rosen and Stacey Rosen 17830 Monte Vista Drive Boca Raton, FL 33496 | Albanese-Popkin The Oaks Development Group, LLP | Wachovia Mortgage Corporation 1100 Corporate Center Drive Raleigh, NC 27607 |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT: | I. SETTLEMENT DATE: |
|---|---|---|
| 17830 Monte Vista Drive Boca Raton, FL 33496 Palm Beach County, Florida | Access Country Title, Inc. PLACE OF SETTLEMENT 5458 Town Center Rd., Ste.801 Boca Raton, FL 33486 | August 7, 2006 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER: | | 400. GROSS AMOUNT DUE TO SELLER: | |
| 101. Contract Sales Price | 1,050,000.00 | 401. Contract Sales Price | 1,050,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 14,437.73 | 403. | |
| 104. | | 404. | |
| 105. 2% Carrying Charge to Albanese-Popkin The Oaks | 21,000.00 | 405. 2% Carrying Charge | 21,000.00 |
| Adjustments For Items Paid By Seller in advance | | Adjustments For Items Paid By Seller in advance | |
| 106. City/Town Taxes         to | | 406. City/Town Taxes        to | |
| 107. County Taxes  01/01/05 to 12/31/05 | 4,202.14 | 407. County Taxes  01/01/ to 12/31/05 | 4,202.14 |
| 108. Assessments       to | | 408. Assessments       to | |
| 109. Survey Reimb | 375.00 | 409. Survey Reimb | 375.00 |
| 110. HOA Reimb 11/12/04-8/7/06 | 10,638.89 | 410. HOA Reimb 11/12/04-8/7/06 | 10,638.89 |
| 111. Water/Sewer Conn. Reimb | 4,450.00 | 411. Water/Sewer Conn. Reimb | 4,450.00 |
| 112. 1 1/2% Development Fee | 15,750.00 | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 1,120,853.76 | 420. GROSS AMOUNT DUE TO SELLER | 1,090,666.03 |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER: | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER: | |
| 201. Deposit or earnest money | 210,000.00 | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan | 175,000.00 | 502. Settlement Charges to Seller (Line 1400) | 10,537.10 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Lender Credit | 6,000.00 | 504. Payoff of first Mortgage to Ohio Savings Bank | 818,393.96 |
| 205. | | 505. Payoff of second Mortgage | |
| 206. | | 506. Deposit retained by seller | 210,000.00 |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments For Items Unpaid By Seller | | Adjustments For Items Unpaid By Seller | |
| 210. City/Town Taxes       to | | 510. City/Town Taxes       to | |
| 211. County Taxes       to | | 511. County Taxes       to | |
| 212. Assessments       to | | 512. Assessments       to | |
| 213. Commission Credit | 31,500.00 | 513. Commission Credit | 31,500.00 |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY/FOR BORROWER | 422,500.00 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | 1,070,431.06 |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER: | | 600. CASH AT SETTLEMENT TO/FROM SELLER: | |
| 301. Gross Amount Due From Borrower (Line 120) | 1,120,853.76 | 601. Gross Amount Due To Seller (Line 420) | 1,090,666.03 |
| 302. Less Amount Paid By/For Borrower (Line 220) | 422,500.00 | 602. Less Reductions Due Seller (Line 520) | 1,070,431.06 |
| 303. CASH ( X FROM ) ( TO ) BORROWER | 698,353.76 | 603. CASH ( X TO ) ( FROM ) SELLER | 20,234.97 |

The undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.

Borrower _____
Kevin Rosen
Stacey Rosen

Seller   Albanese-Popkin The Oaks Development Group, L.P., a Florida limited partnership

By: Albanese-Popkin Development Group, LLC a Florida limited liability company, General Partner

By _____
Executive VP

KROSEN - 000106

## L. SETTLEMENT CHARGES

| | | | | PAID FROM BORROWERS FUNDS AT SETTLEMENT | PAID FROM SELLERS FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|
| **700. TOTAL COMMISSION Based on Price** | $ 1,050,000.00 @ 3.5 % | | 36,750.00 | | |
| Division of Commission (line 700) as Follows: | | | | | |
| 701. $ 36,750.00 to The Oaks at Boca Raton Realty | | | | | |
| 702. $ to | | | | | |
| 703. Commission Paid at Settlement | | | POC $26250.00s | | |
| 704. | to | | | | 10,500.00 |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | | |
| 801. Loan Origination Fee | % | to | | | |
| 802. Loan Discount | % | to | | | |
| 803. Appraisal Fee | | to Facendo Associates | | 850.00 | |
| 804. Credit Report | | to Info 1 | | 30.00 | |
| 805. Tax Service Fee | | to Farets/Trets | | 78.00 | |
| 806. Processing Fee | | to Wachovia Mortgage Corporation | | 350.00 | |
| 807. Application Fee | | to Wachovia Mortgage Corporation | | 60.00 | |
| 808. Doc Transmission Fee | | to Wachovia Mortgage Corporation | | 25.00 | |
| 809. Flood Certification Fee | | to First American Flood | | 15.00 | |
| 810. Admin Fee | | to Wachovia Mortgage Corporation | | 300.00 | |
| 811. MERS Fee | | to Wachovia Mortgage Corporation | | 3.95 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | | |
| 901. Interest From 08/07/06 to 08/01/06 @ $ 32.363200/day ( 25 days %) | | | | 809.08 | |
| 902. Mortgage Insurance Premium for months to | | | | | |
| 903. Hazard Insurance Premium for 1.0 years to | | | | | |
| 904. | | | | | |
| 905. | | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | | | |
| 1001. Hazard Insurance | 3.000 months @ $ | 562.47 per month | | 1,687.41 | |
| 1002. Mortgage Insurance | months @ $ | per month | | | |
| 1003. City/Town Taxes | months @ $ | per month | | | |
| 1004. County Taxes | 12.000 months @ $ | 350.18 per month | | 4,202.16 | |
| 1005. Assessments | months @ $ | per month | | | |
| 1006. | months @ $ | per month | | | |
| 1007. Flood Insurance | 3.000 months @ $ | 26.42 per month | | 79.26 | |
| 1008. Aggregate Adjustment | months @ $ | per month | | -1,766.69 | |
| **1100. TITLE CHARGES** | | | | | |
| 1101. Settlement or Closing Fee | | to Cross Country Title, Inc. | | 425.00 | |
| 1102. Abstract or Title Search | | to | | | |
| 1103. E-File Digital Imaging | | to Forensis | | 35.00 | |
| 1104. Internet Download Fee | | to Siegel, Lipman, Dunay & Shepard | | 75.00 | |
| 1105. copy/fax/mail/courier fee | | to Siegel, Lipman, Dunay & Shepard | | 75.00 | |
| 1106. Notary Fees | | to | | | |
| 1107. Attorney's Fees | | to | | | |
| (includes above item numbers: | | ) | | | |
| 1108. Title Insurance | | to Cross Country Title, Inc. | | 250.00 | |
| (includes above item numbers: | | ) | | | |
| 1109. Lender's Coverage | $ 600,000.00 | | | | |
| 1110. Owner's Coverage | $ 1,050,000.00 | | | | |
| 1111. Florida Form 9 | | to Cross Country Title, Inc. | | 548.00 | |
| 1112. ALTA 5.1/6/8.1 | | to Cross Country Title, Inc. | | 75.00 | |
| 1113. Overnight/Courier Fees | | to Cross Country Title, Inc. | | 50.00 | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | | |
| 1201. Recording Fees: Deed $ 10.60; Mortgage $ 163.60; Releases $ | | POC $10.60s | | 163.60 | |
| 1202. City/County Tax/Stamps: Deed ; Mortgage | | 350.00 | | 350.00 | |
| 1203. State Tax/Stamps: Deed ; Mortgage | | 612.50 | | 612.50 | |
| 1204. Term. of NOC | | to Palm Beach County | | 37.10 | |
| 1205. | | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | | |
| 1301. Survey | | to | | | |
| 1302. Pest Inspection | | to | | | |
| 1303. Capital Contribution | | to The Oaks at Boca Raton POA | | 1,943.48 | |
| 1304. 3rd Qtr HQA 8/7-9/30/06 | | to The Oaks at Boca Raton POA | | 1,171.50 | |
| 1305. 4th Qtr POA | | to The Oaks at Boca Raton POA | | 1,943.48 | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | | | 14,437.73 | 10,537.10 |

By signing page 1 of this statement, the signatories acknowledge receipt of a completed copy of page 2 of this two page statement.

Cross Country Title, Inc.
Settlement Agent

Certified to be a true copy.

[ LOT30GROSEN / LOT30GROSEN / 16 ]

KROSEN - 000107

THIS INSTRUMENT PREPARED BY:
RECORD & RETURN TO:
Carl E. Siegel, Esquire
Cross Country Title, Inc.
5355 Town Center Road, Suite 801
Boca Raton, Florida 33486

Property Control No.: 00-42-46-31-07-007-0300

## SPECIAL WARRANTY DEED

THIS Warranty Deed, made this 1 day of August, 2006, between **ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P.,** a Florida limited partnership, by ALBANESE-POPKIN DEVELOPMENT GROUP, LLC a Florida limited liability Company, General Partner having its principal place of business c/o Albanese-Popkin The Oaks Development Group, L.P. 1200 S. Rogers Circle #11, Boca Raton, Florida 33487 (hereinafter called the "Grantor") and **KEVIN ROSEN and STACEY ROSEN,** husband and wife, whose post office address is: 17830 Monte Vista Drive, Boca Raton, Florida 33496, (hereinafter called "Grantee"):

WITNESSETH That the Grantor, for and in consideration of the sum of Ten Dollars U.S. Dollars ($10.00) lawful money of the United States of America, to it in hand paid by the Grantee, at or before the ensealing and delivery of these presents, the receipt of which is hereby acknowledged, has granted, bargained, sold, aliened, remised, released, conveyed and confirmed and by these presents does grant, bargain, sell, alien, remise, release, convey and confirm unto the Grantee and their heirs or successors and assigns forever. the following parcel of land, situate, lying and being in the County of Palm Beach, State of Florida, and more particularly described as follows:

Lot 30, Block G1 of OAKS AT BOCA RATON PLAT SIX, according to the Plat thereof, as recorded in Plat Book 103, Pages 57 thru 63, inclusive, of the Public Records of Palm Beach County, Florida.

SUBJECT TO: All restrictions, reservations, covenants and easements relating thereto; taxes and assessments for the year 2006 and years subsequent thereto; land use regulations and restrictions imposed by governmental authorities;

TO HAVE AND TO HOLD, the same in fee simple forever.

AND the Grantor does hereby covenant with the Grantee that it is lawfully seized of said land in fee simple; that it has good right and lawful authority to sell and convey said land; that it hereby fully warrants the title of said land and will defend the same against the lawful claims of all persons claiming by, through, or under the said Grantor.

"Grantor" and "Grantee" are used for singular or plural, as the context requires.

IN WITNESS WHEREOF, the Grantor has hereunto set Grantor's hand and seal the day and year first above written.

Signed, sealed and delivered
in the presence of

ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, BY: ALBANESE-POPKIN DEVELOPMENT GROUP, LLC a Florida limited liability Company, General Partner

By: _____

Edward D. Popkin, Manager

BEVERLY A. DONNELLY
Printed Name:

Melanie Kunkel
Printed Name:

STATE OF FLORIDA       )
COUNTY OF PALM BEACH   )

I hereby certify that on this 1 day of August, 2006 before me, an officer duly authorized in the State and County aforesaid to take acknowledgments, personally appeared, EDWARD D. POPKIN, as Manager of ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, BY: ALBANESE-POPKIN DEVELOPMENT GROUP, LLC a Florida limited liability Company, General Partner named as Grantor in the foregoing deed, that he severally acknowledges executing the same in the present of two subscribing witnesses freely and voluntarily under authority duly vested in him by said company and who is personally known to me and who did not take an oath.

_____
Notary Public

My Commission Expires:

MELANIE KUNKEL
MY COMMISSION # DD 491488
EXPIRES: September 20, 2009
Bonded Thru Notary Public Underwriters

Printed Name: _____

Melanie-wpdocs\oaks\lot30G-Rosen\sellersdocs

KROSEN - 000108

THIS INSTRUMENT PREPARED BY:
RECORD & RETURN TO:
Carl E. Siegel, Esquire
Cross Country Title, Inc.
5355 Town Center Road, Suite 801
Boca Raton, Florida 33486

Property Control No.: 00-42-46-31-07-007-0300

## 'ECIAL WARRANTY DE[

THIS W.rranty Deed, ... ie this ⊥ day of August, 2006, bet ... n ALBANESE-POPKIN THE OAKS
DEVELOPMENT GROUP, I ... a Florida limited ... ability Company, General Partner ... .ANESE-POPKIN DEVELOPMENT
GROUP, LLC a Florida limit ... ability Company, General Partner ... ng its principal place of business c/o
Albanese-Popkin The Oaks ... opment Group, L.P. 1200 S. Roger ... .rcle #11, Boca Raton, Florida 33487
(hereinafter called the "Grante ... nd KEVIN ROSEN and STACEY RO: ... , husband and wife, whose post office
address is 17830 Monte Vista ... .e, Boca Raton, Florida 33496, (herein ... called "Grantee"):

WITNESSETH That th ... .antor, for and in consideration of the ... of Ten Dollars U.S. Dollars ($10.00)
lawful money of the United S ... of America, to it in hand paid by th ... .antee, at or before the ensealing and
delivery of these presents, th ... ipt of which is hereby acknowledg ... .as granted, bargained, sold, aliened,
remised, released, conveyed a ... onfirmed and by these presents does ... .ht, bargain, sell, alien, remise, release,
convey and confirm unto the G ... .ee and their heirs or successors and as ... forever, the following parcel of land,
situate, lying a being in the C ... .ity of Palm Beach, State of Florida, an ... .ore particularly described as follows:

Lot 30, .lock G1 of ... S AT BOCA RATON PLAT SIX, according to the Plat thereof, as
record in Plat Boo ... . Pages 57 thru 63, inclusive, of the Public Re ...ds of Palm Beach
Coun .lorida.

SUBJECT TO: A .estrictions, re ... .ations, covenants and easements relating thereto; .xes and assessments for the
year 2006 and yea subsequent ... .to; land use regulations and restrictions imposed v governmental authorities;

TO HAVE AND TO HOLD, the ... e in fee simple forever.

AND the Gra or does he ... .ovenant with the Grantee that it is lawfully seized of said land in fee simple; that it has
good right and lawfu .thority to sell and convey said land; that it hereby fully warrants the title of said land and will defend
the same against th la d claims of all persons claiming by, through, or under the said Grantor.

"Grantor" and "Grai e" are used for singular or plural, as the context requires.

IN V ESS W....REOF, the Grantor has hereunto set Grantor's hand and seal the day and year first
above written.

Signed, seal nd delivered
in the presence of

_Beverly A. Donnelly_
BEVERLY A. DONNELLY
Printed Name:

_Melanie Kunkel_
Melanie Kunkel
Printed Name:

ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP,
L.P., a Florida limited partnership, BY: ALBANESE-POPKIN
DEVELOPMENT GROUP, LLC a Florida limited liability
Company, General Partner

By: _____
Edward D. Popkin, Manager

STATE OF FLORIDA )
COUNTY OF PALM BEACH )

I hereby certify that on this ⊥ day of August, 2006 before me, an officer duly authorized in the State and County
aforesaid to take acknowledgments, personally appeared, EDWARD D. POPKIN, as Manager of ALBANESE-
POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, BY: ALBANESE-POPKIN
DEVELOPMENT GROUP, LLC a Florida limited liability Company, General Partner named as Grantor in the
foregoing deed, that he severally acknowledges executing the same in the present of two subscribing witnesses freely
and voluntarily under authority duly vested in him by said company and who is personally known to me and who
did not take an oath.

_____
Notary Public

My Commission Expires:  
MELANIE KUNKEL
MY COMMISSION # DD 431468
EXPIRES: September 20, 2009
Bonded Thru Notary Public Underwriters

Printed Name: _____

Melanie-wpdocs\oek\.lot\OG-Rosen\sellersdocs

KROSEN - 000109

# CERTIFICATE OF OCCUPANCY

Palm Beach County
Planning, Zoning & Building Department
100 Australian Avenue, West Palm Beach, FL 33406
www.co.palm-beach.fl.us/pzb
(561) 233-5000

This is to certify that the   RESIDENTIAL   Structure Built Under Permit No. B05018027

Described as   SINGLE-FAMILY DWELLING/DETACHED
SINGLE-FAMILY DWELLING/D

Owned By   ALBANESE POPKIN DEV.,

Contractor  LEONARD A ALBANESE

and Located at  17830  MONTE VISTA DR
** RESIDENT INSPECTOR **

Section  31 , Township 46

In Subdivision  OAKS AT BOCA RATON PUD PLAT 6 (

Range  42 , Lot  30  , Block G  , Units 001  , was inspected and at the time of issuance
of this certificate, was found to the best of my knowledge, to conform to the code requirements of
the county of Palm Beach and/or was certified by Florida Registered architect or engineer that it
meets the requirements of said codes, and is approved for utility services, as intended by the
permit.

REBECCA CALDWELL
BUILDING OFFICIAL

ED J CAIRNES
JULY 28, 2006
DATE                                      INSPECTOR       examine watermark for validity
ORIGINAL   1 OF 3

KROSEN - 000110

# OWNER'S POLICY OF TITLE INSURANCE

## Issued by Lawyers Title Insurance Corporation


**LandAmerica**
**Lawyers Title**

*Lawyers Title Insurance Corporation is a member of the LandAmerica family of title insurance underwriters.*

**POLICY NUMBER**

A81-Z004990

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, LAWYERS TITLE INSURANCE CORPORATION, a Virginia corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land.

The Company also will pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured, but only to the extent provided in the Conditions and Stipulations.

IN WITNESS WHEREOF, LAWYERS TITLE INSURANCE CORPORATION has caused its corporate name and seal to be hereunto affixed by its duly authorized officers, the Policy to become valid when countersigned by an authorized officer or agent of the Company.

**LAWYERS TITLE INSURANCE CORPORATION**

Attest:

Secretary



SEAL
1925
RICHMOND VA

By

President

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.
4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:
   (a) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or
   (b) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:
      (i) to timely record the instrument of transfer; or
      (ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

ALTA Owner's Policy (10/17/92) with Florida Modifications
**Form 1190-78Z**                    **ORIGINAL**                    Valid only if Schedules A and B and Cover are attached

KROSEN - 000111

## Policy of Title Insurance

Lawyers Title Insurance Corporation

### Schedule A

**Order Number:** 51275700LA

**Policy Number:** A81-Z004990

**Reference Number:** Lot 30G1/Rosen

**Amount of insurance:** $1,050,000.00

Date of Policy: The date shown below or the date of recording of the instruments referred to in Item 3, whichever is the later.

August 7, 2006

1.  Name of Insured

    Kevin Rosen and Stacey Rosen, Husband and Wife

2.  The estate or interest in the land described herein and which is covered by this policy is:
    Fee Simple

3.  Title to the estate or interest in the land is vested in:
    Kevin Rosen and Stacey Rosen, Husband and Wife

4.  The Land referred to in this policy is described as follows:
    (See attached Exhibit A for legal description)

Cross Country Title, Inc.

5355 Town Center Road
Suite 801
Boca Raton, FL 33433

This policy is invalid unless a cover sheet and Schedule B are attached.

http://sflorida.titlewave.net/TSRPolicyPreview.asp?DocNum=1264762&FolderNum=22003... 8/2/2006

KROSEN - 000112

Exhibit A

Policy Number: A81-Z004990

Lot 30, Block G1, OAKS AT BOCA RATON PLAT SIX, according to the plat thereof, recorded in Plat Book 103, Pages 57 thru 63, inclusive, of the Public Records of Palm Beach County, Florida.

KROSEN - 000113

<center>Schedule B</center>

Policy Number: A81-Z004990

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes and assessments for the year 2006 and subsequent years.

2. Restrictions, covenants, conditions, easements and dedications as contained on the Plat of Oaks at Boca Raton Plat Six, recorded in Plat Book 103, Page 57, of the Public Records of Palm Beach County, Florida.

3. Restrictions, covenants, conditions, easements and dedications as contained on the Plats of Oaks at Boca Raton Plat One, recorded in Plat Book 95, Page 16, as affected by Surveyor's Affidavit in Official Records Book 13675, Page 1262 and Resolution in Official Records Book 15336, Page 395; Oaks at Boca Raton Plat Two, recorded in Plat Book 98, Page 196; Oaks at Boca Raton Plat Three, recorded in Plat Book 99, Page 37; Oaks at Boca Raton Plat Four, recorded in Plat Book 99, Page 180 and Oaks at Boca Raton Plat Five, recorded in Plat Book 100, Page 76, as to road access and common areas.

4. Terms, restrictions, covenants, conditions and easements, which include provisions for a private charge or assessment, an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant, as contained in the Amended and Restated Declaration of Covenants and Restrictions for The Oaks at Boca Raton (formerly Fox Hill Estates of Boca Raton) recorded in Official Record Book 17679, Page 883, together with the amendments in Official Records Book 17679, page 1044 and Official Records Book 17786, Page 1797.

   **NOTE:** This exception omits any restriction, covenant, or condition based on race, color, religion, sex, handicap, familial status or national origin, if any, unless and only to the extent that the restriction is not in violation of state or federal law, or relates to a handicap, but does not discriminate against handicapped people.

5. Oil, gas and mineral rights as reserved in those deeds to Everglades Drainage District recorded in Deed Book 703, Page 216, corrected in Deed Book 707, Page 439, as affected by Non-Use Commitment in 13753, Page 225.

6. Oil, gas and mineral rights as reserved in those deeds to Everglades Drainage District recorded in Deed Book 703, Page 221, corrected in Deed Book 707, Page 437, partially released in Official Records Book 1149, Page 218.

7. Terms, restrictions, covenants and conditions with Lake Worth Drainage District in the Restrictive Covenant Agreement recorded in Official Record Book 11120, Page 1562; as modified in Official Record Book 11844, Page 752; Official Records Book 13219, Page 431 and Official Records Book 14881, Page 277.

8. Terms, restrictions, covenants and conditions as contained in the Covenant recorded in Official Record Book 12585, Page 724, together with the assignment of Declarant's rights in Official Records Book 13854, Page 1663.

9. Terms, conditions and provisions of the Standard Potable Water and Wastewater Development Agreement with Palm Beach County recorded in Official Records Book 13880, Page 1679.

10. Terms, restrictions, covenants and conditions with Palm Beach County in the Restrictive Covenant Agreement recorded in Official Records Book 15220, Page 950, as amended in Official Records Book 17493, Page 1931.

11. Covenants, conditions, restrictions and other provisions contained in Easement Deed to Lake Worth Drainage District recorded in Official Records Book 15429, Page 1083 and Official Records Book 17078,

http://sflorida.titlewave.net/TSRPolicyPreview.asp?DocNum=1264762&FolderNum=22003...  8/2/2006

KROSEN - 000114

12. Environmental Resource Permit Notice recorded in Official Records Book 16888, Page 1361.

13. Terms and conditions of the Palm Beach County Removal Agreement recorded in Official Records Book 18288, Page 1606.

14. Landscape Improvement Easement to Adelphia Cable, Bell South Communications, Florida Public Utility Co., Florida Power & Light Co. and Palm Beach County Water Utilities Department, recorded in Official Records Book 18869, Page 1213, as re-recorded in Official Records Book 18906, Page 1018.

15. The nature, extent or existence of riparian rights are not insured.

16. The following state of facts as disclosed by survey prepared by Caulfield & Wheeler, Inc., dated July 21, 2006: paver drive encroaches on 10' utility easement at the front of subject property.

17. Mortgage by and between Kevin Rosen and Stacey Rosen and Wachovia Mortgage Corporation dated August 7, 2006 in the original principal amount of $175,000.00 to be recorded in the Public Records of Palm Beach County, Florida, which mortgage encumbers the property described on Exhibit A attached hereto.

NOTE: All recording references in this commitment/policy shall refer to the Public Records of Palm Beach County, Florida, unless otherwise noted.

NOTE: In accordance with Florida Statutes section 627.4131, please be advised that the insured hereunder may present inquiries, obtain information about coverage, or receive assistance in resolving complaints, by contacting the Lawyers Title Insurance Corporation Regional Office, 201 South Orange Avenue, Suite 1350, Orlando, FL 32801 Telephone 407-481-8181.

KROSEN - 000115

## CONDITIONS AND STIPULATIONS

### 1. DEFINITION OF TERMS.

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A, and, subject to any rights or defenses the Company would have had against the named insured, those who succeed to the interest of the named insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

### 2. CONTINUATION OF INSURANCE AFTER CONVEYANCE OF TITLE.

The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

### 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required, provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

### 4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

### 5. PROOF OF LOSS OR DAMAGE.

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim.

### 6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.

To pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations to the insured under this policy, other than to make the payment required, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

continued on next page of cover

KROSEN - 000116

CONDITIONS AND STIPULATIONS - Continued

or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which he Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' ees and expenses incurred by the insured claimant which were authorized by he Company up to the time of payment and which the Company is obligated o pay.

Upon the exercise by the Company of either of the options provided for n paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute r continue any litigation.

### DETERMINATION, EXTENT OF LIABILITY AND COINSURANCE.

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss r damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the east of:

(i) the Amount of Insurance stated in Schedule A; or,

(ii) the difference between the value of the insured estate or nterest as insured and the value of the insured estate or interest subject to he defect, lien or encumbrance insured against by this policy.

(b) *(This paragraph dealing with Coinsurance was removed from Florida policies.)*

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

### APPORTIONMENT.

If the land described in Schedule A consists of two or more parcels which are not used as a single site, and a loss is established affecting one or nore of the parcels but not all, the loss shall be computed and settled on a ro rata basis as if the amount of insurance under this policy was divided pro ata as to the value on Date of Policy of each separate parcel to the whole, xclusive of any improvements made subsequent to Date of Policy, unless a ability or value has otherwise been agreed upon as to each parcel by the Company and the insured at the time of the issuance of this policy and shown y an express statement or by an endorsement attached to this policy.

### LIMITATION OF LIABILITY.

(a) If the Company establishes the title, or removes the alleged defect, en or encumbrance, or cures the lack of a right of access to or from the land, r cures the claim of unmarketability of title, all as insured, in a reasonably iligent manner by any method, including litigation and the completion of any ppeals therefrom, it shall have fully performed its obligations with respect to nat matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or vith the Company's consent, the Company shall have no liability for loss or amage until there has been a final determination by a court of competent jrisdiction, and disposition of all appeals therefrom, adverse to the title as isured.

(c) The Company shall not be liable for loss or damage to any insured or liability voluntarily assumed by the insured in settling any claim or suit vithout the prior written consent of the Company.

### 0. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.

All payments under this policy, except payments made for costs, ttorneys' fees and expenses, shall reduce the amount of the insurance pro anto.

### 1. LIABILITY NONCUMULATIVE.

It is expressly understood that the amount of insurance under this policy hall be reduced by any amount the Company may pay under any policy issuing a mortgage to which exception is taken in Schedule B or to which the isured has agreed, assumed, or taken subject, or which is hereafter xecuted by an insured and which is a charge or lien on the estate or interest escribed or referred to in Schedule A, and the amounts so paid shall be eemed a payment under this policy to the insured owner.

No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

### 13. SUBROGATION UPON PAYMENT OR SETTLEMENT.

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to these rights and remedies in the proportion which the Company's payment bears to the whole amount of the loss.

If loss should result from any act of the insured claimant, as stated above, that act shall not void this policy, but the Company, in that event, shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(b) The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

### 14. ARBITRATION.

Unless prohibited by applicable law, arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association may be demanded if agreed to by both the Company and the insured. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, and service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

### 15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

### 16. SEVERABILITY.

In the event any provision of the policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

### 17. NOTICES WHERE SENT.

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to: Consumer Affairs Department, P.O. Box 27567, Richmond, Virginia 23261-7567.

KROSEN - 000117

## THANK YOU.

Title insurance provides for the protection of your real estate investment. We suggest you keep this policy in a safe place where it can be readily available for future reference.

If you have questions about title insurance or the coverage provided by this policy, contact the office that issued this policy, or you may call or write:

Lawyers Title Insurance Corporation
Consumer Affairs
P.O. Box 27567
Richmond, Virginia 23261-7567
*telephone, toll free:* 800-446-7086
*web:* www.landam.com

We thank you for choosing to do business with Lawyers Title Insurance Corporation, and look forward to meeting your future title insurance needs.

Lawyers Title Insurance Corporation
is a member of the LandAmerica family of title insurance underwriters.

**LandAmerica**
**Lawyers Title**

---

## OWNER'S POLICY OF TITLE INSURANCE

(with Florida modifications)
American Land Title Association (10/17/92)

Issued by

**Lawyers Title
Insurance Corporation**

Lawyers Title Insurance Corporation
is a member of the LandAmerica family of title insurance underwriters.

**LandAmerica**
**Lawyers Title**

LandAmerica Financial Group, Inc.
101 Gateway Centre Parkway
Richmond, Virginia 23235-5153
www.landam.com

Form B 1190-782

Page 1 of 2
FL0804.0318

LB: 7337


**EXACTAFL**
A LAND SURVEY COMPANY

Boundary Survey                    SURVEY # FL0804.0318

PROPERTY ADDRESS:
17830 MONTE VISTA DRIVE
BOCA RATON, FLORIDA 33496

LEGAL DESCRIPTION:

Lot 30, Block G1 OAKS AT BOCA RATON PLAT SIX according to the
plat thereof, as recorded in Plat Book 103, Page 57 THRU 63 of the
Public Records of PALM BEACH County, FLORIDA.

Community Number: 120192
Panel: 0215 Suffix: A
Index Date: 6/2/1992 F.I.R.M. Date:   02/01/79
Flood Zone  B
Field Work: 4/11/2008 Completed: 4/11/2008

CERTIFIED TO:

KEVIN D. AND STACEY A. ROSEN; FORMAN &
ALTINO, P.A.; FIRST AMERICAN TITLE INSURANCE
COMPANY; WACHOVIA MORTGAGE, FSB;  ;
ATIMA ; ISAOA.

For Surveyors Notes and Legend, see page 2



FL 0804-0318
PALM BEACH COUNTY
BOUNDARY SURVEY

LOT 30
BLK G1

MONTE VISTA DR. 50' R/W

KROSEN - 000119

Page 2 of 2
FL0804.0318

## 'ECIAL SURVEYOR'S NOTES

## SURVEYOR'S NOTES

1. THIS SURVEY HAS A "SH... 1" SECURE HASH MESSAGE DIGEST AUTHENTICATION CODE WITHIN ITS SIGNATURE FILE. A MANUALLY SIGNED AND SEALED LOG C... THIS SURVEYS SIGNATURE FILE IS KEPT ON FILE AT EXACTA LAND SURVEYORS; THEREFORE, IN ACCORDANCE WITH FLORIDA STATUTE 61G17-7.0025, THIS SURVEY IS ELECTRONICALLY SIGNED AND SEALED AND CAN BE DEEMED AN ORIGINAL DOCUMENT.

2. ANY ATTEMPT TO C... ANGE AN... ...ING ON THIS SURVEY WILL RESULT IN A CHANGE IN ITS AUTHENTICATION CODE THEREBY REMOVING THE ELEC... ...ONIC SIGNATURE AND VOIDING THE VALIDITY OF THIS SURVEY.

3. THE LEGAL DESC... ...TION USED TO PERFORM THIS SURVEY WAS PROVIDED BY OTHERS. THIS SURVEY DOES NOT DETERMINE OR IMPLY OWNERSHIP.

4. AN EXAMINATIC... OF THE ABSTRACT C... ...TLE WAS NOT MADE BY THE SURVEYOR TO DETERMINE RECORDED INSTRUMENTS, IF ANY, AFFECTING THIS PROPERTY.

5. BOUNDARY DISTANCES AND DIRECTIO... ...RE PLATTED AND MEASURED UNLESS OTHERWISE NOTED.

6. ELEVATIONS AND VERTICAL DATA, ... ...OWN, REFER TO NGVD 1929, UNLESS OTHERWISE NOTED.

7. THIS SURVEY ONLY SHOWS IMPROVEMENTS FOUND ABOVE GROUND. UNDERGROUND UTILITIES, FOOTINGS AND ENCROACHMENTS ARE NOT LOCATED ON THIS SURVEY MAP.

8. IF A SEPTIC TANK OR DRAINAGE FIELD IS SHOWN ON THIS SURVEY, THE LOCATION WAS SHOWN TO US BY OTHERS.

9. FENCE OWNERSHIP IS NOT DETERMINED, APPARENT CLEARANCES AND / OR ENCROACHMENTS ARE NOTED BY VISUAL MEANS ONLY.

10. NO IDENTIFICATION CAPS FOUND ON RECOVERED MONUMENTS UNLESS OTHERWISE NOTED.

11. THIS SURVEY IS EXCLUSIVELY FOR THE USE OF THE PARTIES TO WHOM IT IS CERTIFIED.

12. ADDITIONS OR DELETIONS TO SURVEY MAPS AND / OR NOTES ARE PROHIBITED. THIS SURVEY IS ONLY VALID WITH ALL OF THE PAGES CONTAINED HEREIN.

13. IF THIS SURVEY WAS RECEIVED ELECTRONICALLY, THIS SURVEY MAP IS NOT VALID WITHOUT A SIGNATURE AND AN AUTHENTICATED INK SEAL OF A FLORIDA REGISTERED PROFESSIONAL LICENSED SURVEYOR AND MAPPER, AND IT IS ONLY VALID IF ITS SHA-1 HASH MATCHES THE AUTHENTICATION CODE ON FILE AT EXACTA LAND SURVEYORS.

14. IF THIS SURVEY WAS RECEIVED BY MAIL, THIS SURVEY IS NOT VALID WITHOUT A SIGNATURE AND A RAISED SEAL OF A FLORIDA REGISTERED PROFESSIONAL LICENSED SURVEYOR AND MAPPER.

15. BASIS OF BEARINGS ARE ASSUMED OR BASED ON THE LINE MARKED AS B.R. OR AS OTHERWISE SPECIFIED.

16. DIMENSIONS ARE IN FEET AND DECIMALS THEREOF.

17. EXACTA LAND SURVEYORS IS NOT REGISTERED WITH FEMA TO PROVIDE FLOOD CERTIFICATES. THE FEMA FLOOD ZONE DATA ON THIS SURVEY IS FOR INFORMATIONAL PURPOSES ONLY.

## PRINTING PROCEDURES

****BECAUSE THIS FILE HAS BEEN SENT ELECTRONICALLY, IT IS IMPERATIVE THAT THE PRINT SETTINGS BE CORRECT IN ORDER TO DEPICT AN ACCURATE REPRESENTATION OF THIS DOCUMENT ON PAPER.

1. INSERT LEGAL SIZED PAPER INTO YOUR PRINTER.
2. WHILE VIEWING THE SURVEY IN THE ADOBE READER, SELECT PRINT UNDER THE FILE TAB.

THE FOLLOWING COMMANDS ARE INSIDE THE ADOBE READER PRINT BOX:

3. SELECT COLOR PRINTER (IF AVAILABLE.)
4. UNDER PRINT RANGE, SELECT ALL.
5. UNDER PAGE HANDLING, SELECT NUMBER OF COPIES.
6. UNDER PAGE HANLING, SELECT 'NONE' FOR PAGE SCALING.
7. UNDER PAGE HANDLING, UNCHECK AUTO ROTATE AND CENTER.
8. UNDER PAGE HANDLING, CHECK CHOOSE PAPER SOURCE BY PDF SIZE.
9. CLICK PRINT.

## SURVEYOR'S LEGEND

| Symbol | Description | | Symbol | Description | | Abbr. | Description | | Abbr. | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| ℮ | PROPERTY LINE | | ▼ FND | FOUND | | C. | CALCULATED | | TEL. | TELEPHONE FACILITIES |
| | STRUCTURE | | ○ | NOT FOUND | | B.R. | BEARING REFERENCE | | U.P. | UTILITY POLE |
| | CONC. BLOCK WALL | | ⊛ | SET | | Δ | CENTRAL ANGLE or DELTA | | E.U.B. | ELECTRIC UTILITY BOX |
| | CHAIN-LINK or WIRE FENCE | | ▲ | CONTROL POINT | | R. | RADIUS or RADIAL | | SEP. | SEPTIC TANK |
| | WOOD FENCE | | ■ | CONCRETE MONUMENT | | RAD. | RADIAL TIE | | D.F. | DRAIN FIELD |
| | IRON FENCE | | 🌳 | TREE | | N.R. | NON RADIAL | | A/C. | AIR CONDITIONING |
| | EASEMENT | | | | | TYP. | TYPICAL | | S/W | SIDEWALK |
| ℄ | CENTER LINE | | ☆ P.P. | POWER POLE | | I.R. | IRON ROD | | D/W | DRIVEWAY |

KROSEN_000120

## A. Settlement Statement

**U.S. Department of Housing and Urban Development**



OMB No. 2502-0265

| B. Type of Loan | | |
|---|---|---|
| 1. ☐ FHA  2.☐ FmHA 3. ☒ Conv. Unins.  4.☐ VA  5.☐ Conv. Ins. | 6. File Number  581002 | 7. Loan Number  6837606 | 8. *Mortgage* Insurance Case Number |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. NAME OF BORROWER:** Kevin ...n and Stacey A. Ros...

**ADDRESS OF BORROWER:** 17830 ... Vista Drive, Boca Ra... , FL 3349...

**E. NAME OF SELLER:** FUNI... REFINANCE ...ATE: 04/15/2008

**ADDRESS OF SELLER:** Wach... rtgage, FSB, its succes... s and assigns ATI...

**F. NAME OF LENDER:**

**ADDRESS OF LENDER:** 1100 ... e Center Drive, Ralei... , NC 27607

**G. PROPERTY LOCATION:** 17830 ... Vista Drive  Boca R... L 33496

**H. SETTLEMENT AGENT:** FORMA... ALTINO, P.A.  2101 W... MERCIAL BLVD., SUITE 2800, FT. LAUD... DALE FL 33309

**PLACE OF SETTLEMENT:** 2101 W. C... MERCIAL BLVD., SUITE 2800, FT. LAU... DALE FL 33309

**I. SETTLEMENT DATE:** 4/10/2008

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER | | 400. GROSS AMOUNT DUE TO SELLER | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 16,072.5... | | |
| 104. Payoff 1st Mtg to Wachovia Mortgage FSB | 172,415.31 | | |
| 105. | | | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes       to | | 406. City/town taxes       to | |
| 107. County taxes       to | | 407. County taxes       to | |
| 108. Assessments       to | | 408. Assessments       to | |
| 109. | | 409. | |
| 110.       to | | 410.       to | |
| 111.       to | | 411.       to | |
| 112.       to | | 412.       to | |
| **120. GROSS AMOUNT DUE FROM BORROWER** ▶ | **188,487.83** | **420. GROSS AMOUNT DUE TO SELLER** ▶ | |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 200,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. Principal amount of new loan(s) | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| 209a. | | 509a. | |
| 209b. | | 509b. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes       to | | 510. City/town taxes       to | |
| 211. County taxes       to | | 511. County taxes       to | |
| 212. Assessments       to | | 512. Assessments       to | |
| 213.       to | | 513.       to | |
| 214.       to | | 514.       to | |
| 215.       to | | 515.       to | |
| 216.       to | | 516.       to | |
| 217.       to | | 517.       to | |
| 218.       to | | 518.       to | |
| 219.       to | | 519.       to | |
| **220. TOTAL AMOUNTS PAID BY OR IN BEHALF OF BORROWER** ▶ | **200,000.00** | **520. TOTAL REDUCTIONS IN AMOUNT DUE SELLER** ▶ | |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER | | 600. CASH AT SETTLEMENT TO/FROM SELLER | |
| 301. Gross amount due from borrower (line 120) | 188,487.83 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | 200,000.00 | 602. Less reductions in amount due seller (line 520) | |
| **303. CASH ☐ From ☒ To  BORROWER** ▶ | **11,512.17** | **603. CASH ☒ To ☐ From  SELLER** ▶ | |

PAGE 1

HUD-1 (3-86) RESPA, HB 4305.2

KROSEN - 000121

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

| L. Settlement Charges | | | Paid From Borrower's Funds At Settlement | Paid From Seller's Funds At Settlement |
|---|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COM. based on price @ % = | | | | |
| Division of Commission (line 700) as follows: | | | | |
| 701. | | to | | |
| 702. | | to | | |
| 703. Commission paid at Settlement | | | | |
| 704. | | to | | |
| 800. Items Payable In Connection With Loan | | | | |
| 801. Loan Origination Fee | 1.00 % | to Wachovia Mortgage <$2,000.00> L | *P.O.C.* | |
| 802. Loan Discount | % | to | | |
| 803. Appraisal Fee | | to Wachovia Mortgage, FSB <$300.00> L | *P.O.C.* | |
| 804. Credit Report | | to Land America Credit Services | 15.00 | |
| 805. Lender's Inspection Fee | | to | | |
| 806. Mortgage Insurance Application Fee | | to | | |
| 807. Tax Service Fee | | to First Amer. Real Estate Tax | 78.00 | |
| 808. Flood Certification | | to Wachovia Settlement Services | 15.00 | |
| 809. Document Transmission Fee | | to Wachovia Mortgage, FSB <$25.00> L | *P.O.C.* | |
| 810. Administrative Fee | | to Wachovia Mortgage, FSB | 300.00 | |
| 811. Processing Fee | | to Wachovia Mortgage, FSB <$350.00> L | *P.O.C.* | |
| 812. Application fee | | to Wachovia Mortgage, FSB <$60.00> L | | |
| 813. MERS | | to MERS | 3.95 | |
| 814. Float Down Fee | | to Floatdown Refund to Borrower | (1,000.00) | |
| 815. | | to | | |
| 900. Items Required By Lender To Be Paid in Advance | | | | |
| 901. Interest from 4/15/2008 to 5/1/2008 | @ 28.77 /day | | 460.32 | |
| 902. Mortgage Insurance Premium for months to | | | | |
| 903. Hazard Insurance Premium for years to | | | | |
| 904. | years to | | | |
| 905. | years to | | | |
| 1000. Reserves Deposited With Lender | | | | |
| 1001. Hazard insurance | 11 months@ | 321.00 per month | 3,531.00 | |
| 1002. Mortgage insurance | months@ | per month | | |
| 1003. City property taxes | months@ | per month | | |
| 1004. County property taxes | 9 months@ | 1,355.42 per month | 12,198.78 | |
| 1005. Annual assessments | months@ | per month | | |
| 1006. | months@ | per month | | |
| 1007. | months@ | per month | | |
| 1008. | months@ | per month | | |
| 1009. Aggregate Adjustment | | | (2,318.43) | |
| 1100. Title Charges | | | | |
| 1101. Settlement or closing fee | | to Forman & Altino, P.A. | 325.00 | |
| 1102. Abstract or title search | | to First American Title Insurance/F & A; PA | 225.00 | |
| 1103. Title examination | | to | | |
| 1104. Title insurance binder | | to | | |
| 1105. Document preparation | | to | | |
| 1106. Notary fees | | to | | |
| 1107. Attorney's fees | | to | | |
| (includes above items numbers: | | | | |
| 1108. Title insurance | | to | 630.00 | |
| (includes above items numbers: | | | | |
| 1109. Lender's coverage: Risk Premium | 1,075.00 INS AMT: | 200,000.00 | | |
| 1110. Owner's coverage: Risk Premium | INS AMT: | | | |
| 1110a. Endorsements: FF9 1-63.00;ALTA 8.1-25.00; | | | 88.00 | |
| 1111. | | to | | |
| 1112. | | to | | |
| 1113. | | to | | |
| 1200. Government Recording and Transfer Charges **Includes: Termination of NOC $27.60 | | | | ** |
| 1201. Recording Fees: L-Mortgage(s) $172.10; Releases | | | 199.70 | |
| 1202. City/county tax/stamps: L-Mortgage(s) $400.00 | | | 400.00 | |
| 1203. State tax/stamps: L-Mortgage(s) $700.00 | | | 700.00 | |
| 1204. Recording Same Name Affidavit | Clerk of Court | | 10.60 | |
| 1205. Record Cont. Marriage Affidavit | Clerk of Court | | 10.60 | |
| 1300. Additional Settlement Charges | | | | |
| 1301. Survey | | to | | |
| 1302. Pest Inspection | | to | | |
| 1303. Roof Inspection | | to | | |
| 1304. Lien Search | | to ASAP Tax & Lien Search | 75.00 | |
| 1305. Fax Phone and Photocopies | | to Forman & Altino, P.A. | 45.00 | |
| 1306. UPS Federal Express Mail | | to Forman & Altino, P.A. | 80.00 | |
| 1307. | | to | | |
| 1308. | | to | | |
| 1309. | | to | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, SectionK) ▶ | | | 16,072.52 | |

CERTIFICATION                                                                      DATE   4/10/2008

I have carefully reviewed the HUD - 1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD - 1 Settlement Statement.

_____ Borrower

Kevin D. Rosen

_____ Borrower

Stacey A. Rosen
The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement.                                FORMAN & ALTINO, P.A.
                                                                 Settlement Agent                        4/10/2008        Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

KROSEN - 000122

581002

THIS INSTRUMENT PREPARED BY:
RECORD & RETURN TO:
Carl E. Stigell, Esquire
Crnos Country Title, Inc.
5355 Town Center Road, Suite 801
Boca Raton, Florida 33486

Property Control No.: 00-42-46-31-07-002-0300

CFN 20060465683
OR BK 20768 PG 1084
RECORDED 08/09/2006 10:26:21
Palm Beach County, Florida
AMT 1,650,000.00
Doc Stamp 7,350.00
Sharon R. Bock, CLERK & COMPTROLLER
Pg 1084; (1pg)

## SPECIAL WARRANTY DEED

THIS Warranty Deed, made this ___ day of August, 2006, between ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, by ALBANESE-POPKIN DEVELOPMENT GROUP, LLC, a Florida limited liability Company, General Partner having its principal place of business c/o Albanese-Popkin The Oaks Development Group, L.P. 1200 S. Rogers Circle #11, Boca Raton, Florida 33487 (hereinafter called the "Grantor") and KEVIN ROSEN and STACEY ROSEN, husband and wife, whose post office address is 17930 Monte Vista Drive, Boca Raton, Florida 33496, (hereinafter called "Grantee").

WITNESSETH That the Grantor for and in consideration of the sum of Ten Dollars U.S. Dollars ($10.00) lawful money of the United States of America, to it in hand paid by the Grantee, at or before the ensealing and delivery of these presents, the receipt of which is hereby acknowledged, has granted, bargained, sold, aliened, remised, released, conveyed and confirmed and by these presents does grant, bargain, sell, alien, remise, release, convey and confirm unto the Grantee and their heirs in succession and assigns forever: the following piece of land situate, lying and being in the County of Palm Beach, State of Florida, and more particularly described as follows:

Lot 30, Block 6J of OAKS AT BOCA RATON PLAT SIX, according to the Plat thereof, as recorded in Plat Book 103, Pages 57 thru 65, inclusive, of the Public Records of Palm Beach County, Florida.

SUBJECT TO All restrictions, reservations, covenants and easements, if any, then in taxes and assessments for the year 2006 and years subsequent thereto; land use regulations and restrictions imposed by governmental authorities.

TO HAVE AND TO HOLD, the same in fee simple forever.

AND the Grantor does hereby covenant with the Grantee that it lawfully seized of said land in fee simple; that it has good right and lawful authority to sell and convey said land; that it hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons claiming by, through, or under the said Grantor.

"Grantor" and "Grantee" are used for singular or plural, as the context requires.

IN WITNESS WHEREOF, the Grantor has hereunto set Grantor's hand and seal the day and year first above written.

Signed, sealed and delivered
in the presence of:

ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP,
L.P., a Florida limited partnership, BY ALBANESE-POPKIN
DEVELOPMENT GROUP, LLC, a Florida limited liability
Company, General Partner

By: _____
Edward D. Popkin, Manager

_____
BEVERLY A. BONELLY
Printed Name:

_____
Melaine Kunkel
Printed Name:

STATE OF FLORIDA
COUNTY OF PALM BEACH

I hereby certify that on this ___ day of August, 2006 before me, an officer duly authorized in the State and County aforesaid to take acknowledgments, personally appeared EDWARD D. POPKIN, as Manager of ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, LLC, a Florida limited partnership, BY ALBANESE-POPKIN DEVELOPMENT GROUP, LLC a Florida limited liability Company, General Partner named as Grantor in the foregoing deed, that he personally acknowledged executing the same in the presence of two subscribing witnesses freely and voluntarily under authority duly vested in him by said company and who is personally known to me and who did not take an oath.

_____
Notary Public
Printed Name:

...[difficulty] of these presents, the receipt of which is hereby acknowledged, has granted, bargained, sold, aliened, remised, released, conveyed and confirmed and by these presents does grant, bargain, sell, alien, remise, release, convey and confirm unto the Grantee and their heirs or successors and assigns forever, the following parcel of land, situate, lying and being in the County of Palm Beach, State of Florida, and more particularly described as follows:

Lot 39, Block G1 of OAKS AT BOCA RATON PLAT SIX, according to the Plat thereof, as recorded at Plat Book 103, Pages 57 thru 65, inclusive, of the Public Records of Palm Beach County, Florida.

SUBJECT TO: All restrictions, reservations, covenants and easements relating thereto; taxes and assessments for the year 2006 and years subsequent thereto; land use regulations and restrictions imposed by governmental authorities;

TO HAVE AND TO HOLD, the same in fee simple forever.

AND the Grantor does hereby covenant with the Grantee that it is lawfully seized of said land in fee simple; that it has good right and lawful authority to sell and convey said land; that it hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons claiming by, through, or under the said Grantor.

"Grantor" and "Grantee" are used for singular or plural, as the context requires.

IN WITNESS WHEREOF, the Grantor has hereunto set Grantor's hand and seal the day and year first above written.

Signed, sealed and delivered
in the presence of:

BEVERLY A. DONNELLY
Printed Name

Melanie Kunkel
Printed Name:

ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, BY: ALBANESE-POPKIN DEVELOPMENT GROUP, LLC, a Florida limited liability Company, General Partner

By: _____
Edward D. Popkin, Manager

STATE OF FLORIDA
COUNTY OF PALM BEACH

I hereby certify that on this ___ day of August, 2006 before me, an officer duly authorized in the State and County aforesaid to take acknowledgments, personally appeared, EDWARD D. POPKIN, as Manager of ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership BY: ALBANESE-POPKIN DEVELOPMENT GROUP, LLC, a Florida limited liability Company, General Partner named as Grantor in the foregoing deed, that he severally acknowledges executing the same in the presence of two subscribing witnesses freely and voluntarily under authority duly vested in him by and company, and who is personally known to me and who did not take an oath.

My Commission Expires:

Notary Public

Printed Name

KROSEN - 000124

FABC 443

Policy No

# POLICY OF TITLE INSURANCE

ISSUED BY

*First American Title Insurance Company*

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land;
5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;
6. The priority of any lien or encumbrance over the lien of the insured mortgage;
7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:
   (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or
   (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;
8. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

*First American Title Insurance Company*

BY *Gary L. Kermott* PRESIDENT

ATTEST *Mark R Arneson* SECRETARY

**ALTA Loan Policy (10/17/92)** *(With Florida Modifications)*

**First American Title Insurance Company**

Schedule A
ALTA Loan Policy

### SCHEDULE A

| | |
|---|---|
| Issuing Office File No.: ▊ | Policy No: FA- ▊ |
| Date of Policy: 04/17/08<br>08 : 53 . 00 a.m. | Amount of Insurance: $ 200,000.00 |

1. Name of Insured:
   **Wachovia Mortgage, FSB , its successors and/or assigns, ATIMA**

2. The estate or interest in the land which is encumbered by the insured mortgage is:
   **Fee Simple**

3. Title to the estate or interest in the land is vested in:
   **Kevin Rosen and Stacey Rosen**

4. The insured mortgage and assignments thereof, if any, are described as follows:

   **Mortgage executed by Kevin D. Rosen and Stacey A. Rosen, husband and wife, in favor of Wachovia Mortgage, FSB, dated April 10, 2008, and recorded April 17, 2008, in Official Record Book 22580 at Page 1807 of the Public Records of Palm Beach County, Florida in the original principal amount of $200,000.**

5. The land referred to in this policy is described as follows:

   **Lot 30, Block G1 of OAKS AT BOCA RATON PLAT SIX, according to the plat thereof, as recorded in Plat Book 103, Pages 57 thru 63, inclusive, of the Public Records of Palm Beach County, Florida.**

**FORMAN & ALTINO, P.A.**

(Insert above line name of Agent)

By: _____
Authorized Signatory

(1P 1/03)

First American Title Insurance Company cares about its customers and their ability to obtain information and service on a convenient, timely and accurate basis. A qualified staff of service representatives is dedicated to serving you. A toll-free number is available for your convenience in obtaining information about coverage and to provide assistance in resolving complaints: 1-800-929-7186. Office hours are from 8:30 A.M. through 5:30 P.M., Monday through Friday.

(10/01 DisplaySoft 88-WD1-1-FL-MTGA1

KROSEN - 000126

First American Title Insurance Company

Schedule B Part I
ALTA Loan Policy
(with printed mineral exception)

**SCHEDULE B**

Issuing Office File No.: [REDACTED]          Policy No: PA- [REDACTED]

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

**PART I**

1. Any rights, interests, or claims of parties in possession of the land not shown by the public records.

2. Any rights, interests, or claims affecting the land which a correct survey would disclose and which are not shown by the public records.

3. Any lien for services, labor, or materials in connection with improvements, repairs or renovations provided before, on, or after Date of Policy, not shown by the public records.

4. Any dispute as to the boundaries caused by a change in the location of any water body within or adjacent to the land prior to Date of Policy, and any adverse claim to all or part of the land that is, at Date of Policy, or was previously, under water.

5. Taxes or special assessments not shown as liens in the public records or in the records of the local tax collecting authority, at Date of Policy.

6. Any minerals or mineral rights leased, granted or retained by current or prior owners.

7. Taxes and assessments for the year ___2008___ and subsequent years, not yet due and payable.

NOTE: Exceptions Numbered 1-6 _____ Above are Hereby Deleted.

8. Restrictions, dedications, conditions, reservations, easements and other matters shown on the plat of OAKS AT BOCA RATON PLAT SIX, as recorded in Plat Book 103, Page(s) 57 thru 63, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

9. Restrictions, dedications, conditions, reservations, easements and other matters shown on the plat of OAKS AT BOCA RATON PLAT ONE, as recorded in Plat Book 95, Page(s) 16, as affected by Surveyor's Affidavit in Book 13675, Page 1262 and Resolution in Book 16336, Page 395; OAKS AT BOCA RATON PLAT TWO, recorded in Plat Book 98, Page 196; OAKS AT BOCA RATON PLAT THREE, recorded in Plat Book 99, Page 37; OAKS BOCA RATON PLAT FOUR, recorded in Plat Book 99, Page 180 and OAKS AT BOCA RATON PLAT FIVE, recorded in Plat Book 100, Page 76, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

10. Declaration of Covenants, Conditions, Restrictions and Easements, including any amendments or modifications thereto, which contains provisions for a private charge or assessments, and provides for a right of first refusal or the prior approval of a future purchaser or occupant, recorded in Book 17679, Page 889, together with the amendments in Book 17679, Page 1044 and Book 17786, Page 1797 , but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

11. Oil, gas and mineral rights as reserved in those deeds to Everglades Drainage District recorded in Deed Book 703, Page 216, corrected in Deed Book 707, Page 439, as affected by Non-Use Commitment in Book 13753, Page 225.

**See Continuation Sheet**

(TP 10/95)
(09/91 Danjay)<ck o4-WIN-1-FL-MPBB2)

KROSEN - 000127

CONTINUATION SHEET
(SCHEDULE B CONTINUED)

Commitment or Policy No.: **36-1250383**

12.  Oil, gas and mineral rights as reserved in those deeds to Everglades Drainage District recorded in Deed Book 703, Page 221, corrected in Deed Book 707, Page 437, partially released in Book 1149 , Page 218.

13.  Declaration of Covenants, Conditions and Restrictions, including any amendments or modifications thereto, recorded in Book 11120, Page 1562; as modified in Book 11844, Page 752; Book 13219 , Page 431 and Book 14881, Page 277 , but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

14.  Declaration of Covenants, Conditions and Restrictions recorded in Book 12586, Page 724, together with the assignment of Declarant's rights in Book 13854, Page 1663, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

15.  Terms, conditions and provisions of the Standard Potable Water and Wastewater Development Agreement with Palm Beach County recorded in Book 13880, Page 1679.

16.  Declaration of Covenants, Conditions and Restrictions, including any amendments or modifications thereto, recorded in Book 15220, Page 950, as amended in Book 17493, Page 1931 , but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

17.  Declaration of Covenants, Conditions, Restrictions and Easements, recorded in Book 15429, Page 1083 and Book 17078, Page 901 , but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

18.  Environmental Resource Permit Notice recorded in Book 18888, Page 1361.

19.  Terms and conditions of the Palm Beach County Removal Agreement recorded in Book 19288, Page 1606.

20.  Landscape Improvement Easement to Adelphia Cable, Bell South Communications, Florida Public Utility Co., Florida Power & Light Co. and Palm Beach County Water Utilities Department recorded in Book 18869, Page 1213, as re-recorded in Book 18908, Page 1018.

21.  Riparian and/or littoral rights are not insured.

22.  Any matters, discrepancies, overlaps or conflicts in boundary lines, any shortage in area or quantity of land, and any other matters disclosed by that certain survey prepared by Exacta Survey Company dated April 11, 2008, Job No. FL0804.0318, including without limitation:
See Continuation Sheet

(10/97 DisplaySoft 88-WIN-1-FL-MFBCO/07)

KROSEN - 000128

CONTINUATION SHEET

(SCHEDULE B CONTINUED)

Commitment or Policy No.: **36-1250383**

      a. Brick driveway over the ten (10') foot utility easement; and
      b. Metal fence which encroaches into the ten (10') foot utility easement.

Note: All of the recording information contained herein refers to the Public Records of Palm Beach County, Florida , unless otherwise indicated. Any reference herein to a Book and Page is a reference to the Official Record Books of said county, unless indicated to the contrary.

(10/97 DisplaySoft 68-WIN-1-FL-MPBCON)

KROSEN - 000129

FAYTC-433

# First American Title Insurance Company

## SCHEDULE B - PART II

Issuing Office File No:                                          Policy No.

Loan

### EXCEPTIONS FROM COVERAGE

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the Company insures that these matters are subordinate to the lien or charge of the insured mortgage upon the estate or interest:

**NONE**

FORMAN & ALTINO, P.A.

Countersigned

Authorized Signatory

SCHEDULE B - PART II                    Schedule B of this Policy consists of        pages.

Loan Form
Form No. 3145 (Rev. 8/93)
[02/99 DispleySuit 68-WIN-1-FL-MTG82]

KROSEN - 000130

ALTA FORM 5.1 PUD

# PLANNED UNIT DEVELOPMENT
## ENDORSEMENT
### ISSUED BY

## First American Title Insurance Company

Issuing Office File No.: **581002**          Attached to Policy No.: FA- **36-1250383**

The Company insures the Insured against loss or damage sustained by reason of:

1.  Present violations of any restrictive covenants referred to in Schedule B which restrict the use of the land, except violations relating to environmental protection unless a notice of a violation thereof has been recorded or filed in the public records and is not excepted in Schedule B.  The restrictive covenants do not contain any provisions which will cause a forfeiture or reversion of title.

2.  Any charges or assessments in favor of any association of homeowners which are provided for in any document referred to in Schedule B due and unpaid at Date of Policy.

3.  The enforced removal of any existing structure on the land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.

4.  The failure of title by reason of a right of refusal to purchase the land which was exercised or could have been exercised at date of policy.

    This endorsement is made a part of the policy and is subject to all the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

    This Endorsement shall not be valid or binding unless signed by either a duly authorized officer or agent of the Company.

Issue Date: _____ 04/17/08

FORMAN & ALTINO, P.A.

(Insert above line name of Agent)

By: _____
       Authorized Signatory

First American Title Insurance Company

By: _____ President

Attest: _____ Secretary

(0901 DisplaySoft 5F WIN-1-FL-ALTAS1)

KROSEN - 000131

ALTA Florida Form-8.1
(Florida Rev. 04/07)

## ENVIRONMENTAL PROTECTION LIEN ENDORSEMENT

ISSUED BY

## *First American Title Insurance Company*

Issuing Office File No. **581002**                    Attached to Policy No.: **36-1250383**

The Company insures the Insured against loss or damage sustained by reason of the lack of priority of the lien of the insured mortgage over:

(a)      any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the clerk of the United States district court for the district in which the land is located, except as set forth in Schedule B; or

(b)      any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statute(s):

This Endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any prior endorsements, nor does it extend the effective date of the Policy and any prior endorsements, nor does it increase the face amount of insurance.

This endorsement shall not be valid or binding unless signed by either a duly authorized officer or agent of the Company.

**FORMAN & ALTINO, P.A.**

*First American Title Insurance Company*

_____
(Insert above line name of Agent)

By: _____
Authorized Signatory

By: _____ President
        Gary L. Kermott

Attest: _____ Secretary
        Mark E. Arneson

FA TIC-719FL
ALTA Florida Form-8.1
(Florida Rev. 04/07)

(08/07 DisplaySoft 6S-WIN-1-FL, EPLI)

# FLORIDA FORM OF ENDORSEMENT

## ISSUED BY

# First American Title Insurance Company

Issuing Office File No.: ▉▉▉▉▉          Attached to Policy No.: FA- ▉▉▉▉▉▉

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1. Any incorrectness in the assurance that, at Date of Policy:

   (a) There are no covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

   (b) Unless expressly excepted in Schedule B:

   (1) There are no present violations on the land of any enforceable covenants, conditions or restrictions nor do any existing improvements on the land violate building setback lines shown on a plat or subdivision recorded or filed in the public records.

   (2) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land does not, in addition (i) establish an easement on the land; (ii) provide a lien for liquidated damages; (iii) provide for a private charge or assessment; (iv) provide for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.

   (3) There is no encroachment of existing improvements located on the land onto adjoining land, nor any encroachment onto the land of existing improvements located on adjoining land.

   (4) There is no encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.

   (5) There are no notices of violation of covenants, conditions or restrictions relating to environmental protection recorded or filed in the public records.

2. Any future violation on the land of an existing covenant, condition or restriction occurring prior to the acquisition of title to the estate or interest in the land, provided the violation results in:

   (a) Invalidity, loss of priority, or unenforceability of the lien of the insured mortgage; or,

   (b) Loss of title to the estate or interest in the land if the Insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.

3. Damage to existing improvements (excluding lawns, shrubbery or trees):

   (a) Which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved.

   (b) Which results from the future exercise of any right to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted in Schedule B.

4. Any final court order or judgment requiring the removal from any land adjoining the land of any encroachment excepted in Schedule B.

5. Any final court order or judgment denying the right to maintain any existing improvement on the land because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat or subdivision recorded or filed in the public records.

Wherever in this endorsement the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease. As used in paragraphs 1(b)(1) and 5, the phrase "covenants, conditions or restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection.

This endorsement is made a part of the policy and is subject to all the terms and provisions thereof and any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

This endorsement shall not be valid or binding unless signed by either a duly authorized officer or agent of the Company.

Issue Date. _____ 04/17/08 _____          First American Title Insurance Company

FORMAN & ALTINO, P.A.                            By: _Gary L. Kennett_ President

_(Insert above line name of Agent)_             Attest: _Mark R. Arneson_ Secretary

By: _Vincent D. Altino_
_Authorized Signatory_

(080) DisplaySoft (A-WIN-1-FL-FF9)

KROSEN - 000133

FATIC-763

## First American Title Insurance Company

### MASTER ENDORSEMENT LIST

Agent's File No:                    Attached to Policy No.

The indicated endorsements, in the form mandated as of the effective date of this policy by the Florida Department of Insurance, pursuant to Rule 4-186, Florida Administrative Code, are incorporated herein.

Only the endorsements marked with an "X" below are deemed incorporated herein:

| | | |
|---|---|---|
| _____ | ALTA 2 | Truth-in-Lending Endorsement |
| _____ | ALTA 4.1 | Condominium Endorsement |
| _____ | ALTA 5 | Planned Unit Development ("PUD") Endorsement |
| X | ALTA 5.1 | Planned Unit Development ("PUD") Endorsement |
| _____ | ALTA 6 | Variable Rate Mortgage Endorsement |
| _____ | ALTA 6.1 | Variable Rate Mortgage Endorsement [with the word "NONE" inserted in the blank line following paragraph no. 2] |
| _____ | ALTA 6.2 | Variable Rate Mortgage Endorsement with Negative Amortization |
| _____ | ALTA 7 | Manufactured Housing Endorsement |
| X | ALTA 8.1 | Environmental Protection Lien Endorsement [with the word "NONE" inserted under paragraph (b)] |
| _____ | | Revolving Credit Endorsement |
| X | | Florida Form 9 Endorsement (Restrictions, Easements, Minerals) |
| _____ | | Navigational Servitude Endorsement |
| _____ | | Shared Appreciation Endorsement |
| _____ | | Additional Interest Endorsement |
| _____ | | Option Endorsement |
| _____ | | Change of Partners ("Fairways") Endorsement |
| _____ | | Foreign Currency Endorsement |
| _____ | | ALTA - Lender FNMA Balloon Mortgage Endorsement |

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated in the endorsements provided hereunder, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

This endorsement shall not be valid or binding unless countersigned by either a duly authorized agent or representative of the company.

IN WITNESS WHEREOF, First American Title Insurance Company has caused its corporate seal to be hereunto affixed and these presents to be signed in facsimile under authority of its By-Laws.

Dated this __17th__ day of __April__, __2008__

First American Title Insurance Company

By: _Gary L. Kermott_ President

Attest: _Mark R. Arneson_ Secretary

FORMAN & ALTINO, P.A.

(Insert above line name of Agent)

By: _Vincent D. Altino_
Authorized Signatory
(TP 2/08)

(08/01 DisplaySoft 61-WIN-1-FL-EML)

KROSEN - 000134

LAW OFFICES

# FORMAN & ALTINO, P.A.

SUITE 2800
2101 WEST COMMERCIAL BOULEVARD
FORT LAUDERDALE, FLORIDA 33309

ROBERT S. FORMAN
VINCENT J. ALTINO

TELEPHONE
TELEFAX

OF COUNSEL
BERMAN, KEAN & RIGUERA, P.A.

July 24, 2009

RE: Kevin Rosen & Stacey Rosen

TO WHOM IT MAY CONCERN:

This is to confirm that Forman & Altino, P.A. is holding the sum of $10,000.00 in our trust account in connection with our clients proposed lease of residential property.

Very truly yours,

Vincent J. Altino
VJA:brb

Case 1:09-cv-23007-EEG-MBN Document 23380-10 Filed 12/02/19 Page 213 of 251
Case 1:09-md-02047-MGC Document 27011-1 Entered on FLSD Docket 05/13/2013 Page 145 of 459
07/28/2009 17:54 KENNETH G ADAMS PAGE 82
Jul 28 09 05:48p p.3




**for Single Family Home and Duplex**

**INSTRUCTIONS:**

1. Licensee: Give this disclosure to the Landlord prior to your assisting with the completion of the attached Lease.
2. Licensee: As the person assisting with the completion of the attached form, insert your name in the first (5) blank "Name" spaces below.
3. Licensee: SIGN the disclosure below.
4. Landlord/Owner and Tenant: Check the applicable provision regarding English contained in the disclosure and SIGN below.
5. Licensee: Retain a copy for your files for at least 6 years. Landlord/Owner and Tenant: Retain a copy for your files. This disclosure does not act as or constitute a waiver, disclaimer or limitation of liability.

**THIS FORM WAS COMPLETED WITH THE ASSISTANCE OF:**

| Kenneth G. Adams | Diverse Real Estate Services |
|---|---|
| Licensee Name | Name of Brokerage/Business |

| 770 NE 37th Street Boca Raton, FL | |
|---|---|
| Address | Phone Number |

**DISCLOSURE:**

____ Ken Adams/Sally Thacher ____ told me that he / she is a nonlawyer and may not give
(Name)
legal advice, cannot tell me what my rights or remedies are, cannot tell me how to testify in court, and cannot represent me in court.

Rule 10-2.1(b) of the Rules Regulating the Florida Bar defines a paralegal as a person who works under the supervision of a member of the Florida Bar and who performs specifically delegated substantive legal work for which a member of the Florida Bar is responsible. Only persons who meet the definition may call themselves paralegals.

____ Ken Adams/Sally Thacher ____ informed me that he / she is not a paralegal as defined
(Name)
by the rule and cannot call himself/herself a paralegal.

____ Ken Adams/Sally Thacher ____ told me that he/she may only help me type the factual
(Name)
information provided by me in writing into the blanks on the form.

____ Ken Adams/Sally Thacher ____ may not help me fill in the form and may not complete
(Name)
the form for me.

If using a form approved by the Supreme Court of Florida, ____ Ken Adams/Sally Thacher ____ may
(Name)
ask me factual questions to fill in blanks on the form and may also tell me how to file the form.

Landlord/Owner:                                              Tenant:
_X_ I can read English.                                      _X_ I can read English.
___ I cannot read English but this notice was read to me by   ___ I cannot read English but this notice was read to me by

____ in ____ (Language) ____ which I understand.
(Name)

| (Licensee Signature) | (Landlord Signature) | (Tenant Signature) |
|---|---|---|
| K.Adams S. Thacher | E. & J. DiYanni | E. & S. Rosen |

This form is available for use by the entire real estate industry and is not intended to identify the user as a Realtor. Realtor is a registered collective membership mark that may be used only by real estate licensees who are members of the National Association of Realtors and who subscribe to its Code of Ethics.

The copyright laws of the United States (17 U.S. Code) forbid the unauthorized reproduction of blank forms by any means including facsimile or computerized forms.

RLHD-2x   Rev. 11/07   © 2007   Florida Association of Realtors®   All Rights Reserved
This software is licensed to [Kenneth Adams - Diverse Real Estate Services] www.transactiondesk.com.

KROSEN - 000136

Case 2:09-md-02047-EEF-MBN Document 22380-40 Filed 12/02/19 Page 214 of 251
Case 2:09-md-02047-MDC Document 22011 Entered on FLSD Docket 05/30/2019 Page 146 of 459
07/28/2009 17:54                              KENNETH G ADAMS                    PAGE 03
Jul 28 09 05:48p                                                                p.4

 **for Single Family Home and Duplex**
REALTORS®



(FOR A TERM NOT TO EXCEED ONE YEAR)
A BOX (☐) OR A BLANK SPACE (____) INDICATES A PROVISION WHERE A CHOICE OR DECISION MUST BE MADE BY THE PARTIES.

THIS LEASE IMPOSES IMPORTANT LEGAL OBLIGATIONS. MANY RIGHTS AND RESPONSIBILITIES OF THE PARTIES ARE GOVERNED BY CHAPTER 83, PART II, RESIDENTIAL LANDLORD AND TENANT ACT, FLORIDA STATUTES. UPON REQUEST, THE LANDLORD SHALL PROVIDE A COPY OF THE RESIDENTIAL LANDLORD AND TENANT ACT TO THE TENANT(S).

**1. PARTIES.** This is a lease ("the Lease") between ____ Edward and Jacqueline Divanni ____
(name and address of owner of the property)

10515 Fairway Ct. Carmel, CA 93923-8030 ____ ("Landlord") and

Kevin and Stacey Rosen, jointly and severally
(name(s) of person(s) to whom the property is leased)

5540 NE Trieste Way, Boca Raton, FL 33487 ____ ("Tenant.")

**2. PROPERTY RENTED.** Landlord leases to Tenant the land and buildings located at ____ 5540 NE Trieste Way ____
(street, suite, etc.)

Boca Raton, FL 33487 ____, Florida ____ 33487
(zip code)

together with the following furniture and appliances [List all furniture and appliances. If none, write "none."] (In the Lease, the property leased, including furniture and appliances, if any, is called "the Premises"):

Washer, Dryer, Refrigerator, Dishwasher, Wall Ovens

Contract to lease dated 7/27/2009 made part and parcel to this lease

The Premises shall be occupied only by the Tenant and the following persons: ____
Children of Kevin and Stacey Rosen

**3. TERM.** This is a lease for a term, not to exceed twelve months, beginning on ____ August ____ 1st ____ 2009 ____
(month, day, year)

and ending ____ July ____ 31 ____ 2010 (the "Lease Term").
(month, day, year)

**4. RENT PAYMENTS, TAXES AND CHARGES.** Tenant shall pay total rent in the amount of $____ 39,600.00 ____ (excluding taxes) for the Lease Term. The rent shall be payable by Tenant in advance
☒ in installments. If in installments, rent shall be payable

☒ monthly, on the ____ 1st ____ day of each month. (If left blank, on the first day of each month.)
☐ weekly, on the ____ day of each week. (If left blank, on Monday of each week.)

in the amount of $ 3,300.00 per installment.

☐ in full on ____ in the amount of $ ____
(date)

Tenant shall also be obligated to pay taxes on the rent when applicable in the amount of $____ 0.00 ____
☐ with each rent installment ☐ with the rent for the full term of the Lease. Landlord will notify Tenant if the amount of the tax changes.

**Payment Summary**
☒ If rent is paid in installments, the total payment per installment including taxes shall be in the amount of $ 3,300.00.
☐ If rent is paid in full, the total payment including taxes shall be in the amount of $ ____

Landlord ____ and Tenant ____ acknowledge receipt of a copy of this page which is Page 1 of 6
FLHD-2   Rev. 10/00   © 2000   Approved for use under rule 10-2.1(a) of The Rules Regulating The Florida Bar

This software is licensed to [Kenneth Adams - Divorce Real Estate Services] www.transactiondesk.com.

*Instanet Forms*

Case 2:09-md-02047-EEF-MBN Document 22380-40 Filed 12/02/19 Page 215 of 251
Case 1:09-cv-02047-JSR Document 27 Entered on FLSD Docket 05/13/2015 Page 147 of 455
07/28/2009 17:54    561-392-3957    KENNETH G ADAMS    PAGE  04
Jul 28 09 05:48p                                           p.5

All rent payments shall be payable to _____ Edward and Jacqueline _____ at
_____ (name)

_____ 10515 Fairway Ct.  Carmel, CA 93923 _____ .(if left blank, to Landlord at Landlord's address).
        (address)

☐ If the tenancy starts on a day other than the first day of the month or week as designated above, the rent shall be prorated from
_____ through _____ in the amount of $ _____ and shall be due on
(date)        (date)
_____ , (if rent paid monthly, prorate on a 30 day month.)
(date)

Tenant shall make rent payments required under the Lease by (choose all applicable) ☐ cash, ☒ personal check, ☒ money order,
☒ cashier's check, or ☐ other _____ (specify). If payment is accepted by any means other than
cash, payment is not considered made until the other instrument is collected.

If Tenant makes a rent payment with a worthless check, Landlord can require Tenant ☒ to pay all future payments by ☒ money order,
cashier's check or official bank check or ☐ cash or other (specify) _____
and ☒ to pay bad check fees in the amount of $ ____50.00____ (not to exceed the amount prescribed by Florida Statutes
section 68.065).

5. MONEY DUE PRIOR TO OCCUPANCY. Tenant shall pay the sum of $ 9,900.00 in accordance with this Paragraph prior
to occupying the Premises. Tenant shall not be entitled to move in or to keys to the Premises until all money due prior to occupancy
has been paid. If no date is specified below, then funds shall be due prior to tenant occupancy. Any funds designated in this para-
graph due after occupancy, shall be paid accordingly. Any funds due under this paragraph shall be payable to Landlord at Landlord's
address or to _____
                           (name)
at _____
                           (address)

| First ☒ month's ☐ week's rent plus applicable taxes | $ | 3,300.00 | due | 7/31/2009 |
|---|---|---|---|---|
| Prorated rent plus applicable taxes | $ | 0.00 | due | |
| Advance rent for ☐ month ☐ week of _____ | | | | |
| plus applicable taxes | $ | 0.00 | due | |
| Last ☒ month's ☐ week's rent plus applicable taxes | $ | 3,300.00 | due | 7/31/2009 |
| Security deposit | $ | 3,300.00 | due | 7/31/2009 |
| Additional security deposit | $ | | due | |
| Security deposit for homeowner's association | $. | | due | |
| Other (Association Fee paid directly to Assn) | $ | 200.00 | due | |
| Other | $ | | due | |

6. LATE FEES. (Complete if applicable) In addition to rent, Tenant shall pay a late charge in the amount of $ 250.00 for
each rent payment made ___16___ days after the day it is due (if left blank, 5 days if rent is paid monthly, 1 day if rent is paid weekly).
7. PETS. Tenant ☐ may ☒ may not keep pets or animals on the Premises. If Tenant may keep pets, the pets described in this
Paragraph are permitted on the Premises.

No Pets
(Specify number of pets, type(s), breed, maximum adult weight of pets.)

8. NOTICES. _____ By E-MAIL TO: _____ is Landlord's Agent.
All notices must be sent to:
    ☒ Landlord _____ Ed Diyanni _____
                                          (name)
    at _____ 10515 Fairway Ct.  Carmel, CA 93923 _____
                                          (address)
    ☐ Landlord's Agent _____ By E-MAIL TO: _____
                                          (name)
    at _____ Cell Phone # _____
                                          (address)

Landlord [  ] [  ] and Tenant (   ) (   ) acknowledge receipt of a copy of this page which is Page 2 of 6
RLHD-2  Rev. 10/00 /-© 2000  Approved for use under rule 10-2.1(a) of The Rules Regulating The Florida Bar    instanet forms
This software is licensed to [Kenneth Adams - Diyanne Real Estate Services] www.transactiondesk.com.

KROSEN - 000138

unless Landlord gives Tenant written notice of a change. All notices of such names and addresses or changes thereto shall be delivered to the Tenant's residence or, if specified in writing by the Tenant, to any other address. All notices to the Landlord or the Landlord's Agent (whichever is specified above) shall be given by U.S. mail or by hand delivery.

Any notice to Tenant shall be given by U.S. mail or delivered to Tenant at the Premises. If Tenant is absent from the Premises, a notice to Tenant may be given by leaving a copy of the notice at Premises.

**9. UTILITIES.** Tenant shall pay for all utilities services during the Lease Term and connection charges and deposits for activating existing utility connections to the Premises except for <u>Homeowners Association Fees, landscaping and lawn</u>

<u>maintenance, pool, spa maintenance, trash collection</u>, that Landlord agrees to provide at Landlord's expense.

**10. MAINTENANCE.** Landlord shall be responsible for compliance with Section 83.51, Florida Statutes, and shall be responsible for maintenance and repair of the Premises, unless otherwise stated below:

(Fill in each blank space with "Landlord" for Landlord or "Tenant" for Tenant. If left blank, Landlord will be responsible for the item):

| | | | | | |
|---|---|---|---|---|---|
| <u>Landlord</u> | roofs | <u>Landlord</u> | windows | <u>Landlord</u> | screens |
| <u>Landlord</u> | steps | <u>Landlord</u> | doors | <u>Landlord</u> | floors |
| <u>Landlord</u> | porches | <u>Landlord</u> | exterior walls | <u>Landlord</u> | foundations |
| <u>Landlord</u> | plumbing | <u>Landlord</u> | structural components | | |
| <u>Landlord</u> | heating | <u>Landlord</u> | hot water | <u>Landlord</u> | running water |
| <u>Landlord</u> | locks and keys | <u>Landlord</u> | electrical system | <u>Landlord</u> | cooling |
| <u>Landlord</u> | smoke detection devices | | | <u>Landlord</u> | garbage removal/outside receptacles |
| <u>Landlord</u> | extermination of rats, mice, roaches, ants and bedbugs | | <u>Landlord</u> | extermination of wood-destroying organisms |
| <u>Landlord</u> | lawn/shrubbery | <u>Landlord</u> | pool/spa/hot tub | <u>Landlord</u> | water treatment |
| <u>Tenant</u> | filters(specify) | <u>2 A/C</u> | | <u>Landlord</u> | ceilings  <u>Landlord</u>  interior walls |

Other (specify) <u>Landlord - Alarm & A/C Systems. Tenant not responsible for normal wear & tear</u>

Tenant shall notify _____ <u>Ed Diyanni</u> _____ at <u>10515 Fairway Ct.   Carmel, CA 93923</u>
                                    (Name)                                              (address)

<u>E-Mail...</u> _____ and _____ <u>Cell #</u> _____ of maintenance
                                                            (telephone number)

and repair requests.

**11. ASSIGNMENT.** Tenant ☐ may ☒ may not assign the lease or sublease all or any part of the Premises without first obtaining the Landlord's written approval and consent to the assignment or sublease.

**12. KEYS AND LOCKS.** Landlord shall furnish Tenant _1_ # of sets of keys to the dwelling  _1_ # of mail box keys

_____ _2_ # of garage door openers

If there is a homeowner's association, Tenant will be provided with the following to access the association's

common areas/facilities; _____ # of keys to _____

_____ # of remote controls to _____

_2_ # of electronic cards to <u>Guard Gate</u> _____

other (specify) to _____

At end of Lease Term, all items specified in this Paragraph shall be returned to _____ <u>Ed Diyanni</u> _____
                                                                                              (name)

at _____ <u>10515 Fairway Ct.   Carmel, CA 93923</u> _____ (If left blank, Landlord at Landlord's address).
                            (address)

**13. LEAD-BASED PAINT.** ☐ Check and complete if the dwelling was built before January 1, 1978.

**Lead Warning Statement**

Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, Lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

Landlord (initials) and Tenant (initials) acknowledge receipt of a copy of this page which is Page 3 of 6
RLHD-2   Rev. 10/00  © 2000   Approved for use under rule 10-2.1(a) of The Rules Regulating The Florida Bar

This software is licensed to (Kenneth Adams - Diverse Real Estate Services) www.transactiondesk.com.

KROSEN - 000139

Case 2:09-md-02047-EEF-MBN Document 22380-40 Filed 12/02/19 Page 217 of 251
Case 2:09-cv-02047-MGC Document 27-11 Entered on FLSD Docket 05/30/2017 Page 149 of 455
07/28/2009 17:54         KENNETH G ADAMS                PAGE 05

Jul 28 09 05:40p                                                              p.7

Lessor's Disclosure (initial)

_____ (a) Presence of lead-based paint or lead-based paint hazards (check (i) or (ii) below):

(i) ____ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

(ii) ____ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

_____ (b) Records and reports available to the Lessor (check (i) or (ii) below):

(i) ____ Lessor has provided the Lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (List documents below).

(ii) . Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

Lessee's Acknowledgment (initial)

_____ (c) Lessee has received copies of all information listed above.

_____ (d) Lessee has received the pamphlet *Protect Your Family From Lead in Your Home.*

Agent's Acknowledgment (initial)

_____ . (e) Agent has informed the Lessor of the Lessor's obligations under 42 U.S.C, 4052d and is aware of his/her responsibility to ensure compliance.

Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

| Edward 7 DiYanni | 7-28-09 | Jacqueline DiYanni | 7-28-09 |
|---|---|---|---|
| Lessor Edward DiYanni | Date | Lessor JacquelineDiYanni | Date |
| Lessee Kevin Rosen | 7-28-09 Date | Lessee Stacey Rosen | 7/28/09 Date |
| Agent Ken Adams | 7/28/09 Date | Agent Sally Thacher | 7-28-09 Date |

14. MILITARY/U.S. CIVIL SERVICE. ☐ Check if applicable. In the event Tenant, who is in the Military/U.S. Civil Service, should receive government orders for permanent change of duty station requiring Tenant to relocate away from the Premises, then Tenant may terminate the Lease without further liability by giving Landlord 30 days advance written notice and a copy of the transfer order.

15. LANDLORD'S ACCESS TO THE PREMISES. As provided in Chapter 83, Part II, Residential Landlord and Tenant Act, Florida Statutes, Landlord or Landlord's Agent may enter the Premises in the following circumstances:

A. At any time for the protection or preservation of the Premises.

B. After reasonable notice to Tenant at reasonable times for the purpose of repairing the Premises.

C. To inspect the Premises; make necessary or agreed-upon repairs, decorations, alterations, or improvements; supply agreed services; or exhibit the Premises to prospective or actual purchasers, mortgagees, tenants, workers, or contractors under any of the following circumstances:

1. with Tenant's consent; 2. in case of emergency; 3. when Tenant unreasonably withholds consent; or

4. if Tenant is absent from the Premises for a period of at least one-half a Rental Installment period. (If the rent is current and Tenant notifies Landlord of an intended absence, then Landlord may enter only with Tenant's consent or for the protection or preservation of the Premises.)

16. HOMEOWNER'S ASSOCIATION. If Tenant must be approved by a homeowner's association ("association"), Landlord and Tenant agree that the Lease is contingent upon receiving approval from the association. Any application fee required by an association shall be paid by ☐ Landlord ☐ Tenant and is ☐ refundable ☒ nonrefundable. If such approval is not obtained prior to commencement of Lease Term, Tenant shall receive return of deposits specified in Paragraph 6, if made, and the obligations of the parties under this Lease shall terminate. Tenant agrees to use due diligence in applying for association approval, to comply with the requirements for obtaining approval and agrees to pay any fee required by the association for procuring approval. ☐ Landlord ☒ Tenant shall pay the security deposit required by the association, if applicable.

Landlord (_____) (_____) and Tenant (_____) (_____) acknowledge receipt of a copy of this page which is Page 4 of 6

RLHD-2    Rev. 10/00.  © 2000    Approved for use under rule 10-2.1(a) of The Rules Regulating The Florida Bar

This software is licensed to [Kenneth Adams - Diverse Real Estate Services] www.transactiondesk.com.

KROSEN - 000140

**17. USE OF THE PREMISES.** Tenant shall use the Premises for residential purposes. Tenant shall have exclusive use and right of possession to the dwelling. The Premises shall be used so as to comply with all state, county, municipal laws and ordinances, and all covenants and restrictions affecting the Premises and all rules and regulations of homeowners' associations affecting the Premises. Tenant may not paint or make any alterations or improvements to the Premises without first obtaining the Landlord's written consent to the alteration or improvement. Any improvements or alterations to the Premises made by the Tenant shall become Landlord's property. Tenant agrees not to use, keep, or store on the Premises any dangerous, explosive, toxic material which would increase the probability of fire or which would increase the cost of insuring the Premises.

**18. RISK OF LOSS/INSURANCE.**

A. Landlord and Tenant shall each be responsible for loss, damage, or injury caused by its own negligence or willful conduct.

B. Tenant should carry insurance covering Tenant's personal property and Tenant's liability insurance

**19. DEFAULTS/REMEDIES.** Should a party to the Lease fail to fulfill their responsibilities under the Lease or need to determine whether there has been a default of the Lease, refer to Part II, Chapter 83, entitled Florida Residential Landlord and Tenant Act which contains information on same, and/or remedies available to the parties.

**20. SUBORDINATION.** The Lease is subordinate to the lien of any mortgage encumbering the fee title to the Premises from time to time.

**21. LIENS.** Tenant shall not have the right or authority to encumber the Premises or to permit any person to claim or assert any lien for the improvement or repair of the Premises made by the Tenant. Tenant shall notify all parties performing work on the Premises at Tenant's request that the Lease does not allow any liens to attach to Landlord's interest.

**22. RENEWAL/EXTENSION.** The Lease can be renewed or extended only by a written agreement signed by both Landlord and Tenant, but the term of a renewal or extension together with the original Lease Term may not exceed one year. A new lease is required for each year.

**23. TENANT'S PERSONAL PROPERTY. BY SIGNING THIS RENTAL AGREEMENT, TENANT AGREES THAT UPON SURRENDER OR ABANDONMENT, AS DEFINED BY THE FLORIDA STATUTES, LANDLORD SHALL NOT BE LIABLE OR RESPONSIBLE FOR STORAGE OR DISPOSITION OF TENANT'S PERSONAL PROPERTY.**

**24. TENANT'S TELEPHONE NUMBER.** Tenant shall within 5 business days of obtaining telephone services at the Premises, send written notice to Landlord of Tenant's telephone numbers at the Premises.

**25. ATTORNEY'S FEES.** In any lawsuit brought to enforce the Lease or under applicable law, the party who wins may recover its reasonable court costs and attorney's fees from the party who loses.

**26. MISCELLANEOUS.**

A. Time is of the essence of the Lease.

B. The Lease shall be binding upon and for the benefit of the heirs, personal representatives, successors, and permitted assigns of Landlord and Tenant, subject to the requirements specifically mentioned in the Lease. Whenever used, the singular number shall include the plural or singular and the use of any gender shall include all appropriate genders.

C. The agreements contained in the Lease set forth the complete understanding of the parties and may not be changed or terminated orally.

D. No agreement to accept surrender of the Premises from Tenant will be valid unless in writing and signed by Landlord.

E. All questions concerning the meaning, execution, construction, effect, validity, and enforcement of the Lease shall be determined pursuant to the laws of Florida.

F. A facsimile copy of the Lease and any signatures hereon shall be considered for all purposes originals.

G. As required by law, Landlord makes the following disclosure: "RADON GAS." Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

Landlord (____) and Tenant (____) acknowledge receipt of a copy of this page which is Page 5 of 6
RLHD-2   Rev 10/00   © 2000   Approved for use under rule 10-2.7(a) of The Rules Regulating The Florida Bar

This software is licensed to [Kenneth Adams - Diverse Real Estate Services] www.transactiondesk.com.

KROSEN - 000141

Case 2:09-cv-02047-MRC-EEF-MBN Document 22380-40 Filed 12/02/19 Page 219 of 251
Case 2:09-cv-02047-EEF-MBN Document 22380-40 Entered on FLSD Docket 05/13/2019 Page 151 of 459
KENNETH G ADAMS                    PAGE   08

07/28/2069  17:54     561-392-3957                                    p.9
Jul 28 09 05:50p

27. BROKERS' COMMISSION. ☒ Check and complete if applicable. The brokerage companies named below will be paid the commission set forth in this Paragraph by ☒ Landlord ☐ Tenant for procuring a tenant for this transaction.

| Kenneth G. Adams | Sally A. Thacher |
|---|---|
| Real Estate Licensee | Real Estate Licensee |
| Diverse Real Estate Services | Diverse Real Estate Services |
| Real Estate Brokerage Company | Real Estate Brokerage Company |
| $1980 | $1980 |
| Commission | Commission |

28. EXECUTION.
Executed by Landlord

*Edward F Diyanni*

Landlord's Signature Edward Diyanni

*Jacqueline Di Yanni*

Landlord's Signature Jacqueline Diyanni

7-28-09

Date

7-28-09

Date

Executed by Tenant

Tenant's Signature Beryl Rosen

Tenant's Signature Stacey Rosen

7-28-09

Date

7/28/09

Date

This form was completed with the assistance of:

Name of Individual:       Ken Adams/ Sally Thacher

Name of Business:         Diverse Real Estate Services, Inc.

Address:                  Mailing Adress 770 NE 37th St, Boca Raton, FL  33431

Telephone Number:

Landlord ( ) ( ) and Tenant ( ) ( ) acknowledge receipt of a copy of this page which is Page 6 of 6
RLHD-2   Rev. 10/00  © 2000    Approved for use under rule 10-2.1(a) of The Rules Regulating The Florida Bar                 Instanet Forms
This software is licensed to [Kenneth Adams - Diverse Real Estate Services] www.transactiondesk.com.

KROSEN - 000142

Case 1:09-cv-02047-MGC Document 22380-40 Filed 12/02/19 Page 220 of 251
Case 9:09-cv-80047-KLR Document 27-01 Entered on FLSD Docket 05/30/2009 Page 152 of 459
07/28/2009 17:54 561-392-3957 KENNETH G ADAMS PAGE 09
Jul 28 09 05:50p p.10

## CONTRACT TO LEASE

This CONTRACT TO LEASE is between

Kevin and Stacey Rosen ("Prospective Tenant")

and Edward Divanni ("Prospective Landlord")

for the proposed rental of the real property located at 5340 NW Triesta Way

Boca Raton, FL 33487

**1. DEPOSIT RECEIPT:** Law Offices of Forman & Altino, P.A. ("Broker")
acknowledges receipt of a deposit in the amount of $ 3,300.00

**2. DESCRIPTION OF PROPERTY:** 3 BR 3 BA ☐ furnished ☒ unfurnished ☐ inventory attached

Parking: spaces 2 , vehicles prohibited (if any)

Pets: ☐ prohibited ☒ permitted, restrictions: with Refundable Deposit

Property Use Restrictions: Residential

Property is to be used by 4 occupant(s) for (purpose): Residence

**3. TERMS:** Proposed Lease Term to commence on the 1st day of August , 3009 and end
on the 31st day of July , 2010 .

Total rent $ 39,600.00 per year .

Security deposit $ 3,300.00    Pet fee(s) ☒ refundable $ 500.00
☐ non-refundable $

Advance rent $ 6,600.00    Other First/Last $

Application fee $ 250.00    Other Pay Assn. $

Security deposit, advance rent, and refundable fees will be held by ☐ Broker ☒ Prospective Landlord ☐ Other
in a separate ☐ interest bearing ☒ non-interest bearing account in a Florida financial institution.

**4. EXPENSES:** To be paid by:

| UTILITIES: | Landlord | Tenant | N/A | MAINTENANCE: | Landlord | Tenant | N/A |
|---|---|---|---|---|---|---|---|
| Electric | ☐ | ☒ | ☐ | A/C and Heating | ☒ | ☐ | ☐ |
| Gas/Fuel | ☐ | ☒ | ☐ | Building Interior | ☒ | ☐ | ☐ |
| Sewer | ☐ | ☒ | ☐ | Building Exterior | ☒ | ☐ | ☐ |
| Water | ☐ | ☒ | ☐ | Lawn | ☒ | ☐ | ☐ |
| Trash Collection | ☒ | ☐ | ☐ | Pool and Equipment | ☒ | ☐ | ☐ |
| Telephone | ☐ | ☒ | ☐ | Pest Control | ☒ | ☐ | ☐ |
| | | | | Appliances | ☒ | ☐ | ☐ |
| TAXES: | | | | Common Areas | ☒ | ☐ | ☐ |
| Real Property | ☒ | ☐ | ☐ | | | | |
| Sales and Services | ☒ | ☐ | ☐ | INSURANCE: | | | |
| Personal Property | ☒ | ☐ | ☐ | Personal Liability | ☒ | ☐ | ☐ |
| Intangible | ☒ | ☐ | ☐ | Property Damage | ☒ | ☐ | ☐ |
| | | | | Flood | ☒ | ☐ | ☐ |
| OTHER: | ☐ | ☐ | ☐ | RENTERS | ☐ | ☒ | ☐ |

**5. PREPARATION OF LEASE AGREEMENT:** The parties to this Contract agree to prepare or have prepared a lease
agreement consistent with the terms and conditions of this Contract. The lease agreement will be executed by all parties no
later than July 29th, 2009 . Lease provisions which conflict with provisions of this Contract will control.

**6. ASSOCIATION APPROVAL:** Where applicable, this Contract is subject to and contingent upon the Prospective Tenant
being approved by the condominium/cooperative/homeowners association. Prospective Tenant will pay a non-refundable
application fee of $ 200.00 and make application for association approval within 2 days from the

Prospective Landlord (___) (___) and Prospective Tenant (___) (___) acknowledge receipt of a copy of this page,
which is Page 1 of 2 Pages.

CL-2x 10/08 ©2008 Florida Association of Realtors® All Rights Reserved
This software is licensed to [Kenneth Adams - Diverse Real Estate Services] www.transactiondesk.com.

KROSEN - 000143

Case 2:09-md-02047-EEF-MBN Document 22380-40 Filed 12/02/19 Page 221 of 251
Case 2:09-cv-02047-EEF-MBN Document 2701-17 Entered on FLSD Docket 05/30/2012 Page 153 of 459
07/28/2009  17:54    561-392-3957              KENNETH G ADAMS              PAGE  10
Jul 28 09 05:51p                                                            p.11

effective date of this Contract. In the event the Prospective Tenant is not approved, this Contract will terminate and all deposit(s) made will be refunded to the Prospective Tenant unless otherwise specified. The parties will make all reasonable efforts, including any required personal appearances, to obtain Association approval. Occupancy ☐ is ☒ is not permitted prior to Association approval.

7. FAILURE TO PERFORM: If Prospective Tenant fails to perform any of the promises of this Contract, the deposit(s) paid or agreed to be paid by Prospective Tenant may be retained by or for the account of Prospective Landlord as agreed upon liquidated damages, consideration for the execution of this Contract, and in full settlement of any claims, and Prospective Landlord and Prospective Tenant will be relieved of all obligations under this Contract. If Prospective Landlord fails to perform any of the promises of this Contract, the deposit(s) will be refunded to Prospective Tenant without waiving any action for damages resulting from Prospective Landlord's breach.

8. RETAINED DEPOSITS: In the event Prospective Landlord retains a deposit, Prospective Landlord will pay to Broker 50% of the deposit, not to exceed any previously agreed upon compensation, as full consideration for Broker's services.

9. USE RESTRICTIONS: The Parties agree that the Property is being rented subject to zoning ordinances, restrictions, limitations, easements, and public utilities of record; however, this Contract is contingent upon the intended use stated in Paragraph 2 being permissible.

10. ASSIGNABILITY: This Contract is binding upon and inures to the benefit of the Parties and their respective heirs, personal representatives, and successors. Prospective Tenant may not assign this Contract without the prior written consent of the Prospective Landlord.

11. OTHER AGREEMENTS: No modification or change to this Contract will be valid or binding unless in writing and signed by both Parties.

12. RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

13. BROKERAGE DISCLOSURE: Broker represents ☐ Prospective Landlord ☐ Prospective Tenant.

14. FACSIMILE: A facsimile copy of this Contract and any signatures thereon will be considered for all purposes as originals.

15. SPECIAL CLAUSES:
At the time of lease execution and at the time of each Lease renewal (if any), Landlord shall provide Tenants with copy of Landlord's then current and most recent mortgage statement indicating that Landlord is current in its payments with its Mortgage Lender. Tenants shall have option to renew lease for 12 months at $3,500.00 per month rent. Lease Option needs to be exercised 60 days prior to termination of 1st year Lease.

Landlord to allow installation of all TV's, fans or chandeliers as long as the unit is returned to original condition at end of lease. This includes any damage caused by and including wall holes, spackling brackets, etc.

Unit will be returned to the full original condition at termination of lease, Including, but not limited to, walls, carpets, doors, and electrical components, etc.

Tenants have attached a letter dated 07/28/09 from The Law Offices of Forman & Altino, P.A. regarding Tenants' funds on trust deposit.

This Contract is not a lease. It is intended to be a legally binding contract. If not fully understood, seek the advice of an attorney prior to signing.

| | | |
|---|---|---|
| Date: _7-28-09_ | Prospective Tenant _____ | Tax ID/SSN: _____ |
| | Kevin Grams | |
| Date: _____ | Prospective Tenant _____ | Tax ID/SSN: _____ |
| | Stacey Rubin | |
| Home Telephone: __ | Work Telephone: _____ | Facsimile: _____ |
| Address: _____ | | |
| | E-mail: _____ | |
| Date: _7-28-09_ | Prospective Landlord: _Edward F Di Janni_ | |
| Date: _9-28-09_ | Prospective Landlord: _Jacquline DiYanni_ | |

This form is available for use by the entire real estate industry and is not intended to identify the user as a Realtor. Realtor is a registered collective membership mark that may be used only by real estate licensees who are members of the National Association of Realtors and who subscribe to its Code of Ethics.
The copyright laws of the United States (17 U.S. Code) forbid the unauthorized reproduction of blank forms by any means including facsimile or computerized forms.

Prospective Landlord (___) (___) and Prospective Tenant (___) (___) acknowledge receipt of a copy of this page, which is Page 2 of 2 Pages.
CL-2x  10/06  © 2006  Florida Association of Realtors®  All Rights Reserved
This software is licensed to [Kenneth Adams - Diverse Real Estate Services] www.transactiondesk.com.

KROSEN - 000144

Kevin & Stacey Rosen - Chinese Drywall Expenses and Damages

# OUT OF POCKET EXPENSES

| Date | Item | Amount |
|---|---|---|
| 9/12/2008 | AZ Plumbing | $75.00 |
| 10/23/2008 | Central Vacuum Connection | $69.95 |
| 12/4/2008 | First Class AC & Appliance | $79.00 |
| 3/4/2009 | Florida Public Utilities | $130.00 |
| 4/13/2009 | Sunstate A/C | $550.00 |
| 8/11/2006 | Mattress - Damaged and Discarded | $5,255.00 |
| 7/27/2009 | Target - Relocation Baby Clothes | $114.93 |
| 7/28/2009 | Publix - Relocation Laundry Hampers | $40.74 |
| 7/28/2009 | Townhouse - HOA Application | $200.00 |
| 7/29/2009 | Baby Love - Infant Mattress | $169.59 |
| 7/29/2009 | City Mattress - Adult and Child Bedding | $1,215.17 |
| 7/30/2009 | Townhouse - 1st/Last Month Rent+ Security | $9,900.00 |
| 7/30/2009 | Townhouse - AT&T Phone Service | $68.27 |
| 7/30/2009 | Townhouse - FPU Gas Deposit & Transfer | $68.00 |
| 7/31/2009 | Home Depot - Townhouse Toilet Parts | $35.84 |
| 7/31/2009 | Fed Ex - Rent+ Security to Landlord | $13.04 |
| 8/1/2009 | 2 Men & Truck - Moving Company | $1,128.50 |
| 8/1/2009 | Gas - Cargo Van | $48.15 |
| 8/1/2009 | City Mattress - Box Springs and Frame | $319.50 |
| 8/1/2009 | Walmart - Cleaning Supplies | $19.05 |
| 8/4/2009 | Home Depot - Townhouse Water Filter | $42.59 |
| 8/6/2009 | Target - Cleaning Supplies | $44.37 |
| 8/6/2009 | Homedepot - Air Filters Townhouse | $43.51 |
| 8/8/2009 | Posh French Cleaners | $139.43 |
| 8/8/2009 | Laundromat | $96.60 |
| 8/8/2009 | Thanks a Lock Locksmith - Townhouse | $11.18 |
| 8/9/2009 | U Gas - Cargo Van | $15.00 |
| 8/10/2009 | Other Perlis Insurance - Townhouse | $1,127.52 |
| 8/11/2009 | Flood Insurance Policy - Townhouse | $189.00 |
| 8/11/2009 | Windstorm Insurance - Townhouse | $598.00 |

KROSEN - 000145

| | | |
|---|---|---|
| 8/11/2009 | Fed Ex to Colson Hicks | $5.27 |
| 8/11/2009 | Fed Ex to Colson Hicks | $91.44 |
| 8/12/2009 | Laundromat | $19.55 |
| 8/15/2009 | Posh French Cleaners | $1,167.17 |
| 8/16/2009 | Laundromat | $22.25 |
| 8/16/2009 | Laundromat | $90.85 |
| 8/17/2009 | Stain Away Rug Cleaning - Area Rugs | $337.50 |
| 8/21/2009 | Comcast - Townhouse | $117.49 |
| 8/21/2009 | Thompson Pest Control - Townhouse | $45.00 |
| 8/21/2009 | City of Boca Raton Water - Townhouse | $250.00 |
| 8/21/2009 | FPL - Townhouse | $55.22 |
| 8/21/2009 | Posh French Cleaners | $545.18 |
| 8/25/2009 | Home Fitness - Relocated Eliptical | $125.00 |
| 8/29/2009 | Posh French Cleaners | $55.90 |
| 8/30/2009 | Laundromat | $12.25 |
| 8/31/2009 | Townhouse - Comcast | $125.59 |
| 8/31/2009 | Townhouse - FPU | $10.67 |
| 9/4/2009 | Homedepot - Padlock Storage | $12.24 |
| 9/4/2009 | Posh French Cleaners | $55.90 |
| 9/4/2009 | Mission Bay - Storage Rental | $466.20 |
| 9/4/2009 | Mission Bay - Storage Rental | $2,252.47 |
| 9/4/2009 | Mission Bay - Truck Rental | $74.52 |
| 9/5/2009 | Two Men & Truck | $577.50 |
| 9/9/2009 | Townhouse - Thompson Pest Control | $27.00 |
| 9/9/2009 | Townhouse - FPL | $220.61 |
| 9/9/2009 | Townhouse - AT&T | $113.88 |
| 9/10/2009 | Townhouse - Comcast | $92.91 |
| 9/19/2009 | Parker Crystals - Chandelier & Sconces | $1,940.00 |
| 9/19/2009 | Stor-All Rental | $20.00 |
| 9/19/2009 | Homedepot - Padlock Storage | $12.24 |
| 9/22/2009 | Townhouse - Plumbing Repair | $120.00 |
| 9/23/2009 | Posh French Cleaners | $280.18 |
| 9/26/2009 | Townhouse - October 2009 Rent | $3,300.00 |
| 9/26/2009 | Two Men & Truck - Chandelier Move | $200.00 |
| 9/26/2009 | Townhouse - Comcast | $92.91 |
| 10/2/2009 | Thompson Pest Control - Townhouse | $27.00 |

KROSEN - 000146

| 10/8/2009 | Townouse - FPU | $27.71 |
|---|---|---|
| 10/18/2009 | Townhouse - AT&T | $60.79 |
| 10/18/2009 | Townhouse - FPL | $219.20 |
| 10/26/2009 | Townhouse - November 2009 Rent | $3,300.00 |
| 10/26/2009 | Townhouse - City of Boca Raton Water | $145.25 |
| 10/26/2009 | Townhouse - Comcast | $113.91 |
| 10/26/2009 | Townhouse - FPU | $28.01 |
| 10/26/2009 | Boca Raton Stor-All | $234.30 |
| 11/9/2009 | Townhouse - FPL | $196.74 |
| 11/23/2009 | Townhouse - FPU | $30.40 |
| 11/23/2009 | Townhouse - December 2009 Rent | $3,300.00 |
| 11/23/2009 | Boca Raton Stor-All | $234.30 |
| 12/12/2009 | Townhouse - FPL | $149.78 |
| 12/12/2009 | Townhouse - Comcast | $49.64 |
| 12/17/2009 | Boynton Billiards | $325.00 |
| 12/23/2009 | Townhouse - January 2010 Rent | $3,300.00 |
| 12/23/2009 | The Oaks - Closing Costs | $42,592.70 |
| 12/31/2009 | Townhouse - City of Boca Raton Water | $117.74 |
| 12/31/2009 | Townhouse - Comcast | $157.98 |
| 12/31/2009 | Boca Raton Stor-All | $702.90 |
| 3/29/2010 | Boca Raton Stor-All | $468.60 |
| | **TOTAL EXPENSES** | **$90,523.77** |

## Home Value Damage

| 6/18/2009 | Appraisal - House / Realtor Opinion | $1,225,000.00 |
|---|---|---|
| 12/23/2009 | Mortgage Balance at Closing | $174,949.20 |
| 12/23/2009 | Contract Sales Price - House | $501,000.00 |
| | **LOSS OF EQUITY** | **$549,050.80** |
| 12/23/2009 | Settlement Charges/Closing Costs | $42,592.70 |
| | **LOSS OF EQUITY + CLOSING COSTS** | **$591,643.50** |

**TOTAL DAMAGES (OUT OF POCKET EXPENSES, LOSS OF EQUITY & CLOSING CLOSTS)**

$682,167.27

Last updated 07/14/2013

KROSEN - 000148

POSH FRENCH CLEANERS
16950 JOG RD
DELRAY BEACH, FL 33484

8063

TERMINAL I.D.:
MERCHANT # :

08/15/09          8:42 AM

SALE
BATCH: 000442
INV:000070

AUTH: 00295S

TOTAL          $1167.17

KEVIN ROSEN

CUSTOMER COPY

KROSEN - 000149





Posh
&
FRENCH
CLEANERS
& LAUNDERERS

16950 JOG ROAD
DELRAY BEACH, FL 33446
(561) 498-8852

498 WEST HILLSBORO BLVD.
DEERFIELD BEACH, FL 33441
(954) 427-9988

NAME  ROSEN, KEVIN

ACCT. NO.  R2406256    TICKET NUMBER ► 550002

LUIS DI    STORE/EMP. NO./PC LOCATION    LOT NO.    CK.

DATE / TIME
08/08/09 11:41

5 POLO BLAC-COTN- // -YELW-SILK- // -
WHIT-COTN- // -RED -SILK- // -RED -
COTN-                          34.25

Ready  Wednesday 08/12/09
MONDAY - FRIDAY AFTER 5:00 PM
SATURDAYS AFTER 10:00 AM
5  Piece(s)        Subtotal  $   27.40
                        Tax  $    0.00
        Environmental Fee  $    2.06

Discount included      Total $   29.46

KROSEN - 000151



KROSEN - 000152



KROSEN - 000153



**Posh French CLEANERS & LAUNDERERS**

16950 JOG ROAD
DELRAY BEACH, FL 33446
(561) 498-8852

498 WEST HILLSBORO BLVD.
DEERFIELD BEACH, FL 33441
(954) 427-9988

NAME **ROSEN, KEVIN**

ACCT. NO. R2406256   TICKET NUMBER **549993**

LUIS DI   STORE/EMP. NO./PC   LOCATION   LOT NO.   CK.

DATE / TIME
08/08/09 11:24

1 COAT BLAC-COTT-LIND-BELT-           34.00

A BUSINESS FOUNDED ON QUALITY
CPF
DRIVEN BY EXCELLENCE

Ready  Wednesday 08/12/09
MONDAY - FRIDAY AFTER 5:00 PM
SATURDAYS AFTER 10:00 AM

1   Piece(s)        Subtotal   $   27.20
1   Belt(s)              Tax   $    0.00
         Environmental Fee   $    2.04

Discount included      Total  $   29.50

KROSEN - 000154



KROSEN - 000155



*Posh* *by* **FRENCH CLEANERS** & **LAUNDERERS**

**16950 JOG ROAD**
**DELRAY BEACH, FL 33446**
**(561) 498-8852**

498 WEST HILLSBORO BLVD.
DEERFIELD BEACH, FL 33441
(954) 427-9988

NAME   ROSEN, KEVIN

ACCT. NO.   R2406256     TICKET NUMBER   549974

LUIS DI     STORE/EMP. NO./PC   LOCATION     LOT NO.     CK

DATE/TIME   08/08/09 10:46

3 SWTR BLAC-COTT- // -WHIT-COTT- // -
BLAC-COTT-                                    21.95

A BUSINESS FOUNDED ON QUALITY
CPF
DRIVEN BY EXCELLENCE

Ready   Wednesday 08/12/09
MONDAY - FRIDAY AFTER 5:00 PM
SATURDAYS AFTER 10:00 AM
3   Piece(s)          Subtotal   $   17.56
                          Tax   $    0.00
            Environmental Fee   $    1.32

Discount included     Total   $   18.88

KROSEN - 000156



Posh & FRENCH CLEANERS & LAUNDERERS

16950 JOG ROAD
DELRAY BEACH, FL 33446
(561) 498-8852

498 WEST HILLSBORO BLVD.
DEERFIELD BEACH, FL 33441
(954) 427-9988

NAME ROSEN, KEVIN

ACCT. NO. R2406256  TICKET NUMBER 549969

LUIS DI  STORE/EMP. NO./PC  LOCATION 37  LOT NO.  CK.

DATE / TIME  08/08/09 10:40

3 PANT BEIG-COTT- // -BLAC-COTT- // -
  BROW-COTT-                          20.85
1 SHRT BLAC-COTT-                      6.95

Ready  Wednesday 08/12/09
MONDAY - FRIDAY AFTER 5:00 PM
SATURDAYS AFTER 10:00 AM

4 Piece(s)        Subtotal  $  22.24
                       Tax  $   0.00
            Environmental Fee  $   1.67

Discount included     Total  $  23.91

KROSEN - 000157



KROSEN - 000158



KROSEN - 000159



**16950 JOG ROAD**
**DELRAY BEACH, FL 33446**
**(561) 498-8852**

498 WEST HILLSBORO BLVD.
DEERFIELD BEACH, FL 33441
(954) 427-9988

NAME ROSEN, KEVIN

ACCT. NO. R2406256    TICKET NUMBER 549987

LUIS DI    STORE/EMP. NO./PC LOCATION    LOT NO.    CK.

DATE / TIME
08/08/09 11:13

2 SJKT YELW-COTN-LIND- // -GRAY-COTN-
LIND-                                    23.00

A BUSINESS FOUNDED ON QUALITY
CPF
DRIVEN BY EXCELLENCE

Ready  Wednesday 08/12/09
MONDAY - FRIDAY AFTER 5:00 PM
SATURDAYS AFTER 10:00 AM
 2  Piece(s)        Subtotal    $   18.40
                        Tax    $    0.00
             Environmental Fee  $    1.38

Discount included      Total  $   19.78

KROSEN - 000160



**Posh FRENCH CLEANERS & LAUNDERERS**

16950 JOG ROAD
DELRAY BEACH, FL 33446
(561) 498-8852

498 WEST HILLSBORO BLVD.
DEERFIELD BEACH, FL 33441
(954) 427-9988

NAME ROSEN, KEVIN

ACCT. NO. R2406256 TICKET NUMBER 549973

STORE/EMP. NO./PC LOCATION LOT NO. CK.
LUIS DI

DATE/TIME 08/08/09 10:45

3 SWTR WHIT-COTT- // -BLUE-CHNR- // -
GREE-COTT-                                    23.95

A BUSINESS FOUNDED ON QUALITY
DRIVEN BY EXCELLENCE

Ready   Wednesday 08/12/09
MONDAY - FRIDAY AFTER 5:00 PM
SATURDAYS AFTER 10:00 AM
3 Piece(s)          Subtotal  $   19.16
                         Tax  $    0.00
          Environmental Fee  $    1.44
Discount included     Total  $   20.60

KROSEN - 000161



KROSEN - 000162



KROSEN - 000163



**16950 JOG ROAD**
**DELRAY BEACH, FL 33446**
**(561) 498-8852**

498 WEST HILLSBORO BLVD.
DEERFIELD BEACH, FL 33441
(954) 427-9988

*Posh*
*(F)*
**FRENCH**
**CLEANERS**
& LAUNDERERS

NAME  ROSEN, KEVIN

ACCT. NO.  R2406256    TICKET NUMBER  549984    CK.

LUIS DI    STORE/EMP. NO./PC  LOCATION    LOT NO.

DATE/TIME
08/08/09 11:11

1 S2PC BLAC-NAVY-STRP-CDTN-LIND-PLEA-
                                        17.25

A BUSINESS FOUNDED ON QUALITY
CPF
DRIVEN BY EXCELLENCE

Ready  Wednesday 08/12/09
MONDAY - FRIDAY AFTER 5:00 PM
SATURDAYS AFTER 10:00 AM
  2 Piece(s)        Subtotal  $   13.80
                         Tax  $    0.00
            Environmental Fee  $    1.03

Discount included     Total  $   14.83

KROSEN - 000164



**Posh**
**FRENCH CLEANERS**
**& LAUNDERERS**

16950 JOG ROAD
DELRAY BEACH, FL 33446
(561) 498-8852

498 WEST HILLSBORO BLVD.
DEERFIELD BEACH, FL 33441
(954) 427-9988

NAME  ROSEN,  KEVIN

ACCT. NO.  R2406256    TICKET NUMBER  54998

LUIS DI   STORE/EMP. NO./PC | LOCATION | LOT NO. | CK.

DATE / TIME
08/08/09 11:29

4 TIE  BLAC-SILK- // -BLUE-STRP-SILK-
    // -RED -BLUE-STRP-SILK- // -GRAY-
    SILK-                              29.80

A BUSINESS FOUNDED ON QUALITY
PF
DRIVEN BY EXCELLENCE

Ready  Wednesday 08/12/09
MONDAY - FRIDAY AFTER 5:00 PM
SATURDAYS AFTER 10:00 AM
4 Piece(s)           Subtotal  $   23.84
                          Tax  $    0.00
              Environmental Fee  $    1.79

Discount included       Total  $   25.63

KROSEN - 000165



KROSEN - 000166



Posh French Cleaners & Launderers

16950 JOG ROAD
DELRAY BEACH, FL 33446
(561) 498-8852

498 WEST HILLSBORO BLVD.
DEERFIELD BEACH, FL 33441
(954) 427-9988

NAME ROSEN, KEVIN

ACCT. NO. R2406256    TICKET NUMBER 550013

LUIS DI    STORE/EMP. NO./PC LOCATION    LOT NO.    CK.

DATE/TIME
08/08/09 11:51

1 SJKT PINK-COTN-LADY-                    9.75
2 SWTR PINK-COTT- // -BLUE-COTT-         14.30

A BUSINESS FOUNDED ON QUALITY
PF
DRIVEN BY EXCELLENCE

Ready  Wednesday 08/12/09
MONDAY - FRIDAY AFTER 5:00 PM
SATURDAYS AFTER 10:00 AM
3  Piece(s)           Subtotal  $   19.24
                           Tax  $    0.00
              Environmental Fee  $    1.45

Discount included      Total  $   20.69

KROSEN - 000167



**Posh** ℗ℱ **FRENCH CLEANERS & LAUNDERERS**

**16950 JOG ROAD**
**DELRAY BEACH, FL 33446**
**(561) 498-8852**

**498 WEST HILLSBORO BLVD.**
**DEERFIELD BEACH, FL 33441**
**(954) 427-9988**

NAME  ROSEN, KEVIN

ACCT. NO.  R2406256        TICKET NUMBER ◆ 549981

LUIS DI    STORE/EMP. NO./PC  LOCATION        LOT NO.        CK.

DATE / TIME
08/08/09 10:59

1 SJKT BLAC-GRAY-WHIT-PRNT-COTN-LADY-
  LIND-                                        9.90
3 BLOU WHIT-COTT-LACE- // -BROW-SILK-
  // -BLAC-SILK-                              25.45

Ready  Wednesday 08/12/09
MONDAY - FRIDAY AFTER 5:00 PM
SATURDAYS AFTER 10:00 AM
 4  Piece(s)      Subtotal  $   28.28
                      Tax  $    0.00
          Environmental Fee  $    2.12

Discount included      Total $   30.40

KROSEN - 000168



KROSEN - 000169



KROSEN - 000170



KROSEN - 000171



KROSEN - 000172



KROSEN - 000173



KROSEN - 000174