# EXHIBIT 31 part 5

# EXHIBIT B18

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others similarly
situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG
TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN
PLASTERBOARD CO., LTD., et al.,

      Defendants.

_____/

### CLAIMANT MICAHEL AND ROBYN ROSEN'S ANSWERS TO DEFENDANT TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN PLASTERBOARD COMPANY, LTD. AND BNBM PLC'S SECOND SET OF INTERROGATORIES

Pursuant to by Fed. R. Civ. P. 26 and 33 and LR 26.1(g) and as required by Fed. R. Civ. P. 26(e), Claimants Michael and Robyn Rosen ("Claimants") hereby serve answers to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd., and BNBM PLC (collectively "Defendants"), interrogatories propounded on November 21, 2018 ("Defendants Second Set of Interrogatories").

Dated: December 4, 2018

Respectfully submitted,

/s/ Patrick S. Montoya, Esq.

Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL  33134-2351
Telephone:  (305) 476-7400
Facsimile:  (305) 476-7444

*Interim Lead Counsel for Plaintiffs*

## CLAIMANT MICHAEL AND ROBYN ROSEN'S OBJECTIONS AND ANSWERS TO DEFENDANTS' SECOND SET OF INTERROGATORIES

1.    Please IDENTIFY each party YOU contend supplied and/or installed any defective Chinese-manufactured drywall in YOUR PROPERTY.

**ANSWER:** In addition to the information provided in conjunction with Claimants' Supplemental Plaintiff Profile Form ("SPPF"), which was negotiated among the parties and ordered by Judge Fallon to be completed pursuant to Pretrial Order No. 11A (MDL Rec. Doc. 21162), and which is incorporated herein by reference, Claimants answer as follows:

the drywall in our home was supplied by Banner Supply and installed by O.C.D. of S. Florida, Inc.

2.    Please IDENTIFY any financial compensation YOU have received or may receive (including but not limited to insurance payments, insurance claims, legal claims against any party, legal settlements with any party, government funding programs, tax credits, or any other form of financial relief) RELATED TO alleged damage to YOUR PROPERTY caused by defective Chinese-manufactured drywall or RELATED TO any other harm YOU claim was caused by defective Chinese-manufactured drywall.

**ANSWER:** In addition to the information provided by Claimants in their SPPF and the information contained in documents produced in response to Request 1 of Defendants' Second Request for Production of documents dated November 21, 2018 ("Defendants' Second Set of Document Requests"), Claimants answer as follows: We received Settlement Funds as part of the Chinese Drywall Settlement Program in MDL 2047. We also received a Chinese drywall loss deduction on our Federal Income Taxes. Pursuant to Rule 33(d), Fed.R.Civ.P., please see documentation in the Brown Greer Chinese Drywall Portal regarding funds received as part of the Chinese Drywall Settlement in MDL 2047.

3.     Please IDENTIFY the names, contact information, and locations of contracting companies used for and the date, scope, and costs of any remediation efforts for each and every one of YOUR PROPERTIES that has undergone any form of remediation, in part or in full, for any damage that YOU contend was caused by defective Chinese-manufactured drywall.

**ANSWER:** Claimants have not remediated the subject property and therefore, this interrogatory is not applicable.

4.     Please IDENTIFY all facts and circumstances that RELATE TO any purchase, sale, or transfer of ownership of YOUR PROPERTY during the RELEVANT TIME PERIOD.

**ANSWER:**  In addition to the information provided by Claimants in their SPPF and information contained in documents produced in response to Request 1 of Defendants' Request for Production of Documents dated November 16, 2018 ("Defendants' First Set of Document Requests"), Claimants answer as follows: Pursuant to Rule 33(d), Fed.R.Civ.P., please see documentation bates labeled MROSEN-000047 – MROSEN-00049, MROSEN-000192 – MROSEN-000202, MROSEN-000222 and MROSEN-000223 – MROSEN-000233. In addition, Defendants will have the opportunity to question Claimants on this topic at their depositions.

5.     Please IDENTIFY all facts and circumstances that RELATE TO any assignment of personal right of action for purported damages to YOUR PROPERTY.

**ANSWER:**  In their SPPF, Claimants identified that they did not assign their personal right of action for purported damages to the subject property to anyone.  In addition to that information, responsive information may be contained in any documents produced pursuant to Request 5 of Defendants' First Set of Document Requests and furthermore, Defendants will have the opportunity to question Claimants on this topic at their depositions.

6.     Please IDENTIFY all facts and circumstances that RELATE TO YOUR first awareness that allegedly defective Chinese-manufactured drywall had been installed in YOUR

PROPERTY, including the date or dates on which YOU first became aware that allegedly defective Chinese-manufactured drywall had been installed in YOUR PROPERTY.

**ANSWER:**   Pursuant to Rule 33(d), Fed.R.Civ.P., please see documentation bates labeled MROSEN-000234. In the SPPF, Claimants identified when they believed the Chinese-manufactured drywall was installed in the subject Property and when they first became aware that the subject Property contained Chinese-manufactured drywall.   In addition to that information, Defendants will have the opportunity to question Claimants on this topic at their depositions.

### CERTIFICATE OF SERVICE

I hereby certify that on this day, December 4th, 2018, I caused the foregoing Answers to

Defendants' Second Set of Interrogatories to be served via email on the following:

Craig P. Kalil, Esquire
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue, Suite 2250
Miami, FL 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929
Email: ckalil@aballi.com

L. Christopher Vejnoska, Esquire
Eric Matthew Hairston, Esquire
Andrew Davidson, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA 94105
Telephone: (415) 773-5700
Email: cvejnoska@orrick.com
        ehairston@orrick.com
        adavidson@orrick.com

James L. Stengel, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Email: jstengel@orrick.com

*Attorneys for Beijing New Building Materials Public Limited Company*

Enjolique D. Aytch, Esquire
AKERMAN LLP
Las Olas Centre II – Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: enjolique.aytch@akerman.com

Bernard Taylor, Esquire
Michael P. Kenny, Esquire
Christina Hull Eikhoff, Esquire
David Venderbush, Esquire

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
        mike.kenny@alston.com
        christy.eikhoff@alston.com
        david.venderbush@alston.com


*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*


                                        /s/ Patrick S. Montoya, Esq.

                                        Patrick Shanan Montoya
                                        Fla. Bar No. 0524441
                                        Email: Patrick@colson.com
                                        Colson Hicks Eidson
                                        255 Alhambra Circle, PH
                                        Coral Gables, FL  33134-2351
                                        Telephone:  (305) 476-7400
                                        Facsimile:  (305) 476-7444
                                        *Interim Lead Counsel for Plaintiffs*

| A. Settlement Statement | U.S. Department of Housing and Urban Development | |
|---|---|---|

OMB Approval No. 2502-0265

**B. Type of Loan**

| 1.☐ FHA  2.☐ FmHA  3.☒ Conv. Unins. | 6. File Number ROSEN-SHUKOW | 7. Loan Number | 8. Mortgage Insurance Case Number |
|---|---|---|---|
| 4.☐ VA  5.☐ Conv. Ins. | | | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. NAME OF BORROWER:** Allen Shukow and Donna Shukow

**ADDRESS OF BORROWER:**

**E. NAME OF SELLER:** Michael Rosen and Robyn M. Rosen

**ADDRESS OF SELLER:**

**F. NAME OF LENDER:**

**ADDRESS OF LENDER:**

**G. PROPERTY LOCATION:** 17538 Middlebrook
Boca Raton, FL 33496

**H. SETTLEMENT AGENT:** LAW OFFICES OF WEISMAN & MARGOLIES, P.A.
2385 EXECUTIVE CENTER DRIVE, SUITE 270, BOCA RATON, FL 33431

**PLACE OF SETTLEMENT:** 2385 EXECUTIVE CENTER DRIVE, SUITE 270, BOCA RATON, FL 33431

**I. SETTLEMENT DATE:** 12/4/2009

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100.GROSS AMOUNT DUE FROM BORROWER | | 400. GROSS AMOUNT DUE TO SELLER | |
| 101.Contract sales price | 876,000.00 | 401.Contract sales price | 876,000.00 |
| 102.Personal property | | 402.Personal property | |
| 103.Settlement charges to borrower (line 1400) | 2,671.56 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106.City/town taxes          to | | 406.City/town taxes          to | |
| 107.County taxes  12/4/2009 to 12/31/2009 | 1,691.21 | 407.County taxes  12/4/2009 to 12/31/2009 | 1,691.21 |
| 108.Assessments          to | | 408.Assessments          to | |
| 109.Solid Waste  12/4/2009 to  9/30/2010 | 261.37 | 409.Solid Waste  12/4/2009 to  9/30/2010 | 261.37 |
| 110.Homeowner Asso.  12/4/2009 to 12/31/2009 | 584.74 | 410.Homeowner Asso.  12/4/2009 to 12/31/2009 | 584.74 |
| 111.          to | | 411.          to | |
| 112.          to | | 412.          to | |
| 120.GROSS AMOUNT DUE FROM BORROWER ▶ | 881,208.88 | 420. GROSS AMOUNT DUE TO SELLER ▶ | 878,537.32 |
| 200.AMOUNTS PAID BY OR IN BEHALF OF BORROWER | | 500.REDUCTIONS IN AMOUNT DUE TO SELLER | |
| 201.Deposit or earnest money | 87,600.00 | 501.Excess deposit (see instructions) | |
| 202.Principal amount of new loan(s) | | 502.Settlement charges to seller (line 1400) | 72,182.78 |
| 203.Existing loan(s) taken subject to | | 503.Existing loan(s) taken subject to | |
| 204. | | 504.Payoff of first mortgage loan | 581,705.43 |
| | | Chase Bank | |
| 205. | | 505.Payoff of second mortgage loan | 298,114.78 |
| | | Chase Bank | |
| 206.Principal amount of new loan(s) | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| 209a | | 509a | |
| 209b | | 509b | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210.City/town taxes          to | | 510.City/town taxes          to | |
| 211.County taxes          to | | 511.County taxes          to | |
| 212.Assessments          to | | 512.Assessments          to | |
| 213.          to | | 513.          to | |
| 214.          to | | 514.          to | |
| 215.          to | | 515.          to | |
| 216.          to | | 516.          to | |
| 217.          to | | 517.          to | |
| 218.          to | | 518.          to | |
| 219.          to | | 519.          to | |
| 220.TOTAL AMOUNTS PAID BY OR IN BEHALF OF BORROWER ▶ | 87,600.00 | 520.TOTAL REDUCTIONS IN AMOUNT DUE SELLER ▶ | 952,002.99 |
| 300.CASH AT SETTLEMENT FROM/TO BORROWER | | 600. CASH AT SETTLEMENT TO/FROM SELLER | |
| 301.Gross amount due from borrower (line 120) | 881,208.88 | 601.Gross amount due to seller (line 420) | 878,537.32 |
| 302.Less amounts paid by/for borrower (line 220) | 87,600.00 | 602.Less reductions in amount due seller (line 520) | 952,002.99 |
| 303.CASH ☒ From ☐ To  BORROWER ▶ | 793,608.88 | 603.CASH ☐ To ☒ From  SELLER ▶ | 73,465.67 |

MROSEN - 000047

PAGE 1

©2004 Display Systems, Inc. (863) 763-5555 - Laser Generated

HUD-1 (3-86) RESPA, HB 4305.2

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SETTLEMENT STATEMENT                                                    PAGE 2

| L.   Settlement Charges | | | Paid From Borrower's Funds At Settlement | Paid From Seller's Funds At Settlement |
|---|---|---|---|---|
| 700.  TOTAL SALES/BROKER'S COM. based on price | 876,000.00  @ | % =  38,170.00 | | |
| Division of Commission (line 700) as follows: | | | | |
| 701.  16,520.00 | to  Realty Associates | | | |
| 702.  21,650.00  (2% + $4130 referral fee) | to  Prud.Realty ($4380 to Addison Mizner ) | | | |
| 703.  Commission paid at Settlement | | | | 38,170.00 |
| 704.  Processing fee | to  Realty Associates | | 395.00 | |
| 800.  Items Payable In Connection With Loan | | | | |
| 801.  Loan Origination Fee | % | to | | |
| 802.  Loan Discount | % | to | | |
| 803.  Appraisal Fee | to | | | |
| 804.  Credit Report | to | | | |
| 805.  Lender's Inspection Fee | to | | | |
| 806.  Mortgage Insurance Application Fee | to | | | |
| 807. | to | | | |
| 808. | to | | | |
| 809. | to | | | |
| 810. | to | | | |
| 811. | to | | | |
| 812. | to | | | |
| 813. | to | | | |
| 814. | to | | | |
| 815. | to | | | |
| 900.  Items Required By Lender To Be Paid In Advance | | | | |
| 901.  Interest from  12/4/2009  to   1/1/2010   @ | /day | | | |
| 902.  Mortgage Insurance Premium for | months to | | | |
| 903.  Hazard Insurance Premium for | years  to | | | |
| 904. | years  to | | | |
| 905. | years  to | | | |
| 1000.  Reserves Deposited With Lender | | | | |
| 1001. Hazard insurance | months@ | per month | | |
| 1002. Mortgage insurance | months@ | per month | | |
| 1003. City property taxes | months@ | per month | | |
| 1004. County property taxes | months@ | per month | | |
| 1005. Annual assessments | months@ | per month | | |
| 1006. | months@ | per month | | |
| 1007. | months@ | per month | | |
| 1008. | months@ | per month | | |
| 1009. | | | | |
| 1100.  Title Charges | | | | |
| 1101. Settlement or closing fee | to  Weisman & Margolies, P.A. | | | 495.00 |
| 1102. Abstract or title search | to  First American Title | | | 100.00 |
| 1103. Title examination | to | | | |
| 1104. Title insurance binder | to | | | |
| 1105. Document preparation | to | | | |
| 1106. Notary fees | to | | | |
| 1107. Attorney's fees | to | | | |
| (includes above items numbers: | | | | |
| 1108. Title insurance | to  First American/Weisman Margolies | | | 4,455.00 |
| (includes above items numbers: | | | | |
| 1109. Lender's coverage: Risk Premium | INS AMT: | | | |
| 1110. Owner's coverage: Risk Premium  4,455.00 | INS AMT: $76,000.00 | | | |
| 1110a | | | | |
| 1111. Tax/lien search | to  Florida Tax Service | | | 160.00 |
| 1112. | to | | | |
| 1113. | to | | | |
| 1200.  Government Recording and Transfer Charges | | | | |
| 1201. Recording Fees: Deed $19.10; L-Mortgage(s)   ; S-Mortgage(s)   ; Releases | | | 19.10 | |
| 1202. City/county tax/stamps: Deed    ; L-Mortgage(s)   ; S-Mortgage(s) | | | | |
| 1203. State tax/stamps: Deed $6,132.00; L-Mortgage(s)   ; S-Mortgage(s) | | | | 6,132.00 |
| 1204. CMA | | | | 10.60 |
| 1205. | | | | |
| 1300.  Additional Settlement Charges | | | | |
| 1301. Survey | to  Caulfield Wheeler | | 275.00 | |
| 1302. Pest Inspection | to | | | |
| 1303. Roof Inspection | to | | | |
| 1304. 2009 real estate taxes | to  Palm Beach County Tax Collector | | | 22,485.18 |
| 1305. Capital contribution | to  The Oaks HOA | | 1,982.46 | |
| 1306. HOA Estoppel Fee | to  Continental (Reimburse MSM) | | | 175.00 |
| 1307. | to | | | |
| 1308. | to | | | |
| 1309. | to | | | |
| 1400.  Total Settlement Charges  (enter on lines 103, Section J and 502, SectionK)    ▶ | | | 2,671.56 | 72,182.78 |

MROSEN - 000048

ROSEN-SHUKOW

## HUD-1 Settlement Statement Signature Page

### Certification

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____          _____
Allen Shukow                                              Michael Rosen

_____          _____
Donna Shukow                                           Robyn M. Rosen

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

LAW OFFICES OF WEISMAN & MARGOLIES, P.A.

_____          12/04/09
Settlement Agent                                       Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

| File #: | Loan #: | Mortgage Ins. Case #: |
| --- | --- | --- |
| ROSEN-SHUKOW | | |

MROSEN - 000049

## Residential Sale and Purchase Contract

LUXURY PARTNERS

1'  **1. SALE AND PURCHASE:** _____ Michael and Robyn M Rosen - H/W _____ ("Seller")
2'  and _____ Donna and Allen Shukow - H/W _____ ("Buyer")
3   agree to sell and buy on the terms and conditions specified below the property described as:
4'  Address: __17538__ __Middlebrook__
5'  __Boca Raton__ __FL__ __33496__ County: _____ Palm Beach
6'  Legal Description: __Fox Hill Estates Boca Raton Lot:148 Blk: Lot SqFt:10454 Frontage: Depth:__
7'  _____ Tax ID No: _____ 00424631010001480
8   together with all existing improvements and attached items, including fixtures, built-in furnishings, major appliances (including
9'  but not limited to range(s), refrigerator(s), dishwasher(s), washer(s), and dryer(s), ____ (#) ceiling fans (if left blank, all ceiling fans),
10' light fixtures, attached wall-to-wall carpeting, rods, draperies and other window treatments as of Effective Date. The only other
11' items included in the purchase are: _____
12' _____
13' _____
14' The following attached items are excluded from the purchase: __none__
15' _____
16  The real and personal property described above as included in the purchase is referred to as the "Property." Personal property listed
17  in this Contract is included in the purchase price, has no contributory value and is being left for Seller's convenience.

18
### PRICE AND FINANCING
19' **2. PURCHASE PRICE:** $_____ 876,000.00 _____ payable by Buyer in U.S. currency as follows:
20' (a) $_____ 10,000.00      Deposit received (checks are subject to clearance) on __October__ __22nd__ , __2009__ by
21' _____ for delivery to __Palm Title Services__ ("Escrow Agent")
22  _____
23' _____ Name of Company
    Signature
    (Address of Escrow Agent) __165 E. Palmetto Boca Raton__ _____ Florida
24' (Phone # of Escrow Agent) _____
25' (b) $_____ 77,600.00      Additional deposit to be delivered to Escrow Agent by _____
26' _____ or _____ days from Effective Date. (10 days if left blank)
27' (c) _____          Total financing (see Paragraph 3 below) (express as a dollar amount or percentage)
28' (d) $_____          Other: _____
29' (e) $_____ 788,400.00      Balance to close (not including Buyer's closing costs, prepaid items and prorations). All funds paid
30                                at closing must be paid by locally drawn cashier's check, official bank check, or wired funds.

31' **3. FINANCING:** (Check as applicable) ☒ (a) Buyer will pay cash for the Property with no financing contingency.
32' ☐ (b) Buyer will apply for new ☐ conventional ☐ FHA ☐ VA financing specified in paragraph 2(c) at the prevailing interest rate and
33' loan costs based on Buyer's creditworthiness (the "Financing") within _____ days from Effective Date (5 days if left blank) and
34  provide Seller with either a written Financing commitment or approval letter ("Commitment") or written notice that Buyer is unable to
35' obtain a Commitment within _____ days from Effective Date (the earlier of 30 days after the Effective Date or 5 days prior to Closing
36  Date if left blank) ("Commitment Period"). Buyer will keep Seller and Broker fully informed about loan application status, progress
37  and Commitment issues and authorizes the mortgage broker and lender to disclose all such information to Seller and Broker. If,
38  after using diligence and good faith, Buyer is unable to provide the Commitment and provides Seller with written notice that Buyer is
39  unable to obtain a Commitment within the Commitment Period, either party may cancel this Contract and Buyer's deposit will be
40  refunded. Buyer's failure to provide Seller with written notice that Buyer is unable to obtain a Commitment within the Commitment
41  Period will result in forfeiture of Buyer's deposit(s). Once Buyer provides the Commitment to Seller, the financing contingency is
42  waived and Seller will be entitled to retain the deposits if the transaction does not close by the Closing Date unless (1) the Property
43  appraises below the purchase price and either the parties cannot agree on a new purchase price or Buyer elects not to proceed, (2)
44  the property related conditions of the Commitment have not been met (except when such conditions are waived by other provisions
45  of this Contract), or (3) another provision of this Contract provides for cancellation.

46
### CLOSING
47  **4. CLOSING DATE; OCCUPANCY:** Unless the Closing Date is specifically extended by the Buyer and Seller or by any other provision in
48  this Contract, the Closing Date shall prevail over all other time periods including, but not limited to, inspection and financing periods. This
49' Contract will be closed on __Dec.__ __21st__ , __2009__ ("Closing Date") at the time established by the closing agent, by which time Seller
50  will (a) have removed all personal items and trash from the Property and swept the Property clean and (b) deliver the deed, occupancy
51  and possession, along with all keys, garage door openers and access codes, to Buyer. If on Closing Date insurance underwriting is
52  suspended, Buyer may postpone closing up to 5 days after the insurance suspension is lifted. If this transaction does not close for any
53  reason, Buyer will immediately return all Seller-provided title evidence, surveys, association documents and other items.
54' Buyer (____) (____) and Seller (____) (____) acknowledge receipt of a copy of this page, which is Page 1 of 8 Pages.

FAR-9  4/07  © 2007  Florida Association of REALTORS®  All Rights Reserved
This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

Instanet forms

MROSEN - 000192

**5. CLOSING PROCEDURE; COSTS:** Closing will take place in the county where the Property is located and may be conducted by mail or electronic means. If title insurance insures Buyer for title defects arising between the title binder effective date and recording of Buyer's deed, closing agent will disburse at closing the net sale proceeds to Seller and brokerage fees to Broker as per Paragraph 19. In addition to other expenses provided in this Contract, Seller and Buyer will pay the costs indicated below.

**(a) Seller Costs:**
Taxes and surtaxes on the deed
Recording fees for documents needed to cure title
Other: _____
Seller will pay up to $_____ or _____% (1.5% if left blank) of the purchase price for repairs to warranted items ("Repair Limit"); and up to $_____ or _____% (1.5% if left blank) of the purchase price for wood-destroying organism treatment and repairs ("WDO Repair Limit"); and up to $_____ or _____% (1.5% if left blank) of the purchase price for costs associated with closing out open permits and obtaining required permits for unpermitted existing improvements ("Permit Limit").

**(b) Buyer Costs:**
Taxes and recording fees on notes and mortgages
Recording fees on the deed and financing statements
Loan expenses
Lender's title policy
Inspections
Survey
Flood insurance, homeowner insurance, hazard insurance
Other: _____

**(c) Title Evidence and Insurance: Check (1) or (2):**
☒ **(1)** The title evidence will be a Paragraph 10(a)(1) owner's title insurance commitment. ☒ Seller will select the title agent and will pay for the owner's title policy, search, examination and related charges or ☐ Buyer will select the title agent and pay for the owner's title policy, search, examination and related charges or ☐ Buyer will select the title agent and Seller will pay for the owner's title policy, search, examination and related charges.
☐ **(2)** Seller will provide an abstract as specified in Paragraph 10(a)(2) as title evidence. ☐ Seller ☐ Buyer will pay for the owner's title policy and select the title agent. Seller will pay fees for title searches prior to closing, including tax search and lien search fees, and Buyer will pay fees for title searches after closing, including tax search and lien search fees.

**(d) Prorations:** The following items will be made current (if applicable) and prorated as of the day before Closing Date: real estate taxes, interest, bonds, assessments, association fees, insurance, rents and other current expenses and revenues of the Property. If taxes and assessments for the current year cannot be determined, taxes shall be prorated on the basis of taxes for the preceding year as of the day before Closing Date and shall be computed and readjusted when the current taxes are determined with adjustment for exemptions and improvements. If there are completed improvements on the Property by January 1 of the year of the Closing Date, which improvements were not in existence on January 1 of the prior year, taxes shall be prorated based on the prior year's millage and at an equitable assessment to be agreed upon by the parties prior to Closing Date, failing which, request will be made to the County Property Appraiser for an informal assessment taking into consideration available exemptions. If the County Property Appraiser is unable or unwilling to perform an informal assessment prior to Closing Date, Buyer and Seller will split the cost of a private appraiser to perform an assessment prior to Closing Date. Nothing in this paragraph shall act to extend the Closing Date. This provision shall survive closing.

**(e) Special Assessment by Public Body:** Regarding special assessments imposed by a public body, Seller will pay (i) the full amount of liens that are certified, confirmed and ratified before closing and (ii) the amount of the last estimate of the assessment if an improvement is substantially completed as of Effective Date but has not resulted in a lien before closing, and Buyer will pay all other amounts. If special assessments may be paid in installments ☐ Buyer ☐ Seller (if left blank, Buyer) shall pay installments due after closing. If Seller is checked, Seller will pay the assessment in full prior to or at the time of closing. Public body does not include a Homeowner Association or Condominium Association.

**(f) Tax Withholding:** Buyer and Seller will comply with the Foreign Investment in Real Property Tax Act, which may require Seller to provide additional cash at closing if Seller is a "foreign person" as defined by federal law.

**(g) Home Warranty:** ☐ Buyer ☐ Seller ☒ N/A will pay for a home warranty plan issued by _____ at a cost not to exceed $_____. A home warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in appliances in the event of breakdown due to normal wear and tear during the agreement period.

## PROPERTY CONDITION

**6. INSPECTION PERIODS:** Buyer will complete the inspections referenced in Paragraphs 7 and 8(a)(2) by _____ (the earlier of 10 days after the Effective Date or 5 days prior to Closing Date if left blank) ("Inspection Period"); the wood-destroying organism inspection by _____ (at least 5 days prior to Closing Date if left blank); and the walk-through inspection on the day before Closing Date or any other time agreeable to the parties; and the survey referenced in Paragraph 10(c) by _____, _____ (at least 5 days prior to closing if left blank).

Buyer (____) (____) and Seller (____) (____) acknowledge receipt of a copy of this page, which is Page 2 of 8 Pages.

FAR-9 4/07 © 2007 Florida Association of REALTORS® All Rights Reserved
This software is licensed to (Michael Silverman - Realty Assoc, Luxury Partners) www.transactiondesk.com.

Instanet forms

113 **7. REAL PROPERTY DISCLOSURES: Seller** represents that **Seller** does not know of any facts that materially affect the value
114 of the Property, including but not limited to violations of governmental laws, rules and regulations, other than those that **Buyer**
115 can readily observe or that are known by or have been disclosed to **Buyer**.
116    **(a) Energy Efficiency: Buyer** acknowledges receipt of the energy-efficiency information brochure required by Section 553.996,
117 *Florida Statutes.*
118    **(b) Radon Gas:** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient
119 quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and
120 state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be
121 obtained from your county public health unit. **Buyer** may, within the Inspection Period, have an appropriately licensed person
122 test the Property for radon. If the radon level exceeds acceptable EPA standards, **Seller** may choose to reduce the radon
123 level to an acceptable EPA level, failing which either party may cancel this Contract.
124    **(c) Flood Zone: Buyer** is advised to verify by survey, with the lender and with appropriate government agencies which flood
125 zone the Property is in, whether flood insurance is required and what restrictions apply to improving the Property and rebuilding
126 in the event of casualty. If the Property is in a Special Flood Hazard Area or Coastal High Hazard Area and the buildings are built
127 below the minimum flood elevation, **Buyer** may cancel this Contract by delivering written notice to **Seller** within 20 days from
128 Effective Date, failing which **Buyer** accepts the existing elevation of the buildings and zone designation of the Property.
129    **(d) Homeowners' Association:** If membership in a homeowners' association is mandatory, an association disclosure
130 summary is attached and incorporated into this Contract. **BUYER SHOULD NOT SIGN THIS CONTRACT UNTIL**
131 **BUYER HAS RECEIVED AND READ THE DISCLOSURE SUMMARY.**
132    **(e) PROPERTY TAX DISCLOSURE SUMMARY: BUYER** SHOULD NOT RELY ON THE **SELLER'S** CURRENT PROPERTY
133 TAXES AS THE AMOUNT OF PROPERTY TAXES THAT **BUYER** MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT
134 TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE
135 PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING
136 VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR FURTHER INFORMATION.
137    **(f) Mold:** Mold is part of the natural environment that, when accumulated in sufficient quantities, may present health risks to
138 susceptible persons. For more information, contact the county indoor air quality specialist or other appropriate professional.
139    **(g) Coastal Construction Control Line:** If any part of the Property lies seaward of the coastal construction control line as
140 defined in Section 161.053 of the Florida Statutes, **Seller** shall provide **Buyer** with an affidavit or survey as required by law
141 delineating the line's location on the Property, unless **Buyer** waives this requirement in writing. The Property being purchased
142 may be subject to coastal erosion and to federal, state, or local regulations that govern coastal property, including delineation
143 of the coastal construction control line, rigid coastal protection structures, beach nourishment, and the protection of marine
144 turtles. Additional information can be obtained from the Florida Department of Environmental Protection, including whether
145 there are significant erosion conditions associated with the shoreline of the Property being purchased.
146    ☐ **Buyer** waives the right to receive a CCCL affidavit or survey.

147 **8. MAINTENANCE, INSPECTIONS AND REPAIR: Seller** will keep the Property in the same condition from Effective Date until
148 closing, except for normal wear and tear ("Maintenance Requirement") and repairs required by this Contract. **Seller** will provide
149 access and utilities for **Buyer's** inspections. **Buyer** will repair all damages to the Property resulting from the inspections,
150 return the Property to its pre-inspection condition and provide **Seller** with paid receipts for all work done on Property upon its
151 completion. If **Seller** is unable to complete required repairs or treatments or meet the Maintenance Requirement prior to
152 closing, **Seller** will give **Buyer** a credit at closing for the cost of the repairs and maintenance **Seller** was obligated to perform. At
153 closing, **Seller** will assign all assignable repair and treatment contracts to **Buyer** and provide **Buyer** with paid receipts for all
154 work done on the Property pursuant to the terms of this Contract. At closing, **Seller** will provide **Buyer** with any written
155 documentation that all open permits have been closed out and that **Seller** has obtained required permits for improvements to
156 the Property.
157    **(a) Warranty, Inspections and Repair:**
158      **(1) Warranty: Seller** warrants that non-leased major appliances and heating, cooling, mechanical, electrical, security,
159 sprinkler, septic and plumbing systems, seawall, dock and pool equipment, if any, are and will be maintained in working
160 condition until closing; that the structures (including roofs, doors and windows) and pool, if any, are structurally sound
161 and watertight; and that torn or missing screens and missing roof tiles will be repaired or replaced. **Seller** warrants that
162 all open permits will be closed out and that **Seller** will obtain any required permits for improvements to the Property
163 prior to Closing Date. **Seller** does not warrant and is not required to repair cosmetic conditions, unless the cosmetic
164 condition resulted from a defect in a warranted item. **Seller** is not obligated to bring any item into compliance with
165 existing building code regulations unless necessary to repair a warranted item. "Working order" means operating in
166 the manner in which the item was designed to operate and "cosmetic conditions" means aesthetic imperfections that
167 do not affect the working condition of the item, including pitted marcite; tears, worn spots and discoloration of floor
168 coverings/wallpapers/window treatments; nail holes, scratches, dents, scrapes, chips and caulking in bathroom
169 ceiling/walls/flooring/tile/fixtures/mirrors; cracked roof tiles; curling or worn shingles; and minor cracks in floor
170 tiles/windows/driveways/sidewalks/pool decks/garage and patio floors.
171      **(2) Professional Inspection: Buyer** may, at **Buyer's** expense, have warranted items inspected by a person who
172 specializes in and holds an occupational license (if required by law) to conduct home inspections or who holds a Florida
173 license to repair and maintain the items inspected ("professional inspector"). **Buyer** must, within 5 days from the end of the
174 Inspection Period, deliver written notice of any items that are not in the condition warranted and a copy of the portion of

175 Buyer (_____) (_____) and Seller (_____) (_____) acknowledge receipt of a copy of this page, which is Page 3 of 8 Pages.
FAR-9   4/07   © 2007   Florida Association of REALTORS®   All Rights Reserved
This software is licensed to [Michael Silverman – Realty Assoc. Luxury Partners] www.transactiondesk.com.

*Instanet Forms*

MROSEN - 000194

176   inspector's written report dealing with such items to Seller. If Buyer fails to deliver timely written notice, Buyer waives
177   Seller's warranty and accepts the items listed in subparagraph (a) in their "as is" conditions, except that Seller must meet
178   the maintenance requirement.
179   **(3) Repair:** Seller will obtain repair estimates and is obligated only to make repairs necessary to bring warranted items
180   into the condition warranted, up to the Repair Limit. Seller may, within 5 days from receipt of Buyer's notice of items
181   that are not in the condition warranted, have a second inspection made by a professional inspector and will report
182   repair estimates to Buyer. If the first and second inspection reports differ and the parties cannot resolve the differences,
183   Buyer and Seller together will choose, and equally split the cost of, a third inspector, whose written report will be
184   binding on the parties. If the cost to repair warranted items equals or is less than the Repair Limit, Seller will have the
185   repairs made in a workmanlike manner by an appropriately licensed person. If the cost to repair warranted items
186   exceeds the Repair Limit, either party may cancel this Contract unless either party pays the excess or Buyer
187   designates which repairs to make at a total cost to Seller not exceeding the Repair Limit and accepts the balance of
188   the Property in its "as is" condition.
189   **(4) Permits:** Seller shall close out any open permits and remedy any violation of any governmental entity, including
190   but not limited to, obtaining any required permits for improvements to the Property, up to the Permit Limit, and with final
191   inspections completed no later than 5 days prior to Closing Date. If final inspections cannot be performed due to delays
192   by the governmental entity, Closing Date shall be extended for up to 10 days to complete such final inspections, failing
193   which, either party may cancel this Contract and Buyer's deposit shall be refunded. If the cost to close out open
194   permits or to remedy any violation of any governmental entity exceeds the Permit Limit, either party may cancel this
195   Contract unless either party pays the excess or Buyer accepts the Property in its "as is" condition and Seller credits
196   Buyer at closing the amount of the Permit Limit.
197   **(b) Wood-Destroying Organisms:** "Wood-destroying organism" means arthropod or plant life, including termites, powder-post
198   beetles, oldhouse borers and wood-decaying fungi, that damages or infests seasoned wood in a structure, excluding fences.
199   Buyer may, at Buyer's expense, have the Property inspected by a Florida-licensed pest control business to determine the
200   existence of past or present wood-destroying organism infestation and damage caused by infestation. If the inspector finds
201   evidence of infestation or damage, Buyer will deliver a copy of the inspector's written report to Seller within 5 days from the date
202   of the inspection. If Seller previously treated the Property for the type of wood-destroying organisms found, Seller does not have
203   to treat the Property again if (i) there is no visible live infestation, and (ii) Seller transfers to Buyer at closing a current full treatment
204   warranty for the type of wood-destroying organisms found. Otherwise, Seller will have 5 days from receipt of the inspector's
205   report to have reported damage estimated by a licensed building or general contractor and corrective treatment estimated by a
206   licensed pest control business. Seller will have treatments and repairs made by an appropriately licensed person at Seller's
207   expense up to the WDO Repair Limit. If the cost to treat and repair the Property exceeds the WDO Repair Limit, either party may
208   pay the excess, failing which either party may cancel this Contract by written notice to the other. If Buyer fails to timely deliver the
209   inspector's written report, Buyer accepts the Property "as is" with regard to wood-destroying organism infestation and damage,
210   subject to the maintenance requirement.
211   **(c) Walk-through Inspection/Reinspection:** Buyer, and/or Buyer's representative, may walk through the Property solely
212   to verify that Seller has made repairs required by this Contract, has met the Maintenance Requirement and has met
213   contractual obligations. If Buyer, and/or Buyer's representative, fails to conduct this inspection, Seller's repair obligations
214   and Maintenance Requirement will be deemed fulfilled.

215   **9. RISK OF LOSS:** If any portion of the Property is damaged by fire or other casualty before closing and can be restored by the
216   Closing Date or within 45 days after the Closing Date to substantially the same condition as it was on Effective Date, Seller,
217   will, at Seller's expense, restore the Property and deliver written notice to Buyer that Seller has completed the restoration, and
218   the parties will close the transaction on the later of: (1) Closing Date; or, (2) 10 days after Buyer's receipt of Seller's notice.
219   Seller will not be obligated to replace trees. If the restoration cannot be completed in time, Buyer may cancel this Contract
220   and Buyer's deposit shall be refunded, or Buyer may accept the Property "as is", and Seller will credit the deductible and
221   assign the insurance proceeds, if any, to Buyer at closing in such amounts as are (i) attributable to the Property and (ii) not yet
222   expended in restoring the Property to the same condition as it was on Effective Date.

223                                               TITLE
224   **10. TITLE:** Seller will convey marketable title to the Property by statutory warranty deed or trustee, personal representative or
225   guardian deed as appropriate to Seller's status.
226   **(a) Title Evidence:** Title evidence will show legal access to the Property and marketable title of record in Seller in accordance with
227   current title standards adopted by the Florida Bar, subject only to the following title exceptions, none of which prevent residential
228   use of the Property: covenants, easements and restrictions of record; matters of plat; existing zoning and government regulations;
229   oil, gas and mineral rights of record if there is no right of entry; current taxes; mortgages that Buyer will assume; and
230   encumbrances that Seller will discharge at or before closing. Seller will, at least 2 days prior to closing, deliver to Buyer Seller's
231   choice of one of the following types of title evidence, which must be generally accepted in the county where the Property is located
232   (specify in Paragraph 5(c) the selected type). Seller will use option (1) in Palm Beach County and option (2) in Miami-Dade County.
233     **(1) A title insurance commitment** issued by a Florida-licensed title insurer in the amount of the purchase price and
234   subject only to title exceptions set forth in this Contract.
235     **(2) An existing abstract of title** from a reputable and existing abstract firm (if firm is not existing, then abstract must be
236   certified as correct by an existing firm) purporting to be an accurate synopsis of the instruments affecting title to the

237 Buyer (_____) (_____) and Seller (_____) (_____) acknowledge receipt of a copy of this page, which is Page 4 of 8 Pages.

FAR-9  Rev. 7/07  © 2007  Florida Association of Realtors®  All Rights Reserved
This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.



238 Property recorded in the public records of the county where the Property is located and certified to Effective Date.
239 However, if such an abstract is not available to Seller, then a prior owner's title policy acceptable to the proposed
240 insurer as a base for reissuance of coverage. Seller will pay for copies of all policy exceptions and an update in a format
241 acceptable to Buyer's closing agent from the policy effective date and certified to Buyer or Buyer's closing agent,
242 together with copies of all documents recited in the prior policy and in the update. If a prior policy is not available to
243 Seller then (1) above will be the title evidence. Title evidence will be delivered no later than 10 days before Closing Date.
244 **(b) Title Examination:** Buyer will examine the title evidence and deliver written notice to Seller, within 5 days from receipt of
245 title evidence but no later than Closing Date, of any defects that make the title unmarketable. Seller will have 30 days from
246 receipt of Buyer's notice of defects ("Curative Period") to cure the defects at Seller's expense. If Seller cures the defects
247 within the Curative Period, Seller will deliver written notice to Buyer and the parties will close the transaction on Closing
248 Date or within 10 days from Buyer's receipt of Seller's notice if Closing Date has passed. If Seller is unable to cure the
249 defects within the Curative Period, Seller will deliver written notice to Buyer and Buyer will, within 10 days from receipt of
250 Seller's notice, either cancel this Contract or accept title with existing defects and close the transaction.
251 **(c) Survey:** Buyer may, at Buyer's expense, have the Property surveyed and deliver written notice to Seller, within 5 days from
252 receipt of survey but no later than closing, of any encroachments on the Property, encroachments by the Property's improvements
253 on other lands or deed restriction or zoning violations. Any such encroachment or violation will be treated in the same manner as a
254 title defect and Buyer's and Seller's obligations will be determined in accordance with subparagraph (b) above.

255                                        MISCELLANEOUS
256 **11. EFFECTIVE DATE; TIME; FORCE MAJEURE:**
257 **(a) Effective Date:** The "Effective Date" of this Contract is the date on which the last of the parties initials or signs and
258 delivers the final offer or counteroffer. **Time is of the essence for all provisions of this Contract.**
259 **(b) Time:** All time periods will be computed in business days (a "business day" is every calendar day except Saturday, Sunday
260 and national legal holidays). If any deadline falls on a Saturday, Sunday or national legal holiday, performance will be due the
261 next business day. All time periods will end at 5:00 p.m. local time (meaning in the county where the Property is
262 located) of the appropriate day.
263 **(c) Force Majeure:** Buyer or Seller shall not be required to perform any obligation under this Contract or be liable to
264 each other for damages so long as the performance or non-performance of the obligation is delayed, caused or prevented
265 by an act of God or force majeure. An "act of God" or "force majeure" is defined as hurricanes, earthquakes, floods, fire,
266 unusual transportation delays, wars, insurrections and any other cause not reasonably within the control of the Buyer or
267 Seller and which by the exercise of due diligence the non-performing party is unable in whole or in part to prevent or
268 overcome. All time periods, including Closing Date, will be extended (not to exceed 30 days) for the period that the force
269 majeure or act of God is in place. In the event that such "act of God" or "force majeure" event continues beyond the 30
270 days in this sub-paragraph, either party may cancel the Contract by delivering written notice to the other and Buyer's
271 deposit shall be refunded.

272 **12. NOTICES:** All notices shall be in writing and will be delivered to the parties and Broker by mail, personal delivery or electronic
273 media. Except for the notices required by Paragraph 3 of this Contract, Buyer's failure to deliver timely written notice to
274 Seller, when such notice is required by this Contract, regarding any contingencies will render that contingency null and
275 void and the Contract will be construed as if the contingency did not exist. Any notice, document or item delivered to
276 or received by an attorney or licensee (including a transaction broker) representing a party will be as effective as if
277 delivered to or by that party.

278 **13. COMPLETE AGREEMENT:** This Contract is the entire agreement between Buyer and Seller. Except for brokerage
279 agreements, no prior or present agreements will bind Buyer, Seller or Broker unless incorporated into this Contract.
280 Modifications of this Contract will not be binding unless in writing, signed or initialed and delivered by the party to be bound.
281 Signatures, initials, documents referenced in this Contract, counterparts and written modifications communicated electronically
282 or on paper will be acceptable for all purposes, including delivery, and will be binding. Handwritten or typewritten terms
283 inserted in or attached to this Contract prevail over preprinted terms. If any provision of this Contract is or becomes invalid or
284 unenforceable, all remaining provisions will continue to be fully effective. Buyer and Seller will use diligence and good faith in
285 performing all obligations under this Contract. This Contract will not be recorded in any public records.

286 **14. ASSIGNABILITY; PERSONS BOUND:** Buyer may not assign this Contract without Seller's written consent. The terms
287 "Buyer," "Seller," and "Broker" may be singular or plural. This Contract is binding on the heirs, administrators, executors,
288 personal representatives and assigns (if permitted) of Buyer, Seller and Broker.

289                                   DEFAULT AND DISPUTE RESOLUTION
290 **15. DEFAULT: (a) Seller Default:** If for any reason other than failure of Seller to make Seller's title marketable after diligent effort, Seller
291 fails, refuses or neglects to perform this Contract, Buyer may choose to receive a return of Buyer's deposit without waiving the right to
292 seek damages or to seek specific performance as per Paragraph 16. Seller will also be liable to Broker for the full amount of the
293 brokerage fee. **(b) Buyer Default:** If Buyer fails to perform this Contract within the time specified, including timely payment of all deposits,
294 Seller may choose to retain and collect all deposits paid and agreed to be paid as liquidated damages or to seek specific performance as

295 Buyer (____) and Seller (____) acknowledge receipt of a copy of this page, which is Page 5 of 8 Pages.
FAR-9    Rev. 7/07 © 2007   Florida Association of REALTORS®   All Rights Reserved
This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

*Instanet Forms*

MROSEN - 000196

286 per Paragraph 16; and Broker will, upon demand, receive 50% of all deposits paid and agreed to be paid (to be split equally among
287 Broker) up to the full amount of the brokerage fee.

288 **16. DISPUTE RESOLUTION:** This Contract will be construed under Florida law. All controversies, claims and other matters in
289 question arising out of or relating to this transaction or this Contract or its breach will be settled as follows:
300     (a) Disputes concerning entitlement to deposits made and agreed to be made: Buyer and Seller will have 30 days from the
301     date conflicting demands are made to attempt to resolve the dispute through **mediation.** If that fails, Escrow Agent will
302     submit the dispute, if so required by Florida law, to Escrow Agent's choice of arbitration, a Florida court or the Florida Real
303     Estate Commission ("FREC"). Buyer and Seller will be bound by any resulting award, judgment or order. A broker's
304     obligation under Chapter 475, FS and the FREC rules to timely notify the FREC of an escrow dispute and timely resolve the
305     escrow dispute through mediation, arbitration, interpleader or an escrow disbursement order, if the broker so chooses,
306     applies to brokers only and does not apply to title companies, attorneys or other escrow companies.
307     (b) All other disputes: Buyer and Seller will have 30 days from the date a dispute arises between them to attempt to
308     resolve the matter through mediation, failing which the parties will resolve the dispute through neutral binding **arbitration**
309     in the county where the Property is located. The arbitrator may not alter the Contract terms or award any remedy not
310     provided for in this Contract. The award will be based on the greater weight of the evidence and will state findings of fact
311     and the contractual authority on which it is based. If the parties agree to use discovery, it will be in accordance with the
312     Florida Rules of Civil Procedure and the arbitrator will resolve all discovery-related disputes. Any disputes with a real
313     estate licensee or firm named in Paragraph 19 will be submitted to arbitration only if the licensee's broker consents in
314     writing to become a party to the proceeding. This clause will survive closing.
315     (c) Mediation and Arbitration; Expenses: "Mediation" is a process in which parties attempt to resolve a dispute by
316     submitting it to an impartial mediator who facilitates the resolution of the dispute but who is not empowered to impose a
317     settlement on the parties. Mediation will be in accordance with the rules of the American Arbitration Association ("AAA") or
318     other mediator agreed on by the parties. The parties will equally divide the mediation fee, if any. "Arbitration" is a process in
319     which the parties resolve a dispute by a hearing before a neutral person who decides the matter and whose decision is
320     binding on the parties. Arbitration will be in accordance with the rules of the AAA or other arbitrator agreed on by the
321     parties. Each party to any arbitration will pay its own fees, costs and expenses, including attorneys' fees, and will equally
322     split the arbitrators' fees and administrative fees of arbitration.

323                                              ESCROW AGENT AND BROKER
324 **17. ESCROW AGENT:** Buyer and Seller authorize Escrow Agent to receive, deposit and hold funds and other items in escrow and,
325 subject to clearance, disburse them upon proper authorization and in accordance with Florida law and the terms of this Contract,
326 including disbursing brokerage fees. The parties agree that Escrow Agent will not be liable to any person for misdelivery of escrowed
327 items to Buyer or Seller, unless the misdelivery is due to Escrow Agent's willful breach of this Contract or gross negligence. If Escrow
328 Agent interpleads the subject matter of the escrow, Escrow Agent will pay the filing fees and costs from the deposit and will recover
329 reasonable attorneys' fees and costs to be paid from the escrowed funds or equivalent and charged and awarded as court costs in
330 favor of the prevailing party. All claims against Escrow Agent will be arbitrated, so long as Escrow Agent consents to arbitrate.

331 **18. PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify all facts and representations that are
332 important to them and to consult an appropriate professional for legal advice (for example, interpreting contracts, determining the
333 effect of laws on the Property and transaction, status of title, foreign investor reporting requirements, the effect of property lying
334 partially or totally seaward of the coastal construction control line, etc.) and for tax, property condition, environmental and other
335 specialized advice. Buyer acknowledges that Broker does not reside in the Property and that all representations (oral, written or
336 otherwise) by Broker are based on Seller representations or public records. Buyer agrees to rely solely on Seller, professional
337 inspectors and governmental agencies for verification of the Property condition, square footage and facts that materially affect
338 Property value. Buyer and Seller respectively will pay all costs and expenses, including reasonable attorneys' fees at all levels,
339 incurred by Broker and Broker's officers, directors, agents and employees in connection with or arising from Buyer's or Seller's
340 misstatement or failure to perform contractual obligations. Buyer and Seller hold harmless and release Broker and Broker's officers,
341 directors, agents and employees from all liability for loss or damage based on (1) Buyer's or Seller's misstatement or failure to
342 perform contractual obligations; (2) Broker's performance, at Buyer's and/or Seller's request, of any task beyond the scope of
343 services regulated by Chapter 475, F.S., as amended, including Broker's referral, recommendation or retention of any vendor; (3)
344 products or services provided by any vendor; and (4) expenses incurred by any vendor. Buyer and Seller each assume full
345 responsibility for selecting and compensating their respective vendors. This paragraph will not relieve Broker of statutory obligations.
346 For purposes of this paragraph, Broker will be treated as a party to this Contract. This paragraph will survive closing.

347 **19. BROKERS:** The licensee(s) and brokerage(s) named below are collectively referred to as "Broker." **Instruction to Closing**
348 **Agent:** Seller and Buyer direct closing agent to disburse at closing the full amount of the brokerage fees as specified in separate
349 brokerage agreements with the parties and cooperative agreements between the brokers, except to the extent Broker has
350 retained such fees from the escrowed funds. In the absence of such brokerage agreements, closing agent will disburse
351 brokerage fees as indicated below. This paragraph will not be used to modify any MLS or other offer of compensation made by
352 Seller or listing broker to cooperating brokers.

353 Buyer ( ) ( ) and Seller ( ) ( ) acknowledge receipt of a copy of this page, which is Page 6 of 8 Pages.

FAR-9      © 2007   Florida Association of REALTORS®   All Rights Reserved
This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

*Instanet forms*

MROSEN - 000197

| 354' | Michael Silverman | Realty Assoc. Luxury Partners |
| --- | --- | --- |
| 355 | *Selling Sales Associate/License No.* | *Selling Firm/Brokerage Fee: ($ or % of Purchase Price)* $16520.00 |
| 356' | Tipton,Birmingham and Berk | Prudential & Addison Mizner |
| 357 | *Listing Sales Associate/License No.* | *Listing Firm/Brokerage fee: ($ or % of Purchase Price)* 2% |

ADDENDA AND ADDITIONAL TERMS

358
359 **20. ADDENDA:** The following additional terms are included in the attached addenda and incorporated into this Contract (check if
360 applicable):

| | | |
| --- | --- | --- |
| 361' ☐ A. Condo. Assn. | ☐ H. As Is w/Right to Inspect | ☐ O. Interest-Bearing Account | ☒ V. Prop. Disclosure Stmt. |
| 362' ☒ B. Homeowners' Assn. | ☐ I. Inspections | ☐ P. Back-up Contract | ☐ W. FIRPTA |
| 363' ☐ C. Seller Financing | ☐ J. Insulation Disclosure | ☐ Q. Broker - Pers. Int. in Prop. | ☐ X. 1031 Exchange |
| 364' ☐ D. Mort. Assumption | ☐ K. Pre-1978 Housing Stmt. (LBP) | ☐ R. Rentals | ☐ Y. Additional Clauses |
| 365' ☐ E. FHA Financing | ☐ L. Insurance | ☐ S. Sale/Lease of Buyer's Property | |
| 366' ☐ F. VA Financing | ☐ M. Housing Older Persons | ☐ T. Rezoning | ☐ Other_____ |
| 367' ☐ G. New Mort. Rates | ☐ N. Lease purchase/Lease option | ☐ U. Assignment | ☐ Other_____ |

368' **21. ADDITIONAL TERMS:**
369' Buyer and seller acknowledge that the subject property has "Chinese
370' Drywall Syndrome" and the house will have to be gutted and rebuilt
371' inside. Therefore, the only items subject to inspection are as follows:
372' All items on the exterior of the house - all items in the garage - the
373' roof - and truss system -(both roof and second floor) - and the windows.
374'
375' The buyer shall have access to the house during the contract period
376' for the purpose of meeting with architects and builders.
377'
378' The seller will help to facilitate the process by signing applications
379' for permits as needed. All fees etc. are the sole responsibility of the
380' buyer.
381'
382'
383' The buyer may choose to close earlier, and may select a date prior to
384' December 21, 2009 with 5 days notice.
385'
386' The buyers acknowledge that the sellers, realtors and real estate
387' brokerage companies do not have any responsibility for curing the
388' "Chinese Drywall Syndrome." The buyers completely release the sellers,
389' realtors, and real estate brokerage companies of any and all liability
390' for the physical condition of the house effective upon closing. Buyers
391' agree to sign a release at closing
392'
393' The seller shall have the right to remove all the appliances from the
394' kitchen and laundry room prior to closing. The seller shall have the
395' right to remove the kitchen and butler's pantry cabinets and
396' countertops. The seller shall have the right to remove all of the wood
397' trim in the house - this includes all moldings and wood wall treatments
398' - crown - baseboard - door trims etc. The seller may take any of the
399' children's room fabric valances and drapes. The seller is responsible
400' for insuring that the window treatments,windows,flooring and studs are
401' not damaged in this process.
402'
403'
404' The seller will pay up to a maximum of $4130 of the referral fee due
405' Prudential from Realty Associates.
406'
407'
408'
409'

410' Buyer (_____) and Seller (_____) acknowledge receipt of a copy of this page, which is Page 7 of 8 Pages.

FAR-9 7/07 © 2007 Florida Association of REALTORS® All Rights Reserved
This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

Instanet forms

411     This is intended to be a legally binding contract. If not fully understood, seek the advice of an attorney prior to signing.

412                    **OFFER AND ACCEPTANCE**

413* **(Check if applicable:** ❑ Buyer received a written real property disclosure statement from Seller before making this Offer.)

414   Buyer offers to purchase the Property on the above terms and conditions. Unless this Contract is signed by Seller and a copy

415* delivered to Buyer no later than   **5:00**   ❑ a.m.☒ p.m. on  **November**   **16th**  ,  **2009** , this offer will be revoked

416   and Buyer's deposit refunded subject to clearance of funds.

417                **COUNTER OFFER/REJECTION**

418* ❑ Seller counters Buyer's offer (to accept the counter offer, Buyer must sign or initial the counter offered terms and deliver a copy

419   of the acceptance to Seller. Unless otherwise stated, the time for acceptance of any counteroffers shall be 2 days from the

420* date the counter is delivered. ❑ Seller rejects Buyer's offer.

421* Date: __11/15/09__     Buyer: _____

422*                      Print name: _____ Donna Shukow _____

423* Date: __11/15/09__     Buyer: _____

424* Phone: _____   Print name: _____ Allen Shukow _____

425* Fax: _____    Address: _____

426* E-mail: _____

427* Date: __11/16/09__     Seller: _____

428*                      Print name: _____ Robyn M. Rosen _____

429* Date: __11/15/09__     Seller: _____

430* Phone: _____   Print name: _____ Michael Rosen _____

431* Fax: _____    Address: _____

432* E-mail: _____

433* | Effective Date: __11/15/09__  (The date on which the last party signed or initialed and delivered the final offer or counteroffer.) |

434* Buyer _____ and Seller _____ acknowledge receipt of a copy of this page, which is Page 8 of 8 Pages.

The Florida Association of REALTORS and local Boards/Association of REALTORS make no representation as to the legal validity or adequacy of any provision of this form in any specific transaction. This standardized form should not be used in complex transactions or with extensive riders or additions. This form is available for use by the entire real estate industry and is not intended to identify the user as a REALTOR. REALTOR is a registered collective membership mark that may be used only by real estate licensees who are members of the National Association of REALTORS and who subscribe to its Code of Ethics.

The copyright laws of the United States (17 U.S. Code) forbid the unauthorized reproduction of blank forms by any means including facsimile or computerized forms.

FAR-9   4/07   © 2007   Florida Association of REALTORS®   All Rights Reserved

This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

**Instanet forms**

MROSEN - 000199

1 The clause below will be incorporated into the Contract between _____ Robyn M. and Michael Rosen H/W _____ (Seller)
2 and _____ Donna and Allen Shukow - H/W _____ (Buyer) concerning the Property described as
3 _____ 17538 Middlebrook _____ Boca Raton _____ FL _____ 33496 _____ only if initialed by all parties:

4 ☐ B. Homeowners' Association: The Property is located in a community with a ☐ voluntary
5 ☐ mandatory (see the disclosure summary below) homeowners' association ("Association"). Seller's warranty under
6 Paragraph 8 of the Contract and risk of loss under Paragraph 9 or Paragraph H of the Comprehensive Addendum (if
7 applicable) extend only to the Property and does not extend to common areas or facilities described below.
8 Notice: Association documents may be obtained from the county record office or, if not public record, from the developer or
9 Association manager. The Property may be subject to recorded restrictive covenants governing the use and occupancy of
10 properties in the community and may be subject to special assessments.
11 (1) Association Approval: If the Association documents give the Association the right to approve Buyer as a purchaser, this
12 Contract is contingent on such approval by the Association. Buyer will apply for approval within _____ days from Effective
13 Date (5 days if left blank) and use diligent effort to obtain approval, including making personal appearances and paying
14 related fees if required. Buyer and Seller will sign and deliver any documents required by the Association to complete the
15 transfer. If Buyer is not approved, this Contract will terminate and Seller will return Buyer's deposit unless this Contract
16 provides otherwise.
17 (2) Right of First Refusal: If the Association has a right of first refusal to buy the Property, this Contract is contingent on the
18 Association deciding not to exercise such right. Seller will, within 3 days from receipt of the Association's decision, give
19 Buyer written notice of the decision. If the Association exercises its right of first refusal, this Contract will terminate, Buyer's
20 deposit will be refunded unless this Contract provides otherwise and Seller will pay Broker's full commission at closing in
21 recognition that Broker procured the sale.
22 (3) Fees: Buyer will pay any application, transfer and initial membership fees charged by the Association. Seller will pay all
23 fines imposed against the Property as of Closing Date and any fees the Association charges to provide information about its
24 fees or the Property, and will bring maintenance and similar periodic fees and rents on any recreational areas current as of
25 Closing Date. If, after the Effective Date, the Association imposes a special or other assessment for improvements, work or
26 services, Seller will pay all amounts due before Closing Date and Buyer will pay all amounts due after Closing Date. If special
27 assessments may be paid in installments ☒ Buyer ☐ Seller (if left blank, Buyer) shall pay installments due after Closing Date. If Seller
28 is checked, Seller will pay the assessment in full prior to or at the time of Closing. Seller represents that he/she is not aware of any
29 pending special or other assessment that the Association is considering except as follows:

30 $ _____ per _____ to _____ None _____
31 The following dues/maintenance fees are currently charged by the homeowners' association:
32 $ _____ 654.00 _____ per _____ month _____ to _____ HOA _____
33 $ _____ per _____ to _____
34 $ _____ per _____ to _____

35 (4) Damage to Common Elements: If any portion of the common element is damaged due to fire, hurricane or other casualty before
36 closing, either party may cancel the Contract and Buyer's deposit shall be refunded if (a) as a result of damage to the common
37 elements, the Property appraises below the purchase price and either the parties cannot agree on a new purchase price or Buyer
38 elects not to proceed, or (b) the Association cannot determine the assessment attributable to the Property for the damage at least 5
39 days prior to Closing Date, or (c) the assessment determined or imposed by the Association attributable to the Property for the
40 damage to the common element is greater than $ _____ or % _____ of the purchase price (1.5% if left blank).
41 (5) Disclosure Summary for Mandatory Associations: IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401,
42 FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS
43 CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BY DELIVERING TO SELLER OR SELLER'S AGENT OR
44 REPRESENTATIVE WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE
45 DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THIS
46 VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING.

47 Disclosure Summary For (Name of Community) _____ The Oaks of Boca Raton _____ :
48 (1) AS A PURCHASER OF PROPERTY IN THIS COMMUNITY, YOU WILL BE OBLIGATED TO BE A MEMBER OF A
49 HOMEOWNERS' ASSOCIATION.
50 (2) THERE HAVE BEEN OR WILL BE RECORDED RESTRICTIVE COVENANTS GOVERNING THE USE
51 AND OCCUPANCY OF PROPERTIES IN THIS COMMUNITY.
52 (3) YOU WILL BE OBLIGATED TO PAY ASSESSMENTS TO THE ASSOCIATION. ASSESSMENTS MAY BE SUBJECT TO
53 PERIODIC CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS $ _____ 654.00 _____ PER _____ Month _____
54 YOU WILL ALSO BE OBLIGATED TO PAY ANY SPECIAL ASSESSMENTS IMPOSED BY THE ASSOCIATION. SUCH

(See Continuation)

55
56 Buyer ( _____ ) and Seller ( _____ ) acknowledge receipt of a copy of this page.
57 FARA-10  1/07  © 2009 Florida Association of Realtors®   All Rights Reserved   Page _____ of Addendum No._____
This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

instanet forms

MROSEN - 000200

58* _____ ( ___ ) - ( _____ ) B. Homeowners' Association (CONTINUATION)

59  SPECIAL ASSESSMENTS MAY BE SUBJECT TO CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS
60* $_____ PER _____none_____.
61  (4) YOU MAY BE OBLIGATED TO PAY SPECIAL ASSESSMENTS TO THE RESPECTIVE MUNICIPALITY, COUNTY, OR
62  SPECIAL DISTRICT. ALL ASSESSMENTS ARE SUBJECT TO PERIODIC CHANGE.
63  (5) YOUR FAILURE TO PAY SPECIAL ASSESSMENTS OR ASSESSMENTS LEVIED BY A MANDATORY HOMEOWNERS'
64  ASSOCIATION COULD RESULT IN A LIEN ON YOUR PROPERTY.
65  (6) THERE MAY BE AN OBLIGATION TO PAY RENT OR LAND USE FEES FOR RECREATIONAL OR OTHER COMMONLY
66  USED FACILITIES AS AN OBLIGATION OF MEMBERSHIP IN THE HOMEOWNERS' ASSOCIATION. IF APPLICABLE, THE
67* CURRENT AMOUNT IS $_____ PER _____None_____.
68  (7) THE DEVELOPER MAY HAVE THE RIGHT TO AMEND THE RESTRICTIVE COVENANTS WITHOUT THE APPROVAL
69  OF THE ASSOCIATION MEMBERSHIP OR THE APPROVAL OF THE PARCEL OWNERS.
70  (8) THE STATEMENTS CONTAINED IN THIS DISCLOSURE FORM ARE ONLY SUMMARY IN NATURE, AND, AS A
71  PROSPECTIVE PURCHASER, YOU SHOULD REFER TO THE COVENANTS AND THE ASSOCIATION GOVERNING
72  DOCUMENTS BEFORE PURCHASING PROPERTY.
73  (9) THESE DOCUMENTS ARE EITHER MATTERS OF PUBLIC RECORD AND CAN BE OBTAINED FROM THE RECORD
74  OFFICE IN THE COUNTY WHERE THE PROPERTY IS LOCATED, OR ARE NOT RECORDED AND CAN BE OBTAINED
75  FROM THE DEVELOPER.

76  Buyer acknowledges receipt of this summary before signing this Contract.

77* _____    11/15/09        _____    11/15/09
78  *Buyer*                     *Date*          *Buyer*                     *Date*

79* Buyer ( ___ ) ( ___ ) and Seller ( ___ ) ( ___ ) acknowledge receipt of a copy of this page.
80* FARA-10  1/09  © 2009  Florida Association of Realtors®  All Rights Reserved        Page _____ of Addendum No._____

This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

Instanet forms

MROSEN - 000201

1*   The clause below will be incorporated into the Contract between     Robyn M. and Michael Rosen H/W     (Seller)

2*   and     Donna and Allen Shukow - H/W     (Buyer) concerning the Property described as     
    Boca Raton     FL   33496   only if initialed by all parties:

3*   17538 Middlebrook

4*   (  ) (  ) - (    ) V. **Property Disclosure Statement:** This offer is contingent on Seller completing, signing and

5   delivering to Buyer a written real property disclosure statement within 3 days from Effective Date. If the statement discloses any

6   material information about the Property that is unacceptable to Buyer, Buyer may cancel this Contract by written notice to

7   Seller within 3 days from receipt of Seller's written statement.

8*   Buyer (  ) (  ) and Seller (    ) acknowledge receipt of a copy of this page.     Page _____ of Addendum No._____

9*   FARA-10   1/09   © 2009   Florida Association of REALTORS®   All Rights Reserved

This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

**Instanet**
**forms**

MROSEN - 000202

## AGREEMENT OF UNDERTAKING AND COMPLIANCE

BUYER:     Donna and Allen Shukow

SELLER:    Michael and Robyn M. Rosen

PROPERTY:   17538 Middlebrook, Boca Raton, Fl. 33496

The undersigned buyers and sellers acknowledge the seller is authorized to remove the following items from the property:

4 electrical items;                                    *Kios Valence*
3 pieces of copper pipe showing signs of sulfur;
several drywall samples, and
a/c coils

The parties further agree that the a/c coils from the downstairs unit shall remain with the property until such time that the Buyer has replaced the unit. In exchange for the closing and funding of the above referenced transaction, the undersigned Buyer has placed $500.00 in escrow with Weisman & Margolies, P.A., the closing agent, to be released to the Buyer upon the delivery of the downstairs a/c coils by the Buyer to the Seller.

Upon delivery of the a/c coils the closing agent is authorized to release the escrowed funds to the Buyer.

In the event the a/c coils are not delivered to the Seller within 90 days from the date of closing, the closing agent is authorized to release the escrowed funds to the Seller.

DATED effective this ___4___ day of December, 2009.


_____
Michael Rosen

_____
Robyn Rosen

_____
Donna Shukow

_____
Allen Shukow

# Residential Sale and Purchase Contract

**1. SALE AND PURCHASE:** _____ Michael and Robyn M Rosen - H/W _____ ("Seller")
and _____ Donna and Allen Shukow - H/W _____ ("Buyer")
agree to sell and buy on the terms and conditions specified below the property described as:
Address: __17538__ __Middlebrook__
__Boca Raton__ __FL__ __33496__ County: __Palm Beach__
Legal Description: __Fox Hill Estates Boca Raton Lot:148 Blk: Lot SqFt:10454 Frontage: Depth:__
_____ Tax ID No: _____
together with all existing improvements and attached items, including fixtures, built-in furnishings, major appliances (including but not limited to range(s), refrigerator(s), dishwasher(s), washer(s), and dryer(s), ____ (#) ceiling fans (if left blank, all ceiling fans), light fixtures, attached wall-to-wall carpeting, rods, draperies and other window treatments as of Effective Date. The only other items included in the purchase are: _____
_____
_____
The following attached items are excluded from the purchase: __none__
_____
The real and personal property described above as included in the purchase is referred to as the "Property." Personal property listed in this Contract is included in the purchase price, has no contributory value and is being left for Seller's convenience.

## PRICE AND FINANCING

**2. PURCHASE PRICE:** $_____ 876,000.00 _____ payable by Buyer in U.S. currency as follows:
(a) $_____ 10,000.00    Deposit received (checks are subject to clearance) on __October__ __22nd__, __2009__ by
_____ for delivery to __Palm Title Services__ ("Escrow Agent")
_____Signature_____                          _____Name of Company_____
(Address of Escrow Agent) __165 E. Palmetto Boca Raton__ __Florida__
(Phone # of Escrow Agent) _____ 561-367-0596 _____
(b) $_____ 77,600.00    Additional deposit to be delivered to Escrow Agent by
_____ or _____days from Effective Date. (10 days if left blank)
(c) _____    Total financing (see Paragraph 3 below) (express as a dollar amount or percentage)
(d) $_____    Other: _____
(e) $_____ 788,400.00    Balance to close (not including Buyer's closing costs, prepaid items and prorations). All funds paid
                            at closing must be paid by locally drawn cashier's check, official bank check, or wired funds.

**3. FINANCING:** (Check as applicable) ☒ (a) Buyer will pay cash for the Property with no financing contingency.
☐ (b) Buyer will apply for new ☐ conventional ☐ FHA ☐ VA financing specified in paragraph 2(c) at the prevailing interest rate and loan costs based on Buyer's creditworthiness (the "Financing") within _____ days from Effective Date (5 days if left blank) and provide Seller with either a written Financing commitment or approval letter ("Commitment") or written notice that Buyer is unable to obtain a Commitment within _____ days from Effective Date (the earlier of 30 days after the Effective Date or 5 days prior to Closing Date if left blank) ("Commitment Period"). Buyer will keep Seller and Broker fully informed about loan application status, progress and Commitment issues and authorizes the mortgage broker and lender to disclose all such information to Seller and Broker. If, after using diligence and good faith, Buyer is unable to provide the Commitment and provides Seller with written notice that Buyer is unable to obtain a Commitment within the Commitment Period, either party may cancel this Contract and Buyer's deposit will be refunded. Buyer's failure to provide Seller with written notice that Buyer is unable to obtain a Commitment within the Commitment Period will result in forfeiture of Buyer's deposit. Once Buyer provides the Commitment to Seller, the financing contingency is waived and Seller will be entitled to retain the deposits if the transaction does not close by the Closing Date unless (1) the Property appraises below the purchase price and either the parties cannot agree on a new purchase price or Buyer elects not to proceed, (2) the property related conditions of the Commitment have not been met (except when such conditions are waived by other provisions of this Contract), or (3) another provision of this Contract provides for cancellation.

## CLOSING

**4. CLOSING DATE; OCCUPANCY:** Unless the Closing Date is specifically extended by the Buyer and Seller or by any other provision in this Contract, the Closing Date shall prevail over all other time periods including, but not limited to, inspection and financing periods. This Contract will be closed on __Dec.__ __21st__, __2009__ ("Closing Date") at the time established by the closing agent, by which time Seller will (a) have removed all personal items and trash from the Property and swept the Property clean and (b) deliver the deed, occupancy and possession, along with all keys, garage door openers and access codes, to Buyer. If on Closing Date insurance underwriting is suspended, Buyer may postpone closing up to 5 days after the insurance suspension is lifted. If this transaction does not close for any reason, Buyer will immediately return all Seller-provided title evidence, surveys, association documents and other items.

Buyer (___) (___) and Seller (___) (___) acknowledge receipt of a copy of this page, which is Page 1 of 8 Pages.
FAR-9 4/07 © 2007 Florida Association of REALTORS® All Rights Reserved
This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

InstanetForms

MROSEN - 000223

55 **5. CLOSING PROCEDURE; COSTS:** Closing will take place in the county where the Property is located and may be conducted by
56 mail or electronic means. If title insurance insures Buyer for title defects arising between the title binder effective date and recording
57 of Buyer's deed, closing agent will disburse at closing the net sale proceeds to Seller and brokerage fees to Broker as per
58 Paragraph 19. In addition to other expenses provided in this Contract, Seller and Buyer will pay the costs indicated below.
59    **(a) Seller Costs:**
60 Taxes and surtaxes on the deed
61 Recording fees for documents needed to cure title
62* Other: _____
63* Seller will pay up to $_____ or _____% (1.5% if left blank) of the purchase price for repairs to warranted items ("Repair
64* Limit"); and up to $_____ or _____% (1.5% if left blank) of the purchase price for wood-destroying organism treatment
65* and repairs ("WDO Repair Limit"); and up to $_____ or _____% (1.5% if left blank) of the purchase price for costs
66 associated with closing out open permits and obtaining required permits for unpermitted existing improvements ("Permit Limit").
67    **(b) Buyer Costs:**
68 Taxes and recording fees on notes and mortgages
69 Recording fees on the deed and financing statements
70 Loan expenses
71 Lender's title policy
72 Inspections
73 Survey
74 Flood insurance, homeowner insurance, hazard insurance
75* Other: _____
76
77*    **(c) Title Evidence and Insurance: Check (1) or (2):** _____
78*    ☒ (1) The title evidence will be a Paragraph 10(a)(1) owner's title insurance commitment. ☒ Seller will select the title agent
79* and will pay for the owner's title policy, search, examination and related charges or ☐ Buyer will select the title agent and pay
80 for the owner's title policy, search, examination and related charges or ☐ Buyer will select the title agent and Seller will pay
81* for the owner's title policy, search, examination and related charges.
82    ☐ (2) Seller will provide an abstract as specified in Paragraph 10(a)(2) as title evidence. ☐ Seller ☐ Buyer will pay for the
83 owner's title policy and select the title agent. Seller will pay fees for title searches prior to closing, including tax search and
84 lien search fees, and Buyer will pay fees for title searches after closing.
85    **(d) Prorations:** The following items will be made current (if any), title examination fees and closing fees.
86 estate taxes, interest, bonds, assessments, association fees, insurance, rents and other current expenses and revenues of the
87 Property. If taxes and assessments for the current year cannot be determined, taxes shall be prorated on the basis of taxes for
88 the preceding year as of the day before Closing Date and shall be computed and readjusted when the current taxes are
89 determined with adjustment for exemptions and improvements. If there are completed improvements on the Property by
90 January 1 of the year of the Closing Date, which improvements were not in existence on January 1 of the prior year, taxes shall
91 be prorated based on the prior year's millage and at an equitable assessment to be agreed upon by the parties prior to Closing
92 Date, failing which, request will be made to the County Property Appraiser for an informal assessment taking into consideration
93 available exemptions. If the County Property Appraiser is unable or unwilling to perform an informal assessment prior to Closing
94 Date, Buyer and Seller will split the cost of a private appraiser to perform an assessment prior to Closing Date. Nothing in this
95 paragraph shall act to extend the Closing Date. This provision shall survive closing.
96    **(e) Special Assessment by Public Body:** Regarding special assessments imposed by a public body, Seller will pay (i) the full
97 amount of liens that are certified, confirmed and ratified before closing and (ii) the amount of the last estimate of the assessment
98* if an improvement is substantially completed as of Effective Date but has not resulted in a lien before closing, and Buyer will pay
99 all other amounts. If special assessments may be paid in installments ☐ Buyer ☐ Seller (if left blank, Buyer) shall pay
100 installments due after closing. If Seller is checked, Seller will pay the assessment in full prior to or at the time of closing. Public
101 body does not include a Homeowner Association or Condominium Association.
102    **(f) Tax Withholding:** Buyer and Seller will comply with the Foreign Investment in Real Property Tax Act, which may require
103* Seller to provide additional cash at closing if Seller is a "foreign person" as defined by federal law.
104*    **(g) Home Warranty:** ☐ Buyer ☐ Seller ☒ N/A will pay for a home warranty plan issued by _____ at a
105 cost not to exceed $_____. A home warranty plan provides for repair or replacement of many of a home's mechanical
systems and major built-in appliances in the event of breakdown due to normal wear and tear during the agreement period.
106
**PROPERTY CONDITION**
107* **6. INSPECTION PERIODS:** Buyer will complete the inspections referenced in Paragraphs 7 and 8(a)(2) by _____
108* _____ (the earlier of 10 days after the Effective Date or 5 days prior to Closing Date if left blank) ("Inspection Period");
109* the wood-destroying organism inspection by _____ (at least 5 days prior to closing, if left
110 blank); and the walk-through inspection on the day before Closing Date or any other time agreeable to the parties; and the
111* survey referenced in Paragraph 10(c) by _____ , _____ (at least 5 days prior to closing if left blank).
112* Buyer (___) (___) and Seller (___) (___) acknowledge receipt of a copy of this page, which is Page 2 of 8 Pages.

FAR-9 4/07 © 2007 Florida Association of REALTORS® All Rights Reserved
This software is licensed to (Michael Silverman - Realty Assoc, Luxury Partners) www.transactiondesk.com.

Instanet forms

MROSEN - 000224

113 **7. REAL PROPERTY DISCLOSURES: Seller** represents that **Seller** does not know of any facts that materially affect the value
114 of the Property, including but not limited to violations of governmental laws, rules and regulations, other than those that **Buyer**
115 can readily observe or that are known by or have been disclosed to **Buyer**.

116    **(a) Energy Efficiency: Buyer** acknowledges receipt of the energy-efficiency information brochure required by Section 553.996,
117 *Florida Statutes.*

118    **(b) Radon Gas:** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient
119 quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and
120 state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be
121 obtained from your county public health unit. **Buyer** may, within the Inspection Period, have an appropriately licensed person
122 test the Property for radon. If the radon level exceeds acceptable EPA standards, **Seller** may choose to reduce the radon
123 level to an acceptable EPA level, failing which either party may cancel this Contract.

124    **(c) Flood Zone: Buyer** is advised to verify by survey, with the lender and with appropriate government agencies which flood
125 zone the Property is in, whether flood insurance is required and what restrictions apply to improving the Property and rebuilding
126 in the event of casualty. If the Property is in a Special Flood Hazard Area or Coastal High Hazard Area and the buildings are built
127 below the minimum flood elevation, **Buyer** may cancel this Contract by delivering written notice to **Seller** within 20 days from
128 Effective Date, failing which **Buyer** accepts the existing elevation of the buildings and zone designation of the Property.

129    **(d) Homeowners' Association:** If membership in a homeowners' association is mandatory, an association disclosure
130 summary is attached and incorporated into this Contract. **BUYER SHOULD NOT SIGN THIS CONTRACT UNTIL**
131 **BUYER HAS RECEIVED AND READ THE DISCLOSURE SUMMARY.**

132    **(e) PROPERTY TAX DISCLOSURE SUMMARY: BUYER** SHOULD NOT RELY ON THE **SELLER'S** CURRENT PROPERTY
133 TAXES AS THE AMOUNT OF PROPERTY TAXES THAT **BUYER** MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT
134 TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE
135 PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING
136 VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR FURTHER INFORMATION.

137    **(f) Mold:** Mold is part of the natural environment that, when accumulated in sufficient quantities, may present health risks to
138 susceptible persons. For more information, contact the county indoor air quality specialist or other appropriate professional.

139    **(g) Coastal Construction Control Line:** If any part of the Property lies seaward of the coastal construction control line as
140 defined in Section 161.053 of the Florida Statutes, **Seller** shall provide **Buyer** with an affidavit or survey as required by law
141 delineating the line's location on the Property, unless **Buyer** waives this requirement in writing. The Property being purchased
142 may be subject to coastal erosion and to federal, state, or local regulations that govern coastal property, including delineation
143 of the coastal construction control line, rigid coastal protection structures, beach nourishment, and the protection of marine
144 turtles. Additional information can be obtained from the Florida Department of Environmental Protection, including whether
145 there are significant erosion conditions associated with the shoreline of the Property being purchased.

146*    ❑ **Buyer** waives the right to receive a CCCL affidavit or survey.

147 **8. MAINTENANCE, INSPECTIONS AND REPAIR: Seller** will keep the Property in the same condition from Effective Date until
148 closing, except for normal wear and tear ("Maintenance Requirement") and repairs required by this Contract. **Seller** will provide
149 access and utilities for **Buyer's** inspections. **Buyer** will repair all damages to the Property resulting from the inspections,
150 return the Property to its pre-inspection condition and provide **Seller** with paid receipts for all work done on Property upon its
151 completion. If **Seller** is unable to complete required repairs or treatments or meet the Maintenance Requirement prior to
152 closing, **Seller** will give **Buyer** a credit at closing for the cost of the repairs and maintenance **Seller** was obligated to perform. At
153 closing, **Seller** will assign all assignable repair and treatment contracts to **Buyer** and provide **Buyer** with paid receipts for all
154 work done on the Property pursuant to the terms of this Contract. At closing, **Seller** will provide **Buyer** with any written
155 documentation that all open permits have been closed out and that **Seller** has obtained required permits for improvements to
156 the Property.

157    **(a) Warranty, Inspections and Repair:**

158      **(1) Warranty: Seller** warrants that non-leased major appliances and heating, cooling, mechanical, electrical, security,
159 sprinkler, septic and plumbing systems, seawall, dock and pool equipment, if any, are and will be maintained in working
160 condition until closing; that the structures (including roofs, doors and windows) and pool, if any, are structurally sound
161 and watertight; and that torn or missing screens and missing roof tiles will be repaired or replaced. **Seller** warrants that
162 all open permits will be closed out and that **Seller** will obtain any required permits for improvements to the Property
163 prior to Closing Date. **Seller** does not warrant and is not required to repair cosmetic conditions, unless the cosmetic
164 condition resulted from a defect in a warranted item. **Seller** is not obligated to bring any item into compliance with
165 existing building code regulations unless necessary to repair a warranted item. "Working condition" means operating in
166 the manner in which the item was designed to operate and "cosmetic conditions" means aesthetic imperfections that
167 do not affect the working condition of the item, including pitted marcite; tears, worn spots and discoloration of floor
168 coverings/wallpapers/window treatments; nail holes, scratches, dents, scrapes, chips and caulking in bathroom
169 ceiling/walls/flooring/tile/fixtures/mirrors; cracked roof tiles; curling or worn shingles; and minor cracks in floor
170 tiles/windows/driveways/sidewalks/pool decks/garage and patio floors.

171      **(2) Professional Inspection: Buyer** may, at **Buyer's** expense, have warranted items inspected by a person who
172 specializes in and holds an occupational license (if required by law) to conduct home inspections or who holds a Florida
173 license to repair and maintain the items inspected ("professional inspector"). **Buyer** must, within 5 days from the end of the
174 Inspection Period, deliver written notice of any items that are not in the condition warranted and a copy of the portion of

175* Buyer (     ) and Seller (     ) acknowledge receipt of a copy of this page, which is Page 3 of 8 Pages.

FAR-9   4/07   © 2007   Florida Association of REALTORS®   All Rights Reserved
This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

Instanet
forms

176 inspector's written report dealing with such items to Seller. If Buyer fails to deliver timely written notice, Buyer waives
177 Seller's warranty and accepts the items listed in subparagraph (a) in their "as is" conditions, except that Seller must meet
178 the maintenance requirement.
179 **(3) Repair:** Seller will obtain repair estimates and is obligated only to make repairs necessary to bring warranted items
180 into the condition warranted, up to the Repair Limit. Seller may, within 5 days from receipt of Buyer's notice of items
181 that are not in the condition warranted, have a second inspection made by a professional inspector and will report
182 repair estimates to Buyer. If the first and second inspection reports differ and the parties cannot resolve the differences,
183 Buyer and Seller together will choose, and equally split the cost of, a third inspector, whose written report will be
184 binding on the parties. If the cost to repair warranted items equals or is less than the Repair Limit, Seller will have the
185 repairs made in a workmanlike manner by an appropriately licensed person. If the cost to repair warranted items
186 exceeds the Repair Limit, either party may cancel this Contract unless either party pays the excess or Buyer
187 designates which repairs to make at a total cost to Seller not exceeding the Repair Limit and accepts the balance of
188 the Property in its "as is" condition.
189 **(4) Permits:** Seller shall close out any open permits and remedy any violation of any governmental entity, including
190 but not limited to, obtaining any required permits for improvements to the Property, up to the Permit Limit, and with final
191 inspections completed no later than 5 days prior to Closing Date. If final inspections cannot be performed due to delays
192 by the governmental entity, Closing Date shall be extended for up to 10 days to complete such final inspections, failing
193 which, either party may cancel this Contract and Buyer's deposit shall be refunded. If the cost to close out open
194 permits or to remedy any violation of any governmental entity exceeds the Permit Limit, either party may cancel this
195 Contract unless either party pays the excess or Buyer accepts the Property in its "as is" condition and Seller credits
196 Buyer at closing the amount of the Permit Limit.
197 **(b) Wood-Destroying Organisms:** "Wood-destroying organism" means arthropod or plant life, including termites, powder-post
198 beetles, oldhouse borers and wood-decaying fungi, that damages or infests seasoned wood in a structure, excluding fences.
199 Buyer may, at Buyer's expense, have the Property inspected by a Florida-licensed pest control business to determine the
200 existence of past or present wood-destroying organism infestation and damage caused by infestation. If the inspector finds
201 evidence of infestation or damage, Buyer will deliver a copy of the inspector's written report to Seller within 5 days from the date
202 of the inspection. If Seller previously treated the Property for the type of wood-destroying organisms found, Seller does not have
203 to treat the Property again if (i) there is no visible live infestation, and (ii) Seller transfers to Buyer at closing a current full treatment
204 warranty for the type of wood-destroying organisms found. Otherwise, Seller will have 5 days from receipt of the inspector's
205 report to have reported damage estimated by a licensed building or general contractor and corrective treatment estimated by a
206 licensed pest control business. Seller will have treatments and repairs made by an appropriately licensed person at Seller's
207 expense up to the WDO Repair Limit. If the cost to treat and repair the Property exceeds the WDO Repair Limit, either party may
208 pay the excess, failing which either party may cancel this Contract by written notice to the other. If Buyer fails to timely deliver the
209 inspector's written report, Buyer accepts the Property "as is" with regard to wood-destroying organism infestation and damage,
210 subject to the maintenance requirement.
211 **(c) Walk-through Inspection/Reinspection:** Buyer, and/or Buyer's representative, may walk through the Property solely
212 to verify that Seller has made repairs required by this Contract, has met the Maintenance Requirement and has met
213 contractual obligations. If Buyer, and/or Buyer's representative, fails to conduct this inspection, Seller's repair obligations
214 and Maintenance Requirement will be deemed fulfilled.

215 **9. RISK OF LOSS:** If any portion of the Property is damaged by fire or other casualty before closing and can be restored by the
216 Closing Date or within 45 days after the Closing Date to substantially the same condition as it was on Effective Date, Seller,
217 will, at Seller's expense, restore the Property and deliver written notice to Buyer that Seller has completed the restoration, and
218 the parties will close the transaction on the later of: (1) Closing Date; or, (2) 10 days after Buyer's receipt of Seller's notice.
219 Seller will not be obligated to replace trees. If the restoration cannot be completed in time, Buyer may cancel this Contract
220 and Buyer's deposit shall be refunded, or Buyer may accept the Property "as is", and Seller will credit the deductible and
221 assign the insurance proceeds, if any, to Buyer at closing in such amounts as are (i) attributable to the Property and (ii) not yet
222 expended in restoring the Property to the same condition as it was on Effective Date.

223                                                          TITLE
224 **10. TITLE:** Seller will convey marketable title to the Property by statutory warranty deed or trustee, personal representative or
225 guardian deed as appropriate to Seller's status.
226   **(a) Title Evidence:** Title evidence will show legal access to the Property and marketable title of record in Seller in accordance with
227 current title standards adopted by the Florida Bar, subject only to the following title exceptions, none of which prevent residential
228 use of the Property: covenants, easements and restrictions of record; matters of plat; existing zoning and government regulations;
229 oil, gas and mineral rights of record if there is no right of entry; current taxes; mortgages that Buyer will assume; and
230 encumbrances that Seller will discharge at or before closing. Seller will, at least 2 days prior to closing, deliver to Buyer Seller's
231 choice of one of the following types of title evidence, which must be generally accepted in the county where the Property is located
232 (specify in Paragraph 5(c) the selected type). Seller will use option (1) in Palm Beach County and option (2) in Miami-Dade County.
233     **(1) A title insurance commitment** issued by a Florida-licensed title insurer in the amount of the purchase price and
234 subject only to title exceptions set forth in this Contract.
235     **(2) An existing abstract of title** from a reputable and existing abstract firm (if firm is not existing, then abstract must be
236 certified as correct by an existing firm) purporting to be an accurate synopsis of the instruments affecting title to the
237 Buyer (____) and Seller (____) acknowledge receipt of a copy of this page, which is Page 4 of 8 Pages.

FAR-9  Rev. 7/07 © 2007  Florida Association of Realtors®  All Rights Reserved
This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

Instanet forms

MROSEN - 000226

Property recorded in the public records of the county where the Property is located and certified to Effective Date. However, if such an abstract is not available to Seller, then a prior owner's title policy acceptable to the proposed insurer as a base for reissuance of coverage. Seller will pay for copies of all policy exceptions and an update in a format acceptable to Buyer's closing agent from the policy effective date and certified to Buyer or Buyer's closing agent, together with copies of all documents recited in the prior policy and in the update. If a prior policy is not available to Seller then (1) above will be the title evidence. Title evidence will be delivered no later than 10 days before Closing Date.

**(b) Title Examination:** Buyer will examine the title evidence and deliver written notice to Seller, within 5 days from receipt of title evidence but no later than Closing Date, of any defects that make the title unmarketable. Seller will have 30 days from receipt of Buyer's notice of defects ("Curative Period") to cure the defects at Seller's expense. If Seller cures the defects within the Curative Period, Seller will deliver written notice to Buyer and the parties will close the transaction on Closing Date or within 10 days from Buyer's receipt of Seller's notice if Closing Date has passed. If Seller is unable to cure the defects within the Curative Period, Seller will deliver written notice to Buyer and Buyer will, within 10 days from receipt of Seller's notice, either cancel this Contract or accept title with existing defects and close the transaction.

**(c) Survey:** Buyer may, at Buyer's expense, have the Property surveyed and deliver written notice to Seller, within 5 days from receipt of survey but no later than closing, of any encroachments on the Property, encroachments by the Property's improvements on other lands or deed restriction or zoning violations. Any such encroachment or violation will be treated in the same manner as a title defect and Buyer's and Seller's obligations will be determined in accordance with subparagraph (b) above.

## MISCELLANEOUS

**11. EFFECTIVE DATE; TIME; FORCE MAJEURE:**

**(a) Effective Date:** The "Effective Date" of this Contract is the date on which the last of the parties initials or signs and delivers the final offer or counteroffer. **Time is of the essence for all provisions of this Contract.**

**(b) Time:** All time periods will be computed in business days (a "business day" is every calendar day except Saturday, Sunday and national legal holidays). If any deadline falls on a Saturday, Sunday or national legal holiday, performance will be due the next business day. All time periods will end at 5:00 p.m. local time (meaning in the county where the Property is located) of the appropriate day.

**(c) Force Majeure:** Buyer or Seller shall not be required to perform any obligation under this Contract or be liable to each other for damages so long as the performance or non-performance of the obligation is delayed, caused or prevented by an act of God or force majeure. An "act of God" or "force majeure" is defined as hurricanes, earthquakes, floods, fire, unusual transportation delays, wars, insurrections and any other cause not reasonably within the control of the Buyer or Seller and which by the exercise of due diligence the non-performing party is unable in whole or in part to prevent or overcome. All time periods, including Closing Date, will be extended (not to exceed 30 days) for the period that the force majeure or act of God is in place. In the event that such "act of God" or "force majeure" event continues beyond the 30 days in this sub-paragraph, either party may cancel the Contract by delivering written notice to the other and Buyer's deposit shall be refunded.

**12. NOTICES:** All notices shall be in writing and will be delivered to the parties and Broker by mail, personal delivery or electronic media. Except for the notices required by Paragraph 3 of this Contract, Buyer's failure to deliver timely written notice to Seller, when such notice is required by this Contract, regarding any contingencies will render that contingency null and void and the Contract will be construed as if the contingency did not exist. Any notice, document or item delivered to or received by an attorney or licensee (including a transaction broker) representing a party will be as effective as if delivered to or by that party.

**13. COMPLETE AGREEMENT:** This Contract is the entire agreement between Buyer and Seller. Except for brokerage agreements, no prior or present agreements will bind Buyer, Seller or Broker unless incorporated into this Contract. Modifications of this Contract will not be binding unless in writing, signed or initialed and delivered by the party to be bound. Signatures, initials, documents referenced in this Contract, counterparts and written modifications communicated electronically or on paper will be acceptable for all purposes, including delivery, and will be binding. Handwritten or typewritten terms inserted in or attached to this Contract prevail over preprinted terms. If any provision of this Contract is or becomes invalid or unenforceable, all remaining provisions will continue to be fully effective. Buyer and Seller will use diligence and good faith in performing all obligations under this Contract. This Contract will not be recorded in any public records.

**14. ASSIGNABILITY; PERSONS BOUND:** Buyer may not assign this Contract without Seller's written consent. The terms "Buyer," "Seller," and "Broker" may be singular or plural. This Contract is binding on the heirs, administrators, executors, personal representatives and assigns (if permitted) of Buyer, Seller and Broker.

## DEFAULT AND DISPUTE RESOLUTION

**15. DEFAULT: (a) Seller Default:** If for any reason other than failure of Seller to make Seller's title marketable after diligent effort, Seller fails, refuses or neglects to perform this Contract, Buyer may choose to receive a return of Buyer's deposit without waiving the right to seek damages or to seek specific performance as per Paragraph 16. Seller will also be liable to Broker for the full amount of the brokerage fee. **(b) Buyer Default:** If Buyer fails to perform this Contract within the time specified, including timely payment of all deposits, Seller may choose to retain and collect all deposits paid and agreed to be paid as liquidated damages or to seek specific performance as

Buyer (_____) and Seller (_____) acknowledge receipt of a copy of this page, which is Page 5 of 8 Pages.

FAR-9     Rev. 10/2007     Florida Association of REALTORS®     All Rights Reserved
This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

*Instanet Forms*

per Paragraph 16; and Broker will, upon demand, receive 50% of all deposits paid and agreed to be paid (to be split equally among Broker) up to the full amount of the brokerage fee.

**16. DISPUTE RESOLUTION:** This Contract will be construed under Florida law. All controversies, claims and other matters in question arising out of or relating to this transaction or this Contract or its breach will be settled as follows:

    (a) Disputes concerning entitlement to deposits made and agreed to be made: Buyer and Seller will have 30 days from the date conflicting demands are made to attempt to resolve the dispute through **mediation**. If that fails, Escrow Agent will submit the dispute, if so required by Florida law, to Escrow Agent's choice of arbitration, a Florida court or the Florida Real Estate Commission ("FREC"). Buyer and Seller will be bound by any resulting award, judgment or order. A broker's obligation under Chapter 475, FS and the FREC rules to timely notify the FREC of an escrow dispute and timely resolve the escrow dispute through mediation, arbitration, interpleader or an escrow disbursement order, if the broker so chooses, applies to brokers only and does not apply to title companies, attorneys or other escrow companies.

    (b) All other disputes: Buyer and Seller will have 30 days from the date a dispute arises between them to attempt to resolve the matter through mediation, failing which the parties will resolve the dispute through neutral binding **arbitration** in the county where the Property is located. The arbitrator may not alter the Contract terms or award any remedy not provided for in this Contract. The award will be based on the greater weight of the evidence and will state findings of fact and the contractual authority on which it is based. If the parties agree to use discovery, it will be in accordance with the Florida Rules of Civil Procedure and the arbitrator will resolve all discovery-related disputes. Any disputes with a real estate licensee or firm named in Paragraph 19 will be submitted to arbitration only if the licensee's broker consents in writing to become a party to the proceeding. This clause will survive closing.

    (c) Mediation and Arbitration; Expenses: "Mediation" is a process in which parties attempt to resolve a dispute by submitting it to an impartial mediator who facilitates the resolution of the dispute but who is not empowered to impose a settlement on the parties. Mediation will be in accordance with the rules of the American Arbitration Association ("AAA") or other mediator agreed on by the parties. The parties will equally divide the mediation fee, if any. "Arbitration" is a process in which the parties resolve a dispute by a hearing before a neutral person who decides the matter and whose decision is binding on the parties. Arbitration will be in accordance with the rules of the AAA or other arbitrator agreed on by the parties. Each party to any arbitration will pay its own fees, costs and expenses, including attorneys' fees, and will equally split the arbitrators' fees and administrative fees of arbitration.

### ESCROW AGENT AND BROKER

**17. ESCROW AGENT:** Buyer and Seller authorize Escrow Agent to receive, deposit and hold funds and other items in escrow and, subject to clearance, disburse them upon proper authorization and in accordance with Florida law and the terms of this Contract, including disbursing brokerage fees. The parties agree that Escrow Agent will not be liable to any person for misdelivery of escrowed items to Buyer or Seller, unless the misdelivery is due to Escrow Agent's willful breach of this Contract or gross negligence. If Escrow Agent interpleads the subject matter of the escrow, Escrow Agent will pay the filing fees and costs from the deposit and will recover reasonable attorneys' fees and costs to be paid from the escrowed funds or equivalent and charged and awarded as court costs in favor of the prevailing party. All claims against Escrow Agent will be arbitrated, so long as Escrow Agent consents to arbitrate.

**18. PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify all facts and representations that are important to them and to consult an appropriate professional for legal advice (for example, interpreting contracts, determining the effect of laws on the Property and transaction, status of title, foreign investor reporting requirements, the effect of property lying partially or totally seaward of the coastal construction control line, etc.) and for tax, property condition, environmental and other specialized advice. Buyer acknowledges that Broker does not reside in the Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or public records. Buyer agrees to rely solely on Seller, professional inspectors and governmental agencies for verification of the Property condition, square footage and facts that materially affect Property value. Buyer and Seller respectively will pay all costs and expenses, including reasonable attorneys' fees at all levels, incurred by Broker and Broker's officers, directors, agents and employees in connection with or arising from Buyer's or Seller's misstatement or failure to perform contractual obligations. Buyer and Seller hold harmless and release Broker and Broker's officers, directors, agents and employees from all liability for loss or damage based on (1) Buyer's or Seller's misstatement or failure to perform contractual obligations; (2) Broker's performance, at Buyer's and/or Seller's request, of any task beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral, recommendation or retention of any vendor; (3) products or services provided by any vendor; and (4) expenses incurred by any vendor. Buyer and Seller each assume full responsibility for selecting and compensating their respective vendors. This paragraph will not relieve Broker of statutory obligations. For purposes of this paragraph, Broker will be treated as a party to this Contract. This paragraph will survive closing.

**19. BROKERS:** The licensee(s) and brokerage(s) named below are collectively referred to as "Broker." **Instruction to Closing Agent:** Seller and Buyer direct closing agent to disburse at closing the full amount of the brokerage fees as specified in separate brokerage agreements with the parties and cooperative agreements between the brokers, except to the extent Broker has retained such fees from the escrowed funds. In the absence of such brokerage agreements, closing agent will disburse brokerage fees as indicated below. This paragraph will not be used to modify any MLS or other offer of compensation made by Seller or listing broker to cooperating brokers.

*Instanet forms*

Buyer (    ) and Seller (    ) acknowledge receipt of a copy of this page, which is Page 6 of 8 Pages.

FAR-9    © 2007  Florida Association of REALTORS®  All Rights Reserved
This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

MROSEN - 000228

| | |
|---|---|
| 354'    Michael Silverman | Realty Assoc. Luxury Partners |
| 355 *Selling Sales Associate/License No.* | *Selling Firm/Brokerage Fee: ($ or % of Purchase Price)*   $16520.00 |
| 356'    Tipton,Birmingham and Berk | Prudential & Addison Mizner |
| 357 *Listing Sales Associate/License No.* | *Listing Firm/Brokerage fee: ($ or % of Purchase Price)*   2% |

**ADDENDA AND ADDITIONAL TERMS**

358

359 **20. ADDENDA:** The following additional terms are included in the attached addenda and incorporated into this Contract (check if
360 applicable):

361' ☐ A. Condo. Assn.    ☐ H. As Is w/Right to Inspect    ☐ O. Interest-Bearing Account    ☒ V. Prop. Disclosure Stmt.
362' ☒ B. Homeowners' Assn.    ☐ I. Inspections    ☐ P. Back-up Contract    ☐ W. FIRPTA
363' ☒ C. Seller Financing    ☐ J. Insulation Disclosure    ☐ Q. Broker - Pers. Int. in Prop.    ☐ X. 1031 Exchange
364' ☐ D. Mort. Assumption    ☐ K. Pre-1978 Housing Stmt. (LBP)    ☐ R. Rentals    ☐ Y. Additional Clauses
365' ☐ E. FHA Financing    ☐ L. Insurance    ☐ S. Sale/Lease of Buyer's Property
366' ☐ F. VA Financing    ☐ M. Housing Older Persons    ☐ T. Rezoning    ☐ Other_____
367' ☐ G. New Mort. Rates    ☐ N. Lease purchase/Lease option    ☐ U. Assignment    ☐ Other_____

368' **21. ADDITIONAL TERMS:**
369' Buyer and seller acknowledge that the subject property has "Chinese
370' Drywall" and the house will have to be gutted and rebuilt
371' inside. Therefore, the only items subject to inspection are as follows:
372' All items on the exterior of the house - all items in the garage - the
373' roof - and truss system -(both roof and second floor) - and the windows.
374'

375' The buyer shall have access to the house during the contract period
376' for the purpose of meeting with architects and builders.
377'

378' The seller will help to facilitate the process by signing applications
379' for permits as needed.  All fees etc. are the sole responsibility of the
380' buyer.
381'

382'

383' The buyer may choose to close earlier, and may select a date prior to
384' December 21, 2009 with 5 days notice.
385'

386' The buyers acknowledge that the sellers, realtors and real estate
387' brokerage companies do not have any responsibility for curing the
388' "Chinese Drywall Syndrome." The buyers completely release the sellers,
389' realtors, and real estate brokerage companies of any and all liability
390' for the physical condition of the house effective upon closing. Buyers
391' agree to sign a release at closing
392'

393' The seller shall have the right to remove all the appliances from the
394' kitchen and laundry room prior to closing.  The seller shall have the
395' right to remove the kitchen and butler's pantry cabinets and
396' countertops.  The seller shall have the right to remove all of the wood
397' trim in the house - this includes all moldings and wood wall treatments
398' - crown - baseboard - door trims etc. The seller may take any of the
399' children's room fabric valances and drapes. The seller is responsible
400' for insuring that the window treatments,windows,flooring and studs are
401' not damaged in this process.
402'

403'

404' The seller will pay up to a maximum of $4130 of the referral fee due
405' Prudential from Realty Associates.
406'

407'

408'

409'

410' Buyer (    ) and Seller (    ) acknowledge receipt of a copy of this page, which is Page 7 of 8 Pages.

FAR-9   7/07 © 2007 Florida Association of REALTORS®   All Rights Reserved
This software is licensed to (Michael Silverman - Realty Assoc. Luxury Partners) www.transactiondesk.com.
Instanet forms

MROSEN - 000229

411   This is intended to be a legally binding contract. If not fully understood, seek the advice of an attorney prior to signing.

412                                      OFFER AND ACCEPTANCE
413* (Check if applicable: ❑ Buyer received a written real property disclosure statement from Seller before making this Offer.)
414  Buyer offers to purchase the Property on the above terms and conditions. Unless this Contract is signed by Seller and a copy
415* delivered to Buyer no later than ___5:00___ ❑ a.m.☒ p.m. on __November___16th___, _2009_, this offer will be revoked
416  and Buyer's deposit refunded subject to clearance of funds.

417                                    COUNTER OFFER/REJECTION
418* ❑ Seller counters Buyer's offer (to accept the counter offer, Buyer must sign or initial the counter offered terms and deliver a copy
419  of the acceptance to Seller. Unless otherwise stated, the time for acceptance of any counteroffers shall be 2 days from the
420* date the counter is delivered. ❑ Seller rejects Buyer's offer.

421* Date: __11/15/09__        Buyer: _____
422*                           Print name: _____ Donna Shukow

423* Date: __11/15/09__        Buyer: _____
424* Phone: _____    Print name: _____ Allen Shukow
425* Fax: _____      Address: _____
426* E-mail: _____

427* Date: __11/15/09__        Seller: _____
428*                           Print name: _____ Robyn M. Rosen

429* Date: __11/15/09__        Seller: _____
430* Phone: _____    Print name: _____ Michael Rosen
431* Fax: _____      Address: _____
432* E-mail: _____

433* | Effective Date: __11/15/09__   (The date on which the last party signed or initialed and delivered the final offer or counteroffer.) |

434* Buyer _____ and Seller _____ acknowledge receipt of a copy of this page, which is Page 8 of 8 Pages.

The Florida Association of REALTORS and local Board/Association of REALTORS make no representation as to the legal validity or adequacy of any provision of this form in any specific transaction. This standardized form should not be used in complex transactions or with extensive riders or additions. This form is available for use by the entire real estate industry and is not intended to identify the user as a REALTOR. REALTOR is a registered collective membership mark that may be used only by real estate licensees who are members of the National Association of REALTORS and who subscribe to its Code of Ethics.

The copyright laws of the United States (17 U.S. Code) forbid the unauthorized reproduction of blank forms by any means including facsimile or computerized forms.
FAR-9   4/07   © 2007   Florida Association of REALTORS   All Rights Reserved

This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

Instanet forms

MROSEN - 000230

1 The clause below will be incorporated into the Contract between _____ Robyn M. and Michael Rosen H/W _____ (Seller)
2 and _____ Donna and Allen Shukow - H/W _____ (Buyer) concerning the Property described as
3 __ 17538 Middlebrook _____ Boca Raton _____ FL ____ 33496 ____ only if initialed by all parties:

4 _____ B. Homeowners' Association: The Property is located in a community with a ☐ voluntary
5 ☐ mandatory (see the disclosure summary below) homeowners' association ("Association"). Seller's warranty under
6 Paragraph 8 of the Contract and risk of loss under Paragraph 9 or Paragraph H of the Comprehensive Addendum (if
7 applicable) extend only to the Property and does not extend to common areas or facilities described below.
8 **Notice:** Association documents may be obtained from the county record office or, if not public record, from the developer or
9 Association manager. The Property may be subject to recorded restrictive covenants governing the use and occupancy of
10 properties in the community and may be subject to special assessments.
11 **(1) Association Approval:** If the Association documents give the Association the right to approve Buyer as a purchaser, this
12 Contract is contingent on such approval by the Association. **Buyer** will apply for approval within _____ days from Effective
13 Date (5 days if left blank) and use diligent effort to obtain approval, including making personal appearances and paying
14 related fees if required. **Buyer** and **Seller** will sign and deliver any documents required by the Association to complete the
15 transfer. If **Buyer** is not approved, this Contract will terminate and **Seller** will return **Buyer's** deposit unless this Contract
16 provides otherwise.
17 **(2) Right of First Refusal:** If the Association has a right of first refusal to buy the Property, this Contract is contingent on the
18 Association deciding not to exercise such right. **Seller** will, within 3 days from receipt of the Association's decision, give
19 **Buyer** written notice of the decision. If the Association exercises its right of first refusal, this Contract will terminate, **Buyer's**
20 deposit will be refunded unless this Contract provides otherwise and **Seller** will pay Broker's full commission at closing in
21 recognition that Broker procured the sale.
22 **(3) Fees:** Buyer will pay any application, transfer and initial membership fees charged by the Association. **Seller** will pay all
23 fines imposed against the Property as of Closing Date and any fees the Association charges to provide information about its
24 fees or the Property, and will bring maintenance and similar periodic fees and rents on any recreational areas current as of
25 Closing Date. If, after the Effective Date, the Association imposes a special or other assessment for improvements, work or
26 services, **Seller** will pay all amounts due before Closing Date and **Buyer** will pay all amounts due after Closing Date. If special
27 assessments may be paid in installments ☒ Buyer ☐ Seller (if left blank, Buyer) shall pay installments due after Closing Date. If Seller
28 is checked, Seller will pay the assessment in full prior to or at the time of Closing. **Seller** represents that he/she is not aware of any
29 pending special or other assessment that the Association is considering except as follows:

30 $ _____ per _____ to _____ None
31 The following dues/maintenance fees are currently charged by the homeowners' association:
32 $ ___ 654.00 ___ per __ month __ to _____ HOA
33 $ _____ per _____ to _____
34 $ _____ per _____ to _____

35 **(4) Damage to Common Elements:** If any portion of the common element is damaged due to fire, hurricane or other casualty before
36 closing, either party may cancel the Contract and Buyer's deposit shall be refunded if (a) as a result of damage to the common
37 elements, the Property appraises below the purchase price and either the parties cannot agree on a new purchase price or **Buyer**
38 elects not to proceed, or (b) the Association cannot determine the assessment attributable to the Property for the damage at least 5
39 days prior to Closing Date, or (c) the assessment determined or imposed by the Association attributable to the Property for the
40 damage to the common element is greater than $ _____ or % _____ of the purchase price (1.5% if left blank).
41 **(5) Disclosure Summary for Mandatory Associations:** IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401,
42 FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS
43 CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BY DELIVERING TO **SELLER** OR SELLER'S AGENT OR
44 REPRESENTATIVE WRITTEN NOTICE OF THE **BUYER'S** INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE
45 DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THIS
46 VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING.

47 Disclosure Summary For (Name of Community) _____ The Oaks of Boca Raton _____ :
48 (1) AS A PURCHASER OF PROPERTY IN THIS COMMUNITY, YOU WILL BE OBLIGATED TO BE A MEMBER OF A
49 HOMEOWNERS' ASSOCIATION.
50 (2) THERE HAVE BEEN OR WILL BE RECORDED RESTRICTIVE COVENANTS GOVERNING THE USE
51 AND OCCUPANCY OF PROPERTIES IN THIS COMMUNITY.
52 (3) YOU WILL BE OBLIGATED TO PAY ASSESSMENTS TO THE ASSOCIATION. ASSESSMENTS MAY BE SUBJECT TO
53 PERIODIC CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS $ ___ 654.00 ___ PER __ Month __.
54 YOU WILL ALSO BE OBLIGATED TO PAY ANY SPECIAL ASSESSMENTS IMPOSED BY THE ASSOCIATION. SUCH

(See Continuation)

56 Buyer ( _____ ) and Seller ( _____ ) acknowledge receipt of a copy of this page. Page _____ of Addendum No. _____

57 FARA-10   1/07   © 2009  Florida Association of REALTORS®   All Rights Reserved
This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

Instanet forms

MROSEN - 000231

58* _____ (____) - (_____) B. Homeowners' Association (CONTINUATION)

59 SPECIAL ASSESSMENTS MAY BE SUBJECT TO CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS
60* $_____ PER _____none_____.
61 (4) YOU MAY BE OBLIGATED TO PAY SPECIAL ASSESSMENTS TO THE RESPECTIVE MUNICIPALITY, COUNTY, OR
62 SPECIAL DISTRICT. ALL ASSESSMENTS ARE SUBJECT TO PERIODIC CHANGE.
63 (5) YOUR FAILURE TO PAY SPECIAL ASSESSMENTS OR ASSESSMENTS LEVIED BY A MANDATORY HOMEOWNERS'
64 ASSOCIATION COULD RESULT IN A LIEN ON YOUR PROPERTY.
65 (6) THERE MAY BE AN OBLIGATION TO PAY RENT OR LAND USE FEES FOR RECREATIONAL OR OTHER COMMONLY
66 USED FACILITIES AS AN OBLIGATION OF MEMBERSHIP IN THE HOMEOWNERS' ASSOCIATION. IF APPLICABLE, THE
67* CURRENT AMOUNT IS $_____ PER _____None_____.
68 (7) THE DEVELOPER MAY HAVE THE RIGHT TO AMEND THE RESTRICTIVE COVENANTS WITHOUT THE APPROVAL
69 OF THE ASSOCIATION MEMBERSHIP OR THE APPROVAL OF THE PARCEL OWNERS.
70 (8) THE STATEMENTS CONTAINED IN THIS DISCLOSURE FORM ARE ONLY SUMMARY IN NATURE, AND, AS A
71 PROSPECTIVE PURCHASER, YOU SHOULD REFER TO THE COVENANTS AND THE ASSOCIATION GOVERNING
72 DOCUMENTS BEFORE PURCHASING PROPERTY.
73 (9) THESE DOCUMENTS ARE EITHER MATTERS OF PUBLIC RECORD AND CAN BE OBTAINED FROM THE RECORD
74 OFFICE IN THE COUNTY WHERE THE PROPERTY IS LOCATED, OR ARE NOT RECORDED AND CAN BE OBTAINED
75 FROM THE DEVELOPER.

76 Buyer acknowledges receipt of this summary before signing this Contract.

77* _____    11/15/09    _____    11/15/09
78 Buyer                        Date        Buyer                       Date

79 Buyer (____) (____) and Seller (_____) acknowledge receipt of a copy of this page.
80* FARA-10   1/09   © 2009  Florida Association of Realtors®   All Rights Reserved          Page ____ of Addendum No.____

This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

Instanet forms

MROSEN - 000232

1* The clause below will be incorporated into the Contract between _____ Robyn M. and Michael Rosen H/W _____ (Seller)

2* and _____ Donna and Allen Shukow - H/W _____ (Buyer) concerning the Property described as _____ Boca Raton FL 33496 only if initialed by all parties:

3* 17538 Middlebrook

4* (___) (___) - (___) V. **Property Disclosure Statement:** This offer is contingent on Seller completing, signing and

5 delivering to Buyer a written real property disclosure statement within 3 days from Effective Date. If the statement discloses any

6 material information about the Property that is unacceptable to Buyer, Buyer may cancel this Contract by written notice to

7 Seller within 3 days from receipt of Seller's written statement.

8* Buyer (___) (___) and Seller (___) acknowledge receipt of a copy of this page.

9* FARA-10   1/09   © 2009   Florida Association of REALTORS®   All Rights Reserved   Page _____ of Addendum No. _____

This software is licensed to [Michael Silverman - Realty Assoc. Luxury Partners] www.transactiondesk.com.

*Instanet forms*

MROSEN - 000233

# INSPECTION REPORT
# 08/30/2009

The following inspection was conducted on 8/30/09:


2        MICHAEL ROSEN                         (CLIENT)
         17538 MIDDLEBROOK WAY
         BOCA RATON, FLORIDA

         Builder: ALBANESE-POPKIN
         (ESI DID NOT ATTEND INSPECTION)
         Inspection photographed
         Evidence collected- Ground wire and drywall samples
         Evidence of contaminated drywall found in residence.
         A/C coils black.
         A/C high pressure line black.
         All ground wires checked on the 2nd floor show no signs of
         corrosion.
         All ground wires checked on the first floor are black.
         Sulfur odor only on first floor.
         No pitting in faucets
         No blackening in mirrors.
         Over 40 holes opened in different walls throughout the home.
         Only found National Gypsum Grid Marx in 2nd floor walls.

         Found the following boards on the first floor:
                  1- KNAUF
                     Found in 1st floor guest bathroom wall behind sink.
                  2- Drywall 4 feet x 12 feet x ½ inch
                     This board was found in several locations mixed in with
                     National Gypsum Gridmarx

                              9297 INSPECTIONS 083009
                              **JAVIER YANES**

MROSEN -000234

### MICHAEL AND ROBIN ROSEN'S CHINESE DRYWALL
### DAMAGES CHART

| Item/Cost/Vendor | Description | Amount |
|---|---|---|
| Home Depot | Capital Improvements | $8.38 |
| Salty's Plumbing | Plumbing | $441.00 |
| Thanks-A-Lock | Moving, delivering and installing safe to alternative living residence. | $148.00 |
| Joe Bonnie & Sons Moving & Storage | Moving expense to alternative living residence. | $5,857.00 |
| X-Pert Carpet Care | Cleaning of rugs and furnishings. | $1,425.00 |
| Climate Control Services | HVAC repairs | To be provided |
| Joe Bonnie & Sons Moving & Storage | Packing for move to alternative living residence. | $2,465.75 |
| Tech Air of Westgate, Inc. | A/C Maintenance and Repair | $435.00 |
| Gervis Design | Repair and replacement of sideboard and hardware due to CDW | $199.13 |
| Kinderguard Pool Fence | Capital Improvements | $1,145.00 |
| Posh French Cleaners | Cleaning of personal effects due to CDW | $25.00<br>$25.89<br>$54.99<br>$739.29<br>$104.29<br>$7.15<br>$55.26<br>$51.60 |
| Best Buy | Replacement of damages electronics | $1,907.99<br>$1,889.99 |
| Potomac Garage Solutions | Capital Improvements | $12,465.00 |
| Closet Systems | Capital Improvements | $10,385.00 |
| Turkell & Gervis Design | Capital Improvements | $182,470.60 |
| Rance Masheck | Lease Payment | $41,600.00 |
| Chase Bank | Mortgage Payments | $147,760.00 |
| | **TOTAL:** | $411,666.31 |

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others similarly
situated,

       Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG
TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN
PLASTERBOARD CO., LTD., et al.,

      Defendants.

_____/

## CLAIMANTS MICHAEL AND ROBYN ROSEN'S ANSWERS TO DEFENDANTS TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN  PLASTERBOARD COMPANY, LTD. AND BNBM PLC'S INTERROGATORIES

Pursuant to by Fed. R. Civ. P. 26 and 33 and LR 26.1(g) and as required by Fed. R. Civ. P.

26(e), Claimants Michael and Robyn Rosen hereby serve answers to Defendants Taishan Gypsum

Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd., and BNBM PLC (collectively

"Defendants"), interrogatories propounded on November 16, 2018.

Dated: December 4, 2018             Respectfully submitted,

                          /s/ Patrick S. Montoya, Esq.
                          Patrick Shanan Montoya
                          Fla. Bar No. 0524441
                          Email: Patrick@colson.com
                          Colson Hicks Eidson
                          255 Alhambra Circle, PH
                          Coral Gables, FL  33134-2351
                          Telephone:  (305) 476-7400
                          Facsimile:  (305) 476-7444
                          *Interim Lead Counsel for Plaintiffs*

**CLAIMANTS MICHAEL AND ROBYN ROSEN'S ANSWERS TO DEFENDANT
TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN PLASTERBOARD
COMPANY, LTD'. AND BNBM PLC'S INTERROGATORIES**

1. Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

   **ANSWER:** We are seeking all compensatory damages, including, but not limited to personal property costs and alternative living expenses, lost equity (including down payments, mortgage payments and capital improvements), remediation damages as determined the Court, diminution in value, loss of use and enjoyment, punitive damages and pre-judgment interest. Please see attached chart reflecting liquidated damages for alternative living expenses, personal property and capital improvements. The amount of diminution in value and lost equity will be quantified by an expert. Loss of use and enjoyment damages and punitive damages will be determined by the jury. Pre-judgment interest will be determined by the Court as a post-judgment ministerial matter.

2. Did you ever vacate the Property because of Chinese Drywall?

   **ANSWER:** Yes. Our fear over potential bodily injuries, adverse health effects and the uninhabitable condition of the Property forced us to vacate our home to seek alternative housing.

   a. If so, identify the dates and location of your alternative residence.

      **ANSWER:** We leased from August of 2009 through March of 2010. The address of our alternative housing was 16056 Bristol Isle Way, Boca Raton, FL.

   b. If so, did you continue to make mortgage payments on the Property during the period(s) of alternative residence?

      **ANSWER:** Yes. I continued to make full and timely mortgage payments until the date I was able to sell the Property in an attempt to mitigate losses caused by the defective Chinese drywall.

3. Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

**ANSWER:** No, we are not pursuing bodily injury claims caused or aggravated by Chinese Drywall. However, it was our fear over potential bodily injuries and adverse health effects that led to our vacating our home and having to seek alternative housing. This, coupled with the anxiety of our losses and the diminished value of our home, led to a substantial amount of emotional distress and exacerbated our loss of use and enjoyment of our home.

   a. If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

   **ANSWER:** Not applicable.

   b. If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

   **ANSWER:** Not applicable.

   c. If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

   **ANSWER:** Not applicable.

4. Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

**ANSWER:** While we are not pursuing bodily injury claims caused or aggravated by Chinese Drywall, we did suffer a number of physical symptoms while living in the house, including shortness of breath, eye irritation and respiratory problems. It was our fear over these symptoms, other potential bodily injuries and adverse health effects that led to our

vacating our home and having to seek alternative housing. This, coupled with the anxiety of our losses and the diminished value of our home, led to a substantial amount of emotional distress and exacerbated our loss of use and enjoyment of our home.

    a.  If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

       **ANSWER:** While we are not pursuing bodily injury claims caused or aggravated by Chinese Drywall, we did suffer a number of physical symptoms while living in the house, including shortness of breath, eye irritation and respiratory problems. This, coupled with the anxiety of our losses and the diminished value of our home, led to a substantial amount of emotional distress and exacerbated our loss of use and enjoyment of our home.

    b.  If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

       **ANSWER:** Not applicable.

    c.  If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

       **ANSWER:** Not applicable.

5.  If you contend that a short sale occurred as a result of damage to your Property, identify any lenders or mortgagees that had a security interest on the Property at any time during your ownership (to the extent not already identified in the Supplemental Plaintiff Profile Form).

**ANSWER:** My Property was sold through a sale in mitigation as a result of damage to the Property. My Property was not sold through a short sale. The property was purchased for $1,825,000.00. At the time of the sale, I had a 1st and 2nd mortgage with Choice Mortgage Bank totaling $879,820.21.

   a. If the Property was the subject of a short sale, identify the following (to the extent not already identified in the Supplemental Plaintiff Profile Form):

      i. Lender's name;

         **ANSWER:** Chase Mortgage Bank

      ii. Loan number;

         **ANSWER:** #:

      iii. Original loan/mortgage amount;

         **ANSWER:** $802,500.00

      iv. Date of original loan/mortgage;

         **ANSWER:** November 6, 2006

      v. The amount owed on the loan/mortgage at the date of short sale;

         **ANSWER:** Not applicable. **The Property was not sold in a short sale, but through a sale in mitigation** as the result of damage to the Property caused by defective Chinese drywall. That said, the amount owed on the mortgage was $879,820.21 and was satisfied at the time of sale.

      vi. Date of the short sale;

         **ANSWER:** Not applicable. **The Property was not sold in a short sale, but through a sale in mitigation** as the result of damage to the Property

caused by defective Chinese drywall. That said, the date of the Sale was December 4, 2009.

vii.  Short sale price.

**ANSWER:** Not applicable. **The Property was not sold in a short sale, but through a sale in mitigation** as the result of damage to the Property caused by defective Chinese drywall. That said, the sale price of the home was $876,000.00

b.  If you claim a diminution in value of the Property as a result of Chinese Drywall, identify the total amount of such diminution of value being claimed.

**ANSWER**:    Yes, we are making a claim for diminution of value of the home. The total amount of the diminution being claimed is the applicable amount pursuant to Florida law as determined by a jury.

## CERTIFICATE OF SERVICE

I hereby certify that on this day, December 4, 2018, I caused the foregoing Answers to Defendants' First Set of Interrogatories to be served on counsel below listed by uploading the same to the Brown Greer Chinese Drywall Portal.

Craig P. Kalil, Esquire
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue, Suite 2250
Miami, FL 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929
Email: ckalil@aballi.com

L. Christopher Vejnoska, Esquire
Eric Matthew Hairston, Esquire
Andrew Davidson, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA  94105
Telephone: (415) 773-5700
Email: cvejnoska@orrick.com
       ehairston@orrick.com
       adavidson@orrick.com

James L. Stengel, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Email: jstengel@orrick.com

*Attorneys for Beijing New Building Materials Public Limited Company*

Enjolique D. Aytch, Esquire
AKERMAN LLP
Las Olas Centre II – Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: enjolique.aytch@akerman.com

Bernard Taylor, Esquire
Michael P. Kenny, Esquire

Christina Hull Eikhoff, Esquire
David Venderbush, Esquire
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**Case No. 1:11-CV-22408-MGC**

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others similarly
situated,

     Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG
TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN
PLASTERBOARD CO., LTD., et al.,

     Defendants.

_____/

## CLAIMANT MICHAEL ROSEN'S ANSWERS TO DEFENDANTS TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN PLASTERBOARD COMPANY, LTD. AND BNBM PLC'S INTERROGATORIES

Pursuant to by Fed. R. Civ. P. 26 and 33 and LR 26.1(g) and as required by Fed. R. Civ.

P. 26(e), Claimant Michael Rosen hereby serves answers to Defendants Taishan Gypsum

Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd., and BNBM PLC (collectively

"Defendants"), interrogatories propounded on November 16, 2018.

Dated: November 30, 2018       Respectfully submitted,

          /s/ Patrick S. Montoya, Esq.
          Patrick Shanan Montoya
          Fla. Bar No. 0524441
          Email: Patrick@colson.com
          Colson Hicks Eidson
          255 Alhambra Circle, PH
          Coral Gables, FL 33134-2351
          Telephone: (305) 476-7400
          Facsimile: (305) 476-7444
          *Interim Lead Counsel for Plaintiffs*

**CLAIMANT MICHAEL ROSEN'S ANSWERS TO DEFENDANT TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN PLASTERBOARD COMPANY, LTD'. AND BNBM PLC'S INTERROGATORIES**

1.  Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

    **ANSWER:** We are seeking all compensatory damages, including, but not limited to personal property costs and alternative living expenses, lost equity (including down payments, mortgage payments and capital improvements), remediation damages as determined the Court, diminution in value, loss of use and enjoyment, punitive damages and pre-judgment interest. Please see attached chart reflecting liquidated damages for alternative living expenses, personal property and capital improvements. The amount of diminution in value and lost equity will be quantified by an expert. Loss of use and enjoyment damages and punitive damages will be determined by the jury. Pre-judgment interest will be determined by the Court as a post-judgment ministerial matter.

2.  Did you ever vacate the Property because of Chinese Drywall?

    **ANSWER:** Yes. Our fear over potential bodily injuries, adverse health effects and the uninhabitable condition of the Property forced us to vacate our home to seek alternative housing.

    a.  If so, identify the dates and location of your alternative residence.

        **ANSWER:** We leased from August of 2009 through March of 2010. The address of our alternative housing was 16056 Bristol Isle Way, Boca Raton, FL.

    b.  If so, did you continue to make mortgage payments on the Property during the period(s) of alternative residence?

ANSWER: Yes. I continued to make full and timely mortgage payments until the date I was able to sell the Property in an attempt to mitigate losses caused by the defective Chinese drywall.

3. Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

ANSWER: No, we are not pursuing bodily injury claims caused or aggravated by Chinese Drywall. However, it was our fear over potential bodily injuries and adverse health effects that led to our vacating our home and having to seek alternative housing. This, coupled with the anxiety of our losses and the diminished value of our home, led to a substantial amount of emotional distress and exacerbated our loss of use and enjoyment of our home.

   a. If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

   ANSWER: Not applicable.

   b. If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

   ANSWER: Not applicable.

   c. If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

   ANSWER: Not applicable.

4. Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

3

**ANSWER:** While we are not pursuing bodily injury claims caused or aggravated by Chinese Drywall, we did suffer a number of physical symptoms while living in the house, including shortness of breath, eye irritation and respiratory problems. It was our fear over these symptoms, other potential bodily injuries and adverse health effects that led to our vacating our home and having to seek alternative housing. This, coupled with the anxiety of our losses and the diminished value of our home, led to a substantial amount of emotional distress and exacerbated our loss of use and enjoyment of our home.

a.  If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

    **ANSWER:** While we are not pursuing bodily injury claims caused or aggravated by Chinese Drywall, we did suffer a number of physical symptoms while living in the house, including shortness of breath, eye irritation and respiratory problems. This, coupled with the anxiety of our losses and the diminished value of our home, led to a substantial amount of emotional distress and exacerbated our loss of use and enjoyment of our home.

b.  If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

    **ANSWER:** Not applicable.

c.  If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

    **ANSWER:** Not applicable.

4

5. If you contend that a short sale occurred as a result of damage to your Property, identify any lenders or mortgagees that had a security interest on the Property at any time during your ownership (to the extent not already identified in the Supplemental Plaintiff Profile Form).

**ANSWER:** My Property was sold through a sale in mitigation as a result of damage to the Property. My Property was not sold through a short sale. The property was purchased for $1,825,000.00. At the time of the sale, I had a 1st and 2nd mortgage with Choice Mortgage Bank totaling $879,820.21.

    a. If the Property was the subject of a short sale, identify the following (to the extent not already identified in the Supplemental Plaintiff Profile Form):

        i. Lender's name;

        **ANSWER:** Chase Mortgage Bank

        ii. Loan number;

        **ANSWER:** #:

        iii. Original loan/mortgage amount;

        **ANSWER:** $802,500.00

        iv. Date of original loan/mortgage;

        **ANSWER:** November 6, 2006

        v. The amount owed on the loan/mortgage at the date of short sale;

        **ANSWER:** Not applicable. **The Property was not sold in a short sale, but through a sale in mitigation** as the result of damage to the Property caused by defective Chinese drywall. That said, the amount owed on the mortgage was $879,820.21 and was satisfied at the time of sale.

5

vi. Date of the short sale;

**ANSWER:** Not applicable. **The Property was not sold in a short sale, but through a sale in mitigation** as the result of damage to the Property caused by defective Chinese drywall. That said, the date of the Sale was December 4, 2009.

vii. Short sale price.

**ANSWER:** Not applicable. **The Property was not sold in a short sale, but through a sale in mitigation** as the result of damage to the Property caused by defective Chinese drywall. That said, the sale price of the home was $876,000.00

b. If you claim a diminution in value of the Property as a result of Chinese Drywall, identify the total amount of such diminution of value being claimed.

**ANSWER:** Yes, we are making a claim for diminution of value of the home. The total amount of the diminution being claimed is the applicable amount pursuant to Florida law as determined by a jury.

STATE OF FLORIDA )
                              )SS:
COUNTY OF Miami-Dade )

BEFORE ME, a Notary Public, duly authorized and administered to take oaths,

personally appeared Michael Rosen who is personally known to me or who has produced

_____ as identification and who did/did not take an oath, and says that the

following Answers to Interrogatories are true and correct to the best of his/her knowledge, and

that he/she has read the Answers to Interrogatories and knows the contents thereof.

SWORN TO AND SUBSCRIBED before me this 30 day of November 2018.

Affiant:

sign _____

print Michael Rosen

Notary Public:

sign _____

print Belkis Ferrer

State of Florida at Large (Seal)

My Commission Expire

7

BELKIS FERRER
Notary Public - State of Florida
Commission # GG 001885
My Comm. Expires Jun 14, 2020
Bonded through National Notary Assn

BELKIS FERRER
Notary Public - State of Florida
Commission # GG 091805
My Comm. Expires Jun 14, 202...
Bonded through National Notary Assn.

## CERTIFICATE OF SERVICE

I hereby certify that on this day, November 30, 2018, I caused the foregoing Answers to

Defendants' First Set of Interrogatories to be served on counsel below listed by uploading the same

to the Brown Greer Chinese Drywall Portal.

Craig P. Kalil, Esquire
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue, Suite 2250
Miami, FL 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929
Email: ckalil@aballi.com

L. Christopher Vejnoska, Esquire
Eric Matthew Hairston, Esquire
Andrew Davidson, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA 94105
Telephone: (415) 773-5700
Email: cvejnoska@orrick.com
        ehairston@orrick.com
        adavidson@orrick.com

James L. Stengel, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Email: jstengel@orrick.com

*Attorneys for Beijing New Building Materials Public Limited Company*

Enjolique D. Aytch, Esquire
AKERMAN LLP
Las Olas Centre II – Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: enjolique.aytch@akerman.com

Bernard Taylor, Esquire
Michael P. Kenny, Esquire

8

Christina Hull Eikhoff, Esquire
David Venderbush, Esquire
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
     mike.kenny@alston.com
     christy.eikhoff@alston.com
     david.venderbush@alston.com

*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

          /s/ Patrick S. Montoya, Esq.
          Patrick Shanan Montoya
          Fla. Bar No. 0524441
          Email: Patrick@colson.com
          Colson Hicks Eidson
          255 Alhambra Circle, PH
          Coral Gables, FL 33134-2351
          Telephone: (305) 476-7400
          Facsimile: (305) 476-7444
          *Interim Lead Counsel for Plaintiffs*

# EXHIBIT B19

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all
others similarly situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A
SHANDONG TAIHE DONGXIN CO., LTD.;
TAIAN TAISHAN PLASTERBOARD CO., LTD., et
al.,

      Defendants.

_____/

## PRIORITY CLAIMANT LARRY WALLS' FIRST AMENDED ANSWERS TO INTERROGATORIES

PURSUANT TO Fed. R. Civ. P. 26 and 33 and LR 26.1(g), Plaintiff, Larry Walls, through Plaintiff's undersigned attorney, hereby responds to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd. and BNBM PLC (collectively "Defendants") Interrogatories as follows:

## INTERROGATORIES

1.    Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

    **ANSWER:**    We seek alternative living expenses from June 2010 through July 2014 of at least $88,640.96 and personal property damage expenses of at least $73,000.00, lost equity, diminution in value, loss of use and enjoyment, punitive damages, and pre-judgment interest. In addition, we seek remediation damages as determined by the Court. The total amount of diminution in value, loss of use and enjoyment, and punitive damages will be determined by the jury and pre-judgment interest by the Court as a post-judgment ministerial matter.



1

2.     Did you ever vacate the Property because of Chinese Drywall?

a.     If so, identify the dates and location of your alternative residence.

b.     If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**ANSWER:**     Yes, we vacated the Property because of Chinese Drywall. We feared that we would suffer from continued adverse health effects if we continued to live in the Chinese Drywall Property. We vacated the Property in June 2010 and moved to 1206 NW 37th Place, Cape Coral, FL 33993 until the present. The property at 1206 NW 37th Place, Cape Coral, FL 33993 was a rental property that we owned and had rented out for years. We had to let our tenant go so we could move into this property and lost $1,300.00 a month income. We had requested a Forbearance from our bank for the Van Buren property and were denied our request. We stopped paying our mortgage payments shortly after moving out of the Property into our rental property.

3.     Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

a.     If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

b.     If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

c.     If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**ANSWER:**     While we did not intend to pursue bodily injury claims arising from Chinese Drywall, we did suffer from nose bleeds, eye irritation, sinus infections, swollen joints, allergy attacks, swollen joints, itchy skin and respiratory problems while living in the Chinese Drywall Property. It was our fear of the long-term effects of living in the Chinese Drywall Property that caused us to leave the Property and find an alternative residence.

4.    Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

a.    If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

b.    If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

c.    If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

**ANSWER:**    While we are not pursuing bodily injury claims related to Chinese Drywall, we did suffer from nose bleeds, eye irritation, sinus infections, swollen joints, allergy attacks, swollen joints, itchy skin, fatigue and respiratory problems while living in the Chinese Drywall Property. It was our fear of the long-term effects of living in the Chinese Drywall Property that caused us to leave the Property and find an alternative residence.

5.    If you contend that a foreclosure occurred as a result of damage to your Property, identify any lenders or mortgagees that had a security interest on the Property at any time during your ownership (to the extent not already identified in the Supplemental Plaintiff Profile Form).

**ANSWER:**    Yes, we do contend that a foreclosure occurred as a result of damage to our property. Please see Supplemental Profile Form as well as documents produced.

6.    If the Property was the subject of a foreclosure, identify the following (to the extent not already identified in the Supplemental Plaintiff Profile Form):

a.    Lender's name;

b.    Loan number;

c.    Original loan/mortgage amount;

d.    Date of original loan/mortgage;

3

e.    The amount owed on the loan/mortgage at the date of foreclosure;

f.    Date of the foreclosure.

**ANSWER:** The Property was the subject of a foreclosure. Duetsche Bank National Trust Company, Trustee for American Home Mortgage Servicing, Inc. was the lender and the Loan number was 0031475114. Cost of home was $432,810.00, original loan/mortgage amount is $285,500.00 on 6/14/2005. $335,084.73 was the remaining amount of the mortgage. See documents produced.

This the 10th day of December 2018.

> */s/ Panagiotis V. Albanis*
> Panagiotis "Pete" V. Albanis
> Morgan & Morgan – Complex Litigation
> 12800 University Drive Suite 600
> Fort Myers, FL 33907
> Tel:    239-433-6880
> Fax:    239-433-6836
> palbanis@forthepeople.com
>
> *Attorney for Plaintiff*

4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **PRIORITY CLAIMANT LARRY WALLS' ANSWERS TO DEFENDANTS INTERROGATORIES** has been served on the following counsel via email:

Enjoliqué D. Aytch, Esq.
AKERMAN LLP
Las Olas Centre II - Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, Florida 33301
Tel: 954-463-2700
Fax: 954-463-2224
enjolique.aytch@akerman.com

Bernard Taylor, Esq.
Michael P. Kenny, Esq.
Christina Hull Eikhoff, Esq.
David Venderbush, Esq.
ALSTON & BIRD LLP
1201 West Peachtree Street Atlanta, Georgia 30309
Tel: 404-881-7000
Fax: 404-881-7777
bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Attorneys for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

Craig P Kalil
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue Suite 2250
Miami, FL 33131
Tel: 305-373-6600
Fax: 305-373-7929
ckalil@aballi.com

L. Christopher Vejnoska
Eric Matthew Hairston
Andrew K. Davidson
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700
cvejnoska@orrick.com

James L. Stengel
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel: 212-506-5000
jstengel@orrick.com

*Counsel for BNBM PLC*

This 10th day of December, 2018.

*/s/ Panagiotis V. Albanis*
Panagiotis "Pete" V. Albanis

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all
others similarly situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A
SHANDONG TAIHE DONGXIN CO., LTD.;
TAIAN TAISHAN PLASTERBOARD CO., LTD., et
al.,

      Defendants.

_____/

## PRIORITY CLAIMANT LARRY WALLS' ANSWERS TO INTERROGATORIES

PURSUANT TO Fed. R. Civ. P. 26 and 33 and LR 26.1(g), Plaintiff, Larry Walls, through Plaintiff's undersigned attorney, hereby responds to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd. and BNBM PLC (collectively "Defendants") Interrogatories as follows:

## INTERROGATORIES

1.       Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

      **ANSWER:**       We seek alternative living expenses from June 2010 through July 2014 of at least $63,400.00 and personal property damage expenses of at least $73,000.00, lost equity, diminution in value, loss of use and enjoyment, punitive damages, and pre-judgment interest. In addition, we seek remediation damages as determined by the Court. The total amount of diminution in value, loss of use and enjoyment, and punitive damages will be determined by the jury and pre-judgment interest by the Court as a post-judgment ministerial matter.

2.      Did you ever vacate the Property because of Chinese Drywall?

        a.      If so, identify the dates and location of your alternative residence.

        b.      If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**ANSWER:**      Yes, we vacated the Property because of Chinese Drywall. We feared that we would suffer from continued adverse health effects if we continued to live in the Chinese Drywall Property. We vacated the Property in June 2010 and moved to 1206 NW 37th Place, Cape Coral, FL 33993 until the present. We had requested a forbearance from our bank and were denied our request. We stopped paying our mortgage payments shortly after moving out of the Property.

3.      Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

        a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

        b.      If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

        c.      If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**ANSWER:**      While we did not intend to pursue bodily injury claims arising from Chinese Drywall, we did suffer from nose bleeds, eye irritation, sinus infections, swollen joints, allergy attacks, swollen joints, itchy skin and respiratory problems while living in the Chinese Drywall Property. It was our fear of the long-term effects of living in the Chinese Drywall Property that caused us to leave the Property and find an alternative residence.

4.      Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

        a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

   b.  If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

   c.  If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

  **<u>ANSWER:</u>** While we are not pursuing bodily injury claims related to Chinese Drywall, we did suffer from nose bleeds, eye irritation, sinus infections, swollen joints, allergy attacks, swollen joints, itchy skin, fatigue and respiratory problems while living in the Chinese Drywall Property. It was our fear of the long-term effects of living in the Chinese Drywall Property that caused us to leave the Property and find an alternative residence.

  5.  If you contend that a foreclosure occurred as a result of damage to your Property, identify any lenders or mortgagees that had a security interest on the Property at any time during your ownership (to the extent not already identified in the Supplemental Plaintiff Profile Form).

  **<u>ANSWER:</u>**  Yes, we do contend that a foreclosure occurred as a result of damage to our property. Please see Supplemental Profile Form as well as documents produced.

  6.  If the Property was the subject of a foreclosure, identify the following (to the extent not already identified in the Supplemental Plaintiff Profile Form):

   a.  Lender's name;

   b.  Loan number;

   c.  Original loan/mortgage amount;

   d.  Date of original loan/mortgage;

   e.  The amount owed on the loan/mortgage at the date of foreclosure;

   f.  Date of the foreclosure.

  **<u>ANSWER:</u>** The Property was the subject of a foreclosure. Duetsche Bank National Trust Company, Trustee for American Home Mortgage Servicing, Inc. was the lender and the Loan number was 0031475114. Cost of home was

$432,810.00, original loan/mortgage amount is $285,500.00 on 6/14/2005.
$335,084.73 was the remaining amount of the mortgage. See documents produced.

This the 30th day of November 2018.

*/s/ Panagiotis V. Albanis*
Panagiotis "Pete" V. Albanis
Morgan & Morgan – Complex Litigation
12800 University Drive Suite 600
Fort Myers, FL 33907
Tel:   239-433-6880
Fax:   239-433-6836
palbanis@forthepeople.com

*Attorney for Plaintiff*

CERTIFICATE OF SERVICE

    The undersigned hereby certifies that a true and correct copy of the foregoing **PRIORITY CLAIMANT LARRY WALLS' ANSWERS TO DEFENDANTS INTERROGATORIES** has been served on the following counsel via email:

Enjoliqué D. Aytch, Esq.
AKERMAN LLP
Las Olas Centre II - Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, Florida 33301
Tel: 954-463-2700
Fax: 954-463-2224
enjolique.aytch@akerman.com

Bernard Taylor, Esq.
Michael P. Kenny, Esq.
Christina Hull Eikhoff, Esq.
David Venderbush, Esq.
ALSTON & BIRD LLP
1201 West Peachtree Street Atlanta, Georgia 30309
Tel: 404-881-7000
Fax: 404-881-7777
bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Attorneys for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

Craig P Kalil
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue Suite 2250
Miami, FL 33131
Tel: 305-373-6600
Fax: 305-373-7929
ckalil@aballi.com

L. Christopher Vejnoska
Eric Matthew Hairston
Andrew K. Davidson
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700
cvejnoska@orrick.com

James L. Stengel
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel: 212-506-5000
jstengel@orrick.com

*Counsel for BNBM PLC*

This 30th day of November, 2018.

/s/ Panagiotis V. Albanis
Panagiotis "Pete" V. Albanis

## VERIFICATION

I hereby affirm, under the penalty of perjury, that the foregoing responses to Defendants' Interrogatories propounded on November 16, 2018 are based on my personal knowledge, and are true and correct to the best of my knowledge, information, and belief.

Dated: 11/30/2018                                        By: _____

                                                              Larry Walls

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all
others similarly situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A
SHANDONG TAIHE DONGXIN CO., LTD.;
TAIAN TAISHAN PLASTERBOARD CO., LTD., et
al.,

      Defendants.

_____/

## PRIORITY CLAIMANT ROSALEE WALLS' FIRST AMENDED ANSWERS TO INTERROGATORIES

PURSUANT TO Fed. R. Civ. P. 26 and 33 and LR 26.1(g), Plaintiff, Rosalee Walls, through Plaintiff's undersigned attorney, hereby responds to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd. and BNBM PLC (collectively "Defendants") Interrogatories as follows:

## INTERROGATORIES

1.      Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

**ANSWER:**      We seek alternative living expenses from June 2010 through July 2014 of at least $88,640.96.00 and personal property damage expenses of at least $73,000.00, lost equity, diminution in value, loss of use and enjoyment, punitive damages, and pre-judgment interest. In addition, we seek remediation damages as determined by the Court. The total amount of diminution in value, loss of use and enjoyment, and punitive damages will be determined by the jury and pre-judgment interest by the Court as a post-judgment ministerial matter.

1

  2.  Did you ever vacate the Property because of Chinese Drywall?

    a.  If so, identify the dates and location of your alternative residence.

    b.  If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**<u>ANSWER:</u>**  Yes, we vacated the Property because of Chinese Drywall. We feared that we would suffer from continued adverse health effects if we continued to live in the Chinese Drywall Property. We vacated the Property in June 2010 and moved to 1206 NW 37th Place, Cape Coral, FL 33993 until the present. The property at 1206 NW 37th Place, Cape Coral, FL 33993 was a rental property that we owned and had rented out for years. We had to let our tenant go so we could move into this property and lost $1,300.00 a month income. We had requested a forbearance from our bank and were denied our request. We stopped paying our mortgage payments shortly after moving out of the Property.

  3.  Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

    a.  If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

    b.  If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

    c.  If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**<u>ANSWER:</u>**  While we did not intend to pursue bodily injury claims arising from Chinese Drywall, we did suffer from nose bleeds, eye irritation, sinus infections, swollen joints, allergy attacks, swollen joints, itchy skin and respiratory problems while living in the Chinese Drywall Property. It was our fear of the long-term effects of living in the Chinese Drywall Property that caused us to leave the Property and find an alternative residence.

  4.  Does anyone in your household claim to have suffered bodily injury

because of the Chinese Drywall?

        a.    If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

        b.    If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

        c.    If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

    **ANSWER:**    While we are not pursuing bodily injury claims related to Chinese Drywall, we did suffer from nose bleeds, eye irritation, sinus infections, swollen joints, allergy attacks, swollen joints, itchy skin, fatigue and respiratory problems while living in the Chinese Drywall Property. It was our fear of the long-term effects of living in the Chinese Drywall Property that caused us to leave the Property and find an alternative residence.

    5.    If you contend that a foreclosure occurred as a result of damage to your Property, identify any lenders or mortgagees that had a security interest on the Property at any time during your ownership (to the extent not already identified in the Supplemental Plaintiff Profile Form).

    **ANSWER:**    Yes, we do contend that a foreclosure occurred as a result of damage to our property. Please see Supplemental Profile Form as well as documents produced.

    6.    If the Property was the subject of a foreclosure, identify the following (to the extent not already identified in the Supplemental Plaintiff Profile Form):

        a.    Lender's name;

        b.    Loan number;

        c.    Original loan/mortgage amount;

        d.    Date of original loan/mortgage;

        e.    The amount owed on the loan/mortgage at the date of foreclosure;

       f.      Date of the foreclosure.

**ANSWER:**      The Property was the subject of a foreclosure. Duetsche Bank National Trust Company, Trustee for American Home Mortgage Servicing, Inc. was the lender and the Loan number was 0031475114. Cost of home was $432,810.00, original loan/mortgage amount is $285,500.00 on 6/14/2005. $335,084.73 was the remaining amount of the mortgage. See documents produced.

This the 10th day of December 2018.

*/s/ Panagiotis V. Albanis*
Panagiotis "Pete" V. Albanis
Morgan & Morgan – Complex Litigation
12800 University Drive Suite 600
Fort Myers, FL 33907
Tel:    239-433-6880
Fax:   239-433-6836
palbanis@forthepeople.com

*Attorney for Plaintiff*

4

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **PRIORITY CLAIMANT ROSALEE WALLS' ANSWERS TO DEFENDANTS INTERROGATORIES** has been served on the following counsel via email:

Enjoliqué D. Aytch, Esq.
AKERMAN LLP
Las Olas Centre II - Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, Florida 33301
Tel: 954-463-2700
Fax: 954-463-2224
enjolique.aytch@akerman.com

Bernard Taylor, Esq.
Michael P. Kenny, Esq.
Christina Hull Eikhoff, Esq.
David Venderbush, Esq.
ALSTON & BIRD LLP
1201 West Peachtree Street Atlanta, Georgia 30309
Tel: 404-881-7000
Fax: 404-881-7777
bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Attorneys for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

Craig P Kalil
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue Suite 2250
Miami, FL 33131
Tel: 305-373-6600
Fax: 305-373-7929
ckalil@aballi.com

L. Christopher Vejnoska
Eric Matthew Hairston
Andrew K. Davidson
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700
cvejnoska@orrick.com

James L. Stengel
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel: 212-506-5000
jstengel@orrick.com

*Counsel for BNBM PLC*

This 10th day of December, 2018.

/s/ Panagiotis V. Albanis
Panagiotis "Pete" V. Albanis

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all
others similarly situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A
SHANDONG TAIHE DONGXIN CO., LTD.;
TAIAN TAISHAN PLASTERBOARD CO., LTD., et
al.,

      Defendants.

_____/

## PRIORITY CLAIMANT ROSALEE WALLS' ANSWERS TO INTERROGATORIES

PURSUANT TO Fed. R. Civ. P. 26 and 33 and LR 26.1(g), Plaintiff, Rosalee Walls, through Plaintiff's undersigned attorney, hereby responds to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd. and BNBM PLC (collectively "Defendants") Interrogatories as follows:

## INTERROGATORIES

1.      Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

      **ANSWER:**      We seek alternative living expenses from June 2010 through July 2014 of at least $63,400.00 and personal property damage expenses of at least $73,000.00, lost equity, diminution in value, loss of use and enjoyment, punitive damages, and pre-judgment interest. In addition, we seek remediation damages as determined by the Court. The total amount of diminution in value, loss of use and enjoyment, and punitive damages will be determined by the jury and pre-judgment interest by the Court as a post-judgment ministerial matter.

1

2.　　　Did you ever vacate the Property because of Chinese Drywall?

　　　a.　　　If so, identify the dates and location of your alternative residence.

　　　b.　　　If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**ANSWER:**　　　Yes, we vacated the Property because of Chinese Drywall. We feared that we would suffer from continued adverse health effects if we continued to live in the Chinese Drywall Property. We vacated the Property in June 2010 and moved to 1206 NW 37th Place, Cape Coral, FL 33993 until the present. We had requested a forbearance from our bank and were denied our request. We stopped paying our mortgage payments shortly after moving out of the Property.

3.　　　Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

　　　a.　　　If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

　　　b.　　　If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

　　　c.　　　If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**ANSWER:**　　　While we did not intend to pursue bodily injury claims arising from Chinese Drywall, we did suffer from nose bleeds, eye irritation, sinus infections, swollen joints, allergy attacks, swollen joints, itchy skin and respiratory problems while living in the Chinese Drywall Property. It was our fear of the long-term effects of living in the Chinese Drywall Property that caused us to leave the Property and find an alternative residence.

4.　　　Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

　　　a.　　　If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in

part, because of Chinese Drywall.

      b.    If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

      c.    If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

> **ANSWER:**    While we are not pursuing bodily injury claims related to Chinese Drywall, we did suffer from nose bleeds, eye irritation, sinus infections, swollen joints, allergy attacks, swollen joints, itchy skin, fatigue and respiratory problems while living in the Chinese Drywall Property. It was our fear of the long-term effects of living in the Chinese Drywall Property that caused us to leave the Property and find an alternative residence.

5.    If you contend that a foreclosure occurred as a result of damage to your Property, identify any lenders or mortgagees that had a security interest on the Property at any time during your ownership (to the extent not already identified in the Supplemental Plaintiff Profile Form).

> **ANSWER:**    Yes, we do contend that a foreclosure occurred as a result of damage to our property. Please see Supplemental Profile Form as well as documents produced.

6.    If the Property was the subject of a foreclosure, identify the following (to the extent not already identified in the Supplemental Plaintiff Profile Form):

      a.    Lender's name;

      b.    Loan number;

      c.    Original loan/mortgage amount;

      d.    Date of original loan/mortgage;

      e.    The amount owed on the loan/mortgage at the date of foreclosure;

      f.    Date of the foreclosure.

> **ANSWER:**    The Property was the subject of a foreclosure. Duetsche Bank National Trust Company, Trustee for American Home Mortgage Servicing, Inc.

was the lender and the Loan number was 0031475114. Cost of home was $432,810.00, original loan/mortgage amount is $285,500.00 on 6/14/2005. $335,084.73 was the remaining amount of the mortgage. See documents produced.

This the 30th day of November 2018.

/s/ Panagiotis V. Albanis
Panagiotis "Pete" V. Albanis
Morgan & Morgan – Complex Litigation
12800 University Drive Suite 600
Fort Myers, FL 33907
Tel:    239-433-6880
Fax:    239-433-6836
palbanis@forthepeople.com

*Attorney for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing **PRIORITY CLAIMANT ROSALEE WALLS' ANSWERS TO DEFENDANTS INTERROGATORIES** has been served on the following counsel via email:

Enjoliqué D. Aytch, Esq.
AKERMAN LLP
Las Olas Centre II - Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, Florida 33301
Tel: 954-463-2700
Fax: 954-463-2224
enjolique.aytch@akerman.com

Bernard Taylor, Esq.
Michael P. Kenny, Esq.
Christina Hull Eikhoff, Esq.
David Venderbush, Esq.
ALSTON & BIRD LLP
1201 West Peachtree Street Atlanta, Georgia 30309
Tel: 404-881-7000
Fax: 404-881-7777
bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Attorneys for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

Craig P Kalil
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue Suite 2250
Miami, FL 33131
Tel: 305-373-6600
Fax: 305-373-7929
ckalil@aballi.com

5

L. Christopher Vejnoska
Eric Matthew Hairston
Andrew K. Davidson
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Tel: 415-773-5700
cvejnoska@orrick.com

James L. Stengel
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel: 212-506-5000
jstengel@orrick.com

*Counsel for BNBM PLC*

This 30th day of November, 2018.

/s/ Panagiotis V. Albanis
Panagiotis "Pete" V. Albanis

## VERIFICATION

     I hereby affirm, under the penalty of perjury, that the foregoing responses to Defendants' Interrogatories propounded on November 16, 2018 are based on my personal knowledge, and are true and correct to the best of my knowledge, information, and belief.

Dated: __11/30/2018__              By: _Rasalee Walls_

                                       Rosalee Walls

# EXHIBIT B20

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others similarly
situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG
TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN
PLASTERBOARD CO., LTD., et al.,

      Defendants.

_____/

## CLAIMANT JENNIFER WITES'S ANSWERS TO DEFENDANT TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN PLASTERBOARD COMPANY, LTD. AND BNBM PLC'S SECOND SET OF INTERROGATORIES

Pursuant to by Fed. R. Civ. P. 26 and 33 and LR 26.1(g) and as required by Fed. R. Civ.

P. 26(e), Claimant Jennifer Wites ("Claimant") hereby serves answers to Defendants Taishan

Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd., and BNBM PLC

(collectively "Defendants"), interrogatories propounded on November 21, 2018

("Defendants Second Set of Interrogatories").

Dated: December 4, 2018               Respectfully submitted,

                                    /s/ Patrick S. Montoya, Esq.

                                    Patrick Shanan Montoya
                                    Fla. Bar No. 0524441
                                    Email: Patrick@colson.com
                                    Colson Hicks Eidson
                                    255 Alhambra Circle, PH
                                    Coral Gables, FL 33134-2351
                                    Telephone: (305) 476-7400

1

Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

## CLAIMANT JENNIFER WITES'S OBJECTIONS AND ANSWERS
## TO DEFENDANTS' SECOND SET OF INTERROGATORIES

1.      Please IDENTIFY each party YOU contend supplied and/or installed any defective Chinese-manufactured drywall in YOUR PROPERTY.

**ANSWER:** In addition to the information provided in conjunction with Claimant's Supplemental Plaintiff Profile Form ("SPPF"), which was negotiated among the parties and ordered by Judge Fallon to be completed pursuant to Pretrial Order No. 11A (MDL Rec. Doc. 21162), and which is incorporated herein by reference, Claimant answers as follows: the drywall in our home was supplied by Banner Supply and installed by O.C.D. of S. Florida, Inc.

2.      Please IDENTIFY any financial compensation YOU have received or may receive (including but not limited to insurance payments, insurance claims, legal claims against any party, legal settlements with any party, government funding programs, tax credits, or any other form of financial relief) RELATED TO alleged damage to YOUR PROPERTY caused by defective Chinese-manufactured drywall or RELATED TO any other harm YOU claim was caused by defective Chinese-manufactured drywall.

**ANSWER:** In addition to the information provided by Claimant in the SPPF and the information contained in documents produced in response to Request 1 of Defendants' Second Request for Production of documents dated November 21, 2018 ("Defendants' Second Set of Document Requests"), Claimant answers as follows: We received Settlement Funds as part of the Chinese Drywall Settlement Program in MDL 2047. We also received a Chinese drywall loss deduction on our Federal Income Taxes. Pursuant to Rule 33(d), Fed.R.Civ.P., please see documentation in the Brown Greer Chinese Drywall Portal regarding funds received as part of the Chinese Drywall Settlement in MDL 2047.

3.     Please IDENTIFY the names, contact information, and locations of contracting companies used for and the date, scope, and costs of any remediation efforts for each and every one of YOUR PROPERTIES that has undergone any form of remediation, in part or in full, for any damage that YOU contend was caused by defective Chinese-manufactured drywall.

**ANSWER:** Claimant objects that discovery related to remediation of the subject Property is beyond the scope of permissible discovery because remediation damage awards are, per the Court's Order (ECF No. 112), being handled on a separate track from Claimant's other damages and are being decided by the Special Master.

Subject to and without waiver of this objection, Claimant has provided this information in the SPPF and the information is contained in documents produced in response to Request 3 of Defendants' Second Set of Document Requests.   In addition, by way of further answer: Pursuant to Rule 33(d), Fed.R.Civ.P., please see documentation in the Brown Greer Chinese Drywall Portal regarding the remediation of the home.

4.     Please IDENTIFY all facts and circumstances that RELATE TO any purchase, sale, or transfer of ownership of YOUR PROPERTY during the RELEVANT TIME PERIOD.

**ANSWER:**  In addition to the information provided by Claimant in the SPPF and information contained in documents produced in response to Request 1 of Defendants' Request for Production of Documents dated November 16, 2018 ("Defendants' First Set of Document Requests"), Claimant answers as follows: Not applicable.

5.     Please IDENTIFY all facts and circumstances that RELATE TO any assignment of personal right of action for purported damages to YOUR PROPERTY.

**ANSWER:** In her SPPF, Claimant identified that he did not assign her personal right of action for purported damages to the subject property to anyone.  In addition to that information,

responsive information may be contained in any documents produced pursuant to Request

5 of Defendants' First Set of Document Requests and furthermore, Defendants will have the

opportunity to question Claimant on this topic at her deposition.

      6.    Please IDENTIFY all facts and circumstances that RELATE TO YOUR first

awareness that allegedly defective Chinese-manufactured drywall had been installed in

YOUR PROPERTY, including the date or dates on which YOU first became aware that

allegedly defective Chinese-manufactured drywall had been installed in YOUR PROPERTY.

**ANSWER:**  Pursuant to Rule 33(d), Fed.R.Civ.P., please see documentation bates labeled

MWITES0000320. In the SPPF, Claimant identified when he believed the Chinese-

manufactured drywall was installed in the subject Property and when he first became aware

that the subject Property contained Chinese-manufactured drywall.  In addition to that

information, Defendants will have the opportunity to question Claimant on this topic at her

deposition.

## CERTIFICATE OF SERVICE

I hereby certify that on this day, December 4th, 2018, I caused the foregoing Answers

to Defendants' Second Set of Interrogatories to be served via email on the following:

Craig P. Kalil, Esquire
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue, Suite 2250
Miami, FL 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929
Email: ckalil@aballi.com

L. Christopher Vejnoska, Esquire
Eric Matthew Hairston, Esquire
Andrew Davidson, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA  94105
Telephone: (415) 773-5700
Email: cvejnoska@orrick.com
        ehairston@orrick.com
        adavidson@orrick.com

James L. Stengel, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Email: jstengel@orrick.com

*Attorneys for Beijing New Building Materials Public Limited Company*

Enjolique D. Aytch, Esquire
AKERMAN LLP
Las Olas Centre II – Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: enjolique.aytch@akerman.com

Bernard Taylor, Esquire

Michael P. Kenny, Esquire
Christina Hull Eikhoff, Esquire
David Venderbush, Esquire
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
        mike.kenny@alston.com
        christy.eikhoff@alston.com
        david.venderbush@alston.com

*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*


                                    /s/ Patrick S. Montoya, Esq.

                                    Patrick Shanan Montoya
                                    Fla. Bar No. 0524441
                                    Email: Patrick@colson.com
                                    Colson Hicks Eidson
                                    255 Alhambra Circle, PH
                                    Coral Gables, FL  33134-2351
                                    Telephone:  (305) 476-7400
                                    Facsimile:  (305) 476-7444
                                    *Interim Lead Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others similarly
situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG
TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN
PLASTERBOARD CO., LTD., et al.,

      Defendants.

_____/

## CLAIMANT MARC WITES'S ANSWERS TO DEFENDANT TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN PLASTERBOARD COMPANY, LTD. AND BNBM PLC'S SECOND SET OF INTERROGATORIES

Pursuant to by Fed. R. Civ. P. 26 and 33 and LR 26.1(g) and as required by Fed. R. Civ. P. 26(e), Claimant Marc Wites ("Claimant") hereby serves answers to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd., and BNBM PLC (collectively "Defendants"), interrogatories propounded on November 21, 2018 ("Defendants Second Set of Interrogatories").

Dated: December 4, 2018

Respectfully submitted,

/s/ Patrick S. Montoya, Esq.

Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400

Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

## CLAIMANT MARC WITES'S OBJECTIONS AND ANSWERS
## TO DEFENDANTS' SECOND SET OF INTERROGATORIES

1.     Please IDENTIFY each party YOU contend supplied and/or installed any defective Chinese-manufactured drywall in YOUR PROPERTY.

**ANSWER:** In addition to the information provided in conjunction with Claimant's Supplemental Plaintiff Profile Form ("SPPF"), which was negotiated among the parties and ordered by Judge Fallon to be completed pursuant to Pretrial Order No. 11A (MDL Rec. Doc. 21162), and which is incorporated herein by reference, Claimant answers as follows: the drywall in our home was supplied by Banner Supply and installed by O.C.D. of S. Florida, Inc.

2.     Please IDENTIFY any financial compensation YOU have received or may receive (including but not limited to insurance payments, insurance claims, legal claims against any party, legal settlements with any party, government funding programs, tax credits, or any other form of financial relief) RELATED TO alleged damage to YOUR PROPERTY caused by defective Chinese-manufactured drywall or RELATED TO any other harm YOU claim was caused by defective Chinese-manufactured drywall.

**ANSWER:** In addition to the information provided by Claimant in the SPPF and the information contained in documents produced in response to Request 1 of Defendants' Second Request for Production of documents dated November 21, 2018 ("Defendants' Second Set of Document Requests"), Claimant answers as follows: We received Settlement Funds as part of the Chinese Drywall Settlement Program in MDL 2047. We also received a Chinese drywall loss deduction on our Federal Income Taxes. Pursuant to Rule 33(d), Fed.R.Civ.P., please see documentation in the Brown Greer Chinese Drywall Portal regarding funds received as part of the Chinese Drywall Settlement in MDL 2047.

3.      Please IDENTIFY the names, contact information, and locations of contracting companies used for and the date, scope, and costs of any remediation efforts for each and every one of YOUR PROPERTIES that has undergone any form of remediation, in part or in full, for any damage that YOU contend was caused by defective Chinese-manufactured drywall.

**ANSWER:** Claimant objects that discovery related to remediation of the subject Property is beyond the scope of permissible discovery because remediation damage awards are, per the Court's Order (ECF No. 112), being handled on a separate track from Claimant's other damages and are being decided by the Special Master.

Subject to and without waiver of this objection, Claimant has provided this information in the SPPF and the information is contained in documents produced in response to Request 3 of Defendants' Second Set of Document Requests. In addition, by way of further answer: Pursuant to Rule 33(d), Fed.R.Civ.P., please see documentation in the Brown Greer Chinese Drywall Portal regarding the remediation of the home.

4.      Please IDENTIFY all facts and circumstances that RELATE TO any purchase, sale, or transfer of ownership of YOUR PROPERTY during the RELEVANT TIME PERIOD.

**ANSWER:** In addition to the information provided by Claimant in the SPPF and information contained in documents produced in response to Request 1 of Defendants' Request for Production of Documents dated November 16, 2018 ("Defendants' First Set of Document Requests"), Claimant answers as follows: Not applicable.

5.      Please IDENTIFY all facts and circumstances that RELATE TO any assignment of personal right of action for purported damages to YOUR PROPERTY.

**ANSWER:** In her SPPF, Claimant identified that he did not assign his personal right of action for purported damages to the subject property to anyone. In addition to that

information, responsive information may be contained in any documents produced pursuant to Request 5 of Defendants' First Set of Document Requests and furthermore, Defendants will have the opportunity to question Claimant on this topic at his deposition.

6.      Please IDENTIFY all facts and circumstances that RELATE TO YOUR first awareness that allegedly defective Chinese-manufactured drywall had been installed in YOUR PROPERTY, including the date or dates on which YOU first became aware that allegedly defective Chinese-manufactured drywall had been installed in YOUR PROPERTY.

**ANSWER:**  Pursuant to Rule 33(d), Fed.R.Civ.P., please see documentation bates labeled MWITES0000320. In the SPPF, Claimant identified when he believed the Chinese-manufactured drywall was installed in the subject Property and when he first became aware that the subject Property contained Chinese-manufactured drywall.  In addition to that information, Defendants will have the opportunity to question Claimant on this topic at his deposition.

## CERTIFICATE OF SERVICE

I hereby certify that on this day, December 4th, 2018, I caused the foregoing Answers

to Defendants' Second Set of Interrogatories to be served via email on the following:

Craig P. Kalil, Esquire
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue, Suite 2250
Miami, FL 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929
Email: ckalil@aballi.com

L. Christopher Vejnoska, Esquire
Eric Matthew Hairston, Esquire
Andrew Davidson, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA 94105
Telephone: (415) 773-5700
Email: cvejnoska@orrick.com
        ehairston@orrick.com
        adavidson@orrick.com

James L. Stengel, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Email: jstengel@orrick.com

*Attorneys for Beijing New Building Materials Public Limited Company*

Enjolique D. Aytch, Esquire
AKERMAN LLP
Las Olas Centre II – Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: enjolique.aytch@akerman.com

Bernard Taylor, Esquire

6

Michael P. Kenny, Esquire
Christina Hull Eikhoff, Esquire
David Venderbush, Esquire
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
        mike.kenny@alston.com
        christy.eikhoff@alston.com
        david.venderbush@alston.com

*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

/s/ Patrick S. Montoya, Esq.

Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

**YANES SECURITY &
INVESTIGATIVE SERVICES, INC.**

*Private Investigations*

### MEMO

Date: November 10, 2009

To: Ervin Gonzalez

From: Javier Yanes

Re: Marc & Jennifer Wites

---

# PRODUCT IDENTIFICATION INSPECTION

On November 09, 2009 we traveled to the Wites residence located at 17625 Middlebrook Way Boca Raton, Florida and conducted a product ID search.  No KNAUF was found, only **Grimarx National Gypsum** and unknown board manufacturer (**4 feet x 12 feet x 1/2 inch Drywall**) Enclosed, please find a CD containing photos of said inspection.

Thank you.

Javier Yanes
9297 MARC & JENNIFER WITES 111009

P.O. BOX 145486 • CORAL GABLES, FLORIDA  33114-5486

MWITES - 000321

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others similarly
situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG
TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN
PLASTERBOARD CO., LTD., et al.,

      Defendants.

_____/

## PRIORITY CLAIMANT JENNIFER WITES' ANSWERS TO DEFENDANT TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN PLASTERBOARD COMPANY, LTD'. AND BNBM PLC'S INTERROGATORIES

Pursuant to by Fed. R. Civ. P. 26 and 33 and LR 26.1(g) and as required by Fed. R. Civ. P. 26(e), Claimant Jennifer Wites hereby serves answers to Defendants Taishan Gypsum Company, Ltd., Tai'an Taishan Plasterboard Company, Ltd., and BNBM PLC (collectively "Defendants"), interrogatories propounded on November 16, 2018.

Dated: November 30, 2018

                                  Respectfully submitted,

                                    /s/ Patrick S. Montoya, Esq.
                                    Patrick Shanan Montoya
                                    Fla. Bar No. 0524441
                                    Email: Patrick@colson.com
                                    Colson Hicks Eidson
                                    255 Alhambra Circle, PH
                                    Coral Gables, FL 33134-2351
                                    Telephone: (305) 476-7400
                                    Facsimile: (305) 476-7444
                                    *Interim Lead Counsel for Plaintiffs*

**PRIORITY CLAIMANT JENNIFER WITES' ANSWERS TO DEFENDANT TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN PLASTERBOARD COMPANY, LTD.'S AND BNBM PLC'S INTERROGATORIES**

1.      Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

**ANSWER:**    Pursuant to Rule 33(d), Fed.R.Civ.P., Plaintiff will produce documents from which the answer to this interrogatory may be ascertained.  Plaintiff further states as follows: We are seeking all compensatory damages, including, but not limited to personal property costs and alternative living expenses, lost equity, remediation damages as determined by the Court, diminution in value, loss of use and enjoyment, punitive damages and pre-judgment interest. Please see attached chart reflecting costs incurred for remediation, alternative living expenses and personal property. The amount of diminution in value and lost equity will be quantified by an expert. Loss of use and enjoyment damages and punitive damages will be determined by the jury. Pre-judgment interest will be determined by the Court as a post-judgment ministerial matter.

2.      Did you ever vacate the Property because of Chinese Drywall?

**ANSWER:**    Yes.

           a.       If so, identify the dates and location of your alternative residence.

**ANSWER:**    We leased from June 11, 2010 through February 11, 2011. The address of our alternative housing was 8132 Valhalla Drive, Delray Beach, FL 33446

    b.  If so, did you continue to make mortgage payments on the

Property during the period(s) of your alternative residence?

**ANSWER:** Yes.

 3.  Do you intend to pursue a claim for damages arising from bodily injury caused or

aggravated by Chinese Drywall?

**ANSWER:** No.

    a.  If so, identify and describe all conditions, diagnoses, symptoms,

bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part,

because of Chinese Drywall.

**ANSWER:** Not applicable.

    b.  If so, identify any physician and/or medical professional who has

diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in

whole or in part.

**ANSWER:** Not applicable.

    c.  If so, identify any physician and/or medical professional who has

treated you for any of the conditions you have identified.

**ANSWER:** Not applicable.

 4.  Does anyone in your household claim to have suffered bodily injury because of the

Chinese Drywall?

**ANSWER:** No.

         a.      If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

**ANSWER:**   Not applicable.

         b.      If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

**ANSWER:**   Not applicable.

         c.      If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

**ANSWER:**   Not applicable.

   5.      If you claim a diminution in value of the Property as a result of Chinese Drywall, identify the total amount of such diminution of value being claimed.

**ANSWER:**   Yes, we are making a claim for diminution of value of the home. The diminution in value will be calculated by an expert, and the amount of such diminution in value has not yet been determined.  Plaintiff will disclose such amount in connection with her expert witness disclosures as required by the Court's pre-trial order. The total amount of the diminution in value will be determined by the jury.

Pursuant to 28 USC Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____          11/30/18
Jennifer S. Wites                          Date

STATE OF ___FLORIDA___ )
                                    SS:
COUNTY OF __Miami-Dade__ )

BEFORE ME, a Notary Public, duly authorized and administered to take oaths,

personally appeared __Jennifer Wites__ who is personally known to me or who has produced

_____ as identification and who did/did not take an oath, and says that the

following Answers to Interrogatories are true and correct to the best of his/her knowledge, and

that he/she has read the Answers to Interrogatories and knows the contents thereof.

SWORN TO AND SUBSCRIBED before me this __30th__ day of __November__ 2018.

Affiant:                                  Notary Public:

sign _____            sign _____

print __Jennifer Wites__                 print __Belkis Ferrer__

                                         State of __Florida__ at Large (Seal)

                                         My Commission Expires

BELKIS FERRER
Notary Public - State of Florida
Commission # GG 001885
My Comm. Expires Jun 14, 2020
Bonded through National Notary Assn.

## CERTIFICATE OF SERVICE

I hereby certify that on this day, November 30, 2018, I caused the foregoing Answers to

Defendants' First Set of Interrogatories to be served on counsel below listed by uploading the same

to the Brown Greer Chinese Drywall Portal.

Craig P. Kalil, Esquire
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue, Suite 2250
Miami, FL 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929
Email: ckalil@aballi.com

L. Christopher Vejnoska, Esquire
Eric Matthew Hairston, Esquire
Andrew Davidson, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA  94105
Telephone: (415) 773-5700
Email: cvejnoska@orrick.com
        ehairston@orrick.com
        adavidson@orrick.com

James L. Stengel, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Email: jstengel@orrick.com

*Attorneys for Beijing New Building Materials Public Limited Company*

Enjolique D. Aytch, Esquire
AKERMAN LLP
Las Olas Centre II – Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: enjolique.aytch@akerman.com

Bernard Taylor, Esquire
Michael P. Kenny, Esquire

6

Christina Hull Eikhoff, Esquire
David Venderbush, Esquire
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
        mike.kenny@alston.com
        christy.eikhoff@alston.com
        david.venderbush@alston.com

*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*


                                    /s/ Patrick S. Montoya, Esq.
                                    Patrick Shanan Montoya
                                    Fla. Bar No. 0524441
                                    Email: Patrick@colson.com
                                    Colson Hicks Eidson
                                    255 Alhambra Circle, PH
                                    Coral Gables, FL  33134-2351
                                    Telephone:  (305) 476-7400
                                    Facsimile:  (305) 476-7444
                                    *Interim Lead Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:11-CV-22408-MGC

EDUARDO AND CARMEN AMORIN et al.,
individually, and on behalf of all others similarly
situated,

      Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG
TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN
PLASTERBOARD CO., LTD., et al.,

      Defendants.

_____/

## PRIORITY CLAIMANT MARC WITES' ANSWERS TO DEFENDANT TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN PLASTERBOARD COMPANY, LTD'. AND BNBM PLC'S INTERROGATORIES

Pursuant to by Fed. R. Civ. P. 26 and 33 and LR 26.1(g) and as required by Fed. R. Civ.

P. 26(e), Claimant Marc Wites hereby serves answers to Defendants Taishan Gypsum Company,

Ltd., Tai'an Taishan Plasterboard Company, Ltd., and BNBM PLC (collectively "Defendants"),

interrogatories propounded on November 16, 2018.

Dated: November 30, 2018

Respectfully submitted,

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

**PRIORITY CLAIMANT MARC WITES ANSWERS TO DEFENDANT TAISHAN GYPSUM COMPANY, LTD., TAI'AN TAISHAN PLASTERBOARD COMPANY, LTD'. AND BNBM PLC'S INTERROGATORIES**

1.      Identify all types of damages that you seek in this Lawsuit (e.g. alternative living expenses, diminution in value, loss of use/enjoyment, etc.) and specify amounts sought for each category.

**ANSWER:**   Pursuant to Rule 33(d), Fed.R.Civ.P., Plaintiff will produce documents from which the answer to this interrogatory may be ascertained.  Plaintiff further states as follows: We are seeking all compensatory damages, including, but not limited to personal property costs and alternative living expenses, lost equity, remediation damages as determined by the Court, diminution in value, loss of use and enjoyment, punitive damages and pre-judgment interest. Please see attached chart reflecting costs incurred for remediation, alternative living expenses and personal property. The amount of diminution in value and lost equity will be quantified by an expert. Loss of use and enjoyment damages and punitive damages will be determined by the jury. Pre-judgment interest will be determined by the Court as a post-judgment ministerial matter.

2.      Did you ever vacate the Property because of Chinese Drywall?

**ANSWER:**   Yes.

        a.      If so, identify the dates and location of your alternative residence.

**ANSWER:**   We leased from June 11, 2010 through February 11, 2011. The address of our alternative housing was 8132 Valhalla Drive, Delray Beach, FL 33446

b.  If so, did you continue to make mortgage payments on the Property during the period(s) of your alternative residence?

**ANSWER:**   Yes.

3.  Do you intend to pursue a claim for damages arising from bodily injury caused or aggravated by Chinese Drywall?

**ANSWER:**   No.

a.  If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses that you claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

**ANSWER:**   Not applicable.

b.  If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of your identified conditions is Chinese Drywall, in whole or in part.

**ANSWER:**   Not applicable.

c.  If so, identify any physician and/or medical professional who has treated you for any of the conditions you have identified.

**ANSWER:**   Not applicable.

4.  Does anyone in your household claim to have suffered bodily injury because of the Chinese Drywall?

**ANSWER:**   No.

3

a.     If so, identify and describe all conditions, diagnoses, symptoms, bodily harms, and/or illnesses, that they claim were caused or aggravated, in whole or in part, because of Chinese Drywall.

**ANSWER:**    Not applicable.

b.     If so, identify any physician and/or medical professional who has diagnosed or opined that the cause of any of their identified conditions is Chinese Drywall, in whole or in part.

**ANSWER:**    Not applicable.

c.     If so, identify any physician and/or medical professional who has treated them for any of the conditions they have identified.

**ANSWER:**    Not applicable.

5.     If you claim a diminution in value of the Property as a result of Chinese Drywall, identify the total amount of such diminution of value being claimed.

**ANSWER:**    Yes, we are making a claim for diminution of value of the home. The diminution in value will be calculated by an expert, and the amount of such diminution in value has not yet been determined.   Plaintiff will disclose such amount in connection with his expert witness disclosures as required by the Court's pre-trial order. The total amount of the diminution in value will be determined by the jury.

4

Pursuant to 28 USC Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____          11/30/18
Marc Wites                                Date


STATE OF Florida        )
                        )     SS:
COUNTY OF Broward       )

BEFORE ME, a Notary Public, duly authorized and administered to take oaths,

personally appeared Marc Wites who is (personally known to me) or who has produced

_____ as identification and who did/did not take an oath, and says that the

following Answers to Interrogatories are true and correct to the best of his knowledge, and that

he/she has read the Answers to Interrogatories and knows the contents thereof.

SWORN TO AND SUBSCRIBED before me this 30th day of November, 2018.

Affiant:                                  Notary Public:

sign _____               sign _____

print _____Marc A. Wites____             print Jacqueline Kay Newborn

                                          State of Florida at Large (Seal)

                                          My Commission Expires

                                          JACQUELINE KAY NEWBORN
                                          Commission # GG 175563
                                          Expires January 18, 2022
                                          Bonded Thru Budget Notary Services

## CERTIFICATE OF SERVICE

I hereby certify that on this day, November 30, 2018, I caused the foregoing Answers to

Defendants' First Set of Interrogatories to be served on counsel below listed by uploading the same

to the Brown Greer Chinese Drywall Portal.

Craig P. Kalil, Esquire
ABALLI MILNE KALIL P.A.
SunTrust International Center
1 SE 3rd Avenue, Suite 2250
Miami, FL 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929
Email: ckalil@aballi.com

L. Christopher Vejnoska, Esquire
Eric Matthew Hairston, Esquire
Andrew Davidson, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA 94105
Telephone: (415) 773-5700
Email: cvejnoska@orrick.com
         ehairston@orrick.com
         adavidson@orrick.com

James L. Stengel, Esquire
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Email: jstengel@orrick.com

*Attorneys for Beijing New Building Materials Public Limited Company*

Enjolique D. Aytch, Esquire
AKERMAN LLP
Las Olas Centre II – Suite 1600
350 E. Las Olas Boulevard
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: enjolique.aytch@akerman.com

Bernard Taylor, Esquire
Michael P. Kenny, Esquire

6

Christina Hull Eikhoff, Esquire
David Venderbush, Esquire
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: bernard.taylor@alston.com
mike.kenny@alston.com
christy.eikhoff@alston.com
david.venderbush@alston.com

*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*