# EXHIBIT 32 part 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| EDUARDO AND CARMEN AMORIN, *et al.*, individually, and on behalf of all others similarly situated,<br><br>  **Plaintiffs,**<br><br>    **v.**<br><br>TAISHAN GYPSUM CO., LTD. f/k/a SHANDONG TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN PLASTERBOARD CO., LTD., et al.,<br><br>  **Plaintiffs.** | **Case No. 1:11-CV-22408-MGC** |

## PRIORITY CLAIMANTS' NOTICE OF FILING ADDITIONAL RECORD EVIDENCE ON A PER PRIORITY CLAIMANTS BASIS IN RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE, AND COUNTERSTATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON NON-FORMULA DAMAGES

Priority Claimants, by and through undersigned counsel, hereby file the following Additional Record Evidence on a per Priority Claimant Basis in support of their Response to Defendants' Motion and Memorandum for Summary Judgment (Dkt. No. 245) and Defendants' Statement of Material Facts Not In Dispute (Dkt. No. 250). The exhibits below will be cited in Priority Claimants' Reponses to docket numbers 245 and 250.

| Composite Exhibit | Additional Record Evidence |
|---|---|
| D1 | Janet Avery |
| D2 | Lillian Chatmon |
| D3 | David Deeg & Deborah Hooker |
| D4 | Cathy & Steve Etter |
| D5 | Andrew & Dawn Feldkamp |
| D6 | William & Vicki Foster |
| D7 | David & Diane Griffin |
| D8 | Jose Miranda |
| D9 | Tracy Nguyen |
| D10 | Kelly & Lori O'Brien |
| D11 | Kevin & Stacy Rosen |

| D12 | Michael & Robyn Rosen |
| D13 | Larry & Rosalee Walls |
| D14 | Marc & Jennifer Wites |

Dated: May 13, 2019

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL  33134-2351
Telephone:  (305) 476-7400
Facsimile:  (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing motion was served by via CM/ECF on all parties authorized to receive service via CM/ECF, this 13th day of May 2019.

/s/ Patrick S. Montoya, Esq.
Patrick Shanan Montoya
Fla. Bar No. 0524441
Email: Patrick@colson.com
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134-2351
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
*Interim Lead Counsel for Plaintiffs*

# EXHIBIT D1

| A. U.S. Department of Housing and Urban Development | | B. Type of Loan | | |
|---|---|---|---|---|
| | | 1. [ ] FHA | 2. [ ] FMHA | 3. [X] Conv. Unins. |
| | | 4. [ ] VA | 5. [ ] Conv. Ins. | |
| **Settlement Statement** | | 6. File Number | | 7. Loan Number |
| | | 413641 | | 9755 |
| | | 8. Mortgage Ins. Case No. | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing; they are shown here for information purposes and are not included in the totals.

| | |
|---|---|
| D. Name of Borrower: | Janet C. Avery, 13001 Sandy Kay Bend, #U-2, North Fort Myers, FL 33903 |
| E. Name of Seller: | Bay Colony-Gateway, Inc., 24301 Walden Center Drive, Bonita Springs, FL 34134 |
| F. Name of Lender: | Fifth Third Mortgage Company, 38 Fountain Square Plaza, Cincinnati, OH 45263-1000 |
| G. Property Location: | Lot 35, Block B, Villa Capri at Pelican Preserve Tract T<br><br>10671 Camaralle Circle, Fort Myers, FL 33913 |
| H. Settlement Agent: | First Fidelity Title, Inc. d/b\a WCI Title (239) 437-3250 |
| Place of Settlement: | 6611 Orion Drive, Suite 104, Fort Myers, FL 33912 |
| I. Settlement Date: | 11/30/2007          Proration Date:          11/30/2007 |

| | J. Summary of Borrower's Transaction | | | K. Summary of Seller's Transaction | |
|---|---|---|---|---|---|
| 100. | Gross amount due from borrower: | | 400. | Gross amount due to seller: | |
| 101. | Contract sales price | 195,000.00 | 401. | Contract sales price | 195,000.00 |
| 102. | Personal property | | 402. | Personal property | |
| 103. | Settlement charges to borrower (line 1400) | 7,125.73 | 403. | | |
| 104. | | | 404. | | |
| 105. | | | 405. | | |
| | Adjustments for items paid by seller in advance: | | | Adjustments for items paid by seller in advance: | |
| 106. | City/town taxes | | 406. | City/town taxes | |
| 107. | County taxes 11/30/2007 to 1/1/2008 | 285.62 | 407. | County taxes 11/30/2007 to 1/1/2008 | 285.62 |
| 108. | Assessments | | 408. | Assessments | |
| 109. | Non Advalorem Taxes 11/30/2007 to 9/30/2008 | 448.02 | 409. | Non Advalorem Taxes 11/30/2007 to 9/30/2008 | 448.02 |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| 120. | Gross amount due from borrower: | 202,859.37 | 420. | Gross amount due to seller: | 195,733.64 |
| 200. | Amounts paid by or in behalf of the borrower: | | 500. | Reduction in amount due to seller: | |
| 201. | Deposit or earnest money | 19,500.00 | 501. | Excess deposit (see instructions) | |
| 202. | Principal amount of new loan(s) | 90,000.00 | 502. | Settlement charges to seller (line 1400) | 27,334.97 |
| 203. | Existing loan(s) taken subject to | | 503. | Existing loan(s) taken subject to | |
| 204. | | | 504. | Payoff of first mortgage loan | |
| 205. | | | 505. | Payoff of second mortgage loan | |
| 206. | | | 506. | Deposit or earnest money | 19,500.00 |
| 207. | | | 507. | | |
| 208. | | | 508. | | |
| 209. | Closing Cost Credit | 100.00 | 509. | Closing Cost Credit | 100.00 |
| | Adjustments for items unpaid by seller: | | | Adjustments for items unpaid by seller: | |
| 210. | City/town taxes | | 510. | City/town taxes | |
| 211. | County taxes | | 511. | County taxes | |
| 212. | Assessments | | 512. | Assessments | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. | Total paid by/for borrower: | 109,600.00 | 520. | Total reduction in amount due seller: | 46,934.97 |
| 300. | Cash at settlement from/to borrower: | | 600. | Cash at settlement to/from seller: | |
| 301. | Gross amount due from borrower (line 120) | 202,859.37 | 601. | Gross amount due to seller (line 420) | 195,733.64 |
| 302. | Less amount paid by/for borrower (line 220) | 109,600.00 | 602. | Less total reduction in amount due seller(line 520) | 46,934.97 |
| 303. | CASH (X)FROM ()TO BORROWER | 93,259.37 | 603. | CASH ()FROM (X)TO SELLER | 148,798.67 |

**SUBSTITUTE FORM 1099 SELLER STATEMENT** - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.
**SELLER INSTRUCTION** - If this real estate was your principle residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide First Fidelity Title, Inc. d/b\a WCI Title (239) 437-3250 with your correct taxpayer identification number.
If you do not provide First Fidelity Title, Inc. d/b\a WCI Title (239) 437-3250 with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

Bay Colony-Gateway, Inc.

Avery, J Doc ID 178127

| | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| 700. | Sales/broker commission | | | |
| | Division of commission (line 700) as follows: | | | |
| 701. | $ | | | |
| 702. | $ | | | |
| 703. | Commission paid at settlement | | | |
| 704. | | | | |
| 705. | Commission                    to   WCI Realty | POCS 4250.00 | | |
| 706. | | | | |
| 707. | | | | |
| 800. | Items payable in connection with loan | | | |
| 801. | Loan origination fee | | | |
| 802. | Loan discount              to   Fifth Third Mortgage Compa( 0.375%) | | (337.50) | |
| 803. | Appraisal fee               to   Appraisal System, Inc. | | 350.00 | |
| 804. | Credit report               to   CBCInnovis Consumer Relations | | 9.95 | |
| 805. | Lender's inspection fee | | | |
| 806. | Mortgage insurance application fee | | | |
| 807. | Assumption fee | | | |
| 808. | Tax Service Fee            to   First American Real Estate | | 72.00 | |
| 809. | Flood Cert Fee             to   Southwest Financial Services, Inc. | | 4.00 | |
| 810. | Document Prep Fee | | | |
| 811. | Underwriting Fee          to   Fifth Third Mortgage Company | | 313.32 | |
| 812. | Processing Fee             to   Fifth Third Mortgage Company | | 400.00 | |
| 813. | Application Fee            to   Fifth Third Mortgage Company | POCB 200.00 | | |
| 814. | Yield Spread Premium | | | |
| 815. | | | | |
| 900. | Items required by lender to be paid in advance | | | |
| 901. | Interest from    11/30/2007 to 12/1/2007    at $15.93500/day  for 1 days. | | 15.94 | |
| 902. | Mortgage insurance premium for | | | |
| 903. | Hazard insurance premium for        1 yrs.        to Security First Insuran | | 535.50 | |
| 904. | | | | |
| 905. | | | | |
| 1000. | Reserves deposited with lender | | | |
| 1001. | Hazard insurance | | | |
| 1002. | Mortgage insurance | | | |
| 1003. | City property taxes | | | |
| 1004. | County property taxes | | | |
| 1005. | Annual assessments (maint.) | | | |
| 1006. | Flood insurance | | | |
| 1007. | | | | |
| 1008. | | | | |
| 1009. | Aggregate Adjustment | | | |
| 1100. | Title charges | | | |
| 1101. | Settlement or closing fee      to   First Fidelity Title, Inc. d/b/a WCI Title | | | 400.00 |
| 1102. | Abstract or title search       to   Chicago Title | | | 50.00 |
| 1103. | Title examination | | | |
| 1104. | Title insurance binder | | | |
| 1105. | Document preparation | | | |
| 1106. | Notary fees | | | |
| 1107. | Attorney's fees to | | | |
| | includes above items no.: | | | |
| 1108. | Title insurance             to   First Fidelity Title, Inc. d/b/a WCI Title | | 25.00 | 1,050.00 |
| | includes above items no.: | | | |
| 1109. | Lender's coverage           $90,000.00         $25.00 | | | |
| 1110. | Owner's coverage            $195,000.00         $1,050.00 | | | |
| 1111. | Florida Form 9              to   First Fidelity Title, Inc. d/b/a WCI Title | | 107.50 | |
| 1112. | ALTA 8.1 and 5              to   First Fidelity Title, Inc. d/b/a WCI Title | | 50.00 | |
| 1113. | | | | |
| 1200. | Government recording and transfer charges | | | |
| 1201. | Recording fees:             Deed $18.50  Mortgage $61.00 | | 79.50 | |
| 1202. | City/county tax/stamps: Intangible      Mortgage $180.00 | | 180.00 | |
| 1203. | State tax/stamps:           Deed $1365.00  Mortgage $315.00 | | 1,680.00 | |
| 1204. | Record Partial Release of Mortgag to   Clerk of the Circuit Court | | | 28.50 |
| 1205. | | | | |
| 1206. | | | | |
| 1300. | Additional settlement charges | | | |
| 1301. | Survey | | | |
| 1302. | Pest inspection | | | |
| 1303. | Pay 2007 Taxes              to   Lee County Tax Collector | | | 3,794.03 |
| 1304. | Capital Assessment          to   Gateway Services CDD | | 2,000.00 | |
| 1305. | Capital Assessment          to   Pelican Preserve Community Association | | 250.00 | |
| 1306. | Capital Assessment          to   Milano at Pelican Preserve | | 300.00 | |
| 1307. | Qrtly Membership Dues 11/30-2/2 to   Pelican Preserve Community Association | | 245.32 | |
| 1308. | Qrtly Membership Dues 11/30-2/2 to   Pelican Preserve Towncenter | | 194.78 | |
| 1309. | Qrtly Expenses 11/30-2/29    to   Pelican Preserve Towncenter | | 249.63 | |
| 1310. | Qrtly Dues 11/30-2/29        to   Milano at Pelican Preserve | | 400.79 | |
| 1311. | Bond                        to   Gateway Services CDD | | | 21,862.44 |
| 1312. | Processing Fee              to   District Management Services | | | 150.00 |
| 1313. | | | | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | | 7,125.73 | 27,334.97 |

and ~~~ as on my behalf or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

_Janet C Avery_
Janet C. Avery

_____
Bay Colony-Gateway, Inc.

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____
First Fidelity Title, Inc. d/b/a WCI Title

11/30/07
Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18: U.S. Code Section 1001 and Section 1010.

ACE - Fifth Third Bank                                                Page 1 of 1



**FIFTH THIRD BANK**   EIN/SSN/ITIN: [____] Find      **ACE**              [ECIF]
                       Advanced Search  Adding Machine

                                                    Home | Quick Links ▼ | Logoff

ECIF Search Results | Customer | Addresses | Transactions | eBanking | Contacts | Contact Notes | Document Center | Add Issue | Offers | FNA

| JANET C AVERY | General | History | Escrow Payee | Escrow Ans | ARM/Buyd | Delq/Fees | YTD/EOY | Notes | Maintenance |

⊟ Mailing Address

**Property Address**

10671 CAMARELLE CIRCLE

FORT MYERS, FL 33913

| Balances | | Payment | | | |
|---|---|---|---|---|---|
| Principal | | P&I | $561.48 | Next Due Date | 06/01/10 |
| Escrow | | Escrow | | Last Pymt Date | 07/26/11 |
| Undisbursed | | Opt Ins | | First Pymt Date | 01/01/08 |
| Subsidy | | Subsidy | | Pymt Freq | MONTHLY |
| Unapplied | | Total | $561.48 | Pymt Method | COUPONS |

| Loan Characteristics | | | | | |
|---|---|---|---|---|---|
| Loan Type | FIXED CONV | Status | | | CLOSED |
| Investor | FREDDIE | Origination | $90,000.00 | | 11/30/07 |
| Current Interest Rate | 6.37500 | Loan Term/Maturity Date | 360 months | | 12/01/37 |
| Current Loan To Value | | Appraisal | $195,000.00 | | 10/01/07 |
| Prepayment Penalty | N | Purchase Price | | | $195,000.00 |
| Last Media | | Construction To Perm Date | | | |
| Next Coupon Book Start | 03/01/09 | Closed | | | 07/26/11 |
| | | Affiliate | | | FTFL |

Account Signers                                         * Reporting TIN

| Name | TIN | Relationship | Comments |
|---|---|---|---|
| JANET C AVERY | ▇-1639 | PRIMARY ACCOUNT HOLDER | |

Copyright © 2016 Fifth Third Bank | For Authorized Internal Use Only | version 18.3.0.F.0303

EXHIBIT
8
Avery R-718

**FIFTH THIRD BANK**

NOV 2 / 2018

02187-08

| 08/25/11 | 05/01/10 | BALANCE AFTER | $0.00 | $0.00 |
|----------|----------|---------------|-------|-------|
| 08/25/11 | 05/01/10 | UNAPPLIED DEBIT | ($1,250.00) | $0.00 |
| 08/24/11 | 05/01/10 | BALANCE AFTER | $0.00 | $0.00 |
| 08/24/11 | 05/01/10 | UNAPPLIED DEBIT | ($1,892.80) | $0.00 |
| 08/24/11 | 05/01/10 | FEE COLLECTED | $325.00 | $0.00 |
| 08/24/11 | 05/01/10 | FEE COLLECTED | $1,567.80 | $0.00 |
| 08/23/11 | 05/01/10 | BALANCE AFTER | $0.00 | $0.00 |
| 08/23/11 | 05/01/10 | UNAPPLIED CREDIT | $3,142.80 | $0.00 |
| 08/15/11 | 05/01/10 | BALANCE AFTER | $0.00 | $0.00 |
| 08/15/11 | 05/01/10 | UNAPPLIED DEBIT | ($3,456.39) | $0.00 |
| 08/15/11 | 05/01/10 | UNAPPLIED CREDIT | $2,206.39 | $0.00 |
| 08/15/11 | 05/01/10 | UNAPPLIED CREDIT | $1,250.00 | $0.00 |
| 08/15/11 | 05/01/10 | ESCROW BAL CREDIT | $2,206.39 | $0.00 |
| 08/15/11 | 05/01/10 | FEE COLLECTED | $650.00 | $0.00 |
| 08/15/11 | 05/01/10 | FEE COLLECTED | $600.00 | $0.00 |
| 08/03/11 | 05/01/10 | BALANCE AFTER | $0.00 | $0.00 |
| 08/03/11 | 05/01/10 | FEE WAIVED | ($50.00) | $0.00 |
| 07/27/11 | 05/01/10 | BALANCE AFTER | $0.00 | $0.00 |
| 07/27/11 | 05/01/10 | PAYOFF | $57,120.58 | $57,120.58 |
| 07/27/11 | 05/01/10 | FEE WAIVED | ($11.50) | $0.00 |
| 07/27/11 | 05/01/10 | FEE WAIVED | ($11.50) | $0.00 |
| 07/27/11 | 05/01/10 | FEE WAIVED | ($11.50) | $0.00 |
| 07/27/11 | 05/01/10 | FEE WAIVED | ($11.50) | $0.00 |
| 07/27/11 | 05/01/10 | FEE WAIVED | ($11.50) | $0.00 |
| 07/27/11 | 05/01/10 | FEE WAIVED | ($11.50) | $0.00 |
| 07/27/11 | 05/01/10 | FEE WAIVED | ($11.50) | $0.00 |
| 07/27/11 | 05/01/10 | FEE WAIVED | ($11.50) | $0.00 |
| 07/27/11 | 05/01/10 | FEE WAIVED | ($11.50) | $0.00 |
| 07/27/11 | 05/01/10 | FEE WAIVED | ($11.50) | $0.00 |
| 07/27/11 | 05/01/10 | FEE WAIVED | ($11.50) | $0.00 |
| 07/18/11 | 05/01/10 | BALANCE AFTER | $0.00 | $87,394.02 |
| 07/18/11 | 05/01/10 | FEES BILLED | $11.50 | $0.00 |
| 06/13/11 | 05/01/10 | BALANCE AFTER | $0.00 | $87,394.02 |
| 06/13/11 | 05/01/10 | FEES BILLED | $11.50 | $0.00 |
| 05/09/11 | 05/01/10 | BALANCE AFTER | $0.00 | $87,394.02 |
| 05/09/11 | 05/01/10 | FEES BILLED | $11.50 | $0.00 |
| 04/04/11 | 05/01/10 | BALANCE AFTER | $0.00 | $87,394.02 |
| 04/04/11 | 05/01/10 | FEES BILLED | $11.50 | $0.00 |
| 03/03/11 | 05/01/10 | BALANCE AFTER | $0.00 | $87,394.02 |
| 03/03/11 | 05/01/10 | FEES BILLED | $11.50 | $0.00 |
| 02/02/11 | 05/01/10 | BALANCE AFTER | $0.00 | $87,394.02 |
| 02/02/11 | 05/01/10 | FEES BILLED | $11.50 | $0.00 |
| 01/04/11 | 05/01/10 | BALANCE AFTER | $0.00 | $87,394.02 |
| 01/04/11 | 05/01/10 | FEES BILLED | $11.50 | $0.00 |
| 12/02/10 | 05/01/10 | BALANCE AFTER FIFTH THIRD BANK | $0.00 | $87,394.02 |

NOV 2 / 2018

02187-08

| 12/02/10 | 05/01/10 | FEES BILLED | | $11.50 | $0.00 |
|---|---|---|---|---|---|
| 11/23/10 | 05/01/10 | BALANCE AFTER | | $0.00 | $87,394.02 |
| 11/23/10 | 05/01/10 | FEES BILLED | | $325.00 | $0.00 |
| 11/23/10 | 05/01/10 | FEES BILLED | | $2,217.80 | $0.00 |
| 11/23/10 | 05/01/10 | FEES BILLED | | $600.00 | $0.00 |
| 11/10/10 | 05/01/10 | BALANCE AFTER | | $0.00 | $87,394.02 |
| 11/10/10 | 05/01/10 | ESC DISB - TAXES | | $880.39 | $0.00 |
| 11/05/10 | 05/01/10 | BALANCE AFTER | | $0.00 | $87,394.02 |
| 11/05/10 | 05/01/10 | FEES BILLED | | $11.50 | $0.00 |
| 10/06/10 | 05/01/10 | BALANCE AFTER | | $0.00 | $87,394.02 |
| 10/06/10 | 05/01/10 | FEES BILLED | | $11.50 | $0.00 |
| 09/16/10 | 05/01/10 | BALANCE AFTER | | $0.00 | $87,394.02 |
| 09/16/10 | 05/01/10 | ESC DISB - TAXES | | $1,582.85 | $0.00 |
| 09/01/10 | 05/01/10 | BALANCE AFTER | | $0.00 | $87,394.02 |
| 09/01/10 | 05/01/10 | FEES BILLED | | $11.50 | $0.00 |
| 08/09/10 | 05/01/10 | BALANCE AFTER | | $0.00 | $87,394.02 |
| 08/09/10 | 05/01/10 | PAYMENT REVERSAL | | ($561.48) | ($97.20) |
| 08/05/10 | 06/01/10 | BALANCE AFTER | | $0.00 | $87,296.82 |
| 08/05/10 | 06/01/10 | MORTGAGE PAYMENT | | $561.48 | $97.20 |
| 08/03/10 | 05/01/10 | BALANCE AFTER | | $0.00 | $87,394.02 |
| 08/03/10 | 05/01/10 | FEES BILLED | | $11.50 | $0.00 |
| 07/13/10 | 05/01/10 | BALANCE AFTER | | $0.00 | $87,394.02 |
| 07/13/10 | 05/01/10 | PAYMENT REVERSAL | | ($561.48) | ($97.20) |
| 07/13/10 | 05/01/10 | FEES BILLED | | $25.00 | $0.00 |
| 07/06/10 | 06/01/10 | BALANCE AFTER | | $0.00 | $87,296.82 |
| 07/06/10 | 06/01/10 | MORTGAGE PAYMENT | | $561.48 | $97.20 |
| 06/07/10 | 05/01/10 | BALANCE AFTER | | $0.00 | $87,394.02 |
| 06/07/10 | 05/01/10 | MORTGAGE PAYMENT | | $561.48 | $96.69 |
| 05/12/10 | 04/01/10 | BALANCE AFTER | | $0.00 | $87,490.71 |
| 05/12/10 | 04/01/10 | PAYMENT REVERSAL | | ($561.48) | ($96.69) |
| 05/12/10 | 04/01/10 | FEES BILLED | | $25.00 | $0.00 |
| 05/05/10 | 05/01/10 | BALANCE AFTER | | $0.00 | $87,394.02 |
| 05/05/10 | 05/01/10 | MORTGAGE PAYMENT | | $561.48 | $96.69 |
| 04/05/10 | 04/01/10 | BALANCE AFTER | | $0.00 | $87,490.71 |
| 04/05/10 | 04/01/10 | MORTGAGE PAYMENT | | $561.48 | $96.17 |
| 03/05/10 | 03/01/10 | BALANCE AFTER | | $0.00 | $87,586.88 |
| 03/05/10 | 03/01/10 | MORTGAGE PAYMENT | | $561.48 | $95.67 |
| 02/05/10 | 02/01/10 | BALANCE AFTER | | $0.00 | $87,682.55 |
| 02/05/10 | 02/01/10 | MORTGAGE PAYMENT | | $561.48 | $95.16 |
| 01/05/10 | 01/01/10 | BALANCE AFTER | | $0.00 | $87,777.71 |
| 01/05/10 | 01/01/10 | MORTGAGE PAYMENT | | $561.48 | $94.66 |
| 12/07/09 | 12/01/09 | BALANCE AFTER | | $0.00 | $87,872.37 |
| 12/07/09 | 12/01/09 | MORTGAGE PAYMENT | | $561.48 | $94.16 |
| 11/05/09 | 11/01/09 | BALANCE AFTER | | $0.00 | $87,966.53 |
| 11/05/09 | 11/01/09 | MORTGAGE PAYMENT | | $561.48 | $93.66 |
| 10/05/09 | 10/01/09 | BALANCE AFTER | | $0.00 | $88,060.19 |

FIFTH THIRD BANK

NOV 2 / 2018

02187-08

| | | | | |
|---|---|---|---|---|
| 10/05/09 | 10/01/09 | MORTGAGE PAYMENT | $561.48 | $93.17 |
| 09/08/09 | 09/01/09 | BALANCE AFTER | $0.00 | $88,153.36 |
| 09/08/09 | 09/01/09 | MORTGAGE PAYMENT | $561.48 | $92.67 |
| 08/05/09 | 08/01/09 | BALANCE AFTER | $0.00 | $88,246.03 |
| 08/05/09 | 08/01/09 | MORTGAGE PAYMENT | $561.48 | $92.18 |
| 07/06/09 | 07/01/09 | BALANCE AFTER | $0.00 | $88,338.21 |
| 07/06/09 | 07/01/09 | MORTGAGE PAYMENT | $561.48 | $91.70 |
| 06/05/09 | 06/01/09 | BALANCE AFTER | $0.00 | $88,429.91 |
| 06/05/09 | 06/01/09 | MORTGAGE PAYMENT | $561.48 | $91.21 |
| 05/05/09 | 05/01/09 | BALANCE AFTER | $0.00 | $88,521.12 |
| 05/05/09 | 05/01/09 | MORTGAGE PAYMENT | $561.48 | $90.73 |
| 04/06/09 | 04/01/09 | BALANCE AFTER | $0.00 | $88,611.85 |
| 04/06/09 | 04/01/09 | MORTGAGE PAYMENT | $561.48 | $90.25 |
| 03/05/09 | 03/01/09 | BALANCE AFTER | $0.00 | $88,702.10 |
| 03/05/09 | 03/01/09 | MORTGAGE PAYMENT | $561.48 | $89.77 |
| 02/05/09 | 02/01/09 | BALANCE AFTER | $0.00 | $88,791.87 |
| 02/05/09 | 02/01/09 | MORTGAGE PAYMENT | $561.48 | $89.30 |
| 01/05/09 | 01/01/09 | BALANCE AFTER | $0.00 | $88,881.17 |
| 01/05/09 | 01/01/09 | MORTGAGE PAYMENT | $561.48 | $88.83 |
| 12/05/08 | 12/01/08 | BALANCE AFTER | $0.00 | $88,970.00 |
| 12/05/08 | 12/01/08 | MORTGAGE PAYMENT | $561.48 | $88.36 |
| 11/05/08 | 11/01/08 | BALANCE AFTER | $0.00 | $89,058.36 |
| 11/05/08 | 11/01/08 | MORTGAGE PAYMENT | $561.48 | $87.89 |
| 10/06/08 | 10/01/08 | BALANCE AFTER | $0.00 | $89,146.25 |
| 10/06/08 | 10/01/08 | MORTGAGE PAYMENT | $561.48 | $87.43 |
| 09/05/08 | 09/01/08 | BALANCE AFTER | $0.00 | $89,233.68 |
| 09/05/08 | 09/01/08 | MORTGAGE PAYMENT | $561.48 | $86.96 |
| 08/05/08 | 08/01/08 | BALANCE AFTER | $0.00 | $89,320.64 |
| 08/05/08 | 08/01/08 | MORTGAGE PAYMENT | $561.48 | $86.50 |
| 07/07/08 | 07/01/08 | BALANCE AFTER | $0.00 | $89,407.14 |
| 07/07/08 | 07/01/08 | MORTGAGE PAYMENT | $561.48 | $86.05 |
| 06/05/08 | 06/01/08 | BALANCE AFTER | $0.00 | $89,493.19 |
| 06/05/08 | 06/01/08 | MORTGAGE PAYMENT | $561.48 | $85.59 |
| 05/05/08 | 05/01/08 | BALANCE AFTER | $0.00 | $89,578.78 |
| 05/05/08 | 05/01/08 | MORTGAGE PAYMENT | $561.48 | $85.14 |
| 04/07/08 | 04/01/08 | BALANCE AFTER | $0.00 | $89,663.92 |
| 04/07/08 | 04/01/08 | MORTGAGE PAYMENT | $561.48 | $84.69 |
| 03/17/08 | 03/01/08 | BALANCE AFTER | $0.00 | $89,748.61 |
| 03/17/08 | 03/01/08 | LATE CHARGE WAIVED | $28.07 | $0.00 |
| 03/05/08 | 03/01/08 | BALANCE AFTER | $0.00 | $89,748.61 |
| 03/05/08 | 03/01/08 | MORTGAGE PAYMENT | $561.48 | $84.24 |
| 02/28/08 | 02/01/08 | BALANCE AFTER | $0.00 | $89,832.85 |
| 02/28/08 | 02/01/08 | MORTGAGE PAYMENT | $561.48 | $83.80 |
| 02/22/08 | 01/01/08 | BALANCE AFTER | $0.00 | $89,916.65 |
| 02/22/08 | 01/01/08 | PAYMENT REVERSAL | ($561.48) | ($83.80) |
| 02/05/08 | 02/01/08 | BALANCE AFTER | $0.00 | $89,832.85 |

FIFTH THIRD BANK

NOV 2 / 2018

02187-08

| 02/05/08 | 02/01/08 | MORTGAGE PAYMENT | $561.48 | $83.80 |
| 01/07/08 | 01/01/08 | BALANCE AFTER | $0.00 | $89,916.65 |
| 01/07/08 | 01/01/08 | MORTGAGE PAYMENT | $561.48 | $83.35 |

FIFTH THIRD BANK

NOV 2 / 2018

02187-08



# RESIDENTIAL LEASE

This agreement, made this 8TH day of _March_ 20 _10_, between Ann Thompson , , hereinafter referred to as the LANDLORD, through its agent and Janet Avery , hereinafter referred to as the TENANT, concerning the lease of the following described property: 950 Hancock Bridge South Blvd. Unit 315, Cape Coral, FL 33909 is agreed to by and shall bind the TENANT, its heirs, estate, or legally appointed representatives. TENANT as herein used shall include all persons to whom this property is leased. LANDLORD as herein used shall include the owner(s) of the premises, its heirs, assigns or representatives and or any agent(s) designated by the owner(s).

**TERM OF LEASE: March 8, 2010 to February 28, 2011.** If for any reason LANDLORD cannot deliver possession of the premises to TENANT by the beginning date, the beginning date may be extended up to 30 days or lease voided at LANDLORD'S option without LANDLORD being liable for any expenses caused by such delay or termination.

**OCCUPANTS:** Only the following individuals shall occupy the premises unless written consent of the LANDLORD is obtained: Janet Avery, , , . A reasonable number of guests may occupy the premises without prior written consent if stay is limited to 72 hours.

**PRORATED RENT:** TENANT agrees to pay the sum of $522.48 as prorated rent for the period March 8, 2010 to March 31, 2010.

**ADVANCE RENT:** TENANT agrees to pay the sum of $675.00 as advance rent representing payment for the last month of lease term or any renewal.

**RENT:** TENANT agrees to pay the monthly rent amount of **$675.00** plus any applicable sales tax as rent on the 1st day of each month in advance without demand at **ANN THOMPSON, 24141 Redfish Cove Drive Punta Gorda, FL 33955** Phone number (941) 916-0281. Emergency number (941) 916-0281. Rent must be received by LANDLORD or its designated agent on or before the due date. A late fee of **$25.00** plus **$5.00** per day thereafter shall be due as additional rent if TENANT fails to make rent payments on or before the **4th** day of each month. Cash payments are not accepted. If TENANT'S check is dishonored, all future payments must be made by money order or cashier's check; dishonored checks will be subject to the greater of 5% of the check amount or a $40.00 charge as additional rent. If LANDLORD has actual knowledge that there are insufficient funds to cover a check, rent will be considered unpaid, LANDLORD may serve TENANT with a Three Day Notice and will not be required to deposit the check. Third party checks are not permitted. Time is of the essence. The imposition of late fees and/or dishonored check charges is not a substitution or waiver of available Florida law remedies. If rent is not received by the **1st** day of each month, LANDLORD may serve a Three Day Notice on the next day or any day thereafter as allowed by law. All signatories to this lease are jointly and severally responsible for the faithful performance of this lease. All payments made shall first be applied to any outstanding balances of any kind including late charges and/or any other charges due under this lease. All notices by TENANT to LANDLORD shall be sent to LANDLORD'S address above by certified mail.

**PETS:** TENANT shall not keep any animal or pet in or around the rental premises without LANDLORD'S prior written approval and a PET ADDENDUM signed by all parties.

**SECURITY DEPOSIT:** TENANT agrees to pay LANDLORD the sum of **$675.00**, as security for faithful performance by TENANT of all terms, covenants and conditions of this lease. This deposit may be applied by the LANDLORD for any monies owed by TENANT under the lease or Florida law, physical damages to the premises, costs, and attorney's fees associated with TENANT's failure to fulfill the terms of the lease and any monetary damages incurred by LANDLORD due to TENANT's default. TENANT cannot dictate that this deposit be used for any rent due. If TENANT breaches the lease by abandoning, surrendering or being evicted from the rental premises prior to the lease expiration date (or the expiration of any extension) TENANT will be responsible for unpaid rent, physical damages, future rent due, attorney's fees, costs and any other amounts due under the terms of the tenancy or Florida law. The security deposit (and advance rent, if applicable) will be held in the following manner: Deposited in a separate non interest bearing account with T I B Bank, 506 Cape Coral Pkwy., Cape Coral, Fl 33904. Florida statutory law, 83.49(3) provides:

(3)(a) Upon the vacating of the premises for termination of the lease, if the landlord does not intend to impose a claim on the security deposit, the LANDLORD shall have 15 days to return the security deposit together with interest if otherwise required, or the landlord shall have 30 days to give the TENANT written notice by certified mail to the TENANT last known mailing address of his intention to impose a claim on the deposit, and the reason for imposing the claim. The notice shall contain a statement in substantially the following form: This is a notice of my intention to impose a claim for damages in the amount of ___ upon your security deposit, due to _____. It is sent to you as required by s. 83.49(3), Florida Statutes. You are hereby notified that you must object in writing to this deduction from your security deposit within 15 days from the time you receive this notice or I will be authorized to deduct my claim from your security deposit. Your objection must be sent to (landlord's address). If the LANDLORD fails to give the required notice within the 30-day period, he forfeits his right to impose a claim upon the security deposit.

(b) Unless the TENANT objects to the imposition of the landlord's claim or the amount thereof within 15 days after receipt of the

Page 1          Initials _____

Avery, J Doc ID 365706

Landlord's notice of intention to impose a claim, the LANDLORD may then deduct the amount of his claim and shall remit the balance of the deposit to the TENANT within 30 days after the date of the notice of intention to impose a claim for damages.

If either party institutes an action in a court of competent jurisdiction to adjudicate his right to the security deposit, the prevailing party is entitled to receive his court costs plus a reasonable fee for his attorney. The court shall advance the cause on the calendar.

Compliance with this subsection by an individual or business entity authorized to conduct business in this state, including Florida licensed real estate brokers and salespersons, shall constitute compliance with all other relevant Florida Statutes pertaining to security deposits held pursuant to a rental agreement or other landlord-tenant relationship. Enforcement personnel shall look solely to this subsection to determine compliance. This subsection prevails over any conflicting provisions in chapter 475 and in other sections of the Florida Statutes.

Security deposit refunds if any shall be made by mail only, as provided by law, made out in names of all TENANTS in one check, and, may not be picked up in person from LANDLORD.

**ASSIGNMENTS:** TENANT shall not assign this lease or sublet the premises or any part thereof. Any unauthorized transfer of interest by the TENANT shall be a breach of this agreement.

**APPLICATION:** If TENANT has filled out a rental application, any misrepresentation made by the TENANT in same will be a breach of this agreement and LANDLORD may terminate the tenancy.

**FIXTURES AND ALTERATIONS:** TENANT must obtain prior written consent from LANDLORD before painting, installing fixtures, making alterations, additions or improvements and if permission granted, same shall become LANDLORD'S property and shall remain on the premises at the termination of the tenancy.

**USE OF PREMISES:** TENANT shall maintain the premises in a clean and sanitary condition and not disturb surrounding residents or the peaceful and quiet enjoyment of the premises or surrounding premises. TENANT shall install window shades or draperies (no foil, sheets, paper etc. allowed) within 15 days of taking occupancy if not already provided. Premises are to be used and occupied by the TENANT for only residential, non business, private housing purposes only. TENANT shall not operate any type of day care or child sitting service on the premises. TENANT shall secure insurance immediately for any water filled devices with a loss payable clause to LANDLORD. No trampolines, athletic equipment, recreational equipment, or any items or activities which can cause interference with the insurance coverage on the premises will be permitted.

**SMOKING:** Smoking is NOT permitted inside the premises by TENANT, guests or invitees. TENANT understands that smoking inside the premises shall be considered a material default under this lease agreement

**RISK OF LOSS:** All TENANTS' personal property shall be at the risk of the TENANT or owner thereof and LANDLORD shall not be liable for any damage to said personal property of the TENANT arising from criminal acts, fire, storm, flood, rain or wind damage, acts of negligence of any person whomsoever, or from the bursting or leaking of water pipes. TENANT is strongly urged to secure insurance for personal property.

**DEFAULT:** (1) Failure of TENANT to pay rent or any additional rent when due, or (2) TENANT'S violation of any other term, condition or covenant of this lease (and if applicable, attached rules and regulations), condominium by-laws or neighborhood deed restrictions or (3) failure of TENANT to comply with any Federal, State and/or Local laws, rules and ordinances, or (4) TENANT'S failure to move into the premises or tenants abandonment of the premises, shall constitute a default by TENANT. Upon default, TENANT shall owe LANDLORD rent and all sums as they become due under the terms of this lease and any addendums attached hereto and any and all amounts owed to LANDLORD as permitted by Florida law. If the TENANT abandons or surrenders possession of the premises during the lease term or any renewals, or is evicted by the LANDLORD, LANDLORD may retake possession of the premises and make a good faith effort to rerent it for the TENANT account. Retaking of possession shall not constitute a rescission of this lease nor a surrender of the leasehold estate. If TENANT(s) breach this lease agreement, in addition to any other remedies available by law and this lease agreement, TENANT(s) shall be responsible for any leasing fee or commission charge which OWNER may incur in attempting to re-lease the premises through a licensed real estate company. If TENANT'S actions or inactions result in any fines, attorneys fees, costs or charges from or imposed by a condo association or homeowners association if in place, TENANT shall be in default of this lease and shall be immediately required to pay such sums as additional rent.

**ATTORNEY'S FEES:** If LANDLORD employs an attorney due to TENANT's violation of the terms and conditions of this lease, TENANT shall be responsible for all costs and reasonable attorney's fees as incurred by the LANDLORD whether or not suit is filed. LANDLORD and TENANT waives the right to demand a jury trial concerning any litigation between LANDLORD and TENANT.

**UTILITIES:** LANDLORD is responsible for providing the following utilities only: **WATER, GARBAGE,** . The TENANT agrees to pay all charges and deposits for all other utilities and TENANT agrees to have all accounts for utilities immediately placed in TENANT name with accounts kept current throughout occupancy. Garbage and or trash removal is considered a utility under this lease. If the utilities which TENANT is responsible for are still in LANDLORD's name at the time TENANT takes occupancy, TENANT agrees that LANDLORD shall order such utilities to be terminated.

Page 2          Initials _____

**VEHICLES:** Vehicle(s) must be currently licensed, owned by TENANT, registered, operational and properly parked. TENANT agrees to abide by all parking rules established now or in the future by LANDLORD or condo /homeowner association's rules, if applicable. No trailers, campers, vehicles on blocks, motorcycles, boats or commercial vehicles are allowed on or about the premises without Landlord's prior written approval. TENANT is not to repair or disassemble vehicles on the premises. Vehicles not meeting the above requirements and additional rules of LANDLORD are unauthorized vehicles subject to being towed at TENANT expense. Parking on the grass is prohibited. TENANT agrees to indemnify LANDLORD for any expenses incurred due to the towing of any vehicle belonging to the guest or invitee of TENANT. TENANT agrees that only the following vehicles will be parked on the premises: Cadillac 2006

**MAINTENANCE/INSPECTION:** TENANT agrees that they have fully inspected the premises and accepts the condition of the premises in "as is" condition with no warranties or promises express or implied. TENANT shall maintain the premises in good, clean and tenantable condition throughout the tenancy, keep all plumbing fixtures in good repair, use all electrical, plumbing, heating, cooling, appliances and other equipment in a reasonable manner, removing all garbage in a clean and sanitary manner. In the event TENANT or TENANT'S guests or invitees cause any damage to the premises, LANDLORD may at its option repair same and TENANT shall pay for the expenses of same on demand or LANDLORD may require TENANT repair same, all charges incurred as additional rent. **TENANT shall be fully responsible for, and agrees to maintain and repair at TENANT'S expense, the following: A/C FILTERS, EXTERMINATION, SMOKE ALARM(S),** . In the event a major repair to the premises must be made which will necessitate the TENANT'S vacating the premises, LANDLORD may at its option terminate this agreement and TENANT agrees to vacate the premises holding LANDLORD harmless for any damages suffered if any. TENANT shall notify LANDLORD immediately of any maintenance needed or repair in writing. TENANT agrees that they shall immediately test the smoke detector and shall maintain same.

**VACATING:** At the expiration of this agreement or any extension, TENANT shall peaceably surrender the premises and turn in all keys and any other property owned by LANDLORD leaving the premises in good, clean condition, ordinary wear and tear excepted. TENANT agrees to have the carpeting cleaned professionally upon moveout or will incur a minimum carpet cleaning charge to be deducted from the security deposit in the amount of $100.00. In the event all keys are not returned upon moveout, there will be a minimum charge to be deducted from the security deposit in the amount of $25.00. In addition to any cleaning charges or any other charges due under the terms of this lease, TENANT agrees to a mandatory minimum unit cleaning charge to be deducted from the security deposit in the amount of $100.00.

**RENEWAL:** If LANDLORD consents to TENANT remaining in the premises after the natural expiration of this lease, and no new lease is signed, the tenancy will be extended as a month-to-month tenancy and may be terminated by TENANT giving written notice not less than 15 days prior to the end of any monthly payment period OR LANDLORD giving written notice not less than 15 days prior to the end of any monthly payment period. Termination of the tenancy shall occur on the last day of the month. Notice from TENANT to LANDLORD must be made by certified mail. All other conditions of this lease shall remain in effect. Failure to give 30 days notice by TENANT prior to the end of the lease period will result in additional liability of TENANT for the following full monthly rental period in addition to security deposit forfeiture. If TENANT fails to vacate after the initial term, or any successive consensual periods after termination, TENANT shall additionally be held liable for holdover (double) rent.

**RIGHT OF ENTRY:** LANDLORD, upon reasonable notice by telephone, hand-delivery or posting to TENANT, has the right of entry to the premises for showing, repairs, appraisals, inspections, or any other reason. LANDLORD has immediate right of entry in cases of emergency, or to protect or preserve the premises. TENANT shall not alter or add locks without prior written consent. If consent is given, TENANT must provide LANDLORD with a key to all locks. LANDLORD may place "For Sale" or "For Rent" signs on the premises at any time.

**CONDEMNATION, DAMAGE TO PREMISES, ACTS OF GOD and TERMINATION:** If for any reason the premises are condemned by any governmental authority, destroyed, rendered uninhabitable, rendered dangerous to persons or property, and/or damaged through fire, water, smoke, wind, flood, act of God, nature or accident, or, if it becomes necessary, in the opinion of LANDLORD or its agent, that TENANT must vacate the premises in order for repairs to the premises to be undertaken, this lease shall, at LANDLORD'S option and upon 7 days written notice to TENANT, cease and shall terminate, TENANT agrees to and shall vacate and TENANT, if not in default of the lease, shall owe no further rent due under the terms of the lease. In such case, TENANT hereby waives all claims against LANDLORD for any damages suffered by such condemnation, damage, destruction or lease termination. TENANT agrees that in the event there are hurricane or storm shutters on the premises, TENANT will install same if there is a hurricane or tropical storm watch or warning in effect and/or at the request of the property manager or owner. If TENANT is unable to perform this task for any reason, TENANT agrees to notify property manager or owner as soon as any storm watch or warning is placed into effect.

**WAIVERS:** The rights of the LANDLORD under this lease shall be cumulative, and failure on the part of the LANDLORD to exercise promptly any rights given hereunder shall not operate to forfeit any other rights allowed by this lease or by law.

Page 3         Initials

**INDEMNIFICATION:** TENANT agrees to reimburse LANDLORD upon demand in the amount of the loss, property damage, or cost of repairs or service (including plumbing trouble) caused by the negligence or improper use by TENANT, his agents, family or guests. TENANT at all times, will indemnify and hold harmless LANDLORD from all losses, damages, liabilities and expenses which can be claimed against LANDLORD for any injuries or damages to the person or property of any persons, caused by the acts, omissions, neglect or fault of TENANT, his agents, family or guests, or arising from TENANT's failure to comply with any applicable laws, statutes, ordinances or regulations.

**DISPUTES AND LITIGATION:** In the event of a dispute concerning the tenancy created by this agreement, TENANT agrees that if the premises are being managed by an agent for the record owner TENANT agrees to hold agent, its heirs, employees and assigns harmless and shall look solely to the record owner of the premises in the event of a legal dispute.

**INTEGRATION:** This lease and exhibits and attachments, if any, set forth the entire agreement between LANDLORD and TENANT concerning the premises, and there are no covenants, promises, agreements, conditions, or understandings, oral or written between them other than those herein set forth. If any provision in this agreement is illegal, invalid or unenforceable, that provision shall be void but all other terms and conditions of the agreement shall be in effect.

**MODIFICATIONS:** No subsequent alteration, amendment, change or addition to this lease shall be binding upon LAND-LORD unless reduced to writing and signed by the parties.

**RADON GAS:** State law requires the following notice to be given: "Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quanities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit."

**ABANDONED PROPERTY: BY SIGNING THIS RENTAL AGREEMENT, THE TENANT AGREES THAT UPON SUR-RENDER, ABANDONMENT, OR RECOVERY OF POSSESSION OF THE DWELLING UNIT DUE TO THE DEATH OF THE LAST REMAINING TENANT, AS PROVIDED BY CHAPTER 83, FLORIDA STATUTES, THE LANDLORD SHALL NOT BE LIABLE OR RESPONSIBLE FOR STORAGE OR DISPOSITION OF THE TENANT'S PERSONAL PROPER-TY.**

**ADDITIONAL STIPULATIONS :**

(1) Tenant agrees smoking is NOT permitted on the premises by Tenant and / or Tenant's guests. In the event the premises are damaged in any way due to smoke, Tenant agrees they will be fully responsible for eradication of smoke-related odors and/or repair of damage due to smoke. Tenant agrees smoke related damages will in no way be considered ordinary wear and tear.
(2) Tenant is responsible for changing batteries in any battery powered items within the home, including, but not limited to: thermostats, garage door opener transmitters, sprinkler timer battery backups, and smoke detectors, at Tenant's expense.
(3) Tenant agrees to pay a $50.00 fee if a default notice is required to be delivered to Tenant as additional rent.
(4) Tenant understands and agrees that the electric and water (if applicable) service is currently on in the Landlord's name. Tenant agrees that the Landlord shall order the electric and water service be taken out of the name of the Landlord within 3 days, and Tenant shall place the electric and water service in Tenant's name and pay all necessary deposits. Tenant understands that Tenant is fully responsible for payment of the utilities for the full duration of the lease term.
(5) If this property is governed by an Association, your lease is subject to all the rules and regulations of the Association. Association amenities are subject to change without notice and the Landlord and the leasing company shall not be held responsible for any changes enacted by the Association.
(6) Tenant may terminate this agreement early with 30 days written notice. Tenant must, in any event, remain on the premises until September 30,2010 prior to taking advantage of the early termination option. Tenant agrees that any termination shall occur as of the last day of a calendar month.

# SIGNATURE PAGE

ACCEPTANCE BY FACSIMILE BY ANY OF THE PARTIES SHALL CONSTITUTE VALID BINDING ACCEPTANCE OF THIS LEASE AGREEMENT.

_____ TENANT
Janet Avery

_____ AGENT FOR OWNER

This lease has been drafted by the Law Offices of Heist, Weisse & Davis, P.A. 1 800 253 8428
Reference #295159

Page 5        Initials

TENANT(S) AGREE TO REPORT IN WRITING:

*VISIBLE OR SUSPECTED MOLD

*ALL A/C OR HEATING PROBLEMS OR ABNORMALITIES

* LEAKS, MOISTURE ACCUMULATIONS, MAJOR SPILLAGE

*PLANT WATERING OVERFLOWS

*SHOWER/BATH/SINK/TOILET OVERFLOWS

*LEAKY FAUCETS, PLUMBING, PET URINE ACCIDENTS

*DISCOLORATION OF WALLS, BASEBOARDS, DOORS, WINDOW FRAMES, CEILINGS

*MOLDY CLOTHING, REFRIGERATOR AND A/C DRIP PAN OVERFLOWS

*MOISTURE DRIPPING FROM OR AROUND ANY VENTS, A/C CONDENSER LINES

*LOOSE, MISSING OR FAILING GROUT OR CAULK AROUND TUBS, SHOWERS, SINKS, FAUCETS, COUNTERTOPS, CLOTHES DRYER VENT LEAKS

*ANY AND ALL MOISTURE AND MUSTY ODORS

SMALL AREAS OF MOLD: If mold has occurred on a small non-porous surface such as ceramic tile, formica, vinyl flooring, metal, or plastic and the mold is not due to an ongoing leak or moisture problem, Tenant(s) agree to clean the areas with soap (or detergent) and a small amount of water, let the surface dry, and then, within 24 hours apply a non staining cleaner such as Lysol Disinfectant, Pine-Sol Disinfectant (original pine-scented), Tilex Mildew Remover, or Clorox Cleanup.

TERMINATION OF TENANCY: Owner or agent reserves the right to terminate the tenancy and TENANT(s) agree to vacate the premises in the event owner or agent in its sole judgment feels that either there is mold or mildew present in the dwelling unit which may pose a safety or health hazard to TENANT(S) or other persons and/or TENANT(S) actions or inactions are causing a condition which is conducive to mold growth.

INSPECTIONS: TENANT(S) agree that Owner or agent may conduct inspections of the unit at any time with reasonable notice.

VIOLATION OF ADDENDUM: IF TENANT(S) FAIL TO COMPLY WITH THIS ADDENDUM, Tenant(s) will be held responsible for property damage to the dwelling and any health problems that may result. Noncompliance includes but is not limited to Tenant(s) failure to notify Owner or Agent of any mold, mildew or moisture problems immediately IN WRITING. Violation shall be deemed a material violation under the terms of the Lease, and owner or agent shall be entitled to exercise all rights and remedies it possesses against TENANT(S) at law or in equity and TENANT(S) shall be liable to Owner for damages sustained to the Leased Premises. TENANT(S) shall hold Owner and agent harmless for damage or injury to person or property as a result of TENANT(S) failure to comply with the terms of this Addendum.

HOLD HARMLESS: If the premises is or was managed by an agent of the Owner, TENANT(S) shall hold agent harmless and shall look solely to the property Owner in the event of any litigation or claims concerning injury, damage or harm suffered due to mold.

PARTIES: THIS ADDENDUM IS BETWEEN THE TENANT(S) AND OWNER AND OR AGENT MANAGING THE PREMISES. THIS ADDENDUM IS IN ADDITION TO AND MADE PART OF THE LEASE AGREEMENT AND IN THE EVENT THERE IS ANY CONFLICT BETWEEN THE LEASE AND THIS ADDENDUM, THE PROVISIONS OF THIS ADDENDUM SHALL GOVERN.

_____
Janet Avery

_____
Owner or Owners Agent

_____

_____

Page 7          Initials

# DRUG/CRIME FREE ADDENDUM

In consideration of the execution or renewal of the lease, Owner, Management and Resident agree as follows:

1.     Resident, any member of the Resident's household, or a guest or other person under the Resident's control shall not engage in criminal activity, including drug-related criminal activity, on, near or within sight of the rental premises. "Drug-related criminal activity" means the illegal manufacture, sale, distribution, transportation, storage, use, or possession with intent to manufacture, sell, distribute, store, transport or use a controlled substance including but not limited to marijuana or cocaine and/or illegal drug paraphernalia.

2.     Resident, any member of the Resident's household, or a guest or other person under the Resident's control shall not engage in any act intended to facilitate criminal activity, including drug-related criminal activity, on, near or within sight of the premises.

3.     Resident or member of the household will not permit the dwelling unit inside or out to be used for, or to facilitate criminal activity, including drug-related criminal activity, regardless of whether the individual engaging in such activity is a member of the household or a guest.

4.     Resident or member of the household will not engage in the manufacture, sale, storage, transportation, use, possession or distribution of illegal drugs and/or drug paraphernalia at any location, whether on, near or within sight of the premises or otherwise.

5.     Resident, any member of the Resident's household, or a guest or other person under Resident's control shall not engage in any illegal activity including but not limited to prostitution, public drunkenness, lewd behavior, trespass by your guests if they have previously received a trespass warning, dangerous operation of a motor vehicle in the premises, disorderly conduct, street gang activity, battery, assault, discharging weapons, acts of violence or threats of violence, sexual crimes on or off the premises, or any breach of the lease agreement that otherwise jeopardizes the safety or welfare or any persons.

6.     VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL VIOLATION OF THE RENTAL AGREEMENT AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this addendum shall be deemed a serious violation and material noncompliance with the Rental Agreement. It is understood and agreed that a single violation shall be good cause for termination of the Rental Agreement. Unless otherwise provided by law, PROOF OF VIOLATION SHALL NOT REQUIRE CRIMINAL CONVICTION, but shall be a preponderance of the evidence.

7.     In case of conflict between the provisions of this addendum and any other provisions of the Rental Agreement, the provisions of the addendum shall govern.

RESIDENTS INITIALS: ( ) ( ) ( )

FORM PROVIDED BY
LAW OFFICES OF
HEIST, WEISSE & DAVIS, P.A.
1-800-253-8428



EXHIBIT D2

2013-Aug-07 1117 AM Bank of America 813-637-2346                5/8

ALTERNATIVE LIVING EXPENSES

Statement:

I, Lillian Chatmon, relocated with family at 1530 Creekbend Drive, Brandon, Florida, 33510 in April of 2010 due to Chinese Drywall that was found in my residence at 4151 Bismarck Palm Drive. I am presently relocated at the same address. (April, 2010 - present).

| Months Contributed | Cash Amount Contributed Monthly | Cash Total Contributed |
|---|---|---|
| Apr. 2010 - Dec. 2011 (21 mos) | 150.00 | 3150.00 |
| Jan. 2012 - Aug. 2013 (20 mos.) | 200.00 | 4000.00 |

Signature: Lillian Chatmon

Resident Owner: Sophia Cheng

Date: 8/7/2013

State of Florida, Hillsborough County
The foregoing instrument was acknowledged before me this 7th day of August, 2013
by Lillian P. Chatmon
Notary Grethel Perez



GRETHEL PEREZ
Notary Public, State of Florida
Commission # FF 21327
My comm. expires May 23, 2017


EXHIBIT
Chatmon
1/14/19 JRC

Chatmon_000120

# Alternative Living Expenses

Statement:
I, Lillian Chatmon, relocated with family at 1530 Creekbend Drive, Brandon, Florida, 33510, due to Chinese drywall in my home.

I have been compensated (paid) $7150.00 for that time period. April - 2010 - Dec. 2011 - 21mos, 150$\frac{00}{}$ → 3150$\frac{00}{}$
Jan - 2012 - Aug. 2013 - 20 mo. - 200$\frac{00}{}$ → 4000$\frac{00}{}$

Lillian Chatmon $7150$\frac{00}{}$
Feb. 20, 2018

---

Section VII #1 Attach

# Additional Alternative Living Expenses
*(not compensated for)*

Statement:
I, Lillian Chatmon, continued to live with family at 1530 Creekbend Dr. Brandon, FL from September 2013 - June 2014.

| Months Contributed | Amount Cash Contributed | Total Cash Contributed |
|---|---|---|
| Sept. 2013 - June 2014 (10mo) | 200.00 | $2000.00 |

Signature: Lillian Chatmon
Resident Owner: Ddia Cherry
Date: 2/22/2018

Other
Damages
Section VII.
Attach # 2

# Additional Alternative Living Expenses
## *(not compensated for)

Statement:

I, Lillian Chatmon, relocated with family (Kimberly Chatmon Cain) at 1949 Grand Isle Drive, Brandon, Florida, 33511, (Apartment Complex) in July, 2014 — present time (Feb. 2018).

This additional move resulted because I am still out of my home at 4151 Bismarck Palm Drive, Tampa, 33610 due to Chinese Drywall that has not been repaired.

| Months Contributed | Amount each Contributed | Total each Contributed |
|---|---|---|
| July, 2014 – Feb. 2018 (44mo) | $250.00 | * $11,000.00 |

Signature: Lillian Chatmon
Resident Owner: KCCa
Date: 2/22/2018

## Alternative Living Expenses

Statement:

   I, Lillian Chatmon, relocated with family at 1530 Creekbend Dr. Brandon, Florida, 33510, in April of 2010 due to Chinese Drywall that was found in my residence at 4151 Bismarck Palm Dr.

   I moved out of that residence in July of 2014.

| Months contributed | Monthly Amount Contributed (cash) | Total Contributed (cash) |
|---|---|---|
| Apr. 2010-Dec. 2011 (21 mo.) | $150.00 | $3150.00 |
| Jan. 2012 - June 2014 (30 mos.) | $200.00 | 6000.00 |
| | | $9150.00 |

Signature: _Lillian Chatmon_

Resident Owner: _Sophia Cheng_

Date: _11-28-18_

Lillian Chatmon

## Alternative Living Expenses

Relocated with family at 1949 Grand Isle Drive, Brandon, Florida, 33511, in July, 2014 to present time (November, 2018).

Contribute monthly toward rent, telephone and utilities.

\* __Checks Available__

| | |
|---|---|
| July 2014 | 700.00 |
| Dec. 2014 | 800.00 |
| Jan. 2015 | 300.00 |
| Feb. 2015 | 300.00 |
| Mar. 2015 | 300.00 |
| Apr. 2015 | 300.00 |
| May 2015 | 300.00 |
| June 2015 | 300.00 |
| July 2015 | 300.00 |
| Aug. 2015 | 300.00 |
| Sept. 2015 | 300.00 |
| Oct. 2015 | 300.00 |
| Nov. 2015 | 300.00 |
| Dec. 2015 | 150.00 |
| Jan. 2016 | 300.00 |
| Feb. 2016 | 200.00 |
| Apr. 2016 | 200.00 |
| May 2016 | 150.00 |
| July 2016 | 1300.00 |

| | |
|---|---|
| July 2017 | 250.00 |
| Sept. 2017 | 200.00 |
| Oct. 2017 | 200.00 |
| Nov. 2017 | 250.00 |
| Dec. 2017 | 250.00 |
| Jan. 2018 | 300.00 |
| Feb. 2018 | 300.00 |
| Mar. 2018 | 300.00 |
| April 2018 | 300.00 |
| May 2018 | 300.00 |
| June 2018 | 450.00 |
| July 2018 | 450.00 |
| Aug. 2018 | 450.00 |
| Sept. 2018 | 450.00 |
| Oct. 2018 | 470.00 |
| Nov. 2018 | 470.00 |

\* no checks __Available__

| | |
|---|---|
| Mar. 2016 | 300.00 |
| Dec. 2016 | 300.00 |
| Jan. 2017 | 250.00 |
| Feb. 2017 | 250.00 |
| Mar. 2017 | 250.00 |
| Apr. 2017 | 250.00 |
| May 2017 | 250.00 |
| June 2017 | 250.00 |
| July 2017 | |

Chatmon_000124

Total paid for rent July 2014 — present (nov. 2018)

Amount paid

Checks Available: ——→    $ 1 2, 6 9 0. 00

No Checks Available: ——→  +   2, 1 00. 00

$ 1 4, 7 9 0. 00

Sign: Lillian Chatmon

Family Member
(Daughter)              Kimberly Chatmon Cain

Date: 11 - 28 - 2018

Chatmon_000125



https://onlinebanking.regions.com/accounts/details/1

LILLIAN E CHATMON
SOPHIA W CHERRY
P O Box 4898
Albany, GA 31706

9836
64-137/611

*Oct. 1, 2018*
DATE

PAY TO THE
ORDER OF *Kimberly C. Cain* $ *470.00*

*Four hundred seventy + 00/100* DOLLARS

**REGIONS**

FOR _____

*Lillian Chatmon*

8611 0 9836

Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
10/01/2018 - 14:02:33

Security Features exceed industry standards
...

**CHECK HERE IF MOBILE DEPOSIT**

**LILLIAN E CHATMON**
**SOPHIA W CHERRY**
P O Box 4898
Albany, GA 31706

9832
84-137/611

9/2/2018
DATE

PAY TO THE
ORDER OF  *Kimberly C. Cain*  | $ 450.00

*Four hundred fifty + 00/100*  DOLLARS

**REGIONS**

FOR _____

*Lillian Chatmon*

B611"09832

O9832
Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
09/04/2018 - 16:23:15

Security features ex...ed industry standa...
Deposits

Do not cash ?

FOR DEPOSIT ONLY
CHECK HERE IF MOBILE DEPOSIT

*K C Cain
For deposit at NFCU
only*



**LILLIAN E. CHATMON 10-67**
**OR SOPHIA W. CHERRY**
P. O. Box 4898
Albany, GA 31706

9816
64-137/611

7/01/2018
DATE

PAY TO THE
ORDER OF   _Kimberly C. Cain_   | $ 450.00

_Four hundred fifty dollars & 00/100_   DOLLARS

**REGIONS**

FOR _____   _Lillian Chatmon_

⑆8611⑆09816⑆

Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
07/02/2018 - 17:19;28

**LILLIAN E. CHATMON 10-67**
**OR SOPHIA W. CHERRY**
P. O. Box 4898
Albany, GA 31706

9807
64-157/811

DATE: 6-01-2018

PAY TO THE ORDER OF: Mrs. Kimberly C. Cain         $ 450.00

Four hundred fifty dollars + 00/100         DOLLARS

**REGIONS**

FOR _____

Lillian Chatmon

⑈861⑈⑈09807

Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
06/03/2018 - 06:37:44

LILLIAN E. CHATMON 10-67
OR SOPHIA W. CHERRY
P. O. Box 4898
Albany, GA 31706

9801
64-137/611

DATE 5/4/2018

PAY TO THE
ORDER OF _Kimberly C. Cain_ | $ 300.00

_Three hundred dollars + 00/100_ DOLLARS

# REGIONS

FOR _____  _Lillian Chatmon_

⑈861⑈⑈09801⑈

Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
05/04/2018 - 17:21:15

CHECK HERE IF MOBILE DEPOSIT

_Kimberly C. Cain
mobile deposit only at NFCU_

Security features exceed industry standards and include
• Matching account and check number on most Region's checks
• The Security Weave - pattern on back - designed to defer fraud
• Microprint MP line - printed on front and back
• The words ORIGINAL DOCUMENT across the back
• Photo Safe Deposit - icon visible on front and back

Do not cash if
• Any of the features listed above are missing or appear altered
• Feature of color here looks pink or has disappeared
• Brown stains and crackles appear on both front and back

Chatmon_000132

LILLIAN E. CHATMON 10-67
OR SOPHIA W. CHERRY
P.O. Box 4898
Albany, GA 31706

9783
64-137/611

DATE 4/2/2018

PAY TO THE
ORDER OF _Kimberly C. Cain_     $ 300.00

_Three Hundred dollars + no/100_ DOLLARS

**REGIONS**

FOR ____     _Lillian Chatmon_

⑈8611⑈09783

Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
04/04/2018 - 18:28:35

CHECK HERE IF MOBILE DEPOSIT

for deposit only at NFCU

**LILLIAN E. CHATMON** 10-67
OR SOPHIA W. CHERRY
P. O. Box 4898
Albany, GA 31706

**9774**
64-137/611

3-4-2018
DATE

PAY TO THE ORDER OF _Ms. Kimberly C. Cain_ | $ 300.00

_Three hundred dollars & 00/100_ DOLLARS

**REGIONS**

FOR _____

_Lillian Chatmon_

8611 09774

Navy Federal Credit Union
820-Follin Lane, Vienna VA 22180
03/05/2018 - 17:18:50

8611

For Deposit only @ NFCU

CHECK HERE IF MOBILE DEPOSIT

**LILLIAN E. CHATMON** 10-67
OR SOPHIA W. CHERRY
P.O. Box 4898
Albany, GA 31706

9769
64-137/611

2/4/2018

PAY TO THE ORDER OF *Kimberly C. Cain* $300.00

*Three hundred dollars + 00/100* DOLLARS

**REGIONS**

FOR

*Lillian Chatmon*

Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
02/04/2018 - 15:40:32

CHECK HERE IF MOBILE DEPOSIT

LILLIAN E. CHATMON 10-67
OR SOPHIA W. CHERRY
P. O. Box 4898
Albany, GA 31706

9754
64-137/811

1-2-2018
DATE

PAY TO THE
ORDER OF  Kimberly C. Cain                     | $ 300.00

Three hundred dollars + 00/100              DOLLARS

REGIONS

ECB

Lillian Chatmon

8611"09754

Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
01/04/2018 - 07:10:30

CHECK HERE IF MOBILE DEPOSIT

For deposit only at NFCU



**Regions Bank**
North Slappy
2322 North Slappy Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #          8611

Page          3    of 3



Check# 9326     07/07/2014     $400.00
Check# 9327     07/02/2014     $700.00
Check# 9328     07/02/2014     $200.00
Check# 9329     07/09/2014     $235.19
Check# 9330     07/08/2014     $20.00
Check# 9337     07/15/2014     $10.00
Check# 9338     07/21/2014     $55.00
Check# 9339     07/14/2014     $200.00
Check# 9340     07/17/2014     $34.43

Chatmon_000137



Regions Bank
North Slappey
2322 North Slappey Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #          8611

Page          4   of 4



Check# 9390     12/04/2014     $55.00
Check# 9391     12/01/2014     $1831.40
Check# 9392     12/02/2014     $150.00
Check# 9393     12/02/2014     $100.00
Check# 9394     12/09/2014     $55.00
Check# 9396     12/11/2014     $65.00
Check# 9397     12/08/2014     $800.00
Check# 9398     12/08/2014     $100.00
Check# 9399     12/19/2014     $31.50
Check# 995033   12/16/2014     $116.32

Chatmon_000138



**Regions Bank**
North Slappey
2322 North Slappey Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #          8611

Page          4    of 4



Check# 9400    12/29/2014    $50.00
Check# 9401    12/29/2014    $200.00
Check# 9402    01/08/2015    $463.00
Check# 9405    01/16/2015    $20.00
Check# 9406    01/07/2015    $203.64
Check# 9407    01/07/2015    $249.30
Check# 9408    01/07/2015    $318.50
Check# 9409    01/06/2015    $25.00
Check# 9410    01/05/2015    $60.00
Check# 9411    01/08/2015    $300.00
Check# 9412    01/20/2015    $100.00

Regions Bank
North Slappey
2322 North Slappy Blvd
Albany, GA 31702



LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #                  8611

Page          3    of 3



| Check# 9414 | 02/03/2015 | $100.00 |
| Check# 9416 | 02/04/2015 | $300.00 |
| Check# 9417 | 02/18/2015 | $10.00 |
| Check# 9418 | 02/13/2015 | $100.00 |
| Check# 995040 | 02/11/2015 | $122.73 |

Chatmon_000140



**Regions Bank**
North Slappey
2322 North Slappy Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #        3611

Page     3   of 3



| Check# 9420 | 02/25/2015 | $150.00 | Check# 9421 | 02/25/2015 | $100.00 | Check# 9422 | 03/02/2015 | $100.00 |

| Check# 9423 | 03/02/2015 | $300.00 | Check# 995046 | 03/13/2015 | $102.89 |

Chatmon_000141



**Regions Bank**
North Slappey
2322 North Slappy Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #           8611

Page       3    of 3



Check# 9425    04/06/2015    $300.00
Check# 9426    04/07/2015    $100.00
Check# 9427    04/15/2015    $20.00
Check# 9429    04/13/2015    $1200.00
Check# 9430    04/22/2015    $52.00
Check# 9431    04/21/2015    $55.00
Check# 995051    04/13/2015    $133.93

Chatmon_000142



**Regions Bank**
North Slappey
2322 North Slappey Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT # ████████ 8611

Page          3    of 3



| Check# 9432 | 04/27/2015 | $100.00 |
| Check# 9434 | 05/15/2015 | $20.00 |
| Check# 9435 | 05/04/2015 | $300.00 |
| Check# 9436 | 06/12/2015 | $375.00 |
| Check# 9437 | 05/06/2015 | $1208.00 |
| Check# 9438 | 06/11/2015 | $100.00 |
| Check# 9439 | 05/04/2015 | $100.00 |
| Check# 9440 | 06/13/2015 | $110.00 |
| Check# 996058 | 06/13/2015 | $90.71 |



**Regions Bank**
North Slappey
2322 North Slappy Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #         8611

Page         3    of 3



Check# 9441    06/05/2015    $118.00
Check# 9442    06/09/2015    $75.00
Check# 9443    06/09/2015    $50.00

Check# 9444    06/03/2015    $300.00
Check# 9445    06/11/2015    $65.00
Check# 9446    06/08/2015    $100.00

Check# 9450    06/22/2015    $20.00
Check# 995066    06/10/2015    $92.26

Chatmon_000144



Regions Bank
North Slappey
2322 North Slappy Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #          8611

Page          3   of 3



| Check# 9448 | 06/29/2015 | $50.00 | Check# 9451 | 06/23/2015 | $25.00 | Check# 9452 | 07/08/2015 | $28.48 |
| Check# 9453 | 07/07/2015 | $20.00 | Check# 9454 | 07/02/2015 | $300.00 | Check# 9457 | 07/06/2015 | $100.00 |
| Check# 9458 | 07/14/2015 | $55.00 | Check# 9459 | 07/16/2015 | $125.00 | Check# 996074 | 07/08/2015 | $96.37 |

Chatmon_000145



**Regions Bank**
North Slappey
2322 North Slappy Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898



ACCOUNT #          8611

Page          3     of 3





| Check# 9460 | 08/06/2015 | $55.00 | Check# 9461 | 08/04/2015 | $300.00 | Check# 9463 | 08/21/2015 | $50.00 |

Chatmon_000146



Regions Bank
North Slappey
2322 North Slappy Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #                    8611

Page          3      of 3



| | | |
|---|---|---|
| Check# 9462  08/27/2015  $125.00 | Check# 9464  09/08/2015  $55.00 | Check# 9465  09/09/2015  $52.00 |
| Check# 9466  09/08/2015  $300.00 | Check# 9467  09/11/2015  $125.00 | Check# 9468  09/14/2015  $100.00 |
| Check# 9469  09/21/2015  $110.00 | | |

Chatmon_000147



**Regions Bank**
North Slappey
2322 North Slappy Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #                    8611

Page          3      of 3



| | | |
|---|---|---|
| Check# 9471 10/15/2015 $16.00 | Check# 9472 10/08/2015 $463.00 | Check# 9473 10/02/2015 $300.00 |
| Check# 9474 10/05/2015 $100.00 | Check# 9475 10/05/2015 $100.00 | Check# 9477 10/09/2015 $175.00 |
| Check# 9479 10/15/2015 $275.60 | Check# 9480 10/15/2015 $136.00 | Check# 9481 10/16/2015 $12.03 |
| Check# 9482 10/20/2015 $15.00 | Check# 9486 10/16/2015 $50.00 | Check# 9486 10/20/2015 $160.00 |
| Check# 9487 10/20/2015 $100.00 | | |



**Regions Bank**
North Slappey
2322 North Slappey Blvd
Albany, GA 31702



LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT # 86

Page 3 of 3



| Check# 9476 | 10/26/2015 | $20.00 | Check# 9478 | 10/27/2015 | $55.00 | Check# 9488 | 11/16/2015 | $90.00 |
| Check# 9489 | 11/18/2015 | $20.00 | Check# 9491 | 11/03/2015 | $300.00 | Check# 995098 | 11/10/2015 | $119.00 |

Chatmon_000149



**Regions Bank**
North Slappey
2322 North Slappy Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #                    8611

Page         3     of 3



| Check# 9470 | 12/07/2015 | $76.00 |
| Check# 9492 | 11/30/2015 | $55.00 |
| Check# 9493 | 11/30/2015 | $100.00 |
| Check# 9494 | 12/04/2015 | $1867.35 |
| Check# 9495 | 12/03/2015 | $150.00 |
| Check# 9496 | 12/15/2015 | $65.00 |
| Check# 9497 | 12/14/2015 | $100.00 |
| Check# 995104 | 12/09/2015 | $98.34 |

Chatmon_000150

**Regions Bank**
North Slappey
2322 North Slappy Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #            8611

Page        3    of 3



Check# 9498     12/29/2015     $125.00

Check# 9499     12/29/2015     $50.00

Check# 9500     12/31/2015     $60.00

Check# 9502     01/08/2016     $20.00

Check# 9504     01/05/2016     $300.00

Check# 9505     01/07/2016     $100.00

Check# 9506     01/19/2016     $55.00

Check# 996111     01/12/2016     $93.05

Chatmon_000151



Regions Bank
North Slappey
2322 North Slappy Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #            8611

Page            3    of 3



Check# 9507    01/28/2016    $23.98
Check# 9510    02/01/2016    $100.00
Check# 9511    02/04/2016    $300.00
Check# 9512    02/08/2016    $100.00
Check# 9513    02/12/2016    $128.20
Check# 9516    02/16/2016    $82.00
Check# 9517    02/11/2016    $75.00
Check# 9519    02/16/2016    $82.00
Check# 9520    02/10/2016    $125.00
Check# 9522    02/12/2016    $200.00
Check# 995113    02/09/2016    $95.94

Chatmon_000152



**Regions Bank**
North Slappey
2322 North Slappey Blvd
Albany, GA 31702

LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #                    8611

Page          3     of 3



| | | |
|---|---|---|
| Check# 9536   03/28/2016   $40.00 | Check# 9537   04/04/2016   $300.00 | Check# 9538   04/11/2016   $55.00 |
| Check# 9539   04/12/2016   $20.00 | Check# 9540   04/11/2016   $100.00 | Check# 9541   04/11/2016   $50.00 |
| Check# 9542   04/04/2016   $100.00 | Check# 9543   04/06/2016   $100.00 | Check# 995127   04/11/2016   $116.77 |

Chatmon_000153

**Regions Bank**
North Slappey
2322 North Slappy Blvd
Albany, GA 31702



LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #      8611

Page          3    of 3



Check# 3        04/25/2016    $150.00

Check# 9545     05/02/2016    $100.00

Check# 9547     05/18/2016    $20.00

Check# 9548     05/06/2016    $150.00

Check# 9549     05/03/2016    $150.00

Check# 9553     05/10/2016    $55.00

Check# 9554     05/11/2016    $68.00

Check# 995135   05/10/2016    $90.81

Chatmon_000154

**Reglone Bank**
North Slappey
2322 North Slappey Blvd
Albany, GA 31702



LILLIAN E CHATMON
SOPHIA W CHERRY
PO BOX 4898
ALBANY GA 31706-4898

ACCOUNT #          8611

Page          3     of 3



Check# 9573     07/28/2016     $1300.00

Check# 9574     08/11/2016     $70.00

Check# 9575     08/15/2016     $110.00

Check# 9576     08/16/2016     $200.00

Check# 9577     08/16/2016     $100.00

Check# 9578     08/11/2016     $500.00

Chatmon_000155

LILLIAN E. CHATMON 10-67
OR SOPHIA W. CHERRY
P. O. Box 4898
Albany, GA 31706

9739
64-137/611

12/2/2017
DATE

PAY TO THE
ORDER OF   Kimberly C. Cain                    | $300.00

Three hundred dollars + 00/100                 DOLLARS

REGIONS

FOR _____

*Lillian Chatmon*

8611 09739

Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
12/03/2017 - 07:13:45

Deposited

Security Features based industry standard include

Do not cash if

CHECK HERE IF MOBILE DEPOSIT
DO NOT WRITE STAMP OR SIGN BELOW THIS LINE

K.C. Cai
for deposit into NFCU only

Chatmon_000156

LILLIAN E. CHATMON 10-67
OR SOPHIA W. CHERRY
P. O. Box 4898
Albany, GA 31706

9731
64-137/611

11/02/2017
DATE

PAY TO THE
ORDER OF _Kimberly C. Cain_                    $ 250.00

_Two hundred fifty dollars +_ ⁿᵒ/₁₀₀    DOLLARS

**REGIONS**

FOR _____        _Lillian Chatmon_

8611⁗09731

Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
11/02/2017 - 12:44:25

Security Features exceed industry standards. Details on back

• SEE back account and check number on back (Features in Blue box)
• THE Security Screen - pattern on back Can't could to sales fraud
• Micro print MP Lines printed in front and back
• The ORIGINAL DOCUMENT across the back
• Photo safe Deposit item visible on front and back

Do not cash if
• Any of the features listed above are missing or appear altered
• ...
• Below features are altered that's appear on both front and back

CHECK HERE IF MOBILE DEPOSIT

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
FOR FINANCIAL INSTITUTION USE ONLY

K.C. Cain
For deposit my @ NFCU

Chatmon_000157

LILLIAN E. CHATMON 10-67
OR SOPHIA W. CHERRY
P. O. Box 4898
Albany, GA 31706

9722
64-137/611

10/2/2017 DATE

PAY TO THE
ORDER OF _Kimberly C. Cain_____ $ 200.00

_Two hundred dollars & ⁰⁰/₁₀₀_____ DOLLARS

**REGIONS**

FOR _____      _Lillian Chatmon_

⑆8611⑆09722

Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
10/02/2017 - 17:53:55

Deposits

CHECK HERE IF MOBILE DEPOSIT

For deposit only at NFCU

LILLIAN E. CHATMON 10-67
OR SOPHIA W. CHERRY
P. O. Box 4898
Albany, GA 31706

9714
64-137/611

_9-14-17_
DATE

PAY TO THE
ORDER OF _Kimberly C. Cain_ | $200.00

_Two hundred dollars + 00/100_ DOLLARS

**REGIONS**

FOR _____

_Lillian Chatmon_

⑆861170ⷦ09714⑈

Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
09/14/2017 - 15:51:18

ENTER HERE IF MOBILE DEPOSIT

K S C Cain
or deposit only @ NFCU

LILLIAN E. CHATMON 10-67
OR SOPHIA W. CHERRY
P. O. Box 4898
Albany, GA 31706

9696

84-137/611

DATE  _7-9-2017_

PAY TO THE
ORDER OF   _Kimberly C. Cain_   | $ _250.00_

_Two hundred fifty dollars +_ ⁰⁰/₁₀₀ DOLLARS

**REGIONS**

FOR _____

_Lillian Chatmon_

⑈8616⑈09696

Navy Federal Credit Union
820 Follin Lane, Vienna VA 22180
07/10/2017 - 17:23:24

CHECK HERE IF MOBILE DEPOSIT

K.C Cain
For eDeposit only @ NFCU

Chatmon_000160

# EXHIBIT D3

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. REFER TO THIS CONTRACT AND THE OTHER HOMEOWNERS DOCUMENTS FOR CORRECT REPRESENTATIONS.

## CONTRACT FOR PURCHASE AND SALE
## OF A UNIT IN
## STUART CAY

THIS CONTRACT is made between Treasure Coast Communities, LLC, a Florida limited liability company, with its principal office at 212 SW 5th St., Stuart, FL 34994, (hereinafter called "Seller" or "Developer"), and the "Purchaser" whose name and address are set forth fully on Schedule "A" attached hereto and made a part hereof.

### WITNESSETH:

Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Unit hereinafter described for the price and on the terms and conditions now about to be set forth.

### I UNIT

Purchaser agrees to buy the Unit described in Schedule A. The Unit shall include the residential lot, a single family home, and a membership interest in STUART CAY Home Owners Association, Inc., in accordance with and subject to the "Homeowners Documents" (defined herein). If the plat on which the Unit is to be located has not been recorded on the date of this Contract, then the term "plat" shall mean the proposed plat which will be substantially similar to the Property Plan or Site Plan.

### II PURCHASE PRICE

1. _Purchase Price_. The Purchase Price and the manner of payment are described in Schedule A. The parties agree that the Purchase Price set forth in this Contract shall be increased by all additional or increased fees, costs, and taxes imposed by any governmental authority on or against the Unit, after the date of this Contract, including, without limitation, additional or increased, impact fees, special assessments, permit fees, sales or service taxes, building code requirements, and similar additional or increased fees, costs, and taxes imposed on the Seller prior to the delivery of the Unit to Purchaser. Seller shall give evidence of having incurred such additional or increased fees, costs, and taxes to Purchaser as soon as reasonably available after

1



Deeg-Hooker000029

DEEG000029

such additional or increased fees, costs, and taxes are known. The parties agree that the total Purchase Price increase authorized by this provision shall not exceed one percent (1%) of the Purchase Price. Seller and Buyer agree that this provision does not apply to additional or increased federal or state income taxes.

    2. <u>Cash Closing Provisions</u>. If the Purchaser intends to pay the Purchase Price in cash at the time of closing without third party financing, this provision shall be checked. The cash closing Purchaser will not be entitled to any discount or credit as a result of the cash closing.

    3. <u>Mortgage Provisions</u>

        A.     <u>Use of Mortgage Loan.</u> These provisions apply to a Purchaser who intends to pay for a portion of the purchase price by obtaining a mortgage loan ("Mortgage Loan"), in an amount not in excess of ninety percent (90%) of the purchase price described in Schedule A, from a bona fide lending institution (hereinafter referred to as "Mortgagee")

        (I) <u>Mortgagee</u>. Purchaser may apply to any institutional Mortgagee of Purchaser's choice subject to the provisions of paragraph 3 B below.

        (ii) <u>Time to Make Application</u>. Purchaser shall complete the application for any mortgage loan required by Purchaser within ten (10) days of the execution of this Contract by Purchaser. Failure to complete said application within said period shall be deemed a Purchaser default.

        (iii) <u>Reduction in Mortgage Amount</u> . The Seller agrees that the Purchaser may elect to reduce the mortgage amount set forth in Schedule A. The parties agree that the acceptance by Purchaser of a mortgage loan commitment for the purchase of the Unit for a sum which is less than the sum set forth in Schedule A shall constitute good and adequate evidence of Purchaser's election to reduce the mortgage amount set forth in Schedule A, and good and adequate evidence of Purchaser's agreement to pay in cash at Closing any additional amount that may be required as a result of the reduction in the mortgage amount.

        (iv) <u>Mortgage Loan Acts</u> . Purchaser agrees to perform all of the following acts (hereinafter referred to as the "Mortgage Loan Acts"): (I) to make application for the mortgage loan within the time period set forth in subparagraph (ii) above; (ii) to use his best efforts to obtain the mortgage loan in good faith; (iii) to promptly execute all necessary documents and disclose all information; (iv) to promptly and duly comply with all requests of Mortgagee and Seller to apply for and close the mortgage loan; and (v) to take such actions as are

2

Deeg-Hooker000013

DEEG000030

reasonably necessary for obtaining the mortgage loan. Purchaser agrees that the Mortgagee may release to Seller information regarding the status and progress of Purchaser's loan application.

B.    Alternate Mortgage . In the event Purchaser, having undertaken and performed the Mortgage Loan Acts, fails to qualify or is otherwise declined by the initial Mortgagee for a Mortgage Loan in the amount specified in Schedule A within 45 days of the date of acceptance hereof, then Purchaser shall so notify the Seller in writing that the Purchaser has not been able to obtain the Mortgage Loan. Failure of the Purchaser to notify the Seller in writing within said 45-day period that Purchaser has been unable to obtain a Mortgage Loan shall constitute a default by Purchaser entitling the Seller to retain all sums paid hereunder as set forth in Article V herein. In the event the Purchaser does notify the Seller in writing within said 45-day period that the Purchaser has been unable to obtain mortgage financing, then the parties agree that the Seller may instruct the Purchaser to make application for a Mortgage Loan with an alternate institutional mortgagee acceptable to Seller ("Alternate Mortgagee"). Purchaser agrees to complete the application for a mortgage loan with the Alternate Mortgagee within ten (10) days of instructions from Seller directing Purchaser to the Alternate Mortgagee. Failure to make such application within said period shall be deemed a Purchaser default. Purchaser agrees to perform the Mortgage Loan Acts for the alternate institutional mortgagee within 10 days after making application.

C.    Default by Purchaser in Mortgage Loan Acts. In the event that the Seller ascertains that the Purchaser has failed to qualify for a Mortgage Loan due to the failure to perform any of the Mortgage Loan Acts, such an event shall constitute a default by Purchaser hereunder entitling Seller to retain all sums paid hereunder as set forth in Article V herein.

D.    Modification to Cash Closing. Notwithstanding Purchaser's decision to obtain a Mortgage Loan, the parties agree that if Purchaser advises Seller in writing not less than thirty (30) days before the date of Closing that Purchaser wishes to change the manner of payment from mortgage to cash, then the Purchaser may elect to modify the manner of payment from mortgage to cash at the time of closing.

E.    Refundability of Deposit Monies. Notwithstanding anything to the contrary contained herein, Purchaser specifically agrees that once an Acceptable Loan Commitment in the amount described in Schedule A, or in the amount accepted by Purchaser under Article II, 3.A(iii), has been obtained by Purchaser from a Mortgagee, or in the event the Purchaser is in default under Article II.3.B or C; (1) the deposit monies paid by Purchaser to Seller shall no longer be refundable unless Seller is in default hereunder, notwithstanding the subsequent disapproval of Purchaser by that Mortgagee, if such subsequent disapproval is caused

3

Deeg-Hooker000014

DEEG000031

by or results from the willful or intentional actions of Purchaser, and (2) no change in the
Mortgagee shall be permitted unless Purchaser notifies Seller of his decision to change
Mortgagees at least 14 days prior to Closing, and the new Mortgagee has issued an Acceptable
Loan Commitment in the amount specified in Schedule A, or in the amount accepted by
Purchaser under Article II, 3.A. (iii).

### III HOME OWNERS DOCUMENTS

1. <u>Homeowners Documents</u>. Purchaser acknowledges that prior to the execution of this
Contract, he has received Home Owners documents, including the Declaration of Protective
Covenants, Conditions and Restrictions for STUART CAY ("Declaration"), the Articles of
Incorporation of STUART CAY Home Owners Association, Inc. ("Association"), the By-Laws
of the Association, the Rules and Regulations of the Association, the typical form of Special
Warranty Deed, the form of Contract for Purchase and Sale, the Limited Warranty, the Property
Plan or Site Plan. The foregoing documents shall be hereinafter collectively referred to as the
"Home Owners Documents". Purchaser agrees that the Home Owners Documents may be
changed or amended, if necessary, to meet the requirements of a mortgagee, public authority, or
title insurance company, or if such change is in the best interest of the Association, as Seller, in
its sole discretion, may determine. It is understood and agreed, however, that no changes or
amendments will be made which would either alter or modify in a material manner the offering
of the Unit or materially affect the rights of Purchaser or the value of the Unit without obtaining
the approval of Purchaser. In the event the Purchaser does not so approve, Purchaser shall be
entitled to terminate this Contract and receive a refund of all monies paid to Seller hereunder.
Purchaser shall not have the right to prevent the Seller from amending any of the foregoing
Home Owners Documents. Purchaser agrees to be bound by the terms of the Home Owners
Documents, to acquire the Unit subject thereto and to execute any documents required to
implement the same, including the Special Warranty Deed described in Article VIII herein. In the
event that Purchaser is declined for mortgage financing and this Contract is terminated, or if this
contract is otherwise terminated by the agreement of the parties, Purchaser agrees to return the
Home Owners Documents to Seller in good and usable condition. The Purchaser agrees that if
he fails to return the Home Owners Documents in good and usable condition, that the sum of
$200.00 shall be deducted from his deposit prior to its return to him.

2. <u>Disclosure Summary</u>. The Purchaser acknowledges that prior to the execution of this
Contract he has received a Disclosure Summary as required by Florida Statutes, Section 689.26.
A copy of the Disclosure Summary is incorporated by reference herein, and is marked Schedule
"B". THE PURCHASER SHOULD NOT EXECUTE THIS CONTRACT UNTIL HE HAS
RECEIVED AND READ THE DISCLOSURE SUMMARY.

4

Deeg-Hooker000015

DEEG000032

## IV CLOSING

It is mutually agreed that the closing of this Contract ("Closing") shall be held on the applicable one of the following dates: (a) within 30 days from the date of approval of this Contract by Seller, if this Contract is signed after the "Completion Date", which is defined as the date of issuance of a certificate of occupancy for the Unit; or (b) on the Completion Date. The expected Completion Date is set forth on Schedule A. The actual Completion Date, and therefore the closing date, may be as much as 90 days before, or 90 days after, the expected Completion Date. If this Contract is signed after the Completion Date, the provisions of Article X shall apply. The specific time and place for Closing shall be designated by Seller in writing to Purchaser at least thirty (30) days prior to the date of Closing.

## V DEFAULT

1.     Purchaser's Default: Purchaser shall be in default under this Contract in the event that (a) Purchaser fails or refuses to complete and execute all of the instruments required of Purchaser under this Contract promptly or when requested to do so by Seller or the Mortgagee, if any, or (b) Purchaser fails or refuses to make timely payment of any payments required under this Contract, or (c) Purchaser fails to perform the Mortgagee Loan Acts, or (d) Purchaser in any other manner fails or refuses to perform his obligations under this Contract. In the event of any such default by Purchaser, Seller shall give Purchaser written notice of such default and allow fourteen (14) days from the date of such notice for Purchaser to cure such default. If Purchaser shall fail to cure such default within such seven-day period, Seller shall, and does hereby have, the unrestricted option to: (a) consider Purchaser in default under this Contract, (b) retain all sums paid to it hereunder plus any interest accruing thereon, if any, as agreed upon and liquidated damages, and (c) terminate all rights of Purchaser under this Contract. Purchaser and Seller recognize the impossibility of measuring Seller's damages if Purchaser defaults. The provision herein contained for agreed upon and liquidated damages is a bona fide provision for such damages and is not a penalty. The Purchaser understands that by reason of the withdrawal of the Unit from sale to the general public at a time when other prospective purchasers would be interested in purchasing it, that the Seller will have sustained damages if the Purchaser defaults, which damages will be substantial but not capable of being determined with mathematical precision. Purchaser agrees that if he defaults in this agreement that he will not file any action against Seller seeking the return of any portion of said liquidated and agreed upon damages, nor seeking any reduction in the amount of said liquidated and agreed upon damages. In the event Purchaser defaults after the Completion Date, then Seller may, at its option, and on notice to Purchaser, either seek specific performance of this Contract or retain all monies paid to date of

5

Deeg-Hooker000016

DEEG000033

default as liquidated damages as aforesaid.

2.    <u>Seller's Default</u>. If Seller defaults in the performance of this Contract, Purchaser shall give Seller written notice of such default and Seller shall have seven (7) days from receipt of such written notice within which to begin to take such action as would cure the default within a reasonable period of time. In the event Seller fails to begin to take such action within such seven-day period, then Purchaser, upon having performed all of his obligations hereunder, shall have the right to seek any remedy to which Purchaser may be entitled by operation of law.

## VI CONSTRUCTION

1.    <u>Plans and Specifications</u>. Purchaser acknowledges that there has been made available to him and that he has been shown the model or the model floor plans of the Unit being purchased by him hereunder. Purchaser further acknowledges that Seller has made available to Purchaser, complete plans and specifications for the Unit and the improvements comprising the Home Owners association property within STUART CAY. Where this Contract is executed prior to the Completion Date, Seller agrees to construct the Unit substantially in accordance with the model or model floor plans and specifications for the Unit to be built or as built in STUART CAY, subject however, to job site changes and architectural changes required during construction and shortages in materials or supplies or substantial increases in the cost of same which, in the sole discretion of the Seller, may require a substitution of materials or supplies or the cancellation of a supplier. In the event of substitution, Seller agrees, whenever reasonably possible, to use materials or supplies of equal or comparable quality; but in no event shall any materials or supplies be of less quality than required by applicable building codes or substantially change the product for which Purchaser has contracted. Purchaser acknowledges that easements reserved for present or future utility or other services have been or may be located on or adjacent to the Unit and the Lot described in Schedule A. Utility facilities or equipment may be installed within such easements, including, but not limited to, pipes, lines, meters, transformers, pedestals, boxes, and similar above ground and underground facilities and equipment for water, irrigation, sewer, gas, telephone, electricity, cable television, or other information or communication services. Seller makes no representations as to the location or size of such facilities or equipment. The parties understand that models or model floor plans available for review in other developments which may be built by the same Seller or its affiliates, are not a complete and accurate representation of the Units to be built in STUART CAY.

2.    <u>Carpet Colors</u>. Purchaser agrees to promptly make any requested carpet color selection from the choices which Seller shall make available to Purchaser for inspection during

6

Deeg-Hooker000017

DEEG000034

reasonable hours. Any selection by Purchaser shall be final, unless the selected color becomes unavailable to Seller, and Seller requests Purchaser to make an alternative selection. If Purchaser fails to make a selection within ten (10) days after the Seller's request to do so, then Seller may, at its option, make that selection on Purchaser's behalf, without further notice, and any such selection shall be binding on Purchaser. Seller makes no representations about any color selected by Purchaser, but will use its best efforts to install colors as close as possible to those selected.

     3.    <u>Model Furnishings and Fixtures</u>. Purchaser acknowledges that all furnishings, fixtures, moldings, stereo equipment, built-ins or other decorative improvements appearing in the model are not included in the Unit herein purchased, and that carpeting, ceramic tiles, and paints may be of a different but comparable quality, color or grade than as shown. Purchaser further acknowledges that quality, colors or grades of items supplied by Seller may vary from those selected by Purchaser due to shortages, discontinuances of selections or substantial increases in the costs of same or color run variations, but such substitute items shall be comparable in quality, color or grade. Unless otherwise indicated in the model, kitchen appliances, plumbing fixtures, carpeting, and ceramic tiles or comparable substitutions for reasons described above are included in the purchase price.

     4.    <u>No Entry</u>. Except for models or sales offices located thereon, Purchaser shall not enter upon the construction site or related facility areas until after Purchaser has closed this Contract and taken possession of his Unit. Purchaser shall not in any way interfere with the construction of the development.

     5.    <u>Energy-efficiency Information</u>. The Purchaser agrees that a copy of an energy-efficiency information brochure prepared by the State of Florida notifying the Purchaser of the option to obtain an energy-efficiency rating on the Unit has been made available to Purchaser.

     6.    <u>Options</u>. Where applicable, the Purchaser may purchase one or more options offered by Seller. The options selected by Purchaser are set forth on Schedule "A" attached hereto and made a part hereof. Where a sample of the option has been constructed at the model unit, Seller and Purchaser agree that the option purchased by Purchaser shall be substantially similar in appearance, dimensions, and materials to the option displayed in the model unit for and located in the subdivision described in Schedule "A", subject however, to job site changes and architectural changes required during construction and shortages of materials or supplies or substantial increases in the cost of same, which, in the sole discretion of Seller, may require a substitution of materials or supplies or the cancellation of a supplier. In the event of a substitution, the Seller agrees, whenever reasonably possible, to use materials or supplies of equal or comparable quality; but in no event shall any materials or supplies be of less quality than

7



Deeg-Hooker000018

DEEG000035

required by applicable building codes, or substantially change the option.

## VII PLAN OF DEVELOPMENT

1. <u>General Plan of Development</u>. It is the present intent of the Seller to develop and complete STUART CAY in a single construction effort. Initial construction of Units within STUART CAY should commence by May 1, 2005. Purchaser and Seller understand and agree that if no building permit has been issued for the construction of Units within STUART CAY within 90 days of said date, this Contract shall be voidable by Purchaser upon seven (7) days written notice. Upon cancellation of this Contract, Seller shall return to Purchaser his deposit made hereunder in full with interest, unless previously waived by Purchaser, in accordance with Florida Statutes Section *501.1375*. Upon such refund, all parties to this Contract shall be fully discharged and relieved from the terms and obligations hereunder. In no event shall Seller be liable to Purchaser for any damages Purchaser may sustain.

2. <u>Construction Delays</u>. Upon commencement of construction of the Unit, Seller shall diligently attempt to complete construction of the Unit described herein on or before the expected completion date found in Schedule A. Seller shall not incur any liability or responsibility for damages resulting from any delay in completion of a Unit, which were occasioned by circumstances beyond its control such as acts of God, strikes, shortages, and catastrophes which interfere with Seller and the construction of the Unit. The last stated clause shall also apply to delays of like nature to the manufacturers, millworkers, builders, and suppliers to Seller. Seller shall attempt to complete the Unit not earlier than 90 days before, or 90 days after, the expected completion date. Notwithstanding anything to the contrary in this Contract, unless prevented by an act of God, casualty, or operation of law, the Seller agrees to complete the Unit within a period of two years from the date hereof. The purpose of the previous sentence is to comply with certain state and federal land sales exemptions. This Contract shall be interpreted so as to qualify for such exemptions.

## VIII SPECIAL WARRANTY DEED;
## TITLE; CLOSING PROCEDURES

1. <u>Special Warranty Deed</u>. Seller covenants and agrees that the conveyance of the Unit shall be by a Special Warranty Deed, which Purchaser shall sign with Seller. The proposed form of Special Warranty Deed is an exhibit to the Home Owners Documents.

2. <u>Exceptions to Title</u>. The Unit being conveyed hereunder shall be conveyed subject to all of the covenants and provisions set forth in the form of Special Warranty Deed, including

8

Deeg-Hooker000019

DEEG000036

the following: (a) terms, conditions, restrictions, covenants and provisions of the Home Owners Documents, including any amendments thereto, if any; (b) zoning regulations and ordinances; (c) real estate taxes for the year of closing and subsequent years; (d) all reservations, restrictions and easements of record and easements referred to in the Home Owners Documents, or in any plat; and (e) standard exceptions to title contained in an ALTA Owners Policy of Title Insurance, Standard Form B-1970, or its equivalent, unless such standard exceptions are deleted by the title insurer. A commitment for said Title Insurance shall be supplied to Purchaser by Seller prior to Closing in accordance with this Article VIII.

3.    <u>Existing Mortgages</u>. This Contract is and will be subject and subordinate to the liens of any mortgages now or hereafter placed by Seller on the general plan of development prior to Closing, and all amendments, modifications, renewals, consolidations, and extensions thereof, and all voluntary and involuntary future advances made thereunder, provided however, that Seller shall cause any such mortgage to be discharged of record as to the herein described Unit contemporaneously with the delivery or recording of the Special Warranty Deed to the Unit. The acceptance of the Special Warranty Deed by Purchaser shall be deemed to be acceptance of full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Contract, except obligations, which specifically survive the closing, and obligations under Articles XI and XIV herein, if any.

4.    <u>Closing</u>.

A.    <u>Purchaser's Obligations</u>. At the closing, the Purchaser will pay for: all closing costs and prepayments, including, without limitation, all costs of closing the transaction, such as, all state documentary stamps and recording fees on the Special Warranty Deed, the cost of a boundary survey, the premium for the owner's title insurance policy commitment and binder, the premium for any simultaneous issue of mortgage title insurance, all mortgagee fees or points, if any, all prepayments of interest, taxes and waste collection assessments (including any tax service charge to establish or maintain a tax escrow account), hazard and fire insurance, private mortgage insurance, and other prepayments required by the lender; a proration of real estate taxes including, without limitation, any taxes imposed by any special taxing district, if any, and assessments for the Solid Waste Authority, if any, and similar assessments which are typically paid with real estate taxes for the Unit; utility service deposits (i.e. water, sewer, electric, telephone, cable tv, refuse, etc.); a proration of the maintenance assessments for the Association for the period from the date of closing to the end of the quarter-annual period in which the closing takes place; and a capital contribution sum to the Association in the amount of $300.00. Purchaser shall also reimburse Seller for all school impact fees Seller paid with respect to the Unit. Purchaser shall pay Purchaser's obligations by cash, cashier's check, or by wire transfer.

9



Deeg-Hooker000020

DEEG000037

5. <u>Maintenance Assessments</u>. Maintenance assessments for the Association shall be due and payable quarterly in advance. The maintenance assessment for the Association will be Three Hundred Ninety Six Dollars ($396.00) per quarter for the Unit. After the closing, the Purchaser shall pay the maintenance assessment promptly on its due date to the Association. After closing, the amount of the assessments and the time of payment shall be determined by the Association.

6. <u>Real Estate Taxes</u>. If the real estate tax bills are not available at the time of Closing, Purchaser shall pay an amount with respect thereto as is estimated by Seller with a reproration of the Real Estate Taxes to be made after the applicable tax bill for the year of Closing has been issued. In order to apply for a reproration of Real Estate Taxes, the Purchaser must provide a copy of the paid tax bill to Seller together with a copy of the Settlement Statement. The reproration shall be as of the date of Closing, and shall be based on the maximum allowable discount. The agreement to re-prorate taxes shall lapse and be of no further force or effect if a claim for reproration is not made within one (1) year of the date of Closing.

7. <u>Closing Delays</u>. Purchaser also agrees to execute any closing statements or other documents which may be required in connection with the Closing of this Contract or closing of any mortgage financing desired by Purchaser, whether or not such financing is closed simultaneously with the Closing of this Contract. In the event Closing is not completed on the date noticed for Closing due to the fault of Purchaser, Purchaser shall pay Seller an amount equal to interest accruing daily at eighteen percent (18%) per annum (the highest rate permitted by law) on the unpaid balance of the Purchase Price from the date noticed for Closing until the actual Closing occurs and all monies to be paid by Purchaser to Seller pursuant to the terms of this Contract are received by Seller. For purposes of calculating prorations at Closing, the date specified in the notice of Closing shall be the date of Closing.

## IX ESCROW OF DEPOSIT MONIES

1. <u>Escrow Agent</u>. In accordance with Florida Statutes Section *501.1375*, Seller has established an escrow account with McCarthy, Summers, Bobko, Wood, Sawyer, & Perry, P.A ("Escrow Agent"), which account shall hereinafter be referred to as the "Escrow Account". Unless waived, all deposit monies received by Seller from Purchaser prior to closing pursuant to this Contract shall be deposited into the Escrow Account. Such payments shall be held in the Escrow Account, together with payments of other Purchasers of Units. Purchaser may, upon written request to the Escrow Agent, obtain a receipt for his deposit.

10



Deeg-Hooker000021

DEEG000038

2.    <u>Statutory Statement</u>. PURCHASER HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10% OF THE PURCHASE PRICE) DEPOSITED IN AN INTEREST-EARING ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED IN WRITING BY THE PURCHASER.

3.    <u>Use of Escrow Funds</u>.

A.    <u>Purchaser's Waiver</u>. The Purchaser may waive the right to have up to 10% of the purchase price placed in an interest-bearing escrow account by initialing the correct portion of the Schedule A. If Purchaser waives mandatory escrow of the deposit, then Seller shall be permitted to use the deposit, however, Seller's use of the deposit is restricted solely to construction purposes.

B.    <u>Purchaser's Non-Waiver</u>. If the Purchaser does not waive the mandatory escrow of the deposit, then the deposit (up to 10% of the purchase price) shall be deposited into an interest-bearing escrow account with the Escrow Agent. THE INTEREST EARNED SHALL BE CREDITED TO THE SELLER AT CLOSING (except as otherwise provided by Florida Statute Sec. 501.1375).

C.    <u>Use of Escrowed Deposit</u>. If the Purchaser does not waive the escrow of the deposit, and the Seller desires to use the escrowed deposit for construction purposes, then, after notice to Purchaser, and at the Purchaser's expense; (a) Seller may acquire a master surety bond or other surety bond issued by a Company licensed to do business in the State of Florida, in an amount equal to or greater than the amount of the deposit, or, at the election of Seller (b) Seller may borrow money for construction purposes in the amount of the deposit.

(I)    <u>Master Surety Bond</u>. If Seller obtains a master surety bond, Purchaser shall be debited at Closing in an amount equal to the premium for the applicable portion of the bond securing his deposit.

(ii)    <u>Other Surety Bond</u>. In the event that the Seller acquires a separate surety bond, then Purchaser shall be debited at Closing for the premium of the separate surety bond securing the deposit.

(iii)    <u>Construction Loan</u>. If Seller elects to borrow money for construction purposes, Buyer shall pay to Seller the interest on the construction fund borrowed by Seller in

11

Deeg-Hooker000022

DEEG000039

excess of the amount earned by the interest-bearing escrow account.

    4.    <u>Indemnification</u>. Purchaser agrees to indemnify and hold Escrow Agent harmless from any claims or damages which may result from Escrow Agent's escrowing or disbursing of Purchaser's payments held in accordance with Florida Statutes Section 501.1375, other than those claims or damages resulting from Escrow Agent's gross negligence or willful malfeasance.

    5.    <u>Disputes</u>. In the event that, prior to Closing, the Escrow Agent receives written notice of a dispute between Purchaser and Seller regarding the escrow deposit, Escrow Agent is authorized in its sole discretion to: (1) comply with the terms of the Escrow Agreement, a copy of which is part of the Home Owners Documents; (2) retain the escrow deposit until such dispute is resolved by the agreement of Purchaser and Seller or by a court of competent jurisdiction; or (3) commence an action in the nature of interpleader and seek to deliver the documents, instruments, and escrow deposit to a court of competent jurisdiction, and thereafter be relieved of all liability or responsibility to either party. If Escrow Agent interpleads any escrow deposit monies Escrow Agent shall be reimbursed for all costs, expense and attorneys fees from the escrow funds.

X   PROVISIONS RELATING TO CONTRACT<br/>SIGNED AFTER COMPLETION DATE

    In the event this Contract is executed after the Completion Date, the provisions of Article VI 1. shall not be applicable to this Contract, and Purchaser acknowledges that there has been made available to him and that he has been shown the model or model floor plans of the Unit being purchased by him hereunder. Purchaser further acknowledges that Seller has made available to Purchaser complete plans and specifications for the Unit, and that Purchaser has had the right and opportunity to examine the Unit.

XI LIMITATION OF WARRANTIES

    1.    <u>Workmanship</u>. After completion of the Unit, and upon notice from the Seller, Purchaser shall have the right to inspect the Unit prior to Closing. Purchaser hereby agrees that from and after Closing, Purchaser shall not make or bring any claim or action against Seller or Seller's agents with respect to the dimensions of the Unit or the Association property, the materials employed in the construction of the Unit or the Association property, or the quality of workmanship of the Unit or the Association property, except such claim or actions as may be permitted by Paragraph 2 of this Article XI.

12



Deeg Hooker000023

DEEG000040

2.    Limited Warranty.  Seller is hereby providing Purchaser with the warranty contained in the most recent edition of the Home Buyers Warranty Booklet, as of the date of the execution of this Agreement (the "Limited Warranty").  That Booklet has been made available to Purchaser, and is incorporated by reference and made a part of this Purchase Agreement.  The warranty contained in the 2-10 Home Buyers Warranty Booklet is the sole warranty provided to Purchaser.  Any other warranty or warranties, whether express or implied, are disclaimed by Seller and waived by Purchaser, unless otherwise prohibited by particular state law.

THE LIMITED WARRANTY IS EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESS OR IMPLIED. EXCEPT FOR THE LIMITED WARRANTY, SELLER DISCLAIMS ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS AS TO THE UNIT, THE ASSOCIATION PROPERTY, AND ALL FIXTURES OR ITEMS OF PERSONAL PROPERTY CONTAINED THEREIN, WHETHER ARISING FROM CUSTOM, USAGE, COURSE OF TRADE, CASE LAW OR OTHERWISE. The Limited Warranty is part of the Home Owners Documents. All terms and conditions of the Limited Warranty are incorporated herein by reference.

3.    Personal Property Warranties. Seller will deliver to Purchaser all manufacturer's warranties for appliances and equipment installed in the Unit, such as refrigerator, range, hot water heater, dishwasher, garbage disposer, air conditioner, and like items to be included in the purchase of the Unit ("appliances and equipment"). The appliances and equipment are excluded from the Limited Warranty because they are covered by manufacturers' warranties. Carpet and vinyl, if any, are also excluded from the Limited Warranty because they are covered by manufacturers' warranties. Seller shall not be liable to Purchaser to substitute, replace or repair such appliances or equipment, or carpet and vinyl.

4.    Additional Exclusions. No responsibility is assumed for, and there is excluded from the Limited Warranty, any and all items not specifically included in the Limited Warranty. We do not assume responsibility for, and there is excluded from the Limited Warranty:

A.    Common Defects. Defects which are the result of characteristics common to the materials used, such as, but not limited to:

(I)    warping and deflection of wood;

(ii)    fading, chalking and checking of paint due to sunlight;

13

Deeg-Hooker000024

DEEG000041

    (iii)    cracks, due to drying and curing, to the following: concrete, stucco, plaster, bricks, tile and masonry; and

    (iv) drying, shrinking and cracking of caulking and weather stripping;

    B.    <u>Damage by Elements</u>. Any loss caused by the elements or Acts of God.

    C.    <u>Expansion/Contraction</u>. Conditions resulting from condensation on, or expansion or contraction of materials.

    D.    <u>Damage by Third Parties</u>. Any loss caused by third parties, not employees or operating under the direct control of Seller.

    E.    <u>Loss of Landscaping Materials</u>. Any loss to landscaping materials.

    5.    <u>Service Work</u>. In the event service or warranty work is requested, the Seller shall attempt to perform such work in a timely manner during normal business hours. If the Purchaser fails to keep service work appointments or fails to permit the Seller to gain access to his Unit to perform such service work during normal business hours on three (3) consecutive occasions, then Seller shall no longer be required to perform such service work.

    6.    <u>Survival</u>. The provisions of this Article XI shall survive the Closing.

## XII CONDEMNATION

    1.    <u>Unit</u>. If all or any part of a Unit is acquired or taken by eminent domain by any public or quasi-public use or purpose, then this Contract shall terminate as of the date title vests in the condemning authority.

    2.    <u>Common Area</u>.

    A.    <u>Total</u>. If all of the Common Areas are acquired or taken by eminent domain by any public or quasi-public use or purpose, then this Contract shall terminate as of the date title vests in the condemning authority.

    B.    <u>Partial</u>. If any part of the Common Areas is acquired or taken by eminent domain, and such partial taking shall substantially and materially affect the General Plan of Development, then this Contract shall terminate as of the date title vests in the condemning

14

Deeg-Hooker000025

DEEG000042

authority. If such partial taking does not substantially and materially affect the General Plan of Development, then this Contract shall continue in effect.

      C.   <u>Right of Seller</u>. If more than fifteen percent (15%) of the Common Areas shall be taken, the Seller may, by written notice to the Purchaser, terminate this Contract effective as of the date title vests in the condemning authority.

   3.   <u>Contract Cancellation</u>. If this Contract is canceled as provided in this Article, then Seller shall return the deposit to the Purchaser, and thereafter, the parties shall be relieved of all further rights and obligations hereunder.

   4.   <u>Condemnation Award</u>. The parties agree that the Purchaser shall not be entitled to and expressly waives all claims to any condemnation award for any taking. Provided, however, that to the extent that a claim made by the Purchaser does not reduce the Seller's condemnation award, the Purchaser shall have the right to claim from the condemning authority, such compensation as may be recoverable by Purchaser, in his or her own right, for contractual damages.

XIII MANDATORY RADON GAS NOTICE

   1.   <u>Statutory Notice</u>. The notice appearing below is required by Florida Statutes, Section 404.056(8), to be included in at least one document, form, or application executed at the time of, or prior to, contract for sale and purchase of any building, or execution of a rental agreement for any building.

   "RADON GAS": Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health authorities.

   2.   <u>Radon</u>. Radon is an odorless, colorless, tasteless, radioactive, naturally occurring gas that is caused by the radioactive decay of the element radium. Since radium is contained in the earth's crust and dissolves readily in water, RADON CAN BE FOUND VIRTUALLY EVERYWHERE. This notice serves to advise the Purchaser that above average levels of radon gas may accumulate in any Unit or home, regardless of the type of Unit or home or who builds it. Specific radon levels depend on a variety of factors, including site-specific variables, such as soil type and conditions, wind and climate conditions, geology and groundwater, as well as on

15

Deeg-Hooker000026

DEEG000043

building-specific variables such as construction materials and techniques, age of the Unit or home, heating, ventilating and air conditioning systems, and Owner lifestyle. Also indoor radon levels can fluctuate on a yearly, seasonal, or even daily basis. The State of Florida has established certain guidelines for exposure to radon, and has begun research to develop building codes for radon-resistant buildings.

3.  <u>Disclaimer</u>. Seller has made no test, investigation, analysis, or verification to determine whether there is radon gas or other environmental pollutants in the Unit or affecting the premises although such conditions may exist. SELLER FURTHER DISCLAIMS AND PURCHASER WAIVES ANY WARRANTIES, EXPRESS OR IMPLIED, THAT COULD BE CONSTRUED TO COVER THE PRESENCE OF RADON OR OTHER ENVIRONMENTAL POLLUTANTS. THE ONLY WARRANTY SELLER PROVIDES TO THE PURCHASER IS FOUND IN THE CONTRACT ARTICLE ENTITLED "LIMITATION OF WARRANTIES".

### XIV  MISCELLANEOUS PROVISIONS

<u>Brokers</u>. Purchaser warrants that this sale was not made by Purchaser's personnel and agents. Purchaser agrees to indemnify Seller against any claims of real estate brokers claiming by, through, or under Purchaser's authority for commissions relating to this sale.

<u>No Recording</u>. Purchaser shall not record this Contract amongst the Public Records of Martin County, Florida or otherwise. The recording by Purchaser of this Contract shall constitute a default by Purchaser.

<u>Prior Occupancy</u>. (Strike inapplicable wording.) Seller warrants that the Unit (has/has not) been occupied. (In the event the inapplicable wording is not stricken, the Unit has not been occupied.)

<u>Notices</u>. Any notice required or permitted to be given to Purchaser under this Contract may be delivered either personally or by mail addressed to Purchaser at the address of Purchaser set forth on Schedule A. Any notice required or permitted to be given to Seller under this Contract must be mailed by United States certified mail, return receipt requested, postage prepaid, to Seller at the address of Seller set forth on page 1 of this Contract. Any notice to Purchaser or Seller under this Contract except as otherwise expressly provided hereinabove shall be deemed given and delivered when mailed or personally delivered in the manner set forth in this paragraph.

<u>Certification</u>. The Purchaser hereby personally certifies that he or his authorized

16

Deeg-Hooker000027
DEEG000044

agent was physically in the State of Florida on the date of execution of this Contract, that he, or his authorized agent, visited the Development of his own volition, and that he or his agent was not solicited either by telephone or by mail to visit the property (except for solicitations, if any, within the State of Florida). Purchaser hereby requests that the Seller mail to him such documents and information as may be required by the State of Florida, as may be required in order to close the sale of the Unit, or as the Seller may consider necessary.

Integration. All understandings and agreements between the parties are merged into this Contract which fully and completely expresses the parties' agreement. This Contract may not be changed or terminated orally and shall inure to the benefit of and shall be binding upon the parties hereto, their respective heirs, personal representatives, and successors. This Contract and any interest thereunder may not be assigned, sold or transferred by Purchaser in whole or in part without the prior written consent thereto by Seller, which consent is in Seller's sole discretion.

Pre-Closing Inspection. Prior to Closing and upon notice from Seller, Purchaser shall inspect the Unit with Seller and complete the inspection form presented to him by Seller specifying any work required to conform the Unit to the model or model floor plans and specifications. Seller will diligently attempt to correct any deficiencies found in the Unit during the inspection prior to Closing. Seller shall have a period of sixty (60) days from the date of the inspection by Purchaser to complete all remaining work. No requests for adjustments, improvements or repairs shall be honored by Seller unless set forth on the inspection form. The fact that Seller has still to complete the work contemplated under the inspection form shall not delay or postpone the obligation of Purchaser to close and pay the balance of the Purchase Price. This last provision shall survive Closing.

Further Documents. The parties agree to execute all documentation reasonably requested to give full force and effect to this Contract.

No Third Party Beneficiaries. The provisions of this Contract are for the exclusive benefit of the Seller and the Purchaser and no other parties shall have any right or claim against the Seller or the Purchaser by reason of this Contract, or be entitled to benefit therefrom or to enforce any of the provisions thereof

No Seller Representations. It is agreed that Purchaser has not been induced by or relied upon any representations, warranties, or statements whether expressed or implied, or whether written or oral made by Seller or any other person which are not expressly set forth in this Agreement. No representation has been or is made as to the value of STUART CAY.

17

Deeg-Hooker000028

DEEG000045

Typewritten or Handwritten Provisions. Handwritten or typewritten provisions inserted into this Agreement and initialed by all parties shall control over all typewritten provisions in conflict therewith. Riders or addenda shall control all printed provisions of this Contract in conflict with them.

IN WITNESS WHEREOF, the parties have hereunto affixed their respective hands and seals on the day and year set forth adjacent to their respective names on Schedule A.

① Seller to pay $7,000.00 toward Purchasers' closing costs, which may include at Purchasers' option any fees due for the Homeowners' Association.

② This contract is assignable between the Purchasers, David R. Deeg and Deborah M. Hooker, and any entity solely owned by the Purchasers.

③ Closing to be NO LATER THAN October 23, 2007.

18

Deeg-Hooker000079
DEEG000046

## SCHEDULE A

**STUART CAY** David R. Deeg     PRODUCT: 2642

1. Purchaser 1: David R. Deeg    SS# ████████████

Purchaser 2: Deborah M. Hooker    SS# ████████████

Mailing Address: ████████████████████

████████████ Zip ████████████

Telephone:(Home) ████████ (Bus) ████████████ (Fax) ████████████

2. Lot being purchased: Lot **8** STUART CAY, according to the Plat thereof, recorded in Plat Book
   **16** Page **3** Public Records of Martin County, Florida.

Expected Completion Date: House is Complete

3. Purchase Price: (Lot and Home)     $US **400,500**
   b.   Deposit (See Article IX of the Contract)
      1. Initial deposit     **40,050**
      2. Additional deposit due on **n/a**     **-0-**

   c.   Proceeds of mortgage loan     **360,450**
      (Please note Article I 3. of the Contract)

   d.   Balance of purchase price upon closing    $US **-0-** (by cash or cashier's check )

4. Manner of payment: (Please initial one.)
   (X) A conventional mortgage with Bank of America ("Mortgagee").
   ( ) CASH at the time of closing.

5. Standard carpet color: ~~TBD~~ Already Installed

6. Deposit (Initial choice.)
   (X) Escrow waived. Use for construction purposes ( ) Bond at Purchaser's Expense

The undersigned Purchaser(s) acknowledge(s) that the Homeowners Documents described in Article III have been received. If Purchaser fails to purchase the above-captioned lot, Purchaser understands and agrees that the Homeowners Documents are to be returned to the Seller in good and useable condition. The failure to return the Homeowners Documents in such condition will result in a deduction of $200.00 from the Purchaser's deposit. No changes will be allowed to Paragraphs 3, 4 (except as provided in Article 11 3.E.), 5 or 6 after initialing. Deposit(s) made by check will be subject to clearance which is presumed to require 30 days.

Treasure Coast Communities, LLC        _____ 9-25-07
By: _____ 9/24/07       Purchaser/Date
Authorized Agent / Date          _____ 9-25-07
                         Purchaser/Date

19

Deeg-Hooker000030

DEEG000047

**SCHEDULE B**

**DISCLOSURE SUMMARY**

**FOR**

**STUART CAY**

IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 689.26, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY PURCHASER BY DELIVERING TO SELLER OR SELLER'S AGENT WRITTEN NOTICE OF THE PURCHASER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST, ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT. PURCHASER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING.

PURCHASER SHOULD NOT EXECUTE THIS CONTRACT UNTIL PURCHASER HAS RECEIVED AND READ THIS DISCLOSURE.

Disclosure Summary for Stuart Cay:

1.      AS A PURCHASER OF PROPERTY IN THIS COMMUNITY, YOU WILL BE OBLIGATED TO BE A MEMBER OF A HOMEOWNERS' ASSOCIATION.

2.      THERE HAVE BEEN OR WILL BE RECORDED RESTRICTIVE COVENANTS ("COVENANTS") GOVERNING THE USE AND OCCUPANCY OF PROPERTIES IN THIS COMMUNITY.

3.      YOU WILL BE OBLIGATED TO PAY ASSESSMENTS TO THE ASSOCIATION. YOU WILL BE OBLIGATED TO PAY SPECIAL ASSESSMENTS TO THE RESPECTIVE MUNICIPALITY, COUNTY OR SPECIAL DISTRICT. ALL ASSESSMENTS ARE SUBJECT TO PERIODIC CHANGE.

4.      YOUR FAILURE TO PAY SPECIAL ASSESSMENTS OR ASSESSMENTS LEVIED BY A MANDATORY HOMEOWNERS' ASSOCIATION COULD RESULT IN A LIEN ON YOUR PROPERTY.

18

Deeg-Hooker000031

DEEG000048

5.    THERE IS NOT AN OBLIGATION TO PAY RENT OR LAND USE FEES FOR RECREATIONAL OR OTHER COMMONLY USED FACILITIES AS AN OBLIGATION OF MEMBERSHIP IN THE HOMEOWNERS' ASSOCIATION.

6.    THE RESTRICTIVE COVENANTS CAN BE AMENDED WITHOUT THE APPROVAL OF THE ASSOCIATION MEMBERSHIP OR, IF NO MANDATORY ASSOCIATION EXISTS, PARCEL OWNERS.

7.    THE STATEMENTS CONTAINED IN THIS DISCLOSURE FORM ARE ONLY SUMMARY IN NATURE, AND, AS A PROSPECTIVE PURCHASER, YOU SHOULD REFER TO THE COVENANTS AND THE ASSOCIATION GOVERNING DOCUMENTS BEFORE PURCHASING PROPERTY.

8.    THESE DOCUMENTS ARE MATTERS OF PUBLIC RECORD AND CAN BE OBTAINED FROM THE RECORD OFFICE IN THE COUNTY WHERE THE PROPERTY IS LOCATED.

DATE: 9-25-07                 PURCHASER: _____

9-25-07                 _____

F:\users\TPM\CONTRACT\sale of unit\StuartCay.doc (10/6/2004 10:12:39 AM)

19



Deeg-Hooker000032

DEEG000049

*DRD*  *J.M.H.*

## "AS IS" Residential Contract For Sale And Purchase

**Real Estate of Florida**

THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR

1. PARTIES: _Deborah M. Hooker_ & _DAVID A. DEEG_ _____ ("Seller"),
2. and _GERALD W. BASHANT JR (RE License)_ & _NANCY LEWANDOWSKI_ _____ ("Buyer"),
3. agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property
4. (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale And
5. Purchase and any riders and addenda ("Contract"):
6. **1. PROPERTY DESCRIPTION:**
7. (a) Street address, city, zip: _516 SW AKRON AVE, STUART FL 34994_
8. (b) Property is located in: _MARTIN_ County, Florida, Real Property Tax ID No._053841021000000800_
9. (c) Real Property: The legal description is _LOT 8 STUART CAY_   _PB16 P63_
10.
11.
12. together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and
13. attached wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or
14. by other terms of this Contract.
15. (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items
16. which are owned by Seller and existing on the Property as of the date of the initial offer are included in the
17. purchase: range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), intercom, light fixture(s),
18. drapery rods and draperies, blinds, window treatments, smoke detector(s), garage door opener(s), security
19. gate and other access devices, and storm shutters/panels ("Personal Property").
20. Other Personal Property items included in this purchase are: _washer   Dryer   stove   FRIDGE (not_
21. _working)   and plantation shutters_
22. Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
23. (e) The following items are excluded from the purchase: _garage white refrigerator and_
24. _dining room chandelier_
25. PURCHASE PRICE AND CLOSING
26. **2. PURCHASE PRICE** (U.S. currency):............................................................$ _330,000_
27. (a) Initial deposit to be held in escrow in the amount of (checks subject to COLLECTION) ......$ _10,000_
28. The initial deposit made payable and delivered to "Escrow Agent" named below
29. (CHECK ONE): (i) ☐ accompanies offer or (ii) ☑ is to be made within _3 days_ (if left
30. blank, then 3) days after Effective Date. IF NEITHER BOX IS CHECKED, THEN
31. OPTION (ii) SHALL BE DEEMED SELECTED.
32. Escrow Agent Information: Name: _Advantage Title Company_
33. Address: _2895 SE ocean Blvd     STUART   FL_
34. Phone: _772-287 7400_ E-mail: _____ Fax: _____
35. (b) Additional deposit to be delivered to Escrow Agent within _____ (if left blank, then 10)
36. days after Effective Date .......................................................................$ _20,000_
37. (All deposits paid or agreed to be paid, are collectively referred to as the "Deposit")
38. (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8 ......$ _300,000_
39. (d) Other: ................................................................................$ _____
40. (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
41. transfer or other COLLECTED funds .........................................................$ _300,000_
42. NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.
43. **3. TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:**
44. (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before
45. _04/04/2016_ , this offer shall be deemed withdrawn and the Deposit, if any, shall be returned
46. to Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the
47. day the counter-offer is delivered.
48. (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or
49. initialed and delivered this offer or final counter-offer ("Effective Date").
50. **4. CLOSING DATE:** Unless modified by other provisions of this Contract, the closing of this transaction shall occur
51. and the closing documents required to be furnished by each party pursuant to this Contract shall be delivered
52. ("Closing") on _05/16/16_ _____ ("Closing Date"), at the time established by the Closing Agent.

Buyer's Initials _JB_  _ndl_            Page 1 of 12            Seller's Initials _DRD_  _D.M.H._

FloridaRealtors/FloridaBar-ASIS-4x   Rev.2/16 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.
Serial#: 000509-100146-9C 4357

*formsimplicity*

DEEG000226

5. **EXTENSION OF CLOSING DATE:**

   (a) If Paragraph 8(b) is checked and Closing funds from Buyer's lender(s) are not available on Closing Date due to Consumer Financial Protection Bureau Closing Disclosure delivery requirements ("CFPB Requirements"), then Closing Date shall be extended for such period necessary to satisfy CFPB Requirements, provided such period shall not exceed 10 days.

   (b) If extreme weather or other condition or event constituting "Force Majeure" (see STANDARD G) causes: (i) disruption of utilities or other services essential for Closing or (ii) Hazard, Wind, Flood or Homeowners' insurance, to become unavailable prior to Closing, Closing shall be extended a reasonable time up to 3 days after restoration of utilities and other services essential to Closing and availability of applicable Hazard, Wind, Flood or Homeowners' insurance. If restoration of such utilities or services and availability of insurance has not occurred within _____ (if left blank, then 14) days after Closing Date, then either party may terminate this Contract by delivering written notice to the other party, and Buyer shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract.

6. **OCCUPANCY AND POSSESSION:**

   (a) Unless the box in Paragraph 6(b) is checked, Seller shall, at Closing, deliver occupancy and possession of the Property to Buyer free of tenants, occupants and future tenancies. Also, at Closing, Seller shall have removed all personal items and trash from the Property and shall deliver all keys, garage door openers, access devices and codes, as applicable, to Buyer. If occupancy is to be delivered before Closing, Buyer assumes all risks of loss to the Property from date of occupancy, shall be responsible and liable for maintenance from that date, and shall be deemed to have accepted the Property in its existing condition as of time of taking occupancy.

   (b) ☐ CHECK IF PROPERTY IS SUBJECT TO LEASE(S) OR OCCUPANCY AFTER CLOSING. If Property is subject to a lease(s) after Closing or is intended to be rented or occupied by third parties beyond Closing, the facts and terms thereof shall be disclosed in writing by Seller to Buyer and copies of the written lease(s) shall be delivered to Buyer, all within 5 days after Effective Date. If Buyer determines, in Buyer's sole discretion, that the lease(s) or terms of occupancy are not acceptable to Buyer, Buyer may terminate this Contract by delivery of written notice of such election to Seller within 5 days after receipt of the above items from Seller, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Estoppel Letter(s) and Seller's affidavit shall be provided pursuant to STANDARD D. If Property is intended to be occupied by Seller after Closing, see Rider U. POST-CLOSING OCCUPANCY BY SELLER.

7. **ASSIGNABILITY: (CHECK ONE):** Buyer ☐ may assign and thereby be released from any further liability under this Contract; ☒ may assign but not be released from liability under this Contract; or ☐ may not assign this Contract

FINANCING

8. **FINANCING:**

   ☐ (a) Buyer will pay cash for the purchase of the Property at Closing. There is no financing contingency to Buyer's obligation to close. If Buyer obtains a loan for any part of the Purchase Price of the Property, Buyer acknowledges that any terms and conditions imposed by Buyer's lender(s) or by CFPB Requirements shall not affect or extend the Buyer's obligation to close or otherwise affect any terms or conditions of this Contract.

   ☒ (b) This Contract is contingent upon Buyer obtaining a written loan commitment for a ☐ conventional ☐ FHA ☐ VA or ☒ other _HELOC_ (describe) loan on the following terms within _30 days_ (if left blank, then 45) days after Effective Date ("Loan Commitment Date") for (CHECK ONE):☐ fixed, ☐ adjustable, ☒ fixed or adjustable rate loan in the Loan Amount (See Paragraph 2(c)), at an initial interest rate not to exceed _4.25_ % (if left blank, then prevailing rate based upon Buyer's creditworthiness), and for a term of _____ (if left blank, then 30) years ("Financing").

Buyer shall make mortgage loan application for the Financing within _____ (if left blank, then 5) days after Effective Date and use good faith and diligent effort to obtain a written loan commitment for the Financing ("Loan Commitment") and thereafter to close this Contract. Buyer shall keep Seller and Broker fully informed about the status of mortgage loan application and Loan Commitment and authorizes Buyer's mortgage broker and Buyer's lender to disclose such status and progress to Seller and Broker.

Upon Buyer's receipt of Loan Commitment, Buyer shall provide written notice of same to Seller. If Buyer does not receive Loan Commitment by Loan Commitment Date, then thereafter either party may cancel this Contract up to the earlier of:

Buyer's Initials _____ _____     Page 2 of 12     Seller's Initials _____ _____

FloridaRealtors/FloridaBar-ASIS-4x   Rev.2/16 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.
Serial: 069509-100145-9614857

formsimplicity

DEEG000227

107     (i.) Buyer's delivery of written notice to Seller that Buyer has either received Loan Commitment or elected
108       to waive the financing contingency of this Contract; or
109     (ii.) 7 days prior to the Closing Date specified in Paragraph 4, which date, for purposes of this Paragraph
110       8(b) (ii), shall not be modified by Paragraph 5(a).
111 If either party timely cancels this Contract pursuant to this Paragraph 8 and Buyer is not in default under the terms
112 of this Contract, Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further
113 obligations under this Contract. If neither party has timely canceled this Contract pursuant to this Paragraph 8,
114 then this financing contingency shall be deemed waived by Buyer.

115 If Buyer delivers written notice of receipt of Loan Commitment to Seller and this Contract does not thereafter
116 close, the Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's default; (2) Property related
117 conditions of the Loan Commitment have not been met (except when such conditions are waived by other
118 provisions of this Contract); (3) appraisal of the Property obtained by Buyer's lender is insufficient to meet terms
119 of the Loan Commitment; or (4) the loan is not funded due to financial failure of Buyer's lender, in which event(s)
120 the Deposit shall be returned to Buyer, thereby releasing Buyer and Seller from all further obligations under this
121 Contract.
122* ☐ (c) Assumption of existing mortgage (see rider for terms).
123* ☐ (d) Purchase money note and mortgage to Seller (see riders; addenda; or special clauses for terms).

124                       **CLOSING COSTS, FEES AND CHARGES**

125 **9. CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:**
126     **(a) COSTS TO BE PAID BY SELLER:**
127     • Documentary stamp taxes and surtax on deed, if any     • HOA/Condominium Association estoppel fees
128     • Owner's Policy and Charges (if Paragraph 9(c) (i) is checked)   • Recording and other fees needed to cure title
129     • Title search charges (if Paragraph 9(c) (iii) is checked)     • Seller's attorneys' fees
130*     • Municipal lien search (if Paragraph 9(c) (i) or (iii) is checked)   • Other: _____
131       If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11
132       a sum equal to 125% of estimated costs to meet the AS IS Maintenance Requirement shall be escrowed at
133       Closing. If actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall
134       pay such actual costs. Any unused portion of escrowed amount(s) shall be returned to Seller.
135     **(b) COSTS TO BE PAID BY BUYER:**
136     • Taxes and recording fees on notes and mortgages     • Loan expenses
137     • Recording fees for deed and financing statements     • Appraisal fees
138     • Owner's Policy and Charges (if Paragraph 9(c)(ii) is checked)   • Buyer's Inspections
139     • Survey (and elevation certification, if required)     • Buyer's attorneys' fees
140     • Lender's title policy and endorsements     • All property related insurance
141     • HOA/Condominium Association application/transfer fees   • Owner's Policy Premium (if Paragraph
142     • Municipal lien search (if Paragraph 9(c) (ii) is checked)     9 (c) (iii) is checked.)
143*     • Other: _____
144*     **(c) TITLE EVIDENCE AND INSURANCE:** At least _____ (if left blank, then 15, or if Paragraph 8(a) is checked,
145     then 5) days prior to Closing Date ("Title Evidence Deadline"), a title insurance commitment issued by a
146     Florida licensed title insurer, with legible copies of instruments listed as exceptions attached thereto ("Title
147     Commitment") and, after Closing, an owner's policy of title insurance (see STANDARD A for terms) shall be
148     obtained and delivered to Buyer. If Seller has an owner's policy of title insurance covering the Real Property,
149     a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date. The owner's title
150     policy premium, title search and closing services (collectively, "Owner's Policy and Charges") shall be paid, as
151     set forth below. The title insurance premium charges for the owner's policy and any lender's policy will be
152     calculated and allocated in accordance with Florida law, but may be reported differently on certain federally
153     mandated closing disclosures and other closing documents.
154     (CHECK ONE):
155*     ☐ (i) Seller shall designate Closing Agent and pay for Owner's Policy and Charges, and Buyer shall pay the
156     premium for Buyer's lender's policy and charges for closing services related to the lender's policy,
157     endorsements and loan closing, which amounts shall be paid by Buyer to Closing Agent or such other
158     provider(s) as Buyer may select; or
159*     ☒ (ii) Buyer shall designate Closing Agent and pay for Owner's Policy and Charges and charges for closing
160     services related to Buyer's lender's policy, endorsements and loan closing; or
161*     ☐ (iii) [MIAMI-DADE/BROWARD REGIONAL PROVISION]: Seller shall furnish a copy of a prior owner's
162     policy of title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title

Buyer's Initials ___ ___            Page 3 of 12            Seller's Initials ___ ___

DEEG000228

163 evidence, which is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search;
164 and (C) municipal lien search. Buyer shall obtain and pay for post-Closing continuation and premium for
165 Buyer's owner's policy, and if applicable, Buyer's lender's policy. Seller shall not be obligated to pay more
166* than $ _____ (if left blank, then $200.00) for abstract continuation or title search ordered or
167 performed by Closing Agent.
168 (d) **SURVEY:** On or before Title Evidence Deadline, Buyer may, at Buyer's expense, have the Real Property
169 surveyed and certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real
170 Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.
171* (e) **HOME WARRANTY:** At Closing, ☐ Buyer ☐ Seller ☒ N/A shall pay for a home warranty plan issued by
172* _____ at a cost not to exceed $_____. A home
173 warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in
174 appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.
175 (f) **SPECIAL ASSESSMENTS:** At Closing, Seller shall pay: (i) the full amount of liens imposed by a public body
176 ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and
177 ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an
178 improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being
179 imposed on the Property before Closing. Buyer shall pay all other assessments. If special assessments may
180 be paid in installments (CHECK ONE):
181* ☒ (a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after Closing.
182 Installments prepaid or due for the year of Closing shall be prorated.
183* ☐ (b) Seller shall pay the assessment(s) in full prior to or at the time of Closing.
184 IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.
185 This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district
186 (CDD) pursuant to Chapter 190, F.S., which lien shall be prorated pursuant to STANDARD K.

## DISCLOSURES

188 **10. DISCLOSURES:**
189 (a) **RADON GAS:** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in
190 sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that
191 exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding
192 radon and radon testing may be obtained from your county health department.
193 (b) **PERMITS DISCLOSURE:** Except as may have been disclosed by Seller to Buyer in a written disclosure,
194 Seller does not know of any improvements made to the Property which were made without required permits
195 or made pursuant to permits which have not been properly closed.
196 (c) **MOLD:** Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned
197 or desires additional information regarding mold, Buyer should contact an appropriate professional.
198 (d) **FLOOD ZONE; ELEVATION CERTIFICATION:** Buyer is advised to verify by elevation certificate which flood
199 zone the Property is in, whether flood insurance is required by Buyer's lender, and what restrictions apply to
200 improving the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area"
201 or "Coastal Barrier Resources Act" designated area or otherwise protected area identified by the U.S. Fish
202 and Wildlife Service under the Coastal Barrier Resources Act and the lowest floor elevation for the building(s)
203 and /or flood insurance rating purposes is below minimum flood elevation or is ineligible for flood insurance
204 coverage through the National Flood Insurance Program or private flood insurance as defined in 42 U.S.C.
205 §4012a, Buyer may terminate this Contract by delivering written notice to Seller within _____ (if left blank,
206* then 20) days after Effective Date, and Buyer shall be refunded the Deposit thereby releasing Buyer and
207 Seller from all further obligations under this Contract, failing which Buyer accepts existing elevation of
208 buildings and flood zone designation of Property. The National Flood Insurance Program may assess
209 additional fees or adjust premiums for pre-Flood Insurance Rate Map (pre-FIRM) non-primary structures
210 (residential structures in which the insured or spouse does not reside for at least 50% of the year) and an
211 elevation certificate may be required for actuarial rating.
212 (e) **ENERGY BROCHURE:** Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information
213 Brochure required by Section 553.996, F.S.
214 (f) **LEAD-BASED PAINT:** If Property includes pre-1978 residential housing, a lead-based paint disclosure is
215 mandatory.
216 (g) **HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE:** BUYER SHOULD NOT EXECUTE THIS
217 CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS'
218 ASSOCIATION/COMMUNITY DISCLOSURE, IF APPLICABLE.

Buyer's Initials _____ _____     Page 4 of 12     Seller's Initials _____ _____
FloridaRealtors/FloridaBar-ASIS-4x Rev.2/15 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.
Serial: 000609-100146-9614957

DEEG000229

(h) **PROPERTY TAX DISCLOSURE SUMMARY:** BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(i) **FIRPTA TAX WITHHOLDING:** Seller shall inform Buyer in writing if Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act ("FIRPTA"). Buyer and Seller shall comply with FIRPTA, which may require Seller to provide additional cash at Closing. If Seller is not a "foreign person", Seller can provide Buyer, at or prior to Closing, a certification of non-foreign status, under penalties of perjury, to inform Buyer and Closing Agent that no withholding is required. See STANDARD V for further information pertaining to FIRPTA. Buyer and Seller are advised to seek legal counsel and tax advice regarding their respective rights, obligations, reporting and withholding requirements pursuant to FIRPTA.

(j) **SELLER DISCLOSURE:** Seller knows of no facts materially affecting the value of the Real Property which are not readily observable and which have not been disclosed to Buyer. Except as provided for in the preceding sentence, Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation.

**PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS**

**11. PROPERTY MAINTENANCE:** Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the Property, including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS IS Maintenance Requirement").

**12. PROPERTY INSPECTION; RIGHT TO CANCEL:**

(a) *PROPERTY INSPECTIONS AND RIGHT TO CANCEL: Buyer shall have _____ (if left blank, then 15) days after Effective Date ("Inspection Period") within which to have such inspections of the Property performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely terminates this Contract, the Deposit paid shall be returned to Buyer, thereupon, Buyer and Seller shall be released of all further obligations under this Contract; however, Buyer shall be responsible for prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to terminate granted herein, Buyer accepts the physical condition of the Property and any violation of governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all repairs and improvements required by Buyer's lender.*

(b) **WALK-THROUGH INSPECTION/RE-INSPECTION:** On the day prior to Closing Date, or on Closing Date prior to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS Maintenance Requirement and has met all other contractual obligations.

(c) **SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS:** If Buyer's inspection of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open or needed Permits, and shall promptly cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations, consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to expend, any money.

Buyer's Initials _____ Page 5 of 12 Seller's Initials _____

FloridaRealtors/FloridaBar-ASIS-4x Rev. 2/16 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.

Serial#: 000509-100145-5514857

formsimplicity

DEEG000230

271    (d) ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES: At Buyer's option and
272       cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties
273       to Buyer.

## ESCROW AGENT AND BROKER

275 **13. ESCROW AGENT:** Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds
276 and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow
277 within the State of Florida and, subject to COLLECTION, disburse them in accordance with terms and conditions
278 of this Contract. Failure of funds to become COLLECTED shall not excuse Buyer's performance. When conflicting
279 demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent
280 may take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties
281 or liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow
282 until the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall
283 determine the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction
284 of the dispute. An attorney who represents a party and also acts as Agent may represent such party in such
285 action. Upon notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate,
286 except to the extent of accounting for any items previously delivered out of escrow. If a licensed real estate
287 broker, Agent will comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve
288 escrow disputes through mediation, arbitration, interpleader or an escrow disbursement order.
289 Any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder,
290 or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable
291 attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent.
292 Agent shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is
293 due to Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing
294 or termination of this Contract.
295 **14. PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify Property condition,
296 square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate
297 professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property
298 and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the
299 Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or
300 public records. BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND
301 GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND
302 FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL,
303 WRITTEN OR OTHERWISE) OF BROKER. Buyer and Seller (individually, the "Indemnifying Party") each
304 individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and
305 employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees
306 at all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection
307 with or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of
308 information provided by the Indemnifying Party or from public records; (ii) Indemnifying Party's misstatement(s) or
309 failure to perform contractual obligations; (iii) Broker's performance, at Indemnifying Party's request, of any task
310 beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral,
311 recommendation or retention of any vendor for, or on behalf of Indemnifying Party; (iv) products or services
312 provided by any such vendor for, or on behalf of, Indemnifying Party; and (v) expenses incurred by any such
313 vendor. Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors
314 and paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not
315 relieve Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14,
316 Broker will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this
317 Contract

## DEFAULT AND DISPUTE RESOLUTION

319 **15. DEFAULT:**
320    (a) BUYER DEFAULT: If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract,
321       including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the
322       Deposit for the account of Seller as agreed upon liquidated damages, consideration for execution of this
323       Contract, and in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further
324       obligations under this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity
325       to enforce Seller's rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon

Buyer's Initials [handwritten initials]      Page 6 of 12      Seller's Initials [handwritten initials]

FloridaRealtors/FloridaBar-ASIS-4x   Rev.2/18 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.
Serial: 000509-100145-9616857

DEEG000231

326      default by Buyer, shall be split equally between Listing Broker and Cooperating Broker; provided however,
327      Cooperating Broker's share shall not be greater than the commission amount Listing Broker had agreed to
328      pay to Cooperating Broker.
329   (b) **SELLER DEFAULT:** If for any reason other than failure of Seller to make Seller's title marketable after
330      reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract,
331      Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting
332      from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific
333      performance.
334      This Paragraph 15 shall survive Closing or termination of this Contract.
335 **16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and
336    Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be
337    settled as follows:
338   (a) Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to
339      resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under Paragraph
340      16(b).
341   (b) Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida
342      Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules").
343      The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be
344      sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16
345      may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph
346      16 shall survive Closing or termination of this Contract.
347 **17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted
348    by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in
349    conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to
350    recover from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting
351    the litigation. This Paragraph 17 shall survive Closing or termination of this Contract.
352                  **STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")**
353 **18. STANDARDS:**
354   **A. TITLE:**
355    (i)  **TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS:** Within the time period provided in
356      Paragraph 9(c), the Title Commitment, with legible copies of instruments listed as exceptions attached thereto,
357      shall be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by
358      Seller at or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title
359      insurance in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the
360      Real Property, subject only to the following matters: (a) comprehensive land use plans, zoning, and other land
361      use restrictions, prohibitions and requirements imposed by governmental authority; (b) restrictions and matters
362      appearing on the Plat or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of
363      record without right of entry; (d) unplatted public utility easements of record (located contiguous to real property
364      lines and not more than 10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes
365      for year of Closing and subsequent years; and (f) assumed mortgages and purchase money mortgages, if any (if
366      additional items, attach addendum); provided, that, none prevent use of Property for **RESIDENTIAL PURPOSES.**
367      If there exists at Closing any violation of items identified in (b) – (f) above, then the same shall be deemed a title
368      defect. Marketable title shall be determined according to applicable Title Standards adopted by authority of The
369      Florida Bar and in accordance with law.
370    (ii)  **TITLE EXAMINATION:** Buyer shall have 5 days after receipt of Title Commitment to examine it and notify
371      Seller in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and
372      it is delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after
373      date of receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period")
374      after receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Buyer fails to so notify
375      Seller, Buyer shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller
376      will deliver written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties
377      will close this Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of
378      Seller's notice). If Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after
379      expiration of Cure Period, deliver written notice to Seller: (a) extending Cure Period for a specified period not to
380      exceed 120 days within which Seller shall continue to use reasonable diligent effort to remove or cure the defects
381      ("Extended Cure Period"); or (b) electing to accept title with existing defects and close this Contract on Closing

Buyer's Initials _(initials)_           Page 7 of 12           Seller's Initials _(initials)_

FloridaRealtors/FloridaBar-ASIS-4x   Rev.2/16 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.
Serial#: 000500-100145-5614557

_formsimplicity_

DEEG000232

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

382 Date (or if Closing Date has passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's
383 receipt of Seller's notice), or (c) electing to terminate this Contract and receive a refund of the Deposit, thereby
384 releasing Buyer and Seller from all further obligations under this Contract. If after reasonable diligent effort, Seller
385 is unable to timely cure defects, and Buyer does not waive the defects, this Contract shall terminate, and Buyer
386 shall receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under this
387 Contract.

388 **B. SURVEY:** If Survey discloses encroachments on the Real Property or that improvements located thereon
389 encroach on setback lines, easements, or lands of others, or violate any restrictions, covenants, or applicable
390 governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of
391 such matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later
392 than Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and
393 Survey shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a
394 prior survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the
395 preparation of such prior survey, to the extent the affirmations therein are true and correct.

396 **C. INGRESS AND EGRESS:** Seller represents that there is ingress and egress to the Real Property and title to
397 the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of
398 access.

399 **D. LEASE INFORMATION:** Seller shall, at least 10 days prior to Closing, furnish to Buyer estoppel letters from
400 tenant(s)/occupant(s) specifying nature and duration of occupancy, rental rates, advanced rent and security
401 deposits paid by tenant(s) or occupant(s)("Estoppel Letter(s)"). If Seller is unable to obtain such Estoppel Letter(s)
402 the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit
403 and Buyer may thereafter contact tenant(s) or occupant(s) to confirm such information. If Estoppel Letter(s) or
404 Seller's affidavit, if any, differ materially from Seller's representations and lease(s) provided pursuant to
405 Paragraph 6, or if tenant(s)/occupant(s) fail or refuse to confirm Seller's affidavit, Buyer may deliver written notice
406 to Seller within 5 days after receipt of such information, but no later than 5 days prior to Closing Date, terminating
407 this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations
408 under this Contract. Seller shall, at Closing, deliver and assign all leases to Buyer who shall assume Seller's
409 obligations thereunder.

410 **E. LIENS:** Seller shall furnish to Buyer at Closing an affidavit attesting (i) to the absence of any financing
411 statement, claims of lien or potential lienors known to Seller and (ii) that there have been no improvements or
412 repairs to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been
413 improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all
414 general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth
415 names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all
416 charges for improvements or repairs which could serve as a basis for a construction lien or a claim for damages
417 have been paid or will be paid at Closing.

418 **F. TIME:** Calendar days shall be used in computing time periods. Time is of the essence in this Contract.
419 Other than time for acceptance and Effective Date as set forth in Paragraph 3, any time periods provided for or
420 dates specified in this Contract, whether preprinted, handwritten, typewritten or inserted herein, which shall end or
421 occur on a Saturday, Sunday, or a national legal holiday (see 5 U.S.C. 6103) shall extend to 5:00 p.m. (where the
422 Property is located) of the next business day.

423 **G. FORCE MAJEURE:** Buyer or Seller shall not be required to perform any obligation under this Contract or be
424 liable to each other for damages so long as performance or non-performance of the obligation is delayed, caused
425 or prevented by Force Majeure. "Force Majeure" means: hurricanes, earthquakes, floods, fire, acts of God,
426 unusual transportation delays, wars, insurrections, and acts of terrorism, and which, by exercise of reasonable diligent
427 effort, the non-performing party is unable in whole or in part to prevent or overcome. All time periods, including
428 Closing Date, will be extended for the period that the Force Majeure prevents performance under this Contract;
429 provided, however, if such Force Majeure continues to prevent performance under this Contract more than 14
430 days beyond Closing Date, then either party may terminate this Contract by delivering written notice to the other
431 and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all further obligations under
432 this Contract.

433 **H. CONVEYANCE:** Seller shall convey marketable title to the Real Property by statutory warranty, trustee's,
434 personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters
435 described in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be
436 transferred by absolute bill of sale with warranty of title, subject only to such matters as may be provided for in
437 this Contract.

438 **I. CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:**

Buyer's Initials _____ _____     Page 8 of 12     Seller's Initials DRD _____

FloridaRealtors/FloridaBar-ASIS-4x Rev 2/16 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.
Seria's. 000599-100145-9614857

formsimplicity

DEEG000233

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

439    (i)  LOCATION: Closing will take place in the county where the Real Property is located at the office of the
440  attorney or other closing agent ("Closing Agent") designated by the party paying for the owner's policy of title
441  insurance, or, if no title insurance, designated by Seller. Closing may be conducted by mail or electronic means.
442    (ii)  CLOSING DOCUMENTS: Seller shall at or prior to Closing, execute and deliver, as applicable, deed, bill of
443  sale, certificate(s) of title or other documents necessary to transfer title to the Property, construction lien affidavit
444  (s), owner's possession and no lien affidavit(s), and assignment(s) of leases. Seller shall provide Buyer with paid
445  receipts for all work done on the Property pursuant to this Contract. Buyer shall furnish and pay for, as applicable
446  the survey, flood elevation certification, and documents required by Buyer's lender.
447    (iii)  PROCEDURE: The deed shall be recorded upon COLLECTION of all closing funds. If the Title Commitment
448  provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow closing
449  procedure required by STANDARD J shall be waived, and Closing Agent shall, subject to COLLECTION of all
450  closing funds, disburse at Closing the brokerage fees to Broker and the net sale proceeds to Seller.
451  J.  ESCROW CLOSING PROCEDURE: If Title Commitment issued pursuant to Paragraph 9(c) does not provide
452  for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following
453  escrow and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent
454  for a period of not more than 10 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault
455  of Buyer, Buyer shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days
456  from date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit
457  and all Closing funds paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and,
458  simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-
459  convey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely
460  demand for refund of the Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening
461  defect except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.
462  K.  PRORATIONS; CREDITS: The following recurring items will be made current (if applicable) and prorated as
463  of the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes
464  (including special benefit tax assessments imposed by a CDD), interest, bonds, association fees, insurance, rents
465  and other expenses of Property. Buyer shall have option of taking over existing policies of insurance, if
466  assumable, in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may
467  be required by prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will
468  be credited to Buyer. Escrow deposits held by Seller's mortgagee will be paid to Seller. Taxes shall be prorated
469  based on current year's tax with due allowance made for maximum allowable discount, homestead and other
470  exemptions. If Closing occurs on a date when current year's millage is not fixed but current year's assessment is
471  available, taxes will be prorated based upon such assessment and prior year's millage. If current year's
472  assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements
473  on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st
474  of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be
475  agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an
476  informal assessment taking into account available exemptions. A tax proration based on an estimate shall, at
477  either party's request, be readjusted upon receipt of current year's tax bill. This STANDARD K shall survive
478  Closing.
479  L.  ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH: Seller
480  shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections,
481  including a walk-through (or follow-up walk-through if necessary) prior to Closing.
482  M.  RISK OF LOSS: If, after Effective Date, but before Closing, Property is damaged by fire or other casualty
483  ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does
484  not exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed
485  pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated
486  cost to complete restoration (not to exceed 1.5% of Purchase Price), will be escrowed at Closing. If actual cost of
487  restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not in excess of 1.5% of Purchase
488  Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of
489  Purchase Price, Buyer shall elect to either take Property "as is" together with the 1.5%, or receive a refund of the
490  Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation
491  with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.
492  N.  1031 EXCHANGE: If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneously with
493  Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall
494  cooperate in all reasonable respects to effectuate the Exchange, including execution of documents; provided,

Buyer's Initials _____ _____        Page 9 of 12        Seller's Initials _____ _____

*formsimplicity*

DEEG000234

STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

495 however, cooperating party shall incur no liability or expense related to the Exchange, and Closing shall not be
496 contingent upon, nor extended or delayed by, such Exchange.
497 O. CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; DELIVERY; COPIES; CONTRACT
498 EXECUTION: Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall
499 be binding on, and inure to the benefit of, the parties and their respective heirs or successors in interest.
500 Whenever the context permits, singular shall include plural and one gender shall include all. Notice and delivery
501 given by or to the attorney or broker (including such broker's real estate licensee) representing any party shall be
502 as effective as if given by or to that party. All notices must be in writing and may be made by mail, personal
503 delivery or electronic (including "pdf") media. A facsimile or electronic (including "pdf") copy of this Contract and
504 any signatures hereon shall be considered for all purposes as an original. This Contract may be executed by use
505 of electronic signatures, as determined by Florida's Electronic Signature Act and other applicable laws.
506 P. INTEGRATION; MODIFICATION: This Contract contains the full and complete understanding and agreement
507 of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or
508 representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or
509 change in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties
510 intended to be bound by it.
511 Q. WAIVER: Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this
512 Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or
513 rights.
514 R. RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS: Riders, addenda, and typewritten
515 or handwritten provisions shall control all printed provisions of this Contract in conflict with them.
516 S. COLLECTION or COLLECTED: "COLLECTION" or "COLLECTED" means any checks tendered or
517 received, including Deposits, have become actually and finally collected and deposited in the account of
518 Escrow Agent or Closing Agent. Closing and disbursement of funds and delivery of closing documents
519 may be delayed by Closing Agent until such amounts have been COLLECTED in Closing Agent's
520 accounts.
521 T. LOAN COMMITMENT: "Loan Commitment" means a statement by the lender setting forth the terms and
522 conditions upon which the lender is willing to make a particular mortgage loan to a particular borrower. Neither a
523 pre-approval letter nor a prequalification letter shall be deemed a Loan Commitment for purposes of this Contract.
524 U. APPLICABLE LAW AND VENUE: This Contract shall be construed in accordance with the laws of the State
525 of Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the
526 county where the Real Property is located.
527 V. FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"): If a seller of U.S. real property is a
528 "foreign person" as defined by FIRPTA, Section 1445 of the Internal Revenue Code requires the buyer of the real
529 property to withhold up to 15% of the amount realized by the seller on the transfer and remit the withheld amount
530 to the Internal Revenue Service (IRS) unless an exemption to the required withholding applies or the seller has
531 obtained a Withholding Certificate from the IRS authorizing a reduced amount of withholding. Due to the
532 complexity and potential risks of FIRPTA, Buyer and Seller should seek legal and tax advice regarding
533 compliance, particularly if an "exemption" is claimed on the sale of residential property for $300,000 or less.
534 (i) No withholding is required under Section 1445 if the Seller is not a "foreign person," provided Buyer accepts
535 proof of same from Seller, which may include Buyer's receipt of certification of non-foreign status from Seller,
536 signed under penalties of perjury, stating that Seller is not a foreign person and containing Seller's name, U.S.
537 taxpayer identification number and home address (or office address, in the case of an entity), as provided for in
538 26 CFR 1.1445-2(b). Otherwise, Buyer shall withhold the applicable percentage of the amount realized by Seller
539 on the transfer and timely remit said funds to the IRS.
540 (ii) If Seller has received a Withholding Certificate from the IRS which provides for reduced or eliminated
541 withholding in this transaction and provides same to Buyer by Closing, then Buyer shall withhold the reduced
542 sum, if any required, and timely remit said funds to the IRS.
543 (iii) If prior to Closing Seller has submitted a completed application to the IRS for a Withholding Certificate and
544 has provided to Buyer the notice required by 26 CFR 1.1445-1(c) (2)(i)(B) but no Withholding Certificate has been
545 received as of Closing, Buyer shall, at Closing, withhold the applicable percentage of the amount realized by
546 Seller on the transfer and, at Buyer's option, either (a) timely remit the withheld funds to the IRS or (b) place the
547 funds in escrow, at Seller's expense, with an escrow agent selected by Buyer and pursuant to terms negotiated
548 by the parties, to be subsequently disbursed in accordance with the Withholding Certificate issued by the IRS or
549 remitted directly to the IRS if the Seller's application is rejected or upon terms set forth in the escrow agreement.
550 (iv) In the event the net proceeds due Seller are not sufficient to meet the withholding requirement(s) in this
551 transaction, Seller shall deliver to Buyer, at Closing, the additional COLLECTED funds necessary to satisfy the

Buyer's Initials _____ Page 10 of 12 Seller's Initials _____
FloridaRealtors/FloridaBar-ASIS-4x Rev. 2/15 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.
Serial: 009509-100145-9816387

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

652  applicable requirement and thereafter Buyer shall timely remit said funds to the IRS or escrow the funds for
653  disbursement in accordance with the final determination of the IRS, as applicable.
654  (v) Upon remitting funds to the IRS pursuant to this STANDARD, Buyer shall provide Seller copies of IRS Forms
655  8288 and 8288-A, as filed.
656  W. RESERVED
657  X. BUYER WAIVER OF CLAIMS: *To the extent permitted by law,' Buyer waives any claims against Seller
658  *and against any real estate licensee involved in the negotiation of this Contract for any damage or*
659  *defects pertaining to the physical condition of the Property that may exist at Closing of this Contract and*
660  *be subsequently discovered by the Buyer or anyone claiming by, through, under or against the Buyer.*
661  *This provision does not relieve Seller's obligation to comply with Paragraph 10(j). This Standard X shall*
662  *survive Closing.*
683                              ADDENDA AND ADDITIONAL TERMS

684*  **19. ADDENDA:** The following additional terms are included in the attached addenda or riders and incorporated into
665  this Contract (Check if applicable):

| | | |
|---|---|---|
| ☐ A. Condominium Rider | ☐ K. RESERVED | ☐ T. Pre-Closing Occupancy |
| ☒ B. Homeowners' Assn. | ☐ L. RESERVED | ☐ U. Post-Closing Occupancy |
| ☐ C. Seller Financing | ☒ M. Defective Drywall | ☐ V. Sale of Buyer's Property |
| ☐ D. Mortgage Assumption | ☐ N. Coastal Construction Control Line | ☐ W. Back-up Contract |
| ☐ E. FHA/VA Financing | ☐ O. Insulation Disclosure | ☐ X. Kick-out Clause |
| ☐ F. Appraisal Contingency | ☐ P. Lead Paint Disclosure (Pre-1978) | ☐ Y. Seller's Attorney Approval |
| ☐ G. Short Sale | ☐ Q. Housing for Older Persons | ☐ Z. Buyer's Attorney Approval |
| ☐ H. Homeowners'/Flood In | ☐ R. Rezoning | ☒ AA. Licensee Property Interest |
| ☐ J. Interest-Bearing Acct. | ☐ S. Lease Purchase/ Lease Option | ☐ BB. Binding Arbitration |

568*  **20. ADDITIONAL TERMS:** You acknowledge that Broker is representing you in a statutory Transaction Brokerage
567  relationship as set forth in section 475.01(1)(l) and 475.278(2)(b), Florida Statutes. In addition to the commission
668  to be paid by Seller. You (Buyer) agree to pay Real Estate of Florida a commission of $295.00 at closing. You will
669  have no obligation to pay if closing does not occur.
570
571  *Need To see seller's disclosure.*
572  _____
573  _____
574  _____
575  _____
576  _____
577  _____
578  _____
579  _____
580  _____
581  _____
582  _____

683                              COUNTER-OFFER/REJECTION

684*  ☐ Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and
686  deliver a copy of the acceptance to Seller).
686*  ☐ Seller rejects Buyer's offer.

687  **THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE**
688  **ADVICE OF AN ATTORNEY PRIOR TO SIGNING.**

589  **THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.**

590  *Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the terms*
591  *and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and conditions*

Buyer's Initials _____ Page 11 of 12          Seller's Initials _____

FloridaRealtors/FloridaBar-ASIS-4x    Rev 2/16 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.
Serial#: 000509-100145-9814357

DEEG000236

592  should be negotiated based upon the respective interests, objectives and bargaining positions of all interested
593  persons.

594  AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK TO
595  BE COMPLETED.

597* Buyer: _Gerald Bashant_ - FLORIDA Real ESTaTe Licensee     Date: _04/02/16_
599* Buyer: _Nancy A. Kwandowski_                                  Date: _04/02/16_
601* Seller: _Dave R. Dax_                                          Date: _4-2-16_
603* Seller: _Deborah M. Mobley_                                    Date: _4-2-16_

605  Buyer's address for purposes of notice              Seller's address for purposes of notice
606* _544 SW AKRON AVE_
607* _STUART      FL_
608* _34994_

609  **BROKER:** Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers entitled
610  to compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct Closing Agent
611  to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage agreements with the
612  parties and cooperative agreements between the Brokers, except to the extent Broker has retained such fees from the
613  escrowed funds. This Contract shall not modify any MLS or other offer of compensation made by Seller or Listing
614  Broker to Cooperating Brokers.

615* _GERALD W BASHANT JR_                               _Susan Maxwell_
616  Cooperating Sales Associate, if any                 Listing Sales Associate

617* _REAL ESTATE OF FLORIDA_                            _RE/MAX of Stuart_
618  Cooperating Broker, if any                          Listing Broker

Buyer's Initials _____ _____          Page 12 of 12          Seller's Initials _DRD_ _____
FloridaRealtors/FloridaBar-ASIS-4x    Rev.2/16 © 2015 Florida Realtors® and The Florida Bar.  All rights reserved.
Serial: 000809-100145-9614857                                              formsimplicity

DEEG000237

## Comprehensive Rider to the
## Residential Contract For Sale And Purchase
THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR

Real Estate of Florida

If initialed by all parties, the clauses below will be incorporated into the Florida Realtors®/Florida Bar Residential Contract For Sale And Purchase between _Debra A Hooker & David RDEEG_ (SELLER) and _GERALDW BASHANT JR & NANCY LEWANDOWSKI_ (BUYER) concerning the Property described as _516 SW AKRON AVE STUART FL 34994_ _LOT 8 STUART CAV_

Buyer's Initials  _GB_  _nal_          Seller's Initials  _DRD_  _D.R.H._

### M. DEFECTIVE DRYWALL.

During the time Florida was experiencing building material shortages, some homes were built or renovated using drywall imported from or manufactured in China or elsewhere which reportedly emit levels of sulfur, methane and/or other volatile organic compounds that cause corrosion of air conditioner and refrigerator coils, copper tubing, electrical wiring, computer wiring and other household items as well as create noxious odors which may also pose health risks ("Defective Drywall").

1. Seller's Knowledge: Except as indicated below, Seller has no actual knowledge of the presence of Defective Drywall or the existence of any information, records, reports, or other documents pertaining to Defective Drywall affecting the Property: (describe all known Defective Drywall information and list all available documents pertaining to Defective Drywall and provide documents, if any, to Buyer before accepting Buyer's offer) _Defective Chinese Drywall is Present (see Seller's Property Disclosure-Resident_

2. Defective Drywall Inspection: (Check One):
   (a) ☒ Buyer waives the opportunity to conduct a risk assessment or inspection for the presence of Defective Drywall and accepts the Drywall in the Property in its existing condition.
   (b) ☐ Buyer, at Buyer's expense, may have a home inspector, licensed contractor or other licensed professional (if required by law) to conduct an inspection or risk assessment of the Property for the presence of Defective Drywall within _____ (if left blank, then 15) days from the Effective Date ("Drywall Inspection Period"). If the drywall inspection or risk assessment reveals the presence of Defective Drywall or reveals damage to the Property resulting from the Defective Drywall and the cost to remove/replace the Defective Drywall or damage resulting from the Defective Drywall exceeds $_____ (if left blank, $500.00), Buyer may cancel this Contract by giving written notice to Seller on or before expiration of the Drywall Inspection Period. If Buyer timely terminates this Contract, the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller of all further obligations under this Contract, except as provided in Paragraph 3 below. If Buyer fails to timely cancel or fails to conduct the inspections permitted in this Paragraph, Buyer may not terminate this Contract pursuant to this Addendum.
   IF NEITHER BOX IS CHECKED, THEN OPTION (b) SHALL BE DEEMED SELECTED.

3. Repair of Inspection Damages to Property: Buyer shall be responsible for prompt payment for such inspections and repair all damages to the Property resulting from the inspections.

4. Professional Advice: Buyer acknowledges that Broker has not conducted any independent investigations to verify the accuracy or completeness of any representations about Defective Drywall made by Broker or Seller. Buyer agrees to rely solely on Seller, professional inspectors, governmental agencies or any third parties retained by the Buyer regarding any issue related to Defective Drywall.

CR-4 Rev. 8/15 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.
Serial: 080874-100166-9015036

formsimplicity

DEEG000238

## Seller's Property Disclosure – Residential

*of Stuart*

**Notice to Licensee:** The **Seller** should fill out this form.

**Notice to Seller:** Florida law[1] requires a seller of a home to disclose to the buyer all known facts that materially affect the value of the property being sold and that are not readily observable or known by the buyer. This disclosure form is designed to help you comply with the law. However, this disclosure form may not address every significant issue that is unique to the Property. You should think about what you would want to know if you were buying the Property today; and if you need more space for additional information, comments, or explanations, check the Paragraph 10 checkbox and attach an addendum.

**Notice to Buyer:** The following representations are made by **Seller** and **not** by any real estate licensee. This disclosure is not a guaranty or warranty of any kind. It is not a substitute for any inspections, warranties, or professional advice you may wish to obtain. It is not a substitute for your own personal judgment and common sense. The following information is based only upon **Seller's** actual knowledge of the Property's condition. Sellers can disclose only what they actually know. **Seller** may not know about all material or significant items. You should have an independent, professional home inspection to verify the condition of the Property and determine the cost of repairs, if any. This disclosure is not a contract and is not intended to be a part of any contract for sale and purchase.

**Seller** makes the following disclosure regarding the property described as: <u>516 SW Akron Ave Stuart FL 34994</u>
_____ (the "Property")

The Property is ☒owner occupied ☐tenant occupied ☐unoccupied (If unoccupied, how long has it been since **Seller** occupied the Property? _____

|  | **Yes** | **No** | **Don't Know** |
|---|---|---|---|
| **1. Structures; Systems; Appliances:** | | | |
| (a) Are the structures, including roofs; ceilings; walls; doors; windows; foundation; and pool, hot tub, and spa, if any, structurally sound and free of leaks? | ☒ | ☐ | ☐ |
| (b) Is seawall, if any, and dockage, if any, structurally sound? | ☒ | ☐ | ☐ |
| (c) Are existing major appliances and heating, cooling, mechanical, electrical, security, and sprinkler systems, in working condition, i.e., operating in the manner in which the item was designed to operate? | ☐ | ☒ | ☐ |
| (d) Are any of the appliances leased? If yes, which ones: _____ | ☐ | ☒ | ☐ |
| (e) If any answer to questions 1(a) -- 1(c) is no, please explain: _____ <br> defective drywall | | | |
| **2. Termites; Other Wood-Destroying Organisms; Pests:** | | | |
| (a) Are termites; other wood-destroying organisms, including fungi; or pests present on the Property or has the Property had any structural damage by them? | ☐ | ☒ | ☐ |
| (b) Has the Property been treated for termites; other wood-destroying organisms, including fungi; or pests? | ☐ | ☒ | ☐ |
| (c) If any answer to questions 2(a) - 2(b) is yes, please explain: _____ | | | |
| **3. Water Intrusion; Drainage; Flooding:** | | | |
| (a) Has past or present water intrusion affected the Property? | ☐ | ☒ | ☐ |
| (b) Have past or present drainage or flooding problems affected the Property? | ☐ | ☒ | ☐ |
| (c) Is any of the Property located in a special flood hazard area? | ☐ | ☐ | ☒ |
| (d) Is any of the Property located seaward of the coastal construction control line? | ☐ | ☐ | ☒ |
| (e) Does your lender require flood insurance? | ☒ | ☐ | ☐ |
| (f) Do you have an elevation certificate? If yes, please attach a copy. | ☐ | ☐ | ☒ |
| (g) If any answer to questions 3(a) - 3(d) is yes, please explain: _____ | | | |

_____

[1] *Johnson v. Davis*, 480 So.2d 625 (Fla. 1985).

**Buyer** (___)(___) and **Seller** (___)(___) acknowledge receipt of a copy of this page, which is Page 1 of 4.
SPDR-1
©2013 Florida Association of REALTORS®

DEEG000239

|  | Yes | No | Don't Know |
|---|---|---|---|

4. **Plumbing:**
   (a) What is your drinking water source? ☒public ☐private ☐well ☐other
   (b) Have you ever had a problem with the quality, supply, or flow of potable water? ☐ ☒ ☐
   (c) Do you have a water treatment system? ☐ ☒ ☐
   If yes, is it ☐owned ☐leased?
   (d) Do you have a ☒sewer or ☐septic system? If septic system, describe the location of each system: _____
   _____
   (e) Are any septic tanks, drain fields, or wells that are not currently being used located on the Property? ☐ ☒ ☐
   (f) Have there been any plumbing leaks since you have owned the Property? ☒ ☐ ☐
   (g) Are any polybutylene pipes on the Property? ☐ ☐ ☒
   (h) If any answer to questions 4(b), 4(c), and 4(e) - 4(g) is yes, please explain: _____
   washing machine and dishwasher have leaked

5. **Pools; Hot Tubs; Spas:**
   **Note:** Florida law requires swimming pools, hot tubs, and spas that received a certificate of completion on or after October 1, 2000, to have at least one safety feature as specified by Section 515.27, Florida Statutes.
   (a) If the Property has a swimming pool, hot tub, or spa that received a certificate of completion on or after October 1, 2000, indicate the existing safety feature(s): ☐enclosure that meets the pool barrier requirements ☐approved safety pool cover ☐required door and window exit alarms ☐required door locks ☐none
   (b) Has an in-ground pool on the Property been demolished and/or filled? ☐ ☒ ☐

6. **Sinkholes:**
   **Note:** When an insurance claim for sinkhole damage has been made by the seller and paid by the insurer, Section 627.7073(2)(c), Florida Statutes, requires the seller to disclose to the buyer that a claim was paid and whether or not the full amount paid was used to repair the sinkhole damage.
   (a) Does past or present settling, soil movement, or sinkhole(s) affect the Property or adjacent properties? ☐ ☒ ☐
   (b) Has any insurance claim for sinkhole damage been made? ☐ ☒ ☐
   (c) If any insurance claim for sinkhole damage was made, was the claim paid? ☐ ☐ ☐
   (d) If any insurance claim for sinkhole damage was paid, were all the proceeds used to repair the damage? ☐ ☐ ☐
   (e) If any answer to questions 6(a) - 6(c) is yes or the answer to question 6(d) is no, please explain: _____

7. **Deed/Homeowners' Association Restrictions; Boundaries; Access Roads:**
   (a) Are there any deed or homeowners' restrictions? ☒ ☐ ☐
   (b) Are there any proposed changes to any of the restrictions? ☐ ☒ ☐
   (c) Are there any resale or leasing restrictions? ☐ ☐ ☒
   (d) Is membership mandatory in a homeowners' association? ☒ ☐ ☐
   (e) Are fees charged by the homeowners' association? ☒ ☐ ☐
   (f) Are any driveways, walls, fences, or other features shared with adjoining landowners? ☐ ☒ ☐
   (g) Are there any encroachments on the Property or any encroachments by the Property's improvements on other lands? ☐ ☒ ☐
   (h) Are there boundary line disputes or easements affecting the Property? ☐ ☒ ☐
   (i) Are access roads ☒private ☐public? If private, describe the terms and conditions of the maintenance agreement: _____
   HOA's responsibility
   (j) If any answer to questions 7(a) - 7(h) is yes, please explain: _____
   restrictive covenants

DEEG000240

|   | Yes | No | Don't Know |
|---|---|---|---|

**8. Environmental:**
(a) Was the Property built before 1978? ☐ ☒ ☐
   If yes, please see Lead-Based Paint Disclosure.
(b) Does anything exist on the Property that may be considered an environmental hazard, including but not limited to, lead-based paint; asbestos; mold; urea formaldehyde; radon gas; methamphetamine; defective drywall; fuel, propane, or chemical storage tanks (active or abandoned); or contaminated soil or water? ☒ ☐ ☐
(c) Has there been any damage, clean up, or repair to the Property due to any of the substances or materials listed in subsection (b) above? ☒ ☐ ☐
(d) Are any mangroves, archeological sites, or other environmentally sensitive areas located on the Property? ☒ ☐ ☐
(e) If any answer to questions 8(b) - 8(d) is yes, please explain: _____
   1) defective drywall has not been remediated, and 2) mangroves surround the dock

**9. Governmental:**
(a) Are there any zoning violations or nonconforming uses? ☐ ☒ ☐
(b) Are there any zoning restrictions affecting additions, improvements, or replacement of the Property? ☐ ☒ ☐
(c) Do any zoning, land use, or administrative regulations conflict with the existing or intended use of the Property? ☐ ☒ ☐
(d) Do any restrictions, other than association and flood area requirements, affect improvements or replacement of the Property? ☐ ☒ ☐
(e) Are any improvements, including additions, located below the base flood elevation? ☐ ☒ ☐
(f) Have any improvements been constructed in violation of applicable local flood guidelines? ☐ ☒ ☐
(g) Have any improvements or additions to the Property, whether by you or by others, been constructed in violation of building codes or without necessary permits? ☐ ☒ ☐
(h) Are there any active permits on the Property that have not been closed by a final inspection? ☐ ☒ ☐
(i) Is there any violation or non-compliance regarding any unrecorded liens; code enforcement violations; or governmental, building, environmental, and safety codes, restrictions, or requirements? ☐ ☒ ☐
(j) If any answer to questions 9(a) - 9(i) is yes, please explain: _____

**10.** ☒ (If checked) Other Matters; Additional Comments: The attached addendum contains additional information, explanation, or comments.

Seller represents that the information provided on this form and any attachments is accurate and complete to the best of Seller's knowledge on the date signed by Seller. Seller authorizes listing broker to provide this disclosure statement to real estate licensees and prospective buyers of the Property. Seller understands and agrees that Seller will promptly notify Buyer in writing if any information set forth in this disclosure statement becomes inaccurate or incorrect.

Seller: _____ / David Deeg        Date: 1-31-16
Seller: _____ / Deborah Hooker    Date: 1-31-16

Buyer acknowledges that Buyer has read, understands, and has received a copy of this disclosure statement.

Buyer: _____ / NANCY LEWANDOWSKI   Date: 4-6-2016
Buyer: _____ / GERALD BASHANT      Date: 4-6-2016

Buyer (___) and Seller (___) acknowledge receipt of a copy of this page, which is Page 3 of 4
SPDR-1                                      ©2013 Florida Association of REALTORS®

DEEG000241



# CHINESE DRYWALL SCREENING LLC

Inspections and documentation from leading experts

November 9, 2010

Attorney Gregory Weiss
Leopold-Kuvin, P.A.
2925 PGA Blvd., Ste. 200
Palm Beach Gardens, FL 33410

RE: Chinese Drywall Screening Report: FL19-0110
    Deeg, David / Hooker, Deborah
    516 SW Akron Avenue
    Stuart, FL 34994

Mr. Weiss,

At your request, an investigation of the above referenced property was performed on **November 8, 2010**. Chinese Drywall Screening, LLC (CDS) is providing the summary below for your use. This is a professional opinion based on a visual inspection of the accessible materials and not an exhaustive technical evaluation.

Based on our visual observations of blackened A/C coils, electrical wires and copper plumbing coupled with known affects from reactive drywall, CDS is of the opinion that reactive drywall **is** present in the above referenced property. Chinese drywall markings discovered are:

| No. | Drywall Mfg | Markings on Drywall | Location in home |
|-----|-------------|---------------------|------------------|
| 14 | Taishan | "DrYwall"… "4fe" | Foyer/Family Room/Living Room/Kitchen/Dining Room/Master Bedroom/Bedroom 2/Bedroom 3 |

Another type of drywall found that is not typically reactive is No. 30 – USG. This type was observed on the interior ceiling.

Based on the **2,879 sf** size of the home with **8'5" to 9' average ceiling height,** we estimate that there is **11,516 sf of drywall** in the home.

Pursuant to your agreement with Chinese Drywall Screening, LLC, we cannot guarantee the presence or absence of reactive drywall or the levels in which it may be present without extensive testing and/or laboratory analysis.

Please feel free to contact us should you have any questions regarding our findings or if we may be of further assistance to you.

Sincerely,

Howard Ehrsam, EI, CDP, LEED AP
CGC 1509717
  on behalf of Chinese Drywall Screening, LLC

Chinese Drywall Screening, LLC
411 SW Silver Palm Cove, Port St Lucie, FL 34986
PH: 772-224-8660 ◊ FX: 772-409-5948
www.chinesedrywallscreening.com

DEEG000242

**Seller's Update**

**Instructions to Seller:** If the information set forth in this disclosure statement becomes inaccurate or incorrect, you must promptly notify **Buyer**. Please review the questions and your answers. Use the space below to make corrections and provide additional information, if necessary. Then acknowledge that the information is accurate as of date signed below.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Seller** represents that the information provided on this form and any attachments is accurate and complete to the best of **Seller's** knowledge on the date signed by **Seller**.

Seller: _____ / David Deeg                    Date: _1-31-16_
              (signature)                        (print)

Seller: _____ / Deborah Hooker               Date: _1-31-16_
              (signature)                        (print)

**Buyer** acknowledges that **Buyer** has read, understands, and has received a copy of this revised disclosure statement.

Buyer: _____ / NANCY LEWANDOWSKI          Date: _4-6-2016_
              (signature)                        (print)

Buyer: _____ / GERALD BASHANT               Date: _4-6-2016_
              (signature)                        (print)

Buyer (____) and Seller (____) acknowledge receipt of a copy of this page, which is Page 4 of 4.
SPDR-1                                        ©2013 Florida Association of REALTORS®

DEEG000243

**A. Settlement Statement**

U.S. Department of Housing
and Urban Development

OMB No. 2502-0265

**B. Type of Loan**

| | | | 6. File Number | 7. Loan Number | 8. Mortg. Ins. Case Num. |
|---|---|---|---|---|---|
| 1. FHA | 2. FmHA | 3. Conv. Unins. | 16-045 | | |
| 4. VA | 5. Conv. Ins. | | ID: | | |

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. NAME OF BORROWER:** GERALD W. BASHANT, JR. AND NANCY LEWANDOWSKI, as joint tenants with rights of survivorship and not as tenants in common

Address of Borrower: 544 SW Akron Ave. Stuart, Florida 34994

**E. NAME OF SELLER:** DAVID R. DEEG, a single man and DEBORAH M. HOOKER, a single woman

Address of Seller:

**F. NAME OF LENDER:**

Address of Lender:

**G. PROPERTY LOCATION:** 516 SW Akron Ave., Stuart, Florida 34994

**H. SETTLEMENT AGENT:** WILLIAM D. ANDERSON, JR., P.A.

Place of Settlement: 2897 SE Ocean Blvd , Stuart, Florida 34996

TIN: 59-1510535

Phone: 772-283-2411

**I. SETTLEMENT DATE:** 4/27/16

DISBURSEMENT DATE: 5/2/16

| J. Summary of borrower's transaction | | K. Summary of seller's transaction | |
|---|---|---|---|
| **100. Gross amount due from borrower:** | | **400. Gross amount due to seller:** | |
| 101. Contract sales price | 330,000.00 | 401. Contract sales price | 330,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (Line 1400) | 6,036.66 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance:** | | **Adjustments for items paid by seller in advance:** | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments/Fire T1 from 04/27/16 to 09/30/16 | 46.47 | 408. Assessments/Fire T1 from 04/27/16 to 09/30/16 | 46.47 |
| 109. assessmenrs/Fire T2 from 04/27/16 to 09/30/16 | 21.74 | 409. assessmenrs/Fire T2 from 04/27/16 to 09/30/16 | 21.74 |
| 110. Second Quarter HOA from 04/27/16 to 06/30/16 | 317.86 | 410. Second Quarter HOA from 04/27/16 to 06/30/16 | 317.86 |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross amount due from borrower:** | 336,422.73 | **420. Gross amount due to seller:** | 330,386.07 |
| **200. Amounts paid by or in behalf of borrower:** | | **500. Reductions in amount due to seller:** | |
| 201. Deposit or earnest money | 30,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 22,590.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Principal amount of second mortgage | | 504. Payoff of first mortgage loan | 290,612.18 |
| 205. First Draw | 26,740.50 | 505. Payoff of second mortgage loan | |
| 206. | | 506. Deposits held by seller | |
| 207. Principal amt of mortgage held by seller | | 507. Principal amt of mortgage held by seller | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller:** | | **Adjustments for items unpaid by seller:** | |
| 210. City/town taxes from 01/01/16 to 04/27/16 | 1,213.77 | 510. City/town taxes from 01/01/16 to 04/27/16 | 1,213.77 |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total paid by/for borrower:** | 57,954.27 | **520. Total reductions in amount due seller:** | 314,415.95 |
| **300. Cash at settlement from/to borrower:** | | **600. Cash at settlement to/from seller:** | |
| 301. Gross amount due from borrower (line 120) | 336,422.73 | 601. Gross amount due to seller (line 420) | 330,386.07 |
| 302. Less amount paid by/for the borrower (line 220) | (57,954.27) | 602. Less total reductions in amount due seller (line 520) | (314,415.95) |
| 303. Cash ( ✓ From  To ) Borrower: | 278,468.46 | 603. Cash ( ✓ To  From ) Seller: | 15,970.12 |

**Substitute Form 1099 Seller Statement:** The information contained in blocks E, G, H, and I on line 401 is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

**Seller Instructions:** If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your tax return; for other transactions, complete the applicable parts of Form 4797, Form 6262 and/or Schedule D (Form 1040).

Borrower's Initial(s):

Seller's Initial(s):

DoubleTime®

DEEG000246

U.S. Department of Housing and Urban Development

Page 2

| L. Settlement charges | | | | Borrower POC Seller POC | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|---|---|---|
| 700. Total Sales/Brokers Com. based on price | $330,000.00 @ | 6.0000 % = | 19,800.00 | | | |
| 701. | 9,900.00 | 3.0000 % to REMAX OF STUART | | | | |
| 702. | 9,900.00 | 3.0000 % to REAL ESTATE OF FLORIDA | | | | |
| 703. Commission paid at settlement | | | | | | 19,800.00 |
| 704. Processing Fee | | to REAL ESTATE OF FLORIDA | | | 295.00 | |
| 800. Items payable in connection with loan: | | | | Borrower POC Seller POC | | |
| 801. Loan origination fee | % to | | | | | |
| 802. Loan discount | % to | | | | | |
| 803. Appraisal fee | to | | | | | |
| 804. Credit report | to | | | | | |
| 805. Lender's inspection fee | to | | | | | |
| 806. Mortgage insurance application fee | to | | | | | |
| 807. Assumption Fee | to | | | | | |
| 808. | to | | | | | |
| 809. | to | | | | | |
| 810. | to | | | | | |
| 811. | to | | | | | |
| 900. Items required by lender to be paid in advance: | | | | Borrower POC Seller POC | | |
| 901. Interest from | @ | /day | | | | |
| 902. Mortgage insurance premium for | months to | | | | | |
| 903. Hazard insurance premium for | years to | | | | | |
| 904. Flood insurance premium for | years to | | | | | |
| 905. | years to | | | | | |
| 1000. Reserves deposited with lender: | | | | Borrower POC Seller POC | | |
| 1001. Hazard insurance | months @ | per month | | | | |
| 1002. Mortgage insurance | months @ | per month | | | | |
| 1003. City property taxes | months @ | per month | | | | |
| 1004. County property taxes | months @ | per month | | | | |
| 1005. Annual assessments | months @ | per month | | | | |
| 1006. Flood insurance | months @ | per month | | | | |
| 1007. | months @ | per month | | | | |
| 1008. | months @ | per month | | | | |
| 1009. Aggregate accounting adjustment | | | | | | |
| 1100. Title charges: | | | | Borrower POC Seller POC | | |
| 1101. Settlement or closing fee | to WILLIAM D. ANDERSON, JR., P.A. | | | | 200.00 | |
| 1102. Abstract or title search | to WILLIAM D. ANDERSON, JR., P.A. | | | | 125.00 | |
| 1103. Title examination | to | | | | | |
| 1104. Title insurance binder | to | | | | | |
| 1105. Document preparation | to | | | | | |
| 1106. Permit Search | to WILLIAM D. ANDERSON, JR., P.A. | | | | 75.00 | |
| 1107. Attorney's Fees | to FERRARO LAW GROUP | | | | | 250.00 |
| (includes above item numbers: | | | ) | | | |
| 1108. Title Insurance | to Old Republic Nat. Title/WILLIAM D. ANDERSON | | | | 1,725.00 | |
| (includes above item numbers: | | | ) | | | |
| 1109. Lender's coverage (Premium): | | | | | | |
| 1110. Owner's coverage (Premium): | $330,000.00 ($1,725.00) | | | | | |
| 1111. Endorse: | | | | | | |
| 1112. Title Surcharge | to WILLIAM D. ANDERSON, JR., P.A. | | | | 3.28 | |
| 1113. Wire Fees | to WILLIAM D. ANDERSON, JR., P.A. | | | | 20.00 | 20.00 |
| 1200. Government recording and transfer charges: | | | | Borrower POC Seller POC | | |
| 1201. Recording fees | Deed $27.00 Mortgage(s) | Releases | $10.00 | | 27.00 | 10.00 |
| 1202. City/county tax/stamps | Deed Mortgage(s) | | | | | |
| 1203. State tax/stamps | Deed $2,310.00 Mortgage(s) | | | | | 2,310.00 |
| 1204. | to | | | | | |
| 1205. | to | | | | | |
| 1300. Additional settlement charges: | | | | Borrower POC Seller POC | | |
| 1301. Survey | to | | | | | |
| 1302. Pest Inspection | to | | | | | |
| 1303. Estoppel Reimbursement | to WILLIAM D. ANDERSON, JR., P.A. | | | | | 200.00 |
| 1304. | to | | | | | |
| 1305. Closing costs 544 SW Akron | to | | | | 3,566.38 | |
| 1306. | to | | | | | |
| 1307. | to | | | | | |
| 1308. | to | | | | | |
| 1309. | | | | | | |
| 1400. Total settlement charges: | | | | | | |
| ( Enter on lines 103, Section J and 502, Section K ) | | | | | 6,036.66 | 22,590.00 |

Borrower's Initial(s):

Seller's Initial(s):

DoubleTime®

DEEG000247

## BUYER/SELLER
## SETTLEMENT STATEMENT ADDENDUM

File Number:    16-045

I have carefully reviewed the Settlement Statement and to the best of my knowledge and belief, it is a true and
accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further
certify that I have received a copy of the Settlement Statement.

### Buyer(s)

GERALD W. BASHANT, JR.                               NANCY A. LEWANDOWSKI

### Seller(s)

DAVID R. DEEG                                        DEBORAH M. HOOKER

### Settlement Agent

The Settlement Statement which I have prepared is a true and accurate account of this transaction. I have
caused or will cause the funds to be disbursed in accordance with this statement.

WILLIAM D. ANDERSON, JR., P.A.

By:                                      Date:    5/2/16

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form.
Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001
and Section 1010.

DoubleTime®

DEEG000248

# HUD-1 SETTLEMENT STATEMENT ADDENDUM

File Number:    16-045

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

## Borrower(s)

_____
GERALD W. BASHANT, JR.

_____
NANCY A. LEWANDOWSKI
(GERALD W BASHANT JR)

## Seller(s)

_____
DAVID R. DEEG

_____
DEBORAH M. HOOKER

## Settlement Agent

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

WILLIAM D. ANDERSON, JR., P.A.

By: _____    Date:  5/2/16

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

DEEG000249

Case 2:00-md-02047-EEF-MBN Document 22380-44 Filed 12/02/19 Page 108 of 151
Case 1:11-cv-22408-MGC Document 276-4 Entered on FLSD Docket 05/13/2019 Page 1 of
164

# EXHIBIT D4



**Residential Lease for Single Family Home or Duplex**

FloridaRealtors

**INSTRUCTIONS:**
1. Licensee: Give this disclosure to the Landlord prior to your assisting with the completion of the attached Lease.
2. Licensee: As the person assisting with the completion of the attached form, insert your name in the first (5) blank "Name" spaces below.
3. Licensee: **SIGN** the disclosure below.
4. Landlord/Owner and Tenant: Check the applicable provision regarding English contained in the disclosure and **SIGN** below.
5. Licensee: Retain a copy for your files for at least 6 years. Landlord/Owner and Tenant: Retain a copy for your files. This disclosure does not act as or constitute a waiver, disclaimer or limitation of liability.

**THIS FORM WAS COMPLETED WITH THE ASSISTANCE OF:**

MICHELE SOUSA
_____
Licensee Name

K2 REALTY
_____
Name of Brokerage/Business

11676 US HWY 1 N. PALM BEACH, FL
_____
Address

561-262-1835
_____
Phone Number

**DISCLOSURE:**

MICHELE SOUSA
_____ told me that he/she is a nonlawyer and may not give
(Name)
legal advice, cannot tell me what my rights or remedies are, cannot tell me how to testify in court, and cannot represent me in court.

Rule 10-2.1(b) of the Rules Regulating the Florida Bar defines a paralegal as a person who works under the supervision of a member of the Florida Bar and who performs specifically delegated substantive legal work for which a member of the Florida Bar is responsible. Only persons who meet the definition may call themselves paralegals.

MICHELE SOUSA
_____ informed me that he/she is not a paralegal as defined
(Name)
by the rule and cannot call himself/herself a paralegal.

MICHELE SOUSA
_____ told me that he/she may only help me type the factual
(Name)
information provided by me in writing into the blanks on the form.

MICHELE SOUSA
_____ may not help me fill in the form and may not complete
(Name)
the form for me.

If using a form approved by the Supreme Court of Florida, _____ MICHELE SOUSA _____ may
(Name)
ask me factual questions to fill in the blanks on the form and may also tell me how to file the form.

Landlord/Owner:                                      Tenant:

[X] I can read English.                              [X] I can read English.
[ ] I cannot read English but this notice was read to me by    [ ] I cannot read English but this notice was read to me by

_____ in _____ which I understand.
(Name)                        (Language)

_____    _____    _____
(Licensee Signature)          (Landlord Signature)          (Tenant Signature)

This form is available for use by the entire real estate industry and is not intended to identify the user as a REALTOR. REALTOR is a registered collective membership mark that may be used only by real estate licensees who are members of the National Association of REALTORS and who subscribe to its Code of Ethics.
The copyright laws of the United States (17 U.S. Code) forbid the unauthorized reproduction of blank forms by any means including facsimile or computerized forms.

RLHD-3   Rev. 4/10   © 2010   Florida Realtors®   All Rights Reserved

Realtor: Michele Sousa | Brokerage: K2 Realty, Inc.  11676 U.S. Highway 1 North Palm Beach FL 33408

▨ formsimplicity

## Residential Lease for Single Family Home or Duplex

### (FOR A TERM NOT TO EXCEED ONE YEAR)

A BOX (☐) OR A BLANK SPACE (____) INDICATES A PROVISION WHERE A CHOICE OR DECISION MUST BE MADE BY THE PARTIES.

THE LEASE IMPOSES IMPORTANT LEGAL OBLIGATIONS. MANY RIGHTS AND RESPONSIBILITIES OF THE PARTIES ARE GOVERNED BY CHAPTER 83, PART II, RESIDENTIAL LANDLORD AND TENANT ACT, FLORIDA STATUTES. A COPY OF THE RESIDENTIAL LANDLORD AND TENANT ACT IS ATTACHED TO THIS LEASE.

**1. PARTIES.** This is a lease ("the Lease") between _____ Carol R. Dennie-Green and/or assigns, heirs, et al
(name and address of owner of the property)

176 Via Veracruz Jupiter, FL 33458 ("Landlord") and

STEVEN ETTER AND CATHY ETTER ("Tenant").
(name(s) of person(s) to whom the property is leased)

Landlord's E-mail Address: gidiupp@comcast.net

Landlord's Telephone Number: 561-309-8717

Tenant's E-mail Address: ███████████████

Tenant's Telephone Number: ███████████████

**2. PROPERTY RENTED.** Landlord leases to Tenant the land and buildings located at _____ Pines on Pennock Ln Pud Pl 2 Lt 217
(street address)

176 VIA VERACRUZ, JUPITER , Florida 33458
(zip code)

together with the following furniture and appliances [List all furniture and appliances. If none, write "none."] (In the Lease, the property leased, including furniture and appliances, if any, is called "the Premises"):

range,dishwasher, 2 refrigerators, 2 microwaves, disposal, hot water heater, auto. garage door opener, 8 ceiling fans, 4

hanging light fixtures, inactive security system, smoke detectors, misc. outdoor furniture

The Premises shall be occupied only by the Tenant and the following persons: NONE

**3. TERM.** This is a lease for a term, not to exceed twelve months, beginning on _____ NOVEMBER 15, 2012 and
(month, day, year)

ending _____ JULY 15, 2013 _____ (the "Lease Term").
(month, day, year)

**4. RENT PAYMENTS, TAXES AND CHARGES.** Tenant shall pay rent in the amount of $ 29,200.00 (excluding taxes) for the Lease Term. The rent shall be payable by Tenant in advance in installments or in full as provided in the options below:

[x] in installments. If in installments, rent shall be payable

[x] monthly, on the ___ 15 ___ day of each month (if left blank, on the first day of each month) in the amount of

$ 3,650.00 per installment.
OR

☐ weekly, on the _____ day of each week. (If left blank, on Monday of each week.) in the amount of $ _____ per installment.

Landlord (____) (____) and Tenant (initials) acknowledge receipt of a copy of this page which is Page 1 of 7
RLHD-3    Rev. 4/10    ©2010   Approved for use under rule 10-2.1(a) of The Rules Regulating the Florida Bar

formsimplicity

☐ in full on _____ in the amount of $_____.
       (date)

Tenant shall also be obligated to pay taxes on the rent when applicable in the amount of $_____ ☐ with each rent installment

☐ with the rent for the full term of the Lease. Landlord will notify Tenant if the amount of the tax changes.

**Payment Summary**

☒ If rent is paid in installments, the total payment per installment including taxes shall be in the amount of $____ 3,650.00.

☐ If rent is paid in full, the total payment including taxes shall be in the amount of $_____.

All rent payments shall be payable to _____ CAROL R. DENNIE-GREEN _____ at
                                  (name)
_____ 51 MARTIN DR. FEURA BUSH, NY 12067 _____ . (If left blank, to Landlord at Landlord's address.)
                  (address)

☐ If the tenancy starts on a day other than the first day of the month or week as designated above, the rent shall be prorated from

_____ through _____ in the amount of $_____ and shall be due
    (date)                       (date)

on _____ . (If rent paid monthly, prorate on a 30-day month.)
    (date)

Tenant shall make rent payments required under the Lease by (choose all applicable) ☒ cash, ☐ personal check, ☐ money order, ☒ cashier's check, or ☒ other ____ Direct Deposit to Landlord's Bank Account ____ (specify). If the payment is accepted by any means other than cash, payment is not considered made until the other instrument is collected.

If Tenant makes a rent payment with a worthless check, Landlord can require Tenant ☒ to pay all future payments by ☒ money order, ☒ cashier's check, or official bank check or ☒ cash or other (specify) ____ Direct Deposit to Landlord's Bank Account ____, and ☒ to pay bad check fees in the amount of $____ 182.50 (not to exceed the amount prescribed by Section 68.065, Florida Statutes).

**5. MONEY DUE PRIOR TO OCCUPANCY.** Tenant shall pay the sum of $____ 11,200.00 in accordance with this paragraph prior to occupying the Premises. Tenant shall not be entitled to move in or to keys to the Premises until all money due prior to occupancy has been paid. If no date is specified below, then funds shall be due prior to Tenant occupancy. Any funds designated in this paragraph due after occupancy, shall be paid accordingly. Any funds due under this paragraph shall be payable to Landlord at Landlord's address or

to _____
                            (name)

at _____
                         (address)

| | | | |
|---|---|---|---|
| First ☒ month's ☐ week's rent plus applicable taxes | $ 3,650.00 | due | UPON SIGNING OF LEASE |
| Prorated rent plus applicable taxes | $ | due | |
| Advance rent for ☐ month ☐ week of | | | |
| _____ plus applicable taxes | $ | due | |
| Last ☒ month's ☐ week's rent plus applicable taxes | $ 3,650.00 | due | UPON SIGNING OF LEASE |
| Security deposit | $ 3,650.00 | due | UPON SIGNING OF LEASE |
| Additional security deposit | $ | due | |
| Security deposit for homeowner's association | $ | due | |
| Pet Deposit | $ 250.00 | due | UPON SIGNING OF LEASE |
| Other_____ | $ | due | |
| Other_____ | $ | due | |

Landlord (☒) (____) and Tenant (☒) (☒) acknowledge receipt of a copy of this page which is Page 2 of 7
RLHD-3   Rev. 4/10 ©2010  Approved for use under rule 10-2.1(a) of The Rules Regulating the Florida Bar

formsimplicity

**6. LATE FEES.** (Complete if applicable) In addition to rent, Tenant shall pay a late charge in the amount of $ ___182.50___ (If left blank, 4% of the rent payment) for each rent payment made ___3___ days after the day it is due (if left blank, 5 days if rent is paid monthly, 1 day if rent is paid weekly).

**7. PETS AND SMOKING.** Unless this box ☒ is checked or a pet deposit is paid, Tenant may not keep pets or animals on the Premises. If Tenant may keep pets, the pets described in this paragraph are permitted on the Premises.

___1 FEMALE CAIRN TERRIER, 11 YEARS OLD___
(Specify number of pets, type(s), breed, maximum adult weight of pets.)

Unless this box ☐ is checked, no smoking is permitted in the Premises.

**8. NOTICES.**

___NONE___ is Landlord's Agent. All notices must be sent to

☒ Landlord ___Carol R. Dennie-Green and/or assigns, heirs, et al___ at ___176 Via Veracruz Jupiter, FL 33458___

☐ Landlord's Agent _____ at _____

unless Landlord gives Tenant written notice of a change. All notices of such names and addresses or changes thereto shall be delivered to the Tenant's residence or, if specified in writing by the Tenant, to any other address. All notices to the Landlord or the Landlord's Agent (whichever is specified above) shall be given by U.S. mail or by hand delivery.

Any notice to Tenant shall be given by U.S. mail or delivered to Tenant at the Premises. If Tenant is absent from the Premises, a notice to Tenant may be given by leaving a copy of the notice at Premises.

**9. UTILITIES.** Tenant shall pay for all utilities services during the Lease Term and connection charges and deposits for activating existing utility connections to the Premises except for ___Sewer___, that Landlord agrees to provide at Landlord's expense (If blank, then "NONE").

**10. MAINTENANCE .** Landlord shall be responsible for compliance with Section 83.51, Florida Statutes, and shall be responsible for maintenance and repair of the Premises, unless otherwise stated below: (Fill in each blank space with "Landlord" for Landlord or "Tenant" for Tenant, if left blank, Landlord will be responsible for the item):

| | | | |
|---|---|---|---|
| ___ roofs | ___ windows | ___ screens | ___ steps |
| ___ doors | ___ floors | ___ porches | ___ exterior walls |
| ___ foundations | ___ plumbing | ___ structural components | |
| ___ heating | ___ hot water | ___ running water | ___ locks and keys |
| ___ electrical system | | ___ cooling | ___ smoke detection devices |
| ___ garbage removal/ outside receptacles | | | |
| ___ extermination of rats, mice, roaches, ants and bedbugs | | | |
| ___ extermination of wood-destroying organisms | | | |
| ___ lawn/shrubbery | ___ pool/spa/hot tub | | |
| ___ water treatment | ___ filters (specify) _____ | | |
| ___ ceilings | ___ interior walls | | |
| ___ Other (specify) | ___ Section 10 will comply with Act 83.51 as it applies to Single-Farmily Res. | | |

Tenant shall notify ___CAROL R. DENNIE-GREEN___ at ___51 Martin Dr. Feura Bush, NY 12067___ (if left blank, Landlord at
_____(name)_____ _____(address)_____

Landlord's address) and ___561-309-8717___ of maintenance and repair requests.
_____(telephone number)_____

**11. ASSIGNMENT.** Unless this box ☐ is checked, Tenant may not assign the Lease or sublease all or any part of the Premises without first obtaining the Landlord's written approval and consent to the assignment or sublease.

**12. KEYS AND LOCKS.** Landlord shall furnish Tenant

___4___ # of sets of keys to the dwelling
_____ # of mail box keys
___3___ # of garage door openers

Landlord ( ___ ) and Tenant ___ ___ acknowledge receipt of a copy of this page which is Page 3 of 7
RLHD-3    Rev. 4/10 ©2010   Approved for use under rule 10-2.1(a) of The Rules Regulating the Florida Bar

formsimplicity

If there is a homeowner's association, Tenant will be provided with the following to access the association's common areas/facilities:

| | # of keys to | _____ |
| | # of remote controls to | _____ |
| 2 | # of electronic cards to | Pool/Clubhouse |
| | other (specify) to | _____ |

At end of Lease Term, all items specified in this paragraph shall be returned to _____ CAROL R. DENNIE-GREEN _____
(name)
at _____ 51 MARTIN DR. FEURA BUSH, NY 12067 _____ (If left blank, Landlord at Landlord's address).
(address)

**13. LEAD-BASED PAINT.** ☐ Check and complete if the dwelling was built before January 1, 1978. **Lead Warning Statement** (when used in this article, the term Lessor refers to Landlord and the term Lessee refers to Tenant).

Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, Lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

**Lessor's Disclosure (initial)**

_____ (a) Presence of lead-based paint or lead-based paint hazards (check (i) or (ii) below):
(i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

_____

(ii) ☐ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
_____ (b) Records and reports available to the Lessor (check (i) or (ii) below):
(i) ☐ Lessor has provided the Lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____

_____

(ii) ☐ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgment (initial)**

_____ (c) Lessee has received copies of all information listed above.
_____ (d) Lessee has received the pamphlet *Protect Your Family From Lead in Your Home* .

**Agent's Acknowledgment (initial)**

_____ (e) Agent has informed the Lessor of the Lessor's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

| | | | |
|---|---|---|---|
| Lessor's signature | Date | Lessee's signature | Date |
| | | | |
| Lessor's signature | Date | Lessee's signature | Date |
| | | | |
| Agent's signature | Date | Agent's signature | Date |

**14. SERVICEMEMBER** . If Tenant is a member of the United States Armed Forces on active duty or state active duty or a member of the Florida National Guard or United States Reserve Forces, the Tenant has rights to terminate the Lease as provided in Section 83.682, Florida Statutes, the provisions of which can be found in the attachment to this Lease.

Landlord (_____) (_____) and Tenant (_____) (_____) acknowledge receipt of a copy of this page which is Page 4 of 7
RLHD-3 Rev. 4/10 ©2010 Approved for use under rule 10-2.1(a) of The Rules Regulating the Florida Bar

formsimplicity

**15. LANDLORD'S ACCESS TO THE PREMISES.** Landlord's Agent may enter the Premises in the following circumstances:
  A. At any time for the protection or preservation of the Premises.
  B. After reasonable notice to Tenant at reasonable times for the purpose of repairing the Premises.
  C. To inspect the Premises; make necessary or agreed-upon repairs, decorations, alterations, or improvements; supply agreed services; or exhibit the Premises to prospective or actual purchasers, mortgagees, tenants, workers, or contractors under any of the following circumstances:
    (1) with Tenant's consent;
    (2) in case of emergency;
    (3) when Tenant unreasonably withholds consent; or
    (4) if Tenant is absent from the Premises for a period of at least one-half a rental installment period. (If the rent is current and Tenant notifies Landlord of an intended absence, then Landlord may enter only with Tenant's consent or for the protection or preservation of the Premises.)

**16. HOMEOWNER'S ASSOCIATION. IF TENANT MUST BE APPROVED BY A HOMEOWNER'S ASSOCIATION ("ASSOCIATION"), LANDLORD AND TENANT AGREE THAT THE LEASE IS CONTINGENT UPON RECEIVING APPROVAL FROM THE ASSOCIATION. ANY APPLICATION FEE REQUIRED BY AN ASSOCIATION SHALL BE PAID BY ☐ LANDLORD ☒ TENANT. IF SUCH APPROVAL IS NOT OBTAINED PRIOR TO COMMENCEMENT OF LEASE TERM, EITHER PARTY MAY TERMINATE THE LEASE BY WRITTEN NOTICE TO THE OTHER GIVEN AT ANY TIME PRIOR TO APPROVAL BY THE ASSOCIATION, AND IF THE LEASE IS TERMINATED, TENANT SHALL RECEIVE RETURN OF DEPOSITS SPECIFIED IN ARTICLE 6, IF MADE.** If the Lease is not terminated, rent shall abate until the approval is obtained from the association. Tenant agrees to use due diligence in applying for association approval and to comply with the requirements for obtaining approval. ☐ Landlord ☒ Tenant shall pay the security deposit required by the association, if applicable.

**17. USE OF THE PREMISES.** Tenant shall use the Premises for residential purposes. Tenant shall have exclusive use and right of possession to the dwelling. The Premises shall be used so as to comply with all state, county, municipal laws and ordinances, and all covenants and restrictions affecting the Premises and all rules and regulations of homeowners' associations affecting the Premises. Tenant may not paint or make any alterations or improvements to the Premises without first obtaining the Landlord's written consent to the alteration or improvement. However, unless this box ☐ is checked, Tenant may hang pictures and install window treatments in the Premises without Landlord's consent, provided Tenant removes all such items before the end of the Lease Term and repairs all damage resulting from the removal. Any improvements or alterations to the Premises made by the Tenant shall become Landlord's property. Tenant agrees not to use, keep, or store on the Premises any dangerous, explosive, toxic material which would increase the probability of fire or which would increase the cost of insuring the Premises.

**18. RISK OF LOSS/INSURANCE** .
  A. Landlord and Tenant shall each be responsible for loss, damage, or injury caused by its own negligence or willful conduct.
  B. Tenant should carry insurance covering Tenant's personal property and Tenant's liability insurance.

**19. PROHIBITED ACTS BY LANDLORD** . Landlord is prohibited from taking certain actions as described in Section 83.67, Florida Statutes, the provisions of which can be found in the attachment to this Lease.

**20. CASUALTY DAMAGE.** If the Premises are damaged or destroyed other than by wrongful or negligent acts of Tenant or persons on the Premises with Tenant's consent, so that the use of the Premises is substantially impaired, Tenant may terminate the Lease within 30 days after the damage or destruction and Tenant will immediately vacate the Premises. If Tenant vacates, Tenant is not liable for rent that would have been due after the date of termination. Tenant may vacate the part of the Premises rendered unusable by the damage or destruction, in which case Tenant's liability for rent shall be reduced by the fair rental value of the part of the Premises that was damaged or destroyed.

**21. DEFAULTS/REMEDIES.** Should a party to the Lease fail to fulfill their responsibilities under the Lease or need to determine whether there has been a default of the Lease, refer to Part II, Chapter 83, entitled Florida Residential Landlord and Tenant Act which contains information on defaults and remedies. A copy of the current version of this Act is attached to the Lease.

**22. SUBORDINATION.** The Lease is automatically subordinate to the lien of any mortgage encumbering the fee title to the Premises from time to time.

**23. LIENS. THE INTEREST OF THE LANDLORD SHALL NOT BE SUBJECT TO LIENS FOR IMPROVEMENTS MADE BY THE TENANT AS PROVIDED IN SECTION 713.10, FLORIDA STATUTES**. Tenant shall notify all parties performing work on the Premises at Tenant's request that the Lease does not allow any liens to attach to Landlord's interest.

**24. RENEWAL/EXTENSION.** The Lease can be renewed or extended only by a written agreement signed by both Landlord and Tenant, but the term of a renewal or extension together with the original Lease Term may not exceed one year. A new lease is required for each year.

**25. TENANT'S TELEPHONE NUMBER.** Tenant shall, within 5 business days of obtaining telephone services at the Premises, send written notice to Landlord of Tenant's telephone numbers at the Premises.

**26. ATTORNEYS' FEES.** In any lawsuit brought to enforce the Lease or under applicable law, the party in whose favor a judgment or decree has been rendered may recover reasonable court costs, including attorneys' fees, from the non-prevailing party.

Landlord (____) (____) and Tenant *SMS* (____) acknowledge receipt of a copy of this page which is Page 5 of 7
RLHD-3    Rev. 4/10    ©2010   Approved for use under rule 10-2.1(a) of The Rules Regulating the Florida Bar

**27. MISCELLANEOUS.**

A. Time is of the essence of the performance of each party's obligations under the Lease.

B. The Lease shall be binding upon and for the benefit of the heirs, personal representatives, successors, and permitted assigns of Landlord and Tenant, subject to the requirements specifically mentioned in the Lease. Whenever used, the singular number shall include the plural or singular and the use of any gender shall include all appropriate genders.

C. The agreements contained in the Lease set forth the complete understanding of the parties and may not be changed or terminated orally.

D. No agreement to accept surrender of the Premises from Tenant will be valid unless in writing and signed by Landlord.

E . All questions concerning the meaning, execution, construction, effect, validity, and enforcement of the Lease shall be determined pursuant to the laws of Florida.

F. A facsimile copy of the Lease and any signatures hereon shall be considered for all purposes originals.

G. As required by law, Landlord makes the following disclosure: "RADON GAS." Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

**28. BROKERS' COMMISSION.** [X] Check and complete if applicable. The brokerage companies named below will be paid the commission set forth in this paragraph by [X] Landlord [ ] Tenant for procuring a tenant for this transaction.

| MICHELE SOUSA, BROKER ASSOCIATE | MIMI DELISLE |
|---|---|
| Real Estate Licensee | Real Estate Licensee |
| K2 REALTY | NEWTON REALTY, LLC |
| Real Estate Brokerage Company | Real Estate Brokerage Company |
| 5% OF TOTAL 8 MONTH RENT | 5% OF TOTAL 8 MONTH RENT |
| Commission | Commission |

**29. TENANT'S PERSONAL PROPERTY.** TENANT MUST INITIAL IN THIS BOX [X] FOR THE FOLLOWING PROVISION TO APPLY. BY SIGNING THIS RENTAL AGREEMENT, THE TENANT AGREES THAT UPON SURRENDER, ABANDONMENT, OR RECOVERY OF POSSESSION OF THE DWELLING UNIT DUE TO THE DEATH OF THE LAST REMAINING TENANT, AS PROVIDED BY CHAPTER 83, FLORIDA STATUTES, THE LANDLORD SHALL NOT BE LIABLE OR RESPONSIBLE FOR STORAGE OR DISPOSITION OF THE TENANT'S PERSONAL PROPERTY.

The Lease has been executed by the parties on the dates indicated below.

| | |
|---|---|
| Landlord's Signature | 11/9/12 Date |
| Landlord's Signature | Date |
| Landlord's Signature | Date |
| Tenant's Signature | Nov. 9, 2012 Date |
| Tenant's Signature | Nov. 9, 2012 Date |

This form was completed with the assistance of:

| | |
|---|---|
| Name of Individual: | MICHELE SOUSA, BROKER ASSOCIATE |
| Name of Business: | K2 REALTY |
| Address: | 11676 US HIGHWAY 1 NORTH PALM BEACH, FL 33458 |
| Telephone Number: | 561-262-1835 |

Landlord ( ) ( ) and Tenant ( ) ( ) acknowledge receipt of a copy of this page which is Page 6 of 7

RLHD-3    Rev. 4/10    ©2010   Approved for use under rule 10-2.1(a) of The Rules Regulating the Florida Bar

formsimplicity

## Early Termination Fee/Liquidated Damages Addendum

[ ☐ ] I agree, as provided in the rental agreement, to pay $ _____ (an amount that does not exceed two months' rent) as liquidated damages or an early termination fee if I elect to terminate the rental agreement and the landlord waives the right to seek additional rent beyond the month in which the landlord retakes possession.

[ ☒ ] I do not agree to liquidated damages or an early termination fee, and I acknowledge that the landlord may seek damages as provided by law.

_Carol Dennis Green_            _11/9/12_
Landlord's Signature                       Date

_____      _____
Landlord's Signature                       Date

_____      _____
Landlord's Signature                       Date

_Steven M. Betts_             _Nov. 9, 2012_
Tenant's Signature                       Date

_Cathy R. Betten_             _Nov. 9, 2012_
Tenant's Signature                       Date

Landlord ( ) ( ) and Tenant ( ) ( ) acknowledge receipt of a copy of this page which is Page 7 of 7
RLHD-3   Rev. 4/10   ©2010   Approved for use under rule 10-2.1(a) of The Rules Regulating the Florida Bar

▪ formsimplicity

From: **Michele Sousa** mms128@aol.com
Subject: 12 Point Email RE: 176 Via Vera Cruz
Date: November 8, 2012 6:31 PM
To: mimimi@comcast.net
Cc: gidiupp@comcast.net

Mimi,

Please ask Mr. and Mrs. Etter to initial the following previously drafted email.

Thanks,

Michele

12 Point Email:

1) $3,650/month. 8 month lease, then transition month to month after that.
2) At least 30 days prior to the end of the 8 month lease, Tenant will give written notice to Landlord to terminate or renew for another month. during the month to month lease- the tenant will give a 30 day written notice to terminate.
3) After the 8 months the tenant agrees to allow the landlord to show the home to prospective tenants. 24 hour notice will be given
4) no smoking inside the house
5) The landlord will maintain use of the owners closet on the office (front downstairs bedroom) during the lease period
6) The landlord will provide 4 Medco keys. If all keys are not returned at the end of the lease then a re-keying fee of $350 will be taken out of the security deposit by the landlord.
7) With regard to renters insurance, the tenant agrees to carry an HO4 form for landlord. (renters rider- landlord will be made an "interested party" on the policy)
8) Landlord will pay for interior and exterior pest control, landscaping maintenance, sewer and all maintenance for the home including appliances and the pool pump.
9) Tenant will pay for and establish in their name electric, water, cable (basic cable is included - tenant pays for premium channels) Internet service & home security.
10) pet deposit $250 , *REFUNDABLE*
11) If there is any issue regarding the home that is not covered by the landlord's maintenance contracts, the tenant will contact the landlord directly. There is no need for a monthly visit by a handyman. Landlord will pay for repairs.
12) Landlord will provide 2 Key Fobs for the pool and 3 garage door openers.

Michele Sousa
Broker Associate
K2 Realty
msousa@K2-Realty.com
561-262-1835

PER LEASE ONLY

**ETTER HOME**

**CHRISTIAN THOMAS CONSTRUCTION BILLING**

INITIAL DEPOSIT $50,000    EXPERT TESTIMONY $2,384    Ok #O

ok #388
#60,850.00

LEEDS PAYMENTS
1/28 $50,000 DEP. KIT. SME CHK #421 $6900

| INVOICE DATE 12-Dec | ITEM Expert Testimony | DRAW REQUEST | WAREHOUSE | TOTAL PAYMENT | BY CHECK | CHECK NO. | FROM DEPOSIT | COST TO DATE | REMAINING DEPOSIT |
|---|---|---|---|---|---|---|---|---|---|
| 1/4/2013 | DEC. DRAW | $ 82,550.83 | $ | 82,550.83 | | 270 | | $ 2,348.00 | |
| 2/8/2013 | JAN. DRAW | $ 113,415.86 | $ 390.00 | 82,550.83 | $ 74,607.50 | 307 | $ 8,333.33 | $ 85,288.83 | $41,666.67 |
| 2/28/2013 | FEB. DRAW | $ 109,278.54 | | 113,415.86 | $ 105,082.53 | 389 | $ 8,333.33 | $ 198,704.69 | $33,333.34 |
| 4/2/2013 | MAR. DRAW | $ 79,919.05 | $ 585.00 | 109,278.54 | $ 100,945.21 | 396 | $ 8,333.33 | $ 307,983.23 | $25,000.01 |
| 4/30/2013 | APRIL DRAW | $ 65,426.26 | $ 1,170.00 | 80,504.05 | $ 72,170.72 | 412 | $ 8,333.33 | $ 388,487.28 | $16,666.68 |
| 5/30/2013 | MAY DRAW | $ 138,865.12 | $ 585.00 | 66,596.26 | $ 58,262.93 | 428 | $ 8,333.33 | $ 455,083.54 | $ 8,333.35 |
| 6/30/2013 | JUNE DRAW | $ 88,744.10 | $ 585.00 | 138,450.12 | $ 131,116.79 | 443 | $ 8,333.33 | $ 594,533.66 | |
| 7/31/2013 | JULY DRAW | $ 143,131.45 | $ 585.00 | 89,329.10 | $ 88,744.10 | 459 | | $ 683,862.76 | |
| 8/27/2013 | AUG DRAW | $ 65,902.82 | | 143,716.45 | | 438 445 | | $ 827,579.21 | |
| 10/7/2013 | SEP/OCT DRAW | $ 22,363.42 | | 65,902.82 | | 445 | | $ 893,482.03 | |
| | | | | 22,363.42 | | 514 | | $ 915,845.45 | |

**TOTAL CHRISTIAN THOMAS CONSTRUCTION**    $ 915,845.45

**TOTAL COSTS DIRECTLY RELATED TO CHINESE DRYWALL REMEDIATION OF THE ETTER PROPERTY**

ACTUAL COSTS
# 915,845.45
75,365.20
22,123.23
34,446.85
$41,053,330.73

| | |
|---|---|
| TOTAL CHRISTIAN THOMAS CONSTRUCTION | $ 915,845.45 |
| PURCHASES TO REPLACE DAMAGED AND UNUSABLE ITEMS | $ 24,485.20 |
| EXPENSES TO REPAIR CDW DAMAGED ITEMS | $ 22,123.23 |
| TEMPORARY LIVING EXPENSES | $ 35,996.85 |

**TOTAL CDW RELATED COSTS**    $ 998,450.73

ETTER000101

ETTER CASE

## PURCHASES TO REPLACE DAMAGED AND UNUSABLE ITEMS IN HOUSE PAID DIRECTLY BY THE ETTERS

TOTAL PAID TO CHRISTIAN THOMAS, INC.          $          916,845.45

| DATE | ITEM | COST | TOTAL ACCUMULATED COST | PAYMENT |
|------|------|------|------------------------|---------|
| 4/2/2013 | VANITY SINK (LOWES) | $ 157.41 | $ 916,002.86 | AmExp |
| 4/9/2013 | MICROWAVE(HOME DEPOT) | $ 368.88 | $ 916,371.74 | AmExp |
| 4/26/2013 | ACCURATE TILE & MARBLE | $ 3,225.00 | $ 919,596.74 | CHK #441 |
| 4/29/2013 | LEEDS CUSTOM CABINETS | $ 6,900.00 | $ 926,496.74 | CHK #421 |
| 5/27/2013 | MIRROR (HOME GOODS) | $ 57.22 | $ 926,553.96 | AmExp |
| 5/31/2013 | CARPET (WELL FLOOR U) | $ 1,040.00 | $ 927,593.96 | AmExp |
| 5/31/2013 | ICE MAKER (JETSON) | $ 2,061.70 | $ 929,655.66 | MASTER CARD |
| 5/31/2013 | COUNTER TOPS(HOME DEPOT) | $ 221.30 | $ 929,876.96 | AmExp |
| 5/31/2013 | COUNTER TOPS ACCESS. | $ 40.96 | $ 929,917.92 | AmExp |
| 6/6/2013 | LIGHT FIXTURES(CAPITOL) | $ 259.47 | $ 930,177.39 | AmExp |
| 7/9/2013 | CAB. HARDWARE(MILLERS) | $ 275.27 | $ 930,452.66 | AmExp |
| 7/15/2013 | KIT. SINK(BROEDELLS) | $ 623.74 | $ 931,076.40 | MASTER CARD |
| 7/16/2013 | ACC.TILE & MRBL(BALANCE) | $ 3,412.25 | $ 934,488.65 | AmExp |
| 7/17/2013 | KIT.GRANITE(ACC. TILE&MRBL) | $ 4,080.00 | $ 938,568.65 | AmExp |
| 8/6/2013 | CABINET HARDWARE(MILLERS) | $ 317.66 | $ 938,886.31 | AmExp |
| 8/7/2013 | CARPET(BALANCE) WFU | $ 1,444.34 | $ 940,330.65 | AmExp |
| | **TOTAL THIS CATEGORY** | **$ 24,485.20** | | |

## EXPENSES AND REPAIRS RELATED TO CDW REMEDIATION

| | | | | |
|------|------|------|------|------|
| 11/28/12&9/30/13 | U & ME MOVING | $ 10,245.30 | $ 950,575.95 | CHK 503 & |
| 12/15/12&1/23/13 | CDW SCREENING (REPORT) | $ 5,000.00 | $ 955,575.95 | CHKS 394 & 393 |
| 8/21/2013 | SURREAL SOUND(RPLC SYS) | $ 50.00 | $ 955,625.95 | CHK 480 |
| 8/22/2013 | RESIDENTIAL ELEVATORS | $ 375.00 | $ 956,000.95 | CHK 481 |
| 8/26/2013 | REINSTALL DRAPES(DEC.PROD.) | $ 455.00 | $ 956,455.95 | CHK 485 |
| 8/27/2013 | APPLIANCE RPR(MICROWAVE ELEC.) | $ 490.78 | $ 956,946.73 | CHK483 |
| 9/4/2013 | SURREAL SOUND(RPLC SYS) | $ 1,922.01 | $ 958,868.74 | CHK490 |
| 9/5/2013 | APPLIANCE RPR(MICROWAVE ELEC.) | $ 168.81 | $ 959,037.55 | CHK 499 |
| 9/9/2013 | REINSTALL SEC. SYSTEM (ADT) | $ 2,588.58 | $ 961,626.13 | AmExp |
| 8/13/2013 | CLEAN CPTS & SOFA(STEAM-A-WAY) | $ 827.75 | $ 962,453.88 | |
| | **TOTAL THIS CATEGORY** | **$ 22,123.23** | | |

ETTER000102

**ETTER CASE**

## TEMPORARY LIVING EXPENSES

| # | Date | Description | Amount | Balance | Type |
|---|------|-------------|--------|---------|------|
| 37 | 11/12 TO 8/13 | LEASE AT VIA VERACRUZ | $ 32,850.00 | $ 995,303.88 | DIR. DEP. |
| 38 | 10/24/2012 | REQ'D PASEOS PROP. OWNERS FEE | $ 100.00 | $ 995,403.88 | CHK |
| 39 | 12/24/2012 | ADT SECURITY | $ 114.49 | $ 995,518.37 | ON LINE PYMT |
| 40 | 12/24/2012 | COMCAST | $ 164.10 | $ 995,682.47 | ON LINE PYMT |
| 41 | 12/17/2012 | TOWN OF JUPITER, FL | $ 20.42 | $ 995,702.89 | CHK 346 |
| 42 | 12/12/2012 | FL POWER & LIGHT | $ 32.94 | $ 995,735.83 | ON LINE PYMT |
| 43 | 1/6/2013 | TOWN OF JUPITER, FL | $ 60.35 | $ 995,796.18 | CHK 372 |
| 44 | 1/8/2013 | FL POWER & LIGHT | $ 161.63 | $ 995,957.81 | ON LINE PYMT |
| 45 | 2/24/2013 | COMCAST | $ 217.80 | $ 996,175.61 | ON LINE PYMT |
| 46 | 2/15/2013 | FL POWER & LIGHT | $ 124.65 | $ 996,300.26 | ON LINE PYMT |
| 47 | 3/6/2013 | COMCAST | $ 53.70 | $ 996,353.96 | ON LINE PYMT |
| 48 | 3/4/2013 | TOWN OF JUPITER, FL | $ 138.62 | $ 996,492.58 | CHK 394 |
| 49 | 3/4/2013 | ADT SECURITY | $ 76.24 | $ 996,568.82 | CHK 395 |
| 50 | 3/14/2013 | FL POWER & LIGHT | $ 76.51 | $ 996,645.33 | ON LINE PYMT |
| 51 | 4/3/2013 | FL POWER & LIGHT | $ 117.06 | $ 996,762.39 | ON LINE PYMT |
| 52 | 4/2/2013 | TOWN OF JUPITER, FL | $ 68.18 | $ 996,830.57 | CHK 411 |
| 53 | 4/26/2013 | FL POWER & LIGHT | $ 65.77 | $ 996,896.34 | CHK 420 |
| 54 | 5/14/2013 | FL POWER & LIGHT | $ 155.88 | $ 997,052.22 | ON LINE PYMT |
| 55 | 5/30/2013 | ADT SECURITY | $ 95.36 | $ 997,147.58 | CHK 436 |
| 56 | 5/30/2013 | TOWN OF JUPITER, FL | $ 75.06 | $ 997,222.64 | CHK 440 |
| 57 | 6/13/2013 | FL POWER & LIGHT | $ 202.89 | $ 997,425.53 | ON LINE PYMT |
| 58 | 6/23/2013 | COMCAST | $ 82.72 | $ 997,508.25 | CHK 451 |
| 59 | 7/6/2013 | TOWN OF JUPITER, FL | $ 87.26 | $ 997,595.51 | CHK 461 |
| 60 | 7/12/2013 | FL POWER & LIGHT | $ 278.69 | $ 997,874.20 | ON LINE PYMT |
| 61 | 7/31/2013 | COMCAST | $ 76.56 | $ 997,950.76 | CHK 469 |
| 62 | 8/13/2013 | FL POWER & LIGHT | $ 270.45 | $ 998,221.21 | ON LINE PYMT |
| 63 | 9/6/2013 | FL POWER & LIGHT | $ 229.52 | $ 998,450.73 | ON LINE PYMT |
| | | **TOTAL THIS CATEGORY** | **$ 35,996.85** | | |

ETTER000103

1997 ITION

## AIA DOCUMENT | A101-1997

*Standard Form of Agreement Between Owner and Contractor*

*where the basis of payment is a STIPULATED SUM*

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

**AGREEMENT** made as of the
in the year **2004**
*(In words, indicate day, month and year)*

26th    day of **November**

**BETWEEN** the Owner:
*(Name, address and other information)*

Steven M. & Cathy L. Etter

one 11/29/04
CE 11/29/04
CE 12/08/07
JH

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

and the Contractor:
*(Name, address and other information)*

J. HEim Const. Inc. dba
Sundown Development
PO Box 3967
Tequesta, FL  33469

This document has been approved and endorsed by The Associated General Contractors of America.

The Project is:
*(Name and location)*

Lot 4, Emerald Harbour
18894 SE Jupiter Inlet Way
Tequesta, FL  33469

The Architect is:
*(Name, address and other information)*

Yates, Rainho Architects, Inc.
AA-0002536
6205 S. Dixie Hwy
West Palm Beach, FL  33405



© 1997  A I A ®
**AIA DOCUMENT A101-1997**
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

The Owner and Contractor agree as follows.

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission

1

Etter000018

## ARTICLE 1 THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 8.

## ARTICLE 2 THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

## ARTICLE 3 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

**3.1** The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

If, prior to the commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

**3.2** The Contract Time shall be measured from the date of commencement.

**3.3** The Contractor shall achieve Substantial Completion of the entire Work not later than 300 days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

*TOOK*
*2 yrs*
*Sept. 06 Move-in*

, subject to adjustments of this Contract Time as provided in the Contract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time or for bonus payments for early completion of the Work.)*

N/A



© 1997 AIA®
**AIA DOCUMENT A101-1997**
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

2

Etter000019

## ARTICLE 4 CONTRACT SUM

**4.1** The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be

Dollars ($ 865,716.00

subject to additions and deductions as provided in the Contract Documents.

**4.2** The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:   N/A
*(State the numbers or other identification of accepted alternates. If decisions on other alternates are to be made by the Owner subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires.)*

**4.3** Unit prices, if any, are as follows:   N/A

## ARTICLE 5 PAYMENTS

### 5.1 PROGRESS PAYMENTS

**5.1.1** Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

**5.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

As per Bank Draw Schedule

**5.1.3** Provided that an Application for Payment is received by the Architect not later than the 25th day of a month, the Owner shall make payment to the Contractor not later than the 10th day of the following month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than 15 days after the Architect receives the Application for Payment.

**5.1.4** Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.



© 1997  AIA®
**AIA DOCUMENT A101-1997**
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Etter000020

**3**

**5.1.5** Applications for Payment shall indicate the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

**5.1.6** Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

    .1 Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of    **Five**    percent (  5  %). Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Subparagraph 7.3.8 of AIA Document A201-1997;

    .2 Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of   **Five**   percent (  5  %);

    .3 Subtract the aggregate of previous payments made by the Owner; and

    .4 Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Paragraph 9.5 of AIA Document A201-1997.

**5.1.7** The progress payment amount determined in accordance with Subparagraph 5.1.6 shall be further modified under the following circumstances:

    .1 Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Architect shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and *(Subparagraph 9.8.5 of AIA Document A201-1997 requires release of applicable retainage upon Substantial Completion of Work with consent of surety, if any.)*

    .2 Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Subparagraph 9.10.3 of AIA Document A201-1997.

**5.1.8** Reduction or limitation of retainage, if any, shall be as follows:    **5 %**
*(If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Clauses 5.1.6.1 and 5.1.6.2 above, and this is not explained elsewhere in the Contract Documents, insert here provisions for such reduction or limitation.)*

        **As sub-contract work is 100% completed, retainage would reduce to 0% 3o days after work is 100% complete.  Final releases will be provided at time retainage is funded.**

**5.1.9** Except with the Owner's prior approval, the Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

**5.2 FINAL PAYMENT**

**5.2.1** Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

    .1 the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Subparagraph 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; and

    .2 a final Certificate for Payment has been issued by the Architect.



© 1997   A I A ®
**AIA DOCUMENT A101-1997**
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Etter000021

**4**

**5.2.2** The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

## ARTICLE 6 TERMINATION OR SUSPENSION
**6.1**   The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201-1997.

**6.2**   The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201-1997.

## ARTICLE 7 MISCELLANEOUS PROVISIONS
**7.1**   Where reference is made in this Agreement to a provision of AIA Document A201-1997 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

**7.2**   Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**7.3**   The Owner's representative is:
*(Name, address and other information)*

Steven or Cathy Etter

**7.4**   The Contractor's representative is:
*(Name, address and other information)*

James Helm
PO Box 3967
Tequesta, FL   33469
561-743-4420

**7.5**   Neither the Owner's nor the Contractor's representative shall be changed without ten days' written notice to the other party.

**7.6**   Other provisions:



© 1997  A I A ®
**AIA DOCUMENT A101-1997**
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

5

Etter000022

## ARTICLE 8 ENUMERATION OF CONTRACT DOCUMENTS

**8.1** The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

**8.1.1** The Agreement is this executed 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A101-1997.

**8.1.2** The General Conditions are the 1997 edition of the General Conditions of the Contract for Construction, AIA Document A201-1997.

**8.1.3** The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated                                         , and are as follows:

| Document | Title | Pages |
|----------|-------|-------|
| N/A      |       |       |

**8.1.4** The Specifications are those contained in the Project Manual dated as in Subparagraph 8.1.3, and are as follows:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

| Section | Title | Pages |
|---------|-------|-------|
| N/A     |       |       |

**8.1.5** The Drawings are as follows, and are dated                            unless a different date is shown below:
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*

| Number  | Title | Date |
|---------|-------|------|
| 04-0647 |       | OCTOBER 25 August 6, 2004 |

Sheets   A-1,A-2,A-2.1,A-2.2, A-3, A-3.1
         A-4, A-4.1, A-4.2, A-5, A-6,A-7

*JN 12/08/07*
*11/29/04*
*SME @ 11/29/04*

© 1 9 9 7   A I A ®
**AIA DOCUMENT A101-1997**
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

6

**8.1.6** The Addenda, if any, are as follows:   N/A

Number                    Date                              Pages

Portions of Addenda relating to bidding requirements are not part of the Contract Documents
unless the bidding requirements are also enumerated in this Article 8.

**8.1.7** Other documents, if any, forming part of the Contract Documents are as follows:
*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document
A201-1997 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders,
sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this
Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

This Agreement is entered into as of the day and year first written above and is executed in at least
three original copies, of which one is to be delivered to the Contractor, one to the Architect for use
in the administration of the Contract, and the remainder to the Owner. *J. HELM CONN. INC d/b/A*
                                                                        *Sundown Development*

_____          _____
**OWNER** *(Signature)*                **CONTRACTOR** *(Signature)*

Steven & Cathy Etter               James T. Helm
*(Printed name and title)*            *(Printed name and title)*



**CAUTION:** *You should sign an original AIA document or a licensed reproduction. Originals contain the AIA logo
printed in red; licensed reproductions are those produced in accordance with the Instructions to this document.*

© 1 9 9 7    A I A ®
**AIA DOCUMENT A101-1997**
OWNER-CONTRACTOR
AGREEMENT

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

7

WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

Etter000024

Emerald Harbour Lot 4
Costs

| Acct # | Account | Contract | | | | |
|--------|---------|----------|--|--|--|--|
| 54130 | Appliances | 10,000. | | | | |
| 54135 | Architectural Design | 17,000. | | | | |
| 54138 | Beams/Block | 88,608. | | | | |
| 54150 | Blue Prints | 500. | | | | |
| 54170 * | Cabinetry-Granite Tops | 45,000. | | | | |
| 54179 * | Carpet | 10,000. | | | | |
| 54180 | Carpentry | 35,443. | | | | |
| 54181 | Cast Stone | 10,000. | | | | |
| 54185 | Central Vacuum | 1,500. | | | | |
| 54189 * | Ceramic Tile Labor | 5,000. | | | | |
| 54190 * | Ceramic Tile Material | 5,000. | | | | |
| 54193 | Cleaning | 3,000. | | | | |
| 54197 | Concrete Walk/AC Pads | 2,000. | | | | |
| 54205 | Cove Densities | 500. | | | | |
| 54255 | Drive Way/Walk Way | 7,500. | | | | |
| 54271 | Electrical | 21,000. | | | | |
| 54275 | Elevator | 10,000. | | | | |
| 54272 * | Electrical Fixtures | 7,500. | | | | |
| 54281 | Engineering | 500. | | | | |
| 54300 * | Fence & Rails | 2,500. | | | | |
| 54313 | Floor System | 5,000. | | | | |
| 54330 | Garage Door | 3,500. | | | | |
| 54333 * | Gas Generator | 10,000. | | | | |
| 54335 | Gas Service | 2,500. | | | | |
| 54367 | Grading | 1,000. | | | | |
| 54400 | HVAC | 18,000. | | | | |
| 54415 | Insulation | 6,500. | | | | |
| 54420 * | Intercom Stereo | 2,500. | | | | |
| 54545 * | Landscaping/Irrigation | 20,000. | | | | |
| 54555 | Lot Preparation | 1,500. | | | | |
| 54575 * | Marble Flooring Labor | 12,500. | | | | |
| 54576 * | Marble Flooring Material | 12,500. | | | | |
| 54586 | Metal Framing/Drywall | 39,500. | | | | |
| 54589 | Mirrors | 1,500. | | | | |
| 54591 | Miscellaneous | 3,000. | | | | |
| 54685 | Paint | 25,000. | | | | |
| 54697 | Permits | 12,000. | | | | |
| 54701 | Plumbing | 14,500. | | | | |
| 54702 * | Plumbing Fixtures | 20,000. | | | | |
| 54751 | Roofing | 24,000. | | | | |
| 54770 | Security System | 2,500. | | | | |
| 54776 | Shelving | 7,000. | | | | |
| 54778 * | Shower Enclosure | 2,500. | | | | |
| 54782 | Slab | 53,165. | | | | |
| 54787 | Soil Treatment | 1,000. | | | | |
| 54790 * | Stairway | 10,000. | | | | |
| 54797 | Stucco | 25,500. | | | | |
| 54800 | Supervision | 25,000. | | | | |
| 54801 | Survey | 2,000. | | | | |

initials
EH4 Cost breakdown
Etter 00025

Emerald Harbour Lot 4
Costs

| Acct # | Account | Contract | | | | |
|--------|---------|----------|---|---|---|---|
| **54805** * | Swimming Pool/Deck | 20,000. | | | | |
| 54835 | Temporary Facilities | 1,500. | | | | |
| 54836 | Trash Removal | 2,500. | | | | |
| 54838 | Trim Carpentry | 18,000. | | | | |
| **54428** * | Trim Material/Doors | 21,500. | | | | |
| 54841 | Truss | 18,000. | | | | |
| 54870 | Utilities/Connection Fees | 3,000. | | | | |
| 54940 | Windows | 55,000. | | | | |
| **54960** * | Wood Flooring | 5,000. | | | | |
| | Builder Fee | 75,000. | | | | |
| | Discounted Lot Price | 600,000. | | | | |
| | | | | | | |
| | * denotes allowance | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | Totals | 1,465,716. | 0. | 0. | 0. | 0. |

*[handwritten]* 11/29/04
*[handwritten]* 11/29/04
initials
*[handwritten]* 12/08/04

EH4 Cost breakdown
Eller000028

## AMENDMENT TO CONTRACT

THIS AMENDMENT is dated the 8th day of December, 2004, and is attached to that certain Agreement For Sale (the "Agreement") dated August 11, 2004, entered into by Emerald Harbour of Jupiter, Inc. (referred to as "Seller") and Steven M. Etter and Cathy L. Etter (collectively referred to as "Buyer"), in Palm Beach County, Florida.

1.      **Inconsistent Terms**.  All terms and conditions contained in this Amendment shall control and prevail over any terms contained in the Agreement which are inconsistent herewith.

2.      **Purchase Price**.  The purchase price of Lot is hereby decreased to Six Hundred Dollars ($600,000.00).

3.      **Ratification**.  All other terms and conditions of the Agreement which are not specifically modified hereby shall remain in full force and effect.

Emerald Harbour of Jupiter, Inc., a
Florida corporation

By: _____         _____
    James T. Helm, President                 Steven M. Etter

                                             _____
                                             Cathy L. Etter

5/15/2019 Case 2:09-md-02047-EEF-MBN Document 22380-44 Filed 12/02/19 Page 132 of 151
Case 1:12-cv-22408-MGC Document 279-4 Entered on FLSD Docket 05/13/2019 Page 25 of
164

INSTR # 1798714
OR BK 01963 PG 0364
RECORDED 12/13/2004 12:49:27 PM
MARSHA EWING
CLERK OF MARTIN COUNTY FLORIDA
DEED DOC TAX 4,200.00
RECORDED BY T Copus (asst mgr)

Prepared by/return to:
D.R. Girvin, Esquire
Douglas Rawls Girvin, P.A.
1080 E. Indiantown Road, Suite 105
Jupiter, Florida 33477

(this space reserved for recording)

## SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED made the 8th day of December, 2004, by

### EMERALD HARBOUR OF JUPITER, INC., a Florida corporation

hereinafter called the grantor, and

### STEVEN M. ETTER and CATHY L. ETTER, his wife

whose post office address is 18894 S.E. Jupiter Inlet Way, Tequesta, Florida 33469, hereinafter called the grantee:

(Wherever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

WITNESSETH: That the grantor, for and in consideration of the sum of $10.00 and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the grantee, all that certain land situate in Martin County, Florida, viz:

**Lot 4, Plat of EMERALD HARBOUR, according to the map or plat as recorded in Plat Book 15, Page 75, public records of Martin County, Florida.**

SUBJECT TO: Taxes subsequent to December 31, 2004, as well as all restrictions, reservations and easements of record, including but not limited to the following matters:

1.   Restrictions, conditions, reservations, easements, and other matters contained on the Plat of Emerald Harbour, as recorded in Plat Book 15, Page(s) 75, Public Records of Martin County, Florida.

2.   Covenants, conditions and restrictions recorded in O.R. Book 1833, Page 1679; as amended in O. R. Book 1854, Page 2405, Public Records of Martin County, Florida.

3.   Grant of Easements recorded in O.R. Book 1833, Page 1743, Public Records of Martin County, Florida.

4.   Sovereignty Submerged Land Lease recorded in O.R. Book 939, Page 981; as modified and renewed in that certain Sovereignty Submerged Land Lease Renewal recorded in O.R. Book 1183, Page 761, Public Records of Martin County, Florida; as modified and renewed in Official Records Book 1664, Page 0001; and as further modified and renewed in Official Records Book 1868, Page 2432, all of the public records of Martin County, Florida.

5.   Notice of Lien Rights recorded in O.R. Book 686, Page 2260, Public Records of Martin County, Florida.

6.   Resolution regarding aquatic preserve recorded in O.R. Book 1294, Page 772, Public Records of Martin County, Florida.

7.   Developer's Agreement recorded in O.R. Book 1790, Page 1547, Public Records of Martin County, Florida.

OR BK 01963 PG 0365

(This space reserved for recording)

TOGETHER, with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

TO HAVE AND TO HOLD, the same in fee simple forever.

AND the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land, and hereby warrants the title to said land and will defend the same against the lawful claims of all persons claiming by, through or under the said grantor.

IN WITNESS WHEREOF, the said grantor has hereunto set her hand and seal the day and year first above written.

Signed, sealed and delivered
in our presence:

Emerald Harbour of Jupiter, Inc., a Florida corporation

D.R. Girvin

By: _____
James T. Helm, President

Christy L. Verzi

(Corporate Seal)

STATE OF FLORIDA:
COUNTY OF PALM BEACH:

The foregoing instrument was acknowledged before me this 8th day of December, 2004, by James T. Helm, as president of Emerald Harbour of Jupiter, Inc., a Florida corporation, who did not take an oath and ☐ who is personally known to me or ☒ who has produced _____ (TYPE OF IDENTIFICATION) as identification.

(Notary Seal)

D. R. GIRVIN
NOTARY PUBLIC - STATE OF FLORIDA
COMMISSION # DD178992
EXPIRES 02/12/2007
BONDED THRU 1-888-NOTARY1

D.R. Girvin (Notary Public)
Commission No: DD178992
My Commission Expires: 02/12/2007

Page 2

| American Land Title Association | ALTA Settlement Statement - Combined |
|---|---|
| | Adopted 05-01-2015 |

### South Florida Title Insurers of Palm Beach County
### 4425 Military Trail
### Suite 106
### Jupiter, Florida 33458
### 561-804-7677

| | |
|---|---|
| File No./Escrow No.: | 16-5343 |
| Print Date & Time: | September 28, 2016 at 9:47 AM |
| Officer/Escrow Officer: | Gregory B. Taylor, Esq. |
| Settlement Location: | South Florida Title Insurers of Palm Beach County, 4425 Military Trail Ste 106, Jupiter, FL 33458 |
| | 4425 Military Trail, Suite 106, Jupiter, Florida 33458 |
| Property Address: | 18894 SE Jupiter Inlet Way, Tequesta, FL 33469 |
| Borrower: | Daniel W. Corns and Jessica L. Corns |
| Seller: | Steven M. Etter and Cathy L. Etter |
| Lender: | FirstCity Bank of Commerce, ISAOA/ATIMA |
| Settlement Date: | September 28, 2016 |
| Disbursement Date: | September 28, 2016 |

| Seller | | Description | | Borrower/Buyer | |
|---|---|---|---|---|---|
| Debit | Credit | | | Debit | Credit |
| | | **Financial** | | | |
| | 1,580,000.00 | Sale Price of Property | | 1,580,000.00 | |
| | | Deposit including earnest money | | | 55,000.00 |
| | | Loan Amount | | | 1,264,000.00 |
| | | **Prorations/Adjustments** | | | |
| 8,388.17 | | County Taxes from 01/01/16 to 09/28/16 | | | 8,388.17 |
| | 39.13 | Emerald Harbour HOA from 09/28/16 to | | 39.13 | |
| | 3.05 | LRECD- Sewer from 09/28/16 to 09/30/16 | | 3.05 | |
| | | **Loan Charges to To Be Determined** | | | |
| | | Prepaid Interest | | 441.53 | |
| | | 147.1781 per day from 09/28/16 to 10/01/16 | | | |
| | | **Other Loan Charges** | | | |
| | | Mortgage Broker Fee | Mortgage Firm | 12,640.00 | |
| | | Processing Fee | | 595.00 | |
| | | Underwriting Fee | | 375.00 | |
| | | Appraisal fee | First City Bank | 850.00 | |
| | | Attorney Fee | Owen Law | 500.00 | |
| | | Credit report | Factual Data | 23.90 | |
| | | Flood certification | Lerta Flood Service | 13.00 | |
| | | Lender Doc Prep Fee | Docmagic | 35.00 | |
| | | Tax service | Lerta Tax Service | 75.00 | |
| | | **Impounds** | | | |
| | | Homeowner's Insurance | | 1,074.51 | |
| | | 358.17 per month for 3 mo. | | | |
| | | Property Taxes | | 12,652.25 | |
| | | 973.25 per month for 13 mo. | | | |
| | | Aggregate Adjustment | | -716.34 | |
| | | **Title Charges** | | | |
| | | Title - Lender's title insurance | South Florida Title Insurers | 25.00 | |
| | | FL Form 9 | | 655.00 | |
| | | ALTA 8.1 Endorsement | | 25.00 | |
| 6,525.00 | | Title - Owner's title insurance (optional) | South Florida Title Insurers | | |
| 100.00 | | Title - City Lien Search | South Florida Title Insurers | | |
| | | Title - Electronic Recording Fee | Simplifile | 18.00 | |
| 400.00 | | Title - Settlement or closing fee | South Florida Title Insurers | 650.00 | |

Copyright 2015 American Land Title Association
All rights reserved.

File #: 16-5343
Printed on 09/28/2016 at 9:47 AM

ETTER000017

ALTA Settlement Statement - Combined - Continued

| Seller | | Description | | Borrower/Buyer | |
|---|---|---|---|---|---|
| Debit | Credit | | | Debit | Credit |
| 3.28 | | Title - State of Florida Surcharge | WFG National Title Insurance Company | | |
| 75.00 | | Title - Title Search Fee | WFG National Title Insurance Company | | |
| 25.00 | | Title - Wire Fee | South Florida Title Insurers | 25.00 | |
| | | **Commission** | | | |
| 55,300.00 | | Real Estate Commission | Water Pointe Realty Group | | |
| 39,500.00 | | Real Estate Commission | Water Pointe Realty Group | | |
| | | **Government Recording and Transfer Charges** | | | |
| | | Record Deed | Clerk of Circuit Court | 27.00 | |
| | | Record Trust/Deed Mortgage | Clerk of Circuit Court | 154.50 | |
| 11,060.00 | | Deed Documentary Stamps | Clerk of Circuit Court | | |
| | | Mortgage Doc Stamps | Clerk of Circuit Court | 4,424.00 | |
| | | Intangible Tax | Clerk of Circuit Court | 2,528.00 | |
| | | **Other Charges** | | | |
| | | Homeowner's Insurance Premium | | 4,298.00 | |
| | | 12 (mo.) | | | |
| | | 4th Qtr | Loxahatchee River District | 93.68 | |
| | | 4th Quarter | Emerald Harbour POA | 1,200.00 | |
| | | Survey | NexGen Surveying | 600.00 | |
| 106.65 | | Utilities | Village of Tequesta | | |

| Seller | | | Borrower/Buyer | |
|---|---|---|---|---|
| Debit | Credit | | Debit | Credit |
| 121,483.10 | 1,580,042.18 | **Subtotals** | 1,623,324.21 | 1,327,388.17 |
| | | Due From Borrower | | 295,936.04 |
| 1,458,559.08 | | Due To Seller | | |
| 1,580,042.18 | 1,580,042.18 | **TOTALS** | 1,623,324.21 | 1,623,324.21 |

Copyright 2015 American Land Title Association
All rights reserved.

File #: 16-5343
Printed on 09/28/2016 at 9:47 AM

ETTER000018

## ADDENDUM TO
## CLOSING DISCLOSURE

I have carefully reviewed the accompanying Closing Disclosure and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the Closing Disclosure.

_____
Steven M. Etter

_____
Cathy L. Etter

Dated: September 27, 2016

_____
Daniel W. Corns

_____
Jessica L. Corns

Dated: September 27, 2016

The accompanying Closing Disclosure, to the best of my knowledge and belief, is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with the Closing Disclosure.

**South Florida Title Insurers of Palm Beach County**

_____
By: Kristina Neville, Settlement Agent

Dated: September 27, 2016

File # 16-5343                          Page 1                          Addendum to Closing Disclosure

ETTER000019

## ADDENDUM TO HUD-1 SETTLEMENT STATEMENT

I have carefully reviewed the foregoing HUD-1 Settlement Statement and, to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

If this Settlement Statement contains any prorations for taxes based on an estimate, the undersigned agree to re-prorate such taxes between them upon the receipt of the actual tax bill. Should it become necessary for either party to enforce this provision, the prevailing party shall be entitled to reasonable attorney's fees and costs from the non-prevailing party.

Sellers and Buyers recognize that unpaid utility bills for water and sewer services constitute unrecorded liens upon the property, and the parties further recognize that Settlement Agent does not issue title insurance to cover and pay for any such unpaid and unrecorded liens, nor does Settlement Agent assume any responsibility for the correctness of figures given by either the Seller or the political subdivision furnishing said utility services.

Sellers and Buyers acknowledge that the account for water and sewer utility services serving the property has been checked prior to closing, and Sellers represent that all payments on the account have been made and that the account is currently fully paid. In the event of error or oversight in the calculation of the utility bill, the Sellers warrant and represent as a condition to survive this closing that any such unpaid utility account amounts shall be paid directly to the Buyers upon demand.

In consideration for Settlement Agent's services in closing this transaction, the undersigned agree, at the request of the Settlement Agent, to fully cooperate with Settlement Agent and to execute any documents necessary to correct typographical, clerical, and administrative errors on all closing documents. Should it become necessary for Settlement Agent to enforce this provision against any party, Settlement Agent shall be entitled to reasonable attorney's fees and costs from such party or parties.

**SUBSTITUTION FORM 1099 SELLER STATEMENT:** The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on Line 401 above constitutes the Gross Proceeds of this transaction.

**SELLER INSTRUCTIONS:** If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide the Settlement Agent with your correct taxpayer identification number. If you do not provide your correct taxpayer identification number, you may be subject to civil and criminal penalties imposed by law.

Sellers:

**Steven M. Etter**

**Cathy L. Etter**

Buyers:

**Daniel W. Corns**

**Jessica L. Corns**

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused, or will cause, the funds to be disbursed in accordance with this statement

Settlement Agent

**South Florida Title Insurers of Palm Beach County**

By: _____

**Kristina Neville**

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

ETTER000020

# 18894 SE Jupiter Inlet Way, Tequesta, FL 33469

**$1,795,000**

| | | |
|---|---|---|
| **List Number:** RX-10240297 | **St:** Active | **Type:** Single Family Detached |
| **County:** Martin | **Parcel ID:** 194043002000000400 | **Tax Year / Tax Amt.:** 2015 / $11,679; County Only |
| **Zoning:** RES | **Legal Desc:** LOT 4 EMERALD HARBOUR (PB 15 PG 75) | |

**Subdivision:** Emerald Harbour
**Short Sale:** No    **Front Exp:** E
**Multiple Ofrs Acptd:**    **Lot Description:** East of US-1; < 1/4 Acre; Cul-De-Sac
**Short Sale Add:** No
**Hardship Package:**    **Private Pool:** Yes

**Waterfront:** No
**Waterfront Details:** Intracoastal; Ocean Access
**Waterfrontage:**

**REO:** No
**HOPA:** No Hopa

**Garage Spaces:** 3
**Carport Spaces:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Living Room | 14 X 15 | Den | 14 X 14 | Master Bedroom | 20 X 22 | **LivSqFt:** 4,597 |
| Kitchen | 16 X 17 | Family Room | 22 X 18 | Bedroom 2 | 12 X 15 | **SqFt - Total:** 6,124 |
| Dining Room | 15 X 15 | | | Bedroom 3 | 14 X 16 | **SqFt Source:** Tax Rolls |

**Guest Hse:**
**Yr Built:** 2006

**Bedrooms:** 3
**Baths - Full:** 3
**Baths - Half:** 2
**Baths - Total:** 3.2
**Pets Allowed:** Yes

**HOA/POA/COA (Monthly):** $400
**Governing Bodies:** HOA
**Homeowners Assoc:** Mandatory
**Application Fee:** 0
**Fee Incl:** Common Areas; Insurance-Other; Other

**Total Units in Bldg:**
**Unit Floor #:** Unit Floor #:
**Total Floors/Stories:** 2
**Ttl Units in Complex:** 6
**Membership Fee Amount:**

**Min Days to Lease:**
**Lease Times p/Year:**

**Total Assessed Value:**
**Special Assessment:** No

**Design:** < 4 Floors; Mediterranean
**Construction:** CBS
**Unit Desc:**
**Flooring:** Carpet; Marble; Wood Floor

**Dining Area:** Breakfast Area; Formal; Snack Bar
**Guest House:**
**Master Bedroom/Bath:** Bidet; Dual Sinks; Mstr Bdrm - Sitting; Mstr Bdrm - Upstairs; Separate Shower
**Window Treatments:** Hurricane Windows; Impact Glass; Plantation Shutters

**Private Pool:** Heated; Inground; Spa

**Furnished:** Unfurnished
**View:**
**Cooling:** Ceiling Fan; Central; Zoned
**Heating:** Central; Zoned
**Security:** Gate - Unmanned; Security Sys-Owned; TV Camera
**Membership:** No Membership Avail
**Utilities:** Cable; Electric Available; Gas Bottle; Public Sewer; Public Water
**Boat Services:** Private Dock; Up to 30 Ft Boat; Up to 40 Ft Boat; Up to 50 Ft Boat; Lift; Electric Available; Water Available
**Special Info:** Sold As-Is

**Terms Considered:** Cash; Conventional
**Parking:** Driveway; Garage - Attached

**Restrict:** Other
**Dining Area:** Breakfast Area; Formal; Snack Bar
**Rooms:** Attic; Cabana Bath; Den/Office; Family; Laundry-Inside; Media

**Roof:** Barrel

**Equip/Appl:** Auto Garage Open; Central Vacuum; Dishwasher; Disposal; Dryer; Ice Maker; Microwave; Purifier; Range - Gas; Refrigerator; Smoke Detector; Storm Shutters; Wall Oven; Washer; Water Heater - Gas; Water Softener-Owned
**SubdivInfo:** Boating
**Interior:** Bar; Built-in Shelves; Elevator; Entry Lvl Lvng Area; Foyer; French Door; Laundry Tub; Pantry; Split Bedroom; Volume Ceiling; W/D Hookup; Walk-in Closet
**Exterior:** Auto Sprinkler; Built-in Grill; Covered Balcony; Covered Patio; Custom Lighting; Shutters; Summer Kitchen; Zoned Sprinkler

Information is deemed to be reliable, but is not guaranteed. © 2016 MLS and FBS. Prepared by Julianne Johnson on Tuesday, June 07, 2016 10:54 AM. The information on this sheet has been made available by the MLS and may not be the listing of the provider.

THIS INSTRUMENT PREPARED BY AND RETURN TO:
**Gregory B. Taylor, Esq.**
South Florida Title Insurers of Palm Beach County
4425 Military Trail, Suite 106
Jupiter, Florida 33458
Our File No.: **16-5343**
Property Appraisers Parcel Identification (Folio) Number: **19-40-43-002-000-00040.00000**
State of Florida Deed Documentary Stamps paid on this transaction: **$**

_____SPACE ABOVE THIS LINE FOR RECORDING DATA_____

# WARRANTY DEED

**THIS WARRANTY DEED**, made the 27th day of **September, 2016** by **Steven M. Etter and Cathy L. Etter, husband and wife**, whose post office address is **18894 SE Jupiter Inlet Way, Tequesta, FL 33469** herein called the Grantors, to **Daniel W. Corns and Jessica L. Corns, husband and wife** whose post office address is **18894 SE Jupiter Inlet Way, Tequesta, FL 33469**, hereinafter called the Grantees:
*(Wherever used herein the terms "Grantor" and "Grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)*

**W I T N E S S E T H:** That the Grantors, for and in consideration of the sum of TEN AND 00/100'S ($10.00) Dollars and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the Grantee all that certain land situate in MARTIN County, State of Florida, viz.:

   **Lot 4, Emerald Harbour, according to the Plat thereof as recorded in Plat Book 15, page 75, of the Public Records of Martin County, Florida.**

   Subject to easements, restrictions and reservations of record and taxes for the year 2016 and thereafter.

**TOGETHER,** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**TO HAVE AND TO HOLD,** the same in fee simple forever.

**AND,** the Grantors hereby covenant with said Grantees that the Grantors are lawfully seized of said land in fee simple; that the Grantors have good right and lawful authority to sell and convey said land, and hereby warrant the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to December 31, 2015.

File No.: **16-5343**

LTF

Recorded in Martin County, FL Carolyn Timmann, Clerk of the Circuit Court 09/29/2016 03:25:07 PM
DEED DOC 11,060.00
CFN# 2598381 OR BK 2881 PG 2968 PAGE 1 OF 2

http://or.martinclerk.com/LandmarkWeb/Search/DocumentAndInfoByBookPage?Key=Assessor&booktype=O&booknumber=2881&pagenumber=2968#    1/2

**IN WITNESS WHEREOF,** the said Grantors have signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

_____
Witness #1 Signature

Gregory Taylor
Witness #1 Printed Name

_____
Witness #2 Signature

MARK D EBLE
Witness #2 Printed Name

_____
Steven M. Etter

_____
Cathy L. Etter

Unofficial Copy

**STATE OF FLORIDA**
**COUNTY OF MARTIN**

The foregoing instrument was acknowledged before me this 27th day of September, 2016, by Steven M. Etter and Cathy L. Etter who are personally known to me or have produced ____VALID JD____ as identification and ☐ did ☐ did not take an oath.

**SEAL**

GREGORY B. TAYLOR
MY COMMISSION # FF 916643
EXPIRES: January 8, 2020
Bonded Thru Notary Public Underwriters

_____
Notary Public

_____
Printed Notary Name

My commission expires:

File No.: **16-5343**

LTF

Purchases to replace damaged and unusable items

ETTER000041

**Ameriprise** Financial

Jeff Mumper, CFP®, ChFC®, CASL®
Financial Advisor
Managing Director

**Jeff Mumper and Associates**

A financial advisory practice of
Ameriprise Financial Services, Inc.

9545 Kenwood Road Suite 200
Cincinnati, OH 45242
Tel: 513.792.8025
Fax: 877.674.6208
Toll Free: 800.684.1700
jemumper@ampf.com
ameripriseadvisors.com/
jeffrey.t.mumper

# Items Purchased for House

| Date | Item | Amount | Payment |
|------|------|--------|---------|
| 4/2/13 | Vanity Sink (Lowe's) | $157.41 | (amX) |
| 4/9/13 | Microwave (Home Depot) | $368.88 | (amX) |
| 4/26/13 | Accurate Tile & Marble, Inc. | $3225.00 | ck # 441 |
| 4/29/13 | Leeds Custom Cabinets | $6900.00 | ck. # 421 |
| 5/27/13 | Mirror Bath #3 (HomeGoods) | 57.22 | (amX) |
| 5/31/13 | We'll Floor U | $1040 | (amX) |
| 5/31/13 | Jetson Ice Make | 2061.20 | (mK) |
| 5/31/13 | Laundry Countertops (Home Depot) | $221.33 | (amX) |
| " | " " Accessories " " | $40.96 | (amX) |
| 5/31/13 | Ice Machine (Jetson's) | $620.00 | (amX) |
| 6/6/13 | Lights (Capital Lighting) | $259.47 | (amX) |
| 7/9/13 | Cabinet Hardware (millers) | $275.27 | (amX) |
| 7/15/13 | Kitchen Sink (Broxdell's) | $623.74 | (Master Card) |

(over)



Also registered with Securities America, Inc., Member FINRA and SIPC, a subsidiary of Ameriprise Financial, Inc. Ameriprise Financial Services, Inc. offers financial advisory services, investments, insurance and annuity products. *RiverSource®* and Columbia *Management®* products are offered by affiliates of Ameriprise Financial Services, Inc., Member FINRA and SIPC.

ETTER000042

7/15/13    Ice Machine (Jetson's)    $1441.70 Balance on AmX

7/16/13    Accurate Tile & Marble    $3412.25 on balance AmX

7/17/13    "   "   "    $4080.00 AmX
granite for Kitchen

8/6/13    Cabinet hardware (Millers) $317.66 Balance on AmX

8/7/13    We'll Floor U   balance & closets    $1444.34 AmX

ETTER000043

*Expenses*

**Ameriprise Financial**

Jeff Mumper, CFP®, ChFC®, CASL®
Financial Advisor
Managing Director

**Jeff Mumper and Associates**

A financial advisory practice of
Ameriprise Financial Services, Inc.

9545 Kenwood Road Suite 200
Cincinnati, OH 45242
Tel: 513.792.8025
Fax: 877.674.6208
Toll Free: 800.684.1700
jemumper@ampf.com
ameripriseadvisors.com/
jeffrey.t.mumper

11/28/2012 → 9/30/2013 U & me moving → $10,245

12/15/12 Chinese Drywall Screening

$3100.00    ck. #340

1/23/13    "      "      1900.00    ck #393

~~1/29/13 Loda Custom Cabinets 1200.00 ck #421~~

~~5/9/13 Counter Tile 2200.00 ck #444~~

8/21/13   Surreal Sound      50.00    ck #480

8/22/13   Residential Elevators   375.00   ck. #481
8/26/13   Decorative Products, Inc.   455.00   ck #485
8/27/13   Microwave Electric   490.78   ck #483
     (appliance repair)

9/4/13   Surreal Sound      1922.01    ck #490

9/5/13   Microwave Electric   168.81   ck #491
     (appliance repair)

9/9/13   ADT      2588.58    ck #499

↓ Labor to reinstall existing shades & draperies

Also registered with Securities America, Inc., Member FINRA and SIPC, a subsidiary of Ameriprise Financial, Inc. Ameriprise Financial
Services, Inc. offers financial advisory services, investments, insurance and annuity products. RiverSource® and Columbia
Management® products are offered by affiliates of Ameriprise Financial Services, Inc., Member FINRA and SIPC.



M/ M Steve Etter Residence
18894 SE Jupiter Inlet Way
Lot 4 Emerald Harbor Way
Tequesta, Florida 33469
Martin County, Florida

*BUDGET*
*SCHEDULE*
*CONTROL*
*TRACK*

8/9/12 revised                    **DRAFT**

Specifications to free the residence of  Chinese Drywall, in accordance with the
protocol set forth by the industry report prepared by the National Association of
Home Builders, entitled **" Imported Problematic Drywall: Identification
Strategies and Remediation", dated March 2011.**  Prepared by Marsh Risk
Consulting and Building Health Sciences, Inc.

PROCEDURES AS [EODUCED BY Roger Thomas.

We will be required to provide at signed and sealed set of plans in order to submit
and receive a permit.

**Permitting;**
1. Prepare 2 sets of plans for the corrective work signed and sealed by an
   architect or engineer.
2. Complete Martin County Permit form and submit for permit along with,
3. A detailed list of work contemplated.

**COVER AND PROTECT AND SECURE.**
1. ALL MARBLE FLOORING with one layer of rosin paper taped at all joints,
   cover that with ½" fiber board tape all joints, cover that with ¼" or 3/8"
   plywood cut 14/" plywood strips to cover all joints glue strips with PL 200.
   Do not use screws or nails.
2. Garage build a secure plywood covered 2x4 wall enclosure with lockable
   door and hinges that can bot be removed from outside. Double lock with
   dead bolt. This occurs at that east end of the garage to secure owners fishing
   and boat gear.
3. Balance of garage to be secured with plywood covered walls leaving a
   corridor for workers access to house. Install temp a/c system in the garage
   and store items to be reused like doors cabinets etc. no furnishings,
   furnishing to go the U & M Storage.
4. Cover front door with temp walls both sides. This door is not to be used for
   access.
5. Cover all other exterior doors with fiberboard and red plastic tape.
6. Cover all window jambs interior with red plastic tape.
7. Cover all glass with clear plastic carpet protectant. Self-adhesive.
8.  Cover all stair rails and handrails with cardboard and tape place fiberboard
   at all corners where damage could occur and then wrap with cardboard.

ETTER000154

9. Cover all return air grills with tow layers of filters on top of regular filters and change weekly. Protecting A/C ductwork from contamination.
10. Run 3 air scrubbers with HEPA filters and move each day to areas of work that involve dust. Change the stage one and stage 2 filters weekly of more often as needed when drywall demo or installation is underway.
11. Cover stone fire place. See if we can access back of fireplace to remove drywall with out destroying the stone. See
    RT if not possible
12. Dura rock or cement board does not have to be demolished unless necessary for plumbing or tile replacement.
13. Remove den, library, and family room cabinets so that they can be reinstalled store in garage.
14. Notify RGT of any casework or cabinets that may be reusable.


**Demolition;**

Prepare and protect all surfaces that are remaining.
**Remove all;**
1. Carpet, carpet padding and discard.
2. Millwork, casework, cabinetry, doors and jambs, closet built-ins retaining what can be reused and reinstalled discarding the unusable material.
3. Drywall, wallboard and ceiling board. Discard in an approved landfill. all metal framing will remain untouched.
4. Remove and discard all wall and ceiling insulation including R-4.1 foil masonry wall and insulation.
5. Remove all shower door and enclosures and move to secure storage. Order new hardware
6. Remove any ceramic tile showers or tub surrounds that may be necessary to access plumbing piping or valves, and discard. If piping can be accessed from back side save tile and remove from the rear. Replace all shower valves and piping, replace all sink and lav valves.
7. Remove all mirrors and discard.
8. Remove all toilet accessories and inspect for damage, undamaged ones are saved and defective ones inventoried and photo graphed and logged for replacement.
9. Defective electrical conveying system, including switches, outlets, and circuit breakers, disconnects and wiring tag ends.
10. Remove all and light surface mounted fixtures and log in and photograph.
11. Remove all recessed built in light fixtures and if damage is evident discard of all affected.
12. Remove all smoke detectors, carbon monoxide detectors and discard.
13. Remove all low voltage wiring for speakers, security systems, CATV, and telecommunication and discard of.
14. Plumbing copper lines and any metallic fixtures, retaining the PVC lines in the original condition.

Case 2:09-md-02047-EEF-MBN Document 22380-44 Filed 12/02/19 Page 147 of 151
Case 1:11-cv-22408-MGC Document 27-4 Entered on FLSD Docket 05/13/2019 Page 40 of
164

15. HVAC flexible ductwork, collection boxes, Supports made of metallic material. Air handler coils, remove actual AHU units from site during reconstruction and re install at appropriate time.
16. Gas; remove all Gas lines and discard of it.
17. Remove all appliances and send to storage, have tech examine for any corrosion or defective wiring or coils.
18. Remove all wood flooring and discard.
19. Inspect all elevator control wiring and remove if corroded or discolored.
20. Remove all other low voltage wiring including but not limited to Garage door control wiring, doorbell wiring, thermostat wiring, access entry wiring and discard of same.
21. Call for demolition final from Martin County, if they require it.

**Cleaning:**

Once all demolition is completed and general waste material has been removed proceed with the following;

1. HEPA Vacuum all floors and exterior wall surfaces to remove all contaminated residue.
2. Wash all remaining surfaces with detergent and damp rags as to remove all dust particles left behind.
3. Allow the building to air out with windows open fans running for a period for not less those 14 days.
4. Install and run negative air scrubbers until all odors have been eliminated.
5. Complete clearance testing.
6. Walk thru inspection with the owner or owner's representative.

**Reconstruction;**

1. Install rough plumbing replacing all copper water lines, tub and shower valves and other removed items that were contaminated, prepare for rough inspection.
2. Install all required missing dead wood. Repair any damaged metal framing components.
3. Install missing or discarded electrical wiring, new recessed switches, circuit breaker, missing or discarded panel parts, and prepare for inspection.
4. Replace all HVAC ductwork, thermostat wiring, and missing components, prepare for rough inspection.
5. Install all low voltage wiring including but not limited to, security alarms, door bell, speaker and sound system wiring, CATV wiring, telephone and communication wiring, garage door control wiring and dedicated computer wiring, prepare for inspection.

6. WALK THE RESIDENCE WITH THE OWNER TO APPROVE ANS SIGN OFF ON ROUGHT IN.
7. CALL FOR AN ALL TRADES 6010, FRAMING INSPECTION
8. PASS 6010 INSPECTION
9. Install all insulation.
10. CALL FOR 6064 FRAMING INSPECTION
11. Pass inspection.
12. Check with the owner he may want to change all 1/2" drywall to 5/8". Notify the owner that if this decision is made, all doorjambs will have to be replaced for the thicker wall size, or extension jambs added.
13. Install all now US manufactured drywall. ½" on the wall and 5/8" on the ceiling.
14. Install all ceramic tile and or corrective marble repairs.
15. Install doors, millwork, casing, crown, window trim etc. following the as-built photographs or video.
16. Prime all painted surfaces.
17. Install all special molding ceiling beams and other millwork prior to casework installation.
18. Install all kitchen cabinets and vanities.
19. Install all solid surface counter and vanity tops.
20. Plumbing final install all fixtures and faucets. Prepare for final inspection.
21. Install all pre engineered wood flooring.
22. Final painting and staining
23. Install all cabinetry, closet built-ins.
24. Stain and paint or touchup all reused cabinetry to bring into like new appearance.
25. Install all accessories and finish hardware
26. Install all switches, outlets built-in lighting trim, circuit breakers and other components required for final inspection
27. Trim all HVAC, set all AHU's with new coils installed, trim and set al thermostats.
28. Start all HVAC systems and balance systems.
29. Trim all low voltage systems.
30. Install carpet and pad.
31. Install all appliances
32. **CALL FOR 6099 FINAL INSPECTIONS.**
33. PASS 6099 FINAL INSPECTIONS.
34. Remove all hard floor coverings.
35. Clean and polish all marble floors.
36. General final cleaning ready for occupancy.
37. Walk thru with owner compile punch list with owner sign off.
38. Complete punch list.
39. Final walk thru with owner and sign off of completed punch list.
40. Return all owners furniture and personal belongings to the site.
41. Connect and install all electrical components and or systems, both audio and visual.

ETTER000157

42. Final balance of AVAC system.
43. Check all systems for proper working condition.

ETTER000158

**From:** Roger Thomas <roger.rgtgc@gmail.com>
**Date:** November 1, 2012, 10:37:12 AM EDT
**To:** Steve Etter
**Subject: Fw: Contracts and Addendums**

had to forward sent to old email by mistake. let me know if you get this please.

Roger Thomas
Please note my New Email Address: Roger.Christianthomas@gmail.com


CHRISTIAN THOMAS CONSTRUCTION, INC
935 TOWN HALL AVENUE
JUPITER, FLORIDA 33458
P: 561.339-0573

christianthomasgc@gmail.com (mailto:christianthomasgc@gmail.com)

1

ETTER000159

Forwarded message:

From: Roger Thomas <roger.rgtgc@gmail.com>

To: Steve Etter

Date: Thursday, November 1, 2012 10:31:38 AM

Subject: Contracts and Addendums

Steve, Attached is the a copy of the actual contract with the addendum's. make sure this is what you want to send the attorney.

Added Comments should include the following.

Items removed from the contract and noted "Removed, Furnished by Owner" are still part of the cost to complete the work.

The contract is base on the reuse of most of the cabinetry, including but not limited to;

605 Den Cabinetry

611 Office Cabinetry

640 Bath Vanities

653 Granite tops

If these items cannot be reused these cost will increase base on the difference to replace the same with new.

The protocol set forth by the National Association of Home Builders advises that all cabinetry be replaced and not reused.

The likelihood of saving and not breaking the Granite and marble counter tops is not good many parts if not all will likely have to be replaced. more will be know after demolition occurs.

Attached please find the contract and attachments.

Roger Thomas

Please note my New Email Address: Roger.Christianthomas@gmail.com (mailto:Roger.Christianthomas@gmail.com)

CHRISTIAN THOMAS CONSTRUCTION, INC

935 TOWN HALL AVENUE

JUPITER, FLORIDA 33458

P: 561.339-0573

2

ETTER000160