# EXHIBIT 32 part 2

christianthomasgc@gmail.com (mailto:christianthomasgc@gmail.com)

ETTER000161

**Project**

ADDRESS LOCATION & PERMIT JURISDICTION
Etter Residence
16994 SE Federal Highway
Tequesta, Florida , Martin County

**Owners**

Steve and Cathy Etter Residence
16994 SE Federal Hwy
Tequesta Florida 33469

**Architect**
VAR Dwellings Inc.
6707 South Dixie Hwy
West Palm Beach, Fl
561-493-1500

| Date produced | 9/9/08 |
| Revised | 6/7/10 |
| Revised | 10/8/12 |
| REVISED | |
| Revised | |
| Revised | |

| Area Calculations | |
| A/C Living | 4289 | SF |
| Covered porches & entry | 676 | SF |
| Garage | 580 | SF |
| Total | 6005 | SF |

CONTRACT SUMMARY
10/6/12

<SPECIFICATION SHEET 1>

| ITEM | STATUS | MATERIAL | LABOR | SUBCONTRACTOR | TOTAL TO Complete | Owner furnished item |
|---|---|---|---|---|---|---|
| **DIVISION 1** | | | | | | |
| **GENERAL REQUIREMENTS** | | | | | | |
| 100 | DEMOLITION OF INTERIOR AFTER CABINETS AND BUILDING REMOVED | | 1500 | 10000 | 0 | $15,200 | |
| 101 | PROTECTION OF 1ST FLOOR MARBLE & COVER PROTECT UNCOVER CLEAN COVER | | 2550 | 1500 | 0 | $4,000 | |
| 102 | PROTECTION OF THE PARTLY DRIVE DURING CONTRACTION | | 480 | 600 | 0 | $1,080 | |
| 103 | RE SETTING OF THE PAPER DRIVEWAY WERE DAMAGED BY TRUCKS & DUMPSTERS | | 0 | 0 | 3400 | $2,400 | |
| 104 | DUMPSTERS AND LANDFILL CHARGES FOR DEMOLITION ONLY | | 4800 | 0 | 0 | $4,600 | |
| 105 | TESTING AND REPAIR OF INVESTIGATIVE DEMOLITION | | | | | Removed, furnished by owner | |
| 106 | BLUE PRINTS | | $200 | $0 | $0 | $200 | |
| 107 | SITE PROTECTION | | $1,000 | $1,000 | $0 | $2,000 | |
| 108 | CHEMICAL TOILETS | | $670 | $0 | $0 | $670 | |
| 109 | GENERAL LABOR | | $0 | $2,800 | $0 | $2,800 | $4,000 |
| | | | | | | | |
| 167 | FINAL CLEANING | | $0 | $0 | $2,300 | $2,300 | |
| 168 | | | | | | | |

ETTER000162

| DIVISION 2 SITE WORK | | | | | |
|---|---|---|---|---|---|
| 1001 | STREET CLEANUP THROUGH OUT JOB DURATION | $300.00 | $600.00 | $0.00 | $500.00 |

| DIVISION 6 WOOD AND CARPENTRY | | | | | |
|---|---|---|---|---|---|
| 601 | ROUGH CARPENTRY MATERIALS | $1,600.00 | $2,800.00 | $0.00 | $3,600.00 |
| 602 | REMOVE, CATELOG, PACK FOR STORAGE, AND RE INSTALL ALL CLAMP SILK WARE | $1.00 | | $9,600.00 | $9,600.00 |
| 603 | MILLWORK MATERIALS | $34,134.00 | | $0.00 | $39,134.00 |
| 604 | MILLWORK LABOR | $0.00 | $33,000.00 | $0.00 | $33,000.00 |
| 605 | REMOVE DEN CABINETRY (PACK AND STORE) AND RE INSTALL AT COMPLETION | $0.00 | $12,500.00 | $0.00 | $12,500.00 |
| 610 | RE FINISH DEN CABINETRY | $0.00 | $0.00 | $7,000.00 | $7,000.00 |
| 611 | REMOVE OFFICE CABINETRY ( PACK AND STORE) AND RE INSTALL AT COMPLETION | $0.00 | $15,000.00 | $0.00 | $15,000.00 |
| 620 | RE FINISH OFFICE CABINETRY | $0.00 | $0.00 | $9,500.00 | $9,500.00 |
| 630 | REMOVE ALL BATH ROOM VANITIES (PACK FOR STORAGE) & REINSTALL | $0.00 | $3,000.00 | $0.00 | $3,000.00 |
| 640 | REFINISH BATH VANITIES | $0.00 | $0.00 | $3,000.00 | $3,000.00 |
| 651 | REMOVE ALL KITCHEN CABINETS (PACK AND STORE) AND REINSTALL | $0.00 | $14,000.00 | $0.00 | $14,000.00 |
| 660 | REFINISH ALL KITCHEN CABINETS | $0.00 | $0.00 | $13,000.00 | $13,000.00 |
| 652 | REMOVE ALL COUNTER TOPS (PACK AND STORE) AND REINSTALL | $0.00 | $0.00 | $7,000.00 | $7,000.00 |
| 665 | WOOD STAIR RAIL RENOVATIONS | $0.00 | $0.00 | $5,000.00 | $5,000.00 |

| DIVISION 8 GLASS AND GLAZING | | | | | |
|---|---|---|---|---|---|
| 800 | MIRRORS (TUB AND SHOWER ENCLOSURES) | | | $4,650.00 | $4,519.00 |
| 805 | RE-KEY LOCKS UPON OCCUPANCY | | | $235.00 | $235.00 |
| 810 | FINISH HARDWARE | $4,650.00 | $4,650.00 | $7,000.00 | $7,000.00 |

| DIVISION 9 FINISHES | | | | | |
|---|---|---|---|---|---|
| 901 | WIRE DRYWALL AND DURA ROCK INSTALLATION ON EXISTING FRAMING | $0.00 | $0.00 | $26,160.00 | $26,160.00 |
| 905 | REPAIR FRAMING AFTER DEMOLITION IN PREPARATION FOR DRYWALL (ALLOWANCE) | $0.00 | $0.00 | $5,400.00 | $5,400.00 |
| 907 | INSULATION | $0.00 | $0.00 | $7,000.00 | $7,000.00 |
| 911 | PAINTING, STAINING, MAHOGANY FINISHES | $0.00 | $0.00 | $63,000.00 | $63,000.00 |
| 999 | CERAMIC TILE WET WALLS IN MUDROOMS, & BANDS IN MASTER | $0.00 | $0.00 | $26,000.00 | $26,000.00 |
| 915 | POLISH AND RE SEAL LIMESTONE FLOOR | $0.00 | $0.00 | $7,723.00 | $7,723.00 |
| 918 | CARPETING, STAIRS AND SECOND FLOOR | $0.00 | $0.00 | $16,350.00 | $16,350.00 |
| 920 | NEW WOOD FLOORING | $0.00 | $0.00 | $8,000.00 | $8,000.00 |
| 980 | PUNCH OUT LABOR | $0.00 | $1,600.00 | $0.00 | $1,600.00 |
| 972 | REMOVE AIR AND DE HUMIDIFICATION EQUIPMENT | $6,000.00 | $4,650.00 | $5,100.00 | $16,100.00 |
| 995 | PORTABLE AIR REQUIRED TO REMOVE MILDEW | $0.00 | $0.00 | $4,000.00 | $4,000.00 |

| DIVISION 11 APPLIANCES | | | | | |
|---|---|---|---|---|---|
| 1101 | APPLIANCES - REPLACE WIRING AND COOLANT COPPER (BAD) | $0.00 | $0.00 | Removed, furnished by owner | $16,350.00 |
| 1105 | CENTRAL VACUUM SYSTEM | $0.00 | $0.00 | $4,650.00 | $4,650.00 |

| DIVISION 12 FURNISHINGS | | | | | |
|---|---|---|---|---|---|
| | REMOVE AND STORE ALL FURNISHING AND RE USABLE MATERIAL FOR RE CONSTRUCTION | $0.00 | $0.00 | $0.00 Removed, furnished by owner | $5,000.00 |

ETTER000163

| DIVISION 15 MECHANICAL | | | | |
|---|---|---|---|---|
| 1500 | PLUMBING | $0.00 | $0.00 | $35,000.00 |
| 1510 | PLUMBING FIXTURES AND ACCESSORIES DAMAGED BY DRYWALL | $11,000.00 | $0.00 | $15,000.00 |
| 1550 | H.V.A.C. | $0.00 | $25,000.00 | $25,000.00 |
| 1557 | GAS | $0.00 | $0.00 | $5,000.00 |
| DIVISION 16 ELECTRICAL | | | | |
| 1600 | ELECTRICAL | $0.00 | $45,000.00 | $45,000.00 |
| 1610 | ELECTRICAL STRUCTURED WIRING | $0.00 | $5,000.00 | $5,000.00 |
| 1630 | ELECTRICAL FIXTURES & FANS | $3,500.00 | $0.00 | $8,500.00 |
| 1650 | SECURITY SYSTEM | $0.00 | $5,000.00 | $5,000.00 |
| 1680 | SPEAKERS AND VOLUME CONTROLS | $0.00 | $10,000.00 | $10,000.00 |
| DIVISION 18 PERMITS | | | | |
| 1800 | PERMIT FEES REQUIRED / CONTRACTOR INSURANCE COSTS (ESTIMATE) | $2,500.00 | $0.00 | $2,500.00 |
| | SUBTOTAL | | | $681,161.00 |
| 2000 | CONTRACTORS FEE 20% | | | $136,256.20 |
| | CONTRACT AMOUNT | | | $817,417.20 |

$50,280.00

smc 10/13/12

# ▲AIA® Document A102™ – 2007

## Standard Form of Agreement Between Owner and Contractor *where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price*

**AGREEMENT** made as of the    8th    day of October
in the year 2012
*(In words, indicate day, month and year.)*

**BETWEEN** the Owner:
*(Name, legal status, address and other information)*
ETTER, Steven M and Cathy L
18894 SE JUPITER INLET WAY
TEQUESTA, FL 33469

and the Contractor:
*(Name, legal status, address and other information)*
CHRISTIAN THOMAS CONSTRUCTION INC
935 TOWN HALL AVENUE
JUPITER, FL 33458

for the following Project:
*(Name, location and detailed description)*
Interior Remodel to the ETTER Residence
EMERALD HARBOUR; 18894 SE JUPITER INLET WAY, TEQUESTA, FL
Interior remodel only due to Chinese drywall remediation.

The Architect:
*(Name, legal status, address and other information)*
Not applicable
Not applicable
Not applicable

The Owner and Contractor agree as follows.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

This document is not intended for use in competitive bidding.

AIA Document A201™–2007, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

8 M E
10/13/12

**Init.**

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was created on   09/17/2012 09:18:54   under the terms of AIA Documents-on-Demand™ order no. 2008480999, and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

1

ETTER000165

## TABLE OF ARTICLES

1    THE CONTRACT DOCUMENTS

2    THE WORK OF THIS CONTRACT

3    RELATIONSHIP OF THE PARTIES

4    DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

5    CONTRACT SUM

6    CHANGES IN THE WORK

7    COSTS TO BE REIMBURSED

8    COSTS NOT TO BE REIMBURSED

9    DISCOUNTS, REBATES AND REFUNDS

10   SUBCONTRACTS AND OTHER AGREEMENTS

11   ACCOUNTING RECORDS

12   PAYMENTS

13   DISPUTE RESOLUTION

14   TERMINATION OR SUSPENSION

15   MISCELLANEOUS PROVISIONS

16   ENUMERATION OF CONTRACT DOCUMENTS

17   INSURANCE AND BONDS

### ARTICLE 1   THE CONTRACT DOCUMENTS
The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement, all of which form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. If anything in the other Contract Documents, other than a Modification, is inconsistent with this Agreement, this Agreement shall govern.

### ARTICLE 2   THE WORK OF THIS CONTRACT
The Contractor shall fully execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.

### ARTICLE 3   RELATIONSHIP OF THE PARTIES
The Contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to ~~cooperate with the Architect and~~ exercise the Contractor's skill and judgment in furthering the interests of the Owner; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. The Owner agrees to furnish and approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents.

SME  10/13/12

Init.

/

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was created on   09/17/2012 09:18:54   under the terms of AIA Documents-on-Demand™ order no.  2008460998 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

2

ETTER000166

**ARTICLE 4 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION**
§ 4.1 The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement, if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

Within five (5) business days upon receipt of all applicable building permits and with release from Owner.

~~If, prior to commencement of the Work, the Owner requires time to file mortgages and other security interests, the Owner's time requirement shall be as follows:~~

§ 4.2 The Contract Time shall be measured from the date of commencement.

§ 4.3 The Contractor shall achieve Substantial Completion of the entire Work not later than
one hundred eighty                              ( 180 ) days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. If appropriate, insert requirements for earlier Substantial Completion of certain portions of the Work.)*

| Portion of Work | Substantial Completion Date |
|---|---|
|  |  |

, subject to adjustments of this Contract Time as provided in the Contract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to achieve Substantial Completion on time, or for bonus payments for early completion of the Work.)*

Substantial completion will also be subject to delays caused by Owner, Acts of God, the unavailability of materials, strikes, other labor problems, governmental orders, or other events which would support a defense based upon impossibility of performance for reasons beyond Builder's control.

**ARTICLE 5 CONTRACT SUM**
§ 5.1 The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum is the Cost of the Work as defined in Article 7 plus the Contractor's Fee.

§ 5.1.1 The Contractor's Fee:
*(State a lump sum, percentage of Cost of the Work or other provision for determining the Contractor's Fee.)*

The Contractor's Fee shall be 20% of the Cost of the Work.

*10/13/12*
*SME*

Init.

/

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was created on   09/17/2012 06:16:54   under the terms of AIA Documents-on-Demand™ order no.  2008460998 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

3

§ 5.1.2 The method of adjustment of the Contractor's Fee for changes in the Work:

§ 5.1.3 Limitations, if any, on a Subcontractor's overhead and profit for increases in the cost of its portion of the Work:

§ 5.1.4 Rental rates for Contractor-owned equipment shall not exceed _____ percent ( _____ %) of the standard rate paid at the place of the Project.

§ 5.1.5 Unit prices, if any:
*(Identify and state the unit price; state the quantity limitations, if any, to which the unit price will be applicable.)*

| Item | Units and Limitations | Price per Unit ($0.00) |
|------|----------------------|------------------------|
|      |                      |                        |

*SMe  OCT. 13, 2012*

§ 5.2 Guaranteed Maximum Price
§ 5.2.1 The Contract Sum is guaranteed by the Contractor not to exceed – INCLUDING 20% CONTRACTORS FEE –

($ 817,417.00 ), subject to additions and deductions by Change Order as provided in the Contract Documents. Such maximum sum is referred to in the Contract Documents as the Guaranteed Maximum Price. Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Contractor without reimbursement by the Owner.
*(Insert specific provisions if the Contractor is to participate in any savings.)*

§ 5.2.2 The Guaranteed Maximum Price is based on the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner.
*(State the numbers or other identification of accepted alternates. If bidding or proposal documents permit the Owner to accept other alternates subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when the amount expires.)*

*SMe  10/13/12*

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was created on 09/17/2012 09:18:54 under the terms of AIA Documents-on-Demand™ order no. 2006460098 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

Init.

/

4

ETTER000168

§ 5.2.3 ~~Allowances included in the Guaranteed Maximum Price, if any:~~
~~(Identify allowance and state exclusions, if any, from the allowance price.)~~

~~Item~~            ~~Price~~

§ 5.2.4 Assumptions, if any, on which the Guaranteed Maximum Price is based:

§ 5.2.5 To the extent that the Drawings and Specifications are anticipated to require further development ~~by the Architect~~, the Contractor has provided in the Guaranteed Maximum Price for such further development consistent with the Contract Documents and reasonably inferable therefrom. Such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order.

## ARTICLE 6   CHANGES IN THE WORK
§ 6.1 Adjustments to the Guaranteed Maximum Price on account of changes in the Work may be determined by any of the methods listed in Section 7.3.3 of AIA Document A201–2007, General Conditions of the Contract for Construction.

§ 6.2 In calculating adjustments to subcontracts (except those awarded with the Owner's prior consent on the basis of cost plus a fee), the terms "cost" and "fee" as used in Section 7.3.3 of AIA Document A201–2007 and the term "costs" as used in Section 7.3.7 of AIA Document A201–2007 shall have the meanings assigned to them in AIA Document A201–2007 and not be modified by Articles 5, 7 and 8 of this Agreement. Adjustments to subcontracts awarded with the Owner's prior consent on the basis of cost plus a fee shall be calculated in accordance with the terms of those subcontracts.

§ 6.3 In calculating adjustments to the Guaranteed Maximum Price, the terms "cost" and "costs" as used in the above-referenced provisions of AIA Document A201–2007 shall mean the Cost of the Work as defined in Article 7 of this Agreement and the term "fee" shall mean the Contractor's Fee as defined in Section 5.1.1 of this Agreement.

§ 6.4 If no specific provision is made in Article 5 for adjustment of the Contractor's Fee in the case of changes in the Work, or if the extent of such changes is such, in the aggregate, that application of the adjustment provisions of Article 5 will cause substantial inequity to the Owner or Contractor, the Contractor's Fee shall be equitably adjusted on the same basis that was used to establish the Fee for the original Work, and the Guaranteed Maximum Price shall be adjusted accordingly.

## ARTICLE 7   COSTS TO BE REIMBURSED
§ 7.1 Cost of the Work
§ 7.1.1 The term Cost of the Work shall mean costs necessarily incurred by the Contractor in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 7.

§ 7.1.2 Where any cost is subject to the Owner's prior approval, the Contractor shall obtain this approval prior to incurring the cost. The parties shall endeavor to identify any such costs prior to executing this Agreement.

§ 7.2 Labor Costs
§ 7.2.1 Wages of construction workers directly employed by the Contractor to perform the construction of the Work at the site or, with the Owner's prior approval, at off-site workshops.

Init.

/
AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was created on  09/17/2012 09:18:54  under the terms of AIA Documents-on-Demand™ order no.  2008480998 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

5

ETTER000169

§ 7.2.2 Wages or salaries of the Contractor's supervisory and administrative personnel when stationed at the site with the Owner's prior approval.

*(If it is intended that the wages or salaries of certain personnel stationed at the Contractor's principal or other offices shall be included in the Cost of the Work, identify in Article 15, the personnel to be included, whether for all or only part of their time, and the rates at which their time will be charged to the Work.)*

§ 7.2.3 Wages and salaries of the Contractor's supervisory or administrative personnel engaged at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

§ 7.2.4 Costs paid or incurred by the Contractor for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Sections 7.2.1 through 7.2.3.

§ 7.2.5 Bonuses, profit sharing, incentive compensation and any other discretionary payments paid to anyone hired by the Contractor or paid to any Subcontractor or vendor, with the Owner's prior approval.

### § 7.3 Subcontract Costs
Payments made by the Contractor to Subcontractors in accordance with the requirements of the subcontracts.

### § 7.4 Costs of Materials and Equipment Incorporated in the Completed Construction
§ 7.4.1 Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

§ 7.4.2 Costs of materials described in the preceding Section 7.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Contractor. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

### § 7.5 Costs of Other Materials and Equipment, Temporary Facilities and Related Items
§ 7.5.1 Costs of transportation, storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Contractor at the site and fully consumed in the performance of the Work. Costs of materials, supplies, temporary facilities, machinery, equipment and tools that are not fully consumed shall be based on the cost or value of the item at the time it is first used on the Project site less the value of the item when it is no longer used at the Project site. Costs for items not fully consumed by the Contractor shall mean fair market value.

§ 7.5.2 Rental charges for temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Contractor at the site and costs of transportation, installation, minor repairs, dismantling and removal. The total rental cost of any Contractor-owned item may not exceed the purchase price of any comparable item. Rates of Contractor-owned equipment and quantities of equipment shall be subject to the Owner's prior approval.

§ 7.5.3 Costs of removal of debris from the site of the Work and its proper and legal disposal.

§ 7.5.4 Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

§ 7.5.5 Costs of materials and equipment suitably stored off the site at a mutually acceptable location, subject to the Owner's prior approval.

### § 7.6 Miscellaneous Costs
§ 7.6.1 Premiums for that portion of insurance and bonds required by the Contract Documents that can be directly attributed to this Contract. Self-insurance for either full or partial amounts of the coverages required by the Contract Documents, with the Owner's prior approval.

§ 7.6.2 Sales, use or similar taxes imposed by a governmental authority that are related to the Work and for which the Contractor is liable.

**Init.**

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties,** and will be prosecuted to the maximum extent possible under the law. This document was created on 09/17/2012 09:18:54 under the terms of AIA Documents-on-Demand™ order no. 2006480998 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

**6**

**§ 7.6.3** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Contractor is required by the Contract Documents to pay.

**§ 7.6.4** Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by Section 13.5.3 of AIA Document A201–2007 or by other provisions of the Contract Documents, and which do not fall within the scope of Section 7.7.3.

**§ 7.6.5** Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Contractor resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Contractor's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded by the last sentence of Section 3.17 of AIA Document A201–2007 or other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.

**§ 7.6.6** Costs for electronic equipment and software, directly related to the Work with the Owner's prior approval.

**§ 7.6.7** Deposits lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility in the Contract Documents.

**§ 7.6.8** Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Contractor, reasonably incurred by the Contractor after the execution of this Agreement in the performance of the Work and with the Owner's prior approval, which shall not be unreasonably withheld.

**§ 7.6.9** Subject to the Owner's prior approval, expenses incurred in accordance with the Contractor's standard written personnel policy for relocation and temporary living allowances of the Contractor's personnel required for the Work.

**§ 7.6.10** That portion of the reasonable expenses of the Contractor's supervisory or administrative personnel incurred while traveling in discharge of duties connected with the Work.

**§ 7.7 Other Costs and Emergencies**
**§ 7.7.1** Other costs incurred in the performance of the Work if, and to the extent, approved in advance in writing by the Owner.

**§ 7.7.2** Costs incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Section 10.4 of AIA Document A201–2007.

**§ 7.7.3** Costs of repairing or correcting damaged or nonconforming Work executed by the Contractor, Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Contractor and only to the extent that the cost of repair or correction is not recovered by the Contractor from insurance, sureties, Subcontractors, suppliers, or others.

**§ 7.8 Related Party Transactions**
**§ 7.8.1** For purposes of Section 7.8, the term "related party" shall mean a parent, subsidiary, affiliate or other entity having common ownership or management with the Contractor; any entity in which any stockholder in, or management employee of, the Contractor owns any interest in excess of ten percent in the aggregate; or any person or entity which has the right to control the business or affairs of the Contractor. The term "related party" includes any member of the immediate family of any person identified above.

**§ 7.8.2** If any of the costs to be reimbursed arise from a transaction between the Contractor and a related party, the Contractor shall notify the Owner of the specific nature of the contemplated transaction, including the identity of the related party and the anticipated cost to be incurred, before any such transaction is consummated or cost incurred. If the Owner, after such notification, authorizes the proposed transaction, then the cost incurred shall be included as a cost to be reimbursed, and the Contractor shall procure the Work, equipment, goods or service from the related party, as a Subcontractor, according to the terms of Article 10. If the Owner fails to authorize the transaction, the Contractor shall procure the Work, equipment, goods or service from some person or entity other than a related party according to the terms of Article 10.

**Init.**

**/**

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was created on 09/17/2012 09:16:54 under the terms of AIA Documents-on-Demand™ order no. 2008480998 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

7

ETTER000171

## ARTICLE 8  COSTS NOT TO BE REIMBURSED

§ 8.1 The Cost of the Work shall not include the items listed below:

.1 Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other than the site office, except as specifically provided in Section 7.2. or as may be provided in Article 15;

.2 Expenses of the Contractor's principal office and offices other than the site office;

.3 Overhead and general expenses, except as may be expressly included in Article 7;

.4 The Contractor's capital expenses, including interest on the Contractor's capital employed for the Work;

.5 Except as provided in Section 7.7.3 of this Agreement, costs due to the negligence or failure of the Contractor, Subcontractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable to fulfill a specific responsibility of the Contract;

.6 Any cost not specifically and expressly described in Article 7; and

.7 Costs, other than costs included in Change Orders approved by the Owner, that would cause the Guaranteed Maximum Price to be exceeded.

## ARTICLE 9  DISCOUNTS, REBATES AND REFUNDS

§ 9.1 Cash discounts obtained on payments made by the Contractor shall accrue to the Owner if (1) before making the payment, the Contractor included them in an Application for Payment and received payment from the Owner, or (2) the Owner has deposited funds with the Contractor with which to make payments; otherwise, cash discounts shall accrue to the Contractor. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Contractor shall make provisions so that they can be obtained.

§ 9.2 Amounts that accrue to the Owner in accordance with the provisions of Section 9.1 shall be credited to the Owner as a deduction from the Cost of the Work.

## ARTICLE 10  SUBCONTRACTS AND OTHER AGREEMENTS

§ 10.1 Those portions of the Work that the Contractor does not customarily perform with the Contractor's own personnel shall be performed under subcontracts or by other appropriate agreements with the Contractor. The Owner may designate specific persons from whom, or entities from which, the Contractor shall obtain bids. The Contractor shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work and shall deliver such bids to the Architect. The Owner shall then determine, with the advice of the Contractor and the Architect, which bids will be accepted. The Contractor shall not be required to contract with anyone to whom the Contractor has reasonable objection.

§ 10.2 When a specific bidder (1) is recommended to the Owner by the Contractor; (2) is qualified to perform that portion of the Work; and (3) has submitted a bid that conforms to the requirements of the Contract Documents without reservations or exceptions, but the Owner requires that another bid be accepted, then the Contractor may require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Contractor and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

§ 10.3 Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement, and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner. If the Subcontract is awarded on a cost-plus a fee basis, the Contractor shall provide in the Subcontract for the Owner to receive the same audit rights with regard to the Subcontractor as the Owner receives with regard to the Contractor in Article 11, below.

## ARTICLE 11  ACCOUNTING RECORDS

The Contractor shall keep full and detailed records and accounts related to the cost of the Work and exercise such controls as may be necessary for proper financial management under this Contract and to substantiate all costs incurred. The accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's auditors shall, during regular business hours and upon reasonable notice, be afforded access to, and shall be permitted to audit and copy, the Contractor's records and accounts, including complete documentation supporting accounting entries, books, correspondence, instructions, drawings, receipts, subcontracts, Subcontractor's proposals, purchase orders, vouchers, memoranda and other data relating to this Contract. The Contractor shall preserve these records for a period of three years after final payment, or for such longer period as may be required by law.

**Init.**

**/**

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was created on   09/17/2012 09:18:54   under the terms of AIA Documents-on-Demand® order no.  2008460988 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

8

ETTER000172

**ARTICLE 12 PAYMENTS**
**§ 12.1 Progress Payments**
**§ 12.1.1** Based upon Applications for Payment submitted ~~to the Architect~~ by the Contractor ~~and Certificates for Payment issued by the Architect~~, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

**§ 12.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

All requests for payment are based on one calendar month ending on the last day of said month.

**§ 12.1.3** Provided that an Application for Payment is received by ~~the Architect~~ not later than the 1st day of a month, the Owner shall make payment of the certified amount to the Contractor not later than the 10th day of the same month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than ten ( 10 ) days receives the Application for Payment.
*(Federal, state or local laws may require payment within a certain period of time.)*

**§ 12.1.4** With each Application for Payment, the Contractor shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner ~~or Architect~~ to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor; less (2) that portion of those payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment.

**§ 12.1.5** Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Contractor's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy ~~as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.~~

**§ 12.1.6** Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage of completion shall be the lesser of (1) the percentage of that portion of the Work which has actually been completed; or (2) the percentage obtained by dividing (a) the expense that has actually been incurred by the Contractor on account of that portion of the Work for which the Contractor has made or intends to make actual payment prior to the next Application for Payment by (b) the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values.

**§ 12.1.7** Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

   .1   Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage of completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 7.3.9 of AIA Document A201–2007;

   .2   Add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing;

   .3   Add the Contractor's Fee, less retainage of 0.00 percent ( 0.00 %). The Contractor's Fee shall be computed upon the Cost of the Work at the rate stated in Section 5.1.1 or, if the Contractor's Fee is stated as a fixed sum in that Section, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work bears to a reasonable estimate of the probable Cost of the Work upon its completion;

   .4   Subtract retainage of 0.00 percent ( 0.00 %) from that portion of the Work that the Contractor self-performs;

   .5   Subtract the aggregate of previous payments made by the Owner;

   .6   Subtract the shortfall, if any, indicated by the Contractor in the documentation required by Section 12.1.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's auditors in such documentation; and

**Init.**

**/**

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was created on 09/17/2012 09:16:54 under the terms of AIA Documents-on-Demand™ order no. 2008460998 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

9

.7 ~~Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Section 9.5 of AIA Document A201–2007.~~

**§ 12.1.8** The Owner and the Contractor shall agree upon a ~~(1)~~ mutually acceptable procedure for review and approval of payments to Subcontractors ~~and (2) the percentage of retainage held on Subcontracts;~~ and the Contractor shall execute subcontracts in accordance with those agreements.

~~§ 12.1.9 In taking action on the Contractor's Applications for Payment, the Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Contractor and shall not be deemed to represent that the Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Section 12.1.4 or other supporting data; that the Architect has made exhaustive or continuous on-site inspections; or that the Architect has made examinations to ascertain how or for what purposes the Contractor has used amounts previously paid on account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's auditors acting in the sole interest of the Owner.~~

**§ 12.2 Final Payment**
**§ 12.2.1** Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when

.1  the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A201–2007, and to satisfy other requirements, if any, which extend beyond final payment;

.2  the Contractor has submitted a final accounting for the Cost of the Work and a final Application for Payment; and

.3  ~~a final Certificate for Payment has been issued by the Architect.~~

~~§ 12.2.2 The Owner's auditors will review and report in writing on the Contractor's final accounting within 30 days after delivery of the final accounting to the Architect by the Contractor. Based upon such Cost of the Work as the Owner's auditors report to be substantiated by the Contractor's final accounting, and provided the other conditions of Section 12.2.1 have been met, the Architect will, within seven days after receipt of the written report of the Owner's auditors, either issue to the Owner a final Certificate for Payment with a copy to the Contractor, or notify the Contractor and Owner in writing of the Architect's reasons for withholding a certificate as provided in Section 9.5.1 of the AIA Document A201–2007. The time periods stated in this Section 12.2.2 supersede those stated in Section 9.4.1 of the AIA Document A201–2007. The Architect is not responsible for verifying the accuracy of the Contractor's final accounting.~~

**§ 12.2.3** If the Owner's auditors report the Cost of the Work as substantiated by the Contractor's final accounting to be less than claimed by the Contractor, the Contractor shall be entitled to request mediation of the disputed amount without seeking an initial decision pursuant to Section 15.2 of A201–2007. A request for mediation shall be made by the Contractor within 30 days ~~after the Contractor's receipt of a copy of the Architect's final Certificate for Payment.~~ Failure to request mediation within this 30-day period shall result in the substantiated amount reported by the Owner's auditors becoming binding on the Contractor. Pending a final resolution of the disputed amount, the Owner shall pay the Contractor the amount certified in the ~~Architect's~~ final Certificate for Payment.

**§ 12.2.4** The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the ~~Architect's~~ final Certificate for Payment, or as follows:

*10/13/12*

**§ 12.2.5** If, subsequent to final payment and at the Owner's request, the Contractor incurs costs described in Article 7 and not excluded by Article 8 to correct defective or nonconforming Work, the Owner shall reimburse the Contractor such costs and the Contractor's Fee applicable thereto on the same basis as if such costs had been incurred prior to final payment, but not in excess of the Guaranteed Maximum Price. If the Contractor has participated in savings as provided in Section 5.2, the amount of such savings shall be recalculated and appropriate credit given to the Owner in determining the net amount to be paid by the Owner to the Contractor.

Init.

/

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was created on   09/17/2012 09:16:54   under the terms of AIA Documents-on-Demand™ order no.  2008480998 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

10

ETTER000174

## ARTICLE 13   DISPUTE RESOLUTION

§ 13.1 Initial Decision Maker

~~The Architect will serve as Initial Decision Maker pursuant to Section 15.2 of AIA Document A201–2007, unless the parties appoint below another individual, not a party to the Agreement, to serve as Initial Decision Maker.~~
~~(If the parties mutually agree, insert the name, address and other contact information of the Initial Decision Maker, if other than the Architect.)~~

### § 13.2 Binding Dispute Resolution
For any Claim subject to, but not resolved by mediation pursuant to Section 15.3 of AIA Document A201–2007, the method of binding dispute resolution shall be as follows:
*(Check the appropriate box. If the Owner and Contractor do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, Claims will be resolved by litigation in a court of competent jurisdiction.)*

[☑] Arbitration pursuant to Section 15.4 of AIA Document A201–2007

[ ] Litigation in a court of competent jurisdiction

[ ] Other: *(Specify)*

## ARTICLE 14   TERMINATION OR SUSPENSION
§ 14.1 Subject to the provisions of Section 14.2 below, the Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201–2007.

§ 14.2 If the Owner terminates the Contract for cause as provided in Article 14 of AIA Document A201–2007, the amount, if any, to be paid to the Contractor under Section 14.2.4 of AIA Document A201–2007 shall not cause the Guaranteed Maximum Price to be exceeded, nor shall it exceed an amount calculated as follows:

.1   Take the Cost of the Work incurred by the Contractor to the date of termination;
.2   Add the Contractor's Fee computed upon the Cost of the Work to the date of termination at the rate stated in Section 5.1.1 or, if the Contractor's Fee is stated as a fixed sum in that Section, an amount that bears the same ratio to that fixed-sum Fee as the Cost of the Work at the time of termination bears to a reasonable estimate of the probable Cost of the Work upon its completion; and
.3   Subtract the aggregate of previous payments made by the Owner.

§ 14.3 The Owner shall also pay the Contractor fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Contractor that the Owner elects to retain and that is not otherwise included in the Cost of the Work under Section 14.2.1. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Contractor shall, as a condition of receiving the payments referred to in this Article 14, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Contractor, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Contractor under such subcontracts or purchase orders.

§ 14.4 The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201–2007; in such case, the Guaranteed Maximum Price and Contract Time shall be increased as provided in Section 14.3.2 of AIA Document A201–2007, except that the term "profit" shall be understood to mean the Contractor's Fee as described in Sections 5.1.1 and Section 6.4 of this Agreement.

## ARTICLE 15   MISCELLANEOUS PROVISIONS
§ 15.1 Where reference is made in this Agreement to a provision of AIA Document A201–2007 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was created on   09/17/2012 09:15:54   under the terms of AIA Documents-on-Demand™ order no.   2008460098 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

Init.

/

11

**§ 15.2** Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located. *(Insert rate of interest agreed upon, if any.)*

Effective annual percentage rate as of the date this Contract was signed.

**§ 15.3** The Owner's representative:
*(Name, address and other information)*

Mr. Steve Etter
18894 SE Jupiter Inlet Way
Tequesta, Florida 33469

**§ 15.4** The Contractor's representative:
*(Name, address and other information)*

Mr. Roger Thomas
Mr. Christian Thomas
Christian Thomas Construction, Inc.
935 Town Hall Avenue, Ste 2, Jupiter, Florida 33458

**§ 15.5** Neither the Owner's nor the Contractor's representative shall be changed without ten days' written notice to the other party.

**§ 15.6** Other provisions:

Florida Homeowner's Construction Recovery Fund Notice; Construction Industry Recovery Fund, Section 489.1425.a

Payment may be available from the Construction Industries Recovery Fund if you lose money on a project performed under Contract, where the loss results from specified violations of Florida Law by a state-licensed Contractor. For information about the Recovery Fund and filing a claim, contact The Florida Construction Industry Licensing Board at the following telephone number and address: Department of Business and Professional Regulation, 1940 N Monroe Street, Tallahassee, Florida 32399, (850) 487-1395

**ARTICLE 16   ENUMERATION OF CONTRACT DOCUMENTS**
**§ 16.1** The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated in the sections below.

**§ 16.1.1** The Agreement is this executed AIA Document A102–2007, Standard Form of Agreement Between Owner and Contractor.

**§ 16.1.2** The General Conditions are AIA Document A201–2007, General Conditions of the Contract for Construction.

~~**§ 16.1.3** The Supplementary and other Conditions of the Contract:~~

| ~~Document~~ | ~~Title~~ | ~~Date~~ | ~~Pages~~ |
| --- | --- | --- | --- |

10/13/12

*sme*

**Init.**

**/**

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was created on   08/17/2012 09:18:54   under the terms of AIA Documents-on-Demand™ order no.  2008460698 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

**12**

ETTER000176

§ 16.1.4 The Specifications:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

| Section | Title | Date | Pages |
|---------|-------|------|-------|
| | Specification Sheet 1 | 8/03/09 revised 10/08/12 | 3 |

§ 16.1.5 The Drawings:
~~*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*~~

| Number | Title | Date |
|--------|-------|------|
| | | |

§ 16.1.6 The Addenda, if any:

| Number | Date | Pages |
|--------|------|-------|
| 1 | October 8, 2012 | 2 |

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 16.

§ 16.1.7 Additional documents, if any, forming part of the Contract Documents:
.1 ~~AIA Document E201™–2007, Digital Data Protocol Exhibit, if completed by the parties, or the following:~~

.2 Other documents, if any, listed below:
*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201–2007 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

AIA Document A132™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was created on 09/17/2012 09:18:54 under the terms of AIA Documents-on-Demand™ order no. 2008480998 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

Init.

/

13

ETTER000177

**ARTICLE 17  INSURANCE AND BONDS**
The Contractor shall purchase and maintain insurance and provide bonds as set forth in Article 11 of AIA Document A201–2007.
*(State bonding requirements, if any, and limits of liability for insurance required in Article 11 of AIA Document A201–2007.)*

**Type of Insurance or Bond**                     **Limit of Liability or Bond Amount ($0.00)**

This Agreement entered into as of the day and year first written above.

_____                   _____ Pres
**OWNER** *(Signature)*                             **CONTRACTOR** *(Signature)*

STEVEN  M.  ETTER
Cathy L. Etter                                      Roger G. Thomas  pres.
*(Printed name and title)*                          *(Printed name and title)*

**Init.**

**/**

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was created on   09/17/2012 09:18:54   under the terms of AIA Documents-on-Demand™ order no.  2008460296 , and is not for resale. This document is licensed by the American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

**14**

ETTER000178

AIA Document A102 – 2007
Addendum I
ETTER RESIDENCE
18894 SE Jupiter Inlet Way, Tequesta, FL

Article 5      Contract Sum
               5.2    Guaranteed Maximum Price

               5.2.4   The original estimate from 8/03/09 had the cabinetry and built-ins
                       throughout the house to be removed, stored, reinstalled and finished. The
                       protocol established by the National Association of Home Builders on the
                       remediation of Chinese drywall has since been released, and they
                       recommend that the correct course of action is to remove and dispose of all
                       millwork, which would include all cabinetry and built-ins. Final decision
                       shall be at the Owner's discretion; Owner will need to advise Contractor.

               5.2.5   ... and said Change Order will be billed at a fixed price to Owner. All
                       Change Orders will include the cost of supervision and a 20% Contractor's
                       Fee.

               5.2.6   Individual cost line items may change from the original estimate dated
                       8/03/09 without affecting the Guaranteed Maximum Price. A
                       Management Revision will be created by the Contractor and presented to
                       the Owner showing the internal movement of money within the line items
                       of the attached summary.

Article 7      Costs to be Reimbursed
               7.4    Costs of Materials and Equipment Incorporated in the Completed
                      Construction

               7.4.3   All tools and equipment, whether rented or owned by the Contractor, shall
                       be billed at the fixed price as established in lines #153, 154, 155, 191 and 193 of the
                       Estimate.

Article 10     Subcontracts and Other Agreements
               10.4   Contractor shall have no obligation or responsibility to direct the means,
                      methods, procedures or techniques of any contractors directly retained or
                      contracted by the Owner or its designated representatives on the Project, nor shall
                      Contractor have any responsibility for the failure of any of Owner's separate
                      contractors, design professionals or agents. Owner shall be responsible for the acts
                      and omissions of its separate contractors, employees, representatives and any other
                      persons or entities performing portions of the work for or on behalf of the Owner
                      or its separate contractors.

Article 11     Accounting Records
               11.1   Labor Rates for Christian Thomas Construction Inc. employees are as
                      follows:

                      ~~Project Manager~~      ~~$65 per man hour~~   *SMC*  *OCT. 13, 2012*
                      ~~Superintendent~~       ~~$75 per man hour~~

                                              1

ETTER000179

| Carpenter Foreman | $60 per man hour |
| Carpenter | $57 per man hour |
| Carpenter Assistant | $43 per man hour |
| Labor Foreman | $36 per man hour |
| General Labor | $29 per man hour |
| Painter / Plasterer | $57 per man hour |

Some of Christian Thomas Construction Inc.'s payroll is subcontracted to a PEO (Professional Employee Organization) or an employee leasing company.

11.2    Employees of Christian Thomas Construction Inc. call in their hours each day to our bookkeeper. Our bookkeeper then creates a time sheet based upon tasked worked, hours worked and established labor rates (as outlined in Section 11.1).

11.3    At certain times during the construction process the Contractor may choose to use certain craftsman that are employed as contract labor under Contractor's insurance policy. These craftsman are billed out at a fixed rate of $ 60.00 per man hour.

11.4    The cost for Project Logistics as shown in line #158 of the estimate will be a fixed cost of $83,600.00. This cost was based upon 180 days of construction. This cost includes Contract Administration, On-Site Supervision, and Roger Thomas' hours dating back to 2009.

Article 17      Insurance and Bonds

17.1    Damage Before Completion – If between the date of this Contract and the Date of Completion, the Home and or Property is damaged by hurricane, fire or other casualty, the following shall apply:

      a. Risk of loss to the improvements by hurricane, fire or other casualty will be assumed by Owner. Owner agrees to provide insurance to cover losses.



2

ETTER000180

AIA Document A102 – 2007
Addendum II
ETTER RESIDENCE
18894 SE Jupiter Inlet Way, Tequesta, FL

Article 12        Payments
                  12.2     Final Payment

                  12.2.4   The Owner's final payment to the Contractor shall be made no later than
                           thirty (30) calendar days after:
                           (a) the issuance of the final Certificate of Payment by Contractor to Owner
                           (b) the issuance of a "pass" for the residential final inspection as pertaining
                           to the Contractor's Work as described in the contract documents.

Owner:                                                    Contractor:

_____  10/15/12                         _____  10/15/12
M/M Etter              /Date                               Christian Thomas Construction, Inc.   /Date

1

ETTER000181

| From: | SteveEtter |
| --- | --- |
| Sent: | Friday, December 14, 2012 1:49 PM |
| To: | lori@chinesedrywallscreening.com |
| Cc: | c e; Roger Thomas; Tatum Whiddon |
| Subject: | Re: Chinese Drywall Screening Client Agreements for Steve Etter / Preservation of Evidence (POE) & Storage of Evidence |

Lori,

It appears we need to get this effort started tomorrow. I can be at the house with a check so you will have your 50% at the start. Re: the price, Howard told me the cost was about $1 per square foot, which would be around $4,500. How on earth did we get to $6,200? Also, as an engineer, I can't figure out why square footage has much to do with the price anyway..e.g. four walls per room, our house has only 3 bedrooms. Our rental house is only 3,500 square feet, but has 5 bedrooms and more walls to sample. Perhaps you could enlighten me. After I hear from you, I will sign the contracts with any clarifications and bring them with me tomorrow also. Thanks.

Regards,

Steve

---

**From:** "lori@chinesedrywallscreening.com" <lori@chinesedrywallscreening.com>
**To:** "setter1@bellsouth.net"
**Sent:** Thu, December 13, 2012 9:26:50 AM
**Subject:** Chinese Drywall Screening Client Agreements for Steve Etter / Preservation of Evidence (POE) & Storage of Evidence

Dear Steve,

Per our conversation, attached please find our client agreements for the Preservation of Evidence (POE) and Evidence Storage. The POE cost of $6,200 includes the first year of evidence storage. Additional storage, if needed, is $300.00 per year.

We have estimated 4 days for pre-demo and demo with additional days at: $950.00, as needed. Our schedule would allow the pre-demo to begin Saturday, 12/15, and continue on Sunday, 12/16, and the demo to begin on Monday, 12/17, to finish on Tuesday, 12/18.

A 50% deposit is required prior to the pre-demo day. We charge a 3.5% finance charge for a credit card payment. The credit card authorization is at the bottom of page 2 of the POE agreement. Please initial and sign the agreement where applicable. Please email or fax the signed agreement back to me, my fax number is: 407-557-3421. Please advise, should you have any questions or concerns.

Thank you,

Lori Weyant
Operations Manager
**Chinese Drywall Screening, LLC**
772-224-8660

1

ETTER000182

*Confidentiality Note: The information contained in this electronic transmission is legally privileged and confidential, and is intended solely for the use of the individual identified hereinabove as the intended recipient. If the reader of this electronic transmission is not the intended recipient, you are hereby notified that any dissemination, distribution, publication, discussion, retransmission or reproduction of this communication is unauthorized and prohibited. If you have received this electronic transmission in error, please delete this communication immediately and notify the sender via reply email.*

ETTER000183



**CHINESE DRYWALL** SCREENING LLC
Inspections and documentation from leading experts

# Storage Agreement

This Storage Agreement is executed in duplicate this <u>December 12, 2012,</u> Between Chinese Drywall Screening, LLC, a Florida Limited Liability Company (hereinafter referred to as CDS) and, <u>Steve Etter,</u> (hereinafter referred to as Client) whose present contact information is as follows:

CDS:                                                          Client:

Chinese Drywall Screening, LLC                  <u>Steve Etter</u>
501 SE Port St. Lucie Blvd., Ste. 101         Property Address: <u>18894 SE Jupiter Inlet Drive</u>
Port St Lucie, FL  34984                                               <u>Tequesta, FL  33469</u>
Attn: Storage Department                            Mailing Address: _____
Phone: (772) 224-8660                                           _____
E-mail <u>storage@chinesedrywallscreening.com</u>            E-mail: _____
                                                                       PH: _____

Storage Collection and Commencement Date: _____

1.  This is a month to month Storage Agreement: having a minimum term of one (l) month, commencing on the Storage Collection and Commencement Date as described above.  Fees shall begin at the first of the subsequent month following the collection of evidence.  All storage fees are due and payable in U.S. funds, without demand, in advance on storage fee due date which is the first day of each month.  Storage Agreement expires on the last day of the paid thru period and shall automatically renew upon the accepted advanced storage fee payment each month CDS is in possession of the stored evidence. CDS may terminate this Agreement at their option if Client is not in full compliance with the terms of this Storage Agreement. Time and costs for depositions and/or court appearances are not included and, if required, shall be charge at the current rates at the time of service or occurrence.

2.  In the event the Client's account is delinquent: by close of business on the fifth (5th) day past your due date, a LATE FEE of $10.00 will be assessed to the Clients account due and payable immediately upon posting. If the account is still delinquent at the close of business on the fifteenth (l5th) day past your due date an additional 10.00 late fee will be assessed to the Clients account. Any account twenty (21) days past due will be considered in default an additional default and pre-foreclosure fee of $25.00 will be assessed. A "Late Fee" is a fee or charge that is an estimate of any loss incurred by CDS for occupant's failure to pay storage fee when due. A late fee is not a penalty, interest on a debt, nor is a late fee a reasonable expense that CDS may incur in the course of collecting unpaid storage fee or in enforcing the owner's lien right.

3.  THERE WILL BE A RETURNED CHECK FEE OF $25.00 FOR ANY CHECKS NOT PAID BY THE BANK ON WHICH THEY WERE DRAWN. SUBSEQUENT PAYMENT MUST BE IN CASH. WE DO NOT REPROCESS RETURNED CHECKS. ACCESS TO THE ASSIGNED SPACE WILL BE DENIED AND ADDITIONAL LATE FEES WILL BE APPLIED UNTIL THE ACCOUNT IS PAID IN FULL. THE RECEIPT OF A CHECK SHALL NOT BE CONSIDERED PAYMENT TO CDS IF THE CHECK IS DISHONORED OR NOT PAID FOR ANY REASON.  IF CLIENT'S CHECKS ARE DISHONORED MORE THAN ONCE, FOR ANY REASON, CDS MAY REQUIRE THAT ALL FUTURE STORAGE FEES SHALL BE PAID BY CERTIFIED CHECK, MONEY ORDER, CASHIER'S CHECK OR CASH. ONCE A LATE FEE HAS BEEN CHARGED AND ACCESS IS RESTRICTED, PAYMENT MUST BE MADE BY CASH, MONEY ORDER OR CERTIFIED CASHIER'S CHECK FOR IMMEDIATE ACCESS.  LATE PAYMENTS PAID BY CHECK REQUIRE A TEN (10) DAY HOLD BEFORE ACCESS IS GRANTED.

4.  **In the event any storage fee shall be due and unpaid,** or Client shall default in any of the covenants or conditions herein contained, or if the evidence shall be abandoned by Client, CDS may elect among the following: A.) Terminate this Storage Agreement upon written notice to Client and may restrict access to space to protect and preserve the contents thereof. B.) In the event CDS reasonably deems the stored evidence to have been abandoned by Client, CDS may seize and take possession of said property and after written notice to Client if the storage fee and expenses due to CDS are not paid, may take possession of and dispose of or sell said property by public sale, or other demise, the contents for the payment of said storage fee and expenses. From the sale proceeds CDS shall deduct all past due storage fee and expenses relating to taking possession and sale of said property, or seek any other remedies provided by law. An additional charge shall be applied for the labor, advertising and disposal of said contents in the amount of no less than $100.00, to be assessed to the Clients account no sooner than thirty days past the due date.

5.  **Client shall give CDS ten (10) days written notice** to remove contents from storage for either disposal or turned over to a Client's authorized representative in order to avoid responsibility for the payment of the next month's storage fee. Client understands that there is NO REFUNDS of any unused storage fees.

Case 2:09-md-02047-EEF-MBN Document 22380-45 Filed 12/02/19 Page 36 of 179
Case 1:11-cv-22408-MGC Document 276-4 Entered on FLSD Docket 09/18/2013 Page 69 of
164

**CHINESE** | SCREENING
**DRYWALL**

6. **Insurance:** Client acknowledges that CDS DOES NOT PROVIDE INSURANCE covering Client's stored property. Client agrees to maintain, at Client's expense, a policy of fire and extended coverage insurance for loss by way of theft, vandalism and malicious mischief, with endorsements for the full value of the Client's property being stored. To the extent that Client does not maintain that insurance, Client shall be deemed to have self insured totally (i.e. Client has chosen not to insure their property, or any portion thereof, with any duly licensed insurance company) and shall bear the entire burden of loss or damage to their property or any portion thereof. CDS shall not be liable to Client or Client's invitee, family, employees, agents or servants for any personal injuries or property damage or loss from theft, vandalism, fire, smoke, water, hurricane, rain, tornado, explosion or Act of God or any other cause whatsoever, even should such loss be caused by the act, error, omission or negligence of CDS or its employees, agents, servants or assigns. Client acknowledges that CDS does not agree to provide protection for the facility, the space or the contents thereof. Further, no bailment(s) is/are created hereunder by way of this agreement. Client agrees that in the event he/she/it elects to purchase insurance as outlined, CDS shall be named as an additional insured under the certificate of insurance for the benefit of protection from any damage/damages of whatever nature caused by the Client's use of the facilities. These insurances are a material condition of this agreement and are for the benefit of both CDS and Client. Further, Client agrees that the carrier of such insurance shall not be subrogated to any claim or Client against CDS, CDS's employees or agents. CLIENT AGREES TO INDEMNIFY AND HOLD HARMLESS, from any expense, cost or damage incurred by reason of any claim or action based in whole or in part upon such subrogation, even should such loss be caused by or through the error, omission or negligence of CDS or any agent, employee or assign of CDS. While certain information may be made available to the Client with respect to insurance, CDS, AND CDS'S AGENTS, ASSIGNS, AND EMPLOYEES ARE NOT INSURERS OF THE CLIENT'S PROPERTY IN ANY MANNER. Further, CDS and CDS's agents, assigns and employees are not representatives of, nor are they affiliated with any insurance carrier or underwriter and do not act as any insurance company's agent, broker, solicitor and shall not assist in the explanation of coverage or in the making of claims under any insurance policy.

7. **Non-Liability of CDS and Insurance Obligations of Client:** All stored evidence and property shall be controlled by CDS at all times. However, storage shall be at Clients sole risk. CDS carries no insurance which in any way covers any loss whatsoever that Client may claim and therefore Client must obtain insurance desired at his own expense. CDS strongly recommends that Client secure his own insurance to protect himself and his property against all perils of whatsoever nature. If Client does not obtain insurance coverage for the full value of their property, whether perceived, inherent or actual, Client will personally assume all risk of loss to the property in accordance with this Storage Agreement.

Release of CDS's Liability - Client acknowledges that CDS does not warrant or represent that stored property will be safely kept, nor that it will be secure against any hazards caused by rodents, insects, water, and fire, elements of weather, hurricane, rain, tornado, earthquake or Act of God. It is agreed by Client that this release of CDS's liability is a bargained for condition of the storage fee set forth here and that were CDS not released from liability as set forth, a much higher storage fee would have to be agreed upon between the parties. However, CDS shall, at all times throughout the time of storage, keep the evidence within a locked storage unit with controlled access. Storage facility shall have security measures including, but limited to, lockable spaces, controlled access buildings, controlled access grounds and video surveillance. CDS shall not be liable for loss or damage resulting from failure, interruption or malfunction of the utilities of storage facility.

8. **Client's Right to Enter, Inspect and/or Collect:** Upon the request of Client, CDS shall provide access to Client to enter the storage space for the purpose of inspection or collection. 2 business days minimum notice shall be provided with access during normal business hours only. Access fees shall apply.

9. **Contractual Lien:** In addition to any liens and remedies provided by law to secure and collect storage fee, and cumulative therewith, CDS is hereby given a contractual lien upon property, now or at any time hereafter, stored as part of this agreement, to secure the timely performance of this agreement by Client and secure the payment of all storage fees, charges and costs incident to Clients default. Furthermore, CDS has a lien on all property stored as part of this agreement for payments of storage fee or other charges that are due and unpaid by the Client pursuant to the applicable laws in Florida. In addition, Client agrees to reimburse CDS for all costs incurred by CDS in enforcing any lien, including but not limited to, inventory of stored property and reasonable storage costs as may be provided by law. In the event that any lien is satisfied prior to sale, CDS shall have three (3) days thereafter to release liened property, which may have been removed or resecured during lien enforcement. CDS is not responsible for any damage(s) or breaks in chain-of-custody included during removal or re-secure of property. ALL PAYMENTS MADE TO SATISFY OUTSTANDING LIEN AMOUNTS AND CHARGES SHALL BE PAID BY CERTIFIED CHECK, CASHIER'S CHECK, MONEY ORDER, OR CASH ONLY.

10. **Default:** Time is of the essence in the performance of this agreement and in the payment of each and every installment of storage fees and charges herein covenanted to be paid. If any storage fee or charge shall be due and unpaid, if Client shall fail or refuse to perform any of the covenants, conditions, or terms of this agreement, Client shall be conclusively deemed in default in the performance of this agreement.

In case of default at its option and without prejudice to any other remedies, CDS may:
A. Terminate the storage agreement

CHINESE
DRYWALL SCREENING

B. Seize and sell the property against which a lien has attached under the applicable laws of the state of Florida. In accordance with the provisions as said property code section, which provide said property will be advertised for sale by newspaper, publication or by posting and sold at public sale to the highest bidder at the self-service storage facility, or at a reasonably nearby public place following written notice of CDS's claim being sent to Client, default has continued until the 15th day after the day on which the first notice of sale was published or posted; or

C. Seize and sell the property against which a lien has attached under the applicable laws of the State of Florida, in accordance with a judgment by court of competent jurisdiction that forecloses the lien and orders the sale of the property.

11. **Property Not Sold**: If any of the property remains unsold after CDS has complied with all relevant requirements of the applicable laws of the State of Florida, CDS may otherwise dispose of said property in any manner considered appropriate by CDS, including, but not limited to, destroying the personal property.

12. **Breach of Covenants or Conditions**: A breach of any of the covenants or condition of this agreement by the Client shall, at the option of CDS, terminate this Storage Agreement and at which time said Storage Agreement shall become null and void.

13. **Waiver**: No waiver by CDS, his agents, representatives or employees of any breach of default in the performance of any covenant, condition or term contained herein shall constituted a waiver of any subsequent breach or default in the performance of the same or any other covenant, condition or term hereof.

14. **Change of Terms**: All terms of this agreement, including without limitation, monthly storage fee rates, conditions of storage, and charges are Subject To Change Upon (30) Days Prior Written Notice to Client. If changes are made, the Client may choose to terminate this agreement and is free to do so upon rendering and fulfilling Clients own 10 day notice to terminate. If the Client does not give such notice, the change shall become effective and apply to the storage of subject evidence.

15. **Recovery of Attorney's Fees and Costs**: In the event any action be instituted or other proceedings taken to enforce any term, covenant or condition herein contained or to recover any storage fee or charge due or to recover possession of the space or facility for any default or breach of this storage fee agreement by Client, Client agrees to and shall pay CDS's reasonable attorney's fees, costs and expenses in connection therewith.

16. **Indemnify and Hold Harmless**: The Client agrees to indemnify and hold harmless CDS from any and all costs, disbursements, expenses, ( Including attorney's fees) demands, claims, actions, or causes of action arising directly or indirectly from this agreement or any renewal or extension thereof.

17. **Change of Address**: It shall be the duty of the Client to furnish.CDS notification in writing at CDS's address provided herein, of any change of address or phone number.

18. **No Oral Agreements**: This Storage Agreement contains the entire agreement between CDS and Client, and NO ORAL AGREEMENTS shall be of any effect whatsoever. Client agrees that he/she/it is not relying on and will not rely on any oral representation made by CDS, or by CDS's agents, employees, assigns or servants purporting to modify, change, add to or limit this agreement in any way.

19. **Severability Clause**: If any part of this agreement for any reason is declared invalid, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain if full force and effect as if the agreement had been executed with the invalid portion thereof eliminated, it is hereby declared the intention of the parties that they would have excluded the remaining portion of this agreement without including any such part.

20. **Succession**: All the provisions hereof shall apply to and be obligatory upon the parties and their heirs, assigns, executors, administrators, representatives, and successors of the parties hereto.

21. **Florida Law to Apply**: This agreement and any action arising between the parties shall be construed under and in accordance with the substantive laws of the State of Florida. Should any action be brought by Client, or any agent/assignee, successor in interest, representative or any person/entity/estate whomsoever seeking to enforce the terms and conditions of this agreement or advance any claim, of any nature whatsoever against CDS, venue for any such claim/suit/action shall be brought only in the State of Florida, County of St Lucie.

22. **Waiver of Jury Trail**: Client hereby waives his/her/its rights to trial by jury of any cause of action, claim, counterclaims, cross claims or any other cause of action brought by either CDS against Client or Client against CDS on any matter arising out of, or in any way connected with, this storage fee agreement, or the enforcement of any remedy under any law, statue or regulation.

Storage Agreement
Rev. 12/12/2012

Page 3 of 4

Initial____
Client: ____

ETTER000186

**CHINESE DRYWALL** SCREENING

23. **Limitations on Actions to Bring Suit:** Any claims, suits or defenses to any action brought by Client which may arise out of this agreement or its preliminary negotiations, or out of the parties performances hereunder, or for the loss or damage to stored property or personal injury shall be barred unless commenced by Client within one (1) year after the date of the alleged loss giving rise to the suit, action or claim.

24. **Exclusion of All Warrantees:** The agents and employees of CDS are not authorized to make warranties about the space, premises, or facility referred to in this agreement as CDS agents and employees oral statements do not constitute warranties. The parties hereto agree that the implied Warranties of Merchantability and Fitness for a Particular Purpose and all other warranties, expressed or implied, are excluded from this transaction and shall not apply to the storage space, premises, and facility referred herein.

25. **Entire Agreement Clause:** This agreement constitutes the sole and only agreement of the parties hereto and supersedes any prior understandings, either by written or oral agreement, between the parties respecting the subject matter contained herein. No amendment or alteration of the terms hereof shall be binding unless the same is in writing, dated subsequent to the date hereof, and duly executed by the parties hereto, or unless such terms are modified pursuant to the provisions of paragraph 12 above.

26. **Headings:** The headings of various provisions of this agreement have been included for the convenience of the parties and are not to be used in construing this agreement nor in ascertaining the intentions of the parties.

**Fees**

| | | |
|---|---|---|
| Annual Storage Fee | $ | 300.00 |
| Access Fee per Occurrence | $ | 75.00 |
| Disposal Fee | $ | 200.00 |
| | $ | |

Payment options:
1) Make checks payable to: Chinese Drywall Screening, LLC
2) Visa/MasterCard/Discover/American Express*

**\*3.5% surcharge for credit card transaction shall apply**

Cardholder Name: _____
Card Number: _____
Expiration Date: _____ CVV Code: _____

IN WITNESS WHEREOF, the parties hereto have executed this contract the day and year first written above.

**CLIENT:**                                      **CDS:**

_____                 Chinese Drywall Screening, LLC
CLIENT NAME                                      CDS NAME

BY: _____             BY: _____
SIGNATURE                                        SIGNATURE

_____                 Howard Ehrsam, President
PRINTED NAME                                    PRINTED NAME AND TITLE

DATE: _____           DATE: _____


CHINESE SCREENING
DRYWALL

# This Contract limits the liability of Chinese Drywall Screening, LLC. Please read it carefully.

This is a contract between the Client and Chinese Drywall Screening, LLC

Client: **STEVE ETTER**

Date: **DECEMBER 12, 2012**

I (Client) hereby request a **destructive investigation and preservation of evidence** of the home at the address identified below to be conducted by Chinese Drywall Screening, LLC (CDS). I have read the following agreement carefully, and understand that I am bound by the terms of the contract. **Please initial here** _____

## 1- Scope of the Investigation
CDS agrees to perform limited destructive investigation and preservation services, to the extent reasonably feasible, in accordance to the guidelines provided in Pre-Trial Order 1(I).

## 2- Outside the Scope of Investigation
Providing access to property and the suspect area(s) is the responsibility of the Client. CDS does not include moving furnishings or personal property. Unless otherwise agreed, repairs are not included. This includes, but not limited to, drywall, plumbing, HVAC and electrical components. If any conditions require repair, or the inspector recommends consulting specialists in any trade, craft or profession, the Client must do so at the Client's choice and expense. Time and costs for depositions and/or court appearances are not included and, if required, shall be charge at the current rates at the time of service or occurrence.

## 3 - Deliverables
The Client acknowledges that inspectors for Chinese Drywall Screening, LLC are generalists, and are not acting as licensed engineers or experts in any craft or trade. Digital copies of reports, photos and videos shall be provided. Unless otherwise agreed, physical evidence shall be turned over to Client's representative upon completion. Provided documentation is only a summation of observations made by the inspector, based on current known information regarding tainted drywall.

## 4- Disclaimer of Warranty
**The Client acknowledges that the report is in no way a written warranty, guarantee, insurance policy, or substitute for legally required disclosures.**

## 5- Indemnity for 3rd Party use
The Client agrees to indemnify, defend, and hold harmless CDS from any third party claims relating to this investigation or investigation report.

## 6- Arbitration
Any dispute concerning the interpretation of this agreement or arising from this investigation and report shall be resolved informally between the parties or by arbitration by an arbitrator who is agreed upon by the parties. The parties agree that any action which is required to be filed to enforce the terms of this Agreement shall be filed in St. Lucie County, in the State of Florida.

## 7- Attorney's Fees
The prevailing party in any dispute arising out of this agreement shall be awarded all attorney fees, arbitrator fees, and other costs.

## 8- Severability
Client and CDS agree that should a Court of Competent Jurisdiction determine and declare any portion of this contract void, avoidable, and unenforceable, the remaining provisions and portions shall remain in full force and effect.

## 9- Time Limits for Claims
Any claims, or legal actions, including the arbitration described in paragraph six (6), including, but not limited to, those proceedings involving claims arising from this investigation against CDS must be brought within one (1) year from the date of the investigation. Failure to bring said action within one (1) year from the date of the investigation is a full and complete waiver of any rights, actions, or causes of actions that may have arisen there from.

## 10 – Disclosures
Client represents that there has been none of the following that has not been disclosed: 1) no previous inspections for reactive drywall, 2) no modifications to components subject to the affects of reactive drywall and 3) no renovations.

ETTER000188

Rev. 12/13/12

Case 2:09-md-02047-EEF-MBN Document 22380-45 Filed 12/02/19 Page 30 of 179
Case 1:11-cv-22408-MGC Document 27624 Entered on FLSD Docket 08/13/2013 Page 3 of 164

**11 - Limitation on Liabilities** – CDS shall indemnify and hold Client harmless for any and all affects associated with Chinese drywall. CDS shall maintain liability and workers compensation insurance. A certificate is available upon request. CDS's liability for any and all acts arising under this agreement shall be limited to a refund of the fee paid for services rendered. The liability of CDS's principals, inspectors, or employees is also limited to the fee paid. This liability limitation is binding on the Client and the Client's spouses, heirs, principals, assigns, and anyone else who may otherwise claim through the Client.

**12 – 50% is due prior to commencement, payment in full, as indicated below, is due upon completion.**

**13 –** Client authorizes CDS to share the report with various research companies, government agencies or other organizations in order to aid in research and development._____(Client initials)

**14 –** CDS reserves the right to amend our report if additional, pertinent information is discovered.

**15 -** This Agreement represents the entire agreement between CDS and the Client. No change or modification shall be enforceable against either party unless such change or modification is in writing and signed by all parties. This agreement shall be binding and enforceable by the parties and their heirs, executors, administrators, successors, and assigns.

**Fees**

| | |
|---|---|
| Base Preservation Fee (4 Days Demo) | $ 6,200.00 |
| Handling and storage | $ 300/yr with $75 access fee (1st year included) |
| Disposal Fee (If needed) | $ 200.00 |
| Additional Days Demo (as needed)* | $ 950.00* |
| Balance Due (4 Days Demo) | $ 6,200.00* |

(see payment options below)

**Client/Job Address:**    STEVE ETTER
18894 SE JUPITER INLET DR
TEQUESTA, FL 33469

**Mailing Address:** _____

**Signed:** _____    **Date:** ___/___/___
Client

**Signed:** _____    **Date:** 12/13/2012
for Chinese Drywall Screening, LLC

Payment options:
1) Make checks payable to: Chinese Drywall Screening, LLC
2) Visa/MasterCard/Discover/American Express*

**\*3.5% surcharge for credit card transaction shall apply**

Visa/MasterCard (circle one);    Cardholder Name: _____
Card Number: _____
Expiration Date: _____ CVI Code: _____

Chinese Drywall Screening, LLC
501 SE Port St. Lucie Blvd., Ste. 101, Port St Lucie, FL 34984
PH: 772-224-8660 ◊ FX: 407-557-3421
www.chinesedrywallscreening.com

Rev. 12/13/12                                                                              ETTER000189

| From: | Roger Thomas <roger.christianthomas@gmail.com> |
|---|---|
| Sent: | Tuesday, April 2, 2013 3:56 PM |
| To: | Tatum Whiddon |
| Subject: | ETTER INVOICE |
| Attachments: | Change order 3 Insurance .xls; signature0.png |

Steve Etter, ask that I forward you this invoice

Roger Thomas


CHRISTIAN THOMAS CONSTRUCTION, INC
935 TOWN HALL AVENUE
JUPITER, FLORIDA 33458
P: 561.339-0573

christianthomasgc.com (mailto:christianthomasgc@gmail.com)

1

ETTER000190



CHRISTIAN THOMAS
CONSTRUCTION INC

935 Town Hall Avenue Jupiter Florida 33458
P: 561.330.0573    www.christianthomasgc.com

Project:    Steve and Cathy Etter Residence
            18894 SE Jupiter Inlet Way
            Tequesta, Florida , Martin County

Date of Invoice    March ,1 2013

## Change Order - 3

Drywall Screening and micro cleaning and testing

The extent of detailed micro cleaning and the addition of several processes including cleaning over scrap, dust partial, chemical washing of every piece of ceiling framing, wall framing, wood framing components, masonry components, recessed light fixtures, all switch and outlet boxes and other components that remained in the house, finally to HEPA vacuumed all of the same components to free all from the contamination of Chinese Drywall Particulates. All of which was dictated by the engineer, all certified by the same engineer and the eventual issuance of a clean environment certificate This extensive cleaning operation took 11 weeks to accomplish adding 11 weeks to the job. The 11 week add is represented by the charge for the additional time for the Project Logistics indicated as the last item on this change order.

| Drywall Screening | | |
|---|---|---|
| Supervision | | |
| 3.01 | Additional labor for drywall screening coordination 18 hrs @$75, Week Ending 12/17 | $1,350.00 |
| 3.02 | Micro Cleaning Supervision W/E 12/31/12 | $450.00 |
| Micro cleaning | | |
| 3.03 | Work as directed by the Drywall screening co, including samples of all drywall, micro cleaning HEPA Air scrubbing, HEPA vacuuming. | |
| | Week ending 12/31 | $4,618.00 |
| | Week ending 1/7/13 | $2,932.00 |
| | Week ending 1/14/13 | $2,329.00 |
| | Week ending 1/21/13 | $5,916.00 |
| | week ending 1/28/13 | $6,690.00 |
| | week ending 1/31/13 | $2,885.50 |
| | work is still in progress as of the date of the billing | |
| 3.04 | Month of February micro cleaning complete HEPA vac and chemical wash all components with approved chemicals this included all metal studs, | |

ETTER000191

metal framing Ceiling and soffit framing wood components that were in contact with the contaminated drywall. Upon completion clearance testing
passed the inspection of the air quality inspector and a certificate was issued

| | | |
|---|---|---|
| Week ending 9/4/15 | | $2,232.00 |
| Week ending 9/11/15 | | $4,285.00 |
| Week ending 9/18/15 | | $3,840.00 |
| Week ending 9/25/15 | | $5,499.00 |
| Week ending 9/28/15 | | $3,319.00 |
| AIR SCRUBBERS | Air scrubber rental 92 days x 4 units at $78 | $11,760.00 |
| | Replacement filters HEPA 4 ea. @ $185 | $740.00 |
| | Replacement primary and secondary dust filters 84 x 4 =$96 ea. @ $4.25 changed daily 4 units | $1,428.00 |
| | HEPA Vacuum charges 3 ea. 5 weeks | $2,160.00 |
| | HEPA Vac filter replacements 3 each @ 120 | $360.00 |
| Logistics | 11weeks additional Project Logistics delay in project completion @$ 9365 per/week | $41,505.00 |
| Engineering | BMC Consulting, engineering clearance testing and certification of Air quality and free of Chinese contamination. | $4,950.00 |
| Screening | Screening engineering cost, Chinese Drywall Screening LLC | $5,000.00 |
| Storage | Additional 11 weeks of storage of owners furnishings | $1,486.00 |

This change order has affected the time of completion by an additional 60 days.

| | | | | |
|---|---|---|---|---|
| Project Manager | $65 p.m.h | Carpenter Assistant | $43 p.m.h | Subtotal $117,734.50 |
| Superintendent | $75 p.m.h | Labor Forman | $36 p.m.h | |
| Carpenter Forman | $60 p.m.h | General Labor | $29 p.m.h | |
| Carpenter | $57 p.m.h | Painter/Plaster | $57 p.m.h | Contractor Fee (20%) $23,546.90 |

The change oeder is time sensetive and the affect of this change order increases the schedule and completion of the project by and additional 11 weeks. Time added to the contract.

**Change Order Total** $141,281.40

ETTER000192



# BMC CONSULTING, LLC

### ETTER RESIDENCE – IAQ CLEARANCE REPORT FOR CHINESE DRYWALL REMEDIATION

January 31, 2013

Etter Residence
18894 SE Jupiter Inlet Way
Jupiter, FL 33469

Reference: Chinese Drywall Remediation Effort

Weather Conditions: 88 deg. F
Skies: Clear
Rain: None

## EXECUTIVE SUMMARY:

BMC Consulting, LLC representative Bruce M. Ciarlariello, P.E., LEED AP, CMR, CxA was on-site with Cristian Acero (ACECA Construction) and Clay Thomas (Christian Thomas Construction) to observe the Etter Residence for the removal of the drywall, electrical wiring, plumbing copper piping and refrigerant copper piping.

BMC Consulting and ACECA Construction conduct periodic site visits during the remediation and flush out phase as well as reconstruction phase to observe the National Association of Home Builders (NAHB) guidelines were followed. Site visits were conducted on 01-22-2013, 01-25-2013, 01-30-2013 and 02-01-2013.

During these site visits photographic documentation was collected of the progress as well as providing verbal feedback and guidance to the on-site Project Manager Clay Thomas for the effort.

**BMC Consulting, LLC** (CA-29409)
8297 Rosalie Ln, Wellington, FL 33414 – Phone: 1-561-644-1329 – Fax: 1-561-296-5260
E-mail: bruce@bmcconsultingllc.com website: www.bmcconsultingllc.com

ETTER000194

# BMC CONSULTING, LLC

ETTER RESIDENCE – IAQ CLEARANCE REPORT FOR CHINESE DRYWALL REMEDIATION

## PHOTOGRAPHIC DOCUMENTATION:

Photo's of the 01-22-2013 site visit are shown below and are representative of the effort.



Photo 1



Photo 2



Photo 3



Photo 4

**BMC** Consulting, LLC (CA-29409)
8297 Rosalie Ln, Wellington, FL 33414 – Phone: 1-561-644-1329 – Fax: 1-561-296-5260
E-mail: bruce@bmcconsultingllc.com website: www.bmcconsultingllc.com

ETTER000195

# BMC CONSULTING, LLC

ETTER RESIDENCE – IAQ CLEARANCE REPORT FOR CHINESE DRYWALL REMEDIATION



Photo 5

Site visit was conducted on Friday, January 25, 2013 to observe the progress made with the cleaning of the metal studs as well as the removal of the electrical wiring. The photos below are representative of the effort made by the contractor ,while complying the NAHB guidelines.



Photo 1



Photo 2

**BMC Consulting, LLC** (CA-29409)
8297 Rosalie Ln, Wellington, FL 33414 – Phone: 1-561-644-1329 – Fax: 1-561-296-5260
E-mail: bruce@bmcconsultingllc.com website: www.bmcconsultingllc.com

# BMC CONSULTING, LLC

### ETTER RESIDENCE – IAQ CLEARANCE REPORT FOR CHINESE DRYWALL REMEDIATION



Photo 3

Photo's of the 01-30-2013 site visit are shown below and are representative of the effort. These photo's show the **ODORKLENZ** product used and applied to the metal stud framing of the house to comply with the NAHB remediation protocol.



Photo 6



Photo 6

**BMC Consulting, LLC** (CA-29409)
8297 Rosalie Ln, Wellington, FL 33414 – Phone: 1-561-644-1329 – Fax: 1-561-296-5260
E-mail: bruce@bmcconsultingllc.com website: www.bmcconsultingllc.com

ETTER000197

# BMC CONSULTING, LLC

### ETTER RESIDENCE – IAQ CLEARANCE REPORT FOR CHINESE DRYWALL REMEDIATION



Photo 7



Photo 8

Photo's of the 02-01-2013 site visit are shown below and are representative of the effort. The photos below are representative of the effort made by the contractor, while complying the NAHB guidelines.



Photo 1



Photo 2

BMC Consulting, LLC (CA-29409)
8297 Rosalie Ln, Wellington, FL 33414 – Phone: 1-561-644-1329 – Fax: 1-561-296-5260
E-mail: bruce@bmcconsultingllc.com website: www.bmcconsultingllc.com

ETTER000198

# BMC CONSULTING, LLC

### ETTER RESIDENCE — IAQ CLEARANCE REPORT FOR CHINESE DRYWALL REMEDIATION



Photo 3



Photo 4



Photo 5



Photo 6

**BMC** Consulting, LLC (CA-29409)
8297 Rosalie Ln, Wellington, FL 33414 — Phone: 1-561-644-1329 — Fax: 1-561-296-5260
E-mail: bruce@bmcconsultingllc.com website: www.bmcconsultingllc.com

ETTER000199

# BMC CONSULTING, LLC

ETTER RESIDENCE – IAQ CLEARANCE REPORT FOR CHINESE DRYWALL REMEDIATION

## EXECUTIVE CONCLUSION:

The Etter Residence was remediated as per the NAHB guidelines. The Chinese drywall, originally used for the construction of the house, has been completely removed. The building materials were which were impacted by the Chinese drywall were cleaned, sanitized, coated with disinfecting agents as noted above in the body of the report, and the house was placed under a negative pressure via negative air machines in addition to re-circulating air scrubbers for a period of time to cleans the air of impurities related to the Chinese drywall.

All areas of the metals studs were Hepa-Vacuumed to rid of dust and debris. The electrical wiring and copper plumbing piping throughout the house was replaced with new construction materials.

Based upon the efforts put forth and acknowledging the NAHB guidelines were followed, the house has been observed to comply with all requirements and meets the intent of the effort.

Sincerely,

Bruce M. Ciarlariello, P.E., CMR, LEED AP, CxA
President
BMC Consulting, LLC



**BMC Consulting, LLC** (CA-29409)
8297 Rosalie Ln, Wellington, FL 33414 – Phone: 1-561-644-1329 – Fax: 1-561-296-5260
E-mail: bruce@bmcconsultingllc.com website: www.bmcconsultingllc.com

ETTER000200



# LUMBERMEN'S

LCA LUMBERMEN'S

CORPORATE HEADQUARTERS
701 East Commercial Blvd
Fort Lauderdale FL 33334-3261
(954) 771-2100 Fax (954) 771-1777

## NOTICE TO OWNER / NOTICE TO CONTRACTOR

**WARNING!** FLORIDA'S CONSTRUCTION LIEN LAW ALLOWS SOME UNPAID CONTRACTORS, SUBCONTRACTORS, AND MATERIAL SUPPLIERS TO FILE LIENS AGAINST YOUR PROPERTY EVEN IF YOU HAVE MADE PAYMENT IN FULL. UNDER FLORIDA LAW, YOUR FAILURE TO MAKE SURE THAT WE ARE PAID MAY RESULT IN A LIEN AGAINST YOUR PROPERTY AND YOUR PAYING TWICE. TO AVOID A LIEN AND PAYING TWICE, YOU MUST OBTAIN A WRITTEN RELEASE FROM US EVERY TIME YOU PAY YOUR CONTRACTOR.

LCA Request #: 497075-006

Certified Mail Number(s)   7108734718300132219-132220

**To Owner:**   **Certified Mail # 132219**
ETTER, STEVEN
ETTER, CATHY
18875 POND CYPRESS CT
JUPITER FL 33458

Date:   02/22/06

The undersigned hereby informs you that he has furnished or is furnishing services or materials as follows:
BUILDING MATERIALS                                      for the improvement of the real property identified as:
NOC:1963-464 in MARTIN County, FL  Recd:12/13/04
Street:  18894 SE JUPITER INLET WAY, JUPITER
Lot:4 Subdiv:EMERALD HARBOUR PB 15 PG 75
JUPITER INLET WAY SE,18894/RESIDENCE

under an order given by: SUNDOWN DEVELOPMENT & REALTY

Florida law prescribes the serving of this notice and restricts your right to make payments under your contract in accordance with Section 713.06, Florida Statutes. IN THE EVENT THAT THE CONTRACT FOR IMPROVEMENTS IS BONDED, PURSUANT TO SECTION 713.23, FLORIDA STATUTES, SECTION 255.05, FLORIDA STATUTES, TITLE 40 U.S.C, SECTION 270, OR ANY OTHER FORM OF BOND, THE UNDERSIGNED INTENDS TO LOOK TO THAT BOND FOR PROTECTION AND PAYMENT. THIS NOTICE IS NOT A LIEN, CLOUD NOR ENCUMBRANCE UPON TITLE TO YOUR PROPERTY, NOR IS IT A MATTER OF PUBLIC RECORD.

### IMPORTANT INFORMATION FOR YOUR PROTECTION

Under Florida's laws, those who work on your property or provide materials and are not paid, have a right to enforce their claim for payment against your property. This claim is known as a construction lien. If your contractor fails to pay subcontractors or material suppliers or neglects to make other legally required payments, the people who are owed money may look to your property for payment, EVEN IF YOU HAVE PAID YOUR CONTRACTOR IN FULL.

### PROTECT YOURSELF!

RECOGNIZE that this Notice to Owner may result in a lien against your property unless all those supplying a Notice to Owner have been paid. LEARN more about the Construction Lien Law, Chapter 713, Part I, Florida Statutes, and the meaning of this notice by contacting an attorney or the Florida Department of Professional Regulation.

All demands pursuant to Chapter 713 Florida Statutes are to be directed to:   BANNER SUPPLY CO. - PORT ST L

**By:**   Van Saliba        Agent For:

BANNER SUPPLY CO. - PORT ST LUCIE
(772) 466-1311
2101 NW SETTLE AVE
PORT ST LUCIE FL  34986
ATTN: PAT HOOD, NTO DEPT

General Contractor:
SUNDOWN DEVELOPMENT
PO BOX 3967
TEQUESTA FL 33469

LENDER :132220
FIRST NATIONAL BANK & TRUST
OF THE TREASURE COAST
PO BOX 9012
STUART FL 34995

3/18/09  3:15 PM

CHRIS -

" WILL GET BACK TO ME
w/ IF CHINEE DRYWALL
WAS USED," etc.
SE

HAS TO CHECK HIS
RECORDS.

ETTER000201



CHINESE DRYWALL | SCREENING LLC

Inspections and documentation from leading experts

# AUTHORIZATION and INDEMNIFICATION FOR EVIDENCE

# DISPOSAL

Name of Client: _STEVEN   ETTER_

Address of Property: _18894  SE JUPITER INLET WAY   TEQUESTA  FL  33469_

Client Mailing Address: ████████████████████████

Representing Attorney (optional): _____

Attorney Mailing Address (optional): _____

_____

Client hereby directs Chinese Drywall Screening, LLC (CDS) to immediately dispose of the evidence, pertaining to the subject property as of February 6, 2017. The Client has read and understands the requirements of MDL 2047 Pre-Trial Order No. 1(I) and the associated risks of destroying evidence. The Client agrees to indemnify, defend, and hold harmless CDS and all those affiliated from any claims or repercussions relating to this case.

Client Signature: _Steven M Etter_    Date Signed: _5/17/2017_

Printed Name: _STEVEN M. ETTER_

ETTER000202







ETTER000205



ETTER000206



ETTER000207



ETTER000206



ETTER000203



ETTER000210



ETTER000211







ETTER000214



ETTER000215





ETTER000217



ETTER000218



ETTER000219



ETTER000220



ETTER000221



ETTER000222



ETTER000223

Case 1:11-cv-22408-MGC Document 276-4 Entered on FLSD Docket 05/13/2015 Page 108 of 164



ETTER000224



ETTER000225

Case 2:09-md-02047-EEF-MBN Document 22380-45 Filed 12/02/19 Page 67 of 179
Case 1:11-cv-22408-MGC Document 276-4 Entered on FLSD Docket 05/13/2019 Page 110 of
164











ETTER000230

Case 2:09-md-02047-EEF-MBN Document 22380-45 Filed 12/02/19 Page 72 of 179
Case 1:11-cv-22408-MGC Document 276-4 Entered on FLSD Docket 05/13/2019 Page 115 of
164









ETTER000234



ETTER000235



ETTER000236





ETTER000238





ETTER000240



ETTER000241



Saturday, December 15, 2012

Inventory Item # _21_

Steve Etter
18894 SE Jupiter Inlet Way
Tequesta, Florida 33469

Type: Drywall Edge Tape

Wall Section ID: _15B_

ETTER000242









ETTER000246



ETTER000247



ETTER000246



ETTER000249



ETTER000250





ETTER000252





ETTER000254





ETTER000256



ETTER000257



ETTER000258





ETTER000260



ETTER000261



ETTER000262



ETTER000263



ETTER000264



ETTER000265



ETTER000266



ETTER000267



ETTER000268



ETTER000269



ETTER000270



ETTER000271





ETTER000273





EITER000275





ETTER000377





ETTER000279



# EXHIBIT D5

THIS FORM HAS BEEN APPROVED BY THE FLORIDA ASSOCIATION OF REALTORS® AND THE FLORIDA BAR

## "As Is" Contract For Sale And Purchase   "As Is"

1* PARTIES: _Owner of Record_ ("Seller"),
2* and _Dawn Maurer + Andrew Feldkamp_ ("Buyer"),
3 hereby agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property (collectively "Property")
4 pursuant to the terms and conditions of this Contract for Sale and Purchase and any riders and addenda ("Contract"):
5 I. DESCRIPTION:
6* (a) Legal description of the Real Property located in _Lee_ County, Florida:
7* _Lehigh Acres Unit 6 blk 35 P626 Pg 33 Lot 23_
8* (b) Street address, city, zip, of the Property: _5237 Butte St, Lehigh Acres Fl 33971_
9 (c) Personal Property includes existing range(s), refrigerator(s), dishwasher(s), ceiling fan(s), light fixture(s), and window treatment(s) unless
10 specifically excluded below.
11* Other items included are: _Washer, dryer, garage door opener + remote controls_
12*
13* Items of Personal Property (and leased items, if any) excluded are:
14*

15* II. PURCHASE PRICE (U.S. currency): ....................................... $ ~~125,000~~ 135,000 MF
16 PAYMENT: ~~Sunbelt Title N.S.~~ ~~7,500.00~~ MF
17* (a) Deposit held in escrow by _Title Professionals_ ("Escrow Agent") in the amount of (checks subject to clearance) $ 1,000.00
18* Escrow Agent's address: _____ Phone: _____
19* (b) Additional escrow deposit to be made to Escrow Agent within _____ days after Effective Date in the amount of.......... $ ~~121,250~~ MF
20* (c) Financing in the amount of ("Loan Amount") see Paragraph IV below ...................................... $ ~~124,000~~ MF
21* (d) Other _____ $
22 (e) Balance to close by cash, wire transfer or LOCALLY DRAWN cashier's or official bank check(s), subject
23* to adjustments or prorations .......................................................................................... $ 1,250.00 MF

24 III. TIME FOR ACCEPTANCE OF OFFER AND COUNTEROFFERS; EFFECTIVE DATE:
25* (a) If this offer is not executed by and delivered to all parties OR FACT OF EXECUTION communicated in writing between the parties on or
26* before _June 18, 2008_ the deposit(s) will, at Buyer's option, be returned and this offer withdrawn. Unless other-
27 wise stated, the time for acceptance of any counteroffers shall be 2 days from the date the counteroffer is delivered.
28 (b) The date of Contract ("Effective Date") will be the date when the last one of the Buyer and Seller has signed or initialed this offer or the
29 final counteroffer. If such date is not otherwise set forth in this Contract, then the "Effective Date" shall be the date determined above for
30 acceptance of this offer or, if applicable, the final counteroffer.

31 IV. FINANCING:
32* ☐ (a) This is a cash transaction with no contingencies for financing;
33* ☒ (b) This Contract is contingent on Buyer obtaining written loan commitment which confirms underwriting loan approval for a loan to purchase
34* the Property ("Loan Approval") within _30_ days (if blank, then 30 days) after Effective Date ("Loan Approval Date") for (CHECK ONLY
35* ONE): ☐ a fixed; ☐ an adjustable; or ☒ a fixed or adjustable rate loan, in the Loan Amount: (See Paragraph II.(c)) at an initial interest rate not to
36* exceed _per lender_ % and for a term of _30_ years. Buyer will make application within _5_ days (if blank, then 5 days) after Effective Date.
37 BUYER: Buyer shall use reasonable diligence to: obtain Loan Approval; notify Seller in writing of receipt of Loan Approval by Loan Approval
38 Date; satisfy terms of the Loan Approval; and close the loan. Loan Approval which requires a condition related to the sale of other property shall
39 not be deemed Loan Approval for purposes of this subparagraph. Buyer shall pay all loan expenses. Buyer authorizes the mortgage broker(s) and
40 lender(s) to disclose information regarding the conditions, status, and progress of loan application and Loan Approval to Seller, Seller's attorney,
41 real estate licensee(s), and Closing Agent.
42 SELLER: If Buyer does not deliver to Seller written notice of Loan Approval by Loan Approval Date, Seller may thereafter cancel this Contract by
43 delivering written notice ("Seller's Cancellation Notice") to Buyer, but not later than seven (7) days prior to Closing. Seller's Cancellation Notice shall
44 notify Buyer that Buyer has three (3) days to deliver to Seller written notice waiving this Financing contingency, or the Contract shall be cancelled.
45 DEPOSIT(S) (for purposes of this Financing Paragraph IV(b) only): If Buyer has used reasonable diligence but does not obtain Loan Approval
46 by Loan Approval Date, and thereafter either party elects to cancel this Contract, the deposit(s) shall be returned to Buyer. If Buyer obtains Loan
47 Approval or waives this Financing contingency, and thereafter the Contract does not close, then the deposit(s) shall be paid to Seller; provided how-
48 ever, if the failure to close is due to: (i) Seller's failure or refusal to close or Seller otherwise fails to meet the terms of the Contract, or (ii) Buyer's
49 fails to receive and approve an appraisal of the Property in an amount sufficient to meet the terms of the Loan Approval, then the deposit(s) shall be
50 returned to Buyer.
51* ☐ (c) Assumption of existing mortgage (see rider for terms); or
52* ☐ (d) Purchase money note and mortgage to Seller (see "As Is" Standards B and K and riders; addenda; or special clauses for terms).
53* V. TITLE EVIDENCE: At least _5_ days (if blank, then 5 days) before Closing a title insurance commitment with legible copies of instruments listed as
54 exceptions attached thereto ("Title Commitment") and, after Closing, an owner's policy of title insurance (see Standard A for terms) shall be obtained by:
55* (CHECK ONLY ONE): ☒ (1) Seller, at Seller's expense and delivered to Buyer or Buyer's attorney; or
56* ☐ (2) Buyer at Buyer's expense.
57* (CHECK HERE): ☐ If an abstract of title is to be furnished instead of title insurance, and attach rider for terms. _Aug 4 2008_ MF
58* VI. CLOSING DATE: This transaction shall be closed and the closing documents delivered on _July 30, 2008_ ("Closing"), unless
59 modified by other provisions of this Contract. In the event of extreme weather or other conditions or events constituting "force majeure", Closing will be
60 extended a reasonable time until: (i) restoration of utilities and other services essential to Closing, and (ii) availability of Hazard, Wind, Flood, or Homeowners'
61* insurance. If such conditions continue more than _14_ days (if blank, then 14 days) beyond Closing Date, then either party may cancel this Contract.

FAR/BAR ASIS-2x Rev. 2/08 © 2008 Florida Association of Realtors® and The Florida Bar All Rights Reserved Page 1 of 5

62 VII. RESTRICTIONS; EASEMENTS; LIMITATIONS: Seller shall convey marketable title subject to: comprehensive land use plans, zoning,
63 restrictions, prohibitions and other requirements imposed by governmental authority; restrictions and matters appearing on the plat or otherwise
64 common to the subdivision; outstanding oil, gas and mineral rights of record without right of entry; unplatted public utility easements of record
65 (located contiguous to real property lines and not more than 10 feet in width as to the rear or front lines and 7 1/2 feet in width as to the side
66 lines); taxes for year of Closing and subsequent years; and assumed mortgages and purchase money mortgages, if any (if additional items, see
67* addendum); provided, that there exists at Closing no violation of the foregoing and none prevent use of the Property for _____
68* ___Single Family Residence___ purpose(s).
69 VIII. OCCUPANCY: Seller shall deliver occupancy of Property to Buyer at time of Closing unless otherwise stated herein. If Property is intended
70 to be rented or occupied beyond Closing, the fact and terms thereof and the tenant(s) or occupants shall be disclosed pursuant to "AS IS" Standard
71 F. If occupancy is to be delivered before Closing, Buyer assumes all risks of loss to Property from date of occupancy, shall be responsible and liable
72 for maintenance from that date, and shall be deemed to have accepted Property in its existing condition at time of taking occupancy.
73 IX. TYPEWRITTEN OR HANDWRITTEN PROVISIONS: Typewritten or handwritten provisions, riders and addenda shall control all printed pro-
74 visions of this Contract in conflict with them.
75* X. ASSIGNABILITY: (CHECK ONLY ONE): Buyer ☑ may assign and thereby be released from any further liability under this Contract; ☐ may
76* assign but not be released from liability under this Contract; or ☐ may not assign this Contract.
77 XI. DISCLOSURES:
78 (a) The Property may be subject to unpaid special assessment lien(s) imposed by a public body ("public body" does not include a
79 Condominium or Homeowners' Association). Such lien(s), if any, whether certified, confirmed and ratified, pending, or payable in installments,
80* as of Closing, shall be paid as follows: ☑ by Seller at closing ☐ by Buyer (if left blank, then Seller at Closing). If the amount of any
81 assessment to be paid by Seller has not been finally determined as of Closing, Seller shall be charged an amount equal to the
82 last estimate or assessment for the improvement by the public body.
83 (b) Radon is a naturally occurring radioactive gas that when accumulated in a building in sufficient quantities may present health risks to per-
84 sons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.
85 Additional information regarding radon or radon testing may be obtained from your County Public Health unit.
86 (c) Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or desires additional information
87 regarding mold, Buyer should contact an appropriate professional.
88 (d) Buyer acknowledges receipt of the Florida Energy-Efficiency Rating Information Brochure required by Section 553.996, F.S.
89 (e) If the Real Property includes pre-1978 residential housing, then a lead-based paint rider is mandatory.
90 (f) If Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act, the parties shall comply with that Act.
91 (g) BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS' ASSOCIA-
92 TION/COMMUNITY DISCLOSURE.
93 (h) PROPERTY TAX DISCLOSURE SUMMARY: BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT
94 OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNER-
95 SHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES.
96 IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.
97 XII. MAXIMUM REPAIR COSTS: **DELETED**
98* XIII. HOME WARRANTY: ☐ Seller ☐ Buyer ☒ N/A will pay for a home warranty plan issued by _____
99* at a cost not to exceed $ _____
100* XIV. INSPECTION PERIOD AND RIGHT TO CANCEL: (a) Buyer shall have __1__ days from Effective Date ("Inspection Period") within
101 which to have such inspections of the Property performed as Buyer shall desire and utilities service shall be made available by the
102 Seller during the Inspection Period; (b) Buyer shall be responsible for prompt payment for such inspections and repair of damage
103 to and restoration of the Property resulting from such inspections and this provision (b) shall survive termination of this Contract;
104 and (c) if Buyer determines, in Buyer's sole discretion, that the Property is not acceptable to Buyer, Buyer may cancel this Contract
105 by delivering facsimile or written notice of such election to Seller prior to the expiration of the Inspection Period. If Buyer timely
106 cancels this Contract, the deposit(s) paid shall be immediately returned to Buyer; thereupon, Buyer and Seller shall be released of
107 all further obligations under this Contract, except as provided in this Paragraph XIV. Unless Buyer exercises the right to cancel
108 granted herein, Buyer accepts the Property in its present physical condition, subject to any violation of governmental, building,
109 environmental, and safety codes, restrictions or requirements and shall be responsible for any and all repairs and improvements
110 required by Buyer's lender.
111 XV. RIDERS; ADDENDA; SPECIAL CLAUSES: CHECK those riders which are applicable AND are attached to and made part of this Contract:
112* ☐ CONDOMINIUM ☐ VA/FHA ☐ HOMEOWNERS' ASSN. ☐ LEAD-BASED PAINT ☐ COASTAL CONSTRUCTION CONTROL LINE
113* ☐ INSULATION ☐ EVIDENCE OF TITLE (SOUTH FLORIDA CONTRACTS) ☐ Other Comprehensive Rider Provisions ☐ Addenda
114* Special Clause(s): _____
115* _____
116* _____
117* _____
118* _____
119* _____
120* _____
121* _____
122* _____
123* _____
124* _____
125* _____
126 XVI. "AS IS" STANDARDS FOR REAL ESTATE TRANSACTIONS ("AS IS" Standards): Buyer and Seller acknowledge receipt of a copy
127 of "AS IS" Standards A through Z on the reverse side or attached, which are incorporated as part of this Contract.



128  THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD,
129  SEEK THE ADVICE OF AN ATTORNEY PRIOR TO SIGNING.

130  THIS "AS IS" FORM HAS BEEN APPROVED BY THE FLORIDA ASSOCIATION OF REALTORS® AND THE FLORIDA BAR.
131  Approval does not constitute an opinion that any of the terms and conditions in this Contract should be accepted by the parties in a
132  particular transaction. Terms and conditions should be negotiated based upon the respective interests, objectives and bargaining
133  positions of all interested persons.
134  AN ASTERISK(*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK TO BE COMPLETED.

135* Dawn Maurer        (dkbS)                        6/19/8
136  (BUYER)            (DATE)        (SELLER)         (DATE)

137*                                                  6/18/08
138  (BUYER)            (DATE)        (SELLER)         (DATE)

139* Buyers' address for purposes of notice _____    ellers' address for purposes of notice _____
140* 4900 Lee cir S
141* Lehigh Acres FL 33971         Phone                                    Phone

142  BROKERS: The brokers (including cooperating brokers, if any) named below are the only brokers entitled to compensation in connection with
143  this Contract:
144* Name: Michelle Simmons, C21 Sunbelt          Ralph Albanese, Coldwell Banker Res
145           Cooperating Brokers, if any                    Listing Broker

Saxon Mortgage Services, Inc. formerly
named Meritech Mortgage Services, Inc.,
as servicing agent for _____
(JP Morgan Chase Bank/Bankers Trust/Wells Fargo)
_____, as _____
(trustee and custodian or custodian) _____, )
it's attorney in fact NRT/Coldwell Banker REO Division.

148

## "AS IS" STANDARDS FOR REAL ESTATE TRANSACTIONS

147 A. TITLE INSURANCE: The Title Commitment shall be issued by a Florida licensed title insurer agreeing to issue Buyer, upon recording of the deed to Buyer,
148 an owner's policy of title insurance in the amount of the purchase price, insuring Buyer's marketable title to the Real Property, subject only to matters contained
149 in Paragraph VII and those to be discharged by Seller at or before Closing. Marketable title shall be determined according to applicable Title Standards adopt-
150 ed by authority of The Florida Bar and in accordance with law. Buyer shall have 5 days from date of receiving the Title Commitment to examine it, and if title is
151 found defective, notify Seller in writing specifying defect(s) which render title unmarketable. Seller shall have 30 days from receipt of notice to remove the
152 defects, falling which Buyer shall, within 5 days after expiration of the 30 day period, deliver written notice to Seller either: (1) extending the time for a reason-
153 able period not to exceed 120 days within which Seller shall use diligent effort to remove the defects; or (2) requesting a refund of deposit(s) paid which shall
154 be returned to Buyer. If Buyer fails to so notify Seller, Buyer shall be deemed to have accepted the title as it then is. Seller shall, if title is found unmarketable,
155 use diligent effort to correct defect(s) within the time provided. If, after diligent effort, Seller is unable to timely correct the defects, Buyer shall either waive the
156 defects, or receive a refund of deposit(s), thereby releasing Buyer and Seller from all further obligations under this Contract. If Seller is to provide the Title
157 Commitment and it is delivered to Buyer less than 5 days prior to Closing, Buyer may extend Closing so that Buyer shall have up to 5 days from date of receipt
158 to examine same in accordance with this "AS IS" Standard.

159 B. PURCHASE MONEY MORTGAGE; SECURITY AGREEMENT TO SELLER: A purchase money mortgage and mortgage note to Seller shall provide for a
160 30 day grace period in the event of default if a first mortgage and a 15 day grace period if a second or lesser mortgage; shall provide for right of prepayment
161 in whole or in part without penalty; shall permit acceleration in event of transfer of the Real Property; shall require all prior liens and encumbrances to be kept
162 in good standing; shall forbid modifications of, or future advances under, prior mortgage(s); shall require Buyer to maintain policies of insurance containing a
163 standard mortgagee clause covering all improvements located on the Real Property against fire and all perils included within the term "extended coverage
164 endorsements" and such other risks and perils as Seller may reasonably require, in an amount equal to their highest insurable value; and the mortgage, note
165 and security agreement shall be otherwise in form and content required by Seller; but Seller may only require clauses and coverage customarily found in mort-
166 gages, mortgage notes and security agreements generally utilized by savings and loan institutions or state or national banks located in the county wherein the
167 Real Property is located. All Personal Property and leases being conveyed or assigned will, at Seller's option, be subject to the lien of a security agreement evi-
168 denced by recorded or filed financing statements or certificates of title. If a balloon mortgage, the final payment will exceed the periodic payments thereon.

169 C. SURVEY: Buyer, at Buyer's expense, within time allowed to deliver evidence of title and to examine same, may have the Real Property surveyed and certi-
170 fied by a registered Florida surveyor. If the survey discloses encroachments on the Real Property or that improvements located thereon encroach on setback
171 lines, easements, lands of others or violate any restrictions, Contract covenants or applicable governmental regulations, the same shall constitute a title defect.

172 D. WOOD DESTROYING ORGANISMS: DELETED

173 E. INGRESS AND EGRESS: Seller warrants and represents that there is ingress and egress to the Real Property sufficient for its intended use as described
174 in Paragraph VII hereof and title to the Real Property is insurable in accordance with "AS IS" Standard A without exception for lack of legal right of access.

175 F. LEASES: Seller shall at least 10 days before Closing, furnish to Buyer copies of all written leases and estoppel letters from each tenant specifying the nature
176 and duration of the tenant's occupancy, rental rates, advanced rent and security deposits paid by tenant. If Seller is unable to obtain such letter from each ten-
177 ant, the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit, and Buyer may thereafter contact ten-
178 ant to confirm such information. If the terms of the leases differ materially from Seller's representations, Buyer may terminate this Contract by delivering written
179 notice to Seller at least 5 days prior to Closing. Seller shall, at Closing, deliver and assign all original leases to Buyer.

180 G. LIENS: Seller shall furnish to Buyer at time of Closing an affidavit attesting to the absence, unless otherwise provided for herein, of any financing statement,
181 claims of lien or potential lienors known to Seller and further attesting that there have been no improvements or repairs to the Real Property for 90 days imme-
182 diately preceding date of Closing. If the Real Property has been improved or repaired within that time, Seller shall deliver release or waivers of construction
183 liens executed by all general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth the names of all such gen-
184 eral contractors, subcontractors, suppliers and materialmen, further affirming that all charges for improvements or repairs which could serve as a basis for a
185 construction lien or a claim for damages have been paid or will be paid at the Closing of this Contract.

186 H. PLACE OF CLOSING: Closing shall be held in the county wherein the Real Property is located at the office of the attorney or other closing agent ("Closing
187 Agent") designated by the party paying for title insurance, or, if no title insurance, designated by Seller.

188 I. TIME: Calendar days shall be used in computing time periods except periods of less than six (6) days, in which event Saturdays, Sundays and state or nation-
189 al legal holidays shall be excluded. Any time periods provided for herein which shall end on a Saturday, Sunday, or a legal holiday shall extend to 5:00 p.m. of the
190 next business day. Time is of the essence in this Contract.

191 J. CLOSING DOCUMENTS: Seller shall furnish the deed, bill of sale, certificate of title, construction lien affidavit, owner's possession affidavit, assignments of leas-
192 es, tenant and mortgagee estoppel letters and corrective instruments. Buyer shall furnish mortgage, mortgage note, security agreement and financing statements.
193 K. EXPENSES: Documentary stamps on the deed and recording of corrective instruments shall be paid by Seller. All costs of Buyer's loan (whether obtained
194 from Seller or third party), including, but not limited to, documentary stamps and intangible tax on the purchase money mortgage and any mortgage assumed,
195 mortgage title insurance commitment with related fees, and recording of purchase money mortgage, deed and financing statements shall be paid by Buyer.
196 Unless otherwise provided by law or rider to this Contract, charges for related closing services, title search, and closing fees (including preparation of closing
197 statement), shall be paid by the party responsible for furnishing the title evidence in accordance with Paragraph V.

198 L. PRORATIONS; CREDITS: Taxes, assessments, rent, interest, insurance and other expenses of the Property shall be prorated through the day before Closing.
199 Buyer shall have the option of taking over existing policies of insurance, if assumable, in which event premiums shall be prorated. Cash at Closing shall be
200 increased or decreased as may be required by prorations to be made through day prior to Closing, or occupancy, if occupancy occurs before Closing. Advance
201 rent and security deposits will be credited to Buyer. Escrow deposits held by mortgagee will be credited to Seller. Taxes shall be prorated based on the current
202 year's tax with due allowance made for maximum allowable discount, homestead and other exemptions. If Closing occurs at a date when the current year's mill-
203 age is not fixed and current year's assessment is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's assess-
204 ment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements on the Real Property by January 1st of year of Closing,
205 which improvements were not in existence on January 1st of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assess-
206 ment to be agreed upon between the parties; falling which, request shall be made to the County Property Appraiser for an informal assessment taking into
207 account available exemptions. A tax proration based on an estimate shall, at request of either party, be readjusted upon receipt of current year's tax bill.

208 M. (RESERVED - purposely left blank)

209 N. INSPECTION AND REPAIR: DELETED

210 O. RISK OF LOSS: If, after the Effective Date, the Property is damaged by fire or other casualty ("Casualty Loss") before Closing and cost of restoration (which
211 shall include the cost of pruning or removing damaged trees) does not exceed 1.5% of the Purchase Price, cost of restoration shall be an obligation of Seller and
212 Closing shall proceed pursuant to the terms of this Contract, and if restoration is not completed as of Closing, restoration costs will be escrowed at Closing. If
213 the cost of restoration exceeds 1.5% of the Purchase Price, Buyer shall either take the Property as is, together with the 1.5% or receive a refund of deposit(s)
214 thereby releasing Buyer and Seller from all further obligations under this Contract, Seller's sole obligation with respect to tree damage by casualty or other natu-
215 ral occurrence shall be the cost of pruning or removal.

216 P. CLOSING PROCEDURE: The deed shall be recorded upon clearance of funds. If the title agent insures adverse matters pursuant to Section 627.7841,
217 F.S., as amended, the escrow and closing procedure required by this "AS IS" Standard shall be waived. Unless waived as set forth above the following



218   "AS IS" STANDARDS FOR REAL ESTATE TRANSACTIONS (CONTINUED)

219  closing procedures shall apply: (1) all closing proceeds shall be held in escrow by the Closing Agent for a period of not more than 5 days from Closing; (2)
220  if Seller's title is rendered unmarketable, through no fault of Buyer, Buyer shall, within the 5 day period, notify Seller in writing of the defect and Seller shall
221  have 30 days from date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, all deposits and closing funds shall, upon
222  written demand by Buyer and within 5 days after demand, be returned to Buyer and, simultaneously with such repayment, Buyer shall return the Personal
223  Property, vacate the Real Property and reconvey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand
224  for refund, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect except as may be available to Buyer by virtue of war-
225  ranties contained in the deed or bill of sale.

226  Q. ESCROW: Any Closing Agent or escrow agent (collectively "Agent") receiving funds or equivalent is authorized and agrees by acceptance of them to deposit
227  them promptly, hold same in escrow, and, subject to clearance, disburse them in accordance with terms and conditions of this Contract. Failure of funds to
228  clear shall not excuse Buyer's performance. If in doubt as to Agent's duties or liabilities under the provisions of this Contract, Agent may, at Agent's option, con-
229  tinue to hold the subject matter of the escrow until the parties hereto agree to its disbursement or until a judgment of a court of competent jurisdiction shall
230  determine the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the dispute. An attorney who represents
231  a party and also acts as Agent may represent such party in such action. Upon notifying all parties concerned of such action, all liability on the part of Agent
232  shall fully terminate, except to the extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will comply with
233  provisions of Chapter 475, F.S., as amended. Any suit between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder, or in
234  any suit wherein Agent interpleads the subject matter of the escrow, Agent shall recover reasonable attorney's fees and costs incurred with these amounts to
235  be paid from and out of the escrowed funds or equivalent and charged and awarded as court costs in favor of the prevailing party. The Agent shall not be liable
236  to any party or person for misdelivery to Buyer or Seller of items subject to the escrow, unless such misdelivery is due to willful breach of the provisions of this
237  Contract or gross negligence of Agent.

238  R. ATTORNEY'S FEES; COSTS: In any litigation, including breach, enforcement or interpretation, arising out of this Contract, the prevailing party in such liti-
239  gation, which, for purposes of this "AS IS" Standard, shall include Seller, Buyer and any brokers acting in agency or nonagency relationships authorized by
240  Chapter 475, F.S., as amended, shall be entitled to recover from the non-prevailing party reasonable attorney's fees, costs and expenses.

241  S. FAILURE OF PERFORMANCE: If Buyer fails to perform this Contract within the time specified, including payment of all deposits, the deposit(s) paid by
242  Buyer and deposit(s) agreed to be paid, may be recovered and retained by and for the account of Seller as agreed upon liquidated damages, consideration for
243  the execution of this Contract and in full settlement of any claims; whereupon, Buyer and Seller shall be relieved of all obligations under this Contract; or Seller,
244  at Seller's option, may proceed in equity to enforce Seller's rights under this Contract. If for any reason other than failure of Seller to make Seller's title mar-
245  ketable after diligent effort, Seller fails, neglects or refuses to perform this Contract, Buyer may seek specific performance or elect to receive the return of Buyer's
246  deposit(s) without thereby waiving any action for damages resulting from Seller's breach.

247  T. CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; COPIES: Neither this Contract nor any notice of it shall be recorded in any public records.
248  This Contract shall bind and inure to the benefit of the parties and their successors in interest. Whenever the context permits, singular shall include plural and
249  one gender shall include all. Notice and delivery given by or to the attorney or broker representing any party shall be as effective as if given by or to that party.
250  All notices must be in writing and may be made by mail, personal delivery or electronic media. A legible facsimile or electronic (including "pdf") copy of this
251  Contract and any signatures hereon shall be considered for all purposes as an original.

252  U. CONVEYANCE: Seller shall convey marketable title to the Real Property by statutory warranty, trustee's, personal representative's, or guardian's deed, as
253  appropriate to the status of Seller, subject only to matters contained in Paragraph VII and those otherwise accepted by Buyer. Personal Property shall, at the
254  request of Buyer, be transferred by an absolute bill of sale with warranty of title, subject only to such matters as may be otherwise provided for herein.

255  V. OTHER AGREEMENTS: No prior or present agreements or representations shall be binding upon Buyer or Seller unless included in this Contract. No mod-
256  ification to or change in this Contract shall be valid or binding upon the parties unless in writing and executed by the parties intended to be bound by it.

257  W. SELLER DISCLOSURE: (1) There are no facts known to Seller materially affecting the value of the Property which are not readily observable by Buyer or
258  which have not been disclosed to Buyer; *(2) Seller extends and intends no warranty and makes no representation of any type, either express or implied,*
259  *as to the physical condition or history of the Property; (3) Seller has received no written or verbal notice from any governmental entity or agency as*
260  *to a currently uncorrected building, environmental or safety code violation; (4) Seller has no knowledge of any repairs or improvements made to the*
261  *Property without compliance with governmental regulation which have not been disclosed to Buyer.*

262  X. PROPERTY MAINTENANCE; PROPERTY ACCESS; ASSIGNMENT OF CONTRACTS AND WARRANTIES: Seller shall maintain the Property, including,
263  but not limited to, lawn, shrubbery, and pool in the condition existing as of Effective Date, ordinary wear and tear and Casualty Loss excepted. Seller shall, upon
264  reasonable notice, provide utilities service and access to the Property for appraisal and inspections, including a walk-through prior to Closing, to confirm that
265  all items of Personal Property are on the Real Property and that the Property has been maintained as required by this "AS IS" Standard. Seller will assign all
266  assignable repair and treatment contracts and warranties to Buyer at Closing.

267  Y. 1031 EXCHANGE: If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneous with Closing or deferred) with respect to the Property
268  under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate in all reasonable respects to effectuate the Exchange, includ-
269  ing the execution of documents; provided (1) the cooperating party shall incur no liability or expense related to the Exchange and (2) the Closing shall not be
270  contingent upon, nor extended or delayed by, such Exchange.

271  Z. PROPERTY WAIVER OF CLAIMS: *Buyer waives any claims against Seller and, to the extent permitted by law, against any real estate licensee involved*
272  *in the negotiation of the Contract, for any defects or other damage that may exist at Closing of the Contract and be subsequently discovered by the*
273  *Buyer or anyone claiming by, through, under or against the Buyer.*

INSTR # 2008000213955, Doc Type MTG, Pages 10, Recorded 08/08/2008 at 04:27 PM,
Charlie Green Clerk of the Circuit Court Lee County FL Rec. Fee 1st of 179
$248.04 Rec. Fee $86.50 Deputy Clerk SPINNACE
Case 2:09-md-02047-EEF-MBN Document 22880-15 Filed 07/02/2020 Page 128 of 179
Case 2:14-cv-24083-JC Document 296-3 Entered on FLSD Docket 03/15/2019 Page 77 of 22

RETURN TO:
Sunbelt Title Agency
809 South Orlando Avenue
Suites K-O
Winter Park, Florida 32789

Return To:

Fifth Third Mortgage Company
5001 Kingsley Drive, MD:
1MOB3A
Cincinnati, OH  45227

This document was prepared by: Pat Ayala

Fifth Third Mortgage Company
5050 Kingsley Drive
MD 1MOB 2X
Cincinnati, OH  45263

——————————— [Space Above This Line For Recording Data] ———————————

**State of Florida**

FHA Case No.

**MORTGAGE**

8-703

THIS MORTGAGE ("Security Instrument") is given on August 04, 2008.
The Mortgagor is Dawn M Maurer, an unmarried woman and Andrew W Feldkamp, an
unmarried man

, whose address is

4900 Lee Circle S., Lehigh Acres, FL 33971

("Borrower"). This Security Instrument is given to Fifth Third Mortgage Company

which is organized and existing under the laws of the state of Ohio                        , and
whose address is 5050 Kingsley Drive, MD 1MOB 2X, Cincinnati, OH  45263
("Lender"). Borrower owes Lender the principal sum of
One Hundred Twenty Four Thousand Nineteen And Zero/100
                                    Dollars (U.S. $ 124,019.00          ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides
for monthly payments, with the full debt, if not paid earlier, due and payable on August 01, 2038
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and
all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced
under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's

XXXXX7933                                                                      XXXXX7933

FHA Florida Mortgage - 4/96
Wolters Kluwer Financial Services
VMP®-4D(FL) (0401).01
Page 1 of 9                    Initials:

!0343030405997

Feldkamp Doc ID 366340

INSTR # 2008000213955 Page Number: 2 of 10

Case 2:09-md-02047-EEF-MBN Document 22280-45 Filed 12/02/19 Page 129 of 179
Case 2:11-cv-22408-MGC Document 276-5 Entered on FLSD Docket 09/13/2013 Page 69 of 22

covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to the Lender the following described property located in Lee County, Florida:
Lot 23, Block 35, Unit 6, Lehigh Acres, Secion 20, Township 44 South, Range 26 East, according to the map or plat thereof, as recorded in Plat Book 26, Page 33, of the Public Records of Lee County, Florida.

Parcel ID Number: 20442606000350230
which has the address of 5237 Butte Street                                                    [Street]
Lehigh Acres                              [City], Florida 33971          [Zip Code] ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Borrower and Lender covenant and agree as follows:

UNIFORM COVENANTS.

**1. Payment of Principal, Interest and Late Charge.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

**2. Monthly Payment of Taxes, Insurance and Other Charges.** Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under paragraph 4. In any year in which the Lender must pay a mortgage insurance premium to the Secretary of Housing and Urban Development ("Secretary"), or in any year in which such premium would have been required if Lender still held the Security Instrument, each monthly payment shall also include either: (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for the monthly charge by the Secretary, these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

INSTR # 2008000213955 Page Number: 3 of 10

Case 2:09-md-02047-EEF-MBN Document 22280-45 Filed 12/02/19 Page 130 of 179
Case 2:11-cv-22408-MGC-EEF Document 276-5 Entered on FLSD Docket 05/13/2013 Page 9 of 22

Lender may, at any time, collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may be required for Borrower's escrow account under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. Section 2601 *et seq.* and implementing regulations, 24 CFR Part 3500, as they may be amended from time to time ("RESPA"), except that the cushion or reserve permitted by RESPA for unanticipated disbursements or disbursements before the Borrower's payments are available in the account may not be based on amounts due for the mortgage insurance premium.

If the amounts held by Lender for Escrow Items exceed the amounts permitted to be held by RESPA, Lender shall account to Borrower for the excess funds as required by RESPA. If the amounts of funds held by Lender at any time are not sufficient to pay the Escrow Items when due, Lender may notify the Borrower and require Borrower to make up the shortage as permitted by RESPA.

The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. If Borrower tenders to Lender the full payment of all such sums, Borrower's account shall be credited with the balance remaining for all installment items (a), (b), and (c) and any mortgage insurance premium installment that Lender has not become obligated to pay to the Secretary, and Lender shall promptly refund any excess funds to Borrower. Immediately prior to a foreclosure sale of the Property or its acquisition by Lender, Borrower's account shall be credited with any balance remaining for all installments for items (a), (b), and (c).

**3. Application of Payments.** All payments under paragraphs 1 and 2 shall be applied by Lender as follows:

First, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and

Fifth, to late charges due under the Note.

**4. Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

VMP®-4D(FL) (0401).01                                    Page 3 of 9                                    Initials

INSTR # 2008000213955 Page Number: 4 of 10

Case 1:09-md-02047-EEF-MBN Document 22380-45 Filed 12/02/19 Page 131 of 179
Case 1:07-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2015 Page 40 of 22

**5. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument (or within sixty days of a later sale or transfer of the Property) and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that requirement will cause undue hardship for Borrower, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall notify Lender of any extenuating circumstances. Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

**6. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of condemnation, are hereby assigned and shall be paid to Lender to the extent of the full amount of the indebtedness that remains unpaid under the Note and this Security Instrument. Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order provided in paragraph 3, and then to prepayment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments, which are referred to in paragraph 2, or change the amount of such payments. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**7. Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

If Borrower fails to make these payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.

Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement, at the Note rate, and at the option of Lender, shall be immediately due and payable.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

INSTR # 2008000213955 Page Number: 5 of 10

Case 2:09-md-02047-EEF-MBN Document 22380-45 Filed 12/02/19 Page 132 of 179
Case 2:11-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2013 Page 21 of 22

**8. Fees.** Lender may collect fees and charges authorized by the Secretary.

**9. Grounds for Acceleration of Debt.**

    **(a) Default.** Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

        (i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

        (ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

    **(b) Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including Section 341(d) of the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

        (i) All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

        (ii) The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

    **(c) No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

    **(d) Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

    **(e) Mortgage Not Insured.** Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

    **10. Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument. This right applies even after foreclosure proceedings are instituted. To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current including, to the extent they are obligations of Borrower under this Security Instrument, foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure proceeding. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument.

INSTR # 2008000213955 Page Number: 6 of 10

Case 2:09-md-02047-EEF-MBN Document 22380-45 Filed 12/02/19 Page 133 of 179
Case 1:09-cv-22408-MGC Document 279-8 Entered on FLSD Docket 05/13/2013 Page 12 of 22

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time of payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successor in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-Signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9(b). Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**14. Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**15. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**16. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 16, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 16, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**17. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph 17.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

**18. Foreclosure Procedure. If Lender requires immediate payment in full under paragraph 9, Lender may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies in this paragraph 18, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Paragraph 9, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 *et seq.*) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Paragraph 18 or applicable law.**

**19. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

**20. Attorneys' Fees.** As used in this Security Instrument and the Note, "attorneys' fees" shall include any attorneys' fees awarded by an appellate court.

**21. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)].

☐ Condominium Rider                ☐ Growing Equity Rider              ☐ Other [specify]
☐ Planned Unit Development Rider   ☐ Graduated Payment Rider

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____       _____ (Seal)
Marlene DeMarmels                           Dawn M Maurer            -Borrower

_____       _____ (Seal)
Erica Sheridan                                Andrew W Feldkamp       -Borrower

_____ (Seal)     _____ (Seal)
                            -Borrower                                  -Borrower

_____ (Seal)     _____ (Seal)
                            -Borrower                                  -Borrower

_____ (Seal)     _____ (Seal)
                            -Borrower                                  -Borrower

INSTR # 2008000213955 Page Number: 9 of 10

Case 2:09-md-02047-EEF-MBN Document 22380-45 Filed 12/02/19 Page 136 of 179
Case 2:11-cv-22408-MGC Document 278-8 Entered on FLSD Docket 05/13/2015 Page 15 of 22

————————————[Space Below This Line For Notary Acknowledgment]————————————

**STATE OF FLORIDA**, LEE                                                  County ss:  Lee
      The foregoing instrument was acknowledged before me this August 04, 2008                    by
Dawn M Maurer and Andrew W Feldkamp


who is personally known to me or who has produced _h DL_ _____ as identification.

_Marlene SMarme_
                                    Notary Public

MARLENE DE MARMELS
MY COMMISSION # DD 706094
EXPIRES: October 16, 2011
Bonded Thru Notary Public Underwriters

Initials

INSTR # 2008000213955 Page Number: 10 of 10

Case 2:09-md-02047-EEF-MBN Document 22380-45 Filed 12/02/19 Page 137 of 179
Case 2:11-cv-22408-MGC Document 278-8 Entered on FLSD Docket 05/13/2019 Page 26 of 22

## LEGAL DESCRIPTION OF PROPERTY

Borrower Name: Dawn M Maurer, Andrew W Feldkamp

Property Address: 5237 Butte Street, Lehigh Acres, FL   33971

Date: 08/04/08

Property Description:
Lot 23, Block 35, Unit 6, Lehigh Acres, Secion 20, Township 44 South, Range
26 East, according to the map or plat thereof, as recorded in Plat Book 26,
Page 33, of the Public Records of Lee County, Florida.

-4034 (0106)          VMP MORTGAGE FORMS - (800)521-7291          6/01

!14443010405



IN THE CIRCUIT COURT OF THE
TWENTIETH JUDICIAL CIRCUIT
IN AND FOR LEE COUNTY, FLORIDA
CIVIL DIVISION

Case No.: 12-CA-055751
Division: T

FIFTH THIRD MORTGAGE COMPANY

     Plaintiff,

vs.

DAWN M. MAURER, ANDREW W. FELDKAMP, et al.

     Defendants.

_____/

# FILED

### JUL 2 4 2015

LINDA DOGGETT, CLERK
CIRCUIT/COUNTY COURTS
BY_____
                   D.C.

## FINAL JUDGMENT OF FORECLOSURE

     **THIS CAUSE** came before the Court for non-jury trial on July 24, 2015. Upon the evidence presented, it is hereby

     **ORDERED AND ADJUDGED** as follows:

     1.     Final judgment is entered for Plaintiff, FIFTH THIRD MORTGAGE COMPANY, against Defendant(s): DAWN M. MAURER N/K/A DAWN M. FELDKAMP; ANDREW W. FELDKAMP A/K/A ANDREW FELDKAMP; UNKNOWN SPOUSE OF ANDREW W. FELDKAMP A/K/A ANDREW FELDKAMP; UNKNOWN SPOUSE OF DAWN M. MAURER N/K/A DAWN M. FELDKAMP.

     2.     **Amounts Due and Owing**. Plaintiff, FIFTH THIRD MORTGAGE COMPANY, is due:

| | |
|---|---|
| Principal | $118,705.34 |
| Accrued interest from 08/01/2008 to 7/24/2015 | $26,708.80 |
| Per diem interest at $ 46.67 | |
| Pre Accelerated Late Charges | $96.51 |
| Title Search | $0.00 |
| Title Update | $0.00 |

FINAL DISPOSITION FORM

LEE COUNTY
12-CA-055751
/1449418df
Page 2


Δ π EXHIBIT 12
Deponent Feldkamp
Date 12-13-18 Rptr KE
WWW.DEPOBOOK.COM

| | |
|---|---|
| Property Taxes | $3.427.42 |
| Hazard Insurance | $4,520.37 |
| Attorneys' Fees: | |
|     Finding as to reasonable number of hours | |
|     Finding as to reasonable hourly rate | |
|     Other* $840.00 | |
|         Attorneys' Fees Total | $840.00 |

\* (The requested attorney's fee is a flat rate fee that the
firm's client has agreed to pay in this matter. Given the
amount of the fee requested and the labor expended, the
Court finds that a lodestar analysis is not necessary and
that the flat fee is reasonable.)

**Court Costs:**

| | |
|---|---|
|     Filing Fee | $0.00 |
|     Service of Process | $0.00 |
|     Re-Open Fee | $53.00 |
| **SUBTOTAL** | **$154,351.44** |

**Additional Costs:**

| | |
|---|---|
|     Property Inspections | $420.00 |
|     Property Preservation | $7,231.89 |
|     Prior Legal Fees | $5,746.00 |
| **GRAND TOTAL** | **$167,749.33** |

    3.    **Interest**. The grand total amount referenced in paragraph 2 shall bear interest from this date forward at the prevailing statutory legal rate of interest, which is presently 4.75% per year.

    4.    **Lien on Property**. Plaintiff, whose address is:5001 KINGSLEY DR, CINCINNATI, OH 45227 holds a lien for the grand total sum superior to all claims or estates of the Defendant(s) on the following described property in Lee County, Florida:

        LOT 23, BLOCK 35, UNIT 6, LEHIGH ACRES, SECTION 20, TOWNSHIP
        44 SOUTH, RANGE 26 EAST, ACCORDING TO THE MAP OR PLAT
        THEREOF AS RECORDED IN PLAT BOOK 26, PAGE 33, OF THE

PUBLIC RECORDS OF LEE COUNTY, FLORIDA

Property address: 5237 BUTTE STREET LEHIGH ACRES, FL 33971.

5.  **Sale of Property**. If the grand total sum with interest at the rate described in paragraph 3, and all costs accrued subsequent to this judgment are not paid, the Clerk of this Court shall sell the property at electronic sale on _September 24, 2015_, at 9:00 A.M. to the highest bidder for cash, except as prescribed in paragraph 6, in accordance with section 45.031, Florida Statutes. Sales are held online at www.lee.realforeclose.com.

6.  **Costs**. Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the Clerk if Plaintiff is not the purchaser of the property, provided, however, that the purchaser of the property for sale shall be responsible for documentary stamps affixed to the certificate of title. If Plaintiff is the purchaser, the Clerk shall credit Plaintiff's bid with the grand total sum with interest and costs accruing subsequent to this judgment, or such part of it, as is necessary to pay the bid in full.

7.  **Distribution of Proceeds**. On filing the Certificate of Title, the Clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of the Plaintiff's costs; second, documentary stamps affixed to the Certificate; third, Plaintiff's attorneys' fees; fourth, the total sum due to Plaintiff, less the items paid, plus interest at the rate prescribed in paragraph 3 from this date to the date of the sale; and by retaining any remaining amount pending the further order of this Court.

8.  **Right of Possession**. On the filing of Certificate of Sale, Defendant(s) and all persons claiming under or against Defendant(s) since the filing of the Notice of Lis Pendens shall be foreclosed of all estate or claim in the property, except as to claims or rights under Chapter 718 or Chapter 720, Fla. Stat., if any. Upon filing of the Certificate of Title, the person named on the Certificate of Title shall be let into possession of the property.

9.  **Jurisdiction**. The Court retains jurisdiction of this action to enter further orders that are proper, including without limitation, orders authorizing writs of possession; an award of

additional attorney's fees; to enter a deficiency judgment against those parties who may be personally liable and not discharged in bankruptcy, except as may otherwise be provided in this judgment; to enter a reforeclosure judgment/order to correct errors or omissions in this foreclosure action; or to determine the amounts due any association under §718.116 or §720.3085.

The Court also reserves jurisdiction so that in the event additional sums are expended by Plaintiff to protect its interest in the property after entry of this judgment including, but not limited to, real estate taxes, hazard insurance, property preservation, or other necessary costs, Plaintiff may file an affidavit setting forth such expenditures and the Court may enter an order awarding Plaintiff the amount expended and add it to the grand total amount due under this final judgment, or if the property has been redeemed by payment of the judgment the Court can enter a new foreclosure judgment for the amount expended.

**IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THIS FINAL JUDGMENT.**

**IF YOU ARE A SUBORDINATE LIEN HOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN SIXTY (60) DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.**

**IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF. YOU ARE NOT REQUIRED TO HAVE A LAWYER OR ANY OTHER REPRESENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH YOU ARE ENTITLED. PLEASE CHECK WITH THE CLERK OF THE COURT, 1700 MONROE STREET, FT. MYERS, FLORIDA (TELEPHONE: 239-533-5000,1,5,0 F/C**

Case 2:09-md-02047-EEF-MBN Document 22380-45 Filed 12/02/19 Page 142 of 179
INSTR # 2015000166638 Page Number: 5 of 6
Case 2:12-cv-02402-MCE Document 278-5 Entered on FLSD Docket 05/13/2019 Page 21 of 22

DEPT. SUZANNE EXT 4273 239-533-5000,1,5,0), WITHIN (10) DAYS AFTER THE SALE TO SEE IF THERE IS ADDITIONAL MONEY FROM THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE COURT.

IF YOU DECIDE TO SELL YOUR HOME OR HIRE SOMEONE TO HELP YOU CLAIM THE ADDITIONAL MONEY, YOU SHOULD READ VERY CAREFULLY ALL PAPERS YOU ARE REQUIRED TO SIGN, ASK SOMEONE ELSE, PREFERABLY AN ATTORNEY WHO IS NOT RELATED TO THE PERSON OFFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND WHAT YOU ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR PROPERTY OR THE EQUITY IN YOUR PROPERTY WITHOUT THE PROPER INFORMATION. IF YOU CANNOT AFFORD TO PAY AN ATTORNEY, YOU MAY CONTACT Florida Rural Legal Services-Fort Myers-239-334-4554, TO SEE IF YOU QUALIFY FINANCIALLY FOR THEIR SERVICES. IF THEY CANNOT ASSIST YOU, THEY MAY BE ABLE TO REFER YOU TO A LOCAL BAR REFERRAL AGENCY OR SUGGEST OTHER OPTIONS. IF YOU CHOOSE TO CONTACT Florida Rural Legal Services-Fort Myers-239-334-4554, YOU SHOULD DO SO AS SOON AS POSSIBLE AFTER RECEIPT OF THIS NOTICE.

DONE AND ORDERED in Lee County, Florida, on *July 24, 2015*

_____
CIRCUIT JUDGE

Conformed Copy furnished to:

Michael L. Tebbi, Esq
Kass Shuler, P.A.
1505 N. Florida Ave.
Tampa, FL 33602-2613
Attorney for Plaintiff

DAWN M. MAURER N/K/A DAWN M.
FELDKAMP
5543 BILLINGS STREET
LEHIGH ACRES, FL 33971
dawnfeldkamp@gmail.com

ANDREW W. FELDKAMP A/K/A
ANDREW FELDKAMP
5543 BILLINGS STREET
LEHIGH ACRES, FL 33971
dawnfeldkamp@gmail.com

UNKNOWN SPOUSE OF ANDREW W.
FELDKAMP A/K/A ANDREW FELDKAMP
5543 BILLINGS STREET
LEHIGH ACRES, FL 33971

UNKNOWN SPOUSE OF DAWN M.
MAURER N/K/A DAWN M. FELDKAMP
5543 BILLINGS STREET
LEHIGH ACRES, FL 33971

LINDA DOGGETT, CLERK, CIRCUIT COURT
BY: _K. Perham_ D.C.

JUL 29 2015

# EXHIBIT D6

# Budget Blinds®

*a style for every point of view*®

**An independently owned and operated franchise**

Source Code _____

Invoice #: _____

Fort Myers South, Fort Myers, FL • Office **239.221.8255** • Cell 239.220.6057

NAME _____

ADDRESS _____

CITY _____ STATE ____ ZIP _____

CUST. E-MAIL _____

HOME PHONE _____ WORK PHONE _____

| ORDER DATE | | | |
|---|---|---|---|
| | Date | Amount | Check # |
| | | | |
| | | | |

| ROOM | IB/OB | COST CODE | SIZES | CTRL | DESCRIPTION - COLOR # | AUTO. | PRODUCT | PRODUCT |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | 645 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | 453 |
| | | | | | | | | 315 |
| | | | | Other blinds + cornice board were contaminated/couldn't get clean | | | |

☐ 1 Year Service Guarantee  ☐ 2 Year Service Guarantee  ☐ 5 Year Service Guarantee
☐ Life-Time Service Guarantee  ☐ I decline the optional service guarantee  INITIAL _____

COMMENTS:

| | |
|---|---|
| SUB TOTAL | |
| **TAX** | |
| LABOR | |
| TOTAL | 5084 |

CUSTOMERS SIGNATURE _____ DATE _____ CONSULTANT _____

You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the notice of cancellation form on the back of this invoice for an explanation of this right.

www.budgetblinds.com

William P. and Vicki D. Foster
10814 Fortina Drive
Fort Myers, FL 33913

Alternative Living Addresses
Lived at this address from October 3, 2009 until July, 13, 2011
10137 Colonial Country Club #1106
Fort Myers, FL 33913

Lived at this address from July 13, 2011 until November 17, 2012 in then moved back
into our partially remediated home at 10814 Fortina Drive, Fort Myers, FL 33913
10828 Tiberio Drive
Fort Myers, FL 33913



# Dwelling Lease

_Vicki Foster_ does hereby lease to

_Robert Lorebeck_ the dwelling located at

_10137 Colonial CC Blvd, #1106, FT. Myers, FL33913_ under the following terms and conditions.

## 1. INITIAL PERIOD OF LEASE AND RENT

The lease shall begin on _9/27/08_ and end at midnight on _9/26/08   9/26/09_. The rent for this period is $ _850, 900_ per month payable on or before the first day of each month. The rent payment shall be increased $50.00 if payment is received after the fifth of the month.
Mailing Address for rent to be sent to:
Vicki Foster
10814 Fortina Drive
Fort Myers, FL 33913

## 2. UTILITIES

Included in the rent is water and basic cable. All other utilities are to be paid by the tenant. The Owner shall not be responsible to Tenant or any others for a loss or reduction of services by acts not willful, or conditions beyond Owner's control, nor shall any loss or reduction of services terminate this lease or reduce the amount of rental due.

## 3. SECURITY DEPOSIT

The tenant has paid a Security Deposit of _$1000.00_ Date _9/19/08_.
**Refund of Security Deposit:**
The tenant shall be refunded the Security Deposit upon vacating the dwelling unit, provided: (A) Proper notice is given and all rents and other charges are paid. (B) The dwelling unit and its equipment are left clean: and there is not damage to the dwelling or its equipment beyond that due to normal wear and tear. (C) The dwelling keys are returned to the owner.

The Security Deposit will not be refunded until the Tenant has vacated the dwelling and the dwelling has been inspected by the owner, preferably in the presence of the tenant. The Security Deposit will not be used to pay the rent or other charges while the Tenant is in occupancy. The Security Deposit is not an advance payment of rent and does not relieve the Tenant from the obligations to pay rent, including rent for the last month of occupancy.

Lanlord agrees that the balance, after payment of items as provided for above, if any, shall be returned along with an itemized statement of those costs to the Tenant at his/her last known address within thirty days after Tenant vacates premises.

**4. OBLIGATIONS OF TENANT**    The tenant agrees:

(A)  Not to assign this lease, nor to sublet or transfer possession of the premises, nor to give accomidations to boarders or lodgers without the written consent of the Owner, nor to use or permit the use of the dwelling unit for any commercial purpose or any purpose whatsoever other than as a private dwelling unit solely for the Tenant and his/her family and/or dependants as listed hereafter:

_____    _____

_____    _____

_____    _____

(B)  To comply with all obligations imposed upon Tenants by applicable provisions of building and housing codes materially affecting health and safety.

(C)  To keep the premises and such other areas as may be assigned to him/her for his/her exclusive use in a clean and safe condition.

(D) To install hurricane shutters & remove during/after hurricane

(E)  To dispose all garbage, rubbish and other waste from the premises in a safe and sanitary manner.

(F)  To refrain from, and to cause his hosehold and guests to refrain from destroying, defacing, damaging, or removing any part of the dwelling unit or premises.

(G)  To pay all charges (other than normal wear and tear) for the repair of damages to the dwelling unit, premises, facilities or common areas caused by Tenant, his/her household or guests.

(H)  To conduct himself/herself, to control any animals and to cause other persons who come to premises to conduct themselves in a manner which will not disburb his/her neighbor.

(I)  To refrain from illegal or other activity which impairs the physical or social environment of the premises.

(J)  To notify the Owner of any anticipated extended absence from the premises.

(K)  To replace battery in Smoke Detector and filter in furnace.

**5. OBLIGATIONS OF OWNER**

(A)  To comply with requirements of applicable building codes, and housing codes materially affecting health, safety and the social environment of the premises.

(B)  To make necessary repairs to the premises.

(C)  To maintain in good and safe working order and condition electrical, plumbing and heating; and to furnish a working Smoke Detector for each floor at time of move in.

## 6. INSPECTIONS  Right of Entry and Repair

(A) Prior to occupancy, the Owner and the Tenant shall inspect the premises.

(B) The Tenant agrees to permit the Owner or his/her agent or employers to enter the dwelling unit during reasonable hours for the purpose of making inspections or repairs. Except in case of emergency, the owner will attempt to give the Tenant prior notice by phone.

(C) The Tenant agrees to promptly notify the Owner when any repairs to the dwelling or equipment are necessary, the Owner may make regular inspections to determine whether repairs are needed in addition to those reported by the Tenant. The Owner will give the Tenant prior written notice of at least two days, when doing a routine inspection..

(D) The Tenant agrees to pay, when billed, for repairs for damages caused by himself/herself, members of his/her family or his/her guests. Such charges shall be billed to the Tenant.

(E) The Tenant agrees not to make any repairs or alterations to the dwelling or permises without the prior consent of the Owner, this includes wallpaper /contact paper.

The Owner does not insure Tenant's person and all personal property in the leased premises or elsewhere shall be at the risk of Tenant only and that Tenant will carry such insurance as Tenant sees necessary therefor. The Tenants states that the leased premiss have been examined to the extent necessary to ascertain its condition. The Owner shall not be liable to Tenant, or anyone on the premises with consent or at the invitation of the Tenant, for property damage or personal injuries caused by or arising out of the condition of the leased premises.

## 7. TERMINATION OF LEASE

After the Tenant has occupied the dwelling for a year, this lease can be terminated with a thirty days written notice to the owner.

This lease can be terminated any time by the owner, with proper legal notices, if the Tenant does not abide by the lease. All legal fees will be paid by the Tenant.

If the Tenant should be declared bankrupt during the term of this lease, the Owner, at his/her option, may terminate this lease.

Tenant

Tenant

Date   9·18·08

Owner

Phone

Date   9/19/08

# LEASE AGREEMENT

Page 1 of 2 of

| | |
|---|---|
| **LEASE DATE:** | The parties agree as follows:<br>*June 4 2011* |
| **PARTIES TO THIS LEASE:** | Landlord *William + Vicki Foster*<br>Address for notices *16814 Fortuna Dr.  FT myers, FL 33913* |
| | Tenants and Addresses:<br>*Ted Koch  10132 Colonial C.C. BLVD #807 FT. Myers, 33913*<br>*Michelle MAcejewski. 7515 Coverly Drive Drive North Spring GrouI 62081* |
| **TERM:** | 1. The Term of this Lease Shall be 0 years **or** months: beginning *July 14, 2011* and ending *July 13, 2012* |
| **PREMISES RENTED:** | 2. *10137 Colonial CC. Blvd #1106*<br>*FT. Myers, FL 33913* |
| **USE OF PREMISES:** | 3. The Premises may be used as a *living place for those listed on this lease only* as per *Florida* regulations. |
| **RENT:** | 4. The rent is as follows: enter rent instructions *$950.00 per month,*<br>Landlord need not give Tenant notice to pay rent.  Tenant must pay the rent in full and not subtract any amount from it. |
| **SECURITY:** | 5. Tenant has given Landlord $*1,000* as security.  If Tenant fully complies with all of the terms of this Lease Landlord will return the security after the Term ends.  If Tenant does not fully comply with the term of this Lease, Landlord may use the security to pay amounts owed by Tenant, including damages. |
| **UTILITIES AND SERVICES:** | 6. Tenant must pay for the following utilities and services: ~~gas~~, ~~water~~, electric, telephone, ~~cable~~, ~~garbage~~, interior cleaning |
| **FURNISHINGS:** | 7. The Unit ✓ IS _____ IS NOT furnished.  If furnished, include a list of furniture and condition on another sheet. |
| **REPAIRS, ALTERATIONS:** | 8. Tenant must keep, and at the end of the term return the Premises and all appliances, equipment, furniture, furnishings and other personal property clean and in good order and repair.  Tenant is not responsible for ordinary wear or damage to the elements.  If Tenant defaults, Landlord has the right to make repairs and charge Tenant the cost.  The cost will be added to and payable as rent.  *Tenant must not alter, ~~decorate,~~ change or add to the Premises. ~~This includes signs, nails or pin holes on the walls, ceilings, or floors.~~* |
| **LANDLORD MAY ENTER, SIGNS:** | 9. Landlord may at reasonable times, enter the Premises to examine, to make repairs, and to show it to possible buyers, lenders or tenants.  Landlord may place the usual "For Rent" or "For Sale" signs upon the Premises. |
| **COMPLIANCE WITH AUTHORITIES:** | 10. Tenant must, at Tenant's cost, promptly comply with all laws, orders, rules and directions of all governmental authorities, property owners associations, insurance carriers or Board of Fire Underwriters of similar group. |
| **COOKING:** | 11. Tenant may cook only in the areas specially set aside by Landlord for cooking. |
| **CARE OF PREMISES, GROUNDS:** | 12. Tenant must not allow anyone to bring in dirt or sand, nor enter the Premises in wet clothing.  Tenant must use special areas provided for showering and dressing after outside activities.  Tenant shall keep the grounds neat and clean.  Vehicles may be driven or parked only in driveways ~~or in the garage~~. |
| **FIRE DAMAGE:** | 13. Tenant must give Landlord immediate notice in case of fire or other damages to the Premises.  Landlord will have the right to repair the damage within a reasonable time or cancel this Lease.  If Landlord repairs, Tenant shall pay rent only to the date of the fire or damage and shall start to pay rent again when the Premises become usable.  Landlord may cancel the Lease by giving Tenant *60* days' written notice.  The Term shall be over at the end of ___*60*___ day and all rent shall be paid to the date of the damage. |
| **NO LIABILITY:** | 14. Landlord shall not be liable for injury or damage to Tenant or to any person who uses or is on the Premises, or be liable for damage to their property, unless it results from Landlord's negligence.  Tenant is responsible for all acts of Tenant's family, employees and persons Tenant invites onto the Premises. |
| **LANDLORD'S CONSENT:** | 15. If Tenant requires Landlord's consent to any act and such consent is not given, Tenant's only right is to ask the Court to force Landlord to give consent.  Tenant agrees not to make any claim against Landlord for money or subtract any sum from the rent because such consent was not given. |
| **ASSIGNMENT, SUBLET:** | 16. Tenant may not sublet all or Part of the premises, or assign this Lease or permit any other person to use the Premises. |

## LEASE AGREEMENT
Page 2 of 3

| | |
|---|---|
| **TENANT'S DEFAULTS:** | **17.a** Landlord may give 5 days written notice to tenant to correct any of the following defaults: |

17.a.1 Failure to pay rent or added rent on time.
17.a.2 Improper assignment of the Lease, subletting all or part of the Premises, or allowing another to use the Premises.
17.a.3 Improper conduct by Tenant or other occupant of the Premises.
17.a.4 Failure to fully perform any other term in the Lease.

**17.b** If Tenant fails to correct the defaults in section 17.a within 5 days, Landlord may cancel the Lease by giving Tenant a written 3 day notice stating the date the Term will end. On that date the Term and Tenant's rights in this Lease automatically end and Tenant must leave the Premises and give Landlord the keys. Tenant continues to be responsible for rent, expenses, damages and losses.

**LANDLORD'S REMEDIES:** **17.c** If the Lease is cancelled, or rent or added rent is not paid on time, or Tenant vacates the Premises, Landlord may in addition to other remedies take any of the following steps:
17.c.1 Enter the Premises and remove Tenant and any person or property;
17.c.2 Use dispossess, eviction or other lawsuit method to take back the Premises.

**17.d** If the Lease is ended or Landlord takes back the Premises, Landlord may re-rent the Premises and anything in it for any Term. Landlord may re-rent for a lower rent and give allowances to the new tenant. Tenant shall be responsible for Landlord's cost of re-renting. Landlord's cost shall include the cost of repairs, decorations. Broker's fees, attorney's fees, advertising and preparation for renting. Tenant shall continue to be responsible for rent, expenses, damages and losses. Any rent received from the re-renting shall be applied to the reduction of money Tenant owes. Tenant waves all rights to return to the Premises after possession is given to the Landlord by a Court.

**CORRECTING TENANT'S DEFAULT:** **18.** If Tenant fails to correct a default after notice from landlord, Landlord may correct it for Tenant at Tenant's expense. The sum Tenant must repay to Landlord will be added to and payable as rent.

**WAIVER OF JURY. CONTERCLAIM, SET OFF:** **19.** Landlord and Tenant waive trail by jury in any matter which comes up between the parties under or because of this lease (except for a personal injury or property damage claim). In a proceeding to get possession of the premises, Tenant shall not have the right to make a counterclaim or set off.

**ILLEGALITY:** **20.** If any part of this Lease is not legal, the rest of the Lease will be unaffected.

**NO WAIVER:** **21.** Landlord's failure to enforce any terms of this Lease shall not prevent Landlord from enforcing such terms at a later time.

**NOTICES:** **22.** Any bill, statement or notice must be in writing and delivered or mailed to the Tenant at the Premises and to the Landlord at the Address for Notices. It will be considered delivered on the day mailed or if not mailed, when left at the proper address. Any notice must be sent by certified mail. Landlord must send Tenant written notice if Landlord changes the Address for Notices.

**SUBORDINATION:** **23.** This lease and Tenant's rights are subject and subordinate to: all leases for the Premises or the land on which it stands, mortgages on the leases or on the Premises or on the land, money paid or to be paid by the lender under mortgages, and changes of any kind in and extensions of such mortgages or leases whether now or in the future. Tenant must promptly execute any certificate(s) that Landlord requests to show that this Lease is subject and subordinate.

**MARGIN HEADINGS:** **24.** The margin headings are for convenience only.

**QUIET ENJOYMENT:** **25.** Landlord agrees that if Tenant pays the rent and is not in default under this Lease, Tenant may peaceably and quietly have hold and enjoy the Premises for the Term of this Lease.

**SUCCESSORS: CHANGES:** **26.** This Lease is binding on all parties who lawfully succeed to the rights or take the place of the Landlord or Tenant.
**29.** This Lease can be changed only by an agreement in writing signed by the parties to the Lease.

**PETS:** **30.** No pets of any kind are allowed to visit or live on the Premises. *Just advise before hand.*

**SIGNATURES:** The parties have entered into this Lease on the date first above stated.

Landlord: *Vicki Foster*  ..........................................

Tenant: ..........................................  ..........................................

..........................................  ..........................................

## Dwelling Lease

Jack and Joanne Walsh  does hereby lease to

Vicki and Paul Foster the dwelling located at
10828 Fortina Drive, Fort Myers 33913
under the following terms and conditions.

### 1. Initial Period of Lease And Rent
The lease shall begin on July 15, 2011 and end at midnight on
July 14, 2012. The rent for this period is $905.00 per month
payable on or before the first day of each month. The rent
payment shall be increased $50.00 if payment is received after
the fifth of the month.

Mailing address for rent to be sent to:
10828 Tiberio Drive
Fort Myers, FL 33913

### 2. Utilities
Included in the rent is basic cable.  All other utilities are to be
paid by the tenant.

3. Security Deposit
The tenant has paid a Security Deposit of _$ 1,000.00_ . Date
paid _____7/7/11_____ .
### Refund of Security Deposit:
The tenant shall be refunded the Security Deposit upon
vacating the dwelling unit, provided: (A) Proper notice is given
and all rents and other charges are paid. (B) The dwelling unit
and its equipment are left clean: and there is not damage to the
dwelling or it's equipment beyond that due to normal wear and
tear. (C) The dwelling keys are returned to the owner.

The Security Deposit will not be refunded until the Tenant has vacated the dwelling and the dwelling has been inspected by the owner, preferably in the presence of the tenant. The Security Deposit will not be used to pay the rent or other charges while the Tenant is in occupancy. The Security Deposit is not an advance payment of rent and does not relieve the Tenant from the obligations to pay rent, including rent for the last month of occupancy.

Landlord agrees that the balance, after payment of items as provided for above, if any, shall be returned along with an itemized statement of those costs to the Tenant at his/her last known address within thirty days after Tenant vacates premises.

4. Obligations Of Tenant: The Tenant Agrees:
(A) Not to assign this lease, nor to sublet or transfer possession of the premises, nor to give accommodations to boarders or lodgers without the written consent of the Owner, nor to use or permit the use of the dwelling unit for any commercial purpose or any purpose whatsoever other than as a private dwelling unit solely for the Tenant an his/her family and /or dependants as listed hereafter:

_____    _____

_____    _____

(B) To comply with all obligations imposed upon Tenants by applicable provisions of building and housing codes materially affecting health and safety.
(C) To keep the premises and such other areas as may be assigned to him/her for his/her exclusive use in a clean and safe condition.

(D) To dispose of all garbage, rubbish and other waste from the premises in a safe and sanitary manner.

(E) To refrain from, and to cause his household and guests to refrain from destroying, defacing, damaging, or removing any part of the dwelling unit or premises.

(F) To pay all charges (other than normal wear and tear) for the repair of damages to the dwelling unit, premises, facilities or common areas caused by Tenant, his/her household or guests.

(G) To conduct himself/herself, to control any animals and to cause other persons who come to premises to conduct themselves in a manner which will not disturb his/her neighbor.

(H) To refrain from illegal or other activity which impairs the physical or social environment of the premises.

(I) To notify the Owner of any anticipated extended absence from the premises.

(J) To replace battery in the Smoke Detector and filter in furnace on a regular basis.

5. Obligations Of Owner

(A) To comply with requirements of applicable building codes, and housing codes materially affecting health, safety and the social environment of the premises.

(B) To make necessary repairs to the premises.

(C) To maintain in good and safe working order and condition electrical, plumbing and heating; and to furnish a working Smoke Detector for each floor at time of move in.

6. Inspections: Right of Entry and Repair

(A) Prior to Occupancy, the Owner and the Tenant shall inspect the premises.

(B) The Tenant agrees to permit the Owner or his/her agent or employers to enter the dwelling unit during reasonable hours for the purpose of making inspections or repairs. In case of emergency, the owner will attempt to give the Tenant prior notice by phone.

(C) The Tenant agrees to promptly notify the Owner when any repairs to the dwelling or equipment are necessary, the Owner may make regular inspections to determine whether repairs are needed in addition to those reported by the Tenant. The Owner will give the Tenant prior written notice of at least two days, when doing a routine inspection.

(D) The Tenant agrees to pay, when billed, for repairs for damages caused by himself/herself, members of his/her guests. Such charges shall be billed to the Tenant.

(E) The Tenant agrees not to make any repairs or alterations to the dwelling or premises without the prior consent of the Owner: this includes wallpaper/contact paper.

The Owner **does not** insure Tenant's person and all personal property in the leased premises or elsewhere shall be at the risk of Tenant only and that Tenant will carry such insurance as Tenant sees necessary therefore. The Tenants states that the leased premises have been examined to the extent necessary to ascertain its condition. The Owner shall not be liable to Tenant, or anyone on the premises with consent or at the invitation of the Tenant, for property damage or personal injuries caused by or arising out of the condition of the leased premises.

7. Termination of Lease

After the Tenant has occupied the dwelling for a year, this lease can be terminated with a thirty days written notice to the owner.

If the Tenant should be declared bankrupt during the term of
this lease, the Owner, at his/her option, may terminate this
lease.

_____          ____7/7/11____
Tenant                                            Date

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬          ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
Home Phone                                        Cell #

_____          ____7/7/11____
Tenant                                            Date

_____          _____
Home Phone                                        Cell #

_____          ___7-7-11_____
Owner                                             Date

_____          _____
Phone                                             Cell #

Termination of lease at 10828 Tiberio Dr.

Expenses for November thru the 17th

Rent  32.03 a day = 544.51

Water last month --57.80

Water this month  1.93 a day = 32.81

Total   635.12

Condition of house excellent

Original deposit $1000

Less expenses of 635.12

Due renter  $364.88

Thrift store  ████████    Manager  - Cynthia Conzatti

DON'T BREAK IT--DEDUCT IT FROM WHAT obama GETS

THANKS

JACK AND JOANNE

# EXHIBIT D7

CPB0006228787

# FIRST PAYMENT LETTER
## AND TEMPORARY PAYMENT COUPONS

Date: OCTOBER 06, 2006

Loan Number: ▮▮▮▮▮▮▮

Borrowers: DAVID DERRICK GRIFFIN, A MARRIED MAN

Property Address: 9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

It has been our privilege to serve you in obtaining your mortgage loan. The following information is provided as an added convenience in handling your mortgage loan payments.

Unless otherwise indicated in your promissory note, each loan payment is due on the 1ST day of each month. To assure proper credit to your account, please include your loan number on all of your loan payment checks. Each payment should be mailed early enough to reach the Note Holder or Servicer on or before that date. Any payments received after 15 days after the due date are subject to late charges.

Your "total monthly payment" for the initial payment of the loan is due DECEMBER 01, 2006, and has been estimated to be:

| | | |
|---|---|---|
| Initial Monthly Payment (as provided in the Note): | $ | 3,596.76 |
| Monthly Escrow Deposits: | | |
| HAZARD INSURANCE | $ | 380.83 |
| COUNTY PROPERTY TAX (IMPROVED) | $ | 929.23 |
| | $ | |
| | $ | |
| | $ | |
| Less Buydown Subsidy: | $ | |
| | $ | 4,906.82 TOTAL ESTIMATED MONTHLY PAYMENT |

If you have established an escrow account with your Lender, you should receive an Initial Escrow Account Statement at settlement that is prepared according to the aggregate accounting method. The escrow portion of the mortgage payment is based on information available at settlement. Any changes in the escrow items could result in a shortage or surplus in your escrow account.

When all information has been verified by the Note Holder or Servicer, you will receive payment coupons/notices at the mailing address you have indicated on the address certification. The coupon will indicate the monthly payment amount and give the address where the payments should be sent. Your monthly payment may differ from the estimate shown above. If you do not receive your coupon book prior to the first payment due date, please use the coupons provided and mail to the address shown. Payments should be mailed to :

COLONIAL BANK, N.A.
POST OFFICE BOX 5627
MONTGOMERY, AL 36103

Should you have any questions regarding the servicing of your mortgage, please contact:

COLONIAL BANK, N.A.
POST OFFICE BOX 5627, MONTGOMERY, AL 36103
1-888-890-1965 X3461

I/We have read, understood and received a copy of this first payment letter and temporary payment coupons.

DAVID DERRICK GRIFFIN
_____    _____

_____    _____

_____    _____

_____    _____

**PLEASE USE THE TEMPORARY COUPONS ON THE FOLLOWING PAGE TO MAIL IN MONTHLY PAYMENTS UNTIL YOUR COUPON BOOK IS RECEIVED**

DGRIFFIN - 000001

CPB0006228787

## TEMPORARY PAYMENT COUPON

DAVID DERRICK GRIFFIN

9801 COBBLESTONE LAKES COURT
BOYNTON BEACH, FLORIDA 33437

MAIL PAYMENT TO:

COLONIAL BANK, N.A.

POST OFFICE BOX 5627
MONTGOMERY, AL 36103

**PLEASE RETURN THIS COUPON WITH YOUR PAYMENT**

Remember to write your Loan Number on your check or money
order to insure proper credit.

DECEMBER 01, 2006
Payment Due Date                   Loan Number

| | |
|---|---|
| Monthly Payment | $ 4,906.82 |
| Additional Principal | $ |
| Additional Escrow | $ |
| Late Charge - $179.84 | |
| *ONLY if payment received more than 15 days late | $ |
| TOTAL AMOUNT ENCLOSED | $ |

## TEMPORARY PAYMENT COUPON

DAVID DERRICK GRIFFIN

9801 COBBLESTONE LAKES COURT
BOYNTON BEACH, FLORIDA 33437

MAIL PAYMENT TO:

COLONIAL BANK, N.A.

POST OFFICE BOX 5627
MONTGOMERY, AL 36103

**PLEASE RETURN THIS COUPON WITH YOUR PAYMENT**

Remember to write your Loan Number on your check or money
order to insure proper credit.

JANUARY 01, 2007
Payment Due Date                   Loan Number

| | |
|---|---|
| Monthly Payment | $ 4,906.82 |
| Additional Principal | $ |
| Additional Escrow | $ |
| Late Charge - $179.84 | |
| *ONLY if payment received more than 15 days late | $ |
| TOTAL AMOUNT ENCLOSED | $ |

## TEMPORARY PAYMENT COUPON

DAVID DERRICK GRIFFIN

9801 COBBLESTONE LAKES COURT
BOYNTON BEACH, FLORIDA 33437

MAIL PAYMENT TO:

COLONIAL BANK, N.A.

POST OFFICE BOX 5627
MONTGOMERY, AL 36103

**PLEASE RETURN THIS COUPON WITH YOUR PAYMENT**

Remember to write your Loan Number on your check or money
order to insure proper credit.

FEBRUARY 01, 2007
Payment Due Date                   Loan Number

| | |
|---|---|
| Monthly Payment | $ 4,906.82 |
| Additional Principal | $ |
| Additional Escrow | $ |
| Late Charge - $179.84 | |
| *ONLY if payment received more than 15 days late | $ |
| TOTAL AMOUNT ENCLOSED | $ |

## ***ATTENTION CLOSING AGENT***
### Borrower(s) Must Be Provided a Copy of the First Payment Letter and Temporary Payment Coupons

JISTPAYCOL (09/05)

DGRIFFIN - 000002

# ADJUSTABLE RATE NOTE

1000675-0006228787-2

(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

OCTOBER 06, 2006          FORT LAUDERDALE                     FLORIDA
[Date]                    [City]                              [State]

9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 585,235.00           (this amount is called "Principal"), plus interest, to the order of Lender. Lender is
COLONIAL BANK, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        7.3750 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the 1ST      day of each month beginning on  DECEMBER 01, 2006
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on NOVEMBER 01, 2036          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
POST OFFICE BOX 1108, MONTGOMERY, AL 36101-1108
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 3,596.76           . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

FIRST LIEN                                      CPB0006228787

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) - Single Family - Fannie Mae UNIFORM INSTRUMENT

Amended for Florida

Form 3520 1/01

⑳-838N(FL) (0005)          VMP MORTGAGE FORMS - (800)521-7291
                           Page 1 of 4                          Initials: _____

DGRIFFIN - 000003

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the 1ST day of NOVEMBER , 2011 , and on that day every 6TH month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO & ONE-QUARTER percentage points ( 2.2500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 13.3750 % or less than 2.2500 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO percentage point(s) ( 2.0000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.3750 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

FIRST LIEN                                                CPB0006228787

-838N(FL) (0005)                    Page 2 of 4                    Form 3520 1/01
Initials: _____

DGRIFFIN - 000004

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

**FIRST LIEN**

CPB0006228787

838N(FL) (0005)

Page 3 of 4

Form 3520 1/01
Initials: _____

DGRIFFIN - 000005

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

SEE ADDENDUM TO NOTE ATTACHED HERETO AND MADE A PART HEREOF

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| _____ (Seal) | _____ (Seal) |
| DAVID DERRICK GRIFFIN        -Borrower | -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |

*[Sign Original Only]*

FIRST LIEN                     CPB0006228787

-838N(FL) (0005)                Page 4 of 4                   Form 3520 1/01

**Pay to the order of**

LEHMAN BROTHERS BANK, FSB

**without recourse**

COLONIAL BANK, N.A.

Signature: _____

Printed Name: _____

Title: _____

DGRIFFIN - 000006

# INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE PROMISSORY NOTE

Loan Number: [redacted]

Property Address: 9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

THIS ADDENDUM is made this 6TH day of OCTOBER , 2006 , and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as the Addendum executed by the undersigned and payable to COLONIAL BANK, N.A.

(the Lender).

THIS ADDENDUM supersedes Section 3(A), 3(B), 4(C) and 7 (A) of the Note. None of the other provisions of the Note are changed by this Addendum.

3. PAYMENTS

(A) Time and Place of Payments

I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. I will pay principal and interest by making payments every month thereafter for the next 240 payment(s) in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only period over the remaining term of the Note in equal monthly payments.

I will make my monthly payments on the 1ST day of each month beginning on DECEMBER 01, 2006 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on NOVEMBER 01, 2036 , I still owe amounts under this Note, I will pay those amounts in full on that date which is called the "Maturity Date."

I will make my payments at
POST OFFICE BOX 1108, MONTGOMERY, AL 36101-1108

or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payment

Each of my initial monthly payments will be in the amount of U.S. $ 3,596.76 . This payment amount is based on the original principal balance of the Note. This payment amount may change.

4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO & ONE-QUARTER percentage point(s) ( 2.2500 %) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

FIRST LIEN                                    CFB0006228787

JALSION (12/02)                Page 1 of 2                    Form 603E 1/01

DGRIFFIN - 000007

During the Interest-Only period, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay accrued interest. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance. At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0000 % of my overdue payment of interest for the first 120 payments, 5.0000 % of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

Dated: _____

_____ (Seal)        _____ (Seal)
DAVID DERRICK GRIFFIN          -Borrower                                              -Borrower

_____ (Seal)        _____ (Seal)
                                     -Borrower                                              -Borrower

_____ (Seal)        _____ (Seal)
                                     -Borrower                                              -Borrower

_____ (Seal)        _____ (Seal)
                                     -Borrower                                              -Borrower

FIRST LIEN                                  CPB0006228787

DGRIFFIN - 000008

CPB0006228787

# ADDENDUM TO NOTE

This addendum is made OCTOBER 06, 2006 , and is incorporated into and deemed to amend and supplement the Adjustable Rate Note of the same date.

The property covered by this addendum is described in the Security Instrument and located at:
9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

AMENDED PROVISIONS
In addition to the provisions and agreements made in the Note, I/we further covenant and agree as follows:

ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 13.3750 % or less than 2.2500 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than TWO percentage point(s) ( 2.0000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.3750 %. My interest rate will never be less than 2.2500 %.

UNIFORM SECURED NOTE
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

In Witness Thereof, Trustor has executed this addendum.

Date: _____

_____ (Seal)          _____ (Seal)
DAVID DERRICK GRIFFIN          -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                          -Borrower

Return To:
ADORNO & YOSS

350 EAST OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

This document was prepared by:

COLONIAL BANK
400 N. TAMPA STREET
TAMPA, FL 33602
813-314-3100

----------------[Space Above This Line For Recording Data]----------------

# MORTGAGE

MIN 1000675-0006228787-2

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated OCTOBER 06, 2006
together with all Riders to this document.
(B) "Borrower" is
DAVID DERRICK GRIFFIN, A MARRIED MAN

JOINED HEREIN BY DIANE GRIFFIN

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is
COLONIAL BANK, N.A.

CPB0006228787

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS            Form 3010  1/01

Page 1 of 16
VMP -6A(FL) (0005).02            VMP Mortgage Solutions, Inc.            Initials:_____

DGRIFFIN - 000010

Lender is a NATIONAL BANKING ASSOCIATION
organized and existing under the laws of THE UNITED STATES OF AMERICA
Lender's address is
32 COMMERCE STREET, MONTGOMERY, AL 36104
(E) "Note" means the promissory note signed by Borrower and dated OCTOBER 06, 2006
The Note states that Borrower owes Lender
FIVE HUNDRED EIGHTY FIVE THOUSAND TWO HUNDRED THIRTY FIVE & NO/100   Dollars
(U.S. $ 585,235.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than NOVEMBER 01, 2036           .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[x] Adjustable Rate Rider   [ ] Condominium Rider       [ ] Second Home Rider
[ ] Balloon Rider           [x] Planned Unit Development Rider   [x] 1-4 Family Rider
[ ] VA Rider                [ ] Biweekly Payment Rider
[x] Other(s) [specify] ADDENDUM TO ADJUSTABLE RATE RIDER

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

CPB0006228787

-6A(FL) (0005).02                    Page 2 of 16            Initials:_____            Form 3010   1/01

DGRIFFIN - 000011

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the County of **PALM BEACH**

[Name of Recording Jurisdiction]:

**SEE ATTACHED EXHIBIT A**

Parcel ID Number:

which currently has the address of

9801 COBBLESTONE LAKES COURT                                                          [Street]
BOYNTON BEACH                                           [City], Florida  33437          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

CPB0006228787

VMP -6A(FL) (0005).02                         Page 3 of 16          Initials: _____          Form 3010  1/01

DGRIFFIN - 000012

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

CPB0006228787

Initials: _____

VMP®-6A(FL) (0005).02               Page 4 of 16               Form 3010   1/01

DGRIFFIN - 000013

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

CPB0006228787

VMP®-6A(FL) (0005).02

Page 5 of 16

Initials:_____

Form 3010  1/01

DGRIFFIN - 000014

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

CPB0006228787

VMP ®-6A(FL) (0005).02                    Page 6 of 16          Initials: _____          Form 3010   1/01

DGRIFFIN - 000015

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

CPB0006228787

Initials: _____

-6A(FL) (0005).02                    Page 7 of 16                    Form 3010   1/01

DGRIFFIN - 000016

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

CPB0006228787

VMP®-6A(FL) (0005).02          Page 8 of 16          Initials: _____          Form 3010  1/01

DGRIFFIN - 000017

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

CPB0006228787

-6A(FL) (0005).02                     Page 9 of 16     Initials: _____              Form 3010   1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of

CPB0006228787

VMP®-6A(FL) (0005).02                Page 10 of 16                Initials: _____                Form 3010   1/01

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers

CPB0006228787

Initials: _____

VMP ®-6A(FL) (0005).02                     Page 11 of 16                     Form 3010  1/01

DGRIFFIN - 000020

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the

CPB0006228787

Initials: _____

VMP -6A(FL) (0005).02

Page 12 of 16

Form 3010   1/01

DGRIFFIN - 000021