# EXHIBIT 32 part 3

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

CPB0006228787

VMP®-6A(FL) (0005).02          Page 13 of 16          Initials: _____          Form 3010  1/01

DGRIFFIN - 000022

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

CPB0006228787

-6A(FL) (0005).02          Page 14 of 16          Initials: _____          Form 3010   1/01

DGRIFFIN - 000023

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.
Signed, sealed and delivered in the presence of:

_____        _____ (Seal)
                                       DAVID DERRICK GRIFFIN        -Borrower


_____        _____ (Seal)
                                       DIANE GRIFFIN                -Borrower


_____ (Seal)          _____ (Seal)
                -Borrower                                           -Borrower


_____ (Seal)          _____ (Seal)
                -Borrower                                           -Borrower


_____ (Seal)          _____ (Seal)
                -Borrower                                           -Borrower


CPB0006228787

-6A(FL) (0005).02            Page 15 of 16            Form 3010   1/01

DGRIFFIN - 000024

STATE OF FLORIDA, _____ County ss:
    The foregoing instrument was acknowledged before me this _____ by
DAVID DERRICK GRIFFIN AND DIANE GRIFFIN


who is personally known to me or who has produced _____ as identification.

                                     _____
                                     Notary Public

Initials:_____

CPB0006228787

-6A(FL) (0005).02                   Page 16 of 16                 Form 3010  1/01

DGRIFFIN - 000025

# Exhibit A

Lot 120, Block 2, COUNTRYSIDE MEADOWS REPLAT, according to the Plat thereof, as recorded in Plat Book 104, Page 12, of the Public Records of Palm Beach County, Florida.

Parcel Identification Number: 00-42-45-20-05-002-1200

File Number: 212080.0009

DoubleTime®

DGRIFFIN - 000026

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 6TH                   day of
OCTOBER          , 2006     , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the
same date, given by the undersigned (the "Borrower") to secure Borrower's Note to
COLONIAL BANK, N.A.

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at:

9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling,
together with other such parcels and certain common areas and facilities, as described in
DECLARATIONS, COVENANTS, CONDITIONS AND RESTRICTIONS

(the "Declaration"). The Property is a part of a planned unit development known as

COBBLESTONE CREEK
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the
"Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners
Association; and (iii) any by-laws or other rules or regulations of the Owners Association.
Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the
Constituent Documents.

CPB0006228787

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                                   Page 1 of 3
VMP-7R (0411)          VMP Mortgage Solutions, Inc. (800)521-7291          Initials: _____

DGRIFFIN - 000027

   **B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

   What Lender requires as a condition of this waiver can change during the term of the loan.

   Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

   In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

   **C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

   **D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

   **E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

   **F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

CPB0006228787

-7R (0411)                         Page 2 of 3      Initials: _____      Form 3150 1/01

DGRIFFIN - 000028

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)          _____ (Seal)
DAVID DERRICK GRIFFIN          -Borrower          DIANE GRIFFIN                    -Borrower

_____ (Seal)          _____ (Seal)
                               -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                               -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                               -Borrower                                          -Borrower

                                                  CPB0006228787

VMP®-7R (0411)              Page 3 of 3              Form 3150 1/01

DGRIFFIN - 000029

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 6TH day of OCTOBER , 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to
COLONIAL BANK, N.A.

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

CFB0006228787

MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3170 01/01                     Page 1 of 3
VMP-57R (0411)        VMP Mortgage Solutions, Inc. - (800) 521-7291      Initials:_____

DGRIFFIN - 000030

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

CPB0006228787

**VMP®**-57R (0411)                    Page 2 of 3         Initials: _____      Form 3170 1/01

DGRIFFIN - 000031

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)          _____ (Seal)
DAVID DERRICK GRIFFIN         -Borrower      DIANE GRIFFIN             -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                               -Borrower


                                                            CPB0006228787

VMP-57R (0411)                  Page 3 of 3                 Form 3170 1/01
Return To:
ADORNO & YOSS

350 EAST OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

DGRIFFIN - 000032

Return To:
ADORNO & YOSS

350 EAST OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

# ADJUSTABLE RATE RIDER
(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 6TH    day of OCTOBER      , 2006   ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
COLONIAL BANK, N.A.

("Lender") of the same date and covering the property described in the Security Instrument
and located at:

9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:
A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of      7.3750 %. The Note provides for
changes in the interest rate and the monthly payments, as follows:
4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the 1ST    day of NOVEMBER    , 2011   ,
and on that day every 6TH    month thereafter. Each date on which my interest rate
could change is called a "Change Date."

CPB0006228787

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *The
Wall Street Journal*) - Single Family - Fannie Mae Uniform Instrument
VMP-838R (0402)                  Page 1 of 4                      Form 3138 1/01
                 VMP Mortgage Solutions, Inc. (800)521-7291        Initials:_____

DGRIFFIN - 000033

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO & ONE-QUARTER percentage points ( 2.2500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 13.3750 % or less than 2.2500 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO percentage points ( 2.0000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.3750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

Initials: _____

CPB0006228787

-838R (0402)

Page 2 of 4

Form 3138 1/01

DGRIFFIN - 000034

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CPB0006228787

-838R (0402)                    Page 3 of 4                    Form 3138 1/01

DGRIFFIN - 000035

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)     _____ (Seal)
DAVID DERRICK GRIFFIN            -Borrower   DIANE GRIFFIN                    -Borrower

_____ (Seal)     _____ (Seal)
                                 -Borrower                                    -Borrower

_____ (Seal)     _____ (Seal)
                                 -Borrower                                    -Borrower

_____ (Seal)     _____ (Seal)
                                 -Borrower                                    -Borrower

CPB0006228787

VMP-838R (0402)          Page 4 of 4          Form 3138 1/01

# ADDENDUM TO ADJUSTABLE RATE RIDER

THIS ADDENDUM is made OCTOBER 06, 2006        , and is incorporated into and deemed to amend and supplement the Adjustable Rate Rider of the same date.

The property covered by this addendum is described in the Security Instrument and located at:

9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437
[Property Address]

**AMENDED PROVISIONS**
In addition to the provisions and agreements made in the Security Instrument, I/we further covenant and agree as follows:

**ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than 13.3750     % or less than 2.2500        %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than TWO            percentage point(s) (       2.0000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than        13.3750 %. My interest rate will never be less than      2.2500 %.

**TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CPB0006228787
1202 LIBOR Addendum to Rider 1/01

JAUR01R (08/05)                    Page 1 of 2                    Initials:_____

DGRIFFIN - 000037

In Witness Thereof, Trustor has executed this addendum.

Date: _____

_____ --(Seal}          _____ (Seal)
DAVID DERRICK GRIFFIN          -Borrower          DIANE GRIFFIN          -Borrower

_____ (Seal)               _____ (Seal)
                               -Borrower                                 -Borrower

_____ (Seal)               _____ (Seal)
                               -Borrower                                 -Borrower

_____ (Seal)               _____ (Seal)
                               -Borrower                                 -Borrower

CPB0006228787

JAUR01R (08/05)                    Page 2 of 2

Return To:
ADORNO & YOSS

350 EAST OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

DGRIFFIN - 000038

# INTEREST-ONLY ADDENDUM
# TO ADJUSTABLE RATE RIDER

Loan Number:

Property Address:
9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

THIS ADDENDUM is made this 6TH day of OCTOBER , 2006 , and is
incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same
date as this Addendum executed by the undersigned and payable to
COLONIAL BANK, N.A.

(the Lender).

THIS ADDENDUM supersedes Section 4(C) of the Rider. None of the other provisions of the Note are
changed by this Addendum.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (C) Calculations of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO & ONE-QUARTER percentage points ( 2.2500 %) to the
Current Index for such Change Date. The Note Holder will then round the result of this addition to the
nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this
rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, the Note Holder will then determine the amount of the monthly
payment that would be sufficient to repay accrued interest. This will be the amount of my monthly
payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a
voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal
during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the
amount necessary to pay interest at the then current interest rate on the lower principal balance.

CFB0006228787

JALS(OR (12/02)                      Page 1 of 2                      Initials:_____
                                                                     Form 603F 1/01

DGRIFFIN - 000039

At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The results of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Interest-Only Addendum to Adjustable Rate Rider.

Date: _____

_____ (Seal)        _____ (Seal)
DAVID DERRICK GRIFFIN      -Borrower     DIANE GRIFFIN              -Borrower

_____ (Seal)        _____ (Seal)
                           -Borrower                               -Borrower

_____ (Seal)        _____ (Seal)
                           -Borrower                               -Borrower

_____ (Seal)        _____ (Seal)
                           -Borrower                               -Borrower

CPB0006228787

JALSIOR (12/02)               Page 2 of 2              Form 603F 1/01

Return To:
ADORNO & YOSS

350 EAST OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

DGRIFFIN - 000040

# FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

10/6/2006

**Borrowers**

DAVID DERRICK GRIFFIN

APPLICATION#: WPB-GRIFFIN.D09
LOAN#:
Aurora Loan Services, Inc.
2530 S. Parker Road, Suite 601
Aurora, CO 80014

**Property**

9801 COBBLESTONE LAKES COURT
BOYNTON BEACH, FL 33437

## Itemization of Amount Financed

| | | | |
|---|---|---|---|
| $ | 580,798.51 | Total amount financed | $ 580,798.51 |
| $ | 75.00 | Tax Service | |
| $ | 30.00 | Courier | |
| $ | 350.00 | Underwriting Fee | |
| $ | 12.00 | Flood Certification | |
| $ | 350.00 | Processing | |
| $ | 3,074.49 | Interest | |
| $ | 545.00 | Settlement or closing fee | |
| $ | 4,436.49 | Total prepaid finance charges | $ 4,436.49 |
| $ | 700.00 | Appraisal Fee | |
| $ | 50.00 | Credit Report | |
| $ | 25.00 | 3rd Party Doc Prep | |
| $ | 200.00 | Doc Prep | |
| $ | 1,142.49 | Hazard insurance reserves | |
| $ | 1,858.46 | County property tax reserves | |
| $ | -380.83 | Aggregate adjustment | |
| $ | 3,595.12 | Total amount paid to others | |

THE FIRST PAYMENT FOR YOUR
5/6 Year ARM 6/2/6 IO

FOR:           $585,235.00
AT:            7.3750004%
WHICH WILL PAY OFF IN  360 PAYMENTS

IS BROKEN DOWN AS FOLLOWS:

| | | |
|---|---|---|
| PRINCIPAL &/OR INTEREST | $ | 3,596.76 |
| Mortgage Insurance | | 0.00 |
| Taxes and Assessments | | 929.23 |
| Insurance | | 380.83 |
| TOTAL PAYMENT | $ | 4,906.82 |

LOAN AMOUNT $  585,235.00

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.5481% | $1,000,393.49 | $580,798.51 | $1,581,192.00 |

## Your Payment Schedule Will Be:

| | | |
|---|---|---|
| 60 payments | monthly of $3,596.76 | beginning December 1, 2006 |
| 60 payments | monthly of $3,718.68 | beginning December 1, 2011 |
| 239 payments | monthly of $4,759.45 | beginning December 1, 2016 |
| 1 payment | of $4,757.05 | due on     November 1, 2036 |

This loan contains a variable-rate feature. Disclosures about the variable-rate feature have been provided to you earlier.

Security Interest:    You are giving a security interest in the property located at
                      9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FL 33437.
Late Charge:          If payment is 15 days late, you will be charged 5.0000% of the payment.
Prepayment:           If you pay off early, you will not have to pay a penalty.
                      If you pay off early, you will not be entitled to a refund of part of the finance charge.
Assumption:           Someone buying your home cannot assume the remainder of the mortgage on the original terms.
This Obligation:      will NOT have a demand feature.

Insurance: You may obtain property insurance from anyone you want that is acceptable to Lender.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties.

e means an estimate

I (We) hereby acknowledge receiving a completed copy of this disclosure.

| | |
|---|---|
| DAVID DERRICK GRIFFIN _____  Date _____ | _____  Date _____ |
| _____  Date _____ | _____  Date _____ |

Truth In Lending - Version 1 Final  © 2006 Harland Financial Solutions, Inc.

01/13/2006

DGRIFFIN - 000041

SERVICER:

## INITIAL ESCROW ACCOUNT DISCLOSURE STATEMENT

| PROPERTY LOCATION:<br>9801 COBBLESTONE LAKES COURT<br>BOYNTON BEACH, FL 33472 | | FILE NUMBER: KPB-GRIFFIN.009<br>LOAN NUMBER:<br>M. I. CASE NUMBER: |
|---|---|---|

THIS IS AN ESTIMATE OF ACTIVITY IN YOUR ESCROW ACCOUNT DURING THE COMING YEAR BASED ON PAYMENTS ANTICIPATED TO BE MADE FROM YOUR ACCOUNT.

| Month | Payments to Escrow | Payments from Escrow | Description | Escrow Balance |
|---|---|---|---|---|
| Starting Balance: | | | | $ 2,620.12 |
| Dec 06 | $ 1,310.06 | $ 0.00 | | 3,930.18 |
| Jan 07 | 1,310.06 | 0.00 | | 5,240.24 |
| Feb | 1,310.06 | 0.00 | | 6,550.30 |
| Mar | 1,310.06 | 0.00 | | 7,860.36 |
| Apr | 1,310.06 | 0.00 | | 9,170.42 |
| May | 1,310.06 | 0.00 | | 10,480.48 |
| Jun | 1,310.06 | 0.00 | | 11,790.54 |
| Jul | 1,310.06 | 0.00 | | 13,100.60 |
| Aug | 1,310.06 | 0.00 | | 14,410.66 |
| Sep | 1,310.06 | 0.00 | | 15,720.72 |
| Oct | 1,310.06 | 4,570.00 | 4,570.00 | Hazard Insurance | 12,460.78 |
| Nov | 1,310.06 | 11,150.72 | 11,150.72 | County Taxes | 2,620.12 |

(PLEASE KEEP THIS STATEMENT FOR COMPARISON WITH THE ACTUAL ACTIVITY IN YOUR ACCOUNT AT THE END OF THE ESCROW ACCOUNTING COMPUTATION YEAR.)

Cushion selected by servicer: $ 2,620.12

YOUR MONTHLY MORTGAGE PAYMENT FOR THE COMING YEAR WILL BE $ 4,906.82 OF WHICH $ 3,596.76 WILL BE FOR PRINCIPAL AND INTEREST AND $ 1,310.06 WILL GO INTO YOUR ESCROW ACCOUNT.

_____          _____
DAVID DERRICK GRIFFIN                    DATE                                          DATE

_____          _____
                                        DATE                                          DATE

Initial Escrow Account Disclosure Statement  © 2005 Harland Financial Solutions, Inc.         02/07/2005

DGRIFFIN - 000042

Six-Month LIBOR Adjustable-Rate Loan Program Disclosure — Fixed for First Five Years — Interest-Only
Important Mortgage Loan Information — *Please read carefully*

This disclosure describes the features of the Adjustable-Rate Mortgage (ARM) program you are considering. Information on other ARM programs is available from your Lender will be provided upon request. This disclosure does not constitute a commitment to make a loan to you. If you eventually obtain a loan, the Note, Security Instrument and related documents will establish your legal rights and obligations regarding the loan.

**HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED:**
- Your initial interest rate is not based on the index plus the margin. However, the initial interest rate may be equal to the index plus the margin or may include a discount or may include a premium. If your initial interest rate includes a discount, the initial rate will be lower than the sum of the index plus the margin. If your initial interest rate includes a premium, the initial rate will be higher than the sum of the index plus the margin. Please ask your Lender for the initial interest rate, discount or premium.
- Your interest rate will be periodically adjusted based on the index rate plus the margin. Please ask your Lender for the current index rate and margin.
- The index rate is the average of interbank offered rates for six month U.S. Dollar-denominated deposits in the London market, commonly referred to as the "LIBOR" index, as published in *The Wall Street Journal*. If this index is no longer available a comparable index will be substituted.
- The effective date of a change in the interest rate is a "Change Date."
- Except for your initial interest rate, which may be lower than, equal to or higher than the rate that is based on the index plus the margin, the interest rate will equal the index rate plus the margin, rounded to the nearest one-eighth of one percentage point (.125%), unless your interest rate "caps" limit the amount of change in the interest rate on a Change Date.
- Please note that if your initial interest rate is lower than the rate that is based on the index plus the margin, the interest rate may increase on the first Change Date even if the index decreases.
- Payments made during the first one-hundred-twenty (120) regularly scheduled monthly payments will be applied towards interest only. This means that the regular monthly payments will not reduce the principal balance during the interest-only period.
- Beginning with the one-hundred-twenty-first (121) regularly scheduled monthly payment, your payments will be applied towards principal and interest.
- During the period that you make payments of interest only, your payment will be based on the interest rate and loan balance. After that period, your payment will be based on the interest rate, loan balance and remaining loan term.

**HOW YOUR INTEREST RATE CAN CHANGE:**
Your interest rate is fixed for the first sixty (60) regularly scheduled monthly payments. Your interest rate can change for the 61st regularly scheduled payment and every six (6) months thereafter to the index rate plus the margin, subject to the following limits:
- Your interest rate will be rounded to the nearest one-eighth of one percentage point (.125%).
- Your interest rate cannot increase more than six percentage points (6.000%) at the first Change Date and two percentage points (2.000%) increase or decrease per adjustment thereafter.
- Your interest rate cannot increase more than six percentage points (6.000%) over the initial interest rate over the term of the loan.
- Your interest rate cannot decrease to be less than the initial interest rate over the term of the loan.

**HOW YOUR PAYMENT CAN CHANGE:**
- Your payment can change each time your interest rate changes.
- You will be notified in writing at least twenty-five (25) days before the due date of each adjustment. This notice will contain information about your interest rate, payment amount and loan balance.
- Your payment may increase or decrease substantially depending on changes in the interest rate.

**INITIAL AND MAXIMUM INTEREST RATE:**
For example, on a $10,000 thirty-year loan with an initial interest rate of 6.125% (index plus the margin rounded to the nearest .125%), the maximum amount that the interest rate can rise under this program is six percentage points (6.000%) to 12.125%, and the monthly payment can rise from a first year payment of $51.04 to a maximum of $110.98 in the 11 year.
  1. An index in effect on July 25, 2005 is 3.881. The index in effect at the time the initial interest rate is established for your loan may be different. The initial interest rate on your loan may be lower than, equal to or higher than the rate that is based on the index plus the margin.
  2. Margin of two and one quarter percentage points (2.250%). This is a margin we have used recently. Your margin may be different.

**CALCULATING YOUR PAYMENTS:**
To see what your payments (excluding escrow payments) would be, divide your mortgage amount by $10,000; then multiply the loan payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000 would be $60,000 / $10,000 = 6; 6 x $51.04 = $306.24).
I/We hereby acknowledge receipt of this disclosure as well as other ARM program disclosures for which I/We have expressed an interest prior to application.
I/We hereby acknowledge receipt of the Adjustable Rate Mortgage Disclosure Booklet.

_____          _____
Borrower                          Date

_____          _____
Borrower                          Date
6/6 LIBOR ARM Disclosure - 10 Year Interest Only          page 1 of 1
8/03/05  6/2/6.5 - Non-Convertible
Form 1025-10

DGRIFFIN - 000043

# ***IMPORTANT***
# DOCUMENT FORMATTING

This package may contain both legal & letter size documents.
## Each document must be printed on the appropriate sized paper.

Use of inappropriate paper size or mechanical reduction or enlargement of margins or font sizes is unacceptable.



SCHWARTZ
& Associates

# LOAN CLOSING
# PACKAGE

Loan Number: ███████████

Borrower: DAVID DERRICK GRIFFIN

File Number: J2181088 FL

Date: OCTOBER 05, 2006

**CHECK PRINTER SETTINGS**
This document should print on LEGAL size paper with 1" margin on each side.

JCOVER (07/05)

DGRIFFIN - 000044

# SPECIFIC LOAN CLOSING INSTRUCTIONS PROVIDED FOR

COLONIAL BANK, N.A.

**Return Closed Loan Package to:**
COLONIAL BANK, N.A.
919 WEST STATE ROAD 436, SUITE 102
ALTAMONTE SPRINGS, FL 32714

**Date:** OCTOBER 05, 2006

**Closing Representative:**
TAMMY COLE
Telephone: 813-314-3106
Fax Number: 813-314-3117

**Funding Representative:**
TAMMY COLE
Telephone: 813-314-3106
Fax Number: 813-314-3117

| | | |
|---|---|---|
| Loan Number: CPB0006228787 | MIN Number: | 1000675-0006228787-2 |
| FHA/VA Case Number: | Inv. MIN Number: | 1000675-0006228787-2 |

Borrower(s):
DAVID DERRICK GRIFFIN, A MARRIED MAN

Property Address:
9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

Legal Description:
SEE ATTACHED EXHIBIT A

| | | | | | |
|---|---|---|---|---|---|
| Loan Type: | CONVENTIONAL ARM/PURCHASE | Special Characteristics: | NO PMI | | |
| | | Interest Rate: | | 7.3750 % | |
| Lien Status: | FIRST LIEN | Loan Amount: | $ | 585,235.00 | |
| Closing Date: | OCTOBER 06, 2006 | Sales Price: | $ | 731,544.00 | |
| Funding Date: | OCTOBER 06, 2006 | Appraised Value: | $ | 732,000.00 | |
| First Payment: | DECEMBER 01, 2006 | Earnest Money: | $ | | |
| Maturity Date: | NOVEMBER 01, 2036 | P&I Payment: | $ | 3,596.76 | |
| Lock Expiration: | OCTOBER 30, 2006 | Term: | | 360 months | |

*SHOULD THIS LOAN FAIL TO CLOSE AND FUND ON THE DATES INDICATED ABOVE, FUNDS MUST BE RETURNED IMMEDIATELY. CONTACT THE CLOSING REPRESENTATIVE FOR FURTHER INSTRUCTIONS.*

## DO NOT DISBURSE THIS TRANSACTION UNTIL YOU HAVE CALLED THE FUNDING REPRESENTATIVE

Provided to:
Closing Agent: ADORNO & YOSS
Address: 350 EAST OLAS BLVD SUITE 1700
FORT LAUDERDALE, FLORIDA 33301

Contact Name: STEPHEN PULLEY
Telephone: (954) 766-7883
Fax Number: (954) 671-4571

Title File #

The Lender's name and address for HUD-1 is:

COLONIAL BANK, N.A.
400 N. TAMPA STREET
TAMPA, FL 33602

You are hereby required to close the loan described in these instructions in strict accordance with the instructions contained herein. Your agreement to the terms herein will be evidenced by your disbursement of loan proceeds. You must close this loan in accordance with Closing Procedures which are incorporated herein. Any costs associated with your failure to do so shall be your responsibility. Lender's approval of the HUD-1 does not negate your responsibility and does not constitute Lender's written approval to deviate from instructions. Cooperative follow-up may be required on this loan. Failure to be responsive and/or to comply with instructions will result in costs, claims and/or the termination of the responsibility of closing loans.

DO NOT DEVIATE FROM THESE WRITTEN INSTRUCTIONS WITHOUT PRIOR WRITTEN APPROVAL FROM CLOSING REPRESENTATIVE ONLY. RETURN THE CLOSED LOAN PACKAGE TO THE ADDRESS AT THE BEGINNING OF THESE INSTRUCTIONS.

Closing Agent agrees to provide a title policy to Lender, in accordance with its commitment, within 25 days of the funding of the loan. The Closing Agent shall be responsible for any additional costs associated with the failure to provide the final title policy or for any losses sustained by Lender in secondary marketing of the loan due to the failure of Closing Agent to provide said policy within 25 days.

DGRIFFIN - 000045

CPB0006228787

| CLOSING COSTS/LOAN FEES |
|---|

**Investor:**
AURORA LOAN SERVICES, INC.
**Lender:**
COLONIAL BANK, N.A.
**Broker/Correspondent:**
COLONIAL BANK, N.A.
**Mortgage Insurance Company:**

## SHOW TO WHOM ALL FEES WERE DISBURSED ON THE HUD-1 SETTLEMENT STATEMENT

Fees paid by Broker/Correspondent must be deducted from any monies they are to receive and paid to appropriate recipient.
( ☒  = Fee to be Net Funded from loan proceeds provided)
(POC = Paid Outside Closing)

| HUD-1 Line Number<br>Loan Fees | Collect | Paid By | Pay To | Net Fund | Amount POC |
|---|---|---|---|---|---|
| 800<br>DOCUMENT PREPARATION FEE | $    25.00 | | COLONIAL BANK FOR SCHWARTZ & ASSOCIATES | ☒ | $ |
| 800<br>DOCUMENT PREPARATION FEE | $ | | COLONIAL BANK | ☒ | $ |
| 1100<br>ESCROW/SETTLEMENT FEE | $ | | ADORNO & YOSS | ☐ | $ |
| 1100<br>COURIER FEE | $ | | ADORNO & YOSS | ☐ | $ |
| 803<br>APPRAISAL FEE | $   700.00 | BORROWER | COLONIAL BANK FOR APPRAISAL AUTHORITY CO | ☒ | $ |
| 804<br>CREDIT REPORT FEE | $    50.00 | BORROWER | COLONIAL BANK FOR CBC | ☒ | $ |
| 800<br>TAX RELATED SERVICE FEE | $    75.00 | BORROWER | COLONIAL BANK FOR FIRST AMERICAN | ☒ | $ |
| 800<br>COURIER FEE | $    30.00 | BORROWER | COLONIAL BANK FOR FEDEX | ☒ | $ |
| 800<br>UNDERWRITING FEE | $   350.00 | BORROWER | COLONIAL BANK | ☒ | $ |
| 800<br>FLOOD CERTIFICATION | $    12.00 | BORROWER | COLONIAL BANK FOR FIRST AMERICAN FLOOD | ☒ | $ |
| 800<br>DOCUMENT PREPARATION FEE | $   200.00 | BORROWER | COLONIAL BANK | ☒ | $ |
| 800<br>PROCESSING FEE | $   350.00 | BORROWER | COLONIAL BANK | ☒ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |
| | $ | | | ☐ | $ |

DGRIFFIN - 000046

CPB0006228787

## ESCROWS/IMPOUNDS

Closing Agent is responsible for proper proration of taxes between parties and paid receipts for first year premiums for hazard, flood insurance and/or any other required insurance coverage.

Calculate and collect the following escrows/impounds and prepaid interest and remit by separate check to COLONIAL BANK, N.A.

☐ **ESCROWS WAIVED** - Collect Per Diem Interest Only *(as indicated below)*

| ESCROW ITEM | # MONTHS | | MONTHLY AMT. | DUE AT CLOSING |
|---|---|---|---|---|
| | _____ mos. | @ $ _____ | | = $ _____ |
| HAZARD INSURANCE | 3 mos. | @ $ 380.83 | | = $ 1,142.49 |
| COUNTY PROPERTY TAX (IMPROVED) | 2 mos. | @ $ 929.23 | | = $ 1,858.46 |
| | _____ mos. | @ $ _____ | | = $ _____ |
| | _____ mos. | @ $ _____ | | = $ _____ |
| | _____ mos. | @ $ _____ | | = $ _____ |
| AGGREGATE ADJUSTMENT CREDIT: *(Show on Line 1008 of HUD-1)* | | | | ( $ (380.83) ) |
| PER DIEM INTEREST: ☐ *Interest Credit* | 26 days | @ $ 118.2495 | | = $ 3,074.49 |

Per Diem Interest includes day of disbursement, OCTOBER 06, 2006 , to NOVEMBER 01, 2006

## TITLE REQUIREMENTS

[X] Title Standards referenced in the enclosed General Closing Instructions are required and must be provided.

[X] Closing Protection Letter or Insured Closing Letter *(Texas T-50)* is required, unless previously provided to Lender.
NEW YORK LOANS - Agent Authorization Letter as to title insurer's liability as Principal for the acts of its Agent.

[X] **SHORT FORM POLICY or REGULAR TITLE POLICY WITH EXTENDED COVERAGE** - Without exception to Survey matters or Addendum to Short Form and insuring all taxes/assessments not yet due and payable. An original, signed Commitment/Binder with jacket is required if the Title Policy will not be issued at closing.

[X] **UNALTERED ENDORSEMENT FORMS OR THEIR EQUIVALENTS ARE REQUIRED UNLESS OTHERWISE COVERED IN POLICY:**
  [X] Restrictions, Encroachments & Minerals or Comprehensive *(ALTA 9/CLTA 100/Florida 9 Form/TLTA T-19)*
  [X] Environmental Protection *(ALTA 8.1/TLTA T-36)*
  [ ] Tax Deletion *(TLTA T-30)*
  [X] Planned Unit Development *(ALTA 5/TLTA T-17)*
  [ ] Condominium *(ALTA 4/TLTA T-28)*
  [X] Adjustable Rate Mortgage *(ALTA 6/TLTA T-33)*
  [ ] Balloon *(TLTA T-39)*
  [ ] Manufactured Housing *(ALTA 7/TLTA T-31 & T-31.1)*
  [ ] Leasehold *(ALTA 13.1/TLTA T-5)*
  [ ] Texas Equity Loan Mortgage *(TLTA T-42 & T-42.1)*
  [ ] Location
  [ ] 3R, 5
  [ ] Negative Amortization ARM *(ALTA 6.2/TLTA T-33.1)* and Insured amount must be _____ % of loan amount.
  [ ] Lien-Free *(CLTA 101.2)*
  [ ] Foundation *(CLTA 102.4 & 102.5)*
[X] All endorsements must be issued in their original form with no modifications, deletions or alterations.

[ ] **COLORADO LOANS** - Gap coverage and the Form CLTA 116 are required on all loans. If there are Mining and Mineral exceptions on the commitment, please include a Form 100.30 Mining and Mineral Endorsement.

[ ] **IOWA LOANS** - TITLE GUARANTY CERTIFICATE WITH ATTORNEY'S OPINION. Opinion returned in closed loan package and original certificate to follow upon issuance. (Must conform to the standards of the Iowa Title Guaranty Division of the Iowa Finance Authority.)

[ ] **TEXAS LOANS**
  [ ] Delete Arbitration Provision from the Title Policy
  [ ] P-39 Express Insurance Coverage on any claim that the insured lien is invalid because the loan amount includes funds advanced by the Lender for closing costs and/or reserves or impounds for taxes and insurance.

DGRIFFIN - 000047

CPB0006228787

## UNDERWRITING AND CLOSING CONDITIONS

Satisfy and check off closing conditions, sign and return with closed loan package.

**LOAN DISBURSEMENT IS SUBJECT TO:**

☐ ☒ All documents must be dated, as required, and signed exactly as name(s) appears under signature line(s).

☐ ☒ HUD-1 Settlement Statement - FAX to __813-314-3117__ prior to closing for review.

☐ ☒ Final typed 1003 Loan Application and/or addenda must be signed and dated by Borrower(s).

☐ ☐ Final Inspection ☐ with Photos ☐ Recertification of Value ☐ Certificate of Occupancy

☐ ☐ Clear Termite Inspection Report signed by Borrower(s) and Inspector - FAX

☐ ☐ Clear Health Department Approval of: ☐ Septic ☐ Well

☐ ☐ Repair Inspection(s)

☐ ☐ Proof of sale (HUD-1 & Warranty Deed) of present home netting $ _____ for property located at:

☐ ☐ Payoff of oustanding debts to: *(any amounts reflected are estimates only)*

☐ ☒ Title Commitment Corrections: See title requirements for additional title conditions. Update effective date; Schedule "A" to reflect correct proposed insured and Borrower(s); insured amount must reflect $ __585,235.00__ .

☐ ☐ Sales Contract and Addenda to reflect correct sales/loan terms with all corrections to be initialled by all parties; receipt earnest money. Certified copy to be returned in closed loan package.

☐ ☒ Require proof HOA/PUD is SUBORDINATE and applicable unaltered title endorsement issued or contact Closing Representative immediately. Dues must be current at time of closing.

☐ ☒ **These closing instructions and conditions are also subject to the following closing instruction addenda which are attached hereto and made a part hereof for all purposes:**

☒ Closing Conditions ☐ Texas Home Equity ☐ Manufactured Home
☐ FHA *(Purchase only)* ☐ New York CEMA ☐ Lender Specific

**Note: Additional Funding Requirements are listed in General Closing Instructions, Item #10.**

☐ ☒ FORWARD ORIGINAL CLOSED LOAN PACKAGE WITH APPROPRIATE COPIES NO LATER THAN 24 HOURS AFTER DISBURSEMENT TO:
COLONIAL BANK, N.A.
919 WEST STATE ROAD 436, SUITE 102
ALTAMONTE SPRINGS, FL 32714

CLOSING AGENT shall be responsible for any additional costs/penalties and any losses sustained by Lender in secondary marketing of the loan associated with the failure to forward the original closed loan package as indicated above.

☐ ☒ Original Security Instrument, Title Policy and recorded documents must be forwarded to:
COLONIAL BANK
P. O. BOX 5627
MONTGOMERY, AL 36103-5627

This loan must be closed and disbursed according to these instructions. If you obtain information which is contrary to the information contained herein, do NOT proceed with closing until you have contacted the Closing Representative for written authorization of changes. Do not disburse any funds until you have complied with all of the requirements contained in these instructions.
This loan was closed and disbursed in strict accordance with these instructions and addenda.

_____
Closing Agent

DGRIFFIN - 000048

CFB0006228787

GRIFFIN

## CLOSING CONDITIONS ADDENDUM

This CLOSING CONDITIONS ADDENDUM is a continuation of the UNDERWRITING AND CLOSING CONDITIONS and is made a part of the closing instructions.

[X] CLOSING AGENT TO SECURE/PREPARE WARRANTY DEED.

CLOSING AGENT TO COMPLETE PARCEL ID # ON SECURITY INSTRUMENT.

FORM(S) 4506(T) TO BE SIGNED.

ALL COURIER FEES MUST BE ITEMIZED AS THEY AFFECT THE TIL.  ALL FEE CHANGES

AFTER PREPARATION OF TIL MAY AFFECT TIL AND MUST BE APPROVED BY CLOSING

REPRESENTATIVE.

BORROWER TO PROVIDE EVIDENCE OF HAZARD INSURANCE AND/OR FLOOD INSURANCE (IF

FLOOD IS REQUIRED) AT CLOSING.  EVIDENCE OF INSURANCE MUST BE INCLUDED IN

CLOSED LOAN PACKAGE.

NON-OBLIGATED BORROWER(S) TO SIGN ALL APPROPRIATE DOCUMENTS.

BORROWER TO SIGN FLOOD NOTICE & CREDIT SCORE DISCLOSURE AT CLOSING

TITLE COMPANY TO EXECUTE PATRIOT ACT ADDENDUM FOR DIANE AT CLOSING

TITLE COMPANY TO EXECUTE EXHIBIT A, LEGAL DESCRIPTION AND RECORD WITH MORTGAGE

$500.00 LENDER CREDIT TO SHOW ON HUD-THIS CHECK WILL COME FROM LOCAL BRANCH

COLLECT 2006 PROPERTY TAXES AND SHOW ON HUD-1

PLEASE FAX HUD TO 813-314-3118, ATTN : TAMMY, TIL FAXED ONCE HUD IS APPROVED

LOAN PROCEEDS CHECK $583,443.00 TO BE SENT VIA FEDEX

BORROWER(S) TO EXECUTE TAX RETURNS

DGRIFFIN - 000049



# CLOSING CONDITIONS ADDENDUM

This CLOSING CONDITIONS ADDENDUM is a continuation of the UNDERWRITING AND CLOSING CONDITIONS and is made a part of the closing instructions. Closing Agent MUST return a copy of this form with the closed loan package. Form should be completed with items "CHECKED OFF" in left column.

## LOAN DISBURSEMENT IS SUBJECT TO:

☐ ☒ Provide a copy of insured closing letter from title insurer issued to Colonial.

☐ ☒ Prior to Borrower(s) signing, the following must be faxed to
TAMMY COLE _____ at __813-314-3117_____ for Truth-in-Lending and escrow calculations:

    ☒ Preliminary HUD-1
    ☒ Evidence of all insurance for the property (required even if a non-escrow loan).
    ☒ Amount of annual property taxes and due dates.

    Any changes to fees after the preparation of the Truth-In-Lending may affect the calculations and must be approved by Colonial Closing Representative.

☐ ☒ Fees must be shown on the HUD-1 exactly as they are shown on page 2 of these instructions. Colonial Bank may be abbreviated as "CB" if space is limited.

☐ ☒ Verify names and property address on the documents. Closing Agent must contact the Closing Representative immediately if errors are discovered. If changes to borrower's name are authorized on Security Instrument, the Assignment must also be changed accordingly. Re-recording charges as a result of failure to do so will be borne by Closing Agent.

☐ ☒ All documents must be executed by the borrower in BLUE INK, except for loans in Nevada. BLACK INK is required in Nevada..

☐ ☒ Borrower must sign the Flood Certificate. Examine Flood Certification carefully. Flood Insurance is MANDATORY if any portion of the structure or improvements lie within within a Special Flood Hazard Area. Provide evidence of insurance if required.

☐ ☒ Survey - Not over 90 days old on purchase transaction; on a refinance transaction, a copy of older survey is acceptable with the required title coverage. Provide copy of survey to Colonial.

☐ ☐ If FHA streamline refinance, line 813 of HUD-1 to read:
New MIP $ _____ less refund credit $ _____ (FHA # _____ ) =
$ _____ . (total MIP to collect from borrower.)

☐ ☐ Acquisition Loans - Buyer's closing costs are included in the loan amount. The cost is estimated to be at least
$ _____ , (excluding discount and prepaid items). If the amount stated is less than the actual closing cost, call the Closing Representative immediately. A change in the loan amount may be required.

☐ ☐ Cash to Borrower at closing is not allowed over $ _____ . If more, call the Colonial Closing Representative immediately.

☐ ☒ Seller/Third Party contributions cannot exceed _3.0000_ % or $ _____ .

☐ ☐ Borrower to provide evidence of gift funds for $ _____ by certified check with donor's name and account number on the check.

☐ ☐ Proof upon Closing of liquidation of _____ for at least $ _____ .

☐ ☒ Should loan not close on the scheduled date, call the Closing Representative for further instructions. The interest rate is subject to change if loan does not close on the scheduled date. Do not alter the funding check from Colonial in any way.

☐ ☐ Record the Assignment simultaneously with the Security Instrument. Provide certified copy of assignment with closed loan package. The recording fee for the Assignment of Mortgage is paid by Colonial Bank. The recording fee has been ADDED to the funding check and must be shown on the HUD-1 as "POC by Colonial."

☐ ☒ Amend General Instructions page 4 of 6, provide one copy of all certified documents and original and one copy of all other documents.

☐ ☒ All recorded documents must be returned in a timely manner. The closing agent shall be responsible for any additional costs associated with the failure to provide the recorded documents or for any losses sustained by Lender in secondary marketing of the loan due to failure of closing agent to provide said recorded documents in a timely manner.

CFB0006228787

DGRIFFIN - 000050

# ENCLOSED DOCUMENTS

We are enclosing the following documents:

| | |
|---|---|
| JCOVER | COVER LETTER |
| JCLOS1 | SPECIFIC CLOSING INSTRUCTIONS |
| JCLOS2 | |
| JCLOSADD | CLOSING CONDITIONS ADDENDUM |
| JCLOSCOL | CLOSING CONDITIONS ADDENDUM |
| JDOC | CLOSING INSTRUCTIONS (Document List) |
| JCLOS3 | GENERAL CLOSING INSTRUCTIONS |
| JCOL36 | CLOSED LOAN SUBMISSION CHECKSHEET |
| HUD1 | HUD-1 SETTLEMENT STATEMENT |
| 1838NFL | FNMA FLORIDA ADJUSTABLE RATE NOTE (6 MO LIBOR) |
| JALSION | INTEREST-ONLY ADDENDUM TO ADJUSTABLE RATE PROMISSORY NOTE |
| JAUR01N | ADDENDUM TO NOTE |
| 106A01FL | FNMA FLORIDA MORTGAGE WITH MERS |
| 106A02FL | |
| 106A03FL | |
| 106A04FL | |
| 106A05FL | |
| 106A06FL | |
| 106A07FL | |
| 106A08FL | |
| 106A09FL | |
| 106A10FL | |
| 106A11FL | |
| 106A12FL | |
| 106A13FL | |
| 106A14FL | |
| 106A15FL | |
| 106A16FL | |
| 1007R | FNMA MULTISTATE PLANNED UNIT DEVELOPMENT RIDER |
| 1057R | FNMA MULTISTATE 1-4 FAMILY RIDER |
| 1838R | FNMA MULTISTATE ADJUSTABLE RATE RIDER (6 MO LIBOR) |
| JAUR01R | ADDENDUM TO ADJUSTABLE RATE RIDER |
| JALSIOR | INTEREST-ONLY ADDENDUM TO ADJUSTABLE RATE RIDER |
| JNAMEAFF | NAME AFFIDAVIT FOR BORROWER 1 |
| JSHOCK | PAYMENT SHOCK NOTICE |
| J1STPAYCOL | FIRST PAYMENT LETTER AND TEMPORARY COUPONS (Inv. Loan Number) |
| 4506TC | REQUEST FOR TRANSCRIPT OF TAX RETURN FOR BORROWER 1 (INVESTOR) |
| 4506TC2 | REQUEST FOR TRANSCRIPT OF TAX RETURN FOR BORROWER 2 (INVESTOR) |
| W9 | W9 FOR BORROWER 1 |
| JADDRESS | ADDRESS CERTIFICATION |
| JCLOSAFF01 | LOAN CLOSING AFFIDAVIT (Conventional) |
| JD02 | HOMESTEAD DISCLAIMER & DESIGNATION FOR BORROWER 1 |
| JFACTACT01 | BORROWER AFFIDAVIT - FEDERAL REQUIREMENT TO PROVIDE CREDIT SCORE |
| JMINERAL | MINERAL RIGHTS ACKNOWLEDGEMENT |
| JTAXINFO | TAX INFORMATION FORM |
| JLAST | END OF PACKAGE NOTIFICATION |

JDOC  (10/98)

DGRIFFIN - 000051

CFB0006228787

## GENERAL CLOSING INSTRUCTIONS

### GENERAL REQUIREMENTS

These General Instructions have been prepared to provide Closing Agents with our general policies and requirements for conducting the loan closing. These requirements supplement the Specific Loan Closing Instructions (SLCI) issued on each loan. To the extent that the SLCI conflicts with any other information contained in these General Closing Instructions, the SLCI shall control. Some of the documents included are partially completed, please complete and insure that all documents have been fully completed, properly initialled, executed and acknowledged. Provide copies of all closing documents to the borrowers. The closing documents and the instructions may only be modified with written approval from Lender's Closing Representative.

1. **CLOSING AND DISBURSEMENT DATES**
   The closing and disbursement dates for the loan are shown on the specific closing instructions. The closing documents provided have been prepared reflecting the scheduled closing date. Borrower(s) may not execute any document prior to the scheduled closing date. If the loan, for any reason, does not close or disburse on these dates, call Lender for further instructions. Interest rate, discount, first payment date and other terms are subject to change after this date.

2. **CLOSING CONDITIONS**
   The closing conditions will be stated in the SLCI and any addenda attached and made a part thereof. IF YOU DO NOT UNDERSTAND OR CANNOT COMPLY WITH ALL OF THE REQUIRED CONDITIONS, CALL LENDER FOR FURTHER WRITTEN INSTRUCTIONS PRIOR TO CLOSING. If you receive instructions which are contrary to the information contained in these instructions, do not proceed until you have contacted Lender for written authorization of the changes. DO NOT disburse any funds until all of the requirements in the SLCI and the General Closing Instructions have been met, reviewed and approved by Lender. Funding must be authorized by Lender.

   Whenever possible, a form will be provided to satisfy the condition. However, in some cases, a form is inappropriate and the only place the condition will be stated is in the SLCI, Closing Instruction Addenda and the General Closing Instructions. Therefore, it is very important to read and comply with all of these instructions.

   Follow-up documentation may be required on this loan. Failure to be responsive to requests made concerning any follow up item(s) may result in claims, penalties and/or removal from approved closing agent listings.

3. **POSSESSION OF MORTGAGE NOTE AND LOAN DOCUMENTS FOR LENDER**
   At closing, you shall take possession of the mortgage note and all other loan documents in trust for the sole and exclusive benefit of, and as bailee for, Lender until the mortgage note and all loan documents are physically delivered to the address contained in these instructions.

4. **TITLE STANDARDS**
   The title policy MUST insure that the Note and Security Instrument create a valid first lien in favor of the Lender (*unless title policy is expressly ordered for subordinate lien transaction*). Closing Agent is responsible for verification of the payoff and satisfaction of any prior liens or encumbrances and Lender assumes no liability or risk related thereto. Any knowledge of secondary financing or junior liens must be disclosed to Lender prior to closing. Should title search reveal any superior liens that cannot be subordinated (such as Homeowner Association dues), Closing Agent must call Lender prior to closing for further written instructions.

   Title Policies issued on standard ALTA (American Land Title Association ) or TLTA (Texas Land Title Association) are acceptable. Title Policy is to be issued through the same company that issued the Binder/Commitment. The title insurance company must have at least one of the following ratings (unless insurer is covered by an acceptable reinsurance arrangement):

   - A "Financial Stability Rating" of "S" (strong) or better, or a "Statutory Accounting Rating" of "C" (Average) or better from Demotech, Inc.;
   - a "BBB" or better rating from Duff and Phelps Credit Rating Company;
   - a "C" or better rating from LACE Financial Corporation; or
   - a "Baa" or better rating from Moody's Investor Service; or
   - a "BBB" or better rating from Standard and Poor's, Inc.

   **Creditor's rights exclusion statement acceptable as provided under EXCLUSIONS FROM COVERAGE ALTA Loan Policy #7 and TLTA Mortgagee Policy (T-2) #8.** Otherwise, the policy *cannot* contain a creditor's rights exclusion statement that excludes any claim which arises out of the transaction creating the interest to the mortgage insured under the policy by reason of the operation of federal bankruptcy, state insolvency, or similar creditor's rights laws UNLESS SUCH EXCLUSION IS BASED ON: (a) the transaction creating the interest to the insured mortgage being a fraudulent conveyance or fraudulent transfer; or (b) subordination of the interest of the insured mortgagee as a result of the application of the doctrine of an equitable subordination; or (c) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer, except where the preferential transfer results from the failure: (i) to timely record the instrument or transfer; or (ii) of such recordation to impart notice to a purchaser for value or a judgment lien creditor.

   The title of the property as disclosed by the mortgagee policy must be good and merchantable, clear and free of all liens and encumbrances. The policy must assure full protection to the Lender or subsequent assignees of record and/or their successors and assigns. The title insurance must disclose all subordinate financing. Subordinate financing that may appear on the title must have the approval of Lender.

   Ownership must be reflected as FEE SIMPLE or LEASEHOLD (*if approved by Lender*). Title Company must insure that any person not joined in this transaction who may claim spousal, community property or other interest to subject property has waived interest according to any applicable federal or state law. This includes execution of appropriate documents, if applicable.

DGRIFFIN - 000052

Depending on the type of loan, the Title Policy must insure and Mortgagee Clause should read:

[X] Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for

[X] COLONIAL BANK, N.A.

[ ] and/or the Secretary of Housing and Urban Development of Washington, D.C.

[ ] and/or the Secretary of Veterans Affairs

[ ] *(For Texas only:)*
and each successor in ownership of the indebtedness secured by the insured mortgage, except a successor who is an obligor under the provisions of Section 12(c) of the Conditions and Stipulations
**or**
[X] *(For all other states;)*
its successors and/or assigns who are the lawful owner or owners of the evidence of debt identified herein and any subsequent owner or owners thereof

Lender requires Short Form Residential Loan Policies without exceptions to the title coverage and survey matters. If state law prohibits the use of a Short Form Policy, a regular Long Form Policy is acceptable. An existing or new survey, if required by the title company, in order to remove exceptions to survey matters on title, must be included in the closed loan package. When a title policy is issued, an ALTA 9 / CLTA 116 / Florida 9 Form / TLTA T-19 or Comprehensive Endorsement is required unless otherwise covered in policy. (*Texas - Required Survey Exception Amendment P-2*)

Title Policy must be issued within 25 days of closing and in accordance with the following:
- Effective date of the policy must be the date of the recording of the security instrument or thereafter, insuring against possible existence of adverse matters or defects in the title which are recorded during the period of time between the effective date of the title binder/commitment and the date of recording the document creating the estate or interest to be insured.
- If for any reason the security instrument is re-recorded, the effective date of the policy must be through the date of the re-recording.
- Any and all Taxes, Assessments, Liens, Charges, Obligations and Fees must be shown as either "Current", "Paid", or "Not Yet Due and Payable". No exception to rollback taxes, changes in land usage, ownership or exemptions is allowed. (*Texas - Required Tax Exception Amendment P-29, T-30 Endorsement*)
- Coverage amount must equal at least the loan amount. If the loan has negative amortization, coverage must equal maximum possible increase amount.
- Legal description must be same as on the security instrument.
- No exception may be taken which was not previously reflected on Title Commitment. Exceptions must be specific as to size, purpose, location and recording data and must be affirmatively insured against; if not, contact Lender. (**Texas P-5**)
- No exception may be taken for any future "Operation of Law" event, unrecorded leases, rights of parties/tenants in possession or visible and apparent easements, the location of which cannot be determined by a review of the applicable public records.
- If a survey is required:
  - any exception shown as not affecting subject property by an acceptable survey must be deleted.
  - any exception such as a building line, easement, etc. must be located on an acceptable survey or must be deleted.
- Any rights of reversion, forfeiture or first refusal must be waived or released.
- Legal right of access to and from subject property must be insured.
- All loans require an Environmental Protection Endorsement.
- All items and liens on ALTA Schedule B-I or TLTA Schedule C must be satisfied and no additional exceptions to be reflected.
- Refer to SLCI for required title endorsements and additional requirements.

5. **SURVEY**
**The Flood Determination Certificate will take precedence over the survey on flood matters.**

A survey may be required by the title company or due to loan program guidelines. It must show no encroachment and/or deviations from the Title Insurance, must have DATE, SEAL, and SIGNATURE of Surveyor and must include volume and page of the map record or plat book and page number.
- Survey must indicate property address, legal description and directional indicator must be shown.
- The legal description of the property must agree with the Security Instrument *and* the Title Policy
- Survey must include all improvements and other items of real or personal property which may affect the marketability or value of the property.
- Survey must show dimensions of improvements, building set-back lines, all easements of record that will appear on the Title Policy, and all encroachments or violations.
- Survey must be acceptable to the title company in order to remove exceptions to survey matters on Title.
- See Paragraph 4 "Title Standards" for survey deletion requirements.

A copy of the survey must be provided in the closed loan package. The survey must conform to:
- The title insurance company's or attorney's standards, and
- Any applicable legal standards relating to surveys

DGRIFFIN - 000053

CPB0006228787

6. **HAZARD, FLOOD & OTHER INSURANCE**

At closing, the loan must have in effect Hazard Insurance and Flood Insurance (if applicable). The amount of coverage for the Hazard Insurance, including Windstorm/Hail, must be the maximum available on the insurable value of the improvements as established by the property insurer or required to compensate for damage or loss on a replacement cost basis. The maximum amount of coverage for Flood Insurance is required, as established by the property insurer or the maximum available under the NFIA program. The Lender will accept a Guaranteed Replacement Cost Endorsement.

## HAZARD INSURANCE

The Closing Agent MUST forward the original or copy of Policy showing the required coverage, deductible amount, correct names, property address and a paid receipt for the first year's premium, which must be signed by an authorized agent, with the closed loan package. Evidence of insurance is acceptable if clause requiring 10 day notification to mortgagee before cancellation is contained. Original policy is required prior to binder expiration.

When premium is collected at closing, you are responsible to ensure that it has been paid and furnish Lender proof of such payment. You are responsible for remitting the premium to the insurance company within 24 hours of disbursement.

The insurance must be written on a company that has either a "B" or better general policyholder's rating or a "6" or better financial performance index rating in Best's Key Rating Guide, or an "A" or better rating from Demotech, Inc. We will also accept coverage from Lloyd's of London. Policy must meet state requirements.

Insurance must protect against loss or damage from fire and other hazards covered by standard extended coverage insurance. Windstorm and hail coverage must be included in the hazard coverage or obtained in a separate policy. The coverage may be obtained from an approved insurance company or from a state agency. You are responsible for notifying Lender of any other coverage which is expressly excluded.

The amount of the deductible may not be any more than the higher of $1,000 or one percent of the policy face value.

The deductible on windstorm and hail coverage may be $2,000 or 2% of the policy face value, whichever is higher. This only applies to these particular types of coverage.

## FLOOD INSURANCE

We will accept as evidence of coverage a Flood Insurance application with a paid receipt and/or Policy Declaration page. Effective date MUST be on or before the date of closing. Flood insurance must be issued by a member of the National Flood Insurance Administration (NFIA) or a licensed property and casualty insurance company authorized to participate in NFIA's "Write Your Own" program. When premium is collected at closing, provide proof of payment to Lender. You are responsible for remitting the premium to the insurance company within 72 hours of disbursement.

The amount of the deductible may not be any more than the higher of $1,000 or one percent of the policy face value.

A **Flood Determination** is required on every loan. If a copy of the Determination is included in the closing package, examine carefully for flood insurance requirements.

## CONDOMINIUM AND PUD INSURANCE

A certified copy of the current "master" or "blanket" policy is required on Condominium and PUDs for hazard and/or flood. The Homeowners Association holds the original policy. Provide a certificate of insurance showing that the individual unit that secures this lien is covered under the master policy. MUST have an endorsement with the correct Lender's Loss Payable clause below.

## RENT LOSS INSURANCE

Rent loss insurance may be required on 1-4 Family (Investment) properties. The coverage must protect against a minimum of six (6) months rent loss.

## LENDER'S LOSS PAYABLE

Each Insurance Policy must include Mortgagee's Clause which should read:

COLONIAL BANK, N.A.
ITS SUCCESSORS AND/OR ASSIGNS
AS THEIR INTEREST MAY APPEAR
POST OFFICE BOX 23
MONTGOMERY, AL 36101-0023
Loan Number: CPB0006228787

**REFINANCES:** We would like to have a new policy at closing. If this is not possible, a copy of the existing policy will be acceptable provided:

- Copy of Policy must contain a signature of insurance company representative.
- MUST have an endorsement to the Policy with the correct Lender's Loss Payable clause above.
- Paid receipt showing the next due date of the premium. If escrows are not waived, sufficient pro-rated escrow funds should be collected at closing to establish the escrow account as the account MUST have twelve (12) full months deposited by the next anticipated disbursement date.

DGRIFFIN - 000054

CPB0006228787

7. **ESCROWS WILL BE ESTABLISHED ON THE AGGREGATE ANALYSIS METHOD**
   Applicable escrow accounts are required on all loans, unless other written instructions are provided by Lender. Sufficient funds should be collected at closing to establish escrow accounts in accordance with the escrow section of the SLCI. Specifically the following will apply:

   - <u>TAXES</u> - Collect and disburse property taxes directly to the taxing authority if the delinquent date is within 30 days after closing. Provide paid receipt.
   - <u>HAZARD AND FLOOD INSURANCE</u> - The monthly amount collected at closing should equal one-twelfth of the annual premium.
   - <u>MORTGAGE INSURANCE</u>
   - <u>LEASEHOLD PAYMENTS</u> - When the mortgage property is a leasehold estate notify Lender in order to verify property eligibility. The amount collected at closing should equal one-twelfth of the annual lease payment. Provide evidence that the lease is current.

   An aggregate adjustment credit must be calculated and entered on Line 1008 of the HUD-1. The aggregate adjustment credit will apply to the total amount of escrows reflected on the HUD-1 Settlement Statement. See SLCI.

8. **TYPOGRAPHICAL CORRECTIONS**
   Typographical errors should be avoided. However, when such errors are made type "///" (slashes) through the incorrect portions and type in the correction (ERASURES OR WHITE-OUTS ARE NOT PERMITTED). All corrections MUST be initialled on ALL copies by the parties executing the documents. Contact Lender for approval of any corrections.

9. **CERTIFIED COPIES**
   All certified copies must have the original (ink "wet") signature of the person certifying the copy to be a true and accurate copy of the original. Stamped signatures are not acceptable.

10. **FUNDING REQUIREMENTS**
    The following items (marked with an "X") are required to be completed/executed and returned in the closing package.
    We require all checks and following documents to be returned to the address at the beginning of these instructions no later than 24 hours after DISBURSEMENT                    . Contact the Closing Representative if you have any questions regarding these instructions. You MUST return a completed ("CHECKED-OFF" in left column) copy of this form with your closing package. All certified copies MUST carry the original signature of the person certifying the copy.

|   |   |   |
|---|---|---|
| | X | Closing Instructions (Original signed by Closing Agent) |
| | X | Truth-In-Lending Disclosure (Original and 1 certified copy) |
| | X | Note with applicable Addenda (Original and 3 certified copies) |
| | X | Security Instrument with Applicable Riders (3 certified copies) |
| | X | Warranty Deed *(if applicable)* (1 certified copy) |
| | X | Assignment *(if applicable)* (3 certified copies) |
| | X | HUD-1 Settlement Statement (2 Originals and 3 certified copies) |
| | X | Hazard and/or Flood Insurance Policy with paid receipt for 1 full year premium (Original and 1 certified copy) |
| | X | Survey *(if applicable)* (3 Originals or certified copies) |
| | X | Restrictions, Easements & Mineral Reservations (1 certified copy) |
| | X | Original Title Policy or Title Commitment (Binder) and applicable endorsements |
| | X | Any Other Conditions and/or Documents as Specified in Underwriting and Closing Conditions |
| | X | All Original Documents fully executed |

DGRIFFIN - 000055

CPB0006228787

| INSTRUMENTS, FORMS AND DOCUMENTS |
|---|

1.  **AMENDMENTS TO DOCUMENTS**
    Do not close the transaction if the Borrower, Broker and/or the Seller amends any document provided by Lender. If this happens, call the Closing Representative for written instructions. Amendments include, but are not limited to, alterations, deletions and/or additions to terms or verbiage. Review all documents for accuracy and completeness even if the documents are provided by Lender or its designated agent. You are responsible if any necessary corrections are not made prior to closing. Failure to correct an apparent error on the face of the documents may result in fees and penalties assessed to you. The Note and Security Instrument included in the loan closing package are the most current legal documents required by the investor; these documents are to be used without exception. **No substitutions are allowed without prior written approval from Lender.**

2.  **HUD-1/FINAL SETTLEMENT STATEMENT**
    A condition for serving as the Closing Agent on this loan, the HUD-1 Settlement Statement form must be provided and prepared by the Closing Agent. The HUD-1 must be typed with all heading information completely filled in, including addresses. Changes, corrections and/or alterations must be initialled by all parties.

    In order to comply with Federal Regulation X, the HUD-1 must be explained and agreed to prior to the consummation of this transaction. Send the original to Lender, one copy each to borrower and seller.
    *   COLONIAL BANK, N.A.
        must appear as the Lender on the HUD-1.
    *   Per diem interest must accurately reflect date and amount. Interest calculations based on   365        days.
    *   Taxes must be broken down by EACH authority.
    *   Indicate to whom each fee charged is payable; the amount of the fee; and who paid it.
    *   Do NOT vary fees from one party to another and NO CREDITS are to appear unless authorized in writing by Lender.
    *   All POC items must be on HUD-1 and MUST show amount of fee, to whom it was paid, and who paid it.
    *   Cash back to Borrower(s) is NOT allowed unless authorized in writing by Lender. *Texas Owner Occupied Homestead Properties* - Cash back to Borrower(s) is NOT allowed unless transaction is a bonafide Texas Home Equity Loan.
    *   Escrow for Repairs is NOT allowed unless authorized in writing by Lender.
    *   All borrower(s), seller(s) and Closing Agents MUST sign and date HUD-1.

    Verify Borrower/Seller fees to sales contract and notify Lender of any changes. Notify Lender, prior to closing, if the Borrower will pay more costs than described in the Sales Contract, or if the amount of earnest money to be credited differs from the Sales Contract, or if any figures differ from those shown on SLCI. Disburse fees to appropriate parties. <u>CLOSING AGENT WILL BE RESPONSIBLE FOR ANY FEES NOT COLLECTED.</u>

3.  **TRUTH-IN-LENDING DISCLOSURE STATEMENT (TIL)**
    It is your responsibility as Closing Agent to contact Lender for our computations pertaining to this statement, if so instructed in the SLCI. You are responsible for contacting Lender for recalculation of TIL if any of the figures or dates change or you become aware of an error. <u>FAILURE TO COMPLY WITH THIS REQUIREMENT COULD RESULT IN SEVERE MONETARY PENALTIES.</u> The borrower(s) MUST sign <u>exactly</u> as TIL is typed and initial all pages.

4.  **POWER OF ATTORNEY (POA)**
    Use of a POA requires prior written approval by Lender. A POA must be specific to the property and transaction, and must be properly notarized. The POA must be recorded in correct form and recorded prior to the execution of the Security Instrument. POA should only be used in rare circumstances when it is <u>impossible</u> for all parties to be present at closing. You are responsible for determining that the use of a POA does not violate state or local laws and that the format is in compliance with the state and local laws, and does not adversely affect the required title coverage in any way. All closing documents must be signed by the Attorney-In-Fact, in his/her own handwriting. The signature on each document must be identified as that of the Attorney-In-Fact. Example: *Jane Doe by John Doe, Attorney-in-Fact.*

5.  **MORTGAGE NOTE**
    Executed original and 3 certified copies to Lender and one certified copy to Borrower(s). Names used on Note MUST be <u>exactly</u> as they are shown on the SLCI or as you find them to be more accurate through your analysis. The borrower(s) MUST sign <u>exactly</u> as Note is typed and initial all pages.

6.  **SECURITY INSTRUMENT**
    *   Three certified copies (recorded original to follow) to Lender and one copy to borrower(s).
    *   The names on the Security Instrument should be <u>exactly</u> as they are shown on the SLCI or as you find them to be more accurate through your analysis. The borrower(s) MUST sign <u>exactly</u> as the Security Instrument is typed and initial all pages.
    *   Legal description on the Security Instrument MUST be <u>exactly</u> as shown on the Title Policy.
    *   Notary section must be fully completed and properly executed.
    *   Rider(s), if applicable, will be provided in the loan closing package for your use. Rider(s) MUST be referenced in the "Riders" section of the Security Instrument with each Rider's corresponding box being marked. Originals of all Riders and Exhibits MUST be recorded with the Security Instrument.

DGRIFFIN - 000056

CPB0006228787

7.  **SUBORDINATION AGREEMENTS**
If the SLCI require a subordination agreement by another lien holder, you must obtain that agreement.  It is your responsibility to see that it is signed prior to closing and that the subordination agreement is recorded immediately after the Security Instrument.  The subordination agreement must show the recording information from both Security Instruments.  LENDER, ITS AGENTS OR SUCCESSORS AND/OR ASSIGNS, WILL NOT ENTER INTO SUBORDINATION AGREEMENTS.  Second lien holder subordination agreements which simply subordinate the existing lien to the Lender's lien are the only subordination agreements which are acceptable to Lender.

The Title Policy must insure that Lender is in first lien position.

If the SLCI does not require a subordination agreement and a second lien exists, call Lender  prior to closing.  It will be necessary for the loan to be reviewed by an Underwriter prior to closing.

8.  **NOTICE OF RIGHT TO CANCEL**
- A Notice of Right to Cancel will be enclosed when the transaction requires a three (3) day right of recession period under Federal Regulation Z.
- Two (2) copies of the completed Notice of Right to Cancel must be provided to each borrower and each person having an ownership interest and occupies the security property as their principal residence.
- Advise each person signing the Notice of his or her right to cancel the transaction until midnight of the third (3rd) business day after the day of closing.  Sundays and federal legal holidays (recognized by the Federal Government) are not considered "Business Days" for the purpose of the three day rescission period.
- Disclosure of all costs to borrower, including a completed HUD-1 Settlement Statement, Truth-In-Lending Disclosure and Notice of Right to Cancel must be provided and executed on the same date.
- if a confirmation has been provided, it must be signed on the fourth (4th) business day.
- On the fourth (4th) business day following the original signing date, the loan proceeds may  be disbursed if the borrower(s) or any person with an ownership interest has not exercised the option to cancel this transaction.
- Should any person having an ownership interest in the property rescind the transaction or request a waiver of  the rescission period or any other modification concerns involving the Notice of Right to Cancel, the closing agent must contact Lender for further instruction.

9.  **INITIAL ESCROW ACCOUNT STATEMENT**
If escrows are collected, the borrower(s) will be provided an Initial Escrow Account Statement based on the initial escrow analysis at closing.  Borrower(s) are required to sign analysis.  Return original in closed loan package.

DGRIFFIN - 000057

CPB0006228787



# CLOSED LOAN SUBMISSION CHECKSHEET

**Closing Agent to complete when sending closed loan to Colonial within 24 hours of loan disbursement.**

---

### ***IMPORTANT NOTICE***

Please provide the information below for the party responsible for post-closing correspondence. Address shown on page one of the closing instructions will be used if information below is **not** completed.

Name: _____

Address: _____

City: _____ State:_____ Zip Code: _____

---

[   ] FUNDS due to Colonial **$** _____ (place on top of documents)

[   ] Note-*executed original.*

[   ] Borrower's Power of Attorney
    (certified copy of recorded original)

[   ] Broker Power of Attorney (copy or recorded original)

[   ] Modification Agreement-with Terms of Modification
    (certified copy)

[   ] Assignment of Security Instrument
    (certified copy)
    (   ) Colonial to Investor

[   ] HUD-1 Settlement Statement- original

[   ] Truth-In-Lending Disclosure

[   ] Mortgage/Deed of Trust/Security Deed
    (certified copy)
    **Required Riders Attached:**
    [   ] PUD   [   ] Condo   [   ] Balloon
    [   ] Adjustable Rate Rider
    [   ] 1-4 Family Rider

[   ] Loan Closing Affidavit

[   ] Tax Information Form

[   ] Name Affidavit

[   ] Address Certification

[   ] Mining and Mineral Rights Letter

[   ] Notice of Right to Cancel-refinance

[   ] First Payment Letter

[   ] Notice of Assignment, Sale or Transfer
    (   ) Colonial to Investor

[   ] Request For Taxpayer ID Number (aka W9)

[   ] Title Commitment or Binder

[   ] Title Policy with required Endorsements

[   ] Hazard Policy or Declaration Page - with evidence first
    year premium has been paid.

[   ] Windstorm & Hail Policy- if separate policy with
    evidence premium has been paid.

[   ] Notice to Borrower/Flood Certificate

[   ] Flood Insurance Application –with evidence of premium
    payment.

[   ] Initial Escrow Acct. Statement

[   ] Loan Application (1003 form)

[   ] Buydown Agreement

[   ] No Escrow Account Option Agreement

[   ] Escrow/Holdback Agreement

[   ] Subordination Agreement

[   ] Survey

[   ] Private Mortgage Insurance

[   ] Final Inspection
    (   ) With Photos
    (   ) Re-certification of Value
    (   ) Certificate of Occupancy

[   ] Health Authority Approval of:
    (   ) Septic Tank   (   ) Well

### State Specific Documents

[   ] Georgia Settlement Disclosure

[   ] Texas-Loan Agreement Notice

### Other Enclosures

[   ] _____

[   ] _____

[   ] _____

[   ] _____

[   ] _____

[   ] _____

[   ] _____

---

| **RETURN CLOSED LOAN TO ADDRESS BELOW** | **SEND RECORDED DOCUMENTS & TITLE POLICY** |
|---|---|
| Colonial Bank, N.A. | Colonial Bank, N.A. |
| 919 WEST STATE ROAD 436, SUITE 102 | **P.O. Box 5627** |
| ALTAMONTE SPRINGS, FL 32714 | Montgomery, AL 36103-5627 |

DGRIFFIN - 000058

| FUNDING NUMBER REQUEST |
| --- |

### *****URGENT ACTION REQUIRED*****

To confirm the loan has closed and obtain your funding number, this certification is to be signed, dated and faxed to Colonial Bank Mortgage Division along with all requested conditions as noted on our Closing Instructions on the day of closing.

Please fax to Colonial Bank Fax # (813)314-3118
ATTENTION: Tammy Cole

Borrower(s) Name: Griffin

Property Address: 9801 Cobblestone Lakes Ct

Loan Number: ███████

This is to certify that the above referenced loan closed on:

Date of Closing: 10/06/2006

Refi (please confirm borrower did not rescind) _____

Agent/Attorney: _____        Fax# _____

Contact Name: _____
                    (Agent/Attorney Signature Certifying Loan Closed)
If all conditions have been faxed along with this SIGNED certification, we will fax back your funding number.

CB FUNDING # _____

Return settlement package within 24 HOURS OF DISBURSEMENT to:

**Colonial Bank**
**Attn: Post Closing**
**919 West State Rd 436, Suite 102**
**Altamonte Springs, FL 32714**

**PLEASE FAX PATRIOT ACT ADDENDUM FOR HER WITH THIS COMPLETED FORM TO THE FAX NUMBER LISTED ABOVE.**

## A. Settlement Statement

**U.S. Department of Housing and Urban Development**

OMB No. 2502-0265

### B. Type of Loan

| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ Conv. Unins. | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number |
|---|---|---|---|---|---|
| 4. ☐ VA | 5. ☐ Conv. Ins. | | | | |

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. NAME AND ADDRESS OF BORROWER:** DAVID DERRICK GRIFFIN, A MARRIED MAN

1200 SE ATLANTIC DR.                    LANTANA, FLORIDA 33462

**E. NAME AND ADDRESS OF SELLER:**

TIN: _____

**F. NAME AND ADDRESS OF LENDER:** COLONIAL BANK, N.A.
400 N. TAMPA STREET
TAMPA, FL 33602

**G. PROPERTY**
LOCATION: 9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

**H. SETTLEMENT AGENT:** ADORNO & YOSS
PLACE OF SETTLEMENT: 350 EAST OLAS BLVD SUITE 1700
FORT LAUDERDALE, FLORIDA 33301

TIN: _____

**I. SETTLEMENT DATE:** OCTOBER 06, 2006          **DISBURSEMENT DATE:** OCTOBER 06, 2006

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract sales price | 731,544.00 | 401. Contract sales price | 731,544.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower: | | 403. | |
| (from line 1400) | | | |
| 104. | | 404. | |
| 105. | | 405. | |
| ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | | ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | |
| 106. City/town taxes      to | | 406. City/town taxes      to | |
| 107. County taxes      to | | 407. County taxes      to | |
| 108. Assessments      to | | 408. Assessments      to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER:** ► | | **420. GROSS AMOUNT DUE TO SELLER:** ► | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess deposit  (see instructions) | |
| 202. Principal amount of new loan(s) | 585,235.00 | 502. Settlement charges to seller  (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | | ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | |
| 210. City/town taxes      to | | 510. City/town taxes      to | |
| 211. County taxes      to | | 511. County taxes      to | |
| 212. Assessments      to | | 512. Assessments      to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER:** ► | | **520. TOTAL REDUCTIONS IN AMOUNT DUE SELLER:** ► | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross amount due from borrower  (line 120) | | 601. Gross amount due to seller  (line 420) | |
| 302. Less amount paid by/for borrower  (line 220) | ) | 602. Less total reductions in amount due seller  (line 520) | ( ) |
| 303. CASH ☐ FROM ☐ TO ☐ BORROWER ► | | 603. CASH ☐ / TO ☐ FROM ☐ SELLER ► | |

Previous Edition is Obsolete                    **HUD-1 (3-86) - RESPA, HB 4305.2**

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained in Blocks E, G, H, and I and on line 401 (or, if line 401 is estimated, lines 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER INSTRUCTIONS: If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide [see box H] with your correct taxpayer identification number. If you do not provide [see box H] with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law, and, under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

_____
Seller's Signature

HUD-1

VMP-501B (0205).02                    VMP MORTGAGE FORMS - (800)521-7291                    PAGE 1

DGRIFFIN - 000060

| HUD-1 (Rev. 3/86) | | | OMB No. 2502-0265 |
|---|---|---|---|

**L.** SETTLEMENT CHARGES

| | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|
| 700. TOTAL SALES / BROKER'S COMMISSION: | | | | |
| BASED ON PRICE | $ | @ % = | | |
| DIVISION OF COMMISSION (LINE 700) AS FOLLOWS: | | | | |
| 701. $ | to | | | |
| 702. $ | to | | | |
| 703. Commission paid at settlement | | | | |
| 704. | | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN:** | | | | |
| 801. Loan origination fee | % | | | |
| 802. Loan discount | % | | | |
| 803. Appraisal fee to: | | | | |
| 804. Credit report to: | | | | |
| 805. Lender's inspection fee | | | | |
| 806. Mortgage insurance application fee to | | | | |
| 807. Assumption fee | | | | |
| 808. | | | | |
| 809. | | | | |
| 810. | | | | |
| 811. | | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE:** | | | | |
| 901. Interest from OCTOBER 06, 2006 to NOVEMBER 01, 2006 @ $ 118.2495 /day | | | 3,074.49 | |
| 902. Mortgage insurance premium for 0 mos. to | | | 0.00 | |
| 903. Hazard insurance premium for yrs. to | | | | |
| 904. *Flood Insurance Premium for* yrs. to | | | | |
| 905. | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER:** | | | | |
| 1001. Hazard Insurance | months @ $ | per month | | |
| 1002. Mortgage insurance | months @ $ | per month | | |
| 1003. City property taxes | months @ $ | per month | | |
| 1004. County property taxes | months @ $ | per month | | |
| 1005. Annual assessments | months @ $ | per month | | |
| 1006. *Flood Insurance* | months @ $ | per month | | |
| 1007. | months @ $ | per month | | |
| 1008. Aggregate Adjustment Credit | | < (380.83) > | | |
| **1100. TITLE CHARGES:** | | | | |
| 1101. Settlement or closing fee to | | | | |
| 1102. Abstract or title search to | | | | |
| 1103. Title examination to | | | | |
| 1104. Title insurance binder to | | | | |
| 1105. Document preparation to | | | | |
| 1106. Notary fees to | | | | |
| 1107. Attorneys' fees to | | | | |
| *(includes above items Numbers:* | | ) | | |
| 1108. Title insurance to | | | | |
| *(includes above items Numbers:* | | ) | | |
| 1109. Lender's coverage $ | | | | |
| 1110. Owner's coverage $ | | | | |
| 1111. | | | | |
| 1112. | | | | |
| 1113. | | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES:** | | | | |
| 1201. Recording fees: Deed $ ; Mortgage $ ; Releases $ | | | | |
| 1202. City/county tax / stamps: Deed $ ; Mortgage $ | | | | |
| 1203. State tax / stamps Deed $ ; Mortgage $ | | | | |
| 1204. | | | | |
| 1205. | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES:** | | | | |
| 1301. Survey to | | | | |
| 1302. Pest inspection to | | | | |
| 1303. | | | | |
| 1304. | | | | |
| 1305. | | | | |
| 1306. | | | | |
| 1307. | | | | |
| **1400. TOTAL SETTLEMENT CHARGES** (*Enter on line 103, Section J and line 502, Section K*) ▶ | | | | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

| Borrower: | Date: | Seller: | Date: |
|---|---|---|---|

| Borrower: | Date: | Seller: | Date: |
|---|---|---|---|

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

| | Date: | Settlement Agent: | Date: |
|---|---|---|---|

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

502 (9708)     VMP MORTGAGE FORMS - (800)521-7291     PAGE 2

DGRIFFIN - 000061

CPB0006228811

# FIRST PAYMENT LETTER
# AND TEMPORARY PAYMENT COUPONS

Date: OCTOBER 06, 2006                          Loan Number: ▮▮▮▮▮▮

Borrowers: DAVID DERRICK GRIFFIN, A MARRIED MAN

Property Address: 9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

It has been our privilege to serve you in obtaining your mortgage loan. The following information is provided as an added convenience in handling your mortgage loan payments.

Unless otherwise indicated in your promissory note, each loan payment is due on the 1ST day of each month. To assure proper credit to your account, please include your loan number on all of your loan payment checks. Each payment should be mailed early enough to reach the Note Holder or Servicer on or before that date. Any payments received after 15 days after the due date are subject to late charges.

Your "total monthly payment" for the initial payment of the loan is due DECEMBER 01, 2006, and has been estimated to be:

Initial Monthly Payment (as provided in the Note): $_____628.51__

Monthly Escrow Deposits:
$_____
$_____
$_____
$_____
$_____
$_____
Less Buydown Subsidy: $_____

$_____628.51__ TOTAL ESTIMATED MONTHLY PAYMENT

If you have established an escrow account with your Lender, you should receive an Initial Escrow Account Statement at settlement that is prepared according to the aggregate accounting method. The escrow portion of the mortgage payment is based on information available at settlement. Any changes in the escrow items could result in a shortage or surplus in your escrow account.

When all information has been verified by the Note Holder or Servicer, you will receive payment coupons/notices at the mailing address you have indicated on the address certification. The coupon will indicate the monthly payment amount and give the address where the payments should be sent. Your monthly payment may differ from the estimate shown above. If you do not receive your coupon book prior to the first payment due date, please use the coupons provided and mail to the address shown. Payments should be mailed to :

COLONIAL BANK, N.A.
POST OFFICE BOX 5627
MONTGOMERY, AL 36103

Should you have any questions regarding the servicing of your mortgage, please contact:

COLONIAL BANK, N.A.
POST OFFICE BOX 5627, MONTGOMERY, AL 36103
1-888-890-1965 X3461

I/We have read, understood and received a copy of this first payment letter and temporary payment coupons.

_____        _____
DAVID DERRICK GRIFFIN

_____        _____

_____        _____

_____        _____

PLEASE USE THE TEMPORARY COUPONS ON THE FOLLOWING PAGE TO MAIL IN MONTHLY PAYMENTS
UNTIL YOUR COUPON BOOK IS RECEIVED

J1STPAYCOL (09/05)                                                Page 1 of 2

DGRIFFIN - 000062

CFB0006228811

## TEMPORARY PAYMENT COUPON

DAVID DERRICK GRIFFIN

9801 COBBLESTONE LAKES COURT
BOYNTON BEACH, FLORIDA 33437

MAIL PAYMENT TO:

COLONIAL BANK, N.A.

POST OFFICE BOX 5627
MONTGOMERY, AL 36103

PLEASE RETURN THIS COUPON WITH YOUR PAYMENT

Remember to write your Loan Number on your check or money order to insure proper credit.

DECEMBER 01, 2006
Payment Due Date — Loan Number

| | | |
|---|---|---|
| Monthly Payment | $ | 628.51 |
| Additional Principal | $ | |
| Additional Escrow | $ | |
| Late Charge - $ *ONLY *if payment received* more than 15 days late | $ | |
| TOTAL AMOUNT ENCLOSED | $ | |

## TEMPORARY PAYMENT COUPON

DAVID DERRICK GRIFFIN

9801 COBBLESTONE LAKES COURT
BOYNTON BEACH, FLORIDA 33437

MAIL PAYMENT TO:

COLONIAL BANK, N.A.

POST OFFICE BOX 5627
MONTGOMERY, AL 36103

PLEASE RETURN THIS COUPON WITH YOUR PAYMENT

Remember to write your Loan Number on your check or money order to insure proper credit.

JANUARY 01, 2007
Payment Due Date — Loan Number

| | | |
|---|---|---|
| Monthly Payment | $ | 628.51 |
| Additional Principal | $ | |
| Additional Escrow | $ | |
| Late Charge - $ *ONLY *if payment received* more than 15 days late | $ | |
| TOTAL AMOUNT ENCLOSED | $ | |

## TEMPORARY PAYMENT COUPON

DAVID DERRICK GRIFFIN

9801 COBBLESTONE LAKES COURT
BOYNTON BEACH, FLORIDA 33437

MAIL PAYMENT TO:

COLONIAL BANK, N.A.

POST OFFICE BOX 5627
MONTGOMERY, AL 36103

PLEASE RETURN THIS COUPON WITH YOUR PAYMENT

Remember to write your Loan Number on your check or money order to insure proper credit.

FEBRUARY 01, 2007
Payment Due Date — Loan Number

| | | |
|---|---|---|
| Monthly Payment | $ | 628.51 |
| Additional Principal | $ | |
| Additional Escrow | $ | |
| Late Charge - $ *ONLY *if payment received* more than 15 days late | $ | |
| TOTAL AMOUNT ENCLOSED | $ | |

## ***ATTENTION CLOSING AGENT***
### Borrower(s) Must Be Provided a Copy of the First Payment Letter and Temporary Payment Coupons

J1STPAYCOL (09/05)

DGRIFFIN - 000063

| NOTE | 1000675-0006228811-0 |

OCTOBER 06, 2006          FORT LAUDERDALE          FLORIDA
*Date*                          *City*                          *State*

9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437
*Property Address*

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 73,154.00          (this amount will be called
``principal''), plus interest, to the order of the Lender. The Lender is
COLONIAL BANK, N.A.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled
to receive payments under this Note will be called the ``Note Holder.''

**2. INTEREST**
I will pay interest at a yearly rate of          9.7500 %.
Interest will be charged on unpaid principal until the full amount of principal has been paid.

**3. PAYMENTS**
I will pay principal and interest by making payments each month of U.S. $ 628.51
I will make my payments on the 1ST     day of each month beginning on DECEMBER 01, 2006
I will make these payments every month until I have paid all of the principal and interest and any other charges,
described below, that I may owe under this Note. If, on NOVEMBER 01, 2036
I still owe amounts under this Note, I will pay all those amounts, in full, on that date.
I will make my monthly payments at POST OFFICE BOX 1108
MONTGOMERY, AL 36101-1108          or at a different place if required by the Note Holder.

**4. BORROWER'S FAILURE TO PAY AS REQUIRED**
(A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any of my monthly payments by the end of  15
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be
5.0000          % of my overdue payment, but not less than U.S. $ 1.00          and not more than
U.S. $ 31.43          . I will pay this late charge only once on any late payment.
(B) Notice from Note Holder
If I do not pay the full amount of each monthly payment on time, the Note Holder may send me a written notice telling me
that if I do not pay the overdue amount by a certain date I will be in default. That date must be at least 10 days after the date on
which the notice is mailed to me or, if it is not mailed, 10 days after the date on which it is delivered to me.
(C) Default
If I do not pay the overdue amount by the date stated in the notice described in (B) above, I will be in default. If I am in
default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the
interest that I owe on that amount.

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described
above, the Note Holder will still have the right to do so if I am in default at a later time.

SECOND LIEN          CPB0006228811

| FLORIDA - SECOND MORTGAGE - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT |

Form 3910
Amended 10/98
VMP-75(FL) (0303)          VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3          Initials: _____

DGRIFFIN - 000064

**(D) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**5. THIS NOTE SECURED BY A MORTGAGE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, dated OCTOBER 06, 2006 , protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Mortgage describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.

**6. BORROWER'S PAYMENTS BEFORE THEY ARE DUE**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a ``prepayment.'' When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a ``full prepayment.'' A prepayment of only part of the unpaid principal is known as a ``partial prepayment.''

I may make a full prepayment or a partial prepayment without paying any penalty. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make a full prepayment at any time. If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same day that one of my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

**7. BORROWER'S WAIVERS**

I waive my rights to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as ``presentment''); (B) to give notice that amounts due have not been paid (known as ``notice of dishonor''); (C) to obtain an official certification of nonpayment (known as a ``protest''). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons are known as ``guarantors, sureties and endorsers.''

**8. GIVING OF NOTICES**

Any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail addressed to me at the Property Address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

**9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note. Any person who takes over my rights or obligations under this Note will have all of my rights and must keep all of my promises made in this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.

**10. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the Mortgage securing this indebtedness.

SECOND LIEN                                CPB0006228811

Initials: _____

VMP-75(FL) (0303)                    Page 2 of 3                    Form 3910

DGRIFFIN - 000065

**NOTICE TO BORROWER**
Do not sign this Note if it contains blank spaces.
All spaces should be completed before you sign.

_____ {Seal}          _____ {Seal}
DAVID DERRICK GRIFFIN          -Borrower                              -Borrower

_____ {Seal}          _____ {Seal}
                               -Borrower                              -Borrower

_____ {Seal}          _____ {Seal}
                               -Borrower                              -Borrower

_____ {Seal}          _____ {Seal}
                               -Borrower                              -Borrower

                                                          *[Sign Original Only]*

SECOND LIEN                        CPB0006228811

-75(FL) (0303)              Page 3 of 3              Form 3910

**Pay to the order of**

LEHMAN BROTHERS BANK, FSB

**without recourse**

COLONIAL BANK, N.A.

Signature: _____
Printed Name: _____
Title: _____

DGRIFFIN - 000066

Return To:
ADORNO & YOSS

350 EAST LAS OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

This instrument was prepared by:

COLONIAL BANK
400 N. TAMPA STREET
TAMPA, FL 33602
813-314-3100

## MORTGAGE

MIN 1000675-0006228811-0

THIS MORTGAGE is made this 6TH        day of OCTOBER              , 2006        , between the Mortgagor,
DAVID DERRICK GRIFFIN, A MARRIED MAN

JOINED HEREIN BY DIANE GRIFFIN

, whose address is
1200 SE ATLANTIC AVE., LANTANA, FLORIDA 33462
(herein "Borrower"), and the Mortgagee, Mortgage Electronic Registration Systems, Inc. ("MERS"), (solely as nominee for
Lender, as hereinafter defined, and Lender's successors and assigns). MERS is organized and existing under the laws of
Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
COLONIAL BANK, N.A.
("Lender") is organized and existing under the laws of THE UNITED STATES OF AMERICA       , and has an address of
32 COMMERCE STREET, MONTGOMERY, AL 36104

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. $73,154.00        which indebtedness is
evidenced by Borrower's note dated OCTOBER 06, 2006       and extensions and renewals thereof (herein "Note"),
providing for monthly installments of principal and interest, with the balance of the indebtedness, if not sooner paid, due and
payable on NOVEMBER 01, 2036       ;
     TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all
other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and the
performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey
to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the
following described property located in the County of  PALM BEACH                      , State of Florida:
SEE ATTACHED EXHIBIT A

which has the address of 9801 COBBLESTONE LAKES COURT                                     [Street]
BOYNTON BEACH                          [City], Florida  33437        [ZIP Code] (herein "Property Address");

     TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances
and rents, all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the
foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as
the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this
Mortgage; but, if necessary to comply with law or custom, MERS, (as nominee for Lender and Lender's successors and
assigns), has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the
Property; and to take any action required of Lender including, but not limited to, releasing or cancelling this Mortgage.

CPB0006228811

FLORIDA - SECOND MORTGAGE - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT WITH MERS

VMP Mortgage Solutions, Inc. (800)521-7291
Initials:_____
Form 3810
Amended 2/01

-76N(FL) (0307)

DGRIFFIN - 000067

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest.** Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessments, if any) which may attain priority over this Mortgage and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender.

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Mortgage that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Mortgage.

If the amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Mortgage, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Mortgage.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.

**4. Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

**5. Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require and in such amounts and for such periods as Lender may require.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.

**6. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

 -76N(FL) (0307)

Page 2 of 8

Initials: _____

CFPB0006228811
Form 3810

DGRIFFIN - 000068

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Mortgage, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

**8. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Mortgage, but does not execute the Note, (a) is co-signing this Mortgage only to mortgage, grant and convey that Borrower's interest in the Property to Lender under the terms of this Mortgage, (b) is not personally liable on the Note or under this Mortgage, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Mortgage or the Note without that Borrower's consent and without releasing that Borrower or modifying this Mortgage as to that Borrower's interest in the Property.

**12. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**13. Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein, "costs," "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

**14. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and of this Mortgage at the time of execution or after recordation hereof.

**15. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

**16. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Mortgage. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Mortgage.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Mortgage. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Mortgage without further notice or demand on Borrower.


DGRIFFIN - 000069

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**17. Acceleration; Remedies.** Except as provided in paragraph 16 hereof, upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Lender prior to acceleration shall give notice to Borrower as provided in paragraph 12 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 10 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, foreclosure by judicial proceeding, and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding. Lender shall be entitled to collect in such proceeding all expenses of foreclosure, including, but not limited to, reasonable attorneys' fees, court costs, and costs of documentary evidence, abstracts and title reports.

**18. Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Mortgage due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued at any time prior to entry of a judgment enforcing this Mortgage if: (a) Borrower pays Lender all sums which would be then due under this Mortgage and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage, and in enforcing Lender's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees and court costs; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

**19. Assignment of Rents; Appointment of Receiver.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender shall be entitled to have a receiver appointed by a court to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Mortgage. The receiver shall be liable to account only for those rents actually received.

**20. Release.** Upon payment of all sums secured by this Mortgage, Lender shall release this Mortgage without charge to Borrower. Borrower shall pay all costs of recordation, if any.

**21. Attorneys' Fees.** As used in this Mortgage and in the Note, "attorneys' fees" shall include attorneys' fees, if any, which may be awarded by an appellate court.

**22. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

☒ Subordination Rider
☒ Planned Unit Development Rider
☐ Condominium Rider
☒ 1-4 FAMILY RIDER

DGRIFFIN - 000070

**REQUEST FOR NOTICE OF DEFAULT**
**AND FORECLOSURE UNDER SUPERIOR**
**MORTGAGES OR DEEDS OF TRUST**

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

IN WITNESS WHEREOF, Borrower has executed this Mortgage.

**NOTICE TO BORROWER**

Do not sign this Mortgage if it contains blank spaces. All spaces should be completed before you sign.

Signed, sealed and delivered in the presence of:

_____     _____ {Seal}
(Witness)                                     DAVID DERRICK GRIFFIN              -Borrower

                                              1200 SE ATLANTIC AVE.
                                              LANTANA, FLORIDA 33462            (Address)

_____     _____ {Seal}
(Witness)                                     DIANE GRIFFIN                     -Borrower

                                                                               (Address)

_____ {Seal}     _____ {Seal}
                             -Borrower                                    -Borrower

(Address)                                     (Address)

_____ {Seal}     _____ {Seal}
                             -Borrower                                    -Borrower

(Address)                                     (Address)

_____ {Seal}     _____ {Seal}
                             -Borrower                                    -Borrower

(Address)                                     (Address)

STATE OF FLORIDA, _____ County ss:

The foregoing instrument was acknowledged before me this _____ by
DAVID DERRICK GRIFFIN AND DIANE GRIFFIN

who is personally known to me or who has produced _____ as identification.

_____
Notary Public

VMP-76N(FL) (0307)                     Page 5 of 5                    CPB0006228811
                                                                      Form 3810

DGRIFFIN - 000071

# Exhibit A

Lot 120, Block 2, COUNTRYSIDE MEADOWS REPLAT, according to the Plat thereof, as recorded in Plat Book 104, Page 12, of the Public Records of Palm Beach County, Florida.

Parcel Identification Number: 00-42-45-20-05-002-1200

DGRIFFIN - 000072

Return To:
ADORNO & YOSS

350 EAST LAS OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

# 1-4 FAMILY RIDER
(Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 6TH      day of OCTOBER          , 2006      ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Note to

COLONIAL BANK, N.A.

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at:

9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter
attached to the Property to the extent they are fixtures are added to the Property description,
and shall also constitute the Property covered by the Security Instrument: building materials,
appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or
intended to be used in connection with the Property, including, but not limited to, those for
the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light,
fire prevention and extinguishing apparatus, security and access control apparatus, plumbing,
bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers,
disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades,
curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain
a part of the Property covered by the Security Instrument. All of the foregoing together with
the Property described in the Security Instrument (or the leasehold estate if the Security
Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security
Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or
make a change in the use of the Property or its zoning classification, unless Lender has
agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations
and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow
any lien inferior to the Security Instrument to be perfected against the Property without
Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in
addition to the other hazards for which insurance is required by Section entitled "Hazard
Insurance" of the Security Instrument.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section entitled "Borrower's Right
to Reinstate" of the Security Instrument is deleted.

CPB0006228811

MULTISTATE 1- 4 FAMILY RIDER - Second Mortgage
1057BR (09/04)                    Page 1 of 3      Initials:_____    Modified Form 3170 1/01

DGRIFFIN - 000073

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Borrower's occupancy of the Property is not required.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section entitled "Acceleration; Remedies" of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section entitled "Protection of Lender's Security" of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

CPB0006228811

1057BR (09/04)                    Page 2 of 3       Initials: _____    Modified Form 3170 1/01

DGRIFFIN - 000074

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)         _____ (Seal)
DAVID DERRICK GRIFFIN        -Borrower        DIANE GRIFFIN        -Borrower

_____ (Seal)         _____ (Seal)
                         -Borrower                              -Borrower

_____ (Seal)         _____ (Seal)
                         -Borrower                              -Borrower

_____ (Seal)         _____ (Seal)
                         -Borrower                              -Borrower

CPB0006228811

1057BR (09/04)                    Page 3 of 3                    Modified Form 3170 1/01

DGRIFFIN - 000075

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 6TH                    day of
OCTOBER        , 2006    , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the
same date, given by the undersigned (the "Borrower") to secure Borrower's Note to
COLONIAL BANK, N.A.

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at:

9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling,
together with other such parcels and certain common areas and facilities, as described in
DECLARATIONS, COVENANTS, CONDITIONS AND RESTRICTIONS

(the "Declaration"). The Property is a part of a planned unit development known as

COBBLESTONE CREEK
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the
"Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners
Association; and (iii) any by-laws or other rules or regulations of the Owners Association.
Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the
Constituent Documents.

CPB0006228811

**MULTISTATE PUD RIDER** - Single Family/Second Mortgage                    3/99
Page 1 of 3
VMP®-207R (0411)    VMP Mortgage Solutions, Inc. (800)521-7291    Initials: _____

DGRIFFIN - 000076

**B. Hazard Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Uniform Covenant 2 for the monthly payment to Lender of the yearly premium installments for hazard insurance on the Property; and (ii) Borrower's obligation under Uniform Covenant 5 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage provided by the master or blanket policy.

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Uniform Covenant 9.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

CPB0006228811

-207R (0411)                    Page 2 of 3                 Initials: _____          3/99

DGRIFFIN - 000077

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____(Seal)                _____(Seal)
DAVID DERRICK GRIFFIN           -Borrower         DIANE GRIFFIN                    -Borrower

_____(Seal)                _____(Seal)
                                -Borrower                                         -Borrower

_____(Seal)                _____(Seal)
                                -Borrower                                         -Borrower

_____(Seal)                _____(Seal)
                                -Borrower                                         -Borrower

                                                                         CPB0006228811

-207R (0411)                    Page 3 of 3                               3/99

Return To:
ADORNO & YOSS

350 EAST LAS OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

DGRIFFIN - 000078

# SUBORDINATION RIDER

THIS SUBORDINATION RIDER is made this **6TH** day of **OCTOBER** , **2006** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to
**COLONIAL BANK, N.A.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437**

[Property Address]

The lien of this Security Instrument is subject, junior and subordinate to that certain Security Instrument dated **OCTOBER 06, 2006** to
**COLONIAL BANK**
recorded in Real Property Records, **PALM BEACH** County,
**FLORIDA** , securing a certain Promissory Note, of even date therewith in the original principal amount of $ **585,235.00** executed by
**DAVID DERRICK GRIFFIN, A MARRIED MAN**

and payable to the order of
**COLONIAL BANK**

CPB0006228811

JSUBR (05/01)                    Page 1 of 2                    Initials:_____

DGRIFFIN - 000079

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Subordination Rider.

_____ (Seal)          _____ (Seal)
DAVID DERRICK GRIFFIN        -Borrower      DIANE GRIFFIN                -Borrower

_____ (Seal)          _____ (Seal)
                             -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                             -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                             -Borrower                                  -Borrower


                                                          CPB0006228811

JSUBR (05/01)                    Page 2 of 2
Return To:
ADORNO & YOSS

350 EAST LAS OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

DGRIFFIN - 000080

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

10/6/2006

Borrowers

APPLICATION#: NPR-GRIFFIN2.09
LOAN#:
Aurora Loan Services, Inc.
2530 S. Parker Road, Suite 601
Aurora, CO 80014

DAVID DERRICK GRIFFIN

1200 SE ATLANTIC AVE.
LANTANA, FL 33462

Property
9801 COBBLESTONE LAKES COURT
BOYNTON BEACH, FL 33437

### Itemization of Amount Financed

| $ | 71,570.93 | Total amount financed | $ | 71,570.93 |
|---|---|---|---|---|
| $ | 30.00 | Courier | | |
| $ | 150.00 | Underwriting Fee | | |
| $ | 150.00 | Processing | | |
| $ | 938.07 | Interest | | |
| $ | 545.00 | Settlement or closing fee | | |
| $ | 1,583.07 | Total prepaid finance charges | $ | 1,583.07 |
| $ | 200.00 | Doc Prep | | |
| $ | 200.00 | Total amount paid to others | | |

THE FIRST PAYMENT FOR YOUR
Fixed Rate Second

FOR:         $73,154.00
AT:          9.7500000%
WHICH WILL PAY OFF IN  360 PAYMENTS
IS BROKEN DOWN AS FOLLOWS:

| | |
|---|---|
| PRINCIPAL &/OR INTEREST $ | 628.51 |
| Mortgage Insurance | 0.00 |
| Taxes and Assessments | 0.00 |
| Insurance | 0.00 |
| TOTAL PAYMENT          $ | 628.51 |

LOAN AMOUNT $                                73,154.00

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 9.9244% | $154,683.98 | $71,570.93 | $226,254.91 |

#### Your Payment Schedule Will Be:

359 payments   monthly of $628.51  beginning December 1, 2006
1 payment      of $619.82  due on   November 1, 2036

**Security Interest:** You are giving a security interest in the property located at 9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FL 33437.

**Late Charge:** If payment is 15 days late, you will be charged 5.000% of the payment.

**Prepayment:** If you pay off early, you will not have to pay a penalty.
If you pay off early, you will not be entitled to a refund of part of the finance charge.

**Assumption:** Someone buying your home cannot assume the remainder of the mortgage on the original terms.

**This obligation:** will NOT have a demand feature.

Insurance: You may obtain property insurance from anyone you want that is acceptable to Lender.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties.

e means an estimate

I (We) hereby acknowledge receiving a completed copy of this disclosure.

DAVID DERRICK GRIFFIN                                    Date                                          Date

                                                         Date                                          Date

DGRIFFIN - 000081

CFB0006228811



# **COLONIAL BANK**, N.A.

## NAME AFFIDAVIT

Date:        OCTOBER 06, 2006

Loan Number: ████████████

Case Number:

Borrower(s):
DAVID DERRICK GRIFFIN, A MARRIED MAN

Property Address:
9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

Before me, the undersigned authority, on this day personally appeared the undersigned Borrower, who after being duly sworn on oath stated the following:

1.   I, the undersigned Borrower, am the same person named in (i) the Note in the amount of $ 73,154.00 evidencing the Loan from Lender, and (ii) the Security Instrument securing the Note.

2.   I am one and the same person as:

     DAVID DERRICK GRIFFIN
     DAVID GRIFFIN

3.   The signature below is my true and exact signature for execution of the Loan documentation.

4.   I understand that this Affidavit is given as a material inducement to cause Lender to make a residential mortgage loan to me and that any false statements, misrepresentations, or material omissions may result in civil and criminal penalties.

EXECUTED this   6TH     day of   OCTOBER       . 2006

_____
DAVID DERRICK GRIFFIN

STATE OF FLORIDA_____ , COUNTY OF PALM BEACH_____

This instrument was acknowledged before me on the_____ day of   OCTOBER      , 2006

_____
Notary Public

My Commission Expires: _____

INAMEAFF (03/02)

DGRIFFIN - 000082

Form **4506-T**
(Rev. April 2006)

Department of the Treasury
Internal Revenue Service

**Request for Transcript of Tax Return**

▶ Do not sign this form unless all applicable lines have been completed.
Read the instructions on page 2.
▶ Request may be rejected if the form is incomplete, illegible, or any required line was blank at the time of signature.

OMB No. 1545-1872

Tip: Use Form 4506-T to order a transcript or other return information free of charge. See the product list below. You can also call 1-800-829-1040 to order a transcript. If you need a copy of your return, use Form 4506, Request for Copy of Tax Return. There is a fee to get a copy of your return.

1a Name shown on tax return. If a joint return, enter the name shown first.

**DAVID DERRICK GRIFFIN**

1b First social security number on tax return or employer identification number (see instructions)

2a If a joint return, enter spouse's name shown on tax return

2b Second social security number if joint tax return

3 Current name, address (including apt., room, or suite no.), city, state, and ZIP code
**1200 SE ATLANTIC AVE.**
**LANTANA, FLORIDA 33462**

4 Previous address shown on the last return filed if different from line 3

5 If the transcript or tax information is to be mailed to a third party (such as a mortgage company), enter the third party's name, address, and telephone number. The IRS has no control over what the third party does with the tax information.
**AURORA LOAN SERVICES, INC.**
**2530 SOUTH PARKER ROAD, SUITE 601, AURORA, CO 80014**

Caution: If a third party requires you to complete Form 4506-T, do not sign Form 4506-T if lines 6 and 9 are blank.

6 Transcript requested. Enter the tax form number here (1040, 1065, 1120, etc.) and check the appropriate box below. Enter only one tax form number per request. ▶

a Return Transcript, which includes most of the line items of a tax return as filed with the IRS. Transcripts are only available for the following returns: Form 1040 series, Form 1065, Form 1120, Form 1120A, Form 1120H, Form 1120L, and Form 1120S. Return transcripts are available for the current year and returns processed during the prior 3 processing years. Most requests will be processed within 10 business days . . . ☐

b Account Transcript, which contains information on the financial status of the account, such as payments made on the account, penalty assessments, and adjustments made by you or the IRS after the return was filed. Return information is limited to items such as tax liability and estimated tax payments. Account transcripts are available for most returns. Most requests will be processed within 30 calendar days . . . ☐

c Record of Account, which is a combination of line item information and later adjustments to the account. Available for current year and 3 prior tax years. Most requests will be processed within 30 calendar days . . . ☐

7 Verification of Nonfiling, which is proof from the IRS that you did not file a return for the year. Most requests will be processed within 10 business days . . . ☐

8 Form W-2, Form 1099 series, Form 1098 series, or Form 5498 series transcript. The IRS can provide a transcript that includes data from these information returns. State or local information is not included with the Form W-2 information. The IRS may be able to provide this transcript information for up to 10 years. Information for the current year is generally not available until the year after it is filed with the IRS. For example, W-2 information for 2003, filed in 2004, will not be available from the IRS until 2005. If you need W-2 information for retirement purposes, you should contact the Social Security Administration at 1-800-772-1213. Most requests will be processed within 45 days . . . ☐
Caution: If you need a copy of Form W-2 or Form 1099, you should first contact the payer. To get a copy of the Form W-2 or Form 1099 filed with your return, you must use Form 4506 and request a copy of your return, which includes all attachments.

9 Year or period requested. Enter the ending date of the year or period, using the mm/dd/yyyy format. If you are requesting more than four years or periods, you must attach another Form 4506-T. For requests relating to quarterly tax returns, such as Form 941, you must enter each quarter or tax period separately.

Signature of taxpayer(s). I declare that I am either the taxpayer whose name is shown on line 1a or 2a, or a person authorized to obtain the tax information requested. If the request applies to a joint return, either husband or wife must sign. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute Form 4506-T on behalf of the taxpayer.

Telephone number of taxpayer on line 1a or 2a

**Sign Here**

Signature (see instructions) | Date

Title (if line 1a above is a corporation, partnership, estate, or trust)

Spouse's signature | Date

For Privacy Act and Paperwork Reduction Act Notice, see page 2.  Cat. No. 37667N  Form **4506-T** (Rev. 4-2006)

Wolters Kluwer Financial Services - VMP®-9045T (0603)  Page 1 of 2

CFPB0006228811

DGRIFFIN - 000083

Form 4506-T (Rev. 4-2006)

## General Instructions

**Purpose of form.** Use Form 4506-T to request tax return information. You can also designate a third party to receive the information. See line 5.

**Tip.** Use Form 4506, Request for Copy of Tax Return, to request copies of tax returns.

**Where to file.** Mail or fax Form 4506-T to the address below for the state you lived in when that return was filed. There are two address charts: one for individual transcripts (Form 1040 series and Form W-2) and one for all other transcripts.

**Note:** *If you are requesting more than one transcript or other product and the chart below shows two different service centers, mail your request to the service center based on the address of your most recent return.*

## Chart for individual transcripts (Form 1040 series and Form W-2)

| If you filed an individual return and lived in: | Mail or fax to the "Internal Revenue Service" at: |
|---|---|
| District of Columbia, Maine, Maryland, Massachusetts, New Hampshire, New York, Vermont | RAIVS Team Stop 679 Andover, MA 05501 978-247-9255 |
| Alabama, Delaware, Florida, Georgia, North Carolina, Rhode Island, South Carolina, Virginia | RAIVS Team P.O. Box 47-421 Stop 91 Doraville, GA 30362 678-530-5326 |
| Arkansas, Kansas, Kentucky, Louisiana, Mississippi, Oklahoma, Tennessee, Texas, West Virginia | RAIVS Team Stop 6716 AUSC Austin, TX 73301 512-460-2272 |
| Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nebraska, Nevada, New Mexico, Oregon, South Dakota, Utah, Washington, Wyoming | RAIVS Team Stop 38101 Fresno, CA 93888 559-253-4990 |
| Connecticut, Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, Wisconsin | RAIVS Team Stop 6705-B41 Kansas City, MO 64999 816-823-7667 |
| New Jersey, Pennsylvania, a foreign country, or A.P.O. or F.P.O. address | RAIVS Team DP 135SE Philadelphia, PA 19255-0695 215-516-2931 |

## Chart for all other transcripts

| If you lived in or your business was in: | Mail or fax to the "Internal Revenue Service" at: |
|---|---|
| Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Hawaii, Idaho, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Tennessee, Texas, Utah, Washington, Wyoming | RAIVS Team P.O. Box 9941 Mail Stop 6734 Ogden, UT 84409 801-620-6922 |
| Connecticut, Delaware, District of Columbia, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Vermont, Virginia, West Virginia, Wisconsin | RAIVS Team P.O. Box 145500 Stop 2800 F Cincinnati, OH 45250 859-669-3592 |
| A foreign country, or A.P.O. or F.P.O. address | RAIVS Team DP 135SE Philadelphia, PA 19255-0695 215-516-2931 |

**Line 1b.** Enter your employer identification number (EIN) if your request relates to a business return. Otherwise, enter the first social security number (SSN) shown on the return. For example, if you are requesting Form 1040 that includes Schedule C (Form 1040), enter your SSN.

**Line 6.** Enter only one tax form number per request.

**Signature and date.** Form 4506-T must be signed and dated by the taxpayer listed on line 1a or 2a. If you completed line 5 requesting the information be sent to a third party, the IRS must receive Form 4506-T within 60 days of the date signed by the taxpayer or it will be rejected.

**Individuals.** Transcripts of jointly filed tax returns may be furnished to either spouse. Only one signature is required. Sign Form 4506-T exactly as your name appeared on the original return. If you changed your name, also sign your current name.

**Corporations.** Generally, Form 4506-T can be signed by: (1) an officer having legal authority to bind the corporation, (2) any person designated by the board of directors or other governing body, or (3) any officer or employee on written request by any principal officer and attested by the secretary or other officer.

**Partnerships.** Generally, Form 4506-T can be signed by any person who was a member of the partnership during any part of the tax period requested on line 9.

**All others.** See Internal Revenue Code section 6103(e) if the taxpayer has died, is insolvent, is a dissolved corporation, or if a trustee, guardian, executor, receiver, or administrator is acting for the taxpayer.

**Documentation.** For entities other than individuals, you must attach the authorization document. For example, this could be the letter from the principal officer authorizing an employee of the corporation or the Letters Testamentary authorizing an individual to act for an estate.

**Privacy Act and Paperwork Reduction Act Notice.** We ask for the information on this form to establish your right to gain access to the requested tax information under the Internal Revenue Code. We need this information to properly identify the tax information and respond to your request. Sections 6103 and 6109 require you to provide this information, including your SSN or EIN. If you do not provide this information, we may not be able to process your request. Providing false or fraudulent information may subject you to penalties.

Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation, and cities, states, and the District of Columbia for use in administering their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by section 6103.

The time needed to complete and file Form 4506-T will vary depending on individual circumstances. The estimated average time is: Learning about the law or the form, 10 min.; Preparing the form, 12 min.; and Copying, assembling, and sending the form to the IRS, 20 min.

If you have comments concerning the accuracy of these time estimates or suggestions for making Form 4506-T simpler, we would be happy to hear from you. You can write to the Internal Revenue Service, Tax Products Coordinating Committee, SE:W:CAR:MP:T:T:SP, 1111 Constitution Ave. NW, IR-6406, Washington, DC 20224. Do not send the form to this address. Instead, see *Where to file* on this page.

VMP®-9045T (0606)

Page 2 of 2

CPB0006228811

Initials: _____

DGRIFFIN - 000084

Form **4506-T**
(Rev. April 2006)

## Request for Transcript of Tax Return

Department of the Treasury
Internal Revenue Service

► Do not sign this form unless all applicable lines have been completed.
Read the instructions on page 2.
► Request may be rejected if the form is incomplete, illegible, or any required
line was blank at the time of signature.

OMB No. 1545-1872

Tip: Use Form 4506-T to order a transcript or other return information free of charge. See the product list below. You can also call 1-800-829-1040 to order a transcript. If you need a copy of your return, use Form 4506, Request for Copy of Tax Return. There is a fee to get a copy of your return.

| 1a  Name shown on tax return. If a joint return, enter the name shown first. | 1b  First social security number on tax return or employer identification number (see instructions) |
|---|---|
| DIANE GRIFFIN | |
| 2a  If a joint return, enter spouse's name shown on tax return | 2b  Second social security number if joint tax return |

3    Current name, address (including apt., room, or suite no.), city, state, and ZIP code
1200 SE ATLANTIC AVENUE
LANTANA, FLORIDA 33462

4    Previous address shown on the last return filed if different from line 3

5    If the transcript or tax information is to be mailed to a third party (such as a mortgage company), enter the third party's name, address, and telephone number. The IRS has no control over what the third party does with the tax information.

AURORA LOAN SERVICES, INC.
2530 SOUTH PARKER ROAD, SUITE 601, AURORA, CO 80014

Caution: *If a third party requires you to complete Form 4506-T, do not sign Form 4506-T if lines 6 and 9 are blank.*

6    Transcript requested. Enter the tax form number here (1040, 1065, 1120, etc.) and check the appropriate box below. Enter only one tax form number per request. ►

a    **Return Transcript**, which includes most of the line items of a tax return as filed with the IRS. Transcripts are only available for the following returns: Form 1040 series, Form 1065, Form 1120, Form 1120A, Form 1120H, Form 1120L, and Form 1120S. Return transcripts are available for the current year and returns processed during the prior 3 processing years. Most requests will be processed within 10 business days  . . . . . □

b    **Account Transcript**, which contains information on the financial status of the account, such as payments made on the account, penalty assessments, and adjustments made by you or the IRS after the return was filed. Return information is limited to items such as tax liability and estimated tax payments. Account transcripts are available for most returns. Most requests will be processed within 30 calendar days  . . . . . □

c    **Record of Account**, which is a combination of line item information and later adjustments to the account. Available for current year and 3 prior tax years. Most requests will be processed within 30 calendar days  . . . . . □

7    Verification of Nonfiling, which is proof from the IRS that you did not file a return for the year. Most requests will be processed within 10 business days  . . . . . □

8    Form W-2, Form 1099 series, Form 1098 series, or Form 5498 series transcript. The IRS can provide a transcript that includes data from these information returns. State or local information is not included with the Form W-2 information. The IRS may be able to provide this transcript information for up to 10 years. Information for the current year is generally not available until the year after it is filed with the IRS. For example, W-2 information for 2003, filed in 2004, will not be available from the IRS until 2005. If you need W-2 information for retirement purposes, you should contact the Social Security Administration at 1-800-772-1213. Most requests will be processed within 45 days  . . . . . □

Caution: *If you need a copy of Form W-2 or Form 1099, you should first contact the payer. To get a copy of the Form W-2 or Form 1099 filed with your return, you must use Form 4506 and request a copy of your return, which includes all attachments.*

9    Year or period requested. Enter the ending date of the year or period, using the mm/dd/yyyy format. If you are requesting more than four years or periods, you must attach another Form 4506-T. For requests relating to quarterly tax returns, such as Form 941, you must enter each quarter or tax period separately.

Signature of taxpayer(s). I declare that I am either the taxpayer whose name is shown on line 1a or 2a, or a person authorized to obtain the tax information requested. If the request applies to a joint return, either husband or wife must sign. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute Form 4506-T on behalf of the taxpayer.

|  | | Telephone number of taxpayer on line 1a or 2a |
|---|---|---|
| **Sign Here** | Signature (see instructions)                          Date | |
|  | Title (if line 1a above is a corporation, partnership, estate, or trust) | |
|  | Spouse's signature                                    Date | |

For Privacy Act and Paperwork Reduction Act Notice, see page 2.        Cat. No. 37667N        Form **4506-T** (Rev. 4-2006)

CPB0006228811

Wolters Kluwer Financial Services - VMP®-9045T (0605)        Page 1 of 2

DGRIFFIN - 000085

Form 4506-T (Rev. 4-2008)

Page 2

## General Instructions

**Purpose of form.** Use Form 4506-T to request tax return information. You can also designate a third party to receive the information. See line 5.

**Tip.** Use Form 4506, Request for Copy of Tax Return, to request copies of tax returns.

**Where to file.** Mail or fax Form 4506-T to the address below for the state you lived in when your return was filed. There are two address charts: one for individual transcripts (Form 1040 series and Form W-2) and one for all other transcripts.

**Note:** *If you are requesting a transcript or other product and the chart below shows two different service centers, mail your request to the service center based on the address of your most recent return.*

## Chart for individual transcripts (Form 1040 series and Form W-2)

| If you filed an individual return and lived in: | Mail or fax to the "Internal Revenue Service" at: |
|---|---|
| District of Columbia, Maine, Maryland, Massachusetts, New Hampshire, New York, Vermont | RAIVS Team Stop 679 Andover, MA 05501  978-247-9255 |
| Alabama, Delaware, Florida, Georgia, North Carolina, Rhode Island, South Carolina, Virginia | RAIVS Team P.O. Box 47-421 Stop 91 Doraville, GA 30362  678-530-5326 |
| Arkansas, Kansas, Kentucky, Louisiana, Mississippi, Oklahoma, Tennessee, Texas, West Virginia | RAIVS Team Stop 6716 AUSC Austin, TX 73301  512-460-2272 |
| Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nebraska, Nevada, New Mexico, Oregon, South Dakota, Utah, Washington, Wyoming | RAIVS Team Stop 38101 Fresno, CA 93888  559-253-4990 |
| Connecticut, Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, North Dakota, Ohio, Wisconsin | RAIVS Team Stop 6705-B41 Kansas City, MO 64999  816-823-7667 |
| New Jersey, Pennsylvania, a foreign country, or A.P.O. or F.P.O. address | RAIVS Team DP 135SE Philadelphia, PA 19255-0695  215-516-2931 |

## Chart for all other transcripts

| If you lived in or your business was in: | Mail or fax to the "Internal Revenue Service" at: |
|---|---|
| Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Hawaii, Idaho, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Tennessee, Texas, Utah, Washington, Wyoming | RAIVS Team P.O. Box 9941 Mail Stop 6734 Ogden, UT 84409  801-620-6922 |
| Connecticut, Delaware, District of Columbia, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Vermont, Virginia, West Virginia, Wisconsin | RAIVS Team P.O. Box 145500 Stop 2800 F Cincinnati, OH 45250  859-669-3592 |
| A foreign country, or A.P.O. or F.P.O. address | RAIVS Team DP 135SE Philadelphia, PA 19255-0695  215-516-2931 |

**Line 1b.** Enter your employer identification number (EIN) if your request relates to a business return. Otherwise, enter the first social security number (SSN) shown on the return. For example, if you are requesting Form 1040 that includes Schedule C (Form 1040), enter your SSN.

**Line 6.** Enter only one tax form number per request.

**Signature and date.** Form 4506-T must be signed and dated by the taxpayer listed on line 1a or 2a. If you completed line 5 requesting the information be sent to a third party, the IRS must receive Form 4506-T within 60 days of the date signed by the taxpayer or it will be rejected.

**Individuals.** Transcripts of jointly filed tax returns may be furnished to either spouse. Only one signature is required. Sign Form 4506-T exactly as your name appeared on the original return. If you changed your name, also sign your current name.

**Corporations.** Generally, Form 4506-T can be signed by: (1) an officer having legal authority to bind the corporation, (2) any person designated by the board of directors or other governing body, or (3) any officer or employee on written request by any principal officer and attested to by the secretary or other officer.

**Partnerships.** Generally, Form 4506-T can be signed by any person who was a member of the partnership during any part of the tax period requested on line 9.

**All others.** See Internal Revenue Code section 6103(e) if the taxpayer has died, is insolvent, is a dissolved corporation, or if a trustee, guardian, executor, receiver, or administrator is acting for the taxpayer.

**Documentation.** For entities other than individuals, you must attach the authorization document. For example, this could be the letter from the principal officer authorizing an employee of the corporation or the Letters Testamentary authorizing an individual to act for an estate.

## Privacy Act and Paperwork Reduction Act Notice.

We ask for the information on this form to establish your right to gain access to the requested tax information under the Internal Revenue Code. We need this information to properly identify the tax information and respond to your request. Sections 6103 and 6109 require you to provide this information, including your SSN or EIN. If you do not provide this information, we may not be able to process your request. Providing false or fraudulent information may subject you to penalties.

Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation, and cities, states, and the District of Columbia for use in administering their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by section 6103.

The time needed to complete and file Form 4506-T will vary depending on individual circumstances. The estimated average time is: Learning about the law or the form, 10 min.; Preparing the form, 12 min.; and Copying, assembling, and sending the form to the IRS, 20 min.

If you have comments concerning the accuracy of these time estimates or suggestions for making Form 4506-T simpler, we would be happy to hear from you. You can write to the Internal Revenue Service, Tax Products Coordinating Committee, SE:W:CAR:MP:T:T:SP, 1111 Constitution Ave, NW, IR-6406, Washington, DC 20224. Do not send the form to this address. Instead, see *Where to file* on this page.

CPB0006228811

VMP ®.9045T (0605)

Page 2 of 2

Initials: _____

DGRIFFIN - 000086

Form **W-9**
(Rev. November 2005)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer Identification Number and Certification**

Give form to the requester.
Do not send to the IRS.

Name (as shown on your income tax return)

DAVID DERRICK GRIFFIN

Business name, if different from above

Check appropriate box: [X] Individual/Sole proprietor   [ ] Corporation   [ ] Partnership   [ ] Other ▶

[ ] Exempt from backup withholding

Address (number, street, and apt. or suite no.)

1200 SE ATLANTIC AVE.

Requester's name and address (optional)

City, state, and ZIP code

LANTANA, FLORIDA 33462

List account number(s) here (optional)

### Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

**or**

Employer identification number

### Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

Sign Here | Signature of U.S. person ▶     Date ▶

### Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

U.S. person. Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

In 3 above, if applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes you are considered a person if you are:

* An individual who is a citizen or resident of the United States.

* A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

* Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purpose of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

* The U.S. owner of a disregarded entity and not the entity.

* The U.S. grantor or the other owner of a grantor trust and not the trust, and

CFB0006228811

VMP -9030 (0601)     VMP Mortgage Solutions, Inc.     Page 1 of 4     Form **W-9** (Rev. 11-2005)     Cat. No. 10231X

DGRIFFIN - 000087

Form W-9 (Rev. 11-2005)

- The U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person, do not use Form W-9. Instead, use the appropriate Form W-8 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity not subject to backup withholding, give the requester the appropriate completed Form W-8.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments (after December 31, 2002). This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 4 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions below and the separate instructions for the Requester of Form W-9.

Also see *Special rules regarding partnerships* on page 1.

**Penalties**

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

**Specific Instructions**

**Name**

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name" line.

**Limited liability company (LLC).** If you are a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Treasury regulations section 301.7701-3, enter the owner's name on the "Name" line. Enter the LLC's name on the "Business name" line. Check the appropriate box for your filing status (sole proprietor, corporation, etc.), then check the box for "Other" and enter "LLC" in the space provided.

**Other entities.** Enter your business name as shown on required Federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name" line.

**Note.** You are requested to check the appropriate box for your status (individual/sole proprietor, corporation, etc.).

**Exempt From Backup Withholding**

If you are exempt, enter your name as described above and check the appropriate box for your status, then check the "Exempt from backup withholding" box in the line following the business name, sign and date the form.

CFB0006228811

-9030 (0601)

Page 2 of 4

DGRIFFIN - 000088

Form W-9 (Rev. 11-2005)

Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends.

**Note.** If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

**Exempt payees.** Backup withholding is not required on any payments made to the following payees:

1. An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2),

2. The United States or any of its agencies or instrumentalities,

3. A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities,

4. A foreign government or any of its political subdivisions, agencies, or instrumentalities, or

5. An international organization or any of its agencies or instrumentalities.

Other payees that may be exempt from backup withholding include:

6. A corporation,

7. A foreign central bank of issue,

8. A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States,

9. A futures commission merchant registered with the Commodity Futures Trading Commission,

10. A real estate investment trust,

11. An entity registered at all times during the tax year under the Investment Company Act of 1940,

12. A common trust fund operated by a bank under section 584(a),

13. A financial institution,

14. A middleman known in the investment community as a nominee or custodian, or

15. A trust exempt from tax under section 664 or described in section 4947.

The chart below shows types of payments that may be exempt from backup withholding. The chart applies to the exempt recipients listed above, 1 through 15.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt recipients except for 9 |
| Broker transactions | Exempt recipients 1 through 13. Also, a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker |
| Barter exchange transactions and patronage dividends | Exempt recipients 1 through 5 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt recipients 1 through 7 [2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation (including gross proceeds paid to an attorney under section 6045(f), even if the attorney is a corporation) and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees; and payments for services paid by a Federal executive agency.

## Part I. Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-owner LLC that is disregarded as an entity separate from its owner (see *Limited liability company (LLC)* on page 2), enter your SSN (or EIN, if you have one). If the LLC is a corporation, partnership, etc., enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form on-line at *www.socialsecurity.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/businesses* and clicking on Employer ID Numbers under Related Topics. You can get Forms W-7 and SS-4 from the IRS by visiting *www.irs.gov* or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Writing "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

*Caution: A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.*

 -9030 (0601)

Page 3 of 4

CPB0006228811

Form W-9 (Rev. 11-2005)

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). Exempt recipients, see *Exempt From Backup Withholding* on page 2.

**Signature requirements.** Complete the certification as indicated in 1 through 5 below.

1. **Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

2. **Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. **Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

4. **Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. **Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or single-owner LLC | The owner [3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship or single-owner LLC | The owner [3] |
| 7. A valid trust, estate, or pension trust | Legal entity [4] |
| 8. Corporate or LLC electing corporate status on Form 8832 | The corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership or multi-member LLC | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the second name line. You may use either your SSN or EIN (if you have one). If you are a sole proprietor, IRS encourages you to use your SSN.

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules regarding partnerships* on page 1.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA, or Archer MSA or HSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation, and to cities, states, and the District of Columbia, and U.S. possessions to carry out their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 28% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.

CPB0006228811

VMP₃-9030 (0601)

Page 4 of 4

DGRIFFIN - 000090

Case 2:09-md-02047-EEF-MBN Document 22380-46 Filed 12/02/19 Page 71 of 133
Case 1:11-cv-22408-MGC Document 276-7 Entered on FLSD Docket 09/18/2013 Page 92 of
222

 **COLONIAL BANK, N.A.**



## ADDRESS CERTIFICATION

Date: **OCTOBER 06, 2006**

I hereby certify that the mortgaged property is located at the address indicated below and that the correct mailing address of the primary borrower is also indicated below:

The complete PROPERTY STREET ADDRESS is as follows:
**9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437**

The complete MAILING STREET ADDRESS of the primary borrower is as follows:

NOTE: ALL CORRESPONDENCE WILL BE SENT TO THIS MAILING ADDRESS UNTIL THE LENDER IS OTHERWISE NOTIFIED IN WRITING.

_____ (Seal)        _____ (Seal)
DAVID DERRICK GRIFFIN         -Borrower                                   -Borrower

_____ (Seal)        _____ (Seal)
                                     -Borrower                                   -Borrower

_____ (Seal)        _____ (Seal)
                                     -Borrower                                   -Borrower

_____ (Seal)        _____ (Seal)
                                     -Borrower                                   -Borrower

Sworn before me on this _____ day of **OCTOBER** , 2006 .

_____
Notary Public

JADDRESS (07/01)

DGRIFFIN - 000091

# LOAN CLOSING AFFIDAVIT

Borrower(s): DAVID DERRICK GRIFFIN, A MARRIED MAN

Property Address:
9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

### Loan Information

I (whether one or more), the undersigned, do hereby certify and acknowledge that any and all information provided by me or obtained on my behalf in reference to my mortgage loan application was true and correct, and that all of said information is currently true and correct, and further as follows:

[1]     There has been no change in my employment since the time of my loan application. I have no knowledge of, nor have I received notice of a pending layoff or reduction in workforce. My monthly income is equal to or greater than the amount stated at the time of my application.

[2]     My debts are currently equal to or less than they were at the time of loan application. I am not currently obligated and do not intend to become obligated, in the near future, for any debts related to the Property which were not disclosed to the Lender during the application process.

[3]     The information regarding income, other assets and debts on my FNMA 1003 (typed application form) is correct and complete.

[4]     Any information provided in the form of a copy or fax (telecopier) was true and correct.

[5]     The sales agreement or contract (if applicable) is a valid, bona fide, and legitimate sales agreement and all terms and conditions in the sales agreement and addenda (as disclosed to the Lender) are true and correct, disclosing and expressing any and all agreements of all of the parties to the sales agreement. To my knowledge, there are no agreements "outside" of the sales agreement. I have not been nor will I be paid or reimbursed (with money or any "thing of value") for any costs associated with this transaction, unless it is specifically stated in the sales agreement.

### Occupancy Statement

I will, within sixty (60) days after the loan transaction has been closed and disbursed, occupy the above referenced Property as my primary principal residence, unless the Property is to be used as a second home or investment property, as disclosed, in writing, to my Lender during the application process.

### Hold Harmless

I further certify that I am NOT relying on any representations or warranties by the Lender as to the condition of the title or the existence of any easements or encroachments thereon. I hereby save and hold the Lender, its successors and/or assigns, harmless from any costs, damages or expenses in any way arising from the existence of the aforementioned encroachments, easements, limitations and/or conditions and do hereby release the Lender, its successors and/or assigns, from any liability arising in any manner therefrom.

### Insurance Company/Agent Notice

The insurance laws provide that the Lender may not require the Borrower(s) to take insurance through any particular insurance agent or company to protect the mortgaged property. The Borrower(s) may, subject to state law, have the right to have the insurance placed with an insurance agent or company of his choice provided the insurance agent or company meets the requirements of the Lender. The Lender has the right to designate reasonable financial requirements as to the company and the adequacy of coverage.

### Hazard or Property Insurance

I hereby certify that, as of the date of closing, there is in force hazard insurance which covers any and all hazards (fire, hazard, windstorm, earthquake, flood where required, etc.) deemed necessary by the Lender to protect its interest in the property and required by law. I certify that any Flood Hazard Insurance required pursuant to the National Flood Insurance Program is in force. I further certify that I have obtained maximum insurance available as established by the property insurer or by law. I have acquired and agree to maintain all insurance, other than windstorm coverage, with a deductible of not more than the greater of one thousand dollars ($1,000.00) or 1 percent of the policy face amount. The deductible for windstorm coverage will not be more than the greater of two thousand dollars ($2,000.00) or 2 percent of the policy face amount.

I understand that the insurance required is in no way meant to be relied upon as the type or amount of insurance necessary to fully protect my interest. I also understand that the insurable value of the improvements is established by my insurance agent and that the Lender has no responsibility in establishing said amount. I further understand that maintaining insurance in the amount as determined by the property insurer may not fully protect my interest in the property or my obligations under the mortgage. I understand that in the event of a loss I will continue to be fully responsible for the amounts due under the mortgage even if the insurance funds do not fully compensate for the loss.

In the event there are changes in the insurance coverage required by the Lender I will notify the Lender immediately and will take whatever action is necessary to obtain and maintain insurance coverage satisfactory to the Lender. If Flood Hazard Insurance is not currently required, in the event that it is ever determined that the above referenced property is located in a designated Flood Hazard Area, I understand that in accordance with the terms of my Security Instrument I will be required to obtain Flood Hazard Insurance coverage. If I fail to obtain and maintain any required insurance satisfactory to the Lender, I understand that the Lender may obtain insurance on my property pursuant to the Security Instrument, and any money or fees advanced by the Lender will become additional debt secured by the Security Instrument. My escrow payment will be adjusted to pay the premium on any insurance so obtained.

JCLOSAFF01 (10/04)                                                                                     Page 1 of 4

DGRIFFIN - 000092

## Conventional Loans Requiring PMI

If mortgage insurance is required by the Lender as a condition of financing this mortgage loan, I am responsible for the premium (costs) of the insurance.

I agree that the Lender/Mortgagee, may, at any time during the mortgage term, and at its sole discretion, apply for renewal of private mortgage (guaranty) insurance (PMI) covering the Security Instrument (Mortgage, Deed of Trust, Security Deed) executed by me relating to the property referenced above, pay the payments due, and require repayment by me of such amounts as are advanced by the Lender/Mortgagee. In the event of my failure to repay such amounts to the Lender Mortgagee, such failure will be considered a default, and all provisions of the Note and Security Instrument with regard to default will be applicable.

The insurance is for the Lender's benefit. The Lender's, its successors and/or assigns, servicing policies will take precedence over any servicing policies of the insurance company. The premium may or may not be refundable in the event of any early payoff.

Some loans programs may have a mandatory minimum term for mortgage insurance coverage. I may request that the coverage be cancelled by contacting the Servicer. The Lender or Servicer will then process the request in accordance with investor guidelines, and I will be notified as to whether the coverage may be cancelled.

PMI coverage will be automatically terminated as applicable to federal, state and/or investor guidelines. Not all loans are subject to automatic termination of PMI. The Lender can provide specific guidelines for cancellation and termination of PMI.

## Execution/Correction of Documents

If any document prepared in connection with this loan, through inadvertent error, had not been properly executed, or if any executed loan document has been destroyed, lost, misplaced, or incorrectly drafted, I will execute a duplicate or corrected document upon request by the Lender. If a new Note must be executed, the Lender will indemnify me against demand on the original Note.

I agree to fully comply with the lender's request within 30 days of receipt.

## No Verbal Agreements

**My rights and obligations and the rights and obligations of the Lender will be determined solely from the written Loan Agreements (Note, Security Instrument, all Riders/Addenda thereto and other documents) and any prior verbal agreements between myself and the Lender, or any interim Lenders, Brokers, or Realtors are superseded by and merged into the Loan Agreements. The Loan Agreements may not be varied or modified in any way by any verbal agreements or discussions that occur before, contemporaneously with, or subsequent to the execution of the Loan Agreements. THE WRITTEN LOAN AGREEMENTS REPRESENT THE FINAL AGREEMENTS BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT VERBAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN VERBAL AGREEMENTS BETWEEN THE PARTIES.**

## Federal Regulation Z & X

Federal Regulations Z and X require that an applicant for a mortgage loan be given certain disclosures by the originating Lender within certain time periods according to application date. I acknowledge receipt of all early disclosures as explained by the Lender. I understand that my loan may be sold to another Lender and that all compliance disclosures are the responsibility of the originating Lender. I agree that I will hold harmless any Lender who purchases my loan for any errors in the disclosures or timing of the disclosures required by the above-mentioned regulations.

## Radon Gas Notification

Radon Gas: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines may be found in buildings in your area. Additional information regarding radon and radon testing may be obtained from your county public health unit.

## Planned Refinance

A refinance of this loan transaction has not been planned, promised, guaranteed or implied. The originating Lender, an affiliate company, or any interim Lender will not solicit a refinance unless mortgage market rates decline.

## Homeowner Tax Certification

In order for the Lender to pay taxes promptly and correctly, the Tax Information form must be completed accurately by the Closing Agent. Taxes for the current year will be in the name of the owner as of the time of listing and the bill will be mailed in that name. If the tax bill is not paid at closing and is due in the current year, I will be responsible for obtaining this information from my taxing authority and forwarding it to the Lender to whom I make my payments.

If I fail to forward this information and the Lender is unable to pay my tax bill prior to delinquency, all penalties will be disbursed from my escrow account. I am responsible for supplying the Lender with this information for the current year.

If my taxing authority refused to send tax information to my mortgage lender or their representative, I will be responsible for supplying the Lender with the tax bill. I will include my loan number on all information forwarded to the Lender.

DGRIFFIN - 000093



I must pay close attention to when taxes are required to be paid. If the taxes will be delinquent within 30 days of settlement, the Closing Agent must disburse directly to the taxing authority. If their failure to do so results in my taxes being paid delinquent, all penalties will be disbursed from my escrow account.

## Escrow Account

An escrow account is being established, unless otherwise agreed in writing, to assure payment of certain obligations relating to the mortgaged property, such as taxes, insurance and other charges.

I will receive an Initial Escrow Disclosure Statement at settlement prepared in accordance with the requirements of the Real Estate Settlement Procedures Act (RESPA). Based upon information available at settlement, the disclosure will outline the anticipated disbursements from the escrow account for the coming year.

I understand that like all escrow items, anticipated taxes are subject to change. I understand that if construction of the home that secures this loan was not completed prior to this year's tax assessment date, my property taxes were probably assessed on the lower unimproved or partially improved value of the property and that it may be as long as two years before the assessment reflects the homes total value. I also understand that the previous owner of the property may have been entitled to a special exemption on the assessment date and that taxes for the current year may be based upon such an exemption, but are subject to increase at the next assessment. I understand that the improvements made by construction or loss of an exemption are likely to increase the taxes owed on the property and may result in a shortage in my escrow account.

I understand that payment to the escrow account is due as part of my monthly mortgage payment. I understand that changes in the amounts necessary to pay the items paid from the escrow account may change the monthly escrow payment and may result in a shortage in the escrow account. I understand that my obligation to make my escrow payment includes payment of any shortages in the escrow account as determined by the future analysis of the escrow account.

## Confirmation of Taxpayer Identification Number

Internal Revenue Service regulations require me to furnish my Taxpayer Identification Number (Social Security Number). Failure to do so may make me subject to a penalty imposed by the Internal Revenue Service. I have provided this information on an IRS W-9 form.

## Verification/Reverification Authorization

Verification or reverification of any information contained in my application or obtained during the application process may be made at any time by the Lender, its agents, successors and assigns, either directly or through a credit reporting agency, from any source named in my application or obtained during the application process. A copy or fax of this signed affidavit will constitute sufficient authorization to release any verification or reverification information requested.

## Notice Regarding Furnishing of Negative Information

Lender may report information about my account to credit bureaus.

Late payments, missed payments, or other defaults on my account may be reflected in my credit report.

## Title 18 Certification
I FULLY UNDERSTAND THAT IT IS A FEDERAL CRIME PUNISHABLE BY FINE OR IMPRISONMENT, OR BOTH, TO KNOWINGLY MAKE ANY FALSE STATEMENT, WRITTEN OR VERBAL, CONCERNING THE ABOVE FACTS AS APPLICABLE UNDER THE PROVISIONS OF TITLE 18, UNITED STATES CODE, SECTION 1014.

I (whether one or more), the undersigned, acknowledge that I have read and do understand and agree with the terms and disclosures provided on page 1, page 2 and page 3 of this Loan Closing Affidavit. I further understand that there are serious penalties for breach or circumvention of these terms and disclosures.

DGRIFFIN - 000094

**Acknowledgment**

Date: _____

_____          _____
DAVID DERRICK GRIFFIN

| Home Phone | Work Phone | Home Phone | Work Phone |
|------------|------------|------------|------------|

| Home Phone | Work Phone | Home Phone | Work Phone |
|------------|------------|------------|------------|

| Home Phone | Work Phone | Home Phone | Work Phone |
|------------|------------|------------|------------|

| Home Phone | Work Phone | Home Phone | Work Phone |
|------------|------------|------------|------------|

**Closing Agent Certification**

THIS FORM MAY NOT BE ALTERED OR AMENDED. IF AMENDMENTS OR ALTERATIONS ARE MADE, YOU
CANNOT CLOSE THE LOAN WITHOUT THE PERMISSION OF THE LENDER PURCHASING THE LOAN (ISSUING
THE FUNDS FOR CLOSING).

_____
Closing Agent

DGRIFFIN - 000095

CPB0006228811

# HOMESTEAD DISCLAIMER & DESIGNATION

STATE OF _____

COUNTY OF _____

    BEFORE ME, the undersigned authority, a Notary Public in and for said County and State, on this day personally appeared **DAVID DERRICK GRIFFIN**
who after being by me first duly sworn, upon oath do/does depose and say:

    THAT the undersigned does not use, occupy or reside in or upon or claim as exempt from forced sale under the Constitution and the laws of the State of **FLORIDA** any part of the hereinbelow described property, and the undersigned renounces all and every claim thereto under any such law or Constitution:

9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

and expressly designates the following described property as the homestead to which he / she is entitled as exempt from forced sale under such law and Constitution:

1200 SE ATLANTIC AVE., LANTANA, FLORIDA 33462

_____
DAVID DERRICK GRIFFIN

STATE OF _____

COUNTY OF _____

    BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared

_____
known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that _____
executed the same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, _____.

My commission expires: _____
Printed Name of Notary: _____

_____
Notary Public

JD02 (08/03)

DGRIFFIN - 000096

BORROWER AFFIDAVIT ACKNOWLEDGING LENDER COMPLIANCE
WITH FEDERAL REQUIREMENT TO PROVIDE CREDIT SCORE DISCLOSURES
(Section 609 of the Fair Credit Reporting Act, 15 U.S.C. 1681g)

Lender: COLONIAL BANK, N.A.

Loan No.: ▮▮▮▮▮▮▮

Property Address: 9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

BEFORE ME, the undersigned authority, on this day personally appeared the undersigned person(s) (collectively the "Borrower", whether one or more), being all the owners of the residential real property located at the referenced Property Address securing the loan made or arranged by Lender, who, first being duly sworn according to law, upon oath depose(s) and say(s):

Prior to closing of the loan, Borrower received from the Lender the following disclosures required by the Fair Credit Reporting Act:

(A) the current credit score of the Borrower or the most recent credit score of the Borrower that was previously calculated by a credit reporting agency for a purpose related to the loan;
(B) the range of possible credit scores under the model used;
(C) all of the key factors that adversely affected the credit score of the Borrower in the model used, the total number of which did not exceed 4, subject to (F) below;
(D) the date on which the credit score was created;
(E) the name of the person or entity that provided the credit score or credit file upon which the credit score was created;
(F) if a key factor that adversely affected the credit score of the Borrower consists of the number of enquiries made with respect to the Borrower's consumer report, that factor was included in the disclosure pursuant to (C) above without regard to the numerical limitation in (C); and
(G) the Notice to the Home Loan Applicant (including the name, address, and telephone number of each consumer reporting agency providing a credit score that was used).

When the Borrower is more than one person, this instrument shall read as though pertinent verbs, nouns, and pronouns were changed to correspond, and reference to any gender shall include either gender.

CAUTION: THIS IS A SWORN STATEMENT. DO NOT SIGN THIS AFFIDAVIT UNLESS YOU HAVE READ IT AND. ON OATH, YOU BELIEVE IT TO BE TRUE AND CORRECT.

_____ (Seal)          _____ (Seal)
DAVID DERRICK GRIFFIN          -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                               -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                               -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                               -Borrower                                        -Borrower

SWORN TO AND SUBSCRIBED BEFORE ME, this _____ day of _____, _____.

My Commission Expires:

                                                 _____
                                                 Notary Public

                                                 _____
                                                 Notary's Typed or Printed Name

JFACTACT01 (11/05)                                                    CPB0006228811

DGRIFFIN - 000097

CPB0006228811

 **COLONIAL BANK**, N.A.

Loan Number: ▮▮▮▮▮▮

Property Address/Description:
9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437
SEE ATTACHED EXHIBIT A

## MINING AND MINERAL RESERVATIONS

(This form applies if oil, gas or mineral reservations or rights appear on the title policy)

With reference to the oil, gas or mineral reservations listed under Schedule B of the mortgage title policy insuring the above referenced mortgage, I/we hereby certify to
COLONIAL BANK, N.A.
its successors and/or assigns, that said rights are common in this area and generally acceptable to prudent lenders, informed buyers and leading attorneys in the community.

I/We also do hereby certify that the exercise of said oil, gas or mineral reservations would not affect the property securing the above referenced mortgage for residential purposes.

Date: _____

ADORNO & YOSS

_____
Closing Agent Signature

Name: _____

Title: _____

JMINERAL (05/01)

DGRIFFIN - 000098

CPB0006228811

# TAX INFORMATION FORM

BORROWER(S):
DAVID DERRICK GRIFFIN, A MARRIED MAN

PROPERTY ADDRESS:
9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

LEGAL DESCRIPTION:
SEE ATTACHED EXHIBIT A

_____County_____Taxes
Tax Delinquent Date: _____
Next Tax Due Date: _____
Amount of taxes paid $_____
Taxes collected based on Improvements: Yes_____ No_____
Estimated Improved Tax Amount $_____
Parcel #: _____
Tax I.D. #: _____
Address: _____

_____City_____Taxes
Tax Delinquent Date: _____
Next Tax Due Date: _____
Amount of taxes paid $_____
Taxes collected based on Improvements: Yes_____ No_____
Estimated Improved Tax Amount $_____
Parcel #: _____
Tax I.D. #: _____
Address: _____

_____School_____Taxes
Tax Delinquent Date: _____
Next Tax Due Date: _____
Amount of taxes paid $_____
Taxes collected based on Improvements: Yes_____ No_____
Estimated Improved Tax Amount $_____
Parcel #: _____
Tax I.D. #: _____
Address: _____

_____Other Assessment_____Taxes
Tax Delinquent Date: _____
Next Tax Due Date: _____
Amount of taxes paid $_____
Taxes collected based on Improvements: Yes_____ No_____
Estimated Improved Tax Amount $_____
Parcel #: _____
Tax I.D. #: _____
Address: _____

_____Leasehold Assessment_____Taxes
Tax Delinquent Date: _____
Next Tax Due Date: _____
Amount of taxes paid $_____
Taxes collected based on Improvements: Yes_____ No_____
Estimated Improved Tax Amount $_____
Parcel #: _____
Tax I.D. #: _____
Address: _____

**IMPORTANT INFORMATION**

IT IS VERY IMPORTANT THAT THE TAX INFORMATION ON THIS LOAN IS ACCURATE AND COMPLETE AS OUR MUTUAL CUSTOMER'S PAYMENT IS BASED ON THE INFORMATION PROVIDED ON THIS FORM.

AS CLOSING AGENT FOR LENDER NAMED IN THE NOTE AND SECURITY INSTRUMENT, I CERTIFY THAT THE ABOVE INFORMATION IS COMPLETE AND ACCURATE.

_____        _____
CLOSING AGENT or AUTHORIZED PERSONNEL        DATE

JTAXINFO (09/97)
MAY 1995

DGRIFFIN - 000099

CPB0006228811

## THIS IS THE END OF THE CLOSING PACKAGE

Lender:
COLONIAL BANK, N.A.

Loan Number: █████████

Borrower(s):
DAVID DERRICK GRIFFIN, A MARRIED MAN



## IF YOU RECEIVE THIS PAGE, THIS PACKAGE IS COMPLETE.

JLAST (10/01)

DGRIFFIN - 000100

# Exhibit A

Lot 120, Block 2, COUNTRYSIDE MEADOWS REPLAT, according to the Plat thereof, as recorded in Plat Book 104, Page 12, of the Public Records of Palm Beach County, Florida.

Parcel Identification Number: 00-42-45-20-05-002-1200

DoubleTimes

DGRIFFIN - 000101

# \*\*\*IMPORTANT\*\*\*
## DOCUMENT FORMATTING

This package may contain both legal & letter size documents.
### Each document must be printed on the appropriate sized paper.

Use of inappropriate paper size or mechanical reduction or enlargement of margins or font sizes is unacceptable.



# LOAN CLOSING

# PACKAGE

Loan Number: ▮▮▮▮▮▮▮▮

Borrower:  DAVID DERRICK GRIFFIN

File Number:  J2189090 FL

Date:  OCTOBER 05, 2006

**CHECK PRINTER SETTINGS**
This document should print on LEGAL size paper with 1" margin on each side.

JCOVER (07/05)

DGRIFFIN - 000102

# SPECIFIC LOAN CLOSING INSTRUCTIONS PROVIDED FOR

COLONIAL BANK, N.A.

**Return Closed Loan Package to:**
COLONIAL BANK, N.A.
919 WEST STATE ROAD 436, SUITE 102
ALTAMONTE SPRINGS, FL 32714

Date: OCTOBER 05, 2006

**Closing Representative:**
TAMMY COLE
Telephone: 813-314-3106
Fax Number: 813-314-3117

**Funding Representative:**
TAMMY COLE
Telephone: 813-314-3106
Fax Number: 813-314-3117

---

Loan Number:
FHA/VA Case Number: ████████

MIN Number: 1000675-0006228811-0
Inv. MIN Number: 1000675-0006228811-0

Borrower(s):
DAVID DERRICK GRIFFIN, A MARRIED MAN

Property Address:
9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

Legal Description:
SEE ATTACHED EXHIBIT A

| Loan Type: | CONVENTIONAL FIXED/PURCHASE | Special Characteristics: NO PMI | |
|---|---|---|---|
| Lien Status: | SECOND LIEN | Interest Rate: | 9.7500 % |
| Closing Date: | OCTOBER 06, 2006 | Loan Amount: $ | 73,154.00 |
| Funding Date: | OCTOBER 06, 2006 | Sales Price: $ | 731,544.00 |
| First Payment: | DECEMBER 01, 2006 | Appraised Value: $ | 732,000.00 |
| Maturity Date: | NOVEMBER 01, 2036 | Earnest Money: $ | |
| Lock Expiration: | OCTOBER 30, 2006 | P&I Payment: $ | 628.51 |
| | | Term: | 360 months |

*SHOULD THIS LOAN FAIL TO CLOSE AND FUND ON THE DATES INDICATED ABOVE, FUNDS MUST BE RETURNED IMMEDIATELY. CONTACT THE CLOSING REPRESENTATIVE FOR FURTHER INSTRUCTIONS.*

## DO NOT DISBURSE THIS TRANSACTION UNTIL
## YOU HAVE CALLED THE FUNDING REPRESENTATIVE

---

Provided to:
Closing Agent: ADORNO & YOSS
Address: 350 EAST LAS OLAS BLVD SUITE 1700
FORT LAUDERDALE, FLORIDA 33301

Contact Name: STEPHEN PULLEY
Telephone: (954) 766-7883
Fax Number: (954) 671-4571                Title File #

---

The Lender's name and address for HUD-1 is:

COLONIAL BANK, N.A.
400 N. TAMPA STREET
TAMPA, FL 33602

You are hereby required to close the loan described in these instructions in strict accordance with the instructions contained herein. Your agreement to the terms herein will be evidenced by your disbursement of loan proceeds. You must close this loan in accordance with Closing Procedures which are incorporated herein. Any costs associated with your failure to do so shall be your responsibility. Lender's approval of the HUD-1 does not negate your responsibility and does not constitute Lender's written approval to deviate from instructions. Cooperative follow-up may be required on this loan. Failure to be responsive and/or to comply with instructions will result in costs, claims and/or the termination of the responsibility of closing loans.

DO NOT DEVIATE FROM THESE WRITTEN INSTRUCTIONS WITHOUT PRIOR WRITTEN APPROVAL FROM CLOSING REPRESENTATIVE ONLY. RETURN THE CLOSED LOAN PACKAGE TO THE ADDRESS AT THE BEGINNING OF THESE INSTRUCTIONS.

---

Closing Agent agrees to provide a title policy to Lender, in accordance with its commitment, within 25 days of the funding of the loan. The Closing Agent shall be responsible for any additional costs associated with the failure to provide the final title policy or for any losses sustained by Lender in secondary marketing of the loan due to the failure of Closing Agent to provide said policy within 25 days.

JCLOS1 (3/06)                Specific Loan Closing Instructions                Page 1 of 5

DGRIFFIN - 000103

CPB0006228811

## CLOSING COSTS/LOAN FEES

Investor:
AURORA LOAN SERVICES, INC.
Lender:
COLONIAL BANK, N.A.
Broker/Correspondent:
COLONIAL BANK, N.A.
Mortgage Insurance Company:

### SHOW TO WHOM ALL FEES WERE DISBURSED ON THE HUD-1 SETTLEMENT STATEMENT

Fees paid by Broker/Correspondent must be deducted from any monies they are to receive and paid to appropriate recipient.
( [X] = Fee to be Net Funded from loan proceeds provided)
(POC = Paid Outside Closing)

| HUD-1 Line Number Loan Fees | Collect | Paid By | Pay To | Net Fund | Amount POC |
|---|---|---|---|---|---|
| 800 DOCUMENT PREPARATION FEE | $ 25.00 | | COLONIAL BANK FOR SCHWARTZ & ASSOCIATES | [x] | $ |
| 800 DOCUMENT PREPARATION FEE | $ | | COLONIAL BANK | [x] | $ |
| 1100 ESCROW/SETTLEMENT FEE | $ | | ADORNO & YOSS | [ ] | $ |
| 1100 COURIER FEE | $ | | ADORNO & YOSS | [ ] | $ |
| 800 COURIER FEE | $ 30.00 | BORROWER | COLONIAL BANK FOR FEDEX | [x] | $ |
| 800 UNDERWRITING FEE | $ 350.00 | BORROWER | COLONIAL BANK | [x] | $ |
| 800 DOCUMENT PREPARATION FEE | $ 175.00 | BORROWER | COLONIAL BANK | [x] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |
| | $ | | | [ ] | $ |

DGRIFFIN - 000104

CPB0006228811

---

## ESCROWS/IMPOUNDS

Closing Agent is responsible for proper proration of taxes between parties and paid receipts for first year premiums for hazard, flood insurance and/or any other required insurance coverage.

Calculate and collect the following escrows/impounds and prepaid interest and remit by separate check to COLONIAL BANK, N.A.

☐ **ESCROWS WAIVED** - Collect Per Diem Interest Only *(as indicated below)*

| ESCROW ITEM | # MONTHS | MONTHLY AMT. | DUE AT CLOSING |
|---|---|---|---|
| _____ | _____ mos. | @ $ _____ | = $ _____ |
| _____ | _____ mos. | @ $ _____ | = $ _____ |
| _____ | _____ mos. | @ $ _____ | = $ _____ |
| _____ | _____ mos. | @ $ _____ | = $ _____ |
| _____ | _____ mos. | @ $ _____ | = $ _____ |
| _____ | _____ mos. | @ $ _____ | = $ _____ |
| **AGGREGATE ADJUSTMENT CREDIT:** *(Show on Line 1008 of HUD-1)* | | | ( $ _____ ) |
| **PER DIEM INTEREST:** ☐ *Interest Credit* | 26 days | @ $ 19.5411 | = $ 508.07 |

Per Diem Interest includes day of disbursement, OCTOBER 06, 2006 , to NOVEMBER 01, 2006

---

## TITLE REQUIREMENTS

[X] Title Standards referenced in the enclosed General Closing Instructions are required and must be provided.

[X] Closing Protection Letter or Insured Closing Letter *(Texas T-50)* is required, unless previously provided to Lender.
NEW YORK LOANS - Agent Authorization Letter as to title insurer's liability as Principal for the acts of its Agent.

[X] **SHORT FORM POLICY or REGULAR TITLE POLICY WITH EXTENDED COVERAGE** - Without exception to Survey matters or Addendum to Short Form and insuring all taxes/assessments not yet due and payable. An original, signed Commitment/Binder with jacket is required if the Title Policy will not be issued at closing.

[X] **UNALTERED ENDORSEMENT FORMS OR THEIR EQUIVALENTS ARE REQUIRED UNLESS OTHERWISE COVERED IN POLICY:**
  [X] Restrictions, Encroachments & Minerals or Comprehensive *(ALTA 9/CLTA 100/Florida 9 Form/TLTA T-19)*
  [X] Environmental Protection *(ALTA 8.1/TLTA T-36)*
  [ ] Tax Deletion *(TLTA T-30)*
  [X] Planned Unit Development *(ALTA 5/TLTA T-17)*
  [ ] Condominium *(ALTA 4/TLTA T-28)*
  [ ] Adjustable Rate Mortgage *(ALTA 6/TLTA T-33)*
  [ ] Balloon *(TLTA T-39)*
  [ ] Manufactured Housing *(ALTA 7/TLTA T-31 & T-31.1)*
  [ ] Leasehold *(ALTA 13.1/TLTA T-5)*
  [ ] Texas Equity Loan Mortgage *(TLTA T-42 & T-42.1)*
  [ ] Location
  [ ] 3R, 5
  [ ] Negative Amortization ARM *(ALTA 6.2/TLTA T-33.1)* and Insured amount must be _____ % of loan amount.
  [ ] Lien-Free *(CLTA 101.2)*
  [ ] Foundation *(CLTA 102.4 & 102.5)*
  [X] All endorsements must be issued in their original form with no modifications, deletions or alterations.

[ ] **COLORADO LOANS** - Gap coverage and the Form CLTA 116 are required on all loans. If there are Mining and Mineral exceptions on the commitment, please include a Form 100.30 Mining and Mineral Endorsement.

[ ] **IOWA LOANS - TITLE GUARANTY CERTIFICATE WITH ATTORNEY'S OPINION.** Opinion returned in closed loan package and original certificate to follow upon issuance. (Must conform to the standards of the Iowa Title Guaranty Division of the Iowa Finance Authority.)

[ ] **TEXAS LOANS**
  [ ] Delete Arbitration Provision from the Title Policy
  [ ] P-39 Express Insurance Coverage on any claim that the insured lien is invalid because the loan amount includes funds advanced by the Lender for closing costs and/or reserves or impounds for taxes and insurance.

---

DGRIFFIN - 000105

CPB0006228811

## UNDERWRITING AND CLOSING CONDITIONS

Satisfy and check off closing conditions, sign and return with closed loan package.

**LOAN DISBURSEMENT IS SUBJECT TO:**

☐ ☒ All documents must be dated, as required, and signed exactly as name(s) appears under signature line(s).

☐ ☒ HUD-1 Settlement Statement - FAX to <u>813-314-3117</u> prior to closing for review.

☐ ☒ Final typed 1003 Loan Application and/or addenda must be signed and dated by Borrower(s).

☐ ☐ Final Inspection ☐ with Photos ☐ Recertification of Value ☐ Certificate of Occupancy

☐ ☐ Clear Termite Inspection Report signed by Borrower(s) and Inspector - FAX

☐ ☐ Clear Health Department Approval of: ☐ Septic ☐ Well

☐ ☐ Repair Inspection(s)

☐ ☐ Proof of sale (HUD-1 & Warranty Deed) of present home netting $ _____ for property located at:

☐ ☐ Payoff of oustanding debts to: *(any amounts reflected are estimates only)*

☐ ☒ Title Commitment Corrections: See title requirements for additional title conditions. Update effective date; Schedule "A" to reflect correct proposed insured and Borrower(s); insured amount must reflect $ <u>73,154.00</u> .

☐ ☐ Sales Contract and Addenda to reflect correct sales/loan terms with all corrections to be initialled by all parties; receipt earnest money. Certified copy to be returned in closed loan package.

☐ ☒ Require proof HOA/PUD is SUBORDINATE and applicable unaltered title endorsement issued or contact Closing Representative immediately. Dues must be current at time of closing.

☐ ☒ These closing instructions and conditions are also subject to the following closing instruction addenda which are attached hereto and made a part hereof for all purposes:

  ☒ Closing Conditions   ☐ Texas Home Equity   ☐ Manufactured Home
  ☐ FHA *(Purchase only)*   ☐ New York CEMA   ☐ Lender Specific

<u>Note</u>: Additional Funding Requirements are listed in General Closing Instructions, Item #10.

☐ ☒ FORWARD ORIGINAL CLOSED LOAN PACKAGE WITH APPROPRIATE COPIES NO LATER THAN 24 HOURS AFTER DISBURSEMENT TO:

    COLONIAL BANK, N.A.
    919 WEST STATE ROAD 436, SUITE 102
    ALTAMONTE SPRINGS, FL 32714

CLOSING AGENT shall be responsible for any additional costs/penalties and any losses sustained by Lender in secondary marketing of the loan associated with the failure to forward the original closed loan package as indicated above.

☐ ☒ Original Security Instrument, Title Policy and recorded documents must be forwarded to:

    COLONIAL BANK
    P. O. BOX 5627
    MONTGOMERY, AL 36103-5627

This loan must be closed and disbursed according to these instructions. If you obtain information which is contrary to the information contained herein, do NOT proceed with closing until you have contacted the Closing Representative for written authorization of changes. Do not disburse any funds until you have complied with all of the requirements contained in these instructions.
This loan was closed and disbursed in strict accordance with these instructions and addenda.

_____
Closing Agent

DGRIFFIN - 000106

CPB0006228811

GRIFFIN

# CLOSING CONDITIONS ADDENDUM

This CLOSING CONDITIONS ADDENDUM is a continuation of the UNDERWRITING AND CLOSING CONDITIONS and is made a part of the closing instructions.

[X] CLOSING AGENT TO SECURE/PREPARE WARRANTY DEED.

THESE INSTRUCTIONS ARE FOR 2ND LIEN TRANSACTION ONLY.

FORM(S) 4506(T) TO BE SIGNED.

ALL COURIER FEES MUST BE ITEMIZED AS THEY AFFECT THE TIL. ALL FEE CHANGES

AFTER PREPARATION OF TIL MAY AFFECT TIL AND MUST BE APPROVED BY CLOSING

REPRESENTATIVE.

BORROWER TO PROVIDE EVIDENCE OF HAZARD INSURANCE AND/OR FLOOD INSURANCE (IF

FLOOD IS REQUIRED) AT CLOSING. EVIDENCE OF INSURANCE MUST BE INCLUDED IN

CLOSED LOAN PACKAGE.

NON-OBLIGATED BORROWER(S) TO SIGN ALL APPROPRIATE DOCUMENTS.

BORROWER TO SIGN FLOOD NOTICE & CREDIT SCORE DISCLOSURE AT CLOSING

TITLE COMPANY TO EXECUTE PATRIOT ACT ADDENDUM FOR HER AT CLOSING

TITLE COMPANY TO EXECUTE EXHIBIT A, LEGAL DESCRIPTION AND RECORD WITH MORTGAGE

PLEASE FAX HUD TO 813-314-3118, ATTN : TAMMY, TIL FAXED ONCE HUD IS APPROVED

LOAN PROCEEDS CHECK $72,574.00 TO BE SENT VIA FEDEX

BORROWER(S) TO EXECUTE TAX RETURNS

DGRIFFIN - 000107

 **COLONIAL BANK**, N.A.   CLOSING CONDITIONS ADDENDUM

This CLOSING CONDITIONS ADDENDUM is a continuation of the UNDERWRITING AND CLOSING CONDITIONS and is made a part of the closing instructions. Closing Agent MUST return a copy of this form with the closed loan package. Form should be completed with items "CHECKED OFF" in left column.

## LOAN DISBURSEMENT IS SUBJECT TO:

☐ ☒ Provide a copy of insured closing letter from title insurer issued to Colonial.

☐ ☒ Prior to Borrower(s) signing, the following must be faxed to
TAMMY COLE_____ at 813-314-3117_____ for Truth-in-Lending and escrow calculations:

    ☒ Preliminary HUD-1
    ☒ Evidence of all insurance for the property (required even if a non-escrow loan).
    ☒ Amount of annual property taxes and due dates.

    Any changes to fees after the preparation of the Truth-In-Lending may affect the calculations and must be approved by Colonial Closing Representative.

☐ ☒ Fees must be shown on the HUD-1 exactly as they are shown on page 2 of these instructions. Colonial Bank may be abbreviated as "CB" if space is limited.

☐ ☒ Verify names and property address on the documents. Closing Agent must contact the Closing Representative immediately if errors are discovered. If changes to borrower's name are authorized on Security Instrument, the Assignment must also be changed accordingly. Re-recording charges as a result of failure to do so will be borne by Closing Agent.

☐ ☒ All documents must be executed by the borrower in BLUE INK, except for loans in Nevada. BLACK INK is required in Nevada..

☐ ☒ Borrower must sign the Flood Certificate. Examine Flood Certification carefully. Flood Insurance is MANDATORY if any portion of the structure or improvements lie within within a Special Flood Hazard Area. Provide evidence of insurance if required.

☐ ☒ Survey - Not over 90 days old on purchase transaction; on a refinance transaction, a copy of older survey is acceptable with the required title coverage. Provide copy of survey to Colonial.

☐ ☐ If FHA streamline refinance, line 813 of HUD-1 to read:
New MIP $_____ less refund credit $ _____ (FHA # _____ ) =
$ _____ . (total MIP to collect from borrower.)

☐ ☐ Acquisition Loans - Buyer's closing costs are included in the loan amount. The cost is estimated to be at least $ _____ . (excluding discount and prepaid items). If the amount stated is less than the actual closing cost, call the Closing Representative immediately. A change in the loan amount may be required.

☐ ☐ Cash to Borrower at closing is not allowed over $ _____ . If more, call the Colonial Closing Representative immediately.

☐ ☒ Seller/Third Party contributions cannot exceed 3.0000 % or $ _____ .

☐ ☐ Borrower to provide evidence of gift funds for $ _____ by certified check with donor's name and account number on the check.

☐ ☐ Proof upon Closing of liquidation of _____ for
at least $ _____ .

☐ ☒ Should loan not close on the scheduled date, call the Closing Representative for further instructions. The interest rate is subject to change if loan does not close on the scheduled date. Do not alter the funding check from Colonial in any way.

☐ ☐ Record the Assignment simultaneously with the Security Instrument. Provide certified copy of assignment with closed loan package. The recording fee for the Assignment of Mortgage is paid by Colonial Bank. The recording fee has been ADDED to the funding check and must be shown on the HUD-1 as "POC by Colonial."

☐ ☒ Amend General Instructions page 4 of 6, provide one copy of all certified documents and original and one copy of all other documents.

☐ ☒ All recorded documents must be returned in a timely manner. The closing agent shall be responsible for any additional costs associated with the failure to provide the recorded documents or for any losses sustained by Lender in secondary marketing of the loan due to failure of closing agent to provide said recorded documents in a timely manner.

CFB0006228811

DGRIFFIN - 000108

# ENCLOSED DOCUMENTS

We are enclosing the following documents:

| | |
|---|---|
| JCOVER | COVER LETTER |
| JCLOS1 | SPECIFIC CLOSING INSTRUCTIONS |
| JCLOS2 | |
| JCLOSADD | CLOSING CONDITIONS ADDENDUM |
| JCLOSCOL | CLOSING CONDITIONS ADDENDUM |
| JDOC | CLOSING INSTRUCTIONS (Document List) |
| JCLOS3 | GENERAL CLOSING INSTRUCTIONS |
| JCOL36 | CLOSED LOAN SUBMISSION CHECKSHEET |
| HUD1 | HUD-1 SETTLEMENT STATEMENT |
| 1075PL | FNMA FLORIDA SECOND MORTGAGE NOTE |
| 2076NFL | FNMA FLORIDA SECOND MORTGAGE W/MERS |
| 1057BR | MULTISTATE 1-4 FAMILY RIDER- SECOND MORTGAGE |
| 1207R | FNMA MULTISTATE SECOND MORTGAGE PLANNED UNIT DEVELOPMENT RIDER |
| JSUBR | SUBORDINATION RIDER |
| JNAMEAFF | NAME AFFIDAVIT FOR BORROWER 1 |
| J1STPAYCOL | FIRST PAYMENT LETTER AND TEMPORARY COUPONS (Inv. Loan Number) |
| 4506TC | REQUEST FOR TRANSCRIPT OF TAX RETURN FOR BORROWER 1 (INVESTOR) |
| 4506TC2 | REQUEST FOR TRANSCRIPT OF TAX RETURN FOR BORROWER 2 (INVESTOR) |
| W9 | W9 FOR BORROWER 1 |
| JADDRESS | ADDRESS CERTIFICATION |
| JCLOSAFF01 | LOAN CLOSING AFFIDAVIT (Conventional) |
| JD02 | HOMESTEAD DISCLAIMER & DESIGNATION FOR BORROWER 1 |
| JFACTACT01 | BORROWER AFFIDAVIT - FEDERAL REQUIREMENT TO PROVIDE CREDIT SCORE |
| JMINERAL | MINERAL RIGHTS ACKNOWLEDGEMENT |
| JTAXINFO | TAX INFORMATION FORM |
| JLAST | END OF PACKAGE NOTIFICATION |

JDOC (10/96)

DGRIFFIN - 000109

## GENERAL CLOSING INSTRUCTIONS

CPB0006228811

| GENERAL REQUIREMENTS |

These General Instructions have been prepared to provide Closing Agents with our general policies and requirements for conducting the loan closing. These requirements supplement the Specific Loan Closing Instructions (SLCI) issued on each loan. To the extent that the SLCI conflicts with any other information contained in these General Closing Instructions, the SLCI shall control. Some of the documents included are partially completed, please complete and insure that all documents have been fully completed, properly initialled, executed and acknowledged. Provide copies of all closing documents to the borrowers. The closing documents and the instructions may only be modified with written approval from Lender's Closing Representative.

1. **CLOSING AND DISBURSEMENT DATES**
   The closing and disbursement dates for the loan are shown on the specific closing instructions. The closing documents provided have been prepared reflecting the scheduled closing date. Borrower(s) may not execute any document prior to the scheduled closing date. If the loan, for any reason, does not close or disburse on these dates, call Lender for further instructions. Interest rate, discount, first payment date and other terms are subject to change after this date.

2. **CLOSING CONDITIONS**
   The closing conditions will be stated in the SLCI and any addenda attached and made a part thereof. IF YOU DO NOT UNDERSTAND OR CANNOT COMPLY WITH ALL OF THE REQUIRED CONDITIONS, CALL LENDER FOR FURTHER WRITTEN INSTRUCTIONS PRIOR TO CLOSING. If you receive instructions which are contrary to the information contained in these instructions, do not proceed until you have contacted Lender for written authorization of the changes. DO NOT disburse any funds until all of the requirements in the SLCI and the General Closing Instructions have been met, reviewed and approved by Lender. Funding must be authorized by Lender.

   Whenever possible, a form will be provided to satisfy the condition. However, in some cases, a form is inappropriate and the only place the condition will be stated is in the SLCI, Closing Instruction Addenda and the General Closing Instructions. Therefore, it is very important to read and comply with all of these instructions.

   Follow-up documentation may be required on this loan. Failure to be responsive to requests made concerning any follow up item(s) may result in claims, penalties and/or removal from approved closing agent listings.

3. **POSSESSION OF MORTGAGE NOTE AND LOAN DOCUMENTS FOR LENDER**
   At closing, you shall take possession of the mortgage note and all other loan documents in trust for the sole and exclusive benefit of, and as bailee for, Lender until the mortgage note and all loan documents are physically delivered to the address contained in these instructions.

4. **TITLE STANDARDS**
   The title policy MUST insure that the Note and Security Instrument create a valid first lien in favor of the Lender (*unless title policy is expressly ordered for subordinate lien transaction*). Closing Agent is responsible for verification of the payoff and satisfaction of any prior liens or encumbrances and Lender assumes no liability or risk related thereto. Any knowledge of secondary financing or junior liens must be disclosed to Lender prior to closing. Should title search reveal any superior liens that cannot be subordinated (such as Homeowner Association dues), Closing Agent must call Lender prior to closing for further written instructions.

   Title Policies issued on standard ALTA (American Land Title Association ) or TLTA (Texas Land Title Association) are acceptable. Title Policy is to be issued through the same company that issued the Binder/Commitment. The title insurance company must have at least one of the following ratings (unless insurer is covered by an acceptable reinsurance arrangement):

   - A "Financial Stability Rating" of "S" (strong) or better, or a "Statutory Accounting Rating" of "C" (Average) or better from Demotech, Inc.;
   - a "BBB" or better rating from Duff and Phelps Credit Rating Company;
   - a "C" or better rating from LACE Financial Corporation; or
   - a "Baa" or better rating from Moody's Investor Service; or
   - a "BBB" or better rating from Standard and Poor's, Inc.

   Creditor's rights exclusion statement acceptable as provided under EXCLUSIONS FROM COVERAGE ALTA Loan Policy #7 and TLTA Mortgage Policy (T-2) #8. Otherwise, the policy cannot contain a creditor's rights exclusion statement that excludes any claim which arises out of the transaction creating the interest to the mortgage insured under the policy by reason of the operation of federal bankruptcy, state insolvency, or similar creditor's rights laws UNLESS SUCH EXCLUSION IS BASED ON: (a) the transaction creating the interest to the insured mortgage being a fraudulent conveyance or fraudulent transfer; or (b) subordination of the interest of the insured mortgagee as a result of the application of the doctrine of an equitable subordination; or (c) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer, except where the preferential transfer results from the failure: (i) to timely record the instrument or transfer; or (ii) of such recordation to impart notice to a purchaser for value or a judgment lien creditor.

   The title of the property as disclosed by the mortgagee policy must be good and merchantable, clear and free of all liens and encumbrances. The policy must assure full protection to the Lender or subsequent assignees of record and/or their successors and assigns. The title insurance must disclose all subordinate financing. Subordinate financing that may appear on the title must have the approval of Lender.

   Ownership must be reflected as FEE SIMPLE or LEASEHOLD (*if approved by Lender*). Title Company must insure that any person not joined in this transaction who may claim spousal, community property or other interest to subject property has waived interest according to any applicable federal or state law. This includes execution of appropriate documents, if applicable.

DGRIFFIN - 000110

Depending on the type of loan, the Title Policy must insure and Mortgagee Clause should read:

[X] Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for

[X] COLONIAL BANK, N.A.

[ ] and/or the Secretary of Housing and Urban Development of Washington, D.C.

[ ] and/or the Secretary of Veterans Affairs

[ ] *(For Texas only:)*
and each successor in ownership of the indebtedness secured by the insured mortgage, except a successor who is an obligor under the provisions of Section 12(c) of the Conditions and Stipulations
or

[X] *(For all other states:)*
its successors and/or assigns who are the lawful owner or owners of the evidence of debt identified herein and any subsequent owner or owners thereof

Lender requires Short Form Residential Loan Policies without exceptions to the title coverage and survey matters. If state law prohibits the use of a Short Form Policy, a regular Long Form Policy is acceptable. An existing or new survey, if required by the title company, in order to remove exceptions to survey matters on title, must be included in the closed loan package. **When a title policy is issued, an ALTA 9 / CLTA 116 / Florida 9 Form / TLTA T-19 or Comprehensive Endorsement is required unless otherwise covered in policy.** *(Texas - Required Survey Exception Amendment P-2)*

Title Policy must be issued within 25 days of closing and in accordance with the following:
- Effective date of the policy must be the date of the recording of the security instrument or thereafter, insuring against possible existence of adverse matters or defects in the title which are recorded during the period of time between the effective date of the title binder/commitment and the date of recording the document creating the estate or interest to be insured.
- If for any reason the security instrument is re-recorded, the effective date of the policy must be through the date of the re-recording.
- Any and all Taxes, Assessments, Liens, Charges, Obligations and Fees must be shown as either "Current", "Paid", or "Not Yet Due and Payable". No exception to rollback taxes, changes in land usage, ownership or exemptions is allowed. *(Texas - Required Tax Exception Amendment P-29, T-30 Endorsement)*
- Coverage amount must equal at least the loan amount. If the loan has negative amortization, coverage must equal maximum possible increase amount.
- Legal description must be same as on the security instrument.
- No exception may be taken which was not previously reflected on Title Commitment. Exceptions must be specific as to size, purpose, location and recording data and must be affirmatively insured against; if not, contact Lender. **(Texas P-5)**
- No exception may be taken for any future "Operation of Law" event, unrecorded leases, rights of parties/tenants in possession or visible and apparent easements, the location of which cannot be determined by a review of the applicable public records.
- If a survey is required:
  - any exception shown as not affecting subject property by an acceptable survey must be deleted.
  - any exception such as a building line, easement, etc. must be located on an acceptable survey or must be deleted.
- Any rights of reversion, forfeiture or first refusal must be waived or released.
- Legal right of access to and from subject property must be insured.
- All loans require an Environmental Protection Endorsement.
- All items and liens on ALTA Schedule B-1 or TLTA Schedule C must be satisfied and no additional exceptions to be reflected.
- Refer to SLCI for required title endorsements and additional requirements.

5. **SURVEY**
**The Flood Determination Certificate will take precedence over the survey on flood matters.**

A survey may be required by the title company or due to loan program guidelines. It must show no encroachment and/or deviations from the Title Insurance, must have DATE, SEAL, and SIGNATURE of Surveyor and must include volume and page of the map record or plat book and page number.
- Survey must indicate property address, legal description and directional indicator must be shown.
- The legal description of the property must agree with the Security Instrument <u>and</u> the Title Policy
- Survey must include all improvements and other items of real or personal property which may affect the marketability or value of the property.
- Survey must show dimensions of improvements, building set-back lines, all easements of record that will appear on the Title Policy, and all encroachments or violations.
- Survey must be acceptable to the title company in order to remove exceptions to survey matters on Title.
- See Paragraph 4 "Title Standards" for survey deletion requirements.

A copy of the survey must be provided in the closed loan package. The survey must conform to:
- The title insurance company's or attorney's standards, and
- Any applicable legal standards relating to surveys

DGRIFFIN - 000111

CPB0006228811

**6. HAZARD, FLOOD & OTHER INSURANCE**

At closing, the loan must have in effect Hazard Insurance and Flood Insurance (if applicable). The amount of coverage for the Hazard Insurance, including Windstorm/Hail, must be the maximum available on the insurable value of the improvements as established by the property insurer or required to compensate for damage or loss on a replacement cost basis. The maximum amount of coverage for Flood insurance is required, as established by the property insurer or the maximum available under the NFIA program. The Lender will accept a Guaranteed Replacement Cost Endorsement.

<u>HAZARD INSURANCE</u>

The Closing Agent MUST forward the original or copy of Policy showing the required coverage, deductible amount, correct names, property address and a paid receipt for the first year's premium, which must be signed by an authorized agent, with the closed loan package. Evidence of insurance is acceptable if clause requiring 10 day notification to mortgagee before cancellation is contained. Original policy is required prior to binder expiration.

When premium is collected at closing, you are responsible to ensure that it has been paid and furnish Lender proof of such payment. You are responsible for remitting the premium to the insurance company within 24 hours of disbursement.

The insurance must be written on a company that has either a "B" or better general policyholder's rating or a "6" or better financial performance index rating in <u>Best's Key Rating Guide</u>, or an "A" or better rating from Demotech, Inc. We will also accept coverage from Lloyd's of London. Policy must meet state requirements.

Insurance must protect against loss or damage from fire and other hazards covered by standard extended coverage insurance. Windstorm and hail coverage must be included in the hazard coverage or obtained in a separate policy. The coverage may be obtained from an approved insurance company or from a state agency. You are responsible for notifying Lender of any other coverage is expressly excluded.

The amount of the deductible may not be any more than the <u>higher</u> of $1,000 or one percent of the policy face value.

The deductible on windstorm and hail coverage may be $2,000 or 2% of the policy face value, whichever is higher. This only applies to these particular types of coverage.

<u>FLOOD INSURANCE</u>

We will accept as evidence of coverage a Flood Insurance application with a paid receipt and/or Policy Declaration page. Effective date MUST be on or before the date of closing. Flood insurance must be issued by a member of the National Flood Insurance Administration (NFIA) or a licensed property and casualty insurance company authorized to participate in NFIA's "Write Your Own" program. When premium is collected at closing, provide proof of payment to Lender. You are responsible for remitting the premium to the insurance company within 72 hours of disbursement.

The amount of the deductible may not be any more than the <u>higher</u> of $1,000 or one percent of the policy face value.

A **Flood Determination** is required on every loan. If a copy of the Determination is included in the closing package, examine carefully for flood insurance requirements.

<u>CONDOMINIUM AND PUD INSURANCE</u>

A certified copy of the current "master" or "blanket" policy is required on Condominium and PUDs for hazard and/or flood. The Homeowners Association holds the original policy. Provide a certificate of insurance showing that the individual unit that secures this lien is covered under the master policy. MUST have an endorsement with the correct Lender's Loss Payable clause below.

<u>RENT LOSS INSURANCE</u>

Rent loss insurance may be required on 1-4 Family (Investment) properties. The coverage must protect against a minimum of six (6) months rent loss.

<u>LENDER'S LOSS PAYABLE</u>

Each Insurance Policy must include Mortgagee's Clause which should read:

COLONIAL BANK, N.A.<br>
ITS SUCCESSORS AND/OR ASSIGNS<br>
AS THEIR INTEREST MAY APPEAR<br>
POST OFFICE BOX 23<br>
MONTGOMERY, AL 36101-0023<br>
Loan Number: CPB0006228811

**REFINANCES:** We would like to have a new policy at closing. If this is not possible, a copy of the existing policy will be acceptable provided:

* Copy of Policy must contain a signature of insurance company representative.
* MUST have an endorsement to the Policy with the correct Lender's Loss Payable clause above.
* Paid receipt showing the next due date of the premium. If escrows are not waived, sufficient pro-rated escrow funds should be collected at closing to establish the escrow account as the account MUST have twelve (12) full months deposited by the next anticipated disbursement date.

DGRIFFIN - 000112

CPB0006228811

7. **ESCROWS WILL BE ESTABLISHED ON THE AGGREGATE ANALYSIS METHOD**

Applicable escrow accounts are required on all loans, unless other written instructions are provided by Lender. Sufficient funds should be collected at closing to establish escrow accounts in accordance with the escrow section of the SLCI. Specifically the following will apply:

- **TAXES** - Collect and disburse property taxes directly to the taxing authority if the delinquent date is within 30 days after closing. Provide paid receipt.
- **HAZARD AND FLOOD INSURANCE** - The monthly amount collected at closing should equal one-twelfth of the annual premium.
- **MORTGAGE INSURANCE**
- **LEASEHOLD PAYMENTS** - When the mortgage property is a leasehold estate notify Lender in order to verify property eligibility. The amount collected at closing should equal one-twelfth of the annual lease payment. Provide evidence that the lease is current.

An aggregate adjustment credit must be calculated and entered on Line 1008 of the HUD-1. The aggregate adjustment credit will apply to the total amount of escrows reflected on the HUD-1 Settlement Statement. See SLCI.

8. **TYPOGRAPHICAL CORRECTIONS**

Typographical errors should be avoided. However, when such errors are made type "///" (slashes) through the incorrect portions and type in the correction (ERASURES OR WHITE-OUTS ARE NOT PERMITTED). All corrections MUST be initialled on ALL copies by the parties executing the documents. Contact Lender for approval of any corrections.

9. **CERTIFIED COPIES**

All certified copies must have the original (ink "wet") signature of the person certifying the copy to be a true and accurate copy of the original. Stamped signatures are not acceptable.

10. **FUNDING REQUIREMENTS**

The following items (marked with an "X") are required to be completed/executed and returned in the closing package.

We require all checks and following documents to be returned to the address at the beginning of these instructions no later than 24 hours after **DISBURSEMENT**              . Contact the Closing Representative if you have any questions regarding these instructions. You MUST return a completed ("CHECKED-OFF" in left column) copy of this form with your closing package. All certified copies MUST carry the original signature of the person certifying the copy.

| | X | Closing Instructions (Original signed by Closing Agent) |
| | X | Truth-In-Lending Disclosure (Original and 1 certified copy) |
| | X | Note with applicable Addenda (Original and 3 certified copies) |
| | X | Security Instrument with Applicable Riders (3 certified copies) |
| | X | Warranty Deed *(if applicable)* (1 certified copy) |
| | X | Assignment *(if applicable)* (3 certified copies) |
| | X | HUD-1 Settlement Statement (2 Originals and 3 certified copies) |
| | X | Hazard and/or Flood Insurance Policy with paid receipt for 1 full year premium (Original and 1 certified copy) |
| | X | Survey *(if applicable)* (3 Originals or certified copies) |
| | X | Restrictions, Easements & Mineral Reservations (1 certified copy) |
| | X | Original Title Policy or Title Commitment (Binder) and applicable endorsements |
| | X | Any Other Conditions and/or Documents as Specified in Underwriting and Closing Conditions |
| | X | All Original Documents fully executed |

DGRIFFIN - 000113

## INSTRUMENTS, FORMS AND DOCUMENTS                                                    CFB0006228811

1.  **AMENDMENTS TO DOCUMENTS**
    Do not close the transaction if the Borrower, Broker and/or the Seller amends any document provided by Lender. If this happens, call the Closing Representative for written instructions. Amendments include, but are not limited to, alterations, deletions and/or additions to terms or verbiage. Review all documents for accuracy and completeness even if the documents are provided by Lender or its designated agent. You are responsible if any necessary corrections are not made prior to closing. Failure to correct an apparent error on the face of the documents may result in fees and penalties assessed to you. The Note and Security Instrument included in the loan closing package are the most current legal documents required by the investor; these documents are to be used without exception. **No substitutions are allowed without prior written approval from Lender.**

2.  **HUD-1/FINAL SETTLEMENT STATEMENT**
    A condition for serving as the Closing Agent on this loan, the HUD-1 Settlement Statement form must be provided and prepared by the Closing Agent. The HUD-1 must be typed with all heading information completely filled in, including addresses. Changes, corrections and/or alterations must be initialled by all parties.

    In order to comply with Federal Regulation X, the HUD-1 must be explained and agreed to prior to the consummation of this transaction. Send the original to Lender, one copy each to borrower and seller.
    - COLONIAL BANK, N.A.
      must appear as the Lender on the HUD-1.
    - Per diem interest must accurately reflect date and amount. Interest calculations based on  365    days.
    - Taxes must be broken down by EACH authority.
    - Indicate to whom each fee charged is payable; the amount of the fee; and who paid it.
    - Do NOT vary fees from one party to another and NO CREDITS are to appear unless authorized in writing by Lender.
    - All POC items must be on HUD-1 and MUST show amount of fee, to whom it was paid, and who paid it.
    - Cash back to Borrower(s) is NOT allowed unless authorized in writing by Lender. *Texas Owner Occupied Homestead Properties* - Cash back to Borrower(s) is NOT allowed unless transaction is a bonafide Texas Home Equity Loan.
    - Escrow for Repairs is NOT allowed unless authorized in writing by Lender.
    - All borrower(s), seller(s) and Closing Agents MUST sign and date HUD-1.

    Verify Borrower/Seller fees to sales contract and notify Lender of any changes. Notify Lender, prior to closing, if the Borrower will pay more costs than described in the Sales Contract, or if the amount of earnest money to be credited differs from the Sales Contract, or if any figures differ from those shown on SLCI. Disburse fees to appropriate parties. <u>CLOSING AGENT WILL BE RESPONSIBLE FOR ANY FEES NOT COLLECTED.</u>

3.  **TRUTH-IN-LENDING DISCLOSURE STATEMENT (TIL)**
    It is your responsibility as Closing Agent to contact Lender for our computations pertaining to this statement, if so instructed in the SLCI. You are responsible for contacting Lender for recalculation of TIL if any of the figures or dates change or you become aware of an error. <u>FAILURE TO COMPLY WITH THIS REQUIREMENT COULD RESULT IN SEVERE MONETARY PENALTIES.</u> The borrower(s) MUST sign <u>exactly</u> as TIL is typed and initial all pages.

4.  **POWER OF ATTORNEY (POA)**
    Use of a POA requires prior written approval by Lender. A POA must be specific to the property and transaction, and must be properly notarized. The POA must be recorded in correct form and recorded prior to the execution of the Security Instrument. POA should only be used in rare circumstances when it is impossible for all parties to be present at closing. You are responsible for determining that the use of a POA does not violate state or local laws and that the format is in compliance with the state and local laws, and does not adversely affect the required title coverage in any way. All closing documents must be signed by the Attorney-In-Fact, in his/her own handwriting. The signature on each document must be identified as that of the Attorney-In-Fact. **Example:** *Jane Doe by John Doe, Attorney-in-Fact.*

5.  **MORTGAGE NOTE**
    Executed original and 3 certified copies to Lender and one certified copy to Borrower(s). Names used on Note MUST be <u>exactly</u> as they are shown on the SLCI or as you find them to be more accurate through your analysis. The borrower(s) MUST sign <u>exactly</u> as Note is typed and initial all pages.

6.  **SECURITY INSTRUMENT**
    - Three certified copies (recorded original to follow) to Lender and one copy to borrower(s).
    - The names on the Security Instrument should be <u>exactly</u> as they are shown on the SLCI or as you find them to be more accurate through your analysis. The borrower(s) MUST sign <u>exactly</u> as the Security Instrument is typed and initial all pages.
    - Legal description on the Security Instrument MUST be <u>exactly</u> as shown on the Title Policy.
    - Notary section must be fully completed and properly executed.
    - Rider(s), if applicable, will be provided in the loan closing package for your use. Rider(s) MUST be referenced in the "Riders" section of the Security Instrument with each Rider's corresponding box being marked. Originals of all Riders and Exhibits MUST be recorded with the Security Instrument.

DGRIFFIN - 000114

7. **SUBORDINATION AGREEMENTS**

CPB0006228811

If the SLCI require a subordination agreement by another lien holder, you must obtain that agreement. It is your responsibility to see that it is signed prior to closing and that the subordination agreement is recorded immediately after the Security Instrument. The subordination agreement must show the recording information from both Security Instruments. LENDER, ITS AGENTS OR SUCCESSORS AND/OR ASSIGNS, WILL NOT ENTER INTO SUBORDINATION AGREEMENTS. Second lien holder subordination agreements which simply subordinate the existing lien to the Lender's lien are the only subordination agreements which are acceptable to Lender.

The Title Policy must insure that Lender is in first lien position.

If the SLCI does not require a subordination agreement and a second lien exists, call Lender prior to closing. It will be necessary for the loan to be reviewed by an Underwriter prior to closing.

8. **NOTICE OF RIGHT TO CANCEL**
   - A Notice of Right to Cancel will be enclosed when the transaction requires a three (3) day right of recession period under Federal Regulation Z.
   - Two (2) copies of the completed Notice of Right to Cancel must be provided to each borrower and each person having an ownership interest and occupies the security property as their principal residence.
   - Advise each person signing the Notice of his or her right to cancel the transaction until midnight of the third (3rd) business day after the day of closing. Sundays and federal legal holidays (recognized by the Federal Government) are not considered "Business Days" for the purpose of the three day rescission period.
   - Disclosure of all costs to borrower, including a completed HUD-1 Settlement Statement, Truth-In-Lending Disclosure and Notice of Right to Cancel must be provided and executed on the same date.
   - If a confirmation has been provided, it must be signed on the fourth (4th) business day.
   - On the fourth (4th) business day following the original signing date, the loan proceeds may be disbursed if the borrower(s) or any person with an ownership interest has not exercised the option to cancel this transaction.
   - Should any person having an ownership interest in the property rescind the transaction or request a waiver of the rescission period or any other modification concerns involving the Notice of Right to Cancel, the closing agent must contact Lender for further instruction.

9. **INITIAL ESCROW ACCOUNT STATEMENT**
   If escrows are collected, the borrower(s) will be provided an Initial Escrow Account Statement based on the initial escrow analysis at closing. Borrower(s) are required to sign analysis. Return original in closed loan package.

DGRIFFIN - 000115

CPB0006228811

# CLOSED LOAN SUBMISSION CHECKSHEET

**Closing Agent to complete when sending closed loan to Colonial within 24 hours of loan disbursement.**

---

**\*\*\*IMPORTANT NOTICE\*\*\***

Please provide the information below for the party responsible for post-closing correspondence. Address shown on page one of the closing instructions will be used if information below is not completed.

Name: _____

Address: _____

City: _____ State: _____ Zip Code: _____

---

[ ] FUNDS due to Colonial $ _____ (place on top of documents)

[ ] Note-*executed original.*
[ ] Borrower's Power of Attorney
    (certified copy of recorded original)
[ ] Broker Power of Attorney (copy or recorded original)
[ ] Modification Agreement-with Terms of Modification
    (certified copy)
[ ] Assignment of Security Instrument
    (certified copy)
    ( ) Colonial to Investor
[ ] HUD-1 Settlement Statement- original
[ ] Truth-In-Lending Disclosure
[ ] Mortgage/Deed of Trust/Security Deed
    (certified copy)
    **Required Riders Attached:**
    [ ] PUD [ ] Condo [ ] Balloon
    [ ] Adjustable Rate Rider
    [ ] 1-4 Family Rider
[ ] Loan Closing Affidavit
[ ] Tax Information Form
[ ] Name Affidavit
[ ] Address Certification
[ ] Mining and Mineral Rights Letter
[ ] Notice of Right to Cancel-refinance
[ ] First Payment Letter
[ ] Notice of Assignment, Sale or Transfer
    ( ) Colonial to Investor
[ ] Request For Taxpayer ID Number (aka W9)
[ ] Title Commitment or Binder
[ ] Title Policy with required Endorsements
[ ] Hazard Policy or Declaration Page - with evidence first
    year premium has been paid.
[ ] Windstorm & Hail Policy- if separate policy with
    evidence premium has been paid.

[ ] Notice to Borrower/Flood Certificate
[ ] Flood Insurance Application -with evidence of premium
    payment.
[ ] Initial Escrow Acct. Statement
[ ] Loan Application (1003 form)
[ ] Buydown Agreement
[ ] No Escrow Account Option Agreement
[ ] Escrow/Holdback Agreement
[ ] Subordination Agreement
[ ] Survey
[ ] Private Mortgage Insurance
[ ] Final Inspection
    ( ) With Photos
    ( ) Re-certification of Value
    ( ) Certificate of Occupancy
[ ] Health Authority Approval of:
    ( ) Septic Tank ( ) Well

**State Specific Documents**

[ ] Georgia Settlement Disclosure
[ ] Texas-Loan Agreement Notice

**Other Enclosures**

[ ] _____
[ ] _____
[ ] _____
[ ] _____
[ ] _____
[ ] _____
[ ] _____

---

| **RETURN CLOSED LOAN TO ADDRESS BELOW** | **SEND RECORDED DOCUMENTS & TITLE POLICY** |
|---|---|
| Colonial Bank, N.A. | Colonial Bank, N.A. |
| 919 WEST STATE ROAD 436, SUITE 102 | P.O. Box 5627 |
| ALTAMONTE SPRINGS, FL 32714 | Montgomery, AL 36103-5627 |

JCOL36 (03/04)      January 2000 / Colonial Bank/Conventional Loan Checklist

DGRIFFIN - 000116

| A. Settlement Statement | U.S. Department of Housing and Urban Development | | OMB No. 2502-0265 |
|---|---|---|---|
| **B. Type of Loan** | | | |

1. ☐ FHA 2. ☐ FmHA 3. ☒ Conv. Unins.  4. ☐ VA 5. ☐ Conv. Ins. | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME AND ADDRESS OF BORROWER: DAVID DERRICK GRIFFIN, A MARRIED MAN

1200 SE ATLANTIC AVE.    LANTANA, FLORIDA 33462

E. NAME AND ADDRESS OF SELLER:

TIN:

F. NAME AND ADDRESS OF LENDER: COLONIAL BANK, N.A.
400 N. TAMPA STREET
TAMPA, FL 33602

G. PROPERTY LOCATION: 9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

H. SETTLEMENT AGENT: ADORNO & YOSS
PLACE OF SETTLEMENT: 350 EAST LAS OLAS BLVD SUITE 1700
FORT LAUDERDALE, FLORIDA 33301
TIN:

I. SETTLEMENT DATE: OCTOBER 06, 2006   DISBURSEMENT DATE: OCTOBER 06, 2006

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract sales price | 731,544.00 | 401. Contract sales price | 731,544.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower: (from line 1400) | | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | | ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | |
| 106. City/town taxes to | | 406. City/town taxes to | |
| 107. County taxes to | | 407. County taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER:** ▶ | | **420. GROSS AMOUNT DUE TO SELLER:** ▶ | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 73,154.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | | ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | |
| 210. City/town taxes to | | 510. City/town taxes to | |
| 211. County taxes to | | 511. County taxes to | |
| 212. Assessments to | | 512. Assessments to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER:** ▶ | | **520. TOTAL REDUCTIONS IN AMOUNT DUE SELLER:** ▶ | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross amount due from borrower (line 120) | | 601. Gross amount due to seller (line 420) | |
| 302. Less amount paid by/for borrower (line 220) | | 602. Less total reductions in amount due seller (line 520) | |
| **303. CASH ☐ FROM ☐ TO BORROWER:** ▶ | | **603. CASH ☐ TO ☐ FROM SELLER:** ▶ | |

Previous Edition is Obsolete    HUD-1 (3-86) - RESPA, HB 4305.2

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained in Blocks E, G, H, and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER INSTRUCTIONS: If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide [box H] with your correct taxpayer identification number. If you do not provide [see box H] with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law, and Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

HUD-1

VMP-501B (0205).02   VMP MORTGAGE FORMS - (800)521-7291

Seller's Signature

PAGE 1

DGRIFFIN - 000117

HUD-1 (Rev. 3/86)

| L. | | SETTLEMENT CHARGES | | OMB No. 2502-0265 |
|---|---|---|---|---|

| **700. TOTAL SALES / BROKER'S COMMISSION:** | | | **PAID FROM BORROWER'S FUNDS AT SETTLEMENT** | **PAID FROM SELLER'S FUNDS AT SETTLEMENT** |
|---|---|---|---|---|
| BASED ON PRICE $ | @ % = | | | |
| DIVISION OF COMMISSION (LINE 700) AS FOLLOWS: | | | | |
| 701. $ | to | | | |
| 702. $ | to | | | |
| 703. Commission paid at settlement | | | | |
| 704. | | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN:** | | | | |
| 801. Loan origination fee | % | | | |
| 802. Loan discount | % | | | |
| 803. Appraisal fee to: | | | | |
| 804. Credit report to: | | | | |
| 805. Lender's inspection fee | | | | |
| 806. Mortgage insurance application fee to | | | | |
| 807. Assumption fee | | | | |
| 808. | | | | |
| 809. | | | | |
| 810. | | | | |
| 811. | | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE:** | | | | |
| 901. Interest from OCTOBER 06, 2006 to NOVEMBER 01, 2006 @ $ 19.5411 /day | | | 508.07 | |
| 902. Mortgage insurance premium for 0 mos. to | | | | |
| 903. Hazard insurance premium for yrs. to | | | 0.00 | |
| 904. Flood Insurance Premium for yrs. to | | | | |
| 905. | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER:** | | | | |
| 1001. Hazard insurance | months @ $ | | | |
| 1002. Mortgage insurance | months @ $ | per month | | |
| 1003. City property taxes | months @ $ | per month | | |
| 1004. County property taxes | months @ $ | per month | | |
| 1005. Annual assessments | months @ $ | per month | | |
| 1006. Flood Insurance | months @ $ | per month | | |
| 1007. | months @ $ | per month | | |
| 1008. Aggregate Adjustment Credit | | per month | | |
| **1100. TITLE CHARGES:** | | | < > | |
| 1101. Settlement or closing fee to | | | | |
| 1102. Abstract or title search to | | | | |
| 1103. Title examination to | | | | |
| 1104. Title insurance binder to | | | | |
| 1105. Document preparation to | | | | |
| 1106. Notary fees to | | | | |
| 1107. Attorneys' fees to | | | | |
| (includes above items Numbers: | | | | |
| 1108. Title insurance to | | ) | | |
| (includes above items Numbers: | | | | |
| 1109. Lender's coverage $ | | ) | | |
| 1110. Owner's coverage $ | | | | |
| 1111. | | | | |
| 1112. | | | | |
| 1113. | | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES:** | | | | |
| 1201. Recording fees: Deed $ | ; Mortgage $ | ; Releases $ | | |
| 1202. City/county tax / stamps: Deed $ | ; Mortgage $ | | | |
| 1203. State tax / stamps Deed $ | ; Mortgage $ | | | |
| 1204. | | | | |
| 1205. | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES:** | | | | |
| 1301. Survey to | | | | |
| 1302. Pest inspection to | | | | |
| 1303. | | | | |
| 1304. | | | | |
| 1305. | | | | |
| 1306. | | | | |
| 1307. | | | | |
| **1400. TOTAL SETTLEMENT CHARGES** (Enter on line 103, Section J and line 502, Section K) ▶ | | | | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower: _____  Date: _____  Seller: _____  Date: _____

Borrower: _____  Date: _____  Seller: _____  Date: _____

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

_____  Date: _____  Settlement Agent: _____  Date: _____

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

VMP-502 (9708)  VMP MORTGAGE FORMS - (800)521-7291

PAGE 2

DGRIFFIN - 000118

# Aurora · Loan Services

10350 Park Meadows Drive
Littleton, CO 80124
www.myAuroraLoan.com

47081-0025120-006-1-010-010-000-000

364 0033340530534BIL011910
DAVID DERRICK GRIFFIN

## ACCOUNT STATEMENT

| | |
|---|---|
| Statement Date: | 01/19/10 |
| Account Number: | |
| Property Address: | 9801 COBBLESTONE LAKES CT BOYNTON BEACH FL 33437 |

| | |
|---|---|
| Customer Service: | 1-800-550-0508 |
| TDD: | 1-877-266-7210 |
| Loan Counseling: | 1-800-550-0509 |
| TDD: | 1-877-266-7211 |
| Insurance Center: | 1-800-732-6578 |

**\* See reverse side for hours of operation and other important contact information**

## ACCOUNT INFORMATION

Balances as of 01/19/10
| | |
|---|---|
| Principal Balance* | $71,779.80 |
| Escrow Balance | $0.00 |
| Suspense Balance | $0.00 |
| Interest Rate | 9.750% |

Year-to-Date
| | |
|---|---|
| Principal Paid | $0.00 |
| Interest Paid | $0.00 |
| Taxes Paid | $0.00 |

\* The principal balance is not the total amount required to pay your loan in full.

## PAYMENT SUMMARY

| | |
|---|---|
| Principal and/or Interest | $628.51 |
| Escrow | $0.00 |
| Optional Products | $0.00 |
| Misc Fees | $0.00 |
| HUD/Buydown Subsidy | $0.00 |
| **Total Monthly Payment** | **$628.51** |

## AMOUNT DUE

| | |
|---|---|
| Payment Due Date | 06/01/09 |
| Payment Amount Due | $628.51 |
| Past Due Amounts | $5,028.08 |
| Unpaid Late Charges | $251.44 |
| Unpaid Return Check Fees | $0.00 |
| Cumulative Other Fees | $0.00 |
| Cumulative Advances | $120.00 |
| **TOTAL AMOUNT DUE** | **$6,028.03** |
| If Paid After 02/16/10 | |
| Late Charge Amount | $31.43 |
| Total Amount Due | $6,059.46 |

## TRANSACTION ACTIVITY SINCE LAST STATEMENT

| Transaction Description | Date Due | Transaction Date | Total Received | Principal | Interest | Escrow | Optional Products | Suspense / Advances / Fees |
|---|---|---|---|---|---|---|---|---|
| Property Value Fee | | 12/18/09 | | | | | | -120.00 |
| Late Charge | | 01/19/10 | | | | | | -31.43 |

---

| IMPORTANT TAX INFORMATION | | PLEASE RETAIN FOR YOUR RECORDS |

**2009 MORTGAGE INTEREST STATEMENT**
1098 Substitute OMB No. 1545-0901 - Copy B for Payer

DAVID DERRICK GRIFFIN
9801 COBBLESTONE LAKES CT
BOYNTON BEACH FL 33437

Loan #

AURORA LOAN SERVICES
2617 COLLEGE PARK
P.O. BOX 1706
SCOTTSBLUFF, NE 69363-1706
1-800-550-0508
TIN:

*SEE IMPORTANT INFORMATION ON REVERSE SIDE*

| PAYER'S SOCIAL SECURITY NUMBER | 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 | 1 Mortgage interest received from payer(s)/borrower(s) | $2,922.47 |
|---|---|---|---|
| 2 Points paid on purchase of principal residence | $0.00 | 3 Refund of overpaid interest | $0.00 |
| 4 Mortgage insurance premiums | $0.00 | | |

ESCROW RECONCILIATION
| | |
|---|---|
| BEGINNING BALANCE | $0.00 |
| DEPOSITS | $0.00 |
| DISBURSEMENTS | $0.00 |
| ENDING BALANCE | $0.00 |

ESCROW DISBURSEMENTS
| | |
|---|---|
| TAXES PAID | $0.00 |
| HAZARD INS PAID | $0.00 |
| MORTGAGE INS PAID | $0.00 |

PRINCIPAL RECONCILIATION
| | |
|---|---|
| BEGINNING BALANCE | $72,031.31 |
| PRINCIPAL APPLIED | $251.51 |
| ENDING BALANCE | $71,779.80 |

| | |
|---|---|
| CURRENT TOTAL PAYMENT | $628.51 |
| CURRENT ESCROW PAYMENT | $0.00 |
| LATE CHARGES PAID | $31.43 |
| INTEREST ON ESCROW | $0.00 |

*YOU MAY OR MAY NOT BE ABLE TO DEDUCT THESE ITEMS. IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT YOUR TAX ADVISOR.*

DETACH HERE. Retain this portion of your statement for your records. Please allow 7 to 10 days for postal delivery.

| ACCOUNT INFORMATION | | PAYMENT SUMMARY | | AMOUNT DUE | |
|---|---|---|---|---|---|
| Balances as of 01/19/10 | | Principal and/or Interest | $628.51 | Payment Due Date | 06/01/09 |
| Principal Balance* | $71,779.80 | | | Payment Amount Due | $628.51 |
| Escrow Balance | $0.00 | Escrow | $0.00 | Past Due Amounts | $5,028.08 |
| Suspense Balance | $0.00 | | | Unpaid Late Charges | $251.44 |
| Interest Rate | 9.750% | Optional Products | $0.00 | Unpaid Return Check Fees | $0.00 |
| Year-to-Date | | | | Cumulative Other Fees | $0.00 |
| Principal Paid | $0.00 | Misc Fees | $0.00 | Cumulative Advances | $120.00 |
| Interest Paid | $0.00 | HUD/Buydown Subsidy | $0.00 | TOTAL AMOUNT DUE | $6,028.03 |
| Taxes Paid | $0.00 | | | If Paid After 02/16/10 | |
| * The principal balance is not the total amount required to pay your loan in full. | | Total Monthly Payment | $628.51 | Late Charge Amount | $31.43 |
| | | | | Total Amount Due | $6,059.46 |

## TRANSACTION ACTIVITY SINCE LAST STATEMENT

| Transaction Description | Date Due | Transaction Date | Total Received | Principal | Interest | Escrow | Optional Products | Suspense / Advances / Fees |
|---|---|---|---|---|---|---|---|---|
| Property Value Fee | | 12/16/09 | | | | | | -120.00 |
| Late Charge | | 01/19/10 | | | | | | -31.43 |

| IMPORTANT TAX INFORMATION | | 2009 MORTGAGE INTEREST STATEMENT 1098 Substitute OMB No. 1545-0901 - Copy B for Payer | | PLEASE RETAIN FOR YOUR RECORDS |

DAVID DERRICK GRIFFIN
9801 COBBLESTONE LAKES CT
BOYNTON BEACH FL 33437

Loan #

AURORA LOAN SERVICES
2617 COLLEGE PARK
P.O. BOX 1706
SCOTTSBLUFF, NE 69363-1706
1-800-550-0508
TIN:

SEE IMPORTANT INFORMATION ON REVERSE SIDE

| PAYER'S SOCIAL SECURITY NUMBER | 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 | 1 Mortgage interest received from payer(s)/borrower(s) | $2,922.47 |
| 2 Points paid on purchase of principal residence | $0.00 | 3 Refund of overpaid interest | $0.00 |
| 4 Mortgage insurance premiums | $0.00 | | |

ESCROW RECONCILIATION
BEGINNING BALANCE $0.00
DEPOSITS $0.00
DISBURSEMENTS $0.00
ENDING BALANCE $0.00

ESCROW DISBURSEMENTS
TAXES PAID $0.00
HAZARD INS PAID $0.00
MORTGAGE INS PAID $0.00

PRINCIPAL RECONCILIATION
BEGINNING BALANCE $72,031.31
PRINCIPAL APPLIED $251.51
ENDING BALANCE $71,778.80

CURRENT TOTAL PAYMENT $628.51
CURRENT ESCROW PAYMENT $0.00

LATE CHARGES PAID $31.43
INTEREST ON ESCROW $0.00

YOU MAY OR MAY NOT BE ABLE TO DEDUCT THESE ITEMS. IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT YOUR TAX ADVISOR.

DETACH HERE. Retain this portion of your statement for your records. Please allow 7 to 10 days for postal delivery.

Remit U.S. funds payable to Aurora Loan Services. Include your loan number on your check. Aurora Loan Services does not solicit post dated checks. All checks are subject to immediate deposit.

| ACCOUNT NUMBER | PAYMENT DUE DATE | PAYMENT AMOUNT DUE | PAST DUE AMOUNT | TOTAL FEES DUE | TOTAL AMOUNT DUE |
|---|---|---|---|---|---|
| 0033340530 | 06/01/09 | 628.51 | 5,028.08 | 371.44 | 6,028.03 |

Notwithstanding any instructions to the contrary, funds will be applied in the following order as detailed in your loan documents:
(1) interest due; (2) principal due; (3) escrow due; (4) fees due; (5) to reduce your principal balance once your loan is contractually current.

If payment is made after 02/16/10, remit this amount

LATE PAYMENT
6,059.46

DAVID DERRICK GRIFFIN

A/33

☐ Please check here if address, phone #, or e-mail change is indicated on reverse side.

Payment Amount
Additional Principal

Aurora • Loan Services
ATTN: CASHIERING
PO BOX 5180
DENVER CO 80217-5180

Additional Escrow
Late Charges/Fees
Amount Enclosed $

0033340530 000065994 000062851 000602803

Case 2:09-md-02047-EEF-MBN Document 22380-46 Filed 12/02/19 Page 101 of 133



# NORTHSTAR
## HOMES

February 3, 2005

Mr. and Mrs. Derrick Griffin

███████████████

     Re: Purchase of Lot 120, Cobblestone Creek

Dear Derrick and Diane:

I want to personally extend my thanks to you for your new home purchase in Cobblestone Creek. We, at Northstar Homes, recognize that this purchase is one of the most important decisions that you will ever make.

Northstar Homes has been developing residential communities in Palm Beach County for almost fifteen years and, we are committed to providing exceptional customer service and ensuring complete satisfaction with your new residence.

We are extremely excited about this new family community and, we look forward to seeing you throughout the process of building your home.

If you have any questions, please don't hesitate to call.

Sincerely,

*David Ettinger*
David Ettinger
President

DE/jmk

cc:    Sales

**GRIFFIN**
**0001**

14406 Military Trail, Delray Beach, FL 33484   (561) 498-3731 or 1-888-769-2513   Fax (561) 498-4354
www.northstarhomes.net
License #: CGC1504252

DGRIFFIN - 000121

Case 1:21-cv-22409-MGC Document 270 Entered on FLSD Docket 08/15/2013 Page 323 of 222
Case 2:09-md-02047-EEF-MBN Document 22280-46 Filed 12/03/19 Page 102 of 133

Page 1 of 35



# COBBLESTONE
·CREEK·

### PURCHASE AND SALE AGREEMENT

This agreement is made by and between **NORTHSTAR HOLDINGS AT B AND A, LLC**, a Florida limited liability company whose corporate address is 14406 Military Trail, Delray Beach, Florida 33484 ("Seller") and,

("Purchaser"): _DERRICK  GRIFFIN_

("Purchaser"): _Diane  Griffin_

Address: ▮

Res. Phone: ▮   Bus. Phone ▮   Cell Phone: ▮

SS# ▮   SS# ▮   Fax Number: ▮   E-mail: ▮

Seller's Sales Associate: _Matthew S. Shore and Karen Wendman_

**1. Property:**

Seller agrees to Sell and Purchaser agrees to purchase Lot _120_, Block 2, according to the Plat of Cobblestone Creek of Palm Beach, County, Florida, together with a residence to be constructed thereon by Seller in substantial conformity with plans and specifications for the Model known as _Fairfax_, Garage (Right) (Left), which plans and specifications have been approved by and (circle one) filed with the local building department having jurisdiction ("Property").

**2. Purchase Price:**

| | | |
|---|---|---|
| Base Purchase Price: | $ | 487,900.00 |
| Premium Lot Price: | $ | 80,000.00 |
| Elevation Price: | $ | 4,000.00 |
| Options (per attached Options Selections Addendum): | $ | 76,500.00 |
| Other: | $ | 0 |
| *Total Purchase Price | $ | 588,400.00 |

**3. Method of Payment:**

(a) Reservation deposit (if any) paid prior to execution of Contract: $ _0_

(b) 5% Deposit on Total Purchase Price, Less Reservation Deposit, if any, Paid Upon Execution of this Contract by Purchaser, Receipt of which is Acknowledged: $ _29,420.00_

(c) Additional 5% deposit on Total Purchase Price due 30 days from Contract Execution Date by Purchaser: _2-28-05_ $ _29,420.00_

(d) Mortgage Proceeds, subject to the Conditions of Paragraph A, "Mortgage Contingency": $ _529,560.00_

(e) Balance of Total Purchase Price due at Closing by wire transfer or cashier's check drawn on Florida Bank: $ _0_

TOTAL: $ _588,400.00_

* The Total Purchase Price and the cash due at closing will be adjusted based upon alternate selections, upgrades of options; and credits, adjustments, prorations, charges and expenses as hereinafter set forth.

**4. Estimated Completion Date:**

Estimated Completion Date: _December, 2005_ subject to Paragraph E.3 of the Standard Provisions.

**5. Standard Terms and Conditions:**

This Agreement is subject to all the terms and conditions of the Standard Terms and Conditions which are incorporated herein by reference.

**6. Escrow Waiver:**

WHEREAS, THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10% OF THE PURCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER; and

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC   Initials _DDG_  _DG_

GRIFFIN
0002
DGRIFFIN - 000122

WHEREAS, in the event the above right is not waived by the Buyer, all funds (up to 10% of the Purchase Price) shall be placed in an escrow account with the Escrow Agent (as hereinafter defined);

NOW, THEREFORE, Seller and Purchaser hereby agree as follows:

A.  PURCHASER, BY EXECUTION HEREOF, HEREBY AGREES AS FOLLOWS (*strike the inapplicable paragraph and initial the appropriate paragraph*):

    1.  Purchaser hereby waives the right to have the deposit funds placed in an escrow account and agrees that all deposits may be used by Seller solely for construction purposes.  *Initial* __DMG__  __DC__ $ __58,840.00__

    OR

    2.  Purchaser does not waive the right to have all of the deposit funds (up to 10% of the Purchase Price) placed in an escrow account, subject to the obligations imposed by paragraph B below. *Initial* _____ _____

B.  Purchaser further acknowledges that if paragraph A.1 above is stricken and therefore the deposit funds (up to 10% of the Purchase Price) are deposited in an escrow account, then the following shall apply:

    1.  Any interest earned, in accordance with Section 501.1375(4), Florida Statutes, shall be payable to Seller at Closing, except as otherwise provided in Section 501.1375, Florida Statutes.

    2.  If Seller desires to use the funds for building purposes, Seller may borrow money for construction purposes in the amount of the deposit funds. In such event, Purchaser shall pay to Seller the interest on the loan for a period not to exceed twelve (12) months, less any interest accrued on the escrow account.

    3.  If Seller desires to use the funds for building purposes, Seller may in the alternative acquire a master surety bond issued by a company licensed to do business in the State of Florida, in an amount equal to or greater than the total amount of the escrowed funds. In such event, Purchaser shall pay to Seller at Closing an amount equal to the premium for the applicable portion of said surety bond securing Purchaser's deposit.

    4.  In accordance with Section 501.1375(3), Florida Statutes, Seller has established an escrow account (the "Escrow Account") with Adorno & Yoss, P.A. (the "Escrow Agent"), 350 East Las Olas Boulevard, Suite 1700, Ft. Lauderdale, FL 33301.

    5.  Unless waived herein, all deposit monies (up to 10% of the Purchase Price) received by Seller from Purchaser prior to Closing pursuant to the Purchase Contract shall be deposited into the Escrow Account. Such payments shall be held in the Escrow Account, together with payments of other buyers of homes in the Community. Purchaser may, upon written request to the Escrow Agent, obtain a receipt for his deposit.

    6.  Purchaser agrees to indemnify and hold Escrow Agent harmless from any claims or damages which may result from Escrow Agent's escrowing or disbursing of Purchaser's payments held in accordance with Section 501.1375, Florida Statues, other than those claims or damages resulting from Escrow Agent's gross negligence or willful malfeasance. The provisions of this paragraph shall survive closing and any termination of the Purchase Contract described above.

    7.  In the event that, prior to Closing, Escrow Agent receives written notice of a dispute between Purchaser and Seller regarding the escrow deposit, Escrow Agent is authorized in its sole discretion to comply with the terms of the Escrow Agreement, or retain the escrow deposit until such dispute is resolved by the agreement of Purchaser and Seller or by a court of competent jurisdiction, or commence an action in the nature of interpleader and seek deliver the documents, instruments and escrow deposit to a court of competent jurisdiction.

7.  IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 689.26, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BY DELIVERING TO SELLER OR SELLER'S AGENT WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST.  ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT.  BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING.  PURCHASER SHOULD NOT SIGN THIS AGREEMENT UNTIL PURCHASER HAS READ THE DISCLOSURE SUMMARY REQUIRED BY SECTION 689.26, FLORIDA STATUTES.

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES AND SHOULD BE READ THOROUGHLY PRIOR TO SIGNING.  IF PURCHASER HAS ANY QUESTIONS ABOUT PURCHASER'S RIGHTS OR RESPONSIBILITIES UNDER THIS AGREEMENT, PURCHASER MAY WISH TO CONSULT AN ATTORNEY OF PURCHASER'S CHOICE. PURCHASER'S SIGNATURE ON THIS DOCUMENT AND PURCHASER'S SIGNATURE AND/OR INITIALS ON EXHIBITS AND ADDENDA EVIDENCES PURCHASER'S ACCEPTANCE AND UNDERSTANDING OF ITS TERMS. PURCHASER ACKNOWLEDGES AND REPRESENTS THAT PURCHASER HAS READ THIS AGREEMENT AND ALL EXHIBITS AND ADDENDA TO IT, THAT PURCHASER AGREES TO BE BOUND BY ALL OF ITS TERMS AND THAT PURCHASER IS NOT RELYING ON ANY STATEMENT, PROMISE, CONDITION OR STIPULATION NOT SPECIFICALLY SET FORTH IN THIS AGREEMENT.  PURCHASER UNDERSTANDS THAT SELLER IS RELYING ON PURCHASER'S ACKNOWLEDGMENT AND REPRESENTATIONS, AND SELLER WOULD NOT AGREE TO SELL THE PROPERTY TO PURCHASER WITHOUT PURCHASER'S ACKNOWLEDGMENT AND REPRESENTATIONS.

U:\Jen\cobblestone creek\Masters\Purchase and Sale Agreement final DOC      Initials __DMG__ __DC__

GRIFFIN
0003

DGRIFFIN - 000123

Case 2:09-md-02047-EEF-MBN Document 22380-46 Filed 12/02/19 Page 104 of 133
Case 1:11-cv-22408-MGC Document 276 Entered on FLSD Docket 09/15/2013 Page 125 of 222

Page 3 of 35

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals this 31st day of
JANUARY , 2005.

Purchaser
DERRICK GRIFFIN
Print Name

Purchaser
Diane GRIFFIN
Print Name

Kathleen O'Shore
Sales Associate

This Agreement must be approved by an Authorized Agent of Cobblestone Creek and shall not be a valid binding Agreement until
such signature is affixed.

NORTHSTAR HOLDINGS AT B AND A, LLC,
a Florida limited liability company

By:
Authorized Agent

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC          Initials ___

GRIFFIN
0004

DGRIFFIN - 000124

Case 1:09-cv-02047-EEF-MBN Document 22380-46 Filed 12/02/19 Page 105 of 133
Case 2:09-md-02047-EEF-MBN Document 22380-46 Filed 08/15/2019 Page 326 of 222

Page 4 of 35

## STANDARD TERMS AND CONDITIONS

These Standard Provisions and the terms and conditions contained herein are a part of and, by this reference, incorporated into the Contract between Seller and Purchaser in the community known as Cobblestone Creek (the "Community").

### A. MORTGAGE CONTINGENCY

1. **Applicability and Term.** Purchaser intends to obtain a mortgage commitment from an institutional or duly licensed mortgage lender of its own choice ("Mortgage Lender") for a mortgage loan of no more than the amount of the Mortgage Proceeds as set forth on the front pre-printed page of this Contract, if any ("Mortgage Loan"). Purchaser and Seller agree that this Contract is contingent upon Purchaser obtaining a preliminary mortgage approval from Mortgage Lender in the amount of the Mortgage Loan (the "Preliminary Approval") within fourteen (14) days of the date of this Contract (the "Contingency Date") subject to the terms and conditions of this Section A (the "Mortgage Contingency"). For purposes of this Section A, the date of this Contract shall be the date when the Seller signs it. If the amount of Mortgage Proceeds set forth on the front pre-printed page of this Contract is left blank or is zero (-0-), there shall be no Mortgage Contingency and therefore, the provisions of Sections A.2 through A.5 following shall not apply.

Purchaser further acknowledges and agrees that: (i) Purchaser's choice of Mortgage Lender is Purchaser's own choice and Purchaser is not required in any manner whatsoever to use any particular Mortgage Lender in connection with the Purchase of the home; (ii) Seller is not responsible for any loan program(s)( that the Mortgage Lender may offer or for mortgage Lender's performance or failure to perform there under; and (iii) Purchaser releases and agrees to hold harmless Seller from and against any and all claims relating to the Mortgage Lender including, without limitation, Mortgage Lender's performance or failure to perform under any loan program or otherwise and/or Mortgage Lender's failure to close the Mortgage Loan for any reason whatsoever. The foregoing release and hold harmless agreement shall survive closing and any termination of this Contract.

2. **Mortgage Loan Acts.** Purchaser agrees to perform all of the following acts (the "Mortgage Loan Acts"); (a) make application for the Mortgage Loan ("Mortgage Application") with Mortgage Lender within five (5) days of the date of this Contract in such form and content as required by Mortgage Lender; (b) use Purchaser's best efforts to obtain the Preliminary Approval in good faith; (c) comply with all requests of Mortgage Lender during the Mortgage Application process including, without limitation, prompt execution of instruments and supplying information required by Mortgage Lender; and (d) take all other action necessary to satisfy the requirements of Mortgage Lender in order to obtain the Preliminary Approval. In addition, Purchaser agrees not to take or fail to take any action whatsoever that would cause Purchaser's Mortgage Application to be denied. Purchaser's failure to perform any of the Mortgage Loan Acts, or Purchaser's taking of or failing to take any action that would cause Purchaser's Mortgage Application to be denied, shall, at Seller's option, constitute a default under this Contract. Purchaser hereby consents to and authorizes the released to Seller by Mortgage Lender of all information regarding the status and progress of Purchaser's Mortgage Application and the Preliminary Approval. Purchaser acknowledges and agrees that Seller may decide, until such time as Seller has received a copy of Purchaser's Preliminary Approval: (i) not to apply for a building permit for the home, (ii) not to commence construction of the Home if a building permit has been issued, or (iii) to stop construction of the Home if construction has commenced; and any of such events could result in a delay of the estimated closing date as reflected on the front page of this Contract.

3. **Termination of Contingency.** The Mortgage Contingency shall automatically terminate and Purchaser will no longer

have any right to terminate this Contract on account of a failure to obtain the Preliminary Approval for any reason whatsoever upon the occurrence of anyone of the following events: (a) Purchaser receives Preliminary Approval on or before the Contingency Date; (b) on or before the Contingency Date, Seller receives a letter issued by Mortgage Lender denying the Preliminary Approval of approval of the Mortgage Loan (the "Mortgage Denial Letter"), but Seller is able to procure a Preliminary Approval for Purchaser on terms set forth in Section A4 below within forty-five (45) days from Seller's receipt of the Mortgage Denial Letter; (c) Seller has not received a Mortgage Denial Letter for Purchaser on or before the Contingency Date; (d) Purchaser fails to perform any of the Mortgage Loan Acts; (e) Purchaser notifies Seller in writing of Purchaser's waiver of the Mortgage Contingency on or before the Contingency Date; or (f) any action or inaction by Purchaser that causes Purchaser's mortgage Application to be denied. If the Mortgage Contingency terminates due to the occurrence of any one of the events set forth in (c), (d), (e) or (f) above in this Section A.3, and the total deposit shown n the front page of this Contract is less than 10% of the Total Purchase Price, then Purchaser shall immediately deliver to Seller an additional deposit in a sum sufficient to bring the total deposit paid by Purchaser to 10% of the Total Purchase Price (the "Supplemental Deposit"). Failure of Purchaser to immediately deliver the Supplemental deposit to Seller shall, at Seller's option, constitute a default under this Contract. The terms contained herein shall not be construed so as to create (i) a contract between Purchaser and the Mortgage Lender for the issuance of the Mortgage Loan, or (ii) any other obligation or requirement that Purchaser use Mortgage Lender to obtain the closing proceeds. Purchaser hereby acknowledges and agrees that the Mortgage Contingency is immediately terminated upon Purchaser's receipt of the Preliminary Approval regardless of whether Purchaser either accepts its terms and conditions or ultimately closes the Mortgage Loan with the Mortgage Lender. In that regard, Purchaser fully understands and agrees that upon termination of the Mortgage Contingency all deposit and other monies paid by Purchaser pursuant to this contract are fully non-refundable (other than as a result of a default by Seller which Seller fails to cure after notice and the expiration of the applicable cure period, without any default by Purchaser) and Purchaser is obligated to close in accordance with the terms and conditions of this Contract.

A Preliminary Approval (whether obtained by Purchaser or Seller as provided in this Section A) which is subject to conditions or contingencies shall be deemed an acceptable Preliminary Approval for the purposes of Section A, and hence, termination of the Mortgage Contingency for purposes of this Contract. This provision is intended to cover Purchaser's receipt of a Preliminary Approval conditioned on the happening of a future event. Purchaser acknowledges and agrees that this provision is fair and reasonable. Accordingly, Purchaser fully understands and agrees that Purchaser should properly bear the risk that, once a Preliminary Approval is issued to Purchaser thereby terminating the Mortgage Contingency, that Mortgage Lender may not close the Mortgage Loan due to, but not limited to, a change in Purchaser's financial condition (including, without limitation a loss of employment), a change in interest rates, Purchaser's failure to remove or satisfy a condition or contingency of the Mortgage Loan, and/or some other event that occurs which causes Mortgage Lender to rescind or terminate the Preliminary Approval and/or Mortgage Loan. Notwithstanding anything contained herein to the contrary, Seller reserves the right to accept a Preliminary Approval after the Contingency Date without altering or adversely affecting any other provision of this Section A.

4. **Seller Obtaining Financing.** Should Seller receive a Mortgage Denial Letter from Purchaser on or before the

U:\Jen\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initials: DDG    DG

GRIFFIN
0005
DGRIFFIN - 000125

Case 2:09-cv-02067-EFB-MRN Document 22 Filed 12/02/09 Page 106 of 133
Case 2:12-cv-02484-MCE Document 270 Entered on FLSD Docket 08/15/2013 Page 27 of 222
Page 5 of 35

Contingency Date, then Seller shall have the right, but not the obligation, to procure a Preliminary Approval for a Mortgage Loan for Purchaser. In the event Seller exercises its right to procure a Preliminary Approval for Purchaser, then Purchaser agrees to provide to seller (or the lender designated by Seller), at Seller's request, all personal and financial information regarding Purchaser's income, employment, assets, and debts as may be required by the lender designated by Seller including, but not limited to, Purchaser's tax returns and W-2 forms for the past two (2) years. Purchaser shall complete and return all mortgage loan application forms which may be provided by seller (r the lender designated by Seller) within five (5) days of delivery of such forms to Purchaser. It shall constitute a default by Purchaser under this Contract if Purchaser fails to provide or if Purchaser falsifies: (a) any information requested by Seller pursuant to this Section A.4 including, but not limited to, any information contained in mortgage loan applications provided by and returned to Seller; and (b) any other information provided to Seller. Purchaser hereby authorizes the Mortgage Lender which denied mortgage financing to Purchaser to deliver to Seller (or the lender designated by Seller) Purchaser's Mortgage Application and all related information in said Mortgage Lender's possession upon the request of Seller.

Purchaser agrees to accept the Preliminary Approval and the mortgage financing obtained by Seller for Purchaser within forty-five (45) days from seller's receipt of the Mortgage Denial Letter. In such event and in accordance with the preceding Section A.3, the Mortgage Contingency shall automatically terminate and Purchaser shall no longer have any right to terminate this Contract on account of a failure to obtain the Preliminary Approval for a Mortgage Loan, regardless of whether Purchaser ultimately closes on such Mortgage Loan obtained by Seller for Purchaser. Notwithstanding anything to the contrary, this Section A.4 shall not be construed to create any obligation whatsoever on the part of Seller to procure a Preliminary Approval or a Mortgage Loan for Purchaser.

5. Failure to Obtain Preliminary Approval. Seller shall return to Purchaser the deposit monies paid by Purchaser to Seller if, and only if: (a) Seller received a written Mortgage Denial Letter on or before the Contingency Date; (b) Seller was unable or unwilling to procure a Preliminary Approval for Purchaser within forty-five (45) days of the date on which Seller received the Mortgage Denial Letter; (c) Purchaser complied with all of the Mortgage Loan Acts; and (d) Purchaser did not take any action or fail to take any action that caused Purchaser to be denied a Preliminary Approval. Upon the return of such deposit monies, the parties shall be relieved of all further rights and obligations under this Contract.

B. MODEL HOMES AND MODEL ROW

1. Finalization of Lot and Model Selection. Purchaser acknowledges that the Lot and Model purchased is FINAL once Seller has executed this Contract. Any request by Purchaser for a change in the Lot and/or Model may or may not be accepted by Seller in the sole discretion of Seller. Should Seller approve any such request, Seller reserves the right to charge Purchaser, and Purchaser agrees to pay to Seller, a contract re-write fee in an amount not less than $1,000 if the request is granted during the thirty (30) days following the date of this Contract or; a contract re-write fee in the amount of not less than $2,500 or the sum of the difference of the purchase price at the time of the original executed contract and the date of the contract re-write, whichever sum is greater, if such request is granted thereafter; however, Purchaser's offer or agreement to pay such fee shall not obligate Seller to agree to the change requested. If the Color Selection Process (as hereinafter defined) has commenced or is completed, additional fees shall also be charged to Purchaser if Seller should approve a change of Lot and/or Model. Purchaser agrees to pay the preceding fees, as applicable, in addition to permitting and/or other costs incurred by Seller in accommodating such request, if any, plus delay damages, if any. Purchaser acknowledges that such a

request may require additional time for delivery of possession of the Home.

2. Model Upgrades. Purchaser acknowledges that, unless specifically included in the document entitled Standard Features Addendum (receipt of which is hereby acknowledged by Purchaser), all furnishings, window treatments, accessories, built-ins, drywall details, lighting fixtures, fans, custom paint colors, custom wall finishes, wall coverings, molding details, fixtures, mirrors, recessed lighting, floor coverings, features and other decorative improvements appearing in any model home, including any model home in a model row offered by one of Seller's affiliates, are not included in the Home and may not be available for selection, purchase and/or installation in the Home. Purchaser further acknowledges that standard carpeting, cabinets, countertops, plumbing fixtures, appliances, floor tile, paints and exterior flatwork may be of a different quality, color or grade than as shown. If Seller has not built a model home of the floor plan which Purchaser has selected to purchase on the front page hereof, Purchaser acknowledges that items viewed in any other model home may not be standard features or available options of the Home purchased. Purchaser also acknowledges that the landscaping surrounding the model homes and sales center may be more extensive than will be provided with the Home.

3. Model Home Lots. Purchaser acknowledges that the models of its product may be situated on wider lots than the standard width of the lot upon which the Home will be constructed. Construction of models on wider lots is intended to consolidate Seller's multiple product lines into a single model row(s) and not to misrepresent the size of lots or distance between homes typically available in the Community.

4. Right to Construct Model Row(s). Seller hereby reserves the right to construct one or more "model row(s)" in the Community. In the event that Seller, as developer of the Community, constructs a model row(s), such model row(s) may be used for any of Seller's projects or its affiliates' projects for an indefinite period of time which may extend past the date of turnover of control of the Association (as hereinafter defined). The provisions of this paragraph shall survive the closing.

5. Other Model Rows. Purchaser acknowledges that Purchaser may have viewed model homes at a model row operated by one of Seller's affiliates which features a similar product line to the Home being constructed by Seller ("Viewed Community") for purposes of viewing the product line constructed by Seller. Notwithstanding the preceding, Purchaser hereby acknowledges that product lines offered in other communities owned by Seller or its affiliates may be similar but never identical. Purchaser further acknowledges that local building code requirements, construction specifications and/or standard features may be different between the Community and the Viewed Community. Furthermore, Purchaser acknowledges that subcontractors, construction labor personnel and construction supervisors responsible for constructing the Community and the Viewed Community may be different. Therefore, substantive differences may exist between the Home and the model home seen in the Viewed Community including, by way of example and not limitation, room dimensions, ceiling heights, ceiling styles, room layouts, location and number of windows and doors, transom windows, drywall treatments, exterior elevations, the "footprint" of the Home, location and type of air conditioning equipment, privacy walls, marble tubs, millwork, locations of lighting and electrical fixtures, windows, thickness of second story walls, standard cabinets and standard fixtures. Purchaser acknowledges that Seller has no obligation whatsoever to construct, supply or provide in the Home those differences between the Home and the model home seen in the Viewed Community. Available color selections for the Home and the model home seen in the Viewed Community may differ due to, among other things, variations in standard product specifications and/or contracted material suppliers and labor subcontractors. Purchaser acknowledges that the standard color selections made

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initials 

GRIFFIN
0006
DGRIFFIN - 000126

Case 8:12-cv-02047-CEH-MAP Document 22 Filed 12/02/08 Page 107 of 133
Case 1:09-md-02047-EEF-MBN Document 22280-46 Filed 08/15/2019 Page 328 of 222

Page 6 of 35

available with the Home and specific to the Community are the only color selections available.

**6. No Representation or Warranty Intended by Model.** If there is a model of the Home which Seller (or its affiliates) has constructed, Purchaser hereby acknowledges and agrees that the model home is for the limited purpose of assisting Purchaser in viewing the basic floor plan layout and some of the options available for sale by Purchaser. Purchaser further acknowledges and agrees that the use of a model home shall not and is not intended to create any express or implied warranty or representation of any kind that the Home being purchased pursuant to this Contract shall conform to the model home so constructed.

**7. Standard Features.** Purchaser acknowledges that the standard features specific to the Community are set forth in the document entitled Standard Features Addendum. All features and appliances are subject to availability and to change or substitution as deemed advisable by Seller, its architect or its engineer, or as required by law. In the event the features or appliances are changed or substituted for at any time prior to the closing, Seller agrees that such modifications will not substantially lessen the value of the Home and Seller will provide substitutions which are of similar, equal or better quality. In the event the features or appliances are changed or substituted for, Purchaser agrees that Purchaser will accept such changes or substitutions without notice and/or compensation, and that this Contract shall remain in full force and effect.

**8. Other Builder within Community.** Cobblestone Creek is a planned community with many types of homes, some of which may be built by Centerline Homes at B and A, LLC, and the obligation of Centerline Homes at B and A, LLC is not guaranteed by Northstar Holdings at B and A, LLC.

Initials _DDG_       Initials _DG_

## C. CONSTRUCTION

**1. Options.** The Purchase price of the Home includes those items shown on the document entitled Standard Features Addendum. Alternate selections or "upgrades" are available at Purchaser's option at an additional expense. Purchaser agrees that the elevation, colors, and all options, changes, additions, deletions or other modifications in the construction of the Home (the "Selections") desired by Purchaser and agreed to at the sole discretion of Seller shall be agreed upon in writing by Purchaser and Seller during the Color Selection Process on any Options Selections Addendum(s). Any Selections purchased simultaneous with the Color Selection Process in accordance with the provisions of Section C.2 below shall be subject to the provisions of Section C.3 below and will require that twenty percent (20%) of the costs of such Selection be paid to Seller by Purchaser at the time of execution of the Option Addendum(s), as applicable. Any changes to or additional Selections purchased after Purchaser has completed the Color Selection Process in accordance with the provisions of Section C.2 below, as determined in the sole discretion of Seller, shall also be subject to the provisions of Section C.3 below and, if accepted by Seller (which it shall have no obligation to do), will require that one hundred percent (100%) of the additional costs or charges incurred due to such changes to or additional Selections be paid to Seller by Purchaser at the time of execution of the Option Addendum(s). All such payments shall be payable to Seller and shall not be a deposit or any part of a deposit for the purchase of the Home but are separate consideration paid by Purchaser to Seller to induce Seller to alter or amend Seller's plans, specifications and procedures to accommodate the preferences of Purchaser. Further, because of the personalized nature of the Selections, such payments shall not be refunded to Purchaser under any circumstances other than a default by Seller (which Seller fails to cure after notice and the expiration of the applicable cure period) without any default by Purchaser, and Seller shall be entitled to retain such payments

in the event of a default by Purchaser as liquidated damages in accordance with the provisions of Section G.1 below.

**2. Purchaser Selections.** Purchaser shall meet with the Seller's Representative to preview the Selections within fourteen (14) days of the date of this Contract or, in the event Purchaser is obtaining a mortgage on the Property, within fourteen (14) days from the date written evidence of Purchaser's mortgage approval is provided to Seller. Purchaser shall complete the option and Color Selection Process for the Home (the "Color Selection Process") within thirty (30) days from the date of the Options Preview Appointment The Color Selection Process shall be deemed complete when the Purchaser has executed the Options Selections Addendum, if any, for those items as to which Purchaser has a choice of selection and any supporting documentation or addendum(s) required by Seller in connection with the Color Selection Process. In the event the Purchaser fails to timely complete the Color Selection Process, Purchaser agrees to pay at Closing the sum of $1,000 per month ("Purchaser Delay Fee") until the Color Selection Process has been completed; however, Seller has the right in its sole discretion to complete the Color Selection Process by making selections as Seller deems advisable to facilitate the permit application process for the construction of the Home and Purchaser agrees to accept the selections made by Seller and pay the accrued Purchaser Delay Fee at Closing. Purchaser acknowledges that selection of roof and/or exterior wall colors may be limited based upon roof and/or exterior wall color selections for homes on either side of the Home. In addition, Purchaser acknowledges that Seller's sales personnel and options coordinators are not interior decorators or designers, and their participation in the Color Selection Process is merely intended to facilitate Purchaser's completion of the Color Selection Process within the time frame set forth above and not to recommend particular selections to Purchaser. In that regard, Purchaser further acknowledges and agrees that Purchaser shall be responsible for all selections made during the Color Selection Process, and if Purchaser is not satisfied for any reason whatsoever with any selections made during the Color Selection Process, Seller (and Seller's sales personnel and options coordinators) shall not have any responsibility or liability therefore.

A.     Options Preview Appointment: Purchaser shall meet with Seller's option coordinator at the design center for the Community at a time and date to be appointed at the time of Contract execution or, in the event Purchaser is obtaining a mortgage on the Property, within fourteen (14) days from the date written evidence of Purchaser's mortgage approval is provided to Seller, which appointment will begin the Color Selection Process. The Options Preview Appointment will be Purchaser's introduction to the Color Selection Process and the time for Purchaser to become familiar with the Selections that are available for purchase by Purchaser and to ask questions regarding the available Selections for or in the Home. If Purchaser misses the Options Preview Appointment, Purchaser shall be given one (1) additional opportunity to meet with an options coordinator on a date and time determined by Seller in Seller's sole discretion (the "Re-scheduled Options Preview Appointment"), which re-scheduled appointment shall not be later than five (5) business days following the date of the originally scheduled Options Preview Appointment. In the event Purchaser misses the Re-scheduled Options Preview Appointment, Purchaser shall not be given any additional opportunity to meet with an options coordinator for orientation.

B.     Options Selections Appointment: Purchaser shall meet with Seller's option coordinator at the design center for the Community at a time and date to be appointed, at Seller's sole discretion, which appointment will be set at the time of the Options Preview Appointment. At the Options Selections Appointment, Purchaser shall execute an Options Selections Addendum and other supporting documentation and addenda required by Seller to evidence the Selections made by Purchaser in connection with the Color Selection Process and Purchaser shall pay the amounts due for such Selections as required by the Purchase Contract. If Purchaser misses the

Initials _DDG_       _DG_

GRIFFIN
0007

DGRIFFIN - 000127

Options Selection Appointment, Purchaser shall be given one (1) additional opportunity to meet with an options coordinator on a date and time determined by Seller, in Seller's sole discretion (the "Re-scheduled Options Selection Appointment") which re-scheduled appointment shall not be later than five (5) business days following the date of the originally scheduled Options Selection Appointment, except as may be required by Seller. In the event Purchaser misses the Re-scheduled Options Selection Appointment, Purchaser shall not be given any additional opportunity to meet with an options coordinator to complete the Color Selection Process. Notwithstanding anything to the contrary in this paragraph, the Options Selections Appointment shall not be later than the date which is thirty (30) days following the Options Preview Appointment, except as may be required by Seller. The thirty (30) day time period to complete the Color Selection Process shall run even if Purchaser misses any applicable appointment or re-scheduled appointment.

C. Completion of the Color Selection Process. The Color Selection Process shall be deemed complete upon the earlier to occur of: (a) Purchaser's execution of the Options Selections Addendum and other supporting documentation and addenda required by Seller to evidence the Selections made by Purchaser in connection with the Color Selection Process, or (b) thirty (30) days following the Options Preview Appointment.

D. Failure to Complete Color Selection Process. In the event Purchaser fails to complete the Color Selection Process in accordance with this Contract:

(i) Seller shall be entitled to apply for a building permit for the Home and to thereafter construct the Home based on Seller's standard plans for the Home. In that regard and without limiting the generality of the foregoing, Purchaser acknowledges that the Home will therefore be constructed with the standard footprint of the Home, the standard location and design of all walls and partitions within the Home, and the standard locations of HVAC, plumbing and electrical components within the Home; and

(ii) Seller shall be entitled to make such Selections (including, without limitation, the color of floor tile and carpeting and the color and style of cabinetry) as Seller deems advisable to facilitate the permit application and construction process for the Home and Purchaser agrees to accept such Selections made by Seller.

_NDB_ Initials        _R.G._ Initials

3. Finalization of Selections and Requests for Changes. Purchaser acknowledges and agrees that the Selections are FINAL once the Color Selection Process is deemed complete in accordance with the terms of Section C.2 above. Purchaser shall be allowed one (1) opportunity to request changes, additions, deletions or other modifications to the Selections ("the Request") which Request must be made to Seller by Purchaser, in writing, prior to the beginning of construction of the Home as determined in the sole discretion of Seller. Purchaser acknowledges and agrees that the Request may or may not be accepted by Seller as determined in the sole discretion of Seller. Should Seller approve a Request, Seller reserves the right to charge Purchaser a $500 administrative change order fee. Furthermore, should Seller approve the Request and the Request results in the need for modification of the building permit for the Home, Seller reserves the right to charge Purchaser a $250 permit revision fee in addition to the $500 administrative change order fee. Purchaser hereby agrees to pay the preceding fees, as applicable, together with: (a) any permitting and/or other costs incurred by Seller in accommodating the Request by Purchaser including, without limitation, delay damages and (b) the sales price of all items included in the Request. Furthermore, if, in the sole discretion of Seller, the Request represents a substantial repeat of the Color Selection Process, then Seller reserves the right to charge Purchaser a $2,500 color re-selection fee. In the event Purchaser fails to timely complete the Color Selection Process as set forth in Section

C.2 above, Purchaser acknowledges and agrees that the subsequent completion of the Color Selection Process, otherwise completed by Seller, shall constitute the Request and shall be subject to the fees and costs as set forth above. Should Seller approve the Request, Purchaser acknowledges and agrees that the Request may require additional time for delivery of possession of the Home, in which event; Purchaser shall be required to pay Seller additional monies in accordance with this Contract. Purchaser acknowledges and agrees that neither the Request nor any changes, additions, deletions or other modifications to the Selections, as may be modified by the Request, shall be permitted once construction of the Home has commenced, as determined in the sole discretion of Seller. For purposes of this Section, construction of the Home shall be deemed commenced when the building permit has been issued by the local building department having jurisdiction.

4. Unavailable Selections. Seller reserves the right to make changes and substitutions of material of a similar, equal or better quality than those contained in the model home(s), if any, or in any other home within the Community, shown on the plans and specifications and/or displayed in Seller's color selection room. In the event an item selected by Purchaser on the Options Selections Addendum is discontinued, changed, substituted for or otherwise made unavailable for installation, Purchaser shall promptly and without compensation re-select that item from the choices made available by Seller. The quality of the item to be re-selected shall be similar to, equal to or better than the item originally selected; however, Purchaser acknowledges and accepts that significant differences may exist in color availability. In the event Purchaser fails to timely re-select an item, Seller shall have the right to make such re-selection on behalf of Purchaser as it deems advisable to facilitate completion of construction and Purchaser agrees to accept such colors or items as selected by Seller. In the event re-selection of an item is required, Purchaser shall not select an upgrade except at an additional cost to Purchaser (which cost shall not include the administrative change order fee referenced in Section C.3 above) and only upon approval by Seller.

5. Plans and Specifications. The Home will be erected substantially in accordance with the plans and specifications prepared by the architect provided, however, that the plans and specifications are subject to change, without notice, as may be deemed necessary or advisable by Seller, its architect or its engineers, or as may be required by law, or as may be necessitated by a change in Sellers subcontractors. Purchaser agrees to close notwithstanding such changes. Seller agrees that such changes shall not materially lessen the value of the Home. Such changes include, but shall not be limited to: changes in the dimensions of rooms, covered patios and verandas; changes in the location of doors, windows, walls, partitions, television outlets, electrical outlets, telephone outlets, outside air-conditioning components, electrical panel boxes; and/or changes to the exterior elevations. Decisions will be made to locate features and options at the discretion of Seller without prior notice to Purchaser. Ceiling heights and direction of trusses may vary in floor plans built with alternative elevations not shown on Sellers model row, if any. All illustrations shown in brochures are artist's renderings and landscaping depicted is not to scale and may vary as to maturity and number. All dimensions and locations shown thereon are approximate and may vary according to building conditions and codes. In addition, Purchaser expressly acknowledges and agrees that: (i) all floor plans of the Home are not to scale and may be the reverse (mirror) image of those shown; (ii) all measurements shown on floor plans of the Home are approximate; and (iii) the square footage shown on floor plans of the Home is measured from the outside of exterior walls. The provisions of this paragraph shall survive the closing.

6. Changes in Building Code and Governmental Fees. Purchaser acknowledges that the Purchase Price of the Home has been agreed upon by Purchaser and Seller based upon the plans and specifications for the Home, the applicable building codes and the applicable governmental fees (including, by way of example and not limitation, impact fees) and taxes (other

U:\lan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initials _NDB_ _R.G._

GRIFFIN
0008

DGRIFFIN - 000128

Case 2:09-cv-02067-EEF-MBN Document 22380-46 Filed 12/02/19 Page 109 of 133
Case 2:09-cv-02067-MCE Document 270 Entered on FLSD Docket 08/15/2013 Page 30 of 222
Page 8 of 35

than real estate taxes), all as they exist on the date of this Contract. Purchaser further acknowledges that the applicable building codes may change after the date hereof in such a way as would require that the plans and specifications for the Home be modified so that the Home is constructed in compliance with the applicable building codes as modified. In addition, Purchaser acknowledges that the applicable governmental fees and taxes may increase after the date hereof. Purchaser hereby agrees that the risk of any such changes in the applicable building codes and governmental fees and taxes shall be borne by Purchaser; that is to say, Purchaser agrees to pay to Seller at the closing: (i) the reasonable cost of any changes made to the Home and to the plans and specifications which were required to be made as a result of any such changes in the applicable building codes, (ii) the amount of any increases in the applicable governmental fees, after the date hereof, and (iii) any taxes now or hereafter imposed on the sale and/or construction of the Home (including, without limitation, sales taxes). Seller agrees to notify Purchaser within a reasonable time after Seller learns of any such changes in the applicable building codes and governmental fees, and to keep Purchaser informed of Seller's determinations of the cost of any changes and the amount of any increases which Purchaser shall be required to bear. The provisions of this paragraph shall survive the closing.

**7. Changes to Options Selected.** If any options or changes are omitted by Seller, whether as required by law or for any other reason, Purchaser shall receive a refund of any amounts paid for each item omitted and Seller will have no further liability to Purchaser. The omission of an option shall not give Purchaser the right to terminate this Contract or otherwise require Seller to install or provide the omitted option. If any options or upgrades have been installed by Seller in or around the Home which have not been agreed upon in writing by Seller and Purchaser in either this Contract and/or Options Addendum(s), Purchaser may elect to purchase such options or upgrades, in which event Seller shall collect the selling price of the option or upgrade from Purchaser at closing (or thereafter if discovered after closing). In the event Purchaser does not elect to purchase such options or upgrades at their selling price, Seller shall cause the option or upgrade to be removed from the Home. The provisions of this paragraph shall survive the closing.

**8. Warranty.** Seller warrants all workmanship and material against defects for a period of one (1) year from the date of Purchaser's closing or occupancy of the Property, whichever shall first occur. This Warranty does not include normal deterioration, negligence of Purchaser or others, malicious damage or misuse, of items specifically limited to a lesser period of time. The Seller is not liable or responsible for inconvenience, loss of time, damage to contents and/or personal effects or injury resulting from or caused by defective items. The Warranty is personal to the Purchaser and is not transferable. The Seller disclaims all implied warranties of merchantability and fitness for a particular purpose as to the Property, and in place of these implied warranties to be ineffective, the parties agree that any action brought under any implied warranty must be brought within one (1) year from the date of Purchaser's closing. In addition, Seller shall provide an extended Warranty Insurance Policy for a period of ten (10) years from the date of closing in accordance with the terms of such policy. The parties further agree that warranties as to appliances and air conditioning are manufacturers' warranties only, and the Purchaser agrees to look only to the manufacturers' warranties for any relief pertaining thereto as to breach of expressed or implied warranty. **PURCHASER RELINQUISHES AND WAIVES, AND SELLER HEREBY EXPRESSLY DISCLAIMS, ANY AND ALL OTHER WARRANTIES AS TO THE HOME AND THE OTHER PROPERTY WHICH IS THE SUBJECT OF THIS CONTRACT, WHETHER ARISING FROM CUSTOM, USAGE OF TRADE, COURSE OF DEALING, CASE LAW OR OTHERWISE. SELLER GIVES NO EXPRESS WARRANTY ON THOSE ITEMS DEFINED AS "CONSUMER PRODUCTS" BY THE MAGNUSON-MOSS WARRANTY ACT. TO THE EXTENT THAT BY**

**LAW OR OTHERWISE ANY OF SUCH WARRANTIES CANNOT BE ENTIRELY DISCLAIMED, ALL SECONDARY, INCIDENTAL AND CONSEQUENTIAL DAMAGES ARE SPECIFICALLY EXCLUDED AND DISCLAIMED, AND PURCHASER RELINQUISHES AND WAIVES ANY RIGHTS PURCHASER MAY HAVE TO ANY SUCH DAMAGES (CLAIMS FOR SUCH SECONDARY, INCIDENTAL AND CONSEQUENTIAL DAMAGES BEING CLEARLY UNAVAILABLE AND WAIVED BY PURCHASER IN THE CASE OF WARRANTIES WHICH ARE ENTIRELY DISCLAIMED).**

**9. Insulation.** Seller advises Purchaser that insulation has been or will be installed in the Home. The location, type, approximate thickness and approximate R-value (according to the manufacturers thereof) of the insulation are as follows:

| Location | Type | Thickness | R-Value |
|---|---|---|---|
| a) Ceiling over air conditioned living area | Blown | 12" | R-30 |
| b) CBS Walls | Foil | N/A | R-4.1 |
| c) Frame wall between house & garage | Batt | 3.5" | R-11 |
| d) Knee wall | Batt | 9.5" | R-30 |
| e) 2nd Floor Overhang | Batt | 3.5" | R-11 |
| f) Exterior frame walls | Batt | 6.25" | R-19 |

The R-value is based solely on information given by applicable manufacturers (based on thickness listed) and Purchaser agrees that Seller is not responsible for any manufacturer's errors. Seller reserves the right to use a different type of insulation with a different thickness and R-value in accordance with the provisions of Section C.3 above.

**10. Lot Grade.** Purchaser acknowledges that drainage swales have been designed and established between homes ("Side Yard Swales") to carry storm water off the lot and to maintain positive drainage away from the Home. Side Yard Swales exist between any two lots situated side-by-side and may vary in depth from swale to swale. Drainage swales may also exist in the front yard of a lot near the road pavement as part of both the lot and roadway drainage systems. Purchaser further acknowledges that standing or ponding water in drainage swales, roads, driveways and yards may remain for certain periods of time, and after severe weather conditions, may remain in excess of 24 hours provided there is no additional rainfall and the sprinklers are disengaged during the dissipation period. In addition, yard swales may remain wet up to 48 hours, especially under severe weather conditions. This acknowledgment shall survive the closing.

**11. Flood Insurance.** The Lot may be situated in a flood zone, as defined by FEMA, and that Flood Insurance may be required by a lender providing mortgage financing.

**12. Post Closing Home Improvements by Purchaser.** Purchaser acknowledges and agrees that, with respect to the construction of the Home: (a) Seller's sole obligation is to construct the Home in accordance with this Contract, (b) except as expressly provided in Sections E.6 and E.7, of this Contract, Seller has no obligation to perform any other work (repair, modification or otherwise) to or in the Home following closing, and (c) except for the Dwelling Warranty to be delivered to Purchaser at closing, there are no warranties (express or implied) in connection with the Home. In the event that after closing, Purchaser makes or causes to be made any additions or alterations to the Home ("Post Closing Improvements"), Purchaser shall do so at Purchaser's sole risk and expense, and Seller shall not be responsible or liable in any way whatsoever for any such Post-Closing Improvements and/or any damages caused to the Home by or from any such Post-Closing Improvements. Purchaser hereby expressly acknowledges and agrees that Post-Closing Improvements may void, invalidate or otherwise limit the coverage provided by the Dwelling Warranty. (Refer to the Dwelling Warranty

Initials _DDB_ _DJ_

U:\lan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

GRIFFIN
0009
DGRIFFIN - 000129

Case 2:09-md-02047-EEF-MBN Document 22280-46 Filed 12/02/19 Page 110 of 133
Case 1:12-cv-22408-MGC Document 276 Entered on FLSD Docket 08/15/2013 Page 331 of 222

Page 9 of 35

for more information.) This paragraph shall survive closing.

_____        _____
Initials                       Initials

## D. LOT DESCRIPTION

**1. Easements.** Purchaser acknowledges that easement(s) are located beneath, across or over the Lot. An easement grants the right for others to use the easement property for the purposes specified in the grant of easement. A grant of easement also restricts Purchaser's usage of the easement property including, by way of example and not limitation, restricting the placement, erection or installation of improvements, structures, fences and landscaping therein. Additionally, setbacks for houses, pools, enclosures and other structures may be established from the easement line, and not the property line. Furthermore, Purchaser acknowledges that the location of easements upon the Lot may necessitate changing the planned location of the air conditioning pad and compressor to an alternate location to avoid conflict with easement property. Utility easements provide access to underground utility lines, repair of which may necessitate driveway repair as a result of work performed. The Plat and Association Documents set forth the easements. which may be granted. Typical easements include, by way of example but not limitation: utility, drainage; maintenance, lake maintenance access; lake maintenance; lift station; buffer; limited access; Bell South Telephone; well site; and, drainage, maintenance and overhang.

**2. Above Ground Equipment.** Purchaser acknowledges that above ground utility equipment and fixtures (the "Above Ground Equipment"), including, but not limited to, street lights, telephone boxes, cable television service pedestals, fire hydrants, lift stations, electrical transformers, secondary power pedestals and/or switch cabinets, may be located within the utility easements or easements granted specifically to a utility franchise. The locations of Above Ground Equipment are determined by the utility company, municipality and/or Association as they deem necessary in their sole discretion to supply utility services. Purchaser also acknowledges that the location or relocation of Above Ground Equipment is absolutely not within the control or the responsibility of Seller. Purchaser hereby agrees that Purchaser is not entitled to receive compensation, the right to terminate or invalidate this Contract or the right to transfer lots in the event any Above Ground Equipment is located upon the Lot.

**3. Setbacks.** Purchaser acknowledges that specific setback requirements have been established by the Association Documents and/or applicable building and/or development codes, as applied to or modified for the approved site plan for the Community, for the construction, erection and installation of (a) buildings, including by way of example and not limitation, homes, covered patios, room additions and other improvements, (b) screen enclosures, and (c) pools. Purchaser agrees to purchase the Home and Lot subject to the established setbacks such that any improvements undertaken by Purchaser subsequent to the closing of the Home are required to comply with those setback requirements. Furthermore, Purchaser acknowledges that Seller has made no representations or guarantees that future improvements to be undertaken by Purchaser shall fit upon the Lot within the setbacks. This determination is the sole responsibility of Purchaser.

**4. Lakefront Lots, Edge of Water, and Wetland Plantings.** If the Lot which is the subject of this Contract is adjacent to a lake and/or lake maintenance easement, Purchaser acknowledges that a portion of the lake areas, including any lake areas adjacent to the Lot, may have wetland and/or littoral plantings of native species as required by the applicable governmental authority. Purchaser further acknowledges and agrees that: (a) the edge of water may be separated from the Lot by both the lake maintenance easement and a lake bank which stretches from the edge of water up to the lake maintenance easement, and (b) the designation on the applicable plat(s), or in any lot fit study or survey, of a lake tract does not define the location of the edge of water as being at the perimeter of the lake tract.

**5. Temporary Construction Easement.** During construction, Seller has the right to use the Common Areas for trailers, other construction equipment, storage and other related matters. Seller is hereby granted by Purchaser the right of ingress and egress for itself, its employees, agents and subcontractors, and designees and assigns, over and upon any portion of the Lot as may be reasonably required for the construction of improvements upon an adjacent Property, and the parties expressly agree that this provision shall survive the closing.

**6. OS Tracts.** If the Lot which is the subject property of this Contract is adjacent to an "OS" or open space tract as designated on any plat of the Community or any portion thereof or in any lot fit study or survey, Purchaser acknowledges that such "OS" or open space tract is not part of the Lot, and nothing may be planted, constructed, stored or placed by Purchaser in such "OS" or open space tract.

**7. Lot Fit Study.** Purchaser acknowledges receipt of a lot fit study which is a graphic depiction of the proposed standard Home location. The actual location of the Home may vary based upon a variety of factors including, but not limited to: options selected by Purchaser, field conditions, normal construction tolerances, applicable governmental regulations, additional easements which may be granted, the Association Documents, drainage requirements, driveway conditions and the existence of Above Ground Equipment. Accordingly, Purchaser acknowledges that the proposed Home location may be shifted forward, back, left, right and/or rotated clockwise or counter-clockwise. As a result, all dimensions shown on the lot fit study are proposed and may vary. Purchaser may be requested by Seller to timely sign off on a plot plan survey prior to or simultaneous with the commencement of construction. This plot plan survey shall supersede the lot fit study. In the event Purchaser fails to timely sign off on the plot plan survey, Seller shall have the right to proceed with construction as it deems advisable to facilitate completion of construction and Purchaser agrees to accept any changes between the lot fit study and the plot plan survey. In the event the dimensions as indicated on the lot fit study are different than the plot plan survey, Purchaser agrees that Purchaser will accept such changes without compensation and that this Contract shall remain in full force and effect. Purchaser agrees to close notwithstanding such changes. Seller agrees that such changes shall not substantially lessen the value of the Home. Furthermore, Purchaser acknowledges that the availability of certain optional items which may appear on the lot fit study may be restricted and/or unavailable to Purchaser due to a variety of factors, including, but not limited to, setback requirements, lot coverage limitations and/or easements.

**8. Survival of Closing.** The provisions of this Section D shall survive the closing.

## E. CLOSING

**1. Title.** Seller shall convey fee simple title to the Home to Purchaser by Special Warranty Deed, subject to; (a) the provisions of the Association Documents; (b) matters shown on the Plat; (c) taxes and assessments for the year of closing and subsequent years including, but not limited to, pending and certified county or municipal improvements liens; (d) any other restrictions, reservations, conditions, limitations and easements of record prior to closing or imposed by governmental authorities having jurisdiction or control over the subject property; (e) zoning, building code, zoning and development laws, ordinances, regulations and rights or interests vested in the United States or the State of Florida; and (f) any matters not listed above as long as affirmative title insurance is given for these matters.

**2. Certificate of Occupancy.** Completion of construction shall be conclusively evidenced by the Issuance of a Certificate of Occupancy, or its equivalent, by the appropriate governmental authority. The subsequent conveyance of title to the Home from Seller to Purchaser will constitute full

U:\lan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initials _____  _____

GRIFFIN
0010

DGRIFFIN - 000130

Case 9:12-cv-80467-KLR Document 22-4 Entered on FLSD Docket 08/15/2013 Page 132 of 222
Case 2:09-md-02047-EEF-MBN Document 22380-46 Filed 12/02/19 Page 111 of 133

Page 10 of 35

performance by Seller of all Seller's obligations under this Contract (except as set forth on the 'Inspection List' described in Section E.6 below).

**3. Estimated Closing Date/Completion of Construction.** Seller shall attempt to complete the Home on or before the estimated closing date as reflected on the front page hereof. Seller cannot guarantee a firm completion and availability date, such advance projections being, and by their very nature having to be, approximate estimates. The actual closing date may vary from the estimated closing date as a result of a number of factors including, by way of example but not limitation, the following: the time period required for the development of raw land into lots ready to accommodate home construction; the time period required by Purchaser to obtain Preliminary Approval; the time period necessary for the governing authority to issue a building permit, perform required inspections and issue the Certificate of Occupancy; inclement weather during the development and construction processes; any requests by Purchaser for changes, additions, deletions or other modifications to the Home subsequent to the finalization of selections as referenced in Section C.3; and, unavailability of materials or labor problems during the construction process. Seller shall make every reasonable and diligent effort to meet or exceed estimated construction schedules. In any event, Seller shall complete the construction of the Home within two (2) years (the time limitation required to insure Seller's exemption under Section 1702(a) (2) of the Federal Interstate Land Sales Full Disclosure Act).

**4. Reliance Upon Estimated Closing Date.** Purchaser acknowledges that the actual closing date cannot be determined until the Certificate of Occupancy for the Home is issued by the governing authority. Therefore, Purchaser acknowledges that the estimated closing date as reflected on the front page hereof should not be relied upon for purposes of decision making including, but not limited to, lock in mortgage interest rates, terminating leases or establishing parameters of other housing arrangements. Purchaser further acknowledges that Purchaser will not rely upon any representations by Seller's representatives with respect to any subsequent estimates of closing dates during the construction of the Home. Seller shall not be liable or held responsible for any loss, liability or claim arising out of Purchaser's reliance on an estimated closing date including, by way of example and not limitation, additional monies owed to extend rate lock periods, higher interest rates due to expiration of rate lock periods, additional or higher rental payments and/or storage costs.

**5. Actual Closing Date.** This transaction shall close at the time and place scheduled in the written notice sent by Seller or Seller's Closing Agent ("Scheduled Closing Date") to Purchaser. In no event shall the notice be sent less than ten (10) days prior to the Scheduled Closing Date, nor shall the closing take place prior to the issuance of a Certificate of Occupancy. The closing shall be deemed to have occurred on the date that Seller receives all funds due from Purchaser, including Purchaser's mortgage proceeds if any (the "Actual Closing Date"). If Purchaser is unable to close on the Scheduled Closing Date for any reason whatsoever, including but not limited to, the unavailability of funds from Purchaser's mortgage lender or another third party, Purchaser shall be in default. Purchaser further acknowledges that it is Purchaser's sole responsibility to ensure that Purchaser's lender is ready to close on time because any delay will cause Purchaser to be in default. In the event of such default, at Seller's option and without limiting the generality of Section G.1 below, Seller may postpone the closing, in which event Purchaser agrees to pay interest on the Purchase Price at the highest non-usurious rate allowed by law or, if no rate is provided, then eighteen percent (18%) per annum from the Scheduled Closing Date until the Actual Closing Date and further agrees that the prorations for taxes and maintenance shall be as of the Scheduled Closing Date. The parties agree that such interest charge constitutes liquidated damages to Seller for actual costs incurred and loss of interest by Seller. Such interest shall be charged on the closing statement through the Actual Closing Date. If Seller elects to postpone the closing, Purchaser agrees

to close on the date to which closing is postponed. Should Purchaser desire to close by mail rather than in person, Seller will attempt to accommodate Purchaser within the parameters of this Contract. However, any delays caused by such procedures, including delays in mail delivery shall be the responsibility of Purchaser and shall not relieve Purchaser of this obligation to close by the Scheduled Closing Date or to pay liquidated damages as provided above. The provisions of this paragraph shall survive the closing.

**6. Closing Inspection.** Purchaser acknowledges that prior to the Scheduled Closing Date, Purchaser will be advised that an appointment has been arranged with Seller's representative to inspect the Home ("New Home Orientation") within twenty-four (24) hours of the Closing. At the New Home Orientation (commonly referred to as a "walk-through"), Purchaser and the representative of Seller shall make and sign an "Inspection List" which shall specifically indicate the items to be finished or work to be performed by Seller. By inspecting the Home and making an Inspection List with Seller's representative, Purchaser shall be deemed to have accepted the condition of the Home, subject only to the work specified in said Inspection List. Seller shall do the work specified in said Inspection List as expeditiously as possible within a reasonable period of time after the closing not to exceed forty-five (45) days, unless materials are not readily available, and shall notify Purchaser, either verbally or in writing, of completion of those items; but Seller's obligations to so perform shall not be grounds for postponing the closing, or imposing any conditions on closing, nor shall it be grounds for any demand by Purchaser that any part of the Purchase Price be held in escrow, subsequent to closing. The transaction shall be closed as scheduled and Seller's obligation to take care of the items on the Inspection List shall survive the closing. Purchaser's failure to inspect the Home and/or make and sign an Inspection List with Seller's representative shall be deemed to be an unconditional acceptance by Purchaser of the condition of the Home and the closing shall be on the Scheduled Closing Date. Purchaser agrees to provide Seller's representatives at the arranged appointment with access to the Home after closing during Seller's regular working hours in order for the Inspection List items to be completed. Once Seller has completed the Inspection List, Purchaser agrees to promptly execute an acknowledgment that the Inspection List items have been completed. The provisions of this paragraph shall survive the closing.

**7. Post Closing Tile Repair.** Purchaser acknowledges that floor slabs, driveways, patios, sidewalks and any other poured concrete items will settle and possibly crack. Any tile or other topping or surface placed over such concrete may also crack and the foregoing shall not be the responsibility of the Seller. Further, Seller agrees only to repair any tile cracks on a one-time basis within one calendar year of closing only if such tile was installed by Seller with the cork or a similar crack reduction underlay option. Should Purchaser elect to purchase tile from Seller without the cork or similar crack reduction underlay, then Seller does not warrant the tile from cracking. Purchaser acknowledges that Purchaser will accept any minor color variations that may exist due to dye lot differences. Seller shall not be responsible for the repairs of any tile or concrete if said items were not purchased through Seller. The provisions of this paragraph shall survive closing.

**8. Closing.** Closing shall take place in the office of Seller's agent or at such other place as may be designated by Seller or its designated agent. All monies required to be paid by Purchaser at closing shall be in U.S. currency in the form of a cashier's check drawn upon a financial institution with offices in Broward County, Dade County or Palm Beach County, Florida, or by wire transfer in the form of federal funds.

**9. Purchaser's Closing Expenses.** At the closing, Purchaser shall pay: (i) a reimbursement to Seller of FPL connection fees, and any and all other utility deposits and/or installation charges or new service connection charges or hookup fees paid by Seller with respect to the Home; (ii) all costs and fees payable in connection with any mortgage that Purchaser may obtain for the purchase of the Home, which costs are variable

Initials: _ΦΦ6: ___ ___

U:\lan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

GRIFFIN
0011
DGRIFFIN - 000131

depending on the mortgage lender; (iii) a Working Fund Contribution to the Association, as Association is hereinafter defined, equal to three month's share of Association assessments pursuant to the estimated operating budget of the Association as further described in Section F.5 hereof; (iv) Purchaser's prorated share of the Association assessments for the assessment payment period in which closing occurs plus the following period if closing occurs later than mid-term of any period; (v) the costs of recording the Special Warranty Deed and the costs of Florida Documentary Stamps to be affixed to the Special Warranty Deed; (vi) $375.00 for the final survey for Purchaser or Purchaser's lender; (vii) solid waste charges and assessments charged to Seller upon the issuance of the building permit and/or certificate of occupancy; (viii) abstract and title recertification fee of $70.00; and (ix) Purchaser's reimbursement for Seller's construction loan interest or a surety bond premium, as provided in the Escrow Waiver section of the Purchase Contract, if applicable. Purchaser shall pay all utility charges for the Home purchased from and after the date of closing.

In addition to the foregoing, Purchaser shall pay Seller, at Closing, a fee in an amount equal to one percent (1%) of the Total Purchase Price of the Home (the "Builder's Fee"). The Builder's Fee represents a partial reimbursement to Seller of the various impact fees and other charges paid or payable by Seller in connection with the development of the Community and the construction of the Home. Depending on the town, city and/or county in which the Home is located, the impact fees and other charges may included but are not limited to, the following: (a) school impact fees; (b) education impact fees; (c) road impact fees; (d) fire impact fees; (e) fire rescue impact fees; (f) public facilities impact fees; (g) park and recreational impact fees; (h) library impact fees; (i) law enforcement impact fees; (j) water and sewer reservation fees (including, without limitation, water and sewer equivalent residential connections); (k) building permit fees; and (l) additional fees as set forth herein. For purposes of this Section, the "Total Purchase Price" of the Home shall be deemed to include the Total Purchase Price as it appears on the first page of this Contract plus (to the extent not already included therein) the cost of any Selections purchased by Purchaser pursuant to this Contract, and/or any Options Selections Addendum, Change Order Forms, or otherwise.

10. Title Insurance. An owner's title insurance commitment and policy shall be provided by Seller to Purchaser. The owner's title insurance commitment and policy will be subject to real estate taxes for the year of closing, the Association or Community Documents, those matters set forth in Section E.1 above, mortgage liens which are to be released at closing, and the standard exceptions contained in the then current ALTA form of Owner's Policy of Title Insurance. The foregoing shall be provided by Seller's closing agent at Seller's expense. Purchaser may utilize the foregoing arrangement for title insurance, or may arrange to obtain and pay directly for his own title insurance by giving Seller written notice of such election at least ninety (90) days prior to closing, in which event thirty percent (30%) of the promulgated risk rate for the amount of the purchase price charged to Seller for title insurance shall be credited to Purchaser at closing.

11. Prorations. Real estate taxes, less any available discount, the assessments payable to the Association and any other proratable items shall be prorated as of the scheduled closing date, unless possession is delivered to Purchaser prior to the closing, in which event the proration shall be as of the date the Seller delivers possession of the Home to Purchaser prior to the Actual Closing Date. Any tax proration at closing based upon an estimate shall be subsequently re-adjusted at the request of either party to the transaction upon receipt of a tax bill. Interim service fees, which have been prorated by the municipality and paid for by Seller at issuance of the certificate of occupancy shall be reimbursed by Purchaser at closing. The provisions of this paragraph shall survive the closing.

12. Errors in Bookkeeping. Errors in bookkeeping include

Page 11 of 35

and summation errors within this Contract, subsequent addendum(s), options and change orders pertaining to this Contract (including payment for options which are inadvertently omitted) and which are clerical in nature. Purchaser and Seller have the right to demand that errors in bookkeeping be corrected. Purchaser has the obligation to pay to Seller the dollar amount of any error in bookkeeping understating the correct Total Purchase Price. Purchaser is entitled to a credit of the dollar amount of an error in bookkeeping overstating the correct Total Purchase Price. Errors in bookkeeping discovered at or prior to closing shall be settled between Purchaser and Seller at the Closing. Errors in bookkeeping discovered subsequent to Closing shall be settled by the appropriate transfer of funds between the parties in a timely manner. The provisions of this paragraph shall survive the closing.

13. Possession. Possession shall be delivered simultaneously with the Actual Closing Date.

F. HOMEOWNER'S ASSOCIATION

1. Development Plan. Seller initially intends that the Community will be developed and will contain approximately two hundred fifty (250) detached homes. Purchaser acknowledges and agrees that the Community is presently anticipated to include, among others, single family and zero-lot line homes. The Community is or will be subject to a Declaration of Covenants, Restrictions and Easements for the Community (the "Declaration"), Articles of Incorporation of THE COBBLESTONE CREEK HOMEOWNER'S ASSOCIATION, INC. ("Association") and Bylaws of the Association, all as may be amended or supplemented from time to time (collectively the "Association Documents"). The purchase and use of the Home will be subject to the terms and conditions of all the Association Documents. Purchaser agrees to be bound by, and take title to the Home subject to, the Association Documents. Purchaser acknowledges, accepts and agrees to the restrictions placed upon the Lot and the Community by the Association Documents. Purchaser acknowledges receipt of the current Association Documents and the current Estimated Operating Budget of the Association. Purchaser acknowledges and agrees that Seller, as the Declarant under the Declaration, has certain rights to amend the Association Documents under the terms of the respective Association Documents, including, but not limited to, the right to modify its plan of development, the right to add to, change or reduce the planned recreational facilities, and the right to add land to or withdraw land from the Community. Therefore, the number and size of lots and/or the types of residential units within the Community may change.

2. Membership in Association. Purchaser acknowledges that, as an owner of the Home, Purchaser will be a member of the Association subject to all of the respective rights and obligations applicable to a member of the Association. Purchaser acknowledges that Purchaser is liable for the payment of all fees and assessments applicable to Purchaser as an owner of the Home under the Declaration, and that the Home will be subject to a lien as security for the payment of such fees and assessments. Purchaser acknowledges that Seller, as Declarant under the Declaration, may use the "Working Fund Contribution" to be paid by Purchaser pursuant to Section E.8 hereof to offset Operating Expenses (as defined in the Association Documents). Purchaser also acknowledges that Seller may have to advance money to the Association to permit it to pay for certain of its start-up expenses (which may include, by way of example but not limitation, insurance premiums, utility charges and deposits, permit and license fees, fees under service contracts, landscape maintenance management fees and other similar expenses) and Seller is entitled to reimbursement from the Association for all of these expenses advanced by Seller. The Association may reimburse Seller out of assessments and the Working Fund Contribution paid by Purchaser and the purchasers of other homes in the Community or by way of credit against any obligation Seller may have to the Association, at Seller's election. Purchaser acknowledges and

GRIFFIN
0012



~~~~~~ in all other of national over each contract documents;          agrees that construction of all improvements on the Lot

U:\lan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC          Initials · QDB: _DJ·_

**GRIFFIN
0013**

DGRIFFIN - 000133

undertaken by Purchaser after closing, and any modifications or additions thereto, will be subject to the requirements of the Declaration, any design guidelines promulgated under the Declaration and approval by the Architectural Control Committee of the Association. Purchaser further acknowledges that the Association is controlled by Seller and that Seller will be entitled to operate the Association and enforce the Association Documents until such time as control of the Association is turned over to the homeowners.

3. **Maintenance of Association Property.** Purchaser acknowledges that the Association is responsible for all maintenance and repair of the common areas within the Community defined in the Declaration as "Association Property" which may include, but not be limited to, the following: the recreational tract(s); gate house(s); private streets and roadways; landscaping; buffer tracts; lakes; littoral plantings; open space tracts; site walls or fences; monument walls; boundary walls, retaining walls; the rotunda; fountains; decorative street lights; bike paths; sidewalks; irrigation system(s); lighting; and entrance features. The costs and expenses of the operation, maintenance, repair and replacement of the Association Property and other areas which are maintained and repaired by the Association are shared by all homeowners in the Community.

4. **Return of Documents.** In the event the closing contemplated by this Contract is not consummated for any reason, Purchaser shall return to Seller the Association Documents furnished to Purchaser in the same condition in which Purchaser received them, allowing for normal wear and tear. Purchaser's failure to return the Association Documents shall entitle Seller to the sum of $100 to defray Seller's costs and expenses of printing and delivering the Association Documents.

5. **Estimated Operating Budget.** Purchaser understands that: the Estimated Operating Budget of the Association provides only an estimate of what it will cost to run the Association when the Community is fully constructed and the Association may make changes in the Estimated Operating Budget at any time to cover increases or decreases in actual or estimated expenses. Purchaser also understands that the assessments for the Home as shown in the Estimated Operating Budget are not guaranteed, except to the extent and only in the manner provided (if at all) in the Association Documents, and Seller is not obligated to pay assessments on the lots and other property owned by Seller. Purchaser acknowledges and agrees that assessments payable by Purchaser may also change based on, among other things, (i) costs of manning the gate house as more fully described in Section F.6 below; (ii) the costs of operating and maintaining any recreational facilities; and/or (iii) changes by Seller in the plan of development for the Community such as a change or reduction in the number of units to be constructed within the Community.

6. **Community Gate House/Interconnectivity.** Purchaser acknowledges that Seller intends to build a gate house at the main entryway to the Community, and that the gate house will have the capacity to be manned. Manning of the gate house however is at the discretion of the Association. Accordingly, Seller makes no representation or guarantee whatsoever as to if, how, when and/or in what manner the gate house will be manned. Purchaser acknowledges and agrees that once control of the Association is turned over to the homeowners in the Community, the homeowners may determine to change the hours in which the gate house is manned or not to man the gate house at all. Seller represents that the Community is required to have inter-connectivity with any adjacent mixed use development in which case a gate will be installed for resident's use only for ingress and egress to said development. Purchaser also acknowledges and agrees that the Community is not a "secured community".

7. **Maintenance Responsibilities.** Purchaser acknowledges that the Community is not a "fully maintained" community. Rather, the Association shall be responsible for the common area lawn maintenance and care encompassed within the Community, including, but not limited to, perimeter landscape buffers, entry way, recreational tracts and off-site landscape medians. Purchaser acknowledges that it is Purchaser's responsibility to keep and maintain the Lot and the Home in good order, condition and repair, as more fully described in the Declaration and other Association Documents. Lawn maintenance and care includes mowing, edging, fertilizing, spraying and irrigating of lawns, and replacement of sod.

8. **No Amendment.** The provisions of this Section F shall survive the closing; however, the provisions of this Section F are not intended to, and shall not be deemed to, modify, amend, or otherwise alter the Association Documents.

## G. OPERATION OF CONTRACT

1. **Purchaser's Default.** In the event that purchaser shall default in the performance of the obligations to be performed by Purchaser pursuant to this Contract, including, but not limited to, the timely payment of additional deposits, if and as required, and timely closing and funding of proceeds, and such default continues for ten (10) days of Seller's written notice to Purchaser of such default, then Seller shall retain a sum equal to all deposits tendered, plus all payments for options made pursuant to Section C.1 above and/or any Options Selections Addendum(s) or change orders. The foregoing sum, in view of the impossibility of accurately ascertaining the loss which Seller will suffer by reason of Purchaser's default hereunder is hereby fixed and agreed as the liquidated damages which Seller will suffer by reason of such default and not as a penalty. In the event that Purchaser shall default in the performance of any of its obligations which by the terms of this Contract survive closing, Seller shall be entitled to all remedies available under applicable law. Seller, in its sole and absolute discretion, may unilaterally extend Purchaser's time frames to comply with any requirements of this Contract. Seller's failure to exercise, or delay in exercising any of its rights or remedies shall not be construed as a waiver of any such right or remedy or a waiver of any default of Purchaser nor shall it prevent or impair the later exercise of such right or remedy by Seller. The provisions of this paragraph shall survive the closing.

2. **Seller's Default.** If Seller shall default in the performance of any of the obligations to be performed by Seller pursuant to this Contract, Purchaser shall give Seller written notice of such default. If Seller within ten (10) days from receipt of such written notice shall fail to take action that would cure the default within a reasonable period of time, and if Purchaser has performed all Purchaser's obligations hereunder, then Purchaser shall have such options as are available under Florida law. Nothing contained herein shall be deemed to restrict Purchaser's remedy of specific performance of this Contract or any other remedy with respect to Seller's obligations if Purchaser shall be entitled to such remedy under applicable law.

3. **Construction Interference.** Purchaser agrees not to interfere with nor molest any workmen and that all matters pertaining to the construction of the subject Property will be taken up by the Purchaser directly with Seller, in writing. During construction pursuant to various insurance requirements beyond the Seller's control and for Purchaser's safety, Purchaser and his agents shall not enter upon the Property, other than the sales office or models, and any violation thereof shall be deemed a breach of this Agreement. Seller shall not be liable or responsible for any injury, loss or damage resulting from any violation of this paragraph or any visit to the construction site by Purchaser or Purchaser's agent or representatives. In addition, Purchaser agrees to indemnify and hold Seller harmless from and against any and all injury, loss or damage (including, without limitation, reasonable attorneys' fees and court costs at both trial and appellate levels) arising out of or in connection with any violation of this paragraph or any visit to the construction site by Purchaser or Purchaser's agents or representatives. In order to maintain quality, safety and control, only those contractors specifically under contract to Seller are allowed to participate in the construction of the Residence. Purchaser or Purchaser's

U:\lan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initials _____ _____

GRIFFIN
0014

DGRIFFIN - 000134

Case 2:09-cv-02067-EEF-MBN Document 22280-46 Filed 12/02/19 Page 115 of 133
Case 2:12-cv-02084-MSC Document 270 Entered on FLSD Docket 08/15/2013 Page 136 of 222

Page 13 of 35

contractors shall not be allowed access to, and shall not enter, the Residence until after Closing. Should Purchaser or Purchaser's contractors perform any installations or alterations to the Residence prior to Closing, the installations and/or alterations may be removed by Seller at Purchaser's sole expense. The foregoing indemnity shall survive the closing and any termination of this contract prior to closing.

**4. Sales Interference.** Purchaser agrees not to interfere in any manner whatsoever in the sales process with other purchasers or prospective buyers in the Community or any other community owned or developed by Seller or any of its affiliates. In the event of interference, in addition to any remedies provided for in this Contract, Seller may seek remedies available under applicable law. The provisions of this paragraph shall survive the closing and any termination of this Contract prior to closing.

**5. Indemnity and Hold Harmless.** Seller shall not be liable or responsible for any injury, loss or damage (including, without limitation, property damage, personal injury and/or death) resulting from any visit to the construction site by Purchaser or Purchaser's agent or representatives. In addition, Purchaser agrees to indemnify and hold Seller harmless from and against any and all injury, loss or damage (including, without limitation, reasonable attorneys' fees and court costs at arbitration or trial and through all appellate levels and whether or not suit be brought, arising out of or in connection with any visit to the construction site by Purchaser or Purchaser's agents or representatives.

**6. Access to Home.** Purchaser agrees that Purchaser and Purchaser's agents and representatives shall not in any way interfere with workmen during the performance of any work performed pursuant to the Dwelling Warranty. Purchaser agrees to provide access to the Home during normal business hours for inspection, testing and repairs to be performed by Seller, the Third Party Administrator and each of their respective agents and subcontractors pursuant to the Dwelling Warranty. Failure to allow access to the Home will void the Dwelling Warranty and be a breach of this Contract. The provisions of this paragraph shall survive closing and any termination of this Contract prior to closing.

**7. Contract; Subordination.** This Contract is subordinate and subject to any mortgage which Seller may obtain to finance any portion of the construction of the Community, or any mortgage and proceeds of which are used to satisfy any such mortgage, and any modifications of such mortgages, even if such mortgages (and modifications of such mortgages) are made or recorded after the date of this Contract. The provisions hereof shall be self-executing, but Purchaser agrees upon request of Seller to execute any document of subordination as reasonably requested by Seller or any mortgage lender. If a mortgage encumbers the Home at the time of closing, Seller may use Purchaser's closing funds to obtain a partial release of such mortgage after the closing. Neither this Agreement, nor Purchaser payment of deposits or payment for options, shall give Purchaser any lien or claim against the Home or the Community. The provisions of this paragraph shall survive the closing and any termination of this Contract.

**8. Purchaser May Not Assign Contract.** This Contract may not be assigned by Purchaser (see attached No Investor Rider).

**9. Persons Bound.** This Contract, together with any amendments, modifications and/or addendum thereto, shall be construed in accordance with the laws of the State of Florida. All notices relating to closing or default shall be sent to the address shown on the cover page to this Contract and shall be sent by certified mail, return receipt requested. Any such notice, demand or request by mail shall be deemed received on the date appearing on the return receipt thereof. Rejection or other refusal to accept or inability to deliver because of a changed address of which no notice has been received by Seller shall constitute receipt of the notice, demand or request sent on the date such notice was attempted to be sent by registered or certified mail, return receipt requested, addressed

U:\Ian\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

as set forth above. The signature of an employee, family member or any other person at the designated address shall be deemed to constitute receipt by the addressee. If Purchaser is not a resident of the United States, Purchaser shall designate a United States resident as agent for the purposes of accepting notices under this Contract and such person shall be listed on the local address section on the first page of this Contract. Notwithstanding the foregoing, notice of the acceptance of this Contract by Seller may be made by first class mail, and this Contract shall be deemed accepted by Seller on the day a fully executed copy hereof is either personally delivered to Purchaser or deposited in the U.S. mail. Notices (other than for closing or default) may be verbal, in person, by telephone or any other appropriate method.

**10. Recording of Contract.** Purchaser shall be in default by recording this contract or any memorandum or other document referring to or describing this Contract in the Public Records of any county in the State of Florida. Further, Purchaser shall not record any lis pendens against the Home or the Community in the Public Records of any county in the State of Florida. The provisions of this paragraph shall survive closing and any termination of this Contract.

**11. Time.** Time is of the essence with regard to all provisions of this Contract. All references in this Contract to days shall mean calendar days (and not business days); however, any time period provided for in this Contract which would end on a Saturday, Sunday or legal holiday shall be deemed extended to the next business day immediately following such Saturday, Sunday or legal holiday.

**12. Amendment.** Except as expressly provided herein to the contrary, this Contract may only be amended or modified by an instrument in writing signed by Purchaser and Seller. This contract may not be changed or terminated orally.

**13. Severability.** Should any provisions or portion of this Contract be found or ruled to be invalid by a court of competent jurisdiction, the same will not invalidate the remaining provisions of this Contract, which provisions will remain in full force and effect. Without limiting the generality of the foregoing and notwithstanding anything to the contrary in this Agreement, if any provisions of this Agreement serve to limit or qualify Seller's obligation to complete construction of the Home within the time period set forth in Section E.3 above and such qualifications or limitations, or any other provisions of this Contract, are not permitted if Seller's exemption under Section 1702(a)(2) of the Federal Interstate Land Sales Full Disclosure Act is to apply or this Contract is to otherwise be fully enforceable, then all of those provisions are hereby deleted and made null and void as if never a part of this Agreement.

**14. Captions.** Captions contained in this Contract are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Contract or the intent of any provision thereof.

## H. ADDITIONAL DISCLOSURES & ACKNOWLEDGMENTS

1. **Receipt of Documents and Exhibits.** Purchaser specifically acknowledges receipt of copies of the following documents and exhibits:

a) No Investor Rider;
b) Platting Addendum;
c) Disclosure Summary;
d) Estimated Operating Budget of HOA;
e) List of Easements;
f) Notice of Non-Representation;
g) Color Selection Acknowledgment & Product Disclaimer;
h) Notice of Residential Swimming Pool Safety Act;
i) Notice Regarding Construction Defect Claims;
j) Indoor Air Quality Addendum;
k) New York/New Jersey Resident Certification (if applicable)
l) Standard Features Addendum;

Initials _____ _____

GRIFFIN
0015

DGRIFFIN - 000135

m)  Association Documents;
n)  Informational Brochure Regarding Energy Efficiency

**2. Verification of Cash to Close.** Purchaser intends to pay in cash the Balance of Total Purchase Price due at closing (the "Balance"), if any, as set forth on the front page of this Contract. Purchaser acknowledges that Seller may elect not to commence construction of the Home until Seller has received written notice of Purchaser's ability to pay in cash the Balance, should Seller so request in writing to receive such written notice from Purchaser. Within ten (10) days from the date of such written request, Purchaser agrees to deliver to Seller written verification from Purchaser's attorney, certified public accountant, bank or securities broker verifying Purchaser's ability to pay the Balance in cash at closing.

**3. Seller's Representations.** Purchaser acknowledges that neither Seller nor any of its agents or representatives have made any representation of any kind as to tax or other economic benefits or advantages, if any, which may be realized from owning the Home, nor any representations as to the ability or willingness of Seller or its affiliates to assist Purchaser in renting or selling the Home. In addition, Purchaser acknowledges that neither Seller nor any of its agents or representatives has made any representation, warranty or guarantee of any kind whatsoever upon which Purchaser has relied as to the land use plan designation, zoning, current or future uses, or any other matters with respect to any property which is located adjacent to or in the vicinity of the Community. The properties surrounding the Community presently have various land uses including, without limitation, mixed use, commercial, retail, office, agricultural related uses and/or other uses as may be permitted by applicable governmental authorities. SELLER HEREBY DISCLOSES THE EXISTENCE OF AGRICULTURAL PRODUCTION RELATED USES IN THE VICINITY OF THE COMMUNITY, INCLUDING THE GROWING AND/OR PACKING OF AGRICULTURAL PRODUCTS. Purchaser further acknowledges and agrees that: (a) it is Purchaser's responsibility to make its own investigation of any and all of the foregoing matters with the city, town, county, state, federal and other governmental agencies with jurisdiction thereover; (b) Seller has no duty or obligation to disclose or investigate any such matters; and (c) Seller will have absolutely no responsibility or liability for any such matters, the accuracy of any of the foregoing and/or changes thereto, and/or for failure to disclose any other matters relating to property which is located adjacent to or in the vicinity of the Community. However, as required by Palm Beach County, Seller hereby discloses to Purchaser, and Purchaser hereby acknowledges and agrees that the Community lies in an area where several of the adjacent and surrounding properties are presently zoned for and/or may be used for agricultural uses, a permissive zoning designation allowing, among other things, groves/row crops, livestock raising, private kennels, stables, farm worker quarters, and others. Although Seller has made the foregoing disclosures to Purchaser, Seller cannot and does not represent, warrant or guarantee the manner in which any of such properties are now or in the future will be zoned or used, or how any of same will affect the Community, and Seller shall have absolutely no liability whatsoever therefore. Refer to the Association Documents for other matters affecting the Community.

This Contract contains the entire understanding between Purchaser and Seller, and Purchaser hereby acknowledges that the displays, topographic maps, artist renderings and other promotional materials contained in or distributed from the sales office and model homes are for promotional purposes only and may not be relied upon. Purchaser warrants that Purchaser has not relied upon any verbal representations, advertising, portrayals or promises other than as expressly contained herein and in the Association Documents. The provisions of this paragraph shall survive the closing. Purchaser acknowledges the above disclosures made by Seller in this paragraph H.3.

Purchaser _____  Purchaser _____

**4. Risk of Loss.** If a casualty occurs to the Residence prior to closing, Seller may, in its sole discretion, either cancel this Agreement and rebuild as soon as possible, in which event this Agreement shall be in full force and effect. The completion date shall be extended by the amount of time occasioned by such casualty, but in no event later than two (2) years from the Effective Date of this Agreement. Under no circumstances shall Purchaser have any interest in any insurance proceeds paid on account of said casualty. However, if possession of the Home is delivered to Purchaser prior to closing, risk of loss shall be borne by Purchaser as of the date of delivery of possession. The provisions of this paragraph shall survive the closing.

**5. Disposition of Earnest Money and Deposits.** Purchaser acknowledges that Escrow Agent is Seller's attorney and, notwithstanding, agrees that, in the event of a dispute hereunder, Escrow Agent shall be entitled to continue to represent Seller in any litigation. Upon disbursement of the earnest money as provided in the escrow agreement, Escrow Agent shall be discharged from all further liability and responsibility for such funds and from all other further responsibility and liability under this agreement. If Purchaser so requests, Purchaser may obtain a receipt for Purchaser's deposits from the Escrow Agent. Seller may change escrow agents (as long as the new escrow agent is authorized to be an escrow agent under applicable Florida law), in which case Purchaser's deposits (and any interest actually earned on them) may be transferred to the new escrow agent at Seller's direction.

**6. Real Estate Brokerage.** Purchaser covenants and represents to Seller that Purchaser has dealt only with Seller's sales personnel and has not dealt with any other real estate broker or salesman in connection with this transaction unless such broker or salesman has registered under the Broker Participation Program if offered. Purchaser agrees to indemnify and hold Seller harmless from any claim whatsoever by any other real estate broker or salesman for any commission and for the costs and expenses of defending any claim for commission including, without limitation, reasonable attorneys' fees, arising out of or related to this transaction. The provisions of this paragraph shall survive the closing.

**7. Proprietary Documentation.** All documentation, marketing materials, sketches, house plans, photographs, site plans, and the like, which may have been provided to Purchaser concerning this Agreement are proprietary to Seller and shall not be reproduced or disseminated in any way, shape or form by Purchaser. Furthermore, Purchaser acknowledges and agrees that Purchaser shall have no right to copies of any architectural plans or other materials whether copyrighted or not of Seller. This paragraph shall survive closing.

**8. Energy Efficiency.** Purchaser acknowledges that Seller will provide Purchaser with a complete and accurate energy performance display card for the Residence which has been certified and signed by Seller together with a copy of the Florida Building Energy-Efficiency Rating System brochure prepared by the Florida Department of Community Affairs. Seller is providing this Disclosure to Purchaser in compliance with Section 553.9085 and 553.996 F.S. This Disclosure is intended for the sole and exclusive use of Purchaser and Seller shall not be liable or responsible to any third party who may have relied upon the information contained therein.

**9. Grading and Drainage.** Purchaser understands that the Property has been or will be graded by Seller to drain in accordance with a government approved grading and drainage plan. Any future construction on the Property by Purchaser (including pools, spas, fences, landscaping, etc.) can disrupt the drainage and cause flooding, excessive settlement, and their problems. Seller is responsible for drainage of the grade or soil condition, and any and any damages or loss resulting there from, shall be Purchaser's sole responsibility and Purchaser releases Seller, its agents and employees from any

U:\lan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initials _____  _____

GRIFFIN
0016

DGRIFFIN - 000136

and all liability and/or damages which may arise from such changes. This provision shall survive Closing.

**10. District Park/School.** Certain of the displays, site plans and other promotional materials contained in or distributed from Seller's sales office or otherwise depict a proposed 52 acre District Park Site and a Future School Site across the street from the Community. Purchaser acknowledges and agrees that: (a) the layout and identification of any proposed improvements (including, without limitation, ball fields, stadium-style lighting, courts, structures, gymnasiums, and other amenities) on any such displays, site plans and promotional materials are preliminary and proposed only, have been prepared by Palm Beach County but not formally approved by Palm Beach County, and are subject to change without notice in the sole and absolute discretion of Palm Beach County, (b) the timing and manner of the construction of any such improvements ultimately to be constructed by or on behalf of Palm Beach County have not yet been determined and when determined, may be changed by Palm Beach County at any time, and (c) there can be no assurances, and Seller and its representatives have not made and will not make any representations whatsoever as to if, when and in what manner such improvements, if any, will be constructed and/or how any such improvements (including, without limitation, any stadium-style lighting installed and/or the noise from users of such improvements) will affect the Community. Seller shall have absolutely no liability whatsoever therefore. The provisions of this paragraph shall survive the closing.

**11. School Boundaries.** Purchaser acknowledges that the Palm Beach County School Board has full decision making powers to modify or change public school boundaries at any time and those boundaries are currently re-examined by the school board on an annual basis. School age children may not be assigned to the public school closest to the Home. Purchaser acknowledges that Purchaser has not relied on any verbal representations from Seller or its representatives with respect to school boundaries and that Purchaser is responsible to make its own investigation of any such matters with the School Board. There can be no assurances, and Seller and its representatives have not made and will not make any representations, that the Community will be included by the county school board in any particular school district. The provisions of this paragraph shall survive the closing.

**12. Public Thoroughfares/Bus Stop.** In conformance with Palm Beach County requirements, Seller hereby discloses to Purchaser that a Palm Tran Mass Transit Shelter may be constructed within the vicinity of the entrance to the Community and that Lyons Road is a planned thoroughfare roadway adjacent to Cobblestone Creek which is currently under construction to be widened to two (2) lanes and up to four (4) lanes. Purchaser acknowledges and agrees that because Lyons Road is a public roadway, utilities and other improvements (including, without limitation, overhead power lines and/or light poles) may or may not be constructed within such roadway or any adjacent utility easements.

**13. Full Performance.** The acceptance of a deed by Purchaser and the closing of the transaction shall be acknowledgment by the Purchaser of the full performance by Seller of all of its agreements, obligations and responsibilities under the Agreement, and no performance of any agreement, obligation or representation of Seller shall survive the closing of the transaction except as specifically stated in writing signed by Seller to the contrary and the warranties contained in the deed and provided by law. All warranties, covenants and acknowledgments by Purchaser shall survive Closing.

**14. Advertising/Promotional Material.** Purchaser represents that Purchaser has not relied upon any statement, verbal or written, published by or under the authority of Seller in any advertising and promotional material including, but not limited to, brochures, newspaper, radio or television advertisements, but has based the decision to purchase on personal investigation, observation and the materials provided herewith. Changes or amendments to the Residence, including but not limited to the plans, specifications,

equipment and the legal description of the Property, may be made from time to time which do not materially affect the rights of Purchaser or the value of the Residence, without the approval of Purchaser. Such changes or amendments which do not materially affect the rights and liabilities of the parties under this Agreement shall not be a cause or reason for termination or rescission of this Agreement by any party.

**15. Land, Gases, Atmospheric Elements & Building Materials.** Some persons may experience reactions to components of various land, gases, atmospheric elements or building materials. Seller does not warrant the land, air, or any building materials used in, under or above the Residence to be free from any possible toxicity to users or occupants, and therefore, disclaim any liability from any problems arising from those items. Purchaser may, prior to closing and after reasonable notice to Seller, inspect for radon gas or other toxic materials, which may affect the Residence and for which Seller disclaims all liability. This provision shall survive closing.

**16. Property View.** Seller makes no representations as to any particular view or orientation of the Residence. Purchaser acknowledges that the installation of any construction, landscaping, or other improvements by Seller or others may obstruct views from the Residence. Purchaser acknowledges that the land use or zoning of adjacent properties may have an impact on the Residence and that Purchaser has investigated such impact and satisfied themselves as to any such impacts. This provision shall survive Closing.

**17. Home Inspection Services.** In the event Purchaser elects to hire an independent home inspector ("Inspector") at Purchaser's sole expense, Seller agrees to allow Inspector access to the Residence based upon the following criteria to which Purchaser hereby agrees that Purchaser and Inspector shall comply: (a) carry workman's compensation insurance and general liability insurance in an amount of not less than $500,000 and provide Seller with an insurance certificate naming Seller as an additional insured; (b) be licensed in the city or county having jurisdiction over the Residence; (c) perform inspections at a time which is reasonably convenient to Seller provided that Seller receives no less than 48 hours notice of the inspection; (d) provide the results of any inspection to Seller in writing detailing any alleged violations of the applicable building code with citation of the relevant sections; (e) any inspection shall be performed in the presence of an authorized representative of the Seller; (f) inspections shall be visual only, no disassembly or removal of construction shall be allowed.

**18. Radon Disclosure.** Florida Law requires the following disclosure:
RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

**19. Community Systems Agreements.** Purchaser acknowledges that the Association may enter into agreement(s) for the Community with one or more providers pursuant to which such provider(s) would make services available to and within the Community. Services which may (but are not obligated to) be provided include, but are not limited to, cable TV, digital cable, telephony, high speed internet access and alarm system monitoring. Such services shall be determined by Seller in Seller's sole discretion, but are all subject to availability from the providers. Purchaser acknowledges that the fees (or portions thereof) to be paid to the service provider(s) for providing such services to the Community may be included in the assessments of the Association. Purchaser further acknowledges that the service provider(s) may be an entity(ies) in which an affiliate of Seller has an interest, financial or otherwise, and/or which may share certain revenue fees with Seller for the services (or portions

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initials 

GRIFFIN
0017

DGRIFFIN - 000137

Case 2:09-md-02047-EEF-MBN Document 22380-46 Filed 12/02/19 Page 118 of 133
Case 9:11-cv-22408-MGC Document 276 Entered on FLSD Docket/08/15/2013 Page 139 of 222

Page 16 of 35

thereof) provided to the homes in the Community by such service provider(s). This paragraph shall survive closing.

20. **Construction Industries Recovery Fund.** Section 489.1425(1) Florida Statutes, requires the following to be disclosed in any contract for the construction of residential real property:

CONSTRUCTION INDUSTRIES RECOVERY FUND
PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A STATE LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS: (904) 727-6530; 7960 ARLINGTON EXPRESSWAY, SUITE 300, JACKSONVILLE, FLORIDA 32211.

21. **Property Tax Disclosure Summary.** BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

22. **Confidentiality.** The terms of this Agreement are confidential and shall not be disclosed by the Purchaser to any other prospective purchaser.

THE FOLLOWING DISCLOSURE IS PROVIDED TO THE PURCHASER NOT AS PART OF THE CONTRACT TERMS BUT FOR INFORMATIONAL PURPOSES ONLY.

Purchaser is hereby warned that upon closing, additional costs may be demanded from the Purchaser in the form of closing costs, which may include the following:

- The balance of the total purchase price, plus any unpaid extras;
- Solid Waste Assessment fee imposed by Palm Beach county;
- A Builder's Fee of 1% of the price of the Home (as further described herein), including lot premium and option/upgrade costs;
- Abstract and recertification fee of $70.00.
- Homeowner's Association assessments for the quarter during which the closing takes place (and the subsequent quarter, if closed later than mid-term) and a working capital contribution to the homeowner's association equal to three months of assessments;
- FPL connection fee, water meter connection fee and any other deposits, installation charges or hook up fees for utilities;
- Purchaser's own hazard and liability insurance;
- Documentary Stamps paid to the State of Florida which are affixed to the instrument of conveyance. Seller will be providing an Owner's Policy of Title Insurance.
- Purchaser's share of the cost of the Surety Bond or Seller's construction interest on the deposit held in escrow, both as described in paragraph 6.B, whichever may be applicable. It is estimated that this cost shall be four hundred fifty dollars ($450.00)
- Reimbursement to Seller of $375.00 for Survey.
- Additional fees as set forth herein.

**END OF PAGE**

U:\lan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initials \_\_\_\_ DDB \_\_\_\_ DG

GRIFFIN
0018
DGRIFFIN - 000138

Case 2:09-cv-92067-EEF-MBN Document 22380-46 Filed 12/02/09 Page 119 of 133
Case 1:11-cv-22408-MGC Document 270 Entered on FLSD Docket 08/15/2013 Page 340 of 222

Page 17 of 35



**NO INVESTOR RIDER**
**TO PURCHASE AND SALE AGREEMENT**

1.      Seller desires to promote a stable, residential community consisting of purchasers who intend to own and occupy their Property (the "Residence" or "Residences"). Accordingly, Seller seeks to discourage investor speculation in its communities by prohibiting purchasers from assigning contracts or "flipping" purchase contracts, short-term resale of Residences, and the purchase of Residences for rental income.

2.      This "no investor" policy ("Policy") is expressly stated in this rider. This policy shall also be placed as a restriction on the deed delivered to Purchaser at the time the Residence is transferred to Purchaser. This Policy and this rider survive the closing of this transaction.

3.      Purchaser acknowledges that only one Residence will be sold to each Purchaser   This Contract is not assignable or transferable. All Residences shall be owned and occupied by the original Purchaser(s) for a minimum of one (1) year from the Closing ("Minimum Holding Period").

4.      Purchaser expressly represents and warrants to Seller as follows, with full knowledge that Seller is entering into this Agreement with Purchaser in reliance on the truth of same:

        a.      Purchaser is purchasing the Residence in order to make it either Purchaser's primary residence or a secondary residence in Florida for Purchaser's use.

        b.      Purchaser is not purchasing the Residence for speculation or immediate resale purposes.

        c.      Purchaser has not entered into and will not, during the Minimum Holding Period, enter into, directly or indirectly (through friends, relatives, entities owned or controlled by Purchaser or otherwise) or caused to be entered into for or on behalf of Purchaser another reservation or Purchase Agreement for a Residence from Seller or from a company affiliated with Seller at another community.

        d.      Prior to the closing and throughout the Minimum Holding Period, Purchaser will not market, list or advertise (or cause to be marketed, listed or advertised) the Residence for sale or lease with any broker, multiple listing service or otherwise.

5.      Any attempt to violate the provisions of this "No Investor Rider" shall constitute a material breach of the Purchase and Sale Agreement, in which event Seller has the right, at Seller's sole discretion to either:

        a.      Terminate this Agreement and retain all deposits and other monies paid by Purchaser pursuant to this Agreement; or Require Purchaser to pay to Seller at the closing on any prohibited resale of the Residence, in addition to all other sums due, an amount equal to one hundred percent (100%) of the Gain, which is defined as the difference between the gross price of the Residence as purchased by Purchaser from Seller and the gross sales price of the Residence subsequently sold or otherwise transferred by Purchaser to a third party, exclusive of any real estate commissions, customary closing costs, or other expenses incidental to either purchase and sale; or

        b.      If Purchaser breaches the restriction on renting or leasing, Purchaser shall forfeit and pay to Seller all rental income received for the Residence, and Seller shall be entitled, among other remedies, to retain all rental income received by Purchaser.

6.      The no investor restrictions provided in this section shall not be applicable to those Residences in the community which are designated by Seller as "model homes." Seller may sell model homes and an OWNER of a model home  may  lease  the  Residence back to the Seller for the purpose of the continued use of the Residence as a        model home. In addition, the Seller can sell, lease, or transfer any model home to any person or entity for the purpose of owning, managing, or using the Residence for the purpose of a model home, and the no investor restrictions shall have no application to such Residence.  This exception is to the no investor restriction is necessary in order for the Seller to be able to construct and use model homes for the development, marketing and sale of Residences in the community.

7.      Notwithstanding the foregoing, an original Purchaser may be allowed to sell the Residence under the following circumstances:

        a.      A documented job transfer of the original Purchaser to a location which would make commuting from the Residence an undue hardship; or

        b.      Death of the original Purchaser or the Purchaser's spouse; or

        c.      Transfer by gift, devise or inheritance to a spouse or child; or

        d.      Transfer by operation of law to a surviving joint tenant; or

        e.      Transfer to a spouse pursuant to the terms of a final judgment of dissolution of marriage or court-approved property settlement agreement; or

        f.      Transfer pursuant to a distributive deed by a grantor into a revocable trust, in which the grantor has not less than the right to reside in the Residence during the grantor's lifetime; or

        g.      Transfer by an Purchaser to the Purchaser and the Purchaser's spouse, as tenants by the entirety, or transfer by operation of law to a surviving tenant by the entirety; or

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC                    Initials _____ _____

Case 2:09-md-02047-EEF-MBN Document 22380-46 Filed 12/03/19 Page 120 of 133
Case 1:11-cv-22408-MGC Document 276 Entered on FLSD Docket/09/15/2013 Page 341 of 222

Page 18 of 35

h.  Other documented reason acceptable by Seller in Seller's sole and unbridled judgment.

8.  Purchaser acknowledges that the Declaration of Restrictions and Covenants for the Community contains the following provisions and expressly agrees to same:

"NO INVESTOR RESTRICTIONS. Each DECLARANT has adopted in its purchaser contracts and/or incorporated into its deeds of conveyance certain restrictions regarding resale and leases of RESIDENCES within COBBLESTONE CREEK. Reference should be made by OWNERS to their purchase agreements and/or deeds of conveyance for the specific details of this restriction."

9.  PURCHASER ACKNOWLEDGES, BY EXECUTING THIS RIDER, THAT THIS RIDER AND THE DECLARATION PROVISIONS ABOVE CONSTITUTE A RESTRICTION ON PURCHASER'S ABILITY TO ALIENATE (CONVEY OR LEASE) THE RESIDENCE, AND FURTHER ACKNOWLEDGES THAT THIS RESTRICTION IS IN THE BEST INTEREST OF THE COMMUNITY AND ITS RESIDENTS AND IS NOT AN UNREASONABLE RESTRICTION ON THE ALIENATION OF PROPERTY.

10.  Any violation of this "no investor" policy shall not defeat or render invalid the lien of any first mortgage made in good faith and for value by Purchaser. The covenants and provisions of this policy shall be inferior and subordinate to any such first mortgage recorded concurrently with the deed conveying the Residence to Purchaser.

11.  Seller has the right to amend, terminate and reinstate the Policy in its sole discretion at any time.

IN WITNESS WHEREOF, the parties have hereunder set their hands and seals the day and year first above written.

PURCHASER(S):

_____        _1 - 31 - 05_
                                         DATE

_Diane Griffin_____           _1 - 31 - 05_
                                         DATE

SELLER:

NORTHSTAR HOLDINGS AT B AND A, LLC

By:_____        _7/1/05_
     Authorized Signatory                DATE

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initial _____  _____

GRIFFIN
0020

DGRIFFIN - 000140



### COBBLESTONE
· C R E E K ·

#### PLATTING ADDENDUM

This Platting Addendum ("Addendum") is executed in conjunction with and, by this reference, incorporated into the Purchase Contract dated *1-31-05* between *m/m GRIFFIN* ("Purchaser") and Seller, whose name appears below, for Block 2, Lot *#120*, Model *FAIRFAX* (the "Purchase Contract").

Purchaser and Seller hereby agree as follows:

1.      All initial capitalized terms used herein but not defined shall have the same meaning as set forth in the Purchase Contract.

2.      Seller hereby advises Purchaser and Purchaser hereby acknowledges that the platting of the Community has not yet been completed. Any and all references to lot numbers, lot dimensions, lot sizes, lot locations, configuration of lots, location and sizes of easements, road alignment, lakes, recreation area, preservation area, front entrance, etc. are all subject to final platting.

3.      Notwithstanding the foregoing, Purchaser acknowledges that Purchaser is bound by the Purchase Contract and may not cancel the Purchase Contract because platting has not been finalized. Further, should the plat not be accepted as submitted, Seller shall submit an alternate plat and, if Purchaser's lot on the alternate plat is no longer shown or is substantially modified from such lot as depicted on the original plat, Purchaser shall be required to choose a replacement lot of equal value to the lot chosen in the Purchase Contract. Seller shall use its best efforts to satisfy this requirement of closing at the earliest possible date.

4.      In the event of a conflict between the provisions of this Addendum and the provisions of the Purchase Contract, the provisions of this Addendum shall control. Except as otherwise provided herein, all terms and provisions of the Purchase Contract shall remain in full force and effect.

Executed the day and year written below.

PURCHASER                                    *1-31-05*
                                              DATE

PURCHASER                                    *1-31-05*
                                              DATE

SELLER: NORTHSTAR HOLDINGS AT B AND A, LLC

By:                                          *2/1/05*
        Authorized Signatory                 DATE

U:\len\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC          Initial ___ ___

**GRIFFIN**
**0021**

DGRIFFIN - 000141



**COBBLESTONE CREEK**
Disclosure Summary

1. AS A PURCHASER OF PROPERTY IN THIS COMMUNITY, YOU WILL BE OBLIGATED TO BE A MEMBER OF A HOMEOWNER'S ASSOCIATION.

2. THERE HAVE BEEN OR WILL BE RECORDED, RESTRICTIVE COVENANTS GOVERNING THE USE AND OCCUPANCY OF PROPERTIES IN THIS COMMUNITY.

3. YOU WILL BE OBLIGATED TO PAY ASSESSMENTS TO THE ASSOCIATION. ASSESSMENTS MAY BE SUBJECT TO PERIODIC CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS $200.00 PER MONTH. YOU WILL ALSO BE OBLIGATED TO PAY ANY SPECIAL ASSESSMENTS IMPOSED BY THE ASSOCIATION. SUCH SPECIAL ASSESSMENTS MAY BE SUBJECT TO CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS $ N/A PER N/A.

4. YOU MAY BE OBLIGATED TO PAY SPECIAL ASSESSMENTS TO THE RESPECTIVE MUNICIPALITY, COUNTY, OR SPECIAL DISTRICT. ALL ASSESSMENTS ARE SUBJECT TO PERIODIC CHANGE.

5. YOUR FAILURE TO PAY SPECIAL ASSESSMENTS OR ASSESSMENTS LEVIED BY A MANDATORY HOMEOWNER'S ASSOCIATION COULD RESULT IN A LIEN ON YOUR PROPERTY.

6. THERE MAY BE AN OBLIGATION TO PAY RENT OR LAND USE FEES FOR RECREATIONAL OR OTHER COMMONLY USED FACILITIES AS AN OBLIGATION OF MEMBERSHIP IN THE HOMEOWNER'S ASSOCIATION. IF APPLICABLE, THE CURRENT AMOUNT IS $N/A PER N/A.

7. THE DEVELOPER MAY HAVE THE RIGHT TO AMEND THE RESTRICTIVE COVENANTS WITHOUT THE APPROVAL OF THE ASSOCIATION MEMBERSHIP OR THE APPROVAL OF THE PARCEL OWNERS.

8. THE STATEMENTS CONTAINED IN THIS DISCLOSURE ARE ONLY SUMMARY IN NATURE AND, AS A PROSPECTIVE PURCHASER; YOU SHOULD REFER TO THE COVENANTS AND THE ASSOCIATION GOVERNING DOCUMENTS BEFORE PURCHASING PROPERTY.

9. THESE DOCUMENTS ARE EITHER MATTERS OF PUBLIC RECORD AND CAN BE OBTAINED FROM THE RECORD OFFICE IN THE COUNTY WHERE THE PROPERTY IS LOCATED, OR ARE NOT RECORDED AND CAN BE OBTAINED FROM THE DEVELOPER.

BY SIGNING THIS DOCUMENT, PURCHASER ACKNOWLEDGES THAT PURCHASER HAS RECEIVED AND READ THE DISCLOSURE SUMMARY.

Purchaser: *_____ Date: _1-31-05_

Purchaser: *_____ Date: _1-31-05_

U:\la\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initial _____ _____

GRIFFIN
0022

DGRIFFIN - 000142

COBBLESTONE CREEK HOMEOWNERS ASSOCIATION, INC.
ESTIMATED OPERATING BUDGET
NUMBER OF HOMES                              250
BUDGET YEAR: 2005

| | | BUDGET ANNUAL | BUDGET MONTHLY | MONTHLY PER HOME |
|---|---|---|---|---|
| | **ADMINISTRATIVE EXPENSES:** | | | |
| 1 | MANAGEMENT FEES | 45,000 | 3,750 | 15.00 |
| 2 | LEGAL | 5,000 | 417 | 1.67 |
| 3 | ANNUAL REVIEW/TAX PREP | 2,000 | 167 | 0.67 |
| 4 | INSURANCE | 21,700 | 1,808 | 7.23 |
| 5 | LICENSE, FEES & TAXES | 500 | 42 | 0.17 |
| 6 | OFFICE SUPPLIES | 3,643 | 304 | 1.21 |
| | TOTAL ADMIN EXPENSES | 77,843 | 6,487 | 25.95 |
| | **OPERATING EXPENSES:** | | | |
| 7 | ELECTRIC | 46,800 | 3,900 | 15.60 |
| 8 | WATER & SEWER | 1,200 | 100 | 0.40 |
| 9 | COMMON AREA LANDSCAPE MAINT | 110,400 | 9,200 | 36.80 |
| 10 | COMMON AREA LANDSCAPE EXTRAS | 12,000 | 1,000 | 4.00 |
| 11 | TREE TRIMMING | 4,000 | 333 | 1.33 |
| 12 | IRRIGATION | 2,500 | 208 | 0.83 |
| 13 | PEST CONTROL | 12,600 | 1,050 | 4.20 |
| 14 | GATEHOUSE ATTENDANTS | 125,101 | 10,425 | 41.70 |
| 15 | GATE MAINTENANCE | 4,000 | 333 | 1.33 |
| 16 | GATEHOUSE PHONES | 2,100 | 175 | 0.70 |
| 17 | GENERAL REPAIRS | 2,500 | 208 | 0.83 |
| 18 | LAKE MAINTENANCE | 9,000 | 750 | 3.00 |
| 19 | LAKE FOUNTAIN MAINT/REPAIR | 500 | 42 | 0.17 |
| 20 | BULK CABLE TV | 86,250 | 7,188 | 28.75 |
| | TOTAL OPERATING EXPENSES | 418,951 | 34,913 | 139.65 |
| | SUB TOTAL | 496,794 | 41,400 | 165.60 |
| | **RECREATION AREA:** | | | |
| 21 | TRASH REMOVAL | 1,500 | 125 | 0.50 |
| 22 | ELECTRIC | 20,000 | 1,667 | 6.67 |
| 23 | TELEPHONE | 3,000 | 250 | 1.00 |
| 24 | REC AREA LANDSCAPE MAINT | 20,000 | 1,667 | 6.67 |
| 25 | REC AREA LANDSCAPE EXTRAS | 5,606 | 467 | 1.87 |
| 26 | JANITORIAL & SUPPLIES | 23,100 | 1,925 | 7.70 |
| 27 | POOL & SPA MAINTENANCE | 12,000 | 1,000 | 4.00 |
| 28 | WATER & SEWER | 2,500 | 208 | 0.83 |
| 29 | ON SITE PERSONNEL | | NONE AT THIS TIME | |
| 30 | RECREATION AREA & MAINTENANCE | 8,000 | 667 | 2.67 |
| 31 | INSURANCE | 7,500 | 625 | 2.50 |
| 32 | RESERVES | | NONE AT THIS TIME | |
| | TOTAL RECREATION AREA | 103,206 | 8,601 | 34.40 |
| | TOTAL EXPENSES | 600,000 | 50,000 | 200.00 |

| | ANNUAL | QUARTERLY | MONTHLY |
|---|---|---|---|
| MAINTENANCE FEES | $2,400.00 | $600.00 | $200.00 |

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initial _OWB_  _D.G._

GRIFFIN
0023

DGRIFFIN - 000143



**COBBLESTONE CREEK**
**LIST OF EASEMENTS**

The following list describes the easements typically granted in the Community and is not intended to limit (a) the number or scope of existing easements, (b) easements to be granted pursuant to plat(s) of the Community, any additional plat(s), or the terms of the Declaration, or (c) the rights of Seller to grant additional easements in accordance with Section D.1 of the Standard Provisions to the Purchase Contract. In general, no planting or construction shall be permitted in any easement without the prior written permission of the easement beneficiary and the Architectural Control Committee of the Association.

<u>Utility Easements</u>. Easements granted in favor of a public or franchised utility (the "Utility"), the Association (as that term is defined in the Purchase Contract), and/or Palm Beach County, Florida (the "County") for the construction, installation, maintenance, service, repair and replacement of pipe equipment, conduit lines and all other improvements necessary to supply utility services to the Community. The Utility, Association and/or County, as appropriate, determine in their sole discretion the items to be placed within the easement and their final locations. Utility services provided in these types of easements include, by way of example and not limitation, electric, water, sewer, irrigation and drainage.

<u>Buffer Easements</u>. Easements granted in favor of the Association for the purpose of providing dedicated landscaped areas to provide a buffer between the Community and adjoining parcels of land.

<u>Drainage and Irrigation Easements</u>. Easements granted in favor of the Association for the construction, installation, maintenance, service, repair and replacement of drainage and irrigation facilities necessary to provide for the drainage of storm water and for irrigation.

<u>Drainage, Maintenance and Overhang Easements (Zero Lot Line Only)</u>. Easements granted to purchasers over a limited portion of adjacent property for (i) the encroachment of their roof overhang into the airspace of adjacent property; (ii) to access adjacent property for the purpose of maintaining, repairing or replacing all or a portion of improvements located along a zero Lot Line, and the roof overhanging the zero lot line; and (iii) allowing water to drain off the Purchaser's lot in accordance with the drainage plans approved by the County and off of their overhanging roof onto adjacent property.

<u>Lake Maintenance Access Easements</u>. Easements granted in favor of the Association and/or applicable governmental authorities for the purpose of accessing the lakes: (a) to perform lake maintenance; (b) to perform storm water management and drainage facilities maintenance activities; and (c) to install, maintain and replace littoral shelf plantings. Owners, their guests, invitees, tenants and other persons are specifically prohibited from utilizing the lake maintenance access easements for the purpose of accessing the lakes for recreation, enjoyment or other uses.

<u>Lake Maintenance Easements</u>. Easements granted in favor of the Association and/or applicable governmental authorities for the purpose of maintaining the lakes and storm water management and drainage facilities within the Community's lakes. Owners of lots adjacent to the lake maintenance easement (the "Lake Lot Owners") have the right to the use and enjoyment of that portion of the lake maintenance easement abutting their lot. Lake Lot Owners, however, are strictly prohibited from installing landscaping, fencing or other improvements within any portion of the lake maintenance easement.

<u>Lift Station Easements</u>. Easements granted in favor of the County for the installation, repair, maintenance and service of equipment, lines and other structures necessary to supply sanitary sewer services to the Community.

<u>Limited Access Easements</u>. Easements granted in favor of the County for the purpose of control and jurisdiction over access rights across and within the Community.

<u>Community Systems Easements</u>. Easements reserved by Seller for itself, an affiliate, any other entity which Seller or its affiliate may have an interest (financial or otherwise), or for any third party granted the rights to provide Community Systems in the Community, for the installation, operation, maintenance, repair, replacement alteration and expansion of lines and equipment to provide television (cable, satellite, or otherwise), entertainment, telecommunication, internet access, alarm/monitoring and other utility services to the Community.

<u>Temporary Construction Easement</u>. During construction, Seller has the right to use the Common Areas for trailers, other construction equipment, storage and other related matters. Seller is hereby granted by Purchaser the right of ingress and egress for itself, its employees, agents and subcontractors, and designees and assigns, over and upon any portion of the Lot as may be reasonably required for the construction of improvements upon an adjacent Property.

Acknowledged the day and year written below.

Purchaser: _____     Date: 1-31-05

Purchaser: _Diane Griffin_____     Date: 1-31-05

U:\ax\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC          Initial _____ D.G.

**GRIFFIN**
**0024**

Case 2:09-md-02047-EEF-MBN   Document 22380-46   Filed 12/02/19   Page 125 of 133
Case 1:11-cv-22408-MGC   Document 276   Entered on FLSD Docket 08/15/2013   Page 346 of 222

Page 23 of 35



## COBBLESTONE
· C R E E K ·

### NOTICE OF NON-REPRESENTATION

FLORIDA LAW REQUIRES THAT REAL ESTATE LICENSEES PROVIDE THIS NOTICE AT FIRST CONTACT TO
ALL POTENTIAL SELLERS AND BUYERS OF REAL ESTATE

You are hereby notified that NORTHSTAR HOLDINGS AT B AND A, LLC and I do not represent you in any capacity.
You should not assume that any real estate broker or salesperson represents you unless you agree to engage a real estate
licensee in an authorized brokerage relationship, either as a single agent or as a transaction broker.  You are advised not to
disclose any information you want to be held in confidence until you make a decision on representation.

Your signature below acknowledges receipt of this form and does not establish a brokerage relationship.

PURCHASER(S):

_____        1-31-05
                                     DATE

_____        1-31-05
Diane Griffin                        DATE

SELLER:

NORTHSTAR HOLDINGS AT B AND A, LLC

By:_____        2/1/05
   Authorized Signatory              DATE

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC          Initial _____ _____

GRIFFIN
0025

DGRIFFIN - 000145



Case 2:09-md-02047-EEF-MBN Document 22380-46 Filed 12/02/19 Page 126 of 133
Case 1:11-cv-22408-MGC Document 270 entered on FLSD Docket 08/15/2013 Page 147 of 222

Page 24 of 35

## COBBLESTONE
·C R E E K·

### COLOR SELECTION ACKNOWLEDGMENT AND PRODUCT DISCLAIMER

This Color Selection Acknowledgment and Product Disclaimer ("Addendum") is executed in conjunction with and, by this reference, incorporated into the ("Purchase Contract") dated ___Jan 31___, 2005 between ("Seller") and ___DeRRICK_ and _Diane GRIFFIN_ ("Purchaser") for Lot _#1.20_, Block 2, Model _Fairfax_, in the community known as Cobblestone Creek.

**A.** **Color Variations.** Purchaser acknowledges that actual colors may vary from samples. Seller will not be responsible for variations in color due to differences between different product runs (commonly referred to as "dye lots") and other manufacturing processes not within Seller's control. Additionally, Purchaser further acknowledges that colors may not match identically amongst fixtures in the same room due to the use of different manufacturers including, by way of example and not limitation, the bathroom tub, toilet and sink or vanity

**B.** **Berber Carpet.** Purchaser acknowledges that Berber carpet seams tend to be quite noticeable due to the nature of the Berber carpet material. Purchaser agrees to accept the Berber carpet including the seams as installed provided the Berber carpet is installed in a good and workmanlike manner. Purchaser also acknowledges that specific support carpet padding will be installed with the Berber carpet for which no upgrade is available. Purchaser agrees not to include any item pertaining to the Berber carpet seams on the Inspection List (as that term is defined in the Purchase Contract) or on any customer service requests submitted by Purchaser to Seller subsequent to closing.

**C.** **Brick Pavers.**
    **1.** **Inherent Characteristics.** Purchaser acknowledges that Brick Pavers are a cement product with the following inherent characteristics (the "Brick Paver Inherent Characteristics"):

- Brick Pavers are individually set and compacted by hand. As a result, spacing and brick paver placement shall vary within and between installations.
- Brick Pavers are a cement product typified by shading and texture variations. Shade and texture variations are most evident with the replacement of Brick Pavers after the initial installation.
- Brick Pavers, as a cement product, are susceptible to chipping.
- Brick Pavers will vary in size of bricks.
- Brick Pavers do not generally require sealing or coating. However, due to the porous nature of cement products, it is recommended that Brick Pavers be sealed by Purchaser in areas of intensive use and traffic. Any cleaning products to be used on the Brick Pavers should not contain acid.
- Brick Pavers shall not be installed in the sidewalk areas.
- Brick Pavers in the rear and/or side yards are not installed over concrete footers. Accordingly, Brick Pavers are not suitable or fit for installation of screen enclosures.

    **2.** **No Warranty.** Purchaser acknowledges and agrees that neither Seller, the Brick Paver manufacturer nor the Brick Paver installer warrants the Brick Pavers with respect to the Brick Paver Inherent Characteristics set forth above. Furthermore, Purchaser agrees that the Brick Paver Inherent Characteristics are acceptable conditions of the Brick Pavers for purposes of closing and that Purchaser shall not include any item pertaining to the Brick Paver Inherent Characteristics on the Inspection List or on any customer service requests submitted by Purchaser to Seller subsequent to closing.

**D.** **Cabinets.**
    **1.** **Standard Selections.** Purchaser acknowledges that significant portions of Seller's cabinet selections are manufactured using mica, melamine and/or other products. These portions include the side panels, toe kicks, interior and exterior surfaces of cabinet boxes and other components and, in some cabinet selections, the doors and drawer fronts. Purchaser further acknowledges that color variations will exist between melamine and other products, including mica, even in situations where the names of the colors are identical.
    **2.** **Upgraded Wood Cabinet Packages.** Purchaser acknowledges and agrees that the wood cabinet package may consist of wood doors and drawer fronts only. The side panels, end panels, toe kicks, interiors and other components of the wood cabinet package may be constructed of mica, melamine and/or other products. Accordingly, Purchaser acknowledges and agrees that natural grain and color variations may exist within and between the doors, drawers and the other components. Purchaser further acknowledges and agrees that the wood doors and drawer fronts are subject to warpage and mitre separation in areas of high humidity. bathrooms, garages and patios are typically areas of high humidity.
    **3.** **Inherent Characteristics.** Purchaser acknowledges and agrees that shade and grain variations and knots are inherent characteristics of wood. Each tree has its own wood characteristics that are unique. Differences in color and grain directions are produced by nature in every tree. Since these differences in texture and grain do affect the finish, it is impossible to guarantee an exact match in finish within and between cabinet doors, drawer fronts and/or other components. As a result, the wood cabinet package may include knots within and/or shade variations within or between doors, drawer fronts and other component. Furthermore, shade and grain variations may also exist within replacement wood cabinet package doors, drawer fronts and other components subsequently installed by Purchaser or Seller as compared to the shades and grains of existing doors, drawer fronts and/or the other components. Similarly, color variations arid consistency of wood grain patterns may exist between the doors, drawer fronts and the other components.
    **4.** **Glazing.** If Purchaser has also selected to have such wood cabinets glazed, then Purchaser further acknowledges and agrees that the glazing is applied by hand to give the cabinets an old-fashioned appearance, and that the different grain variations within any door and between doors and other components of the wood cabinet package will accept the glazing application differently. As a result, the glazing may not appear even or consistent in application and may cause shade variations within or on doors and between doors and other components of the cabinets.
    **5.** **Availability.** Purchaser acknowledges that the only cabinets which are available for selection by Purchaser for Purchaser's Home are those which are shown in the cabinet door display in Seller's Design Center. In that regard, Purchaser

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC      Initial ____ ____

GRIFFIN
0026

DGRIFFIN - 000146

acknowledges that the cabinet sets shown in Seller's model homes may not be available for selection by Purchaser unless such cabinets are shown in the cabinet door display in Seller's Design Center, and therefore the cabinets selected by Purchaser from the cabinet door display in Seller's Design Center may differ from the cabinet sets shown in Seller's model homes. Purchaser shall be obligated to verify that the cabinet series number and color identified on the Option Addendum(s) executed by Purchaser match the cabinet series number and color shown on the cabinet door selected by Purchaser from the cabinet door display in Seller's Design Center. Accordingly, Purchaser acknowledges that such Option Addendum(s), if and when executed, accurately reflect the cabinets selected by Purchaser, and Purchaser agrees to accept the Home with such cabinets, notwithstanding that they may not match the cabinet sets shown in Seller's model homes.

6.  **Acceptance.** Purchaser agrees to accept the wood cabinet package including any replacement doors, drawers and/or other components notwithstanding the existence of the above-described knots, color variations and/or shade and grain variations. Purchaser further agrees that Seller is not obligated to replace any components due to the existence of knots and/or shade and grain variations. Furthermore, Purchaser agrees that Purchaser shall not include any item pertaining to the above-described knots and/or shade and grain variations on the Inspection List or on any customer service requests submitted by Purchaser to Seller subsequent to closing.

E.  **Ceramic Tile**

1.  **High Gloss Tiles.** Purchaser acknowledges that high gloss ceramic tiles are highly susceptible to scratches and will show scratches much more quickly and noticeably than matte finish tiles. Purchaser acknowledges and agrees that neither Seller, the ceramic tile manufacturer nor the ceramic tile installer warrants the high gloss ceramic tile against scratches. Purchaser agrees that this characteristic is an acceptable condition of the tile for purposes of closing and that Purchaser shall not include any scratches on high gloss ceramic tile on the Inspection List or on any customer service requests submitted by Purchaser to Seller subsequent to closing. Purchaser further acknowledges that high gloss ceramic tile is not recommended on floors of wet areas such as bathrooms.

2.  **Stone Look Tiles.** Purchaser acknowledges that there are significant differences between different dye lots of the tile. As a result, the tile installed in the Home may differ considerably in color, texture and appearance from the tile as demonstrated in Seller's color selection showroom. Purchaser agrees to accept the tile as installed notwithstanding the existence of the above-described differences in color, texture and/or appearance. Furthermore, Purchaser agrees that Purchaser shall not include any item pertaining to the above-described differences in color and/or appearance on the Inspection List or on any customer service requests submitted by Purchaser to Seller subsequent to closing.

3.  **Grout Joints.** Purchaser acknowledges that grout joints will vary from house to house depending on tile and field conditions. Furthermore, Purchaser acknowledges that if they select an option for narrow grout joints, Seller will make a good faith effort to make the grout joints as narrow as possible, but Seller cannot and does not guarantee any minimum or specified thickness of the grout joints.

4.  **Tile Edge.** Purchaser acknowledges and agrees that the tile floor which will be installed by Seller on the steps will have an exposed tile edge. Purchaser further acknowledges and agrees that the exposed edge of most ceramic tile will be unfinished and without coloring. Purchaser agrees that the tile selected by Purchaser shall be installed at the elevated foyer with an exposed tile edge which may be unfinished. In the alternative, Purchaser and Seller may agree, in writing, by executing one of Seller's Color Selection or Option Addendum Forms during the Color Selection Process to either: (a) install one of Seller's selections of tumble stone tiles to be installed at the exposed edge, or (b) install a plastic strip to cover the exposed tile edge. If ceramic tile is installed with an exposed edge at an elevated area, then Purchaser agrees that this unfinished characteristic of the exposed tile edge is an acceptable condition of the tile for purposes of closing and that Purchaser shall not include any item arising out of or pertaining to the exposed tile edge on the Inspection List or on any customer service requests submitted by Purchaser to Seller subsequent to closing.

5.  **Slip Resistance of Tiles.** Purchaser acknowledges that all tiles (including, without limitation, tile with matte finishes or high coefficient of friction) tends to be slippery when damp or wet and neither Seller, the tile manufacturer nor the tile installer warrants that any particular tile will not be slippery or will resist slippage when damp or wet. Purchaser further acknowledges that it is recommended that Purchaser lay a floor mat, area rug or bath mat in tiled areas which tend to become damp or wet, such as at entry doors, in front of tubs, showers and sinks in baths and in front of the kitchen and laundry room sink.

F.  **Concrete.** Purchaser acknowledges and agrees that concrete is affected by many variables that may cause the color of the concrete to vary. Because concrete is poured in batches, the following factors may affect the color of driveways, sidewalks and patios where concrete is used: weather, temperature, hydration and moisture content of the concrete, moisture of the soil the concrete is poured on, and different mixtures of aggregate. Accordingly, Purchaser agrees that such color variations are acceptable conditions of concrete for purposes of closing and that Purchaser shall not include any item pertaining thereto on the Inspection List or on any customer service requests submitted by Purchaser to Seller subsequent to closing. In addition, Seller shall not be responsible to repair any cracks in concrete unless it is the result of a settlement crack in excess of 1/8" in diameter and is not caused by Purchaser.

Purchaser acknowledges and agrees that Seller has made no representations that Extended Concrete is suitable or fit for any particular use now or in the future, including, by way of example and not limitation, covered patios or room additions. Purchaser further acknowledges and agrees that Seller has made no representations that the Extended Concrete is suitable or fit for Purchaser's possible future construction of a privacy wall along the zero lot line, if applicable. Furthermore, Purchaser acknowledges that scoring and construction expansion joints are a standard industry practice suitable for the installation of concrete flatwork purchased by Purchaser.

G.  **Covered Patio**

1.  **Privacy Wall.** Purchaser hereby acknowledges and agrees the following: (a) the codes, provisions and ordinances governing the building of the Home may require the erection of a privacy wall along the property (or portion thereof) if the covered patio and/or pool deck are situated on the property line of the Lot (the "Privacy Wall"); and, (b) Seller will build the Privacy Wall only if, as and to the extent required by applicable codes, provisions and ordinances. Furthermore, Purchaser acknowledges and agrees that Purchaser may be required to build a Privacy Wall in accordance with the applicable codes, provisions and ordinances if Purchaser should choose to add a covered patio and/or pool deck after the date of closing, including a foundation of proper size to support the Privacy Wall.

2.  **Covered Patio.** Purchaser acknowledges that one of the following situations may pertain to the Purchase and Sale Agreement:

- A covered patio which is located on the zero property line may be a standard feature of the Home;
- Purchaser has agreed to purchase and Seller has agreed to sell an option covered patio and the covered patio is located on the zero property line; and/or

U:\Ian\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initial _____

GRIFFIN
0027

DGRIFFIN - 000147

• Purchaser has agreed to purchase and Seller has agreed to sell a pool and pool deck and the edge of the pool deck is located on the zero property line.

    3.    **Acknowledgment.**  Purchaser acknowledges and agrees that the purchase of an optional covered patio or any other modification to the size or configuration of a standard covered patio does not in any manner change, modify or alter: (a) the location of the GFI electrical outlet, if any, on the rear exterior wall of the Home; (b) the location of the hose bib, if any, on the rear exterior wall of the Home; and (c) the location of any light fixture(s) on the rear exterior wall of the Home.  Purchaser further acknowledges and agrees that the (a) relocation or addition of a GFI electrical outlet on the rear exterior wall of the Home, (b) addition of a hose bib on the rear exterior wall of the Home and/or (c) addition of a light or fan outlet to the ceiling of any Covered Patio is the sole responsibility of Purchaser and, if offered by Seller, must be purchased by Purchaser during the Color Selection Process but in no event later than the Request (as those terms are defined in the Purchase Contract).

**H.**    **Garages**
    1.    **Garage Dimensions.**  Purchaser acknowledges and agrees that the garage of the Home purchased may not accommodate all vehicles.  Furthermore, it is agreed that the Purchaser is ultimately responsible to determine if Purchaser's vehicle(s) will fit within the garage given the height, width and length of the garage to be constructed.
    2.    **Garage Options.**  Seller may offer for sale changes affecting the interior of the garage, including, by way of example and not limitation, relocating the washer and dryer and/or laundry (or utility) sink in the garage, relocating the water heater within the garage, installing a circuit for a future refrigerator in the garage, converting a single water heater to a double water heater system, relocating the air handler units in the garages and/or deleting the garage step-up (the "Garage Options").  If Purchaser has agreed to purchase one or more of the Garage Options, Purchaser acknowledges that the purchase of one or more of the Garage Options may result in one or more "Garage Options Consequences" including, by way of example and not limitation, the following:
•    Vehicles may be unable to fit in the garage.
•    Items located in the garage may be damaged due to contact with vehicles entering the garage.
•    Items located in the garage may be damaged due to prolonged exposure to heat and humidity.
•    Interior garage walls may be damaged due to contact with vehicles entering the garage.
    3.    **Acceptance.**  Purchaser agrees to accept the Garage Options as constructed notwithstanding the existence of Garage Option Consequences.  Furthermore, Purchaser agrees not to include any item arising out of or pertaining to the existence of Garage Option Consequences on the Inspection List or on any customer service requests submitted by Purchaser subsequent to closing.

**I.**    **Wood Flooring.**  Purchaser acknowledges that shade variations and knots are inherent characteristics of wood.  As a result, wood flooring may include knots within and/or shade variations within or between individual wood planks comprising the wood flooring.  Purchaser also acknowledges that, from plank to plank, wood flooring may vary minimally in height and wood grain.  Furthermore, shade variations may exist within individual replacement wood planks subsequently installed by Purchaser or Seller as compared to the shades of existing individual wood planks comprising the wood flooring.  In addition, Purchaser acknowledges that the wood flooring shall be installed with no sub-floor but rather shall be glued directly to the slab upon installation.  Purchaser agrees to accept the wood flooring including any replacement wood planks notwithstanding the existence of the above-described conditions.  Failure to follow the manufacturer's maintenance guidelines may result in damage to the wood and its protective coating.  Furthermore, Purchaser acknowledges that the wood flooring color, shades and grain patterns will not match Seller's stain selections for stair components.

**J.**    **Wood Moldings.**
    1.    **Paint Grade.**  Purchaser acknowledges that, unless otherwise specified in any Option Addendum(s) executed between Purchaser and Seller, the Wood Moldings will be paint grade and not stain grade.  Accordingly, any paint grade moldings are not intended to be left unpainted or to be subsequently stripped of paint with the intent to stain.
    2.    **Stain Grade.**  Purchaser acknowledges that stains applied to various species comprising the Wood Moldings are not represented by Seller to match each other and/or any stair components.  Purchaser further acknowledges that stain grade Wood Moldings have the same inherent characteristics as paint grade Wood Moldings, as illustrated in the following paragraph.
    3.    **Inherent Characteristics.**  Purchaser acknowledges that Wood Moldings, including both stain grade and paint grade moldings, are wood products with the following inherent characteristics (the "Wood Molding Inherent Characteristics"):
•    Imperfections may exist in the Wood Moldings, including, but not limited to, shade variations, inconsistent grain patterns, knots, cracks, chips and dark or light spots.
•    Variations in shade, height and/or wood grain may exist within individual replacement wood sections subsequently installed by Purchaser or Seller as compared to the shades of existing individual wood sections comprising the Wood Moldings.
•    Where Wood Moldings are joined, slight separations will be apparent between the joined surfaces and may vary in width.
•    Where nail holes in Wood Moldings are filled with painter's putty to cover nail heads, a discoloration of the stain will be apparent.
•    Where Wood Moldings are applied to drywall details or in tray and coffered ceilings, separations may be evident between the molding surfaces and the drywall details where the molding width does not match the width of the drywall surfaces.
•    Profiles of Wood Moldings may very between molding sections and, accordingly, there will be an apparent difference in the alignment of the profiles where they are joined together.
•    Where walls or ceilings form a radius, flexible moldings may be used.  In such event, stain finishes applied to the moldings will have a dissimilar appearance to each other in terms of color variation, profile and graining patterns.
    4.    **No Warranty and Acceptance.**  Purchaser hereby agrees to accept the Wood Moldings in an "as is" condition with no substitutions, notwithstanding the existence of the above-described Wood Molding Inherent Characteristics and regardless of the degree of imperfection.  Furthermore, Purchaser agrees not to include any item arising out of or pertaining to the existence of Wood Molding Inherent Characteristics on the Inspection List or on any customer service requests submitted by Purchaser subsequent to closing.

**K.**    **Second Story Concrete Block.**  If the Home which is the subject of the Purchase and Sale Agreement is a two story home, Purchaser acknowledges and agrees that Seller shall construct the second story exterior walls with concrete block to the second story tie beam only in instances where the second story exterior walls rest directly on the first story exterior walls.  Any second story walls which do not rest directly over the first story exterior walls, including, but not limited to, the walls which cross the garage at the front of the Home, will be built with frame construction.  Roof gable ends created by a truss that spans an opening or a gable end that is

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC        Initial

GRIFFIN
0028

DGRIFFIN - 000148

Case 2:09-cv-02067-CEF-MRN Document 22380-46 Filed 12/02/09 Page 129 of 133
Case 2:09-cv-02067-CEF-MRN Document 270 Entered on FLSD Docket 08/13/2013 Page 150 of 222
Page 27 of 35

above a wall shall be constructed with wood framing. Covered patios and verandahs may be supported by reinforced steel columns. Covered entries are supported by wood members and concrete block columns.

**L.** **Second Story Acoustical Concrete Sub-flooring.** Purchaser acknowledges and agrees that acoustical concrete sub-flooring will be installed by Seller on the second floor of the Home is a standard feature of the Home. Such acoustical concrete sub-flooring is not a poured in place concrete slab floor which would be an integral part of the Home's structure. In that regard, Purchaser further acknowledges and agrees that such second floor system will consist of wood sub-floors placed over wood trusses, and that the acoustical concrete sub-flooring is a non-structural floor underlayment (or sub-flooring) compound consisting of dense gypsum cement mixed with sand and water which is pumped into form a gypsum concrete over the wood sub-floor panels. Purchaser also acknowledges and agrees that the gypsum concrete underlayment is not installed under bath tubs and shower pans. Although the gypsum concrete underlayment in intended to improve the sound insulation provided by the wood sub-floor panels, it is not intended to and does not eliminate all sound transmission.

**M.** **Pre-Wire for Fixtures.** Purchaser acknowledges and agrees that any electric junction box pre-wired for a future light fixture is not rated to support many fixtures, including, but not limited to chandelier light fixtures and ceiling fan fixtures. Purchaser acknowledges and agrees that any electric junction box pre-wired for a future ceiling fan fixture is rated to support fixtures, including, by way of example and not limitation, ceiling fan fixtures or chandelier light fixtures, up to a weight of 35 pounds of dead weight. Purchaser acknowledges that, while certain junction boxes and fixtures are manufactured with high ratings or in such a way as to be directly fastened to the roof trusses, the bottom chords of the trusses installed in the Home are not engineered for a bottom chord point load to accommodate the weight heavier fixtures. Purchaser further acknowledges that should Purchaser install any fixture for which the junction box or trusses are not designed, then leaks, cracked drywall and other damage may occur.

**N.** Electric for Future Spa and/or Pool.
    **1.** **Description of Option.** Purchaser acknowledges and agrees that the option includes the following:
    For pre-wire for a future spa and pool:
- one (1) wall mounted 100 amp electrical service panel located on an exterior wall near the air conditioning condensing equipment;
- one (1) 100 amp breaker dedicated for the future spa and pool inside the main electrical service panel of the Home
- minimum 3 gauge wire connecting the service panel to the 100 amp breaker inside the main electrical service panel; and
- one (1) switch located on an interior wall for a future spa and/or pool light
For pre-wire for a future spa or pool:
- one (1) sub-panel located on an exterior wall near the rear of the home and on the same side as the main electrical service panel, unless otherwise specified;
- one 60 amp breaker dedicated for the future spa or pool and
- one (1) switch located on an interior wall for a future spa and/or pool light.
Upgraded electrical service for the Home (on select models only) may be required at an additional cost.

    **2.** **Locations.** Purchaser acknowledges and agrees that Seller is responsible for selecting the location of the service panel or disconnect box, switch and junction box and that Purchaser may have the opportunity to locate only the switch. In planning these locations, Purchaser acknowledges and agrees that the GFI outlet provided by Seller on the rear of the Home can be no closer than ten feet (10') to, nor more than twenty feet (20') from, the spa and pool. Purchaser further acknowledges and agrees that a light adjacent to a door on the rear of the Home, a ceiling fan outlet or other ceiling outlet cannot be within five feet (5') of the spa and pool. Nothing contained in this paragraph shall relieve Purchaser of the obligation to meet all applicable codes, ordinances and regulations pertaining to the installation of the spa and/or pool upon the Lot.

**O.** **Electrical Upgrades.** Purchaser acknowledges and agrees that the purchase of such electrical options and upgrades may increase the electrical load of the Home to a level that may require the electrical service of the Home be upgraded from its designed level. If such an upgrade in electrical service is required, Purchaser acknowledges and agrees that Purchaser shall bear the cost of such an upgrade. Purchaser further acknowledges and agrees that the determination of whether an upgrade in electrical service is required may not occur until the permit for the Home has been received or after construction of the Home has commenced and proceeded through electrical inspections.

**P.** **Front Door Hardware.** Purchaser acknowledges that Seller has agreed to install a brass front door handle set as a standard feature in the Home. Purchaser further acknowledges and agrees that the lifetime finish warranty on the polished brass finish is provided directly from the manufacturer and not from Seller. Furthermore, Purchaser acknowledges that the warranty covers pitting and tarnishing but not scratching or any pitting and tarnishing which may occur from scratching. The lifetime finish warranty only applies to the bright brass finish.

**Q.** **Solid Surfaces.** Purchaser acknowledges the following inherent characteristics with respect to the solid surface materials (the "Solid Surface Inherent Characteristics"):
- Solid surface materials are products of nature (other than Corian) and will, experience variations in color, shading, veining, marking, pattern and tone. Corian will also show scratches and burns. In addition, wide variations will exist between individual squares of solid surface materials and from samples as demonstrated in Seller's color selection showroom.
- Granite slabs come in varying lengths. There may be seams in a countertop different from the seams shown in models due to the varying length of granite slabs. At seams, where the granite countertops are going in different directions, a difference in color and/or pattern may appear.
- Fillers are used in the preparation and installation of solid surface materials.
- Fine, hairline cracks occur in all solid surface materials and will be more visible in some slabs. Such cracking is not indicative of defects in the material.
- Polished solid surface materials will show scratches.
- Solid surface materials (including Corian) are subject to staining.
- Solid surface materials (including Corian) are susceptible to damage by strong chemicals including, but not limited to, paint removers, oven cleaners, metal cleaners, acetone nail polish removers and acid drain cleaners.

Purchaser acknowledges and agrees that neither Seller nor the installer of solid surface materials warrants the solid surface materials with respect to the Solid Surface Inherent Characteristics set forth above. Furthermore, Purchaser agrees not to include any

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC      Initial _____ _____

**GRIFFIN**
**0029**

DGRIFFIN - 000149

Case 2:09-md-02047-EEF-MBN Document 22380-46 Filed 12/02/19 Page 130 of 133
Case 1:11-cv-22408-MGC Document 270 Entered on FLSD Docket 08/15/2013 Page 151 of 222
Page 28 of 35

item arising out of or pertaining to the existence of the Solid Surface Inherent Characteristics on the Inspection List or on any customer service requests submitted by Purchaser to Seller subsequent to closing.

**R.     Cultured Marble.** Purchaser acknowledges that Seller has agreed to install cultured marble countertops as a standard feature in the Home. Purchaser acknowledges and agrees that the swirling intensity, colors and shading will vary from samples in Seller's color selection showroom, and Purchaser further acknowledges that light scratches are inherent in cultured marble countertops. Purchaser hereby agrees to accept the cultured marble countertops notwithstanding the extent of swirling intensity or color variation from Seller's samples, and/or the presence of light scratches. Furthermore, Purchaser agrees not to include any item pertaining to scratching, swirling intensity or color variation on the Inspection List. Purchaser additionally agrees not to include any item pertaining to scratching, swirling intensity or color variation on any customer service requests submitted by Purchaser subsequent to closing.

**S.     Black Cast Iron Enamel Sinks.** Black cast iron enamel sinks are extremely susceptible to scratching, will show water spots and are subject to staining. Purchaser should carefully inspect black cast iron enamel sinks for scratches prior to closing. Purchaser acknowledges that light scratches are inherent in black cast iron enamel sinks and therefore agrees to accept the black cast iron enamel sinks notwithstanding the presence of light scratches. Furthermore, Purchaser agrees not to include any item pertaining to light scratches on the Inspection List. Purchaser additionally agrees not to include any item arising out of or pertaining to the existence of scratches, water spots and/or stains on any customer service requests submitted by Purchaser to Seller subsequent to closing.

**T.     Stair Components.** If the Home is a two-story floor plan, Purchaser hereby acknowledges and agrees that imperfections may exist in the wood stair components, including, but not limited to, shade variations, inconsistent grain patterns, knots, cracks, chips and dark or light spots. Purchaser further acknowledges and agrees that the stair components may include knots and/or shade variation within a component or between various components, and may not accept stain with the same consistency. Purchaser hereby agrees to accept the stair components in an "as is" condition with no substitutions, regardless of the degree of imperfection. Purchase also acknowledges and agrees that Purchaser has viewed the sample pickets in Seller's Design Center.

**U.     Lake Pumps.** Purchaser acknowledges and agrees that Seller may agree to install a sprinkler pump from the lake ("Lake Pump") as a standard feature in the Home. For purposes of this section, a lake lot is defined as any lot which is immediately adjacent to a lake maintenance easement. Purchaser acknowledges and agrees that the Lake Pump may include a check valve, lake screen and stain tank. Purchaser further acknowledges and agrees that the water drawn from the lake may contain iron, residue from fertilizers and other chemical compounds and impurities and that the inclusion of a stain tank does not guarantee that effective stain control will occur. Furthermore, Purchase acknowledges and agrees that it shall be the responsibility of Purchaser to maintain the stain tank and keep it filled with chemicals.

**V.     Glass/Mirror.** Purchaser acknowledges and agrees that such glass and/or mirror may have any of the following inherent characteristics ("Glass/Mirror Inherent Characteristics"): bubbles, slight discolorations, blurs and/or hairline scratches. These are to be expected as they are inherent qualities of glass and mirror that meet or exceed American Society for Testing Materials (ASTM) Standard Specifications for Flat Glass C1036. Purchasers should carefully inspect glass and mirrors for scratches prior to Closing that are not in accordance with the foregoing. The standard set forth for inspection of glass shall be as follows: When looking through the glass, standing perpendicular to it using daylight without direct sunlight, a scratch should not be visible at a distance greater than 3 feet. Purchaser agrees that Purchaser shall not include any item pertaining to the Glass/Mirror Inherent Characteristics on the Inspection List or on any customer service requests submitted by Purchaser to Seller subsequent to closing. In addition, Purchaser acknowledges and agrees that no scratch, even if it does not meet the above standard, shall be included on any customer service requests submitted by Purchaser to seller subsequent to Closing.

**W.     Impact Resistant Glass.** Purchaser acknowledges and agrees that the impact resistant glass is susceptible to scratches and shall be different in appearance than any other windows in the home which have not been glazed with impact resistant glass. Purchaser agrees that scratches to impact resistant glass, other than those obvious to the naked eye during normal observation, shall not be included on the Inspection List (as that term is defined in the Contract). Additionally, Purchaser agrees not to include any scratches on impact resistant glass on any customer service requests submitted by Purchaser subsequent to closing.

**X.     Drywall Finish.** Purchaser acknowledges and agrees that: (a) orange peel finish is a light, textured wall finish; (b) the texture of orange peel finish may vary in appearance across the wall and (c) certain characteristics inherent in drywall work such as seams, tape joints, fasteners, surface irregularities and patching required during the normal course of construction may be apparent with orange peel finish. Purchaser further acknowledges that orange peel finish characteristics may be particularly apparent and even highlighted or exaggerated in critical lighting conditions where there is strong side lighting from windows or surface-mounted light fixtures such as wall and ceiling areas abutting window frames, long hallways, or atrium areas flooded with artificial and/or natural lighting. Purchaser agrees not to include on the Inspection List or any customer service requests submitted by Purchaser subsequent to the closing any item pertaining to minor surface imperfections (such as joints or fasteners or the shadowing of finished joint areas, which are visible through the orange peel finish.

**Y.     Air Handler Units in Garage.**
    **1. Garage Installed Air Handler Consequences.** If the Home contains the air handler unit or units for the air conditioning system installed in the garage ("the Garage-Installed Air Handlers"), either because the Garage-Installed Air Handlers are a standard feature of the Home or because Seller offers the Garage-Installed Air Handlers as a Garage Option and Purchaser has agreed to purchase such Garage Option, then Purchaser acknowledges and agrees that the air handlers are not located within air conditioned space. Purchaser further acknowledges and agrees that installation of the air handlers in non-air conditioned space may result in one or more "Garage-Installed Air Handler Consequences" including, by way of example and not limitation, the following:
*   Consequences pertaining to or arising out of sweating of, or condensation occurring on or around, the air handler units and/or the refrigerant or condensate lines attached to the air handler units.
*   Consequences pertaining to or arising out of rusting of the air handler units.
*   Consequences pertaining to or arising out of mold and/or mildew of the air handler units and/or the structures supporting the air handler units.
*   Consequences pertaining to or arising out of rotting and/or decay of the air handler units and/or the structures supporting the air handler units.

U:\lan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC                    Initial ___ODB___   ___DG___

GRIFFIN
0030
DGRIFFIN - 000150

- Consequences pertaining to or arising out of Purchaser being required to maintain air handler units located high on a wall or in a ceiling area, including, but not limited to, the changing of the air filters by use of a ladder.
- Garage Option Consequences, including, without limitation, vehicles may be unable to fit in the garage.

   **2. Acceptance.** Purchaser agrees to accept the Garage-Installed Air Handlers as constructed notwithstanding the existence of Garage-Installed Air Handler Consequences. Furthermore, Purchaser agrees not to include any item arising out of or pertaining to the existence of Garage-Installed Air Handler Consequences on the Inspection List or on any customer service requests submitted by Purchaser subsequent to closing.

   **3. Required Maintenance.** Purchaser agrees to: (a) maintain and operate the air handler units in accordance with the Homeowner Manual received by Purchaser at closing (including, without limitation having the air handler units and the rest of the air conditioning system serviced annually by a licensed air conditioning contractor); and (b) check for and remove (in accordance with the Indoor Air Quality Addendum executed by Purchaser in connection with the Contract) any excess moisture which may arise out of the sweating of the air handler units and any mold and/or mildew which may arise in the air handler units and/or the structures supporting the air handler units.

**Z.      Structured Wiring/High Speed Internet.** Purchaser acknowledges that Seller has agreed to install structured wiring as a standard feature in the Home. Purchaser further acknowledges and agrees that the Category 5 cable that is part of the structured wiring which supports telephone services. There is a certification of the wiring and outlets available for purchase to certify compliance with Category 5 minimum specifications if Purchaser plans on using (or in the future expects that they may use) features other than just voice services, such as data transfer or networking of computers. Although this cable may also be used for data applications, Seller does not and will not certify or guarantee transmission speeds or that the cable will perform at Category 5 specifications. Although Category 5 specification capabilities are not necessary to support voice telephone services, Purchaser may have the certification performed at an additional charge if requested during and as part of the Color Selection Process. If not so requested, no such certification will be performed.

   Purchaser further acknowledges and agrees that high-speed internet access through digital subscriber lines (DSL), cable modems or other technologies are subject to availability by various third party service providers, and may not be available at all at this time in the Community. Because of the rapidly changing nature of technology, Purchaser should contact the various service providers to find out the availability of such high-speed internet access alternatives in the Community. Seller has not made and will not make any representations as to if or when high-speed internet access and/or other data and communication services will be available in the Community.

   The provisions of this Addendum shall survive the closing. All of the terms and conditions of the Purchase Contract and Standard Provisions attached thereto remain in full force and effect, unless specifically modified herein.

Executed this day and year written below.

**PURCHASER(S):**

_____          _1-31-05_
                                   DATE

_Diane Griffin_                    _1-31-05_
                                   DATE

**SELLER:**

NORTHSTAR HOLDINGS AT B AND A, LLC

By: _____      _2/1/05_
   Authorized Signatory             DATE

U:\lan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC          Initial _DDG_  _DG_

GRIFFIN
0031

DGRIFFIN - 000151

Case 2:09-md-02047-EEF-MBN Document 22380-46 Filed 12/02/19 Page 132 of 133
Case 1:11-cv-22408-MGC Document 270 Entered on FLSD Docket 08/15/2013 Page 153 of 222
Page 30 of 35



## COBBLESTONE
## · C R E E K ·

### NOTICE OF RESIDENTIAL SWIMMING POOL SAFETY ACT

The undersigned Purchaser is hereby notified that effective October 1, 2000, the Preston de Ibern/McKenzie Merriam Residential Swimming Pool Safety Act, Chapter 515, Florida Statutes (the "Act"), went into effect. The Act was enacted by the legislature as a result of, among other things, their findings that swimming pools are the leading cause of death for young children and significant cause of death for those 65 years and older. The Act sets forth certain pool safety feature and disclosure requirements regarding drowning prevention and pool ownership.

All new residential swimming pools, spas, and hot tubs must be equipped with at least one pool safety feature as specified the Act, designed to deny, delay or detect unsupervised entry in to a swimming pool, spa or hot tub, in order to reduce drowning a near-drowning incidents.

The Act also requires that the State of Florida Department of Health be responsible for producing its own or adopting nationally recognized publication that provides the public with information on drowning prevention and the responsibilities of pool ownership and also for developing its own or adopting a nationally recognized drowning prevention education program for the public and for persons violating the requirements of the Act. As of the date hereof, no publication has been prepared or adopted, but at the recommendation of the State of Florida Department of Health, Seller has delivered to Purchaser, and Purchaser hereby acknowledges receipt of a copy of the United States Consumer Product Safety Commission publication entitled "Safety Barrier Guidelines for Home Pools" which provides information on drowning prevention and the responsibilities of pool ownership. The following are such provisions of the Act:

**Definitions:** (a) "Approved safety pool cover" means a manually or power operated safety pool cover that meets all of the performance standards of the American Society for Testing and Materials (ASTM) in compliance with standard F1346-91; (b) "Barrier" means fence, dwelling wall, or non-dwelling wall, or any combination thereof, which completely surrounds the swimming pool and obstructs access to the swimming pool, especially access from the residence or from the yard outside the barrier; and (c) "Exit alarm" means device that makes audible, continuous alarm sounds when any door or window which permits access from the residence to any pool area that is without an intervening enclosure is opened or left ajar.

**515.27 Residential swimming pool safety feature options; penalties.** (1) In order to pass final inspection and receive a certificate completion, a residential swimming pool must meet at least one of the following requirements relating to pool safety features:
    (a)    The pool must be isolated from access to a home by an enclosure that meets the pool barrier requirements of 515.29;
    (b)    The pool must be equipped with an approved safety pool cover;
    (c)    All doors and windows providing direct access from the home to the pool must be equipped with an exit alarm that has a minimum sound pressure rating of 85 dB A at 10 feet; or
    (d)    All doors providing direct access from the home to the pool must be equipped with a self-closing, self-latching device with a release mechanism placed no lower than 54 inches above the floor.
(2) A person who fails to equip a new residential swimming pool with at least one pool safety device feature as required in subsection (1) commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083, except that no penalty shall be imposed if the person, within 45 days after arrest or issuance of a summons or a notice to appear, has equipped the pool with at least one safety feature as required in subsection (1) and has attended a drowning prevention education program established by s. 515.31. However, the requirement of attending a drowning prevention education program waived if such program is not offered within 45 days after issuance of the citation.

**515.29 Residential swimming pool barrier requirements.** (1) A residential swimming pool barrier must have all of the following characteristics:
    (a)    The barrier must be at least 4 feet high on the outside.
    (b)    The barrier may not have any gaps, openings, indentations, protrusions, or structural components that could allow young child to crawl under, squeeze through, or climb over the barrier.
    (c)    The barrier must be placed around the perimeter of the pool and must be separate from any fence, wall, or other enclosure surrounding the yard unless the fence, wall or other enclosure or portion thereof is situated on the perimeter of the pool, is being used as part of the barrier, and meets the barrier requirements of this section.
    (d)    The barrier must be placed sufficiently away from the water's edge to prevent a young child or medically frail elder person who may have managed to penetrate the barrier from immediately falling into the water.
(3) Gates that provide access to swimming pools must open outwards away from the pool and be self-closing and equipped with self-latching locking device, the release mechanism of which must be located on the pool side of the gate and so placed that it cannot be reached by a young child over the top or through any opening or gap. (4) A wall of a dwelling may serve as part of the barrier if it does not contain any door or window that opens to provide access to the swimming pool. (5) A barrier may not be located in a way that allows any permanent structure, equipment, or similar object to be used for climbing the barrier.

**515.31 Drowning prevention education program; public information publication.** (1) The Department of Health shall develop a drowning prevention education program, which shall be made available to the public at the state and local levels and which shall be required as set forth in s. 515.27(2) for person in violation of the pool safety requirements of this chapter. The department may charge a fee, not to exceed $100, for attendance at such a program. The drowning prevention education program shall be funded using fee proceeds, state funds appropriated for such purpose, and grants. The department, in lieu of developing its own program, may adopt a nationally recognized drowning prevention education program to be approved for use in local safety education programs, as provided in rule of the department. (2) The department shall also produce for distribution to the public at no charge, a publication that provides information on drowning prevention and the responsibilities of pool ownership. The department, in lieu of developing its own publication, may adopt a nationally recognized drowning prevention and responsibilities of pool ownership publication, as provided in rule of the department.

**THE UNDERSIGNED PURCHASER HEREBY ACKNOWLEDGES THAT THIS DISCLOSURE WAS PROVIDED TO PURCHASER IN ACCORDANCE WITH THE ACT.**

Purchaser: _(signature)_          Date: _1-31-05_

Purchaser: _Diane Griffin_          Date: _1-31-05_

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC          Initial _DDL_    _D.G._

**GRIFFIN
0032**

DGRIFFIN - 000152

Case 2:09-md-02047-EEF-MBN Document 22380-46 Filed 12/02/19 Page 133 of 133
Case 1:11-cv-22408-MGC Document 276 Entered on FLSD Docket 09/15/2011 Page 154 of 222

Page 31 of 35



**ADDENDUM TO PURCHASE CONTRACT**
**NOTICE REGARDING CONSTRUCTION DEFECT CLAIMS**

This Addendum to Purchase Contract (the "Addendum") is executed in conjunction with and, by this reference, incorporated into the Purchase and Sale Agreement between m/m GRIFFIN ("Purchaser"), and NORTHSTAR HOLDINGS AT B AND A, LLC ("Seller"), for Lot #120, Block 2, Model FAIRFAX (the "Purchase Contract").

In the event that Purchaser alleges any construction defect against Seller (or any contractor, subcontractor, supplier, or design professional), before filing a lawsuit against Seller (or any contractor, subcontractor, supplier, or design professional) certain deadlines and procedures must first be followed pursuant to Florida law. In that regard, pursuant to Florida law, Seller is required to provide the following notice to Purchaser:

FLORIDA LAW CONTAINS IMPORTANT REQUIREMENTS YOU (PURCHASER) MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME, SIXTY (60) DAYS BEFORE YOU (PURCHASER) FILE YOUR LAWSUIT, YOU (PURCHASER) MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU (PURCHASER) ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU (PURCHASER) ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.

Purchaser hereby acknowledges having received, read and understood such notice.

Purchaser: _____ Date: 1·31·05
Purchaser: _____ Date: 1·31·05

GRIFFIN
0033
DGRIFFIN - 000153