# EXHIBIT 32 part 4

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

CPB0006228787

VMP®-57R (0411)                Page 2 of 3          Initials: _____        Form 3170 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)
DAVID DERRICK GRIFFIN          -Borrower

_____ (Seal)
DIANE GRIFFIN          -Borrower

_____ (Seal)
          -Borrower

_____ (Seal)
          -Borrower

_____ (Seal)
          -Borrower

_____ (Seal)
          -Borrower

_____ (Seal)
          -Borrower

_____ (Seal)
          -Borrower

VMP ®-57R (0411)          Page 3 of 3

CPB0006228787

Form 3170 1/01

Return To:
ADORNO & YOSS

350 EAST OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

This is not a certified copy

Return To:
ADORNO & YOSS

350 EAST OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

# ADJUSTABLE RATE RIDER
(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **6TH** day of **OCTOBER**     , 2006   ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
**COLONIAL BANK, N.A.**

("Lender") of the same date and covering the property described in the Security Instrument
and located at:

9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:
**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of     **7.3750** %. The Note provides for
changes in the interest rate and the monthly payments, as follows:
**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the **1ST** day of **NOVEMBER**     , 2011   ,
and on that day every **6TH** month thereafter. Each date on which my interest rate
could change is called a "Change Date."

CPB0006228787

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *The Wall Street Journal*) - Single Family - **Fannie Mae Uniform Instrument**
®-838R (0402)          Page 1 of 4          Form 3138 1/01
VMP Mortgage Solutions, Inc. (800)521-7291          Initials: _DG_

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO & ONE-QUARTER percentage points ( 2.2500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 13.3750 % or less than 2.2500 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO percentage points ( 2.0000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.3750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

    **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

    To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

    If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CPB0006228787

VMP®-838R (0402)        Page 3 of 4        Form 3138 1/01

DGRIFFIN - 000627
Page 26 of 31

Book20948/Page1457

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)        _____ (Seal)
DAVID DERRICK GRIFFIN       -Borrower    DIANE GRIFFIN              -Borrower

_____ (Seal)        _____ (Seal)
                            -Borrower                              -Borrower

_____ (Seal)        _____ (Seal)
                            -Borrower                              -Borrower

_____ (Seal)        _____ (Seal)
                            -Borrower                              -Borrower

CPB0006228787

VMP-838R (0402)                    Page 4 of 4                    Form 3138 1/01

This is not a certified copy

# ADDENDUM TO ADJUSTABLE RATE RIDER

THIS ADDENDUM is made **OCTOBER 06, 2006**, and is incorporated into and deemed to amend and supplement the Adjustable Rate Rider of the same date.

The property covered by this addendum is described in the Security Instrument and located at:

**9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437**
[Property Address]

**AMENDED PROVISIONS**

In addition to the provisions and agreements made in the Security Instrument, I/we further covenant and agree as follows:

**ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **13.3750** % or less than **2.2500** %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage point(s) ( **2.0000** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **13.3750** %. My interest rate will never be less than **2.2500** %.

**TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CPB0006228787
1202 LIBOR Addendum to Rider 1/01

JAUR01R (08/05)          Page 1 of 2          Initials:

This is not a certified copy

In Witness Thereof, Trustor has executed this addendum.

Date October 6, 2006

_____ (Seal)
DAVID DERRICK GRIFFIN          -Borrower

_____ (Seal)
DIANE GRIFFIN                  -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

CPB0006228787

JAUR01R (08/05)                    Page 2 of 2

Return To:
ADORNO & YOSS

350 EAST OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

DGRIFFIN - 000630
Page 29 of 31



## INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE RIDER

Loan Number: CPB0006228787

Property Address:
9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437

THIS ADDENDUM is made this 6TH day of OCTOBER , 2006 , and is incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date as this Addendum executed by the undersigned and payable to
COLONIAL BANK, N.A.

(the Lender).

THIS ADDENDUM supersedes Section 4(C) of the Rider. None of the other provisions of the Note are changed by this Addendum.

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(C) Calculations of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO & ONE-QUARTER percentage points ( 2.2500 %) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance.

CPB0006228787

Initials:
Form 603F 1/01

JALSIOR (12/02)          Page 1 of 2

This is the Certified Copy

At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The results of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Interest-Only Addendum to Adjustable Rate Rider.

Date: _October 6, 2006_

_____ (Seal)
DAVID DERRICK GRIFFIN          -Borrower

_____ (Seal)
DIANE GRIFFIN                  -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

CPB0006228787

JALSIOR (12/02)              Page 2 of 2              Form 603F 1/01

Return To:
ADORNO & YOSS

350 EAST OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

DGRIFFIN - 000632

CFN 20060576395
OR BK 20948 PG 1463
RECORDED 10/11/2006 10:38:03
Palm Beach County, Florida
AMT 73,154.00
Deed Doc 256.20
Intang 146.31
Sharon R. Bock,CLERK & COMPTROLLER
Pgs 1463 - 1476; (14pgs)

Return To:
ADORNO & YOSS

350 EAST LAS OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

This instrument was prepared by:

COLONIAL BANK
400 N. TAMPA STREET
TAMPA, FL 33602
813-314-3100

## MORTGAGE

MIN 1000675-0006228811-0

THIS MORTGAGE is made this 6TH day of OCTOBER , 2006 , between the Mortgagor,
DAVID DERRICK GRIFFIN, A MARRIED MAN

JOINED HEREIN BY DIANE GRIFFIN

, whose address is
1200 SE ATLANTIC AVE., LANTANA, FLORIDA 33462
(herein "Borrower"), and the Mortgagee, Mortgage Electronic Registration Systems, Inc. ("MERS"), (solely as nominee for
Lender, as hereinafter defined, and Lender's successors and assigns). MERS is organized and existing under the laws of
Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
COLONIAL BANK, N.A.
("Lender") is organized and existing under the laws of THE UNITED STATES OF AMERICA , and has an address of
32 COMMERCE STREET, MONTGOMERY, AL 36104 .

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. $73,154.00 which indebtedness is
evidenced by Borrower's note dated OCTOBER 06, 2006 and extensions and renewals thereof (herein "Note"),
providing for monthly installments of principal and interest, with the balance of the indebtedness, if not sooner paid, due and
payable on NOVEMBER 01, 2036 ;

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all
other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and the
performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey
to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the
following described property located in the County of PALM BEACH , State of Florida:
SEE ATTACHED EXHIBIT A

which has the address of 9801 COBBLESTONE LAKES COURT                                                    [Street]
BOYNTON BEACH                          [City], Florida 33437         [ZIP Code] (herein "Property Address");

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances
and rents, all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the
foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as
the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this
Mortgage; but, if necessary to comply with law or custom, MERS, (as nominee for Lender and Lender's successors and
assigns), has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the
Property; and to take any action required of Lender including, but not limited to, releasing or canceling this Mortgage.

CPB0006228811

FLORIDA - SECOND MORTGAGE - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT WITH MERS

VMP -76N(FL) (0307)

Page 1 of 5
VMP Mortgage Solutions, Inc. (800)521-7291

Initials:

Form 3810
Amended 2/01

DGRIFFIN - 000633

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest.** Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessments, if any), which may attain priority over this Mortgage and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender.

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Mortgage that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Mortgage.

If the amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Mortgage, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Mortgage.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.

**4. Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

**5. Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require and in such amounts and for such periods as Lender may require.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.

**6. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

-76N(FL) (0307)

Page 2 of 5

Initials: _____

CPB0006228811
Form 3810

DGRIFFIN - 000634

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Mortgage, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

**8. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Mortgage, but does not execute the Note, (a) is co-signing this Mortgage only to mortgage, grant and convey that Borrower's interest in the Property to Lender under the terms of this Mortgage, (b) is not personally liable on the Note or under this Mortgage, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Mortgage or the Note without that Borrower's consent and without releasing that Borrower or modifying this Mortgage as to that Borrower's interest in the Property.

**12. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**13. Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein, "costs," "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

**14. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and of this Mortgage at the time of execution or after recordation hereof.

**15. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

**16. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Mortgage. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Mortgage.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Mortgage. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Mortgage without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

17. **Acceleration; Remedies.** Except as provided in paragraph 16 hereof, upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Lender prior to acceleration shall give notice to Borrower as provided in paragraph 12 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 10 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, foreclosure by judicial proceeding, and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding. Lender shall be entitled to collect in such proceeding all expenses of foreclosure, including, but not limited to, reasonable attorneys' fees, court costs, and costs of documentary evidence, abstracts and title reports.

18. **Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Mortgage due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued at any time prior to entry of a judgment enforcing this Mortgage if: (a) Borrower pays Lender all sums which would be then due under this Mortgage and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage, and in enforcing Lender's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees and court costs; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

19. **Assignment of Rents; Appointment of Receiver.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender shall be entitled to have a receiver appointed by a court to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Mortgage. The receiver shall be liable to account only for those rents actually received.

20. **Release.** Upon payment of all sums secured by this Mortgage, Lender shall release this Mortgage without charge to Borrower. Borrower shall pay all costs of recordation, if any.

21. **Attorneys' Fees.** As used in this Mortgage and in the Note, "attorneys' fees" shall include attorneys' fees, if any, which may be awarded by an appellate court.

22. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.

[Check applicable box(es)]

☒ Subordination Rider
☒ Planned Unit Development Rider
☐ Condominium Rider
☒ 1-4 FAMILY RIDER

DGRIFFIN - 000636

## REQUEST FOR NOTICE OF DEFAULT AND FORECLOSURE UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

IN WITNESS WHEREOF, Borrower has executed this Mortgage.

### NOTICE TO BORROWER

Do not sign this Mortgage if it contains blank spaces. All spaces should be completed before you sign.

Signed, sealed and delivered in the presence of:

(Witness) _____ Daniel P. Wurtenberger

_____ (Seal)
DAVID DERRICK GRIFFIN -Borrower

1200 SE ATLANTIC AVE.
LANTANA, FLORIDA 33462 (Address)

(Witness) _____ Beverly A. Berard

_____ (Seal)
DIANE GRIFFIN -Borrower

_____ (Address)

_____ (Seal) -Borrower
_____ (Address)

_____ (Seal) -Borrower
_____ (Address)

_____ (Seal) -Borrower
_____ (Address)

_____ (Seal) -Borrower
_____ (Address)

_____ (Seal) -Borrower
_____ (Address)

_____ (Seal) -Borrower
_____ (Address)

STATE OF FLORIDA, PALM Beach County ss:

The foregoing instrument was acknowledged before me this October 6, 2006 by DAVID DERRICK GRIFFIN AND DIANE GRIFFIN

who is personally known to me or who has produced FL Drivers Licenses as identification.

DANIEL P. WURTENBERGER
MY COMMISSION # DD 542708
EXPIRES: June 23, 2010
Bonded Thru Budget Notary Services

_____ Notary Public

VMP -76N(FL) (0307)    Page 5 of 5

CPB0006228811
Form 3810

DGRIFFIN - 000637

# Exhibit A

Lot 120, Block 2, COUNTRYSIDE MEADOWS REPLAT, according to the Plat thereof, as recorded in Plat Book 104, Page 12, of the Public Records of Palm Beach County, Florida.

Parcel Identification Number: 00-42-45-20-05-002-1200

This is not a certified copy

File Number: **212080.0009a**

DoubleTime

DGRIFFIN 000638



Return To:
ADORNO & YOSS

350 EAST LAS OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **6TH** day of **OCTOBER** , 2006 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Note to

COLONIAL BANK, N.A.

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at:

9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter
attached to the Property to the extent they are fixtures are added to the Property description,
and shall also constitute the Property covered by the Security Instrument: building materials,
appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or
intended to be used in connection with the Property, including, but not limited to, those for
the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light,
fire prevention and extinguishing apparatus, security and access control apparatus, plumbing,
bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers,
disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades,
curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain
a part of the Property covered by the Security Instrument. All of the foregoing together with
the Property described in the Security Instrument (or the leasehold estate if the Security
Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security
Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or
make a change in the use of the Property or its zoning classification, unless Lender has
agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations
and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow
any lien inferior to the Security Instrument to be perfected against the Property without
Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in
addition to the other hazards for which insurance is required by Section entitled "Hazard
Insurance" of the Security Instrument.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section entitled "Borrower's Right
to Reinstate" of the Security Instrument is deleted.

CPB0006228811

MULTISTATE 1- 4 FAMILY RIDER - Second Mortgage
1057BR (09/04) Page 1 of 3 Initials: _____ Modified Form 3170 1/01



**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Borrower's occupancy of the Property is not required.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section entitled "Acceleration; Remedies" of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section entitled "Protection of Lender's Security" of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

CPB0006228811

1057BR (09/04)                 Page 2 of 3      Initials: _____  Modified Form 3170 1/01

DGRIFFIN - 000640

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)
DAVID DERRICK GRIFFIN    -Borrower

_____ (Seal)
DIANE GRIFFIN            -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

CPB0006228811

1057BR (09/04)            Page 3 of 3            Modified Form 3170 1/01

DGRIFFIN - 000641



# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **6TH** day of **OCTOBER** , **2005** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **COLONIAL BANK, N.A.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437**
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in **DECLARATIONS, COVENANTS, CONDITIONS AND RESTRICTIONS**

(the "Declaration"). The Property is a part of a planned unit development known as

**COBBLESTONE CREEK**
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

CPB0006228811

**MULTISTATE PUD RIDER** - Single Family/Second Mortgage                 3/99
Page 1 of 3
⊗-207R (0411)          VMP Mortgage Solutions, Inc. (800)521-7291          Initials:

DGRIFFIN - 000642



**B. Hazard Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Uniform Covenant 2 for the monthly payment to Lender of the yearly premium installments for hazard insurance on the Property; and (ii) Borrower's obligation under Uniform Covenant 5 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage provided by the master or blanket policy.

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Uniform Covenant 9.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

CPB0006228811

-207R (0411)            Page 2 of 3            Initials:            3/99

DGRIFFIN - 000643



**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)          _____ (Seal)
DAVID DERRICK GRIFFIN        -Borrower          DIANE GRIFFIN        -Borrower

_____ (Seal)          _____ (Seal)
                             -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                             -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                             -Borrower                               -Borrower

CPB0006228811

VMP®-207R (0411)                    Page 3 of 3                    3/99

Return To:
ADORNO & YOSS

350 EAST LAS OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

DGRIFFIN - 000644



# SUBORDINATION RIDER

THIS SUBORDINATION RIDER is made this **6TH** day of **OCTOBER** ,2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **COLONIAL BANK, N.A.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437**
[Property Address]

The lien of this Security Instrument is subject, junior and subordinate to that certain Security Instrument dated **OCTOBER 06, 2006** to **COLONIAL BANK** , recorded in Real Property Records, **PALM BEACH** County, **FLORIDA** , securing a certain Promissory Note, of even date therewith in the original principal amount of $ **585,235.00** executed by **DAVID DERRICK GRIFFIN, A MARRIED MAN**

and payable to the order of **COLONIAL BANK**

CPB0006228811

JSUBR (05/01)                    Page 1 of 2                    Initials:

DGRIFFIN - 000645

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Subordination Rider.

_____ (Seal)          _____ (Seal)
DAVID DERRICK GRIFFIN    -Borrower       DIANE GRIFFIN            -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                               -Borrower

CPB0006228811

JSUBR (05/01)                Page 2 of 2
Return To:
ADORNO & YOSS

350 EAST LAS OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

This is not a certified copy

DGRIFFIN - 000646

EXHIBIT D8

# A. Settlement Statement

U.S. Department of Housing
and Urban Development

OMB No. 2502-0265

| B. Type of Loan | | |
|---|---|---|
| 1.☐ FHA    2.☐ RHS    3.☒ Conv. Unins. | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number |
| 4.☐ VA    5.☐ Conv. Ins. | | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for information purposes and are not included in the totals.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| JOSE F. MIRANDA<br>8890 SW 229 STREET<br>MIAMI, FLORIDA 33190 | PRIDE HOMES OF LAKES BY THE BAY ·<br>PARCEL H, LLC.<br>12448 SW 127TH AVENUE<br>MIAMI, FLORIDA 33186 | WELLS FARGO BANK, N.A.<br>11401 S.W. 40TH STREET #401<br>MIAMI, FLORIDA 33165 |

| G. Property Location | H. Settlement Agent | |
|---|---|---|
| 8890 SW 229 STREET<br>MIAMI, FLORIDA 33190 | TITLE COMPANY OF AMERICA, INC. | |
| LOT 2, BLOCK 8, THE TRELLIS AT BAYSHORE<br>DADE COUNTY, FLORIDA | Place of Settlement<br>5835 BLUE LAGOON DRIVE #200<br>MIAMI, FLORIDA 33126 | I. Settlement Date<br>01/22/07 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER | | 400. GROSS AMOUNT DUE TO SELLER | |
| 101. Contract sales price | 302,790.00 | 401. Contract sales price | 302,790.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 13,096.14 | 403. | |
| 104. IMPACT/SURVEY/WATER METER FEES | 2,550.00 | 404. IMPACT/SURVEY/WATER METER FEES | 2,550.00 |
| 105. CDD TAX (2006 - 2007) | 487.82 | 405. CDD TAX (2006 - 2007) | 487.82 |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes      to | | 406. City/town taxes      to | |
| 107. County taxes      to | | 407. County taxes      to | |
| 108. Assessments      to | | 408. Assessments      to | |
| 109. CAPITAL CONTRIBUTION (MAINTENANCE) | 121.70 | 409. | |
| 110. CAPITAL CONTRIBUTION (MASTER) | 98.50 | 410. CAPITAL CONTRIBUTION (MASTER) | 98.50 |
| 111. CAPITAL CONTRIBUTION (CLUB HOUSE) | 120.00 | 411. | |
| 112. MAINTENANCE (1/22 - 2/28/07)(MAINTENANCE) | 77.14 | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 319,341.30 | 420. GROSS AMOUNT DUE TO SELLER | 305,926.32 |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT TO SELLER | |
| 201. Deposit or earnest money | 30,200.00 | 501. Excess Deposit (see instructions) | 30,200.00 |
| 202. Principal amount of new loan(s) | 272,511.00 | 502. Settlement charges to seller (line 1400) | 33.33 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | 220,019.00 |
| | | OCEAN BANK | |
| 205. | | 505. Payoff of second mortgage loan | |
| | | | |
| 206. | | 506. BOND BUILDERS HOME WARRANTY | 226.49 |
| 207. LENDER'S CREDIT | 1,000.00 | 507. | |
| 208. SELLERS CREDIT TOWARDS CLOSING COSTS | 4,000.00 | 508. SELLERS CREDIT TOWARDS CLOSING COSTS | 4,000.00 |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes      to | | 510. City/town taxes      to | |
| 211. County taxes    01/01 to 01/22 | 73.81 | 511. County taxes    01/01 to 01/22 | 73.81 |
| 212. Assessments      to | | 512. Assessments      to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY / FOR BORROWER | 307,784.81 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | 254,552.63 |
| 300. CASH AT SETTLEMENT FROM OR TO BORROWER | | 600. CASH AT SETTLEMENT TO OR FROM SELLER | |
| 301. Gross amount due from borrower (line 120) | 319,341.30 | 601. Gross amount due to seller (line 420) | 305,926.32 |
| 302. Less amounts paid by/for borrower (line 220) | 307,784.81 | 602. Less reduction amount due to seller (line 520) | 254,552.63 |
| 303. CASH    FROM    BORROWER | 11,556.49 | 603. CASH    TO    SELLER | 51,373.69 |

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT — SETTLEMENT STATEMENT
File Number: TRS14668

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700. | **TOTAL SALES/BROKER'S COMMISSION** based on price $    @    = | | |
| | Division of commission (line 700) as follows: | | |
| 701. | $    to | | |
| 702. | $    to | | |
| 703. | Commission paid at Settlement | | |
| 704. | | | |
| 800. | **ITEMS PAYABLE IN CONNECTION WITH LOAN**    P.O.C. | | |
| 801. | Loan Origination Fee    % | | |
| 802. | Loan Discount    % | | |
| 803. | Appraisal Fee    to  RELS    325.00 | | 325.33B |
| 804. | Credit Report    to  RELS | 55.00 | |
| 805. | Lender's Inspection Fee    to | | |
| 806. | Mtg. Ins. Application Fee    to | | |
| 807. | Assumption Fee    to | | |
| 808. | FLOOD LIFE OF LOAN FEE    W.F.F.S. | 18.00 | |
| 809. | PROCESSING FEE    WELLS FARGO BANK | 350.00 | |
| 810. | TAX SERVICE FEE    W.F.F.R.E.T.S. | 78.00 | |
| 811. | UNDERWRITING FEE    WELLS FARGO BANK | 350.00 | |
| 812. | | | |
| 813. | | | |
| 814. | | | |
| 815. | | | |
| 900. | **ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. | Interest from  01/22/07  to  02/01/07  @$  48.53  /day    10 day(s) | 485.30 | |
| 902. | Mortgage Insurance Premium    to | | |
| 903. | Hazard Insurance Premium    1 yrs. to  LIBERTY AMERICAN | 2,649.00 | |
| 904. | FLOOD INSURANCE    LIBERTY FLOOD    626.00B | | |
| 905. | | | |
| 1000. | **RESERVES DEPOSITED WITH LENDER FOR** | | |
| 1001. | Hazard Insurance    3 mo. @$  220.75  / mo. | 662.25 | |
| 1002. | Mortgage Insurance    mo. @$    / mo. | | |
| 1003. | City property taxes    mo. @$    / mo. | | |
| 1004. | County property taxes    5 mo. @$  375.00  / mo. | 1,875.00 | |
| 1005. | Annual Assessments    mo. @$    / mo. | | |
| 1006. | FLOOD INSURANCE    3 mo. @$  52.17  / mo. | 156.51 | |
| 1007. | | mo. @$    / mo. | | |
| 1008. | Aggregate Credit for Hazard/Flood Ins. City/County Prop Taxes, Mortgage Ins & Annual Assessments | -750.04 | |
| 1100. | **TITLE CHARGES** | | |
| 1101. | Settlement or closing fee    to  TITLE COMPANY OF AMERICA | 450.00 | |
| 1102. | Abstract or title search    to  ATTORNEYS TITLE INSURANCE FUND | 250.00 | |
| 1103. | Title examination    to  TITLE COMPANY OF AMERICA | 295.00 | |
| 1104. | Title insurance binder    to | | |
| 1105. | Document preparation    to | | |
| 1106. | Notary fees    to | | |
| 1107. | Attorney's fees    to | | |
| | (includes above Item No: ) | | |
| 1108. | Title Insurance    to  ATTORNEYS TITLE INSURANCE FUND | 1,615.00 | |
| | (includes above Item No: ) | | |
| 1109. | Lender's coverage  272,511.00 --- 25.00 | | |
| 1110. | Owner's coverage  302,790.00 --- 1,590.00 | | |
| 1111. | Form 9, ALTA 8.1, ALTA 5.0    ATTORNEYS TITLE INSURANCE FUND | 211.50 | |
| 1112. | RECERTIFICATION OF TITLE    ATTORNEYS TITLE INSURANCE FUND | 150.00 | |
| 1113. | | | |
| 1200. | **GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. | Recording fees  Deed $  27.00  ; Mortgage $  214.00  ; Releases $  83.50 | 324.50 | |
| 1202. | City/county/stamps  Deed $    ; Mortgage $ | | |
| 1203. | State tax/stamps  Deed $  1,816.80  ; Mortgage $  954.10 | 2,770.90 | |
| 1204. | Intangible Tax  Deed $    ; Mortgage $  545.02 | 545.02 | |
| 1205. | RECORD AFFIDAVIT | 10.00 | |
| 1300. | **ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. | Survey    to | | |
| 1302. | Pest Inspection    to | | |
| 1303. | COURIER/WIRE/ARCHIVE FEE    TITLE COMPANY OF AMERICA | 150.00 | |
| 1304. | WASTE FEES    METRO DADE DEPT. OF SOLID WASTE | 332.50 | 33.33 |
| 1305. | MAINTENANCE (1/22 - 2/28/07)    MASTER: THE TRELLIS AT BAYSHORE MASTER ASS | 62.70 | |
| 1306. | LIEN LETTERS | | |
| 1307. | POST SELLERS DOCS | | |
| 1308. | | | |
| 1400. | **TOTAL SETTLEMENT CHARGES** (enter on lines 103 and 502, Sections J and K) | 13,096.14 | 33.33 |

PRIDE HOMES DE-LAKES BY THE BAY - PARCEL H, LLC.

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

JOSE F. MIRANDA                    MARTHA FERNANDEZ, AS MANAGING MEMBER

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

TITLE COMPANY OF AMERICA, INC.                    1/22/07
                                                   Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

PER321-HP-1805-G, REV. HUD4(3/86)

CFN: 20170625977 BOOK 30746 PAGE 2491
DATE:11/06/2017 12:00:35 PM
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CT

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

CASE NO. 13-2016-CA-026218
CIRCUIT CIVIL DIVISION

WELLS FARGO BANK, N.A.

    Plaintiff,

v.

JOSE F. MIRANDA; ADELA MIRANDA;
UNKNOWN TENANT 1; UNKNOWN
TENANT 2; ISLES AT BAYSHORE CLUB,
LLC; ISLES AT BAYSHORE MASTER
ASSOCIATION, INC.; THE TRELLIS AT
BAYSHORE HOMEOWNERS
ASSOCIATION, INC.



    Defendants.

_____/

## CONSENT FINAL JUDGMENT OF FORECLOSURE

    **THIS ACTION** was heard before the Court at Non-Jury Trial on this 2nd day of November, 2017. On the evidence presented,

    **IT IS ORDERED AND ADJUDGED** that Plaintiff's Final Judgment is **GRANTED** against all Defendants listed by name: JOSE F. MIRANDA; ADELA MIRANDA; ISLES AT BAYSHORE CLUB, LLC; ISLES AT BAYSHORE MASTER ASSOCIATION, INC.; THE TRELLIS AT BAYSHORE HOMEOWNERS ASSOCIATION, INC..

1. **Amounts Due and Owing.** Plaintiff is due:

| | |
|---|---|
| Principal | $ 272,511.00 |
| Interest on the note and mortgage from 01/01/2012 through 06/14/2017 | $ 66,095.06 |
| Title Search Expense | $ 325.00 |
| Tax Disbursements | $ 21,791.18 |

        2009: $3,480.64
        2010: $2,902.84
        2011: $1,243.82
        2012: $2,016.10
        2013: $2,132.47

888160293          Page 1          13-2016-CA-026218

CFN: 20170625977 BOOK 30746 PAGE 2492

|  |  |
|---|---|
| 2014: $2,163.62 | |
| 2015: $3,934.45 | |
| 2016: $3,917.23 | |
| Hazard Insurance Disbursements | $ 24,174.64 |
| 2009: $2,673.99 | |
| 2011: $2,761.62 | |
| 2012: $3,005.98 | |
| 2013: $3,151.65 | |
| 2014: $3,129.76 | |
| 2015: $3,076.69 | |
| 2016: $3,179.95 | |
| 2017: $3,195.00 | |
| Flood Insurance Disbursements | $ 8,777.00 |
| 2009: $842.00 | |
| 2010: $915.00 | |
| 2012: $988.00 | |
| 2013: $1,006.00 | |
| 2014: $1,075.00 | |
| 2015: $1,055.00 | |
| 2016: $1,422.00 | |
| 2017: $1,474.00 | |

Attorneys' Fees:
     For the contested portion of the foreclosure action:
     Finding as to reasonable number of hours: 89.80 hours
     Finding as to reasonable hourly rate up to: $215.00 per hour $13,615.00
     Other*: For the uncontested portion of the foreclosure action $3,350.00
     (* The requested attorney's fee is a flat rate fee that the firm's client has
     agreed to pay in this matter. Given the amount of the fee requested and the
     labor expended, the Court finds that a lodestar analysis is not necessary
     and that the flat fee is reasonable.)

| Attorneys' Fee Total: | $ 16,965.00 |
|---|---|

Court Cost:

| | |
|---|---|
| Filing Fee | $ 1,906.00 |
| E File Convenience Fee | $ 5.00 |
| Service of Process | $ 495.00 |
| Skip Trace / Search for Service | $ 96.30 |
| Recording Fee - Lis Pendens | $ 5.00 |

888160293          Page 2          13-2016-CA-026218

CFN: 20170625977 BOOK 30746 PAGE 2493

| Clerk - Issue Summons | $ | 70.00 |
|---|---|---|
| LP Update & Examination | $ | 75.00 |
| Other: | | |
| Late Charges | $ | 73.81 |
| Property Inspections | $ | 95.00 |
| PMI / MIP Insurance | $ | 11,674.87 |
| Condominium Insurance | $ | 42.42 |
| **SUBTOTAL** | | **$ 425,177.28** |
| LESS: Escrow Advance Recovery | $ | -4,053.15 |
| LESS: Hazard Premium Refund | $ | -7.07 |
| LESS: PMI Refund | $ | -27.25 |
| **GRAND TOTAL** | | **$ 421,089.81** |

2. **Interest.** The grand total amount referenced in Paragraph 1 shall bear interest from this day forward at the prevailing legal interest rate of 5.35 percent per year.

3. **Lien on Property.** Plaintiff, whose address is One Home Campus, Des Moines, IA 50328, holds a First Mortgage lien for the grand total sum superior to all claims or estates of the defendant(s), on the following described property in Miami Dade County, Florida:

### LOT 2, BLOCK 8, TRELLIS AT BAYSHORE, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 164, PAGE 47, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

Property address: **8890 SW 229TH ST, MIAMI, FL 33190-1959**

4. **Sale of Property.** If the grand total amount with interest at the rate described in paragraph 2 and all costs accrued subsequent to this judgment are not paid, the Clerk of the Court shall sell the subject property at public sale. The Clerk of Courts shall conduct the sale online at www.miamidade.realforeclose.com commencing at 09:00 AM on March 2,  2018 **(120 day extended sale date)**, to the highest bidder for cash.

5. **Costs.** Plaintiff shall advance all subsequent costs of the action and shall be reimbursed for them by the Clerk if plaintiff is not the purchaser of the property for sale, provided, however, that the purchaser of the property for sale shall be responsible for documentary stamps affixed to the certificate of title. If plaintiff is the purchaser, the Clerk shall credit plaintiff's bid with the total sum with interest and costs accruing subsequent to this judgment, or such part of it, as is necessary to pay the bid in full.

6. **Distribution of Proceeds.** On filing the Certificate of Title, the Clerk shall distribute the proceeds of sale, so far as they are sufficient, by paying: first, all of the plaintiff's costs; second, documentary stamps affixed to the Certificate; third, plaintiff's attorneys' fees; fourth, the total

888160293	Page 3	13-2016-CA-026218

Miami-Dade Official Records - Print Document                    https://www2.miami-dadeclerk.com/officialrecords/PrintDocument.asp...

Case 1:09-md-02047-EEF-MBN Document 22380-47 Filed 12/02/19 Page 32 of 136
Case 2:11-cv-22408-MSC Document 276-9 Entered on FLSD Docket 09/13/2013 Page 7 of 9

CFN: 20170625977 BOOK 30746 PAGE 2494

sum due to the plaintiff, less the items paid, plus interest at the rate prescribed in paragraph 2 from this date to the date of the sale; and by retaining any remaining amount pending the further order of this Court.

7. **Right of Possession.** Upon filing of the Certificate of Sale, defendant(s) and all persons claiming under or against defendant(s) since the filing of the Notice of Lis Pendens shall be foreclosed of all estate or claim in the property, except as to claims or rights under Section 45.01315, Fla. Stat, shall be terminated, except as to claims or rights under Chapter 718 or Chapter720. Fla. Stat., if any. Upon filing of the Certificate of Title, the person named on the Certificate of Title shall be let into possession of the property, subject to tenant protection in compliance with the provisions of Section 83.561, Fla. Stat. (2015).

8. **Attorney Fees.** The Court finds, based upon the affidavits/testimony presented and upon reasonable inquiry of counsel for the plaintiff, that 44.70 hours were reasonably expended by plaintiff's counsel and that an hourly rate of $175.00 is appropriate. Plaintiff's counsel represents that the attorneys' fee awarded does not exceed its contract fee with the plaintiff. The Court finds that there is/are no reduction or enhancement factors for consideration by the Court pursuant to Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla. 1985).

9. **Jurisdiction.** The Court retains jurisdiction of this action to enter further orders that are proper, including, without limitation, writs of possession and deficiency judgments.

10. **Jurisdiction Continued. The Court retains jurisdiction of this action to enter further orders that are proper, including, without limitation, orders authorizing supplemental proceedings to eliminate any interest omitted from this action, cure any title defects, determine amounts owed to associations, an award of attorney's fees, and to enter deficiency judgment if the borrower has not been discharged in bankruptcy.**

11. **The expiration of the lis pendens is extended through the issuance of the Certificate of Title. The Clerk of the Circuit Court is hereby directed to record this Final Judgment of Foreclosure to create constructive notice of the extension of the Notice of Lis Pendens recorded in connection with this action.**

**IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THE FINAL JUDGMENT.**

**IF YOU ARE A SUBORDINATE LIEN HOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN SIXTY (60) DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.**

**IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF. YOU ARE NOT REQUIRED TO HAVE A LAWYER OR ANY OTHER REPRESENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH YOU ARE ENTITLED. PLEASE CHECK WITH THE CLERK OF THE COURT, 140 WEST FLAGLER STREET, ROOM 908, MIAMI, FLORIDA (TELEPHONE: (305) 375-5943), WITHIN TEN (10) DAYS AFTER THE SALE TO SEE IF THERE IS ADDITIONAL**

888160293                          Page 4                          13-2016-CA-026218

CFN: 20170625977 BOOK 30746 PAGE 2495

**MONEY FROM THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE COURT.**

**IF YOU DECIDE TO SELL YOUR HOME OR HIRE SOMEONE TO HELP YOU CLAIM THE ADDITIONAL MONEY, YOU SHOULD READ VERY CAREFULLY ALL PAPERS YOU ARE REQUIRED TO SIGN, ASK SOMEONE ELSE, PREFERABLY AN ATTORNEY WHO IS NOT RELATED TO THE PERSON OFFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND WHAT YOU ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR PROPERTY OR THE EQUITY IN YOUR PROPERTY WITHOUT THE PROPER INFORMATION. IF YOU CANNOT AFFORD TO PAY AN ATTORNEY, YOU MAY CONTACT THE LEGAL AID SOCIETY AT THE DADE COUNTY BAR ASSOCIATION, 123 N.W. 1ST AVENUE, SUITE 214, MIAMI, FLORIDA, (TELEPHONE: (305) 579-5733), TO SEE IF YOU QUALIFY FINANCIALLY FOR THEIR SERVICES. IF THEY CANNOT ASSIST YOU, THEY MAY BE ABLE TO REFER YOU TO A LOCAL BAR REFERRAL AGENCY OR SUGGEST OTHER OPTIONS. IF YOU CHOOSE TO CONTACT THE DADE COUNTY BAR ASSOCIATION LEGAL AID SOCIETY, YOU SHOULD DO SO AS SOON AS POSSIBLE AFTER RECEIPT OF THIS NOTICE.**

**DONE AND ORDERED** in Miami Dade County, Florida, on this 2nd day of November, 2017.

Circuit Judge

SAMANTHA RUIZ COHEN
CIRCUIT COURT JUDGE

Copies furnished to all parties:

eXL Legal, PLLC
12425 28TH STREET NORTH, SUITE 200
ST. PETERSBURG, FL 33716
EFILING@EXLLEGAL.COM
*COUNSEL FOR THE PLAINTIFF*

ISLES AT BAYSHORE CLUB, LLC
CT CORPORATION SYSTEM, R.A.
1200 SOUTH PINE ISLAND ROAD
SUITE 250
PLANTATION, FL 33324

888160293                     Page 5              13-2016-CA-026218

CFN: 20170625977 BOOK 30746 PAGE 2496

RAMON C. PALACIO, ESQ.
PO BOX 311059
MIAMI, FL 33231
RAMON@ALGPL.COM
FILINGS@ALGPL.COM
*OPPOSING COUNSEL FOR ISLES AT BAYSHORE MASTER ASSOCIATION, INC.*

JENNIFER ESPINET-PORTELL, ESQ.
14335 SW 120 ST, STE. 207
MIAMI, FL 33186
JEPORTELL@JPLAWFIRM.ORG
*OPPOSING COUNSEL FOR MIRANDA, ADELA, MIRANDA, JOSE F.*

ROBERT F. COOKE, ESQ.
75 VALENCIA AVE.
CORAL GABLES, FL 33134
LITIGATION@RFC-LAW.COM
KR@RFC-LAW.COM
*OPPOSING COUNSEL FOR THE TRELLIS AT BAYSHORE HOMEOWNERS ASSOCIATION, INC.*

# EXHIBIT D9



# A. Settlement Statement (HUD-1)

OMB No. 2502-0265

## B. Type of Loan

| 1. ☐ FHA   2. ☐ RHS   3. ☐ Conv Unins | *6. File Number | 7. Loan Number | 8. Mortgage Ins Case Number |
|---|---|---|---|
| 4. ☐ VA   5. ☐ Conv Ins.   6. ☐ Seller Fin | R10004893 | | |
| 7. ☒ Cash Sale. | | | |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower | E. Name & Address of Seller | F. Name & Address of Lender |
|---|---|---|
| Tracy Mai Nguyen<br>2100 Southwest Santa Barbara Place<br>Cape Coral, FL 33991 | Federal Home Loan Mortgage Corporation<br>5000 Plano Parkway<br>Carrollton, TX 75010 | Cash |

| G. Property Location | H. Settlement Agent Name<br>New House Title, L.L.C.<br>4805 Independence Parkway, Ste. 250<br>Tampa, FL 33634<br>813-342-2200<br>Underwritten By: Westcor Land Title Insurance<br>Company | I. Settlement Date<br>6/17/2011<br>Fund: |
|---|---|---|
| Cape Coral Unit 62, Lot 32-33, Block 3046, Lee County<br>2100 SOUTHWEST SANTA BARBARA PLACE<br>CAPE CORAL, FL 33991 | | |
| | Place of Settlement<br>New House Title, LLC<br>4919 Memorial Highway, Suite 200<br>Tampa, FL 33634 | |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract sales price | $90,000.00 | 401. Contract sales price | $90,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower | $1,424.50 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. County property taxes | | 406. County property taxes | |
| 107. HOA | | 407. HOA | |
| 108. Condo Assoc. | | 408. Condo Assoc. | |
| 109. Non Ad-Valorem    06/17/11 thru 09/30/11 | $66.94 | 409. Non Ad-Valorem    06/17/11 thru 09/30/11 | $66.94 |
| 110. 2nd HOA | | 410. 2nd HOA | |
| 111. COA | | 411. COA | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| **120. Gross Amount Due From Borrower** | $91,491.44 | **420. Gross Amount Due to Seller** | $90,066.94 |
| **200. Amounts Paid By Or in Behalf Of Borrower** | | **500. Reductions in Amount Due to Seller** | |
| 201. Deposit or earnest money | $1,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | $10,845.63 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. Portion of Owner's Policy Paid by Seller | $517.50 | 508. Portion of Owner's Policy Paid by Seller | $517.50 |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. County property taxes    01/01/11 thru 06/16/11 | $654.61 | 510. County property taxes    01/01/11 thru 06/16/11 | $654.61 |
| 211. HOA | | 511. HOA | |
| 212. Condo Assoc. | | 512. Condo Assoc. | |
| 213. Non Ad-Valorem | | 513. Non Ad-Valorem | |
| 214. 2nd HOA | | 514. 2nd HOA | |
| 215. COA | | 515. COA | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |

Nguyen 365784

## L. Settlement Charges

| 700. Total Real Estate Broker Fees | $5,400.00 | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| Division of Commission (line 700) as follows: | | | | |
| 701. $2,700.00 | to | Century 21 Birchwood Realty, Inc. | | |
| 702. $2,700.00 | to | TSD Realty | | |
| 703. Commission Paid at Settlement | | | $0.00 | $5,400.00 |
| 704. Selling Bonus | to | TSD Realty | | $1,200.00 |

| 800. Items Payable in Connection with Loan | | | | |
|---|---|---|---|---|
| 801. Our origination charge | | $0.00 | (from GFE #1) | |
| 802. Your credit or charge (points) for the specific rate chosen | | $0.00 | (from GFE #2) | |
| 803. Your adjusted origination charges | to | | (from GFE A) | |
| 804. Appraisal Fee | to | | (from GFE #3) | |
| 805. Credit report | to | | (from GFE #3) | |
| 806. Tax service | to | | (from GFE #3) | |
| 807. Flood certification | to | | (from GFE #3) | |
| 808. Administration Fee | to | | (from GFE #3) | |
| 809. Doc Storage Fee | to | | (from GFE #3) | |
| 810. Underwriting Fee | to | | (from GFE #3) | |
| 811. Processing Fee | to | | (from GFE #3) | |

| 900. Items Required by Lender To Be Paid in Advance | | |
|---|---|---|
| 901. Daily interest charges from 6/17/2011 to 7/1/2011 @ $0/day | (from GFE #10) | |
| 902. Mortgage Insurance Premium for  months  to | (from GFE #3) | |
| 903. Homeowner's insurance for  years  to | (from GFE #11) | |

| 1000. Reserves Deposited With Lender | | | | | |
|---|---|---|---|---|---|
| 1001. Initial Deposit for your escrow account | | | (from GFE #9) | $0.00 | |
| 1002. Homeowner's insurance | months @ | per month | $0.00 | | |
| 1003. Mortgage insurance | months @ | per month | $0.00 | | |
| 1004. County property taxes | months @ | per month | $0.00 | | |
| 1005. HOA | months @ | per month | $0.00 | | |
| 1006. Condo Assoc. | months @ | per month | $0.00 | | |
| 1007. Non Ad-Valorem | months @ | per month | $0.00 | | |
| 1008. 2nd HOA | months @ | per month | $0.00 | | |
| 1009. COA | 0 | months @ | | | |
| 1010. . | 0 | months @ | | | |
| 1011. Aggregate Adjustment | | | | | |

| 1100. Title Charges | | | | | |
|---|---|---|---|---|---|
| 1101. Title services and lender's title insurance | to | New House Title, LLC | (from GFE #4) | $250.00 | |
| 1102. Settlement or closing fee | to | New House Title, LLC | $250.00 | | $550.00 |
| 1103. Owner's title insurance | to | New House Title, LLC | (from GFE #5) | $517.50 | |
| 1104. Lender's title insurance | to | New House Title, LLC | $0.00 | | |
| 1105. Lender's title policy limit $ | $0.00/$0.00 . | | | | |
| 1106. Owner's title policy limit $ | $90,000.00/$517.50 | | | | |
| 1107. Agent's portion of the total title insurance premium | to | New House Title, LLC | $362.25 | | |
| 1108. Underwriter's portion of the total title insurance premium | to | Westcor Land Title | $155.25 | | |
| 1109. City Research Fee | to | New House Title, LLC | | | |
| 1110. Courtesy Closing Fee Pd by NHT | to | Sunshine Signing Connection, Inc. | POC $125.00 | | |
| 1111. Attorney's fees | to | Florida Default Law Group | | | $50.00 |
| 1112. Municipal Lien Search and Review Pd by N | to | New House Title, LLC | POC $85.00 | | |
| 1113. Estoppel Search and Review | to | New House Title, LLC | | | |
| 1114. Electronic Recording Fee | to | New House Title, LLC | POC $4.50 | (from GFE #4) | $0.00 |

| 1200. Government Recording and Transfer Charges | | | | |
|---|---|---|---|---|
| 1201. Government recording charges | | | (from GFE #7) | $27.00 |
| 1202. Deed $27.00 ; Mortgage  , Release $0.00 | | to Lee County Clerk of Court | | |
| 1203. Transfer taxes | | | (from GFE #8) | $630.00 |
| 1204. City/County tax/stamps | Deed $0.00 ; Mortgage $0.00 | | | |
| 1205. State tax/stamps | Deed $630.00 ; Mortgage $0.00 | to Lee County Clerk of Court | | |

File No. R10004893

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement.

Federal Home Loan Mortgage Corporation

By

Melissa J. Nunley of New House Title, LLC.
AS ATTORNEY-IN-FACT FOR
FEDERAL HOME LOAN MORTGAGE CORPORATION

Tracy Mai Nguyen

SETTLEMENT AGENT CERTIFICATION
The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement.

Settlement Agent  Laura Whiteley                    Date

**Warning:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.



**SunTrust Bank**
13901 N. Cleveland Avenue
North Ft. Myers, Florida 33903
Tel 239.995.2400
Fax 239.997-7278

06/17/2011

Tracy M Nguyen
925 SW Santa Barbara Pl
Cape Coral Fl 33991

To Whom It May Concern:

This letter is to confirm that Tracy M Nguyen wire $89,319.33 to New House Title on 06/17/2011. Wire confirmation number ▇▇▇▇▇▇▇3831.

Sincerely,

Michelle Chase
Assistant Branch Manager

# Beneficiary Transfer

**Reference Number** ▇▇▇▇▇▇▇▇3831 is Pending Approval.

**Branch** 1472167 NORTH 41 OFFICE

| | | |
|---|---|---|
| **Payment Amount** | 89,319.33 USD **Rate** | **Contract Number** |
| **Debit Amount** | 89,319.33 USD | **Charge Party** None |

**Send Date** 17JUN2011    **Value Date** 17JUN2011

## Debit Party

▇▇▇▇▇▇3092
TRACY M NGUYEN
925 SW SANTA BARBARA PL
CAPE CORAL FL 33991-2066

## Beneficiary

Is Beneficiary a Bank? No
▇▇▇7366
NEW HOUSE ITLE LLC
4919 MEMORIAL HIGHWAY STE 200
TAMPA FL 33634

## Beneficiary's Bank

▇▇▇▇8680
THE BANK OF TAMPA
TAMPA, FL

## Bank to Bank Information

## Originator to Beneficiary Information

REF # ▇▇▇▇4893
TRACY MAI NGUYEN
2100 SW SANTA BARBARA PL
CAPE CORAL FL 33991

Charlie Green, Lee County Clerk of Circuit Court, Deed Doc. D $630.00 Rec. Fee
$27.00 Deputy Clerk ERECORD

Prepared by:
The Florida Default Law Group, PL
Jonathan Mesker
9119 Corporate Lake Drive, Suite 300
Tampa, Florida 33634
File Number: R10004893

Return to:
New House Title
P.O. Box 20328
Tampa, Florida 33663-1385

(Space Above This Line For Recording Data)

# Special Warranty Deed

**This Special Warranty Deed** made this 16th day of June, 2011, between **Federal Home Loan Mortgage Corporation** whose post office address is **5000 Plano Parkway, Carrollton, TX, 75010**, grantor, and **Tracy Mai Nguyen, an unmarried person**, whose post office address is **2100 Southwest Santa Barbara Place, Cape Coral, FL 33991**, grantee:

(Whenever used herein the terms grantor and grantee include all the parties to this instrument and the heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporations, trusts and trustees)

**Witnesseth,** that said grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable considerations to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in the **Lee County, Florida**, to-wit:

**LOT(S) 32 AND 33, BLOCK 3046, UNIT 62, CAPE CORAL SUBDIVISION, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 21, PAGE(S) 21-38, INCLUSIVE, IN THE PUBLIC RECORDS OF LEE COUNTY, FLORIDA.**

**Parcel Identification Number: 26-44-23-C3-03046.0320**

This deed is being executed by virtue of a power of attorney recorded on March 30th, 2011, in Official Records Book 20435, Page 636, of the Public Records of Hillsborough County, Florida.

**Together** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**To Have and to Hold,** the same in fee simple forever.

**And** the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons claiming by, through or under grantors.

**In Witness Whereof,** grantor has hereunto set grantor's hand and seal the day and year shown in the acknowledgement below.

Signed, sealed and delivered in our presence:

Witness Name: _____

Witness Name: _____ Laura White __

**Federal Home Loan Mortgage Corporation**
**By Florida Default Law Group**
**as attorney in fact**

By: Melissa J. Nunley
Its authorized signor

State of Florida _____

County of Hillsborough _____

The foregoing instrument was acknowledged before me this 16th day of June, 2011, by Melissa J. Nunley, as Authorized Signor of the Florida Default Law Group, on behalf of the corporation, who ( ✔ ) is/are personally known to me or (____) has/have produced _____ as identification.

Notary Public

Printed Name: _____ L LONG

My Commission Expires: _____

L LONG
MY COMMISSION # EE 060655
EXPIRES: February 4, 2015
Bonded Thru Notary Public Underwriters

# Exhibit "A"

## Florida Default Law Group

### Corporate Resolution

It is hereby resolved this <u>21</u> day of April, 2011 that the following individuals are authorized to sign as Attorney-in-Fact for Federal Home Loan Mortgage Corporation under the Limited Power of Attorney recorded on March 31, 2011 in Official Records Book 20435, Page 636-639, in the Public Records of Hillsborough County, Florida.

|  |  |
|---|---|
| NANCY A. JONES | REBECCA M. DALY |
| JUDY KANE | JEFFREY ISMAN |
| DIANE L. REESE | ANDREA SOMERS |
| GARY MOREIRA | CHRISTIE ROONEY |
| HENRY DINNAN | AMY H. GRIMALDO |
| VALERIE TONEY | MELISSA J. NUNLEY |
| TINA WORKMAN | |

It is further resolved that any signatories in the past that my have varied from this procedure are hereby ratified, nunc pro tunc, and have authority by the firm to execute said documents.

WITNESS MY HAND AND SEAL OF OFFICE THIS <u>21</u> DAY OF APRIL, 2011.

Ronald R. Wolfe, Vice President

## CITY OF CAPE CORAL
## UTILITY DEPOSIT

DATE 6/20/11    CUSTOMER NAME Nguyen, Tracy

SERVICE ADDRESS 2100 SW 3 nd Pl over

CUSTOMER ID: 4463656                    01

LOCATION ID: 372025

WT: Susu w3

SR: 0

CR. CD. _____    TOTAL $100

CK # _____  CASH 100    BY FB

# EXHIBIT D10

HUD-1

**A. Settlement Statement**

U.S. Department of Housing
and Urban Development

OMB No. 2502-0265

**B. Type of Loan**

| | | | |
|---|---|---|---|
| ○ 1. FHA | ○ 2. FmHA | ○ 3. Conv. Unins. | **6. File Number** 638 | **7. Loan Number** ID: | **8. Mortg. Ins. Case Num.** |
| ○ 4. V.A. | ○ 5. Conv. Ins. | | | | |

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. NAME OF BORROWER:** Kelly O'Brien and Lori O'Brien, husband and wife
**Address of Borrower:** 3321 W Carrington St., Tampa, Florida 33611

**E. NAME OF SELLER:** Cobblestone II, LLC, a Florida limited liability company
**Address of Seller:** 8716 Cobblestone Drive, Tampa, Florida 33615
TIN:

**F. NAME OF LENDER:**
**Address of Lender:**

**G. PROPERTY LOCATION:** 3116 Wallcraft Avenue, Tampa, Florida 33611

**H. SETTLEMENT AGENT:** Flagship Title, LLC
**Place of Settlement:** 3719 Swann Avenue, Tampa, Florida 33609
TIN: ▮1994
Phone: 813-875-1200

**I. SETTLEMENT DATE:** 6/9/04
**DISBURSEMENT DATE:** 6/9/04

*[handwritten note in left margin: purchase of Wallcraft vacant lot $185,000]*

| J. Summary of borrower's transaction | | K. Summary of seller's transaction | |
|---|---|---|---|
| **100. Gross amount due from borrower:** | | **400. Gross amount due to seller:** | |
| 101. Contract sales price | 185,000.00 | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (Line 1400) | 518.50 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance: | | Adjustments for items paid by seller in advance: | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross amount due from borrower:** | 185,518.50 | **420. Gross amount due to seller:** | |
| **200. Amounts paid or in behalf of borrower:** | | **500. Reductions in amount due to seller:** | |
| 201. Deposit or earnest money | 2,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Principal amount of second mortgage | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. Deposits held by seller | |
| 207. Principal amt of mortgage held by seller | | 507. Principal amt of mortgage held by seller | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller: | | Adjustments for items unpaid by seller: | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes from 01/01/04 to 06/09/04 | 794.05 | 511. County taxes from 01/01/04 to 06/09/04 | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total paid by/for borrower:** | 2,794.05 | **520. Total reductions in amount due seller:** | |
| **300. Cash at settlement from/to borrower:** | | **600. Cash at settlement from/to seller:** | |
| 301. Gross amount due from borrower (line 120) | 185,518.50 | 601. Gross amount due to seller (line 420) | |
| 302. Less amount paid by/for the borrower (line 220) | (2,794.05) | 602. Less total reductions in amount due seller (line 520) | |
| **303. Cash ( ☑ From ☐ To ) Borrower:** | 182,724.45 | **603. Cash ( ☐ To ☐ From ) Seller:** | |

**Substitute Form 1099 Seller Statement:** The information contained in blocks E, G, H, and I and on line 401 is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

**Seller Instructions:** If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your tax return; for other transactions, complete the applicable parts of Form 4797, Form 6262 and/or Schedule D (Form 1040).

Borrower's initial(s):

Seller's initial(s):

O'Brien Doc ID 222901

| HUD-1 | U.S. Department of Housing and Urban Development | | | Page 2 |
|---|---|---|---|---|

| L. Settlement charges | | Borrower POC Seller POC | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|---|
| 700. Total Sales/Brokers Com. based on price | $185,000.00 @ | % = | | |
| 701. | % to | | | |
| 702. | % to | | | |
| 703. Commission paid at settlement | | | | |
| 704. | to | | | |
| **800. Items payable in connection with loan:** | | Borrower POC Seller POC | | |
| 801. Loan origination fee | % to | | | |
| 802. Loan discount | % to | | | |
| 803. Appraisal fee | to | | | |
| 804. Credit report | to | | | |
| 805. Lender's inspection fee | to | | | |
| 806. Mortgage insurance application fee | to | | | |
| 807. | to | | | |
| 808. | to | | | |
| 809. | to | | | |
| 810. | to | | | |
| 811. | to | | | |
| **900. Items required by lender to be paid in advance:** | | Borrower POC Seller POC | | |
| 901. Interest from | to @ | /day | | |
| 902. Mortgage insurance premium for | months to | | | |
| 903. Hazard insurance premium for | years to | | | |
| 904. Flood Insurance premium for | years to | | | |
| 905. | years to | | | |
| **1000. Reserves deposited with lender:** | | Borrower POC Seller POC | | |
| 1001. Hazard insurance | months @ | per month | | |
| 1002. Mortgage Insurance | months @ | per month | | |
| 1003. City property taxes | months @ | per month | | |
| 1004. County property taxes | months @ | per month | | |
| 1005. Annual assessments | months @ | per month | | |
| 1006. Flood insurance | months @ | per month | | |
| 1007. | months @ | per month | | |
| 1008. | months @ | per month | | |
| 1009. Aggregate accounting adjustment | | | | |
| **1100. Title charges:** | | Borrower POC Seller POC | | |
| 1101. Settlement or closing fee | to Flagship Title, LLC | | | |
| 1102. Abstract or title search | to Flagship Title, LLC | | 150.00 | |
| 1103. Title examination | to Flagship Title, LLC | | | |
| 1104. Title insurance binder | to | | | |
| 1105. Document preparation | to | | | |
| 1106. Notary fees | to | | | |
| 1107. Attorney's Fees | to | | | |
| (includes above item numbers: | ) | | | |
| 1108. Title Insurance | to Flagship Title, LLC | | | |
| (includes above item numbers: | ) | | | |
| 1109. Lender's coverage (Premium): | | | | |
| 1110. Owner's coverage (Premium): | $185,000.00 ($1,000.00) | | | |
| 1111. Endorse: | | | | |
| 1112. Warehouse Fee | to Flagship Title, LLC | | 95.00 | |
| 1113. Courier | to Flagship Title, LLC | | 30.00 | |
| **1200. Government recording and transfer charges:** | | | | |
| 1201. Recording fees | Deed $18.50 Mortgage(s) Releases | | 18.50 | |
| 1202. City/county tax/stamps | Deed Mortgage(s) | | | |
| 1203. State tax/stamps | Deed $1,295.00 Mortgage(s) | | | |
| 1204. Record POA Affidavit | to | | | |
| 1205. | to | | | |
| **1300. Additional settlement charges:** | | Borrower POC Seller POC | | |
| 1301. Survey | to Murphy's Land Surveying | | 225.00 | |
| 1302. Pest Inspection | to | | | |
| 1303. | to | | | |
| 1304. | to | | | |
| 1305. | to | | | |
| 1306. | to | | | |
| 1307. | to | | | |
| 1308. | to | | | |
| 1309. | | | | |
| **1400. Total settlement charges** | | | | |
| ( Enter on lines 103, Section J and 502, Section K ) | | | 518.50 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Cobblestone II LLC

_____ Borrower  By: _____ Seller
Kelly O'Brien                                         John T. Gillis, Managing Member

_____ Borrower      _____ Seller
Lori O'Brien

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused, or will cause, the funds to be disbursed in accordance with this statement.

Flagship Title, LLC
By: _____

As Its Authorized Representative                  _____
                                                   Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

DoubleTime®

INSTR # 2004232668
O BK 13945 PG 0205
Pgs 0205 - 206; (2pgs)
RECORDED 06/17/2004 12:39:45 PM
RICHARD AKE CLERK OF COURT
HILLSBOROUGH COUNTY
DOC TAX PD(F.S.201.02) 1,295.00
DEPUTY CLERK D LeDuc

Prepared by and return to:

Flagship Title, LLC
3719 Swann Avenue
Tampa, FL 33609
813-875-1200
File Number: 638
Grantee SSN:

_____ [Space Above This Line For Recording Data] _____

# Warranty Deed

**This Warranty Deed** made this **9th** day of **June, 2004** between **Cobblestone II, LLC, a Florida limited liability company** whose post office address is **8716 Cobblestone Drive, Tampa, FL 33615**, grantor, and **Kelly O'Brien and Lori O'Brien, husband and wife** whose post office address is **3321 W Carrington St., Tampa, FL 33611**, grantee:

(Whenever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporations, trusts and trustees)

**Witnesseth**, that said grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable considerations to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in **Hillsborough County, Florida** to-wit:

> **The West 1/2 of Lot 7, Block 2, West Bay Bluff, according to the map or plat thereof as recorded in Plat Book 5, Page 56, Public Records of Hillsborough County, Florida.**
>
> **Parcel Identification Number: A-03-30-18-3VR-000002-00007.2**

**Together** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**To Have and to Hold**, the same in fee simple forever.

**And** the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to **December 31, 2003**, and covenants, conditions, restrictions, easements, reservations and limitations of record, if any.

**In Witness Whereof**, grantor has hereunto set grantor's hand and seal the day and year first above written.

DoubleTime®

Signed, sealed and delivered in our presence:

Witness Name: ~~Robert Mackinnon~~

Witness Name: ~~Rebecca Coomer~~

Cobblestone II LLC

By: _____
John T. Gillis, Managing Member

(Corporate Seal)

State of Florida
County of Hillsborough

The foregoing instrument was acknowledged before me this 9th day of June, 2004 by John T. Gillis, Managing Member of Cobblestone II LLC, on behalf of the corporation. He/she [_] is personally known to me or [X] has produced a driver's license as identification.

[Notary Seal]

Notary Public

Printed Name: ~~Robert MacKinnon~~

My Commission Expires: 12/2/05

NOTARY PUBLIC

Robert MacKinnon
My Commission DD075879
Expires December 2, 2005

DoubleTime®

## Attorneys' Title Insurance Fund, Inc.
### OWNER'S POLICY
## Schedule A

Policy No.:
OPM-7057416

Effective Date:
June 17, 2004 @ 12:39 PM

Agent's File Reference:
638

Amount of Insurance: $185,000.00

1.   Name of Insured:   Kelly O'Brien and Lori O'Brien

2.   The estate or interest in the land described herein and which is covered by this policy is a fee simple (if other, specify same) and is at the effective date hereof vested in the named insured as shown by instrument recorded as Document No. 2004232668 in Official Records Book 13945, Page 0205, of the Public Records of Hillsborough County, Florida.

3.   The land referred to in this policy is described as follows:

The West 1/2 of Lot 7, Block 2, West Bay Bluff, according to the map or plat thereof as recorded in Plat Book 5, Page 56, Public Records of Hillsborough County, Florida.

Agent No.: **27425**

Issuing Agent:

**Flagship Title, LLC
3719 Swann Avenue
Tampa, FL 33609**

Agent's Signature
**Walter O. Hobbs**

Form OPM-SCH. A
(rev. 1/98)

DoubleTime®

## Attorneys' Title Insurance Fund, Inc.
*OWNER'S POLICY*
## Schedule B

Policy No.:
OPM-7057416

Agent's File Reference:
638

This policy does not insure against loss or damage by reason of the following exceptions:

1.  Taxes for the year of the effective date of this policy and taxes or special assessments which are not shown as existing liens by the public records.

2.  Rights or claims of parties in possession not shown by the public records.

3.  Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.

4.  Easements or claims of easements not shown by the public records.

5.  Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

6.  Any adverse ownership claim by the State of Florida by right of sovereignty to any portion of the lands insured hereunder, including submerged, filled and artificially exposed lands, and lands accreted to such lands.

7.  The lien of all taxes for the year 2004 and thereafter, which are not yet due and payable.

8.  Restrictions, conditions, reservations, easements, and other matters contained on the Plat of West Bay Bluff, as recorded in Plat Book 5, Page(s) 56, Public Records of Hillsborough County, Florida.

9.  Matters set forth in that certain survey prepared by Murphy's Land Surveying, Inc., dated May 25, 2004, under Job No. 041266.

Note: Exceptions 1, 2 and 5 above are hereby deleted. Exceptions 3 and 4 are modified by #9 above.



Steven R. Carter, Inc.
General Contractors
CGC 044640

5658 West San Nicholas
Tampa, Florida 33629
Ph 813/250-0604
Fx 813/250-0835
E-mail  srcinc@tampabay.rr.com

*Construction
agreement to
build house*

January 10, 2006

Kelly & Lori O'Brien
New at 3118 Wallcraft

Dear Kelly & Lori,
    We are pleased to quote on your project, this proposal is based on plans by Precision Drafting & Design, and dated October 15, 2005 we have however, made certain assumptions and specified items, which are listed below.

The price for your new home including the work specified below is $352,416.00 Three Hundred Fifty-two Thousand Four Hundred Sixteen Dollars and No Cents


Specifications as follows:


Impact/Connection Fees - Allowance $7,500.00

Site Utilities - Water and Temporary Electric Pole Included

Structural Engineering - Included
Homeowners Insurance (Known as Builder's Risk during Construction Period) - Included

Permit Fees - Included

Plans – By Owner

Survey's -    Foundation (with flood certification if needed for F.E.M.A.) and final survey's are included. A sealed site survey including topo and trees to City specifications will be needed to generate the project site plan and be submitted with the permit package.  This cost for this survey is not included

Tree Removal – Included

Driveway & Sidewalks - Concrete shall be a minimum of 3 1-2" thick, 3000-psi strength at 28 days, reinforced with fiber mesh, with the exception of the right of way apron that will be 6" thick.

Landscape Sod Irrigation and Trees (labor and material) Allowance $5,000.00. This will be done to the City of Tampa Chapter 13 irrigation and landscape regulations (version April 2002)

Foundation- Foundation will be 4 block courses high. All exterior foundation footings will be 20" wide by 10" deep 3000 psi concrete with (3) #5 dia. steel reinforcing bars continuous.

Slab- A 6 mil. Thick Polyethylene film is lapped 12" then taped as a vapor barrier. Concrete shall be a minimum of 3 1-2" thick, fiber mesh reinforced 3000-psi (not 2500) strength at 28 days.

Walls-First floor walls 8" CMU stucco exterior, 1X2 interior furring at 16" OC with 2x4 frame interior walls at 16" O.C. Second Floor Frame walls at 16" O.C. with ½" CDX plywood sheathing and 15# asphalt impregnated felt weather barrier.

Insulation-  First floor     R= 4.3 Insulation block walls, R-11 frame walls (exterior)
            Second Floor R= R-11 frame walls (exterior)
            Ceilings     R= 30 blown-in the flat areas and batt insulation in vaulted areas.

Termite Protection - Bora-Care treatment. This system treats all of the wood Interior and exterior) on the first floor to a height of 3'. There will be tubes in the slab for termite treatment.

Stucco – Walls textured with sand finish banding/trim will typically be in 3/4" steps sand finish with PVC stops.

Floor Framing - Engineered trusses at 24" OC the trusses will be 16" deep

Roof Framing - Engineered trusses at 24" OC

Roofing - 30-year dimensional fiberglass shingles.

Soffit-The soffit will be level back Vinyl with Aluminum fascia

Windows-  The windows are white painted aluminum single glazed glass with colonial muntins. These windows feature tilt out sashes with a triple locking mechanism with night venting option. Windowsills are wood, with dry wall returns. Add $14,200.00 for impact windows. All windows will have 3-1/4' 'DELTA HOWE' casing

Doors – Front and French doors are single glazed insulated fiberglass, paint grade jambs, interior doors are painted 'Colonist' paneled with 3-1/4' 'DELTA HOWE' casing. There will 8'-0" high doors downstairs and 6'-8" Doors upstairs. The base trim is 5- 1/4". Door hardware 'Saxton' levers by Kwikset. Front door handle set with single dead bolt, French doors keyed entry lock with single dead bolt.

Trim - Base trim is 5- 1/4". . We have included 540' 5 ¼" painted crown molding in the following rooms Living, Dinning, all bedrooms, loft, family/kitchen and Master bedroom.

Shelving - Wire shelving with continuous rod in hanging closets heavy-duty wire (tight mesh) in the pantry closet.

Garage -   Door - 16'x 8' steel 32 panel door with operator and two remote controls.
           Walls - Frame drywall finished and textured
                 - Block walls floated and painted.

Stair parts - Oak railing #6010, painted balusters # 5015 and oak newels # 4040.
http://www.coffmanstairs.com/post-to-post/p_traditional.htm Oak treads with painted risers.
 The stair treads will be finished natural. Add $350.00 for stained treads. Note we cannot
garnet an exact match to stained prefinished flooring.

Cabinetry – The cabinets and vanities will be AMERICAN CHERRY raised panel style.
Allowance (labor & material) $16,000.00. Tops Granite Allowance (labor & material) $6,800.00
Included is an undercount sink in the kitchen, vanity sinks drop in.

Mirrors/ Bath Enclosure Custom cut mirrors 48" tall. Custom shower enclosure in brushed
nickel finish with your choice of clear or obscure tempered glass.

Ceramic tile - Allowance (labor and material) is $9,815.00. This includes ceramic towel bars,
               soap dishes, shower pans etc. This works out to approximately $2.25/SF for
               floor tile and $1.40/SF for wall material.

Sheet rock - All walls and ceilings 1/2" finished with three coats, walls to receive light orange
peal spray finish, and ceilings to receive knock down finish. Tile areas to have tile board to
height of tile

Paint -    Exterior-   Primer - 100% Acrylic Latex for wood or siding
                       Paint - 100% Acrylic Flat Latex for wood or masonry
                       Trim paint - 100% Acrylic Satin Latex for wood or masonry

           Interior    Walls/Ceilings - (One color through out) Polyvinyl Acetate Flat latex
                       Wood Trim - (One color through out) 100% Acrylic Latex Semi
                                         Enamel
gloss

Plumbing -   Kitchen Sink   Upgraded Stainless Steel (undercount)
             Vanity Sinks   19" China
             Water Closets Elongated
             Valves  'DELTA' 'LELAND' Style in chrome finish


             See attached proposal by Ragano Plumbing.

Electrical-    Allowance Material for Decorative electrical fixtures, undercounter lighting, bulbs and fans $2,000.00

Cost of adding standard electrical options:

| | | |
|---|---|---|
| a) | Duplex Receptacle | $ 45.00 |
| b) | Switch | $ 45.00 |
| c) | Recess Can with switch | $ 85.00 |
| d) | Flood Light with motion/switch | $ 75.00 |
| f) | Phone  (3 pair wire) | $ 40.00 |
| g) | TV Outlet | $ 40.00 |
| h) | Assemble & Hang Fan (after trim) | $ 45.00 |
| i) | Floor Outlet with brass cover | $260.00 |

Note:
- Addition of more than 4 devices may necessitate the need for an additional circuit.  Which will be an additional cost.
- The service is budgeted to be overhead/ back to back (meter socket directly opposite interior breaker panel in garage),  Should TECO determine the point of attachment is at another location and we need to install a split service ( Added main breaker and feed) the cost will be an additional $650

HVAC - Consists of (2) systems. Both are High Efficiency Heat Pumps with a Seasonal Energy Efficiency Rating (SEER) of 13.0.

Gas piping- Allowance (labor and material) $2,000.00 (includes 65 gal HWH)

Floor covering - Allowance Carpet (labor and material)  $25.00/ sy  $1,250.00.  Wood (labor and material)  $14,680.00

Appliances-   Allowance (material, delivery and installation) $3,500.00

Alarm system - Allowance (labor and material) $800.00

Sound – Included Surround  prewire Family Room, Stereo pre-wire with volume control capability the following rooms Rear Porch, Dinning, Master Bedroom and Bedroom 5/Study

Structured Wiring –
• Phones Category 5 wiring with up to (6) outlets
• Cable RG6 wiring with up to (6) outlets also included is a Satellite exterior stub out
• All phone and cable wiring individually 'home run' to an interface panel located in the home

THERE IS NO PROVISION IN THIS PROPOSAL FOR THE FOLLOWING ITEMS:

• Site survey to City of Tampa specifications
• Gutters  (May be required by City of Tampa Storm water)
• Fencing
• Plans for permitting

This proposal may be subject to a cost review and increase if permitting and/or construction has not commenced within Ninety (90) days.

Sincerely,
Steve Carter

Steven R. Carter, Inc.

Acceptance of Proposal:
The above prices and specifications are satisfactory and are hereby accepted.  In the event of a discrepancy between the specifications and the plans as drawn, the specifications shall prevail. Steven R. Carter, Inc. is authorized to do the work as specified.  Payments will be made according to a mutually agreed upon staged draw schedule.

Accepted By: _Kelly O'Brien_ _____
                                                        Owner

_Lou D. O'Brien_ _____
                                                        Owner

Date: _1-11-2006_

SRC/pcw
Enclosures

3118 WALLCRAFT

| CONTRACT AMOUNT $352,416 | % | AMOUNT | START UP | 1ST | 2ND | 3RD | 4TH | 5TH |
|---|---|---|---|---|---|---|---|---|
| ADDRESS: 3118 WALLCRAFT | | | | | | | DATE: | |
| WORK COMPLETED | % | AMOUNT | START UP | 1ST | 2ND | 3RD | 4TH | 5TH |
| IMPACT FEES/PERMITS | 2% | $7,048.32 | $10,000.00 | | | | | |
| SITE PREP | 1% | $3,524.16 | | | | | | |
| FOOTERS | 1% | $3,524.16 | | | | | | |
| ROUGH PLUMBING | 2% | $7,048.32 | | | | | | |
| FOUNDATION WALLS/SLAB | 6% | $21,144.96 | | | | | | |
| EXTERIOR WALLS-1ST FLOOR | 3% | $10,572.48 | | | | | | |
| 1ST FLOOR INTERIOR PART | 4% | $14,098.64 | | | | | | |
| FL JOISTS, SUB-FL STAIRS | 3% | $10,572.48 | | | | | | |
| EXTERIOR WALLS TO ROOF | 3% | $10,572.48 | | | | | | |
| ROOF FRAMED & DRIED IN | 3% | $10,572.48 | | | | | | |
| SOFFIT INSTALLED | 1% | $3,524.16 | | | | | | |
| WINDOWS INSTALLED | 2% | $7,048.32 | | | | | | |
| 2ND FLOOR PARTITIONS | 4% | $14,098.64 | | | | | | |
| TUB SET PLUMBING | 2% | $7,048.32 | | | | | | |
| ELECTRICAL ROUGH-IN | 3% | $10,572.48 | | | | | | |
| A/C DUCTS INSTALLED | 3% | $10,572.48 | | | | | | |
| ROOFING COMPLETE | 5% | $17,620.80 | | | | | | |
| INSULATION WALLS | 1% | $3,524.16 | | | | | | |
| DRYWALL HUNG | 3% | $10,572.48 | | | | | | |
| DRYWALL SPRAY | 3% | $10,572.48 | | | | | | |
| CERAMIC TILE | 4% | $14,098.64 | | | | | | |
| INTERIOR TRIM | 7% | $24,669.12 | | | | | | |
| INTERIOR PAINT | 3% | $10,572.48 | | | | | | |
| EXTERIOR COMP FOR PAINT | 6% | $21,144.96 | | | | | | |
| KITCHEN CABINETS | 7% | $24,669.12 | | | | | | |
| PLUMBING COMPLETE | 2% | $7,048.32 | | | | | | |
| ELECTRICAL COMPLETE | 2% | $7,048.32 | | | | | | |
| EXTERIOR PAINT | 2% | $7,048.32 | | | | | | |
| DRIVEWAY/WALKS | 2% | $7,048.32 | | | | | | |
| A/C COMPRESSOR | 1% | $3,524.16 | | | | | | |
| FINISH FLOOR/CARPET | 4% | $14,098.64 | | | | | | |
| PUNCH OUT/CO | 5% | $17,620.80 | | | | | | |
| COMPLETE TO DATE | 100% | $352,416.00 | $352,416.00 | | | | | |
| START UP FUNDS PAID AT CLOSING | | | | | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | BY: | STEVEN R. CARTER, INC. | | Pres. | |
| BALANCE TO FINISH: | | $352,416.00 | | | | | | |

---

## RESIDENTIAL CONSRUCTION AGREEMENT

THIS RESIDENTIAL CONSTRUCTION CONTRACT ("Contract") is made and entered into by and between STEVEN R. CARTER, INC., a Florida corporation, 3808 West San Nicholas Street, Tampa, Fl 33629 (813) 250-0604 (CGCO44540) ("Contractor"), and KELLY and LORI O'BRIEN ("Buyer") regarding that certain real property situated in Hillsborough County, Florida with a street address of ___3118 WALLCRAFT ST,TAMPA, FL. 33629___ -

And legally described as:

> The West Half of Lot 7, Block 2, WEST BAY BLUFF, according to the map or plat thereof as recorded in Plat Book 5, Page 56, Public Records of Hillsborough County, Florida

(the "Lot"), upon which Lot improvements are to be constructed thereon by Contractor substantially in accordance with the plans and specifications attached hereto as Exhibit "A" and incorporated herein by reference ("Specifications"), plus any optional items or extras itemized in this Contract, or the riders attached thereto (collectively the "improvements"). The Contract together with all such riders shall be referred to as the "Agreement". The Lot and the Improvements are collectively referred to in this Agreement as the "Property."

1. **SCOPE OF AGREEMENT** (check one)

   Contractor hereby agrees to construct the Improvements on the Lot owned by Buyer, and Buyer hereby agrees to pay for the Improvements, pursuant to and in accordance with all of the terms and conditions set forth in this Agreement.

2. **PURCHASE PRICE** The purchase price ("Purchase Price") shall be: THREE HUNDRED FIFTY TWO THOUSAND FOUR HUNDRED SIXTEEN DOLLARS AND NO CENTS

   Total Purchase Price                                         $352,416.00

3. **METHOD OF PAYMENT** The Purchase Price shall be paid in the following manner:

   3.1   Buyer shall agree to deliver to Contractor a deposit in the amount of ($10,000.00) (the "Deposit"), which Deposit shall he disbursed at the closing of the construction loan in accordance with the terms and conditions of this Agreement. Unless Buyer otherwise defaults under this Agreement, the full amount of the Deposit shall be applied against the first draw payment due Contractor, or as otherwise required in the Buyer's construction loan agreement. All other payments to Contractor for the Improvements shall be paid in accordance with the draw/disbursement schedule attached to this Contract, or as otherwise agreed by Buyer and Contractor in writing. Payments not made by Buyer on the date due shall bear interest at the rate eighteen percent (18%) per annum from the date such payments were due.

   3.2   The deposit (and all interest which may be earned thereon) shall be non-refundable, except as provided in paragraph 4.1 below.

   3.3   The parties acknowledge that the Deposit has been required, among other reasons, to pay for certain items that would not otherwise be incorporated in the Property, and if the agreement shall terminate for any reason whatsoever, other than Buyer's default, after Contractor has commenced installation or construction any such option(s) (or after Contractor has ordered such option(s) from the manufacturers or suppliers thereof or has ordered any professional fees such as engineering) then the portion of the Deposit necessary to pay for such option(s) shall be paid to Contractor from the Deposit, notwithstanding any provision in the

Buyer's default, then the "Default" of other applicable provisions set forth below shall control.

3.4    ALTHOUGH BUYER RECOGNIZES THAT, AS THE PURCHASER OF A ONE-FAMILY OR TWO FAMILY RESIDENTIAL DWELLING UNIT, BUYER HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO TEN PERCENT OF THE PUCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT, BUYER SPECIFICALLY WAIVES SUCH RIGHT AND AGREES THAT ANY AND ALL SUCH DEPOSITS (A) SHALL NOT BE GOVERNED BY THE PROVISIONS OF SECTION 501.1375 FLORIDA STATUTES, AND (B) WILL NOT BE MAINTAINED IN AN INTEREST BEARING OR EXCROW ACCOUNT.

4.    FINANCING

4.1    In the event Buyer is obtaining mortgage loan financing, this Agreement shall be contingent upon Buyer obtaining, within forty-five (45) days from the effective Date (as defined below), a binding commitment for a mortgage loan from a lender approved by Contractor in the principal sum of not less than $_____ at an interest rate not to exceed _____. Buyer shall provide Contractor with written evidence of such commitment within such 45-day period. Buyer agrees to apply for such mortgage loan within three (3) business days after the signing of the Agreement in an amount as stated above, and to proceed with all due diligence to obtain such commitment. The commitment must meet the approval of Contractor in form and substance. In the event Buyer fails to obtain such commitment within such 45-day period through no fault or misrepresentation on the part of the Buyer, then Buyer shall have the right to terminate this Agreement by delivering written notice to Contractor within such 45-day period, and the Deposit (exclusive of interest earned thereon) shall be returned to Buyer, less any costs and expenses of Contractor actually incurred prior to that date or as a result of the placement of the loan application, including without limitation, appraisal fees. If Buyer desires to continue to proceed to the Closing and waive this financing contingency, then Buyer shall no notify Contractor in writing within such 45-day period, and Contractor shall continue to hold the Deposit, which shall then be fully nonrefundable, and this Agreement shall remain in full force and effect provided that Buyer has made other arrangements satisfactory to Contractor for the payment of the Purchase Price.

4.2    Buyer and Contractor agree that Buyer's designated lender shall be _____ _____. If Buyer is unable to obtain a binding commitment through that Lender, then Contractor in its sole discretion may designate another lender ("Lender").

4.3    If Buyer's failure to obtain such a loan commitment is due to Buyer's misrepresentation, failure to cooperate, failure to provide requested documents or failure to proceed diligently at any time during the term of this Agreement, then such failure shall be deemed to be a default under this Agreement by Buyer, and the Deposit shall be forfeited to Contractor as liquidated damages and not as a penalty, and this Agreement shall be immediately and automatically terminated and neither party shall have any further obligation to the other with respect to the Property.

5.    THE LOT

Buyer warrants and represents that Buyer has full fee title ownership of the Lot, free and clear of all liens or encumbrances except:_____ _____, and further warrants and represents that the Improvements contemplated in this Agreement may be lawfully built upon the Lot without need for variances, rezoning or further governmental approval(s).

6.  **AGREEMENT TO COMPLETE**   Contractor shall cause the Improvements to be substantially completed (as defined below) within approximately <u>270</u> days from the actual start of construction (as defined below), but in any event, not later than nine (9) _____ months _____ from _____ the Effective date, subject to delays caused by unavailability of material, strikes or other labor problems, moratoriums, governmental orders, acts of god, riot or other civil disturbance, acts of Buyer, or any other event which would support a defense based upon impossibility or impracticability of performance or for any reasons beyond Contractor's control.  For purposes of this paragraph, "substantially completed" means that the Improvements have been completed in the manner required by this agreement in Contractor's opinion (punchlist items excluded), but not earlier than satisfaction by Contractor of the conditions for the issuance of a temporary or final Certificate of Occupancy or final inspection for the Improvements by the appropriate governmental agency, whichever is later.  "Start of Construction" means the date on which footings are poured, or in the case of monolithic footings and slab, the day rough plumbing is begun.  Notwithstanding anything contained in the Agreement to the contrary, in no event shall Contractor be responsible for any damages, inconveniences or expenses suffered by Buyer due to Contractor's failure to substantially complete the Improvements within the time period set forth above.  Regardless of the reason for such delay.  start of construction is projected for the month of _____

Should the start of construction be delayed beyond that time by Buyer, or by reason of ruling or regulation of any governmental authority or by reason of any other cause not the fault of Contractor, then the Purchase Price may be increased due too any increase in labor or material costs to Contractor as a result of such delay.  However, if the delay in the start of construction is caused by Contractor, the Purchase Price will remain unchanged as a result of such delay. Notwithstanding the provisions of Florida Statutes 489.126 (which are hereby specifically waived by Buyer) or any provision in this Agreement to the contrary, Contractor shall have no obligation to commence the work or apply for any applicable permits or governmental authorizations or approval until after all Deposits have been paid to Contractor and any and all financing or other contingencies in this Agreement have been satisfied or otherwise waived in writing.

7.  **FINAL INSPECTION**.   When Contractor deems the Improvements to be substantially complete, Contractor shall furnish a notice of substantial completion to Buyer, and within five (5) days thereof Buyer shall attend a formal presentation of the Improvements with Contractor's representative during which any incomplete work or defects shall be itemized and the itemized list ("punchlist") shall be signed by Buyer and Contractor.  If Buyer does not inspect the Improvements at that time, Buyer shall have waived Buyer's right to such inspection and Buyer shall be deemed to have accepted the Improvements and release Contractor from liability for any incomplete work or visible defects not specifically noted at that time.

8.  POSSESSION   Possession of the Property shall be delivered to Buyer after the Certificate of Occupancy has been issued and all sums due Contractor under this Agreement have been paid in full.  Buyer shall in no event take possession or be entitled to take possession of the Property prior to that time.

9.  INSULATION   The type, thickness and r-value of insulation for the Improvement is described in the attached letter of Proposal

10. EXTRAS; OPTIONS; CHANGES   In the event that Buyer, at any time during construction of the Improvements, requests any extras, options or changes to the Specifications (whether as a result of Buyer's preference or as the result of any requirement imposed by any governmental authority or applicable board of association or otherwise), Buyer shall have the right to make such changes when practicable in the sole discretion of Contractor, subject to the terms and conditions of this paragraph.  Buyer hereby agrees to pay Contractor, upon request the total charge imposed by Contractor for any extras, options or changes and understands and agrees that installation of such extras, options or changes will not be commenced until payment in full is received by Contractor, unless otherwise agreed to by

Contractor in writing. Contractor's charge for and extra, option or change shall be non refundable, and shall be paid by Buyer in cash upon signing by Buyer and acceptance by Contractor in writing of such extra, option or change pursuant to an additional work order on Contractor's customary form, in order to permit timely completion of the Improvements. Contractor approval of any extra option or change shall be deemed void and of no effect if Contractor's charge for the extra, option or change is not timely paid. In the event any such changes are requested by Buyer more than fourteen (14) days following Buyer's signing of the Agreement, then each such change so requested by Buyer shall be subject to a processing fee of $50.00 per change in addition to the regular charge or credit applicable to the change requested. The time within which Contractor is to complete the Improvements shall be extended by the time necessary to perform the additional work.

11.  <u>WARRANTY</u>  Contractor warrants that the Improvements shall be free from defects in material and workmanship for a period of one year from the issuance of the Certificate of Occupancy or the date Buyer takes possession of the Property, which ever is earlier. **CONTRACTOR MAKES NO OTHER WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, QUALITY, DESIGN, CONDITION, CAPACITY, SUITABILITY OR PERFORMANCE OF THE IMPROVEMENTS OR WORKMANSHIP THEREOF OR AS TO INTELLECTUAL PROPERTY RIGHTS. CONTRACTOR'S LIABILITY FOR NON-CONFORMING IMPROVEMENTS (INCLUDING LATE DELIVERED PRODUCT) IS EXPRESSLY LIMITED TO THE REPAIR OR REPLACEMENT OF THE NON-CONFORMING WORK. SUCH REMEDY SHALL BE BUYER'S SOLE AND EXCLUSIVE REMEDY. CONTRACTOR SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL OR INCIDENTAL DAMAGES (INCLUDING BUT NOT LIMITED TO ANY LABOR OR OTHER CHARGES INCURRED BY BUYER ASSOCIATED WITH THE REPAIR OR REPLACEMENT OF NON-CONFORMING WORK) AND ALL SUCH DAMAGES ARE HEREBY EXCLUDED.** It is further agreed that any and all warranties shall be void if and when the Improvements or any portion thereof, or any structural element or support thereto is in any way altered, modified or removed by anyone other than Contractor. The foregoing disclaimer and waiver shall also apply to any and all express or implied warranty as to any "consumer products" as defined in the Magnuson Moss Warranty Act. 15 U.S.C. 12301, which consumer products shall not be warranted by Contractor; provided, however, that Contractor shall deliver to Buyer upon completion of the Improvements and final payment therefor any manufacturer's or supplier warranties with respect to such consumer products. Notwithstanding anything to the contrary contained in this Agreement, any limitation of warranty shall not apply to any warranties granted to Buyer by Contractor under the auspices of the VA or the FHA. If the Improvements include a swimming pool, the parties agree that upon completion of construction of the swimming pool, Contractor shall cause to be delivered to Buyer any warranty for the swimming pool which may be limited by the contractor employed to construct the swimming pool. **CONTRACTOR HAS MADE NO GEOLOGICAL OR ENVIRONMENTAL TESTS OR SURVEYS OF THE PROPERTY (INCLUDING THE LOT) AND MAKES NO REPRESENTATION OR WARRANTY CONCERNING GEOLOGICAL OR ENVIRONMENTAL MATTERS SUCH AS SINK HOLES OR RADON GAS AND SPECIFICALLY EXCLUDES SUCH GEOLOGICAL AND ENVIRONMENTAL MATTERS FROM ANY WARRANTIES GIVEN UNDER THIS AGREEMENT. BUYER ACKNOWLEDGES AND UNDERSTANDS THAT CONTRACTOR MAKES NO WARRANTY OR REPRESENTATION REGARDING SHIFTING SOILS, UNSETTLED SOILS, UNUSUAL ROCKS OR SUBSURFACE CONDITIONS, THE RISK OF WHICH BUYER HEREBY ASSUMES. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT THE LIMITED WARRANTY PROVIDED ABOVE DOES NOT INCLUDE DEFECTS CAUSED BY NORMAL WEAR AND TEAR, INSUBSTANTIAL OR IMMATERIAL VARIANCES OR DEFECTS, THE ELEMENTS, NATURAL DISASTERS OR FAULTY MAINTENANCE, OPERATION OR ABUSIVE USE. UNDER NO CIRCUMSTANCES SHALL CONTRACTOR BE LIABLE FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES. IF THE IMPROVEMENTS INCLUDE A SWIMMING POOL, BUYER EXPRESSLY ACKNOWLEDGES THAT POOL MARCITE IS A NATURAL PRODUCT AND THEREFORE A LIGHT GRAY SPOTTING OR STREAKING DISCOLORATION CALLED "MOTTLING" MAY OCCUR, WHICH BUYER**

**ACKNOWLEDGES AND AGREES IS A NORMAL CONDITION OF MARCITE FINISHES AND IS NOT A DEFECT.**

12. <u>SECURITY SYSTEM</u> Contractor may offer as an option to the plans and specifications, an alarm/security system to be installed by an independent security company not affiliated with Contractor. The installation of the system and continued subscription of the services provided by the Security Company shall be at the sole option and expense of Buyer. Contractor does not warrant or guarantee the equipment installed by the security company or the services provided by such security company, and Contractor shall not be liable for any event of breakdown or failure of such equipment or disruption of service. Contractor shall not install the equipment or maintain same or monitor same if external monitoring capabilities are included therewith. Contractor shall not be responsible for or bound by any representations or warranties made by the Security Company, written or oral. Buyer acknowledges and agrees that Contractor is not an insurer of Buyer's property or safety, or the property or safety of Buyer's guests, invitees or tenants. Contractor does not make or imply any warranty that the security equipment or services will prevent or lessen the effects of burglaries, fire or other occurrences or events which the system is or may be designed to detect, prevent or monitor. Buyer acknowledges and agrees that Contractor shall not be liable for loss or damage to property or person (including death) whether directly or indirectly due to any failure or non-performance of the system, the equipment or the component parts thereof, or the failure or non-performance of any of the services which may be provided by the security company, or the acts or omissions (negligent, intentional, or otherwise) of the security company or its officers, agents or employees.

13. <u>DEFAULT</u> In the event Buyer defaults under any of the terms or conditions of this Agreement prior to the commencement of construction, Contractor shall be entitled to retain the full amount of the Deposit paid or owed by Buyer to Contractor under this Agreement as liquidated damages, and not a penalty, for Buyer's default under this Agreement, it being agreed that in such a case Contractor's actual damages would be difficult to ascertain, in which event the parties shall be relieved of all obligations under the Agreement. In the event Buyer defaults under this Agreement after commencement of construction, Contractor shall be entitled to retain any and all sums paid to Contractor through that date, in addition to which Buyer shall pay Contractor, within ten (10) days of demand, the value of any and all work completed and/or materials ordered through the date of demand but not yet paid for by Buyer, along with Contractor's anticipated profit on the entire Agreement; Contractor may apply the Deposit to reduce the net amount due from Buyer. In the event Contractor shall default under this Agreement, Buyer's sole remedy shall be limited to the return of the Deposit(s) paid (except such portion of the Deposit as Contractor may be entitled to retain as otherwise provided in this Agreement), along with any other payments made to Contractor to that date (less the reasonable value of the work completed through that date), plus the sum of $1,000.00 as liquidated damages against Contractor, and not a penalty, for Contractor's default under this Agreement, in which event the parties shall be relieved of all obligations under the Agreement.

14. <u>VENUE; WAIVER OF JURY TRIAL</u> The parties to this Agreement specifically agree that the sole and exclusive venue for any litigation arising from or pertaining to this Agreement or the parties' rights and obligations thereunder shall be Hillsborough County, Florida, and further expressly waive any and all right to trial by jury in any such action(s). Buyer and Contractor specifically agree that notwithstanding anything to the contrary, the rights and obligations set forth in this paragraph shall survive (a) the Closing; (b) the termination of this Agreement by either party: or (c) the default under this Agreement by either party.

15. <u>ATTORNEYS' FEES AND COSTS</u> In any dispute, including breach, enforcement or interpretation arising out of this Agreement, the prevailing party in such dispute shall be entitled to recover reasonable attorneys' fees, legal assistants' fees, costs and expenses, including, without limitation, those incurred in mediation, trial, appeal or bankruptcy actions.

### 16. DANGEROUS CONDITION; CONSTRUCTION WORK; ENTRY UPON PROPERTY

16.1    Buyer understands and agrees that the Property is a construction site and that the Property and the Improvements, equipment and supplies located on the Property constitute a danger to those who may enter on the Property. Buyer shall not enter onto the Property prior to transfer of possession as provided in this Agreement unless authorized to do so and accompanied by Contractor's representative. Any unauthorized, unaccompanied entry by Buyer shall constitute a breach of this Agreement by Buyer, at Contractor's election. Any entry by Buyer onto the Property, whether accompanied, authorized, or not, shall be done at Buyer's own risk and in compliance with all federal, state and local safety laws and regulations. Buyer waives, releases and agrees to indemnify Contractor, its officers, directors, employees, agents, subcontractors and suppliers from any and all claims, losses or damage, whether to property or persons, suffered or incurred by Buyer, Buyer's family members or guests, as a direct or indirect result of any entry onto the Property.

16.2    Buyer agrees that supervision and direction of the working forces, including, without limitation, all subcontractors, is to be done exclusively by Contractor, and Buyer agrees not to issue any instructions to the working forces or otherwise hinder construction or installation of improvements on the Property. Buyer shall not do or have any work done on the Property, nor may Buyer store any possession thereon, prior to transfer of possession to Buyer.

17.  CASUALTY BEFORE COMPLETION Contractor shall furnish Builder's Risk Insurance in the full amount of the Purchase Price during the construction period; Buyer shall furnish at Buyer's expense all other insurance coverage Buyer deems necessary in order to protect Buyer's interests in the Property.  In the event the Improvements are damaged by fire or other casualty during construction which is covered and paid by such Builder's Risk Insurance, Contractor shall perform the repairs necessitated thereby, and Contractor shall be entitled to a corresponding extension of time within which to complete the Improvements.  In the event the Improvements are damaged by fire or other casualty during construction which is not covered by such Builder's Risk Insurance, or if the coverage afforded by such insurance is insufficient to cover the expense of all necessary repairs, Buyer shall pay for such repair expenses not covered or not completely covered by such insurance, Contractor shall perform the repairs necessitated thereby, and Contractor shall be entitled to a corresponding extension of time within which to complete the Improvements.

18.    UTILITIES The cost of installation of water and electric meters for the Property will be included in the Purchase Price. Contractor will pay utility bills for electricity and water used during construction of the Improvements. Buyer understands and agrees that all utilities will be disconnected by Contractor three (3) business days following the issuance of a temporary or final Certificate of Occupancy, whichever is earlier, and it shall be Buyer's sole responsibility to arrange for the supply of all utilities to the Property thereafter.

19.    SELECTIONS Buyer acknowledges and agrees that any and all selections to be made by Buyer shall be promptly and timely made in accordance with Contractor's requirements so that Contractor's work or the progress thereof is not delayed.  In the event Buyer fails to furnish written selections within the time provided by Contractor, Contractor may make such selections as it deems appropriate in its sole discretion, and shall be entitled to a corresponding extension of time to complete the Improvements.

20.    ALLOWANCES; BUYER'S SELECTION OF PERSONS TO PERFORM OR FURNISH ALLOWANCE ITEMS  Buyer acknowledges that a portion of the Purchase Price may include allowances for various items.  In the event that the costs associated with Buyer's selection of such allowance items shall exceed the allowance established by Contractor, Buyer shall promptly pay such excess amount to Contractor within five (5) days of Contractor's invoice for same; in the

event that the costs shall not exceed the allowance, Buyer shall be entitled to any credit. In the event that Buyer selects a subcontractor or supplier to perform or furnish an allowance item, Contractor's sole responsibility shall be to pay such subcontractor or supplier an amount not to exceed to the allowance amount or such excess amount as may have been actually paid by Buyer to Contractor, and in any such circumstance any contract entered into between Contractor and the subcontractor or supplier selected by Buyer shall be deemed to have been entered into by Contractor solely as the disclosed agent and at the direction of Buyer. In no event shall Contractor be responsible for any delay, breach of contract, variation, inferior or unacceptable quality or quantity, dispute or non-performance on the part of the subcontractor or supplier selected by Buyer.

21. RADON GAS DISCLOSURE Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

22. BINDING EFFECT; EFFECTIVE DATE The "Effective Date" shall be the date on which the last of Buyer or an officer or authorized agent of Contractor executes this Agreement, and at that time this Agreement shall become a binding contract between Contractor and Buyer and shall inure to the benefit of the heirs, representatives, successors and permitted assigns of such parties. If the Agreement is signed by someone other than an officer of Contractor, this Agreement shall not be binding upon Contractor unless and until an officer of Contractor agrees in writing that Contractor desires to be bound hereby. If Buyer consists of more than one (1) person or entity, the obligations assumed hereunder by such persons or entities are hereby declared to be joint and several. If Buyer is a corporation or a partnership, the person(s) signing this Agreement on behalf of such corporation or partnership hereby warrant(s) that they have the full authority from such corporation or partnership to sign this Agreement and obligate the corporation or partnership hereunder and said person(s) and the corporation or partnership shall be jointly and severally liable for all amounts that may be due and owing to Contractor under the terms of this Agreement, including attorney's fees and costs. By signing this Agreement, the signor(s) acknowledge(s) that they have read this Agreement and are familiar with its terms and conditions.

23. TIME Time is of the essence of this Agreement. In computing time periods of less than six (6) days, Saturdays, Sundays, and state or national legal holidays shall be excluded. Any time periods provided for in this Agreement which shall end on a Saturday, Sunday or a legal holiday shall extend to 5:00 p.m. of the next business day.

24. SUSPENSION FOR NON-PAYMENT In addition to any other right hereunder, in the event that Contractor is not paid any sums on the date they are due, Contractor may, upon 72 hours notice to Buyer, stop work and suspend all performance until such time as the payment(s) due and owing Contractor (including any interest thereon) have been paid. The time to reach substantial completion shall be automatically extended by such time period, and the Purchase Price shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, which expenses shall be promptly paid by Buyer before Contractor shall be under any duty or obligation to resume construction. In the event such non-payment shall continue for ten (10) days or more from the date such payment was due, Buyer shall be deemed to be in default and the provisions of paragraph 14 shall apply and Contractor may terminate all performance under this Agreement without liability to Buyer.

25. SEVERABILITY In the event any part, term, sentence, clause or provision of this Agreement should be held to he invalid or unenforceable, such invalidity or unenforceability shall not affect in any way the remainder of this Agreement, not otherwise invalid or unenforceable, all of which shall continue, nevertheless, in full force and effect.

26.  **GOVERNING LAW** This Agreement shall be construed in accordance with the laws of the State of Florida.

27.   **PROHIBITION AGAINST ASSIGNMENT** This Agreement shall not be assigned by Buyer without prior written consent of Contractor.

28. **COUNTERPARTS** This Agreement may be signed in any number of counterparts each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument.

29. **EXHIBITS; RIDERS; ADDENDA** All exhibits, riders and addenda attached to or otherwise referenced in this Agreement or listed on **Exhibit "B"** attached to this Agreement are hereby incorporated into and made a part of this Agreement.

30.  **NO CONTRACTOR'S REPRESENTATIONS; ENTIRE AGREEMENT:**  Buyer certifies that Buyer has read each and every part of this Agreement, including any addenda, and that this Agreement constitutes the entire agreement between Buyer and Contractor. No agreements, promises, representations or warranties have been made by Contractor or any of its salespersons or other agents, officers, or employees except as expressly stated in this Agreement. No agreements, promises, representations or warranties, whether oral, written or otherwise, made by Contractor, its agents or employees, or by any broker, contractor or by any other person, are binding upon Contractor unless expressly stated in this Agreement. This Agreement shall be construed as if both Buyer and Contractor equally participated in the drafting thereof.

31.   **CONSTRUCTION INDUSTRIES RECOVERY FUND** Payment may be available from the Construction Industries Recovery Fund if you lose money on a project performed under contract, where the loss results from specified violations of Florida law by a state-licensed contractor. For information about the Recovery Fund and filing a claim, contact the Florida Construction Licensing Board at the following telephone number and address: 7960 Arlington Expressway, Jacksonville, Florida 32211-7467; (904) 727-6530.

# ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001-713.37, FLORIDA STATUTES), THOSE WHO WORK ON YOUR PROPOERTY OR PROVIDE MATERIALS AND ARE NOT PAID IN FULL HAVE A RIGHT TO ENFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. THIS CLAIM IS KNOWN AS A CONSTRUCTION LIEN. IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS OR MATERIAL SUPPLIERS OR NEGLECTS TO MAKE OTHER LEGALLY REQUIRED PAYMENTS, THE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR PAYMENT,

EVEN IF YOU HAVE PAID YOUR CONTRACTOR IN
FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR,
YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON
YOUR PROPERTY. THIS MEANS IF A LIEN IS
FILED YOUR PROPERTY COULD BE SOLD
AGAINST YOUR WILL TO PAY FOR LABOR,
MATERIALS, OR OTHER SERVICES THAT YOUR
CONTRACTOR OR A SUBCONTRACTOR MAY
HAVE FAILED TO PAY. FLORIDA 'S
CONSTUCTION LIEN LAW IS COMPLEX AND IT IS
RECOMMENDED THAT WHENEVER A SPECIFIC
PROBLEM ARISES, YOU CONSULT AN
ATTORNEY.

IN WITNESS WHEREOF, this Agreement is entered into as of the Effective Date.

Agreed and Accepted:

Buyers                                          STEVEN R. CARTER, INC.

_Kelly O'Brien_ Date 1-11-2006   by: _____ Date 1/11/06

_Lori D. O'Brien_ Date 1/11/06

|  |  |  |
|---|---|---|
| Date: | | 05/01/2007 |
| Loan Number: | | ▇9365 |
| FHA/VA/MI/Case Number: | | |
| Mortgagor(s) or Trustor(s): | | KELLY,P,OBRIEN |
| | | LORI,D,OBRIEN |
| | | |
| | | |
| Property Address: | | 3120 W WALLCRAFT AVE |
| City, State, Zip Code: | | TAMPA FL 33611 |

*Construction mod to permanent loan* (handwritten)

## Agreement For Modification or Extension of Mortgage

The Mortgagor (or Trustor) identified above (hereinafter referred to as the "Mortgagor") does hereby apply for a **Modification** of the payment provisions of the above-referenced mortgage loan covering an indebtedness owing from (Modification or Extension) the Mortgagor to  Third Federal Savings and Loan Association of Cleveland  (hereinafter referred to as "Mortgagee"), evidenced by a note (or bond) and secured by a real property mortgage or trust deed (said note or bond and real property mortgage or trust deed are hereinafter referred to as the "Mortgage"), and the Mortgagor represents and agrees as follows:

(1) Mortgagor is now the owner and holder of the real property encumbered by said Mortgage, recorded in the public records in the County of  HILLSBOROUGH , State of  FLORIDA , in book  16149 , page  51 , or document or file number  2006092891 .

(2) Under the terms of said Mortgage, there remains unpaid as of the first day of the month in which this Agreement is made, the sum of $  357991.00 , for principal, $ -0- of interest thereon, $-0-, of advances made by the Mortgagee thereunder, and $ -0-  for interest on such advances, aggregating a total sum of $  357991.00 , for which amount the Mortgagor is indebted to the Mortgagee under said Mortgage, which is a valid lien, to which Mortgagor has no defenses, offsets, or counterclaims.

(3) Mortgagor hereby deposits with the Mortgagee, if such deposits is required by the Mortgagee, the sum of $  184,945.00 , which is to be applied to the present balance due on the principal of said Mortgage (including advances, if any), and the sum of $ -0- , which is to be applied to the delinquent interest due on the said principal (and advances, if any), with the application of said deposited amounts to be made as of the effective date of this Agreement. If the modification or extension is not agreed to by Mortgagee, said deposited amount shall be returned to Mortgagor.

(4) Mortgagor agrees the terms of said Mortgage are modified or extended relative to the payment of the said indebtedness by providing for payment of the balance of the principal, including any unpaid interest due thereon (after the aforementioned deposits, if any, have been applied thereto) as follows: Said total balance of $  174,055.00 is to be paid, plus interest on the unpaid balance at a rate of  6.200 % per annum (with such rate changing periodically if required by the provisions of the mortgage note.) in equal monthly installments of $  1081.03 (excluding the sums required to be deposited for the payment of insurance, taxes, etc.). The first of said installments shall become due and payable on the 1st day of  June ,  2007  and the remaining installments, as they may be changed periodically if required by the provisions of the mortgage note, successively, on the 1st day of each and every month thereafter, until said mortgage indebtedness is fully paid, except that, if not sooner paid, the final payment of principal and interest shall be due and payable on the 1st day of  March ,  2036  which is the present or extended maturity date.

(5) Mortgagor agrees to make the payments as specified in Paragraph (4) hereof and understands and agrees that:
  (a) All the rights and remedies, stipulations, and conditions contained in said Mortgage relating to default in the making of payments under the Mortgage shall also apply to default in the making of said modified payments hereunder.

MODEXT/11-03

b) All covenants, agreements, stipulations and conditions in said Mortgage shall be and remain in full force and effect, except as herein modified, and none of the Mortgagor's obligations or liabilities under said Mortgage shall be diminished or released by any provisions hereof; nor shall this Agreement in any way impair, diminish, or affect any of the Mortgagee's rights under or remedies on the Mortgage, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which the Mortgagee is presently entitled against any property or any other persons in any way obligated for or liable on the Mortgage, are expressly reserved by the Mortgagee.

(c) All costs and expenses incurred by Mortgagee in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by Mortgagor and shall be secured by said Mortgage, unless stipulated otherwise by Mortgagee.

(d) Mortgagor agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by the Mortgagee, shall bind and inure to the heirs, executors, administrators, and assigns of the Mortgagor.

(6) For the purpose of inducing and influencing the Mortgagee to execute this Agreement, the undersigned Mortgagor represents of his or her own knowledge that the names of all owners or other persons having an interest in the mortgaged property are as follows:

KELLY, P, OBRIEN                         LORI, D, OBRIEN
_____          _____

_____          _____

All such persons identified above are of legal age, and none is under any legal disability, except as follows:

_____          _____

_____          _____

**Executed by:**

X _____        _____
  KELLY, P, OBRIEN          (Mortgagor)   LORI, D, OBRIEN          (Mortgagor)

X _____        _____
                           (Mortgagor)                            (Mortgagor)

**\*Acknowledgement**

The undersigned, being obligated for the payment of the above-described Mortgage indebtedness hereby consents to the execution of this Agreement between the Mortgagor therein described and the Mortgagee, and further consents to any modification or extension of the Mortgage under said Agreement.

X _____    X _____
          (Co-Maker or Endorser)                    (Co-Maker or Endorser)

AGREED TO BY:
Third Federal Savings and Loan
Association of Cleveland:                 _____
(Mortgage Servicer)-(Mortgage of Record)

                                          _____

_____          _____
Paul T. Kobylesky, Vice President

                                          _____

_____          _____
(Date)                                    (Date)

\*The execution of this agreement should be witnessed and the appropriate acknowledgment clause should be added, if these are requirements under local law. In addition, if required under local law or practice, this Agreement should be filed for record.

Fannie Mae
Form 181 July 99

MODEXT.MDF/11-03

| | |
|---|---|
| Date: | 05/01/2007 |
| Loan Number: | ████9365 |
| FHA/VA/MI/Case Number: | |
| Mortgagor(s) or Trustor(s): | KELLY,P,OBRIEN |
| | LORI,D,OBRIEN |
| | |
| | |
| | |
| Property Address: | 3120 W WALLCRAFT AVE |
| City, State, Zip Code: | TAMPA FL 33611 |

*(handwritten, left margin:)* Construction mod to permanent loan

## Agreement For Modification or Extension of Mortgage

The Mortgagor (or Trustor) identified above (hereinafter referred to as the "Mortgagor") does hereby apply for a **Modification** of the payment provisions of the above-referenced mortgage loan covering an indebtedness owing from (Modification or Extension) the Mortgagor to  Third Federal Savings and Loan Association of Cleveland  (hereinafter referred to as "Mortgagee"), evidenced by a note (or bond) and secured by a real property mortgage or trust deed (said note or bond and real property mortgage or trust deed are hereinafter referred to as the "Mortgage"), and the Mortgagor represents and agrees as follows:

(1) Mortgagor is now the owner and holder of the real property encumbered by said Mortgage, recorded in the public records in the County of  HILLSBOROUGH , State of  FLORIDA , in book  16149 , page  51 , or document or file number  2006092891 .

(2) Under the terms of said Mortgage, there remains unpaid as of the first day of the month in which this Agreement is made, the sum of $  357991.00 , for principal, $ -0- of interest thereon, $-0-, of advances made by the Mortgagee thereunder, and $ -0-  for interest on such advances, aggregating a total sum of $  357991.00 , for which amount the Mortgagor is indebted to the Mortgagee under said Mortgage, which is a valid lien, to which Mortgagor has no defenses, offsets, or counterclaims.

(3) Mortgagor hereby deposits with the Mortgagee, if such deposits is required by the Mortgagee, the sum of $  184,945.00 , which is to be applied to the present balance due on the principal of said Mortgage (including advances, if any), and the sum of $ -0- , which is to be applied to the delinquent interest due on the said principal (and advances, if any), with the application of said deposited amounts to be made as of the effective date of this Agreement. If the modification or extension is not agreed to by Mortgagee, said deposited amount shall be returned to Mortgagor.

(4) Mortgagor agrees the terms of said Mortgage are modified or extended relative to the payment of the said indebtedness by providing for payment of the balance of the principal, including any unpaid interest due thereon (after the aforementioned deposits, if any, have been applied thereto) as follows: Said total balance of $  174,055.00 is to be paid, plus interest on the unpaid balance at a rate of  6.200 % per annum (with such rate changing periodically if required by the provisions of the mortgage note.) in equal monthly installments of $  1081.03 (excluding the sums required to be deposited for the payment of insurance, taxes, etc.). The first of said installments shall become due and payable on the 1st day of  June , 2007  and the remaining installments, as they may be changed periodically if required by the provisions of the mortgage note, successively, on the 1st day of each and every month thereafter, until said mortgage indebtedness is fully paid, except that, if not sooner paid, the final payment of principal and interest shall be due and payable on the 1st day of  March , 2036  which is the present or extended maturity date.

(5) Mortgagor agrees to make the payments as specified in Paragraph (4) hereof and understands and agrees that:
(a) All the rights and remedies, stipulations, and conditions contained in said Mortgage relating to default in the making of payments under the Mortgage shall also apply to default in the making of said modified payments hereunder.

(a) All covenants, agreements, stipulations and conditions in said Mortgage shall be and remain in full force and effect, except as herein modified, and none of the Mortgagor's obligations or liabilities under said Mortgage shall be diminished or released by any provisions hereof; nor shall this Agreement in any way impair, diminish, or affect any of the Mortgagee's rights under or remedies on the Mortgage, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which the Mortgagee is presently entitled against any property or any other persons in any way obligated for or liable on the Mortgage, are expressly reserved by the Mortgagee.

(c) All costs and expenses incurred by Mortgagee in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by Mortgagor and shall be secured by said Mortgage, unless stipulated otherwise by Mortgagee.

(d) Mortgagor agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by the Mortgagee, shall bind and inure to the heirs, executors, administrators, and assigns of the Mortgagor.

(6) For the purpose of inducing and influencing the Mortgagee to execute this Agreement, the undersigned Mortgagor represents of his or her own knowledge that the names of all owners or other persons having an interest in the mortgaged property are as follows:

KELLY,P,OBRIEN          LORI,D,OBRIEN

All such persons identified above are of legal age, and none is under any legal disability, except as follows:

**Executed by:**

X _____     _____
KELLY,P,OBRIEN      (Mortgagor)     LORI,D,OBRIEN     (Mortgagor)

X _____     _____
       (Mortgagor)             (Mortgagor)

**\*Acknowledgement**
The undersigned, being obligated for the payment of the above-described Mortgage indebtedness hereby consents to the execution of this Agreement between the Mortgagor therein described and the Mortgagee, and further consents to any modification or extension of the Mortgage under said Agreement.

X _____   X _____
     (Co-Maker or Endorser)           (Co-Maker or Endorser)

AGREED TO BY:
Third Federal Savings and Loan
Association of Cleveland:
(Mortgage Servicer)-(Mortgage of Record)

Paul T. Kobylesky, Vice President

_____
(Date)

_____
(Date)

*The execution of this agreement should be witnessed and the appropriate acknowledgment clause should be added, if these are requirements under local law. In addition, if required under local law or practice, this Agreement should be filed for record.

Fannie Mae
Form 181 July 99

MODEXT.MDF/11-03

4c Bayshore

CONSTRUCTION LOAN

THIS IS NOT A CERTIFIED COPY

PREPARED BY:
THIRD FEDERAL SAVINGS
7007 BROADWAY AVENUE
CLEVELAND, OH 44105

Return To:

Loan Completion Department

INSTR # 2006092891
O BK 16149 PG 0051
Pgs 0051 - 56; (6pgs)
RECORDED 02/23/2006 09:46:52 AM
PAT FRANK CLERK OF COURT
HILLSBOROUGH COUNTY
DOC TAX PD(F.S.201.08) 1,256.50
INT.TAX PD(F.S.199) 718.00
DEPUTY CLERK L Pertuis

9365

**TOTAL INDEBTNESS, EXCLUDING INTEREST AND SUMS ADVANCED IN ACCORDANCE HEREWITH, NOT TO EXCEED $359,000.**

[Space ...]

**MORTGAGE**

DEFINITIONS

Words used in multiple sections of this document are defined below and in the Master Mortgage Form (as hereinafter defined).
**(A) "Security Instrument"** means this document, which is dated February 20 , 2006 , together with all Riders to this document and in the Master Mortgage Form.
**(B) "Borrower"** is **KELLY P OBRIEN AND LORI D OBRIEN, HUSBAND AND WIFE**

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is **Third Federal Savings and Loan Association of Cleveland**. Lender is a **Federal Savings Association** organized and existing under the laws of the **United States of America**. Lender's address is **7007 Broadway Avenue, Cleveland, OH 44105**. Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated February 20 , 2006 . The Note states that Borrower owes Lender **Three Hundred Fifty Nine Thousand and no/100** Dollars (U.S. $ 359,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **March 01, 2036**
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☒ Planned Unit Development Rider ☒ Legal Description
☐ 1-4 Family Rider ☐ Biweekly Payment Rider ☒ Other(s) [specify] **Construction Loan Rider**

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the
**County** of **HILLSBOROUGH** :
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

**Parcel No.:** **127850-0100**

which currently has the address of

**LOT 7 BLOCK 2**
[Street]

**TAMPA** , Florida **33629-0000** ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

T8580 - FL

Page 1 of 2

9365

BEST IMAGE(S)

## MASTER MORTGAGE FORM

All terms, provisions, covenants, conditions, obligations, powers and other contents of that certain master mortgage form ("Master Mortgage Form") recorded on **10/26/04** , pursuant to Section 695.02, Florida Statutes in the county in which the above described property is situated  are incorporated by reference herein as fully and to the same extent as if set forth and contained herein.

Third Federal Savings and Loan Association of Cleveland (sometimes on title line only, Third Federal Savings and Loan Association of Cleveland), has recorded a master mortgage form Instrument No. **2004416122** in the following county in the State of Florida at the following Official Record Book and Pages: O.R. Book **14342** , Page **0580-0588** , of the Public Records of **HILLSBOROUGH** County, Florida.

COPY:

A copy of the Master Mortgage Form has been furnished to the mortgagor prior to the execution of this Security Instrument and mortgagor hereby acknowledges receipt of the same by signing at the end of this instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument (including but not limited to the Master Mortgage Form) and in any Rider executed by Borrower and recorded with it. If for any reason the Master Mortgage Form shall not be deemed a part of this Security Instrument, this two (2) page instrument, plus any Rider(s) and attached legal description shall stand by itself as a mortgage document, binding on the Borrower for the benefit of Third Federal Savings and Loan Association of Cleveland, its successors and assigns.

- Borrower **KELLY P. OBRIEN**
2912 W MARLIN AVE
TAMPA, FL 33611

- Borrower **LORI D. OBRIEN** (Seal)
2912 W MARLIN AVE
TAMPA, FL 33611

- Borrower

- Borrower (Seal)

- Borrower

- Borrower (Seal)

Signed, sealed and delivered in the presence of:

NANCY H. PEREZ

State of **Florida**
County of **Hillsborough**

The foregoing instrument was acknowledged before me this **20th** day of **February, 2006** by **KELLY P. OBRIEN LORI D. OBRIEN , husband and wife**

who is personally known to me or who has produced **drivers licenses** as identification.

NANCY H. PEREZ
MY COMMISSION # DD 349678
EXPIRES: September 7, 2008
Bonded Thru Notary Public Underwriters

Notary Public
**NANCY H. PEREZ**

T6560/FL – 2006.01

9365

EXHIBIT "A"

The West 1/2 of Lot 7, Block 2 of WEST BAY BLUFF, according to the Plat thereof as recorded in Plat Book 5, Page(s) 56, of the Public Records of Hillsborough County, Florida.



9365

## CONSTRUCTION LOAN RIDER TO MORTGAGE

THIS CONSTRUCTION LOAN RIDER TO MORTGAGE is made effective as of the date of the Mortgage from the undersigned Borrower ("Borrower") to THIRD FEDERAL SAVINGS AND LOAN ASSOCIATION OF CLEVELAND (the "Lender") (the "Mortgage") given to secure that certain Note (the "Mortgage Note") from the Borrower to Third Federal of the same date, and amends and supplements the Mortgage and becomes a part of the Mortgage in the following respects:

1.     Borrower and Lender have entered into a Residential Construction Loan Agreement on or even date herewith, pursuant to which Lender will disburse amounts up to the principal sum stated in the Mortgage Note for the construction of residential improvements on the property secured by the Mortgage during the period commencing with the date of the Mortgage Note and ending on the earlier of (a) the date of substantial completion of the Improvements, or (b) the date of occupancy thereof, or (c) the last day of the 12th calendar month following the date of the Mortgage Note (the "Construction Period"). The Mortgage secures the performance by the Borrower of the covenants and agreements of the Residential Construction Loan Agreement, the terms and conditions of which are incorporated herein by reference during the Construction Period but not thereafter.

2.     An Event of Default, as such term is defined in the Residential Construction Loan Agreement, shall constitute a breach under the Mortgage and shall entitle the Lender to take whatever remedies are permitted under the Mortgage, including acceleration.

WITNESSES:                                                  BORROWER(S):

_Nancy D. Perez_ (signature)                               _Kelly P. O'Brien_ (signature)
NANCY H. PEREZ                                             KELLY P. OBRIEN
                                                           2912 W MARLIN AVE
                                                           TAMPA, FL 33611

_Rico Casares_ (signature)                                 _Lori D. O'Brien_ (signature)
Rico Casares                                               LORI D. OBRIEN
                                                           2912 W MARLIN AVE
                                                           TAMPA, FL 33611

_____                           _____


STATE OF  Florida

COUNTY OF Hillsborough

        The foregoing instrument was acknowledged before me this 20th day of February , 2006 , by Kelly P. OBrien and Lori D. OBrien _____ who is personally known to me, or has produced drivers licenses _____ as identification.

                                                           _Nancy D. Perez_ (signature)
                                                           Notary Public

T8507 - 7/01                                               NANCY H. PEREZ




THIS IS NOT A
CERTIFIED COPY

9365

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this _____ day of _____ , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **THIRD FEDERAL SAVINGS AND LOAN ASSOCIATION**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**LOT 7 BLOCK 2
TAMPA, FL 33629-0000**

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in **the Declaration of Covenants, Conditions, and Restrictions**

(the "Declaration"). The Property is a part of a planned unit development known as

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

**MULTISTATE PUD RIDER**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          **Form 3150 1/01**

ITEM 1622L1 (0011)                    *(Page 1 of 2 pages)*                    GREATLAND ■
                                                                To Order Call: 1-800-530-9393  ⊐ Fax: 616-791-1131
MFCD8519

9365

THIS IS NOT A CERTIFIED COPY

9365

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in pages 1 and 2 of this PUD Rider.

_Kelly P. O'Brien_ (Seal)
**KELLY P. OBRIEN** -Borrower

_Lori D. O'Brien_ (Seal)
**LORI D. OBRIEN** -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

**MULTISTATE PUD RIDER**—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3150 1/01
ITEM 1622L2 (0011)    *(Page 2 of 2 pages)*    To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131    GREATLAND ■
MFCD8519

9365

| A. | U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT SETTLEMENT STATEMENT | B. | TYPE OF LOAN |
|---|---|---|---|

**Star Title Partners of Tampa, LLC**
3450 Buschwood Park Drive, Suite 345
Tampa, Florida 33618
(813) 319-6633 fax: (813) 319-6644

| 1. ☐ FHA | 2. ☐ FMHA | 3. ☐ CONV. UNINS. |
|---|---|---|
| 4. ☐ VA | 5. ☐ CONV. INS. | |

6. File Number: TP11175    7. Loan Number:

8. Mortgage Ins Case No.

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked (poc) were paid outside the closing. They are shown here for informational purposes and are not included in the totals.*

| D. Buyer: | John Merrill Investments, Inc. a California corporation<br>1261 N. Lakeview Avenue, #J-701<br>Anaheim Hills, CA 92807 |
|---|---|
| E. Seller: | Kelly O'Brien and Lori O'Brien, husband and wife<br>3120 W. Wallcraft Avenue<br>Tampa, Florida 33611 |
| F. Lender: | |
| G. Property: | 3120 W. Wallcraft Avenue<br>Tampa, Hillsborough County, Florida 33611<br>The West 1/2 of Lot 7, Block 2, West Bay Bluff, Book 5, Page 56, Hillsborough County, Florida |
| H. Settlement Agent: | Star Title Partners of Tampa, LLC |
| Place of Settlement: | 3450 Buschwood Park Drive, Suite 345, Tampa, Florida 33618  Hillsborough County |
| I. Settlement Date: | February 17, 2012 |

| J. | Summary of Buyer's Transaction | | K. | Summary of Seller's Transaction | |
|---|---|---|---|---|---|
| **100. Gross Amount Due From Buyer:** | | | **400. Gross Amount Due To Seller:** | | |
| 101. | Contract Sales Price | 340,000.00 | 401. | Contract Sales Price | 340,000.00 |
| 102. | Personal Property | | 402. | Personal Property | |
| 103. | Settlement Charges to Buyer (line 1400) | 268.50 | 403. | | |
| **Adjustments for Items Paid by Seller in Advance:** | | | **Adjustments for Items Paid by Seller in Advance:** | | |
| 106. | City / Town Taxes | | 406. | City / Town Taxes | |
| 107. | County / Parish Taxes | | 407. | County / Parish Taxes | |
| 108. | Assessments | | 408. | Assessments | |
| **120.** | **Gross Amount Due from Buyer:** | **340,268.50** | **420.** | **Gross Amount Due to Seller:** | **340,000.00** |
| | | | | | |
| **200. Amounts Paid by or in Behalf of Buyer:** | | | **500. Reductions in Amount Due to Seller:** | | |
| 201. | Deposit / Earnest Money | | 501. | Excess Deposit (see instructions) | |
| 202. | Principal Amount of New Loan | | 502. | Settlement Charges to Seller (Line 1400) | 19,780.00 |
| 203. | Existing Loan(s) | | 503. | Existing Loan(s) | |
| 204. | | | 504. | Payoff of First Mortgage to Third Federal | 143,416.78 |
| 205. | | | 505. | Payoff of Second Mortgage | |
| 206. | | | 506. | Purchase Money Mortgage | |
| **Adjustments for Items Unpaid by Seller:** | | | **Adjustments for Items Unpaid by Seller:** | | |
| 210. | City / Town Taxes | | 510. | City / Town Taxes | |
| 211. | County / Parish Taxes Jan 1, 2012 thru Feb 16, 2012 | 150.88 | 511. | County / Parish Taxes Jan 1, 2012 thru Feb 16, 2012 | 150.88 |
| 212. | Assessments | | 512. | Assessments | |
| **220.** | **Total Paid by / for Buyer:** | **150.88** | **520.** | **Total Reductions in Amount Due Seller:** | **163,347.66** |
| | | | | | |
| **300. Cash at Settlement from / to Buyer:** | | | **600. Cash at Settlement to / from Seller:** | | |
| 301. | Gross Amount due from Buyer (line 120) | 340,268.50 | 601. | Gross Amount due to Seller (line 420) | 340,000.00 |
| 302. | Less Amount Paid by/for Buyer (line 220) | 150.88 | 602. | Less Reductions Amount due Seller (line 520) | 163,347.66 |
| | | | | | |
| **303.** | **Cash From Buyer:** | **$340,117.62** | **603.** | **Cash To Seller:** | **$176,652.34** |

*Sale of Wallcraft*

O'Brien Doc ID 361431

| | | Paid from Buyer's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|
| **700. Total Sales / Broker's Commission:** | | | |
| Based on Price $340,000.00 @ 4.50% = $15,300.00 | | | |
| Division of Commission as follows | | | |
| 701. 15,300.00 to GN Enterprises, LLC dba Keller Williams Tampa Properties | | | |
| 702. | | | |
| 703. Commission Paid at Settlement | | | 15,300.00 |
| 704. Transaction Fee to Seller | | | |
| 705. Transaction Fee to Buyer | | | |
| 706. | | | |
| **800. Items Payable in Connection with Loan:** | | | |
| 801. Loan Origination Fee | | | |
| 802. Loan Discount | | | |
| 803. Appraisal Fee | | . | |
| 804. Credit Report | | | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | | |
| 807. Assumption Fee | | | |
| **900. Items Required by Lender to be Paid in Advance:** | | | |
| 901. Daily interest charge from Feb 17, 2012 | | | |
| 902. Mortgage Insurance Premium | | | |
| 903. Hazard Insurance Premium | | | |
| 904. Flood Insurance Premium | | | |
| **1000. Reserves Deposited with Lender:** | | | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | | |
| 1003. City Property Taxes | | | |
| 1004. County Property Taxes | | | |
| 1005. Annual Assessments | | | |
| **1100. Title Charges:** | | | |
| 1101. Settlement or Closing Fee to Star Title Partners of Tampa, LLC | | 250.00 | 250.00 |
| 1102. Abstract or Title Search to Westcor Land Title Insurance Company | | | 75.00 |
| 1103. | | | |
| 1104. Title Insurance Binder | | | |
| 1105. | | | |
| 1106. | | | |
| 1107. Attorney Fees (includes above item numbers:) | | | |
| 1108. Title Insurance to Westcor Land Title Insurance Company (includes above item numbers:) | | | 1,775.00 |
| 1109. Lender's Coverage 0.00 | | | |
| 1110. Owner's Coverage 340,000.00 Risk Rate Premium: $1,775.00 | | | |
| 1111. | | | |
| 1112. | | | |
| 1113. | | | |
| **1200. Government Recording and Transfer Charges:** | | | |
| 1201. Recording Fees: Deed 18.50 Mortgage 0.00 Releases 0.00 | | 18.50 | |
| 1202. City/County Tax/Stamps: Deed 0.00 Mortgage 0.00 | | | |
| 1203. State Tax/Stamps: Deed 2,380.00 Mortgage 0.00 | | | 2,380.00 |
| 1204. Intangible Tax to Clerk of the Circuit Court | | | |
| 1205. to Clerk of the Circuit Court | | | |
| **1300. Additional Settlement Charges:** | | | |
| 1301. Survey | | | |
| 1302. Pest Inspection | | | |
| 1303. 2011 Property Tax to Doug Belden Tax Collector (poc $1,174.97 by Seller) | | | |
| 1304. Home Warranty | | | |
| **1400. Total Settlement Charges (Enter on line 103, Section J and line 502, Section K)** | | **$268.50** | **$19,780.00** |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

John Merrill Investments, Inc.

Buyer:
Chris J. Weiler, President

Seller: Kelly O'Brien

Seller: Lori D. O'Brien

| 1000. | Reserves Deposited with Lender | | | | | |
|---|---|---|---|---|---|---|
| 1001. | Hazard Insurance | | | | | |
| 1002. | Mortgage Insurance | | | | | |
| 1003. | City Property Taxes | | | | | |
| 1004. | County Property Taxes | | | | | |
| 1005. | Annual Assessments | | | | | |
| **1100.** | **Title Charges:** | | | | | |
| 1101. | Settlement or Closing Fee to Star Title Partners of Tampa, LLC | | | | 250.00 | 250.00 |
| 1102. | Abstract or Title Search to Westcor Land Title Insurance Company | | | | | 75.00 |
| 1103. | | | | | | |
| 1104. | Title Insurance Binder | | | | | |
| 1105. | | | | | | |
| 1106. | | | | | | |
| 1107. | Attorney Fees (includes above item numbers: | | | | | |
| 1108. | Title Insurance to Westcor Land Title Insurance Company (includes above item numbers: | | | | | 1,775.00 |
| 1109. | Lender's Coverage | 0.00 | | | | |
| 1110. | Owner's Coverage | 340,000.00 | Risk Rate Premium: | $1,775.00 | | |
| 1111. | | | | | | |
| 1112. | | | | | | |
| 1113. | | | | | | |
| **1200.** | **Government Recording and Transfer Charges:** | | | | | |
| 1201. | Recording Fees: Deed 18.50 Mortgage 0.00 Releases 0.00 | | | | 18.50 | |
| 1202. | City/County Tax/Stamps: Deed 0.00 Mortgage 0.00 | | | | | |
| 1203. | State Tax/Stamps: Deed 2,380.00 Mortgage 0.00 | | | | | 2,380.00 |
| 1204. | Intangible Tax to Clerk of the Circuit Court | | | | | |
| 1205. | to Clerk of the Circuit Court | | | | | |
| **1300.** | **Additional Settlement Charges:** | | | | | |
| 1301. | Survey | | | | | |
| 1302. | Pest Inspection | | | | | |
| 1303. | 2011 Property Tax to Doug Belden Tax Collector (poc $1,174.97 by Seller) | | | | | |
| 1304. | Home Warranty | | | | | |

| **1400. Total Settlement Charges (Enter on line 103, Section J and line 502, Section K)** | **$268.50** | **$19,780.00** |
|---|---|---|

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

John Merrill Investments, Inc.

Buyer: _____

    Chris J. Weiler, President

Seller: _____
    Kelly O'Brien

Seller: _____
    Lori O'Brien

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

    WESTCOR 11-22334

Settlement Agent _____
    Mia R. Ortiz

Date: February 17, 2012

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**Doug Belden, Hillsborough County Tax Collector**      *2011 Notice of Ad Valorem Taxes and Non-Ad Valorem Assessments*

For Customer Service, please call 813.635.5200

**Skip the Trip - Pay online at www.hillstax.org**
- **E-Check - A FREE electronic payment from your checking account**
- **Credit Card - 2.35% fee is charged**

| Folio No. | 127850.0100 | PIN | A-03-30-18-3VR-000002-00007.2 |
|---|---|---|---|
| Use this number for BILLPAY payments: Acct No | | | 0100 |

| Pay this amount | 1,127.97 | 1,139.72 | 1,151.47 | 1,163.22 | 1,174.97 |
|---|---|---|---|---|---|
| If postmarked by | Nov 30 2011 | Dec 31 2011 | Jan 31 2012 | Feb 29 2012 | Mar 31 2012 |

**Owner Name & Property Location**
O'BRIEN KELLY
O'BRIEN LORI
3120 W WALLCRAFT AVE
TAMPA 33611

KELLY AND LORI O'BRIEN
3120 W WALLCRAFT AVE
TAMPA FL 33611-1943

Legal Description: WEST BAY BLUFF W 1/2 LOT 7 BLOCK 2

*Keep this portion for your records*
*WALK-IN CUSTOMERS PLEASE BRING FOR YOUR RECEIPT*

| Ad Valorem Taxes | Just Value 93600 | | | | | Tax District TH |
|---|---|---|---|---|---|---|
| Taxing Authority | Telephone | Millage | Assessed Value | Exemption | Taxable Value | Tax Amount |
| COUNTY OPERATING | 813-272-5890 | 5.73910 | 93600 | 50000 | 43600 | 250.22 |
| ENVIRONMENTAL LAND | 813-272-5890 | 0.06040 | 93600 | 50000 | 43600 | 2.63 |
| LIBRARY-SERVICE | 813-273-3660 | 0.55830 | 93600 | 50000 | 43600 | 24.34 |
| SCHOOL - LOCAL | 813-272-4064 | 2.24800 | 93600 | 25000 | 68600 | 154.21 |
| SCHOOL - STATE | 813-272-4064 | 5.66500 | 93600 | 25000 | 68600 | 388.62 |
| PORT AUTHORITY | 813-905-5132 | 0.19000 | 93600 | 50000 | 43600 | 8.28 |
| HILLS CO TRANSIT AUTHORITY | 813-623-5835 | 0.50000 | 93600 | 50000 | 43600 | 21.80 |
| CHILDRENS BOARD | 813-229-2884 | 0.50000 | 93600 | 50000 | 43600 | 21.80 |
| WATER MANAGEMENT | 800-423-1476 | 0.39280 | 93600 | 50000 | 43600 | 17.13 |
| WATER MANAGEMENT H | 800-423-1476 | 0.00000 | 93600 | 50000 | 43600 | 0.00 |
| TAMPA CITY | 813-274-8552 | 5.73260 | 93600 | 50000 | 43600 | 249.94 |

| Total Millage | 21.58620 |
|---|---|
| Total Ad Valorem Taxes | 1,138.97 |

| Non-Ad Valorem Assessments | | | |
|---|---|---|---|
| Authority | Purpose | Telephone | Amount |
| TAMPA STORMWATER | STORMWATER CONTROL | 813-274-7491 | 36.00 |

| Total Non-Ad Valorem Assessments | 36.00 |
|---|---|

| Combined Taxes & Assessments | 1,174.97 |
|---|---|

---

**Doug Belden, Hillsborough County Tax Collector**      *2011 Notice of Ad Valorem Taxes and Non-Ad Valorem Assessments*

| Folio No. | 127850.0100 | Acct No. | 0100 | PIN | A-03-30-18-3VR-000002-00007.2 | Tax District | TH | Escrow | | Assessed Value | 93600 |
|---|---|---|---|---|---|---|---|---|---|---|---|

WEST BAY BLUFF W 1/2 LOT 7 BLOCK 2

| Exemptions | |
|---|---|
| HB | 25000 |
| HX5 | 25000 |

**Skip the Trip - Pay online at www.hillstax.org**

| Pay this amount | 1,127.97 | 1,139.72 | 1,151.47 | 1,163.22 | 1,174.97 |
|---|---|---|---|---|---|
| If postmarked by | Nov 30 2011 | Dec 31 2011 | Jan 31 2012 | Feb 29 2012 | Mar 31 2012 |

*Detach this portion and return it with your payment.*

Make checks payable in US funds to
**DOUG BELDEN, TAX COLLECTOR**
P.O. BOX 30012
TAMPA FL 33630-3012

KELLY AND LORI O'BRIEN
3120 W WALLCRAFT AVE
TAMPA FL 33611-1943

*** Paid ***    11/9/2011    3492 - 80    1127.97

## AIR CONDITIONING PROBLEMS

| DATE | AMOUNT (LABOR) | UP/DOWN | DESCRIPTION |
|---|---|---|---|
| 4/2007 | | | New system |
| 6/2007 | | DOWN | Replaced evaporator motor |
| 3/13/08 | 237.50 | UP | Replaced evaporator motor |
| 6/30/08 | | DOWN | Freon 2lb low; bad TXV valve; ordered valve |
| 7/11/08 | | DOWN | Low Freon; bad evaporator coil; ordered coil |
| 7/14/08 | 945.00 | DOWN | Installed evaporator coil and TXV valve |
| 9/29/08 | 526.75 | UP | Leak in evaporator coil; ordered part; installed |
| 12/10/08 | 1465.00 | DOWN | Bad defrost board; installed new board; did not fix Bad condenser; installed new condenser |
| 5/27/09 | 129.00 | DOWN | System frozen; de-iced and added freon |
| 6/19/09 | 107.00 | UP | Low on Freon; added Freon |
| 8/10/09 | 1000.00 | UP/DOWN | Replaced both evaporator coils |
| 5/2010 | 1700 (850 each) | UP/DOWN | Coils |
| 6/7/2010 | 850 | UP | Replaced evap coils |
| 6/25/2010 | 850 | DOWN | Replaced evap coils |
| **Total** | **$6100.25** | | |

## SUMMARY OF COIL REPLACEMENT

| UP/DOWN | START DATE | REPLACED DATE | MONTHS LASTED |
|---|---|---|---|
| **1st set of coils** | | | |
| Down | 4/2007 | 7/14/08 | 15 months |
| Up | 4/2007 | 9/29/08 | 18 months |
| **2nd set of coils** | | | |
| Down | 7/14/08 | 8/10/09 | 12-13 months |
| Up | 9/29/08 | 8/10/09 | 10 months |
| **3rd set of coils** | | | |
| Down | 8/10/09 | 6/25/10 | 10 months |
| Up | 8/10/09 | 6/07/10 | 10 months |
| **4th set of coils** | | | |
| Down | 6/25/10 | | |
| Up | 6/07/10 | | |

**Downstairs:**

Old Condenser model: U PNE-024JAZ    serial: 7344-M2406-22774  (replaced 12/08)

New condenser model: UPNE-024JAZ    serial: 7344-M0608-13204

Air handler model: UHSA-HM2417JA    serial: M3506-11401

**Upstairs:**

Condenser model: UPNE-030JAZ    serial: 7345-M4006-05508

Air handler model: UHSA-HM3017JA    serial: M3906-01273



EXHIBIT
O'Brien
6
12/12/18 JP

OBrienDepo000036

UPSTAIRS

**Morris**
Air Conditioning and Heating, Inc.

PO Box 1427
Mango, FL 33550

**(813) 689-5171**
CAC058479   CAC058322

| Customer: Lori O'Brien | | | Phone: 878-3872 | | Date: 3 13 08 |
|---|---|---|---|---|---|
| Street: 3120 Wallcraft Ave | | | City: Tampa | | Zip: 33629 |
| Unit: upstairs | Model: | | Serial: | | Filter: |
| Comp Amp: | Low: | High: | Room Temp: | Supply: | Diff: |

Service Problem: Replaced evaporator motor in
Warrantee. Checked both systems and
found o/k. Freon pressures ok on
both systems

pd ck# 3322

| All Service Work C.O.D. | Please Pay | Total: # 237.50 |
|---|---|---|
| All Returned Checks - $20 Charge | Technician | |

GUARANTEE: We are pleased to guarantee all parts installed by Morris Air Conditioning and Heating, Inc., against normal service failure for a period of 90 days, labor for 30 days. Warranty labor free during normal business hours only.
PLEASE NOTE: The above charges cover this specific repair job only.

I hereby accept the above service as being satisfactory
and acknowledge that the equipment has been left in good condition.

| Technician: Russell | Customer Signature: |
|---|---|

OBrienDepo 00037

DOWNSTAIRS

## Morris
Air Conditioning and Heating, Inc.

PO Box 1427
Mango, FL 33550
**(813) 689-5171**
**CAC058479 CAC058322**

| Customer: LORI O'BRIEN | Phone: 832-2610 | Date: 7/14/08 |
|---|---|---|
| Street: 3120 W WALLCRAFT Ave | City: TAMPA | Zip: 33611 |

| Unit: | Model: | Serial: | | Filter: |
|---|---|---|---|---|
| Comp Amp: | Low: | High: | Room Temp: | Supply: | Diff: |

**Service Problem:** No A/c 1ST FLOOR

6/30
CHECKED SYSTEM 2 LB 22 LOW ON FREON
CHECKED SYSTEM in HEAT BAD TXV VALVE
WELL ORDER PARTS —

7/1
LOW ON FREON - 2 LB 22 - BAD EVP COIL
WELL ORDER PART

7/14
INSTALLED NEW EVP COIL AND TXV VILVE AND
TESTED

PAID @ CH $33.00

All Service Work C.O.D.     Please Pay   Total: $945
All Returned Checks - $20 Charge   Technician

**GUARANTEE:** We are pleased to guarantee all parts installed by Morris Air Conditioning and Heating, Inc., against normal service failure for a period of 90 days, labor for 30 days. Warranty labor free during normal business hours only.
PLEASE NOTE: The above charges cover this specific repair job only.

I hereby accept the above service as being satisfactory and acknowledge that the equipment has been left in good condition.

Technician:     Customer Signature: Lori D. O'Brien

OBrienDepo000038

UPSTAIRS

**Morris**
Air Conditioning and Heating, Inc.

PO Box 1427
Mango, FL 33550
(813) 689-5171
CAC058479  CAC058322

| Customer: LORI O'Brien | Phone: 832-2610 | Date: 7/29/0 |
|---|---|---|
| Street: 3120 W WALLCRAFT AVE | City: TAMPA | Zip: 33629 |
| Unit: | Model: | Serial: | Filter: |

| Comp Amp: | Low: | High: | Room Temp: | Supply: | Diff: |
|---|---|---|---|---|---|

Service Problem: NO AK 2ND FLOOR

CHECKED SYSTEM FOUND FREON
LEAK IN EVP. COIL WILL ORDER
NEW COIL

REMOVED AND INSTALLED new
EVP COIL AND TESTED
PAUL HECK 3343

All Service Work C.O.D.
All Returned Checks - $20 Charge

Please Pay Technician

Total: # 526 75

GUARANTEE: We are pleased to guarantee all parts installed by Morris Air Conditioning and Heating, Inc., against normal service failure for a period of 90 days, labor for 30 days. Warranty labor free during normal business hours only.
PLEASE NOTE: The above charges cover this specific repair job only.

I hereby accept the above service as being satisfactory
and acknowledge that the equipment has been left in good condition.

Technician: | Customer Signature: Lori D O'Brien

OBrienDepo000039

$?$$?$ $\cancel{N.5141.1K5}$
$?$ 6895171

PO Box 1427
Mango, FL 33550

**Morris**
Air Conditioning and Heating, Inc.
(813) 689-5171
CAC058479  CAC058322

| Customer: LORI O'BRIAN | | | Phone: 532-2010 | Date: 12/10/08 |
|---|---|---|---|---|
| Street: 3120 W WILL CRAFT | | | City: TAMPA | Zip: 33629 |
| Unit: | Model: | | Serial: | Filter: |
| Comp Amp: | Low: | High: | Room Temp: | Supply: | Diff: |

Service Problem: 1 ST FLOOR NO HEAT

FOUND BAD DEFROST BOARD INSTALLED
WARRANTY BOARD — DID NOT FIX PROBLEM
TESTED SYSTEM — CHL RUAD
BAD CONDENSER — INSTALLED NEW
CONDENSER

M/C App# 0358013

| All Service Work C.O.D. All Returned Checks - $20 Charge | Please Pay Technician | Total: 1465 00 |
|---|---|---|

GUARANTEE: We are pleased to guarantee all parts installed by Morris Air Conditioning and Heating, Inc., against normal service failure for a period of 90 days, labor for 30 days. Warranty labor free during normal business hours only.
PLEASE NOTE: The above charges cover this specific repair job only.

I hereby accept the above service as being satisfactory and acknowledge that the equipment has been left in good condition.

Technician: JW  Customer Signature: Lori D. O'Brien

OBrienDepo000040



**Morris**
Air Conditioning and Heating, Inc.

PO. Box 1427
Mango, FL 33550
(813) 689-5171
CAC058479  CAC058322

# INVOICE

| Date | Invoice # | Customer # |
|------|-----------|------------|
| 5/27/2009 | 0000016778 | 0002194 |

**Billing Address:**

Lori O'Brien
3120 Wallcraft Ave
Tampa, FL 33629

**Shipping Address:**

O'Brien, Lori
3120 Wallcraft Ave
Tampa, FL 33629

2588

DOWNSTAIRS

| P.O. Number | | Terms | Sales Person | |
|-------------|--|-------|--------------|--|
| | | COD | 0003 | |
| **Quantity** | | **Description** | **Price Each** | **Amount** |
| 1.00 | | Diagnostic | 129.00000 | 129.00 |
| 2.00 | R22 | R-22 Freon | | |
| | | 5/27/09  JW  CHECKED THE SYSTEM AND | | |
| | | FOUND THE SYSTEM FROZEN UP DEICED | | |
| | | RHE UNIT AND ADDED FREON THE SYSTEM | | |
| | | RUNNING GOOD | | |

PAID
CHECK
3451

| | | | TOTAL | $129.00 |
|--|--|--|-------|---------|

OBrienDepo000041



# INVOICE

| Date | Invoice # | Customer # |
|------|-----------|------------|
| 6/19/2009 | 0000016909 | 0002194 |

**Billing Address:**

Lori O'Brien
3120 Wallcraft Ave
Tampa, FL 33629

**Shipping Address:**

O'Brien, Lori
3120 Wallcraft Ave
Tampa, FL 33629

2742

UPSTAIRS

| P.O. Number | | Terms | | Sales Person |
|---|---|---|---|---|
| | | COD | | 0003 |

| Quantity | | Description | Price Each | Amount |
|---|---|---|---|---|
| 1.00 | | Diagnostic | 107.00000 | 107.00 |
| 1.00 | R22 | R-22 Freon | | |
| | | 6/19/09   JW    CHECKED THE SYSTEM AND | | |
| | | FOUND THE UNIT LOW ON FREON  ADDED | | |
| | | THE FREON AND RETESTED THE SYSTEM | | |
| | | THE UNIT WORKING GOOD | | |

PAID
CHECK
3457

| | TOTAL | $107.00 |
|---|---|---|

OBrienDepo000042



**Morris**
Air Conditioning and Heating, Inc.

PO Box 1427
Mango, FL 33550
*(813)* 689-5171
CAC058479  CAC058322

### INVOICE

| Date | Invoice # | Customer # |
|------|-----------|------------|
| 8/10/2009 | 0000017194 | 0002194 |

**Billing Address:**

Lori O'Brien
3120 Wallcraft Ave
Tampa, FL 33629

**Shipping Address:**

O'Brien, Lori
3120 Wallcraft Ave
Tampa, FL 33629

3001

| P.O. Number | | Terms | Sales Person | |
|-------------|--|-------|--------------|--|
| | | COD | 0001 | |
| Quantity | Description | | Price Each | Amount |
| 1.00 | Warranty coils, R-22, labor<br>Troy & Kyle<br><br>Removed evaporater coils, Leaks in both.<br>Replaced,<br>Pressure checked systems, vac. systems,<br>recharged. Ok | | 1,000.00000 | 1,000.00 |

Pd  C.C.
Auth # 045962

| | | | TOTAL | $1,000.00 |

OBrienDepo000043



**Morris**
Air Conditioning and Heating, Inc.

PO Box 1427
Mango, FL 33550
*(813)* 689-5171
CAC058479 CAC058322

**INVOICE**

| | | |
| --- | --- | --- |
| 9/25/2009 | 0000017377 | 0002194 |

Lori O'Brien
3120 Wallcraft Ave
Tampa, FL 33629

O'Brien, Lori
3120 Wallcraft Ave
Tampa, FL 33629

3276

| | | | COD | 0003 |
| --- | --- | --- | --- | --- |
| 1.00 | | Diagnostic | | |
| 4.00 | R22 | R-22 Freon | | |
| | | 9/25/09   JW    CHECKED THE 1st FLOOR SYSTEM AND FOUND THE UNITLOW ON FREON. FOUND THE FREON LEAK IN THE REVERSING VALVE SUCTION  LINE PORT TUB.  RESOLDERED THE LINE AND CHARGED THE SYSTEM. | | |
| | | NO CAHARGE FOR THE LABOR AND FREON AS PER JIM MORRIS | | |
| | | **TOTAL** | | **$0.00** |

OBrienDepo000044

Sunstate Mechanical Contractors, Inc.

Sunstate Mechanical Contractors, Inc.
P.O. Box 248
Sydney, FL
813-657-8200

TO Kelly O'Brien
ADDRESS 312c Walcraft
Tampa, FL
ATTENTION

DATE ORDERED: 6/7/2010   ORDER TAKEN BY
PHONE NO. 832-2610   CUSTOMER ORDER #
JOB LOCATION
JOB PHONE   STARTING DATE
TERMS

| QTY. | MATERIAL | UNIT | AMOUNT | DESCRIPTION OF WORK |
|------|----------|------|--------|---------------------|
| 1 | Evaporator Coil | | | Evaporator Coil leaking |
| 1 | Freon R22 6 lbs | | | due to Chinese drywall. |
| 1 | Coil Sealed by | | | Warranty is void. |
| | Extreme Seal. | | | Replace Evaporator |
| | | | | coil + adjusted Freon |
| | | | | charge. |
| | Total Parts + Labor | | 850 00 | |
| | PAID 6/7/2010 | | | |
| | Approval # 01523Z | | | |

MISCELLANEOUS CHARGES

| LABOR | HRS. | RATE | AMOUNT |
|-------|------|------|--------|
| | | | |

WORK ORDERED BY
DATE ORDERED
DATE COMPLETED

CUSTOMER APPROVAL
SIGNATURE

AUTHORIZED SIGNATURE

adams NC2817

| | | |
|---|---|---|
| TOTAL LABOR | | |
| TOTAL MATERIALS | | |
| TOTAL MISCELLANEOUS | | |
| SUBTOTAL | 850 | 00 |
| TAX | | |
| GRAND TOTAL | 850 | 00 |

**JOB INVOICE**

OBrienDepo0 00045

**Sunstate Mechanical Contractors, Inc.**

Sunstate Mechanical Contractors, Inc.
Keep Cool!   Lic#CMC1249731
PO Box 218
Sydney, FL 33587
(813) 657-8200   Fax (813) 684-3314
www.sunstatemech.com
info@sunstatemech.com

**TRANE**

# Invoice № 008004

**METHOD OF PAYMENT**
- [ ] CASH
- [ ] CHECK   DR. LIC. #
- [ ] CREDIT CARD [ ] M/C [ ] VISA [ ] AMEX [ ] OTHER
- CC NO.
- EXP. DATE  App# 015852

**CHECKLIST**

NAME  Kelly O'Brien
ADDRESS  3120 Walcott
CITY  Tampa, FL
PHONE (HOME)  813 345 2936
TECHNICIAN

DATE  6/1/2010
PROMISED
SCHED TIME  [ ] AM [ ] PM

WORK TO BE PERFORMED  Seal + Replace Evaporator Coils
Downstairs unit.

**DESCRIPTION OF WORK**

System for downstairs not cooling.
Leak in evaporator coils. Replaced bad
evaporator coils. Coil not covered under
Warranty due to Chinese Drywall. Also,
had coil sealed _____ by Extreme Seal
prior to installing.

**energy** ★
Money Isn't All You're Saving

| QTY | MATERIALS & SERVICES | UNIT PRICE | AMOUNT |
|---|---|---|---|
| 4 | REFRIGERANT R-  4  LBS. | | |
| | FILTERS  x  x | | |
| 1 | Evaporator Coil | | |
| 1 | Extreme Seal | | |

**TOTAL MATERIALS**

| HRS | LABOR | RATE | AMOUNT |
|---|---|---|---|
| 3 | Shane Labor | | |

**TOTAL LABOR**

TOTAL MATERIALS
TOTAL LABOR
TRAVEL CHARGE
SUB TOTAL  850
GST / TAX
**TOTAL  850**

**RECOMMENDATIONS**

**TERMS**

LIMITED WARRANTY: All materials, parts and equipment are warranted by the manufacturers' or suppliers' written warranty only. All labor performed by the above named company is warranted for 90 days or as otherwise indicated in writing. The above named company makes no other warranties, express or implied, and its agents or technicians are not authorized to make any such warranties on behalf of above named company

- [ ] REGULAR   [ ] WARRANTY
- [ ] SERVICE CONTRACT

CUSTOMER SIGNATURE                    DATE

OBrienDepo000046

# *Order*

FAMOUS TATE
APPLIANCE & BEDDING CENTERS

*Scheduled: Friday 01/14/11*

Number
ST01131007

Date
01/13/2011

Page
1

3347 Henderson Blvd.
TAMPA, FL 33609
Phone: (813) 253-2421
Fax: (813) 254-2347

Sold To:
Customer # OBRIK14094
KELLY OBRIEN
3120 WEST WALLCRAFT AVE
TAMPA, FL 33611
Phone      (813) 832-2610

Ship To:
KELLY OBRIEN
3120 WEST WALLCRAFT AVE
TAMPA, FL 33611
Phone      (813) 832-2610

| SalesPerson | PO Number | Tax Exempt # | Comment |
|---|---|---|---|
| Ron W. | | | |

| Terms | Ship Method |
|---|---|
| PrePayment | Delivery |

Model Numbers

| | | | | |
|---|---|---|---|---|
| 1 | DB11783-D-6M | 6/6 MATT DR. BREUS SIGNATURE | $1,353.00 | $1,353.00 |
| | | Allo: DB11783-D-6M / #### Loc: '0903' | | |
| 2 | B11787-EF-6B | 6/6 BASE DR. BREUS | $200.00 | $400.00 |
| | | Allo: B11787-EF-6B / #### Loc: '0903' | | |
| | | Allo: B11787-EF-6B / #### Loc: '0903' | | |
| 1 | I-CS375K | MANTUA, BED FRAME 5/0-6/6 STD | $50.00 | $50.00 |
| | | Allo: I-CS375K / #### Loc: '0903' | | |
| 1 | K1007S13-6 | PROTECT-A-BED, 6/6 BED BUG PROTECTION | $149.99 | $149.99 |
| | | Allo: K1007S13-6 / #### Loc: '0903' | | |
| 2 | DB11780-A-3M | 3/3 MATT DR. BREUS MONOGRAM | $490.00 | $980.00 |
| | | Special order requires 25% non-refundable deposit. No returns, refunds, exchanges or comfort exchanges. | | |
| 1 | B11787-AF-3B | 3/3 BASE DR. BREUS | $100.00 | $100.00 |
| 2 | K1B01S09-3 | Protect-a-Bed, 3/3 BED BUG PROTECTION PAC | $99.00 | $198.00 |
| | | Allo: K1B01S09-3 / #### Loc: '0903' | | |
| | | Allo: K1B01S09-3 / #### Loc: '0903' | | |

Additional Notes:
Customer has signed the Mattress Checklist and understands comfort guarantee policy
Delivery Team will call on the morning of delivery and provide a 2-hour window.

NOTICE FOR SPECIAL ORDERS
In order to ensure your complete satisfaction, please note that SPECIAL ORDER items require a minimum
25% NON-REFUNDABLE DEPOSIT. In addition, special order items are subject to a RESTOCKING
CHARGE and certain items may be NON-RETURNABLE. By signing below, you acknowledge that your sales
associate has discussed these terms.

BY _____
        CUSTOMER SIGNATURE                    DATE

* Minimum 25% non-refundable deposit on all special orders. * Returned goods subject to a minimum 20%
restocking charge. * Orders not claimed within 6 months will be voided and deposit

Summary
| | |
|---|---|
| Sub Total | $3,230.99 |
| Taxable Sub Total | $3,230.99 |
| Tax Total | $226.17 |
| Delivery Charge | $35.00 |
| Total | $3,492.16 |
| Amex | $3,492.16 |
| Total Payments | $3,492.16 |
| Amount Due | $0.00 |

Case 2:09-md-02047-EEF-MBN Document 22380-47 Filed 12/02/19 Page 93 of 136
Case 1:11-cv-22408-MGC Document 276 Entered on FLSD Docket 05/13/2013 Page 155 of 222

Page 32 of 35



## COBBLESTONE
· C R E E K ·

### INDOOR AIR QUALITY ADDENDUM

This Addendum to Purchase Contract (the "Addendum") is executed in conjunction with and, by this reference, incorporated into the Purchase and Sale Agreement between DERRICK & DIANE GRIFFIN ("Purchaser"), and NORTHSTAR HOLDINGS AT B AND A, LLC ("Seller"), for Block 2, Lot _120_ Model _FAIRFAX_ (the "Purchase Contract").

### THIS ADDENDUM SHOULD BE READ AND UNDERSTOOD CAREFULLY

This Addendum contains important information on indoor air quality and what homeowners can do to minimize the risk for water intrusion and to help control indoor environmental contaminants such as mold. Seller is not an expert on mold and the information described in this Addendum has been obtained from various third party sources, including governmental agencies. However, there is continuing research and studies being conducted in the areas addressed by this Addendum and the accuracy of the information contained herein can change at anytime. Therefore, you, the Purchaser, should independently verify the information and latest developments, and seek additional information regarding any matter of concern to you. Additional information concerning moisture control, mold and your home can be obtained from the websites of organizations like the U.S. Environmental Protection Agency ("EPA"), the Center for Disease Control ("CDC") and the U.S. Consumer Product Safety Commission, and in the booklet "A Brief Guide to Mold, Moisture, and Your Home" published by the EPA.

Public awareness of mold and the effects of mold on the indoor air quality in the home is increasing. Most homeowners are familiar with mold in at least some way, such as mold growth on food (such as bread or cheese) or mold growth in the bathroom (such as on bathroom tile). Seller wants you to be aware of what mold is, what you can do to minimize the chance of growth of mold in your home, and how you can minimize any negative impact on the indoor air quality of your home. Since you are living in your home and have sole responsibility for fully maintaining your home, you have the ability to identify early conditions which could potentially give rise to the growth of mold or otherwise affect the indoor air quality. In addition, every new home is constructed with products that have water, powders, solids and industrial chemicals that are used. The Home which you are purchasing contains building materials which may be made of or may be treated with various chemicals in measurable amounts. There are also other types of substances that people are exposed to, in addition to mold and chemicals, such as pet dander and dust mites. IF YOU ARE NOT COMFORTABLE WITH THE FACT THAT MOLD, CHEMICALS AND OTHER SUBSTANCES MAY EXIST IN SOME AMOUNT IN THE HOME YOU ARE PURCHASING, YOU SHOULD NOT PURCHASE THE HOME.

Understanding what mold is and how it spreads, together with the immediacy of responding to mold growth, is paramount. Mold is a type of fungus and is found virtually everywhere indoors and outdoors. There are many different kinds of molds, the vast majority of which are not harmful to human health and which are necessary to our daily lives. Mold may appear in many colors, including black, white, green, orange and red. Residential home construction is NOT designed to, nor can it exclude, mold spores and other substances. There is no practical way to completely eliminate mold spores and other substances in an indoor environment. Mold spreads by means of microscopic spores borne on the wind or circulating air. Since mold spores are in the air outside and are spread by the wind and circulating air, mold spores may enter your home through open doorways, windows and other openings in your home. In addition, every time you walk into your home from the outside you bring mold and other substances into your home on your clothes, your pets and your personal belongings. Therefore, everyone is exposed to these items on a daily basis, but most of the time without any evident consequence.

Mold occurs naturally in the environment, and is necessary for the natural decomposition of plant and other organic material. In order to grow, mold spores require a food source and sufficient moisture. In the indoor environment, food sources could include building materials, such as drywall and baseboards, or other items in the home such as fabric, carpeting and wallpaper. Since the potential food source will always be present, Purchaser will be faced with the prospect of having to be sensitive to, and maintaining control over, sources of moisture in the home. Moisture can come from many sources including leaks, condensation, irrigation, spills, precipitation, and high humidity. The way the Home and indoor living environment is maintained by Purchaser will also affect the indoor air quality of the Home. Good housekeeping and home maintenance practices are essential in the effort to prevent mold growth. See *"Prevention of Mold Growth: Homeowner Responsibilities"* section below. The key to controlling indoor mold growth is to control the moisture. If moisture is allowed to remain on the growth medium, mold can develop within 24 to 48 hours.

Although the vast majority of molds are not known to cause health problems, some types have been shown to have adverse health effects in susceptible persons. Since sensitivities to various types of mold and other substances differ from person to person, experts disagree about the level of mold exposure that may cause health problems, and about the exact nature and extent of the health problems, if any, that may be caused by mold. The Center for Disease Control states that a causal link between the presence of mold and serious health conditions has not been proven. The most common effects that have been reported, however, are hay fever-like allergic symptoms similar to those caused by plant pollen and animal dander (such as watery eyes, runny nose, coughing, skin irritation, sneezing, congestion, sore throat and headaches). Research on mold and its health effects is on-going and the list is not intended to be all-inclusive. Many of these conditions also have causes unrelated to the indoor environment. Therefore, it is currently unknown how many potential health problems, if any, relate exclusively to the indoor environment. Purchaser must determine whether Purchaser, Purchaser's family members or any other individuals who will occupy or use the home may have increased risk to any of these conditions. Seller is not responsible for any health effects resulting from mold in the Home. See *"Disclaimer Release and Waiver"* section below. Naturally, common sense dictates that you should consult your physician for any symptoms or other items of concern to you.

*Prevention of Mold Growth: Homeowner Responsibilities.* Since microscopic mold spores exist everywhere naturally in our environment, mold cannot be prevented or removed entirely. Therefore, the best way to prevent mold growth is to eliminate excessive moisture in the home. It is important to know where water sources can occur and what Purchaser can and needs to do to prevent or avoid the introduction of water into the home, which can lead to the growth of mold. Do not allow moisture to stand or make contact with carpet, furniture and cellulose-based materials such as drywall or wood. Dry all water damaged areas immediately to prevent mold growth. Visible mold must be removed immediately. Purchaser must take positive steps to eliminate excessive moisture in the Home, and thereby prevent mold growth and any possible adverse effects that may be caused by mold growth. Purchaser's responsibilities include, but are not limited to, the following:

    **Don't Bring Mold Home.** Before bringing items into the Home, check for signs of mold. Potted plants (roots and soil), furnishings, or stored clothing and bedding material, as well as many other household goods, could already contain mold growth. Even furniture and other personal belongings from other residences or storage facilities may have mold. So check these items as well prior to moving them into the Home.

    **Keep the Home Clean and Dry.** Regular vacuuming and cleaning will help reduce mold levels. Mild cleaning solutions are generally effective in eliminating or preventing mold growth. After cleaning carpets, make sure that the carpets are completely dry before replacing furniture. Do not close closet doors or otherwise enclose spaces until the carpets have completely dried out. Make sure shower curtains are not allowed to drip on the floor and that shower heads are not spraying out of the enclosure, either of which conditions could saturate the flooring and cabinetry materials and result in mold growth.

U:\Jan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC        Initial _____

GRIFFIN
0034
DGRIFFIN - 000154

Case 2:09-md-02047-EEF-MBN Document 22380-47 Filed 12/02/19 Page 94 of 136
Case 1:11-cv-22408-MGC Document 276 Entered on FLSD Docket 05/13/2013 Page 256 of 222

Page 33 of 35

**Routine Maintenance and Inspection is a Must.** It is important that Purchaser regularly inspect and maintain the Home, and make arrangements for regular inspections of the home if no one will be in the Home for any extended period of time. By way of example and not limitation, regularly caulk windows, faucets, drains, tubs, showers, and other plumbing fixtures; repair cracks in the exterior stucco; maintain roofs and keep them in good repair; inspect for leaks on a regular basis; look for discolorations or wet spots; and inspect condensation pans in the air conditioners and refrigerators for mold growth. Be alert to musty odors, stains, and other signs of mold. If you smell a musty odor in your Home, start looking for the source immediately and remove it. Purchaser should also periodically inspect window and slider tracks for blockages impeding the ability of moisture to drain through the weep holes, and clean window and slider tracks. Follow all manufacturers' instructions for the air conditioning system and other major appliances, and have them inspected, cleaned and serviced regularly by a qualified professional. In addition, regularly change the air filters, clean air conditioning coils, and clean condensation pans and lines of the air conditioning system. Purchaser should also have the Home repainted within three to five years following closing.

**Watch Humidity and Ventilate.** Keep the humidity (water vapor) in the home low. If you see condensation or moisture collecting on windows, walls or pipes, act quickly to dry the wet surface and reduce the moisture source. Condensation can be a sign of high humidity. When the Home is not occupied but the outdoor air temperature is high enough such that the air conditioning system would typically be run if the Home were occupied, do not turn off the air conditioning system, even during daily absences. Ventilate kitchens and bathrooms by opening windows, using the pre-installed exhaust fans (do not disconnect them), and by running the air conditioning to remove excess moisture in the air and to facilitate evaporation of water from wet surfaces. Other moisture sources that increase humidity include, but are not limited to, steam from showers, baths, cooking, indoor plants, washing dishes, washing clothes, hanging wet clothes on indoor drying lines and humidifiers. Therefore, open doors between rooms to increase air circulation in the home including doors to closets to periodically ventilate enclosed spaces. Even an aquarium in the home can contribute to excess moisture.

**Exterior Grading, Drainage and Irrigation.** The grading and drainage systems on the property are designed to direct water away from the Home. Purchaser understands and agrees that any changes made to the contour of the land resulting from installation of pools, patios, other improvements and/or landscaping could alter this design, cause water to be directed towards (instead of away from) the Home, and result in mold growth. Purchaser should be sure to landscape and construct improvements so that water continues to be directed away from the Home. Regular inspection and maintenance must be performed to keep any drainage devices free from dirt and obstructions. Irrigation systems should also be set to spray water away from the Home, and should be checked regularly to be sure the sprinklers are not spraying water onto the house, thereby saturating the stucco substrate.

**Home Owner Manual.** At closing, Purchaser will receive a Home Owner Manual from Seller. Refer to the Home Owner Manual for additional areas of suggested maintenance and operation (including, without limitation, operation of the air conditioning system), which must be adhered to by Purchaser. Purchaser agrees to read and comply with the Home Owner Manual. Copies of the Home Owner Manual are also available from Seller upon request prior to closing; however, Purchaser acknowledges and agrees that the Home Owner Manual is subject to change prior to closing.

*Mold Cleanup.* If mold is found, it must be removed and the source of the water must be eliminated immediately. The measures taken to initiate the clean up process are dependent on the extent of the problem. According to the EPA, if the affected area is less than about 10 square feet (less than roughly a 3 ft. by 3 ft. patch), in most cases it can be taken care of by the homeowner by thoroughly cleaning with a mild cleaning solution. If the affected area is greater than about 10 square feet or the homeowner does not think they can manage the cleanup themselves, a professional who has experience in cleaning mold in homes should be contacted. While Seller does not anticipate that Purchaser will experience any such conditions, in the unlikely event that a leak or abnormal amount of moisture should occur, Purchaser must act immediately since moisture control is the key to minimizing the risk of mold growth. If Purchaser believes there is a leak or abnormal amount of moisture accumulating in sections of the home as a result of an item which is covered by the Dwelling Warranty (as defined in the Purchase Contract), Purchaser should follow the claims procedure as provided in the Dwelling Warranty delivered to Purchaser at closing including, without limitation, immediately providing Seller with notice of any potential claims and access to the Home to investigate such claims. Purchaser hereby understands that mold grows very quickly, and can start growing anywhere from 24 to 48 hours after the introduction of water. Accordingly, time is of the essence for Purchaser to act.

*DISCLAIMER, RELEASE AND WAIVER.* As provided in Section C.8 of the Standard Provisions of the Purchase Contract, all claims against Seller for secondary, incidental and consequential damages are specifically excluded and disclaimed, and Purchaser relinquishes and waives any and all rights Purchaser may have to any such damages. Without limiting the generality of the foregoing, Purchaser expressly understands and agrees that Seller will not be responsible for, and hereby knowingly and voluntarily releases and discharges Seller from and against, any and all damages whatsoever (whether to property, persons, pets or otherwise) caused by or resulting from mold and/or growth of mold in the Home, whether or not associated with defects in construction of the Home including, but not limited to, property damage, loss of use, loss of value, adverse health effects, personal injury, death, loss of income, emotional distress, and/or any other effects. As also provided in Section C.8 of the Standard Provisions of the Purchase Contract, except only for the Dwelling Warranty: (i) there are no warranties (express or implied) provided to Purchaser in connection with the Home, and (ii) Purchaser knowingly and voluntarily relinquishes and waives, and Seller hereby expressly disclaims, any and all warranties (express or implied) as to the Home and the other property which is the subject of the Purchase Contract, whether arising from custom, usage of trade, course of dealing, case law or otherwise, including, but not limited to, any implied warranty of habitability, any implied warranty of merchantability or any implied warranty of fitness for any intended or particular purpose. For Purposes of this Disclaimer Release and Waiver: (i) references to Seller include Seller and Seller's partners, affiliates, agents, successors, and assigns, and (ii) references to Purchaser include Purchaser and Purchaser's family members, heirs, personal representatives, executors, tenants, successors and assigns.

I/we understand and acknowledge that we have received, reviewed and fully understand this Addendum (including, without limitation, Purchaser's obligations with respect to home ownership) and have fully considered this Addendum in making my/our purchaser decision. I/we agree to comply with the provisions of this Addendum. Except as modified by this Addendum, all terms and provisions of the Purchase Contract remain in full force and effect. This Addendum shall survive Closing and at Letter's option, the terms of this Addendum may be included in the deed of conveyance delivered to Purchaser at closing.

Purchaser: _____    Date: 1·31·05

Purchaser: _____    Date: 1·31·05

U:\Ian\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initial _____ _____

GRIFFIN
0035
DGRIFFIN - 000155

Page 34 of 35



## · COBBLESTONE ·
### · C R E E K ·

### NEW YORK RESIDENT CERTIFICATION

This Certification is being executed in conjunction with the Purchase Contract dated _____ (the "Purchase Contract") between _____ ("Purchaser") and NORTHSTAR HOLDINGS AT B AND A, LLC ("Seller"), for Lot ____, Block 2, Model _____, in Cobblestone Creek (the "Community"). Unless otherwise defined herein, all capitalized terms used in this Certification shall have the same definitions as given to them in the Standard Provisions to the Purchase Contract.

Purchaser hereby certifies to Seller as follows:

I.   Purchaser is a resident of the State of New York.

II.  Purchaser's first contact with or from Seller or any affiliate of Seller was at the time of Purchaser's initial visit to the sales center for the Community on _____ (*insert date of registration*).

III. Purchaser did not learn of the Community or enter into the Purchase Contract as a result of any advertisement, inducement, solicitation or other sales activity by Seller or any affiliate of Seller made in New York.

This Certification shall survive the closing under the Purchase Contract.

Executed the day and year written below.

Purchaser: _____     Date: _____

Purchaser: _____     Date: _____

### NEW JERSEY RESIDENT CERTIFICATION

This Certification is being executed in conjunction with the Purchase Contract dated _____ (the "Purchase Contract") between _____ ("Purchaser") and NORTHSTAR HOLDINGS AT B AND A, LLC ("Seller"), for Lot ____, Block 2, Model _____, in Cobblestone Creek (the "Community"). Unless otherwise defined herein, all capitalized terms used in this Certification shall have the same definitions as given to them in the Standard Provisions to the Purchase Contract.

Purchaser hereby certifies to Seller as follows:

I.   Purchaser is a resident of the State of New Jersey.

II.  Purchaser's first contact with or from Seller or any affiliate of Seller was at the time of Purchaser's initial visit to the sales center for the Community on _____ (*insert date of registration*).

III. Purchaser did not learn of the Community or enter into the Purchase Contract as a result of any advertisement, inducement, solicitation or other sales activity by Seller or any affiliate of Seller made in New Jersey.

This Certification shall survive the closing under the Purchase Contract.

Executed the day and year written below.

Purchaser: _____     Date: _____

Purchaser: _____     Date: _____

N A

U:\Ian\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

Initial _____

Case 2:09-md-02047-EEF-MBN Document 22380-47 Filed 12/02/19 Page 96 of 136
Case 1:11-cv-22408-MGC Document 276 Entered on FLSD Docket 05/13/2013 Page 158 of 222

Page 35 of 35



**COBBLESTONE**
· C R E E K ·

**COBBLESTONE CREEK
STANDARD FEATURES ADDENDUM**

*Inside Your New Home ≈ Exceptional Design Elements Throughout*
- Designer 18" x 18" Ceramic Floor Tile in Foyer, Living Room, Dining Room, Family Room, Kitchen, Breakfast Room, Powder Room and Laundry Room
- Designer 12" x 12" Ceramic Floor Tile in Master Bath and Secondary Bathrooms
- Luxurious Well-to-Wall Carpet in All Bedrooms, Den, Sitting Room and Loft (Per Plan)
- Expansive Flat and Vaulted Ceilings (Per Plan)
- Knockdown Textured Ceilings
- 8' Knockdown Textured Ceilings
- 8' Panel Interior Doors
- 8' Raised Panel Bi-Fold Closet Doors
- 8' Mirrored Closet Doors in Master Bedroom Suite (Per Plan)
- Separate His and Her Closets in Master Bedroom Suite (Per Plan)
- Decorator Lever Handle Door Hardware
- Colonial Style Baseboards and Door Casing
- Marble Window Sills
- Abundant Storage Space with Ventilated Vinyl Shelving
- Recessed and Designer Lighting (Per Plan)

*In Your New Kitchen ≈ Great for Family and Entertaining*
- Stylish 42" European Style Hidden-Hinge Cabinets in Your Choice of Wood or Matte Foil
- Granite Countertops with 4" Backsplash and Standard Edge Profile
- Designer 18" x 18" Ceramic Floor Tile Including the Breakfast Area
- Recessed and Designer Lighting (Quantity Varies by Plan)
- Kohler® Double Basin Stainless Steel Sink with Kohler® Pull-Out Faucet
- Spacious Pantry for Added Storage
- G.E.® Designer Appliance Package in Stainless Steel or Choice of Colors:
  - o   G.E. ® 25 cu.ft. Capacity Side-By-Side Refrigerator with Ice Maker and Water Dispenser in Door Panel
  - o   G.E.® Freestanding Ceramic Glass Cook up Range
  - o   G.E.® Microwave Oven
  - o   G.E.® Built-In Dishwasher
  - o   ½ HP Food Waste Garbage Disposal

*Luxurious Bathrooms ≈ Tranquil Retreats*
- Thoughtfully Designed Bathroom Plans
- Designer 12" x 12" Ceramic Tile Floors with Coordinating 6" x 8" Ceramic Shower Wall Tile in Master Bath
- Designer 18" x18" Ceramic Floor Tile in Powder Room
- 6" x 6" Ceramic Tile On Floors and Tub Walls in Secondary Bathrooms
- One Row Ceramic Listello Detail in Master Bath Shower Wall and Secondary Baths Tub Wall
- European Style Hidden-Hinge Matte Foil Cabinets in Master Bath and Secondary Baths
- Oversized Roman Tub in Cultured Marble with Deck-Mounted Tub Valves and Marble Backsplashes in Master Bath
- Separate Shower with Clear Glass Enclosure and Chrome Frame in Master Bath
- Individual His and Her Raised Vanity Counters in Master Bath
- Cultured Marble Vanity Counters with Integrated Sinks in Master Bath and Secondary Baths
- Kohler® Chrome Bathroom Fixtures with Lever Handles in All Bathrooms
- Kohler® Pedestal Sink in Powder Room
- Kohler® Elongated Commodes in All Bathrooms
- Full Width Vanity Mirrors
- Recessed and Designer Lighting (Per Plan)
- Medicine Cabinets with Beveled Edge (Per Plan)

*Laundry Room*
- G.E. ® 3.2 cu.ft. Super Capacity Washer
- G.E. ® 6.0 cu.ft. Extra Large Capacity Dryer
- Laundry Room Cabinets (Per Plan)
- Laundry Tub
- 18" x 18" Ceramic Floor Tile

*Architectural Standards ≈ Superior Exterior Details and Solid Construction*
- Covered Entry with 8' Raised-Panel Double Door Entry
- Schlage® Front Door Lever Handle Set with Lifetime Finish Warranty
- Exquisite Exterior Paint and Roof Colors to Compliment the Architectural Features of the Home
- Light Sand Exterior Finish with Decorative Bands and Moldings
- Color Coordinated Brick Pavers on Driveway, Entry Walkway & Covered Patio
- Two Car & Three Car Garages (Per Plan)
- Decorative 8' Raised-Panel Garage Doors
- Concrete S-Style Tile Roof

U:\lan\cobblestone creek\Masters\Purchase and Sale Agreement.final.DOC

- Soil at Slab Foundation Pre-Treated for Sub-Terrain Termite Protection
- Steel Reinforced Concrete Building Foundation with Concrete Block Construction, Steel Reinforced, Poured Concrete Columns and Tie Beam System
- Concrete Block Second Floor Construction
- Protective Steel Hurricane Panels
- Pre-Engineered Roof Trusses with Hurricane Straps and Connections Engineered for Uplift, Load and Lateral Forces
- 5/8" Plywood with Tin Tagged Roof System and Nailed-On Tile
- Copper Plumbing Water Pipes Throughout, Including All Slab and Riser Lines
- Moisture-Resistant Wallboard in All Wet Areas in Attic (Where Applicable)
- Acoustical Gypsum Concrete Sub flooring on Second Floor of Two-Story Homes (Except Under Bathtubs and Shower Pans)
- Exterior Hose Bibs

*Electrical Specifications*
- Rocker-Style Electrical Switches for Ease of Operation
- Recessed and Designer Lighting (Per Plan)
- Pre-wired for Ceiling Lighting Fixtures in Foyer, Dining Room and Breakfast Room
- Pre-Wired for Ceiling Fans in Family Room and All Bedrooms (Per Plan)
- Fluorescent Lighting Fixtures in all Walk-In Closets, Laundry Room and Garage
- Digital Readout A/C Thermostats for Easy Viewing
- Category 5 Structured Wiring for Phones/Computer/Fax Lines in Kitchen, Family Room and All Bedrooms (Per Plan)
- RG 6 Shielded Coaxial Cable for Television and Video in Family Room and All Bedrooms (Per Plan)
- 150 – 200 AMP Electric Service (Per Plan)
- Designer Exterior Lighting Fixtures in Outdoor Entry and Covered Patios
- Coach Lights at Garage
- Electric Door Chime
- Weatherproof Exterior Electric GFI Outlets

*Security and Safety in Your Home*
- Alarm System with Keypad
- Medical Emergency Panic and Fire Alert Buttons on Alarm Keypad
- Automatic Garage Door Opener with Two Remote Transmitters
- Deadbolt Locks on Front Entry Door
- Peephole Magnifier on Front Entry Door
- Screens on All Operable Windows and Sliding Glass Doors
- Tempered Glass in Sliding Doors and Windows in Wet Areas
- Anti-Skid Bath Tubs
- Pressure Balance Control Valve at all Bath and Shower Locations
- Smoke Detectors Throughout the Home

*Energy Savings and Home Warranty Features*
- Energy-Efficient 80-Gallon Quick Recovery Water Heater
- High Energy-Efficient Central Air Conditioning and Heating System
- R-30 Ceiling Insulation
- R-11 Insulation at Garage Partition
- Steel Insulated Front Door with Weather Stripping
- Raised Panel Galvanized Steel Garage Doors
- Energy-Efficient Sealant Around All Exterior Windows, Doors and Penetrations
- Extended 10-Year Structural Warranty
- Manufacturer Warranties on All Appliances
- Interior Paint with 5-Year Manufacturer Product Warranty

*Your New Neighborhood*
- Homeowner's Association
- 24-Hour Manned Gate House
- Quick-Action Lifting Arm Gates at Main Entrance
- Charming Common Area Landscaping within the Buffer Tracts, Open Spaces and Rights-of-Way
- Beautiful Clubhouse with Fitness Center featuring State-of-the-Art Cardiovascular and Physical Training Equipment
- Resort Style Community Pool and Children's Aqua Park
- Children's Playgrounds
- FPL Street Lights, plus Decorative Street Lighting at the Community Entrance
- All Private Streets, Sidewalks and Walking/Bike Paths
- Basic Cable Television Service
- Easy Access to Major Highways
- Convenient to Shopping, Entertainment, Parks, Schools, Transportation and Business

Initial _____ _____

# ENERGY PERFORMANCE LEVEL (EPL) DISPLAY CARD

**ESTIMATED ENERGY PERFORMANCE SCORE\* =** _____
The higher the score, the more efficient the home.

1. New home or addition _____
2. Single family or multifamily _____
3. Number of units (if multifamily) _____
4. Number of bedrooms _____
5. Is this a worst case? (yes or no) _____
6. Conditioned floor area _____ sq.ft.
7. Glass type & area
   a. Single pane, clear _____ sq.ft.
   b. Single pane, tinted _____ sq.ft.
   c. Double pane, clear _____ sq.ft.
   d. Double pane, tinted _____ sq.ft.
8. Floor types, Insulation level
   a. Slab-on-grade, edge insulation R= _____
   b. Wood, raised R= _____
   c. Concrete, raised R= _____
9. Wall types, Insulation level
   Exterior
   a. Wood frame R= _____
   b. Metal frame R= _____
   c. Concrete block R= _____
   d. Log R= _____
   e. Other: R= _____
   Adjacent
   a. Wood frame R= _____
   b. Metal frame R= _____
   c. Concrete block R= _____
   d. Log R= _____
   e. Other: R= _____
10. Ceiling types, Insulation level
    a. Under attic R= _____
    b. Single assembly R= _____
    c. Knee walls/skylight walls R= _____
    d. Radiant barrier installed _____
    e. Interior radiation control coating _____
    f. White roof credit _____

11. Ducts, Location & Insulation Level
    a. Supply ducts: R= _____
    b. Return ducts: R= _____
    c. Air handling unit (AHU) _____
12. Cooling systems Capacity: _____
    a. Split system SEER: _____
    b. Single package SEER: _____
    c. Ground water source COP: _____
    d. Room unit EER: _____
    e. PTAC EER: _____
13. Heating systems Capacity: _____
    a. Split system heat pump HSPF: _____
    b. Single package heat pump HSPF: _____
    c. Gas furnace, natural gas AFUE: _____
    d. Gas furnace, LPG AFUE: _____
    e. Gas-driven heat pump COP: _____
    g. Combo water/space gas: Recov.Eff.: _____
14. Water heating systems
    a. Electric resistance EF: _____
    b. Gas-fired, natural gas EF: _____
    c. Gas-fired, LPG EF: _____
    d. Solar system with tank EF: _____
    e. Dedicated heat pump with tank EF: _____
    f. Heat recovery unit HeatRec%: _____
    g. Other: _____
15. HVAC credits claimed
    a. Ceiling fans _____
    b. Cross ventilation _____
    c. Whole house fan _____
    d. Multizone cooling credit _____
    e. Multizone heating credit _____
    f. Programmable thermostat _____
    g. Airtight duct credit claimed _____
    h. Factory-sealed AHU credit _____

_I certify_ that this home has complied with the Florida Energy Efficiency Code For Building Construction through the above energy saving features which will be installed (or exceeded) in this home before final inspection. Otherwise, a new EPL Display Card will be completed based on Code compliant features. _Builder Signature:_ _____ _Date:_ _____

_New Home Address:_ _____ _City/FL Zip_ _____

\*NOTE: The home's estimated energy performance score is only available through the FLA/RES computer program. This is _not_ a Building Energy Rating. If your score is 80 or greater (or 86 for a US EPA/DOE Energy Star™ designation), your home may qualify for energy efficiency mortgage (EEM) incentives if you obtain a Florida Energy Gauge Rating. Contact the Energy Gauge Hotline at 321/638-1492 or the web site at www.fsec.ucf.edu for information and a list of certified Raters.

Initials _____ DG

GRIFFIN
0038

DGRIFFIN - 000158

# Thinking About Buying a New Home?

## Consider the Benefits:

- More House for Less Money
- Improved Mortgage Options
- Enhanced Indoor Comfort
- Superior Energy Efficiency
- More Environmental Sustainability
- Tested Quality Construction
- Greater Resale Value



Congratulations on your decision to purchase a home.

As you know, there's a lot of factors to consider before signing on the dotted line. By now you've probably checked out the location of the home you like the best. You know how many bedrooms there are, whether your dining room table will fit, where you'll park your car and lots of other important things.

But wait, there's still one more important thing you really ought to do.

You wouldn't buy a car without asking how many miles-per-gallon it gets, would you? So why would you even think of buying a house without knowing how much the power bills will be? That's why now is the perfect time to get an Energy Gauge rating on the house.

Since 1994, there has been a voluntary statewide energy-efficiency rating system for homes in Florida, and prospective home-owners just like you all around the state are getting their homes rated before they make their purchase. There are several very important reasons why:

Energy ratings give homebuyers a market-place yardstick that measures the benefits of energy-efficiency improvements. You get detailed estimates of how much your energy use will cost.

Energy ratings give you clear and specific information that lets you compare similar homes on their energy use. Two homes might look similar, but one may be efficient and comfortable and the other an energy-guzzler with a very uncomfortable interior.

Maybe most important of all, the national Home Energy Rating System (HERS) score on the energy rating can qualify you for a number of special mortgage programs that offer lower interest rates, lower closing costs, and other benefits. More and more lenders are coming into Florida with money-saving packages for buyers of energy-efficient homes.

Before buying your next home, hire a Certified Energy Rater to do a rating.
Your builder or Realtor can help you find a Certified Rater in your area. After the rating, you'll get an easy-to-understand Energy Guide that estimates how much it will cost to pay for energy used in that home, and will allow you to look at a number of separate areas of energy use throughout the house. For many years, buyers have had home inspectors look over a home before making their purchase. This is a great way to find out about potential house problems before you make your purchase. Smart homebuyers around the country are now also asking for a home energy rating to look specifically at the energy-users in a home and determine their efficiency. Because energy costs can often equal house payments, the relatively small cost of a home energy rating can easily be offset by many years of lower energy payments.

Initials

GRIFFIN
0039
DGRIFFIN - 000159

You're already familiar with the miles-per-gallon stickers on new automobiles, and the yellow EnergyGuide labels on home appliances. Shoppers use this information to figure out how much that car or appliance is really going to cost them. This information gives the buyer a good estimate of what it will cost to operate that car or use that appliance, over and above the purchase price. A car or product that is cheaper to buy can often be more expensive to operate, so this information can be very important to assure that you make the best purchase decision

Here's how the Florida EnergyGauge program works.

After the rating, you'll get an easy-to-read form like the one above. The Rating Guide has a scale that allows you to compare the specific home you're looking at with the most efficient and the least-efficient homes of the same size with the same number of bedrooms available in your part of the state today. And in addition to this overall estimate of energy use and comparisons, you get a detailed breakdown on the energy costs of the home's air conditioning, space heating, water heating, refrigerator, clothes dryer, cooking costs, lighting, pool pumping and other miscellaneous equipment.

One of the keys to the success of this program is the uniformity of ratings, made possible by the fact that the EnergyGauge® software developed by the Florida Solar Energy Center® has been specifically designed to let Raters input the key data on the home and obtain accurate information for comparison purposes. A unique optimization feature even lets Raters determine what energy-efficiency features can be added to the home to maximize cost-savings and comfort-improvements.

So how can a home energy rating help you reduce your energy use and save money?

That's easy. All energy Raters in Florida can provide cost-effective improvement recommendations like the ones shown on the Energy Guide above. Note that the improvements to this home will save the homeowner $360 per year. While the design and construction of your home and the efficiency of its appliances and equipment control the most significant portion of its energy use, occupant life-style will still have a big effect on exactly how much energy gets used. Your comfort preferences and personal choices like the level at which you set the thermostat, whether or not you turn off lights and fans when leaving a room, how much natural ventilation you use, and other factors - all will affect your home's actual monthly energy use.

The Ratings program in Florida closely parallels national activities.

The U.S. Department of Energy has been working to set national standards for Home Energy Rating Systems, and Florida's system surpasses these standards. The Florida Building Energy Rating Guide provides a HERS score for the home. This national score enables homes to qualify for national mortgage financing options requiring a HERS score. This score is computed in accordance with proposed national guidelines, considering the heating, cooling, and hot water energy uses. HERS awards stars to the rating

Tell your Realtor or builder that you want to get the home rated before you buy it.

They can give you the names of Raters in your area. Additional information on the program is available from the Energy Gauge Program Office at 407-638-1492, or visit our website at www.fsec.ucf.edu.

Initials DG

GRIFFIN
0040
DGRIFFIN - 000160

**Who does Energy Ratings?**

It is important to note that only State Certified Raters are allowed to perform ratings. These Raters have undergone rigorous training programs and have passed the required challenge exams. They are also required to undergo continuing education classes and further exams to keep their certifications current. An on-going quality control program also watches over their Ratings and their work. All their Ratings are submitted to a central Registry that checks them for accuracy and compiles generic building data.

**Energy Ratings in Florida**

The Florida Building Energy-Efficiency Rating Act (Florida Statute 553.990) was passed by the State Legislature in 1993 and amended in 1994. It established a voluntary statewide energy-efficiency rating system for homes. The Rating System has been adopted by DCA Rule 9B-60.

The Florida Energy Gauge Program
Florida's Building Energy Rating System
679 Clearlake Road Cocoa, Florida 32922-5703
Phone: 407-638-1492; Fax 407-638-1010
E-Mail: EnGauge@fsec.ucf.edu
Website: www.fsec.ucf.edu/ratings/

Initials: ___ D.G. ___

GRIFFIN
0041

DGRIFFIN - 000161





Initials

GRIFFIN
0042
DGRIFFIN - 000162



LOT 120 BLOCK 2
LOT-FIT STUDY (NOT A SURVEY)

LAKE

20' L.M.E.

R = 178.10' L = 110.52'
D = 35° 33'22"

2' R.E.E.

121

120.10'

N46° 37'21"W

FAIRFAX
2 STORY
GARAGE LEFT

8798 SF

2' R.E.E.

120.10'

N17°03'59"W

119

18' DRIVEWAY

10' U.E.

R = 58.00'
L = 35.99'
D = 35° 33'22"

**SETBACKS**
FRONT LOAD GAR.      22.50'
FRONT                10.00'
SIDE                 10.00'
REAR                 10.00'
SIDE STREET          15.00'
SCREEN ENCLOSURE      2.00'

**LEGEND**
- - - - -   ROOF ENCROACH. ESMT.
- - - - - -   SCREEN ENC. SETBACK
————   SETBACK LINE
══════   EDGE OF WATER
════════   2' VALLEY GUTTER
— —   EASEMENT LINE
CB   CATCH BASIN
⊙   STORM MANHOLE
✦   FIRE HYDRANT

**NOTES**
1. THIS IS NOT A SURVEY, BUT A GRAPHIC DEPICTION OF
   PROPOSED MODEL LOCATIONS. ACTUAL MODEL LOCATIONS AND
   DIMENSIONS MAY VARY DUE TO FIELD CONDITIONS AND OTHER
   CONSIDERATIONS.
2. EASEMENTS AND RIGHTS-OF-WAY SHOWN HEREON ARE BASED
   ON THE PROPOSED PLAT. NO SEARCH OF THE PUBLIC RECORDS
   HAS BEEN PERFORMED IN RELATION TO THIS DRAWING.

| JOB NO. 03111 | Project Name: COUNTRYSIDE MEADOWS | DWG BY: HHB | SCALE: 1"=30' | |
| | | CK'D By: JSH | DATE: AUGUST 2004 | SHEET 1 OF 1 |

GRIFFIN #120.

*Derrick Griffin*
DERRICK GRIFFIN

*Diane Griffin*
Diane GRIFFIN

GRIFFIN
0043

DGRIFFIN - 000163



GRIFFIN 0044

## COBBLESTONE CREEK

**OPTIONS ADDENDUM**

This Options Addendum is executed in conjunction with and by this reference, incorporated into the ("Purchase Contract") dated _Jan. 31, 2005_, 2005 between ("Seller"),and _DERRICK and DIANE GRIFFIN_ ("Purchaser") for Lot #_120_, Block 2, Model _Fairfax_, in the community known as Cobblestone Creek.

| OPTIONS SELECTED | COST |
|---|---|
| 1. optional loft | $ 7,000 |
| 2. laundry Room downstairs and additional bath up. | 9,500 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **TOTAL** | $ 16,500 |

PURCHASER(S):

_[signature]_     1·31·05
            DATE

_Diane Griffin_     1·31·05
            DATE

SELLER:

NORTHSTAR HOLDINGS AT B AND A, LLC

By: _[signature]_     2·1·05
    Authorized Signatory     DATE

**GRIFFIN**
**0045**

DGRIFFIN - 000165

GRIFFIN & SON STUCCO, INC.
6825 VISTA PARKWAY NORTH
WEST PALM BEACH, FL 33411
561-689-9433

COLONIAL BANK
Royal Palm Beach, FL
63-151
670  16

001598

fourteen Thousand four hundred Twenty & 40/100 —

DATE
Jan 31. 2005

AMOUNT
14,420⁰⁰

PAY
TO THE
ORDER
OF

Northstar Holdings at B and A L.LC.

---

CO.....

002403

fifteen Thousand & no/100 —

Jan 31 2005

AMOUNT
15000.00

PAY
TO THE
ORDER
OF

Northstar Holdings at B&A LLC.

GRIFFIN
0046
DGRIFFIN - 000166

| A. Settlement Statement | | U.S. Department of Housing and Urban Development | | | OMB No. 2502-0265 |
|---|---|---|---|---|---|

**B. Type of Loan**

| ○ 1. FHA | ○ 2. FmHA | ● 3. Conv. Unins. | **6. File Number** | **7. Loan Number** | **8. Mortg. Ins. Case Num.** |
|---|---|---|---|---|---|
| ○ 4. V.A. | ○ 5. Conv. Ins. | | | ID: | |

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| | |
|---|---|
| **D. NAME OF BORROWER:** | David Derrick Griffin, a married man |
| Address of Borrower: | |
| **E. NAME OF SELLER:** | NORTHSTAR HOLDINGS AT B AND A, LLC, a Florida Limited Liability Company |
| Address of Seller: | 14406 Military Trail, Delray Beach, Florida 33484   TIN: 81-0599232 |
| **F. NAME OF LENDER:** | COLONIAL BANK, N.A. |
| Address of Lender: | 400 N. Tampa Street, Tampa, Florida 33602 |
| **G. PROPERTY LOCATION:** | 9801 Cobblestone Lakes Court, Boynton Beach, Florida 33437 |
| **H. SETTLEMENT AGENT:** | Adorno & Yoss, LLP   TIN: 59-2746043 |
| Place of Settlement: | 350 East Las Olas Boulevard, Suite 1700, Fort Lauderdale, Florida 33301   Phone: 954-763-1200 |
| **I. SETTLEMENT DATE:** | 10/6/06   DISBURSEMENT DATE: 10/6/06 |

| J. Summary of borrower's transaction | | K. Summary of seller's transaction | |
|---|---|---|---|
| **100. Gross amount due from borrower:** | | **400. Gross amount due to seller:** | |
| 101. Contract sales price | 731,544.00 | 401. Contract sales price | 731,544.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (Line 1400) | 20,635.96 | 403. | |
| 104. 1% Builder's Fee | 7,315.44 | 404. 1% Builder's Fee | 7,315.44 |
| 105. Default Interest @ $360.76 | 360.76 | 405. Default Interest @ $360.76 | 360.76 |
| **Adjustments for items paid by seller in advance:** | | **Adjustments for items paid by seller in advance:** | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. Survey | 375.00 | 409. Survey | 375.00 |
| 110. Water Meter | 212.50 | 410. Water Meter | 212.50 |
| 111. Electric Meter | 110.00 | 411. Electric Meter | 110.00 |
| 112. Solid Waste Authority | 99.20 | 412. Solid Waste Authority | 99.20 |
| **120. Gross amount due from borrower:** | 760,652.86 | **420. Gross amount due to seller:** | 740,016.90 |
| **200. Amounts paid or in behalf of borrower:** | | **500. Reductions in amount due to seller:** | |
| 201. Deposit or earnest money | 58,840.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 585,235.00 | 502. Settlement charges to seller (line 1400) | 4,864.46 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Principal amount of second mortgage | | 504. Payoff of first mortgage loan | 329,330.00 |
| 205. | | 505. Payoff of second mortgage loan | 14,630.88 |
| 206. Proceeds from 2nd Mtg Loan closing (simultaneous) | 70,382.49 | 506. Deposits held by seller | 58,840.00 |
| 207. Principal amt of mortgage held by seller | | 507. Principal amt of mortgage held by seller | |
| 208. Options Deposit | 25,737.60 | 508. Options Deposit | 25,737.60 |
| 209. Lender Closing Cost Credit check #592331149 | 500.00 | 509. | |
| **Adjustments for items unpaid by seller:** | | **Adjustments for items unpaid by seller:** | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes from 01/01/06 to 10/04/06 | 621.50 | 511. County taxes from 01/01/06 to 10/04/06 | 621.50 |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total paid by/for borrower:** | 741,316.59 | **520. Total reductions in amount due seller:** | 433,824.44 |
| **300. Cash at settlement from/to borrower:** | | **600. Cash at settlement to/from seller:** | |
| 301. Gross amount due from borrower (line 120) | 760,652.86 | 601. Gross amount due to seller (line 420) | 740,016.90 |
| 302. Less amount paid by/for the borrower (line 220) | (741,316.59) | 602. Less total reductions in amount due seller (line 520) | (433,824.44) |
| 303. Cash ( ☑ From ☐ To ) Borrower: | 19,336.27 | 603. Cash ( ☑ To ☐ From ) Seller: | 306,192.46 |

**Substitute Form 1099 Seller Statement:** The information contained in blocks E, G, H, and I and on line 401 is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

**Seller Instructions:** If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

DoubleTime®

DGRIFFIN - 000167

**L. Settlement charges**

| | | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|
| 700. Total Sales/Brokers Com. based on price | $731,544.00 @ % = | Borrower POC Seller POC | |
| 701. | % to | | |
| 702. | % to | | |
| 703. Commission paid at settlement | | | |
| 704. | to | | |
| **800. Items payable in connection with loan:** | | Borrower POC Seller POC | |
| 801. Loan origination fee | % to | | |
| 802. Loan discount | % to | | |
| 803. Document Preparation Fee | to Colonial Bank for Schwartz & Associates | 25.00 | |
| 804. Appraisal Fee | to Colonial Bank for Appraisal Authority Co. | 700.00 | |
| 805. Credit Report Fee | to Colonial Bank for CBC | 50.00 | |
| 806. Tax Related Service Fee | to Colonial Bank for First American | 75.00 | |
| 807. Courier Fee | to Colonial Bank for FEDEX | 30.00 | |
| 808. Underwriting Fee | to COLONIAL BANK, N.A. | 350.00 | |
| 809. Flood Certification | to Colonial Bank for First American Flood | 12.00 | |
| 810. Document Preparation Fee | to COLONIAL BANK, N.A. | 200.00 | |
| 811. Processing Fee | to COLONIAL BANK, N.A. | 350.00 | |
| **900. Items required by lender to be paid in advance:** | | Borrower POC Seller POC | |
| 901. Interest from 10/06/06 to 11/01/06 | @ 118.2495 /day | 3,074.49 | |
| 902. Mortgage insurance premium for | months to | | |
| 903. Hazard insurance premium for | years to | | |
| 904. Flood insurance premium for | years to | | |
| 905. | years to | | |
| **1000. Reserves deposited with lender:** | | Borrower POC Seller POC | |
| 1001. Hazard insurance | 3 months @ $380.83 per month | 1,142.49 | |
| 1002. Mortgage insurance | months @ per month | | |
| 1003. City property taxes | months @ per month | | |
| 1004. County property taxes | 2 months @ $929.23 per month | 1,858.46 | |
| 1005. Annual assessments | months @ per month | | |
| 1006. Flood insurance | months @ per month | | |
| 1007. | months @ per month | | |
| 1008. | months @ per month | | |
| 1009. Aggregate accounting adjustment | | -380.83 | |
| **1100. Title charges:** | | Borrower POC Seller POC | |
| 1101. Settlement or closing fee | to Adorno & Yoss, LLP | 425.00 | |
| 1102. Abstract or title search | to | | |
| 1103. Title examination | to | | |
| 1104. Title insurance binder | to | | |
| 1105. Document preparation | to | | |
| 1106. Notary fees | to | | |
| 1107. Attorney's Fees | to Adorno & Yoss, LLP | | 94.00 |
| (includes above item numbers: | ) | | |
| 1108. Title Insurance | to Adorno & Yoss, LLP | 25.00 | 3,598.25 |
| (includes above item numbers: | ) | | |
| 1109. Lender's coverage (Premium): $672,750.00 ($25.00) | | | |
| 1110. Owner's coverage (Premium): $731,544.00 ($3,733-RIC$134.75=$3,598.25) | | | |
| 1111. Endorse: 5.1-25;6.2-25;8.1-25;F9-364.83 | | | |
| 1112. Recertification | to Adorno & Yoss, LLP | 439.83 | |
| 1113. Disbursement(fax/copy/courier) | to Adorno & Yoss, LLP | 70.00 | |
| | | 50.00 | |
| **1200. Government recording and transfer charges:** | | | |
| 1201. Recording fees Deed $53.10 Mortgage(s) $265.60 Releases $21.20 | | 318.70 | 21.20 |
| 1202. City/county tax/stamps Deed Mortgage(s) $1,170.47 | | 1,170.47 | |
| 1203. State tax/stamps Deed $5,121.20 Mortgage(s) $2,048.55 | | 7,169.75 | |
| 1204. | to | | |
| 1205. | to | | |
| **1300. Additional settlement charges:** | | Borrower POC Seller POC | |
| 1301. Survey | to | | |
| 1302. Pest Inspection | to | | |
| 1303. Prorated October Association Fees | to COBBLESTONE CREEK HOMEOWNERS ASSOC., | 180.60 | |
| 1304. October Association Fees | to COBBLESTONE CREEK HOMEOWNERS ASSOC., | 200.00 | |
| 1305. Homeowner Capital Contribution | to COBBLESTONE CREEK HOMEOWNERS ASSOC., | 600.00 | |
| 1306. Home Warranty | to 2-10 Home Buyers Warranty | | 804.70 |
| 1307. Withhold 2% of 1% of Builder's Fee | to Adorno & Yoss, LLP Trust Account | | 146.31 |
| 1308. 2006 County Property Tax (estimate) | to Adorno & Yoss, LLP Trust Account | 2,500.00 | |
| 1309. | | | |
| **1400. Total settlement charges:** | | | |
| ( Enter on lines 103, Section J and 502, Section K ) | | 20,635.96 | 4,664.46 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

David Derrick Griffin _____ Borrower

Diane Griffin _____ Borrower

NORTHSTAR HOLDINGS AT B AND A, LLC

By: _____ Seller
Authorized Representative

_____ Seller

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused, or will cause, the funds to be disbursed in accordance with this statement.

Adorno & Yoss, LLP

by: _____     10.6.2006
As its Authorized Representative     Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

DoubleTime®

DGRIFFIN - 000168

## A. Settlement Statement

and Urban Development

OMB No. 2502-0265

### B. Type of Loan

| | | | 6. File Number | 7. Loan Number | 8. Mortg. Ins. Case Num. |
|---|---|---|---|---|---|
| ○ 1. FHA | ○ 2. FmHA | ● 3. Conv. Unins. | | | |
| ○ 4. V.A. | ○ 5. Conv. Ins. | | | ID: | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. NAME OF BORROWER:** David Derrick Griffin, a married man
**Address of Borrower:**

**E. NAME OF SELLER:**                                                                      TIN:
**Address of Seller:**

**F. NAME OF LENDER:** COLONIAL BANK, N.A.
**Address of Lender:** 400 N. Tampa Street, Tampa, Florida 33602

**G. PROPERTY LOCATION:** 9801 Cobblestone Lakes Court, Boynton Beach, Florida 33437

**H. SETTLEMENT AGENT:** Adorno & Yoss, LLP                                    TIN: 59-2748043
**Place of Settlement:** 350 East Las Olas Boulevard, Suite 1700, Fort Lauderdale, Florida 33301      Phone: 954-763-1200

**I. SETTLEMENT DATE:** 10/6/06                         DISBURSEMENT DATE: 10/6/06

| J. Summary of borrower's transaction | | K. Summary of seller's transaction | |
|---|---|---|---|
| **100. Gross amount due from borrower:** | | **400. Gross amount due to seller:** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (Line 1400) | 2,771.51 | 403. | |
| 104. 1% Builder's Fee | | 404. 1% Builder's Fee | |
| 105. Payoff of second mortgage loan | | 405. | |
| **Adjustments for items paid by seller in advance:** | | **Adjustments for items paid by seller in advance:** | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross amount due from borrower:** | 2,771.51 | **420. Gross amount due to seller:** | 0.00 |
| **200. Amounts paid or in behalf of borrower:** | | **500. Reductions in amount due to seller:** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Principal amount of second mortgage | 73,154.00 | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. Deposits held by seller | |
| 207. Principal amt of mortgage held by seller | | 507. Principal amt of mortgage held by seller | |
| 208. Options Deposit | | 508. Options Deposit | |
| 209. Seller Credit | | 509. | |
| **Adjustments for items unpaid by seller:** | | **Adjustments for items unpaid by seller:** | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total paid by/for borrower:** | 73,154.00 | **520. Total reductions in amount due seller:** | 0.00 |
| **300. Cash at settlement from/to borrower:** | | **600. Cash at settlement to/from seller:** | |
| 301. Gross amount due from borrower (line 120) | 2,771.51 | 601. Gross amount due to seller (line 420) | 0.00 |
| 302. Less amount paid by/for the borrower (line 220) | (73,154.00) | 602. Less total reductions in amount due seller (line 520) | 0.00 |
| 303. Cash ( ☐ From ☑ To ) Borrower: | 70,382.49 | 603. Cash ( ☐ To ☐ From ) Seller: | 0.00 |

**Substitute Form 1099 Seller Statement:**    The information contained in blocks E, G, H, and I and on line 401 is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

**Seller Instructions:**    If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

DoubleTime®

DGRIFFIN - 000169

Case 2:09-md-02047-EEF-MBN Document 22380-47 Filed 12/02/19 Page 109 of 136
Case 2:09-md-02047-EEF-MBN Document 22380-47 Filed 12/02/19 Page 109 of 136
222
Page 2

| L. Settlement charges | | | | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|---|---|
| 700. Total Sales/Brokers Com. based on price | @ | % = | Borrower POC Seller POC | | |
| 701. | % to | | | | |
| 702. | % to | | | | |
| 703. Commission paid at settlement | | | | | |
| 704. | to | | | | |
| 800. Items payable in connection with loan: | | | Borrower POC Seller POC | | |
| 801. Loan origination fee | % to | | | | |
| 802. Loan discount | % to | | | | |
| 803. Document Preparation Fee | to Colonial Bank for Schwartz & Associates | | | 25.00 | |
| 804. Courier Fee | to Colonial Bank for FEDEX | | | 30.00 | |
| 805. Underwriting Fee | to COLONIAL BANK, N.A. | | | 350.00 | |
| 806. Document Preparation Fee | to COLONIAL BANK, N.A. | | | 175.00 | |
| 807. Processing Fee | to COLONIAL BANK, N.A. | | | 150.00 | |
| 808. | to | | | | |
| 809. | to | | | | |
| 810. | to | | | | |
| 811. | to | | | | |
| 900. Items required by lender to be paid in advance: | | | Borrower POC Seller POC | | |
| 901. Interest from 10/06/06 to 11/01/06 @ 19.5411 /day | | | | 508.07 | |
| 902. Mortgage insurance premium for months to | | | | | |
| 903. Hazard insurance premium for years to | | | | | |
| 904. Flood Insurance premium for years to | | | | | |
| 905. years to | | | | | |
| 1000. Reserves deposited with lender: | | | Borrower POC Seller POC | | |
| 1001. Hazard insurance | months @ | per month | | | |
| 1002. Mortgage insurance | months @ | per month | | | |
| 1003. City property taxes | months @ | per month | | | |
| 1004. County property taxes | months @ | per month | | | |
| 1005. Annual assessments | months @ | per month | | | |
| 1006. Flood insurance | months @ | per month | | | |
| 1007. | months @ | per month | | | |
| 1008. | months @ | per month | | | |
| 1009. Aggregate accounting adjustment | | | | | |
| 1100. Title charges: | | | Borrower POC Seller POC | | |
| 1101. Settlement or closing fee | to Adorno & Yoss, LLP | | | 425.00 | |
| 1102. Abstract or title search | to | | | | |
| 1103. Title examination | to | | | | |
| 1104. Title insurance binder | to | | | | |
| 1105. Document preparation | to | | | | |
| 1106. Notary fees | to | | | | |
| 1107. Attorney's Fees | to | | | | |
| (includes above item numbers: | ) | | | | |
| 1108. Title Insurance | to Adorno & Yoss, LLP | | | 25.00 | |
| (includes above item numbers: | ) | | | | |
| 1109. Lender's coverage (Premium): $73,154.00 ($25.00) | | | | | |
| 1110. Owner's coverage (Premium): | | | | | |
| 1111. Endorse: 5.1-25;6-25;8.1-25;F9-364.83 | | | | 439.83 | |
| 1112. Recertification | to Adorno & Yoss, LLP | | | 70.00 | |
| 1113. Disbursement(fax/copy/courier) | to Adorno & Yoss, LLP | | | 50.00 | |
| 1200. Government recording and transfer charges: | | | | | |
| 1201. Recording fees Deed | Mortgage(s) | $121.10 Releases | | 121.10 | |
| 1202. City/county tax/stamps Deed | Mortgage(s) | $146.31 | | 146.31 | |
| 1203. State tax/stamps Deed | Mortgage(s) | $256.20 | | 256.20 | |
| 1204. | to | | | | |
| 1205. | to | | | | |
| 1300. Additional settlement charges: | | | Borrower POC Seller POC | | |
| 1301. Survey | to | | | | |
| 1302. Pest inspection | to | | | | |
| 1303. Prorated September Association Fees | to COBBLESTONE CREEK HOMEOWNERS ASSOC., | | | | |
| 1304. October Association Fees | to COBBLESTONE CREEK HOMEOWNERS ASSOC., | | | | |
| 1305. Homeowner Capital Contribution | to COBBLESTONE CREEK HOMEOWNERS ASSOC., | | | | |
| 1306. Home Warranty | to HOME BUYER WARRANTY | | | | |
| 1307. Withhold 2% of 1% of Builder's Fee | to Adorno & Yoss, LLP Trust Account | | | | |
| 1308. | to | | | | |
| 1309. | | | | | |
| 1400. Total settlement charges: | | | | | |
| ( Enter on lines 103, Section J and 502, Section K ) | | | | 2,771.51 | 0.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____ Borrower     _____ Seller
David Derrick Griffin

_____ Borrower     _____ Seller
Diane Griffin

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused, or will cause, the funds to be disbursed in accordance with this statement.

Adorno & Yoss, LLP
By: _____
As its Authorized Representative     10-6-06 Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

DoubleTime®

DGRIFFIN - 000170

```
CFN 20060576393
OR BK 20948 PG 1426
RECORDED 10/11/2006 10:38:03
Palm Beach County, Florida
AMT 731,544.00
Doc Stamp 5,121.20
Sharon R. Bock,CLERK & COMPTROLLER
Pgs 1426 - 1431; (6pgs)
```

Prepared by and return to:
Daniel P. Wurtenberger
Attorney at Law
Adorno & Yoss, LLP
350 East Las Olas Boulevard Suite 1700
Fort Lauderdale, FL 33301
954-763-1200
File Number: 212080.0009

_____[Space Above This Line For Recording Data]_____

# Special Warranty Deed

**This Special Warranty Deed** made this 5th day of **October**, 2006 between **NORTHSTAR HOLDINGS AT B AND A, LLC, a Florida Limited Liability Company** whose post office address is **14406 Military Trail, Delray Beach, FL 33484**, grantor, and **David Derrick Griffin and Diane Griffin, husband and wife** whose post office address is **1200 SE Atlantic Drive, Lantana, FL 33462**, grantee:

(Whenever used herein the terms grantor and grantee include all the parties to this instrument and the heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporations, trusts and trustees)

**Witnesseth**, that said grantor, for and in consideration of the sum TEN AND NO/100 DOLLARS ($10.00) and other good and valuable considerations to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in **Palm Beach County, Florida**, to-wit:

> **Lot 120, Block 2, COUNTRYSIDE MEADOWS REPLAT, according to the Plat thereof, as recorded in Plat Book 104, Page 12, of the Public Records of Palm Beach County, Florida.**
>
> **Parcel Identification Number: 00-42-45-20-05-002-1200**

**Subject to (a) the Declaration of Covenants and Restrictions for Cobblestone Creek, recorded at Official Records Book 18696 Page 897 of the Public Records of Palm Beach County, Florida; (b) matters shown on the Countryside Meadows Replat, according to the Plat thereof, as recorded in Plat Book 104, Page 12 of the Public Records of Palm Beach County, Florida; (c) real estate taxes and assessments for the year 2006 and subsequent years, (d) restrictions, reservations, conditions, limitations, and easements of record and (e) the restrictions set forth on Exhibit "A" annexed hereto and made a part hereof.**

**Together** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**To Have and to Hold**, the same in fee simple forever.

**And** the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons claiming by, through or under grantors.

**In Witness Whereof**, grantor has hereunto set grantor's hand and seal the day and year first above written.

**DoubleTime®**

Signed, sealed and delivered in our presence:

NORTHSTAR HOLDINGS AT B AND A, LLC, a Florida limited liability company

Witness Name: _____

By: _____
David Ettinger, Manager

Witness Name: _____

(Corporate Seal)

State of Florida
County of Palm Beach

The foregoing instrument was acknowledged before me this __5__ day of __October__, __2006__ by David Ettinger, Manager of NORTHSTAR HOLDINGS AT B AND A, LLC, a Florida limited liability company, on behalf of the corporation. He [_] is personally known to me or [X] has produced a driver's license as identification.

[Notary Seal]

Notary Public

Printed Name: _____

My Commission Expires: _____

MICHELLE A. REMMERDEN
MY COMMISSION # DD 515148
EXPIRES: March 11, 2007
Bonded Thru Notary Public Underwriters

*Special Warranty Deed - Page 2*

**DoubleTime®**

EXHIBIT A TO DEED

DEED RESTRICTION
MINIMUM HOLDING PERIOD AND RESTRICTION AGAINST LEASING

As a material consideration inducing the grantor ("Seller") under the attached deed ("Deed") to sell to the grantee under such Deed ("Buyer") that certain real property described in this Deed (the "Property"), Buyer has represented to Seller that Buyer intends to and will occupy the Property as Buyer's principal or secondary residence for a minimum of one (1) year after Buyer's closing on its acquisition of the Property (the "Minimum Holding Period"). Seller and Buyer have entered into a separate unrecorded No Investor Rider (the "Agreement") pursuant to which Buyer has agreed to occupy the Property as provided herein, and Buyer has agreed not to sell or lease the Property for the duration of the Minimum Holding Period. This Deed Restriction is to put third parties on notice of such commitments by Buyer, and Seller's rights upon a breach of such commitments by Buyer, as provided in the Agreement, and nothing contained in this Deed Restriction shall, or shall be deemed to, modify or amend the Agreement in any respect. In the event of any conflict between the provisions of the Agreement and the provisions of this Deed Restriction, the provisions of the Agreement shall prevail. Notwithstanding the foregoing, this Deed Restriction includes certain mortgagee protections which shall be in addition to, and shall not be superseded by, the mortgagee protections in the Agreement.

Buyer acknowledges that Seller, as a developer and builder of single family and multi-family residences, has an interest in ensuring that such residences, and the residences in the communities in which they are built, including the Property and the homeowner's association of which the Property is a part (such homeowner's association being referred to herein as the "Association") are purchased and occupied only by persons who will actually occupy them as a principal or secondary residence, and to mitigate shortage of available residences for permanent residents.

1. Occupancy Covenants. Buyer on behalf of itself and its successors and assigns, hereby covenants to and for the benefit of Seller that during the Minimum Holding Period: (a) Buyer will occupy the Property as Buyers principal or secondary residence after closing; (b) Buyer shall not lease or rent the residence during the Minimum Holding Period; and (c) Buyer shall not enter into any agreement for the sale or other transfer of the Property which would result in Buyer's failure to hold title thereto in fee simple for the duration of the Minimum Holding Period.

2. Hardship Situations. Seller recognizes that a transfer of the Property in certain circumstances would not be inconsistent with the intent of the Agreement. Seller may, in its sole and absolute discretion decided on a case by case basis, consent to the transfer of the Property during the Minimum Holding Period. Furthermore, Seller shall not unreasonably withhold consent to a transfer in the following instances (each a "Hardship Situation"):

a.   A documented job transfer of the original Purchaser to a location which would make commuting from the Residence an undue hardship; or

b.   Death of the original Purchaser or the Purchaser's spouse; or

c.   Transfer by gift, devise or inheritance to a spouse or child; or

d.   Transfer by operation of law to a surviving joint tenant; or

e.   Transfer to a spouse pursuant to the terms of a final judgment of dissolution of marriage or court-approved property settlement agreement; or

f.   Transfer pursuant to a distributive deed by a grantor into a revocable trust, in which the grantor has not less than the right to reside in the Residence during the grantor's lifetime; or

g.   Transfer by an Purchaser to the Purchaser and the Purchaser's spouse, as tenants by the entirety, or transfer by operation of law to a surviving tenant by the entirety; or

h.   Other documented reason acceptable by Seller in Seller's sole and unbridled judgment.

3.   Automatic Termination of Deed Restriction. The covenants set forth above, and the restrictions on the transfer or lease of the Property set forth herein and in the Agreement, shall automatically terminate and be of no further force or effect on the date which is one (1) year from the date of recordation of this Deed.

4.   Remedies for Breach. If Buyer or Buyer's successors or assigns, breaches, violates or fails to perform or satisfy any of the covenants set forth in the Agreement, Seller, and Seller's successors and assigns, may enforce the remedies set forth in the Agreement including, without limitation, the right and option to recover damages (as defined in the Agreement) upon a sale or upon the lease of the Property, and Buyer's obligation to pay such damages shall constitute a lien on the Property which shall run with the land and shall be binding on successors and assigns and may be foreclosed in the same manner as a mortgage or deed of trust.

5.   No Duty to Enforce. Seller makes no representation or warranty to Buyer that Seller will impose these requirements on other buyers of residences in the Association and/or that, if Seller has imposed or in the future imposes these requirements on another buyer, that Seller will enforce the requirements set forth in this Deed Restriction or in the Agreement against other owners in the Association. Buyer specifically acknowledges and agrees that Seller is not guaranteeing Buyer or assuring Buyer in any way that the Association will now or in the future be occupied only or primarily by owner occupants and/or that there will not be buyers in the Association who are purchasing residences for rentals or as an investment with no intention of living in the residence.

2

JGR-F6N-000174

6. <u>Survival of Covenant on Transfer</u>. Except as provided in Paragraph 8 below, Buyer's obligations, and Seller's rights hereunder and under the Agreement shall survive transfer of the Property by Buyer.

7. <u>No Unreasonable Restraint</u>. Buyer acknowledges that the purpose of this Deed Restriction is (i) to comply with Seller's intention to sell residences only to persons who will actually occupy them as a principal or secondary residence; (ii) to obtain a stabilized Association of owner-occupied residences; and (iii) to prevent a shortage of available residences in the Association for permanent residents. Buyer agrees that the provisions and restrictions set forth in this Deed Restriction do not constitute an unreasonable restraint upon alienation of the Property.

8. <u>Survival; Severability</u>. All of the covenants contained herein shall survive the delivery of and recordation of the Deed conveying the Property from Seller to Buyer. The provisions of this Deed Restriction shall be independent and severable, and a determination of invalidity or partial invalidity or enforceability of any one provision or portion hereof shall not affect the validity or enforceability of any other provision of this Deed Restriction or the Agreement.

9. <u>Mortgagee Protection Provisions</u>.

9.1 <u>Permitted Financing</u>. Notwithstanding anything to the contrary in this Deed Restriction or in the Agreement, Buyer may encumber the Property as security for a loan made by an institutional lender.

9.2 <u>Subordination</u>. Seller hereby acknowledges and agrees that a violation of this Deed Restriction by Buyer shall not defeat or render invalid the lien of any first or second mortgage or deed or trust in favor of an institutional lender or investor and made in good faith and for value by Buyer, and that the covenants and provisions of this Deed Restriction shall be inferior and subordinate to the lien of any such first or second mortgage or deed of trust made by an institutional lender or investor, whether recorded concurrently with or subsequent to the deed conveying the Property to Buyer.

9.3 <u>Termination on Foreclosure</u>. This Deed Restriction and the Agreement are subject and subordinate to any first or second priority deed or trust or mortgage on the Property made by or held by an institutional lender or investor. Any party and its successors and assigns, receiving title to the Property pursuant to a judicial or non-judicial foreclosure, or by an conveyance in lieu of such foreclosure, under a power of sale contained in such a first or second priority mortgage or deed of trust recorded against the Property in the Public Records of the County in which the Property is located shall take title free and clear of the provisions of this Deed Restriction and the Agreement.

3

9.4   HUD or VA Insured or Guaranteed Mortgages.  If Buyer has acquired the Property by a mortgage insured by the Secretary of the United States Department of Housing and Urban Development, or guaranteed by the United States Department of Veteran's Affairs, then this Deed Restriction and the Agreement shall automatically terminate if title to the Property is transferred by foreclosure or deed-in-lieu of foreclosure, or if the insured or guaranteed mortgage is assigned to the Secretary of the VA.

9.5   Insurance Proceeds and Condemnation Award.  In the event the Property is damaged or destroyed, or in the event of condemnation, Seller shall have no claim or right to any proceeds relating to the Property and such proceeds shall be held and distributed in accordance with the terms of any lien on the Property, in their order of priority.

_____          _____
Buyer/ Derrick Griffin                     Buyer/ DIANE GRIFFIN

Date: _10-6-06_____                     Date: ___10-6-06_____

STATE OF FLORIDA

COUNTY OF PALM Beach

Sworn to and subscribed before me this _6th_ day of _October_____, 200_6_, ___
DAVID Griffin and Diane Griffin
personally known to me or who have produced _FL Drivers License_____ as identification, and who executed the foregoing instrument and acknowledged to and before me that he executed same for the purposes therein expressed.

DANIEL P. WURTENBERGER
MY COMMISSION # DD 542708
EXPIRES: June 23, 2010
Bonded Thru Budget Notary Services

_____
NOTARY PUBLIC
Print Name:

_____

My Commission Expires:

4

RFN- 000176

Return To:
ADORNO & YOSS

350 EAST OLAS BLVD SUITE 1700
FORT LAUDERDALE, FL 33301

This document was prepared by:

COLONIAL BANK
400 NO TAMPA STREET
TAMPA, FL 33602
813-314-3100

CFN 20060576394
OR BK 20948 PG 1432
RECORDED 10/11/2006 10:38:03
Palm Beach County, Florida
AMT 585,235.00
Deed Doc 2,048.55
Intang 1,170.47
Sharon R. Bock, CLERK & COMPTROLLER
Pgs 1432 - 1462; (31pgs)

————————————— [Space Above This Line For Recording Data] —————————————

# MORTGAGE

MIN 1000675-0006228787-2

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated OCTOBER 06, 2006           ,
together with all Riders to this document.
(B) "Borrower" is
DAVID DERRICK GRIFFIN, A MARRIED MAN

JOINED HEREIN BY DIANE GRIFFIN

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is
COLONIAL BANK, N.A.

CPB0006228787

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3010  1/01

Page 1 of 16
VMP Mortgage Solutions, Inc.

-6A(FL) (0005).02

Initials: _____

DGRIFFIN - 000602

Lender is a **NATIONAL BANKING ASSOCIATION**
organized and existing under the laws of **THE UNITED STATES OF AMERICA** .
Lender's address is
**32 COMMERCE STREET, MONTGOMERY, AL 36104** .
(E) "Note" means the promissory note signed by Borrower and dated **OCTOBER 06, 2006** .
The Note states that Borrower owes Lender
**FIVE HUNDRED EIGHTY FIVE THOUSAND TWO HUNDRED THIRTY FIVE & NO/100** Dollars
(U.S. $ **585,235.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **NOVEMBER 01, 2036** .
(F) "**Property**" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | |
| [X] Other(s) [specify] ADDENDUM TO ADJUSTABLE RATE RIDER | | |

(I) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "**Escrow Items**" means those items that are described in Section 3.
(M) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

CPB0006228787

Initials: _____

VMP® -6A(FL) (0005).02      Page 2 of 16      Form 3010 1/01

DGRIFFIN - 000603

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the County of **PALM BEACH**
    [Name of Recording Jurisdiction]:
**SEE ATTACHED EXHIBIT A**

Parcel ID Number:

which currently has the address of

9801 COBBLESTONE LAKES COURT                              [Street]
BOYNTON BEACH                            [City] , Florida 33437       [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

(VMP) -6A(FL) (0005).02              Page 3 of 16      Initials       CPB0006228787
                                                                      Form 3010  1/01

DGRIFFIN - 000604

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

CPB0006228787

Initials: DDG
D.G.

VMP -6A(FL) (0005).02                    Page 4 of 16                    Form 3010  1/01

DGRIFFIN - 000605

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

-6A(FL) (0005).02                    Page 5 of 16          Initials          CPB0006228787

                                                                      Form 3010  1/01

DGRIFFIN - 000606

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

-6A(FL) (0005).02          Page 6 of 16          Initials: _____          CPB0006228787
                                                                           Form 3010   1/01

DGRIFFIN - 000607

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

VMP®-6A(FL) (0005).02          Page 7 of 16          Initials _____          CPB0006228787

                                                                              Form 3010   1/01

DGRIFFIN - 000608

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

VMP®-6A(FL) (0005).02    Page 8 of 16    Initials: _____    CPB0006228787

Form 3010  1/01

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

CPB0006228787

VMP -6A(FL) (0005).02    Page 9 of 16    Initials    Form 3010 1/01

DGRIFFIN - 000610

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of

CPB0006228787

-6A(FL) (0005).02                    Page 10 of 16          Initials:          Form 3010  1/01

DGRIFFIN - 000611

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers

CPB0006228787

Initials: _____

-6A(FL) (0005).02          Page 11 of 16          Form 3010   1/01

DGRIFFIN - 000612

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the

VMP®-6A(FL) (0005).02                     Page 12 of 16                     Initials: _____

CPB0006228787

Form 3010   1/01

DGRIFFIN - 000613

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

VMP® -6A(FL) (0005).02          Page 13 of 16          Initials: _____          CPB0006228787

Form 3010   1/01

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

VMP®  -6A(FL) (0005).02                     Page 14 of 16             Initials _____

CPB0006228787

Form 3010   1/01

DGRIFFIN - 000615

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____       _____ (Seal)

DANIEL W. Uhtenbeyer                     DAVID DERRICK GRIFFIN      -Borrower

_____       _____ (Seal)

BEVERLY E. BRYAN                          DIANE GRIFFIN            -Borrower

_____ (Seal)       _____ (Seal)
            -Borrower                                         -Borrower

_____ (Seal)       _____ (Seal)
            -Borrower                                         -Borrower

_____ (Seal)       _____ (Seal)
            -Borrower                                         -Borrower

CPB0006228787

VMP® -6A(FL) (0005).02                 Page 15 of 16                 Form 3010   1/01

DGRIFFIN - 000616

STATE OF FLORIDA, _PALM Beach_____ County ss:
The foregoing instrument was acknowledged before me this _octbr 6, 2006_ by
DAVID DERRICK GRIFFIN AND DIANE GRIFFIN

who is personally known to me or who has produced _FL Drivr Licc_____ as identification.

DANIEL P. WURTENBERGER
MY COMMISSION # DD 542708
EXPIRES: June 23, 2010
Bonded Thru Budget Notary Services

Notary Public

VMP -6A(FL) (0005).02

Page 16 of 16

Initials:

CPB0006228787

Form 3010   1/01

DGRIFFIN - 000617

# Exhibit A

Lot 120, Block 2, COUNTRYSIDE MEADOWS REPLAT, according to the Plat thereof, as recorded in Plat Book 104, Page 12, of the Public Records of Palm Beach County, Florida.

Parcel Identification Number: 00-42-45-20-05-002-1200

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **6TH** day of **OCTOBER** , 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **COLONIAL BANK, N.A.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437**
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in **DECLARATIONS, COVENANTS, CONDITIONS AND RESTRICTIONS**

(the "Declaration"). The Property is a part of a planned unit development known as

**COBBLESTONE CREEK**
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

CPB0006228787

**MULTISTATE PUD RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3150 1/01** Page 1 of 3
VMP®-7R (0411) VMP Mortgage Solutions, Inc. (800)521-7291 Initials:

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

CPB0006228787

®-7R (0411)  Page 2 of 3  Initials: _____  Form 3150 1/01

DGRIFFIN - 000620
Page 19 of 31

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
DAVID DERRICK GRIFFIN            -Borrower

_____ (Seal)
DIANE GRIFFIN                    -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

                                        CPB0006228787

VMP®-7R (0411)          Page 3 of 3          Form 3150 1/01

DGRIFFIN - 000621
Page 20 of 31

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **6TH** day of **OCTOBER** , 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **COLONIAL BANK, N.A.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

9801 COBBLESTONE LAKES COURT, BOYNTON BEACH, FLORIDA 33437
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

CPB0006228787

MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3170 01/01        Page 1 of 3

VMP®-57R (0411)        VMP Mortgage Solutions, Inc. - (800) 521-7291        Initials: _____